# EXHIBIT 32

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, SN EF UNSUB GP, LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE COMANCHE AGREEMENTS**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 2

BACKGROUND ........ 4

A. The Comanche Transaction ........ 4

B. Recordation of the Joint Development Agreement and Drilling Commitment Agreement ........ 10

C. The Joint Development Agreement and Sanchez's Status as Operator ........ 11

D. The LLC Agreement and Governance of UnSub ........ 12

E. The Marketing Agreement and the Springfield Agreements ........ 13

OBJECTION ........ 17

I. The Debtors Cannot Reject the Comanche Agreements Because They Constitute an Indivisible Contract that Contains Covenants Running with the Land ........ 17

A. The Comanche Agreements Are Part of One Integrated Contract that Must Be Accepted or Rejected Together ........ 17

B. The Inseverable Comanche Agreements Contain Covenants Running with the Land ........ 25

II. Rejection of the Marketing Agreement Is Not a Sensible Exercise of the Debtors' Business Judgment ........ 29

CONCLUSION ........ 34

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Alta Mesa Res., Inc.*,
No. 19-35133, 2019 WL 7580122 (Bankr. S.D. Tex. Dec. 20, 2019) ....25, 28

*Am. Ref. Co.* v. *Tidal W. Oil Corp.*,
264 S.W. 335 (Tex. Civ. App. 1924) ....27

*In re Badlands Energy, Inc.*,
608 B.R. 854 (Bankr. D. Colo. 2019) ....25, 28

*In re Buffets Holdings, Inc.*,
387 B.R. 115 (Bankr. D. Del. 2008) ....23

*Cont'l Warranty, Inc.* v. *Warner*,
108 F. Supp. 3d 250 (D. Del. 2015) ....19

*In re DeVries*,
No. 11-43165-DML-7, 2014 WL 4294540 (Bankr. N.D. Tex. Aug. 27, 2014) ....23

*In re Dickinson Theatres, Inc.*,
No. 12-22602, 2012 WL 4867220 (Bankr. D. Kan. Oct. 12, 2012) ....20

*In re Energytec, Inc.*,
739 F.3d 215 (5th Cir. 2013) ....25

*In re Foothills Texas, Inc.*,
476 B.R. 143 (Bankr. D. Del. 2012) ....18

*In re Houston Bluebonnet, LLC*,
No. 16-34850, 2020 WL 930111 (Bankr. S.D. Tex. Feb. 21, 2020) ....25, 27

*In re Houston Reg'l Sports Network, L.P.*,
547 B.R. 717 (Bankr. S.D. Tex. 2016) ....21

*In re Indep. Am. Real Estate, Inc.*,
146 B.R. 546 (Bankr. N.D. Tex. 1992) ....18, 21, 24

*Inwood N. Homeowners' Ass'n, Inc.* v. *Harris*,
736 S.W.2d 632 (Tex. 1987) ....25

*Johnson* v. *Walker*,
824 S.W.2d 184 (Tex. App. 1991) ....18

*Jones* v. *Kelley*,
614 S.W.2d 95 (Tex. 1981) ....22

## TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*,
139 S. Ct. 1652 (2019)....................30

*MJR Oil & Gas 2001 LLC* v. *AriesOne, LP*,
558 S.W.3d 692 (Tex. App. 2018)....................26

*In re Murexco Petroleum, Inc.*,
15 F.3d 60 (5th Cir. 1994)....................30

*In re Nat'l Gypsum Co.*,
208 F.3d 498 (5th Cir. 2000)....................24

*Norman* v. *Elkin*,
338 F. Supp. 3d 361 (D. Del. 2018)....................19

*In re Oregon Arena Corp.*,
No. 304-31605-ELP11, 2006 WL 488713 (D. Or. Feb. 28, 2006)....................21, 22, 24

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993)....................29

*Petroleum Expl. Int'l, S.A.* v. *Canrig Drilling Techs., Ltd.*,
No. 08-cv-1283, 2009 WL 4716043 (S.D. Tex. Dec. 7, 2009)....................18, 19, 20

*In re Pilgrim's Pride Corp.*,
403 B.R. 413 (Bankr. N.D. Tex. 2009)....................29

*In re Plaza*,
363 B.R. 517 (Bankr. S.D. Tex. 2007)....................18

*Richmond Leasing Co.* v. *Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985)....................29

*In re Sabine Oil & Gas Corp.*,
550 B.R. 59 (Bankr. S.D.N.Y. 2016)....................25

*Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*,
83 F.3d 735 (5th Cir. 1996)....................18, 23

*Matter of T & H Diner, Inc.*,
108 B.R. 448 (D.N.J. 1989)....................24

*In re Teligent, Inc.*,
268 B.R. 723 (Bankr. S.D.N.Y. 2001)....................24

# TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*In re Trinity Coal Corp.*,
514 B.R. 526 (Bankr. E.D. Ky. 2014) ....................................................................21, 22, 24

*In re Wagstaff Minnesota, Inc.*,
No. BR 11-43073, 2012 WL 10623 (D. Minn. Jan. 3, 2012) ..................................................24

STATUTES

11 U.S.C. § 365 ....................................................................................................................25, 29

Tex. Prop. Code § 13.002 ..........................................................................................................28

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), UnSub GP, and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], of the following agreements:[2] the Hydrocarbons Purchase and Marketing Agreement by and between SN EF Maverick, LLC ("Maverick") and UnSub, dated as of January 12, 2017; the Letter Agreement among Sanchez Energy Corporation ("Sanchez"), Maverick and UnSub, dated January 12, 2017; the Joint Development Agreement by and among Gavilan Resources, LLC, Maverick, UnSub, and Sanchez, dated as of March 1, 2017; the Memorandum of the Joint Development Agreement; the Development Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Maverick, UnSub, and Gavilan Resources, LLC, dated March 1, 2017; the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017; the Amended and Restated Securities Purchase Agreement among Sanchez, SN UR Holdings, LLC, SN EF UnSub GP, LLC, UnSub, SN EF Unsub Holdings, LLC, GSO, and Intrepid Private Equity V-A, LLC, dated February 28, 2017; and the Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LLP, Maverick, UnSub, and Aguila Production, LLC, dated January 12, 2017.

---

[2] These agreements, and other supporting documents, are attached to this Objection as exhibits. Each exhibit is cited as "Ex. __."

**PRELIMINARY STATEMENT**

In 2017, Sanchez entered into a $2 billion transaction to purchase a 49% working interest (the "Anadarko Interest") in over 300,000 gross acres of oil and gas rights known as the "Comanche Assets." Sanchez did not have the financial ability to undertake this purchase itself, and so brought in outside investors and other partners to consummate the Comanche Transaction. Given the large purchase price, the scope of the assets, and the multiple parties involved, the transaction was complex, requiring numerous interrelated agreements. Sanchez made its investment through two entities: Maverick, an unrestricted, wholly owned subsidiary of Sanchez that is one of the Debtors, and UnSub, an unrestricted, partially-owned, bankruptcy-remote subsidiary that served as a joint investment vehicle for Sanchez and GSO and is not one of the Debtors.

Among these interrelated agreements (the "Comanche Agreements") are: the Purchase and Sale Agreement that governed the sale of the Anadarko Interest; the Securities Purchase Agreement that governed the terms by which GSO made its investment in UnSub; the Joint Development Agreement that set forth the terms for how the buyers of the Anadarko Interest would operate them; the Marketing Agreement, in which UnSub agreed to Sanchez (through Maverick) marketing its share of hydrocarbons in exchange for a share of the net proceeds after deducting certain specified costs; and the Letter Agreement that set forth additional terms of the relationship between UnSub and Maverick.

The Debtors have now scheduled most, but not all, of the Comanche Agreements for rejection. This is not permitted for two reasons:

*First*, all of the documents effectuating the Comanche Transaction constitute—by express agreement of the parties—a single, indivisible contract, described in the Marketing Agreement as "unseverable." Indeed, the Debtors have waived any argument to the contrary. In

several of these agreements—including three the Debtors now purport to reject: the Securities Purchase Agreement, the Letter Agreement, and the Marketing Agreement—Sanchez stated in clear and unambiguous terms that it "waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents [a term defined to include the Comanche Agreements] are anything other than a true single agreement relating to such matters." As a result, the Debtors must accept or reject the entire suite of interrelated agreements together. And that makes sense, not just as a formal matter, but as a practical one, given the cross references throughout the agreements and interrelated nature of the agreements.

But the Debtors are seeking to assume one of the Comanche Agreements—the LLC Agreement governing the management of UnSub—and reject the remaining documents. This attempt to "cherry pick" from an indivisible agreement is clearly not allowed. Further, the Debtors cannot reject any of the integrated documents comprising the Comanche Agreements because several of the agreements include covenants running with the land. A debtor may not reject an agreement with a covenant that "runs with the land" because such a covenant creates a real property interest that is not extinguished through bankruptcy. As detailed below, each of the factors that courts examine to determine whether a covenant runs with the land is easily satisfied. And because these agreements are part of an inseverable whole, the only alternative available to the Debtors is assumption of the Comanche Agreements in their entirety—including the LLC Agreement.

*Second*, the Debtors' rejection of the Comanche Agreements—which by operation of law constitutes a breach—represents a disastrous exercise of the Debtors' business judgment. While the business judgment standard is no doubt deferential, there are limits, and the rejection of these agreements exceeds them. The negative effects of such a breach could include, among other

things, Sanchez's liability for Maverick and UnSub's entire share of the Comanche midstream costs, Sanchez's loss of operatorship over the Comanche Assets, and a potential default under UnSub's credit agreement, which could permit UnSub's reserve-based lenders to foreclose upon Sanchez's entire stake in UnSub's reserves. The harm that would befall the Debtors if their ill-conceived attempt to reject the Comanche Agreements were granted simply cannot be justified as an exercise of reasonable business judgment.

For these reasons, and as set forth in greater detail below, GSO and UnSub respectfully request that this Court deny rejection of the Comanche Agreements or, in the alternative, deny assumption of the LLC Agreement.

## BACKGROUND

### A. The Comanche Transaction

1. On January 12, 2017, Sanchez and its co-investors agreed to pay over $2 billion to purchase a 49% working interest in over 300,000 gross acres of oil and gas rights from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko"). This acreage—collectively called the "Comanche Assets"—is primarily located in the Western Eagle Ford Shale. (*See* Ex. A, Sanchez's Form 10-K for 2016, dated February 27, 2017 ("2016 10-K"), at 62.[3]) The transaction closed on March 1, 2017. (*See* Ex. B, Sanchez's Form 8-K dated March 6, 2017.[4])

2. As one might expect given the size and price of these assets, the purchase was a complex transaction requiring outside financing. Half of the overall purchase price for the

---

[3] Available at https://www.sec.gov/Archives/edgar/data/1528837/000155837017001086/sn-20161231x10k.htm.

[4] Available at https://www.sec.gov/Archives/edgar/data/1528837/000110465917014418/a17-7482_28k.htm.

Anadarko Interest was paid by Gavilan Resources, LLC ("Gavilan"), an entity controlled by The Blackstone Group, L.P. ("Blackstone"), which accordingly acquired half of the Anadarko Interest, representing an approximately 25% uniform working interest across the Comanche field. The other half of the Anadarko Interest, representing an approximately 25% working interest in the Comanche field (the "Maverick/UnSub Share"), was acquired by Maverick (a wholly-owned Sanchez subsidiary) and UnSub (a partially-owned, unrestricted Sanchez subsidiary). The Maverick/UnSub Share was divided unevenly between Maverick and UnSub: Maverick acquired none of proved developed producing ("PDP") assets and 60% of the undeveloped reserves, while UnSub acquired 100% of the PDP assets and 40% of the undeveloped reserves. (2016 10-K at 62.) UnSub paid a substantial purchase price for its share of the Maverick/UnSub Share, with $500 million contributed by GSO and its co-investors in exchange for preferred equity in UnSub, $100 million by Sanchez in subordinated common equity, and $175 million from the RBL lenders. (*See* Ex. A, 2016 10-K, at 64.)

3. Sanchez, Gavilan, and GSO negotiated terms for how the Comanche Assets would be developed and operated, as well as how the revenues and costs associated with the Comanche Assets would be allocated among the parties. Gavilan and UnSub were given a seat at the table alongside Sanchez when making certain decisions about operating the assets. Further, GSO agreed that UnSub's share of the oil and gas would be marketed by Maverick, subject to detailed provisions specifying how Sanchez's midstream production costs (especially pipeline costs) would be passed on to UnSub. The parties agreed that Sanchez would operate the Comanche Assets pursuant to the JDA and would also initially have control of a majority of UnSub's board of directors. But the parties were also careful not to give Sanchez unfettered control of UnSub,

building in a robust set of minority governance protections for UnSub, including the ability to take over UnSub's board under certain circumstances—which has since occurred.

4. This complex transaction by which Sanchez financed, purchased, and operated the Anadarko Interest (the "Comanche Transaction") was embodied in a number of agreements between multiple parties. These parties included the following, among others:

- Anadarko: the seller of the Anadarko Interest;
- Sanchez (a Debtor);
- Maverick (*i.e.*, SN EF Maverick, LLC) (a Debtor): the restricted, wholly-owned subsidiary of Sanchez through which Sanchez paid about 13% of the purchase price for the Anadarko Interest, and which acquired 30% of the proved developed nonproducing ("PDNP") reserves and 30% of the undeveloped reserves (but none of the PDP reserves);
- SN UR Holdings, LLC (a Debtor): the holding company for Sanchez's other unrestricted subsidiaries;
- UnSub (*i.e.*, SN EF UnSub, LP): an unrestricted, non-debtor subsidiary of Sanchez that paid a substantial part of the purchase price for the Anadarko Interest ($100 million coming from Sanchez, $500 million from GSO and its co-investors, and $175 million from UnSub's reserve-based lenders), and acquired 50% of the PDP reserves, 20% of the PDNP reserves, and 20% of the undeveloped reserves;
- SN EF UnSub GP, LLC ("UnSub GP"): UnSub's general partner, whose management board includes representation from both Sanchez and GSO;
- Gavilan (referred to in the transactional documents under its former name, Aguila Production, LLC): the Blackstone-controlled entity that paid about 50% of the purchase price for and received half of the Anadarko Interest; and
- GSO.

5. The agreements effecting the Comanche Transaction included the following, among others:

- A **Purchase and Sale Agreement** (dated January 12, 2017) in which Anadarko agreed to sell the Anadarko Interest to Maverick, UnSub, and Gavilan;

- A **Development Agreement** (dated March 1, 2017) (the "Drilling Commitment Agreement") between Anadarko and the three buyers (Maverick, UnSub, and Gavilan), in which the buyers promised to drill at least 60 wells per year on the Comanche Assets for five years;

- A **Securities Purchase Agreement** (initially dated January 12, 2017, and then amended and restated on February 28, 2017) in which GSO and a minority investor agreed to invest in the Comanche Assets through UnSub. The Sanchez parties to this agreement included Sanchez, Maverick, UnSub, and SN UR Holdings, LLC (the holding company for Sanchez's other unrestricted subsidiaries and one of the Debtors);

- A **Limited Liability Company Agreement** (dated March 1, 2017) (the "LLC Agreement") for UnSub GP, the entity that effectively controls the operations of UnSub. Sanchez initially had a majority of the seats on UnSub GP's management board, subject to substantial protections for GSO (discussed in greater detail below);

- The **Marketing Agreement** (dated January 12, 2017) between Maverick and UnSub, under which Maverick agreed to buy UnSub's share of the oil and gas produced by the Comanche Assets, and which set forth how much Maverick would pay UnSub for the oil and gas after taking into account costs, including certain midstream production costs (discussed in greater detail below);

- A **Letter Agreement** (dated January 12, 2017) between Maverick and UnSub, that laid out various other terms of the relationship between Maverick and UnSub;

- A **Joint Development Agreement** (dated March 1, 2017) among Sanchez, Maverick, UnSub, and Gavilan, which governs how decisions are made about developing and operating the Comanche Assets; and

- A **First Lien Credit Agreement** (dated March 1, 2017) (the "RBL Agreement") between UnSub and its reserve-based lenders.[5]

---

[5] In citations, we will refer to these agreements using the following abbreviations: the Purchase and Sale Agreement as the "PSA"; the Drilling Commitment Agreement (Ex. H) as the "DCA"; the Amended and Restated Securities Purchase Agreement (Ex. C) as "SPA"; the Marketing Agreement (Ex. D) as "MA"; the Letter Agreement (Ex. E) as "LA"; the Joint Development Agreement (Ex. G) as "JDA"; the LLC Agreement (Ex. F) as the "LLC Agmt."; and the RBL Agreement (Ex. P) as the "RBL Agmt."

Case 23-90558 Document 1347 Filed 07/13/23 in TXSB Page 14 of 1759

6. All of the agreements effectuating the Comanche Transaction—the foregoing as well as several others—represent an intricate machinery, each piece necessary to carry out the expectations of the parties. The Securities Purchase Agreement was accordingly drafted to condition GSO's nearly half-billion-dollar investment on the execution of these agreements, attaching all of them as exhibits. (*See* SPA § 1.01.) To the extent not already executed on January 12, 2017, the date of signing, they all had to be executed by closing on March 1, 2017. (*See* SPA §§ 2.03–2.06.)

7. The agreements also made clear that they consisted of a single, integrated contract governing the Comanche Transaction. Each of the agreements set forth above (including all of the Comanche Agreements the Debtors seek to reject) are referred to as "Basic Documents," a term defined in the Securities Purchase Agreement (*see* SPA § 1.01) and incorporated by reference elsewhere.[6] The Marketing Agreement, Letter Agreement, LLC Agreement, and Securities Purchase Agreement each explained that they, together with all of the other Basic Documents, consist of a single, integrated contract:

> This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) **the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby**, (ii) **it waives, on behalf of itself and each of its Affiliates, any claim or defense**

[6] The Letter Agreement, LLC Agreement, and Marketing Agreement cross-reference the definition of "Basic Documents." (*See* MA Annex I; LLC Agmt. § 11.1; LA § 9.)

> **based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and** (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. **Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.**

(MA § 8.14 (emphasis added); *see also* LA § 14; LLC Agmt. § 12.3; SPA § 8.06 (substantially identical provisions).)

8. The Comanche Agreements are integrated not just as a formal legal matter, but as a practical, substantive matter. Their operative provisions repeatedly cross-reference each other. For example, the LLC Agreement contains several provisions that reference other Comanche Agreements, including by:

a. providing for the appointment of UnSub's representative to the operating committee formed by the Joint Development Agreement (LLC Agmt. § 5.7(a)(xxx));

b. requiring GSO's approval to "terminate, extend, amend, or modify" the Marketing Agreement (LLC Agmt. § 5.7(b)(xix));

c. requiring GSO's approval to amend the Joint Development Agreement in a manner unfavorable to UnSub (LLC Agmt. § 5.7(b)(xxi));

d. requiring GSO's approval on affiliate transactions, including those with Sanchez Midstream Partners, LP (LLC Agmt. § 5.7(b)(xiii)); and

e. requiring GSO's approval on various development and operational decisions for UnSub in relation to capital expenditures and non-consent decisions (LLC Agmt. § 5.7(b)(xxiv)–(xxvi).)

**B. Recordation of the Joint Development Agreement and Drilling Commitment Agreement**

9. Two agreements—the Joint Development Agreement and the Drilling Commitment Agreement—played a particularly important role in the Comanche Transaction. The three buyers (Maverick, UnSub, and Gavilan) entered into a Joint Development Agreement to establish the "capital planning, operatorship, transfer, and economic rights" with respect to the jointly-owned Comanche Assets. (JDA, Recitals.) Simultaneously, the buyers executed a Drilling Commitment Agreement with Anadarko to address Anadarko's concerns about the "near-term development" of the Comanche Assets. (DCA, Recitals.)

10. These agreements contained important covenants in relation to the Comanche Assets. The memorandum of record filed in the real property records associated with the JDA has a clear and unambiguous statement that all of the terms of the JDA are covenants running with the land. For example, in Section 5.3 ("Spacing Protections") of the Joint Development Agreement, the three buyers promised each other that they would ensure minimum spacing between wells drilled on the land. (JDA § 5.3.) And in Section 2.1 ("Drilling Commitments") of the Drilling Commitment Agreement, the buyers promised Anadarko that they would drill at least 60 wells per year on the land for the first five years "[a]s part of the consideration" for the acquisition of the Anadarko Interest. (DCA, Recitals; *see id.* §§ 2.1, 3.2.)

11. Both agreements expressly stated that these covenants run with the land. Section 5.3 of the Joint Development Agreement provided that it contains "covenants running with the land and shall be binding upon the Parties and their assigns," that these covenants "will burden

the lands" and "create a privity of estate between the Parties," and that "such obligations will not be subject to rejection in the event of any bankruptcy." (JDA § 5.3(f).) And Section 4.1 of the Drilling Commitment Agreement stated that the drilling commitments "shall be covenants running with the land." (DCA § 4.1.)

12. Because these documents created property rights, they were recorded in county property registries pursuant to Texas law. A memorandum of the Joint Development Agreement[7] was filed in Maverick, Webb, La Salle, and Dimmit Counties. It expressly memorialized the parties' intent that "the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land." (JDA Mem. § 7.) The Drilling Commitment Agreement was also recorded.

**C. The Joint Development Agreement and Sanchez's Status as Operator**

13. The Joint Development Agreement had further importance to the Comanche Transaction by specifying how the Comanche Assets will be operated, including by providing for Sanchez's continuing role as operator of the assets.

14. The Comanche Assets are divided into approximately 18 different areas, each governed by a different Joint Operating Agreement (each, a "JOA"). The parties to each JOA are all the owners of working interests in that area. The Anadarko Interest—which represents approximately 50% of the Comanche field—is owned collectively by Maverick, UnSub, and Gavilan, and the remaining 50%—the portion of the Comanche field not previously owned by Anadarko—is owned by other working-interest holders.

15. Under each JOA, Sanchez has been appointed as the operator of the assets and is entitled to substantial compensation for performing that role—compensation that totals $20 million

[7] Cited as the "JDA Mem." (Ex. I).

for all the Comanche Assets. (*See, e.g.*, Ex. K, Exhibit 99.1 to Sanchez's Form 8-K, dated April 7, 2020, at 33.) Sanchez can, however, be removed as operator for "good cause" in a given area by a majority vote of the non-operating working-interest holders. Moreover, Sanchez automatically becomes ineligible to serve as operator if it no longer has any working interest in that area. (*See, e.g.*, Ex. L, JOA for the Maverick Basin Project § V(A)(1).)

16. Under the Joint Development Agreement, Maverick, UnSub, and Gavilan have agreed that they will vote their combined 50% working interest together under each JOA, retaining Sanchez as the operator and supporting Sanchez's decisions about how to develop and operate the assets. To the extent UnSub and Gavilan seek to influence Sanchez's decisions, they must do so through an operating committee established under the Joint Development Agreement, while presenting a united front to the other working-interest holders under each JOA. (*See* JDA §§ 3.2, 3.8.)

17. As described above, Maverick's and UnSub's ownership of the Maverick/UnSub Share is not uniform. The Debtors do not own any interest in approximately 1,500 of the 1,800 wells in the field because they did not acquire any of the PDP wells at closing.[8] In this vein, the Debtors, through Maverick, own an interest in just 300 of the total 1,800 wells in the Comanche field. Accordingly, the Debtor derives significant control and value through the JDA, and the JDA provides operational protections to Gavilan and UnSub to the extent Sanchez remains operator.

**D. The LLC Agreement and Governance of UnSub**

18. UnSub, a limited partnership, serves as a joint investment vehicle holding a share of the Comanche Assets purchased with investments from both Sanchez ($100 million) and GSO

[8] The Debtors also have a common-equity interest in UnSub; however, that interest, which is subordinated to UnSub's RBL debt and GSO's preferred-equity interest, is out of the money.

and its co-investors ($500 million), as well as RBL lenders ($175 million). The proper management of GSO's half-billion-dollar investment in UnSub was naturally of great concern to GSO in entering into the Comanche Transaction.

19. UnSub is managed by its general partner, UnSub GP—a limited liability company managed pursuant to the LLC Agreement. Even though GSO contributed vastly more equity to UnSub's purchase of its share of the Anadarko Interest than Sanchez did, it was understood that Sanchez—given its economic ownership of the common equity of UnSub and given it is in the business of operating oil and gas assets—would initially manage UnSub's business operations. Accordingly, the LLC Agreement establishes a management board that initially consisted of three Sanchez representatives and two GSO representatives. Nonetheless, in order to protect GSO's investment, the LLC Agreement permitted GSO to take over UnSub GP (and thus UnSub), and even transfer the assets or equity of UnSub, under certain conditions. Section 9.5 of the LLC Agreement defines several Investor Redemption Events. Following such an event, the composition of UnSub GP's board automatically changes to give GSO a majority of the seats—permitting GSO to take control of UnSub from Sanchez. (LLC Agmt. § 5.3(d).) Moreover, such an event gives GSO the right to pursue a merger of UnSub into any other business entity, a sale of all or any portion of Sanchez's membership interest in UnSub GP, or a sale of all of the assets of UnSub. (*Id.* § 9.5(a)(1)–(3).)

20. On May 1, 2020, GSO notified Sanchez that an Investor Redemption Event had previously occurred, and UnSub's board automatically expanded to give GSO a majority of the seats. (Ex. M, Letter from Marisa Beeney to Gregory Kopel, dated May 1, 2020.)

**E. The Marketing Agreement and the Springfield Agreements**

21. The Marketing Agreement also played a critical role in the Comanche Transaction by providing important economic protections for UnSub.

22. As noted above, the Marketing Agreement regulated how Sanchez would pay for UnSub's oil and gas and how Sanchez's midstream costs would be passed on to UnSub. UnSub has not entered into any midstream agreements itself; rather, Sanchez has entered into midstream agreements, and UnSub relies on Sanchez to market its volumes and remit net revenues to it, after Sanchez has deducted UnSub's share of the midstream charges. A major component of Sanchez's midstream costs came from pipeline agreements (the "Springfield Agreements") it entered into with Springfield Pipeline, LLC ("Springfield," a subsidiary of Western Gas Partners, LP).[9] These agreements contained minimum volume commitments, requiring Sanchez to deliver certain minimum quantities of oil and gas to Springfield's pipelines. (Springfield Oil Gathering Agmt., § 3(D)(ii)(a)); Springfield Gas Gathering Agmt. § 3(E)(i)(a).) The commitment levels effectively require Sanchez to deliver Maverick and UnSub's combined share of the oil and gas produced by the Comanche Assets to Springfield. Sanchez has warranted that it holds title to all productions to be delivered to Springfield—guaranteeing that it can deliver both Maverick's and UnSub's share—and it accesses UnSub's share through Maverick's right to market UnSub's hydrocarbons under the Marketing Agreement. (*See* Springfield Gas Gathering Agmt. § 12.1; Springfield Oil Gathering Agmt. § 13(H).) If it does not meet the minimum volume commitments, Sanchez incurs additional charges (which we will refer to as "midstream charges"). (*See* Springfield Oil Gathering Agmt., § 3(D)(ii)(a)); Springfield Gas Gathering Agmt. § 3(E)(i)(a).)

23. Importantly, these volume commitments increase over time and continue long into the future, reflecting Springfield's and Sanchez's expectations, when they entered into the

---

[9] We discuss here the two most important agreements between Springfield and Sanchez, the Second Amended and Restated Lease Dedication and Oil Gathering Agreement (Ex. N, cited as the "Springfield Oil Gathering Agmt.") and Second Amended and Restated Lease Dedication and Gas Gathering Agreement (Ex. O, cited as the "Springfield Gas Gathering Agmt.), both dated June 1, 2017.

Springfield Agreements, of rising production from drilling undeveloped acreage. In contrast, over time, the PDP wells that were producing at the time of the Comanche Transaction (assets purchased by, and allocated exclusively to, UnSub) will begin to run dry and experience declining production. Thus, in order to continue meeting its volume commitments, Sanchez had to develop and bring into production PDNP and undeveloped reserves that were not yet producing when the Anadarko Interest was acquired. If Sanchez failed to do so, the overall midstream charges of the Comanche field would increase relative to production levels, and Sanchez would incur midstream charges commensurate with its ownership of both developed and undeveloped reserves net of reimbursement from UnSub.

24. The Marketing Agreement determines how the midstream charges under the Springfield Agreements would be passed onto UnSub (and, ultimately, GSO)—a critically important subject, because the Maverick/UnSub Share was not divided evenly between Maverick and UnSub. Together, Maverick and UnSub acquired half of the Anadarko Share—that is, 50% of the PDP reserves, 50% of the PDNP reserves, and 50% of the undeveloped reserves of the Anadarko Share. But these reserves were allocated unevenly. UnSub acquired all of these PDP reserves (*i.e.*, the entire 50% of the Anadarko Share), but only a minority of the PDNP and undeveloped reserves: Maverick took 30% of the PDNP and undeveloped reserves of the Anadarko Share, while UnSub took the remaining 20% of the PDNP and undeveloped reserves of the Anadarko Share. As a result of this asset split, UnSub's production would be expected to modestly grow, remain flat, or decline over time, while Maverick's production would be expected to experience extremely high growth (from zero at the time of closing to a substantial level).

25. While this allocation of the reserves gave Sanchez (through Maverick) a greater share in the upside from future development and no initial production, it was foundational to the

Case 19-34508 Document 1354 Filed 07/22/20 Page 21 of 39

transaction that midstream charges be allocated appropriately based on ownership of *both developed and undeveloped reserves* and that a portion of future midstream charges be satisfied from development of then undeveloped reserves; that Sanchez bear an appropriate share of midstream charges associated with its planned development as significant owner of undeveloped reserves and operator; and that UnSub would not bear an unreasonably high portion of the midstream charges if production levels were low as a result of Sanchez's failure to develop undeveloped reserves. If Sanchez chose not to tap into the PDNP and undeveloped reserves (or to do so slowly), overall production levels would be below expectations—causing higher per unit midstream charges under the Springfield Agreements. At the same time, the share of overall production attributable to the initial PDP reserves (all owned by UnSub) would remain high. If the resulting midstream charges were allocated between UnSub and Maverick purely on a pro rata basis by volume (which it was not), UnSub would disproportionately bear these cost increases. In effect, UnSub (and through it, GSO) would bear the costs that should rightfully be allocated to Sanchez given its higher share of undeveloped reserves and given its responsibility for the costs and risks of development of the undeveloped acreage.

26. To avoid such an outcome and realign Sanchez's incentives with UnSub's, Exhibit A to the Marketing Agreement contained a schedule of minimum and maximum rates, based on Sanchez' forecast, that UnSub would pay on its share of oil-and-gas production. (MA Ex. A; *see also* MA Annex I (definition of "Producer's Allocable Share of the Springfield Agreements").) If production was lower than expected, the maximum rate limited UnSub's exposure to the resulting midstream charges. By contrast, if production increased and average costs fell, the minimum rate would cause UnSub to take on more than its pro rata share of production costs. This structure was intended to allocate midstream charges appropriately among

the parties based on their respective shares of developed and undeveloped reserves, and provided Sanchez with upside in the event it beat expectations in developing the PDNP and undeveloped reserves.

27. This made the Marketing Agreement a critical component of the overall Comanche Transaction. Without the protections afforded by allocation of midstream charges under the Marketing Agreement, UnSub (and thus GSO) would have faced unacceptable risk of paying more than its fair share of the midstream charges and there never would have been a deal, because GSO would not have invested in UnSub.

28. UnSub's reserve-based lenders also would not have participated absent the Marketing Agreement. Indeed, the RBL Agreement included the Marketing Agreement as a "Material Contract," meaning that UnSub is prohibited from modifying or terminating it and that UnSub must give the lenders notice of any breach of the Marketing Agreement. (*See* RBL Agmt. §§ 1.1, 6.1(x), 9.1(n), 10.13(a).). UnSub's RBL lenders have included the Marketing Agreement in their determination of the borrowing base, and are permitted a special redetermination of lending value if the Marketing Agreement is rejected, potentially causing permanent damage to UnSub.

## OBJECTION

### I. The Debtors Cannot Reject the Comanche Agreements Because They Constitute an Indivisible Contract that Contains Covenants Running with the Land

#### A. The Comanche Agreements Are Part of One Integrated Contract that Must Be Accepted or Rejected Together

29. The Debtors seek to assume the LLC Agreement but reject the other agreements effectuating the Comanche Transaction. But they cannot do so. By the parties' express agreement, all of the agreements effectuating the Comanche Transaction—including the LLC Agreement—constituted a single, indivisible contract. Indeed, the plain language of the contracts estops the Debtors from characterizing the Comanche Agreements as severable from one another. Other

factors typically consulted by Texas courts to evaluate severability—the subject matter of the agreement and the parties' conduct—only confirm this conclusion.

30. "The general rule in bankruptcy is that a contract must be assumed or rejected in its entirety"; a debtor cannot pick and choose, assuming some parts of a contract and rejecting others. *In re Plaza*, 363 B.R. 517, 522 (Bankr. S.D. Tex. 2007) (citing *Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996)). State law determines whether a collection of agreements compromises one indivisible contract or many severable contracts. *In re Indep. Am. Real Estate, Inc.*, 146 B.R. 546, 550 (Bankr. N.D. Tex. 1992). Here, some of the agreements (including the Marketing Agreement) are governed by Texas law (*see* MA § 8.4(a)), while others (such as the Securities Purchase Agreement) are governed by Delaware law (*see* SPA § 3.10). The result under either state's law is the same.

31. Under Texas law, the "issue as to severability is whether or not the parties would have entered into the agreement absent the [severed] parts." *Stewart Title*, 83 F.3d at 739 (alteration in original) (quoting *McFarland* v. *Haby*, 589 S.W.2d 521, 524 (Tex. Civ. App. 1979), *writ refused n.r.e.* (Feb. 27, 1980). "If there is a single assent to a whole transaction involving several things, a contract is entire, but if there is a separate assent to each of the several things involved, it is divisible." *Johnson* v. *Walker*, 824 S.W.2d 184, 187 (Tex. App. 1991). In determining severability, Texas courts look to "(1) the intent of the parties; (2) the subject matter of the agreement; and (3) the conduct of the parties." *Petroleum Expl. Int'l, S.A.* v. *Canrig Drilling Techs., Ltd.*, No. 08-cv-1283, 2009 WL 4716043, at *1 (S.D. Tex. Dec. 7, 2009) (citing *Johnson*, 824 S.W.2d at 187). "The intent of the parties is the primary determinant." *Id.* (citing *Stewart Title*, 83 F.3d at 739). Indeed, the other factors—the agreement's subject matter and the parties' conduct—are relevant only because they may evidence the parties' intent. *See In re Foothills*

*Texas, Inc.*, 476 B.R. 143, 153 (Bankr. D. Del. 2012) (applying Texas law). "In construing a contract, its unambiguous language alone will generally be deemed to express the intent of the parties." *Petroleum Expl. Int'l*, 2009 WL 4716043, at *1 (quoting *Stewart Title*, 83 F.3d at 739).

32. The test under Delaware law is essentially the same. "Whether or not the terms of a contract are severable is purely a question of the intent of the parties." *Cont'l Warranty, Inc.* v. *Warner*, 108 F. Supp. 3d 250, 255 (D. Del. 2015) (quoting *Tracey* v. *Franklin*, 67 A.2d 56, 61 (Del. 1949)). "When determining the parties' intent regarding severability, Delaware courts ask whether the parties gave a single assent to the whole transaction or whether they assented separately to several things." *Id.* In undertaking this analysis, the court examines "the terms and subject matter of the contract, taken together with pertinent facts and circumstances surrounding the contract." *Norman* v. *Elkin*, 338 F. Supp. 3d 361, 374 (D. Del. 2018) (quoting *Kaplan* v. *Jackson*, No. 90C-JN-6, 1994 WL 45429, at *3 (Del. Super. Ct. Jan. 20, 1994)).

33. Here, the Court need look no further than the text of the agreements themselves, several of which unambiguously state that the Comanche Agreements constitute one indivisible contract. *See Petroleum Expl. Int'l*, 2009 WL 4716043, at *1 ("The Contract is not ambiguous, and the Court therefore looks to its language."). For example, Section 8.14 of the Marketing Agreement provides:

> This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an

> unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

(MA § 8.14.) Section 14 of the Letter Agreement between Maverick and UnSub (the parties to the Marketing Agreement) has substantially the same language, as does Section 12.3 of the LLC Agreement (to which SN UR Holdings, LLC is a party) and Section 8.06 of the Securities Purchase Agreement (to which two of the other Debtors, Sanchez and SN UR Holdings, LLC, were parties). (*See* LA § 14; LLC Agmt. § 12.3; SPA § 8.06.) The "Basic Documents," as defined in all three agreements, comprise each of the Comanche Agreements—including, critically, the Joint Development Agreement and the Drilling Commitment Agreement. (*See* SPA § 1.01; LA § 9; MA Annex I.)

34. This unambiguous evidence of intent is sufficient ground to conclude that the Comanche Agreements were all parts of one indivisible contract. Another court, reviewing similar language, concluded that it "expressly and unambiguously states the [contract] is not divisible." *In re Dickinson Theatres, Inc.*, No. 12-22602, 2012 WL 4867220, at *2 (Bankr. D. Kan. Oct. 12, 2012); *Petroleum Expl. Int'l*, 2009 WL 4716043, at *1.

35. Indeed, this language not only provides irrefutable evidence of the parties' intent, but also estops the Debtors from characterizing any of the Comanche Agreements as severable from one another. Promissory estoppel bars attempts to escape from a promise when the following elements are met: "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to her detriment." ***In re Houston Reg'l Sports Network, L.P.***, 547 B.R. 717, 753 (Bankr. S.D. Tex. 2016). In the Marketing Agreement, Letter Agreement, LLC Agreement and Securities Purchase Agreement, Maverick and the other Debtors promised not to challenge the indivisibility of the Comanche Agreements. These agreements expressly foresaw that UnSub, its investors (principally GSO) and its lenders would rely on the Debtors' promise, "a material inducement" to entering into the agreements, in their decision to enter into the Comanche Transaction. (MA § 8.14; LA § 14; LLC Agmt. § 12.3; SPA § 8.06.) And GSO did so rely when it made its substantial investment.

36. Because the language of the contract is clear, there is no need to consult the other two factors—the subject matter of the agreement and the parties' conduct—for further evidence of what the parties intended. But if consulted, these factors only further support the conclusion that the Comanche Agreements are indivisible from one another.

37. First, all of these agreements had the same subject matter: the effectuation of the Comanche Transaction. ***Cf. In re Trinity Coal Corp.***, 514 B.R. 526, 531 (Bankr. E.D. Ky. 2014) (agreements integrated where "all relate[d] to the same subject matter, i.e., the operations of the parties' respective mining operations"); ***In re Oregon Arena Corp.***, No. 304-31605-ELP11, 2006 WL 488713, at *1, *3 (D. Or. Feb. 28, 2006) (multiple agreements "encompass[ed] the same subject matter" where all "address[ed] the development and operation of [an arena] and related properties"); ***Indep. Am. Real Estate***, 146 B.R. at 551 (multiple agreements indivisible where all

"refer[red] to the same subject matter, the development of shopping centers"). While the Comanche Transaction had many component parts and involved multiple parties, all were necessary for Sanchez to acquire the Anadarko Share. Sanchez did not have near enough capital to purchase those assets from Anadarko, and so it had to secure partners, including Gavilan and GSO. GSO's decision to invest was predicated on a carefully negotiated package of governance and economic rights and agreements regarding operation of the Comanche Assets and marketing of hydrocarbons the assets produce. Each of the Comanche Agreements played a role in the purchase, financing, and operation of the Anadarko Share, and without any one of them the transaction could not have occurred.

38. The conduct of the parties further supports the conclusion that the transaction documents are not severable. The parties executed all of the agreements—including the Purchase and Sale Agreement, the Securities Purchase Agreement, the Marketing Agreement, the Letter Agreement, and the Joint Development Agreement—contemporaneously: all of these agreements either were executed on January 12, 2017, or attached as exhibits to the Securities Purchase Agreement and executed by closing. This demonstrates the parties' understanding that all were part of a single, indivisible transaction. *See Jones* v. *Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) ("The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together."); *cf. Trinity Coal*, 514 B.R. at 531 (multiple agreements integrated where all "were executed contemporaneously on June 23, 2008," and transaction would be cancelled unless ancillary agreements, "models" of which were attached as exhibits, "were entered into at the Closing"); *Oregon Arena*, 2006 WL 488713, at *3 (multiple agreements formed single contract where all "were executed contemporaneously," "include[d] extensive cross

references to one another," and "[e]xecution of all the related agreements was a condition precedent to the closing of the Development Agreement"). This conduct makes plain that the Comanche Agreements were a package deal and that the parties would not "have entered into the [overall] agreement absent" any single component of the entire package. ***Stewart Title***, 83 F.3d at 739. For example, the Marketing Agreement was of critical importance to GSO and UnSub. It is simply not plausible that GSO—an outside investor relying on Sanchez to develop the Comanche Assets—and thus UnSub would have participated in the Comanche Transaction without any agreement about how its hydrocarbons would be gathered, processed and sold into the market, and how it would be paid for its share of the oil and gas and how pipeline costs would be appropriately allocated between itself and Sanchez for their non-uniform interests. Likewise, Sanchez, Gavilan, and UnSub would not have entered into the Comanche Transaction without the Joint Development Agreement, which established Sanchez's operatorship of the Comanche Assets and Gavilan and UnSub's rights regarding operations. And Anadarko would not have sold the Anadarko Share without a firm commitment from the buyers that they would drill at least 60 wells per year on the land for the first five years, which was documented in the Drilling Commitment Agreement.

39. Where "the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." ***In re Buffets Holdings, Inc.***, 387 B.R. 115, 122 (Bankr. D. Del. 2008) (quoting ***In re United Air Lines, Inc.***, 453 F.3d 463, 468, 470 (7th Cir. 2006)) (internal quotation marks omitted). In similar circumstances, courts across the country have found multiple, interrelated agreements designed to carry out a single transaction to be indivisible. ***See In re DeVries***, No. 11-43165-DML-7, 2014 WL 4294540, at *11–12 (Bankr. N.D. Tex. Aug. 27, 2014) (multiple contemporaneous agreements related to governance of

business were "quintessential 'package deal'" and inseverable); ***Trinity Coal***, 514 B.R. at 531–32 (agreements regarding easement and disposal of coal spoil inseverable from agreement to exchange coal property); ***In re Wagstaff Minnesota, Inc.***, No. BR 11-43073, 2012 WL 10623 (D. Minn. Jan. 3, 2012) (various agreements relating to franchise restaurant stores inseverable from franchise agreement); ***Oregon Arena***, 2006 WL 488713, at *2–5 (agreement to operate coliseum inseverable from agreement to develop property); ***In re Teligent, Inc.***, 268 B.R. 723, 728–29 (Bankr. S.D.N.Y. 2001) (non-compete and non-disclosure agreements held inseverable from merger agreement); ***Indep. Am. Real Estate***, 146 B.R. at 550–52 (profit-sharing and put-option agreements inseverable from agreements to develop shopping centers); ***Matter of T & H Diner, Inc.***, 108 B.R. 448, 453–54 (D.N.J. 1989) (agreement to purchase restaurant inseverable from lease of underlying land). The same result should obtain here.

40. In sum, the Comanche Agreements constitute a single, inseverable contract that must be accepted or rejected together. The Debtors thus cannot assume the LLC Agreement while rejecting the other Comanche Agreements. Indeed, it would be grossly unfair to permit Sanchez to avoid the promises it made UnSub and GSO under the Marketing Agreement while retaining the benefits it received from GSO under the other agreements, including the LLC Agreement (which initially gave Sanchez control of UnSub GP and, through it, UnSub). Sanchez must take the benefits of the Comanche Transaction "*cum onere*," accepting "both the obligations and the benefits of the executory contract." ***In re Nat'l Gypsum Co.***, 208 F.3d 498, 506 (5th Cir. 2000). Accordingly, the Bankruptcy Code and the case law mandates that the Debtors assume ***all of*** the Comanche Agreements or, in the alternative, reject the LLC Agreement. But, as discussed immediately below, the Comanche Agreements are not even capable of rejection and must therefore be assumed in their entirety.

### B. The Inseverable Comanche Agreements Contain Covenants Running with the Land

41. The Comanche Agreements cannot be rejected, because they contain covenants running with the land that cannot be rejected through bankruptcy. "[U]nder Section 365, it is not possible for a debtor to reject a covenant that 'runs with the land,' since such a covenant creates a property interest that is not extinguished through bankruptcy." *In re Badlands Energy, Inc.*, 608 B.R. 854, 875 (Bankr. D. Colo. 2019) (quotation marks omitted); *accord In re Alta Mesa Res., Inc.*, No. 19-35133, 2019 WL 7580122, at *5 (Bankr. S.D. Tex. Dec. 20, 2019).

42. For a covenant to run with the land, it must: (1) touch and concern the land; (2) relate to a thing in existence or specifically bind the parties and their assigns; (3) be intended by the original parties to run with the land; (4) the successor to the burden must have notice. *In re Houston Bluebonnet, LLC*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) (citing *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013)); *Inwood N. Homeowners' Ass'n, Inc.* v. *Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Additionally, Texas law likely requires privity of estate between the parties when the covenant is made. *In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 69 (Bankr. S.D.N.Y. 2016) (discussing that it is unclear but likely that privity is required). The inseverable Comanche Agreements clearly satisfy this standard.

43. Factor three—the parties' intent—is easily established because two of the Comanche Agreements expressly state an intent to run with the land. *See Energytec*, 739 F.3d at 221. The first is the Joint Development Agreement, as well as the summary memorandum of that agreement filed in the Texas property records for Maverick, Webb, La Salle, and Dimmit Counties. Each of these documents expressly and unambiguously states that provisions of the Joint Development Agreement are covenants running with the land. Section 5.3 of the Joint Development Agreement—which requires Sanchez to, among other things, put minimum spacing

between wells on certain specified land—expressly states that it contains "covenants running with the land and shall be binding upon the Parties and their assigns," that these covenants "will burden the lands" and "create a privity of estate between the Parties," and that "such obligations will not be subject to rejection in the event of any bankruptcy." (JDA § 5.3(f).) Under well-settled Texas law, when a covenant is unambiguous, "the instrument alone will be deemed to express the intention of the parties." *See MJR Oil & Gas 2001 LLC* v. *AriesOne, LP*, 558 S.W.3d 692, 700 (Tex. App. 2018) (quoting *City of Pinehurst* v. *Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). And if there were any doubt, it would be erased by Section 7 of each summary memorandum, which provides:

> It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement ***be covenants running with the land*** during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

(JDA Mem. § 7 (emphasis added).)

44. The Drilling Commitment Agreement, another one of the Basic Documents (*see* SPA § 1.01), also expressly and unambiguously states it runs with the land. In the agreement, the three buyers of the Anadarko Share (Maverick, UnSub, and Gavilan) promised Anadarko that they would drill at least 60 wells on the acquired land per year for a period of five years. (*See* DCA §§ 2.1, 3.1.) In Section 4.1 of the agreement, the parties expressly agreed that these drilling obligations were covenants running with the land:

> The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the

> Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall ***be covenants running with the land***. Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.

(DCA § 4.1 (emphasis added).) Here too, the parties' intent was clear.

45. The remaining elements are also easily satisfied. First, the parties were in privity of estate because, as simultaneous purchasers (and in Anadarko's case, a seller) of the Anadarko Share, they created the covenants in connection with a conveyance of their property interest in the Anadarko Share, including as "partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments." (DCA, § 4.1); *see Houston Bluebonnet*, 2020 WL 930111, at *17 ("Under the [privity] requirement, the covenant must be made between parties who are in . . . a mutual or successive relationship to the same rights of property."). To touch and concern the land, it is enough that the covenants required the Parties to commit to certain minimum drilling obligations on the lands, as covered by the Comanche Transaction agreements. *See Am. Ref. Co.* v. *Tidal W. Oil Corp.*, 264 S.W. 335, 338 (Tex. Civ. App. 1924) ("[A] condition in the nature of a covenant binding the grantee to perform certain duties with reference to the land itself runs with the land."). The covenants, by the terms therein, also relate to a thing in existence—the Parties' property interests acquired in the Comanche Transaction—and expressly bind the Parties and their successors and assigns. (*See* DCA, § 4.1; JDA Mem., § 7); *Houston Bluebonnet, LLC*, 2020 WL 930111, at *12. The final element, notice to successors, is also satisfied because the Debtors were themselves parties to these agreements and had actual notice; in any event, they have constructive notice because the parties properly recorded memoranda of the Joint Development Agreement and Drilling Commitment Agreement in the appropriate county property-records

offices. (JDA Mem.; Ex. J, DCA Mem.); *see* Tex. Prop. Code § 13.002 (providing that recording of memoranda constitutes constructive notice to any successors).

46. In sum, the Comanche Agreements satisfy all the requirements for covenants running with the land under Texas law, and the Debtors have no basis to assert otherwise. For that reason, all these agreements—which, as set forth above, constitute one indivisible contract—cannot be rejected by the Debtors. *See Badlands Energy*, 608 B.R. at 875; *Alta Mesa*, 2019 WL 7580122, at *5.

47. We note that Debtors' assumption of the Comanche Agreements, which include the LLC Agreement, will not change the current governance of UnSub under the LLC Agreement. As mentioned above, at least one Investor Redemption Event has already occurred, and as a result, the board automatically expanded, with GSO appointing a majority of the seats on UnSub's board. While Paragraph 20 of the Confirmation Order entered on April 29 (Docket No. 1212) provides for release and satisfaction of claims and defaults under assumed agreement, an Investor Redemption Event is not a claim or default under the LLC Agreement. As a result, assumption of the LLC Agreement will not restore the prior composition of UnSub's board, permit the Debtors to regain control of UnSub, nor impair other Investor Redemption events from occurring in the future.

* * *

48. To summarize: the Debtors are required to assume all of the Comanche Agreements because they are not capable of rejection. And even if the Court finds that the Comanche Agreements are capable of rejection, the Debtors cannot cherry pick some agreements for assumption, while rejecting others. Accordingly, the Comanche Agreements must be assumed in their entirety, or, in the alternative, rejected in their entirety—including the LLC Agreement.

## II. Rejection of the Marketing Agreement Is Not a Sensible Exercise of the Debtors' Business Judgment

49. Rejection of the Comanche Agreements would also cause the Debtors to default on a number of their core contractual obligations, exposing the estate to enormous risk.

50. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309). Courts "should consider 'the risks of the proposed transaction, the available alternatives, and the danger of prejudice to the objecting parties.'" *Id.* (quoting *Richmond Leasing Co.*, 762 F.2d at 1312 n.11).

51. While this test is undoubtedly deferential, the Debtors' proposed rejection of the Comanche Agreements fails it. First, without the Marketing Agreement, Sanchez has no means to market UnSub's hydrocarbons to meet the commitments under any of its midstream obligations, including minimum volume requirements under the Springfield Agreements, exposing Sanchez to midstream charges that Sanchez will be unable to defray (by marketing UnSub's hydrocarbons). Sanchez does not appear to have any means of meeting these obligations, absent the Marketing Agreement. Second, rejecting (and breaching) the Joint Development Agreement will undermine

Case 19-34508 Document 1354 Filed in TXSB on 06/22/20 Page 35 of 39

the value of (and perhaps even jeopardize) Sanchez's operatorship of the Comanche Assets and Sanchez's value in the Comanche assets. Third, rejection of the Marketing Agreement results in a substantial risk of default under UnSub's RBL Agreement.

52. ***First***, without the Marketing Agreement, Sanchez will not be able to purchase and thereby deliver UnSub's hydrocarbons through the Springfield gathering systems, exposing Sanchez to midstream charges under the Springfield Agreements. And Sanchez will also lose the ability to pass on any of the midstream charges to UnSub (which the Marketing Agreement permits as deductions from the revenue payments Sanchez makes to UnSub), having to bear them all itself. Without access to UnSub's hydrocarbons, Sanchez will struggle to meet the minimum-volume commitments in the Springfield Agreements, exposing itself to liabilities well in excess of its share of production. Nonetheless, despite GSO and UnSub's repeated urging, Sanchez has done hardly anything to renegotiate the Springfield Agreements. Nor has Sanchez explored other midstream improvements for the Comanche field (other than high-cost commitments under the proposed settlement agreement pending before the Court that benefit Sanchez's Catarina interests), which is almost inexplicable—UnSub has received unsolicited proposals from midstream providers interested in servicing the Comanche field, but Sanchez has shown no interest in such proposals.[10]

53. ***Second***, by rejecting the Joint Development Agreement, the Debtors have constructively breached it. *See Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019) ("[R]ejection is a breach."). Such a breach would excuse performance of the Joint Development Agreement by the other parties, UnSub and Gavilan. *See In re Murexco Petroleum,*

---

[10] Instead, Sanchez appears to have focused on striking the deal reflected in the settlement motion pending before the Court (Docket No. 1309), which GSO and UnSub will oppose in the coming days.

*Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994) (by definition, breach of executory contract subject to rejection "excus[es] the performance of the other party").

54. A breach of the Joint Development Agreement could impair Sanchez's ability to operate the Comanche Assets—and more likely even eliminate it entirely, causing substantial harm to Sanchez including by causing Sanchez to lose substantial payments it receives in its role as operator. Under the agreement, Maverick, UnSub, and Gavilan have promised to vote their combined 50% working interest together under each JOA within the Comanche Assets—including by voting to retain Sanchez as operator and to support Sanchez's decisions about how to develop and operate the assets. (*See* JDA §§ 3.2, 3.8.) If UnSub and Gavilan were freed of their obligations under the Joint Development Agreement, they would no longer have to support Sanchez's decision about drilling.

55. Without the support of UnSub and Gavilan, Sanchez—left with only the working interest of about 8% of the Comanche Assets that it owns through Maverick, and without any direct ownership in 1,500 wells (the PDP wells at closing) —would effectively lose operational control. The other working-interest holders could frustrate Sanchez's drilling plan by submitting alternative well proposals. (*See* JOA for the Maverick Basin Project § VI(B)(1).) Or they could seek to remove Sanchez as operator, for example if Sanchez ever sought to transfer its interest. (*See id.* § VI(B)(2).) They could also withhold consent from Sanchez's drilling proposals, which UnSub and Gavilan would not be required to fund absent the JDA. In that instance, Sanchez alone would have to bear the full cost of developing the wells it drills (*see id.*)—something that is not economical for an operator with a working interest of only about 8%. Indeed, it is unusual for an operator to own such a small share of the overall working interest and without any direct ownership of 1,500 wells in the field.

56. Loss of some or all of its operatorship would have a direct financial impact on Sanchez, which—like other oil and gas operators—receives substantial payments from other working-interest owners in exchange for its work as operator. Moreover, this outcome would place Sanchez in an economically untenable position and impede its ability to effectively plan capital budgets, implement drilling plans, and otherwise perform as operator of the Comanche Assets. Thus, without UnSub's and Gavilan's cooperation, Sanchez's operatorship is an exercise in futility. Sanchez acknowledges as much in its most recent 10-Q: "Loss of operatorship of some portion or all of the Comanche Assets, or a finding that [] Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations." (Ex. Q, Sanchez's Form 10-Q for 3Q 2019, dated Nov. 8, 2019, at 59.)[11] These risks to the value of Sanchez's operatorship provide yet another reason why rejection of the Comanche Agreements is not a sound exercise of business judgment.

57. ***Third***, the Debtors' rejection of the Comanche Agreements could lead to a default under UnSub's RBL Agreement. The RBL Agreement provides that any Material Contract—defined to include the Joint Development Agreement, the Drilling Commitment Agreement, the Marketing Agreement, and the Letter Agreement—can only be replaced on the same terms as the existing agreement. (RBL Agmt., §§ 1.1, 10.13(b).) Presumably, the Debtors have rejected all these agreements because they intend either to negotiate replacement agreements with materially different terms or to walk away from them entirely. UnSub's reserve-based lenders could argue that this constitutes a default by UnSub under the RBL Agreement (RBL Agmt. § 11.3(a)), which

[11] Available at https://www.sec.gov/Archives/edgar/data/1528837/000155837019010632/sn-20190930x10q.htm.

would permit them to foreclose upon UnSub's assets, likely wiping out Sanchez's entire stake in UnSub, including UnSub's reserves.

58. As the examples above illustrate, rejection of the Comanche Agreements is not a sound exercise of business judgment. Rejecting these agreements would expose the Debtors to damaging consequences, creating enormous risk of loss for the bankruptcy estate.

59. The Court should accordingly disapprove of the Debtors' rejection of the Comanche Agreements as an unsound exercise of business judgment.

[*Remainder of page intentionally blank*]

## CONCLUSION

WHEREFORE, GSO, UnSub GP, and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Comanche Agreements or, in the alternative, deny assumption of the LLC Agreement, and grant such other and further relief as the Court may deem just and proper.

Dated: June 22, 2020
Houston, Texas

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6648
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (pending *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub GP and UnSub*

# Exhibit A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2016**
**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number: 1-35372**

## Sanchez Energy Corporation
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **45-3090102**<br>(I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>(Address of principal executive offices) | **77002**<br>(Zip Code) |

Registrant's telephone number, including area code **(713) 783-8000**
Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |
| Rights to purchase Series C Junior Participating Preferred Stock, par value $0.01 per share | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Registrant as of June 30, 2016: $392,858,811

Number of shares of Registrant's common stock outstanding as of February 24, 2017: 78,648,272.

**Documents Incorporated By Reference:**

Portions of the Registrant's definitive proxy statement for its 2017 Annual Meeting of Stockholders or an amendment to this Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days of December 31, 2016, are incorporated by reference into Part III of this report for the year ended December 31, 2016.

**SANCHEZ ENERGY CORPORATION**
**FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2016**

**Table of Contents**


| | | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 51 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | Selected Financial Data | 55 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 61 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 78 |
| Item 8. | Financial Statements and Supplementary Data | 79 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A. | Controls and Procedures | 80 |
| Item 9B. | Other Information | 81 |
| | PART III | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 82 |
| Item 11. | Executive Compensation | 82 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 82 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 82 |
| Item 14. | Principal Accountant Fees and Services | 82 |
| Glossary of Selected Oil and Natural Gas Terms | | 83 |
| | PART IV | |
| Item 15. | Exhibits, Financial Statement Schedules | 87 |
| Item 16. | Form 10-K Summary | 93 |
| Signatures | | 94 |
| Index to Consolidated Financial Statements | | F-1 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this Annual Report on Form 10-K that address activities, events, conditions or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. These statements are based on certain assumptions we made based on management's experience, perception of historical trends and technical analyses, current conditions, anticipated future developments and other factors believed to be appropriate and reasonable by management. When used in this Annual Report on Form 10-K, words such as "will," "potential," "believe," "estimate," "intend," "expect," "may," "should," "anticipate," "could," "plan," "predict," "project," "profile," "model," "strategy," "future" or their negatives or the statements that include these words or other words that convey the uncertainty of future events or outcomes, are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. In particular, statements, express or implied, concerning our future operating results and returns, our strategy and plans or view of the market, or our ability to replace or increase reserves, increase production, or generate income or cash flows are forward-looking statements. Forward-looking statements are not guarantees of performance. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. Although we believe that the expectations reflected in our forward-looking statements are reasonable and are based on reasonable assumptions, no assurance can be given that these assumptions are accurate or that any of these expectations will be achieved (in full or at all) or will prove to have been correct. Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- the timing and extent of changes in prices for, and demand for, crude oil and condensate, natural gas liquids ("NGLs"), natural gas and related commodities;
- our ability to successfully execute our business and financial strategies;
- our ability to utilize the services, personnel and other assets of Sanchez Oil & Gas Corporation ("SOG") pursuant to existing services agreements;
- our ability to replace the reserves we produce through drilling and property acquisitions;
- our ability to close our recently announced Comanche Acquisition, including the related financing transactions;
- the realized benefits of the acreage acquired in our various acquisitions, including our pending Comanche Acquisition, and other assets and liabilities assumed in connection therewith;
- our ability to successfully integrate the assets acquired in our pending Comanche Acquisition, if consummated, into our operations;
- the realized benefits of our partnership with affiliates of The Blackstone Group, L.P.;
- the realized benefits of our joint ventures;
- the realized benefits of our transactions with Sanchez Production Partners LP ("SPP");
- the extent to which our drilling plans are successful in economically developing our acreage in, and to produce reserves and achieve anticipated production levels from, our existing and future projects;
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may therefore be imprecise;

- the extent to which we can optimize reserve recovery and economically develop our plays utilizing horizontal and vertical drilling, advanced completion technologies and hydraulic fracturing;

- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;

- the credit worthiness and performance of our counterparts, including financial institutions, operating partners and other parties;

- competition in the oil and natural gas exploration and production industry in the marketing of crude oil, natural gas and NGLs and for the acquisition of leases and properties, employees and other personnel, equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;

- our ability to access the credit and capital markets to obtain financing on terms we deem acceptable, if at all, and to otherwise satisfy our capital expenditure requirements;

- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;

- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic fracturing and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws and regulations with respect to derivatives and hedging activities;

- developments in oil-producing and natural gas-producing countries, the actions of the Organization of Petroleum Exporting Countries (“OPEC”) and other factors affecting the supply of oil and natural gas;

- our ability to effectively integrate acquired crude oil and natural gas properties into our operations, fully identify existing and potential problems with respect to such properties and accurately estimate reserves, production and costs with respect to such properties;

- the extent to which our crude oil and natural gas properties operated by others are operated successfully and economically;

- the use of competing energy sources and the development of alternative energy sources;

- unexpected results of litigation filed against us;

- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage; and

- the other factors described under “Item 1A. Risk Factors” in this Annual Report on Form 10-K and any updates to those factors set forth in our subsequent Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

In light of these risks, uncertainties and assumptions, the events anticipated by our forward-looking statements may not occur, and, if any of such events do, we may not have correctly anticipated the timing of their occurrence or the extent of their impact on our actual results. Accordingly, you should not place any undue reliance on any of our forward-looking statements. Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to correct or update any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by applicable law. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

# PART I

## Item 1. *Business*

## Overview

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities. We have included definitions of some of the oil and natural gas terms used in this Annual Report on Form 10-K in the "Glossary of Selected Oil and Natural Gas Terms."

Listed below is a table of our significant consummated transactions since January 1, 2014:

| Transaction | Transaction Date | Transaction Effective Date | Core Area | Net Acreage Acquired | Net Acreage Remaining at 12/31/16 | | (Purchase) / Disposition Price (millions) | |
|---|---|---|---|---|---|---|---|---|
| Cotulla Disposition | 12/14/2016 | 6/1/2016 | Cotulla, Eagle Ford | N/A | N/A | $ | 161 | * |
| Carnero Processing Disposition | 11/22/2016 | 11/22/2016 | N/A | N/A | N/A | $ | 56 | |
| Production Asset Transaction | 11/22/2016 | 7/1/2016 | Palmetto and Cotulla, Eagle Ford | N/A | N/A | $ | 26 | |
| Carnero Gathering Disposition | 7/5/2016 | 7/5/2016 | N/A | N/A | N/A | $ | 37 | |
| Western Catarina Midstream Divestiture | 10/14/2015 | 10/14/2015 | Catarina, Eagle Ford | N/A | N/A | $ | 346 | |
| Palmetto Disposition | 3/31/2015 | 1/1/2015 | Palmetto, Eagle Ford | N/A | N/A | $ | 83 | |
| Catarina Acquisition | 6/30/2014 | 1/1/2014 | Catarina, Eagle Ford | 106,100 | 106,100 | $ | (557) | |

* On December 14, 2016, we completed the initial closing of the Cotulla Disposition for cash consideration of approximately $153.5 million. Subsequently, a second closing on an additional portion of the assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings.

On December 14, 2016, the Company completed the initial closing of the Cotulla Disposition (as defined in "Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures") for cash consideration of approximately $153.5 million. Subsequent to December 31, 2016, a second closing on an additional portion of the Cotulla Assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings. The assets sold included (based on the Company's internal estimates) estimated net proved reserves, as of the effective date of June 1, 2016, of approximately 6.9 MMBoe. Proved developed reserves are estimated to account for approximately 90% of the total net proved reserves. As of the effective date of June 1, 2016, the Cotulla Assets consisted of approximately 15,000 net acres with 112 gross (93 net) wells producing approximately 3,000 Boe/d.

On November 22, 2016, the Company completed the disposition of its 50% equity interests in Carnero Processing, LLC ("Carnero Processing") to SPP, a joint venture that is 50% owned by Targa Resources Corp. (NYSE: TRGP) ("Targa"). The Company received aggregate cash consideration of

approximately $55.5 million and SPP agreed to assume approximately $24.5 million of the Company's remaining capital contribution commitments in connection

with the acquisition (the “Carnero Processing Disposition”). The purchase price was determined through arm’s length negotiations between the Company and SPP, including independent committees of both entities.

On November 22, 2016, the Company also completed the Production Asset Transaction (as defined in “Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures”) cash consideration of $25.6 million after $1.4 million in normal and customary closing adjustments. The purchase price was determined through arm’s length negotiations between the Company and SPP, including independent committees of both entities. The Production Asset Transaction included the disposition of working interests in 23 producing Eagle Ford wellbores located in Dimmit and Zavala counties in South Texas together with escalating working interests in an additional 11 producing wellbores located in the Palmetto Field in Gonzales County, Texas to SPP. The effective date of the Production Asset Transaction was July 1, 2016.

On July 5, 2016, the Company completed the disposition of its 50% equity interest in Carnero Gathering, LLC (“Carnero Gathering”) a joint venture that is 50% owned by Targa, to SPP for an initial payment of approximately $37.0 million and the assumption by SPP of the Company’s remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million as of that date (the “Carnero Gathering Disposition”). In addition, SPP is required to pay the Company an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering’s delivery points from the Company and other producers. Carnero Gathering owns a total of approximately 45 miles (10 miles of which remain under construction as of December 31, 2016) of high pressure natural gas gathering pipelines that currently connect SPP’s Western Catarina Midstream system to nearby pipelines in South Texas. The Carnero Gathering System is designed to directly connect to a cryogenic natural gas processing plant in South Texas that is expected to be operational in the spring of 2017. The Company’s 50% equity interest in this processing plant was conveyed to SPP in the Carnero Processing Disposition.

On October 14, 2015, the Company completed the Western Catarina Midstream Divestiture (as defined in “Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures”) for an adjusted purchase price of $345.8 million in cash. In connection with the closing of the Western Catarina Midstream Divestiture, the Company entered into a Firm Gathering and Processing Agreement (the “Gathering Agreement”) on October 14, 2015 for an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas will be dedicated for gathering by Catarina Midstream, LLC (“Catarina Midstream”). In addition, for the first five years of the Gathering Agreement, SN Catarina, LLC will be required to meet a minimum quarterly volume delivery commitment of 10,200 barrels per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments.

On March 31, 2015, we completed the Palmetto Disposition (as defined in “Item 8. Financial Statements and Supplementary Data —Note 3, Acquisitions and Divestitures”) for an adjusted purchase price of approximately $83.4 million. The effective date of the transaction was January 1, 2015. The aggregate average working interest percentage initially conveyed was 18.25% per wellbore and, upon January 1 of each subsequent year after the closing, the working interest of the purchaser, a wholly owned subsidiary of SPP, will automatically increase in incremental amounts according to the purchase agreement until January 1, 2019, at which point the purchaser will own a 47.5% working interest, and we will own a 2.5% working interest in each of the wellbores.

On June 30, 2014, we completed our acquisition of 106,000 net contiguous acres in Dimmit, LaSalle and Webb Counties, Texas (the “Catarina Acquisition”) in the Eagle Ford Shale with an effective date of January 1, 2014. All proved reserves in the Catarina area are covered under lease acreage that is held by production, which acreage amounted to approximately 29,000 acres. Under the lease we have a 100% working interest and 75% net revenue interest in the lease acreage over the Eagle Ford Shale formation from the top of the Austin Chalk formation to the base of the Buda Lime formation. The 77,000 acres of undeveloped acreage that were included in the Catarina Acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and

other lease obligations. Our current capital budget and plans include drilling at least the minimum annual well requirement necessary to maintain access to such undeveloped acreage.

**Our Business Strategies**

Our primary business objective is to increase reserves, production and cash flows at an attractive return on invested capital. Our business strategy is currently focused on exploiting long-life, unconventional oil, condensate, NGL and natural gas reserves from the Eagle Ford Shale as well as other projects that directly enhance the profitability of our oil and gas development activities. Key elements of our business strategy include:

- ***Efficiently develop our Eagle Ford Shale leasehold positions.*** We intend to efficiently drill and develop our acreage position to maximize the value of our resource potential. At December 31, 2016, approximately 67% of our proved reserves were proved undeveloped. As of December 31, 2016, we had 473 net wells, and had identified over 3,000 net locations, for potential future drilling in our Eagle Ford Shale area that will be our primary targets in the near term. In 2017, we plan to invest between $395 million and $440 million on development drilling and completion in the Eagle Ford Shale, which represents 100% of our 2017 drilling and completion budget and 93% of our total 2017 capital budget.

- ***Enhance returns by focusing on operational and cost efficiencies.*** We are focused on the improvement of our operating measures and have significant experience in successfully converting early-stage resource opportunities into cost-efficient development projects. We believe the magnitude and concentration of our acreage within our core project areas provide us with the opportunity to capture economies of scale, including the ability to directly procure goods and services from manufacturers, drill multiple wells from a single pad, utilize centralized production and fluid handling facilities and implement a line-management approach to improve efficiencies in drilling and completions. In addition, we focus on midstream and other projects that serve our production and add optionality to end markets, ultimately enhancing our realized prices.

- ***Adopt and employ leading drilling and completion techniques.*** We are focused on enhancing our drilling and completion techniques to maximize recovery of reserves. Industry methods with respect to drilling and completion have significantly evolved over the last several years, resulting in increased initial production rates and recoverable hydrocarbons per well through the implementation of longer laterals, more tightly spaced fracture stimulation stages and large proppant volumes. We evaluate industry drilling results and monitor the results of other operators to improve our operating practices, and we expect our drilling and completion techniques to continue to evolve.

- ***Leverage our relationship with our affiliates to expand unconventional assets.*** SOG, headquartered in Houston, Texas, is a private full service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates. The Company refers to SOG and its affiliates (but excluding the Company), collectively, as the "Sanchez Group." Various members of the Sanchez Group have drilled or participated in over 3,000 wells, directly and through joint ventures, and have invested substantial amounts of capital in the oil and natural gas industry since 1972. During this period, they have carefully cultivated relationships with mineral and surface rights owners in and around our core areas and compiled an extensive technological database that we believe gives us a competitive advantage in acquiring additional leasehold positions in these areas. We have unrestricted access to the proprietary portions of the technological database related to our properties and SOG is otherwise required to interpret and use the database for our benefit. We plan to leverage our affiliates' expertise, industry relationships and size to opportunistically expand reserves and our leasehold positions in the Eagle Ford Shale and other onshore unconventional oil, condensate, NGL and natural gas resources.

- ***Pursue strategic acquisitions to grow our leasehold position in the Eagle Ford Shale and seek opportunistic entry into new basins.*** We believe that we will be able to identify and acquire additional acreage and producing assets in the Eagle Ford Shale at attractive valuations by leveraging our longstanding relationships in and knowledge of South Texas. We also plan to selectively target additional

007923

domestic basins that would allow us to employ our strategies on attractive acreage positions that we believe are similar to our Eagle Ford Shale acreage.

- ***Maintain substantial financial liquidity and flexibility.*** As of December 31, 2016, we had a liquidity position of approximately $800 million, consisting of approximately $500 million of cash and cash equivalents and $300 million of availability under our undrawn Second Amended and Restated Credit Agreement (defined in "Item 8. Financial Statements and Supplementary Data —Note 5, Long-Term Debt"), which had a $350 million borrowing base (with a $300 million aggregate elected commitment amount). We evaluate our level of operating activity in light of both actual commodity prices and changes we are able to make to our costs of operations and, based upon this evaluation, adjust our capital spending program as appropriate. In addition, we expect to continue to regularly review acquisition opportunities from third parties or other members of the Sanchez Group. We have entered into and intend to continue executing hedging transactions for a significant portion of our expected production to achieve more predictable cash flow and to reduce our exposure to adverse fluctuations in oil and natural gas prices.

**Our Competitive Strengths**

We believe the following competitive strengths will allow us to successfully execute our business strategies:

- ***Geographically concentrated leasehold position in leading North American unconventional oil resource trends.*** We have assembled a current leasehold position of approximately 278,000 net acres in the Eagle Ford Shale, which we believe to be one of the highest rates of return unconventional oil and natural gas formations in North America. In addition to further leveraging our base of technical expertise in our project areas, our geographically concentrated acreage position allows us to establish economies of scale with respect to drilling, production, operating and administrative costs, in addition to further leveraging our base of technical expertise in our project areas. We believe that our recent well results and offset operator activity in and around our project areas have significantly de-risked our acreage position such that there are low geologic risks and ample repeatable drilling opportunities across our core operating areas.
- ***Proven low cost operator.*** We are recognized as one of the lowest cost operators in the Eagle Ford Shale. We utilize a combination of initiatives that have improved the efficiency of our operations and reduced the cost of sourcing goods and services. The Company has implemented systems and processes that provide complete transparency for our well program across our organization thereby eliminating drag and waste on repetitive tasks. We have also segmented and optimized each step in drilling and completing a well. In addition, our supply chain management team takes a rigorous and methodical approach to reducing the total delivered costs of purchased good and services by examining costs on their most granular level. Goods and services are commonly sourced directly from suppliers, eliminating the middleman and their markups. Additionally, we constantly review the value chain for opportunities to internally provide services in order to further reduce, or provide sustainability in, current costs.
- ***Demonstrated ability to drive liquids production and reserves growth.*** Our average production for the full year 2016 was approximately 53,350 Boe/d, substantially all of which was from the Eagle Ford Shale. This compares to approximately 52,600 Boe/d for the full year 2015. Our total proved reserves at December 31, 2016 were 192.8 MMBoe, an increase of approximately 51% over the prior year.
- ***Large oil-weighted multi-year drilling inventory.*** We have an inventory of over 3,000 net locations for potential future drilling on our acreage position in the oil, natural gas and condensate, or black oil and volatile oil and gas, windows of the Eagle Ford Shale.
- ***Experienced management and strong technical team.*** Our team is comprised of individuals with a long history in the oil and natural gas business, and a number of our key executives have prior experience as members of public company management teams. Furthermore, members of the Sanchez Group have a 40-plus year operating history in the areas in which we operate, providing us with extensive knowledge of the basins and the ability to leverage longstanding relationships with mineral owners. Through SOG, we have access to an experienced staff of oil and natural gas professionals including geophysicists, geologists, drilling and completion engineers, production and reservoir engineers and technical support personnel. SOG's technical team has significant experience and expertise in applying the most sophisticated

technologies used in conventional and unconventional resource style plays including 3-D seismic interpretation capabilities, horizontal drilling, comprehensive multi-stage hydraulic fracture stimulation programs and other exploration, production and processing technologies. We believe this technical expertise is integral to successful exploitation of our assets, including defining new core producing areas in emerging plays.

**Core Properties**

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest and have over 3,300 gross (3,050 net) locations for potential future drilling. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale.

In our Catarina area, we have approximately 106,000 net acres in Dimmit, LaSalle and Webb Counties, Texas with a 100% working interest. We anticipate drilling, completion and facilities costs on our acreage to be between $2.9 million and $3.3 million per well based on our current estimates and historical well costs. Current Estimated Ultimate Recovery ("EUR") per well in Catarina is expected to range between 400 MBoe and 1,200 MBoe. We have identified between 1,300 and 1,650 gross and net locations for potential future drilling on our Catarina acreage. For the year 2017, we plan to spend $160 million to $170 million to spud 49 net wells and complete 53 net wells in our Catarina area.

In our Maverick area, we have approximately 100,000 net acres in Dimmit, Frio, LaSalle, Zavala, and McMullen Counties, Texas with an average working interest of approximately 96%. We believe that our Maverick acreage lies in the black oil window, where we anticipate drilling, completion and facilities costs on our acreage to be between $3.0 million and $4.0 million per well based on our current estimates and historical well costs. Current EUR per well in Maverick is expected to range between 300 MBoe and 400 MBoe. We have identified up to 1,100 gross (1,000 net) locations based on 75 acre well-spacing for potential future drilling on our Maverick area. For the year 2017, we plan to spend $100 million to $110 million to spud 35 net wells and complete 35 net wells in our Maverick area.

In our Javelina area, we have approximately 39,500 net acres in LaSalle and Webb Counties, Texas with an average working interest of 100%. Our Javelina acreage encompasses proven Eagle Ford down-dip areas. We currently anticipate drilling, completion and facilities costs on our acreage to be between $6.0 million and $7.5 million per well based on our current estimates. We expect average EUR per well in Javelina to range between 1,500 MBoe and 2,500 MBoe. We have identified up to 265 gross (265 net) locations based on 120 acre well-spacing for potential future drilling on our Javelina area. For the year 2017, we do not plan to drill any wells in this area.

In our Palmetto area, we have approximately 8,000 net acres in Gonzales County, Texas with an average working interest of approximately 49%. We believe that our Palmetto acreage lies in the volatile oil window where we anticipate drilling, completion and facilities costs on our acreage to be between $5.5 and $6.0 million per well based on our current estimates and historical well costs. Current EUR per well in Palmetto is expected to range between 500 MBoe and 600 MBoe. We have identified up to 295 gross (143 net) locations based on 40 acre well-spacing for potential future drilling in our Palmetto area. For the year 2017, we plan to spend $5 million to $10 million to spud 2 net wells and complete three net wells in our Palmetto area.

In our Marquis area, we have approximately 21,000 net acres, the majority of which are in southwest Fayette and northeast Lavaca Counties, Texas with a 100% working interest. We believe that our Marquis acreage lies in the volatile oil window, where we anticipate drilling, completion and facilities costs on our acreage to be between $4.0 million and $5.0 million per well based on our current estimates and historical well costs. Current EUR per well in Marquis is expected to range between 275 MBoe and 375 MBoe. We have identified up to 200 gross and net locations based on 60 acre well-spacing for potential future drilling on our Marquis acreage. For the year 2017, we do not have any planned capital spending on drilling and completions in our Marquis area.

***Tuscaloosa Marine Shale***

In August 2013, we acquired approximately 40,000 net undeveloped acres in what we believe to be the core of the TMS for cash and shares of our common stock (the "TMS Transaction"). In connection with the TMS Transaction, we established an area of mutual interest ("AMI") in the TMS with SR Acquisition I, LLC ("SR"), a subsidiary of our affiliate Sanchez Resources, LLC ("Sanchez Resources"), which included a carry on drilling costs for up to 6 gross (3 net) wells. As part of the TMS Transaction, we acquired all of the working interests in the AMI owned at closing from three sellers (two third parties and one related party of the Company, SR), resulting in our owning an undivided 50% working interest across the AMI through the TMS formation.

Total consideration for the transactions consisted of approximately $70 million in cash and the issuance of 342,760 common shares of the Company, valued at approximately $7.5 million. The total cash consideration provided to SR, an affiliate of the Company, was $14.4 million, before consideration of any well carries. The acquisitions were accounted for as the purchase of assets at cost at the acquisition date. We also committed, as a part of the total consideration, to carry SR for its 50% working interest in an initial 3 gross (1.5 net) TMS wells to be drilled within the AMI (the "Initial Well Carry") with an option to drill an additional 6 gross (3 net) TMS wells ("Additional Wells") within the AMI. In August 2015, after completing the Initial Well Carry, the Company signed an agreement with SR whereby the Company paid SR approximately $8 million in lieu of drilling the remaining two Additional Wells (the "Buyout Agreement"). The Buyout Agreement stipulates that SN has earned full rights to all acreage stated in the TMS Transaction and effectively terminates any future well carry commitments.

As of December 31, 2016, the AMI held rights to approximately 98,000 (64,000 net) acres, of which we owned approximately 45,600 net acres. The TMS development is currently challenged due to high well costs and depressed commodity prices. We believe that the TMS play has significant development potential and still has significant upside as changes in technology, commodity prices, and service prices occur. The average remaining lease term on the acreage is over 2 years, giving us ample time to allow other industry participants to further de-risk the play.

**Oil and Natural Gas Reserves and Production**

***Internal Controls***

Our estimated reserves at December 31, 2016 were prepared by Ryder Scott Company, L.P. ("Ryder Scott"), our independent third-party reserve engineers pursuant to their report dated January 24, 2017, which is filed as an exhibit to this Annual Report on Form 10-K. We expect to continue to have our reserve estimates prepared semi-annually by Ryder Scott. Our internal professional staff works closely with Ryder Scott to ensure the integrity, accuracy and timeliness of data that is furnished to them for their reserve estimation process. All of the reserve information maintained in our reserve engineering database is provided to the external engineers. In addition, we provide Ryder Scott other pertinent data, such as seismic information, geologic maps, well logs, production tests, material balance calculations, well performance data, operating procedures and relevant economic criteria. We make all requested information, as well as our pertinent personnel, available to the external engineers as part of their evaluation of our reserves. The estimated proved reserves attributable to the Comanche Assets (as defined in "Item 1A. Risk Factors—*There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.*") are as of June 30, 2016, are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition (as defined in "Item 1A. Risk Factors—*There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.*") and have not been independently verified or estimated.

***Technology Used to Establish Reserves***

Under the rules of the Securities and Exchange Commission (the "SEC"), proved reserves are those quantities of oil and natural gas that by analysis of geoscience and engineering data can be estimated with reasonable certainty to be economically producible from a given date forward from known reservoirs, and under existing economic conditions, operating methods and government regulations. The term "reasonable certainty" implies a high

degree of confidence that the quantities of oil and natural gas actually recovered will equal or exceed the estimate. Reasonable certainty can be established using techniques that have been proven effective by actual production from projects in the same reservoir or

an analogous reservoir or by other evidence using reliable technology that establishes reasonable certainty. Reliable technology is a grouping of one or more technologies (including computational methods) that has been field tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in an analogous formation.

To establish reasonable certainty with respect to our estimated proved reserves, Ryder Scott employed technologies that have been demonstrated to yield results with consistency and repeatability. The technologies and economic data used in the estimation of our reserves include, but are not limited to, electrical logs, radioactivity logs, core analyses, geologic maps and available downhole and production data, seismic data and well test data. Reserves attributable to producing wells with sufficient production history were estimated using appropriate decline curves or other performance relationships. Reserves attributable to producing wells with limited production history and for undeveloped locations were estimated using performance from analogous wells in the surrounding area and geologic data to assess the reservoir continuity. These wells were considered to be analogous based on production performance from the same formation and completion using similar techniques.

***Qualifications of Responsible Technical Persons***

*Internal SOG Engineers.* Daniel Furbee is the technical person primarily responsible for overseeing the preparation of our reserve estimates. Mr. Furbee has over a decade of industry experience with positions of increasing responsibility in engineering and evaluations with companies such as Baker Hughes and LINN Energy. He holds a Bachelor of Science Petroleum Engineering degree from Marietta College and a Masters of Business Administration from the University of Houston. Mr. Furbee is a Registered Professional Engineer in the State of Texas.

*Independent Reserve Engineers.* Ryder Scott is an independent oil and natural gas consulting firm. No director, officer or key employee of Ryder Scott has any financial ownership in any member of the Sanchez Group or us. Ryder Scott's compensation for the required investigations and preparation of its report is not contingent upon the results obtained and reported, and Ryder Scott has not performed other work for SOG or us that would affect its objectivity. The engineering information presented in Ryder Scott's report was overseen by Michael F. Stell, P.E. Mr. Stell is an experienced reservoir engineer having been a practicing petroleum engineer since 1981. He has more than 24 years of experience in reserves evaluation with Ryder Scott. He has a Bachelor of Science degree in Chemical Engineering from Purdue University and Master of Science degree in Chemical Engineering from University of California - Berkeley. Mr. Stell is a Registered Professional Engineer in the State of Texas.

***Estimated Proved Reserves***

The following table presents the estimated net proved oil and natural gas reserves attributable to our properties and the standardized measure amounts associated with the estimated proved reserves attributable to our properties as of December 31, 2016, based on a reserve report prepared by Ryder Scott, our independent reserve engineers. The standardized measure amounts shown in the table are not intended to represent the current market value of our estimated oil and natural gas reserves.

| | As of December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Oil (MMBbl) | Natural Gas Liquids (MMBbl) | Natural Gas (Bcf) | Total Estimated Proved Reserves (MMBoe) (2) | PV-10 (in millions) |
| Reserve Data [1]: | | | | | |
| Estimated proved reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 48.3 | 57.5 | 410.9 | 174.3 | $ 392.2 |
| Maverick | 11.3 | 0.2 | 1.1 | 11.7 | 90.1 |
| Palmetto | 3.0 | 0.6 | 3.6 | 4.2 | 10.3 |
| Marquis | 1.8 | 0.4 | 1.6 | 2.4 | 17.9 |
| Total Eagle Ford | 64.4 | 58.7 | 417.2 | 192.6 | 510.5 |
| TMS | 0.2 | — | — | 0.2 | 2.9 |
| Total | 64.6 | 58.7 | 417.2 | 192.8 | $ 513.4 |
| Standardized Measure (in millions) [1][3] | | | | | $ 513.4 |
| | | | | | |
| Estimated proved developed reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 12.1 | 20.4 | 146.0 | 56.8 | $ 267.5 |
| Maverick | 3.9 | 0.2 | 1.1 | 4.3 | 60.1 |
| Palmetto | 0.3 | 0.1 | 0.4 | 0.5 | 5.4 |
| Marquis | 1.8 | 0.4 | 1.6 | 2.4 | 17.9 |
| Total Eagle Ford | 18.1 | 21.1 | 149.1 | 64.0 | 350.9 |
| TMS | 0.2 | — | — | 0.2 | 2.9 |
| Total | 18.3 | 21.1 | 149.1 | 64.2 | $ 353.8 |
| | | | | | |
| Estimated proved undeveloped reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 36.2 | 37.1 | 264.9 | 117.5 | $ 124.7 |
| Maverick | 7.4 | — | — | 7.4 | 30.0 |
| Palmetto | 2.7 | 0.5 | 3.2 | 3.7 | 4.9 |
| Marquis | — | — | — | — | — |
| Total Eagle Ford | 46.3 | 37.6 | 268.1 | 128.6 | 159.6 |
| TMS | — | — | — | — | — |
| Total | 46.3 | 37.6 | 268.1 | 128.6 | $ 159.6 |

(1) Our estimated net proved reserves and related standardized measure were determined using index prices for oil and natural gas, without giving effect to commodity derivative contracts, held constant throughout the life of our properties. The unweighted arithmetic average first-day-of-the-month

Case 4:23-cv-04508 Document 1354317 Filed in TXSB on 07/28/20 Page 63 of 1759

prices for the prior twelve months were $42.75/Bbl for WTI Cushing oil, $[illegible]/Bbl for NGLs and $2.49/MMBtu for Henry Hub natural gas at December 31, 2016. These prices were adjusted by lease for quality, transportation fees, geographical differentials, marketing bonuses or deductions and other factors affecting the price realized at the wellhead. For the year ended December 31, 2016, the average realized prices for oil, NGLs and natural gas were $37.95 per Bbl, $13.72 per Bbl and $2.50 per Mcf, respectively. For a description of our commodity derivative contracts, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations—Operating Costs and Expenses—Commodity Derivative Transactions" and "Item 7. Management's Discussion and

Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Derivative Instruments."

(2) One Boe is equal to six Mcf of natural gas or one Bbl of oil or NGLs based on a rough energy equivalency. This is a physical correlation and does not reflect a value or price relationship between the commodities.

(3) Standardized measure is calculated in accordance with Accounting Standards Codification ("ASC"), Topic 932, Extractive Activities—Oil and Gas. For further information regarding the calculation of the standardized measure, see "Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)" included in "Item 8. Financial Statements and Supplementary Data."

The data in the table above represents estimates only. Oil, NGLs and natural gas reserve engineering is inherently a subjective process of estimating underground accumulations of oil, NGLs and natural gas that cannot be measured exactly. The accuracy of any reserve estimate is a function of the quality of available data and engineering and geological interpretation and judgment. Accordingly, reserve estimates may vary from the quantities of oil, NGLs and natural gas that are ultimately recovered. For a discussion of risks associated with reserve estimates, please read "Item 1A. Risk Factors—Our estimated reserves and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves."

Future prices realized for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. The standardized measure amounts shown above should not be construed as the current market value of our estimated oil and natural gas reserves. The 10% discount factor used to calculate standardized measure, which is required by Financial Accounting Standard Board ("FASB") pronouncements, is not necessarily the most appropriate discount rate. The present value, no matter what discount rate is used, is materially affected by assumptions as to timing of future production, which may prove to be inaccurate.

***Development of Proved Undeveloped Reserves***

None of our proved undeveloped reserves ("PUD") at December 31, 2016 are scheduled to be developed on a date more than five years from the date the reserves were initially booked as proved undeveloped. Historically, our drilling and development programs were substantially funded from capital contributions, cash flow from operations and the issuance of debt and equity securities. Based on our current expectations of our cash flows and drilling and development programs, which includes drilling of proved undeveloped locations, we believe that we can fund the drilling of our current inventory of proved undeveloped locations and our expansions and extensions in the next five years from our cash on hand combined with cash flow from operations and utilization of available borrowing capacity under our credit facility.

At a pace of approximately 30 wells per rig per year, our current 293 PUD drilling locations will all be developed within the next five years by running an average gross rig count of two rigs. As of December 31, 2016, we were running two active rigs and have an approved annual budget that allows for approximately six rigs to be run through 2017. For a more detailed discussion of our liquidity position, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

As of December 31, 2016, we identified 293 gross (282 net) PUD drilling locations which we anticipate drilling within the next five years. The table below details the activity in our PUD locations from December 31, 2015 to December 31, 2016:

| | Net Oil (MBbl) | Net Natural Gas Liquids (MBbl) | Net Natural Gas (MMcf) | Net Volume (MBoe) |
|---|---|---|---|---|
| PUDs as of December 31, 2015 | 30,048 | 15,995 | 101,564 | 62,971 |
| Revisions of previous estimates | | | | |
| Revisions due to price change | (15,372) | (10,603) | (67,150) | (37,167) |
| Technical revisions | (451) | 241 | 3,589 | 388 |
| Extensions and discoveries | 37,381 | 34,482 | 246,300 | 112,913 |
| Purchases | — | — | — | — |
| Divestitures | (1,137) | (81) | (479) | (1,298) |
| Conversion to proved developed reserves during the year | (4,137) | (2,428) | (15,688) | (9,180) |
| PUDs as of December 31, 2016 | 46,332 | 37,606 | 268,136 | 128,627 |

Excluding acquisitions, we expect to make capital expenditures related to drilling and completion of wells of approximately $265 million to $290 million during the year ended December 31, 2017. We plan to spend approximately 80% to 88% of these capital expenditures on development of PUDs in 2017. Technical revisions of PUD estimates are the result of changes in forecasted performance. There are net positive changes on our PUD forecast driven by better performance on our Catarina asset. As a result of price change, 131 PUD locations were removed. The total PUD volume impacted by price changes are 37.2 MMBoe as a result of locations that were removed from our Catarina, Cotulla, Marquis and Palmetto assets.

For more information about our historical costs associated with the development of proved undeveloped reserves, please read "Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)" included in "Item 8. Financial Statements and Supplementary Data."

***Reconciliation of PV-10 to Standardized Measure***

PV-10 is derived from the Standardized Measure of discounted future net cash flows, which is the most directly comparable financial measure in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). PV-10 is a computation of the Standardized Measure on a pre-tax basis. PV-10 is equal to the Standardized Measure at the applicable date, before deducting future income taxes, discounted at 10%. We believe that the presentation of PV-10 is relevant and useful to investors because it presents the discounted future net cash flows attributable to our estimated net proved reserves prior to taking into account future corporate income taxes, and it is a useful measure for evaluating the relative monetary significance of our oil and natural gas properties. Further, investors may utilize the measure as a basis for comparison of the relative size and value of our reserves to other companies. We use this measure when assessing the potential return on investment related to our oil and natural gas properties. PV-10, however, is not a substitute for the Standardized Measure. Our PV-10 measure and the Standardized Measure do not purport to present the fair value of our oil and natural gas reserves.

The following table provides a reconciliation of PV-10 to the Standardized Measure at December 31, 2016 for our proved reserves (in millions):

| | Proved Reserves |
|---|---|
| PV-10 | $ 513.4 |
| Present value of future income taxes discounted at 10% | — |
| Standardized Measure (1) | $ 513.4 |

(1) Standardized measure is calculated in accordance with ASC Topic 932, Extractive Activities—Oil and Gas. For further information regarding the calculation of the standardized measure, see "Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)" included in "Item 8. Financial Statements and Supplementary Data."

***Production, Revenues and Price History***

The following table sets forth information regarding combined net production of oil, NGLs, and natural gas and certain price and cost information attributable to our properties for each of the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Production:** | | | |
| **Oil - MBbl** | | | |
| Catarina | 3,615 | 3,210 | 847 |
| Maverick | 858 | 396 | 168 |
| Cotulla | 810 | 1,436 | 1,868 |
| Palmetto | 351 | 606 | 1,255 |
| Marquis | 693 | 1,448 | 1,910 |
| TMS | 44 | 69 | 32 |
| Total | 6,371 | 7,165 | 6,080 |
| **Natural gas liquids - MBbl** | | | |
| Catarina | 5,475 | 5,066 | 1,580 |
| Maverick | 14 | 5 | 6 |
| Cotulla | 237 | 326 | 486 |
| Palmetto | 78 | 139 | 267 |
| Marquis | 156 | 218 | 251 |
| TMS | — | — | — |
| Total | 5,960 | 5,754 | 2,590 |
| **Natural gas - MMcf** | | | |
| Catarina | 40,544 | 33,775 | 9,244 |
| Maverick | 93 | 42 | 52 |
| Cotulla | 1,393 | 2,075 | 3,067 |
| Palmetto | 494 | 774 | 1,491 |
| Marquis | 656 | 901 | 974 |
| TMS | 9 | 27 | — |
| Total | 43,189 | 37,594 | 14,828 |
| **Net production volumes:** | | | |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 11,141 |
| Average daily production (Boe/d) | 53,358 | 52,560 | 30,523 |
| **Average Sales Price [1]:** | | | |
| Oil ($ per Bbl) | $ 37.95 | $ 42.98 | $ 88.64 |
| Natural gas liquids ($ per Bbl) | $ 13.72 | $ 11.99 | $ 25.86 |
| Natural gas ($ per Mcf) | $ 2.50 | $ 2.63 | $ 4.06 |
| Oil equivalent ($ per Boe) | $ 22.09 | $ 24.80 | $ 59.79 |
| **Average unit costs per Boe:** | | | |
| Oil and natural gas production expenses | $ 8.43 | $ 8.16 | $ 8.40 |
| Production and ad valorem taxes | $ 1.01 | $ 1.40 | $ 3.39 |
| General and administrative expense | $ 5.64 | $ 3.87 | $ 5.72 |
| Adjusted G&A per Boe [2][3] | $ 3.32 | $ 2.89 | $ 4.40 |

007937

| | | | | | | |
|---|---|---|---|---|---|---|
| Depreciation, depletion, amortization and accretion | $ | 8.18 | $ | 17.96 | $ | 30.35 |
| Impairment of oil and natural gas properties | $ | 8.66 | $ | 71.15 | $ | 19.19 |

(1) Excludes the impact of derivative instruments.



007938

(2) For the years ended December 31, 2016, 2015 and 2014, Adjusted general and administrative ("G&A") expense excludes stock-based compensation expense of approximately $37.1 million ($1.90 per Boe), $14.8 million ($0.77 per Boe) and $12.8 million ($1.15 per Boe), respectively.

(3) For the years ended December 31, 2016, 2015 and 2014, Adjusted G&A expense excludes acquisition and divestiture costs included in G&A expense of $8.1 million ($0.42 per Boe), $3.8 million ($0.20 per Boe) and $1.8 million ($0.16 per Boe), respectively.

The table above in addition to other areas throughout this Annual Report on Form 10-K contains disclosures of G&A expenses excluding expenses related to stock-based compensation expense and certain costs related to acquisitions and divestitures, which is referred to as "Adjusted G&A." Adjusted G&A is a "non-GAAP financial measure," as defined in SEC rules. Please see "Item 6. Selected Financial Data -- Non-GAAP Financial Measures," for a reconciliation of G&A and G&A per Boe to Adjusted G&A and Adjusted G&A per Boe, respectively.

***Drilling Activities***

The following table sets forth information with respect to wells drilled and completed during the periods indicated. The information should not be considered indicative of future performance, nor should a correlation be assumed between the number of productive wells drilled, quantities of reserves found or economic value. At December 31, 2016, 25 gross (22 net) wells were in various stages of completion.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| | Gross | Net | Gross | Net | Gross | Net |
| **Development wells:** | | | | | | |
| Productive | 67.0 | 64.0 | 128.0 | 108.0 | 115.0 | 82.0 |
| Dry [(1)] | 1.0 | 1.0 | — | — | — | — |
| **Exploratory wells:** | | | | | | |
| Productive | — | — | 8.0 | 8.0 | 6.0 | 5.5 |
| Dry | — | — | — | — | — | — |
| **Total wells:** | | | | | | |
| Productive | 67.0 | 64.0 | 136.0 | 116.0 | 121.0 | 87.5 |
| Dry [(1)] | 1.0 | 1.0 | — | — | — | — |

(1) The Company encountered mechanical malfunctions during drilling and was unable to complete the well.

The following table sets forth information at December 31, 2016 relating to the productive wells in which we owned a working interest as of that date. Productive wells consist of producing wells and wells capable of production, including natural gas wells awaiting pipeline connections to commence deliveries and oil wells awaiting connection to production facilities. Gross wells are the total number of producing wells in which we own an interest, and net wells are the sum of our fractional working interests owned in gross wells.

| | Oil | | Natural Gas | | Total | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| Operated by us | 158.0 | 116.4 | 333.0 | 333.0 | 491.0 | 449.4 |
| Non-operated | 119.0 | 22.9 | 1.0 | 0.3 | 120.0 | 23.2 |
| Total | 277.0 | 139.3 | 334.0 | 333.3 | 611.0 | 472.6 |

***Developed and Undeveloped Acreage***

The following table sets forth information as of December 31, 2016 relating to our leasehold acreage. Acreage related to royalty, overriding royalty and other similar interests is excluded from this summary.

| | Developed Acreage | | Undeveloped Acreage | | Total Acreage | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| Catarina | 26,400 | 26,400 | 79,651 | 79,651 | 106,051 | 106,051 |
| Maverick | 6,375 | 5,911 | 104,307 | 96,715 | 110,682 | 102,626 |
| Javelina | — | — | 39,506 | 39,506 | 39,506 | 39,506 |
| Marquis | 4,140 | 4,140 | 17,337 | 17,337 | 21,477 | 21,477 |
| Palmetto | 3,200 | 1,554 | 13,474 | 6,543 | 16,674 | 8,097 |
| Total Eagle Ford | 40,115 | 38,005 | 254,275 | 239,752 | 294,390 | 277,757 |
| TMS | 1,000 | 711 | 63,147 | 44,928 | 64,147 | 45,639 |
| Other | 2,908 | 727 | - | - | 2,908 | 727 |
| Total | 44,023 | 39,443 | 317,422 | 284,680 | 361,445 | 324,123 |

As of December 31, 2016, approximately 58% of our acreage was held by production. As of December 31, 2016, we have leases that were not held by production and not impaired representing 8,768 net acres (all which were in the Eagle Ford Shale) expiring in 2017, 15,539 net acres (all of which were in the Eagle Ford Shale) expiring in 2018, and 105,859 net acres (94,088 of which were in the Eagle Ford Shale) expiring in 2019 and beyond. We anticipate that our current and future drilling plans along with selected lease extensions will address the majority of our leases expiring in the Eagle Ford Shale in 2017 and beyond. In addition to these lease expirations, we also have a continuous development obligation in our Catarina area that requires us to drill, but not complete, (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120 day period in order to maintain rights to any future undeveloped acreage.

***Delivery Commitments***

We have made commitments to certain purchasers to deliver a portion of our natural gas production from our Catarina area.

As of December 31, 2016, in our Catarina area, we have three contracts that require us to deliver portions of our natural gas, with delivery requirements through 2020, 2021 and 2022, respectively. Under our contract expiring in 2020, we are required to deliver 207 Bcf of natural gas through the Catarina Midstream gathering facilities. Under our contract expiring in 2021, we are required to deliver approximately 79 Bcf of natural gas. Under our contract expiring in 2021, which begins in 2017, we are required to deliver approximately 228 Bcf of natural gas. During 2016, we recorded expenses related to deficiencies on delivery commitments of approximately $1.6 million. These amounts were recorded to natural gas production expenses in our consolidated statement of operations and were not considered material to the financial statement line item or to the consolidated financial statements as a whole. We do not expect to have additional expenses in 2017 related to deficiencies on our natural gas delivery commitments.

Also in our Catarina area, we have one contract that requires us to deliver a portion of our oil production through the Catarina Midstream gathering facilities. This contract expires in 2020 and requires us to deliver approximately 15 MMBbls of oil. We do not expect to have additional expenses in 2017 related to deficiencies on our oil delivery commitments.

**Operations**

***Oil and Natural Gas Leases***

The typical oil and natural gas lease agreement covering our properties provides for the payment of royalties to the mineral owner for all oil and natural gas produced from any well drilled on the lease premises. The lessor royalties

and other leasehold burdens on our Eagle Ford properties range from 20.8% to 36.7%, resulting in a net revenue interest to us ranging from 63.3% to 79.2%.

***Marketing and Major Customers***

For the year ended December 31, 2016, purchases by three of our customers accounted for more than 10% (33%, 20%, and 14%, respectively) of our total revenues. The three customers, who are not affiliates of the Company, purchased oil, NGLs and natural gas production from us pursuant to existing marketing agreements with terms that are currently on "evergreen" status and renew on a month-to-month basis until either party gives 30-day advance written notice of non-renewal.

Since the oil, NGLs and natural gas that we sell are commodities for which there are a large number of potential buyers and because of the adequacy of the infrastructure to transport oil, NGLs and natural gas in the areas in which we operate, if we were to lose one or more customers, we believe that we could readily procure substitute or additional customers such that our production volumes would not be materially affected for any significant period of time.

***Hedging Activities***

We enter into commodity derivative contracts with unaffiliated third parties to achieve more predictable cash flows and to reduce our exposure to short-term fluctuations in oil and natural gas prices. For a more detailed discussion of our hedging activities, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations—Operating Costs and Expenses—Commodity Derivative Transactions," "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Derivative Instruments" and "Item 7A. Quantitative and Qualitative Disclosures about Market Risk."

***Competition***

We operate in a highly competitive environment for leasing and acquiring properties and in securing trained personnel. Our competitors specifically include major and independent oil and natural gas companies that operate in our project areas. These competitors include, but are not limited to, Carrizo Oil & Gas, Inc., Chesapeake Energy Corporation, EOG Resources, Inc., Marathon Oil Corporation, SM Energy Company and Noble Energy, Inc. Many of our competitors possess and employ financial, technical and personnel resources substantially greater than ours, which can be particularly important in the areas in which we operate. As a result, our competitors may be able to pay more for productive oil and natural gas properties and exploratory prospects, as well as evaluate, bid for and purchase a greater number of properties and prospects than our financial or personnel resources permit. Our ability to acquire additional properties and to find and develop reserves will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. In addition, there is substantial competition for capital available for investment in the oil and natural gas industry.

We are also affected by the competition for and the availability of equipment, including drilling rigs, completion equipment and materials. We are unable to predict when, or if, shortages of such equipment may occur or how they would affect our development and exploitation programs.

***Title to Properties***

Prior to completing an acquisition of producing oil and natural gas properties, we perform title reviews on significant leases, and depending on the materiality of properties, we may obtain a title opinion or review previously obtained title opinions. As a result, title examinations have been obtained on a significant portion of our properties. After an acquisition, we review the assignments from the seller for scrivener's and other errors and execute and record corrective assignments as necessary.

As is customary in the oil and natural gas industry, we initially conduct only a cursory review of the titles to our properties on which we do not have proved reserves. Prior to the commencement of drilling operations on those properties, we conduct a thorough title examination and perform curative

work with respect to significant defects. To the

extent title opinions or other investigations reflect title defects on those properties, we are typically responsible for curing any title defects at our expense. We generally will not commence drilling operations on a property until we have cured any material title defects on such property.

We believe that we have satisfactory title to all of our material assets. Although title to these properties is subject to encumbrances in some cases, such as customary interests generally retained in connection with the acquisition of real property, customary royalty interests and contract terms and restrictions, liens under operating agreements, liens related to environmental liabilities associated with historical operations, liens for current taxes and other burdens, easements, restrictions and minor encumbrances customary in the oil and natural gas industry, we believe that none of these liens, restrictions, easements, burdens and encumbrances will materially detract from the value of these properties or from our interest in these properties or materially interfere with our use of these properties in the operation of our business. In addition, we believe that we have obtained sufficient rights-of-way grants and permits from public authorities and private parties for us to operate our business in all material respects as described in this Annual Report on Form 10-K.

***Seasonal Nature of Business***

Generally, but not always, the demand for natural gas decreases during the summer months and increases during the winter months, resulting in seasonal fluctuations in the price we receive for our natural gas production. Seasonal anomalies such as mild winters or hot summers sometimes lessen this fluctuation. In addition, certain natural gas users utilize natural gas storage facilities and purchase some of their anticipated winter requirements during the summer, which can lessen seasonal demand fluctuations.

**Environmental Matters and Regulation**

***General***

Our operations are subject to stringent and complex federal, state and local laws and regulations governing environmental protection as well as the discharge of materials into the environment or otherwise relating to protection of the environment or occupational health and safety. Numerous governmental agencies, such as the Environmental Protection Agency (the “EPA”) and the Texas Railroad Commission (“Commission”), issue regulations, which often require difficult and costly compliance measures that carry substantial administrative, civil and criminal penalties and may result in injunctive obligations for failure to comply. These laws and regulations may, among other things (i) require the acquisition of permits to conduct exploration, drilling and production operations; (ii) restrict the types, quantities and concentration of various substances that can be released into the environment or injected into formations in connection with oil and natural gas drilling, production and transportation activities; (iii) govern the sourcing and disposal of water used in the drilling and completion process; (iv) limit or prohibit drilling or injection activities on certain lands lying within wilderness, wetlands, seismically active areas, and other protected areas; (v) require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells; (vi) result in the suspension or revocation of necessary permits, licenses and authorizations; (vii) impose substantial liabilities for pollution resulting from drilling and production operations; and (viii) require that additional pollution controls be installed. Any failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of corrective or remedial obligations, and the issuance of orders enjoining performance of some or all of our operations. Furthermore, liability under such laws and regulations is often strict (i.e., no showing of “fault” is required) and can be joint and several.

These laws and regulations may also restrict the rate of oil and natural gas production below the rate that would otherwise be possible. The regulatory burden on the oil and natural gas industry increases the cost of doing business in the industry and consequently affects profitability. Additionally, The U.S. Congress and federal and state agencies frequently revise environmental laws and regulations, and any changes that result in more stringent and costly waste handling, disposal and cleanup requirements for the oil and natural gas industry could have a significant impact on our operating costs.

The trend in environmental regulation has been to place more restrictions and limitations on activities that may affect the environment. Any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly waste handling, storage transport, disposal, or remediation requirements could have a material adverse effect on our financial position and results of operations. Moreover, accidental releases or spills may occur in the course of our operations, and we could incur significant costs and liabilities as a result of such releases or spills, including any third-party claims for damage to property, natural resources or persons. While we believe that we are in substantial compliance with existing laws and regulations and that continued compliance with existing
requirements will not materially affect us, there is no assurance that this situation will continue in the future.

The following is a summary of the more significant existing environmental, health and safety laws and regulations to which our business operations are subject and for which compliance may have a material adverse impact on our capital expenditures, results of operations or financial position.

***Hazardous Substances and Waste Handling***

Our operations are subject to environmental laws and regulations relating to the management and release of hazardous substances, solid and hazardous wastes and petroleum hydrocarbons. These laws generally regulate the generation, storage, treatment, transportation and disposal of solid and hazardous waste and may impose strict and, in some cases, joint and several liability for the investigation and remediation of affected areas where hazardous substances may have been released or disposed. The Comprehensive Environmental Response, Compensation and Liability Act, as amended, or CERCLA, also known as the Superfund law, and comparable state laws impose liability, without regard to fault or legality of conduct, on classes of persons considered to be responsible for the release, deemed “responsible parties,” of a “hazardous substance” into the environment. These persons include the current owner or operator of the site where the release occurred, past owners or operators at the time a hazardous substance was released at the site, and anyone who disposed or arranged for the disposal of a hazardous substance released at the site. Under CERCLA, such persons are subject to strict liability that, in some circumstances, may be joint and several for the costs of cleaning up the hazardous substances that have been released into the environment, for damages to natural resources and for the costs of certain health studies. CERCLA also authorizes the EPA and, in some instances, third parties to act in response to threats to the public health or the environment and to seek to recover the costs they incur from the responsible classes of persons. It is not uncommon for neighboring landowners and other third parties to file common law-based claims for personal injury and property damage allegedly caused by hazardous substances or other pollutants released into the environment. We generate materials in the course of our operations that may be regulated as hazardous substances, and despite the “petroleum exclusion” of Section 101(14) of CERCLA, which currently encompasses natural gas, we may nonetheless handle hazardous substances within the meaning of CERCLA, or similar state statutes, in the course of our ordinary operations and, as a result, may be jointly and severally liable under CERCLA for all or part of the costs required to clean up sites at which these hazardous substances have been released into the environment. In addition, we may have liability for releases of hazardous substances at our properties by prior owners or operators or other third parties.

The Resource Conservation and Recovery Act, as amended, or RCRA, and comparable state statutes and their implementing regulations, regulate the generation, transportation, treatment, storage, disposal and cleanup of hazardous and non-hazardous wastes. Under the auspices of the EPA, most states administer some or all of the provisions of RCRA, sometimes in conjunction with their own, more stringent requirements. Federal and state regulatory agencies can seek to impose administrative, civil and criminal penalties for alleged non-compliance with RCRA and analogous state requirements. Drilling fluids, produced waters, and most of the other wastes associated with the exploration, development, and production of oil or natural gas, if properly handled, are exempt from regulation as hazardous waste under Subtitle C of RCRA. These wastes, instead, are regulated under RCRA's less stringent solid waste provisions, state laws or other federal laws. It is possible, however, that certain oil and natural gas exploration, development and production wastes now classified as non-hazardous could be classified as hazardous wastes in the future and therefore be subject to more rigorous and costly disposal requirements. Indeed, legislation has been proposed from time to time in The U.S. Congress to re-categorize certain oil and natural gas exploration and production wastes as “hazardous wastes.” Also, in December 2016, the EPA agreed in a consent decree to review its regulations of oil and gas waste. It has until March 2019 to determine whether any revisions are necessary. Any such change could result in an increase in our costs

to manage and dispose of wastes, which could have a material adverse effect on our results of operations and financial position.

We currently own, lease, or operate numerous properties that have been used for oil and natural gas exploration, production and processing for many years. Although we believe that we are in substantial compliance with the requirements of CERCLA, RCRA, and related state and local laws and regulations, that we hold all necessary and up-to-date permits, registrations and other authorizations required under such laws and regulations and that we have utilized operating and waste disposal practices that were standard in the industry at the time, hazardous substances, wastes, or hydrocarbons may have been released on, under or from the properties owned or leased by us, or on, under or from other locations, including off-site locations, where such substances have been taken for disposal. In addition, some of our properties have been operated by third parties or by previous owners or operators whose treatment and disposal of hazardous substances, wastes, or hydrocarbons was not under our control. These properties and the substances disposed or released on, under or from them may be subject to CERCLA, RCRA and analogous state laws. Under such laws, we could be required to undertake response or corrective measures, which could include removal of previously disposed substances and wastes, cleanup of contaminated property or performance of remedial plugging or pit closure operations to prevent future contamination.

***Water and Other Water Discharges and Spills***

The Federal Water Pollution Control Act, as amended, also known as the Clean Water Act, the Safe Drinking Water Act, or the SDWA, the Oil Pollution Act of 1990, or the OPA, and analogous state laws, impose restrictions and strict controls with respect to the discharge of pollutants, including oil, produced waters and other hazardous substances, into federal and state waters. The discharge of pollutants into regulated waters is prohibited, except in accordance with the terms of a permit issued by EPA or an analogous state agency. The discharge of dredge and fill material in regulated waters, including wetlands, is also prohibited, unless authorized by a permit issued by the U.S. Army Corps of Engineers. The EPA has also adopted regulations requiring certain oil and natural gas exploration and production facilities to obtain individual permits or coverage under general permits for storm water discharges. Some states also maintain groundwater protection programs that require permits for discharges or operations that may impact groundwater conditions. The underground injection of fluids is subject to permitting and other requirements under state laws and regulation.

Furthermore, the EPA is examining regulatory requirements for “indirect dischargers” of wastewater – i.e., those that send their discharges to private or publicly owned treatment facilities, which treat the wastewater before discharging it to regulated waters. On June 28, 2016, the EPA published a final rule prohibiting the discharge of wastewater from onshore unconventional oil and gas extraction facilities to publicly owned wastewater treatment plants. The EPA is also conducting a study of private wastewater treatment facilities (also known as centralized waste treatment, or CWT, facilities) accepting oil and gas extraction wastewater. The EPA is collecting data and information related to the extent to which CWT facilities accept such wastewater, available treatment technologies (and their associated costs), discharge characteristics, financial characteristics of CWT facilities, and the environmental impacts of discharges from CWT facilities.

Costs may be associated with the treatment of wastewater or developing and implementing storm water pollution prevention plans, as well as for monitoring and sampling the storm water runoff from certain of our facilities. Obtaining permits also has the potential to delay the development of oil and natural gas projects. These same regulatory programs also limit the total volume of water that can be discharged, hence limiting the rate of development, and require us to incur compliance costs.

The OPA amends the Clean Water Act and establishes strict liability and natural resource damages liability for unauthorized discharges of oil into waters of the United States. The OPA is the primary federal law imposing oil spill liability. The OPA contains numerous requirements relating to the prevention of and response to petroleum releases into waters of the United States, including the requirement that operators of offshore facilities and certain onshore facilities near or crossing waterways must maintain certain significant levels of financial assurance to cover potential environmental cleanup and restoration costs. The OPA subjects owners of facilities to strict liability that, in some circumstances, may be joint and several for all containment and cleanup costs and certain other damages arising from a

release, including, but not limited to, the costs of responding to a release of oil to surface waters.

Pursuant to these laws and regulations, we may be required to obtain and maintain approvals or permits for the discharge of wastewater or storm water and the underground injection of fluids and are required to develop and implement spill prevention, control and countermeasure, or SPCC plans, in connection with on-site storage of significant quantities of oil. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations. We maintain all required discharge permits necessary to conduct our operations, and we believe we are in substantial compliance with their terms.

***Regulation of Hydraulic Fracturing***

Hydraulic fracturing is an important and common process used by oil and natural gas exploration and production operators in the completion of certain oil and natural gas wells whereby water, sand and chemicals are injected under pressure into subsurface formations to stimulate production of oil and/or natural gas. The federal Safe Drinking Water Act, or SDWA, regulates the underground injection of substances through the Underground Injection Control, or UIC, Program. Hydraulic fracturing is generally exempt from regulation under the UIC Program, and thus the hydraulic fracturing process is typically regulated by state oil and natural gas commissions. The EPA, however, has asserted federal regulatory authority over hydraulic fracturing involving diesel additives under the UIC Program. On February 12, 2014, the EPA published a revised UIC Program guidance for oil and natural gas hydraulic fracturing activities using diesel fuel. The guidance document describes how regulations of Class II wells, which are those wells injecting fluids associated with oil and natural gas production activities, may be tailored to address the purported unique risks of diesel fuel injection during the hydraulic fracturing process. Although the EPA is not the permitting authority for UIC Class II programs in Texas, Mississippi, and Louisiana, where we maintain acreage, the EPA is encouraging state programs to review and consider use of the above-mentioned guidance. In addition, the EPA plans to develop a Notice of Proposed Rulemaking by June 2018, which would describe a proposed mechanism - regulatory, voluntary, or a combination of both - to collect data on hydraulic fracturing chemical substances and mixtures. Furthermore, legislation to amend the SDWA to repeal the exemption for hydraulic fracturing from the definition of "underground injection" and require federal permitting and regulatory control of hydraulic fracturing, as well as legislative proposals to require disclosure of the chemical constituents of the fluids used in the fracturing process, have been proposed in recent sessions of The U.S. Congress.

The protection of groundwater quality is extremely important to us. We believe that we follow all state and federal regulations and apply industry standard practices for groundwater protection in our operations. These measures are subject to close supervision by state and federal regulators. Our policy and practice is to follow all applicable guidelines and regulations in the areas where we conduct hydraulic fracturing. Accordingly, we set surface casing strings below the deepest usable quality fresh water zones and cement them back to the surface in accordance with applicable regulations, potential lease requirements and other legal requirements to ensure protection of existing fresh water zones. Also, prior to commencing drilling operations for the production portion of the hole, the surface casing strings are pressure tested to ensure mechanical integrity.

Although not presently relevant to our current 2017 development plans, on March 26, 2015, the Bureau of Land Management ("BLM") published a final rule governing hydraulic fracturing on federal and Indian lands. The rule requires public disclosure of chemicals used in hydraulic fracturing, implementation of a casing and cementing program, management of recovered fluids, and submission to BLM of detailed information about the proposed operation, including wellbore geology, the location of faults and fractures, and the depths of all usable water. On June 21, 2016, the United States District Court for Wyoming set aside the rule, holding that the BLM lacked Congressional authority to promulgate the rule. The BLM has appealed to the Tenth Circuit Court of Appeals.

Furthermore, there are certain governmental reviews either underway or being proposed that focus on environmental aspects of hydraulic fracturing practices. For example, on December 13, 2016, the EPA released a study examining the potential for hydraulic fracturing to impact drinking water resources finding that, under some circumstances, the use of water in hydraulic fracturing activities can impact drinking water resources. Also, on February 6, 2015, the EPA released a report with findings and recommendations related to public concern about induced seismic

activity from disposal wells. The report recommends strategies for managing and minimizing the potential for significant injection-induced seismic events. Other governmental agencies, including the U.S. Department of Energy, the U.S. Geological Survey, and the U.S. Government Accountability Office, have evaluated or are evaluating various other aspects of hydraulic fracturing.

These ongoing or proposed studies, depending on their degree of pursuit and any meaningful results obtained, could spur initiatives to further regulate hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells under the SDWA or other regulatory mechanism.

Also, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances or otherwise require the public disclosure of chemicals used in the hydraulic fracturing process. For example, in December 2011, the Commission adopted rules and regulations requiring that oil and gas operators publicly disclose the chemicals used in the hydraulic fracturing process. Also, in May 2013, the Commission adopted new rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The new rules took effect in January 2014. Additionally, on October 28, 2014, the Commission adopted disposal well rule amendments designed, amongst other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed, new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Commission has used this authority to deny permits for waste disposal sites.

A number of lawsuits and enforcement actions have been initiated across the country alleging that hydraulic fracturing practices have induced seismic activity and adversely impacted drinking water supplies, use of surface water, and the environment generally. Several states and municipalities have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances. These or any other new laws or regulations that significantly restrict hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells could make it more difficult or costly for us to drill and produce from conventional and tight formations as well as make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings.

Further federal, state and/or local laws governing hydraulic fracturing could result in additional permitting and financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements and also to attendant permitting delays and potential increases in costs. Such changes could cause us to incur substantial compliance costs, and compliance or the consequences of failure to comply by us could have a material adverse effect on our financial condition and results of operations. At this time, it is not possible to estimate the potential impact on our business that may arise if additional federal or state and/or local laws are enacted.

***Air Emissions***

The federal Clean Air Act, as amended, or the CAA, and comparable state laws, regulate emissions of various air pollutants through air emissions standards, construction and operating permitting programs and the imposition of other compliance requirements. In addition, the EPA has developed, and continues to develop, stringent regulations governing emissions of toxic air pollutants at specified sources. On August 16, 2012, the EPA published final rules that subject oil and natural gas production, processing, transmission, and storage operations to regulation under the New Source Performance Standards (“NSPS”) and National Emission Standards for Hazardous Air Pollutants (“NESHAP”) programs. The rule includes NSPS for completions of hydraulically fractured gas wells and establishes specific new requirements for emissions from compressors, controllers, dehydrators, storage vessels, natural gas processing plants and certain other equipment. The final rule seeks to achieve a 95% reduction in Volatile Organic Compounds (“VOCs”) emitted by requiring the use of reduced emission completions or "green completions" on all hydraulically fractured wells constructed or refractured after January 1, 2015. The EPA received numerous requests for reconsideration of these rules from both industry and the environmental community, and court challenges to the rules were also filed. In response, the

Case 4:19-34508 Document 1354-17 Filed 07/22/20 Page 41 of 175

EPA has issued, and will likely continue to issue, revised rules responsive to some of the requests for reconsideration. In particular, on May 12, 2016, the EPA amended its regulations to impose new standards for methane and VOC emissions for certain new, modified, and reconstructed equipment, processes, and activities across the oil and natural gas sector. On the same day, the EPA finalized a plan to implement its minor new source review program in Indian country for oil and natural gas production, and it issued for public comment an information request that will require companies to provide extensive information instrumental for the development of regulations to reduce methane emissions from existing oil and gas sources.

Also, on November 15, 2016, the BLM finalized a rule to reduce the flaring, venting and leaking of methane from oil and gas operations on federal and Indian lands. The rule requires operators to use currently available technologies and equipment to reduce flaring, periodically inspect their operations for leaks, and replace outdated equipment that vents large quantities of gas into the air. The rule also clarifies when operators owe the government royalties for flared gas. State and industry groups have challenged this rule in federal court, asserting that the BLM lacks authority to prescribe air quality regulations. In addition, Congress has taken certain initial steps to repeal the rule pursuant to the Congressional Review Act, though it remains uncertain whether the rule will ultimately be repealed.

These laws and regulations may require us to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain and strictly comply with stringent air permit requirements or utilize specific equipment or technologies to control emissions. The need to obtain permits has the potential to delay the development of oil and natural gas projects, and our failure to comply with these requirements could subject us to monetary penalties, injunctions, conditions or restrictions on operations and, potentially, criminal enforcement actions. While we may be required to incur certain capital expenditures in the next few years for air pollution control equipment or other air emissions-related issues, we do not believe that such requirements will have a material adverse effect on our operations.

***Climate Change***

In recent years, federal, state and local governments have taken steps to reduce emissions of GHGs. The EPA has finalized a series of GHG monitoring, reporting and emission control rules for the oil and natural gas industry, and the U.S. Congress has, from time to time, considered adopting legislation to reduce emissions. Almost one-half of the states have already taken measures to reduce emissions of GHGs primarily through the development of GHG emission inventories and/or regional GHG cap-and-trade programs.

Furthermore, in December 2015, the United States participated in the 21st Conference of the Parties (COP-21) of the United Nations Framework Convention on Climate Change in Paris, France. The resulting Paris Agreement calls for the parties to undertake “ambitious efforts” to limit the average global temperature, and to conserve and enhance sinks and reservoirs of GHGs. The Agreement went into effect on November 4, 2016 and establishes a framework for the parties to cooperate and report actions to reduce GHG emissions. Also, on June 29, 2016, the leaders of the United States, Canada and Mexico announced an Action Plan to, among other things, boost clean energy, improve energy efficiency, and reduce greenhouse gas emissions. The Action Plan specifically calls for a reduction in methane emissions from the oil and gas sector by 40 to 45 percent by 2025. It remains unclear whether and how the results of the 2016 U.S. election could impact the regulation of greenhouse gas emissions at the federal and state level.

Restrictions on GHG emissions that may be imposed could adversely affect the oil and natural gas industry. The adoption of any legislation or regulations that otherwise limit emissions of GHGs from our equipment and operations, could require us to incur increased operating costs to monitor and report on GHG emissions or reduce emissions of GHGs associated with our operations, such as costs to purchase and operate emissions control systems, to acquire emissions allowances or comply with new regulatory requirements. Any GHG emissions legislation or regulatory programs applicable to power plants or refineries could also increase the cost of consuming, and thereby adversely affect demand for the oil and natural gas that we produce. Consequently, legislation and regulatory programs to reduce GHG emissions could have an adverse effect on our business, financial condition and results of operations.

In addition, claims have been made against certain energy companies alleging that GHG emissions from oil and natural gas operations constitute a public nuisance under federal and/or state common law. As a result, private individuals may seek to enforce environmental laws and regulations against

us and could allege personal injury or

property damages. While our business is not a party to any such litigation, we could be named in actions making similar allegations. An unfavorable ruling in any such case could significantly impact our operations and could have an adverse impact on our financial condition.

Moreover, there has been public discussion that climate change may be associated with extreme weather conditions such as more intense hurricanes, thunderstorms, tornados and snow or ice storms, as well as rising sea levels. Another possible consequence of climate change is increased volatility in seasonal temperatures. Some studies indicate that climate change could cause some areas to experience temperatures substantially colder than their historical averages. Extreme weather conditions can interfere with our production and increase our costs and damage resulting from extreme weather may not be fully insured. However, at this time, we are unable to determine the extent to which climate change may lead to increased storm or weather hazards affecting our operations.

***National Environmental Policy Act***

Oil and natural gas exploration, development and production activities on federal lands are subject to the National Environmental Policy Act, as amended, or NEPA. NEPA requires federal agencies, including the DOI, to evaluate major agency actions having the potential to significantly impact the environment. In the course of such evaluations, an agency will prepare an Environmental Assessment to evaluate the potential direct, indirect and cumulative impacts of a proposed project and, if necessary, will prepare a more detailed Environmental Impact Statement that may be made available for public review and comment. Currently, we have minimal exploration and production activities on federal lands. However, to the extent our current or future activities on federal lands are subject to the requirements of NEPA, this process has the potential to delay the receipt of governmental permits and the development of oil and natural gas projects. Authorizations under NEPA also are subject to protest, appeal or litigation, which can delay or halt projects.

***Endangered Species Act***

The Federal Endangered Species Act, or the ESA, and analogous state statutes restrict activities that may adversely threatened or endangered species or their habitat. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. Federal agencies are required to insure that any action authorized, funded or carried out by them is not likely to jeopardize the continued existence of listed species or modify their critical habitat. While some of our facilities on federal lands may be located in areas that are designated as habitat for endangered or threatened species, we believe that we are in substantial compliance with the ESA. The U.S. Fish and Wildlife Service may identify, however, previously unidentified endangered or threatened species or may designate critical habitat and suitable habitat areas that it believes are necessary for survival of a threatened or endangered species, which could cause us to incur additional costs or become subject to operating restrictions or bans in the affected areas.

***Occupational Safety and Health Act***

We are also subject to the requirements of OSHA and comparable state laws that regulate the protection of the health and safety of employees. In addition, OSHA's hazard communication standard requires that information be maintained about hazardous materials used or produced in our operations and that this information be provided to employees, state and local government authorities and citizens. We believe that our operations are in substantial compliance with the OSHA requirements.

***Other Regulation of the Oil and Natural Gas Industry***

The oil and natural gas industry is extensively regulated by numerous federal, state and local authorities. Legislation affecting the oil and natural gas industry is under constant review for amendment or expansion, frequently increasing the regulatory burden. Additionally, numerous departments and agencies, both federal and state, are authorized by statute to issue rules and regulations that are binding on the oil and natural gas industry and its individual members, some of which carry substantial penalties for failure to comply. Although the regulatory burden on the oil and natural gas industry increases our cost of doing business and, consequently, affects our profitability, these burdens generally do not affect us any differently or to any greater or lesser extent than they affect other companies in the oil and natural gas industry with similar types, quantities and locations of production.

***Drilling and Production***

Our operations are subject to various types of regulation at federal, state and local levels. These types of regulation include requiring permits for the drilling of wells, drilling bonds and reports concerning operations. Most states, and some counties and municipalities, in which we operate also regulate one or more of the following:

- the location of wells;
- the method of drilling and casing wells;
- the disclosure of the chemicals used in the hydraulic fracturing process;
- the surface use and restoration of properties upon which wells are drilled;
- the plugging and abandoning of wells; and
- notice to surface owners and other third parties.

State laws regulate the size and shape of drilling and spacing units or proration units governing the pooling of oil and natural gas properties. Some states allow forced pooling or integration of tracts to facilitate exploration, while other states rely on voluntary pooling of lands and leases. In some instances, forced pooling or unitization may be implemented by third parties and may reduce our interest in the unitized properties. In addition, state conservation laws establish maximum rates of production from oil and natural gas wells, generally prohibit the venting or flaring of natural gas and impose requirements regarding the ratability of production. These laws and regulations may limit the amount of oil and natural gas we can produce from our wells or limit the number of wells or the locations at which we can drill. Moreover, each state generally imposes a production or severance tax with respect to the production and sale of oil, natural gas and NGLs within its jurisdiction.

***Natural Gas Regulation***

The availability, terms and cost of transportation significantly affect sales of natural gas. The interstate transportation and sale for resale of natural gas is subject to federal regulation, including regulation of the terms, conditions and rates for interstate transportation, storage and various other matters, primarily by the Federal Energy Regulatory Commission, or FERC. Federal and state regulations govern the price and terms for access to natural gas pipeline transportation. FERC's regulations for interstate natural gas transmission in some circumstances may also affect the intrastate transportation of natural gas.

The FERC also possesses regulatory oversight over natural gas markets, including the purchase, sale and transportation activities of non-interstate pipelines and other natural gas market participants. FERC possesses substantial enforcement authority for violations of the Natural Gas Act, or NGA, including the ability to assess civil penalties, order disgorgement of profits and recommend criminal penalties. The Energy Policy Act of 2005 amended the NGA to grant FERC new authority to facilitate price transparency in markets for the sale or transportation of physical natural gas in interstate commerce, and to prohibit market manipulation. FERC's anti-manipulation regulations apply to FERC jurisdictional activities, which have been broadly construed by the FERC. Should we fail to comply with all applicable FERC-administered statutes, rules, regulations and orders, we could be subject to substantial civil and criminal penalties, including civil penalties of up to $1.0 million per day, per violation.

In 2008, FERC took additional steps to enhance its market oversight and monitoring of the natural gas industry. Order No. 704, as clarified in orders on rehearing, requires buyers and sellers of natural gas above a de minimis level, including entities not otherwise subject to FERC jurisdiction, to submit an annual report to FERC describing their wholesale physical natural gas transactions that use an index or that contribute to or may contribute to the formation of a gas index. The FERC also contemplated expanding the industry's reporting requirements. On November 15, 2012, the FERC issued a Notice of Inquiry seeking comments whether requiring quarterly reporting of every gas transaction within the FERC's jurisdiction that entails physical

delivery for the next day or the next month would provide useful information for improving natural gas market transparency. The FERC ultimately determined that imposing a quarterly

reporting requirement is not necessary at this time and exercised its discretion to terminate the Notice of Inquiry on November 17, 2015.

Although natural gas prices are currently unregulated, The U.S. Congress historically has been active in the area of natural gas regulation. We cannot predict whether new legislation to regulate natural gas might be proposed, what proposals, if any, might actually be enacted by The U.S. Congress or the various state legislatures, and what effect, if any, the proposals might have on the operations of our properties. Sales of condensate and NGLs are not currently regulated and are made at market prices.

***State Regulation***

The various states regulate the drilling for, and the production, gathering and sale of, oil and natural gas, including imposing severance taxes and requirements for obtaining drilling permits. For example, Texas currently imposes a 4.6% severance tax on oil production and a 7.5% severance tax on natural gas production. States also regulate the method of developing new fields, the spacing and operation of wells and the prevention of waste of natural gas resources. States may regulate rates of production and may establish maximum daily production allowables from natural gas wells based on market demand or resource conservation, or both. States do not regulate wellhead prices or engage in other similar direct economic regulation, but there can be no assurance that they will not do so in the future. The effect of these regulations may be to limit the amount of natural gas that may be produced from our wells and to limit the number of wells or locations we can drill.

The oil and natural gas industry is also subject to compliance with various other federal, state and local regulations and laws. Some of those laws relate to resource conservation and equal employment opportunity. We do not believe that compliance with these laws will have a material adverse effect on us.

**Employees**

We currently do not have any employees. Pursuant to our Services Agreement with SOG (the "Services Agreement"), SOG performs services for us, including the operation of our properties. Please also read "Item 8. Financial Statements and Supplementary Data —Note 9, Related Party Transactions." As of December 31, 2016, SOG had approximately 235 employees, including 27 engineers, 13 geoscientists and 13 land professionals. None of these employees are represented by labor unions or covered by any collective bargaining agreement. We believe that SOG's relations with its employees are satisfactory.

We also contract for the services of independent consultants involved in land, engineering, regulatory, accounting, financial and other disciplines as needed.

**Offices**

For our principal offices, we currently share offices with other members of the Sanchez Group under leases entered into by the Company covering approximately 90,000 square feet of office space in Houston, Texas at 1000 Main Street, Suite 3000, Houston, Texas 77002, expiring in 2025. In addition, SOG maintains offices in Laredo and San Antonio, Texas.

**Available Information**

We are required to file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any documents filed by us with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Our filings with the SEC are also available to the public from commercial document retrieval services and at the SEC's website at http://www.sec.gov.

Our common stock is listed and traded on the New York Stock Exchange ("NYSE") under the symbol "SN." Our reports, proxy statements and other information filed with the SEC can also be inspected and copied at the New York Stock Exchange, 20 Broad Street, New York, New York 10005.

We also make available on our website at http://www.sanchezenergycorp.com all of the documents that we file with the SEC, free of charge, as soon as reasonably practicable after we electronically file such material with the SEC. Information contained on our website is not incorporated by reference into this Annual Report on Form 10-K.

**Item 1A.** ***Risk Factors***

*Our business involves a high degree of risk. You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Annual Report on Form 10-K, including the financial statements and the related notes appearing at the end of this Annual Report on Form 10-K. If any of the following risks, or any risk described elsewhere in this Annual Report on Form 10-K, actually occurs, our business, business prospects, financial condition, results of operations or cash flows could be materially adversely affected. The risks below are not the only ones facing the Company. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. This Annual Report on Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below. Also, please read "Cautionary Note Regarding Forward-Looking Statements."*

**Risks Related to Our Business**

***Market conditions for oil, natural gas and NGLs are highly volatile. A sustained decline in prices for these commodities could adversely affect our revenue, cash flows, profitability and growth.***

Prices for oil, natural gas and NGLs fluctuate widely in response to a variety of factors that are beyond our control, such as:

- domestic and foreign supply of and demand for oil, natural gas and NGLs;
- weather conditions and the occurrence of natural disasters;
- overall domestic and global economic conditions;
- political and economic conditions in oil, natural gas and NGL producing countries globally, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;
- actions of OPEC and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on oil, natural gas and NGL prices;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting our ability to apply hydraulic fracturing to our wells, and taxation;

- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of oil, natural gas and NGL pipelines and other transportation facilities;

- the availability of refining capacity; and

- the price and availability of, and consumer demand for, alternative fuels.

Governmental actions may also affect oil, natural gas and NGL prices. It is uncertain what impact the election of President Trump and the new Congress may have on the exploration for and production of oil, natural gas and NGLs. In the past, oil, natural gas and NGL prices have been extremely volatile, and we expect this volatility to continue. Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. The West Texas Intermediate posted price used to calculate the full cost ceiling in accordance with SEC rules declined from an annual high of $105.34 per Boe on July 1, 2014 to $69.00 per Boe on December 1, 2014, $41.85 per Boe on December 1, 2015 and $31.62 per Boe on February 1, 2016. Such volatility has negatively affected the amount of our net estimated proved reserves and has negatively affected the standardized measure of discounted future net cash flows of our net estimated proved reserves. We recorded a full cost ceiling test impairment after income taxes of $169 million for the year ended December 31, 2016, and we recorded a full cost ceiling impairment test impairment after income taxes of $1,365 million for the year ended December 31, 2015. The impact of lower commodity prices adversely affecting proved reserve values primarily contributed to the ceiling impairment. Changes in production rates, prices, levels of reserves, future development costs, transfers of unevaluated properties, and other factors will determine our actual ceiling test calculation and impairment analyses in future periods. The 12-month average commodity price could continue to decline, which could result in additional impairments being recorded during 2017.

In addition, our revenue, profitability and cash flow depend upon the prices of and demand for oil, natural gas and NGL reserves, and continued price volatility and low commodity prices, or a sustained drop in prices could negatively affect our financial results and impede our growth. In particular, sustained declines in commodity prices will:

- limit our ability to enter into commodity derivative contracts at attractive prices;

- reduce the value and quantities of our reserves, because declines in oil, natural gas and NGL prices would reduce the amount of oil, natural gas and NGLs that we can economically produce;

- reduce the amount of cash flow available for capital expenditures;

- limit our ability to borrow money or raise additional capital; and

- make it uneconomical for our operating partners to commence or continue production levels of oil, natural gas and NGLs.

***An increase in the differential between the NYMEX or other benchmark prices of oil, natural gas and NGLs and the wellhead price we receive for our production could adversely affect our business, financial condition and results of operations.***

The prices that we receive for our oil, natural gas and NGL production sometimes reflect differences between the relevant benchmark prices, such as NYMEX, that are used for calculating hedge positions. The difference between the benchmark price and the price we receive is called a basis differential. Increases in the basis differential between the benchmark prices for oil, natural gas and NGLs and the wellhead price we receive could adversely affect our business, financial condition and results of operations. We do not have or currently plan to have any commodity derivative contracts covering the amount of the basis differentials we experience in respect of our production. As such, we will be exposed to any increase in such differentials, which could adversely affect our business, financial condition and results of operations.

As of February 27, 2017, we had commodity derivative contracts in place covering approximately 36% and 98% of the mid-point of our estimated oil and natural gas production, respectively, for 2017. The contracts consist of swaps and put spreads covering crude oil and natural gas

production. In the future, we expect to continue to enter into commodity derivative contracts for a portion of our estimated production, which could result in net gains or losses on commodity derivatives. Our hedging strategy and future hedging transactions will be determined by our management,

which is not under any obligation to enter into commodity derivative contracts covering any specific portion of our production.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon oil, natural gas and NGL prices at the time we enter into these transactions, which may be substantially higher or lower than past or current oil, natural gas and NGL prices. Accordingly, our price hedging strategy may not protect us from significant declines in oil, natural gas and NGL prices realized for our future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases. As such, our hedging strategy may not protect us from changes in oil, natural gas and NGL prices that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

***Lower oil, natural gas and NGL prices have caused us to record ceiling limitation impairments, reducing our earnings and our stockholders' equity and further declines in commodity prices may cause us to record further impairments, which would reduce our earnings and stockholders' equity.***

We use the full-cost method of accounting and accordingly, we capitalize all costs associated with the acquisition, exploration and development of oil, natural gas and NGL properties, including unproved and unevaluated property costs. Under full cost accounting rules, the net capitalized cost of oil, natural gas and NGL properties may not exceed a "ceiling limit" that is based upon the present value of estimated future net revenues from net proved reserves, discounted at 10%, plus the lower of the cost or fair market value of unproved properties and other adjustments as required by SEC rules. If net capitalized costs of oil, natural gas and NGL properties exceed the ceiling limit, we must charge the amount of the excess to earnings, which could have a material adverse effect on our results of operations for the periods in which such charges are taken. This is called a "ceiling limitation impairment." The risk that we will experience a ceiling limitation impairment increases when oil, natural gas or NGL prices are depressed as in the current environment, if we have substantial downward revisions in estimated net proved reserves or if estimates of future development costs increase significantly. Based upon current price trends we could experience ceiling limitation impairments in future periods.

Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. Given this decline in commodity prices, the net book value of our oil and natural gas properties exceeded our ceiling amount using the WTI unweighted 12-month average price adjusted by lease for quality, transportation fees, geographical differentials, marketing bonuses or deductions and other factors affecting the price realized at the wellhead, resulting in a total write-downs of our oil and natural gas properties of $1,365 million after income taxes during 2015 and $169.0 million after income taxes during 2016. As ceiling test computations depend upon the calculated unweighted arithmetic average prices, it is difficult to predict the likelihood, timing and magnitude of any future impairments. However, a decline in 12-month average commodity prices could result in additional impairments recorded during 2017. A ceiling test write down would negatively affect our results of operations.

Costs associated with unevaluated properties are not initially subject to the ceiling test limitation. Rather, we assess all items classified as unevaluated property on a quarterly basis for possible impairment or reduction in value based upon our intentions, as approved by our board of directors and management, with respect to drilling on such properties, the remaining lease term, geological and geophysical evaluations, drilling results, the assignment of proved reserves, and the economic viability of development if proved reserves are assigned. These factors are significantly influenced by our expectations regarding future commodity prices, development costs, and access to capital at acceptable cost. During any period in which these factors indicate impairment, the cumulative drilling costs incurred to date for such property and all or a portion of the associated leasehold costs are transferred to the full cost pool and are then subject to amortization and the ceiling test limitation. Accordingly, a significant change in these factors, many of which are beyond our control, may shift a significant amount of cost from unevaluated properties into the full cost pool that is subject to amortization and the ceiling test limitation.

Lower oil and natural gas prices also reduces the amount of oil and natural gas that we can produce economically. Substantial and sustained decreases in oil and natural gas prices would render uneconomic a significant portion of our development and exploitation projects. This may result in our having to make downward adjustments to our estimated proved reserves. As a result, substantial and sustained declines in oil and natural gas prices may materially

and adversely affect our future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.

***The Company's derivative risk management activities could result in financial losses.***

To mitigate the effect of commodity price volatility on the Company's net cash provided by operating activities, support the Company's annual capital budgeting and expenditure plans and reduce commodity price risk associated with certain capital projects, the Company's strategy is to enter into derivative arrangements covering a portion of its oil, NGL and natural gas production. These derivative arrangements are subject to mark-to-market accounting treatment, and the changes in fair market value of the contracts are reported in the Company's statements of operations each quarter, which may result in significant non-cash gains or losses. After the current hedges expire, there is significant uncertainty that we will be able to put new hedges in place that will provide us with the same benefit. These derivative contracts may also expose the Company to risk of financial loss in certain circumstances, including when:

- production is less than the contracted derivative volumes, in which case we might be forced to satisfy all or a portion of our hedging obligations without the benefit of the cash flow from our sale of the underlying physical commodity;
- the counterparty to the derivative contract defaults on its contractual obligations;
- there is a widening of price basis differentials between delivery points for our production and the delivery point assumed in the hedge instrument; or
- the derivative contracts limit the benefit the Company would otherwise receive from increases in commodity prices.

Such financial losses could materially impact our liquidity, business, financial condition and results of operations.

***There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.***

On January 12, 2017, the Company, through two of our subsidiaries, SN EF UnSub, LP ("SN UnSub") and SN EF Maverick, LLC ("SN Maverick"), along with an entity controlled by The Blackstone Group, L.P., Gavilan Resources, LLC ("Blackstone"), signed a purchase and sale agreement (the "Comanche Purchase Agreement") to acquire assets (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") for $2,275 million in cash, subject to customary closing adjustments (the "Comanche Acquisition"). The consummation of the Comanche Acquisition is subject to certain closing conditions, including conditions that must be met by Anadarko and that are beyond our control. In addition, under certain circumstances, we, Blackstone or Anadarko are able to terminate the Comanche Purchase Agreement. In addition, we may be required to seek or utilize additional or other financing sources to consummate the Comanche Acquisition, if we do not have sufficient liquidity at closing or if our anticipated financing sources, including the preferred unit investment by affiliates of GSO Capital Partners LP (individually or collectively, as the context requires, "GSO") in SN UnSub or the credit facility to be entered into by SN UnSub at the closing of the Comanche Acquisition, are not available, and we cannot assure you that such additional or other financing sources will be available on terms acceptable to us, or at all. There can be no assurances that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.

If the Comanche Acquisition is not consummated, under certain circumstances, we may be required to forfeit our approximate $56.9 million deposit under the Comanche Purchase Agreement. Furthermore, our stock price could be negatively impacted if we fail to complete the Comanche Acquisition.

007970

Case 4:23-cv-00587 Document 1-1 Filed 07/19/23 Page 61 of 235

There are a number of risks and uncertainties relating to the Comanche Acquisition. There can be no assurance that events will not intervene to delay or result in the failure to close the Comanche Acquisition. In addition, we, Blackstone and Anadarko have the ability to terminate the Comanche Purchase Agreement under certain circumstances. Failure to complete the Comanche Acquisition would prevent us from realizing the anticipated benefits of the Comanche Acquisition. We would also remain liable for significant transaction costs, including legal, accounting and financial advisory fees. In addition, the market price of our common stock may reflect various market assumptions as to whether the Comanche Acquisition will be completed. Consequently, the failure to complete or any delay in the closing of the Comanche Acquisition could result in a significant change in the market price of our common stock.

***The Comanche Acquisition or any other acquisition we may undertake involve risks associated with acquisitions and integration of acquired assets, and the intended benefits of the Comanche Acquisition or any other acquisition we may undertake may not be realized.***

The Comanche Acquisition or any other acquisition we may undertake involve risks associated with acquisitions and integrating acquired assets into existing operations, including that:

- our senior management's attention may be diverted from the management of daily operations of Catarina and our other legacy assets to the integration of the assets acquired in the Comanche Acquisition;

- we could incur significant unknown and contingent liabilities for which we have limited or no contractual remedies or insurance coverage;

- we may be unable to achieve the economies of scale that we expect from integrating the Comanche Assets or any other assets we may acquire into our existing operations;

- the assets acquired in the Comanche Acquisition or any other acquisition we may undertake may not perform as well as we anticipate; and

- unexpected costs, delays and challenges may arise in integrating the assets acquired in the Comanche Acquisition or any other acquisition we may undertake into our existing operations.

Even if we successfully integrate the assets acquired in the Comanche Acquisition or any other acquisition we may undertake into our operations, it may not be possible to realize the full benefits we anticipate or we may not realize these benefits within the expected timeframe. If we fail to realize the benefits we anticipate from the Comanche Acquisition or any other acquisition we may undertake, our business, results of operations and financial condition may be adversely affected.

***Under the terms of the lease with respect to the Catarina assets and under the terms of the Comanche Development Agreement, we are subject to annual drilling and development requirements and failure to comply with these requirements may result in loss of our interests in the Catarina area that are not held by production or sizable default payments to Anadarko, respectively.***

In order to protect our exploration and development rights in the Catarina area, we are required to drill 50 wells per year (measured from July 1 to June 30). If we fail to meet the minimum drilling commitment under the terms of the Catarina Lease, we could forfeit our acreage under the Catarina Lease and rights to develop land not held by production (excluding, in certain instances, associated rights such as midstream assets). If we drill more than 50 wells in a prescribed twelve month period, we may apply such additional wells (up to a maximum of 30 additional wells) toward the following prescribed twelve month period's 50-well requirements. In addition, the Catarina Lease requires us to go no longer than 120 days without spudding a well, and, under the terms of the Catarina Lease, failure to do so could result in the forfeiture of our acreage under the Catarina Lease and rights to develop land not held by production (excluding, in certain instances, acreage upon which associated midstream assets are located). Our drilling plans for our undeveloped leasehold acreage are subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs,

availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we cannot assure you that we will be able meet our obligations under the Catarina Lease. If the Catarina Lease expires, we will lose our right to develop the related properties on this acreage, which could adversely affect our business, financial condition and results of operations.

At the closing of the Comanche Acquisition, we will enter into a development agreement (the "Development Agreement") with Anadarko pursuant to which we will commit to completing and equipping 60 wells per year for 5 years. If we complete and equip more than 60 wells in a year, we may apply such additional wells (up to a maximum of 30 additional wells) toward the following years' 60-well requirements. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we must pay Anadarko a default fee of $200,000 for each well we fail to timely complete and equip. The drilling plan is subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we cannot assure you that we will be able meet our obligations under the Development Agreement following the closing of the Comanche Acquisition.

***Our agreements with Blackstone and GSO will restrict us from transferring our right, title and interest to the Comanche Assets.***

At the closing of the Comanche Acquisition, we will enter into a joint development agreement with Blackstone (the "JDA") that provides for the administration, operation and transfer of the jointly-owned Comanche Assets.  Under the terms of the JDA, except under limited circumstances, neither we nor Blackstone can transfer any of our rights, title or interest to any asset or related assets (including any working interests) prior to the third anniversary of the JDA.  In addition, under our agreements with GSO, following the closing of the Comanche Acquisition, we will not be able to dispose of all or a substantial portion of the Comanche Assets without GSO's consent.  These restrictions may prohibit us from taking advantage of certain opportunities, including our ability to sell these assets, which may arise from time to time.

***The JDA will contain right of first offer ("ROFO") and tag-along provisions that may hinder our ability to sell our interest in the Comanche Assets within our desired time frame or on our desired terms, and could delay or prevent an acquisition of us, even if the acquisition would be beneficial to our stockholders.***

Under the terms of the JDA, both parties have a ROFO in the event that the other party intends to sell or otherwise transfer its interests.  In addition, the JDA provides both parties with a tag-along right in the event that the other party intends to sell at least 35% of its total interests to a third-party purchaser (including upon a change of control transaction involving us). These features could limit third-party offers, inhibit our ability to sell our interests or adversely affect the timing of any sale of our interests and our ability to obtain the highest price possible in the event that we decide to market or sell our interests. In addition, the tag-along provisions of the JDA may also frustrate or prevent any attempts by our stockholders or a third party to replace or remove our current management or to acquire an interest in or engage in other corporate transactions with us, by subjecting certain corporate change of control transactions to a tag-along provision pursuant to which a third party may be required to acquire Blackstone's interest in the Comanche Assets if it desires to enter into a corporate transaction with us.

***Upon closing the Comanche Acquisition, we will enter into the JDA with Blackstone and amend and restate the limited partnership agreement of one of our subsidiaries, SN UnSub and the limited liability company agreement of SN UnSub's general partner, SN EF UnSub GP, LLC, to admit GSO as a limited partner and member, respectively, therein, which involves risk.***

At the closing of the transactions contemplated by the Comanche Acquisition, we will enter into the JDA that provides for the administration, operation and transfer of the jointly-owned Comanche Assets. The JDA provides for the parties to establish an operating committee, which will control the timing, scope and budgeting of operations on the Comanche Assets (subject to certain exceptions). Although we will be designated as operator of the Comanche Assets

under the JDA, under certain circumstances we may be removed as operator and, furthermore, because we will not control the operating committee we will not have unilateral control over many key variables of the operation and development of the Comanche Assets, including the establishment of the budget and development plan for the Comanche Assets. There can be no assurance that Blackstone will continue its relationship with us in the future or that we will be able to pursue our stated strategies with respect to the Comanche Assets. Furthermore, Blackstone may (a) have economic or business interests or goals that are inconsistent with ours; (b) take actions contrary to our policies or objectives; (c) undergo a change of control; (d) experience financial and other difficulties; or (e) be unable or unwilling to fulfill their obligations under the JDA, which may affect our financial conditions or results of operations.

Under the amended and restated limited partnership agreement of SN UnSub and limited liability company agreement of SN UnSub's general partner, we will not be able to cause SN UnSub or its general partner to take or not to take certain actions unless GSO consents. GSO has committed to make a substantial investment (including contributions and other commitments) in SN UnSub at the closing of the Comanche Acquisition and, accordingly, has required that the relevant organizational documents of SN UnSub and its general partner contain certain features designed to provide it with the opportunity to participate in the management of SN UnSub and its general partner and to protect its investment in SN UnSub, as well as any other assets which may be substantially dependent on or otherwise affected by the activities of SN UnSub. These participation and protective features include a governance structure that consists of a board of directors of SN UnSub's general partner, only some of whom are appointed by us. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources."

In addition, at the closing of the Comanche Acquisition, we expect that SN UnSub, which is an "unrestricted subsidiary" (as further described in "Item 8. Financial Statements and Supplementary Data —Note 5. Long Term Debt"), will have entered into a $330 million senior secured reserve-based revolving credit facility with JPMorgan Chase Bank, N.A., Citibank, N.A. and certain of their affiliates (the "SN UnSub Credit Facility") or other alternate "stand alone" financing arrangement, which will limit its freedom to take certain actions. Thus, without the concurrence of GSO and/or the lenders under the SN UnSub Credit Facility or other financing arrangements, we will not be able to cause SN UnSub and its general partner to take or not to take certain actions, even though those actions may be in the best interest of SN UnSub, its general partner, or us. Furthermore, we, SN UnSub's lenders, GSO and Blackstone may have different or conflicting goals or interests which could make it more difficult or time-consuming to obtain any necessary approvals or consents to pursue activities that we believe to be in the best interests of our stockholders. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources."

***Our estimated reserves and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves.***

Numerous uncertainties are inherent in estimating quantities of oil, natural gas and NGL reserves and future production. It is not possible to measure underground accumulations of oil, natural gas and NGLs in an exact way. Oil, natural gas and NGL reserve engineering is complex, requiring subjective estimates of underground accumulations of oil, natural gas and NGLs and assumptions concerning future oil, natural gas and NGL prices, future production levels and operating and development costs. In estimating our level of oil, natural gas and NGL reserves, we and our independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- the level of oil, natural gas and NGL prices;
- future production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;

- the accuracy and reliability of the underlying engineering and geologic data; and
- the availability of funds.

If these assumptions prove to be incorrect, our estimates of our reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery and our estimates of the future net cash flows from our estimated reserves could change significantly. For example, with other factors held constant, if the commodity prices used in our reserve report as of December 31, 2016 had decreased by 10%, then the standardized measure of our estimated proved reserves as of that date would have decreased by approximately $216.7 million, from approximately $513.4 million to approximately $296.7 million.

Our standardized measure is calculated using unhedged oil, natural gas and NGL prices and is determined in accordance with the rules and regulations of the SEC. Over time, we may make material changes to reserve estimates to take into account changes in our assumptions and the results of actual development and production.

The reserve estimates we make for wells or fields that do not have a lengthy production history are less reliable than estimates for wells or fields with lengthy production histories. A lack of production history may contribute to inaccuracy in our estimates of proved reserves, future production rates and the timing of development expenditures.

***Our estimated oil, natural gas and NGL reserves will naturally decline over time, and we may be unable to develop, find or acquire additional reserves to replace our current and future production at acceptable costs, which would adversely affect our business, financial condition and results of operations.***

Our future oil, natural gas and NGL reserves, production volumes, and cash flow depend on our success in developing and exploiting our current reserves efficiently and finding or acquiring additional recoverable reserves economically. Our estimated oil, natural gas and NGL reserves will naturally decline over time as they are produced. Our success depends on our ability to economically develop, find or acquire additional reserves to replace our own current and future production. If we are unable to do so, or if expected development is delayed, reduced or cancelled, the average decline rates will likely increase.

***The pro forma financial statements for the Comanche Acquisition and Carrizo Disposition are presented for illustrative purposes only and may not be an indication of our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition.***

The pro forma financial statements for the Comanche Acquisition and Carrizo Disposition included in our Current Reports on Form 8-K filed January 31, 2017 and January 9, 2017, respectively, are presented for illustrative purposes only, are based on various adjustments and assumptions, many of which are preliminary, and may not be an indication of our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition. Our actual financial condition and results of operations following the Comanche Acquisition may not be consistent with, or evident from, these pro forma financial statements and other statements relating to the Comanche Acquisition or the Carrizo Disposition. In addition, the assumptions used in preparing the pro forma financial data and estimates may not prove to be accurate, and other factors may affect our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition. Therefore, investors should refer to our historical financial statements included in this Annual Report on Form 10-K when evaluating an investment in our common stock.

***Developing and producing oil, natural gas and NGLs are costly and high-risk activities with many uncertainties that could adversely affect our business, financial condition and results of operations.***

The cost of developing, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well. Additionally, drilling wells with no or sub-economic levels of oil, natural gas and NGL production (dry holes) will negatively impact our financial position. In addition, our use of 2D and 3D seismic data and visualization techniques to identify subsurface structures and hydrocarbon indicators do not enable the interpreter to

know whether hydrocarbons are, in fact, present in those structures and requires additional pre-development expenditures. Furthermore, our development and production operations may be curtailed, delayed or canceled as a result of other factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor or other services;
- composition of sour gas, including sulfur and mercaptan content;
- unexpected operational events and conditions;
- reductions in oil, natural gas and NGL prices;
- increases in severance taxes;
- adverse weather conditions and natural disasters;
- facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of our facilities and equipment due to the highly corrosive nature of sour gas;
- title problems;
- pipe or cement failures, casing collapses or other downhole failures;
- compliance with ever-changing environmental and other governmental requirements;
- environmental hazards, such as natural gas leaks, oil, natural gas and NGL spills, salt water spills, pipeline ruptures, discharges of toxic gases or other releases of hazardous substances;
- lost or damaged oilfield development and service tools;
- unusual or unexpected geological formations and pressure or irregularities in formations;
- loss of drilling fluid circulation;
- fires, blowouts, surface craterings and explosions;
- uncontrollable flows of oil, natural gas, NGL or well fluids;
- loss of leases due to incorrect payment of royalties;
- limited availability of financing at acceptable rates; and
- other hazards, including those associated with sour gas such as an accidental discharge of hydrogen sulfide gas, that could also result in personal injury and loss of life, pollution and suspension of operations.

Case 4:23-cv-00058 Document 13-7 Filed on 07/19/23 in TXSD Page 110 of 1759
Case 19-34508 Document 1354-7 Filed in TXSB on 05/22/20 Page 70 of 2759

If any of these factors were to occur with respect to a particular field, we could lose all or a part of our investment in the field, or we could fail to realize the expected benefits from the field, either of which could materially and adversely affect our business, financial condition and results of operations.

We routinely apply hydraulic fracturing techniques in many of our drilling and completion operations. Hydraulic fracturing has recently become subject to increased public scrutiny and recent changes in federal and state law, as well as proposed legislative changes, could significantly restrict the use of hydraulic fracturing. Such laws could make it more difficult or costly for us to perform fracturing to stimulate production from dense subsurface rock formations

and, in the event of local prohibitions against commercial production of natural gas, may preclude our ability to drill wells. In addition, such laws could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. If hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, our fracturing activities could become subject to additional permitting requirements and result in permitting delays, financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements, as well as potential increases in costs. Please read "—Federal and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays" and "Item 1. Business—Environmental Matters and Regulation—Water and Other Water Discharges and Spills."

Additionally, hydraulic fracturing, drilling, transportation and processing of hydrocarbons bear an inherent risk of loss of containment. Potential consequences include loss of reserves, loss of production, loss of economic value associated with the affected wellbore, contamination of soil, ground water, and surface water, as well as potential fines, penalties or damages associated with any of the foregoing consequences.

***Our acquisition, development and production operations require us to make substantial capital expenditures. Although we expect to fund our capital expenditure budget for 2017 using cash flow from operations and cash on hand, if our cash flow from operations turns out to be less than we currently expect and we are required, but are unable, to fund our remaining capital budget from other sources, such as borrowings under our credit facility and/or the issuance of debt or equity securities, our failure to obtain the funds that we need could have a material adverse effect on our business, financial condition and results of operations.***

The oil and natural gas industry in which we operate is capital intensive and we must make substantial capital expenditures in our business for the acquisition, development and production of oil, natural gas and NGL reserves. Our cash on hand, cash flows from operations, ability to borrow and access to capital markets are subject to a number of variables, many of which are beyond our control, including:

- our estimated proved oil, natural gas and NGL reserves;
- the amount of oil, natural gas and NGLs we produce;
- the prices at which we sell our production;
- the results of our hedging strategy;
- the costs of developing, producing, and transporting our oil, natural gas and NGL assets, including costs attributable to governmental regulation and taxation;
- our ability to acquire, locate and produce new reserves;
- fluctuations in our working capital needs;
- interest payments, debt service and dividend payment requirements;
- prevailing economic and capital markets conditions, especially for oil and gas companies;
- our financial condition; and
- the ability and willingness of banks and other lenders to lend to us.

Continued decreases in our revenues or the borrowing base under our revolving credit facility as a result of lower oil, NGL or natural gas prices, operating difficulties, declines in reserves or for any other reason, will adversely impact our ability to obtain the capital necessary to sustain our operations at current levels. In addition, we may be

unable to access the capital markets for debt or equity financing. If we are unsuccessful in obtaining the funds we need to fund our capital budget, we will be forced to reduce our capital expenditures, which in turn could lead to a decline in our production, revenues and our reserves, and could adversely affect our business, financial condition and results of operations.

***Our stock price has been volatile, and investors in our common stock could incur substantial losses.***

Our stock price has been volatile. For example, during the year ended December 31, 2016, our stock price had a low closing price of $2.29 per share and a high closing price per share of $9.78 per share. As a result of this volatility, investors may not be able to sell their common stock at or above the price at which they purchased their shares. The market price for our common stock may be influenced by many factors, including, but not limited to:

- the price of oil, NGLs and natural gas;
- the success of our exploration and development operations, and the marketing of any oil we produce;
- regulatory developments in the United States;
- the recruitment or departure of key personnel;
- quarterly or annual variations in our financial results or those of companies that are perceived to be similar to us;
- market conditions in the industries in which we compete and issuance of new or changed securities;
- analysts’ reports or recommendations;
- the failure of securities analysts to cover our common stock or changes in financial estimates by analysts;
- the inability to meet the financial estimates of analysts who follow our common stock;
- our issuance of any additional securities;
- investor perception of our company and of the industry in which we compete; and
- general economic, political and market conditions.

***Certain of our undeveloped leasehold acreage is subject to leases that will expire over the next several years unless production is established on units containing the acreage or the leases are extended.***

Certain of our undeveloped leasehold acreage is subject to leases that will expire unless production in paying quantities is established during their primary terms or we obtain extensions of the leases. Our drilling plans for our undeveloped leasehold acreage are subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we do not know if our undeveloped leasehold acreage will ever be drilled or if we will be able to produce crude oil, natural gas or NGLs from these or any other potential drilling locations. If our leases expire and we do not have them held by production, we will lose our right to develop the related properties on this acreage.

As of December 31, 2016, approximately 58% of our acreage was held by production. As of December 31, 2016, we have leases that were not held by production and not impaired representing 8,768 net acres (all which were in the Eagle Ford Shale) expiring in 2017, 15,539 net acres (all of which were in the Eagle Ford Shale) expiring in 2018, and 105,859 net acres (94,088 of which were in the Eagle Ford Shale) expiring in 2019 and beyond. While we anticipate that our current and future drilling plans will address the majority of our leases expiring in the Eagle Ford Shale in 2017, our actual drilling activities may materially differ from those presently identified, which could adversely affect our business, financial condition and results of operation.

***Our identified drilling location inventories are scheduled out over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.***

Our management has specifically identified and scheduled drilling locations as an estimation of our future drilling activities on our existing acreage. These identified drilling locations represent a significant part of our growth strategy. Our ability to drill and develop these locations depends on a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, oil, NGL and natural gas prices, costs and drilling results. Because of these uncertainties, we do not know if the numerous potential drilling locations we have identified will ever be drilled or if we will be able to produce oil, NGL or natural gas from these or any other potential drilling locations. As such, our actual drilling activities may materially differ from those presently identified, which could adversely affect our business, financial condition and results of operations.

***We may be unable to compete effectively with larger companies, which may adversely affect our ability to generate revenue.***

The oil and natural gas industry is intensely competitive with respect to acquiring prospects and properties, marketing oil, NGLs and natural gas, and securing equipment and trained personnel. Many of our competitors are large independent oil and natural gas companies that possess and employ financial, technical and personnel resources substantially greater than those of the Sanchez Group. Those entities may be able to develop and acquire more properties than our financial or personnel resources permit. Our ability to acquire additional properties and to discover reserves in the future will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Many of our larger competitors not only drill for and produce oil and natural gas but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for oil and natural gas properties and evaluate, bid for and purchase a greater number of properties than our financial, technical or personnel resources permit. In addition, there is substantial competition for investment capital in the oil and natural gas industry. These larger companies may have a greater ability to continue development activities during periods of low oil, NGL and natural gas prices and to absorb the burden of present and future federal, state, local and other laws and regulations. Furthermore, we may not be able to aggregate sufficient quantities of production to compete with larger companies that are able to sell greater volumes of production to intermediaries, thereby reducing the realized prices attributable to our production. Any inability to compete effectively with larger companies could have a material adverse impact on our business, financial condition and results of operations.

***Our operations are subject to operational hazards and unforeseen interruptions for which we may not be adequately insured.***

There are a variety of operating risks inherent in our wells and other operating properties and facilities, such as leaks, explosions, mechanical problems and natural disasters, all of which could cause substantial financial losses. Any of these or other similar occurrences could result in the disruption of our operations, substantial repair costs, personal injury or loss of human life, significant damage to property, environmental pollution, impairment of our operations and substantial revenue losses. The location of our wells and other operating properties and facilities near populated areas, including residential areas, commercial business centers and industrial sites, could significantly increase the level of damages resulting from these risks.

Insurance against all operational risks is not available to us. We are not fully insured against all risks, including development and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable. Additionally, we may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs or on commercially reasonable terms. Changes in the insurance markets due to weather, adverse economic conditions, and the aftermath of the Macondo well incident in the Gulf of Mexico have made it more difficult for us to obtain certain types of coverage. As a result, we may not be able to obtain the levels or types of insurance we would otherwise have obtained prior to these market changes,

and we cannot be sure the insurance coverage we do obtain will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on our business, financial condition and results of operations.

***Our lack of diversification increases the risk of an investment in us and we are vulnerable to risks associated with operating in one major contiguous area.***

Our current business focus is on the oil and natural gas industry in a limited number of properties, in the Eagle Ford Shale in South Texas and, to a lesser extent, the TMS in Southwest Mississippi and Southeast Louisiana. Larger companies have the ability to manage their risk by diversification. However, we currently lack diversification, in terms of both the nature and geographic scope of our business. For example, our Catarina assets, comprised of approximately 106,000 contiguous net acres in Dimmit, LaSalle and Webb Counties, Texas under the Catarina Lease (the "Catarina Lease"), represent approximately 90% of our proved reserves as of December 31, 2016, approximately 33% of our Eagle Ford acreage as of December 31, 2016 and, approximately 81% of our total production volumes for the year ended December 31, 2016. As a result, we will likely be impacted more acutely by factors affecting our industry or the regions in which we operate than we would if our business were more diversified, increasing our risk profile. In particular, we may be disproportionately exposed to the impact of delays or interruptions of production from wells in which we have an interest that are caused by transportation capacity constraints, curtailment of production, availability of equipment, facilities, personnel or services, significant governmental regulation, natural disasters, adverse weather conditions, plant closures for scheduled maintenance or interruption of transportation of oil or natural gas produced from wells in the Eagle Ford Shale. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***We cannot control activities on properties that we do not operate and are unable to control their proper operation and profitability.***

We do not operate all of the properties in which we own an ownership interest. As a result, we have limited ability to exercise influence over, and control the risks associated with, the operations of these non-operated properties. The failure of an operator of our wells to adequately perform operations, an operator's breach of the applicable agreements or an operator's failure to act in ways that are in our best interests could reduce our production, revenues and reserves. The success and timing of our drilling and development activities on properties operated by others therefore depend upon a number of factors outside of our control, including:

- the nature and timing of the operator's drilling and other activities;
- the timing and amount of required capital expenditures;
- the operator's geological and engineering expertise and financial resources;
- the approval of other participants in drilling wells; and
- the operator's selection of suitable technology.

***Our ability to produce oil and natural gas could be impaired if we are unable to acquire adequate supplies of water for our drilling and completion operations or are unable to dispose of the water we use at a reasonable cost and within applicable environmental rules.***

Water is an essential component of oil and natural gas production during both the drilling and hydraulic fracturing processes. Drought conditions have persisted in our areas of operation in past years. These drought conditions have led governmental authorities to restrict the use of water, subject to

their jurisdiction, for hydraulic fracturing to protect local water supplies. If we are unable to obtain water to use in our operations, we may be unable to economically

produce oil and natural gas, which could have a material and adverse effect on our financial condition, results of operations and cash flows.

Furthermore, the Clean Water Act imposes restrictions and strict controls regarding the discharge of produced waters and other oil and natural gas waste into navigable waters. In addition, the underground injection of fluids is subject to permitting and other requirements under state laws and regulation. Public concerns regarding the potential impacts to groundwater and induced seismic activity have resulted in new requirements related to the underground injection and disposal of fluids. The EPA is also examining regulatory requirements for "indirect dischargers" of wastewater – i.e., those that send their discharges to private or publicly owned treatment facilities, which treat the wastewater before discharging it to regulated waters. Compliance with environmental regulations and permit requirements governing the discharge of underground injection of fluids and the withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing of wells may increase our operating costs and cause delays, interruptions or termination of our operations, the extent of which cannot be predicted.

***We may lose our rights to the Sanchez Group's technological database, including its 3D and 2D seismic data, under certain circumstances.***

Pursuant to the Services Agreement, we have access to the unrestricted, proprietary portions of the technological database owned and maintained by the Sanchez Group and related to our properties, and SOG is otherwise required to interpret and use the database, to the extent relating to our properties, for our benefit under the Services Agreement. For a description of the Services Agreement see "Item 8. Financial Statements and Supplementary Data —Note 9, Related Party Transactions" in the notes to the consolidated financial statements in "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. This database includes the 2D and 3D seismic data used for our exploration and development projects as well as the well logs, LAS files, scanned well documents and other well documents and software that are necessary for our daily operations. This information is critical for the operation and expansion of our business. Under certain circumstances, including if SOG provides at least 180 days' advance written notice of its desire to terminate the Services Agreement, the license agreement will terminate and we will lose our rights to this technological database unless members of the Sanchez Group permit us to retain some or all of these rights, which they may decline to do in their sole discretion. In such event, we are unlikely to be able to obtain rights to similar information under substantially similar commercial terms or to continue our business operations as proposed and our liquidity, business, financial condition and results of operations will be materially and adversely affected and it could delay or prevent an acquisition of us.

***If we do not purchase additional acreage or make acquisitions on economically acceptable terms, our future growth will be limited.***

Our ability to grow depends in part on our ability to make acquisitions on economically acceptable terms. We may be unable to make such acquisitions because we are:

- unable to identify attractive acquisition candidates or negotiate acceptable purchase contracts with their owners;
- unable to obtain financing for such acquisitions on economically acceptable terms; or
- outbid by competitors.

If we are unable to acquire properties containing estimated proved reserves, our total level of estimated proved reserves will decline as a result of our production.

***Any acquisitions we complete or geographic expansions we undertake will be subject to substantial risks that could have a negative impact on our business, financial condition and results of operations.***

Any acquisition involves potential risks, including, among other things:

- mistaken assumptions about estimated proved reserves, future production, revenues, capital expenditures, operating expenses and costs, including synergies, timing of expected development and the potential for expiration of underlying leaseholds;

- an inability to successfully integrate the assets or businesses we acquire;

- a decrease in our liquidity by using a significant portion of our cash and cash equivalents to finance acquisitions;

- a significant increase in our interest expense or financial leverage if we incur debt to finance acquisitions;

- the assumption of unknown liabilities, losses or costs for which we are not indemnified or for which any indemnity we receive is inadequate;

- the diversion of management's attention from other business concerns;

- mistaken assumptions about the overall cost of equity or debt;

- an inability to hire, train or retain qualified personnel to manage and operate our growing business and assets;

- facts and circumstances that could give rise to significant cash and certain non-cash charges; and

- customer or key employee losses at the acquired businesses.

Further, we may in the future expand our operations into new geographic areas with operating conditions and a regulatory environment that may not be as familiar to us as our existing project areas. As a result, we may encounter obstacles that may cause us not to achieve the expected results of any such acquisitions, and any adverse conditions, regulations or developments related to any assets acquired in new geographic areas may have a negative impact on our business, financial condition and results of operations.

Our decision to acquire a property will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic data and other information, the results of which are often inconclusive and subject to various interpretations. Our reviews of acquired properties are inherently incomplete because it generally is not feasible to perform an in-depth review of the individual properties involved in each acquisition, given time constraints imposed by sellers. Even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit a buyer to become sufficiently familiar with the properties to assess fully their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as groundwater contamination, are not necessarily observable even when an inspection is undertaken.

***We adopted the Rights Plan, which though it was designed to preserve the value of our NOLs, may discourage the acquisition and sale of large blocks of our common stock and may result in significant dilution for certain stockholders.***

On July 28, 2015, the Company entered into a net operating loss carryforwards ("NOLs") rights plan (the "Rights Plan") designed to preserve stockholder value and the value of our NOLs by acting as a deterrent to any person acquiring beneficial ownership of 4.9% or more of the Company's outstanding common stock without the approval of our board of directors. The Rights Plan may discourage existing 5% common stockholders from selling their interest in a single block, which may impact the liquidity of the Company's common stock, may deter institutional investors from investing in our common stock, and may deter potential acquirers from making premium offers to acquire the Company, factors which may depress the market price of our common stock. We can make no assurances the Rights Plan will be effective in meeting its intended objectives, including to deter a change in control and protecting or realizing NOLs.

***If we were to experience an ownership change, we could be limited in our ability to use net operating losses arising prior to the ownership change to offset future taxable income.***

As of December 31, 2016, we had NOLs of $1,200.9 million. If we were to experience an “ownership change,” as determined under Section 382 of the Internal Revenue Code, our ability to offset taxable income arising after the ownership change with NOLs arising prior to the ownership change would be limited, possibly substantially. An ownership change would establish an annual limitation on the amount of our pre-change NOLs we could utilize to offset our taxable income in any future taxable year to an amount generally equal to the value of our stock immediately prior to the ownership change multiplied by the long-term tax-exempt rate. In general, an ownership change will occur if there is a cumulative increase in our ownership of more than 50 percentage points by one or more “5% shareholders” (as defined in the Internal Revenue Code) at any time during a rolling three-year period.

***Our business could be negatively impacted by security threats, including cyber-security threats, and other disruptions.***

As an oil and natural gas producer, we face various security threats, including cyber-security threats to gain unauthorized access to sensitive information or to render data or systems unusable, threats to the safety of our employees, threats to the security of our facilities and infrastructure or third-party facilities and infrastructure, such as processing plants and pipelines, and threats from terrorist acts. Cyber-security attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data, and other electronic security breaches that could lead to disruptions in critical systems, unauthorized release of confidential or otherwise protected information and corruption of data. Although we utilize various procedures and controls to monitor and protect against these threats and to mitigate our exposure to such threats, there can be no assurance that these procedures and controls will be sufficient in preventing security threats from materializing. If any of these events were to materialize, they could lead to losses of sensitive information, critical infrastructure, personnel or capabilities essential to our operations and could have a material adverse effect on our reputation, financial position, results of operations or cash flows.

***We may be able to incur substantially more debt. This could exacerbate the risks associated with our indebtedness.***

Despite our current level of indebtedness, we and our subsidiaries may be able to incur substantial additional indebtedness in the future, including under our credit facility and the UnSub Credit Facility. As of December 31, 2016, we had $1.71 billion of debt outstanding, net of premium, discount and debt issuance costs, all of which was attributable to our Senior Notes, and a borrowing base of $350 million (with an aggregate elected commitment amount of $300 million) under our credit facility for secured revolver borrowings. In connection with the Comanche Acquisition, we expect to incur additional indebtedness at the closing of the Comanche Acquisition under the UnSub Credit Facility, which is expected to be on substantially the same terms as our existing facility, conformed to current market conditions and non-recourse to our other assets. Our increased indebtedness could adversely affect our business. In particular, it could increase our vulnerability to sustained, adverse macroeconomic weakness, limit our ability to obtain further financing and limit our ability to pursue certain operational and strategic opportunities. If new debt is added to our current debt levels, the related risks that we and our subsidiaries now face could intensify.

***Our variable rate indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly.***

We will be subject to interest rate risk in connection with borrowings under our credit facility and expect to be subject to interest rate risk with respect to the UnSub Credit Facility, which we intend to enter at the closing of the Comanche Acquisition, which bears or is expected to bear in the case of the UnSub Credit Facility interest at variable rates. Interest rate changes will not affect the market value of any debt incurred under such facilities, but could affect the amount of our interest payments, and accordingly, our future earnings and cash flows, assuming other factors are held constant. We currently do not have any interest rate hedging arrangements with respect to our existing credit facility, nor are any for any of our facilities contemplated in the future. A significant increase in prevailing interest rates that results in a substantial increase in the interest rates applicable to our indebtedness could substantially increase our interest expense and have a material adverse effect on our financial condition and results of operations.

***Restrictive covenants may adversely affect our operations.***

Our credit facility, the indenture governing the Senior Notes contains, and we believe that the UnSub Credit Facility that we expect to enter into at the closing of the Comanche Acquisition will contain, a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interest, including our ability, among other things, to:

- incur or assume additional debt or provide guarantees in respect of obligations of other persons;
- issue redeemable stock and preferred stock;
- pay dividends or distributions or redeem or repurchase capital stock;
- prepay, redeem or repurchase certain debt;
- make loans and investments;
- create or incur liens;
- restrict distributions from our subsidiaries;
- sell assets and capital stock of our subsidiaries;
- consolidate or merge with or into another entity, or sell all or substantially all of our assets; and
- enter into new lines of business.

A breach of the covenants under the indentures governing the Senior Notes, the covenants under our credit facility or the covenants under the UnSub Credit Facility could result in an event of default under the applicable indebtedness. An event of default may allow the creditors to accelerate the related debt and may result in an acceleration of any other debt that contains a cross-acceleration or cross-default provision (however, we expect that a default under our credit facility or the Senior Notes would not result in the acceleration of or default under the UnSub Credit Facility and that a default under the UnSub Credit Facility would not result in the acceleration of or default under our credit facility or Senior Notes). In addition, an event of default under our credit facility or the UnSub Credit Facility would permit the lenders under the relevant facility to terminate all commitments to extend further credit under that facility. If we were unable to repay those amounts, the lenders under our credit facility or the UnSub Credit Facility, as applicable, could proceed against the collateral granted to them to secure that debt.

***We have a substantial amount of indebtedness, and expect to incur additional indebtedness in connection with the Comanche Acquisition, which may adversely affect our cash flow and our ability to operate our business, remain in compliance with debt covenants and make payments on our debt.***

The aggregate amount of our outstanding indebtedness could have important consequences for us, including the following:

- any failure to comply with the obligations of any of our debt agreements, including financial and other restrictive covenants, could result in an event of default under the agreements governing such indebtedness;



- the covenants contained in our debt agreements limit our ability to borrow money in the future for acquisitions, capital expenditures or to meet

our operating expenses or other general corporate obligations and may limit our flexibility in operating our business;

- we may have a higher level of debt than some of our competitors, which may put us at a competitive disadvantage;

- we may be more vulnerable to economic downturns and adverse developments in our industry or the economy in general, especially extended or further declines in oil and natural gas prices; and

- our debt level could limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate.

After the closing of the Comanche Acquisition, we expect to have additional outstanding indebtedness under the UnSub Credit Facility, which is expected to be on substantially the same terms as our existing credit facility, conformed to current market conditions and non-recourse to our other assets. Our ability to meet our expenses and debt obligations will depend on our future performance, which will be affected by financial, business, economic, regulatory and other factors. We will not be able to control many of these factors, such as economic conditions and governmental regulation. We cannot be certain that our cash flow from operations will be sufficient to allow us to pay the principal and interest on our debt and meet our other obligations. If we do not have enough cash to service our debt, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or raise equity. We may not be able to refinance our debt, sell assets, borrow more money or raise equity on terms acceptable to us, if at all.

***Because we have no plans to pay dividends on our common stock, investors must look solely to stock appreciation for a return on their investment in us.***

We do not anticipate paying any cash dividends on our common stock in the foreseeable future. We currently intend to retain all future earnings to fund the development and growth of our business. Any payment of future dividends will be at the discretion of our board of directors and will depend on, among other things, our earnings, financial condition, capital requirements, level of indebtedness, statutory and contractual restrictions applying to the payment of dividends and other considerations that our board of directors may deem relevant. Covenants contained in our credit facility, future credit facilities we may enter into, our indenture and the certificates of designations for our preferred stock restrict our ability to pay dividends on our common stock. In addition, the Delaware General Corporation Law (the “DGCL”) permits payment of dividends only out of a corporation’s surplus, which is defined as the excess of net assets (total assets less total liabilities) over a corporation’s capital as determined under the DGCL. If commodity prices continue to decline, the value of our net assets will also continue to decline and, accordingly, our ability to lawfully declare and pay dividends may also decline. Investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

***Federal and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Hydraulic fracturing is an important and common process used by oil and natural gas exploration and production operators in the completion of certain oil and natural gas wells whereby water, sand and chemicals are injected under pressure into subsurface formations to stimulate production of oil and/or natural gas. Hydraulic fracturing is generally exempt from federal regulation, and thus the process is typically regulated by state agencies. Nevertheless, the EPA has asserted federal regulatory authority over hydraulic fracturing involving diesel additives under the Underground Injection Control or UIC Program. In Texas, Louisiana and Mississippi, where we maintain acreage, the EPA is encouraging state programs to review and consider EPA guidance in these areas. In addition, the EPA plans to develop a Notice of Proposed Rulemaking by June 2018, which would describe a proposed mechanism – regulatory, voluntary, or a combination of both – to collect data on hydraulic fracturing chemical substances and mixtures.

On May 12, 2016, the EPA amended its regulations to impose new standards for methane and VOC emissions for certain new, modified, and reconstructed equipment, processes, and activities across the oil and natural gas sector. These standards, as well as any future laws and their implementing regulations, may require us to obtain pre-approval for the expansion or modification of existing facilities or the construction of new facilities expected to produce air

emissions, impose stringent air permit requirements, or mandate the use of specific equipment or technologies to control emissions.

Furthermore, there are certain governmental reviews either underway or being proposed that focus on environmental aspects of hydraulic fracturing practices. These ongoing or proposed studies, depending on their degree of pursuit and any meaningful results obtained, could spur initiatives to further regulate hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells. Also, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances or otherwise require the public disclosure of chemicals used in the hydraulic fracturing process, and a number of lawsuits and enforcement actions have been initiated across the country alleging that hydraulic fracturing practices have induced seismic activity and adversely impacted drinking water supplies, use of surface water, and the environment generally. These proceedings or regulations or any other new laws or regulations that significantly restrict hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells could make it more difficult or costly for us to drill and produce from conventional or tight formations, increase our costs of compliance and doing business and make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings.

Further federal, state and/or local laws governing hydraulic fracturing could result in additional permitting and financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements and also to attendant permitting delays and potential increases in costs. Such changes could cause us to incur substantial compliance costs, and compliance or the consequences of failure to comply by us could have a material adverse effect on our business, financial condition and results of operations. At this time, it is not possible to estimate the potential impact on our business that may arise if additional federal, state and/or local laws are enacted.

***We are subject to complex federal, state, local and other laws and regulations that could adversely affect the cost, manner or feasibility of conducting our operations. In addition, the third parties on whom we rely on for gathering and transportation services are also subject to complex federal, state and other laws that could adversely affect the cost, manner or feasibility of conducting our business.***

Our oil and natural gas development and production operations are subject to complex and stringent laws and regulations. To conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. We may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, our costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become applicable to our operations. Failure to comply with such laws and regulations, as interpreted and enforced, could have a material adverse effect on our business, financial condition and results of operations. Please read “Item 1. Business—Environmental Matters and Regulation” for a description of the laws and regulations that affect us.

In addition, the operations of the third parties on whom we rely for gathering and transportation services are also subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third-party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that we pay for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom we rely could have a material adverse effect on our business, financial condition and results of operations. Please read “Item 1. Business—Environmental Matters and Regulation” for a description of the laws and regulations that affect the third parties on whom we rely.

***Climate change legislation or regulations restricting emissions of greenhouse gases could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

In recent years, federal, state and local governments have taken steps to reduce emissions of GHGs. The EPA has finalized a series of GHG monitoring, reporting and emission control rules for the oil and natural gas industry, and the U.S. Congress has, from time to time, considered adopting legislation to reduce emissions. Almost one-half of the

states have already taken measures to reduce emissions of GHGs primarily through the development of GHG emission inventories and/or regional GHG cap-and-trade programs.

Furthermore, in December 2015, the United States participated in the 21st Conference of the Parties (COP-21) of the United Nations Framework Convention on Climate Change in Paris, France. The resulting Paris Agreement calls for the parties to undertake "ambitious efforts" to limit the average global temperature, and to conserve and enhance sinks and reservoirs of GHGs. The Agreement went into effect on November 4, 2016 and establishes a framework for the parties to cooperate and report actions to reduce GHG emissions. Also, on June 29, 2016, the leaders of the United States, Canada and Mexico announced an Action Plan to, among other things, boost clean energy, improve energy efficiency, and reduce GHG emissions. The Action Plan specifically calls for a reduction in methane emissions from the oil and gas sector by 40 to 45 percent by 2025. It remains unclear whether and how the results of the 2016 U.S. election could impact the regulation of GHG emissions at the federal and state level.

Restrictions on GHG emissions that may be imposed could adversely affect the oil and gas industry. The adoption of any legislation or regulations that otherwise limit emissions of GHGs from our equipment and operations could require us to incur increased operating costs, such as costs to monitor and report GHG emissions, purchase and operate emissions control systems to reduce emissions of GHGs associated with our operations, acquire emissions allowances or comply with new regulatory requirements. Any GHG emissions legislation or regulatory programs applicable to power plants or refineries could also increase the cost of consuming, and thus could adversely affect demand for the oil and natural gas that we produce. Consequently, legislation and regulatory programs to reduce GHG emissions could have an adverse effect on our business, financial condition and results of operations. Please read "Item 1. Business—Environmental Matters and Regulation."

In addition, claims have been made against certain energy companies alleging that GHG emissions from oil and natural gas operations constitute a public nuisance under federal and/or state common law. As a result, private individuals may seek to enforce environmental laws and regulations against us and could allege personal injury or property damages. While our business is not a party to any such litigation, we could be named in actions making similar allegations. An unfavorable ruling in any such case could significantly impact our operations and could have an adverse impact on our financial condition.

Moreover, there has been public discussion that climate change may be associated with extreme weather conditions such as more intense hurricanes, thunderstorms, tornadoes and snow or ice storms, as well as rising sea levels. Another possible consequence of climate change is increased volatility in seasonal temperatures. Some studies indicate that climate change could cause some areas to experience temperatures substantially colder than their historical averages. Extreme weather conditions can interfere with our production and increase our costs and damage resulting from extreme weather may not be fully insured. However, at this time, we are unable to determine the extent to which climate change may lead to increased storm or weather hazards affecting our operations.

***Our operations are subject to environmental and operational safety laws and regulations that may expose us to significant costs and liabilities.***

We may incur significant delays, costs and liabilities as a result of stringent and complex environmental, health and safety requirements applicable to our oil and natural gas development and production operations. These laws and regulations may impose numerous obligations applicable to our operations, including that they may (i) require the acquisition of permits to conduct exploration, drilling and production operations; (ii) restrict the types, quantities and concentration of various substances that can be released into the environment or injected into formations in connection with oil and natural gas drilling, production and transportation activities; (iii) govern the sourcing and disposal of water used in the drilling and completion process; (iv) limit or prohibit drilling or injection activities on certain lands lying within wilderness, wetlands, seismically active areas, and other protected areas; (v) require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells; (vi) result in the suspension or revocation of necessary permits, licenses and authorizations; (vii) impose substantial liabilities for pollution resulting from drilling and production operations; and (viii) require that additional pollution controls be installed. Numerous governmental authorities, such as the EPA and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, often requiring difficult and

costly compliance or corrective actions. Failure to comply with these laws and regulations may result in the assessment of sanctions, including administrative, civil or criminal penalties, the imposition of investigatory or remedial obligations, the suspension or revocation of necessary permits, licenses and authorizations, the requirement that additional pollution controls be installed and, in some instances, the issuance of orders limiting or prohibiting some or all of our operations. In addition, we may experience delays in obtaining or be unable to obtain required permits, which may delay or interrupt our operations and limit our growth and revenue. These laws and regulations are complex, change frequently and have tended to become increasingly stringent over time.

There is inherent risk of incurring significant environmental costs and liabilities in the performance of our operations due to our handling of petroleum hydrocarbons and wastes, because of air emissions and wastewater discharges related to our operations, and as a result of historical industry operations and waste disposal practices. Under certain environmental laws and regulations, we could be subject to strict and joint and several liability for the removal or remediation of previously released materials or property contamination regardless of whether we were responsible for the release or contamination or the operations were in compliance with all applicable laws at the time those actions were taken. Private parties, including the owners of properties upon which our wells are drilled and facilities where our petroleum hydrocarbons or wastes are taken for reclamation or disposal, also may have the right to pursue legal actions to enforce compliance as well as to seek damages for non-compliance with environmental laws and regulations or for personal injury or property or natural resource damages. In addition, the risk of accidental spills or releases could expose us to significant liabilities that could have a material adverse effect on our business, financial condition and results of operations. Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste control, handling, storage, transport, disposal or cleanup requirements could require us to make significant expenditures to attain and maintain compliance and may otherwise have a material adverse effect on our competitive position, business, financial condition and results of operations. We may not be able to recover some or any of these costs from insurance. Please read "Item 1. Business—Environmental Matters and Regulation" for more information.

***Derivatives reform legislation and related regulations could have an adverse effect on our ability to hedge risks associated with our business.***

The July 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, provides for federal oversight of the over-the-counter derivatives market and entities that participate in that market and mandates that the Commodity Futures Trading Commission, or the CFTC, the SEC and certain federal regulators of financial institutions, or Prudential Regulators, adopt rules or regulations implementing the Dodd-Frank Act and providing definitions of terms used in the Dodd-Frank Act. The Dodd-Frank Act establishes margin requirements and requires clearing and trade execution practices for certain market participants and may result in certain market participants needing to curtail or cease their derivatives activities.

Although some of the rules necessary to implement the Dodd-Frank Act remain to be adopted, the CFTC, the SEC and the Prudential Regulators have issued many rules to implement the Dodd-Frank Act, including a rule, which we refer to as the "Mandatory Clearing Rule," requiring clearing of hedges, or swaps, that are subject to it (currently, only certain interest rate and credit default swaps, which we do not presently have), a rule, which we refer to as the "End User Exception," establishing an "end user" exception to the Mandatory Clearing Rule, a rule, which we refer to as the "Margin Rule," setting forth collateral requirements in connection with swaps that are not cleared and also an exception to the Margin Rule for end users that are not financial end users, which exception we refer to as the "Non-Financial End User Exception," and a rule, subsequently vacated by the United States District Court for the District of Columbia and remanded to the CFTC for further proceedings, imposing position limits. The CFTC proposed a new version of this rule with respect to which the comment period closed but no final rule was issued and has re-proposed a new version of such rule, which we refer to as the "Re-Proposed Position Limit Rule," with respect to which the comment period is scheduled to close on February 28, 2017. The Re-Proposed Position Limit Rule provides an exemption from the position limits for swaps that constitute "bona fide hedging positions" within the definition of such term under the Re-Proposed Position Limit Rule, subject to the party claiming the exemption complying with the applicable filing, recordkeeping and reporting requirements of the Re-Proposed Position Limit Rule.

Case 19-34508 Document 1354-1 Filed in TXSB on 06/23/20 Page 95 of 235

We qualify for the End User Exception and will utilize it if the Mandatory Clearing Rule is expanded to cover swaps in which we participate, we qualify for the Non-Financial End User Exception and will not be required to post margin under the Margin Rule and limits our existing and anticipated hedging positions constitute "bona fide hedging positions" under the Re-Proposed Position Limit Rule and we intend to do the filing, recordkeeping and reporting necessary to utilize the bona fide hedging position exemption under the Re-Proposed Position Limit Rule if and when it becomes effective, so we do not expect to be directly affected by any of such rules. However, most if not all of our hedge counterparties will be subject to mandatory clearing in connection with their hedging activities with parties who do not qualify for the End User Exception and will be required to post margin in connection with their hedging activities with other swap dealers, major swap participants, financial end users and other persons that do not qualify for the Non-Financial End User Exception. In addition, the European Union and other non-U.S. jurisdictions have enacted laws and regulations (including laws and regulations giving European Union financial authorities the power to write down amounts we may be owed on hedging agreements with counterparties subject to such laws and regulations and/or require that we accept equity interests in such counterparties in lieu of cash in satisfaction of such amounts), which we refer to collectively as "Foreign Regulations" which may apply to our transactions with counterparties subject to such Foreign Regulations. The Dodd-Frank Act, the rules which have been adopted and not vacated, and, to the extent that the Re-Proposed Position Limit Rule is ultimately effected, such proposed rule could significantly increase the cost of our derivative contracts, materially alter the terms of our derivative contracts, reduce the availability of derivatives to us that we have historically used to protect against risks that we encounter in our business, reduce our ability to monetize or restructure our existing derivative contracts, and increase our exposure to less creditworthy counterparties. The Foreign Regulations could have similar effects. If we reduce our use of derivatives as a result of the Dodd-Frank Act and regulations and Foreign Regulations, our results of operations may become more volatile and our cash flows may be less predictable, which could adversely affect our ability to plan for and fund capital expenditures. Finally, the Dodd-Frank Act was intended, in part, to reduce the volatility of oil and natural gas prices, which some legislators attributed to speculative trading in derivatives and commodity contracts related to oil and natural gas. Our revenues could therefore be adversely affected if a consequence of the Dodd-Frank Act and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on us, our financial condition, and our results of operations.

***We may incur more taxes and certain of our projects may become uneconomic if certain federal income tax deductions currently available with respect to oil and natural gas exploration and production are eliminated as a result of future legislation.***

In past years, legislation has been proposed from time to time that contains proposals to eliminate certain key U.S. federal income tax preferences currently available to oil and natural gas exploration and production companies. These proposals include, but are not limited to (i) the repeal of the percentage depletion allowance for oil and natural gas properties, (ii) the elimination of current deductions for intangible drilling and development costs, (iii) the elimination of the deduction for certain U.S. production activities and (iv) an extension of the amortization period for certain geological and geophysical expenditures. The Trump Administration has called for a comprehensive tax reform that would significantly change U.S. tax laws. It is unclear whether any of the foregoing proposals will actually be considered and enacted as part of tax reform legislation or how soon any such changes in law could become effective. The passage of any legislation as a result of these proposals or any other similar change in U.S. federal income tax law could eliminate and/or defer certain tax deductions that are currently available with respect to oil and natural gas exploration and production. Any such change could materially adversely affect our business, financial condition and results of operations by increasing the after-tax costs we incur which would in turn make it uneconomic to drill some locations if commodity prices are not sufficiently high, resulting in lower revenues and decreases in production and reserves.

***We are subject to anti-takeover provisions in our restated certificate of incorporation and amended and restated bylaws, our Rights Plan and Delaware law that could delay or prevent an acquisition of our company, even if the acquisition would be beneficial to our stockholders.***

Provisions in our restated certificate of incorporation and amended and restated bylaws may delay or prevent an acquisition of us. These provisions may also frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, who are responsible for appointing the members of our management team. Furthermore, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the DGCL, which prohibits, with some exceptions,

stockholders owning in excess of 15% of our outstanding voting stock from merging or combining with us. In addition, the Company entered into the Rights Plan on July 28, 2015. The Rights Plan is designed to preserve stockholder value and the value of our NOLs by acting as a deterrent to any person acquiring beneficial ownership of 4.9% or more of the Company's outstanding common stock without the approval of our board of directors. Although not intended for this purpose, the Rights Plan has an anti-takeover effect. For more information on possible risks associated with our rights plan, please see "*—We adopted the Rights Plan, which though it was designed to preserve the value of our NOLs, may discourage the acquisition and sale of large blocks of our common stock and may result in significant dilution for certain stockholders.*" Finally, our amended and restated bylaws establish advance notice requirements for nominations for election to our board of directors and for proposing matters that can be acted upon at stockholder meetings. Although we believe these provisions together provide an opportunity to receive higher bids by requiring potential acquirers to negotiate with our board of directors, they would apply even if an offer to acquire us may be considered beneficial by some stockholders.

***We are subject to legal proceedings and legal compliance risks.***

We, including our officers and directors, are involved in various legal proceedings from time to time. Certain of these legal proceedings may be a significant distraction to management and could expose our Company to significant liability, including damages, fines, penalties and attorneys' fees and costs, any of which could have a material adverse effect on our business and results of operations.

We discuss the risks and uncertainties related to our litigation in more detail below in "Item 3. Legal Proceedings" and in "Item 8. Financial Statements and Supplementary Data — Note 14, Commitments and Contingencies."

***We may have potential business conflicts of interest with members of the Sanchez Group regarding our past, ongoing and future relationships and the resolution of these conflicts may not be favorable to us.***

Conflicts of interest may arise between members of the Sanchez Group and us in a number of areas relating to our past, ongoing and future relationships, including:

- labor, tax, employee benefit, indemnification and other matters arising under agreements with SOG;
- employee recruiting and retention;
- business opportunities that may be attractive to both members of the Sanchez Group and us; and
- business transactions that we enter into with members of the Sanchez Group.

We may not be able to resolve any potential conflicts, and, even if we do so, the resolution may be less favorable to us than if we were dealing with an unaffiliated party.

Finally, in connection with our initial public offering ("IPO"), we entered into several agreements with members of the Sanchez Group. In addition, at the closing of the Comanche Acquisition, we expect to enter into management services agreements with SOG for it to perform various management service functions for SN UnSub and Blackstone and/or their affiliates. These agreements were or will be made in the context of a related party transaction. The terms of these agreements may be more or less favorable to us than if they had been negotiated with unaffiliated third parties.

***Pursuant to the terms of our restated certificate of incorporation, members of the Sanchez Group are not required to offer corporate opportunities to us, and our directors and officers may be permitted to offer certain corporate opportunities to members of the Sanchez Group before us.***

Our board of directors includes persons who are also directors and/or officers of members of the Sanchez Group. Our restated certificate of incorporation provides that:

- members of the Sanchez Group are free to compete with us in any activity or line of business;

- we do not have any interest or expectancy in any business opportunity, transaction, or other matter in which members of the Sanchez Group engage or seek to engage merely because we engage in the same or similar lines of business;

- to the fullest extent permitted by law, members of the Sanchez Group will have no duty to communicate their knowledge of, or offer, any potential business opportunity, transaction, or other matter to us, and members of the Sanchez Group are free to pursue or acquire such business opportunity, transaction, or other matter for themselves or direct the business opportunity, transaction, or other matter to its affiliates; and

- if any director or officer of any member of the Sanchez Group who is also one of our officers or directors becomes aware of a potential business opportunity, transaction, or other matter (other than one expressly offered to that director or officer in writing solely in his or her capacity as our director or officer), that director or officer will have no duty to communicate or offer that business opportunity to us, and will be permitted to communicate or offer that business opportunity to such member of the Sanchez Group and that director or officer will not, to the fullest extent permitted by law, be deemed to have (1) breached or acted in a manner inconsistent with or opposed to his or her fiduciary or other duties to us regarding the business opportunity or (2) acted in bad faith or in a manner inconsistent with our best interests or those of our stockholders.

***We depend on SOG to provide us with certain services for our business. The services that SOG provides to us may not be sufficient to meet our needs, and we may have difficulty finding replacement services or be required to pay increased costs to replace these services after our agreements with SOG expire.***

Certain services required by us for the operation of our business, including general and administrative services, geological, geophysical and reserve engineering, lease and land administration, marketing, accounting, operational services, information technology services, compliance, insurance maintenance and management of outside professionals, are provided by SOG pursuant to the Services Agreement. The services provided under the Services Agreement commenced on the date that the IPO closed and will terminate five years thereafter. The term automatically extends for additional 12-month periods and is terminable by either party at any time upon 180 days' written notice. See "Corporate Governance—Compensation Committee" in the proxy statement for the 2016 annual meeting of stockholders, which is incorporated by reference to this report. While these services are being provided to us by SOG, our operational flexibility to modify or implement changes with respect to such services or the amounts we pay for them is limited. After the expiration or termination of this agreement, we may not be able to replace these services or enter into appropriate third-party agreements on terms and conditions, including cost, comparable to those that we will receive from SOG under our agreements with SOG.

In addition, SOG may outsource some or all of these services to third parties, and a failure of all or part of SOG's relationships with its outsourcing providers could lead to delays in or interruptions of these services. Our reliance on SOG and others as service providers and on SOG's outsourcing relationships, and our limited ability to control certain costs, could have a material adverse effect on our business, financial condition and results of operations.

***Sector cost inflation could adversely affect our ability to execute our exploration and development plans on a timely basis and within our budget.***

Our industry is cyclical and third party oilfield materials, service and supply costs are also subject to supply and demand dynamics. During periods of decreasing levels of industry exploration and production, such as occurred in 2015 and 2016, the demand for, and cost of, drilling rigs and oilfield services decreases. Conversely, during periods of increasing levels of industry activity, the demand for, and cost of, drilling rigs and oilfield services increases.

In the second half of 2016, we witnessed a modest improvement in commodity prices. If this trend continues, and if the commodity price recovery is robust, we expect industry exploration and production activities to increase, resulting in higher demand for oilfield services and supplies, which could result in sector price inflation. In addition, the costs of such items could increase and their availability may become limited, particularly in basins of relatively higher activity.

***A portion of our total outstanding shares is held by members of the Sanchez Group and may be sold into the market at any time. In addition, if the Comanche Acquisition is consummated, Blackstone and GSO (or their affiliates) will receive a substantial number of our securities. This could cause the market price of our common stock to drop significantly, even if our business is doing well.***

As of February 7, 2017, members of the Sanchez Group owned, in the aggregate, approximately 15.0% of our outstanding common stock. There are also an additional 8,961,750 shares available for future issuance to our directors, officers and employees as restricted stock or stock option awards pursuant to our Amended and Restated 2011 Long Term Incentive Plan. These shares are eligible for resale in the public markets, subject to the volume, manner of sale and other limitations under Rule 144 of the Securities Act. In addition, at the closing of the transaction contemplated by the Comanche Acquisition, we will issue 1.5 million shares of common stock to GSO and warrants to purchase 2.0 million and 6.5 million shares of common stock, at an exercise price of $10.00 per share, to GSO and an affiliate of Blackstone, respectively, resulting in GSO and such Blackstone affiliate owning approximately 3.9% and 7.3% of our common stock, respectively, assuming that the warrants will be fully exercised at closing. Following the conclusion of a two-year lockup period, these shares will be eligible for resale in the public markets, subject to the volume, manner of sale and other limitations under Rule 144 of the Securities Act. In addition, under certain circumstances, members of the Sanchez Group, GSO and such Blackstone affiliate have the right to require us to register the resale of their shares. Moreover, we have registered all of the shares of our common stock that we may issue under our employee benefit plans. These shares can be freely sold in the public market upon issuance unless, pursuant to their terms, these stock awards have transfer restrictions attached to them. Sales of a substantial number of shares of our common stock, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

**Item 1B.** ***Unresolved Staff Comments***

None.

**Item 2.** ***Properties***

The information required by Item 2 is contained in Item 1. Business.

**Item 3.** ***Legal Proceedings***

The information required by this Item is set forth in “Item 8. Financial Statements and Supplementary Data —Note 14, Commitments and Contingencies.”

**Item 4.** ***Mine Safety Disclosures***

Not applicable.

## PART II

### Item 5. *Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities*

*Market for Registrant's Common Equity.* Shares of our common stock are traded on the NYSE under the symbol "SN." The following table sets forth the reported high and low sales prices of our common stock as reported by the NYSE for the periods indicated:

| | Common Stock | |
|---|---|---|
| | High | Low |
| 2016: | | |
| First Quarter | $ 6.35 | $ 2.06 |
| Second Quarter | $ 9.83 | $ 4.84 |
| Third Quarter | $ 9.49 | $ 5.64 |
| Fourth Quarter | $ 10.14 | $ 5.90 |

| | Common Stock | |
|---|---|---|
| | High | Low |
| 2015: | | |
| First Quarter | $ 16.14 | $ 7.66 |
| Second Quarter | $ 15.85 | $ 9.45 |
| Third Quarter | $ 9.95 | $ 4.48 |
| Fourth Quarter | $ 8.39 | $ 3.46 |

On February 24, 2017, the last sale price of our common stock, as reported on the NYSE, was $11.31 per share.

*Holders.* The number of holders of record of our common stock was approximately 31 on February 27, 2017, which does not include beneficial owners whose shares are held by a clearing agency, such as a broker or a bank.

*Preferred Dividends.* We pay preferred dividends quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by the Company's board of directors on our Series A and Series B Preferred Stock in the amounts of 4.875% and 6.50%, respectively. The Company may, at its option, pay dividends in cash and, subject to certain conditions, common stock or any combination thereof. As of December 31, 2016, we have paid approximately $56.8 million in dividends to holders of our Series A and Series B Preferred Stock since their respective issuances. The dividends accrued for the period from January 1 to March 31, 2016 were declared by the Board and paid in cash by the Company. The dividends accrued for the periods from April 1 to July 31, August 1 to September 30, and October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock.

We have not paid any cash dividends on our common equity since our inception. Although our future dividend policy is within the discretion of our board of directors and will depend upon various factors, including our results of operations, financial condition, capital requirements and investment opportunities, we do not anticipate declaring or paying any cash dividends to holders of our common stock in the foreseeable future. In addition, covenants contained in our credit facility, future credit facilities we may enter into, our indenture and the certificates of designations for our preferred stock restrict our ability to pay dividends on our common stock and the DGCL permits payment of dividends only out of a corporation's surplus, which is defined as the excess of net assets (total assets less total liabilities) over a corporation's capital as determined under the DGCL. We currently intend to retain future earnings to finance current operations and the future expansion of our business.

*Securities Authorized for Issuance Under Equity Compensation Plans.* The following table sets forth certain information as of December 31, 2016 regarding the Sanchez Energy Corporation Third Amended and Restated 2011 Long Term Incentive Plan (the "LTIP"). The LTIP was approved by our stockholders on May 24, 2016, which increased the number of the shares of our common stock available for incentive awards pursuant to the LTIP's predecessor, which was approved by our stockholders on May 21, 2015.

| | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | (b) Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | (c) Number of Securities Remaining Available For Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
|---|---|---|---|
| **Plan Category:** | | | |
| Equity Compensation Plans Approved by Stockholders | — | N/A | 6,669,005 (1) |
| Equity Compensation Plans Not Approved by Stockholders | N/A | N/A | N/A |
| **Total** | — | — | 6,669,005 |

(1) The maximum number of shares that may be delivered pursuant to the LTIP is limited to 17,239,790 shares plus an automatic increase equal to the lesser of (A) 15% of such issuance of additional Common Shares and (B) such lesser number of Common Shares as determined by the Board of Directors and Compensation Committee; provided, however, withheld to satisfy tax withholding obligations are not considered to be delivered under the LTIP.

*Recent Sales of Unregistered Securities.* All sales of unregistered securities within the last fiscal year have been previously reported in our Quarterly Reports on Form 10-Q and/or Current Reports on Form 8-K.

*Repurchases of Equity Securities.* Neither we nor any "affiliated purchaser" repurchased any of our equity securities in the quarter ended December 31, 2016.

**Comparative Stock Performance**

The performance graph below compares the cumulative total stockholder return for our common stock to that of the Standard and Poor's, or S&P, 500 Index and the S&P 500 Oil & Gas Exploration and Production Index for the period from December 31, 2011 to December 31, 2016. "Cumulative total return" means the change in share price during the measurement period divided by the share price at the beginning of the measurement period. The graph assumes an investment of $100 was made in the Company's common stock and in each of the S&P 500 Index and the S&P 500 Oil & Gas Exploration and Production Index at the closing market price on December 31, 2011.

**COMPARISON OF CUMULATIVE TOTAL RETURN**
**AMONG SANCHEZ ENERGY CORPORATION, THE S&P 500 INDEX,**
**AND THE S&P 500 OIL & GAS EXPLORATION AND PRODUCTION INDEX**




Note: The stock price performance of our common stock is not necessarily indicative of future performance.

*The above information under the caption "Comparative Stock Performance" shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or the Exchange Act except to the extent that we specifically request that such information be treated as "soliciting material" or specifically incorporate such information by reference into such a filing.*

**Item 6.** ***Selected Financial Data***

The selected financial data table below shows our historical consolidated financial data as of and for each of the five years in the period ended December 31, 2016. The selected financial data is derived from our audited historical financial statements.

The selected financial data should be read together with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8. Financial Statements and Supplementary Data" included in this Annual Report on Form 10-K.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (in thousands, except per share amounts) | | | | |
| **REVENUES:** | | | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 | $ 290,322 | $ 42,377 |
| Natural gas liquids sales | 81,744 | 69,011 | 66,989 | 13,013 | 15 |
| Natural gas sales | 107,816 | 98,797 | 60,188 | 11,085 | 766 |
| Total revenues | 431,326 | 475,779 | 666,064 | 314,420 | 43,158 |
| **OPERATING COSTS AND EXPENSES:** | | | | | |
| Oil and natural gas production expenses | 164,567 | 156,528 | 93,581 | 35,669 | 3,401 |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 | 17,334 | 2,124 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | 134,845 | 15,922 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| General and administrative [1] | 110,081 | 74,160 | 63,692 | 47,951 | 37,239 |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 | 235,799 | 58,686 |
| Operating income (loss) | (191,761) | (1,491,351) | (80,914) | 78,621 | (15,528) |
| Other income (expense): | | | | | |
| Interest income | 856 | 442 | 193 | 187 | 74 |
| Other income (expense) | 134 | (2,605) | 96 | (52) | — |
| Gain on disposal of assets | 112,294 | — | — | — | — |
| Interest expense | (126,973) | (126,399) | (89,800) | (30,934) | (99) |
| Earnings from equity investments | 3,466 | — | — | — | — |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 | (16,938) | (742) |
| Total other income (expense) | (63,372) | 44,324 | 47,694 | (47,737) | (767) |
| Income (loss) before income taxes | (255,133) | (1,447,027) | (33,220) | 30,884 | (16,295) |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) | 3,986 | — |
| **Net income (loss)** | (256,958) | (1,454,627) | (21,791) | 26,898 | (16,295) |
| Less: | | | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) | (18,525) | (2,112) |
| Net income allocable to participating securities[2][3] | — | — | — | (364) | — |
| **Net income (loss) attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) | $ 8,009 | $ (18,407) |
| Net income (loss) per common share - basic and diluted | $ (4.63) | $ (25.70) | $ (1.06) | $ 0.22 | $ (0.56) |
| Weighted average number of shares used to calculate net income (loss) attributable to common stockholders - basic and diluted [4] | 58,900 | 57,229 | 52,338 | 36,379 | 33,000 |

(1) Includes stock based compensation expense of $[illegible] million, $14.8 million, $[illegible] million, $[illegible] million and $[illegible] million for the years ended December 31, 2016, 2015, 2014, 2013 and 2012, respectively. Also includes acquisition and divestiture costs of $8.1 million, $3.8 million, $1.8 million and $4.1 million for the years ended December 31, 2016, 2015, 2014 and 2013, respectively.



008019

(2) The Company's restricted shares of common stock are participating securities.

(3) For the years ended December 31, 2016, 2015, 2014 and 2012 no losses were allocated to participating restricted stock because such securities do not have a contractual obligation to share in the Company's losses.

(4) The year ended December 31, 2016 excludes 2,113,462 shares of weighted average restricted stock and 12,554,481 shares of common stock resulting from an assumed conversion of the Company's Series A Convertible Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2015 excludes 2,663,010 shares of weighted average restricted stock and 12,529,314 shares of common stock resulting from an assumed conversion of the Company's Series A Convertible Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2014 excludes 1,732,888 shares of weighted average restricted stock and 13,527,738 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2013 excludes 757,963 shares of weighted average restricted stock and 14,979,225 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2012 excludes 184,230 shares of weighted average restricted stock and 1,992,857 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive.

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (in thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ 385,808 | $ 499,112 | $ 412,798 | $ 54,061 | $ 15,671 |
| Total assets [1] | $ 1,286,280 | $ 1,501,304 | $ 2,994,000 | $ 1,602,465 | $ 426,574 |
| Long term debt, net of premium, discount and debt issuance costs[1] | $ 1,712,767 | $ 1,705,927 | $ 1,698,095 | $ 573,452 | $ — |
| Total stockholders' equity (deficit) | $ (696,140) | $ (456,169) | $ 999,587 | $ 857,309 | $ 366,743 |

(1) As a result of the adoption of ASU 2015-03 on a retrospective basis as of the quarter ended December 31, 2016, the total assets and long term debt, net of premium, discount and debt issuance costs as of December 31, 2015, 2014 and 2013 were reduced by approximately $41.0 million, $48.2 million and $19.8 million, respectively. These retrospective changes are reflected in the total assets and long term debt, net of premium, discount and debt issuance costs amounts in the table above. See further discussion on the adoption of ASU 2015-03 in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt."

| | Year Ended December 31, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | | 2013 | | 2012 | |
| | (in thousands) | | | | | | | | | |
| **Cash Flow Data:** | | | | | | | | | | |
| Net cash provided by operating activities | $ | 181,251 | $ | 272,025 | $ | 415,335 | $ | 189,261 | $ | 29,072 |
| Net cash used in investing activities | $ | (108,637) | $ | (294,331) | $ | (1,361,264) | $ | (1,093,363) | $ | (181,427) |
| Net cash provided by (used in) financing activities | $ | (5,745) | $ | (16,360) | $ | 1,266,112 | $ | 1,007,286 | $ | 139,661 |

**Non-GAAP Financial Measures**

***Adjusted EBITDA***

We present adjusted EBITDA attributable to common stockholders (“Adjusted EBITDA”) in addition to our reported net income (loss) in accordance with U.S. GAAP. Adjusted EBITDA is a non-GAAP financial measure that is used as a supplemental financial measure by our management and by external users of our financial statements, such as investors, commercial banks and others, to assess our operating performance as compared to that of other companies in our industry, without regard to financing methods, capital structure or historical costs basis. It is also used to assess our ability to incur and service debt and fund capital expenditures.

We define Adjusted EBITDA as net income (loss):

- Plus:
  - Interest expense, including net losses (gains) on interest rate derivative contracts;
  - Net losses (gains) on commodity derivative contracts;
  - Net settlements received (paid) on commodity derivative contracts;
  - Depreciation, depletion, and amortization and accretion;
  - Impairment of oil and natural gas properties;
  - Stock-based compensation expense;
  - Acquisition and divestiture costs included in general and administrative;
  - Income tax expense (benefit); and
  - Certain other items that we deem appropriate.
- Less:
  - Gain on disposal of assets;

- Amortization of deferred gain on Western Catarina Midstream Divestiture;
- Interest income; and
- Certain other items that we deem appropriate.

Our Adjusted EBITDA should not be considered an alternative to net income (loss), operating income (loss), cash flows provided by (used in) operating activities or any other measure of financial performance or liquidity presented in accordance with U.S. GAAP. Our Adjusted EBITDA may not be comparable to similarly titled measures of another company because all companies may not calculate Adjusted EBITDA in the same manner.

The following table presents a reconciliation of our net income (loss) to Adjusted EBITDA (in thousands):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Net income (loss)** | $ (256,958) | $ (1,454,627) | $ (21,791) | $ 26,898 | $ (16,295) |
| Plus: | | | | | |
| Interest expense | 126,973 | 126,399 | 89,800 | 30,934 | 99 |
| Net losses (gains) on commodity derivative contracts | 53,149 | (172,886) | (137,205) | 16,938 | 742 |
| Net settlements received (paid) on commodity derivative contracts | 135,600 | 142,468 | 5,600 | (5,787) | 2,749 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | 134,845 | 15,922 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in general and administrative | 8,130 | 3,814 | 1,808 | 4,129 | — |
| Write off of joint venture receivable, non-recurring | — | 2,251 | — | — | — |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) | 3,986 | — |
| Less: | | | | | |
| Gain on disposal of assets | (112,294) | — | — | — | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,812) | (3,086) | — | — | — |
| Premiums on commodity derivative contracts[1] | — | — | (718) | (2,838) | (3,059) |
| Interest income | (856) | (443) | (193) | (190) | (74) |
| **Adjusted EBITDA** | $ 306,653 | $ 375,893 | $ 490,633 | $ 226,666 | $ 25,626 |

(1) This amount has been reduced by premiums associated with derivatives that settled during the respective periods, which may include premiums accrued but not yet paid as of the end of the quarter based on timing of cash settlement payments with counterparties.

The following table presents a reconciliation of net cash provided by operating activities to Adjusted EBITDA (in thousands):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Net cash provided by operating activities** | $ 181,251 | $ 272,025 | $ 415,335 | $ 189,261 | $ 29,072 |
| Net change in operating assets and liabilities | 5,190 | (27,961) | (6,238) | 12,334 | (3,806) |
| Cash reimbursements received for operating leasehold improvements | — | (2,648) | — | — | — |
| Interest expense, net [1] | 117,645 | 117,723 | 79,850 | 23,584 | (74) |
| Settlements on commodity derivative contracts, non-cash | (11,093) | 11,466 | (122) | (2,642) | 434 |
| Loss on inventory market adjustment | (649) | — | — | — | — |
| Distributions from equity investments | (930) | — | — | — | — |
| Earnings from equity investments | 3,466 | — | — | — | — |
| Income tax expense | 1,825 | 158 | — | — | — |
| Write off of joint venture receivable, non-cash | — | 2,251 | — | — | — |

| | | | | | |
|---|---|---|---|---|---|
| Acquisition and divestiture costs included in general and administrative | 9,120 | 3,814 | 1,808 | 4,129 | — |
| Gain (loss) on investment in SPP | 1,818 | (935) | — | — | — |
| **Adjusted EBITDA** | $ 306,653 | $ 375,893 | $ 490,633 | $ 226,666 | $ 25,626 |

(1) This amount includes cash interest expense on our Senior Notes and credit agreements, net of interest income.

***Adjusted Earnings (Loss)***

We present adjusted earnings (loss) attributable to common stockholders ("Adjusted Earnings (Loss)"), in addition to our reported net income (loss) in accordance with U.S. GAAP. This information is provided because management views the exclusion of the items included in our definition of Adjusted Earnings (Loss) below as helpful for decision making by identifying operating trends that could otherwise be masked by these items and highlighting the impact that commodity price volatility has on our results. In addition, management believes the exclusion of the items included in our definition of Adjusted Earnings (Loss) below will help investors compare results between periods, identify operating trends and understand how the volatility of commodity prices impacts the Company's results. We define Adjusted Earnings (Loss) as net income (loss):

Less:

- Preferred stock dividends; and
- Certain other items that we deem appropriate.

Plus:

- Net losses (gains) on commodity derivative contracts;
- Net settlements received (paid) on commodity derivative contracts;
- Impairment of oil and natural gas properties;
- Stock-based compensation expense;
- Acquisition and divestiture costs included in general and administrative;
- Gain on disposal of assets;
- Amortization of deferred gain on Western Catarina Midstream Divestiture;
- Certain other items that we deem appropriate; and
- Tax impact of adjustments to net income (loss).

The following table presents a reconciliation of our net income (loss) to Adjusted Earnings (Loss) (in thousands, except per share data):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Net income (loss)** | $ (256,958) | $ (1,454,627) | $ (21,791) | $ 26,898 | $ (16,295) |
| Less: Preferred stock dividends | (15,948) | (16,008) | (33,590) | (18,525) | (2,112) |
| **Net income (loss) attributable to common shares and participating securities** | (272,906) | (1,470,635) | (55,381) | 8,373 | (18,407) |
| Plus: | | | | | |
| Non-cash preferred stock dividends associated with conversion | — | 48 | 17,297 | — | — |
| Non-cash write off of joint venture receivables | — | 2,251 | — | — | — |
| Net losses (gains) on commodity derivatives contracts | 53,149 | (172,886) | (137,205) | 16,938 | 742 |
| Net settlements received (paid) on commodity derivative contracts | 135,600 | 142,468 | 5,600 | (5,787) | 2,749 |
| Premiums on commodity derivative contracts [(1)] | — | — | (718) | (2,838) | (3,059) |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in general and administrative | 8,130 | 3,814 | 1,808 | 4,129 | — |
| Gain on disposal of assets | (112,294) | — | — | — | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,812) | (3,086) | — | — | — |
| Tax impact of adjustments to net income (loss) [(2)] | 260 | 12,385 | (33,081) | (3,898) | — |
| **Adjusted Earnings (Loss)** | 3,263 | (105,810) | 24,984 | 34,668 | 7,567 |
| **Adjusted Earnings allocable to participating securities**[(3)] | (321) | — | (1,157) | (1,513) | (221) |
| **Adjusted Earnings (Loss) attributable to common stockholders** | $ 2,942 | $ (105,810) | $ 23,827 | $ 33,155 | $ 7,346 |
| Weighted average number of shares used to calculate net income (loss) attributable to common stockholders - basic and diluted | 58,900 | 57,229 | 52,338 | 36,379 | 33,000 |

(1) This amount has been reduced by premiums associated with derivatives that settled during the respective periods, which may include premiums accrued but not yet paid as of the end of the quarter based on timing of cash settlement payments with counterparties.

(2) The tax impact is computed by utilizing the Company's effective tax rate on the adjustments to reconcile net income (loss) to Adjusted Earnings (loss).

(3) The Company's restricted shares of common stock are participating securities.

Adjusted Earnings (Loss) is not intended to represent cash flows for the period, nor is it presented as a substitute for net income (loss), operating income (loss), cash flows provided by (used in) operating activities or any other measure of financial performance or liquidity presented in accordance with U.S. GAAP.

***Adjusted G&A and Adjusted G&A per Boe***

We present Adjusted G&A expense in addition to our reported G&A expense in accordance with U.S. GAAP. Adjusted G&A is reported herein because this measure is commonly used by management, analysts and investors as an indicator of cost management and operating efficiency on a comparable basis from period to period. In addition, management believes Adjusted G&A per Boe is used by analysts and others in valuation, comparison and investment recommendations of companies in the oil and gas industry to allow for analysis of G&A spend without regard to stock-based compensation programs which can vary substantially from company to company. Adjusted G&A per Boe should not be considered as an alternative to, or more meaningful than, total G&A per Boe as determined in accordance with U.S. GAAP and may not be comparable to other similar titled measures of other companies. We define Adjusted G&A as G&A:

Less:

- Stock-based compensation expense; and
- Certain costs related to acquisitions and divestitures.

The following table presents a reconciliation of our G&A to Adjusted G&A (in thousands, except per Boe data):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2016** | **2015** | **2014** | **2013** | **2012** |
| | **(in thousands, except per Boe data)** | | | | |
| General and administrative expense | $ 110,081 | $ 74,160 | $ 63,692 | $ 47,951 | $ 37,239 |
| Stock-based compensation expense included in G&A | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in G&A | 8,130 | 3,814 | 1,808 | 4,129 | - |
| Adjusted G&A | $ 64,861 | $ 55,515 | $ 49,041 | $ 26,071 | $ 11,697 |
| | | | | | |
| **Average unit costs per Boe:** | | | | | |
| General and administrative expense | $ 5.64 | $ 3.87 | $ 5.72 | $ 12.39 | $ 79.43 |
| Stock-based compensation expense included in G&A | $ 1.90 | $ 0.77 | $ 1.15 | $ 4.58 | $ 54.48 |
| Acquisition and divestiture costs included in G&A | $ 0.42 | $ 0.20 | $ 0.16 | $ 1.07 | $ - |
| Adjusted G&A per Boe | $ 3.32 | $ 2.89 | $ 4.40 | $ 6.73 | $ 24.95 |

**Item 7.** ***Management's Discussion and Analysis of Financial Condition and Results of Operations***

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes set forth in "Item 8. Financial Statements and Supplementary Data," our consolidated financial data set forth in "Item 6. Selected Financial Data" and the risk factors identified in "Item 1A. Risk Factors" of this Annual Report on Form 10-K.*

*Our estimated proved reserve information as of December 31, 2016 contained in this Annual Report on Form 10-K is based on a report prepared by Ryder Scott Company, L.P. ("Ryder Scott"), our independent reserve engineers. Estimated reserve information for the Comanche Assets contained in this Annual Report on Form 10-K is based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the*

Page 158 of 1759

*Comanche Acquisition and has not been independently verified or estimated. Unless otherwise specified in this Annual Report on Form 10-K, the information in this Annual Report on Form 10-K does not give effect to the Comanche Acquisition.*

*Certain items in our discussion below are forward-looking statements. These forward looking statements involve risks and uncertainties. A number of factors could cause actual results to differ materially from those implied or expressed in such forward-looking statements. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation, a Delaware corporation formed in 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the TMS in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale.

On January 12, 2017, the Company, through two of our subsidiaries, SN UnSub and SN Maverick, along with Blackstone signed the Comanche Purchase Agreement to acquire the Comanche Assets from Anadarko for $2,275 million in cash, subject to customary closing adjustments. The Comanche Assets are primarily located in the Western Eagle Ford Shale and are expected to significantly expand our asset base and production. The Comanche Assets consist of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) Pearsall Shale acres, with an approximate 49% average working interest therein, contain, as of June 30, 2016, approximately 300 MMBoe of proved reserves (70% liquids, 75% proved developed), and had production of approximately 67,000 Boe/d (70% liquids) as of December 31, 2016. The estimated proved reserves attributable to the Comanche Assets are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition and have not been independently verified or estimated. The Comanche Purchase Agreement provides that SN UnSub will pay approximately 37% of the purchase price (including through a $100 million cash contribution from the Company) and SN Maverick will pay approximately 13% of the purchase price and SN UnSub and SN Maverick would acquire half of the 49% working interest in and to the Comanche Assets in the aggregate (and approximately 50% and 0%, respectively, of the estimated total proved developed producing reserves, 20% and 30%, respectively, of the estimated total proved developed non-producing reserves, and 20% and 30%, respectively, of the total proved undeveloped reserves), and Blackstone will pay 50% of the purchase price and would acquire the remaining half of the 49% working interest in and to the Comanche Assets (approximately 50% of the estimated total proved developed producing reserves, proved developed non-producing reserves and proved undeveloped reserves). We expect to close the Comanche Acquisition during the first quarter of 2017. The effective date of the transaction is July 1, 2016. A working interest owner (the "Tag Owner") held a tag right, exercisable until February 12, 2017, to sell its interest in the Comanche Assets (which is approximately one-half Anadarko's interest) on substantially the same terms and conditions as Anadarko. However, the Tag Owner elected to waive its tag right. The estimated proved reserves attributable to the Comanche Assets are as of June 30, 2016, are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition and have not been independently verified or estimated.

For the year 2017, we plan to invest substantially all of our 2017 capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities.

For further discussion of our business, including a description of various acquisitions completed during the periods presented in the consolidated financial statements, refer to "Item 1. Business—Overview."

***Basis of Presentation***

The consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Our Properties***

We and our predecessor entities have a long history in the Eagle Ford Shale, where we have assembled approximately 278,000 net leasehold acres with an average working interest of approximately 94%. Using approximately 75 acre well-spacing for our Maverick area, approximately 120 acre well-spacing for our Javelina area, approximately 40 acre well-spacing for our Palmetto area, approximately 60 acre well-spacing for our Marquis area and approximately 75 acre well-spacing for our Catarina area, and assuming 80% of the acreage is drillable for our Maverick, Javelina, Marquis and Catarina areas, and 90% of the acreage is drillable for our Palmetto area, we believe that there could be over 3,300 potential gross (3,050 net) locations for potential future drilling in the Eagle Ford Shale. Pro forma for the pending Comanche Acquisition, we will have assembled approximately 339,000 net leasehold acres with an approximate 61% average working interest as of December 31, 2016, and will have over 7,300 potential gross (4,050 net) Eagle Ford locations for potential drilling. Our average well-spacing for the Comanche area is planned to be 600 foot apparent spacing (in zone), with plans for multi-bench development of two to four Eagle Ford targets across our acreage position.

The TMS development is currently challenged due to high well costs and depressed commodity prices. We believe that the TMS play has significant development potential and may offer upside opportunity as changes in technology, commodity prices, and service prices occur. The average remaining lease term on the acreage is over 2 years, giving us ample time to allow other industry participants to further de-risk the play. Using approximately 250 acre well-spacing for our TMS area and assuming 80% of the acreage is drillable, we believe that there are up to 200 gross (150 net) locations for potential future drilling.

In total, pro forma for the pending Comanche Acquisition, we believe that there are over 7,500 potential gross (4,200 net) Eagle Ford and TMS locations for future drilling. Consistent with other operators in this area, we perform multi-stage hydraulic fracturing up to 30 stages on each well depending upon the length of the lateral section. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale.

For further discussion of our properties, including a description of recent well results in our core operating areas, refer to "Item 1. Business—Core Properties."

***Recent Developments***

*Comanche Acquisition*

As noted above in "Item 7. Management's Discussion and Analysis—Business Overview", the Company, through two of our subsidiaries, SN UnSub and SN Maverick, along with Blackstone, signed the Comanche Purchase Agreement to acquire the Comanche Assets from Anadarko for $2,275 million in cash, subject to customary closing adjustments. The Comanche Assets are primarily located in the Western Eagle Ford Shale and are projected to more than double our gross drilling inventory as of December 31, 2016, add 132 gross drilled but uncompleted wells and provide a path for strong growth within projected cash flow. With the Comanche Assets strategically located adjacent to our existing Catarina assets, we anticipate substantial operating synergies and other benefits arising from the scale and concentration of our expanded Eagle Ford position. Our continued focus on the Western Eagle Ford, expertise at multi-bench development and efficient cost structure provide us with opportunities to create significant value from the Comanche Assets. With the potential to duplicate the cost structure of our Catarina and Maverick operations throughout the Comanche Assets, we expect to further improve operating efficiencies while enhancing our capability to achieve sustainability of well cost reductions over time.

In connection with the pending Comanche Acquisition, on January 12, 2017, SN UnSub, JPMorgan Chase Bank, N.A., Citibank, N.A., and certain of their affiliates entered into a debt financing commitment letter for the SN UnSub Credit Facility.

*Interim Investors Agreement*

In connection with the execution of the Common Purchase Agreement, on January 12, 2022, we and Blackstone entered into an Interim Investors Agreement to govern the relationship between us and Blackstone pending



---

the closing of the transactions contemplated by the Comanche Purchase Agreement and provide for certain agreements to be entered into among us and Blackstone and their affiliates in connection with the closing of the Comanche Acquisition.

*Securities Purchase Agreement*

As part of the financing for the acquisition of the Comanche Assets, on January 12, 2017, we and GSO entered into a Securities Purchase Agreement (the “SPA”). The SPA provides that, at the closing of the transactions contemplated by the Comanche Purchase Agreement and subject to the other terms and conditions provided therein, (i) SN EF UnSub Holdings, LLC, the limited partner of SN UnSub, will purchase 100,000 common units of SN UnSub for $100 million and GSO will purchase at least 500,000 preferred units of SN UnSub for $500 million plus, at GSO’s sole election, additional preferred units if SN UnSub intends to incur senior debt other than pursuant to the SN UnSub Credit Facility, if there is an unsuccessful syndication of the SN UnSub Credit Facility, or the availability under the SN UnSub Credit Facility as of the closing will be less than $65 million (the “Debt Replacement Units”), and (ii) GSO will purchase one common unit in SN UnSub's general partner for nominal consideration. In addition, GSO has committed, pursuant to the terms and conditions of the SPA, to purchase additional preferred units (and, at its sole option, additional Debt Replacement Units).

*2017 Capital Program*

Our 2017 capital budget is focused on the development of our approximately 339,000 net acres in the Eagle Ford Shale, inclusive of net acreage attributable to the pending Comanche Acquisition. In 2017, we plan to invest $395 million to $440 million, or 100%, of our drilling and completion budget to complete 144 net Eagle Ford Shale wells. We also plan to invest $30 million to $35 million for facilities, leasing and seismic activities. This 2017 capital budget of $425 million to $475 million represents an increase of approximately 64% over our budgeted 2016 capital investment of $250 million to $300 million. The increase in our 2017 capital budget is attributable to the planned development of new locations expected to be added through the Comanche Acquisition. Capital allocation to the Catarina, Maverick and Palmetto assets remains unchanged as a result of the Comanche Acquisition, and is generally in line with 2016 activity levels.

The following table presents summary data for each of our project areas as of December 31, 2016, pro forma for the Comanche Acquisition as well as our drilling and completion budget for 2017 fiscal year:

| | | | | Identified Drilling Locations (2) | | 2017 Capital Expenditure Budget | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Net Acreage | Average Working Interest (1) | Operator | Gross | Net | Net Wells Spud | Net Wells Completed | Drilling & Completion ("D&C") Capital (in millions) | % of Operating Capital | % of D&C Capital |
| Catarina | 106,051 | 100% | Sanchez Energy | 1,400 | 1,400 | 49 | 53 | $160 - $170 | 35% | 37% |
| Comanche | 61,262 | 23% | Sanchez Energy | 4,000 | 1,000 | 30 | 53 | $130 - $150 | 32% | 35% |
| Maverick | 102,626 | 96% | Sanchez Energy | 1,100 | 1,000 | 35 | 35 | $100 - $110 | 24% | 26% |
| Javelina | 39,506 | 100% | Sanchez Energy | 300 | 300 | - | - | $0 | 0% | 0% |
| Palmetto | 8,097 | 49% | Marathon | 300 | 150 | 2 | 3 | $5 - $10 | 2% | 2% |
| Marquis | 21,477 | 100% | Sanchez Energy | 200 | 200 | - | - | $0 | 0% | 0% |
| Total Eagle Ford | 339,019 | 61% | | 7,300 | 4,050 | 116 | 144 | $395 - $440 | 93% | 100% |
| TMS | 45,639 | 71% | Sanchez Oil and Gas | 200 | 150 | - | - | $0 | 0% | 0% |
| Other | 727 | 25% | Sanchez Energy | - | - | - | - | $0 | 0% | 0% |
| Total | 385,385 | 62% | | 7,500 | 4,200 | 116 | 144 | $395 - $440 | 93% | 100% |
| Facilities, Leasing and Seismic | | | | | | | | $30 - $35 | 7% | |
| Total Capital Budget | | | | | | | | $425 - $475 | 100% | |

(1) Average working interests reflect the Company’s average working interests in the leases it holds.

Case 4:23-34509 Document 1254-17 Filed in TXSB on 07/28/20 Page 124 of 2759

(2) Using approximately 75 acre well-spacing for our Maverick area, approximately 120 acre well-spacing for our Javelina area, approximately 40 acre well-spacing for our Palmetto area, approximately 60 acre well-spacing for our Marquis area and approximately 75 acre well-spacing for our Catarina and assuming 80% of the acreage is drillable for our Maverick, Javelina, Marquis and Catarina areas, and 90% of the acreage is drillable for our Palmetto area, we believe that there could be over 3,300 potential gross (3,050 net) locations for potential future drilling in the Eagle Ford Shale. Following the completion of the pending Comanche Acquisition, we believe that we will have

over 7,300 gross (4,050 net) locations for potential future drilling in the Eagle Ford Shale. Our average well-spacing for the Comanche area is planned to be 600 foot apparent spacing (in zone), with plans for multi-bench development of two to four Eagle Ford targets across our acreage position, providing approximately 4,000 potential gross (1,000 net) locations. Using approximately 250 acre well-spacing for our TMS area and assuming 80% of the acreage is drillable, we believe that there are up to 200 gross (150 net) locations for potential future drilling. In total, pro forma for the pending Comanche Acquisition, we believe that there are over 7,500 potential gross (4,200 net) Eagle Ford and TMS locations for future drilling.

In our Comanche area, pro forma for the pending Comanche Acquisition, we have approximately 61,000 net acres in Dimmit, Webb, La Salle and Maverick Counties, Texas with a 24% working interest. We anticipate drilling, completion and facilities costs on our acreage to average approximately $3.2 million per well based on our current estimates. Current EUR per well in Comanche is expected to range between 600 MBoe and 700 MBoe. We have identified between 4,000 and 1,000 gross and net Eagle Ford locations for potential future drilling on our Comanche acreage. For the year 2017, we plan to spend between $130 million to $150 million to complete 53 net wells, 32 of which were drilled by the previous operator.

*Common Equity Offering*

On February 6, 2017, the Company completed an underwritten public offering of 10,000,000 shares of the Company's common stock at a price of $12.50 per share ($11.7902 per share, net of underwriting discounts). The Company granted the Underwriters a 30-day option to purchase up to an additional 1,500,000 shares of the Company's common stock on the same terms, which was exercised in full on February 1, 2017. The Company received net proceeds of approximately $135.9 million (after deducting underwriting discounts) from the sale of the shares of common stock. The Company intends to use the net proceeds of the offering for general corporate purposes, including working capital.

***Outlook***

Although capital markets have shown signs of improvement recently, our operating environment continues to be influenced by commodity price volatility. As a result, we face persistent uncertainty with respect to the future of our industry, which may continue into future years. In this environment, the Company plans to carefully manage its capital spending and operating activities in order to preserve liquidity. The Company maintains significant operational and financial flexibility to respond to changes in market and operating conditions, and our capital budget remains at all times subject to adjustment.

We expect to use a portion of our cash on hand, internally generated cash flows from operations, and funds raised through the strategic sale of certain non-core assets, to fund our 2017 capital expenditures, and currently project no borrowings under the Second Amended and Restated Credit Agreement for purposes of our development activity at our planned level of capital spending. We will continuously evaluate our capital spending and operating activities in light of realized commodity prices and the results of our operations, and may make further adjustments to our capital spending program as warranted, subject to our obligations under the JDA following the expected closing of the Comanche Acquisition. In addition, we will continuously review acquisition and divestiture opportunities involving third parties, SPP and/or other members of the Sanchez Group.

The average oil price (WTI Cushing) used in the SEC pricing methodology for calculating the PV-10 and Standardized Measures and for performing impairment tests under the full cost method, calculated as the unweighted arithmetic average of the first day of the month price for each month within the 12 month period ended December 31, 2016 was $42.75 per barrel and the average natural gas price, at Henry Hub, and calculated in the same manner, was $2.49 per MMBtu. At these price levels, SEC prices for oil and natural gas have decreased approximately 15% and 4%, respectively, since December 31, 2015, but have increased approximately 3% and 9%, respectively, since September 30, 2016.

As a result of less favorable commodity prices adversely impacting our proved reserve values, and the impact of commodity price volatility on our future drilling opportunities, we recorded a full cost ceiling test impairment after

income taxes of $169.0 million for the year ended December 31, 2016. While there is a possibility that the Company will incur additional impairments to our full cost pool in 2017, factors impacting the full cost ceiling test impairment calculation have not yet been determined. Based upon known improvements in the current NYMEX forward prices, we believe that there is a reasonable likelihood of an increase in the average 12 month trailing first-day-of-the-month pricing in the first quarter of 2017.

**Results of Operations**

***Revenue and Production***

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Year Ended December 31, | | | Increase (Decrease) | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2016 vs 2015 | | 2015 vs 2014 | |
| | 2016 | 2015 | 2014 | $ | % | $ | % |
| **Net Production:** | | | | | | | |
| Oil (MBbl) | 6,370 | 7,165 | 6,080 | (795) | (11)% | 1,085 | 18 % |
| Natural gas liquids (MBbl) | 5,960 | 5,754 | 2,590 | 206 | 4 % | 3,164 | 122 % |
| Natural gas (MMcf) | 43,189 | 37,594 | 14,828 | 5,595 | 15 % | 22,767 | 154 % |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 11,141 | 345 | 2 % | 8,043 | 72 % |
| **Average Sales Price Excluding Derivatives[1]:** | | | | | | | |
| Oil ($ per Bbl) | $ 37.95 | $ 42.98 | $ 88.64 | $ (5.03) | (12)% | $ (45.66) | (52)% |
| Natural gas liquids ($ per Bbl) | 13.72 | 11.99 | 25.86 | 1.73 | 14 % | (13.87) | (54)% |
| Natural gas ($ per Mcf) | 2.50 | 2.63 | 4.06 | (0.13) | (5)% | (1.43) | (35)% |
| Oil equivalent ($ per Boe) | $ 22.09 | $ 24.80 | $ 59.79 | $ (2.71) | (11)% | $ (34.99) | (59)% |
| **Average Sales Price Including Derivatives[2]:** | | | | | | | |
| Oil ($ per Bbl) | $ 55.37 | $ 60.28 | $ 89.26 | $ (4.91) | (8)% | $ (28.98) | (32)% |
| Natural gas liquids ($ per Bbl) | 13.72 | 11.99 | 25.86 | 1.73 | 14 % | (13.87) | (54)% |
| Natural gas ($ per Mcf) | 3.07 | 3.12 | 4.13 | (0.05) | (2)% | (1.01) | (24)% |
| Oil equivalent ($ per Boe) | $ 29.03 | $ 32.23 | $ 60.22 | $ (3.20) | (10)% | $ (27.99) | (46)% |
| **REVENUES[1]:** | | | | | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 | $ (66,205) | (21)% | $ (230,916) | (43)% |
| Natural gas liquids sales | 81,744 | 69,011 | 66,989 | 12,733 | 18 % | 2,022 | 3 % |
| Natural gas sales | 107,816 | 98,797 | 60,188 | 9,019 | 9 % | 38,609 | 64 % |
| Total revenues | $ 431,326 | $ 475,779 | $ 666,064 | $ (44,453) | (9)% | $ (190,285) | (29)% |

(1) Excludes the realized impact of derivative instruments.

(2) Includes the realized impact of derivative instruments.

*Net Production.* Production increased from 19,184.4 MBoe in 2015 to 19,528.7 MBoe in 2016 due to our drilling program in 2016. The number of gross wells producing at year end and the production for the periods were as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| | # Wells | MBoe | # Wells | MBoe | # Wells | MBoe |
| Catarina | 333 | 15,847 | 287 | 13,905 | 193 | 3,967 |
| Maverick | 36 | 888 | 24 | 409 | 18 | 182 |
| Cotulla | 49 | 1,279 | 121 | 2,108 | 111 | 2,865 |
| Palmetto | 76 | 511 | 72 | 874 | 64 | 1,771 |
| Marquis | 103 | 958 | 103 | 1,816 | 90 | 2,324 |
| TMS | 14 | 46 | 14 | 73 | 9 | 32 |
| Total | 611 | 19,529 | 621 | 19,184 | 485 | 11,141 |

In 2016, 33% of our production was oil, 30% was NGLs and 37% was natural gas compared to 2015 production that was 37% oil, 30% NGLs and 33% natural gas. In 2014, 55% of our production was oil, 23% NGLs and 22% natural gas. The change in production mix during the year ended December 31, 2016 was due to the increase in production from the producing properties in Catarina that have a higher proportion of NGL and natural gas production as compared to oil production from this area. Throughout the year ended December 2016, production from Catarina continued to increase in proportion to the total production, and as such, a higher proportion of NGL and natural gas was produced as compared to oil.

*Revenues.* Oil, NGL and natural gas sales revenues totaled approximately $431.3 million, $475.8 million, and $666.1 million for the years ended December 31, 2016, 2015 and 2014, respectively. Oil revenue for the year ended December 31, 2016 decreased $66.2 million, while revenues from NGL and natural gas sales revenue for the year ended December 31, 2016 increased $12.8 million and $9.0 million, respectively, as compared to the year ended December 31, 2015.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from the year ended December 31, 2015 to the year ended December 31, 2016 (in thousands, except average sales price):

| | 2016 Production Volume | 2015 Production Volume | Production Volume Difference | 2015 Average Sales Price | Revenue Increase/(Decrease) due to Production |
|---|---|---|---|---|---|
| Oil (MBbl) | 6,370 | 7,165 | (795) | $ 42.98 | $ (34,140) |
| Natural gas liquids (MBbl) | 5,960 | 5,754 | 206 | $ 11.99 | $ 2,470 |
| Natural gas (MMcf) | 43,189 | 37,594 | 5,595 | $ 2.63 | $ 14,704 |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 345 | $ 24.80 | $ (16,966) |

| | 2016 Average Sales Price | 2015 Average Sales Price | Average Sales Price Difference | 2016 Production Volume | Revenue Increase/(Decrease) due to Price |
|---|---|---|---|---|---|
| Oil (MBbl) | $ 37.95 | $ 42.98 | $ (5.03) | 6,370 | $ (32,065) |
| Natural gas liquids (MBbl) | $ 13.72 | $ 11.99 | $ 1.73 | 5,960 | $ 10,263 |
| Natural gas (MMcf) | $ 2.50 | $ 2.63 | $ (0.13) | 43,189 | $ (5,685) |
| Total oil equivalent (MBoe) | $ 22.09 | $ 24.80 | $ (2.71) | 19,529 | $ (27,487) |

Case 4:23-34508 Document 1254317 Filed in TXSB on 07/28/20 Page 170 of 1759

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2016 by $43.1 million.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from the year ended December 31, 2014 to the year ended December 31, 2015 (in thousands, except average sales price):

| | 2015 Production Volume | 2014 Production Volume | Production Volume Difference | 2014 Average Sales Price | Revenue Increase/(Decrease) due to Production |
|---|---|---|---|---|---|
| Oil (MBbl) | 7,165 | 6,080 | 1,085 | $ 88.64 | $ 96,176 |
| Natural gas liquids (MBbl) | 5,754 | 2,590 | 3,164 | $ 25.86 | $ 81,834 |
| Natural gas (MMcf) | 37,594 | 14,828 | 22,766 | $ 4.06 | $ 92,412 |
| Total oil equivalent (MBoe) | 19,184 | 11,141 | 8,043 | $ 59.79 | $ 270,422 |

| | 2015 Average Sales Price | 2014 Average Sales Price | Average Sales Price Difference | 2015 Production Volume | Revenue Increase/(Decrease) due to Price |
|---|---|---|---|---|---|
| Oil (MBbl) | $ 42.98 | $ 88.64 | $ (45.66) | 7,165 | $ (327,092) |
| Natural gas liquids (MBbl) | $ 11.99 | $ 25.86 | $ (13.87) | 5,754 | $ (79,812) |
| Natural gas (MMcf) | $ 2.63 | $ 4.06 | $ (1.43) | 37,594 | $ (53,803) |
| Total oil equivalent (MBoe) | $ 24.80 | $ 59.79 | $ (34.99) | 19,184 | $ (460,707) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2015 by $47.6 million.

***Operating Costs and Expenses***

The table below presents a detail of operating costs and expenses for the periods indicated (in thousands except percentages):

| | Year Ended December 31, | | | Increase (Decrease) | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2016 vs 2015 | | 2015 vs 2014 | |
| | 2016 | 2015 | 2014 | $ | % | $ | % |
| **OPERATING COSTS AND EXPENSES:** | | | | | | | |
| Oil and natural gas production expenses | $ 164,567 | $ 156,528 | $ 93,581 | $ 8,039 | 5 % | $ 62,947 | 67 % |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 | (7,237) | (27)% | (10,917) | (29)% |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | (184,812) | (54)% | 6,475 | 2 % |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | (1,195,954) | (88)% | 1,151,179 | * |
| General and administrative [(1)] | 110,081 | 74,160 | 63,692 | 35,921 | 48 % | 10,468 | 16 % |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 | (1,344,043) | (68)% | 1,220,152 | 163 % |
| | | | | | | | |
| Interest income and other income (expense) | 990 | (2,163) | 289 | 3,153 | * | (2,452) | * |
| Interest expense | (126,973) | (126,399) | (89,800) | 574 | (0)% | 36,599 | (41)% |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 | (226,035) | (131)% | 35,681 | 26 % |
| Income tax benefit (expense) | (1,825) | (7,600) | 11,429 | 5,775 | (76)% | (19,029) | * % |

* Not meaningful.

(1)Includes stock-based compensation expense of $37.1 million, $14.8 million and $12.8 million for the years ended December 31, 2016, 2015 and 2014,

Case 20-34508 Document 1254-17 Filed in TXSB on 07/28/20 Page 172 of 1759

respectively, and includes acquisition and divestiture costs of $4.1 million, $5.8 million and $1.8 million for the years ended December 31, 2016, 2015 and 2014, respectively.



008042

*Oil and Natural Gas Production Expenses.* Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Such costs also include field personnel costs, utilities, chemical additives, salt water disposal, maintenance, repairs and occasional well workover expenses related to our oil and natural gas properties. Our oil and natural gas production expenses increased 5% to $164.6 million for the year ended December 31, 2016, as compared to $156.5 million for the same period in 2015 and $93.6 million for the same period in 2014. The increase in oil and natural gas production expenses from 2014 to 2016 is directly attributable to our increased production activities in the Eagle Ford Shale, as a result of increased drilling in our Catarina acreage, acquired in 2014. In addition, there was an increase in gathering and transportation costs primarily related to the Gathering Agreement with SPP that began in October 2015. Our average production expenses increased from $8.16 per Boe during the year ended December 31, 2015 to $8.43 per Boe for the year ended December 31, 2016. This increase was due primarily to the increase in gathering and transportation costs, which had an increased from $3.93 per Boe for the year ended December 31, 2015 to $6.29 per Boe for the year ended December 31, 2016. While we expect our oil and natural gas production expenses to increase as we add producing wells, we expect to continue our efficient operation of our properties, and do not expect significant increases in our average production expenses per Boe.

*Production and Ad Valorem Taxes.* Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach by a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $19.6 million, $26.9 million and $37.8 million for the years ended December 31, 2016, 2015 and 2014, respectively. The tax decrease from 2015 to 2016 is attributable to the decrease in revenues of 9% between the periods and the decrease in appraised property values from the sustained decline in commodity prices and decrease in drilling activity during the current period. This tax decrease from 2014 to 2015 was attributable to the decrease in revenues of 29% between the periods and the decrease in appraised property values due to the decline in commodity prices between the periods. Our average production and ad valorem taxes decreased from $1.40 per Boe during the year ended December 31, 2015 to $1.01 per Boe for the year ended December 31, 2016. This decrease in rate is attributable to the decrease in expense by 27% from 2015 to 2016 coupled with the increase in production volumes by 2% from 2015 to 2016. In addition, the majority of our horizontal wells are characterized as tight gas wells, which apply a reduced production tax rate after certification from the state regulatory body. Until the Company receives the proper certification, the normal production tax rates are applied to the wells, and once the certification is approved, the reduced rates are applied and tax credits are received from the state. The timing of receipt of the certifications and tax credits vary from well to well.

*Depreciation, Depletion, Amortization, and Accretion.* Depletion, depreciation, amortization, and accretion ("DD&A") reflects the systematic expensing of the capitalized costs incurred in the acquisition, exploration and development of oil and natural gas properties. We use the full-cost method of accounting and accordingly, we capitalize all costs associated with the acquisition, exploration and development of oil and natural gas properties, including unproved and unevaluated property costs. Internal costs are capitalized only to the extent they are directly related to acquisition, exploration and development activities and do not include any costs related to production, selling or general corporate administrative activities. Capitalized costs of oil and natural gas properties are amortized using the units of production method based upon production and estimates of proved oil and natural gas reserve quantities. Unproved and unevaluated property costs are excluded from the amortizable base used to determine DD&A expense.

Our DD&A expense for the year ended December 31, 2016 decreased to $159.8 million ($8.18 per Boe) from $344.6 million ($17.96 per Boe) in 2015 and $338.1 million in 2014 ($30.35 per Boe). The majority of the decrease in DD&A is related to a decrease in the depletion rate, resulting primarily from a decrease in the full-cost pool proved property amortization base as result of approximately $1,748 million of full-cost ceiling impairments recorded over the periods from the fourth quarter 2014 to the third quarter 2016. We did not record a full-cost ceiling impairment during the fourth quarter 2015 or fourth quarter 2016. This was slightly offset by an increase in production between the periods. Higher production in 2016 as compared to 2015 resulted in a $6.2 million increase in depletion expense and the change in depletion rate resulted in an offsetting $191.0 million decrease in depletion expense. Higher production in 2015 as compared to 2014 resulted in a $244.1 million increase in depletion expense and the change in depletion rate resulted in an offsetting $237.6 million decrease in depletion expense.

*Impairment of Oil and Natural Gas Properties.* We utilize the full cost method of accounting to account for our oil and natural gas exploration and development activities. Under this method of accounting, we are required on a quarterly basis to determine whether the book value of our oil and natural gas properties (excluding unevaluated properties) is less than or equal to the "ceiling," based upon the expected after tax present value (discounted at 10%) of the future net cash flows from our proved reserves. Any excess of the net book value of our oil and natural gas properties over the ceiling must be recognized as a non-cash impairment expense. We recorded a full cost ceiling test impairment after income taxes of $22.1 million, $87.4 million, and $59.6 million for the three months ended March 31, 2016, June 30, 2016, and September 30, 2016, respectively, and did not record a full cost ceiling impairment during the fourth quarter 2016. We recorded a full cost ceiling test impairment after income taxes of $441.5 million, $468.9 million, and $454.6 million for the three months ended March 31, 2015, June 30, 2015, and September 30, 2015, respectively, and did not record a full-cost ceiling impairment during the fourth quarter 2015. We recorded a full cost ceiling test impairment before income taxes of $213.8 million for the year ended December 31, 2014. The impact of less favorable commodity prices adversely affecting estimated proved reserve volumes and future estimated revenues was the main contributor to the ceiling impairments. Changes in production rates, levels of reserves, future development costs, transfers of unevaluated properties, and other factors will determine our actual ceiling test calculation and impairment analyses in future periods. Based upon known improvements in the current NYMEX forward prices, we believe that there is a reasonable likelihood of an increase in the average 12 month trailing first-day-of-the-month pricing in the first quarter of 2017.

If the simple average of oil and natural gas prices as of the first day of each month for the trailing 12-month period ended December 31, 2016 had been $2.78 per MMbtu for natural gas, $47.62 per Bbl of oil, and $24.70 per Bbl of NGL, while all other factors remained constant, our ceiling test limitation related to the net book value of our proved oil and natural gas properties would have increased by approximately $389.2 million and our net PUD and total proved reserves would have increased by approximately 4.8 MMBoe and 11.8 MMBoe, respectively. The aforementioned prices were calculated based on a 12-month simple average, which includes the oil and natural gas prices on the first day of the month for the 11 months ended February 2017 and the February 2017 prices were held constant for the remaining one month. This calculation of the impact of volatile commodity prices is prepared based on the presumption that all other inputs and assumptions are held constant with the exception of oil, natural gas, and NGL prices. Therefore, this calculation strictly isolates the impact of commodity prices on our ceiling test limitation and proved reserves. The impact of price is only a single variable in the estimation of our proved reserves and other factors noted above could have a significant impact on future reserves and the present value of future cash flows. There are numerous uncertainties inherent in the estimation of proved reserves and accounting for oil and natural gas properties in subsequent periods and this pro forma estimate should not be construed as indicative of our development plans or future results.

*General and Administrative Expenses.* Our G&A expenses, totaled $110.1 million for the year ended December 31, 2016 compared to $74.2 million and $63.7 million for the same periods in 2015 and 2014, respectively. This increase was due primarily to additional costs for added personnel at SOG performing services for the Company and for consulting services and increased fees for legal services during 2016. Our G&A expenses per Boe increased from $3.87 per Boe for the year ended December 31, 2015 to $5.64 per Boe for the year ended December 31, 2016. Our G&A expenses totaled $74.2 million ($3.87 per Boe) for the year ended December 31, 2015 compared to $63.7 million ($5.72 per Boe) for the same period in 2014. This increase was due primarily to additional costs for added personnel at SOG performing services for the Company and for consulting services and increased fees for legal services during 2015.

We recorded stock-based compensation expense of $37.1 million for the year ended December 31, 2016 as compared to expense of $14.8 million for the year ended December 31, 2015. The increase was due primarily to the increase in awards made during the year and the associated amortization recognized in addition to the increase in the stock price from period to period. We recorded stock-based compensation expense of $14.8 million and $12.8 million for the year ended December 31, 2015, and 2014, respectively. The increase from 2014 to 2015 was due primarily to the increase in awards made during the year and the associated amortization recognized offset by a decrease in the Company's stock price from period to period. The Company records stock-based compensation expense for awards granted to non-employees at fair value and the unvested awards are revalued each period, impacting the amortization over the remaining life of the awards.

We recorded costs associated with the Carnero Gathering Sale, Carnero Processing Sale, Production Asset Transaction, Cotulla Sale, and the pending Comanche Acquisition that are included in G&A of $8.1 million for the year ended December 31, 2016. We recorded costs associated with the Palmetto Disposition and the Western Catarina Midstream Divestiture that are included in G&A of $3.8 million for the year ended December 31, 2015. We recorded costs associated with the Catarina Acquisition of $1.8 million for the year ended December 31, 2014.

Adjusted G&A, excluding stock-based compensation expense and acquisition and divestiture costs included in G&A, totaled $64.9 million ($3.32 per Boe), $55.5 million ($2.89 per Boe), and $49.0 million ($4.40 per Boe) for the years ended December 31, 2016, 2015 and 2014, respectively.

*Interest Expense.* For the year ended December 31, 2016, interest expense totaled $127.0 million and included $7.8 million in amortization of debt issuance costs. This is compared to the year ended December 31, 2015, for which interest expense totaled $126.4 million and included $7.5 million in amortization of debt issuance costs. The interest expense incurred during the year ended December 31, 2016 is primarily related to the 7.75% Notes (as defined in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt") and 6.125% Notes (as defined in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt").

For the year ended December 31, 2015, interest expense totaled $126.4 million and included $7.5 million in amortization of debt issuance costs. This is compared to the year ended December 31, 2014, for which interest expense totaled $89.8 million and included $9.0 million in amortization of debt issuance costs and write-offs of previously incurred debt issuance costs in connection with the unused senior unsecured bridge facility obtained as part of the Catarina Acquisition that expired. The interest expense incurred during the year ended December 31, 2015 is primarily related to the 7.75% Notes (as defined in Note 5, "Long-Term Debt") and 6.125% Notes (as defined in Note 5, "Long-Term Debt").

*Commodity Derivative Transactions.* We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the year ended December 31, 2016, we recognized a net loss of $53.1 million on our commodity derivative contracts, which included net gains of $135.6 million associated with the settlements of commodity derivative contracts, offset by mark to market losses of $188.7 million on unsettled commodity derivative contracts. The mark to market losses were a result of the increase in estimated future commodity prices as compared to the derivative settlement prices. The settlement gains realized during the period were primarily the result of decreases in commodity prices from the time the trades were entered until the time of cash settlement for trades that liquidated by their terms during the current period. During the year ended December 31, 2015, we recognized a net gain of $172.9 million on our commodity derivative contracts, which included net gains of $142.5 million associated with the settlements of commodity derivative contracts. During the year ended December 31, 2014, we recognized a net gain of $137.2 million on our commodity derivative contracts, which included net gains of $4.9 million associated with the settlements of commodity derivative contracts.

*Income tax expense.* For the year ended December 31, 2016, the Company recorded income tax expense of $1.8 million. Our effective tax rate for the year ended December 31, 2016 was (0.7)% as compared to a statutory rate of 35%. The difference between the statutory rate and the Company's effective tax rate is primarily related to the valuation allowance of approximately $86.6 million recorded during the period. For the year ended December 31, 2015, the Company recorded income tax expense of $7.6 million. Our effective tax rate for the year ended December 31, 2015 was (0.5)% as compared to a statutory rate of 35%. The difference between the statutory rate and the Company's effective tax rate is related to the valuation allowance of approximately $515 million recorded during the period. We expect our effective tax rate going forward to be approximately 0% as we have recorded a full valuation allowance against our net deferred tax assets.

**Liquidity and Capital Resources**

As of December 31, 2016, we had approximately $502 million in cash and cash equivalents and a $300 million in borrowing capacity at the aggregate elected commitment amount under the Second Amended and Restated Credit Agreement with a syndicate of 16 participating banks, resulting in availability liquidity of approximately $802 million.

The Company recently announced a new 2017 capital spending plan of approximately $425 million to $475 million. The new spending plan was approved in conjunction with the anticipated close of the Comanche Acquisition in March 2017 along with expected improvements in commodity prices during 2017. We may from time to time seek to retire or purchase our outstanding debt as well as our outstanding equity securities, both common stock and preferred stock, through cash purchases and/or exchanges for equity securities and/or debt securities, as applicable, in open market purchases, privately negotiated transactions or otherwise. Such repurchases or exchanges, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. The amounts involved may be material.

For a description of current and previous credit agreements along with the indentures covering our Senior Notes refer to "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt."

On February 6, 2017, we closed a firm commitment underwritten public offering of shares of our common stock and received net proceeds of approximately $135.9 million (after deducting underwriting discounts). We intend to use the net proceeds of the offering for general corporate purposes, including working capital.

Under the terms of SN UnSub's preferred unit financing with GSO, if consummated the preferred units held by GSO in SN UnSub will receive a quarterly dividend of 10.0% per annum on the preferred units, payable in cash or in kind at SN UnSub's election, provided that to the extent permitted under SN UnSub's debt arrangements, SN UnSub will be required to pay the quarterly dividend in cash. After the first anniversary of the closing of the Anadarko transactions, to the extent permitted under SN UnSub's debt arrangements, SN UnSub may apply all available cash to make additional payments towards the Base Return (as defined below) or redeem the preferred units. SN UnSub may not make cash distributions on the SN UnSub common units held by us until the preferred units are redeemed in full, and the preferred units would have priority over the common units, to the extent of the Base Return, upon a liquidation, a change of control or any redemption of the preferred units.

GSO will have the option to request SN UnSub to redeem the preferred units for the greater of (i) a 14.0% internal rate of return and (ii) a 1.50x return on investment (the "Base Return") following the seventh anniversary of issuance. If the preferred units are not so redeemed, GSO may cause a sale of the assets or equity of SN UnSub, or obtain majority control of SN UnSub's board of directors.

SN UnSub may at any time redeem the preferred units in whole or in part for cash for the Base Return.

GSO's approval is required for a number of actions by UnSub (unless the preferred units are redeemed at or prior to such actions), including:

- incurring additional debt or providing guarantees in respect of obligations of other persons;
- amending material debt instruments or the JDA;
- effecting a change of control, liquidation or dissolution;
- selling or acquiring assets or modifying hedging arrangements;
- issuing any additional capital stock;
- filing for bankruptcy; and
- incurring general and administrative costs in excess of $5 million.

In connection with the Comanche Acquisition, on January 12, 2017, SN UnSub, JPMorgan Chase Bank, N.A., Citibank, N.A., and certain of their affiliates entered into a debt commitment letter with respect to the SN UnSub Credit

Facility. The new facility is expected to be on substantially the same terms as our existing facility, conformed to current market conditions and non-recourse to our other assets.

**Cash Flows**

Our cash flows for the years ended December 31, 2016, 2015 and 2014 are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Cash Flow Data:** | | | |
| Net cash provided by operating activities | $ 181,251 | $ 272,025 | $ 415,335 |
| Net cash used in investing activities | $ (108,637) | $ (294,331) | $ (1,361,264) |
| Net cash provided by (used in) financing activities | $ (5,745) | $ (16,360) | $ 1,266,112 |

*Net Cash Provided by Operating Activities.* Net cash provided by operating activities was $181.3 million for the year ended December 31, 2016 compared to $272.0 million and $415.3 million for the same periods in 2015 and 2014, respectively. This decrease was related to the unfavorable impact of lower average commodity prices between the periods, partially offset by higher sales volumes.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company partially mitigates by entering into commodity derivatives. Sales volume changes also impact cash flow. The Company's cash flows from operating activities are also dependent on the costs related to continued operations and debt service.

*Net Cash Used in Investing Activities.* Net cash flows used in investing activities totaled $108.6 million for the year ended December 31, 2016 compared to $294.3 million and $1.4 billion for the same periods in 2015 and 2014, respectively. Capital expenditures for leasehold and drilling activities for the year ended December 31, 2016 totaled $313.3 million, primarily associated with bringing online 48 gross wells and expanding our acreage and asset development position in the Eagle Ford Shale through leasing. We spent approximately $36.5 million towards equity method investments prior to selling these investments in the Carnero Gathering Sale and Carnero Processing Sale (further discussed in Note 16, "Investments") for a combined cash inflow of approximately $92.5 million. In addition, we received cash of approximately $153.5 million for the Cotulla Sale, purchased common units of SPP for $25 million, and invested approximately $5.4 million in other assets.

For the year ended December 31, 2015, we incurred capital expenditures for leasehold and drilling activities of $656.1 million, primarily associated with bringing online 136 gross wells. We received total cash of approximately $427.6 million for the Palmetto Disposition and the Western Catarina Midstream Divestiture, while spending approximately $50.0 million towards equity method investments (further discussed in Note 16, "Investments") and $8.0 million for the Buyout Agreement (defined in Note 9, "Related Party Transactions" below). In addition, we invested $8.1 million in other assets.

For the year ended December 31, 2014, we incurred capital expenditures for leasehold and drilling activities of $791.3 million, primarily associated with bringing online 121 gross wells. We paid cash of $557.1 million for the oil and natural gas properties acquired in the Catarina Acquisition. We received cash of $0.7 million and $0.5 million as final settlement for the oil and natural gas properties acquired in the Cotulla and Wycross Acquisitions, respectively. In addition, we invested $14.1 million in other property and equipment.

*Net Cash Provided by (Used in) Financing Activities.* Net cash flows used in financing activities totaled $5.7 million for the year ended December 31, 2016 compared to $16.4 million net cash flows used in financing activities and $1.3 billion in cash provided by financing activities for the same period in 2015 and 2014, respectively.

Page 182 of 1759

During the year ended December 31, 2016, we made payments of $4.0 million for dividends on our Series A Preferred Stock and Series B Preferred Stock, and payments of approximately $1.7 million for deferred financing costs associated with the Sixth Amendment to the Second Amended and Restated Credit Agreement.



008052

During the year ended December 31, 2015, we made payments of $16.0 million for dividends on our Series A Convertible Perpetual Preferred Stock and Series B Convertible Perpetual Preferred Stock.

During the year ended December 31, 2014, we received net proceeds from the issuance of common stock of $167.5 million, after deducting offering costs payable by us of $8.7 million. We also made payments of $16.3 million for dividends on our Series A Preferred Stock and Series B Preferred Stock. We received net proceeds of approximately $1.12 billion from the issuance of our 6.125% Notes, consisting of a face value of $1.15 billion, including the Additional 6.125% Notes which were issued at a premium to face value of $2.3 million, less debt issuance costs of $27.4 million. Other debt issuance costs for the year ended December 31, 2016 totaled $10.0 million. On May 12, 2014, the Company borrowed $100 million under the Amended and Restated Credit Agreement. The Company used proceeds from the issuance of the Original 6.125% Notes to repay the $100 million outstanding under the Amended and Restated Credit Agreement, in addition to funding a portion of the purchase price of the Catarina Acquisition.

**Commitments and Contractual Obligations**

Refer to “Item 8. Financial Statements and Supplementary Data — Note 14, Commitments and Contingencies” for a description of lawsuits pending against the Company.

During the year ended December 31, 2015, the Company entered into the Gathering Agreement with SPP as part of the Western Catarina Midstream Divestiture (defined below in “Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures”) that provides a firm commitment of oil and natural gas volumes at a fixed gathering fee. The Gathering Agreement represents an operating lease of the Catarina midstream assets. The firm commitment term under the Gathering Agreement commenced on October 14, 2015 and continues until October 13, 2020. As of December 31, 2016, our contractual obligations included our Senior Notes, interest expense on our Senior Notes, asset retirement obligations, rent expense for our corporate offices, lease of the Catarina midstream assets and other long term lease payments. The following table summarizes our contractual obligations as of December 31, 2016 (in thousands):

| | Less than 1 year | 1 - 3 years | 3 - 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Senior Notes | $ — | $ — | $ 600,000 | $ 1,150,000 | $ 1,750,000 |
| Interest expense (1) | 116,938 | 233,875 | 210,625 | 105,655 | 667,093 |
| Asset retirement obligations (2) | — | — | — | 25,087 | 25,087 |
| Office rent (3) | 5,213 | 10,680 | 11,038 | 18,741 | 45,672 |
| Midstream assets lease (4) | 41,928 | 83,857 | 32,854 | — | 158,639 |
| Other leases (5) | 1,791 | 3,583 | 3,584 | 3,131 | 12,089 |
| Total | $ 165,870 | $ 331,995 | $ 858,101 | $ 1,302,614 | $ 2,658,580 |

(1) Represents estimated interest payments that will be due under the $600 million 7.75% Notes and $1,150 million 6.125% Notes that will mature on June 15, 2021 and January 15, 2023, respectively.

(2) Amounts represent the present value of our estimate of future asset retirement obligations. Because these costs typically extend many years into the future, estimating these future costs requires management to make estimates and judgments that are subject to future revisions based upon numerous factors, including the rate of inflation, changing technology and the political and regulatory environment. See “Item 8. Financial Statements and Supplementary Data — Note 12, Asset Retirement Obligations.”

(3) Represents payments due for leasing corporate office space in Houston, Texas. The lease began on November 1, 2014 and continues until March 31, 2025.

Case 4:23-34508 Document 1254-17 Filed on 04/19/23 in TXSB Page 184 of 1875

(4)Represents payments due with respect to firm commitment oil and natural gas volumes under the Gathering Agreement contract signed with SPP as part of the Western Catarina Midstream Divestiture. As part of this sale, the

Gathering Agreement represents an operating lease of the Catarina midstream assets. The firm commitment term under the Gathering Agreement commenced on October 14, 2015 and continues until October 13, 2020.

(5)Represents payments due for a ground lease agreement for land owned by the Calhoun Port Authority which commenced on August 25, 2014 and continues until August 25, 2024. Also represents payments due for an acreage lease agreement for a promotional ranch managed by the Company in Kenedy County, Texas which commenced on March 1, 2014 and continues until February 28, 2024.

In connection with the Catarina Acquisition, the 77,000 acres of undeveloped acreage that were included in the acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. Our current capital budget and plans include the drilling of at least the minimum number of wells required to maintain access to such undeveloped acreage.

The lease agreement for the acreage in Kenedy County, Texas includes a contractual requirement for the Company to spend a minimum of $4 million to make permanent improvements over the ten year life of the lease. The lease agreement does not specify the timing for such improvements to be made within the lease term. The Company has the right to terminate the lease obligation without penalty at any time with nine months advanced written notice and payment of any accrued leasehold expenses.

The Company’s ground lease with the Calhoun Port Authority is terminable upon 180 days written notice by the Company to the lessor in addition to a $1 million termination payment.

**Off-Balance Sheet Arrangements**

As of December 31, 2016, we did not have any off-balance sheet arrangements.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon consolidated financial statements that have been prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses. Our significant accounting policies are described in “Item 8. Financial Statements and Supplementary Data — Note 2, Basis of Presentation and Summary of Significant Accounting Policies.” When we prepare our financial statements, we review our estimates, including those related to oil, NGL and natural gas revenues, oil and natural gas properties, oil, NGL and natural gas reserves, fair value of derivative instruments, abandonment liabilities, income taxes, commitments and contingencies, depreciation, depletion and amortization, and full cost ceiling calculation. Our estimates are based on historical experience and various assumptions that we believe to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions. We believe the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements.

***Oil and Natural Gas Properties***

The Company’s oil and natural gas properties are accounted for using the full cost method of accounting. All direct costs and certain indirect costs associated with the acquisition, exploration and development of oil and natural gas properties are capitalized. Once evaluated, these costs, as well as the estimated costs to retire the assets, are included in the amortization base and amortized to depletion expense using the units-of-production method. Depletion is calculated based on estimated proved oil and natural gas reserves. Proceeds from the sale or disposition of oil and natural gas properties are

applied to reduce net capitalized costs unless the sale or disposition causes a significant change in the relationship between costs and the estimated quantities of proved reserves.



---

*Full Cost Ceiling Test*—Capitalized costs (net of accumulated depreciation, depletion and amortization and deferred income taxes) of proved oil and natural gas properties are subject to a full cost ceiling limitation. The ceiling limits these costs to an amount equal to the present value, discounted at 10%, of estimated future net cash flows from estimated proved reserves less estimated future operating and development costs, abandonment costs (net of salvage value) and estimated related future income taxes. In accordance with SEC rules, the oil and natural gas prices used to calculate the full cost ceiling are the 12-month average prices, calculated as the unweighted arithmetic average of the first-day-of-the-month price for each month within the 12-month period prior to the end of the reporting period, unless prices are defined by contractual arrangements. Prices are adjusted for "basis" or location differentials. Prices are held constant over the life of the reserves. If unamortized costs capitalized within the cost pool exceed the ceiling, the excess is charged to expense and separately disclosed during the period in which the excess occurs. Amounts thus required to be written off are not reinstated for any subsequent increase in the cost center ceiling. During the year ended December 31, 2016, the Company recorded a full cost ceiling test impairment after income taxes of $169.0 million. During the year ended December 31, 2015, the Company recorded a full cost ceiling test impairment after income taxes of $1,365 million. During the year ended December 31, 2014, the Company recorded a full cost ceiling test impairment before income taxes of $213.8 million.

*Depreciation, depletion, amortization and accretion*—DD&A is provided using the units-of-production method based upon estimates of proved oil, NGL and natural gas reserves with oil, NGL and natural gas production being converted to a common unit of measure based upon their relative energy content. All capitalized costs of oil and natural gas properties, including the estimated future costs to develop proved reserves, are amortized using the units-of-production method based on total proved reserves. Investments in unproved properties and major development projects are not amortized until proved reserves associated with the projects can be determined or until impairment occurs. If the results of an assessment indicate that the properties are impaired, the amount of the impairment is added to the capitalized costs to be amortized. Once the assessment of unproved properties is complete and when major development projects are evaluated, the costs previously excluded from amortization are transferred to the full cost pool and amortization begins. The amortizable base includes estimated future development costs and where significant, dismantlement, restoration and abandonment costs, net of estimated salvage value.

In arriving at depletion rates under the units-of-production method, the quantities of recoverable oil and natural gas reserves are established based on estimates made by internal and third party geologists and engineers, which require significant judgment as does the projection of future production volumes and levels of future costs, including future development costs. In addition, considerable judgment is necessary in determining when unproved properties become impaired and in determining the existence of proved reserves once a well has been drilled. All of these judgments may have significant impact on the calculation of depletion and impairment expense. At December 31, 2016, a 10% positive revision to proved reserves would decrease the depletion rate by approximately $0.67 per Boe and a 10% negative revision to proved reserves would increase the depletion rate by approximately $0.81 per Boe. Further, a 10% increase or decrease in estimated future development costs would increase or decrease the depletion rate by approximately $0.32 per Boe at December 31, 2016.

*Unproved Properties*—Costs associated with unproved properties and properties under development are excluded from the full cost amortization base until the properties have been evaluated. Additionally, the costs associated with seismic data, leasehold acreage, and wells currently drilling are also initially excluded from the amortization base. Unproved properties are identified on a project basis, with a project being an area in which significant leasehold interests are acquired within a contiguous area. Unproved properties are reviewed periodically by management and transferred into the full cost pool subject to amortization when management determines that a project area has been evaluated through drilling operations or thorough geologic evaluation, or through determination that the unproved leases will no longer be drilled upon prior to the lease expiration.

***Oil and Natural Gas Reserves***

The Company's most significant estimates relate to its proved oil, NGL and natural gas reserves. The estimates of oil, NGL and natural gas reserves as of December 31, 2016, 2015 and 2014 are based on reports prepared by a third party engineering firm, Ryder Scott.

Estimates of proved reserves are based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Ryder Scott has historically prepared a reserve and economic evaluation of the Company's properties, utilizing information provided to it by management and other information available, including information from the operators of the property.

The standards of the FASB and rules of the SEC permit the use of new technologies to determine proved reserve estimates if those technologies have been demonstrated empirically to lead to reliable conclusions about reserve volume estimates. These rules allow, but do not require, companies to disclose their probable and possible reserves to investors in documents filed with the SEC.

In addition, the disclosure guidelines require companies to report oil and natural gas reserves using an average price based upon the prior 12-month first-day-of-the-month price rather than a period-end price.

Reserves and their relation to estimated future net cash flows impact the depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The reserve estimates and the projected cash flows derived from these reserve estimates are prepared in accordance with SEC guidelines. The independent engineering firm noted above adheres to these guidelines when preparing their reserve reports. The accuracy of the reserve estimates is a function of many factors including the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions, and the judgments of the individuals preparing the estimates, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered. Additionally, with other factors held constant, if the commodity prices used in our reserve report as of December 31, 2016 had decreased by 10%, then the standardized measure of our estimated proved reserves as of that date would have decreased by approximately $216.7 million, from approximately $513.4 million to approximately $296.7 million.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, well life, inflation and credit-adjusted risk free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset. Upon settlement of the liability, any gain or loss is treated as an adjustment to the full cost pool.

***Income Taxes***

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities arise from the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary difference and carryforwards are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce the deferred tax asset to the amount more likely than not to be recovered.

Additionally, the Company is required to determine whether it is more likely than not (a likelihood of more than 50%) that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position in order to record any financial statement benefit. If that step is satisfied, then the Company must measure the tax position to determine the amount of benefit to recognize in the financial statements. The tax position is measured at the largest amount of benefit that has greater than a 50% likelihood

of being realized upon ultimate settlement. Any interest or penalties would be recognized as a component of income tax expense.

The Company applies significant judgment in evaluating its tax positions and estimating its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The actual outcome of these future tax consequences could differ significantly from these estimates, which could impact the Company's financial position, results of operations and cash flows. The Company does not have any material uncertain tax positions during the years ended December 31, 2016, 2015 or 2014.

***Stock-Based Compensation***

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of ASC 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

Awards granted to employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expense equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered.

For the restricted stock awards and phantom stock awards granted to non-employees, stock-based compensation expense is based on fair value re-measured at each reporting period and recognized over the vesting period using the straight-line method. Compensation expense for these awards will be revalued at each period end until vested.

***Revenue Recognition***

Oil, NGL and natural gas sales are recognized when production is sold to a purchaser at a fixed or determinable price, delivery has occurred, title has transferred, and collectability of the revenue is probable. Delivery occurs and title is transferred when production has been delivered to a pipeline, railcar or truck, or a tanker lifting has occurred. The sales method of accounting is used for oil, NGL and natural gas sales such that revenues are recognized based on our share of actual proceeds from the oil, NGLs and natural gas sold to purchasers. Oil and natural gas imbalances are generated on properties for which two or more owners have the right to take production "in-kind" and, in doing so, take more or less than their respective entitled percentage.

***Derivative Instruments***

At times we may utilize derivative instruments to manage our exposure to fluctuations in the underlying commodity prices for the products sold by us. The carrying amount of derivative assets and liabilities is reported on the balance sheet at the estimated fair value of the derivative instruments. Our management sets and implements all of our hedging policies, including volumes, types of instruments and counterparties, on a monthly basis. These derivative transactions are not designated as cash flow hedges. Accordingly, these derivative contracts are marked-to-market and any changes in the estimated value of derivative contracts held at the balance sheet date are recognized in the statement of operations as net gains (losses) on commodity derivatives.

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

We are exposed to market risk, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The term "market risk" refers to the risk of loss arising from adverse changes in oil, NGLs and natural gas prices and interest rates. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our major market risk exposure is in the pricing that we receive for our oil, NGL and natural gas production. Realized pricing is primarily driven by the prevailing market prices applicable to our oil, NGL and natural gas production. Pricing for oil, NGL and natural gas has been volatile and unpredictable for several years, and this volatility is expected to continue in the future. The prices we receive for our oil, NGL and natural gas production depend on many factors outside of our control, such as the strength of the global economy.

To reduce the impact of fluctuations in oil and natural gas prices on the Company's revenues, or to protect the economics of property acquisitions, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or, through options, modify the future prices to be realized. These transactions may include price swaps whereby the Company will receive a fixed price for its production and pay a variable market price to the contract counterparty. Additionally, the Company may enter into collars, whereby it receives the excess, if any, of the fixed floor over the floating rate or pays the excess, if any, of the floating rate over the fixed ceiling price. In addition, the Company enters into option transactions, such as puts or put spreads, as a way to manage its exposure to fluctuating prices. These hedging activities are intended to support oil and natural gas prices at targeted levels and to manage exposure to oil and natural gas price fluctuations. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Please refer to "Item 8. Financial Statements and Supplementary Data — Note 10, Derivative Instruments" for a description of all of our derivatives covering anticipated future production as of December 31, 2016. In connection with the pending Comanche Acquisition, we expect to hedge a portion of projected future production attributable to the pending Comanche Acquisition, using hedge transactions that are consistent with the Company's current hedging strategy.

At December 31, 2016, the fair value of our commodity derivative contracts was a net liability of approximately $37.1 million (inclusive of approximately $2.1 million liability for premiums incurred but not paid). We have commodity derivative contracts in place covering approximately 35% of the mid-point of our total estimated oil production and approximately 99% of the mid-point of our total estimated natural gas production for 2017. A 10% increase in the oil and natural gas index prices above the December 31, 2016 prices would result in a decrease in the fair value of our commodity derivative contracts of $110.8 million; conversely, a 10% decrease in the oil and natural gas index prices would result in an increase of $108.5 million.

**Interest Rate Risk**

As of December 31, 2016, no amounts were outstanding under our Second Amended and Restated Credit Agreement. Our 7.75% Notes bear a fixed interest rate of 7.75% with an expected maturity date of June 15, 2021, and we had $600 million outstanding as of December 31, 2016. Our 6.125% Notes bear a fixed interest rate of 6.125% with an expected maturity date of January 15, 2023, and we had $1.15 billion outstanding as of December 31, 2016. We currently do not have any interest rate derivative contracts in place. If we incur significant debt with a risk of fluctuating interest rates in the future, we may enter into interest rate derivative contracts on a portion of our then outstanding debt to mitigate the risk of fluctuating interest rates.

**Item 8.** ***Financial Statements and Supplementary Data***

The information required by this Item is included in this report as set forth in the "Index to Consolidated Financial Statements" beginning on page F-1 of this Annual Report on Form 10-K and is incorporated by reference herein.

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

On June 19, 2015, the Company (i) dismissed BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm and (ii) appointed KPMG LLP ("KPMG"), effective immediately, to serve as the Company's new independent registered public accounting firm to audit the Company's financial statements as of and for the fiscal year ending December 31, 2015. The Audit Committee of the Company pursuant to its charter exercised its sole authority to approve BDO's dismissal and KPMG's appointment as the Company's independent registered public accounting firm.

The report of BDO on the financial statements of the Company as of and for the fiscal year ended December 31, 2014 did not contain any adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope or accounting principles. During the Company's fiscal year ended December 31, 2014, and the interim period through June 19, 2015, (i) the Company had no disagreements with BDO on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to BDO's satisfaction, would have caused BDO to make reference to the subject matter of such disagreements in its reports on the financial statements of the Company for such years and (ii) there were no reportable events of the type described in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended, except the following material weakness:

1. In connection with the performance of its audit of the Company's financial statements for the year ended December 31, 2014, BDO reported that our internal control over financial reporting was not effective as of December 31, 2014 as a result of the identification of one material weakness related to an over-estimation of future development costs in the year-end reserve report. This material weakness was disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2014.

The Company provided BDO with a copy of the foregoing disclosure and requested that BDO furnish the Company with a letter addressed to the SEC stating whether or not BDO agreed with the statements above concerning BDO. In a letter attached to the Current Report on Form 8-K filed on June 23, 2015, BDO stated that it agreed with the aforementioned disclosure.

**Item 9A.** ***Controls and Procedures***

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

As required by Rule 13a-15(b) of the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon the evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective at December 31, 2016 at the reasonable assurance level.

***Management's Annual Report on Internal Control Over Financial Reporting and Attestation Report of the Registered Public Accounting Firm***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act). Even an effective system of internal control over financial reporting, no matter how well designed, has inherent limitations, including the

possibility of human error, circumvention of controls or overriding of controls and, therefore, can provide only reasonable assurance with respect to reliable financial reporting. Furthermore, the effectiveness of a system of internal control over financial reporting in future periods can change as conditions change. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013). Based on this assessment and such criteria, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

KPMG, an independent registered public accounting firm, has issued its report on the effectiveness of the Company's internal control over financial reporting at December 31, 2016. The report from KPMG is included in this Item 8 under the heading "Report of Independent Registered Public Accounting Firm."

**Report of Independent Registered Public Accounting Firm**

Please see Report of Independent Public Accounting Firm under "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting during the three months ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.** ***Other Information***

None.

Case 4:23-cv-00558 Document 1-11 Filed on 02/15/23 in TXSD Page 198 of 1759
Case 4:23-34508 Document 125-17 Filed in TXSB on 06/28/20 Page 158 of 275

# PART III

**Item 10.** ***Directors, Executive Officers and Corporate Governance***

Information regarding our directors, executive officers and certain corporate governance items will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders, in either case, to be filed within 120 days after December 31, 2016, and is incorporated by reference to this report.

**Item 11.** ***Executive Compensation***

Information regarding executive compensation will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

Information regarding beneficial ownership and management and related stockholder matters will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 13.** ***Certain Relationships and Related Transactions, and Director Independence***

Information regarding certain relationships and related transactions and director independence will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 14.** ***Principal Accountant Fees and Services***

Information regarding principal accounting fees and services will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

## GLOSSARY OF SELECTED OIL AND NATURAL GAS TERMS

The following includes a description of the meanings of some of the oil and natural gas industry terms used in this Annual Report on Form 10-K. The definitions “analogous reservoir,” “development costs,” “development project,” “development well,” “economically producible,” “exploratory well,” “field,” “possible reserves,” “probable reserves,” “production costs,” “proved area,” “reservoir,” “resources,” and “unproved properties” have been excerpted from the applicable definitions contained in Rule 4-10(a) of Regulation S-X.

***American Petroleum Institute (“API”) gravity:*** A system of classifying oil based on its specific gravity, whereby the greater the gravity, the lighter the oil.

***analogous reservoir:*** Analogous reservoirs, as used in resource assessments, have similar rock and fluid properties, reservoir conditions (depth, temperature, and pressure) and drive mechanisms, but are typically at a more advanced stage of development than the reservoir of interest and thus may provide concepts to assist in the interpretation of more limited data and estimation of recovery. When used to support proved reserves, analogous reservoir refers to a reservoir that shares all of the following characteristics with the reservoir of interest: (i) the same geological formation (but not necessarily in pressure communication with the reservoir of interest); (ii) the same environment of deposition; (iii) similar geologic structure; and (iv) the same drive mechanism.

***basin:*** A large depression on the earth’s surface in which sediments accumulate.

***Bbl:*** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

***Bcf:*** One billion cubic feet of natural gas.

***black oil:*** A quality of oil with an API gravity of 40° or less and with a gas-to-oil ratio of 500 cubic feet per barrel or less.

***Boe:*** One barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Boe of oil.

***Boe/d:*** One Boe per day.

***btu:*** One British thermal unit, the quantity of heat required to raise the temperature of a one-pound mass of water by one degree Fahrenheit.

***completion:*** The process of treating a drilled well followed by the installation of permanent equipment for the production of oil or natural gas, or in the case of a dry hole, the reporting of abandonment to the appropriate agency.

***developed acreage:*** The number of acres that are allocated or assignable to producing wells or wells capable of production.

***development costs:*** Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and natural gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to: (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves; (ii) drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly; (iii) acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems; and (iv) provide improved recovery systems.

***development project:*** A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

***development well:*** A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

***differential:*** An adjustment to the price of oil or natural gas from an established spot market price to reflect differences in the quality and/or location of oil or natural gas.

***dry hole:*** A well found to be incapable of producing hydrocarbons in sufficient quantities such that proceeds from the sale of such production would exceed production expenses and taxes.

***economically producible:*** The term economically producible, as it relates to a resource, means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

***exploitation:*** A development or other project that may target proven or unproven reserves (such as probable or possible reserves), but that generally has a lower risk than that associated with exploration projects.

***exploratory well:*** A well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or natural gas in another reservoir.

***field:*** An area consisting of a single reservoir or multiple reservoirs, all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The field name refers to the surface area, although it may refer to both the surface and the underground productive formations.

***gross acres or gross wells:*** The total acres or wells, as the case may be, in which we have working interest.

***horizontal drilling:*** A drilling technique used in certain formations where a well is drilled vertically to a certain depth and then drilled at a right angle within a specified interval.

***independent exploration and production company:*** A company whose primary line of business is the exploration and production of crude oil and natural gas.

***LLS:*** Louisiana light sweet crude.

***MBbl:*** One thousand Bbl.

***MBoe:*** One thousand Boe.

***Mcf:*** One thousand cubic feet of natural gas.

***MMBbl:*** One million Bbl.

***MMBoe:*** One million Boe.

***MMbtu:*** One million British thermal units.

***MMcf:*** One million cubic feet of natural gas.

***net acres or net wells:*** Gross acres or wells, as the case may be, multiplied by our working interest ownership percentage.

***net production:*** Production that is owned by us less royalties and production due others.

***net revenue interest:*** A working interest owner's gross working interest in production less the royalty, overriding royalty, production payment and net profits interests.

***NGLs:*** The combination of ethane, propane, butane and natural gasolines that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.

***NYMEX:*** New York Mercantile Exchange.

***operator:*** The individual or company responsible for the exploration and/or production of an oil or natural gas well or lease.

***possible reserves:*** Additional reserves that are less certain to be recovered than probable reserves.

***probable reserves:*** Additional reserves that are less certain to be recovered than proved reserves but that, in sum with proved reserves, are as likely as not to be recovered.

***production costs:*** Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

***productive well:*** A well that produces commercial quantities of hydrocarbons, exclusive of its capacity to produce at a reasonable rate of return.

***proved area:*** The part of a property to which proved reserves have been specifically attributed.

***proved developed reserves:*** Reserves that can be expected to be recovered through existing wells with existing equipment and operating methods.

***proved oil and natural gas reserves:*** The estimated quantities of oil, natural gas and NGLs that geological and engineering data demonstrate with reasonable certainty to be commercially recoverable in future years from known reservoirs under existing economic and operating conditions.

***proved undeveloped reserves:*** Proved reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion.

***realized price:*** The cash market price less all expected quality, transportation and demand adjustments.

***recompletion:*** The completion for production of an existing wellbore in another formation from that which the well has been previously completed.

***reserve:*** That part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination.

***reservoir:*** A porous and permeable underground formation containing a natural accumulation of producible oil and/or natural gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

Page 204 of 1759

***resources:*** Resources are quantities of oil and natural gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable and another portion may be considered unrecoverable. Resources include both discovered and undiscovered accumulations.

***spacing:*** The distance between wells producing from the same reservoir. Spacing is often expressed in terms of acres (e.g., 75 acre well-spacing) and is often established by regulatory agencies.

***standardized measure:*** The present value of estimated future after tax net revenue to be generated from the production of proved reserves, determined in accordance with the rules and regulations of the SEC (using prices and costs in effect as of the date of estimation), less future development, production and income tax expenses, and discounted at 10% per annum to reflect the timing of future net revenue. Standardized measure does not give effect to derivative transactions.

***trend:*** A geographic area with hydrocarbon potential.

***undeveloped acreage:*** Lease acreage on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

***unproved properties:*** Properties with no proved reserves.

***volatile oil:*** A quality of oil with an API gravity greater than 40° and with a gas-to-oil ratio of greater than 500 cubic feet per barrel.

***wellbore:*** The hole drilled by the bit that is equipped for oil or natural gas production on a completed well. Also called well or borehole.

***working interest:*** An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

***workover:*** Operations on a producing well to restore or increase production.

***WTI:*** West Texas Intermediate crude.

## PART IV

**Item 15.** ***Exhibits and Financial Statement Schedules***

a. The following documents are filed as a part of this Annual Report on Form 10-K or incorporated herein by reference:

(1) Financial Statements:

See Item 8. Financial Statements and Supplementary Data.

(2) Financial Statement Schedules:

None.

(3) Exhibits:

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

b. The following exhibits are filed or furnished with this Annual Report on Form 10-K or incorporated by reference:

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 2.1 | ** | Purchase and Sale Agreement, dated as of May 21, 2014, by and among SWEPI LP, Shell Gulf of Mexico Inc., as sellers, and Sanchez Energy Corporation, as buyer (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on May 22, 2014, and incorporated herein by reference). |
| 2.2 | ** | Purchase and Sale Agreement, dated as of March 31, 2015, by and among SEP Holdings III, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on April 1, 2015, and incorporated herein by reference). |
| 2.3 | ** | Purchase and Sale Agreement, dated as of September 25, 2015, by and among Sanchez Energy Corporation, SN Catarina, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on September 29, 2015, and incorporated herein by reference). |
| 2.4 | ** | Purchase and Sale Agreement, dated as of July 5, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on July 6, 2016, and incorporated herein by reference). |
| 2.5 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.6 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among SN Cotulla Assets, LLC, SN Palmetto, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (filed as Exhibit 2.2 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.7 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among Sanchez Energy Corporation, SN Terminal, LLC and Sanchez Production Partners LP (filed as Exhibit 2.3 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.8 | ** | Purchase and Sale Agreement, dated as of October 24, 2016, by and among SN Cotulla Assets, LLC, Carrizo (Eagle Ford) LLC, Carrizo Oil & Gas, Inc., and for the limited purposes set forth therein, Sanchez Energy Corporation (filed as Exhibit 2.1 on the Company's Current Report on Form 8-K on January 13, 2017, and incorporated herein by reference). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 2.9 ** | Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Aguila Production, LLC, and solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on January 17, 2017, and incorporated herein by reference). |
| 3.1 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on May 28, 2013, and incorporated herein by reference). |
| 3.2 | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 3.3 | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015, and incorporated herein by reference). |
| 3.4 | Amended and Restated Bylaws dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011, and incorporated herein by reference). |
| 4.1 | Form of Common Stock Certificate (filed as Exhibit 4.1 to Amendment No. 3 to the Company's Registration Statement on Form S-1 (File. No. 333-176613) on November 25, 2011, and incorporated herein by reference). |
| 4.2 | Indenture, dated as of June 13, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and U.S. Bank National Association as trustee (filed as Exhibit 4.1 to the Company's Current Report on Form 8- K on June 14, 2013 and incorporated herein by reference). |
| 4.3 | First Supplemental Indenture, dated as of September 11, 2013, by and among Sanchez Energy Corporation, SN TMS, LLC, the existing guarantors and U.S. Bank National Association as trustee (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on September 19, 2013 and incorporated herein by reference). |
| 4.4 | Registration Rights Agreement, dated as of June 13, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on June 14, 2013, and incorporated herein by reference). |
| 4.5 | Registration Rights Agreement, dated as of September 18, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 4.3 to the Company's Current Report on Form 8-K on September 13, 2013, and incorporated herein by reference). |
| 4.6 | Registration Rights Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Sanchez Energy Partners I, LP (filed as Exhibit 10.3 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 4.7 | Second Supplemental Indenture, dated as of June 2, 2014, by and among Sanchez Energy Corporation, SN Catarina, LLC, the existing guarantors and U.S. Bank National Association, as trustee (filed as Exhibit 4.6 to the Company's Registration Statement on Form S-4 (File No. 333-196660)on June 11, 2014, and incorporated herein by reference). |
| 4.8 | Indenture, dated as of June 27, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee (filed as Exhibit 4.1 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.9 | Registration Rights Agreement, dated as of June 27, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |
| 4.10 | Registration Rights Agreement, dated as of September 12, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 4.11 | Rights Plan dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as Rights Agent (including the form of Certificate of Designations of Series C Junior Participating Preferred Stock attached thereto as Exhibit A, the form of Right Certificate attached thereto as Exhibit B and the Summary of Rights attached thereto as Exhibit C) (filed as Exhibit 4.1 to the Company's Current Report on Form 8-K on July 29, 2015, and incorporated herein by reference). |
| 4.12 | Instrument of Resignation, Appointment and Acceptance (7.75% Senior Notes), dated as of May 20, 2016, by and among Sanchez Energy Corporation, Delaware Trust Company and U.S. Bank National Association (filed as Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q on August 8, 2016, and incorporated herein by reference). |
| 4.13 | Instrument of Resignation, Appointment and Acceptance (6.125% Senior Notes), dated as of May 20, 2016, by and among Sanchez Energy Corporation, Delaware Trust Company and U.S. Bank National Association (filed as Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q on August 8, 2016, and incorporated herein by reference). |
| 10.1 | Services Agreement, dated as of December 19, 2011, by and between Sanchez Oil & Gas Corporation and Sanchez Energy Corporation (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.2 | Geophysical Seismic Data Use License Agreement, dated as of December 19, 2011, by and among Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, SEP Holdings III, LLC and SN Marquis LLC (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.3 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Antonio R. Sanchez, III (filed as Exhibit 10.4 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.4 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Michael G. Long (filed as Exhibit 10.5 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.5 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Gilbert A. Garcia (filed as Exhibit 10.6 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.6 * | Form of Restricted Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |
| 10.7 * | Form of Restricted Stock Agreement for Non-employee Directors (filed as Exhibit 10.2 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |
| 10.8 * | Form of Restricted Stock Agreement for Antonio R. Sanchez, III (filed as Exhibit 10.3 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 10.9 | * | Indemnification Agreement, dated as of March 9, 2012, by and between Sanchez Energy Corporation and Greg Colvin (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 14, 2012, and incorporated herein by reference). |
| 10.10 | * | Indemnification Agreement, dated as of March 9, 2012, by and between Sanchez Energy Corporation and Kirsten A. Hink (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on March 14, 2012, and incorporated herein by reference). |
| 10.11 | * | Indemnification Agreement, dated as of November 27, 2012, by and between Sanchez Energy Corporation and A.R. Sanchez, Jr. (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 3, 2012, and incorporated herein by reference). |
| 10.12 | * | Indemnification Agreement, dated as of November 27, 2012, by and between Sanchez Energy Corporation and Alan G. Jackson (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on December 3, 2012, and incorporated herein by reference). |
| 10.13 | * | Indemnification Agreement, dated as of March 4, 2014, by and between Sanchez Energy Corporation and Christopher Heinson (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 6, 2014, and incorporated herein by reference). |
| 10.14 | | Purchase Agreement, dated as of June 13, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on June 16, 2014, and incorporated herein by reference). |
| 10.15 | | Second Amended and Restated Credit Agreement, dated as of June 30, 2014, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC, as loan parties, Royal Bank of Canada, as administrative agent, Capital One, National Association, as syndication agent, Compass Bank, SunTrust Bank as co-documentation agents, RBC Capital Markets as sole lead arranger and sole book runner, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |
| 10.16 | | Purchase Agreement, dated as of September 9, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 10.17 | | First Amendment to Second Amended and Restated Credit Agreement, dated as of September 9, 2014, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC, as loan parties, Royal Bank of Canada, as administrative agent, Capital One, National Association, as syndication agent, Compass Bank, SunTrust Bank as co-documentation agents, RBC Capital Markets as sole lead arranger and sole book runner, and the lenders party thereto (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 10.18 | * | Indemnification Agreement, dated as of November 4, 2014, by and between Sanchez Energy Corporation and Sean Maher (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on November 6, 2014, and incorporated herein by reference). |
| 10.19 | | Second Amendment to Second Amended and Restated Credit Agreement, dated as of March 31, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 1, 2015, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 10.20 | * | Indemnification Agreement, dated as of May 5, 2015, by and between Sanchez Energy Corporation and Thomas Brian Carney (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on May 8, 2015, and incorporated herein by reference). |
| 10.21 | * | Indemnification Agreement, dated as of May 5, 2015, by and between Sanchez Energy Corporation and G. Gleeson Van Riet (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on May 8, 2015, and incorporated herein by reference). |
| 10.22 | * | Sanchez Energy Corporation Second Amended and Restated 2011 Long Term Incentive Plan (filed as Exhibit 99.1 to the Company's Current Report on Form 8-K on May 27, 2015, and incorporated herein by reference). |
| 10.23 | * | Indemnification Agreement, dated as of October 1, 2015, by and between Sanchez Energy Corporation and Eduardo Sanchez (filed as Exhibit 10.1 to the Company’s Current Report on Form 8-K on October 6, 2015, and incorporated herein by reference). |
| 10.24 | | Third Amendment to Second Amended and Restated Credit Agreement, dated as of July 20, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 10.25 | | Fourth Amendment to Second Amended and Restated Credit Agreement, dated as of September 29, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 10.26 | | Fifth Amendment to Second Amended and Restated Credit Agreement, dated as of October 30, 2015, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on November 4, 2015, and incorporated herein by reference). |
| 10.27 | | Sixth Amendment to Second Amended and Restated Credit Agreement, dated as of January 22, 2016, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company’s Current Report on Form 8-K on January 25, 2016, and incorporated herein by reference). |
| 10.28 | | Seventh Amendment to Second Amended and Restated Credit Agreement, dated as of March 18, 2016, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company’s Current Report on Form 8-K on March 21, 2016, and incorporated herein by reference). |
| 10.29 | (a) | Letter Agreement, dated as of December 9, 2016, by and among Royal Bank of Canada, as administrative agent under the Second Amended and Restated Credit Agreement, as amended, Sanchez Energy Corporation, as borrower and the other parties thereto. |
| 10.30 | * | Indemnification Agreement, dated as of December 14, 2015, by and between Sanchez Energy Corporation and Gregory B. Kopel (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 16, 2015, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 10.31 | * | Indemnification Agreement, dated as of March 8, 2016, by and between Sanchez Energy Corporation and Garrick Hill (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 8, 2016, and incorporated herein by reference). |
| 10.32 | * | Form of Restricted Stock Award Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.33 | * | Form of Performance Accelerated Restricted Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.34 | * | Form of Phantom Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.35 | * | Form of Performance Accelerated Phantom Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.36 | * | Indemnification Agreement, dated as of August 2, 2016, by and between Sanchez Energy Corporation and Robert Nelson (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on August 3, 2016, and incorporated herein by reference). |
| 10.37 | * | Indemnification Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.38 | * | Restricted Stock Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.2 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.39 | * | Phantom Stock Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.3 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.40 | * | Indemnification Agreement, dated as of November 3, 2016, by and between Sanchez Energy Corporation and Patricio D. Sanchez (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on November 9, 2016, and incorporated herein by reference). |
| 10.41 | ** | Securities Purchase Agreement, dated as of January 12, 2017, by and among Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF UnSub, LP, SN EF UnSub GP, LLC, GSO ST Holdings Associates LLC, and GSO ST Holdings LP (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on January 17, 2017, and incorporated herein by reference). |
| 10.42 | ** | Interim Investors Agreement, dated as of January 12, 2017, by and among Sanchez Energy Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Aguila Production, LLC, Aguila Production HoldCo, LLC, Blackstone Capital Partners VII L.P., and Blackstone Energy Partners II L.P. (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on January 12, 2017, and incorporated herein by reference). |
| 16.1 | | Letter from BDO USA, LLP, dated as of June 23, 2015, regarding the change in certifying accountant (filed as Exhibit 16.1 to the Company's Current Report on Form 8-K on June 23, 2015, and incorporated herein by reference). |
| 21.1 | (a) | List of Subsidiaries of Sanchez Energy Corporation. |
| 23.1 | (a) | Consent of KPMG LLP. |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 23.3 | (a) | Consent of Ryder Scott Company, L.P. |
| 31.1 | (a) | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2 | (a) | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1 | (b) | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2 | (b) | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 99.1 | (a) | Ryder Scott Company, L.P. Summary of December 31, 2016 Reserves. |
| 101.INS | (a) | XBRL Instance Document. |
| 101.SCH | (a) | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | (a) | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | (a) | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | (a) | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE | (a) | XBRL Taxonomy Extension Presentation Linkbase Document. |

(a) Filed herewith.

(b) Furnished herewith.

* Management contract or compensatory plan or arrangement.

** The exhibits and schedules to this agreement have been omitted form this filing pursuant to Item 601(b)(2) of Regulation S-K. The Company will furnish copies of such omitted exhibits and schedules to the SEC upon request.

**Item 16.** ***Form 10-K Summary***

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on February 27, 2017.

SANCHEZ ENERGY CORPORATION

By: /s/ Antonio R. Sanchez, III
Antonio R. Sanchez, III
*Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Antonio R. Sanchez, III and Howard J. Thill, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Antonio R. Sanchez, III<br>Antonio R. Sanchez, III | Chief Executive Officer | February 27, 2017 |
| /s/ Howard J. Thill<br>Howard J. Thill | Executive Vice President and Chief Financial Officer | February 27, 2017 |
| /s/ Kirsten A. Hink<br>Kirsten A. Hink | Senior Vice President and Chief Accounting Officer | February 27, 2017 |
| /s/ A. R. Sanchez, Jr.<br>A. R. Sanchez, Jr. | Executive Chairman of the Board of Directors | February 27, 2017 |
| /s/ Gilbert A. Garcia<br>Gilbert A. Garcia | Director | February 27, 2017 |
| /s/ Greg Colvin<br>Greg Colvin | Director | February 27, 2017 |
| /s/ Alan G. Jackson<br>Alan G. Jackson | Director | February 27, 2017 |
| /s/ Sean m. Maher | Director | February 27, 2017 |

| | | |
|---|---|---|
| /s/ Brian Carney<br>Brian Carney | Director | February 27, 2017 |
| /s/ Robert V. Nelson, III<br>Robert V. Nelson, III | Director | February 27, 2017 |

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

***Sanchez Energy Corporation***


| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-2 |
| *Consolidated Financial Statements:* | |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | F-5 |
| Consolidated Statements of Operations for the years ended December 31, 2016, 2015 and 2014 | F-6 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2016, 2015 and 2014 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2016, 2015 and 2014 | F-8 |
| Notes to Consolidated Financial Statements | F-10 |
| Supplemental Quarterly Financial Results (Unaudited) | F-54 |
| Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited) | F-56 |

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation:

We have audited the accompanying consolidated balance sheets of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the two-year period ended December 31, 2016. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2016, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Sanchez Energy Corporation's internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2017 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

Houston, Texas
February 27, 2017

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation:

We have audited Sanchez Energy Corporation's internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Sanchez Energy Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Sanchez Energy Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the two-year period ended December 31, 2016, and our report dated February 27, 2017 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

Houston, Texas
February 27, 2017

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation
Houston, Texas

We have audited the accompanying consolidated statements of operations, stockholders' equity, and cash flows of Sanchez Energy Corporation (the "Company") for the year ended December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Sanchez Energy Corporation for the year ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO USA, LLP

Houston, Texas
March 2, 2015, except for Note 18, as to which the date is February 27, 2017

**Sanchez Energy Corporation**

**Consolidated Balance Sheets**

**(in thousands, except share and per share amounts)**

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 501,917 | $ 435,048 |
| Oil and natural gas receivables | 41,057 | 30,668 |
| Joint interest billings receivables | 496 | 1,259 |
| Accounts receivable - related entities | 6,401 | 3,697 |
| Fair value of derivative instruments | — | 172,494 |
| Other current assets | 12,934 | 23,452 |
| Total current assets | 562,805 | 666,618 |
| Oil and natural gas properties, at cost, using the full cost method: | | |
| Unproved oil and natural gas properties | 231,424 | 253,529 |
| Proved oil and natural gas properties | 3,164,115 | 2,914,867 |
| Total oil and natural gas properties | 3,395,539 | 3,168,396 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (2,736,951) | (2,412,293) |
| Total oil and natural gas properties, net | 658,588 | 756,103 |
| Other assets: | | |
| Fair value of derivative instruments | — | 5,789 |
| Investments (Investment in SPP measured at fair value of $26.8 million and $0 as of December 31, 2016 and 2015, respectively) | 39,656 | 49,985 |
| Other assets | 25,231 | 22,809 |
| Total assets | $ 1,286,280 | $ 1,501,304 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,076 | $ 4,184 |
| Other payables | 2,251 | 2,004 |
| Accrued liabilities: | | |
| Capital expenditures | 35,154 | 51,983 |
| Other | 82,458 | 69,974 |
| Deferred premium liability | 2,079 | 24,548 |
| Fair value of derivative instruments | 31,778 | — |
| Other current liabilities | 22,201 | 14,813 |
| Total current liabilities | 176,997 | 167,506 |
| Long term debt, net of premium, discount and debt issuance costs | 1,712,767 | 1,705,927 |
| Asset retirement obligations | 25,087 | 25,907 |
| Fair value of derivative instruments | 3,236 | — |
| Other liabilities | 64,333 | 58,133 |
| Total liabilities | 1,982,420 | 1,957,473 |
| Commitments and contingencies (Note 14) | | |
| Stockholders' equity: | | |
| Preferred stock ($0.01 par value, 15,000,000 shares authorized; 1,838,985 shares issued and outstanding as of December 31, 2016 and 2015 of 4.875% Convertible Perpetual Preferred Stock, Series A; 3,527,830 and 3,532,330 shares issued and outstanding as of December 31, 2016 and 2015 of 6.500% Convertible Perpetual Preferred Stock, Series B, respectively) | 53 | 53 |
| Common stock ($0.01 par value, 150,000,000 shares authorized; 66,156,378 and 61,928,089 shares issued and outstanding as of December 31, 2016 and 2015, respectively) | 670 | 619 |
| Additional paid-in capital | 1,112,397 | 1,079,513 |
| Accumulated deficit | (1,809,260) | (1,536,354) |
| Total stockholders' equity (deficit) | (696,140) | (456,169) |
| Total liabilities and stockholders' equity (deficit) | $ 1,286,280 | $ 1,501,304 |

The accompanying notes are an integral part of these consolidated financial statements.

**Sanchez Energy Corporation**

**Consolidated Statements of Operations**

**(in thousands, except per share amounts)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **REVENUES:** | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 |
| Natural gas liquid sales | 81,744 | 69,011 | 66,989 |
| Natural gas sales | 107,816 | 98,797 | 60,188 |
| Total revenues | 431,326 | 475,779 | 666,064 |
| **OPERATING COSTS AND EXPENSES:** | | | |
| Oil and natural gas production expenses | 164,567 | 156,528 | 93,581 |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 |
| General and administrative (inclusive of stock-based compensation expense of $37,090, $14,831, and $12,843 and for 2016, 2015, and 2014, respectively) | 110,081 | 74,160 | 63,692 |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 |
| Operating loss | (191,761) | (1,491,351) | (80,914) |
| Other income (expense): | | | |
| Interest income | 856 | 442 | 193 |
| Other income (expense) | 134 | (2,605) | 96 |
| Gain on disposal of assets | 112,294 | — | — |
| Interest expense | (126,973) | (126,399) | (89,800) |
| Earnings from equity investments | 3,466 | — | — |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 |
| Total other income (expense) | (63,372) | 44,324 | 47,694 |
| Loss before income taxes | (255,133) | (1,447,027) | (33,220) |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) |
| **Net loss** | (256,958) | (1,454,627) | (21,791) |
| Less: | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) |
| Net income allocable to participating securities | — | — | — |
| **Net loss attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) |
| | | | |
| Net loss per common share - basic and diluted | $ (4.63) | $ (25.70) | $ (1.06) |
| Weighted average number of shares used to calculate net loss attributable to common stockholders - basic and diluted | 58,900 | 57,229 | 52,338 |

The accompanying notes are an integral part of these consolidated financial statements.

**Sanchez Energy Corporation**

**Consolidated Statements of Stockholders' Equity (Deficit)**

**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | (Deficit) |
| **BALANCE, December 31, 2013** | 3,000 | $ 30 | 4,500 | $ 45 | 46,369 | $ 464 | $ 867,108 | $ (10,338) | $ 857,309 |
| Common shares issued, net of offering costs of $8,731 | — | — | — | — | 5,000 | 50 | 167,469 | — | 167,519 |
| Preferred stock dividends | — | — | — | — | — | — | — | (16,293) | (16,293) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 1,673 | 17 | (17) | — | — |
| Exchange of preferred stock for common stock | (1,161) | (12) | (968) | (10) | 5,539 | 55 | 17,264 | (17,297) | — |
| Stock-based compensation | — | — | — | — | — | — | 12,843 | — | 12,843 |
| Net loss | — | — | — | — | — | — | — | (21,791) | (21,791) |
| **BALANCE, December 31, 2014** | 1,839 | 18 | 3,532 | 35 | 58,581 | 586 | 1,064,667 | (65,719) | 999,587 |
| Preferred stock dividends | — | — | — | — | — | — | — | (15,960) | (15,960) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 3,337 | 33 | (33) | — | — |
| Exchange of preferred stock for common stock | — | — | (4) | — | 10 | — | 48 | (48) | — |
| Stock-based compensation | — | — | — | — | — | — | 14,831 | — | 14,831 |
| Net loss | — | — | — | — | — | — | — | (1,454,627) | (1,454,627) |
| **BALANCE, December 31, 2015** | 1,839 | 18 | 3,528 | 35 | 61,928 | 619 | 1,079,513 | (1,536,354) | (456,169) |
| Preferred stock dividends | — | — | — | — | 967 | 10 | 7,964 | (15,948) | (7,974) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 4,092 | 41 | (41) | — | — |
| Stock-based compensation | — | — | — | — | — | — | 24,961 | — | 24,961 |
| Net loss | — | — | — | — | — | — | — | (256,958) | (256,958) |
| **BALANCE, December 31, 2016** | 1,839 | $ 18 | 3,528 | $ 35 | 66,987 | $ 670 | $ 1,112,397 | $ (1,809,260) | $ (696,140) |

The accompanying notes are an integral part of these consolidated financial statements.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements**

**Sanchez Energy Corporation**
**Consolidated Statements of Cash Flows**
**(in thousands)**

## Sanchez Energy Corporation

## Notes to the Consolidated Financial Statements (Continued)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ (256,958) | $ (1,454,627) | $ (21,791) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 |
| Gain on disposal of assets | (112,294) | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 |
| Net (gains) losses on commodity derivative contracts | 53,149 | (172,886) | (137,205) |
| Net cash settlement received on commodity derivative contracts | 122,145 | 131,123 | 5,600 |
| Losses incurred on premiums for derivative contracts | 24,548 | (121) | (596) |
| Cash reimbursements received for operating leasehold improvements | — | 2,648 | — |
| (Gain) loss on investment in SPP | (1,818) | 935 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,813) | (3,086) | — |
| Amortization of debt issuance costs | 7,840 | 7,529 | 9,002 |
| Accretion of debt discount, net | 633 | 703 | 755 |
| Deferred taxes | — | 7,443 | (11,429) |
| Loss on inventory market adjustment | 649 | — | — |
| Distributions from equity investments | 930 | — | — |
| Earnings from equity investments | (3,466) | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (9,626) | 60,480 | (26,971) |
| Other current assets | 1,504 | (450) | (21,633) |
| Accounts payable | (3,108) | (25,303) | (2,868) |
| Accounts receivable - related entities | (2,704) | (3,311) | (1,347) |
| Other payables | 247 | (2,290) | 1,522 |
| Accrued liabilities | 8,498 | 2,813 | 51,590 |
| Other current liabilities | — | (5,166) | 5,166 |
| Other liabilities | (1) | 1,188 | 779 |
| Net cash provided by operating activities | 181,251 | 272,025 | 415,335 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Payments for oil and natural gas properties | (313,342) | (656,136) | (791,260) |
| Payments for other property and equipment | (5,394) | (8,123) | (14,062) |
| Proceeds from sale of oil and natural gas properties | 179,143 | 427,571 | — |
| Acquisition of oil and natural gas properties | — | (7,658) | (555,942) |
| Investment in SPP | (25,000) | — | — |
| Purchases of investments | (36,502) | (49,985) | — |
| Sale of investments | 92,458 | — | — |
| Net cash used in investing activities | (108,637) | (294,331) | (1,361,264) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from borrowings | 60,000 | — | 100,000 |
| Repayment of borrowings | (60,000) | — | (100,000) |
| Issuance of senior notes, net of premium and discount | — | — | 1,152,250 |
| Issuance of common stock | — | — | 176,250 |
| Payments for offering costs | — | — | (8,731) |
| Financing costs | (1,758) | (400) | (37,364) |
| Preferred dividends paid | (3,987) | (15,960) | (16,293) |
| Net cash provided by (used in) financing activities | (5,745) | (16,360) | 1,266,112 |
| Increase (decrease) in cash and cash equivalents | 66,869 | (38,666) | 320,183 |
| Cash and cash equivalents, beginning of period | 435,048 | 473,714 | 153,531 |
| Cash and cash equivalents, end of period | $ 501,917 | $ 435,048 | $ 473,714 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | | |
| Change in asset retirement obligations | $ (2,895) | $ (1,877) | $ 20,303 |
| Change in accrued capital expenditures | (16,829) | (110,744) | 75,843 |
| Capital expenditures in accounts payable | — | — | 14,545 |
| Common stock issued in exchange for preferred stock | — | 273 | 123,731 |
| **SUPPLEMENTAL DISCLOSURE:** | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash paid for taxes | $ | 1,996 | $ | 158 | $ | — |
| Cash paid for interest | $ | 118,498 | $ | 121,644 | $ | 48,064 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The accompanying notes are an integral part of these consolidated financial statements.

**Note 1. Organization and Business**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale. Pro forma for the Comanche Acquisition (defined below), we will have assembled 339,000 net leasehold acres with an approximate 61% average working interest as of December 31, 2016. Following completion of the Comanche Acquisition, we will have over 7,000 gross (4,000 net) locations for potential future drilling. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities. We have included definitions of some of the oil and natural gas terms used in this Annual Report on Form 10-K in the "Glossary of Selected Oil and Natural Gas Terms."

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

***Basis of Presentation***

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

***Recent Accounting Pronouncements***

In January 2017, the FASB issued Accounting Standards Update ("ASU") 2017-01 "Business Combinations (Topic 805) - Clarifying the Definition of a Business," which provides a new framework for determining whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2017. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In December 2016, the FASB issued Accounting Standards Update ASU 2016-19 "Technical Corrections and Improvements," which amends a number of Topics in the FASB ASC. The ASU is part of an ongoing FASB project to facilitate Codification updates for non-substantive technical corrections, clarifications, and improvements that are not expected to have a significant effect on accounting practice or create a significant administrative cost to most entities. The ASU will apply to all reporting entities within the scope of the affected accounting guidance. Most amendments are effective upon issuance (December 2016).

In November 2016, the FASB issued ASU 2016-18 "Statement of Cash Flows (Topic 230): Restricted Cash," which requires companies to include cash and cash equivalents that have restrictions on withdrawal or use in total cash and cash equivalents on the statement of cash flows. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2017. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

In October 2016, the FASB issued ASU 2016-16 "Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory," which eliminates a current exception in U.S. GAAP to the recognition of the income tax effects of temporary differences that result from intra-entity transfers of non-inventory assets. The intra-entity exception is being eliminated under the ASU. The standard is required to be applied on a modified retrospective basis and will be effective beginning with the first quarter of 2018. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15 "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments". This ASU is intended to clarify the presentation of cash receipts and payments in specific situations. The amendments in this ASU are effective for financial statements issued for annual periods beginning after December 15, 2017, including interim periods within those annual periods, and early application is permitted. The Company does not anticipate that ASU 2016-15 will have a material effect on its consolidated and condensed financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09 "Improvements to Employee Share-Based Payment Accounting," effective for annual and interim periods for public companies beginning after December 15, 2016, with a cumulative-effect and prospective approach to be used for implementation. ASU 2016-09 changes several aspects of the accounting for share-based payment award transactions including accounting for income taxes, classification of excess tax benefits on the statement of cash flows, forfeitures, minimum statutory tax withholding requirements and classification of employee taxes paid on the statement of cash flows when an employer withholds shares for tax-withholding purposes. The Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02 "Leases (Topic 842)," effective for annual and interim periods for public companies beginning after December 15, 2018, with a modified retrospective approach to be used for implementation. The standard updates the previous lease guidance by requiring the recognition of a right-to-use asset and lease liability on the statement of financial position for all leases with lease terms of more than 12 months. The lease liability represents the discounted obligation to make future minimum lease payments and corresponding right-of-use asset on the balance sheet for most leases. Recognition, measurement and presentation of expenses and cash flows arising from a lease will depend on classification as a finance or operating lease. The Company has several operating leases as further discussed in Note 16, "Commitments and Contingencies," which will be impacted by the new rules under this standard. The Company will not early adopt this standard, and will apply the revised lease rules for our interim and annual reporting periods starting January 1, 2019. The Company is currently evaluating the impact of these rules on its financial statements and has started the assessment process by evaluating the population of leases under the revised definition. The adoption of this standard will result in an increase in the assets and liabilities on the Company's consolidated balance sheets. The quantitative impacts of the new standard are dependent on the leases in force at the time of adoption. As a result, the evaluation of the effect of the new standards will extend over future periods.

During November 2015, the FASB issued ASU 2015-17, "Balance Sheet Classification of Deferred Taxes", which simplifies the presentation of deferred income taxes. This ASU requires that deferred tax assets and liabilities be classified as non-current in a statement of financial position by jurisdiction rather than separately presented as current and non-current portions. ASU 2015-17 is effective for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. Early adoption is permitted for financial statements as of the beginning of an interim or annual reporting period. The Company chose to adopt ASU 2015-17 as of the quarter ended December 31, 2015 on a retrospective basis. Adoption of this guidance affected the balance sheets as of December 31, 2014 as follows (in thousands):

Case: 23-40508 Document: 43-1 Page 198 of 275

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Decrease in Non-current assets of approximately $33,242
Decrease in Current liabilities of approximately $33,242

In July 2015, the FASB issued ASU No. 2015-11, “Simplifying the Measurement of Inventory,” effective for annual and interim periods beginning after December 15, 2016. ASU 2015-11 changes the inventory measurement principle for entities using the first-in, first out (FIFO) or average cost methods. For entities utilizing one of these methods, the inventory measurement principle will change from lower of cost or market to the lower of cost and net realizable value. The Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements, but do not expect the impact to be material.

May 2014, the FASB issued ASU No. 2014-09, “Revenue from Contracts with Customers (Topic 606).” In March, April, and May of 2016, the FASB issued rules clarifying several aspects of the new revenue recognition standard. The new guidance is effective for fiscal years and interim periods beginning after December 15, 2017. This guidance outlines a new, single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. This new revenue recognition model provides a five-step analysis in determining when and how revenue is recognized. The new model will require revenue recognition to depict the transfer of promised goods or services to customers in an amount that reflects the consideration a company expects to receive in exchange for those goods and services. The new standard also requires more detailed disclosures related to the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. The Company will not early adopt the standard although early adoption is permitted. The Company is currently evaluating whether to apply the retrospective approach or modified retrospective approach with the cumulative effect recognized as of the date of initial application. The Company is currently evaluating the impact the standard is expected to have on its consolidated financial statements by evaluating current revenue streams and evaluating contracts under the revised standards.

***Principles of Consolidation***

The Company’s consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

***Use of Estimates***

The accompanying consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative expenses. Actual results could differ materially from those estimates.

***Cash Equivalents***

Cash and cash equivalents consist primarily of cash on deposit, money market accounts and investment grade commercial paper that are readily convertible into cash and purchased with original maturities of three months or less.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Oil and Natural Gas Receivables***

The majority of the Company's receivables arise from sales of oil, natural gas liquids ("NGLs") or natural gas. The Company does not have any off-balance-sheet credit exposure related to its customers. Receivables from the sale of oil and natural gas are generally unsecured. Allowances for doubtful accounts are determined based on management's assessment of the creditworthiness of the customer. Receivables are considered past due if full payment is not received by the contractual due date. Past due accounts are written off against the allowance for doubtful accounts only after all the collection attempts have been exhausted. At December 31, 2016 and 2015, management believed that all balances were fully collectible and no allowance for doubtful accounts was deemed necessary.

***Oil and Natural Gas Properties***

The Company's oil and natural gas properties are accounted for using the full cost method of accounting. All direct costs and certain indirect costs associated with the acquisition, exploration and development of oil and natural gas properties are capitalized. Once evaluated, these costs, as well as the estimated costs to retire the assets, are included in the amortization base and amortized to depletion expense using the units-of-production method. Depletion is calculated based on estimated proved oil and natural gas reserves. Proceeds from the sale or disposition of oil and natural gas properties are applied to reduce net capitalized costs unless the sale or disposition causes a significant change in the relationship between costs and the estimated quantities of proved reserves.

*Full Cost Ceiling Test*—Capitalized costs (net of accumulated depreciation, depletion and amortization and deferred income taxes) of proved oil and natural gas properties are subject to a full cost ceiling limitation. The ceiling limits these costs to an amount equal to the present value, discounted at 10%, of estimated future net cash flows from estimated proved reserves less estimated future operating and development costs, abandonment costs (net of salvage value) and estimated related future income taxes. In accordance with Securities and Exchange Commission ("SEC") rules, the oil and natural gas prices used to calculate the full cost ceiling are the 12-month average prices, calculated as the unweighted arithmetic average of the first-day-of-the-month price for each month within the 12-month period prior to the end of the reporting period, unless prices are defined by contractual arrangements. Prices are adjusted for "basis" or location differentials. Prices are held constant over the life of the reserves. If unamortized costs capitalized within the cost pool exceed the ceiling, the excess is charged to expense and separately disclosed during the period in which the excess occurs. Amounts thus required to be written off are not reinstated for any subsequent increase in the cost center ceiling. During the year ended December 31, 2016, the Company recorded a full cost ceiling test impairment after income taxes of $169.0 million. During the year ended December 31, 2015, the Company recorded a full cost ceiling test impairment after income taxes of $1,365 million. During the year ended December 31, 2014, the Company recorded a full cost ceiling test impairment before income taxes of $213.8 million.

*Depreciation, depletion, amortization and accretion*—Depreciation, depletion, amortization and accretion ("DD&A") is provided using the units-of-production method based upon estimates of proved oil, NGL and natural gas reserves with oil, NGL and natural gas production being converted to a common unit of measure based upon their relative energy content. All capitalized costs of oil and natural gas properties, including the estimated future costs to develop proved reserves, are amortized using the units-of-production method based on total proved reserves. Investments in unproved properties and major development projects are not amortized until proved reserves associated with the projects can be determined or until impairment occurs. If the results of an assessment indicate that the properties are impaired, the amount of the impairment is added to the capitalized costs to be amortized. Once the assessment of unproved properties is complete and when major development projects are evaluated, the costs previously excluded from amortization are transferred to the full cost pool and amortization begins. The amortizable base includes estimated future

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

development costs and where significant, dismantlement, restoration and abandonment costs, net of estimated salvage value.

In arriving at depletion rates under the units-of-production method, the quantities of recoverable oil and natural gas reserves are established based on estimates made by internal and third party geologists and engineers, which require significant judgment as does the projection of future production volumes and levels of future costs, including future development costs. In addition, considerable judgment is necessary in determining when unproved properties become impaired and in determining the existence of proved reserves once a well has been drilled. All of these judgments may have significant impact on the calculation of depletion and impairment expense.

*Unproved Properties*—Costs associated with unproved properties and properties under development are excluded from the full cost amortization base until the properties have been evaluated. Additionally, the costs associated with seismic data, leasehold acreage, and wells currently drilling are also initially excluded from the amortization base. Unproved properties are identified on a project basis, with a project being an area in which significant leasehold interests are acquired within a contiguous area. Unproved properties are reviewed periodically by management and transferred into the full cost pool subject to amortization when management determines that a project area has been evaluated through drilling operations or a thorough geologic evaluation.

Based on management's review and current operating plans, 5%, 8% and 25% of the unproved property balance at December 31, 2016 is expected to be added to the amortization base during the years 2017, 2018 and 2019, respectively. The remaining balances in unproved properties relate to project areas that will not be thoroughly evaluated until after 2019, and represent leasehold interests that have expiration dates beginning in 2020 or leasehold interests that are currently held by production.

The table below sets forth the cost of unproved properties excluded from the amortization base as of December 31, 2016, and notes the year in which the associated costs were incurred (in thousands):

| | Year of Acquisition | | | | |
|---|---|---|---|---|---|
| | **Prior to 2014** | **2014** | **2015** | **2016** | **Total** |
| Leasehold acquisition costs | $ 33,052 | $ 93,505 | $ 16,587 | $ 44,053 | $ 187,197 |
| Exploration costs | 2,680 | 479 | 343 | 342 | 3,844 |
| Development costs | 1,040 | 3,428 | 1,442 | 34,473 | 40,383 |
| Total | $ 36,772 | $ 97,412 | $ 18,372 | $ 78,868 | $ 231,424 |

***Oil and Natural Gas Reserve Quantities***

The Company's most significant estimates relate to its proved oil and natural gas reserves. The estimates of oil and natural gas reserves as of December 31, 2016, 2015 and 2014 are based on reports prepared by a third party engineering firm, Ryder Scott Company, L.P. ("Ryder Scott").

Estimates of proved reserves are based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Ryder Scott has historically prepared a reserve and economic evaluation of the Company's properties, utilizing information provided to it by management and other information available, including information from the operators of the property.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The standards of the Financial Accounting Standards Board ("FASB") and rules of the SEC permit the use of new technologies to determine proved reserve estimates if those technologies have been demonstrated empirically to lead to reliable conclusions about reserve volume estimates. These rules allow, but do not require, companies to disclose their probable and possible reserves to investors in documents filed with the SEC.

In addition, the disclosure guidelines require companies to report oil and natural gas reserves using an average price based upon the prior 12-month first-day-of-the-month price rather than a period-end price.

Reserves and their relation to estimated future net cash flows impact the depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The reserve estimates and the projected cash flows derived from these reserve estimates are prepared in accordance with SEC guidelines. The independent engineering firm noted above adheres to these guidelines when preparing their reserve reports. The accuracy of the reserve estimates is a function of many factors including the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions, and the judgments of the individuals preparing the estimates, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered.

***Debt Issuance Costs***

Debt issuance costs relating to long-term debt have been deferred and are being amortized and recorded as interest expense over the term of the related debt instrument. During 2016, the Company capitalized approximately $0.1 million in costs associated with the filing of a Form S-3 Registration Statement, and capitalized approximately $1.6 million associated with amending our Second Amended and Restated Agreement (as defined in Note 5, "Long-Term Debt"). During 2015, the Company capitalized approximately $0.4 million in costs associated with amending our Second Amended and Restated Agreement. During 2014, the Company capitalized approximately $37.4 million in costs associated with the issuance of the 6.125% Notes (as defined in Note 5, "Long-Term Debt") and costs incurred to enter into the Second Amended and Restated Credit Agreement. The Company expensed $3.9 million of debt issuance costs during 2014 in conjunction with the termination of our senior unsecured Bridge Facility (as defined in Note 5, "Long-Term Debt") obtained in connection with the Catarina Acquisition (as defined in Note 3, "Acquisitions and Divestitures"). At December 31, 2016 and December 31, 2015, the Company had approximately $35.0 million and $41.0 million, respectively, of debt issuance costs (net of accumulated amortization of $22.5 million and $14.7 million, respectively) remaining that are being amortized over the terms of the respective debt. In accordance with ASU 2015-03, "Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs," the debt issuance costs related to the issuance of the 6.125% Notes and Second Amended and Restated Agreement are presented on the balance sheet as a direct deduction from the long-term debt.

***Environmental Expenditures***

The Company is subject to extensive federal, state and local environmental laws and regulations. These laws regulate the discharge of materials into the environment and may require the Company to remove or mitigate the environmental effects of the disposal or release of petroleum or chemical substances at various sites. Environmental expenditures are expensed or capitalized depending on their future economic benefit. Expenditures that relate to an existing condition caused by past operations and that have no future economic benefits are expensed. Liabilities for expenditures of a non-capital nature are recorded when environmental assessment and/or remediation is probable, and the costs can be reasonably estimated. Such liabilities are generally not discounted unless the timing of cash payments for the liability or component is fixed or reliably determinable.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Liabilities for loss contingencies, including environmental remediation costs arising from claims, assessments, litigation, fines, and penalties and other sources, are recorded when it is probable that a liability has been incurred and the amount of the assessment and/or remediation can be reasonably estimated. Recoveries of environmental remediation costs from third parties, which are probable of realization, are separately recorded and are not offset against the related environmental liability.

Management believes the Company is currently in compliance with all applicable federal, state and local regulations associated with its properties. Accordingly, no environmental remediation liability or loss associated with the Company's properties was recorded as of December 31, 2016 and 2015.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, well life, inflation and credit-adjusted risk-free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset. Upon settlement of the liability, any gain or loss is treated as an adjustment to the full cost pool.

To estimate the fair value of an asset retirement obligation, the Company employs a present value technique, which reflects certain assumptions, including its credit-adjusted risk-free interest rate, inflation rate, the estimated settlement date of the liability and the estimated current cost to settle the liability. Changes in timing or to the original estimate of cash flows will result in change to the carrying amount of the liability.

***Stock-Based Compensation***

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

Stock-based compensation awards and phantom stock awards, including those awards with market performance acceleration conditions, granted to employees of the Sanchez Group (as defined in Note 7, "Stock-Based Compensation") (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expenses equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered. In accordance with the guidance, the inclusion of market performance acceleration conditions does not change the accounting classification as compared to those awards without market performance acceleration conditions. The phantom stock awards are required to be settled in cash by the Company and are classified

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

as a liability. Compensation expense for the unvested awards is revalued at each period end and is amortized over the vesting period of the stock-based award.

***Revenue Recognition***

Oil, NGL and natural gas sales are recognized when production is sold to a purchaser at a fixed or determinable price, delivery has occurred, title has transferred, and collectability of the revenue is probable. Delivery occurs and title is transferred when production has been delivered to a pipeline, railcar or truck, or a tanker lifting has occurred. The sales method of accounting is used for oil, NGL and natural gas sales. Oil and natural gas imbalances are generated on properties for which two or more owners have the right to take production "in-kind" and, in doing so, take more or less than their respective entitled percentage. As of December 31, 2016, 2015 and 2014 there were no material oil and natural gas imbalances.

***Sales to Major Customers***

The Company's oil, NGL and natural gas production was sold to certain customers representing 10% or more of its total revenues for the years ended December 31, 2016, 2015 and 2014 as listed below:

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Customer A | 4% | 7% | 23% |
| Customer B | 14% | 14% | 4% |
| Customer C | 0% | 4% | 15% |
| Customer D | 33% | 38% | 37% |
| Customer E | 20% | 0% | 0% |

Production is normally sold to relatively few customers. Substantially all of the Company's customers are concentrated in the oil and natural gas industry and revenue can be materially affected by current economic conditions, the price of certain commodities such as crude oil and natural gas and the availability of alternate purchasers. Management believes the loss of any of the Company's major customers would not have a long-term material adverse effect on the Company's operations.

***General and Administrative Expenses***

On December 19, 2011, the Company entered into a services agreement and other related agreements with Sanchez Oil & Gas Corporation ("SOG"), pursuant to which SOG (directly or through its subsidiaries) agreed to provide the Company with the services and data that the Company believes are necessary to manage, operate and grow its business, and the Company agreed to reimburse SOG for all direct and indirect costs incurred on its behalf. See detailed discussion of the Company's relationship with SOG in Note 9, "Related Party Transactions."

***Derivative Instruments***

The Company utilizes derivative instruments in order to manage price risk associated with future crude oil and natural gas production. Management sets and implements all of the hedging policies, including volumes, types of instruments and counterparties, on a monthly basis. The

Company recognizes all derivatives as either assets or liabilities, measured at fair value, and recognizes changes in the fair value of derivatives in current earnings because it does not designate its derivatives as cash flow hedges.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Income Taxes***

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities arise from the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary difference and carryforwards are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce the deferred tax asset to the amount more likely than not to be recovered.

Additionally, the Company is required to determine whether it is more likely than not (a likelihood of more than 50%) that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position in order to record any financial statement benefit. If that step is satisfied, then the Company must measure the tax position to determine the amount of benefit to recognize in the financial statements. The tax position is measured at the largest amount of benefit that has greater than a 50% likelihood of being realized upon ultimate settlement. Any interest or penalties would be recognized as a component of income tax expense.

The Company applies significant judgment in evaluating its tax positions and estimating its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The actual outcome of these future tax consequences could differ significantly from these estimates, which could impact the Company’s financial position, results of operations and cash flows. The Company does not have any material uncertain tax positions during the years ended December 31, 2016 or 2015.

***Earnings per Share***

Basic net income (loss) per common share are computed using the two-class method. The two-class method is required for those entities that have participating securities. The two-class method is an earnings allocation formula that determines net income (loss) per share for participating securities according to dividends declared (or accumulated) and participation rights in undistributed earnings. The Company’s restricted shares of common stock (see Note 7, “Stock-Based Compensation”) are participating securities under ASC 260, “Earnings per Share,” because they may participate in undistributed earnings with common stock. Participating securities do not have a contractual obligation to share in the Company’s losses. Therefore, in periods of net loss, no portion of the loss is allocated to participating securities.

Diluted net income (loss) per common share reflect the dilutive effects of the participating securities using the two-class method or the treasury stock method, whichever is more dilutive. They also reflect the effects of the potential conversion of the Company’s Series A and Series B Preferred Stock using the if-converted method, if the effect is dilutive.

**Note 3. Acquisitions and Divestitures**

Our acquisitions are accounted for under the acquisition method of accounting in accordance with ASC Topic 805, “Business Combinations” (“ASC Topic 805”). A business combination may result in the recognition of a gain or goodwill based on the measurement of the fair value of the assets acquired at the acquisition date as compared to the fair value of consideration transferred, adjusted for purchase price adjustments. The initial accounting for acquisitions may

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

not be complete and adjustments to provisional amounts, or recognition of additional assets acquired or liabilities assumed, may occur as more detailed analyses are completed and additional information is obtained about the facts and circumstances that existed as of the acquisition dates. The results of operations of the properties acquired in our acquisitions have been included in the consolidated financial statements since the closing dates of the acquisitions.

*Catarina Acquisition*

On June 30, 2014, we completed the Catarina Acquisition for an aggregate adjusted purchase price of $557.1 million. The effective date of the transaction was January 1, 2014. The purchase price was funded with a portion of the proceeds from the issuance of the $850 million senior unsecured 6.125% notes due 2023 (the ‘‘Original 6.125% Notes’’) and cash on hand. The purchase price allocation for the Catarina Acquisition is preliminary and is subject to further adjustments and the settlement of certain post-closing adjustments with the seller. The total purchase price was allocated to the assets purchased and liabilities assumed based upon their fair values on the date of acquisition as follows (in thousands):

| | |
|---|---|
| Proved oil and natural gas properties | $ 446,906 |
| Unproved properties | 122,224 |
| Other assets acquired | 2,682 |
| Fair value of assets acquired | 571,812 |
| Asset retirement obligations | (14,723) |
| Fair value of net assets acquired | $ 557,089 |

*Cotulla Disposition*

On December 14, 2016, SN Cotulla Assets, LLC (“SN Cotulla”), a wholly-owned subsidiary of the Company, completed the initial closing of the sale of certain oil and gas interests and associated assets located in Dimmit County, Frio County, LaSalle County, Zavala County and McMullen County, Texas (the “Cotulla Assets”) to Carrizo (Eagle Ford) LLC (“Carrizo Eagle Ford”), pursuant to a Purchase and Sale Agreement dated October 24, 2016 for an adjusted purchase price of approximately $153.5 million (the “Cotulla Disposition”). The effective date of the Cotulla Disposition is June 1, 2016. Subsequent to December 31, 2016, a second closing on an additional portion of the Cotulla Assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings.

Normally, sales of oil and gas properties are accounted for as adjustments to capitalized costs with no gain or loss recognized. However, in circumstances where treating a sale like a normal retirement would result in a significant change in the company’s amortization rate, judgment should be applied. The Company determined that adjustments to capitalized costs for the Cotulla Disposition would cause a significant change in the company’s amortization rate. As such, the Company recorded a gain of approximately $112.3 million related to the Cotulla Disposition. The Company expects to record additional gains related to the potential future closings on the Cotulla Disposition in 2017, as noted above.

*Production Asset Transaction*

On November 22, 2016, the Company completed the sale of certain non-core producing oil and gas assets, located in South Texas, to SPP for an adjusted purchase price of approximately $25.6 million in cash (the “Production Asset Transaction”). The Production Asset Transaction includes working

Case 23-34508 Document 1354-17 Filed in TXSB on 07/28/23 Page 254 of 1759

interests in 23 producing Eagle Ford wellbores located in Dimmit and Zavala counties in South Texas together with escalating working interests in an additional 11

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

producing wellbores located in the Palmetto Field in Gonzales County, Texas. The effective date of the Production Asset Transaction was July 1, 2016. The aggregate average working interest percentage initially conveyed was 17.92% per wellbore and, upon January 1 of each subsequent year after the closing, the purchaser's working interest will automatically increase in incremental amounts according to the purchase agreement until January 1, 2018, at which point the purchaser will own a 47.5% working interest and we will own a 2.5% working interest in each of the wellbores. The Company did not record any gains or losses related to the Production Asset Transaction.

*Western Catarina Midstream Divestiture*

On October 14, 2015, the Company and SN Catarina, LLC ("SN Catarina") completed the sale of SN Catarina's interests in Catarina Midstream, LLC, a wholly-owned subsidiary of SN Catarina ("Catarina Midstream"), which as of the closing included certain midstream gathering lines and associated assets and interests located in Dimmit County and Webb County, Texas and 105,263 SPP Common Units to SPP for an adjusted purchase price of $345.8 million in cash (the "Western Catarina Midstream Divestiture"). In connection with the closing of the Western Catarina Midstream Divestiture, SN Catarina and Catarina Midstream entered into a Firm Gathering and Processing Agreement (the "Gathering Agreement") on October 14, 2015 for an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas will be dedicated for gathering by Catarina Midstream. In addition, for the first five years of the Gathering Agreement, SN Catarina will be required to meet a minimum quarterly volume delivery commitment of 10,200 barrels per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. SN Catarina will be required to pay gathering and processing fees of $0.96 per barrel for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through the gathering system, in each case, subject to an annual escalation for a positive increase in the consumer price index. In addition, SN Catarina has, under certain circumstances, a right of first refusal during the term of the agreement and afterwards with respect to dispositions by Catarina Midstream of its ownership interest in the gathering system. The Company recorded a deferred gain of approximately $74.1 million as a result of Gathering Agreement being accounted for as an operating lease. This deferred gain will be amortized straight-line over the firm commitment term of five years as an offset to the transportation fees paid to SPP under the Gathering Agreement.

*Palmetto Disposition*

On March 31, 2015, we completed our disposition to a subsidiary of Sanchez Production Partners LP ("SPP") of escalating amounts of partial working interests in 59 wellbores located in Gonzales County, Texas (the "Palmetto Disposition") for an adjusted sales price of approximately $83.4 million. The effective date of the transaction was January 1, 2015. The aggregate average working interest percentage initially conveyed was 18.25% per wellbore and, upon January 1 of each subsequent year after the closing, the purchaser's working interest will automatically increase in incremental amounts according to the purchase agreement until January 1, 2019, at which point the purchaser will own a 47.5% working interest and we will own a 2.5% working interest in each of the wellbores. We received consideration consisting of approximately $83.0 million (approximately $81.4 million as adjusted) cash and 1,052,632 common units of SPP (the "SPP Common Units") valued at approximately $2.0 million as of the date of the closing. These SPP Common Units were later sold back to SPP in October 2015 as part of the Western Catarina Midstream Divestiture described below. The Company did not record any gains or losses related to the Palmetto Disposition.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

## Note 4. Cash and Cash Equivalents

As of December 31, 2016 and 2015, cash and cash equivalents consisted of the following (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Cash at banks | $ 58,269 | $ 35,600 |
| Money market funds | 443,648 | 399,448 |
| Total cash and cash equivalents | $ 501,917 | $ 435,048 |

## Note 5. Long-Term Debt

Long-term debt as of December 31, 2016 consisted of $1.15 billion face value of 6.125% senior notes (the “6.125% Notes,” consisting of $850 million in Original 6.125% Notes and $300 million in Additional 6.125% Notes (defined below), which were issued at a premium to face value of $2.3 million) maturing on January 15, 2023, and $600 million principal amount of 7.75% senior notes (the “7.75% Notes,” consisting of $400 million in Original 7.75% Notes (defined below) and $200 million in Additional 7.75% Notes, which were issued at a discount to face value of $7.0 million), maturing on June 15, 2021. During the first quarter 2016, the Company adopted ASU 2015-03 retrospectively to the comparable periods in this Form 10-Q. Adoption of this guidance affected the balance sheets as of December 31, 2015 as follows (in thousands):

Decrease in Long term debt, net of premium, discount and debt issuance costs of approximately $41,039
Decrease in Debt issuance costs, net (Other Assets) of approximately $41,039

As of December 31, 2016 and 2015 the Company’s long-term debt consisted of the following:

| | | | Amount Outstanding (in thousands) as of | |
|---|---|---|---|---|
| | Interest Rate | Maturity date | December 31, 2016 | December 31, 2015 |
| Second Amended and Restated Credit Agreement | Variable | June 30, 2019 | $ — | $ — |
| 7.75% Notes | 7.75% | June 15, 2021 | 600,000 | 600,000 |
| 6.125% Notes | 6.125% | January 15, 2023 | 1,150,000 | 1,150,000 |
| | | | 1,750,000 | 1,750,000 |
| Unamortized discount on Additional 7.75% Notes | | | (4,030) | (4,933) |
| Unamortized premium on Additional 6.125% Notes | | | 1,629 | 1,899 |
| Unamortized debt issuance costs | | | (34,832) | (41,039) |
| Total long-term debt | | | $ 1,712,767 | $ 1,705,927 |

Sanchez Energy Corporation

Notes to the Consolidated Financial Statements (Continued)

The components of interest expense are (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Interest on Senior Notes | $ (116,938) | $ (116,938) | $ (78,479) |
| Interest expense and commitment fees on credit agreement | (1,561) | (1,229) | (1,564) |
| Amortization of debt issuance costs | (7,840) | (7,529) | (9,002) |
| Amortization of discount on Additional 7.75% Notes | (904) | (904) | (905) |
| Amortization of premium on Additional 6.125% Notes | 270 | 201 | 150 |
| Total interest expense | $ (126,973) | $ (126,399) | $ (89,800) |

***Credit Facility***

***Previous Credit Agreement:*** On May 31, 2013, we and our subsidiaries, SEP Holdings III, LLC ("SEP III"), SN Marquis LLC ("SN Marquis") and SN Cotulla, collectively, as the borrowers, entered into a revolving credit facility represented by a $500 million Amended and Restated Credit Agreement with Royal Bank of Canada as the administrative agent and collateral agent, and the lenders party thereto (the "Amended and Restated Credit Agreement"). The Amended and Restated Credit Agreement was to mature on May 31, 2018.

On May 12, 2014, the Company borrowed $100 million under the Amended and Restated Credit Agreement. The Company used proceeds from the issuance of the Original 6.125% Notes to repay the $100 million outstanding.

***Second Amended and Restated Credit Agreement:*** On June 30, 2014, the Company, as borrower, and SEP III, SN Marquis, SN Cotulla, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC as loan parties, entered into a revolving credit facility represented by a $1.5 billion Second Amended and Restated Credit Agreement with Royal Bank of Canada, as the administrative agent and collateral agent, and the lenders party thereto (together with all subsequent amendments, the "Second Amended and Restated Credit Agreement"). The Second Amended and Restated Credit Agreement provides for the issuance of letters of credit, limited in the aggregate to the lesser of $80 million and the total availability thereunder. As of December 31, 2016, there were no borrowings and no letters of credit outstanding under the Second Amended and Restated Credit Agreement, which had a borrowing base of $350 million and aggregate elected commitments of $300 million. Availability under the Second Amended and Restated Credit Agreement is at all times subject to customary conditions and the then applicable borrowing base and aggregate elected commitment amount. All of the $300 million aggregate elected commitment amount was available for future revolver borrowings as of December 31, 2016.

The Second Amended and Restated Credit Agreement matures on June 30, 2019. The borrowing base under the Second Amended and Restated Credit Agreement is redetermined semi-annually by the lenders based on, among other things, an evaluation of the Company's and its restricted subsidiaries' oil and natural gas reserves. Semi-annual redeterminations of the borrowing base are generally scheduled to occur on or before April 1 and October 1 of each year. The borrowing base is also subject to (i) automatic reduction by 25% of the amount of any increase in the aggregate amount of the Company's high yield debt and second lien debt, other than high yield or second lien debt issued in exchange for or to refinance existing high yield debt, permitted second lien debt incurred to refinance or replace permitted second lien debt, and permitted second lien debt representing the payment of interest in kind, (ii) interim redetermination at the election of the Company once between each scheduled redetermination, (iii) interim redetermination at the election of a majority of the lenders once between each scheduled redetermination, and (iv) if the

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

required lenders so direct, in connection with asset sales and swap terminations during the period since the most recent borrowing base determination with a combined borrowing base value of more than 10% of the value of the proved developed oil and gas properties included in the most recent reserve report, a reduction in an amount equal to the borrowing base value, as determined by the administrative agent in its reasonable judgment, of such assets and swaps

The Company's obligations under the Second Amended and Restated Credit Agreement are guaranteed by all of the Company's existing and future subsidiaries not designated as "unrestricted subsidiaries" and secured by a first priority lien on substantially all of the Company's assets and the assets of its existing and future subsidiaries including the SPV, defined below, an "unrestricted subsidiary," but excluding other subsidiaries designated as "unrestricted subsidiaries," including a first priority lien on all ownership interests in existing and future subsidiaries not designated as "unrestricted subsidiaries."

At the Company's election, interest on borrowings under the Second Amended and Restated Credit Agreement may be calculated based on an alternate base rate or an adjusted eurodollar (LIBOR) rate, plus an applicable margin. The applicable margin varies from 1.00% to 2.00% for alternate base rate borrowings and from 2.00% to 3.00% for eurodollar (LIBOR) borrowings and letters of credit, if any, depending on the Company's utilization of the borrowing base. The Company is also required to pay a commitment fee of 0.50% per annum on any unused aggregate elected commitment amount.

The Second Amended and Restated Credit Agreement contains various affirmative and negative covenants and events of default that limit the Company's ability to, among other things, incur indebtedness, make restricted payments, grant liens, consolidate or merge, dispose of certain assets, make investments, engage in transactions with affiliates, enter into hedge transactions and make acquisitions. The Second Amended and Restated Credit Agreement also provides for cross default between the Second Amended and Restated Credit Agreement and the other debt (including debt under the 6.125% Notes and the 7.75% Notes) and obligations in respect of hedging agreements (on a mark-to-market basis), of the Company and its restricted subsidiaries, in an aggregate principal amount in excess of $10 million. Furthermore, the Second Amended and Restated Credit Agreement contains financial covenants that require the Company to satisfy the following tests: (i) current assets plus undrawn borrowing capacity on the Second Amended and Restated Credit Agreement to current liabilities of at least 1.0 to 1.0 at all times, and (ii) net first lien debt (defined as the excess of first lien debt over cash) to consolidated last twelve months EBITDA of not greater than 2.00 to 1.0 as of the last day of any fiscal quarter. As of December 31, 2016, the Company was in compliance with the covenants of the Second Amended and Restated Credit Agreement.

The Second Amended and Restated Credit Amendment, among other things, also (a) permits the repurchase by the Company and its restricted subsidiaries, or by a special purpose unrestricted subsidiary of the Company (the "SPV"), of the Company's senior unsecured notes and common and preferred equity securities, from cash in excess of lender credit exposure in an aggregate amount up to approximately $298.5 million subject to certain caps on purchases of the Company's common and preferred equity securities and other limitations; (b) permits (i) the formation and capitalization of the SPV with up to $150 million, (ii) the SPV to purchase, hold and dispose of, including by way of distribution to its immediate parent, up to $150 million of the Company's senior unsecured notes and common and preferred equity securities, (iii) the SPV to hold cash received from its immediate parent in a deposit account maintained with a lender under the Second Amended and Restated Credit Agreement, and (iv) the SPV to distribute cash to its immediate parent; (c) requires (i) the Company to cause the SPV to distribute all cash held by it or in its name as of the close of business on December 31, 2016 to its immediate parent, (ii) the equity interests in the SPV to be pledged in favor of the secured parties and (iii) the Company to maintain all deposits, securities and commodity accounts with lenders or affiliates of lenders under the Second Amended and Restated Credit Agreement and to enter into account control agreements in favor of the administrative agent for the benefit of the secured parties in respect of each of such accounts; (d) provides that, in

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

the event of a borrowing base deficiency, the Company shall use unrestricted cash of the Company and its subsidiaries in excess of $35 million to prepay borrowings and cash collateralize letter of credit exposure, as applicable; and (e) restricts the Company from increasing its aggregate elected commitment amount until the lenders' next regularly scheduled borrowing base redetermination, which is expected to occur in the fourth quarter 2016.

From time to time, the agents, arrangers, book runners and lenders under the Second Amended and Restated Credit Agreement and their affiliates have provided, and may provide in the future, investment banking, commercial lending, hedging and financial advisory services to the Company and its affiliates in the ordinary course of business, for which they have received, or may in the future receive, customary fees and commissions for these transactions.

***7.75% Senior Notes Due 2021***

On June 13, 2013, we completed a private offering of $400 million in aggregate principal amount of the Company's 7.75% senior notes that will mature on June 15, 2021 (the "Original 7.75% Notes"). Interest on the notes is payable on each June 15 and December 15. We received net proceeds from this offering of approximately $388 million, after deducting initial purchasers' discounts and offering expenses, which we used to repay outstanding indebtedness under our credit facilities. The Original 7.75% Notes are senior unsecured obligations and are guaranteed on a joint and several senior unsecured basis by, with certain exceptions, substantially all of our existing and future subsidiaries.

On September 18, 2013, we issued an additional $200 million in aggregate principal amount of our 7.75% senior notes due 2021 (the "Additional 7.75% Notes" and, together with the Original 7.75% Notes, the "7.75% Notes") in a private offering at an issue price of 96.5% of the principal amount of the Additional 7.75% Notes. We received net proceeds of $188.8 million (after deducting the initial purchasers' discounts and offering expenses of $4.2 million) from the sale of the Additional 7.75% Notes. The Company also received cash for accrued interest from June 13, 2013 through the date of issuance of $4.1 million, for total net proceeds of $192.9 million from the sale of the Additional 7.75% Notes. The Additional 7.75% Notes were issued under the same indenture as the Original 7.75% Notes, and are, therefore, treated as a single class of securities under the indenture. We used the net proceeds from the offering to partially fund our acquisition of contiguous acreage in McMullen County, Texas (the "Wycross Acquisition") completed in October 2013, a portion of the 2013 and 2014 capital budgets, and for general corporate purposes.

The 7.75% Notes are senior unsecured obligations and rank equally in right of payment with all of our existing and future senior unsecured indebtedness. The 7.75% Notes rank senior in right of payment to our future subordinated indebtedness. The 7.75% Notes are effectively junior in right of payment to all of our existing and future secured debt (including under our Second Amended and Restated Credit Agreement) to the extent of the value of the assets securing such debt. The 7.75% Notes are fully and unconditionally guaranteed (except for customary release provisions) on a joint and several senior unsecured basis by the subsidiary guarantors party to the indenture governing the 7.75% Notes. To the extent set forth in the indenture governing the 7.75% Notes, certain of our subsidiaries will be required to fully and unconditionally guarantee the 7.75% Notes on a joint and several senior unsecured basis in the future.

The indenture governing the 7.75% Notes, among other things, restricts our ability and our restricted subsidiaries' ability to: (i) incur, assume, or guarantee additional indebtedness or issue certain types of equity securities; (ii) pay distributions on, purchase or redeem shares or purchase or redeem subordinated debt; (iii) make certain investments; (iv) enter into certain transactions with affiliates; (v) create or incur liens on their assets; (vi) sell assets; (vii) consolidate, merge or transfer all or substantially all of their assets; (viii) restrict distributions or other payments from the Company's restricted subsidiaries; and (ix) designate subsidiaries as unrestricted subsidiaries.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

We have the option to redeem all or a portion of the 7.75% Notes, at any time on or after June 15, 2017 at the applicable redemption prices specified in the indenture plus accrued and unpaid interest. We may also redeem the 7.75% Notes, in whole or in part, at a redemption price equal to 100% of their principal amount plus a make whole premium, together with accrued and unpaid interest and additional interest, if any, to the redemption date, at any time prior to June 15, 2017. In addition, we may be required to repurchase the 7.75% Notes upon a change of control or if we sell certain of our assets.

On July 18, 2014, we completed an exchange offer of $600 million aggregate principal amount of the 7.75% Notes that had been registered under the Securities Act of 1933, as amended (the "Securities Act"), for an equal amount of the 7.75% Notes that had not been registered under the Securities Act.

***6.125% Senior Notes Due 2023***

On June 27, 2014, the Company completed a private offering of $850 million in aggregate principal amount senior unsecured 6.125% notes due 2023 (the Original 6.125% Notes). Interest on the notes is payable on each July 15 and January 15. The Company received net proceeds from this offering of approximately $829 million, after deducting initial purchasers' discounts and estimated offering expenses, which the Company used to repay all of the $100 million in borrowings outstanding under its Amended and Restated Credit Agreement and to finance a portion of the purchase price of the Catarina Acquisition. We used the remaining proceeds from the offering to fund a portion of the remaining 2014 capital budget and for general corporate purposes. The Original 6.125% Notes are the senior unsecured obligations of the Company and are guaranteed on a joint and several senior unsecured basis by, with certain exceptions, substantially all of the Company's existing and future subsidiaries.

On September 12, 2014, we issued an additional $300 million in aggregate principal amount of our 6.125% senior notes due 2023 (the "Additional 6.125% Notes" and, together with the Original 6.125% Notes, the "6.125% Notes" and, together with the 7.75% Notes, the "Senior Notes") in a private offering at an issue price of 100.75% of the principal amount of the Additional 6.125% Notes. We received net proceeds of $295.9 million, after deducting the initial purchasers' discounts, adding premiums to face value of $2.3 million and deducting estimated offering expenses of $6.4 million. The Company also received cash for accrued interest from June 27, 2014 through the date of the issuance of $3.8 million, for total net proceeds of $299.7 million from the sale of the Additional 6.125% Notes. The Additional 6.125% Notes were issued under the same indenture as the Original 6.125% Notes, and are therefore treated as a single class of securities under the indenture. We used a portion of the net proceeds from the offering to fund a portion of the 2014 capital budget and used the remainder of the net proceeds to fund a portion of the 2015 capital budget, and for general corporate purposes.

The 6.125% Notes are senior unsecured obligations and rank equally in right of payment with all of our existing and future senior unsecured indebtedness. The 6.125% Notes rank senior in right of payment to the Company's future subordinated indebtedness. The 6.125% Notes are effectively junior in right of payment to all of the Company's existing and future secured debt (including under the Second Amended and Restated Credit Agreement) to the extent of the value of the assets securing such debt. The 6.125% Notes are fully and unconditionally guaranteed (except for customary release provisions) on a joint and several senior unsecured basis by the subsidiary guarantors party to the indenture governing the 6.125% Notes. To the extent set forth in the indenture governing the 6.125% Notes, certain of our subsidiaries will be required to fully and unconditionally guarantee the 6.125% Notes on a joint and several senior unsecured basis in the future.

The indenture governing the 6.125% Notes, among other things, restricts our ability and our restricted subsidiaries' ability to: (i) incur, assume or guarantee additional indebtedness or issue certain types of equity securities;

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

(ii) pay distributions on, purchase or redeem shares or purchase or redeem subordinated debt; (iii) make certain investments; (iv) enter into certain transactions with affiliates; (v) create or incur liens on their assets; (vi) sell assets; (vii) consolidate, merge or transfer all or substantially all of their assets; (viii) restrict distributions or other payments from the Company's restricted subsidiaries; and (ix) designate subsidiaries as unrestricted subsidiaries.

The Company has the option to redeem all or a portion of the 6.125% Notes, at any time on or after July 15, 2018 at the applicable redemption prices specified in the indenture plus accrued and unpaid interest. The Company may also redeem the 6.125% Notes, in whole or in part, at a redemption price equal to 100% of their principal amount plus a make whole premium, together with accrued and unpaid interest and additional interest, if any, to the redemption date, at any time prior to July 15, 2018. In addition, the Company may redeem up to 35% of the 6.125% Notes prior to July 15, 2017 under certain circumstances with an amount not greater than the net cash proceeds of one or more equity offerings at the redemption price specified in the indenture. The Company may also be required to repurchase the 6.125% Notes upon a change of control or if we sell certain Company assets.

On February 27, 2015, we completed an exchange offer of $1.15 billion aggregate principal amount of the 6.125% Notes that had been registered under the Securities Act, for an equal amount of the 6.125% Notes that had not been registered under the Securities Act.

Pursuant to tripartite agreements by and among the Company, U.S. Bank National Association ("U.S. Bank") and Delaware Trust Company ("Delaware Trust"), effective May 20, 2016, U.S. Bank resigned as the Trustee, Notes Custodian, Registar and Paying Agent ("Trustee") under the indentures of the Senior Notes and Delaware Trust was appointed as successor Trustee. No other changes to the indentures for the 6.125% Notes or the 7.75% Notes were made at the time of the change in Trustee.

**Note 6. Stockholders' Equity**

*Common Stock Offerings*— On September 18, 2013, the Company completed a public offering of 11,040,000 shares of common stock (including 1,440,000 shares purchased pursuant to the full exercise of the underwriters' overallotment option), at an issue price of $23.00 per share. The Company received net proceeds from this offering of $241.4 million, after deducting underwriters' fees and offering expenses of $12.5 million. The Company used the net proceeds from the offering to partially fund the Wycross Acquisition completed in October 2013 and a portion of the 2013 and 2014 capital budgets, and for general corporate purposes.

On June 12, 2014, the Company completed a public offering of 5,000,000 shares of common stock, at an issue price of $35.25 per share. The Company received net proceeds from this offering of $167.5 million, after deducting underwriters' fees and offering expenses of $8.7 million. The Company used the net proceeds from the offering to partially fund the 2014 capital budget and for general corporate purposes.

As discussed further below in Note 19, "Subsequent Events," on February 6, 2017, the Company completed a public offering of 11,500,000 shares of common stock (including 1,500,000 shares purchased pursuant to the full exercise of the underwriters' overallotment option), at an issue price of $12.50 per share. The Company received net proceeds from this offering of $135.9 million, after deducting underwriters' discounts fees of approximately $7.8 million.

*Series A Preferred Stock Offering*—On September 17, 2012, the Company completed a private placement of 3,000,000 shares of Series A Preferred Stock, which were sold to a group of qualified institutional buyers pursuant to the Rule 144A exemption from registration under the Securities Act. The issue price of each share of the Series A Preferred

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Stock was $50.00. The Company received net proceeds from the private placement of $144.5 million, after deducting initial purchasers' discounts and commissions and offering costs of $5.5 million.

Each share of Series A Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.325 shares of common stock per share of Series A Preferred Stock (which is equal to an initial conversion price of $21.51 per share of common stock) and is subject to specified adjustments. As of December 31, 2016, based on the initial conversion price, approximately 4,275,640 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series A Preferred Stock.

The annual dividend on each share of Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Company's Board of Directors (the "Board"). The Company may, at its option, pay dividends in cash and, subject to certain conditions, common stock or any combination thereof. Dividends are cumulative, and as of December 31, 2016, all dividends accumulated through that date had been paid. The dividends accrued for the period from October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock on January 3, 2017.

Except as required by law or the Company's Amended and Restated Certificate of Incorporation, (the "Charter"), holders of the Series A Preferred Stock will have no voting rights unless dividends fall into arrears for six or more quarterly periods (whether or not consecutive). In that event and until such arrearage is paid in full, the holders of the Series A Preferred Stock and the holders of the Series B Preferred Stock, voting as a single class, will be entitled to elect two directors and the number of directors on the Board will increase by that same number.

At any time on or after October 5, 2017, the Company may at its option cause all outstanding shares of the Series A Preferred Stock to be automatically converted into common stock at the conversion price, if, among other conditions, the closing sale price (as defined) of the Company's common stock equals or exceeds 130% of the conversion price for a specified period prior to the conversion.

If a holder elects to convert shares of Series A Preferred Stock upon the occurrence of certain specified fundamental changes, the Company will be obligated to deliver an additional number of shares above the applicable conversion rate to compensate the holder for lost option time value of the shares of Series A Preferred Stock as a result of the fundamental change.

*Series B Preferred Stock Offering*—On March 26, 2013, the Company completed a private placement of 4,500,000 shares of Series B Preferred Stock. The issue price of each share of the Series B Preferred Stock was $50.00. The Company received net proceeds from the private placement of $216.6 million, after deducting placement agent's fees and offering costs of $8.4 million.

Each share of Series B Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock (which is equal to an initial conversion price of approximately $21.40 per share of common stock) and is subject to specified adjustments. As of December 31, 2016, based on the initial conversion price, approximately 8,244,539 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series B Preferred Stock.

The annual dividend on each share of Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. The Company may, at its option, pay dividends in cash and, subject to certain conditions,

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

common stock or any combination thereof. Dividends are cumulative, and as of December 31, 2016, all dividends accumulated through that date had been paid. The dividends accrued for the period from October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock on January 3, 2017.

Except as required by law or the Charter, holders of the Series B Preferred Stock will have no voting rights unless dividends fall into arrears for six or more quarterly periods (whether or not consecutive). In that event and until such arrearage is paid in full, the holders of the Series B Preferred Stock and the holders of the Series A Preferred Stock, voting as a single class, will be entitled to elect two directors and the number of directors on the Board will increase by that same number.

At any time on or after April 6, 2018, the Company may at its option cause all outstanding shares of the Series B Preferred Stock to be automatically converted into common stock at the conversion price, if, among other conditions, the closing sale price (as defined) of the Company's common stock equals or exceeds 130% of the conversion price for a specified period prior to the conversion.

If a holder elects to convert shares of Series B Preferred Stock upon the occurrence of certain specified fundamental changes, the Company will be obligated to deliver an additional number of shares above the applicable conversion rate to compensate the holder for lost option time value of the shares of Series B Preferred Stock as a result of the fundamental change.

*Preferred Stock Exchange*—On February 12, 2014 and February 13, 2014, the Company entered into exchange agreements with certain holders (the "February 2014 Holders") of the Series A Preferred Stock and the Series B Preferred Stock pursuant to which such holders agreed to exchange an aggregate of (i) 947,490 shares of the Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 2,425,574 shares of the Company's common stock, and (ii) 756,850 shares of the Series B Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 2,021,066 shares of the Company's common stock.

Additionally, on May 29, 2014, the Company entered into exchange agreements with certain holders (the "May 2014 Holders") of the Series A Preferred Stock and the Series B Preferred Stock pursuant to which such holders agreed to exchange an aggregate of (i) 166,025 shares of the Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 418,715 shares of the Company's common stock, and (ii) 210,820 shares of the Series B Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 553,980 shares of the Company's common stock.

Further, on August 28, 2014, the Company entered into exchange agreements with certain holders (the "August 2014 Holders,'" and together with the May 2014 Holders and the February 2014 Holders, the "Holders") of the Series A Preferred Stock, pursuant to which such holders agreed to exchange an aggregate of 47,500 shares of Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 119,320 shares of the Company's common stock.

Since the Holders were not entitled to any consideration over and above the initial conversion rates of 2.325 and 2.337 shares of common stock for each preferred share exchanged for Series A Preferred Stock and Series B Preferred Stock, respectively, any consideration is considered an inducement for the Holders to convert earlier than the Company could have forced conversion.

The Company has determined the fair value of consideration transferred to the Holders and the fair value of consideration transferrable pursuant to the original conversion terms. The $13.9 million, $3.1 million and $0.3 million

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

excess of the fair value of the shares of common stock issued over the carrying value of the Series A Preferred Stock and Series B Preferred Stock redeemed in connection with the exchange agreements entered into in February, May and August 2014, respectively, has been reflected as an additional preferred stock dividend (i.e., as an increase in accumulated deficit) to arrive at net loss attributable to common stockholders in our condensed consolidated financial statements.

*Preferred Stock Conversion*—On November 20, 2015, a holder of our Series B Preferred Stock exercised its right to convert 4,500 shares our Series B Preferred Stock, at the prescribed initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock, in exchange for 10,517 shares of our common stock.

*NOL Rights Plan*—On July 28, 2015, the Company entered into a net operating loss carryforwards ("NOLs") rights plan (the "Rights Plan") with Continental Stock Transfer & Trust Company, as rights agent. In connection therewith, the Board declared a dividend of one preferred share purchase right ("Right") for each outstanding share of the Company's common stock. The dividend was paid on August 10, 2015 to stockholders of record as of the close of business on August 7, 2015 (the "NOL Record Date"). In addition, one Right automatically attaches to each share of common stock issued between the NOL Record Date and such date as when the Rights become exercisable.

*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net earnings (loss) per share for the years ended December 31, 2016, 2015, and 2014 (in thousands, except per share amounts):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Net loss** | $ (256,958) | $ (1,454,627) | $ (21,791) |
| Less: | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) |
| Net loss allocable to participating securities[(1)(2)] | — | — | — |
| **Net loss attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic net loss per share | 58,900 | 57,229 | 52,338 |
| Dilutive shares[(3)(4)(5)] | — | — | — |
| Denominator for diluted loss per common share | 58,900 | 57,229 | 52,338 |
| **Net loss per common share - basic and diluted** | $ (4.63) | $ (25.70) | $ (1.06) |

(1) The Company's restricted shares of common stock are participating securities.

(2) For the years ended December 31, 2016, 2015 and 2014, no losses were allocated to participating restricted stock because such securities do not have a contractual obligation to share in the Company's losses.

(3) The year ended December 31, 2016 excludes 2,113,462 shares of weighted average restricted stock and 12,554,481 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

(4) The year ended December 31, 2015 excludes 2,663,010 shares of weighted average restricted stock and 12,529,314 shares of common stock resulting

from an assumed conversion of the Company's Series A Preferred Stock and

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

(5) The year ended December 31, 2014 excludes 1,732,888 shares of weighted average restricted stock and 13,527,738 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

**Note 7. Stock-Based Compensation**

At the Annual Meeting of Stockholders of the Company held on May 24, 2016 ("2016 Annual Meeting"), the Company's stockholders approved the Sanchez Energy Corporation Third Amended and Restated 2011 Long Term Incentive Plan (the "LTIP"). The Board had previously approved the LTIP on May 21, 2015, subject to stockholder approval.

The Company's directors and consultants as well as employees of SOG and its affiliates (excluding the Company) (collectively, the "Sanchez Group") who provide services to the Company are eligible to participate in the LTIP. Awards to participants may be made in the form of stock options, stock appreciation rights, restricted shares, phantom stock, other stock-based awards or stock awards, or any combination thereof. The maximum shares of common stock that may be delivered with respect to awards under the LTIP shall be (i) 17,239,790 shares plus (ii) upon the issuance of additional shares of common stock from time to time after April 1, 2016, an automatic increase equal to the lesser of (A) 15% of such issuance of additional shares of common stock, and (B) such lesser number of shares of common stock as determined by the Board or Compensation Committee; provided, however, withheld to satisfy tax withholding obligations are not considered to be delivered under the LTIP. If any award is forfeited, cancelled, exercised, paid, or otherwise terminates or expires without the actual delivery of shares of common stock pursuant to such award (the grant of restricted stock is not a delivery of shares of common stock for this purpose), the shares subject to such award shall again be available for awards under the LTIP. There shall not be any limitation on the number of awards that may be paid in cash. Any shares delivered pursuant an award shall consist, in whole or in part, of shares of common stock newly issued by the Company, shares of common stock acquired in the open market, from any affiliate of the Company, or any combination of the foregoing, as determined by the Board or Compensation Committee in its discretion.

The LTIP is administered by the Compensation Committee of the Board as appointed by the Board. The Board may terminate or amend the LTIP at any time with respect to any shares for which a grant has not yet been made. The Board has the right to alter or amend the LTIP or any part of the LTIP from time to time, including increasing the number of shares that may be granted, subject to stockholder approval as may be required by the exchange upon which shares of the common stock are listed at that time, if any. No change may be made in any outstanding grant that would materially reduce the benefits of the participant without the consent of the participant. The LTIP will expire upon its termination by the Board or, if earlier, when no shares remain available under the LTIP for awards. Upon termination of the LTIP, awards then outstanding will continue pursuant to the terms of their grants.

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of ASC 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Awards granted to employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expenses equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered.

For the restricted stock awards granted to non-employees, stock-based compensation expense is based on fair value re-measured at each reporting period and recognized over the vesting period using the straight-line method. Compensation expense for these awards will be revalued at each period end until vested.

During the year ended December 31, 2016, the Company issued 156,126 shares of restricted common stock pursuant to the LTIP to five directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair values of $8.00 and $5.81 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the vesting period.

The Company also issued approximately 4.4 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 3.3 million shares of restricted common stock vest in equal annual amounts over a three-year period and the remaining 1.1 million shares of restricted common stock with cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

During the year ended December 31, 2015, the Company issued 95,237 shares of restricted common stock pursuant to the LTIP to five directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair values of $12.65 and $9.80 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the vesting period

The Company also issued approximately 3.4 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 3.3 million shares of restricted common stock vest in equal annual amounts over a three-year period and approximately 0.1 million shares of restricted common stock vest in equal annual amounts over a five-year period.

During the year ended December 31, 2014, the Company issued 35,769 shares of restricted common stock pursuant to the LTIP to four directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair value of $33.05 and $14.90 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the one year vesting period.

The Company also issued approximately 2.0 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 0.7 million shares of restricted common stock vest in equal annual amounts over a two-year

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

period and approximately 1.3 million shares of restricted common stock vest in equal annual amounts over a three-year period.

In February 2016 and April 2016, the Compensation Committee approved several new forms of agreement for use in equity awards pursuant to the LTIP. The new forms of agreements consist of two new forms of restricted stock award agreements, one of which provides for vesting in equal annual increments over a three year period from the grant date (the "Grant Date") and the other of which provides for cliff vesting five years after the Grant Date or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the form of agreement (the "Performance Accelerated Restricted Stock" or "PARS"), and two new forms of phantom stock agreements payable only in cash, one of which provides for vesting in equal annual increments over a three year period from the Grant Date (the "Phantom Stock") and the other of which provides for cliff vesting five years after the Grant Date or earlier if the Company's common stock closing price equals or exceeds certain benchmarks as set forth in the form of agreement (the "Performance Accelerated Phantom Stock" or "PAPS").

The PARS, PAPS and Phantom Stock awards granted to certain employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 718, "Compensation – Stock Compensation." In accordance with the guidance, the inclusion of market performance acceleration conditions does not change the accounting classification as compared to the restricted stock without market performance acceleration conditions, as both are still classified as equity within the Company's balance sheet. The Phantom Stock awards are required to be settled in cash by the Company and, per the guidance, should be classified as a liability. Compensation expense for the unvested awards is revalued at each period end and is amortized over the vesting period of the stock-based award.

During the year ended December 31, 2016, the Company issued approximately 1.1 million shares of PARS pursuant to the LTIP to certain employees of SOG (including the Company's officers), with whom the Company has a services agreement. These PARS shares vest have cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

During the year ended December 31, 2016, the Company issued approximately 4.0 million shares of Phantom Stock and PAPS pursuant to the LTIP to certain employees of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 2.8 million shares of Phantom Stock vest in equal annual amounts over a three-year period and the remaining 1.2 million shares of PAPS have cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Restricted stock awards, directors | $ 1,000 | $ 917 | $ 802 |
| Restricted stock awards, non-employees | 18,145 | 13,914 | 12,041 |
| Phantom Stock awards | 17,945 | — | — |
| Total stock-based compensation expense | $ 37,090 | $ 14,831 | $ 12,843 |

F-32

Case 19-34508 Document 1251-17 Filed in TXSB on 07/28/20 Page 241 of 275

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $22.2 million of unrecognized compensation cost related to these non-vested restricted shares (excluding the PARS shares) outstanding. The cost is expected to be recognized over a weighted average period of approximately 1.85 years.

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $3.9 million of unrecognized compensation cost related to these non-vested PARS restricted shares outstanding. The cost is expected to be recognized over a weighted average period of approximately 3.42 years.

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $23.2 million of unrecognized compensation cost related to the non-vested PAPS and Phantom Stock award shares outstanding. The cost is expected to be recognized over an average period of approximately 2.50 years.

A summary of the status of the non-vested restricted common shares and PARS as of December 31, 2016 is presented below (in thousands, except per share amounts):

| | Number of Shares | Weighted Average Fair Value | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|
| Non-vested common stock at December 31, 2015 | 4,425,767 | $ 12.21 | $ 54,053 |
| Granted | 4,558,640 | 4.59 | 20,930 |
| Vested | (1,991,025) | 5.04 | (10,036) |
| Forfeited | (466,407) | 10.85 | (5,061) |
| Non-vested common stock at December 31, 2016 | 6,526,975 | $ 9.18 | $ 59,886 |

As of December 31, 2016, approximately 6.7 million shares remain available for future issuance to participants under the LTIP.

A summary of the status of the non-vested Phantom Stock shares and PAPS as of December 31, 2016 is presented below (in thousands, except per share amounts):

| | Number of Shares | Weighted Average Fair Value | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|
| Non-vested common stock at December 31, 2015 | — | $ — | $ — |
| Granted | 3,990,413 | 4.87 | 19,451 |
| Vested | — | — | — |
| Forfeited | (78,000) | 6.62 | (516) |
| Non-vested common stock at December 31, 2016 | 3,912,413 | $ 4.84 | $ 18,935 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 8. Income Taxes**

The components of the federal income tax provision for the years ended December 31, 2016, 2015 and 2014 are (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Current expense as a result of current operations | $ 1,825 | $ 158 | $ — |
| Deferred benefit as a result of current operations | (86,606) | (506,943) | (11,429) |
| Increase in valuation allowance | 86,606 | 514,385 | — |
| Net income tax expense (benefit) | $ 1,825 | $ 7,600 | $ (11,429) |

The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 35% and the Company's effective tax rate of (0.7)% is summarized as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Income tax benefit at the federal statutory rate | $ (89,297) | $ (506,460) | $ (11,627) |
| Officers' compensation limitation | 3,115 | 1,328 | — |
| State Taxes (net of federal benefit) | (232) | (5,463) | — |
| Non-deductible general and administrative expenses | 743 | 309 | 231 |
| Percentage depletion carryforward | (144) | — | (107) |
| Other | 39 | — | — |
| Differences between actual income taxes and amounts estimated in prior years | 995 | 3,501 | 74 |
| Income tax expense (benefit) | (84,781) | (506,785) | (11,429) |
| Valuation allowance | 86,606 | 514,385 | — |
| Net income tax expense (benefit) | $ 1,825 | $ 7,600 | $ (11,429) |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The Company's deferred tax position reflects the net tax effects of the temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax reporting. Significant components of the deferred tax assets and liabilities are as follows (in thousands):

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Deferred tax assets (liabilities): | | |
| Derivative assets (obligations) | $ 12,516 | $ (54,638) |
| Depreciable, depletable property, plant and equipment | 144,348 | 288,736 |
| Share-based compensation | 12,408 | 2,897 |
| Revenue Recognition | 7,077 | 8,417 |
| Other | 1,085 | (535) |
| Federal net operating loss carryforward | 420,302 | 268,068 |
| State net operating loss carryforward | 3,256 | 1,440 |
| Deferred tax assets: | 600,992 | 514,385 |
| Valuation allowance | (600,992) | (514,385) |
| Total Deferred tax assets | $ — | $ — |

As of December 31, 2016, the Company had NOLs of approximately $1,200.9 million which begin to expire in 2031. Additionally, the Company had net operating losses in the states of Montana, Mississippi, and Louisiana which will begin to expire in 2018, 2033 and 2026, respectively.

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. A significant piece of objective negative evidence evaluated was the cumulative loss incurred over the three-year period ended December 31, 2016.

On the basis of this evaluation, as of December 31, 2016, a valuation allowance of approximately $601.0 million has been recorded to record only the portion of the deferred tax asset that is more likely than not to be realized. The Company will continue to assess the need for a valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

The Company files income tax returns in the U.S. and various state jurisdictions. Sanchez is no longer subject to examination by federal income tax authorities prior to 2013. State statues vary by jurisdiction.

As of December 31, 2016, 2015 and 2014, the Company had no material uncertain tax positions.

**Note 9. Related Party Transactions**

SOG, headquartered in Houston, Texas, is a private full service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates.

The Company does not have any employees. On December 19, 2017 it entered into a services agreement with SOG pursuant to which specified employees of SOG provide certain services with respect to the Company's business under the direction, supervision and control of SOG. Pursuant to this arrangement, SOG performs centralized corporate functions for the Company, such as general and administrative services, geological, geophysical and reserve engineering,

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

lease and land administration, marketing, accounting, operational services, information technology services, compliance, insurance maintenance and management of outside professionals. The Company compensates SOG for the services at a price equal to SOG's cost of providing such services, including all direct costs and indirect administrative and overhead costs (including the allocable portion of salary, bonus, incentive compensation and other amounts paid to persons that provide the services on SOG's behalf) allocated in accordance with SOG's regular and consistent accounting practices, including for any such costs arising from amounts paid directly by other members of the Sanchez Group on SOG's behalf or borrowed by SOG from other members of the Sanchez Group, in each case, in connection with the performance by SOG of services on the Company's behalf. The Company also reimburses SOG for sales, use or other taxes, or other fees or assessments imposed by law in connection with the provision of services to the Company (other than income, franchise or margin taxes measured by SOG's net income or margin and other than any gross receipts or other privilege taxes imposed on SOG) and for any costs and expenses arising from or related to the engagement or retention of third party service providers.

Salaries and associated benefits of SOG employees and are allocated to the Company based on a fixed percentage that is reviewed quarterly and adjusted, if needed, based on a detailed analysis of actual time spent by the professional staff on Company projects and activities. General and administrative expenses such as office rent, utilities, supplies and other overhead costs, are allocated on the same percentages as the SOG employee salaries. Expenses allocated to the Company for general and administrative expenses for the years ended December 31, 2016, 2015 and 2014 are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Administrative fees | $ 40,901 | $ 30,430 | $ 33,610 |
| Third-party expenses | 5,001 | 5,427 | 4,515 |
| Total included in general and administrative expenses | $ 45,902 | $ 35,857 | $ 38,125 |

As of December 31, 2016 and December 31, 2015, the Company had a net receivable from SOG and other members of the Sanchez Group of $6.4 million and $3.7 million, respectively, which are reflected as "Accounts receivable—related entities" and "Accounts payable—related entities," respectively, in the consolidated balance sheets. The net receivable as of December 31, 2016 and December 31, 2015 consists primarily of advances paid related to leasehold and other costs paid to SOG. In addition, the net receivable as of December 31, 2016 and December 31, 2015 includes approximately $0.7 million and $0.7 million, respectively, of net receivable from Sanchez Resources, LLC ("Sanchez Resources").

As of December 31, 2016, the Company had a net payable to SPP of approximately $9.0 million that consists primarily of the November and December accrual for fees associated with the Gathering Agreement (see Note 3, "Acquisitions and Divestitures" for further discussion), which is reflected in the "Other Accrued liabilities" account on the consolidated balance sheets.

*Production Asset Transaction*

On November 22, 2016, we completed the Production Asset Transaction discussed above to SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

*Carnero Processing Disposition*

On November 22, 2016, we sold our membership interests in Carnero Processing, LLC ("Carnero Processing"), to SPP, which is a related party (see Note 16, "Investments").

*Carnero Gathering Disposition*

On July 5, 2016, we sold our membership interests in Carnero Gathering, LLC ("Carnero Gathering") to SPP, which is a related party (see Note 16, "Investments").

*Palmetto Disposition*

On March 31, 2015, we completed the Palmetto Disposition discussed above to a subsidiary of SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

*Western Catarina Midstream Divestiture*

On October 14, 2015, we completed the Western Catarina Midstream Divestiture discussed above to SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

*TMS Asset Purchase*

In August 2013, we acquired rights to approximately 40,000 net undeveloped acres in what we believe to be the core of the TMS (the "TMS Transaction") for cash and shares of our common stock. In connection with the TMS Transaction, we established an Area of Mutual Interest ("AMI") in the TMS with SR Acquisition I, LLC ("SR"), a subsidiary of our affiliate Sanchez Resources, which transaction included a carry on drilling costs for up to 6 gross (3 net) wells. Sanchez Resources is indirectly owned, in part, by our Chief Executive Officer and the Executive Chairman of the Board, who each also serve on our Board. Eduardo Sanchez, Patricio Sanchez and Ana Lee Sanchez Jacobs, each an immediate family member of our Chief Executive Officer and the Executive Chairman of our Board, collectively, either directly or indirectly, own a majority of the equity interests of Sanchez Resources. Sanchez Resources is managed by Eduardo Sanchez, who is the brother of our Chief Executive Officer and the son of our Executive Chairman of the Board. In addition, Eduardo Sanchez was named President of Sanchez Energy, effective as of October 1, 2015.

As part of the transaction, we acquired our working interests in the AMI owned at closing from three sellers (two third parties and one related party of the Company, SR) resulting in our owning an undivided 50% working interest across the AMI through the TMS.

Total consideration for the transactions consisted of approximately $70 million in cash and the issuance of 342,760 common shares of the Company, valued at approximately $7.5 million. The total cash consideration provided to SR, an affiliate of the Company, was $14.4 million, before consideration of any well carries. The acquisitions were accounted for as the purchase of assets at cost at the acquisition date. We also committed, as a part of the total consideration, to carry SR for its 50% working interest in an initial 3 gross (1.5 net) TMS wells to be drilled within the AMI (the "Initial Well Carry") with an option to drill an additional 6 gross (3 net) TMS wells ("Additional Wells") within the AMI. In August 2015, after completing the Initial Well Carry, the Company signed an agreement with SR whereby the Company paid SR approximately $8 million in lieu of drilling the remaining two

Case 4:23-34508 Document 1254-17 Filed in TXSB on 06/28/23 Page 289 of 1759

Additional Wells (the “Buyout Agreement”). The Buyout Agreement stipulates that SN has earned full rights to acreage stated in the TMS Transaction and effectively terminates any future well carry commitments.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 10. Derivative Instruments**

To reduce the impact of fluctuations in oil and natural gas prices on the Company's revenues, or to protect the economics of property acquisitions, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. The derivative contracts may include fixed-for-floating price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed-for-floating price swaps by agreeing to expand the notional quantity hedged under a fixed-for-floating price swap at the counterparty's election on a designated date.

These hedging activities, which are governed by the terms of our Second Amended and Restated Credit Agreement, are intended to support oil and natural gas prices at targeted levels and manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market makers. All of our derivatives with lenders, or affiliates of lenders, in our Second Amended and Restated Credit Agreement are collateralized by the assets securing our Second Amended and Restated Credit Agreement and, therefore, do not currently require the posting of cash collateral. Our existing derivatives with non-lender counterparties, as designated under the Second Amended and Restated Credit Agreement, are unsecured and do not require the posting of cash collateral. It is never the Company's intention to enter into derivative contracts for speculative trading purposes.

All of our derivatives are accounted for as mark-to-market activities. Under ASC Topic 815, "Derivatives and Hedging," these instruments are recorded on the condensed consolidated balance sheets at fair value as either short term or long term assets or liabilities based on their anticipated settlement date. The Company nets derivative assets and liabilities by commodity for counterparties where a legal right to such offset exists. Changes in the derivatives' fair values are recognized in current earnings since the Company has elected not to designate its current derivative contracts as cash flow hedges for accounting purposes.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The following table presents derivative positions for the periods indicated as of December 31, 2016:

| | January 1 - December 31, 2017 | 2018 | 2019 |
|---|---|---|---|
| **Oil positions:** | | | |
| Fixed-for-floating price swaps (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 1,825,000 | - | - |
| Average price ($/Bbl) | $ 51.70 | $ - | $ - |
| | | | |
| Collars (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 730,000 | - | - |
| Average long put price ($/Bbl) | $ 45.00 | $ - | $ - |
| Average short call price ($/Bbl) | $ 62.00 | $ - | $ - |
| | | | |
| **Natural gas positions:** | | | |
| Fixed-for-floating price swaps (NYMEX Henry Hub): | | | |
| Hedged volume (MMBtu) | 40,805,000 | 29,532,500 | 7,300,000 |
| Average price ($/MMBtu) | $ 3.07 | $ 3.02 | $ 3.02 |

The following table sets forth a reconciliation of the changes in fair value of the Company's commodity derivatives for the years ended December 31, 2016, 2015, and 2014 (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Beginning fair value of commodity derivatives | $ 178,283 | $ 123,316 | $ (3,397) |
| Net gains (losses) on crude oil derivatives | (47,389) | 170,592 | 115,602 |
| Net gains (losses) on natural gas derivatives | (30,307) | 26,843 | 21,603 |
| Net settlements on derivative contracts: | | | |
| Crude oil | (135,491) | (123,946) | (4,503) |
| Natural gas | (24,657) | (18,522) | (1,097) |
| Net premiums on derivative contracts: | | | |
| Crude oil | 24,547 | — | (4,892) |
| Ending fair value of commodity derivatives | $ (35,014) | $ 178,283 | $ 123,316 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Balance Sheet Presentation***

The Company's derivatives are presented on a net basis as "Fair value of derivative instruments" on the consolidated balance sheets. The following information summarizes the gross fair values of derivative instruments, presenting the impact of offsetting the derivative assets and liabilities on the Company's consolidated balance sheets (in thousands):

| | December 31, 2016 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 844 | $ (844) | $ — |
| Long-term asset | 1,426 | (1,426) | — |
| Total asset | $ 2,270 | $ (2,270) | $ — |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 32,622 | $ (844) | $ 31,778 |
| Long-term liability | 4,662 | (1,426) | 3,236 |
| Total liability | $ 37,284 | $ (2,270) | $ 35,014 |

| | December 31, 2015 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 172,518 | $ (24) | $ 172,494 |
| Long-term asset | 5,821 | (32) | 5,789 |
| Total asset | $ 178,339 | $ (56) | $ 178,283 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 24 | $ (24) | $ — |
| Long-term liability | 32 | (32) | — |
| Total liability | $ 56 | $ (56) | $ — |

**Note 11. Fair Value of Financial Instruments**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an

orderly transaction between market participants at the measurement date. Fair value measurements are classified and disclosed in one of the following categories:

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Level 1:** Measured based on unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities. Active markets are considered those in which transactions for the assets or liabilities occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

**Level 2:** Measured based on quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability. This category includes those derivative instruments that can be valued using observable market data. Substantially all of these inputs are observable in the marketplace throughout the term of the derivative instrument, can be derived from observable data, or supported by observable levels at which transactions are executed in the marketplace.

**Level 3:** Measured based on prices or valuation models that require inputs that are both significant to the fair value measurement and less observable from objective sources (i.e. supported by little or no market activity). The valuation models used to value derivatives associated with the Company's oil and natural gas production are primarily industry standard models that consider various inputs including: (a) quoted forward prices for commodities, (b) time value, and (c) current market and contractual prices for the underlying instruments, as well as other relevant economic measures. Although third party quotes are utilized to assess the reasonableness of the prices and valuation techniques, there is not sufficient corroborating evidence to support classifying these assets and liabilities as Level 2.

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

***Fair Value on a Recurring Basis***

The following tables set forth, by level within the fair value hierarchy, the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2016 and 2015 (in thousands):

| | As of December 31, 2016 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash and cash equivalents:* | | | | |
| Money market funds | $ 443,648 | $ — | $ — | $ 443,648 |
| *Equity investment:* | | | | |
| Investment in SPP | 26,818 | — | — | 26,818 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | (8,291) | — | (8,291) |
| Collars | — | (572) | — | (572) |
| *Gas derivative instruments:* | | | | |
| Swaps | — | (26,151) | — | (26,151) |
| Total | $ 470,466 | $ (35,014) | $ — | $ 435,452 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash and cash equivalents:* | | | | |
| Money market funds | $ 399,448 | $ — | $ — | $ 399,448 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 72,887 | — | 72,887 |
| Puts | — | 76,583 | — | 76,583 |
| *Gas derivative instruments:* | — | — | — | — |
| Swaps | — | 28,813 | — | 28,813 |
| Total | $ 399,448 | $ 178,283 | $ — | $ 577,731 |

*Financial Instruments:* The Level 1 instruments presented in the tables above consist of money market funds included in cash and cash equivalents on the Company's consolidated balance sheets as of December 31, 2016 and 2015. The Company's money market funds represent cash equivalents backed by the assets of high-quality banks and financial institutions. The Company identified the money market funds as Level 1 instruments due to the fact that the money market funds have daily liquidity, quoted prices for the underlying investments can be obtained and there are active markets for the underlying investments. In addition, the Level 1 instruments include the Company's equity investment in common units of SPP as further discussed in Note 16, "Investments." The investment in SPP is being accounting for under the fair value option, included in investments on the Company's balance sheet as of December 31, 2016. The Company identified the common units in SPP as a Level 1 instruments due to the fact that SPP is a publicly traded company on the NYSE MKT with daily quoted prices that can be easily obtained.

The Company's derivative instruments, which consist of swaps, collars and puts, are classified as Level 2 as of December 31, 2016 and 2015, in the table above. The fair values of the Company's derivatives are based on third-party pricing models which utilize inputs that are either readily available in the public market, such as forward curves, or can be corroborated from active markets of broker quotes. Swaps and collars generally have no unobservable inputs and they are classified as Level 2. Puts and call swaption derivatives have inputs which are observable, either directly or indirectly, using market data. As of December 31, 2016 and 2015, the Company believes that substantially all of the inputs required to calculate the fair value of puts and call swaptions are observable in the marketplace throughout the term of these derivative instruments or supported by observable levels at which transactions are executed in the marketplace, and are, therefore, classified as Level 2. Derivative instruments are also subject to the risk that counterparties will be unable to meet their obligations. Such non-performance risk is considered in the valuation of the Company's derivative instruments, but to date has not had a material impact on estimates of fair values. Significant changes in the quoted forward prices for commodities and changes in market volatility generally lead to corresponding changes in the fair value measurement of the Company's derivative instruments.

There were no derivative instruments classified as Level 3 as of December 31, 2016 or December 31, 2015. The fair values of the Company's derivative instruments classified as Level 3 as of December 31, 2014 were $75.5 million. The significant unobservable inputs for Level 3 contracts as of December 31, 2014 include unpublished forward prices of commodities, market volatility and credit risk of counterparties.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The following table sets forth a reconciliation of changes in the fair value of the Company's derivative instruments classified as Level 3 in the fair value hierarchy (in thousands):

| | (Level 3) Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Beginning balance | $ — | $ 75,523 | $ (519) |
| Total gains (losses) included in earnings | — | 418 | 81,404 |
| Net settlements on derivative contracts(1) | — | (14,277) | (5,362) |
| Derivative contracts transferred to Level 2 | — | (61,664) | — |
| Ending balance | $ — | $ — | $ 75,523 |
| Gains (losses) included in earnings related to derivatives still held as of December 31, 2016, 2015, and 2014 | $ — | $ (940) | $ 76,760 |

(1) Includes ($12,919) of net settlements in Level 2 that were transferred from Level 3 during 2015.

***Fair Value on a Non-Recurring Basis***

The Company follows the provisions of ASC 820-10 for nonfinancial assets and liabilities measured at fair value on a non-recurring basis. Fair value measurements of assets acquired and liabilities assumed in business combinations are based on inputs that are not observable in the market and thus represent Level 3 inputs. The fair value of acquired properties is based on market and cost approaches. Our purchase price allocations for the Catarina Acquisition is presented in Note 3, "Acquisitions and Divestitures." Liabilities assumed include asset retirement obligations existing at the date of acquisition. Asset retirement obligation estimates are derived from historical costs as well as management's expectation of future cost environments. As there is no corroborating market activity to support the assumptions, the Company has designated these liabilities as Level 3. A reconciliation of the beginning and ending balances of the Company's asset retirement obligations is presented in Note 12, "Asset Retirement Obligations."

In connection with the exchange agreements entered into in February, May and August 2014 by the Company with certain holders of the Company's Series A Preferred Stock and Series B Preferred Stock, the Company issued common stock according to the conversion rate pursuant to each agreement and additional shares to induce the holders of the preferred stock to convert prior to the date the Company could mandate conversion. In addition, on November 20, 2015, a holder of our Series B Preferred Stock exercised its right to convert 4,500 shares our Series B Preferred Stock, at the prescribed initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock, in exchange for 10,517 shares of our common stock. The fair value of the common stock issued is based on the price of the Company's common stock on the date of issuance. There were no conversions of Series A Preferred Stock or Series B Preferred Stock into shares of the Company's common stock during the year ended December 31, 2016. As there is an active market for the Company's common stock, the Company has designated this fair value measurement as Level 1. A detailed description of the Company's common stock and preferred stock issuances and redemptions is presented in Note 6, ''Stockholders' Equity.''

***Fair Value of Other Financial Instruments***

Financial instruments not carried at fair value consist of oil and natural gas receivables, accounts payable and accrued liabilities and long-term debt. The carrying amounts of our oil and natural gas receivables, accounts payable and accrued liabilities approximate fair value due to the highly liquid nature of these short term instruments. The registered 7.75% Notes are traded in an active market, and as such, are classified as Level 1 financial instruments. The estimated

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

fair value of the 7.75% Notes was $612.0 million as of December 31, 2016, and was calculated using quoted market prices based on trades of such debt as of that date. The Company uses a market approach to determine fair value of its unregistered 6.125% Notes using observable market data. However, as the market for the 6.125% Notes is far less active than that of the 7.75% Notes, the Company also uses comparable market values for similar instruments, which results in a Level 2 fair value measurement. The estimated fair value of the 6.125% Notes was $1,098.3 million as of December 31, 2016.

**Note 12. Asset Retirement Obligations**

The Company's asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. Revisions in estimated liabilities during the period relate primarily to changes in estimates of asset retirement costs. Revisions in estimated liabilities can also include, but are not limited to, revisions of estimated inflation rates, changes in property lives, and the expected timing of settlement. The changes in the asset retirement obligation for the years ended December 31, 2016 and 2015 were as follows (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Abandonment liability as of January 1, | $ 25,907 | $ 25,694 |
| Liabilities incurred during period | 1,492 | 6,021 |
| Acquisitions | 219 | — |
| Divestitures | (4,433) | (379) |
| Revisions | (172) | (7,623) |
| Accretion expense | 2,074 | 2,194 |
| Abandonment liability as of December 31, | $ 25,087 | $ 25,907 |

**Note 13. Accrued Liabilities**

The following information summarizes accrued liabilities as of December 31, 2016 and 2015 (in thousands):

| | As of December 31, 2016 | As of December 31, 2015 |
|---|---|---|
| Capital expenditures | $ 35,154 | $ 51,983 |
| Other: | | |
| General and administrative costs | 14,738 | 5,214 |
| Production taxes | 2,396 | 2,532 |
| Ad valorem taxes | 2,756 | 886 |
| Lease operating expenses | 23,942 | 27,077 |
| Interest payable | 34,266 | 34,265 |
| Preferred stock dividends and other | 4,360 | — |
| Total accrued liabilities | $ 117,612 | $ 121,957 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 14. Commitments and Contingencies**

*Litigation*

From time to time, the Company may be involved in lawsuits that arise in the normal course of its business. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

On December 4, 2013, and December 16, 2013, three derivative actions were filed in the Court of Chancery of the State of Delaware against the Company, certain of its officers and directors, Sanchez Resources, Altpoint Capital Partners LLC and Altpoint Sanchez Holdings, LLC (Friedman v. A.R. Sanchez, Jr. et al., No. 9158; City of Roseville Employees' Retirement System v. A.R. Sanchez, Jr. et al., No. 9132; and Delaware County Employees Retirement Fund v. A.R. Sanchez, Jr. et al., No. 9165 (collectively, the "Consolidated Derivative Actions")).

On December 20, 2013, the Consolidated Derivative Actions were consolidated, co-lead counsel for the plaintiffs was appointed and the plaintiffs were ordered to file an amended consolidated complaint (In re Sanchez Energy Derivative Litigation, Consolidated C.A. No. 9132-VCG, hereinafter, the "Delaware Derivative Action"). On January 28, 2014, a verified consolidated stockholder derivative complaint was filed. The Consolidated Derivative Actions concern the Company's purchase of working interests in the TMS from SR. Plaintiffs alleged breaches of fiduciary duty against the individual defendants as directors of the Company; breaches of fiduciary duty against Antonio R. Sanchez, III as an executive director of the Company; aiding and abetting breaches of fiduciary duty against SR, Eduardo Sanchez, Altpoint Capital Partners LLC and Altpoint Sanchez Holdings, LLC; and unjust enrichment against A.R. Sanchez, Jr. and Antonio R. Sanchez, III. All of the defendants filed a motion to dismiss on April 1, 2014. Briefing concerning the motions to dismiss concluded on June 27, 2014. A hearing was held on August 11, 2014, on the motions to dismiss, and the court subsequently granted the motions to dismiss. The plaintiffs appealed the case to the Delaware Supreme Court for which the parties fully briefed the appeal and provided oral argument. On October 2, 2015, the Delaware Supreme Court reversed the motions to dismiss and remanded the case to the Court of Chancery of the State of Delaware. The Consolidated Derivative Actions are currently in the early stages of discovery. A mediation in connection with the matter was held on July 7, 2016. The Company is unable to reasonably predict an outcome or to reasonably estimate a range of possible loss.

On January 9, 2014, a derivative action was filed in 333rd district court in Harris County, Texas against the Company and certain of its officers and directors, styled Martin v. Sanchez, No. 2014-01028 (333rd Dist. Harris County, Texas). The complaint alleged a breach of fiduciary duty, corporate waste and unjust enrichment against various officers and directors. No action has been taken to date and damages are unspecified. On March 14, 2014, this action was stayed following a ruling on the motion to dismiss in the Delaware Derivative Action. After the motions to dismiss were granted in the Delaware Derivative Action, the parties entered into another agreed stay pending the appeal of the Delaware Derivative Action to the Delaware Supreme Court. This stay was entered by the court on February 5, 2015. This action is in its preliminary stages, and the Company is unable to reasonably predict an outcome or to estimate a range of reasonably possible loss.

Defendants believe that the allegations contained in the matters described above are without merit and intend to vigorously defend themselves against the claims raised.

*Catarina Drilling Obligation*

In connection with the Catarina Acquisition, the 77,000 acres of undeveloped acreage that were included in the acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120 - day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. Our current capital budget and plans include the drilling of at least the minimum number of wells required to maintain access to such undeveloped acreage.

*Lease Payment Obligations*

As of December 31, 2016, the Company had $216.4 million in lease payment obligations that satisfy operating lease criteria. These obligations include: (i) $158.6 million in payments due with respect to firm commitment of oil and natural gas volumes under the Gathering Agreement contract signed with SPP as part of the Western Catarina Midstream Divestiture that commenced on October 14, 2015 and continues until October 13, 2020, (ii) $45.7 million for a corporate office lease that commenced in the fourth quarter of 2014 and has an expiration date in March 2025, (iii) $6.2 million for a ground lease agreement for land owned by the Calhoun Port Authority that commenced during the third quarter of 2014 and has an expiration date in August 2024 and (iv) $5.9 million for a 10 year acreage lease agreement for a promotional ranch managed by the Company in Kenedy County, Texas.

The lease agreement for the acreage in Kenedy County, Texas includes a contractual requirement for the Company to spend a minimum of $4 million to make permanent improvements over the ten year life of the lease. The lease agreement does not specify the timing for such improvements to be made within the lease term. The Company has the right to terminate the lease obligation without penalty at any time with nine months advanced written notice and payment of any accrued leasehold expenses.

The Company's ground lease with the Calhoun Port Authority is terminable upon 180 days written notice by the Company to the lessor in addition to a $1 million termination payment.

**Note 15. Subsidiary Guarantors**

The Company filed registration statements on Form S-3 with the SEC, which became effective January 14, 2013 and June 11, 2014 and April 25, 2016 and registered, among other securities, debt securities. The subsidiaries of the Company named therein are co-registrants with the Company, and the registration statement registered guarantees of debt securities by such subsidiaries. As of December 31, 2016, such subsidiaries are 100 percent owned by the Company and any guarantees by these subsidiaries will be full and unconditional (except for customary release provisions). In the event that more than one of these subsidiaries provide guarantees of any debt securities issued by the Company, such guarantees will constitute joint and several obligations.

The Company also filed a registration statement on Form S-4 with the SEC, which became effective on June 20, 2014, pursuant to which the Company completed an offering of the 7.75% Notes, which are guaranteed by its subsidiaries named therein. As of December 31, 2016, such guarantor subsidiaries are 100 percent owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several. The Company also filed a registration statement on Form S-4 with the SEC, which became effective on January 23, 2015, pursuant to which the Company completed an offering of the 6.125% Notes, which are guaranteed by its subsidiaries named therein. As of December 31, 2016, such guarantor subsidiaries are 100 percent owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

The rules of Regulation S-X Rule 3-10 require that condensed consolidating financial information be provided for a subsidiary that has guaranteed the debt of a registrant issued in a public offering, where the guarantee is full, unconditional and joint and several and where the voting interest of the subsidiary is 100% owned by the registrant. See Note 18, “Condensed Consolidating Financial Information” for further discussion regarding the condensed consolidating financial information for guarantor and non-guarantor subsidiaries.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiaries to distribute funds to the Company.

**Note 16. Investments**

On November 22, 2016, a subsidiary of the Company purchased 2,272,727 common units of SPP for $25.0 million as part of a private equity issuance. As of December 31, 2016, this ownership represents approximately 16.9% of SPP’s common units outstanding. Rather than accounting for the investment under the equity method, the Company elected the fair value option to account for its interest in SPP. The Company records the equity investment in SPP at fair value at the end of each reporting period. Any gains or losses are recorded as a component of other income (expense) in the consolidated statement of operations. The Company recorded gains related to the investment in SPP for the twelve months ended December 31, 2016 of approximately $1.8 million.

On October 2, 2015, the Company, via SN Catarina, purchased from a subsidiary of Targa a 10% undivided interest in the Silver Oak II Gas Processing Facility (the “SOII Facility”) in Bee County, Texas for a purchase price of $12.5 million. Targa owns the remaining undivided 90% interest in the SOII Facility, which is operated by Targa. Concurrently with the execution of the purchase and sale agreement for the SOII Facility, the Company entered into a firm gas processing agreement, whereby Targa is processing a firm quantity, 125,000 Mcf/d, until the in-service date of the Carnero Processing Plant discussed below. The Company is accounting for the investment in the SOII Facility as an equity method investment as Targa is the operator and majority interest owner of the SOII Facility. As of December 31, 2016, the Company had invested capital of $12.5 million in the SOII Facility. The Company recorded earnings from the SOII Facility investment of approximately $1.2 million from equity investments during 2016.

On November 22, 2016, SN Midstream sold its membership interests in Carnero Processing to SPP for an initial payment of $55.5 million and the assumption by SPP of remaining capital commitments to Carnero Processing, which are estimated at approximately $24.5 million (the “Carnero Processing Disposition”). The Company was accounting for this joint venture as an equity method investment as Targa is the operator of the joint ventures and has the most influence with respect to the normal day-to-day construction and operating decisions. Prior to the sale, the Company had invested approximately $48.0 million in Carnero Processing joint venture. The membership interests disposed of constitute 50% of the outstanding membership interests in Carnero Processing. The remaining 50% membership interests of Carnero Processing are owned by an affiliate of Targa. Prior to the sale of Carnero Processing, the Company recorded losses of approximately $0.1 million from equity investments during 2016. The Company recorded a deferred gain of approximately $7.5 million included in “Other Liabilities” as a result of the firm gas processing agreement that remains between the Company and Targa. This deferred gain will be amortized periodically over the term of this firm gas processing agreement according to volumes processed through the Carnero Processing facility.

On July 5, 2016, SN Midstream sold its membership interests in Carnero Gathering to SPP for an initial payment of approximately $37.0 million and the assumption by SPP of remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million (the “Carnero Gathering Disposition”). The Company was accounting for this joint venture as an equity method investment as Targa is the operator of the joint ventures and has the most influence with respect to the normal day-to-day construction and operating decisions. Prior to the sale, the

I-47

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Company had invested approximately $26.0 million in Carnero Gathering joint venture. As part of the Carnero Gathering Disposition, SPP is required to pay SN Midstream a monthly earnout based on gas received at Carnero Gathering's receipt points from SN Catarina and gas delivered and processed at the Processing Plant by other producers. The membership interests disposed of constitute 50% of the outstanding membership interests in Carnero Gathering. The remaining 50% membership interests of Carnero Gathering are owned by an affiliate of Targa. Prior to the sale of Carnero Gathering, the Company recorded earnings of approximately $2.3 million from equity investments during 2016. The Company recorded a deferred gain of approximately $8.7 million included in "Other Liabilities" as a result of the firm gas gathering agreement that remains between the Company and Targa and a transportation services agreement between Targa and Carnero Gathering. This deferred gain will be amortized periodically over the term of this firm gas gathering agreement according to volumes delivered through the Carnero Gathering pipelines.

**Note 17. Variable Interest Entities**

During the first quarter of 2016, the Company adopted ASU 2015-02, "Consolidation—Amendments to the Consolidation Analysis," which introduces a separate analysis for determining if limited partnerships and similar entities are variable interest entities ("VIEs") and clarifies the steps a reporting entity would have to take to determine whether the voting rights of stockholders in a corporation or similar entity are substantive.

As noted above in Note 16, "Investments," the Company, through SN Midstream, entered into joint venture agreements with an affiliate of Targa in October 2015 to, among other things, construct the Processing Plant and associated high pressure gathering pipelines near the Company's Catarina asset in South Texas. In addition, the Company, via SN Catarina, purchased from a subsidiary of Targa a 10% undivided interest in the SOII Facility. As noted above in Note 16, "Investments," on July 5, 2016 and November 22, 2016, the Company sold its interests, and any remaining commitment to invest in Carnero Gathering and Carnero Processing, respectively, to SPP. The Company determined that ownership in the SOII Facility are more similar to limited partnerships than corporations. Under the revised guidance of ASU 2015-02, a limited partnership or similar entity with equity at risk will not be a VIE if they are able to exercise kick-out rights over the general partner(s) or they are able to exercise substantive participating rights. We concluded that the investment in SOII Facility is a VIE under the revised guidance because we cannot remove Targa as operator and we do not have substantive participating rights. In addition, Targa has the discretion to direct activities of the VIEs regarding the risks associated with price, operations, and capital investment which have the most significant impact on the VIEs economic performance.

The Company's investment in the SOII Facility represents a VIE that could expose the Company to losses. The amount of losses the Company could be exposed to from the investment in the SOII Facility is limited to the equity in the investment at any point in time.

As of December 31, 2016, the Company had invested capital of $12.5 million in the SOII Facility, and recorded earnings from the equity investment of $0.3 million. As of December 31, 2016, no debt has been incurred by the SOII Facility. The Company is accounting for the VIE as an equity method investment and determined that Targa is the primary beneficiary of the VIE as Targa is the operator of the SOII Facility and has the most influence with respect to the normal day-to-day operating decisions of the facility. We have included the VIE in the "Other Assets - Investments" long-term asset line on the balance sheet.

As noted above in Note 16, "Investments," in November 2016, the Company purchased common units of SPP for $25.0 million as part of a private equity issuance. Rather than accounting for the investment under the equity method, the Company elected the fair value option to account for its interest in SPP. The Company's investment in SPP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The carrying amounts of the investment in SPP and the Company's maximum exposure to loss as of December 31, 2016, was approximately $26.8 million.

Below is a tabular comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of December 31, 2016 and December 31, 2015 (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Capital investments | $ 37,527 | $ 49,985 |
| Earnings in equity investments | 311 | — |
| Gain (loss) from change in fair value of investment in SPP | 1,818 | — |
| Equity in equity investments | $ 39,656 | $ 49,985 |

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Equity in equity investments | $ 39,656 | $ 49,985 |
| Guarantees of capital investments | — | 65,526 |
| Maximum exposure to loss | $ 39,656 | $ 115,511 |

**Note 18. Condensed Consolidating Financial Information**

As noted above, the rules of the SEC require that condensed consolidating financial information be provided for a subsidiary that has guaranteed the debt of a registrant issued in a public offering, where the guarantee is full, unconditional and joint and several and where the voting interest of the subsidiary is 100% owned by the registrant. The Company is, therefore, presenting condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) and should be read in conjunction with the consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows, or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically, in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

Case 4:19-34508 Document 1254-17 Filed in TXSB on 07/22/20 Page 212 of 1759

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | December 31, 2016 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 428,384 | $ 157,154 | $ 158,589 | $ (181,322) | $ 562,805 |
| Total oil and natural gas properties, net | - | 658,588 | - | - | 658,588 |
| Investment in subsidiaries | 734,704 | - | - | (734,704) | - |
| Other assets | 14,376 | 15,221 | 35,290 | - | 64,887 |
| **Total Assets** | $ 1,177,464 | $ 830,963 | $ 193,879 | $ (916,026) | $ 1,286,280 |
| | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current liabilities | $ 109,539 | $ 78,344 | $ 170,435 | $ (181,321) | $ 176,997 |
| Long-term liabilities | 1,764,064 | 25,087 | 16,273 | (1) | 1,805,423 |
| Total shareholders' equity (deficit) | (696,139) | 727,532 | 7,171 | (734,704) | (696,140) |
| **Total Liabilities and Shareholders' Equity (deficit)** | $ 1,177,464 | $ 830,963 | $ 193,879 | $ (916,026) | $ 1,286,280 |

| | December 31, 2015 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 671,278 | $ 37,005 | $ 704 | $ (42,369) | $ 666,618 |
| Total oil and natural gas properties, net | - | 756,103 | - | - | 756,103 |
| Investment in subsidiaries | 700,053 | - | - | (700,053) | - |
| Other assets | 14,481 | 17,737 | 46,365 | - | 78,583 |
| **Total Assets** | $ 1,385,812 | $ 810,845 | $ 47,069 | $ (742,422) | $ 1,501,304 |
| | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current liabilities | $ 78,840 | $ 88,666 | $ 42,369 | $ (42,369) | $ 167,506 |
| Long-term liabilities | 1,764,060 | 25,907 | - | - | 1,789,967 |
| Total shareholders' equity (deficit) | (457,088) | 696,272 | 4,700 | (700,053) | (456,169) |
| **Total Liabilities and Shareholders' Equity (deficit)** | $ 1,385,812 | $ 810,845 | $ 47,069 | $ (742,422) | $ 1,501,304 |



008182

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 431,326 | $ - | $ - | $ 431,326 |
| Total operating costs and expenses | 111,155 | 509,985 | 1,947 | - | 623,087 |
| Other income (expense) | (177,710) | 109,920 | 4,418 | - | (63,372) |
| **Income (loss) before income taxes** | (288,865) | 31,261 | 2,471 | - | (255,133) |
| | | | | | |
| Income tax expense | 1,825 | - | - | - | 1,825 |
| Equity in income (loss) of subsidiaries | 33,730 | - | - | (33,730) | - |
| **Net income (loss)** | $ (256,960) | $ 31,261 | $ 2,471 | $ (33,730) | $ (256,958) |

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 475,779 | $ - | $ - | $ 475,779 |
| Total operating costs and expenses | 75,096 | 1,890,342 | 1,692 | - | 1,967,130 |
| Other income (expense) | 44,726 | (402) | - | - | 44,324 |
| **Loss before income taxes** | (30,370) | (1,414,965) | (1,692) | - | (1,447,027) |
| | | | | | |
| Income tax expense | 7,600 | - | - | - | 7,600 |
| Equity in income (loss) of subsidiaries | (1,416,657) | - | - | 1,416,657 | - |
| **Net income (loss)** | $ (1,454,627) | $ (1,414,965) | $ (1,692) | $ 1,416,657 | $ (1,454,627) |

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 666,064 | $ - | $ - | $ 666,064 |
| Total operating costs and expenses | 64,454 | 681,876 | 648 | - | 746,978 |
| Other income (expense) | 47,678 | 16 | - | - | 47,694 |
| **Loss before income taxes** | (16,776) | (15,796) | (648) | - | (33,220) |
| | | | | | |
| Income tax benefit | (11,429) | - | - | - | (11,429) |
| Equity in income (loss) of subsidiaries | (16,443) | - | - | 16,443 | - |
| **Net income (loss)** | $ (21,790) | $ (15,796) | $ (648) | $ 16,443 | $ (21,791) |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (38,646) | $ 219,266 | $ 631 | $ - | $ 181,251 |
| Net cash provided by (used in) investing activities | (46,602) | (133,814) | 55,571 | 16,208 | (108,637) |
| Net cash provided by (used in) financing activities | (5,745) | (85,452) | 101,660 | (16,208) | (5,745) |
| **Net increase (decrease) in cash and cash equivalents** | (90,993) | - | 157,862 | - | 66,869 |
| **Cash and cash equivalents, beginning of period** | 434,934 | - | 114 | - | 435,048 |
| **Cash and cash equivalents, end of period** | $ 343,941 | $ - | $ 157,976 | $ - | $ 501,917 |

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (44,090) | $ 317,499 | $ (1,384) | $ - | $ 272,025 |
| Net cash provided by (used in) investing activities | 21,670 | (249,185) | (40,327) | (26,489) | (294,331) |
| Net cash provided by (used in) financing activities | (16,360) | (68,314) | 41,825 | 26,489 | (16,360) |
| **Net increase (decrease) in cash and cash equivalents** | (38,780) | - | 114 | - | (38,666) |
| **Cash and cash equivalents, beginning of period** | 473,714 | - | - | - | 473,714 |
| **Cash and cash equivalents, end of period** | $ 434,934 | $ - | $ 114 | $ - | $ 435,048 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (100,047) | $ 516,474 | $ (1,092) | $ - | $ 415,335 |
| Net cash provided by (used in) investing activities | (845,882) | (1,347,416) | (6,492) | 838,526 | (1,361,264) |
| Net cash provided by (used in) financing activities | 1,266,112 | 830,942 | 7,584 | (838,526) | 1,266,112 |
| **Net increase (decrease) in cash and cash equivalents** | 320,183 | - | - | - | 320,183 |
| **Cash and cash equivalents, beginning of period** | 153,531 | - | - | - | 153,531 |
| **Cash and cash equivalents, end of period** | $ 473,714 | $ - | $ - | $ - | $ 473,714 |

**Note 19. Subsequent Events**

On January 12, 2017, the Company, through two of our subsidiaries, SN EF UnSub, LP ("SN UnSub") and SN EF Maverick, LLC ("SN Maverick"), along with an entity controlled by The Blackstone Group, L.P., Gavilan Resources, LLC ("Blackstone"), signed a purchase and sale agreement (the "Comanche Purchase Agreement") to acquire assets (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP for $2,275 million in cash, subject to customary closing adjustments (the "Comanche Acquisition"). The Comanche Assets are primarily located in the Western Eagle Ford Shale and are expected to significantly expand our asset base and production. The Comanche Assets consist of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) Pearsall Shale acres, with an approximate 49% average working interest therein, contain approximately 300 MMBoe of proved reserves (70% liquids, 75% proved developed), and had production of approximately 67,000 Boe/d (70% liquids) as of December 31, 2016. The Comanche Purchase Agreement provides that SN UnSub will pay approximately 37% of the purchase price (including through a $100 million cash contribution from the Company) and SN Maverick will pay approximately 13% of the purchase price and SN UnSub and SN Maverick would acquire half of the 49% working interest in and to the Comanche Assets in the aggregate (and approximately 50% and 0%, respectively, of the estimated total proved developed producing reserves, 20% and 30%, respectively, of the estimated total proved developed non-producing reserves, and 20% and 30%, respectively, of the total proved undeveloped reserves), and Blackstone will pay 50% of the purchase price and would acquire the remaining half of the 49% working interest in and to the Comanche Assets (approximately 50% of the estimated total proved developed producing reserves, proved developed non-producing reserves and proved undeveloped reserves). We expect to close the Comanche Acquisition during the first quarter of 2017. The effective date of the transaction is July 1, 2016.

On February 6, 2017, the Company completed an underwritten public offering of 10,000,000 shares of the Company's common stock at a price of $12.50 per share ($11.7902 per share, net of underwriting discounts). The Company granted the Underwriters a 30-day option to purchase up to an additional 1,500,000 shares of the Company's common stock on the same terms, which was exercised in full and closed on February 6, 2017. The Company received net proceeds of approximately $135.9 million (after deducting underwriting discounts of approximately $7.8 million) from the sale of the shares of common stock. The Company intends to use the net proceeds of the offering for general corporate purposes, including working capital.

**Sanchez Energy Corporation**

**Supplementary Quarterly Financial Results (Unaudited)**

The following table presents the Company's unaudited quarterly financial information for 2016 and 2015 (in thousands, except per share amounts):

| **2016:** | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
|---|---|---|---|---|
| Oil and natural gas revenue | $ 79,816 | $ 110,968 | $ 114,807 | $ 125,735 |
| Impairment of oil and natural gas properties | (22,084) | (87,380) | (59,582) | — |
| Operating costs and expenses | (115,081) | (118,432) | (107,505) | (113,023) |
| Operating income (loss) | (57,349) | (94,844) | (52,280) | 12,712 |
| Interest income | 325 | 158 | 146 | 227 |
| Other income (expense) | (414) | 211 | 7 | 330 |
| Gain on disposal of assets | — | — | — | 112,294 |
| Interest expense | (31,606) | (31,822) | (31,797) | (31,748) |
| Earnings from Equity Investments | 512 | 2,179 | 463 | 312 |
| Net gains (losses) on commodity derivatives | 22,757 | (58,750) | 18,640 | (35,796) |
| Other income (expense), net | (8,426) | (88,024) | (12,541) | 45,619 |
| Income (loss) before income taxes | (65,775) | (182,868) | (64,821) | 58,331 |
| Income tax expense (benefit) | — | — | 1,441 | 384 |
| Net income (loss) | (65,775) | (182,868) | (66,262) | 57,947 |
| Less: | | | | |
| Preferred stock dividends | (3,987) | (3,987) | (3,987) | (3,987) |
| Net income allocable to participating securities [(1)] [(2)] | — | — | — | (5,601) |
| **Net income (loss) attributable to common stockholders** | $ (69,762) | $ (186,855) | $ (70,249) | $ 48,359 |
| Basic income (loss) per share [(3)] | $ (1.20) | $ (3.20) | $ (1.19) | 0.82 |
| Weighted average common shares outstanding - basic | 58,099 | 58,413 | 59,190 | 59,252 |
| Diluted income (loss) per share [(3)] | $ (1.20) | $ (3.20) | $ (1.19) | $ 0.73 |
| Weighted average common shares outstanding - diluted | 58,099 | 58,413 | 59,190 | 71,772 |

(1) No losses are allocated to participating restricted stock. Such securities do not have a contractual obligation to share in the Company's losses.

(2) The sum of quarterly net income allocable to participating securities will not agree with total year net income allocable to participating securities as each quarterly computation is based on the allocation of net income for the quarter to the participating securities.

(3) The sum of quarterly net income per share may not agree with total year net income per share as each quarterly computation is based on the allocation of net income for the quarter to the participating securities and the weighted average shares outstanding

| 2015: | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Oil and natural gas revenue | $ 110,593 | $ 141,128 | $ 114,526 | $ 109,532 |
| Impairment of oil and natural gas properties | (441,450) | (468,922) | (454,628) | — |
| Operating costs and expenses | (166,967) | (170,640) | (148,401) | (116,122) |
| Operating income | (497,824) | (498,434) | (488,503) | (6,590) |
| Interest and other income | (1,824) | 773 | (753) | (359) |
| Interest expense | (31,558) | (31,500) | (31,442) | (31,899) |
| Net gains (losses) on commodity derivatives | 41,303 | (33,749) | 103,996 | 61,336 |
| Other income (expense), net | 7,921 | (64,476) | 71,801 | 29,078 |
| Income (loss) before income taxes | (489,903) | (562,910) | (416,702) | 22,488 |
| Income tax expense (benefit) | 7,442 | — | 158 | — |
| Net income (loss) | (497,345) | (562,910) | (416,860) | 22,488 |
| Less: | | | | |
| Preferred stock dividends | (3,991) | (3,991) | (3,991) | (4,035) |
| Net income allocable to participating securities [(1)(2)] | — | — | — | — |
| **Net income (loss) attributable to common stockholders** | $ (501,336) | $ (566,901) | $ (420,851) | $ 18,453 |
| Basic income (loss) per share [(3)] | $ (8.83) | $ (9.91) | $ (7.33) | 0.32 |
| Weighted average common shares outstanding - basic | 56,805 | 57,184 | 57,426 | 57,490 |
| Diluted income (loss) per share [(3)] | $ (8.83) | $ (9.91) | $ (7.33) | $ 0.32 |
| Weighted average common shares outstanding - diluted | 56,805 | 57,184 | 57,426 | 57,490 |

(1) No losses are allocated to participating restricted stock. Such securities do not have a contractual obligation to share in the Company’s losses.

(2) The sum of quarterly net income allocable to participating securities will not agree with total year net income allocable to participating securities as each quarterly computation is based on the allocation of net income for the quarter to the participating securities.

(3) The sum of quarterly net income per share may not agree with total year net income per share as each quarterly computation is based on the allocation of net income for the quarter to the participating securities and the weighted average shares outstanding.

**Sanchez Energy Corporation**
**Supplemental Information on Oil and Natural Gas Exploration,**
**Development and Production Activities**
**(Unaudited)**

The Company's oil and natural gas properties are located within the United States of America, which constitutes one cost center.

***Capitalized Costs***—Capitalized costs and accumulated depreciation, depletion and impairment relating to the Company's oil and natural gas producing activities are summarized below as of the dates indicated (in thousands):

| | As of December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Oil and Natural Gas Properties: | | | |
| Unproved | $ 231,424 | $ 253,529 | $ 385,827 |
| Proved | 3,164,115 | 2,914,867 | 2,582,441 |
| Total Oil and Natural Gas Properties | 3,395,539 | 3,168,396 | 2,968,268 |
| Less Accumulated depreciation, depletion, amortization and impairment | (2,736,951) | (2,412,293) | (706,590) |
| Net oil and natural gas properties capitalized | $ 658,588 | $ 756,103 | $ 2,261,678 |

***Costs Incurred***—Costs incurred in oil and natural gas property acquisition, exploration and development activities are summarized below (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Exploration costs | $ 379 | $ 30,523 | $ 64,534 |
| Development costs | 284,569 | 512,208 | 806,644 |
| Acquisition and Divestiture costs: | | | |
| Proved properties | 50 | — | 432,271 |
| Unproved properties | 13,430 | 8,508 | 122,224 |
| Total Costs Incurred | $ 298,428 | $ 551,239 | $ 1,425,673 |
| | | | |
| Seismic costs included in exploration costs | $ 379 | $ 1,446 | $ 833 |

***Results of Operations***—Results of operations for the Company's oil, NGL and natural gas producing activities are summarized below (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Oil, NGL, and natural gas revenue | $ 431,326 | $ 475,779 | $ 666,064 |
| Less operating expenses: | | | |
| Oil, NGL, and natural gas production expenses | (164,567) | (156,528) | (93,581) |
| Production and ad valorem taxes | (19,633) | (26,870) | (37,787) |
| Depreciation, depletion, amortization and accretion | (159,760) | (344,572) | (338,097) |
| Impairment of oil and natural gas properties | (169,046) | (1,365,000) | (213,821) |

| | | | |
|---|---|---|---|
| Results of operations from oil and gas producing activities | $ [illegible] | $ [illegible] | $ [illegible] |

***Reserves***—Proved reserves are those quantities of oil, NGL and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date



008192

forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probalistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

Proved developed reserves are proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared with the cost of a new well.

Proved undeveloped reserves ("PUDs") are reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required. Reserves on undrilled acreage are limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of producing economic quantities at a greater distance. Only those undrilled locations that are scheduled to be drilled within five years pursuant to a development plan can be allocated to undeveloped reserves, unless the specific circumstances justify a longer time. As of December 31, 2016, the Company did not have any PUDs previously disclosed that have remained undeveloped for five years or more and no PUD locations included in the Company's proved oil reserves are scheduled to be drilled after five years.

Estimates of proved developed and undeveloped reserves for the periods presented are based on estimates made by the independent engineers, Ryder Scott.

Proved reserves for all periods presented were estimated in accordance with the guidelines established by the SEC and FASB. The rules require SEC reporting companies to prepare their reserve estimates based on the average prices during the 12 month period prior to the ending date of the period covered in the report, determined as the unweighted arithmetic average of the prices in effect on the first day of the month for each month within such period, unless prices were defined by contractual arrangements. The product prices used to determine the future gross revenues for each property reflect adjustments to the benchmark prices for gravity, quality, local conditions, and/or distance from the market. The pricing used for the estimates of the Company's reserves of oil and condensate as of December 31, 2016, 2015 and 2014 was based on unweighted twelve month average WTI posted prices of $42.75, $50.28, and $94.99, respectively. The pricing used for the estimates of the Company's reserves of natural gas as of December 31, 2016, 2015 and 2014 were based on an unweighted twelve month average Henry Hub spot natural gas prices average of $2.49, $2.58, and $4.35, respectively. The pricing used for the estimates of the Company's reserves of natural gas liquids as of December 31, 2016, 2015 and 2014 were based on an unweighted twelve month average Mt. Belvieu prices average of $19.97, $19.90, and $44.84, respectively.

*Net proved quantities summary*

The following table sets forth the net proved, proved developed and proved undeveloped reserves activity for the years ended December 31, 2016, 2015 and 2014:

| | Oil (MBbl) | Natural Gas Liquids (MBbl) | Natural Gas (MMcf) | MBoe (1) |
|---|---|---|---|---|
| Balance as of December 31, 2013 | 45,420 | 6,615 | 40,156 | 58,727 |
| Revisions of previous estimates | 1,261 | 3,901 | 6,412 | 6,231 |
| Extensions and discoveries | 12,107 | 6,612 | 32,691 | 24,168 |
| Purchases of reserves in place | 11,826 | 20,746 | 145,222 | 56,775 |
| Production | (6,080) | (2,590) | (14,828) | (11,141) |
| Balance as of December 31, 2014 | 64,534 | 35,284 | 209,653 | 134,760 |
| Revisions of previous estimates | (16,395) | (1,999) | 3,427 | (17,823) |
| Extensions and discoveries | 14,369 | 10,091 | 63,860 | 35,103 |
| Purchases of reserves in place | (3,578) | (824) | (4,871) | (5,213) |
| Production | (7,165) | (5,754) | (37,594) | (19,184) |
| Balance as of December 31, 2015 | 51,765 | 36,798 | 234,475 | 127,643 |
| Revisions of previous estimates | (20,506) | (10,733) | (49,076) | (39,418) |
| Extensions and discoveries | 42,778 | 39,237 | 278,715 | 128,467 |
| Purchases (sales) of reserves in place | (3,090) | (675) | (3,760) | (4,392) |
| Production | (6,370) | (5,960) | (43,189) | (19,529) |
| Balance as of December 31, 2016 | 64,577 | 58,667 | 417,165 | 192,771 |
| Proved developed reserves: | | | | |
| As of December 31, 2014 | 27,460 | 18,554 | 110,543 | 64,438 |
| As of December 31, 2015 | 21,718 | 20,803 | 132,911 | 64,672 |
| As of December 31, 2016 | 18,245 | 21,060 | 149,029 | 64,143 |
| Proved undeveloped reserves: | | | | |
| As of December 31, 2014 | 37,074 | 16,730 | 99,110 | 70,322 |
| As of December 31, 2015 | 30,048 | 15,995 | 101,564 | 62,970 |
| As of December 31, 2016 | 46,332 | 37,606 | 268,136 | 128,627 |

(1) Oil equivalents are determined under the relative energy content method by using the ratio of 6.0 Mcf of gas to 1.0 Bbl of oil.

***Standardized Measure***—The standardized measure of discounted future net cash flows relating to the Company's ownership interest in proved oil, NGL and natural gas reserves as of December 31, 2016, 2015 and 2014 is shown below (in thousands):

| Standardized Measure | As of December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Future cash inflows | $ 4,300,728 | $ 3,424,682 | $ 7,835,812 |
| Future production costs | (2,362,243) | (1,744,947) | (2,635,281) |
| Future development costs | (919,418) | (667,117) | (1,639,991) |
| Future income taxes | — | — | (407,193) |
| Discount to present value at 10% annual rate | (505,696) | (419,144) | (1,372,769) |
| Standardized measure of discounted future net cash flows | $ 513,371 | $ 593,474 | $ 1,780,578 |

The future cash flows are based on average first-day-of-month prices during the prior 12-month period and cost rates in existence at the time of the projections.

***Changes in standardized measure of discounted future net cash flows***—Changes in standardized measure of discounted future net cash flows relating to proved oil, NGL and natural gas reserves for each of the three years in the period ended December 31, 2016 are summarized below (in thousands):

| Summary of Changes | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Balance, beginning of period | $ 593,474 | $ 1,780,578 | $ 1,209,555 |
| Net changes in prices and costs | (209,286) | (1,790,803) | (725,716) |
| Revisions of previous quantity estimates | (235,324) | (120,836) | 130,752 |
| Extensions, discoveries and improved recovery, less related costs | 239,765 | 279,679 | 448,464 |
| Sales of oil and gas - net of production costs | (247,126) | (292,382) | (535,580) |
| Net change in income taxes | — | 142,761 | 113,008 |
| Changes in development costs | 456,565 | 426,246 | 629,403 |
| Accretion of discount | 59,347 | 178,058 | 120,955 |
| Purchases of reserves in place | 2,319 | — | 590,559 |
| Sales of reserves in place | (49,738) | (136,828) | — |
| Change in production rates, timing, and other | (96,625) | 127,001 | (200,822) |
| Net change | (80,103) | (1,187,104) | 571,023 |
| Balance, end of period | $ 513,371 | $ 593,474 | $ 1,780,578 |





/

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of Report (date of earliest event reported): **March 1, 2017**

# SANCHEZ ENERGY CORPORATION

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-35372** | **45-3090102** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1000 Main Street, Suite 3000**
**Houston, Texas 77002**
(Address of principal executive offices) (Zip Code)

**(713) 783-8000**
(Registrant’s telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240-14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01. Entry into a Material Definitive Agreement.**

*Closing of Comanche Eagle Ford Acquisition*

On March 1, 2017, Sanchez Energy Corporation (for the limited purposes set forth therein) (the "***Company***"), SN EF Maverick, LLC, a subsidiary of the Company ("***SN Maverick***"), SN EF UnSub, LP, an unrestricted, non-guarantor subsidiary of the Company for purposes of the agreements governing the Company's indebtedness ("***SN UnSub***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), an entity controlled by affiliates of The Blackstone Group L.P. ("***Gavilan***" and, together with SN Maverick and SN UnSub, the "***Buyers***") completed the closing of the transactions contemplated by the purchase and sale agreement (the "***Purchase Agreement***") among the Buyers and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP (together, the "***Sellers***"). At the closing, the Buyers collectively purchased all of the right, title and interest of the Sellers in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb and LaSalle Counties, Texas, consisting of approximately 318,000 gross (155,000 net) acres and an average approximate 49.00% working interest therein (the "***Comanche Eagle Ford Assets***") for aggregate consideration of approximately $2.078 billion, subject to customary post-closing purchase price adjustments. The effective time for the acquisition is 12:01 a.m. on July 1, 2016.

In accordance with the terms of the Purchase Agreement, (i) SN Maverick paid approximately 13% of the purchase price and SN UnSub paid approximately 37% of the purchase price (including through a $100 million cash contribution from other Company entities) and SN UnSub and SN Maverick acquired approximately 77,500 net acres and an average approximate 24.50% working interest in the aggregate (and approximately 50% and 0%, respectively, of the estimated proved developed producing reserves (PDPs), 20% and 30%, respectively, of the estimated proved developed non-producing reserves (PDNPs), and 20% and 30%, respectively, of the proved undeveloped reserves (PUDs)) and (ii) Gavilan paid approximately 50% of the purchase price and acquired approximately 77,500 net acres and an average approximate 24.50% working interest in the aggregate (and approximately 50% of the estimated PDPs, PDNPs and PUDs), subject to purchase price adjustments applicable to such Buyers' shares of the purchase price in the foregoing percentages.

*Joint Development Agreement*

In connection with the closing of the transactions contemplated by the Purchase Agreement, the Buyers entered into an eight-year (subject to earlier termination as provided for therein) joint development agreement ("***JDA***") that provides for the administration, operation and transfer of the jointly-owned Comanche Eagle Ford Assets.

The JDA provides for the parties to (i) establish an operating committee which will control the timing, scope and budgeting of operations on the Comanche Eagle Ford Assets (subject to certain exceptions) and (ii) designate SN Maverick as operator of the Comanche Eagle Ford Assets and certain other interests (subject to forfeiture in the event of certain default events). The operating committee is to consist of six representatives, two of which will be appointed by SN Maverick, one of which will be appointed by SN UnSub and three of which will be appointed by Gavilan.

If (i) the operating committee is unable to approve a budget and work plan within the time periods specified in the JDA or (ii) either Gavilan or SN Maverick otherwise elects to cause a



division of operatorship under the JDA for any reason during a budget negotiation period or, as applicable, in the event of an Equitable Partition (as defined below), then, either Gavilan or SN Maverick will have the right to cause a division of operatorship pursuant to which, subject to the terms of the JDA and any applicable joint operating agreements, the rights to operatorship pursuant to applicable joint operating agreements will be divided between Gavilan and SN Maverick on a geographic wellpad-by-wellpad basis.

Subject to certain exceptions, the JDA prohibits direct or indirect transfers of a party's interests in the Comanche Eagle Ford Assets prior to the third anniversary of the date of the JDA. After the third anniversary, each party will have (i) certain tag-along rights in the event that another party directly or indirectly proposes to transfer 35% or more of its interests in the Comanche Eagle Ford Assets (including, in the case of Gavilan, certain change of control transactions with respect to the Company) and (ii) certain rights of first offer in connection with certain proposed direct or indirect transfers of any of a party's Comanche Eagle Ford Assets. In addition, if at any time after the third anniversary of the JDA (or within nine months following the termination of the JDA), Gavilan desires to directly or indirectly transfer all or substantially all of its and its affiliates' interests in a specified area which includes the area in which the Comanche Eagle Ford Assets are located (a "***Sale Transaction***," including a Sale Transaction Equitable Partition (as defined below) but not an Alternative Equity Partition (as defined below)), subject to certain exceptions, Gavilan may require the Company, SN Maverick, SN UnSub, and their respective affiliates to sell or otherwise convey their interests within such area comprising 75% of the fair market value of such area (the "***Included Percentage***") to Gavilan's transferee. However, if the transfer of such land would result in the Company transferring all or substantially all of its assets

pursuant to applicable law, then such applicable percentage of fair market value shall be such lesser percentage that would not constitute all or substantially all of the Company's assets pursuant to applicable law, but in no event less than 66% (such area, the "***Included Sale Transaction Area***," and the remainder of such designated area, the "***Excluded Sale Transaction Area***" and such remaining percentage, the "***Excluded Percentage***"). At the time of the Sale Transaction, Gavilan and its affiliates must convey all of their interests within the Excluded Sale Transaction Area to SN and SN UnSub (a "***Sale Transaction Equitable Partition***") or, in lieu thereof, make such conveyance pursuant to an alternative partition such that the Included Sale Transaction Area comprises interests in such designated area equal to 50% of the aggregate fair market value of such designated area (or such other percentage proportionate to the parties' interests, if applicable) (such percentage, the "***Gavilan Percentage***"). The Excluded Sale Transaction Area comprises that percentage of interests in such designated area equal to 100% less the Gavilan Percentage (an "***Alternative Equitable Partition***" and together with a Sale Transaction Equitable Partition, each an "***Equitable Partition***").

In the event that Gavilan is unable to cause the Company, SN Maverick, SN UnSub and/or their respective affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in the JDA, then Gavilan will have the right to effectuate an Alternative Equitable Partition, whereby Gavilan will be entitled to all interests of the parties in the Included Sale Transaction Area and SN and SN UnSub will be entitled to all interests of the parties in the Excluded Sale Transaction Area and the parties will use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the parties shall use their respective reasonable best efforts to cause Gavilan or its designee (or if applicable the transferee in a Sale Transaction) to become operator under each joint operating agreement applicable



to the conveyed assets included in the Included Sale Transaction Area and cause SN Maverick or its designee to become operator under each joint operating agreement applicable to the assets included in the Excluded Sale Transaction Area.

In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than 25% in value of publicly traded securities, subject to certain exceptions and limitations in SN Maverick's debt agreements. In addition, Gavilan may not cause Sanchez Energy, SN Maverick, SN UnSub and their respective affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN Maverick, SN UnSub and their respective affiliates achieves certain specified thresholds and satisfies certain other requirements specified in the JDA.

The JDA also establishes an area of mutual interest in respect of an area surrounding the vicinity of the Comanche Eagle Ford Assets for a period of five years from the date the JDA is signed or termination of the JDA, whichever occurs first.

*Securities Purchase Agreement*

As part of the financing for the acquisition of the Comanche Eagle Ford Assets, on January 12, 2017, the Company, SN UnSub, SN EF UnSub GP, LLC, the general partner of SN UnSub (the "***SN UnSub General Partner***"), SN UR Holdings, LLC, a subsidiary of the Company ("***SN UR Holdings***"), SN EF UnSub Holdings, LLC, a subsidiary of SN UR Holdings ("***SN UnSub Holdings***"), GSO ST Holdings Associates LLC ("***GSO Associates LLC***"), and GSO ST Holdings LP (the "***GSO Associates LP***") entered into a Securities Purchase Agreement (the "***SPA***").

On February 28, 2017, the parties to the SPA amended and restated the SPA (the "***Amended and Restated SPA***") to add Intrepid Private Equity V-A, LLC ("***Intrepid***" and, together with GSO Associates LP, the "***Preferred Unit Purchasers***") as an additional party to the SPA. GSO Associates LP is an investment vehicle owned by funds managed or advised by GSO Capital Partners LP ("***GSO***") and GSO Associates LLC, which is GSO Associates LP's general partner, is a controlled affiliate of GSO.

At the closing of the transactions contemplated by the Purchase Agreement, pursuant to the Amended and Restated SPA and subject to the other terms and conditions provided therein:

- SN UnSub Holdings purchased 100,000 common units of SN UnSub for $100,000,000,
- GSO Associates LP purchased 485,000 preferred units of SN UnSub for $485,000,000;
- Intrepid purchased 15,000 preferred units of SN UnSub for $15,000,000;

- SN UR Holdings purchased 99 "Class A Units" in SN UnSub General Partner for nominal consideration;

- GSO Associates LLC purchased 1 "Class B Unit" in SN UnSub General Partner for nominal consideration;



- Certain funds managed or advised by GSO (the "***GSO Funds***") received (i) 1,455,000 shares of the Company's common stock and (ii) warrants to purchase 1,940,000 shares of the Company's common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments; and

- Intrepid received (i) 45,000 shares of the Company's common stock and (ii) warrants to purchase 60,000 shares of the Company's common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments.

The Amended and Restated SPA contains representations and warranties, covenants, and termination and indemnification that are customary for this type of transaction. The representations and warranties and covenants in the Amended and Restated SPA were made or agreed to, among other things, to provide the parties with specified rights and obligations and to allocate risk among the parties. Accordingly, the Amended and Restated SPA should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Warrant Agreements*

At the closing of the transactions contemplated by the Purchase Agreement, the Company entered into (i) three separate warrant agreements to purchase an aggregate of 6,500,000 shares of the Company's common stock with each of Gavilan Resources Holdings—A, LLC, Gavilan Resources Holdings—B, LLC, and Gavilan Resources Holdings—C, LLC (collectively, the "***Blackstone Warrantholders***"), affiliates of The Blackstone Group L.P., (ii) a warrant agreement to purchase an aggregate of 1,940,000 shares of the Company's common stock with the GSO Funds, and (iii) a warrant agreement to purchase 60,000 shares of the Company's common stock with Intrepid (collectively, the "***Warrant Agreements***").

The Warrant Agreements provide for a $10 exercise price per share to purchase the Company's common stock. The exercise price and the number of shares of the Company's common stock for which a warrant is exercisable are subject to adjustment from time to time upon the occurrence of certain events including: (i) payment of a dividend or distribution to holders of shares of the Company's common stock payable in the Company's common stock, (ii) a subdivision, combination, or reclassification of the Company's common stock, (iii) the distribution of any rights, options or warrants (excluding rights issued under the Company's rights agreement) to all holders of the Company's common stock entitling them for a certain period of time to purchase shares of the Company's common stock at a price per share less than the fair market value per share, and (iv) payment of a cash distribution to all holders of the Company's common stock or a distribution to all holders of the Company's common stock any shares of the Company's capital stock, evidences of indebtedness, or any of assets or any rights, warrants or other securities of the Company. The Warrant Agreements also provide that, if the Company proposes a voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, the holders of the warrants will receive the kind and number of other securities or assets which the holder would have been entitled to receive if the holder had exercised the warrant in full immediately prior to the time of such dissolution, liquidation or winding up and the right to exercise the warrant will terminate on the date on which the holders of record of the shares of common stock are entitled to exchange their shares for securities or assets deliverable upon such dissolution, liquidation or winding up.



The warrants issued to the Blackstone Warrantholders expire on March 1, 2022 and the warrants issued to the GSO Funds and Intrepid expire on March 1, 2032, in each case in accordance with the terms and conditions of the applicable Warrant Agreement.

This summary of the Warrant Agreements does not purport to be complete, and is qualified in its entirety by reference to the full text of the Warrant Agreements, which are filed as Exhibit 4.1, Exhibit 4.2, Exhibit 4.3, Exhibit 4.4, and Exhibit 4.5 to this Current Report on Form 8-K and are incorporated into this Item 1.01 by reference.

*Registration Rights Agreements*

At the closing of the transactions contemplated by the Purchase Agreement, the Company entered into separate registration rights agreements with the Blackstone Warrantholders (the "***Blackstone Registration Rights Agreement***"), the GSO Funds (the "***GSO Registration Rights Agreement***"), and Intrepid (together with the Blackstone Registration Rights Agreements and the GSO Registration Rights Agreement, the "***Registration Rights Agreements***"). The Registration Rights Agreements grant the parties certain registration rights for the shares of the Company's common stock acquired by the parties, including the shares issuable upon the exercise of the warrants to purchase the Company's common stock. The Blackstone Registration Rights Agreement and the GSO Registration Rights Agreement provide that the Company will use its reasonable best efforts to prepare and file a shelf registration statement with the U.S. Securities and Exchange Commission (the "***SEC***") to permit the public resale of all registrable securities covered by the applicable Registration Rights Agreement within 18 months of the date of the agreement and to cause such shelf registration statement to be declared effective no later than two years after the date of the agreement.

The Registration Rights Agreements include piggyback rights for the applicable holders, which provide that, if the Company proposes to file certain registration statements or supplements to certain effective registration statements for the sale of shares of the Company's common stock in an underwritten offering for its own account or that of another person or both, then the Company is required to offer the holders the opportunity to include in such underwritten offering such number of registrable securities as each such holder may request, subject to certain cutback rights if the Company has been advised by the managing underwriter that the inclusion of registrable securities for sale for the benefit of the holders will have an adverse effect on the price, timing or distribution of the shares of common stock in the underwritten offering.

The representations and warranties and covenants in the Registration Rights Agreements were made or agreed to, among other things, to provide the respective parties with specified rights and obligations and to allocate risk among the respective parties. Accordingly, the Registration Rights Agreements should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Standstill and Voting Agreement*

On March 1, 2017, the Company and each of Blackstone Capital Partners VII L.P. and Blackstone Energy Partners II L.P. (together, the "***Blackstone Funds***") entered into a Standstill and Voting Agreement (the "***Standstill and Voting Agreement***"). The Blackstone Funds agreed that, without the prior consent of the Company, the Blackstone Funds and their controlled affiliates,



including the Blackstone Warrantholders, will not, among other things, (i) subject to certain exceptions, acquire interests in any of voting securities of the Company or all or substantially all of the assets of the Company or any of its subsidiaries, (ii) call a special meeting of the holders of voting securities of the Company or any of its subsidiaries, or (iii) seek representation on the board of directors or seek the removal of any member of the board of directors of the Company or any of its subsidiaries.

Without the prior written consent of the Company, during the period commencing on the date of the Standstill and Voting Agreement and ending on the second anniversary of the date of the closing of the transactions contemplated by the Purchase Agreement, the Blackstone Funds and their controlled affiliates, including the Blackstone Warrantholders, may not, subject to certain exceptions, (i) offer, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any of the shares of the Company's common stock or the warrants to purchase the Company's common stock or (ii) directly or indirectly engage in any short sales or other derivative or hedging transactions with respect to the shares of the Company's common stock or the warrants to purchase the Company's common stock.

The Blackstone Funds also agreed that, during the term of the Standstill and Voting Agreement, subject to certain exceptions, the Blackstone Funds and their controlled affiliates will vote any voting securities of the Company that they beneficially own in the same manner as recommended by the board of directors of the Company to the other holders of voting securities of the Company.

The Company previously entered into a Standstill and Voting Agreement with the GSO Funds on February 6, 2017 with substantially similar terms as the Standstill and Voting Agreement.

The representations and warranties and covenants in the Standstill and Voting Agreement were made or agreed to, among other things, to provide the respective parties with specified rights and obligations and to allocate risk among the respective parties. Accordingly, the Standstill and Voting Agreement should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Shareholders Agreement*

On March 1, 2017, the Company and Gavilan Resources Holdco, LLC ("***Gavilan Holdco***") entered into a Shareholders Agreement (the "***Shareholders Agreement***") pursuant to which, until the earlier of (i) the termination of the JDA, (ii) the sale of all or substantially all of the Assets (as defined in the Purchase Agreement) acquired by Gavilan and (iii) the consummation of a Sale Transaction, Gavilan Holdco will have the right, but not the obligation, to appoint one observer representative to be present at all regularly scheduled meetings of the full board of directors of the Company, subject to the terms, conditions and limitations set forth in the Shareholders Agreement.

*SN UnSub Governing Documents*

At the closing of the transactions contemplated by the Purchase Agreement, the applicable parties entered into an amended and restated partnership agreement of SN UnSub (the "***Partnership***



***Agreement***") and an amended and restated limited liability company agreement of SN UnSub General Partner (the "***GP LLC Agreement***").

Under the terms of the Partnership Agreement, SN UnSub's preferred units are entitled to receive distributions of 10.0% per annum, payable quarterly in cash, unless a cash payment is then prohibited by certain of SN UnSub's debt agreements, in which case such distribution will be deemed to have been paid in kind. SN UnSub may not make distributions on the SN UnSub common units until the preferred units are redeemed in full.

The preferred units have priority over the common units, to the extent of the Base Return (as defined below), upon a liquidation, sale of all or substantially all assets, certain change of control and exit transactions.

UnSub may, from time to time and subject to the conditions set forth in the Partnership Agreement, redeem preferred units at a purchase price per unit sufficient to achieve the greater of (i) a 14.0% internal rate of return for such unit and (ii) a 1.50x return on the purchase price for such unit, in each case inclusive of previous distributions made in cash (the "***Base Return***"). Partners holding a majority of the preferred units in SN UnSub will have the option to request SN UnSub to redeem all of the preferred units for the Base Return at any time following the seventh anniversary of issuance or upon the occurrence of certain change of control transactions, as further described in the Partnership Agreement.

If (i) the preferred units are not timely redeemed by SN UnSub when required, (ii) SN UnSub fails, after March 1, 2018, to pay the preferred units a cash distribution in any two quarters, regardless of whether consecutive, and such failure is continuing, (iii) SN UnSub takes certain material actions without the consent of the preferred unitholders, when required, (iv) certain events of default under SN UnSub and the Company's credit agreements have occurred or (v) SN Maverick is removed as operator under the JDA under certain circumstances, then the holders of the preferred units will be entitled to appoint a majority of the members of the board of directors of SN UnSub General Partner and may cause a sale of the assets or equity of SN UnSub in order to redeem the preferred units.

Under the terms of the GP LLC Agreement, SN UR Holdings has the right to appoint three members and GSO Associates LLC has the right to appoint two members to the five-member board of directors of SN UnSub General Partner. The approval of GSO Associates LLC is required for a number of material actions by SN UnSub (unless the preferred units are redeemed at or prior to such actions), including, among other things:

008202

- subject to certain exceptions, incurring additional debt or providing guarantees in respect of obligations of other persons;

- amending debt instruments (other than with respect to certain capital leases and purchase money security interests) or amending the JDA in a way that would adversely impact SN UnSub General Partner and certain related parties (including SN UnSub) in any material respect;

- effecting a change of control, liquidation or dissolution;



- selling or acquiring assets other than with respect to the sale of production in the ordinary course of business;

- entering hedging arrangements outside of the parameters of SN UnSub's hedging program;

- issuing any additional capital stock in SN UnSub General Partner or in SN UnSub, except for certain limited partner interests in SN UnSub that would be junior to the preferred units and would otherwise not result in SN UnSub Holdings owning less than 51% of the economic interests in SN UnSub (excluding interests represented by preferred units);

- entering into contracts with affiliates of members of SN UnSub General Partner, except that (x) no approval is required if (i) the terms of the contract are arm's length and (ii) (A) such action is not reasonably expected to result in revenue to, or costs or expenses incurred by, SN UnSub General Partner and certain affiliates (including SN UnSub) of more than $5 million or (B) such action together with all prior such actions with respect to such member or affiliate would not be reasonably expected to result in revenue to, or costs or expenses incurred by, SN UnSub General Partner and certain affiliates (including SN UnSub) of more than $25 million in the aggregate (the thresholds set forth in (A) and (B), the "***Affiliate Threshold***") and (y) with respect to any agreement between SN UnSub and certain affiliates on the one hand, and Sanchez Production Partners, LP on the other hand, that is in excess of the Affiliate Threshold, consent from GSO Associates LLC is not to be unreasonably withheld, conditioned or delayed (subject to certain exceptions including an agreement that is not arm's length or that is not approved in writing by the independent board of directors of the Company and certain other conflicts committees);

- subject to certain exceptions, making capital expenditures for drilling and completion of wells during any quarterly period if certain financial metrics have not been met within two years of the closing under the Purchase Agreement or thereafter as calculated on a quarterly basis;

- filing for bankruptcy; and

- incurring general and administrative costs in excess of $5 million during any calendar year ending on or before December 31, 2019, or in excess of $10 million in any calendar year thereafter.

*SN UnSub Credit Agreement*

On March 1, 2017, SN UnSub, as borrower, entered into a revolving credit facility represented by a $500 million Credit Agreement dated as of March 1, 2017 with JPMorgan Chase Bank, N.A. as the administrative agent and the lenders party thereto (the "***SN UnSub Credit Agreement***"). The initial borrowing base amount under the SN UnSub Credit Agreement is $330 million. Additionally, the SN UnSub Credit Agreement provides for the issuance of letters of credit, limited in the aggregate to the lesser of $50 million and the total availability under the borrowing base. As of March 1, 2017, there is approximately $173.5 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. Availability under the SN



UnSub Credit Agreement is at all times subject to customary conditions and the then applicable borrowing base, which is subject to periodic redetermination.

The SN UnSub Credit Agreement matures on March 1, 2022. The borrowing base under the SN UnSub Credit Agreement can be subsequently redetermined up or down by the lenders based on, among other things, their evaluation of SN UnSub's and its subsidiaries' oil and natural gas reserves. Redeterminations of the borrowing base are scheduled to occur 60 days after March 1, 2017, October 1, 2017 and thereafter semi-annually on April 1 and October 1 of each year. The borrowing base is also subject to reduction by 25% of the amount of certain junior debt issuances other than the first $200 million of such debt and by reductions as a result of terminating hedge positions and asset dispositions that exceed 5% of the then-effective borrowing base, together with other customary adjustments.

SN UnSub's obligations under the SN UnSub Credit Agreement are secured by a first priority lien on substantially all of SN UnSub's assets and the assets of SN UnSub's existing and future subsidiaries not designated as "unrestricted subsidiaries," including a first priority lien on all ownership interests in existing and future subsidiaries not designated as "unrestricted subsidiaries," as well as a pledge of equity interests in SN UnSub held by SN UnSub Holdings and SN UnSub General Partner, in each case, subject to customary exceptions. The obligations under the SN UnSub Credit Agreement are guaranteed by all of SN UnSub's existing and future subsidiaries not designated as "unrestricted subsidiaries," subject to customary exceptions. As of March 1, 2017, SN UnSub has no subsidiaries.

At SN UnSub's election, borrowings under the SN UnSub Credit Agreement may be made on an alternate base rate or a eurodollar rate basis, plus an applicable margin. The applicable margin varies from 1.75% to 2.75% for alternate base rate borrowings and from 2.75% to 3.75% for eurodollar borrowings, depending on the utilization of the borrowing base. Furthermore, SN UnSub is also required to pay a commitment fee on the amount of any unused commitments at a rate of 0.50% per annum.

The SN UnSub Credit Agreement contains various affirmative and negative covenants and events of default that limit SN UnSub's ability to, among other things, incur indebtedness, make restricted payments, grant liens, consolidate or merge, dispose of certain assets, make certain investments, engage in transactions with affiliates, enter into and maintain hedge transactions and make certain acquisitions. The SN UnSub Credit Agreement also provides for an event of default upon a change of control and cross default between the SN UnSub Credit Agreement and other indebtedness in an aggregate principal amount exceeding $25 million. Additionally, the SN UnSub Credit Agreement contains "separateness" covenants that require SN UnSub to comply with certain corporate formalities and transact with affiliates on an arms' length basis. Furthermore, the SN UnSub Credit Agreement contains financial covenants that require SN UnSub to satisfy certain specified financial ratios, including (i) a current assets to current liabilities ratio of at least 1.0 to 1.0 as of the last day of each fiscal quarter commencing with the fiscal quarter ending June 30, 2017 and (ii) a net debt to consolidated EBITDA ratio of not greater than 4.0 to 1.0 as of the last day of each fiscal quarter, commencing with the fiscal quarter ending June 30, 2017.

The representations and warranties and covenants in the SN UnSub Credit Agreement were made or agreed to, among other things, to provide the parties with specified rights and obligations



and to allocate risk among the parties. Accordingly, the SN UnSub Credit Agreement should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

From time to time, the agents, arrangers, book runners and lenders under the SN UnSub Credit Agreement and their affiliates have provided, and may provide in the future, investment banking, commercial lending, hedging and financial advisory services to SN UnSub and its affiliates in the ordinary course of business, for which they have received, or may in the future receive, customary fees and commissions for these transactions.

*Rights Agreement Amendment*

On March 1, 2017, the Company and Continental Stock Transfer & Trust Company, as rights agent, entered into an amendment (the "***Rights Agreement Amendment***") to the Rights Agreement, dated as of July 28, 2015, by and between the Company and the rights agent (the "***Rights Agreement***") to, among other things, amend the definition of "Exempt Person" to allow the Blackstone Warrantholders, certain specified funds managed or advised by GSO, and any other person that, together with the Blackstone Warrantholders and the specified funds managed or advised by GSO, constitutes a "group" as defined for purposes of the Securities Exchange Act of 1934, as amended, or an "entity" within the meaning of specified treasury regulations (collectively, the "***Exempted Holders***"), to acquire securities of the Company in excess of 4.9% of the then outstanding shares of the Company's common stock in connection with the consummation of the transactions contemplated by the Amended and Restated SPA without triggering the rights under the Rights Agreement. Except as provided in the Rights Agreement, as

amended by the Rights Agreement Amendment, if any of the Exempted Holders becomes the beneficial owner of any additional shares of the Company's common stock in excess of an additional 1% of the then outstanding shares of common stock, then such Exempted Holder will be deemed an "Acquiring Person" under the Rights Agreement.

This summary of the Rights Agreement Amendment does not purport to be complete, and is qualified in its entirety by reference to the full text of the Rights Agreement Amendment, which is filed as Exhibit 4.6 to this Current Report on Form 8-K and is incorporated into this Item 1.01 by reference.

**Item 2.01. Completion of Acquisition or Disposition of Assets.**

The information set forth in Item 1.01 of the Current Report on Form 8-K under the heading "Closing of Eagle Ford Comanche Acquisition" is incorporated by reference into this Item 2.01.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth in Item 2.03 of this Current Report on Form 8-K under the heading "SN UnSub Credit Agreement" is incorporated by reference into this Item 2.03.



**Item 3.02. Unregistered Sales of Equity Securities.**

The information in Item 1.01 of this Current Report on Form 8-K regarding the issuance of (i) warrants to purchase an aggregate of 6,500,000 shares of the Company's common stock to the Blackstone Warrantholders, (ii) 1,455,000 shares of the Company's common stock and warrants to purchase 1,940,000 shares of the Company's common stock to the GSO Funds and (iii) 45,000 shares of the Company's common stock and warrants to purchase 60,000 shares of the Company's common stock to Intrepid is incorporated by reference into this Item 3.02. The securities were issued pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act of 1933, as amended, as an issuance not involving a public offering.

**Item 9.01. Financial Statements and Exhibits.**

(d) *Exhibits*.

The following materials are included as exhibits to this Current Report on Form 8-K:

| Exhibit No. | Exhibit |
|---|---|
| 2.1* | Purchase and Sale Agreement, dated January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, and Aguila Production, LLC and, solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation |
| 4.1 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—A, LLC |
| 4.2 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—B, LLC |
| 4.3 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—C, LLC |
| 4.4 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and GSO Capital Opportunities Fund III LP, GSO Energy Select Opportunities Fund LP, GSO Energy Partners—A LP, GSO Energy Partners—B LP, GSO Energy Partners—C LP, GSO Energy Partners—C II LP, GSO Energy Partners—D LP, GSO Credit Alpha Trading (Cayman) LP, GSO Harrington Credit Alpha Fund (Cayman) L.P., and GSO Capital Solutions Funds II LP |
| 4.5 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Intrepid Private Equity V-A, LLC |

| | |
|---|---|
| 4.6 | Amendment No. 1, dated as of March 1, 2017, to Rights Agreement, dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as rights agent (incorporated by reference from Exhibit 4.2 to the Company's Form 8-A/A filed with the SEC on March 3, 2017) |

---

* Exhibits and Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A list of these Exhibits and Schedules is included in the index of the Purchase Agreement. The Company agrees to furnish a supplemental copy of any such omitted Exhibit or Schedule to the SEC upon request.



## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

SANCHEZ ENERGY CORPORATION

Date: March 6, 2017

By: /s/ Howard J. Thill
Howard J. Thill
Executive Vice President and Chief Financial Officer



## EXHIBIT INDEX

| Exhibit No. | Exhibit |
|---|---|
| 2.1* | Purchase and Sale Agreement, dated January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, and Aguila Production, LLC and, solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation |
| 4.1 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—A, LLC |
| 4.2 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—B, LLC |
| 4.3 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—C, LLC |
| 4.4 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and GSO Capital Opportunities Fund III LP, GSO Energy Select Opportunities Fund LP, GSO Energy Partners—A LP, GSO Energy Partners—B LP, GSO Energy Partners—C LP, GSO Energy Partners—C II LP, GSO Energy Partners—D LP, GSO Credit Alpha Fund LP, GSO Harrington Credit Alpha Fund (Cayman) L.P., and GSO Capital Solutions Funds II LP |
| 4.5 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Intrepid Private Equity V-A, LLC |
| 4.6 | Amendment No. 1, dated as of March 1, 2017, to Rights Agreement, dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as rights agent (incorporated by reference from Exhibit 4.2 to the Company's Form 8-A/A filed with the SEC on March 3, 2017) |

Case 1:19-cv-05087 Document 13-2 Filed 06/06/20 Page 332 of 1275

* Exhibits and Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A list of these Exhibits and Schedules is included in the index of the Purchase Agreement. The Company agrees to furnish a supplemental copy of any such omitted Exhibit or Schedule to the SEC upon request.





/

# Exhibit C

EX-10.7 19 sn-20170331ex107153f8e.htm EX-10.7

**Exhibit 10.7**

**AMENDED AND RESTATED**

**SECURITIES PURCHASE AGREEMENT**

by and among

SANCHEZ ENERGY CORPORATION,

SN UR HOLDINGS, LLC

SN EF UNSUB GP, LLC

SN EF UNSUB, LP,

SN EF UNSUB HOLDINGS, LLC,

GSO ST HOLDINGS ASSOCIATES LLC,

GSO ST HOLDINGS LP,

AND

INTREPID PRIVATE EQUITY V-A, LLC

**FEBRUARY 28, 2017**

---

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 3 |
| Section 1.01 | Definitions | 3 |
| ARTICLE II AGREEMENT TO SELL AND PURCHASE | | 11 |
| Section 2.01 | Anadarko Commitment and Related Matters | 11 |
| Section 2.02 | Anadarko Related Commitment and Related Matters | 13 |
| Section 2.03 | | 14 |
| Section 2.03 | Closing | 14 |
| Section 2.04 | Deliveries | 15 |
| Section 2.05 | Deliveries Upon Execution of KNOC PSA. Promptly following the execution of the KNOC PSA: | 15 |
| Section 2.06 | Deliveries Upon the Closings | 16 |
| Section 2.07 | Conditions of GSO Associates' and GSO Holdings' Obligations at the Closing | 18 |
| Section 2.08 | Conditions of the Common Unit Purchaser's Obligations at Committed Closing | 20 |
| Section 2.09 | Conditions of Intrepid's Obligations at the Closing | 20 |
| Section 2.10 | Nature of Obligations | 21 |
| Section 2.11 | Further Assurances | 21 |
| Section 2.12 | UCC Filings After January 12, 2017 | 21 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES RELATED TO THE GENERAL PARTNER AND THE PARTNERSHIP | | 21 |
| Section 3.01 | Existence and Power | 21 |
| Section 3.02 | Authority; Enforceability | 22 |
| Section 3.03 | Capitalization; Issuance of Units | 22 |
| Section 3.04 | Subsidiaries | 23 |
| Section 3.05 | Litigation | 23 |
| Section 3.06 | No Conflicts | 24 |
| Section 3.07 | Approvals | 24 |
| Section 3.08 | No Liabilities | 24 |
| Section 3.09 | Investment Company Status | 24 |
| Section 3.10 | No Registration Required | 25 |
| Section 3.11 | Certain Fees | 25 |
| Section 3.12 | No Integration | 25 |
| Section 3.13 | No Restrictions on Dividends | 25 |
| Section 3.14 | Springfield Gathering | 25 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASERS | | 26 |
| Section 4.01 | Existence | 26 |
| Section 4.02 | Authorization, Enforceability | 26 |
| Section 4.03 | No Breach | 26 |
| Section 4.04 | Approvals | 27 |
| Section 4.05 | Certain Fees | 27 |
| Section 4.06 | Restricted Securities | 27 |
| Section 4.07 | Financing | 28 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SN | | 29 |
| Section 5.01 | Existence | 29 |

| | | |
|---|---|---|
| Section 5.02 | Authorization, Enforceability | 29 |
| Section 5.03 | No Conflicts | 30 |
| Section 5.04 | Approvals | 30 |
| Section 5.05 | Certain Fees | 30 |
| Section 5.06 | The GSO Allocated Shares, the Intrepid Allocated Shares and the Warrants | 30 |
| Section 5.07 | Investment Company Status | 31 |
| Section 5.08 | Stock Exchange Listing and Reporting Requirements | 31 |
| Section 5.09 | No Registration Required | 31 |
| Section 5.10 | No Integration | 31 |
| Section 5.11 | Restricted Securities | 31 |
| Section 5.12 | Litigation | 32 |
| Section 5.13 | Solvency | 32 |
| Section 5.14 | No Obligation to be Guarantor or Restricted Subsidiary | 33 |
| ARTICLE VI INDEMNIFICATION, COSTS AND EXPENSES | | 33 |
| Section 6.01 | Indemnification | 33 |
| Section 6.02 | Indemnification Procedure | 35 |
| Section 6.03 | Survival | 37 |
| ARTICLE VII TERMINATION | | 37 |
| Section 7.01 | Termination | 37 |
| Section 7.02 | Notice of Termination | 38 |
| Section 7.03 | Effect of Termination | 38 |
| Section 7.04 | Termination of Commitment Related to KNOC Closing | 38 |
| ARTICLE VIII MISCELLANEOUS | | 38 |
| Section 8.01 | Expenses | 38 |
| Section 8.02 | Interpretation | 38 |
| Section 8.03 | Amendments and Waivers | 38 |
| Section 8.04 | Binding Effect | 40 |
| Section 8.05 | Communications | 40 |
| Section 8.06 | Entire Agreement; Integrated Transaction | 41 |
| Section 8.07 | Governing Law; Submission to Jurisdiction | 42 |
| Section 8.08 | Waiver of Jury Trial | 42 |
| Section 8.09 | Execution in Counterparts | 42 |
| Section 8.10 | Successors and Assigns | 42 |
| Section 8.11 | Severability | 42 |
| Section 8.12 | Interim Actions | 43 |
| Section 8.13 | No Recourse | 44 |
| Section 8.14 | Creditors | 44 |
| Section 8.15 | Public Disclosure; Confidentiality | 44 |
| Section 8.16 | Time is of the Essence | 45 |
| Section 8.17 | Remedies Generally | 45 |

**EXHIBITS**

| | | |
|---|---|---|
| EXHIBIT A | – | Form of Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP |
| EXHIBIT B | – | Form of Limited Liability Company Agreement of SN EF UnSub GP, LLC |
| EXHIBIT C-1 | – | Form of GSO Warrant Agreement |
| EXHIBIT C-2 | – | Form of Intrepid Warrant Agreement |
| EXHIBIT D | – | Form of Management Services Agreement |
| EXHIBIT E | – | Form of Joint Development Agreement |
| EXHIBIT F | – | APC/KM PSA |
| EXHIBIT G | – | Hydrocarbon Marketing Agreement |
| EXHIBIT H-1 | – | Form of GSO Registration Rights Agreement |
| EXHIBIT H-2 | – | Form of Intrepid Registration Rights Agreement |
| EXHIBIT I | – | Opinion Matters |
| EXHIBIT J | – | Equity Commitment Letters |
| EXHIBIT K-1 | – | Form of GSO Non-Solicitation Agreement |
| EXHIBIT K-2 | – | Form of Intrepid Non-Solicitation Agreement |
| EXHIBIT L | – | GSO Voting Agreement |
| EXHIBIT M | – | Allocation of SN Shares and Warrants |
| EXHIBIT N | – | SN Letter Agreement |

**SCHEDULES**

SCHEDULE 3.07 – Partnership Approvals
SCHEDULE 3.08 – Liabilities
SCHEDULE 4.04 – Preferred Unit Purchasers Approvals
SCHEDULE 5.04 – SN Approvals

**AMENDED AND RESTATED**

**SECURITIES PURCHASE AGREEMENT**

This AMENDED AND RESTATED SECURITIES PURCHASE AGREEMENT (this "***Agreement***"), is entered into on February 28, 2017 (the "***Effective Date***"), by and among Sanchez Energy Corporation, a Delaware corporation ("***SN***"); SN UR Holdings, LLC, a Delaware limited liability company ("***SN GP Member***"); SN EF UnSub Holdings, LLC, a Delaware limited liability company ("***Common Unit Purchaser***"); SN EF UnSub, LP, a Delaware limited partnership (the "***Partnership***"); SN EF UnSub GP, LLC, a Delaware limited liability company and the general partner of the Partnership (the "***General Partner***"); Intrepid Private Equity V-A, LLC, a Delaware limited liability company ("***Intrepid***"); GSO ST Holdings Associates LLC, a Delaware limited liability company ("***GSO Associates***"); and GSO ST Holdings LP, a Delaware limited partnership ("***GSO Holdings***" and together with Intrepid, the "***Preferred Unit Purchasers***" and, collectively with GSO Associates and Intrepid, the "***Purchasers***"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in accordance with Article I.

**RECITALS:**

WHEREAS, on January 12, 2017, the Partnership entered into the APC/KM PSA as a Buyer Party, an executed copy of which APC/KM PSA is attached as Exhibit F hereto, pursuant to which the Partnership has agreed to purchase, and Anadarko has agreed to sell to the Partnership, the Acquired Properties;

WHEREAS, upon execution of the APC/KM PSA, Anadarko sent a Sale Notice to KNOC whereby KNOC will have thirty (30) days to elect to sell the KNOC Properties to the Buyer Parties under the same terms and conditions that Anadarko proposes to transfer the Acquired Properties under the APC/KM PSA;

WHEREAS, if KNOC elects to sell the KNOC Properties to the Buyer Parties pursuant to the terms included in the Sale Notice (the "***KNOC Election***"), then the Partnership and other Buyer Parties will execute a purchase agreement with KNOC pursuant to the terms of the Sale Notice, this Agreement and as otherwise agreed among the parties (such purchase agreement, if any, the "***KNOC PSA***");

WHEREAS, the Anadarko Closing (as defined below) and the KNOC Closing (as defined below) may occur on different days, provided that in such case the KNOC Closing shall not occur unless the Anadarko Closing has previously occurred ("***Separate Closings***"), or on the same day (a "***Dual Closing***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing, the Partnership will issue to the Common Unit Purchaser 100,000 newly issued Common Units in consideration for a contribution of $100,000,000.00 (the "***Common Unit Funding Amount***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing and, if applicable, the KNOC Closing, GSO Holdings has committed to contribute to the Partnership in the aggregate up to $800,000,000.00 (the "***Preferred Unit GSO Commitment Amount***"), with the actual amount to be contributed by GSO Holdings at the Anadarko Closing (whether it occurs in a Separate Closing or as part of a Dual Closing) to be set forth in the Closing Notice, provided that if the Anadarko Closing occurs in a Separate Closing the amount to be contributed by GSO Holdings shall be $500.0 million (the actual amount so contributed at the Anadarko Closing and less the amount of the Intrepid Contribution, if any, the "***Preferred Unit Anadarko Funding Amount***") and, if applicable, the actual amount (which shall be determined by SN but shall not be less than $200.0 million and not greater than $300.0 million) to be contributed by GSO Holdings at the KNOC Closing (whether it occurs in a Separate Closing or as part of a Dual Closing) to be set forth (i) in the Closing Notice if a Dual Closing is to occur and (ii) in the Supplemental Closing Notice if Separate Closings will occur (the

"***Preferred Unit KNOC Funding Amount***" and, together with the "***Preferred Unit Anadarko Funding Amount***", the "***Preferred Funding Amounts***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing, Intrepid has committed to contribute to the Partnership an amount equal to $15,000,000 (the "***Intrepid Contribution***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, (i) at the Anadarko Closing, the Partnership will issue to (A) GSO Holdings, a number of newly issued Preferred Units equal to the Preferred Unit Anadarko Funding Amount divided by the Preferred Unit Purchase Price and (B) Intrepid a number of newly issued Preferred Units equal to the Intrepid Contribution divided by the Preferred Unit Purchase Price and (ii) if applicable, at the KNOC Closing, the Partnership will issue to GSO Holdings a number of newly issued Preferred Units equal to the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price;

WHEREAS, in accordance with this Agreement and the Partnership Agreement, the Partnership will utilize the Common Unit Funding Amount, Preferred Funding Amounts and the Intrepid Contribution, together with the proceeds of the Credit Facility and Senior Debt drawn at the Preferred Unit Closings, to (i) pay to Anadarko consideration for the sale by Anadarko to the Partnership of the Acquired Properties pursuant to the APC/KM PSA, (ii) if applicable, pay to KNOC consideration for the sale by KNOC to the Partnership of the KNOC Properties pursuant to the KNOC PSA and (iii) the payment of certain fees and expenses as provided herein;

WHEREAS, concurrently with the execution of the APC/KM PSA, the Partnership, SN and SN Maverick entered into the SN Letter Agreement, an executed copy of which is attached hereto as Exhibit N, and concurrently with the execution and delivery of the Original SPA (as defined herein) the Partnership and SN Maverick entered into the Hydrocarbons Marketing Agreement (as defined herein) an executed copy of which is attached hereto as Exhibit G;

WHEREAS, at the Anadarko Closing, the Partnership will enter into the Management Services Agreement and the Joint Development Agreement, which agreements will be in the form of Exhibit D and Exhibit E hereto, respectively;

WHEREAS, as partial consideration for the commitment by GSO Holdings to contribute the Preferred Unit Anadarko Funding Amount and the Preferred Unit KNOC Funding Amount to the Partnership pursuant to this Agreement, SN has agreed, on the terms and subject to the conditions set forth in this Agreement and in the GSO Warrant Agreement, that at the Anadarko Closing, SN will issue to GSO Holdings the GSO Allocated Shares and the Warrants, which Warrants shall be issued pursuant to the GSO Warrant Agreement in the form attached as Exhibit C-1;

WHEREAS, GSO Holdings has directed SN to issue at the Anadarko Closing the GSO Allocated Shares and the Warrants included in the GSO Warrant Agreement to the funds managed by GSO that are identified in Exhibit M in the proportions set forth in Exhibit M (collectively, the "***GSO Funds***");

WHEREAS, as partial consideration for the obligation of Intrepid to contribute the Intrepid Contribution to the Partnership pursuant to this Agreement, SN has agreed, on the terms and subject to the conditions set forth in this Agreement and in the Intrepid Warrant Agreement, that at the Anadarko Closing, SN will issue to Intrepid the Intrepid Allocated Shares and the Warrants included in the Intrepid Warrant Agreement, which shall be in the form attached as Exhibit C-2;

WHEREAS, at the Anadarko Closing SN and the GSO Funds will enter into the GSO Registration Rights Agreement in the form attached as Exhibit H-1, and SN and Intrepid will enter into the Intrepid Registration

Rights Agreement in the form attached as Exhibit H-2, in each case relating to the registration of the SN Common Stock to be issued to the GSO Funds and Intrepid at the Anadarko Closing and the SN Common Stock subject to issuance upon exercise of the applicable Warrants;

WHEREAS, as a condition to and inducement for the SN Parties to enter into the Original SPA, contemporaneously with the execution of the Original SPA, the GSO Funds executed and delivered to the Partnership and SN two equity commitment letters, enforceable by SN and the Partnership, with respect to certain of GSO Holdings' obligations hereunder, copies of which are attached hereto as Exhibits J-1 and J-2 (the "***Equity Commitment Letters***");

WHEREAS, the parties hereto intend that the General Partner and the Partnership shall constitute bankruptcy remote, non-guarantor, unrestricted special purpose Subsidiaries of SN; and

WHEREAS, the parties hereto desire to amend and restate the original Securities and Purchase Agreement executed by and among SN, SN GP Member, Common Unit Purchaser, the Partnership, the General Partner, GSO Associates and GSO Holdings on January 12, 2017 ("***Original SPA***") in its entirety (including the Exhibits and Schedules thereto) to give effect to the foregoing and to the other agreements as further set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby amend and restate the Original SPA in its entirety and agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Definitions. As used in this Agreement, the following terms have the meanings indicated:

"***Acquired Properties***" means the properties, assets and rights to be acquired, directly or indirectly, by the Partnership from Anadarko at the Closing (as such term is defined in the APC/KM PSA) pursuant to the "UnSub Assignment" (as such term is defined in the APC/KM PSA) in the form attached as Exhibit C-2 to the APC/KM PSA.

"***Affiliate***" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For purposes of this Agreement, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P. shall constitute an Affiliate of GSO, and (ii) none of GSO or its Affiliates or any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates shall constitute an Affiliate of the Partnership or the General Partner.

"***Agreement***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Anadarko***" means Anadarko Onshore and Kerr-McGee Oil and Gas Onshore LP, a Delaware limited partnership.

"***Anadarko Closing***" means the issuance and sale of the Common Units and the Preferred Units to the Common Unit Purchaser and the Preferred Unit Purchasers, respectively, in consideration for the Common Unit

Funding Amount, the Preferred Unit Anadarko Funding Amount and Intrepid Contribution, respectively, in accordance with Section 2.01(a).

"***Anadarko Closing Date***" means the date that is the "Closing Date", as such term is defined in the APC/KM PSA.

"***Anadarko Onshore***" means Anadarko E&P Onshore LLC, a Delaware limited liability company.

"***APC/KM PSA***" means that certain Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN Maverick, the Partnership and Blackstone Newco, dated January 12, 2017, an executed copy of which is attached as Exhibit F hereto.

"***Basic Documents***" means, collectively, this Agreement, the Partnership Agreement, the GP LLC Agreement, the APC/KM PSA, the KNOC PSA if such document is executed, the Management Services Agreement, the Joint Development Agreement, the Hydrocarbons Marketing Agreement, the GSO Warrant Agreement, the Intrepid Warrant Agreement, the GSO Registration Rights Agreement, the Intrepid Registration Rights Agreement, the Equity Commitment Letters, the SN Letter Agreement, the definitive documents relating to the Credit Facility and the Senior Debt, if any, the GSO Voting Agreement, the GSO Non-Solicitation Agreement, the Intrepid Non-Solicitation Agreement and the Drilling Commitment Agreement.

"***Blackstone***" means The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.

"***Blackstone Newco***" means Gavilan Resources, LLC, a Delaware limited liability company.

"***Business Day***" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"***Buyer Party***" and "***Buyer Parties***" have the meaning set forth in the APC/KM PSA.

"***Citi***" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America Inc. and/or any of their Affiliates.

"***Class A Common Interests***" has the meaning assigned to such term in Section 2.01(b).

"***Class B Common Interests***" has the meaning assigned to such term in Section 2.01(b).

"***Closing Notice***" means a written notice prepared and delivered by SN to GSO Holdings not less than thirteen (13) Business Days prior to the Anadarko Closing Date, which notice shall specify (i) if there will be Separate Closings, the Preferred Unit Anadarko Funding Amount in the Anadarko Closing that occurs in a Separate Closing (which amount shall be $500.0 million) and shall include wiring instructions for receipt of such Preferred Unit Anadarko Funding Amount and (ii) if there will be a Dual Closing, the Preferred Unit Anadarko Funding Amount in such Dual Closing and the Preferred Unit KNOC Funding Amount in such Dual Closing (which combined amount shall be determined by SN, but shall not exceed $800.0 million and shall not be less than $700.0 million) and shall include wiring instructions for receipt of the Preferred Unit Anadarko Funding Amount and the Preferred Unit KNOC Funding Amount, and in all cases, the Closing Notice shall be subject to deemed adjustment with respect to any Initial Debt Replacement Units in accordance with Section 2.01(c). If there will be a Dual Closing, the Anadarko Closing Date and the KNOC Closing Date will occur on the same day.

"***Commission***" means the United States Securities and Exchange Commission.

"***Commitment Fee***" means a fee payable by SN to GSO Holdings as of the date of the Original SPA in immediately available funds accordance with Section 2.04(a)(vii) of the Original SPA, which Commitment Fee shall be in an amount equal to $20.0 million.

"***Common Indemnified Parties***" has the meaning specified in Section 6.01(b).

"***Common Unit Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Common Unit Purchaser***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Common Units***" means the "Common Units" as such term is defined in the Partnership Agreement.

"***Contract***" means any contract, agreement, indenture, note, bond, mortgage, deed of trust, loan, instrument, lease, license, commitment or other arrangement, understanding, undertaking, commitment or obligation, whether written or oral.

"***Control***" has the meaning set forth in the Partnership Agreement.

"***Credit Facility***" means the up to $500.0 million senior secured first lien reserve based revolving credit facility among the Partnership, as borrower, and J.P. Morgan and Citi, as joint lead arrangers and joint book runners, J.P. Morgan as administrative agent, and J.P. Morgan, Citi and the syndicate of banks and financial institutions named therein as the lenders; *provided*, *however*, that if J.P. Morgan and Citi are unable to fully syndicate such facility, SN may in its discretion reduce, but subject to the rights of GSO Holdings set forth in Section 2.01(c), the amount of such credit facility by up to $300.0 million in the aggregate (the "***Facility Reduction Amount***") and incur Senior Debt in an amount up to such reduction.

"***Damages***" means losses, judgments, liabilities, damages and fines and all reasonable costs, fees, outlays, expenses, expenditures and disbursements of every nature (including costs of investigation and fees and expenses of attorneys, accountants, consultants, expert witnesses and other witnesses).

"***Delaware Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as amended from time to time, and any successor to the Delaware Act.

"***Deposit***" has the meaning set forth in the APC/KM PSA.

"***Drilling Commitment Agreement***" means the Development Agreement to be entered into at the Anadarko Closing (whether it occurs in a Separate Closing or at the Dual Closing), by and among Anadarko, SN Maverick, the Partnership and Blackstone Newco, and, solely for the purpose specified therein, SN, the form of which is attached as Exhibit N to the APC/KM PSA.

"***DRULPA***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C §17-101 et seq. as amended from time to time and any successor to DRULPA.

"***Dual Closing***" has the meaning specified in the recitals of this Agreement.

"***Effective Date***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Equity Commitment Letters***" has the meaning set forth in the recitals.

"***Equity Interests***" means (i) equity interests (including capital stock, membership interests and partnership interests) of any applicable Person, (ii) obligations, evidences of indebtedness or other securities or

interests convertible or exchangeable into equity interests, and (iii) warrants, options or other rights to purchase or otherwise acquire or receive equity interests.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Facility Reduction Amount***" has the meaning set forth in the definition of the term "Credit Facility".

"***Fee Letter***" means that certain Project Lightning Fee Letter, dated January 12, 2017, among J.P. Morgan, Citi and the Partnership.

"***Final Availability Cushion***" has the meaning assigned to such term in Section 2.02(b).

"***Final Debt Replacement Election***" has the meaning assigned to such term in Section 2.02(b).

"***Final Debt Replacement Units***" has the meaning assigned to such term in Section 2.02(b).

"***Final Non-Syndicated Debt***" has the meaning set forth in Section 2.02(b).

"***Fundamental Representations***" means those representations and warranties set forth in Sections 3.01, 3.02, 3.03, 3.04, 3.05 (solely as such representation relates to the absence of proceedings as of the Effective Date), 3.06, 3.09, 3.10, 3.13, 4.01, 4.02, 5.01, 5.02, 5.03, 5.06, 5.09, 5.10, 5.12 (solely as such representation relates to the absence of proceedings as of the Effective Date) and 5.14.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Governmental Authority***" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"***GP LLC Agreement***" means the Amended and Restated Limited Liability Company Operating Agreement of the General Partner in the form attached as Exhibit B hereto.

"***GSO***" means GSO Capital Partners LP, a Delaware limited partnership.

"***GSO Allocated Shares***" means the 1,455,000 shares of SN Common Stock to be issued by SN to the GSO Funds at the Anadarko Closing, such number of shares subject to adjustment in accordance with the last sentence of Section 6.01(b).

"***GSO Associates***" has the meaning set forth in the introductory paragraph to this Agreement.

"***GSO Funds***" has the meaning set forth in the recitals.

"***GSO Holdings***" has the meaning set forth in the introductory paragraph to this Agreement.

"***GSO Non-Solicitation Agreement***" means the Non-Solicitation Agreement to be entered into at the Anadarko Closing by and among SN, SOG and GSO, substantially in the form attached as Exhibit K-1 hereto.

"***GSO Registration Rights Agreement***" means the Registration Rights Agreement to be entered into at the Anadarko Closing between SN and the GSO Funds, substantially in the form attached as Exhibit H-1 hereto.

"***GSO Voting Agreement***" means the Voting and Standstill Agreement, executed on February 6, 2017 by and between the GSO Funds and SN, attached as Exhibit L hereto.

"***GSO Warrant Agreement***" means the Warrant Agreement to be entered into at the Anadarko Closing between the GSO Funds and SN, substantially in the form attached as Exhibit C-1 hereto.

"***Hydrocarbon Marketing Agreement***" means the Hydrocarbons Purchase and Marketing Agreement entered into on January 12, 2017 between SN Maverick and the Partnership attached as Exhibit G hereto.

"***Indebtedness***" means, with respect to any specified Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for a deferred purchase price (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person under capital leases, (e) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, regardless of whether drawn, (f) all obligations of such Person created or arising under any conditional sale or title retention agreement, (g) the liquidation value or redemption price, as the case may be, of all preferred or redeemable stock of such Person, (h) all net obligations of such Person payable under any rate, currency, commodity or other swap, option or derivative agreement, (i) all obligations secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person, regardless of whether such Person has assumed or become liable for the payment of such obligation and (j) all obligations of others guaranteed by such Person.

"***Indemnified Party***" has the meaning specified in Section 6.02(a).

"***Indemnifying Party***" has the meaning specified in Section 6.02(a).

"***Initial Availability Cushion***" has the meaning assigned to such term in Section 2.01(c).

"***Initial Debt Replacement Election***" has the meaning assigned to such term in Section 2.01(c).

"***Initial Debt Replacement Units***" has the meaning assigned to such term in Section 2.01(c).

"***Intrepid***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Intrepid Allocated Shares***" means the 45,000 shares of SN Common Stock to be issued by SN to Intrepid at the Anadarko Closing, such number of shares subject to adjustment in accordance with the last sentence of Section 6.01(b).

"***Intrepid Contribution***" has the meaning specified in the recitals of this Agreement.

"***Intrepid Non-Solicitation Agreement***" means the Non-Solicitation Agreement to be entered into at the Anadarko Closing by and among SN, SOG and Intrepid, substantially in the form attached as Exhibit K-2 hereto.

"***Intrepid Registration Rights Agreement***" means the Registration Rights Agreement to be entered into at the Anadarko Closing between SN and Intrepid, substantially in the form attached as Exhibit H-2 hereto.

"***Intrepid Warrant Agreement***" means the Warrant Agreement to be entered into at the Anadarko Closing between the Intrepid and SN, substantially in the form attached as Exhibit C-2 hereto.

"***Joint Development Agreement***" means the Joint Development Agreement to be entered into between the Partnership, Blackstone Newco and SN Maverick substantially in the form attached as Exhibit D hereto.

"***J.P. Morgan***" means J.P. Morgan Chase Bank, N.A.

"***KNOC***" means Eagle Ford TX LP, a Texas limited partnership.

"***KNOC Closing***" means the issuance and sale of the KNOC Preferred Units to GSO Holdings and, if Intrepid elects to participate in accordance with the terms hereof, Intrepid in consideration for the Preferred Unit KNOC Funding Amount in accordance with Section 2.02(a); provided, however, that in no event will the KNOC Closing occur unless the Anadarko Closing has previously occurred or occurs concurrently with the KNOC Closing.

"***KNOC Closing Date***" means, the day upon which closing occurs pursuant to the KNOC PSA, which date shall occur (i) on the day of the Anadarko Closing if a Dual Closing occurs or (ii) on a date after the Anadarko Closing has occurred if the KNOC Closing occurs in a Separate Closing.

"***KNOC Election***" has the meaning set forth in the recitals.

"***KNOC Participation Agreement***" means that certain Maverick Basin Area Participation Agreement, dated March 17, 2011, by and among Anadarko and KNOC.

"***KNOC Properties***" means KNOC's pro rata share of the Interests (as defined in the KNOC Participation Agreement).

"***KNOC PSA***" has the meaning set forth in the recitals.

"***Knowledge of SN***" means the actual knowledge, after due inquiry, of any of Antonio R. Sanchez, III, Eduardo A. Sanchez, Patricio D. Sanchez and Cameron W. George.

"***Law***" means any federal, state, local or foreign order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"***Lien***" means any mortgage, claim, encumbrance, pledge, lien (statutory or otherwise), security agreement, conditional sale or trust receipt or a lease, consignment or bailment, preference or priority, assessment, deed of trust, charge, easement, servitude or other encumbrance upon or with respect to any property of any kind.

"***Management Services Agreement***" means the Management Services Agreement to be entered into at the Anadarko Closing by and between the Partnership and SOG, substantially in the form attached hereto as Exhibit D.

"***Non-Syndicated Debt***" has the meaning set forth in Section 2.01(c).

"***NYSE***" has the meaning assigned to such term in Section 5.07.

"***Original SPA***" has the meaning specified in the recitals of this Agreement.

"***Partnership***" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Partnership Agreement***" means the Amended and Restated Agreement of Limited Partnership of the Partnership to be entered into at the Anadarko Closing by and among the General Partner, Common Unit Purchaser and the Preferred Unit Purchasers, substantially in the form attached as Exhibit A hereto.

"***Permits***" means any approvals, authorizations, consents, licenses, permits, variances, waivers, grants, franchises, concessions, exemptions, orders, registrations or certificates of a Governmental Authority.

"***Person***" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Authority.

"***Preferred Funding Amounts***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Anadarko Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Closings***" means the Anadarko Closing and the KNOC Closing.

"***Preferred Unit GSO Commitment Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit KNOC Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Purchase Price***" means a cash purchase price of $1,000 per Preferred Unit.

"***Preferred Unit Purchasers***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Preferred Units***" means "Preferred Units", as defined in the Partnership Agreement.

"***Purchased Preferred Units***" means those Preferred Units purchased by the Preferred Unit Purchasers in accordance with Section 2.01(a) and, if applicable, Section 2.02(a).

"***Purchaser Indemnified Parties***" has the meaning specified in Section 6.01(a).

"***Purchasers***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Restricted Subsidiary***" has the meaning assigned to such term in the SN Credit Agreement, or in any indenture or other agreement pertaining to indebtedness of SN.

"***Rights***" has the meaning assigned to such term under the SN Rights Plan.

"***Sale Notice***" has the meaning assigned to such term under Section 22.2 of the KNOC Participation Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time, and the rules and regulations of the Commission promulgated thereunder.

"***Senior Debt***" means the senior credit facility (other than, for the avoidance of doubt, the Credit Facility) and/or securities or note issuance among the Partnership, as borrower or issuer, J.P. Morgan and Citi as joint lead arrangers and joint book runners (or other equivalent roles), J.P. Morgan as administrative agent (or equivalent role) and J.P. Morgan, Citi and the syndicate of banks and the financial institutions as the lenders or holders in an original principal amount up to $300 million, but in no event shall the original principal amount of the Senior Debt exceed the Facility Reduction Amount.

"***Separate Closings***" has the meaning specified in the recitals of this Agreement.

"***SN***" has the meaning set forth in the introductory paragraph to this Agreement.

"***SN Common Stock***" means the common stock, par value $0.01 per share of SN. For purposes of this Agreement, references to a share or shares of SN Common Stock shall be deemed to include the Right(s)

associated with such share or shares that are issued pursuant to the SN Rights Plan or any similar successor plan hereafter adopted by SN.

"***SN Credit Agreement***" means the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy Corporation, Royal Bank of Canada, as Administrative Agent, and the lenders party thereto, as amended, restated, modified, renewed, refunded, replaced or refinanced from time to time.

"***SN GP Member***" has the meaning set forth in the introductory paragraph to this Agreement.

"***SN Letter Agreement***" means that certain Letter Agreement, dated as of January 12, 2017, by and among SN, SN Maverick and the Partnership, attached as Exhibit P hereto.

"***SN Maverick***" means SN EF Maverick, LLC, a Delaware limited liability company.

"***SN Parties***" means SN, SN GP Member, the General Partner, the Partnership and the Common Unit Purchaser.

"***SN Rights Plan***" means that certain Rights Agreement, dated as of July 28, 2015, between SN and Continental Stock Transfer & Trust Company, as rights agent, including the exhibits attached thereto, as such rights agreement may be amended, modified or supplemented from time to time.

"***SOG***" means Sanchez Oil & Gas Corporation, a Delaware corporation.

"***Springfield Gathering Agreements***" means (a) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield Pipeline LLC, a Texas limited liability company ("***Springfield***"), and SN and (b) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and SN, in each case to be entered into upon termination of the Marketing Transition Services Agreement pursuant to the APC/KM PSA.

"***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership interests, partnership interests or other similar ownership interests thereof with voting rights is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of the limited liability company, partnership, association or other business entity gains or losses or shall be or Control, directly or indirectly, the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.

"***Supplemental Closing Notice***" means a written notice prepared and delivered by SN to GSO Holdings not less than thirteen (13) Business Days prior to the KNOC Closing Date that will occur in a Separate Closing, which notice shall specify the Preferred Unit KNOC Funding Amount (which amount shall be determined by SN, but shall not exceed $300.0 million and shall not be less than $200.0 million, such amount not in duplication of any amounts funded at the Anadarko Closing that has or, prior to the KNOC Closing, will occur in a Separate Closing), which Supplemental Closing Notice shall be subject to deemed adjustment with respect to any Final Debt Replacement Units in accordance with Section 2.02(b); *provided that* such written notice shall only be

delivered if Separate Closings will occur. A Supplemental Closing Notice may be only be delivered by SN to GSO Holdings if a Closing Notice for the Anadarko Closing that will occur in a Separate Closing has previously been delivered by SN to GSO Holdings.

"***Third Party Claim***" has the meaning specified in Section 6.02(b).

"***Unrestricted Subsidiary***" has the meaning assigned to such term in the SN Credit Agreement, or in any indenture or other agreement pertaining to Indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries).

"***Warrants***" means the Warrants issued in accordance with the GSO Warrant Agreement and the Intrepid Warrant Agreement, as applicable.

## ARTICLE II
## AGREEMENT TO SELL AND PURCHASE

Section 2.01 Anadarko Commitment and Related Matters.

(a) At, or prior to, the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, (i) GSO Holdings shall contribute and fund to the Partnership by wire transfer of immediately available funds the Preferred Unit Anadarko Funding Amount, (ii) Intrepid shall contribute and fund to the Partnership by wire transfer of immediately available funds the Intrepid Contribution and (iii) the Common Unit Purchaser shall contribute and fund to the Partnership by wire transfer of immediately available funds the Common Unit Funding Amount. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and Common Unit Funding Amount shall be paid by wire transfer of immediately available funds to an account of the Partnership designated in writing by SN in the Closing Notice; *provided that*, the Intrepid Contribution may be paid by Intrepid by wire transfer of immediately available funds to an account of GSO Holdings designated in writing by GSO Holdings to Intrepid at or contemporaneously with the Anadarko Closing and such payment shall be, upon GSO Holdings' contribution thereof to the Partnership, deemed a contribution of the Intrepid Contribution by Intrepid to the Partnership, in consideration for the issuance by the Partnership (x) to the Common Unit Purchaser 100,000 Common Units, (y) to Intrepid a number of Preferred Units equal to the Intrepid Contribution divided by the Preferred Unit Purchase Price and (z) subject to increase in accordance with Section 2.01(c), to GSO Holdings a number of Preferred Units equal to the Preferred Unit Anadarko Funding Amount divided by the Preferred Unit Purchase Price. Each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and the Common Unit Funding Amount shall be used, together with the proceeds of the Senior Debt, if any, and drawings on the Credit Facility as of the Anadarko Closing, to fund the portion of the "Purchase Price" (as defined in the APC/KM PSA) attributable to the Acquired Properties, with any excess funds being retained by the Partnership for its general business purposes and reimbursement of the Purchasers' expenses to the extent required under the Basic Documents.

(b) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, (i) GSO Associates and SN GP Member shall each make the applicable nominal contribution to the General Partner set forth in the GP LLC Agreement and (ii) the General Partner shall issue to the SN GP Member 99 Class A common membership interest (the "***Class A Common Interests***") and to GSO Associates 1 Class B common membership interest (the "***Class B Common Interest***"). Funds contributed to the General Partner pursuant to this Section 2.01(b) shall be paid by wire transfer of immediately available funds to an account designated by the General Partner pursuant to a written notice



008223

delivered to SN GP Member and GSO Associates no later than two (2) Business Days before the Anadarko Closing.

(c) Notwithstanding anything to the contrary contained herein, not less than thirteen (13) Business Days prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall notify GSO Holdings whether (i)(a) it intends to cause the Partnership to incur any Senior Debt on the day of the Anadarko Closing or (b) if the lenders to the Credit Facility have not achieved a "Successful Syndication" (as such term is defined in the Fee Letter) and the maximum size of the "Demand Facility" (as such term is defined in the Fee Letter) that may be requested by the lenders pursuant to a "Term Loan" (as such term is defined in the Fee Letter) (the "***Non-Syndicated Debt***"), or (ii) if the availability under the Credit Facility will be less than (A) $65.0 million immediately following the Anadarko Closing if Separate Closings will occur or (B) $100.0 million immediately following the Dual Closings if a Dual Closing will occur (such shortfall in clause (ii)(A) or (ii)(B), the "***Initial Availability Cushion***"), and following delivery of such notification GSO Holdings may elect within seven (7) Business Days thereafter to, in its sole discretion by written notice provided to SN (any such election, a "***Initial Debt Replacement Election***"), irrevocably commit in writing to purchase on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) an additional number of Preferred Units equal to (i) to the extent applicable (a) all or part of the Senior Debt proposed to be incurred by the Partnership on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), and/or (b) all or a part of the Initial Availability Cushion and/or (c) the Non-Syndicated Debt, divided by (ii) the Preferred Unit Purchase Price (such number of additional Preferred Units, the "***Initial Debt Replacement Units***"). Following receipt of a timely Initial Debt Replacement Election and in accordance with such election, on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), (i) the Partnership shall not incur to the extent applicable (x) the portion of the proposed Senior Debt corresponding to the portion of the proposed Senior Debt to be funded by GSO Holdings as set forth in the Initial Debt Replacement Election and/or (y) borrowings under the Credit Facility in an amount corresponding to the portion of the Initial Availability Cushion to be funded by GSO Holdings as set forth in the Initial Debt Replacement Election and/or (z) the Non-Syndicated Debt, (ii) GSO Holdings shall purchase the Initial Debt Replacement Units, (iii) the maximum number of Preferred Units authorized to be issued by the Partnership shall be increased by the Initial Debt Replacement Units, (iv) the Preferred Unit Anadarko Funding Amount shall automatically be increased by the product of (A) the Initial Debt Replacement Units to be purchased by GSO Holdings at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and (B) the Preferred Unit Purchase Price and (v) the number of Preferred Units to be issued at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) to GSO Holdings shall be increased by the Initial Debt Replacement Units purchased on the day of the Anadarko Closing. In addition, at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall pay to GSO Holdings a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Initial Debt Replacement Units actually purchased by GSO Holdings at the Anadarko Closing. If GSO Holdings delivers to SN an Initial Debt Replacement Election, it shall furnish a copy of same to Intrepid and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the Initial Debt Replacement Election, to elect to pay to the Partnership at the Anadarko Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the product of the Preferred Unit Purchase Price and the number of Initial Debt Replacement Units and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the Anadarko Closing an additional number of Preferred Units equal to three percent (3.0%) of the number of Initial Debt Replacement Units and to GSO Holdings ninety-seven percent (97.0%) of the number of Initial Debt Replacement Units; *provided, however*, that if Intrepid does not elect to participate in such Initial Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement. In addition, at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall pay to Intrepid a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Initial Debt Replacement Units actually purchased by Intrepid at the Anadarko Closing.

(d) Not less than thirteen (13) Business Days prior to the Anadarko Closing Date, SN shall provide, based upon information available to them at such time, notice to GSO Holdings in writing of the proposed key terms of the Credit Facility and Senior Debt, if any Senior Debt is contemplated. In addition, SN and the Partnership shall, and the Common Unit Purchaser shall cause the Partnership to, keep GSO Holdings reasonably apprised of the expected Anadarko Closing Date and apprised of whether the Anadarko Closing is expected to occur on the same day as the KNOC Closing, and shall use their commercially reasonable efforts (based upon information available to them) (i) to notify GSO Holdings not later than thirteen (13) Business Days prior to the Anadarko Closing Date, ***provided*** that, any failure to so notify GSO Holdings shall not limit GSO Holding's obligations hereunder, including with respect to funding the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and (ii) to deliver the Closing Notice to GSO Holdings not later than thirteen (13) Business Days prior to the Anadarko Closing Date, which Closing Notice shall be prepared by SN.

(e) SN will use its commercially reasonable efforts if the KNOC Election is timely made to cause the Anadarko Closing and the KNOC Closing to occur at the Dual Closing; provided that SN shall have no liability to any Person if the Anadarko Closing and the KNOC Closing do not occur on the same day.

Section 2.02 Anadarko Related Commitment and Related Matters.

(a) SN shall promptly deliver to GSO Holdings a copy of the KNOC Election upon SN's receipt of same. At the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, on the terms and subject to the conditions set forth in this Agreement, GSO Holdings shall contribute and fund to the Partnership by wire transfer of immediately available funds the Preferred Unit KNOC Funding Amount in consideration for the issuance by the Partnership to GSO Holdings of a number of Preferred Units equal to the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price. Funds contributed to the Partnership pursuant to this Section 2.02(a) shall be paid by wire transfer of immediately available funds to an account designated by the General Partner pursuant to a written notice delivered to GSO Holdings no later than two (2) Business Days before the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing). If the KNOC Election is made, GSO Holdings shall promptly furnish a copy of same to Intrepid after GSO Holdings receives same from SN and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the copy of such KNOC Election, to elect to pay to the Partnership at the KNOC Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the Preferred Unit KNOC Funding Amount and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the KNOC Closing an additional number of Preferred Units equal to three percent (3.0%) of the quotient of the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price and to GSO Holdings ninety-seven percent (97.0%) of the quotient of the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price; provided, however, that if Intrepid does not elect to participate in such Final Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement.

(b) Notwithstanding anything to the contrary contained herein, but only if the KNOC Closing will occur in a Separate Closing, not less than thirteen (13) Business Days prior to the KNOC Closing that will occur in a Separate Closing, if such closing is to occur, SN shall notify GSO Holdings whether (i)(a) it intends to cause the Partnership to incur any Senior Debt at the KNOC Closing or (b) if the lenders to the Credit Facility have not achieved a "Successful Syndication" (as such term is defined in the Fee Letter) and the maximum size of the "Demand Facility" (as such term is defined in the Fee Letter) that may be requested by the lenders pursuant to a "Term Loan" (as such term is defined in the Fee Letter) (the "***Final Non-Syndicated Debt***") or (ii) if the availability under the Credit Facility will be less than $100.0 million at the KNOC Closing (such shortfall, the "***Final Availability Cushion***"), and following delivery of such notification GSO Holdings may elect within seven (7) Business Days thereafter to, in its sole discretion by written notice provided to SN (any such election, a "***Final Debt Replacement Election***"), irrevocably commit in writing to purchase at the KNOC Closing an additional

number of Preferred Units equal to (i) to the extent applicable (a) all or part of the Senior Debt proposed to be incurred by the Partnership, and/or (b) all or a part of the Final Availability Cushion and/or (c) the Final Non-Syndicated Debt, divided by (ii) the Preferred Unit Purchase Price (such number of additional Preferred Units, the "***Final Debt Replacement Units***"). Following receipt of a timely Final Debt Replacement Election and in accordance with such election, at the KNOC Closing that will occur in a Separate Closing, (i) the Partnership shall not incur to the extent applicable (x) the portion of the proposed Senior Debt corresponding to the portion of the proposed Senior Debt to be funded by GSO Holdings as set forth in the Final Debt Replacement Election and/or (y) borrowings under the Credit Facility in an amount corresponding to the portion of the Final Availability Cushion to be funded by GSO Holdings as set forth in the Final Debt Replacement Election and/or (z) the Final Non-Syndicated Debt, (ii) GSO Holdings shall purchase on the day of the KNOC Closing that will occur in a Separate Closing, the Final Debt Replacement Units, (iii) the maximum number of Preferred Units authorized to be issued by the Partnership shall be increased on the day of the KNOC Closing that will occur in a Separate Closing, by the Final Debt Replacement Units, (iv) the Preferred Unit KNOC Funding Amount shall automatically be increased on the day of the KNOC Closing that will occur in a Separate Closing, by the product of (A) the Final Debt Replacement Units to be purchased by GSO Holdings at the KNOC Closing and (B) the Preferred Unit Purchase Price and (v) the number of Preferred Units to be issued at the KNOC Closing that will occur in a Separate Closing, to GSO Holdings shall be increased by the Final Debt Replacement Units. In addition, if there are Separate Closings, then at the KNOC Closing that will occur in a Separate Closing, if such closing occurs, SN shall pay to GSO Holdings a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Final Debt Replacement Units actually purchased by GSO Holdings at the KNOC Closing. If GSO Holdings delivers to SN an Final Debt Replacement Election, it shall furnish a copy of same to Intrepid and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the Final Debt Replacement Election, to elect to pay to the Partnership at the KNOC Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the product of the Preferred Unit Purchase Price and the number of Final Debt Replacement Units and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the KNOC Closing an additional number of Preferred Units equal to three percent (3.0%) of the number of Final Debt Replacement Units and to GSO Holdings ninety-seven percent (97.0%) of the number of Final Debt Replacement Units; provided, however, that if Intrepid does not elect to participate in such Final Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement.

(c) SN will, or will cause its Affiliates to, promptly provide GSO Holdings with copies of all notices provided to and received from KNOC regarding its response to the Sale Notice sent to KNOC by Anadarko on January 12, 2017. Additionally, SN will use commercially reasonable efforts to notify GSO Holdings within fifteen (15) days of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) if it anticipates that KNOC will exercise the KNOC Election. If KNOC makes the KNOC Election, SN will, or will cause its Affiliates to, keep GSO Holdings reasonably apprised of the expected KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing), and shall use their commercially reasonable efforts (based upon information available to them) (i) to notify GSO Holdings not later than thirteen (13) Business Days prior to the KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing), which notice may be combined with the notice provided in Section 2.01(d), *provided* that, any failure to so notify GSO Holdings shall not limit GSO Holding's obligations hereunder, including with respect to funding the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and (ii) to deliver the Supplemental Closing Notice to GSO Holdings not later than thirteen (13) Business Days prior to the KNOC Closing Date, which Supplemental Closing Notice shall be prepared by SN.

Section 2.03 Closing.

(a) On the terms and subject to the conditions hereof, the consummation of the funding of each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and the Common Unit Funding Amount shall take place on the Anadarko Closing Date (whether in a Separate Closing or as part of a Dual Closing) at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002, at the same time as the "Closing" (as such term is defined in the APC/KM PSA).

(b) If the KNOC Election occurs, then on the terms and subject to the conditions hereof, the consummation of the funding of the Preferred Unit KNOC Funding Amount shall take place on the KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing) at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002, at the same time as the closing under the KNOC PSA.

Section 2.04 Deliveries.

(a) Deliveries of SN Parties.

(i) On the Effective Date, SN shall deliver to the Purchasers counterparts of this Agreement, duly executed by the SN Parties;

(ii) On the date of the Original SPA, SN GP Member delivered to GSO Holdings and GSO Associates an executed copy of the limited liability company agreement of the General Partner, duly executed by the General Partner and SN GP Member;

(iii) On the date of the Original SPA, Common Unit Purchaser delivered to GSO Holdings and GSO Associates an executed copy of the agreement of limited partnership of the Partnership, duly executed by the General Partner and Common Unit Purchaser;

(iv) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a copy of the APC/KM PSA, duly executed by the parties thereto, including evidence that SN Maverick has paid the Deposit on behalf of SN Maverick and the Partnership;

(v) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a counterpart of (A) the SN Letter Agreement, duly executed by SN, SN Maverick and the Partnership, and (B) the Hydrocarbon Marketing Agreement, duly executed by SN Maverick and the Partnership;

(vi) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates copies of the duly executed commitments for the Credit Facility and the fee letter with respect to the Credit Facility providing the market "flex" provisions applicable to the Senior Debt;

(vii) On the date of the Original SPA, SN delivered payment to GSO Holdings of the Commitment Fee; and

(viii) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a copy of the Sale Notice furnished to KNOC.

(b) Deliveries by Purchasers.

(i) On the Effective Date, the Purchasers shall each deliver a counterpart of this Agreement duly executed by each of the Purchasers to the SN Parties; and

(ii) On the date of the Original SPA, GSO Holdings delivered copies of each of the Equity Commitment Letters, duly executed by GSO or the GSO Funds, as applicable, to SN and the Partnership.

Section 2.05 Deliveries Upon Execution of KNOC PSA. Promptly following the execution of the KNOC PSA:

(a) SN will deliver or cause to be delivered to GSO Holdings a copy of the KNOC PSA (including all schedules, exhibits and annexes thereto), duly executed by the parties thereto; and

(b) GSO Holdings will deliver to SN an equity commitment letter in form and substance consistent in all material respects with the Equity Commitment Letter attached as Exhibit J-1 hereto with such changes as are appropriate to address (i) the commitment of the GSO Investors (as defined in such Equity Commitment Letter attached as Exhibit J-1 hereto) to fund to the Partnership the amount necessary for the Partnership to fund the Preferred Unit KNOC Funding Amount instead of the Preferred Unit Anadarko Funding Amount and (ii) in Section 2 of such equity commitment letter the conditions to the KNOC Closing instead of the Anadarko Closing as are addressed in Section 2 of the Equity Commitment Letter attached as Exhibit J-1 hereto; ***provided, that*** KNOC shall not be a third party beneficiary of such equity commitment letter unless specifically requested by KNOC.

Section 2.06 Deliveries Upon the Closings.

(a) Deliveries of SN - Anadarko Closing. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN will deliver or cause to be delivered:

(i) a counterpart of the GP LLC Agreement, duly executed by the SN GP Member and the General Partner, to the Purchasers;

(ii) a counterpart of the Partnership Agreement, duly executed by the Common Unit Purchaser and the General Partner, to the Purchasers;

(iii) a counterpart of each of the Management Services Agreement which shall be duly executed by SOG and the Partnership, the Joint Development Agreement, duly executed by SN Maverick, Blackstone Newco and the Partnership, and the Drilling Commitment Agreement, duly executed by the parties thereto, to the Purchasers;

(iv) the GSO Registration Rights Agreement, duly executed by SN, to GSO Holdings;

(v) the GSO Allocated Shares and a counterpart of the GSO Warrant Agreement, duly executed by SN, to GSO Holdings (which in accordance with the direction of GSO Holdings will be issued to the GSO Funds, but delivered at the Anadarko Closing to GSO Holdings on behalf of the GSO Funds);

(vi) fully executed copies of the definitive agreements for the Credit Facility and, if applicable, Senior Debt, subject to Section 2.01(c), to GSO Holdings and GSO Associates;

(vii) payment by SN to GSO Holdings of the fee due in accordance with the final sentence of Section 2.01(c) in respect of the Initial Debt Replacement Units to be issued and sold to GSO Holdings at the Anadarko Closing, if any, by wire transfer of immediately available funds to an account specified by GSO Holdings not less than two (2) Business Days prior to the Anadarko Closing;

(viii) an opinion of (a) Kirkland & Ellis LLP, as counsel to SN addressing such matters set forth in substantially the same form attached hereto as Exhibit I-1 hereto and (b) Akin, Gump, Strauss, Hauer & Feld

LLP, as counsel to SN, addressing such matters set forth in substantially the same form attached hereto as Exhibit I-2, to GSO Holdings and GSO Associates;

(ix) a counterpart of the GSO Non-Solicitation Agreement, duly executed by SN and SOG

(x) the Intrepid Allocated Shares and a counterpart of the Intrepid Warrant Agreement, duly executed by SN, to Intrepid;

(xi) a counterpart of the Intrepid Non-Solicitation Agreement, duly executed by SN and SOG; and

(xii) a counterpart of the Intrepid Registration Rights Agreement, duly executed by SN, to Intrepid.

(b) Deliveries of Purchasers - Anadarko Closing. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the applicable Purchaser executing such document shall deliver to each SN Party, as applicable, the following:

(i) a counterpart of the GP LLC Agreement, duly executed by GSO Associates;

(ii) a counterpart of the Partnership Agreement, duly executed by GSO Holdings;

(iii) a counterpart of the GSO Warrant Agreement, duly executed by the GSO Funds;

(iv) a counterpart of the GSO Registration Rights Agreement, duly executed by the GSO Funds;

(v) a counterpart of the GSO Non-Solicitation Agreement; duly executed by GSO;

(vi) a counterpart of the Partnership Agreement, duly executed by Intrepid;

(vii) a counterpart of the Intrepid Warrant Agreement, duly executed by Intrepid;

(viii) a counterpart of the Intrepid Registration Rights Agreement, duly executed by Intrepid; and

(ix) a counterpart of the Intrepid Non-Solicitation Agreement; duly executed by GSO.

(c) Deliveries of SN Parties - KNOC Closing. At the KNOC Closing that occurs in a Separate Closing:

(i) SN shall deliver payment of the fee due in accordance with the final sentence of Section 2.02(b) in respect of the Final Debt Replacement Units to be issued and sold to GSO Holdings at the KNOC Closing that occurs in a Separate Closing, if any, by wire transfer of immediately available funds to an account specified by GSO Holdings not less than two (2) Business Days prior to the KNOC Closing.

(d) Delivery of Funds.

(i) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Holdings shall deliver the Preferred Unit Anadarko Funding Amount to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(ii) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), Intrepid shall deliver the Intrepid Contribution to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(iii) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Common Unit Purchaser shall deliver the Common Unit Funding Amount to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(iv) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Associates shall deliver to the General Partner such nominal amounts as set forth in the GP LLC Agreement pursuant to Section 2.01(b); and

(v) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the SN GP Member shall deliver to the General Partner such nominal amounts as set forth in the GP LLC Agreement pursuant to Section 2.01(b).

(vi) At the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, GSO Holdings shall deliver the Preferred Unit KNOC Funding Amount, if any, to the Partnership by wire transfer of immediately available funds pursuant to Section 2.02(b).

Section 2.07 Conditions of GSO Associates' and GSO Holdings' Obligations at the Closing. The obligations of GSO Holdings and/or GSO Associates to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(i) and Section 2.06(d)(iv) and, if applicable, the KNOC Closing pursuant to Section 2.06(d)(vi), and the obligations of GSO Holdings and GSO Associates to deliver the documents specified in Section 2.06(b), as applicable, are subject to the satisfaction (or waiver by GSO Holdings and GSO Associates) on or prior to the Anadarko Closing Date (whether in a Separate Closing or as part of a Dual Closing), and, as applicable, the KNOC Closing Date, of the following conditions:

(a) no statute, order, rule, decree or regulation has been entered by any Governmental Authority having jurisdiction over the parties hereto or the subject matter of this Agreement that restrains or prohibits the transactions contemplated by this Agreement and that remains in effect at the applicable Preferred Unit Closing and there shall not be pending any suit, action or proceeding by any Governmental Authority or other Person seeking to restrain, preclude, enjoin or prohibit the transactions contemplated by this Agreement;

(b) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous "Closing" (as such term is defined in the APC/KM PSA) and (ii) the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, the simultaneous consummation of the transactions contemplated by the KNOC PSA and the Anadarko Closing shall have occurred or in the case of a Dual Closing shall occur immediately before or concurrently with the KNOC Closing;

(c) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Partnership shall not have been assigned any interest under the Springfield Gathering Agreements, and SN and Anadarko shall have executed and delivered at the Anadarko Closing the Marketing Transition Services Agreement (as such term is defined in the APC/KM PSA) in accordance with the APC/KM PSA;

(d) all of (i) the Fundamental Representations of SN contained in Article III and Article V of this Agreement shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date), (ii) the representations and warranties of SN contained in Sections 3.08, 3.14 and 5.13 shall be true and correct in all material respects at and as of each of the Anadarko

Closing Date and KNOC Closing Date, and (iii) all of the other representations and warranties of SN contained in Article III and Article V of this Agreement not specified in clauses (i) or (ii) of this Section 2.07(d), excluding for purposes of this determination any qualification in such representations or warranties of materiality or material adverse effect therein (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date) shall be true and correct at and as of each of the Anadarko Closing Date and the KNOC Closing Date, as applicable, except where the failure of any such representations and warranties to be true and correct has not had, and is not reasonably likely to have, individually or in the aggregate, a material and adverse effect on the General Partner and the Partnership considered as a whole, or GSO Holdings;

(e) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding by the Common Unit Purchaser of the Common Unit Funding Amount;

(f) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the closings of the Credit Facility and, if applicable, the Senior Debt shall have occurred or shall occur simultaneous with such Anadarko Closing, and the Partnership shall have unused availability under the Credit Facility of not less than $100.0 million, *provided that*, if a KNOC Election is not made or the KNOC Closing will not occur in a Dual Closing, the Partnership shall have unused availability under the Credit Facility of not less than $65.0 million, in each case subject to Section 2.01(c);

(g) solely with respect to the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), the Partnership shall have unused availability under the Credit Facility of not less than $100.0 million;

(h) each of the SN Parties shall have performed in all material respects all of the covenants required to be performed by it hereunder at or prior to each of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), as applicable;

(i) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), if GSO Holdings together with any of its Affiliates is or would become an Acquiring Person (as defined in the SN Rights Plan) as of such Anadarko Closing (taking into account all SN Common Stock issuable upon exercise of the Warrants and any warrants issued to any Affiliate of GSO Holdings), then the Board of Directors shall have taken all actions necessary to cause the SN Rights Plan to be amended, in a form reasonably acceptable to SN and GSO Holdings, to provide that none of GSO Holdings or any of its Affiliates shall be deemed an Acquiring Person, by designating such Persons as an Exempt Person (as defined in the SN Rights Plan) or otherwise; *provided*, *however*, that SN shall be entitled to (i) place a limitation on the maximum percentage of shares beneficially owned (as defined in the SN Rights Plan) by GSO Holdings and any of its Affiliates so long as such limitation is a higher ownership percentage than is represented by the Allocated GSO Shares and Warrants issuable at the Anadarko Closing to GSO Holdings and/or the GSO Funds and/or their Affiliates (including, without limitation, warrants to purchase Allocated GSO Shares issued to Affiliates of GSO Holdings and/or the GSO Funds), including for the avoidance of doubt the shares of SN Common Stock for which the Warrants (and such warrants issued to any such Affiliate) may be exercisable by GSO Holdings and/or the GSO Funds and/or their Affiliates after the Anadarko Closing (provided, that SN will place separate percentage limits on Affiliates associated with Blackstone, on the one hand, and Affiliates associated with GSO, on the other hand) and (ii) provide in such amendment that, (x) at such time as GSO Holdings together with any of its Affiliates no longer Beneficially Owns 4.9% or more of the SN Common Stock (provided, that SN will place separate percentage limits on Affiliates associated with Blackstone, on the one hand, and Affiliates associated with GSO, on the other hand), then such Person may no longer be an Exempt Person and/or may be an Acquiring Person thereafter, and (y) Persons not subject to or bound by the GSO Voting Agreement (or substantially similar

agreement with SN) shall not be entitled to the benefits of the exemptions provided for in such amendment. As used in this clause (h) "***Affiliates***" has the meaning ascribed to such term in the SN Rights Plan; *provided, further*, that in no event will the amendment to the SN Rights Plan be structured to prohibit such Exempt Persons from maintaining their respective then-current percentage ownership in SN or from exercising Rights to acquire Allocated GSO Shares to maintain their then-current respective percentage interests;

(j) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Board of Directors of SN shall have reserved for issuance a number of shares of SN Common Stock equal to the number of shares issuable upon exercise of the GSO Warrants;

(k) neither the General Partner nor the Partnership shall be, and shall not be required to become, a guarantor or a Restricted Subsidiary under any credit agreement, indenture or other loan agreement or other material agreement relating to indebtedness of, or guaranteed by, SN or any of its Subsidiaries (other than the General Partner and the Partnership); and

(l) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the GSO Allocated Shares and the SN Common Stock subject to issuance upon the exercise of the GSO Warrants shall be approved for listing on the NYSE, subject to the official notice of issuance.

Section 2.08 Conditions of the Common Unit Purchaser's Obligations at Committed Closing. The obligation of the Common Unit Purchaser and SN GP Member to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(iii) and Section 2.06(d)(v), and the obligation of SN to deliver, or cause to be delivered, (a) those Anadarko Closing deliverables set forth in Section 2.06(a) is subject to the satisfaction (or waiver by the SN Parties) on or prior to the Anadarko Closing Date and (b) the KNOC Closing deliverables set forth in Section 2.06(c) is subject to the satisfaction (or waiver by the SN Parties) on or prior to the KNOC Closing Date, of the following conditions:

(a) no statute, order, rule, decree or regulation has been entered by any Governmental Authority having jurisdiction over the parties hereto or the subject matter of this Agreement that restrains or prohibits the transactions contemplated by this Agreement and that remains in effect at the applicable Preferred Unit Closing and there shall not be pending any suit, action or proceeding by any Governmental Authority or other Person seeking to restrain, preclude, enjoin or prohibit the transactions contemplated by this Agreement;

(b) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous "Closing" (as such term is defined in the APC/KM PSA) and (ii) the KNOC Closing, if such closing occurs, the simultaneous consummation of the transactions contemplated by the KNOC PSA;

(c) all of the Fundamental Representations of the Preferred Unit Purchasers contained in this Agreement shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct on and as of such date) and all of the other representations and warranties of the Preferred Unit Purchasers contained in Article IV of this Agreement excluding for purposes of this determination any qualification in such representations or warranties of materiality or material adverse effect therein shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date) except where the failure of any such representation has not had, and is not reasonably like to have, individually and in the aggregate, a material and adverse effect on the General Partner and the Partnership considered as a whole, or the Common Unit Purchaser;

(d) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding of the Preferred Unit Anadarko Funding Amount and (ii) the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding of the Preferred Unit KNOC Funding Amount; and

(e) each of GSO Associates and GSO Holdings shall have performed in all material respects all of the covenants required to be performed by them hereunder at or prior to each of the Anadarko Closing Date and KNOC Closing Date.

Section 2.09 Conditions of Intrepid's Obligations at the Closing. The obligations of Intrepid to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(ii) and the obligations of Intrepid to deliver the documents specified in Section 2.06(b), as applicable, are subject solely to the simultaneous funding of the Preferred Unit Anadarko Funding Amount at the Anadarko Closing.

Section 2.10 Nature of Obligations. The obligations hereunder of GSO Holdings and GSO Associates, on the one hand, and Intrepid, on the other hand, are several and not joint. For the avoidance of doubt and notwithstanding anything to the contrary herein, the obligation of GSO Holdings to contribute the Preferred Unit Anadarko Funding Amount in accordance with Section 2.01(a) and to perform its other obligations hereunder and under the Equity Commitment Letters are not conditioned by or subject to in any manner (and the Preferred Unit GSO Commitment Amount shall not be subject to reduction) any termination of this Agreement with respect to Intrepid, Intrepid's failure to contribute the Intrepid Contribution in accordance with Section 2.01(a) or Intrepid otherwise failing to perform its other obligations hereunder.

Section 2.11 Further Assurances. From time to time after the date hereof, without further consideration, each of SN, SN GP Member, the General Partner, the Partnership, the Common Unit Purchaser and the Purchasers shall use their reasonable best efforts to take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and the other Basic Documents.

Section 2.12 UCC Filings After January 12, 2017. The parties hereto acknowledge that on January 12, 2017, SN caused filings on UCC Form 1s to be filed on behalf of the Partnership in the States of Delaware and Texas and in such other locations as were directed by GSO Holdings with respect to the Liens and security interests of the Partnership under the Hydrocarbons Marketing Agreement to secure payments that become due to the Partnership thereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## RELATED TO THE GENERAL PARTNER AND THE PARTNERSHIP

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, SN represents and warrants to the Purchasers as follows:

Section 3.01 Existence and Power.

(a) The General Partner has been duly formed and is validly existing as a limited liability company in good standing under the Laws of the State of Delaware, has the full limited liability company power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited liability company, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so

qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the General Partner. All limited liability company action required to be taken by the General Partner for the execution and delivery of this Agreement and the other Basic Documents to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the applicable Preferred Unit Closing shall have been, duly and validly taken. Upon the execution and delivery of the GP LLC Agreement by the parties thereto, the General Partner will have all requisite power and authority to issue, sell and deliver the Class A Common Interests and the Class B Common Interests, in accordance with and upon the terms set forth in this Agreement and the GP LLC Agreement.

(b) The Partnership has been duly formed and is validly existing as a limited partnership under the Laws of the jurisdiction of the State of Delaware, has the full limited partnership power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited partnership, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the Partnership. All limited partnership action required to be taken by the Partnership for the execution and delivery by the Partnership of this Agreement and the other Basic Documents to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the applicable Preferred Unit Closing shall have been, duly and validly taken. Upon execution of the Partnership Agreement, the Partnership will have all requisite power and authority to issue, sell and deliver the non-economic general partner interest, the Common Units to be issued to the Common Units Purchaser in accordance with Section 2.01(a) and the Preferred Units to be issued to the Preferred Unit Purchasers in accordance with Section 2.01(a) and Section 2.02(a).

Section 3.02 Authority; Enforceability.

(a) The limited liability company agreement of the General Partner and agreement of limited partnership of the Partnership, each as of the Effective Date, have been duly authorized, executed and delivered by (i) in the case of the General Partner, SN GP Member and (ii) in the case of the Partnership, by Common Unit Purchaser and the General Partner, and constitute valid and legally binding agreements, enforceable in accordance with their respective terms, except as the enforceability of such agreements may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) Each of the Basic Documents to which the General Partner or the Partnership is or will be a party have been duly and validly authorized and executed, or when executed shall be duly and validly authorized and executed by each of the General Partner or the Partnership, as the case may be, and constitutes, or will when executed constitute, the legal, valid and binding obligations of each of the General Partner or the Partnership that is a party thereto, as the case may be, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.03 Capitalization; Issuance of Units.

(a) As of the Effective Date:

(i) The General Partner's authorized Equity Interests consist of 100 Common Units which membership interests have been duly authorized and validly issued in accordance with the governing documents of the General Partner and applicable Law; and

(ii) The Partnership's authorized Equity Interests consist solely of (A) a non-economic general partner interest held by the General Partner and (B) 100 common limited partner interests held by Common Unit Purchaser, which partnership interests have been duly authorized and validly issued in accordance with the governing documents of the Partnership and applicable Law.

(b) Immediately following the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), after giving effect to the execution of the GP LLC Agreement and the Partnership Agreement by the parties thereto:

(i) The outstanding Equity Interests of the General Partner, shall consist of the 99 Class A Common Interests issued to SN GP Member and 1 Class B Common Interest issued to GSO Associates, which membership interests, when issued, will have been duly authorized and validly issued in accordance with the GP LLC Agreement and applicable Law, will be free of any and all Liens and restrictions on transfer, other than restrictions on transfer under the GP LLC Agreement under or applicable state and federal securities Laws and will be fully paid and non-assessable (except as such non-assessability may be affected by Sections 18-607 and 18-804 of the Delaware Act); and

(ii) The outstanding Equity Interests of the Partnership, shall consist of (A) the non-economic general partner interest held by the General Partner, (B) the Common Units issued to the Common Unit Purchaser pursuant to Section 2.01(a) and (C) the Preferred Units issued to the Preferred Unit Purchasers pursuant to Section 2.01(a), subject to increase in accordance with Section 2.01(c), which Equity Interests will be duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Common Units and Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(c) Immediately following the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing):

(i) The outstanding Equity Interests of the Partnership, shall consist of (A) the non-economic general partner interest held by the General Partner, (B) the Common Units issued to the Common Unit Purchaser pursuant to Section 2.01(a) and (C) the Preferred Units issued to the Preferred Unit Purchasers pursuant to Section 2.01(a) and Section 2.02(a), subject to increase in accordance with Section 2.01(c) and, if the KNOC Closing occurs in a Separate Closing, Section 2.02(b), respectively, which partnership interests will be duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Common Units and Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(d) Except as set forth in this Agreement or (i) with respect to the General Partner, the GP LLC Agreement or (ii) with respect to the Partnership, the Partnership Agreement, there are no Persons entitled to preemptive, statutory or other similar contractual rights to subscribe for any Class A Common Interests, Class B Common Interests, any general partner interest of the Partnership, Common Units, Preferred Units or any other Equity Interests of either the General Partner or the Partnership.

(e) Except for the Class A Common Interests, the Class B Common Interest, the non-economic interest of the General Partner, the Common Units and the Preferred Units to be issued pursuant to this Agreement, there are no options, warrants or other rights to purchase, agreements or other obligations to issue, or rights to convert any obligations into or exchange any securities for, membership interest, general partner interest, limited partner interest or any other ownership interests in the General Partner or the Partnership, as applicable.

Section 3.04 Subsidiaries of the General Partner and the Partnership. Except for its non-economic general partnership interest in the Partnership, the General Partner does not have any Subsidiary and does not own, directly or indirectly, any Equity Interests in any other Person. The Partnership does not have any Subsidiaries and does not own, directly or indirectly, any Equity Interests in any other Person.

Section 3.05 Litigation. As of the Effective Date, there are no, and as of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if occurring, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), there will not be any, legal or governmental proceedings pending to which the General Partner or the Partnership is a party or to which any property or asset of the General Partner or the Partnership is subject or which challenges the validity of any of the Basic Documents or the right of the General Partner or the Partnership to enter into any of the Basic Documents to which it is a party or to consummate the transactions contemplated hereby or thereby and, to the Knowledge of SN, no such proceedings are threatened by any Governmental Authorities or others.

Section 3.06 No Conflicts. None of (a) the offering, issuance and sale by (i) the General Partner of the Class A Common Interests or Class B Common Interests or (ii) the Partnership of the non-economic general partners interest, the Common Units or the Preferred Units, and, in each case, the application of the proceeds therefrom, (b) the execution, delivery and performance by the General Partner or the Partnership of the Basic Documents to which it is or will be a party, or (c) the consummation of the transactions contemplated hereby or thereby (i) constitutes or will constitute a violation of the other organizational documents of the General Partner or the Partnership, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, any Contract to which the General Partner or the Partnership is a party or by which any of them or any of their respective properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over the General Partner or the Partnership or any of their respective properties in a proceeding to which any of them or their property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on the Partnership and the General Partner, taken as a whole.

Section 3.07 Approvals. Except as set forth on Schedule 3.07, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with (a) the execution, delivery or performance by any of the General Partner or the Partnership of any of the Basic Documents, (b) the General Partner's issuance at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and sale of the Class A Common Interests or Class B Common Interests, or (c) the Partnership's issuance at (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) of the non-economic general partner interest and the Common Units to be issued to the Common Unit Purchaser pursuant to Section 2.01(a) (ii) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if occurring the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), of the Preferred Units to be issued to the Preferred Unit Purchasers pursuant to Section 2.01(a) and, if applicable, Section 2.02(a).

Section 3.08 No Liabilities. Except (i) as arising under this Agreement, the APC/KM PSA or, if entered into, the KNOC PSA, (ii) as set forth on Schedule 3.08 and (iii) for obligations of the General Partner and the

Partnership arising under any document contemplated (x) hereby, (y) in the APC/KM PSA or (z) if entered into, the KNOC PSA, to be entered into by the Partnership at or prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), as of the Effective Date and as of the time immediately prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or, if the KNOC PSA is entered into, immediately prior to the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), neither the General Partner or the Partnership is or will be subject to any liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent or otherwise) nor has conducted any business other than in connection with the foregoing.

Section 3.09 Investment Company Status. Neither the General Partners nor the Partnership is, and upon the issuance and sale of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interest, the Common Units and the Preferred Units as herein contemplated and the application of the net proceeds therefrom, neither the General Partner nor the Partnership will be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 3.10 No Registration Required. Assuming the accuracy of the representations and warranties of the Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Closing of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units and the Preferred Units pursuant to this Agreement is exempt from the registration requirements of the Securities Act, and neither the General Partner nor the Partnership nor, to the Knowledge of SN, any authorized representative acting on behalf of the General Partner or the Partnership has taken or will take any action hereafter that would cause the loss of such exemption.

Section 3.11 Certain Fees. Except for fees payable to J.P. Morgan, Citi and the other lenders in respect of the Credit Facility or Senior Debt that have been disclosed in writing to GSO Holdings prior to the Effective Date and pursuant to the terms of the Fee Letter, no fees or commissions are or will be payable by the General Partner or the Partnership, and each of the Preferred Unit Purchasers and their Affiliates shall not be subject to any liability or other obligation with respect, to brokers, finders or investment bankers in connection with or relating to the issuance of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units, the Preferred Units, the Initial Debt Replacement Units, the Final Debt Replacement Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the Warrants, the issuance of SN Common Stock upon exercise of the Warrants or the consummation of the transactions contemplated by this Agreement; provided that, SN shall pay for any fees payable to J.P. Morgan, Citi and the other lenders that are not provided for pursuant to the Fee Letter.

Section 3.12 No Integration. Neither the General Partner nor the Partnership has, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units or the Preferred Units in a manner that would require the offer and sale of any of the Class A Common Interests, Class B Common Interests, the non-economic general partner interests, Common Units or Preferred Units to be registered under the Securities Act.

Section 3.13 No Restrictions on Dividends. Neither the General Partner nor the Partnership is a party to or otherwise subject to or bound by any instrument or agreement that limits or prohibits or could limit or prohibit, directly or indirectly, the General Partner or the Partnership from (a) redeeming the Preferred Units pursuant to their terms or (b) paying any dividends or making other distributions on the Preferred Units that may be issued, except as may be set forth in the GP LLC Agreement, the Partnership Agreement, the Credit Facility or any documents relating to the Senior Debt, if applicable.

Section 3.14 Springfield Gathering. At the Closing and assuming the "Closing" (as such term is defined in the APC/KM PSA) has occurred, the Partnership shall not have been assigned any interest under the Springfield Gathering Agreements, and SN and Anadarko shall have executed and delivered at the Anadarko Closing the Marketing Transition Services Agreement (as such term is defined in the APC/KM PSA) in accordance with the APC/KM PSA.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASERS

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, GSO Holdings (severally and not jointly with Intrepid) represents and warrants to the SN Parties with respect to representations and warranties related to GSO Associates, GSO Holdings and the GSO Funds, and Intrepid (severally and not jointly with GSO Holdings and GSO Associates) represents and warrants to the SN Parties with respect to representations and warrants related to Intrepid, as follows:

Section 4.01 Existence. GSO Associates is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. GSO Holdings is duly organized and validly existing as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. Each of the GSO Funds is duly organized as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. Intrepid is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 4.02 Authorization, Enforceability. GSO Associates and Intrepid have all necessary limited liability company, and GSO Holdings and the GSO Funds have all necessary limited partnership legal power and authority to enter into, deliver and perform its obligations (if any) under the Basic Documents to which it is or will be a party. The execution, delivery and performance by such Purchaser and the GSO Funds of the Basic Documents to which it is or will be a party and the consummation by it of the transactions contemplated hereby and thereby have been or, when executed, will be duly and validly authorized by all necessary legal action of such Purchaser and the GSO Funds, and no further consent or authorization of such Purchaser or the GSO Funds is required. The Basic Documents to which such Purchaser or the GSO Funds is or will be a party have been or, prior to the Closing, will be duly executed and delivered by such Purchaser or the GSO Funds, as the case may be, and constitute or, when executed, will constitute legal, valid and binding obligations of such Purchaser or the GSO Funds, as the case may be; except as, the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03 No Breach. None of the execution, delivery or performance by such Purchaser or the GSO Funds of the Basic Documents to which it is, or prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or, as applicable, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), will be a party or the consummation by such Purchaser or the GSO Funds of the transactions contemplated hereby or thereby will (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any material agreement to which such Purchaser is a party or by



008238

which such Purchaser or the GSO Funds are bound or to which any of the property or assets of such Purchaser or the GSO Funds is subject, (b) conflict with or result in any violation of the provisions of the organizational documents of each such Purchaser, or (c) violate any statute, order, rule or regulation of any court or Governmental Authority or body having jurisdiction over each such Purchaser or the GSO Funds or the property or assets of each such Purchaser or the GSO Funds, except in the case of clauses (a) and (c), for such conflicts, breaches, violations or defaults as would not prevent the consummation of the transactions contemplated by the Basic Documents to which each Purchaser or the GSO Funds, as the case may be, is or, prior to the Anadarko Closing and if applicable, the KNOC Closing, will be a party.

Section 4.04 Approvals. Except as set forth on Schedule 4.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by such Purchaser or the GSO Funds of any of the Basic Documents.

Section 4.05 Certain Fees. No fees or commissions are or will be payable by such Purchaser or the GSO Funds to brokers, finders or investment bankers with respect to the purchase by GSO Associates of the Class B Common Interest or the purchase of any of the Purchased Preferred Units by GSO Holdings and Intrepid, respectively, the issuance to the GSO Funds of the GSO Allocated Shares and GSO Warrants, the issuance to Intrepid of the Intrepid Allocated Shares and Intrepid Warrants or the consummation of the transactions contemplated by this Agreement, in each case, for which an SN Party may be liable.

Section 4.06 Restricted Securities. Except for possible permitted transfers subject to the terms of (a) in the case of Class B Common Interest, the GP LLC Agreement or (b) in the case of the Purchased Preferred Units, the Partnership Agreement, GSO Associates is acquiring the Class B Common Interest, such Preferred Unit Purchaser is acquiring its respective Purchased Preferred Units (as issued and delivered to GSO Holdings and Intrepid, respectively, pursuant to Section 2.01(a)), the GSO Funds are acquiring the GSO Allocated Shares and the GSO Warrants, and any SN Common Stock acquired upon exercise of the GSO Warrants, and Intrepid is acquiring the Intrepid Allocated Shares and the Intrepid Warrants, and any SN Common Stock acquired upon exercise of the Intrepid Warrants, for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. Such Purchaser and the GSO Funds has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its proposed investment in (a) in the case of GSO Associates, the Class B Common Interest, (b) in the case of the Preferred Unit Purchasers, each such Preferred Unit Purchaser's investment in its respective Purchased Preferred Units, (c) in the case of the GSO Funds, the GSO Allocated Shares, the GSO Warrants and any SN Common Stock issued upon exercise of the GSO Warrants and (d) in the case of Intrepid, the Intrepid Allocated Shares, the Intrepid Warrants and any SN Common Stock issued upon exercise of the Intrepid Warrants and is capable of bearing the economic risk of such investment. Such Purchaser and each GSO Fund is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501(a)(4)) promulgated under the Securities Act. Such Purchaser and each of the GSO Funds acknowledges and understands as applied to such party that the acquisition by (a) GSO Associates of the Class B Common Interest, (b) GSO Holdings and Intrepid of their respective portion of the Purchased Preferred Units, (c) the GSO Funds of the GSO Allocated Shares and the GSO Warrants and (d) Intrepid of the Intrepid Allocated Shares and the Intrepid Warrants has not been, and prior to the Closing will not be, and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants, as applicable, will not be, registered under the Securities Act in each case in reliance on an exemption therefrom and that each of SN, the General Partner and the Partnership is relying upon the truth and accuracy of, and such Purchaser's and the GSO Funds' compliance with, the representations, warranties, agreements, acknowledgments and understandings of each of the Purchasers and the GSO Funds set forth herein in order to determine the availability of such exemptions and the eligibility of GSO Associates to acquire the Class B Common Interest, the Preferred Unit Purchasers to acquire their respective portion of the Purchased Preferred Units, the GSO Funds to acquire the

GSO Allocated Shares, the GSO Warrants and any SN Common Stock acquired upon exercise of the GSO Warrants, and Intrepid to acquire the Intrepid Allocated Shares, the Intrepid Warrants and any SN Common Stock acquired upon exercise of the Intrepid Warrants and the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares the GSO Warrants, the Intrepid Warrants and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. Such Purchaser and each of the GSO Funds further acknowledge and understand, as to the equity interests being acquired by it, that (x) none of the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants, and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants may be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and (y) when issued at the Closing, the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants and when issued upon exercise of the GSO Warrants or Intrepid Warrants, any SN Common Stock so issued, will bear a legend substantially as set forth below:

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

Section 4.07 Financing.

(a) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if applicable, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Holdings will have all funds necessary for its payment of up to the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), in each case in accordance with this Agreement, and for all other actions necessary for GSO Associates and GSO Holdings to consummate the transactions contemplated in this Agreement and to perform its obligations hereunder. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), Intrepid will have all funds necessary for its payment of the Intrepid Contribution at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) in accordance with this Agreement, and for all other actions necessary for Intrepid to consummate the transactions contemplated in this Agreement and to perform its obligations hereunder. Each of the Purchasers understands that its obligations to consummate the transactions contemplated by this Agreement (including the payment of all amounts when due) are not subject to the availability to the Purchasers or Intrepid of any financing or funding.

(b) On January 12, 2017, GSO Holdings delivered to SN and the Partnership a true, complete and correct copy of each of the executed Equity Commitment Letters pursuant to which the applicable investor party or parties thereto has or have committed, on the terms and subject to the conditions set forth therein, to invest in GSO Holdings the cash amount set forth therein.

(c) GSO Holdings represents and warrants that:

(i) Neither of the Equity Commitment Letters has been modified or amended and no modification or amendment is contemplated, and the commitment thereunder has not been terminated, reduced, withdrawn or rescinded in any respect and no such termination, reduction, withdrawal or recession is contemplated. There are no side letters or other Contracts or arrangements related to the funding therein that contradicts or reduces the obligations of the Affiliates of GSO thereunder to perform subject to the conditions and on the terms set forth therein. Each of the Equity Commitment Letters is in full force and effect and is the legal, valid, binding and enforceable obligations of GSO Holdings and each of the other parties thereto, as the case may be. There are no conditions precedent or other contingencies related to the funding of the full amount (or any portion) except as set forth in the Equity Commitment Letters and this Agreement. No event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a default or breach on the part of GSO Holdings or any other party thereto under either of the Equity Commitment Letters. GSO Holdings has not incurred any obligation, commitment, restriction or other liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or other liability of any kind, in either case which would impair or adversely affect such resources, funds or capabilities. The Equity Commitment Letters designate SN as an intended third party beneficiary thereof who may enforce the rights of GSO Holdings pursuant to such Equity Commitment Letter as if each SN was a party thereto. All commitments and other fees, if any, required to be paid under the Equity Commitment Letters prior to the Effective Date have been paid in full.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SN

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, SN represents and warrants to the Partnership, the General Partner and each of the Purchasers as follows:

Section 5.01 Existence.

(a) SN is duly organized and validly existing as a corporation and in good standing under the Laws of its state of formation, with all necessary power and authority to own, lease and operate its properties and to conduct its business as currently conducted, and is duly registered or qualified as a foreign corporation, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on SN. SN has all requisite corporate power and authority to execute and deliver this Agreement and the other Basic Documents to which it is or will be a party and to perform its obligations hereunder and thereunder.

(b) SN GP Member is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

(c) Common Unit Purchaser is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 5.02 Authorization, Enforceability. Each of SN, SN GP Member and Common Unit Purchaser has all necessary legal power and authority to enter into, deliver and perform its obligations under the Basic Documents to which it is or will be a party. The execution, delivery and performance by SN, SN GP Member and Common Unit Purchaser of the Basic Documents and the consummation by it of the transactions

contemplated hereby and thereby have been or, when executed, will be duly and validly authorized by all necessary legal action, and no further consent or authorization of SN, SN GP Member or Common Unit Purchaser is required. The Basic Documents to which SN, SN GP Member or Common Unit Purchaser, as the case may be, is or will be a party have been or will be duly executed and delivered by SN, SN GP Member and/or Common Unit Purchaser, as the case may be, and constitute or, when executed, will constitute the legal, valid and binding obligations of SN, SN GP Member or Common Unit Purchaser, as the case may be, except or the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.03 No Conflicts. None of (a) the execution, delivery and performance by SN, SN GP Member or Common Unit Purchaser of the Basic Documents to which it is or will be a party or (b) the consummation of the transactions contemplated hereby or thereby (i) constitutes or will constitute a violation of the other organizational documents of SN, SN GP Member or Common Unit Purchaser, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, the SN Credit Agreement or any indenture or any other agreement pertaining to indebtedness to which SN or any of its Subsidiaries is a party or any Contract to which SN is a party or by which any of them or any of their respective properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over SN, SN GP Member or Common Unit Purchaser or any of their respective properties in a proceeding to which any of them or their property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on SN.

Section 5.04 Approvals. Except as set forth on Schedule 5.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by SN, SN GP Member or Common Unit Purchaser of any of the Basic Documents to which it is a party, other than consents, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations that have been or prior to Closing are obtained or made. Prior to the Anadarko Closing, and if applicable, the KNOC Closing, SN shall use its commercially reasonable efforts to take, or shall cause the SN Parties to take, all actions necessary to cause the conditions to Closing set forth in Sections 2.07 and 2.09 to be satisfied at and as of the Closing.

Section 5.05 Certain Fees. No fees or commissions are or will be payable by SN GP Member or the Common Unit Purchaser to brokers, finders or investment bankers with respect to the purchase of any of the Common Unit Purchaser's Class A Common Interests or the Common Units or the consummation of the transactions contemplated by this Agreement, in each case, for which any the General Partner, the Partnership, GSO Holdings or Intrepid may be liable.

Section 5.06 The GSO Allocated Shares, the Intrepid Allocated Shares and the Warrants. When issued to the GSO Funds and Intrepid at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the GSO Allocated Shares and Intrepid Allocated Shares will be duly authorized, validly issued, fully paid and nonassessable. The offer and sale by SN of the GSO Warrants to the GSO Funds and the Intrepid Warrants to Intrepid has been duly authorized by SN pursuant to its organizational documents and applicable Law and, when issued and delivered to the GSO Funds and Intrepid in accordance with the terms of this Agreement and the GSO Warrant Agreement and Intrepid Warrant Agreement will each be validly issued, fully paid (to the extent required by applicable Law and, as applicable, each of the GSO Warrant Agreement and Intrepid Warrant Agreement), non-assessable and issued in compliance with all applicable Laws, including

securities Laws, and will be free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the GSO Warrant Agreement and Intrepid Warrant Agreement, as applicable, or arising under applicable state and federal securities Laws. Neither the execution, delivery and performance by SN of the GSO Warrant Agreement or the Intrepid Warrant Agreement, or the issuance of the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants or SN Common Stock upon exercise of the GSO Warrants or the Intrepid Warrants and compliances by SN with its objections under each of the GSO Warrant Agreement and Intrepid Warrant Agreement will, whether with or without the giving of notice, the passage of time or both, require any consent, approval or notice under, or will constitute a breach or violation of the organization documents of SN, conflict with or constitute a material breach of, or default under, or result in the creation or imposition of any Lien upon the property or assets of SN pursuant to any Contract to which SN is a party, or result in a violation of any applicable material Law, judgment, order, writ or decree of any Governmental Authority with jurisdiction over SN or its assets. The SN Common Stock to be issued upon exercise of the Warrants will, when issued, be validly issued, fully paid and non-assessable. The shares of SN Common Stock subject to issuance upon exercise of the Warrants have been reserved for issuance by SN and will be so reserved until the exercise in full of the Warrants. The holders of the outstanding Equity Interests of SN are not entitled to subscribe for any of the Warrants or the SN Common Stock to be issued upon exercise of the Warrants. The GSO Funds and Intrepid, as applicable, will have the right on the terms and subject to the conditions set forth in the GSO Registration Rights Agreement and Intrepid Registration Rights Agreement, to require SN to register the GSO Allocated Shares and Intrepid Allocated Shares and the SN Common Stock subject to issuance upon exercise of the warrants for resale on a registration statement to be filed by SN with the Commission.

Section 5.07 Investment Company Status. SN is not, and upon the issuance and sale of the GSO Allocated Shares and the Intrepid Allocated Shares and Warrants as herein contemplated will not be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 5.08 Stock Exchange Listing and Reporting Requirements. The SN Common Stock is registered pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange (the "***NYSE***") and SN has taken no action designed to, or likely to have the effect of, terminating the registration of the SN Common Stock under the Exchange Act or delisting the SN Common Stock from the NYSE, and SN has not received any notification that the Commission or the NYSE is contemplating terminating such registration or listing. Prior to the Anadarko Closing, the GSO Allocated Shares and the SN Allocated Shares and the SN Common Stock subject to issuance upon exercise of the Warrants will be approved for listing on the NYSE, subject only to notice of official issuance.

Section 5.09 No Registration Required. Assuming the accuracy of the representations and warranties of the Preferred Unit Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Anadarko Closing of the GSO Allocated Shares and the Intrepid Allocated Shares and the Warrants pursuant to this Agreement (and, when issued, the issuance of SN Common Stock upon exercise of the Warrant) is exempt from the registration requirements of the Securities Act, and SN has not and, to the Knowledge of SN, no authorized representative acting on behalf of any of SN has taken or will take any action hereafter that would cause the loss of such exemption. The issuance and sale of the GSO Allocated Shares and the Intrepid Allocated Shares and the Warrants and the issuance of SN Common Stock upon exercise of the Warrants does not contravene the rules and regulations of the NYSE.

Section 5.10 No Integration. SN has not, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the GSO Allocated Shares, Intrepid Allocated Shares or the Warrants in a manner that would require the offer and sale of the GSO Allocated Shares, Intrepid Allocated Shares or the Warrants to be registered under the Securities Act.

Section 5.11 Restricted Securities. Except for possible permitted transfers subject to the terms of (a) in the case of Class A Common Interest, the GP LLC Agreement or (b) in the case of the Common Units, the Partnership Agreement, SN GP Member is acquiring the Class A Common Interests and Common Unit Purchaser is acquiring the Common Units for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. Each of SN GP Member and Common Unit Purchaser has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in (a), in the case of SN GP Member, the Class A Common Interests and (b), in the case of Common Unit Purchaser, the Common Units and is capable of bearing the economic risk of such investment. Each of SN GP Member and Common Unit Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501 (a)(4)) promulgated under the Securities Act. Each of SN GP Member and Common Unit Purchaser acknowledges and understands that (a) (i), in the case of SN GP Member, the acquisition of the Class A Common Interests and (ii), in the case of Common Unit Purchaser, the acquisition of the Common Units, have not been registered under the Securities Act in reliance on an exemption therefrom and that each of the General Partner and the Partnership is relying upon the truth and accuracy of, and SN GP Member's and Common Unit Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of SN GP Member and Common Unit Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of SN GP Member to acquire the Class A Common Interests and Common Unit Purchaser to acquire the Common Units; (b) the Class A Common Interests and the Common Units will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. Each of SN GP Member and Common Unit Purchaser further acknowledges and understands that the Class A Common Interests and the Common Units (x) may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and the Warrants and (y) will bear a legend substantially as set forth below.

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

Section 5.12 Litigation. As of the Effective Date, there are no, and as of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), and if occurring, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), there will not be any, legal or governmental proceedings pending to which SN, SN GP Member or Common Unit Purchaser is a party that challenges the validity of any of the Basic Documents or the right of SN, SN GP Member or Common Unit Purchaser to enter into any of the Basic Documents to which it is or will be a party or to consummate the transactions contemplated hereby or thereby and, to the Knowledge of SN, no such proceedings are threatened by any Governmental Authorities or others.

Section 5.13 Solvency. As of the Effective Date and giving pro forma effect to the "Closing" (as defined in the APC/KM PSA) and the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the consummation of the transactions contemplated by this Agreement and the Basic Documents and the APC/KM PSA and to the KNOC Closing (assuming KNOC exercises its tag right and delivers the election notice), assuming (a) such transactions were to occur at or concurrently with the Effective Date and concurrently with the funding by the Partnership, SN Maverick and Blackstone Newco of the "Purchase Price"

(as defined in the APC/KM PSA) and that (b) (i) Anadarko and Blackstone Newco have each satisfied the conditions to SN Maverick and the Partnership's obligations to consummate the transactions contemplated by the APC/KM PSA and that the representations and warranties of Anadarko and Blackstone Newco set forth in the APC/KM PSA are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation), (ii) the Purchasers and the GSO Funds have each satisfied the conditions to the SN Parties' obligations to consummate the transactions contemplated by this Agreement and that the representations and warranties of the Purchasers and the GSO Funds set forth in this Agreement are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation) and (iii) each of Anadarko, Blackstone Newco, GSO, the Purchasers and the GSO Funds, as applicable, have complied with the terms of any other Basic Document to which it is a party and that any representations or warranties made by Anadarko, Blackstone Newco, GSO, the Purchasers and the GSO Funds, as applicable, set forth in such Basic Document are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation), (x) the amount of the "fair saleable value" of the assets of SN will, as of such time, exceed the sum of (A) the value of all "liabilities of such SN, including contingent and other liabilities," as of such time, as such quoted terms are generally determined in accordance with applicable laws governing determinations of the insolvency of debtors, and (B) the amount that will be required to pay the probable liabilities of SN, as of such date, on its existing debts (including contingent and other liabilities) as such debts become absolute and mature, (y) SN will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (z) SN will be able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature. For purposes of this definition, "not have an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged" and "able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature" means that SN will be able to generate enough cash from operations, asset dispositions or refinancing, or a combination thereof, to meet its obligations as they become due.

Section 5.14 No Obligation to be Guarantor or Restricted Subsidiary. As of the Effective Date, the Anadarko Closing Date and, if occurring, the KNOC Closing Date, neither the General Partner nor the Partnership or any of its Subsidiaries is required, or upon the Anadarko Closing and if applicable, the KNOC Closing, the consummation of the transactions contemplated hereby and by the other Basic Documents and the consummation by the Partnership of the transactions to be effected in connection with the "Closing" (as that term is defined in the APC/KM PSA) and if applicable, the consummation by the Partnership of the transaction to be effected in connection with the closing of the KNOC PSA, will be required, to become a guarantor or a Restricted Subsidiary under the SN Credit Agreement (or any amendment or replacement thereof), or under any indenture or other agreement pertaining to indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries). SN shall have taken, or caused to be taken, all actions necessary or appropriate to cause each of the General Partner and the Partnership to constitute an Unrestricted Subsidiary of SN and its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries) under the SN Credit Agreement (or any amendment or replacement thereof), and under any indenture or other agreement pertaining to indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries).

## ARTICLE VI
## INDEMNIFICATION, COSTS AND EXPENSES

Section 6.01 Indemnification.

(a) SN agrees to indemnify and hold harmless each of the Purchasers, and each of their officers, managers, directors, employees, Affiliates, members, partners, stockholders, and agents, and the successors to and permitted assigns of the foregoing (and their respective officers, managers, directors, employees, Affiliates (including as to GSO Holdings and GSO Associates, GSO or its Affiliates or any fund or account managed, advised or sub-advised by GSO or its Affiliates, members, partners, stockholders, agents and successors and permitted assigns and solely for purposes of this Section 6.01(a), The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.) (collectively, the "***Purchaser Indemnified Parties***") from and against any and all Damages incurred or suffered by any of the Purchaser Indemnified Parties as a result of or arising out of (i) any failure of any representation or warranty in Article III or Article V to be true and correct and (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by the SN Parties pursuant to this Agreement. Without duplication of any Damages paid under the preceding sentence, if this Agreement is terminated pursuant to Section 7.01(b) or Section 7.01(c), and the termination of the APC/KM PSA referred to in Section 7.01(b) or the KNOC PSA referred to in Section 7.01(c) was not the result of a breach by GSO Holdings of its obligations under Section 2.01(a), Section 2.01(b), Section 2.02(a) or Section 7.01(e), as applicable, or the APC/KM PSA is terminated pursuant to Section 7.1(c) thereof and such termination of the APC/KM PSA is not the result of a breach by GSO Holdings of its obligation under Section 2.01(a) or Section 2.01(b) and any Purchaser Indemnified Parties, other than Intrepid and its Affiliates, suffers or incurs Damages (including unreimbursed out-of-pocket expenses incurred in due diligence or negotiating the Basic Documents) as a result of a claim brought by a third-party (other than The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.) against the Purchaser Indemnified Parties, other than Intrepid and its Affiliates, in connection with such termination, then SN shall indemnify and hold harmless the Purchaser Indemnified Parties, other than Intrepid and its Affiliates, for all such Damages, but in no event shall the aggregate amount payable by SN pursuant to this sentence exceed the Preferred Unit GSO Commitment Amount; *provided that* any such payment shall not be in duplication of any amounts received by The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. independently of any Purchaser Indemnified Party's claims hereunder.

(b) GSO Holdings agrees to indemnify and hold harmless the SN Parties and each of their respective officers, managers, directors, employees, Affiliates, members, partners, stockholders and agents and the successors and permitted assigns to the foregoing (and their respective officers, managers, directors, employees, Affiliates, members, partners, stockholders, agents, and successors and permitted assigns) (collectively, the "***Common Indemnified Parties***") from and against any and all Damages incurred or suffered by a Common Indemnified Party as a result of or arising out of (i) any failure of any representation or warranty made by GSO Holdings (for the avoidance of doubt, regardless of whether or not given on behalf of GSO Holdings, GSO Associates or the GSO Funds) in Article IV to be true and correct or (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by GSO Holdings or GSO

Associates pursuant to this Agreement. Without duplication of any Damages paid under the preceding sentence, if (A) GSO Holdings breaches its obligation under Section 2.01(a) to contribute the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of the Deposit or (B) GSO Holdings breaches its obligation under Section 2.02(a) to contribute the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of any deposit due under the KNOC PSA, and in the case of (A) or (B), any Damages actually incurred by the Common Indemnified Parties to Anadarko or Blackstone Newco pursuant to the APC/KM PSA and/or the KNOC PSA, as applicable, and all reasonable, out-of-pocket third-party costs and expenses incurred by such Common Indemnified Parties in connection with any resulting breach of the APC/KM PSA and/or KNOC PSA, as applicable, then GSO Holdings shall indemnify and hold harmless the Common Indemnified Parties for all such Damages but in no event shall the aggregate amount payable by GSO Holdings pursuant to this sentence exceed the excess, if any, of the Preferred Unit GSO Commitment Amount over any amounts paid to the Partnership or SN under the Equity Commitment Letter.

(c) Intrepid agrees to indemnify and hold harmless the Common Indemnified Parties from and against any and all Damages incurred or suffered by a Common Indemnified Party as a result of or arising out of (i) any failure of any representation or warranty given by Intrepid in Article IV to be true and correct or (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by Intrepid pursuant to this Agreement.

(d) Intrepid agrees to indemnify and hold harmless the GSO Holdings from and against any and all Damages incurred or suffered by GSO Holdings as a result of or arising out of any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by Intrepid pursuant to this Agreement. Notwithstanding anything to the contrary provided herein, if Intrepid fails to pay the Intrepid Contribution to GSO Holdings or the Partnership at the Anadarko Closing in accordance with Section 2.06(d)(ii), then (i) no Preferred Units will be issued to Intrepid at the Anadarko Closing and the Preferred Units that were to be issued to Intrepid will instead be issued to GSO Holdings, (ii) the Intrepid Allocated Shares will not be issued to Intrepid and will instead be issued to the GSO Funds and (iii) the Intrepid Warrant Agreement will not be executed and the Warrants that were to be issued thereunder will instead be issued to the GSO Funds pursuant to the GSO Warrant Agreement (with the number of Intrepid Shares and Warrants subject to the Intrepid Warrant Agreement to be allocated among the GSO Funds as directed by GSO Holdings); *provided that*, in each case, GSO Holdings has funded to the Partnership in accordance with the terms of this Agreement, an amount equal to the Intrepid Contribution.

Section 6.02 Indemnification Procedure.

(a) A claim for indemnification for any matter not involving a third-party claim may be asserted by notice from the party that may be entitled to indemnification pursuant to this Article VI (the "***Indemnified Party***") to the party that may be obligated to provide indemnification pursuant to this Article VI (the "***Indemnifying Party***"); *provided, however*, that failure to so notify the Indemnifying Party shall not release, waive or otherwise affect the Indemnifying Party's obligations with respect thereto, except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure. The notice of claim shall state in reasonable detail the basis of the claim for indemnification.

(b) If any legal proceedings shall be instituted or any claim or demand shall be asserted by any third party in respect of which indemnification may be sought under Section 6.01(a), Section 6.01(b) or Section 6.01(c) hereof (a "***Third Party Claim***"), the Indemnified Party shall promptly give written notice of the assertion of the Third Party Claim to the Indemnifying Party; *provided, however*, that failure of the Indemnified Party to

so notify the Indemnifying Party shall not release, waive or otherwise affect the Indemnifying Party's obligations with respect thereto, except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure. Subject to the provisions of this Section 6.02, the Indemnifying Party shall have the right, at its sole expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any losses indemnified against by it hereunder; *provided that*, in order to defend against, negotiate, settle or otherwise deal with any such Third Party Claim, the Indemnifying Party must first acknowledge in writing to the Indemnified Party its unqualified obligation to indemnify the Indemnified Party as provided hereunder and provide to the Indemnified Party reasonable evidence that the Indemnifying Party has reasonably sufficient financial resources to enable it to fulfill its obligations under this Article VI. Notwithstanding the preceding sentence, the Indemnifying Party shall not have the right to defend against, negotiate, settle, or otherwise deal with any Third Party Claim (i) if the Third Party Claim is not solely for monetary damages (except where any non-monetary relief being sought is merely incidental to a primary claim for monetary damages), (ii) if the Third Party Claim involves criminal allegations, or (iii) if the Indemnifying Party fails to prosecute or defend, actively and diligently, the Third Party Claim. If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Third Party Claim, it shall within fifteen (15) days of the Indemnified Party's written notice of the assertion of such Third Party Claim (or sooner if the nature of the Third Party Claim so requires) notify the Indemnified Party of its intent to do so; *provided that*, the Indemnifying Party must conduct its defense of the Third Party Claim actively and diligently thereafter in order to preserve its rights in this regard. If the Indemnifying Party elects not to defend against, negotiate, settle, or otherwise deal with any Third Party Claim, fails to notify the Indemnified Party of its election as herein provided or contests its obligation to indemnify the Indemnified Party for losses relating to such Third Party Claim under this Agreement, the Indemnified Party may defend against, negotiate, settle, or otherwise deal with such Third Party Claim. If the Indemnified Party defends any Third Party Claim, then the Indemnifying Party shall reimburse the Indemnified Party for the expenses of defending such Third Party Claim upon submission of periodic bills, which reimbursement shall be made within thirty (30) days of the applicable submission. If the Indemnifying Party shall assume the defense of any Third Party Claim, the Indemnified Party may participate, at his, her or its own expense, in the defense of such Third Party Claim; *provided*, *further*, that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; *provided further* that the Indemnifying Party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all Indemnified Parties in connection with any single Third Party Claim. Each party hereto shall provide reasonable access to each other party to such documents and information as may reasonably be requested in connection with the defense, negotiation or settlement of any Third Party Claim. Notwithstanding anything in this Section 6.02 to the contrary, the Indemnifying Party shall not enter into any settlement of any Third Party Claim without the written consent of the Indemnified Party if such settlement (i) would create any liability of the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder, (ii) would provide for any injunctive relief or other non-monetary obligation affecting the Indemnified Party, or (iii) does not include an unconditional release of the Indemnified Party from all liability in respect of the Third Party Claim.

(c) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement, in each case with respect to a Third Party Claim, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter and the Indemnifying Party shall pay all of such remaining sums so due and owing to the Indemnified Party by wire transfer of immediately available funds within five (5) Business Days after the date of such notice.

(d) Notwithstanding anything to the contrary in this Agreement, GSO Holdings shall not have any liability in the aggregate for any Damages arising from or relating to this Agreement that exceeds the excess, if any, of the Preferred Unit GSO Commitment Amount *minus* any amounts funded to the Partnership pursuant to the Equity Commitment Letters. Notwithstanding anything to the contrary in this Agreement, Intrepid shall not have any liability in the aggregate for any Damages arising from or relating to this Agreement that exceeds the amount of the Intrepid Contribution.

(e) Notwithstanding anything to the contrary in this Article VI or any other provision of this Agreement, in no event shall the Purchasers or SN have any liability or indemnification obligation to any other party for punitive, consequential, special, indirect, diminution in value, loss of profit, penalty or other indirect or unforeseen Damages, whether in law or equity, arising from the performance of this Agreement or the transactions contemplated hereby; *provided that* if GSO Holdings breaches its obligations under Section 2.01(a) and Section 2.06(d)(i) to contribute the Preferred Unit Anadarko Funding Amount at the Anadarko Closing and/or GSO Holdings breaches its obligations under Section 2.02(a) and Section 2.06(d)(vi) to contribute the Preferred Unit KNOC Funding Amount at the KNOC Closing, and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of the Deposit or the deposit under the KNOC PSA, if any, and any damages payable to Anadarko or Blackstone Newco as a result thereof, then the loss of the Deposit and/or the deposit under the KNOC PSA, if any, and any Damages actually incurred by the Common Indemnified Parties to Anadarko or Blackstone Newco pursuant to the APC/KM PSA or the KNOC PSA, as applicable, in respect thereof shall be recoverable by the Common Indemnified Parties subject to the maximum specified in Section 6.02(d) above**.**

Section 6.03 Survival. All of the Fundamental Representations shall survive the execution and delivery of this Agreement and the consummation of the Closing for a period equal to the statute of limitations applicable to breach of contract under Delaware law. All of the representations and warranties other than the Fundamental Representations set forth in Articles III, IV and V shall survive the execution and delivery of this Agreement, and the consummation of the Closing for a period ending on the one (1) year anniversary of the Closing; *provided that* any claim made prior to such date shall survive the one (1) year anniversary of the Closing until finally determined in accordance with this Article VI. All covenants contemplated herein to be performed at or prior to the Closing shall survive the Closing for a period equal to the statute of limitations applicable to breach of contract under Delaware law. Notwithstanding the foregoing, the indemnity obligations of Intrepid provided for in the first sentence of Section 6.01(d) shall not survive the funding by Intrepid of the Intrepid Contribution.

## ARTICLE VII
## TERMINATION

Section 7.01 Termination. This Agreement may be terminated at any time prior to the Closing Date as follows:

(a) as to all parties, by mutual written consent of each SN Party, GSO Holdings and GSO Associates;

(b) as to all parties, by any SN Party, GSO Holdings or GSO Associates, if the APC/KM PSA shall have been validly terminated in accordance with its terms;

(c) by any SN Party, GSO Holdings or GSO Associates, solely with respect to the obligations under this Agreement related to actions to be taken pursuant to Section 2.02 and Section 2.06 (d)(v), if the KNOC PSA shall have been validly terminated in accordance with its terms;

(d) as to all parties, by GSO Holdings or GSO Associates if the "Closing" (as defined in the APC/KM PSA) has not occurred on or before March 31, 2017;

(e) as to all parties, by GSO Holdings or GSO Associates if at any time the representations and warranties regarding the SN Parties contained in this Agreement shall fail to be true and correct or an SN Party shall at any time have failed to perform and comply with all agreements and covenants of such Person contained in this Agreement requiring performance or compliance prior to such time, and in either case, such failure (i) shall be such that, if not cured, the conditions set forth in Section 2.07(d) or Section 2.07(h) would not be fulfilled prior to or on either the Anadarko Closing Date or the KNOC Closing Date and (ii) if capable of being cured, shall not have been cured within 10 Business Days of the receipt of written notice thereof by such SN Party from either Purchaser;

(f) as to all parties, by any SN Party if at any time the representations and warranties regarding GSO Holdings or GSO Associates contained in this Agreement shall fail to be true and correct or either GSO Holdings or GSO Associates shall at any time have failed to perform and comply with all agreements and covenants of such Person contained in this Agreement requiring performance or compliance prior to such time, and in either case, such failure (i) shall be such that, if not cured, the conditions set forth in Section 2.08(c) or Section 2.08(e) would not be fulfilled prior to or on the Anadarko Closing Date or the KNOC Closing Date and (ii) if capable of being cured, shall not have been cured within 10 Business Days of the receipt of written notice thereof by GSO Holdings or GSO Associates, as applicable, from any SN Party; and

(g) solely as to Intrepid, by (i) any SN Party if at any time, the representations and warranties regarding Intrepid contained in this Agreement shall fail to be true and correct or Intrepid shall at any time have failed to perform and comply with all agreements and covenants of such Intrepid contained in this Agreement requiring performance or compliance prior to such time or (ii) GSO Holdings if Intrepid fails to contribute the Intrepid Contribution in full at the Anadarko Closing in accordance with Section 2.06(d)(ii) and GSO Holdings has instead contributed such amounts.

Section 7.02 Notice of Termination. GSO Associates and GSO Holdings may exercise their right to terminate this Agreement by giving written notice thereof from time to time to the SN Parties or, in the case of termination as to Intrepid in accordance with Section 7.01(g)(ii), Intrepid specifying the basis for the termination. Each SN Party may exercise its right to terminate this Agreement by giving written notice thereof from time to time to GSO Holdings and GSO Associates or, in the case of termination as to Intrepid in accordance with Section 7.01(g)(i), Intrepid specifying the basis for the termination.

Section 7.03 Effect of Termination. If a termination of this Agreement pursuant to the provisions of Section 7.01 shall occur with respect to any party, this Agreement shall become void and have no effect with respect to such party, and there shall be no further liability on such party in respect hereof, except that Article VIII shall survive any such termination; *provided*, *however*, that no such termination shall relieve any party of any liability resulting from any breach of this Agreement by such party prior to the time of such termination. In the event this Agreement is terminated by any SN Party pursuant to Section 7.01(f), GSO Holdings shall immediately remit to SN the Commitment Fee by wire transfer of immediately available funds.

Section 7.04 Termination of Commitment Related to KNOC Closing. If the KNOC Closing (whether in a Dual Closing or Separate Closing) has not occurred by midnight, Houston, Texas time on March 31, 2017, the Preferred Unit GSO Commitment Amount shall be reduced to $500.0 million unless GSO Holdings elects in its sole discretion for the Preferred Unit GSO Commitment Amount to remain at $800.0 million for such additional time as GSO Holdings determines to be appropriate.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01 Expenses.

(a) Except as provided in Section 8.01(b), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation, negotiation and due diligence of this Agreement or the other Basic Documents and the transactions contemplated thereby shall be paid by the party incurring such costs and expenses unless otherwise expressly stated in such Basic Document, provided that (i) if the Anadarko Closing occurs, then the Partnership shall reimburse GSO and its Affiliates for all of their reasonable, documented, third-party out-of-pocket costs and expenses incurred in connection with the transactions contemplated hereby and thereby and (ii) if the Anadarko Closing does not occur, then SN shall reimburse GSO and its Affiliates for all of their reasonable, documented, third-party out-of-pocket costs and expenses incurred in connection with the transactions contemplated hereby and thereby prior to termination of this Agreement; *provided that* from and after the Effective Date GSO shall promptly notify the Partnership and SN at such time as the costs and expenses for which GSO intends to seek reimbursement pursuant to this Section 8.01 equal increments of $250,000; and *provided further* that GSO and its Affiliates will not entitled to any such reimbursement if this Agreement is terminated by the Common Unit Purchaser pursuant to Section 7.01(f).

(b) At or promptly after the Anadarko Closing or upon any termination of this Agreement (i) as to Intrepid pursuant to Section 7.01(g) or (ii) as to all parties pursuant to Section 7.01 at a point in time when the Agreement could be terminated as to Intrepid pursuant to Section 7.01(g), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred by any SN Party or GSO Holdings and its Affiliates in connection with the amendment and restatement of this Agreement and the drafting and negotiation of the other Basic Documents in connection therewith, as applicable, shall be reimbursed by Intrepid to the party incurring such costs. For the avoidance of doubt, Intrepid shall be responsible for all reasonable and documented costs and expenses described in this Section 8.01(b) and in no event shall GSO or any SN Party (including the Partnership) be responsible for any of the reasonable and documented costs and expenses described in this Section 8.01(b).

Section 8.02 Interpretation. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to the lawful currency of the United States of America. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Unless expressly provided to the contrary, the word "or" is not exclusive. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices, Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "day" or "days" shall

mean calendar day, unless denoted as a Business Day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both". Unless otherwise noted, references herein to a "party" are references to the applicable party to this Agreement.

Section 8.03 Amendments and Waivers.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each SN Party, GSO Associates and GSO Holdings, or in the case of a waiver, by the party against whom the waiver is to be effective; provided, further that any amendment or waiver that affects the rights and obligations of Intrepid under this Agreement shall also require the written consent of Intrepid. For the purposes of clarity, no signature or consent of any third-party beneficiary to any provision of Article VI shall be required in order to amend or waive any provision of Article VI.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided will be cumulative and not exclusive of any rights or remedies hereunder, under any other Basic Document, or at law or in equity; accordingly, no exercise of any right or remedy shall be construed as an election of remedies by any party.

Section 8.04 Binding Effect. This Agreement shall be binding upon the parties and their respective successors and permitted assigns, and shall remain in full force and effect after the Anadarko Closing and if occurring, the KNOC Closing. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

Section 8.05 Communications. All notices and demands provided for hereunder shall be in writing and shall be given by registered or certified mail, return receipt requested, telecopy, air courier guaranteeing overnight delivery or personal delivery to the following addresses

(a) If to GSO Associates or GSO Holdings:

c/o GSO Capital Partners
GSO ST Holdings LP
1111 Bagby Street, #2050
Houston, Texas 77002
Attention: Robert Horn
Email: robert.horn@gsocap.com

with a copy to (which shall not constitute notice):

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, New York 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

with a copy to (which shall not constitute notice):

Andrews Kurth Kenyon LLP
600 Travis Street, Suite 4200
Houston, Texas 77002
Attention: G. Michael O'Leary
Jon Daly
Facsimile: (713) 220-4285
Email: moleary@akllp.com
jondaly@andrewskurth.com

(b) If to an SN Party:

1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, Texas 77002
Attention: John D. Pitts, P.C.
Email: john.pitts@kirkland.com

(c) If to Intrepid:

Intrepid Private Equity V-A, LLC
c/o Intrepid Private Equity Fund GP, LLC
540 Madison Avenue, 21st Floor
New York, NY 10022
Attention: Christopher Winchenbaugh
Email: Winchenbaugh@intrepidfp.com

with a copy to (which shall not constitute notice):

Baker Botts L.L.P.
910 Louisiana St.
Houston, TX 77002
Attention: Felix Phillips
Jeremy Moore
Email: felix.phillips@bakerbotts.com
jeremy.moore@bakerbotts.com

or to such other address as the parties hereto may designate in writing. All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; upon actual receipt if sent by certified or registered mail, return receipt requested, or regular mail, if mailed; upon actual receipt of the overnight courier copy, if sent via facsimile; and upon actual receipt when delivered to an air courier guaranteeing overnight delivery.

Section 8.06 Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein are intended by the parties as a final

expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter including those set forth in the Original SPA. Each of the parties hereto acknowledges and agrees that in executing this Agreement (i) the intent of the parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.06 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the parties hereto stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.06.

Section 8.07 Governing Law; Submission to Jurisdiction. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), will be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflicts of laws. Any action against any party relating to the foregoing shall be brought in any federal or state court of competent jurisdiction located within the State of Delaware, and the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the State of Delaware over any such action. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 8.08 Waiver of Jury Trial. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, AND AGREES TO CAUSE ITS AFFILIATES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 8.09 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement.

Section 8.10 Successors and Assigns. The provisions of this Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns. No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement (including any transfer by way of merger or operation of law) without the consent of each other party, and any such purported assignment in violation of this Section 8.10 shall be void *ab initio*. Notwithstanding the foregoing, GSO Holdings may assign its rights and obligations under this Agreement without the prior approval of any other party to this Agreement to any fund or account managed, advised or sub-advised by GSO or any of its Affiliates; provided that any such assignment shall not relieve GSO Holdings of any of its obligations hereunder.

Section 8.11 Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

Section 8.12 Interim Actions.

(a) SN shall consult in good faith with GSO Holdings and GSO Associates in connection with any amendment, modification or waiver of any right under or the satisfaction of any condition in the APC/KM PSA or KNOC PSA, as applicable, to be satisfied by Anadarko, it being understood that, except as specified in the immediately following sentence, the foregoing shall not be construed to require the consent of GSO Holdings and GSO Associates in order to effect any such termination amendment, modification or waiver. Notwithstanding anything to the contrary set forth in this Agreement, neither SN nor any of its Affiliates will take any of the following actions in respect of the APC/KM PSA, without the prior approval of GSO Holdings and GSO Associates, such approval not to be unreasonably withheld:

(i) Approve any amendment or modification to any provision of, or waive any right or condition under, the APC/KM PSA or KNOC PSA;

(ii) Enter into any agreements with any counterparty in respect of a "Hard Consent" (as such term is defined in the APC/KM PSA) or a consent required to assign any of the gathering or processing agreements (including, without limitation, either of the Springfield Gathering Agreements) included in the "Applicable Agreements" (as such term is defined in the APC/KM PSA), in order to obtain consents to assignment required to be obtained under the APC/KM PSA or KNOC PSA, as applicable, that would result in a $2,000,000 net cost to the Partnership (and such cost shall be shared proportionately among SN, Blackstone Newco and the Partnership with the Partnership bearing a 20% share) or that would have a material and adverse effect on the Partnership;

(iii) Enter into any hedge contracts on behalf of the Partnership, except to the extent such hedge contracts are consistent with Section 6.7 of the Partnership Agreement; *provided*, *however*, that prior to the Anadarko Closing SN shall use its commercially reasonable efforts to cause Anadarko to enter into hedges in respect of the Acquired Properties that are consistent with the hedge plan set forth in Schedule 11.9(a), Part I of the APC/KM PSA as such Schedule is in effect on the Effective Date;

(iv) Approve any amendment or modification of, or waive any right under, the Hydrocarbons Marketing Agreement; or

(v) Enter into the KNOC PSA if (A) the KNOC PSA is not on substantially the same terms and conditions as the APC/KM PSA (including, without limitation, the portion of the purchase price to be paid



008255

by the Partnership at the KNOC Closing and the form of conveyance of properties to the Partnership by KNOC) or (B) the unadjusted base purchase price (which shall correspond to the definition of "Purchase Price" under the APC/KM PSA) payable to KNOC thereunder shall not exceed $1,137,500,000.00.

(b) SN shall consult in good faith with GSO Holdings and GSO Associates in connection with (i) SN's actions or any of its Affiliates' actions relating to each of the title defect and environmental defect process under Articles XIII and XIV, respectively, of the APC/KM PSA, or any similar provisions under the KNOC PSA, as applicable, including reviewing any interim and final defect notices prior to submission thereof to Anadarko or KNOC, as applicable, exercise of elections by or on behalf of the Partnership regarding curative matters, and arbitration and settlement title and environmental disputes and with respect to the settlement of any defect dispute after the consummation of the "Closing" (as such term is defined in the APC/KM PSA) contemplated by the APC/KM PSA or, as applicable, the exercise any analogous right under the KNOC PSA; (ii) the submission to Anadarko or KNOC, as applicable, of preliminary and final accounting settlement statements and agreements with Anadarko or KNOC, as applicable, on such settlement statements and any arbitration proceedings to resolve such matters; (iii) SN's plan to hire any Anadarko employees or KNOC employees, as applicable, and the anticipated impact thereof on general and administrative expenditures and lease operating expenditures that would be chargeable by SN or its Affiliates to the Partnership in respect of the Acquired Properties or KNOC Properties, as applicable, and operations conducted thereon; and (iv) any public announcements proposed to be made by Anadarko and SN or its Affiliates regarding the APC/KM PSA; KNOC and SN or its Affiliates regarding the KNOC PSA; the Basic Documents or the transactions contemplated thereby; in each case to the extent applicable to either GSO Holdings and/or GSO Associates and their Affiliates. Furthermore, SN shall consult in good faith with GSO Holdings and GSO Associates in connection with any contemplated termination of the APC/KM PSA and/or KNOC PSA, it being understood that the foregoing shall not be construed to require the consent of GSO Holdings and GSO Associates in order to effect any such termination.

Section 8.13 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any party may be a partnership or limited liability company, each party hereto, by its acceptance of the benefits of this Agreement and the other Basic Documents, covenants, agrees and acknowledges that, except as may be set forth in each of the Equity Commitment Letters, no Persons other than the parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any party (or any of their successors or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the parties, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such Persons and entities, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

Section 8.14 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of SN or by any creditors of any Subsidiary or Affiliate of SN.

Section 8.15 Public Disclosure; Confidentiality. Unless required by Law (or the advice of counsel to an applicable party), no press release or public announcement related to the Partnership or the General Partner, this Agreement or the transactions contemplated herein or any other related announcement or communication shall be issued or made by any party without the advance approval of each other parties, in which case each party shall be provided a reasonable opportunity to review and provide suggested comments concerning the disclosure contained in such press release, announcement or communication prior to issuance, distribution or publication. In addition, except as required by Law (or the advice of counsel to an applicable party), no party shall, and each party shall cause its respective representatives not to, disclose the terms and conditions of this Agreement to any third party, in each case, without the prior written consent of each of the parties, except to authorized directors, managers, officers, legal counsel, accountants and financial advisors of such party or its Affiliates. In furtherance of the foregoing, each party shall treat the terms and conditions of this Agreement as confidential; *provided, however*, that GSO Holdings and its Affiliates shall be entitled to disclose the terms contemplated herein and high-level summary information regarding the General Partner's and the Partnership's operations (including total production volumes, total revenues, etc.) to its limited partners, owners, co-investors, prospective investors, and existing and potential investors in funds or accounts managed, advised or sub-advised by GSO, in each case, without the consent of any Person; ***provided, further***, that nothing in this Section 8.15 shall derogate from the rights of any Purchaser to disclose any information it is permitted to disclose without the consent of any other Person under Section 6.6 of the Partnership Agreement. Notwithstanding anything to the contrary herein, nothing in this Section 8.15 shall limit SN or its Affiliates from publicly filing this Agreement and making additional disclosures therewith, in each case as required by applicable Law and securities regulations.

Section 8.16 Time is of the Essence. Time is of the essence in the performance of all obligations under this Agreement.

Section 8.17 Remedies Generally. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at law or that an award of specific performance is not an appropriate remedy for any reason at law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 8.17 shall not be required to provide any bond or other security in connection with any such injunction. Notwithstanding anything to the contrary provided herein, Intrepid covenants and agrees that (i) Intrepid's sole right to determine if the conditions to the Anadarko Closing are satisfied are as set forth in Section 2.09 and Intrepid shall not have the right to claim that other conditions to the Anadarko Closing have not been satisfied, and (ii) GSO Holdings shall have the sole right to determine whether to pursue any claim or remedy against SN or any its Affiliates for any breach, violation or claim under this Agreement, including, without limitation, and claim for indemnification under Section 6.01(a).

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto execute this Agreement, effective as of the Effective Date.

**SN:**

**SANCHEZ ENERGY CORPORATION**

By: /s/ Howard J. Thill
Name: Howard J. Thill
Title: Executive Vice President and Chief Fiancial Officer

**SN GP MEMBER:**

**SN UR HOLDINGS, LLC**

By: /s/ Howard J. Thill
Name: Howard J. Thill
Title: Executive Vice President and Chief Fiancial Officer

**PARTNERSHIP:**
**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**GENERAL PARTNER:**
**SN EF UNSUB GP, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**COMMON UNIT PURCHASER:**

**SN EF UNSUB HOLDINGS, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Executive Vice President

**GSO ASSOCIATES:**

**GSO ST HOLDINGS ASSOCIATES LLC**

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

**PREFERRED UNIT PURCHASERS:**

**GSO ST HOLDINGS LP**

By: GSO ST HOLDINGS ASSOCIATES LLC, its General Partner

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

**INTREPID PRIVATE EQUITY V-A, LLC**

By: Intrepid Private Equity Fund GP, LLC, its manager

By: /s/ Hugh E. McGee III
Name: Hugh E. McGee III
Title: Managing Member

# Exhibit D

**HYDROCARBONS PURCHASE AND MARKETING AGREEMENT**

**Between**

**SN EF MAVERICK, LLC**

**and**

**SN EF UNSUB, LP**

**Dated as of January 12, 2017**

---

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1. | Specific Definitions | 1 |
| 1.2. | Construction | 1 |
| ARTICLE II PURCHASE AND SERVICES | | 2 |
| 2.1. | Purchase by Marketer | 2 |
| 2.2. | Limitations | 2 |
| 2.3. | Standard of Care | 2 |
| 2.4. | Repurchase Right | 2 |
| 2.5. | Reporting | 3 |
| 2.6. | Right to Cure | 3 |
| ARTICLE III PRICE AND PAYMENT | | 3 |
| 3.1. | Price | 3 |
| 3.2. | Statements and Payments | 3 |
| 3.3. | Audit Rights | 4 |
| 3.4. | Statement Errors | 4 |
| 3.5. | Setoff and Recoupment | 4 |
| 3.6. | Deposit of Producer's Proceeds and Security Interest. | 5 |
| ARTICLE IV WARRANTY OF TITLE | | 6 |
| 4.1. | Title Warranties | 6 |
| 4.2. | Title and Risk of Loss | 6 |
| ARTICLE V FORCE MAJEURE | | 7 |
| 5.1. | Suspension of Obligations | 7 |
| 5.2. | Definition of Force Majeure | 7 |
| ARTICLE VI TAXES | | 7 |
| 6.1. | Taxes | 7 |
| 6.2. | Reimbursement | 7 |
| ARTICLE VII TERM AND TERMINATION | | 7 |
| 7.1. | Term and Termination | 7 |
| 7.2. | Early Termination | 7 |
| 7.3. | Effect of Termination | 8 |
| ARTICLE VIII GENERAL PROVISIONS | | 8 |
| 8.1. | Waivers | 8 |
| 8.2. | Assignment; Binding Effect | 8 |
| 8.3. | Joinder | 8 |
| 8.4. | Governing Law; Severability | 9 |
| 8.5. | Further Assurances | 9 |
| 8.6. | Counterparts | 9 |
| 8.7. | Notices | 9 |
| 8.8. | Remedies | 10 |
| 8.9. | Disputes | 10 |
| 8.10. | Expenses | 11 |
| 8.11. | Third Party Beneficiaries | 11 |
| 8.12. | Conflict | 12 |
| 8.13. | Subchapter K | 12 |
| 8.14. | Entire Agreement; Integrated Transaction | 12 |
| 8.15. | Sanchez Support | 12 |
| Annex I | Definitions | |
| Exhibit A | Springfield Agreements Allocable Share | |
| Exhibit B | Midstream Contracts | |

**HYDROCARBONS PURCHASE AND MARKETING AGREEMENT**

This **HYDROCARBONS PURCHASE AND MARKETING AGREEMENT** (this "Agreement"), dated as of January 12, 2017 (the "Effective Date"), is between SN EF Maverick, LLC, a Delaware limited liability company ("Marketer"), SN EF UnSub, LP, a Delaware limited partnership ("Producer"), and solely for purposes of Sections 8.15 and 8.16 hereof, Sanchez Energy Corporation, a Delaware corporation ("Sanchez"). Each of Marketer and Producer is referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS**

A. The Parties entered into that certain Purchase and Sale Agreement, dated effective as of July 1, 2016, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko"), Aguila Production, LLC ("Aguila"), and the Parties, (together with any purchase agreement that may be entered into with Korea National Oil Corporation ("KNOC") pursuant to certain tag-along rights, the "Purchase Agreement"), pursuant to which Aguila and the Parties collectively purchased all of the working interests of Anadarko and KNOC to the extent that it exercises its tag-along rights, collectively in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas (collectively, the "Assets").

B. Marketer desires to purchase from Producer, and Producer desires to sell to Marketer, the oil, gas and other Hydrocarbons produced from and attributable to the Working Interests in the Assets acquired by Producer under the Purchase Agreement as well as other Working Interests acquired by Producer after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts (such interests, "Producer's Interests"), which Marketer will gather, process, transport, market and sell, as applicable, on the terms and conditions set forth in this Agreement and the Midstream Contracts.

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1. Specific Definitions. Capitalized terms used in this Agreement have the meanings assigned to such terms in Annex I.

1.2. Construction. Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular includes the plural, and the plural includes the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof refer to the corresponding article, section or subdivision of this Agreement unless specific reference is made to articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

**ARTICLE II**
**PURCHASE AND SERVICES**

2.1. Purchase by Marketer. On each Day during the Term, Producer shall sell and deliver to Marketer, and Marketer shall purchase and receive from Producer, at the Receipt Points, all Hydrocarbons produced from and attributable to Producer's Interests, in accordance with the terms and conditions of this Agreement, other than Producer's Reserved Hydrocarbons.

2.2. Limitations. Marketer shall not, without Producer's prior written consent (such consent not to be unreasonably withheld) and only to the extent relating to or affecting Producer's Hydrocarbons, (1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to Producer's Hydrocarbons, (ii) impose minimum volume, take or pay, demand charges, reservation fees, or deficiency payments obligations or extensions thereof, or (iii) fix prices for the resale of Producer's Hydrocarbons for a term longer than six months (or that cannot be terminated without penalty upon six months' notice or less) or (b) otherwise have an adverse effect, in any material respect, on Producer, in each case, except to the extent the items set forth in in clauses (a) or (b) are required by Law, (2) enter into any contract with an Affiliate of Marketer that is on terms materially less favorable to Producer than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of Producer that are in excess of $20 million in any calendar year or (3) enter into any Midstream Contract after the Effective Date if such contract (a) is not also applicable to Sanchez's Hydrocarbons and Aguila's Hydrocarbons on a proportional basis (based upon reasonable forecasts of anticipated production that pertain to the Midstream Contract) or (b) has not been expressly approved by the independent members of the Sanchez board of directors or by the working interest owners that are subject to production marketing agreements or elections applicable to such Midstream Contract; *provided* that, if Producer does not consent or object in writing to Marketer's written request to undertake any of the actions described in preceding clauses (1) through (3) within 10 Business Days of Producer's receipt of such written request from Marketer, Producer shall be deemed to have consented to such action for purposes of this Section 2.2.

2.3. Standard of Care. Marketer shall purchase and provide services for Producer's Hydrocarbons delivered hereunder in accordance with all applicable Laws and in compliance with the terms of the applicable Midstream Contracts, and shall use commercially reasonable efforts to (a) obtain market rates in the area under any new contracts for the resale of Producer's Hydrocarbons, and (b) avoid any imbalances or scheduling variances and any penalty charges associated therewith under the Midstream Contracts. Producer's Hydrocarbons must be gathered, processed, transported and sold on terms and conditions no less favorable to Producer than the terms and conditions applicable to Sanchez's Hydrocarbons.

2.4. Repurchase Right. From and after April 1, 2023, for so long as the Springfield Agreements are in force and effect, Producer shall have the right for any Month, exercisable from time to time upon written notice to Marketer at least ten (10) days prior to the first day of such Month, to repurchase from Marketer at the applicable Delivery Point (as defined in the applicable Springfield Agreement) all volumes of Producer's Hydrocarbons delivered to Marketer at the Receipt Points in such Month less any LAUF or Line Fill deducted under the Springfield Agreements. If Producer exercises the repurchase right for any Month as to all or part of Producer's Hydrocarbons, then (a) Marketer shall redeliver, or cause to be redelivered, such volumes of Producer's Hydrocarbons to Producer at such applicable Delivery Point and transfer title to such Producer's Hydrocarbons to Producer at such applicable Delivery Point and (b) Producer shall pay Marketer an amount equal to Producer's Allocable Share of the Springfield Agreements for that Month attributable to such Hydrocarbons repurchased by Producer in such month. Notwithstanding the above, if Marketer has entered into Midstream Contracts that are attributable to Producer's Hydrocarbons and such contracts were approved by Producer prior to the exercise of its repurchase right hereunder, then Producer will not be entitled to exercise its repurchase rights

hereunder for the portion of Producer's Hydrocarbons committed to such approved Midstream Contracts during the term of such Midstream Contracts.

2.5. Reporting. Marketer shall consult with and provide reports to Producer on a quarterly basis regarding marketing activities concerning Producer's Hydrocarbons. Such reports will contain such information, details, and supporting documentation as Producer may reasonably request, and shall include (a) a schedule identifying the markets into which each of Producer's Hydrocarbons and Sanchez's Hydrocarbons are being sold and the realized net back pricing being received by each, broken down by sales point and by each Midstream Contract, (b) amendments to any of the Midstream Contracts pursuant to which Producer's Hydrocarbons are being gathered, processed, transported or sold, (c) upon request from Producer, any reports or other information provided to Marketer under the terms of any of the Midstream Contracts and (d) any material issues or disputes arising under such agreements. In addition to the foregoing reporting requirements, and the provisions of Section 2.6, prior to the Redemption Date, Marketer shall promptly deliver to GSO copies of all material notices delivered to Marketer under any Marketing Contract and Midstream Contract by the applicable counterparty with respect to Producer's Hydrocarbons.

2.6. Right to Cure. If Marketer defaults in the performance of any of its obligations under the Midstream Contracts, or upon the occurrence or non-occurrence of any event or condition under the Midstream Contracts that would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable the applicable counterparty to terminate or suspend its obligations or exercise any other right or remedy under such contracts or under applicable Law (a "Marketer Event"), then Marketer shall (a) promptly notify Producer of such Marketer Event, (b) use its commercially reasonable efforts to cause the applicable counterparty to allow Producer to cure such Marketer Event with respect to Producer's Hydrocarbons, and (c) use its commercially reasonable efforts to continue to perform each of Marketer's other obligations under the Midstream Contracts.

## ARTICLE III
## PRICE AND PAYMENT

3.1. Price. For each Month, in full consideration for Marketer's purchase of Producer's Hydrocarbons hereunder, Marketer shall pay to Producer an amount equal to (i) the payments received by Marketer from Third Parties upon the resale of Producer's Hydrocarbons and all constituents thereof (including any residue gas, condensate, and natural gas liquids, as applicable) during such Month after being gathered, treated, transported, and processed under the Midstream Contracts less (ii) Producer's Allocable Share of Midstream Charges for such Month less any actual or estimated deductions for the amounts set forth in Section 3.2(c)(ii) and (iii) (such amount, the "Net Amount"). Positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information.

3.2. Statements and Payments.

(a) Statements and Payments. Marketer shall pay to Producer the Net Amount for any given Month consistent with Marketer's normal business practice under similar circumstances, on or before the date that is 10 days after the date on which Marketer actually receives readily available funds for Producer's Hydrocarbons sold by Marketer or its Affiliates for such calendar Month from the applicable purchasers of such Producer's Hydrocarbons (such date, the "Due Date"), along with a detailed statement describing such amounts payable to Producer hereunder in such Month.

(b) Late Payments. Any amounts not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date to but excluding the date the delinquent amount is paid in full.

(c) Collection and Payment. Marketer shall use commercially reasonable efforts to (i) collect all production funds from the purchasers of such Producer's Hydrocarbons, (ii) arrange for the timely payment of severance taxes to any Governmental Authorities, (iii) make timely payment to royalty owners and third party working interest owners, and (iv) remit to Partnership its net proceeds from the sale of Producer's Hydrocarbons after making all necessary or appropriate allocations and distributions in connection with the receipt of such proceeds in accordance with Section 3.1. The Parties recognize that the calculation and payment of severance taxes and royalty payments set forth above may be based upon estimates at the time of the payment of the Net Amount in accordance with Section 3.1 and that positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information regarding actual severance tax and royalty payments.

(d) Notices. Marketer shall provide written notice to Producer not less than five Business Days prior to entering into, amending, or terminating any Midstream Contract.

3.3. Audit Rights. Upon not less than 10 Days' prior written notice to the other Party, either Party or its or representative, at reasonable times during business hours and at its own expense, may audit the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge or computation made under or pursuant to this Agreement.

3.4. Statement Errors. If an error is discovered in the amount shown to be due on any statement rendered by Marketer hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than 30 Days after the discovery of the error. If a dispute arises as to the amount payable in any invoice rendered hereunder, the disputed statement must nevertheless be paid in full, but payment will not waive the payor's right to dispute such statement in accordance with this Section 3.4. Any invoice dispute or statement adjustment must be in writing and must state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment must be made within 15 Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date to but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two years after the date on which the statement is rendered. The provisions of Section 3.3 and this Section 3.4 will survive the termination of this Agreement for the later of (a) 24 Months following the date on which such termination occurred, or (b) until a dispute initiated within such 24-Month period is finally resolved.

3.5. Setoff and Recoupment. Upon the occurrence of either or both of (a) an Event of Default of a Party, or (b) a circumstance under clauses (a), (b), (c) of Section 3.6(a), either Party may with respect to Section 3.5(a) and Producer may with respect to Section 3.5(b), in its sole discretion and without limiting any other rights or remedies, undertake any one or all of the following actions: (i) such Party may exercise recoupment by retaining, freezing, holding, and/or liquidating any proceeds that would otherwise be payable to the other Party to satisfy and apply to any amounts owed by such other Party under this Agreement or applicable Law as of the time of such recoupment or at any later time; and/or (ii) such Party may exercise setoff by retaining, freezing, holding, and liquidating any proceeds that would be otherwise deliverable or payable to such other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from such other Party to the other Party under this Agreement or applicable Law as of the time of the setoff or offset or at any later time. Should a Party elect to exercise its rights under this Section 3.5, such Party shall notify the other Party in writing, within 10 Days of such recoupment, setoff, and/or offset; provided, however, such Party will not be required to provide such other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party hereby agrees to (x) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable Law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (y) not oppose a motion by a Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 3.5, that any recoupment exercised as provided for herein will be considered to be within a

single transaction. The rights granted to the Parties pursuant to this Section 3.5 are in addition to any rights of recoupment, setoff, and/or offset the Parties may be otherwise entitled.

3.6. Deposit of Producer's Proceeds and Security Interest.

(a) Deposit of Producer Proceeds. If (a) an Investor Redemption Event occurs, (b) Marketer has failed to pay amounts owed to Producer under this Agreement within five (5) days of the applicable Due Date or (c) Producer otherwise has reasonable grounds for insecurity regarding the performance by Marketer of any obligation under this Agreement (with clause (c) being a "Basis For Requesting Assurance"), then, within 10 Business Days after written notice from Producer, Marketer and its Affiliates will direct all purchasers of Producer's Hydrocarbons to deposit amounts owed by such purchasers for Producer's Hydrocarbons into (a) a bank account or accounts designated by Producer (in which case Producer shall remit to Marketer Producer's Allocable Share of Midstream Charges or any other costs owed by Producer to Marketer) or (b) a mutually agreed escrow account (in which case Producer shall be entitled to receive amounts due each month under Section 3.1 and Marketer shall be entitled to the remainder of the amounts from such account). A Basis for Requesting Assurance will include, without limitation, any reasonable grounds for insecurity with respect to the performance of Marketer and/or any grounds that might constitute a basis for requesting adequate assurance of performance under Section 2.609 of the Uniform Commercial Code.

(b) Security Interest. Marketer is marketing Producer Hydrocarbon's on Producer's behalf and holding all proceeds from the sale of Producer's Hydrocarbons in trust on behalf of Producer. In addition, Producer retains, and Marketer grants to Producer, a first priority lien and security interest (subject to Permitted Liens (as defined below)) on (a) all of Producer's Hydrocarbons purchased under this Agreement, (b) all proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer and (c) all accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer (the "Collateral"). Marketer shall have the right to resell all of Producer's Hydrocarbons without obtaining a release of the lien or other permission from Producer. Upon the resale of Producer's Hydrocarbons, the lien and security interests retained and granted above shall be completely and automatically released by Producer without the need for execution of any document or instrument and, in lieu thereof, shall affix to the proceeds and accounts receivable resulting from the resale of Producer's Hydrocarbons to such purchasers. Producer may enforce its lien and security interest and exercise any and all of the rights and remedies available to a secured party under the Uniform Commercial Code, in addition to all of the rights and remedies otherwise provided by Law. Producer may file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Marketer, in each case where permitted by Law, and may take any and all other actions necessary to secure its interest in the Collateral. In addition, Marketer agrees that from time to time it will promptly execute and deliver all instruments and documents, and take all further actions, that Producer may reasonably request as being necessary or desirable to perfect and protect the security interest granted or purported to be granted hereby or to enable Producer to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Marketer will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as Producer may request as being necessary or desirable in order to perfect and preserve the security interests granted or purported to be granted hereby. The lien and security interest granted herein are in addition to any statutory or common law liens on Producer's Hydrocarbons in favor of Producer. Marketer warrants that, except as set forth in the sentence after this sentence, it has not consensually granted and will not consensually grant any liens or security interests on the Collateral to any other Person. Without affecting any priority of the liens and security interests on the Collateral granted to it under this Agreement or arising pursuant to Section 9.343 of the Texas Business and Commerce Code, Producer agrees and acknowledges that Marketer may, as security for the "Obligations" as defined in the Credit Agreement (defined below) and any refinancing thereof or as security for any obligations under any junior lien indebtedness that is subject to a security grant consistent with such Credit Agreement or the refinancing thereof, grant a security interest over all of Marketer's assets, including, without limitation, Producer's Hydrocarbons purchased under

this Agreement, any deposit account of Marketer in which proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer may be deposited and any accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer. As used in the preceding sentence, "Credit Agreement" means the Second Amended and Restated Credit Agreement among Sanchez, as borrower, Royal Bank of Canada, as administrative agent, and others, as amended to date and as the same may hereafter be amended, modified, refinanced, replaced, restated or supplemented. As used in this Section 3.6(b), "Permitted Liens" means (a) liens for taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like liens arising by operation of law incident to the exploration, development, operation and maintenance of oil and gas properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (c) Liens (as defined in the Credit Agreement) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board (as defined in the Credit Agreement) and no such deposit account is intended by the Borrower (as defined in the Credit Agreement) or any of its Subsidiaries (as defined in the Credit Agreement) to provide collateral to the depository institution and (d) judgment liens.

3.7. Marketing Transition Services Agreement. Pursuant to the terms of the Marketing Transition Services Agreement, the Provider (as that term is defined in such agreement) will provide Marketer certain marketing transition services, including the purchase and sale of Producer's Hydrocarbons. For avoidance of doubt, the Parties agree that the billing and payment provisions set forth in this Article III will apply during the period in which the Marketing Transition Services Agreement is in effect, including the payment of amounts to Producer for the resale of Producer's Hydrocarbons and the allocation of demand charges under the Midstream Contracts.

## ARTICLE IV
## WARRANTY OF TITLE

4.1. Title Warranties.

(a) Producer represents and warrants to Marketer that Producer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Marketer hereunder, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes, subject to the performance by the Manager of its obligations under the MSA.

(b) If Producer elects to repurchase Producer's Hydrocarbons under Section 2.4, then Marketer shall represent and warrant to Producer that Marketer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Producer under Section 2.4, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes.

4.2. Title and Risk of Loss. Title to and risk of loss of Producer's Hydrocarbons purchased by Marketer from Producer hereunder will pass from Producer to Marketer at the inlet of Springfield's measurement facilities at the Receipt Points under the Springfield Agreements or at such other receipt points as the Parties agree. As between the Parties, title to and risk of loss of Producer's Hydrocarbons shall remain with Marketer thereafter unless such Producer's Hydrocarbons are repurchased by Producer under Section 2.4, in which case title to and

risk of loss of any such repurchased Producer's Hydrocarbons shall pass to Producer at the applicable Delivery Points under the Springfield Agreements or at such other delivery points as the Parties agree.

## ARTICLE V
## FORCE MAJEURE

5.1. Suspension of Obligations. If either Producer or Marketer is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Party, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder), so far as they are affected by such Force Majeure, will be suspended during the continuance of any inability so caused, but for no longer period, and such cause must be remedied with all reasonable dispatch.

5.2. Definition of Force Majeure. The term "Force Majeure" means any event or circumstance not reasonably within the control of the Party claiming suspension declared as Force Majeure by a counterparty to any of the Midstream Contracts.

## ARTICLE VI
## TAXES

6.1. Taxes. Manager under the MSA shall pay, on behalf of Producer, to the appropriate taxing authorities severance and other Taxes levied on Producer's Hydrocarbons prior to the delivery of such Producer's Hydrocarbons to the Receipt Points hereunder. Marketer or its Affiliates shall pay any and all Taxes levied on Producer's Hydrocarbons after title to such Hydrocarbons has transferred to Marketer.

6.2. Reimbursement. If Marketer or any of its Affiliates pays or remits any Tax for or on behalf of Producer, including severance Taxes on production, then Marketer may deduct such amounts in determining the Net Amount due hereunder as shown on the Monthly statement described in Section 3.2.

## ARTICLE VII
## TERM AND TERMINATION

7.1. Term and Termination. The term of this Agreement will commence on the Effective Date and, unless otherwise agreed by the Parties or earlier terminated in accordance with this Section 7.2, will continue until the earlier of (i) the date of termination of both Springfield Agreements and (ii) December 31, 2034 (the "Term").

7.2. Early Termination.

(a) Either Party may terminate this Agreement effective immediately upon notice to the other Party if the other Party (or its Affiliates, with respect to Marketer) (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer in a court of competent jurisdiction seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of all or any substantial part of such its assets or properties; or (vii) is liquidated and dissolved; or

(b) Either Party may terminate this Agreement upon notice to the other Party if (i) such other Party is in material breach of this Agreement and such breach is not remedied within 30 days after such other Party's receipt of such notice or (ii) all of the Midstream Contracts are terminated or otherwise no longer in full force and effect; provided that Marketer may not terminate this Agreement pursuant to this Section 7.1(b) (x) if at the time of such breach, Sanchez and its Affiliates hold a majority of the board of directors of SN EF UnSub, GP or (y) such breach was caused by a breach of Manager under the MSA; or

(c) Following an Investor Redemption Event, Producer may terminate this Agreement in whole or in part by written notice to Marketer, provided that Producer may not terminate its obligation related to the Springfield Agreements (including to pay to Marketer Producer's Allocable Share of the Springfield Agreements) without Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain if requested by Producer.

7.3. Effect of Termination. The expiration or termination of this Agreement, for any reason, will not release either Party from any obligation or Liability to the other Party, including any payment obligation, that has already accrued hereunder. Following early termination under Sections 7.2(a), 7.2(b), or 7.2(c) upon Producer's request, Marketer and its Affiliates shall use commercially reasonable efforts to work with Producer and the applicable counterparties to partially assign, or to enter into replacements for, any of the Midstream Contracts identified by Producer to assist in the continued delivery of Producer's Hydrocarbons following the termination of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1. Waivers. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

8.2. Assignment; Binding Effect. Neither Party may assign its rights or interests under this Agreement, or delegate any duties or obligations hereunder, without the prior written consent of the other Party, which consent may be withheld by the other Party in its sole discretion; *provided* that consent is not required for an assignment of rights or interests under this Agreement by a Party (a) to an Affiliate of a Party (without releasing the assigning Party of its obligations under this Agreement) or (b) subject to obtaining Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain, to a Third Party in connection with a conveyance of all or a part of Producer's Interests. This Agreement is binding upon and inures to the benefit of the Parties and their respective legal representatives, successors, and permitted assigns.

8.3. Joinder. Marketer shall cause any of its Affiliates that acquire or own Working Interests in jointly owned properties with Producer after the Effective Date to ratify and become a party to this Agreement by an amendment executed and delivered by the Parties and such Affiliate or Affiliates.

8.4. Governing Law; Severability.

(a) **THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED AND WILL BE CONSTRUED, INTERPRETED AND GOVERNED PURSUANT TO AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES THAT , IF APPLIED, MIGHT PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement, or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will not be affected thereby and that provision will be enforced to the greatest extent permitted by applicable Law.

8.5. Further Assurances. Subject to the terms and conditions set forth in this Agreement, each of the Parties shall use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

8.6. Counterparts. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, will be deemed an original, and all of which will constitute but one and the same instrument.

8.7. Notices. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement must be in writing and sent to the address of the Party set forth below, or to such other more recent address of which the sending Party actually has received written notice. Any notice or communication provided to Producer pursuant to this Agreement shall be provided concurrently to GSO by electronic email:

(a) if to Marketer, to:

SN EF Maverick, LLC
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

(b) if to Producer, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

prior to Redemption Date, with a copy to (which shall not constitute notice):
GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com
With a copy to:
Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com
(c) if to Sanchez, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

Each such notice or other communication must be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

8.8. Remedies. Except as provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party will be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties shall not assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

8.9. Disputes.

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR

PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), WILL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES MUST BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY WILL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL WILL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN WILL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

8.10. Expenses. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.11. Third Party Beneficiaries.

(a) Prior to the Redemption Date, GSO and its Affiliates shall be express third party beneficiaries of Producer's rights under this Agreement. Other than as set forth in the preceding sentence or in clause (b) below, the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns, and this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities or obligations are owed by a Party, or (b) any liquidator, trustee or creditor acting on behalf of any Party, and no such creditor or any other Person will have any rights under this Agreement.

(b) Subject to clause (a) above, notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith may be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

8.12. Conflict. In the event of a conflict between the terms of this Agreement and the terms of any joint operating agreement applicable to the Producer Interests, the terms of this Agreement will control as between the Parties.

8.13. Subchapter K. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code.

8.14. Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its

Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

8.15. Sanchez Support. Sanchez is executing this Agreement to evidence its agreement to cause Marketer to perform and comply with Marketer's obligations under Section 3.1, Section 3.2, Section 3.6, and Section 8.3. Sanchez hereby guarantees the performance of Marketer under such provisions and agrees to be directly liable to Producer under such provisions in the event of any breach by Marketer.

8.16. Fees to Marketer and Sanchez. In consideration for (a) certain services provided by Marketer to Producer, Producer hereby agrees to pay to Marketer an annual fee equal to $50,000 and (b) certain services provided by Sanchez to Producer, Producer hereby agrees to pay to Sanchez an annual fee equal to $50,000, which such fees, in the case of preceding clauses (a) and (b), shall be due and payable by Producer to Marketer and Sanchez, as applicable, on the Effective Date and each one year anniversary of the Effective Date.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**SN EF MAVERICK, LLC:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UnSub GP, LLC, its general partner
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Solely for purposes of Sections 8.15 and 8.16,**
**SANCHEZ ENERGY CORPORATION:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**<u>Annex I</u>**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" (including its derivatives and similar terms) means possessing the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise. Notwithstanding the foregoing, Marketer and its Affiliates, on the one hand, and Producer and its Affiliates, on the other hand, will not be considered Affiliates of one another. For purposes of this Agreement, Sanchez Oil & Gas Corporation and its Affiliates, including all member of the Sanchez family, shall be deemed to be Affiliates of Marketer.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Aguila</u>" has the meaning set forth in the recitals.

"<u>Aguila's Hydrocarbons</u>" means the Hydrocarbons, including all constituencies thereof, produced from the interests acquired by Aguila under the Purchase Agreement.

"<u>Anadarko</u>" has the meaning set forth in the recitals.

"<u>Assets</u>" has the meaning set forth in the recitals.

"<u>Basic Documents</u>" has the meaning given to such term in the Securities Purchase Agreement.

"<u>Basis for Requesting Assurance</u>" has the meaning set forth in <u>Section 3.6(a)</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"<u>Central Time</u>" means Central Standard time, as adjusted for Central Daylight time.

"<u>Claims</u>" means all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

"<u>Collateral</u>" has the meaning given to such term in <u>Section 3.6</u>.

"<u>Day</u>" or "<u>Daily</u>" means a period of 24 hours, commencing at 7:00 a.m., Central Time, on a calendar day and ending at 7:00 a.m., Central Time, on the next succeeding calendar day.

"<u>Delivery Point</u>" means the "Delivery Points" as defined and listed in the Springfield Agreements, and any future Delivery Point thereunder.

"<u>Due Date</u>" has the meaning set forth in <u>Section 3.2(a)</u>.

"<u>Effective Date</u>" has the meaning set forth in the preamble.

"Event of Default" means, in respect of any Party, the failure to remedy, within 30 days of receipt of written notice thereof from any other Party, the material non-performance of or material non-compliance with any agreements, obligations or undertakings of such Party contained in this Agreement.

"Force Majeure" has the meaning set forth in Section 5.2.

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means GSO ST Holdings LP, a Delaware limited partnership.

"Hydrocarbons" means oil, gas, natural gas liquids, condensate, and other gaseous and liquid hydrocarbons, or any combination of the foregoing.

"Interest Rate" means an annual rate of interest equal to 2% above the prime rate published by *The Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

"Investor Redemption Event" has the meaning set forth in the LP Agreement.

"Joint Development Agreement" means the Joint Development Agreement to be entered into, among Producer, Aguila, and Marketer at the time of the closing pursuant to the Purchase Agreement.

"KNOC" has the meaning given to such term in the recitals.

"LAUF" means lost, unaccounted for, fuel and other losses of Producer's Hydrocarbons in connection with the services provided under an applicable Midstream Contract, in each case to the extent provided under the applicable Midstream Contract.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Line Fill" means line fill and tank bottom inventory and working tank inventory requirements, in each case required to be delivered to the applicable counterparty under a Midstream Contract.

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"LP Agreement" means the Amended and Restated Agreement of Limited Partnership of SN EF Unsub, LP to be entered into at the time of the closing pursuant to the Purchase Agreement, as may be amended.

"Manager" means the Manager under the MSA.

"Marketer" has the meaning set forth in the preamble.

"Marketing Transition Services Agreement" means the Marketing Transition Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement by and among Marketer, Anadarko Energy Services Company, Kerr-McGeee Oil & Gas Onshore LP and Anadarko E&P Onshore LLC and Sanchez Energy Corporation solely for purposes of defined provisions in the agreement, pursuant to which certain marketing transition services will be provided to Marketer.

"Midstream Contracts" means the contracts listed on Exhibit B hereto, including any amendments thereto, and any gathering, processing, transportation or sales agreements entered into after the Effective Date, including any amendments thereto, relating to the Producer's Interests and the Hydrocarbons produced therefrom.

"Month" or "Monthly" means a period of time beginning at 7:00 a.m., Central Time on the first Day of a calendar month and ending at 7:00 a.m., Central Time on the first Day of the next succeeding calendar month.

"MSA" means the Management Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement between Sanchez Oil & Gas Corporation and Producer.

"Net Amount" has the meaning set forth in Section 3.1.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 8.11(b).

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Producer" has the meaning set forth in the preamble.

"Producer's Allocable Share of Midstream Charges" means the sum of Producer's Allocable Share of the Springfield Agreements, plus Producer's Allocable Share of the Other Contracts.

"Producer's Allocable Share of the Other Contracts" means, for all Midstream Contracts other than the Springfield Agreements, a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to the counterparties under such Midstream Contracts during a Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to the counterparties under such Midstream Contracts during such Month, multiplied by the sum of (a) any deficiency payments or other similar fees, payments, or penalties resulting from failure to achieve minimum volume obligations that are paid by Marketer under such Midstream Contracts, (b) any commodity charges, and LAUF and Line Fill volumes incurred under such contracts that are borne by Marketer under such contracts and (c) any other amounts invoiced to Marketer under such Midstream Contracts. Notwithstanding the foregoing, (1) other than with respect to the Firm Intrastate Transportation Agreement dated January 17, 2012 between Eagle Ford Midstream, LP and Anadarko Energy Services and Transportation Services Agreement dated March 1, 2012 between Enterprise Products

Operating LLC and Anadarko Energy Services Company for the Intrastate Movement of NGLs, Producer shall not be obligated to bear any deficiency payment or other similar feeds, payments or penalties in (a) above in an amount greater than 40% of any such payments, fees or penalties that are attributable to the aggregate volume of Producer's Hydrocarbons and Marketer's and its Affiliates' Hydrocarbons produced from the Producer Interests and Sanchez's Interests and (2) Marketer shall not terminate or amend the obligation of other producers under producer marketing agreements or elections applicable to such Midstream Contracts that would increase Producer's Allocable Share of the Other Contracts in any material respect without the consent of Producer.

"Producer's Allocable Share of the Springfield Agreements" means, for as long as Marketer remains a party to the Springfield Agreements, the sum of: (i) the product of the Allocable Springfield Demand Rate in the applicable Month multiplied by the Monthly Minimum Volume Commitment (as defined in each of the Springfield Agreements) under each Springfield Agreement for such Month; (ii) the product of the Allocable Springfield Commodity Rate in the applicable Month multiplied by the volumes of Producer's Hydrocarbons delivered under each Springfield Agreement during such Month; (iii) any LAUF and Line Fill volumes retained by Springfield under the terms of the Springfield Agreements that are attributable to Producer's Hydrocarbons delivered under the Springfield Agreements; and (iv) any other amounts invoiced to Marketer under Article VII of the Springfield Agreements and attributable to Producer's Hydrocarbons being delivered under the Springfield Agreements. For purposes of this definition, (a) "Allocable Springfield Demand Rate" in any Month shall be equal to the applicable Demand Rate (as defined in each of the Springfield Agreements) multiplied by a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to Springfield under each applicable Springfield Agreement during such Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to Springfield under each applicable Springfield Agreement during such Month and (c) the Allocable Springfield Commodity Rate in any Month shall be equal to the applicable Commodity Rate (as defined in each of the Springfield Agreements); *provided* that, in any given Month, if the Total Allocable Rate for such Month is (x) greater than the "Max Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be equal to the product of the "Max Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month or (y) less than the "Min Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be the product of the "Min Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month.

"Producer's Hydrocarbons" means the Hydrocarbons produced from and attributable to Producer's Interests, including all constituencies thereof.

"Producer's Interests" has the meaning set forth in the recitals.

"Purchase Agreement" has the meaning set forth in the recitals.

"Receipt Points" means (i) the "Receipt Points" as defined and listed in the Springfield Agreements, and any future Receipt Point thereunder and (ii) for Hydrocarbons that are not delivered to Springfield, the first point at which Marketer delivers such Hydrocarbons from the wellhead to the facilities of a counterparty under a Midstream Contract.

"Redemption Date" is defined in the MSA.

"Representative" means officers, directors, employees, and other representatives of the referenced entity and its Affiliates.

"Reserved Hydrocarbons" means the volumes of Hydrocarbons that Producer does not deliver under the Springfield Agreements that are associated with field and other similar uses of Producer that are expressly reserved or excepted from the definition of Dedicated Production thereunder.

"Sanchez" has the meaning set forth in the preamble.

"Sanchez's Hydrocarbons" the Hydrocarbons produced from Sanchez's Interests, including all constituencies thereof.

"Sanchez's Interests" means the interests in the Assets acquired by Marketer under the Purchase Agreement as well as other Working Interests acquired by Marketer or its Affiliates after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts.

"Springfield" means Springfield Pipeline LLC, or its permitted successors or assigns as party to the Springfield Agreements.

"Springfield Agreements" means (1) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield and Sanchez, and (2) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and Sanchez, in each case to be entered into at the termination of the Marketing Transition Services Agreement and as each such contract may be amended from time to time.

"Taxes" means all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"Term" has the meaning set forth in Section 7.1.

"Third Party" means any Person other than a Party or one of their Affiliates.

"Total Allocable Rate" means, for any given Month, the rate calculated separately for each of the Springfield Agreements equal to (a) the Producer's Allocable Share of the Springfield Agreement divided by (b) the total volumes of Producer's Hydrocarbons delivered to Springfield under such Springfield Agreement during such Month.

"Securities Purchase Agreement" the Securities Purchase Agreement, dated January 12, 2017, among Producer, Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub GP, LLC, SN EF UnSub Holdings, LLC, GSO ST Holdings Associates LLC and GSO ST Holdings LP.

"Working Interest" means with respect to any lease or well or wellpad, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease, well, or wellpad.

* * *

# Exhibit A

## Springfield Agreements Allocable Share

| | WES Gas Fee ($/mcf) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 1.14 | 1.80 |
| 2017 | 1.04 | 1.58 |
| 2018 | 0.94 | 1.37 |
| 2019 | 0.86 | 1.20 |
| 2020 | 0.85 | 1.17 |
| 2021 | 0.87 | 1.21 |
| 2022 | 0.83 | 1.12 |
| 2023 | 0.80 | 1.04 |
| 2024 | 0.77 | 0.98 |
| 2025 | 0.73 | 0.89 |
| 2026 | 0.71 | 0.84 |
| 2027 | 0.69 | 0.79 |
| 2028 | 0.69 | 0.78 |
| 2029 | 0.68 | 0.76 |
| 2030 | 0.68 | 0.75 |
| 2031 | 0.70 | 0.78 |
| 2032 | 0.71 | 0.80 |
| 2033 | 0.72 | 0.81 |
| 2034 | 0.72 | 0.81 |

Case 4:19-cv-34508 Document 1353-7 Filed 04/19/23 in TX 06/22/2020 Page 413 of 2759

| | WES Oil Fee ($/bbl) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 2.41 | 3.67 |
| 2017 | 2.05 | 2.90 |
| 2018 | 1.82 | 2.42 |
| 2019 | 1.71 | 2.18 |
| 2020 | 1.74 | 2.22 |
| 2021 | 1.73 | 2.19 |
| 2022 | 1.73 | 2.15 |
| 2023 | 1.65 | 1.97 |
| 2024 | 1.55 | 1.76 |
| 2025 | 1.54 | 1.71 |
| 2026 | 1.53 | 1.68 |
| 2027 | 1.54 | 1.67 |
| 2028 | 1.53 | 1.64 |
| 2029 | 1.54 | 1.63 |
| 2030 | 1.56 | 1.66 |
| 2031 | 1.59 | 1.70 |
| 2032 | 1.61 | 1.73 |
| 2033 | 1.63 | 1.75 |
| 2034 | 1.64 | 1.76 |

**Exhibit B**

**Midstream Contracts**

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation | 10/1/2010 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| Anadarko E&P Company LP | Texas Pipleline LLC (Howard) | Firm Transportation (gas) | 10/5/2010 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| Anadarko Energy Services Company | Flint Hills Resources, LP | Crude Oil Supply Agreement (Sales Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | Arrowhead Gathering Company, L.P. | Crude Oil Throughput and Deficiency Agreement (TPT Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 2) | 6/28/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Pipeline, LP | Crude Oil T&D (NuStar) (TPT Tranche 2) | 7/2/2012 |
| Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE) (TPT Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Plains Marketing, LP | Crude Oil Purchase Contract | 4/1/2014 |
| Anadarko E&P Onshore LLC | Shell Trading (US) Compnay | Crude Sales Contract | 12/1/2016 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Condensate Stabilization Agreement | 7/1/2014 |
| Anadarko E&P Onshore LLC | Plains South Texas Gathering LLC | Shipping Agreement | 5/1/2014 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Transportation Service Agmnt | 3/1/2013 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Gas Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Oil Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 1) | 9/1/2010 |

Case 19-34508 Document 1354-7 Filed in TXSB on 06/22/20 Page 26 of 27

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 2) | 2/1/2011 |
| Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |
| Anadarko E&P Onshore LLC | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Shoup) | 3/1/2013 |
| Anadarko E&P Onshore LLC | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2017 |
| Anadarko E&P Company LP | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2011 |
| Anadarko E&P Onshore LLC | Texas Pipeline LLC | NGL Bank Service Agreement | 7/25/2013 |
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation Agreement for NGPA Section 311 Service, No. 9138E | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | Purchase Contract | 10/13/2016 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Master Terminal Services Agreement | 7/2/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Terminal Services Schedule No. Anadarko E&P Company LP – 001 | 7/2/2012 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Gas Gathering (Clear Springs) | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 9/9/2015 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P | Gas Processing Agreement | 8/1/2012 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement | 8/1/2015 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purch. Agreement | 9/1/2008 |
| Anadarko E&P Company LP | Trimac Transportation Central Inc. | Crude Trucking | 3/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | NGL Marketing | 10/13/2016 |

**NAESB Contract Confirmations**

| Gas Sales | Counterparty | Volume (MMBtu/d) | End Date |
|---|---|---|---|
| | Air Liquide (255602) | 12,500 | 3/31/2017 |
| | Air Liquide (255604) | 12,500 | 3/31/2017 |
| | Diamond Shamrock (248974) | 6,045 | 8/31/2017 |
| | Kinder Morgan (255681) | 10,000 | 3/31/2017 |
| | Repsol (244011) | 25,000 | 3/31/2017 |
| | Repsol (255144) | 10,000 | 3/31/2017 |
| | Techgen (221544) | 30,000 | 9/31/2021 |
| | Valero (248973) | 12,060 | 8/31/2017 |
| | Valero (248975) | 4,020 | 8/31/2017 |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 |

# Exhibit E

Sanchez Energy Corporation
1000 Main St, Suite 3000
Houston, Texas 77002

January 12, 2017

SN EF UnSub, LP
1000 Main Street, Suite 3000
Houston, Texas 77002

SN EF Maverick, LLC
1000 Main Street, Suite 3000
Houston, Texas 77002

Re: Letter Agreement

Reference is made to that certain Purchase and Sale Agreement, dated as of January 12, 2017 (the "***APC PSA***"), by and among Anadarko E&P Onshore LLC, a Delaware limited liability company ("***AEP***"), Kerr-McGee Oil & Gas Onshore LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Seller***"), SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***"), Aguila Production, LLC, a Delaware limited liability company ("***AcqCo***" and collectively with SN and UnSub, "***Buyer***"), and, solely for the purposes of Section 15.22 and Schedule 13.4(a) of the APC PSA, Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in the APC PSA.

The purpose of this letter agreement (this "***Letter Agreement***") is to set forth certain agreements of SN, SN Parent and UnSub.

NOW, THEREFORE, for and in consideration of the mutual promises contained herein, the benefits to be derived by each party hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all, SN, SN Parent and UnSub agree as follows:

1. Purchase Price Adjustment. At the Closing, the Purchase Price to be paid by SN and UnSub shall be adjusted pursuant to the provisions of Section 3.3 and Section 3.5 of the APC PSA (herein referred to as the "***Preliminary Purchase Price Adjustment***"). On or before 120 days after the Closing, the Purchase Price shall be adjusted pursuant to the provisions of Section 3.6 of the APC PSA (herein referred to as the "***Final Purchase Price Adjustment***"). Each of the Preliminary Purchase Price Adjustment and the Final Purchase Price Adjustment are sometimes hereinafter referred to individually as a "***Purchase Price Adjustment***." Pursuant to the terms of the APC PSA, Seller (a) will only be adjusting the Purchase Price pursuant to such provisions on an aggregate basis and (b) will not be providing allocations of such adjustments between SN and UnSub. The following sets forth the agreement among SN and UnSub as to allocations of such adjustments between SN and UnSub.

(a) Upon receipt of the Preliminary Settlement Statement or the Final Settlement Statement from APC, on or before (i) three (3) Business Days prior to Closing (in the case of the Preliminary Settlement Statement) or (ii) seven (7) calendar days prior to the Final Payment Date (in the case of the Final Settlement Statement), SN shall use reasonable efforts to submit to UnSub a statement that allocates the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment, as applicable, between SN and UnSub attributable to the undivided interests in the Assets to be acquired by SN and UnSub at Closing. Prior to Closing or the Final Payment Date, whichever is applicable, SN and UnSub will in good faith attempt to agree upon such allocations.

(b) If SN and UnSub are able to agree upon the allocation of the Preliminary Purchase Price Adjustment described in clause (a) above on or before two (2) Business Days prior to the Closing, then SN will notify Seller of the resulting allocation of the Preliminary Purchase Price Adjustment as between SN and UnSub prior to Closing. If SN and UnSub are able to agree upon the allocation of the Final Purchase Price Adjustment described in clause (a) above on or before two (2) Business Days prior to the Final Payment Date, then SN will notify Seller of the resulting allocation of the Final Purchase Price Adjustment as between SN and UnSub prior to the Final Payment Date.

(c) If SN is unable to submit the allocations of the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment described in clause (a) above to UnSub pursuant to the dates set forth in clause (a) above or if SN and UnSub are unable to agree upon such allocations after exercising good faith attempts to do so, then (i) if the applicable Purchase Price Adjustment would result in a payment from Seller to SN and UnSub collectively (or net downward adjustment to the Purchase Price), then such Purchase Price Adjustment shall be allocated 10% to SN and 90% to UnSub at the Closing or Final Payment Date, as applicable, and (ii) if the applicable Purchase Price Adjustment would result in a payment from SN and UnSub collectively to Seller (or net upward adjustment to the Purchase Price), then such Purchase Price Adjustment shall be allocated 90% to SN and 10% to UnSub at the Closing or Final Payment Date, as applicable, in each case, pending final settlement or agreement hereunder. SN and UnSub will continue to attempt in good faith to agree upon the allocation of the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment for thirty (30) days after the Closing or the Final Payment Date, as applicable. If SN and UnSub are able to agree upon such allocations, then appropriate payments between SN and UnSub will be made within three (3) Business Days to reflect the agreed-upon allocation of such Purchase Price Adjustments between SN and UnSub. If SN and UnSub are unable to agree upon the allocation of the Final Purchase Price Adjustment between SN and UnSub, then SN and UnSub will resolve such disagreement according to the dispute resolution procedures set forth in Section 3.7 of the APC PSA, which shall apply *mutatis mutandis* to this Letter Agreement.

(d) SN and UnSub agree that the allocation of Purchase Price Adjustments between SN and UnSub will be based upon the Purchase Price adjustment provisions set forth in Section 3.3, Section 3.5 and Section 3.6 of the APC PSA, which will attempt to the maximum extent practicable to allocate costs and revenues to the particular undivided interests in the Assets to be acquired by each of SN and UnSub at Closing, *provided*, for the avoidance of doubt, that as between SN and UnSub, Purchase Price Adjustments pursuant to Section 3.3(a)(vii) or Section 3.3 (b)(vii) of the APC PSA will be allocated 100% to UnSub. If a Purchase Price Adjustment is not directly attributable to particular Assets transferred to each of SN and UnSub at Closing, then SN and UnSub agree to allocate such Purchase Price Adjustments 60% to SN and 40% to UnSub.

(e) Subject to Section 1(f) below, Purchase Price Adjustments for Title Defects and Environmental Defects pursuant to Section 3.3(b)(ii) and Section 3.3(b)(iii) of the APC PSA will be allocated to each of SN and UnSub based upon the ratio of (i) the sum of (A) the Title Defect Amounts for the valid uncured Title Defects attributable to such Party plus (B) the Remediation Amounts for the valid unremediated Environmental Defects attributable to such Party, compared to (ii) the sum of (A) all Title Defect Amounts for all valid uncured Title Defects asserted by all Buyer Parties plus (B) all Remediation Amounts for all valid unremediated Environmental Defects asserted by all Buyer Parties.

(f) Notwithstanding anything to the contrary in Section 1(e) above, the ratio described therein shall be calculated without regard to Title Defects or Environmental Defects related to Assets excluded from the transactions contemplated by the APC PSA, and SN and UnSub acknowledge that (i) the Purchase Price Adjustments for such excluded Assets will be determined pursuant to Section 3.3(b)(iv) of the APC PSA, and (ii) SN's and UnSub's shares of such Purchase Price Adjustments shall be based upon

the undivided interest in such excluded Assets that would be acquired by such Party at Closing if such Asset was not excluded.

(g) UnSub's agreement to the allocations of the Preliminary Purchase Price Adjustment and Final Purchase Price Adjustment proposed by SN pursuant to this Letter Agreement shall require the consent of Preferred Unit Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(h) The provisions of this Section 1 shall apply *mutatis mutandis* to any provisions of the KNOC PSA pertaining to purchase price adjustment (only if such provisions are substantially identical to Sections 3.3, 3.5 and 3.6 of the APC PSA).

2. Reimbursement for Indemnification Expenses.

(a) UnSub hereby agrees to reimburse SN and/or SN Parent for any payments made by SN and/or SN Parent, as applicable, in respect of any Liabilities incurred by (a) SN pursuant to SN's Indemnity Obligations under Section 8.3 of the APC PSA, a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 8.3 of the APC PSA) or pursuant to the Development Agreement or the License, in each case to the extent that such Liabilities are attributable to UnSub's acquired properties thereunder, (b) SN pursuant to Section 15.23 of the APC PSA or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 15.23 of the APC PSA) or (c), in the case of SN Parent, incurred by SN Parent in connection with an Indemnification Obligation of SN that is paid by SN Parent as a result of the SN Parent Guaranty given by SN Parent in favor of SN pursuant to Section 15.22 of the APC PSA or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 15.22 of the APC PSA), in each case to the extent that such Liabilities are attributable to UnSub's acquired properties thereunder.

(b) SN Parent and SN, jointly and severally, hereby agree to reimburse UnSub for any payments made by UnSub in respect of any Liabilities incurred by UnSub pursuant to UnSub's Indemnity Obligations under Section 8.3 or Schedule 13.4 of the APC PSA, Section 8.3 or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 8.3 or Schedule 13.4 of the APC PSA, as applicable) or pursuant to the Development Agreement or the License, in each case to the extent that such Liabilities are attributable to SN and/or SN Parent's acquired properties thereunder.

(c) For the avoidance of doubt, any Indemnity Obligation incurred by the SN Parties as a result of a joint breach of a covenant made by both SN and UnSub that cannot otherwise be allocated solely to either SN or UnSub shall be allocated 60% to SN and 40% to UnSub.

(d) Each of SN and SN Parent hereby represents and warrants to UnSub that it is not a party to, or bound by, any contract or agreement that prohibits SN or SN Parent from making indemnification payments or reimbursements pursuant to the APC PSA or this Letter Agreement. Each of SN and SN Parent shall not enter into any contract or agreement that prohibits SN or SN Parent from making indemnification payments or reimbursements pursuant to the APC PSA or this Letter Agreement.

(e) In consideration for the services provided by SN and certain of its Affiliates to UnSub, UnSub hereby agrees to pay to SN an annual fee equal to $400,000, which such fee shall be due and payable in advance on the date hereof and on each one year anniversary thereafter.

3. Credit Support. If SN is required to post a letter of credit or surety bond for the benefit of Seller pursuant to Section 11.11(a)(iv) of the APC PSA or a comparable provision of the KNOC PSA (only if such

provision is substantially identical to Section 11.11(a)(iv) of the APC PSA), the costs and expenses of such letter of credit or surety bond shall be allocated 60% to SN and 40% to UnSub.

4. Joint Properties.

(a) *Spacing Restrictions*. Without the prior written consent of UnSub, prior to the Redemption Date, SN Parent shall not, and shall cause its Affiliates (including SN) not to, vote for any successor operator under any Operating Agreement, resign or attempt to resign as the operator under any Operating Agreement, or take or omit to take any action with the intent to effectively or constructively terminate its status as operator under any Operating Agreement, unless such successor operator has agreed in writing to abide by the spacing restrictions set forth in Section 5.3 of the Joint Development Agreement.

(b) *AMI and Participation in Future Acquisitions*.

(i) If any Sanchez Vehicle or its Affiliate elects to participate in an AMI Acquisition pursuant to the terms of the Joint Development Agreement or acquire Oil and Gas Properties within the area of mutual interest in Exhibit A attached hereto (in either case, an "***AMI Participation Opportunity***"), then SN Parent shall cause the applicable Sanchez Vehicle(s) or its Affiliate to offer in writing forty percent (40%) of the interest to be acquired by the applicable Sanchez Vehicle(s) or its Affiliate in such acquisition to UnSub on the same purchase price, terms and conditions as such acquisition and otherwise in accordance with Section 5.11 of the GP LLC Agreement. In addition, if any party or parties to an Operating Agreement non-consents to an operation proposed thereunder, then UnSub shall be offered 40% of the pro rata portion of such non-consenting party's interest in such proposed operation that becomes available to SN Parent, SN or any of their Affiliates.

(ii) Notwithstanding anything in the GP LLC Agreement or Partnership Agreement to the contrary, Preferred Unit Purchaser shall have the right to act on behalf of, and enforce all rights of, UnSub in connection with Section 4.5 of the Joint Development Agreement.

(c) *Non-Consent Properties*.

(i) After receiving a capital expenditure request with respect to any property in which any Partnership Group Company, on the one hand, and any Sanchez Vehicle or any of its Affiliates (other than, for the avoidance of doubt, any Partnership Group Company), on the other hand, owns an interest, prior to responding and in no event more than ten days after receiving such request, UnSub shall or shall cause the applicable Partnership Group Company to notify SN Parent as to whether or not the applicable Partnership Group Company intends to consent to such request and SN Parent shall or shall cause the applicable Sanchez Vehicle or its Affiliate to notify UnSub as to whether or not the applicable Sanchez Vehicle or its Affiliate intends to consent to such request.

(ii) If, following the Closing, (A) UnSub intends to non-consent to any capital expenditure in respect of any of UnSub's properties in which any Sanchez Vehicle also owns an interest, or UnSub intends to cause any other Partnership Group Company to non-consent to any such capital expenditure with respect to such properties, and (B) any Sanchez Vehicle intends to consent to such capital expenditure, then, subject to the terms of any applicable Operating Agreement, joint development agreement (including the Joint Development Agreement) or participation agreement or other similar agreement(s) affecting such property, UnSub shall and shall cause the Partnership Group Companies, as applicable, and SN Parent shall and shall cause its designated Affiliate, as applicable, to use their respective commercially reasonable efforts, subject to the terms of their respective organizational documents and financing arrangements, to

take such actions as may be necessary or appropriate for the non-consenting Partnership Group Company to convey its interest in the affected property to SN Parent or its designated Affiliate, subject to reversion to the conveying Partnership Group Company after SN Parent or its Affiliates, as applicable, have recovered the applicable non-consent penalty set forth in the applicable Operating Agreement.

(iii) If, following the Closing, (A) any Sanchez Vehicle intends to non-consent to any capital expenditure in respect of any of its properties in which any Partnership Group Company owns an interest and (B) UnSub intends to consent to such capital expenditure, or intends to cause any other Partnership Group Company to consent to such capital expenditures, then, subject to the terms of the applicable Operating Agreement, joint development agreement (including the Joint Development Agreement) or participating agreement(s) or other similar agreement affecting such property, SN Parent shall cause the applicable Sanchez Vehicle(s), and UnSub shall or shall cause its designated Partnership Group Company to, use their respective commercially reasonable efforts, subject to the terms of their respective organizational documents and financing arrangements, to take such actions as may be necessary or appropriate for the non-consenting Sanchez Vehicle(s) to convey their interest in the affected property to UnSub or its designated Partnership Group Company, subject to reversion to the conveying Sanchez Vehicle after UnSub or its designated Partnership Group Company, as applicable, has recovered the applicable non-consent penalty set forth in the applicable Operating Agreement.

(d) *Certain Restricted Transfers by SN Parent*. SN Parent shall not, and shall cause each Sanchez Vehicle not to, without the prior written consent of UnSub, sell or transfer any Joint Properties, including any of the properties acquired by any Sanchez Vehicle pursuant to the APC PSA, to any third party not affiliated with SN Parent, unless in connection with such sale all outstanding Preferred Units will be redeemed in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement); ***provided***, that, the foregoing restrictions shall not apply to any sale or transfer or series of sales or transfers of such assets by any Sanchez Vehicle(s) if (i) the buyer or transferee in such sale or transfer is Sanchez Production Partners LP, a Delaware limited partnership ("***SPP***"), or (ii)(A) the aggregate sales proceeds of all such sales (giving pro forma effect to those currently proposed) does not exceed 45% of the PDP PV-10 of the Joint Properties owned by the Sanchez Vehicles and (B) the aggregate net acreage conveyed or transferred in all such sales (giving pro forma effect to those currently proposed) does not exceed 45% of the Sanchez Vehicles' aggregate net acreage included in the properties acquired by the Sanchez Vehicle(s) at Closing pursuant to the APC PSA or any subsequently acquired Joint Properties in any Type Curve Area (as defined in Exhibit B attached hereto and incorporated herein) or in the aggregate.

(e) *Certain Workover and Recompletion Operations.* Upon receipt of a Workover and Recompletion Proposal from UnSub, SN Parent shall cause each Sanchez Representative to propose such operations identified in the Workover and Recompletion Proposal to the Operating Committee in accordance with the terms of the Joint Development Agreement and vote in favor of such operations. Notwithstanding anything to the contrary contained herein, upon compliance with the foregoing terms of this Section 4(e), there shall be no liability on behalf of SN Parent or any Sanchez Representative if such proposed operations are rejected or otherwise not approved by Blackstone Representatives (as defined under the Joint Development Agreement) of the Operating Committee.

(f) *Division of Operatorship*. SN Parent shall not, and shall cause each Sanchez Vehicle not to, agree to any "Equitable Division" (as defined in the Joint Development Agreement) that would result in a material adverse effect to "Existing Producing Wells" (as defined in the Joint Development

Agreement) or related offset locations owned by the Partnership Group Companies without the prior written consent of UnSub.

(g) *Tag-Rights*. UnSub shall have the tag-along rights on sales of Joint Properties by SN Parent, SN or any of their Affiliates as set forth in Exhibit C attached hereto.

(h) *Fair Market Value*. The Parties agree that, in determining the Fair Market Value of properties to be sold by UnSub and SN, respectively, pursuant to Sections 4.2 or 4.5 of the Joint Development Agreement, SN and UnSub agree that any midstream charges and the allocations set forth in the Hydrocarbons Marketing Agreement of such midstream charges (including any minimum and maximum charges contained therein) will be used in determining the Fair Market Value of such properties. The Parties agree that, although this provision will not bind Aquila regarding any position it might take with respect to the Fair Market Value of such properties, as between the Parties, they will not assert any position in such determinations of Fair Market Value that is inconsistent with the above.

5. Certain Actions. Until the Redemption Date, each of SN Parent and SN shall not, and shall cause its Affiliates not to, take any action that is not consistent with or that violates or is prohibited by the GP LLC Agreement, and each of SN Parent and SN shall comply, and shall cause its Affiliates to comply, with the GP LLC Agreement, including Sections 5.7(b), 5.11, 5.15 and 9.5.

6. No Guarantor and Restricted Subsidiary. SN Parent shall not, and shall not permit any of its Affiliates to, take any action that would cause UnSub to become a guarantor or a restricted subsidiary pursuant to any agreement governing any material indebtedness of SN Parent, SN or any of their Affiliates.

7. Tax Partnership. In the event the Tax Partnership is not terminated as contemplated by the provisions of Section 11.14 of the APC PSA, the parties agree to use commercially reasonable efforts to cause the partnership agreement of the Tax Partnership to be revised or a new agreement of tax partnership to be entered into such that all allocations of income and deduction reflect the economic interests of the parties in the properties acquired pursuant to the APC PSA and that the parties will be in the same economic position as would have occurred had the Tax Partnership been terminated prior to the Closing Date.

8. Determination of Sanchez Shares and Warrants Amount. Preferred Unit Purchaser shall propose, prior to a date that is five (5) days prior to the Anadarko Closing Date, the valuation of the SN Shares as of the Anadarko Closing Date (the "***Sanchez Shares Value***") and the valuation of the Warrants as of the Anadarko Closing Date (the "***Warrants Value***"). Preferred Unit Purchaser shall take into account any reasonable comments received from Common Unit Purchaser within two (2) days after provision of the proposed valuations. The parties shall cooperate in good faith to resolve any differences as to the Sanchez Shares Value and the Warrants Value. In the event Common Unit Purchaser and Preferred Unit Purchaser are nonetheless unable to reach an agreement as to each of the Sanchez Shares Value and the Warrants Value prior to the Anadarko Closing Date, then the matter shall be submitted for resolution and determination to a nationally recognized independent accounting firm or nationally recognized independent investment banking firm, as determined by the Preferred Unit Purchaser and reasonably acceptable to Common Unit Purchaser, in which case the nationally recognized firm will deliver to Common Unit Purchaser and Preferred Unit Purchaser a written determination of the Sanchez Shares Value and the Warrants Value no later than one (1) day prior to the Anadarko Closing Date (the Sanchez Shares Value together with the Warrants Value, in each case as finally determined pursuant this Section 8, the "***Sanchez Shares and Warrants Amount***"). The fees and expenses of the nationally recognized firm shall be paid fifty percent (50%) by Common Unit Purchaser and fifty percent (50%) by Preferred Unit Purchaser. Common Unit Purchaser and Preferred Unit Purchaser agree that they will not take nor will they permit any Affiliate to take, for Tax purposes, any position inconsistent with such valuation of the Sanchez Shares and Warrants; *provided*, that nothing contained herein shall prevent the Common Unit Purchaser or the Preferred Unit Purchaser from settling

in good faith any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Sanchez Shares and Warrants Amount, and neither Common Unit Purchaser nor Preferred Unit Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging such Sanchez Shares and Warrants Amount. Common Unit Purchaser, on the one hand, or Preferred Unit Purchaser, on the other hand, shall notify Preferred Unit Purchaser or Common Unit Purchaser, respectively, within ten (10) days after notice or commencement of an examination, audit or other proceeding based upon or arising from the Sanchez Shares and Warrants Amount.

9. Certain Definitions. As used in this Letter Agreement:

"***Affiliate***" means, with respect to any person, any other person that, directly or indirectly, controls, is controlled by, or is under common control with, such person. For the purposes of this Letter Agreement, "***control***," when used with respect to any specified person, means the power, direct or indirect, to direct or cause the direction of the management and policies of such person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "***controlling***" and "***controlled***" shall have correlative meanings. Notwithstanding the foregoing, solely for the purposes of this Letter Agreement, UnSub and its subsidiaries will be deemed not to be Affiliates of SN Parent or SN, and vice versa.

"***AMI Acquisition***" has the meaning given to the term "Acquisition" in the Joint Development Agreement.

"***Anadarko Closing Date***" has the meaning set forth in the Securities Purchase Agreement.

"***Base Preferred Return Amount***" has the meaning set forth in the Partnership Agreement.

"***Basic Documents***" has the meaning set forth in the Securities Purchase Agreement.

"***Common Unit Purchaser***" has the meaning set forth in the Securities Purchase Agreement.

"***Core Area***" has the meaning set forth in the Joint Development Agreement.

"***Governmental Authority***" has the meaning set forth in the Securities Purchase Agreement.

"***GP LLC Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Hydrocarbons***" means oil, gas, coal seam gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate and all other liquid and gaseous hydrocarbons produced or to be produced in conjunction therewith from a well bore and all products, by-products and other substances derived therefrom or the processing thereof, and all other minerals and substances produced in conjunction with such substances, including, but not limited to, sulfur, geothermal steam, water, carbon dioxide, helium and any and all minerals, ores or substances of value and the products and proceeds therefrom.

"***Joint Development Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Joint Properties***" has the meaning set forth in the GP LLC Agreement.

"***KNOC PSA***" has the meaning set forth in the Securities Purchase Agreement.

"***Leases***" means all oil and gas leases, oil, gas and mineral leases, oil, gas and casinghead gas leases or any other instruments, agreements, or conveyances under and pursuant to which the owner thereof has or obtains the right to enter upon lands and explore for, drill, and develop such lands for the production of Hydrocarbons.

"***Management Services Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Oil and Gas Properties***" means fee mineral interests, term mineral interests, Leases, subleases, farmouts, royalties, overriding royalties, net profit interests, carried interests, production payments and similar mineral interests, and all unsevered and unextracted Hydrocarbons in, under or attributable to the foregoing, in each case relating to Hydrocarbons.

"***Operating Agreement***" has the meaning set forth in the Joint Development Agreement.

"***Operating Committee***" has the meaning set forth in the Joint Development Agreement.

"***Partnership Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Partnership Group Companies***" has the meaning set forth in the GP LLC Agreement.

"***PDP PV-10***" means the net present value, discounted at ten percent (10%) per annum, of the future net revenues (using NYMEX forward curve pricing for the next five (5) years as of the date of determination and flat prices from the fifth calendar year thereafter) expected to accrue to the Sanchez Vehicle's collective interest in any Proved Developed Producing Reserves (as defined in the Partnership Agreement) in any Joint Properties (in each case determined as of the last day of the most recent fiscal year or fiscal quarter for which a reserve report of the Partnership is available) during the remaining expected economic lives of such reserves. Each calculation of such expected future net revenues shall be made in accordance with the then existing standards of the Society of Petroleum Engineers, provided that in any event (a) appropriate deductions shall be made for severance and ad valorem taxes, and for operating, gathering, transportation and marketing costs required for the production and sale of such reserves, (b) the pricing assumptions used in determining PDP PV-10 Proved Reserves (as defined in the GP LLC Agreement) for any particular reserves shall be based upon the Strip Price (as defined under the GP LLC Agreement) for the next five (5) years, (c) the cash-flows derived from the pricing assumptions set forth in clause (b) above shall be further adjusted to account for the historical basis differential and (d) PDP PV-10 shall be based on the valuation of applicable properties in the Partnership reserve report as adjusted for the Sanchez Vehicles' working interest ownership percentage in such properties.

"***Preferred Unit Purchaser***" has the meaning set forth in the Securities Purchase Agreement.

"***Preferred Units***" has the meaning set forth in the Partnership Agreement.

"***Redemption Date***" means the date of redemption of all outstanding Preferred Units in cash at the Base Preferred Return Amount under the Partnership Agreement.

"***Sanchez Representative***" has the meaning set forth in the Joint Development Agreement.

"***SN Shares***" has the meaning set forth in the Securities Purchase Agreement.

"***Sanchez Vehicle***" has the meaning set forth in the GP LLC Agreement.

"***Securities Purchase Agreement***" means that certain Securities Purchase Agreement, dated as of the date hereof, by and among SN Parent, SN UR Holdings, LLC, a Delaware limited liability company, SN EF UnSub Holdings, LLC, a Delaware limited liability company, UnSub, SN EF UnSub GP, LLC, a Delaware limited liability company and the general partner of the Partnership, GSO ST Associates LLC, a Delaware limited liability company, and Preferred Unit Purchaser.

"***Warrants***" has the meaning set forth in the Securities Purchase Agreement.

"***Workover and Recompletion Proposal***" has the meaning set forth in the GP LLC Agreement.

10. Conflict of Law; Jurisdiction; Venue; Jury Waiver. The provisions of Section 15.13 of the APC PSA shall apply *mutatis mutandis* to this Letter Agreement, as if such provisions were set forth in full herein.

11. Amendments. This Letter Agreement may be amended, restated, modified or changed only by a written instrument signed by SN, SN Parent and UnSub.

12. Counterparts. This Letter Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to each of the other parties hereto (including via facsimile or other electronic transmission), it being understood that each of the parties need not sign the same counterpart.

13. Specific Performance. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Letter Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Letter Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Letter Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Letter Agreement and to enforce specifically the terms and provisions of this Letter Agreement in accordance with this Section 13 shall not be required to provide any bond or other security in connection with any such injunction. The specific performance or other equitable relief available pursuant to this Section 13 is not an exclusive remedy and any non-breaching party to this Letter Agreement may pursue any remedy at Law or equity available to it.

14. Entire Agreement; Integrated Transaction. This Letter Agreement, the Securities Purchase Agreement and the Basic Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein with respect to the rights granted by the Company set forth herein. This Letter Agreement, the Securities Purchase Agreement and the Basic Documents supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the parties hereto acknowledges and agrees that in executing this Letter Agreement (i) the intent of the parties is this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 14 constitute a material inducement to enter into this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the parties hereto stipulates and agrees (x) not to challenge the validity, enforceability or characterization of this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (y) this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (z) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 14.

15. Notices. All notices and other communications provided for hereunder shall be in writing and shall be given by hand delivery, electronic mail, registered or certified mail, return receipt requested, regular mail or air courier guaranteeing overnight delivery to the following addresses:

if to SN or SN Parent to:

Sanchez Energy Corporation
1000 Main Street
Suite 3000
Houston, Texas 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld, LLP
1111 Louisiana Street, Suite #44
Houston, TX 77002
Attention: David Elder
Facsimile: 713-236-0822
Email: delder@akingump.com

if to UnSub to:

SN EF UnSub GP, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, Texas 77002
Attention: John D. Pitts
Email: john.pitts@kirkland.com

with a copy to:

c/o GSO Capital Partners
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn

Email: Robert.horn@gsocap.com

with a copy to :

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, New York 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

with a copy to (which shall not constitute notice):

Andrews Kurth Kenyon LLP
4200 Travis Street
Suite 4200
Houston, Texas 77002
Attention: G. Michael O'Leary
Jon Daly

or to such other address as may be specified in a notice given pursuant to this Section 15. All notices and communications shall be deemed to have been duly given: (i) at the time delivered by hand, if personally delivered; (ii) when notice is sent by the sender and the recipient has read the message, if sent by electronic mail; (iii) upon actual receipt if sent by registered or certified mail, return receipt requested, or regular mail, if mailed; or (iv) upon actual receipt when delivered to an air courier guaranteeing overnight delivery. The parties may change the address to which notices are to be given by giving five (5) days' prior notice of such change in accordance herewith.

[*Signature Pages Follow*]

**SANCHEZ ENERGY CORPORATION**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

Accepted and Agreed to
as of the date written above

**SN EF UNSUB, LP**
By: SN EF UnSub GP, LLC, its general partner

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Exhibit A**

(Attached)


EagleFord
AMI
Core Area
ZAVALA
FRIO
MAVERICK
DIMMIT
LA SALLE
WEBB
10
Miles

**Exhibit B**

**Type Curve Areas**

(Attached)


Exhibit B: Type Curve Areas
MAVERICK
DIMMIT
TEXAS
WEBB
LA SALLE
Big Wells
APC - 66.67% WI
KNOC - 33.33% WI
La Bandera Ranch
South Spur
Carla Ranch
Catarina North
Catarina Ranch
Stumberg
Maund Family LP
Roger Dentonio Ranch
Catarina West
Catarina South
San Pedro
Dennhorn
Chip East
Briscoe Friday
Diamond H Ranch
Diamond H Ranch Detail
Diamond H State
Briscoe Cochina West Ranch
Cochina East
Rancho Encantado
Chaparral Wildlife
Chupadera Ranch
Pearsall Formation Only
Worthey Ranch
Stanley Ranch
1
2
3
4
5
6
7
MAVERICK BASIN
Scale 1:100,000
Projection: NAD 1983
Date 10.5.2016
Author: Andrew Baron

## Exhibit C

### Tag-Along Rights

(a) If at any time SN Parent, SN or any of their Affiliates proposes to transfer, directly or indirectly, all or any portion of its Joint Properties, whether in a single transaction or series of related transactions to a Third Party purchaser or purchasers (a "Proposed Sale"), such party seeking to transfer such Joint Properties (the "***Transferring Party***") shall furnish to UnSub a written notice of such Proposed Sale (the "***Tag-Along Notice***") and provide UnSub the opportunity to participate in such Proposed Sale on the terms described in this Exhibit C to the extent of its respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice shall include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Joint Properties to be transferred, (B) the name of the proposed transferee (the "***Proposed Transferee***"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed transfer date, if known, which date shall not be less than thirty (30) Business Days after delivery of such Tag-Along Notice; and

(ii) an invitation to UnSub to participate in such Proposed Sale at the same per Working Interest percentage price per applicable asset, for the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party shall deliver or cause to be delivered to UnSub copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) UnSub may exercise the tag-along rights provided by this Exhibit C within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "***Tag-Along Offer***") to the Transferring Party indicating UnSub's desire to exercise its tag-along rights hereunder. If UnSub does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, UnSub shall be deemed to have waived its rights under this Exhibit C with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to transfer the applicable Joint Properties to the Proposed Transferee without the participation of UnSub, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If UnSub elects to participate in the Proposed Sale pursuant to this Exhibit C, (i) the consideration to be received by the parties in such sale (a "***Tag-Along Transaction***") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds between the Transferring Party and UnSub based upon the relative Fair Market Value of the Leases, Wellpads and other applicable assets and other interests included by such parties (collectively, the "***Tag Interests***"), as agreed by the Transferring Party and UnSub or as otherwise determined pursuant to the valuation process set forth in paragraph (g) below, taking into account (in either case) the parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party purchaser (but only to the extent that all parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, provided that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Transferring Party and UnSub in the Proposed Sale; and (ii)

UnSub shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one party is transferring Working Interests and the other party is transferring equity interests holding Working Interests, and such other distinctions as may be applicable to the parties or their interests in the Leases, Wellpads, and other applicable Assets); ***provided***, that (A) no party shall be liable for the breach of any covenant by any other party, (B) in no event shall any party be required to make representations and warranties or provide indemnities as to any other party, and (C) in no event shall UnSub be responsible for any liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by UnSub in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act of 1933, as amended, and UnSub exercises its tag-along rights hereunder in connection with such Proposed Sale, if the Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that UnSub will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) Any offer of UnSub contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, UnSub shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Oil and Gas Property interest transferred, as the Transferring Party; ***provided***, ***however***, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to UnSub than those set forth in the Tag-Along Notice, UnSub shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from its obligations.

(e) If UnSub exercises its rights under this Exhibit C, the closing of the sale of the Transferring Party's and UnSub's Joint Properties in the Tag-Along Transaction will take place concurrently. If the closing with the Proposed Transferee (whether or not UnSub has exercised its rights under this Exhibit C) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on transfer contained herein shall again be in effect with respect to such Oil and Gas Property interest and proposed transfer.

(f) The costs of any transactions contemplated by this Exhibit C shall be deducted pro rata from the proceeds to be paid to the Transferring Party and UnSub in connection with such transaction.

(g) In the event the Transferring Party and UnSub (for purposes of this paragraph, collectively, the "***Dispute Parties***") disagree as to the relative Fair Market Value of the Tag Interests included by each party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in Eagle Ford Shale (the "***Valuation Firm***") to determine the relative Fair Market Value (on a percentage basis) of the Tag Interests included by each party. The Valuation Firm shall be selected by the Dispute Parties from among the Approved Financial Advisor Arbiters and if the Dispute Parties are unable to agree then SN Parent shall chose. The Dispute Parties shall each cooperate fully with the

Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Dispute Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; *provided*, *however*, the Dispute Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Tag Interests (the "***Final Valuation***") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall allocated 50% to SN and 50% to UnSub.

Terms used in this Exhibit C but not defined elsewhere in this Letter Agreement shall have the following meanings:

"***Approved Financial Advisor Arbiters***" means the banks or valuation firms listed on Annex IV to the Joint Development Agreement.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"***Fair Market Value***" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"***Governmental Authority***" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"***Leases***" means, collectively, oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other oil and gas interests.

"***Person***" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"***Third Party***" means any Person other than an Affiliate of SN Parent or a Permitted Holder, *provided* that for purposes of Section 4(g) and this Exhibit C, each of SPP and its controlled Affiliates shall be deemed a Third Party of SN Parent and its Affiliates.

"***Wellpads***" has the meaning set forth in the Joint Development Agreement.

"***Working Interest***" means with respect to any lease or well or wellpad relating to the any Joint Properties, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

**SCHEDULE 3.07**

**Partnership Approvals**

1. The approval of (i) the General Partner and (ii) the sole member of the General Partner is required for the Partnership and General Partner, respectively, actions specified above, which approvals have been obtained.

2. With respect to such other Basic Documents that are to be executed at Closing and the performance of which is to occur after Closing, any authorizations, consents, approvals, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations contemplated by such Basic Documents.

**SCHEDULE 3.08**

**Liabilities**

1. Liabilities and obligations of the General Partner arising under its Limited Liability Company Agreement, dated as of December 21, 2016.

2. Liabilities and obligation of the Partnership arising under its Agreement of Limited Partnership, dated as of December 21, 2016.

**SCHEDULE 4.04**

**Preferred Unit Purchasers Approvals**

None.

Case 19-34508 Document 1351-7 Filed in TXSB on 06/22/20 Page 24 of 24

**SCHEDULE 5.04**

**SN Approvals**

1. With respect to the Warrant Agreement and the Registration Rights Agreement, such of the foregoing as may be required under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, state and foreign securities or "blue sky" laws, The New York Stock Exchange or any other applicable self-regulatory organization.

2. With respect to such other Basic Documents that are to be executed at Closing and the performance of which is to occur after Closing, any authorizations, consents, approvals, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations contemplated by such Basic Documents.

# Exhibit F

EX-10.3 15 sn-20170331ex10304f7b0.htm EX-10.3

**Exhibit 10.3**

**SN EF UnSub GP, LLC**

A Delaware Limited Liability Company

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

Dated as of March 1, 2017

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I ORGANIZATION | | 2 |
| 1.1 | Continuation of the Company | 2 |
| 1.2 | Name | 2 |
| 1.3 | Registered Office; Registered Agent | 2 |
| 1.4 | Principal Place of Business | 2 |
| 1.5 | Fiscal Year | 2 |
| 1.6 | Foreign Qualification | 2 |
| 1.7 | Term | 3 |
| 1.8 | No State-Law Partnership | 3 |
| 1.9 | Purposes | 3 |
| ARTICLE II MEMBERS | | 3 |
| 2.1 | Members | 3 |
| 2.2 | No Liability of Members | 3 |
| 2.3 | Representations and Warranties | 4 |
| ARTICLE III UNITS AND CAPITAL CONTRIBUTIONS | | 5 |
| 3.1 | Membership Interests | 5 |
| 3.2 | Capital Contributions | 5 |
| 3.3 | Return of Contribution | 5 |
| 3.4 | Withdrawal of Capital | 5 |
| 3.5 | Additional Capital Contributions | 6 |
| 3.6 | Additional Members | 6 |
| ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS | | 6 |
| 4.1 | Distributions | 6 |
| 4.2 | Allocations | 6 |
| 4.3 | Capital Accounts | 6 |
| ARTICLE V MANAGEMENT | | 6 |
| 5.1 | Management by the Board of Directors | 6 |
| 5.2 | Actions by the Board; Delegation of Authority and Duties; Reliance by Third Parties | 6 |
| 5.3 | Board Composition | 7 |
| 5.4 | Board Meetings; Quorum; Vote Required | 9 |
| 5.5 | Action by Written Consent | 10 |
| 5.6 | Officers | 10 |
| 5.7 | Actions Requiring Approval | 12 |
| 5.8 | Issuance of Preferred Units and Certain Debt Matters | 22 |
| 5.9 | Enforcement of Affiliate Contracts | 23 |
| 5.10 | Limitation of Duties and Corporate Opportunities | 23 |
| 5.11 | AMI and Participation in Future Acquisitions | 26 |

| | | |
|---|---|---|
| 5.12 | Meetings of the Members | 27 |
| 5.13 | Company Covenants, Representations and Warranties | 28 |
| 5.14 | Tag-Rights Control | 30 |
| 5.15 | Certain Workover and Recompletion Operations | 30 |
| ARTICLE VI BOOKS, REPORTS AND COMPANY FUNDS | | 30 |
| 6.1 | Records and Accounting | 30 |
| 6.2 | Reports | 31 |
| 6.3 | Inspection by Members | 31 |
| 6.4 | Public Disclosure | 31 |
| ARTICLE VII TAX MATTERS | | 32 |
| 7.1 | Tax Controversies | 32 |
| ARTICLE VIII EXCULPATION AND INDEMNIFICATION | | 32 |
| 8.1 | Performance of Duties; No Liability of Members, Directors and Officers | 32 |
| 8.2 | Right to Indemnification | 33 |
| 8.3 | Advance Payment | 33 |
| 8.4 | Indemnification of Employees and Agents | 34 |
| 8.5 | Appearance as a Witness | 34 |
| 8.6 | Nonexclusivity of Rights | 34 |
| 8.7 | Insurance | 34 |
| 8.8 | Savings Clause | 34 |
| 8.9 | Fund Indemnitors | 34 |
| ARTICLE IX UNITS, TRANSFERS, AND OTHER EVENTS | | 35 |
| 9.1 | Unit Certificates | 35 |
| 9.2 | Record Holders | 36 |
| 9.3 | Restrictions on Transfers of Units | 36 |
| 9.4 | Disposition Transactions | 37 |
| 9.5 | Exit Transactions. | 37 |
| 9.6 | Expenses | 42 |
| 9.7 | Transfers Generally; Substitute Members | 42 |
| 9.8 | Closing Date | 43 |
| 9.9 | Effect of Incapacity | 43 |
| 9.10 | No Appraisal Rights | 43 |
| 9.11 | Effect of Non-Compliance | 43 |
| ARTICLE X DISSOLUTION, LIQUIDATION AND TERMINATION | | 44 |
| 10.1 | Dissolution | 44 |
| 10.2 | Liquidation and Termination | 44 |
| ARTICLE XI DEFINITIONS | | 45 |
| 11.1 | Definitions | 45 |
| 11.2 | Construction | 57 |
| ARTICLE XII MISCELLANEOUS | | 58 |
| 12.1 | Notices | 58 |

| | | |
|---|---|---|
| 12.2 | Confidential Information | 58 |
| 12.3 | Entire Agreement; Integrated Transaction | 59 |
| 12.4 | Effect of Waiver or Consent | 59 |
| 12.5 | Amendment or Modification | 60 |
| 12.6 | Binding Effect | 60 |
| 12.7 | Consent to Jurisdiction; Waiver of Trial by Jury | 60 |
| 12.8 | Governing Law | 61 |
| 12.9 | Further Assurances | 61 |
| 12.10 | Waiver of Certain Rights | 61 |
| 12.11 | Notice to Members of Provisions | 61 |
| 12.12 | Counterparts | 61 |
| 12.13 | Headings | 61 |
| 12.14 | Remedies | 61 |
| 12.15 | Severability | 61 |
| 12.16 | No Recourse | 62 |

EXHIBITS

| | |
|---|---|
| Exhibit A | Members, Capital Contributions and Units Held |
| Exhibit B | Board Designations |
| Exhibit C | Officers |
| Exhibit D | Approved Successor Independent Auditors and Independent Reservoir Engineers |
| Exhibit E | Form of Purchase Agreement |
| Exhibit F | LTM EBITDA Levels |

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**SN EF UnSub GP, LLC**
**A Delaware Limited Liability Company**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of SN EF UnSub GP, LLC, a Delaware limited liability company (the "Company"), effective as of March 1, 2017 (the "Effective Date"), is made and entered into by the Company; GSO ST Holdings Associates LLC, a Delaware limited liability company (the "GSO Investor"); and SN UR Holdings, LLC, a Delaware limited liability company (the "Sanchez Investor"), as the initial Members of the Company.

**R E C I T A L S**:

WHEREAS, the Company was formed as a limited liability company under the Delaware Act, pursuant to the filing of the Certificate of Formation of the Company (the "Delaware Certificate") filed with the Secretary of State of the State of Delaware on December 21, 2016; and

WHEREAS, the Sanchez Investor, as the sole initial Member, executed the Limited Liability Company Agreement of SN EF UnSub GP, LLC, effective December 21, 2016 (the "Original LLC Agreement"); and

WHEREAS, the Company owns the non-economic general partner interest in, and serves as the sole general partner of, the Partnership; and

WHEREAS, the Company is a party to that certain Securities Purchase Agreement, dated as of January 12, 2017 (the "Securities Purchase Agreement"), pursuant to which the Company, the Partnership, the Sanchez Parent, SN EF UnSub Holdings, LLC, a Delaware limited liability company, the Sanchez Investor, GSO ST Holdings LP, a Delaware limited partnership, and the GSO Investor agreed, among other things, that the Original LLC Agreement would be amended and restated by this Agreement; and

WHEREAS, the Company caused the Partnership to enter into each of the Sanchez Letter Agreement and the Hydrocarbons Marketing Agreement on January 12, 2017; and

WHEREAS, the Sanchez Investor and the GSO Investor deem it advisable to amend and restate the Original LLC Agreement in its entirety as set forth herein; and

WHEREAS, as part of the Anadarko Closing, the Company, in its capacity as the general partner of the Partnership, shall cause the Partnership to enter into the MSA and the Joint Development Agreement, and will amend and restate the agreement of limited partnership of the Partnership by entering into the Partnership Agreement in the form attached as Exhibit A to the Securities Purchase Agreement; and

WHEREAS, unless the context otherwise requires, capitalized terms used herein shall have the respective meanings ascribed to them in Section 11.1.

NOW, THEREFORE, for and in consideration of the premises, the covenants and the agreements hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby amend and restate the Original LLC Agreement in its entirety as follows:

**ARTICLE I**
**ORGANIZATION**

1.1 Continuation of the Company. The Company was formed as a Delaware limited liability company on December 21, 2016 by the filing of the Delaware Certificate in the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act. The Members desire to continue the Company for the purposes and upon the terms and conditions set forth herein. As of the Effective Date, the GSO Investor and the Sanchez Investor constitute the sole Members of the Company. Except as provided herein, the rights, duties and liabilities of each Member will be as provided in the Delaware Act.

1.2 Name. The name of the Company is "SN EF UnSub GP, LLC". Company business will be conducted in such name or such other names that comply with applicable Law as the Board may select from time to time.

1.3 Registered Office; Registered Agent. The registered office of the Company in the State of Delaware will be the initial registered office designated in the Delaware Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware will be the initial registered agent designated in the Delaware Certificate, or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

1.4 Principal Place of Business. The principal place of business of the Company will be at 1000 Main Street, Suite 3000, Houston, Texas 77002, or such other location as the Board may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Board may determine appropriate.

1.5 Fiscal Year. The fiscal year of the Company (the "Fiscal Year") for financial statement and federal and applicable state and local income tax purposes will end on December 31 unless otherwise determined by the Board or required under the Code.

1.6 Foreign Qualification. The Board is authorized to cause the Company to comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction in which the Company owns property or transacts business or elsewhere where such qualification may be necessary or advisable for the protection of the limited liability of the Members or to permit the Company to lawfully own property or transact business, and to obtain similar qualifications for the Company's Subsidiaries. Each Officer is authorized, on behalf of the Company, to execute, acknowledge, swear to and deliver all certificates and other instruments as may be necessary or appropriate in connection with the foregoing qualifications. Further, upon request of the Board, each Member will execute,

acknowledge, swear to and deliver all certificates and other instruments that are reasonably necessary or appropriate to obtain, continue, modify or terminate such qualifications.

1.7 Term. The term of the Company commenced on the date the Delaware Certificate was filed with the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved as determined under Section 10.1.

1.8 No State-Law Partnership. Except to the extent provided in the next sentence, the Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Officer shall be a partner or joint venturer of any other Member or Officer, for any purposes, and this Agreement shall not be construed to the contrary. Notwithstanding the foregoing, the Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes. Except to the extent otherwise provided herein, each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment unless otherwise required by law.

1.9 Purposes. The nature or purposes of the business to be conducted or promoted by the Company is to own the non-economic general partner interest in, and to serve as the general partner of, SN EF UnSub, LP, a Delaware limited partnership (the "Partnership"), and to engage in the operation and management of the Partnership in accordance with this Agreement and the Partnership Agreement, including actions that the Partnership may undertake with respect to its Subsidiaries (the Partnership and its Subsidiaries, collectively, the "Partnership Group Companies") and in any other lawful act or activity incidental or related thereto authorized by the Board and for which limited liability companies may be organized under the Delaware Act. The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. In furtherance of its purpose, (a) the Company shall have and may exercise all of the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Delaware Act and (b) the Company shall have the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or for the protection and benefit of the Company. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company formed under the laws of the State of Delaware.

## ARTICLE II
## MEMBERS

2.1 Members. The names, addresses, Capital Contribution balances and Percentage Interests of each Member are set forth on Exhibit A attached hereto and incorporated herein. The Board, or any appropriate Officer of the Company, is hereby authorized and directed to complete, supplement, modify, correct or amend Exhibit A to reflect the creation or issuance of any Additional Units, the admission of any additional Members, the withdrawal of any Member, the change of address of any Member, the Capital Contributions of any Member, the Units held by any Member and other information called for by Exhibit A in conformity with this Agreement. Such completion, supplementation, modification, correction or amendment may be made from time to time as and when the Board or such Officer considers it appropriate in accordance with this Section 2.1.

2.2 No Liability of Members. Except as otherwise required by applicable Law and as expressly set forth in this Agreement, no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company. Each Member shall be liable only to make such Member's

Capital Contribution to the Company and the other payments and covenants provided expressly herein. Except as otherwise provided in this Agreement, a Member's liability (in its capacity as a Member) for debts, liabilities and losses of the Company shall be limited to such Member's pro rata share of the Company's assets in accordance with each Member's respective Percentage Interests.

2.3 Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

(a) Power and Authority. Such Member has full power and authority to enter into this Agreement and to perform its obligations hereunder;

(b) No Conflicts. The execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which such Member is a party or by which it is or its assets are bound;

(c) Contributed Property. All property contributed to the Company by such Member, and any property thereafter to be contributed to the Company by such Member, has been or will be duly and lawfully acquired;

(d) Own Account. Such Member has acquired or is acquiring its interest in the Company for investment purposes only for its own account and not with a view to any distribution, reoffer, resale or other disposition that is not in compliance with the Securities Act or any applicable state securities laws;

(e) Expertise. Such Member alone, or together with its representatives, possesses such expertise, knowledge and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that such Member is capable of evaluating the merits and economic risks of acquiring and holding the Units, and that such Member is able to bear all such economic risks now and in the future;

(f) Awareness of Economic Risk. Such Member is aware that it must bear the economic risk of such Member's investment in the Company for an indefinite period of time because Units have not been registered under the Securities Act or under the securities laws of any state, and, therefore, such Units cannot be sold unless they are subsequently registered under the Securities Act and any applicable state securities laws or an exemption from registration is available;

(g) No Registration Rights. Such Member is aware that only the Company can take action to register Units in the Company under the Securities Act and that the Company is under no such obligation and does not propose or intend to attempt to do so;

(h) Transfer Restrictions. Such Member is aware that this Agreement provides restrictions on the ability of a Member to Transfer Units, and such Member will not seek to effect any Transfer other than in accordance with such restrictions; and

(i) Accredited Investor. Such Member is, and at such time that it makes any additional Capital Contributions to the Company, will be an "accredited investor" within the meaning of Rule 501 under the Securities Act (an "Accredited Investor") unless such status as an Accredited Investor is not required in order for the Transfer of Units to such Member to be exempt from registration under the Securities Act.

**ARTICLE III**
**UNITS AND CAPITAL CONTRIBUTIONS**

3.1 Membership Interests.

(a) The Units issued by the Company shall consist of Class A Units and Class B Units. As of the Effective Date, the Company is authorized to issue up to 99 Class A Units and 1 Class B Unit. Subject to the terms and conditions set forth in this Agreement and the Securities Purchase Agreement, and after giving effect to the transactions contemplated by the Securities Purchase Agreement, as of the Effective Date, the Company has issued 99 Class A Units to the Sanchez Investor and 1 Class B Unit to the GSO Investor. Additional Units (or series or classes of Units) or securities convertible into or exercisable for additional Units or rights to purchase additional Units (which for purposes of this Agreement shall be "Additional Units") may be issued from time to time as may be determined by the Board pursuant to Sections 5.7(a)(xii) and 5.7(b)(x), with such relative rights, powers and duties as the Board may determine in accordance with this Agreement. The Company may issue fractional Units.

(b) Units shall constitute "securities" governed by Article 8 of the Delaware Uniform Commercial Code, as amended from time to time after the Effective Date.

(c) Upon the redemption or liquidation in full of all outstanding Preferred Units pursuant to the Partnership Agreement, each Unit then outstanding that is held by any Class B Member, GSO or any of its Affiliates shall be terminated and extinguished (including all rights and obligations associated therewith) and, other than the right to indemnification pursuant to Section 8.2 for the time period in which such Member was a Member of the Company, such Member shall not have any interest in the Company or any rights pursuant to this Agreement following such termination.

3.2 Capital Contributions. All Members acknowledge and agree that the Capital Contributions set forth on Exhibit A as of the Effective Date represent the amount of money contributed by the Members to the Company as of the Effective Date.

3.3 Return of Contribution. No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. Any Capital Contribution that has not been repaid is not a liability of the Company or of the other Members. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return the other Members' Capital Contributions.

3.4 Withdrawal of Capital. No Member has the right to withdraw any part of its Capital Contribution from the Company or to receive the return of any part of its Membership Interest in the Company prior to the Company's liquidation and termination pursuant to Article X hereof.

3.5 Additional Capital Contributions. No Class A Member or Class B Member shall be obligated to make additional Capital Contributions to the Company, and no Member is obligated to make any Capital Contributions except as the Members may otherwise expressly agree to in writing.

3.6 Additional Members. In order for a Person to be admitted as a Member of the Company with respect to any Additional Units and the exercise of any rights hereunder relating thereto, such Person shall be required to have first delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement, together with such other documents and instruments as the Board reasonably determines to be necessary or appropriate in connection with the issuance of such Additional Units to such Person or to effect such Person's admission as a Member.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

4.1 Distributions. All distributions by the Company shall be allocated to the Members pro rata in accordance with each Member's respective Percentage Interests (at the time the amounts of such distributions are determined) and in such aggregate amounts and at such times as shall be determined by the Board. Subject to the limitations set forth in the Delaware Act and any other applicable Law, prior to the dissolution, winding-up and liquidation of the Company, the Board may, in its discretion, direct the Company to make distributions of cash or other property to the Members. Notwithstanding any provision to the contrary contained in this Agreement, neither the Company nor the Board, on behalf of the Company, shall be required or permitted to make a distribution to any Member on account of its Membership Interest if such distribution would violate the Delaware Act or other applicable Law. Any distributions pursuant to this Article IV made in error or in violation of Section 18-607(a) of the Delaware Act will, upon demand by the Board, be returned to the Company.

4.2 Allocations. Unless otherwise required by the Allocation Regulations, all items of income, gain, loss, deduction and credits will be allocated to the Members pro rata in accordance with their respective Percentage Interests.

4.3 Capital Accounts. The Company shall establish and maintain for each Member a separate capital account ("Capital Account") in accordance with the Allocation Regulations.

## ARTICLE V
## MANAGEMENT

5.1 Management by the Board of Directors. The powers, business and affairs of the Company and its Subsidiaries, including, without limitation, the powers, business and affairs of the Company that relate to management and Control of any of its Subsidiaries or the Partnership Group Companies, shall be exercised by or under the authority or direction of a board of directors (the "Board of Directors" or the "Board"), except for cases in which the approval of the Members is expressly required by non-waivable provisions of applicable law, including the Delaware Act, or in accordance with the express provisions of this Agreement. The Company shall cause the Partnership Group Companies to comply with contracts and agreements to which they are a party.

5.2 Actions by the Board; Delegation of Authority and Duties; Reliance by Third Parties.

(a) In managing the business and affairs of the Company and exercising its powers, the Board may act through meetings and written consents pursuant to Sections 5.4 and 5.5,

respectively, and through any Officer of the Company to whom authority and duties have been delegated pursuant to Section 5.6.

(b) Any Person dealing with the Company may rely on the authority of any Officer in taking any action in the name of the Company authorized by the Board without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

5.3 Board Composition.

(a) Composition.

(i) The Board shall initially be composed of five (5) directors (or such other number of directors as the Board may unanimously determine) that are natural persons (each, a "Director" and, collectively, the "Directors"). The Directors shall be "managers" within the meaning of Section 18-101 of the Delaware Act. No Director in his or her individual capacity shall have the authority to manage the Company or approve matters relating to, or otherwise to bind the Company, such powers being reserved to the Directors acting through the Board and to such other committees of the Board, and Officers and agents of the Company, as designated by the Board. Three (3) Directors shall be designated from time to time by the Class A Member (any Director so designated by the Class A Member, a "Sanchez Director") and, subject to Section 5.3(d) and Section 5.3(e), two (2) Directors shall be designated from time to time by the Class B Member (any Director so designated by the Class B Member, a "GSO Director"). The Sanchez Directors and the GSO Directors as of the Effective Date are set forth on Exhibit B. Notwithstanding anything to the contrary provided herein and subject to Section 5.3(e), at any time during which the Class B Member is not entitled to appoint any GSO Directors, the Board does not include a representative of the GSO Investor or the consent of such representative is not required for the Company or any Partnership Group Company to take any act described in Section 5.7(b)(vi), the Class A Member shall appoint an Independent Director to the Board no later than five (5) Business Days after the occurrence of such triggering event. The Independent Director may only be removed for Cause and no resignation or removal of the Independent Director shall be effective until (i) the Class A Member has provided the Credit Agreement Agent with five (5) Business Days' prior written notice of such resignation or removal, and (ii) a successor Independent Director is appointed. No appointment of a successor Independent Director shall be effective until such successor shall have accepted his or her appointment as the Independent Director by a written instrument. In the event of a vacancy in the position of the Independent Director, the Class A Member shall, as soon as practicable, appoint a successor Independent Director.

(ii) Each Member having the right to designate a Director to the Board hereunder shall also have the right to designate one natural person to act as its Board observer at all meetings of the Board, which designation shall be made by written notice to the Company. No Board observer shall be entitled to vote on any matter



008324

presented to the Board. After receipt of each such designation under this Section 5.3(a)(ii), the Company will (A) give timely advance notice to each such Board observer of all such meetings of the Board and all proposals to such body for action without a meeting, (B) allow each such Board observer to attend all such meetings and (C) provide each such Board observer with copies of all written materials distributed to the Board, in connection with such meetings or proposals for action without a meeting, including but not limited to all minutes of previous actions and proceedings; *provided*, *however,* that each such Board observer shall agree to hold in confidence and trust all information so provided; and *provided further*, that the Company reserves the right to withhold any information and to exclude each such Board observer from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets.

(b) Removal; Vacancies. Subject to Section 5.3(a)(i), no Director may be removed from the Board except at the written direction of the Member(s) entitled to designate such Director, which Member(s) will upon any such removal be entitled to appoint an alternative Director to fill the vacancy. A Director may resign at any time, such resignation to be made in writing and to take effect immediately or on such later date as may be specified therein. Each of the Members may change or replace any of its respective Directors on the Board upon twenty-four (24) hours' prior written notice to the Board and the other Members. Any vacancy in the Board, whether created by the removal, resignation, retirement of a Director or otherwise, shall be filled only by the Member entitled to designate such Director in accordance with this Section 5.3.

(c) Subsidiaries. To the extent any Subsidiary of the Company is not a member-managed limited liability company or partnership of which a Partnership Group Company is the managing general partner, the Company shall take all necessary action to ensure that the board of directors, board of managers, partnership committee or similar governing body of such Subsidiary of the Company shall be comprised of designees of each of the Class A Member(s), the Class B Member(s) and the Independent Director, if applicable, that, as nearly as is practicable, are in proportion to the number of their respective designees on the Board and require the vote, consent or decision (and presence for quorum) of each such designee to the same extent as would be required for comparable actions and meetings at the Board.

(d) Board Restructuring. Following an Investor Redemption Event and solely for so long as such Investor Redemption Event remains uncured, the size and composition of the Board shall automatically, and without further action by the Board or the Members, be increased in size to seven (7) Directors such that there shall be two (2) additional Directors that shall be designated by the Class B Member, and as a result of which there shall be four (4) GSO Directors in total and three (3) Sanchez Directors in total; *provided* that, once all pending Investor Redemption Events have been cured, the composition of the Board shall automatically, and without further action by the Board or the Members, be reconstituted in accordance with Section 5.3(a)(i) and the Class B Member shall notify the Company which two (2) natural persons will serve as the GSO Directors, unless Section 5.3(e) would apply at such time.

(e) Automatic Resignation. Notwithstanding anything to the contrary contained herein, upon the redemption or liquidation in full of all outstanding Preferred Units pursuant to the Partnership Agreement, (i) all GSO Directors shall automatically be deemed to resign from the Board at the time of such redemption, (ii) the right of the Class B Member to appoint Directors pursuant to Section 5.3(a)(i) or Section 5.3(d), as applicable, shall be null and void and shall be of no further force and effect, (iii) the Class A Member shall have the right to appoint all members of the Board following such redemption and (iv) the Class A Member shall designate one natural person to serve as the Independent Director; *provided however*, that the Independent Director shall only vote on matters set forth in Section 5.7(c).

5.4 Board Meetings; Quorum; Vote Required.

(a) Meetings. The Board shall meet at least quarterly at the offices of the Company (or such other place as determined by the Board). Special meetings of the Board, to be held at the offices of the Company (or such other place as shall be determined by the Board), shall be called at the direction of any one Director, upon reasonable advance notice, but in any event upon not less than forty-eight (48) hours' prior written notice, to all Directors. Subject to the requirements of the Delaware Act, the Delaware Certificate or this Agreement for notice of meetings, the Directors may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened or is not called or convened in accordance with this Agreement. Attendance of a Director at a meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business on the ground that such meeting is not properly called or convened. All meetings of the Board shall be presided over by the chairman of the meeting, who shall be a Person designated by a majority of the Directors. The chairman of the meeting of the Board shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as determined by him or her to be in order.

(b) Quorum. At all meetings of the Board, the presence of a majority of the number of Directors fixed by this Agreement, including at least one GSO Director, or for so long as the Board has seven (7) Directors pursuant to Section 5.3(d), at least one Sanchez Director (such Director, as applicable, the "Minority Director"), shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board; ***provided, however,*** that if at least one Minority Director is not present at a meeting of the Board called in accordance with the terms of this Agreement and is not present at the rescheduled meeting of the Board, then no Minority Director(s) shall be required in order to establish a quorum at any meeting that is rescheduled after the initially rescheduled meeting. Notwithstanding the foregoing, at any meeting which will require a vote under Section 5.7(c), the Independent Director must be present to establish a quorum. Participation by a Director in a meeting in accordance with Section 5.4(a), or pursuant to a valid written consent pursuant to Section 5.5, shall constitute presence in person at a meeting. If a quorum is not present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time for a period not to exceed sixty (60) days, without notice other than announcement at the meeting, until a quorum is present. A Director may be counted as

present for purposes of a quorum of the Board pursuant to a valid written proxy delivered to another Director who is present at such Board meeting.

(c) Board Voting. On all matters requiring the vote or action of the Board, each Director shall be entitled to one vote. Subject to Sections 5.7(b) and 5.7(c), all actions undertaken by the Board must be authorized by the affirmative vote of a majority of Directors at any meeting at which a quorum is present.

(d) Compensation of Directors. Directors shall not be entitled to any compensation unless otherwise determined by the Board, acting with unanimous consent.

5.5 Action by Written Consent. Any action permitted or required by the Delaware Act, the Delaware Certificate or this Agreement to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Directors entitled to vote thereon. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board.

5.6 Officers.

(a) The Officers of the Company shall be appointed as provided in this Section 5.6 and shall include a President and Chief Executive Officer (the "CEO"), a Chief Financial Officer and a Chief Operations Officer, and may include a Secretary, a Treasurer, one or more Vice Presidents (including, one or more Executive or Senior Vice Presidents), and such other Officers with such titles and responsibilities as the Board may from time to time determine. The Board may choose not to fill any office for any period as it may deem advisable. Any two or more offices may be held by the same Person and Officers need not be employees of the Company. The CEO shall be appointed by the Board. The CEO shall nominate all other potential Officers of the Company, subject to the Board's confirmation and approval in accordance with Section 5.7(a)(xvii), and any such potential Officer shall become an Officer of the Company upon receipt of such Board confirmation and approval. Each Officer shall hold office until a successor is duly elected and qualified or until the earlier of his or her death, resignation or removal as hereinafter provided. Any Officer of the Company may be removed at any time by the Board. Any vacancy occurring in any office of an Officer because of death, resignation, removal, disqualification or otherwise, may be filled by the Board then in office. In the case of the absence or disability of any Officer of the Company and of any Person hereby authorized to act in such Officer's place during such Officer's absence or disability, the Board may by resolution delegate the powers and duties of such Officer to any other Officer, or to any other Person whom it may select. Subject to (i) Section 5.7, (ii) any limitations, restrictions or directions provided for in this Agreement or by the Board and (iii) the general oversight of the Board, the CEO and other Officers of the Company shall have, in a manner consistent with the management and control granted to officers of a corporation under the laws of the state of Delaware, power and authority to manage and control the day-to-day business, operations and affairs of the Company in the ordinary course of its business, to make all decisions affecting the day-to-day business, operations and affairs of the Company in the ordinary course of its business and to take all such actions as they determine necessary or appropriate to accomplish the foregoing.

(b) The Officers of the Company as of the Effective Date are set forth on Exhibit C hereto.

(c) Except as may otherwise be determined by the Board, the duties and responsibilities of the Officers of the Company shall be as follows:

(i) CEO. The CEO shall have general and active management and control of the business and affairs of the Company, subject to the control of the Board, and shall see that all orders and resolutions of the Board are carried into effect, and shall perform all other duties incident to such office.

(ii) Chief Financial Officer. The Chief Financial Officer shall have general and active management and control of the financial affairs of the Company, including assisting in the preparation of the capital budget, subject to the control of the CEO and the Board.

(iii) Chief Operations Officer. The Chief Operations Officer shall have general and active management and control of the operations of the Company, subject to the control of the CEO and the Board.

(iv) Vice Presidents. Vice Presidents, if any, in order of their seniority or in any other order determined by the Board, shall generally assist the CEO, the Chief Financial Officer and the Chief Operations Officer and perform such other duties as the Board or the CEO shall prescribe.

(v) The Secretary. The Secretary shall, to the extent practicable, attend all meetings of the Board and all meetings of the Members and shall record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform the same duties for any committee of the Board when so requested by such committee. The Secretary shall give or cause to be given notice of all meetings of the Members and of the Board, shall perform such other duties as may be prescribed by the Board or the CEO and shall act under the supervision of the CEO and the Chief Operations Officer. The Secretary shall keep in safe custody the seal of the Company, if any, and affix the same to any instrument that requires that the seal be affixed to it and which shall have been duly authorized for signature in the name of the Company and, when so affixed, the seal shall be attested by his signature or by the signature of the Treasurer. The Secretary shall keep in safe custody the certificate books and Member records and such other books and records of the Company as the Board or the CEO may direct and shall perform all other duties incident to the office of Secretary and such other duties as from time to time may be assigned by the Board, the CEO or the Chief Operations Officer.

(vi) The Treasurer. The Treasurer shall have the care and custody of all the funds of the Company and shall deposit such funds in such banks or other depositories as the Board, or any Officer(s) or any Officer and agent jointly, duly authorized by the Board, shall, from time to time, direct or approve. The Treasurer shall disburse the funds of the Company under the direction of the Board, the CEO,

the Chief Financial Officer and the Chief Operations Officer. The Treasurer shall keep a full and accurate account of all moneys received and paid on account of the Company and shall render a statement of accounts whenever the Board, the CEO, the Chief Financial Officer or the Chief Operations Officer shall so request and shall perform such other duties incident to the office of Treasurer and such other duties as from time to time may be assigned by the Board, the CEO, the Chief Financial Officer or the Chief Operations Officer.

(d) The Officers, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

5.7 Actions Requiring Approval.

(a) Board Approval. In addition to such other matters as the Board may from time to time by resolution determine, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall take any of the actions described in this Section 5.7(a) without the approval of the Directors constituting a majority of the Board (in accordance with Section 5.4), unless the taking of such action is expressly and specifically contemplated by any capital budget approved pursuant to this Section 5.7(a):

(i) approve, amend, supplement, change or modify any semi-annual plan or budget of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(ii) incur general and administrative expenses including "Overhead Costs" as defined in the MSA, (A) in excess of $5.0 million each year during the two calendar years following the Effective Date and (B) thereafter, in excess of $10.0 million in any calendar year;

(iii) other than (A) drawings under the Credit Agreement or Replacement Credit Agreement for expenditures or other applications in each case that are items included in the then applicable plan or budget approved in accordance with Section 5.7(a)(i) above, (B) Indebtedness not to exceed an aggregate of $15.0 million at any time outstanding for capital leases and purchase money security interests or (C) the incurrence of trade payables arising in the ordinary course of business and obligations under Hedge Agreements, (1) create or incur any Indebtedness, assume any Indebtedness of, or guarantee or otherwise become responsible for the obligations of, any Person, in any single transaction or series of transactions, (2) redeem prior to maturity or refinance any Senior Debt or any other Indebtedness funded or committed at the date of either Preferred Unit Closing (other than pursuant to the mandatory prepayment or redemption provisions thereof) or (3) permit, create or suffer to exist any Lien (other than Permitted Liens) arising from Indebtedness on any material assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(iv) alter, repeal, amend or adopt, or consent to the waiver of, any provision of this Agreement or the Delaware Certificate or the governing document of any of the Partnership Group Companies;

(v) change, amend or otherwise modify, or take action outside of, the Company's purpose (as set forth in Section 1.9) or the Partnership's purpose (as set forth in Section 2.4 of the Partnership Agreement), or engage in any business activity outside of the AMI;

(vi) effect any recapitalization, restructuring or reorganization or any Unit, Preferred Unit or Common Unit split;

(vii) dissolve the Company, any of its Subsidiaries or any of the Partnership Group Companies; take any action that would result in a Bankruptcy Event; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(viii) directly or indirectly purchase or otherwise acquire any assets or all or any part of the business of, or Equity Interests in, or invest in or make a capital contribution to, any Person (other than a wholly owned Subsidiary of the Company), including in connection with the formation of or participation in any joint venture, partnership or similar arrangement;

(ix) make a loan or extend credit (other than, in the ordinary course, trade credit) to any Person;

(x) enter into any agreement with respect to, or consummate, any sale of any business or assets, whether by sale, merger, consolidation, restructuring, conversion, recapitalization, transfer or disposition of assets (including, without limitation, entry into any contract, arrangement or other commitment in connection with any volumetric production payment or forward sale of hydrocarbon production), other than with respect to the Partnership's sale of production in the ordinary course of business;

(xi) effect any merger, consolidation or other similar business combination of the Company, any of its Subsidiaries or any of the Partnership Group Companies or any sale of all or substantially all of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(xii) except as set forth in Section 5.8 or as set forth in the Securities Purchase Agreement, issue any Additional Units, Equity Interests or Equity Securities;

(xiii) enter into, amend, modify or terminate any commodity, basis or interest rate hedges or swaps or other derivative transactions, including, without limitation, any Hedging Activity in effect as of the date of the Anadarko Closing or required pursuant to Section 6.7 of the Partnership Agreement;

(xiv) initiate any litigation or other legal or administrative proceeding or enter into any settlement agreement with respect to any such litigation or other legal or administrative proceeding that requires the payment of any amount greater than $1,000,000 or settle any disputes related to accounts receivable or accounts payable in excess of $1,000,000;

(xv) change or modify any accounting policies, except as required by applicable regulatory authorities or independent accountants;

(xvi) enter into, terminate, extend, enforce, amend, or modify, or waive any right under, any contract, agreement, arrangement or transaction between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Member or any Affiliate of a Member, on the other hand;

(xvii) approve the appointment, hiring, termination or removal of any Officer;

(xviii) appoint, remove or terminate the engagement of, or cause the Company or any Subsidiary of the Company to appoint, remove or terminate the engagement of, the independent auditors or reserve engineer for the Company or such Subsidiary; *provided* that, as of the date of the Effective Date, the Company's independent auditors shall be KPMG LLP and the Company's reserve engineer shall be Ryder Scott Company, L.P. and no further Board approval shall be required under this Section 5.7(a)(xviii) for such initial appointments;

(xix) (A) change or designate the Tax Matters Member or Partnership Representative or, except as contemplated by this Agreement, make any tax election or take, or cause the Company or any Subsidiary of the Company to take, any other action with respect to taxes, including causing the Company or any Subsidiary of the Company to be classified as other than a partnership for federal income tax purposes, or (B) change or designate the Tax Matters Partner or Partnership Representative (each as defined in the Partnership Agreement) pursuant to the Partnership Agreement;

(xx) enter into, terminate or amend any agreement that could reasonably be expected to result in obligations of more than $10.0 million in any 12-month period that are not otherwise included in the capital budget;

(xxi) make or declare any distribution or dividend of the Company;

(xxii) authorize any Subsidiary to make or declare any distribution or dividend or determine the amount of Available Cash;

(xxiii) effectuate an initial public offering of any Equity Interests of the Company or any of its Subsidiaries or any of the Partnership Group Companies;

(xxiv) enter into an agreement with respect to or consummate any Change of Control, Disposition Transaction or any liquidation or dissolution pursuant to Section 12.2 of the Partnership Agreement;

(xxv) approve or disapprove of a transfer of all or any part of the General Partner Interest (as defined in the Partnership Agreement) in the Partnership;

(xxvi) make any payments or distributions to, or effect any redemptions in respect of, Common Units, or make any distributions on any Equity Interests other than in cash;

(xxvii) amend or modify any Senior Debt Agreement, Replacement Credit Agreement or any agreement governing Indebtedness required to be approved by the Board or related documents thereto;

(xxviii) enter into, terminate, extend, amend, or modify any midstream or marketing agreement, including, but not limited to, the Hydrocarbons Marketing Agreement;

(xxix) create any Subsidiary or invest in any Subsidiary that is not wholly owned by the Company;

(xxx) appoint the UnSub Representative to the Operating Committee pursuant to the Joint Development Agreement; or

(xxxi) take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

(b) Full Board and Class B Member Approval. Notwithstanding anything to the contrary in this Agreement (including duplicative provisions in Section 5.7(a)), in addition to such other matters as the Board may from time to time by resolution determine, so long as there are any Preferred Units outstanding, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall take any of the following actions without having first obtained the unanimous approval of the Directors constituting the entire Board (other than, for the avoidance of doubt, any Independent Director) and the Class B

Member(s) holding a majority of the then-outstanding Preferred Units (together, "Special Approval"):

(i) incur general and administrative expenses, including "Overhead Costs" as defined in the MSA, (A) in excess of $5.0 million each year during the two calendar years following the Effective Date and (B) thereafter, in excess of $10.0 million in any calendar year; *provided* that no such general and administrative costs may be incurred without Special Approval if such general and administrative costs do not constitute actual costs (on a cost pass-through and no profit basis) incurred by the "Manager" (as such term is defined under the MSA) or its Affiliates that are incremental costs (over and above cost structure prior to the Anadarko Closing) incurred in connection with the businesses of the Company, its Subsidiaries and Partnership Group Companies, and, to the extent such general and administrative costs relate to the management of properties or assets in which any of the (x) Partnership Group Companies and (y) Sanchez Vehicles and/or Blackstone Newco own an interest, such costs are allocated 60% to the Partnership and 40% to the Sanchez Vehicles, respectively, after taking into account reimbursements of such costs from Blackstone Newco, if applicable;

(ii) other than (A) any drawings under the Senior Debt Agreement(s) (1) at the time of the KNOC Closing or Dual Closing, if any, and for the first year thereafter under the Demand Facility not to exceed an aggregate of $500.0 million (provided that exchange into a Demand Facility pursuant to the terms of the Fee Letter as of the date hereof with the first year of the closing shall be permitted hereunder), or (2) at the time of the Anadarko Closing that occurs in a Separate Closing, and for the first year thereafter (subject to increase at the KNOC Closing, if applicable, pursuant to clause (ii)(A)(1)) under the Demand Facility not to exceed an aggregate of $330.0 million (provided that exchange into a Demand Facility pursuant to the terms of the Fee Letter as of the date hereof with the first year of the closing shall be permitted hereunder), in each case such amount to be reduced by the value of the Initial Debt Replacement Units, if any, and Final Debt Replacement Units, if any, funded in accordance with Section 2.01(c) or Section 2.02(b), respectively, of the Securities Purchase Agreement), (B) any drawings under the Credit Agreement or Replacement Credit Agreement(s) following the Anadarko Closing, *provided* that (I) after giving effect to such drawing(s), the remaining undrawn committed capacity under the Credit Agreement or Replacement Credit Agreement(s) is not less than twenty percent (20%) of the total committed borrowing base then available under the Credit Agreement or Replacement Credit Agreement (s) and (II) pro forma for such drawing and the application of such proceeds as approved by the Board, the Partnership will not have more than $25.0 million of cash on hand; *provided further* that total outstanding Indebtedness under clauses (A) and (B) of this Section 5.7(b)(ii) shall not exceed $700.0 million if the Tag Right Interests are transferred or conveyed in connection with the exercise of the Tag Right, or $466.0 million if the Tag Right Interests are not so transferred or conveyed, at any time without Special Approval, (C) Indebtedness not to exceed $15.0 million at any time outstanding for capital leases and purchase money security interests and (D) the incurrence of trade

payables arising in the ordinary course of business and obligations under Hedge Agreements, (1) create or incur any Indebtedness, assume any Indebtedness of, or guarantee or otherwise become responsible for the obligations of, any Person, in any single transaction or series of transactions, (2) redeem prior to maturity utilizing Indebtedness or refinance any Senior Debt or any other Indebtedness funded or committed at the date of either Preferred Unit Closing (other than pursuant to the mandatory prepayment or redemption provisions thereof) or (3) permit, create or suffer to exist any Lien (other than Permitted Liens) arising from Indebtedness on any material assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies; *provided* that, notwithstanding anything to the contrary in this Section 5.7(b)(ii), neither the unanimous approval of the Directors constituting the entire Board nor the approval of the Class B Member shall be required in connection with the incurrence of any Indebtedness if the proceeds of such Indebtedness are used to redeem the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit, as may be required pursuant to the Partnership Agreement;

(iii) amend or modify any Senior Debt Agreement, Replacement Credit Agreement or any other agreement governing other Indebtedness, including any document related thereto, other than as relating to the incurrence of Indebtedness under Section 5.7(a)(iii)(B) or Section 5.7(b)(ii)(C) that does not require Special Approval;

(iv) change, amend or otherwise modify, or take action outside of, the Company's purpose (as set forth in Section 1.9) or the Partnership's purpose (as set forth in Section 2.4 of the Partnership Agreement), or engage in any business activity outside of the Core Area of the AMI;

(v) effect any recapitalization, restructuring or reorganization or any Unit, Preferred Unit or Common Unit split; *provided* that the foregoing shall not restrict the issuance of additional Common Units pursuant to the terms of the Partnership Agreement;

(vi) dissolve the Company, any of its Subsidiaries or any of the Partnership Group Companies; take any action that would result in a Bankruptcy Event of the Company, any of its Subsidiaries or any of the Partnership Group Companies; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a

receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(vii) directly or indirectly purchase or otherwise acquire any assets or all or any part of the business of, or Equity Interests in, or invest in or make a capital contribution to, any Person (other than a wholly owned Subsidiary of the Company), including in connection with the formation of or participation in any joint venture, partnership or similar arrangement;

(viii) make a loan or extend credit (other than in the ordinary course trade credit) to any Person;

(ix) enter into any agreement with respect to, or consummate, any sale of any business or assets, whether by sale, merger, consolidation, restructuring, conversion, recapitalization, transfer or disposition of assets (including, without limitation, any exercise of tag rights of the Partnership or the occurrence of a Sale Transaction, in each case, under the Joint Development Agreement, or entry into any contract, arrangement or other commitment in connection with any volumetric production payment or forward sale of hydrocarbon production), other than with respect to the Partnership's sale of production in the ordinary course of business or a sale that occurs concurrent with the redemption of the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement);

(x) (A) create, grant or issue any Additional Units or Equity Interests of the Company or (B) create, grant or issue (1) a General Partner Interest (as defined in the Partnership Agreement) or (2) any Equity Securities of the Partnership that (w) have a liquidation preference or any rights senior to or on parity with the Preferred Units, (x) require the Partnership to pay dividends or distributions that will have priority to or parity with dividends or distributions payable on the Preferred Units, (y) have rights to dividends or distributions that would reduce the Preferred Units' distributions under the Partnership Agreement or that would be permitted to receive cash distributions prior to liquidation or redemption of the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement), or (z) results in Sanchez Parent and its Affiliates beneficially owning less than 51.0% of the economic interest in the Partnership (excluding any economic interest related to the Preferred Units);

(xi) enter into, amend, modify or terminate any commodity, basis or interest rate hedges or swaps or other derivative transactions other than those permitted to be entered into pursuant to Section 6.7 of the Partnership Agreement;

(xii) initiate, compromise or settle any litigation, administrative proceeding or other dispute involving an amount greater than $2,500,000;

(xiii) enter into, terminate, extend, enforce, amend, or modify, or waive any right under, any contract, agreement, arrangement or transaction between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Member or any Affiliate of a Member, on the other hand; ***provided,*** that (A) with respect to any contract, agreement, arrangement or transaction between any of the Partnership Group Companies, on the one hand, and an Affiliate of a Member (other than, with respect to the Sanchez Investor, SPP), on the other hand, no such approval shall be required under this Section 5.7(b)(xiii) if the entry into, termination, extension, enforcement, amendment or modification of, or waiver of any right under, such contract, agreement, arrangement or transaction (x) is on terms no less favorable to the Partnership Group Companies than would be obtained in a comparable arm's length transaction with an independent third party and (y) (I) such action would not be reasonably expected to (and does not ultimately) result in revenue to, or costs or expenses incurred by, the Company, any of its Subsidiaries or the Partnership Group Companies of more than $5.0 million or (II) such action together with all prior such action(s) in respect of any Member or Affiliate of any Member would not be reasonably expected to result in revenue to, or costs or expenses incurred by, the Company, any of its Subsidiaries or the Partnership Group Companies when considered in the aggregate of more than $25.0 million for any period of time (the immediately preceding clauses (I) and (II) collectively, the "Affiliate Threshold") and (B) with respect to any contract, agreement, arrangement or transaction between any of the Partnership Group Companies, on the one hand, and SPP, on the other hand, that is in excess of the Affiliate Threshold, the approval of the Class B Member required under this Section 5.7(b)(xiii) shall not be unreasonably withheld, conditioned or delayed; ***provided*** that it is expressly acknowledged that the Class B Member may withhold such approval or consent if the contract, agreement, arrangement or transaction with SPP (x) is on terms less favorable to the Partnership Group Companies than would be obtained in a comparable arm's length transaction with an independent third party or (y) is not approved in writing by the independent members of the board of directors of Sanchez Parent, the conflicts committee of the board of directors of the general partner of SPP and Blackstone Newco, or (z) Sanchez Parent and its Affiliates and Blackstone Newco, respectively, are not assuming a proportional share of such contract, agreement, arrangement or transaction, based on each party's respective working interests associated with the related contract or expenditure, on the same terms and conditions as the Partnership; ***provided*** that, notwithstanding anything to the contrary in this Section 5.7(b)(xiii), neither the unanimous approval of the Directors constituting the entire Board nor the approval of the Class B Member shall be required in connection with any sale of any business or assets to any Member or any Affiliate of a Member if the proceeds of such sale are used to redeem the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit, as may be required pursuant to the Partnership Agreement.

(xiv) appoint, remove or terminate the engagement of, or cause the Company or any Subsidiary of the Company or Partnership Group Company to appoint, remove or terminate the engagement of, the independent auditors or reserve engineer for the Company or such Subsidiary; ***provided*** that, as of the Effective Date, the Company's and the Partnership's independent auditors shall be KPMG LLP and the Company's reserve engineer shall be Ryder Scott Company, L.P. and no further approval shall be required under this Section 5.7(b)(xiv) for such initial appointments; ***provided further***, that following the Effective Date, no approval shall be required under this Section 5.7(b)(xiv) for the appointment of any entity that is listed in Exhibit D hereto as a successor of the independent auditor or reserve engineer, as applicable, provided that the entity designated as the successor independent auditor or reserve engineer is the then-current independent auditor or independent reserve engineer for the Class A Member;

(xv) (A) change or designate the Tax Matters Member or Partnership Representative or make any tax election or take, or cause the Company or any Subsidiary of the Company to take, any action with respect to taxes that would cause the Company or any Subsidiary of the Company to be classified as other than a partnership for federal income tax purposes, or (B) change or designate the Tax Matters Partner or Partnership Representative (each as defined in the Partnership Agreement) pursuant to the Partnership Agreement;

(xvi) enter into an agreement with respect to or consummate any Change of Control, Disposition Transaction or any liquidation or dissolution pursuant to Section 12.2 of the Partnership Agreement unless, upon the consummation of such Change of Control, Disposition Transaction or liquidation or dissolution, as the case may be, all outstanding Preferred Units will be redeemed in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement);

(xvii) transfer all or any part of the General Partner Interest (as defined in the Partnership Agreement) in the Partnership;

(xviii) make any payments or distributions to, or effect any redemptions in respect of, Common Units, in each case, prior to the redemption in full of all Preferred Units by the Partnership, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Units (as may be required pursuant to the Partnership Agreement), or make any distributions on any Equity Interests other than in cash;

(xix) terminate, extend, amend, or modify the Hydrocarbons Marketing Agreement and the Sanchez Letter Agreement;

(xx) create any Subsidiary;

(xxi) make or agree to make any amendment, supplement, modification or waiver of any provision of the Joint Development Agreement that, if implemented, would adversely impact the Company, any of its Subsidiaries or any of the Partnership Group Companies in any material respect, including, without limitation, the spacing protections set forth in Section 5.3 of the Joint Development Agreement;

(xxii) make or agree to make any amendment, supplement, modification or waiver of any provision in either of the Springfield Gathering Agreements that, if implemented, would adversely impact the Partnership Group Companies in any material respect, including any increase in fees or extension of any applicable duration of the demand charge period;

(xxiii) make any election for capital expenditures on behalf of any Partnership Group Company that is different than the election made by a Sanchez Vehicle with respect to operations on assets in which the Partnership Group Companies and Sanchez Vehicles both own an interest (*i.e.*, non-consent for the Partnership and consent for Sanchez Vehicle, or vice versa);

(xxiv) if, as of the end of a calendar quarter preceding the date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, elect to non-consent for greater than five percent (5%) of the gross wells proposed by Persons other than the Sanchez Vehicles in any rolling twelve-month period; *provided* that regardless of whether the PDP PV-10 Ratio is equal to or greater than the then-effective Test Level, except pursuant to the rights of the Operating Committee under the Joint Development Agreement, Special Approval shall be required to non-consent to greater than five percent (5%) of gross wells proposed by Blackstone Newco or its Affiliates (or successor owners of its working interests) in any rolling twelve-month period;

(xxv) make capital expenditures for drilling and completion of wells in any quarterly period commencing twenty-four (24) months after the Effective Date in which as of the end of the calendar quarter preceding the date of determination the PDP PV-10 Ratio was less than the then-effective Test Level, provided that if such capital expenditures constitute an "Approved Operation" (as defined in the Joint Development Agreement) pursuant to the Joint Development Agreement, then the required approval pursuant to this Section 5.7(b)(xxv) will only be applicable to an amendment or modification of such "Approved Operation" or approval of a subsequent "Approved Operation";

(xxvi) if, as of the end of a calendar quarter preceding the date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, make any elections under the Joint Development Agreement or any Operating Agreement in respect of the Partnership's properties with respect to the operation or series of related operations on Existing Producing Wells in excess of $25.0 million in any year;

(xxvii) admit or accept any Obligation (as such term is defined in the APC/KM PSA) contained in any Claim Notice (as such term is defined in the APC/KM PSA) received pursuant to the APC/KM PSA;

(xxviii) provide consent to any transaction pursuant to Section 4 (d) or Section 4(f) of the Sanchez Letter Agreement; or

(xxix) take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

(c) Notwithstanding anything to the contrary in this Agreement, at any time during which an Independent Director is required to be appointed, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall, without the consent of the entire Board, including the Independent Director, take any action that would result in a Bankruptcy Event of the Company, any of its Subsidiaries or any of the Partnership Group Companies; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies.

5.8 Issuance of Preferred Units and Certain Debt Matters. If after the Effective Date, (a) an event of default or borrowing base deficiency (or analogous term or event) under any of the Senior Debt Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies (including, without limitation, any Replacement Credit Agreement) has occurred and such event of default remains uncured by the applicable Partnership Group Company for ten (10) Business Days following receipt by the Company of notice of such event of default or (b) any of the Senior Debt Agreements, Replacement Credit Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies prohibits the payment by the Partnership of any Tax Distributions (as defined in the Partnership Agreement) or, following the date that is twelve (12) months following the Effective Date, Distributions in cash on the Preferred Units pursuant to Section 4.1(b) of the Partnership Agreement and such prohibition persists for ten (10) Business Days after the date such distribution is due to be paid, then, notwithstanding Section 5.7, the Class B Member shall have the right, in its sole discretion, to cause the Partnership to issue additional Preferred Units, which number of Preferred Units shall be determined by the Class B Member, in its sole discretion following consultation with the Board, to the GSO Partner on the same terms and conditions that the Preferred Units were issued to the GSO Partner on the Effective Date. In order to exercise such right, the Class B Member shall deliver a written notice (an "Additional Preferred Units Notice") to the Company setting forth the request and the

number of Preferred Units to be issued by the Partnership. Notwithstanding Section 5.7, upon receipt of the Additional Preferred Units Notice, the Company and the Board shall be required to cause the Partnership (A) to enter into a purchase agreement with the GSO Partner in substantially the form attached hereto as Exhibit E (with any such changes to the extent the parties thereto may mutually agree) and (B) to issue the number of Preferred Units set forth in the Additional Preferred Units Notice within five (5) Business Days of receipt of the Additional Preferred Units Notice. The Partnership shall use the proceeds from the issuance of such Preferred Units to the GSO Partner solely to repay outstanding Indebtedness of any of the Partnership Group Companies under any of the Senior Debt Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies (including a Replacement Credit Agreement) so as to remedy the applicable condition(s) described in clauses (a) and (b) of this Section 5.8.

5.9 Enforcement of Affiliate Contracts. Notwithstanding anything to the contrary in Section 5.7, each of the Members agree that any term or condition of any arrangement, agreement or contract between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Affiliate of a Member or Affiliate of the Company (excluding at any pertinent time, any Subsidiary of the Company or Partnership Group Company), on the other hand, other than the APC/KM PSA, shall be exercised or enforced by the Company, the applicable Subsidiary or the applicable Partnership Group Company as directed by the non-Affiliated Member, without the requirement of the approval by the Board or any other Person; ***provided, however,*** that any such exercise or enforcement shall not entitle such non-Affiliated Member to vary any obligation of the Company or of such Affiliate under such arrangement, agreement or contract. The Company will provide to the non-Affiliated Member copies of all formal notices or material correspondence under any of such arrangements, agreements or contracts at the same time as delivery to any counterparty under such arrangements, agreements or contracts. For clarity, the foregoing shall not permit the Class B Member to enforce the rights and obligations of any Partnership Group Company under the Joint Development Agreement or any Operating Agreement to the extent that the term or condition of such arrangement, agreement or contract relates solely to a party that is not an Affiliate of a Member or Affiliate of the Company (***provided***, for the avoidance of doubt, the foregoing shall not limit the Class B Member, or the rights of its designees to the Board, under Sections 5.7(a) and 5.7(b)); ***provided further*** that, for clarity, the Class B Member shall be entitled to direct the exercise and enforcement by the Company, the applicable Subsidiary or the applicable Partnership Group Company under the Joint Development Agreement or any Operating Agreement to the extent that (i) the term or condition of such arrangement, agreement or contract relates to a party that is an Affiliate of a Member or an Affiliate of the Company and the Class B Member reasonably determines in good faith that there is a conflict of interest by the applicable member of the Sanchez Group in exercising or enforcing such term or condition or (ii) either the applicable member of the Sanchez Group or the Partnership is then in breach of the applicable arrangement, agreement or contract.

5.10 Limitation of Duties and Corporate Opportunities.

(a) To the fullest extent permitted by law, the Directors (each in his or her capacity as a Director) and the UnSub Representative shall owe no fiduciary or similar duty or obligation whatsoever to the Company, any Member (other than for a Director (other than the Independent Director), the Member designating such Director) or the other Directors, except as required by any provisions of the Delaware Act or other applicable Law that cannot be waived. Subject to the foregoing, each of the Company and the Members acknowledge and agree that (i) each Director may decide or determine any matter subject to the Board's approval in the sole and absolute discretion of such Director, it being the intent of all Members that such Director (other than the Independent Director) shall have the right to make such determination solely on the basis of the interests of the Member that designated such Director, (ii) the UnSub Representative shall act at the direction of the Board and (iii) the Independent Director shall only consider the interests

of the Company, its Subsidiaries and the Partnership Group Companies, as applicable, when making a determination under Section 5.7(c) and shall not consider the interests of any Members or partners. Each of the Company and the Members hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against any Director or the UnSub Representative for or in connection with any such decision or determination, in each case whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are in each case expressly released and waived by the Company and each Member, to the fullest extent permitted by law, as a condition of, and as part of the consideration for, the execution of this Agreement and any related agreement, and the incurring by the Members of the obligations provided in such agreements.

(b) Each Director and, except as expressly provided herein, each Member and each of their respective Affiliates, shall be free to engage or invest in, and devote its and their time to, any other business venture or activity of any nature and description, regardless of whether such activities are considered competitive with the Company, and neither the Company nor any other Person shall have any right by virtue of this Agreement or the relationship created hereby in or to such other venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of such other venture or activity shall not be deemed wrongful or improper. No notice, approval or other sharing of any such other opportunity or activity shall be required and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity.

(c) Notwithstanding anything in this Agreement to the contrary, the Company and each of the Members acknowledges and agrees that certain of the GSO Investor's Affiliates (which, solely for purposes of this Section 5.10(c), shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) (x) have made, prior to the date hereof, and are expected to make, on and after the date hereof, investments (by way of capital contributions, loans or otherwise), and (y) have engaged, prior to the date hereof, and are expected to engage, on and after the date hereof, in other transactions with and with respect to, in each case, Persons engaged in businesses that directly or indirectly compete with the business of the Company, its Subsidiaries and the Partnership Group Companies as conducted from time to time. The Company and the Members agree that, subject only to the limitations provided in Section 5.10(d) below, any involvement, engagement or participation of the GSO Investor and its Affiliates (including any Director designated to the Board by the GSO Group) in such investments, transactions and businesses, even if competitive with the Company, its Subsidiaries or the Partnership Group Companies, shall not be deemed wrongful or improper or to violate any duty express or implied under applicable Law or this Agreement and shall not be deemed a conflict of interest. For the purposes of clarity, the GSO Investor shall be deemed not to violate this Section 5.10 if it or any of its Affiliates shall invest in a fund or other entity, whether or not the GSO Investor Controls such fund or entity that makes an investment that directly or indirectly competes with the Company, its Subsidiaries or the Partnership Group Companies.

(d) Each of the Company and the Sanchez Investor (on behalf of itself and its respective Affiliates) hereby renounces any co-participation right, expectancy and any other rights (including information rights) with respect to any business opportunity in which the GSO Investor participates or desires or seeks to participate that either (x) is not within the purposes of the

Company as set forth in Section 1.9 or (y) is within such purposes of the Company but is not a business opportunity that (i) the Company presents to a Director solely in such individual's capacity as a Director or (ii) is identified to the Director solely through the disclosure of information by or on behalf of the Company to the Director (each business opportunity other than those referred to in clauses (x), (y)(i) or (y)(ii) are referred to as a "Renounced Business Opportunity"); for clarity, the GSO Investor and any other member of the GSO Group can pursue other opportunities in the AMI. Neither the GSO Investor nor any GSO Director nor any Affiliate of any of the foregoing (solely for purposes of this Section 5.10(d), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) shall have any obligation to communicate or offer any Renounced Business Opportunity to the Company or the Sanchez Investor, and the GSO Investor may pursue for itself or direct, sell, assign or transfer to a Person other than the Company any Renounced Business Opportunity, and any such action shall not be deemed a conflict of interest, a breach of this Agreement, or a breach of any duty. Notwithstanding anything to the contrary in this Agreement, any business opportunity that is within the purpose of the Company (as set forth in Section 1.9) and which is presented to the GSO Investor solely by the Company (as distinguished from opportunities presented by multiple Persons), will not be pursued by the GSO Investor or by GSO unless otherwise agreed to in writing by a majority of the Sanchez Directors.

(e) Each of the Company and the Members hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(e), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) for or in connection with any such investment activity or other transaction activity or other matters made in compliance with Section 5.10(c) or Section 5.10(d)), or activities related to any of the foregoing, whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are expressly released and waived by the Company and each Member, in each case to the fullest extent permitted by applicable law; *provided, however,* that the foregoing shall not release any claims for actual fraud, willful misconduct, or a breach of this Agreement.

(f) Notwithstanding anything in this Agreement to the contrary, each of the Company and the Members acknowledges and agrees that the GSO Investor and its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) have obtained, prior to the date hereof, and are expected to obtain, on and after the date hereof, confidential information from other companies in connection with the activities and transactions described in this Section 5.10 or otherwise. The Company and each of the Members hereby agree that (x) none of the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) has any obligation to use in connection with the business, operations, management or other activities of the Company or to furnish to the Company, its Subsidiaries, the

Partnership Group Companies or any Member any such confidential information, and (y) any claims against, actions, rights to sue, other remedies or other recourse to or against the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) for or in connection with any such failure to use or to furnish such confidential information, whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are expressly released and waived by each of the Company and the Members to the fullest extent permitted by applicable law.

(g) Notwithstanding anything in this Agreement to the contrary:

(i) the Company and each of the Members acknowledge and agree that as of the Effective Date, SN Maverick, an Affiliate of Sanchez Parent, and Blackstone Newco purchased from Anadarko Petroleum Corporation and Kerr McGee Oil and Gas Onshore LP certain oil, gas and mineral interests in the AMI, in connection therewith entered into the Joint Development Agreement and related Operating Agreements and on and after the Effective Date, Sanchez Investor's Affiliates (including Sanchez Parent and its Subsidiaries) will engage in oil and gas activities in the AMI related to such assets and agreements including, but not limited to, acquiring oil and gas assets, drilling and completing wells, producing oil and gas, gathering, processing, transporting and marketing oil and gas both for its own account and for the account of Blackstone Newco (the "Additional Sanchez Activities") and the Additional Sanchez Activities may directly or indirectly compete with the business of the Company, the Partnership Group Companies and any other Subsidiary of the Company as conducted from time to time; and

(ii) except as set forth in the Joint Development Agreement, the Sanchez Letter Agreement or Section 5.11, the GSO Investor shall not be entitled to and hereby renounces any co-participation right in any business opportunities pursued by SN Maverick and its Affiliates (other than the Company or any of the Partnership Group Companies).

5.11 AMI and Participation in Future Acquisitions. Upon receipt by the Partnership of an offer from Sanchez Parent or any of its Affiliates of forty percent (40%) of the interest of Sanchez Parent and its Affiliates to be acquired in an AMI Acquisition or other AMI Participation Opportunity, in each case, as such offer is required to be so presented under the Joint Development Agreement or Sanchez Letter Agreement, the Partnership shall automatically, without the need for any further action by the Board or any Member, be deemed to have approved such acquisition of the offered portion of such AMI Acquisition or AMI Participation Opportunity, unless the Class B Member declines such acquisition pursuant to Section 5.7(b), in which case the Partnership Group Companies shall be deemed to have irrevocably waived their right to acquire any properties and assets comprising the AMI Acquisition or other AMI Participation Opportunity if such acquisition is consummated on the terms and subject to the conditions presented to the Partnership within one-hundred fifty (150) days from the date that the Class B Member declines such acquisition. If the Partnership has been deemed to approve any AMI Acquisition or other AMI Participation Opportunity, then (a) the Company shall cause the Partnership to consummate the AMI Acquisition or other AMI Participation Opportunity on the terms and conditions required by the Joint Development Agreement

or the Sanchez Letter Agreement and such acquisition shall be funded by the Partnership (and the Members agree to cause their respective Affiliates who are limited partners in the Partnership to comply with the following) as follows, unless otherwise mutually determined by the Board acting with unanimous consent: (i) *first*, with cash on hand at the Partnership Group Companies, *provided* that the Partnership has not then failed to pay when due any Tax Distributions or any quarterly Distributions to the Preferred Units in cash pursuant to Section 4.1(b) of the Partnership Agreement and such failure is continuing, (ii) *second*, by incurring Indebtedness by drawing upon the Credit Agreement (or any Replacement Credit Agreement), *provided* that, with respect to any funding of such acquisition under either the immediately preceding clause (i) or this clause (ii), (A) the use of cash on hand at the Partnership Group Companies and any such drawing upon the Credit Agreement (or any Replacement Credit Agreement) does not result in undrawn committed borrowing capacity of less than sixty percent (60%) of the total committed borrowing base to then be available under the Credit Agreement (or any Replacement Credit Agreement), and (B) the ratio of (x) the sum of outstanding Indebtedness of the Partnership Group Companies and the Base Preferred Return Amount to (y) LTM EBITDA (as defined in the Credit Agreement) shall not exceed the levels set forth on Exhibit F immediately prior to and pro forma for such acquisition, (iii) *third*, by causing the Partnership to issue additional Preferred Units to Affiliates of the Class B Member designated by the Class B Member in an amount equal to 60% of the remaining purchase price and additional Common Units to Affiliates of the Class A Member designated by the Class A Member in an amount equal to 40% of the remaining purchase price; *provided* that the Class A Member and its Affiliates shall not be required to fund any amounts pursuant to this clause (iii) if prohibited from doing so pursuant to any agreement governing any Indebtedness of such entities and their Affiliates and (iv) *fourth,* any remaining amounts shall be satisfied by causing the Partnership to issue additional Preferred Units to Affiliates of the Class B Member designated by the Class B Member pursuant to a purchase agreement in substantially the form attached hereto as Exhibit E (with any such changes to the extent the parties thereto may mutually agree).

5.12 Meetings of the Members. Meetings of the Members may be called by the Board, but shall not otherwise be required for any purpose, except as may be required by applicable Law.

(a) Place of Meetings. The Board may designate any place as the place of meeting for any meeting of the Members.

(b) Notice of Meetings. Written or printed notice stating the place, day and hour of the meeting and the purposes for which the meeting is called shall be delivered to each Member entitled to vote thereat not less than five (5) Business Days (or forty-eight (48) hours in the case of a telephonic meeting) before the meeting.

(c) Manner of Acting. When a vote on any matter is required by the Members, each Member shall be entitled to one vote for each Unit held by such Member within a specified class or series of Units entitled to vote on such matter. Unless otherwise provided by Law or this Agreement, the affirmative vote of a majority of the Units having the right to vote on the matter or action subject to such vote shall constitute the act of the Members and the affirmative vote of a majority of the Units of a specified class or series having the right to vote on the matter or action subject to such vote shall constitute the act of the Members holding that class or series of Units.

(d) Proxies. At any meeting of the Members of a specified class or series of Units, a Member may vote by proxy executed in writing by such Member or by its duly authorized representative.

(e) Written Actions. Any action required to be, or which may be, taken by Members may be taken without meeting if consented thereto in a writing setting forth the action so taken and signed by all of the Members entitled to vote who are required to take such action.

(f) Telephonic Participation in Meetings. Members may participate in any meeting through telephonic or similar communications equipment by which all Persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

5.13 Company Covenants, Representations and Warranties.

(a) Notwithstanding anything in this Agreement to the contrary, for so long as any Preferred Units remain outstanding or any obligations under the Senior Debt Agreements remain outstanding, the Company shall not, and shall cause each of the Partnership Group Companies not to:

(i) fail to observe all corporate, limited liability company or partnership formalities and other formalities required by their respective organizational documents or the laws of the jurisdiction where such entity is organized, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the Delaware Act (or such other applicable Law in the jurisdiction where such entity is organized);

(ii) commingle its funds or assets with the funds or assets of any other Person; ***provided, however,*** that distributions made by the Partnership not in violation of the Partnership Agreement or any Senior Debt Agreement shall not be considered assets of the Partnership for purposes of this Section 5.13(a)(ii);

(iii) fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates);

(iv) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v) hold itself out to be responsible for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person (other than pursuant to the arrangements provided for in (A) the APC/KM PSA, (B) the KNOC PSA, (C) the MSA, (D) the Hydrocarbons Marketing Agreement, (E) the Sanchez Letter Agreement, (F) the Drilling Commitment Agreement and (G) financing fees paid at the Anadarko Closing and KNOC Closing or Dual Closing, as applicable);

(vi) fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) conduct its business solely in its own name, (C) hold its assets in its own name or (D) correct any known misunderstanding

regarding its separate identity (*provided*, the Partnership may authorize agents pursuant to the MSA, in their own name as agents for the Partnership, to perform management services on behalf of the Partnership);

(vii) fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(viii) fail to pay its own liabilities from its own funds (other than pursuant to the arrangements provided for in (A) the APC/KM PSA, (B) the KNOC PSA, (C) the MSA, (D) the Hydrocarbons Marketing Agreement, (E) the Sanchez Letter Agreement, (F) the Drilling Commitment Agreement and (G) financing fees paid at the Anadarko Closing and KNOC Closing or Dual Closing, as applicable);

(ix) identify its partners or other Affiliates, as applicable, as a division or part of it;

(x) guarantee, or otherwise become a restricted subsidiary pursuant to any agreement governing, the Indebtedness of the Sanchez Investor or any of its Affiliates (other than the Company or the Partnership Group Companies);

(xi) fail to be adequately capitalized to engage in its business separate and apart from Sanchez Parent and its Affiliates and to remain solvent; *provided* the foregoing shall not be construed as imposing an obligation on any Member to contribute or loan additional capital, property or services to the Company;

(xii) fail to ensure that all material transactions between the Company, its Subsidiaries or the Partnership Group Companies, on the one hand, and any member of the Sanchez Group, on the other hand, whether currently existing or hereafter entered into, will be on an arm's length basis; or

(xiii) have the same slate of Persons serving as officers of Sanchez Parent or any of its Affiliates (excluding the Company, any of its Subsidiaries and the Partnership Group Companies) also serve in the same capacities with the Company, any of its Subsidiaries or any of the Partnership Group Companies.

(b) The assets of the Company and its Subsidiaries or the Partnership Group Companies have not been and will not be listed as assets on the financial statement of any other Person; *provided, however,* that the assets of the Company and its Subsidiaries or the Partnership Group Companies may be included in a consolidated financial statement of Sanchez Parent and its Affiliates, *provided* that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of the Company and its Subsidiaries or the Partnership Group Companies and the Members and their Affiliates and to indicate that the Company's and its Subsidiaries or the Partnership Group Companies' assets and credit are not available to satisfy the debts and other obligations of the Members and their Affiliates or any other Person and (ii) such assets shall be listed on the Company's and its Subsidiaries or the Partnership Group Company's own separate balance sheet(s). Such consolidation shall not affect the status of the Company and its Subsidiaries or the Partnership Group Companies as separate legal entities with its separate

Case 4:19-cv-40505 Document 135-6 Filed 04/19/23 in TXSD Page 478 of 1759
Case 2:19-cv-34007 Document 13-4-7 Filed in TXSD on 06/22/20 Page 43 of 98

assets and separate liabilities. The Company (in its capacity as the general partner of the Partnership) and the Partnership Group Companies have maintained and will maintain their respective books, records, resolutions and agreements as official records. Failure by the Company (in its capacity as the general partner of the Partnership) or the Partnership Group Companies to comply with any of the obligations set forth in this Section 5.13(b) shall not affect the status of the Company, the Partnership and each other Partnership Group Company as a separate legal entity, each with its separate assets and separate liabilities.

(c) The Members acknowledge and agree that the Company and each of the Partnership Group Companies are special purpose, non-guarantor, unrestricted Subsidiaries of Sanchez Parent or any Affiliate thereof and shall be bankruptcy remote from Sanchez Parent or any Affiliate of Sanchez Parent that is not the Company or is not included in the Partnership Group Companies.

5.14 Tag-Rights Control. With respect to a transfer by Blackstone Newco, at any time (a) following the fifth anniversary of the Effective Date or (b) during any calendar quarter in which the PDP PV-10 Ratio is less than the then-effective Test Level, if any Partnership Group Company receives a Tag-Along Offer (as such term is defined in the Joint Development Agreement) pursuant to the Joint Development Agreement, the Class B Member shall be permitted to cause the Partnership Group Companies to participate in the subject Tag-Along Transaction (as such term is defined in the Joint Development Agreement) in accordance with the terms of the Joint Development Agreement. With respect to a transfer by SN Maverick or any Sanchez Vehicle, the Class B Member shall be permitted to cause the Partnership Group Companies to participate in the subject Tag-Along Transaction (as such term is defined in the Joint Development Agreement and the Sanchez Letter Agreement) pursuant to the Joint Development Agreement or the Sanchez Letter Agreement.

5.15 Certain Workover and Recompletion Operations. If, as of the end of any calendar quarter preceding a date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, the Class B Member shall be entitled to (a) propose in writing to Sanchez Investor from time to time workover or recompletion operations relating to the Partnership Group Companies' assets, in each case pursuant to the terms of the Joint Development Agreement or any applicable Operating Agreement and (b) cause the Partnership to deliver such proposal in writing to Sanchez Parent. Upon receipt of such proposal, the Board will instruct the UnSub Representative to propose such operations to the Operating Committee in accordance with the terms of the Joint Development Agreement and vote in favor of such operations. Notwithstanding anything to the contrary contained herein, upon compliance with the foregoing terms of this Section 5.15, there shall be no liability on behalf of the Partnership or the UnSub Representative if such proposed operations are rejected or otherwise not approved by the Blackstone Representatives (as defined under the Joint Development Agreement) of the Operating Committee.

## ARTICLE VI
## BOOKS, REPORTS AND COMPANY FUNDS

6.1 Records and Accounting. The Company shall keep or cause to be kept at the principal office of the Company appropriate books and records with respect to the Company's business. The books of the Company shall be maintained, for financial reporting purposes, on an accrual basis in accordance with generally accepted accounting principles ("GAAP"). All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Board.

6.2 Reports.

(a) The Company shall use commercially reasonable efforts to deliver or cause to be delivered to each Member, within seventy-five (75) days after the end of each Fiscal Year, an annual report containing a statement of changes, if any, in the Member's equity and the Member's Capital Account balance for such Fiscal Year, if any.

(b) The Company shall use commercially reasonable efforts to deliver or cause to be delivered, within seventy-five (75) days after the end of each Fiscal Year, to each Person who was a Member at any time during such Fiscal Year all information necessary for the preparation of such Person's United States federal and state income tax returns.

(c) The Company shall use commercially reasonable efforts to deliver or cause to be delivered, within seventy-five (75) days after the end of each Fiscal Year, all information requested by a Member in order for such Member to complete its unrelated business taxable income and FIRPTA tax filings, if any.

(d) The Company shall use commercially reasonable efforts to deliver or cause to be delivered to each Member, within sixty (60) days after the end of each Fiscal Year, estimates of each of the items in Sections 6.2(a), 6.2(b) and 6.2(c) to the extent such items have not then been delivered.

(e) The Company shall cause the Partnership to deliver or cause to be delivered to each of the Members no later than the time delivered to the Partners (as defined in the Partnership Agreement) those reports that are required to be delivered to the Partners pursuant to Section 7.2 of the Partnership Agreement. The Company shall cause the Partnership to deliver or cause to be delivered to the Class B Member no later than the time delivered to the holders of Preferred Units the information that is required to be delivered to such holders pursuant to Section 5.7 of the Partnership Agreement.

6.3 Inspection by Members. Except as may be necessary to preserve attorney-client or similar privilege of the Company, any Member, and any accountants, attorneys, financial advisors and other representatives of such Member, may from time to time at such Member's sole expense for any reasonable purpose, visit and inspect the respective properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies, examine (and make copies and extracts of) the Company's, any of its Subsidiaries' or any of the Partnership Group Companies' respective books, records and documents of any kind, and discuss the Company's, any of its Subsidiaries' or any of the Partnership Group Companies' respective affairs with its employees or independent accountants, all at such reasonable times as such Member may request upon reasonable notice.

6.4 Public Disclosure. Unless required by Law, including the rules and regulations of any securities exchange (with the advice of counsel to the Company), no press release or public announcement related to the Company, any of the Company's Subsidiaries, any of the Partnership Group Companies, this Agreement or the transactions contemplated herein or any other announcement or communication shall be issued or made by any Member, a Director, the Company, any of its Subsidiaries or any of the Partnership Group Companies without the advance approval of the Board (including any Directors appointed by the GSO Group), in which case the Board shall be provided a reasonable opportunity to review and provide suggested comments concerning the disclosure contained in such press release, announcement or communication prior to issuance, distribution or publication. The foregoing shall not limit Sanchez Parent

or its Affiliates from publicly filing the Partnership Agreement and making additional disclosures in connection therewith, in each case as required by applicable Law and securities regulations.

## ARTICLE VII
## TAX MATTERS

7.1 Tax Controversies. Subject to Sections 5.4 and 5.7, for any taxable year beginning before January 1, 2018, the Class A Member is designated as the "Tax Matters Member" as defined in Code Section 6231 (the "Tax Matters Member") as of the date hereof, and for any taxable year beginning on or after January 1, 2018, the Class A Member is designated as the "Partnership Representative" as defined in Code Section 6223(a), as added by the Bipartisan Budget Act of 2015 (the "Partnership Representative"). The Tax Matters Member or the Partnership Representative shall cause to be prepared and timely filed (on behalf of the Company) all federal, state and local tax returns, if any, required to be filed by the Company. The Company shall bear the costs of the preparation and filing of its returns. Subject to Sections 5.4 and 5.7, the Tax Matters Member or the Partnership Representative shall determine whether to make any elections on behalf of the Company. Without consent of the Board, the Tax Matters Member or the Partnership Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Company administrative adjustment or enter into any settlement agreement relating to any Company item of income, gain, loss, deduction or credit for any Fiscal Year. In the event the "TEFRA audit provisions" of Code Section 6221 *et seq.* apply by their terms, the Tax Matters Member shall ensure that each other Member is a notice partner within the meaning of Section 6231(a)(8) of the Code. Each Member agrees to cooperate with the Tax Matters Member or the Partnership Representative and to do or refrain from doing any and all things required by the Tax Matters Member or the Partnership Representative to conduct such proceedings. Subject to Sections 5.4 and 5.7, the designation of the Tax Matters Member or the Partnership Representative may be changed from time to time as determined by the Board.

## ARTICLE VIII
## EXCULPATION AND INDEMNIFICATION

8.1 Performance of Duties; No Liability of Members, Directors and Officers. No Member or Director (in their respective capacities as such) shall have any duty to the Company or any Member of the Company except as expressly set forth herein or in other agreements to which such Persons are party or as required by applicable law. No Member, Director or Officer of the Company (in their respective capacities as such) shall be liable to the Company, and no Director or Officer of the Company (in their respective capacities as such) shall be liable to any Member, for any loss or damage sustained by the Company or such Member (as applicable), unless such loss or damage shall (as finally determined by a court of competent jurisdiction) have resulted from such Person's fraud, intentional misconduct or, in the case of any Member, willful breach of this Agreement or, in the case of any Director or Officer of the Company, knowing and intentional breach of this Agreement or, in the case of an Officer, breach of such Person's duties pursuant to Section 5.6(d). In performing such Person's duties, each such Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid) of the following other Persons or groups: one or more Officers or employees of the Company, any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or any other Person who has been selected with reasonable care by or on behalf of the Company, in each case as to matters which such relying Person reasonably believes to be within such other Person's competence. The preceding sentence shall in no way limit any Person's right to rely on information to the

extent provided in Section 18-406 of the Delaware Act. No Member, Director or Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member, Director or Officer of the Company or any combination of the foregoing. Nothing in this Agreement shall limit the liabilities and obligations of the Members, or entitle any Member to indemnification hereunder from the Company with respect to any claims made under, when acting in any capacity for or on behalf of the Company other than those expressly described above. For the avoidance of doubt, nothing in this Agreement shall limit the liability of any Member to any other Member for breach of this Agreement.

8.2 Right to Indemnification. Subject to the limitations and conditions as provided in this Article VIII, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative or in the nature of an alternative dispute resolution in lieu of any of the foregoing ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member, a Director or Officer or, in each case, a representative thereof (each, an "Indemnified Person") shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, reasonable attorneys' and experts' fees) actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation ("Loss"), unless (a) such Loss shall have been finally determined by a court of competent jurisdiction to have resulted from such Person's fraud, intentional misconduct or, in the case of any Member, willful breach of this Agreement or, in the case of any Director or Officer, knowing and intentional breach of this Agreement or (b) in the case of an Officer, such Loss shall have been finally determined by a court of competent jurisdiction to have resulted from such Person's failure to act in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company or other failure to comply with such Officer's duties pursuant to Section 5.6, or such Officer had reasonable cause to believe his or her conduct was unlawful. Indemnification under this Article VIII shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article VIII, including the rights to advancement granted under Section 8.3, shall be deemed contract rights, and no amendment, modification or repeal of this Article VIII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal. The foregoing indemnification is for the benefit of the Persons identified above acting in the capacities described above and not in any other capacity. For the avoidance of doubt and notwithstanding anything in this Article VIII to the contrary, nothing in this Agreement shall provide for any indemnification of any Member or any legal representative thereof in respect of any Proceeding by any other Member against such Member for breach of this Agreement.

8.3 Advance Payment. The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company for the reasonable documented, out-of-pocket, third-party expenses incurred by a Person (other than an Officer of the Company in respect of claims by the Company against such Officer in such Officer's capacity as such) entitled to be indemnified under Section 8.2 who was, or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; *provided*, *however*, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct

necessary for indemnification under this Article VIII and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Article VIII or otherwise.

8.4 Indemnification of Employees and Agents. The Company, at the direction of the Board, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses under Sections 8.2 and 8.3.

8.5 Appearance as a Witness. Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse reasonable out-of-pocket expenses incurred by a Director, Member, Officer, employee or agent in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6 Nonexclusivity of Rights. The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right that a Member, Director, Officer or other Person indemnified pursuant to this Article VIII may have or hereafter acquire under any Law (common or statutory) or provision of this Agreement.

8.7 Insurance. The Board may obtain and maintain, at the Company's or a Partnership Group Company's expense, insurance to protect the Members, Directors, Officers, employees and agents from any expense, liability or loss arising out of or in connection with such Person's status and actions as a Member, Director, Officer, employee or agent. In addition, the Board may cause the Company to purchase and maintain insurance, at the Company's expense, to protect the Company and any other Member, Director, Officer or agent of the Company who is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article VIII.

8.8 Savings Clause. If this Article VIII or any portion hereof shall be invalidated on any ground by any court or other Governmental Authority of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article VIII as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

8.9 Fund Indemnitors. The Company hereby acknowledges that certain Indemnified Persons have certain rights to indemnification, advancement of expenses or insurance provided by The Blackstone Group L.P. and certain of its Affiliates or GSO and certain of its Affiliates (collectively, the "Fund Indemnitors", and the Indemnified Persons benefitting from such rights to indemnification, and other rights, from the Fund Indemnitors, the "Fund Indemnified Persons"). The Company hereby agrees (a) that it is the indemnitor of first resort (*i.e.*, its obligations to the Fund Indemnified Persons are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Fund Indemnified Persons are secondary), (b) that it shall be required to advance the full amount of expenses incurred by an applicable Fund Indemnified Person and shall be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights any Fund Indemnified Person may have against the Fund Indemnitors, and (c) that it irrevocably waives, relinquishes

and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of any Fund Indemnified Person with respect to any claim for which a Fund Indemnified Person has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Fund Indemnified Person against the Company. The Company acknowledges and agrees, notwithstanding anything herein to the contrary, that the Fund Indemnitors are express third-party beneficiaries of the terms of this Section 8.9.

## ARTICLE IX
## UNITS, TRANSFERS, AND OTHER EVENTS

9.1 Unit Certificates.

(a) Units in the Company may be evidenced by certificates in a form approved by the Board ("Certificates") but there shall be no requirement that the Company issue certificates to evidence the Units. Any Certificate will bear the following legend reflecting the restrictions on the Transfer of such securities:

"THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "33 ACT"), AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE 33 ACT OR IN A TRANSACTION WHICH, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, QUALIFIES AS AN EXEMPT TRANSACTION UNDER THE 33 ACT AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER.

THE SECURITIES EVIDENCED HEREBY ARE SUBJECT TO THE TERMS OF THAT CERTAIN AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF MARCH 1, 2017, AS AMENDED FROM TIME TO TIME, BY AND AMONG THE COMPANY AND THE MEMBERS IDENTIFIED THEREIN, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER. A COPY OF SUCH LIMITED LIABILITY COMPANY AGREEMENT HAS BEEN FILED WITH THE SECRETARY OF THE COMPANY AND IS AVAILABLE UPON REQUEST."

(b) If Certificates have been issued, upon any Transfer of all or a portion of the Units hereunder, the Transferor shall surrender the Certificate(s) representing the Units so Transferred to the Company for cancellation. If a Certificate represents a greater portion of the Transferor's Units than that intended for Transfer, upon surrender of such certificate for cancellation the Company shall issue to the Transferor a new Certificate which represents the Units being retained by such Transferor. Upon a determination by the Board, the Company shall issue to each Transferee who is Transferred Units pursuant to this Agreement and who is admitted to the Company as a Substitute Member in accordance with Section 9.7, a Certificate evidencing the Units held by such Transferee. Such Certificate shall indicate the Units then owned by such Transferee and shall represent the Units owned by such Transferee from time to time thereafter as set forth in the then effective Exhibit A hereto, regardless of the Units indicated in the Certificate.

Upon receipt of written notice or other evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of any Certificate and, in the case of any such loss, theft or destruction upon receipt of the Member's unsecured indemnity agreement, or in the case of any other holder of a Certificate or Certificates, other indemnity reasonably satisfactory to the Board or in the case of any such mutilation upon surrender or cancellation of such Certificate, the Company will make and deliver a new Certificate, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Certificate.

9.2 Record Holders. The Company shall keep a register or other records which reflect the Units and any Certificates. Except as otherwise required by law, the Company shall be entitled to, and shall only, recognize the exclusive right of a Person registered on its books as the record holder of a Unit, whether or not represented by a Certificate, to receive distributions in respect of such Unit, to vote as the owner of such Unit and to be entitled to the benefits, and subject to the obligations, of this Agreement with respect to such Unit.

9.3 Restrictions on Transfers of Units.

(a) General Transfer Restrictions. No Member shall Transfer any interest in any Units except in accordance with this Section 9.3. The Class A Member shall not Transfer any interest in any Class A Units in a single transaction or series of related transactions without the prior written consent of the Class B Member, other than to Permitted Transferees (provided, that in the case of a Transfer of Class A Units to a Permitted Transferee that is not already a party hereto, such Permitted Transferee agrees in writing to be bound by this Agreement). The Class B Member shall not Transfer any interest in any Class B Units in a single transaction or series of related transactions without the prior written consent of the Class A Member (which consent shall not be unreasonably withheld, conditioned or delayed, provided that the Class A Member may withhold such consent if any such Transfer would result in the Class B Member and its Permitted Transferees owning less than a majority of the outstanding Class B Units), other than to Permitted Transferees, *provided, however*, that following the occurrence and during the continuance of an Investor Redemption Event, the Class B Member may Transfer any interest in any Units without the consent of the Class A Member or the Board. Subject to Section 9.4, any Transfers by a Member, other than to Permitted Transferees and except as set forth in the provisions of the immediately preceding sentence, shall require the prior approval of the Board.

(b) Prohibited Transfers. Notwithstanding anything to the contrary in this Article IX, no Transfer of Units shall be permitted or made if such Transfer would:

(i) violate the then applicable federal or state securities laws or rules and regulations of the Securities Exchange Commission, any state securities commission or any other Governmental Authority with jurisdiction over such Transfer;

(ii) terminate the existence or qualification of the Company under the laws of the jurisdiction of its formation;

(iii) cause the Company to be treated as an association taxable as a corporation or otherwise not to be treated as a partnership for U.S. federal income tax purposes;

(iv) cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended, or subject the Company , any of its Subsidiaries or any of the Partnership Group Companies to the Investment Advisers Act of 1940, as amended, or the Employee Retirement Income Security Act of 1974, as amended; or

(v) violate any other provision of this Agreement.

Any Transfer of Units in violation of this Agreement or applicable Law shall be void ***ab initio***, and the Company has the power to rescind such Transfer.

9.4 Disposition Transactions. In connection with any Disposition Transaction (including by any consolidation, conversion, merger or other business combination involving the Partnership in which Equity Securities are exchanged for or converted into cash, securities of a corporation or other business organization or other property, and any sale of all or substantially all of the assets of the Partnership), (a) none of the Members, the Company or the Partnership Group Companies shall enter into any definitive documentation relating to such Disposition Transaction unless the Partnership has delivered to the Class B Member a written undertaking that expressly provides that upon or prior to the closing of such Disposition Transaction, an amount of cash equal to the Base Preferred Return Amount shall be paid in respect of each Preferred Unit in redemption or liquidation of all outstanding Preferred Units, (b) the Class B Member shall not be obligated to be subject to any non-competition, non-solicitation, or similar restrictive covenants that may be binding on GSO or any of its Affiliates in connection with any Disposition Transaction and (c) upon the consummation of any Disposition Transaction, the Partnership shall have paid or shall concurrently pay an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full or liquidation of all outstanding Preferred Units. No Disposition Transaction may be consummated if the redemption of the outstanding Preferred Units contemplated by the immediately preceding sentence is not consummated in accordance with the terms hereof.

9.5 Exit Transactions.

(a) If (i) a Redemption Non-Payment shall have occurred, shall not have been cured within fifteen (15) Business Days thereof and shall be continuing; (ii) after the first anniversary of the Effective Date, the Partnership shall have failed to pay the Quarterly Distribution Amount in cash to the Preferred Units in any two quarters, regardless of whether consecutive, and such failure is continuing; (iii) the Class A Member shall have caused the Company or any Partnership Group Company to take any action that requires Special Approval without first obtaining such Special Approval, ***provided*** that such failure has not been cured by the Class A Member within the earlier of (A) thirty (30) days following receipt of written notice of such failure from the Class B Member and (B) thirty (30) days after any Officer becomes aware of such failure; ***provided further*** that such cure period shall not apply if the Class A Member has caused the Company or any Partnership Group Company to take any action that requires Special Approval pursuant to Sections 5.7(b)(ii) (***provided*** that such failure relates to an aggregate amount of Indebtedness that is greater than $10.0 million), 5.7(b)(iii), 5.7(b)(iv) (with respect to the acquisition of any assets outside the Core Area of the AMI), 5.7(b)(v), 5.7(b)(vi), 5.7(b)(ix) (***provided*** that such failure relates to a sale of business or assets at a price that is greater than $5.0 million), 5.7(b)(x), 5.7(b)(xi) (***provided*** that such failure represents a variance from the hedging plan established in compliance with Section 6.7 of the Partnership Agreement of greater than five percent (5%) of volumes or relates to derivative transactions other than those permitted



008358

to be entered into pursuant to Section 6.7 of the Partnership Agreement), 5.7(b)(xv), 5.7(b)(xvi), 5.7(b)(xvii), 5.7(b)(xviii), 5.7(b)(xix), 5.7(b)(xx), 5.7(b)(xxi), 5.7(b)(xxii), 5.7(b)(xxvii) or 5.7(b)(xxix) in connection with the foregoing; (iv) Sanchez Parent suffers (A) a Specified Event of Default (as such term is defined in the Joint Development Agreement) under a Specified Credit Agreement (as such term is defined in the Joint Development Agreement) and such Specified Event of Default is continuing or (B) an event of default under the Indenture or other agreement governing any Indebtedness for borrowed money of Sanchez Parent and its Subsidiaries (other than the Company and the Partnership Group Companies) in an amount greater than $50.0 million and such event of default has caused the repayment of such Indebtedness to have been accelerated or (v) SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) becomes a Defaulting Operator (as such term is defined in the Joint Development Agreement) and as such has been removed as Operator (as such term is defined in the Joint Development Agreement) pursuant to the Joint Development Agreement or SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) has resigned as Operator at any such time as an Operator Default Event (as such term is defined in the Joint Development Agreement) exists such that SN Maverick (or any successor operator under the Joint Development Agreement that is an Affiliate of Sanchez Parent) can then be removed as a Defaulting Operator pursuant to the Joint Development Agreement (any event in clauses (i), (ii), (iii), (iv) or (v) of this Section 9.5(a), an "Investor Redemption Event"), then, in each such case, the Class B Member shall be entitled to cause (and the Class A Member and the Company agree to facilitate, as reasonably requested by the Class B Member):

(1) a consolidation or merger of the Company, any of its Subsidiaries or any of the Partnership Group Companies with or into any other business entity or other corporate reorganization;

(2) a sale of all or any portion of the outstanding Units held by the Members; or

(3) a transaction in which all or substantially all of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies are sold, leased or otherwise disposed of

(each of the transactions described in Sections 9.5(a)(1), 9.5(a)(2) and 9.5(a)(3) are referred to herein as an "Exit Transaction"), *provided* that, solely with respect to an Investor Redemption Event described in Section 9.5(a)(ii) above (i.e. resulting from the Partnership's failure to pay the Quarterly Distribution Amount in cash to the Preferred Units in any two quarters (regardless of whether consecutive) and such failure is continuing), the Investor Representative (as such term is defined in the Partnership Agreement) shall only be permitted to cause the Partnership to enter into a definitive agreement for an Exit Transaction after three months following the date upon which such Investor Redemption Event in Section 9.5(a)(ii) occurred.

(b) If the Class B Member elects to pursue an Exit Transaction: (i) following good faith consultation with the Board, the Class B Member may exclusively identify, negotiate, structure and otherwise pursue the Exit Transaction, which Exit Transaction may be structured and accomplished as determined by the Class B Member in its sole discretion, whether as a merger, consolidation, sale of all or any portion of the Units, corporate reorganization, sale of assets or

otherwise; and (ii) the Exit Transaction shall be effected on the terms and conditions negotiated by the Class B Member, including any terms imposing on the Members' obligations with respect to reasonable and customary indemnities, escrows, holdbacks or other contingent obligations that are applicable to all Members equally. In connection with any Exit Transaction, each of the Members shall, if requested by the Class B Member, waive any dissenters' rights, appraisal rights or similar rights that such Member may have in connection therewith; *provided, however,* that the Class B Member shall use its reasonable good faith efforts to maximize the Exit Transaction Consideration payable to the holders of Common Units. In addition, the Company shall, and the Company shall cause its Subsidiaries and the Partnership Group Companies to, take such action as the Class B Member may reasonably request in connection with any proposed Exit Transaction, including engaging an investment banker or other advisor in connection with such Exit Transaction, providing such financial and operational information as the Class B Member may request and causing employees and other representatives of the Company, its Subsidiaries or the Partnership Group Companies to cooperate (including by participating in management presentations, preparing marketing materials and making diligence materials available in an electronic data room) with the Class B Member in any marketing process in connection with any proposed Exit Transaction. Notwithstanding anything to the contrary herein or in the Partnership Agreement, the Units of the Company and the general partnership interest in the Partnership may only be sold for nominal consideration and the holders of the Units shall not be entitled to receive any consideration in any such Exit Transaction in excess of the Capital Contributions made by such members to the Company as of the Effective Date.

(c) If the Class B Member elects to pursue an Exit Transaction, then the Sanchez Investor and its Affiliates shall use their commercially reasonable efforts to obtain as promptly as practicable: (i) the consents or amendments required under the applicable contracts and leases to which the Sanchez Investor or any of its Affiliates is a party that would be necessary to transfer the assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies (including the approval of Sanchez Parent or any of its Affiliates of such transfer under the Joint Development Agreement or any Operating Agreement); and (ii) the consents or amendments to, or the direct assignment of, any purchase, marketing, transportation, storage, processing or sales contract; *provided* that the Sanchez Investor and its Affiliates shall not be required to expend any amounts in connection with the foregoing unless such expenditures will be reimbursed by the Partnership Group Companies or the potential acquirer in an Exit Transaction, in each case upon the consummation of such Exit Transaction; *provided further,* that the Sanchez Investor and its Affiliates shall have no liability pursuant to the immediately preceding clause (ii) of this Section 9.5(c) if a Governmental Authority or Blackstone Newco prevents the Sanchez Investor or its Affiliates from providing such consents, amendments or assignments.

(d) In addition, the Sanchez Investor and its Affiliates shall use their commercially reasonable efforts in order to provide any potential acquirer in an Exit Transaction with reasonable access upon at least five (5) days' notice to all reasonably necessary information and properties to permit it to perform due diligence with respect to the proposed Exit Transaction, including access to permits, contracts and infrastructure associated with the properties, but only to the extent that such access is requested prior to the closing of such Exit Transaction; *provided*, that, if so requested by the Sanchez Investor or its Affiliates, such potential acquirer may be required to enter into customary access agreements prior to being provided with such access.

(e) The Class B Member shall regularly consult and cooperate with the Board with respect to the status of the sale process for such Exit Transaction; *provided, however,* that the Board and the Class A Member shall have no consent, voting or appraisal rights with respect to the final terms of an Exit Transaction and shall have no right to object to an Exit Transaction that is completed in a manner consistent with this Section 9.5.

(f) At least fifteen (15) Business Days prior to consummating an Exit Transaction, the Class B Member shall deliver to each of the other Members written notice that shall state (i) that the Exit Transaction has been structured in a manner that complies with this Section 9.5, (ii) the amount and form of consideration to be received by the Company or its Members in the Exit Transaction ("Exit Transaction Consideration") and (iii) all other material terms and conditions of the Exit Transaction (including the identity of the purchaser) and current drafts of the definitive documents related thereto.

(g) Each other Member hereby makes, constitutes and appoints the Class B Member, with full power of substitution and re-substitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this Section 9.5, including any vote or approval required under Section 18-209 of the Delaware Act and any waiver contemplated by Section 9.5(b). The proxy granted pursuant to this Section 9.5(g) is a proxy coupled with an interest and is irrevocable.

(h) Each of the Members required to participate in an Exit Transaction (collectively, the "Participating Sellers"), whether in its capacity as a Participating Seller, Member or otherwise, and the Company, its Subsidiaries, the Partnership Group Companies and the Board, shall take or cause to be taken all such actions as may be reasonably necessary or desirable in order expeditiously to consummate such Exit Transaction and any related transactions, including (i) making reasonable and customary representations and warranties, (ii) executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, (iii) furnishing information and copies of documents, (iv) filing applications, reports, returns, filings and other documents or instruments with Governmental Authorities and (v) otherwise using reasonable best efforts to fully cooperate with the Class B Member. Without limiting the generality of the foregoing, each Participating Seller agrees to execute and deliver such agreements as may be reasonably specified by the Class B Member to which all Participating Sellers will also be party, including agreements to (x) make reasonable and customary individual representations, warranties, covenants and other agreements as to the unencumbered title to its Units and the power, authority and legal right to Transfer such Units, (y) provide other reasonable and customary representations, warranties and indemnities, *provided* that any indemnification for representations and warranties regarding any of the Partnership Group Companies and their respective assets and operations shall be limited to any escrow of proceeds that is established in connection with the Exit Transaction or be limited to the proceeds actually received by the Participating Sellers in the Exit Transaction, and (z) be severally (on a pro rata basis in proportion to the related Exit Transaction Consideration to be received by each Member) liable (whether by purchase price adjustment, escrows, holdbacks, indemnity payments, contingent obligations or otherwise) in respect of representations, warranties, covenants and agreements in respect of the Company, its Subsidiaries and the Partnership Group Companies; *provided, however,* that (i) any escrow of proceeds of any such transaction shall be withheld on a pro rata basis among all

Participating Sellers (in proportion to the relative Exit Transaction Consideration to be received by each Member), (ii) no Class A Member shall be liable for any amount in excess of its pro rata share of any indemnification obligation (based on Exit Transaction Consideration) in excess of any amounts placed in escrow and (iii) no Class A Member shall be obligated to be subject to any non-competition, non-solicitation, or similar restrictive covenants that may be binding on GSO or any of its Affiliates in connection with any Exit Transaction.

(i) The closing of an Exit Transaction shall take place at such time and place as the Class B Member shall specify by notice to each Participating Seller no later than five (5) Business Days prior to the closing of such Exit Transaction. At the closing of an Exit Transaction, each Participating Seller shall deliver any documentation evidencing the Units to be sold (if any) by such Participating Seller and the assignment thereof, free and clear of any liens, against delivery of the applicable consideration.

(j) In connection with any Exit Transaction, the Participating Sellers shall receive the Exit Transaction Consideration in accordance with the order of priority specified in Section 4.1(d) of the Partnership Agreement, after any payments required under the Senior Debt Agreements and deduction of the proportionate share of (A) the reasonable, documented, third-party out-of-pocket expenses associated with such sale or Exit Transaction, including the reasonable, documented out-of-pocket legal fees of the Company, its Subsidiaries, the Partnership Group Companies, the Class B Member and each Participating Seller, and reasonable, documented out-of-pocket brokers fees and other commissions and any other expenses incurred by the Class B Member in connection with such Exit Transaction, (B) amounts paid into escrow or held back, in the reasonable determination of the Class B Member, for indemnification or post-closing expenses and (C) amounts subject to post-closing purchase price adjustments; ***provided, however,*** that upon the determination of such purchase price adjustments, indemnification or post-closing expenses and upon release of any such escrow or hold back, as applicable, the remaining amount of the Exit Transaction Consideration, if any, shall be distributed to the Participating Sellers so that the total amount distributed is in accordance with the order of priority specified in Section 4.1(d) of the Partnership Agreement.

(k) Subject to the last sentence of Section 9.5(b), the consideration to be paid to each Member in an Exit Transaction shall be calculated by treating such Exit Transaction as a liquidation of the Company in which all of the assets of the Company (including goodwill) were sold in exchange for the Exit Transaction Consideration (including any deemed assumption of liabilities), as the case may be, and the proceeds of that sale, together with the profits, losses, items of income, gain, loss and deduction, and distributions were applied, allocated and distributed in accordance with the principles and priorities set forth in Section 4.1(d) of the Partnership Agreement.

(l) No action may be taken under this Section 9.5 if such action would result in the breach of any Senior Debt Agreement, Replacement Credit Agreement or any other agreement relating to material Indebtedness of the Partnership Group; ***provided***, ***however***, that the Company and the Members shall use their commercially reasonable efforts to obtain a waiver of any such breach or otherwise amend or cause to be amended the terms of any such agreement in a manner which permits such action; and ***provided further***, ***however***, that this Section 9.5(l) shall not apply

if the proceeds from any Exit Transaction are sufficient to, and are used to, pay in full any outstanding borrowings under any such applicable agreements.

(m) Notwithstanding anything to the contrary provided herein, if an Investor Redemption Event has occurred and given rise to the Class B Member's rights under this Section 9.5 and (i) has been cured by the Company prior to the earlier of (A) one hundred eighty (180) days following the first occurrence of such Investor Redemption Event and (B) the execution of a bona fide binding definitive purchase agreement with a bona fide purchaser or (ii) all Preferred Units have been redeemed in full for an amount of cash equal to the Base Preferred Return Amount per Preferred Unit prior to the execution of a bona fide binding definitive purchase agreement with a bona fide purchaser, then the provisions of this Section 9.5 will be suspended and the Exit Transaction process shall terminate, provided that, in such case, the Partnership shall pay the reasonable and documented fees and expenses of any investment bank or other advisors (including legal counsel) engaged by the Class B Member prior to such suspension and termination.

9.6 Expenses. The Transferor and Transferee of any Units or other interest in the Company shall be jointly and severally obligated to reimburse the Company for all reasonable out-of-pocket expenses (including attorneys' fees and expenses) incurred by the Company for any Transfer or proposed Transfer, regardless of whether consummated.

9.7 Transfers Generally; Substitute Members.

(a) Additional Procedural Conditions to Transfers. Without limiting Section 9.3(a), any Transfer of Units shall be valid hereunder only if:

(i) The Transferor and the Transferee execute and deliver to the Company such documents and instruments of conveyance as may be reasonably requested by the Board to effect such Transfer and to confirm the agreement of the Transferee to be bound by the provisions of this Agreement;

(ii) The Transferor and the Transferee provide to the Board the Transferee's taxpayer identification number and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns; and

(iii) The Company is reimbursed by the Transferor and/or the Transferee for all costs and expenses that the Company reasonably incurs in connection with the Transfer as required by Section 9.6.

(b) Rights and Obligations of Transferees and Transferors. Subject to Section 9.7(c), the Transferee of any Transfer permitted pursuant to this Agreement shall be a Transferee only, and only shall receive, to the extent Transferred, the Economic Interest associated with the Units so Transferred, and such Transferee shall not be entitled or enabled to exercise any other rights or powers of a Member, such other rights, and all obligations relating to, or in connection with, such Units remaining with the Transferring Member. The Transferring Member shall remain a Member even if it has Transferred all of its Units to one or more Transferees until such time as all such Transferees are admitted to the Company as Substitute Members pursuant to Section 9.7 (c), as applicable. In the event any Transferee desires to make a further Transfer of all

or any portion of its Units, such Transferee shall be subject to all of the provisions of this Agreement to the same extent and in the same manner as the Member who initially held such Units.

(c) Admission of Transferee as Substitute Member. Subject to the other provisions of this Article IX, a Transferee shall be admitted to the Company as a Substitute Member following a Transfer of Units in accordance with this Article IX upon satisfaction of all of the following conditions, upon which the Transferee shall have all of the rights and powers, and be subject to all of the restrictions and liabilities, of a Member under the Delaware Act and this Agreement with respect to the Units Transferred: (i) the Transferee shall become a party to this Agreement as a Member by executing a joinder or counterpart signature page to this Agreement and executing such other documents and instruments as the Board may reasonably request for the sole purpose of confirming such Transferee's admission as a Member and agreement to be bound by the terms and conditions of this Agreement and (ii) the Transferee pays or reimburses the Company for all reasonable costs that the Company incurs in connection with the admission of the Transferee as a Member as required by Section 9.6.

(d) Effect on Transferor and Company. Upon the admission of a Transferee as a Substitute Member, (i) the Transferor shall (A) cease to be a Member with respect to the portion of the Units so Transferred and (B) be released from any obligations arising after the date of such Transfer with respect to the Units so Transferred and (ii) the Transferee will become a Member hereunder with respect to such Units with all the rights and obligations of a Member held by the Transferor in respect of such Units immediately prior to the time of Transfer.

9.8 Closing Date. Any Transfer and any related admission of a Person as a Member in compliance with this Article IX shall be deemed effective on such date that the Transferee or successor in interest complies with the requirements of this Agreement.

9.9 Effect of Incapacity. Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Member that has experienced such Incapacity shall be deemed to be the assignee of such Member's Economic Interest and may, subject to the terms and conditions set forth in this Article IX, become a Substitute Member.

9.10 No Appraisal Rights. No Member shall be entitled to any valuation, appraisal or similar rights with respect to such Member's Units, whether individually or as part of any class or group of Members, in the event of a merger, consolidation, sale of the Company or other transaction involving the Company or its securities unless such rights are expressly provided by the agreement of merger, agreement of consolidation or other document effectuating such transaction.

9.11 Effect of Non-Compliance.

(a) Improper Transfers Void. ANY ATTEMPTED TRANSFER NOT STRICTLY IN ACCORDANCE WITH THE PROVISIONS OF THIS ARTICLE IX WILL BE VOID *AB INITIO* AND OF NO FORCE OR EFFECT WHATSOEVER, ***PROVIDED***, THAT ANY SUCH ATTEMPTED TRANSFER MAY BE A BREACH OF THIS AGREEMENT, NOTWITHSTANDING THAT SUCH ATTEMPTED TRANSFER IS VOID.

(b) Other Consequences. Without limiting the foregoing, if any Unit or Certificate representing a Unit is purported to be Transferred in whole or in part in contravention of this Article IX, the Person to whom such purported Transfer was made shall not be entitled to any rights as a Member whatsoever, including, without limitation, any of the following rights:

(i) to participate in the management, business or affairs of the Company;

(ii) to receive any reports pursuant to Section 6.2 hereof or obtain information concerning the Company pursuant to Section 6.3 or any other provision hereof;

(iii) to inspect or copy the Company's books or records;

(iv) to receive any Economic Interest in the Company; or

(v) to receive upon the dissolution and winding up of the Company the net amount otherwise distributable to the Transferor pursuant to Section 10.2(c)(iii) hereof.

## ARTICLE X
## DISSOLUTION, LIQUIDATION AND TERMINATION

10.1 Dissolution. The Company will dissolve and its affairs will be wound up only upon the approval of the Board and, if applicable, the Class B Member in accordance with Section 5.7.

10.2 Liquidation and Termination. On dissolution of the Company, a majority of the Board may appoint one or more other Persons as liquidator(s). The liquidator will proceed diligently to wind up the affairs of the Company and liquidate the Company's assets and make final distributions as provided herein. The costs of liquidation will be borne as a Company's expense. Until final distribution, the liquidator will continue to operate the Company properties with all of the power and authority of the Members. Subject to Section 18-804 of the Delaware Act, the steps to be accomplished by the liquidator are as follows:

(a) Accounting. As promptly as possible after dissolution and again after final liquidation, the liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) Payments. The liquidator will pay from Company funds all of the debts and liabilities of the Company (including all expenses incurred in liquidation) or otherwise make adequate provision therefor (including the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(c) Disposition of Assets. The Company will dispose of all remaining assets as follows:

(i) the liquidator may sell any or all Company property, and any resulting gain or loss from each sale will be computed and allocated to the Members pursuant to Section 4.2;

(ii) with respect to all Company property that has not been sold, the fair market value of that property will be determined and the Capital Accounts of the Members will be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable Transfer of that property for the fair market value of that property on the date of distribution; and

(iii) thereafter, Company property will be distributed among the Members in accordance with Section 4.1. All distributions made pursuant to this clause (iii) will be made by the end of such taxable year (or, if later, within ninety (90) days after the date of such liquidation).

(d) Distributions. All distributions in kind to the Members will be made subject to the liability of each distributee for its allocable share of costs, expenses and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses and liabilities will be allocated to the distributee pursuant to this Section 10.2.

(e) Cancellation of Filing. On completion of the distribution of Company assets as provided herein, the Company will be terminated, and the Board (or such other Person or Persons as may be required) will cause the cancellation of any other filings made as provided in Section 1.6 and will take such other actions as may be necessary to terminate the Company.

## ARTICLE XI
## DEFINITIONS

11.1 Definitions. As used in this Agreement, the following terms have the following meanings:

"Accredited Investor" has the meaning set forth in Section 2.3(i).

"Additional Preferred Units Notice" has the meaning set forth in Section 5.8.

"Additional Sanchez Activities" has the meaning set forth in Section 5.10(g)(i).

"Additional Units" has the meaning set forth in Section 3.1(a).

"Affiliate" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For the purposes of this Agreement, The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P. or its Affiliates that are not part of

the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or subadvised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P. shall be considered an Affiliate of GSO. For the avoidance of doubt, (i) GSO or its Affiliates or any fund or account managed, advised or subadvised by or Controlled by GSO or its Affiliates shall not be considered an Affiliate of the Partnership or the Company, and (ii) Affiliates of the Sanchez Investor shall include any member of the Sanchez Group.

"Affiliate Threshold" has the meaning set forth in Section 5.7(b)(xiii).

"Agreement" means this Amended and Restated Limited Liability Company Agreement, as it may be amended, modified, supplemented or restated from time to time.

"Allocation Regulations" means Treasury Regulation §§1.704-1(b), 1.704-2 and 1.704-3, as such regulations may be amended and are in effect from time to time and any corresponding provisions of succeeding regulations.

"AMI" has the meaning given to such term in the Joint Development Agreement.

"AMI Acquisition" has the meaning given to the term "Acquisition" in the Joint Development Agreement.

"AMI Participation Opportunity" has the meaning given to such term in the Sanchez Letter Agreement.

"Anadarko Closing" has the meaning set forth in the Securities Purchase Agreement.

"APC/KM PSA" means that certain Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN Maverick, the Partnership and Blackstone Newco, dated January 12, 2017, as it may be amended, modified, supplemented or restated from time to time.

"Available Cash" has the meaning given to such term in the Partnership Agreement.

"Bankruptcy Event" means, with respect to any Person, the occurrence of one or more of the following events: (a) such Person (i) admits in writing its inability to pay its debts as they become due, (ii) files, or consents or acquiesces by answer or otherwise to the filing against it of a petition for relief or reorganization or rearrangement, readjustment or similar relief or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, dissolution, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, (v) is adjudicated as bankrupt or as insolvent or to be liquidated, (vi) gives notice to any Governmental Authority of insolvency or pending insolvency, or (vii) takes corporate action for the purpose of any of the foregoing; or (b) a court of Governmental Authority of competent

jurisdiction enters an order appointing, without consent by such Person, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of such Person, or a petition or involuntary case with respect to any of the foregoing shall be filed or commenced against such Person.

"Base Preferred Return Amount" has the meaning given to such term in the Partnership Agreement.

"Basic Documents" has the meaning assigned to such term in the Securities Purchase Agreement.

"Blackstone Newco" means Aguila Production, LLC.

"Board of Directors" or "Board" has the meaning set forth in Section 5.1.

"Business Day" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"Capital Account" has the meaning set forth in Section 4.3.

"Capital Contribution" means, with respect to any Member, the total amount of money contributed to the capital of the Company by such Member, whether as an initial Capital Contribution or as an additional Capital Contribution.

"Cause" means, with respect to the Independent Director, (a) acts or omissions by such Independent Director that constitute willful disregard of such Independent Director's duties under this Agreement, bad faith or gross negligence, (b) that such Independent Director has engaged in or has been charged with, or has been convicted of, fraud or other acts constituting a crime under any law applicable to such Independent Director, (c) that such Independent Director is unable to perform his or her duties as Independent Director due to disability or incapacity or (d) that such Independent Director no longer meets the definition of Independent Director.

"CEO" has the meaning set forth in Section 5.6.

"Certificates" has the meaning set forth in Section 9.1.

"Change of Control" has the meaning set forth in the Indenture.

"Citi" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. or any of their respective affiliates, as may be applicable.

"Class A Member" means any Member holding Class A Units with regard to such Person's particular limited liability company equity interest designated by Class A Units.

"Class A Unit" means a limited liability company Equity Interest in the Company designated as a "Class A Unit" and which shall provide the holder thereof with the rights and obligations specified with respect to a Class A Unit in this Agreement.

"Class B Member" means any Member holding Class B Units with regard to such Person's particular limited liability company equity interest designated by Class B Units.

"Class B Unit" means a limited liability company Equity Interest in the Company designated as a "Class B Unit" and which shall provide the holder thereof with the rights and obligations specified with respect to a Class B Unit in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Common Unit" has the meaning given to such term in the Partnership Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Confidential Information" has the meaning set forth in Section 12.2.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of, the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. The terms "Controlled" and "Controlling" shall have correlative meanings.

"Core Area" has the meaning given to such term in the Joint Development Agreement.

"Credit Agreement" means the credit agreement governing the up to $500 million senior secured, first-lien, reserve-based revolving credit facility, among the Partnership, as borrower, and JPMorgan Chase Bank, N.A. and Citi, as joint lead arrangers and joint book runners, JPMorgan Chase Bank, N.A. as administrative agent, and JPMorgan Chase Bank, N.A., Citi and the syndicate of banks and financial institutions named therein as the lenders, as amended or modified from time to time.

"Credit Agreement Agent" means the administrative agent under the Credit Agreement or a Replacement Credit Agreement.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 *et seq.*, as it may be amended from time to time, and any successor statute thereto.

"Delaware Certificate" has the meaning set forth in the Recitals hereto.

"Demand Facility" has the meaning given to such term in that certain Project Lightning Fee Letter, dated January 12, 2017, among J.P. Morgan, Citi and the Partnership, as in effect on the date thereof.

"Director" or "Directors" has the meaning set forth in Section 5.3(a)(i).

"Disposition Transaction" has the meaning given to such term in the Partnership Agreement.

"Distributions" has the meaning given to such term in the Partnership Agreement.

"Drilling Commitment Agreement" has the meaning given to such term in the Securities Purchase Agreement.

"Dual Closing" has the meaning set forth in the Securities Purchase Agreement.

"Economic Interest" means a Person's right to share in the income or loss or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member including, without limitation, the right to vote, consent or otherwise participate in the management of the Company, the right to designate Directors to the Board, or, except as specifically provided in this Agreement or required under the Delaware Act, any right to information concerning the business and affairs of the Company.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Equity Interests" has the meaning given to such term in the Partnership Agreement.

"Equity Securities" has the meaning given to such term in the Partnership Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Existing Producing Wells" has the meaning given to such term in the Joint Development Agreement.

"Exit Transaction" has the meaning set forth in Section 9.5(a)

"Exit Transaction Consideration" has the meaning set forth in Section 9.5(f).

"FIRPTA" means the Foreign Investment in Real Property Tax Act of 1980.

"Fiscal Year" has the meaning set forth in Section 1.5.

"Fund Indemnified Persons" has the meaning set forth in Section 8.9.

"Fund Indemnitors" has the meaning set forth in Section 8.9.

"GAAP" has the meaning set forth in Section 6.1.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States of America, the United States of America or a foreign entity or government.

"GSO" means GSO Capital Partners LP, a Delaware limited partnership.

"GSO Director" has the meaning set forth in Section 5.3(a)(i).

"GSO Group" means the GSO Investor and its Affiliates, other than the Company, the Partnership and their respective Subsidiaries.

"GSO Investor" has the meaning set forth in the preamble to this Agreement.

"GSO Partner" means GSO ST Holdings LP.

"Hedge Agreements" has the meaning given to such term in the definition of "Indebtedness".

"Hedging Activity" has the meaning given to such term in the Partnership Agreement.

"Hydrocarbons Marketing Agreement" means the Hydrocarbons Purchase and Marketing Agreement, dated as of the Effective Date, by and between SN Maverick and the Partnership.

"Incapacity" means with respect to any Person, the bankruptcy (as defined in the Delaware Act), liquidation, dissolution or termination of such Person.

"Indebtedness" means, with respect to any specified Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for a deferred purchase price (other than trade payables incurred in the ordinary course of such Person's business, consistent with past practice), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person under capital leases, (e) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, regardless of whether drawn, (f) all obligations of such Person created or arising under any conditional sale or title retention agreement, (g) all net obligations of such Person payable under any rate, currency, commodity or other swap, option or derivative agreement (collectively, "Hedge Agreements"), (h) all obligations secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person, regardless of whether such Person has assumed or become liable for the payment of such obligation and (i) all obligations of others guaranteed by such Person.

"Indemnified Person" has the meaning set forth in Section 8.2.

"Indenture" means that certain Indenture, dated as of June 27, 2014, among the Sanchez Parent, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee, as amended or supplemented on or prior to the date hereof, but without giving effect to any amendment or supplement entered into after the date hereof and regardless of whether the Indenture remains in effect.

"Independent Director" means an individual who (1) has prior experience as an independent director, independent manager or independent member with at least three (3) years of employment experience, (2) is either provided by (x) CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company, or Lord Securities Corporation or (y) if none of those companies is then providing professional Independent Directors, a nationally recognized company reasonably approved by the Credit Agreement Agent that provides professional Independent Directors and other corporate services in the ordinary course of its business, and (3) is duly appointed as an Independent Director and is not, and has never been, and will not while serving as Independent Director be, any of the following:

(a) a member, partner, equityholder, manager, director, officer or employee of the Company or the Partnership Group Companies or Affiliates thereof;

(b) a creditor, supplier or service provider (including provider of professional services) to the Company, any Partnership Group Company, the Member or any of their respective equityholders or Affiliates (other than a nationally-recognized company that routinely provides professional Independent Directors and other corporate services to the Company, the Member or any of its Affiliates in the ordinary course of its business);

(c) a family member of any such member, partner, equityholder, manager, director, officer, employee, creditor, supplier or service provider; or

(d) a Person that controls (whether directly, indirectly or otherwise) any of (a), (b) or (c) above.

"Investor Redemption Event" has the meaning set forth in Section 9.5(a).

"Joint Development Agreement" means the Joint Development Agreement, dated as of the Effective Date, among the Partnership, Blackstone Newco and SN Maverick, as it may be amended, modified, supplemented or restated from time to time.

"Joint Properties" means the properties in which Sanchez Parent and its Affiliates (other than, for the avoidance of doubt, the Partnership Group Companies), on the one hand, and any of the Partnership Group Companies, on the other hand, jointly own working interests.

"KNOC Closing" has the meaning set forth in the Securities Purchase Agreement.

"KNOC PSA" has the meaning set forth in the Securities Purchase Agreement.

"Law" means any federal, state and local statute, law (including common law and the Delaware Act), rule, regulation, code, order, ordinance, license, writ, injunction, judgment, award (including awards of any arbitrator) and decree and other legally enforceable requirement enacted, adopted, issued or promulgated by any Governmental Authority.

"Liens" means any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or other encumbrance of any kind, or any

conditional sale contract, title retention contract or other contract or agreement to give any of the foregoing.

"Loss" has the meaning set forth in Section 8.2.

"Member" means each Person identified as a holder of Units on Exhibit A hereto as of the date hereof who has executed this Agreement or a counterpart hereof and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"Membership Interest" means a Member's ownership interest in the Company, which may be expressed as one or more Units, including such Member's right to share in distributions, profits and losses and the right, if any, to participate in the management of the business and affairs of the Company, including the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Members, the right to designate Directors to the Board, and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly providing in this Agreement or otherwise required by the Delaware Act.

"Minority Director" has the meaning set forth in Section 5.4(b).

"MSA" means the Management Services Agreement, dated as of the Effective Date, by and between Sanchez Oil and Gas Corporation and the Partnership, as it may be amended, modified, supplemented or restated from time to time.

"NYMEX Pricing" means, as of any date of determination with respect to any month (i) for crude oil, the closing settlement price for the Light, Sweet Crude Oil futures contract for each month, and (ii) for natural gas, the closing settlement price for the Henry Hub Natural Gas futures contract for such month, in each case as published by New York Mercantile Exchange (NYMEX) on its website currently located at www.nymex.com or any successor thereto (as such pricing may be corrected or revised from time to time by the NYMEX in accordance with its rules and regulations).

"Officer" means each Person designated as an officer of the Company pursuant to Section 5.6 for so long as such Person remains an officer pursuant to the provisions of Section 5.6.

"Operating Agreement" has the meaning given to such term in the Joint Development Agreement.

"Operating Committee" has the meaning given to such term in the Joint Development Agreement.

"Original LLC Agreement" has the meaning set forth in the Recitals hereto.

"Participating Sellers" has the meaning set forth in Section 9.5(h).

"Partnership" has the meaning set forth in Section 1.9.

"Partnership Agreement" means the Partnership's Amended and Restated Agreement of Limited Partnership, as it may be amended from time to time.

"Partnership Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other quarterly accounting period of the Partnership as may be established by the Company. It is understood and agreed that the first Partnership Fiscal Quarter shall be deemed the period of time commencing on the Effective Date and concluding on the date that is the last day of the Fiscal Quarter during which the Effective Date occurs.

"Partnership Fiscal Year" means the calendar year ending on December 31, or such other annual accounting period for the Partnership as may be established by the Company.

"Partnership Group Companies" has the meaning set forth in Section 1.9.

"Partnership Representative" has the meaning set forth in Section 7.1.

"PDP PV-10" means the net present value, discounted at ten percent (10%) per annum, of the future net revenues (using NYMEX forward curve pricing for the next five (5) years as of the date of determination and flat prices from the fifth calendar year thereafter) expected to accrue to the Partnership's collective interest in any Proved Developed Producing Reserves (as defined in the Partnership Agreement) (in each case determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter for which a reserve report prepared under Section 5.7 of the Partnership Agreement is available) during the remaining expected economic lives of such reserves. Each calculation of such expected future net revenues shall take into account the mark-to-market value of all Hedge Agreement of the Partnership Group Companies relating to the Partnership's production and shall be made as of the date requested in accordance with the then existing standards of the Society of Petroleum Engineers, ***provided*** that in any event (a) appropriate deductions shall be made for severance and ad valorem taxes, and for operating, gathering, transportation and marketing costs required for the production and sale of such reserves, (b) the pricing assumptions used in determining PDP PV-10 for any particular reserves shall be based upon the Strip Price for the next five (5) years and (c) the cash-flows derived from the pricing assumptions set forth in clause (b) above shall be further adjusted to account for the historical basis differential.

"PDP PV-10 Ratio" means, as of any date of determination, the ratio of (i) PDP PV-10 (determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter for which a reserve report prepared by an independent reservoir engineering firm is available) to (ii) the sum of the outstanding Indebtedness of the Partnership Group Companies and the Base Preferred Return Amount (as defined in the Partnership Agreement) (disregarding for purposes of this determination clause (ii) in the definition of Base Preferred Return Amount), in each case determined as of the last day of the most recent Partnership Fiscal Year or Partnership Fiscal Quarter (as each are defined in the Partnership Agreement) for which financial statements of the Partnership are available.

"Percentage Interest" means, as of the date of determination (a) with respect to any Member and particular class or series of Unit, that percentage corresponding with the ratio that such Member's relative number of Units within such class or series bears to the total outstanding number of Units of such class or series held by all Members and (b) with respect to any Member and all Units, that percentage corresponding with the ratio that such Member's relative Membership Interests represented by its Units bears to the total Membership Interests of all Members represented by their outstanding Units, in each case, as set forth in Exhibit A.

"Permitted Lien" means (i) Liens for taxes not yet due and payable or which are being actively contested in good faith by appropriate proceedings with appropriate reserves therefor; (ii) mechanics', materialmens', carriers', workmens', warehousemens', repairmens' or landlords' Liens or other like Liens and security obligations that are not delinquent; (iii) matters of record, zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, in each case, which do not materially interfere with the ordinary conduct of business of the Company and its Subsidiaries and do not materially detract from the value or use of the property subject thereto, (iv) Liens securing Indebtedness incurred under any Senior Debt, including pursuant to the Credit Agreement or Replacement Credit Agreement or any other Senior Debt Agreement and (v) Liens permitted under any Senior Debt, including the Credit Agreement or Replacement Credit Agreement or any other Senior Debt Agreement or Replacement Credit Agreement.

"Permitted Transferee" means, with respect to any Person, (i) any of such Person's Affiliates (it being understood that in the case of (a) the GSO Investor, such Affiliate must be an entity or fund managed, advised or sub-advised by or Controlled by GSO or its Affiliates, and (b) the Sanchez Investor, such Affiliate must be wholly owned, directly or indirectly, by Sanchez Parent for purposes of being deemed a Permitted Transferee), or (ii) any transferee in connection with an Exit Transaction.

"Person" means an individual or a corporation, partnership, limited liability company, trust, estate, unincorporated organization, association, "group" (as such term is defined in Section 13(d) of the Exchange Act) or other entity.

"Preferred Unit Closings" has the meaning set forth in the Securities Purchase Agreement.

"Preferred Units" has the meaning given to such term in the Partnership Agreement.

"Proceeding" has the meaning set forth in Section 8.2.

"Quarterly Distribution Amount" has the meaning given to such term in the Partnership Agreement.

"Redemption Non-Payment" has the meaning given to such term in the Partnership Agreement.

"Renounced Business Opportunity" has the meaning set forth in Section 5.10(d).

"Replacement Credit Agreement" means a credit agreement that provides for revolving loans to the Partnership and is established among the Partnership and one or more commercial banks and other commercial lenders in replacement of the current Credit Agreement, which credit agreement shall be on terms and conditions that are generally considered market for a company similarly situated to the Partnership and that, in the aggregate, are at least as favorable to the Partnership as the Credit Agreement; ***provided*** that the financial covenants, voluntary prepayments, mandatory prepayments, and provisions relating to events of default, interest costs (including upfront lender fees and discounts), call protection or costs associated with voluntary or mandatory repayment, and restricted payments (including restrictions on Distributions) shall each be at least as favorable to the Partnership as the Credit Agreement; ***provided, further,*** that such credit agreement shall in no way limit or restrict the payment of distributions or redemption of the Preferred Units other than as permitted by the terms of the Partnership Agreement as in effect on the Effective Date.

"Sale Transaction" has the meaning given to such term in the Joint Development Agreement.

"Sanchez Director" has the meaning set forth in Section 5.3(a)(i).

"Sanchez Group" means the Sanchez Parent and its Affiliates, Sanchez Investor, SPP, Sanchez Oil & Gas Corporation, Blackstone Newco, and any Person Controlled by any one or more of the foregoing (other than the Company, the Partnership and their respective Subsidiaries).

"Sanchez Investor" has the meaning set forth in the preamble to this Agreement.

"Sanchez Letter Agreement" means that certain Letter Agreement between SN Maverick, Sanchez Parent and the Partnership, dated as of the Effective Date.

"Sanchez Parent" means Sanchez Energy Corporation, a Delaware corporation.

"Sanchez Vehicle" means SN Maverick or Sanchez Parent or any of its Affiliates (other than the Company or its Subsidiaries or any Partnership Group Company) that holds title to any of the properties acquired by SN Maverick at the "Closing" (as defined in the APC/KM PSA) pursuant to the APC/KM PSA or any Joint Properties.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Purchase Agreement" has the meaning set forth in the Recitals hereto.

"Senior Debt" means credit or other debt facilities or issuances, including, but not limited to, the credit facility provided pursuant to the Credit Agreement.

"Senior Debt Agreements" means the Credit Agreement and any other credit agreement, note purchase agreement, indenture or other agreements evidencing Senior Debt, collectively, and any documents related thereto.

"Separate Closing" has the meaning set forth in the Securities Purchase Agreement.

"SN Maverick" means SN EF Maverick, LLC, a Delaware limited liability company.

"Special Approval" has the meaning set forth in Section 5.7(b).

"SPP" means Sanchez Production Partners LP, a Delaware limited partnership.

"Springfield Gathering Agreements" means (i) the Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of January 1, 2016, between Springfield Pipeline LLC, a Texas limited liability company ("Springfield"), and Anadarko Onshore (as defined in the Securities Purchase Agreement) and (ii) the Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of January 1, 2016, between Springfield and Anadarko Onshore, of which, to the extent related to the properties acquired by SN Maverick and the Partnership at the Anadarko Closing or Dual Closing, as applicable, the rights and obligations of Anadarko Onshore with respect to operations from and after such Anadarko Closing or Dual Closing, as applicable, will be assigned by Anadarko Onshore to Sanchez Parent.

"Strip Price" means, at any time, (i) for the remainder of the current calendar year, the average NYMEX Pricing for the remaining contracts in the current calendar year, (ii) for each of the succeeding three (3) complete calendar years, the average NYMEX Pricing for the twelve (12) months in each such calendar year, and (iii) for the succeeding fourth complete calendar year, and for each calendar year thereafter, the average NYMEX Pricing for the twelve (12) months in such fourth calendar year.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of limited liability, partnership or other similar ownership interests thereof with voting rights at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or Control, directly or indirectly, the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.

"Substitute Member" means any Transferee that has been admitted as a Member of the Company pursuant to Section 9.7(c) by virtue of such Transferee receiving all or a portion of a Member's Units from a Member.

"Tag Right" has the meaning given to such term in the APC/KM PSA.

"Tag Right Interests" has the meaning given to such term in the APC/KM PSA.

"Tax Matters Member" has the meaning set forth in Section 7.1.

"Test Level" means (i) for any quarter in 2017, 1.0x, (ii) for any quarter in 2018, 1.10x, (iii) for any quarter in the period commencing January 1, 2019 and ending December 31, 2021, 1.25x, and (iv) for any quarter in the period commencing January 1, 2022 and ending December 31, 2023, 1.40x.

"Transfer" means any direct or indirect sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, gift, grant of a security interest or other direct or indirect disposition or encumbrance (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof, including derivative or similar transactions or arrangements whereby a portion or all of the Economic Interest in, or risk of loss or opportunity for gain with respect to, Units is transferred or shifted to another Person; *provided* that any indirect transfer of Equity Interests in Sanchez Parent that does not result in a Change of Control shall not be deemed a "Transfer" for purposes of this Agreement.

"Transferee" means a Person that acquires all or any portion of a Member's Units as a result of a Transfer.

"Transferor" means a Person that Transfers all or any portion of such Person's Units as a result of a Transfer.

"Unit" means a limited liability company Equity Interest in the Company comprising a Member's Membership Interest in the Company and designated as a Class A Unit, Class B Unit or any other class of Units designated by the Board.

"UnSub Representative" has the meaning given to such term in the Joint Development Agreement.

11.2 Construction. Whenever the context requires, (a) the gender of all words used in this Agreement includes the masculine, feminine, and neuter and (b) terms "hereof," "herein," "hereby" and derivative or similar words refer to this Agreement, and such words do not refer to the Delaware Act or any particular section, clause or provision of this Agreement. All references to a Person include such Person's successors and permitted assigns. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to exhibits attached hereto, each of which is made a part hereof for all purposes. The use herein of the word "include" or "including," when following any general statement, term or matter, will not be construed to limit such statement, term or matter to the specific items or matters set forth following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather will be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The term "or" is not exclusive. The definitions set forth or referred to in Section 11.1 will apply equally to both the singular and plural forms of the terms defined and derivative forms of defined terms will have correlative meanings. Where any provision in this Agreement refers to action to be taken by any Person, or which such Person is prohibited from taking, such

provision will be applicable whether such action is taken directly or indirectly by such Person, including actions taken by or on behalf of any Affiliate of such Person. All accounting terms used herein and not otherwise defined herein will have the meanings accorded them in accordance with GAAP and, except as expressly provided herein, all accounting determinations will be made in accordance with GAAP. The parties acknowledge that this Agreement has been negotiated by such parties with the benefit of counsel and, accordingly, any principle of law that provides that any ambiguity in a contract or agreement shall be construed against the party that drafted such contract or agreement shall be disregarded and is expressly waived by all of the parties hereto.

## ARTICLE XII
## MISCELLANEOUS

12.1 Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by (a) depositing such writing with a reputable overnight courier for next day delivery, (b) depositing such writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or (c) delivering such writing to the recipient in person, by courier or by electronic mail transmission; and a notice, request or consent given under this Agreement is effective upon receipt against the Person who receives it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Exhibit A, or such other address as that Member may specify by notice to the other Members. Any notice, request or consent to the Company or the Board must be given to the Board or, if appointed, the secretary of the Company at the Company's chief executive offices. Whenever any notice is required to be given by Law or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

12.2 Confidential Information. Each Member recognizes and acknowledges that it has received and may in the future receive certain confidential and proprietary information and trade secrets of Sanchez Parent and its Subsidiaries, the Company and its Subsidiaries, the Partnership Group Companies and the Members (including their respective predecessors) (the "Confidential Information"). Except as otherwise consented to by the Company in writing, each Member agrees that it will not, during or after the term of this Agreement, whether directly or indirectly through an Affiliate or otherwise, use any Confidential Information for any purposes other than in connection with its investment in the Company or disclose any Confidential Information for any reason or purpose whatsoever, except for disclosures: (i) to authorized directors, managers, officers, representatives, agents and employees of such Member or its Affiliates (other than portfolio companies of the GSO Investor), the Company, its Subsidiaries or the Partnership Group Companies and as otherwise may be proper in the course of performing such Member's obligations, or enforcing such Member's rights, under this Agreement and the agreements expressly contemplated hereby, *provided*, that each such Person is informed of the confidential nature of such Confidential Information, agrees to hold such Confidential Information confidential and that the disclosing Member remains liable for any breach of this provision by such Persons; (ii) made to the limited partners, owners, co-investors, and prospective investors in funds managed, advised or sub-advised by the Class B Member or its Affiliates; *provided* that if such limited partners, owners, co-investors, and prospective investors are receiving Confidential Information (other than with respect to high-level summary information regarding the operations of the Company, any of its Subsidiaries or any of the Partnership Group Companies (*e.g.*, total production volumes, total revenues, etc.)), such receiving Person shall be subject to confidentiality obligations to the GSO Investor or its Affiliates; (iii) to any bona fide prospective purchaser of the equity or assets of the Company, any of its Subsidiaries, any of the Partnership Group Companies or their respective Affiliates or the Units held by such Member, to prospective financing sources, or a prospective merger partner of such Member, the Company, its Subsidiaries, the Partnership

Group Companies or any of their respective Affiliates and, except in connection with transactions contemplated under Section 9.5 and except as may be precluded by contractual restrictions on disclosure, following prior written notice of such disclosure to the Company or the Partnership, *provided*, that such purchaser, financing sources, or merger partner agrees in writing to be bound by the provisions of this Section 12.2 or other confidentiality agreement that includes confidentiality and use provisions at least as restrictive as the provisions herein; (iv) to attorneys, accountants and other professionals of such Member or its Affiliates; (v) as is required to be disclosed by order of a court of competent jurisdiction, administrative body or governmental body, or by subpoena, summons or legal process, or by law, rule or regulation or in connection with any disclosure to regulatory or Governmental Authority that regulates the Class B Member, *provided*, that the Member shall provide to the Company prompt notice of any such requirement to enable the Company to seek an appropriate protective order or confidential treatment (except no such opportunity shall be afforded in the case of any law, rule or regulation or a routine audit or examination by, or a blanket document request from, a governmental or regulatory entity that does not reference the Company or this Agreement or if notifying the Company in advance of such disclosure is prohibited by applicable law) and shall disclose only that portion of such Confidential Information so required to be disclosed and (vi) by Sanchez Parent in connection with any publicly filed reports to the extent (A) relating to the Partnership Group Companies' operations and assets and (B) the disclosure of such information is required by applicable law or regulation to be included therein. For purposes of this Section 12.2, the term "Confidential Information" shall not include any information that (x) a Person learns from a source other than the Company, its Subsidiaries or the Partnership Group Companies, or any of their respective representatives, employees, agents or other service providers, (y) is disclosed to the public or is available in the public domain or (z) was in a Person's possession prior to disclosure hereunder; *provided* such information is not known by such Person to be subject to an obligation of confidentiality owed to the other Members. Furthermore, the Members understand that Members and their representatives who have access to the Confidential Information may retain mental impressions of some aspects of the Confidential Information and the Members agree that neither the Members nor any of their representatives shall have any liability hereunder for use of such mental impressions in evaluating other business opportunities, except as otherwise expressly provided in this Agreement or any ancillary agreement thereto.

12.3 Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein are intended by the Members as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Members acknowledges and agrees that in executing this Agreement (i) the intent of the parties in this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 12.3 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Members stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 12.3.

12.4 Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder or with

respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person hereunder or with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default hereunder or with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

12.5 Amendment or Modification. Except for amendments authorized by Section 2.1, this Agreement and any provision hereof may be amended, waived (except as otherwise provided herein), or modified from time to time only by a unanimous written instrument signed by the Members; *provided* any modifications, amendments or waivers (including by any restatement or supplements) (a) effecting the obligations to appoint, and the rights of, an Independent Director, including without limitation under Sections 5.3(a)(i), 5.3(c), 5.3(e), 5.4 (b) and 5.7(c) that adversely affect the Lenders (as defined in the Credit Agreement) under the Credit Agreement, (b) to the definitions of "Independent Director" and "Cause", and (c) to Sections 5.13, 12.5 and 12.6 shall require the prior written consent of the Credit Agreement Agent, and the Credit Agreement Agent shall be a third party beneficiary hereunder to enforce such provisions.

12.6 Binding Effect. Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and permitted assigns and all other Persons hereafter holding, having or receiving an interest in the Company, whether as Transferees, Substitute Members or otherwise. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than the Credit Agreement Agent for the matters described in Section 12.5.

12.7 Consent to Jurisdiction; Waiver of Trial by Jury.

(a) Each Member and the Company irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court of Chancery of the State of Delaware, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement or the agreements delivered in connection herewith or the transactions contemplated hereby or thereby or for recognition or enforcement of any judgment relating thereto, and each of the parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding except in such courts, (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in the Court of Chancery of the State of Delaware, (iii) waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any such action or proceeding in the Court of Chancery of the State of Delaware, and (iv) waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in the Court of Chancery of the State of Delaware. Each Member and the Company agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Member and the Company irrevocably consents to service of process in the manner provided for notices in Section 12.1. Nothing in this Agreement will affect the right of any Member or the Company to serve process in any other manner permitted by applicable law.

(b) EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO

INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND ANY OF THE AGREEMENTS DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

12.8 Governing Law. This Agreement shall be construed in accordance with and governed by the internal laws of the State of Delaware, without regard to the principles of conflicts of law (whether of the State of Delaware or otherwise) that would result in the application of the laws of any other jurisdiction. In the event of a direct conflict between the provisions of this Agreement and any provision of the Delaware Certificate or any mandatory provision of the Delaware Act, the applicable provision of the Delaware Certificate or the Delaware Act shall control.

12.9 Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

12.10 Waiver of Certain Rights. Each Member irrevocably waives any right it may have to demand any distributions or withdrawal of property from the Company except as provided herein or to maintain any action for dissolution (whether pursuant to Section 18-802 of the Delaware Act or otherwise) of the Company or for partition of the property of the Company and confirms that such waivers are a material term of this Agreement.

12.11 Notice to Members of Provisions. By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article IX) and (b) all of the provisions of the Delaware Certificate.

12.12 Counterparts. This Agreement may be executed in multiple counterparts, any of which may be delivered via facsimile or PDF, with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

12.13 Headings. The headings used in this Agreement are for the purpose of reference only and will not otherwise affect the meaning or interpretation of any provision of this Agreement.

12.14 Remedies. The Company and the Members shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement (including costs of enforcement) and to exercise any and all other rights existing in their favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that the Company or any Member may in its or his sole discretion apply to any court of law or equity of competent jurisdiction for specific performance or injunctive relief (without posting a bond or other security) in order to enforce or prevent any violation or threatened violation of the provisions of this Agreement.

12.15 Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction,

but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

12.16 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Member may be a partnership or limited liability company, each Member hereto, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Members shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Member (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Member (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member (or, in each case, any financing source for any of the foregoing) of any of the foregoing, but in each case not including the Members, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such Persons, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith or in connection or contemplation hereof, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

[*Separate Signature Page Attached*]

IN WITNESS WHEREOF, the Company and the Members have executed this Agreement as of the Effective Date.

**COMPANY:**

**SN EF UNSUB GP, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**MEMBERS:**

**SN UR HOLDINGS, LLC**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**GSO ST HOLDINGS ASSOCIATES LLC**

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

Exhibit A

Members, Capital Contributions and Units Held

| Member | Capital Contribution | Capital Account Balance | Units | Percentage Interest |
|---|---|---|---|---|
| **Sanchez Investor** | $990 | $990 | 99 Class A Units | 99% |
| **GSO Investor** | $10 | $10 | 1 Class B Units | 1% |
| **Total** | $1,000 | $1,000 | 100 Units | 100% |

Members' Address for Notices

**Sanchez Investor**

c/o Sanchez Energy Corporation
SN UR Holdings, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

**With a copy to (which shall not constitute notice):**

Kirkland & Ellis LLP
600 Travis, Suite 3300
Houston, TX 77002
Attn: John D. Pitts
Email: john.pitts@kirkland.com

**GSO Investor**

GSO ST Holdings Associates LLC
c/o GSO Capital Partners
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Email: Robert.horn@gsocap.com

**With a copy to:**

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, NY 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

**With a copy to (which shall not constitute notice):**

Andrews Kurth Kenyon LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Attn: G. Michael O'Leary
Jon W. Daly
Email: moleary@andrewskurth.com
jondaly@andrewskurth.com

**The Company** SN EF UnSub GP, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

**With copies to:**

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

and

GSO ST Holdings Associates LLC
c/o GSO Capital Partners
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Email: Robert.horn@gsocap.com

Exhibit B

Board Designations

**Sanchez Directors**:

Patricio D. Sanchez
Cameron W. George
Daniel Furbee

**GSO Directors**:

Robert Horn
Anthony Borreca

---

Exhibit C

Officers

President and Chief Executive Officer: Patricio D. Sanchez

Chief Financial Officer and Treasurer: Cameron W. George

Chief Operating Officer: Daniel Furbee

Secretary: Alfredo Gutierrez

Exhibit D

Approved Successor Independent Auditors and
Independent Reservoir Engineers

Approved Independent Auditors

1. Pricewaterhouse Coopers, LLP

2. Deloitte LLP

3. Ernst & Young Global Limited

Approved Independent Reservoir Engineers

4. DeGolyer & MacNaughton

5. Netherland Sewell & Associates

6. Cawley, Gillespie & Associates

Exhibit E

Form of Purchase Agreement

(Attached.)

## SECURITIES PURCHASE AGREEMENT

This SECURITIES PURCHASE AGREEMENT (this "***Agreement***"), is entered into on [●] (the "***Closing Date***") by and between SN EF UnSub, LP, a Delaware limited partnership (the "***Partnership***") and GSO ST Holdings LP, a Delaware limited partnership ("***Preferred Unit Purchaser***"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in accordance with Article I.

**R E C I T A L S:**

WHEREAS, on **[●]**, 2017, the Partnership, Sanchez Energy Corporation, SN EF UnSub GP, LLC ("***General Partner***"), SN EF UnSub, LP, SN EF UnSub Holdings LLC, GSO ST Associates LLC and the Preferred Unit Purchaser entered into that certain Securities Purchase Agreement (the "***Original SPA***");

WHEREAS, pursuant to Section 3.1(c)(ii) of the Partnership Agreement or Section 5.8 of the GP LLC Agreement, upon the occurrence of certain events, then each of the Preferred Unit Purchaser and the Class B Member, respectively, may elect in its sole discretion to cause the Partnership to issue additional Preferred Units to Preferred Unit Purchaser;

WHEREAS, the the Preferred Unit Purchaser and the Class B Member have delivered an Additional Preferred Units Notice (as defined in the Partnership Agreement and GP LLC Agreement) to the Partnership and General Partner on [●], whereby the Preferred Unit Purchaser and Class B Member have elected to cause the Partnership to sell [●] Preferred Units to the Preferred Unit Purchaser; and

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Closing, the Partnership will issue to the Preferred Unit Purchaser [●] newly issued Preferred Units in consideration for a contribution to the Partnership by the Preferred Unit Purchaser of $[●][1].

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Definitions. As used in this Agreement, the following terms have the meanings indicated:

"***Affiliate***" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For purposes of this Agreement, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P.shall constitute an Affiliate of GSO, and (ii) none of GSO or its Affiliates or any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates shall constitute an Affiliate of the Partnership or the General Partner.

[1] Note to Draft: To equal agreed Preferred Unit Purchase Price as of closing.

"***Agreement***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Business Day***" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"***Class B Member***" has the meaning set forth in the GP LLC Agreement.

"***Closing***" means the issuance and sale of the Preferred Units to the Preferred Unit Purchaser in consideration for $[●] in accordance with Section 2.01.

"***Closing Date***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Commission***" means the United States Securities and Exchange Commission.

"***Common Units***" means "Common Units", as defined in the Partnership Agreement.

"***Contract***" means any contract, agreement, indenture, note, bond, mortgage, deed of trust, loan, instrument, lease, license, commitment or other arrangement, understanding, undertaking, commitment or obligation, whether written or oral.

"***Control***" has the meaning set forth in the Partnership Agreement.

"***DRULPA***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C §17-101 et seq. as amended from time to time and any successor to DRULPA.

"***Equity Interests***" means (i) equity interests (including capital stock, membership interests and partnership interests) of any applicable Person, (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into equity interests, and (iii) warrants, options or other rights to purchase or otherwise acquire or receive equity interests.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" has the meaning set forth in the recitals.

"***Governmental Authority***" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"***GP LLC Agreement***" means the Amended and Restated Limited Liability Company Operating Agreement of the General Partner, dated as of [●], as amended from time to time.

"***GSO***" means GSO Capital Partners LP, a Delaware limited partnership.

"***Hydrocarbon Marketing Agreement***" has the meaning set forth in the Partnership Agreement.

"***Indebtedness***" has the meaning set forth in the Partnership Agreement.

"***Joint Development Agreement***" has the meaning set forth in the Partnership Agreement.

"***Knowledge of Partnership***" means the actual knowledge, after due inquiry, of the current duly appointed officers of the General Partner.

"***Law***" means any federal, state, local or foreign order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"***Lien***" means any mortgage, claim, encumbrance, pledge, lien (statutory or otherwise), security agreement, conditional sale or trust receipt or a lease, consignment or bailment, preference or priority, assessment, deed of trust, charge, easement, servitude or other encumbrance upon or with respect to any property of any kind.

"***Material Agreement***" means the Partnership Agreement, the GP LLC Agreement, any Senior Debt Agreement or Replacement Credit Agreement (as applicable), the Joint Development Agreement, the MSA and the Hydrocarbon Marketing Agreement.[2]

"***MSA***" has the meaning set forth in the Partnership Agreement.

"***Original SPA***" has the meaning set forth in the recitals.

"***Partnership***" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Partnership Agreement***" means the Amended and Restated Agreement of Limited Partnership of the Partnership, dated as of [●], as amended from time to time.

"***Permits***" means any approvals, authorizations, consents, licenses, permits, variances, waivers, grants, franchises, concessions, exemptions, orders, registrations or certificates of a Governmental Authority.

"***Person***" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Authority.

"***Preferred Unit Purchaser***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Preferred Units***" means "Preferred Units", as defined in the Partnership Agreement.

"***Purchased Preferred Units***" means those Preferred Units issued pursuant to Section 2.01.

"***Replacement Credit Agreement***" has the meaning set forth in the Partnership Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time, and the rules and regulations of the Commission promulgated thereunder.

"***Senior Debt Agreement***" has the meaning set forth in the Partnership Agreement.

"***Subsidiary***" has the meaning set forth in the Partnership Agreement.

[2] Note to Form: To revise so that at the time of execution, this definition includes agreements of similar materiality to those listed.

**ARTICLE II**
**AGREEMENT TO SELL AND PURCHASE**

Section 2.01 Contribution and Issuance. At the Closing, on the terms set forth in this Agreement, the Preferred Unit Purchaser shall contribute and fund to the Partnership by wire transfer of immediately available funds an amount equal to $[●] in consideration for the issuance by the Partnership to the Preferred Unit Purchaser of [●] Preferred Units. The Partnership shall use the proceeds from such contribution solely to repay outstanding Indebtedness of any of the Partnership and its Subsidiaries under the Senior Debt Agreements or any other agreements governing any material Indebtedness of the Partnership or any of its Subsidiaries (including a Replacement Credit Agreement) so as to remedy the applicable condition(s) that gave rise to event giving the Preferred Unit Purchaser and Class B Member the right to elect to purchase the Preferred Units hereunder.

Section 2.02 Closing. On the terms and subject to the conditions hereof, the consummation of the funding of $[●] by the Preferred Unit Purchaser shall take place on the Closing Date at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002.

Section 2.03 Further Assurances. From time to time after the Closing Date, without further consideration, each of Partnership and the Preferred Unit Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**
**RELATED TO THE PARTNERSHIP**

As of the Closing, the Partnership represents and warrants to the Preferred Unit Purchaser as follows:[3]

Section 3.01 Existence and Power. The Partnership has been duly formed and is validly existing as a limited partnership under the Laws of the jurisdiction of the State of Delaware, has the full limited partnership power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited partnership, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the Partnership. All limited partnership action required to be taken by the Partnership for the execution and delivery by the Partnership of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly taken. The Partnership has all requisite power and authority to issue, sell and deliver the [●] Preferred Units to be issued to the Preferred Unit Purchaser.

---

[3] Note to Form: Disclosure schedules to be added/removed at the time of the transaction in the sole discretion of the Partnership.

Section 3.02 Authority; Enforceability. This Agreement has been duly and validly authorized and executed by the Partnership and constitutes the legal, valid and binding obligations of the Partnership, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.03 Capitalization; Issuance of Units.

(a) As of the Closing Date, the Partnership's authorized Equity Interests consist solely of those interests set forth on Schedule 3.03(a), which such interests have been duly authorized and validly issued in accordance with the governing documents of the Partnership and applicable Law.

(b) Immediately following the Closing, the outstanding Equity Interests of the Partnership shall consist of those interests set forth on Schedule 3.03(b). The Purchased Preferred Units have been duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(c) Except as set forth in this Agreement, the Partnership Agreement and the GP LLC Agreement, (i) there are no Persons entitled to preemptive, statutory or other similar contractual rights to subscribe for any general partner interest of the Partnership, Common Units, Preferred Units or any other Equity Interests of the Partnership and (ii) there are no options, warrants or other rights to purchase, agreements or other obligations to issue, or rights to convert any obligations into or exchange any securities for, membership interest, general partner interest, limited partner interest or any other ownership interests in the Partnership.

Section 3.04 Subsidiaries(a) of the General Partner and the Partnership. Except as set forth on Schedule 3.04, the Partnership does not have any Subsidiaries and does not own, directly or indirectly, any Equity Interests in any other Person.

Section 3.05 Litigation. As of the Closing Date, there are no legal or governmental proceedings pending to which the Partnership is a party or to which any property or asset of the Partnership is subject or which challenges the validity of this Agreement or the Partnership Agreement or the right of the Partnership to enter into this Agreement or to consummate the transactions contemplated hereby and, to the Knowledge of Partnership, no such proceedings are threatened by any Governmental Authorities or others.

Section 3.06 No Conflicts. None of (a) the offering, issuance and sale by the Partnership of the Preferred Units and the application of the proceeds therefrom, (b) the execution, delivery and performance by the Partnership of this Agreement, or (c) the consummation of the transactions contemplated hereby (i) constitutes or will constitute a violation of the other organizational documents of the Partnership, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, any Contract to which the Partnership is a party or by which it or any of its properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over the Partnership or any of its properties in a proceeding to which it or its property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on the Partnership.

Section 3.07 Approvals. Except as set forth on Schedule 3.07, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with (a) the execution, delivery or performance by any of the Partnership of this Agreement or (b) the Partnership's issuance at the Closing of the [●] Preferred Units issued to the Preferred Unit Purchaser.

Section 3.08 Investment Company Status

The Partnership is not, and upon the application of the net proceeds therefrom, will not be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 3.09 No Registration Required

Assuming the accuracy of the representations and warranties of the Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Closing of the Preferred Units pursuant to this Agreement is exempt from the registration requirements of the Securities Act, and neither the Partnership nor, to the Knowledge of Partnership, any authorized representative acting on behalf of the Partnership has taken or will take any action hereafter that would cause the loss of such exemption.

Section 3.10 Certain Fees. Except as set forth on Schedule 3.10, no fees or commissions are or will be payable by the Partnership, and the Preferred Unit Purchaser and its Affiliates shall not be subject to any liability or other obligation with respect, to brokers, finders or investment bankers in connection with or relating to the issuance of the the Preferred Units upon the consummation of the transactions contemplated by this Agreement.

Section 3.11 No Integration

The Partnership has not, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the Preferred Units in a manner that would require the offer and sale of any Preferred Units to be registered under the Securities Act.

Section 3.12 Material Agreements. Except as set forth on Schedule 3.12, (a) no Partnership Group Company is in material breach of, or material default under, any Material Agreement and (b) no event has occurred which, with the delivery of notice or the lapse of time or both, would result in a Partnership Group Company being in material breach of, or material default under, any Material Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASER

As of the Closing Date, the Preferred Unit Purchaser represents and warrants to the Partnership as follows:

Section 4.01 Existence. The Preferred Unit Purchaser is duly organized and validly existing as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 4.02 Authorization, Enforceability. The Preferred Unit Purchaser has all necessary legal power and authority to enter into, deliver and perform its obligations under this Agreement. The execution, delivery and performance by the Preferred Unit Purchaser of this Agreement and the consummation by it of the transactions contemplated hereby have been duly and validly authorized by all necessary legal action of the Preferred Unit Purchaser, and no further consent or authorization of the Preferred Unit Purchaser is required. This Agreement constitutes a legal, valid and binding obligation of the Preferred Unit Purchaser; except as, the enforceability hereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03 No Breach. None of the execution, delivery or performance by the Preferred Unit Purchaser of this Agreement and the consummation by the Preferred Unit Purchaser of the transactions contemplated hereby will (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any material agreement to which the Preferred Unit Purchaser is a party or by which the Preferred Unit Purchaser is bound or to which any of the property or assets of the Preferred Unit Purchaser is subject, (b) conflict with or result in any violation of the provisions of the organizational documents of the Preferred Unit Purchaser, or (c) violate any statute, order, rule or regulation of any court or Governmental Authority or body having jurisdiction over the Preferred Unit Purchaser or the property or assets of the Preferred Unit Purchaser, except in the case of clauses (a) and (c), for such conflicts, breaches, violations or defaults as would not prevent the consummation of the transactions contemplated by this Agreement.

Section 4.04 Approvals. Except as set forth on Schedule 4.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by the Preferred Unit Purchaser of this Agreement.

Section 4.05 Certain Fees. No fees or commissions are or will be payable by the Preferred Unit Purchaser to brokers, finders or investment bankers with respect to the purchase of the Purchased Preferred Units or the consummation of the transactions contemplated by this Agreement, in each case, for which the Partnership may be liable.

Section 4.06 Restricted Securities. Except for possible permitted transfers subject to the terms of the Partnership Agreement, the Preferred Unit Purchaser is acquiring the Purchased Preferred Units for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. The Preferred Unit Purchaser has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its proposed investment in the Purchased Preferred Units and is capable of bearing the economic risk of such investment. The Preferred Unit Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501(a)(4)) promulgated under the Securities Act. The Preferred Unit Purchaser acknowledges and understands that its acquisition of the Purchased Preferred Units has not been registered under the Securities Act in each case in reliance on an exemption therefrom and that the Partnership is relying upon the truth and accuracy of the Preferred Unit Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Preferred Unit Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of the Preferred Unit Purchaser to acquire the Purchased Preferred Units and the Purchased Preferred Units will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. The Preferred Unit Purchaser further acknowledge and understand that (x) the Purchased Preferred Units may not be sold, transferred, offered for sale, pledged,

hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and (y) when issued at the Closing, the Purchased Preferred Units will bear a legend substantially as set forth below:

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

## ARTICLE V
## MISCELLANEOUS

Section 5.01 No Liability. The representations and warranties set forth in Articles III and IV shall terminate as of the Closing. Both the Preferred Unit Purchaser and the Partnership hereby expressly acknowledge and agree that from and after the Closing, neither the Preferred Unit Purchaser nor the Partnership shall be liable for any inaccuracy or any breach of any representation made therein.

Section 5.02 Interpretation. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to the lawful currency of the United States of America. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the Closing Date. Unless expressly provided to the contrary, the word "or" is not exclusive. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices, Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "day" or "days" shall mean calendar day, unless denoted as a Business Day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both". Unless otherwise noted, references herein to a "party" are references to the applicable party to this Agreement.

Section 5.03 Amendments and Waivers.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party, or in

the case of a waiver, by the party against whom the waiver is to be effective.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided will be cumulative and not exclusive of any rights or remedies hereunder or at law or in equity; accordingly, no exercise of any right or remedy shall be construed as an election of remedies by any party.

Section 5.04 Binding Effect. This Agreement shall be binding upon the parties and their respective successors and permitted assigns, and shall remain in full force and effect after the Closing. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

Section 5.05 Communications. All notices and demands provided for hereunder shall be in writing and shall be given by registered or certified mail, return receipt requested, telecopy, air courier guaranteeing overnight delivery or personal delivery to the following addresses

(a) If to the Preferred Unit Purchaser:

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

with a copy to (which shall not constitute notice):

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

(b) If to the Partnership:

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

with a copy to (which shall not constitute notice):

[●]
[Address Line 1]
[Address Line 2]
Attention: [●]
Email: [●]

or to such other address as the parties hereto may designate in writing. All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; upon actual receipt if sent by certified or registered mail, return receipt requested, or regular mail, if mailed; upon actual receipt of the overnight courier copy, upon confirmation of receipt if sent via email; and upon actual receipt when delivered to an air courier guaranteeing overnight delivery.

Section 5.06 Entire Agreement. This Agreement constitutes the entire agreement among the parties and supersedes any prior understandings, negotiations, agreements or representations among the parties or any of their respective affiliates of any nature, whether written or oral, to the extent they relate in any way to the transactions contemplated hereby or thereby.

Section 5.07 Governing Law; Submission to Jurisdiction. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), will be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflicts of laws. Any action against any party relating to the foregoing shall be brought in any federal or state court of competent jurisdiction located within the State of Delaware, and the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the State of Delaware over any such action. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 5.08 Waiver of Jury Trial. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, AND AGREES TO CAUSE ITS AFFILIATES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 5.09 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement.

Section 5.10 Successors and Assigns. The provisions of this Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns. No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement (including any transfer by way of merger or operation of law) without the consent of the other party, and any such purported assignment in violation of this Section 5.10 shall be void *ab initio*. Notwithstanding the foregoing, the Preferred Unit Purchaser may assign its rights and obligations under this Agreement without

the prior approval of the other party to this Agreement to any fund or account managed, advised or sub-advised by GSO or any of its Affiliates; provided that any such assignment shall not relieve the Preferred Unit Purchaser of any of its obligations hereunder.

Section 5.11 Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

Section 5.12 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any party may be a partnership or limited liability company, each party hereto, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that, no Persons other than the parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any party (or any of their successors or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the parties, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such persons and entities, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

Section 5.13 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or by any creditors of any Subsidiary or Affiliate of the Partnership.

Section 5.14 Remedies Generally. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy

for any reason at Law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 5.14 shall not be required to provide any bond or other security in connection with any such injunction.

*[signature page follows]*

Case 23-34508 Document 1354-7 Filed in TXSB on 06/22/20 Page 537 of 1759

IN WITNESS WHEREOF, the parties hereto execute this Agreement, effective as of the Effective Date.

**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: ____________________
Name:
Title:

**GSO ST HOLDINGS LP**

By: GSO ST ASSOCIATES LLC, its General Partner

By: ____________________
Name:
Title:

Exhibit F

LTM EBITDA Levels

| | maximum levels for each applicable calendar year ended | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 12/31/24 | 12/31/25 | Thereafter |
| Ratio of (x) the sum of outstanding indebtedness of the Partnership Group Companies and the Base Preferred Return Amount to (y) LTM EBITDA (as defined in the Credit Agreement) | 3.0x | 3.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x | 2.0x |

# Exhibit G

Case 19-34508 Document 1353-7 Filed in TXSB on 06/22/20 Page 540 of 1759
Case 4:23-cv-00587 Document 1-4 Filed on 04/19/23 in TXSD Page 24 of 251

EX-10.9 21 sn-20170331ex1098e1ee4.htm EX-10.9

**Exhibit 10.9**

**JOINT DEVELOPMENT AGREEMENT**

**By and Among**

**GAVILAN RESOURCES, LLC,**

**SN EF MAVERICK, LLC,**

**SN EF UNSUB, LP,**

**and**

**SANCHEZ ENERGY CORPORATION, but solely with respect to Section 2.2, Section 4.2, Section 4.5 and Article VII**

**Dated as of March 1, 2017**

---

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 | SPECIFIC DEFINITIONS | 1 |
| 1.2 | CONSTRUCTION | 1 |
| ARTICLE II WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES | | 2 |
| 2.1 | WORKING INTEREST | 2 |
| 2.2 | REPRESENTATIONS AND WARRANTIES | 2 |
| ARTICLE III OPERATING COMMITTEE; BUDGETS AND WORK PLAN | | 2 |
| 3.1 | MANAGEMENT BY OPERATING COMMITTEE | 2 |
| 3.2 | FUNCTION OF THE OPERATING COMMITTEE | 2 |
| 3.3 | OPERATING COMMITTEE | 4 |
| 3.4 | MEETINGS OF THE OPERATING COMMITTEE | 5 |
| 3.5 | QUORUM AND VOTING | 6 |
| 3.6 | DEADLOCK MECHANISMS | 7 |
| 3.7 | BUDGETS AND WORK PLAN; AFES AND APPROVED OPERATIONS | 8 |
| 3.8 | OPERATORSHIP UNDER THE OPERATING AGREEMENT | 11 |
| 3.9 | DEFAULT | 18 |
| ARTICLE IV TRANSFER; EXIT OPPORTUNITIES | | 19 |
| 4.1 | RESTRICTIONS ON THE TRANSFER OF INTERESTS | 19 |
| 4.2 | TAG-ALONG RIGHT | 21 |
| 4.3 | RIGHT OF FIRST OFFER | 24 |
| 4.4 | INITIAL PUBLIC OFFERING | 26 |
| 4.5 | SALE TRANSACTION | 26 |
| ARTICLE V ADDITIONAL COVENANTS | | 34 |
| 5.1 | INFORMATION RIGHTS | 34 |
| 5.2 | AREA OF MUTUAL INTEREST | 35 |
| 5.3 | SPACING PROTECTIONS | 38 |
| 5.4 | COOPERATION | 40 |
| ARTICLE VI TERM AND TERMINATION | | 40 |
| 6.1 | TERM AND TERMINATION | 40 |
| 6.2 | EFFECT OF TERMINATION | 41 |
| ARTICLE VII GENERAL PROVISIONS | | 41 |
| 7.1 | ENTIRE AGREEMENT | 41 |
| 7.2 | WAIVERS | 41 |
| 7.3 | ASSIGNMENT; BINDING EFFECT | 42 |
| 7.4 | GOVERNING LAW; SEVERABILITY | 42 |
| 7.5 | FURTHER ASSURANCES | 42 |
| 7.6 | COUNTERPARTS | 42 |
| 7.7 | CONFIDENTIAL INFORMATION | 43 |
| 7.8 | NO THIRD PARTY BENEFICIARIES | 44 |
| 7.9 | NON-SOLICITATION | 45 |
| 7.10 | NOTICES | 45 |
| 7.11 | REMEDIES | 47 |
| 7.12 | DISPUTES | 48 |

| | | |
|---|---|---|
| 7.13 | EXPENSES | 49 |
| 7.14 | NO RECOURSE | 49 |
| 7.15 | CONFLICT | 50 |
| 7.16 | SUBCHAPTER K | 50 |
| 7.17 | RELATIONSHIP OF SN AND SN UNSUB | 50 |
| 7.18 | OPERATING COMMITTEE; AFFILIATES | 51 |
| 7.19 | FORCE MAJEURE | 51 |

| | |
|---|---|
| Annex I | Definitions |
| Annex II | Representatives |
| Annex III | Working Interests |
| Annex IV | Approved Financial Advisor Arbiters |
| Annex V | Existing Producing Wells |
| Annex VI | Existing Drilled and Uncompleted Wells |
| Annex VII | Restricted Areas |
| Exhibit A | [Intentionally omitted] |
| Exhibit B | Form of Operating Agreement |
| Exhibit C | Area of Mutual Interest |
| Exhibit D | Form of Assignment |
| Exhibit E | Form of Memorandum of Joint Development Agreement |
| Exhibit F | Form of Notice of Termination of the Joint Development Agreement |

1. JOINT DEVELOPMENT AGREEMENT

This **JOINT DEVELOPMENT AGREEMENT** (this "Agreement"), is entered into as of March 1, 2017 (the "Effective Date"), by and between SN EF Maverick, LLC, a Delaware limited liability company ("SN"), SN EF UnSub, LP, a Delaware limited partnership ("SN UnSub"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Blackstone"), and, solely for the purposes of Section 2.2, Section 4.2, Section 4.5 and Article VII, Sanchez Energy Corporation, a Delaware corporation ("Sanchez Energy"). Each of SN, SN UnSub, Sanchez Energy (with respect to the provisions of this Agreement to which it is a party) and Blackstone are referred to herein individually as a "Party" and collectively as the "Parties."

RECITALS

**WHEREAS**, the Parties and, solely for the purposes of Section 15.22 thereof, Sanchez Energy, entered into that certain Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko") and the Parties (the "Purchase Agreement"), pursuant to which the Parties collectively purchased all of the Working Interests of Anadarko comprising an undivided fifty percent (50%) Working Interest in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas, as described in more detail in Annex III; and

**WHEREAS**, the Parties desire to enter into this Agreement in connection with the transactions and conveyances contemplated by the Purchase Agreement to, among other things, provide for certain capital planning, operatorship, transfer, and economic rights between the Parties with respect to the development, operation, and maintenance of the Assets and the Parties' interests therein.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

**1.1 Specific Definitions.** Capitalized terms used in this Agreement shall be given the meanings ascribed to such terms on Annex I.

**1.2 Construction.** Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular shall include the plural, and the plural shall include the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections, or

subdivisions thereof shall refer to the corresponding article, section, or subdivision thereof of this Agreement unless specific reference is made to such articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words “include,” “includes” and “including” shall be deemed to be followed by the words “without limitation,” and the words “hereof,” “herein,” “hereunder,” and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.

**ARTICLE II**
**WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES**

**2.1** **Working Interest.** As of the Effective Date, the Parties each own the Working Interests in each of the Leases as set forth on Annex III.

**2.2** **Representations and Warranties**. Each of the Parties, severally and not jointly, solely in respect of itself and not another Party, hereby represents and warrants to the other Parties as follows as of the Effective Date: (a) such Party is duly formed, validly existing, and in good standing under the laws of its jurisdiction of formation, (b) such Party has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver and perform this Agreement, (c) such Party has duly executed and delivered this Agreement and this Agreement is legal, valid, and binding with respect to such Party and is enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, or similar laws affecting creditors’ rights generally, (d) except to the extent contemplated herein, no permit, consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or Third Party (collectively, “Consents”) is required in connection with the execution, delivery, or performance by such Party of this Agreement, or to consummate any transactions contemplated hereby that have not been obtained or waived prior to the Effective Date, and (e) *provided*, that the Consents are obtained, the authorization, execution, delivery, and performance of this Agreement by such Party does not, and will not, breach or conflict with or constitute a default under (A) such Party’s organizational documents or (B) any agreement or arrangement to which such Party is a party or by which it is otherwise bound.

**ARTICLE III**
**OPERATING COMMITTEE; BUDGETS AND WORK PLAN**

**3.1** **Management by Operating Committee**. The Parties hereby establish an operating committee composed of representatives (each, a “Representative”) from the Parties duly appointed in accordance with this Article III (the “Operating Committee”). The Operating Committee shall exercise its rights and carry out its duties over the Assets in compliance with this Agreement.

**3.2** **Function of the Operating Committee**. The Parties agree that, among the Parties, the timing, scope and budgeting of operations on the Assets (other than with respect to the Initial Budget and Work Plan) and amendments to the Initial Budget and Work Plan shall be ultimately

approved by the Operating Committee. To the extent permitted or allowed under the applicable Operating Agreement, the Operator shall, in its own discretion and in accordance with the applicable Operating Agreement, propose, approve, and undertake any actions or decisions pursuant to such applicable Operating Agreement unless Unanimous Consent of the Operating Committee is required under this Agreement. The Operating Committee shall have no authority over the ownership of any interest in an Asset, which authority shall remain exclusively with the Party holding such ownership interest, subject to the other terms of this Agreement, including Article IV. The matters set forth below shall require the Unanimous Consent of the Operating Committee, and each Party agrees that it will not take or knowingly facilitate, and will cause its Controlled Affiliates and shall use its reasonable best efforts to cause its other Affiliates not to take or knowingly facilitate, any action under any applicable Operating Agreement or otherwise with respect to the Assets contemplated by clauses (a) through (h) of this Section 3.2 without the Unanimous Consent of the Operating Committee.

(a) approving any Subsequent Budget and Work Plan;

(b) making any amendments or modifications of the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan; *provided*, that, any increase to the aggregate amount of expenditures in the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan (as applicable) shall not require Unanimous Consent of the Operating Committee so long as such increase would not exceed the approved budgeted amount by more than ten percent (10%) and is otherwise consistent with the applicable Approved Budget;

(c) approving any AFE with respect to an Approved Operation to the extent that all AFEs issued for such Approved Operation exceed one hundred twenty percent (120%) of the budgeted amount for such Approved Operation in an Approved Budget; *provided*, *however*, that any AFEs so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(d) approving any E&D Operations or S&A Operations proposed by a Third Party unless previously authorized pursuant to an Approved Budget; *provided*, *however*, that any such E&D Operations or S&A Operations that are so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(e) designating a new Operator (other than as provided in Section 3.8(e) or Section 3.8(f));

(f) commencing or settling litigation related to the Assets that affect or would reasonably be expected to affect all Parties with respect to their ownership of the Working Interests, if the claims or settlements at issue exceed, or would reasonably be expected to exceed, a total of $2,000,000 in the aggregate or otherwise involve any equitable relief, or request for equitable relief, related to the Assets;

(g) amending this Agreement or any applicable Operating Agreement; and

(h) approving or amending of any Material Contracts.

(i) In the event that the Operating Committee approves any matter under Section 3.2 by Unanimous Consent, each Party shall take, and shall cause its Affiliates to take, such actions within such Party's Control under an applicable Operating Agreement that are reasonably necessary to effectuate such approved matter (and shall not knowingly take any action that could reasonably be expected to subvert, or otherwise materially interfere with the effectuation of such approved matter, including by encouraging Third Party Working Interest holders under an Operating Agreement to submit alternative or competing proposals against those proposals approved by the Operating Committee pursuant to this Section 3.2). Without limiting the generality of the foregoing but subject to Section 3.7(c), each Party will vote its respective Working Interests under an applicable Operating Agreement in favor of, and make appropriate elections with respect to, and the Operator will make proposals for the activities contemplated by, matters that have been approved by the necessary consents required by this Section 3.2 as provided hereunder, and are otherwise in accordance with the terms of this Agreement and any applicable Operating Agreement. Once a matter is approved pursuant to the applicable Operating Agreement, the Joint Exploration Agreement, and the Participation Agreement, the provisions of such other agreements shall control the implementation of such matter other than as expressly set forth in this Agreement.

**3.3 Operating Committee.**

(a) *Composition.*

(i) The Operating Committee shall consist of six (6) natural persons.

(ii) SN shall have the right to appoint two (2) Representatives and SN UnSub shall have the right to appoint one (1) Representative (each, a "Sanchez Representative"), *provided*, *however*, at any time following a Qualified Foreclosure Transfer, the Qualified Foreclosure Transferee shall have the right to appoint one (1) Representative (the "Qualified Foreclosure Transferee Representative") and SN shall have the right to appoint two (2) Representatives (which such two (2) Representatives shall then be the only Sanchez Representatives hereunder), and SN UnSub will no longer have the right to appoint a Representative. Notwithstanding anything in this Agreement to the contrary, (a) SN shall have the right to direct the vote of each Sanchez Representative appointed by SN, (b) SN UnSub will have the right to direct the vote of the Sanchez Representative appointed by SN UnSub, and (c) the Qualified Foreclosure Transferee shall have the right to direct the vote of the Qualified Foreclosure Transferee Representative. Notwithstanding anything to the contrary in this Agreement, at any time that SN is in Default, the Sanchez Representative appointed by SN UnSub shall be an investment professional affiliated with GSO for so long as GSO owns any interest in SN UnSub.

(iii) Blackstone shall have the right to appoint three (3) Representatives (each, a "Blackstone Representative"). Notwithstanding anything in this Agreement to the contrary, Blackstone shall have the right to direct the vote of each Blackstone Representative.

(iv) The initial Representatives are set forth on Annex II.

(v) Each Representative may vote by delivering his or her written proxy to another Representative. A Representative shall serve until such Representative resigns or is removed as provided in Section 3.3(b).

(b) *Resignation; Removal and Vacancies*. Any Representative may resign at any time by giving written notice to the Operating Committee. The resignation of any Representative shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Sanchez Representative may be removed at any time, with or without cause, by (and only by) SN (if such Sanchez Representative was appointed by SN) or SN UnSub (if such Sanchez Representative was appointed by SN UnSub). Any Blackstone Representative may be removed at any time, with or without cause, by (and only by) Blackstone. Any Qualified Foreclosure Transferee Representative may be removed at any time, with or without cause, by (and only by) the Qualified Foreclosure Transferee. The removal of a Representative shall be effective only upon receipt of notice thereof by the remaining Representatives and by SN, SN UnSub, Blackstone, or the Qualified Foreclosure Transferee, as applicable. Any vacancy in the number of Representatives occurring for any reason shall be filled promptly by the appointment of a new Representative by (i) SN, with respect to a Sanchez Representative appointed by SN, (ii) SN UnSub, with respect to a Sanchez Representative appointed by SN UnSub, (iii) Blackstone, with respect to a Blackstone Representative, and (iv) the Qualified Foreclosure Transferee, with respect to the Qualified Foreclosure Transferee Representative. The appointment of a new Representative is effective upon receipt of notice thereof by or at such time as shall be specified in such notice to the remaining Representatives.

**3.4 Meetings of the Operating Committee.**

(a) Regular meetings of the Operating Committee shall be held on a regular basis, but not less than monthly, at such times or places as may be determined by the Operating Committee. Special meetings of the Operating Committee may be called by any of the Representatives, subject to the requirements listed under Section 3.4(b). Each Party shall use reasonable best efforts, in good faith, to cause its designated Representatives to attend each regular or special meeting of the Operating Committee. The Operating Committee and the Operator shall hold bi-monthly conference calls on the 1st and the 15th of each month (or if any such dates are not a Business Day, the immediately following Business Day) to discuss the daily drilling operations, the production reports required to be provided pursuant to Section 5.1(a) and other operational updates during regular business hours, and the Operator shall otherwise provide the Parties with full access to, and shall make its personnel available upon reasonable prior notice to discuss with the Operating Committee such matters; *provided*, that upon the reasonable request by any Party, the Operating Committee and Operator will hold additional conference calls not to exceed one conference call per week.

(b) Notice of the time and place of any regular meeting of the Operating Committee shall be in accordance with the meeting schedule approved by the Operating

Committee or as otherwise agreed to by the Parties. Special meetings of the Operating Committee may be called by any Party by providing notice to the Representatives at least three (3) days prior to such meeting. Special meetings of the Operating Committee to deal with emergencies may be called by a Party providing at least twelve (12) hours' notice prior to the meeting, so long as each Representative provides written confirmation of receipt of notice or waives notice (including by attending the emergency meeting). Written notice of meetings of the Operating Committee, including the purpose of the meeting for special (including emergency) meetings, shall be given to each Representative with the notice of the meeting. Any Representative may waive notice of any meeting by the execution of a written waiver prior or subsequent to such meeting. The attendance of a Representative at any meeting shall constitute a waiver of notice of such meeting, except where a Representative attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction or voting of any business or matter because the meeting has not been lawfully called or convened. Notice may be given by electronic mail to an electronic mail address provided in writing by a Representative, by facsimile to a facsimile number provided in writing by a Representative, by personal delivery, or by national reputable courier service such as Federal Express or United Parcel Service to an address specified in writing by a Representative.

(c) The Operating Committee may adopt whatever rules and procedures relating to its activities as it may deem appropriate; *provided*, that such rules and procedures shall not be inconsistent with or violate the provisions of this Agreement; and *provided*, *further*, that such rules and regulations shall permit Representatives to participate in meetings (and the representatives of the Parties to observe) by telephone, video conference or the like, or by written proxy, and such participation shall be deemed attendance for purposes of determining whether a Quorum is present.

(d) At each regular meeting of the Operating Committee, the Operator shall update the Operating Committee on the operational performance of the Assets being operated by the Operator, including by presenting relevant quality, health, safety and environmental metrics regarding operations.

**3.5 Quorum and Voting.**

(a) At all meetings of the Operating Committee, the presence of a majority of the Representatives (including at least one (1) Sanchez Representative appointed by SN, one (1) Blackstone Representative and either the Sanchez Representative appointed by SN UnSub or the Qualified Foreclosure Transferee Representative, as applicable) shall be necessary and sufficient to constitute a quorum of the Operating Committee for the transaction of business (a "Quorum").

(b) Each Representative shall be entitled to one (1) vote on each matter to be voted upon by the Operating Committee.

(c) All actions and approvals of the Operating Committee listed in Section 3.2(a)-(h) shall be approved and passed at a meeting at which a Quorum is present by Unanimous Consent.

(d) Any Representative may participate in a meeting of the Operating Committee via conference telephone or any communications equipment that allows all Representatives and other individuals participating in the meeting to communicate with each other.

(e) Any action required or permitted to be taken at any meeting of the Operating Committee may be taken without a meeting or a vote, if consents in writing, setting forth the action so taken, are signed by Representatives constituting Unanimous Consent. Each written consent shall bear the date and signature of each Representative who signs the consent.

**3.6 Deadlock Mechanisms.**

(a) If any matter or proposal requiring Unanimous Consent for approval by the Operating Committee (i) is brought before the Operating Committee and such matter or proposal is not approved by Unanimous Consent or (ii) would have been brought before the Operating Committee, but for the fact that a Quorum was not present at three (3) consecutive meetings called for the purpose of approving such matter or proposal, then any Representative(s), by written notice to the other Representatives may call a meeting of the Operating Committee to reconsider such matter or proposal. Such meeting shall be held when, where and as reasonably specified in such notice, but not less than three (3) Business Days nor more than seven (7) Business Days after such notice has been delivered. If such meeting is called and held as provided in the immediately preceding sentence and the matter or proposal is offered at such meeting again and (A) is not approved by Unanimous Consent or (B) a Quorum is not present at such Operating Committee meeting, then any Representative(s) may within three (3) Business Days thereafter, declare a deadlock (a "Deadlock") by giving written notice to the other Representatives containing a brief description of the nature of the issue subject to such Deadlock (a "Deadlock Notice"). A Deadlock may also be declared as provided in Section 5.3(e)(ii). All Deadlocks shall be subject to the provisions of Section 3.6(b) and, if applicable, mediation, in accordance with Section 3.6(c).

(b) Within ten (10) Business Days after the receipt of a Deadlock Notice, a designated senior executive from each Party shall meet in good faith effort to reach an accord that will end the Deadlock. If a decision is not made by common accord that ends the Deadlock within ten (10) Business Days after the date of such meeting, any Representative(s) may declare a final Deadlock (a "Final Deadlock") by providing written notice to the other Representative (a "Final Deadlock Notice"). Notwithstanding anything in this Agreement to the contrary, if the designated senior executive of any Party is unwilling or unable to meet with the designated senior representative of any other Party, then any Representative(s) may immediately invoke the provisions of Section 3.6(c).

(c) If within ten (10) Business Days following receipt of a Final Deadlock Notice, the matter or proposal subject to such Final Deadlock remains in contention, then any Representative may subject the matter or proposal to non-binding mediation, which process shall be conducted as promptly as reasonably practicable, and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such non-binding mediation.

**3.7 Budgets and Work Plan; AFEs and Approved Operations.**

(a) *Initial Budget and Work Plan.* On the Effective Date, the Parties approved an Initial Budget and Work Plan (as may be amended from time to time by Unanimous Consent under Section 3.2(a), the "Initial Budget and Work Plan"), which sets forth estimates of the amounts to be incurred by the Operator (subject to authorization required under an applicable Operating Agreement) to conduct (x) the activities approved in such Initial Budget and Work Plan and (y) other operations related to the Assets contemplated by such Initial Budget and Work Plan, in each case, from the Effective Date through the second (2nd) anniversary of the execution of the Purchase Agreement (such activities and operations being the "Initial Approved Operations"). Each AFE issued by the Operator to implement an Approved Operation shall be deemed an Approved AFE in accordance with Section 3.2(c) and each Party shall consent to such Approved AFEs under any applicable Operating Agreement. Operator shall promptly issue supplements to any Approved AFE that it reasonably anticipates will exceed the estimated expenditures thereunder by one hundred twenty percent (120%) of the budgeted amount subject to approval by Unanimous Consent of the Operating Committee.

(b) *Subsequent Budgets and Work Plans.*

(i) The Operator shall prepare and submit to the Operating Committee for approval no later than October 1, 2018, and every October 1 thereafter, (A) a proposal for E&D Operations and S&A Operations to be conducted by the Operator during the subsequent twelve (12) month period and (B) a proposed budget (together, a "Subsequent Budget and Work Plan") which sets forth in reasonable detail the projects and activities (the "Subsequent Proposed Operations") and estimated amounts expected to be incurred by the Operator during the subsequent twelve (12) month period to conduct (x) the Subsequent Proposed Operations and (y) other estimated operating expenses related to the Assets. For the avoidance of doubt the expiration of an Approved Budget shall not affect any Approved Operation in such Approved Budget which is not yet complete. In the event that there is more than one Operator as a result of a Division of Operatorship or any other reason, then the applicable Post-Division Operators shall cooperate in good faith to submit such proposals to the Operating Committee as contemplated above.

(ii) The Operating Committee shall work in good faith to approve or disapprove of the Subsequent Budget and Work Plan no later than forty-five (45) days prior to the expiration date of the Approved Budget then in effect. Upon approval, the Subsequent Budget and Work Plan shall become the Approved Budget (all Subsequent Proposed Operations, as may be approved or amended by the Operating Committee, shall become "Subsequent Approved Operations").

(iii) If the Operating Committee approves the Subsequent Budget and Work Plan, then the Operator shall (A) use its reasonable best efforts to propose to Working Interest holders under any applicable Operating Agreement and put into effect such Subsequent Approved Operations in accordance with the Approved Budgets and (B) incur

costs and expenses in accordance with the Approved Budget, in each case to the extent such actions are approved by the required vote under the applicable Operating Agreement.

(iv) If the Operating Committee fails to approve a Subsequent Budget and Work Plan by the expiration date of the Approved Budget then in effect, and such Approved Budget is (A) the Initial Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith (as among the Representatives and between the Operating Committee and the Operator, as applicable) for a six (6) month period following the expiration of the Initial Budget and Work Plan, or (B) any Subsequent Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith for a three (3) month period following the expiration of the applicable Approved Budget (as applicable, the "Budget Negotiation Period"). During the Budget Negotiation Period, until a Subsequent Budget and Work Plan is approved by the Operating Committee and agreed to by the Operator, the most recent Approved Budget shall remain in effect as between the Parties, subject to a ten percent (10%) increase for each line item of the then-existing Approved Budget during the Budget Negotiation Period, after which all activities shall cease if a Subsequent Budget and Work Plan is not approved; *provided*, that, during the Budget Negotiation Period, the Operator shall use its reasonable best efforts to (A) for the first three months during a Budget Negotiation Period, continue to engage in E&D Operations and S&A Operations which were approved pursuant to Approved Budgets (but for the avoidance of doubt, except as specifically approved by the Operating Committee pursuant to Section 3.2, the Operator shall not be authorized to engage in any E&D Operations or S&A Operations not included in an Approved Budget) (*provided*, that after such Budget Negotiation Period, no new E&D Operations and S&A Operations may be initiated regardless of whether they were previously included in an Approved Budget), (B) take such actions as may be necessary to comply with the APC Well Commitment and satisfy continuous drilling obligations and otherwise maintain the Leases in accordance with their terms, and (C) incur costs and expenses in the ordinary course of business in amounts consistent with the most recent Approved Budget, including with respect to producing wells pursuant to any applicable Operating Agreement, in each case to the extent such actions are approved by the required vote or are otherwise permissible under the applicable Operating Agreement.

(c) *Approval of Additional Activities.* From time to time, SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee may present to the Operating Committee, E&D Operations and S&A Operations proposed to be undertaken with respect to the Assets that were not included in an Approved Budget.

(i) For any new E&D Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional E&D Proposal"), SN, SN UnSub or Blackstone or, if applicable, the Qualified Foreclosure Transferee, shall present to the Operating Committee and the Operator (A) proposed revisions to the Approved Budget in respect of such activities, (B) the surface location and objective formation of each vertical and lateral wellbore included in the Additional E&D Proposal, (C) the proposed spud and completion dates for each such wellbore, (D) relevant seismic/geophysical and reservoir

data, anticipated oil, gas, and liquids ratios, initial production and estimated ultimate recovery figures, decline curves, and the drilling and completion design for each proposed well, (E) the total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by well, (F) an AFE in respect of such Additional E&D Proposal, and (G) any other information reasonably requested by the Operating Committee and the Operator. The Operating Committee and the Operator shall evaluate such Additional E&D Proposal and such portion of the Additional E&D Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the applicable Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.2 and Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(ii) For any new S&A Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional S&A Proposal"), SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee shall present to the Operating Committee and the Operator, (A) proposed revisions to the Approved Budget in respect of such activities, (B) the proposed date of commencement of such activities and the proposed development and construction program for each included project (including the proposed timing and project scheduling), (C) the anticipated upside/cost saving for each included project and total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by project, (D) an AFE in respect of such Additional S&A Proposal, (E) any relevant data from any prior or comparable operations undertaken by SN, Blackstone or, if applicable, the Qualified Foreclosure Transferee or third parties relevant to the cost/benefit analysis of the proposed project(s), and (F) any other information reasonably requested by the Operating Committee or the Operator. The Operating Committee and the Operator shall evaluate such Additional S&A Proposal and such portion of the Additional S&A Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(d) *Timely Payment Commitment*. Notwithstanding anything in the applicable Operating Agreements to the contrary, on or before the 15th day of each month, Operator shall provide the other Party(ies) an invoice ("Monthly Invoice") for (i) such Party(ies) proportionate share of all projected cash outlays for the following month ("Estimated Cash Outlays") and (ii) any adjustments to the previously sent invoices so that the amount ultimately paid by a Party for a given month is equal to the actual amounts expended by Operator for such month ("True-Up Amount") (e.g., Operator will send a Monthly Invoice on or before June 15 and such Monthly Invoice will consist of the Estimated Cash Outlays for July plus or minus a True-Up Amount (if any) to reconcile the Estimated Cash Outlays for May). Each Party shall pay the Monthly Invoice on or before the last day of the month in which the Monthly Invoice was delivered to such Party.

(e) *APC Well Commitment; Other Required Actions.* Unless otherwise approved by the Operating Committee by Unanimous Consent, Operator will propose wells necessary to the meet the APC Well Commitment and avoid any financial penalty thereunder and shall be authorized to take any other action to the extent necessary to meet any continuous drilling obligations under any Lease. To the extent Operator does not propose such wells when required pursuant to the foregoing sentence, any Party is permitted to propose wells under any applicable Operating Agreements in order to ensure such APC Well Commitment is satisfied to the extent that failure to propose wells at such point in time would reasonably be likely to result in financial penalty under the APC Well Commitment. Further, any Party shall be permitted to propose the taking of any other action reasonably required to meet any continuous drilling obligations under any Lease.

**3.8 Operatorship Under the Operating Agreement.**

(a) As of the Effective Date, the Parties acknowledge and agree that SN is designated as the operator of the Assets pursuant to, and in accordance with, the Operating Agreements (in such capacity, "Sanchez Operator"). As contemplated by this Agreement, Blackstone or its designee, including a buyer or its designee in connection with a Sale Transaction may succeed to SN's status as operator of some or all of the Assets (in such capacity, "Blackstone Operator") and, in that event, Sanchez Operator may thereafter succeed to Blackstone Operator's status as operator of some or all of the Assets. Sanchez Operator and Blackstone Operator shall be referred to interchangeably as the "Operator," and each reference to the "Operator" herein means either Sanchez Operator or Blackstone Operator, depending on which of such parties holds the operatorship of the Assets in question following the receipt of all Required Operatorship Consents. For the avoidance of doubt, the term "Operator" does not include any successor Third Party operator of the Assets other than Blackstone Operator once such successor Third Party operator has obtained all Required Operatorship Consents with respect to any applicable Lease, Wellpad or other Asset. None of the Operating Committee or the Parties, by virtue of their ownership of an interest in the Assets, shall have any power, authority, or any Control over the day-to-day operation or management of the Assets, which authority and obligations reside with the Operator pursuant to the Operating Agreements. The Operator shall use its reasonable best efforts to execute an Approved Budget as agreed upon by the Parties pursuant to this Agreement and act under each Operating Agreement consistently with this Agreement, including with respect to carrying out the development plan and budget as set forth in an Approved Budget; *provided*, *however*, notwithstanding anything to the contrary herein, if this Agreement and the express requirements of the Operator under an Operating Agreement directly conflict, the Operator shall comply with such Operating Agreement to the extent necessary to avoid violating the terms of such Operating Agreement; *provided*, *further*, that Operator shall use reasonable best efforts to follow the estimated detailed drilling and completion specifications set forth in each Approved Budget but immaterial deviations shall not require an amendment of the applicable Approved Budget or an approval by Unanimous Consent of the Operating Committee nor shall such immaterial deviations be considered a default or breach of the Operator's obligations under this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, including the Operating Committee's actions pursuant to Section 3.2, if any Party reasonably believes there is any emergency involving actual or imminent loss of life, material damage to any of the Assets or the environment, or substantial and immediate financial loss, such Party may, in the sole exercise of its discretion, act for and on behalf of the Parties (including by causing the Operator to take such actions) in any manner reasonably necessary or useful under the circumstances without the necessity of giving prior notice to the other Parties or receiving any approval or consent from the Operating Committee or any Party. In the event that any Party takes any action pursuant to this Section 3.8(b) without the prior approval of the Operating Committee, such Party shall promptly (but in all events within twenty-four (24) hours) notify the Operating Committee of the taking of such actions.

(c) Without the prior written consent of Blackstone, SN UnSub, and if applicable, the Qualified Foreclosure Transferee, except as required to implement a transfer of operatorship required by this Agreement, SN (in its capacity as Sanchez Operator) shall not resign or attempt to resign as the operator under any Operating Agreement or take or omit to take any action that would effectively or constructively result in the termination of its status as operator under any Operating Agreement.

(d) In the event of a transfer of operatorship under any Operating Agreement in accordance with Section 3.8(f), the Alternate Operator or its designee as successor operator shall, as a condition to such transfer, be deemed to become a party to this Agreement as Operator under such Operating Agreement and be bound by the terms hereof in the same capacity as Operator, *mutatis mutandis*, and if not a Party to this Agreement, such operator shall be required to execute a joinder of this Agreement to such effect, and the Defaulting Operator shall be automatically discharged from all further obligations as the Operator under this Agreement with respect to any such Operating Agreement and the Assets subject to such Operating Agreement.

(e) *Division of Operatorship.* The following rights and procedures shall apply if (i) the Operating Committee is unable to approve a Subsequent Budget and Work Plan within the Budget Negotiation Period or (ii) either Blackstone or SN otherwise elects to cause a Division of Operatorship pursuant to this Section 3.8(e) for any reason during a Budget Negotiation Period or, as applicable, in the event that an Equitable Partition is to be consummated pursuant to Section 4.5, then, upon the expiration of such Budget Negotiation Period or at any time during such Budget Negotiation Period:

(i) Either Blackstone or SN shall have the right to cause a division of operatorship (a "Division of Operatorship") pursuant to which, subject to the terms of the applicable Operating Agreements and the other provisions of this Section 3.8(e), the rights to operatorship pursuant to applicable Operating Agreements for the Wellpads shall be divided between Blackstone Operator and Sanchez Operator on a geographic Wellpad-by-Wellpad basis approximating an alternating, checkerboard pattern (or such other pattern as may be mutually agreed by SN and Blackstone), such that once the Division of Operatorship is completed, such Division of Operatorship shall (A) result in Blackstone Operator and Sanchez Operator each having rights to operatorship pursuant to applicable

Operating Agreements over a number of Wellpads that constitute approximately fifty percent (50%) of the aggregate Fair Market Value of (x) the Working Interests underlying all the Wellpads and (y) the Existing Producing Wells and related offset locations and sections, and (B) evenly (or as evenly as commercially practicable) distribute to Blackstone Operator and Sanchez Operator: (1) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (2) producing wells and current production, (3) remaining reserves, (4) potential future well locations, and (5) operatorship of the Existing Producing Wells and related offset locations and sections (an "Equitable Division") and (6) in the case of an Alternative Equitable Partition, such other criteria set forth in Section 4.5(a). Upon the election of any Party to cause a Division of Operatorship, SN and Blackstone shall negotiate in good faith for a period of forty-five (45) days to designate by area, and based on substantially equal geographic divisions, all Wellpads under the Leases based on customary industry practices and their respective reserve reports covering the previous twelve (12) month period and agree upon an Equitable Division. If, following such forty-five (45) day period, SN and Blackstone are unable to agree upon an Equitable Division, each of them shall retain an independent, Third Party financial advisor or investment bank with expertise in valuing oil and gas assets in the Eagle Ford Shale (a "Financial Advisor") to determine an Equitable Division which will largely be based on such Party's engineering and geological reserve reports for the last twelve (12) month period and taking into account the then current strip pricing forecast. Sanchez and Blackstone shall each present the results of its Financial Advisor and provide its associated reserve reporting, including reasonable supporting information, after a period of thirty (30) days to the other Party and each such Party shall have ten (10) days to review the proposal of such other Party. If SN and Blackstone are unable to agree upon an Equitable Division after the period described in the preceding sentence, then SN and Blackstone shall choose within ten (10) Business Days a third Financial Advisor and an engineering and geological advisor to audit the reserve reports of SN and Blackstone (the "Reserve Auditor") from among the entities listed on Annex IV (or if SN and Blackstone are unable to agree on a Reserve Auditor and/or the third Financial Advisor within a reasonable timeframe, they shall cause the other Financial Advisors to choose a third Financial Advisor and Reserve Auditor from among the entities listed on Annex IV within the subsequent five (5) Business Day period) to determine an Equitable Division which shall (A) be based on the provisions set forth in this Section 3.8(e), (B) reflect the Equitable Division proposals by the two (or three, in the case of an Equitable Partition) Financial Advisors (unless such proposal is not consistent with the terms herein in which case such proposal will be rejected and not considered), (C) be rendered as promptly as practicable (but in any event no later than thirty (30) days after the appointment of such Financial Advisor and Reserve Auditor), and (D) be binding on the Parties. The Parties shall cooperate to provide all relevant information reasonably requested by such third Financial Advisor in connection with the determination of a final Equitable Division, including the audit of the Reserve Auditor of the reserve reports provided by SN and Blackstone. With respect to each applicable Operating Agreement, the Party (or its designee) who had operatorship prior to the Division of Operatorship shall be referred to as the "Pre-Division Operator," the Party who is awarded

operatorship pursuant to such Division of Operatorship (or where applicable pursuant to an Equitable Partition) shall be referred to as the "Post-Division Operator," and the other Party to such Division of Operatorship shall be referred to as the "Post-Division Non-Operator." For the avoidance of doubt, in the case of an Equitable Partition pursuant to Section 4.5(a), the provisions of this Section 3.8(e)(i) shall be deemed and interpreted to include SN UnSub as a participant in the Equitable Partition evaluation and determination process, such that GSO (acting on behalf of SN Unsub, as contemplated in Section 4.5 (i)) shall have full rights to participate equally with SN and Blackstone in determining the Equitable Partition in a manner consistent with the terms and conditions of Section 4.5(a) and this Section 3.8(e), including the right to appoint a Financial Advisor and Reserve Auditor.

(ii) Following the final resolution of an Equitable Division pursuant to Section 3.8(e)(i) or an Equitable Partition pursuant to Section 4.5, each Party shall use its reasonable best efforts to take or cause to be taken all actions required to obtain as promptly as practicable any necessary consents or amendments required for a change in operatorship (the "Required Operatorship Consents") under the Leases, Operating Agreements and any other Material Contracts, including all purchase, marketing, transportation, storage, processing and/or sales contracts, related to the Wellpads or Leases reasonably identified by a Party and any other actions reasonably necessary or desirable to effect a Division of Operatorship or an Equitable Partition, including any required notices or filings with applicable Governmental Authorities. If any such required consent or amendment for a Wellpad or Lease is not obtained by the time an Equitable Division or an Equitable Partition, respectively, has been finalized pursuant to Section 3.8(e)(i), then the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment and until such consent or amendment is obtained (or until such other time as the Post-Division Operator reasonably determines that it has the right and capability to assume operatorship), the Pre-Division Operator shall maintain formal rights of operatorship for such Wellpad or Lease and the Post-Division Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad or Lease based on customary terms and conditions, whereby the Post-Division Operator shall have the right to physically conduct all operations, and/or (B) direct the Pre-Division Operator in its exercise of all rights of a reasonable operator with respect to such Wellpad or Lease as though the Post-Division Operator had been appointed as successor operator for such Wellpad or Lease, to the extent (in either case (A) or (B)) reasonably consistent with the Pre-Division Operator's duties as operator under the applicable Operating Agreement, in which case the Pre-Division Operator shall remain the operator with respect to the applicable Asset and carry out all directions of the Post-Division Operator and not take any action under an Operating Agreement unless approved by the Post-Division Operator or required under the applicable Operating Agreement.

(iii) Upon the consummation of an Equitable Division, the Parties shall use their reasonable best efforts to (A) (1) cause all existing Operating Agreements to be terminated to the extent any such Operating Agreements apply to multiple Wellpads

allocated to both SN and Blackstone in connection with an Equitable Division and (2) execute and cause Third Party Working Interest holders in such Wellpads to execute, in place of each terminated Operating Agreement, the Form Operating Agreement (and agree to any reasonable modifications that may be requested by any such Third Party Working Interest holder to such Form Operating Agreement that are reasonably necessary to obtain any required approval), attached hereto as Exhibit B, for each individual Wellpad allocated to a Party pursuant to a Division of Operatorship or (B) with respect to any Wellpad that is subject to an Operating Agreement relating only to such Wellpad, take such action as may be necessary to obtain the required approval to transfer operatorship rights to the applicable Post-Division Operator as successor operator under such Operating Agreement. Additionally, each Post-Division Operator shall provide the other Parties on an annual basis with an approved one (1) year budget and work plan and a three (3) year budgeted forecast regarding the development of each Party's respective Assets for which such Post-Division Operator has been allocated rights of operatorship pursuant to a Division of Operatorship or an Equitable Partition.

(iv) Notwithstanding anything else to the contrary in this Agreement, at any time that a Non-Defaulting Party or its designee has rights to operatorship over one hundred percent (100%) of the Leases or Wellpads, or following the date upon which any Operator Default Event (as defined below) has occurred and is not cured as provided in Section 3.9, the Defaulting Party or its Affiliates shall no longer have the right to elect to cause a Division of Operatorship pursuant to this Section 3.8(e).

(v) Following a Division of Operatorship or an Equitable Partition, if a Post-Division Operator under any Operating Agreement elects to sell or otherwise transfer all of its interest in the assets covered by such Operating Agreement to a Third Party, and if such Third Party desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Non-Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for such Third Party to be selected as the successor operator, including a Third Party buyer in connection with a Sale Transaction or following an Equitable Partition. In all other circumstances in which a Post-Division Operator resigns (other than as a result of a transfer of operatorship to an Affiliate) or is removed as operator under an Operating Agreement, if the Post-Division Non-Operator desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for the Post-Division Non-Operator as successor operator. This Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten (10) years.

(vi) Promptly following the date of this Agreement, upon the request of Blackstone, the Parties shall use their good faith efforts to engage the Third Party owners of Working Interests in the Leases and enter into new joint operating agreements for each Wellpad consistent in all material respects with the existing Operating Agreements, in

addition to any modifications upon which the Parties may agree, in order to facilitate an orderly Division of Operatorship if and when pursued pursuant to this Agreement.

(vii) Blackstone will indemnify SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee, for all damages incurred by such Parties (a) to the Consenting Parties or any other parties whose consent is required under any applicable Operating Agreements arising out of any litigation brought by the Consenting Parties under the Consent Agreement as a result of the consummation of an Equitable Division or an Equitable Partition and (b) to counterparties from whom a Required Operatorship Consent is required in connection with effecting a Division of Operatorship or an Equitable Partition without having obtained any Required Operatorship Consents, which in either case shall include all reasonable legal expenses. In connection with any such litigation pursuant to which Blackstone is obligated to indemnify SN and SN UnSub under this Section 3.8(e)(vii), Blackstone shall have the right to control the defense on behalf of Blackstone, SN, SN UnSub and their respective Affiliates and SN, SN UnSub or, if applicable, the Qualified Foreclosure Transferee, and their respective Affiliates shall reasonably cooperate in connection with such defense; *provided*, that the appointment of counsel by Blackstone shall be subject to the consent of SN, not to be unreasonably withheld, conditioned or delayed, and SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee shall have the right to participate in connection with the defense of any such litigation. In connection with the consummation and implementation of an Equitable Division or an Equitable Partition, the Parties will use their respective commercially reasonable efforts to cooperate with the Consenting Parties to provide for an orderly transition of operatorship and consult with the consenting parties in connection with the implementation of such transition, in each case, in order to maintain an amicable working relationship with the Consenting Parties.

(f) *Transfer of Operatorship Generally*. Effective immediately upon the occurrence of any of the following: (i) Operator is removed as operator pursuant to the terms of any applicable Operating Agreement, (ii) Operator suffers a Specified Event of Default under a Specified Credit Agreement, (iii) Operator resigns as operator under any applicable Operating Agreement with or without the consent of the other parties thereto, (iv) Operator commits an act of gross negligence or willful misconduct with respect to its duties under an applicable Operating Agreement ("Negligent Operator Action"); *provided*, that notice of any Negligent Operator Action must be given to Operator detailing the alleged acts by Operator and Operator shall have a thirty (30) day period from receipt of such notice to cure any such Negligent Operator Action, unless the Negligent Operator Action concerns an ongoing operation being conducted, in which case, Operator must cure such Negligent Operator Action within forty-eight (48) hours of its receipt of the notice; (v) SN or any of its Affiliates breaches in any material respect its obligations under Section 4.5 or (vi) either Party while acting as Operator has committed a Default under this Agreement (any such event described in the preceding clauses (i) through (vi), collectively, an "Operator Default Event"), the operatorship of the applicable Assets (which, in cases (i), (iii), and (iv) above, for avoidance of doubt, shall mean only those Assets covered by the applicable Operating Agreement) and the right to serve as, or to designate, the operator of such Assets under the applicable Operating Agreement(s) shall, subject to the terms of such Operating Agreement(s),

be transferred to Blackstone (if SN is then the Operator) or SN (if Blackstone is then the Operator), as applicable (the "Alternate Operator") or its designated Affiliate or a qualified Third Party operator capable of operating the Assets and selected by the Alternate Operator (a "Third Party Operator"). The Operator who is replaced as a result of such Event of Default (the "Defaulting Operator") shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to) use their reasonable best efforts to (i) take all actions required (at the reasonable direction of the Alternate Operator to effectuate such transfer, including voting its and its Affiliates' interests for an election of the Alternate Operator, its designee or a Third Party Operator, including through one or a series of related transactions, in each case to the extent permitted under the applicable Operating Agreement, (ii) obtain any necessary consents or amendments otherwise required for a change in operatorship under the Leases and applicable Operating Agreements and any other applicable Material Contracts including all Required Operatorship Consents, and (iii) carry out any other actions reasonably necessary to effect such transfer of operatorship. In the event the operatorship of an Asset is transferred to the Alternate Operator, its designee or a Third Party Operator pursuant to this Section 3.8(f), the Alternate Operator shall (and shall cause the successor operator, if other than the Alternate Operator, to), defend, indemnify and hold harmless the Defaulting Operator from all claims, Losses and damages raised by any Third Party related to the applicable Operating Agreements with respect to which operatorship has been transferred to the extent resulting from, pertaining to or arising from the operation of the applicable Assets by the Alternate Operator, its designee or the Third Party Operator from and after the date of such transfer of operatorship of the applicable Assets. The Alternate Operator shall (and shall cause the successor operator, if other than such Alternate Operator to) also use its reasonable best efforts to comply with all requirements of an operator under the applicable Operating Agreement or applicable law. In connection with any transfer of operatorship pursuant to this Section 3.8, the Parties shall use their reasonable best efforts to ensure that the new Operator shall have access to all assets relating to the Assets in which the Parties all hold an ownership interest in the same manner as the Defaulting Operator had prior to any such operatorship transfer, to the extent that a Division of Operatorship has not occurred or this Agreement has not been terminated. If any required consent or amendment required to effect the transfer of operatorship under any applicable Operating Agreement or any required consent or amendment for any other Material Contract related to a Lease or Wellpad for which operatorship is to be transferred, in each case as contemplated by this Section 3.8(f), is not obtained, including all Required Operatorship Consents, then until such consent or amendment is obtained (or until such other time as the Alternate Operator reasonably determines that it has the right and capability to assume operatorship), (i) the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment, (ii) the Defaulting Operator shall maintain formal rights of operatorship for such applicable Lease or Wellpad, and (iii) the Alternate Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad based on customary terms and conditions, whereby the Alternate Operator shall have the right to physically conduct all operations, and/or (B) direct the Defaulting Operator in its exercise of all rights of an operator with respect to such Wellpad as though such Alternate Operator had been appointed as successor operator for such Wellpad to the extent reasonably consistent with the Defaulting Operator's express duties as operator under the applicable Operating Agreement, in which case the Defaulting Operator shall remain the operator

with respect to the applicable Asset and carry out all directions of the Alternate Operator and not take any action under an Operating Agreement unless approved by the Alternate Operator or expressly required under the applicable Operating Agreement. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the transfer of operatorship and the rights related thereto described in this Section 3.8(f) shall be triggered automatically upon the occurrence of an Operator Default Event and shall not be affected in any respect by any change in, or cure of, an Operator Default Event.

**3.9 Default.**

(a) *Remedy Upon Default*. For so long as SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee is in Default (a "Defaulting Party"), (i) its rights under Section 3.2 (Function of the Operating Committee), Section 3.7(b) (Subsequent Budgets and Work Plans), Section 3.8(e) (Operatorship) (such that a Defaulting Party shall not have the right to elect to cause a Division of Operatorship), Section 4.1(a) (Permitted Transfers) (such that a Defaulting Party shall not have a right to Transfer its Asset Interest to a Third Party even after the expiration of the three year limitation in Section 4.1(a), without the prior written consent of the Parties not in Default (the "Non-Defaulting Parties") and *provided*, *however*, that such Default shall not affect rights regarding Permitted Liens), Section 4.2 (Tag-Along Rights), Section 4.3 (Right of First Offer), Section 4.5 (Sale Transaction) (such that if Blackstone is the Defaulting Party, it shall not have a right to compel the other Parties to participate in a Sale Transaction,), and Section 5.2 (Area of Mutual Interest) shall be suspended and any control rights associated with such provisions shall revert to the benefit of the Non-Defaulting Parties in percentages equal to their proportionate share of an AMI acquisition pending such cure or resolution of such Default and in connection therewith, the Representative(s) appointed by the Defaulting Party shall lose all voting rights with respect to the Operating Committee, and the affirmative vote of the Representatives who have not lost voting rights shall be the only votes required for any action to be taken by the Operating Committee (and shall be deemed to constitute Unanimous Consent); *provided*, that, (i) such rights shall not be suspended in the event the Party alleged to be in Default is contesting such allegation in good faith, pursuant to a binding arbitration process in accordance with Section 7.12(c), which shall be conducted as promptly as reasonably practicable (and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such process), and (ii) the Operating Committee shall not have the authority to bind the Defaulting Party and its Affiliates to Subsequent Budgets and Work Plans or to any increases to the then-existing Approved Budget except to the extent that all such increases in the aggregate do not exceed such Approved Budget by more than ten percent (10%). A Default shall not be deemed to be continuing after the Defaulting Party has (i) cured such Default, (ii) entered into and satisfied its obligations under a binding written settlement with the Non-Defaulting Parties related to such Default, or (iii) satisfied its obligations, if any, arising from any arbitration or judicial proceeding related to such Default.

(i) Any reasonable, documented legal fees and other out-of-pocket costs of each Party to a dispute governed under this Section 3.9 shall be borne solely by the non-prevailing Party, as determined in connection with the relevant proceedings and, the prevailing Party in such proceedings shall be entitled, in addition to such other relief

as may be granted, to reimbursement of such reasonable legal fees and costs from the non-prevailing Party.

(ii) Any monetary award granted to a Party in connection with a dispute governed under this Section 3.9 shall include interest accruing daily at a rate of 1.1% per month, compounding monthly, from the date upon which it is determined the applicable state of Default began, until the Party in Default has satisfied in full its obligations arising from the arbitration proceedings (including the payment of such interest amount).

(b) *Remedy Not Exclusive.* The rights of the Non-Defaulting Party set forth in this Section 3.9 or elsewhere in this Agreement shall be in addition to such other rights and remedies that may exist at Law, in equity or under contract on account of such Default.

**ARTICLE IV**
**TRANSFER; EXIT OPPORTUNITIES**

**4.1 Restrictions on the Transfer of Interests.**

(a) *Permitted Transfers.* Each Party may Transfer all or part of such Party's rights, title and interest to any Asset or related assets in the Core Area acquired after the Effective Date and held directly or indirectly by any of the Parties (an "Asset Interest"), including such Party's Working Interests, only in accordance with applicable Law and the provisions of this Agreement, including this Article IV. Prior to the third (3rd) anniversary of the Effective Date, except for transfers to Permitted Transferees and Foreclosure Transfers, none of the Parties shall be permitted to Transfer all or any portion of such Party's Asset Interests without the prior written consent of the non-transferring Parties (each, a "Non-Transferring Party"), which consent may be given or withheld in the sole discretion of such Party. Any purported Transfer in breach of the terms of this Agreement shall be null and void *ab initio,* and the Non-Transferring Party shall not recognize any such prohibited Transfer. Any Party who Transfers or attempts to Transfer any Asset Interests (the "Transferring Party") except in compliance herewith shall be liable to, and shall indemnify and hold harmless, the Non-Transferring Parties for all costs, expenses, damages, and other Liabilities resulting therefrom. No Party shall place or allow to be placed any Lien on any of its Asset Interests other than Permitted Liens. "Permitted Liens" means (i) Liens granted by the Parties and/or subsidiary guarantors under any Applicable Credit Agreement or any security document (including any mortgaged or deeds of trust) entered into in connection therewith (so long as such Applicable Credit Agreement and such security documents are not, after the Effective Date, amended, restated, modified, renewed, refunded, replaced or refinanced in a manner that restricts the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive (including in a manner that would adversely impact the exercise of any Party's rights under this Article IV) than the restrictions imposed by such Applicable Credit Agreement or security document on the Effective Date (or provided for by the applicable form of security document in a form agreed to as of the Effective Date as set forth in such Applicable Credit Agreement)) (ii) Liens under or required by an applicable Operating Agreement, (iii) statutory Liens securing amounts not yet due and payable or which are being contested in good faith, (iv) judgment Liens that are bonded for appeal or will be paid by insurance, (v) all overriding royalty

and net profits interests affecting the Assets on the Effective Date, (vi) Liens securing hedging related to the Assets, (vii) Liens related to debt financing arrangements that do not restrict the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive than the restrictions imposed by Liens that were in place on the Effective Date under other debt arrangements of such Party or its Affiliates, (viii) Liens related to marketing or midstream arrangements, (ix) any volumetric production payment transaction affecting a Party's Asset Interest, *provided* such volumetric production payment transaction shall be released in connection with a Sale Transaction, (x) all cashiers', landlords', workmens', repairmens', mechanics', materialmens', warehousemens' and carriers' Liens and other similar Liens imposed by Law, in each case, incurred in the ordinary course of business, (xi) pledges, deposits or other Liens securing the performance of bids, trade contracts, leases or statutory obligations in each case, incurred in the ordinary course of business, (xii) purchase money Liens incurred in the ordinary course of business, (xiii) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of any of the Asset Interests, (xiv) encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution (which in no event shall burden any Working Interests), or (xv) encumbrances arising out of, under or in connection with applicable securities Laws (which in no event shall burden any Working Interests and which shall be removed prior to the consummation of any Sale Transaction) or custodial arrangements with custodians of securities (which in no event shall burden any Working Interests).

(b) *Effect of Permitted Transfer*. Any Permitted Transferee must satisfy and comply with all requirements of a transferee of a Working Interest under any applicable Operating Agreement. Any Permitted Transferee to which any Asset Interests are Transferred hereunder shall be bound by, and sign on to and join, this Agreement, and shall become a Party for all purposes hereof and be bound by all provisions to which the Party that Transferred Asset Interests to it was or remains bound, *provided* that if a Permitted Transferee does not acquire all or substantially all Asset Interests of a Transferring Party hereunder, then it should obtain no rights under Article III. No Transfer of an Asset Interest shall relieve the Transferring Party of any obligations accruing prior to such Transfer under this Agreement or the applicable Operating Agreement. In a Foreclosure Transfer with respect to the Asset Interests of UnSub (a "Qualified Foreclosure Transfer"), the UnSub Agent or any designated special purpose vehicle established by the UnSub Agent, and in each case, any Permitted Transferee thereof (the "Qualified Foreclosure Transferee") (a) shall be bound by, and sign on to and join, this Agreement, (b) shall become a Party (and replace SN UnSub as a Party) for all purposes hereof and (c) each other Party shall be deemed to consent to the Qualified Foreclosure Transferee becoming a Party; *provided*, *however*, that if such Foreclosure Transfer covers less than all or substantially all of SN UnSub's Asset Interests, then unless otherwise agreed by SN UnSub and the Permitted Transferee, such Qualified Foreclosure Transferee shall not succeed to SN UnSub's rights under Article III. Except as provided in Section 6.2 or in a Foreclosure Transfer, if a Transfer is made to a Third Party in manner permitted by this Agreement or otherwise with the consent of the Non-Transferring Parties, then this Agreement shall terminate upon the consummation of such Transfer but only

with respect to the Asset Interest transferred (and this Agreement will remain in effect with respect to the remainder of the Asset Interests).

(c) *Expenses*. The Transferring Party shall bear all costs and expenses incurred in connection with any Transfer of all or any portion of its Asset Interests. Any transfer or similar taxes arising as a result of such Transfer shall be paid by the Transferring Party.

(d) *Certain Indirect Transfers*. Except for Transfers to Permitted Transferees, no Party shall indirectly Transfer any Asset Interests to the extent such Party is not permitted to Transfer Asset Interests directly pursuant to the terms hereof and any indirect Transfer shall be structured and consummated in such a manner that the Non-Transferring Party shall be provided the same rights and protections as it would have had if such Transfer were structured as a direct Transfer of such Asset Interests pursuant to the terms hereof; *provided*, *however*, that the sale of any Equity Interest in a Qualified Foreclosure Transferee to the extent necessary or desirable to comply with Law (including any bank regulatory requirements) shall not be subject to the restrictions set forth in Section 4.1(a). Notwithstanding anything in this Agreement to the contrary, a Transfer resulting from any change in control or transfer of ownership interests in Sanchez Energy shall not be treated as a Transfer under this Article IV unless such Transfer constitutes a Change of Control in which case Section 4.2 shall apply.

**4.2 Tag-Along Right.**

(a) Other than in connection with an IPO as contemplated by Section 4.4 and in connection with a Foreclosure Transfer, if at any time after the third (3rd) anniversary of the Effective Date and prior to an IPO of such Party (as defined herein), a Party proposes to Transfer all or any portion of its Asset Interests, whether in a single or series of related transactions, that constitute greater than thirty-five percent (35%) of such Party's total Asset Interests held as of the Effective Date to a Third Party purchaser or purchasers (a "Proposed Sale"), after complying with Section 4.3, the Transferring Party shall furnish to the other Parties (the "Non-Initiating Parties") a written notice of such Proposed Sale (the "Tag-Along Notice") and provide the Non-Initiating Parties the opportunity to participate in such Proposed Sale on the terms described in this Section 4.2 to the extent of their respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice will include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Asset Interests to be Transferred, (B) the name of the proposed transferee (the "Proposed Transferee"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable Assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed Transfer date, if known, which date shall not be less than forty-five (45) Business Days after delivery of such Tag-Along Notice*;* and

(ii) an invitation to the Non-Initiating Party to participate in such Proposed Sale at the same per Working Interest percentage price per applicable Asset, for

the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party will deliver or cause to be delivered to the Non-Initiating Party copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) A Non-Initiating Party must exercise the tag-along rights provided by this Section 4.2 within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "Tag-Along Offer") to the Transferring Party indicating its desire to exercise its tag-along rights hereunder. If the Non-Initiating Party does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, the Non-Initiating Party shall be deemed to have waived its rights under this Section 4.2 with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to Transfer the applicable Asset Interests (as defined in Section 4.5(a)) to the Proposed Transferee without the participation of such Non-Initiating Party, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable Asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If one or more Non-Initiating Parties elects to participate in the Proposed Sale pursuant to this Section 4.2, (i) the consideration to be received by the Parties in such sale (a "Tag-Along Transaction") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Leases, Wellpads, and other applicable Assets and other interests included by the Parties (collectively, the "Tag Interests"), as agreed by the Parties or as otherwise determined pursuant to the valuation process set forth in Section 4.5(c), taking into account (in either case) the Parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party buyer (but only to the extent that all Parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, *provided*, that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Parties in the Proposed Sale; and (ii) the Non-Initiating Parties shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one Party is Transferring Working Interests and the other Party is Transferring Equity Interests holding Working Interests, and such other distinctions as may be applicable to the Parties or their interests in the Leases, Wellpads, and other applicable Assets); *provided*, that (A) no Party shall be liable for the breach of any covenant by any other Party, (B) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, and (C) in no event shall a Non-Initiating Party be responsible for any Liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by such Non-Initiating Party in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act, and any Non-Initiating Party exercises its tag-along rights hereunder in connection with such Proposed Sale, if the

Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that each Non-Initiating Party, as applicable, will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) The offer of a Non-Initiating Party contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, such Non-Initiating Party shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Asset Interest Transferred, as the Transferring Party; *provided*, *however*, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to such Non-Initiating Party than those set forth in the Tag-Along Notice, such Non-Initiating Party shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from such Party's obligations.

(e) If a Party exercises its rights under this Section 4.2, the closing of the sale of each Party's Asset Interest in the Tag-Along Transaction will take place concurrently, other than in connection with a Change of Control. If the closing with the Proposed Transferee (whether or not the Non-Initiating Party has exercised its rights under this Section 4.2) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on Transfer contained herein shall again be in effect with respect to such Asset Interest and proposed Transfer.

(f) The costs of any transactions contemplated by this Section 4.2 shall be deducted pro rata from the proceeds to be paid to each Party in connection with such transaction, other than in connection with a Change of Control, in which case each Party participating in a Tag Transaction shall bear its own costs and expenses.

(g) Notwithstanding anything in this Agreement to the contrary, the Parties agree that a Change of Control with respect to Sanchez Energy shall be treated as a Transfer pursuant to this Section 4.2, provided that (i) a Tag Notice in such circumstances shall be given no later than two (2) Business Days following the public announcement of definitive documentation providing for a Change of Control, (ii) such Change of Control may be consummated prior to the consummation of the acquisition of the Non-Initiating Party's Tag Interests (which at the election of the Non-Initiating Party may be effected as an asset sale or as the sale of Equity Interests of an entity directly or indirectly owning the Assets of the Non-Initiating Party (provided that the Proposed Transferee shall not be required to assume any indebtedness for borrowed money and such entity shall have had no material business operations since its formation other than as related to the Assets)), (iii) the Proposed Transferee and the Non-Initiating Party shall enter into a purchase

agreement providing for the acquisition of the Non-Initiating Party's Tag Interests no later than twenty five (25) Business Days after the Non-Initiating Party's acceptance of a Tag Offer, which purchase agreement shall be substantially similar in all material respects to the terms and conditions of the Purchase Agreement, and (iv) the purchase price to be paid for the Non-Initiating Party's Tag Interests shall be determined based on the Fair Market Value of such Tag Interests in accordance with Section 4.5(f), subject to any applicable purchase price adjustments set forth in the purchase agreement referenced in the foregoing clause (iii). Sanchez Energy shall use its reasonable best efforts to cause a proposed transferee to comply with the terms of this Section 4.2(g); provided that in any consensual transaction between Sanchez Energy and a proposed transferee that results in a Change of Control, including a transaction where the board of directors of Sanchez Energy approve such transaction, Sanchez Energy shall cause such transferee to comply with this Section 4.2(g).

**4.3 Right of First Offer.**

(a) Other than in connection with an IPO as contemplated by Section 4.4, or in connection with a Foreclosure Transfer, and subject to the terms of any applicable Operating Agreement, if any Party proposes to Transfer any of the Asset Interests held by such Party, including Blackstone pursuant to Section 4.5 (a "ROFO Transferor") to a Third Party purchaser, the ROFO Transferor agrees that, before entering into negotiations with a Third Party, the Transferring Party will first provide notice (a "ROFO Notice") to the other Parties (the "ROFO Recipients") that the ROFO Transferor proposes to pursue such a transaction. Each such ROFO Notice will invite the ROFO Recipient to submit to the ROFO Transferor an offer in writing (a "ROFO Offer"), which offer shall (i) be irrevocable and in good faith, (ii) be for all cash (except SN may choose to fund a ROFO Offer with cash or SN Common Stock or a combination thereof) (any such ROFO Offer including SN Common Stock as consideration an "SN Equity Financed Offer")), (iii) specify in reasonable detail the material terms and conditions of such offer (including as set forth in Section 4.3(b) with respect to a SN Equity Financed Offer), (iv) shall provide for a closing date of no longer than ninety (90) days from the execution of a definitive purchase agreement and provide for no holdback or escrow of purchase price, and (v) shall remain open for acceptance by the ROFO Transferor for thirty (30) days after the ROFO Transferor's receipt of such ROFO Offer, to purchase from the ROFO Transferor one hundred percent (100%) of the Asset Interests that are the subject of the ROFO Notice, which at the sole election of the ROFO Transferor may be structured as a purchase of Working Interests or Equity Interests of an entity holding Asset Interests (the "ROFO Interests"). The ROFO Offer shall be submitted to the ROFO Transferor within thirty (30) days after the ROFO Recipient's receipt of the ROFO Notice and shall include a proposed definitive purchase agreement that such ROFO Recipient is prepared to execute upon the acceptance by the ROFO Transferor of the ROFO Offer. Upon the receipt by the ROFO Transferor of any ROFO Offer, the ROFO Transferor and the applicable ROFO Recipient shall negotiate in good faith for a period of thirty (30) days regarding the ROFO Offer. In the event the Parties are unable to reach agreement during such period, the ROFO Transferor may elect by notice to such ROFO Recipient submitted at any time during the 30-day period following such negotiation period to accept or reject the ROFO Offer (it being understood that a failure of the ROFO Transferor to submit an unqualified acceptance notice within such 30-day period shall constitute a rejection of the ROFO Offer). If the ROFO Transferor timely submits an

acceptance notice, the ROFO Transferor and the applicable ROFO Recipient shall in good faith negotiate a definitive purchase and sale agreement (which shall include the terms and conditions set forth in the ROFO Offer) and use their reasonable best efforts to consummate the purchase and sale of the ROFO Interests as promptly as practicable and in any event within ninety (90) days from the execution of a definitive purchase agreement. If only one ROFO Recipient timely submits a ROFO Offer, the ROFO Transferor may effectuate the sale of all the ROFO Interests to such ROFO Recipient alone. If neither ROFO Recipient timely submits a ROFO Offer or any ROFO Offer is rejected (or deemed rejected as described above) by the ROFO Transferor, the ROFO Transferor may effectuate a sale of all the ROFO Interests to a Third Party so long as (i) if a ROFO Offer was made, the Transfer price is at least one hundred percent (100%) of the offer price set forth in such ROFO Offer (taking into account Section 4.3(b) below) and the other terms and conditions offered to the Third Party are not materially more favorable to the Third Party than those of such ROFO Offer; and (ii) the execution of definitive documentation for the sale of such ROFO Interests to such Third Party shall occur no later than two hundred and seventy (270) days after a rejection (or deemed rejection) of such ROFO Offer.

(b) In connection with any SN Equity Financed Offer:

(i) the determination of the value of SN Common Stock included in a SN Equity Financed Offer shall (i) apply an appropriate illiquidity discount, which may take into account, as applicable, the discounts applied to comparable private placements or block trades of comparable size as compared to the applicable market price of such securities and/or discounts applied to publicly traded common equity used as acquisition currency by relevant valuation methodologies customarily used by leading financial valuation firms in similar circumstances and (ii) be discounted for any adverse liquidity effects that are attributable to the payment of any applicable taxes associated with the receipt of such SN Common Stock, in each case (i) and (ii), as reasonably determined by the ROFO Transferor, *provided*, that no discount with respect to clause (ii) shall apply if the SN Equity Financed Offer includes a portion of cash consideration equal to or greater than the expected aggregate amount of tax payable by the ROFO Transferor, including Blackstone and any of its direct and indirect equity owners as a result of the consummation of such SN Equity Financed Offer and assuming that the aggregate amount of such tax shall be computed using an assumed tax rate equal to the highest maximum combined marginal federal, state and local income tax rates applicable to an individual or corporate taxpayer resident in New York, NY;

(ii) the ROFO Offer shall provide for a fixed value, including a fixed value for the portion of consideration represented by SN Common Stock, payable upon closing, unless otherwise agreed to by the ROFO Transferor;

(iii) if the ROFO Transferor would beneficially own on a pro forma basis (calculated in accordance with clause (vi) below) more than twenty percent (20%) of the outstanding SN Common Stock, Sanchez Energy shall provide representation rights for the Sanchez Energy Board of Directors to the ROFO Transferor approximately equal to its pro

forma beneficial ownership percentage of SN Common Stock following the consummation of any ROFO Offer pursuant to documentation reasonably acceptable to Blackstone;

(iv) no Event of Default (as such term may be then defined under the SN Credit Agreement) shall have occurred under the SN Credit Agreement;

(v) Sanchez Energy shall have a rating equal to or higher than "B3" (or the equivalent) by Moody's or its successors, or an equivalent rating by S&P or Fitch, Inc. (or either of its successors);

(vi) the resulting share issuance will not cause the ROFO Transferor to beneficially own more than thirty-five percent (35%) of outstanding SN Common Stock on a pro forma basis excluding any SN Common Stock owned prior to the Effective Date or issued to Blackstone or GSO pursuant to this Agreement after the Effective Date;

(vii) the SN Common Stock shall be listed on the New York Stock Exchange or the NASDAQ Stock Market (or their respective successors); and

(viii) the SN Common Stock to be issued to the ROFO Transferor shall be entitled to the benefits of a registration rights agreement substantially similar in form and substance to the Registration Rights Agreement.

**4.4 Initial Public Offering**. Notwithstanding anything to the contrary herein, at any time following the third (3rd) anniversary of the Effective Date, any Party shall have the right to consummate an initial public offering of a vehicle that includes its respective Working Interests in the Assets at the time such IPO is initiated ("IPO"). The Party planning to carry out the IPO (the "IPO Party") may elect to exercise such right by delivering written notice of such election (an "IPO Notice") to the other Parties (each a "Non-IPO Party"). Each Non-IPO Party shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to), following receipt of an IPO Notice, cooperate and take such actions as are reasonably requested by the IPO Party or its Affiliates to help facilitate any such IPO, and the IPO Party shall reimburse each Non-IPO Party and its Affiliates for their reasonable out-of-pocket costs and expenses incurred in connection therewith.

**4.5 Sale Transaction.**

Subject to the limitations and conditions set forth in this Section 4.5 and the Right of First Offer set forth in Section 4.3:

(a) If at any time after the third (3rd) anniversary of the Effective Date (or within nine (9) months following the termination of this Agreement), Blackstone elects, pursuant to a Bona Fide Offer, to pursue a Transfer to a Third Party (other than GSO or any of its Affiliates) pursuant to the terms of such Bona Fide Offer (the "Sale Transaction Transferee") of all or substantially all of the Working Interests and other Assets acquired by Blackstone pursuant to the Purchase Agreement and all related assets in the Core Area acquired after the Effective Date and

then held directly or indirectly by Blackstone and its Affiliates (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads) (other than with respect to Excluded AMI Transactions (as defined in Section 5.2)), or all of the Equity Interests of any entity directly or indirectly owning all of such Working Interests and other Assets and related assets (a "Sale Transaction," which shall include a Sale Transaction Equitable Partition and the consummation of the sale contemplated thereby, but not an Alternative Equity Partition), and *provided*, that (i) Blackstone is not the Operator of all of the Assets, (ii) SN or any of its Affiliates is the Operator of any of the Assets and (iii) SN, SN UnSub and any of their respective Affiliates that then own any interests in the Asset Interests have not unconditionally agreed in writing to vote their applicable interests to support the designation of the Third Party who has made such Bona Fide Offer as operator under the applicable Operating Agreements, Blackstone shall, subject to Section 4.5, including Sections 4.5(h) and 4.5(i), have the right to compel Sanchez Energy, SN, SN UnSub, and their respective Affiliates to sell or otherwise convey to the Sale Transaction Transferee all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of SN and its Affiliates related to the Leases and/or Wellpads ("SN Operatorship Rights")) within an area of land comprising seventy-five percent (75%) of the Fair Market Value of the Core Area (the "Included Percentage") (*provided*, that if the transfer of such land would result in Sanchez Energy transferring all or substantially all of its assets pursuant to applicable Law, then such applicable percentage of Fair Market Value shall be such lesser percentage that would not constitute all or substantially all of the assets of Sanchez Energy pursuant to applicable Law, but in no event shall such percentage be lower than sixty-six percent (66%)) (it being agreed that for purposes of this Section 4.5, the Core Area shall not include any acreage for which a Party or any of its Affiliates does not then own Working Interests) (such area, the "Included Sale Transaction Area," and the remainder of the Core Area, the "Excluded Sale Transaction Area" and such remaining percentage, the "Excluded Percentage") to be determined as provided below in this Section 4.5(a), and in connection and contemporaneously with such Sale Transaction, Blackstone shall convey (and if applicable, cause its Affiliates to convey) all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads ("Blackstone Operatorship Rights")) within the Excluded Sale Transaction Area to SN and SN UnSub. Upon the election by Blackstone to pursue a Sale Transaction, SN, SN UnSub, and Blackstone shall negotiate in good faith for a period of forty-five (45) days to agree upon and designate the Included Sale Transaction Area and the Excluded Sale Transaction Area, based on substantially proportionate geographic divisions and customary industry practices and their respective reserve reports covering the previous twelve (12) month period, such that the Included Sale Transaction Area comprises the Included Percentage and the Excluded Sale Transaction Area comprises the Excluded Percentage, respectively, of the aggregate Fair Market Value of the Core Area (a "Sale Transaction Equitable Partition") in addition to an alternative partition such that the Included Sale Transaction Area comprises Assets in the Core Area equal to fifty percent (50%) of the aggregate Fair Market Value of the Core Area (or if at such time the relative ownership percentages of SN and its Affiliates and Blackstone and its Affiliates in the Core Area are not 50%/50%, then the percentage of the Fair Market Value owned in the Core Area by Blackstone and its Affiliates as compared to SN and its Affiliates) (such percentage, the "Blackstone Percentage") and the Excluded Sale Transaction Area comprises

that percentage of Assets in the Core Area equal to one hundred percent (100%) less the Blackstone Percentage (an "Alternative Equitable Partition" and together with a Sale Transaction Equitable Partition, each an "Equitable Partition"). An Equitable Partition shall (i) proportionately distribute to SN and SN UnSub, on the one hand, and the Sale Transaction Transferee or Blackstone, as applicable, on the other hand, in the same proportion and with substantially similar characteristics as each Party held in the Core Area, prior to the Equitable Partition, the following: (A) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (B) producing wells and current production (including substantially similar decline profiles and cash flow profiles), proved developed non-producing acreage and undeveloped acreage, (C) remaining reserves, (D) potential future well locations, and (E) allocation of exposure to demand charges, minimum volume commitments and commodity charges (and other similar costs and obligations) under the midstream and marketing agreements in place in the Core Area; (ii) seek to allocate the entirety of a Lease and the acreage governed by an applicable joint operating agreement into either the Included Sale Transaction Area or the Excluded Sale Transaction Area; (iii) take into account any other relevant factors, including, if applicable, a prior Division of Operatorship, and any restrictions on assignment of the applicable Working Interests and other Assets and, subject to the other express provisions of this Section 4.5, seek to mitigate any such restrictions if they are reasonably likely to impede or delay an Equitable Partition and (iv) in the case of an Alternative Equitable Partition, in no event shall SN UnSub have lower values of PDP PV-10 or projected cash flow from PDP reserves after such Alternative Equitable Partition (*provided*, that any assignments and conveyances among the Parties under an Alternative Equitable Partition shall be on terms substantially similar to the assignment and conveyance terms under the Purchase Agreement). If, following such forty-five (45) day period, SN, SN UnSub, and Blackstone are unable to agree upon an Equitable Partition, then the Equitable Partition shall be decided by Financial Advisors and Reserve Auditor(s) using the same process as provided for an Equitable Division pursuant to Section 3.8(e)(i), *mutatis mutandis* (but with such modifications as may be necessary to determine a Sale Transaction Equitable Partition and an Alternative Equitable Partition in accordance with this Section 4.5, including in order to include SN UnSub as a party to such process), and after the final determination of the Equitable Partition by the Financial Advisors and upon the execution of definitive documentation as required to carry out the Sale Transaction or the Alternative Equitable Partition, as applicable, pursuant to this Section 4.5, the Parties hereto and their Affiliates shall use their respective reasonable best efforts to effectuate the applicable Equitable Partition as promptly as practicable (for no additional consideration other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied). In order to facilitate an efficient and orderly Sale Transaction process, Blackstone may elect to initiate (and cause Sanchez Energy to participate in) the determination of the Equitable Partition upon the delivery by Blackstone of a ROFO Notice, and from such time as a ROFO Notice is provided until the time that a Sale Transaction or Alternative Equitable Partition is consummated as provided for in this Section 4.5, neither SN nor its Affiliates shall initiate a Division of Operatorship. In the event that Blackstone is unable to cause Sanchez Energy, SN, SN UnSub and/or their respective Affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in this Section 4.5, then Blackstone shall have the right to effectuate an Alternative Equitable Partition, whereby Blackstone shall be entitled to all Assets of

the Parties in the Included Sale Transaction Area and SN and SN UnSub shall be entitled to all Assets of the Parties in the Excluded Sale Transaction Area (in each case as such areas are determined pursuant to this Section 4.5(a) with respect to an Alternative Equitable Partition, for no consideration payable other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied), and the Parties shall use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the Parties shall use their respective reasonable best efforts to cause Blackstone or its designee (or if applicable a Sale Transaction Transferee) to become operator under each joint operating agreement applicable to the Assets included in the Included Sale Transaction Area and cause SN or its designee to become operator under each joint operating agreement applicable to the Assets included in the Excluded Sale Transaction Area, and in the event that such operatorship is not vested in the applicable party prior to the time that a Sale Transaction Equitable Partition (which shall be consummated as of the closing of a Sale Transaction or as promptly as practicable thereafter) or Alternative Equitable Partition is otherwise ready to be completed, then the principles of Section 3.8(e) shall apply, *mutatis mutandis*, as though the party to whom operatorship should be transferred were the Post-Division Operator and the Party or its Affiliate that is the operator under an applicable joint operatorship were the Pre-Division Operator (including, without limitation, Section 3.8(e)(ii)), and, if necessary, the Pre-Division Operator shall maintain a sufficient minimal interest so as to not effect an automatic resignation of operatorship under the applicable operating agreements.

(b) Each of Blackstone, Sanchez Energy, SN and SN UnSub and each of their applicable Affiliates shall consent to such Sale Transaction or to carry out an Alternative Equitable Partition and will cooperate in good faith and use reasonable best efforts to obtain all necessary approvals and authorizations from its and its subsidiaries' shareholders (including holders of any preferred equity interests), Board of Directors or other governing bodies, joint venture partners and lenders (including, for the avoidance of doubt, consent from lenders to an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, and regardless of whether any restriction or limitation in any financing arrangement that is otherwise permitted by this Section 4.5), as applicable, and will cooperate in good faith and use reasonable best efforts to remove all Permitted Liens (other than the Permitted Liens described in clauses (iv) and (xii) of the definition thereof) from the applicable Assets and other interests to be conveyed in a Sale Transaction or Alternative Equitable Partition and to take or cause to be taken all other reasonable actions, including seeking any necessary consents required for assignment of interests in the Assets and related interests to be conveyed in a Sale Transaction or Alternative Equitable Partition or a change in operatorship to the applicable purchaser in a Sale Transaction or in an Alternative Equitable Partition or any other actions reasonably necessary or desirable to cause the consummation of such Sale Transaction on the terms of the Bona Fide Offer and in order to maximize the value to be realized by the Parties in connection with a Sale Transaction or otherwise to effect an Alternative Equitable Partition. For the avoidance of doubt, the preceding sentence shall not be construed to require Sanchez Energy, SN or SN UnSub to restructure its ownership of the Assets, provided that, subject to the terms of this Agreement, none of Blackstone, Sanchez

Energy, SN and SN UnSub nor any of their Affiliates shall take any action for the purpose of preventing or materially impeding the consummation of a Sale Transaction or an Alternative Equitable Partition. Notwithstanding anything in Section 4.5 or this Agreement to the contrary, (i) Blackstone's rights to compel a Sale Transaction or an Alternative Equitable Partition and (ii) the obligations of Sanchez Energy, SN, SN UnSub, and their respective Affiliates to consent to such transaction, are subject to (a) compliance by SN, SN UnSub and their respective Affiliates with the requirements under each of their debt financing arrangements as of the Effective Date (as the same may be amended and together with any new debt financing arrangement, in each case that shall have been established in good faith and for valid business purposes and on market terms); *provided*, that Sanchez Energy, SN, SN UnSub and their respective Affiliates shall use their respective reasonable best efforts to ensure that any new debt financing arrangement or amendment of an existing financing arrangement entered into after the Effective Date shall not expressly restrict an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, (b) compliance with all of the provisions of this Section 4.5 or (c) required landowner consents, midstream consents or other third party consents.

(c) [Intentionally Omitted]

(d) Subject to the limitations and conditions of this Section 4.5, the Parties will execute the agreement negotiated by Blackstone in connection with such a Sale Transaction (a "Sale Transaction Agreement") and will take such other actions as may be reasonably requested by Blackstone to effect such Sale Transaction; *provided*, *however*, that (i) Sanchez Energy, SN, SN UnSub or their Affiliates bound hereby, as applicable, shall only be required to make the same (or substantially similar in all material respects) representations, warranties and covenants and the same indemnities as Blackstone agrees to make in connection with the Sale Transaction (unless expressly contemplated otherwise in this Section 4.5), except that in no event shall any Party be required to agree to any non-competition or non-solicitation covenant in connection with the Sale Transaction or to make any representation or warranty that would be inaccurate when made without the ability to provide disclosure against such representation or warranty, (ii) no Party shall be liable for the breach of any covenants of any other Party, (iii) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, (iv) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations in connection with the Sale Transaction and related to the Assets shall be shared by the Parties pro rata on a several (but not joint) basis in proportion to the proceeds received by each Party in the Sale Transaction, (v) no Party shall have aggregate liability relating to the representations and warranties (and related indemnities) or other indemnification obligations in excess of the purchase price (nor shall any Party have aggregate liability with respect to the breach of non-fundamental or tax-related representations and warranties (and related indemnities) in excess of twenty-five percent (25%) of the purchase price to be received in the Sale Transaction by such Party without such Party's consent, which may be withheld by such Party in its sole discretion) and (vi) any escrow or other holdback of proceeds shall be allocated on a pro rata basis among the applicable Parties.

(e) In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than twenty-five (25%) in value of publicly traded securities, subject to the following: in connection with such a Sale Transaction (i) if the form of consideration is a combination of cash and securities, the portion of such consideration that is cash shall be the greater percentage of (A) seventy-five (75%) percent cash and (B) the percentage of cash necessary for Sanchez Energy, SN and its Affiliates to meet any debt financing covenants which are then in existence (up to one hundred percent (100%) cash requirements) (*provided*, that Blackstone or its applicable Affiliate may elect to take a higher percentage of equity consideration in a Sale Transaction than the other participating sale parties in order to satisfy the requirements of this clause (i)), (ii) subject to the preceding clause (i), all Parties shall be allocated the same form of consideration, or if any Parties are given an option as to the form and amount of consideration to be received, all Parties will be given the same option and (iii) the consideration to be received by the Parties in a Sale Transaction will be calculated by taking the aggregate proceeds from such Sale Transaction (excluding all out-of-pocket costs incurred by the Parties in connection with such Sale Transaction, which shall be borne by the Parties in proportion to their respective rights to the aggregate sale proceeds; *provided*, that any agreements with accountants, attorneys, investment bankers or other such professional service firms in connection with a Sale Transaction shall be negotiated at arms-length and be at prevailing market rates and *provided*, *further*, that SN shall have the right to consent to any investment bank hired to direct the Sale Transaction process, such consent not to be unreasonably withheld, conditioned or delayed) and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Assets and other interests included by Blackstone, SN and SN UnSub and their respective Affiliates in the Sale Transaction (collectively, the "Drag Interests"), as agreed by the Parties or as otherwise determined pursuant to an Equitable Partition.

(f) For purposes of Section 4.5(e) and Section 4.2(b), in the event the applicable Parties (for purposes of this paragraph, collectively, the "Dispute Parties") disagree as to the relative Fair Market Value of the Drag Interests or Tag Interests, as applicable, included by each Party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days) (it being agreed that an Equitable Partition determined in accordance with Section 4.5(a) shall be final and binding on the Parties), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in the Eagle Ford Shale (the "Valuation Firm") to determine the relative Fair Market Value (on a percentage basis) of the Drag Interests or Tag Interests, as applicable, included by each Party. In the event that Blackstone has not effected a Division of Operatorship, any determination of the Fair Market Value shall assume that Blackstone holds rights to operatorship of such portion of the Assets as though an Equitable Division had been consummated. The Valuation Firm shall be selected by the Dispute Parties from among the parties included on Annex IV and if the Dispute Parties are unable to agree then SN in the case of a Sale Transaction or Blackstone in the case of a Proposed Sale shall choose. The Dispute Parties shall each cooperate fully with the Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable

but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; *provided*, *however*, if the dispute relates to Tag Interests, the Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Drag Interests (the "Final Valuation") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall be split equally between the Parties based on their respective proportionate amount of Working Interests to be conveyed in the applicable transaction, and the Parties shall provide, and shall cause their Controlled Affiliates, and shall use their reasonable best efforts to cause their other Affiliates to provide, all information available to them that may be reasonably requested by the Valuation Firm.

(g) In connection with a Sale Transaction, if reasonably requested by the applicable buyer, Sanchez Energy, if the Sanchez Operator remains the Operator for any Wellpads or Leases, shall use its commercially reasonable efforts to enter into a customary transition services agreement with the purchaser at the closing of such Sale Transaction, or Sanchez Energy shall cause any applicable Affiliate or entity then providing management services to Sanchez Energy and capable of providing transition services to enter into such agreement, which transition services agreement shall be substantially similar in all material respects to the transition services agreement with Affiliates of Anadarko pursuant to the Purchase Agreement, *provided*, that the term shall be no more than two months and Sanchez Energy or its Affiliate shall be entitled to earn a mark-up of ten percent (10%) over cost on all services provided thereunder.

(h) Notwithstanding anything contained in this Section 4.5 to the contrary but, with respect to SN UnSub, subject to Section 4.5(i), (i) there shall be no liability or obligation on behalf of Blackstone or its Affiliates if such entities determine, for any reason, not to consummate a Sale Transaction or an Equitable Partition, and Blackstone shall be permitted to discontinue at any time any Sale Transaction or Equitable Partition initiated by Blackstone by providing written notice to SN and SN UnSub and (ii) Blackstone may not cause Sanchez Energy, SN, SN UnSub and their respective Affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN, SN UnSub and their respective Affiliates in such Sale Transaction (including distributions of cash on hand at SN and SN UnSub that are made to SN and UnSub in connection with such sale) would be greater than or equal to the sum (the "Required Return Sum"), without duplication, of (A) (x) the amount of capital which was invested, borrowed, used or otherwise provided in connection with the financing, acquisition, ownership or operation of the Assets, and any related assets (including for the avoidance of doubt, any assets being retained by SN or Unsub in the Sale Transaction) less all distributions previously made on account of any equity capital invested by Parties other than GSO (or its Affiliates), (y) payments by the relevant Person and its Affiliates arising under or related to the redemption, repayment or refinancing of any securities, credit facilities, financial vehicles, debentures, notes, guarantees or liabilities procured to carry out any and all transactions contemplated under the Purchase Agreement or this Agreement, in each case, that are required as a result of the consummation of a Sale Transaction and (z) disbursements, fees or costs reasonably incurred or to be incurred by the relevant Person and its Affiliates to suspend, reassign, demobilize, stack, terminate, sell off and restructure all

applicable personnel, equipment and operations related, directly or indirectly, to the Assets in connection with such Sale Transaction, (B) the amount of capital GSO (or its Affiliates) invested in SN UnSub, (C) the Base Preferred Return Amount as required under the SN UnSub Partnership Agreement and (D) the outstanding indebtedness for borrowed money of SN and SN UnSub upon such applicable date of determination (net of any cash and cash equivalents of SN and SN UnSub as of such date) to the extent that a buyer in connection with a Sale Transaction does not assume or directly repay such outstanding indebtedness; *provided*, for purposes of the foregoing subparts (A) through (D), that such equity or debt that is amended, incurred or established following the Effective Date is done so in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such equity or debt; *provided*, *further*, that with the written consent of GSO, the Required Return Sum will be adjusted downward equitably to reflect the percentage of Assets actually to be transferred in a Sale Transaction by SN and SN UnSub as compared to the Assets acquired by SN and SN UnSub pursuant to the Purchase Agreement. In addition, (i) a fair and reasonable allocation of the proceeds from a proposed Sale Transaction between SN and SN UnSub shall be made in the reasonable judgment, in good faith and for valid business purposes, of Sanchez Energy, SN and SN UnSub (in accordance with their then existing debt arrangements) and (ii) in no event shall SN or SN UnSub be compelled to enter into a Sale Transaction unless, after the application of the proceeds from such Sale Transaction, after satisfying the conditions in the foregoing subpart (i), the proceeds payable to SN UnSub shall be an amount sufficient to return to its equity holders one hundred percent (100%) of the equity invested in SN UnSub.

(i) Notwithstanding anything in this Section 4.5 or this Agreement to the contrary, prior to the Redemption Date, without the prior written consent of GSO, SN UnSub shall not (and shall not be required to), and no Party shall cause SN UnSub to participate in any transfer or disposition (or enter into definitive documentation providing for any transfer or disposition) of any of its Working Interests or other Assets (or any portion thereof) under this Section 4.5 (other than an Alternative Equitable Partition), and Blackstone shall not have the right to compel a Sale Transaction with respect to SN UnSub's Working Interests and Assets (or any portion thereof), unless (i) such transfer or disposition complies with the terms and conditions of SN UnSub's debt financing arrangements applicable as of the Effective Date and such other debt financing arrangements that as amended, or as incurred or established following the Effective Date in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such debt, (ii) the Preferred Units receive an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full of all outstanding Preferred Units, pursuant to and in compliance with the SN UnSub GP LLC Agreement and SN UnSub Partnership Agreement, less any debt incurred, Preferred Units or Common Units issued by SN UnSub in connection with funding of properties outside of the AMI and (iii) GSO has the right to act on behalf of, and enforce all rights of, SN UnSub in connection with this Section 4.5. For the avoidance of doubt and for purposes of clarity, an Alternative Equitable Partition is intended to provide SN UnSub with substantially similar characteristics and value, after giving effect to such Alternative Equitable Partition, as SN UnSub held in the Core Area prior to the Alternative Equitable Partition, in accordance with the procedures in Section 4.5(a).

**ARTICLE V**
**ADDITIONAL COVENANTS**

**5.1 Information Rights.**

(a) Notwithstanding anything to the contrary in the Operating Agreements (but, for the avoidance of doubt, in addition to the information and data required to be provided to the Parties pursuant any Operating Agreement), Operator shall provide the Parties, in electronic format, with the following information and reports with respect to the Assets reasonably promptly after such information becomes available to Operator or could have been prepared without incurring unreasonable time and cost by Operator or any of its Affiliates:

(i) daily volumes for oil, gas, condensate, and water, choke size and tubing, casing, and flowing pressure;

(ii) monthly lease operating expense statement;

(iii) monthly oil, gas, and condensate sales reports;

(iv) drilling and workover reports, which shall include the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and hydrocarbon information, casing and cementation tallies, and estimated cumulative costs;

(v) daily drilling (including completion, stimulation, testing, artificial lifting, daily mud reports, mud logging, directional drilling, etc.) reports;

(vi) copies of all completion and plugging reports;

(vii) to the extent permissible, copies of all seismic data and reports, well tests, core data, microseismic, and associated analysis reports;

(viii) to the extent Operator prepares or receives such information, (A) geological and geophysical, reservoir engineering, drilling and well completion studies, development schedules, and annual progress reports on development projects and (B) well performance reports;

(ix) copies of written notices provided by Governmental Authorities or any Third Party regarding material violations or potential material violations of applicable Law;

(x) copies of all material reports provided by Operator to, or filings made by Operator with, any Governmental Authority relating to material violations or potential material violations of applicable Law;

(xi) copies of any material correspondence between Operator and any Governmental Authority relating to material violations or potential material violations of applicable law;

(xii) to the extent not included in clauses (i)-(xi) above, all material information, data, projections, interpretative data and analysis, operating plans, records, and analysis utilized by Operator in preparing (including the basis for proposing) a Subsequent Budget and Work Plan; and

(xiii) to the extent not included in clauses (i)-(xii) above, as soon as reasonably practicable following a request from a Party, all information reasonably requested by a Party for any purposes, including in connection with satisfying or complying with information requests and disclosure requirements in respect of financing or other capital market activities, including requests from current and prospective lenders and investors, rating agencies, securities exchanges, and Governmental Authorities.

(b) The information described in Section 5.1(a) shall be stored on a commercially available secure, third-party electronic database and document sharing platform and made available to each Party ("VDR"). Such VDR shall be Intralinks, Merrill Datasite, or another VDR platform that is mutually agreeable to the Parties. The VDR shall be maintained by Operator and such expenses shall be shared equally amongst the Parties.

**5.2 Area of Mutual Interest.**

(a) The Parties hereby establish an Area of Mutual Interest ("AMI"), commencing on the Effective Date of this Agreement and covering lands depicted on Exhibit C attached hereto, plus a 4-mile halo in any direction from the perimeter of such lands (excluding, however, any properties owned by SN and its Affiliates as of the Effective Date within the lands depicted on Exhibit C, which shall not be included within the AMI nor otherwise be subject to this Agreement). The AMI shall terminate and have no further force and effect on the earlier of (i) the date that is five (5) years after the Effective Date, or (ii) the date on which this Agreement is terminated in its entirety in accordance with Section 6.1.

(b) For purposes of this Section 5.2, an "Acquisition" shall mean any acquisition of, or agreement or option to acquire, rights, title or interests to any oil and gas properties covering lands within the AMI by a Party or any of its Affiliates (which in the case of Blackstone, for the avoidance of doubt, shall include HoldCo), subject to Section 5.2(h), between the Effective Date and the expiration of the AMI pursuant to Section 5.2(a). Such Acquisition whether acquired directly or indirectly, shall include without limitation, oil and gas leases, options to lease, farm-ins, options to farm-in, acreage contributions, bottom hole agreements or exploratory agreements. If an Acquisition includes lands located within the AMI and lands located outside the boundaries of the AMI, the Acquisition shall be deemed to include only the lands located inside the AMI, unless the Parties agree otherwise.

(c) All Acquisitions must be reported by the acquiring Party to the non-acquiring Parties thirty (30) days prior to the actual closing date of such Acquisition. Such notification shall include, but is not be limited to, a description of the interest acquired, the area covered, the terms of the Acquisition and the cost (including brokerage fees), and a copy of the proposed agreement for the Acquisition.

(d) For purposes of this Section 5.2, the proportionate shares of Blackstone, SN, and SN UnSub or the Qualified Foreclosure Transferee, if applicable, in the right to participate in an Acquisition shall be fifty percent (50%), thirty percent (30%), and twenty percent (20%), respectively. Each non-acquiring Party will have twenty (20) days after receipt of the notice to furnish the acquiring Party with written notice of its election to acquire, or cause its subsidiary to acquire, its proportionate share of the Acquisition for its proportionate share of the purchase price (or cash equal to fair equivalent value if the Acquisition was made for non-cash consideration); *provided*, *however*, that if Blackstone or its Affiliates is the acquiring Party, SN UnSub may assign its right to participate in such Acquisition to SN, or SN may assign its right to participate in such Acquisition to SN UnSub, in which case SN and SN UnSub shall provide a joint written notice evidencing SN's (or SN UnSub's) election to acquire both shares and SN UnSub's (or SN's) agreement to such election; *provided*, *further*, that if SN, SN Unsub or their respective Affiliates is the acquiring party, Blackstone shall have the right to assign its right to participate in such Acquisition to HoldCo, or, subject to the prior written consent of SN in its sole discretion, any other Affiliate. Failure of a Party to provide a written notice of its election within the twenty (20) day period will be deemed an election not to acquire its proportionate share of the Acquisition which will thereafter no longer be subject to the AMI provisions under this Agreement or any applicable Operating Agreement. Further, if neither non-acquiring Party elects to acquire its proportionate share of an Acquisition, the properties acquired in such Acquisition shall not be subject to this Agreement.

(e) If a non-acquiring Party elects to acquire its proportionate share (or, if applicable, SN elects to acquire both its share and SN UnSub's share or SN UnSub elects to acquire both its share and SN's share) of the Acquisition, such non-acquiring Party shall promptly (within ten (10) days of giving its notice) pay for its proportionate share(s) of the Acquisition, and the acquiring Party, within three (3) Business Days of receipt of that payment from the non-acquiring Party for its share(s) of the Acquisition cost, shall deliver (or cause its Affiliates to deliver) to the non-acquiring Party an assignment of the non-acquiring Party's proportionate share(s) of the Acquisition. Assignments pursuant to the AMI shall not contain any reservations in favor of the acquiring Party (or its Affiliates), other than the reservations burdening the Acquisition as of the date of the Acquisition by the acquiring Party (or its Affiliates). Such assignments shall be prepared in accordance with Exhibit D and be properly executed and notarized for recording purposes.

(f) The acquiring Party shall have the right to serve as operator pursuant to an applicable Operating Agreement for an Acquisition that such acquiring Party brings to the other Party pursuant to this Section 5.2 (to the extent permitted by such Operating Agreement); *provided*, that, prior to the occurrence of an Operator Default Event of SN, SN shall be entitled to serve as Operator for any Acquisitions within the Core Area and any oil and gas leasehold interests

covering lands within the Core Area shall be subject to the terms and conditions of this Agreement as though it were an Asset (and shall be deemed to be included in the definition of "Asset" for all purposes hereunder) and added to Annex III accordingly.

(g) If any Party is in Default, any other Party may (*provided*, that such other Party is not in Default) elect, by written notice, to have the terms of this Section 5.2 not restrict the activities of such other Party or any of its Affiliates during the period that the Default is continuing (*provided*, that a Party may thereafter continue to own and develop assets acquired during the applicable period) and any assets acquired by a Non-Defaulting Party during a Default shall be offered only to the other Non-Defaulting Party under this Section 5.2 and the Defaulting Party shall not be deemed to own or in any way otherwise be entitled to any rights or benefits in respect thereof.

(h) Notwithstanding the foregoing, the provisions set forth in this Section 5.2 shall not in any way limit or apply to (i) the activities of any Affiliate of SN or SN UnSub not Controlled by SN or SN UnSub, as applicable (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy), or (ii) (A) the activities of any Affiliate of Blackstone in its business other than the private equity investments made by the "Blackstone Capital Partners VI," "Blackstone Capital Partners VII," "Blackstone Energy Partners I," and/or "Blackstone Energy Partners II" investment funds (collectively, the "Blackstone Funds") affiliated with or managed by Blackstone Management Partners L.L.C., (B) the activities of GSO Capital Partners L.P. or any investment funds or vehicles managed by GSO Capital Partners L.P. or any portfolio companies or other investments of GSO Capital Partners L.P., or (C) the acquisition by any investment funds or vehicles managed by Blackstone Management Partners L.L.C. or any of its Affiliates to the extent such transaction represents the acquisition of any securities of an entity owning an interest in the AMI if such class of securities being acquired are listed on a national securities exchange and such acquisition does not provide for voting interests in excess of twenty-five percent (25%) of such entity, *provided*, that in each of clauses (ii)(A), (B) and (C), (y) Blackstone does not Control or have the right to Control any of the Persons mentioned in clauses (ii)(A), (B) or (C) above, and (z) any of such Persons does not act at the direction of or with encouragement from Blackstone with respect to any matters contemplated by this Section 5.2. For the avoidance of doubt, if any of the actions prohibited under clauses (y) or (z) above occurs, the respective Persons mentioned in clauses (ii)(A), (B) or (C) above shall be subject to, and their activities shall be limited in accordance with, this Section 5.2; provided, however, that for the avoidance of doubt, portfolio companies of GSO Capital Partners L.P. for which neither GSO Capital Partners L.P. nor its Affiliates have majority board control shall not be subject to the AMI provisions of this Section 5.2 notwithstanding the foregoing. The transactions and other activities excluded by this Section 5.2(h) from the other provisions of this Section 5.2 shall be referred to herein as "Excluded AMI Transactions."

(i) Agreement Memorandum. The Parties hereby agree to execute and promptly file a memorandum of this Agreement in the real property records of Maverick, Dimmit, Webb, and LaSalle Counties substantially in the form attached hereto as Exhibit E.

**5.3 Spacing Protections.**

(a) *Limited Restricted Zone.* With respect to each well drilled on lands in the AMI after the Effective Date but prior to the Redemption Date, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Limited Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Limited Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Limited Spacing Restrictions").

(b) *Full Restricted Zone*. Except for Exception Wells as provided below, with respect to each well drilled on lands in the AMI after the Effective Date but prior to the earlier of (x) the fifth (5th) anniversary of the Effective Date, (y) the Redemption Date, or (z) mutual agreement of the Parties to modify these restrictions, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Full Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Full Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Full Spacing Restrictions").

(c) *Illustration*. Illustrations of the Limited Restricted Zone and Full Restricted Zones are shown in Annex VII attached hereto.

(d) *Exceptions to Full Spacing Restrictions*. Notwithstanding the foregoing, the Operator may drill and complete up to thirty (30) wells (the "Exception Wells") in the areas in the AMI shown in Annex VII that do not comply with the Full Spacing Restrictions as long as such Exception Wells comply with the Limited Spacing Restrictions.

(e) *Modifications to Full Restricted Zone*.

(i) *Notice*. Any Party may request that the Full Restricted Zone be modified by giving written notice to the other Parties if (1) twenty (20) Exception Wells have been drilled and completed, (2) at least six (6) Exception Wells have been drilled and completed in each AMI Test Area subject to the proposed modification of the Full Restricted Zone (the "Test Wells"), and (3) the Test Wells have been producing for at least six (6) months. Such written notice shall include a description of the proposed modifications to the Full Restricted Zone and reasonably detailed technical information and data from such requesting Party's consulting reservoir engineers supporting such modifications to the Full Restricted Zone (the "Proposed Modifications"). Each Party shall work in good faith to review the Proposed Modifications and all supporting information. The Proposed Modifications may not contain spacing restrictions that are less restrictive or protective in either the horizontal or vertical plane than those in the Limited Restricted Zone. If the other Parties (and their respective consulting engineers) agree that the Proposed Modifications will not lead to any material reduction in value to each Party's respective Asset base, then the Full Spacing Restrictions shall be modified pursuant to the Proposed Modifications until such time that the Parties agree to subsequent Proposed Modification.

(ii) *Failure to Agree*. If the other Parties (and their respective consulting engineers) fail to agree that the Proposed Modifications will not lead to any reduction in value to each Party's respective Asset base within 30 days after the date of the first notice provided in Section 5.3(e)(i), then any Party may within seven (7) Business Days thereafter, declare a Deadlock by providing a Deadlock Notice to the other Parties. Thereafter, such Deadlock shall be subject to the provisions of Section 3.6(b) and, if applicable, non-binding mediation, in accordance with Section 3.6(c). For the avoidance of doubt, as it relates to this Section 5.3, any decision on behalf of SN UnSub prior to the Redemption Date shall require the approval of the Class B Member of SN UnSub.

(iii) *Amendment*. Prior to drilling offset wells pursuant to such Proposed Modifications, then this Annex VII shall be amended to reflect the Proposed Modifications to the Full Restricted Zone agreed to by the Parties hereunder.

(f) *Covenants Running with the Land and Assumption*. The obligations of the Parties in this Section 5.3 are covenants running with the land and shall be binding upon the Parties and their successors and assigns. For the avoidance of doubt, the Parties agree that the obligations in this Section 5.3 will burden the lands in the AMI and create a privity of estate between the Parties. It is the Parties' express intent that such obligations will not be subject to rejection in the event of any bankruptcy involving any Party or any successor or assign to any of the leases, lands,

or wells that are subject to this Agreement. Each Party agrees to cause its successors and assigns to expressly assume the obligations under this Section 5.3 in connection with any Transfer of all or part of its Assets.

(g) *Existing Producing Wells and Drilled and Uncompleted Wells.* The restrictions listed in this Section 5.3 shall apply solely to wells that are drilled and completed within the Limited Restricted Zone or the Full Restricted Zone of an Existing Wellpad and shall not apply to the Existing Drilled and Uncompleted Wells.

(h) *Applicability to Blackstone.* Notwithstanding anything in Section 5.3, Blackstone shall not be subject to either the Full Spacing Restrictions or the Limited Spacing Restrictions in Section 5.3 after 5 years following the Effective Date.

**5.4 Cooperation**. The Parties agree to cooperate, and to cause their Affiliates to cooperate, with one another in connection with the arrangement of any debt financing related to the Assets as may be reasonably requested by a Party. Any reasonable, out-of-pocket expenses incurred by a Party and its Affiliates in providing reasonable cooperation to a Party in accordance with this Section 5.4 shall be reimbursed by the Party seeking such cooperation.

## ARTICLE VI
## TERM AND TERMINATION

**6.1 Term and Termination**. Subject to Section 6.2, the term of this Agreement shall commence on the Effective Date and continue until the earliest of:

(a) termination by mutual written agreement of each Party;

(b) the eighth anniversary of the Effective Date;

(c) with respect to any interest in the Assets transferred (other than pursuant to a Permitted Transfer or a Foreclosure Transfer) to a Third Party (which for the avoidance of doubt shall not include Sanchez Production Partners LP, Sanchez Oil & Gas Corporation or its Affiliates, any Permitted Holder or any other entity Controlled by any Permitted Holder), upon the consummation of such transfer but only with respect to the interest transferred (and this Agreement will remain in effect with respect to the remainder of the Assets), subject to Section 4.1(b) and the provisions that survive pursuant to Section 6.2 and which are assigned in connection with a Transfer pursuant to Section 7.3;

(d) termination by any Party in its sole discretion after a Division of Operatorship or an Alternative Equitable Partition is completed, but only within thirty (30) days after the consummation of the Alternative Equitable Partition or final Equitable Division resulting therefrom; and

(e) termination by a Non-Defaulting Party in its sole discretion following a Default, but only within thirty (30) days after such Default.

Following the termination of this Agreement in accordance with this Section 6.1, upon the written request of any Party, the Parties agree to execute and file for record a notice of termination of this Agreement in the form attached hereto as Exhibit G.

**6.2** **Effect of Termination**. The expiration or termination of this Agreement, for any reason, shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) has already accrued hereunder, (ii) comes into effect due to the expiration or termination of the Agreement, or (iii) otherwise survives the expiration or termination of this Agreement. Notwithstanding anything in this Agreement to the contrary, (i) the right of Blackstone to pursue a Sale Transaction and/or an Equitable Division pursuant to Section 4.5 (and the provisions set forth in Article VII as they may relate to Section 4.5) shall survive termination due to Division of Operatorship for the later of (A) a period of nine (9) months following the consummation of such Division of Operatorship (it being understood that in the event an Alternative Equitable Partition is to be completed, then the parties shall complete such Alternative Equitable Partition regardless of whether such nine (9) month period has expired) or (B) five (5) months after determination of a final and binding Equitable Partition in accordance with Section 4.5; (ii) the information rights set forth in Section 5.1 shall survive a termination due to a Division of Operatorship indefinitely or until neither Blackstone, SN, nor any of their Affiliates (or any designee thereof) operates any of the Assets, (iii) Section 3.8(e)(i) shall survive for a period of six months following a termination resulting from a sale by SN, or any other Affiliate thereof serving as Operator, to a Third Party, or following a termination under Section 6.1(d), (iv) Section 3.8(e)(ii) and Section 3.8(e)(iii) and the penultimate sentence of Section 3.8(e) shall survive termination indefinitely until all Required Operatorship Consents are obtained (including to the extent a Division of Operatorship is effected following termination of the Agreement pursuant to the immediately preceding clause (iii)), provided that the last sentence of Section 3.8(e)(iii) shall survive the termination of this Agreement in any event for a period of ten years; (v) the provisions of Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten years; and (vi) the spacing restrictions in Section 5.3 shall survive termination until the dates set forth in Section 5.3 .

**ARTICLE VII**
**GENERAL PROVISIONS**

**7.1** **Entire Agreement**. This Agreement, the Operating Agreements and the Purchase Agreement, constitute the entire agreement with respect to the subject matter covered hereby and supersede (i) all prior oral or written proposals, term sheets or agreements, (ii) all contemporaneous oral proposals or agreements, and (iii) all previous negotiations and all other communications or understandings between the Parties with respect to the subject matter hereof.

**7.2** **Waivers**. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement shall be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, shall not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**7.3** **Assignment; Binding Effect**. Subject to the terms and conditions hereunder, each Party may assign its rights or interests under this Agreement, or delegate any duties hereunder, without the prior written consent of the other Party, *provided*, that such assignment or delegation is made in connection with the conveyance by a Party or its Affiliate of (i) all its interest in an Asset to a Third Party, (ii) all or some of its interests in an Asset to an Affiliate, in each case in accordance with the terms of this Agreement or (iii) otherwise in connection with a Sale Transaction, including, for the avoidance of doubt, all rights set forth in Section 3.8(e)(ii) (including with respect to the survival period of such provision as set forth under Section 6.2). This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns; *provided*, *however*, that in the case of only a partial assignment by a Party of their rights or interests under this Agreement to an Affiliate or Permitted Transferee, such Affiliate or Permitted Transferee shall not succeed to such transferring Party's rights under Article III, unless otherwise agreed by the Parties and such Affiliate or Permitted Transferee.

**7.4** **Governing Law; Severability.**

(a) **This Agreement has been executed and delivered and shall be construed, interpreted and governed pursuant to and in accordance with the laws of the State of Texas, without regard to any conflict of Laws principles which, if applied, might permit or require the application of the Laws of another jurisdiction.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by applicable Law.

**7.5** **Further Assurances**. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use its reasonable best efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

**7.6** **Counterparts**. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument.

**7.7** **Confidential Information.**

(a) The Parties acknowledge that they and their respective appointed Representatives (if any) shall receive information from or regarding Assets in the nature of trade secrets or that otherwise is confidential information or proprietary information (as further defined below in this Section 7.7(a), "Confidential Information"), the release of which would be damaging to the Parties or Persons with which the Parties conduct business. Each Party shall hold in strict confidence, and shall require that such Party's appointed Representatives (if any) hold in strict confidence, any Confidential Information that such Party or such Party's appointed Representative receives, and each Party shall not, and each Party shall require that such Party's appointed Representatives agree not to, disclose such Confidential Information to any Person other than another Party or Representative, or use such information for any purpose other than to evaluate, analyze, and keep apprised of the Assets and such Party's interest therein, except for disclosures (i) to comply with any Laws (including applicable stock exchange or quotation system requirements), ***provided***, that, if permitted by applicable Law, a Party or Representative must notify all the Parties promptly of any disclosure of Confidential Information which is required by Law, and any such disclosure of Confidential Information shall be to the minimum extent required by Law, (ii) to Affiliates, partners, members, stockholders, investors, directors, officers, employees, agents, attorneys, consultants, lenders, professional advisers or representatives of the Party or Representative or their Affiliates; ***provided***, that such Party or Representative shall be responsible for assuring such Affiliates,' partners,' members,' stockholders,' investors,' directors,' officers,' employees,' agents,' attorneys,' consultants,' lenders,' professional advisers' and representatives' compliance with the terms hereof (and such Party or Representative, as applicable, shall be liable for any non-compliance by such Persons as if such Persons were bound as a Party hereto), except to the extent any such Person who is not an Affiliate, partner, member, stockholder, director, officer or employee has agreed in writing addressed to all the Parties to be bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a), (iii) to Persons to which that Party's Asset Interests may be Transferred as permitted by this Agreement, but only if the recipients of such information have agreed to be bound by customary confidentiality and non-use undertakings similar to this Section 7.7(a), (iv) of information that a Party or Representative also has received from a source independent of another Party or Representative and that such Party or Representative reasonably believes such source obtained such information without breach of any obligation of confidentiality to another Party, Representative or any of their Affiliates, (v) that have been or become independently developed by a Party, a Representative or their Affiliates, or on their behalf without using any of the Confidential Information, (vi) that are or become generally available to the public (other than as a result of a prohibited disclosure by such Party or Representative or Persons for which such Party or Representative is responsible for under clause (ii) above), (vii) in connection with any proposed Transfer of all or part the Working Interests of a Party, the proposed sale of all or substantially all of a Party or its direct or indirect parent or the proposed debt or equity financing of a Party or its direct or indirect parent, to Persons to which such interest may be directly or indirectly transferred or which may provide such debt or equity financing (and their respective advisors or representatives), but only if the recipients of such information have agreed to be bound by customary undertakings with respect to confidential and proprietary information similar to this

Section 7.7(a) (unless, in the case of advisors or representatives, such Persons are otherwise bound by a duty of non-disclosure and non-use with respect to confidential and proprietary information), (viii) to Third Parties to the extent necessary for a Person to provide services in connection with its capacity as Operator, as applicable, or (ix) to the extent the non-disclosing Parties shall have consented to such disclosure in writing. The Parties agree that breach of the provisions of this Section 7.7(a) by such Party or such Party's appointed Representative (if any) would cause irreparable injury to the non-disclosing Parties for which monetary damages (or other remedy at Law) would be inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Party or Representative to comply with such provisions and (ii) the uniqueness of the Assets and the confidential nature of the Confidential Information. Accordingly, the Parties agree that the provisions of this Section 7.7(a) may be enforced by any Party by temporary or permanent injunction (without the need to post bond or other security, therefor), specific performance or other equitable remedy and by any other rights or remedies that may be available at law or in equity. The term "Confidential Information" shall include any information pertaining to the identity of the Parties and the Assets, which is not available to the public, whether written, oral, electronic, visual form or in any other media, including, such information that is proprietary, confidential or concerning the Parties ownership and operation of the Assets or related matter, including any actual or proposed operations or development project or strategies, other operations and business plans, actual or projected revenues and expenses, finances, contracts and books and records. Notwithstanding the foregoing, Blackstone and its Affiliates may make disclosures to its direct and indirect limited partners and members such information (including Confidential Information) as is customarily provided to current or prospective limited partners in private equity funds sponsored or managed by Affiliates of Blackstone, *provided*, that if such Persons are receiving Confidential Information such Persons are bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a). In the event that a Party wishes to issue a press release relating in any respect to the Assets that in the opinion of such Party does not contain Confidential Information, each Party shall be consulted and have a reasonable amount of time to review and comment upon such proposed press release prior to its issuance. Notwithstanding anything herein to the contrary, in the event a Party has approved or been consulted with respect to any disclosures as required hereunder, the other Party, its Representatives or its Affiliates shall be entitled to make disclosures substantially similar (as to form and content) to those prior disclosures that the non-disclosing Party has approved or been consulted with respect to, as applicable.

(b) The Parties acknowledge and agree that none of the Parties shall furnish or otherwise provide a copy of this Agreement (or any part hereof) to any Person (other than the Parties, their Representatives, and Affiliates, and their respective representative(s) and adviser(s)), unless (i) otherwise agreed in writing by each of the Parties, (ii) required by applicable Laws (and if required by applicable Laws, a copy of the applicable portions of this Agreement shall be furnished only to the extent necessary to comply with such applicable Laws), (iii) by any Party, as required to implement any of the hedging arrangements and financings, and (iv) in compliance with clauses (i)-(ix) of Section 7.7(a), as if this Agreement were Confidential Information.

**7.8 No Third Party Beneficiaries**. Except as set forth in Section 7.14, except for the UnSub Agent in respect of the Cure Right and rights of a Qualified Foreclosure Transferee, and

except for the rights of GSO under Section 4.5 (which may be enforced by GSO) the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns. Except for the foregoing, this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities, or obligations are owed by a Party, or (b) any liquidator, trustee, or creditor acting on behalf of any Party, and no such creditor or any other Person shall have any rights under this Agreement.

**7.9** **Non-Solicitation**. For a period from and after the date hereof until the date that is sixty (60) months after the termination of this Agreement Blackstone shall not, and Blackstone shall cause entities that are Controlled Affiliates of the Blackstone Funds not to, directly or indirectly, (i) solicit, induce or encourage any such employee or officer of the SN, SN UnSub or any of their respective Affiliates to leave their respective positions of employment with SN, SN UnSub and/or or any of their respective Affiliates, (ii) hire or employ any of such employees or officers, whether as a consultant or otherwise, or (iii) hire or employ any such former employee or officer, whether as a consultant or otherwise, within six (6) months of such person's final employment date with SN, SN UnSub or or any of their respective Affiliates; *provided*, that this Section 7.9 shall not preclude Blackstone or any of its Affiliates from soliciting for employment or hiring any such employee, agent or contractor who has been terminated (and not rehired) by SN, SN UnSub or any of their respective Affiliates. Notwithstanding anything in this Agreement to the contrary, a breach of this Section 7.9 shall not be considered for purposes of determining a Default hereunder unless the breach was effected with the knowledge of a private equity professional of the Blackstone Funds and the action underlying such breach would violate the terms of this Section 7.9, or alternatively if Sanchez Energy is able to establish a sustained pattern of breaches of this Section 7.9, and in each case provided that Blackstone take such steps necessary to immediately terminate such employee unless otherwise waived in writing by Sanchez Energy.

**7.10** **Notices**. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement shall be in writing and sent to the address of the Party (or Person) set forth below, or to such other more recent address of which the sending Party actually has received written notice:

(a) if to SN, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Greg Kopel
Electronic Mail: gkopel@sanchezog.com

and with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 43rd Floor
Houston, TX 77002
Fax: 713-236-0822

Attn: David Elder
Michael J. Byrd
Electronic Mail: delder@akingump.com
mbyrd@akingump.com

(b) if to SN UnSub, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Tel: 713.756.2782

with a copy to:

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: crichardson@andrewskurth.com

(c) if to Blackstone, to:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Electronic Mail: acconcia@blackstone.com

and with copies to:

Blackstone Management Partners L.L.C.
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia

Electronic Mail: acconcia@blackstone.com

and

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail: andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com

and

(d) if to the UnSub Agent, to:

JPMorgan Chase Bank, N.A.
712 Main Street, 12th Floor South
Houston, TX 77002
Attention:Darren Vanek
Electronic Mail: darren.m.vanek@jpmorgan.com

and with a copy to (which shall not constitute notice):

Each such notice or other communication shall be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

**7.11** **Remedies**. Except as provided herein, the rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party shall be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

**7.12 <u>Disputes.</u>**

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL

CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) Notwithstanding anything contained in Section 7.12(a), in the event a Party wishes to contest whether it is in Default (the "Contesting Party"), such Party shall provide the Non-Defaulting Parties with its written objection within fifteen (15) days after receipt of a notice of Default (the "Objection Notice"). In such event, a representative of the Contesting Party and each of the Non-Defaulting Parties shall meet and use good faith efforts to mutually agree on a resolution. If such representatives are unable to resolve the disagreement within fifteen (15) days after receipt of the Objection Notice, then the disagreement shall be resolved by arbitration, which arbitration proceedings shall be held in Houston, Texas and conducted pursuant to the Rules for Commercial Arbitration promulgated by the American Arbitration Association, to the extent such rules do not conflict with the terms of this Section 7.12(c). In connection therewith, the arbitrator shall be selected by mutual agreement of the parties to such dispute, or absent such agreement, within ten (10) Business Days of becoming aware that such agreement cannot be made as to the selection of the arbitrator, by the American Arbitration Association. The arbitrator shall not have worked as an employee, consultant, independent contractor or outside counsel for any of the Parties to such dispute or any of their respective Affiliates during the ten (10) year period preceding the arbitration or have any financial interest in the dispute or any assets or businesses of the parties to such dispute. The arbitrator's determination shall be made within fifteen (15) Business Days after submission of the matters in dispute and, absent manifest error, shall be final and binding upon the Parties to such dispute, without right of appeal. In making its determination, the arbitrator shall be and remain at all times wholly impartial, and, once appointed, the arbitrator shall have no *ex parte* communications with any of the Parties to the dispute concerning the arbitration or the underlying dispute.

**7.13 Expenses**. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**7.14 No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees, and acknowledges

that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder, or member of any Party (or any of their successors or permitted assignees), or any Affiliate thereof, or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, general or limited partner, stockholder, manager, or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract, or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation, or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

**7.15** **Conflict**. In the event of a conflict between the terms of this Agreement and the terms of any Operating Agreement applicable to the Assets, the terms of this Agreement shall control as among the Parties.

**7.16** **Subchapter K**. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code

**7.17** **Relationship of SN and SN UnSub**. Notwithstanding anything herein to the contrary, (a) the obligations under this Agreement of SN, on the one hand, and SN UnSub, on the other hand, are several and such obligations shall not be deemed "joint and several," (b) SN shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN UnSub, and (c) SN UnSub shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN. Furthermore, and for the avoidance of doubt, no Party shall be responsible in any way for the performance of the obligations of any other Party under this Agreement. Nothing contained herein, and no action taken by any Party pursuant thereto, shall be deemed to constitute or form a partnership, association, joint venture or any other kind of group or entity, or create a presumption that a Party is in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement. Each Party shall be entitled to independently protect and enforce its rights, in equity, contract or law, including, the rights arising out of this Agreement, and it shall

not be necessary for any other Party to be joined as an additional party in any proceeding for such purpose.

**7.18** **Operating Committee; Affiliates**. To the extent that this Agreement expressly purports to require any Representative of a Party or the Operating Committee to take any action or refrain from taking any action, each such Party agrees to use its reasonable best efforts to cause its Representative(s) and the Operating Committee, as applicable, to take such action or refrain from taking such action, as applicable. To the extent this Agreement purports to require a Party to require any of its Affiliates to take any action or refrain from taking any action, each such Party shall only be required to use its reasonable best efforts to cause an Affiliate not Controlled by it (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy) to take such action or refrain from taking such action, as applicable.

**7.19** **Force Majeure**. If any Party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to indemnify or make money payments or furnish security, that Party shall give to all other Parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the Party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as used in this Section, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other event, circumstance or cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the Party claiming suspension. The affected Party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the Party concerned.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Joint Development Agreement as of the date first set forth above.

**SANCHEZ ENERGY CORPORATION:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UNSUB GP, LLC,
its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**GAVILAN RESOURCES, LLC:**

By: /s/ Angelo Acconcia
Name: Angelo Acconcia
Title: President

**Annex I**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"Acquisition" has the meaning set forth in Section 5.2(b).

"Additional E&D Proposal" has the meaning set forth in Section 3.7(c)(i).

"Additional S&A Proposal" has the meaning set forth in Section 3.7(c)(ii).

"AFE" means a written description and cost estimate of a proposed activity or operation accompanying a proposal for such activity or operation made pursuant to an Operating Agreement and forwarded to the Operating Committee by Operator pursuant to an Operating Agreement. Any AFE that proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which the Parties are permitted to make separate elections under the terms of the relevant Operating Agreement.

"Affiliate" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in the Partnership or the General Partner result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Alternate Operator" has the meaning set forth in Section 3.8(f).

"Alternative Equitable Partition" has the meaning set forth in Section 4.5(a).

“AMI” has the meaning set forth in Section 5.2(a).

“Anadarko” has the meaning set forth in the recitals.

“APC Well Commitment” means wells required to be drilled pursuant to that certain Development Agreement, dated as of the date hereof, by and among Anadarko, SN, SN UnSub and Blackstone.

“Applicable Credit Agreement” means, in the case of (i) SN, the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy, as borrower, Royal Bank of Canada, as administrative agent and the other financial institutions party thereto from time to time, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the “SN Credit Agreement”), (ii) SN UnSub, that certain Credit Agreement, among SN UnSub, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent, and an issuing bank, the banks, financial institutions and other lending institutions from time to time parties as lenders thereto, dated as the date hereof, as amended, restated, amended and restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the “UnSub Credit Agreement”), (iii) Blackstone, (x) that certain Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent and (y) that certain Second Lien Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and Citibank, N.A., as administrative agent and collateral agent, and (iv) a Third Party Operator, any of such Third Party Operator’s debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the “Third Party Credit Agreement”), and (v) a Qualified Foreclosure Transferee, any of such Qualified Foreclosure Transferee’s debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time.

“Approved AFE” means an AFE approved by the Operating Committee pursuant to Section 3.2(g) or deemed approved under Section 3.7(c).

“Approved Budget” means the Initial Budget and Work Plan, any Subsequent Budget and Work Plan approved under Section 3.7(b)(ii), and any amendment to the Initial Budget and Work Plan or approved Subsequent Budget and Work Plan approved as provided under Section 3.2.

"Approved Operation" means an Initial Approved Operation and any Subsequent Approved Operation.

"Area of Mutual Interest" has the meaning set forth in Section 5.2(a).

"Asset Interest" has the meaning set forth in Section 4.1(a).

"Assets" means collectively, the right, title and interest in and to the assets included in the term "Asset" as used in the Purchase Agreement.

"Base Preferred Return Amount" has the meaning give to such term in the SN UnSub Partnership Agreement as in effect as of the Effective Date.

"Blackstone" has the meaning set forth in the preamble.

"Blackstone Funds" has the meaning set forth in Section 5.2(h).

"Blackstone Operator" has the meaning set forth in Section 3.8(a).

"Blackstone Operatorship Rights" has the meaning set forth in Section 4.5(a).

"Blackstone Percentage" has the meaning set forth in Section 4.5(a).

"Blackstone Representative" has the meaning set forth in Section 3.3(a)(iii).

"Board of Directors" means the board of directors of SN.

"Bona Fide Offer" means a bona fide offer received by Blackstone from a Third Party that was obtained or marketed by Blackstone through a bona fide arms-length process (it being understood that such process need not be a broadly marketed process, but could be a direct negotiation and offer from a single party) designed to achieve the fair market value for the Working Interests, Assets and/or other related assets, or Equity Interests, as applicable, related to such offer. For the avoidance of doubt, a Bona Fide Offer will be deemed not to include a Foreclosure Transfer.

"Budget Negotiation Period" has the meaning set forth in Section 3.7(b)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"BX Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Capital Expenditures" means any expenditure by a Party that is required to be capitalized for purposes of such Party's financial statements in accordance with GAAP.

"Change of Control" means, with respect to Sanchez Energy, any of the following transactions: (a) a merger, consolidation or other reorganization, unless securities representing more than thirty-five percent (35%) of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Persons who beneficially owned Sanchez Energy's outstanding voting securities immediately prior to such transaction; or (b) any transaction or series of transactions pursuant to which any "person" or "group" (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934) becomes directly or indirectly the beneficial owner of any of Sanchez Energy's securities possessing more than sixty-five percent (65%) of the total combined voting power of Sanchez's securities (as measured in terms of the power to vote with respect to the election of its board of directors) outstanding immediately after the consummation of such transaction or series of transactions, whether such transaction involves a direct issuance from Sanchez Energy or the acquisition of outstanding securities held by one or more of Sanchez Energy's existing stockholders; excluding, in each case of (a) or (b) above, any transaction with a Permitted Transferee or a Permitted Holder.

"Confidential Information" has the meaning set forth in Section 7.7(a).

"Consents" has the meaning set forth in Section 2.2.

"Consent Agreement" means that certain Consent to Assignment of Interest dated December 24, 2016, from Briscoe Ranch, Inc. et al. to Sanchez Energy and Anadarko E&P Onshore LLC.

"Consenting Parties" means Briscoe Ranch, Inc., Miramar Holdings, L.P., Rancho la Cochina Minerals, Ltd., Janey Briscoe Marmion GST Trust, and El Pescado Minerals, Ltd.

"Contesting Party" has the meaning set forth in Section 7.12(c).

"Control" (including its derivatives and similar terms) means, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Core Area" means the area marked in blue on Exhibit C.

"Cure Right" has the meaning set forth in the definition of "Default".

"Deadlock" has the meaning set forth in Section 3.6(a).

"Deadlock Notice" has the meaning set forth in Section 3.6(a).

"Default" means, in respect of any Party, the failure by such Party or any of its Affiliates to remedy, within thirty (30) days of receipt of a Default Notice from any other Party, the material non-performance or material non-compliance with a material provision of this Agreement by such Party or any of its Affiliates (provided, however, that UnSub and SN shall not be considered to be "Affiliates" for the purposes of this definition of "Default", such that a Default by SN (or by SN's

Affiliates other than SN UnSub) shall not be deemed to be a default by SN UnSub, and a Default by SN UnSub shall not be deemed to be a Default by SN); provided, however, in the event of a failure by UnSub, the UnSub Agent shall also have the right (but not the obligation) to remedy any such failure within such thirty (30) day time period (the "Cure Right").

"Default Notice" means a written notice from a Party containing a detailed description of the basis of a claim that another Party has materially failed to perform or materially failed to comply with this Agreement, including specific references to the provisions in this Agreement that such Party has materially failed to comply with or perform; *provided*, *however*, in the event of an alleged failure by UnSub, such written notice shall also be delivered to the administrative agent under the UnSub Credit Agreement (the "UnSub Agent") substantially concurrently with delivery to UnSub.

"Defaulting Operator" has the meaning set forth in Section 3.8(f).

"Defaulting Party" has the meaning set forth in Section 3.9(a).

"Dispute Parties" has the meaning set forth in Section 4.5(f).

"Division of Operatorship" has the meaning set forth in Section 3.8(e)(i).

"Drag Interests" has the meaning set forth in Section 4.5(e).

"E&D Operations" means all activities and operations related to subsurface exploration and development of the Assets (including all drilling, reworking, plugging back, shutting-in, completing, re-completing, re-fracturing, stimulation, acidization, enhanced recovery operations, plugging and abandonment operations) as well as construction of wellpads and installation and operation of wellsite facilities.

"Effective Date" has the meaning set forth in the preamble.

"Equitable Division" has the meaning set forth in Section 3.8(e)(i).

"Equitable Partition" has the meaning set forth in Section 4.5(a).

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock and any commitments with respect thereto, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, equity interests or other partnership/limited liability company interests, and any commitments with respect thereto, and (c) any other direct or indirect equity ownership or participation in a Person.

"Estimated Cash Outlays" has the meaning set forth in Section 3.7(d).

"Excluded AMI Transactions" has the meaning set forth in Section 5.2(h).

"Excluded Percentage" has the meaning set forth in Section 4.5(a).

"Excluded Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Existing Drilled and Uncompleted Wells" means the oil and gas wells listed in Annex VI.

"Existing Producing Wells" means the oil and gas wells listed in Annex V.

"Existing Wellpad" means, as of any date of determination, each then-existing wellpad with average daily production in excess of 300 BOE/D over the prior twelve-month period under the Leases pursuant to which the Parties (including their respective Affiliates) retain any Working Interests.

"Fair Market Value" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"Final Deadlock" has the meaning set forth in Section 3.6(b).

"Final Deadlock Notice" has the meaning set forth in Section 3.6(b).

"Final Valuation" has the meaning set forth in Section 4.5(f).

"Financial Advisor" has the meaning set forth in Section 3.8(e)(i).

"Foreclosure Transfer" means any assignment, transfer, conveyance, exchange or any other alienation resulting from any judicial or non-judicial foreclosure by the holder of a security interest or other encumbrance or any Transfer to the holder of a security interest or other encumbrance in connection with a workout, bankruptcy, restructuring or similar arrangement, including in each case to the extent effectuated pursuant to Sections 363 or 1129 of the U.S. Bankruptcy Code.

"Form Operating Agreement" means the form of AAPL Joint Operating Agreement attached hereto as Exhibit B.

"Full Restricted Zone" means, for each Existing Producing Well, a three dimensional area in the shape of a rectangular prism, defined by the following: the rectangular subsurface zone extending perpendicularly (i) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (ii) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Full Spacing Restrictions" has the meaning set forth in Section 5.3(b)(iv).

"Future Wellpads" means all prospective wellpads for acreage under the Leases on which there are no Existing Wellpads based on customary industry practices and the reserve report for each Party covering the previous twelve (12) month period.

"GAAP" means those generally accepted accounting principles and practices that are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means ST Holdings L.P.

"HoldCo" means Gavilan Resources HoldCo, LLC (f/k/a Aguila Production HoldCo, LLC).

"Included Percentage" has the meaning set forth in Section 4.5(a).

"Included Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Initial Approved Operations" has the meaning set forth in Section 3.7(a).

"Initial Budget and Work Plan" has the meaning set forth in Section 3.7(a).

"IPO" has the meaning set forth in Section 4.4.

"IPO Notice" has the meaning set forth in Section 4.4.

"IPO Party" has the meaning set forth in Section 4.4.

"Joint Exploration Agreement" means the Joint Exploration Agreement, dated to be effective as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended from time to time.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Leases" means, collectively, the oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other rights included in the term "Leases" as used in the Purchase Agreement.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Lien" shall have the meaning ascribed to "Encumbrance" in the Purchase Agreement.

"Limited Restricted Zone" means, for each Existing Producing Well, two overlapping three dimensional areas, each in the shape of a rectangular prism, defined by the following: (i) the rectangular subsurface zone extending perpendicularly (A) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 90 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well; and (ii) the rectangular subsurface zone extending perpendicularly (A) 275 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Limited Spacing Restrictions" has the meaning set forth in Section 5.3(a)(iv).

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"Material Contracts" means any contract related to E&D Operations or S&A Operations or otherwise relating to the Assets, including drilling and completion agreements, gathering agreements, processing agreements, transportation agreements, supply agreements, disposal agreements, electric supply agreements or marketing or sales agreements, in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000; provided, however, that contracts which are contemplated by any marketing agreements by and between SN or UnSub, as applicable, or any of their Affiliates, on the one hand, and Blackstone and any of its Affiliates, on the other hand, shall not be deemed Material Contracts hereunder.

"Monthly Invoice" has the meaning set forth in Section 3.7(d).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Negligent Operator Action" has the meaning set forth in Section 3.8(f).

"Non-Defaulting Party" has the meaning set forth in Section 3.9(a).

"Non-Initiating Party" has the meaning set forth in Section 4.2(a).

"Non-IPO Party" has the meaning set forth in Section 4.4.

"Non-Transferring Party" has the meaning set forth in Section 4.1(a).

"Objection Notice" has the meaning set forth in Section 7.12(c).

"Operating Agreement" means any Joint Operating Agreement for any of the Leases and, to the extent applicable, the Joint Exploration Agreement and Participation Agreement as it may relate to a Party's ownership of any interest in a Lease.

"Operating Committee" has the meaning set forth in Section 3.1.

"Operator" has the meaning set forth in Section 3.8(a).

"Operator Default Event" has the meaning set forth in Section 3.8(f).

"Participation Agreement" means that certain Maverick Basin Area Participation Agreement, dated effective January 1, 2011, by and between Anadarko and Eagle Ford TX LP.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 7.14.

"Permitted Holders" means (a) Antonio R. Sanchez, III and A.R. Sanchez, Jr., (b) any spouse or descendant of any individual named in (a), or (c) any other natural person who is related to, or who has been adopted by, any such individual or such individual's spouse referenced in (a)-(b) above within the second degree of kinship, or (d) any Person Controlled, directly or indirectly, by any of the Persons referenced in clauses (a)-(c) above, individually or collectively by one or more of such Persons.

"Permitted Liens" has the meaning set forth in Section 4.1(a).

"Permitted Transferee" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person. For purposes of this Agreement, (i) Sanchez Production Partners LP and its Controlled Affiliates shall be deemed to be a Permitted Transferee of SN, except with respect to Section 4.2 for which purposes Sanchez Production Partners LP and its Controlled Affiliates shall not be deemed to be a Permitted Transferee of Sanchez, (ii) Permitted Holders shall be a Permitted Transferee of SN; and (iii) SN and SN UnSub shall each be treated as a Permitted Transferee of each other.

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Post-Division Non-Operator" has the meaning set forth in Section 3.8(e)(i).

"Post-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Pre-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Preferred Units" has the meaning give to such term in the SN UnSub Partnership Agreement.

"Proposed Modifications" has the meaning set forth in Section 5.3(e)(i).

"Proposed Sale" has the meaning set forth in Section 4.2(a).

"Proposed Transferee" has the meaning set forth in Section 4.2(a)(i).

"Purchase Agreement" has the meaning set forth in the recitals.

"Qualified Foreclosure Transfer" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee Representative" has the meaning set forth in Section 3.3(a)(ii).

"Quorum" has the meaning set forth in Section 3.5(a).

"Redemption Date" means the date of redemption of all outstanding Preferred Units in cash under the SN UnSub Partnership Agreement, as such agreement may be amended from time to time, issued as of the Effective Date pursuant to that certain Securities Purchase Agreement dated as of January 12, 2017, by and among Sanchez Energy, SN UR Holdings, LLC, a Delaware limited liability company; SN EF UnSub Holdings, LLC, a Delaware limited liability company; SN UnSub; SN EF UnSub GP, LLC, a Delaware limited liability company; GSO ST Holdings Associates LLC, a Delaware limited liability company; and GSO ST Holdings LP, a Delaware limited partnership.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and between HoldCo and Sanchez Energy.

"Representative" has the meaning set forth in Section 3.1.

"Required Operatorship Consents" has the meaning set forth in Section 3.8(e)(ii).

"Required Return Sum" has the meaning set forth in Section 4.5(h).

"Reserve Auditor" has the meaning set forth in Section 3.8(e)(i).

"ROFO Interests" has the meaning set forth in Section 4.3(a).

"ROFO Notice" has the meaning set forth in Section 4.3(a)

"ROFO Offer" has the meaning set forth in Section 4.3(a).

"ROFO Recipient" has the meaning set forth in Section 4.3(a).

"ROFO Transferor" has the meaning set forth in Section 4.3(a).

"S&A Operations" means any and all activities and operations associated with development and operation of the Assets other than E&D Operations, including, without limitation, procurement, construction, and operation of non-wellsite surface facilities such as water supply, storage, gathering and disposal facilities; electric power facilities; lease roads, frac ponds, and central tank batteries; gathering, treating, compression, dehydration, stabilization, and fractionation facilities; in each case, insofar as such operations are not otherwise dedicated to third-parties pursuant to existing contractual commitments burdening the Assets.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"Sale Transaction" has the meaning set forth in Section 4.5(a).

"Sale Transaction Agreement" has the meaning set forth in Section 4.5(d).

"Sale Transaction Equitable Partition" has the meaning set forth in Section 4.5(a).

"Sale Transaction Transferee" has the meaning set forth in Section 4.5(a).

"Sanchez Energy" means Sanchez Energy Corporation, a Delaware corporation, or for purposes of Section 4.3, any issuer of SN Common Stock.

"Sanchez Operator" has the meaning set forth in Section 3.8(a).

"Sanchez Representative" has the meaning set forth in Section 3.3(a)(ii).

"SN" has the meaning set forth in the preamble.

"SN Common Stock" means shares of common stock of Sanchez Energy, par value $0.01 per share, and any class of stock or other securities resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any liquidation, dissolution or winding up of Sanchez Energy, and any shares or other securities issued in respect of SN Common Stock in connection with any exchange for or replacement of such shares of SN Common Stock, recapitalization, merger, consolidation, conversion or similar transaction.

"SN Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"SN Equity Financed Offer" has the meaning set forth in Section 4.3(a).

"SN Operatorship Rights" has the meaning set forth in Section 4.5(a).

"SN UnSub" has the meaning set forth in the preamble.

"SN UnSub Partnership Agreement" means that certain Amended and Restated Agreement of Limited Partnership of SN UnSub, dated as of the Effective Date.

"SN UnSub GP LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated as of the Effective Date.

"Specified Credit Agreement" means if Operator is (i) SN, the SN Credit Agreement, (ii) BX, the BX Credit Agreement, or (iii) a Third Party, a Third Party Credit Agreement.

"Specified Event of Default" means an Event of Default as such may be defined from time to time under a Specified Credit Agreement, and as a result of such Event of Default, Operator's obligations thereunder have been accelerated prior to their stated maturity and the obligations which have been so accelerated exceed $20,000,000.

"Subsequent Approved Operations" has the meaning set forth in Section 3.7(b)(ii) and Section 3.7(c).

"Subsequent Budget and Work Plan" has the meaning set forth in Section 3.7(b)(i).

"Subsequent Proposed Operations" has the meaning set forth in Section 3.7(b)(i).

"Tag-Along Notice" has the meaning set forth in Section 4.2(a).

"Tag-Along Offer" has the meaning set forth in Section 4.2(b).

"Tag-Along Transaction" has the meaning set forth in Section 4.2(b).

"Tag Interests" has the meaning set forth in Section 4.2(b).

"Test Wells" has the meaning set forth in Section 5.3(e)(i).

"Third Party" means any Person other than a Party or one of their Affiliates or a Permitted Holder.

"Third Party Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Third Party Operator" has the meaning set forth in Section 3.8(f).

"Transfer" (including its derivatives and similar terms) means, with respect to an Asset Interest, a direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance,

exchange, bequest, devise, gift or any other alienation, including, except to the extent constituting Permitted Liens, any pledge or grant of a security interest (in each case, with or without consideration and whether by operation of Law or otherwise, including, by merger or consolidation) of any rights, interests or obligations with respect to all or any portion of such Asset Interest.

"Transferring Party" has the meaning set forth in Section 4.1(a).

"True-Up Amount" has the meaning set forth in Section 3.7(d).

"Unanimous Consent" means (x) the affirmative vote of all of the Representatives of a Party not then in Default in attendance at a duly called and convened meeting of the Operating Committee, which for the avoidance of doubt (assuming no Party is in Default) shall include the affirmative vote of at least one (1) Sanchez Representative appointed by SN, at least one (1) Blackstone Representative, and, either (1) Sanchez Representative appointed by SN UnSub or, if applicable, the Qualified Foreclosure Transferee Representative, or (y) the affirmative written consent in lieu of a meeting executed by all of the Representatives of Parties not in Default then constituting the Operating Committee.

"UnSub Agent" has the meaning set forth in the definition of "Default Notice".

"UnSub Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Valuation Firm" has the meaning set forth in Section 4.5(f).

"VDR" has the meaning set forth in Section 5.1(b).

"Wellpads" means, collectively, the Existing Wellpads and the Future Wellpads.

"Working Interest" means with respect to any lease or well or wellpad relating to the Assets, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

* * *

**Annex II**
**Representatives**

**Sanchez Representatives:**
Tony Sanchez III
Eduardo Sanchez
Chris Heinson

**Blackstone Representatives:**
Angelo Acconcia
Gary Levin
Dave Roberts

Case 4:23-cv-04587 Document 1354-7 Filed in TXSB on 07/28/20 Page 609 of 1759

**Annex III**
**Working Interests**

(*see attached*)

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | [illegible] WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| JEANNE E LUPIEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | | [illegible] | [illegible] |
| BETTY T THON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] PRITCHETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| ROBERT T [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] OIL COMPANY LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KINGDON E HUGHES FAMILY LIMITED PARTNER[illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES A THON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA J [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| MELVA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| DANIEL J PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| MARGARET E MATTHEWS [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| APRIL F ELLIOTT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| MARY SUE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| DONALD E PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2018 | Comments Ext. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 80.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 80.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 80.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Release | Y | [illegible] | [illegible] | [illegible] |
| ELIZABETH L SIMMONS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES ARTHUR [illegible] DANIELS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] DANIELS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY LOU [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO MARGARET M [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| FLOYD R PORTER | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| JOHN B BASSETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| JOHN B BASSETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| MINNIE HELEN [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Release | N | [illegible] | [illegible] | [illegible] |
| J A BOYD ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 4/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE SUPERIOR OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | SUN OPERATING LIMITED PARTNERSHIP | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] HOLLAND | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | |
| [illegible] | [illegible] HOLLAND | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] HOLLAND | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | |
| [illegible] | ROBERT [illegible] SINCLAIR | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ROBERT [illegible] SINCLAIR | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | LIGHTNING OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | [illegible] COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] FOUNDATION ET AL | EDWARD [illegible] VAUGHAN | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | EDWARD [illegible] VAUGHAN | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] [redacted] T AL | EDWARD [illegible] VAUGHAN | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unitvest WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Consents Rct. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | EDWARD U VAUGHAN | 12/11/1995 | 11/30/2002 | TX | Dimmit La Salle | 27116.275 | 11,588.935 | 6,764.518 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 379 335 401 401 | 116 179 121 169 | 7611 7350 79807 79199 |
| SARAH M STOWBRIDGE ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/1999 | 11/04/2011 | TX | Dimmit | 7406.150 | 7,400.770 | 2,466.723 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Below San Miguel | assessment | Y | 354 | 773 | 11222 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 06/17/2010 | 06/17/2016 | TX | Dimmit | 40.000 | 1.500 | 0.500 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 398 | 26 | 16937 |
| RANDALL J GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2016 | TX | Dimmit | 40.000 | 4.500 | 1.500 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 398 | 349 | 16799 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 40.000 | 2.271 | 0.757 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 397 | 12 | 16768 |
| JANET LOUISE AIRDAHT | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 40.000 | 2.271 | 0.757 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 397 | 15 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 40.000 | 3.407 | 1.136 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 397 | 45 | 16768 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 40.000 | 2.271 | 0.757 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 397 | 48 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 40.000 | 6.813 | 2.271 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 397 | 78 | 16767 |
| BECKY DEHAAN | ANADARKO E&P COMPANY LP | 11/16/2010 | 11/16/2015 | TX | Dimmit | 40.000 | 1.500 | 0.500 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 402 | 340 | 18194 |
| CONLEY EUGENE HUEBSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | 05/11/2016 | TX | Dimmit | 40.000 | 1.500 | 0.500 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 425 | 388 | 21282 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 06/20/2013 | 06/20/2016 | TX | Dimmit | 40.000 | 0.852 | 0.284 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Eagle Ford Only | Survey/Cont | Y | 490 | 764 | 31022 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 40.000 | 0.852 | 0.284 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Eagle Ford Only | Survey/Cont | Y | 490 | 778 | 31021 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/21/2013 | 08/21/2016 | TX | Dimmit | 40.000 | 0.852 | 0.284 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | Survey/Cont | N | 490 | 734 | 31020 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 40.000 | 0.852 | 0.284 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Eagle Ford Only | Survey/Cont | Y | 490 | 790 | 31019 |
| BRISCOE RANCH INC | EDWARD U VAUGHAN | 10/06/2006 | 10/15/2016 | TX | Webb | 6399.250 | 6,779.100 | 3,000.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 1401 | 604 | 077966 |
| BRISCOE RANCH INC | EDWARD U VAUGHAN | 01/11/2007 | 10/15/2016 | TX | Webb | 21640.641 | 20,785.586 | 10,572.771 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below Olmos | ?????? | Y | 2469 | 168 | 986046 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/14/2006 | 11/11/2012 | TX | Webb | 1289.000 | 1,188.150 | 594.122 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below Olmos | partial assn | Y | 2581 | 137 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/14/2002 | 12/31/2011 | TX | Webb | 9510.500 | 4,751.810 | 2,375.960 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below Olmos | partial assn | Y | 2581 | 132 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 03/09/2006 | 12/31/2013 | TX | Maverick | 720.000 | 360.000 | 180.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1041 | 57 | 144639 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2010 | TX | Maverick | 720.000 | 360.000 | 180.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1073 | 99 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | TX | Maverick Webb | 400.000 | 200.000 | 100.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1041 2446 | 70 307 | 144636 977062 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | TX | Maverick Webb | 400.000 | 200.000 | 100.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1073 2516 | 165 616 | 147026 993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 05/02/2006 | 10/15/2015 | TX | Webb Dimmit | 36934.712 | 35,591.538 | 17,795.669 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below Olmos | | Y | 1401 339 | 493 542 | 977955 6823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/06/2006 | 06/06/2014 | TX | Maverick Webb | 80.000 | 80.000 | 40.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1067 2606 | 433 779 | 146519 986857 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | TX | Maverick | 160.000 | 160.000 | 80.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | 1067 | 135 | 146513 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/01/2014 | TX | Maverick | 900.000 | 800.000 | 560.000 | | 0.00000000 | 0.00000000 | 0.00000000 | Eagle Ford Only | acres released | Y | 1067 | 175 | 146511 |

Items highlighted in yellow were excluded from the Closing because the relevant consent was not obtained.

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Tx Net | WI | Unsub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | 4644.721 | 4,278.428 | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| DOUGLAS H [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | 4644.721 | [illegible] | 141.644 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 7,760.074 | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | partial [illegible] | N | 344 | [illegible] | [illegible] |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 419 | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | released | Y | [illegible] | [illegible] | [illegible] |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit Maverick | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 344 | 1 | [illegible] |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 14.400 | 7.200 | 1.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 429 | 81 | [illegible] |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 78.125 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SARAH JANE HENDERSON (DECEASED) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 471 | 1 | [illegible] |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 471 | [illegible] | [illegible] |
| [illegible] DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | 311.407 | [illegible] | 77.858 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0.10000000 | [illegible] | Below San Miguel | [illegible] | Y | 344 | [illegible] | [illegible] |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0.10000000 | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0.10000000 | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | 1.250 | 0.417 | [illegible] | [illegible] | 0.10000000 | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SARAH [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | 1.250 | 0.417 | [illegible] | [illegible] | 0.10000000 | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS GLEN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | 0.10000000 | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.250 | 0.417 | [illegible] | [illegible] | 0.10000000 | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | [illegible] WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments Ast. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RALPH H [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KENNETH A [illegible] ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLADYS ELAINE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAUDE F [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRIAN K [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| LAWRENCE [illegible] GATES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KAREN H GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARVIS SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA PYATT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE F [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAY M GATES JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LUCILLE J [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS PAT [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAROLD [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARIE FRITZ SCHOONOVER ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LILLIE M BOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Glen Rose | | Y | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths | [illegible] | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] SOUTH SPUR LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled (Eagle Ford) | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] LIGHT IV TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GEORGE [illegible] LIGHT JR AND SARAH LIGHT TRUSTS | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled (Eagle Ford) | [illegible] released | [illegible] | [illegible] | [illegible] | [illegible] |
| GEORGE [illegible] LIGHT [illegible] ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GEORGE [illegible] LIGHT JR & SARAH LIGHT TRUST [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GEORGE [illegible] LIGHT [illegible] [illegible] LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| MARGARET MITCHELL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| DONNA [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

008486

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Cu Net | NRI | Unitized WI | WI WI | Gastar WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHARON [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WEST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELAINE D [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| REBECCA ANN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA [illegible] STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOROTHY LYNNE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| BRANDON CHRISTOPHER [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| SANDRA D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| TRACI W [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] W WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] E WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH F [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| CHERI [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA [illegible] HUBBARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] | N | [illegible] | [illegible] | [illegible] |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RAY WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA FELTON LINDSAY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANDREA CARROLL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Ext. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | 40.000 | 1.500 | 0.104 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON CHANEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EVELYN G [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA L LANE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN [illegible] SUSAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BRASHEAR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY L GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WEAVER JAMES BARKSDALE JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JO P TOPHAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY ELIZABETH PATTERSON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | UnSub WI | YSV WI | Gastar WI | Current Depths 4/1/2016 | Comments Acc. s. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH JEROME PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HARRY E COOPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES W BRANCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | survey/unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTHA GARRISON [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN MAYS | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGIA [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GARRISON [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GREGORY ALLEN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |
| JOHN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |
| BRENDA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FRANCES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARILYN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] INSURANCE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | survey/unit | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | Unleased WI | UN WI | Quantum WI | Current Depths 9/1/2016 | Comments Ast. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] REVOCABLE TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] REVOCABLE TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] ET AL [illegible] | [illegible] LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANET SCHALLHORN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TAYLOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANN SCHALLHORN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WASHBURN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | La Salle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled (Eagle Ford) | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] WINDHAM JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HOLLAND AKA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH MARSHALL HOLLAND III | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] NELL WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JULIE ANN HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unitized WI | SN WI | Gaston WI | Current Depths 6/1/2016 | Comments Art. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RITA SUE SANDERS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHERRI LYNN WEATHERHEAD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VONNETA ANN LEONARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY HELEN WYNDHAM SEARS ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILL ALTON BEDWORTH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| DORIS N MONROE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| WILL ALTON BEDWORTH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| WILL ALTON BEDWORTH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| EVELYN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ALYCE KUEHLER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLADYS LISTTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FRANK VANCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FLORA PETERSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | [illegible] | County | [illegible] | [illegible] | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 8/1/2016 | [illegible] | [illegible] | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| BLANCHE C. KOETTING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| DAN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| KATHY TERRY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co-Net | WI | [illegible] | UN WI | [illegible] | Current Depths 9/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JENNIFER BOBBY GEORGE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LINDA BOBBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| WILLIAM KEITH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| MEREDITH B TRAM | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| DAVID TRAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| AMY WAY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] CONTRACTING INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] INVESTMENTS LTD | [illegible] RESOURCES COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co.Net | WI | [illegible] WI | [illegible] WI | Sanchez WI | Current Depths [illegible] | Comments/ A.R. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN FITZSIMMONS LOVE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] MINERAL TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHIRLEY ANN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANNE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] RICHARD FRITZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANN FRITZ ALBERT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARGARET T [illegible] REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SHANNON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GARDNER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LAWRENCE E O'NEILL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 6/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| THOMAS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SUZANNE PARRISH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GARY M CLARK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CAROLE CLARK [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MATTHEW [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GARRY NEAL CLARK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SARAH VANDERVOORT [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| FRED S BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JEANNE HELEN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] MINERALS LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY LILLIAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| VICKI ANN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| RAYMOND A [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| R F WOOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JOHN HILL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| FRANK BERRY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | Sanchez WI | Current Depths 9/1/2016 | Comments Art. n Description | Assignment Restrictions | Book | Page | Document |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] CLARK | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANN WOOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES [illegible] CHANDLER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LYNN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JEAN W. MCDERMOTT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] CLARK JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ROYALTIES LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CYPRESS ATLANTIC LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Cu Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 8/1/2016 | Comments Art. a Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN [illegible] TRUST ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUZANNE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES [illegible] STEWART | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANET RUTH STEWART [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTHA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JENNIFER [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STUART [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONALD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RUTH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROGER [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALISON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EUGENE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAROL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALEX [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WHITE TAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| KEVIN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GARY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| LINDA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DEBRA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| STANLEY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS [illegible] ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANIMAL HUMANE SOCIETY OF [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM KENNETH [illegible] ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Ex Net | WI | Unitsub WI | SN WR | Sanchez WI | Current Depths 8/1/2016 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DANIEL EICHHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 5.016 | 1.672 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | survey/unit | Y | 497 | 573 | 11746 |
| RITA JO FRALICK | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.678 | 0.559 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | survey/unit | Y | 497 | 556 | 11749 |
| REGINA LYNN BOUCHARD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.673 | 0.558 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | survey/unit | Y | 497 | 578 | 11747 |
| DALE NED EICHHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 10.035 | 3.345 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | survey/unit | Y | 497 | 563 | 11748 |
| RENEE DAWN MEZERA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.677 | 0.559 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | [illegible] | Y | 497 | 561 | 11750 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 20.070 | 6.690 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | [illegible] | Y | 497 | 560 | 11745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2018 | TX | Dimmit | 10.595 | 10.000 | 5.000 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 405 | 11842 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 05/12/2013 | 05/12/2019 | TX | Dimmit | 10.750 | 10.000 | 3.333 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | Y | 497 | 777 | 90808 |
| NANCY VAN ZLYNE | ANADARKO E&P COMPANY LP | 05/18/2013 | 05/18/2015 | TX | Dimmit | 10.900 | 5.880 | 2.445 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | Y | 498 | 512 | 11894 |
| JANICE CAROL WEATHERMAN | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 617 | 11884 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 614 | 11880 |
| LEA B STAUGHTON | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.000 | 1.667 | 0.694 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 626 | 11470 |
| RAND ROBERT BOUSMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.300 | 1.667 | 0.834 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 675 | 11871 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 10.900 | 0.595 | 0.148 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 605 | 11867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 10.000 | 0.295 | 0.148 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 622 | 11868 |
| CAROL M MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 10.000 | 0.295 | 0.148 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 498 | 624 | 11869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | TX | Dimmit | 10.000 | 0.889 | 0.444 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 500 | 795 | 21160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2014 | 10/09/2019 | TX | Dimmit | 10.300 | 0.833 | 0.417 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 500 | 758 | 42158 |
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 672 | 13416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 675 | 13417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 676 | 13419 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 684 | 13421 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | 12/04/2018 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 661 | 13418 |
| ROBERT W HARRINGTON IV | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.300 | 0.833 | 0.417 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | N | 511 | 665 | 13411 |
| GEORGE T SMITH ET UX | [illegible] RESOURCES COMPANY | 12/13/2009 | 12/13/2014 | TX | Dimmit | 40.000 | 40.000 | 20.000 | 0.5000… | 0.1000… | 0.1500… | 0.2500… | All Depths | | Y | 175 | 678 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/08/2014 | 02/08/2017 | TX | Dimmit | 77.510 | 115.440 | 11.011 | 0.1000… | 0.1000… | 0.1500… | 0.2500… | All Depths | Need to check Title | Y | 508 | 157 | 12553 |
| TONY LULLAIN ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2018 | TX | Dimmit | 20.000 | 10.000 | 1.055 | 0.1111… | 0.0666… | 0.1000… | 0.1666… | All Depths | | N | 494 | 657 | 10087 |
| DALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2018 | TX | Dimmit | 20.000 | 0.560 | 0.187 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | N | 500 | 2 | 12006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 10.300 | 4.725 | 1.575 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | N | 512 | 178 | 13510 |
| WILL MCGARRITT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 10.000 | 4.720 | 1.573 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | Y | 512 | 168 | 13519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 08/10/2014 | 08/10/2019 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | N | 518 | 8 | 14499 |
| EDWARD ROBINSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | TX | Dimmit | 10.000 | 0.200 | 0.067 | 0.3333… | 0.0666… | 0.1000… | 0.1666… | All Depths | | N | 517 | 625 | 14487 |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 9/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MONTY LLOYD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTINE ANN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 20.000 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ATKIN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALLAN [illegible] ATKIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON MAY KINCAID | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Ca Net | WI | OnSub WI | SN WI | Geodan WI | Current Depths 8/1/2016 | Comments Act. ≠ Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 9/1/2016 | Comments Arc. n Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Cr Net | WI | Unsub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Art. ≠ Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BASSORE HENSLEY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRIAN KELLY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH ANN LITTLE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DANA BASSORE WOLDERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA F PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES JOSEPH GILBERT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEFFREY JOHN MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| WESLEY E [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE GUTHRIE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLARA KAY [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FRANCES KAHLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY C [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GLORIA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVEN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] | [illegible] | [illegible] | Current Depths 8/1/2016 | Comments/Act. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA DAUGHERTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT PAUL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] OPERATING LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARTHA GATES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ARCHER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] | SN WI | [illegible] | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2010 | 04/21/2018 | TX | Dimmit | 37.500 | 0.104 | 0.070 | 0.33333333 | 0.16666667 | 0.10000000 | 0.16666667 | All Depths | | N | 545 | 537 | 19442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 08/14/2010 | 08/14/2021 | TX | Dimmit | 75.000 | 0.726 | 0.161 | 0.33333333 | 0.06666667 | 0.15000000 | 0.16666667 | All Depths | | N | 545 | 546 | 19446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2007 | 04/21/2008 | TX | Dimmit | 60.000 | 0.413 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 545 | 615 | 19474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.208 | 0.060 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 123 | 18274 |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 117 | 18271 |
| PATRICIA PARKS SKELLENGOON | ANADARKO E&P ONSHORE LLC | 04/19/2015 | 04/19/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 105 | 18268 |
| REMMA EDD | ANADARKO E&P ONSHORE LLC | 04/11/2015 | 04/11/2018 | TX | Dimmit | 19.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 130 | 18273 |
| LEN E EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.125 | 0.042 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 102 | 18267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 128 | 18275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 124 | 18272 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 97 | 18266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.250 | 0.083 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 111 | 18270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 544 | 108 | 18269 |
| DEBORAH J PUTNAM | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 115 | 19605 |
| DANNY WAYNE CHOUNE JR. ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | 02/05/2018 | TX | Dimmit | 160.000 | 8.337 | 3.111 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 542 | 275 | 18883 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 10.000 | 0.510 | 0.085 | 0.40000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 544 | 766 | 10759 |
| LORI GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | 11/11/2019 | TX | Dimmit | 10.000 | 0.260 | 0.130 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 544 | 755 | 10753 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.417 | 0.208 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 207 | 10607 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.417 | 0.208 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 204 | 10606 |
| TREVER H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 216 | 10612 |
| WILLIAM W [illegible] JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.573 | 0.286 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 213 | 10569 |
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 1.094 | 0.547 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 546 | 210 | 10608 |
| [illegible] HOLDINGS LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | 05/01/2018 | TX | Dimmit | 80.000 | 80.000 | 40.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 549 | 244 | 18387 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | 05/20/2018 | TX | Dimmit | 10.000 | 0.069 | 0.023 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 121 | 19605 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/11/2015 | 04/11/2018 | TX | Dimmit | 10.000 | 0.125 | 0.042 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 547 | 128 | 19602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 09/14/2015 | 09/14/2021 | TX | Dimmit | 70.000 | 0.729 | 0.143 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 546 | 622 | 10852 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 546 | 457 | 19813 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 546 | 476 | 19817 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/05/2014 | 12/05/2017 | TX | Dimmit | 10.000 | 0.625 | 0.208 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 471 | 10831 |
| BARBARA RUTH FAULDS | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2017 | TX | Dimmit | 10.000 | 0.208 | 0.069 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 548 | 474 | 10822 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 08/08/2015 | 08/08/2018 | TX | Dimmit | 20.000 | 0.069 | 0.023 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 552 | 372 | 19827 |
| WAYNE MOODY | ANADARKO E&P ONSHORE LLC | 04/23/2015 | 04/23/2018 | TX | Dimmit | 10.000 | 0.313 | 0.104 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 552 | 368 | 19831 |

008505

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Cr Net | RI | [illegible] WI | [illegible] | [illegible] WI | Current Depths 9/1/2016 | Comments (Lot, ... Description) | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | TX | [illegible] | 10.700 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LLOYD T ELLIOTT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 441 | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEAKE EXPLORATION LLC BY ARTHUR DAY LEAKE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LEAKE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | [illegible] | 10.000 | 0.721 | 0.181 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA [illegible] | ANADARKO E&P ONSHORE LLC | 11/04/2014 | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA L MORRISON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 461 | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA WELCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | UnSub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. v. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2018 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 80.000 | 0.667 | 0.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2018 | TX | Dimmit | 80.000 | 1.250 | 0.625 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 563 | 557 | 40854 |
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.179 | 0.090 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | 07/19/2019 | TX | Dimmit | 1639.310 | 273.218 | 204.914 | 0.75000000 | 0.15000000 | 0.22500000 | 0.37500000 | All Depths | | Y | 577 | 454 | 42708 |

**Annex IV**
**Approved Financial Advisor Arbiters**

Financial Advisors:
Evercore
Jefferies
Citigroup
Royal Bank of Canada
J.P. Morgan
Credit Suisse
Morgan Stanley
Tudor, Pickering, Holt & Co.

Reserve Auditors:
Ryder Scott
W.D. Von Gonten & Co.
Netherland Sewell & Associates
Cawley, Gillespie & Associates
DeGolyer and MacNaughton

**Annex V**
**Existing Producing Wells**

(*see attached*)

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BEINHORN RANCH 10H | 4212733880 |
| BEINHORN RANCH 11H | 4212734113 |
| BEINHORN RANCH 12H | 4212734114 |
| BEINHORN RANCH 13H | 4212734260 |
| BEINHORN RANCH 14H | 4212734259 |
| BEINHORN RANCH 15H | 4212734261 |
| BEINHORN RANCH 16H | 4212734997 |
| BEINHORN RANCH 17H | 4212734998 |
| BEINHORN RANCH 18H | 4212734999 |
| BEINHORN RANCH 19H | 4212734330 |
| BEINHORN RANCH 1H | 4212733624 |
| BEINHORN RANCH 20H | 4212734328 |
| BEINHORN RANCH 21H | 4212734115 |
| BEINHORN RANCH 22H | 4212734329 |
| BEINHORN RANCH 23H | 4212734383 |
| BEINHORN RANCH 24H | 4212734384 |
| BEINHORN RANCH 25H | 4212734385 |
| BEINHORN RANCH 26H | 4212734386 |
| BEINHORN RANCH 27H | 4212735001 |
| BEINHORN RANCH 28H | 4212735000 |
| BEINHORN RANCH 29H | 4212735018 |
| BEINHORN RANCH 2H | 4212733644 |
| BEINHORN RANCH 30H | 4212735020 |
| BEINHORN RANCH 31H | 4212735019 |
| BEINHORN RANCH 32H | 4212735022 |
| BEINHORN RANCH 33H | 4212735032 |
| BEINHORN RANCH 34H | 4212735033 |
| BEINHORN RANCH 35H | 4212735035 |
| BEINHORN RANCH 36H | 4212735034 |
| BEINHORN RANCH 37H | 4212736214 |
| BEINHORN RANCH 38H | 4212736219 |
| BEINHORN RANCH 39H | 4212736220 |
| BEINHORN RANCH 3H | 4212733664 |
| BEINHORN RANCH 40H | 4212736221 |
| BEINHORN RANCH 41H | 4212736223 |
| BEINHORN RANCH 42H | 4212736224 |
| BEINHORN RANCH 43H | 4212736225 |
| BEINHORN RANCH 44H | 4212736226 |
| BEINHORN RANCH 4H | 4212733690 |
| BEINHORN RANCH 5H | 4212733760 |
| BEINHORN RANCH 6H | 4212733761 |
| BEINHORN RANCH 7H | 4212733871 |
| BEINHORN RANCH 8H | 4212733872 |
| BEINHORN RANCH 9H | 4212733879 |
| BEINHORN RANCH UNIT A 10H | 4212736291 |
| BEINHORN RANCH UNIT A 11H | 4212736289 |
| BEINHORN RANCH UNIT A 12H | 4212736294 |
| BEINHORN RANCH UNIT A 1H | 4212736275 |
| BEINHORN RANCH UNIT A 2H | 4212736276 |
| BEINHORN RANCH UNIT A 3H | 4212736277 |
| BEINHORN RANCH UNIT A 4H | 4212736278 |
| BEINHORN RANCH UNIT A 5H | 4212736282 |
| BEINHORN RANCH UNIT A 6H | 4212736286 |
| BEINHORN RANCH UNIT A 7H | 4212736287 |
| BEINHORN RANCH UNIT A 8H | 4212736290 |
| BEINHORN RANCH UNIT A 9H | 4212736288 |
| BOYD, GG 1H | 4212733750 |
| BRISCOE CARLA RANCH 10H | 4212733733 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH 11H | 4212733735 |
| BRISCOE CARLA RANCH 12H | 4212733736 |
| BRISCOE CARLA RANCH 13H | 4212733875 |
| BRISCOE CARLA RANCH 14H | 4212733876 |
| BRISCOE CARLA RANCH 15H | 4212733874 |
| BRISCOE CARLA RANCH 16H | 4212734133 |
| BRISCOE CARLA RANCH 17H | 4212734134 |
| BRISCOE CARLA RANCH 18H | 4212734135 |
| BRISCOE CARLA RANCH 19H | 4212733889 |
| BRISCOE CARLA RANCH 1H | 4212733681 |
| BRISCOE CARLA RANCH 20H | 4212733890 |
| BRISCOE CARLA RANCH 21H | 4212733891 |
| BRISCOE CARLA RANCH 22H | 4212733885 |
| BRISCOE CARLA RANCH 23H | 4212733893 |
| BRISCOE CARLA RANCH 24H | 4212733894 |
| BRISCOE CARLA RANCH 25H | 4212733895 |
| BRISCOE CARLA RANCH 26H | 4212734948 |
| BRISCOE CARLA RANCH 27H | 4212734949 |
| BRISCOE CARLA RANCH 28H | 4212734969 |
| BRISCOE CARLA RANCH 29H | 4212734959 |
| BRISCOE CARLA RANCH 2H | 4212733666 |
| BRISCOE CARLA RANCH 30H | 4212734960 |
| BRISCOE CARLA RANCH 31H | 4212734961 |
| BRISCOE CARLA RANCH 32H | 4212734967 |
| BRISCOE CARLA RANCH 33H | 4212734962 |
| BRISCOE CARLA RANCH 34H | 4212734963 |
| BRISCOE CARLA RANCH 3H | 4212733705 |
| BRISCOE CARLA RANCH 4H | 4212733706 |
| BRISCOE CARLA RANCH 5H | 4212734946 |
| BRISCOE CARLA RANCH 6H | 4212734947 |
| BRISCOE CARLA RANCH 7H | 4212733855 |
| BRISCOE CARLA RANCH 8H | 4212733856 |
| BRISCOE CARLA RANCH 9H | 4212733857 |
| BRISCOE CATARINA N UNIT A 10H | 4212735923 |
| BRISCOE CATARINA N UNIT A 1H | 4212735930 |
| BRISCOE CATARINA N UNIT A 2H | 4212735931 |
| BRISCOE CATARINA N UNIT A 3H | 4212735932 |
| BRISCOE CATARINA N UNIT A 4H | 4212735933 |
| BRISCOE CATARINA N UNIT A 5H | 4212735934 |
| BRISCOE CATARINA N UNIT A 6H | 4212735919 |
| BRISCOE CATARINA N UNIT A 7H | 4212735920 |
| BRISCOE CATARINA N UNIT A 8H | 4212735921 |
| BRISCOE CATARINA N UNIT A 9H | 4212735922 |
| BRISCOE CATARINA NORTH 100H | 4212736732 |
| BRISCOE CATARINA NORTH 101H | 4212736733 |
| BRISCOE CATARINA NORTH 102H | 4212736734 |
| BRISCOE CATARINA NORTH 103H | 4212736735 |
| BRISCOE CATARINA NORTH 10H | 4212733930 |
| BRISCOE CATARINA NORTH 11H | 4212733932 |
| BRISCOE CATARINA NORTH 12H | 4212733931 |
| BRISCOE CATARINA NORTH 133H | 4212736869 |
| BRISCOE CATARINA NORTH 134H | 4212736870 |
| BRISCOE CATARINA NORTH 135H | 4212736866 |
| BRISCOE CATARINA NORTH 136H | 4212736867 |
| BRISCOE CATARINA NORTH 13H | 4212733937 |
| BRISCOE CATARINA NORTH 14H | 4212733938 |
| BRISCOE CATARINA NORTH 15H | 4212733939 |
| BRISCOE CATARINA NORTH 16H | 4212733947 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 17H | 4212733948 |
| BRISCOE CATARINA NORTH 18H | 4212733949 |
| BRISCOE CATARINA NORTH 19H | 4212735063 |
| BRISCOE CATARINA NORTH 1H | 4212733687 |
| BRISCOE CATARINA NORTH 20H | 4212734155 |
| BRISCOE CATARINA NORTH 21H | 4212734156 |
| BRISCOE CATARINA NORTH 22H | 4212734157 |
| BRISCOE CATARINA NORTH 23H | 4212734128 |
| BRISCOE CATARINA NORTH 24H | 4212734129 |
| BRISCOE CATARINA NORTH 25H | 4212734130 |
| BRISCOE CATARINA NORTH 26H | 4212734174 |
| BRISCOE CATARINA NORTH 27H | 4212734175 |
| BRISCOE CATARINA NORTH 28H | 4212734176 |
| BRISCOE CATARINA NORTH 29H | 4212734206 |
| BRISCOE CATARINA NORTH 2H | 4212733995 |
| BRISCOE CATARINA NORTH 30H | 4212734208 |
| BRISCOE CATARINA NORTH 31H | 4212734209 |
| BRISCOE CATARINA NORTH 32H | 4212735064 |
| BRISCOE CATARINA NORTH 33H | 4212735070 |
| BRISCOE CATARINA NORTH 34H | 4212735066 |
| BRISCOE CATARINA NORTH 35H | 4212734221 |
| BRISCOE CATARINA NORTH 36H | 4212734222 |
| BRISCOE CATARINA NORTH 37H | 4212734223 |
| BRISCOE CATARINA NORTH 39H | 4212734226 |
| BRISCOE CATARINA NORTH 3H | 4212734001 |
| BRISCOE CATARINA NORTH 40H | 4212734228 |
| BRISCOE CATARINA NORTH 41H | 4212734229 |
| BRISCOE CATARINA NORTH 42H | 4212734230 |
| BRISCOE CATARINA NORTH 43H | 4212734231 |
| BRISCOE CATARINA NORTH 44H | 4212734343 |
| BRISCOE CATARINA NORTH 45H | 4212734344 |
| BRISCOE CATARINA NORTH 46H | 4212734375 |
| BRISCOE CATARINA NORTH 47H | 4212734376 |
| BRISCOE CATARINA NORTH 48H | 4212734377 |
| BRISCOE CATARINA NORTH 49H | 4212734378 |
| BRISCOE CATARINA NORTH 4H | 4212733804 |
| BRISCOE CATARINA NORTH 50H | 4212734563 |
| BRISCOE CATARINA NORTH 51H | 4212734564 |
| BRISCOE CATARINA NORTH 52H | 4212734565 |
| BRISCOE CATARINA NORTH 53H | 4212734566 |
| BRISCOE CATARINA NORTH 54H | 4212734567 |
| BRISCOE CATARINA NORTH 55H | 4212734568 |
| BRISCOE CATARINA NORTH 56H | 4212734578 |
| BRISCOE CATARINA NORTH 57H | 4212734579 |
| BRISCOE CATARINA NORTH 58H | 4212734580 |
| BRISCOE CATARINA NORTH 59H | 4212734581 |
| BRISCOE CATARINA NORTH 5H | 4212733805 |
| BRISCOE CATARINA NORTH 60H | 4212734582 |
| BRISCOE CATARINA NORTH 61H | 4212734583 |
| BRISCOE CATARINA NORTH 62H | 4212734866 |
| BRISCOE CATARINA NORTH 63H | 4212734869 |
| BRISCOE CATARINA NORTH 64H | 4212734870 |
| BRISCOE CATARINA NORTH 65H | 4212734871 |
| BRISCOE CATARINA NORTH 66H | 4212734874 |
| BRISCOE CATARINA NORTH 67H | 4212734875 |
| BRISCOE CATARINA NORTH 68H | 4212734876 |
| BRISCOE CATARINA NORTH 69H | 4212734891 |
| BRISCOE CATARINA NORTH 6H | 4212733806 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 70H | 4212734890 |
| BRISCOE CATARINA NORTH 71H | 4212734894 |
| BRISCOE CATARINA NORTH 72H | 4212734936 |
| BRISCOE CATARINA NORTH 73H | 4212734930 |
| BRISCOE CATARINA NORTH 74H | 4212734932 |
| BRISCOE CATARINA NORTH 75H | 4212734933 |
| BRISCOE CATARINA NORTH 76H | 4212735159 |
| BRISCOE CATARINA NORTH 77H | 4212735168 |
| BRISCOE CATARINA NORTH 78H | 4212735169 |
| BRISCOE CATARINA NORTH 79H | 4212735170 |
| BRISCOE CATARINA NORTH 7H | 4212733825 |
| BRISCOE CATARINA NORTH 80H | 4212735171 |
| BRISCOE CATARINA NORTH 81H | 4212735172 |
| BRISCOE CATARINA NORTH 82H | 4212735173 |
| BRISCOE CATARINA NORTH 83H | 4212735174 |
| BRISCOE CATARINA NORTH 84H | 4212735816 |
| BRISCOE CATARINA NORTH 85H | 4212735817 |
| BRISCOE CATARINA NORTH 86H | 4212735818 |
| BRISCOE CATARINA NORTH 87H | 4212735819 |
| BRISCOE CATARINA NORTH 88H | 4212735820 |
| BRISCOE CATARINA NORTH 89H | 4212735821 |
| BRISCOE CATARINA NORTH 8H | 4212733826 |
| BRISCOE CATARINA NORTH 90H | 4212736722 |
| BRISCOE CATARINA NORTH 91H | 4212736723 |
| BRISCOE CATARINA NORTH 92H | 4212736724 |
| BRISCOE CATARINA NORTH 93H | 4212736725 |
| BRISCOE CATARINA NORTH 94H | 4212736726 |
| BRISCOE CATARINA NORTH 95H | 4212736727 |
| BRISCOE CATARINA NORTH 96H | 4212736728 |
| BRISCOE CATARINA NORTH 97H | 4212736729 |
| BRISCOE CATARINA NORTH 98H | 4212736730 |
| BRISCOE CATARINA NORTH 99H | 4212736731 |
| BRISCOE CATARINA NORTH 9H | 4212733829 |
| BRISCOE CATARINA RANCH 100H | 4212735430 |
| BRISCOE CATARINA RANCH 101H | 4212735431 |
| BRISCOE CATARINA RANCH 102H | 4212735471 |
| BRISCOE CATARINA RANCH 103H | 4212735472 |
| BRISCOE CATARINA RANCH 104H | 4212735473 |
| BRISCOE CATARINA RANCH 105H | 4212735474 |
| BRISCOE CATARINA RANCH 106H | 4212735475 |
| BRISCOE CATARINA RANCH 107H | 4212735476 |
| BRISCOE CATARINA RANCH 108H | 4212735199 |
| BRISCOE CATARINA RANCH 10H | 4212733677 |
| BRISCOE CATARINA RANCH 11H | 4212734363 |
| BRISCOE CATARINA RANCH 12H | 4212734364 |
| BRISCOE CATARINA RANCH 13H | 4212733680 |
| BRISCOE CATARINA RANCH 14H | 4212734365 |
| BRISCOE CATARINA RANCH 15H | 4212734366 |
| BRISCOE CATARINA RANCH 16H | 4212733790 |
| BRISCOE CATARINA RANCH 17H | 4212733791 |
| BRISCOE CATARINA RANCH 18H | 4212733792 |
| BRISCOE CATARINA RANCH 19H | 4212733780 |
| BRISCOE CATARINA RANCH 1H EAGLEF | 4212733398 |
| BRISCOE CATARINA RANCH 20H | 4212733781 |
| BRISCOE CATARINA RANCH 21H | 4212733782 |
| BRISCOE CATARINA RANCH 22H | 4212734315 |
| BRISCOE CATARINA RANCH 23H | 4212734316 |
| BRISCOE CATARINA RANCH 24H | 4212734317 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 25H | 4212734318 |
| BRISCOE CATARINA RANCH 26H | 4212734319 |
| BRISCOE CATARINA RANCH 27H | 4212734320 |
| BRISCOE CATARINA RANCH 28H | 4212734367 |
| BRISCOE CATARINA RANCH 29H | 4212734368 |
| BRISCOE CATARINA RANCH 2H | 4212733612 |
| BRISCOE CATARINA RANCH 31H | 4212734388 |
| BRISCOE CATARINA RANCH 32H | 4212734389 |
| BRISCOE CATARINA RANCH 33H | 4212734390 |
| BRISCOE CATARINA RANCH 34H | 4212734432 |
| BRISCOE CATARINA RANCH 35H | 4212734433 |
| BRISCOE CATARINA RANCH 36H | 4212734436 |
| BRISCOE CATARINA RANCH 37H | 4212734434 |
| BRISCOE CATARINA RANCH 38H | 4212734439 |
| BRISCOE CATARINA RANCH 39H | 4212734440 |
| BRISCOE CATARINA RANCH 3H | 4212733646 |
| BRISCOE CATARINA RANCH 40H | 4212734441 |
| BRISCOE CATARINA RANCH 41H | 4212734443 |
| BRISCOE CATARINA RANCH 42H | 4212734442 |
| BRISCOE CATARINA RANCH 43H | 4212734444 |
| BRISCOE CATARINA RANCH 44H | 4212734446 |
| BRISCOE CATARINA RANCH 45H | 4212734448 |
| BRISCOE CATARINA RANCH 46H | 4212734754 |
| BRISCOE CATARINA RANCH 47H | 4212734755 |
| BRISCOE CATARINA RANCH 48H | 4212734756 |
| BRISCOE CATARINA RANCH 49H | 4212734757 |
| BRISCOE CATARINA RANCH 4H | 4212733684 |
| BRISCOE CATARINA RANCH 50H | 4212734758 |
| BRISCOE CATARINA RANCH 51H | 4212734774 |
| BRISCOE CATARINA RANCH 52H | 4212734775 |
| BRISCOE CATARINA RANCH 53H | 4212734778 |
| BRISCOE CATARINA RANCH 54H | 4212734777 |
| BRISCOE CATARINA RANCH 55H | 4212734776 |
| BRISCOE CATARINA RANCH 56H | 4212735214 |
| BRISCOE CATARINA RANCH 57H | 4212735215 |
| BRISCOE CATARINA RANCH 58H | 4212735216 |
| BRISCOE CATARINA RANCH 59H | 4212735188 |
| BRISCOE CATARINA RANCH 5H | 4212735292 |
| BRISCOE CATARINA RANCH 60H | 4212735190 |
| BRISCOE CATARINA RANCH 61H | 4212735184 |
| BRISCOE CATARINA RANCH 62H | 4212735183 |
| BRISCOE CATARINA RANCH 63H | 4212735185 |
| BRISCOE CATARINA RANCH 64H | 4212735186 |
| BRISCOE CATARINA RANCH 65H | 4212735193 |
| BRISCOE CATARINA RANCH 66H | 4212735194 |
| BRISCOE CATARINA RANCH 67H | 4212735195 |
| BRISCOE CATARINA RANCH 68H | 4212735196 |
| BRISCOE CATARINA RANCH 69H | 4212735197 |
| BRISCOE CATARINA RANCH 6H | 4212733749 |
| BRISCOE CATARINA RANCH 70H | 4212735198 |
| BRISCOE CATARINA RANCH 71H | 4212735217 |
| BRISCOE CATARINA RANCH 72H | 4212735218 |
| BRISCOE CATARINA RANCH 73H | 4212735219 |
| BRISCOE CATARINA RANCH 74H | 4212735293 |
| BRISCOE CATARINA RANCH 75H | 4212735296 |
| BRISCOE CATARINA RANCH 76H | 4212735297 |
| BRISCOE CATARINA RANCH 77H | 4212735298 |
| BRISCOE CATARINA RANCH 78H | 4212735299 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 79H | 4212735300 |
| BRISCOE CATARINA RANCH 7H | 4212733723 |
| BRISCOE CATARINA RANCH 80H | 4212735301 |
| BRISCOE CATARINA RANCH 81H | 4212735302 |
| BRISCOE CATARINA RANCH 82H | 4212735303 |
| BRISCOE CATARINA RANCH 83H | 4212735304 |
| BRISCOE CATARINA RANCH 84H | 4212735305 |
| BRISCOE CATARINA RANCH 85H | 4212735331 |
| BRISCOE CATARINA RANCH 86H | 4212735332 |
| BRISCOE CATARINA RANCH 87H | 4212735330 |
| BRISCOE CATARINA RANCH 88H | 4212735345 |
| BRISCOE CATARINA RANCH 89H | 4212735346 |
| BRISCOE CATARINA RANCH 8H | 4212733724 |
| BRISCOE CATARINA RANCH 90H | 4212735340 |
| BRISCOE CATARINA RANCH 91H | 4212735341 |
| BRISCOE CATARINA RANCH 92H | 4212735342 |
| BRISCOE CATARINA RANCH 93H | 4212735343 |
| BRISCOE CATARINA RANCH 94H | 4212735344 |
| BRISCOE CATARINA RANCH 95H | 4212735425 |
| BRISCOE CATARINA RANCH 96H | 4212735427 |
| BRISCOE CATARINA RANCH 97H | 4212735426 |
| BRISCOE CATARINA RANCH 98H | 4212735428 |
| BRISCOE CATARINA RANCH 99H | 4212735429 |
| BRISCOE CATARINA RANCH 9H | 4212733674 |
| BRISCOE CATARINA SOUTH 10H | 4212734455 |
| BRISCOE CATARINA SOUTH 11H | 4212734456 |
| BRISCOE CATARINA SOUTH 12H | 4212734457 |
| BRISCOE CATARINA SOUTH 13H | 4212734459 |
| BRISCOE CATARINA SOUTH 14H | 4212734458 |
| BRISCOE CATARINA SOUTH 15H | 4212734460 |
| BRISCOE CATARINA SOUTH 16H | 4212735312 |
| BRISCOE CATARINA SOUTH 17H | 4212735313 |
| BRISCOE CATARINA SOUTH 18H | 4212735314 |
| BRISCOE CATARINA SOUTH 19H | 4212735316 |
| BRISCOE CATARINA SOUTH 1H | 4212733783 |
| BRISCOE CATARINA SOUTH 20H | 4212735322 |
| BRISCOE CATARINA SOUTH 21H | 4212735323 |
| BRISCOE CATARINA SOUTH 22H | 4212735324 |
| BRISCOE CATARINA SOUTH 23H | 4212735325 |
| BRISCOE CATARINA SOUTH 24H | 4212735362 |
| BRISCOE CATARINA SOUTH 25H | 4212735363 |
| BRISCOE CATARINA SOUTH 26H | 4212735364 |
| BRISCOE CATARINA SOUTH 27H | 4212735365 |
| BRISCOE CATARINA SOUTH 28H | 4212735459 |
| BRISCOE CATARINA SOUTH 29H | 4212735515 |
| BRISCOE CATARINA SOUTH 2H | 4212733784 |
| BRISCOE CATARINA SOUTH 30H | 4212735460 |
| BRISCOE CATARINA SOUTH 31H | 4212735461 |
| BRISCOE CATARINA SOUTH 32H | 4212735463 |
| BRISCOE CATARINA SOUTH 33H | 4212735462 |
| BRISCOE CATARINA SOUTH 34H | 4212735481 |
| BRISCOE CATARINA SOUTH 35H | 4212735484 |
| BRISCOE CATARINA SOUTH 36H | 4212735510 |
| BRISCOE CATARINA SOUTH 37H | 4212735511 |
| BRISCOE CATARINA SOUTH 38H | 4212735513 |
| BRISCOE CATARINA SOUTH 39H | 4212735512 |
| BRISCOE CATARINA SOUTH 3H | 4212733785 |
| BRISCOE CATARINA SOUTH 40H | 4212735532 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA SOUTH 41H | 4212735533 |
| BRISCOE CATARINA SOUTH 42H | 4212735534 |
| BRISCOE CATARINA SOUTH 43H | 4212735535 |
| BRISCOE CATARINA SOUTH 44H | 4212735536 |
| BRISCOE CATARINA SOUTH 45H | 4212735557 |
| BRISCOE CATARINA SOUTH 46H | 4212735561 |
| BRISCOE CATARINA SOUTH 47H | 4212735562 |
| BRISCOE CATARINA SOUTH 48H | 4212735563 |
| BRISCOE CATARINA SOUTH 49H | 4212735693 |
| BRISCOE CATARINA SOUTH 4H | 4212733769 |
| BRISCOE CATARINA SOUTH 50H | 4212735694 |
| BRISCOE CATARINA SOUTH 51H | 4212735695 |
| BRISCOE CATARINA SOUTH 52H | 4212735696 |
| BRISCOE CATARINA SOUTH 53H | 4212735698 |
| BRISCOE CATARINA SOUTH 54H | 4212735700 |
| BRISCOE CATARINA SOUTH 55H | 4212735699 |
| BRISCOE CATARINA SOUTH 56H | 4212735701 |
| BRISCOE CATARINA SOUTH 57H | 4212735706 |
| BRISCOE CATARINA SOUTH 58H | 4212735707 |
| BRISCOE CATARINA SOUTH 59H | 4212735708 |
| BRISCOE CATARINA SOUTH 5H | 4212733770 |
| BRISCOE CATARINA SOUTH 60H | 4212735709 |
| BRISCOE CATARINA SOUTH 61H | 4212736439 |
| BRISCOE CATARINA SOUTH 62H | 4212736440 |
| BRISCOE CATARINA SOUTH 63H | 4212736441 |
| BRISCOE CATARINA SOUTH 64H | 4212736442 |
| BRISCOE CATARINA SOUTH 65H | 4212736443 |
| BRISCOE CATARINA SOUTH 66H | 4212736444 |
| BRISCOE CATARINA SOUTH 67H | 4212736417 |
| BRISCOE CATARINA SOUTH 68H | 4212736418 |
| BRISCOE CATARINA SOUTH 69H | 4212736419 |
| BRISCOE CATARINA SOUTH 6H | 4212733771 |
| BRISCOE CATARINA SOUTH 70H | 4212736420 |
| BRISCOE CATARINA SOUTH 71H | 4212736421 |
| BRISCOE CATARINA SOUTH 72H | 4212736410 |
| BRISCOE CATARINA SOUTH 73H | 4212736411 |
| BRISCOE CATARINA SOUTH 74H | 4212736412 |
| BRISCOE CATARINA SOUTH 75H | 4212736413 |
| BRISCOE CATARINA SOUTH 76H | 4212736414 |
| BRISCOE CATARINA SOUTH 77H | 4212736393 |
| BRISCOE CATARINA SOUTH 78H | 4212736394 |
| BRISCOE CATARINA SOUTH 79H | 4212736395 |
| BRISCOE CATARINA SOUTH 7H | 4212733952 |
| BRISCOE CATARINA SOUTH 80H | 4212736396 |
| BRISCOE CATARINA SOUTH 81H | 4212736397 |
| BRISCOE CATARINA SOUTH 82H | 4212736426 |
| BRISCOE CATARINA SOUTH 83H | 4212736427 |
| BRISCOE CATARINA SOUTH 8H | 4212733951 |
| BRISCOE CATARINA SOUTH 9H | 4212733953 |
| BRISCOE CATARINA WEST 10H | 4212733682 |
| BRISCOE CATARINA WEST 116H | 4212736645 |
| BRISCOE CATARINA WEST 117H | 4212736646 |
| BRISCOE CATARINA WEST 118H | 4212736647 |
| BRISCOE CATARINA WEST 119H | 4212736648 |
| BRISCOE CATARINA WEST 120H | 4212736649 |
| BRISCOE CATARINA WEST 121H | 4212736654 |
| BRISCOE CATARINA WEST 125H | 4212736651 |
| BRISCOE CATARINA WEST 126H | 4212736652 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 127H | 4212736653 |
| BRISCOE CATARINA WEST 128H | 4212736655 |
| BRISCOE CATARINA WEST 129H | 4212736656 |
| BRISCOE CATARINA WEST 12H | 4212733753 |
| BRISCOE CATARINA WEST 130H | 4212736657 |
| BRISCOE CATARINA WEST 131H | 4212736658 |
| BRISCOE CATARINA WEST 132H | 4212736659 |
| BRISCOE CATARINA WEST 13H | 4212733762 |
| BRISCOE CATARINA WEST 14H | 4212733763 |
| BRISCOE CATARINA WEST 15H | 4212733777 |
| BRISCOE CATARINA WEST 16H | 4212733778 |
| BRISCOE CATARINA WEST 17H | 4212733779 |
| BRISCOE CATARINA WEST 18H | 4212734166 |
| BRISCOE CATARINA WEST 19H | 4212734167 |
| BRISCOE CATARINA WEST 1H (EAGLEF | 4212733421 |
| BRISCOE CATARINA WEST 20H | 4212734169 |
| BRISCOE CATARINA WEST 21H | 4212734170 |
| BRISCOE CATARINA WEST 22H | 4212734171 |
| BRISCOE CATARINA WEST 23H | 4212734172 |
| BRISCOE CATARINA WEST 24H | 4212734335 |
| BRISCOE CATARINA WEST 25H | 4212734336 |
| BRISCOE CATARINA WEST 26H | 4212734337 |
| BRISCOE CATARINA WEST 27H | 4212734338 |
| BRISCOE CATARINA WEST 28H | 4212734340 |
| BRISCOE CATARINA WEST 29H | 4212734339 |
| BRISCOE CATARINA WEST 2H | 4212733615 |
| BRISCOE CATARINA WEST 30H | 4212734682 |
| BRISCOE CATARINA WEST 31H | 4212734684 |
| BRISCOE CATARINA WEST 32H | 4212734685 |
| BRISCOE CATARINA WEST 33H | 4212734686 |
| BRISCOE CATARINA WEST 34H | 4212734687 |
| BRISCOE CATARINA WEST 35H | 4212734689 |
| BRISCOE CATARINA WEST 36H | 4212734690 |
| BRISCOE CATARINA WEST 37H | 4212734693 |
| BRISCOE CATARINA WEST 38H | 4212734694 |
| BRISCOE CATARINA WEST 39H | 4212734695 |
| BRISCOE CATARINA WEST 40H | 4212734696 |
| BRISCOE CATARINA WEST 41H | 4212734697 |
| BRISCOE CATARINA WEST 42H | 4212734717 |
| BRISCOE CATARINA WEST 43H | 4212734720 |
| BRISCOE CATARINA WEST 44H | 4212734718 |
| BRISCOE CATARINA WEST 45H | 4212734719 |
| BRISCOE CATARINA WEST 46H | 4212734722 |
| BRISCOE CATARINA WEST 47H | 4212734725 |
| BRISCOE CATARINA WEST 48H | 4212734726 |
| BRISCOE CATARINA WEST 49H | 4212734727 |
| BRISCOE CATARINA WEST 4H | 4212733629 |
| BRISCOE CATARINA WEST 50H | 4212734728 |
| BRISCOE CATARINA WEST 51H | 4212735780 |
| BRISCOE CATARINA WEST 52H | 4212735781 |
| BRISCOE CATARINA WEST 53H | 4212735782 |
| BRISCOE CATARINA WEST 54H | 4212735783 |
| BRISCOE CATARINA WEST 55H | 4212735784 |
| BRISCOE CATARINA WEST 56H | 4212735785 |
| BRISCOE CATARINA WEST 57H | 4212735786 |
| BRISCOE CATARINA WEST 58H | 4212735787 |
| BRISCOE CATARINA WEST 59H | 4212735788 |
| BRISCOE CATARINA WEST 5H | 4212733637 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 60H | 4212735789 |
| BRISCOE CATARINA WEST 61H | 4212735790 |
| BRISCOE CATARINA WEST 62H | 4212735793 |
| BRISCOE CATARINA WEST 63H | 4212735794 |
| BRISCOE CATARINA WEST 64H | 4212735795 |
| BRISCOE CATARINA WEST 65H | 4212735796 |
| BRISCOE CATARINA WEST 66H | 4212735825 |
| BRISCOE CATARINA WEST 67H | 4212735834 |
| BRISCOE CATARINA WEST 68H | 4212735836 |
| BRISCOE CATARINA WEST 69H | 4212735835 |
| BRISCOE CATARINA WEST 6H | 4212733648 |
| BRISCOE CATARINA WEST 70H | 4212735837 |
| BRISCOE CATARINA WEST 71H | 4212735859 |
| BRISCOE CATARINA WEST 72H | 4212735860 |
| BRISCOE CATARINA WEST 73H | 4212735861 |
| BRISCOE CATARINA WEST 74H | 4212735862 |
| BRISCOE CATARINA WEST 75H | 4212735882 |
| BRISCOE CATARINA WEST 76H | 4212735883 |
| BRISCOE CATARINA WEST 77H | 4212735885 |
| BRISCOE CATARINA WEST 78H | 4212735886 |
| BRISCOE CATARINA WEST 79H | 4212735888 |
| BRISCOE CATARINA WEST 7H | 4212733643 |
| BRISCOE CATARINA WEST 80H | 4212735889 |
| BRISCOE CATARINA WEST 81H | 4212735890 |
| BRISCOE CATARINA WEST 82H | 4212735891 |
| BRISCOE CATARINA WEST 8H | 4212733685 |
| BRISCOE CATARINA WEST 90H | 4212736881 |
| BRISCOE CATARINA WEST 93H | 4212736884 |
| BRISCOE CATARINA WEST 96H | 4212736887 |
| BRISCOE CATARINA WEST 9H | 4212733801 |
| BRISCOE CHIP EAST RANCH 10H | 4212734152 |
| BRISCOE CHIP EAST RANCH 11H | 4212734478 |
| BRISCOE CHIP EAST RANCH 12H | 4212734479 |
| BRISCOE CHIP EAST RANCH 13H | 4212734480 |
| BRISCOE CHIP EAST RANCH 14H | 4212734153 |
| BRISCOE CHIP EAST RANCH 15H | 4212734481 |
| BRISCOE CHIP EAST RANCH 16H | 4212734482 |
| BRISCOE CHIP EAST RANCH 17H | 4212734483 |
| BRISCOE CHIP EAST RANCH 18H | 4212734507 |
| BRISCOE CHIP EAST RANCH 19H | 4212734508 |
| BRISCOE CHIP EAST RANCH 1H | 4212733768 |
| BRISCOE CHIP EAST RANCH 20H | 4212734509 |
| BRISCOE CHIP EAST RANCH 21H | 4212734510 |
| BRISCOE CHIP EAST RANCH 22H | 4212734511 |
| BRISCOE CHIP EAST RANCH 23H | 4212734512 |
| BRISCOE CHIP EAST RANCH 24H | 4212734522 |
| BRISCOE CHIP EAST RANCH 25H | 4212734523 |
| BRISCOE CHIP EAST RANCH 26H | 4212734524 |
| BRISCOE CHIP EAST RANCH 27H | 4212736184 |
| BRISCOE CHIP EAST RANCH 28HR | 4212736283 |
| BRISCOE CHIP EAST RANCH 29H | 4212736186 |
| BRISCOE CHIP EAST RANCH 2H | 4212733772 |
| BRISCOE CHIP EAST RANCH 30H | 4212736188 |
| BRISCOE CHIP EAST RANCH 31H | 4212736206 |
| BRISCOE CHIP EAST RANCH 32H | 4212736207 |
| BRISCOE CHIP EAST RANCH 33H | 4212736236 |
| BRISCOE CHIP EAST RANCH 34H | 4212736237 |
| BRISCOE CHIP EAST RANCH 3H | 4212733773 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CHIP EAST RANCH 4H | 4212733852 |
| BRISCOE CHIP EAST RANCH 5H | 4212733853 |
| BRISCOE CHIP EAST RANCH 6H | 4212733854 |
| BRISCOE CHIP EAST RANCH 7H | 4212734095 |
| BRISCOE CHIP EAST RANCH 8H | 4212734096 |
| BRISCOE CHIP EAST RANCH 9H | 4212734151 |
| BRISCOE CHIP EAST UNIT B 1H | 4212736168 |
| BRISCOE CHIP EAST UNIT B 2H | 4212736169 |
| BRISCOE CHIP EAST UNIT B 3H | 4212736170 |
| BRISCOE CHIP EAST UNIT B 4H | 4212736171 |
| BRISCOE CHIP EAST UNIT B 5H | 4212736172 |
| BRISCOE CHIP EAST UNIT B 6H | 4212736173 |
| BRISCOE CHIP EAST UNIT E 1H | 4212737052 |
| BRISCOE CHIP EAST UNIT E 2H | 4212737053 |
| BRISCOE CHIP EAST UNIT E 3H | 4212737054 |
| BRISCOE CHUPADERA RANCH 1 | 4247939786 |
| BRISCOE CHUPADERA RANCH 10H | 4247941266 |
| BRISCOE CHUPADERA RANCH 11H | 4247941267 |
| BRISCOE CHUPADERA RANCH 12H | 4247941985 |
| BRISCOE CHUPADERA RANCH 13H | 4247941986 |
| BRISCOE CHUPADERA RANCH 14H | 4247941987 |
| BRISCOE CHUPADERA RANCH 15H | 4247941988 |
| BRISCOE CHUPADERA RANCH 16H | 4247941989 |
| BRISCOE CHUPADERA RANCH 17H | 4247941990 |
| BRISCOE CHUPADERA RANCH 18H | 4247941994 |
| BRISCOE CHUPADERA RANCH 19H | 4247941998 |
| BRISCOE CHUPADERA RANCH 20H | 4247942001 |
| BRISCOE CHUPADERA RANCH 21H | 4247942000 |
| BRISCOE CHUPADERA RANCH 22H | 4247942002 |
| BRISCOE CHUPADERA RANCH 23H | 4247942003 |
| BRISCOE CHUPADERA RANCH 24H | 4247942686 |
| BRISCOE CHUPADERA RANCH 25H | 4247942687 |
| BRISCOE CHUPADERA RANCH 26H | 4247942689 |
| BRISCOE CHUPADERA RANCH 27H | 4247942691 |
| BRISCOE CHUPADERA RANCH 28H | 4247942692 |
| BRISCOE CHUPADERA RANCH 29H | 4247942693 |
| BRISCOE CHUPADERA RANCH 2H | 4247941322 |
| BRISCOE CHUPADERA RANCH 30H | 4247942694 |
| BRISCOE CHUPADERA RANCH 31HR | 4247943008 |
| BRISCOE CHUPADERA RANCH 32H | 4247942696 |
| BRISCOE CHUPADERA RANCH 33H | 4247942697 |
| BRISCOE CHUPADERA RANCH 34H | 4247942700 |
| BRISCOE CHUPADERA RANCH 35H | 4247942701 |
| BRISCOE CHUPADERA RANCH 36H | 4247942702 |
| BRISCOE CHUPADERA RANCH 37H | 4247942703 |
| BRISCOE CHUPADERA RANCH 38H | 4247942704 |
| BRISCOE CHUPADERA RANCH 39H | 4247942705 |
| BRISCOE CHUPADERA RANCH 3H | 4247941212 |
| BRISCOE CHUPADERA RANCH 40H | 4247942706 |
| BRISCOE CHUPADERA RANCH 41H | 4247942707 |
| BRISCOE CHUPADERA RANCH 42H | 4247942708 |
| BRISCOE CHUPADERA RANCH 43H | 4247942711 |
| BRISCOE CHUPADERA RANCH 4H | 4247941211 |
| BRISCOE CHUPADERA RANCH 5H | 4247941219 |
| BRISCOE CHUPADERA RANCH 6H | 4247941220 |
| BRISCOE CHUPADERA RANCH 7H | 4247941226 |
| BRISCOE CHUPADERA RANCH 8H | 4247941255 |
| BRISCOE CHUPADERA RANCH 9H | 4247941256 |

**Existing Producing Wells**

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 100H | 4228334450 |
| BRISCOE COCHINA EAST RANCH 101H | 4228334453 |
| BRISCOE COCHINA EAST RANCH 102H | 4228334469 |
| BRISCOE COCHINA EAST RANCH 103H | 4212736101 |
| BRISCOE COCHINA EAST RANCH 104H | 4212736102 |
| BRISCOE COCHINA EAST RANCH 105H | 4212736117 |
| BRISCOE COCHINA EAST RANCH 106H | 4212736105 |
| BRISCOE COCHINA EAST RANCH 107H | 4212736106 |
| BRISCOE COCHINA EAST RANCH 108H | 4212736108 |
| BRISCOE COCHINA EAST RANCH 109H | 4212736109 |
| BRISCOE COCHINA EAST RANCH 10H | 4212733678 |
| BRISCOE COCHINA EAST RANCH 110H | 4212736110 |
| BRISCOE COCHINA EAST RANCH 111H | 4212736112 |
| BRISCOE COCHINA EAST RANCH 112H | 4212736115 |
| BRISCOE COCHINA EAST RANCH 113H | 4212736116 |
| BRISCOE COCHINA EAST RANCH 114H | 4212736086 |
| BRISCOE COCHINA EAST RANCH 115H | 4212736087 |
| BRISCOE COCHINA EAST RANCH 116H | 4212736088 |
| BRISCOE COCHINA EAST RANCH 117H | 4212736090 |
| BRISCOE COCHINA EAST RANCH 118H | 4212736092 |
| BRISCOE COCHINA EAST RANCH 119H | 4212736093 |
| BRISCOE COCHINA EAST RANCH 11H | 4212733837 |
| BRISCOE COCHINA EAST RANCH 120H | 4212736094 |
| BRISCOE COCHINA EAST RANCH 121H | 4212736095 |
| BRISCOE COCHINA EAST RANCH 122H | 4212736097 |
| BRISCOE COCHINA EAST RANCH 123H | 4212736098 |
| BRISCOE COCHINA EAST RANCH 124H | 4212736099 |
| BRISCOE COCHINA EAST RANCH 125H | 4212736100 |
| BRISCOE COCHINA EAST RANCH 126H | 4212736103 |
| BRISCOE COCHINA EAST RANCH 127H | 4228334853 |
| BRISCOE COCHINA EAST RANCH 128H | 4228334854 |
| BRISCOE COCHINA EAST RANCH 129H | 4228334855 |
| BRISCOE COCHINA EAST RANCH 12H | 4212733838 |
| BRISCOE COCHINA EAST RANCH 130H | 4228334856 |
| BRISCOE COCHINA EAST RANCH 131H | 4228334857 |
| BRISCOE COCHINA EAST RANCH 132H | 4228334858 |
| BRISCOE COCHINA EAST RANCH 13H | 4212733839 |
| BRISCOE COCHINA EAST RANCH 163H | 4212736709 |
| BRISCOE COCHINA EAST RANCH 164H | 4212736708 |
| BRISCOE COCHINA EAST RANCH 165H | 4212736710 |
| BRISCOE COCHINA EAST RANCH 16H | 4212733914 |
| BRISCOE COCHINA EAST RANCH 17H | 4212733916 |
| BRISCOE COCHINA EAST RANCH 188H | 4228335665 |
| BRISCOE COCHINA EAST RANCH 189H | 4228335666 |
| BRISCOE COCHINA EAST RANCH 18H | 4212733968 |
| BRISCOE COCHINA EAST RANCH 190H | 4228335667 |
| BRISCOE COCHINA EAST RANCH 19H | 4212733990 |
| BRISCOE COCHINA EAST RANCH 1H | 4212733620 |
| BRISCOE COCHINA EAST RANCH 20H | 4212733994 |
| BRISCOE COCHINA EAST RANCH 21H | 4212733991 |
| BRISCOE COCHINA EAST RANCH 22H | 4212735204 |
| BRISCOE COCHINA EAST RANCH 23H | 4212735203 |
| BRISCOE COCHINA EAST RANCH 24H | 4212735081 |
| BRISCOE COCHINA EAST RANCH 25H | 4212735072 |
| BRISCOE COCHINA EAST RANCH 26H | 4212735086 |
| BRISCOE COCHINA EAST RANCH 27H | 4212735087 |
| BRISCOE COCHINA EAST RANCH 28H | 4212735205 |
| BRISCOE COCHINA EAST RANCH 29H | 4212735206 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 2H | 4212733621 |
| BRISCOE COCHINA EAST RANCH 30H | 4212735207 |
| BRISCOE COCHINA EAST RANCH 31H | 4212734098 |
| BRISCOE COCHINA EAST RANCH 32H | 4212734107 |
| BRISCOE COCHINA EAST RANCH 33H | 4212735208 |
| BRISCOE COCHINA EAST RANCH 34H | 4212735223 |
| BRISCOE COCHINA EAST RANCH 35H | 4212735210 |
| BRISCOE COCHINA EAST RANCH 36H | 4212735211 |
| BRISCOE COCHINA EAST RANCH 37H | 4212735213 |
| BRISCOE COCHINA EAST RANCH 38H | 4212735228 |
| BRISCOE COCHINA EAST RANCH 39H | 4212735229 |
| BRISCOE COCHINA EAST RANCH 3H | 4212733667 |
| BRISCOE COCHINA EAST RANCH 40H | 4228334138 |
| BRISCOE COCHINA EAST RANCH 41H | 4228334147 |
| BRISCOE COCHINA EAST RANCH 42H | 4228334154 |
| BRISCOE COCHINA EAST RANCH 43H | 4228334156 |
| BRISCOE COCHINA EAST RANCH 44H | 4228334157 |
| BRISCOE COCHINA EAST RANCH 45H | 4228334158 |
| BRISCOE COCHINA EAST RANCH 46H | 4228334163 |
| BRISCOE COCHINA EAST RANCH 47H | 4228334164 |
| BRISCOE COCHINA EAST RANCH 48H | 4228334165 |
| BRISCOE COCHINA EAST RANCH 49H | 4228334166 |
| BRISCOE COCHINA EAST RANCH 4H | 4212733668 |
| BRISCOE COCHINA EAST RANCH 50H | 4228334167 |
| BRISCOE COCHINA EAST RANCH 51H | 4228334168 |
| BRISCOE COCHINA EAST RANCH 52H | 4228334173 |
| BRISCOE COCHINA EAST RANCH 53H | 4228334174 |
| BRISCOE COCHINA EAST RANCH 54H | 4228334175 |
| BRISCOE COCHINA EAST RANCH 55H | 4228334176 |
| BRISCOE COCHINA EAST RANCH 56H | 4228334177 |
| BRISCOE COCHINA EAST RANCH 57H | 4228334225 |
| BRISCOE COCHINA EAST RANCH 58H | 4228334226 |
| BRISCOE COCHINA EAST RANCH 59H | 4228334227 |
| BRISCOE COCHINA EAST RANCH 5H | 4212733669 |
| BRISCOE COCHINA EAST RANCH 60H | 4228334228 |
| BRISCOE COCHINA EAST RANCH 61H | 4212734486 |
| BRISCOE COCHINA EAST RANCH 62H | 4212734487 |
| BRISCOE COCHINA EAST RANCH 63H | 4212734488 |
| BRISCOE COCHINA EAST RANCH 64H | 4212734489 |
| BRISCOE COCHINA EAST RANCH 65H | 4212734492 |
| BRISCOE COCHINA EAST RANCH 66H | 4212734494 |
| BRISCOE COCHINA EAST RANCH 67H | 4228333013 |
| BRISCOE COCHINA EAST RANCH 68H | 4228333015 |
| BRISCOE COCHINA EAST RANCH 69H | 4228333016 |
| BRISCOE COCHINA EAST RANCH 6H | 4212733670 |
| BRISCOE COCHINA EAST RANCH 70H | 4228333017 |
| BRISCOE COCHINA EAST RANCH 71H | 4228333018 |
| BRISCOE COCHINA EAST RANCH 72H | 4228333019 |
| BRISCOE COCHINA EAST RANCH 73H | 4228334307 |
| BRISCOE COCHINA EAST RANCH 74H | 4228334308 |
| BRISCOE COCHINA EAST RANCH 75H | 4228334309 |
| BRISCOE COCHINA EAST RANCH 76H | 4228334310 |
| BRISCOE COCHINA EAST RANCH 77H | 4228334312 |
| BRISCOE COCHINA EAST RANCH 78H | 4228334313 |
| BRISCOE COCHINA EAST RANCH 79H | 4228334362 |
| BRISCOE COCHINA EAST RANCH 7H | 4212733662 |
| BRISCOE COCHINA EAST RANCH 80H | 4228334363 |
| BRISCOE COCHINA EAST RANCH 81H | 4228334364 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 82H | 4228334365 |
| BRISCOE COCHINA EAST RANCH 83H | 4228334392 |
| BRISCOE COCHINA EAST RANCH 84H | 4228334393 |
| BRISCOE COCHINA EAST RANCH 85H | 4228334394 |
| BRISCOE COCHINA EAST RANCH 86H | 4228334395 |
| BRISCOE COCHINA EAST RANCH 87H | 4228334396 |
| BRISCOE COCHINA EAST RANCH 88H | 4228334399 |
| BRISCOE COCHINA EAST RANCH 89H | 4228334400 |
| BRISCOE COCHINA EAST RANCH 8H | 4212733671 |
| BRISCOE COCHINA EAST RANCH 90H | 4228334401 |
| BRISCOE COCHINA EAST RANCH 91H | 4228334402 |
| BRISCOE COCHINA EAST RANCH 92H | 4228334403 |
| BRISCOE COCHINA EAST RANCH 93H | 4228334404 |
| BRISCOE COCHINA EAST RANCH 94H | 4228334406 |
| BRISCOE COCHINA EAST RANCH 95H | 4228334407 |
| BRISCOE COCHINA EAST RANCH 96H | 4228334408 |
| BRISCOE COCHINA EAST RANCH 97H | 4228334409 |
| BRISCOE COCHINA EAST RANCH 98H | 4228334410 |
| BRISCOE COCHINA EAST RANCH 99H | 4228334451 |
| BRISCOE COCHINA EAST RANCH 9H | 4212733672 |
| BRISCOE COCHINA STATE UNIT A-1H | 4228332330 |
| BRISCOE COCHINA STATE UNIT B-1H | 4228332331 |
| BRISCOE COCHINA WEST RANCH 101H | 4212736914 |
| BRISCOE COCHINA WEST RANCH 102H | 4212736916 |
| BRISCOE COCHINA WEST RANCH 103H | 4212736917 |
| BRISCOE COCHINA WEST RANCH 104H | 4212736915 |
| BRISCOE COCHINA WEST RANCH 105H | 4212736918 |
| BRISCOE COCHINA WEST RANCH 11H | 4212733759 |
| BRISCOE COCHINA WEST RANCH 12H | 4212733859 |
| BRISCOE COCHINA WEST RANCH 16H | 4212734116 |
| BRISCOE COCHINA WEST RANCH 17H | 4212734118 |
| BRISCOE COCHINA WEST RANCH 18H | 4212734117 |
| BRISCOE COCHINA WEST RANCH 19H | 4212734831 |
| BRISCOE COCHINA WEST RANCH 1B | 4212735773 |
| BRISCOE COCHINA WEST RANCH 1E | 4212735779 |
| BRISCOE COCHINA WEST RANCH 1H | 4212733658 |
| BRISCOE COCHINA WEST RANCH 20H | 4212734833 |
| BRISCOE COCHINA WEST RANCH 21H | 4212734832 |
| BRISCOE COCHINA WEST RANCH 22H | 4212734445 |
| BRISCOE COCHINA WEST RANCH 23H | 4212734447 |
| BRISCOE COCHINA WEST RANCH 24H | 4212734449 |
| BRISCOE COCHINA WEST RANCH 25H | 4212734450 |
| BRISCOE COCHINA WEST RANCH 26H | 4212734451 |
| BRISCOE COCHINA WEST RANCH 27H | 4212734452 |
| BRISCOE COCHINA WEST RANCH 28H | 4212734834 |
| BRISCOE COCHINA WEST RANCH 29H | 4212734836 |
| BRISCOE COCHINA WEST RANCH 2H | 4212733696 |
| BRISCOE COCHINA WEST RANCH 30H | 4212734837 |
| BRISCOE COCHINA WEST RANCH 39H | 4212734472 |
| BRISCOE COCHINA WEST RANCH 3H | 4212733699 |
| BRISCOE COCHINA WEST RANCH 40H | 4212734473 |
| BRISCOE COCHINA WEST RANCH 41H | 4212734474 |
| BRISCOE COCHINA WEST RANCH 42H | 4212734475 |
| BRISCOE COCHINA WEST RANCH 43H | 4212734476 |
| BRISCOE COCHINA WEST RANCH 44H | 4212734477 |
| BRISCOE COCHINA WEST RANCH 47H | 4212735548 |
| BRISCOE COCHINA WEST RANCH 48H | 4212735549 |
| BRISCOE COCHINA WEST RANCH 49H | 4212735550 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA WEST RANCH 4H | 4212733700 |
| BRISCOE COCHINA WEST RANCH 50H | 4212735551 |
| BRISCOE COCHINA WEST RANCH 51H | 4212735552 |
| BRISCOE COCHINA WEST RANCH 52H | 4212735624 |
| BRISCOE COCHINA WEST RANCH 53H | 4212735626 |
| BRISCOE COCHINA WEST RANCH 54H | 4212735627 |
| BRISCOE COCHINA WEST RANCH 55H | 4212735628 |
| BRISCOE COCHINA WEST RANCH 56H | 4212735630 |
| BRISCOE COCHINA WEST RANCH 57H | 4212735629 |
| BRISCOE COCHINA WEST RANCH 58H | 4212735631 |
| BRISCOE COCHINA WEST RANCH 59H | 4212735632 |
| BRISCOE COCHINA WEST RANCH 5H | 4212733903 |
| BRISCOE COCHINA WEST RANCH 60H | 4212735633 |
| BRISCOE COCHINA WEST RANCH 61H | 4212735634 |
| BRISCOE COCHINA WEST RANCH 62H | 4212735636 |
| BRISCOE COCHINA WEST RANCH 63H | 4212735635 |
| BRISCOE COCHINA WEST RANCH 64H | 4212735640 |
| BRISCOE COCHINA WEST RANCH 65H | 4212735642 |
| BRISCOE COCHINA WEST RANCH 66H | 4212735643 |
| BRISCOE COCHINA WEST RANCH 67H | 4212735644 |
| BRISCOE COCHINA WEST RANCH 68H | 4212736138 |
| BRISCOE COCHINA WEST RANCH 69H | 4212736139 |
| BRISCOE COCHINA WEST RANCH 6H | 4212733904 |
| BRISCOE COCHINA WEST RANCH 70H | 4212736148 |
| BRISCOE COCHINA WEST RANCH 71H | 4212736140 |
| BRISCOE COCHINA WEST RANCH 72H | 4212736141 |
| BRISCOE COCHINA WEST RANCH 73H | 4212736142 |
| BRISCOE COCHINA WEST RANCH 74H | 4212736143 |
| BRISCOE COCHINA WEST RANCH 75H | 4212736144 |
| BRISCOE COCHINA WEST RANCH 76H | 4212736145 |
| BRISCOE COCHINA WEST RANCH 77H | 4212736146 |
| BRISCOE COCHINA WEST RANCH 7H | 4212733905 |
| BRISCOE COCHINA WEST RANCH 88H | 4212736263 |
| BRISCOE COCHINA WEST RANCH 89H | 4212736264 |
| BRISCOE COCHINA WEST RANCH 90H | 4212736265 |
| BRISCOE COCHINA WEST RANCH 91H | 4212736266 |
| BRISCOE COCHINA WEST RANCH 92H | 4212736267 |
| BRISCOE COCHINA WEST RANCH 93H | 4212736268 |
| BRISCOE COCHINA WEST RANCH 94H | 4212736269 |
| BRISCOE COCHINA WEST RANCH 95H | 4212736270 |
| BRISCOE EAST DELGADO UNIT A 10H | 4212735752 |
| BRISCOE EAST DELGADO UNIT A 11H | 4212735753 |
| BRISCOE EAST DELGADO UNIT A 12H | 4212735754 |
| BRISCOE EAST DELGADO UNIT A 13H | 4212735755 |
| BRISCOE EAST DELGADO UNIT A 14H | 4212735756 |
| BRISCOE EAST DELGADO UNIT A 15H | 4212735757 |
| BRISCOE EAST DELGADO UNIT A 1H | 4212735716 |
| BRISCOE EAST DELGADO UNIT A 2H | 4212735717 |
| BRISCOE EAST DELGADO UNIT A 3H | 4212735718 |
| BRISCOE EAST DELGADO UNIT A 4H | 4212735719 |
| BRISCOE EAST DELGADO UNIT A 5H | 4212735720 |
| BRISCOE EAST DELGADO UNIT A 6H | 4212735724 |
| BRISCOE EAST DELGADO UNIT A 7H | 4212735725 |
| BRISCOE EAST DELGADO UNIT A 8H | 4212735726 |
| BRISCOE EAST DELGADO UNIT A 9H | 4212735727 |
| BRISCOE ECKHARDT-SWONKE UNIT 1H | 4212735241 |
| BRISCOE ECKHARDT-SWONKE UNIT 2H | 4212735243 |
| BRISCOE ECKHARDT-SWONKE UNIT 3H | 4212735244 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE ECKHARDT-SWONKE UNIT 4H | 4212735245 |
| BRISCOE ECKHARDT-SWONKE UNIT 5H | 4212735246 |
| BRISCOE ECKHARDT-SWONKE UNIT 6H | 4212735249 |
| BRISCOE ECKHARDT-SWONKE UNIT 7H | 4212735250 |
| BRISCOE FRIDAY RANCH 18H | 4212734158 |
| BRISCOE FRIDAY RANCH 19H | 4212734193 |
| BRISCOE FRIDAY RANCH 1H | 4212733689 |
| BRISCOE FRIDAY RANCH 20H | 4212734194 |
| BRISCOE FRIDAY RANCH 21H | 4212734195 |
| BRISCOE FRIDAY RANCH 22H | 4212734196 |
| BRISCOE FRIDAY RANCH 23H | 4212735385 |
| BRISCOE FRIDAY RANCH 24H | 4212735389 |
| BRISCOE FRIDAY RANCH 25H | 4212734807 |
| BRISCOE FRIDAY RANCH 26H | 4212734810 |
| BRISCOE FRIDAY RANCH 27H | 4212734808 |
| BRISCOE FRIDAY RANCH 28H | 4212734812 |
| BRISCOE FRIDAY RANCH 29H | 4212734813 |
| BRISCOE FRIDAY RANCH 2H | 4212733708 |
| BRISCOE FRIDAY RANCH 30H | 4212734815 |
| BRISCOE FRIDAY RANCH 31H | 4212734817 |
| BRISCOE FRIDAY RANCH 32H | 4212734816 |
| BRISCOE FRIDAY RANCH 33H | 4212734818 |
| BRISCOE FRIDAY RANCH 34H | 4212734820 |
| BRISCOE FRIDAY RANCH 35H | 4212735387 |
| BRISCOE FRIDAY RANCH 36H | 4212735388 |
| BRISCOE FRIDAY RANCH 37H | 4212735392 |
| BRISCOE FRIDAY RANCH 38H | 4212735391 |
| BRISCOE FRIDAY RANCH 39H | 4212735393 |
| BRISCOE FRIDAY RANCH 3H | 4212733709 |
| BRISCOE FRIDAY RANCH 40H | 4212735394 |
| BRISCOE FRIDAY RANCH 41HR | 4212736456 |
| BRISCOE FRIDAY RANCH 42HR | 4212736457 |
| BRISCOE FRIDAY RANCH 43H | 4212736166 |
| BRISCOE FRIDAY RANCH 44H | 4212736167 |
| BRISCOE FRIDAY RANCH 45H | 4212736208 |
| BRISCOE FRIDAY RANCH 46HR | 4212736356 |
| BRISCOE FRIDAY RANCH 47H | 4212736218 |
| BRISCOE FRIDAY RANCH 4H | 4212733720 |
| BRISCOE FRIDAY RANCH 5H | 4212733721 |
| BRISCOE FRIDAY RANCH 6H | 4212733722 |
| BRISCOE FRIDAY RANCH 7H | 4212733755 |
| BRISCOE FRIDAY RANCH 8H | 4212733756 |
| BRISCOE FRIDAY RANCH 9H | 4212733757 |
| BRISCOE FRIDAY RANCH UNIT A 1H | 4212736196 |
| BRISCOE FRIDAY RANCH UNIT A 2H | 4212736197 |
| BRISCOE FRIDAY RANCH UNIT A 3H | 4212736198 |
| BRISCOE FRIDAY RANCH UNIT A 4H | 4212736199 |
| BRISCOE FRIDAY RANCH UNIT A 5H | 4212736200 |
| BRISCOE FRIDAY RANCH UNIT A 6H | 4212736201 |
| BRISCOE FRIDAY RANCH UNIT B 10H | 4212734273 |
| BRISCOE FRIDAY RANCH UNIT B 11H | 4212734275 |
| BRISCOE FRIDAY RANCH UNIT B 12H | 4212734274 |
| BRISCOE FRIDAY RANCH UNIT B 13H | 4212734276 |
| BRISCOE FRIDAY RANCH UNIT B 14H | 4212734309 |
| BRISCOE FRIDAY RANCH UNIT B 15H | 4212734310 |
| BRISCOE FRIDAY RANCH UNIT B 16H | 4212734311 |
| BRISCOE FRIDAY RANCH UNIT B 17H | 4212734313 |
| BRISCOE FRIDAY RANCH UNIT C 10H | 4212736898 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE FRIDAY RANCH UNIT C 11H | 4212736899 |
| BRISCOE FRIDAY RANCH UNIT C 1H | 4212736901 |
| BRISCOE FRIDAY RANCH UNIT C 2H | 4212736902 |
| BRISCOE FRIDAY RANCH UNIT C 3H | 4212736903 |
| BRISCOE FRIDAY RANCH UNIT C 4H | 4212736904 |
| BRISCOE FRIDAY RANCH UNIT C 5H | 4212736905 |
| BRISCOE FRIDAY RANCH UNIT C 6H | 4212736906 |
| BRISCOE FRIDAY RANCH UNIT C 7H | 4212736895 |
| BRISCOE FRIDAY RANCH UNIT C 8H | 4212736896 |
| BRISCOE FRIDAY RANCH UNIT C 9H | 4212736897 |
| BRISCOE FRIDAY SMITH 1H | 4212733984 |
| BRISCOE FRIDAY SMITH 2H | 4212733985 |
| BRISCOE FRIDAY SMITH 3H | 4212733986 |
| BRISCOE METCALF UNIT 1H | 4212737136 |
| BRISCOE METCALF UNIT 2H | 4212737138 |
| BRISCOE METCALF UNIT 3H | 4212737137 |
| BRISCOE METCALF UNIT 4H | 4212737139 |
| BRISCOE METCALF UNIT 5H | 4212737140 |
| BRISCOE METCALF UNIT 6H | 4212737141 |
| BRISCOE SPRINGMAN UNIT A 1H | 4212735278 |
| BRISCOE SPRINGMAN UNIT A 2H | 4212735279 |
| BRISCOE SPRINGMAN UNIT A 3H | 4212735280 |
| BRISCOE SPRINGMAN UNIT A 4H | 4212735281 |
| BRISCOE SPRINGMAN UNIT A 5H | 4212735283 |
| BRISCOE SPRINGMAN UNIT A 6H | 4212735282 |
| BRISCOE SPRINGMAN UNIT A 7H | 4212735284 |
| BRISCOE SPRINGMAN UNIT B 1H | 4212735285 |
| BRISCOE SPRINGMAN UNIT B 2H | 4212735286 |
| BRISCOE SPRINGMAN UNIT B 3H | 4212735287 |
| BRISCOE SPRINGMAN UNIT B 4H | 4212735288 |
| BRISCOE SPRINGMAN UNIT B 5H | 4212735289 |
| BRISCOE SPRINGMAN UNIT B 6H | 4212735290 |
| BRISCOE THON UNIT 1H | 4212735405 |
| BRISCOE THON UNIT 2H | 4212735407 |
| BRISCOE THON UNIT 3H | 4212735408 |
| BRISCOE THON UNIT 4H | 4212735406 |
| BRISCOE THON UNIT 5H | 4212735409 |
| CAGE 1TV | 4232333297 |
| CAGE 2TV | 4232333332 |
| CAGE 3TV | 4232333336 |
| CAGE 4RB | 4232333355 |
| CAGE 5TV | 4232333376 |
| CAGE 6TV | 4232333377 |
| CAGE 7TV | 4232333383 |
| CAGE 8TV | 4232333384 |
| CAGE 9TV | 4232333412 |
| CHAPARRAL WILDLIFE STATE 10H | 4212734800 |
| CHAPARRAL WILDLIFE STATE 11H | 4212734802 |
| CHAPARRAL WILDLIFE STATE 12H | 4212734805 |
| CHAPARRAL WILDLIFE STATE 13H | 4212734803 |
| CHAPARRAL WILDLIFE STATE 19H | 4212736430 |
| CHAPARRAL WILDLIFE STATE 20H | 4212736431 |
| CHAPARRAL WILDLIFE STATE 21H | 4212736432 |
| CHAPARRAL WILDLIFE STATE 22H | 4212736433 |
| CHAPARRAL WILDLIFE STATE 23H | 4212736434 |
| CHAPARRAL WILDLIFE STATE 24H | 4212737047 |
| CHAPARRAL WILDLIFE STATE 25H | 4212737048 |
| CHAPARRAL WILDLIFE STATE 26H | 4212737050 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| CHAPARRAL WILDLIFE STATE 27H | 4212737049 |
| CHAPARRAL WILDLIFE STATE 28H | 4212737051 |
| CHAPARRAL WILDLIFE STATE 4H | 4212734793 |
| CHAPARRAL WILDLIFE STATE 5H | 4212734794 |
| CHAPARRAL WILDLIFE STATE 6H | 4212734795 |
| CHAPARRAL WILDLIFE STATE 7H | 4212734796 |
| CHAPARRAL WILDLIFE STATE 8H | 4212734797 |
| CHAPARRAL WILDLIFE STATE 9H | 4212734798 |
| DENTONIO STATE 22 UNIT 10H | 4212735712 |
| DENTONIO STATE 22 UNIT 11H | 4212735714 |
| DENTONIO STATE 22 UNIT 12H | 4212735715 |
| DENTONIO STATE 22 UNIT 1H | 4212735679 |
| DENTONIO STATE 22 UNIT 2H | 4212735680 |
| DENTONIO STATE 22 UNIT 3H | 4212735681 |
| DENTONIO STATE 22 UNIT 4H | 4212735682 |
| DENTONIO STATE 22 UNIT 5H | 4212735686 |
| DENTONIO STATE 22 UNIT 6H | 4212735687 |
| DENTONIO STATE 22 UNIT 7H | 4212735688 |
| DENTONIO STATE 22 UNIT 8H | 4212735689 |
| DENTONIO STATE 22 UNIT 9H | 4212735711 |
| DENTONIO WHITE 23 UNIT 10H | 4212734923 |
| DENTONIO WHITE 23 UNIT 11H | 4212734924 |
| DENTONIO WHITE 23 UNIT 12H | 4212734931 |
| DENTONIO WHITE 23 UNIT 13H | 4212734927 |
| DENTONIO WHITE 23 UNIT 14H | 4212734926 |
| DENTONIO WHITE 23 UNIT 15H | 4212734928 |
| DENTONIO WHITE 23 UNIT 1H | 4212734549 |
| DENTONIO WHITE 23 UNIT 2H | 4212734550 |
| DENTONIO WHITE 23 UNIT 3H | 4212734551 |
| DENTONIO WHITE 23 UNIT 4H | 4212734552 |
| DENTONIO WHITE 23 UNIT 5H | 4212734553 |
| DENTONIO WHITE 23 UNIT 6H | 4212734554 |
| DENTONIO WHITE 23 UNIT 7H | 4212734938 |
| DENTONIO WHITE 23 UNIT 8H | 4212734940 |
| DENTONIO WHITE 23 UNIT 9H | 4212734941 |
| DIAMOND H RANCH 10H | 4212734751 |
| DIAMOND H RANCH 11H | 4212735057 |
| DIAMOND H RANCH 12H | 4212735201 |
| DIAMOND H RANCH 13H | 4212735403 |
| DIAMOND H RANCH 14H | 4212735646 |
| DIAMOND H RANCH 15H | 4212735647 |
| DIAMOND H RANCH 16H | 4212735648 |
| DIAMOND H RANCH 17H | 4212735649 |
| DIAMOND H RANCH 18H | 4212735651 |
| DIAMOND H RANCH 19H | 4212736475 |
| DIAMOND H RANCH 1H | 4212733561 |
| DIAMOND H RANCH 20H | 4212736482 |
| DIAMOND H RANCH 21H | 4212736483 |
| DIAMOND H RANCH 22H | 4212736474 |
| DIAMOND H RANCH 23H | 4212736484 |
| DIAMOND H RANCH 2H | 4212733693 |
| DIAMOND H RANCH 3H | 4212733819 |
| DIAMOND H RANCH 4H | 4212733892 |
| DIAMOND H RANCH 5H | 4212734314 |
| DIAMOND H RANCH 6H | 4212734150 |
| DIAMOND H RANCH 7H | 4212734408 |
| DIAMOND H RANCH 8H | 4212734410 |
| DIAMOND H RANCH 9H | 4212734610 |

Existing Producing Wells

| WELL NAME | API |
| --- | --- |
| DIAMOND H STATE 10H | 4212736436 |
| DIAMOND H STATE 11H | 4212736338 |
| DIAMOND H STATE 12H | 4212736339 |
| DIAMOND H STATE 13H | 4212736340 |
| DIAMOND H STATE 15H | 4212734896 |
| DIAMOND H STATE 16H | 4212735101 |
| DIAMOND H STATE 17H | 4212735192 |
| DIAMOND H STATE 18H | 4212735093 |
| DIAMOND H STATE 19H | 4212735655 |
| DIAMOND H STATE 1H | 4212733657 |
| DIAMOND H STATE 20H | 4212735652 |
| DIAMOND H STATE 21H | 4212735653 |
| DIAMOND H STATE 22H | 4212735654 |
| DIAMOND H STATE 2H | 4212733694 |
| DIAMOND H STATE 3H | 4212733786 |
| DIAMOND H STATE 4H | 4212733878 |
| DIAMOND H STATE 5H | 4212734312 |
| DIAMOND H STATE 6H | 4212734144 |
| DIAMOND H STATE 7H | 4212734395 |
| DIAMOND H STATE 8H | 4212734403 |
| DIAMOND H STATE 9H | 4212734603 |
| DIAMOND H STATE UNIT A 1H | 4212735396 |
| DIAMOND H STATE UNIT A 2H | 4212735398 |
| DIAMOND H STATE UNIT B 10H | 4212737092 |
| DIAMOND H STATE UNIT B 11H | 4212737094 |
| DIAMOND H STATE UNIT B 12H | 4212737093 |
| DIAMOND H STATE UNIT B 13H | 4212737095 |
| DIAMOND H STATE UNIT B 1H | 4212737075 |
| DIAMOND H STATE UNIT B 2H | 4212737076 |
| DIAMOND H STATE UNIT B 3H | 4212737080 |
| DIAMOND H STATE UNIT B 4H | 4212737077 |
| DIAMOND H STATE UNIT B 5H | 4212737081 |
| DIAMOND H STATE UNIT B 6H | 4212737082 |
| DIAMOND H STATE UNIT B 7H | 4212737083 |
| DIAMOND H STATE UNIT B 8H | 4212737084 |
| DIAMOND H STATE UNIT B 9H | 4212737085 |
| DIAMOND H STATE UNIT D 10H | 4212737063 |
| DIAMOND H STATE UNIT D 11H | 4212737064 |
| DIAMOND H STATE UNIT D 7H | 4212737061 |
| DIAMOND H STATE UNIT D 8H | 4212737057 |
| DIAMOND H STATE UNIT D 9H | 4212737062 |
| FOGMT 10SP | 4212735238 |
| FOGMT 11SP | 4212735242 |
| FOGMT 12SP | 4212735240 |
| FOGMT 13SP | 4212734995 |
| FOGMT 14SP | 4212735002 |
| FOGMT 15SP | 4212735003 |
| FOGMT 16SP | 4212735419 |
| FOGMT 17SP | 4212735420 |
| FOGMT 18SP | 4212736350 |
| FOGMT 19SP | 4212736351 |
| FOGMT 1SP | 4212733411 |
| FOGMT 20SP | 4212736352 |
| FOGMT 21SP | 4212736353 |
| FOGMT 22SP | 4212736354 |
| FOGMT 23SP | 4212736355 |
| FOGMT 24SP | 4212735438 |
| FOGMT 25SP | 4212735441 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| FOGMT 26SP | 4212735439 |
| FOGMT 27SP | 4212735440 |
| FOGMT 28SP | 4212735926 |
| FOGMT 29SP | 4212735927 |
| FOGMT 2SP | 4212733460 |
| FOGMT 30SP | 4212735928 |
| FOGMT 31SP | 4212735929 |
| FOGMT 32SP | 4212735948 |
| FOGMT 33SP | 4212735949 |
| FOGMT 34SP | 4212735950 |
| FOGMT 35SP | 4212735910 |
| FOGMT 36SP | 4212735911 |
| FOGMT 37SP | 4212735909 |
| FOGMT 38SP | 4212736581 |
| FOGMT 39SP | 4212736582 |
| FOGMT 3SH | 4212733592 |
| FOGMT 40SP | 4212736583 |
| FOGMT 41SP | 4212736584 |
| FOGMT 42SP | 4212736585 |
| FOGMT 43SP | 4212736517 |
| FOGMT 44SP | 4212736518 |
| FOGMT 45SP | 4212736519 |
| FOGMT 46SP | 4212736520 |
| FOGMT 47SP | 4212736521 |
| FOGMT 4SP | 4212733628 |
| FOGMT 54SP | 4212737018 |
| FOGMT 55SP | 4212737211 |
| FOGMT 5SH | 4212733654 |
| FOGMT 6SH | 4212733695 |
| FOGMT 7SP | 4212733910 |
| FOGMT 8SP | 4212734491 |
| FOGMT 9SP | 4212734490 |
| FOGMT E 1SP | 4212734996 |
| FOGMT E 2SP | 4212734992 |
| FOGMT F 1SP | 4212734993 |
| FOGMT G 1SP | 4212734994 |
| FOGMT UNIT A 10H | 4212736669 |
| FOGMT UNIT A 1H | 4212736660 |
| FOGMT UNIT A 2H | 4212736661 |
| FOGMT UNIT A 3H | 4212736662 |
| FOGMT UNIT A 4H | 4212736663 |
| FOGMT UNIT A 5H | 4212736664 |
| FOGMT UNIT A 6H | 4212736665 |
| FOGMT UNIT A 7H | 4212736666 |
| FOGMT UNIT A 8H | 4212736667 |
| FOGMT UNIT A 9H | 4212736668 |
| LA BANDERA RANCH 10H | 4212737135 |
| LA BANDERA RANCH 1H | 4212733618 |
| LA BANDERA RANCH 2H | 4212733634 |
| LA BANDERA RANCH 3H | 4212733673 |
| LA BANDERA RANCH 4H | 4212733740 |
| LA BANDERA RANCH 5H | 4212733809 |
| LA BANDERA RANCH 6H | 4212733909 |
| LA BANDERA RANCH 7H | 4212734204 |
| LA BANDERA RANCH 8H | 4212734402 |
| LA BANDERA RANCH 9H | 4212734629 |
| LA BANDERA RANCH UNIT A 1H | 4212735117 |
| LA BANDERA RANCH UNIT A 2H | 4212735091 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| LA BANDERA RANCH UNIT A 3H | 4212735113 |
| LA BANDERA RANCH UNIT A 4H | 4212735555 |
| LA BANDERA RANCH UNIT A 5H | 4212735556 |
| LA BANDERA RANCH UNIT A 6H | 4212735558 |
| LA BANDERA RANCH UNIT A 7H | 4212736331 |
| LA BANDERA RANCH UNIT A 8H | 4212736332 |
| LA BANDERA RANCH UNIT B 1H | 4212736586 |
| LA BANDERA RANCH UNIT B 2H | 4212736587 |
| LA BANDERA RANCH UNIT B 3H | 4212736588 |
| LA BANDERA RANCH UNIT B 4H | 4212736589 |
| LA BANDERA RANCH UNIT B 5H | 4212736590 |
| LA BANDERA RANCH UNIT B 6H | 4212736531 |
| LA BANDERA RANCH UNIT B 7H | 4212736532 |
| LA BANDERA RANCH UNIT B 8H | 4212736533 |
| LA BANDERA RANCH UNIT B 9H | 4212736534 |
| LLOYD BRISCOE 1H | 4232333452 |
| LLOYD BRISCOE 2H | 4232333451 |
| LLOYD BRISCOE 3H | 4232333450 |
| MAUND RANCH 18 UNIT 1H | 4212736795 |
| MAUND RANCH 18 UNIT 2H | 4212736796 |
| MAUND RANCH 18 UNIT 3H | 4212736799 |
| MAUND RANCH 18 UNIT 4H | 4212736800 |
| MAUND RANCH 18 UNIT 5H | 4212736801 |
| MAUND RANCH 18 UNIT 6H | 4212736803 |
| MAUND RANCH 18 UNIT 7H | 4212736804 |
| MAUND RANCH 18 UNIT 8H | 4212736805 |
| MAUND RANCH 18 UNIT 9H | 4212736806 |
| MAUND RANCH 19 UNIT 2H | 4212733999 |
| MAUND RANCH 19 UNIT 3H | 4212734387 |
| MAUND RANCH 19 UNIT 4H | 4212734264 |
| MAUND RANCH 19 UNIT 5H | 4212735553 |
| MAUND RANCH 19 UNIT 6H | 4212735554 |
| MAUND RANCH 23 UNIT 10H | 4212735496 |
| MAUND RANCH 23 UNIT 11H | 4212735497 |
| MAUND RANCH 23 UNIT 12H | 4212735498 |
| MAUND RANCH 23 UNIT 1H | 4212735432 |
| MAUND RANCH 23 UNIT 2H | 4212735433 |
| MAUND RANCH 23 UNIT 3H | 4212735435 |
| MAUND RANCH 23 UNIT 4H | 4212735437 |
| MAUND RANCH 23 UNIT 5H | 4212735436 |
| MAUND RANCH 23 UNIT 6H | 4212735434 |
| MAUND RANCH 23 UNIT 7H | 4212735494 |
| MAUND RANCH 23 UNIT 8H | 4212735493 |
| MAUND RANCH 23 UNIT 9H | 4212735495 |
| MAUND RANCH 26 UNIT 10H | 4212736133 |
| MAUND RANCH 26 UNIT 1H | 4212736124 |
| MAUND RANCH 26 UNIT 2H | 4212736123 |
| MAUND RANCH 26 UNIT 3H | 4212736125 |
| MAUND RANCH 26 UNIT 4H | 4212736126 |
| MAUND RANCH 26 UNIT 5H | 4212736127 |
| MAUND RANCH 26 UNIT 6H | 4212736128 |
| MAUND RANCH 26 UNIT 7H | 4212736129 |
| MAUND RANCH 26 UNIT 8H | 4212736130 |
| MAUND RANCH 26 UNIT 9H | 4212736131 |
| MAUND RANCH 27 UNIT 1H | 4212737107 |
| MAUND RANCH 27 UNIT 2H | 4212737108 |
| MAUND RANCH 27 UNIT 3H | 4212737103 |
| MAUND RANCH 27 UNIT 4H | 4212737104 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| MAUND RANCH 27 UNIT 5H | 4212737105 |
| MAUND RANCH 27 UNIT 6H | 4212737106 |
| MAUND RANCH 27 UNIT 7H | 4212733866 |
| MAUND RANCH 27 UNIT 8H | 4212737109 |
| MAUND RANCH 27 UNIT 9H | 4212737110 |
| RANCHO ENCANTADO 10H | 4212734911 |
| RANCHO ENCANTADO 11H | 4212734915 |
| RANCHO ENCANTADO 12H | 4212734161 |
| RANCHO ENCANTADO 13H | 4212734162 |
| RANCHO ENCANTADO 14H | 4212734943 |
| RANCHO ENCANTADO 15H | 4212734944 |
| RANCHO ENCANTADO 16H | 4212734945 |
| RANCHO ENCANTADO 17H | 4212734181 |
| RANCHO ENCANTADO 18H | 4212734182 |
| RANCHO ENCANTADO 19H | 4212734183 |
| RANCHO ENCANTADO 1H | 4212733729 |
| RANCHO ENCANTADO 20H | 4212734184 |
| RANCHO ENCANTADO 21H | 4212734185 |
| RANCHO ENCANTADO 22H | 4212734211 |
| RANCHO ENCANTADO 23H | 4212734213 |
| RANCHO ENCANTADO 24H | 4212734214 |
| RANCHO ENCANTADO 25H | 4212734215 |
| RANCHO ENCANTADO 26H | 4212734217 |
| RANCHO ENCANTADO 27H | 4212734218 |
| RANCHO ENCANTADO 28H | 4212734331 |
| RANCHO ENCANTADO 29H | 4212735328 |
| RANCHO ENCANTADO 30H | 4212735329 |
| RANCHO ENCANTADO 31H | 4212735334 |
| RANCHO ENCANTADO 32H | 4212735335 |
| RANCHO ENCANTADO 33H | 4212735336 |
| RANCHO ENCANTADO 34H | 4212735981 |
| RANCHO ENCANTADO 35H | 4212735982 |
| RANCHO ENCANTADO 36H | 4212735985 |
| RANCHO ENCANTADO 37H | 4212735987 |
| RANCHO ENCANTADO 38H | 4212735988 |
| RANCHO ENCANTADO 3H | 4212733833 |
| RANCHO ENCANTADO 4H | 4212733834 |
| RANCHO ENCANTADO 5H | 4212733835 |
| RANCHO ENCANTADO 6H | 4212733964 |
| RANCHO ENCANTADO 7H | 4212733961 |
| RANCHO ENCANTADO 8H | 4212733965 |
| RANCHO ENCANTADO 9H | 4212734910 |
| RANCHO ENCANTADO UNIT A 39H | 4212737069 |
| RANCHO ENCANTADO UNIT A 40H | 4212737068 |
| RANCHO ENCANTADO UNIT A 41H | 4212737066 |
| RANCHO ENCANTADO UNIT A 42H | 4212737067 |
| RANCHO ENCANTADO UNIT A 43H | 4212737065 |
| ROGERS DENTONIO 16 UNIT 1H | 4212734425 |
| ROGERS DENTONIO 16 UNIT 2H | 4212734426 |
| ROGERS DENTONIO 16 UNIT 3H | 4212734431 |
| ROGERS DENTONIO 16 UNIT 4H | 4212735412 |
| ROGERS DENTONIO 16 UNIT 5H | 4212735416 |
| ROGERS DENTONIO 16 UNIT 6H | 4212735417 |
| ROGERS DENTONIO 16 UNIT 7H | 4212735413 |
| ROGERS DENTONIO 16 UNIT 8H | 4212735414 |
| ROGERS DENTONIO 16 UNIT 9H | 4212735415 |
| ROGERS DENTONIO 31 UNIT 1H | 4212737035 |
| ROGERS DENTONIO 31 UNIT 2H | 4212737036 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| ROGERS DENTONIO 31 UNIT 3H | 4212737037 |
| ROGERS DENTONIO 31 UNIT 4H | 4212737038 |
| ROGERS DENTONIO 31 UNIT 5H | 4212737039 |
| ROGERS DENTONIO 31 UNIT 6H | 4212737040 |
| ROGERS DENTONIO 32 UNIT 10H | 4212736006 |
| ROGERS DENTONIO 32 UNIT 1H | 4212735997 |
| ROGERS DENTONIO 32 UNIT 2H | 4212735998 |
| ROGERS DENTONIO 32 UNIT 3H | 4212735999 |
| ROGERS DENTONIO 32 UNIT 4H | 4212736000 |
| ROGERS DENTONIO 32 UNIT 5H | 4212736001 |
| ROGERS DENTONIO 32 UNIT 6H | 4212736002 |
| ROGERS DENTONIO 32 UNIT 7H | 4212736003 |
| ROGERS DENTONIO 32 UNIT 8H | 4212736004 |
| ROGERS DENTONIO 32 UNIT 9H | 4212736005 |
| ROGERS DENTONIO 33 UNIT 10H | 4212736022 |
| ROGERS DENTONIO 33 UNIT 11H | 4212736023 |
| ROGERS DENTONIO 33 UNIT 1H | 4212736013 |
| ROGERS DENTONIO 33 UNIT 2H | 4212736014 |
| ROGERS DENTONIO 33 UNIT 3H | 4212736015 |
| ROGERS DENTONIO 33 UNIT 4H | 4212736016 |
| ROGERS DENTONIO 33 UNIT 5H | 4212736017 |
| ROGERS DENTONIO 33 UNIT 6H | 4212736018 |
| ROGERS DENTONIO 33 UNIT 7H | 4212736019 |
| ROGERS DENTONIO 33 UNIT 8H | 4212736020 |
| ROGERS DENTONIO 33 UNIT 9H | 4212736021 |
| ROGERS DENTONIO RANCH 12H | 4212734249 |
| ROGERS DENTONIO RANCH 13H | 4212734251 |
| ROGERS DENTONIO RANCH 14H | 4212734136 |
| ROGERS DENTONIO RANCH 15H | 4212734137 |
| ROGERS DENTONIO RANCH 16H | 4212734252 |
| ROGERS DENTONIO RANCH 1H | 4212733636 |
| ROGERS DENTONIO RANCH 2H | 4212733679 |
| ROGERS DENTONIO RANCH 3H | 4212733845 |
| ROGERS DENTONIO RANCH 4H | 4212733846 |
| ROGERS DENTONIO RANCH 5H | 4212733847 |
| ROGERS DENTONIO RANCH 6H | 4212733864 |
| SOUTH SPUR RANCH 1H | 4212733633 |
| SOUTH SPUR RANCH 2H | 4212733865 |
| SOUTH SPUR STATE 1H | 4212733660 |
| SOUTH SPUR STATE 2H | 4212733686 |
| SOUTH SPUR STATE 3H | 4212733827 |
| SOUTH SPUR STATE 4H | 4212733828 |
| SOUTH SPUR STATE 5H | 4212734465 |
| SOUTH SPUR STATE 6H | 4212734464 |
| SOUTH SPUR STATE 7H | 4212734466 |
| SOUTH SPUR UNIT A 1H | 4212734104 |
| SOUTH SPUR UNIT A 2H | 4212734216 |
| SOUTH SPUR UNIT A 3H | 4212734453 |
| SOUTH SPUR UNIT A 4H | 4212734675 |
| SOUTH SPUR UNIT A 5H | 4212734677 |
| SOUTH SPUR UNIT A 6H | 4212734676 |
| SOUTH SPUR UNIT A 7H | 4212735478 |
| SOUTH SPUR UNIT A 8H | 4212735479 |
| SOUTH SPUR UNIT A 9H | 4212735480 |
| STANLEY RANCH 10H | 4247941428 |
| STANLEY RANCH 11H | 4247941429 |
| STANLEY RANCH 12H | 4247941430 |
| STANLEY RANCH 13H | 4247941431 |

Existing Producing Wells

| WELL NAME | API |
| --- | --- |
| STANLEY RANCH 14H | 4247941432 |
| STANLEY RANCH 15H | 4247941433 |
| STANLEY RANCH 16H | 4247941434 |
| STANLEY RANCH 17H | 4247941422 |
| STANLEY RANCH 18H | 4247941424 |
| STANLEY RANCH 19H | 4247941423 |
| STANLEY RANCH 1H | 4247940742 |
| STANLEY RANCH 20H | 4247941426 |
| STANLEY RANCH 21H | 4247941129 |
| STANLEY RANCH 22H | 4247941130 |
| STANLEY RANCH 23H | 4247941131 |
| STANLEY RANCH 24H | 4247941231 |
| STANLEY RANCH 25H | 4247941241 |
| STANLEY RANCH 26H | 4247942383 |
| STANLEY RANCH 27H | 4247942384 |
| STANLEY RANCH 28H | 4247942293 |
| STANLEY RANCH 29H | 4247942161 |
| STANLEY RANCH 2H | 4247940940 |
| STANLEY RANCH 30H | 4247942449 |
| STANLEY RANCH 31H | 4247942450 |
| STANLEY RANCH 3H | 4247941051 |
| STANLEY RANCH 43H | 4247941907 |
| STANLEY RANCH 44H | 4247941960 |
| STANLEY RANCH 45H | 4247942456 |
| STANLEY RANCH 46H | 4247942458 |
| STANLEY RANCH 47H | 4247942457 |
| STANLEY RANCH 48H | 4247941719 |
| STANLEY RANCH 49H | 4247941723 |
| STANLEY RANCH 4H | 4247941053 |
| STANLEY RANCH 50H | 4247941722 |
| STANLEY RANCH 51H | 4247941727 |
| STANLEY RANCH 52H | 4247941728 |
| STANLEY RANCH 53H | 4247941729 |
| STANLEY RANCH 54H | 4247941696 |
| STANLEY RANCH 55H | 4247941693 |
| STANLEY RANCH 56H | 4247941695 |
| STANLEY RANCH 57H | 4247941683 |
| STANLEY RANCH 58H | 4247941684 |
| STANLEY RANCH 59H | 4247941685 |
| STANLEY RANCH 5H | 4247941054 |
| STANLEY RANCH 60H | 4247941660 |
| STANLEY RANCH 61H | 4247941661 |
| STANLEY RANCH 62H | 4247941663 |
| STANLEY RANCH 63H | 4247942875 |
| STANLEY RANCH 6H | 4247941421 |
| STANLEY RANCH 7H | 4247941435 |
| STANLEY RANCH 8H | 4247941436 |
| STANLEY RANCH 9H | 4247941437 |
| STUMBERG RANCH 10H | 4212734233 |
| STUMBERG RANCH 11H | 4212734235 |
| STUMBERG RANCH 12H | 4212734234 |
| STUMBERG RANCH 16H | 4212734369 |
| STUMBERG RANCH 17H | 4212734370 |
| STUMBERG RANCH 18H | 4212734371 |
| STUMBERG RANCH 19H | 4212734611 |
| STUMBERG RANCH 1H | 4212733717 |
| STUMBERG RANCH 20H | 4212734612 |
| STUMBERG RANCH 21H | 4212734613 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STUMBERG RANCH 22H | 4212734614 |
| STUMBERG RANCH 23H | 4212734615 |
| STUMBERG RANCH 24H | 4212734616 |
| STUMBERG RANCH 25H | 4212734619 |
| STUMBERG RANCH 26H | 4212734620 |
| STUMBERG RANCH 27HR | 4212734710 |
| STUMBERG RANCH 28H | 4212734623 |
| STUMBERG RANCH 29H | 4212734624 |
| STUMBERG RANCH 2H | 4212733719 |
| STUMBERG RANCH 30H | 4212734665 |
| STUMBERG RANCH 31H | 4212734668 |
| STUMBERG RANCH 32H | 4212734666 |
| STUMBERG RANCH 33H | 4212734667 |
| STUMBERG RANCH 34H | 4212734670 |
| STUMBERG RANCH 35H | 4212734669 |
| STUMBERG RANCH 36H | 4212735772 |
| STUMBERG RANCH 37H | 4212735774 |
| STUMBERG RANCH 38H | 4212735775 |
| STUMBERG RANCH 39H | 4212735776 |
| STUMBERG RANCH 3H | 4212733725 |
| STUMBERG RANCH 40H | 4212735827 |
| STUMBERG RANCH 41H | 4212735829 |
| STUMBERG RANCH 42H | 4212735830 |
| STUMBERG RANCH 43H | 4212735831 |
| STUMBERG RANCH 44H | 4212735832 |
| STUMBERG RANCH 45H | 4212735833 |
| STUMBERG RANCH 46H | 4212735838 |
| STUMBERG RANCH 47H | 4212735839 |
| STUMBERG RANCH 48H | 4212735840 |
| STUMBERG RANCH 49H | 4212735841 |
| STUMBERG RANCH 4HR | 4212733933 |
| STUMBERG RANCH 50H | 4212735842 |
| STUMBERG RANCH 51H | 4212735843 |
| STUMBERG RANCH 52HR | 4212737120 |
| STUMBERG RANCH 5H | 4212733934 |
| STUMBERG RANCH 6H | 4212733935 |
| STUMBERG RANCH 7H | 4212733979 |
| STUMBERG RANCH 8H | 4212733977 |
| STUMBERG RANCH 9H | 4212733978 |
| STUMBERG RANCH UNIT A 1H | 4212735519 |
| STUMBERG RANCH UNIT A 2H | 4212735520 |
| STUMBERG RANCH UNIT A 3H | 4212735521 |
| STUMBERG RANCH UNIT A 4H | 4212735540 |
| STUMBERG RANCH UNIT A 5H | 4212735541 |
| STUMBERG RANCH UNIT A 6H | 4212735542 |
| STUMBERG RANCH UNIT A 7H | 4212735543 |
| STUMBERG RANCH UNIT B 1H | 4212735611 |
| STUMBERG RANCH UNIT B 2H | 4212735612 |
| STUMBERG RANCH UNIT B 3H | 4212735613 |
| STUMBERG RANCH UNIT B 4H | 4212735614 |
| STUMBERG RANCH UNIT B 5H | 4212735615 |
| STUMBERG RANCH UNIT B 6H | 4212735616 |
| STUMBERG RANCH UNIT B 7H | 4212735617 |
| STUMBERG RANCH UNIT C 11H | 4212736836 |
| STUMBERG RANCH UNIT C 12H | 4212736837 |
| STUMBERG RANCH UNIT C 13H | 4212736835 |
| STUMBERG RANCH UNIT C 14H | 4212736838 |
| STUMBERG RANCH UNIT C 15H | 4212736839 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| TOVAR WEST-LLOYD 34 B UNIT 1H | 4232333420 |
| TOVAR WEST-LLOYD 34 UNIT 1H | 4232333351 |
| TOVAR WEST-LLOYD 63 A UNIT 1H | 4232333389 |
| TOVAR WEST-LLOYD 63 B UNIT 1H | 4232333400 |
| TOVAR WEST-LLOYD 69 A UNIT 1H | 4232333411 |
| TOVAR WEST-LLOYD 75 A UNIT 1H | 4232333360 |
| TOVAR WEST-LLOYD 77 UNIT 1H | 4232333348 |
| TOVAR WEST-LLOYD 79 A UNIT 1H | 4232333390 |
| TOVAR WLC A UNIT 1H | 4232333415 |
| TOVAR WLC A UNIT 2H | 4232333417 |
| TOVAR WLC A UNIT 3H | 4232333416 |
| TOVAR WLC A UNIT 4H | 4232333435 |
| TOVAR WLC A UNIT 5H | 4232333436 |
| TOVAR WLC A UNIT 6H | 4232333437 |
| TOVAR WLC B UNIT 1H | 4232333438 |
| TOVAR WLC B UNIT 2H | 4232333439 |
| TOVAR WLC B UNIT 3H | 4232333440 |
| WORTHEY RANCH 10H | 4247941107 |
| WORTHEY RANCH 11H | 4247941500 |
| WORTHEY RANCH 12H | 4247941501 |
| WORTHEY RANCH 13H | 4247941502 |
| WORTHEY RANCH 14H | 4247941482 |
| WORTHEY RANCH 15H | 4247941483 |
| WORTHEY RANCH 16H | 4247941484 |
| WORTHEY RANCH 17H | 4247941132 |
| WORTHEY RANCH 18H | 4247941133 |
| WORTHEY RANCH 19H | 4247941134 |
| WORTHEY RANCH 1H | 4247940755 |
| WORTHEY RANCH 20H | 4247941376 |
| WORTHEY RANCH 21H | 4247941377 |
| WORTHEY RANCH 22H | 4247941378 |
| WORTHEY RANCH 23H | 4247941487 |
| WORTHEY RANCH 24H | 4247941488 |
| WORTHEY RANCH 25H | 4247941489 |
| WORTHEY RANCH 26H | 4247941515 |
| WORTHEY RANCH 27H | 4247941517 |
| WORTHEY RANCH 28H | 4247941518 |
| WORTHEY RANCH 29H | 4247941521 |
| WORTHEY RANCH 2H | 4247940941 |
| WORTHEY RANCH 30H | 4247942341 |
| WORTHEY RANCH 31H | 4247942342 |
| WORTHEY RANCH 32H | 4247942344 |
| WORTHEY RANCH 34H | 4247942437 |
| WORTHEY RANCH 35H | 4247942438 |
| WORTHEY RANCH 36H | 4247942440 |
| WORTHEY RANCH 37H | 4247942436 |
| WORTHEY RANCH 38H | 4247941356 |
| WORTHEY RANCH 39H | 4247942339 |
| WORTHEY RANCH 3H | 4247941119 |
| WORTHEY RANCH 40H | 4247942340 |
| WORTHEY RANCH 41H | 4247942347 |
| WORTHEY RANCH 42H | 4247942346 |
| WORTHEY RANCH 43H | 4247941906 |
| WORTHEY RANCH 44H | 4247942160 |
| WORTHEY RANCH 45H | 4247942484 |
| WORTHEY RANCH 46H | 4247942485 |
| WORTHEY RANCH 47H | 4247942486 |
| WORTHEY RANCH 48H | 4247942487 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| WORTHEY RANCH 49H | 4247942488 |
| WORTHEY RANCH 4H | 4247941120 |
| WORTHEY RANCH 50H | 4247942489 |
| WORTHEY RANCH 51H | 4247942491 |
| WORTHEY RANCH 53H | 4247942480 |
| WORTHEY RANCH 54H | 4247942482 |
| WORTHEY RANCH 55H | 4247942483 |
| WORTHEY RANCH 56H | 4247942016 |
| WORTHEY RANCH 57H | 4247942131 |
| WORTHEY RANCH 5H | 4247940971 |
| WORTHEY RANCH 6H | 4247941108 |
| WORTHEY RANCH 7H | 4247941194 |
| WORTHEY RANCH 8H | 4247940983 |
| WORTHEY RANCH 9H | 4247941019 |

**Annex VI**
**Existing Drilling and Uncompleted Wells**

(*see attached*)

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH UNIT A 1H | 4212736445 |
| BRISCOE CARLA RANCH UNIT A 2H | 4212736446 |
| BRISCOE CARLA RANCH UNIT A 3H | 4212736447 |
| BRISCOE CARLA RANCH UNIT A 4H | 4212736450 |
| BRISCOE CARLA RANCH UNIT A 5H | 4212736449 |
| BRISCOE CARLA RANCH UNIT B 1H | 4212736464 |
| BRISCOE CARLA RANCH UNIT B 2H | 4212736465 |
| BRISCOE CARLA RANCH UNIT B 3H | 4212736466 |
| BRISCOE CARLA RANCH UNIT B 4H | 4212736468 |
| BRISCOE CARLA RANCH UNIT B 5H | 4212736467 |
| BRISCOE CARLA RANCH UNIT B 6H | 4212736469 |
| BRISCOE CARLA RANCH UNIT B 7H | 4212736470 |
| BRISCOE CATARINA NORTH 104H | 4212736819 |
| BRISCOE CATARINA NORTH 105H | 4212736820 |
| BRISCOE CATARINA NORTH 106H | 4212736810 |
| BRISCOE CATARINA NORTH 107H | 4212736809 |
| BRISCOE CATARINA NORTH 108H | 4212736811 |
| BRISCOE CATARINA NORTH 109H | 4212736812 |
| BRISCOE CATARINA NORTH 110H | 4212736813 |
| BRISCOE CATARINA NORTH 111H | 4212736814 |
| BRISCOE CATARINA NORTH 112H | 4212736815 |
| BRISCOE CATARINA NORTH 113H | 4212736816 |
| BRISCOE CATARINA NORTH 114H | 4212736817 |
| BRISCOE CATARINA NORTH 115H | 4212736818 |
| BRISCOE CATARINA NORTH 116H | 4212736821 |
| BRISCOE CATARINA NORTH 117H | 4212736822 |
| BRISCOE CATARINA NORTH 118H | 4212736823 |
| BRISCOE CATARINA NORTH 119H | 4212736826 |
| BRISCOE CATARINA NORTH 120H | 4212736828 |
| BRISCOE CATARINA NORTH 121H | 4212736827 |
| BRISCOE CATARINA NORTH 122H | 4212736829 |
| BRISCOE CATARINA NORTH 123H | 4212736830 |
| BRISCOE CATARINA NORTH 124H | 4212736831 |
| BRISCOE CATARINA NORTH 125H | 4212736832 |
| BRISCOE CATARINA NORTH 126H | 4212736833 |
| BRISCOE CATARINA NORTH 127H | 4212736834 |
| BRISCOE CATARINA NORTH 128H | 4212736862 |
| BRISCOE CATARINA NORTH 129H | 4212736863 |
| BRISCOE CATARINA NORTH 130H | 4212736864 |
| BRISCOE CATARINA NORTH 131H | 4212736865 |
| BRISCOE CATARINA NORTH 132H | 4212736868 |
| BRISCOE CATARINA WEST 83H | 4212736874 |
| BRISCOE CATARINA WEST 84H | 4212736875 |
| BRISCOE CATARINA WEST 85H | 4212736876 |
| BRISCOE CATARINA WEST 86H | 4212736877 |
| BRISCOE CATARINA WEST 87H | 4212736878 |
| BRISCOE CATARINA WEST 88H | 4212736879 |
| BRISCOE CATARINA WEST 89H | 4212736880 |
| BRISCOE CATARINA WEST 91H | 4212736882 |
| BRISCOE CATARINA WEST 92H | 4212736883 |
| BRISCOE CATARINA WEST 94H | 4212736886 |
| BRISCOE CATARINA WEST 95H | 4212736885 |
| BRISCOE CATARINA WEST 97H | 4212736888 |
| BRISCOE COCHINA EAST RANCH 133H | 4228334859 |
| BRISCOE COCHINA EAST RANCH 134H | 4228334860 |
| BRISCOE COCHINA EAST RANCH 135H | 4228334861 |
| BRISCOE COCHINA EAST RANCH 136H | 4228334862 |
| BRISCOE COCHINA EAST RANCH 137H | 4228334863 |

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 138H | 4228334864 |
| BRISCOE COCHINA EAST RANCH 139H | 4228334865 |
| BRISCOE COCHINA EAST RANCH 140H | 4228334866 |
| BRISCOE COCHINA EAST RANCH 141H | 4228334867 |
| BRISCOE COCHINA EAST RANCH 142H | 4228334868 |
| BRISCOE COCHINA EAST RANCH 143H | 4228334869 |
| BRISCOE COCHINA EAST RANCH 144H | 4228334870 |
| BRISCOE COCHINA EAST RANCH 145HR | 4228335149 |
| BRISCOE COCHINA EAST RANCH 146H | 4228334872 |
| BRISCOE COCHINA EAST RANCH 147H | 4228334873 |
| BRISCOE COCHINA WEST RANCH 100H | 4212736330 |
| BRISCOE COCHINA WEST RANCH 10H | 4212734822 |
| BRISCOE COCHINA WEST RANCH 13H | 4212734823 |
| BRISCOE COCHINA WEST RANCH 14H | 4212734825 |
| BRISCOE COCHINA WEST RANCH 15H | 4212734824 |
| BRISCOE COCHINA WEST RANCH 31H | 4212734882 |
| BRISCOE COCHINA WEST RANCH 32H | 4212734883 |
| BRISCOE COCHINA WEST RANCH 33H | 4212734889 |
| BRISCOE COCHINA WEST RANCH 34H | 4212734884 |
| BRISCOE COCHINA WEST RANCH 35H | 4212734885 |
| BRISCOE COCHINA WEST RANCH 36H | 4212735038 |
| BRISCOE COCHINA WEST RANCH 37H | 4212735039 |
| BRISCOE COCHINA WEST RANCH 38H | 4212735041 |
| BRISCOE COCHINA WEST RANCH 45H | 4212735042 |
| BRISCOE COCHINA WEST RANCH 46H | 4212735492 |
| BRISCOE COCHINA WEST RANCH 78H | 4212736250 |
| BRISCOE COCHINA WEST RANCH 79H | 4212736253 |
| BRISCOE COCHINA WEST RANCH 80H | 4212736254 |
| BRISCOE COCHINA WEST RANCH 81H | 4212736255 |
| BRISCOE COCHINA WEST RANCH 82H | 4212736256 |
| BRISCOE COCHINA WEST RANCH 83H | 4212736257 |
| BRISCOE COCHINA WEST RANCH 84H | 4212736258 |
| BRISCOE COCHINA WEST RANCH 85H | 4212736259 |
| BRISCOE COCHINA WEST RANCH 86H | 4212736260 |
| BRISCOE COCHINA WEST RANCH 87H | 4212736261 |
| BRISCOE COCHINA WEST RANCH 8H | 4212734821 |
| BRISCOE COCHINA WEST RANCH 96H | 4212736326 |
| BRISCOE COCHINA WEST RANCH 97H | 4212736327 |
| BRISCOE COCHINA WEST RANCH 98H | 4212736328 |
| BRISCOE COCHINA WEST RANCH 99H | 4212736329 |
| BRISCOE COCHINA WEST RANCH 9H | 4212734826 |
| CARLA SOUTH SPUR UNIT A 1H | 4212736476 |
| CARLA SOUTH SPUR UNIT A 2H | 4212736480 |
| CARLA SOUTH SPUR UNIT A 3H | 4212736481 |
| ROGERS DENTONIO 31 UNIT 10H | 4212737044 |
| ROGERS DENTONIO 31 UNIT 11H | 4212737045 |
| ROGERS DENTONIO 31 UNIT 7H | 4212737041 |
| ROGERS DENTONIO 31 UNIT 8H | 4212737042 |
| ROGERS DENTONIO 31 UNIT 9H | 4212737043 |
| SOUTH SPUR RANCH 3H | 4212736374 |
| SOUTH SPUR RANCH 4H | 4212736375 |
| SOUTH SPUR UNIT B 10H | 4212736684 |
| SOUTH SPUR UNIT B 1H | 4212736676 |
| SOUTH SPUR UNIT B 2H | 4212736677 |
| SOUTH SPUR UNIT B 3H | 4212736678 |
| SOUTH SPUR UNIT B 4H | 4212736679 |
| SOUTH SPUR UNIT B 5H | 4212736680 |
| SOUTH SPUR UNIT B 6H | 4212736681 |

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| SOUTH SPUR UNIT B 7H | 4212736682 |
| SOUTH SPUR UNIT B 8H | 4212736683 |
| SOUTH SPUR UNIT B 9H | 4212736936 |
| STUMBERG RANCH 53H | 4212737219 |
| STUMBERG RANCH 54H | 4212737222 |
| STUMBERG RANCH 55H | 4212737220 |
| STUMBERG RANCH 56H | 4212737221 |
| STUMBERG RANCH UNIT C 10H | 4212736700 |
| STUMBERG RANCH UNIT C 1H | 4212736690 |
| STUMBERG RANCH UNIT C 2H | 4212736691 |
| STUMBERG RANCH UNIT C 3H | 4212736692 |
| STUMBERG RANCH UNIT C 4H | 4212736693 |
| STUMBERG RANCH UNIT C 5H | 4212736694 |
| STUMBERG RANCH UNIT C 6H | 4212736696 |
| STUMBERG RANCH UNIT C 7H | 4212736697 |
| STUMBERG RANCH UNIT C 8H | 4212736698 |

**Annex VII**
**Restricted Areas**



**Exhibit A**

[Intentionally omitted]

**Exhibit B**

**Form Operating Agreement**

(*see attached*)

**Exhibit B**

**to Joint Development Agreement, dated as of December 29, 2016,**
**by and among [SN Restricted Sub, SN Unsub, and Blackstone NewCo]**

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

**HORIZONTAL MODIFICATIONS**

**OPERATING AGREEMENT**

**DATED**

_____________ , _________ ,
*Year*

**OPERATOR** ____________________________________________

**CONTRACT AREA** See Exhibit "A" attached

**COUNTY ~~OR PARISH~~ OF** [Maverick, Dimmitt, Webb, LaSalle] **, STATE OF** Texas

**COPYRIGHT 2013 – ALL RIGHTS RESERVED**
**AMERICAN ASSOCIATION OF PROFESSIONAL**
**LANDMEN, 4100 FOSSIL CREEK BLVD. FORT**
**WORTH, TEXAS, 76137, APPROVED FORM.**
**A.A.P.L. NO. 610 - 1989 (Horz.)**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**


| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 3 |
| III. | **INTERESTS OF PARTIES** | 4 |
| | ~~A. OIL AND GAS INTERESTS~~ | 4 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 4 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 4 |
| IV. | **TITLES** | 5 |
| | A. TITLE EXAMINATION | 5 |
| | B. LOSS OR FAILURE OF TITLE | 6 |
| | ~~1. Failure of Title~~ | 6 |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | 6 |
| | 3. ~~Other~~ All Losses | 7 |
| | ~~4. Curing Title~~ | 7 |
| V. | **OPERATOR** | 7 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 7 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 8 |
| | 1. Resignation or Removal of Operator | 8 |
| | 2. Selection of Successor Operator | 8 |
| | 3. Effect of Bankruptcy | 8 |
| | C. EMPLOYEES AND CONTRACTORS | 9 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 9 |
| | 1. Competitive Rates and Use of Affiliates | 9 |
| | 2. Discharge of Joint Account Obligations | 9 |
| | 3. Protection from Liens | 9 |
| | 4. Custody of Funds | 9 |
| | 5. Access to Contract Area and Records | 9 |
| | 6. Filing and Furnishing Governmental Reports | 10 |
| | 7. Drilling and Testing Operations | 10 |
| | 8. Cost Estimates | 10 |
| | 9. Insurance | 10 |
| VI. | **DRILLING AND DEVELOPMENT** | 10 |
| | ~~A. INITIAL WELL~~ | 10 |
| | B. SUBSEQUENT OPERATIONS | 11 |
| | 1. Proposed Operations | 11 |
| | 2. Operations by Less Than All Parties | 11 |
| | 3. Stand-By Costs | 14 |
| | 4. Deepening | 14 |
| | 5. Sidetracking | 15 |
| | 6. Order of Preference of Operations | 16 |
| | 7. Conformity to Spacing Pattern | 16 |
| | 8. Paying Wells | 16 |
| | 9. Spudder Rigs | 16 |
| | 10 Multi-Well Pads | 17 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 17 |
| | 1. Completion | 17 |
| | 2. Rework, Recomplete or Plug Back | 18 |
| | D. OTHER OPERATIONS | 18 |
| | E. ABANDONMENT OF WELLS | 18 |
| | 1. Abandonment of Dry Holes | 18 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)


| Article | Title | Page |
|---|---|---|
| | 2. Abandonment of Wells That Have Produced | 19 |
| | 3. Abandonment of Non-Consent Operations | 20 |
| | F. TERMINATION OF OPERATIONS | 20 |
| | G. TAKING PRODUCTION IN KIND | 20 |
| | (Option 1) Gas Balancing Agreement | 20 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | 21 |
| **VII.** | **EXPENDITURES AND LIABILITY OF PARTIES** | 22 |
| | A. LIABILITY OF PARTIES | 22 |
| | B. LIENS AND SECURITY INTERESTS | 22 |
| | C. ADVANCES | 23 |
| | D. DEFAULTS AND REMEDIES | 24 |
| | 1. Suspension of Rights | 24 |
| | 2. Suit for Damages | 24 |
| | 3. Deemed Non-Consent | 24 |
| | 4. Advance Payment | 25 |
| | 5. Costs and Attorneys' Fees | 25 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 25 |
| | F. TAXES | 25 |
| **VIII.** | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 26 |
| | A. SURRENDER OF LEASES | 26 |
| | B. RENEWAL OR EXTENSION OF LEASES | 26 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 27 |
| | D. ASSIGNMENT; ~~MAINTENANCE OF UNIFORM INTEREST~~ | 27 |
| | E. WAIVER OF RIGHTS TO PARTITION | 28 |
| | ~~F. PREFERENTIAL RIGHT TO PURCHASE~~ | 28 |
| **IX.** | **INTERNAL REVENUE CODE ELECTION** | 29 |
| **X.** | **CLAIMS AND LAWSUITS** | 29 |
| **XI.** | **FORCE MAJEURE** | 29 |
| **XII.** | **NOTICES** | 30 |
| **XIII.** | **TERM OF AGREEMENT** | 30 |
| **XIV.** | **COMPLIANCE WITH LAWS AND REGULATIONS** | 31 |
| | A. LAWS, REGULATIONS AND ORDERS | 31 |
| | B. GOVERNING LAW | 31 |
| | C. REGULATORY AGENCIES | 31 |
| **XV.** | **MISCELLANEOUS** | 32 |
| | A. EXECUTION | 32 |
| | B. SUCCESSORS AND ASSIGNS | 32 |
| | C. COUNTERPARTS | 32 |
| | D. SEVERABILITY | 32 |
| **XVI.** | **OTHER PROVISIONS (Attached)** | 33 |
| | ~~A. CONFLICT OF TERMS~~ | 33 |
| | ~~B. OPERATOR'S DUTY~~ | 33 |
| | ~~C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS~~ | 33 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ________________________________________, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a / well capable of producing ~~producer of~~ Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the ~~D~~deepest Zone proposed in the associated AFE, whichever is the lesser. ~~When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.~~ "Deepen" shall not refer or apply to operations for the Extension of a Lateral.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean

(i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.;[Intentionally Omitted.]

L. The term "Lateral" shall mean that portion of a wellbore / of a Horizontal Well between the point at which the wellbore initially penetrates the objective Zone and the Terminus. that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work Workover or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" shall mean the

Case 4:23-cv-01454-7 Document 135-4 Filed in TXSB on 06/28/20 Page 148 of 255



directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized only for drilling all or part of the vertical component of a Horizontal Well; a rig used only for setting conductor pipe shall not be considered a Spudder Rig.

W. The term "Terminus" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. See Article XVI for additional definitions.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

X A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

~~B. Exhibit "B," Form of Lease.~~

X C. Exhibit "C," Accounting Procedure.

X D. Exhibit "D," Insurance.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

X E. Exhibit "E," Gas Balancing Agreement.

X F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

X G. Exhibit "G," Tax Partnership.

X H. Other: Form of Memorandum of Operating Agreement

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

~~**A. Oil and Gas Interests:**~~

~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations / conducted hereunder ~~on the Contract Area~~ shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter. See also Article XVI.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area / except Subsequently Created Interests created by other parties hereto. ~~up to, but not in excess of, __________ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.~~

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**
**TITLES**

**A. Title Examination**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and outside landmen for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) / title curative and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

/ The Operator ~~Each party~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests / included in the Contract Area ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, / landmen, or consultants which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct

charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions. No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney / or the Operator or title has been accepted by all of the Drilling Parties in such well.

~~B. Loss or Failure of Title:~~

~~1.~~ Failure of Title~~: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

**ARTICLE V.**
**OPERATOR**

**A. Designation and Responsibilities of Operator:**

______________________________________ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations / conducted hereunder on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators,

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this 27 agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred / in connection with operations authorized or approved hereunder except such as may result from gross negligence or willful misconduct. See also Article XVI.

**B. Resignation or Removal of Operator and Selection of Successor:** **See Article XVI.**

~~1. Resignation or Removal of Operator: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

~~Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non- Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.~~

~~2. Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.~~

~~3. Effect of Bankruptcy: If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

~~majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."~~

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by the Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by aAffiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non- Operator funds as herein specifically provided. ~~Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.~~

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Consenting Party ~~Non-Operator~~ or its duly authorized representative, at ~~the Non-Operator'~~its sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account hereunder, ~~on the Contract Area~~ and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner unreasonably interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Consenting Party ~~Non-~~Operator upon request copies of

any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C." or other agreement of the parties. See also Article XVI.

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator will promptly advise Non-Operators of ~~the date on which the well is spudded, or~~ the date on which drilling operations are commenced.

(b) Operator will send to / the Consenting Parties ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well as the Y ~~Non-Operators~~ shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator may ~~shall~~ adequately test all Zones encountered / that fall within the Contract Area and which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

~~**A. Initial Well:**~~

______~~On or before the~~ ______________ ~~day of~~ _______, _______________________, ~~Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)): and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due~~

Case 4:19-34508 Document 1351-77 Filed in TXSB on 06/22/20 Page 148 of 255



~~diligence to The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area ~~other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation as outlined in an AFE. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) include estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may

be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations ~~on the Contract Area~~ pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non- Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty

and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)___100____% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non- Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in ~~the well from the beginning of~~ the proposed operations; and

(ii)___300____% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated ~~there~~in the proposed operation. See Article XVI.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non- consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____300_____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non- Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non- Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back, / Extension or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial

Objective"). / A Vertical ~~Such w~~Well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

~~This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.~~

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth

at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." See Article XVI with respect to Extension operations.

~~This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.~~

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone , unless agreed to by all Consenting Parties in the well, or approved as an exception to the then-existing spacing patterns by the appropriate regulatory agency.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, / Extension or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (*i.e.* proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed 10 days only upon notice and the affirmative vote of not less than 51 % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than 51 % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless 51 % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties in ~~of~~ each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐√Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of a Horizontal ~~the~~ Well, including tankage and/or surface facilities. For any Horizontal Well subject to this Agreement, Completion operations shall be included in the proposed drilling operations for such well.

☐√Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall

constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option 1 shall apply to all Horizontal Wells.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of ____One Hundred Thousand____ Dollars ($__100,000____) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of ____One Hundred Thousand____ Dollars ($__100,000____). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform / Workovers ~~repair work~~ or undertake the installation of artificial lift equipment ~~or ancillary production facilities such as salt water disposal wells~~ or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by~~e~~ those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least ___75____% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled / Sidetracked, or Deepened pursuant to Article VI.B.~~2.~~, any well which has been drilled / Sidetracked, or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties/ then owning an interest in the well.. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within / thirty (30) days, or if a rig is on location, forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within / thirty (30) days, or forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) / (as applicable) after delivery of notice of the proposed plugging shall take over the well as of the end of such ~~forty-eight (48) hour~~ notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any / party may propose that a well which has been completed as a producer ~~shall not~~ be plugged and abandoned / which shall require ~~without~~ the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well. Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material / but free and clear of Subsequently Created Interests, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production~~. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non- abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B~~." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion, / Extension or plugging of a well, ~~including but not limited to the Initial Well,~~ such operation shall not be terminated without consent of parties bearing ____51____% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to
such operation, as appropriate.

**G. Taking Production in Kind:**

~~☐~~☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Gas / production available for sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ **Option No. 2: ~~No Gas Balancing Agreement:~~**

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non- taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of~~



008566

~~such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of

said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests, ~~or~~ fees / or other financial obligations hereunder, or upon the improper use of funds by ~~the Operator~~ / a party, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within / thirty (30) ~~fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment

shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged ~~as a dry hole~~, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting / Consenting ~~p~~Parties in proportion to their interests, and the non-defaulting / Consenting ~~p~~Parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non- Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the / Operator for and on behalf of the joint account, unless otherwise agreed by the parties in writing from time to time. ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least ~~five (5)~~ ten (10) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non- Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless ~~all~~ it ~~parties~~ agrees to

abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment / acquired by the parties hereunder and used exclusively for the surrendered lease, ~~which may be located thereon~~ and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, / or lands pooled therewith, such lease to be on ~~the~~ a form / mutually agreed by the parties. ~~attached hereto as Exhibit "B."~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation / to be conducted hereunder ~~on the Contract Area~~, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they / Operator has ve received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. / Except as otherwise provided herein, the transferring party shall be relieved of liability for the cost and expense of operations attributable to the transferred interest which are conducted after the expiration of the 30-day period above;

*provided* that Nno assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an approved operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations. / The transferee shall be jointly and severally liable with its transferor for payment of its share of the costs and expenses attributable to an approved operation in which its transferor had agreed to participate.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

**F. Preferential Right to Purchase:**

☐ (Optional: Check if applicable)

Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after notice is

~~delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**
**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income. / For federal income tax purposes, the parties agree that any gas imbalances will be reported under the cumulative gas balancing method as defined in Treasury Regulations § 1.761-2(d)(3).

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single / or related aggregate uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed One Hundred Thousand Dollars Dollars ($ 100,000 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount / Operator shall promptly notify Non-Operators, and, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon,

the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, ~~telegram, telex, telecopier or any other form~~ or ~~f~~ facsimile, postage or charges prepaid / each of which may also be delivered by attachment to electronic mail ("Email Notice"), and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the ~~telecopy,~~ facsimile / number or email address ~~or telex machine~~ of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier ~~or telegraph~~ service, or upon transmittal by ~~telex, telecopy or~~ facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, ~~telex, telecopy or other~~ facsimile / or Email Notice within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.
/ Each Email Notice shall clearly state that it is a notice or response to a notice under this agreement. An Email Notice shall be deemed delivered only when affirmatively acknowledged by email reply from the recipient (automatic delivery receipts do not qualify). If the receiving party fails or declines to affirmatively acknowledge an Email Notice, then the transmitting party shall be required to deliver notice and confirm receipt by one of the other methods provided above.

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐ √ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

~~☐~~ Option No. 2: ~~In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is~~

capable of production, and for an additional period of __________ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re- completing, Plugging Back or Reworking operations are commenced within____________________days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited o matters of performance, non- performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Texas______shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from / liability above and beyond its proportionate share of any and all losses, damages, injuries, Claims and causes of action arising out of, incident to our resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of / any governmental agency having jursidiction the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence / or willful misconduct. Each No-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or

application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

**ARTICLE XV.**
**MISCELLANEOUS**

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area. ~~or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:~~

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would ~~have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same.~~

☐ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each ~~party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i).~~

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**E. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Articles I through XV of this agreement, and the provisions of Article XVI, the provisions of Article XVI shall govern.

**ARTICLE XVI.**
**OTHER PROVISIONS (Attached)**

**A. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.

**B. Operator's Duty:**

Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.

**C. Priority of Operations – Horizontal Wells:**

Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:

First: Testing, coring or logging;

Second: Complete drilling operations of all proposed Laterals;

Third: Extend or Deepen a Lateral;

Fourth: Kick out and drill an additional Lateral in the same Zone;

Fifth: Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;

Sixth: Sidetrack; and

Seventh: Plug and abandon as provided for in Article VI.E

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

IN WITNESS WHEREOF, this agreement shall be effective as of the ______________________ day of __________, _______. ______________________________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles ____________, have been made to the form.

**ATTEST OR WITNESS:** **OPERATOR**

By

Type or print name

Title

Date

Tax ID or S.S. No.

**NON-OPERATORS**

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Date ______________________

Tax ID or S.S. No. ______________________

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:
State of ______________ )
) ss.
County of ______________ )

This instrument was acknowledged before me on

______________________ by ______________________.

(Seal, if any)

______________________

Title (and Rank) ______________________

My commission expires ______________________

Acknowledgment in representative capacity:
State of ______________ )
) ss.
County of ______________ )

This instrument was acknowledged before me on

______________________ by ______________________ as ______________________
of ______________________

(Seal, if any)

______________________

Title (and Rank) ______________________

My commission expires ______________________

**Article XVI to Operating Agreement**

**(Other Provisions)**

A. Additional Definitions:

1. The term "**Affiliate**" shall mean, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in [the Partnership or the General Partner] result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

2. The term "**Agreement**" and the phrase "**this agreement**" shall each mean this Operating Agreement, as amended from time to time.

3. The term "**Associated Agreements**" means, collectively, the JDA, MSA, JEA and LLCA, inclusive of all exhibits and schedules, and all other contracts, documents, and instruments entered into by and among the parties in connection with operations and activities under this Agreement, in each case, to the extent in effect and applicable as of the time of reference hereunder.

4. The term "**Business Day**" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Houston, Texas and New York, New York are open for business.

5. The term "**Control**" (including its derivatives and similar terms) shall mean, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

6. The term "**Extension**" or "**Extend**" shall mean an operation related to a Horizontal Well whereby a Lateral is drilled in the same Zone to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) the Displacement to which the Lateral was drilled pursuant to a previous proposal.

7. The term "**JDA**" shall mean that certain Joint Development Agreement dated as of March 1, 2017, by and between SN EF Maverick, LLC ("**SN**"), Aguila Production, LLC ("**Aguila**"), and SN EF UnSub, LP ("**UnSub**"), as the same may be amended from time to time.

8. The term "**JEA**" shall mean that certain Joint Exploration Agreement, dated as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended.

9. The term "**LLCA**" shall mean the Limited Liability Company Agreement of Aguila Production, LLC, as the same may be amended from time to time.

10. The term "**MSA**" shall mean that certain Management Services Agreement, dated as of March 1, 2017, by and among SN, Aguila, and Unsub, as the same may be amended from time to time.

11. The term "**RRC**" shall mean the Railroad Commission of Texas or its applicable successor agency or agencies.

12. The term "**Workover**" shall mean routine maintenance and repair work performed on a well but does not include a Rework operation.

B. Amendments to Exhibit "A": The Operator shall amend Exhibit "A" from time to time in order to correct mistakes therein or to reflect changes in ownership within the Contract Area. Operator's duty to amend Exhibit "A" shall be subject to the following:

1. If such amendment is a correction of the initial Exhibit "A," it shall be effective retroactively as of the effective date of this Agreement. If such amendment reflects a change occurring after the effective date of this Agreement, it shall be effective retroactively as of the effective date of such change. In either event, if the amendment changes the interests of any parties in the Contract Area, the accounts of the affected parties shall be thus adjusted.

2. If a proposed amendment to Exhibit "A" involves only one of the parties, Operator shall amend Exhibit "A" upon the written consent of such affected party.

3. If a proposed amendment to Exhibit "A" results in an increase or decrease in the percentage of ownership of one or more parties, Operator shall amend Exhibit "A" upon the written consent of all affected parties.

4. If any party affected by a proposed amendment to Exhibit "A" fails to give written consent to such amendment, Operator may nevertheless make such amendment in order to conform Exhibit "A" to ownership as reflected in an opinion issued by a licensed attorney, who is neither any employee of a party that is affected by the amendment, nor of any Affiliate of such party. Such amendment shall be binding upon the parties until and unless determined otherwise pursuant to Article XVI.B.6.

5. Whenever an amendment is made to Exhibit "A," Operator shall promptly furnish each party with a copy of the amended Exhibit "A," together with a copy of the attorney's opinion upon which such amendment is based, when applicable, irrespective of whether such party is affected by the amendment.

6. Any party who has not consented to an amendment to Exhibit "A" may pursue litigation as to the validity of the basis for the amendment in a court of competent jurisdiction, by joining all other affected parties as parties to such litigation. If such litigation results in a determination which is contrary to the amendment, Operator shall conform Exhibit "A" to such determination, retroactive to the effective date determined pursuant to Article XVI.B.1 and the accounts of the affected parties shall be thus adjusted.

C. Operator's Limited Agency Authority:

Notwithstanding the provisions of Article V.A., Non-Operators hereby designate and appoint Operator as their agent and attorney-in-fact for the sole purpose of executing, filing for RRC approval, and recording a declaration of pooling or communitization agreement to effectuate the pooling or communitization of the Oil and Gas Leases (to the extent permitted under the terms and conditions thereof) and/or Oil and Gas Interests to conform with the spacing rules or a spacing order of the RRC. However, said agency authority shall only be exercised by Operator after providing written notice (including a copy of the proposed pooling declaration or communitization agreement) to the Non-Operators, and shall be binding upon any Non-Operator failing to provide to Operator a written objection within ten (10) Business Days after receipt of such notice.

D. Third Party Operator:

The Operator shall own an interest in the Contract Area except as provided in this Article XVI.D and subject to the provisions of Article XVI.E.5. A qualified non-owning operator ("**Third Party Operator**") may serve as Operator to the extent authorized by, and subject to the applicable terms and conditions of, (i) the JDA, and/or (ii) a separate agreement of the parties hereto. Unless the JDA or such separate agreement provides otherwise, as a condition precedent to serving as Operator hereunder, the putative Third Party Operator must agree to be bound by all terms and conditions of this Agreement that would be applicable to it as Operator.

E. Resignation or Removal of Operator and Selection of Successor:

1. *Voluntary Resignation*: The Operator may resign at any time by giving written notice thereof to the Non-Operators.

2. *Deemed Resignation of Operator*: If, after the effective date of this agreement, (i) Operator terminates its legal existence, (ii) Operator and its Affiliates no longer own an interest in the Contract Area, or (iii) Operator is no longer capable of serving as Operator, then Operator shall be deemed to have resigned without any action by Non-Operators, except for the selection of a successor Operator. A change of a corporate name or business entity type of Operator shall not be deemed a resignation of Operator.

3. *Effect of Bankruptcy*: If Operator becomes insolvent, bankrupt, or is placed in receivership, it shall be deemed to have resigned without any action of Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor-in-possession, or by a trustee in bankruptcy, shall be deemed a resignation by Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator, and the federal bankruptcy court shall be selected as a member of the operating committee and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

4. *Removal of Operator*: Except as provided in Article XVI.E.5, an Operator that has not voluntarily resigned and is not deemed to have resigned may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be effective until a written notice has been delivered to Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall include, but not be limited to, Operator's (i) gross negligence or willful misconduct, (ii) material breach of or inability to meet the standards of operation contained in Article V.A, (iii) material failure to perform its obligations or duties under this Agreement, or (iv) without limiting the generality of the foregoing, Operator's intentional conduct of an approved operation in a manner that substantially deviates from the specifications of the AFE and/or proposal associated with such approved operation on more than two (2) occasions in any 365-day period other than as permitted in Article XVI.H.2.

5. *Third Party Operator*: Unless the parties have agreed otherwise, a Third Party Operator may be removed at any time, with or without cause, by the affirmative vote of parties owning a majority interest based on ownership as shown on Exhibit "A." Moreover if good cause (as defined in Article XVI.E.4) exists for

removal of such Third Party Operator, the Third Party Operator may be removed by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of any Non-Operator that (i) is an Affiliate of such Third Party Operator, and/or (ii) initiated the appointment of the Third Party Operator under Article XVI.D.

6. *Selection of Successor Operator*: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected by the affirmative vote of one (1) or more parties owning a majority interest based on ownership as shown on Exhibit "A" including the vote(s) of the former Operator and/or any transferee(s) of the former Operator's interest, to the extent that they are owners within the Contract Area; *provided*, however, if any Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. In the event that such vote results in a tie, the candidate supported by the former Operator or the majority of its transferee(s) shall become the successor Operator. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor Operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

7. *Effective Time of Resignation or Removal of Operator*: In the event of the resignation or removal of Operator, pursuant to any of Articles XVI.E.1-5, such resignation shall become effective upon the earlier of:

   a. the time and date that a successor Operator has been selected pursuant to Article XVI.E.6, and assumes the duties of Operator; or

   b. 7:00 A.M. on the first day of the calendar month following the expiration of ninety (90) days after (i) the giving of notice of resignation by Operator, (ii) the event deemed to be Operator's resignation, or (iii) action by the Non-Operators to remove Operator.

Thereafter, the former Operator shall be bound by the terms hereof as a Non-Operator to the extent it continues to be a party hereto.

F. Proposals for Vertical Wells: Any proposal for the drilling of, or other operation in, a Vertical Well shall include:

1. Notice that the proposed operation is for a Vertical Well;

2. Drilling and Completion plans specifying the proposed:

   i. depth;

   ii. surface location, and if deviated, bottom hole location;

   iii. objective Zone;

   iv. utilization and scheduling of rig(s) for drilling and Completion;

   v. stimulation operations, staging, and sizing; and

3. Estimating drilling and Completion costs as set forth in the AFE.

G. Non-Consenting Party's Access to Location and Records:

1. *Generally*: With the exception of information required to be furnished by Operator pursuant to Article VI.B.2(d) or Article XVI.G.2, a Non-Consenting Party is neither entitled by virtue of this agreement to, nor may compel Operator or any Consenting Party to provide, access to the well location, or information and reports (or parts thereof) solely relating to such non-consented operation, until the earlier of full recoupment by the Consenting Parties of the amounts provided for in Article VI.B.2(b)(i) or two (2) years following the date the non-consented operation was commenced. Thereafter, Operator shall promptly furnish such access, information, and reports upon receipt of a written request from the Non-Consenting Party.

2. *Payout Audit*: Except as provided in Article VII.D.1, prior to a payout, a Non- Consenting Party shall be entitled to review the joint account records pertaining to a non-consented operation to the extent necessary to conduct an audit of the payout account. Any such review shall be conducted in accordance with Exhibit "C" or other agreement of the parties.

H. Operator's Implementation of Approved Proposals:

1. *Drilling Horizontal Wells*: For any Horizontal Well drilled under this Agreement, Operator shall drill such well to the Objective Zone(s) and drill the Lateral in the Zone(s) to the proposed Displacement unless drilling operations are terminated pursuant to Article VI.F or modified pursuant to this Article XVI.H.

2. *Extensions*: If, in the event that during actual drilling operations on the Lateral of a Horizontal Well, and prior to reaching the Displacement specified in the approved proposal for such well (the "**Approved Displacement**") Operator desires to Extend the Lateral more than twenty percent (20%) (measured in feet) beyond the Approved Displacement, Operator shall give the Consenting Parties written notice of such intent to Extend, together with the estimated costs, not less than 24 hours before Operator anticipates reaching the Approved Displacement. Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the Extension within 48 hours of receipt of such notice, Operator shall not Extend the Lateral beyond the Approved Displacement and will proceed with Completion in accordance with the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the Extension shall be deemed approved and binding upon all Consenting Parties.[1]

[1] NTD: This Extension provision was added in the 2015 JOA form recently approved by the AAPL.

3. *Other Deviations*: If Operator, in its reasonable judgment, determines that a deviation from an approved proposal other than an Extension is necessary or appropriate based upon information derived from facts and circumstances determined subsequent to the commencement of the operations relating to such proposal (including, without limitation, revision of the original proposed Completion staging and design), Operator shall immediately upon making such determination notify the Consenting Parties of the proposed modification (including all appropriate detail on the basis, cost, and design thereof). Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the proposed modification within 48 hours of receipt of such notice, Operator shall not undertake the modification and will proceed with the operation as specified in the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the proposed modification shall be deemed approved and binding upon all Consenting Parties.[2]

H. Non-Operator Materials: Each Non-Operator hereby agrees to provide Operator with all documentation, affidavits, reports or other materials in its possession as required by Operator to perform those tasks to be undertaken by Operator hereunder, or as may be required by regulations and laws of the governmental authorities having jurisdiction over operations in the Contract Area. Non-Operator Liability for Site Visits:

J. Non-Operator Liability for Site Visits:

EACH NON-OPERATOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OPERATOR, ITS AFFILIATES, AND ITS AND THEIR RESPECTIVE MANAGERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CONTRACTORS AND SUBCONTRACTORS FROM AND AGAINST ANY AND ALL LIABILITY FOR INJURY TO SUCH NON-OPERATOR'S OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS, RESULTING FROM OR IN ANY WAY RELATING TO THE PRESENCE OF ANY SUCH OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS AT OR IN THE VICINITY OF ANY WELL LOCATION OR PRODUCTION FACILITY ON THE CONTRACT AREA OR FROM ANY SUCH PERSON'S TRAVELING TO OR FROM SUCH LOCATION OR FACILITY, OTHER THAN ANY SUCH INJURY AND RESULTING LIABILITY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR.

K. Liability of Non-Consenting Parties:

Notwithstanding anything herein to the contrary, any party who elects or is deemed to have elected not to participate in any proposed operation, as set out in this Agreement, shall not be relieved of (i) any obligations accruing prior to its election or deemed election not to participate or (ii) any obligation with respect to any other operation in which such party is participating or has participated.

L. Right to Set-Off or Recoupment; Netting:

Operator (or any non-defaulting Non-Operator if Operator is the party in default) may take any action to which it may be entitled or pursue any remedy to collect the amounts in default, together with all damages suffered by the non-defaulting parties as a result of the default plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in the COPAS Accounting Procedure attached as Exhibit "C" (without duplication of any interest charges permitted under the Development Agreement), together with reasonable attorneys' fees and court costs related thereto. Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have and be entitled to exercise all rights and remedies of recoupment, setoff and any similar doctrines, and the exercise of such rights and remedies shall be in addition to all other rights and remedies. Without limiting the foregoing, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the additional right to notify the purchaser or purchasers of the defaulting party's Oil and Gas production, and recoup or collect any amounts in default out of the proceeds from the sale of the defaulting party's share of Oil and Gas production until the amount owed has been paid in full. In addition, Operator (or any non-defaulting Non-Operator if Operator is the party in default) may, by notice to a defaulting party, suspend the right of such defaulting party to take and sell or dispose of its share of Oil and Gas production until such default has been cured. With respect to any amount owed pursuant to this Agreement by a defaulting party, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the right, from time to time, to recoup from, and to offset against, proceeds from the sale of such defaulting party's share of Oil and Gas production until payment in full of all amounts owing by such defaulting party, and to remit to such defaulting party a net check in the amount of any such net proceeds to which the defaulting party is then entitled. Any purchaser of such production shall be entitled to rely on Operator's (or any non-defaulting Non-Operator if Operator is the party in default) statement concerning the amount owed by the defaulting party. For the avoidance of doubt, in the event Operator is the party in default, any Non-Operator may cause Operator, by delivering notice to Operator, to exercise the remedies set forth in this Article XVI.L. with respect to Operator's interest covered by this Agreement.

M. Separate Measurement Costs:

In the event separate measurement of production is required, the party creating the necessity for such separate measuremnt shall alone bear the cost of purchase, installation and operation of such measurement facilities.

N. Agreement Subject to Associated Agreements:

The rights, obligations and remedies of the parties under this Agreement are subject to a the provisions of the Associated Agreements, to the extent that such remain in effect as of the time of reference hereunder. To the extent there is a conflict between the terms of this Agreement and any provisions of the Associated Agreements that remain effective, the terms of the Associated Agreements shall control.

O. Headings:

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions of this Agreement.

P. Confidentiality of Information:

No party to this Agreement shall use, publish, disseminate or otherwise disclose, directly or indirectly, any trade secrets, proprietary information or confidential information, including, without limitation, the identity of a party or Affiliates thereof (collectively, the "Confidential Information") that should come into the possession of such party other than: (i) as necessary for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements; (ii) to an Affiliate or representative; (iii) in presentations made by Operator in the ordinary course of business at investor or industry conferences; *provided* that Operator shall not use the name of any Non-Operator or its Affiliates or disclose any provisions of this Agreement or the Associated Agreements in such conferences; or (iv) to the extent a party is required to disclose such Confidential Information (A) pursuant to applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), (B) due to a subpoena or court order or other legal process or (C) in order to enforce its rights under this Agreement or the Associated Agreements; provided that each party may disclose Confidential Information to its prospective and current direct or indirect investors or equity or debt financing sources, advisors and bona fide prospective transferees so long as such parties are subject to a customary confidentiality agreement or duty of confidentiality with respect to the Confidential Information. Each party shall, and shall cause each of its Affiliates, and its and their respective directors, officers, members, partners, investors, employees, representatives and agents (i) to comply with this Article XVI.P, (ii) to refrain from using any Confidential Information other than for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements and (iii) to refrain from disclosing any Confidential Information to a person known to be a competitor of the other party (for the avoidance of doubt, this clause (iii) should not restrict any disclosure in accordance with the proviso in the immediately preceding sentence). If a party is required by law or court order to disclose information that would otherwise be Confidential Information under this Agreement, such party shall immediately notify, to the extent permitted under applicable law, the other parties of such notice and provide each party the opportunity to resist such disclosure by appropriate proceedings.

Q. Media Releases:

1. The parties shall consult with each other with regard to all press releases and other public announcements concerning this Agreement or operations on the Contract Area. Except as expressly permitted in Article XVI.P, without the prior written approval from the other parties hereto, no party will issue, or permit

any Affiliate or representative of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement, the Associated Agreements or the activities contemplated hereby or thereby, in each case except where such release or statement is (i) required by applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), or (ii) limited to previously released publicly available information, which press releases or statements will not be restricted by this Article XVI.Q. Notwithstanding anything to the contrary in Article XVI.Q.1 or Article XVI.P, in the event of any emergency which imminently and materially endangers property, lives or the environment, Operator may issue such press releases or public announcements as it deems reasonably necessary in light of the circumstances and will promptly provide Non-Operators with a copy of any such press release or announcement, if commercially feasible, prior to such press releases or public announcements being released or made.

2. Notwithstanding anything contained herein to the contrary, except as may be required by applicable law or the applicable rules and regulations of any governmental agency or stock exchange, no party shall issue any press release or make any other public announcement (excluding announcements (which shall not include technical data) to limited partners or investors of a party given in the ordinary course of business of such party) that makes reference to the name of another party or such party's Affiliates without the prior written consent of such party, which consent shall not be unreasonably withheld. In no event shall any of the principals or officers of a party be identified in any press releases or public announcements by another party without such party's consent.

R. Memorandum of Operating Agreement:

The parties agree to execute simultaneously herewith the Memorandum of Operating Agreement in the form and language set forth in Exhibit "H", which is attached hereto and made a part hereof. The parties agree to execute amendments of same, from time to time, to accurately reflect the Contract Area covered by this Agreement and the current working interests of the parties. Such memoranda may be recorded as deemed appropriate by any party, including in the records of the relevant counties and in any other jurisdictions where the filing of a financing statement (or similar instrument) is necessary to perfect the security interests granted in this Agreement.

S. Severability:

It is the intent of the parties that the provisions contained in this Agreement shall be severable. If any provisions of this Agreement, in whole or in part, are held invalid, illegal or incapable of being enforced as a matter of law or public policy, such holding shall not affect the other portions of this Agreement, and all other such portions shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

T. Governing Law; Venue; Jury Waiver:

THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION (EXCEPT THAT, WITH RESPECT TO ISSUES RELATING TO REAL PROPERTY FOR PROPERTIES LOCATED IN A

SPECIFIC STATE, THE LAWS OF SUCH STATE SHALL GOVERN). THE PARTIES AGREE THAT THE APPROPRIATE, EXCLUSIVE AND CONVENIENT FORUM FOR ANY DISPUTES BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT, THE ASSOCIATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE IN ANY FEDERAL OR STATE COURT WITH SUBJECT MATTER JURISDICTION LOCATED IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS SOLELY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY ASSOCIATED AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**Exhibit " C "**
**ACCOUNTING PROCEDURE**
**JOINT OPERATIONS**

Attached to and made part of that certain Operating Agreement dated [ ], by and among [ ] as Operator, and [ ], as Non- Operators .

**I. GENERAL PROVISIONS**

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

**1. DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** / has the meaning set forth in the Agreement. ~~means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50% ) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.~~

**"Agreement"** means the operating agreement~~, farmout agreement, or other contract~~ between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to: 44

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
- part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication~~

~~facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.~~

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of ~~Offshore Facilities, Shore Base Facilities,~~ fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

~~**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.~~

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

**2. STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

COPAS 2005 Accounting Procedure
Recommended by COPAS

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within / thirty (30) ~~fifteen (15)~~ days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within / thirty (30) ~~fifteen (15)~~ days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within / thirty (30) ~~fifteen (15)~~ days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or Discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with The additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations

reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

~~E. ☐ ***(Optional Provision – Forfeiture Penalties)*** *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non- Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*~~

**6. APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of ___all___ (__100%__) / of the Parties ~~or more Parties, one of which is the Operator, having a combined working interest of at least percent ( %)~~, which approval shall be binding on all Parties~~, provided, however, approval of at least one (1) Non-Operator shall be required~~.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

**II. DIRECT CHARGES**

The Operator shall charge the Joint Account with the following items:

COPAS 2005 Accounting Procedure
Recommended by COPAS

**1. RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2. LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on ~~Shore Base Facilities, Offshore Facilities, or other~~ facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages~~, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category~~.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of

transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities~~, Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed __twelve__ percent (__12__%) per annum; provided, however, depreciation shall not be charged when the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_100,000.00__ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_100,000.00__ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

/ Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys / and landment for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable / to the Joint Account ~~to the extent permitted as a direct charge in the Agreement~~.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges / to the extent Operator handles such tax matters on behalf of the Joint Account ~~unless approved by the Parties pursuant to Section I.6.A (*General Matters*)~~.

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration
- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1. OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

~~☐ **(Alternative 2)** Percentage Basis, Section III.1.C.~~

A. TECHNICAL SERVICES

*(i)* Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

~~☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.~~

*(ii)* Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates / provided that, offsite geosteering costs shall be charged direct to the Joint Account.

~~☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.~~

~~☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.~~

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $__7,000.00____ (prorated for less than a full month)

Producing Well Rate per month $__700.00_____

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. ~~Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first.~~ No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor

described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

~~C. OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate____percent (___) % of the cost of development of the Joint Property, exclusive of costs rovided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate _____percent ( ____% ) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3. AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished

COPAS 2005 Accounting Procedure
Recommended by COPAS

by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally

available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service

rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.
- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.
- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

**EXHIBIT "D"**

**Attached to and made a part of that certain Joint Operating Agreement dated effective _______, by and among ____________, as Operator, and _______________, as Non-Operators.**

The Operator shall carry insurance at the expense of and for the benefit of the joint account covering Operator's operations upon the Contract Area subject to the Operating Agreement to which this Exhibit "D" is attached as follows:

a) Workers' compensation insurance: In compliance with the workers' compensation laws of the State of Texas, including employer's liability with minimum limits of $[●].

b) Commercial general liability insurance: A limit of $[●] each occurrence for bodily injuries, $[●] aggregate. Property damage liability limit being $[●] each occurrence, $[●] aggregate.

c) Business automobile liability insurance. Limits of bodily injury $[●] each person; $[●] each occurrence; property damage $[●] each occurrence.

During drilling operations, Operator shall also carry Operator's Extra Expense insurance including coverage for well seepage, pollution, cleanup and containment and evacuation expenses. The limit of such insurance is $[●] for any one occurrence.

The insurance provided for herein for the benefit of the joint account provides for certain deductibles and or retentions to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of a deductible and/or retention, said deductible/retention amount shall be a direct charge to the joint account.

No other insurance will be required other than as set forth above. Premiums associated with the insurance for the benefit of the joint account shall be charged to the joint account. Any party may at its own expense acquire such other insurance it deems proper to protect itself against any claims, losses, damages or destruction arising out of operations hereunder.

Operator and each Non-Operator agree to mutually waive subrogation in favor of each other on all insurance carried by each party and/or obtain such waiver from the insurance carrier if so required by the insurance contract.

**INSTRUCTIONS FOR USE OF GAS BALANCING AGREEMENT FORM**

**GENERAL**

This Gas Balancing Agreement form is intended to be used as Exhibit "E" to the 1977, 1982 and 1989 A.A.P.L. Form 610 Model Form Operating Agreements. It is also generally suitable for use with other forms of operating agreements. However, before using this form, both it and the operating agreement in question should be reviewed and revised as required to ensure consistency.

If this form is used as an exhibit to an A.A.P.L. Form 610 Model Form Operating Agreement or other operating agreement, the provisions in Section 15 (Counterparts), the "IN WITNESS WHEREOF" paragraph on page 6 and the signature lines and acknowledgments on page 7 should be omitted.

This Gas Balancing Agreement may also be executed as a separate agreement for properties covered by an existing operating agreement where there is no gas balancing agreement or where the one employed is deemed inadequate. In that event, the properties subject to the form will have to be described, and the provisions of Section 15 (Counterparts), the "IN

WITNESS WHEREOF" on page 6 and the signature lines and acknowledgments will have to be employed.

The description of the area covered by the Agreement may be included in the definition of the Balancing Area in Section 1.02. Care should be taken in drafting this description, however, because it may be desirable to cover more than one Balancing Area. Such a definition might, for example, read as follows:

> Each well subject to that Operating Agreement dated ______, covering ________ that produces gas or is allocated a share of gas production. If a single well is completed in two or more reservoirs, such well shall be considered a separate well with respect to, but only with respect to, each reservoir from which the gas production is not commingled in the wellbore.

This Gas Balancing Agreement contains both "alternative" and "optional" provisions. In the case of alternative provisions, it will generally be necessary to select one alternative in order to make the Gas Balancing Agreement effective. Provisions which are designated as optional (or as Option 1, 2, etc.) may or may not be used. **Note that, in order for an Alternative or Option to be selected and effective, it must be checked. If, however, an Alternative is not selected, "Alternative 1" in each instance will be deemed to have been adopted by the Parties, but if an Option is not selected, it will not form a part of the Gas Balancing Agreement. See Section 12.6.**

HEADING - Indicate the applicable Operating Agreement and other information. If the Gas Balancing Agreement is to be used without an Operating Agreement, the heading on page 1 should be modified appropriately, and the following references to the "Operating Agreement" should be deleted or modified appropriately: Section 1.12; Section 7.1; Section 9; Section 12.4; Section 13.1; and Section 13.2.

SECTION 1.02 - Select the Balancing Area to be used, or insert a description of the Balancing Area. As a general rule, the use of a mineral lease as a Balancing Area will only be appropriate in certain situations involving offshore wells.

SECTION 1.16 - This definition should be used only if one of the optional seasonal limitation provisions in Section 4.2 is employed. The specific months during which makeup is to be restricted should be included, e.g., "the months of November,
December, and the following January and February."

SECTION 2.1 - The parties should decide whether the basis of balancing in the Balancing Area will be in Mcfs or MMBtus. One of the two Alternatives stipulated MUST be selected to avoid an automatic election that Alternative 1 applies.

SECTION 2.2 - Since most gas is now decontrolled, the primary purpose of this provision is to provide for separate application of the form to different price categories in the event that price controls are imposed in the future by governmental entity.

SECTION 3.5 - This provision is intended to limit Overproduction in order to keep a Party from getting too far out of balance. It should be noted that this Section will only have an impact if a Party owns less than a 1/3 working interest in the Balancing Area, since under it a party owning a 1/3 interest will be entitled to take 300%, x 1/3 = 100%.

SECTION 4.1 - Select the number of days' notification that an Underproduced Party must give prior to making up Gas. Also, indicate the percentage of each Overproduced Parties' Gas that Underproduced Parties will be allowed to make up. The percentages should be identical.

SECTION 4.2 - The form sets out two Options for imposing seasonal limitations on making up Gas. It should be noted that it is NOT required that any seasonal limitation be included. If Option 1 is selected, select the number of months prior to the Winter Period that will be used to determine how much Gas an Underproduced Party may make up during the Winter Period. This number and the number of months in the Winter Period (as defined in Section 1.16) should add up to 12 or less. If Option 2 is selected, indicate the percentage of an Overproduced Party's Gas that an Underproduced Party may make up during the Winter Period. This percentage should be lower than the percentage set out in Section 4.1.

SECTION 4.3 - Select the percentage of an Overproduced Party's Gas which it should be required to make available for make up once it has produced all of its share of ultimately recoverable reserves. This percentage should be greater than the percentage set out in Section 4.1.

SECTION 6.2~~- One of the two Alternatives stipulated **MUST** be selected as the basis upon which Royalty is to be calculated and paid in order to avoid an automatic election that Alternative 1 applies.~~

SECTION 7.3~~- One of the two Alternatives stipulated for payment of amounts due under a cash settlement **MUST** be selected in order to avoid an automatic election that Alternative 1 applies. Note that Section 7.3.1 is optional, and may **ONLY** be used with Section 7.3, Alternative 2.~~

SECTION 7.4~~- One of the two alternatives stipulated for determining proceeds received by an Overproduced Party for cash settlement purposes **MUST** be selected in order to avoid an automatic election that Alternative 1 applies.~~

SECTION 7.5.1 through 7.5.2~~- Before selecting any of these provisions, the Parties should review the relevant gas processing arrangements for the Gas. Section 7.5.2, Option 1, contemplates that all wellhead MMBtus of Overproduction(will be valued at the gas price per MMBtu received by the Overproduced Party, without regard to whether any of the gas may have been processed. Section 7.5.2, Option 2, on the other hand, would include any enhanced or impaired values resulting from processing in calculating a valuation for the Overproduction. Note that if Section 7.5.2, Option 1, is selected, and residue gas to be sold on an MMBtu basis, it will be necessary to measure the number of MMBtus produced at the well (even if the parties have elected to balance on Mcfs), in order to determine the total value of Overproduction.~~

SECTION 7.7~~- Select the interest rate payable for unpaid amounts owed pursuant to a cash settlement.~~

SECTION 7.9~~- In the event that the parties anticipate that Overproduction may be subject to a potential refund by an appropriate governmental authority, the Parties may choose this provision.~~

SECTION 7.10~~- If the Parties adopt this provision, an Overproduced Party may make a cash settlement with Underproduced Parties for all or part of outstanding gas imbalances as often as once every twenty-four (24) months.~~

SECTION 8~~- Select the number of days' prior notification required for well tests, as well as the length of such tests.~~

SECTION 12.9~~- Select the appropriate method for computing and reporting income to the Internal Revenue Service based on the "entitlements" or "sales" methods.~~

SECTION 13~~- The purpose of this Section is to stipulate the rights of Parties in the event that any Party sells, exchanges, transfers or assigns its interest in the Balancing Area. Section 13.2 gives the Underproduced Party an option to demand a cash settlement if an Overproduced Party sells its interest, and the number of days' notice and response should be selected to implement this procedure.~~

SECTION 14~~- This provision is intended to provide the Parties an opportunity to modify or supplement any of the Gas balancing Agreement's provisions.~~

SECTION 15~~- This provision is to be utilized ONLY if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, Section 15 should be omitted. Otherwise, the Parties must determine the appropriate Percentage Interest which must execute the form to make it effective and the date by which such interests must execute it.~~

SIGNATURE ELEMENT~~- The "IN WITNESS WHEREOF," signature and attest/witness elements are ONLY to be utilized if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, the "IN WITNESS WHEREOF," signature and attest/witness elements should be omitted. Otherwise, these items should be completed in an appropriate fashion, and any appropriate amendment made to the heading of the Gas Balancing Agreement.~~

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**OPERATING AGREEMENT DATED ______________________ BY AND BETWEEN ______________________, as Operator ______________________ AND , as Non Operators ______________________ ("OPERATING AGREEMENT") RELATING TO THE AREA, [Maverick, Dimmit, Webb, LaSalle] COUNTY/PARISH, STATE OF** Texas.

**1. DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one):**

☐ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

☑ all of the acreage and depths subject to the Operating Agreement.

☐ ______________________________________________

______________________________________________

______________________________________________

______________________________________________

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

~~1.16 ☐ **(Optional)** "Winter Period" shall mean the month(s) of ____________________ in one calendar year and the month(s) of ____________________ in the succeeding calendar year.~~

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ☑ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to

meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, ~~but in no event for a period in excess of one year~~. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following atleast __twenty__ (__20__) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying __twenty-five__ percent (__25__%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than __twenty-five__ percent (__25__%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 1) Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ( ) months immediately preceding the Winter Period.

4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 2) Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than percent ( %) of its Full Share of Current Production for Makeup Gas during the Winter Period.

4.3 ☑ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to ________________________ percent (__100__%) of such Overproduced Party's Full Share of Current Production.

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within ( ninety (90) forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

6.2 ☐ **(Alternative 1 - Entitlements)** Each Party shall pay or cause to be paid all Royalty due with respect to Royalty owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.

6.2.1 ☐ **(Optional - For use only with Section 6.2 - Alternative 1 - Entitlement)** Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.

6.2 ☑ **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within / ninety (90) ~~sixty (60)~~ days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☑ **(Alternative I - Direct Party-to-Party Settlement)** Within/ ninety (90)~~sixty (60)~~ days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.4 ☐ **(Alternative 2 - Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any / post-production expenses, such as reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

~~7.5.1 ☐ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.~~

~~7.5.2 ☐ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ☑ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

7.7 Interest compounded at the rate of prime+one percent(1%) ~~percent (_____%)~~ per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8 In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

~~7.9 ☐ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.~~

7.10 ☑ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.

**8. TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after __thirty______ (__30__) days' prior written notice to the Operator and shall last no longer than __seventy-two______ (__72__) hours.

**9. OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10. LIQUIDS**

The / Operator shall market and settle, for the joint account, liquid hydrocarbons recovered with Gas production by field equipment and the Parties shall share proportionately in and own all liquid hydrocarbons ~~recovered with Gas by field equipment operated for the joint account~~ in accordance with their Percentage Interests in the Balancing Area.

**11. AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12. MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

~~12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.~~

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service **(select one)** ~~— as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or~~ ☑ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations ____.

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ☑ **(Optional - Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least fifteen (15) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**14. OTHER PROVISIONS**

~~**15. COUNTERPARTS**~~

~~This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a percent ( %) therein fail(s) to execute this Agreement on or before, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

~~IN WITNESS WHEREOF, this Agreement shall be effective as of the day of ____________, ____.~~

~~ATTEST OR WITNESS:~~

~~OPERATOR~~

~~BY:~~ ____________________

~~Type or print name~~
~~Title~~ ____________________
~~Date~~ ____________________
~~Tax ID or S.S. No.~~

~~NON-OPERATORS~~

~~BY:~~ ____________________

~~Type or print name~~
~~Title~~ ____________________
~~Date~~ ____________________
~~Tax ID or S.S. No.~~

~~BY:~~ ____________________

~~Type or print name~~
~~Title~~ ____________________
~~Date~~ ____________________
~~Tax ID or S.S. No.~~

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ______________)

______________________) ss.

County of ______________)

This instrument was acknowledged before me on ________________________________________

by

(Seal, if any)

Title (and Rank)

My commission expires:

Acknowledgment in representative capacity:

State of ______________)
______________________) ss.
County of ______________)

This instrument was acknowledged before me on ______________ by ________ as ________ of ________. (Seal, if any)

Title (and Rank)

My commission expires:

**EXHIBIT "F"**
**Attached to and made a part of that certain Operating Agreement dated effective ________, by and among __________, as Operator, and _________________, as Non-Operators.**

**NON-DISCRIMINATION AND CERTIFICATION OF NON-SEGREGATED FACILITIES**

One or more parties to the attached Operating Agreement may be a Government Contractor as defined by law and therefore be required to obtain certification of compliance with certain applicable federal laws, orders, and regulations vendors, suppliers, parties, contractors, and subcontractors with whom they do business.

To ensure compliance with such requirements, Operator hereby agrees to materially comply with the following provisions contained in the Code of Federal Regulations (to the extent such provisions are applicable to Operator and unless Operator is exempted by applicable law), which are incorporated herein by reference: 41 C.F.R. § 60 - 1.4(a) (Equal Employment Opportunity); 41 C.F.R. § 60-741.5(a) (Equal Employment Opportunity for Workers with Disabilities); 41 C.F.R. 60-300.5(a) (Equal Opportunity for Disabled and Other Protected Veterans);

In addition, Operator hereby certifies that it: (a) has developed a written Affirmative Action Compliance Program consistent with the rules and regulations published by the Department of Labor in 41 C.F.R. § 60; (b) files an annual Employer Information Report EEO-1 Standard Form 100 in accordance with 41 C.F.R. § 60-1.7; and (c) that it does not, and will not maintain any facilities for employees in a segregated manner or permit its employees to perform their services at any location under its control, where segregated facilities are maintained, in accordance with 41 C.F.R. § 60-1.8.

**Exhibit "H"**

**Attached to and made a part of that certain Joint Operating Agreement dated [_______], by and among [______], as Operator and [___________________], as Non-Operators**

**MODEL FORM RECORDING SUPPLEMENT TO OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between _____, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated ______ (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding

royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of

production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. Other provisions.

~~_______, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles ____, have been made to the form.~~

IN WITNESS WHEREOF, this agreement shall be effective as of the _______ day of _______, _______.

**OPERATOR**

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**NON-OPERATORS**

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**ACKNOWLEDGMENTS**

~~**NOTE:**~~

~~The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~**Individual Acknowledgment**~~

~~State of ______ §~~

~~______ § ss.~~

~~County of ______ §~~

~~This instrument was acknowledged before me on ______ by ______ (Seal, if any) ______~~

~~Title (and Rank)~~

~~My commission expires:~~

~~**Acknowledgment in Representative Capacity**~~

State of ______________ §

§ ss.

County of ____________ §

This instrument was acknowledged before me on ______________ by _________ as _____ of ______.

(Seal, if any)

______________________________________

Title (and Rank) ______________________

My commission expires: ______________________

**ACKNOWLEDGEMENTS**

State of Texas §

§ ss.

County of Harris §

This instrument was acknowledged before me on ______ by ______ as [______] of ______.

(Seal, if any) ______

Title (and Rank) ______

My commission expires: ______

State of Texas §

§ ss.

County of ______ §

This instrument was acknowledged before me on ______ by ______ as [______] of ______.

(Seal, if any) ______

Title (and Rank) ______

My commission expires: ______

**Exhibit C**

**AMI & Core Area**



**Exhibit D**

**Form of Assignment**

**CONVEYANCE, ASSIGNMENT AND BILL OF SALE**

This **CONVEYANCE, ASSIGNMENT AND BILL OF SALE** ("Conveyance") is executed this ___ day of _________, 20__ (the "Execution Date"), and made effective as of 9:00 A.M., Eastern Time, on the ___ day of _________, 20__ (the "Effective Time") by and between ________________, a ______________, having as its address _______________ ("Assignor"), and ________________, a ______________, having as its address ________________ ("Assignee"). Assignor, on the one hand, and Assignee, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein shall have the meanings set forth in that certain Joint Development Agreement dated as of January [●], 2017, by and between SN EF Maverick, LLC ("SN"), SN EF UnSub, LP ("SN UnSub"), and Aguila Production, LLC ("Blackstone") (the "Joint Development Agreement").

**ARTICLE I**
**GRANTING AND RESERVATION CLAUSES; HABENDUM CLAUSE**

1.1 **Grant**. Assignor, for and in consideration of $10.00, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, transfers, bargains, sells, conveys, assigns and delivers unto Assignee an undivided [●] percent of all of Assignor's existing right, title and interest in and to the following, but only with respect to the rights and obligations arising thereunder from and after the Effective Time and less and except the Excluded Assets (as hereinafter defined) (the "Assigned Assets"):

(a) [________][1]

[1] NTD: Definition of "Assigned Assets" to conform to the specific Acquisition under the Joint Development Agreement giving rise to this Conveyance, and any conveyancing instruments included in such transaction, in order to transfer Assignee its proportionate interest in all such assets.

1.2 **Habendum**. TO HAVE AND TO HOLD the Assigned Assets, together with all rights and appurtenances in any way belonging thereto, unto Assignee and its respective successors and assigns forever, subject, however, to the terms and conditions of this Conveyance, including Section 3.1.

**ARTICLE II**
**SPECIAL WARRANTY; DISCLAIMERS; TARGET FORMATION**

2.1 **Special Warranty**. Assignor hereby warrants and forever defends all and singular title to the Assigned Assets unto Assignee, its successors and assigns, solely against all and singular persons claiming or to claim the same or any part thereof, by, through or under Assignor or any of Assignor's affiliates, but not otherwise.

2.2 **Disclaimers**.

(a) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, (I) ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) ASSIGNOR EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE OR ANY OF ITS AFFILIATES,

EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ASSIGNOR OR ANY OF ITS AFFILIATES).

(b) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSIGNED ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION RELATING TO THE ASSIGNED ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSIGNED ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSIGNED ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSIGNED ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSIGNED ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSIGNED ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY ASSIGNOR OR THIRD PARTIES WITH RESPECT TO THE ASSIGNED ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS CONVEYANCE OR THE JOINT DEVELOPMENT AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING HERETO AND THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THIS CONVEYANCE, ASSIGNOR FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSIGNED ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT, AS BETWEEN ASSIGNOR AND ASSIGNEE, ASSIGNEE WILL BE DEEMED TO BE OBTAINING THE ASSIGNED ASSETS IN THEIR PRESENT STATUS, CONDITION, ENVIRONMENTAL CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE).

(c) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT, ASSIGNOR HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSIGNED ASSETS, AND NOTHING IN THIS CONVEYANCE, THE JOINT DEVELOPMENT AGREEMENT OR OTHERWISE WILL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY.

(d) THE PARTIES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 2.2 ARE "*CONSPICUOUS*" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

2.3 **Subrogation**. Assignor hereby assigns to Assignee all rights, claims and causes of action under title warranties given or made by Assignor's predecessors in interest with respect to the Assigned Assets, and Assignee is specifically subrogated to all rights which Assignor may have against such predecessors in interest with respect to the Assigned Assets, to the extent Assignor may legally transfer such rights and grant such subrogation.

**ARTICLE III**
**ASSUMED OBLIGATIONS**

3.1 **Assumed Obligations**. Without limiting and except for Assignee's rights under Section 2.1 or in the Joint Development Agreement, Assignee hereby assumes and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations, expenses and liabilities, known or unknown, arising from, based upon or associated with the Assigned Assets, including obligations, expenses and liabilities relating in any manner to the use, ownership or operation of the Assigned Assets. [2]

[2] NTD: Section 3.1 herein to be revised as necessary to make clear that Assignee hereby assumes its proportionate share of the obligations incurred by Assignor under the Acquisition.

**ARTICLE IV**
**MISCELLANEOUS**

4.1 **Joint Development Agreement**. This Conveyance is delivered pursuant to, and hereby made subject to, the terms and conditions of the Joint Development Agreement. In the event that any provision of this Conveyance (other than any term defined herein) is construed to conflict with any provision of the Joint Development Agreement, the provisions of the Joint Development Agreement (other than with respect to terms defined herein) shall be deemed controlling to the extent of such conflict.

4.2 **Further Cooperation**. After the date hereof, Assignor and Assignee shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer, and shall take such other actions as any Party may reasonably request, to convey and deliver the Assigned Assets to Assignee.

4.3 **Successors and Assigns**. The provisions of this Conveyance shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

4.4 **GOVERNING LAW AND WAIVER OF JURY TRIAL**. THIS CONVEYANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, IN EACH CASE EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS CONVEYANCE.

4.5 **Exhibits**. All exhibits and attachments hereto are hereby made a part hereof and incorporated herein by this reference. References in such exhibits and attachments to instruments on file in the public records are notice of such instruments for all purposes. Unless provided otherwise, all recording references in such exhibits and schedules are to the appropriate records (the real property records, oil and gas records or other appropriate records) of the county in which the Assigned Assets are located.

4.6 **Captions**. The captions and article and section numbers in this Conveyance are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Conveyance.

4.7 **Counterparts**. This Conveyance may be executed in one or more originals, but all of which together shall constitute one and the same instrument. An executed original of this Conveyance containing complete copies of all exhibits is being filed of record in the county in which the Assigned Assets are located.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF**, the authorized representatives of Assignor and Assignee have executed this Conveyance to be made effective for all purposes as of the Effective Time.

**ASSIGNOR:**

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNEE:**

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNOR:**

**THE STATE OF __________ §**

**COUNTY OF ________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

Notary Public, State of ________________________________

My commission expires: ________________________________

**ASSIGNEE:**

**THE STATE OF ____________ §**

**COUNTY OF _________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by ________________, ________________ of [●], a [●].

_______________________________
Notary Public, State of _______________

My commission expires: _______________________________

| ASSIGNOR'S ADDRESS: | ASSIGNEE'S ADDRESS: |
|---|---|
| [●]<br>[●]<br>[●]<br>Attention: [●] | [●]<br>[●]<br>[●]<br>Attention: [●] |

THIS INSTRUMENT PREPARED BY/WHEN RECORDED RETURN TO:

[●]
[●]
Attention: [●]

**EXHIBIT [●]**

ATTACHED TO AND MADE A PART OF THAT CERTAIN CONVEYANCE BETWEEN [●] AND [●]
[●]

**Exhibit E**

**Form of Memorandum of Joint Development Agreement**

***Final Form***

**MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT**

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of January [●], 2017 (the "Effective Date"), is by and between Aguila Production, LLC, a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of January [●], 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, and LaSalle Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

Case 4:19-cv-05058 Document 135-7 Filed on 01/18/23 in TXSD Page 239 of 251
Case 4:23-cv-00815 Document 14-7 Filed 07/28/20 Page 239 of 1559

**Section 6.** The addresses of the Parties are as follows:



008647

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | SN EF Maverick, LLC<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To Investor: | Aguila Production, LLC<br>345 Park Avenue, 43rd Floor<br>New York, New York 10154<br>Attention: Angelo Acconcia<br>Telephone: (713) 400-8210<br>Electronic Mail:<br>acconcia@blackstone.com |
| With a copy to: | Kirkland & Ellis LLP<br>600 Travis St., Suite 3300<br>Houston, Texas 77002<br>Attention: Andrew Calder, P.C.<br>Rhett Van Syoc<br>Electronic Mail:<br>andrew.calder@kirkland.com<br>hett.vansyoc@kirkland.com |

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Aguila Production, LLC
a Delaware limited liability company

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Aguila Production, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________
Notary Public, State of ______________________

Sanchez Energy Corporation
a Delaware corporation

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

______________________
Notary Public, State of ______________________

SN EF Maverick, LLC
a Delaware limited liability company

By: ______________________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________________
Notary Public, State of

Case 4:23-cv-01537 Document 1-43 Filed on 04/28/23 in TXSD Page 243 of 251

SN EF UnSub, LP
a Delaware limited partnership

By: ______________________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of SN EF Maverick, LLC, a Delaware limited partnership, on behalf of such limited partnership.

______________________________
Notary Public, State of ______________________

**Exhibit F**
**Form of Notice of Termination of the Joint Development Agreement**

**NOTICE OF TERMINATION**

**WHEREAS**, Aguila Production, LLC, Sanchez Energy Corporation, SN EF Maverick, LLC and SN EF UnSub, LP (collectively, the "Parties") are parties to that certain Joint Development Agreement, dated January [●], 2017 (the "Terminated Agreement") a memorandum of which is recorded at ***[describe recording information for all memo(s) filed of record]***;

**WHEREAS**, pursuant to Section 6.1 of the Terminated Agreement, the Parties may terminate the Terminated Agreement; and

**NOW, THEREFORE**, the Parties wish to provide notice of termination effective as of [●].

1. Termination. The Terminated Agreement shall be terminated effective [●]. As of [●], [●] shall have no further claims, of any nature, on [●] in relation to the Terminated Agreement; provided, however, the termination described herein shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) accrued under the Terminated Agreement prior to the effective date hereof, (ii) comes into effect due to the expiration or termination of the Terminated Agreement or (iii) otherwise survives the expiration or termination of the Terminated Agreement.

[*Remainder of page intentionally left blank. Signature pages follow.*]

**Sincerely,**

**AGUILA PRODUCTION, LLC:**

[●]

By: ____________________
Name: ____________________
Title: ____________________

**SANCHEZ ENERGY CORPORATION:**

[●]

By: ____________________
Name: ____________________
Title: ____________________

**SN EF MAVERICK, LLC:**

[●]

By: ____________________
Name: ____________________
Title: ____________________

**SN EF UNSUB, LP:**

[●]

By: ____________________
Name: ____________________
Title: ____________________

**THE STATE OF ____________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

______________________________
Notary Public, State of ______________

My commission expires: ______________________________

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

______________________________
Notary Public, State of ______________

My commission expires: ______________________________

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

Notary Public, State of ______________

My commission expires: ________________________________

**THE STATE OF ____________________ §**

**COUNTY OF ______________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

______________________________________
Notary Public, State of ________________

My commission expires: ______________________________

# Exhibit H

**DEVELOPMENT AGREEMENT**

**among**

**ANADARKO E&P ONSHORE LLC**

**and**

**KERR-MCGEE OIL & GAS ONSHORE LP**

**collectively, as Anadarko**

**and**

**SN EF MAVERICK, LLC,**

**SN EF UNSUB, LP**

**and**

**GAVILAN RESOURCES, LLC (f/k/a AGUILA PRODUCTION, LLC)**

**collectively, as the Drilling Parties**

**dated**

**March 1, 2017**

# DEVELOPMENT AGREEMENT

This DEVELOPMENT AGREEMENT (this "***Agreement***") is made and entered into this 1st day of March, 2017 (the "***Execution Date***") by and among ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and, solely for the purposes of *Section 4.15*, Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko, on the one hand, and the Drilling Parties, on the other hand, are each a "***Party***", and collectively the "***Parties***".

## RECITALS

A. Anadarko and the Drilling Parties entered into that certain Purchase and Sale Agreement dated January 12, 2017 (the "***Purchase Agreement***"), pursuant to which Anadarko sold and assigned, and the Drilling Parties purchased and paid for, the Assets. Capitalized terms used in this Agreement shall have the meanings prescribed in this Agreement where such capitalized terms are defined; provided, however, that capitalized terms used in this Agreement and not otherwise defined shall have the meanings given to such terms in the Purchase Agreement.

B. As part of the transactions contemplated by the Purchase Agreement, Anadarko has conveyed the Assets to the Drilling Parties pursuant to (i) that certain Assignment and Bill of Sale dated as of the Execution Date, but effective as of 12:01 a.m. on July 1, 2016 (the "***Effective Time***"), by and between Anadarko and SN, (ii) that certain Assignment and Bill of Sale dated as of the Execution Date, but effective as of the Effective Time, by and between Anadarko and UnSub, and (iii) that certain Assignment and Bill of Sale dated as of the Execution Date, but effective as of the Effective Time, by and between Anadarko and AcqCo (collectively, the "***Assignments***").

C. As part of the consideration for the sale of the Assets to the Drilling Parties, Anadarko desires the near-term development of the Assets.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

## ARTICLE 1. DEFINITIONS

When not otherwise defined in the body of this Agreement, the following terms will have the below defined meaning:

"*AcqCo*" shall have the meaning set forth in the introductory paragraph of this Agreement.

"*Additional Wells*" shall have the meaning set forth in *Section 2.1*.

"*AEP*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Affiliate*" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, another Person. The term "*control*" and its derivatives with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"*Agreement*" shall have the meaning set forth in the introductory paragraph herein.

"*Anadarko*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Assignments*" shall have the meaning set forth in the recitals of this Agreement.

"*Business Day*" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"*Commitment Period*" shall have the meaning set forth in *Section 2.1*.

"*Commitment Well*" and "*Commitment Wells*" shall have the meaning set forth in *Section 2.1*.

"*Completing*" (and its variants) means all activities necessary in order to complete a Commitment Well as a producing well, including perforating, conducting fracking and fracture stimulation; provided, however, "*Completing*" (and its variants) shall not include any recompletion (including any restimulations or refractures) of a previously Completed well, including any recompletion in a zone other than the originally Completed zone, regardless of whether such well was originally Completed by a Drilling Party, Anadarko or a Third Party.

"*Default Fee*" shall have the meaning set forth in *Section 3.3*.

"*Drilling*" (and its variants) means, with respect to any Commitment Well, any activity related to moving in, rigging up, drilling, logging and testing a well.

"*Drilling Party*" and "*Drilling Parties*" shall have the meaning set forth in the introductory paragraph of this Agreement.

"*Effective Date*" shall have the meaning set forth in *Section 2.1*.

"*Effective Time*" shall have the meaning set forth in the recitals of this Agreement.

"*Equipping*" (and its variants) means, with respect to any Commitment Well, all activities necessary, including installing tubing and any other equipment necessary, or taking any

other actions required of the Drilling Parties, in order to flow Hydrocarbons in paying quantities through the Reciept Points to the Springfield Gathering System.

"***Execution Date***" shall have the meaning set forth in the introductory paragraph of this Agreement.

"***Force Majeure Event***" means any cause or event not reasonably within the control of the Drilling Parties that cannot, despite the exercise of reasonable efforts, be prevented, avoided or removed and that prevents the total or partial performance of obligations of the Drilling Parties under this Agreement (other than the payment of money hereunder). The following causes and events (the list of which is not exhaustive) will be considered Force Majeure Events to the extent such causes and events present the characteristics described above: acts of God, strikes, lockouts or other industrial disputes or disturbances, acts of the public enemy, wars, blockades, insurrections, civil disturbances and riots, epidemics, landslides, lightning, hail storms, earthquakes, fires, tornadoes, hurricanes, winter storms, floods, washouts and warnings for any of the foregoing which may necessitate the precautionary shut-down of wells, plants, pipelines, gathering systems or other related facilities; arrests, orders, requests, directives, restraints and requirements of governments and Governmental Authorities; any application of government conservation or curtailment rules and regulations; explosions, sabotage, breakage or accidents to equipment, machinery, gathering systems, plants, facilities or lines of pipe; outages (shutdown) for the making of repairs, alterations, relocations or inspections; inability to secure saltwater or flowback disposal; inclement weather that necessitates extraordinary measures and expense to construct facilities or maintain operations; or any other causes, whether of the kind enumerated herein or otherwise that present the characteristics described above. Such term will likewise include, in those instances where the Drilling Parties are required to obtain permits or permissions from any Governmental Authority to enable the Drilling Parties to fulfill their obligations hereunder, the inability of the Drilling Parties to acquire, or delays on the part of the Drilling Parties in acquiring, such permits and permissions; provided, however, that a "Force Majeure Event" shall not include (a) lack of financing or funds, (b) loss of markets and loss of supply of equipment or materials or (c) to the extent affecting only the Drilling Parties or their Affiliate's employees, any strike, work stoppage or other organized labor difficulty.

"***Gatherer***" shall mean Springfield Pipeline LLC, a Texas limited liability company.

"***Governmental Authority***" shall mean any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power, and any court or arbitral or other governmental tribunal, including any tribal authority having or asserting jurisdiction.

"***KMOG***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Law***" shall mean any applicable statute, law (including common law), rule, regulation, ordinance, order, code, ruling, judgment, writ, injunction, decree or other official act of or by any Governmental Authority.

"***Obligations***" shall have the meaning set forth in *Section 4.15*.

"***Oil Handling Facilities***" shall mean the Main OHF and Cochina OHF, and such other oil handling facilities added to the System from time to time.

"***Party***" and "***Parties***" shall have the meaning set forth in the introductory paragraph of this Agreement.

"***Person***" shall mean any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Authority or any other entity.

"***Purchase Agreement***" shall have the meaning set forth in the recitals of this Agreement.

"***SN***" shall have the meaning set forth in the introductory paragraph of this Agreement.

"***SN Parent***" shall have the meaning set forth in the introductory paragraph of this Agreement.

"***SN Parent Guaranty***" shall have the meaning set forth in *Section 4.15*.

"***SN Parties***" shall have the meaning set forth in the introductory paragraph of this Agreement.

"***Springfield Gathering System***" shall mean all oil and gas pipelines, oil and gas measurement facilities, oil and gas compressors, dehydrators, Reciept Points and any treating or related facilities, owned or operated by Gatherer, including the Oil Handling Facilities, and any future additions or modifications thereto.

"***Receipt Point(s)***" shall mean the inlet of Gatherer's oil, gas and condensate measurement facilities existing now, or in the future, where Gatherer receives production from the Drilling Parties. The current Receipt Point(s) are set forth on Exhibit B and Exhibit C.

"***Twelve Month Period***" shall mean each of the five consecutive twelve month periods during the Commitment Period, with the first Twelve Month Period beginning on the Effective Date and ending on the first anniversary thereof, and each subsequent Twelve Month Period commencing on the same date each subsequent year and ending on the same date each subsequent year.

"***UnSub***" shall have the meaning set forth in the introductory paragraph of this Agreement.

## ARTICLE 2.
## DRILLING COMMITMENT

Section 2.1 ***Commitment Wells***. Commencing as of September 1, 2017 (the "***Effective Date***"), and continuing thereafter until the fifth (5th) year anniversary thereof ("***Commitment Period***"), the Drilling Parties commit to Complete and Equip sixty (60) gross wells per Twelve Month Period on the lands covered by or unitized with the Leases (all such wells, the "***Commitment Wells***", and each such well, a "***Commitment Well***"); provided,

however, no well Completed and Equipped by the Drilling Parties shall be or count as a Commitment Well hereunder if such well was Drilled prior to the Execution Date. Each well Completed and Equipped by the Drilling Parties will count as a Commitment Well in the Twelve Month Period in which such well is Completed, and the Drilling Parties shall provide Anadarko with a copy of the official completion report filed with the Texas Railroad Commission for each Commitment Well within thirty (30) days of each such Completion. In the event that the Drilling Parties Complete and Equip more Commitment Wells than the required sixty (60) Commitment Wells during any Twelve Month Period (such wells, to the extent exceeding the Commitment Wells for such Twelve Month Period, the "***Additional Wells***"), and such Additional Wells would otherwise constitute Commitment Wells for such Twelve Month Period, the Drilling Parties may carry forward up to, but not exceeding, thirty (30) Additional Wells towards the Commitment Well requirement for any future period.

Section 2.2 ***Force Majeure***. If the Drilling Parties are rendered unable, wholly or in part, by reason of a Force Majeure Event to perform their obligations under this Agreement, including the obligation to Complete and Equip all of the sixty (60) Commitment Wells required by *Section 2.1* for any Twelve Month Period, then the Drilling Parties' obligations shall be suspended to the extent affected by such Force Majeure Event. The Drilling Parties shall provide written notice of the occurrence of any Force Majeure Event to Anadarko as soon as reasonably practicable after commencement of such Force Majeure Event, including full particulars of such Force Majeure Event, the Drilling Parties' plans to overcome such Force Majeure Event, and the Drilling Parties shall keep Anadarko fully advised of its efforts to overcome such Force Majeure Event. The Drilling Parties shall use reasonable efforts to overcome such Force Majeure Event as soon as practicable and shall continue to use reasonable efforts to overcome such Force Majeure Event for the pendency of such Force Majeure Event; *provided, however*, that the foregoing shall not require the settlement of any strike, lockout or any other labor difficulty by any Drilling Party contrary to such Drilling Party's wishes, which shall be handled entirely within such Drilling Party's discretion. If an obligation of the Drilling Parties under this Agreement is suspended due to a Force Majeure Event, and such obligation is subject to satisfaction within a certain time period, then such time period shall be extended by, but in no event longer than, the duration of such Force Majeure Event.

## ARTICLE 3.
## TERMINATION; DEFAULT; REMEDIES

Section 3.1 ***Term***. This Agreement shall terminate upon the earliest to occur of:

(a) the mutual agreement of the Parties; or

(b) the five (5) year anniversary of the Effective Date, provided that the Drilling Parties have Completed and Equipped of all Commitment Wells required for each Twelve Month Period as contemplated by *Section 2.1*, and/or all Default Fees owed to Anadarko under *Section 3.3* have been paid to Anadarko.

Section 3.2 ***Effect of Termination***. Upon the termination of this Agreement pursuant to *Section 3.1*, this Agreement will become void and the Parties will have no further liability or obligation hereunder.

Section 3.3 ***Default.*** If, during any Twelve Month Period, the Drilling Parties fail to Complete and Equip all sixty (60) of the Commitment Wells required for such Twelve Month Period as contemplated by *Section 2.1*, the Drilling Parties will be obligated, jointly and severally, to pay AEP an amount equal to (a) sixty (60) minus the number of Commitment Wells that the Drilling Parties Completed and Equipped during such Twelve Month Period, *multiplied by* (b) two hundred thousand dollars ($200,000) (the aggregate amount for such Twelve Month Period, the "***Default Fee***"). Within 10 days following the end of each Twelve Month Period, the Drilling Parties shall pay AEP the Default Fee, if any, attributable to such Twelve Month Period, if applicable. **ANADARKO ACKNOWLEDGES AND AGREES THAT RECOVERY OF THE DEFAULT FEE FOR EACH TWELVE MONTH PERIOD SHALL BE ANADARKO'S SOLE AND EXCLUSIVE REMEDY FOR FAILURE BY THE DRILLING PARTIES TO SATISFY THE DRILLING COMMITMENT DESCRIBED IN *SECTION 2.1* FOR EACH SUCH TWELVE MONTH PERIOD.**

## ARTICLE 4.
## MISCELLANEOUS

Section 4.1 ***Covenants Running with Lands.*** The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall be covenants running with the land. Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.

Section 4.2 ***Assignment.*** This Agreement may not be assigned by Anadarko or the Drilling Parties without the prior written consent of each Party. In the event the Parties consent to any such assignment, such assignment shall not relieve the assigning Party of any obligations and responsibilities hereunder.

Section 4.3 ***Preparation of Agreement.*** Anadarko, the Drilling Parties, and their respective counsel participated in the preparation of this Agreement. In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

Section 4.4 ***Notices.*** All notices and communications required or permitted to be given hereunder shall be in writing and shall be delivered personally, or sent by bonded overnight courier, or mailed by U.S. Express Mail or by certified or registered United States Mail with all postage fully prepaid, or sent by electronic mail transmission (*provided* that the acknowledgment of the receipt of such electronic mail is requested and received by email, excluding automatic receipts, and such notice and communications are sent promptly thereafter to the reviewing person via overnight courier, U.S. Express Mail or certified or registered United States Mail) addressed to Anadarko or the Drilling Parties, as appropriate, at the address for such Person shown below or at such other address as Anadarko or the Drilling Parties shall have theretofore designated by written notice delivered to the other Parties:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attn: Corporate Development
Tel: 832.636.2738
Email: david.richardson@anadarko.com

With a copy to:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attn: Legal Department
Tel: 832.636.7517
Email: randle.jones@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: General Counsel
Tel: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York 10154
Attn: Angelo Acconcia
Email: acconcia@blackstone.com

With a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
600 Travis Street, 33rd Floor
Houston, TX 77002
Attn: Anthony Speier, P.C.
Rahul Vashi
Email: anthony.speier@kirkland.com
rahul.vashi@kirkland.com

Any notice given in accordance herewith shall be deemed to have been given only when delivered to the addressee in person, or by courier, during normal business hours on a Business Day (or if delivered or transmitted after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day), or upon actual receipt by the addressee during normal business hours on a Business Day after such notice has either been delivered to an overnight courier or deposited in the United States Mail, as the case may be (or if delivered after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day). Anadarko or the Drilling Parties may change the address to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this *Section 4.4*. If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day.

Section 4.5 ***Conflict between Agreements***. This Agreement is subject to the Purchase Agreement, and nothing in this Agreement shall operate to limit, release, or impair any of Anadarko's or the Drilling Parties' respective rights, obligations, remedies, or indemnities in the Purchase Agreement. To the extent the terms and provisions of this Agreement are in conflict, or inconsistent, with the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control.

Section 4.6 ***No Third-Party Beneficiaries***. The terms and provisions of this Agreement are intended solely for the benefit of the Parties, their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

Section 4.7 ***Parties in Interest***. The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than Anadarko and the Drilling Parties and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement; provided that only a Party and its respective successors and permitted assigns will have the right to enforce the provisions of this Agreement (but shall not be obligated to do so).

Section 4.8 ***Amendment***. This Agreement may be amended only by an instrument in writing executed by the Party against whom enforcement is sought.

Section 4.9 ***Waiver; Rights Cumulative***. Any of the terms, covenants, representations, warranties or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party waiving compliance. No course of dealing on the part of Anadarko or the Drilling Parties, or their respective officers, employees, agents or representatives or any failure by Anadarko or the Drilling Parties to exercise any of its or their rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Person at a later time to enforce the performance of such provision. No waiver by

Anadarko or the Drilling Parties of any condition or any breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term or covenant. The rights of Anadarko and the Drilling Parties under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

Section 4.10 ***Conflict of Law Jurisdiction, Venue; Jury Waiver.*** THIS AGREEMENT AND THE LEGAL RELATIONS AMONG ANADARKO AND THE DRILLING PARTIES SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. EACH OF ANADARKO AND THE DRILLING PARTIES CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE COURTS OF THE STATE OF TEXAS FOR ANY ACTION ARISING OUT OF THIS AGREEMENT. ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS AGREEMENT SHALL BE EXCLUSIVELY LITIGATED IN COURTS HAVING SITES IN HOUSTON, HARRIS COUNTY, TEXAS. EACH OF ANADARKO AND THE DRILLING PARTIES WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 4.11 ***Severability.*** If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any of Anadarko or the Drilling Parties. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 4.12 ***Counterparts.*** This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement. Any signature hereto delivered by a Party by facsimile transmission shall be deemed an original signature hereto.

Section 4.13 ***Memorandum of Agreement.*** Contemporaneously with the execution hereof, the Parties shall execute a memorandum of agreement in the form attached hereto as Exhibit A to be promptly recorded by Anadarko in the real property records of each county in which the Leases are located.

Section 4.14 ***References and Rules of Construction.*** All references in this Agreement to Exhibits, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections,

subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited. The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to the Article, Section or subsection hereof in which such words occur. Wherever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limiting the foregoing in any respect." All references to "$" or "dollars" shall be deemed references to United States dollars. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the Execution Date. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. The words "shall" and "will" are used interchangeably throughout this Agreement and shall accordingly be given the same meaning, regardless of which word is used.

Section 4.15 ***SN Parent Guaranty.*** For good and valuable consideration, and to induce Anadarko to enter into this Agreement, SN Parent hereby absolutely, unconditionally and irrevocably guarantees to Anadarko the punctual and complete performance of all obligations of SN under this Agreement (the "***Obligations***"). The guaranty set out in this *Section 4.15* (the "***SN Parent Guaranty***") shall remain in full force and effect until SN has fully discharged all of the Obligations. Upon default by SN of any of the Obligations, Anadarko may proceed directly against SN Parent without proceeding against SN or any other Person or pursuing any other remedy. Anadarko may, without notice to, or consent of, SN Parent, (a) extend or alter, together with SN, the time, manner, place or terms of payment or performance of the Obligations, (b) waive, or, together with SN, amend the terms of this Agreement, (c) release SN from any or all of the Obligations, or (d) release any other guaranty or security for the Obligations, without in any way releasing or discharging SN Parent from liability hereunder. SN Parent waives any defenses (but not rights of set-off or counterclaims) which it may have with respect to the performance of the Obligations, other than defenses that SN would have under the terms of this Agreement. SN Parent further waives notice of the acceptance of this SN Parent Guaranty, presentment, demand, protest, and notices of protest, nonpayment, default or dishonor of the Obligations. SN Parent represents and warrants that (x) it has the full power and authority to enter into and perform the SN Parent Guaranty, (y) there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to SN Parent's knowledge, threatened against SN Parent, and SN Parent is not insolvent or generally not paying its debts as they become due, and (z) the execution, delivery and performance by SN Parent of this SN Parent Guaranty has been duly and validly authorized and approved by all necessary corporate action on the part of SN Parent, and this SN Parent Guaranty constitutes the legal, valid and binding obligation of SN Parent, enforceable against SN Parent in accordance with its terms.

Section 4.16 ***Liability of SN Parties.*** Notwithstanding anything to the contrary in this Agreement, SN and UnSub shall be jointly and severally liable for all obligations and Liabilities of UnSub under this Agreement.

*[Remainder of page intentionally blank.]*

IN WITNESS WHEREOF, this Agreement is executed by the Parties on the Execution Date.

**ANADARKO:**

**ANADARKO E&P ONSHORE LLC**

By: ______________________________

Name: Brian T. Kuck

Title: Vice President Corporate Development

**KERR-MCGEE OIL & GAS ONSHORE LP**

By:____________________________
Name: Brian T. Kuck
Title: Vice President

OR
RGT

**DRILLING PARTIES:**

**SN EF MAVERICK, LLC**

By:______________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**DRILLING PARTIES:**

**SN EF MAVERICK, LLC**

By:__________________________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:__________________________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**GAVILAN RESOURCES, LLC**

By: ______________________________
Name: Angelo Acconcia
Title: President

Case 4:23-cv-00537 Document 13-3 Filed on 04/19/23 in TXSD Page 108 of 375

**Solely for purposes of *Section 4.15*:**

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By: ______________________________
Name: Eduardo A. Sanchez
Title: President

Exhibit A
Form of Memorandum of Development Agreement

(See attached.)

**EXHIBIT A**

**FORM OF MEMORANDUM OF DEVELOPMENT AGREEMENT**

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Aguila Production, LLC, a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

WITNESSETH:

**WHEREAS**, Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of [_____], 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on Appendix A hereto (the "***Leases***"); and

**WHEREAS**, the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation,

certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Aguila Production, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

**ANADARKO**

**ANADARKO E&P ONSHORE LLC**

By:____________________________
Name: __________________________
Title: ___________________________

**KERR-MCGEE OIL & GAS ONSHORE LP**

By:____________________________
Name: __________________________
Title: ___________________________

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:____________________________
Name: __________________________
Title: ___________________________

**SN EF UNSUB, LP**

By:____________________________
Name: __________________________
Title: ___________________________

**AGUILA PRODUCTION, LLC**

By:____________________________
Name: __________________________
Title: ___________________________

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:______________________________________
Name: ____________________________________
Title: _____________________________________

**ACKNOWLEDGMENTS**

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this _____ day of [_____], 2017, within my jurisdiction, the within named ________, duly identified before me, who acknowledged that he is the ____________ of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

______________________________

NOTARY PUBLIC

My Commission Expires: AFFIX SEAL

______________________

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this ______ day of [_____], 2017, within my jurisdiction, the within named ________________________________, duly identified before me, who acknowledged that he is the ______________________________ of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

______________________________

NOTARY PUBLIC

My Commission Expires:

______________________

**STATE OF __________** §
§
**COUNTY OF ________** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this ______ day of [_____], 2017, within my jurisdiction, the within named ______________________________, duly identified before me, who acknowledged that he is the ______________________________ of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

________________________________________

NOTARY PUBLIC

My Commission Expires:

______________________

**STATE OF __________** §
§
**COUNTY OF ________** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this ______ day of [_____], 2017, within my jurisdiction, the within named ______________________________, duly identified before me, who acknowledged that he is the ______________________________ of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

________________________________________

NOTARY PUBLIC

My Commission Expires:

______________________

**STATE OF ________** §
§
**COUNTY OF ________** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this ______ day of [_____], 2017, within my jurisdiction, the within named ______________________________, duly identified before me, who acknowledged that he is the ______________________________ of Aguila Production, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

______________________________

NOTARY PUBLIC

My Commission Expires:

____________________

**STATE OF ________** §
§
**COUNTY OF ________** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this ______ day of [_____], 2017, within my jurisdiction, the within named ______________________________, duly identified before me, who acknowledged that he is the ______________________________ of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

______________________________

NOTARY PUBLIC

My Commission Expires:

____________________

# APPENDIX A

## LEASES

**[NTD: To include leases from PSA Exhibit A for each county where Memorandum will be filed.]**

# EXHIBIT B

## RECEIPT POINT(S)

### Receipt Point(s) - Gas

| Maverick Meter Number | Name | CDP |
|---|---|---|
| 420010040 | LABANDERA-SHAPE CDP | Main CDP |
| 420210008 | BEINHORN 1H | Main CDP |
| 420210020 | RANCHO ENCANTADO 1H | Cochina East CDP(s) |
| 420210028 | CATARINA WEST 10H | Main CDP |
| 420210033 | CHUPADERA 2H | Main CDP |
| 420210037 | DIAMOND H RANCH 9H | Cochina East CDP(s) |
| 420210040 | COCHINA STATE UNIT A 1H | Cochina East CDP(s) |
| 420210041 | COCHINA STATE UNIT B 1H | Cochina East CDP(s) |
| 420210042 | FOGMT G1 SP | Main CDP |
| 420610002 | CATARINA WEST CPFA | Main CDP |
| 420610003 | BEINHORN CPFA | Main CDP |
| 420610004 | CATARINA RANCH CPFA | Main CDP |
| 420610006 | SOUTH SPUR STATE CPFA | Main CDP |
| 420610007 | COCHINA EAST CPFB | Cochina East CDP(s) |
| 420610008 | ROGERS DENTONIO CPFA | Main CDP |
| 420610009 | COCHINA WEST CPFA | Cochina East CDP(s) |
| 420610010 | CATARINA RANCH CPFB IP | Main CDP |
| 420610011 | CARLA RANCH CPFA | Main CDP |
| 420610012 | CARLA CPFB | Main CDP |
| 420610013 | SOUTH SPUR RANCH CPFA | Main CDP |
| 420610014 | COCHINA EAST CPFA | Cochina East CDP(s) |
| 420610015 | FRIDAY CPFA IP | Main CDP |
| 420610016 | CATARINA NORTH CPFA | Main CDP |
| 420610017 | DIAMOND H RANCH CPFA | Cochina East CDP(s) |
| 420610018 | DIAMOND H STATE CPFA | Cochina East CDP(s) |
| 420610019 | STANLEY CPFA LP | Stanley Worthey CDP |
| 420610020 | STANLEY RANCH CPFA HP | Stanley Worthey CDP |
| 420610021 | STANLEY RANCH CPFB LP | Stanley Worthey CDP |
| 420610022 | STANLEY RANCH CPFB HP | Stanley Worthey CDP |
| 420610023 | WORTHEY CPFA LP | Stanley Worthey CDP |
| 420610024 | WORTHEY RANCH CPFA HP | Stanley Worthey CDP |
| 420610025 | WORTHEY CPFB LP | Stanley Worthey CDP |

| | | |
|---|---|---|
| 420610026 | WORTHEY RANCH CPFB HP | Stanley Worthey CDP |
| 420610027 | FRIDAY CPFB IP | Main CDP |
| 420610028 | STUMBERG CPFA IP | Main CDP |
| 420610029 | STUMBERG CPFB | Main CDP |
| 420610032 | CATARINA WEST CPFB IP | Main CDP |
| 420610034 | CHIP EAST CPFA IP | Main CDP |
| 420610036 | COCHINA EAST CPFD | Cochina East CDP(s) |
| 420610037 | CATARINA RANCH CPFC IP | Main CDP |
| 420610038 | CATARINA SOUTH CPFA | Main CDP |
| 420610039 | WORTHEY CPFC LP | Stanley Worthey CDP |
| 420610040 | WORTHEY CPFC HP | Stanley Worthey CDP |
| 420610041 | BEINHORN CPFB IP | Main CDP |
| 420610042 | CARLA CPFC | Main CDP |
| 420610043 | CARLA CPFD | Main CDP |
| 420610044 | CHUPADERA CPFA | Main CDP |
| 420610045 | STANLEY CPFC LP | Stanley Worthey CDP |
| 420610046 | STANLEY CPFC HP | Stanley Worthey CDP |
| 420610047 | LABANDERA CPFB | Main CDP |
| 420610048 | CATARINA NORTH CPFB | Main CDP |
| 420610049 | CATARINA NORTH CPFC | Main CDP |
| 420610050 | RANCHO ENCANTADO CPFA LP | Cochina East CDP(s) |
| 420610051 | COCHINA WEST CPFB | Cochina East CDP(s) |
| 420610052 | CHUPADERA CPFB | Main CDP |
| 420610053 | CHIP EAST CPFB IP | Main CDP |
| 420610054 | CATARINA NORTH CPFD IP | Main CDP |
| 420610056 | DIAMOND H RANCH CPFB | Cochina East CDP(s) |
| 420610057 | FRIDAY UNIT B CPFA LP | Main CDP |
| 420610060 | FRIDAY SMITH CPFA IP | Main CDP |
| 420610062 | Beinhorn CPFC LP | Main CDP |
| 420610063 | Beinhorn CPFC IP | Main CDP |
| 420610065 | STUMBERG CPFC LP | Main CDP |
| 420610066 | CATARINA NORTH CPFE | Main CDP |
| 420610069 | MAUND CPFA | Main CDP |
| 420610070 | STUMBERG CPFD IP | Main CDP |
| 420610071 | CATARINA RANCH CPFD LP | Main CDP |
| 420610072 | CATARINA WEST CPFC IP | Main CDP |
| 420610073 | South Spur Ranch CPFB | Main CDP |
| 420610074 | Rogers Dent 16 Ut CPFA | Main CDP |
| 420610076 | CATARINA RANCH CPFD IP | Main CDP |
| 420610079 | RANCHO ENCANTADO CPFB LP | Cochina East CDP(s) |

| | | |
|---|---|---|
| 420610080 | CATARINA SOUTH CPFB | Main CDP |
| 420610083 | Diamond H State CPFB | Cochina East CDP(s) |
| 420610085 | COCHINA EAST CPFF | Cochina East CDP(s) |
| 420610086 | CATARINA WEST CPFD IP | Main CDP |
| 420610087 | Cochina East CPFE | Cochina East CDP(s) |
| 420610088 | CHAPARRAL WL CPFA LP | Cochina East CDP(s) |
| 420610089 | CHAPARRAL WL CPF-A IP | Rancho Encantado CDP |
| 420610090 | R DENTONIO UNIT 23 CPFA | Main CDP |
| 420610091 | Cochina West CPF-C | Cochina East CDP(s) |
| 420610092 | FOGMT CPF-A | Main CDP |
| 420610093 | FRIDAY CPFC IP | Main CDP |
| 420610095 | LA BANDERA UNIT A CPFA | Main CDP |
| 420610096 | ROGERS DENTONIO UNIT A CPFA | Main CDP |
| 420610097 | STANLEY CPFD LP | Stanley Worthey CDP |
| 420610098 | CHUPADERA CPFC | Main CDP |
| 420610099 | STUMBERG CPFA LP | Main CDP |
| 420610100 | COCHINA W CPFD | Cochina East CDP(s) |
| 420610102 | FRIDAY CPFC LP | Main CDP |
| 420610103 | BEINHORN CPFA IP | Main CDP |
| 420610104 | ERKHARDT-SWONKE UNIT CPFA IP | Main CDP |
| 420610105 | SPRINGMAN UNIT A CPFA LP | Main CDP |
| 420610106 | SPRINGMAN UNIT B CPFA LP | Main CDP |
| 420610107 | ERKHARDT-SWONKE UNIT CPFA LP | Main CDP |
| 420610108 | SPRINGMAN UNIT A CPFA IP | Main CDP |
| 420610109 | SPRINGMAN UNIT B CPFA IP | Main CDP |
| 420610110 | COCHINA E CPFG | Cochina East CDP(s) |
| 420610111 | CATARINA RANCH CPFB LP | Main CDP |
| 420610112 | CATARINA WEST CPFB LP | Main CDP |
| 420610113 | CATARINA WEST CPFC LP | Main CDP |
| 420610114 | CATARINA WEST CPFD LP | Main CDP |
| 420610115 | CATARINA RANCH CPFC LP | Main CDP |
| 420610116 | RANCHO ENCANTADO CPFC LP | Cochina East CDP(s) |
| 420610117 | STUMBERG CPFD LP | Main CDP |
| 420610118 | BEINHORN CPFB LP | Main CDP |

| | | |
|---|---|---|
| 420610119 | FRIDAY CPFA LP | Main CDP |
| 420610120 | FRIDAY CPFB LP | Main CDP |
| 420610121 | FRIDAY SMITH CPFA LP | Main CDP |
| 420610124 | CATARINA RANCH CPFE IP | Main CDP |
| 420610125 | CATARINA RANCH CPFE LP | Main CDP |
| 420610126 | CATARINA NORTH CPFD LP | Main CDP |
| 420610128 | STUMBERG UNIT A CPFA LP | Main CDP |
| 420610129 | CATARINA RANCH CPFF LP | Main CDP |
| 420610130 | CATARINA RANCH CPFF IP | Main CDP |
| 420610131 | DIAMOND H UNIT A CPFA LP | Cochina East CDP(s) |
| 420610134 | MAUND RANCH 23 UNIT CPFA | Main CDP |
| 420610135 | CATARINA SOUTH CPFC LP | Main CDP |
| 420610136 | THON UNIT CPFA LP | Main CDP |
| 420610137 | THON UNIT CPFA IP | Main CDP |
| 420610138 | STUMBERG UNIT B CPFA LP | Main CDP |
| 420610140 | CHIP EAST DELGADO UNIT A CPFA LP | Main CDP |
| 420610141 | CHIP EAST DELGADO UNIT A CPFA IP | Main CDP |
| 420610142 | CHIP EAST CPFB LP | Main CDP |
| 420610143 | CATARINA SOUTH CPFD LP | Main CDP |
| 420610144 | DENTONIO STATE 22 UNIT CPFA LP | Main CDP |
| 420610145 | CATARINA NORTH CPFT-1 LP | Main CDP |
| 420610146 | STANLEY CPFD HP | Stanley Worthey CDP |
| 420610148 | CATARINA NORTH CPFT-2 LP | Main CDP |
| 420610149 | CATARINA WEST CPFE LP | Main CDP |
| 420610150 | CATARINA WEST CPFF LP | Main CDP |
| 420610151 | COCHINA WEST CPFE LP | Cochina East CDP(s) |
| 420610152 | CATARINA NORTH UNIT A CPFA LP | Main CDP |
| 420610153 | STUMBERG CPFE LP | Main CDP |
| 420610154 | CHIP EAST CPFA LP | Main CDP |
| 420610155 | FOGMT CPFB LP | Main CDP |
| 420610156 | ROGERS DENTONIO UNIT 33 CPFA LP | Main CDP |
| 420610157 | WORTHEY CPFD LP | Stanley Worthey CDP |
| 420610158 | WORTHEY CPFD HP | Stanley Worthey CDP |

| | | |
|---|---|---|
| 420610159 | ROGERS DENTONIO UNIT 32 CPFA LP | Main CDP |
| 420610160 | MAUND UNIT 26 CPFA LP | Main CDP |
| 420610161 | COCHINA EAST CPFH LP | Cochina East CDP(s) |
| 420610162 | CHIP EAST UNIT B CPFA LP | Main CDP |
| 420610163 | CHIP EAST UNIT B CPFA IP | Main CDP |
| 420610164 | RANCHO ENCANTADO CPFD LP | Cochina East CDP(s) |
| 420610165 | RANCHO ENCANTADO CPFD IP | Rancho Encantado CDP |
| 420610166 | FRIDAY UNIT A CPFA LP | Main CDP |
| 420610167 | FRIDAY UNIT A CPFA IP | Main CDP |
| 420610168 | BEINHORN UNIT A CPFA LP | Main CDP |
| 420610169 | BEINHORN UNIT A CPFA IP | Main CDP |
| 420610170 | COCHINA EAST CPFI LP | Cochina East CDP(s) |
| 420610171 | COCHINA EAST CPFJ LP | Cochina East CDP(s) |
| 420610172 | CATARINA SOUTH CPFE LP | Main CDP |
| 420610173 | LA BANDERA RANCH UNIT B CPFA LP | Main CDP |
| 420610175 | CATARINA NORTH CPFG LP | Main CDP |
| 420610176 | CATARINA NORTH CPFG IP | Main CDP |
| 420910053 | STANLEY OHF VRU | Stanley Worthey CDP |
| 420910054 | WORTHEY OHF VRU | Stanley Worthey CDP |
| 420910075 | MAV OHF MBJ-460 VRU | Main CDP |
| 420910077 | MAV OHF NGL TK470 VRU | Main CDP |
| 420910135 | COCHINA OHF VRU | Cochina East CDP(s) |

**NGL Receipt Point(s)**

| Name | Location |
|---|---|
| Bay #1 at Main OHF | Main OHF |
| Bay #7 at Main OHF | Main OHF |

**EXHIBIT C**

**RECEIPT POINT(S)**

**OIL RECEIPT POINTS – LACT(S)**

| Oil Receipt Point | CDP DESIGNATION |
|---|---|
| BRISCOE CATARINA RANCH CPFA OIL | MAIN OHF |
| BRISCOE CATARINA MAIN OHF CPFA OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFA OIL | COCHINA OHF |
| BEINHORN RANCH 1H OIL | MAIN OHF |
| TOVAR 78-1H OIL | MAIN OHF |
| SAN PEDRO RANCH 4H OIL | MAIN OHF |
| LA BANDERA RANCH 1H OIL | MAIN OHF |
| SOUTH SPUR UT A CPFA OIL | MAIN OHF |
| BEINHORN RANCH CPFA OIL | MAIN OHF |
| LA BANDERA RANCH CPF-A OIL | MAIN OHF |
| STANLEY RANCH CPFA OIL | MAIN OHF |
| SOUTH SPUR STATE CPFA OIL | MAIN OHF |
| WORTHEY RANCH CPFA OIL | MAIN OHF |
| ROGERS DENTONIO RANCH CPF-A OIL | MAIN OHF |
| DIAMOND H RANCH CPFA OIL | COCHINA OHF |
| BRISCOE CATARINA RANCH CPFB OIL | MAIN OHF |
| BRISCOE COCHINA MAIN OHF CPFA OIL | COCHINA OHF |
| BRISCOE CARLA RANCH CPFB OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFB OIL | COCHINA OHF |
| BRISCOE CATARINA NORTH CPFA OIL | MAIN OHF |
| TOVAR MAIN OHF-LLOYD 77 1H OIL | MAIN OHF |
| DIAMOND H STATE CPFA OIL | COCHINA OHF |
| BRISCOE CARLA RANCH CPFA OIL | MAIN OHF |
| STANLEY RANCH CPFB OIL | MAIN OHF |
| FOGMT 6SH OIL | MAIN OHF |
| WORTHEY RANCH CPFB OIL | MAIN OHF |
| CAGE 4RB OIL | MAIN OHF |
| BRISCOE FRIDAY RANCH CPFA OIL | MAIN OHF |
| TOVAR MAIN OHF LLOYD 34 UT CPFA OIL | MAIN OHF |
| TOVAR MAIN OHF-LLOYD 75A 1H OIL | MAIN OHF |
| BRISCOE FRIDAY RANCH CPFB OIL | MAIN OHF |
| BRISCOE CHIP COCHINA OHF CPFA OIL | MAIN OHF |
| STUMBERG RANCH CPFA OIL | MAIN OHF |
| BRISCOE CATARINA RANCH CPFC OIL | MAIN OHF |
| BOYD, GG 1H OIL | MAIN OHF |
| BRISCOE CATARINA MAIN OHF CPFB OIL | MAIN OHF |
| BRISCOE CATARINA SOUTH CPFA OIL | MAIN OHF |

| | |
|---|---|
| LA BANDERA RANCH CPFB OIL | MAIN OHF |
| BRISCOE CARLA RANCH CPFD OIL | MAIN OHF |
| CAGE 5TV OIL | MAIN OHF |
| CAGE 6TV OIL | MAIN OHF |
| RANCHO ENCANTADO CPFA OIL | COCHINA OHF |
| STUMBERG RANCH CPFB OIL | MAIN OHF |
| CAGE 7TV OIL | MAIN OHF |
| BRISCOE CHUPADERA RANCH CPFB OIL | MAIN OHF |
| BRISCOE CATARINA NORTH CPFC OIL | MAIN OHF |
| STANLEY RANCH CPFC OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFD OIL | COCHINA OHF |
| BEINHORN RANCH CPFB OIL | MAIN OHF |
| CAGE 8TV OIL | MAIN OHF |
| MAUND RANCH 19 UT CPFA OIL | MAIN OHF |
| DIAMOND H RANCH CPFB OIL | COCHINA OHF |
| BRISCOE CHUPADERA RANCH CPFA OIL | MAIN OHF |
| TOVAR MAIN OHF-LLOYD 79A 1H OIL | MAIN OHF |
| TOVAR MAIN OHF LLOYD 63 UT CPFA OIL | MAIN OHF |
| BRISCOE COCHINA MAIN OHF CPFB OIL | COCHINA OHF |
| BRISCOE CATARINA NORTH CPFB OIL | MAIN OHF |
| WORTHEY RANCH CPFC OIL | MAIN OHF |
| BRISCOE CHIP COCHINA OHF CPFB OIL | MAIN OHF |
| BRISCOE FRIDAY SMITH CPFA OIL | MAIN OHF |
| BRISCOE CATARINA NORTH CPFD OIL | MAIN OHF |
| BRISCOE FRIDAY RANCH UT B CPFA OIL | MAIN OHF |
| STUMBERG RANCH CPFC OIL | MAIN OHF |
| BEINHORN RANCH CPFC OIL | MAIN OHF |
| BRISCOE CATARINA NORTH CPFE OIL | MAIN OHF |
| RANCHO ENCANTADO CPFB OIL | COCHINA OHF |
| STUMBERG RANCH CPFD OIL | MAIN OHF |
| ROGERS DENTONIO 16 UT CPFA OIL | MAIN OHF |
| BRISCOE CATARINA MAIN OHF CPFC OIL | MAIN OHF |
| BRISCOE CATARINA RANCH CPFD OIL | MAIN OHF |
| DIAMOND H STATE CPFB OIL | COCHINA OHF |
| BRISCOE CATARINA SOUTH CPFB OIL | MAIN OHF |
| SOUTH SPUR RANCH CPFB OIL | MAIN OHF |
| CAGE 9TV OIL | MAIN OHF |
| DIAMOND H RANCH 9H OIL | COCHINA OHF |
| BRISCOE COCHINA COCHINA OHF CPFE OIL | COCHINA OHF |
| TOVAR WLC A UT CPFA OIL | MAIN OHF |
| TOVAR MAIN OHF LLOYD 69A UN 1H | MAIN OHF |
| FOGMT CPFA OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFF OIL | COCHINA OHF |

| | |
|---|---|
| CHAPARRAL WILDLIFE CPFA OIL | COCHINA OHF |
| BRISCOE COCHINA MAIN OHF CPFC OIL | COCHINA OHF |
| BRISCOE CATARINA MAIN OHF CPFD OIL | MAIN OHF |
| LA BANDERA UT A CPFA OIL | MAIN OHF |
| DENTONIO WHITE 23 UT CPFA OIL | MAIN OHF |
| BRISCOE COCHINA MAIN OHF CPFD OIL | COCHINA OHF |
| BRISCOE FRIDAY RANCH CPFC OIL | MAIN OHF |
| BRISCOE CARLA RANCH CPFC OIL | MAIN OHF |
| BRISCOE CHUPADERA RANCH CPFC OIL | MAIN OHF |
| ROGERS DENTONIO UT A CPFA OIL | MAIN OHF |
| BRISCOE COCHINA STATE UNIT A 1H OIL | COCHINA OHF |
| BRISCOE COCHINA STATE UNIT B 1H OIL | COCHINA OHF |
| FOGMT G 1SP OIL | MAIN OHF |
| BRISCOE ECKHARDT-SWONKE UT CPFA OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFG OIL | COCHINA OHF |
| RANCHO ENCANTADO CPFC OIL | COCHINA OHF |
| BR SPRINGMAN A CPFA OIL | MAIN OHF |
| BR SPRINGMAN B CPFA OIL | MAIN OHF |
| DIAMOND H STATE UT A CPFA OIL | COCHINA OHF |
| TOVAR WLC B UT CPFA OIL | MAIN OHF |
| STUMBERG RANCH UT A CPFA OIL | MAIN OHF |
| BRISCOE CATARINA RANCH CPFE OIL | MAIN OHF |
| BRISCOE CATARINA SOUTH CPFC OIL | MAIN OHF |
| BRISCOE CATARINA RANCH CPFF OIL | MAIN OHF |
| MAUND RANCH 23 UNIT CPFA OIL | MAIN OHF |
| BRISCOE THON UT CPFA OIL | MAIN OHF |
| STUMBERG RANCH UT B CPFA OIL | MAIN OHF |
| BRISCOE CATARINA SOUTH CPFD OIL | MAIN OHF |
| DENTONIO STATE 22 UT CPFA OIL | MAIN OHF |
| BRISCOE CATARINA NORTH CPFT-1 OIL | MAIN OHF |
| LLOYD BRISCOE CPFA OIL | MAIN OHF |
| STANLEY RANCH CPFD OIL | MAIN OHF |
| BRISCOE COCHINA OHF DELGADO UT A CPFA OIL | MAIN OHF |
| BRISCOE CATARINA NORTH CPFT-2-OIL | MAIN OHF |
| BRISCOE CATARINA MAIN OHF CPFF OIL | MAIN OHF |
| BRISCOE CATARINA MAIN OHF CPFE OIL | MAIN OHF |
| BRISCOE COCHINA MAIN OHF CPFE OIL | COCHINA OHF |
| BRISCOE CATARINA NORTH UN A CPF-A | MAIN OHF |
| MAUND RANCH UT 26 CPFA OIL | MAIN OHF |
| FOGMT CPFB OIL | MAIN OHF |
| ROGERS DENTONIO UT 33 CPFA | MAIN OHF |
| WORTHEY RANCH CPFD OIL | MAIN OHF |

| | |
|---|---|
| ROGERS DENTONIO UT 32 CPFA OIL | MAIN OHF |
| STUMBERG RANCH CPFE OIL | MAIN OHF |
| BRISCOE COCHINA COCHINA OHF CPFH | COCHINA OHF |
| BRISCOE CHIP COCHINA OHF UT B CPFA OIL | MAIN OHF |
| RANCHO ENCANTADO CPFD OIL | COCHINA OHF |
| BEINHORN RANCH UNIT A CPFA OIL | MAIN OHF |
| FRIDAY RANCH UNIT A CPFA OIL | MAIN OHF |
| BRISCOE COCHINA E RANCH CPFI OIL | COCHINA OHF |
| BRISCOE CATARINA SOUTH CPFE OIL | MAIN OHF |
| LA BANDERA RCH UT B CPFA OIL | MAIN OHF |
| BRISCOE COCHINA E RANCH CPFJ OIL | COCHINA OHF |
| BRISCOE CATARINA N CPFG OIL | MAIN OHF |
| MAUND RANCH 18 UT CPFA OIL | MAIN OHF |
| FOGMT UNIT A CPFA OIL | MAIN OHF |
| STUMBERG RANCH UNIT C CPFA OIL | MAIN OHF |

**OIL RECEIPT POINTS – TRUCK**

**Receipt Point(s) @ Main OFH, as follows:**

All Maverick Basin OHF Bay(s) receiving truck deliveries.

# Exhibit I

DOC #196628
BOOK 1636 PAGE 444

# MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of March 1, 2017 (the "Effective Date"), is by and between Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of March 1, 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, LaSalle and Zavala Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>c/o Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Tel: 713.756.2782 |
| With a copy to: | GSO ST Holdings LP<br>1111 Bagby Street, Suite 2050 |

| | |
|---|---|
| | Houston, TX 77002<br>Attention: Robert Horn<br>Electronic Mail: Robert.horn@gsocap.com |
| With a copy to: | Christopher Richardson<br>Andrews Kurth Kenyon LLP<br>600 Travis<br>Suite 4200<br>Houston, TX 77002<br>Electronic Mail:<br>crichardson@andrewskurth.com |
| To Investor: | Gavilan Resources, LLC<br>345 Park Avenue, 43rd Floor<br>New York, New York 10154<br>Attention: Angelo Acconcia<br>Telephone: (713) 400-8210<br>Electronic Mail:<br>acconcia@blackstone.com |
| With a copy to: | Kirkland & Ellis LLP<br>600 Travis St., Suite 3300<br>Houston, Texas 77002<br>Attention: Andrew Calder, P.C.<br>Rhett Van Syoc<br>Electronic Mail:<br>andrew.calder@kirkland.com<br>rhett.vansyoc@kirkland.com |

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of

the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Gavilan Resources, LLC
a Delaware limited liability company

By: [signature]
Name: Angelo Acconcia
Title: President
Date: 2/27/2017

STATE OF New York §
§
COUNTY OF Westchester §

This instrument was acknowledged before me this 27th day of February 2017 by Angelo Acconcia as President of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of such limited liability company.

[signature]
Notary Public, State of New York

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

BOOK 1636 PAGE 448

Sanchez Energy Corporation
a Delaware corporation

By: ______________________
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

Carolyn L. George
Notary Public, State of Texas

BOOK 1636 PAGE 449

SN EF Maverick, LLC
a Delaware limited liability company

By: ______________________
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

Carolyn L. George
Notary Public, State of Texas

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

BOOK 1636 PAGE 450

SN EF UnSub, LP
a Delaware limited partnership

By: ______________________
Name: Patricio D. Sanchez
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Patricio D. Sanchez, as CEO of SN EF UnSub, LP, a Delaware limited partnership, on behalf of such limited partnership.

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

______________________
Notary Public, State of TX

BOOK 1636 PAGE 451

**Exhibit A**

**Leases**

BOOK 1636 PAGE 452

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 9926.779 | 329 | 131 | 7000 |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | | 752 | 14931 |
| BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | 387 | 582 | 15240 |
| JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 695 | 17211 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 709 | 17215 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 712 | 17216 |
| ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 60.000 | 406 | 729 | 18412 |
| MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 159.630 | 417 | 612 | 19856 |
| KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 159.630 | 425 | 589 | 21253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 620 | 24591 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 628 | 24593 |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | TX | Dimmit | 60.000 | 445 | 624 | 24592 |
| SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 636 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 632 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 667 | 26041 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 654 | 26037 |
| NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 664 | 26040 |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 660 | 26039 |
| MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 648 | 26035 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 630 | 26029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 642 | 26033 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 651 | 26036 |
| MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 627 | 26028 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 636 | 26031 |
| ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 645 | 26034 |
| DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 456 | 469 | 26264 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 639 | 26032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 657 | 26038 |
| CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 633 | 26030 |
| UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 461 | 254 | 26955 |
| LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 89 | 27233 |
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 85 | 27232 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 10938.500 | 329 | 397 | 7052 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 14601.230 | 338 | 617 | 8649 |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 226 | 18821 |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 229 | 18822 |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 232 | 18823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 15591.810 | 335 | 276 | 8081 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6876.320 | 338 | 621 | 8650 |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 585 | 15241 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 1884.900 | 343 | 325 | 9442 |
| ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 197 | 31626 |
| JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 194 | 31625 |
| SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 500 | 6 | 32007 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 631 | 8652 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 636 | 8653 |

**BOOK 1636 PAGE 454**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 626 | 8651 |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 255 | 14820 |
| MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 262 | 14821 |
| ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | TX | Dimmit | 636.120 | 27 | 384 | 113502 |
| FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | TX | Zavala | 645.030 | 3 | 172 | 113530 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | TX | Zavala | 1120.000 | 3 | 251 | 113554 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 670.800 | 3 | 578 | 113797 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 649.620 | 3 | 582 | 113798 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 638.610 | 3 | 586 | 113799 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 647.710 | 3 | 590 | 113800 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 705.800 | 29<br>4 | 86<br>425 | 129<br>114336 |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | TX | Dimmit | 441.650 | 29 | 322 | 114642 |
| MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | TX | Dimmit | 38.750 | 29 | 332 | 114666 |
| G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 1290.440 | 29 | 355 | 114678 |
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 377 | 114700 |
| L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 381 | 114700-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 41.250 | 29 | 366 | 114736 |
| RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | TX | Dimmit | 82.750 | 29 | 359 | 114737 |
| JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 15.060 | 29 | 469 | 114826 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 41.420 | 30 | 10 | 114829 |
| ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | TX | Dimmit | 43.870 | 31 | 330 | 693 |
| LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | TX | Dimmit | 22.100 | 31 | 464 | 841 |



BOOK 1636 PAGE 455

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | TX | Dimmit | 29.160 | 33 | 505 | 2577 |
| PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | TX | Dimmit | 29.160 | 39 | 193 | 1997 |
| MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | TX | Dimmit | 2.760 | 147 | 136 | 779 |
| CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | TX | Dimmit | 80.220 | 37 | 257 | 300984 |
| OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 353.090 | 97<br>55 | 145<br>185 | 1086<br>46827 |
| B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | TX | Dimmit | 720.000 | 29 | 293 | T16318 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | TX | Zavala | 162.400 | 57 | 53 | NA |
| ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 68 | 48131 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 65 | 48130 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 666 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 671 | 546 |
| MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 676 | |
| I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | TX | Dimmit | 44.100 | 33 | 122 | 800045 |
| MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | TX | Dimmit | 80.460 | 30 | 460 | 800046 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | TX | Dimmit | 321.850 | 30 | 270 | 229 |
| SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | TX | Dimmit | 7.500 | 30 | 495 | 458 |
| ERIN BAIN JONES | W W OATMAN | 05/11/1970 | TX | Dimmit | 681.000 | 31 | 186 | 4150 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Webb | 11127.840 | 2329 | 707 | 960221 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 484 | 7078 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 394 | 7051 |

**BOOK 1636 PAGE 456**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 27136.070 | 460<br>329 | 233<br>487 | 79160<br>7079 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 27136.070 | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | TX | Dimmit | 7428.100 | 354 | 171 | 11322 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | TX | Dimmit | 40.000 | 398 | 26 | 16937 |
| RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 40.000 | 394 | 189 | 16294 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 32 | 16768 |
| JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 26 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 35 | 16769 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 38 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 29 | 16767 |
| BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | TX | Dimmit | 40.000 | 405 | 560 | 18184 |
| CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | TX | Dimmit | 40.000 | 425 | 586 | 21252 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 764 | 31322 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 759 | 31321 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 754 | 31320 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 750 | 31319 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | TX | Webb | 6199.250 | 2435 | 504 | 977956 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | TX | Webb | 21890.630 | 2484 | 238 | 986336 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 1280.000 | 2583 | 185 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 5120.000 | 2583 | 182 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 720.000 | 1041 | 67 | 144189 |

**BOOK 1636 PAGE 457**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 720.000 | 1073 | 94 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 400.000 | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 400.000 | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 36559.710 | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 80.000 | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 160.000 | 1067 | 185 | 146523 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 400.000 | 1067 | 173 | 146521 |
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 4564.723 | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 4564.723 | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 7800.074 | 344 | 6 | 9540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 40.000 | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | TX | Dimmit | 40.000 | 439 | 695 | 23611 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 4317.553 | 343 | 690 | 9504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit<br>Maverick | 52054.310 | 332<br>1012 | 649<br>222 | 7649<br>141603 |
| EWING ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 09/20/2006 | TX | Dimmit | 8209.480 | 344 | 1 | 9539 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | TX | Dimmit | 8209.482 | 343 | 844 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 14.400 | 429 | 83 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 766 | 22087 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 833 | 28385 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 837 | 28386 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 1 | 28887 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 829 | 28384 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 5 | 28388 |
| ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 1808.500 | 336 | 199 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick Webb | 311.437 | 1041 339 | 60 550 | 144183 8821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick Webb | 311.437 | 1073 344 | 99 128 | 147023 15489 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 7243.318 | 344 | 46 | 9545 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | TX | Dimmit | 30.000 | 423 | 49 | 20796 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 66 | 24499 |
| AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 678 | 23607 |
| SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 674 | 23606 |
| THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 682 | 23608 |
| HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 670 | 23605 |
| RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 449 | 521 | 25265 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 10.000 | 453 | 531 | 25849 |
| KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | TX | Dimmit | 10.000 | 495 | 204 | 31491 |
| GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 208 | 31492 |
| CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 212 | 31493 |
| BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 495 | 216 | 31494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 40.000 | 491 | 516 | 31083 |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 504 | 77 | 32389 |

**BOOK 1636 PAGE 459**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 3657.182 | 343 | 694 | 9505 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 379 | 16162 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 398 | 16168 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 382 | 16163 |
| MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 395 | 16167 |
| PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 70.000 | 395 | 525 | 16565 |
| GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | TX | Dimmit | 70.000 | 395 | 522 | 16564 |
| JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 395 | 528 | 16566 |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 40.000 | 420 | 759 | 20412 |
| LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 10.000 | 420 | 757 | 20411 |
| DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 20.000 | 420 | 762 | 20413 |
| HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 80.000 | 426 | 580 | 21449 |
| MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 70.000 | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 10.000 | 429 | 541 | 21885 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 70 | 24500 |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | TX | Dimmit | 10.000 | 456 | 530 | 26278 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | TX | Dimmit | 10.000 | 505 | 738 | 32601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | TX | Dimmit | 10.000 | 505 | 734 | 32600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 10.000 | 505 | 741 | 32602 |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | TX | Webb | 4483.500 | 2672 | 185 | 1020907 |

**BOOK 1636 PAGE 460**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | TX | Webb | 3573.660 | 2668 | 642 | 1020289 |
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | TX | Webb | 5470.072 | 2750 | 95 | 1036351 |
| ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | TX | Dimmit | 610.800 | 369 | 468 | 12860 |
| G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 830<br>207 | 13825<br>84338 |
| GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 836<br>213 | 13826<br>84339 |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 825<br>202 | 13824<br>84337 |
| ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit<br>LaSalle | 1525.810 | 391<br>513 | 488<br>32 | 15860<br>87603 |
| GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 207.860 | 380 | 11 | 13830 |
| GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 7 | 13829 |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 16 | 13831 |
| GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 1 | 13828 |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 379 | 840 | 13827 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | TX | Dimmit | 11684.590 | 382 | 13 | 14190 |
| MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | TX | Dimmit | 60.000 | 383 | 654 | 14548 |
| DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | TX | Dimmit | 391.600 | 385 | 526 | 14884 |
| CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 456 | 15211 |

**BOOK 1636 PAGE 461**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | TX | Dimmit | 50.000 | 388 | 648 | 15418 |
| MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 389 | 719 | 15602 |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 388 | 16165 |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 401 | 16169 |
| WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 286 | 15828 |
| CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 649 | 15876 |
| IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 728 | 16234 |
| ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 641 | 25465 |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 637 | 25464 |
| MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 40.000 | 455 | 623 | 26168 |
| SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 40.000 | 457 | 363 | 26401 |
| GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 390 | 550 | 15691 |
| STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 481 | 15990 |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 484 | 15991 |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 405 | 16170 |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 392 | 16166 |
| REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 408 | 16171 |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 411 | 16172 |
| DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 394 | 192 | 16295 |
| MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | TX | Dimmit | 20.000 | 392 | 487 | 15992 |
| BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | TX | Dimmit | 20.000 | 392 | 490 | 15993 |
| SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 395 | 565 | 16572 |
| TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 402 | 198 | 17629 |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 785 | 22244 |

BOOK 1636 PAGE 462

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 777 | 22242 |
| ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 769 | 22240 |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 761 | 22238 |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 745 | 22234 |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 753 | 22236 |
| CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 737 | 22232 |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 729 | 22230 |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 809 | 22250 |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | TX | Dimmit | 20.000 | 431 | 801 | 22248 |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 793 | 22246 |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | TX | Dimmit | 20.000 | 393 | 385 | 16164 |
| BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | TX | Dimmit | 10.000 | 393 | 414 | 16173 |
| MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 393 | 318 | 16140 |
| KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 394 | 147 | 16284 |
| BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | TX | Dimmit | 40.000 | 409 | 667 | 18878 |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 828 | 19044 |
| ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 831 | 19045 |
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | TX | Dimmit | 40.000 | 418 | 591 | 20043 |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 40.000 | 423 | 615 | 20919 |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 702 | 23613 |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 714 | 23616 |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 698 | 23612 |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 710 | 23615 |

**BOOK 1636 PAGE 463**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 706 | 23614 |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | TX | Dimmit | 40.000 | 482 | 325 | 30186 |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 482 | 322 | 30185 |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 310 | 30181 |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 313 | 30182 |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 316 | 30183 |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 307 | 30180 |
| EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | TX | Dimmit | 40.000 | 482 | 319 | 30184 |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 500 | 316 | 32057 |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 502 | 65 | 32199 |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | TX | Dimmit | 40.000 | 512 | 193 | 33490 |
| JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 196 | 33491 |
| PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 704 | 34283 |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 701 | 34282 |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 582 | 34081 |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 579 | 34080 |
| KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | TX | Dimmit | 40.000 | 517 | 546 | 34428 |
| NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 199 | 33492 |
| SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 576 | 34079 |
| WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 573 | 34078 |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 190 | 33489 |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 136 | 34644 |
| JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 128 | 34642 |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 132 | 34643 |

**BOOK 1636 PAGE 464**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 120 | 34640 |
| ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | TX | Dimmit | 40.000 | 493 | 598 | 31425 |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 124 | 34641 |
| J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | TX | Dimmit | 40.000 | 517 | 543 | 34427 |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 515 | 570 | 34077 |
| SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 821 | 34793 |
| ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 519 | 833 | 34796 |
| HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 825 | 34794 |
| JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 526 | 255 | 35599 |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 526 | 251 | 35598 |
| DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 829 | 34795 |
| ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 222.180 | 392<br>396 | 363<br>579 | 15971<br>16714 |
| BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | TX | Dimmit | 415.020 | 392 | 370 | 15972 |
| DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 76 | 16475 |
| VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 73 | 16474 |
| SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 70 | 16473 |
| MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 67 | 16472 |
| MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 64 | 16471 |
| JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 61 | 16470 |
| JOAN MAYS | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 58 | 16469 |
| GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 52 | 16467 |
| DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 45 | 16465 |
| GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | TX | Dimmit | 415.020 | 418 | 157 | 19936 |
| RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 589 | 19712 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 595 | 19714 |
| SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 592 | 19713 |
| BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 460 | 20887 |
| FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 463 | 20888 |
| MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 466 | 20889 |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 469 | 20890 |
| LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 457 | 20886 |
| EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | TX | Dimmit | 415.020 | 423 | 453 | 20885 |
| DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | TX | Dimmit | 415.020 | 420 | 224 | 20343 |
| SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | TX | Dimmit | 415.020 | 420 | 221 | 20342 |
| CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 423 | 438 | 20881 |
| SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 441 | 20882 |
| MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 445 | 20883 |
| PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 415.020 | 425 | 311 | 21184 |
| R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 449 | 20884 |
| IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 427 | 390 | 21529 |
| JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | TX | Dimmit | 415.020 | 427 | 407 | 21533 |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 412 | 2153 |
| JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | TX | Dimmit | 415.020 | 427 | 399 | 21531 |
| BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | TX | Dimmit | 415.020 | 427 | 394 | 21530 |
| JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 404 | 21532 |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | TX | Dimmit | 415.020 | 433 | 125 | 22468 |
| DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 141 | 22996 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 436 | 125 | 22992 |
| DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 121 | 22991 |
| CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 133 | 22994 |
| GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 129 | 22993 |
| LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 145 | 22997 |
| DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 137 | 22995 |
| MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | TX | Dimmit | 117.000 | 436 | 118 | 22990 |
| M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 439 | 749 | 23626 |
| MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 757 | 23628 |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 745 | 23625 |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 753 | 23627 |
| MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 442 | 304 | 24054 |
| KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | TX | Dimmit | 117.000 | 457 | 360 | 26400 |
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | TX | Dimmit | 415.020 | 458 | 290 | 26535 |
| GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | TX | Dimmit | 415.020 | 478 | 227 | 29445 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | TX | Dimmit | 20.000 | 392 | 360 | 15970 |
| EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 029 | 16938 |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 33 | 16939 |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 037 | 16940 |
| MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 041 | 16941 |
| KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 706 | 17214 |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 691 | 17210 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 702 | 17213 |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 698 | 17212 |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 483 | 17170 |
| DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 400 | 113 | 17276 |
| SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | TX | Dimmit | 42.640 | 399 | 715 | 17217 |
| DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 342 | 17324 |
| MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 348 | 17325 |
| ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | TX | La Salle | 110.900 | 530 | 251 | 90198 |
| JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | TX | Dimmit | 80.000 | 405 | 557 | 18183 |
| MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 169 | 18939 |
| JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 163 | 18937 |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | TX | Dimmit | 80.000 | 412 | 384 | 19214 |
| CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 143 | 22473 |
| ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 431 | 722 | 22228 |
| GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 155 | 22476 |
| EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 433 | 151 | 22475 |
| RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 147 | 22474 |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 129 | 22469 |
| JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 132 | 22470 |
| BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 136 | 22471 |
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 139 | 22472 |
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 721 | 23618 |

**BOOK 1636 PAGE 468**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 724 | 23619 |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 657 | 25469 |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 669 | 25472 |
| SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 80.000 | 450 | 661 | 25470 |
| VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 649 | 25467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | TX | Dimmit | 80.000 | 450 | 673 | 25473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 665 | 25471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | TX | Dimmit | 80.000 | 450 | 653 | 25468 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 455 | 118 | 26085 |
| MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 80.000 | 467 | 91 | 27796 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 82.530 | 403 | 403 | 17810 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | TX | Dimmit | 82.530 | 419 | 106 | 20117 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 39.800 | 403 | 409 | 17812 |
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | TX | Dimmit | 40.050 | 403 | 400 | 17809 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 40.000 | 403 | 406 | 17811 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | TX | Dimmit | 160.000 | 402<br>415 | 201<br>461 | 17630<br>19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 384 | 18328 |
| ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 388 | 18329 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 396 | 18331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 400 | 18332 |
| GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 392 | 18330 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 356 | 18321 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 364 | 18323 |

**BOOK 1636 PAGE 469**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 376 | 18326 |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 372 | 18325 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 160.000 | 406 | 368 | 18324 |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 360 | 18322 |
| PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 744 | 18416 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 380 | 18327 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 385 | 18688 |
| SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 408 | 389 | 18689 |
| BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 740 | 18415 |
| RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 732 | 18413 |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 736 | 18414 |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 393 | 18690 |
| DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 408 | 381 | 18687 |
| DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 148 | 19933 |
| BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 418 | 154 | 19935 |
| KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 151 | 19934 |
| JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | TX | Dimmit | 160.000 | 422 | 387 | 20698 |
| ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 422 | 391 | 20699 |
| SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | TX | Dimmit | 160.000 | 425 | 695 | 21287 |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | TX | Dimmit | 90.890 | 401 | 548 | 17517 |
| EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | TX | Dimmit | 90.890 | 406 | 681 | 18405 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 37.000 | 445 | 640 | 24596 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 37.000 | 405 | 563 | 18185 |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | TX | Dimmit | 42.180 | 406 | 196 | 18282 |
| JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | TX | Dimmit | 10.000 | 408 | 378 | 18686 |



BOOK 1636 PAGE 470

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | TX | Dimmit | 17.200 | 406 | 724 | 18411 |
| JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 10.200 | 409 | 664 | 18877 |
| GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 680 | 18882 |
| TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 677 | 18881 |
| CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | TX | Dimmit | 40.000 | 409 | 674 | 18880 |
| JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 671 | 18879 |
| MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | TX | Dimmit | 10.000 | 422 | 395 | 20700 |
| RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 427 | 735 | 21605 |
| JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | TX | Dimmit | 15.000 | 445 | 61 | 24498 |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | TX | Dimmit | 15.000 | 443 | 152 | 24176 |
| LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 646 | 23600 |
| ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 627 | 23596 |
| ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 651 | 23601 |
| JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 637 | 23598 |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 15.000 | 442 | 832 | 24143 |
| BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 656 | 23602 |
| MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 661 | 23603 |
| ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 435 | 797 | 22943 |
| MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | TX | Dimmit | 15.000 | 445 | 56 | 24497 |
| LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 641 | 23599 |
| WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | TX | Dimmit | 15.000 | 439 | 632 | 23597 |
| MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 456 | 521 | 26276 |
| DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | TX | Dimmit | 15.000 | 465 | 235 | 27497 |

**BOOK 1636 PAGE 471**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | TX | Dimmit | 30.000 | 427 | 741 | 21607 |
| JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | TX | Dimmit | 30.000 | 427 | 738 | 21606 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | TX | Dimmit | 30.000 | 435 | 803 | 22945 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 30.000 | 435 | 800 | 22944 |
| KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 30.000 | 453 | 539 | 25851 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 54 | 21790 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 64 | 21792 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 59 | 21791 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 69 | 21793 |
| JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 143.630 | 433 | 114 | 22463 |
| MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 105 | 22460 |
| FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 111 | 22462 |
| JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 108 | 22461 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 480 | 22358 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 490 | 22360 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 485 | 22359 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 475 | 22357 |
| MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 511 | 23258 |
| GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 505 | 23256 |
| LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 508 | 23257 |
| DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | TX | Dimmit | 37.400 | 379 | 258 | 13696 |
| RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 412 | 23402 |
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 409 | 23401 |
| JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | TX | Dimmit | 7.400 | 438 | 407 | 23399 |

**BOOK 1636 PAGE 472**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 780 | 22089 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 759 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 644 | 24597 |
| S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 654 | 24599 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 649 | 24598 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | TX | Dimmit | 80.000 | 450 | 645 | 25466 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | TX | Dimmit | 84.990 | 444 | 569 | 24432 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | TX | Dimmit | 10.000 | 442 | 828 | 24142 |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 691 | 23610 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | TX | Dimmit | 23.700 | 432 | 700 | 22401 |
| ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | TX | Dimmit | 10.000 | 445 | 74 | 24501 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | TX | Dimmit | 10.000 | 439 | 666 | 23604 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 556 | 26162 |
| JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 563 | 26163 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 569 | 26164 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 550 | 26161 |
| JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 455 | 575 | 26165 |
| MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 458 | 295 | 26536 |
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | TX | Dimmit | 10.000 | 453 | 535 | 25850 |
| KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 505 | 26272 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 501 | 26271 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 459 | 512 | 26722 |

**BOOK 1636 PAGE 473**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | TX | Dimmit | 157.600 | 459 | 528 | 26726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 524 | 26725 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 520 | 26724 |
| JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | TX | Dimmit | 157.600 | 459 | 516 | 26723 |
| LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 157.600 | 455 | 655 | 26176 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 157.600 | 455 | 659 | 26177 |
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 663 | 26178 |
| THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 651 | 26175 |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 647 | 26174 |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 157.600 | 455 | 643 | 26173 |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 455 | 639 | 26172 |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 455 | 631 | 26170 |
| MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 452 | 794 | 25771 |
| SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 806 | 25774 |
| GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 802 | 25773 |
| CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 810 | 25775 |
| MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 627 | 26169 |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 786 | 25769 |
| MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 790 | 25770 |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 798 | 25772 |
| SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 635 | 26171 |
| JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | TX | Dimmit | 157.600 | 470 | 825 | 28383 |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | TX | Dimmit | 157.600 | 469 | 63 | 28143 |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 55 | 28141 |

**BOOK 1636 PAGE 474**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 59 | 28142 |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 280 | 28929 |
| FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 268 | 28926 |
| JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | TX | Dimmit | 157.600 | 478 | 127 | 29425 |
| EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | TX | Dimmit | 157.600 | 474 | 260 | 28924 |
| MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 256 | 28923 |
| MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 87 | 29417 |
| VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 92 | 29418 |
| RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 122 | 29424 |
| B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 117 | 29423 |
| JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 102 | 29420 |
| RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 97 | 29419 |
| AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 107 | 29421 |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 112 | 29422 |
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 272 | 28927 |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 276 | 28928 |
| KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 264 | 28925 |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | TX | Dimmit | 157.600 | 498 | 593 | 31859 |
| ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 498 | 597 | 31860 |
| JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | TX | Dimmit | 157.600 | 498 | 589 | 31858 |
| MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 585 | 31857 |
| KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 581 | 31856 |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | TX | Dimmit | 157.600 | 498 | 573 | 31854 |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | TX | Dimmit | 157.600 | 498 | 577 | 31855 |

BOOK 1636 PAGE 475

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 569 | 31853 |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 564 | 31852 |
| JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | TX | Dimmit | 157.600 | 498 | 560 | 31851 |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 556 | 31850 |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 552 | 31849 |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 544 | 31847 |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 548 | 31848 |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | TX | Dimmit | 157.600 | 498 | 540 | 31846 |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | TX | Dimmit | 157.600 | 498 | 532 | 31844 |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 536 | 31845 |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 529 | 31843 |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 524 | 31842 |
| MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 157.600 | 498 | 520 | 31841 |
| ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 516 | 31840 |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 512 | 31839 |
| GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 601 | 31861 |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 500 | 798 | 32161 |
| KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | TX | Dimmit | 10.000 | 457 | 209 | 26377 |
| HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 10.000 | 457 | 45 | 26336 |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | TX | Dimmit | 10.000 | 457 | 217 | 26379 |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | TX | Dimmit | 10.000 | 457 | 213 | 26378 |
| CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | TX | Dimmit | 10.000 | 455 | 545 | 26160 |
| SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | TX | Dimmit | 10.000 | 459 | 498 | 26719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | TX | Dimmit | 10.000 | 462 | 418 | 27144 |



**BOOK 1636 PAGE 476**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 504 | 26720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 10.000 | 459 | 508 | 26721 |
| JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 494 | 26718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 11 | 27214 |
| EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 1 | 27212 |
| MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 6 | 27213 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 813 | 27206 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 828 | 27209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 838 | 27211 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 818 | 27207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 16 | 27215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 823 | 27208 |
| ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 21 | 27216 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 833 | 27210 |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 337 | 27263 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 332 | 27262 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 327 | 27261 |
| JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 342 | 27264 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 10.000 | 465 | 107 | 27477 |
| DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 121 | 27616 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 127 | 27617 |
| GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 133 | 27618 |
| LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 145 | 27620 |
| DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 139 | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | TX | Dimmit | 10.000 | 498 | 608 | 31863 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | TX | Dimmit | 10.000 | 473 | 112 | 28765 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 288 | 29147 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 292 | 29148 |
| ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | TX | Dimmit | 10.000 | 476 | 298 | 29150 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | TX | Dimmit | 40.000 | 474 | 251 | 28919 |
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 573 | 31746 |
| RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 588 | 31749 |
| REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 10.000 | 498 | 605 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | TX | Dimmit | 10.000 | 487 | 772 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | TX | Dimmit | 10.000 | 498 | 612 | 31864 |
| JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 617 | 31866 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 614 | 31865 |
| LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 626 | 31870 |
| RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 629 | 31871 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 622 | 31868 |
| CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | TX | Dimmit | 10.000 | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 500 | 792 | 32159 |

BOOK 1636 PAGE 478

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 678 | 33418 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 684 | 33420 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | TX | Dimmit | 10.000 | 511 | 681 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 511 | 669 | 33415 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | TX | Dimmit | 40.000 | 378 | 674 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | TX | Dimmit | 77.910 | 508 | 167 | 32959 |
| JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 499 | 837 | 32005 |
| YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 370 | 33520 |
| WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 365 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | TX | Dimmit | 10.000 | 518 | 9 | 34494 |
| EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 10.000 | 517 | 829 | 34489 |
| BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | TX | Dimmit | 10.000 | 517 | 837 | 34491 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 483 | 34716 |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | TX | Dimmit | 10.000 | 519 | 487 | 34717 |
| LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | TX | Dimmit | 10.000 | 523 | 492 | 35222 |
| CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 523 | 496 | 35223 |
| RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 10.000 | 523 | 500 | 35224 |
| DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | TX | Dimmit | 10.000 | 518 | 5 | 34493 |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 833 | 34490 |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | TX | Dimmit | 10.000 | 518 | 1 | 34492 |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 507 | 34722 |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 499 | 34720 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 479 | 34715 |
| JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 491 | 34718 |
| BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 821 | 34487 |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 825 | 34488 |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 514 | 34724 |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 817 | 34486 |
| SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | TX | Dimmit | 10.000 | 519 | 495 | 34719 |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 503 | 34721 |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 90 | 35423 |
| JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 519 | 511 | 34723 |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 20.000 | 506 | 55 | 32616 |
| JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | TX | Dimmit | 20.000 | 506 | 58 | 32617 |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | TX | Dimmit | 20.000 | 506 | 61 | 32618 |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 64 | 32619 |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 68 | 32620 |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 74 | 32622 |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 78 | 32623 |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 82 | 32624 |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 86 | 32625 |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 90 | 32626 |
| SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 94 | 32627 |
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 104 | 32629 |
| VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 113 | 32631 |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 117 | 32632 |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 687 | 33421 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 695 | 33423 |
| JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 699 | 33424 |
| MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | TX | Dimmit | 20.000 | 511 | 703 | 33425 |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | TX | Dimmit | 20.000 | 511 | 707 | 33426 |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | TX | Dimmit | 20.000 | 511 | 711 | 33427 |
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 714 | 33428 |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 718 | 33429 |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 722 | 33430 |
| JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | TX | Dimmit | 20.000 | 511 | 726 | 33431 |
| JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 730 | 33432 |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | TX | Dimmit | 20.000 | 517 | 767 | 34473 |
| ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 817 | 35845 |
| EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | TX | Dimmit | 20.000 | 506 | 71 | 32621 |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 98 | 32628 |
| BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 109 | 32630 |
| JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 691 | 33422 |
| ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 20.000 | 515 | 189 | 33970 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 10.000 | 515 | 184 | 33969 |
| EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 528 | 1 | 35851 |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 284 | 34192 |
| TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 272 | 34190 |
| JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 278 | 34191 |
| MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 266 | 34189 |

**BOOK 1636 PAGE 481**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 749 | 36343 |
| A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 752 | 36344 |
| RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 756 | 36345 |
| RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 759 | 36346 |
| WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | TX | Dimmit | 10.000 | 530 | 737 | 36339 |
| PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 734 | 36338 |
| REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 743 | 36341 |
| ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | TX | Dimmit | 10.000 | 530 | 740 | 36340 |
| LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | TX | Dimmit | 10.000 | 530 | 746 | 36342 |
| THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | TX | Dimmit | 10.000 | 530 | 731 | 36337 |
| SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | TX | Dimmit | 10.000 | 530 | 728 | 36336 |
| LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 762 | 36347 |
| WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 751 | 36646 |
| ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 10.000 | 526 | 263 | 35601 |
| BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 526 | 259 | 35600 |
| SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | TX | Dimmit | 10.000 | 527 | 28 | 35705 |
| CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 527 | 36 | 35707 |
| JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 525 | 364 | 35477 |
| KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 368 | 35478 |
| HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 360 | 35476 |
| RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 356 | 35475 |
| KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 527 | 40 | 35708 |
| FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | TX | Dimmit | 10.000 | 527 | 32 | 35706 |
| TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 534 | 310 | 36857 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 534 | 313 | 36858 |
| TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 534 | 307 | 36856 |
| GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | TX | Dimmit | 20.000 | 527 | 821 | 35846 |
| RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 825 | 35847 |
| NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | TX | Dimmit | 20.000 | 527 | 829 | 35848 |
| JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 20.000 | 522 | 312 | 35105 |
| CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 532 | 357 | 36601 |
| BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | TX | Dimmit | 10.000 | 532 | 367 | 36604 |
| JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 370 | 36605 |
| RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | TX | Dimmit | 10.000 | 532 | 374 | 36606 |
| HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | TX | Dimmit | 10.000 | 532 | 377 | 36607 |
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 380 | 36608 |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 383 | 36609 |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 386 | 36610 |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 389 | 36611 |
| JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 392 | 36612 |
| BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | TX | Dimmit | 10.000 | 532 | 395 | 36613 |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 398 | 36614 |
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 532 | 403 | 36615 |
| DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 406 | 36616 |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | TX | Dimmit | 10.000 | 532 | 409 | 36617 |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | TX | Dimmit | 10.000 | 532 | 364 | 36603 |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | TX | Dimmit | 10.000 | 532 | 361 | 36602 |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | TX | Dimmit | 20.000 | 527 | 837 | 35820 |

**BOOK 1636 PAGE 483**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | TX | Dimmit | 20.000 | 527 | 833 | 35849 |
| MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 10.000 | 523 | 830 | 35256 |
| JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | TX | Dimmit | 10.000 | 536 | 382 | 37176 |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 388 | 37178 |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | TX | Dimmit | 10.000 | 536 | 385 | 37177 |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 391 | 37179 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 80.000 | 517 | 763 | 34472 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 10.000 | 517 | 759 | 34471 |
| WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | TX | Dimmit | 10.000 | 539 | 360 | 37658 |
| RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | TX | Dimmit | 10.000 | 539 | 366 | 37660 |
| CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | TX | Dimmit | 10.000 | 539 | 363 | 37659 |
| FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | TX | Dimmit | 40.000 | 534 | 714 | 36928 |
| LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 40.000 | 534 | 717 | 36929 |
| GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 534 | 720 | 36930 |
| STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 531 | 199 | 36394 |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | TX | Dimmit | 40.000 | 538 | 505 | 37545 |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | TX | Dimmit | 40.000 | 538 | 509 | 37546 |
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | TX | Dimmit | 40.000 | 538 | 792 | 37593 |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | TX | Dimmit | 40.000 | 528 | 179 | 35886 |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 528 | 175 | 35885 |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | TX | Dimmit | 12.310 | 542 | 345 | 38066 |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 421 | 37944 |

**BOOK 1636 PAGE 484**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 424 | 37945 |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | TX | Dimmit | 80.000 | 539 | 765 | 37708 |
| DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 220 | 38040 |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 217 | 38039 |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 75 | 37289 |
| ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 78 | 37290 |
| JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 81 | 37291 |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 84 | 37292 |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 87 | 37293 |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 90 | 37294 |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | TX | Dimmit | 10.000 | 537 | 93 | 37295 |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 96 | 37296 |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 99 | 37297 |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 102 | 37298 |
| 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 105 | 37299 |
| LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | TX | Dimmit | 200.000 | 379 | 498 | 13745 |
| MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 544 | 260 | 38286 |
| RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 525 | 38438 |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 522 | 38437 |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 519 | 38436 |
| BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 528 | 38439 |
| AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 534 | 38441 |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | TX | Dimmit | 10.000 | 545 | 516 | 38435 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 531 | 38440 |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | TX | Dimmit | 10.000 | 545 | 546 | 38445 |
| LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 543 | 38444 |
| JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 540 | 38443 |
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 537 | 38442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 545 | 549 | 38446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 814 | 38474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 123 | 38274 |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 117 | 38272 |
| PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 105 | 38268 |
| RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 120 | 38273 |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 102 | 38267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 126 | 38275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 114 | 38271 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 99 | 38266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 111 | 38270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 108 | 38269 |
| DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 547 | 115 | 38601 |
| DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | TX | Dimmit | 160.000 | 542 | 279 | 38053 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 544 | 756 | 38359 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | TX | Dimmit | 10.000 | 544 | 753 | 38358 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 207 | 38507 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 204 | 38506 |
| STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 216 | 38510 |
| WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 213 | 38509 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 210 | 38508 |
| MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | TX | Dimmit | 80.000 | 545 | 243 | 38397 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | TX | Dimmit | 10.000 | 547 | 121 | 38603 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 547 | 118 | 38602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 548 | 622 | 38850 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | TX | Dimmit | 10.000 | 548 | 477 | 38833 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 549 | 470 | 38927 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 548 | 471 | 38831 |
| BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 548 | 474 | 38832 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | TX | Dimmit | 10.000 | 550 | 372 | 39027 |
| WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 550 | 369 | 39026 |
| DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | TX | Dimmit | 160.000 | 551 | 752 | 39233 |
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 553 | 582 | 39410 |
| LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | TX | Dimmit | 10.000 | 553 | 588 | 39412 |
| JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | TX | Dimmit | 10.000 | 552 | 441 | 39279 |
| MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | TX | Dimmit | 80.000 | 548 | 735 | 38868 |
| DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 321 | 39162 |
| MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 324 | 39163 |
| DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | TX | Dimmit | 80.000 | 551 | 318 | 39161 |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 312 | 39159 |

BOOK 1636 PAGE 487

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | TX | Dimmit | 80.000 | 549 | 725 | 38967 |
| JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | TX | Dimmit | 80.000 | 549 | 728 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 553 | 585 | 39411 |
| BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | TX | Dimmit | 10.000 | 555 | 335 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | TX | Dimmit | 40.000 | 555 | 13 | 39591 |
| DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | TX | Dimmit | 10.000 | 556 | 589 | 39852 |
| SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 556 | 592 | 39853 |
| LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 70.000 | 557 | 385 | 39960 |
| GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 558 | 601 | 40106 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 555 | 422 | 39661 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 555 | 428 | 39663 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 555 | 425 | 39662 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | TX | Dimmit | 80.000 | 555 | 431 | 39664 |
| RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 556 | 436 | 39815 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | TX | Dimmit | 80.000 | 556 | 433 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 379 | 40156 |
| JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 376 | 40155 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 439 | 40165 |
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | TX | Dimmit | 80.000 | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | TX | Dimmit | 80.000 | 563 | 557 | 40854 |

**BOOK 1636 PAGE 488**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | TX | Dimmit | 20.000 | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | TX | Dimmit | 20.000 | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | TX | Dimmit | 1639.310 | 577 | 454 | 42708 |

BOOK 1636 PAGE 489

Case 4:23-cv-00587 Document 1-3 Filed on 02/03/23 in TXSD Page 874 of 1759

**Exhibit B**

**AMI**

**BOOK 1636 PAGE 490**


Frio
La Salle
Zavala
Dimmit
Webb
Maverick
Eagle Ford
AMI

BOOK 1636 PAGE 492

**Doc #: 196628**
**Book: 1636**
**Pages: 444 - 492**

Filed & Recorded:
04/03/2017 02:01PM
SARA MONTEMAYOR
COUNTY CLERK
MAVERICK

| | |
|---|---|
| Recording Fee - Land Recs | $193.00 |
| Records Management | $10.00 |
| Records Preservation Fund | $10.00 |
| Courthouse Security Fee | $3.00 |

Irma Y Holguin, Deputy

STATE OF TEXAS,
COUNTY OF MAVERICK
I hereby certify that this instrument was filed on the date and time stamped thereon by me and was duly recorded in the OFFICIAL PUBLIC RECORDS of Maverick County, Texas.

Any provisions herein which restricts the sale, rental, or use of the described real property because of color or race is invalid and unenforceable under federal law.

SARA MONTEMAYOR
COUNTY CLERK MAVERICK COUNTY, TEXAS



# MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of March 1, 2017 (the "Effective Date"), is by and between Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of March 1, 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, LaSalle and Zavala Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>c/o Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Tel: 713.756.2782 |
| With a copy to: | GSO ST Holdings LP<br>1111 Bagby Street, Suite 2050 |

Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail:
crichardson@andrewskurth.com

To Investor:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Telephone: (713) 400-8210
Electronic Mail:
acconcia@blackstone.com

With a copy to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail:
andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of

the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Gavilan Resources, LLC
a Delaware limited liability company

By: [signature]
Name: Angelo Acconcia
Title: President
Date: 2/27/2017

STATE OF New York §
§
COUNTY OF Westchester §

This instrument was acknowledged before me this 27th day of February 2017 by Angelo Acconcia as President of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of such limited liability company.

[signature]
Notary Public, State of New York

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

Sanchez Energy Corporation
a Delaware corporation

By: [signature]
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

Carolyn L. George
Notary Public, State of Texas

Signature Page to Memorandum of Joint Development Agreement

SN EF Maverick, LLC
a Delaware limited liability company

By: [signature]
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

Carolyn L. George
Notary Public, State of Texas

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

SN EF UnSub, LP
a Delaware limited partnership

By: ______________________
Name: Patricio D. Sanchez
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Patricio D. Sanchez, as CEO of SN EF UnSub, LP, a Delaware limited partnership, on behalf of such limited partnership.

______________________
Notary Public, State of TX

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

# Exhibit A

**Leases**

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 9926.779 | 329 | 131 | 7000 |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | | 752 | 14931 |
| BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | 387 | 582 | 15240 |
| JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 695 | 17211 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 709 | 17215 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 712 | 17216 |
| ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 60.000 | 406 | 729 | 18412 |
| MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 159.630 | 417 | 612 | 19856 |
| KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 159.630 | 425 | 589 | 21253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 620 | 24591 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 628 | 24593 |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | TX | Dimmit | 60.000 | 445 | 624 | 24592 |
| SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 636 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 632 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 667 | 26041 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 654 | 26037 |
| NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 664 | 26040 |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 660 | 26039 |
| MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 648 | 26035 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 630 | 26029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 642 | 26033 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 651 | 26036 |
| MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 627 | 26028 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 636 | 26031 |
| ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 645 | 26034 |
| DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 456 | 469 | 26264 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 639 | 26032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 657 | 26038 |
| CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 633 | 26030 |
| UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 461 | 254 | 26955 |
| LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 89 | 27233 |
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 85 | 27232 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 10938.500 | 329 | 397 | 7052 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 14601.230 | 338 | 617 | 8649 |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 226 | 18821 |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 229 | 18822 |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 232 | 18823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 15591.810 | 335 | 276 | 8081 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6876.320 | 338 | 621 | 8650 |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 585 | 15241 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 1884.900 | 343 | 325 | 9442 |
| ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 197 | 31626 |
| JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 194 | 31625 |
| SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 500 | 6 | 32007 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 631 | 8652 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 636 | 8653 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 626 | 8651 |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 255 | 14820 |
| MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 262 | 14821 |
| ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | TX | Dimmit | 636.120 | 27 | 384 | 113502 |
| FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | TX | Zavala | 645.030 | 3 | 172 | 113530 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | TX | Zavala | 1120.000 | 3 | 251 | 113554 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 670.800 | 3 | 578 | 113797 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 649.620 | 3 | 582 | 113798 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 638.610 | 3 | 586 | 113799 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 647.710 | 3 | 590 | 113800 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 705.800 | 29<br>4 | 86<br>425 | 129<br>114336 |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | TX | Dimmit | 441.650 | 29 | 322 | 114642 |
| MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | TX | Dimmit | 38.750 | 29 | 332 | 114666 |
| G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 1290.440 | 29 | 355 | 114678 |
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 377 | 114700 |
| L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 381 | 114700-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 41.250 | 29 | 366 | 114736 |
| RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | TX | Dimmit | 82.750 | 29 | 359 | 114737 |
| JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 15.060 | 29 | 469 | 114826 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 41.420 | 30 | 10 | 114829 |
| ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | TX | Dimmit | 43.870 | 31 | 330 | 693 |
| LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | TX | Dimmit | 22.100 | 31 | 464 | 841 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | TX | Dimmit | 29.160 | 33 | 505 | 2577 |
| PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | TX | Dimmit | 29.160 | 39 | 193 | 1997 |
| MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | TX | Dimmit | 2.760 | 147 | 136 | 779 |
| CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | TX | Dimmit | 80.220 | 37 | 257 | 300984 |
| OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 353.090 | 97<br>55 | 145<br>185 | 1086<br>46827 |
| B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | TX | Dimmit | 720.000 | 29 | 293 | T16318 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | TX | Zavala | 162.400 | 57 | 53 | NA |
| ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 68 | 48131 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 65 | 48130 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 666 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 671 | 546 |
| MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 676 | |
| I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | TX | Dimmit | 44.100 | 33 | 122 | 800045 |
| MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | TX | Dimmit | 80.460 | 30 | 460 | 800046 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | TX | Dimmit | 321.850 | 30 | 270 | 229 |
| SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | TX | Dimmit | 7.500 | 30 | 495 | 458 |
| ERIN BAIN JONES | W W OATMAN | 05/11/1970 | TX | Dimmit | 681.000 | 31 | 186 | 4150 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Webb | 11127.840 | 2329 | 707 | 960221 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 484 | 7078 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 394 | 7051 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 27136.070 | 460<br>329 | 233<br>487 | 79160<br>7079 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 27136.070 | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | TX | Dimmit | 7428.100 | 354 | 171 | 11322 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | TX | Dimmit | 40.000 | 398 | 26 | 16937 |
| RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 40.000 | 394 | 189 | 16294 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 32 | 16768 |
| JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 26 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 35 | 16769 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 38 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 29 | 16767 |
| BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | TX | Dimmit | 40.000 | 405 | 560 | 18184 |
| CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | TX | Dimmit | 40.000 | 425 | 586 | 21252 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 764 | 31322 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 759 | 31321 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 754 | 31320 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 750 | 31319 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | TX | Webb | 6199.250 | 2435 | 504 | 977956 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | TX | Webb | 21890.630 | 2484 | 238 | 986336 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 1280.000 | 2583 | 185 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 5120.000 | 2583 | 182 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 720.000 | 1041 | 67 | 144189 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 720.000 | 1073 | 94 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 400.000 | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 400.000 | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 36559.710 | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 80.000 | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 160.000 | 1067 | 185 | 146523 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 400.000 | 1067 | 173 | 146521 |
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 4564.723 | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 4564.723 | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 7800.074 | 344 | 6 | 9540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 40.000 | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | TX | Dimmit | 40.000 | 439 | 695 | 23611 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 4317.553 | 343 | 690 | 9504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit<br>Maverick | 52054.310 | 332<br>1012 | 649<br>222 | 7649<br>141603 |
| EWING ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 09/20/2006 | TX | Dimmit | 8209.480 | 344 | 1 | 9539 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | TX | Dimmit | 8209.482 | 343 | 844 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 14.400 | 429 | 83 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 766 | 22087 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 833 | 28385 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 837 | 28386 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 1 | 28887 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 829 | 28384 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 5 | 28388 |
| ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 1808.500 | 336 | 199 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 311.437 | 1041<br>339 | 60<br>550 | 144183<br>8821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 311.437 | 1073<br>344 | 99<br>128 | 147023<br>15489 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 7243.318 | 344 | 46 | 9545 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | TX | Dimmit | 30.000 | 423 | 49 | 20796 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 66 | 24499 |
| AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 678 | 23607 |
| SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 674 | 23606 |
| THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 682 | 23608 |
| HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 670 | 23605 |
| RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 449 | 521 | 25265 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 10.000 | 453 | 531 | 25849 |
| KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | TX | Dimmit | 10.000 | 495 | 204 | 31491 |
| GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 208 | 31492 |
| CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 212 | 31493 |
| BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 495 | 216 | 31494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 40.000 | 491 | 516 | 31083 |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 504 | 77 | 32389 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 3657.182 | 343 | 694 | 9505 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 379 | 16162 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 398 | 16168 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 382 | 16163 |
| MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 395 | 16167 |
| PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 70.000 | 395 | 525 | 16565 |
| GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | TX | Dimmit | 70.000 | 395 | 522 | 16564 |
| JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 395 | 528 | 16566 |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 40.000 | 420 | 759 | 20412 |
| LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 10.000 | 420 | 757 | 20411 |
| DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 20.000 | 420 | 762 | 20413 |
| HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 80.000 | 426 | 580 | 21449 |
| MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 70.000 | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 10.000 | 429 | 541 | 21885 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 70 | 24500 |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | TX | Dimmit | 10.000 | 456 | 530 | 26278 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | TX | Dimmit | 10.000 | 505 | 738 | 32601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | TX | Dimmit | 10.000 | 505 | 734 | 32600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 10.000 | 505 | 741 | 32602 |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | TX | Webb | 4483.500 | 2672 | 185 | 1020907 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | TX | Webb | 3573.660 | 2668 | 642 | 1020289 |
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | TX | Webb | 5470.072 | 2750 | 95 | 1036351 |
| ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | TX | Dimmit | 610.800 | 369 | 468 | 12860 |
| G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 830 207 | 13825 84338 |
| GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 836 213 | 13826 84339 |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 825 202 | 13824 84337 |
| ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit LaSalle | 1525.810 | 391 513 | 488 32 | 15860 87603 |
| GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 207.860 | 380 | 11 | 13830 |
| GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 7 | 13829 |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 16 | 13831 |
| GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 1 | 13828 |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 379 | 840 | 13827 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | TX | Dimmit | 11684.590 | 382 | 13 | 14190 |
| MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | TX | Dimmit | 60.000 | 383 | 654 | 14548 |
| DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | TX | Dimmit | 391.600 | 385 | 526 | 14884 |
| CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 456 | 15211 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | TX | Dimmit | 50.000 | 388 | 648 | 15418 |
| MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 389 | 719 | 15602 |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 388 | 16165 |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 401 | 16169 |
| WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 286 | 15828 |
| CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 649 | 15876 |
| IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 728 | 16234 |
| ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 641 | 25465 |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 637 | 25464 |
| MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 40.000 | 455 | 623 | 26168 |
| SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 40.000 | 457 | 363 | 26401 |
| GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 390 | 550 | 15691 |
| STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 481 | 15990 |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 484 | 15991 |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 405 | 16170 |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 392 | 16166 |
| REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 408 | 16171 |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 411 | 16172 |
| DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 394 | 192 | 16295 |
| MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | TX | Dimmit | 20.000 | 392 | 487 | 15992 |
| BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | TX | Dimmit | 20.000 | 392 | 490 | 15993 |
| SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 395 | 565 | 16572 |
| TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 402 | 198 | 17629 |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 785 | 22244 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 777 | 22242 |
| ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 769 | 22240 |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 761 | 22238 |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 745 | 22234 |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 753 | 22236 |
| CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 737 | 22232 |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 729 | 22230 |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 809 | 22250 |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | TX | Dimmit | 20.000 | 431 | 801 | 22248 |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 793 | 22246 |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | TX | Dimmit | 20.000 | 393 | 385 | 16164 |
| BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | TX | Dimmit | 10.000 | 393 | 414 | 16173 |
| MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 393 | 318 | 16140 |
| KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 394 | 147 | 16284 |
| BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | TX | Dimmit | 40.000 | 409 | 667 | 18878 |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 828 | 19044 |
| ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 831 | 19045 |
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | TX | Dimmit | 40.000 | 418 | 591 | 20043 |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 40.000 | 423 | 615 | 20919 |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 702 | 23613 |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 714 | 23616 |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 698 | 23612 |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 710 | 23615 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 706 | 23614 |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | TX | Dimmit | 40.000 | 482 | 325 | 30186 |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 482 | 322 | 30185 |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 310 | 30181 |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 313 | 30182 |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 316 | 30183 |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 307 | 30180 |
| EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | TX | Dimmit | 40.000 | 482 | 319 | 30184 |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 500 | 316 | 32057 |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 502 | 65 | 32199 |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | TX | Dimmit | 40.000 | 512 | 193 | 33490 |
| JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 196 | 33491 |
| PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 704 | 34283 |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 701 | 34282 |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 582 | 34081 |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 579 | 34080 |
| KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | TX | Dimmit | 40.000 | 517 | 546 | 34428 |
| NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 199 | 33492 |
| SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 576 | 34079 |
| WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 573 | 34078 |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 190 | 33489 |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 136 | 34644 |
| JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 128 | 34642 |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 132 | 34643 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 120 | 34640 |
| ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | TX | Dimmit | 40.000 | 493 | 598 | 31425 |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 124 | 34641 |
| J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | TX | Dimmit | 40.000 | 517 | 543 | 34427 |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 515 | 570 | 34077 |
| SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 821 | 34793 |
| ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 519 | 833 | 34796 |
| HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 825 | 34794 |
| JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 526 | 255 | 35599 |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 526 | 251 | 35598 |
| DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 829 | 34795 |
| ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 222.180 | 392<br>396 | 363<br>579 | 15971<br>16714 |
| BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | TX | Dimmit | 415.020 | 392 | 370 | 15972 |
| DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 76 | 16475 |
| VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 73 | 16474 |
| SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 70 | 16473 |
| MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 67 | 16472 |
| MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 64 | 16471 |
| JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 61 | 16470 |
| JOAN MAYS | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 58 | 16469 |
| GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 52 | 16467 |
| DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 45 | 16465 |
| GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | TX | Dimmit | 415.020 | 418 | 157 | 19936 |
| RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 589 | 19712 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 595 | 19714 |
| SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 592 | 19713 |
| BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 460 | 20887 |
| FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 463 | 20888 |
| MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 466 | 20889 |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 469 | 20890 |
| LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 457 | 20886 |
| EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | TX | Dimmit | 415.020 | 423 | 453 | 20885 |
| DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | TX | Dimmit | 415.020 | 420 | 224 | 20343 |
| SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | TX | Dimmit | 415.020 | 420 | 221 | 20342 |
| CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 423 | 438 | 20881 |
| SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 441 | 20882 |
| MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 445 | 20883 |
| PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 415.020 | 425 | 311 | 21184 |
| R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 449 | 20884 |
| IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 427 | 390 | 21529 |
| JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | TX | Dimmit | 415.020 | 427 | 407 | 21533 |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 412 | 2153 |
| JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | TX | Dimmit | 415.020 | 427 | 399 | 21531 |
| BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | TX | Dimmit | 415.020 | 427 | 394 | 21530 |
| JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 404 | 21532 |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | TX | Dimmit | 415.020 | 433 | 125 | 22468 |
| DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 141 | 22996 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 436 | 125 | 22992 |
| DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 121 | 22991 |
| CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 133 | 22994 |
| GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 129 | 22993 |
| LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 145 | 22997 |
| DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 137 | 22995 |
| MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | TX | Dimmit | 117.000 | 436 | 118 | 22990 |
| M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 439 | 749 | 23626 |
| MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 757 | 23628 |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 745 | 23625 |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 753 | 23627 |
| MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 442 | 304 | 24054 |
| KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | TX | Dimmit | 117.000 | 457 | 360 | 26400 |
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | TX | Dimmit | 415.020 | 458 | 290 | 26535 |
| GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | TX | Dimmit | 415.020 | 478 | 227 | 29445 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | TX | Dimmit | 20.000 | 392 | 360 | 15970 |
| EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 029 | 16938 |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 33 | 16939 |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 037 | 16940 |
| MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 041 | 16941 |
| KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 706 | 17214 |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 691 | 17210 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 702 | 17213 |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 698 | 17212 |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 483 | 17170 |
| DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 400 | 113 | 17276 |
| SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | TX | Dimmit | 42.640 | 399 | 715 | 17217 |
| DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 342 | 17324 |
| MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 348 | 17325 |
| ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | TX | La Salle | 110.900 | 530 | 251 | 90198 |
| JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | TX | Dimmit | 80.000 | 405 | 557 | 18183 |
| MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 169 | 18939 |
| JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 163 | 18937 |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | TX | Dimmit | 80.000 | 412 | 384 | 19214 |
| CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 143 | 22473 |
| ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 431 | 722 | 22228 |
| GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 155 | 22476 |
| EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 433 | 151 | 22475 |
| RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 147 | 22474 |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 129 | 22469 |
| JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 132 | 22470 |
| BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 136 | 22471 |
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 139 | 22472 |
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 721 | 23618 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 724 | 23619 |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 657 | 25469 |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 669 | 25472 |
| SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 80.000 | 450 | 661 | 25470 |
| VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 649 | 25467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | TX | Dimmit | 80.000 | 450 | 673 | 25473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 665 | 25471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | TX | Dimmit | 80.000 | 450 | 653 | 25468 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 455 | 118 | 26085 |
| MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 80.000 | 467 | 91 | 27796 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 82.530 | 403 | 403 | 17810 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | TX | Dimmit | 82.530 | 419 | 106 | 20117 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 39.800 | 403 | 409 | 17812 |
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | TX | Dimmit | 40.050 | 403 | 400 | 17809 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 40.000 | 403 | 406 | 17811 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | TX | Dimmit | 160.000 | 402<br>415 | 201<br>461 | 17630<br>19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 384 | 18328 |
| ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 388 | 18329 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 396 | 18331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 400 | 18332 |
| GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 392 | 18330 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 356 | 18321 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 364 | 18323 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 376 | 18326 |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 372 | 18325 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 160.000 | 406 | 368 | 18324 |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 360 | 18322 |
| PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 744 | 18416 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 380 | 18327 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 385 | 18688 |
| SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 408 | 389 | 18689 |
| BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 740 | 18415 |
| RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 732 | 18413 |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 736 | 18414 |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 393 | 18690 |
| DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 408 | 381 | 18687 |
| DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 148 | 19933 |
| BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 418 | 154 | 19935 |
| KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 151 | 19934 |
| JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | TX | Dimmit | 160.000 | 422 | 387 | 20698 |
| ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 422 | 391 | 20699 |
| SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | TX | Dimmit | 160.000 | 425 | 695 | 21287 |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | TX | Dimmit | 90.890 | 401 | 548 | 17517 |
| EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | TX | Dimmit | 90.890 | 406 | 681 | 18405 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 37.000 | 445 | 640 | 24596 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 37.000 | 405 | 563 | 18185 |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | TX | Dimmit | 42.180 | 406 | 196 | 18282 |
| JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | TX | Dimmit | 10.000 | 408 | 378 | 18686 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | TX | Dimmit | 17.200 | 406 | 724 | 18411 |
| JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 10.200 | 409 | 664 | 18877 |
| GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 680 | 18882 |
| TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 677 | 18881 |
| CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | TX | Dimmit | 40.000 | 409 | 674 | 18880 |
| JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 671 | 18879 |
| MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | TX | Dimmit | 10.000 | 422 | 395 | 20700 |
| RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 427 | 735 | 21605 |
| JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | TX | Dimmit | 15.000 | 445 | 61 | 24498 |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | TX | Dimmit | 15.000 | 443 | 152 | 24176 |
| LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 646 | 23600 |
| ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 627 | 23596 |
| ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 651 | 23601 |
| JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 637 | 23598 |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 15.000 | 442 | 832 | 24143 |
| BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 656 | 23602 |
| MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 661 | 23603 |
| ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 435 | 797 | 22943 |
| MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | TX | Dimmit | 15.000 | 445 | 56 | 24497 |
| LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 641 | 23599 |
| WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | TX | Dimmit | 15.000 | 439 | 632 | 23597 |
| MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 456 | 521 | 26276 |
| DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | TX | Dimmit | 15.000 | 465 | 235 | 27497 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | TX | Dimmit | 30.000 | 427 | 741 | 21607 |
| JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | TX | Dimmit | 30.000 | 427 | 738 | 21606 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | TX | Dimmit | 30.000 | 435 | 803 | 22945 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 30.000 | 435 | 800 | 22944 |
| KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 30.000 | 453 | 539 | 25851 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 54 | 21790 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 64 | 21792 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 59 | 21791 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 69 | 21793 |
| JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 143.630 | 433 | 114 | 22463 |
| MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 105 | 22460 |
| FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 111 | 22462 |
| JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 108 | 22461 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 480 | 22358 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 490 | 22360 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 485 | 22359 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 475 | 22357 |
| MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 511 | 23258 |
| GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 505 | 23256 |
| LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 508 | 23257 |
| DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | TX | Dimmit | 37.400 | 379 | 258 | 13696 |
| RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 412 | 23402 |
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 409 | 23401 |
| JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | TX | Dimmit | 7.400 | 438 | 407 | 23399 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 780 | 22089 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 759 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 644 | 24597 |
| S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 654 | 24599 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 649 | 24598 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | TX | Dimmit | 80.000 | 450 | 645 | 25466 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | TX | Dimmit | 84.990 | 444 | 569 | 24432 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | TX | Dimmit | 10.000 | 442 | 828 | 24142 |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 691 | 23610 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | TX | Dimmit | 23.700 | 432 | 700 | 22401 |
| ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | TX | Dimmit | 10.000 | 445 | 74 | 24501 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | TX | Dimmit | 10.000 | 439 | 666 | 23604 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 556 | 26162 |
| JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 563 | 26163 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 569 | 26164 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 550 | 26161 |
| JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 455 | 575 | 26165 |
| MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 458 | 295 | 26536 |
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | TX | Dimmit | 10.000 | 453 | 535 | 25850 |
| KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 505 | 26272 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 501 | 26271 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 459 | 512 | 26722 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | TX | Dimmit | 157.600 | 459 | 528 | 26726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 524 | 26725 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 520 | 26724 |
| JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | TX | Dimmit | 157.600 | 459 | 516 | 26723 |
| LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 157.600 | 455 | 655 | 26176 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 157.600 | 455 | 659 | 26177 |
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 663 | 26178 |
| THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 651 | 26175 |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 647 | 26174 |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 157.600 | 455 | 643 | 26173 |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 455 | 639 | 26172 |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 455 | 631 | 26170 |
| MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 452 | 794 | 25771 |
| SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 806 | 25774 |
| GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 802 | 25773 |
| CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 810 | 25775 |
| MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 627 | 26169 |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 786 | 25769 |
| MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 790 | 25770 |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 798 | 25772 |
| SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 635 | 26171 |
| JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | TX | Dimmit | 157.600 | 470 | 825 | 28383 |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | TX | Dimmit | 157.600 | 469 | 63 | 28143 |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 55 | 28141 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 59 | 28142 |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 280 | 28929 |
| FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 268 | 28926 |
| JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | TX | Dimmit | 157.600 | 478 | 127 | 29425 |
| EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | TX | Dimmit | 157.600 | 474 | 260 | 28924 |
| MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 256 | 28923 |
| MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 87 | 29417 |
| VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 92 | 29418 |
| RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 122 | 29424 |
| B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 117 | 29423 |
| JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 102 | 29420 |
| RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 97 | 29419 |
| AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 107 | 29421 |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 112 | 29422 |
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 272 | 28927 |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 276 | 28928 |
| KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 264 | 28925 |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | TX | Dimmit | 157.600 | 498 | 593 | 31859 |
| ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 498 | 597 | 31860 |
| JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | TX | Dimmit | 157.600 | 498 | 589 | 31858 |
| MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 585 | 31857 |
| KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 581 | 31856 |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | TX | Dimmit | 157.600 | 498 | 573 | 31854 |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | TX | Dimmit | 157.600 | 498 | 577 | 31855 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 569 | 31853 |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 564 | 31852 |
| JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | TX | Dimmit | 157.600 | 498 | 560 | 31851 |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 556 | 31850 |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 552 | 31849 |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 544 | 31847 |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 548 | 31848 |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | TX | Dimmit | 157.600 | 498 | 540 | 31846 |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | TX | Dimmit | 157.600 | 498 | 532 | 31844 |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 536 | 31845 |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 529 | 31843 |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 524 | 31842 |
| MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 157.600 | 498 | 520 | 31841 |
| ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 516 | 31840 |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 512 | 31839 |
| GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 601 | 31861 |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 500 | 798 | 32161 |
| KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | TX | Dimmit | 10.000 | 457 | 209 | 26377 |
| HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 10.000 | 457 | 45 | 26336 |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | TX | Dimmit | 10.000 | 457 | 217 | 26379 |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | TX | Dimmit | 10.000 | 457 | 213 | 26378 |
| CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | TX | Dimmit | 10.000 | 455 | 545 | 26160 |
| SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | TX | Dimmit | 10.000 | 459 | 498 | 26719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | TX | Dimmit | 10.000 | 462 | 418 | 27144 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 504 | 26720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 10.000 | 459 | 508 | 26721 |
| JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 494 | 26718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 11 | 27214 |
| EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 1 | 27212 |
| MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 6 | 27213 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 813 | 27206 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 828 | 27209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 838 | 27211 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 818 | 27207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 16 | 27215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 823 | 27208 |
| ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 21 | 27216 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 833 | 27210 |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 337 | 27263 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 332 | 27262 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 327 | 27261 |
| JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 342 | 27264 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 10.000 | 465 | 107 | 27477 |
| DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 121 | 27616 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 127 | 27617 |
| GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 133 | 27618 |
| LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 145 | 27620 |
| DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 139 | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | TX | Dimmit | 10.000 | 498 | 608 | 31863 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | TX | Dimmit | 10.000 | 473 | 112 | 28765 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 288 | 29147 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 292 | 29148 |
| ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | TX | Dimmit | 10.000 | 476 | 298 | 29150 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | TX | Dimmit | 40.000 | 474 | 251 | 28919 |
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 573 | 31746 |
| RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 588 | 31749 |
| REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 10.000 | 498 | 605 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | TX | Dimmit | 10.000 | 487 | 772 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | TX | Dimmit | 10.000 | 498 | 612 | 31864 |
| JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 617 | 31866 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 614 | 31865 |
| LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 626 | 31870 |
| RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 629 | 31871 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 622 | 31868 |
| CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | TX | Dimmit | 10.000 | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 500 | 792 | 32159 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 678 | 33418 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 684 | 33420 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | TX | Dimmit | 10.000 | 511 | 681 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 511 | 669 | 33415 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | TX | Dimmit | 40.000 | 378 | 674 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | TX | Dimmit | 77.910 | 508 | 167 | 32959 |
| JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 499 | 837 | 32005 |
| YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 370 | 33520 |
| WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 365 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | TX | Dimmit | 10.000 | 518 | 9 | 34494 |
| EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 10.000 | 517 | 829 | 34489 |
| BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | TX | Dimmit | 10.000 | 517 | 837 | 34491 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 483 | 34716 |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | TX | Dimmit | 10.000 | 519 | 487 | 34717 |
| LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | TX | Dimmit | 10.000 | 523 | 492 | 35222 |
| CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 523 | 496 | 35223 |
| RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 10.000 | 523 | 500 | 35224 |
| DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | TX | Dimmit | 10.000 | 518 | 5 | 34493 |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 833 | 34490 |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | TX | Dimmit | 10.000 | 518 | 1 | 34492 |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 507 | 34722 |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 499 | 34720 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 479 | 34715 |
| JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 491 | 34718 |
| BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 821 | 34487 |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 825 | 34488 |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 514 | 34724 |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 817 | 34486 |
| SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | TX | Dimmit | 10.000 | 519 | 495 | 34719 |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 503 | 34721 |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 90 | 35423 |
| JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 519 | 511 | 34723 |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 20.000 | 506 | 55 | 32616 |
| JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | TX | Dimmit | 20.000 | 506 | 58 | 32617 |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | TX | Dimmit | 20.000 | 506 | 61 | 32618 |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 64 | 32619 |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 68 | 32620 |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 74 | 32622 |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 78 | 32623 |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 82 | 32624 |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 86 | 32625 |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 90 | 32626 |
| SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 94 | 32627 |
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 104 | 32629 |
| VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 113 | 32631 |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 117 | 32632 |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 687 | 33421 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 695 | 33423 |
| JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 699 | 33424 |
| MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | TX | Dimmit | 20.000 | 511 | 703 | 33425 |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | TX | Dimmit | 20.000 | 511 | 707 | 33426 |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | TX | Dimmit | 20.000 | 511 | 711 | 33427 |
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 714 | 33428 |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 718 | 33429 |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 722 | 33430 |
| JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | TX | Dimmit | 20.000 | 511 | 726 | 33431 |
| JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 730 | 33432 |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | TX | Dimmit | 20.000 | 517 | 767 | 34473 |
| ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 817 | 35845 |
| EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | TX | Dimmit | 20.000 | 506 | 71 | 32621 |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 98 | 32628 |
| BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 109 | 32630 |
| JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 691 | 33422 |
| ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 20.000 | 515 | 189 | 33970 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 10.000 | 515 | 184 | 33969 |
| EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 528 | 1 | 35851 |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 284 | 34192 |
| TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 272 | 34190 |
| JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 278 | 34191 |
| MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 266 | 34189 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 749 | 36343 |
| A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 752 | 36344 |
| RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 756 | 36345 |
| RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 759 | 36346 |
| WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | TX | Dimmit | 10.000 | 530 | 737 | 36339 |
| PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 734 | 36338 |
| REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 743 | 36341 |
| ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | TX | Dimmit | 10.000 | 530 | 740 | 36340 |
| LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | TX | Dimmit | 10.000 | 530 | 746 | 36342 |
| THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | TX | Dimmit | 10.000 | 530 | 731 | 36337 |
| SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | TX | Dimmit | 10.000 | 530 | 728 | 36336 |
| LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 762 | 36347 |
| WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 751 | 36646 |
| ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 10.000 | 526 | 263 | 35601 |
| BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 526 | 259 | 35600 |
| SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | TX | Dimmit | 10.000 | 527 | 28 | 35705 |
| CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 527 | 36 | 35707 |
| JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 525 | 364 | 35477 |
| KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 368 | 35478 |
| HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 360 | 35476 |
| RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 356 | 35475 |
| KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 527 | 40 | 35708 |
| FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | TX | Dimmit | 10.000 | 527 | 32 | 35706 |
| TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 534 | 310 | 36857 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 534 | 313 | 36858 |
| TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 534 | 307 | 36856 |
| GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | TX | Dimmit | 20.000 | 527 | 821 | 35846 |
| RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 825 | 35847 |
| NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | TX | Dimmit | 20.000 | 527 | 829 | 35848 |
| JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 20.000 | 522 | 312 | 35105 |
| CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 532 | 357 | 36601 |
| BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | TX | Dimmit | 10.000 | 532 | 367 | 36604 |
| JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 370 | 36605 |
| RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | TX | Dimmit | 10.000 | 532 | 374 | 36606 |
| HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | TX | Dimmit | 10.000 | 532 | 377 | 36607 |
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 380 | 36608 |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 383 | 36609 |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 386 | 36610 |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 389 | 36611 |
| JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 392 | 36612 |
| BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | TX | Dimmit | 10.000 | 532 | 395 | 36613 |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 398 | 36614 |
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 532 | 403 | 36615 |
| DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 406 | 36616 |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | TX | Dimmit | 10.000 | 532 | 409 | 36617 |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | TX | Dimmit | 10.000 | 532 | 364 | 36603 |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | TX | Dimmit | 10.000 | 532 | 361 | 36602 |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | TX | Dimmit | 20.000 | 527 | 837 | 35820 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | TX | Dimmit | 20.000 | 527 | 833 | 35849 |
| MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 10.000 | 523 | 830 | 35256 |
| JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | TX | Dimmit | 10.000 | 536 | 382 | 37176 |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 388 | 37178 |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | TX | Dimmit | 10.000 | 536 | 385 | 37177 |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 391 | 37179 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 80.000 | 517 | 763 | 34472 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 10.000 | 517 | 759 | 34471 |
| WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | TX | Dimmit | 10.000 | 539 | 360 | 37658 |
| RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | TX | Dimmit | 10.000 | 539 | 366 | 37660 |
| CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | TX | Dimmit | 10.000 | 539 | 363 | 37659 |
| FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | TX | Dimmit | 40.000 | 534 | 714 | 36928 |
| LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 40.000 | 534 | 717 | 36929 |
| GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 534 | 720 | 36930 |
| STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 531 | 199 | 36394 |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | TX | Dimmit | 40.000 | 538 | 505 | 37545 |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | TX | Dimmit | 40.000 | 538 | 509 | 37546 |
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | TX | Dimmit | 40.000 | 538 | 792 | 37593 |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | TX | Dimmit | 40.000 | 528 | 179 | 35886 |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 528 | 175 | 35885 |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | TX | Dimmit | 12.310 | 542 | 345 | 38066 |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 421 | 37944 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 424 | 37945 |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | TX | Dimmit | 80.000 | 539 | 765 | 37708 |
| DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 220 | 38040 |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 217 | 38039 |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 75 | 37289 |
| ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 78 | 37290 |
| JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 81 | 37291 |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 84 | 37292 |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 87 | 37293 |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 90 | 37294 |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | TX | Dimmit | 10.000 | 537 | 93 | 37295 |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 96 | 37296 |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 99 | 37297 |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 102 | 37298 |
| 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 105 | 37299 |
| LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | TX | Dimmit | 200.000 | 379 | 498 | 13745 |
| MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 544 | 260 | 38286 |
| RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 525 | 38438 |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 522 | 38437 |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 519 | 38436 |
| BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 528 | 38439 |
| AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 534 | 38441 |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | TX | Dimmit | 10.000 | 545 | 516 | 38435 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 531 | 38440 |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | TX | Dimmit | 10.000 | 545 | 546 | 38445 |
| LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 543 | 38444 |
| JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 540 | 38443 |
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 537 | 38442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 545 | 549 | 38446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 814 | 38474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 123 | 38274 |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 117 | 38272 |
| PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 105 | 38268 |
| RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 120 | 38273 |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 102 | 38267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 126 | 38275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 114 | 38271 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 99 | 38266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 111 | 38270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 108 | 38269 |
| DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 547 | 115 | 38601 |
| DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | TX | Dimmit | 160.000 | 542 | 279 | 38053 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 544 | 756 | 38359 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | TX | Dimmit | 10.000 | 544 | 753 | 38358 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 207 | 38507 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 204 | 38506 |
| STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 216 | 38510 |
| WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 213 | 38509 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 210 | 38508 |
| MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | TX | Dimmit | 80.000 | 545 | 243 | 38397 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | TX | Dimmit | 10.000 | 547 | 121 | 38603 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 547 | 118 | 38602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 548 | 622 | 38850 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | TX | Dimmit | 10.000 | 548 | 477 | 38833 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 549 | 470 | 38927 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 548 | 471 | 38831 |
| BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 548 | 474 | 38832 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | TX | Dimmit | 10.000 | 550 | 372 | 39027 |
| WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 550 | 369 | 39026 |
| DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | TX | Dimmit | 160.000 | 551 | 752 | 39233 |
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 553 | 582 | 39410 |
| LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | TX | Dimmit | 10.000 | 553 | 588 | 39412 |
| JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | TX | Dimmit | 10.000 | 552 | 441 | 39279 |
| MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | TX | Dimmit | 80.000 | 548 | 735 | 38868 |
| DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 321 | 39162 |
| MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 324 | 39163 |
| DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | TX | Dimmit | 80.000 | 551 | 318 | 39161 |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 312 | 39159 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | TX | Dimmit | 80.000 | 549 | 725 | 38967 |
| JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | TX | Dimmit | 80.000 | 549 | 728 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 553 | 585 | 39411 |
| BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | TX | Dimmit | 10.000 | 555 | 335 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | TX | Dimmit | 40.000 | 555 | 13 | 39591 |
| DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | TX | Dimmit | 10.000 | 556 | 589 | 39852 |
| SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 556 | 592 | 39853 |
| LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 70.000 | 557 | 385 | 39960 |
| GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 558 | 601 | 40106 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 555 | 422 | 39661 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 555 | 428 | 39663 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 555 | 425 | 39662 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | TX | Dimmit | 80.000 | 555 | 431 | 39664 |
| RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 556 | 436 | 39815 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | TX | Dimmit | 80.000 | 556 | 433 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 379 | 40156 |
| JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 376 | 40155 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 439 | 40165 |
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | TX | Dimmit | 80.000 | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | TX | Dimmit | 80.000 | 563 | 557 | 40854 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | TX | Dimmit | 20.000 | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | TX | Dimmit | 20.000 | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | TX | Dimmit | 1639.310 | 577 | 454 | 42708 |

Case 4:19-cv-04508 Document 354-7 Filed in TXSD on 06/22/20 Page 92 of 199

**Exhibit B**

**AMI**


Frio
La Salle
Zavala
Dimmit
Webb
Maverick
Eagle Ford
AMI
008795

STATE OF TEXAS
COUNTY OF WEBB
I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED ON THE DATE AND AT THE TIME STAMPED HERON BY ME AND WAS DULY RECORDED IN THE VOLUME AND PAGE OF THE OFFICIAL PUBLIC RECORDS OF WEBB COUNTY TEXAS AS STAMPED HEREON BY ME

COUNTY CLERK
WEBB COUNTY, TEXAS

Doc # 1292328
Recorded
3/27/2017 2:47:27 PM

Signed:
BY DEPUTY
MARGIE RAMIREZ IBARRA
COUNTY CLERK
Fees: $214.00

00124823

# MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of March 1, 2017 (the "Effective Date"), is by and between Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of March 1, 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, LaSalle and Zavala Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

00124823 BK 980 143

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>c/o Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Tel: 713.756.2782 |
| With a copy to: | GSO ST Holdings LP<br>1111 Bagby Street, Suite 2050 |

Doc 00124823 BK OR Vol 950 PG 144

Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail:
crichardson@andrewskurth.com

To Investor:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Telephone: (713) 400-8210
Electronic Mail:
acconcia@blackstone.com

With a copy to:

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail:
andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of

00124823 BK 958 143

the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

DOC 00124823 BK OR VOL 950 PG 148

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Gavilan Resources, LLC
a Delaware limited liability company

By: [signature]
Name: Angelo Acconcia
Title: President
Date: 2/27/2017

STATE OF New York §
§
COUNTY OF Westchester §

This instrument was acknowledged before me this 27th day of February 2017 by Angelo Acconcia as President of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of such limited liability company.

[signature: Gina Santanastasio]
Notary Public, State of New York

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

00124823 BK 986 PG 147

Sanchez Energy Corporation
a Delaware corporation

By: ______________________
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

Carolyn L. George
Notary Public, State of Texas

DOC 00124823 BK OR VO 950 PG 148

SN EF Maverick, LLC
a Delaware limited liability company

By: ______________________
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

Carolyn L. George
Notary Public, State of Texas

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

00124823 BK 960 PG 149

SN EF UnSub, LP
a Delaware limited partnership

By: [signature]
Name: Patricio D. Sanchez
Title: CEO
Date: 3/1/2017

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Patricio D. Sanchez, as CEO of SN EF UnSub, LP, a Delaware limited partnership, on behalf of such limited partnership.

[signature]
Notary Public, State of TX

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

D0124823 OR BK 950 PG 150

Signature Page to Memorandum of Joint Development Agreement

**Exhibit A**

**Leases**

00124823 BK 986 PG 159

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 9926.779 | 329 | 131 | 7000 |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | | 752 | 14931 |
| BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | 387 | 582 | 15240 |
| JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 695 | 17211 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 709 | 17215 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 712 | 17216 |
| ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 60.000 | 406 | 729 | 18412 |
| MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 159.630 | 417 | 612 | 19856 |
| KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 159.630 | 425 | 589 | 21253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 620 | 24591 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 628 | 24593 |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | TX | Dimmit | 60.000 | 445 | 624 | 24592 |
| SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 636 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 632 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 667 | 26041 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 654 | 26037 |
| NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 664 | 26040 |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 660 | 26039 |
| MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 648 | 26035 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 630 | 26029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 642 | 26033 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 651 | 26036 |
| MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 627 | 26028 |

00128823 BK 950 PG 152

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 636 | 26031 |
| ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 645 | 26034 |
| DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 456 | 469 | 26264 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 639 | 26032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 657 | 26038 |
| CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 633 | 26030 |
| UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 461 | 254 | 26955 |
| LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 89 | 27233 |
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 85 | 27232 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 10938.500 | 329 | 397 | 7052 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 14601.230 | 338 | 617 | 8649 |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 226 | 18821 |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 229 | 18822 |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 232 | 18823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 15591.810 | 335 | 276 | 8081 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6876.320 | 338 | 621 | 8650 |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 585 | 15241 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 1884.900 | 343 | 325 | 9442 |
| ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 197 | 31626 |
| JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 194 | 31625 |
| SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 500 | 6 | 32007 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 631 | 8652 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 636 | 8653 |

00129823 BK 980 153

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 626 | 8651 |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 255 | 14820 |
| MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 262 | 14821 |
| ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | TX | Dimmit | 636.120 | 27 | 384 | 113502 |
| FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | TX | Zavala | 645.030 | 3 | 172 | 113530 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | TX | Zavala | 1120.000 | 3 | 251 | 113554 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 670.800 | 3 | 578 | 113797 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 649.620 | 3 | 582 | 113798 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 638.610 | 3 | 586 | 113799 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 647.710 | 3 | 590 | 113800 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 705.800 | 29<br>4 | 86<br>425 | 129<br>114336 |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | TX | Dimmit | 441.650 | 29 | 322 | 114642 |
| MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | TX | Dimmit | 38.750 | 29 | 332 | 114666 |
| G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 1290.440 | 29 | 355 | 114678 |
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 377 | 114700 |
| L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 381 | 114700-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 41.250 | 29 | 366 | 114736 |
| RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | TX | Dimmit | 82.750 | 29 | 359 | 114737 |
| JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 15.060 | 29 | 469 | 114826 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 41.420 | 30 | 10 | 114829 |
| ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | TX | Dimmit | 43.870 | 31 | 330 | 693 |
| LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | TX | Dimmit | 22.100 | 31 | 464 | 841 |

00124823 BK 980 154

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | TX | Dimmit | 29.160 | 33 | 505 | 2577 |
| PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | TX | Dimmit | 29.160 | 39 | 193 | 1997 |
| MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | TX | Dimmit | 2.760 | 147 | 136 | 779 |
| CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | TX | Dimmit | 80.220 | 37 | 257 | 300984 |
| OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 353.090 | 97<br>55 | 145<br>185 | 1086<br>46827 |
| B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | TX | Dimmit | 720.000 | 29 | 293 | T16318 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | TX | Zavala | 162.400 | 57 | 53 | NA |
| ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 68 | 48131 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 65 | 48130 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 666 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 671 | 546 |
| MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 676 | |
| I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | TX | Dimmit | 44.100 | 33 | 122 | 800045 |
| MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | TX | Dimmit | 80.460 | 30 | 460 | 800046 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | TX | Dimmit | 321.850 | 30 | 270 | 229 |
| SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | TX | Dimmit | 7.500 | 30 | 495 | 458 |
| ERIN BAIN JONES | W W OATMAN | 05/11/1970 | TX | Dimmit | 681.000 | 31 | 186 | 4150 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Webb | 11127.840 | 2329 | 707 | 960221 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 484 | 7078 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 394 | 7051 |

Doc 00124823 Bk OR Vol 950 Pg 155



008810

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 27136.070 | 460<br>329 | 233<br>487 | 79160<br>7079 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 27136.070 | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | TX | Dimmit | 7428.100 | 354 | 171 | 11322 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | TX | Dimmit | 40.000 | 398 | 26 | 16937 |
| RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 40.000 | 394 | 189 | 16294 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 32 | 16768 |
| JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 26 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 35 | 16769 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 38 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 29 | 16767 |
| BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | TX | Dimmit | 40.000 | 405 | 560 | 18184 |
| CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | TX | Dimmit | 40.000 | 425 | 586 | 21252 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 764 | 31322 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 759 | 31321 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 754 | 31320 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 750 | 31319 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | TX | Webb | 6199.250 | 2435 | 504 | 977956 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | TX | Webb | 21890.630 | 2484 | 238 | 986336 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 1280.000 | 2583 | 185 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 5120.000 | 2583 | 182 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 720.000 | 1041 | 67 | 144189 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 720.000 | 1073 | 94 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 400.000 | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 400.000 | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 36559.710 | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 80.000 | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 160.000 | 1067 | 185 | 146523 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 400.000 | 1067 | 173 | 146521 |
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 4564.723 | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 4564.723 | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 7800.074 | 344 | 6 | 9540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 40.000 | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | TX | Dimmit | 40.000 | 439 | 695 | 23611 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 4317.553 | 343 | 690 | 9504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit<br>Maverick | 52054.310 | 332<br>1012 | 649<br>222 | 7649<br>141603 |
| EWING ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 09/20/2006 | TX | Dimmit | 8209.480 | 344 | 1 | 9539 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | TX | Dimmit | 8209.482 | 343 | 844 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 14.400 | 429 | 83 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 766 | 22087 |

DOC 00124823 BK OR 950 PG 157

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 833 | 28385 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 837 | 28386 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 1 | 28887 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 829 | 28384 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 5 | 28388 |
| ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 1808.5D0 | 336 | 199 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 311.437 | 1041<br>339 | 60<br>550 | 144183<br>8821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 311.437 | 1073<br>344 | 99<br>128 | 147023<br>15489 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 7243.318 | 344 | 46 | 9545 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | TX | Dimmit | 30.000 | 423 | 49 | 20796 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 66 | 24499 |
| AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 678 | 23607 |
| SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 674 | 23606 |
| THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 682 | 23608 |
| HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 670 | 23605 |
| RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 449 | 521 | 25265 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 10.000 | 453 | 531 | 25849 |
| KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | TX | Dimmit | 10.000 | 495 | 204 | 31491 |
| GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 208 | 31492 |
| CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 212 | 31493 |
| BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 495 | 216 | 31494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 40.000 | 491 | 516 | 31083 |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 504 | 77 | 32389 |

00124823 BK 986 158

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 3657.182 | 343 | 694 | 9505 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 379 | 16162 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 398 | 16168 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 382 | 16163 |
| MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 395 | 16167 |
| PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 70.000 | 395 | 525 | 16565 |
| GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | TX | Dimmit | 70.000 | 395 | 522 | 16564 |
| JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 395 | 528 | 16566 |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 40.000 | 420 | 759 | 20412 |
| LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 10.000 | 420 | 757 | 20411 |
| DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 20.000 | 420 | 762 | 20413 |
| HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 80.000 | 426 | 580 | 21449 |
| MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 70.000 | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 10.000 | 429 | 541 | 21885 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 70 | 24500 |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | TX | Dimmit | 10.000 | 456 | 530 | 26278 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | TX | Dimmit | 10.000 | 505 | 738 | 32601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | TX | Dimmit | 10.000 | 505 | 734 | 32600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 10.000 | 505 | 741 | 32602 |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | TX | Webb | 4483.500 | 2672 | 185 | 1020907 |

00124823 OR BK 981 PG 159

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | TX | Webb | 3573.660 | 2668 | 642 | 1020289 |
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | TX | Webb | 5470.072 | 2750 | 95 | 1036351 |
| ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | TX | Dimmit | 610.800 | 369 | 468 | 12860 |
| G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 830<br>207 | 13825<br>84338 |
| GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 836<br>213 | 13826<br>84339 |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 2965.370 | 379<br>492 | 825<br>202 | 13824<br>84337 |
| ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit<br>LaSalle | 1525.810 | 391<br>513 | 488<br>32 | 15860<br>87603 |
| GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 207.860 | 380 | 11 | 13830 |
| GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 7 | 13829 |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 16 | 13831 |
| GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 1 | 13828 |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 379 | 840 | 13827 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | TX | Dimmit | 11684.590 | 382 | 13 | 14190 |
| MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | TX | Dimmit | 60.000 | 383 | 654 | 14548 |
| DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | TX | Dimmit | 391.600 | 385 | 526 | 14884 |
| CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 456 | 15211 |

00124823 BK 958 PG 160

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | TX | Dimmit | 50.000 | 388 | 648 | 15418 |
| MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 389 | 719 | 15602 |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 388 | 16165 |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 401 | 16169 |
| WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 286 | 15828 |
| CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 649 | 15876 |
| IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 728 | 16234 |
| ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 641 | 25465 |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 637 | 25464 |
| MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 40.000 | 455 | 623 | 26168 |
| SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 40.000 | 457 | 363 | 26401 |
| GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 390 | 550 | 15691 |
| STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 481 | 15990 |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 484 | 15991 |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 405 | 16170 |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 392 | 16166 |
| REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 408 | 16171 |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 411 | 16172 |
| DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 394 | 192 | 16295 |
| MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | TX | Dimmit | 20.000 | 392 | 487 | 15992 |
| BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | TX | Dimmit | 20.000 | 392 | 490 | 15993 |
| SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 395 | 565 | 16572 |
| TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 402 | 198 | 17629 |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 785 | 22244 |

Doc 00124823 Bk OR Vol 950 Pg 161

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 777 | 22242 |
| ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 769 | 22240 |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 761 | 22238 |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 745 | 22234 |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 753 | 22236 |
| CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 737 | 22232 |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 729 | 22230 |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 809 | 22250 |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | TX | Dimmit | 20.000 | 431 | 801 | 22248 |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 793 | 22246 |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | TX | Dimmit | 20.000 | 393 | 385 | 16164 |
| BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | TX | Dimmit | 10.000 | 393 | 414 | 16173 |
| MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 393 | 318 | 16140 |
| KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 394 | 147 | 16284 |
| BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | TX | Dimmit | 40.000 | 409 | 667 | 18878 |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 828 | 19044 |
| ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 831 | 19045 |
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | TX | Dimmit | 40.000 | 418 | 591 | 20043 |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 40.000 | 423 | 615 | 20919 |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 702 | 23613 |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 714 | 23616 |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 698 | 23612 |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 710 | 23615 |





00124823 BK 981 PG 162

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 706 | 23614 |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | TX | Dimmit | 40.000 | 482 | 325 | 30186 |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 482 | 322 | 30185 |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 310 | 30181 |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 313 | 30182 |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 316 | 30183 |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 307 | 30180 |
| EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | TX | Dimmit | 40.000 | 482 | 319 | 30184 |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 500 | 316 | 32057 |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 502 | 65 | 32199 |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | TX | Dimmit | 40.000 | 512 | 193 | 33490 |
| JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 196 | 33491 |
| PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 704 | 34283 |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 701 | 34282 |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 582 | 34081 |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 579 | 34080 |
| KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | TX | Dimmit | 40.000 | 517 | 546 | 34428 |
| NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 199 | 33492 |
| SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 576 | 34079 |
| WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 573 | 34078 |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 190 | 33489 |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 136 | 34644 |
| JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 128 | 34642 |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 132 | 34643 |

DOC 001248823 BK OR 950 PG 163

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 120 | 34640 |
| ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | TX | Dimmit | 40.000 | 493 | 598 | 31425 |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 124 | 34641 |
| J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | TX | Dimmit | 40.000 | 517 | 543 | 34427 |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 515 | 570 | 34077 |
| SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 821 | 34793 |
| ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 519 | 833 | 34796 |
| HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 825 | 34794 |
| JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 526 | 255 | 35599 |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 526 | 251 | 35598 |
| DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 829 | 34795 |
| ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 222.180 | 392<br>396 | 363<br>579 | 15971<br>16714 |
| BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | TX | Dimmit | 415.020 | 392 | 370 | 15972 |
| DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 76 | 16475 |
| VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 73 | 16474 |
| SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 70 | 16473 |
| MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 67 | 16472 |
| MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 64 | 16471 |
| JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 61 | 16470 |
| JOAN MAYS | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 58 | 16469 |
| GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 52 | 16467 |
| DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 45 | 16465 |
| GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | TX | Dimmit | 415.020 | 418 | 157 | 19936 |
| RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 589 | 19712 |

00192823 BK 981 PG 162



008819

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 595 | 19714 |
| SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 592 | 19713 |
| BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 460 | 20887 |
| FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 463 | 20888 |
| MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 466 | 20889 |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 469 | 20890 |
| LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 457 | 20886 |
| EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | TX | Dimmit | 415.020 | 423 | 453 | 20885 |
| DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | TX | Dimmit | 415.020 | 420 | 224 | 20343 |
| SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | TX | Dimmit | 415.020 | 420 | 221 | 20342 |
| CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 423 | 438 | 20881 |
| SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 441 | 20882 |
| MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 445 | 20883 |
| PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 415.020 | 425 | 311 | 21184 |
| R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 449 | 20884 |
| IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 427 | 390 | 21529 |
| JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | TX | Dimmit | 415.020 | 427 | 407 | 21533 |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 412 | 2153 |
| JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | TX | Dimmit | 415.020 | 427 | 399 | 21531 |
| BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | TX | Dimmit | 415.020 | 427 | 394 | 21530 |
| JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 404 | 21532 |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | TX | Dimmit | 415.020 | 433 | 125 | 22468 |
| DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 141 | 22996 |

Doc 00124823 Bk OR Vol 950 Pg 165

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 436 | 125 | 22992 |
| DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 121 | 22991 |
| CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 133 | 22994 |
| GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 129 | 22993 |
| LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 145 | 22997 |
| DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 137 | 22995 |
| MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | TX | Dimmit | 117.000 | 436 | 118 | 22990 |
| M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 439 | 749 | 23626 |
| MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 757 | 23628 |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 745 | 23625 |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 753 | 23627 |
| MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 442 | 304 | 24054 |
| KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | TX | Dimmit | 117.000 | 457 | 360 | 26400 |
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | TX | Dimmit | 415.020 | 458 | 290 | 26535 |
| GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | TX | Dimmit | 415.020 | 478 | 227 | 29445 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | TX | Dimmit | 20.000 | 392 | 360 | 15970 |
| EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 029 | 16938 |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 33 | 16939 |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 037 | 16940 |
| MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 041 | 16941 |
| KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 706 | 17214 |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 691 | 17210 |

00124823 BK 950 PG 129

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 702 | 17213 |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 698 | 17212 |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 483 | 17170 |
| DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 400 | 113 | 17276 |
| SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | TX | Dimmit | 42.640 | 399 | 715 | 17217 |
| DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 342 | 17324 |
| MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 348 | 17325 |
| ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | TX | La Salle | 110.900 | 530 | 251 | 90198 |
| JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | TX | Dimmit | 80.000 | 405 | 557 | 18183 |
| MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 169 | 18939 |
| JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 163 | 18937 |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | TX | Dimmit | 80.000 | 412 | 384 | 19214 |
| CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 143 | 22473 |
| ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 431 | 722 | 22228 |
| GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 155 | 22476 |
| EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 433 | 151 | 22475 |
| RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 147 | 22474 |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 129 | 22469 |
| JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 132 | 22470 |
| BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 136 | 22471 |
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 139 | 22472 |
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 721 | 23618 |

D 00124823 OR BK 950 VOL PG 167

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 724 | 23619 |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 657 | 25469 |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 669 | 25472 |
| SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 80.000 | 450 | 661 | 25470 |
| VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 649 | 25467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | TX | Dimmit | 80.000 | 450 | 673 | 25473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 665 | 25471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | TX | Dimmit | 80.000 | 450 | 653 | 25468 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 455 | 118 | 26085 |
| MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 80.000 | 467 | 91 | 27796 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 82.530 | 403 | 403 | 17810 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | TX | Dimmit | 82.530 | 419 | 106 | 20117 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 39.800 | 403 | 409 | 17812 |
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | TX | Dimmit | 40.050 | 403 | 400 | 17809 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 40.000 | 403 | 406 | 17811 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | TX | Dimmit | 160.000 | 402<br>415 | 201<br>461 | 17630<br>19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 384 | 18328 |
| ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 388 | 18329 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 396 | 18331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 400 | 18332 |
| GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 392 | 18330 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 356 | 18321 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 364 | 18323 |

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 376 | 18326 |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 372 | 18325 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 160.000 | 406 | 368 | 18324 |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 360 | 18322 |
| PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 744 | 18416 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 380 | 18327 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 385 | 18688 |
| SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 408 | 389 | 18689 |
| BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 740 | 18415 |
| RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 732 | 18413 |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 736 | 18414 |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 393 | 18690 |
| DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 408 | 381 | 18687 |
| DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 148 | 19933 |
| BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 418 | 154 | 19935 |
| KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 151 | 19934 |
| JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | TX | Dimmit | 160.000 | 422 | 387 | 20698 |
| ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 422 | 391 | 20699 |
| SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | TX | Dimmit | 160.000 | 425 | 695 | 21287 |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | TX | Dimmit | 90.890 | 401 | 548 | 17517 |
| EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | TX | Dimmit | 90.890 | 406 | 681 | 18405 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 37.000 | 445 | 640 | 24596 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 37.000 | 405 | 563 | 18185 |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | TX | Dimmit | 42.180 | 406 | 196 | 18282 |
| JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | TX | Dimmit | 10.000 | 408 | 378 | 18686 |

Doc 00124823 Bk OR Vol 950 Pg 169

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | TX | Dimmit | 17.200 | 406 | 724 | 18411 |
| JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 10.200 | 409 | 664 | 18877 |
| GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 680 | 18882 |
| TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 677 | 18881 |
| CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | TX | Dimmit | 40.000 | 409 | 674 | 18880 |
| JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 671 | 18879 |
| MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | TX | Dimmit | 10.000 | 422 | 395 | 20700 |
| RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 427 | 735 | 21605 |
| JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | TX | Dimmit | 15.000 | 445 | 61 | 24498 |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | TX | Dimmit | 15.000 | 443 | 152 | 24176 |
| LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 646 | 23600 |
| ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 627 | 23596 |
| ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 651 | 23601 |
| JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 637 | 23598 |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 15.000 | 442 | 832 | 24143 |
| BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 656 | 23602 |
| MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 661 | 23603 |
| ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 435 | 797 | 22943 |
| MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | TX | Dimmit | 15.000 | 445 | 56 | 24497 |
| LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 641 | 23599 |
| WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | TX | Dimmit | 15.000 | 439 | 632 | 23597 |
| MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 456 | 521 | 26276 |
| DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | TX | Dimmit | 15.000 | 465 | 235 | 27497 |

Doc 00124823 BK OR Vol 950 Pg 170

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | TX | Dimmit | 30.000 | 427 | 741 | 21607 |
| JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | TX | Dimmit | 30.000 | 427 | 738 | 21606 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | TX | Dimmit | 30.000 | 435 | 803 | 22945 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 30.000 | 435 | 800 | 22944 |
| KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 30.000 | 453 | 539 | 25851 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 54 | 21790 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 64 | 21792 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 59 | 21791 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 69 | 21793 |
| JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 143.630 | 433 | 114 | 22463 |
| MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 105 | 22460 |
| FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 111 | 22462 |
| JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 108 | 22461 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 480 | 22358 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 490 | 22360 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 485 | 22359 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 475 | 22357 |
| MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 511 | 23258 |
| GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 505 | 23256 |
| LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 508 | 23257 |
| DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | TX | Dimmit | 37.400 | 379 | 258 | 13696 |
| RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 412 | 23402 |
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 409 | 23401 |
| JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | TX | Dimmit | 7.400 | 438 | 407 | 23399 |

DOC 00124823 BK OR VOL 950 PG 171

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 780 | 22089 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 759 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 644 | 24597 |
| S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 654 | 24599 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 649 | 24598 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | TX | Dimmit | 80.000 | 450 | 645 | 25466 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | TX | Dimmit | 84.990 | 444 | 569 | 24432 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | TX | Dimmit | 10.000 | 442 | 828 | 24142 |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 691 | 23610 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | TX | Dimmit | 23.700 | 432 | 700 | 22401 |
| ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | TX | Dimmit | 10.000 | 445 | 74 | 24501 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | TX | Dimmit | 10.000 | 439 | 666 | 23604 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 556 | 26162 |
| JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 563 | 26163 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 569 | 26164 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 550 | 26161 |
| JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 455 | 575 | 26165 |
| MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 458 | 295 | 26536 |
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | TX | Dimmit | 10.000 | 453 | 535 | 25850 |
| KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 505 | 26272 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 501 | 26271 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 459 | 512 | 26722 |

00124823 BK 980 PG 153

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | TX | Dimmit | 157.600 | 459 | 528 | 26726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 524 | 26725 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 520 | 26724 |
| JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | TX | Dimmit | 157.600 | 459 | 516 | 26723 |
| LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 157.600 | 455 | 655 | 26176 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 157.600 | 455 | 659 | 26177 |
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 663 | 26178 |
| THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 651 | 26175 |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 647 | 26174 |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 157.600 | 455 | 643 | 26173 |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 455 | 639 | 26172 |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 455 | 631 | 26170 |
| MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 452 | 794 | 25771 |
| SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 806 | 25774 |
| GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 802 | 25773 |
| CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 810 | 25775 |
| MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 627 | 26169 |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 786 | 25769 |
| MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 790 | 25770 |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 798 | 25772 |
| SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 635 | 26171 |
| JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | TX | Dimmit | 157.600 | 470 | 825 | 28383 |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | TX | Dimmit | 157.600 | 469 | 63 | 28143 |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 55 | 28141 |

Doc 00124823 Bk OR Vol 950 Pg 173

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 59 | 28142 |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 280 | 28929 |
| FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 268 | 28926 |
| JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | TX | Dimmit | 157.600 | 478 | 127 | 29425 |
| EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | TX | Dimmit | 157.600 | 474 | 260 | 28924 |
| MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 256 | 28923 |
| MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 87 | 29417 |
| VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 92 | 29418 |
| RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 122 | 29424 |
| B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 117 | 29423 |
| JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 102 | 29420 |
| RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 97 | 29419 |
| AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 107 | 29421 |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 112 | 29422 |
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 272 | 28927 |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 276 | 28928 |
| KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 264 | 28925 |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | TX | Dimmit | 157.600 | 498 | 593 | 31859 |
| ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 498 | 597 | 31860 |
| JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | TX | Dimmit | 157.600 | 498 | 589 | 31858 |
| MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 585 | 31857 |
| KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 581 | 31856 |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | TX | Dimmit | 157.600 | 498 | 573 | 31854 |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | TX | Dimmit | 157.600 | 498 | 577 | 31855 |

00124823 BK 981 174

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 569 | 31853 |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 564 | 31852 |
| JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | TX | Dimmit | 157.600 | 498 | 560 | 31851 |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 556 | 31850 |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 552 | 31849 |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 544 | 31847 |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 548 | 31848 |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | TX | Dimmit | 157.600 | 498 | 540 | 31846 |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | TX | Dimmit | 157.600 | 498 | 532 | 31844 |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 536 | 31845 |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 529 | 31843 |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 524 | 31842 |
| MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 157.600 | 498 | 520 | 31841 |
| ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 516 | 31840 |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 512 | 31839 |
| GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 601 | 31861 |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 500 | 798 | 32161 |
| KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | TX | Dimmit | 10.000 | 457 | 209 | 26377 |
| HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 10.000 | 457 | 45 | 26336 |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | TX | Dimmit | 10.000 | 457 | 217 | 26379 |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | TX | Dimmit | 10.000 | 457 | 213 | 26378 |
| CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | TX | Dimmit | 10.000 | 455 | 545 | 26160 |
| SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | TX | Dimmit | 10.000 | 459 | 498 | 26719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | TX | Dimmit | 10.000 | 462 | 418 | 27144 |

Doc 00124823 Bk OR Vol 950 Pg 175

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 504 | 26720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 10.000 | 459 | 508 | 26721 |
| JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 494 | 26718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 11 | 27214 |
| EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 1 | 27212 |
| MARTHA LIOJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 6 | 27213 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 813 | 27206 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 828 | 27209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 838 | 27211 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 818 | 27207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 16 | 27215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 823 | 27208 |
| ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 21 | 27216 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 833 | 27210 |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 337 | 27263 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 332 | 27262 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 327 | 27261 |
| JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 342 | 27264 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 10.000 | 465 | 107 | 27477 |
| DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 121 | 27616 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 127 | 27617 |
| GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 133 | 27618 |
| LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 145 | 27620 |
| DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 139 | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | TX | Dimmit | 10.000 | 498 | 608 | 31863 |

00124823 BK 981 PG 172

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | TX | Dimmit | 10.000 | 473 | 112 | 28765 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 288 | 29147 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 292 | 29148 |
| ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | TX | Dimmit | 10.000 | 476 | 298 | 29150 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | TX | Dimmit | 40.000 | 474 | 251 | 28919 |
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 573 | 31746 |
| RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 588 | 31749 |
| REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 10.000 | 498 | 605 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | TX | Dimmit | 10.000 | 487 | 772 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | TX | Dimmit | 10.000 | 498 | 612 | 31864 |
| JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 617 | 31866 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 614 | 31865 |
| LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 626 | 31870 |
| RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 629 | 31871 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 622 | 31868 |
| CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | TX | Dimmit | 10.000 | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 500 | 792 | 32159 |

00124823 BK 958 PG 179

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 678 | 33418 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 684 | 33420 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | TX | Dimmit | 10.000 | 511 | 681 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 511 | 669 | 33415 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | TX | Dimmit | 40.000 | 378 | 674 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | TX | Dimmit | 77.910 | 508 | 167 | 32959 |
| JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 499 | 837 | 32005 |
| YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 370 | 33520 |
| WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 365 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | TX | Dimmit | 10.000 | 518 | 9 | 34494 |
| EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 10.000 | 517 | 829 | 34489 |
| BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | TX | Dimmit | 10.000 | 517 | 837 | 34491 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 483 | 34716 |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | TX | Dimmit | 10.000 | 519 | 487 | 34717 |
| LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | TX | Dimmit | 10.000 | 523 | 492 | 35222 |
| CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 523 | 496 | 35223 |
| RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 10.000 | 523 | 500 | 35224 |
| DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | TX | Dimmit | 10.000 | 518 | 5 | 34493 |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 833 | 34490 |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | TX | Dimmit | 10.000 | 518 | 1 | 34492 |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 507 | 34722 |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 499 | 34720 |

00124823 BK 981 178



008833

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 479 | 34715 |
| JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 491 | 34718 |
| BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 821 | 34487 |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 825 | 34488 |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 514 | 34724 |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 817 | 34486 |
| SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | TX | Dimmit | 10.000 | 519 | 495 | 34719 |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 503 | 34721 |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 90 | 35423 |
| JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 519 | 511 | 34723 |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 20.000 | 506 | 55 | 32616 |
| JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | TX | Dimmit | 20.000 | 506 | 58 | 32617 |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | TX | Dimmit | 20.000 | 506 | 61 | 32618 |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 64 | 32619 |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 68 | 32620 |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 74 | 32622 |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 78 | 32623 |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 82 | 32624 |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 86 | 32625 |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 90 | 32626 |
| SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 94 | 32627 |
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 104 | 32629 |
| VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 113 | 32631 |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 117 | 32632 |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 687 | 33421 |

00124823 BK 950 PG 159

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 695 | 33423 |
| JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 699 | 33424 |
| MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | TX | Dimmit | 20.000 | 511 | 703 | 33425 |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | TX | Dimmit | 20.000 | 511 | 707 | 33426 |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | TX | Dimmit | 20.000 | 511 | 711 | 33427 |
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 714 | 33428 |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 718 | 33429 |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 722 | 33430 |
| JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | TX | Dimmit | 20.000 | 511 | 726 | 33431 |
| JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 730 | 33432 |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | TX | Dimmit | 20.000 | 517 | 767 | 34473 |
| ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 817 | 35845 |
| EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | TX | Dimmit | 20.000 | 506 | 71 | 32621 |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 98 | 32628 |
| BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 109 | 32630 |
| JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 691 | 33422 |
| ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 20.000 | 515 | 189 | 33970 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 10.000 | 515 | 184 | 33969 |
| EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 528 | 1 | 35851 |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 284 | 34192 |
| TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 272 | 34190 |
| JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 278 | 34191 |
| MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 266 | 34189 |

00192823 BK 980 183

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 749 | 36343 |
| A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 752 | 36344 |
| RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 756 | 36345 |
| RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 759 | 36346 |
| WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | TX | Dimmit | 10.000 | 530 | 737 | 36339 |
| PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 734 | 36338 |
| REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 743 | 36341 |
| ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | TX | Dimmit | 10.000 | 530 | 740 | 36340 |
| LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | TX | Dimmit | 10.000 | 530 | 746 | 36342 |
| THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | TX | Dimmit | 10.000 | 530 | 731 | 36337 |
| SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | TX | Dimmit | 10.000 | 530 | 728 | 36336 |
| LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 762 | 36347 |
| WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 751 | 36646 |
| ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 10.000 | 526 | 263 | 35601 |
| BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 526 | 259 | 35600 |
| SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | TX | Dimmit | 10.000 | 527 | 28 | 35705 |
| CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 527 | 36 | 35707 |
| JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 525 | 364 | 35477 |
| KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 368 | 35478 |
| HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 360 | 35476 |
| RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 356 | 35475 |
| KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 527 | 40 | 35708 |
| FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | TX | Dimmit | 10.000 | 527 | 32 | 35706 |
| TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 534 | 310 | 36857 |

00124823 BK 981 PG 181

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 534 | 313 | 36858 |
| TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 534 | 307 | 36856 |
| GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | TX | Dimmit | 20.000 | 527 | 821 | 35846 |
| RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 825 | 35847 |
| NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | TX | Dimmit | 20.000 | 527 | 829 | 35848 |
| JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 20.000 | 522 | 312 | 35105 |
| CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 532 | 357 | 36601 |
| BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | TX | Dimmit | 10.000 | 532 | 367 | 36604 |
| JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 370 | 36605 |
| RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | TX | Dimmit | 10.000 | 532 | 374 | 36606 |
| HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | TX | Dimmit | 10.000 | 532 | 377 | 36607 |
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 380 | 36608 |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 383 | 36609 |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 386 | 36610 |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 389 | 36611 |
| JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 392 | 36612 |
| BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | TX | Dimmit | 10.000 | 532 | 395 | 36613 |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 398 | 36614 |
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 532 | 403 | 36615 |
| DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 406 | 36616 |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | TX | Dimmit | 10.000 | 532 | 409 | 36617 |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | TX | Dimmit | 10.000 | 532 | 364 | 36603 |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | TX | Dimmit | 10.000 | 532 | 361 | 36602 |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | TX | Dimmit | 20.000 | 527 | 837 | 35820 |

00124823 BK 581 PG 183

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | TX | Dimmit | 20.000 | 527 | 833 | 35849 |
| MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 10.000 | 523 | 830 | 35256 |
| JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | TX | Dimmit | 10.000 | 536 | 382 | 37176 |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 388 | 37178 |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | TX | Dimmit | 10.000 | 536 | 385 | 37177 |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 391 | 37179 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 80.000 | 517 | 763 | 34472 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 10.000 | 517 | 759 | 34471 |
| WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | TX | Dimmit | 10.000 | 539 | 360 | 37658 |
| RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | TX | Dimmit | 10.000 | 539 | 366 | 37660 |
| CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | TX | Dimmit | 10.000 | 539 | 363 | 37659 |
| FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | TX | Dimmit | 40.000 | 534 | 714 | 36928 |
| LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 40.000 | 534 | 717 | 36929 |
| GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 534 | 720 | 36930 |
| STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 531 | 199 | 36394 |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | TX | Dimmit | 40.000 | 538 | 505 | 37545 |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | TX | Dimmit | 40.000 | 538 | 509 | 37546 |
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | TX | Dimmit | 40.000 | 538 | 792 | 37593 |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | TX | Dimmit | 40.000 | 528 | 179 | 35886 |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 528 | 175 | 35885 |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | TX | Dimmit | 12.310 | 542 | 345 | 38066 |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 421 | 37944 |

00124823 BK 958 183

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 424 | 37945 |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | TX | Dimmit | 80.000 | 539 | 765 | 37708 |
| DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 220 | 38040 |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 217 | 38039 |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 75 | 37289 |
| ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 78 | 37290 |
| JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 81 | 37291 |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 84 | 37292 |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 87 | 37293 |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 90 | 37294 |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | TX | Dimmit | 10.000 | 537 | 93 | 37295 |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 96 | 37296 |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 99 | 37297 |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 102 | 37298 |
| 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 105 | 37299 |
| LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | TX | Dimmit | 200.000 | 379 | 498 | 13745 |
| MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 544 | 260 | 38286 |
| RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 525 | 38438 |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 522 | 38437 |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 519 | 38436 |
| BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 528 | 38439 |
| AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 534 | 38441 |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | TX | Dimmit | 10.000 | 545 | 516 | 38435 |

00124823 BK 950 184

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 531 | 38440 |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | TX | Dimmit | 10.000 | 545 | 546 | 38445 |
| LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 543 | 38444 |
| JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 540 | 38443 |
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 537 | 38442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 545 | 549 | 38446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 814 | 38474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 123 | 38274 |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 117 | 38272 |
| PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 105 | 38268 |
| RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 120 | 38273 |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 102 | 38267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 126 | 38275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 114 | 38271 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 99 | 38266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 111 | 38270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 108 | 38269 |
| DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 547 | 115 | 38601 |
| DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | TX | Dimmit | 160.000 | 542 | 279 | 38053 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 544 | 756 | 38359 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | TX | Dimmit | 10.000 | 544 | 753 | 38358 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 207 | 38507 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 204 | 38506 |
| STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 216 | 38510 |
| WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 213 | 38509 |

Doc 00124823 Bk OR Vol 950 Pg 185

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 210 | 38508 |
| MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | TX | Dimmit | 80.000 | 545 | 243 | 38397 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | TX | Dimmit | 10.000 | 547 | 121 | 38603 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 547 | 118 | 38602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 548 | 622 | 38850 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | TX | Dimmit | 10.000 | 548 | 477 | 38833 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 549 | 470 | 38927 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 548 | 471 | 38831 |
| BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 548 | 474 | 38832 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | TX | Dimmit | 10.000 | 550 | 372 | 39027 |
| WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 550 | 369 | 39026 |
| DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | TX | Dimmit | 160.000 | 551 | 752 | 39233 |
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 553 | 582 | 39410 |
| LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | TX | Dimmit | 10.000 | 553 | 588 | 39412 |
| JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | TX | Dimmit | 10.000 | 552 | 441 | 39279 |
| MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | TX | Dimmit | 80.000 | 548 | 735 | 38868 |
| DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 321 | 39162 |
| MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 324 | 39163 |
| DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | TX | Dimmit | 80.000 | 551 | 318 | 39161 |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 312 | 39159 |

Doc 00124823 Bk OR Vol 950 Pg 186

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | TX | Dimmit | 80.000 | 549 | 725 | 38967 |
| JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | TX | Dimmit | 80.000 | 549 | 728 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 553 | 585 | 39411 |
| BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | TX | Dimmit | 10.000 | 555 | 335 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | TX | Dimmit | 40.000 | 555 | 13 | 39591 |
| DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | TX | Dimmit | 10.000 | 556 | 589 | 39852 |
| SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 556 | 592 | 39853 |
| LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 70.000 | 557 | 385 | 39960 |
| GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 558 | 601 | 40106 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 555 | 422 | 39661 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 555 | 428 | 39663 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 555 | 425 | 39662 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | TX | Dimmit | 80.000 | 555 | 431 | 39664 |
| RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 556 | 436 | 39815 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | TX | Dimmit | 80.000 | 556 | 433 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 379 | 40156 |
| JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 376 | 40155 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 439 | 40165 |
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | TX | Dimmit | 80.000 | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | TX | Dimmit | 80.000 | 563 | 557 | 40854 |

00124823 BK 950 183

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | TX | Dimmit | 20.000 | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | TX | Dimmit | 20.000 | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | TX | Dimmit | 1639.310 | 577 | 454 | 42708 |

Doc 00124823 Bk OR Vol 950 Pg 188

**Exhibit B**

**AMI**

00125823 BK 986 189


Eagle Ford
AMI
Maverick
Dimmit
Zavala
Webb
La Salle
Frio
Doc 00124823
Bk OR
Vol 950
Pg 190
008845

FILED AND RECORDED
REAL PROPERTY RECORDS
On: Mar 31,2017 at 09:56A

Document Number: 00124823

Amount 214.00

HONORABLE MARGARITA A ESQUEDA
COUNTY CLERK
By
Ana Ramon,
LA SALLE COUNTY

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

00124823 BK 986 151

FILED FOR RECORD
DIMMIT COUNTY, TEXAS
Apr 12, 2017 at 10:38:00 AM

# MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of March 1, 2017 (the "Effective Date"), is by and between Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Investor"); and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

VOL 0591 PG 0830

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of March 1, 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, LaSalle and Zavala Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

Case 4:23-cv-04508 Document 1-54397 Filed in TXSB on 06/28/20 Page 979 of 1759

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Attention: Greg Kopel<br>Electronic Mail:<br>gkopel@sanchezog.com |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>c/o Sanchez Energy Corporation<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br>Tel: 713.756.2782 |
| With a copy to: | GSO ST Holdings LP<br>1111 Bagby Street, Suite 2050 |

VOL 0591 PG 0831

| | |
|---|---|
| | Houston, TX 77002<br>Attention: Robert Horn<br>Electronic Mail: Robert.horn@gsocap.com |
| With a copy to: | Christopher Richardson<br>Andrews Kurth Kenyon LLP<br>600 Travis<br>Suite 4200<br>Houston, TX 77002<br>Electronic Mail:<br>crichardson@andrewskurth.com |
| To Investor: | Gavilan Resources, LLC<br>345 Park Avenue, 43rd Floor<br>New York, New York 10154<br>Attention: Angelo Acconcia<br>Telephone: (713) 400-8210<br>Electronic Mail:<br>acconcia@blackstone.com |
| With a copy to: | Kirkland & Ellis LLP<br>600 Travis St., Suite 3300<br>Houston, Texas 77002<br>Attention: Andrew Calder, P.C.<br>Rhett Van Syoc<br>Electronic Mail:<br>andrew.calder@kirkland.com<br>rhett.vansyoc@kirkland.com |

VOL 0591 PG 0832

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of

the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

VOL 0591 PG 0833

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Gavilan Resources, LLC
a Delaware limited liability company

By: [signature]
Name: Angelo Acconcia
Title: President
Date: 2/27/2017

V O L 0 5 9 1

STATE OF New York §
§
COUNTY OF Westchester §

P G 0 8 3 4

This instrument was acknowledged before me this 27th day of February 2017 by Angelo Acconcia, as President of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of such limited liability company.

[signature]
Notary Public, State of New York

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

Signature Page to Memorandum of Joint Development Agreement

Sanchez Energy Corporation
a Delaware corporation

By: [signature]
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

VOL 0591

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

PG 0835

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

Carolyn L. George
Notary Public, State of Texas

Signature Page to Memorandum of Joint Development Agreement

SN EF Maverick, LLC
a Delaware limited liability company

By: [signature]
Name: Antonio R. Sanchez, III
Title: CEO
Date: 3/1/2017

VOL 0591

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Antonio R. Sanchez, III, as CEO of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

Carolyn L. George
Notary Public, State of Texas

PG 0836

CAROLYN L. GEORGE
Notary Public, State of Texas
Comm. Expires 04-13-2019
Notary ID 7092120

SN EF UnSub, LP
a Delaware limited partnership

By: [signature]
Name: Patricio D. Sanchez
Title: CEO
Date: 3/1/2017

V O L 0 5 9 1

STATE OF Texas §
§
COUNTY OF Harris §

This instrument was acknowledged before me this 1st day of March, 2017 by Patricio D. Sanchez, as CEO of SN EF UnSub, LP, a Delaware limited partnership, on behalf of such limited partnership.

[signature]
Notary Public, State of TX

P G 0 8 3 7

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

Signature Page to Memorandum of Joint Development Agreement

# Exhibit A

**Leases**

VOL 0591 PG 0838

Exhibit A to Memorandum of Joint Development Agreement

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 9926.779 | 329 | 131 | 7000 |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | | 752 | 14931 |
| BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 60.000 | 387 | 582 | 15240 |
| JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 695 | 17211 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 709 | 17215 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 159.630 | 399 | 712 | 17216 |
| ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 60.000 | 406 | 729 | 18412 |
| MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 159.630 | 417 | 612 | 19856 |
| KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 159.630 | 425 | 589 | 21253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 620 | 24591 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 628 | 24593 |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | TX | Dimmit | 60.000 | 445 | 624 | 24592 |
| SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 636 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 60.000 | 445 | 632 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 667 | 26041 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 654 | 26037 |
| NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 664 | 26040 |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 660 | 26039 |
| MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 648 | 26035 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 630 | 26029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 642 | 26033 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 651 | 26036 |
| MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 627 | 26028 |

VOL 0591 PG 0839

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 636 | 26031 |
| ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 645 | 26034 |
| DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 456 | 469 | 26264 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 639 | 26032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 657 | 26038 |
| CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 454 | 633 | 26030 |
| UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 159.630 | 461 | 254 | 26955 |
| LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 89 | 27233 |
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 60.000 | 463 | 85 | 27232 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 10938.500 | 329 | 397 | 7052 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 14601.230 | 338 | 617 | 8649 |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 226 | 18821 |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 229 | 18822 |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 80.000 | 409 | 232 | 18823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 15591.810 | 335 | 276 | 8081 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6876.320 | 338 | 621 | 8650 |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 585 | 15241 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 1884.900 | 343 | 325 | 9442 |
| ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 197 | 31626 |
| JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 496 | 194 | 31625 |
| SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 10.000 | 500 | 6 | 32007 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 631 | 8652 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 636 | 8653 |

VOL 0591 PG 0840

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 6748.900 | 338 | 626 | 8651 |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 255 | 14820 |
| MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 320.000 | 385 | 262 | 14821 |
| ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | TX | Dimmit | 636.120 | 27 | 384 | 113502 |
| FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | TX | Zavala | 645.030 | 3 | 172 | 113530 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | TX | Zavala | 1120.000 | 3 | 251 | 113554 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 670.800 | 3 | 578 | 113797 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 649.620 | 3 | 582 | 113798 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 638.610 | 3 | 586 | 113799 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 647.710 | 3 | 590 | 113800 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 705.800 | 29<br>4 | 86<br>425 | 129<br>114336 |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | TX | Dimmit | 441.650 | 29 | 322 | 114642 |
| MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | TX | Dimmit | 38.750 | 29 | 332 | 114666 |
| G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 1290.440 | 29 | 355 | 114678 |
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 377 | 114700 |
| L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 164.710 | 29 | 381 | 114700-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 41.250 | 29 | 366 | 114736 |
| RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | TX | Dimmit | 82.750 | 29 | 359 | 114737 |
| JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 15.060 | 29 | 469 | 114826 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 41.420 | 30 | 10 | 114829 |
| ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | TX | Dimmit | 43.870 | 31 | 330 | 693 |
| LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | TX | Dimmit | 22.100 | 31 | 464 | 841 |

VOL 0591 PG 0841

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | TX | Dimmit | 29.160 | 33 | 505 | 2577 |
| PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | TX | Dimmit | 29.160 | 39 | 193 | 1997 |
| MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | TX | Dimmit | 2.760 | 147 | 136 | 779 |
| CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | TX | Dimmit | 80.220 | 37 | 257 | 300984 |
| OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 353.090 | 97<br>55 | 145<br>185 | 1086<br>46827 |
| B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | TX | Dimmit | 720.000 | 29 | 293 | T16318 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | TX | Zavala | 162.400 | 57 | 53 | NA |
| ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 68 | 48131 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 65 | 48130 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 666 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 671 | 546 |
| MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 1221.550 | 82 | 676 | |
| I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | TX | Dimmit | 44.100 | 33 | 122 | 800045 |
| MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | TX | Dimmit | 80.460 | 30 | 460 | 800046 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | TX | Dimmit | 321.850 | 30 | 270 | 229 |
| SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | TX | Dimmit | 7.500 | 30 | 495 | 458 |
| ERIN BAIN JONES | W W OATMAN | 05/11/1970 | TX | Dimmit | 681.000 | 31 | 186 | 4150 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Webb | 11127.840 | 2329 | 707 | 960221 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 484 | 7078 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 8000.000 | 329 | 394 | 7051 |

VOL 0591 PG 0842

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 27136.070 | 460<br>329 | 233<br>487 | 79160<br>7079 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 27136.070 | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | TX | Dimmit | 7428.100 | 354 | 171 | 11322 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | TX | Dimmit | 40.000 | 398 | 26 | 16937 |
| RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 40.000 | 394 | 189 | 16294 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 32 | 16768 |
| JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 26 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 35 | 16769 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 38 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.880 | 397 | 29 | 16767 |
| BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | TX | Dimmit | 40.000 | 405 | 560 | 18184 |
| CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | TX | Dimmit | 40.000 | 425 | 586 | 21252 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 764 | 31322 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 759 | 31321 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 754 | 31320 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 40.880 | 492 | 750 | 31319 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | TX | Webb | 6199.250 | 2435 | 504 | 977956 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | TX | Webb | 21890.630 | 2484 | 238 | 986336 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 1280.000 | 2583 | 185 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 5120.000 | 2583 | 182 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 720.000 | 1041 | 67 | 144189 |

VOL 0591 PG 0843

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 720.000 | 1073 | 94 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 400.000 | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 400.000 | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 36559.710 | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 80.000 | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 160.000 | 1067 | 185 | 146523 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 400.000 | 1067 | 173 | 146521 |
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 4564.723 | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 4564.723 | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 7800.074 | 344 | 6 | 9540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 40.000 | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | TX | Dimmit | 40.000 | 439 | 695 | 23611 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 4317.553 | 343 | 690 | 9504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit<br>Maverick | 52054.310 | 332<br>1012 | 649<br>222 | 7649<br>141603 |
| EWING ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 09/20/2006 | TX | Dimmit | 8209.480 | 344 | 1 | 9539 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | TX | Dimmit | 8209.482 | 343 | 844 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 14.400 | 429 | 83 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 245.000 | 430 | 766 | 22087 |

VOL 0591 PG 0844

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 833 | 28385 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 837 | 28386 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 1 | 28887 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 470 | 829 | 28384 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 10.000 | 471 | 5 | 28388 |
| ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 1808.500 | 336 | 199 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick Webb | 311.437 | 1041 339 | 60 550 | 144183 8821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick Webb | 311.437 | 1073 344 | 99 128 | 147023 15489 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 7243.318 | 344 | 46 | 9545 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | TX | Dimmit | 30.000 | 423 | 49 | 20796 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 66 | 24499 |
| AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 678 | 23607 |
| SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 674 | 23606 |
| THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 682 | 23608 |
| HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 670 | 23605 |
| RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 449 | 521 | 25265 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 10.000 | 453 | 531 | 25849 |
| KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | TX | Dimmit | 10.000 | 495 | 204 | 31491 |
| GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 208 | 31492 |
| CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 10.000 | 495 | 212 | 31493 |
| BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 495 | 216 | 31494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 40.000 | 491 | 516 | 31083 |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 10.000 | 504 | 77 | 32389 |

VOL 0591 PG 0845

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 3657.182 | 343 | 694 | 9505 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 379 | 16162 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 398 | 16168 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 70.000 | 393 | 382 | 16163 |
| MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 393 | 395 | 16167 |
| PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 70.000 | 395 | 525 | 16565 |
| GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | TX | Dimmit | 70.000 | 395 | 522 | 16564 |
| JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 70.000 | 395 | 528 | 16566 |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 40.000 | 420 | 759 | 20412 |
| LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 10.000 | 420 | 757 | 20411 |
| DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 20.000 | 420 | 762 | 20413 |
| HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 80.000 | 426 | 580 | 21449 |
| MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 70.000 | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 10.000 | 429 | 541 | 21885 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 20.000 | 445 | 70 | 24500 |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | TX | Dimmit | 10.000 | 456 | 530 | 26278 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | TX | Dimmit | 10.000 | 505 | 738 | 32601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | TX | Dimmit | 10.000 | 505 | 734 | 32600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 10.000 | 505 | 741 | 32602 |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | TX | Webb | 4483.500 | 2672 | 185 | 1020907 |

VOL 0591 PG 0846

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | TX | Webb | 3573.660 | 2668 | 642 | 1020289 |
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | TX | Webb | 5470.072 | 2750 | 95 | 1036351 |
| ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | TX | Dimmit | 610.800 | 369 | 468 | 12860 |
| G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 830 207 | 13825 84338 |
| GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 836 213 | 13826 84339 |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit LaSalle | 2965.370 | 379 492 | 825 202 | 13824 84337 |
| ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit LaSalle | 1525.810 | 391 513 | 488 32 | 15860 87603 |
| GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 207.860 | 380 | 11 | 13830 |
| GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 7 | 13829 |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 16 | 13831 |
| GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 380 | 1 | 13828 |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 3888.970 | 379 | 840 | 13827 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | TX | Dimmit | 11684.590 | 382 | 13 | 14190 |
| MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | TX | Dimmit | 60.000 | 383 | 654 | 14548 |
| DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | TX | Dimmit | 391.600 | 385 | 526 | 14884 |
| CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 40.000 | 387 | 456 | 15211 |

VOL 0591 PG 0847

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | TX | Dimmit | 50.000 | 388 | 648 | 15418 |
| MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 389 | 719 | 15602 |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 388 | 16165 |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 401 | 16169 |
| WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 286 | 15828 |
| CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 391 | 649 | 15876 |
| IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 80.000 | 393 | 728 | 16234 |
| ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 641 | 25465 |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 40.000 | 450 | 637 | 25464 |
| MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 40.000 | 455 | 623 | 26168 |
| SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 40.000 | 457 | 363 | 26401 |
| GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 390 | 550 | 15691 |
| STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 481 | 15990 |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 392 | 484 | 15991 |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 405 | 16170 |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 392 | 16166 |
| REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 408 | 16171 |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 393 | 411 | 16172 |
| DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 40.000 | 394 | 192 | 16295 |
| MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | TX | Dimmit | 20.000 | 392 | 487 | 15992 |
| BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | TX | Dimmit | 20.000 | 392 | 490 | 15993 |
| SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 395 | 565 | 16572 |
| TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 20.000 | 402 | 198 | 17629 |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 785 | 22244 |

VOL 0591 PG 0848

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 777 | 22242 |
| ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 769 | 22240 |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 761 | 22238 |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 745 | 22234 |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 753 | 22236 |
| CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 737 | 22232 |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 729 | 22230 |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 809 | 22250 |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | TX | Dimmit | 20.000 | 431 | 801 | 22248 |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 20.000 | 431 | 793 | 22246 |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | TX | Dimmit | 20.000 | 393 | 385 | 16164 |
| BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | TX | Dimmit | 10.000 | 393 | 414 | 16173 |
| MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 393 | 318 | 16140 |
| KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 40.000 | 394 | 147 | 16284 |
| BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | TX | Dimmit | 40.000 | 409 | 667 | 18878 |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 828 | 19044 |
| ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 40.000 | 410 | 831 | 19045 |
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | TX | Dimmit | 40.000 | 418 | 591 | 20043 |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 40.000 | 423 | 615 | 20919 |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 702 | 23613 |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 714 | 23616 |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 698 | 23612 |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 710 | 23615 |

VOL 0591 PG 0849

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 40.000 | 439 | 706 | 23614 |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | TX | Dimmit | 40.000 | 482 | 325 | 30186 |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 482 | 322 | 30185 |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 310 | 30181 |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 313 | 30182 |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 316 | 30183 |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 40.000 | 482 | 307 | 30180 |
| EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | TX | Dimmit | 40.000 | 482 | 319 | 30184 |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 500 | 316 | 32057 |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 40.000 | 502 | 65 | 32199 |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | TX | Dimmit | 40.000 | 512 | 193 | 33490 |
| JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 196 | 33491 |
| PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 704 | 34283 |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 516 | 701 | 34282 |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 582 | 34081 |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 40.000 | 515 | 579 | 34080 |
| KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | TX | Dimmit | 40.000 | 517 | 546 | 34428 |
| NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 199 | 33492 |
| SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 576 | 34079 |
| WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 40.000 | 515 | 573 | 34078 |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 40.000 | 512 | 190 | 33489 |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 136 | 34644 |
| JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 128 | 34642 |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 132 | 34643 |

VOL 0591 PG 0850

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 120 | 34640 |
| ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | TX | Dimmit | 40.000 | 493 | 598 | 31425 |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 40.000 | 519 | 124 | 34641 |
| J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | TX | Dimmit | 40.000 | 517 | 543 | 34427 |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 40.000 | 515 | 570 | 34077 |
| SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 821 | 34793 |
| ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 519 | 833 | 34796 |
| HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 825 | 34794 |
| JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 40.000 | 526 | 255 | 35599 |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 526 | 251 | 35598 |
| DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 40.000 | 519 | 829 | 34795 |
| ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 222.180 | 392<br>396 | 363<br>579 | 15971<br>16714 |
| BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | TX | Dimmit | 415.020 | 392 | 370 | 15972 |
| DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 76 | 16475 |
| VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 73 | 16474 |
| SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 70 | 16473 |
| MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 67 | 16472 |
| MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 64 | 16471 |
| JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 61 | 16470 |
| JOAN MAYS | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 58 | 16469 |
| GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 52 | 16467 |
| DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 117.000 | 395 | 45 | 16465 |
| GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | TX | Dimmit | 415.020 | 418 | 157 | 19936 |
| RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 589 | 19712 |

VOL 0591 PG 0851

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 595 | 19714 |
| SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 415.020 | 416 | 592 | 19713 |
| BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 460 | 20887 |
| FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 463 | 20888 |
| MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 466 | 20889 |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 469 | 20890 |
| LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 117.000 | 423 | 457 | 20886 |
| EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | TX | Dimmit | 415.020 | 423 | 453 | 20885 |
| DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | TX | Dimmit | 415.020 | 420 | 224 | 20343 |
| SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | TX | Dimmit | 415.020 | 420 | 221 | 20342 |
| CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 423 | 438 | 20881 |
| SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 441 | 20882 |
| MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 445 | 20883 |
| PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 415.020 | 425 | 311 | 21184 |
| R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 415.020 | 423 | 449 | 20884 |
| IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 415.020 | 427 | 390 | 21529 |
| JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | TX | Dimmit | 415.020 | 427 | 407 | 21533 |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 412 | 2153 |
| JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | TX | Dimmit | 415.020 | 427 | 399 | 21531 |
| BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | TX | Dimmit | 415.020 | 427 | 394 | 21530 |
| JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 415.020 | 427 | 404 | 21532 |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | TX | Dimmit | 415.020 | 433 | 125 | 22468 |
| DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 141 | 22996 |

VOL 0591 PG 0852

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 436 | 125 | 22992 |
| DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 121 | 22991 |
| CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 436 | 133 | 22994 |
| GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 415.020 | 436 | 129 | 22993 |
| LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 145 | 22997 |
| DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 415.020 | 436 | 137 | 22995 |
| MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | TX | Dimmit | 117.000 | 436 | 118 | 22990 |
| M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 415.020 | 439 | 749 | 23626 |
| MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 757 | 23628 |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 745 | 23625 |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 415.020 | 439 | 753 | 23627 |
| MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 415.020 | 442 | 304 | 24054 |
| KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | TX | Dimmit | 117.000 | 457 | 360 | 26400 |
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | TX | Dimmit | 415.020 | 458 | 290 | 26535 |
| GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | TX | Dimmit | 415.020 | 478 | 227 | 29445 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | TX | Dimmit | 20.000 | 392 | 360 | 15970 |
| EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 029 | 16938 |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 33 | 16939 |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 037 | 16940 |
| MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 398 | 041 | 16941 |
| KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 706 | 17214 |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 691 | 17210 |

VOL 0591 PG 0853

Case 4:19-34508 Document 1354-9 Filed in TXSB on 07/13/20 Page 1002 of 1759

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 702 | 17213 |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 698 | 17212 |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 399 | 483 | 17170 |
| DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 80.000 | 400 | 113 | 17276 |
| SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | TX | Dimmit | 42.640 | 399 | 715 | 17217 |
| DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 342 | 17324 |
| MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 80.000 | 400 | 348 | 17325 |
| ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | TX | La Salle | 110.900 | 530 | 251 | 90198 |
| JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | TX | Dimmit | 80.000 | 405 | 557 | 18183 |
| MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 169 | 18939 |
| JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 80.000 | 410 | 163 | 18937 |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | TX | Dimmit | 80.000 | 412 | 384 | 19214 |
| CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 143 | 22473 |
| ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 431 | 722 | 22228 |
| GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 155 | 22476 |
| EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 80.000 | 433 | 151 | 22475 |
| RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 80.000 | 433 | 147 | 22474 |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 129 | 22469 |
| JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 132 | 22470 |
| BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 136 | 22471 |
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 80.000 | 433 | 139 | 22472 |
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 721 | 23618 |

VOL 0591 PG 0854

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 724 | 23619 |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 80.000 | 439 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 657 | 25469 |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 669 | 25472 |
| SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 80.000 | 450 | 661 | 25470 |
| VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 649 | 25467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | TX | Dimmit | 80.000 | 450 | 673 | 25473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 450 | 665 | 25471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | TX | Dimmit | 80.000 | 450 | 653 | 25468 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 80.000 | 455 | 118 | 26085 |
| MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 80.000 | 467 | 91 | 27796 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 82.530 | 403 | 403 | 17810 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | TX | Dimmit | 82.530 | 419 | 106 | 20117 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 39.800 | 403 | 409 | 17812 |
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | TX | Dimmit | 40.050 | 403 | 400 | 17809 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 40.000 | 403 | 406 | 17811 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | TX | Dimmit | 160.000 | 402<br>415 | 201<br>461 | 17630<br>19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 384 | 18328 |
| ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 388 | 18329 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 396 | 18331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 400 | 18332 |
| GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 392 | 18330 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 356 | 18321 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 364 | 18323 |

VOL 0591 PG 0855

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 160.000 | 406 | 376 | 18326 |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 406 | 372 | 18325 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 160.000 | 406 | 368 | 18324 |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 406 | 360 | 18322 |
| PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 744 | 18416 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 380 | 18327 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 385 | 18688 |
| SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 408 | 389 | 18689 |
| BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 406 | 740 | 18415 |
| RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 406 | 732 | 18413 |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 406 | 736 | 18414 |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 160.000 | 408 | 393 | 18690 |
| DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 160.000 | 408 | 381 | 18687 |
| DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 148 | 19933 |
| BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 160.000 | 418 | 154 | 19935 |
| KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 160.000 | 418 | 151 | 19934 |
| JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | TX | Dimmit | 160.000 | 422 | 387 | 20698 |
| ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 160.000 | 422 | 391 | 20699 |
| SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | TX | Dimmit | 160.000 | 425 | 695 | 21287 |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | TX | Dimmit | 90.890 | 401 | 548 | 17517 |
| EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | TX | Dimmit | 90.890 | 406 | 681 | 18405 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 37.000 | 445 | 640 | 24596 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 37.000 | 405 | 563 | 18185 |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | TX | Dimmit | 42.180 | 406 | 196 | 18282 |
| JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | TX | Dimmit | 10.000 | 408 | 378 | 18686 |

VOL 0591 PG 0856

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | TX | Dimmit | 17.200 | 406 | 724 | 18411 |
| JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 10.200 | 409 | 664 | 18877 |
| GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 680 | 18882 |
| TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 677 | 18881 |
| CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | TX | Dimmit | 40.000 | 409 | 674 | 18880 |
| JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 40.000 | 409 | 671 | 18879 |
| MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | TX | Dimmit | 10.000 | 422 | 395 | 20700 |
| RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 427 | 735 | 21605 |
| JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | TX | Dimmit | 15.000 | 445 | 61 | 24498 |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | TX | Dimmit | 15.000 | 443 | 152 | 24176 |
| LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 646 | 23600 |
| ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 627 | 23596 |
| ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 651 | 23601 |
| JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 637 | 23598 |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 15.000 | 442 | 832 | 24143 |
| BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 656 | 23602 |
| MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 661 | 23603 |
| ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 15.000 | 435 | 797 | 22943 |
| MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | TX | Dimmit | 15.000 | 445 | 56 | 24497 |
| LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 439 | 641 | 23599 |
| WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | TX | Dimmit | 15.000 | 439 | 632 | 23597 |
| MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 15.000 | 456 | 521 | 26276 |
| DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | TX | Dimmit | 15.000 | 465 | 235 | 27497 |

VOL 0591 PG 0857

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | TX | Dimmit | 30.000 | 427 | 741 | 21607 |
| JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | TX | Dimmit | 30.000 | 427 | 738 | 21606 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | TX | Dimmit | 30.000 | 435 | 803 | 22945 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 30.000 | 435 | 800 | 22944 |
| KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 30.000 | 453 | 539 | 25851 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 54 | 21790 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 64 | 21792 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 59 | 21791 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 245.700 | 429 | 69 | 21793 |
| JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 143.630 | 433 | 114 | 22463 |
| MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 105 | 22460 |
| FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 111 | 22462 |
| JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 103.630 | 433 | 108 | 22461 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 480 | 22358 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 490 | 22360 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 485 | 22359 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 197.280 | 432 | 475 | 22357 |
| MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 511 | 23258 |
| GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 505 | 23256 |
| LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 140.000 | 437 | 508 | 23257 |
| DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | TX | Dimmit | 37.400 | 379 | 258 | 13696 |
| RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 412 | 23402 |
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 7.400 | 438 | 409 | 23401 |
| JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | TX | Dimmit | 7.400 | 438 | 407 | 23399 |

VOL 0591 PG 0858

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 780 | 22089 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 10.000 | 430 | 759 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 644 | 24597 |
| S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 654 | 24599 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 80.000 | 445 | 649 | 24598 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | TX | Dimmit | 80.000 | 450 | 645 | 25466 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | TX | Dimmit | 84.990 | 444 | 569 | 24432 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | TX | Dimmit | 10.000 | 442 | 828 | 24142 |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 10.000 | 439 | 691 | 23610 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | TX | Dimmit | 23.700 | 432 | 700 | 22401 |
| ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | TX | Dimmit | 10.000 | 445 | 74 | 24501 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | TX | Dimmit | 10.000 | 439 | 666 | 23604 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 556 | 26162 |
| JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 563 | 26163 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 569 | 26164 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 455 | 550 | 26161 |
| JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 455 | 575 | 26165 |
| MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 10.000 | 458 | 295 | 26536 |
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | TX | Dimmit | 10.000 | 453 | 535 | 25850 |
| KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 505 | 26272 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 157.600 | 456 | 501 | 26271 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 459 | 512 | 26722 |

VOL 0591 PG 0859

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | TX | Dimmit | 157.600 | 459 | 528 | 26726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 524 | 26725 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 459 | 520 | 26724 |
| JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | TX | Dimmit | 157.600 | 459 | 516 | 26723 |
| LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 157.600 | 455 | 655 | 26176 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 157.600 | 455 | 659 | 26177 |
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 663 | 26178 |
| THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 651 | 26175 |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 647 | 26174 |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 157.600 | 455 | 643 | 26173 |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 455 | 639 | 26172 |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 455 | 631 | 26170 |
| MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 157.600 | 452 | 794 | 25771 |
| SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 806 | 25774 |
| GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 802 | 25773 |
| CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 810 | 25775 |
| MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 157.600 | 455 | 627 | 26169 |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 786 | 25769 |
| MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 452 | 790 | 25770 |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 157.600 | 452 | 798 | 25772 |
| SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 157.600 | 455 | 635 | 26171 |
| JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | TX | Dimmit | 157.600 | 470 | 825 | 28383 |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | TX | Dimmit | 157.600 | 469 | 63 | 28143 |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 55 | 28141 |

VOL 0591 PG 0860

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 157.600 | 469 | 59 | 28142 |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 280 | 28929 |
| FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 268 | 28926 |
| JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | TX | Dimmit | 157.600 | 478 | 127 | 29425 |
| EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | TX | Dimmit | 157.600 | 474 | 260 | 28924 |
| MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 256 | 28923 |
| MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 87 | 29417 |
| VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 92 | 29418 |
| RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 122 | 29424 |
| B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 117 | 29423 |
| JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 102 | 29420 |
| RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 97 | 29419 |
| AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 107 | 29421 |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 478 | 112 | 29422 |
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 157.600 | 474 | 272 | 28927 |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 276 | 28928 |
| KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 157.600 | 474 | 264 | 28925 |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | TX | Dimmit | 157.600 | 498 | 593 | 31859 |
| ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 498 | 597 | 31860 |
| JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | TX | Dimmit | 157.600 | 498 | 589 | 31858 |
| MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 585 | 31857 |
| KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 581 | 31856 |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | TX | Dimmit | 157.600 | 498 | 573 | 31854 |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | TX | Dimmit | 157.600 | 498 | 577 | 31855 |

VOL 0591 PG 0861

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 569 | 31853 |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 564 | 31852 |
| JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | TX | Dimmit | 157.600 | 498 | 560 | 31851 |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 556 | 31850 |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 552 | 31849 |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 544 | 31847 |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 157.600 | 498 | 548 | 31848 |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | TX | Dimmit | 157.600 | 498 | 540 | 31846 |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | TX | Dimmit | 157.600 | 498 | 532 | 31844 |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 157.600 | 498 | 536 | 31845 |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 529 | 31843 |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 524 | 31842 |
| MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 157.600 | 498 | 520 | 31841 |
| ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 516 | 31840 |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 157.600 | 498 | 512 | 31839 |
| GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 157.600 | 498 | 601 | 31861 |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 157.600 | 500 | 798 | 32161 |
| KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | TX | Dimmit | 10.000 | 457 | 209 | 26377 |
| HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 10.000 | 457 | 45 | 26336 |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | TX | Dimmit | 10.000 | 457 | 217 | 26379 |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | TX | Dimmit | 10.000 | 457 | 213 | 26378 |
| CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | TX | Dimmit | 10.000 | 455 | 545 | 26160 |
| SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | TX | Dimmit | 10.000 | 459 | 498 | 26719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | TX | Dimmit | 10.000 | 462 | 418 | 27144 |

VOL 0591 PG 0862

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 504 | 26720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 10.000 | 459 | 508 | 26721 |
| JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 10.000 | 459 | 494 | 26718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 11 | 27214 |
| EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 1 | 27212 |
| MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 6 | 27213 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 813 | 27206 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 828 | 27209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 838 | 27211 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 818 | 27207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 16 | 27215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 823 | 27208 |
| ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 21 | 27216 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 462 | 833 | 27210 |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 337 | 27263 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 332 | 27262 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 327 | 27261 |
| JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 10.000 | 463 | 342 | 27264 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 10.000 | 465 | 107 | 27477 |
| DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 121 | 27616 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 127 | 27617 |
| GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 133 | 27618 |
| LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 145 | 27620 |
| DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 20.000 | 466 | 139 | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | TX | Dimmit | 10.000 | 498 | 608 | 31863 |

VOL 0591 PG 0863

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | TX | Dimmit | 10.000 | 473 | 112 | 28765 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 288 | 29147 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 10.000 | 476 | 292 | 29148 |
| ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | TX | Dimmit | 10.000 | 476 | 298 | 29150 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | TX | Dimmit | 40.000 | 474 | 251 | 28919 |
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 573 | 31746 |
| RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 588 | 31749 |
| REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 40.140 | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 10.000 | 498 | 605 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | TX | Dimmit | 10.000 | 487 | 772 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | TX | Dimmit | 10.000 | 498 | 612 | 31864 |
| JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 617 | 31866 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 10.000 | 498 | 614 | 31865 |
| LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 626 | 31870 |
| RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 498 | 629 | 31871 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 622 | 31868 |
| CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 10.000 | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | TX | Dimmit | 10.000 | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 500 | 792 | 32159 |

VOL 0591 PG 0864

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 678 | 33418 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 10.000 | 511 | 684 | 33420 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | TX | Dimmit | 10.000 | 511 | 681 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 10.000 | 511 | 669 | 33415 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | TX | Dimmit | 40.000 | 378 | 674 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | TX | Dimmit | 77.910 | 508 | 167 | 32959 |
| JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 499 | 837 | 32005 |
| YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 20.000 | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 370 | 33520 |
| WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 20.000 | 512 | 365 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | TX | Dimmit | 10.000 | 518 | 9 | 34494 |
| EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 10.000 | 517 | 829 | 34489 |
| BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | TX | Dimmit | 10.000 | 517 | 837 | 34491 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 483 | 34716 |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | TX | Dimmit | 10.000 | 519 | 487 | 34717 |
| LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | TX | Dimmit | 10.000 | 523 | 492 | 35222 |
| CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 523 | 496 | 35223 |
| RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 10.000 | 523 | 500 | 35224 |
| DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | TX | Dimmit | 10.000 | 518 | 5 | 34493 |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 833 | 34490 |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | TX | Dimmit | 10.000 | 518 | 1 | 34492 |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 507 | 34722 |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 499 | 34720 |

VOL 0591 PG 0865

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 479 | 34715 |
| JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 10.000 | 519 | 491 | 34718 |
| BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 10.000 | 517 | 821 | 34487 |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 825 | 34488 |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 519 | 514 | 34724 |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 10.000 | 517 | 817 | 34486 |
| SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | TX | Dimmit | 10.000 | 519 | 495 | 34719 |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 10.000 | 519 | 503 | 34721 |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 90 | 35423 |
| JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 519 | 511 | 34723 |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 20.000 | 506 | 55 | 32616 |
| JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | TX | Dimmit | 20.000 | 506 | 58 | 32617 |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | TX | Dimmit | 20.000 | 506 | 61 | 32618 |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 64 | 32619 |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 20.000 | 506 | 68 | 32620 |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 74 | 32622 |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 78 | 32623 |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 82 | 32624 |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 86 | 32625 |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 90 | 32626 |
| SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 94 | 32627 |
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 104 | 32629 |
| VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 113 | 32631 |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 117 | 32632 |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 687 | 33421 |

VOL 0591 PG 0866

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 695 | 33423 |
| JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 699 | 33424 |
| MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | TX | Dimmit | 20.000 | 511 | 703 | 33425 |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | TX | Dimmit | 20.000 | 511 | 707 | 33426 |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | TX | Dimmit | 20.000 | 511 | 711 | 33427 |
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 714 | 33428 |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 20.000 | 511 | 718 | 33429 |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 722 | 33430 |
| JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | TX | Dimmit | 20.000 | 511 | 726 | 33431 |
| JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 20.000 | 511 | 730 | 33432 |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | TX | Dimmit | 20.000 | 517 | 767 | 34473 |
| ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 817 | 35845 |
| EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | TX | Dimmit | 20.000 | 506 | 71 | 32621 |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 506 | 98 | 32628 |
| BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 20.000 | 506 | 109 | 32630 |
| JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 20.000 | 511 | 691 | 33422 |
| ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 20.000 | 515 | 189 | 33970 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 10.000 | 515 | 184 | 33969 |
| EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 10.000 | 528 | 1 | 35851 |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 284 | 34192 |
| TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 272 | 34190 |
| JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 278 | 34191 |
| MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 10.000 | 516 | 266 | 34189 |

VOL 0591 PG 0867

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 749 | 36343 |
| A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 752 | 36344 |
| RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 756 | 36345 |
| RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 759 | 36346 |
| WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | TX | Dimmit | 10.000 | 530 | 737 | 36339 |
| PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 734 | 36338 |
| REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 530 | 743 | 36341 |
| ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | TX | Dimmit | 10.000 | 530 | 740 | 36340 |
| LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | TX | Dimmit | 10.000 | 530 | 746 | 36342 |
| THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | TX | Dimmit | 10.000 | 530 | 731 | 36337 |
| SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | TX | Dimmit | 10.000 | 530 | 728 | 36336 |
| LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 10.000 | 530 | 762 | 36347 |
| WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 751 | 36646 |
| ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 10.000 | 526 | 263 | 35601 |
| BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 10.000 | 526 | 259 | 35600 |
| SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | TX | Dimmit | 10.000 | 527 | 28 | 35705 |
| CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 527 | 36 | 35707 |
| JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 10.000 | 525 | 364 | 35477 |
| KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 368 | 35478 |
| HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 10.000 | 525 | 360 | 35476 |
| RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 10.000 | 525 | 356 | 35475 |
| KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 10.000 | 527 | 40 | 35708 |
| FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | TX | Dimmit | 10.000 | 527 | 32 | 35706 |
| TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 534 | 310 | 36857 |

VOL 0591 PG 0868

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 534 | 313 | 36858 |
| TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 534 | 307 | 36856 |
| GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | TX | Dimmit | 20.000 | 527 | 821 | 35846 |
| RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 527 | 825 | 35847 |
| NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | TX | Dimmit | 20.000 | 527 | 829 | 35848 |
| JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 20.000 | 522 | 312 | 35105 |
| CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 20.000 | 532 | 357 | 36601 |
| BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | TX | Dimmit | 10.000 | 532 | 367 | 36604 |
| JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 370 | 36605 |
| RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | TX | Dimmit | 10.000 | 532 | 374 | 36606 |
| HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | TX | Dimmit | 10.000 | 532 | 377 | 36607 |
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 380 | 36608 |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 383 | 36609 |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 386 | 36610 |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 389 | 36611 |
| JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 392 | 36612 |
| BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | TX | Dimmit | 10.000 | 532 | 395 | 36613 |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 10.000 | 532 | 398 | 36614 |
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 532 | 403 | 36615 |
| DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 532 | 406 | 36616 |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | TX | Dimmit | 10.000 | 532 | 409 | 36617 |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | TX | Dimmit | 10.000 | 532 | 364 | 36603 |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | TX | Dimmit | 10.000 | 532 | 361 | 36602 |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | TX | Dimmit | 20.000 | 527 | 837 | 35820 |

VOL 0591 PG 0869

Case 4:19-34508 Doc 1354-9 Filed in TXSB on 06/23/20 Page 1028 of 1759

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | TX | Dimmit | 20.000 | 527 | 833 | 35849 |
| MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 10.000 | 523 | 830 | 35256 |
| JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | TX | Dimmit | 10.000 | 536 | 382 | 37176 |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 388 | 37178 |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | TX | Dimmit | 10.000 | 536 | 385 | 37177 |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 10.000 | 536 | 391 | 37179 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 80.000 | 517 | 763 | 34472 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 10.000 | 517 | 759 | 34471 |
| WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | TX | Dimmit | 10.000 | 539 | 360 | 37658 |
| RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | TX | Dimmit | 10.000 | 539 | 366 | 37660 |
| CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | TX | Dimmit | 10.000 | 539 | 363 | 37659 |
| FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | TX | Dimmit | 40.000 | 534 | 714 | 36928 |
| LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 40.000 | 534 | 717 | 36929 |
| GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 534 | 720 | 36930 |
| STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 531 | 199 | 36394 |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | TX | Dimmit | 40.000 | 538 | 505 | 37545 |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | TX | Dimmit | 40.000 | 538 | 509 | 37546 |
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | TX | Dimmit | 40.000 | 538 | 792 | 37593 |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | TX | Dimmit | 40.000 | 528 | 179 | 35886 |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 40.000 | 528 | 175 | 35885 |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | TX | Dimmit | 12.310 | 542 | 345 | 38066 |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 421 | 37944 |

VOL 0591 PG 0870

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 10.000 | 541 | 424 | 37945 |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | TX | Dimmit | 80.000 | 539 | 765 | 37708 |
| DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 220 | 38040 |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 10.000 | 542 | 217 | 38039 |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 75 | 37289 |
| ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 10.000 | 537 | 78 | 37290 |
| JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 81 | 37291 |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 10.000 | 537 | 84 | 37292 |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 87 | 37293 |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 10.000 | 537 | 90 | 37294 |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | TX | Dimmit | 10.000 | 537 | 93 | 37295 |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 96 | 37296 |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 99 | 37297 |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 102 | 37298 |
| 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 537 | 105 | 37299 |
| LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | TX | Dimmit | 200.000 | 379 | 498 | 13745 |
| MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 40.000 | 544 | 260 | 38286 |
| RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 525 | 38438 |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 522 | 38437 |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 519 | 38436 |
| BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 528 | 38439 |
| AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 534 | 38441 |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | TX | Dimmit | 10.000 | 545 | 516 | 38435 |

VOL 0591 PG 0871

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 545 | 531 | 38440 |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | TX | Dimmit | 10.000 | 545 | 546 | 38445 |
| LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 543 | 38444 |
| JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 540 | 38443 |
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 537 | 38442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 545 | 549 | 38446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 545 | 814 | 38474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 123 | 38274 |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 117 | 38272 |
| PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 10.000 | 544 | 105 | 38268 |
| RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 120 | 38273 |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 102 | 38267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 126 | 38275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 114 | 38271 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 544 | 99 | 38266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 111 | 38270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 544 | 108 | 38269 |
| DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 10.000 | 547 | 115 | 38601 |
| DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | TX | Dimmit | 160.000 | 542 | 279 | 38053 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 10.000 | 544 | 756 | 38359 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | TX | Dimmit | 10.000 | 544 | 753 | 38358 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 207 | 38507 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 204 | 38506 |
| STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 216 | 38510 |
| WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 213 | 38509 |

VOL 0591 PG 0872

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 546 | 210 | 38508 |
| MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | TX | Dimmit | 80.000 | 545 | 243 | 38397 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | TX | Dimmit | 10.000 | 547 | 121 | 38603 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 547 | 118 | 38602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 70.000 | 548 | 622 | 38850 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | TX | Dimmit | 10.000 | 548 | 477 | 38833 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 10.000 | 549 | 470 | 38927 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 548 | 471 | 38831 |
| BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 10.000 | 548 | 474 | 38832 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | TX | Dimmit | 10.000 | 550 | 372 | 39027 |
| WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 10.000 | 550 | 369 | 39026 |
| DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | TX | Dimmit | 160.000 | 551 | 752 | 39233 |
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 10.000 | 553 | 582 | 39410 |
| LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | TX | Dimmit | 10.000 | 553 | 588 | 39412 |
| JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | TX | Dimmit | 10.000 | 552 | 441 | 39279 |
| MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | TX | Dimmit | 80.000 | 548 | 735 | 38868 |
| DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 321 | 39162 |
| MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 324 | 39163 |
| DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 80.000 | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | TX | Dimmit | 80.000 | 551 | 318 | 39161 |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 80.000 | 551 | 312 | 39159 |

VOL 0591 PG 0873

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | TX | Dimmit | 80.000 | 549 | 725 | 38967 |
| JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | TX | Dimmit | 80.000 | 549 | 728 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 553 | 585 | 39411 |
| BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | TX | Dimmit | 10.000 | 555 | 335 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | TX | Dimmit | 40.000 | 555 | 13 | 39591 |
| DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | TX | Dimmit | 10.000 | 556 | 589 | 39852 |
| SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 10.000 | 556 | 592 | 39853 |
| LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 70.000 | 557 | 385 | 39960 |
| GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 10.000 | 558 | 601 | 40106 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 555 | 422 | 39661 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 555 | 428 | 39663 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 555 | 425 | 39662 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | TX | Dimmit | 80.000 | 555 | 431 | 39664 |
| RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 80.000 | 556 | 436 | 39815 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | TX | Dimmit | 80.000 | 556 | 433 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 379 | 40156 |
| JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 559 | 376 | 40155 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 439 | 40165 |
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | TX | Dimmit | 80.000 | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 80.000 | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 80.000 | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 80.000 | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | TX | Dimmit | 80.000 | 563 | 557 | 40854 |

VOL 0591 PG 0874

Exhibit A - Leases

| Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 10.000 | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | TX | Dimmit | 20.000 | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 10.000 | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | TX | Dimmit | 20.000 | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | TX | Dimmit | 1639.310 | 577 | 454 | 42708 |

VOL 0591 PG 0875

**Exhibit B**

**AMI**

VOL 0591 PG 0876

Exhibit B to Memorandum of Joint Development Agreement




44407
MARIO Z. GARCIA
COUNTY CLERK
2017 Apr 12 at 10:38 AM
DIMMIT COUNTY, TEXAS
By: JD Josefa D. De Leon DEPUTY

# Exhibit J

Maverick County

# MEMORANDUM OF DEVELOPMENT AGREEMENT

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

W I T N E S S E T H:

**WHEREAS**, Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of January 12, 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on Appendix A hereto (the "***Leases***"); and

**WHEREAS**, the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation, certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.





DOC #196183
BOOK 1631 PAGE 242

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or

instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

BOOK 1631 PAGE 244

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

**ANADARKO E&P ONSHORE LLC**

By: [signature]

Name: Brian T. Kuck

Title: Vice President Corporate Development

BOOK 1631 PAGE 245

# ACKNOWLEDGMENTS

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President Corporate Development of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

ANGELA RASBERRY
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-4-2018

Angela Rasberry
NOTARY PUBLIC

My Commission Expires: 11/4/18

AFFIX SEAL

BOOK 1631 PAGE 246

**KERR-MCGEE OIL & GAS ONSHORE LP**

By: ________________________

Name: Brian T. Kuck
Title: Vice President

OR RG T

BOOK 1631 PAGE 247

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Angela Rasberry
NOTARY PUBLIC

ANGELA RASBERRY
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-4-2018

My Commission Expires:
11/4/18

**BOOK 1631 PAGE 248**

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:______________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

BOOK 1631 PAGE 249

Case 4:19-34508 Document 1354-7 Filed 04/19/23 Page 1036 of 1760

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:____________________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:____________________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**BOOK 1631 PAGE 250**

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February ________. within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

________________________

NOTARY PUBLIC

My Commission Expires:

09.16.20

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February ________, within my jurisdiction, the within named Patricio D. Sanchez, duly identified before me, who acknowledged that he is the President and Chief Executive Officer of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

________________________

NOTARY PUBLIC

My Commission Expires:

09.16.20

**BOOK 1631 PAGE 251**

**GAVILAN RESOURCES, LLC**

By: ______________________
Name: Angelo Acconcia
Title: President

**BOOK 1631 PAGE 252**

Signature Page to Memorandum of Development Agreement

**STATE OF NEW YORK** §
Westchester §
**COUNTY OF ~~NEW YORK~~** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Angelo Acconcia, duly identified before me, who acknowledged that he is the President of Gavilan Resources, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Gina Santanastasio

NOTARY PUBLIC

My Commission Expires:

10/15/2023

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

**BOOK 1631 PAGE 253**

Case 19-34508 Document 1354-7 Filed in TXSB on 06/22/20 Page 134 of 1165

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:________________________________
Name: Eduardo A. Sanchez
Title: President

**BOOK 1631 PAGE 254**

**STATE OF TEXAS §**
**§**
**COUNTY OF HARRIS §**

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:

09 · 16 · 2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

**BOOK 1631 PAGE 255**

**APPENDIX A**

**LEASES**

[See Attached.]

**Exhibit A**
**Leases**

| Agreement | Lessor | Lessee | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| 1314524000 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1041 | 67 | 144189 |
| 1314525000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 1073 | 94 | 147028 |
| 1314528000 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1041 | 74 | 144190 |
| | | | | | Webb | 2435 | 507 | 977957 |
| 1314529000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 1073 | 108 | 147031 |
| | | | | | Webb | 2528 | 616 | 993897 |
| 1314807000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1067 | 161 | 146519 |
| | | | | | Webb | 2509 | 755 | 990517 |
| 1314809000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1067 | 185 | 146523 |
| 1314810000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1067 | 173 | 146521 |
| 1314959000 | CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck | 1076 | 419 | 147391 |
| | | | | | Dimmit | 369 | 459 | 12859 |
| | | | | | Webb | 2791 | 132 | 1044021 |
| 1314960000 | DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick | 1281 | 101 | 164624 |
| | | | | | Dimmit | 405 | 367 | 18144 |
| | | | | | Webb | 3073 | 569 | 1098663 |
| 1315102000 | FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit | 332 | 649 | 7649 |
| | | | | | Maverick | 1012 | 222 | 141603 |
| 1315114000 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick | 1041 | 60 | 144183 |
| | | | | | Webb | 339 | 550 | 8821 |
| 1315115000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick | 1073 | 99 | 147023 |
| | | | | | Webb | 344 | 128 | 15489 |

BOOK 1631 PAGE 257

**BOOK 1631 PAGE 258**

**Doc #: 196183**
**Book: 1631**
**Pages: 242 - 258**

Filed & Recorded:
03/08/2017 10:34AM
SARA MONTEMAYOR
COUNTY CLERK
MAVERICK

| | |
|---|---|
| Recording Fee - Land Recs | $65.00 |
| Records Management | $10.00 |
| Records Preservation Fund | $10.00 |
| Courthouse Security Fee | $3.00 |

Irma Y Holguin, Deputy

STATE OF TEXAS,
COUNTY OF MAVERICK
I hereby certify that this instrument was filed on the date and time stamped thereon by me and was duly recorded in the OFFICIAL PUBLIC RECORDS of Maverick County, Texas.

Any provisions herein which restricts the sale, rental, or use of the described real property because of color or race is invalid and unenforceable under federal law.

SARA MONTEMAYOR
COUNTY CLERK MAVERICK COUNTY, TEXAS



Webb County

# MEMORANDUM OF DEVELOPMENT AGREEMENT

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

W I T N E S S E T H:

**WHEREAS**, Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of January 12, 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on Appendix A hereto (the "***Leases***"); and

**WHEREAS**, the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation, certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or

instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

**ANADARKO**

**ANADARKO E&P ONSHORE LLC**

By: [signature]

Name: Brian T. Kuck

Title: Vice President Corporate Development

ACKNOWLEDGMENTS

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President Corporate Development of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

ANGELA RASBERRY
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
11-4-2018

Angela Rasberry
NOTARY PUBLIC

My Commission Expires:
11/4/18

AFFIX SEAL

**KERR-MCGEE OIL & GAS ONSHORE LP**

By:______________________________
Name: Brian T. Kuck
Title: Vice President

**STATE OF TEXAS §**
**§**
**COUNTY OF MONTGOMERY §**

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

ANGELA RASBERRY NOTARY PUBLIC STATE OF TEXAS EXPIRES 11-4-2018

Angela Rasbery
NOTARY PUBLIC

My Commission Expires:
11/4/18

Acknowledgment Page to Memorandum of Development Agreement

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:______________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:______________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Patricio D. Sanchez, duly identified before me, who acknowledged that he is the President and Chief Executive Officer of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

**GAVILAN RESOURCES, LLC**

By:______________________________
Name: Angelo Acconcia
Title: President

Signature Page to Memorandum of Development Agreement

Case 4:19-34508 Document 1354-70 Filed in TXSB on 04/19/23 Page 1036 of 1065

**STATE OF NEW YORK §**

**COUNTY OF ~~NEW YORK~~ Westchester §**

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February 2017, within my jurisdiction, the within named Angelo Acconcia, duly identified before me, who acknowledged that he is the President of Gavilan Resources, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Gina Santanastasio

NOTARY PUBLIC

My Commission Expires:

10/15/2023

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15 2023

Acknowledgment Page to Memorandum of Development Agreement

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:________________________________
Name: Eduardo A. Sanchez
Title: President

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:

09.16.2019

**APPENDIX A**

**LEASES**

[See Attached.]

**Exhibit A**
**Leases**

| Agreement | Lessor | Lessee | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| 1313855000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Webb | 2329 | 707 | 960221 |
| 1314474000 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | TX | Webb | 2435 | 504 | 977956 |
| 1314518000 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | TX | Webb | 2484 | 238 | 986336 |
| 1314520000 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 2583 | 185 | 1003979 |
| 1314521000 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | TX | Webb | 2583 | 182 | 1003978 |
| 1314528000 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| 1314529000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| 1314744000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| 1314807000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| 1314959000 | CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| 1314960000 | DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| 1315114000 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | TX | Maverick<br>Webb | 1041<br>339 | 60<br>550 | 144183<br>8821 |
| 1315115000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | TX | Maverick<br>Webb | 1073<br>344 | 99<br>128 | 147023<br>15489 |
| 1316573000 | B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | TX | Webb | 2672 | 185 | 1020907 |
| 1316616000 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | TX | Webb | 2668 | 642 | 1020289 |
| 1316751000 | WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | TX | Webb | 2750 | 95 | 1036351 |

STATE OF TEXAS
COUNTY OF WEBB
I HEREBY CERTIFY THAT THIS INSTRUMENT WAS FILED ON THE DATE AND AT THE TIME STAMPED HERON BY ME AND WAS DULY RECORDED IN THE VOLUME AND PAGE OF THE OFFICIAL PUBLIC RECORDS OF WEBB COUNTY TEXAS AS STAMPED HEREON BY ME

COUNTY CLERK
WEBB COUNTY, TEXAS

Doc # 1290771
Recorded
3/8/2017 3:38:21 PM

Signed:
BY DEPUTY
MARGIE RAMIREZ IBARRA
COUNTY CLERK
Fees: $86.00

La Salle County 00126645

# MEMORANDUM OF DEVELOPMENT AGREEMENT

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

WITNESSETH:

**WHEREAS,** Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of January 12, 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on Appendix A hereto (the "***Leases***"); and

**WHEREAS,** the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE,** the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation, certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.

00126645 OR 947 252

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or



US-DOCS\80947393.2

D0012645 OR BK 967 PG 257

008934

instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

00124645 BK 9427 PG 258



US-DOCS\80947393.2

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

**ANADARKO E&P ONSHORE LLC**

By:______________________________

Name: Brian T. Kuck

Title: Vice President Corporate Development

DOC 001246645 BK OR VOL 947 PG 259

# ACKNOWLEDGMENTS

STATE OF TEXAS §
§
COUNTY OF MONTGOMERY §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President Corporate Development of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

BETHANY A. DENNARD
Notary Public, State of Texas
My Commission Expires
October 31, 2017

Bethany A. Dennard
NOTARY PUBLIC

My Commission Expires:
10/31/17

AFFIX SEAL

00126645 BK 0927 260

**KERR-MCGEE OIL & GAS ONSHORE LP**

By: ______________________

Name: Brian T. Kuck

Title: Vice President

OR RET

DOC 00124645 BK OR VOL 947 PG 261

Signature Page to Memorandum of Development Agreement

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February, 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Terri Winters

NOTARY PUBLIC

My Commission Expires:

1/23/21

TERRI WINTERS
2884775
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JANUARY 23, 2021

00124645 BK 927 PG 29

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:______________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

Doc 00124645 Bk OR Vol 947 Pg 263

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:____________________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:____________________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

00124645 BK 921 PG 264

Signature Page to Memorandum of Development Agreement

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Patricio D. Sanchez, duly identified before me, who acknowledged that he is the President and Chief Executive Officer of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

0012645 OR BK 947 PG 265

**GAVILAN RESOURCES, LLC**

By: ______________________

Name: Angelo Acconcia

Title: President

Signature Page to Memorandum of Development Agreement

00192645 BK 947 PG 262

**STATE OF NEW YORK §**
**§**
**COUNTY OF ~~NEW YORK~~ Westchester §**

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Angelo Acconcia, duly identified before me, who acknowledged that he is the President of Gavilan Resources, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Gina Santanastasio
NOTARY PUBLIC

My Commission Expires:
10/15/2023

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

00124645 BK 927 PG 267

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:________________________________
Name: Eduardo A. Sanchez
Title: President

00124645 BK 947 PG 268

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

D0C 00124645 BK OR 9047 PG 269

**APPENDIX A**

**LEASES**

[See Attached.]

**Exhibit A**

**Leases**

| Agreement | Lessor | Lessee | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| 1313877000 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| 1317385000 | G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 830<br>207 | 13825<br>84338 |
| 1317386000 | GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 836<br>213 | 13826<br>84339 |
| 1317387000 | LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 825<br>202 | 13824<br>84337 |
| 1317388000 | ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit<br>LaSalle | 391<br>513 | 488<br>32 | 15860<br>87603 |
| 1319203000 | ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | TX | La Salle | 530 | 251 | 90198 |
| 1313876000 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/1/2005 | TX | Dimmit<br>La Salle | 27136.1 | 460<br>329 | 233<br>487 |

FILED AND RECORDED
REAL PROPERTY RECORDS
On: Mar 14,2017 at 10:30A

Document Number: 00124645

Amount 86.00

HONORABLE MARGARITA A ESQUEDA
COUNTY CLERK
By
Ana Romon,
LA SALLE COUNTY

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

Doc 00124645 Bk OR Vol 947 Pg 271

FILED FOR RECORD
DIMMIT COUNTY, TEXAS
Mar 08, 2017 at 03:42:00 PM
Dimmit County

# MEMORANDUM OF DEVELOPMENT AGREEMENT

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

VOL 0588

WITNESSETH:

**WHEREAS**, Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of January 12, 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on <u>Appendix A</u> hereto (the "***Leases***"); and

PG 0320

**WHEREAS**, the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation, certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or

VOL 0588 PG 0321

instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

VOL 0588 PG 0322

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

VOL 0588

**ANADARKO E&P ONSHORE LLC**

By: ______________________

Name: Brian T. Kuck

Title: Vice President Corporate Development

PG 0323

**ACKNOWLEDGMENTS**

STATE OF TEXAS §
§
COUNTY OF MONTGOMERY §

VOL 0588

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February, 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President Corporate Development of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Terri Winters

NOTARY PUBLIC

PG 0324

My Commission Expires: 1/23/21

AFFIX SEAL

TERRI WINTERS
2884775
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JANUARY 23, 2021

**KERR-MCGEE OIL & GAS ONSHORE LP**

By: ______________________________
Name: Brian T. Kuck
Title: Vice President

VOL 0588 PG 0325

Signature Page to Memorandum of Development Agreement

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February, 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Terri Winters

NOTARY PUBLIC

My Commission Expires:

1/23/21

TERRI WINTERS
2884775
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JANUARY 23, 2021

VOL 0588 PG 0326

Acknowledgment Page to Memorandum of Development Agreement

Case 4:23-cv-00587 Document 1-10 Filed on 01/19/23 in TXSD Page 1087 of 1759

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:______________________________ VOL
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:______________________________ 0588
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

PG

0327

Signature Page to Memorandum of Development Agreement

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:________________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:________________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

VOL 0588 PG 0328

Signature Page to Memorandum of Development Agreement

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:

09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

VOL 0588 PG 0329

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Patricio D. Sanchez, duly identified before me, who acknowledged that he is the President and Chief Executive Officer of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:

09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

Case 4:19-cv-34508 Document 1354-10 Filed 04/19/23 on 08/20/20 Page 1050 of 1065

**GAVILAN RESOURCES, LLC**

By: __________________________

Name: Angelo Acconcia

Title: President

VOL 0588 PG 0330

Signature Page to Memorandum of Development Agreement

**STATE OF NEW YORK** §
§
**COUNTY OF ~~NEW YORK~~** Westchester §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Angelo Acconcia, duly identified before me, who acknowledged that he is the President of Gavilan Resources, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Gina Santanastasio

NOTARY PUBLIC

My Commission Expires:

10/15/2023

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15 2023

VOL 0588 PG 0331

Acknowledgment Page to Memorandum of Development Agreement

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:____________________
Name: Eduardo A. Sanchez
Title: President

VOL 0588 PG 0332

Signature Page to Memorandum of Development Agreement

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:

09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

VOL 0588 PG 0333

Acknowledgment Page to Memorandum of Development Agreement

**<u>APPENDIX A</u>**

**LEASES**

[See Attached.]

VOL 0588 PG 0334

**Exhibit A**
**Leases**

| Agreement | Lessor | Lessee | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| 1303118000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 329 | 131 | 7000 |
| 1303119000 | JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 385 | 752 | 14931 |
| 1303120000 | BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | TX | Dimmit | 387 | 582 | 15240 |
| 1303122000 | JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 399 | 695 | 17211 |
| 1303123000 | BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 399 | 709 | 17215 |
| 1303124000 | VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | TX | Dimmit | 399 | 712 | 17216 |
| 1303125000 | ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 406 | 729 | 18412 |
| 1303126000 | MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 417 | 612 | 19856 |
| 1303127000 | KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 425 | 589 | 21253 |
| 1303128000 | JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 445 | 620 | 24591 |
| 1303129000 | JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 445 | 628 | 24593 |
| 1303130000 | BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | TX | Dimmit | 445 | 624 | 24592 |
| 1303131000 | SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 445 | 636 | 24595 |
| 1303132000 | LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | TX | Dimmit | 445 | 632 | 24594 |
| 1303133000 | WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 667 | 26041 |
| 1303134000 | SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 654 | 26037 |
| 1303135000 | NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 664 | 26040 |
| 1303136000 | JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 660 | 26039 |
| 1303137000 | MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 648 | 26035 |
| 1303138000 | RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 630 | 26029 |
| 1303139000 | PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 642 | 26033 |
| 1303140000 | APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 651 | 26036 |
| 1303141000 | MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 627 | 26028 |
| 1303142000 | CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 636 | 26031 |
| 1303143000 | ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 645 | 26034 |
| 1303144000 | DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 456 | 469 | 26264 |
| 1303145000 | LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 639 | 26032 |
| 1303146000 | ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 657 | 26038 |
| 1303147000 | CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 454 | 633 | 26030 |
| 1303148000 | UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 461 | 254 | 26955 |
| 1303149000 | LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 463 | 89 | 27233 |
| 1303150000 | PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | TX | Dimmit | 463 | 85 | 27232 |
| 1303151000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 329 | 397 | 7052 |
| 1303152000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 338 | 617 | 8649 |
| 1303153000 | BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 409 | 226 | 18821 |
| 1303154000 | EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 409 | 229 | 18822 |
| 1303155000 | SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | TX | Dimmit | 409 | 232 | 18823 |
| 1303156000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | TX | Dimmit | 335 | 276 | 8081 |

VOL 0588 PG 0335

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1303157000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 338 | 621 | 8650 |
| 1303160000 | BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 387 | 585 | 15241 |
| 1303748000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 343 | 325 | 9442 |
| 1303749000 | ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 496 | 197 | 31626 |
| 1303750000 | JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 496 | 194 | 31625 |
| 1303751000 | SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | TX | Dimmit | 500 | 6 | 32007 |
| 1303752000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 338 | 631 | 8652 |
| 1303753000 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 338 | 636 | 8653 |
| 1303754000 | THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | TX | Dimmit | 338 | 626 | 8651 |
| 1303755000 | MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 385 | 255 | 14820 |
| 1303756000 | MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | TX | Dimmit | 385 | 262 | 14821 |
| 1304795000 | ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | TX | Dimmit | 27 | 384 | 113502 |
| 1304807000 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 29<br>4 | 86<br>425 | 129<br>114336 |
| 1304814000 | DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | TX | Dimmit | 29 | 322 | 114642 |
| 1304815000 | MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | TX | Dimmit | 29 | 332 | 114666 |
| 1304816000 | G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 29 | 355 | 114678 |
| 1304817000 | MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 29 | 377 | 114700 |
| 1304818000 | L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | TX | Dimmit | 29 | 381 | 114700-A |
| 1304819000 | LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | TX | Dimmit | 29 | 366 | 114736 |
| 1304820000 | RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | TX | Dimmit | 29 | 359 | 114737 |
| 1304821000 | JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 29 | 469 | 114826 |
| 1304823000 | DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | TX | Dimmit | 30 | 10 | 114829 |
| 1304827000 | ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | TX | Dimmit | 31 | 330 | 693 |
| 1304828000 | LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | TX | Dimmit | 31 | 464 | 841 |
| 1304829000 | AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | TX | Dimmit | 33 | 505 | 2577 |
| 1304830000 | PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | TX | Dimmit | 39 | 193 | 1997 |
| 1304847000 | MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | TX | Dimmit | 36 | 136 | 779 |
| 1304848000 | CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | TX | Dimmit | 37 | 257 | 300984 |
| 1305072000 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 97<br>55 | 145<br>185 | 1086<br>46827 |
| 1305137000 | B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | TX | Dimmit | 29 | 293 | T16318 |
| 1305213000 | BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | TX | Dimmit | 82 | 666 | |
| 1305214000 | ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 82 | 671 | 546 |
| 1305215000 | MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | TX | Dimmit | 82 | 676 | |
| 1305577000 | I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | TX | Dimmit | 33 | 121 | 800045 |
| 1305578000 | MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | TX | Dimmit | 30 | 460 | 800046 |
| 1305579000 | WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | TX | Dimmit | 30 | 270 | 229 |
| 1305580000 | SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | TX | Dimmit | 30 | 495 | 458 |
| 1306128000 | ERIN BAIN JONES | W W OATMAN | 05/11/1970 | TX | Dimmit | 31 | 186 | 4150 |
| 1313857000 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 329 | 484 | 7078 |

VOL 0588 PG 0336

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1313858000 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 329 | 394 | 7051 |
| 1313876000 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit | 460<br>329 | 233<br>487 | 79160<br>7079 |
| 1313877000 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | TX | Dimmit<br>LaSalle | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| 1313878000 | DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | TX | Dimmit | 354 | 171 | 11322 |
| 1313879000 | HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | TX | Dimmit | 398 | 26 | 16937 |
| 1313881000 | RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 394 | 189 | 16294 |
| 1313882000 | JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 397 | 32 | 16768 |
| 1313883000 | JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 397 | 26 | 16766 |
| 1313884000 | PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 397 | 35 | 16769 |
| 1313885000 | KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 397 | 38 | 16770 |
| 1313886000 | RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 397 | 29 | 16767 |
| 1313887000 | BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | TX | Dimmit | 405 | 560 | 18184 |
| 1313888000 | CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | TX | Dimmit | 425 | 586 | 21252 |
| 1313889000 | CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 492 | 764 | 31322 |
| 1313890000 | JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 492 | 759 | 31321 |
| 1313891000 | CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 492 | 754 | 31320 |
| 1313892000 | KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | TX | Dimmit | 492 | 750 | 31319 |
| 1314744000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Webb<br>Dimmit | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| [redacted] | | ANADARKO E&P COMPANY LP | 08/31/2006 | TX | Maverck<br>Dimmit<br>Webb | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| | | ANADARKO E&P COMPANY LP | 02/01/2011 | TX | Maverick<br>Dimmit<br>Webb | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| 1314962000 | DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 344 | 6 | 9540 |
| 1314963000 | SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 392 | 478 | 15989 |
| 1314964000 | JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | TX | Dimmit | 439 | 695 | 23611 |
| 1314965000 | WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 343 | 690 | 9504 |
| 1315102000 | FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | TX | Dimmit<br>Maverick | 332<br>1012 | 649<br>222 | 7649<br>141603 |
| [redacted] | | ANADARKO E&P COMPANY LP | 09/20/2006 | TX | Dimmit | 344 | 1 | 9539 |
| 1315104000 | LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | TX | Dimmit | 343 | 844 | 9538 |
| 1315105000 | DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 429 | 83 | 21796 |
| 1315106000 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 430 | 773 | 22088 |
| 1315107000 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 430 | 766 | 22087 |

VOL 0588 PG 0337

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1315108000 | SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 470 | 833 | 28385 |
| 1315109000 | RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 470 | 837 | 28386 |
| 1315110000 | CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 471 | 1 | 28887 |
| 1315111000 | CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 470 | 829 | 28384 |
| 1315112000 | BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | TX | Dimmit | 471 | 5 | 28388 |
| 1315113000 | ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | TX | Dimmit | 336 | 199 | 8251 |
| 1315213000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 344 | 46 | 9545 |
| 1315214000 | LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | TX | Dimmit | 423 | 49 | 20796 |
| 1315215000 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 445 | 66 | 24499 |
| 1315218000 | AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 439 | 678 | 23607 |
| 1315219000 | SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 439 | 674 | 23606 |
| 1315220000 | THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 439 | 682 | 23608 |
| 1315221000 | HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 439 | 670 | 23605 |
| 1315222000 | RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 449 | 521 | 25265 |
| 1315223000 | AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 453 | 531 | 25849 |
| 1315229000 | KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | TX | Dimmit | 495 | 204 | 31491 |
| 1315230000 | GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 495 | 208 | 31492 |
| 1315231000 | CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | TX | Dimmit | 495 | 212 | 31493 |
| 1315232000 | BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 495 | 216 | 31494 |
| 1315233000 | JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 491 | 516 | 31083 |
| 1315234000 | JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | TX | Dimmit | 504 | 77 | 32389 |
| 1315709000 | MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | TX | Dimmit | 343 | 694 | 9505 |
| 1315710000 | LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 393 | 379 | 16162 |
| 1315711000 | SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 393 | 398 | 16168 |
| 1315712000 | KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | TX | Dimmit | 393 | 382 | 16163 |
| 1315713000 | MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 393 | 395 | 16167 |
| 1315714000 | PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | TX | Dimmit | 395 | 525 | 16565 |
| 1315715000 | GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | TX | Dimmit | 395 | 522 | 16564 |
| 1315716000 | JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | TX | Dimmit | 395 | 528 | 16566 |
| 1315717000 | MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 420 | 759 | 20412 |
| 1315718000 | LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 420 | 757 | 20411 |
| 1315719000 | DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | TX | Dimmit | 420 | 762 | 20413 |
| 1315720000 | HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 426 | 580 | 21449 |
| 1315721000 | MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 426 | 577 | 21448 |
| 1315722000 | LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | TX | Dimmit | 429 | 541 | 21885 |
| 1315723000 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 445 | 70 | 24500 |
| 1315724000 | BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | TX | Dimmit | 456 | 530 | 26278 |
| 1315725000 | JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | TX | Dimmit | 505 | 738 | 32601 |
| 1315726000 | JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | TX | Dimmit | 505 | 734 | 32600 |
| 1315727000 | BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 505 | 741 | 32602 |
| 1317015000 | ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | TX | Dimmit | 369 | 468 | 12860 |
| 1317385000 | G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 830<br>207 | 13825<br>84338 |

VOL 0588 PG 0338

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1317386000 | GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 836<br>213 | 13826<br>84339 |
| 1317387000 | LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit<br>LaSalle | 379<br>492 | 825<br>202 | 13824<br>84337 |
| 1317388000 | ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | TX | Dimmit<br>LaSalle | 391<br>513 | 488<br>32 | 15860<br>87603 |
| 1317424000 | GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 380 | 11 | 13830 |
| 1317425000 | GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 380 | 7 | 13829 |
| 1317426000 | RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 380 | 16 | 13831 |
| 1317427000 | GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 380 | 1 | 13828 |
| 1317428000 | LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | TX | Dimmit | 379 | 840 | 13827 |
| 1317506000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | TX | Dimmit | 382 | 13 | 14190 |
| 1317512000 | MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | TX | Dimmit | 383 | 654 | 14548 |
| 1317600000 | DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | TX | Dimmit | 385 | 526 | 14884 |
| 1318088000 | CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | TX | Dimmit | 387 | 456 | 15211 |
| 1318090000 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | TX | Dimmit | 388 | 648 | 15418 |
| 1318091000 | MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 389 | 719 | 15602 |
| 1318092000 | MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 393 | 388 | 16165 |
| 1318093000 | PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 393 | 401 | 16169 |
| 1318094000 | WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 391 | 286 | 15828 |
| 1318095000 | CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 391 | 649 | 15876 |
| 1318096000 | IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | TX | Dimmit | 393 | 728 | 16234 |
| 1318097000 | ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 450 | 641 | 25465 |
| 1318098000 | CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | TX | Dimmit | 450 | 637 | 25464 |
| 1318099000 | MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 455 | 623 | 26168 |
| 1318100000 | SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 457 | 363 | 26401 |
| 1318377000 | GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 390 | 550 | 15691 |
| 1318378000 | STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 392 | 481 | 15990 |
| 1318379000 | ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 392 | 484 | 15991 |
| 1318380000 | ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 393 | 405 | 16170 |
| 1318381000 | WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 393 | 392 | 16166 |
| 1318382000 | REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 393 | 408 | 16171 |
| 1318383000 | BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 393 | 411 | 16172 |
| 1318384000 | DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | TX | Dimmit | 394 | 192 | 16295 |
| 1318385000 | MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | TX | Dimmit | 392 | 487 | 15992 |
| 1318386000 | BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | TX | Dimmit | 392 | 490 | 15993 |
| 1318387000 | SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 395 | 565 | 16572 |
| 1318388000 | TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | TX | Dimmit | 402 | 198 | 17629 |

VOL 0588 PG 0339

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1318393000 | MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 785 | 22244 |
| 1318394000 | MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 777 | 22242 |
| 1318395000 | ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 769 | 22240 |
| 1318396000 | ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 761 | 22238 |
| 1318397000 | CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 745 | 22234 |
| 1318398000 | CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 753 | 22236 |
| 1318399000 | CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 737 | 22232 |
| 1318400000 | ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 729 | 22230 |
| 1318401000 | VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 809 | 22250 |
| 1318402000 | VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | TX | Dimmit | 431 | 801 | 22248 |
| 1318403000 | TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | TX | Dimmit | 431 | 793 | 22246 |
| 1318434000 | SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | TX | Dimmit | 393 | 385 | 16164 |
| 1318435000 | BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | TX | Dimmit | 393 | 414 | 16173 |
| 1318436000 | MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 393 | 318 | 16140 |
| 1318438000 | KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | TX | Dimmit | 394 | 147 | 16284 |
| 1318439000 | BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | TX | Dimmit | 409 | 667 | 18878 |
| 1318440000 | ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 410 | 828 | 19044 |
| 1318441000 | ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | TX | Dimmit | 410 | 831 | 19045 |
| 1318442000 | CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | TX | Dimmit | 418 | 591 | 20043 |
| 1318443000 | LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 423 | 615 | 20919 |
| 1318444000 | NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 439 | 702 | 23613 |
| 1318445000 | EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 439 | 714 | 23616 |
| 1318446000 | HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 439 | 698 | 23612 |
| 1318447000 | SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 439 | 710 | 23615 |
| 1318448000 | SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | TX | Dimmit | 439 | 706 | 23614 |
| 1318449000 | PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | TX | Dimmit | 482 | 325 | 30186 |
| 1318450000 | CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 482 | 322 | 30185 |
| 1318451000 | DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 482 | 310 | 30181 |
| 1318452000 | ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 482 | 313 | 30182 |
| 1318453000 | GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 482 | 316 | 30183 |
| 1318454000 | BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | TX | Dimmit | 482 | 307 | 30180 |
| 1318455000 | EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | TX | Dimmit | 482 | 319 | 30184 |
| 1318456000 | VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 500 | 316 | 32057 |
| 1318457000 | KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | TX | Dimmit | 502 | 65 | 32199 |
| 1318458000 | VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | TX | Dimmit | 512 | 193 | 33490 |
| 1318459000 | JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 512 | 196 | 33491 |
| 1318460000 | PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 516 | 704 | 34283 |
| 1318461000 | KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 516 | 701 | 34282 |
| 1318462000 | GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 515 | 582 | 34081 |
| 1318463000 | TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | TX | Dimmit | 515 | 579 | 34080 |
| 1318464000 | KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | TX | Dimmit | 517 | 546 | 34428 |
| 1318465000 | NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 512 | 199 | 33492 |
| 1318466000 | SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 515 | 576 | 34079 |

VOL 0588 PG 0340

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1318467000 | WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | TX | Dimmit | 515 | 573 | 34078 |
| 1318468000 | THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | TX | Dimmit | 512 | 190 | 33489 |
| 1318469000 | WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 519 | 136 | 34644 |
| 1318470000 | JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 519 | 128 | 34642 |
| 1318471000 | MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 519 | 132 | 34643 |
| 1318472000 | ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 519 | 120 | 34640 |
| 1318473000 | ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | TX | Dimmit | 493 | 598 | 31425 |
| 1318474000 | JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 519 | 124 | 34641 |
| 1318475000 | J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | TX | Dimmit | 517 | 543 | 34427 |
| 1318476000 | KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | TX | Dimmit | 515 | 570 | 34077 |
| 1318477000 | SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 519 | 821 | 34793 |
| 1318478000 | ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 519 | 833 | 34796 |
| 1318479000 | HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 519 | 825 | 34794 |
| 1318480000 | JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 526 | 255 | 35599 |
| 1318481000 | BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 526 | 251 | 35598 |
| 1318482000 | DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 519 | 829 | 34795 |
| 1318779000 | ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | TX | Dimmit | 392<br>396 | 363<br>579 | 15971<br>16714 |
| 1318780000 | BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | TX | Dimmit | 392 | 370 | 15972 |
| 1318781000 | DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 76 | 16475 |
| 1318782000 | VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 73 | 16474 |
| 1318783000 | SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 70 | 16473 |
| 1318784000 | MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 67 | 16472 |
| 1318785000 | MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 64 | 16471 |
| 1318786000 | JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 61 | 16470 |
| 1318787000 | JOAN MAYS | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 58 | 16469 |
| 1318788000 | GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 52 | 16467 |
| 1318790000 | DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | TX | Dimmit | 395 | 45 | 16465 |
| 1318791000 | GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | TX | Dimmit | 418 | 157 | 19936 |
| 1318792000 | RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 416 | 589 | 19712 |
| 1318793000 | JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 416 | 595 | 19714 |
| 1318794000 | SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | TX | Dimmit | 416 | 592 | 19713 |
| 1318795000 | BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 423 | 460 | 20887 |
| 1318796000 | FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 423 | 463 | 20888 |
| 1318797000 | MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 423 | 466 | 20889 |
| 1318798000 | BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 423 | 469 | 20890 |
| 1318799000 | LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | TX | Dimmit | 423 | 457 | 20886 |
| 1318800000 | EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | TX | Dimmit | 423 | 453 | 20885 |
| 1318801000 | DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | TX | Dimmit | 420 | 224 | 20343 |
| 1318802000 | SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | TX | Dimmit | 420 | 221 | 20342 |
| 1318803000 | CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 423 | 438 | 20881 |
| 1318804000 | SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 423 | 441 | 20882 |
| 1318805000 | MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 423 | 445 | 20883 |

VOL 0588 PG 0341

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1318806000 | PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | TX | Dimmit | 425 | 311 | 21184 |
| 1318807000 | R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | TX | Dimmit | 423 | 449 | 20884 |
| 1318808000 | IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | TX | Dimmit | 427 | 390 | 21529 |
| 1318809000 | JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | TX | Dimmit | 427 | 407 | 21533 |
| 1318810000 | JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 427 | 412 | 2153 |
| 1318811000 | JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | TX | Dimmit | 427 | 399 | 21531 |
| 1318812000 | BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | TX | Dimmit | 427 | 394 | 21530 |
| 1318813000 | JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | TX | Dimmit | 427 | 404 | 21532 |
| 1318814000 | JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | TX | Dimmit | 433 | 125 | 22468 |
| 1318815000 | DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 436 | 141 | 22996 |
| 1318816000 | BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 436 | 125 | 22992 |
| 1318817000 | DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 436 | 121 | 22991 |
| 1318818000 | CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 436 | 133 | 22994 |
| 1318819000 | GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 436 | 129 | 22993 |
| 1318820000 | LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 436 | 145 | 22997 |
| 1318821000 | DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | TX | Dimmit | 436 | 137 | 22995 |
| 1318822000 | MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | TX | Dimmit | 436 | 118 | 22990 |
| 1318823000 | M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | TX | Dimmit | 439 | 749 | 23626 |
| 1318824000 | MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 439 | 757 | 23628 |
| 1318825000 | MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 439 | 745 | 23625 |
| 1318826000 | JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 439 | 753 | 23627 |
| 1318827000 | MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | TX | Dimmit | 442 | 304 | 24054 |
| 1318828000 | KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | TX | Dimmit | 457 | 360 | 26400 |
| 1318829000 | TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | TX | Dimmit | 458 | 290 | 26535 |
| 1318830000 | GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | TX | Dimmit | 478 | 227 | 29445 |
| 1318831000 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | TX | Dimmit | 392 | 360 | 15970 |
| 1318927000 | EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 398 | 029 | 16938 |
| 1318928000 | JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 398 | 33 | 16939 |
| 1318929000 | JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 398 | 037 | 16940 |
| 1318930000 | MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 398 | 041 | 16941 |
| 1318931000 | KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 399 | 706 | 17214 |
| 1318932000 | WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 399 | 691 | 17210 |
| 1318933000 | EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 399 | 702 | 17213 |
| 1318934000 | JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 399 | 698 | 17212 |
| 1318935000 | TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 399 | 483 | 17170 |
| 1318936000 | DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | TX | Dimmit | 400 | 113 | 17276 |
| 1319018000 | SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | TX | Dimmit | 399 | 715 | 17217 |
| 1319146000 | DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 400 | 342 | 17324 |
| 1319147000 | MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | TX | Dimmit | 400 | 348 | 17325 |
| 1319218000 | JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | TX | Dimmit | 405 | 557 | 18183 |
| 1319221000 | MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 410 | 169 | 18939 |
| 1319222000 | JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | TX | Dimmit | 410 | 163 | 18937 |
| 1319223000 | ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | TX | Dimmit | 412 | 384 | 19214 |

VOL 0588 PG 0342

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1319225000 | CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 433 | 143 | 22473 |
| 1319226000 | ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 431 | 722 | 22228 |
| 1319227000 | GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 433 | 155 | 22476 |
| 1319228000 | EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | TX | Dimmit | 433 | 151 | 22475 |
| 1319229000 | RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | TX | Dimmit | 433 | 147 | 22474 |
| 1319230000 | HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 433 | 129 | 22469 |
| 1319231000 | JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 433 | 132 | 22470 |
| 1319232000 | BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 433 | 136 | 22471 |
| 1319233000 | DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 433 | 139 | 22472 |
| 1319234000 | ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 439 | 721 | 23618 |
| 1319235000 | NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 439 | 724 | 23619 |
| 1319236000 | ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | TX | Dimmit | 439 | 718 | 23617 |
| 1319237000 | GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 450 | 657 | 25469 |
| 1319238000 | RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 450 | 669 | 25472 |
| 1319239000 | SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | TX | Dimmit | 450 | 661 | 25470 |
| 1319240000 | VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 450 | 649 | 25467 |
| 1319241000 | BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | TX | Dimmit | 450 | 673 | 25473 |
| 1319242000 | WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 450 | 665 | 25471 |
| 1319243000 | MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | TX | Dimmit | 450 | 653 | 25468 |
| 1319244000 | JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | TX | Dimmit | 455 | 118 | 26085 |
| 1319245000 | MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 467 | 91 | 27796 |
| 1319246000 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 403 | 403 | 17810 |
| 1319247000 | DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | TX | Dimmit | 419 | 106 | 20117 |
| 1319248000 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 403 | 409 | 17812 |
| 1319249000 | GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | TX | Dimmit | 403 | 400 | 17809 |
| 1319250000 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | TX | Dimmit | 403 | 406 | 17811 |
| 1319279000 | EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | TX | Dimmit | 402<br>415 | 201<br>461 | 17630<br>19563 |
| 1319280000 | GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 406 | 384 | 18328 |
| 1319281000 | ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 406 | 388 | 18329 |
| 1319282000 | DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 406 | 396 | 18331 |
| 1319283000 | PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 406 | 400 | 18332 |
| 1319284000 | GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 406 | 392 | 18330 |
| 1319285000 | FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 406 | 356 | 18321 |
| 1319286000 | MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 406 | 364 | 18323 |
| 1319287000 | JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | TX | Dimmit | 406 | 376 | 18326 |
| 1319288000 | CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 406 | 372 | 18325 |
| 1319289000 | LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | TX | Dimmit | 406 | 368 | 18324 |
| 1319290000 | HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 406 | 360 | 18322 |
| 1319291000 | PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 406 | 744 | 18416 |
| 1319292000 | IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 406 | 380 | 18327 |
| 1319293000 | ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 408 | 385 | 18688 |
| 1319294000 | SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 408 | 389 | 18689 |

VOL 0588 PG 0343

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1319295000 | BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 406 | 740 | 18415 |
| 1319296000 | RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 406 | 732 | 18413 |
| 1319297000 | FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 406 | 736 | 18414 |
| 1319298000 | SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | TX | Dimmit | 408 | 393 | 18690 |
| 1319299000 | DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | TX | Dimmit | 408 | 381 | 18687 |
| 1319300000 | DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 418 | 148 | 19933 |
| 1319301000 | BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | TX | Dimmit | 418 | 154 | 19935 |
| 1319302000 | KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | TX | Dimmit | 418 | 151 | 19934 |
| 1319303000 | JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | TX | Dimmit | 422 | 387 | 20698 |
| 1319304000 | ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | TX | Dimmit | 422 | 391 | 20699 |
| 1319305000 | SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | TX | Dimmit | 425 | 695 | 21287 |
| 1319423000 | TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | TX | Dimmit | 401 | 548 | 17517 |
| 1319424000 | EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | TX | Dimmit | 406 | 681 | 18405 |
| 1319461000 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | TX | Dimmit | 445 | 640 | 24596 |
| 1319462000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 405 | 563 | 18185 |
| 1319493000 | GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | TX | Dimmit | 406 | 196 | 18282 |
| 1319868000 | JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | TX | Dimmit | 408 | 378 | 18686 |
| 1319869000 | AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | TX | Dimmit | 406 | 724 | 18411 |
| 1319871000 | JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | TX | Dimmit | 409 | 664 | 18877 |
| 1320090000 | GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 409 | 680 | 18882 |
| 1320091000 | TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 409 | 677 | 18881 |
| 1320092000 | CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | TX | Dimmit | 409 | 674 | 18880 |
| 1320093000 | JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | TX | Dimmit | 409 | 671 | 18879 |
| 1320626000 | MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | TX | Dimmit | 422 | 395 | 20700 |
| 1321557000 | RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 427 | 735 | 21605 |
| 1321558000 | JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | TX | Dimmit | 445 | 61 | 24498 |
| 1321559000 | MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | TX | Dimmit | 443 | 152 | 24176 |
| 1321560000 | LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 646 | 23600 |
| 1321561000 | ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 627 | 23596 |
| 1321562000 | ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 651 | 23601 |
| 1321563000 | JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 637 | 23598 |
| 1321564000 | SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | TX | Dimmit | 442 | 832 | 24143 |
| 1321565000 | BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 656 | 23602 |
| 1321566000 | MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 661 | 23603 |
| 1321567000 | ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | TX | Dimmit | 435 | 797 | 22943 |
| 1321568000 | MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | TX | Dimmit | 445 | 56 | 24497 |
| 1321569000 | LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 439 | 641 | 23599 |
| 1321570000 | WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | TX | Dimmit | 439 | 632 | 23597 |
| 1321571000 | MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | TX | Dimmit | 456 | 521 | 26276 |
| 1321572000 | DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | TX | Dimmit | 465 | 235 | 27497 |
| 1321588000 | FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | TX | Dimmit | 427 | 741 | 21607 |
| 1321589000 | JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | TX | Dimmit | 427 | 738 | 21606 |
| 1321590000 | SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | TX | Dimmit | 435 | 803 | 22945 |

VOL 0588 PG 0344

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1321591000 | SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | TX | Dimmit | 435 | 800 | 22944 |
| 1321592000 | KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 453 | 539 | 25851 |
| 1321685000 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 429 | 54 | 21790 |
| 1321686000 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 429 | 64 | 21792 |
| 1321687000 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 429 | 59 | 21791 |
| 1321688000 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 429 | 69 | 21793 |
| 1321866000 | JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 433 | 114 | 22463 |
| 1321867000 | MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 433 | 105 | 22460 |
| 1321868000 | FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 433 | 111 | 22462 |
| 1321869000 | JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | TX | Dimmit | 433 | 108 | 22461 |
| 1321875000 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 432 | 480 | 22358 |
| 1321876000 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 432 | 490 | 22360 |
| 1321877000 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 432 | 485 | 22359 |
| 1321878000 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | TX | Dimmit | 432 | 475 | 22357 |
| 1322747000 | MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 437 | 511 | 23258 |
| 1322748000 | GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 437 | 505 | 23256 |
| 1322749000 | LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | TX | Dimmit | 437 | 508 | 23257 |
| 1324011000 | DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | TX | Dimmit | 379 | 258 | 13696 |
| 1324012000 | RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 438 | 412 | 23402 |
| 1324013000 | JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | TX | Dimmit | 438 | 409 | 23401 |
| 1324014000 | JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | TX | Dimmit | 438 | 407 | 23399 |
| 1324170000 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 430 | 780 | 22089 |
| 1324171000 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | TX | Dimmit | 430 | 759 | 22086 |
| 1324483000 | SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 445 | 644 | 24597 |
| 1324484000 | S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 445 | 654 | 24599 |
| 1324485000 | BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | TX | Dimmit | 445 | 649 | 24598 |
| 1324486000 | BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | TX | Dimmit | 450 | 645 | 25466 |
| 1324487000 | HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | TX | Dimmit | 444 | 569 | 24432 |
| 1324488000 | JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | TX | Dimmit | 442 | 828 | 24142 |
| 1324489000 | SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | TX | Dimmit | 439 | 691 | 23610 |
| 1324490000 | BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | TX | Dimmit | 432 | 700 | 22401 |
| 1324491000 | ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | TX | Dimmit | 445 | 74 | 24501 |
| 1324492000 | HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | TX | Dimmit | 439 | 666 | 23604 |
| 1324889000 | JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 556 | 26162 |
| 1324890000 | JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 563 | 26163 |
| 1324891000 | JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 569 | 26164 |
| 1324892000 | BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 550 | 26161 |
| 1324893000 | JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 455 | 575 | 26165 |
| 1324894000 | MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 458 | 295 | 26536 |
| 1324895000 | JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | TX | Dimmit | 453 | 535 | 25850 |
| 1325268000 | KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 456 | 505 | 26272 |
| 1325269000 | DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | TX | Dimmit | 456 | 501 | 26271 |
| 1325270000 | HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 459 | 512 | 26722 |

VOL 0588 PG 0345

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1325271000 | MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | TX | Dimmit | 459 | 528 | 26726 |
| 1325272000 | HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 459 | 524 | 26725 |
| 1325273000 | GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 459 | 520 | 26724 |
| 1325274000 | JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | TX | Dimmit | 459 | 516 | 26723 |
| 1325275000 | LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 455 | 655 | 26176 |
| 1325276000 | NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 455 | 659 | 26177 |
| 1325277000 | ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 455 | 663 | 26178 |
| 1325278000 | THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 455 | 651 | 26175 |
| 1325279000 | JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 647 | 26174 |
| 1325280000 | ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | TX | Dimmit | 455 | 643 | 26173 |
| 1325281000 | FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 455 | 639 | 26172 |
| 1325282000 | BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 455 | 631 | 26170 |
| 1325283000 | MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | TX | Dimmit | 452 | 794 | 25771 |
| 1325284000 | SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 452 | 806 | 25774 |
| 1325285000 | GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 452 | 802 | 25773 |
| 1325286000 | CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 452 | 810 | 25775 |
| 1325287000 | MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | TX | Dimmit | 455 | 627 | 26169 |
| 1325288000 | WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 452 | 786 | 25769 |
| 1325289000 | MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 452 | 790 | 25770 |
| 1325290000 | GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | TX | Dimmit | 452 | 798 | 25772 |
| 1325291000 | SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | TX | Dimmit | 455 | 635 | 26171 |
| 1325292000 | JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | TX | Dimmit | 470 | 825 | 28383 |
| 1325293000 | DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | TX | Dimmit | 469 | 63 | 28143 |
| 1325294000 | PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 469 | 55 | 28141 |
| 1325295000 | SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 469 | 59 | 28142 |
| 1325296000 | MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 474 | 280 | 28929 |
| 1325297000 | FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 474 | 268 | 28926 |
| 1325298000 | JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | TX | Dimmit | 478 | 127 | 29425 |
| 1325299000 | EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | TX | Dimmit | 474 | 260 | 28924 |
| 1325300000 | MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 474 | 256 | 28923 |
| 1325301000 | MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 87 | 29417 |
| 1325302000 | VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 92 | 29418 |
| 1325303000 | RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 122 | 29424 |
| 1325304000 | B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 117 | 29423 |
| 1325305000 | JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 102 | 29420 |
| 1325306000 | RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 97 | 29419 |
| 1325307000 | AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 107 | 29421 |
| 1325308000 | JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 478 | 112 | 29422 |
| 1325309000 | CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | TX | Dimmit | 474 | 272 | 28927 |
| 1325310000 | WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 474 | 276 | 28928 |
| 1325311000 | KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | TX | Dimmit | 474 | 264 | 28925 |
| 1325312000 | COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | TX | Dimmit | 498 | 593 | 31859 |
| 1325313000 | ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 498 | 597 | 31860 |

VOL 0588 PG 0346

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1325314000 | JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | TX | Dimmit | 498 | 589 | 31858 |
| 1325315000 | MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 498 | 585 | 31857 |
| 1325316000 | KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 498 | 581 | 31856 |
| 1325317000 | JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | TX | Dimmit | 498 | 573 | 31854 |
| 1325318000 | JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | TX | Dimmit | 498 | 577 | 31855 |
| 1325319000 | LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 498 | 569 | 31853 |
| 1325320000 | CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 498 | 564 | 31852 |
| 1325321000 | JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | TX | Dimmit | 498 | 560 | 31851 |
| 1325322000 | E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 498 | 556 | 31850 |
| 1325323000 | ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 498 | 552 | 31849 |
| 1325324000 | OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 498 | 544 | 31847 |
| 1325325000 | WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | TX | Dimmit | 498 | 548 | 31848 |
| 1325326000 | ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | TX | Dimmit | 498 | 540 | 31846 |
| 1325327000 | ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | TX | Dimmit | 498 | 532 | 31844 |
| 1325328000 | CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | TX | Dimmit | 498 | 536 | 31845 |
| 1325329000 | JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 498 | 528 | 31843 |
| 1325330000 | ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 498 | 524 | 31842 |
| 1325331000 | MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 498 | 520 | 31841 |
| 1325332000 | ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 498 | 516 | 31840 |
| 1325333000 | CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | TX | Dimmit | 498 | 512 | 31839 |
| 1325334000 | GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | TX | Dimmit | 498 | 601 | 31861 |
| 1325335000 | SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | TX | Dimmit | 500 | 798 | 32161 |
| 1325461000 | KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | TX | Dimmit | 457 | 209 | 26377 |
| 1325462000 | HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | TX | Dimmit | 457 | 45 | 26336 |
| 1325463000 | WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | TX | Dimmit | 457 | 217 | 26379 |
| 1325464000 | TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | TX | Dimmit | 457 | 213 | 26378 |
| 1325465000 | CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | TX | Dimmit | 455 | 545 | 26160 |
| 1325566000 | SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | TX | Dimmit | 459 | 498 | 26719 |
| 1325567000 | SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | TX | Dimmit | 462 | 418 | 27144 |
| 1325568000 | SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 459 | 504 | 26720 |
| 1325569000 | JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | TX | Dimmit | 459 | 508 | 26721 |
| 1325570000 | JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | TX | Dimmit | 459 | 494 | 26718 |
| 1325797000 | DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 11 | 27214 |
| 1325798000 | EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 1 | 27212 |
| 1325799000 | MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 6 | 27213 |
| 1325800000 | JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 813 | 27206 |
| 1325801000 | LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 828 | 27209 |
| 1325802000 | STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 838 | 27211 |
| 1325803000 | DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 818 | 27207 |
| 1325804000 | RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 16 | 27215 |
| 1325805000 | ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 823 | 27208 |
| 1325806000 | ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 21 | 27216 |
| 1325807000 | EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 462 | 833 | 27210 |

VOL 0588 PG 0347

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1325808000 | CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 337 | 27263 |
| 1325809000 | ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 332 | 27262 |
| 1325810000 | GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 327 | 27261 |
| 1325811000 | JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | TX | Dimmit | 463 | 342 | 27264 |
| 1326829000 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 465 | 107 | 27477 |
| 1326868000 | DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 466 | 121 | 27616 |
| 1326869000 | KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 466 | 127 | 27617 |
| 1326870000 | GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 466 | 133 | 27618 |
| 1326871000 | LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 466 | 145 | 27620 |
| 1326872000 | DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | TX | Dimmit | 466 | 139 | 27619 |
| 1326914000 | STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | TX | Dimmit | 498 | 608 | 31863 |
| 1327049000 | THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | TX | Dimmit | 473 | 112 | 28765 |
| 1327087000 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 476 | 288 | 29147 |
| 1327088000 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | TX | Dimmit | 476 | 292 | 29148 |
| 1327089000 | ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | TX | Dimmit | 476 | 298 | 29150 |
| 1327137000 | WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | TX | Dimmit | 474 | 251 | 28919 |
| 1328011000 | SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 573 | 31746 |
| 1328012000 | RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 588 | 31749 |
| 1328013000 | REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 578 | 31747 |
| 1328014000 | SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 563 | 31744 |
| 1328015000 | RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 583 | 31748 |
| 1328016000 | LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | TX | Dimmit | 497 | 568 | 31745 |
| 1328040000 | JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | TX | Dimmit | 498 | 605 | 31862 |
| 1328076000 | LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | TX | Dimmit | 487 | 772 | 30808 |
| 1328086000 | NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | TX | Dimmit | 498 | 612 | 31864 |
| 1328087000 | JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 498 | 617 | 31866 |
| 1328088000 | NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | TX | Dimmit | 498 | 614 | 31865 |
| 1328089000 | LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 498 | 626 | 31870 |
| 1328090000 | RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 498 | 629 | 31871 |
| 1328091000 | BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 498 | 620 | 31867 |
| 1328092000 | KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 498 | 622 | 31868 |
| 1328093000 | CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | TX | Dimmit | 498 | 624 | 31869 |
| 1328094000 | EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | TX | Dimmit | 500 | 795 | 32160 |
| 1328095000 | SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 500 | 792 | 32159 |
| 1328096000 | LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 511 | 672 | 33416 |
| 1328097000 | STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 511 | 675 | 33417 |
| 1328098000 | MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 511 | 678 | 33418 |
| 1328099000 | THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | TX | Dimmit | 511 | 684 | 33420 |
| 1328100000 | TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | TX | Dimmit | 511 | 681 | 33419 |
| 1328101000 | ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | TX | Dimmit | 511 | 669 | 33415 |
| 1328264000 | GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | TX | Dimmit | 378 | 674 | 13611 |
| 1328889000 | MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | TX | Dimmit | 508 | 167 | 32959 |
| 1328890000 | JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 499 | 837 | 32005 |

VOL 0588 PG 0348

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1328891000 | YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | TX | Dimmit | 500 | 1 | 32006 |
| 1328892000 | KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 512 | 370 | 33520 |
| 1328893000 | WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | TX | Dimmit | 512 | 365 | 33519 |
| 1329694000 | JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | TX | Dimmit | 518 | 9 | 34494 |
| 1329695000 | EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | TX | Dimmit | 517 | 829 | 34489 |
| 1329696000 | BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | TX | Dimmit | 517 | 837 | 34491 |
| 1329697000 | MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 519 | 483 | 34716 |
| 1329698000 | LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | TX | Dimmit | 519 | 487 | 34717 |
| 1329699000 | LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | TX | Dimmit | 523 | 492 | 35222 |
| 1329700000 | CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 523 | 496 | 35223 |
| 1329701000 | RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 523 | 500 | 35224 |
| 1329702000 | DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | TX | Dimmit | 518 | 5 | 34493 |
| 1329703000 | PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 517 | 833 | 34490 |
| 1329704000 | ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | TX | Dimmit | 518 | 1 | 34492 |
| 1329705000 | GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 519 | 507 | 34722 |
| 1329706000 | MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 519 | 499 | 34720 |
| 1329707000 | DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 519 | 479 | 34715 |
| 1329708000 | JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | TX | Dimmit | 519 | 491 | 34718 |
| 1329709000 | BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | TX | Dimmit | 517 | 821 | 34487 |
| 1329710000 | TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 517 | 825 | 34488 |
| 1329711000 | CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 519 | 514 | 34724 |
| 1329712000 | NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | TX | Dimmit | 517 | 817 | 34486 |
| 1329713000 | SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | TX | Dimmit | 519 | 495 | 34719 |
| 1329714000 | LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | TX | Dimmit | 519 | 503 | 34721 |
| 1329715000 | JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 525 | 90 | 35423 |
| 1329789000 | JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 519 | 511 | 34723 |
| 1329912000 | ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | TX | Dimmit | 506 | 55 | 32616 |
| 1329913000 | JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | TX | Dimmit | 506 | 58 | 32617 |
| 1329914000 | ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | TX | Dimmit | 506 | 61 | 32618 |
| 1329915000 | GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 506 | 64 | 32619 |
| 1329916000 | JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | TX | Dimmit | 506 | 68 | 32620 |
| 1329917000 | PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 506 | 74 | 32622 |
| 1329918000 | ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 78 | 32623 |
| 1329919000 | CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 82 | 32624 |
| 1329920000 | CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 86 | 32625 |
| 1329921000 | JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 90 | 32626 |
| 1329922000 | SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 94 | 32627 |
| 1329923000 | THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 104 | 32629 |
| 1329924000 | VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 506 | 113 | 32631 |
| 1329925000 | LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 117 | 32632 |
| 1329926000 | MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 511 | 687 | 33421 |
| 1329927000 | GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 511 | 695 | 33423 |
| 1329928000 | JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 511 | 699 | 33424 |

VOL 0588 PG 0349

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1329929000 | MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | TX | Dimmit | 511 | 703 | 33425 |
| 1329930000 | DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | TX | Dimmit | 511 | 707 | 33426 |
| 1329931000 | PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | TX | Dimmit | 511 | 711 | 33427 |
| 1329932000 | JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 511 | 714 | 33428 |
| 1329933000 | BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | TX | Dimmit | 511 | 718 | 33429 |
| 1329934000 | ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 511 | 722 | 33430 |
| 1329935000 | JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | TX | Dimmit | 511 | 726 | 33431 |
| 1329936000 | JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | TX | Dimmit | 511 | 730 | 33432 |
| 1329937000 | JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | TX | Dimmit | 517 | 767 | 34473 |
| 1329938000 | ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 527 | 817 | 35845 |
| 1329939000 | EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | TX | Dimmit | 506 | 71 | 32621 |
| 1329940000 | MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 506 | 98 | 32628 |
| 1329941000 | BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | TX | Dimmit | 506 | 109 | 32630 |
| 1329942000 | JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | TX | Dimmit | 511 | 691 | 33422 |
| 1329943000 | ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 515 | 189 | 33970 |
| 1329985000 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | TX | Dimmit | 515 | 184 | 33969 |
| 1329986000 | EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | TX | Dimmit | 528 | 1 | 35851 |
| 1329987000 | ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 516 | 284 | 34192 |
| 1329988000 | TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 516 | 272 | 34190 |
| 1329989000 | JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 516 | 278 | 34191 |
| 1329990000 | MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | TX | Dimmit | 516 | 266 | 34189 |
| 1341229000 | CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 530 | 749 | 36343 |
| 1341232000 | A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 530 | 752 | 36344 |
| 1341496000 | RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 530 | 756 | 36345 |
| 1341497000 | RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 530 | 759 | 36346 |
| 1341498000 | WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | TX | Dimmit | 530 | 737 | 36339 |
| 1341499000 | PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 530 | 734 | 36338 |
| 1341500000 | REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 530 | 743 | 36341 |
| 1341501000 | ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | TX | Dimmit | 530 | 740 | 36340 |
| 1341502000 | LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | TX | Dimmit | 530 | 746 | 36342 |
| 1341503000 | THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | TX | Dimmit | 530 | 731 | 36337 |
| 1341504000 | SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | TX | Dimmit | 530 | 728 | 36336 |
| 1341505000 | LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | TX | Dimmit | 530 | 762 | 36347 |
| 1341907000 | WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 532 | 751 | 36646 |
| 1342198000 | ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | TX | Dimmit | 526 | 263 | 35601 |
| 1342213000 | BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | TX | Dimmit | 526 | 259 | 35600 |
| 1343274000 | SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | TX | Dimmit | 527 | 28 | 35705 |
| 1343281000 | CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 527 | 36 | 35707 |
| 1343282000 | JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | TX | Dimmit | 525 | 364 | 35477 |
| 1343284000 | KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 525 | 368 | 35478 |
| 1343285000 | HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | TX | Dimmit | 525 | 360 | 35476 |
| 1343286000 | RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 525 | 356 | 35475 |
| 1343287000 | KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | TX | Dimmit | 527 | 40 | 35708 |

VOL 0588 PG 0350

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1343288000 | FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | TX | Dimmit | 527 | 32 | 35706 |
| 1343415000 | TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 534 | 310 | 36857 |
| 1343420000 | AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 534 | 313 | 36858 |
| 1344040000 | TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 534 | 307 | 36856 |
| 1344479000 | GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | TX | Dimmit | 527 | 821 | 35846 |
| 1344513000 | RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 527 | 825 | 35847 |
| 1344846000 | NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | TX | Dimmit | 527 | 829 | 35848 |
| 1344995000 | JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 522 | 312 | 35105 |
| 1345004000 | CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | TX | Dimmit | 532 | 357 | 36601 |
| 1345069000 | BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | TX | Dimmit | 532 | 367 | 36604 |
| 1345072000 | JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 532 | 370 | 36605 |
| 1345073000 | RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | TX | Dimmit | 532 | 374 | 36606 |
| 1345074000 | HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | TX | Dimmit | 532 | 377 | 36607 |
| 1345075000 | JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 532 | 380 | 36608 |
| 1345078000 | CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 532 | 383 | 36609 |
| 1345151000 | BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 532 | 386 | 36610 |
| 1345152000 | CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 532 | 389 | 36611 |
| 1345368000 | JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 532 | 392 | 36612 |
| 1345371000 | BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | TX | Dimmit | 532 | 395 | 36613 |
| 1345373000 | JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | TX | Dimmit | 532 | 398 | 36614 |
| 1345375000 | ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 532 | 403 | 36615 |
| 1345376000 | DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 532 | 406 | 36616 |
| 1345519000 | LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | TX | Dimmit | 532 | 409 | 36617 |
| 1345603000 | SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | TX | Dimmit | 532 | 364 | 36603 |
| 1345605000 | GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | TX | Dimmit | 532 | 361 | 36602 |
| 1345606000 | ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | TX | Dimmit | 527 | 837 | 35820 |
| 1345610000 | JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | TX | Dimmit | 527 | 833 | 35849 |
| 1345741000 | MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | TX | Dimmit | 523 | 830 | 35256 |
| 1345748000 | JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | TX | Dimmit | 536 | 382 | 37176 |
| 1345764000 | PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 536 | 388 | 37178 |
| 1345765000 | LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | TX | Dimmit | 536 | 385 | 37177 |
| 1345767000 | MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 536 | 391 | 37179 |
| 1345771000 | FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 517 | 763 | 34472 |
| 1345772000 | FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | TX | Dimmit | 517 | 759 | 34471 |
| 1346570000 | WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | TX | Dimmit | 539 | 360 | 37658 |
| 1347349000 | RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | TX | Dimmit | 539 | 366 | 37660 |
| 1347350000 | CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | TX | Dimmit | 539 | 363 | 37659 |
| 1347409000 | FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | TX | Dimmit | 534 | 714 | 36928 |
| 1347410000 | LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 534 | 717 | 36929 |
| 1347413000 | GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 534 | 720 | 36930 |
| 1347415000 | STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 531 | 199 | 36394 |
| 1347827000 | DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | TX | Dimmit | 538 | 505 | 37545 |
| 1347875000 | THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | TX | Dimmit | 538 | 509 | 37546 |

VOL 0588 PG 0351

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1347933000 | THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | TX | Dimmit | 538 | 792 | 37593 |
| 1347969000 | ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | TX | Dimmit | 528 | 179 | 35886 |
| 1347970000 | MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | TX | Dimmit | 528 | 175 | 35885 |
| 1348097000 | ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | TX | Dimmit | 542 | 345 | 38066 |
| 1348412000 | CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 541 | 421 | 37944 |
| 1348414000 | STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | TX | Dimmit | 541 | 424 | 37945 |
| 1348892000 | MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | TX | Dimmit | 539 | 765 | 37708 |
| 1349186000 | DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 542 | 220 | 38040 |
| 1349187000 | DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | TX | Dimmit | 542 | 217 | 38039 |
| 1349286000 | LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 537 | 75 | 37289 |
| 1349287000 | ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | TX | Dimmit | 537 | 78 | 37290 |
| 1349288000 | JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 537 | 81 | 37291 |
| 1349289000 | NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | TX | Dimmit | 537 | 84 | 37292 |
| 1349290000 | RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 537 | 87 | 37293 |
| 1349291000 | NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | TX | Dimmit | 537 | 90 | 37294 |
| 1349292000 | THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | TX | Dimmit | 537 | 93 | 37295 |
| 1349293000 | ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 537 | 96 | 37296 |
| 1349294000 | AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 537 | 99 | 37297 |
| 1349295000 | JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 537 | 102 | 37298 |
| 1349331000 | 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 537 | 105 | 37299 |
| 1350069000 | LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | TX | Dimmit | 379 | 498 | 13745 |
| 1350077000 | MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | TX | Dimmit | 544 | 260 | 38286 |
| 1350709000 | RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 545 | 525 | 38438 |
| 1350711000 | MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 522 | 38437 |
| 1350713000 | JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 519 | 38436 |
| 1350715000 | BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 528 | 38439 |
| 1350716000 | AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 534 | 38441 |
| 1350726000 | LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | TX | Dimmit | 545 | 516 | 38435 |
| 1350740000 | LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 545 | 531 | 38440 |
| 1350743000 | LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | TX | Dimmit | 545 | 546 | 38445 |
| 1350745000 | LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 543 | 38444 |
| 1350746000 | JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 540 | 38443 |
| 1350747000 | ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 537 | 38442 |
| 1350748000 | LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 545 | 549 | 38446 |
| 1350779000 | GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 545 | 814 | 38474 |
| 1350786000 | CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 544 | 123 | 38274 |
| 1350789000 | MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 544 | 117 | 38272 |
| 1350790000 | PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | TX | Dimmit | 544 | 105 | 38268 |
| 1350808000 | RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 544 | 120 | 38273 |
| 1350810000 | LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 544 | 102 | 38267 |
| 1350851000 | CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 544 | 126 | 38275 |
| 1350862000 | CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 544 | 114 | 38271 |

VOL 0588 PG 0352

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1350863000 | TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 544 | 99 | 38266 |
| 1350864000 | WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 544 | 111 | 38270 |
| 1350865000 | PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 544 | 108 | 38269 |
| 1351314000 | DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | TX | Dimmit | 547 | 115 | 38601 |
| 1351317000 | DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | TX | Dimmit | 542 | 279 | 38053 |
| 1351876000 | AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | TX | Dimmit | 544 | 756 | 38359 |
| 1351878000 | LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | TX | Dimmit | 544 | 753 | 38358 |
| 1352182000 | SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 546 | 207 | 38507 |
| 1352183000 | NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 546 | 204 | 38506 |
| 1352184000 | STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 546 | 216 | 38510 |
| 1352185000 | WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 546 | 213 | 38509 |
| 1352186000 | DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 546 | 210 | 38508 |
| 1352738000 | MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | TX | Dimmit | 545 | 243 | 38397 |
| 1352923000 | FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | TX | Dimmit | 547 | 121 | 38603 |
| 1352926000 | STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 547 | 118 | 38602 |
| 1353355000 | WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | TX | Dimmit | 548 | 622 | 38850 |
| 1353458000 | SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | TX | Dimmit | 548 | 477 | 38833 |
| 1353461000 | WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 549 | 470 | 38927 |
| 1353573000 | MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 548 | 471 | 38831 |
| 1353986000 | BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | TX | Dimmit | 548 | 474 | 38832 |
| 1354084000 | SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | TX | Dimmit | 550 | 372 | 39027 |
| 1354085000 | WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | TX | Dimmit | 550 | 369 | 39026 |
| 1354820000 | DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | TX | Dimmit | 551 | 752 | 39233 |
| 1355052000 | ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | TX | Dimmit | 553 | 582 | 39410 |
| 1355053000 | LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | TX | Dimmit | 553 | 588 | 39412 |
| 1355278000 | JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | TX | Dimmit | 552 | 441 | 39279 |
| 1355282000 | MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | TX | Dimmit | 548 | 735 | 38868 |
| 1356149000 | DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 551 | 321 | 39162 |
| 1356150000 | MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 551 | 324 | 39163 |
| 1356152000 | DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | TX | Dimmit | 551 | 327 | 39164 |
| 1356153000 | LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | TX | Dimmit | 551 | 318 | 39161 |
| 1356154000 | TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 551 | 315 | 39160 |
| 1356197000 | JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | TX | Dimmit | 551 | 312 | 39159 |
| 1356198000 | JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | TX | Dimmit | 549 | 725 | 38967 |
| 1356199000 | JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | TX | Dimmit | 549 | 728 | 38968 |
| 1357186000 | JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 553 | 585 | 39411 |
| 1357194000 | BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | TX | Dimmit | 555 | 335 | 39649 |
| 1357367000 | HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | TX | Dimmit | 555 | 13 | 39591 |
| 1358228000 | DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | TX | Dimmit | 556 | 589 | 39852 |
| 1358233000 | SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | TX | Dimmit | 556 | 592 | 39853 |
| 1358419000 | LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | TX | Dimmit | 557 | 385 | 39960 |
| 1359040000 | GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | TX | Dimmit | 558 | 601 | 40106 |
| 1359498000 | JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 555 | 422 | 39661 |

VOL 0588 PG 0353

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1359513000 | LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 555 | 428 | 39663 |
| 1359514000 | SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 555 | 425 | 39662 |
| 1359517000 | JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | TX | Dimmit | 555 | 431 | 39664 |
| 1359518000 | RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | TX | Dimmit | 556 | 436 | 39815 |
| 1359520000 | PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | TX | Dimmit | 556 | 433 | 39814 |
| 1359773000 | DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 559 | 379 | 40156 |
| 1359775000 | JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 559 | 376 | 40155 |
| 1360537000 | JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 559 | 439 | 40165 |
| 1360539000 | SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | TX | Dimmit | 559 | 528 | 40204 |
| 1360541000 | LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | TX | Dimmit | 559 | 448 | 40168 |
| 1360542000 | KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | TX | Dimmit | 559 | 445 | 40167 |
| 1360544000 | ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | TX | Dimmit | 559 | 442 | 40166 |
| 1362345000 | LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | TX | Dimmit | 563 | 557 | 40854 |
| 1363351000 | HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | TX | Dimmit | 567 | 466 | 41367 |
| 1363610000 | ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | TX | Dimmit | 570 | 236 | 41766 |
| 1363899000 | PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 570 | 814 | 41874 |
| 1363900000 | ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 570 | 811 | 41873 |
| 1363901000 | MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 570 | 817 | 41875 |
| 1363902000 | BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 570 | 250 | 41768 |
| 1365540000 | WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 571 | 726 | 41988 |
| 1365541000 | FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 573 | 679 | 42227 |
| 1365542000 | WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 573 | 673 | 42225 |
| 1365543000 | SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | TX | Dimmit | 573 | 676 | 42226 |
| 1366948000 | BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | TX | Dimmit | 576 | 239 | 42491 |
| 1367490000 | ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | TX | Dimmit | 577 | 454 | 42708 |
| 1369960000 | KIM CARDWELL | ANADARKO E&P ONSHORE LLC | 12/08/2014 | TX | Dimmit | 586 | 457 | 43897 |

44073
MARIO Z. GARCIA
COUNTY CLERK
2017 Mar 09 at 03:42 PM
DIMMIT COUNTY, TEXAS
By:DD ________, DEPUTY

VOL 0588 PG 0354

ORALIA G. TREVINO - COUNTY C
INST NO.094007
Zavala County
FILED ON ... at 04:27:09
V O L 0 3 9 5 P G 0 6 2 0

# MEMORANDUM OF DEVELOPMENT AGREEMENT

This **MEMORANDUM OF DEVELOPMENT AGREEMENT** (this "***Memorandum***"), is dated effective for all purposes as of July 1, 2016 (the "***Effective Time***") and is by and between ANADARKO E&P ONSHORE LLC, a Delaware limited liability company ("***AEP***") and KERR-MCGEE OIL & GAS ONSHORE LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Anadarko***"), and SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***", and collectively with SN, the "***SN Parties***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("***AcqCo***", and collectively with SN and UnSub, the "***Drilling Parties***", and each of SN, Unsub and AcqCo individually, a "***Drilling Party***"), and solely for the purpose of *Section 4.15* of the Development Agreement (as defined below), Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Anadarko and the Drilling Parties are each a "***Party***" and collectively the "***Parties***".

WITNESSETH:

**WHEREAS**, Anadarko and the Drilling Parties entered into that certain Development Agreement, dated as of January 12, 2017, but effective for all purposes as of the Effective Time (as the same may be amended, modified or supplemented from time to time, the "***Development Agreement***"), with respect to the drilling, completing, equipping and operation of certain oil and gas wells located on oil and gas leases which the Drilling Parties now own, including, without limitation, those oil and gas leases described on Appendix A hereto (the "***Leases***"); and

**WHEREAS**, the Parties have executed this Memorandum for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Development Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

1. The Development Agreement is incorporated in its entirety herein by reference and all capitalized terms used but not defined herein shall have the meaning ascribed to them in the Development Agreement. An original of the Development Agreement may be found at the offices of Anadarko at the address given below.

2. The Leases of the Parties shall be subject to and burdened by the terms and provisions of the Development Agreement.

3. All costs and liabilities incurred in connection with the Development Agreement shall be borne and paid by the Parties as, and to the extent, provided in the Development Agreement.

4. Any Assignment of any interest in the Development Agreement is subject to restrictions and obligations under the Development Agreement including, but without limitation, certain consent requirements, transfer restrictions and specified procedures for compliance with any Assignment.

5. The Development Agreement is effective as of the Effective Time and shall continue in full force and effect until terminated in accordance with the terms and provisions thereof.

6. The addresses of the Parties are as follows:

If to Anadarko:

Anadarko E&P Onshore LLC
1201 Lake Robbins Drive
The Woodlands, Texas 77380
Attention: Corporate Development
Telephone: 832.636.2738
E-mail: david.richardson@anadarko.com

If to the Drilling Parties:

SN EF Maverick, LLC
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: General Counsel
Telephone: 713.756.2782
Email: gkopel@sanchezog.com

and

Gavilan Resources, LLC
345 Park Avenue
New York, New York
Attention: Angelo Acconcia
Telephone:
E-mail: acconcia@blackstone.com

7. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Development Agreement, the terms of the Development Agreement shall prevail.

8. This Memorandum may be executed in any number of counterparts, each of which shall be of equal dignity and all of which shall constitute but one and the same instrument.

9. This Memorandum shall be filed in the real property records of the county or counties in which the Leases are located. In addition to filing the Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or







VOL 0395 PG 0621

instruments required by applicable Law to effectuate the Memorandum and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

[*Signature Pages Follow*]

VOL 0395 PG 0622



US-DOCS\80952803.2

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Development Agreement as of the dates set forth in their respective acknowledgments hereto, but effective for all purposes as of the Effective Time.

**ANADARKO E&P ONSHORE LLC**

By: ______________________________

Name: Brian T. Kuck

Title: Vice President Corporate Development

VOL 0395 PG 0623

VOL 03995 PG 0624

## ACKNOWLEDGMENTS

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President Corporate Development of Anadarko E&P Onshore LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

[signature]
NOTARY PUBLIC

My Commission Expires:

6-12-2020

AFFIX SEAL

TAWNY OLVERA
Notary Public, State of Texas
Comm. Expires 06-12-2020
Notary ID 10551912

**KERR-MCGEE OIL & GAS ONSHORE LP**

By: [signature] SR RLT
Name: Brian T. Kuck
Title: Vice President

VOL 0395 PG 0625

Signature Page to Memorandum of Development Agreement

VOL 03995 PG 00626

**STATE OF TEXAS** §
§
**COUNTY OF MONTGOMERY** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 28th day of February 2017, within my jurisdiction, the within named Brian T. Kuck, duly identified before me, who acknowledged that he is the Vice President of Kerr-McGee Oil & Gas Onshore LP, a Delaware partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

[signature]
NOTARY PUBLIC

My Commission Expires:

6-12-2020

TAWNY OLVERA
Notary Public, State of Texas
Comm. Expires 06-12-2020
Notary ID 10551912

Acknowledgment Page to Memorandum of Development Agreement

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:__________________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:__________________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

VOL 0395 PG 0627

Signature Page to Memorandum of Development Agreement

VOL 0395 PG 0628

**DRILLING PARTIES**

**SN EF MAVERICK, LLC**

By:________________________
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB, LP**

By:________________________
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

Signature Page to Memorandum of Development Agreement

VOL 0395 PG 0629

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of SN EF Maverick, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so ~~to do.~~

NOTARY PUBLIC

My Commission Expires:
09·16·2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, within my jurisdiction, the within named Patricio D. Sanchez, duly identified before me, who acknowledged that he is the President and Chief Executive Officer of SN EF UnSub, LP, a Delaware limited partnership, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

NOTARY PUBLIC

My Commission Expires:
09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

VOL 0395 PG 0630

**GAVILAN RESOURCES, LLC**

By:__________________________________
Name: Angelo Acconcia
Title: President

**STATE OF NEW YORK §**
**westchester §**
**COUNTY OF ~~NEW YORK~~ §**

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Angelo Acconcia, duly identified before me, who acknowledged that he is the President of Gavilan Resources, LLC, a Delaware limited liability company, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

Gina Santanastasio
NOTARY PUBLIC

My Commission Expires:
10/15/2023

GINA SANTANASTASIO
Notary Public, State of New York
No 01SA6175572
Qualified in Westchester County
Commission Expires Oct. 15, 2023

Acknowledgment Page to Memorandum of Development Agreement

VOL 0395 PG 0632

**SN PARENT**

**SANCHEZ ENERGY CORPORATION**

By:______________________________________
Name: Eduardo A. Sanchez
Title: President

Signature Page to Memorandum of Development Agreement

VOL 0395 PG 0633

**STATE OF TEXAS** §
§
**COUNTY OF HARRIS** §

Personally appeared before me, the undersigned authority in and for the said county and state, on this 27th day of February, 2017, within my jurisdiction, the within named Eduardo A. Sanchez, duly identified before me, who acknowledged that he is the President of Sanchez Energy Corporation, a Delaware corporation, and that for and on behalf of the said limited liability company, and as its act and deed, he executed the above and foregoing instrument, after first having been duly authorized by said limited liability company so to do.

____________________________
NOTARY PUBLIC

My Commission Expires:

09.16.2019

NORMA GARCIA
Notary Public, State of Texas
Comm. Expires 09-16-2019
Notary ID 130370472

Acknowledgment Page to Memorandum of Development Agreement

**APPENDIX A**

**LEASES**

[See Attached.]

**Exhibit A**

**Leases**

| Agreement | Lessor | Lessee | Effective Date | State | County | Gross | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|
| 1304796000 | FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | TX | Zavala | 645.030 | 3 | 172 | 113530 |
| 1304797000 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | TX | Zavala | 1120.000 | 3 | 251 | 113554 |
| 1304798000 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 670.800 | 3 | 578 | 113797 |
| 1304799000 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 649.620 | 3 | 582 | 113798 |
| 1304800000 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 638.610 | 3 | 586 | 113799 |
| 1304801000 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | TX | Zavala | 647.710 | 3 | 590 | 113800 |
| 1304807000 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | TX | Dimmit<br>Zavala | 705.800 | 29<br>4 | 86<br>425 | 129<br>114336 |
| 1305072000 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | TX | Dimmit<br>Zavala | 353.090 | 97<br>55 | 145<br>185 | 1086<br>46827 |
| 1305140000 | JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | TX | Zavala | 162.400 | 57 | 53 | NA |
| 1305142000 | ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 68 | 48131 |
| 1305143000 | MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 65 | 48130 |
| 1305144000 | FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | TX | Zavala | 81.180 | 57 | 76 | 48144 |

INST NO.094007
FILED FOR RECORD
2017 Mar 08 at 04:27 PM
ORALIA G. TREVINO, COUNTY C
ZAVALA COUNTY, TEXAS
DEPUTY

VOL 0395 PG 0350

# Exhibit K

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

Results Driven. Manufacturing Focused.







# Sanchez Energy Business Plan

March 2020

SANCHEZ
ENERGY CORPORATION

009003

www.sanchezenergycorp.com

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Management Representatives

**Mo Meghji**
*Chief Restructuring Officer*

**Cam George**
*Executive Vice President and Chief Financial Officer*

**Greg Kopel**
*Executive Vice President, General Counsel and Secretary*

**Mike Blincow**
*Vice President, Production*

**Scott Dunlap**
*Vice President, Drilling and Completions*

**Holly Griffin**
*Director, Asset Development*

**Cham King**
*Director, Finance and Business Development*

**Scott Wike**
*Director, Marketing*

**Cheyne Hermes**
*Manager, Corporate Finance and Strategy*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Table of Contents

I. Executive Summary 4

II. Business Plan and Financial Projections 8

III. Asset Development Plan 20

IV. Midstream 26

V. Corporate G&A 29

## Appendix

A. PDP Reference Case 32

B. Other Supporting Items 34

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# I. Executive Summary

# Business Plan Approach and Summary



**The Sanchez Energy management team and advisors ("SN," or the "Company") have been working diligently on a revised business plan, with the goal of maximizing value for stakeholders by focusing on (1) disciplined and optimized capital spend, (2) preservation of optionality for longer-term value realization (with key decision points clearly identified), (3) a simplified and reduced overhead cost structure and (4) a comprehensive midstream solution**

- **Approach and Objectives:**
  - The Company has put together the principal "building blocks" of a proposed, going concern business plan for the future owners of the Company, with a primary focus on asset development, midstream and corporate overhead expenses
  - The Company has explored three cases that bookend possible scenarios for the development of the asset base
    - The Option Preservation Case assumes drilling at Catarina to hold the lease through June 2021 (but no longer) and full participation/operatorship at Comanche
    - The Accelerated Completions Case assumes completing the drilled but uncompleted wells ("DUCs") at Catarina, full participation/operatorship at Comanche and no further participation in future drilling across the rest of the asset base
    - The PDP Reference Case assumes completing the drilled but uncompleted wells at Catarina, no participation in future drilling across the rest of the asset base and loss of Comanche operatorship
    - The Company and its advisors are exploring any combination or variants of these cases that maximize value and optionality
  - This process has included significant review, diligence and revisions to the Company's previous plan, with work still ongoing to identify additional upside
  - *All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments*
  - *Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation*
- **Key Building Blocks:**
  1. Asset Development
     - Catarina:
       - Option Preservation Case: Retain unique, single ~106,000 acre Catarina lease through 2021 by satisfying current leasehold commitments, but no further drilling after June 2020 (all locations are uneconomic at current prices, and continued activity at historical levels would require a substantial commodity recovery)
       - Accelerated Completions Case: Complete remaining 31 DUCs
     - Comanche: Retain operatorship of entire, multi-lease asset and focus development on highest rate of return opportunities (~50-80 wells per year)
     - At the request of the CRO, the Company's reserves, engineering and development plan assumptions were independently reviewed by the Debtor advisors' technical and E&P teams
       - The technical and E&P teams did not find any variances that would materially change assumptions
       - Feedback has also been solicited from creditor groups, with viable suggestions to be further considered and, if appropriate, incorporated
     - The overarching focus is on a near-term path to free cash flow generation while preserving longer term option value/upside where economically justified
       - We believe this can be achieved through disciplined capital spend on high-graded inventory and leasehold retention wells only 009007
     - See asset development section for additional detail on operational strategy

# Business Plan Approach and Summary *(continued)*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

- **Key Building Blocks *(continued)*:**

  2. Midstream and Marketing

     - A contract-by-contract financial model was created by SN's midstream team, with no involvement from Sanchez Midstream Partners LP ("SNMP") related personnel, to help inform midstream optimization strategy
       - A comprehensive analysis regarding the value of midstream contract optimization is ongoing
     - The SECO pipeline contract with SNMP was terminated on January 13, 2020 (30-day notice provided to SNMP)

  3. Corporate G&A

     - A revised G&A plan has been created and evaluated on a bottom-up basis by the Company and its advisors

009008

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Approach and Summary *(continued)*

- **Preliminary Conclusions:**
  - Preliminary analysis indicates higher asset value under the Option Preservation and Accelerated Completions Cases when compared to the PDP Reference Case
  - The Company believes a going concern business model that drills only economic or leasehold retention wells (as part of a near-term option preservation strategy) provides the best opportunity to maximize value for stakeholders
  - While the intentions and preferences of creditors are likely to shape the longer-term business plan, the Company believes a focused operating business provides stakeholders with potential upside opportunities for NAV accretion, as opposed to the PDP Reference Case
  - The material building blocks of the preliminary business plans are subject to additional input and consideration from the future owners of SN (whether they be the creditors or a new buyer), and therefore the assumptions used in these plans are subject to change

- **Open Issues, Ongoing Business Initiatives and Next Steps:**
  1. Net asset value figures contained throughout the presentation have been prepared using the Company's corporate model and corresponding ARIES database, both of which are subject to continuous review and revision by the Company
  2. Ryder Scott is reviewing PDP and PUD forecasts for the Company's year end reserve report
  3. Further legal and financial analysis on midstream strategy
  4. Potential negotiation with Catarina landowner
  5. Discussions with creditor groups around optimal development plan assumptions
  6. Potential capital structure at emergence (e.g., DIP refinancing, reinstated debt, etc.), which is not addressed by the current business plan
  7. Address issues of all other key stakeholders and counterparties, such as Sanchez Oil & Gas Corporation ("SOG"), Gavilan Resources LLC ("Gavilan"), SNMP, GSO Capital Partners, etc.
  8. The business plan may be further revised based on ongoing analysis in the context of maximizing value for the estate

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# II. Business Plan and Financial Projections

# Business Plan Assumptions

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**The Company and its advisors have conducted a thorough review of business plan assumptions**

| Assumption | Commentary |
|---|---|
| **Commodity Prices** | ◆ Strip pricing as of 2/11/20<br>◆ Realized prices vs. benchmark prices (WTI and Henry Hub): oil (~93%-98%), natural gas (~100%) and NGLs (~15% of WTI oil price) |
| **Midstream/Marketing** | ◆ Option Preservation, Accelerated Completions and PDP Reference Cases assume current contracts remain in place (i.e., status quo)<br>◆ SECO contract terminated with 30-day notice to SNMP in January 2020<br>◆ Interruptible gathering rates at Eastern Catarina are held flat at current rate of $1.50/Mcf |
| **Corporate G&A** | ◆ Projected G&A profile is illustrative; assumes streamlined cost structure, renegotiated office lease and elimination of all non-core expenses under private company emergence assumption<br>◆ Gross G&A projection in the Option Preservation and Accelerated Completions Cases is reduced to approximately $35-$40MM, before adjustment for COPAS recovery<br>◆ The operator of oil and gas properties is generally entitled to receive COPAS recovery for reimbursement of expenses incurred on behalf of the other working interest owners of those properties; COPAS recovery to SN from operating Comanche is governed by the JOA and assumed at approximately $950 per well; 3% annual escalation of COPAS reimbursement based on 10-year historical average |
| **Other Operating Expenses/Taxes** | ◆ Based on 12-month historical averages for each asset from the lease operating statements ("LOS")<br>◆ Ad valorem and severance tax rates are based on latest county estimates as a percentage of production |
| **Catarina** | ◆ Option Preservation Case: Meet drilling requirement (24 additional wells) by June 2020; hold Catarina lease through June 2021; complete all drilled but uncompleted wells ("DUCs") over the next ~18 months<br>◆ Accelerated Completions Case: complete remaining DUCs by June 2020 |
| **Comanche** | ◆ High-graded and optimized development schedule for Comanche drilling (~50-80 wells per year for next 6-8 years)<br>◆ Focus on highest IRR wells within each type curve area, while meeting lease obligations; retains all material leases<br>◆ Ring-fenced, non-debtor subsidiary SN EF UnSub, LP ("UnSub") continues to self-fund its portion of new Comanche development spend |
| **Other Assets** | ◆ Maverick – undeveloped wells uneconomic at current commodity prices; plan assumes PDP only resulting in significant lease expirations<br>◆ Palmetto – non-consent 2020 development capital (10 wells with unproven type curves with net cost to SN of ~$40 million); potential upside from future option to participate in years 2021+ once well economics have been demonstrated. Non-consenting 2020 development program does not forfeit opportunity to participate in 2021+ development wells<br>◆ Other non-core assets include the Company's Tuscaloosa Marine Shale ("TMS") assets and assets operated by others ("OBO") |
| **Well Economics** | ◆ Assumes current authorization for expenditure ("AFE") estimates based on average lateral length<br>◆ Corporate model calculates the cost of every well with specific adjustments for lateral length<br>◆ Well costs supported by historical averages |

009011

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# NAV (PV-10) Analysis and Comparison

- **All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments**
- **Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation**

*$ millions*

| | Option Preservation Case | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $149 | $186 | $283 | $417 | $551 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$288** | **$357** | **$541** | **$795** | **$1,048** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$193** | **$262** | **$446** | **$700** | **$953** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$198** | **$269** | **$463** | **$728** | **$993** |

| | Accelerated Completions Case | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$336** | **$396** | **$571** | **$806** | **$1,042** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$241** | **$301** | **$476** | **$711** | **$947** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$246** | **$308** | **$493** | **$739** | **$986** |

| | PDP Reference Case | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1][7]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4][8] | ($19) | ($12) | $21 | $61 | $100 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$268** | **$308** | **$452** | **$637** | **$821** |
| Total G&A[5] | *($223)* | *($223)* | *($223)* | *($223)* | *($223)* |
| **Asset Value (Post-G&A)** | **$45** | **$85** | **$230** | **$414** | **$599** |

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Valuation excludes estimated cash at emergence. Estimated at approximately $27MM for SN Operating and UR Holdings accounts.*

*(2) Strip pricing as of 2/11/20.*

*(3) The estimated split of PV-10 at strip between Central/Eastern and Western Catarina in the Option Preservation Case is 52% ($157MM) and 48% ($142MM), respectively. The estimated PV-10 split ignores field level expenses that are allocated to the entire field (PV-10 -$101MM) and non-D&C capital (-$12MM). The estimated total production split between Central/Eastern and Western Catarina is 43% and 57%, respectively. Note that blended marketing and LOE rates are applied to all wells. For the Accelerated Completions and PDP Reference Cases, the PV-10 split is Central/Eastern 47% ($158MM) and Western 53% ($181MM).*

*(4) Includes Springfield marketing bands.*

*(5) Represents 30-year PV-10 of corporate G&A. Includes COPAS recovery PV-10 impact of ~$245MM (Option Preservation), ~$245mm (Accelerated Completions) and $6MM (PDP Reference) for each scenario. Of the COPAS recovery PV-10 impact in the Option Preservation and Accelerated Completions cases, ~21% is attributable to UnSub and ~79% to 3rd parties.*

*(6) Assumes 50% non-operated participation in remaining economic type curve areas (estimated 11 well inventory) if initial 2020 well results are in-line with Marathon expectations; wells are assumed to be drilled and completed during 2021-2023 and are not included in Option Preservation, Accelerated Completions or PDP Blowdown Reference Case.*

*(7) Excludes any estimated upside from Palmetto participation as the blowdown case assumes no further D&C capital investment. Potential upside if another operator executes SN's current development plan.*

*(8) Assumes no development activity as another operator's plan/budget cannot be forecasted.*

009012

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Illustrative and Preliminary NAV (PV-10) Sensitivities

## PV-10 for Option Preservation Case, Accelerated Completions Case and PDP Case at Various Price Decks(1) (2)(3)

*($ in millions)*

| Gas Price (HH) | Oil Price (WTI) – Option Preservation | | | | |
|---|---|---|---|---|---|
| | $50 | Strip(4) | $60 | $70 | $80 |
| $2.25 | $158 | $199 | $412 | $665 | $919 |
| Strip(4) | $189 | $262 | $443 | $696 | $950 |
| $2.50 | $193 | $233 | $446 | $700 | $953 |
| $2.75 | $227 | $268 | $481 | $734 | $988 |
| $3.00 | $262 | $302 | $515 | $769 | $1,022 |

| Gas Price (HH) | Oil Price (WTI) – Accelerated Completions | | | | |
|---|---|---|---|---|---|
| | $50 | Strip(4) | $60 | $70 | $80 |
| $2.25 | $209 | $247 | $444 | $679 | $914 |
| Strip(4) | $237 | $301 | $472 | $708 | $943 |
| $2.50 | $241 | $279 | $476 | $711 | $947 |
| $2.75 | $273 | $311 | $508 | $744 | $979 |
| $3.00 | $305 | $343 | $541 | $776 | $1,011 |

| Gas Price (HH) | Oil Price (WTI) – PDP Reference Case | | | | |
|---|---|---|---|---|---|
| | $50 | Strip(4) | $60 | $70 | $80 |
| $2.25 | $18 | $46 | $202 | $387 | $571 |
| Strip(4) | $40 | $85 | $225 | $409 | $594 |
| $2.50 | $45 | $73 | $230 | $414 | $599 |
| $2.75 | $73 | $101 | $257 | $442 | $626 |
| $3.00 | $100 | $128 | $285 | $469 | $654 |

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Mt. Belvieu Propane is assumed to proportionately increase with WTI (32% of WTI); this results in average realized SN NGL basket pricing of approximately 15% of WTI.*

*(2) Asset values after G&A (excludes Palmetto participation).*

*(3) Values excludes estimated cash at emergence.*

*(4) Strip pricing as of 2/11/20.*

009013

# Option Preservation Case Financial Projections (Accrual)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *$ millions* | 2017A | 2018A | 2019E[1] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,070 | 11,891 | 11,520 | 12,391 | 9,871 | 8,959 | 8,551 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 70,384 | 72,356 | 71,344 | 76,633 | 62,844 | 54,925 | 51,322 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,193 | 13,553 | 13,367 | 14,357 | 11,847 | 10,410 | 9,789 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **35,993** | **37,503** | **36,778** | **39,520** | **32,193** | **28,523** | **26,893** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.51 | $48.66 | $49.00 | $48.39 | $48.70 | $49.22 | $49.71 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.33 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.32 | $9.08 | $8.79 | $9.33 | $9.51 | $9.61 | $9.58 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $83 | $124 | $207 | $219 | $175 | $161 | $156 |
| Gas Revenue | 121 | 121 | 87 | 20 | 33 | 52 | 65 | 55 | 49 | 46 |
| NGL Revenue | 117 | 160 | 81 | 17 | 26 | 43 | 49 | 41 | 37 | 34 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$119** | **$183** | **$302** | **$333** | **$271** | **$246** | **$236** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (32) | (30) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (86) | (144) | (145) | (122) | (103) | (92) |
| Production Taxes | (18) | (30) | (18) | (5) | (7) | (12) | (13) | (11) | (10) | (10) |
| Ad Valorem Taxes | (5) | (10) | (10) | (2) | (4) | (6) | (7) | (6) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX [2] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$15** | **$54** | **$69** | **$121** | **$88** | **$84** | **$86** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *13%* | *29%* | *23%* | *36%* | *32%* | *34%* | *37%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(129)* | *$(233)* | *$(212)* | *$(183)* | *$(162)* | *$(150)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(70) | $(79) | $(149) | $(113) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(55)** | **$(25)** | **$(80)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(115)** | **$(25)** | **$(141)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [3] | | | | | | *12,857* | *13,815* | *10,388* | *8,301* | *7,036* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

009014

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case 2020E Financial Projections (Accrual)

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,819 | 11,392 | 10,993 | 10,614 | 10,097 | 13,294 | 13,388 | 12,566 | 11,896 | 11,389 | 11,520 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,779 | 71,511 | 69,886 | 68,105 | 64,354 | 74,784 | 79,188 | 75,921 | 73,337 | 70,914 | 71,344 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,706 | 13,412 | 13,114 | 12,780 | 12,080 | 13,997 | 14,803 | 14,207 | 13,735 | 13,286 | 13,367 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,822** | **36,723** | **35,755** | **34,745** | **32,903** | **39,756** | **41,389** | **39,427** | **37,854** | **36,494** | **36,778** |
| | | | | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| | | | | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.88 | $48.05 | $48.34 | $48.57 | $48.77 | $48.51 | $48.53 | $48.68 | $48.76 | $48.77 | $49.00 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.94 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.20 | $8.12 | $8.71 | $8.96 | $9.19 | $9.36 | $9.53 | $9.71 | $8.79 |
| | | | | | | | | | | | | | |
| Oil Revenue | $19 | $15 | $16 | $16 | $16 | $15 | $15 | $20 | $19 | $19 | $17 | $17 | $207 |
| Gas Revenue | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 52 |
| NGL Revenue | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 43 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$24** | **$23** | **$23** | **$29** | **$28** | **$28** | **$26** | **$27** | **$302** |
| | | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (12) | (12) | (12) | (11) | (11) | (13) | (13) | (13) | (12) | (12) | (144) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (12) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (6) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX (1) | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$2** | **$2** | **$2** | **$6** | **$10** | **$9** | **$9** | **$8** | **$9** | **$69** |
| *EBITDA Margin (%)* | *22%* | *9%* | *11%* | *10%* | *10%* | *8%* | *27%* | *34%* | *33%* | *33%* | *32%* | *33%* | *23%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(20)* | *$(20)* | *$(21)* | *$(21)* | *$(21)* | *$(17)* | *$(19)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(233)* |
| | | | | | | | | | | | | | |
| Capex | $(8) | $(22) | $(16) | $(14) | $(10) | $(36) | $(20) | $(7) | $(3) | $(3) | $(5) | $(4) | $(149) |
| **Adjusted EBITDAX Less Capex** | **$(2)** | **$(20)** | **$(14)** | **$(12)** | **$(7)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(80)** |
| | | | | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(28)** | **$(22)** | **$(21)** | **$(33)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(141)** |
| | | | | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d) (2)* | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *13,478* | *12,522* | *12,078* | *13,931* | *12,793* | *12,664* | *11,808* | *12,857* |
| | | | | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Accelerated Completions Case Financial Projections (Accrual)

| *$ millions* | 2017A | 2018A | 2019E[1] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,949 | 8,658 | 8,212 | 8,001 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,128 | 79,765 | 76,396 | 64,498 | 55,569 | 50,308 | 47,897 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,515 | 14,919 | 14,299 | 12,118 | 10,505 | 9,558 | 9,157 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,910** | **41,155** | **39,291** | **32,817** | **28,425** | **26,154** | **25,140** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.66 | $48.89 | $49.36 | $49.82 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.33 | $9.47 | $9.57 | $9.54 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $177 | $154 | $148 | $146 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 49 | 45 | 43 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 36 | 33 | 32 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$273** | **$239** | **$226** | **$221** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (92) | (149) | (131) | (112) | (96) | (87) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (10) | (9) | (9) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (5) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX [2] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$63** | **$82** | **$79** | **$68** | **$73** | **$78** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *32%* | *25%* | *29%* | *29%* | *32%* | *35%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(136)* | *$(240)* | *$(194)* | *$(171)* | *$(153)* | *$(143)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(97) | $(28) | $(125) | $(38) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(78)** | **$35** | **$(43)** | **$41** | **$18** | **$26** | **$31** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$35** | **$(104)** | **$41** | **$18** | **$26** | **$31** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [3] | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

009016

Case 20-34500 Document 1353-1 Filed in TXSB on 06/22/20 Page 1147 of 1759

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Accelerated Completions Case 2020E Financial Projections (Accrual)

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,644 | 11,623 | 12,428 | 12,009 | 15,829 | 13,954 | 12,858 | 12,432 | 11,933 | 11,509 | 12,259 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,040 | 71,719 | 78,922 | 74,899 | 90,310 | 85,047 | 80,876 | 78,045 | 75,643 | 73,279 | 76,396 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,570 | 13,451 | 14,781 | 14,033 | 16,869 | 15,890 | 15,115 | 14,599 | 14,161 | 13,722 | 14,299 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,387** | **37,027** | **40,363** | **38,525** | **47,749** | **44,019** | **41,452** | **40,039** | **38,701** | **37,444** | **39,291** |
| | | | | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| | | | | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.90 | $48.02 | $48.18 | $48.40 | $48.25 | $48.45 | $48.57 | $48.69 | $48.76 | $48.76 | $48.90 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.93 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.23 | $8.14 | $8.77 | $8.98 | $9.19 | $9.36 | $9.54 | $9.72 | $8.80 |
| | | | | | | | | | | | | | |
| Oil Revenue | $19 | $15 | $16 | $17 | $19 | $17 | $24 | $21 | $19 | $19 | $17 | $17 | $219 |
| Gas Revenue | 4 | 4 | 4 | 4 | 5 | 4 | 6 | 5 | 5 | 5 | 5 | 6 | 56 |
| NGL Revenue | 4 | 3 | 3 | 3 | 4 | 3 | 5 | 4 | 4 | 4 | 4 | 4 | 46 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$27** | **$25** | **$34** | **$31** | **$28** | **$28** | **$27** | **$27** | **$322** |
| | | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (11) | (11) | (13) | (12) | (15) | (14) | (13) | (13) | (12) | (12) | (149) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (13) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (7) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX [(1)] | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$3** | **$4** | **$4** | **$13** | **$11** | **$9** | **$9** | **$9** | **$9** | **$82** |
| *EBITDA Margin (%)* | *23%* | *10%* | *12%* | *12%* | *15%* | *14%* | *37%* | *35%* | *33%* | *33%* | *33%* | *34%* | *25%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(19)* | *$(20)* | *$(21)* | *$(23)* | *$(22)* | *$(21)* | *$(20)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(240)* |
| | | | | | | | | | | | | | |
| Capex | $(8) | $(16) | $(21) | $(5) | $(46) | $(6) | $(1) | $(5) | $(3) | $(3) | $(5) | $(4) | $(125) |
| **Adjusted EBITDAX Less Capex** | **$(1)** | **$(14)** | **$(19)** | **$(2)** | **$(42)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(43)** |
| | | | | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(22)** | **$(28)** | **$(11)** | **$(68)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(104)** |
| | | | | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(2)] | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *15,761* | *14,295* | *15,367* | *14,924* | *13,728* | *13,579* | *12,640* | *13,779* |
| | | | | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

009017

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case Provides Commodity Price Upside

**A going concern company best positions the assets for future rebound in commodity prices or monetization**




009018

*Note: Assumes strip pricing as of 2/11/20.*

# Key Ongoing Business Initiatives

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Immediate steps have been taken to delay capital spend, optimize operations and reduce costs; the Company is focused on key ongoing business initiatives to maximize asset value**

| | |
|---|---|
| **Asset Development** | ◆ **The drilling program at Catarina was thoroughly reviewed, with timing for continued activity pushed approximately one month, from early January to early February 2020; the existing rig was moved from Catarina to Comanche during the first week of January; as part of this review, the Company's drilling schedule was optimized, resulting in an overall lower rig count**<br>◆ The revised development plan has been designed to preserve the asset base and maintain optionality while minimizing near-term capital outlay<br>◆ The business plan assumes drilling only economic wells (minimum threshold of 20% IRR(1)), unless certain wells are required to be drilled to retain a major lease under CDC obligations – if the Accelerated Completions Case were to be adopted, the remaining DUC inventory would be completed with no further development activity in Catarina after June 2020<br>◆ The Company currently has 3 rigs across the entire asset base (1 at Catarina and 2 at Comanche); however, not all are active<br>◆ In the event that the Company pursues a plan that involves the drilling of additional wells in Catarina, that plan would result in 2 active rigs at Catarina and 1 at Comanche |
| **Midstream** | ◆ **The SECO midstream contract was terminated on January 13, 2020, with 30-day notice provided to SNMP**<br>◆ Midstream contract optimization opportunities are being evaluated, with consideration of commercial, economic and legal implications<br>◆ Value accretion to both SN and SNMP may be available through the Debtors' midstream optimization strategy; any value that may be captured by SNMP will be addressed through a comprehensive renegotiation (with the goal of capturing maximum value for SN and providing infill gathering rate certainty in Eastern Catarina) |
| **Corporate G&A** | ◆ **Non-essential overhead expenses, such as the company ranch participation, have been rejected or eliminated, saving approximately $2MM per annum on a run-rate basis; additional cost savings may be realized in the near-term through ongoing G&A review and contract renegotiation and/or rejection**<br>◆ Corporate G&A has been thoroughly reviewed by management, with a proposed plan to reduce overhead expenses from approximately $75MM (~$3.00/Boe) in 2019 to an average of approximately $19MM consolidated G&A after COPAS reimbursement (~$1.50/Boe) from 2021 through 2025 |
| **Asset Lease Preservation** | ◆ Catarina: TBD<br>◆ All major leases at Comanche are being reviewed on a case-by-case basis |

009019

*Note:*
*(1) IRR calculated at $50 oil/$2.50 gas/$14 NGL price deck.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Key Near Term Operational Decisions (2020)

**Outlined below are key operational decisions over the next 12 months**

| Category | Decision |
|---|---|
| **Catarina** | **Option Preservation**<br>◆ Drill remaining 24 wells required in the 2019-2020 lease period – *Project Capital: $45.0MM*<br>◆ Complete 5 DUCs scheduled in February – *Project Capital: $11.8MM completions + $1.3MM infrastructure and non-D&C*<br>◆ Complete 18 DUCs scheduled in June – *Project Capital: $45.6MM completions + $4.7MM infrastructure and non-D&C*<br>◆ Drill required wells for 2020-2021 lease term – *Source rigs for contract, September 2020 spud for 2-rig program*<br>◆ Leaves 31 DUCs to be completed in 2021 – *Project Capital: $66.2MM completions + $8.0MM infrastructure and non-D&C*<br><br>**Accelerated Completions**<br>◆ Complete 31 DUCs scheduled through June<br>◆ *Project Capital: $1.9MM drilling (Feb/Mar 2020 only) + $73.9MM completions + $8.0MM infrastructure and non-D&C* |
| **Comanche** | ◆ Renegotiate lease in La Bandera/FOGMT – *Current lease terms expire in April 2020*<br>◆ Drill required wells for 2020-2021 lease terms – *Source rigs for contract*<br>◆ Renegotiate lease in Maund – *Current lease terms expire in March 2021* |
| **Midstream/ Marketing** | ◆ TBD |

009020

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Potential Risks and Upsides to the Proposed Business Plan

| | Risk/Considerations |
|---|---|
| **Commodity Prices** | ◆ Further degradation in commodity prices, realizations or differentials |
| **Loss of Comanche Operatorship** | ◆ No longer in control of development plan and capital spend<br>◆ Lose ability to collect COPAS from working interest partners and would have to reimburse new operator<br>◆ Likely lower value in a monetization given lack of control |
| **Midstream Rates** | ◆ Interruptible gathering rate on Eastern Catarina could be increased by SNMP<br>◆ Comanche infield gathering rates could increase with cost of service model if volumes significantly decline |
| **G&A Plan** | ◆ The proposed reduction in G&A corresponds to a reduction in required drilling operations per the business plan<br>◆ Talent retention may be difficult |

| | Potential Upside to Business Plan Forecast |
|---|---|
| **Commodity Prices** | ◆ Improvement in commodity prices, realizations or differentials<br>◆ Improved commodity prices would also unlock additional inventory that can be drilled at economic returns |
| **Contract Optimization** | ◆ TBD |
| **Type Curve Outperformance** | ◆ The Company has outperformed production by ~5% compared to its original 2019 budget<br>◆ Many of the Company's type curves have been recently refreshed at year-end based on new well data |
| **Palmetto** | ◆ If Marathon's 2020 development test is successful, the Company could participate in future development<br>◆ If Marathon's tests are not successful, the Company would still participate in cash flow sharing through an Overriding Royalty Interest ("ORRI") election that requires no capital spend on projects proposed in the first 8 months of a given lease year (1% override that converts to a 17.5% working interest after 1.0x payout) |
| **Catarina Lease CDC Relief** | ◆ While unlikely, if landowners are willing to provide near-term relief on drilling requirements, the Company could realize significant value from avoiding uneconomic wells and redirecting budgeted capex dollars towards completion activity |

009021

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# III. Asset Development Plan

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Asset Development Approach and Overview

**A comprehensive asset development assessment was completed since the last business plan presentation**

| | |
|---|---|
| **Strategy** | ◆ Previous mandate focused on holding assets together and preventing lease expiration as the primary driving objective<br>◆ Current strategy focuses on economic drilling and preserving optionality in the most cost-effective manner |
| **Asset Summary** | ◆ ~435,000 gross (~233,000 net) acres in the Eagle Ford<br>◆ More than half of net acreage is held by production and annual/continuous drilling obligations<br>◆ Diversified, lower decline production from significant PDP base with over 2,200 wells (on a gross basis) |
| **Catarina Type Curves** | ◆ Catarina type curves were reviewed and refreshed in Q4 2019 with the benefit of an additional 12 months of production history<br>◆ Type curve boundaries adjusted to incorporate similar well performance, rock properties, fluid properties and seismic characteristics<br>◆ As a result, significant inventory was lost and others shifted from South Central Catarina to Central Catarina, with no remaining "legacy" South Central locations |
| **Comanche Type Curves** | ◆ Utilized recent well performance results with wider well spacing and larger completion designs to refine type curves<br>◆ Identified and incorporated into forecast material changes to some type curves from development plan changes<br>◆ Inventory was reduced as a result of increased well spacing and removal of uneconomic targets/infill locations |
| **Inventory** | ◆ Complete refresh of inventory based on current development planning and spacing assumptions<br>◆ Created map layers that tie individual sticks on a map to model and ARIES |
| **Drilling and Completion Costs** | ◆ Updated to incorporate lower unit costs (sand and horsepower) and drilling and completion efficiencies (7.5 stages/day)<br>◆ Approximately ~12%-15% per well savings incorporated into business plan vs. 2019 budgeted costs |
| **Engineering and Financial Diligence** | ◆ The Debtor advisors' engineering team evaluated and performed diligence on the geological and technical aspects of the business plan<br>◆ The Debtor advisors reviewed the cost and expense assumptions for each asset<br>◆ Creditor feedback on development plan is being considered and may be incorporated where appropriate and value maximizing |

009023

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Catarina Asset Overview

## Asset Map




**E35-E36 (East)**
- 5 DUCs Drilled Q418
- $10.8MM required to frac
- AVG 26% IRR* at $50 WTI

**A44-A45 (West)**
- 18 DUCs Drilled Q418 - Q319
- $47.2 MM required to frac
- AVG 35% IRR* at $50 WTI

**E37-E39 (East)**
- 7 DUCs Drilled Q419
- 4 Remain to be drilled
- $32.8 MM required to Finish drilling and Frac
- AVG 26% IRR* at $50 WTI

*Considers drilling capital on DUC inventory sunk
† Dashed lines denote East and Solid lines denote West

## Lease Summary

- ~106,000 gross / net acres
- EF wet gas / condensate window
- Annual lease term July 1-June 30
- 50-well annual drilling commitment
- 100% WI and 75% NRI
- Oil/Gas/NGL: 24%/37%/40%

- **2019 Production:** ~35,000 Boe/d
- **PDP Count:** 457 wells
- **Current DUC Inventory:** 30 wells
- **Total Planned 2020 Spuds / TTP:**
  - **Option Preservation**: 24 wells / 23 wells
  - **Accelerated Completions**: 1 well / 31 wells

## Rig – Completion Schedule

**Option Preservation**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling Well Count | | 4 | 6 | 6 | 5 | 3 | | | | | | | | | |
| Online Well Count | | | 5 | | | | 10 | 8 | | | | | | 17 | 14 |

**Accelerated Completions**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling Well Count | | 1 | | | | | | | | | | | | | |
| Online Well Count | | | 5 | 8 | | 18 | | | | | | | | | |

*Gross

## Inventory Analysis

| | Development Plan | | |
|---|---|---|---|
| TC Area | Drilled | AVG IRR @ $50 | Wells |
| CATWSO-A | 6 | 45% | 6 |
| CATC-C | 5 | 26% | 11 |
| CATW-A | 18 | 20% | 29 |
| CATWSO-C | 16 | 12% | 45 |
| CATSW-C | 6 | 13% | 51 |
| CATNW-C | 3 | 0% | 54 |
| CATSC-C | - | - | - |
| CATW-C | - | - | - |
| CATNC-C | - | - | - |
| CATNW-A | - | - | - |
| CATC5 - TIER1 | - | - | - |
| CATC5 - TIER2 | - | - | - |
| CATC5 - TIER3 | - | - | - |
| CATE-B | - | - | - |
| Total | 54 | | |

| | Undeveloped Inventory | | |
|---|---|---|---|
| TC Area | Count | WTI for 20% IRR | Cumulative Wells |
| CATC5 - TIER1 | 12 | $65 | 12 |
| CATNW-A | 16 | 68 | 28 |
| CATWSO-C | 12 | 71 | 40 |
| CATWSO-A | 9 | 74 | 49 |
| CATNC-C | 44 | 76 | 93 |
| CATC5 - TIER2 | 12 | 76 | 105 |
| CATNW-C | 17 | 77 | 122 |
| CATSW-C | 35 | 82 | 157 |
| CATC-C | 28 | 84 | 185 |
| CATC5 - TIER3 | 16 | 84 | 201 |
| CATW-A | 1 | 89 | 202 |
| CATE-B | 152 | 107 | 354 |
| Total | 354 | | |

## Asset Level Cash Flow

Option Preservation

Accelerated Completions




009024

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Comanche Asset Overview

## Asset Map




## Lease Summary

- ~250,000 gross / ~61,000 net acres
- EF volatile oil / condensate gas window
- 23 separate lease commitments
- ~40-60 well per year drilling commitment
- **2019 Production:** ~28,000 Boe/d
- **Gross PDP Count:** 1,738 wells
- **Total Planned 2020 Spuds:** 55 wells
- **Total Planned 2020 TTP**: 57 wells
- Average ~24% WI and ~18% NRI; Restricted average ~6% WI and ~4% NRI
- Oil/Gas/NGL: 37%/30%/33%; Restricted Oil/Gas/NGL: 45%/26%/29%

## Rig – Completion Schedule

| | 2020 | | | | | | | | | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR |
| Drilling *Well Count* | 11 | 3 | 2 | 5 | | 5 | 3 | 4 | 3 | 6 | 9 | 4 | 7 | 4 | |
| Online *Well Count* | 3 | 13 | 3 | 6 | 3 | | 1 | | 11 | 7 | 3 | 7 | 8 | 18 | 3 |

*Gross

## Inventory Analysis

| TC Area | Developed Inventory Count | Developed Inventory AVG IRR @ $50 | Cumulative Wells |
|---|---|---|---|
| AREA-3-2 | 20 | 52% | 20 |
| AREA-5-7 | 28 | 52% | 48 |
| AREA-3-1B | 34 | 50% | 82 |
| AREA-3-1A | 41 | 47% | 123 |
| AREA-7-1 | 40 | 47% | 163 |
| AREA-7-2 | 33 | 41% | 196 |
| AREA-3-3S | 23 | 40% | 219 |
| AREA-3-3 | 75 | 37% | 294 |
| AREA-4-1 | 46 | 33% | 340 |
| AREA-5-1 | 11 | 27% | 351 |
| AREA-3-3_UEFAC_Gen10 | 21 | 22% | 372 |
| AREA-3-4 | 41 | 21% | 413 |
| AREA-5-3 | 9 | 17% | 422 |
| CATNW | 5 | 16% | 427 |
| AREA-2-1 | 7 | 6% | 434 |
| AREA-3-4_UEFAC | 4 | 3% | 438 |
| AREA-3-1C | 6 | 2% | 444 |
| AREA 1 | - | - | - |
| AREA 2-2 | - | - | - |
| AREA 2-3 | - | - | - |
| AREA-3-1B_UEFAC | - | - | - |
| AREA-3-2_UEFB | - | - | - |
| AREA-3-3_UEFAC_Gen2 | - | - | - |
| AREA 4-2 | - | - | - |
| AREA 5-2 | - | - | - |
| AREA 5-4 | - | - | - |
| AREA 6-1 | - | - | - |
| MAVERICK | - | - | - |
| Total | 444 | | |

| TC Area | Undeveloped Inventory Count | WTI for 20% IRR | Cumulative Wells |
|---|---|---|---|
| AREA 7-1 | 4 | $32 | 4 |
| AREA-7-2 | 1 | 35 | 5 |
| AREA-3-2 | 1 | 45 | 6 |
| AREA 3-1B | 12 | 51 | 18 |
| MAVERICK | 46 | 52 | 64 |
| AREA-3-3S | 1 | 52 | 65 |
| AREA 3-3 | 11 | 56 | 76 |
| AREA-5-1 | 11 | 61 | 87 |
| CATNW | 12 | 61 | 99 |
| AREA-5-3 | 31 | 62 | 130 |
| AREA-5-7 | 6 | 63 | 136 |
| AREA-3-3_UEFAC_Gen10 | 108 | 67 | 244 |
| AREA-5-2 | 37 | 68 | 281 |
| AREA-3-1A | 5 | 75 | 286 |
| AREA-6-1 | 12 | 79 | 298 |
| AREA-2-3 | 94 | 82 | 392 |
| AREA-3-3 | 14 | 82 | 406 |
| AREA-3-1C | 22 | 83 | 428 |
| AREA-4-2 | 81 | 83 | 509 |
| AREA-4-1 | 194 | 86 | 703 |
| AREA-3-4 | 38 | 90 | 741 |
| AREA-2-1 | 100 | 91 | 841 |
| AREA-2-2 | 118 | 93 | 959 |
| AREA-3-2_UEFB | 93 | 97 | 1,052 |
| AREA-1 | 67 | 99 | 1,119 |
| AREA-5-4 | 63 | 100 | 1,182 |
| AREA-3-2_UEFB | 1 | 119 | 1,183 |
| AREA-3-4_UEFAC | 282 | 130 | 1,465 |
| AREA-3-3_UEFAC_Gen2 | 217 | 311 | 1,682 |
| AREA-3-1B_UEFAC | 26 | 312 | 1,708 |
| Total | 1,708 | | |

## Asset Level Cash Flow (Restricted)

Option Preservation / Accelerated Completions




009025

*Note: Development plan counts are as of 1/1/20 and Comanche's maverick type curve area is largely exploratory with no wells on lease. Individual wells that appear economic at lower prices are isolated and have certain physical operational hinderances to drilling.*

# Palmetto Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




**Barnhart G Pad**
**TTP-ed:** May 2019

**Barnhart 100-103H**
**TTP-ed:** November 2019

**Barnhart 104-107H**
**Spud:** February 2020
**Complete:** Summer 2020

**Barnhart 108-111H**
**Spud:** April 2020
**Complete:** Summer 2020

**Barnhart 48H – 49H**
**Spud:** Q3 2020
**Complete:** Q4 2020

## Lease Summary

- ~15,500 gross / ~7,500 net acres
- EF black oil window
- Annual drilling commitment based on WTI
- Average 50% WI and 36.35% NRI
- Oil/Gas/NGL: 69%/15%/16%
- **2019 Production:** ~1,000 Boe/d
- **Gross PDP Count:** 83 wells
- **Total Planned 2020 Spuds[(1)]:** 10 wells
- **Total Planned 2020 TTP[(1)]:** 10 wells

## Rig – Completion Schedule[(1)]

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling *Well Count* | | | | | | | | | | | | | | | |
| Online *Well Count* | | | | | | | | | | | | | | | |

## Inventory Analysis

| TC Area | Target | Development Plan: Drilled | Development Plan: Avg. IRR @ $50 | Undeveloped Inventory: Count | Undeveloped Inventory: Avg. IRR @ $55 |
|---|---|---|---|---|---|
| BHM | LEF B | - | - | 17 | 10% |
| BHM – 10,000' | LEF B | 8 | 18% | 23 | 18% |
| BHN | LEF B | - | - | 27 | 2% |
| BHS R1 | LEF B | - | - | 21 | 9% |
| BHS R2 | LEF B | 2 | 6% | 13 | 6% |
| BHS R3 | LEF B | - | - | 11 | 0% |
| | **Total** | 10 | | 112 | |

## Asset Level Cash Flow




009026

(1) *Marathon (operator) intends to drill and complete 10 wells in 2020. Due to near term considerations, SN has elected not to participate in 8 of 10, without leasehold risk. Remaining elections pending.*
(2) *Represents gross well economics; new money returns on these 8 wells, net of SN's ORRI, is approximately 25%.*

# Maverick Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




## Lease Summary

- ~62,000 gross / ~40,000 net acres
- ~24,316 net acres held by production
- EF volatile oil / black oil
- 100% WI and 75% NRI
- Oil/Gas/NGL: 97%/2%/2%
- **2019 Production:** ~2,600 Boe/d
- **Gross PDP Count:** 79 wells
- **Total Planned 2020 Spuds:** 0 wells
- **Total Planned 2020 TTP**: 0 wells

## Rig – Completion Schedule

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling *Well Count* | | | | | | | | | | | | | | | |
| Online *Well Count* | | | | | | | | | | | | | | | |

## Inventory Analysis

| TC Area | Target | Development | Count | HBP | WTI for 20% IRR |
|---|---|---|---|---|---|
| | | Inventory Summary | | | |
| HAUSSER | LEF B | 0 | 5 | 5 | $62 |
| NORTH DIMMIT | LEF B | 0 | 55 | 4 | $64 |
| VOTAW | LEF B | 0 | 42 | 29 | $66 |
| HOLDSWORTH | LEF B | 0 | 50 | 7 | $67 |
| HARGIS | LEF B | 0 | 23 | 23 | $73 |
| PETRO PARDS | LEF B | 0 | 119 | 76 | $75 |
| **Total** | | | 294 | 144 | |

## Asset Level Cash Flow




009027

*Note: Maverick asset is largely exploratory with minimal activity in the last year and type curves would need further risking if considering development.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# IV. Midstream

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Illustrative Catarina Marketing Diagram

**Diagrams below represent the flow of hydrocarbons from Catarina**

## Gas Marketing




## Oil Marketing




009029

Case 19-34508 Document 1354-1 Filed in TXSB on 06/22/20 Page 120 of 157
Case 4:23-cv-00587 Document 1-11 Filed 04/18/23 Page 129 of 159

# Illustrative Comanche Marketing Diagram

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




009030

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# V. Corporate G&A

# COPAS Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## General Summary

- The Council of Petroleum Accountants Societies ("COPAS") is a non-profit professional organization established in 1961 that outlines accounting guidelines and practices within the North American petroleum industry
- Base overhead rates that an operator can charge out to working interest partners must be agreed upon in the various Joint Operating Agreements ("JOA") between SN and its various counterparties. However, COPAS accounting procedures provide for the annual adjustment of the fixed rate overhead for drilling and producing wells
- COPAS does not publish or recommend any specific overhead rates or overhead surveys, as the rates are derived through negotiation among the parties to an agreement

## COPAS at SN

- JOAs that SN is party to are subject to the adjustment rates that COPAS releases on an annual basis
- With SN being the operator of the Comanche assets, SN is able to charge the other working interest partners monthly
- The amounts that SN can charge out to working interest parties depend entirely on the well count, irrespective of changes in the Company's expenses
- A charge to the Company's working interest partners is reflected as a credit to G&A on SN's books and records

## COPAS in Business Plan Model

- The business plan forecast calculates the average of the last 10 years of rate adjustments released by COPAS, which is approximately 3%
- The current average amount that SN is able to charge out to working interest partners is $950 per well, each month
- Beginning with the $950 monthly rate per well, the model assumes that the chargeable rate will increase at ~3% annually, as in the last ten years
- In a blowdown scenario where SN gives up operatorship, SN would then incur an additional expense per the JOA, instead of a receipt

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Appendix

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# A. PDP Reference Case

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# PDP Reference Case: Historical and Financial Projections (Accrual)

| *$ millions* | 2017A | 2018A | 2019E[1] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,724 | 7,243 | 5,958 | 5,125 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,109 | 79,748 | 76,379 | 63,919 | 50,995 | 43,261 | 37,926 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,511 | 14,916 | 14,296 | 11,999 | 9,562 | 8,105 | 7,101 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,903** | **41,149** | **39,285** | **32,376** | **25,304** | **21,273** | **18,547** |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.64 | $48.68 | $49.00 | $49.35 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.43 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.34 | $9.60 | $9.80 | $9.88 |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $173 | $129 | $107 | $93 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 45 | 38 | 34 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 34 | 29 | 26 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$268** | **$207** | **$174** | **$152** |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (27) | (27) |
| Marketing | (108) | (131) | (160) | (58) | (91) | (149) | (131) | (108) | (89) | (78) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (8) | (7) | (6) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (4) | (4) | (3) |
| Corporate G&A | (114) | (87) | (89) | (26) | (25) | (51) | (17) | (17) | (18) | (18) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (25) | (111) | (17) | (17) | (18) | (18) |
| Reconciling Items to EBITDAX [2] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$52** | **$70** | **$74** | **$40** | **$29** | **$20** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *26%* | *22%* | *27%* | *19%* | *17%* | *13%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(148)* | *$(252)* | *$(194)* | *$(167)* | *$(145)* | *$(132)* |
| Capex | $(485) | $(512) | $(62) | $(97) | $(27) | $(124) | $(12) | $(1) | $(1) | $(1) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(79)** | **$25** | **$(54)** | **$62** | **$39** | **$28** | **$19** |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$25** | **$(115)** | **$62** | **$39** | **$28** | **$19** |
| *Memo: Catarina Central / East Volumes (Boe/d)* [3] | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$(1)* | *$5* | *$(5)* | *$(5)* | *$(6)* | *$(6)* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$4* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

009035

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# B. Other Supporting Items

# UnSub Historical Financials (and 4Q19 Estimates)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**SN UNSUB**

| | 1Q 17 | 2Q 17 | 3Q 17 | 4Q 17 | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (MBbl) | 300 | 836 | 756 | 819 | 890 | 769 | 680 | 737 | 741 | 689 | 635 | 626 |
| Gas (MMcf) | 1,862 | 5,011 | 5,067 | 4,517 | 4,677 | 4,438 | 3,803 | 3,942 | 3,758 | 3,751 | 3,596 | 3,498 |
| NGL (MBbl) | 266 | 858 | 904 | 776 | 847 | 791 | 714 | 735 | 688 | 688 | 627 | 606 |
| **Total Production (Mboe)** | **877** | **2,529** | **2,504** | **2,348** | **2,516** | **2,300** | **2,027** | **2,129** | **2,055** | **2,002** | **1,862** | **1,815** |
| | | | | | | | | | | | | |
| Oil (Boed) | 9,686 | 9,183 | 8,213 | 8,901 | 9,884 | 8,450 | 7,386 | 8,007 | 8,235 | 7,569 | 6,907 | 6,805 |
| Gas (Mcfd) | 60,077 | 55,066 | 55,072 | 49,101 | 51,969 | 48,764 | 41,335 | 42,844 | 41,754 | 41,223 | 39,083 | 38,022 |
| NGL (Boed) | 8,583 | 9,432 | 9,830 | 8,432 | 9,408 | 8,693 | 7,758 | 7,991 | 7,643 | 7,560 | 6,814 | 6,582 |
| **Total Production (Boed)** | **28,281** | **27,794** | **27,222** | **25,517** | **27,953** | **25,271** | **22,034** | **23,138** | **22,837** | **21,999** | **20,235** | **19,724** |
| | | | | | | | | | | | | |
| **Commodity Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $48.20 | $48.20 | $48.20 | $55.40 | $62.87 | $67.88 | $69.08 | $58.81 | $54.90 | $59.82 | $56.44 | $56.94 |
| Gas ($/mcf) | $3.00 | $3.00 | $3.00 | $2.93 | $3.00 | $2.80 | $2.99 | $3.64 | $3.15 | $2.64 | $2.23 | $2.40 |
| NGL ($/bbl) | $0.44 | $0.44 | $21.37 | $22.84 | $20.95 | $23.21 | $28.40 | $21.26 | $27.82 | $22.78 | $18.29 | $20.95 |
| | | | | | | | | | | | | |
| **Realized Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $42.97 | $42.19 | $42.47 | $53.46 | $60.21 | $63.92 | $68.46 | $57.44 | $55.21 | $60.61 | $55.16 | $53.39 |
| Gas ($/mcf) | $2.66 | $3.06 | $2.99 | $2.77 | $3.04 | $2.85 | $3.10 | $4.01 | $3.20 | $2.61 | $2.40 | $2.47 |
| NGL ($/bbl) | $15.64 | $16.08 | $20.98 | $21.94 | $22.20 | $22.07 | $28.95 | $20.39 | $17.11 | $13.38 | $11.44 | $13.78 |
| | | | | | | | | | | | | |
| Oil Revenue | $12,901 | $35,257 | $32,090 | $43,783 | $53,562 | $49,148 | $46,519 | $42,312 | $40,913 | $41,748 | $35,053 | $33,421 |
| Gas Revenue | $4,951 | $15,338 | $15,127 | $12,520 | $14,197 | $12,665 | $11,786 | $15,794 | $12,035 | $9,806 | $8,632 | $8,652 |
| NGL Revenue | $4,162 | $13,806 | $18,973 | $17,022 | $18,800 | $17,458 | $20,664 | $14,989 | $11,768 | $9,203 | $7,169 | $8,348 |
| **Oil, Gas, & NGL Revenue** | **$22,014** | **$64,401** | **$66,190** | **$73,324** | **$86,559** | **$79,271** | **$78,969** | **$73,095** | **$64,716** | **$60,757** | **$50,854** | **$50,421** |
| | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $0 | $5,350 | $5,713 | $1,408 | ($3,843) | ($5,788) | ($6,883) | ($5,550) | ($1,522) | ($2,220) | $286 | ($577) |
| LOE | $1,676 | $3,816 | $5,540 | $5,844 | $8,511 | $7,076 | $7,832 | $9,094 | $10,539 | $7,684 | $7,158 | $6,986 |
| Marketing | $8,216 | $22,894 | $23,693 | $21,990 | $20,982 | $20,809 | $19,600 | $20,116 | $17,359 | $17,107 | $15,903 | $16,711 |
| Operating Expenses | $9,892 | $26,710 | $29,233 | $27,834 | $29,492 | $27,885 | $27,432 | $29,210 | $27,897 | $24,791 | $23,060 | $23,697 |
| Production Taxes | $865 | $2,288 | $2,501 | $2,421 | $3,004 | $2,824 | $2,839 | $2,593 | $2,231 | $2,135 | $1,670 | $1,644 |
| Ad Valorem Taxes | $388 | $1,163 | $1,948 | $1,240 | $1,536 | $1,613 | $1,583 | $911 | $1,668 | $1,671 | $1,671 | $1,092 |
| Total G&A | $3,786 | $1,978 | $1,786 | $1,551 | $1,813 | $1,479 | $1,370 | $1,370 | $1,921 | $1,149 | $869 | $77 |
| Reconciling Items to EBITDAX | ($0) | $192 | $0 | ($0) | ($0) | ($388) | $388 | ($0) | ($39) | ($0) | ($0) | $0 |
| **Adjusted EBITDAX** | **$7,083** | **$37,804** | **$36,435** | **$41,687** | **$46,870** | **$39,295** | **$39,249** | **$33,461** | **$29,437** | **$28,791** | **$23,870** | **$23,335** |
| | | | | | | | | | | | | |
| Interest Expense | $756 | $2,299 | $2,352 | $2,232 | $2,301 | $2,202 | $2,131 | $2,201 | $2,283 | $2,147 | $1,952 | $1,795 |
| Preferred Dividends / Tax Distributions | $16,466 | $10,950 | $8,347 | $8,497 | $9,908 | $12,500 | $12,500 | $12,500 | $0 | $12,500 | $25,000 | $12,500 |
| **Discretionary Cash Flow** | **($10,138)** | **$24,555** | **$25,736** | **$30,958** | **$34,661** | **$24,593** | **$24,618** | **$18,760** | **$27,154** | **$14,144** | **($3,082)** | **$9,039** |
| | | | | | | | | | | | | |
| Total Capex | $1,463 | $16,762 | $18,312 | $33,202 | $25,193 | $20,521 | $19,662 | $18,218 | $5,396 | $5,442 | $6,687 | $4,130 |
| **Free Cash Flow (before A&D)** | **($11,601)** | **$7,794** | **$7,424** | **($2,244)** | **$9,468** | **$4,072** | **$4,957** | **$542** | **$21,757** | **$8,702** | **($9,770)** | **$4,909** |
| | | | | | | | | | | | | |
| Acquistions / Divestitures | ($673,500) | $0 | $0 | $1,984 | $2,980 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other / Working Capital Adjustment** | $0 | ($13,036) | $11,067 | $1,739 | ($3,944) | $7,675 | ($4,776) | ($17,199) | ($1,952) | $2,589 | ($1,086) | $3,914 |
| **Free Cash Flow (after A&D)** | **($685,101)** | **($5,242)** | **$18,491** | **$1,479** | **$8,504** | **$11,747** | **$180** | **($16,657)** | **$19,805** | **$11,292** | **($10,856)** | **$8,824** |

** Q4 2019 financials not finalized and subject to change.
* Reflects true-up to actual historical cash & RBL balances. This does not forecast a change in future working capital balances.

009037

# Historical EBITDAX Reconciliation – Restricted Group

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *(In Thousands)* | 2017 | | 2018 | |
|---|---|---|---|---|
| | Consolidated SN | Restricted Group (Model) | Consolidated SN | Restricted Group (Model) |
| | FY | FY | FY | FY |
| **Adjusted EBITDAX:** | | | | |
| Net income (loss) | $ 43,191 | $ (6,851) | $ 85,205 | $ (22,501) |
| Adjusted by: | | | | |
| Interest expense | 128,189 | 120,550 | 165,233 | 156,398 |
| Amortization of debt costs (1) | 11,975 | 8,880 | 12,625 | 8,819 |
| Net losses (gains) on commodity derivative contracts (2) | 6,099 | 7,986 | 27,756 | 32,316 |
| Net settlements paid on commodity derivative contracts | 13,140 | 670 | (103,205) | (81,141) |
| Exploration expense | 5,755 | 5,755 | 3,295 | 3,284 |
| Depreciation, depletion, amortization and accretion (1) | 177,153 | 125,696 | 262,481 | 197,388 |
| Impairment of oil and natural gas properties (1) | 39,499 | 39,499 | 14,386 | 14,337 |
| Stock-based compensation (1) | 22,909 | 22,909 | 792 | 792 |
| Acquisition and divestiture costs included in G&A | 30,526 | 30,334 | 778 | 778 |
| Income tax expense (benefit) | (2,336) | (2,336) | - | - |
| Gains on sale of oil and natural gas properties | - | - | (1,528) | (1,528) |
| Gains on disposal of assets | (81,955) | (81,955) | - | - |
| Loss on impairment of other assets | - | - | - | - |
| Impairment of right of use assets | - | - | - | - |
| Accrued amount for executive bonuses included in G&A | - | - | - | - |
| (Gains) losses on embedded derivatives | 1,551 | 1,551 | (700) | (700) |
| (Gains) losses on investments | 871 | 871 | 21,798 | 21,798 |
| Amortization of deferred gain on Catarina Midstream sale | (23,718) | (23,718) | (23,720) | (23,720) |
| Interest income | (836) | (836) | (4,351) | (4,351) |
| **Adjusted EBITDAX** | **$ 372,013** | **$ 249,004** | **$ 460,845** | **$ 301,969** |

009038

*(1) Represent non-cash adjustments to net income.*
*(2) Includes cash received and non-cash (gains) losses.*

# Historical EBITDAX Reconciliation – UnSub

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *($ millions)* | 1Q 2017 | 2Q 2017 | 3Q 2017 | 4Q 2017 | 1Q 2018 | 2Q 2018 | 3Q 2018 | 4Q 2018 |
|---|---|---|---|---|---|---|---|---|
| **Adjusted EBITDA:** | | | | | | | | |
| Net income | $ 18.8 | $ 31.2 | $ 4.5 | $ (4.5) | $ 17.4 | $ (0.3) | $ 13.2 | $ 77.5 |
| Plus: | | | | | | | | |
| Interest expense | 0.8 | 2.3 | 2.4 | 2.2 | 2.3 | 2.2 | 2.1 | 2.2 |
| Net (gains) losses on commodity derivative contracts(1) | (19.1) | (20.9) | 14.4 | 23.7 | 14.2 | 25.5 | 14.3 | (58.5) |
| Net settlements received on commodity derivative contracts | 0.0 | 5.3 | 5.7 | 1.4 | (3.8) | (5.8) | (6.9) | (5.5) |
| Depreciation, depletion, amortization and accretion(2)(3) | 6.1 | 19.0 | 8.5 | 17.8 | 15.9 | 16.8 | 15.5 | 16.9 |
| Acquisition costs included in general and administrative expense | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of debt issuance costs(3) | 0.3 | 0.9 | 0.9 | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 |
| Income tax benefit | 0.2 | (0.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Impairment of oil and natural gas properties(3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Exploration expense | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Adjusted EBITDA** | **$ 7.1** | **$ 37.8** | **$ 36.4** | **$ 41.7** | **$ 46.9** | **$ 39.3** | **$ 39.2** | **$ 33.5** |

009039

*(1) Includes cash received and non-cash (gains) losses.*
*(2) Adjusted from prior period presentation due to conversion to successful efforts from full cost method during Q3 2017.*
*(3) Represent non-cash adjustments to net income.*

Case 20-34508 Document 1354-1 Filed in TXSB on 06/22/20 Page 139 of 175
Case 4:23-cv-03487 Document 1-11 Filed 04/18/23 Page 1170 of 1759

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Option Preservation Case)

## Pricing *(As of 2/11/20)*

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **WTI Oil ($/Bbl)** | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| **Henry Hub Gas ($/MMBtu)** | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| **Mt. Belvieu Propane ($/Bbl)** | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

## Commodity Price Realizations

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| **Oil (% WTI)** | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| **Gas (% Henry Hub)** | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| **NGL (% Mt B Propane)** | 52% | 43% | 69% | 63% | 62% | - | - |

## Lease Operating Expense




## G&A




009040

Note: Strip pricing sourced from Capital IQ as of 2/11/20.

# Business Plan Assumptions (Option Preservation Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




0249041

Case 23-34508 Document 1354-1 Filed 04/18/23 in TXSB Page 1172 of 1759

# Business Plan Assumptions (Option Preservation Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Capital Expenditures**




**Well Costs[1]**




009042

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Accelerated Completions Case)

## Pricing (As of 2/11/20)

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub Gas ($/MMBtu) | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

## Commodity Price Realizations

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| Oil (% WTI) | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| Gas (% Henry Hub) | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| NGL (% Mt B Propane) | 52% | 43% | 69% | 63% | 62% | - | - |

## Lease Operating Expense




## G&A




009043

*Note: Strip pricing sourced from Capital IQ as of 2/11/20.*

Case 23-34508 Document 1353-11 Filed 04/18/23 in TXSB Page 1174 of 1759

# Business Plan Assumptions (Accelerated Completions Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




09044

*Note: In comparison, PDP reference case drilling and completion activity is comprised of the following: Drilling – 1 well in Catarina (2020), 66 wells in Comanche (55 in 2020 and 11 in 2021), Completions - 31 wells in Catarina (all in 2020), 80 wells in Comanche (57 in 2020 and 23 in 2021)*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Accelerated Completions Case)

**Capital Expenditures**




**Well Costs(1)**




009045

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

# Forecast Liquidity

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Similar Liquidity Profile at Exit in Option Preservation, Accelerated Completions, and PDP Reference Scenarios




**PDP Reference scenario does not assume full conversion to non-operated cash based forecast*

- Liquidity at 5/31/2020 of $24.0MM in the Option Preservation scenario, $27.9MM in the Accelerated Completion scenario, and $27.4MM in a PDP Reference scenario.
- Cash Flows include:
  - Payment of accrued DIP interest at 5/31/2020 and exit fees of 1.5% of total new money commitment (~$1.8MM)
  - 1L adequate protection paid during case ($36MM) and accrued adequate protection paid on 5/31/2020 ($9.4MM)
  - Payment of all accrued & unpaid professional fees and success fees (~38.3MM)
- DIP commitment is $150MM of new money and $50MM of 1st lien roll-up to be refinanced upon exit
- No additional disbursements associated with emergence are included in this forecast

009046

# Sanchez Energy Organizational Structure (Pre-Petition)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




*Notes:*

*(1) GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.*

009047

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Comanche Ownership Structure




009048

*Note: Percentages shown represent interest in future development.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual NYMEX WTI Oil Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $53.86 | $51.26 | $50.24 | $50.07 | $50.30 | $50.79 | $51.09 | $51.24 | $51.20 | $51.20 | $51.20 |
| Strip as of 12/15/2019 | $58.05 | $53.99 | $51.92 | $51.16 | $51.08 | $51.32 | $51.52 | $51.62 | $51.58 | $51.58 | $51.58 |
| Strip as of 12/31/2019 | $58.83 | $54.38 | $52.09 | $51.31 | $51.44 | $52.07 | $52.57 | $52.84 | $52.84 | $52.84 | $52.84 |
| Strip as of 1/15/2020 | $56.71 | $53.33 | $51.57 | $51.01 | $51.15 | $51.66 | $52.09 | $52.34 | $52.36 | $52.36 | $52.36 |
| Strip as of 2/11/2020 | $50.76 | $50.89 | $50.96 | $51.32 | $51.69 | $52.04 | $52.22 | $52.38 | $52.40 | $52.40 | $52.40 |

009049

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual NYMEX Henry Hub Gas Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $2.27 | $2.41 | $2.44 | $2.48 | $2.54 | $2.58 | $2.63 | $2.72 | $2.80 | $2.91 | $3.01 |
| Strip as of 12/15/2019 | $2.29 | $2.45 | $2.45 | $2.48 | $2.52 | $2.57 | $2.61 | $2.69 | $2.75 | $2.84 | $2.92 |
| Strip as of 12/31/2019 | $2.29 | $2.42 | $2.42 | $2.46 | $2.49 | $2.53 | $2.55 | $2.60 | $2.65 | $2.69 | $2.75 |
| Strip as of 1/15/2020 | $2.25 | $2.43 | $2.44 | $2.47 | $2.51 | $2.55 | $2.57 | $2.63 | $2.67 | $2.71 | $2.77 |
| Strip as of 2/11/2020 | $2.04 | $2.36 | $2.41 | $2.45 | $2.47 | $2.49 | $2.49 | $2.52 | $2.55 | $2.59 | $2.65 |

009050

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual Mt. Belvieu Propane Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $21.35 | $21.31 | $21.75 | $22.13 | $22.27 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 |
| Strip as of 12/15/2019 | $21.57 | $22.15 | $22.62 | $22.97 | $23.11 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 |
| Strip as of 12/31/2019 | $19.04 | $20.16 | $20.86 | $21.24 | $21.38 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 |
| Strip as of 1/15/2020 | $19.40 | $20.45 | $20.86 | $21.24 | $21.38 | $21.27 | $21.79 | $21.79 | $21.79 | $21.79 | $21.79 |
| Strip as of 2/11/2020 | $17.26 | $18.39 | $18.85 | $19.27 | $19.43 | $19.35 | $19.41 | $19.33 | $19.33 | $19.33 | $19.33 |

009051

# Exhibit L

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

OPERATING AGREEMENT

DATED

**January 1** , **2010** ,
year

OPERATOR **ANADARKO E&P COMPANY LP**

CONTRACT AREA **See Exhibit "A"**

**MAVERICK BASIN PROJECT**

**WORTHEY LEASE**

COUNTY ~~OR PARISH~~ OF **WEBB** , STATE OF **TEXAS**

COPYRIGHT 1989 – ALL RIGHTS RESERVED AMERICAN ASSOCIATION OF PETROLEUM LANDMEN, 4100 FOSSIL CREEK BLVD. FORT WORTH, TEXAS, 76137, APPROVED FORM.

A.A.P.L. NO. 610 – 1989

307201

## TABLE OF CONTENTS


| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 1 |
| III. | **INTERESTS OF PARTIES** | 2 |
| | A. OIL AND GAS INTERESTS: | 2 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION: | 2 |
| | C. SUBSEQUENTLY CREATED INTERESTS: | 2 |
| IV. | **TITLES** | 2 |
| | A. TITLE EXAMINATION: | 2 |
| | B. LOSS OR FAILURE OF TITLE: | 3 |
| | ~~1. Failure of Title~~ | ~~3~~ |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | ~~3~~ |
| | 3. Other Losses | 3 |
| | ~~4. Curing Title~~ | ~~3~~ |
| V. | **OPERATOR** | 4 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR: | 4 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR: | 4 |
| | 1. Resignation or Removal of Operator | 4 |
| | 2. Selection of Successor Operator | 4 |
| | 3. Effect of Bankruptcy | 4 |
| | C. EMPLOYEES AND CONTRACTORS: | 4 |
| | D. RIGHTS AND DUTIES OF OPERATOR: | 4 |
| | 1. Competitive Rates and Use of Affiliates | 4 |
| | 2. Discharge of Joint Account Obligations | 4 |
| | 3. Protection from Liens | 4 |
| | 4. Custody of Funds | 5 |
| | 5. Access to Contract Area and Records | 5 |
| | 6. Filing and Furnishing Governmental Reports | 5 |
| | 7. Drilling and Testing Operations | 5 |
| | 8. Cost Estimates | 5 |
| | 9. Insurance | 5 |
| VI. | **DRILLING AND DEVELOPMENT** | 5 |
| | A. INITIAL WELL: | 5 |
| | B. SUBSEQUENT OPERATIONS: | 5 |
| | 1. Proposed Operations | 5 |
| | 2. Operations by Less Than All Parties | 6 |
| | 3. Stand-By Costs | 7 |
| | 4. Deepening | 8 |
| | 5. Sidetracking | 8 |
| | 6. Order of Preference of Operations | 8 |
| | 7. Conformity to Spacing Pattern | 9 |
| | 8. Paying Wells | 9 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK: | 9 |
| | 1. Completion – **[Option No. 2]** | 9 |
| | 2. Rework, Recomplete or Plug Back | 9 |
| | D. OTHER OPERATIONS: | 9 |
| | E. ABANDONMENT OF WELLS: | 9 |
| | 1. Abandonment of Dry Holes | 9 |
| | 2. Abandonment of Wells That Have Produced | 10 |
| | 3. Abandonment of Non-Consent Operations | 10 |
| | F. TERMINATION OF OPERATIONS: | 10 |
| | G. TAKING PRODUCTION IN KIND: | 10 |
| | (Option 1) Gas Balancing Agreement | 10 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | ~~11~~ |
| VII. | **EXPENDITURES AND LIABILITY OF PARTIES** | 11 |
| | A. LIABILITY OF PARTIES: | 11 |
| | B. LIENS AND SECURITY INTERESTS: | 12 |
| | C. ADVANCES: | 12 |
| | D. DEFAULTS AND REMEDIES: | 12 |
| | 1. Suspension of Rights | 13 |
| | 2. Suit for Damages | 13 |
| | 3. Deemed Non-Consent | 13 |
| | 4. Advance Payment | 13 |
| | 5. Costs and Attorneys' Fees | 13 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES: | 13 |
| | F. TAXES: | 13 |
| VIII. | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 14 |
| | A. SURRENDER OF LEASES: | 14 |
| | B. RENEWAL OR EXTENSION OF LEASES: | 14 |
| | C. ACREAGE OR CASH CONTRIBUTIONS: | 14 |

**TABLE OF CONTENTS**


D. ASSIGNMENT; MAINTENANCE OF UNIFORM INTEREST: ..... 15
E. WAIVER OF RIGHTS TO PARTITION: ..... 15
~~F. PREFERENTIAL RIGHT TO PURCHASE: ..... 15~~
IX. **INTERNAL REVENUE CODE ELECTION** ..... 15
X. **CLAIMS AND LAWSUITS** ..... 15
XI. **FORCE MAJEURE** ..... 16
~~XII. NOTICES ..... 16~~
XIII. **TERM OF AGREEMENT [Option No. 1]** ..... 16
XIV. **COMPLIANCE WITH LAWS AND REGULATIONS** ..... 16
A. LAWS, REGULATIONS AND ORDERS: ..... 16
B. GOVERNING LAW: ..... 16
C. REGULATORY AGENCIES: ..... 16
XV. **MISCELLANEOUS** ..... 17
A. EXECUTION: ..... 17
B. SUCCESSORS AND ASSIGNS: ..... 17
C. COUNTERPARTS: ..... 17
D. SEVERABILITY ..... 17
XVI. **OTHER PROVISIONS** ..... 17

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between __**Anadarko E&P Company LP**__, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**

**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a producer of Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the Deepest Zone proposed in the associated AFE, whichever is the lesser.

E. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

F. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

G. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located.

H. ~~The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~

I. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

J. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

K. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

L. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

M. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

N. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone.

O. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

P. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any routine repair or maintenance work or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

Q. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties.

R. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. **S. See Article XVI for additional defined terms.**

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**

**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

__x__ A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,
(2) Restrictions, if any, as to depths, formations, or substances,
(3) Parties to agreement with addresses and telephone numbers for notice purposes,
(4) Percentages or fractional interests of parties to this agreement,
(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement,
(6) Burdens on production.

_____ B. Exhibit "B," Form of Lease. **There is no Exhibit "B".**
__x__ C. Exhibit "C," Accounting Procedure.
__x__ D. Exhibit "D," Insurance.
__x__ E. Exhibit "E," Gas Balancing Agreement.
__x__ F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.
__x__ G. Exhibit "G," ~~Tax Partnership~~ **Geological Well Data Requirements.**
__x__ H. ~~Other:~~**Exhibit "H", Form of Memorandum of Operating Agreement, Mortgage and Financing Statement**

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

## ARTICLE III.
## INTERESTS OF PARTIES

**A. Oil and Gas Interests:**

If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area up to, but not in excess of, ______25%______ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," –such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

## ARTICLE IV.
## TITLES

**A. Title Examination:**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and landmen for title examination / and/or curative work (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

~~Each party~~ / Operator shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys / and landmen which are associated with hearings before governmental agencies, / or with securing curative matters and so forth as provided above and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C."

Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney or title has been accepted by all of the Drilling Parties in such well.

**B. Loss or Failure of Title:**

~~1. Failure of Title: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

~~2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above~~, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

~~4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.~~

**ARTICLE V.**
**OPERATOR**

**A. Designation and Responsibilities of Operator:**

<u>Anadarko E&P Company LP</u> shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators, Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except provided as / ~~to the type of operation to be undertaken in accordance with the election procedures contained~~ in this agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

**B. Resignation or Removal of Operator and Selection of Successor:**

1. <u>Resignation or Removal of Operator:</u> Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.

Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2. <u>Selection of Successor Operator:</u> Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

3. <u>Effect of Bankruptcy:</u> If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of / a party or ~~two (2) or more~~ parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined by Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. <u>Competitive Rates and Use of Affiliates:</u> All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by affiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. <u>Discharge of Joint Account Obligations:</u> Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. <u>Protection from Liens</u>: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from

liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each Non-Operator or its duly authorized representative, at the Non-Operator's sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Non-Operator upon request copies of any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C."

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator **shall put forth a good faith effort to notify** ~~will promptly advise~~ Non-Operators **in advance** of the date on which the well is **scheduled to be** spudded, or the date on which drilling operations **to be** ~~are~~ commenced.

(b) Operator will send to Non-Operators such reports, test results and notices regarding the progress of operations on the well as the Non-Operators shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator shall adequately test all Zones encountered which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: **If prepared by Opertor, and upon** ~~Upon~~ request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self-insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

**A. ~~Initial Well:~~**

~~On or before the ______ day of ____________________, __________, Operator shall commence the drilling of the Initial Well at the following location:~~

~~and shall thereafter continue the drilling of the well with due diligence to~~

~~The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area~~ other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone

under this agreement and to all other parties in the case of a proposal for Sidetracking or Deepening, specifying the work to be performed, the / the surface and bottom hole locations, proposed depth, objective Zone and the estimated cost of the operation. The parties to whom such a notice is delivered shall ~~have~~ / respond within thirty (30) days after receipt of the notice ~~within which~~ to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations on the Contract Area pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non-Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking,



009061

Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non-Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i) 200 % of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in the well from the beginning of the operations; and

(ii) 400 % of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties 200 % of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non-Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage **and the proportionate share of plugging and abandoning which each party would have paid if the well had been plugged at the time each party participated in an operation on the well.**

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. / **No less often than once each calendar quarter thereafter, during the time the** ~~Each month thereafter, during the time the~~ Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding ~~month~~/ **quarter**. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking,

Sidetracking, Deepening, Recompleting, Plugging Back or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all parties responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day-to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. <u>Deepening:</u> If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial Objective"). Such well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

5. <u>Sidetracking:</u> Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." **<u>The provisions of this subparagraph VI.B.5. will not apply to wells drilled as horizontal wellbores.</u>**

6. <u>Order of Preference of Operations.</u> Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the

initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty-four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐ ~~Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completing and equipping of the well, including necessary tankage and/or surface facilities.~~

☑ / Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of the well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provision of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletion have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of ______ **Fifty Thousand** ______ Dollars ($ **50,000.00** ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of ______ **Fifty Thousand** ______ Dollars ($ **50,000.00** ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform repair work or undertake the installation of artificial lift equipment or ancillary production facilities such as salt water disposal wells or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively be those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least **50** % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled or Deepened pursuant to Article VI.B.2., any well which has been drilled or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be

plugged and abandoned without the consent of all parties. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposed plugging shall take over the well as of the end of such forty-eight (48) hour notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within ~~sixty~~ thirty (~~60~~30) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within ~~sixty~~ thirty (~~60~~30) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well.

Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non-abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion or plugging of a well, including but not limited to the Initial Well, such operation shall not be terminated without consent of parties bearing __51__% of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☑ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment

directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators within 30 days of ~~upon reasonable~~ request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportionate share of total Gas sales to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ ~~**Option No. 2: No Gas Balancing Agreement:**~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

## ARTICLE VII.
## EXPENDITURES AND LIABILITY OF PARTIES

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.



009066

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement (including a photographic or other reproduction hereof) or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within thirty ~~fifteen~~ (30) ~~(15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered

only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged as a dry hole, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting parties in proportion to their interests, and the non-defaulting parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non-Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in the Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by ~~the party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Operator and billed to the joint account. Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.23.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least five (5) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non-Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless all parties agree to abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

~~Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.~~

**ARTICLE VIII.**

**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment which may be located thereon and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby,. / ~~such lease to be on the form attached hereto as Exhibit "B."~~ **Such lease is to be in a form mutually agreeable to the assigning party and the parties receiving the assignment.** Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation on the Contract Area, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment; Maintenance of Uniform Interest:**

For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:

1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or

2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted hereunder in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co-owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~**F. Preferential Right to Purchase:**~~

~~☐ (Optional; Check if applicable.)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after the notice is delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interests to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

## ARTICLE IX.
## INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income.

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed __Fifty Thousand__ Dollars ($__50,000.00__) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be a the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

## ARTICLE XII.
## NOTICES

~~All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, telegram, telex, telecopier or any other form of facsimile, postage or charges prepaid, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the telecopy, facsimile or telex machine of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier or telegraph service, or upon transmittal by telex, telecopy or facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, telex, telecopy or other facsimile within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.~~

## ARTICLE XIII.
## TERM OF AGREEMENT

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☑ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise.

☐ ~~Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is capable of production, and for an additional period of _____ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re-completing, Plugging Back or Reworking operations are commenced within _____ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement as to all or any portion of the Contract Area and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited to matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of ______ Texas ______ shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or

orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from any and all losses, damages, injuries, claims and causes of action arising out of, incident to or resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence. Each Non-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

**ARTICLE XV.**
**MISCELLANEOUS**

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. ~~Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. In the event Operator proceeds with drilling operations for the Initial Well without the execution hereof by all persons listed on Exhibit "A" as having a current working interest in such well, Operator shall indemnify Non-Operators with respect to all costs incurred for the Initial Well which would have been charged to such person under this agreement if such person had executed the same and Operator shall receive all revenues which would have been received by such person under this agreement if such person had executed the same.~~

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**ARTICLE XVI.**
**OTHER PROVISIONS**

# ARTICLE XVI.
## SPECIAL PROVISIONS

**Priority of Agreements**

1) This Agreement is subject to the terms and provisions of that certain Joint Exploration Agreement by and between Anadarko E&P Company LP and TXCO Energy Corp. (the "JEA"). In the event of conflict between the JEA and this Agreement, the provisions of the JEA shall control.

2) In the event of conflict between the provisions of this Article XVI and any other provision of this Agreement or its Exhibits, the provisions of this Article XVI. shall control.

**Notice**

1) Requirements. Each party giving or making any notice, request, demand, or other communication (each, a "Notice") pursuant to this Agreement shall give such Notice in writing and shall use one of the following methods of delivery: personal delivery, Registered or Certified Mail (in each case, return receipt requested and postage prepaid), nationally recognized overnight courier (with all fees prepaid), facsimile, or electronic transmission.

2) Addresses. Any party giving a Notice shall address such Notice to the receiving party (the "Addressee") at the address and to the individual provided on Exhibit "A" attached hereto or at such other address and/or to such other individual as previously designated by the Addressee in a Notice.

   a. Except as specifically provided elsewhere in this Agreement, a Notice is effective only if the party giving or making such Notice has complied with paragraphs 1 and 2 of this Article XVI.B and if the Addressee has received, or been deemed to have received the Notice.

   b. A Notice is deemed to have been received as follows:
      i. If a Notice is delivered in person, upon receipt as indicated by the date on the signed receipt;
      ii. If a Notice is sent by Registered or Certified Mail, upon the earlier of (1) receipt as indicated by the date on the signed receipt or (2) five days after such Notice is deposited in the mail;
      iii. If a Notice is sent by nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt;
      iv. If a Notice is sent by facsimile, upon receipt by the party giving or making such Notice of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the Addressee's facsimile number;
      v. If a Notice involving an item that causes a response period or other time period set forth in this Agreement (a "time-sensitive matter") to commence is sent by electronic transmission (as defined below), upon the notifying party's receipt of a response from the Addressee by electronic transmission or other written or facsimile recognition of receipt of such electronic transmission;
      vi. If a Notice involving an item other than a time-sensitive matter is sent by electronic transmission (as defined below), when transmitted if transmitted prior to 9:00 a.m. on a business day, and otherwise on the next business day following transmission; and

vii. If the Addressee rejects or otherwise refuses to accept a Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given to the party attempting to give or make such Notice, then upon the rejection, refusal, or inability to deliver.

Notwithstanding the foregoing subsections i. through vii above, except as expressly provided to the contrary in subsection v above, if a Notice is received after 5:00 P.M. on a business day where the Addressee is located, or on a day that is not a business day where the Addressee is located, such Notice is deemed received at 9:00 A.M. on the next business day where the Addressee is located.

3) Electronic Transmissions. Each of the parties hereto agrees that: any Notice transmitted by electronic transmission shall be treated in all manner and respects as an original written document; and any such Notice shall be considered to have the same binding and legal effect as a Notice sent by other approved means. Each of the parties further agrees that they will not raise the transmission of a consent or document by electronic transmission as a defense in any proceeding or action in which the validity of such consent or document is at issue and hereby forever waives such defense. For purposes of this Agreement, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process. With respect to any Notice delivered by electronic transmission and involving a time-sensitive matter, the Addressee covenants and agrees to use its best efforts to promptly respond to any such Notice such that the Notice shall be deemed to have been received as set forth in clause "v." above.

**Other Party Acting As Operator**

If any party other than Operator is authorized pursuant to this Agreement or the JEA to perform duties contemplated by this Agreement as the duty of Operator, the party performing such duties shall be accorded all rights and privileges provided to Operator under this Agreement and such party shall fully comply with the terms and provisions of this Agreement with respect to such duties, as if such party had been designated Operator hereunder, for so long as such party is acting in such capacity.

**Proposal to Plug And Abandon**

Notwithstanding anything herein to the contrary, if no written response to a proposal to plug and abandon a well which has been completed as a producer is received by the party making such proposal within thirty (30) days of the date of the receipt of the proposal, it will be conclusively deemed for all purposes that an affirmative election to plug and abandon the well has been made.

**Priority of Operations**

When a well authorized under the terms of this agreement as a vertical well has been drilled to the objective depth authorized in the AFE ("authorized depth"), and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter: (1) a proposal to do additional logging, coring, or testing; (2) a proposal to attempt to complete the well at the authorized depth in the manner set forth in the AFE (i.e. in accordance with the casing, stimulation and other completion programs set forth in the AFE); (3) a proposal to attempt to complete the well at the authorized depth in a manner different than as set forth in the AFE; (4) a proposal to plug back and attempt to complete the well at a depth shallower than the authorized depth, with priority given to objectives in ascending order up the hole; (5) a proposal to drill the well to a depth below

the authorized depth, with priority given to objectives in descending order; (6) a proposal to sidetrack the well to a new target objective for a vertical or deviated hole, with priority given first in ascending order to targets above the authorized depth, and then in descending order to targets below the authorized depth; (7) a proposal to drill a horizontal well, with priority given first to a lateral drain hole at the authorized depth, and then to objectives in ascending order above the authorized depth, and then to objectives in descending order below the authorized depth; and (8) plugging and abandoning the well.

When a well authorized under the terms of this agreement as a horizontal well has been drilled to the authorized depth, and all tests have been completed and the results thereof furnished to the participating parties, and such parties cannot agree upon the sequence and timing of further operations regarding said well, the following proposals shall control in the order enumerated hereafter: (1) a proposal to do additional logging, coring, or testing; (2) a proposal to attempt to complete the well at the authorized depth in the manner set forth in the AFE (i.e., in accordance with the casing, stimulation and other completion programs set forth in the AFE); (3) a proposal to attempt to complete the well at the authorized depth in a manner different than as set forth in the AFE; (4) a proposal to extend the length of the lateral drain hole for a specified number of feet in the direction it is drilling, with priority given to the shortest additional length proposed by any of the participating parties; (5) a proposal to drill a new lateral drain hole in a different direction at the authorized depth; (6) a proposal to drill a new lateral drain hole at a different depth, with priority given in ascending order to objectives above the authorized depth, and then in descending order to objectives below the authorized depth; (7) a proposal to plug back and attempt to complete the well at a depth shallower than the authorized depth, with priority given to objectives in ascending order up the hole; (8) a proposal to deepen the well below the authorized depth; (9) a proposal to sidetrack the well to a new target objective, with priority given first in ascending order to objectives above the authorized depth, and then in descending order to objectives below the authorized depth; and (10) plugging and abandoning the well.

In drilling a horizontal well, the Operator shall have the right at its sole discretion to cease drilling at any time, for any reason, after it has drilled to the objective formation and has drilled laterally for a distance which is at least equal to fifty percent (50%) of the length of the total horizontal displacement (displacement from true vertical) proposed in the AFE; if in such event the well will be deemed to be at its "authorized depth" as that term is used in this agreement.

If at the time the parties are considering a proposed operation, the well is in such condition, in the Operator's judgment, that a reasonably prudent operator would not conduct such operation for fear of mechanical difficulties, placing the hole, equipment or personnel in danger of loss or injury, or fear of loss of the well for any reason without being able to attempt a completion at the authorized depth, then the proposal shall be given no priority to any proposed operation except for plugging and abandoning the well.

**Public Announcement**

There shall be no public announcements or press releases with respect to the existence of this Agreement, the negotiations between the parties in relation to this Agreement, the execution of this Agreement, the contents of this Agreement, the relationship of the parties in respect of this Agreement, or any matters governed by this Agreement without prior written approval of the text of such announcements or press release by both parties. Prior to making any such public announcement or statement, Operator and Non-Operator shall consult with each other and exercise their best efforts to: (i) agree upon the text of any joint public announcement or statement to be made by both parties; or (ii) obtain approval of the other party to the text of a public announcement or statement to be made solely by one party; and the parties agree that any agreement or approval shall not be unreasonably withheld, conditioned or delayed. Nothing contained herein shall preclude any party from making such disclosures as may be required by any federal or state law or regulation or by any stock exchange on which the shares of the party and/or its affiliated companies are listed.

**Confidentiality of Information**

All geophysical, geological or engineering data acquired by the parties under this Agreement as a result of joint operations conducted hereunder shall be kept confidential by the parties unless the release of such information to a third party is agreed upon by the parties or is required by law. Any release of information to a third party must have the prior written consent of all parties hereto and said third party must agree in writing to be bound by the provisions of this paragraph.

Subject to the provisions of Article XVI.0 (Public Announcements), nothing herein shall prohibit any party from disclosing whatever information in such manner as may be required by statute, rule or regulation, including the rules or regulations of any stock exchange on which any securities of such party or any affiliates are traded; nor shall any party be prohibited by the terms hereof from disclosing information acquired under this Agreement to any financial institution or investors providing or proposing financing to the disclosing party.

**Royalties, Overriding Royalties and Other Payments**

If a Non-Operator fails to take its share of production in kind, Operator shall pay or cause to be paid all royalties, overriding royalties, payments out of production, or other amounts or charges which may be or become payable out of production and shall charge all such payments to the account of the Party responsible therefore.

Conversely, during such time as a Non-Operator is taking its share of production in kind, such Non-Operator shall pay or cause to be paid all royalties, overriding royalties, payments out of production, or other amounts or charges which may be or become payable out of such Non-Operator's share of production, unless otherwise agreed to by Operator or the terms of the Leases prohibit such action.

**Payment of Taxes**

At and during such time or times as any Non-Operator is exercising the right to take in kind or separately dispose of its proportionate share of the production as set forth in Article VI.G, such Non-Operator shall pay or arrange for the payment of all production, severance, gathering, sales or similar taxes imposed upon such party's share.

At and during such time or times as Operator is purchasing or selling Non-Operator's proportionate part of the production, as set forth in said Article VI.G, Operator shall pay or arrange for the payment of all such production, severance, gathering, sales, or similar taxes imposed upon such party's share.

**Advance Billing.**

In addition to all rights and powers of the Operator under Article VII, Operator has the following additional rights.

1) Dry Hole Costs – Operator has the right to demand and receive from the parties (or any of them) in its discretion, payment in advance of their respective share or shares of the entire estimated amount of the expenses to be incurred in operations for drilling, Deepening, Sidetracking and testing of a well, up to the casing point, in the amount of the "dry hole costs" set forth on the applicable AFE. Such right may be exercised by submitting to each such party an itemized invoice of the estimated expense. Such invoice shall be submitted no earlier than thirty (30) days prior to the estimated date of spudding the applicable well and the party invoiced shall pay Operator its proportionate share of such estimated expense within thirty (30) days after receipt of such estimate and invoice, or be deemed to have gone non-consent on the proposed operations (regardless of the election the party may have otherwise made).

2) Completion Costs - Operator has the right to demand and receive from the parties payment in advance of their respective share or shares of the entire

estimated amount of the expenses to be incurred in operations for the Completion and equipping of a well in the amount of the "Completion Costs" set forth on the applicable AFE. Such right may be exercised by submitting to each such party an itemized invoice of the estimated expense. Such invoice shall be submitted no earlier than three (3) days prior to the estimated date of commencing the completion operations, unless a drilling rig is on location, in which case such notice shall be submitted no earlier than twenty-four (24) hours prior to the estimated date of commencing the Completion operations. The party invoiced shall pay Operator its proportionate share of such estimated expense within thirty (30) days after receipt of such estimated invoice, or be deemed to have gone non-consent on the proposed operations (regardless of the election the party may have otherwise made).

3) Adjustments - Proper adjustment shall be made between such advance payments and the actual expenses incurred to the end that each party shall bear and pay its proportionate share of the actual expenses incurred, and no more.

**Required Wells and Operations.**

Notwithstanding anything to the contrary stated herein, the non-consent provisions pertaining to the drilling of any well drilled hereunder shall not be applicable to any well or operation which is necessary in order to perpetuate an expiring or terminating Lease or Leases or interest therein, nor shall it be applicable to any well or operation which is necessary in order to earn an additional lease or leases or interest therein pursuant to any farmout or other agreement. A well or other operation commenced within ninety (90) days prior to the date the Lease or Leases (or portions thereof) would expire in the absence of such operations and a well or other operation which must be drilled or conducted to earn or maintain a lease or farmout right shall constitute a "required well" or a "required operation". As to any such "required well" or "required operation" proposed by any party in which any other party elects not to participate, the non-participating party shall release and relinquish all of the non-participating party's interest in and to the lease or leases, farmout agreements or interest therein which would be perpetuated or earned by such "required well" or "required operation". The interest in such relinquished Leases shall be assigned by the non-participating party to the participating party and such interest shall be free of any Subsequently Created Interest(s) which may have placed thereon by the non-participating party. If at any time there is more than one location proposed for the drilling of a required well, the parties agree that the location proposed for a required well with the shallowest formation within the Contract Area, which would serve to perpetuate or earn the subject Lease or interest, shall take precedence.

Nothing herein, however, shall ever be construed so as to require an assignment of any such nonparticipating party's interest in any wells or units then producing in which it has an interest.

Such relinquishment of Leases shall not relieve the relinquishing party from any obligation, liability or responsibility theretofore incurred.

**Right to Propose Operations.**

Notwithstanding anything to the contrary contained herein, only parties with a current working interest in a well may propose a drilling, completing, recompleting, reworking, deepening, sidetracking or plugging back operation to such well.

**Termination of Agreement as to Certain Lands.**

If, during the term hereof, any Lease becomes owned by less than all parties to this agreement, then such Lease shall be excluded from this agreement from and after the date on which less than all parties own such Lease, and if, at the time such Lease is excluded from this agreement, it is then owned by more than one party to this agreement, it shall be subject to a separate Operating Agreement in the form of this agreement, with the parties

who then jointly own such Lease being the only parties to such separate Operating Agreement. In addition, and notwithstanding any other provisions of this agreement to the contrary, including but not limited to the definition of "Contract Area" contained in Article I.C. of this agreement, the parties agree that the Contract Area shall be contracted from time to time during the term of this agreement in order to delete therefrom any Lease or any part thereof, as to lands or depths or both, that has: (i) been released; (ii) expired or terminated (and not thereafter been jointly acquired by all of the parties pursuant to Article VIII. B above); and/or (iii) become owned by less than all parties to this agreement, with the effect of such contraction being that the lands located within the Contract Area and which are attributable to such Lease shall thereafter be excluded from the Contract Area during the remaining term of this agreement; provided that in the event any Lease that has been excluded from this agreement as aforesaid becomes jointly owned by all parties to this agreement during the term hereof, then such Lease shall, again, become subject to this agreement and the Contract Area shall be revised to so account for such Lease

**[END OF ARTICLE XVI]**

IN WITNESS WHEREOF, this agreement shall be effective as of the **1st** day of **January**, **2010**.

~~__________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __________, have been made to the form.~~

**ATTEST OR WITNESS:**

**OPERATOR**

**ANADARKO E&P COMPANY LP**

By [signature]

Laurie A. McNamara
Type or print name

Title Land Manager

Date 3/2/2010

Tax ID or S.S. No. __________

**NON-OPERATORS**

**ST. MARY LAND & EXPLORATION COMPANY**

[signature] [signature]

By [signature]

Greg T. Leyendecker
Type or print name

Title Vice President & Regional Manager

Date 1-7-2010

Tax ID or S.S. No. __________

__________

By __________

Type or print name

Title __________

Date __________

Tax ID or S.S. No. __________

__________

By __________

Type or print name

Title __________

Date __________

Tax ID or S.S. No. __________

# ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ______________ )

) ss.

County of ____________ )

This instrument was acknowledged before me on

____________________________________________ by ____________________________________________

(Seal, if any) ____________________________________________

Title (and Rank) ______________________________

My commission expires: ________________________

Acknowledgment in representative capacity:

State of ______________ )

) ss.

County of ____________ )

This instrument was acknowledged before me on

____________________________________________ by __________________________________________ as

_____________ of _________________________________________________________________________ .

(Seal, if any) ____________________________________________

Title (and Rank) ______________________________

My commission expires: ________________________

## EXHIBIT "A"

To that certain Joint Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company, LP, as Operator, and St. Mary Land & Exploration Company, as Non-Operator, in Webb County, Texas.

### I. LANDS SUBJECT TO THIS AGREEMENT:

Those lands described in the lease described in V below.

### II. RESTRICTIONS AS TO DEPTHS, FORMATIONS AND OPERATIONS:

None.

### III. ADDRESS OF THE PARTIES FOR NOTICE PURPOSES:

**Anadarko E&P Company LP**
1201 Lake Robbins Drive
The Woodlands, Texas 77380
P.O. Box 1330
Houston, Texas 77251-1330
Attn: Land Department
Office 832/636-1000
Fax 832/636-0559
Mark.Heathcote@Anadarko.com

**St. Mary Land & Exploration Company**
777 North Eldridge Parkway
Suite 1000
Houston, Texas 77079
Attn: Land Department
Office 281/677-2800
Fax 281/677-2810
kkindrick@stmaryland.com

### IV. INTEREST OF THE PARTIES:

| PARTY | WORKING INTEREST |
|---|---|
| ST. MARY LAND & EXPLORATION COMPANY | 37.00% |
| ANADARKO E&P COMPANY LP | 63.00% |
| | 100.0% |

### V. OIL AND GAS LEASE SUBJECT TO THIS AGREEMENT:

1. Oil and Gas Lease dated effective March 1, 2009, by and between Worthey Properties, Ltd., a Texas Limited Partnership, as Lessor, and St. Mary Land & Exploration Company, as Lessee, covering 5,470.072 acres of land, more or less, a Memorandum of Oil and Gas Lease being recorded in Volume 2750, Page 95 of the Official Records of Webb County, Texas.

# EXHIBIT "B"

Attached to and made a part of that Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non Operator.

THERE IS NO EXHIBIT "B" TO THIS AGREEMENT

# EXHIBIT " C "
# ACCOUNTING PROCEDURE
# JOINT OPERATIONS

Attached to and made part of that certain Joint Operating Agreement dated January 1, 2010, by and between Anadarko E&P as Operator and St. Mary Land & Exploration Company, as non-operator.

## I. GENERAL PROVISIONS

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

### 1. DEFINITIONS

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50%) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.

**"Agreement"** means the operating agreement, farmout agreement, or other contract between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to:

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties

## 2. STATEMENTS AND BILLINGS

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

### 3. ADVANCES AND PAYMENTS BY THE PARTIES

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within fifteen (15) days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within fifteen (15) days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within fifteen (15) days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or
(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or
(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or
(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

### 4. ADJUSTMENTS

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

### 5. EXPENDITURE AUDITS

A. A Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered.

Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with the additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

*E.* ☐ ***(Optional Provision – Forfeiture Penalties)***
*If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non-Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*

**6. APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of ___Two___ (__2__) or more Parties, one of which is the Operator, having a combined working interest of at least ___Sixty-One___ percent (__61__%), which approval shall be binding on all Parties, provided, however, approval of at least one (1) Non-Operator shall be required.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

## II. DIRECT CHARGES

The Operator shall charge the Joint Account with the following items:

**1. RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2. LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on Shore Base Facilities, Offshore Facilities, or other facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities, Shore Base Facilities, Offshore Facilities, and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed ____Ten____ percent (___10___%) per annum; provided, however, depreciation shall not be charged when the

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $ 75,000 If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $ 50,000 in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys **and land brokers** for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable to the extent permitted as a direct charge in the Agreement.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (*General Matters*)

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

## III. OVERHEAD

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1. OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.
☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A. TECHNICAL SERVICES

(i) Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

(ii) Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates.

☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☑ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 7,000 (prorated for less than a full month)

Producing Well Rate per month $ 700

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first. No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

C. ~~OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate ________________ percent (______) % of the cost of development of the Joint Property, exclusive of costs provided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate ____________________ percent (________%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) ___5___% of total costs if such costs are less than $100,000; plus

(2) ___3___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3) ___2___% of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) ___3___% of total costs if such costs are less than $100,000; plus

(2) ___2___% of total costs in excess of $100,000 but less than $1,000,000; plus

(3) ___1___% of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

### 3. AMENDMENT OF OVERHEAD RATES

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

## IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

### 1. DIRECT PURCHASES

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

## 2. TRANSFERS

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

### A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property

### B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

### C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

copas

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV 2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

### 3. DISPOSITION OF SURPLUS

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.

- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.

- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

### 4. SPECIAL PRICING PROVISIONS

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

## V. INVENTORIES OF CONTROLLABLE MATERIAL

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

COPYRIGHT © 2005 by Council of Petroleum Accountants Societies, Inc. (COPAS)

# EXHIBIT D

Attached to and made a part of the certain Joint Operating Agreement, dated January 1, 2010, by and between, Anadarko E&P Company, LP, as Operator and St. Mary Land & Exploration Company, as Non-Operator.

## INSURANCE

A. Operator shall at all times while performing under this Agreement carry and charge to the Joint Account insurance for the those electing to be covered under the Operator's insurance, which unless otherwise agreed, shall consist of the following coverage:

1) Comprehensive General Public Liability

| | |
|---|---|
| Combined Single Limit | $15,000,000 aggregate |
| For Bodily Injury and Property Damage | $15,000,000 per occurrence |

The above subject to a deductible of $2,000,000 per occurrence

2) Operator's Extra Expense (Control of Well)

| | |
|---|---|
| Onshore wells | $20,000,000 |

The above subject to a deductible of $1,000,000 per occurrence

B. Operator and Non-operators, in relation to their respective employees and motor vehicles, shall at all times while performing under this Agreement carry the following minimum amounts of insurance:

1) Workman's Compensation in accordance with Federal law and the laws of the State in which operations will be conducted and any other applicable jurisdiction.

2) Employer's Liability:

| | | |
|---|---|---|
| a. | Bodily Injury by Accident | $1,000,000 each accident |
| b. | Bodily Injury by Disease | $1,000,000 policy limit |
| c. | Bodily Injury by Disease | $1,000,000 each employee |

3) Comprehensive Automobile Public Liability:

| | | |
|---|---|---|
| a. | Bodily Injury | $2,000,000 per occurrence |
| b. | Property Damage | $2,000,000 per occurrence |

C. No other insurance will be required other than as set forth above. Premiums associated with the insurance for the benefit of the joint account shall be charged to the joint account.

D. The insurance provided for herein for the benefit of the joint account provides for certain deductibles to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of a deductible provision, said deductible amount shall be a direct charge to the joint account.

E. Non-Operator shall elect whether to be covered under Operator's insurance or to carry its own insurance. If no election has been made as of the date that is seven days prior to the spud date of a well, Non-Operator will be deemed to have elected not to be covered by Operator's insurance. If Non-Operator elects to carry its own insurance, upon the request of Operator Non-Operator shall provide a certificate of insurance confirming its insurance coverage.

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**OPERATING AGREEMENT DATED** __January 1, 2010__

**BY AND BETWEEN** __Anadarko E&P Company LP__, __Operator__

**AND** __St. Mary Land & Exploration Company, as non-operator__ **("OPERATING AGREEMENT")**

**RELATING TO THE** __CONTRACT AREA REFERENCED IN THE OPERATING AGREEMENT__ ~~**AREA,**~~

__Webb__ **COUNTY/PARISH, STATE OF** __Texas__.

**1. DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one):**

☑ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

~~☐ all of the acreage and depths subject to the Operating Agreement.~~

~~☐~~ ______________________________

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.16 ☐ **(Optional)** "Winter Period" shall mean the month(s) of ______________________ in one calendar year and the month(s) of ______________________ in the succeeding calendar year.

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in ~~**(Alternative 1)** ☐ Mcfs or **(Alternative 2)**~~ ☐ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to meet all nomination and other

requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one year. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following atleast thirty ( 30 ) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying twenty-five percent ( 25 %) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than fifty percent ( 50 %) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ (Optional — Seasonal Limitation on Makeup — Option 1) Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ______ (____) months immediately preceding the Winter Period.~~

~~4.2 ☐ (Optional — Seasonal Limitation on Makeup — Option 2) Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than ______ percent (____%) of its Full Share of Current Production for Makeup Gas during the Winter Period.~~

~~4.3 ☐ (Optional) Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to ______ percent (____%) of such Overproduced Party's Full Share of Current Production.~~

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within forty-five (45) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

~~6.2 ☐ (Alternative 1 — Entitlements) Each Party shall pay or cause to be paid all Royalty due with respect to Royalty~~

owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.

6.2.1 ☐ **(Optional - For use only with Section 6.2 - Alternative 1 - Entitlement)** Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.

6.2 ☑ **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within sixty (60) days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☐ **(Alternative 1 - Direct Party-to-Party Settlement)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

7.3 ☑ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.

7.3.1 ☐ **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.

7.4 ☑ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

7.4 ☐ **(Alternative 2 - Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

7.5.1 ☑ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.

7.5.2 ☑ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.

7.5.2 ☐ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the

Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

~~7.7 Interest compounded at the rate of ______________________ percent (______%) per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.~~

7.8 In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

7.9 ☒ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.

~~7.10 ☐ (Optional - Interim Cash Balancing) At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.~~

**8. TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after __thirty (30__) days' prior written notice to the Operator and shall last no longer than __forty-eight__ (__48__) hours.

**9. OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10. LIQUIDS**

The Parties shall share proportionately in and own all liquid hydrocarbons recovered with Gas by field equipment operated for the joint account in accordance with their Percentage Interests in the Balancing Area.

**11. AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited but such access shall be limited to no more than two (2) weeks. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12. MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives

and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service ~~(select one) ☐ as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or ☐~~ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations.

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

~~13.2 ☐ (Optional — Cash Settlement Upon Assignment) Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least ________________ (________) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within ________________ (________) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.~~

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

~~**14. OTHER PROVISIONS**~~



009103

~~**15. COUNTERPARTS**~~

~~This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a ______________ percent (________%) therein fail(s) to execute this Agreement on or before ______________, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

IN WITNESS WHEREOF, this Agreement shall be effective as of the __________ day of ______________, ________.

**ATTEST OR WITNESS:** | **OPERATOR**

______________________________

______________________________ BY: ______________________________

______________________________ ______________________________

Type or print name

Title ______________________________

Date ______________________________

Tax ID or S.S. No. ______________________________

NON-OPERATORS

______________________________

______________________________ BY: ______________________________

______________________________ ______________________________

Type or print name

Title ______________________________

Date ______________________________

Tax ID or S.S. No. ______________________________

______________________________

______________________________ BY: ______________________________

______________________________ ______________________________

Type or print name

Title ______________________________

Date ______________________________

Tax ID or S.S. No. ______________________________

**ACKNOWLEDGMENTS**

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ____________________ )

) ss.

County of __________________ )

This instrument was acknowledged before me on ______________________________

__________________________ by ______________________________

(Seal, if any) ______________________________

Title (and Rank) ______________________

My commission expires. ______________________

Acknowledgment in representative capacity:

State of ____________________ )

) ss.

County of __________________ )

This instrument was acknowledged before me on ______________________________

__________________________ by ______________________________ as

______________ of ______________________________.

(Seal, if any) ______________

Title (and Rank) ______________________

My commission expires: ______________________



009105

**EXHIBIT "F"**

Attached to and made a part of the certain Operating Agreement ("Agreement") dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non-Operator.

The term "Contractor" as used herein shall mean the party designated or acting as Contractor, Operator, or Seller in the foregoing agreement, of which this supplement is a part.

During the performance of this contract, Contractor agrees as follows:

**FEDERAL CONTRACT REQUIREMENTS**

A. Equal Opportunity Clause (41 CFR 60-1.4)

Unless otherwise exempted in accordance with Section 204 of Executive Order 11246 or Title 41 of the Code of Federal Regulations, or unless the obligations under Executive Order 11246 or Title 41 are revoked, replaced, or changed, during the performance of this Agreement, Contractor agrees as follows:

(1) Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin. Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: Employment, upgrading, demotion, or transfer, recruitment or recruitment advertising; layoff or termination, rates of pay or other forms of compensation; and selection for training, including apprenticeship. Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this non-discrimination clause.

(2) Contractor will, in all solicitations or advertisements for employees placed by or on behalf of Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) Contractor will send to each labor union or representative of workers with which Contractor has a collective bargaining agreement or other contract or understanding, a notice to be provided by the agency contracting officer advising the labor union of workers' representative of Contractor's commitments under Section 202 of Executive Order 11246 of September 24, 1965 and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965 and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) Contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965 and by the rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6) In the event of Contractor's non-compliance with the non-discrimination clauses of this contract or with any of such rules, regulations, or orders, this contract may be cancelled, terminated or suspended in whole or in part and Contractor may be declared ineligible for further Government contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7) Contractor will include the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. Contractor will take such action with respect to any subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions including sanctions for non-compliance; provided,

however, that in the event Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the contracting agency, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

B. Equal Opportunity for Special Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250)

The regulations in this part apply to all government contracts and subcontracts in excess of $10,000 for the purchase, sale, or use of personal property or non-personal services (including construction).

(1) The Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran or veteran of the Vietnam Era in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified individuals without discrimination based upon their status as a special disabled veteran or veteran of the Vietnam era in all employment practices, including the following:

i. recruitment, advertising, and job application procedures;

ii. hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring;

iii. rates of pay or any other form of compensation and changes in compensation;

iv. job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

v. leaves of absence, sick leave, or any other leave;

vi. fringe benefits available by virtue of employment, whether or not administered by the Contractor;

vii. selection and financial support for training, including apprenticeship, and on-the-job training under 38 U.S.C. 3687, professional meetings, conferences, and other related activities, and selection for leaves of absence to pursue training;

viii. activities sponsored by the Contractor including social or recreational programs; and

ix. any other term, condition, or privilege of employment.

(2) The Contractor agrees to immediately list all employment openings which exist at the time of the execution of this contract and those which occur during the performance of this contract, including those not generated by this contract and including those occurring at an establishment of the Contractor other the one wherein the contract is being performed, but excluding those of independently operated corporate affiliates, at an appropriate local employment service office of the state employment security agency wherein the opening occurs. Listing employment openings with the U.S. Department of Labor's America's Job Bank shall satisfy the requirement to list jobs with the local employment service office.

(3) Listing of employment openings with the local employment service office pursuant to this clause shall be made at least concurrently with the use of any other recruitment source or effort and shall involve the normal obligations which attach to the placing of a *bona fide* job order, including the acceptance of referrals of veterans and nonveterans. The listing of employment openings does not require the hiring of any particular job applicants or from any particular group of job applicants, and nothing herein is intended to relieve the Contractor from any requirements in Executive orders or regulations regarding nondiscrimination in employment.

(4) Whenever the Contractor becomes contractually bound to the listing provisions in paragraphs 2 and 3 of this clause, it shall advise the state employment security agency in each state where it has establishments of the name and location of each hiring location in the state: *Provided*, That this requirement shall not apply to state and local governmental contractors. As long as the Contractor is contractually bound to these provisions and has so advised the state

agency, there is no need to advise the state agency of subsequent contracts. The Contractor may advise the state agency when it is no longer bound by this contract clause.

(5) The provisions of paragraphs 2 and 3 of this clause do not apply to the listing of employment openings which occur and are filled outside of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands.

(6) As used in this clause:

i. *All employment openings* includes all positions except executive and top management, those positions that will be filled from within the Contractor's organization, and positions lasting three days or less. This term includes full-time employment, temporary employment of more than three days' duration, and part-time employment.

ii. *Executive and top management* means any employee:

(a) Whose primary duty consists of the management of the enterprise in which he or she is employed or of a customarily recognized department or subdivision thereof; and

(b) who customarily and regularly directs the work of two or more other employees therein; and

(c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) who customarily and regularly exercises discretionary powers; and

(e) who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his or her hours of work in the work week to activities which are not directly and closely related to the performance of the work described in (a) through (d) of this paragraph 6.ii.; *Provided*, that (e) of this paragraph 6.ii. shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he or she is employed.

iii. *Positions that will be filled from within the Contractor's organization* means employment openings for which no consideration will be given to persons outside the Contractor's organization (including any affiliates, subsidiaries, and parent companies) and includes any openings which the Contractor proposes to fill from regularly established "recall" lists. The exception does not apply to a particular opening once an employer decides to consider applicants outside of his or her own organization.

(7) The Contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(8) In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(9) The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Deputy Assistant Secretary for Federal Contract Compliance Programs, provided by or through the contracting officer. Such notices shall state the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants who are special disabled veterans or veterans of the Vietnam era. The Contractor must ensure that applicants or employees who are special disabled veterans are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually

disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair).

(10) The Contractor will notify each labor organization or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, and is committed to take affirmative action to employ and advance in employment qualified special disabled veterans and veterans of the Vietnam era.

(11) The Contractor will include the provisions of this clause in every subcontract or purchase order of $10,000 or more, unless exempted by the rules, regulations, or orders of the Secretary issued pursuant to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the Deputy Assistant Secretary for Federal Contract Compliance Programs may direct to enforce such provisions, including action for noncompliance.

C. <u>Equal Opportunity For Workers With Disabilities (41 CFR 60.741.5)</u>

Except as provided in 41 CFR 741.40 (Affirmative Action Program Requirement), this provision applies to all non-exempt contracts and subcontracts which exceed $10,000.

(1) The Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. The Contractor agrees to take affirmative action to employ, advance in employment, and otherwise treat qualified disabled individuals without discrimination based upon their physical or mental disability in all employment practices, including the following:

i. recruitment, advertising, and job application procedures;

ii. hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff and rehiring;

iii. rates of pay or any other form of compensation and changes in compensation;

iv. job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

v. leaves of absence, sick leave, or any other leave;

vi. fringe benefits available by virtue of employment, whether or not administered by the Contractor;

vii. selection and financial support for training, including apprenticeship, professional meetings, conferences and other related activities, and selection for leaves of absence to pursue training;

viii. activities sponsored by the Contractor including social or recreational programs; and

ix. any other term, condition, or privilege of employment.

(2) The Contractor agrees to comply with the rules, regulations and related orders of the Secretary of Labor issued pursuant to the Rehabilitation Act of 1973, as amended.

(3) In the event of the Contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the act.

(4) The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices in a form to be prescribed by the Deputy Assistant Secretary for Federal Contract Compliance Programs, provided by or through the contracting officer. Such

notices shall state the rights of applicants and employees as well as the Contractor's obligation under the law to take affirmative action to employ and advance in employment qualified employees and applicants with disabilities. The Contractor must ensure that applicants and employees with disabilities are informed of the contents of the notice (e.g., the Contractor may have the notice read to a visually disabled individual, or may lower the posted notice so that it might be read by a person in a wheelchair).

(5) The Contractor will notify each labor organization or representative of workers with which it has a collective bargaining agreement or other contract understanding, that the Contractor is bound by the terms of section 503 of the Rehabilitation Act of 1973, as amended, and is committed to take affirmative action to employ and advance in employment individuals with physical or mental disabilities.

(6) The Contractor will include the provisions of this clause in every subcontract or purchase order in excess of $10,000, unless exempted by the rules, regulations, or orders of the Secretary issued pursuant to the section 503 of the Rehabilitation Act of 1973, as amended, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the Deputy Assistant Secretary for Federal Contract Compliance Programs may direct to enforce such provisions, including action for noncompliance.

**EXHIBIT "H"**

**Attached to and made a part of that certain Operating Agreement dated January 1, 2010, by and between Anadarko E&P Company LP, as Operator and St. Mary Land & Exploration Company, as Non-operator.**

**MODEL FORM RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between Anadarko E&P Company LP, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated Janaury 1, 2010 (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding

royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. This instrument may be executed in several counterparts, each of which when so executed shall be deemed to be an original, and all of which together shall constitute but one and the same instrument; and for recordation purposes, the separate signature pages and acknowledgement certificates applicable to the separate signature pages may be affixed to the body of one of such original counterparts without the necessity of recording the entirety of each separate counterpart.

IN WITNESS WHEREOF, this agreement shall be effective as of the 1st day of January, 2010.

**OPERATOR**

**ATTEST OR WITNESS**

**ANADARKO E&P COMPANY LP**

By: Laurie A. McNamara

**Type or Print Name**

Title: Agent & Attorney-In-Fact

Date:

Address: 1201 Lake Robbins Dr., The Woodlands, TX 77380

**NON-OPERATORS**

**ATTEST OR WITNESS**

**ST. MARY LAND & EXPLORATION COMPANY**

By:

**Type or Print Name**

Title: Greg T. Leyendecker, Vice President

Date:

Address: 777 North Eldridge Parkway Suite 1000, Houston, Texas 77079

**ATTEST OR WITNESS**

By:

**Type or Print Name**

Title:

Date:

Address:

## ACKNOWLEDGMENTS

**NOTE:**

The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

### Individual Acknowledgment

State of ____________________ §

§ ss.

County of __________________ §

This instrument was acknowledged before me on ______________________________________________

by ______________________________________________________________________________

(Seal, if any) ______________________________

Title (and Rank) ______________________

My commission expires: _________________

### Acknowledgment in Representative Capacity

State of TEXAS §

§ ss.

County of Montgomery §

This instrument was acknowledged before me on ______________________________________________

by ____________________________________ as Agent and Attorney-in-Fact of

Anadarko E&P Company LP ______________________________________________________.

(Seal, if any) ______________________________

Title (and Rank) ______________________

My commission expires: _________________

**Acknowledgment in Representative Capacity**

State of __Texas__ §

§ ss.

County of __Harris__ §

This instrument was acknowledged before me on ______________________________

by ______________________________ as ______________________________ of

__ST. MARY LAND & EXPLORATION COMPANY__.

(Seal, if any)

______________________________

Title (and Rank) ______________________________

My commission expires: ______________________________

**Acknowledgment in Representative Capacity**

State of __Texas__ §

§ ss.

County of ______________ §

This instrument was acknowledged before me on ______________________________

by ______________________________ as ______________________________ of

______________________________.

(Seal, if any)

______________________________

Title (and Rank) ______________________________

My commission expires: ______________________________

# Land > Contract > Agreement & Amendment

D0001389899

Sender Name: Tiffany Vogel
Date Created: 10/04/2010
Barcode Expires: **11/03/2010**
Department: Land Record
Security: Non-Privileged
BLACK AND WHITE DOCUMENT

| Attribute | Value |
|---|---|
| Description | ORIG EXECUTED JOA - WORTHEY LEASE |
| Document Date | 01/01/2010 |
| New Lease Packet | No |
| New Well Handoff | No |
| Contract Number | 307201 |
| Contract Type | JOINT OPERATING AGREEMENT |
| Group Code | LND |
| Prospect Name | MAVERICK BASIN EXPLORATION (APC)/A-40007411 |
| State County | TEXAS:WEBB(479) |

Create another submittal sheet:

New | Based On This One

009119

# Exhibit M

May 1, 2020

Sanchez Energy Corporation
SN UR Holdings, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

SN EF UnSub GP, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

RE: Notice of Investor Redemption Event Pursuant to Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("UnSub") dated March 1, 2017 (the "LLCA"), Termination of Tolling Agreement dated August 10, 2019 (the "Tolling Agreement") and Appointment of Additional Directors. Unless otherwise indicated, any capitalized term used in this notice has the meaning given to such term in the LLCA or the Tolling Agreement

Mr. Kopel:

Pursuant to the terms of the LLCA, following an Investor Redemption Event which has occurred, the Board of UnSub is automatically increased to seven (7) Directors, with the two additional Directors being designated by the Class B Member. Pursuant to the terms of the Tolling Agreement, GSO ST Holdings Associates LLC and GSO ST Holdings LP (collectively "GSO") sent a notice to terminate the Tolling Agreement on April 24, 2020. In accordance with the above, the Class B Member hereby designates James Bennett and Robert Baker as the two additional Directors to the Board of UnSub without the need for any further action by the Board or the Members.

Nothing in this letter, and no other action or inaction by us or any of our Affiliates, representatives, or any other Person related to the matters set forth in this letter or related to UnSub or our investment in UnSub or any matters related thereto, shall be construed as a waiver or modification or amendment of, or shall waive, modify, amend or otherwise affect, any rights or remedies in law, at equity or otherwise, we or our Affiliates may have in any way related to UnSub or any of its Affiliates, representatives, or any other Person (whether under the Basic Documents or otherwise) and all such rights and remedies are hereby expressly reserved and retained in all respects.

**CLASS B MEMBER**:

GSO ST Holdings Associates LLC,
a Delaware limited liability company

By: ______________________________
Name: Marisa Beeney
Title: Authorized Signatory

Copy Kirkland & Ellis LLP
609 Main Street
Houston, Texas 77002
Attention: John D. Pitts
Email: john.pitts@kirkland.com

# Exhibit N

## Filed Under Seal

# Exhibit O

## Filed Under Seal

# Exhibit P

EX-10.5 17 sn-20170331ex1059897c4.htm EX-10.5

**Exhibit 10.5**

**FIRST LIEN CREDIT AGREEMENT**

dated as of March 1, 2017

among

SN EF UNSUB, LP,
as the Borrower,

the several Lenders

from time to time party hereto,

and

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent, Collateral Agent,
and an Issuing Bank

JPMORGAN CHASE BANK, N.A.,
CITIGROUP GLOBAL MARKETS INC.
CAPITAL ONE, NATIONAL ASSOCIATION
RBC CAPITAL MARKETS
as Joint Lead Arrangers and Joint Bookrunners,

BMO HARRIS BANK, NA
ING CAPITAL LLC,
SUNTRUST ROBINSON HUMPHREY, INC.,
as Joint Bookrunners

[1] RBC Capital Markets is the global brand name of the corporate and investment banking business of Royal Bank of Canada and its affiliates.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| Section 1. | Definitions. | 1 |
| 1.1 | Defined Terms. | 1 |
| 1.2 | Other Interpretive Provisions | 41 |
| 1.3 | Accounting Terms | 42 |
| 1.4 | Rounding | 43 |
| 1.5 | References to Agreements, Laws, Etc | 43 |
| 1.6 | Times of Day | 43 |
| 1.7 | Timing of Payment or Performance | 43 |
| 1.8 | Classification of Loans and Borrowings | 43 |
| 1.9 | Hedging Requirements Generally | 43 |
| 1.10 | Certain Determinations | 43 |
| 1.11 | Pro Forma and Other Calculations | 43 |
| Section 2. | Amount and Terms of Credit | 45 |
| 2.1 | Commitments | 45 |
| 2.2 | Minimum Amount of Each Borrowing; Maximum Number of Borrowings | 45 |
| 2.3 | Notice of Borrowing | 45 |
| 2.4 | Disbursement of Funds | 46 |
| 2.5 | Repayment of Loans; Evidence of Debt | 46 |
| 2.6 | Conversions and Continuations | 47 |
| 2.7 | Pro Rata Borrowings | 47 |
| 2.8 | Interest | 47 |
| 2.9 | Interest Periods | 48 |
| 2.10 | Increased Costs, Illegality, Etc | 48 |
| 2.11 | Compensation | 50 |
| 2.12 | Change of Lending Office | 50 |
| 2.13 | Notice of Certain Costs | 50 |
| 2.14 | Borrowing Base | 50 |
| 2.15 | Defaulting Lenders | 50 |
| Section 3. | Letters of Credit | 55 |
| 3.1 | Letters of Credit | 55 |
| 3.2 | Letter of Credit Applications | 56 |
| 3.3 | Letter of Credit Participations | 57 |
| 3.4 | Agreement to Repay Letter of Credit Drawings | 58 |
| 3.5 | New or Successor Issuing Bank | 59 |
| 3.6 | Role of Issuing Bank | 60 |
| 3.7 | Cash Collateral | 61 |
| 3.8 | Applicability of ISP and UCP | 61 |
| 3.9 | Conflict with Issuer Documents | 61 |
| 3.10 | Letters of Credit Issued for Restricted Subsidiaries | 61 |
| 3.11 | Increased Costs | 61 |
| Section 4. | Fees; Commitments. | 62 |
| 4.1 | Fees | 62 |
| 4.2 | Voluntary Reduction of Commitments | 62 |
| 4.3 | Mandatory Termination of Commitments | 63 |


009127

| | | |
|---|---|---|
| Section 5. | Payments. | 63 |
| 5.1 | Voluntary Prepayments | 63 |
| 5.2 | Mandatory Prepayments | 64 |
| 5.3 | Method and Place of Payment | 65 |
| 5.4 | Net Payments | 65 |
| 5.5 | Computations of Interest and Fees | 68 |
| 5.6 | Limit on Rate of Interest | 68 |
| Section 6. | Conditions Precedent to Closing Date | 68 |
| 6.1 | Conditions Precedent to Closing Date | 68 |
| Section 7. | Conditions Precedent to Subsequent Credit Events. | 71 |
| Section 8. | Representations, Warranties and Agreements | 72 |
| 8.1 | Corporate Status | 72 |
| 8.2 | Corporate Power and Authority; Enforceability | 72 |
| 8.3 | No Violation | 72 |
| 8.4 | Litigation | 72 |
| 8.5 | Margin Regulations | 72 |
| 8.6 | Governmental Approvals; Other Consents | 72 |
| 8.7 | Investment Company Act | 73 |
| 8.8 | True and Complete Disclosure | 73 |
| 8.9 | Tax Matters | 73 |
| 8.10 | Compliance with ERISA | 73 |
| 8.11 | Subsidiaries; Equity Interests | 74 |
| 8.12 | Environmental Laws | 74 |
| 8.13 | Properties | 74 |
| 8.14 | Solvency | 75 |
| 8.15 | Security Documents | 75 |
| 8.16 | Gas Imbalances, Prepayments | 75 |
| 8.17 | Marketing of Production | 75 |
| 8.18 | Hedge Agreements | 75 |
| 8.19 | PATRIOT Act | 75 |
| 8.20 | Anti-Corruption Laws and Sanctions | 76 |
| 8.21 | No Material Adverse Effect | 76 |
| 8.22 | Financial Statements | 76 |
| 8.23 | Insurance | 76 |
| 8.24 | Use of Proceeds | 76 |
| 8.25 | Foreign Operations | 76 |
| 8.26 | Senior Debt Status | 76 |
| 8.27 | EEA Financial Institutions | 76 |
| Section 9. | Affirmative Covenants | 76 |
| 9.1 | Information Covenants | 76 |
| 9.2 | Books, Records and Inspections | 81 |
| 9.3 | Maintenance of Insurance | 82 |
| 9.4 | Payment of Taxes and Obligations under Management Services Agreement, Side Letter Agreement and Marketing Agreement | 82 |
| 9.5 | Maintenance of Existence; Compliance | 82 |
| 9.6 | Compliance with Statutes, Regulations, Etc | 82 |
| 9.7 | ERISA | 82 |
| 9.8 | Maintenance of Properties | 83 |

| | | |
|---|---|---|
| 9.9 | Additional Guarantors, Grantors and Collateral | 83 |
| 9.10 | Use of Proceeds | 84 |
| 9.11 | Further Assurances | 84 |
| 9.12 | Reserve Reports | 85 |
| 9.13 | Title Information | 86 |
| 9.14 | Compliance with Environmental Laws | 86 |
| 9.15 | Deposit Account, Securities Account and Commodity Account Control Agreements | 87 |
| 9.16 | Minimum Hedged Volumes | 87 |
| 9.17 | Separateness | 87 |
| 9.18 | Proceeds of Loans | 89 |
| 9.19 | Post-Closing Obligations | 89 |
| Section 10. | Negative Covenants. | 90 |
| 10.1 | Limitation on Indebtedness | 90 |
| 10.2 | Limitation on Liens | 92 |
| 10.3 | Limitation on Fundamental Changes | 94 |
| 10.4 | Limitation on Sale of Assets | 94 |
| 10.5 | Limitation on Investments | 96 |
| 10.6 | Limitation on Restricted Payments | 98 |
| 10.7 | Limitations on Debt Payments and Amendments | 100 |
| 10.8 | Negative Pledge Agreements | 101 |
| 10.9 | Limitation on Subsidiary Distributions | 102 |
| 10.10 | Hedge Agreements | 103 |
| 10.11 | Financial Covenants | 104 |
| 10.12 | Use of Proceeds | 105 |
| 10.13 | Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation | 105 |
| 10.14 | Transactions with Affiliates | 105 |
| 10.15 | End of Fiscal Years; Fiscal Quarters | 106 |
| 10.16 | Change in Business; Foreign Operations | 106 |
| 10.17 | Gas Imbalances, Prepayments | 106 |
| Section 11. | Events of Default | 106 |
| 11.1 | Payments | 106 |
| 11.2 | Representations, Etc | 106 |
| 11.3 | Covenants | 106 |
| 11.4 | Default Under Other Agreements | 106 |
| 11.5 | Bankruptcy, Etc | 107 |
| 11.6 | ERISA | 107 |
| 11.7 | Guarantee and Credit Agreement | 108 |
| 11.8 | Security Documents | 108 |
| 11.9 | Judgments | 108 |
| 11.10 | Change of Control | 108 |
| 11.11 | Status as Unrestricted Subsidiary | 108 |
| 11.12 | Application of Proceeds | 108 |
| 11.13 | Equity Cure | 109 |
| Section 12. | The Agents | 110 |
| 12.1 | Appointment | 110 |
| 12.2 | Delegation of Duties | 111 |
| 12.3 | Exculpatory Provisions | 111 |

| | | |
|---|---|---|
| 12.4 | Reliance by Agents | 111 |
| 12.5 | Notice of Default | 112 |
| 12.6 | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 112 |
| 12.7 | Indemnification | 113 |
| 12.8 | Agents in Its Individual Capacities | 113 |
| 12.9 | Successor Agents | 113 |
| 12.10 | Withholding Tax | 114 |
| 12.11 | Security Documents and Collateral Agent under Security Documents and Guarantee | 114 |
| 12.12 | Right to Realize on Collateral and Enforce Guarantee | 115 |
| 12.13 | Administrative Agent May File Proofs of Claim | 115 |
| 12.14 | Credit Bidding | 116 |
| Section 13. | Miscellaneous | 116 |
| 13.1 | Amendments, Waivers and Releases | 116 |
| 13.2 | Notices | 119 |
| 13.3 | No Waiver; Cumulative Remedies | 119 |
| 13.4 | Survival of Representations and Warranties | 119 |
| 13.5 | Payment of Expenses; Indemnification | 119 |
| 13.6 | Successors and Assigns; Participations and Assignments | 121 |
| 13.7 | Replacements of Lenders under Certain Circumstances | 125 |
| 13.8 | Adjustments; Set-off | 126 |
| 13.9 | Counterparts | 127 |
| 13.10 | Severability | 127 |
| 13.11 | Integration | 127 |
| 13.12 | GOVERNING LAW | 127 |
| 13.13 | Submission to Jurisdiction; Waivers | 127 |
| 13.14 | Acknowledgments | 127 |
| 13.15 | WAIVERS OF JURY TRIAL | 128 |
| 13.16 | Confidentiality | 128 |
| 13.17 | Release of Collateral and Guarantee Obligations | 129 |
| 13.18 | USA PATRIOT Act | 130 |
| 13.19 | Payments Set Aside | 130 |
| 13.20 | Reinstatement | 130 |
| 13.21 | Disposition of Proceeds | 130 |
| 13.22 | Collateral Matters; Hedge Agreements | 130 |
| 13.23 | Agency of the Borrower for the Other Credit Parties | 131 |
| 13.24 | Acknowledgement and Consent to Bail-In of EEA Financial Institutions | 131 |

EXHIBITS


| | |
|---|---|
| Exhibit A | Form of Reserve Report Certificate |
| Exhibit B | Form of Notice of Borrowing |
| Exhibit C | Form of Guarantee |
| Exhibit D | Form of Mortgage/Deed of Trust |
| Exhibit E | Form of Collateral Agreement |
| Exhibit F | Form of Assignment and Assumption |
| Exhibit G | Form of Promissory Note |
| Exhibit H | Form of Intercompany Note |
| Exhibit I | Form of Solvency Certificate |
| Exhibit J | Form of Non-Bank Tax Certificate |
| Exhibit K | Form of Notice of Purchase Election |
| Exhibit L | Form of GSO Preferred Equity Documentation |
| Exhibit M-1 | Legal Opinion of Kirkland & Ellis LLP |
| Exhibit M-2 | Legal Opinion of Kirkland & Ellis LLP |
| Exhibit M-3 | Legal Opinion of Akin Gump Strauss Hauer & Feld |
| Exhibit N-1 | Form of the Joint Development Agreement |
| Exhibit N-2 | Form of the Management Services Agreement |
| Exhibit N-3 | Form of the Borrower's LPA |
| Exhibit N-4 | Form of the Parent LLCA |
| Exhibit N-5 | Form of the Development Agreement |
| Exhibit N-6 | Form of the Marketing Agreement |
| Exhibit N-7 | Form of the Side Letter Agreement |


SCHEDULES


| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.1(e) | Closing Date Subsidiary Guarantors |
| Schedule 8.4 | Litigation |
| Schedule 8.11 | Subsidiaries |
| Schedule 8.13 | Properties |
| Schedule 8.16 | Closing Date Gas Imbalance |
| Schedule 8.17 | Closing Date Marketing Agreements |
| Schedule 8.18 | Closing Date Hedge Agreements |
| Schedule 9.9 | Closing Date Affiliate Transactions |
| Schedule 10.1 | Closing Date Indebtedness |
| Schedule 10.2(d) | Closing Date Liens |
| Schedule 10.5(c) | Closing Date Investments |
| Schedule 10.8 | Closing Date Negative Pledge Agreements |
| Schedule 13.2 | Notice Addresses |

**FIRST LIEN CREDIT AGREEMENT**, dated as of March 1, 2017, among SN EF UNSUB, LP, a Delaware limited partnership (the "Borrower"), the banks, financial institutions and other lending institutions from time to time parties as lenders hereto (each, a "Lender" and, collectively, the "Lenders"), JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for the Lenders and an Issuing Bank, CITIBANK, N.A., as an Issuing Bank and each other Issuing Bank from time to time party hereto.

WHEREAS, on the date hereof, the Borrower will acquire certain oil and gas properties, rights and related assets identified on Exhibit C-2 of the Purchase and Sale Agreement (the "Acquired Assets") from the Sellers (as defined below) pursuant to the Purchase and Sale Agreement (together with all exhibits, schedules and disclosure letters thereto, the "Purchase and Sale Agreement") dated as of January 12, 2017 by and between Anadarko E&P Onshore LLC, a Delaware limited liability company and Kerr-McGee Oil & Gas Onshore LP, a Delaware limited partnership, as sellers, (collectively, the "Sellers") and the Borrower, SN EF Maverick, LLC and Aguila Production, LLC, as buyers (together with any permitted assignees under the Purchase and Sale Agreement (collectively, the "Buyers"; the acquisition of the Acquired Assets, the "Acquisition"));

WHEREAS, to fund the Acquisition, the Borrower will use (a) proceeds from the Loans, (b) the GSO Preferred Equity Proceeds and (c) proceeds from the Sanchez Cash Contribution;

WHEREAS, (a) the Borrower has requested that at any time and from time to time on or after the Closing Date and prior to the Maturity Date, the Lenders provide Loans to the Borrower subject to the Available Commitment and (b) the Borrower has requested that each Issuing Bank issue Letters of Credit (subject to the Available Commitment), at any time and from time to time prior to the L/C Maturity Date, in an aggregate Stated Amount at any time outstanding not to exceed the Letter of Credit Commitment;

WHEREAS, on the Closing Date, the proceeds of the Loans will be used by the Borrower to (a) pay a portion of the purchase price in respect of the Acquisition, (b) pay Transaction fees and expenses, (c) fund any working capital adjustment payable pursuant to the Purchase and Sale Agreement and (d) for the Borrower's general corporate or partnership purposes;

WHEREAS, following the Closing Date, (a) the proceeds of the Loans will be used by the Borrower for the Borrower's and its Restricted Subsidiaries' general corporate or partnership purposes, including capital expenditures, investments, permitted acquisitions and working capital purposes; and (b) the Letters of Credit will be used by the Borrower and its Restricted Subsidiaries (i) for general corporate and partnership purposes, (ii) to support deposits required under purchase agreements pursuant to which the Borrower or one or more Restricted Subsidiaries may acquire Oil and Gas Properties and (iii) to backstop obligations under contracts entered into from time to time incident to the Borrower's business;

WHEREAS, the Lenders and the Issuing Banks are willing to make available to the Borrower such revolving credit and letter of credit facilities upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1. DEFINITIONS.

1.1 Defined Terms.

As used herein, the following terms shall have the meanings specified below:

"ABR" shall mean for any day a fluctuating rate *per annum* equal to the highest of (a) the Federal Funds Effective Rate plus 0.50%, (b) the Prime Rate in effect on such day and (c) the LIBOR Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%, provided that, for the purpose of this definition, the LIBOR Rate for any day shall be based on the rate appearing on the Reuters Screen LIBOR01 Page (or on any successor or substitute page of such page) at approximately 11:00 a.m. London time on such day. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such LIBOR Rate shall take effect at the opening of business

on the day specified in the public announcement of such change in the Prime Rate, the Federal Funds Effective Rate or such LIBOR Rate, respectively.

"ABR Loan" shall mean each Loan bearing interest based on the ABR.

"Acquired Assets" shall have the meaning provided to such term in the recitals of this Agreement.

"Acquisition" shall have the meaning provided to such term in the recitals of this Agreement.

"Additional Material Contract" shall have the meaning provided by Section 10.13(b).

"Adjusted Total Commitment" shall mean, at any time, the Total Commitment less the aggregate amount of Commitments of all Defaulting Lenders.

"Administrative Agent" shall mean JPMorgan Chase Bank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent appointed in accordance with the provisions of Section 12.9.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify in writing to the Borrower and the Lenders.

"Administrative Questionnaire" shall mean, for each Lender, an administrative questionnaire in a form approved by the Administrative Agent.

"Advisor" shall have the meaning provided in Section 13.16.

"Affected Commodity Hedge" shall have the meaning provided in Section 2.14(f)(i).

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative thereto.

"Agent-Related Party" shall mean, with respect to any Agent, its Affiliates and the officers, directors, employees, agents, attorney-in-fact, partners, trustees and advisors of such Agent and of such Agent's Affiliates.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Agreement" shall mean this Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Alternative Equitable Partition Redetermination" shall have the meaning provided in Section 2.14(b).

"Anti-Corruption Laws" shall mean all laws, rules and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Equity Amount" shall mean, at any time (the "Applicable Equity Amount Reference Time"), an amount equal to, without duplication,

(a) the amount of any capital contributions made in cash to, or any proceeds of an equity issuance received by, the Borrower during the period (i) from and including the later of (A) the Business Day immediately following the Closing Date



009133

and (B) the date that is 180 days prior to the Applicable Equity Amount Reference Time (ii) through and including the Applicable Equity Amount Reference Time (such time period, the "Applicable Equity Amount Reference Period"), in each case including proceeds from the issuance of Qualified Equity Interests or Qualified Preferred Equity of any direct or indirect parent of the Borrower;

minus

(b) the sum, without duplication, of:

(i) the aggregate amount of any Indebtedness incurred by the Borrower or any Restricted Subsidiary pursuant to Section 10.1 (b), during the Applicable Equity Amount Reference Period;

(ii) the aggregate amount of any Investments made by the Borrower or any Restricted Subsidiary pursuant to Section 10.5(h) during the Applicable Equity Amount Reference Period;

(iii) the aggregate amount of any Restricted Payments made by the Borrower or any Restricted Subsidiary pursuant to Section 10.6(g) during the Applicable Equity Amount Reference Period; and

(iv) the aggregate amount of prepayments, repurchases, redemptions and defeasances made by the Borrower or any Restricted Subsidiary pursuant to Section 10.7(a)(iv) during the Applicable Equity Amount Reference Period.

"Applicable Equity Amount Reference Period" shall have the meaning provided to such term in the definition of Applicable Equity Amount contained in this Section 1.1.

"Applicable Equity Amount Reference Time" shall have the meaning provided to such term in the definition of Applicable Equity Amount contained in this Section 1.1.

"Applicable Margin" shall mean, for any day, with respect to any ABR Loan or LIBOR Loan, as the case may be, or the Commitment Fee Rate, the rate *per annum* set forth in the grid below based upon the Borrowing Base Utilization Percentage in effect on such day:

| Borrowing Base Utilization Grid | | | | | |
|---|---|---|---|---|---|
| Borrowing Base Utilization Percentage | *≤ 25%* | *>25% and ≤ 50%* | *>50% and ≤ 75%* | *>75% and ≤ 90%* | *>90%* |
| LIBOR Loans | 2.75% | 3.00% | 3.25% | 3.50% | 3.75% |
| ABR Loans | 1.75% | 2.00% | 2.25% | 2.50% | 2.75% |
| Commitment Fee Rate | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% |

Each change in the Commitment Fee Rate or Applicable Margin shall apply during the period commencing on the effective date of such change and ending on the date immediately preceding the effective date of the next such change.

"Applicable Reserve Report" shall have the meaning provided in Section 10.10(d).

"Approved Counterparty" shall mean (a) any Hedge Bank and (b) any other Person whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" shall mean (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company Petroleum Consultants, L.P., (c) Cawley, Gillespie & Associates, Inc., (d) DeGoyler and McNaugton and (e) at the Borrower's option, any other independent petroleum engineers selected by the Borrower and acceptable to the Administrative Agent.

"ASC" shall mean the Financial Accounting Standards Board Accounting Standards Codification, as in effect.

"Assignment and Assumption" shall mean an assignment and acceptance substantially in the form of Exhibit F or such other form as may be approved by the Administrative Agent.

"Attorney Costs" shall mean all reasonable and documented fees, expenses and disbursements of any law firm or other external legal counsel.

"Authorized Officer" shall mean as to any Person with respect to it or its manager, managing member or general partner ,the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operations Officer, any Vice President (including Executive and Senior Vice Presidents), the Treasurer, any equivalent officer of any of the foregoing and any other senior officer designated as such in writing to the Administrative Agent by such Person. Any document delivered hereunder that is signed by an Authorized Officer shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of the Borrower or any other Credit Party and such Authorized Officer shall be conclusively presumed to have acted on behalf of such Person.

"Auto-Extension Letter of Credit" shall have the meaning provided in Section 3.2(b).

"Available Commitment" shall mean, at any time, (a) the Loan Limit at such time minus (b) the aggregate Total Exposures of all Lenders at such time.

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Price Deck" shall mean the Administrative Agent's forward curve for each of oil, natural gas and other Hydrocarbons, as applicable.

"Bankruptcy Code" shall have the meaning provided in Section 11.5.

"Benefited Lender" shall have the meaning provided in Section 13.8(a).

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America (or any successor).

"Board of Directors" shall mean, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning provided in the introductory paragraph hereto.

"Borrower's LPA" shall mean the Amended and Restated Agreement of Limited Partnership of the Borrower, dated as January 12, 2017, by and among Parent, Holdings and GSO ST Holdings LP, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Borrowing" shall mean the incurrence of one Type of Loan on a given date (or resulting from conversions on a given date) having, in the case of LIBOR Loans, the same Interest Period (provided that ABR Loans incurred pursuant to Section 2.10(b) shall be considered part of any related Borrowing of LIBOR Loans).

"Borrowing Base" shall mean, at any time, an amount equal to the amount determined in accordance with Section 2.14, as the same may be adjusted from time to time pursuant to the provisions thereof.

"Borrowing Base Adjustment Provisions" shall mean (a) Sections 2.14(e), 2.14(f), 2.14(g), 2.14(h) and (b) any other provisions hereunder which adjust the amount of the Borrowing Base.

"Borrowing Base Deficiency" occurs if, at any time, the aggregate Total Exposure of all Lenders exceeds the Borrowing Base then in effect. The amount of the Borrowing Base Deficiency is the amount by which the aggregate Total Exposure of all Lenders exceeds the Borrowing Base then in effect.

"Borrowing Base Properties" shall mean the Oil and Gas Properties constituting Proved Reserves of the Credit Parties included in the Initial Reserve Report and thereafter in the Reserve Report most recently delivered pursuant to Section 9.12.

"Borrowing Base Utilization Percentage" shall mean, as of any day, the fraction expressed as a percentage, the numerator of which is the sum of the aggregate Total Exposures of all Lenders on such day, and the denominator of which is the Borrowing Base in effect on such day.

"Borrowing Base Value" shall mean, with respect to any Oil and Gas Property of a Credit Party or any Hedge Agreement of a Credit Party in respect of commodities, the value attributed to such asset in connection with the most recent determination of the Borrowing Base (which Borrowing Base was approved by each Lender or the Required Lenders, as applicable, in accordance with Section 2.14).

"Business Day" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"Buyers" shall have the meaning provided to such term in the recitals of this Agreement.

"Capital Lease" shall mean, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is, or is required to be, accounted for as a capital lease on the balance sheet of that Person; provided that any lease that would be characterized as an operating lease in accordance with GAAP on the Closing Date (whether or not such operating lease was in effect on such date) shall continue to be accounted for as an operating lease (and not as a Capital Lease) for purposes of this Agreement regardless of any change in GAAP following the Closing Date that would otherwise require such lease to be re-characterized (on a prospective or retroactive basis or otherwise) as a Capital Lease.

"Cash Collateralize" shall have the meaning provided in Section 3.7(c).

"Cash Management Agreement" shall mean any agreement entered into from time to time by the Borrower or any of the Borrower's Restricted Subsidiaries in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"Cash Management Bank" shall mean any Person that either (a) at the time it provides Cash Management Services or (b) at any time after it has provided any Cash Management Services, is a Lender or an Agent or an Affiliate of a Lender or an Agent.

"Cash Management Obligations" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"Cash Management Services" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services.

"Casualty Event" shall mean, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"Change in Law" shall mean (a) the adoption of any law, treaty, order, policy, rule or regulation after the Closing Date, (b) any change in any law, treaty, order, policy, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender with any guideline, request, directive or order enacted or promulgated after the Closing Date by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); provided that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith shall be deemed to have gone into effect after the Closing Date regardless of the date adopted, enacted or promulgated and shall be included as a Change in Law.

"Change of Control" shall mean and be deemed to have occurred if:

(a) (i) neither (A) the Sanchez Permitted Holders, in the aggregate nor (B) GSO owns, in each case, directly or indirectly, beneficially, at least 50.1% of the (1) aggregate ordinary voting power (through ownership of voting securities, by contract or otherwise) represented by the issued and outstanding Equity Interests of the Parent and (2) the Class A Units (as defined in the Parent LLCA); or (ii) neither (A) the Sanchez Permitted Holders, in the aggregate nor (B) GSO has the right or ability by voting power, contract or otherwise to elect or designate at least a majority of the Directors (as defined in the Parent LLCA) of the Board of Directors of the Parent;

(b) Permitted Holders, individually or in the aggregate, cease to own, directly or indirectly, beneficially, at least 50.1% of the economic interest (through ownership of securities, by contract or otherwise) represented by the issued and outstanding Equity Interests of Borrower;

(c) (i) a "change of control" (as defined in the documentation governing any Indebtedness of the Borrower or its Restricted Subsidiaries of the type set forth in clauses (a) and (b) of the definition of Indebtedness), in each case to the extent then constituting Material Indebtedness shall have occurred or (ii) the owners of any Qualified Preferred Equity (other than GSO Controlled Preferred Equity Interests) have the right to cause the Redemption of such Qualified Preferred Equity to occur;

(d) a sale of all or substantially all assets of the Credit Parties; provided that any sale made in compliance with Section 10.4(p) shall not constitute a Change of Control;

(e) (i) Parent ceases to be the sole general partner of Borrower or (ii) Holdings ceases to own 100% of the Common Units (as defined in the Borrower's LPA) of Borrower;

(f) a Sanchez Indenture Change of Control occurs; provided that it shall not be a Change of Control pursuant to this clause (f) so long as (i) GSO beneficially owns and controls a majority of Class B Units (as defined in the Parent LLCA) and (ii) at least the majority of the Directors of the Board of Directors of the Parent have been designated by GSO; provided that GSO shall have thirty (30) Business Days from the date of such Sanchez Indenture Change of Control to satisfy clause (ii) so long as (A) GSO beneficially owns and controls a majority of the Class B Units and (B) the Board of Directors of the Parent is expanded within twenty-two (22) Business Days of such date pursuant to Section 5.3(d) of the Parent LLCA, such that GSO has the right to designate at least the majority of the Directors of the Board of Directors of the Parent; or

(g) neither (i) Sanchez nor (ii) GSO beneficially owns and controls a majority of Class B Units (as defined in the Parent LLCA).

"Closing Date" shall mean March 1, 2017.

"Closing Date Financials" shall have the meaning provided in Section 6.1(n).

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing or intended to secure any or all of the Obligations; provided that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein.

"Collateral Agent" shall mean JPMorgan Chase Bank, N.A., as collateral agent under the Security Documents, or any successor collateral agent appointed in accordance with the provisions of Section 12.9.

"Collateral Agreement" shall mean the Collateral Agreement of even date herewith by and among the Borrower, the other grantors party thereto and the Collateral Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit E hereto.

"Collateral Coverage Minimum" shall mean that the Mortgaged Properties represent at least 90% of the PV-9 of the Borrowing Base Properties.

"Commercial Tort Claim" shall have the meaning assigned to such term in the UCC.

"Commitment" shall mean (a) with respect to each Lender that is a Lender on the Closing Date, the amount set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Commitment" in the Assignment and Assumption pursuant to which such Lender assumed a portion of the Total Commitment, in each case as the same may be changed from time to time pursuant to the terms of this Agreement. The aggregate amount of the Commitments as of the Closing Date is $500,000,000.

"Commitment Fee" shall have the meaning provided in Section 4.1(a).

"Commitment Fee Rate" shall mean, for any day, with respect to the Available Commitment on such day, the applicable rate *per annum* set forth next to the row heading "Commitment Fee Rate" in the definition of "Applicable Margin" in Section 1.1 and based upon the Borrowing Base Utilization Percentage in effect on such day.

"Commitment Percentage" shall mean, at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Commitment at such time by (b) the amount of the Total Commitment at such time; provided that at any time when the Total Commitment shall have been terminated, each Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Total Exposure at such time by (ii) the aggregate Total Exposures of all Lenders at such time (with such Total Exposure, and the component thereof, calculated using any applicable Lender's Commitment Percentage immediately prior to the termination of the Total Commitment).

"Commodity Account" has the meaning assigned to such term in the UCC.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"Confidential Information" shall have the meaning provided in Section 13.16.

"Consolidated Current Assets" shall mean, as at any date of determination, without duplication, the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date, plus the Available Commitment, but excluding (a) all non-cash assets under Accounting Standards Codification Topic No. 815, Derivatives and Hedging, (b) assets to the extent resulting from non-cash gains required under Accounting Standards Codification Topic No. 410, Asset Retirement and Environmental Obligations and (c) the current portion of current and deferred income taxes or any amounts payable as tax distributions.

"Consolidated Current Liabilities" shall mean, as at any date of determination, without duplication, the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries on such date, but excluding, without duplication, (a) all non-cash obligations under Accounting Standards Codification Topic No. 815, Derivatives and Hedging, (b) the current portion of current and deferred income taxes or any amounts payable as tax distributions, (c) the current portion of any Loans, Hedging Obligations and other Indebtedness for borrowed money, (d) current liabilities consisting of deferred revenue, (e) any non-cash liabilities recorded in connection with stock-based or similar incentive-based compensation awards or arrangements and (f) liabilities to the extent resulting from non-cash losses or charges required under Accounting Standards Codification Topic No. 410, Asset Retirement and Environmental Obligations.

"Consolidated Depreciation, Depletion and Amortization Expense" shall mean, with respect to any Person for any period, the total amount of depreciation, depletion and amortization expense of such Person and its Restricted Subsidiaries, including the amortization of deferred financing fees, debt issuance costs and commissions, and amortization of unrecognized prior service costs and actuarial gains and losses to pensions and other post-employment benefits of such Person and its Restricted Subsidiaries for such period on a consolidated basis and otherwise determined in accordance with GAAP.

"Consolidated EBITDAX" shall mean, with respect to any Person for any period, the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period:

(a) increased (without duplication) by the following, in each case to the extent deducted (and not added back) in determining Consolidated Net Income for such period:

(i) provision for taxes based on income or profits or capital, including, federal, state, franchise, excise, property and similar taxes and foreign withholding taxes (including the amount of distributions actually made to any Parent Entity in respect of such period in accordance with Section 10.6(c)(i)) plus

(ii) Consolidated Interest Expense for such period (in addition to, without duplication, (x) bank fees and other deferred financing fees and (y) costs of surety bonds in connection with financing activities), plus amounts excluded from Consolidated Interest Expense as set forth in clauses (i)(q) through (y) in the definition of Consolidated Interest Expense, plus

(iii) Consolidated Depreciation, Depletion and Amortization Expense for such period, plus

(iv) any other non-cash charges, including any write-offs or write-downs reducing Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, (A) the Borrower may determine not to add back such non-cash charge in the current period and (B) to the extent the Borrower does decide to add back such non-cash charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDAX to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period), plus

(v) extraordinary, unusual and non-recurring items; provided that, any items falling within the scope of clause (a)(vi) shall be subject to the add back provided therein with respect thereto and shall not be added back pursuant to this clause (a)(v), plus

(vi) restructuring expenses and the amount of "run rate" cost savings, operating expense reductions and savings from synergies related to acquisitions, Dispositions, restructurings, cost savings initiatives and other similar initiatives that are reasonably identifiable, factually supportable and certified by the Borrower to result from actions that have been taken or with respect to which substantial steps have been taken or are expected to be taken (in the good faith determination of the Borrower) within twelve (12) months after such restructuring, acquisition, Disposition, cost saving initiative or other similar initiative; provided that (x) the aggregate amount pursuant to this clause (vi) in such period shall not exceed 10% of Consolidated EBITDAX for such period and (y) no amount shall be added pursuant to this clause (vi) to the extent duplicative of any expenses or charges otherwise added to Consolidated EBITDAX, whether through a *pro forma* adjustment or otherwise, for such period, plus

(vii) any after-tax loss from the early extinguishment or conversion of Hedge Agreements; plus

(viii) any costs or expenses incurred pursuant to any management equity plan, stock option plan or any other management or employee benefit plan, agreement or any stock subscription or stockholders agreement, to the extent that such costs or expenses are (A) funded with cash proceeds contributed to the capital of such Person or (B) net cash proceeds of an issuance of Equity Interests of such Person (other than Disqualified Stock (excluding Qualified Preferred Equity)) and, in each case not used for any other purposes, including a Cure Amount pursuant to Section 11.13(a), plus

(ix) (A) costs and expenses incurred in connection with the Transactions and (B) costs and expenses incurred in connection with any Investments pursuant to Section 10.5(g) (which are consummated), Dispositions, issuances of Equity Interests of such Person or its Restricted Subsidiaries and Refinancings of the Facility or Specified Additional Debt after the Closing Date, plus

(x) exploration expenses or costs (to the extent the Borrower adopts the "successful efforts" method of accounting), and

(b) decreased (without duplication) by the sum of (i) all non-cash gains and (ii) any net after-tax gain from the early extinguishment or conversion of Hedge Agreements, in each case, to the extent included in determining Consolidated Net Income for such period.

For the avoidance of doubt, Consolidated EBITDAX shall be calculated, including *pro forma* adjustments, in accordance with Section 1.11.

"Consolidated Interest Expense" shall mean, with respect to any Person for any period, without duplication, the sum of:

(i) consolidated interest expense of such Person and its Restricted Subsidiaries for such period, to the extent such expense was deducted (and not added back) in computing Consolidated Net Income (including (a) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (b) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers acceptances, (c) non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of obligations under Hedge Agreements or other derivative instruments pursuant to GAAP), (d) the interest component of obligations under Capital Leases, and (e) net payments, if any, made (less net payments, if any, received), pursuant to interest rate Hedge Agreements with respect to Indebtedness, and excluding (q) any prepayment premium or penalty, (r) annual agency fees paid to the administrative agents and collateral agents under any credit facilities or other debt instruments or document, (s) costs associated with Hedge Agreements and breakage costs in respect of Hedge Agreements related to interest rates, (t) any expense resulting from the discounting of any Indebtedness in connection with the application of recapitalization accounting or, if applicable, recapitalization or purchase accounting in connection with the Transactions or any acquisition (or purchase of assets), (u) penalties and interest relating to taxes and any other fees related to the Transactions or any acquisitions (or purchases of assets) after the Closing Date, (v) any "additional interest" with respect to any securities, (w) amortization or expensing of deferred financing fees, amendment and consent fees, debt issuance costs, commissions, fees and expenses, (x) any amortization or expensing of bridge, commitment and other financing fees and any other fees related to the Transactions or related to any acquisitions (or purchases of assets) after the

Closing Date and (y) any accretion of accrued interest on discounted liabilities (other than Indebtedness except to the extent under clause (t) above)); plus

(ii) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued; less

(iii) interest income of such Person and its Restricted Subsidiaries for such period.

For purposes of this definition, interest on obligations in respect of Capital Leases shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such obligations in accordance with GAAP.

"Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (or loss) of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, and otherwise determined in accordance with GAAP; provided, however, that, without duplication:

(a) the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period whether effected through a cumulative effect adjustment or a retroactive application, in each case in accordance with GAAP, shall be excluded;

(b) any net after-tax effect of gains or losses on disposal, abandonment (including asset retirement costs) or discontinuance of disposed, abandoned or discontinued operations, asset dispositions or the sale or other disposition of any equity interests of any Person, as applicable, in each case, other than in the ordinary course of business, as determined in good faith by the Borrower, shall be excluded; provided that any exclusion for the discontinuance of discontinued operations held for sale shall be at the option of the Borrower pending the consummation of such sale;

(c) the net income for such period of any Person that is an Unrestricted Subsidiary or joint venture shall be excluded; provided that Consolidated Net Income of a Person that is an Unrestricted Subsidiary or a joint venture shall be included to the extent the amount of dividends, distributions or other payments that are actually paid in cash or Permitted Investments to such Person or any of its Restricted Subsidiary from income generated by such Unrestricted Subsidiary or joint ventures in respect of such period;

(d) any net after-tax effect of income (loss) from the early extinguishment or conversion of Indebtedness, shall be excluded;

(e) any non-cash equity or phantom equity based or non-cash compensation charge or expense, including any such charge or expense arising from grants of stock appreciation rights, equity incentive programs or similar rights, stock options, restricted stock or other rights to, and any cash charges associated with the rollover, acceleration, or payout of, Equity Interests by management of such Person or of a Restricted Subsidiary or any of its direct or indirect parent companies, shall be excluded;

(f) any fees, expenses or charges incurred during such period, or any amortization thereof for such period, in connection with the novation of any Hedge Agreements entered into in connection with the Closing Date, shall be excluded;

(g) accruals and reserves that are established or adjusted within twelve months after the Closing Date that are so required to be established or adjusted as a result of the Transactions (or within twelve months after the closing of any acquisition that are so required to be established as a result of such acquisition) in accordance with GAAP shall be excluded;

(h) any expenses, charges or losses to the extent covered by insurance (including business interruption insurance) or indemnity and actually reimbursed, or, so long as such Person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer or indemnifying party and only to the extent that such amount is in fact reimbursed within 365 days of the date of such determination (net of any amount so added back in any prior period to the extent not so reimbursed within the applicable 365-day period), shall be excluded;

(i) without duplication, an amount equal to the amount of distributions actually made to any parent or equity holder of such Person in respect of income taxes (or franchise taxes imposed in lieu of income taxes) for such period in accordance with Section 10.6(c)(i) shall be included as though such amounts had been paid as income taxes directly by such Person for such period;

(j) any net unrealized gain or loss (after any offset) resulting in such period from Hedge Agreements and the application of Accounting Standards Codification Topic No. 815, Derivatives and Hedging, shall be excluded; and

(k) contingent consideration obligations (including to the extent accounted for as bonuses or otherwise) shall be excluded.

It is understood that all cash dividends and other cash distributions paid (excluding items eliminated in consolidation) on any series of GSO Preferred Stock, Qualified Preferred Equity or Disqualified Stock shall be excluded from Consolidated Net Income to the extent that would otherwise reduce the income of such Person and its Restricted Subsidiaries.

"Consolidated Total Assets" shall mean the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the most recent consolidated balance sheet of the Borrower (and, in the case of any determination relating to any incurrence of Indebtedness or any Investment or other acquisition, on a Pro Forma Basis including any property or assets being acquired in connection therewith).

"Consolidated Total Indebtedness" shall mean, as of any date of determination, the aggregate principal amount of Indebtedness of the Borrower and its Restricted Subsidiaries on such date, in an amount that would be reflected on a balance sheet of the Borrower and its Restricted Subsidiaries prepared on such date on a consolidated basis in accordance with GAAP consisting of Indebtedness set forth in clauses (a), (b), (d) (in respect of unreimbursed amounts), (e) and (j) (in respect of the foregoing items) of the definition of Indebtedness.

"Consolidated Total Net Leverage Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness as of the last day of the Test Period for such date of determination, net of Unrestricted Cash as of such date up to $25,000,000, to (b) Consolidated EBITDAX for the Test Period for such date of determination (it is understood that the Consolidated Total Net Leverage Ratio shall be determined on a Pro Forma Basis and in accordance with Section 1.11(e) for the applicable Test Periods).

"Contractual Requirement" shall have the meaning provided in Section 8.3.

"Controlled Account" shall mean a Deposit Account, Securities Account or Commodity Account in the name of the Borrower or another Credit Party that is subject to a deposit account control agreement, securities account control agreement or commodity account control agreement, respectively, in form and substance reasonably satisfactory to the Collateral Agent and the account bank, securities intermediary, or commodity intermediary as applicable, for such Deposit Account, Securities Account or Commodity Account.

"Controlled Investment Affiliate" shall mean, as to any Person, any other Person, which directly or indirectly is in control of, is controlled by, or is under common control with such Person and is organized by such Person (or any Person controlling such Person) primarily for making direct or indirect equity or debt investments in the Borrower and/or other companies.

"Copyright" shall have the meaning assigned to such term in the Collateral Agreement.

"Credit Documents" shall mean this Agreement, the Guarantee, the Security Documents, each Letter of Credit, any promissory notes issued by the Borrower under this Agreement and any Customary Intercreditor Agreement with respect to the Facility entered into after the Closing Date to which the Collateral Agent is party.

"Credit Event" shall mean and include the making (but not the conversion or continuation) of a Loan and the issuance of a Letter of Credit.

"Credit Party" shall mean each of the Borrower and the Guarantors.

"Cure Amount" shall have the meaning provided in Section 11.13(a)(i).

"Cure Deadline" shall have the meaning provided in Section 11.13(a)(i).

"Cure Right" shall have the meaning provided in Section 11.13(a)(i).

"Current Ratio" shall mean, as of any date of determination, the ratio of (a) Consolidated Current Assets to (b) Consolidated Current Liabilities.

"Customary Intercreditor Agreement" shall mean a customary intercreditor agreement in form and substance reasonably acceptable to the Administrative Agent and/or the Collateral Agent and the Borrower, which agreement shall provide that the Liens on the Collateral securing such Indebtedness shall rank junior to the Liens on the Collateral securing the Obligations. Such agreement shall be posted to the Lenders not less than five (5) Business Days before execution thereof and, if the Required Lenders shall not have objected in writing to such changes within five (5) Business Days after posting, then the Required Lenders shall be deemed to have agreed that the Administrative Agent's and/or Collateral Agent's entry into such intercreditor agreement (including with such changes) is reasonable and to have consented to such intercreditor agreement (including with such changes) and to the Administrative Agent's and/or Collateral Agent's execution thereof.

"Default" shall mean any event, act or condition that constitutes an Event of Default or with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" shall have the meaning provided in Section 2.8(c).

"Defaulting Lender" shall mean any Lender whose acts or failures to act, whether directly or indirectly, cause it to meet any part of the definition of "Lender Default."

"Deposit Account" shall have the meaning assigned to such term in the UCC.

"Development Agreement" shall mean the Development Agreement dated as of the date hereof among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN EF Maverick, LLC, the Borrower and Aguila Production, LLC, and solely for the purposes of Section 4.15 thereof, Sanchez, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Dispose" or "Disposed of" shall have a correlative meaning to the defined term of "Disposition".

"Disposition" shall have the meaning provided in Section 10.4.

"Disqualified Institution" shall mean (a) those Persons that have been specified in writing by the Borrower to the Administrative Agent prior to January 12, 2017, (b) any competitor of the Borrower and its Subsidiaries and any Affiliates of such competitor identified to the Administrative Agent in writing by the Borrower from time to time that are operating companies (or Affiliates of operating companies), other than their respective financial investors that are not operating companies and other than any Affiliate that is a bona fide diversified debt fund that invests in syndicated loans ("Bona Fide Debt Funds") or (c) affiliates of such Persons set forth in clauses (a) and (b) (in the case of Affiliates of such Persons set forth in clause (b), other than Bona Fide Debt Funds) that are reasonably identifiable solely on the basis of the similarity of such Affiliate's name; provided that (A) the Borrower shall be permitted to remove a Person as a Disqualified Institution by providing written notice to the Administrative Agent and (B) no Person shall retroactively become a Disqualified Institution if such Person that has previously (x) become a Lender or a Participant or committed to (or been approached to) become a Lender or a Participant or (y) entered into a trade to become a Lender or a Participant.

"Disqualified Stock" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation, scheduled redemption or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Secured Cash Management Agreements) and the termination of the Commitments and, to the extent not Satisfactorily Cash Collateralized or Backstopped, outstanding Letters of Credit, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests and other than as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations (other than (i) contingent indemnification obligations as to which no claim has been asserted and (ii) Obligations under Secured Hedge Agreements and Secured Cash Management Agreements) and the termination of the Commitments and, to the extent not Satisfactorily Cash Collateralized or Backstopped, outstanding Letters of Credit), (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Stock, in the case of each of clauses (a), (b), (c) and (d), prior to the date that is ninety-one (91) days after the Maturity Date at the time of issuance of such Equity Interests; provided, that if such Equity Interests are issued pursuant to any plan for the benefit of future, current or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower or its Subsidiaries or by any such plan to such employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members), such Equity Interests shall not constitute Disqualified Stock solely because they may be required to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability; provided, further, that any Equity Interests held by any future, current or former employee, director, officer, member of management or consultant (or their respective Controlled Investment Affiliates or Immediate Family Members) of the Borrower, any of its Restricted Subsidiaries or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the Board of Directors of the Borrower (or the compensation committee thereof), in each case pursuant to any stock subscription or shareholders' agreement, management equity plan or stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Restricted Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's, officer's, management member's or consultant's termination, death or disability.

"Distressed Person" shall have the meaning provided in the definition of "Lender-Related Distress Event" contained in this Section 1.1.

"Dollar-Denominated Production Payments" shall mean production payment obligations recorded as liabilities in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.4(b).

"EEA Financial Institution" shall mean (a) any institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Engineering Reports" shall have the meaning provided in Section 2.14(c)(i).

"Environmental Claims" shall mean any and all of the following written actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, violation or proceedings arising under or based upon any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "Claims"), (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief regarding the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" shall mean any applicable Federal, state, foreign or local statute, law, legally-binding rule, regulation, ordinance, code and common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or human health or safety (to the extent relating to human exposure to Hazardous Materials).

"Environmental Permit" shall mean any permit, approval, identification number, license or other authorization required under any applicable Environmental Law for the operations of the Borrower and each of the Subsidiaries.

"Equity Contribution" shall mean the sum of (a) the GSO Preferred Equity Proceeds in an amount not less than $478,000,000 (as such amount may be reduced to give effect to any purchase price adjustments in accordance with Section 3.3 of the Purchase and Sale Agreement) and (b) the Sanchez Cash Contribution.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing, excluding any debt security that is convertible or exchangeable into any Equity Interests (provided that any instrument evidencing Indebtedness convertible or exchangeable into Equity Interests, whether or not such debt securities include any right of participation with Equity Interests, shall not be deemed to be Equity Interests unless and until such instrument is so converted or exchanged).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) a Reportable Event with respect to a Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the failure of the Borrower or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Plan; (d) a failure to satisfy the minimum funding standard under Section 412 of the Code

or Section 302 of ERISA, or the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard, in each case with respect to a Plan, whether or not waived, or a failure to make any required contribution to a Multiemployer Plan; (e) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent within the meaning of Title IV of ERISA or that is in endangered or critical status, within the meaning of Section 305 of ERISA; (f) the occurrence of any event or condition that would reasonably be considered to constitute grounds under ERISA for the termination of, the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, or the commencement of proceedings by the PBGC to terminate a Plan; (g) the appointment of a trustee to administer, any Plan; (h) the imposition of any liability under Title IV of ERISA, including the imposition of a lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any property (or rights to property, whether real or personal) of the Borrower or any ERISA Affiliate, but excluding PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (i) a determination that any Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303(i)(4)(A) of ERISA or Section 430(i)(4)(A) of the Code); or (j) the occurrence of a non-exempt prohibited transaction with respect to any Plan maintained or contributed to by any Borrower (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in material liability to the Borrower, except in each of (a) – (j) with respect to Foreign Plans.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Excluded Accounts" shall mean (a) each account all or substantially all of the deposits in which consist of amounts utilized to fund payroll, employee benefit or tax obligations of the Borrower and its Restricted Subsidiaries, (b) fiduciary accounts, (c) "zero balance" accounts, (d) trust and suspense accounts of the Borrower and the Guarantors holding royalty obligations, (e) accounts of the Borrower and the Guarantors constituting cash collateral accounts permitted under Section 10.2 (provided that any such account subject to control agreements in favor of the Collateral Agent, for the benefit of the Secured Parties, or otherwise constituting cash collateral in favor of the Collateral Agent, for the benefit of the Secured Parties shall not be an Excluded Account) and (f) other accounts selected by the Borrower and its Subsidiaries so long as the aggregate average daily maximum balance in any such other account over a 30-day period does not at any time exceed $1,000,000; provided that the aggregate daily maximum balance for all such bank accounts excluded pursuant to clauses (a) through (f) on any day shall not exceed $5,000,000.

"Excluded Assets" shall mean (a) motor vehicles and other assets subject to certificates of title (except to the extent the security interest in such assets can be perfected by the filing of an "all assets" UCC financing statement), (b) Commercial Tort Claims with an individual value less than $250,000, (c) any asset specifically requiring perfection through control, control agreements, or other control arrangements (other than (i) Equity Interests (either certificated or uncertificated) that may be perfected by control, (ii) cash, cash equivalents, Deposit Accounts, Securities Accounts and Commodity Accounts that may be perfected by a deposit account control agreement, securities account control agreement or commodity account control agreement or (iii) as may be required by Section 3.7 hereof), (d) assets (i) subject to Liens expressly permitted by Section 10.2(c) to the extent that the grant of Liens to secure the Obligations would be prohibited by an enforceable contractual provision under the Indebtedness secured by such Liens, (ii) over which the granting of Liens to secure the Obligations would be prohibited by any Requirement of Law or to the extent that such Liens would require obtaining the consent of any governmental or regulatory authority (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law and, in each case, other than proceeds thereof to the extent the assignment of such proceeds is expressly deemed effective under the UCC or other Requirements of Law notwithstanding such prohibitions), (e) any foreign collateral or credit support, (f) Excluded Equity Interests (other than in respect of Equity Interests in Immaterial Subsidiaries constituting Collateral), (g) those assets as to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of obtaining a Lien are excessive in relation to the benefit to be obtained by the Secured Parties therefrom, (h) letter of credit rights (other than to the extent a lien thereon can be perfected by filing a

customary UCC financing statement, provided that the value of the assets excluded pursuant to this clause (h) shall not exceed $1,000,000 in the aggregate, (i) any right, title or interest in any license, contract or agreement but only to the extent that such a grant would violate the terms of Requirements of Law or of such license, contract or agreement, or result in a breach of the terms of, or constitute a default under (which could not be waived by the Borrower, its parent or subsidiaries and which was not the result of an effort to circumvent the collateral requirements under the Credit Documents), any such license, contract or agreement (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law, in each case, other than proceeds thereof to the extent the assignment of such proceeds is effective under the UCC notwithstanding such prohibitions) and (j) buildings and manufactured mobile homes (each as defined in the applicable flood insurance regulations), in each case, in an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968; provided that, in each case, the Collateral shall include the proceeds of any of the foregoing unless such proceeds themselves would constitute Excluded Assets.

"Excluded Equity Interests" shall mean (a) any Equity Interests with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) any Equity Interests to the extent the pledge thereof would be prohibited by any Requirement of Law or to the extent that such Liens would require obtaining the consent of any governmental or regulatory authority (in each case, except to the extent such prohibition is unenforceable or rendered ineffective after giving effect to applicable provisions of the UCC or other Requirements of Law and, in each case, other than proceeds thereof to the extent the assignment of such proceeds is expressly deemed effective under the UCC or other Requirements of Law notwithstanding such prohibitions), (c) in the case of any Equity Interests of any non-Wholly owned Subsidiary of the Borrower that does not own Borrowing Base Properties to the extent the pledge of such Equity Interests is prohibited by Specified Contractual Requirements existing on the Closing Date or at the time such Subsidiary is acquired to the extent (i) that a pledge thereof to secure the Obligations is prohibited by any Specified Contractual Requirement, (ii) any Specified Contractual Requirement prohibits such a pledge without the consent of any other party; provided that this clause (ii) shall not apply if (A) such other party is a Credit Party or a Wholly owned Subsidiary or (B) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent)) and for so long as such Specified Contractual Requirement or replacement or renewal thereof is in effect, or (iii) a pledge thereof to secure the Obligations would give any other party (other than a Credit Party or a Wholly owned Subsidiary) to any Specified Contractual Requirement governing such Equity Interests the right to terminate its obligations thereunder (provided that, in the case of Equity Interests, such Specified Contractual Requirements shall, for this purpose, not include (A) customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Requirements of Law, (B) any such Specified Contractual Requirements entered into in contemplation of such Subsidiary being acquired, or (C) any term, covenant, condition or provision that (1) could be waived by the Borrower or its Affiliates or (2) that was the result of an effort to circumvent the collateral requirements of the Credit Documents); provided further, that this exclusion shall not apply to the proceeds of such Equity Interests to the extent that assignment of such proceeds would be effective under the Uniform Commercial Code, (d) the Equity Interests of any Immaterial Subsidiary (unless a security interest in such Subsidiary may be perfected by filing an "all assets" UCC financing statement) and any Unrestricted Subsidiary and (e) Margin Stock.

"Excluded Subsidiary" shall mean (a) each Immaterial Subsidiary, for so long as any such Subsidiary constitutes an Immaterial Subsidiary pursuant to the terms hereof, (b) each Domestic Subsidiary that is not a Wholly owned Subsidiary (for so long as such Subsidiary remains a non-wholly owned Restricted Subsidiary), (c) each Domestic Subsidiary that is prohibited by any applicable Specified Contractual Requirement (provided that such Specified Contractual Requirements shall, for this purpose, not include (i) customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Requirements of Law, (ii) any such Specified Contractual Requirements entered into in contemplation of such entity becoming a Restricted Subsidiary, (iii) any term, covenant, condition or provision that (A) could be waived by the Borrower or its Affiliates or (B) that was the result of an effort to circumvent the requirements of the Credit Documents) or Requirement of Law from guaranteeing or granting Liens to secure the Obligations on the Closing Date or at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect and was not entered into in contemplation of such Subsidiary becoming a Restricted Subsidiary or that would require a material or non-ministerial consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens

to secure the Obligations on the Closing Date or at the time such Subsidiary becomes a Restricted Subsidiary (unless such consent, approval, license or authorization has been received)), (d) any other Domestic Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of providing a Guarantee of the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom and (e) each Unrestricted Subsidiary.

"Excluded Swap Obligation" shall mean with respect to any Guarantor and Parent and Holdings, (a) any Hedging Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor, Parent or Holdings of a security interest to secure, as applicable, such Hedging Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's, Parent's or Holdings' failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of, or grant of such security interest by, as applicable, such Guarantor, Parent or Holdings becomes or would become effective with respect to such Hedging Obligation or (b) any other Hedging Obligation designated as an "Excluded Swap Obligation" of such Guarantor, Parent or Holdings as specified in any agreement between the relevant Credit Parties and counterparty applicable to such Hedging Obligations, and agreed by the Administrative Agent. If a Hedging Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Credit Document, (i) Taxes imposed on or measured by its net income (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), branch profits Taxes and franchise Taxes imposed on it, in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document), (ii) U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document that is required to be imposed on amounts payable to or for the account of a Lender (including any Issuing Bank), other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 13.7, pursuant to laws in force at the time such Lender acquires an interest in a Loan, Letter of Credit or Commitment (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to Section 5.4, (iii) any Tax attributable to the Administrative Agent's, any Lender's or any other recipient's failure to comply with Section 5.4(d), (e), (g) or (h), and (iv) any U.S. federal withholding Tax imposed under FATCA.

"Expected Cure Amount" shall have the meaning provided in Section 11.13(a)(i)(C).

"Expiration Date" shall mean the earlier of (a) 11:59 p.m., New York City time, on or prior to March 31, 2017, and (b) the consummation of the Acquisition with or without any Borrowings hereunder (except to the extent the result of a Defaulting Lender).

"Facility" shall mean this Agreement and the Commitments and the extensions of credit made hereunder.

"Fair Market Value" shall mean, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower in good faith.

"Farm-In Agreement" shall mean an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of one or more exploratory or development wells (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well or wells as all or a part of the consideration provided in exchange for an ownership interest in an Oil and Gas Property.

"Farm-Out Agreement" shall mean a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such Sections of the Code and any law, regulation, rule, promulgation or official agreement implementing an official government agreement with respect to the foregoing.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average rate of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Financial Officer" shall mean with respect to it or its manager, managing member or general partner, the Chief Financial Officer, Chief Accounting Officer, principal accounting officer, Controller, Treasurer or Assistant Treasurer.

"Financial Performance Covenants" shall mean the covenants of the Borrower set forth in Section 10.11.

"Flood Insurance Regulations" shall have the meaning provided in the definition of "Mortgaged Property" contained in this Section 1.1.

"Foreign Plan" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States.

"Fronting Fee" shall have the meaning provided in Section 4.1(c).

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"Governmental Authority" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"Granting Lender" shall have the meaning provided in Section 13.6(g).

"GSO" shall mean, collectively, GSO Capital Partners, LP and funds, managed, advised or sub-advised by GSO Capital Partners LP and their respective Affiliates, but shall exclude (a) any of its operating portfolio companies (it is understood that a company whose only material asset is ownership, directly or indirectly, of Equity Interests in the Borrower shall not be an operating portfolio company for purposes of this definition) and (b) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or controlled by The Blackstone Group, L.P. and their affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.

"GSO Controlled Preferred Equity Interests" shall mean GSO Preferred Equity Interests and any Qualified Preferred Equity issued on or after the Closing Date to GSO or any other Person so long as only GSO has the right or ability (by voting power, contract or otherwise) to control the right of Redemption with respect to such Qualified Preferred Equity, including the exercise of such right.

"GSO Preferred Equity Documentation" shall mean the definitive documentation in respect of the GSO Preferred Equity Interests.

"GSO Preferred Equity Interests" shall mean the non-convertible Preferred Stock issued by the Borrower to GSO which is (a) classified as equity or mezzanine equity under GAAP, (b) pursuant to GSO Preferred Equity Documentation in form and substance consistent with and on terms consistent with Exhibit L as amended, restated, replaced or otherwise modified after the Closing Date in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof and (c) issued on the Closing Date.

"GSO Preferred Equity Proceeds" shall mean the gross proceeds from the issuance of the GSO Preferred Equity Interests.

"Guarantee" shall mean the Guarantee made by the Guarantors in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"Guarantee Obligations" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; provided, however, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantors" shall mean each Domestic Subsidiary listed on Schedule 1.1(e) that becomes a party to the Guarantee on the Closing Date (except to the extent released therefrom in accordance with the terms hereof) and each other Domestic Subsidiary that becomes a party to the Guarantee after the Closing Date pursuant to Section 9.9 or otherwise; provided that, for the avoidance of doubt, the Borrower in its sole discretion may cause any Restricted Subsidiary that is not required to be a Guarantor hereunder or pursuant to the Security Documents to provide a Guarantee by causing such Restricted Subsidiary to execute a Guarantee and such Restricted Subsidiary shall be Guarantor and Credit Party for all purposes hereunder except to the extent released from such Guarantee in accordance with the terms hereof.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, and radon gas and (b)

any chemicals, materials or substances defined as or included in the definition of “hazardous substances”, “hazardous waste”, “hazardous materials”, “extremely hazardous waste”, “restricted hazardous waste”, “toxic substances”, “toxic pollutants”, “contaminants”, or “pollutants”, or words of similar import, under any applicable Environmental Law, or that would otherwise reasonably be expected to result in liability under any applicable Environmental Law, due to their dangerous or deleterious characteristics.

“Hedge Agreements” shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a “Master Agreement”), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

“Hedge Bank” shall mean any Person (other than the Borrower or any of its Subsidiaries) that (a) at the time it enters into a Hedge Agreement is a Lender or Agent or an Affiliate of a Lender or Agent, or (b) at any time after it enters into a Hedge Agreement it becomes a Lender or Agent or an Affiliate of a Lender or Agent.

“Hedging Obligations” shall mean, with respect to any Person, any obligation to pay or perform under any Swap.

“Highest Lawful Rate” shall mean, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

“Holdings” shall mean SN EF UnSub Holdings, LLC, a Delaware limited liability company.

“Hydrocarbon Interests” shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profits interests and production payment interests, including any reserved or residual interests of whatever nature.

“Hydrocarbons” shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

“Immaterial Subsidiary” shall mean any Subsidiary that is not a Material Subsidiary.

“Immediate Family Members” shall mean with respect to any individual, such individual’s (i) parent, stepparent, grandparent, mother-in-law or father-in-law, (ii) spouse or qualified domestic partner (or ex-spouse or ex-qualified domestic partner) and lineal descendants thereof (including by adoption), (iii) lineal descendants (including by adoption) and spouses thereof, (iv) siblings (including by adoption), spouses thereof and lineal descendants thereof (including by adoption) and (v) spouse’s or qualified domestic partner’s siblings (including by adoption), spouses thereof and lineal descendants thereof (including by adoption) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Impacted Interest Period" shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

"Indebtedness" of any Person shall mean the following, if and only to the extent (other than with respect to clause (g) below) the same would constitute indebtedness or a liability in accordance with GAAP, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be required to be shown as a liability on the balance sheet of such Person (other than (i) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (ii) obligations resulting under firm transportation contracts or take or pay contracts), (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) the principal component of all obligations in respect of Capital Leases and all purchase money obligations of such Person, (f) net Hedging Obligations of such Person, (g) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (h) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase in respect of Disqualified Stock (excluding (i) accrued dividends that have not increased the liquidation preference of such Disqualified Stock and (ii) Qualified Preferred Equity), and (i) Dollar-Denominated Production Payments and Volumetric Production Payments and (j) without duplication, all Guarantee Obligations of such Person in respect of the items described in clauses (a) through (i) above; provided that Indebtedness shall not include (1) trade and other similar ordinary-course payables and accrued expenses (which are not more than 90 days past the due date of payment unless the subject of a good faith dispute), (2) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (3) Production Payments and Reserve Sales other than those described in clause (i) above, (4) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business, and (5) any obligation in respect of a Farm-In Agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an Oil and Gas Property.

For purposes hereof, the amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (g) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the greater of (A) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith and (B) the maximum amount for which such Person may be liable in respect of such Indebtedness.

"Indemnified Liabilities" shall have the meaning provided in Section 13.5(b).

"Indemnified Taxes" shall mean all Taxes imposed on or with respect to any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document other than (a) Excluded Taxes and (b) Other Taxes.

"Indemnitees" shall have the meaning provided in Section 13.5(b).

"Industry Investment" shall mean Investments and/or expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business as a means of actively engaging therein through agreements, transactions, interests or arrangements that permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of Oil and Gas Business jointly with third parties, including: (a) ownership interests (directly or through equity) in oil and gas properties or gathering, transportation, processing, or related systems; and (b) Investments and/or expenditures in the form of or pursuant to operating agreements, processing agreements, Farm In Agreements, Farm Out Agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), and other similar agreements (including for limited liability companies) with third parties.

"Information" shall have the meaning provided in Section 8.8(a).

"Initial Reserve Report" shall mean, collectively the reserve engineers' reports (a) evaluating the Proved, Developed, Producing Reserves and (b) evaluating the proved, developed non-producing and proved, undeveloped reserves, in each case, of the Acquired Assets and the oil and gas properties of the Borrower and its subsidiaries, each prepared by Ryder Scott Company Petroleum Consultants, L.P., dated as of July 1, 2016.

"Intercompany Note" shall mean the Intercompany Subordinated Note, dated as of the Closing Date, substantially in the form of Exhibit H executed by the Borrower and each other Subsidiary of the Borrower.

"Interest Period" shall mean, with respect to any Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"Interim Redetermination" shall have the meaning provided in Section 2.14(b).

"Interim Redetermination Date" shall mean the date on which a Borrowing Base that has been redetermined pursuant to an Interim Redetermination becomes effective as provided in Section 2.14.

"Interpolated Rate" shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

"Investment" shall have the meaning provided in Section 10.5.

"Investment Grade Rating" shall mean a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other rating agency selected by the Borrower.

"IRS" shall have the meaning provided in Section 5.4(e)(i).

"ISP" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" shall mean, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable Issuing Bank and the Borrower (or any Restricted Subsidiary) or in favor of the applicable Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" shall mean (a) JPMorgan Chase Bank, N.A. and any of its Affiliates, (b) Citibank, N.A. and any of its Affiliates and (c) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). References herein and in the other Credit Documents to an Issuing Bank shall be deemed to refer to the Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires. Any Lender may, from time to time, become an Issuing Bank under this Agreement with the protections and rights afforded to Issuing Banks hereunder by executing a joinder, in a form reasonably satisfactory to (and acknowledged and accepted by) the Administrative Agent and the Borrower, indicating such Lender's "Letter of Credit Commitment" and upon the execution and delivery of any such joinder, such Lender shall be an Issuing Bank for all purposes hereof.

"Joint Development Agreement" shall mean the Joint Development Agreement dated as the date hereof by and between SN EF Maverick, LLC, a Delaware limited liability company, the Borrower and Aguila Production, LLC, a Delaware limited liability company and, solely for the purposes of Section 2.2, Section 4.5, and Article VII thereof, Sanchez, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Junior Debt" shall have the meaning provided in Section 10.7(a).

"Junior Liens" shall mean Liens on the Collateral (other than Liens securing the Obligations) that are subordinated in all respects to the Liens granted under the Credit Documents pursuant to a Customary Intercreditor Agreement (it being understood that Junior Liens are not required to be *pari passu* with other Junior Liens, and that Indebtedness secured by Junior Liens may have Liens that are senior in priority to, or *pari passu* with, or junior in priority to, other Liens constituting Junior Liens).

"L/C Borrowing" shall mean an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing. All L/C Borrowings shall be denominated in Dollars.

"L/C Maturity Date" shall mean the date that is five Business Days prior to the Maturity Date.

"L/C Obligations" shall mean, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unpaid Drawings, including all L/C Borrowings. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"L/C Participant" shall have the meaning provided in Section 3.3(a).

"L/C Participation" shall have the meaning provided in Section 3.3(a).

"Lead Arranger" shall mean each of JPMorgan Chase Bank, N.A., Citigroup Global Markets Inc., Capital One, National Association and RBC Capital Markets, in its capacity as a joint lead arranger and joint bookrunner in respect of the Facility.

"Lender" shall have the meaning provided in the introductory paragraph to this Agreement.

"Lender Default" shall mean (a) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit, which refusal or failure is not cured within two Business Days after the date of such refusal or failure; (b) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute; (c) a Lender has notified the Borrower or the Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the Facility; (d) the failure by a Lender to confirm in a manner reasonably satisfactory to the Administrative Agent that it will comply with its obligations under the Facility, which failure is not cured after the date of such failure or (e) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event.

"Lender-Related Distress Event" shall mean, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; or such Distressed Person becomes the subject of a Bail-In Action; provided that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof; provided, further, that the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or an entity that directly or indirectly controls a Lender under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation) shall not result in a Lender being deemed a Distressed Person, so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs

of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"Letter of Credit" shall have the meaning provided in Section 3.1(a).

"Letter of Credit Application" shall have the meaning provided in Section 3.2(a).

"Letter of Credit Commitment" shall mean $50,000,000, as the same may be reduced from time to time pursuant to Section 3.1.

"Letter of Credit Exposure" shall mean, with respect to any Lender, at any time, the sum of (a) the principal amount of any Unpaid Drawings in respect of which such Lender has made (or is required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a) at such time and (b) such Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the Lenders have made (or are required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a)), minus the amount of cash or deposit account balances held by the Administrative Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.7.

"Letter of Credit Fee" shall have the meaning provided in Section 4.1(b).

"Letters of Credit Outstanding" shall mean, at any time, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit and (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"LIBO Screen Rate" shall have the meaning provided to such term in the definition of LIBOR Rate contained in this Section 1.1.

"LIBOR Loan" shall mean any Loan bearing interest at a rate determined by reference to the LIBOR Rate (other than an ABR Loan bearing interest by reference to the LIBOR Rate by virtue of clause (c) of the definition of ABR).

"LIBOR Rate" shall mean, for any Interest Period with respect to any Borrowing of a LIBOR Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for Dollars for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters Screen that displays such rate (or, in the event that such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as shall be selected by the Administrative Agent in its reasonable discretion), in each case (the "LIBO Screen Rate") as of 11:00 A.M. (London time) two (2) Business Days prior to the commencement of such Interest Period; provided that if the LIBO Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") with respect to Dollars, then the LIBOR Rate shall be the Interpolated Rate at such time; provided further that if the LIBO Screen Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement. "Interpolated Rate" shall mean, at any time, the rate *per annum* determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which that LIBO Screen Rate is available in Dollars) that is shorter than the Impacted Interest Period and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available in Dollars) that exceeds the Impacted Interest Period, in each case, at such time; provided that if the Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Lien" shall mean, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or (c) Production Payments and Reserve Sales and the like payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Liquidity" shall mean, as of any date of determination, the sum of (a) the Available Commitment on such date and (b) the aggregate amount of Unrestricted Cash of the Borrower and the Restricted Subsidiaries at such date, less the amount of any Borrowing Base Deficiency existing on such date of determination.

"Loan" shall have the meaning provided in Section 2.1(a).

"Loan Limit" shall mean, at any time, the lesser of (a) the Total Commitment at such time and (b) the Borrowing Base at such time (including as it may be reduced pursuant to Section 2.14(h)).

"Majority Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding a majority of the Adjusted Total Commitment at such date, or (b) if the Total Commitment has been terminated or for the purposes of acceleration pursuant to Section 11, Non-Defaulting Lenders having or holding a majority of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Management Services Agreement" shall mean the Management Services Agreement dated as of the date hereof by and between the Borrower and Sanchez O&G, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Margin Stock" shall have the meaning assigned to such terms in Regulation U.

"Marketing Agreement" shall mean the Hydrocarbons Purchase and Marketing Agreement dated as of the date hereof between SN EF Maverick, LLC, a Delaware limited liability company and the Borrower, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Material Adverse Effect" shall mean a material adverse change in, or material adverse effect on (a) the business, assets, operations, properties or financial condition of the Borrower and its Restricted Subsidiaries, taken as a whole, (b) the ability of the Credit Parties, taken as a whole, to perform their material obligations under the Credit Documents, (c) the validity or enforceability of any material Credit Document or (d) the rights and remedies of the Administrative Agent and the Lenders under the Credit Documents.

"Material Contracts" shall mean, collectively, the material commercial contracts of the Borrower and its Restricted Subsidiaries, limited to (a) the Joint Development Agreement, (b) the Management Services Agreement, (c) the Borrower's LPA, (d) the Parent LLCA, (e) the Development Agreement, (f) the Marketing Agreement, (g) the Side Letter Agreement and (h) any Additional Material Contract that replaces any of the foregoing.

"Material Indebtedness" shall mean Indebtedness (other than Loans and Letters of Credit) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $25,000,000.

"Material Subsidiary" shall mean, at any date of determination, each Restricted Subsidiary of the Borrower (a) whose Total Assets (when combined with the assets of such Restricted Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the Test Period were equal to or greater than $5,000,000, (b) whose revenues (when combined with the revenues of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period were equal to or greater than $5,000,000, in each case determined in accordance with GAAP or (c) that owns Borrowing Base Properties; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not Material Subsidiaries have, in the aggregate, (i) Total Assets (when combined with the assets of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Test Period equal to or greater than $10,000,000 or (ii) revenues (when combined with the revenues of such

Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Test Period equal to or greater than $10,000,000, in each case determined in accordance with GAAP, then the Borrower shall, at the request of the Administrative

Agent or on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries."

"Maturity Date" shall mean the fifth anniversary of the Closing Date, or, if such anniversary is not a Business Day, the Business Day immediately following such anniversary.

"Maximum Letter of Credit Commitment" shall mean with respect to each Issuing Bank, the amount set forth opposite such Issuing Bank's name in Schedule 1.1(a) hereto, as such schedule may be amended or modified from time to time by the Borrower, each Issuing Bank affected by such amendment or modification thereto and by the Administrative Agent.

"Minimum Borrowing Amount" shall mean, with respect to any Borrowing of Loans, $500,000 (or, if less, the entire remaining Available Commitments at the time of such Borrowing).

"Minority Investment" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Equity Interests.

"Moody's" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"Mortgage" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed, assignment of as-extracted collateral, fixture filing or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, substantially in the form of Exhibit D (with such changes thereto as may be necessary to account for local law matters) or otherwise in such form as agreed between the Borrower and the Collateral Agent.

"Mortgaged Property" shall mean any Property owned by a Credit Party which is subject to the Liens existing or purported to exist under the terms of a Mortgage; provided that notwithstanding any provision in this Agreement, any Mortgage, or any other Security Document to the contrary, in no event shall any "Building" (as defined in the applicable Flood Insurance Regulation) or "Manufactured (Mobile) Home" (as defined in the applicable Flood Insurance Regulation) be included in the definition of "Mortgaged Property" and no "Building" or "Manufactured (Mobile) Home" shall be encumbered by any Mortgage. As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.*), as the same may be amended or recodified from time to time, (iv) the Flood Insurance Reform Act of 2004 and (v) the Biggert-Waters Flood Reform Act of 2012, and any regulations promulgated thereunder.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Necessary Cure Amount" shall have the meaning provided in Section 11.13(a)(i)(C).

"New Borrowing Base Notice" shall have the meaning provided in Section 2.14(d).

"Non-Consenting Lender" shall have the meaning provided in Section 13.7(b).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Extension Notice Date" shall have the meaning provided in Section 3.2(b).

"Non-U.S. Lender" shall mean any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Notice of Borrowing" shall mean a request of the Borrower in accordance with the terms of Section 2.3(a) and substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent (acting reasonably).

"Notice of Conversion or Continuation" shall have the meaning provided in Section 2.6(a).

"Notice of Purchase Election" shall have the meaning provided in Section 13.6(b)(vii).

"Obligations" shall mean (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party or of Parent or Holdings arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Agreement, in each case, entered into with the Borrower or any of its Restricted Subsidiaries, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Credit Party or any Affiliate thereof in any proceeding under any bankruptcy or insolvency law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) any amounts advanced or expended by the Administrative Agent in connection with the "Cure Right" under and as defined in each of the Management Services Agreement and/or Joint Development Agreement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries and of Parent or Holdings to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay, or secure the payment of, principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document. Notwithstanding the foregoing, Excluded Swap Obligations shall not constitute Obligations. For the avoidance of doubt (a) the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Agreement and under any Secured Cash Management Agreement shall be secured and guaranteed pursuant to the Security Documents and the Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and the other Credit Documents shall not require the consent of the holders of Hedging Obligations under Secured Hedge Agreements or of the holders of Cash Management Obligations under Secured Cash Management Agreements.

"Oil and Gas Business" shall mean:

(a) the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

(b) the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties and products produced in association therewith; and the marketing of oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and minerals obtained from unrelated Persons; and

(c) any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing clauses (a) and (b) of this definition.

"Oil and Gas Properties" shall mean (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization agreements, pooling agreements and declarations of pooled or unitized units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of any Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use

or useful in connection with the operating, working or development of any Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Ongoing Hedges" shall have the meaning provided in Section 10.10(a).

"Organizational Documents" shall mean (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" shall mean any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes arising from any payment made hereunder or made under any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document; provided that such term shall not include any of the foregoing Taxes that result from an assignment, grant of a participation pursuant to Section 13.6(c) or transfer or assignment to or designation of a new lending office or other office for receiving payments under any Credit Document ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor/participating Lender and/or the assignee/Participant and the taxing jurisdiction (other than a connection arising solely from any Credit Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower.

"Overnight Rate" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent or the applicable Issuing Bank, as the case may be, in accordance with banking industry rules on interbank compensation.

"Parent" shall mean SN EF UnSub GP, LLC, a Delaware limited liability company.

"Parent Entity" shall mean any Person that is a direct or indirect parent company (which may be organized as a partnership) of the Borrower.

"Parent LLCA" shall mean the Amended and Restated Limited Liability Company Operating Agreement dated as of January 12, 2017 of Parent, the general partner of the Borrower, as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Participant" shall have the meaning provided in Section 13.6(c)(i).

"Participant Register" shall have the meaning provided in Section 13.6(c)(ii).

"Patent" shall have the meaning assigned to such term in the Collateral Agreement.

"PATRIOT Act" shall have the meaning provided in Section 13.18.

"Payment in Full" shall mean the time at which the Total Commitment and each Letter of Credit have terminated (unless such Letters of Credit have been Satisfactorily Cash Collateralized or Backstopped on or prior to the termination of the Total Commitment) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations incurred hereunder (other than Hedging Obligations under Secured Hedge Agreements, Cash Management Obligations under Secured Cash Management Agreements or contingent indemnification obligations not then due and payable) are paid in full in cash.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Additional Debt" shall mean any unsecured senior, senior subordinated, subordinated loans or notes or other unsecured funded debt or any Junior Debt issued or incurred by the Borrower or a Guarantor, (a) the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the 91st day after the Maturity Date as in effect on the date of determination (other than (i) customary offers to purchase upon a change of control, AHYDO payments, customary asset sale or casualty or condemnation event and customary acceleration rights after an event of default and (ii) Indebtedness incurred pursuant to a customary bridge facility if the Indebtedness pursuant to such customary bridge facility converts at maturity to Indebtedness which does not provide for any scheduled repayment, mandatory redemption or sinking fund obligation (except to the extent permitted pursuant to clause (i)) prior to the 91st day after the Maturity Date as in effect on the date of determination), (b) the covenants, events of default, guarantees and other terms of which (other than interest rate, fees, funding discounts and redemption or prepayment premiums reasonably determined by the Borrower to be "market" rates, fees, discounts and premiums at the time of issuance or incurrence of any such Indebtedness), taken as a whole, are determined by the Borrower to be no more restrictive on or less favorable to the Borrower and its Restricted Subsidiaries than the terms of this Agreement (as in effect at the time of such issuance or incurrence), taken as a whole, except to the extent such terms are (i) consistent with then-prevailing market terms (as in effect at the time of such issuance or incurrence) as determined by the Borrower in consultation with the Administrative Agent and (ii) this Agreement is amended to incorporate any terms more restrictive than this Agreement; provided that a certificate of an Authorized Officer of the Borrower delivered to the Administrative Agent at least three (3) Business Days prior to the incurrence or issuance of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement, (c) if such Indebtedness is subordinated in right of payment to the Obligations, the terms of such Indebtedness provide for customary subordination of such Indebtedness to the Obligations and (d) no Subsidiary of the Borrower (other than a Guarantor) is an obligor under such Indebtedness.

"Permitted Holders" shall mean the Sanchez Permitted Holders and GSO.

"Permitted Investments" shall mean:

(a) United States dollars;

(b) securities issued or directly and fully and unconditionally guaranteed or insured by the United States government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 36 months or less from the date of acquisition;

(c) certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, demand deposits, bankers' acceptances with maturities not exceeding three years and overnight bank deposits, in each case with (i) any Lender or (ii) any domestic or foreign commercial bank having capital and surplus of not less than $250,000,000 in the case of U.S. banks and $100,000,000 (or the United States dollar equivalent as of the date of determination) in the case of non-U.S. banks (any such bank in the forgoing an "Approved Bank");

(d) repurchase obligations for underlying securities of the types described in clauses (b) and (c) above or clauses (f) and (g) below entered into with any financial institution or recognized securities dealer meeting the qualifications specified in clause (c) above;

(e) commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation by, a corporation (other than structured investment vehicles and other than corporations used in structured financing transactions) rated A-2 (or the equivalent thereof) or better rated at least P-2 by Moody's or at least A-2 by S&P or P-2 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) and in each case maturing within 12 months after the date of acquisition thereof;

(f) marketable short-term money market and similar liquid funds having a rating of at least P-2 (or the equivalent thereof) or A-2 (or the equivalent thereof) from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(g) readily marketable direct obligations issued or fully guaranteed by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof; provided, that each such readily marketable direct obligation shall have an Investment Grade Rating from either Moody's or S&P or Moody's (or the equivalent thereof) (or, if at any time neither Moody's nor S&P or Moody's (or the equivalent thereof) shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower) with maturities of 36 months or less from the date of acquisition;

(h) Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower); and

(i) investment funds investing substantially all of their assets in securities of the types de-scribed in clauses (a) through (g) above.

"Permitted Liens" shall mean:

(a) Liens for taxes, assessments or governmental charges or claims not yet overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP, or for property taxes on property that the Borrower or one of its Subsidiaries has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property;

(b) Liens in respect of property or assets of the Borrower or any of the Restricted Subsidiaries imposed by law, such as landlords', sublandlords', vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or incident to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens (i) are not overdue for a period of more than sixty (60) days or (ii) are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(c) Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d) Liens incurred or pledges or deposits made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar legislation, and deposits securing liabilities to insurance carriers under insurance arrangements in respect of such obligations, or to secure (or secure the Liens securing) liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(e) deposits and other Liens securing (or securing the bonds or similar instruments securing) the performance of tenders, statutory obligations, plugging and abandonment or decommissioning obligations, surety, stay, customs and appeal

bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of business or in a manner consistent with past practice or industry practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, or otherwise constituting Investments permitted by Section 10.5;

(f) ground leases, subleases, licenses or sublicenses in respect of real property (other than any Oil and Gas Properties) on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(g) easements, rights-of-way, restrictive covenants, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants and other similar charges or encumbrances (including in any rights-of-way or other property of the Borrower or its Restricted Subsidiaries for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of surface estates, rights of way, facilities and equipment) not (i) interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole, (ii) securing monetary obligations or (iii) materially impairing the value of the affected Borrowing Base Properties, taken as a whole.

(h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(i) Liens arising from precautionary Uniform Commercial Code financing statement or similar filings pursuant to Section 10.1(f);

(j) statutory or common law Liens created in the ordinary course of business in favor of banks and other financial institutions and customary deposit, securities or commodity account terms relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit, securities or commodity accounts or other funds maintained with a creditor depository institution, provided that no such deposit, securities or commodity account is a dedicated cash collateral account (other than a cash withheld account in favor of the Administrative Agent);

(k) contractual or statutory Liens which arise in the ordinary course of business under or in connection with operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, Farm-Out Agreements, Farm-In Agreements, division orders, contracts for the sale, gathering, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual or customary in the Oil and Gas Business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; provided that any such Lien referred to in this clause (m) does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Borrower or any Restricted Subsidiary or materially impair the value of the affected Borrowing Base Properties, taken as a whole;

(l) Liens on pipelines, pipeline facilities, and other midstream assets or facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties;

(m) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(n) Liens on equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower or such Restricted Subsidiary's client at which such equipment is located;

(o) security given to a public utility or any municipality or governmental authority when required by such utility or authority in connection with the operations of that Person in the ordinary course of business; and

(p) any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof and Liens on Permitted Investments to be used to satisfy or discharge Indebtedness; provided that (i) such Permitted Investments are deposited into an account from which payment is to be made, directly or indirectly, to the Person or Persons holding the Indebtedness that is to be satisfied or discharged, (ii) such Liens extend solely to the account in which such Permitted Investments are deposited and are solely in favor of the Person or Persons holding the Indebtedness (or any agent or trustee for such Person or Persons) that is to be satisfied or discharged and (iii) the satisfaction or discharge of such Indebtedness is expressly permitted hereunder.

"Permitted Refinancing Indebtedness" shall mean, with respect to any Indebtedness (the "Refinanced Indebtedness"), any Indebtedness issued or incurred in exchange for, or the net proceeds of which are used to modify, extend, refinance, renew, replace or refund (collectively to "Refinance" or a "Refinancing" or "Refinanced"), such Refinanced Indebtedness (or previous refinancing thereof constituting Permitted Refinancing Indebtedness); provided that (a) the principal amount (or accreted value, if applicable) of any such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness outstanding immediately prior to such Refinancing except by an amount equal to the unpaid accrued interest and premium thereon and other amounts paid in connection with the defeasance or discharge of such Indebtedness plus other amounts paid and fees and expenses incurred in connection with such Refinancing plus an amount equal to any existing commitment unutilized and letters of credit undrawn thereunder, (b) the direct and contingent obligors with respect to such Permitted Refinancing Indebtedness immediately prior to such Refinancing are not changed as a result of such Refinancing (except that a Credit Party may be added as an additional obligor), (c) other than with respect to a Refinancing in respect of Indebtedness permitted pursuant to Section 10.1(f), such Permitted Refinancing Indebtedness shall have a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Refinanced Indebtedness, (d) the terms and conditions of any such Permitted Refinancing Indebtedness, taken as a whole, (i) are not materially more restrictive on or less favorable to the Borrower and its Restricted Subsidiaries than the terms and conditions of the Refinanced Indebtedness (including, if applicable, as to collateral priority and subordination, but excluding as to interest rates, fees, floors, funding discounts and redemption or prepayment premiums) or (ii) are (A) customary for similar indebtedness in light of current market conditions and (B) this Agreement is amended to incorporate any terms more restrictive than this Agreement; provided that a certificate of an Authorized Officer of the Borrower delivered to the Administrative Agent at least three (3) Business Days prior to the incurrence or issuance of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement and (e) if the Refinanced Indebtedness is subordinated in right of payment or security such Permitted Refinancing Indebtedness shall be subordinated on terms no less favorable to the Secured Parties. Notwithstanding the foregoing, Permitted Refinancing Indebtedness in respect of Permitted Additional Debt must constitute Permitted Additional Debt.

"Permitted Tax Distribution" shall have the meaning provided in Section 10.6(c)(i).

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"Petroleum Industry Standards" shall mean the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"Plan" shall mean any multiemployer or single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six plan years sponsored, maintained for or contributed to by (or to which there is or was an obligation to contribute or to make payments to) the Borrower or an ERISA Affiliate, or with respect to which the Borrower or an ERISA Affiliate has any actual or contingent liability.

"Preferred Stock" shall mean any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up (including, without limitation, the GSO Preferred Equity Interests).

"Prime Rate" shall mean the rate of interest *per annum* publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors).

"Pro Forma Basis" shall mean, with respect to compliance with any test or covenant or calculation of any ratio hereunder, the determination or calculation of such test, covenant or ratio (including in connection with Specified Transactions) in accordance with Section 1.11.

"Proceeding" shall have the meaning provided in Section 12.7.

"Production Payments and Reserve Sales" shall mean the grant or transfer by the Borrower or any of its Restricted Subsidiaries to any Person of (a) a contractual royalty, overriding royalty or net profits interest, production payment, partnership or other interest in Oil and Gas Properties or reserves or (b) the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"Prohibited Material Contract Amendments" shall mean (a) any amendment, change, supplement or modification, including through a consent or waiver, to the following provisions and definitions or that would permit the following to occur:

(i) with respect to the Joint Development Agreement, (A) Section 7.8 of the Joint Development Agreement (No Third Party Beneficiaries) as it relates to the Lenders, the Administrative Agent or the Qualified Foreclosure Transferee (as defined therein), (B) any change that would affect the Qualified Foreclosure Transferee's right to succeed to Borrower's rights under the Joint Development Agreement, (C) Section 3.2(g) and Section 3.2(h) of the Joint Development Agreement (Function of the Operating Committee), (D) the definition of "Unanimous Consent" and (E) any change or amendment the effect of which would be to remove the Borrower or the Qualified Foreclosure Transferee, as applicable, from the operating committee thereunder,

(ii) with respect to the Management Services Agreement, (A) Section 16 of the Management Services Agreement (No Third-Party Beneficiaries; Subsidiary Obligations) as they relate to the Lenders, the Administrative Agent or the Qualified Foreclosure Transferee (as defined therein), (B) Section 5(d) of the Management Services Agreement (Separateness Covenants) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)) and (C) any change that would affect the Qualified Foreclosure Transferee's right to succeed to Borrower's rights under the Management Services Agreement,

(iii) with respect to the Borrower's LPA, (A) Section 15.17 of the Borrower's LPA (Third Party Beneficiaries) as it relates to the Lenders or the Administrative Agent, (B) Section 15.1 of the Borrower's LPA (Amendments), (C) Section 15.22 of the Borrower's LPA (Partnership Covenants, Representations and Warranties) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)), (D) Section 5.9(b) of the Borrower's LPA (Independent Director; Separateness Covenants) and (E) any change which would permit Parent to withdraw as the Borrower's general partner to withdraw, and

(iv) with respect to the Parent LLCA, (A) Section 12.6 of the Parent LLCA (Third Party Beneficiaries) as it relates to the Lenders or the Administrative Agent, (B) Section 5.13 of the Parent LLCA (Company Covenants,

Representations and Warranties) (provided that changes to correct typographical or other manifest errors shall be permitted subject to the Borrower providing the Administrative Agent three (3) Business Days' prior written notice of such change (or such lesser time as may be agreed by the Administrative Agent in its sole discretion)) and (C) Section 12.5 of the Parent LLCA (Amendments); and

(b) any amendment, change, supplement or modification, including through a consent or waiver, to the following provisions and definitions or that would permit the following to occur in a manner adverse to the Lenders or the Borrower:

(i) with respect to the Joint Development Agreement, (A) any change which would change the standard that no consent is necessary from any party to the Joint Development Agreement in order for the Qualified Foreclosure Transferee (as defined therein) to join the Joint Development Agreement, (B) any change that affects the Administrative Agent's right to appoint the Qualified Foreclosure Transferee, (C) any change to the definition of "Qualified Foreclosure Transfer" or any provision providing for such transfer, (D) any amendment to the definition of "Foreclosure Transfer", (E) any change to Section 3.7(e) of the Joint Development Agreement, which limits the rights of the Borrower or the Qualified Foreclosure Transferee to propose wells or the taking of other actions to satisfy drilling commitments under the Development Agreement, (F) any change to Section 3.5 of the Joint Development Agreement (Quorum and Voting) and (G) any change to the definition or implementation of an Alternative Equitable Partition as set forth in Section 4.5 of the Joint Development Agreement (Sale Transaction),

(ii) with respect to the Development Agreement, at such time that GSO no longer holds Equity Interests in the Borrower, any changes to Section 2.1 of the Development Agreement (Commitment Wells) and Section 3.3 of the Development Agreement (Default),

(iii) with respect to the Marketing Agreement, at such time that GSO no longer holds Equity Interests in the Borrower, any change to Section 3.1 of the Marketing Agreement (Price) and the definitions of "Purchaser's Allocable Share of Midstream Charges", "Producer's Allocable Share of the Springfield Agreements" and "Producer's Allocable Share of the Other Contracts" only as they affect such provision, and

(iv) with respect to the Borrower's LPA and the Parent LLCA, any change to the independent director provisions, the definition of "Independent Director", "Cause", any other component definitions thereof only as they affect such provisions and voting rights for such independent director.

"Prohibited Preferred Amendments" shall mean any amendment, change, supplement or modification, including through a consent or waiver, to (a) the second sentence of Section 4.1(b) of the Borrower's LPA (Distributions) or any change that would eliminate the effect of such provision, (b) the first sentence of Section 14.2 of the Borrower's LPA (Optional Redemption) or any change that would eliminate the effect of such sentence or make the GSO Preferred Equity Interests due and payable in full upon an event of default and (c) include a maturity date or mandatory redemption provision to the GSO Preferred Equity Interests.

"Projections" shall mean financial estimates, forecasts and other forward-looking information prepared by or on behalf of the Borrower or any of its representatives and that have been made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby and the negotiation of the Credit Documents.

"Proposed Acquisition" shall have the meaning provided in Section 10.10(a).

"Proposed Borrowing Base" shall have the meaning provided in Section 2.14(c)(i).

"Proposed Borrowing Base Notice" shall have the meaning provided in Section 2.14(c)(ii).

"Proved Developed Producing Reserves" shall mean oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"Proved Reserves" shall mean oil and gas mineral interests that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves".

"Purchase and Sale Agreement" shall have the meaning provided to such term in the recitals of this Agreement.

"Purchase and Sale Agreement Representations" shall mean those certain representations and warranties made by the Seller and its Affiliates in the Purchase and Sale Agreement as are material to the interests of the Lenders, to the extent that the Borrower (or its Affiliates) has the right to terminate, collectively or individually, their obligations under the Purchase and Sale Agreement, or to decline to consummate the Acquisition, in whole or in part, as a result of a breach of such representations and warranties.

"PV-9" shall mean, with respect to any Proved Reserves expected to be produced from any Borrowing Base Properties, the net present value, discounted at 9% *per annum*, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves calculated in accordance with the most recent Bank Price Deck.

"Qualified Equity Interests" shall mean any Equity Interests of the Borrower or any Parent Entity other than Disqualified Stock.

"Qualified Preferred Equity" shall mean Preferred Stock of the Borrower that is on the same terms as or on terms no less favorable to the Lenders or Borrower than the terms of the GSO Preferred Equity Interests that are issued on the Closing Date.

"Qualifying IPO" shall mean the issuance by Holdings or Parent of its Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"Redeem" shall mean, with respect to any Equity Interests, the redemption, repurchase, retirement or other acquisition or retirement for value of such Equity Interests. "Redemption" shall have a correlative meaning.

"Redetermination Date" shall mean, with respect to any Scheduled Redetermination or any Interim Redetermination, the date that the redetermined Borrowing Base related thereto becomes effective pursuant to Section 2.14(d).

"Refinance" shall have the meaning provided in the definition of Permitted Refinancing Indebtedness contained in this Section 1.1.

"Register" shall have the meaning provided in Section 13.6(b)(iv).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Date" shall have the meaning provided in Section 3.4(a).

"Related Indemnified Person" shall mean, with respect to an Indemnitee, (a) any controlling Person or controlled Affiliate of such Indemnitee, (b) the respective directors, officers, or employees of such Indemnitee or any of its controlling

Persons or controlled Affiliates and (c) the respective agents and representatives of such Indemnitee or any of its controlling Persons or controlled Affiliates, in the case of this clause (c), acting at the instructions of such Indemnitee, controlling Person or such controlled Affiliate.

"Reportable Event" shall mean an event described in Section 4043(c) of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Requested Interim Redetermination" shall have the meaning provided in Section 2.14(b).

"Required Cash Collateral Amount" shall have the meaning provided in Section 3.7(c).

"Required Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding at least 66.67% of the Adjusted Total Commitment at such date or (b) if the Total Commitment has been terminated,

Non-Defaulting Lenders having or holding at least 66.67% of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" shall mean (a) the Initial Reserve Report and (b) (i) any other subsequent report, in form reasonably satisfactory to the Administrative Agent and/or (ii) any other engineering data reasonably acceptable to the Administrative Agent, setting forth, as of each January 1st or July 1st (or such other date in the event of certain Interim Redeterminations) the Proved Reserves attributable to the Borrowing Base Properties, together with a projection of the rate of production and future net revenues, operating expenses (including production taxes and ad valorem expenses) and capital expenditures with respect thereto as of such date, based upon the most recent Bank Price Deck; provided that in connection with any Interim Redeterminations of the Borrowing Base pursuant to the last sentence of Section 2.14(b), the Borrower shall only be required, for purposes of updating the Reserve Report, to set forth such additional Proved Reserves and related information as are the subject of such acquisition.

"Reserve Report Certificate" shall mean a certificate of an Authorized Officer in substantially the form of Exhibit A certifying as to the matters set forth in Section 9.12(c).

"Restricted Payments" shall have the meaning provided in Section 10.6.

"Restricted Subsidiary" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"S&P" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"Sanchez" shall mean Sanchez Energy Corporation, a Delaware corporation.

"Sanchez Cash Contribution" shall mean the contribution by Sanchez and its subsidiaries, directly or indirectly, to the Borrower in an aggregate amount not less than $100,000,000 for common limited partner interests issued by the Borrower to Holdings.

"Sanchez Indenture Change of Control" shall mean "Change of Control" as defined in the Sanchez Specified Indenture on the date hereof.

"Sanchez O&G" shall mean Sanchez Oil & Gas Corporation, a Delaware corporation.

"Sanchez Parent Credit Agreement" shall mean that certain Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez, Royal Bank of Canada, as Administrative Agent, the other agents party thereto and the lenders party thereto, as the same may be amended, restated, supplemented, replaced, refinanced or otherwise modified from time to time.

"Sanchez Permitted Holders" shall mean (a) Sanchez and its Controlled Investment Affiliates which Sanchez controls, (b) the officers, directors, employees and other members of management of the Persons described in clause (a) and (c) Antonio R. Sanchez, III and A.R. Sanchez, Jr. and their Immediate

Family Members; provided that for purposes of the definition of "Change of Control" the Persons described in clause (c) above shall not constitute Permitted Holders at any time they hold voting power equal to or more than 50% of all Equity Interests collectively and beneficially held by the Persons described in clauses (a) and (b) above.

"Sanchez Specified Indebtedness" shall mean (a) the Sanchez Parent Credit Agreement, (b) that certain 6.125% Senior Secured Notes Due 2023 Indenture dated June 27, 2014 among Sanchez, the guarantors party thereto, and U.S. Bank National Association, as trustee (the "Sanchez Specified Indenture"), (c) that certain 7.75% Senior Notes Due 2021 Indenture dated June 13, 2013 among Sanchez, the guarantors party thereto, and U.S. Bank National Association, as trustee, as supplemented by that certain First Supplemental Indenture, dated as of September 11, 2013 and as further supplemented by that certain Second Supplemental Indenture, dated as of June 2, 2014 and (d) other indebtedness of the type described in clause (a) and (b) of the definition of Indebtedness (including refinancings and replacements of the foregoing) of Sanchez and its subsidiaries that are not "unrestricted subsidiaries" under and pursuant to the terms of the Sanchez Specified Indebtedness.

"Sanchez Specified Indenture" shall have the meaning provided in the definition of Sanchez Specified Indebtedness contained in this Section 1.1.

"Sanctioned Country" shall mean, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" shall mean at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council, the European Union, any EU member state, the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"Sanctions" shall mean all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state, the United Kingdom or other relevant sanctions authority.

"Satisfactorily Cash Collateralized or Backstopped" shall mean, with respect to any Letter of Credit, to (a) pledge and deposit with the Issuing Bank in respect of such Letter of Credit as collateral for the L/C Obligations in respect of such Letter of Credit, cash or deposit account balances in an amount equal to 103% of the amount of the Letters of Credit Outstanding in respect of such Letter of Credit or (b) if the Administrative Agent and relevant Issuing Bank benefiting from such collateral shall agree in their reasonable discretion, other forms of credit support (including any backstop letter of credit) in an amount equal to 103% of the amount of the Letters of Credit Outstanding in respect of such Letter of Credit from an issuer reasonably satisfactory to the Administrative Agent and such Issuing Bank, in each case under clause (a) and (b) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank.

"Scheduled Redetermination" shall have the meaning provided in Section 2.14(b).

"Scheduled Redetermination Date" shall mean the date on which a Borrowing Base that has been redetermined pursuant to a Scheduled Redetermination becomes effective as provided in Section 2.14.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Cash Management Agreement" shall mean any agreement related to Cash Management Services by and between the Borrower or any of its Restricted Subsidiaries and any Cash Management Bank.

"Secured Hedge Agreement" shall mean any Hedge Agreement by and between the Borrower or any of its Restricted Subsidiaries and any Hedge Bank.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, Issuing Bank, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each Subagent pursuant to Section 12.2 appointed by the Administrative Agent with respect to matters relating to the Credit Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Account" shall have the meaning assigned to such term in the UCC.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Documents" shall mean, collectively, (a) the Collateral Agreement, (b) the Mortgages and (c) each other security agreement or other instrument or document executed and delivered pursuant to Section 9.9 or Section 9.11 or pursuant to any other such Security Documents or otherwise to secure or perfect the security interest in any or all of the Obligations.

"Seller" and "Sellers" shall have the meaning provided to such term in the recitals of this Agreement.

"Side Letter Agreement" shall mean the side letter agreement between Sanchez, the Borrower and SN EF Maverick, LLC dated as of January 12, 2017 as amended, restated, replaced or otherwise modified in accordance with the terms of this Agreement (including Section 10.13) and any Additional Material Contract that replaces such agreement in accordance of the terms hereof.

"Solvent" shall mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the assets of such Person and its Restricted Subsidiaries, on a consolidated basis, exceeds their debts and liabilities, subordinated, contingent or otherwise, (b) the present fair saleable value of the property of such Person and its Restricted Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured, (c) such Person and its Restricted Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured and (d) such Person and its Restricted Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital. The amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability.

"Specified Additional Debt" shall mean any unsecured senior, senior subordinated, subordinated loans or notes or other unsecured funded debt or any Junior Debt issued or incurred by the Borrower or a Restricted Subsidiary (including any Indebtedness incurred pursuant to Section 10.1(b), Section 10.1(j) and Section 10.1(k)).

"Specified Contractual Requirements" shall mean, with respect to any Person, the terms of any applicable Organizational Documents, joint venture agreement, shareholders' agreement or similar agreement.

"Specified Representations" shall mean, collectively, the representations and warranties of the Borrower provided in the following sections of this Agreement: Section 8.1(a)(ii), Section 8.2, Sections 8.3(c), Section 8.5, Section 8.7, Section 8.14, Section 8.15, Section 8.19 and Section 8.20 (with respect to the last sentence).

"Specified Subsidiary" shall mean, at any date of determination any Restricted Subsidiary (a) whose Total Assets at the last day of the applicable Test Period were equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and

the Restricted Subsidiaries at such date, or (b) whose revenues during such Test Period were equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP.

"Specified Transaction" shall mean (a) solely for the purposes of determining the applicable cash balance, any contribution of capital, including as a result of an equity issuance, to the Borrower, in each case, in connection with an acquisition or Investment, (b) any designation of operations or assets of the Borrower or a Restricted Subsidiary as discontinued operations (as defined under GAAP) (excluding held-for-sale discontinued operations until actually disposed of), (c) any Investment that results in a Person becoming a Restricted Subsidiary, (d) any designation of a Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary in compliance with this Agreement, (e) any purchase or other acquisition of a business of any Person, of assets constituting a business unit, line of business or division of any Person or the purchase or acquisition of any material Oil and Gas Properties (as determined by the Borrower in good faith), (f) any Disposition (i) that results in a Restricted Subsidiary ceasing to be a Subsidiary of the Borrower or (ii) of a business, business unit, line of business or division of the Borrower or a Restricted Subsidiary or material Oil and Gas Properties (as determined by the Borrower in good faith) or (g) any Investment, issuance or incurrence of Indebtedness, Restricted Payment or transaction under Section 10.7 that by the terms of this Agreement requires a financial ratio to be calculated on a Pro Forma Basis.

"SPV" shall have the meaning provided in Section 13.6(g).

"Stated Amount" of any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"Subagent" shall have the meaning provided in Section 12.2.

"Subsidiary" shall mean, with respect to any Person: (a) any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50.0% of the total voting power of shares of Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, members of management or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; and (b) any partnership, joint venture, limited liability company or similar entity of which: (i) more than 50.0% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and (ii) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity. Unless otherwise specified, "Subsidiary" shall mean a Subsidiary of the Borrower.

"Subsidiary Guarantor" shall mean each Subsidiary that is a Guarantor.

"Subsidiary Redesignation" shall have the meaning provided in the definition of "Unrestricted Subsidiary" contained in this Section 1.1.

"Swap" shall mean any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap PV" shall mean, as of any date of determination, with respect to any commodity Hedge Agreement, the present value, discounted at 9% *per annum*, of the future receipts expected to be paid to the Borrower or its Restricted Subsidiaries under such Hedge Agreement as of such date based on the Administrative Agent's then current Bank Price Deck; provided, that the "Swap PV" shall never be less than $0.00.

"Swap Termination Value" shall mean, in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, the sum of any unpaid amount in respect of such Hedge Agreement and such termination value(s), and (b) for any date prior to the date referenced in

clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Agreements (which may include a Lender or any Affiliate of a Lender).

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" shall mean the earlier to occur of (a) the Maturity Date and (b) the date on which the Total Commitment shall have terminated.

"Test Period" shall mean (subject to Section 1.11(a)), as of any date of determination, the four consecutive fiscal quarters of the Borrower then last ended and for which financial statements have been delivered to the Administrative Agent in accordance with clause (a) or (b) of Section 9.1; provided that with respect to dates of determination prior to the date when financials statements have been delivered to the Administrative Agent in accordance with Section 9.1(a) for the fiscal year of the Borrower ending December 31, 2017, the Test Period shall not be such four consecutive four fiscal quarters of the Borrower then last ended, but instead shall be one, two or three fiscal consecutive quarters of the Borrower then last ended based on customary annualization mechanics that are further described in Section 1.11(e).

"Total Assets" shall mean the total assets of any Person determined in accordance with GAAP as shown on the most recent balance sheet of such Person.

"Total Commitment" shall mean the sum of the Commitments of the Lenders.

"Total Exposure" shall mean, with respect to any Lender at any time, the sum of (a) the aggregate principal amount of the Loans of such Lender then outstanding and (b) such Lender's Letter of Credit Exposure at such time.

"Trademark" shall have the meaning assigned to such term in the Collateral Agreement.

"Transaction Expenses" shall mean any fees or expenses incurred or paid by the Borrower or any of its Subsidiaries (or by Sanchez or any direct or indirect Parent Entity of the Borrower and reimbursed by the Borrower) in connection with the Transactions, this Agreement and the other Credit Documents and the transactions contemplated hereby and thereby.

"Transactions" shall mean, collectively, the Acquisition and the consummation of the other transactions contemplated by the Purchase and Sale Agreement or related thereto, this Agreement, the payment of Transaction Expenses and the other transactions contemplated by this Agreement and the Credit Documents.

"Transferee" shall have the meaning provided in Section 13.6(e).

"Type" shall mean, as to any Loan, its nature as an ABR Loan or a LIBOR Loan.

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection or priority of security interests in any Collateral.

"Unfunded Current Liability" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the date hereof, exceeds the Fair Market Value of the assets allocable thereto.

"Uniform Customs" shall mean, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits as approved by the International Chamber of Commerce, commencing on July 1, 2007 (or such later version thereof as may be in effect at the time of issuance).

"Unpaid Drawing" shall have the meaning provided in Section 3.4(a).

"Unrestricted Cash" shall mean cash or cash equivalents (including Permitted Investments) of the Borrower or any of its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any of its Restricted Subsidiaries; provided that, such Unrestricted Cash shall exclude any cash and cash equivalents of the Borrower and the Restricted Subsidiaries that are (a) set aside in a segregated cash collateral or escrow account for the benefit of a party other than the Borrower, a Guarantor or the Administrative Agent or (b) subject to an account control or securities account control agreement in favor of a third party other than the Administrative Agent.

"Unrestricted Subsidiary" shall mean (a) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; provided that, (i) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the Fair Market Value of the Borrower's investment therein on such date of designation and such designation shall be permitted only to the extent such Investment is permitted under Section 10.5 on the date of such designation, (ii) such designation shall be deemed to be a Disposition pursuant to which the provisions of Section 2.14(f) will apply to the extent contemplated thereby and (iii) no Default, Event of Default or Borrowing Base Deficiency exists or would result from such designation immediately after giving effect thereto and (b) each Subsidiary of an Unrestricted Subsidiary. No Subsidiary may be designated as an Unrestricted Subsidiary if, after such designation, it would be a "Restricted Subsidiary" for the purpose of any Specified Additional Debt or any Permitted Refinancing Indebtedness thereof, in each case, to the extent applicable. The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary (each, a "Subsidiary Redesignation"), and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if (A) to the extent such Subsidiary has outstanding Indebtedness on the date of such designation, immediately after giving effect to such designation, no Borrowing Base Deficiency exists and (B) no Default or Event of Default would result from such Subsidiary Redesignation.

"U.S. Lender" shall mean any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Volumetric Production Payment" shall mean, production payment obligations recorded as deferred revenue in accordance with GAAP, together with all undertakings and obligations in connection therewith.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining scheduled installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final scheduled maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness; provided that the effects of any prepayments made on such Indebtedness shall be disregarded in making such calculation.

"Wholly owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly owned Subsidiary of such person.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2 Other Interpretive Provisions. With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b) The words “herein”, “hereto”, “hereof” and “hereunder” and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c) Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d) The terms “include,” “includes,” and “including” are by way of example and not limitation.

(e) The term “documents” includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f) In the computation of periods of time from a specified date to a later specified date, the word “from” means “from and including”; the words “to” and “until” each mean “to but excluding”; and the word “through” means “to and including”.

(g) Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h) Any reference to any Person shall be constructed to include such Person’s successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(i) Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(j) The word “will” shall be construed to have the same meaning as the word “shall”.

(k) The words “asset” and “property” shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

(l) The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

1.3 Accounting Terms. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at “fair value”, as defined therein and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. In the event that any “Accounting Change” shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating the Borrower’s financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Majority Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. “Accounting Changes” refers to changes

in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

1.4 Rounding. Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5 References to Agreements, Laws, Etc. Unless otherwise expressly provided herein, (a) references to Organizational Documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

1.6 Times of Day. Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

1.7 Timing of Payment or Performance. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.9) or performance shall extend to the immediately succeeding Business Day.

1.8 Classification of Loans and Borrowings. For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "LIBOR Loan").

1.9 Hedging Requirements Generally. For purposes of any determination with respect to compliance with Section 8.18 or Section 10.10 or any other calculation under or requirement of this Agreement in respect of hedging shall be calculated separately for crude, gas and natural gas liquid.

1.10 Certain Determinations. For purposes of determining compliance with a covenant set forth in Section 10.1, 10.2, 10.4, 10.5, 10.6, 10.7 and 10.14, but subject to any limitation expressly set forth therein, as applicable, at any time (whether at the time of incurrence or thereafter), any Lien, Investment, Indebtedness, Disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction meets the criteria of one, or more than one, of the exclusions to such covenant permitted pursuant to Section 10.1, 10.2, 10.4, 10.5, 10.6, 10.7 and 10.14, the Borrower shall, in its sole discretion, determine under which such exclusion to such covenant such Lien, Investment, Indebtedness, Disposition, Restricted Payment, Affiliate transaction, prepayment, redemption or the consummation of any other transaction (or, in each case, any portion thereof) is permitted.

1.11 Pro Forma and Other Calculations.

(a) Notwithstanding anything to the contrary herein, financial ratios and tests, including the Consolidated Total Net Leverage Ratio and the Current Ratio, and compliance with covenants determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities) shall be calculated in the manner prescribed by this Section 1.11; provided, that notwithstanding anything to the contrary in Section 1.11(b), Section 1.11(c) or Section 1.11(d), when calculating the Consolidated Total Net Leverage Ratio and Current Ratio for purposes of Section 10.11 (other than for the purpose of determining *pro forma* compliance with Section 10.11), the events described in this Section 1.11 that occurred subsequent to the end of the applicable Test Period shall not be given *pro forma* effect. In addition, if the Borrower provides to the Administrative Agent the same certifications that it would provide under Section 9.01(b) with respect to internal financial statements of the Borrower, whenever a financial ratio or test is to be calculated on a Pro Forma Basis, the reference to the "Test Period" for purposes of calculating such financial ratio or test shall be deemed to be a reference to, and shall be based on, the most recently ended Test Period for which such internal financial

statements of the Borrower are available (as determined in good faith by the Borrower). For the avoidance of doubt, the provisions of the foregoing sentence shall not apply for purposes of calculating the Consolidated Total Net Leverage Ratio or Current Ratio for purposes of Section 10.11 (other than for the purpose of determining *pro forma* compliance with Section 10.11), which shall be based on the financial statements delivered pursuant to Section 9.1(a) or Section 9.1(b), as applicable, for the relevant Test Period.

(b) For purposes of calculating any financial ratio or test or compliance with any covenant determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities), Specified Transactions (with any incurrence or repayment of any Indebtedness in connection therewith to be subject to Section 1.11(d)) that have been made (i) during the applicable Test Period or (ii) if applicable as described in Section 1.11(a), subsequent to such Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made shall be calculated on a Pro Forma Basis assuming that all such Specified Transactions (and any increase or decrease in Consolidated EBITDAX and the component financial definitions used therein attributable to any Specified Transaction) had occurred on the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities, on the last day of the applicable Test Period). If since the beginning of any applicable Test Period any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such Test Period shall have made any Specified Transaction that would have required adjustment pursuant to this Section 1.11, then such financial ratio or test or compliance with any covenant determined by reference to Consolidated EBITDAX (or Consolidated Total Assets, Total Assets, PV-9, Consolidated Current Assets or Consolidated Current Liabilities) shall be calculated to give *pro forma* effect thereto in accordance with this Section 1.11.

(c) Whenever *pro forma* effect is to be given to a Specified Transaction, the *pro forma* calculations shall be made in good faith by a Financial Officer of the Borrower and may include, for the avoidance of doubt, the amount of "run rate" cost savings, operating expense reductions and synergies resulting from or relating to any Specified Transactions (including the Transaction) which shall be determined in accordance with clause (a)(vi) of the definition of "Consolidated EBITDAX"; provided, for the avoidance of doubt, no amounts shall be added pursuant to this Section 1.11(c) to the extent duplicative of any amounts that are otherwise added back in computing Consolidated EBITDAX (or any other components thereof), whether through a *pro forma* adjustment or otherwise, with respect to such period.

(d) In the event that (i) the Borrower or any Restricted Subsidiary incurs (including by assumption or guarantees) or repays (including by redemption, repayment, retirement, discharge, defeasance or extinguishment) any Indebtedness (other than Indebtedness incurred or repaid under any revolving credit facility unless such Indebtedness has been permanently repaid and not replaced), (ii) the Borrower or any Restricted Subsidiary issues, repurchases or redeems Disqualified Stock or (iii) any Restricted Subsidiary issues, repurchases or redeems Preferred Stock, (A) during the applicable Test Period or (B) subsequent to the end of the applicable Test Period and prior to or simultaneously with the event for which the calculation of any such ratio is made, then such financial ratio or test shall be calculated giving *pro forma* effect to such incurrence or repayment of Indebtedness or such issuance, refinancing or redemption of Disqualified Stock or Preferred Stock to the extent required, as if the same had occurred on the last day of the applicable Test Period.

(e) For the purposes of calculating the Financial Performance Covenant set forth in Section 10.11(a), Consolidated EBITDAX for the fiscal quarter of the Borrower ending (i) June 30, 2017, shall be equal to Consolidated EBITDAX for the fiscal quarter of the Borrower ending on such date multiplied by 4, (ii) September 30, 2017, shall be equal to Consolidated EBITDAX for the two consecutive fiscal quarters of the Borrower ending on such date multiplied by two and (iii) December 31, 2017, shall be equal to Consolidated EBITDAX for the three consecutive fiscal quarters of the Borrower ending on such date multiplied by 4/3; provided that (A) if a calculation of Consolidated EBITDAX is required prior to the delivery of quarterly financial statements for the fiscal quarter of the Borrower ended March 31, 2017 pursuant to Section 9.1(b), then Consolidated EBITDAX shall be equal to (x) the Consolidated EBITDAX for the fiscal quarter ending September 30, 2016 multiplied by two plus (y) the Consolidated EBITDAX for the fiscal quarter ending December 31, 2016 multiplied by two and (B) if Consolidated EBITDAX is required for any Test Period prior to the delivery of quarterly financial statements for the fiscal quarter of the Borrower ended June 30, 2017 pursuant to Section 9.1(b), then Consolidated EBITDAX shall be equal to (x) the

Consolidated EBITDAX for the fiscal quarter ending December 31, 2016 multiplied by two plus (y) the Consolidated EBITDAX for the fiscal quarter ending March 31, 2017 multiplied by two.

SECTION 2. AMOUNT AND TERMS OF CREDIT

2.1 Commitments.

(a) Subject to and upon the terms and conditions herein set forth, each Lender severally, but not jointly, agrees to make a loan or loans denominated in Dollars (each a "Loan" and, collectively, the "Loans") to the Borrower, which Loans (i) shall be made at any time and from time to time on and after the Closing Date and prior to the Termination Date, (ii) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; provided that all Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type, (iii) may be repaid and reborrowed in accordance with the provisions hereof, (iv) shall not, for any Lender at any time, after giving effect thereto and to the application of the proceeds thereof, result in such Lender's Total Exposure at such time exceeding such Lender's Commitment Percentage at such time of the Loan Limit and (v) shall not, after giving effect thereto and to the application of the proceeds thereof, result in the aggregate amount of all Lenders' Total Exposures at such time exceeding the Loan Limit.

(b) Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan, provided that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of Section 2.10 shall apply).

2.2 Minimum Amount of Each Borrowing; Maximum Number of Borrowings. The aggregate principal amount of each Borrowing shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Loans and in a multiple of $100,000 in excess thereof and Loans to reimburse the applicable Issuing Bank with respect to any Unpaid Drawing shall be made in the amounts required by Section 3.3 or Section 3.4, as applicable. More than one Borrowing may be incurred on any date; provided, that at no time shall there be outstanding more than ten Borrowings of LIBOR Loans under this Agreement.

2.3 Notice of Borrowing.

(a) Whenever the Borrower desires to incur Loans (other than borrowings to repay Unpaid Drawings), the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. (New York City time) at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Loans if such Loans are to be initially LIBOR Loans and (ii) written notice (or telephonic notice promptly confirmed in writing) prior to 11:00 a.m. (New York City time) on the date of each Borrowing of Loans that are to be ABR Loans. Such Notice of Borrowing shall specify (A) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (B) the date of the Borrowing (which shall be a Business Day) and (C) whether the respective Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall promptly give each Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Loans, of such Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(b) Borrowings to reimburse Unpaid Drawings shall be made upon the notice specified in Section 3.4(a).

(c) Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

2.4 Disbursement of Funds.

(a) No later than 1:00 p.m. (New York City time) on the date specified in each Notice of Borrowing, each Lender will make available its *pro rata* portion of each Borrowing requested to be made on such date in the manner provided below.

(b) Each Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will (except in the case of Borrowings to repay Unpaid Drawings) make available to the Borrower, by depositing or wiring to a Controlled Account as designated by the Borrower in the Notice of Borrowing to the Administrative Agent the aggregate of the amounts so made available in Dollars. Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing (or, with respect to an ABR Loan, the date of such Borrowing prior to 1:00 p.m. (New York City time)) that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate *per annum* equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the respective Loans.

(c) Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5 Repayment of Loans; Evidence of Debt.

(a) The Borrower agrees to repay to the Administrative Agent, for the benefit of the applicable Lenders, on the earlier of (i) the Termination Date and (ii) on the Maturity Date, the then outstanding Loans.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office from time to time, including the amounts of principal and interest payable and paid to such lending office from time to time under this Agreement.

(c) The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.6(b)(iv), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d) The entries made in the Register and accounts and subaccounts maintained pursuant to Sections 2.5(b) and (c) shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner

affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.6 Conversions and Continuations.

(a) Subject to the penultimate sentence of this Section 2.6(a), (i) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount (and in multiples of $100,000 in excess thereof) of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type and (ii) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; provided that (A) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (B) ABR Loans may not be converted into LIBOR Loans if an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such conversion, (C) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, and (D) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. (New York City time) at least (1) three Business Days', in the case of a continuation of or conversion to LIBOR Loans or (2) the date of conversion, in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "Notice of Conversion or Continuation") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into or continued as LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b) If any Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in Section 2.6(a) above, the Borrower shall be deemed to have elected to continue such Borrowing of LIBOR Loans into a Borrowing of LIBOR Loans having an interest period of one month, effective as of the expiration date of such current Interest Period.

2.7 Pro Rata Borrowings. Each Borrowing of Loans under this Agreement shall be made by the Lenders *pro rata* on the basis of their then applicable Commitment Percentages. It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8 Interest.

(a) The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable Margin plus the ABR, in each case, in effect from time to time.

(b) The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate *per annum* that shall at all times be the Applicable Margin plus the relevant LIBOR Rate, in each case, in effect from time to time.

(c) If all or a portion of (i) the principal amount of any Loan or (ii) any other amount payable under the Credit Documents (including, without limitation, interest payable thereon and premium, if any) shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate *per annum* that is (the "Default Rate") (A) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2.00%, (B) in the case of any overdue interest, to the extent permitted by applicable Requirements of Law, the rate described in Section 2.8(a) plus 2.00% from and including the date of such non-payment to the date on which such amount is paid in full (after as well as before judgment) and (C) in the case of any overdue amount not specified in Sections 2.8(c)(A) or 2.8(c)(B) above, a rate *per annum* equal to the rate *per annum* otherwise payable at such time on ABR Loans plus 2.00% (or if after maturity, at the interest rate payable on ABR Loans as of the maturity date plus 2.00%).

(d) Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; provided that any Loan that is repaid on the same date on which it is made shall bear interest for one day. Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the last Business Day of each March, June, September and December, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period and (iii) in respect of each Loan, (A) on any prepayment (on the amount prepaid), (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(e) All computations of interest hereunder shall be made in accordance with Section 5.5.

(f) The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof. Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.9 Interest Periods. At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower be (i) a one-, two-, three- or six- or (if agreed by all the Lenders making such LIBOR Loans) a twelve-month period or (ii) any period shorter than one month (if agreed by all the Lenders making such LIBOR Loans) as requested by the Borrower.

Notwithstanding anything to the contrary contained above:

(a) the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b) if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c) if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day, but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d) the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the Maturity Date.

2.10 Increased Costs, Illegality, Etc.

(a) In the event that (x) in the case of Section 2.10(a)(i) below, the Majority Lenders or (y) in the case of Sections 2.10(a)(ii) and 2.10(a)(iii) below, any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i) on any date for determining the LIBOR Rate for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Borrowing are not generally available in the relevant market or (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate; or

(ii) any Lender shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto), that a Change in Law occurring at any time after the Closing Date shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender to any Tax (other than (1) Indemnified Taxes or Other Taxes, or (2) Excluded Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (C) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or LIBOR Loans made by such Lender, which results in the cost to such Lender of making, converting into, continuing or maintaining LIBOR Loans or participating in Letters of Credit (in each case hereunder) increasing by an amount which such Lender reasonably deems material or the amounts received or receivable by such Lender hereunder with respect to the foregoing shall be reduced; or

(iii) at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of Section 2.10(a)(i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of Section 2.10(a)(i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion or Continuation given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of Section 2.10(a)(ii) above, the Borrower shall pay to such Lender, promptly (but no later than fifteen days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto and (z) in the case of Section 2.10(a)(iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b) At any time that any LIBOR Loan is affected by the circumstances described in Sections 2.10(a)(ii) or 2.10(a)(iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (i) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Sections 2.10(a)(ii) or 2.10(a)(iii) or (ii) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; provided that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c) If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity requirements of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity

requirements occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity requirements), then from time to time, promptly (but in any event no later than fifteen days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give any such notice shall not, subject to Section 2.13, release or diminish the Borrower's obligations to pay additional amounts pursuant to this Section 2.10(c) upon receipt of such notice.

2.11 Compensation. If (a) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to Section 2.5, Section 2.6, Section 2.10, Section 5.1, Section 5.2 or Section 13.7, as a result of acceleration of the maturity of the Loans pursuant to Section 11 or for any other reason, (b) any Borrowing of LIBOR Loans is not made on the date specified in a Notice of Borrowing, (c) any ABR Loan is not converted into a LIBOR Loan on the date specified in a Notice of Conversion or Continuation, (d) any LIBOR Loan is not continued as a LIBOR Loan on the date specified in a Notice of Conversion or Continuation or (e) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to Section 5.1 or Section 5.2, the Borrower shall after the Borrower's receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent (within fifteen days after such request) for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

2.12 Change of Lending Office. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), Section 2.10(a)(iii), Section 2.10(c), Section 3.11 or Section 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, Section 3.11 or Section 5.4.

2.13 Notice of Certain Costs. Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, Section 2.11 or Section 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, Tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, Section 2.11 or Section 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.14 Borrowing Base.

(a) Initial Borrowing Base. For the period from and including the Closing Date to but excluding the first Redetermination Date, the Borrowing Base shall be $330,000,000; provided that, if less than 95% of the PV-9 of the Acquired Assets identified in the Initial Reserve Report are acquired, such amount may be reduced by the amount the Administrative Agent deems appropriate in good faith in accordance with its usual and customary oil and gas lending criteria as they exist at the particular time (and approved by the Required Lenders) but in no case shall such reduction exceed the PV-9 of the Proved

Reserves in respect of the Acquired Assets that were not acquired. Notwithstanding the foregoing, the Borrowing Base may be subject to further adjustments from time to time pursuant to the Borrowing Base Adjustment Provisions.

(b) Scheduled and Interim Redeterminations. The Borrowing Base shall be redetermined semi-annually in accordance with this Section 2.14 (a "Scheduled Redetermination"), and, subject to Section 2.14(d), such redetermined Borrowing Base shall become effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders on (x) the date that is sixty (60) days after the Closing Date, (y) October 1, 2017 and (z) thereafter, April 1st and October 1st of each year (or, in each case, as promptly as possible thereafter). In addition, (i) the Borrower may at any time, by notifying the Administrative Agent thereof, (A) once prior to the date of the first Scheduled Redetermination and (B) once during the period between any two Scheduled Redeterminations, and (ii) the Administrative Agent, following the date of the first Scheduled Redetermination, may, including at the direction of the Majority Lenders, by notifying the Borrower thereof, once during the period between two Scheduled Redeterminations, in each case elect to cause the Borrowing Base to be redetermined between Scheduled Redeterminations (a "Requested Interim Redetermination") in accordance with this Section 2.14. In addition to, and not including and/or limited by the Requested Interim Redeterminations allowed above, the Borrower may, by notifying the Administrative Agent thereof, at any time between Scheduled Redeterminations, request additional Requested Interim Redeterminations of the Borrowing Base in the event it acquires Oil and Gas Properties with Proved Reserves which are to be Borrowing Base Properties having a PV-9 (calculated at the time of acquisition) in excess of 5.0% of the Borrowing Base in effect immediately prior to such acquisition (as determined by the Administrative Agent); provided that for purposes of the foregoing, the designation of an Unrestricted Subsidiary owning Oil and Gas Properties with Proved Reserves as a Restricted Subsidiary shall be deemed to constitute an acquisition by the Borrower of Oil and Gas Properties with Proved Reserves. Substantially contemporaneously with the consummation of the Alternative Equitable Partition in accordance with Section 10.4(p), there shall be an additional Borrowing Base redetermination (an "Alternative Equitable Partition Redetermination" and together with Requested Interim Redeterminations, "Interim Redeterminations").

(c) Scheduled and Interim Redetermination Procedure.

(i) Each Scheduled Redetermination and each Interim Redetermination shall be effectuated as follows: upon receipt by the Administrative Agent of (A) the Reserve Report and the Reserve Report Certificate, and (B) such other reports, data and supplemental information, including the information provided pursuant to Section 9.12(c) or Section 10.4(p)(ii), as may, from time to time, be reasonably requested by the Required Lenders (the Reserve Report, such Reserve Report Certificate and such other reports, data and supplemental information being the "Engineering Reports"), the Administrative Agent shall evaluate the information contained in the Engineering Reports and shall in good faith propose a new Borrowing Base (the "Proposed Borrowing Base") based upon such information and such other information (including the status of title information with respect to the Borrowing Base Properties as described in the Engineering Reports and the existence of any Hedge Agreements or any other Indebtedness) as the Administrative Agent deems appropriate in good faith in accordance with its usual and customary oil and gas lending criteria as they exist at the particular time.

(ii) The Administrative Agent shall notify the Borrower and the Lenders of the Proposed Borrowing Base (the "Proposed Borrowing Base Notice"):

(A) in the case of a Scheduled Redetermination, (1) if the Administrative Agent shall have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely manner, then on or before thirty (30) days prior to the date of the first Scheduled Redetermination, September 1, 2017 and thereafter, March 1 and September 1 of such year following the date of delivery or (2) if the Administrative Agent shall not have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely manner, then promptly after the Administrative Agent has received complete Engineering Reports from the Borrower and has had a reasonable opportunity to determine the Proposed Borrowing Base in accordance with Section 2.14(c)(i); and

(B) in the case of an Interim Redetermination, promptly, and in any event, within 15 days after the Administrative Agent has received the required Engineering Reports and/or other information as may be required pursuant to Section 10.4(p)(ii).

(iii) Any Proposed Borrowing Base that would increase the Borrowing Base then in effect must be approved by each Lender in each such Lender's sole discretion and consistent with each such Lender's normal and customary oil and gas lending criteria as they exist at the particular time as provided in this Section 2.14(c)(iii) and any Proposed Borrowing Base that would decrease or maintain the Borrowing Base then in effect must be approved or be deemed to have been approved by Lenders constituting at least the Required Lenders in each such Lender's sole discretion and consistent with each such Lender's normal and customary oil and gas lending criteria as they exist at the particular time as provided in this Section 2.14(c)(iii). Upon receipt of the Proposed Borrowing Base Notice, each Lender shall have 15 days to agree with the Proposed Borrowing Base or disagree with the Proposed Borrowing Base by proposing an alternate Borrowing Base. If, however, at the end of such 15-day period, each Lender or the Required Lenders, as applicable, have not approved, as aforesaid, then the Administrative Agent shall promptly thereafter poll the Lenders to ascertain the highest Borrowing Base then acceptable to the each Lender (in the case of any increase to the Borrowing Base) or a number of Lenders sufficient to constitute the Required Lenders (in any other case) and such amount shall become the new Borrowing Base, effective on the date specified in Section 2.14(d).

(d) Effectiveness of a Redetermined Borrowing Base. Subject to Section 2.14(h), after a redetermined Borrowing Base is approved by each Lender or the Required Lenders, as applicable, pursuant to Section 2.14(c)(iii), the Administrative Agent shall promptly thereafter notify the Borrower and the Lenders of the amount of the redetermined Borrowing Base (the "New Borrowing Base Notice"), and such amount shall become the new Borrowing Base, effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders:

(i) in the case of a Scheduled Redetermination, (A) if the Administrative Agent shall have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely and complete manner, on the date that is sixty (60) days after the Closing Date, October 1, 2017 and thereafter, the April 1st and October 1st, (or, in each case, as promptly as possible thereafter), following such notice, or (B) if the Administrative Agent shall not have received the Reserve Reports required to be delivered by the Borrower pursuant to Sections 9.12(a) and 9.12(b) in a timely and complete manner, then on the Business Day next succeeding delivery of such New Borrowing Base Notice; and

(ii) in the case of an Interim Redetermination, on the Business Day next succeeding delivery of such New Borrowing Base Notice.

Subject to Section 2.14(h), such amount shall then become the Borrowing Base until the next Scheduled Redetermination Date, the next Interim Redetermination Date or the next adjustment to the Borrowing Base pursuant to the Borrowing Base Adjustment Provisions, whichever occurs first. Notwithstanding the foregoing, no Scheduled Redetermination or Interim Redetermination shall become effective until the New Borrowing Base Notice related thereto is received by the Borrower.

(e) Reduction of Borrowing Base Upon Incurrence of Borrowing Base Reduction Debt. Upon the issuance or incurrence of any Specified Additional Debt (other than (i) any Specified Additional Debt constituting Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness, but only to the extent that the aggregate principal amount of Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness does not exceed the principal amount of the Refinanced Indebtedness and (ii) without duplication of the Specified Additional Debt referenced in Section 2.14(e)(i), the first $200,000,000 of Specified Additional Debt incurred after the Closing Date), the Borrowing Base then in effect shall be reduced by an amount equal to the product of 0.25 multiplied by the stated principal amount of such Specified Additional Debt (without regard to any original issue discount), and the Borrowing Base as so reduced shall become the new Borrowing Base immediately upon the date of such issuance or incurrence, effective and applicable to the Borrower, the Administrative Agent, the Issuing Banks and the Lenders on such date until the next redetermination or modification thereof hereunder.

(f) Reduction of Borrowing Base Upon Termination of Hedge Positions and Asset Dispositions.

(i) If the Borrower or any Restricted Subsidiary changes the material economic terms, terminates, unwinds or cancels or creates any off-setting positions in respect of any commodity hedge positions (whether evidenced by a

floor, put or other Hedge Agreement) upon which the Lenders relied in determining the Borrowing Base (each, an "Affected Commodity Hedge"), and/or

(ii) If the Borrower or one of the other Credit Parties Disposes of Oil and Gas Properties or Disposes of any Equity Interests in any Restricted Subsidiary or Minority Investment owning Oil and Gas Properties and such Disposition involves Borrowing Base Properties included in the most recently delivered Reserve Report, and

(iii) the sum of (x) the Swap PV of any such Affected Commodity Hedge (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions) plus (y) the aggregate Borrowing Base Value of all such Borrowing Base Properties Disposed of (after giving effect to any concurrent acquisitions of and other Investments in Oil and Gas Properties by the Borrower and the Restricted Subsidiaries with respect to which the Borrower has delivered a Reserve Report in accordance with Section 9.12(b)), in each case, since the later of (I) the last Scheduled Redetermination Date and (II) the last adjustment of the Borrowing Base made pursuant to this Section 2.14(f) exceeds 5.0% of the then-effective Borrowing Base then, the Required Lenders shall have the right (upon the affirmative vote of the Required Lenders) to adjust the Borrowing Base in an amount equal to the sum of (1) the Borrowing Base Value, if any, attributable to such Affected Commodity Hedges in the calculation of the then-effective Borrowing Base (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions) and (2) an amount equal to the Borrowing Base Value, if any, attributable to such Disposed of Borrowing Base Properties in the calculation of the then-effective Borrowing Base (after giving effect to any concurrent acquisitions of and other Investments in Oil and Gas Properties by the Borrower and the Restricted Subsidiaries with respect to which the Borrower has delivered a Reserve Report in accordance with Section 9.12(b)), where in each case the Borrowing Base Value shall be determined by the Required Lenders in accordance with the usual and customary oil and gas lending criteria as it exists at the particular time. If the Required Lenders in fact make any such adjustment, the Administrative Agent shall promptly notify the Borrower in writing of the Borrowing Base Value, if any, attributable to such Affected Commodity Hedges and Disposed of Borrowing Base Properties in the calculation of the then effective Borrowing Base and upon receipt of such notice, the Borrowing Base shall be simultaneously reduced by such amount.

(iv) For the purposes of this Section 2.14(f) a "Disposition" of Oil and Gas Properties shall be deemed to include the designation of a Restricted Subsidiary owning Oil and Gas Properties as an Unrestricted Subsidiary and the Disposition or other transfer of Oil and Gas Properties or the Equity Interests in any Restricted Subsidiary or Minority Investment owning Oil and Gas Properties to an Unrestricted Subsidiary.

(g) Reduction of Borrowing Base Related to Title. If (i) the Borrower fails to provide the information required by Section 9.13(a) within the time period specified therein or (ii) any title defect or exception requested by the Administrative Agent to be cured pursuant to Section 9.13(b) is not cured within the time period specified therein, the Required Lenders shall have the right to adjust the Borrowing Base upon at least three (3) Business Days' prior written notice (which such notice shall include the effective date of reduction) such that, after giving effect to such reduction, the Borrower shall have provided reasonably satisfactory title information in respect of the required percentage of the value of the Borrowing Base Properties, and upon the effective date of the reduction specified in the notice described above, the new Borrowing Base will become effective.

(h) Borrower's Right to Elect Reduced Borrowing Base. Within three (3) Business Days of its receipt of a New Borrowing Base Notice, the Borrower may provide written notice to the Administrative Agent and the Lenders that specifies for the period from the effective date of the New Borrowing Base Notice until the next succeeding Scheduled Redetermination Date, the Borrowing Base will be a lesser amount than the amount set forth in such New Borrowing Base Notice, whereupon such specified lesser amount will become the new Borrowing Base. The Borrower's notice under this Section 2.14(h) shall be irrevocable, but without prejudice to any party's right to initiate an Interim Redetermination or to the Borrowing Base Adjustment Provisions.

(i) Administrative Agent Data. The Administrative Agent hereby agrees to provide, promptly, and in any event within three (3) Business Days, following its receipt of a written request by the Borrower, an updated Bank Price Deck. In addition, the Administrative Agent agrees, upon reasonable request, to meet with the Borrower to discuss its evaluation of

the reservoir engineering of the Oil and Gas Properties included in the Reserve Report, its methodologies for valuing such properties and the other factors considered in calculating the Borrowing Base.

2.15 Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a) Commitment Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a);

(b) The Commitment and Total Exposure of such Defaulting Lender shall not be included in determining whether all Lenders, the Majority Lenders or the Required Lenders or each Lender have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); provided that (i) any waiver, amendment or modification requiring the consent of all Lenders pursuant to Section 13.1 or requiring the consent of each affected Lender pursuant to Section 13.1(a)(A) or (a)(I) shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Maturity Date applicable to such Defaulting Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of post-default interest rates) and any increase in or extension of such Defaulting Lender's Commitment) and (ii) any redetermination, whether an increase, decrease or affirmation, of the Borrowing Base shall occur without the participation of a Defaulting Lender, but the Commitment (***i.e.***, the Commitment Percentage of the Borrowing Base) of a Defaulting Lender may not be increased without the consent of such Defaulting Lender;

(c) If any Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender, then (i) all or any part of such Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders *pro rata* in accordance with their respective Commitment Percentages; provided that (A) each Non-Defaulting Lender's Total Exposure may not in any event exceed the Commitment Percentage of the Loan Limit of such Non-Defaulting Lender as in effect at the time of such reallocation and (B) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Banks or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, (ii) to the extent that all or any portion of the Defaulting Lender's Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso in Section 2.15(c)(i) or otherwise, the Borrower shall within two Business Days following notice by the Administrative Agent Cash Collateralize for the benefit of the applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to Section 2.15(c)(i) above), in accordance with the procedures set forth in Section 3.7 for so long as such Letter of Credit Exposure is outstanding, (iii) if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.15(c), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is Cash Collateralized (and such fees shall be payable to the Issuing Banks), (iv) if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.15(c), then the Letter of Credit Fees payable for the account of the Lenders pursuant to Section 4.1(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Commitment Percentages and the Borrower shall not be required to pay any Letter of Credit Fees to the Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period that such Defaulting Lender's Letter of Credit Exposure is reallocated, or (v) if any Defaulting Lender's Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to this Section 2.15(c), then, without prejudice to any rights or remedies of any Issuing Bank or any Lender hereunder, all Letter of Credit Fees payable under Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to such Issuing Bank until such Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(d) So long as any Lender is a Defaulting Lender, no Issuing Bank will be required to issue any new Letter of Credit or amend any outstanding Letter of Credit to increase the Stated Amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless such Issuing Bank is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Commitments of the Non-Defaulting Lenders or by

Cash Collateralization or a combination thereof in accordance with Section 2.15(c) above or otherwise in a manner reasonably satisfactory to such Issuing Bank, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.15(c)(i) (and Defaulting Lenders shall not participate therein);

(e) If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender and any applicable Cash Collateral shall be promptly returned to the Borrower and any Letter of Credit Exposure of such Lender reallocated pursuant to Section 2.15(c) shall be reallocated back to such Lender; provided that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender; and

(f) Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 11 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 13.8), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a *pro rata* basis of any amounts owing by that Defaulting Lender to each Issuing Bank hereunder; third, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fourth, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fifth, to the payment of any amounts owing to the Lenders, each Issuing Bank as a result of any final judgment of a court of competent jurisdiction obtained by any Lender or such Issuing Bank against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; sixth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any final judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and seventh, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans or Unpaid Drawings, such payment shall be applied solely to pay the relevant Loans of, and Unpaid Drawings owed to, the relevant non-Defaulting Lenders on a *pro rata* basis prior to being applied in the manner set forth in this Section 2.15(f). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to Section 3.7 shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

SECTION 3. LETTERS OF CREDIT

3.1 Letters of Credit.

(a) Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Closing Date and prior to the L/C Maturity Date, each Issuing Bank, severally, and not jointly, agrees, in reliance upon the agreements of the Lenders set forth in this Section 3, to issue upon the request of the Borrower and for the direct or indirect benefit of the Borrower and the Restricted Subsidiaries, a letter of credit or letters of credit (the "Letters of Credit" and each, a "Letter of Credit") in such form and with such Issuer Documents as may be approved by the applicable Issuing Bank in its reasonable discretion; provided that the Borrower shall be a co-applicant of, and jointly and severally liable with respect to, each Letter of Credit issued for the account of a Restricted Subsidiary.

(b) Notwithstanding the foregoing, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letters of Credit Outstanding at such time, would exceed the Letter of Credit Commitment then in effect, (ii) no Letter of Credit shall be issued the Stated Amount of which would cause the aggregate amount of all Lenders' Total Exposures at such time to exceed the Loan Limit then in effect, (iii) each Letter of Credit shall have an expiration date occurring no later

than twelve (12) months after the date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank, unless otherwise agreed upon by the Administrative Agent and the applicable Issuing Bank or as provided under Section 3.2(b); provided that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to twelve (12) months or such longer period of time as may be agreed upon by the applicable Issuing Bank, subject to the provisions of Section 3.2(b); provided, further, that in no event shall such expiration date occur later than the L/C Maturity Date unless such Letter of Credit is Satisfactorily Cash Collateralized or Backstopped (iv) no Letter of Credit shall be issued if it would be illegal under any applicable Requirement of Law for the beneficiary of the Letter of Credit to have a Letter of Credit issued in its favor, (v) no Letter of Credit shall be issued by an Issuing Bank after it has received a written notice from any Credit Party or the Administrative Agent or the Majority Lenders stating that a Default or Event of Default has occurred and is continuing until such time as such Issuing Bank shall have received a written notice (A) of rescission of such notice from the party or parties originally delivering such notice, (B) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.1 or (C) that such Default or Event of Default is no longer continuing, (vi) no Issuing Bank shall have an obligation to issue a Letter of Credit in a Stated Amount which, when added to the outstanding Letters of Credit issued by such Issuing Bank, would exceed such Issuing Bank's Maximum Letter of Credit Commitment, and (vii) without the consent of the applicable Issuing Bank, no Letter of Credit shall be issued in any currency other than Dollars.

(c) Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the applicable Issuing Bank (which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders), the Borrower shall have the right, on any day, permanently to terminate or reduce the Letter of Credit Commitment in whole or in part; provided that, after giving effect to such termination or reduction, the Letters of Credit Outstanding shall not exceed the Letter of Credit Commitment.

3.2 Letter of Credit Applications.

(a) Whenever the Borrower desires that a Letter of Credit be issued, amended or renewed for its account on its own behalf, or on behalf of its Restricted Subsidiaries, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent a Letter of Credit application, amendment request or any such document as may be approved by the applicable Issuing Bank (each, a "Letter of Credit Application"). Upon receipt of any Letter of Credit Application or amendment request, the applicable Issuing Bank will (A) use its best efforts to process such Letter of Credit Application on the Business Day on which such Letter of Credit Application is received, provided that such Letter of Credit Application is received no later than 12:00 p.m. (New York City time) on such Business Day, or (B) otherwise issue such Letter of Credit or amendment on the first Business Day next succeeding receipt of such Letter of Credit Application or amendment. No Issuing Bank shall issue any Letters of Credit unless such Issuing Bank shall have received notice from the Administrative Agent that the conditions to such issuance have been met.

(b) If the Borrower so requests in any applicable Letter of Credit Application, the applicable Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); provided that any such Auto-Extension Letter of Credit must permit such Issuing Bank to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such 12-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable Issuing Bank, the Borrower shall not be required to make a specific request to such Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Maturity Date; provided, however, that such Issuing Bank shall not permit any such extension if (i) such Issuing Bank has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of Section 3.1(b) or otherwise), or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date from the Administrative Agent that one or more of the applicable conditions specified in Section 7 are not then satisfied, and in each such case directing such Issuing Bank not to permit such extension.

(c) Each Issuing Bank (other than the Administrative Agent or any of its Affiliates) shall, at least once each week, provide the Administrative Agent with a list of all Letters of Credit issued by it that are outstanding at such time; provided that, upon written request from the Administrative Agent, such Issuing Bank shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Issuing Bank.

3.3 Letter of Credit Participations.

(a) Immediately upon the issuance by an Issuing Bank of any Letter of Credit, such Issuing Bank shall be deemed to have sold and transferred to each Lender (each such Lender, in its capacity under this Section 3.3, an "L/C Participant"), and each such L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Bank, without recourse or warranty, an undivided interest and participation (each an "L/C Participation"), to the extent of such L/C Participant's Commitment Percentage, in each Letter of Credit, each substitute therefor, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.

(b) In determining whether to pay under any Letter of Credit, the relevant Issuing Bank shall have no obligation relative to the L/C Participants other than to confirm that (i) any documents required to be delivered under such Letter of Credit have been delivered, (ii) such Issuing Bank has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Letter of Credit. Any action taken or omitted to be taken by the relevant Issuing Bank under or in connection with any Letter of Credit issued by it, if taken or omitted in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall not create for such Issuing Bank any resulting liability.

(c) In the event that an Issuing Bank makes any payment under any Letter of Credit issued by it and the Borrower shall not have repaid such amount in full to such Issuing Bank pursuant to Section 3.4(a), such Issuing Bank shall promptly notify the Administrative Agent (which shall promptly notify each L/C Participant) of such failure, and each such L/C Participant shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuing Bank, the amount of such L/C Participant's Commitment Percentage of such unreimbursed payment in Dollars and in immediately available funds. Each L/C Participant shall make available to the Administrative Agent for the account of the relevant Issuing Bank such L/C Participant's Commitment Percentage of the amount of such payment no later than 1:00 p.m. (New York City time) on the first Business Day after the date notified by such Issuing Bank in immediately available funds. If and to the extent such L/C Participant shall not have so made its Commitment Percentage of the amount of such payment available to the Administrative Agent for the account of the relevant Issuing Bank, such L/C Participant agrees to pay to the Administrative Agent for the account of such Issuing Bank, forthwith on demand, such amount, together with interest thereon for each day from such date until the date such amount is paid to the Administrative Agent for the account of such Issuing Bank at a rate *per annum* equal to the Overnight Rate from time to time then in effect, plus any administrative, processing or similar fees customarily charged by such Issuing Bank in connection with the foregoing. The failure of any L/C Participant to make available to the Administrative Agent for the account of any Issuing Bank its Commitment Percentage of any payment under any Letter of Credit shall not relieve any other L/C Participant of its obligation hereunder to make available to the Administrative Agent for the account of such Issuing Bank its Commitment Percentage of any payment under such Letter of Credit on the date required, as specified above, but no L/C Participant shall be responsible for the failure of any other L/C Participant to make available to the Administrative Agent such other L/C Participant's Commitment Percentage of any such payment.

(d) Whenever an Issuing Bank receives a payment in respect of an unpaid reimbursement obligation as to which the Administrative Agent has received for the account of such Issuing Bank any payments from the L/C Participants pursuant to Section 3.3(c) above, such Issuing Bank shall pay to the Administrative Agent and the Administrative Agent shall promptly pay to each L/C Participant that has paid its Commitment Percentage of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such L/C Participant's share (based upon the proportionate aggregate amount originally funded by such L/C Participant to the aggregate amount funded by all L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective L/C Participations at the Overnight Rate.

(e) The obligations of the L/C Participants to make payments to the Administrative Agent for the account of an Issuing Bank with respect to Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i) any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii) the existence of any claim, set-off, defense or other right that the Borrower or any other Person (including an L/C Participant) may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Issuing Bank, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit);

(iii) any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv) the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents;

(v) the occurrence of any Default or Event of Default; or

(vi) any other event, condition of circumstance, whether or not similar to the foregoing.

3.4 Agreement to Repay Letter of Credit Drawings.

(a) The Borrower hereby agrees to reimburse the relevant Issuing Bank by making payment in Dollars or to the Administrative Agent for the account of such Issuing Bank (whether with its own funds or with proceeds of the Loans) in immediately available funds, for any payment or disbursement made by such Issuing Bank under any Letter of Credit issued by it (each such amount so paid until reimbursed, an "Unpaid Drawing") (i) within one Business Day of the date of such payment or disbursement if such Issuing Bank provides notice to the Borrower of such payment or disbursement prior to 11:00 a.m. (New York City time) on such next succeeding Business Day (from the date of such payment or disbursement) or (ii) if such notice is received after such time, on the next Business Day following the date of receipt of such notice (such required date for reimbursement under Section 3.4(a)(i) or 3.4(a)(ii), as applicable, on such Business Day (the "Reimbursement Date")), with interest on the amount so paid or disbursed by such Issuing Bank, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the *per annum* rate for each day equal to the rate described in Section 2.8(a); provided that, notwithstanding anything contained in this Agreement to the contrary, with respect to any Letter of Credit, (i) unless the Borrower shall have notified the Administrative Agent and such Issuing Bank prior to 11:00 a.m. (New York City time) on the Reimbursement Date that the Borrower intends to reimburse such Issuing Bank for the amount of such drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that the Lenders make Loans (which shall be ABR Loans) on the Reimbursement Date in an amount equal to the amount at such drawing, and (ii) the Administrative Agent shall promptly notify each L/C Participant of such drawing and the amount of its Loan to be made in respect thereof, and each L/C Participant shall be irrevocably obligated to make a Loan to the Borrower in the manner deemed to have been requested in the amount of its Commitment Percentage of the applicable Unpaid Drawing by 12:00 noon (New York City time) on such Reimbursement Date by making the amount of such Loan available to the Administrative Agent. Such Loans made in respect of such Unpaid Drawing on such Reimbursement Date shall be made without regard to the Minimum Borrowing Amount and without regard to the satisfaction of the conditions set forth in Section 7. The Administrative Agent shall use the proceeds of such Loans solely for purpose of reimbursing the relevant Issuing Bank for the related Unpaid Drawing. In the event that the Borrower fails to Cash Collateralize any Letter of Credit that is outstanding on the L/C Maturity Date, the full amount of the Letters of Credit Outstanding in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that such Issuing Bank shall hold the proceeds received from the Lenders as contemplated above as cash collateral for such Letter of Credit to reimburse any Drawing under

such Letter of Credit and shall use such proceeds first, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, second, to the extent such Letter of Credit expires or is returned undrawn while any such cash collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and third, to the Borrower or as otherwise directed by a court of competent jurisdiction. Nothing in this Section 3.4(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b) The obligations of the Borrower under this Section 3 shall be absolute, unconditional and irrevocable under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against such Issuing Bank, any beneficiary of a Letter of Credit, the Administrative Agent or any Lender (including in its capacity as an L/C Participant) or any other Person, including any defense based upon (i) the failure of any drawing under a Letter of Credit (each a "Drawing") to conform to the terms of the Letter of Credit, (ii) any non-application or misapplication by the beneficiary of the proceeds of such Drawing, (iii) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (v) any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee, (vi) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or message or advice, however transmitted, in connection with any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank or (vii) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 3.4, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder; provided that the foregoing shall not be construed to excuse the relevant Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The Borrower expressly agrees that any action taken or omitted to be taken by an Issuing Bank under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct (as finally determined by a court of competent jurisdiction), shall be binding on the Borrower and shall not result in any liability of such Issuing Bank to the Borrower; provided that the foregoing shall not be construed to excuse such Issuing Bank from liability to the Borrower to the extent of any direct damages suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care, when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof as determined by a final and non-appealable judgment of a court of competent jurisdiction. In furtherance of the foregoing and without limiting the generality thereof, the parties hereto agree that, with respect to documents presented which appear on their face to be in compliance with the terms of a Letter of Credit, the Issuing Bank that issued such Letter of Credit may in its sole discretion either accept or make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit (unless the Borrower shall consent to payment thereon not withstanding such lack of strict compliance).

3.5 New or Successor Issuing Bank.

(a) Any Issuing Bank may resign as an Issuing Bank upon 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower. The Borrower may replace any Issuing Bank for any reason upon written notice to such Issuing Bank and the Administrative Agent and may add Issuing Banks at any time upon notice to the Administrative Agent. If an Issuing Bank shall resign or be replaced, or if the Borrower shall decide to add a new Issuing Bank under this Agreement, then the Borrower may appoint from among the Lenders (who have agreed to act as successor issuer of Letters of Credit or a new Issuing Bank) a successor issuer of Letters of Credit or a new Issuing Bank, as the case may be, or, with the consent of the Administrative Agent (such consent not to be unreasonably withheld) and such new Issuing Bank, another successor or new issuer of Letters of Credit, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or

resigning Issuing Bank under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of an Issuing Bank hereunder, and the term "Issuing Bank" shall mean such successor or such new issuer of Letters of Credit effective upon such appointment. The acceptance of any appointment as an Issuing Bank hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form reasonably satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become an "Issuing Bank" hereunder. After the resignation or replacement of an Issuing Bank hereunder, the resigning or replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit. In connection with any resignation or replacement pursuant to this Section 3.5(a) (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Issuing Bank replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the outstanding Letters of Credit to be Satisfactorily Cash Collateralized or Backstopped. After any resigning or replaced Issuing Bank's resignation or replacement as Issuing Bank, the provisions of this Agreement relating to an Issuing Bank shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was an Issuing Bank under this Agreement or (B) at any time with respect to Letters of Credit issued by such Issuing Bank.

(b) To the extent that there are, at the time of any resignation or replacement as set forth in Section 3.5(a) above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including any obligations related to the payment of fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in Section 3.5(a) above.

3.6 Role of Issuing Bank. Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, no Issuing Bank shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable to any Lender for (a) any action taken or omitted in connection herewith at the request or with the approval of the Majority Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; provided that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable or responsible for any of the matters described in Section 3.3(e); provided that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such Issuing Bank's willful misconduct or gross negligence (as finally determined by a court of competent jurisdiction) or such Issuing Bank's unlawful failure (as finally determined by a court of competent jurisdiction) to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, any Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Issuing Bank shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

3.7 Cash Collateral.

(a) Upon the request of the Majority Lenders if, as of or following the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the Letters of Credit Outstanding.

(b) If any Event of Default shall occur and be continuing, the Majority Lenders may require that the L/C Obligations be Cash Collateralized; provided that, upon the occurrence of an Event of Default referred to in Section 11.5 with respect to the Borrower, the Borrower shall immediately Cash Collateralize the Letters of Credit then outstanding and no notice or request by or consent from the Majority Lenders shall be required.

(c) For purposes of this Agreement, "Cash Collateralize" shall mean to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to the amount of the Letters of Credit Outstanding required to be Cash Collateralized (the "Required Cash Collateral Amount") or (ii) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to 103% of the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under Section 3.5(c)(i) and 3.5(c)(ii) above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the L/C Participants, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such cash Collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, but under the "control" (as defined in Section 9-104 of the UCC) of the Administrative Agent.

3.8 Applicability of ISP and UCP. Unless otherwise expressly agreed to by the relevant Issuing Bank and the Borrower when a Letter of Credit is issued (a) the rules of the ISP or the Uniform Customs and Practice for Documentary Credits shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

3.9 Conflict with Issuer Documents. In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms hereof shall control.

3.10 Letters of Credit Issued for Restricted Subsidiaries. Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Subsidiary, the Borrower shall be obligated to reimburse the relevant Issuing Bank hereunder for any and all drawings under such Letter of Credit. The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Subsidiaries.

3.11 Increased Costs. If, after the Closing Date, the adoption of any Change in Law shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against Letters of Credit issued by any Issuing Bank, or any L/C Participant's L/C Participation therein, or (b) impose on any Issuing Bank or any L/C Participant any other conditions, costs or expenses affecting its obligations under this Agreement in respect of Letters of Credit or L/C Participations therein or any Letter of Credit or such L/C Participant's L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Issuing Bank or such L/C Participant of issuing, maintaining or participating in any Letter of Credit, or to reduce the amount of any sum received or receivable by such Issuing Bank or such L/C Participant hereunder (other than (i) Indemnified Taxes or Other Taxes or (ii) Excluded Taxes) in respect of Letters of Credit or L/C Participations therein, then, promptly (and in any event no later than 15 days) after receipt of written demand to the Borrower by such Issuing Bank or such L/C Participant, as the case may be (a copy of which notice shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), the Borrower shall pay to such Issuing Bank or such L/C Participant such additional amount or amounts as will compensate such Issuing Bank or such L/C Participant for such increased cost or reduction, it being understood and agreed, however, that no Issuing Bank or L/C Participant shall be entitled to such compensation as a result of such Person's



009192

compliance with, or pursuant to any request or directive to comply with, any such Requirement of Law as in effect on the Closing Date. A certificate submitted to the Borrower by the relevant Issuing Bank or an L/C Participant, as the case may be (a copy of which certificate shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Issuing Bank or such L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

SECTION 4. FEES; COMMITMENTS.

4.1 Fees.

(a) The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender (in each case *pro rata* according to the respective Commitment Percentages of the Lenders), a commitment fee (the "Commitment Fee") for each day from the Closing Date until but excluding the Termination Date. Each Commitment Fee shall be payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and (ii) on the Termination Date (for the period ended on such date for which no payment has been received pursuant to Section 4.1(a)(i) above), and shall be computed for each day during such period at a rate *per annum* equal to the Commitment Fee Rate in effect on such day on the Available Commitment in effect on such day.

(b) The Borrower agrees to pay to the Administrative Agent in Dollars for the account of the Lenders *pro rata* on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "Letter of Credit Fee"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at the *per annum* rate for each day equal to the Applicable Margin for LIBOR Loans on the average daily Stated Amount of such Letter of Credit. Such Letter of Credit Fees shall be due and payable (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to Section 4.1(a)(i) above).

(c) The Borrower agrees to pay to each Issuing Bank a fee in respect of each Letter of Credit issued by it (the "Fronting Fee"), for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% *per annum* (or such other amount as may be agreed in a separate writing between the Borrower and the relevant Issuing Bank) on the average daily Stated Amount of such Letter of Credit (or at such other rate *per annum* as agreed in writing between the Borrower and the relevant Issuing Bank). Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to Section 4.1(a)(i) above).

(d) The Borrower agrees to pay directly to each Issuing Bank upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the relevant Issuing Bank and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e) The Borrower agrees to pay to the Administrative Agent the administrative agent fees in the amounts and on the dates as set forth in writing from time to time between the Administrative Agent and the Borrower.

4.2 Voluntary Reduction of Commitments.

(a) Upon at least three (3) Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Commitments, in whole or in part; provided that (i) with respect to the Commitments, any such termination or reduction shall apply proportionately and permanently to reduce the Commitments of each of the Lenders (provided that (x) after giving effect to any such reduction and to the repayment of any Loans made on such date, the Total Exposure of any such Lender does not exceed the Commitment of such Lender and (y) for the avoidance of doubt, any

such repayment of Loans contemplated by the preceding Section 4.2(a)(i)(x) shall be made in compliance with the requirements of Section 5.3 (a) with respect to the ratable allocation of payments hereunder and prior to any reduction being made to the Commitment of any other Lender), (ii) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $1,000,000 and (iii) after giving effect to such termination or reduction and to any prepayments of Loans or cancellation or Cash Collateralization of Letters of Credit made on the date thereof in accordance with this Agreement, the aggregate amount of the Lenders' Total Exposures shall not exceed the Loan Limit.

(b) The Borrower may terminate the unused amount of the Commitment of a Defaulting Lender upon not less than three (3) Business Days' prior notice to the Administrative Agent (which will promptly notify the Lenders thereof), and in such event the provisions of Section 2.15(f) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), provided that such termination will not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, any Issuing Bank or any Lender may have against such Defaulting Lender.

Notwithstanding anything to the contrary contained in this Agreement, any such notice of commitment termination pursuant to Section 4.2 may state that it is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

4.3 Mandatory Termination of Commitments. The Total Commitment shall terminate at 5:00 p.m. (New York City time) on the Termination Date.

SECTION 5. PAYMENTS.

5.1 Voluntary Prepayments. The Borrower shall have the right to prepay Loans without premium or penalty, in whole or in part from time to time on the following terms and conditions:

(a) the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and (in the case of LIBOR Loans) the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. (New York City time) (i) in the case of LIBOR Loans, three (3) Business Days prior to and (ii) in the case of ABR Loans on the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the Lenders;

(b) each partial prepayment of (i) LIBOR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding LIBOR Loans at such time, and (ii) any ABR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof or a lesser amount to the extent such lesser amount represents the entire aggregate outstanding ABR Loans at such time; provided that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the applicable Minimum Borrowing Amount for such LIBOR Loans; and

(c) any prepayment of LIBOR Loans pursuant to this Section 5.1 on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of Section 2.11.

Each such notice shall specify the date and amount of such prepayment and the Type of Loans to be prepaid. At the Borrower's election in connection with any prepayment pursuant to this Section 5.1, such prepayment shall not be applied to any Loans of a Defaulting Lender except in accordance with Section 2.15(f).

Notwithstanding anything to the contrary contained in this Agreement, any such notice of prepayment pursuant to Section 5.1 may state that it is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

5.2 Mandatory Prepayments.

(a) Repayment following Optional Reduction of Commitments. If, after giving effect to any termination or reduction of the Commitments pursuant to Section 4.2(a), the aggregate Total Exposures of all Lenders exceeds the Loan Limit (as reduced), then the Borrower shall on the same Business Day (i) prepay the Loans on the date of such termination or reduction in an aggregate principal amount equal to such excess and (ii) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, pay to the Administrative Agent on behalf of the Issuing Banks and the L/C Participants an amount in cash or otherwise Cash Collateralize an amount equal to such excess as provided in Section 3.7.

(b) Repayment of Loans Following Redetermination or Adjustment of Borrowing Base.

(i) If, at any time, a Borrowing Base Deficiency exists (including as a result of a redetermination of the Borrowing Base in accordance with Section 2.14(b), but excluding any adjustment to the Borrowing Base pursuant to Sections 2.14(e), 2.14(f) or 2.14(h)), then the Borrower shall, within ten (10) Business Days after (x) its receipt of a New Borrowing Base Notice indicating such Borrowing Base Deficiency or (y) in the case of Section 2.14(g) the effectiveness of a new Borrowing Base, inform the Administrative Agent that it intends to take one or more of the following actions (with the option in Section 5.2(b)(i)(B) being deemed to be selected by the Borrower, if the Borrower fails to so inform the Administrative Agent): (A) within 30 days following such election prepay the Loans in an aggregate principal amount equal to such Borrowing Base Deficiency, (B) prepay the Loans in six equal monthly installments, commencing on the 30th day following such election with each payment being equal to l/6th of the aggregate principal amount of such Borrowing Base Deficiency, (C) within 15 days following such election, designate additional Oil and Gas Properties (accompanied by engineering reports reasonably acceptable to the Administrative Agent) not evaluated in the most recently delivered Reserve Report or other Collateral acceptable to the Administrative Agent having a Borrowing Base Value (as proposed by the Administrative Agent and approved by the Required Lenders in good faith in accordance with their respective usual and customary oil and gas lending criteria as they exist at the particular time) sufficient, after giving effect to any other actions taken pursuant to this Section 5.2(b)(i) to eliminate any such Borrowing Base Deficiency and within 30 days of such designation take actions as may be required for such designated Oil and Gas Properties to become Mortgaged Properties, or (D) undertake a combination of Sections 5.2(b)(i)(A), 5.2(b)(i)(B) and 5.2(b)(i)(C); provided that if, because of Letter of Credit Exposure, a Borrowing Base Deficiency remains after prepaying all of the Loans, the Borrower shall Cash Collateralize such remaining Borrowing Base Deficiency as provided in Section 3.7; provided further, that any Borrowing Base Deficiency must be cured on or prior to the Termination Date.

(ii) Upon any adjustment to the Borrowing Base pursuant to Section 2.14(e), 2.14(f) or 2.14(h), if the aggregate Total Exposures of all Lenders exceeds the Borrowing Base, as adjusted, then the Borrower shall (A) prepay the Loans in an aggregate principal amount equal to such Borrowing Base Deficiency and (B) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, Cash Collateralize such Borrowing Base Deficiency as provided in Section 3.7. The Borrower shall be obligated to make such prepayment and/or deposit of cash collateral no later than three (3) Business Days following the date it receives written notice from the Administrative Agent of the adjustment of the Borrowing Base and the resulting Borrowing Base Deficiency; provided that all payments required to be made pursuant to this Section 5.2(b)(ii) must be made on or prior to the Termination Date.

(c) Application to Loans. With respect to each prepayment of Loans elected under Section 5.1 or required by Section 5.2, the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) being repaid and (ii) the Loans to be prepaid; provided that (A) each prepayment of any Loans made pursuant to a Borrowing shall be applied *pro rata* among such Loans and (B) notwithstanding the provisions of the preceding clause (A), no prepayment of Loans shall be applied to the Loans of a Defaulting Lender except in accordance with Section 2.15(f). In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under Section 2.11.

(d) LIBOR Interest Periods. In lieu of making any payment pursuant to this Section 5.2 in respect of any LIBOR Loan, other than on the last day of the Interest Period thereof so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit, on behalf of the Borrower, with the Administrative Agent an amount equal to the amount of the LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period

therefor in the required amount. Such deposit shall be held by the Administrative Agent in a corporate time deposit account established on terms reasonably satisfactory to the Administrative Agent, earning interest at the then customary rate for accounts of such type. The Borrower hereby grants to the Administrative Agent, for the benefit of the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such deposit shall constitute cash collateral for the LIBOR Loans to be so prepaid; provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 5.2.

(e) Application of Proceeds. The application of proceeds pursuant to this Section 5.2 shall not reduce the aggregate amount of Commitments under the Facility and amounts prepaid may be reborrowed subject to the Available Commitment.

5.3 Method and Place of Payment.

(a) Except as otherwise specifically provided herein, all payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind, to the Administrative Agent for the ratable account of the Lenders entitled thereto or the Issuing Banks entitled thereto, as the case may be, not later than 2:00 p.m. (New York City time), in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. (New York City time) or, otherwise, on the next Business Day in the sole discretion of the Administrative Agent) like funds relating to the payment of principal or interest or fees ratably to the Lenders or the Issuing Banks, as applicable, entitled thereto.

(b) For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Administrative Agent. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day as set forth in Section 1.7 and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4 Net Payments.

(a) Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; provided that if the Borrower, any Guarantor or the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings of Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 5.4) the Administrative Agent, the Collateral Agent, or the applicable Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. After any payment of Taxes by any Credit Party to a Governmental Authority as provided in this Section 5.4, the Borrower or other applicable withholding agent shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by law to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(b) The Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for, any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c) The Credit Parties shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 15 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent, the Collateral Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error and shall constitute a required notice for purposes of Section 2.13.

(d) Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (i) whether or not any payments made hereunder or under any other Credit Document are subject to Taxes, (ii) if applicable, the required rate of withholding or deduction, and (iii) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Credit Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e) Without limiting the generality of Section 5.4(d), each Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i) in the case of a Non-U.S. Lender, deliver to the Borrower and the Administrative Agent two copies of (A) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service ("IRS") Form W-8BEN or form W-8BEN-E, as applicable (or any applicable successor form) (together with a certificate (substantially in the form of Exhibit J hereto) representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c)(3)(A) of the Code, is not a "10-percent shareholder" (within the meaning of Section 881(c)(3)(B) of the Code) of the Borrower, is not a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code) and the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States), (B) IRS Form W-8BEN or Form W-8BEN-E, as applicable, or Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in Section 5.4(e)(i)(A) and 5.4(e)(i)(B) above, provided that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, a certificate substantially in the form of Exhibit J hereto may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or Administrative Agent to determine the withholding or deduction required to be made; provided, however, that such other form and supplementary documentation described in this Section 5.4(e)(i)(D) (other than forms and documentation also described in Sections 5.4(e)(i)(A), 5.4(e)(i)(B), or 5.4(e)(i)(C)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender; and

(ii) in the case of a U.S. Lender, deliver to the Borrower and the Administrative Agent two IRS Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from United States federal backup withholding.

Any documentation and information required to be delivered by a Lender pursuant to this Section 5.4(e) shall be delivered by such Lender (i) on or prior to the date it becomes a party to this Agreement, (ii) on or before any date on which such documentation expires or becomes obsolete or invalid, (iii) after the occurrence of any change in the Lender's circumstances requiring a change in the most recent documentation previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and each such Lender shall promptly notify in writing the Borrower and the Administrative Agent if such Lender is no longer legally eligible to provide any documentation previously provided.

Each Person that shall become a Participant pursuant to Section 13.6 or a Lender pursuant to Section 13.6 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 5.4(e); provided that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

(f) If any Lender, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion exercised in good faith, that it has received a refund of an Indemnified Tax or Other Tax for which it has been indemnified pursuant to this Section 5.4 (including by the payment of additional amounts pursuant to this Section 5.4), then the Lender, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (net of all reasonable out-of-pocket expenses of such Lender, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion exercised in good faith to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse net after-Tax position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; provided that the Borrower or such Guarantor, upon the request of the Lender, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Administrative Agent or the Collateral Agent in the event the Lender, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority. No Lender nor the Administrative Agent nor the Collateral Agent shall be obliged to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Credit Party in connection with this Section 5.4(f) or any other provision of this Section 5.4.

(g) On or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement, the Administrative Agent shall deliver to the Borrower whichever of the following is applicable: (i) two executed copies of IRS Form W-9 or (ii) two executed copies of IRS Form W-8IMY certifying that it is a U.S. branch and has agreed to be treated as U.S. person for U.S. federal withholding tax purposes with respect to payments received by it from the Borrower.

(h) If a payment made to any Lender under this Agreement or any other Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this Section 5.4(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i) For the avoidance of doubt, for purposes of this Section 5.4, the term "Lender" includes any Issuing Bank and the term "applicable law" or "Requirement of Law" includes FATCA.

(j) The agreements in this Section 5.4 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.5 Computations of Interest and Fees.

(a) Except as provided in the next succeeding sentence, interest on LIBOR Loans and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Administrative Agent's prime rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b) Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

5.6 Limit on Rate of Interest.

(a) No Payment Shall Exceed Lawful Rate. Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b) Payment at Highest Lawful Rate. If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c) Adjustment if Any Payment Exceeds Lawful Rate. If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower or any other Credit Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d) Rebate of Excess Interest. Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable Requirement of Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 6. CONDITIONS PRECEDENT TO CLOSING DATE

6.1 Conditions Precedent to Closing Date. The obligations of the Lenders to make Loans and of the Issuing Banks to issue Letters of Credit under this Agreement on the Closing Date are subject to the satisfaction of the following conditions precedent, except as otherwise agreed or waived pursuant to Section 13.1.

(a) Credit Agreement. The Administrative Agent (or its counsel) shall have received from each party hereto counterparts (in such number as may be reasonably requested by the Administrative Agent) of this Agreement signed on behalf of such party.

(b) Consummation of Acquisition. The Acquisition shall have been consummated, or shall be consummated substantially concurrently with the Closing Date, in accordance with the terms of the Purchase and Sale Agreement without giving effect to any amendments, consents or waivers thereto that is materially adverse to the interest of the Lenders without the consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed) and without there being any right of the Borrower or its Affiliates to terminate or not consummate the Acquisition that was available to the Borrower and its

Affiliates which was unexercised without the consent of the Lead Arrangers (such consent not to be unreasonably withheld or delayed).

(c) Purchase and Sale Agreement Representations and Specified Representations. The Administrative Agent shall have received a certificate from an Authorized Officer of the Borrower, certifying that as of the Closing Date, the Purchase and Sale Agreement Representations and the Specified Representations shall be true and correct in all material respects.

(d) Legal Opinions. The Administrative Agent shall have received, on behalf of itself, the Collateral Agent and the Lenders, (i) an opinion of Kirkland & Ellis LLP, counsel to the Credit Parties, substantially in the form of Exhibit M-1, (ii) an opinion of Kirkland & Ellis LLP, as special counsel to Sanchez, Parent, Holdings and Borrower, substantially in the form of Exhibit M-2 and (iii) an opinion of Akin Gump Strauss Hauer & Feld LLP, as special counsel to Sanchez, Parent, Holdings and the Borrower, substantially in the form of Exhibit M-3.

(e) Organizational Documentation. The Administrative Agent shall have received a certificate of an Authorized Officer of the Credit Parties, Parent and Holdings setting forth (i) resolutions of the Board of Directors with respect to the authorization of each of the Credit Parties to execute and deliver the Credit Documents to which it is a party and to enter into the transactions contemplated in those documents, (ii) the officers of each Credit Party, of Holdings or of Parent (A) who are authorized to sign the Credit Documents (on behalf of such Credit Party) to which such Credit Party is a party and (B) who will, until replaced by another officer or officers duly authorized for that purpose, act as its representative for the purposes of signing documents and giving notices and other communications in connection with this Agreement and the transactions contemplated hereby, (iii) specimen signatures of such Authorized Officers, and (iv) the articles or certificate of incorporation and by-laws or other applicable Organizational Documents of the Credit Parties, Holdings and Parent, certified as being true and complete. The Administrative Agent and the Lenders may conclusively rely on such certificate until the Administrative Agent receives notice in writing from the Borrower to the contrary.

(f) Closing Certificate. The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent certifying (i) after giving effect to the Acquisition, to the percentage of the aggregate PV-9 of the Proved Reserves in respect of the Acquired Assets included in the Initial Reserve Report that the Borrower will acquire as a result of the Acquisition, (ii) (A) to the transactions for which the Borrower and/or its Subsidiaries have material joint and several liability with any party as of the Closing Date and (B) that all transactions to which the Borrower and/or its Subsidiaries have joint and several liability are arms-length transactions, (iii) the conditions set forth in Sections 6.1(b), 6.1(c), 6.1(s) and 6.1(w) have been satisfied or waived, (iv) that attached to the certificate as Schedule 1 is a true and complete copy of the Purchase and Sale Agreement and (v) that Exhibits L and N-1 through N-6 represent true and complete copies of the GSO Preferred Equity Documentation referenced in Section 6.1(t) and the Material Contracts referenced in Section 6.1(x).

(g) Good Standing. The Administrative Agent shall have received a certificate of good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Credit Party as of a recent date prior to the Closing Date from such Secretary of State (or other similar official).

(h) Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing as required by Section 2.3(a).

(i) Solvency Certificate. The Administrative Agent shall have received a solvency certificate substantially in the form of Exhibit I hereto and signed by a Financial Officer of the Borrower.

(j) Initial Reserve Report. The Administrative Agent shall have received the Initial Reserve Report.

(k) Security Documents. The Administrative Agent shall have received (i) from each party thereto executed counterparts (in such number as may be reasonably requested by the Administrative Agent) of the Collateral Agreement, (ii) UCC financing statements in proper form for filing sufficient to perfect the Collateral Agent's security interest in the Collateral perfected by such UCC financing statements and authorization to file such UCC financing statements and (iii) stock certificates,

if any, representing the Equity Interests in (A) each Domestic Subsidiary that is a Material Subsidiary owned by a Credit Party and (B) the Borrower, accompanied, in each case, by undated stock powers executed in blank.

(l) Lien Searches. The Administrative Agent (or its counsel) shall have received customary UCC, tax and judgment lien search results with respect to the Borrower and its Restricted Subsidiaries in their applicable jurisdictions of organization.

(m) Insurance Certificates. The Administrative Agent shall have received copies of insurance certificates evidencing the insurance required to be maintained by the Borrower and the Restricted Subsidiaries pursuant to Section 9.3.

(n) Financial Information. The Administrative Agent shall have received audited statements of revenues and direct expenses with respect to the Acquired Assets for fiscal years ended December 31, 2014 and December 31, 2015 and for the nine-month period ended September 30, 2016 (the "Closing Date Financials").

(o) Pro Forma Financials. The Administrative Agent shall have received (a) a *pro forma* consolidated balance sheet and related *pro forma* consolidated statement of income of the Borrower and its Subsidiaries as of and for the nine-month period ending September 30, 2016 and (b) a *pro forma* consolidated statement of income of the Borrower and its Subsidiaries as of and for the twelve-month period ending December 31, 2015, in each case, prepared after giving effect to the Transactions as if the Transactions had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of income).

(p) Minimum Availability. On the Closing Date, after giving effect to the Transactions, the Borrower shall have Available Commitments of not less than $65,000,000.

(q) PATRIOT Act. The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information about the Credit Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the PATRIOT Act that has been requested by the Administrative Agent in writing not less than ten (10) Business Days prior to the Closing Date.

(r) Fees and Expenses. The Administrative Agent, Lead Arrangers and the Lenders shall have received all fees due on the Closing Date and, to the extent invoiced at least three (3) Business Days before the Closing Date (except as otherwise reasonably agreed by the Borrower), reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(s) Equity Contribution. The Equity Contribution shall have been consummated, or on the Closing Date shall be consummated substantially concurrently with the funding of the initial Borrowings hereunder and shall not be less than the amount equal to the greater of (i) the aggregate amount sufficient, when combined with the amount of any Borrowings on the Closing Date, to consummate the Acquisition and (ii) 60.0% of the purchase price paid by the Borrower under the Purchase and Sale Agreement for the Acquired Assets.

(t) GSO Preferred Equity Documentation. The GSO Preferred Equity Documentation shall be consistent with the forms attached hereto as Exhibit L.

(u) Minimum Hedging. The Administrative Agent shall have received reasonably satisfactory evidence from the Borrower that the Borrower has entered into Hedge Agreements with Approved Counterparties having notional volumes (excluding any volumes hedged pursuant to basis differential Hedge Agreements) equal to not less than 80.0% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Proved Developed Producing Reserves in respect of the Acquired Assets based upon the Initial Reserve Reports for the period of eighteen (18) months commencing immediately after the Closing Date (beginning with the calendar month no later than April 2017). With respect to such hedging requirements at least 75.0% of the notional volumes in respect of such Hedging Agreements provided for thereunder shall be in the form of (x) swaps, (y) puts or (z) collars (which, in the case of puts and collars, such puts and the put component of such collars shall be at then market prices as determined in

good faith and certified to by an Authorized Officer of the Borrower; provided that such puts and the put component of such collars may be entered into at prices that are within 5.0% of then market prices for the relevant commodity being hedged).

(v) Releases. The Administrative Agent shall have received, or concurrently with the Closing Date shall receive, evidence reasonably satisfactory to the Administrative Agent that duly executed recordable releases and terminations in forms reasonably acceptable to the Administrative Agent with respect to any and all liens or security interests encumbering the Acquired Assets relating to any Indebtedness for borrowed money of the Sellers or their Affiliates (as such term is defined in the Purchase and Sale Agreement) have been obtained.

(w) No Material Indebtedness. On the Closing Date, after giving effect to the Transactions, neither the Borrower nor any of its Subsidiaries shall have any Material Indebtedness for borrowed money other than the Facility, with any existing Indebtedness for borrowed money having been paid in full, any commitments associated with such indebtedness terminated and all liens and security interests released.

(x) Material Documents. The Material Contracts shall be consistent with the forms attached hereto as (a) in the case of the Joint Development Agreement, Exhibit N-1, (b) in the case of the Management Services Agreement, Exhibit N-2, (c) in the case of the Borrower's LPA, Exhibit N-3, (d) in the case of the Parent LLCA, Exhibit N-4, (e) in the case of the Development Agreement, Exhibit N-5, (f) in the case of the Marketing Agreement, Exhibit N-6 and (g) in the case of the Side Letter Agreement, Exhibit N-7.

(y) Expiration Date. The Closing Date shall occur prior to the Expiration Date.

The Administrative Agent shall notify the Credit Parties and the Lenders of the Closing Date, and such notice shall be conclusive and binding.

SECTION 7. CONDITIONS PRECEDENT TO SUBSEQUENT CREDIT EVENTS.

The agreement of each Lender to make any Loan requested to be made by it on any date after the Closing Date, and the obligation of any Issuing Bank to issue Letters of Credit or amend any Letter of Credit to increase the amount thereof on any date after the Closing Date, is subject to the satisfaction of the following conditions precedent:

(a) No Default or Event of Default. At the time of each such Credit Event and also after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

(b) Representations and Warranties. All representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date and except that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates).

(c) Notice of Borrowing; Letter of Credit Application. Prior to the making of each Loan (other than any Loan made pursuant to Section 3.4(a)), the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.3(a) or, in the case of a Letter of Credit, prior to the issuance of each Letter of Credit or any amendment to increase the amount of any Letter of Credit, the applicable Issuing Bank and the Administrative Agent shall have received a Letter of Credit Application as required by Section 3.2(a).

The acceptance of the benefits of each Credit Event after the Closing Date shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in Section 7 above have been satisfied as of that time.

SECTION 8. REPRESENTATIONS, WARRANTIES AND AGREEMENTS

In order to induce the Lenders to enter into this Agreement, to make the Loans and issue or participate in, or increase the amount of, Letters of Credit as provided for herein, the Borrower makes, on the date of each Credit Event, the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans and the issuance, or increase in the amount, of the Letters of Credit:

8.1 Corporate Status. Each of the Parent, Holdings, Borrower and each Material Subsidiary of the Borrower (a)(i) is duly organized and validly existing under the laws of the jurisdiction of its organization and (ii) has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (b) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.2 Corporate Power and Authority; Enforceability. The Parent, Holdings and each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party. The Parent, Holdings and each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

8.3 No Violation. None of the execution, delivery or performance by the Parent, Holdings or any Credit Party of the Credit Documents to which it is a party will (a) contravene any Requirement of Law, except to the extent such contravention would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Credit Party or any of the Restricted Subsidiaries (other than Liens created under the Credit Documents and Permitted Liens) pursuant to the terms of Sanchez Specified Indebtedness with an aggregate principal amount in excess of $25,000,000, any indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other instrument to which such Credit Party or any of the Restricted Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") except to the extent such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect or in the case of such Sanchez Specified Indebtedness in any material respect or (c) violate any provision of the Organizational Documents of the Parent, Holdings, any Credit Party or any of the Restricted Subsidiaries.

8.4 Litigation. Except as set forth on Schedule 8.4, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened in writing with respect to the Borrower or any of its Restricted Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

8.5 Margin Regulations. Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, Regulation U or Regulation X of the Board.

8.6 Governmental Approvals; Other Consents. The execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority or any other Person in connection with (a) the execution, delivery or performance by, or enforcement against, the Parent, Holdings or any Credit Party of this Agreement or any other Credit Document, (b) the grant by Parent, Holdings or any Credit Party of the Liens granted by it pursuant to the Security Documents, (c) the perfection or maintenance of the Liens created under the Security Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Credit Documents or the remedies in respect of the Collateral pursuant to the Security Documents, except for (i) such as have been obtained or made and are in full force and effect, (ii) filings and recordings in respect of the Liens created pursuant to the

Security Documents and (iii) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

8.7 Investment Company Act. Neither any Credit Party nor the Parent or Holdings is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8.8 True and Complete Disclosure.

(a) All written factual information delivered to the Administrative Agent and the Lenders (other than the Projections, estimates and information of a general economic nature or general industry nature) (the "Information") concerning the Parent, Holdings, the Borrower, the Restricted Subsidiaries, the Transactions and any other transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the Transactions or the other transactions contemplated hereby and the negotiation of the Credit Documents (as modified or supplemented by other information so furnished), when taken as a whole, was true and correct in all material respects, as of the date when made and did not, taken as a whole, contain any untrue statement of a material fact as of the date when made or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

(b) The Projections (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that actual results may vary materially from the Projections), as of the date such Projections were furnished to the Lenders and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

(c) As of the Closing Date, neither the Borrower nor any Restricted Subsidiary has any material Indebtedness, any material guarantee obligations, contingent liabilities, off balance sheet liabilities, partnership liabilities for taxes or unusual forward or long-term commitments that, in each case, have not been disclosed to the Administrative Agent.

8.9 Tax Matters. Except where the failure of which would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect, (a) each of the Borrower and its Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (including in its capacity as withholding agent) and (b) has paid all Taxes payable by it that have become due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP.

8.10 Compliance with ERISA.

(a) (i) Each Plan (excluding Multiemployer Plans and Foreign Plans) is in compliance with ERISA, the Code and any applicable Requirement of Law; (ii) no Reportable Event has occurred with respect to any Plan (excluding Multiemployer Plans and Foreign Plans); (iii) no Plan (excluding Multiemployer Plans and Foreign Plans) is "insolvent" (within the meaning of Section 4245 of ERISA) or is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and no written notice of any such insolvency or endangered or critical status has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (iv) none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate, been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; (v) no proceedings have been instituted (or are reasonably likely to be instituted) to terminate any Plan (excluding Multiemployer Plans and Foreign Plans) or to appoint a trustee to administer any Plan (excluding Multiemployer Plans and Foreign Plans), and no written notice of any such proceedings has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; (vi) no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate been notified in writing that such a lien will be imposed on the assets of the Borrower or any ERISA Affiliate on account of any Plan (excluding Multiemployer Plans and Foreign Plans); and (vii) no ERISA Event has or is reasonably likely

to occur with respect to any Plan, except to the extent that a breach of any of the representations or warranties in this Section 8.10(a) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect. No Plan (other than a Multiemployer Plan) has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.10(a), be reasonably likely to have a Material Adverse Effect. With respect to Plans that are Multiemployer Plans, the representations and warranties in this Section 8.10(a), other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for "termination" (within the meaning of Title IV of ERISA) of such Plans under ERISA, are made to the knowledge of the Borrower.

(b) All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect. All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.11 Subsidiaries; Equity Interests. Schedule 8.11 lists each Subsidiary of the Borrower (and the direct and indirect ownership interest of the Borrower therein), in each case existing on the Closing Date (after giving effect to the Transactions). Each Guarantor, Material Subsidiary and Unrestricted Subsidiary as of the Closing Date (after giving effect to the Transactions) has been so designated on Schedule 8.11. All of the outstanding Equity Interests in the Borrower and the Restricted Subsidiaries have been validly issued, are fully paid and nonassessable and all such Equity Interests owned by any Credit Party are owned free and clear of all Liens except (i) those created under the Security Documents and (ii) any nonconsensual Lien that is permitted under Section 10.2.

8.12 Environmental Laws.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Borrower and each of the Subsidiaries are in compliance with all applicable Environmental Laws; (ii) neither the Borrower nor any Subsidiary has received written notice of any Environmental Claim; (iii) neither the Borrower nor any Subsidiary is conducting or has been ordered by a governmental agency to conduct any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; and (iv) neither the Borrower nor any of the Subsidiaries has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased facility in a manner that would reasonably be expected to give rise to liability of the Borrower or any Subsidiary under Environmental Law.

8.13 Properties.

(a) Assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth on Schedule 8.13 hereto, each Credit Party has good and defensible title to the Borrowing Base Properties evaluated in the most recently delivered Reserve Report (other than those (i) disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent), and valid title to all its material personal properties, in each case, free and clear of all Liens other than Liens permitted by Section 10.2, except in each case where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. After giving full effect to the Liens permitted by Section 10.2, the Borrower or the Restricted Subsidiary specified as the owner owns the working interests and net revenue interests attributable to the Hydrocarbon Interests as such working interests and net revenue interests are reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such property.

(b) All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, except to the extent that any such failure to be valid or subsisting would not reasonably be expected to have a Material Adverse Effect.

(c) The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to have a Material Adverse Effect.

(d) All of the properties of the Borrower and the Restricted Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing would not reasonably be expected to have a Material Adverse Effect.

8.14 Solvency. After giving effect to the consummation of the Transactions (including the execution and delivery of this Agreement), the Borrower on a consolidated basis with its Restricted Subsidiaries will be Solvent.

8.15 Security Documents. The Security Documents create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien or security interest in the respective Collateral described therein as security for the Obligations to the extent that a legal, valid, binding and enforceable Lien or security interest in such Collateral may be created under any applicable Requirement of Law (subjected to Permitted Liens), which Lien or security interest, upon the filing of financing statements, recordation of the Mortgages or the obtaining of possession or "control," in each case, as applicable, with respect to the relevant Collateral as required under the applicable UCC or applicable local law, will constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the Borrower and each other Credit Party thereunder in such Collateral, in each case prior and superior in right to any other Person (other than Permitted Liens which are permitted to be prior and superior), in each case to the extent that a security interest may be perfected by the filing of a financing statement under the applicable UCC, recordation of the Mortgages under applicable local law or by obtaining possession or "control."

8.16 Gas Imbalances, Prepayments. On the Closing Date, except as set forth on Schedule 8.16, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

8.17 Marketing of Production. Except as set forth on Schedule 8.17 or otherwise disclosed to the Administrative Agent in writing, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's and its Restricted Subsidiaries' average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months.

8.18 Hedge Agreements. Schedule 8.18 sets forth, as of the Closing Date, a true and complete list of all material commodity Hedge Agreements of each Credit Party, the terms thereof relating to the type, term, effective date, termination date and notional amounts or volumes, the net mark to market value thereof (as of February 24, 2017), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

8.19 PATRIOT Act. On the Closing Date, each Credit Party is in compliance in all material respects with the material provisions of the PATRIOT Act.

8.20 Anti-Corruption Laws and Sanctions. The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and directors, and to the knowledge of the Borrower, its employees and agents, are in compliance with Anti-Corruption Laws

and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in the Borrower being designated as a Sanctioned Person. None of (a) the Borrower, any Subsidiary or, to the knowledge of the Borrower or such Subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Loan or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

8.21 No Material Adverse Effect. Since the Closing Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

8.22 Financial Statements.

(a) The annual financial statements in respect of the Closing Date Financials and, on and after the first date of delivery of financial statements pursuant to Section 9.1(a), the most recent financial statements delivered pursuant to Section 9.1(a) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except for customary year-end adjustments and the absence of complete footnotes and as otherwise expressly noted therein.

(b) The interim financial statements in respect of the Closing Date Financials and, on and after the first date of delivery of financial statements pursuant to Section 9.1(b), the most recent financial statements delivered pursuant to Section 9.1(b) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

8.23 Insurance. The properties of each Credit Party and each of its Restricted Subsidiaries are insured in accordance with the requirement of Section 9.3.

8.24 Use of Proceeds. The proceeds of the Loans shall be used for the acquisition, development and exploration of Oil and Gas Properties, and for working capital and other general corporate and partnership purposes of the Borrower and its Subsidiaries (including any transaction permitted hereunder).

8.25 Foreign Operations. The Borrower and the other Credit Parties do not own any Oil and Gas Properties not located within and will not conduct any operations outside the geographical boundaries of the United States.

8.26 Senior Debt Status. The Obligations constitute “Senior Indebtedness”, “Designated Senior Indebtedness” or any similar designation under and as defined in any agreement governing any senior subordinated or subordinated Indebtedness and the subordination provisions set forth in each such agreement are legally valid and enforceable against the parties thereto.

8.27 EEA Financial Institutions. No Credit Party is an EEA Financial Institution.

SECTION 9. AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full.

9.1 Information Covenants. The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a) Annual Financial Statements. Within 90 days after the end of each fiscal year (120 days in the case of the fiscal year ending December 31, 2017) (and, in the case of the fiscal year ended December 31, 2016, such financial statements shall be limited to revenues and direct expenses with respect to the Acquired Assets), the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders’ equity and cash flows and

a reasonably detailed description of the business activities that took place during the period covered by the financial statements, and, beginning with the financial statements for the fiscal year ending December 31, 2018, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by KPMG LLP or another independent certified public accountants of recognized national standing whose opinion shall not be materially qualified with a scope of audit or "going concern" or like qualification or exception (other than with respect to, or resulting from, (x) the occurrence of an upcoming maturity date of the Facility, (y) any potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenants, on a future date or in a future period or (z) any cross-default or prospective cross default under another debt facility on the basis of a potential or actual inability to satisfy a financial maintenance covenant, including the Financial Performance Covenants, on a future date or in a future period), together in any event with a certificate of such accounting firm stating that in the course of either (i) its regular audit of the business of the Borrower and its consolidated Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards or (ii) performing certain other procedures permitted by professional standards, such accounting firm has obtained no knowledge of any Event of Default relating to the Financial Performance Covenants that has occurred and is continuing or, if in the opinion of such accounting firm such an Event of Default has occurred and is continuing, a statement as to the nature thereof.

(b) Quarterly Financial Statements. With respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower, on or before the date that is 45 days after the end of each such quarterly accounting period (or, in the case of any fiscal quarter ending after the Closing Date and on or prior to September 30, 2017, 60 days), the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows and a reasonably detailed description of the business activities that took place during the period covered by the financial statements and, beginning with the financial statements for the quarterly period ending March 31, 2018, setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of such periods in the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

(c) Officer's Certificates. At the time of the delivery of the financial statements provided for in Section 9.1(a) and Section 9.1(b), a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) beginning with the fiscal quarter ending June 30, 2017, the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the Financial Performance Covenants as at the end of such fiscal year or period, as the case may be, (ii) a specification of any change in the identity of the Restricted Subsidiaries, Material Subsidiaries, Guarantors and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries, Guarantors and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent fiscal year or period, as the case may be, (iii) the amount of any *pro forma* adjustment not previously set forth in a certificate of a Financial Officer or any change in the amount of a *pro forma* adjustment set forth in any certificate of a Financial Officer previously provided and, in either case, in reasonable detail, the calculations and basis therefor, (iv) in the case of the delivery of financial statements provided for in Section 9.1(a), in reasonable detail the Applicable Equity Amount as at the end of the fiscal year to which such financial statements are applicable, (v) any new Subsidiaries that have been formed since the delivery of the last such certificate, whether such Subsidiaries need to become Credit Parties and copies of their Organizational Documents, (vi) in the case of the delivery of financial statements provided for in Section 9.1(a), a specification of each application by or on behalf of any Credit Party for any Patent with the United States Patent and Trademark Office and each registration of any Trademark or Copyright with the United States Patent and Trademark Office or the United States Copyright

Office, as applicable, filed during the preceding twelve-month period and (vii) a reasonably detailed description of any Preferred Stock (including the aggregate value of such Preferred Stock and information as to whether such Preferred Stock constitutes GSO Controlled Preferred Equity Interests or Qualified Preferred Equity) issued by the Borrower since the later of (A) the Closing Date and (B) the fiscal quarter most recently ended.

(d) Notice of Default; Litigation; ERISA Events. Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (i) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation or governmental proceeding pending or threatened in writing against the Borrower or any of the Subsidiaries that would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect and (iii) the occurrence of any ERISA Event or similar event with respect to a Plan or Foreign Plan, in each case, that would reasonably be expected to have a Material Adverse Effect.

(e) Environmental Matters. Promptly after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i) any Environmental Claim brought, filed or threatened in writing against any Credit Party; and

(ii) the actual release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party in violation of Environmental Laws or as would reasonably be expected to result in liability under Environmental Laws or the conduct of any investigation, or any removal, remedial or other corrective action under Environmental Laws in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any facility owned or leased by a Credit Party.

All such notices shall describe in reasonable detail the nature of the claim, investigation, removal or remedial action.

(f) Other Information. With reasonable promptness, but subject to the limitations set forth in the last sentence of Section 9.2(a), such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time.

(g) Certificate of Authorized Officer – Hedge Agreements. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all commodity Hedge Agreements of the Borrower and each Credit Party, the material terms thereof (in respect of the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or period, as applicable and for which a mark-to-market value is reasonably available), any new credit support agreements relating thereto not listed on Schedule 8.17 or on any previously delivered certificate delivered pursuant to this Section 9.1(g), any margin required or supplied under any credit support document and the counterparty to each such agreement; provided that such certificate shall be required solely to the extent the foregoing certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(h) Certificate of Authorized Officer – Gas Imbalances. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, certifying that as of the last Business Day of the most recently ended fiscal year or period, as applicable, except as specified in such certificate, on a net basis, there are no gas imbalances, ship or pay obligations or other prepayment obligations exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(i) Certificate of Authorized Officer – Production Report and Lease Operating Statement. Concurrently with any delivery of each Reserve Report in connection with a Scheduled Redetermination, a certificate of an Authorized Officer of the Borrower, setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Borrowing Base Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto for each such calendar month; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(j) List of Purchasers. At the time of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth a list of Persons purchasing Hydrocarbons from the Borrower or any other Credit Party which account for greater than 25% of the revenues resulting from the sale of all Hydrocarbons from the Borrower and such other Credit Parties during the fiscal year for which such financial statements relate.

(k) Cash Flow and Capex Projections and Financial Projections; Approved Budget. (i) Concurrently with the delivery of the March 1st and September 1st Reserve Reports pursuant to Section 9.12(a), a reasonably detailed consolidated projection of cash flows and capital expenditures for the following four fiscal quarter period (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of each fiscal quarter, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto), which financial projections shall in each case be accompanied by a certificate of an Authorized Officer stating that such financial projections have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such financial projections, it being understood that actual results may vary from such financial projections and that such variations may be material. (ii) Each Approved Budget (as defined under the Joint Development Committee) when approved by the Operating Committee (as defined under the Joint Development Committee).

(l) Certificate of Authorized Officer – Marketing Agreements. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all material marketing agreements for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and are not cancellable on 60 days' notice or less without penalty or detriment; provided that such certificate shall be required solely to the extent the foregoing information and its certification is not otherwise included in the applicable Reserve Report Certificate delivered in connection with such Reserve Report.

(m) Sales and Dispositions and Hedge Unwinds.

(i) In the event the Borrower or any Restricted Subsidiary intends to Dispose of any Borrowing Base Properties, or Equity Interests in any Person owning Borrowing Base Properties, in each case, with a Borrowing Base Value in excess of 3.0% of the then-effective Borrowing Base in a single transaction or in multiple transactions since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) when combined with the Swap PV of any Hedge Agreements terminated, unwound or otherwise Disposed of by the Borrower or any Restricted Subsidiary during such time period, three (3) Business Days (or such shorter time period agreed by the Administrative Agent) prior written notice (which, for the avoidance of doubt, may be delivered by email) of such Disposition, the Borrowing Base Properties that are the subject of such Disposition, the price thereof and the anticipated date of closing and any other details thereof reasonably requested by the Administrative Agent.

(ii) In the event that the Borrower or any Restricted Subsidiary intends to terminate, unwind or otherwise Dispose of Hedge Agreements with respect to which the Borrower reasonably believes the Swap PV of which (after taking into account the economic effect (including with respect to tenor) of any other Hedge Agreement executed contemporaneously with the taking of such actions and including any anticipated decline in the mark-to market value thereof)

is in excess of 3.0% of the then-effective Borrowing Base in a single transaction or in multiple transactions since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) when combined with the Borrowing Base Value of any Disposition of any Borrowing Base Properties, or Equity Interests in any Person owning Borrowing Base Properties made during such time period, prior or concurrent written notice (which, for the avoidance of doubt, may be delivered by email) of the foregoing, the anticipated decline in the mark-to-market value thereof or net cash proceeds therefrom and any other details thereof reasonably requested by the Administrative Agent.

(n) Notices of Material Events related to Material Contracts.

(i) Written notice of any default or similar event under, or termination of, any Material Contract as promptly as practicable upon the Borrower or an Authorized Officer of the Borrower obtaining knowledge of such event (but, in any event, within three (3) Business Days upon receiving or providing written thereto from a third party (or such longer time agreed to by the Administrative Agent)).

(ii) Three (3) Business Days (or such shorter time agreed to by the Administrative Agent) prior written notice of any amendments, supplements, modifications, including through a waiver or consent, under any Material Contract.

(iii) As promptly as practicable after receipt, or provision, of any "Tag-Along Notice", notice of a "Tag-Along Offer", "ROFO Notice" or "IPO Notice" (each such quoted term having the meaning ascribed to it under the Joint Development Agreement) (but, in any event, within three (3) Business Days upon receiving or providing written thereto from a third party (or such longer time agreed to by the Administrative Agent)).

(iv) Prior written notice of entry into any transaction by the Borrower or its Restricted Subsidiaries with an Affiliate (other than the Borrower and the Restricted Subsidiaries) in which the Borrower or its Restricted Subsidiaries are jointly and severally liable with any other party for any obligation together with a certification from an Authorized Officer of the Borrower that such transaction is an arms-length transaction and will not result in a Default under any Credit Document or a breach of the Borrower's LPA or the Parent LLCA.

(v) After the appointment of an Independent Director (as defined in the Parent LLCA) to the board of directors of Parent or any Subsidiary, (A) five (5) Business Days (or such shorter time agreed to by the Administrative Agent in its sole discretion) prior written notice of any proposed change of such Independent Director and (B) notice of any resignation of such Independent Director no later than three (3) Business Days (or such longer time agreed to by the Administrative Agent in its sole discretion) following such resignation.

(o) Information Regarding the Parent, Holdings, Borrower and Subsidiaries.

(i) Patriot Act. Promptly upon request, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(ii) Changes. Prompt written notice of (and in any event at least five (5) Business Days prior thereto or such later time as the Administrative Agent may agree in its sole discretion) any change (A) in the Parent's, Holdings' or a Credit Party's corporate name, (B) in the location of the Parent's, Holdings' or Credit Party's chief executive office or principal place of business, (C) in the Parent's, Holdings' or Credit Party's form of organization, (D) in the Parent's, Holdings' or Credit Party's jurisdiction of organization and (E) in the Parent's, Holdings' or Credit Party's federal taxpayer identification number.

(iii) New Subsidiaries. Within five (5) Business Days of the formation of any Subsidiary of the Borrower (or such other time as the Administrative Agent may agree in its sole discretion), notice thereof and copies of the Organizational Documents of such Subsidiary.

(iv) Organizational Documents. Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the Organizational Documents of the Borrower or any Subsidiary.

It is understood that documents required to be delivered pursuant to Sections 9.1(a) through (o) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 13.2 or (ii) on which such documents are transmitted by electronic mail to the Administrative Agent; provided that: (A) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 9.1(a), 9.1(b), 9.1(c) and 9.1(f) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (B) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of (or the provision of a link on the Borrower's website to) any such documents and provide to the Administrative Agent by electronic mail electronic versions (***i.e.***, soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

9.2 Books, Records and Inspections.

(a) The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent or officers and designated representatives of the Majority Lenders (as accompanied by the Administrative Agent), to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's and its Affiliates control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's and its Affiliates control to permit such inspection), and to examine the financial records of the Parent, Holdings, the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Parent, Holdings, the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Majority Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent on behalf of the Majority Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 9.2 and the Administrative Agent shall not exercise such rights more than two (2) times during any calendar year absent a continuing Event of Default, and (ii) only one such visit per fiscal year shall be at the Borrower's expense; provided, further, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Majority Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in Section 9.1(f) or this Section 9.2, neither the Parent, Holdings, the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (A) that constitutes non-financial trade secrets or non-financial proprietary information, (B) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or any binding agreement or (C) that is subject to attorney-client or similar privilege or constitutes attorney work product.

(b) The Borrower will, and will cause each of the Restricted Subsidiaries to, maintain financial reports as may be required in accordance with GAAP.

9.3 Maintenance of Insurance. The Borrower will, and will cause each Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its

business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Collateral Agent shall be the loss payee under any such property insurance; provided that, so long as no Event of Default has occurred and is then continuing, the Secured Parties will provide any proceeds of such property insurance to the Borrower.

9.4 Payment of Taxes and Obligations under Management Services Agreement, Side Letter Agreement and Marketing Agreement. The Borrower shall, and shall cause each Restricted Subsidiary to, pay, discharge or otherwise satisfy its payment obligations in respect of (a) all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect and (b) each of (i) the Management Services Agreement, (ii) the Side Letter Agreement and (iii) the Marketing Agreement.

9.5 Maintenance of Existence; Compliance. The Borrower will, and will cause its Restricted Subsidiaries to, (a) (i) preserve, renew and keep in full force and effect its organizational existence in the State of Delaware and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Requirements and Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect; and (c) maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws, the PATRIOT Act and applicable Sanctions.

9.6 Compliance with Statutes, Regulations, Etc. The Borrower will, and will cause each Restricted Subsidiary to, comply with all Requirements of Law applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

9.7 ERISA.

(a) Promptly after the Borrower knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto: (i) that an ERISA Event has occurred or is likely to occur; (ii) that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); (iii) that a proceeding has been instituted against the Borrower or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; (iv) or that the Borrower or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b) Promptly following any request therefor, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of its Subsidiaries may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of its

Subsidiaries may request with respect to any Multiemployer Plan; provided that if the Borrower or any of its Subsidiaries has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable Subsidiaries shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

9.8 Maintenance of Properties. The Borrower will, and will cause each of the Restricted Subsidiaries to, except in each case, where the failure to so comply or cause would not reasonably be expected to result in a Material Adverse Effect (it being understood that this Section 9.8 shall not restrict any transaction otherwise permitted by Section 10.3 or Section 10.4):

(a) operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable Contractual Requirements and all applicable Requirements of Law, including applicable proration requirements and Environmental Laws, and all applicable Requirements of Law of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including all equipment, machinery and facilities; and

(c) to the extent a Credit Party is not the operator of any property, the Borrower shall use commercially reasonable efforts to cause the operator to operate such property in accordance with customary industry practices.

9.9 Additional Guarantors, Grantors and Collateral.

(a) Subject to any applicable limitations set forth in the Guarantee or the Security Documents, the Borrower will cause (i) any direct or indirect Domestic Subsidiary (other than any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date and (ii) any Domestic Subsidiary of the Borrower that ceases to be an Excluded Subsidiary, in each case within 45 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion) to execute (A) a Guarantee or a supplement to the Guarantee, substantially in the form of Exhibit H thereto, in order to become a Guarantor, (B) a supplement to the Collateral Agreement, substantially in the form of Exhibit H thereto, in order to become a grantor and a pledgor thereunder, and (C) a joinder to the Intercompany Note. In connection with the execution and delivery of the Guarantee, the Borrower shall provide a customary opinion of counsel with respect to the Guarantee in form and substance reasonably satisfactory to the Administrative Agent.

(b) Subject to any applicable limitations set forth in the Collateral Agreement, (i) the Borrower will pledge, and, if applicable, will cause each other Subsidiary Guarantor (or Person required to become a Subsidiary Guarantor pursuant to Section 9.9(a)) to pledge, to the Collateral Agent, for the benefit of the Secured Parties, (A) all of the Equity Interests (other than any Excluded Equity Interests) directly owned by the Borrower or any Credit Party (or Person required to become a Guarantor pursuant to Section 9.9(a)), in each case, formed or otherwise purchased or acquired after the Closing Date, pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit H, thereto and (B) except with respect to intercompany Indebtedness, all evidences of Indebtedness of the type set forth in clauses (a) and (b) of the definition of Indebtedness in a principal amount in excess of $500,000 (individually) that is owing to the Borrower or any Guarantor (or Person required to become a Guarantor pursuant to Section 9.9(a)) (which shall be evidenced by a promissory note), in each case pursuant to supplements to the Collateral Agreement substantially in the form of Exhibit H thereto and (ii) Parent and Holdings will pledge, to the Collateral Agent, for the benefit of the Secured Parties, all of the Equity Interests of the Borrower owned by Parent or Holdings, as applicable, pursuant to the Collateral Agreement substantially in the form of Exhibit H, thereto.

(c) The Borrower agrees that all Indebtedness of the Borrower and each of its Restricted Subsidiaries that is owing to any Credit Party (or a Person required to become a Subsidiary Guarantor pursuant to Section 9.9(a)) shall be evidenced

by the Intercompany Note, which promissory note shall be required to be pledged to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Collateral Agreement.

(d) In connection with each redetermination (but not any adjustment) of the Borrowing Base, the Borrower shall review the applicable Reserve Report, if any, and the list of current Mortgaged Properties (as described in Section 9.12(c)), to ascertain whether the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is sufficient to meet the Collateral Coverage Minimum after giving effect to exploration and production activities, acquisitions, Dispositions and production. In the event that the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is not sufficient to meet the Collateral Coverage Minimum, then the Borrower shall, and shall cause the Credit Parties to, grant, within 60 days of delivery of the certificate required under Section 9.12(c) (or such longer period as the Administrative Agent may agree in its reasonable discretion), to the Collateral Agent as security for the Obligations a Lien (subject to Liens permitted by Section 10.2) on additional Oil and Gas Properties not already subject to a Lien of the Security Documents such that, after giving effect thereto, the PV-9 of the Mortgaged Properties (calculated at the time of redetermination) is sufficient to meet the Collateral Coverage Minimum. All such Liens will be created and perfected by and in accordance with the provisions of the Security Documents, including, if applicable, any additional Mortgages. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its property and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with the provisions of Sections 9.9(a), (b) and (c).

9.10 Use of Proceeds.

(a) The Borrower will use the proceeds of Loans for the acquisition, development and exploration of Oil and Gas Properties, and for working capital and other general corporate and partnership purposes of the Borrower and its Subsidiaries (including any transaction expressly permitted hereunder).

(b) The Borrower will use Letters of Credit (i) for general corporate and partnership purposes and (ii) to support deposits required under purchase and sale agreements pursuant to which the Borrower or one or more Restricted Subsidiaries may acquire Oil and Gas Properties and (iii) to backstop obligations under contracts entered into from time to time incident to the Borrower's or any of its Subsidiaries' business.

9.11 Further Assurances.

(a) Subject to the applicable limitations set forth in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture, filings, assignments of as-extracted collateral to the extent constituting Collateral, mortgages, deeds of trust and other documents) that the Collateral Agent or the Required Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

(b) Notwithstanding anything to the contrary in this Agreement, the Collateral Agreement, or any other Credit Document, the Administrative Agent may grant extensions of time for or waivers of the requirements of the creation or perfection of security interests in or the obtaining of title opinions or other title information, legal opinions, appraisals, flood insurance and surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Credit Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items is not required by law or cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Credit Documents.

(c) Notwithstanding the foregoing provisions of this Section 9.11 or anything in this Agreement or any other Credit Document to the contrary: (i) the Collateral shall not include any property constituting an Excluded Asset while such property constitutes an Excluded Asset and (ii) no actions in any jurisdiction outside of the United States or that are necessary to comply with any Requirement of Law of any jurisdiction outside of the United States shall be required in order to create any security interest in assets located, titled, registered or filed outside of the United States or to prefect such security interests (it

being understood that there shall be no collateral agreements, security agreements, pledge agreements, or share charge (or mortgage) agreements governed under the laws of any jurisdiction outside of the United States); provided that nothing in this Section 9.11 or any other provision of the Credit Documents shall affect or impair the Borrower's obligation to meet the Collateral Coverage Minimum.

9.12 Reserve Reports.

(a) On or before (x) the date that is thirty (30) days after the Closing Date, (y) September 1, 2017 and (z) thereafter, March 1st and September 1st of each year, the Borrower shall furnish to the Administrative Agent a Reserve Report evaluating, as of the immediately preceding January 1st and July 1st, the Proved Reserves of the Borrower and the Credit Parties located within the geographic boundaries of the United States of America and other applicable Oil and Gas Properties of the Credit Parties that the Borrower desires to have included in any calculation of the Borrowing Base. Each Reserve Report as of (i) January 1st shall be prepared by one or more Approved Petroleum Engineers and (ii) July 1st shall be prepared, at the sole election of the Borrower, (A) by one or more Approved Petroleum Engineers or (B) by or under the supervision of the chief engineer of Sanchez O&G or Sanchez.

(b) In the event of an Requested Interim Redetermination, the Borrower shall furnish to the Administrative Agent a Reserve Report prepared by one or more Approved Petroleum Engineers or prepared under the supervision of the chief engineer of Sanchez O&G or Sanchez. For any Requested Interim Redetermination pursuant to Section 2.14(b), the Borrower shall provide such Reserve Report with an "as of" date as required by the Administrative Agent, as soon as possible, but in any event no later than 30 days, in the case of any Requested Interim Redetermination requested by the Borrower or 45 days, in the case of any Requested Interim Redetermination requested by the Administrative Agent or the Lenders, following the receipt of such request.

(c) With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent a Reserve Report Certificate from an Authorized Officer of the Borrower certifying that in all material respects:

(i) in the case of Reserve Reports prepared by or under the supervision of the chief engineer of Sanchez O&G or Sanchez (other than January 1 Reserve Reports), such Reserve Report has been prepared, except as otherwise specified therein, in accordance with the procedures used in the immediately preceding January 1 Reserve Report or the Initial Reserve Report, if no January 1 Reserve Report has been delivered;

(ii) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects;

(iii) assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth in an exhibit to such certificate, the Borrower or another Credit Party has good and defensible title to the Borrowing Base Properties evaluated in such Reserve Report (other than those (A) Disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (B) leases that have expired in accordance with their terms and (C) with title defects disclosed in writing to the Administrative Agent) and such Borrowing Base Properties are free of all Liens except for Liens permitted by Section 10.2;

(iv) except as set forth on an exhibit to such certificate, as of the date of such Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 8.16 with respect to the Credit Parties' Oil and Gas Property evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(v) none of the Borrowing Base Properties have been Disposed of since the date of the last Borrowing Base determination except those Borrowing Base Properties listed on such certificate as having been Disposed of; and

(vi) the certificate shall also attach, as schedules thereto, a list of (A) all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and (B) all Borrowing Base Properties constituting Proved Reserves evaluated by such Reserve Report that are Mortgaged Property and demonstrating that the PV-9 of such Mortgaged Property (calculated at the time of delivery of such Reserve Report) is sufficient to meet the Collateral Coverage Minimum.

9.13 Title Information.

(a) In connection with the delivery to the Administrative Agent of each Reserve Report required by Section 9.12(a) following the Closing Date, the Borrower will use commercially reasonably efforts to deliver or make available, if reasonably requested by the Administrative Agent in writing (which such request (i) if, in connection with acquisitions of Oil and Gas Properties resulting in an adjustment to the Borrowing Base, may be made at the time of any such Borrowing Base adjustment and (ii) otherwise, may not be made more than twice per year), within sixty (60) days of the date of such written request (or such longer period as the Administrative Agent may agree in its reasonable discretion), title information in form and substance reasonably acceptable to the Administrative Agent covering enough of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report, so that the Administrative Agent shall have had the opportunity to review (including title information previously made available to the Administrative Agent) title information reasonably satisfactory to the Administrative Agent on Borrowing Base Properties constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(b) If title information has been provided under Section 9.13(a) and the Administrative Agent provides written notice to the Borrower that title defects or exceptions exist with respect to such properties, then the Borrower shall, within sixty (60) days of its receipt of such notice (or such longer period as the Administrative Agent may agree in its reasonable discretion) (i) cure any such title defects or exceptions (including defects or exceptions as to priority of the Collateral Agent's Liens that are not permitted by Section 10.2) raised by such information, (ii) substitute acceptable Mortgaged Properties having an equivalent value with no title defects or exceptions except for Liens permitted by Section 10.2 and/or (iii) deliver title information in form and substance reasonably acceptable to the Administrative Agent so that the Administrative Agent shall have received, (including title information previously made available to the Administrative Agent) reasonably satisfactory title information on Hydrocarbon Interests constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(c) If any title defect or exception requested by the Administrative Agent to be cured cannot be cured or if the Borrower is unable to provide reasonably acceptable title information on Hydrocarbon Interests constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report, in each case, within such 60-day period (or longer period as the Administrative Agent may agree in its reasonable discretion), such default shall not be a Default or Event of Default, but instead the Administrative Agent and Required Lenders shall have the right to adjust the Borrowing Base as contemplated by Section 2.14(g).

9.14 Compliance with Environmental Laws. The Borrower will, and will cause each of the Restricted Subsidiaries to, except, in each case, to the extent that the failure to do so would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) comply, and take all commercially reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits; (b) obtain, maintain and renew all Environmental Permits necessary for its operations and properties; and, (c) in each case to the extent the Credit Parties or Subsidiaries are required by Environmental Laws, conduct any investigation, remedial or other corrective action necessary to address Hazardous Materials at any property or facility in accordance with applicable Environmental Laws.

9.15 Deposit Account, Securities Account and Commodity Account Control Agreements. The Borrower will, and will cause each Guarantor to, in connection with any Deposit Account, Securities Account or Commodity Account (in each case, other than any Excluded Account for so long as it is an Excluded Account) (a) held or maintained on the Closing Date by the Borrower or any such Guarantor, promptly but in any event within sixty (60) days of the Closing Date (or such later date as the Collateral Agent may agree in its sole discretion), enter into and deliver to the Collateral Agent deposit account control agreements, securities account control agreements and commodity account control agreements, as applicable, in form and substance reasonably satisfactory to the Collateral Agent and the account bank or securities intermediary, as applicable, for any such Deposit Account, Securities Account or Commodity Account and (b) established on or after the Closing Date by the Borrower or any such Guarantor, (i) provide written notice to the Administrative Agent of the establishment of such Deposit Account, Securities Account or Commodity Account within ten (10) Business Days of such establishment (or such later time as the Administrative Agent may agree in its sole discretion) and (ii) promptly but in any event within thirty (30) days of the establishment of such Deposit Account, Securities Account or Commodity Account (or such later date as the Collateral Agent may agree in its sole discretion), enter into and deliver to the Collateral Agent a deposit account control agreement, securities account control agreement or commodity account control agreement, as applicable, in form and substance reasonably satisfactory to the Collateral Agent and the account bank, securities intermediary, or commodity intermediary as applicable, for any such Deposit Account, Securities Account or Commodity Account. After the occurrence and during the continuance of an Event of Default, the Collateral Agent may give instructions directing the disposition of funds credited to any Deposit Account, Securities Account or Commodity Account and/or withhold any withdrawal rights from the Borrower or any Guarantor with respect to funds credited to any Deposit Account, Securities Account or Commodity Account.

9.16 Minimum Hedged Volumes. The Borrower will on or before the last day of each fiscal quarter of the Borrower, enter into Hedge Agreements with Approved Counterparties so that, as of the last day of each such fiscal quarter, the Borrower will have entered into Hedge Agreements having notional volumes (excluding any volumes hedged pursuant to (x) basis differential Hedge Agreements or (y) Hedge Agreements which when entered into where not at then current market prices) equal to at least 50% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Borrower's and its Restricted Subsidiaries' Proved Developed Producing Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the period commencing with the last day of such fiscal quarter and ending twenty-four (24) months later; provided that the minimum hedging volume requirement set forth in this Section 9.16 shall be suspended during any time that the (a) Consolidated Total Net Leverage Ratio as of such time is equal to or less than 2.00:1.00 and (b) the aggregate outstanding principal amount of Loans at such time does not exceed $100,000,000.

9.17 Separateness. The Borrower will not, and will not permit any Restricted Subsidiary to:

(a) fail to comply with the covenants set forth in (i) Section 15.22 of the Borrower's LPA and any similar covenants related to separateness and (ii) any similar covenants set forth in the Organizational Documents of any Restricted Subsidiary;

(b) fail to observe all corporate, limited liability company or partnership formalities and other formalities required by their respective Organizational Documents or the laws of the jurisdiction where such entity is organized, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the law in the jurisdiction where such entity is organized;

(c) commingle its funds or assets with the funds or assets of any other Person; provided, however, that distributions made by the Borrower or the Restricted Subsidiary, as applicable, not in violation of its Organizational Documents or the Credit Documents shall not be considered assets of the Borrower or the Restricted Subsidiary, as applicable for purposes of this Section 9.17(c);

(d) fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates);

(e) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(f) hold itself out to be responsible for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person (other than pursuant to the arrangements provided for in (i) the Purchase and Sale Agreement, (ii) the Management Services Agreement, (iii) the Marketing Agreement, (iv) the Side Letter Agreement, (v) the Development Agreement and (vi) pursuant to Guarantees in accordance with the Credit Documents);

(g) fail to (i) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (ii) conduct its business solely in its own name, (iii) hold its assets in its own name or (iv) correct any known misunderstanding regarding its separate identity (provided the Borrower may authorize agents pursuant to the Management Services Agreement, in their own name as agents for the Borrower, to perform management services on behalf of the Borrower);

(h) fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(i) fail to pay its own liabilities from its own funds (other than pursuant to the arrangements provided for in (i) the Purchase and Sale Agreement, (ii) the Management Services Agreement, (iii) the Marketing Agreement, (iv) the Side Letter Agreement, (v) the Development Agreement and (vi) pursuant to Guarantees in accordance with the Credit Documents);

(j) identify its partners or other Affiliates, as applicable, as a division or part of it;

(k) guarantee, or otherwise become a restricted subsidiary pursuant to any agreement governing, the Indebtedness (as defined in the Borrower's LPA as in effect on the date hereof) of Holdings or any of its Affiliates (other than the Borrower and its Subsidiaries);

(l) fail to be adequately capitalized to engage in its business separate and apart from Sanchez and its Affiliates and to remain solvent;

(m) fail to ensure that all material transactions between the Borrower, its Subsidiaries, on the one hand, and Sanchez or its Affiliates (other than the Borrower and its Restricted Subsidiaries), on the other hand, whether currently existing or hereafter entered into, will be on an arm's length basis;

(n) have the same slate of Persons serving as officers of Sanchez or any of its Affiliates (excluding the Borrower and any of its Restricted Subsidiaries) also serve in the same capacities with the Borrower or any of its Subsidiaries;

(o) permit the assets of the Borrower and its Subsidiaries to be listed as assets on the financial statement of any other Person; provided, however, that the assets of the Borrower and its Subsidiaries may be included in a consolidated financial statement of Sanchez and its Affiliates, provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of the Borrower and its Subsidiaries and Parent, Holdings and their Affiliates and to indicate that the Borrower's and its Subsidiaries' assets and credit are not available to satisfy the debts and other obligations of Parent, Holdings, their respective Affiliates or any other Person and (ii) such assets shall be listed on the Borrower's and its Subsidiaries' own separate balance sheet(s);

(p) the representations made pursuant to Section 15.22(c) of the Borrower's LPA shall prove to be untrue.

It is understood that, for the avoidance of doubt, compliance with the covenants set forth in other Sections shall not be deemed to constitute compliance with the covenants contained in this Section 9.17.

9.18 Proceeds of Loans. The Borrower will, and will cause each of the Guarantors, to maintain the proceeds of the Loans in a Controlled Account until such proceeds are transferred to a third party in a transaction not prohibited by the Credit

Documents or a deposit account which is not required to be a Controlled Account for a purpose that is permitted by the Credit Documents.

9.19 Post-Closing Obligations.

(a) The Borrower will, within thirty (30) days following the Closing Date (subject to extension by the Administrative Agent in its sole discretion), provide title information in form and substance reasonably satisfactory to the Administrative Agent covering enough of the Credit Parties' Borrowing Base Properties evaluated by the Initial Reserve Report, so that the Administrative Agent shall have had the opportunity to review title information reasonably satisfactory to the Administrative Agent on Borrowing Base Properties constituting at least 85% of the PV-9 of the Credit Parties' Borrowing Base Properties evaluated by such Reserve Report.

(b) The Borrower will use commercially reasonable efforts to enter into Hedge Agreements with Approved Counterparties as soon as practicable after the Closing Date, taking into account the Borrower's good faith determination of market factors and volume limitations (but in no event later than the twentieth (20th) Business Day following the Closing Date), having notional volumes (excluding any volumes hedged pursuant to basis differential Hedge Agreements) equal to not less than 80.0% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Borrower's and its Restricted Subsidiaries' Proved Developed Producing Reserves in respect of the Acquired Assets based upon the Initial Reserve Reports for the period of 19 through 36 months after the Closing Date (beginning with the calendar month no later than April 2017) . With respect to such hedging requirements (1) at least 75.0% of the notional volumes in respect of such Hedge Agreement provided for thereunder shall be in the form of (x) swaps, (y) puts or (z) collars (which, in the case of puts and collars, such puts and the put component of such collars shall be at then market prices as determined in good faith and certified to by an Authorized Officer of the Borrower; provided that such puts and the put component of such collars may be entered into at prices that are within 5.0% of then market prices for the relevant commodity being hedged) and (2) on a time of the week during business hours identified by the Borrower in writing (which may include email) to the Administrative Agent beginning no later than five (5) Business Days of the Closing Date, the Borrower shall provide a weekly update on the status of hedges put in place and hold a call with the Administrative Agent to discuss the hedging process on a weekly basis until the aforementioned requirement in this Section 9.19 has been met (it being agreed and understood that if the Borrower fails to provide such update and hold such call at such specified times (other than as a result of the failure of the Administrative Agent to participate in such call), the Borrower shall have three (3) Business Days (or such longer time acceptable to the Administrative Agent in its sole discretion) after receipt of written notice from the Administrative Agent of the failure to so provide such update and hold such call and if such update is provided and call occurs within such three (3) Business Day period (or such longer time acceptable to the Administrative Agent in its sole discretion), then no failure of this Section 9.19 shall be deemed to have occurred hereunder).

(c) Within 60 days of the Closing Date, the Borrower shall, and shall cause the Credit Parties to, grant to the Collateral Agent as security for the Obligations a Lien (subject to Liens permitted by Section 10.2) on Oil and Gas Properties such that, after giving effect thereto, the PV-9 of the Borrowing Base Properties constituting Mortgaged Property is sufficient to meet the Collateral Coverage Minimum. All such Liens will be created and perfected by and in accordance with the provisions of the Security Documents. In order to comply with the foregoing, if any Restricted Subsidiary places a Lien on its property and such Subsidiary is not a Guarantor, then it shall become a Guarantor and comply with the provisions of Sections 9.9(a), (b) and (c). In connection with the delivery of Mortgages pursuant to this Section 9.19(c), the Borrower shall deliver to the Administrative Agent (i) customary opinions of counsel in form and substance reasonably acceptable to the Administrative Agent and (ii) any other documents reasonably requested by the Administrative Agent for the prompt completion of the recording or filing of such Mortgages as may be necessary to create a valid first-priority mortgage Lien (subject to Liens permitted by Section 10.02) on such Oil and Gas Properties.

SECTION 10. NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter, until Payment in Full:

10.1 Limitation on Indebtedness. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness other than the following:

(a) Indebtedness arising (i) under the Credit Documents and (ii) any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness; provided that, if such Indebtedness is secured by any of the Collateral, it shall be secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(b) Indebtedness of a Borrower or any Restricted Subsidiary in an amount not to exceed the Applicable Equity Amount so long as such Indebtedness (i) is (A) unsecured or (B) if secured, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement and (ii) does not mature or become subject to mandatory redemption prior to 91 days after the Maturity Date if such Indebtedness is of the type referred to in clauses (a) and (b) of the definition of Indebtedness;

(c) Indebtedness of (i) the Borrower or any Guarantor owing to the Borrower or any Subsidiary; provided that any such Indebtedness owing by a Credit Party to a Subsidiary that is not a Guarantor shall (x) be evidenced by the Intercompany Note or (y) otherwise be outstanding on the Closing Date so long as such Indebtedness is evidenced by an intercompany note substantially in the form of Exhibit H or otherwise subject to subordination terms substantially identical to the subordination terms set forth in Exhibit H, in each case, to the extent permitted by Requirements of Law, (ii) any Subsidiary that is not a Guarantor owing to any other Subsidiary that is not a Guarantor and (iii) to the extent permitted by Section 10.5, any Subsidiary that is not a Guarantor owing to the Borrower or any Guarantor;

(d) subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness or other obligations of the Borrower or other Restricted Subsidiaries that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(d), guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; provided that (A) if the Indebtedness being guaranteed under this Section 10.1(d) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness and (B) no guarantee by any Restricted Subsidiary of any Permitted Additional Debt shall be permitted unless such Restricted Subsidiary shall have also provided a guarantee of the Obligations substantially on the terms set forth in the Guarantee;

(e) Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors, licensees or sublicensees or (ii) otherwise constituting Investments permitted by Sections 10.5(c), 10.5(f), 10.5(g), 10.5(h), 10.5(i), 10.5(n), 10.5(o) and 10.5(p);

(f) (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred prior to or within 270 days following the acquisition, construction, lease, repair, replacement, expansion or improvement of assets (real or personal, and whether through the direct purchase of property or the Equity Interests of a Person owning such property) to finance the acquisition, construction, lease, repair, replacement expansion, or improvement of such assets, (ii) Indebtedness arising under Capital Leases, other than (A) Capital Leases in effect on the Closing Date and (B) Capital Leases entered into pursuant to Section 10.1(f)(i) above and (iii) any Permitted Refinancing Indebtedness issued or incurred to Refinance any such Indebtedness; provided, that the aggregate principal amount of Indebtedness permitted by Sections 10.1(f)(i), 10.1(f)(ii) and 10.1(f)(iii) shall not exceed at any time outstanding the greater of $20,000,000, 2.5% of Consolidated Total Assets and 2.5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date);

(g) Indebtedness outstanding on the date hereof to the extent such Indebtedness is set forth on Schedule 10.1 and any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness;

(h) Indebtedness in respect of Hedge Agreements, subject to the limitations set forth in Section 10.10;

(i) Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, and obligations in respect of letters of credit, bank guaranties or instruments related thereto, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice;

(j) (i) other additional Indebtedness and (ii) any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness, provided that, in each case, (A) the aggregate principal amount of Indebtedness outstanding at any time pursuant to this Section 10.1(j) shall not at the time of incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis, exceed the greater of $50,000,000, 5% of Consolidated Total Assets and 5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date) and (B) if such Indebtedness is secured by any of the Collateral, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(k) Indebtedness in respect of Permitted Additional Debt and any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness; provided that (i) Liquidity shall be greater than or equal to 15.0% of the Borrowing Base immediately prior to such incurrence, (ii) immediately after giving effect to the incurrence or issuance thereof and the use of proceeds therefrom, the Borrower shall be in compliance with the Financial Performance Covenants on a Pro Forma Basis (with the maximum ratio for the Consolidated Total Net Leverage Ratio Financial Covenant being deemed to be 3.50:1.00 for this purpose) and (iii) if secured, secured by Junior Liens subject to the representative of such Indebtedness becoming party to a Customary Intercreditor Agreement;

(l) Cash Management Obligations, Cash Management Services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(m) Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services;

(n) Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case assumed or entered into in connection with the Transactions, Investments permitted by Section 10.5 and the Disposition of any business, assets or Equity Interests not prohibited hereunder;

(o) Indebtedness of the Borrower or any Restricted Subsidiary consisting of obligations to pay insurance premiums;

(p) Indebtedness representing deferred compensation to employees, consultants or independent contractors of (i) the Borrower or (ii) to the extent attributable to the ownership or operation of Parent, Holdings, the Borrower and its Restricted Subsidiaries incurred in the ordinary course of business or consistent with past practice;

(q) Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transactions or any other Investment permitted hereunder; and

(r) Indebtedness associated with bonds or surety obligations required by Requirements of Law or by Governmental Authorities in connection with the operation of Oil and Gas Properties in the ordinary course of business.

For purposes of determining compliance with Section 10.1, in the event that an item of Indebtedness (or any portion thereof) at any time, whether at the time of incurrence or issuance or upon the application of all or a portion of the proceeds thereof or subsequently, meets the criteria of more than one of the categories of permitted Indebtedness described in Sections

10.1(a) through 10.1(r) above, the Borrower, in its sole discretion, will classify and may subsequently reclassify such item of Indebtedness (or any portion thereof) in any one or more of the types of Indebtedness described in Sections 10.1(a) through 10.1(r) and will only be required to include the amount and type of such Indebtedness in such of the above Sections as determined by the Borrower at such time. The Borrower will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 10.1(a) through 10.1(r) above.

The accrual of interest or dividends, the accretion of accreted value, the accretion or amortization of original issue discount, and the payment of interest or dividends in the form of additional Indebtedness of the same class, accretion or amortization of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies, will, in each case, not be deemed to be an incurrence of Indebtedness for purposes of this Section 10.1. The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness or Disqualified Stock, as applicable, being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing. The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal (or equivalent) amount thereof that would be shown on a balance sheet of the Borrower dated such date prepared in accordance with GAAP.

In no event shall any definition of 'Change of Control' or an equivalent concept in any Material Indebtedness of the type contemplated in clauses (a) and (b) of the definition of Indebtedness be less favorable to the Borrower than the definition of Change of Control herein unless this Agreement is amended to incorporate any such less favorable terms.

10.2 Limitation on Liens. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or any Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a) Liens arising under the Credit Documents to secure the Obligations (including Liens in respect of any Letter of Credit or Letter of Credit Application or Liens contemplated by Section 3.7) or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage);

(b) Permitted Liens (which shall not secure Indebtedness set forth in clauses (a) and (b) of the definition thereof);

(c) Liens (including liens arising under Capital Leases to secure obligations under any Capital Lease) securing Indebtedness permitted pursuant to Section 10.1(f); provided that (i) such Liens attach concurrently with or within 270 days after the acquisition, lease, repair, replacement, construction, expansion or improvement (as applicable) financed thereby, (ii) other than the property financed by such Indebtedness, such Liens do not at any time encumber any property, except for replacements thereof and accessions and additions to such property and the proceeds and the products thereof and customary security deposits and (iii) with respect to Capital Leases, such Liens do not at any time extend to or cover any assets (except for accessions and additions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to, or acquired, constructed, repaired, replaced or improved with the proceeds of, such Indebtedness; provided that in each case individual financings permitted pursuant to Section 10.1(f) provided by one lender may be cross collateralized to other financings permitted pursuant to Section 10.1(f) provided by such lender (and its Affiliates);

(d) Liens existing on the date hereof listed on Schedule 10.2(d) and any such replacement thereof that does not increase the principal amount of the Indebtedness secured by such Lien or expand the Collateral subject to such Lien;

(e) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien permitted by this Section 10.2; provided, however, that (x) such new Lien shall be limited to all or part of the same type of property that secured the original Indebtedness (plus improvements on and accessions to such property) (or upon or in after-acquired property (i) that is affixed or incorporated into the property covered by such Lien or (ii) if the terms of such Indebtedness require or include a pledge of after acquired property (it being understood that such requirement shall not be

permitted to apply to any property to which such requirement would not have applied but for such acquisition)), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the applicable Indebtedness at the time the original Lien became a Lien permitted hereunder, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement and (z) on the date of the incurrence of the Indebtedness secured by such Liens, the grantors of any such Liens shall comprise only the same Persons or a subset of such Persons that were the grantors of the Liens securing the debt being refinanced, refunded, extended, renewed or replaced; provided further that in no event shall any such Liens secure Indebtedness set forth in clauses (a) and (b) of the definition thereof with the Collateral unless secured by Junior Liens and the representative of such Indebtedness becomes party to a Customary Intercreditor Agreement;

(f) Liens securing Indebtedness or other obligations (i) of the Borrower or a Restricted Subsidiary in favor of a Credit Party that are Junior Liens and (ii) of any Restricted Subsidiary that is not a Credit Party in favor of any Restricted Subsidiary that is not a Credit Party;

(g) Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 10.5 to be applied against the purchase price for such Investment and (ii) consisting of an agreement to Dispose of any property in a transaction permitted under Section 10.4, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(h) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(i) Liens that are contractual rights of set-off (i) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (ii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(j) Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement in connection with an Investment permitted under Section 10.5;

(k) Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(l) Liens in respect of Production Payments and Reserve Sales, subject to adjustment of the Borrowing Base as set forth in Section 2.14(f) as required under Section 10.4(b);

(m) agreements to subordinate any interest of the Borrower or any Restricted Subsidiary in any accounts receivable or other proceeds arising from inventory consigned by the Borrower or any Restricted Subsidiary pursuant to an agreement entered into in the ordinary course of business;

(n) Liens securing any Indebtedness permitted by (i) Section 10.1(d) (solely and to the same extent that the Indebtedness guaranteed by such Guarantee Obligations is permitted to be subject to a Lien hereunder), (ii) Sections 10.1(i), 10.1(n) and 10.1(r), so long as the aggregate amount of Indebtedness, secured pursuant to this Section 10.2(n)(ii) does not exceed the greater of $20,000,000, 2% of Consolidated Total Assets and 2% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date of incurrence of such Indebtedness based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date), and (iii) Section 10.1(k) (provided that such Liens are Junior Liens on the Collateral and subject to a Customary Intercreditor Agreement);

(o) Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Credit Documents on the property upon which it is a Lien, or

(ii) materially impairs the use of the property covered by such Lien for the purposes for which such property is held; provided that such Liens described in prongs (i) and (ii) shall not be deemed to include institutional controls or activity and use limitations that are utilized in connection with remedial actions pursuant to Environmental Laws;

(p) any amounts held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof, or under any indenture or other debt agreement pursuant to customary discharge, redemption or defeasance provisions to the extent any amount would be permitted to be applied to such Indebtedness in accordance with Section 10.7 on the date when such amount was provided to such trustee; and

(q) additional Liens on property not constituting Borrowing Base Properties and/or Junior Liens on Collateral so long as the outstanding principal amount of the obligations secured thereby, when aggregated with the outstanding principal of other obligations secured by Liens permitted under this Section 10.2(q), at the time of the incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis does not exceed the greater of $50,000,000, 5% of Consolidated Total Assets and 5% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date on which such Lien or the Indebtedness secured is incurred based upon the financial statements or Reserve Report, as applicable, most recently available prior to the such date).

No intention to subordinate the first priority Lien granted in favor of the Administrative Agent and the Lenders is to be hereby implied or expressed by the permitted existence of the Liens permitted under this Section 10.2 or the use of the phrase "subject to" when used in connection with Permitted Liens, Liens permitted by this Section 10.2 or otherwise. It is understood that there shall be no Liens on non-Borrowing Base Properties securing Consolidated Total Indebtedness (excluding Indebtedness of the type set forth in clause (e) of the definition of Indebtedness) other than Lien securing the Obligations and Junior Liens securing Specified Additional Debt.

10.3 Limitation on Fundamental Changes. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, all or substantially all its business units, assets or other properties, taken as a whole, except that:

(a) any Restricted Subsidiary that is not a Guarantor may (i) merge, amalgamate or consolidate with or into any other Restricted Subsidiary and (ii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower, a Guarantor or any other Restricted Subsidiary of the Borrower;

(b) any Subsidiary Guarantor may (i) merge, amalgamate or consolidate with or into any other Subsidiary Guarantor and (ii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Guarantor; and

(c) any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise Disposed of or transferred in accordance with Section 10.4, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution.

10.4 Limitation on Sale of Assets. The Borrower will not, and will not permit any of the Restricted Subsidiaries to, (x) convey, sell, lease, sell and leaseback, assign, transfer (including any Production Payments and Reserve Sales) or otherwise dispose (each of the foregoing a "Disposition") of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired or (y) sell to any Person (other than the Borrower or a Guarantor) any shares owned by it of any Restricted Subsidiary's Equity Interests, except that:

(a) the Borrower and the Restricted Subsidiaries may Dispose of (i) inventory and other goods held for sale, including Hydrocarbons, obsolete, worn out, used or surplus equipment, vehicles and other assets (other than accounts receivable) in the ordinary course of business, (ii) Permitted Investments, and (iii) assets, other than Proved Reserves of the Borrower and its Restricted Subsidiaries, for the purposes of charitable contributions or similar gifts to the extent such assets



009225

are not material to the ability of the Borrower and its Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b) the Borrower and the Restricted Subsidiaries may Dispose of any Borrowing Base Properties or of all the Equity Interests in a Subsidiary owning Borrowing Base Properties so long as (i) such Disposition is for Fair Market Value, (ii) at least 75% of the consideration for such Disposition is cash received by the Borrower or Restricted Subsidiary making such Disposition, (iii) if the aggregate Borrowing Base Value of all such Borrowing Base Properties Disposed of since the later of (A) the last Scheduled Redetermination Date and (B) the last adjustment of the Borrowing Base made pursuant to Section 2.14(f) exceeds 5.0% of the then-effective Borrowing Base (calculated together with the other items required under Section 2.14(f) including the termination or off-set of Hedge Agreements), then the Borrowing Base shall be adjusted in accordance with the provisions of Section 2.14(f) and (iv) (A) no Event of Default exists or would result such Disposition and (B) no Borrowing Base Deficiency exists or would result therefrom (unless, in each case, the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency);

(c) the Borrower and the Restricted Subsidiaries may Dispose of property or assets to the Borrower or to a Restricted Subsidiary; provided that if the transferor of such property is a Credit Party (i) the transferee thereof is a Credit Party or (ii) such transaction is permitted under Section 10.5(f)(iii);

(d) to the extent such transaction constitutes a Disposition, the Borrower and any Restricted Subsidiary may effect any transaction permitted by Section 10.2 (other than Section 10.2(l)), Section 10.3, Section 10.5(d), Section 10.5(h) (as contemplated by the proviso of Section 10.5(h)(i)) or Section 10.5(l), or Section 10.6 (other than in the case of Section 10.6, to the extent any such Restricted Payment by the Borrower consists of Oil and Gas Properties);

(e) the Borrower and the Restricted Subsidiaries may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real (other than Oil and Gas Properties), personal or intellectual property in the ordinary course of business;

(f) Like-kind exchanges of property (other than Borrowing Base Properties) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property and (iii) any such Disposition is for Fair Market Value;

(g) Farm-Out Agreements with respect to undeveloped acreage to which no Proved Reserves are attributable and assignments in connection with such Farm-Out Agreements;

(h) Dispositions at Fair Market Value of Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding agreements to the extent the same would be permitted under Section 10.5(i); provided that, immediately after giving effect thereto and on a Pro Forma Basis, (i) no Event of Default shall have occurred and be continuing and (ii) no Borrowing Base Deficiency exists (unless the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency);

(i) transfers of property subject to a Casualty Event or in connection with any condemnation proceeding with respect to Collateral;

(j) Dispositions or discounts without recourse of accounts receivable in true sale transactions (i) in connection with the collection or compromise thereof in the ordinary course of business or (ii) to the extent the proceeds thereof are used to prepay any Loans then outstanding;

(k) the unwinding or termination of any Hedge Agreement (subject to the terms of Section 2.14(f));

(l) Dispositions of Oil and Gas Properties that are not Borrowing Base Properties or all the Equity Interests of any Restricted Subsidiary or of any Minority Investment owning Oil and Gas Properties that are not Borrowing Base Properties; provided that, immediately after giving effect thereto and on a Pro Forma Basis, (i) no Event of Default shall have

occurred and be continuing and (ii) no Borrowing Base Deficiency exists (unless the net proceeds of such Disposition are applied to reduce such Borrowing Base Deficiency); provided further that, if such Restricted Subsidiary or Minority Investment also own assets other than Oil and Gas Properties that are not Borrowing Base Properties, such Disposition shall not permitted pursuant to this Section 10.4(l) unless another clause of Section 10.4 permits such Disposition with respect to such assets;

(m) any issuance or sale of Equity Interests in, or sale of Indebtedness or other securities of, an Unrestricted Subsidiary (or a Restricted Subsidiary which owns an Unrestricted Subsidiary at Fair Market Value so long as such Restricted Subsidiary owns no assets other than the Equity Interests of such Unrestricted Subsidiary);

(n) subject to adjustment of the Borrowing Base as set forth in Section 2.14(f) to the extent applicable, any swap of assets (other than cash equivalents) in exchange for other assets in the ordinary course of business of comparable or greater value to the business of the Borrower and its Restricted Subsidiaries, taken as a whole, as determined in good faith by the management of the Borrower; it is understood, for avoidance of doubt, that the Alternative Equitable Partition is not permitted under this Section 10.4(n); provided, that, any Disposition of Borrowing Base Properties pursuant to this Section 10.4(n) in any transaction or series of related transactions shall be limited to properties having a value not to exceed 10% of the Borrowing Base then in effect unless otherwise agreed to by the Administrative Agent in its sole discretion;

(o) (i) any Restricted Subsidiary that is not a Guarantor may Dispose of its assets to the Borrower, a Guarantor or any other Restricted Subsidiary of the Borrower and (ii) any Guarantor may Dispose of its assets to the Borrower or any of its Subsidiary Guarantors; and

(p) the Alternative Equitable Partition (as defined in the Joint Development Agreement), subject to (i) prior receipt of the ROFO Notice (as defined in the Joint Development Agreement) as set forth in Section 9.1(n)(iii) and (ii) prior provision of information (A) reasonably necessary to consummate an Alternative Equitable Partition Redetermination upon the consummation of such Alternative Equitable Participation and (B) reasonably requested by the Administrative Agent related to the Alternative Equitable Partition, in each case for this Section 10.4(p)(ii) as soon as practicable in light of the terms of the Joint Development Agreement.

To the extent any Collateral is Disposed of as expressly permitted by this Section 10.4 to any Person other than a Credit Party, such Collateral shall be sold free and clear of the Liens created by the Credit Documents, and, if requested by the Administrative Agent, upon certification by an Authorized Officer of the Borrower that such Disposition is permitted by this Agreement, the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing (provided that the Borrower shall provide such certification prior to the Administrative Agent taking any such actions in respect of a Disposition of Borrowing Base Properties).

10.5 Limitation on Investments. The Borrower will not, and will not permit any of the Restricted Subsidiaries, to (i) purchase or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a wholly owned Restricted Subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of any other Person or make capital contributions to any other Person, (ii) assume, or make any loans, advances or other extensions of credit to (including in respect of the issuance of a Letter of Credit on behalf of) or guarantees of, the Indebtedness of any other Person or (iii) purchase or otherwise acquire (in one transaction or a series of related transactions) (x) all or substantially all of the property and assets or business of another Person or (y) assets constituting a business unit, line of business or division of such Person (each, an "Investment"), except:

(a) extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business;

(b) Investments in assets that constituted Permitted Investments at the time such Investments were made;

(c) (i) Investments existing on, or made pursuant to legally binding written commitments in existence on, the Closing Date as set forth on Schedule 10.5(c), (ii) Investments existing on the Closing Date of the Borrower or any Restricted Subsidiary in any other Subsidiary and (iii) any extensions, modifications, replacements, renewals or reinvestments thereof, so long as the amount of any Investment made pursuant to this Section 10.5(c) is not increased at any time above the amount of

such Investment as of the Closing Date (other than (a) pursuant to an increase as required by the terms of any such Investment as in existence on the Closing Date or (b) as otherwise permitted under this Section 10.5);

(d) any Investment acquired by the Borrower or any of its Restricted Subsidiaries: (i) in exchange for any other Investment, accounts receivable or endorsements for collection or deposit held by the Borrower or any such Restricted Subsidiary in each case in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of, or settlement of delinquent accounts and disputes with or judgments against, the issuer of such other Investment or accounts receivable (including any trade creditor or customer), (ii) in satisfaction of judgments against other Persons, (iii) as a result of a foreclosure by the Borrower or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default or (iv) as a result of the settlement, compromise or resolution of litigation, arbitration or other disputes with Persons who are not Affiliates;

(e) Investments to the extent that payment for such Investments is made with Qualified Equity Interests of the Borrower or a Parent Entity;

(f) Investments (i) by the Borrower in any Guarantor or by any Guarantor in the Borrower, (ii) by any Restricted Subsidiary that is not a Guarantor in the Borrower or any other Restricted Subsidiary, and (iii) by the Borrower or any Guarantor in any Restricted Subsidiary that is not a Guarantor, valued at the Fair Market Value (determined by the Borrower in good faith) of such Investment at the time each such Investment is made, in an aggregate amount outstanding pursuant to this Section 10.5(f)(iii) that, at the time such Investment is made, would not exceed $10,000,000;

(g) Investments constituting direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint bidding, joint venture or area of mutual interest agreements, gathering, transportation, processing or related systems, development agreements, unitization agreements, pooling arrangements, service contracts, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America;

(h) Investments including Investments in joint ventures (regardless of the form of legal entity) or similar Persons that do not constitute Restricted Subsidiaries, in each case valued at the Fair Market Value (determined by the Borrower acting in good faith) of such Investment at the time each such Investment is made, in an aggregate amount outstanding pursuant to this Section 10.5(h) not to exceed the sum of (i) the greater of $30,000,000 and 3% of Consolidated Total Assets and 3% of the PV-9 of the Proved Reserves of the Credit Parties (measured as of the date such Investment is made based upon the financial statements or Reserve Report, as applicable, most recently available prior to such date); provided, however, Investments under this clause (h)(i) made in Persons other than the Borrower and the Guarantors, valued at the Fair Market Value (determined by the Borrower in good faith) of such Investment at the time each Investment is made, together with Investments made under Section 10.5(f)(iii), shall not exceed $10,000,000 at any time outstanding, plus (ii) the Applicable Equity Amount at such time plus (iii) an amount equal to any repayments, interest, returns, profits, distributions, income and similar amounts actually received in cash from cash generated by any such bona fide Investment made under this Section 10.5(h) and which amount shall not exceed the amount of such Investment valued at the Fair Market Value of such Investment at the time such Investment was made;

(i) Investments made at any such time during which, immediately after giving effect to the making of any Investment (i) on a Pro Forma Basis no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (ii) Liquidity is not less than 20% of the then effective Borrowing Base and (iii) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test;

(j) Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 10.4 (other than Sections 10.4(c) and 10.4(d)) or any other disposition of assets not constituting a Disposition;

(k) loans and advances to Holdings in lieu of, and not in excess of the amount of, Restricted Payments to the extent permitted (and without duplication of the amounts of Restricted Payments permitted) to be made to such parent in accordance with Section 10.6;

(l) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(m) Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices or industry practice;

(n) advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case, of the Borrower or any Restricted Subsidiary, in each case in the ordinary course of business;

(o) guarantee obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(p) Investments held by a Person acquired (including by way of merger, amalgamation or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q) to the extent constituting Investments, the Transactions;

(r) Investments in Hedge Agreements permitted by Section 10.1 and Section 10.10;

(s) to the extent constituting Investments, fundamental changes and Restricted Payments permitted under Section 10.3 and Section 10.6;

(t) Investments resulting from pledges and deposits under clauses (d) and (e) of the definition of "Permitted Liens" and Sections 10.2(g) and 10.2(j);

(u) advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(v) Investments consisting of licensing of intellectual property pursuant to joint marketing arrangements with other Persons in the ordinary course of business; and

(w) Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts and loans or advances made to distributors in the ordinary course of business.

10.6 Limitation on Restricted Payments. The Borrower will not directly or indirectly pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than the accrual of any such dividend or distribution or dividends and distributions on Equity Interests payable solely by the issuance of additional Qualified Equity Interests) or Redeem any of its Equity Interests or the Equity Interests of any Parent Entity (other than through the issuance of additional Qualified Equity Interests), or permit any Restricted Subsidiary to Redeem any Equity Interests of the Borrower or any Parent Entity, now or hereafter outstanding or pay any fees to Affiliates (other than the Borrower and its Restricted Subsidiaries) (all of the foregoing, "Restricted Payments"); except that:

(a) the Borrower may (or may make Restricted Payments to permit Parent or Holdings to) redeem, acquire, retire or repurchase shares of its (or such Parent Entity's) Equity Interests held by any present or former officer, manager,

consultant, director or employee (or their respective Affiliates, estates, spouses, former spouses, successors, executors, administrators, heirs, legatees, distributees or immediate family members) of the Borrower and its Restricted Subsidiaries or of Parent or Holdings, in connection with the death, disability, retirement or termination of employment of any such Person or otherwise in accordance with any equity option or equity appreciation rights plan, any management, director and/or employee equity ownership, benefit or incentive plan or agreement, equity subscription plan, employment termination agreement or any other employment agreements or equity holders' agreement; provided that the aggregate amount of Restricted Payments made under this Section 10.6(a) does not exceed in any calendar year the sum of (i) $5,000,000 (which shall increase to $7,500,000 subsequent to the consummation of a Qualifying IPO by the Borrower or Holdings or Parent) (with unused amounts in any calendar year being carried over to the next two succeeding calendar years) plus (ii) all net cash proceeds obtained by or contributed to the Borrower during such calendar year from the sales of Equity Interests to other future, present or former officers, consultants, employees, directors and managers in connection with any permitted compensation and incentive arrangements and not used for any other purpose or included for the purpose of calculating any other basket hereunder or Section 11.13 plus (iii) all net cash proceeds obtained from any key-man life insurance policies received during such calendar year plus (iv) the amount of any cash bonuses otherwise payable to members of management, directors or consultants of any such Parent Entity, the Borrower or its Subsidiaries in connection with the Transactions that are foregone in return for the receipt of Equity Interests; notwithstanding the foregoing, the Borrower may elect to apply all or any portion of the aggregate increase contemplated by Sections 10.6(a)(ii), 10.6(a)(iii) and 10.6(a)(iv) above in any calendar year and provided, further, that cancellation of Indebtedness owing to the Borrower or any of its Restricted Subsidiaries from any future, present or former employees, directors, officers, members of management or consultants (or their respective Controlled Investment Affiliates or Immediate Family Members), of the Borrower, any Restricted Subsidiary, any direct or indirect parent company of the Borrower or any of the Borrower's Restricted Subsidiaries in connection with a repurchase of Equity Interests of the Borrower or any of its direct or indirect parent companies will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of this Agreement;

(b) to the extent constituting Restricted Payments, the Borrower may consummate transactions expressly permitted by Section 10.3;

(c) the Borrower may make and pay Restricted Payments:

(i) with respect to any taxable period ending after the Closing Date for which the Borrower is a partnership or disregarded entity for U.S. federal income tax purposes, distributions to any owner of Borrower in an amount necessary to permit such owner to pay its U.S. federal, state and/or local income taxes and franchise taxes (imposed in lieu of income taxes) (as applicable) attributable to its ownership of the Borrower (and, in the case of franchise taxes, payable by such owner as a result of being treated as a member of a combined or unitary group of which the Borrower is a member) with respect to such taxable period (assuming that each owner is subject to tax at the highest combined marginal federal, state, and/or local income or franchise tax rate applicable to any owner for such taxable period and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes (and any limitations thereon), the alternative minimum tax, any loss of the Borrower allocable to an owner for prior taxable periods to the extent such loss is of a character that would allow such loss to be available to such owner to reduce attributable taxes of such owner in the current taxable period and has not already been taken into account in determining permitted distributions under this Section 10.6(c)(i) for prior periods, and the character (*e.g.*, long-term or short-term capital gain or ordinary or exempt) of the applicable income) (such distributions, "Permitted Tax Distributions"); provided that distributions pursuant to this Section 10.6(c)(i) in respect of an Unrestricted Subsidiary shall be permitted only to the extent that cash distributions were made by such Unrestricted Subsidiary to the Borrower or any of its Restricted Subsidiaries for such purpose;

(ii) the proceeds of which shall be used to allow Parent and Holdings to pay its operating costs and expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and other professional costs and expenses) to the extent attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries;

(iii) the proceeds of which shall be used to make Restricted Payments to allow any Parent or Holdings to pay fees and expenses related to any equity issuance or offering or debt issuance, incurrence or offering, Disposition

or acquisition or investment transaction not relating to any other portfolio company of any Holdings and Parent permitted by this Agreement, whether or not consummated;

(iv) the proceeds of which shall be used to pay fees and expenses required to maintain its corporate existence or good standing under applicable law, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, current or former, directors, officers, employees and consultants of Holdings and Parent, and any payroll, social security or similar taxes thereof, to the extent such salaries, bonuses, other benefits and indemnities are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries; and

(v) in the form of Equity Interests of the Borrower (other than Disqualified Stock (excluding Qualified Preferred Equity) not otherwise permitted by Section 10.1);

(d) if no Default, Event of Default or Borrowing Base Deficiency is continuing or would result therefrom, the Borrower may pay any dividends or distributions within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(e) so long as, immediately after giving effect thereto, (i) on a Pro Forma Basis no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (ii) Liquidity is not less than 20% of the then effective Borrowing Base and (iii) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test, from and after the date that is one year after the Closing Date, the Borrower may declare and pay additional Restricted Payments without limit in cash or otherwise to the holders of its Equity Interests (including, for the avoidance of doubt, Preferred Stock) provided, that, in the case of any Restricted Payment in the form of assets other than cash, no such Restricted Payment shall be made if a Borrowing Base Deficiency would result from an adjustment to the Borrowing Base resulting from such Restricted Payment (unless the Borrower shall have cash on hand sufficient to eliminate any such potential Borrowing Base Deficiency);

(f) the Borrower may consummate the Transactions and make payments of fees pursuant to and in accordance with (i) the Management Services Agreement, (ii) the Side Letter Agreement (in the case of fees payable to Sanchez and its affiliates, limited to an aggregate amount not to exceed $500,000 *per annum*) and (iii) the Marketing Agreement, in each case, as in effect on the Closing Date and as permitted by Section 10.13; provided that the aggregate amounts payable under the foregoing items (i), (ii) and (iii) may be increased by an aggregate amount of up to $2,000,000 during the term of this Agreement; and

(g) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Borrower may declare and pay Restricted Payments in an aggregate amount not to exceed the Applicable Equity Amount at the time such Restricted Payment is paid.

10.7 Limitations on Debt Payments and Amendments.

(a) The Borrower will not, and will not permit any Restricted Subsidiary to prepay, repurchase or redeem or otherwise defease prior to its scheduled maturity any Indebtedness described in clauses (a) and (b) of the definition thereof that is expressly subordinated in right of payment or is unsecured or secured on a junior basis to the Indebtedness incurred hereunder (or any Permitted Refinancing Indebtedness in respect thereof to the extent constituting Junior Debt) (such other Indebtedness or any Permitted Refinancing Indebtedness in respect thereof, "Junior Debt") (for the avoidance of doubt, it being understood that payments of regularly-scheduled cash interest in respect of Junior Debt and any AHYDO payments shall be permitted); provided, however, that the Borrower or any Restricted Subsidiary may prepay, repurchase, redeem or defease prior to its scheduled maturity any Junior Debt (i) in exchange for or with the proceeds of any Permitted Refinancing Indebtedness, (ii) by converting or exchanging any Junior Debt to Qualified Equity Interests or Qualified Preferred Equity of the Borrower or any Parent Entity, (iii) so long as, immediately after giving effect thereto, (A) on a Pro Forma Basis, no Borrowing Base Deficiency exists and no Default or Event of Default shall have occurred and be continuing, (B) Liquidity is not less than 20% of the then effective Borrowing Base and (C) on a Pro Forma Basis the Borrower shall be in compliance with the Financial Performance



009231

Covenant set forth in Section 10.11(a), with the required maximum Consolidated Total Net Leverage Ratio being deemed to be 2.75:1.00 for the purpose of such test; or (iv) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, in an aggregate amount not to exceed the Applicable Equity Amount; provided, further, that, after giving effect to any adjustment of the Borrowing Base made pursuant to Section 2.14(g) and any repayment of the Loans required in connection therewith, so long as no Event of Default then exists, the Borrower or any Restricted Subsidiary may make mandatory prepayments or redemptions in respect of any Junior Debt with the proceeds of the disposition of any assets that have been pledged to secure such Junior Debt;

(b) The Borrower will not amend or modify the terms of any Junior Debt, other than amendments or modifications that (i) otherwise comply with the definition of "Permitted Refinancing Indebtedness" that may be incurred to Refinance any such Indebtedness, (ii) would have the effect of converting any Junior Debt to Qualified Equity Interests of a Parent Entity or Qualified Preferred Equity of the Borrower or (iii) to the extent such amendment or modification would not have been prohibited under this Agreement at the time such Permitted Refinancing Indebtedness or Junior Debt was first issued, incurred or entered into, as applicable (it being understood that in no event shall such amendment or modification make earlier the final maturity date of such Indebtedness or reduce the Weighted Average Life to Maturity of such Indebtedness and, with respect to any Permitted Additional Debt or Permitted Refinancing Indebtedness thereof, such analysis shall assume that the Agreement in effect at the time of such amendment or modification constituted the Agreement at the time when such Permitted Refinancing Indebtedness or Junior Debt was first issued, incurred or entered into, as applicable); and

(c) Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 10.7 shall prohibit (i) the repayment or prepayment of intercompany subordinated Indebtedness owed by the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary, in either case, unless an Event of Default has occurred and is continuing and the Borrower has received a notice from the Collateral Agent instructing it not to make or permit the Borrower and/or the Restricted Subsidiaries to make any such repayment or prepayment or (ii) substantially concurrent transfers of credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

10.8 Negative Pledge Agreements. The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into or permit to exist any Contractual Requirement (other than this Agreement or any other Credit Document) that limits the ability of the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents; provided that the foregoing shall not apply to each of the following Contractual Requirements that:

(a) (i) exist on the Closing Date and (to the extent not otherwise permitted by this Section 10.8) are listed on Schedule 10.8 and (ii) to the extent Contractual Requirements permitted by Section 10.8(a)(i) are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness or obligation so long as such Permitted Refinancing Indebtedness does not expand the scope of such Contractual Requirement;

(b) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such Contractual Requirements were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower and only relate to the assets of such Restricted Subsidiary or any of its Restricted Subsidiaries;

(c) are customary provisions applicable to the assets or equity interests of joint ventures or otherwise arise in agreements restricting the Disposition or distribution of such assets of property subject to oil and gas leases, joint operating agreements, joint exploration and/or development agreements, participation agreements and other similar agreements entered into in the ordinary course of the oil and gas exploration and development business;

(d) are customary restrictions on commercial real estate leases, commercial real estate subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(e) are customary provisions restricting subletting or assignment of any lease governing a commercial real estate leasehold interest of the Borrower or any Restricted Subsidiary;

(f) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(g) restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(h) are imposed by Requirements of Law;

(i) are included in any agreement relating to any Lien, so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 10.8;

(j) are restrictions regarding licenses or sublicenses by the Borrower and the Restricted Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property);

(k) are encumbrances or restrictions contained in an agreement or other instrument of a Person that is assumed in connection with the acquisition of assets from such Person that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to the properties or assets of any Person, other than the property or assets of the Person and its Subsidiaries, so acquired and such agreement or other instrument is not in respect of Indebtedness described in clauses (a) and (b) of the definition thereof; and

(l) are encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in Sections 10.8(a) through 10.8(k) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.9 Limitation on Subsidiary Distributions. The Borrower will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits or transfer any property to the Borrower or any Restricted Subsidiary except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Closing Date, including pursuant to the Credit Documents;

(b) purchase money obligations for property acquired in the ordinary course of business and obligations under any Capital Lease that impose restrictions on transferring the property so acquired;

(c) any applicable Requirement of Law;

(d) any agreement or other instrument of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from a Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated;

(e) contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Equity Interests or assets of such Subsidiary;

(f) secured Indebtedness otherwise permitted to be incurred pursuant to Section 10.1 and Section 10.2 as it relates to the right of the debtor to dispose of the assets securing such Indebtedness;

(g) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(h) other Indebtedness of Restricted Subsidiaries permitted to be incurred subsequent to the Closing Date pursuant to Section 10.1 so long as the provisions relating to such encumbrance or restriction contained in such Indebtedness are no less favorable to the Borrower, taken as a whole, as determined by the Board of Directors of the Borrower in good faith, than the provisions contained in this Agreement as in effect on the Closing Date;

(i) customary provisions in joint venture agreements or agreements governing property held with a common owner and other similar agreements or arrangements relating solely to such joint venture or property or are otherwise customary encumbrances or restrictions imposed pursuant to any agreement of the type described in the definition of "Industry Investments" entered into in the ordinary course of business so long as such provisions do not concern the ability of any Restricted Subsidiary to make cash dividends;

(j) customary provisions contained in commercial real estate leases, commercial real estate sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business;

(k) any agreements entered into with respect to any sale, transfer, lease or other Disposition permitted by Section 10.4 and applicable solely to assets under such sale, transfer, lease or other Disposition; and

(l) any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in Sections 10.9(a) through 10.9(j) above; provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's Board of Directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.10 Hedge Agreements. The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Hedge Agreements with any Person other than:

(a) Hedge Agreements with Approved Counterparties in respect of commodities entered into not for speculative purposes the notional volumes for which (when aggregated with other commodity Hedge Agreements then in effect), other than (i) puts, (ii) floors and (iii) basis differential swaps on volumes already hedged pursuant to other Hedge Agreements permitted under this Section 10.10(a), do not exceed, as of the date the latest hedging transaction is entered into under a Hedge Agreement (and for each month during the period during which such hedge transaction is in effect), (x) 85% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the forty-eight (48) month period from the date of creation of such hedging transaction and (y) 75% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable, subject to update pursuant to Section 10.10(d)) for the eighteen (18) month period beginning with the forty-ninth (49th) month after the date of creation of such hedging transaction (the "Ongoing Hedges"). Ongoing Hedges shall not, in any case, have a tenor greater than sixty-six (66) months. In addition to the Ongoing Hedges, in connection with a proposed or pending acquisition of Oil and Gas Properties (a "Proposed Acquisition"), the Credit Parties may also enter into incremental hedging transactions with respect to the Credit Parties' reasonably anticipated projected Hydrocarbon

production from the total Proved Reserves of the Credit Parties to be acquired pursuant to the Proposed Acquisition with notional amounts (when aggregated with other commodity Hedge Agreements then in effect), other than (i) puts, (ii) floors and (iii) basis differential swaps on volumes hedged pursuant to other Hedge Agreements permitted under this Section 10.10(a), that do not exceed, as of the date the latest any such hedging transaction is entered into under a Hedge Agreement (and for each month during the period during which such hedge transaction is in effect) 15% of the reasonably anticipated Hydrocarbon production, for oil and natural gas (excluding natural gas liquids) calculated separately on a monthly basis, from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable) prior to such Proposed Acquisition (such that the aggregate shall not be more than 100% of such reasonably anticipated Hydrocarbon production prior to the consummation of such Proposed Acquisition) for a period not exceeding 36 months from the date of creation of such hedging transaction during the period between (i) the date on which such Credit Party signs a definitive acquisition agreement in connection with a Proposed Acquisition and (ii) the earliest of (A) the date of consummation of such Proposed Acquisition, (B) the date of termination of such Proposed Acquisition and (C) 90 days after the date of execution of such definitive acquisition agreement. However, all such incremental hedging contracts entered into with respect to a Proposed Acquisition must be terminated or unwound within 90 days following the date of termination of such Proposed Acquisition;

(b) other Hedge Agreements (other than any Hedge Agreements in respect of commodities or equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions) entered into not for speculative purposes (it is understood that commodity Hedge Agreements in respect of (i) puts, (ii) floors and (iii) basis differential swaps on volumes hedged pursuant to other Hedge Agreements are permitted under Section 10.10(a));

(c) It is understood that for purposes of Section 10.10(a) and 10.10(b), the following Hedge Agreements shall be deemed not to be speculative or entered into for speculative purposes: (i) any commodity Hedge Agreement intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Borrower or its Restricted Subsidiaries (whether or not contracted) and (ii) any Hedge Agreement intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or its Restricted Subsidiaries or (B) to manage commodity portfolio exposure associated with changes in interest rates or (C) to hedge any exposure that the Borrower or its Restricted Subsidiaries may have to counterparties under other Hedge Agreements such that the combination of such Hedge Agreements is not speculative taken as a whole.

(d) For purposes of entering into or maintaining Ongoing Hedges under Section 10.10(a) or Hedge Agreement pursuant to Section 9.16, forecasts of reasonably anticipated Hydrocarbon production from the Credit Parties' total Proved Reserves shall be based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.12(a), as applicable (for purposes of this clause (d), the "Applicable Reserve Report"); provided that such forecasts may be revised by the Borrower based on information that is reasonably acceptable to the Administrative Agent to account for any increase or decrease therein anticipated because of information obtained by Borrower or any other Credit Party subsequent to the publication of such Applicable Reserve Report (including the Borrower's or any other Credit Party's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream).

10.11 Financial Covenants.

(a) Consolidated Total Net Leverage Ratio. The Borrower will not permit the Consolidated Total Net Leverage Ratio, as of the last day of any Test Period, commencing with the fiscal quarter of the Borrower ending June 30, 2017, to be greater than 4.00 to 1.00.

(b) Current Ratio. The Borrower will not permit the Current Ratio as of the last day of any fiscal quarter commencing with the quarter ending June 30, 2017 to be less than 1.00 to 1.00.

10.12 Use of Proceeds. The Borrower will not request any Loan or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the

proceeds of any Loan or Letter of Credit (a) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (b) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, the United Kingdom or a European Union member state, or in any Sanctioned Country, (c) in any manner that would result in the violation of any Sanctions applicable to any party hereto or (d) in violation of the PATRIOT Act.

10.13 Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation.

(a) Restrictions on Amendments to Material Documents and GSO Preferred Equity Documentation. The Borrower shall not, and shall not permit Parent, Holdings or its Subsidiaries (or any of their successors and assigns) to, amend, change, supplement or otherwise modify (or permit to be amended, changed, supplement or otherwise modified), including through a consent or wavier, the Material Contracts and the GSO Preferred Equity Documentation in any manner that (i) is materially adverse to the Borrower or Lenders or (ii) would constitute a Prohibited Material Contract Amendment or Prohibited Preferred Amendment (it being understood, for avoidance of doubt, that any Prohibited Material Contract Amendments or Prohibited Preferred Amendment may be made if approved by the Majority Lenders).

(b) Further Assurances. No agreement shall be entered into which effectively replaces (or has the equivalent effect of replacing) any Material Contract or the terms thereof except if such agreement provides for the same terms as such Material Contract (subject only to amendments, changes, supplements or other modification, including through a consent or wavier, of the type that if they were made directly to the applicable Material Contract they would be permitted pursuant to Section 10.13(a)) (any such agreement, an "Additional Material Contract"). The organizational documents of any Restricted Subsidiary shall be in form and substance reasonably satisfactory to the Administrative Agent and shall contain "separateness covenants" and independent directorship obligations consistent with the Parent LLCA.

10.14 Transactions with Affiliates. The Borrower shall not conduct, and cause each of the Restricted Subsidiaries not to conduct, any transactions with any of its Affiliates (other than the Borrower and the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction) unless such transactions are on terms that are as favorable to the Borrower or such Restricted Subsidiary as it would obtain at the time in a comparable arm's-length transaction with a Person that is not an Affiliate, provided that the foregoing restrictions shall not apply to:

(a) the consummation of the Transactions;

(b) equity issuances, repurchases, retirements, redemptions or other acquisitions or retirements of Equity Interests by the Borrower or any dividends and distributions, in each case, permitted under Section 10.6;

(c) loans, advances and other transactions between or among the Borrower, any Subsidiary or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower or such Subsidiary, but for the Borrower's or such Subsidiary's ownership of Equity Interests in such joint venture or such Subsidiary) to the extent permitted under Section 10.5;

(d) payments pursuant to Sections 10.6(f)(i), 10.6(f)(ii) and 10.6(f)(iii);

(e) any issuance of Equity Interests or other payments, awards or grants in securities, Equity Interests or otherwise pursuant to, or the funding of, employment arrangements, equity options and equity ownership plans approved by the Board of Directors of the Borrower; and

(f) any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the Board of Directors of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (i) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary and (ii) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate.

10.15 End of Fiscal Years; Fiscal Quarters. The Borrower shall not and shall not permit any of its Restricted Subsidiaries to have its fiscal year end on a date other than December 31 or have its fiscal quarters end on dates other than March 31, June 30 or September 30.

10.16 Change in Business; Foreign Operations. The Borrower shall not, and shall not permit its Restricted Subsidiaries, (a) to fundamentally or substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date and other business activities incidental, reasonably related or ancillary to any of the foregoing and reasonable extensions thereof, (b) to own any Oil and Gas Properties not located within the geographical boundaries of the United States or (c) be organized under any law other than the laws of the United States or any state thereof or the District of Columbia.

10.17 Gas Imbalances, Prepayments. The Borrower shall not, and shall not permit its Restricted Subsidiaries to have, gas imbalances, take or pay or other prepayments exceeding 2.0% of the aggregate Hydrocarbon volumes (stated on an Mcf equivalent basis) listed on the most recent Reserve Report, that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor; provided, that, so long as such gas imbalance is corrected within five (5) Business Days of the Borrower or such Restricted Subsidiary becoming aware of such imbalance, no violation of this Section 10.17 shall be deemed to occur.

SECTION 11. EVENTS OF DEFAULT

Upon the occurrence of any of the following specified events (each an "Event of Default"):

11.1 Payments. The Borrower shall (a) default in the payment when due of any principal of the Loans or (b) default, and such default shall continue for five or more Business Days, in the payment when due of any interest on the Loans or any Unpaid Drawings, fees or of any other amounts owing hereunder or under any other Credit Document (other than any amount referred to in Section 11.1(a) above).

11.2 Representations, Etc. Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate, report or notice delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made.

11.3 Covenants. Any Credit Party shall:

(a) default in the due performance or observance by it of any term, covenant or agreement contained in Section 9.1(d)(i), Section 9.5 (solely with respect to the Borrower), Section 9.17, Section 9.18 or Section 10; or

(b) default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in Section 11.1 or Section 11.2 or Section 11.3(a)) contained in this Agreement or any Credit Document and such default shall continue unremedied for a period of at least 30 days after the earlier of (i) receipt of written notice thereof by the Borrower from the Administrative Agent or (ii) the date the Borrower or an Authorized Officer of the Borrower knew or should have known of such default.

11.4 Default Under Other Agreements.

(a) The Borrower or any of the Restricted Subsidiaries shall (i) default in any payment with respect to any Material Indebtedness (other than the Indebtedness described in Section 11.1) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than (1) with respect to indebtedness in respect of any Hedge Agreements, termination events or equivalent events pursuant to the terms of such Hedge Agreements, (2) any event requiring prepayment pursuant to customary asset sale provisions and (3) secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement), the effect of which default or other event or condition is to cause, or to permit the holder or holders of such

Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower, or

(b) Without limiting the provisions of Section 11.4(a) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and (i) with respect to Indebtedness consisting of any Hedge Agreements, other than due to a termination event or equivalent event pursuant to the terms of such Hedge Agreements, (ii) other than pursuant to customary asset sale provisions and (iii) other than secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement) prior to the stated maturity thereof.

11.5 Bankruptcy, Etc. The Parent, Holdings, Borrower or any Specified Subsidiary shall commence a voluntary case, proceeding or action concerning itself under Title 11 of the United States Code entitled "Bankruptcy" or any other applicable insolvency, debtor relief, or debt adjustment law as now or hereafter in effect, or any successor thereto (the "Bankruptcy Code"); or an involuntary case, proceeding or action is commenced against the Parent, Holdings, the Borrower or any Specified Subsidiary and the petition is not dismissed or stayed within 60 days after commencement of the case, proceeding or action, the Parent, Holdings, the Borrower or the applicable Specified Subsidiary consents to the institution of such case, proceeding or action prior to such 60-day period, or any order of relief or other order approving any such case, proceeding or action is entered; or a custodian (as defined in the Bankruptcy Code), receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or similar person is appointed for, or takes charge of, the Parent, Holdings, the Borrower or any Specified Subsidiary or all or any substantial portion of the property or business thereof; or the Parent, Holdings, the Borrower or any Specified Subsidiary suffers any appointment of any custodian, receiver, receiver manager, trustee, conservator, liquidator, examiner, rehabilitator, administrator, or the like for it or any substantial part of its property or business to continue undischarged or unstayed for a period of 60 days; the Parent, Holdings, the Borrower or any Specified Subsidiary makes a general assignment for the benefit of creditors.

11.6 ERISA.

(a) (i) Any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; (ii) any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); (iii) an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); (iv) the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); or (v) an ERISA Event has or is reasonably like to occur; and

(b) there would result from any event or events set forth in Section 11.6(a) the imposition of a lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a lien, security interest or liability; and

(c) such lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect.

11.7 Guarantee and Credit Agreement. The Guarantee, this Agreement or any material provision of the foregoing shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Credit Party's obligations thereunder are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.8 Security Documents. The Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate fair market value in excess of $10,000,000 are pledged as

Collateral or any material provision thereof or a Customary Intercreditor Agreement or any material potion thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.9 Judgments. (a) One or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $25,000,000 or more in the aggregate for all such judgments and decrees for the Borrower and/or the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), or (b) any one or more non-monetary judgments that have, or would reasonably be expected to have individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Borrower and/or the Restricted Subsidiaries, in each case which judgments are not satisfied, discharged or effectively waived or stayed for a period of 60 consecutive days.

11.10 Change of Control. A Change of Control shall have occurred.

11.11 Status as Unrestricted Subsidiary. While the Borrower remains a direct or indirect subsidiary of Sanchez, Holdings or the Borrower ceases to be an "unrestricted subsidiary" (as opposed to a "restricted subsidiary") under and as defined in Sanchez Specified Indebtedness.

Then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent may with the consent of and, upon the written request of the Majority Lenders, shall, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement (provided that, if an Event of Default specified in Section 11.5 shall occur with respect to the Borrower, the result that would occur upon the giving of written notice by the Administrative Agent as specified in clauses (a), (b) and (c) below shall occur automatically without the giving of any such notice): (a) declare the Total Commitment terminated, whereupon the Commitment of each shall forthwith terminate immediately, the Borrowing Base shall automatically and concurrently be reduced to $0 and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (b) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (c) demand cash collateral in respect of any outstanding Letter of Credit pursuant to Section 3.7(b) in an amount equal to the aggregate Stated Amount of all Letters of Credit issued and then outstanding. In addition, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

11.12 Application of Proceeds. Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement or any Event of Default with respect to the Borrower under Section 11.5 shall, subject to the terms of any applicable Customary Intercreditor Agreement, be applied:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 12.7 and amounts payable under Section 2) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the Issuing Banks (including fees, disbursements and other charges of counsel payable under Section 12.7) arising under the Credit Documents and amounts payable under Section 2, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees, interest on the Loans and Unpaid Drawings and regularly scheduled payments in respect of Secured Hedge Agreements (but not any close-

out or termination amounts), ratably among the Lenders, the Issuing Banks and the Hedge Banks in proportion to the respective amounts described in this clause Third payable to them;

Fourth, (i) to payment of that portion of the Obligations constituting unpaid principal of the Loans, the Unpaid Drawings and Obligations then owing under Secured Hedge Agreements (to the extent not paid pursuant to clause Third) and the Secured Cash Management Agreements and (ii) to Cash Collateralize that portion of Letters of Credit Outstanding comprising the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Section 3.7, ratably among the Lenders, the Issuing Banks, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth held by them; provided that (x) any such amounts applied pursuant to the foregoing clause (ii) shall be paid to the Administrative Agent for the ratable account of the applicable Issuing Bank to Cash Collateralize such Letters of Credit Outstanding, (y) subject to Section 3.7, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to this clause Fourth shall be applied to satisfy drawings under such Letters of Credit as they occur and (z) upon the expiration of any Letter of Credit, the *pro rata* share of Cash Collateral attributable to such expired Letter of Credit shall be distributed in accordance with this clause Fourth;

Fifth, to the payment of all other Obligations of the Credit Parties owing under or in respect of the Credit Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

Subject to Section 3.7, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above. Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

11.13 Equity Cure.

(a) Notwithstanding anything to the contrary contained in this Section 11 or in any Credit Document, in the event that the Borrower fails to comply with any Financial Performance Covenant, then:

(i) until the expiration of the tenth Business Day subsequent to the date the compliance certificate for calculating such Financial Performance Covenants is required to be delivered pursuant to Section 9.1(c) (the "Cure Deadline"), the Borrower shall have the right to cure such failure (the "Cure Right") by receiving cash proceeds (which cash proceeds shall be received no earlier than the first day of the applicable fiscal quarter for which there is a failure to comply with the applicable Financial Performance Covenant) from an issuance of Qualified Equity Interests (other than Disqualified Stock) or Qualified Preferred Equity or a cash capital contribution, and upon receipt by the Borrower of such cash proceeds (such cash amount being referred to as the "Cure Amount") pursuant to the exercise of such Cure Right, the applicable Financial Performance Covenant shall be recalculated giving effect to the following *pro forma* adjustments:

(A) Consolidated EBITDAX and/or Consolidated Current Assets, as specified by the Borrower, shall be increased, solely for the purpose of determining the existence of an Event of Default resulting from a breach of the applicable Financial Performance Covenant with respect to any Test Period that includes the fiscal quarter for which the Cure Right was exercised and not for any other purpose under this Agreement, by an amount equal to the Cure Amount; provided that, any increase of Consolidated EBITDAX as a result of the application of this Section 11.13(a) shall be added to Consolidated EBITDAX after giving effect to any annualization of Consolidated EBITDAX pursuant to Section 1.11;

(B) Consolidated Total Indebtedness for the applicable fiscal quarter for which there is a failure to comply with the applicable Financial Performance Covenant shall not be decreased by any prepayments of

Indebtedness with the proceeds of the Cure Amount and any cash proceeds shall not be "netted" for purposes of ratio calculations with respect to any four fiscal quarter period in which the fiscal quarter period in which such equity cure has been made is included; and

(C) if, after giving effect to the foregoing recalculations, the Borrower shall then be in compliance with the requirements of the applicable Financial Performance Covenant, the Borrower shall be deemed to have satisfied the requirements of the applicable Financial Performance Covenant as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date, and the applicable breach or default of the applicable Financial Performance Covenant that had occurred shall be deemed cured for the purposes of this Agreement; provided that (1) in each period of four consecutive fiscal quarters there shall be at least two fiscal quarters in which no Cure Right is exercised, (2) Cure Rights shall not be exercised more than five times during the term of this Agreement, (3) each Cure Amount shall be no greater than the amount required to cause the Borrower to be in compliance with the applicable Financial Performance Covenant above (such amount, the "Necessary Cure Amount"); provided that if the Cure Right is exercised prior to the date financial statements are required to be delivered for such fiscal quarter, then the Cure Amount shall be equal to the amount reasonably determined by the Borrower in good faith that is required for purposes of complying with the Financial Performance Covenant for such fiscal quarter (such amount, the "Expected Cure Amount"), (4) in respect of the fiscal quarter in which such Cure Right was exercised and for each Test Period that includes such fiscal quarter, all Cure Amounts shall be disregarded for the purposes of any financial ratio determination under the Credit Documents other than for determining compliance with the applicable Financial Performance Covenant and (5) no Lender or Issuing Bank shall be required to make any extension of credit hereunder during the 10 Business Day period referred to above, unless the Borrower shall have received the Cure Amount and provided a certificate from a Financial Officer of the Borrower certifying such fact; and

(ii) upon receipt by the Administrative Agent of written notice, on or prior to the Cure Deadline, that the Borrower intends to exercise the Cure Right in respect of a fiscal quarter, the Lenders shall not be permitted to accelerate Loans held by them or to exercise remedies against the Collateral on the basis of a failure to comply with the requirements of the applicable Financial Performance Covenant, unless such failure is not cured pursuant to the exercise of the Cure Right on or prior to the Cure Deadline.

(b) Expected Cure Amount. Notwithstanding anything herein to the contrary, to the extent that the Expected Cure Amount is (i) greater than the Necessary Cure Amount, then such difference may be used for the purposes of determining the Applicable Equity Amount and (ii) less than the Necessary Cure Amount, then not later than the applicable Cure Deadline, the Borrower must receive cash proceeds from an issuance of Qualified Equity Interests (other than Disqualified Stock) or Qualified Preferred Equity or a cash capital contribution, the cash proceeds of which received by Borrower shall be equal to the shortfall between such Expected Cure Amount and such Necessary Cure Amount.

SECTION 12. THE AGENTS

12.1 Appointment.

(a) Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. The provisions of this Section 12 (other than Section 12.1(c) with respect to the Lead Arranger, and Section 12.9, Section 12.11, Section 12.12 and the last sentence of Section 12.4 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(b) The Administrative Agent, each Lender and each Issuing Bank hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Issuing Bank irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities except those expressly set forth herein, or any fiduciary relationship with any of the Administrative Agent, the Lenders or the Issuing Banks, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.

(c) Each of the Lead Arrangers, each in its capacity as such, shall not have any obligations, duties or responsibilities under this Agreement but shall be entitled to all benefits of this Section 12.

12.2 Delegation of Duties. The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent. If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3 Exculpatory Provisions. No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder. No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof. The Collateral Agent shall not be under any obligation to the Administrative Agent, any Lender or any Issuing Bank to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.

12.4 Reliance by Agents. The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, email, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent. The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes. The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent and the Collateral

Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; provided that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law. For purposes of determining compliance with the conditions specified in Section 6 on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

12.5 Notice of Default. Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval or consent of the Majority Lenders, the Required Lenders, each individual lender or adversely affect Lender, as applicable.

12.6 Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender or any Issuing Bank. Each Lender and each Issuing Bank represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

12.7 Indemnification. The Lenders severally agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Commitments or Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of any actual or threatened claim, action, suit,

litigation, investigation or proceeding (each, a "Proceeding") relating to the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any Proceeding; provided that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Administrative Agent's or the Collateral Agent's, as applicable, gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction; provided, further, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence, bad faith or willful misconduct for purposes of this Section 12.7. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this Section 12.7 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; provided that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's *pro rata* portion thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence, bad faith or willful misconduct as determined by a final judgment of a court of competent jurisdiction. The agreements in this Section 12.7 shall survive the payment of the Loans and all other amounts payable hereunder.

12.8 Agents in Its Individual Capacities. Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents. With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

12.9 Successor Agents. Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuing Banks and the Borrower. If the Administrative Agent and/or Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or Collateral Agent, may be removed as Administrative Agent or Collateral Agent, as the case may be, at the reasonable request of the Borrower or the Majority Lenders. Upon receipt of any such notice of resignation or removal, as the case may be, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Default under Section 11.1 or 11.5 is continuing, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above (provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Agent on behalf of the Lenders or Issuing Banks under and Credit Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender and Issuing Bank directly, until such time as the Majority Lenders appoint a successor

Agent as provided for above in this Section 12.9). Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this Section 12.9). After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this Section 12 (including Section 12.7) and Section 13.5 shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Agent-Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Any resignation of any Person as Administrative Agent pursuant to this Section 12.9 shall also constitute its resignation as Issuing Bank. Upon the acceptance of a successor's appointment as Administrative Agent hereunder (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (b) the retiring Issuing Bank shall be discharged from all of its duties and obligations hereunder and under the other Credit Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

12.10 Withholding Tax. To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the IRS or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses. In addition, each Lender shall severally indemnify the Administrative Agent for (i) any Indemnified Taxes attributable to such Lender (to the extent the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 13.6(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with a Credit Document, and any reasonable expenses arising therefrom or with respect thereto. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this Section 12.10. For the avoidance of doubt, for purposes of this Section 12.10, the term "Lender" includes any Issuing Bank.

12.11 Security Documents and Collateral Agent under Security Documents and Guarantee. Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents. Subject to Section 13.1, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents or instruments necessary in connection with a Disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is required to be released pursuant to Section 13.17 or (c) release any applicable Guarantor from the Guarantee in accordance with Section 13.17. The Lenders and the Issuing Banks (including in their capacities as potential Cash Management Banks and potential Hedge Banks) irrevocably agree that (x) the Collateral Agent is authorized and the Collateral Agent agrees it shall (for the benefit of Borrower), without any further consent of any Lender, enter into or amend any Customary Intercreditor Agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is permitted under this Agreement, in each case for the purpose of adding the holders of such Indebtedness (or their representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto (it being understood that any such amendment, amendment

and restatement or supplement may make such other changes to the applicable Customary Intercreditor Agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and with any material modifications to be reasonably satisfactory to the Administrative Agent), (y) the Collateral Agent may rely exclusively on a certificate of an Authorized Officer of the Borrower as to whether any such other Liens are permitted and (z) any Customary Intercreditor Agreement referred to in Section 12.11(x) above, entered into by the Collateral Agent, shall be binding on the Secured Parties. Furthermore, the Lenders and the Issuing Banks (including in their capacities as potential Cash Management Bank and potential Hedge Banks) hereby authorize the Administrative Agent and the Collateral Agent to subordinate any Lien on any property granted to or held by the Administrative Agent or Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by Section 10.2(c); provided that prior to any such request, the Borrower shall have in each case delivered to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying that such subordination is permitted under this Agreement.

12.12 Right to Realize on Collateral and Enforce Guarantee. Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Agents and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent.

12.13 Administrative Agent May File Proofs of Claim. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding, constituting an Event of Default under Section 11.5, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid hereunder or under any other Credit Document in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, to the extent due under Section 13.5) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, to the extent due under Section 13.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

12.14 Credit Bidding. The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Majority Lenders, to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (b) at any other sale, foreclosure or acceptance

of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be credit bid by the Administrative Agent at the direction of the Majority Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the Acquired Assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any Disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Majority Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 13.1 of this Agreement), (iv) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason, such Obligations shall automatically be reassigned to the Secured Parties *pro rata* and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in Section 12.14(ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

SECTION 13. MISCELLANEOUS

13.1 Amendments, Waivers and Releases.

(a) Except as expressly set forth in this Agreement, neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1. The Majority Lenders may, or, with the written consent of the Majority Lenders, the Administrative Agent and/or the Collateral Agent shall, from time to time, (i) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents for the purpose of adding any provisions to this Agreement or the other Credit Documents or changing in any manner the rights of the Lenders or of the Credit Parties hereunder or thereunder or (ii) waive in writing, on such terms and conditions as the Majority Lenders or the Administrative Agent and/or Collateral Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; provided, however, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; provided, further, that no such waiver and no such amendment, supplement or modification shall:

(A) forgive or reduce any portion of any Loan or reduce the stated rate (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.8(c)), or forgive or reduce any portion, or extend the date for the payment (including the Maturity Date), of any principal, interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates and any change due to a change in the Borrowing Base or



009247

Available Commitment), or extend the final expiration date of any Lender's Commitment (provided that (1) any Lender, upon the request of the Borrower, may extend the final expiration date of its Commitment in a manner that has no adverse effect on any other Lender without the consent of any other Lender, including the Majority Lenders, and (2) it is understood and agreed that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase of the Commitments of any Lender) or extend the final expiration date of any Letter of Credit beyond the L/C Maturity Date, or increase the amount of the Commitment of any Lender, or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender directly and adversely affected thereby, or

(B) amend, modify or waive any provision of this Section 13.1 in a manner that would reduce the voting rights of any Lender, or reduce the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders", consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3), in each case without the written consent of each Lender, or

(C) amend the provisions of Section 11.12 or any analogous provision of any Security Document, in a manner that would by its terms alter the order of payment specified therein or the *pro rata* sharing of payments required thereby, without the prior written consent of each Lender directly and adversely affected thereby, or

(D) amend, modify or waive any provision of Section 12 without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person, or

(E) amend, modify or waive any provision of Section 3 or the rights or duties of any Issuing Bank without the written consent of each Issuing Bank, or

(F) release all or substantially all of the aggregate value of the Guarantees without the prior written consent of each Lender, or

(G) release all or substantially all of the Collateral under the Security Documents without the prior written consent of each Lender, or

(H) amend Section 2.9 so as to permit Interest Period intervals greater than six months without regard to availability to Lenders, without the written consent of each Lender directly and adversely affected thereby, or

(I) increase the Borrowing Base without the written consent of each Lender (subject to Section 13.1(b) in the case of a Defaulting Lender) or decrease or maintain the Borrowing Base without the written consent of the Required Lenders; provided that a Scheduled Redetermination may be postponed by the Required Lenders; provided, further, with respect to one Scheduled Redetermination, such Scheduled Redetermination may be postponed for not more than 90 days with the consent of the Majority Lenders, or

(J) affect the rights or duties of, or any fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Administrative Agent and all future holders of the affected Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender whose consent is required hereunder.

(b) Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that the Commitment or Loan Limit of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender (provided that the Administrative Agent may with the consent of the Borrower amend, modify or supplement the Credit Documents to effectuate an increase in the Borrowing Base where such Defaulting Lender does not consent to an increase to the Borrowing Base, including not increasing the Borrowing Base by the portion thereof applicable to the Defaulting Lender) and no such amendment, waiver or consent shall disproportionately adversely affect such Defaulting Lender without its consent as compared to other Lenders (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders).

(c) Without the consent of any Lender or Issuing Bank, the Credit Parties and the Administrative Agent or Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment, modification or waiver of any Credit Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Credit Document.

(d) Notwithstanding anything to the contrary herein, no Lender consent is required to effect any amendment, modification or supplement to any Customary Intercreditor Agreement, any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral (i) that is for the purpose of adding the holders of such secured or subordinated Indebtedness permitted to be incurred under this Agreement (or, in each case, a representative with respect thereto), as parties thereto, as expressly contemplated by the terms of such Customary Intercreditor Agreement, such subordination agreement or such other intercreditor agreement or arrangement permitted under this Agreement, as applicable (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing and provided that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders), (ii) that is expressly contemplated by any Customary Intercreditor Agreement, any subordination agreement or other intercreditor agreement or arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral or (iii) otherwise, with respect to any other amendments, modifications or supplements, to the extent such amendment, modification or supplement is satisfactory to the Administrative Agent in its sole discretion; provided that, in each case, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or Collateral Agent hereunder or under any other Credit Document without the prior written consent of the Administrative Agent or Collateral Agent, as applicable.

(e) Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents (including any exhibit, schedule or other attachment) may be made with the consent of the Borrower and the Administrative Agent (i) if such modifications are not adverse in any material respect to the Lenders or the Issuing Banks (in which case, the consent of the Issuing Banks shall be required) or (ii) to the extent necessary to cure any ambiguity, omission, mistake, defect or inconsistency so long as, if requested by the Administrative Agent, the Lenders and the Issuing Banks shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Majority Lenders stating that the Majority Lenders object to such amendment.

13.2 Notices. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a) if to the Borrower, the Administrative Agent, the Collateral Agent, or any Issuing Bank, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b) if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent, the Collateral Agent and the Issuing Banks.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii)(A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; provided that notices and other communications to the Administrative Agent or the Lenders pursuant to Section 2.3, Section 2.6, Section 2.9, Section 4.2 and Section 5.1 shall not be effective until received.

13.3 No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

13.4 Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder. Such representations and warranties shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied (other than Obligations under Secured Hedge Agreements, Secured Cash Management Agreements or contingent indemnification obligations, in any such case, not then due and payable).

13.5 Payment of Expenses; Indemnification.

(a) The Borrower agrees (i) to pay or reimburse the Administrative Agent and the other Agents and the Lead Arranger for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, delivery, execution and administration of this Agreement and the other Credit Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration (including out-of-pocket costs, expenses, taxes, assessments and other charges incurred by the Administrative Agent or Collateral Agent in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement or any Security Documents) of the transactions contemplated hereby and thereby, including all Attorney Costs, which shall be limited to Simpson Thacher & Bartlett LLP and one local counsel as reasonably necessary in any jurisdiction relevant to the interests of the Lenders taken as a whole (and in the case of an actual or perceived conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) and (ii) to pay or reimburse the Administrative Agent, the Collateral Agent, the Issuing Banks and each Lender for out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Credit Documents (including all such costs and expenses incurred during any legal proceeding, including any bankruptcy or insolvency proceeding, and including all respective Attorney Costs). The agreements in this Section 13.5 shall survive the repayment of all other Obligations. All amounts due under this Section 13.5 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request). If any Credit Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Credit Document, such amount may be paid on behalf of such Credit Party by the Administrative Agent in its discretion.

(b) The Borrower shall indemnify and hold harmless each Agent, Lender, Lead Arranger, Agent-Related Party and their Affiliates, and their respective officers, directors, employees, partners, agents, advisors and other representatives of the foregoing (collectively the "Indemnitees") from and against any and all liabilities, losses, damages, claims, or out-of-pocket expenses (including Attorney Costs but limited in the case of legal fees and expenses to the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel for all Indemnitees taken as a whole in each relevant jurisdiction, and in the case of an actual or perceived conflict of interest, one additional counsel and (if reasonably necessary) one local counsel in each relevant jurisdiction to the affected Indemnitees similarly situated) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Credit Document or any other agreement, letter or instrument delivered in connection with the Transactions or the transactions contemplated by, or the consummation of the transactions contemplated by, any Credit Document, (ii) any Commitment or Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged Environmental Claim regarding, or liability or obligation under Environmental Law of, the Credit Parties or any Subsidiary or (iv) any Proceeding and regardless of whether any Indemnitee is a party thereto or whether or not such Proceeding is brought by the Borrower or any other Person and, in each case, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee (all of the foregoing, collectively, the "Indemnified Liabilities"); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, losses, damages, claims or out-of-pocket expenses resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction, (y) a material breach of any obligations under any Credit Document by such Indemnitee or of any of its Related Indemnified Persons, as determined by a final non-appealable judgment of a court of competent jurisdiction or (z) any dispute solely among Indemnitees other than any claims against an Indemnitee in its capacity or in fulfilling its role as a Lender, an administrative agent or collateral agent or arranger or any similar role under this Agreement and other than any claims arising out of any act or omission of the Borrower or any of its Affiliates (as determined in a final and non-appealable judgment of a court of competent jurisdiction). No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement (except for direct (as opposed to indirect, special, punitive or consequential) damages resulting from the gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable judgment, of such Indemnitee), nor shall any Indemnitee, Agent-Related Parties, Credit Party or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date) (other than, in the case of any Credit Party, in respect of any such damages incurred or paid by an Indemnitee to a third party, or which are included in a third-party claim, and for any out-of-pocket expenses related thereto). In the case of a Proceeding to which the indemnity in this Section 13.5 applies, such indemnity shall be effective whether or not such Proceeding is brought by any Credit Party, any Subsidiary of any Credit Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Credit Documents are consummated. All amounts due under this Section 13.5 shall be paid within thirty (30) days after written demand therefor (together with backup documentation supporting such reimbursement request); provided, however, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 13.5. The agreements in this Section 13.5 shall survive the resignation of the Administrative Agent, Collateral Agent or Issuing Banks, the replacement of any of the foregoing or any Lender and the repayment, satisfaction or discharge of all the other Obligations. For the avoidance of doubt, this Section 13.5(b) shall not apply to Taxes, except any Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, prepayments, suits, costs, expenses and disbursements arising from any non-Tax claims.

13.6 Successors and Assigns; Participations and Assignments.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any

attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with this Section 13.6. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in Section 13.6(c) and, to the extent expressly contemplated hereby, the Agent-Related Parties and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) (i) Subject to the conditions set forth in Section 13.6(b)(ii) below, any Lender may at any time assign to one or more assignees (other than any Defaulting Lender, any Disqualified Institution, GSO, except in accordance with Section 13.6(b)(vii), and its Affiliates, Sanchez and its Affiliates (including, for avoidance of doubt, the Borrower or any Subsidiary of the Borrower) or natural persons) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in L/C Obligations) at the time owing to it) with the prior written consent of:

(A) the Borrower (not to be unreasonably withheld or delayed); provided that no consent of the Borrower shall be required for an assignment if (1) the assignee is a Lender, an affiliate of a Lender or an Approved Fund or (ii) an Event of Default under Section 11.1 or Section 11.5 with respect to the Borrower or any Material Subsidiary has occurred and is continuing; provided further that, for any assignments for which the Borrower's consent is required, such consent shall be deemed to have been given if the Borrower has not responded within five (5) Business Days of a written request for such consent pursuant to Section 13.6(h), and

(B) the Administrative Agent and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).

(ii) Assignments shall be subject to the following additional conditions:

(A) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans or an assignment to another Lender, any Affiliate of a Lender or an Approved Fund, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 and increments of $5,000,000 in excess thereof, unless each of the Borrower, each Issuing Bank and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); provided that no such consent of the Borrower shall be required if an Event of Default under Section 11.1 or Section 11.5 with respect to the Borrower or any Material Subsidiary has occurred and is continuing;

(B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and the Administrative Agent shall enter the relevant information in the Register pursuant to paragraph (b)(iv) of this Section 13.6; and

(D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable Tax forms (including those described in Sections 5.4(d), 5.4(e), 5.4(g) and 5.4(h), as applicable).

(iii) Subject to acceptance and recording thereof pursuant to this Section 13.6(b)(iv), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and

Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11, Section 5.4 and Section 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall not be treated as an assignment and shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.6(c).

(iv) The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders (including any SPVs that provide all or any part of a Loan pursuant to Section 13.6(g) hereof), and the Commitments of, and principal amount (and stated interest amounts) of the Loans and L/C Obligations and any payment made by each Issuing Bank under any applicable Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent, each Issuing Bank and, solely with respect to itself, each other Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in this Section 13.6(b) (unless waived) and any written consent to such assignment required by this Section 13.6(b), the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.

(vi) The Administrative Agent shall have no duty to ascertain, monitor or enforce compliance with the restrictions on assignments and participations related to Disqualified Institutions. The Administrative Agent shall be authorized to provide the list of Disqualified Institutions to any Lender that requests the same, subject to the confidentiality obligations in Section 13.16.

(vii) At any time within twenty (20) Business Days following either (x) the acceleration of the Loans pursuant to Section 11 or (y) the occurrence of an Event of Default, if GSO delivers a Notice of Purchase Election substantially in the form of Exhibit K hereto (a "Notice of Purchase Election") to the Administrative Agent, which notice shall be irrevocable, then each Lender shall assign all of its rights, obligations, claims and liabilities under this Agreement (including all of its Commitment and the Loans at such time owing to it) to GSO on the following terms and conditions:

(A) such assignments being at par (including any accrued and unpaid interest, fees, breakage cost and all other amounts payable to the Administrative Agent, Collateral Agent, any other Agent hereunder, the Issuing Banks and the Lenders);

(B) the execution by GSO and each Lender of an Assignment and Assumption;

(C) that GSO shall be assigned the rights and obligations of all (and not less than all) Lenders under this Agreement;

(D) such assignments being consummated within ten (10) Business Days following the delivery of the Notice of Purchase Election;

(E) such assignments being without recourse to or representation by the Administrative Agent or Lenders;

(F) that all Letters of Credit shall have (1) expired or been terminated or (2) Satisfactorily Cash Collateralized or Backstopped;

(G) that any payment made by an Issuing Bank pursuant to a drawing on a Letter of Credit issued by it shall be fully reimbursed;

(H) that all Obligations under Secured Hedge Agreements and Secured Cash Management Agreements shall be (1) paid in full in cash or (2) cash collateralized or otherwise secured, in each case, to the reasonable satisfaction of the applicable Hedge Bank or Cash Management Bank; and

(I) that the documentation to effectuate such assignment is in form and substance reasonably satisfactory to the Administrative Agent to reflect the foregoing terms and conditions.

Notwithstanding anything to the contrary in this Agreement, upon the delivery of a Notice of Purchase Election, the Administrative Agent, the Collateral Agent and any Issuing Bank shall be entitled to resign effective upon the consummation of any such assignment and GSO shall be entitled to appoint a replacement Administrative Agent and Collateral Agent; provided, that, (a) the resigning Administrative Agent shall be entitled to the rights afforded to a resigning Administrative Agent pursuant to Section 12.9 (excluding its right to appoint a successor Administrative Agent pursuant to the third sentence of such Section), (b) the resigning Collateral Agent shall be entitled to the rights afforded to a resigning Collateral Agent pursuant to Section 12.9 (excluding its right to appoint a successor Administrative Agent pursuant to the third sentence of such Section) and (c) any resigning Issuing Bank shall be entitled to the rights afforded to a replaced Issuing Bank pursuant to Section 3.9(a). The Lenders hereby authorize and direct the Administrative Agent to enter into a letter agreement with GSO that is consistent with the terms of this Section 13.6(b)(vii).

(c) (i) Any Lender may, without the consent of the Borrower, the Administrative Agent or any Issuing Bank, sell participations to one or more banks or other entities (each, a "Participant") other than any Defaulting Lender, any Disqualified Institution, GSO and its Affiliates, Sanchez and its Affiliates (including, for avoidance of doubt, the Borrower or any Subsidiary of the Borrower) or natural persons in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, each Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 13.1(a)(A) and 13.1(a)(I) that affects such Participant, provided that the Participant shall have no right to consent to any modification to the percentages specified in the definitions of the terms "Majority Lenders" or "Required Lenders". Subject to Section 13.6(c)(ii), the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 to the same extent as if it were a Lender (subject to the limitations and requirements of those Sections and Section 2.12 and Section 13.7) as though it were a Lender and had acquired its interest by assignment pursuant to Section 13.6(b). To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.10, Section 2.11, Section 3.11 or Section 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (such consent not to be unreasonably withheld); provided that the Participant shall be subject to the provisions in Section 2.12 as if it were an assignee under Section 13.6(a) and Section 13.6 (b). Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest amounts) of each Participant's interest in the Loans or other obligations

under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d) Any Lender may, without the consent of the Borrower, any Issuing Bank or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of Exhibit G, as the case may be, evidencing the Loans owing to such Lender.

(e) Subject to Section 13.16, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "Transferee") and any prospective Transferee any and all Confidential Information (including financial information) in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f) The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g) Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 13.6, any SPV may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This Section 13.6(g) may not be amended without the written consent of the SPV. Notwithstanding anything to the contrary in this

Agreement, subject to the following sentence, each SPV shall be entitled to the benefits of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 to the same extent as if it were a Lender (subject to the limitations and requirements of Section 2.10, Section 2.11, Section 3.11 and Section 5.4 as though it were a Lender, and Sections 2.12 and 13.7, and has acquired its interest by assignment pursuant to Section 13.6 (b). Notwithstanding the prior sentence, an SPV shall not be entitled to receive any greater payment under Section 2.10, Section 2.11, Section 3.11 or Section 5.4 than its Granting Lender would have been entitled to receive absent the grant to such SPV, unless such grant to such SPV is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld).

(h) In the event that the Borrower's consent (or deemed consent) shall be required with respect to any assignment by a Lender described in this Section 13.6, a written request for such consent shall be delivered to an Authorized Officer of the Borrower and any other officer or employee designated by the Borrower in writing to the Administrative Agent.

13.7 Replacements of Lenders under Certain Circumstances.

(a) In the event that any Lender (i) requests reimbursement for amounts owing pursuant to Section 2.10, Section 3.11 or Section 5.4 (other than Section 5.4(b)), (ii) is affected in the manner described in Section 2.10(a)(iii) and as a result thereof any of the actions described in such Section is required to be taken or (iii) becomes a Defaulting Lender, the Borrower shall be entitled to replace such Lender by requiring such Lender to assign its Loans and its Commitments hereunder to one or more assignees, subject to (x) the consent rights that the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) have and (y) the restrictions on the Persons who may be assignees under Section 13.6(b); provided that (A) such replacement does not conflict with any Requirement of Law, (B) the replacement bank or institution shall purchase, at par, all Loans and the Borrower shall pay all other amounts (other than any disputed amounts, until such amounts are no longer in dispute, pursuant to Section 2.10, Section 3.11 or Section 5.4, as the case may be) owing to such replaced Lender prior to the date of replacement (subject to any exceptions agreed to between the assignee(s) and the replaced Lender to facilitate such assignment), (C) the terms and conditions of such replacement, shall be reasonably satisfactory to the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) and (D) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 and the Borrower and the Administrative Agent shall otherwise comply with Section 13.6 (provided that the Borrower shall not be obligated to pay the registration and processing fee referred to therein as long as the replacement Lender pays such fee).

(b) If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination that pursuant to the terms of Section 13.1 requires the consent of all of the Lenders affected, the Required Lenders pursuant to Section 13.1(a)(I) or each Lender and, in each case with respect to which the Majority Lenders shall have granted their consent, then the Borrower shall have the right (unless such Non-Consenting Lender grants such consent) to replace such Non-Consenting Lender by requiring such Non-Consenting Lender to assign its Loans and its Commitments hereunder to one or more assignees, subject to (x) the consent rights that the Administrative Agent and each Issuing Bank (except to the extent such Issuing Bank is, or is an Affiliate of, the Lender being replaced) have and (y) the restrictions on the Persons who may be assignees, in each case, under Section 13.6(b); provided that (i) the assignee (s) shall purchase, at par, all Loans and the Borrower shall pay all other amounts owing to such Non-Consenting Lender prior to the date of replacement (subject to any exceptions agreed to between the assignee(s) and the Non-Consenting Lender to facilitate such assignment) and (ii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 13.6 and the Borrower and the Administrative Agent shall otherwise comply with Section 13.6 (provided that the Borrower shall not be obligated to pay the registration and processing fee referred to therein as long as the replacement Lender pays such fee).

(c) Notwithstanding anything herein to the contrary each party hereto agrees that any assignment pursuant to the terms of this Section 13.7 may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent, each Issuing Bank and the assignee and that the Lender making such assignment need not be a party thereto.

(d) Any such Lender replacement pursuant to this Section 13.7 shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

13.8 Adjustments; Set-off.

(a) If any Lender (a "Benefited Lender") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letter of Credit Obligations held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 11.5, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender entitled thereto, if any, in respect of such other Lender's Loans, or interest thereon, such Benefited Lender shall (i) notify the Administrative Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; provided, however, that (A) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by the Borrower or any other Credit Party pursuant to and in accordance with the terms of this Agreement and the other Credit Documents, (2) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or participant or (3) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or Commitments or any increase in the Applicable Margin in respect of Loans or Commitments of Lenders that have consented to any such extension. Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation; provided, further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation," no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

(b) After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, against any amount due and payable by the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of the Borrower or any Credit Party. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application.

13.9 Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10 Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11 Integration. This Agreement and the other Credit Documents represent the agreement of the Borrower, the Guarantors, the Collateral Agent, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Borrower, the Guarantors, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.

13.12 GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

13.13 Submission to Jurisdiction; Waivers. Each party hereto hereby irrevocably and unconditionally:

(a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the courts of the State of New York and the courts of the United States of America for the Southern District of New York, in each case located in New York County, and appellate courts from any thereof; provided that nothing contained herein or in any other Credit Document will prevent any Lender, the Collateral Agent or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Credit Documents or against any Collateral or any other property of any Credit Party in any other forum in which jurisdiction can be established;

(b) consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on Schedule 13.2 at such other address of which the Administrative Agent shall have been notified pursuant to Section 13.2;

(d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

(e) acknowledges the waiver of special, exemplary, punitive or consequential damages contained in Section 13.5; and

(f) agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.14 Acknowledgments. The Borrower hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b) (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between the Borrower and the other Credit Parties, on the one hand, and the Administrative Agent, the Lenders and the other Agents on the other hand, and the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent, other Agents and the Lenders, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Borrower, any other Credit Parties or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) neither the Administrative Agent, any other Agent, any Lead Arranger, nor any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification

hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent, any Lead Arranger, or any Lender has advised or is currently advising any of the Borrower, the other Credit Parties or their respective Affiliates on other matters) and none of the Administrative Agent, any Agent, any Lead Arranger or any Lender has any obligation to any of the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent and its Affiliates, each other Agent and each of its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Administrative Agent, any other Agent or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) none of the Administrative Agent, any Agent or any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c) no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

13.15 WAIVERS OF JURY TRIAL. THE BORROWER, EACH AGENT, EACH ISSUING BANK AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16 Confidentiality. The Administrative Agent, each other Agent, any Issuing Bank and each other Lender shall hold all Confidential Information (as defined below) confidential in accordance with its customary procedure for handling confidential information of this nature and in any event may make disclosure (a) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof or pursuant to legal process or applicable Requirements of Law, (b) to such Lender's or the Administrative Agent's, any Issuing Bank's or such other Agent's attorneys, professional advisors, independent auditors, trustees, agents or Affiliates (and any Affiliate's attorneys, professional advisors, independent auditors, trustees or agents) (each, an "Advisor") in each case who need to know such Confidential Information in connection with the administration of the Credit Documents and are informed of the confidential nature of such Confidential Information (provided that the Administrative Agent, each Agent, each Issuing Bank and each other Lender shall be responsible for its respective Advisors' compliance with this paragraph), (c) to an investor or prospective investor in a securitization that agrees its access to Confidential Information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a securitization and who agrees to treat such Confidential Information as confidential, (d) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a securitization and who agrees to treat such Confidential Information as confidential, (e) to a nationally recognized ratings agency that requires access to Confidential Information regarding the Credit Parties, the Loans and Credit Documents, (f) to prospective Transferees or to any pledgee referred to in Section 13.6 or to prospective direct or indirect contractual counterparties in Hedge Agreements to be entered into in connection with Loans made hereunder as long as such Person is advised of and agrees to be bound by the provisions of this Section 13.16 or confidentiality provisions at least as restrictive as those set forth in this Section 13.16 and (g) to the extent such Confidential Information becomes public other than by reason of disclosure by such Person in breach of this Agreement; provided that unless prohibited by applicable Requirements of Law, each Lender, the Administrative Agent, any Issuing Bank and each other Agent shall endeavor to notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Lender, the Administrative Agent, any Issuing Bank or such other Agent, as applicable, by any governmental agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; provided further that in no event shall any Lender, the Administrative Agent, any Issuing Bank or any other Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary. "Confidential Information" shall mean all information received from the Borrower or any Restricted Subsidiary not marked as "public" relating to the Borrower, such Restricted

Subsidiary or their respective businesses, other than any such information that is available to the Administrative Agent, any other Agent, any Issuing Bank or any Lender on a non-confidential basis prior to disclosure by the Borrower and other than information pertaining to this Agreement routinely provided by arrangers to data service providers, including league table providers, that serve the lending industry. Any Person required to maintain the confidentiality of Confidential Information as provided in this Section 13.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own confidential information.

13.17 Release of Collateral and Guarantee Obligations.

(a) The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, as set forth in Section 13.7(b) below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Credit Party, to the extent such Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) upon any Collateral becoming an Excluded Asset, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Majority Lenders (or such other percentage of the Lenders whose consent may be required in accordance with Section 13.1), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with this Section 13.17 and (vi) as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents. Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents. Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantees (A) upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or otherwise becoming an Excluded Subsidiary (other than by virtue of such Subsidiary becoming an Immaterial Subsidiary) and (B) in the case of a Guarantor becoming an Excluded Subsidiary by virtue of such Subsidiary becoming an Immaterial Subsidiary upon written request of the Borrower to the Administrative Agent (which request shall include a certification of an Authorized Officer that such Guarantor to be released is an Immaterial Subsidiary). The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender. In connection with any release hereunder, the Administrative Agent and Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Credit Document in respect of such Subsidiary, property or asset. Upon the request of the Administrative Agent, in connection with any documentation to effectuate the release of Collateral pursuant to a partial release of Liens in respect of Collateral, a UCC-3 filing in respect of personal property or similar recording or filing, the Borrower shall certify that only the Collateral intended to be released pursuant to the terms of Section 13.17(a) was released pursuant to such documentation.

(b) Notwithstanding anything to the contrary contained herein or any other Credit Document, upon Payment in Full, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Credit Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Agreements, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent or indemnification obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

13.18 USA PATRIOT Act. The Agents and each Lender hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Agent and such Lender to identify each Credit Party in accordance with the PATRIOT Act.

13.19 Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the applicable Overnight Rate from time to time in effect.

13.20 Reinstatement. This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

13.21 Disposition of Proceeds. The Security Documents contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Collateral Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to their as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property. The Security Documents further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby. Notwithstanding the assignment contained in such Security Documents, until the occurrence of an Event of Default, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Credit Parties and (b) the Lenders hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Credit Parties.

13.22 Collateral Matters; Hedge Agreements. The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a *pro rata* basis pursuant to terms agreed upon in the Credit Documents to any Person (a) under any Secured Hedge Agreement, in each case, after giving effect to all netting arrangements relating to such Hedge Agreements or (b) under any Secured Cash Management Agreement. No Person shall have any voting rights under any Credit Document solely as a result of the existence of obligations owed to it under any such Secured Hedge Agreement or Secured Cash Management Agreement.

13.23 Agency of the Borrower for the Other Credit Parties. Each of the other Credit Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Credit Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

13.24 Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-In Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature Pages Follow.]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**SN EF UNSUB, LP**, as the Borrower

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

Case 4:23-34508 Document 1951-3-16 Filed in 04/19/23 in TXSD Page 1394 of 1759

ADMINISTRATIVE AGENT::

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer

| | |
|---|---|
| LENDER: | **JPMORGAN CHASE BANK, N.A.,**<br>as Lender |
| | By: /s/ Darren Vanek<br>Name: Darren Vanek<br>Title: Authorized Officer |

LENDER:

**CITIBANK, N.A.,**
as Lender

By: /s/ Jeff Ard
Name: Jeff Ard
Title: Vice President

LENDER:

**CAPITAL ONE, NATIONAL ASSOCIATION,**
as Lender

By: /s/ Michael Higgins
Name: Michael Higgins
Title: Senior Director

LENDER:

**ROYAL BANK OF CANADA,**
as Lender

By: /s/ Mark Lumpkin, Jr.
Name: Mark Lumpkin, Jr.
Title: Authorized Signatory

LENDER:

**BMO HARRIS BANK, NA,**
as Lender

By: /s/ Matthew L. Davis
Name: Matthew L. Davis
Title: Vice President

LENDER:

**ING CAPITAL LLC,**
as Lender

By: /s/ Josh Strong
Name: Josh Strong
Title: Director

By: /s/ Charles Hall
Name: Charles Hall
Title: Managing Director

LENDER:

**SUNTRUST BANK,**
as Lender

By: /s/ John Kovarik
Name: John Kovarik
Title: Vice President

LENDER:

**ABN AMRO CAPITAL USA LLC,**
as Lender

By: /s/ David Montgomery
Name: David Montgomery
Title: Executive Director

By: /s/ Uravashi Zutshi
Name: Uravashi Zutshi
Title: Managing Director

LENDER:

**CANADIAN IMPERIAL BANK OF COMMERCE, NEW YORK BRANCH,** as Lender

By: /s/ Richard Antl
Name: Richard Antl
Title: Authorized Signatory

By: /s/ William M. Reid
Name: William M. Reid
Title: Authorized Signatory

LENDER:

**FIFTH THIRD BANK,**
as Lender

By: /s/ Justin Bellamy
Name: Justin Bellamy
Title: Director

LENDER:

**NATIXIS, NEW YORK BRANCH,**
as Lender

By: /s/ Timothy Polvado
Name: Timothy Polvado
Title: Senior Managing Director

By: /s/ Carlos Quinteros
Name: Carlos Quinteros
Title: Managing Director

Case 4:23-cv-00587 Document 1-1 Filed 04/19/23 in TXSD Page 1406 of 1759

| | |
|---|---|
| LENDER: | **PNC BANK, NATIONAL ASSOCIATION,**<br>as Lender |
| | By: /s/ Sandra Aultman<br>Name: Sandra Aultman<br>Title: Managing Director |

Case 4:23-34508 Document 1354-16 Filed in TXSB on 07/18/20 Page 145 of 376

LENDER: **BOKF, NA dba Bank of Texas,**
as Lender

By: /s/ Mari Salazar
Name: Mari Salazar
Title: Senior Vice President, Energy Lending

LENDER:

**CITIZENS BANK, N.A.,**
as Lender

By: /s/ Scott Donaldson
Name: Scott Donaldson
Title: Senior Vice President

LENDER:

**COMERICA BANK,**
as Lender

By: /s/ William B. Robinson
Name: William B. Robinson
Title: Senior Vice President

LENDER:

**The Huntington National Bank,**
as Lender

By: /s/ Margaret Niekrash
Name: Margaret Niekrash
Title: Senior Vice President

**EXHIBIT A TO
CREDIT AGREEMENT**

**[FORM OF] RESERVE REPORT CERTIFICATE**

This Reserve Report Certificate (this "Certificate"), dated as of [_______], 201[ ], relates to the Reserve Report dated as of [January 1] [July 1] [other date in case of Interim Redetermination], 201[ ] delivered pursuant to Section 9.12(c) of that certain Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the lenders from time to time party thereto (the "Lenders"), JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto. Each capitalized term used herein having the same meaning given to it in the Credit Agreement unless otherwise specified. The undersigned certifies he/she is an Authorized Officer and, on behalf of the Borrower, in his/her capacity as an Authorized Officer of the Borrower and not in his/her individual capacity, certifies that in all material respects:

(a) in the case of Reserve Reports prepared by or under the supervision of the chief engineer of the Borrower or Sanchez (other than January 1 Reserve Reports) such Reserve Report has been prepared, except as set forth in an exhibit to such Reserve Report, in accordance with the procedures used in the immediately preceding January 1 Reserve Report or the Initial Reserve Report, if no January 1 Reserve Report has been delivered;

(b) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects;

(c) assuming that all applicable Governmental Authorities have granted approvals, made recordations and taken such other actions as are necessary in connection with the Transactions and any assignments made in connection therewith, except as set forth on Annex I hereto, the Borrower or another Credit Party has good and defensible title to the Borrowing Base Properties evaluated in such Reserve Report (other than those (i) Disposed of in compliance with Section 10.4 of the Credit Agreement since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent) and such Borrowing Base Properties are free of all Liens except for Liens permitted pursuant to Section 10.2 of the Credit Agreement;

(d) except as set forth on Annex II hereto, as of the date of such Reserve Report, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 8.16 of the Credit Agreement with respect to the Credit Parties' Oil and Gas Property evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(e) no Borrowing Base Properties have been Disposed of since the date of the last Borrowing Base determination except those Borrowing Base Properties listed on Annex III hereto; and

(f) Annex IV sets forth a list of (A) all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties' rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable and (B) all Borrowing Base Properties evaluated by such Reserve Report that are Collateral and demonstrating that the PV-9 of the Collateral (calculated at the time of delivery of such Reserve Report) meets the Collateral Coverage Minimum.

*[Remainder of page intentionally left blank; signature page follows]*

EXECUTED AND DELIVERED as of the date first set forth above.

**SN EF UNSUB, LP**

By: ______________________________
Name:
Title:

**EXHIBIT B TO
CREDIT AGREEMENT**

**FORM OF
NOTICE OF BORROWING**

JPMORGAN CHASE BANK, N.A.
712 MAIN STREET, 5TH FLOOR
HOUSTON, TX 77002
Attention: Darren Vanek

[Date]

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of March [●], 2017, among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the Lenders from time to time party thereto, JPMORGAN CHASE BANK, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto (as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement.

The Borrower hereby gives you notice pursuant to Section 2.3 of the Credit Agreement that it requests a Borrowing under the Credit Agreement, and in that connection sets forth below the terms on which such Borrowing is requested to be made:

(A) The aggregate principal amount of Borrowing: ________________
(B) The date of Borrowing[1] (which is a Business Day): ________________
(C) The type of Borrowing[2]: ________________
(D) Interest Period (if LIBOR Borrowing)[3]: ________________
(E) The location and number of the Borrower's Account to which funds are to be disbursed: ________________

**SN EF UNSUB, LP**

By: ______________________________
Name:
Title:

1 Date of Notice of Borrowing: To be submitted (A) prior to 1:00 p.m. (New York City time) at least three Business Days prior to each Borrowing of Loans if such Loans are to be initially LIBOR Loans; or (B) prior to 11:00 a.m. (New York City time) on the date of each Borrowing of Loans that are to be ABR Loans.
2 Specify a LIBOR Borrowing or an ABR Borrowing.
3 The Interest Period applicable to a LIBOR Borrowing shall be subject to the definition of "Interest Period" in the Credit Agreement. If no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration.

**EXHIBIT C TO
CREDIT AGREEMENT**

**FORM OF
GUARANTEE**

[Attached]

# [FORM OF] GUARANTEE AGREEMENT

This **GUARANTEE AGREEMENT** (this "Guaranty"), dated as of **[__________]**, 2017, by and among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), the Subsidiaries of the Borrower listed on the signature page hereof (each such Subsidiary and the Borrower, a "Guarantor" and, collectively, the "Guarantors"), and JPMORGAN CHASE BANK, N.A., as collateral agent and administrative agent for the Secured Parties referred to below (in its capacity as collateral agent, together with any successor thereto in such capacity, the "Collateral Agent").

**WITNESSETH:**

WHEREAS, the Borrower, the Lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto, have entered into a Credit Agreement, dated as of March 1, 2017 (as amended, restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to the Borrower and the issuance of Letters of Credit for the account of the Borrower;

WHEREAS, one or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit");

WHEREAS, the proceeds of the Extensions of Credit will be used in part to enable the Borrower to make valuable transfers to the Guarantors in connection with the operation of their respective businesses;

WHEREAS, it is a condition to the obligations of the Secured Parties to make their respective Extensions of Credit to the Borrower that the Borrower and each Guarantor shall have executed and delivered this Guaranty; and

WHEREAS, each Guarantor will obtain benefits from the Extensions of Credit, and accordingly desires to execute this Guaranty in order to satisfy the conditions described in the preceding paragraph and to induce the Secured Parties to make their respective Extensions of Credit.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and to induce the Administrative Agent, the Collateral Agent, the Issuing Banks and the Lenders to enter into the Credit Agreement and the Lenders and the Issuing Banks to make the Extensions of Credit to the Borrower under the Credit Agreement, to induce one or more Hedge Banks to enter into Secured Hedge Agreements with the Borrower and/or its Restricted Subsidiaries and to induce one or more Cash Management Banks to provide Cash Management Services pursuant to Secured Cash Management Agreements with the Borrower and/or its Restricted Subsidiaries, the Borrower and Guarantors hereby agree with the Collateral Agent, for the benefit of the Secured Parties, as follows:

SECTION 1. DEFINITIONS.

(a) Capitalized terms used herein shall have the meanings assigned to them in the Credit Agreement, unless otherwise defined herein. References to this "Guaranty" shall mean this Guaranty, including all amendments, modifications and supplements and any annexes, exhibits and schedules to any of the foregoing, and shall refer to this Guaranty as the same may be in effect at the time such reference becomes operative.

(b) The following term shall have the following meaning:

"Qualified Keepwell Provider": in respect of any Hedging Obligation, each Credit Party that, at the time the relevant guarantee (or grant of the relevant security interest, as applicable) becomes effective with respect to such Hedging Obligation, constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder

and can cause another person to qualify as an "eligible contract participant" with respect to such Hedging Obligation at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 2. THE GUARANTY.

(a) Guaranty of Guaranteed Obligations. Each Guarantor unconditionally guarantees to the Collateral Agent, jointly with the other Guarantors and severally, as a primary obligor and not merely as a surety, the payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, other than, with respect to any Guarantor, any Excluded Swap Obligations of such Guarantor (the "Guaranteed Obligations") for the benefit of the Secured Parties. Each Guarantor further agrees that the Guaranteed Obligations may be extended, modified, amended or renewed, in whole or in part, without notice to or further assent from it, and that it will remain bound upon its guarantee notwithstanding any extension, modification, amendment or renewal of any Guaranteed Obligation. To the extent permitted by applicable law, each Guarantor waives presentment to, demand of payment from and protest to the Borrower, any other Credit Party or any Restricted Subsidiary of any of the Guaranteed Obligations, and also waives notice of acceptance of its guarantee and notice of protest for nonpayment.

(b) Guaranty of Payment and Performance. Each Guarantor further agrees that its guarantee hereunder constitutes a guarantee of payment and performance when due and not of collection, and waives any right to require that any resort be had by the Collateral Agent or any other Secured Party to any security held for the payment or performance of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Collateral Agent or any other Secured Party in favor of the Borrower or any other person.

(c) Special Guaranty to Confer ECP Status. The Borrower, unconditionally and irrevocably, with respect to each other Guarantor, guarantees such Guarantor's guarantee under Section 2(a) hereof of any Secured Hedge Agreement. The obligations of the Borrower under this Section 2(c) shall remain in full force and effect until Payment in Full. The Borrower intends that this Section 2(c) constitute, and this Section 2(c) shall be deemed to constitute, a guarantee or other agreement for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(d) No Limitations. Except for termination or release of a Guarantor's obligations hereunder as expressly provided for in Section 5(g) hereof and except as otherwise provided under applicable law, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise (other than defense of payment or performance). Without limiting the generality of the foregoing, to the extent permitted by applicable law and except for and subject to any limitations in connection with any applicable termination or release of a Guarantor's obligations hereunder in accordance with the terms of Section 5(g) hereof, the obligations of each Guarantor hereunder shall not be discharged or impaired or otherwise affected by: (i) the failure of the Collateral Agent or any other Secured Party to assert any claim or demand or to exercise or enforce any right or remedy under the provisions of any Credit Document or otherwise; (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Credit Document or any other agreement, including with respect to any other Guarantor under this Guaranty; (iii) the release of, or the failure to perfect any security interest in, or the exchange, substitution, release or any impairment of, any security held by the Collateral Agent or any other Secured Party for the Guaranteed Obligations; (iv) any default, failure or delay, willful or otherwise, in the performance of the Guaranteed Obligations; (v) any other act or omission that may or might in any manner or to any extent vary the risk of any Guarantor or otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than Payment in Full); (vi) any illegality, lack of validity or enforceability of any Guaranteed Obligation; (vii) any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor, or any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Borrower or any other Guarantor or its assets or any resulting release or discharge of any Guaranteed Obligation (other than Payment in Full); (viii) the existence of any claim, set-off or other rights that the Guarantor may have at any time against the Borrower or any other Guarantor, the Collateral Agent, or any other corporation or Person, whether in connection herewith or any unrelated transactions, provided that nothing herein will prevent the assertion of any such claim by separate suit or compulsory counterclaim; and (ix) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Collateral Agent or any Secured Party that might otherwise constitute a defense to, or a legal or equitable discharge of, the Borrower or

any other Credit Party or any other guarantor or surety. Each Guarantor expressly authorizes the applicable Secured Parties to take and hold security for the payment and performance of the Guaranteed Obligations, to exchange, waive or release any or all such security (with or without consideration), to enforce or apply such security and direct the order and manner of any sale thereof in their sole discretion or to release or substitute any one or more other guarantors or obligors upon or in respect of the Guaranteed Obligations, all without affecting the obligations of any Guarantor hereunder. To the fullest extent permitted by applicable law, each Guarantor waives any defense based on or arising out of any defense of any other Guarantor or the unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Guarantor, other than Payment in Full. The Collateral Agent and the other Secured Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with the Borrower or any other Credit Party or exercise any other right or remedy available to them against the Borrower or any other Credit Party, without affecting or impairing in any way the liability of any Guarantor hereunder except to the extent of Payment in Full. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Guarantor against any other Guarantor, as the case may be, or any security.

(e) Reinstatement. Notwithstanding the provisions of Section 5(g)(i) hereof, each Guarantor agrees that its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored or returned by the Collateral Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any other Credit Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any other Credit Party or any substantial part of its property, or otherwise, all as though such payment had not been made.

(f) Agreement To Pay; Subrogation. In furtherance of the foregoing and not in limitation of any other right that the Collateral Agent or any other Secured Party has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Borrower or any other Credit Party to pay any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, after notice of prepayment or otherwise, each Guarantor hereby promises to and will forthwith pay, or cause to be paid, to the Collateral Agent such unpaid Guaranteed

Obligation. Upon payment by any Guarantor of any sums to the Collateral Agent as provided above, all rights of such Guarantor against the Borrower or Credit Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be fully subordinated to the indefeasible Payment in Full.

(g) Information. Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's and each other Credit Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and agrees that neither the Collateral Agent nor any other Secured Party will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

(h) Keepwell. Each Qualified Keepwell Provider hereby jointly and severally absolutely, unconditionally, and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under this guarantee in respect of any Hedging Obligation (provided, however, that each Qualified Keepwell Provider shall only be liable under this Section 2(h) for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified Keepwell Provider under this Section 2(h) shall remain in full force and effect until this Agreement is terminated in accordance with Section 5(g) hereof. Each Qualified Keepwell Provider intends that this Section 2(h) constitute, and this Section 2(h) shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Credit Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 3. FURTHER ASSURANCES.

Each Guarantor agrees, upon the written request of the Collateral Agent, to execute and deliver to the Collateral Agent, from time to time, any additional instruments or documents reasonably considered necessary by the Collateral Agent to cause this Guaranty to be, become or remain valid and effective in accordance with its terms.

SECTION 4. PAYMENTS FREE AND CLEAR OF TAXES.

Each Guarantor agrees that such Guarantor will perform or observe all of the terms, covenants and agreements that Section 5.4 of the Credit Agreement requires such Guarantor to perform or observe, subject to the qualifications set forth therein.

SECTION 5. OTHER TERMS.

(a) Entire Agreement. This Guaranty, together with the other Credit Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements relating to a guaranty of the loans and advances under the Credit Documents.

(b) Headings. The headings in this Guaranty are for convenience of reference only and are not part of the substance of this Guaranty.

(c) Severability. Whenever possible, each provision of this Guaranty shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

(d) Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be given as provided in Section 13.2 of the Credit Agreement.

(e) Successors and Assigns. Whenever in this Guaranty any Guarantor is referred to, such reference shall be deemed to include the permitted successors and assigns of such party (in accordance with the terms of the Credit Agreement); and all covenants, promises and agreements by any Guarantor that are contained in this Guaranty shall bind and inure to the benefit of its respective permitted successors and assigns.

(f) No Waiver; Cumulative Remedies; Amendments. No failure or delay by the Administrative Agent or Collateral Agent in exercising any right, power or remedy hereunder shall operate as a waiver hereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of the Administrative Agent or Collateral Agent hereunder are cumulative and are not exclusive of any rights, powers or remedies that it would otherwise have. No waiver of any provision of this Guaranty or consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be permitted by this Section 5(f), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of any Loan or the issuance of any Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or Collateral Agent may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in similar or other circumstances. When making any demand hereunder against any of the Guarantors, the Administrative Agent, Collateral Agent or any other Secured Party may, but shall be under no obligation to, make a similar demand on the Borrower or any other Guarantor or guarantor, and any failure by the Administrative Agent or Collateral Agent or any other Secured Party to make any such demand or to collect any payments from the Borrower or any such other Guarantor or guarantor or any release of the Borrower or such other Guarantor or guarantor shall not relieve any of the Guarantors in respect of which a demand or collection is not made or any of the Guarantors not so released of their several obligations or liabilities hereunder, and shall not impair or affect the rights and remedies, express or implied, or as a matter of law, of the Collateral Agent or any other Secured Party against any of the Guarantors. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

Neither this Guaranty nor any provision hereof may be waived, amended, supplemented or modified (other than a termination of this Guaranty pursuant to Section 5(g) hereof) except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Guarantor or Guarantors with respect to which such waiver, amendment, supplement or modification is to apply, subject to any consent required in accordance with Section 13.1 of the Credit Agreement.

(g) Termination and Release.

(i) This Guaranty shall terminate upon Payment in Full.

(ii) A Guarantor shall be released from its obligations hereunder in accordance with Section 13.17 of the Credit Agreement.

(iii) In connection with any release pursuant to this Section 5(g), the Collateral Agent shall execute and deliver to the Borrower, at the Borrower's expense, all documents that the Borrower shall reasonably request to evidence such release; provided that, upon request by the Administrative Agent, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying that such transaction has been or was consummated in compliance with the Credit Documents. Any execution and delivery of documents pursuant to this Section 5(g) shall be without recourse to or warranty by the Collateral Agent.

(h) Counterparts. This Guaranty may be executed in any number of counterparts, each of which shall collectively and separately constitute one and the same agreement.

(i) Limitation of Liability. Each Guarantor, and by its acceptance of this Guaranty, the Collateral Agent and each other Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty and the Guaranteed Obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of each Guarantor hereunder. To effectuate the foregoing intention, the Collateral Agent, the other Secured Parties and the Guarantors hereby irrevocably agree that the Guaranteed Obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the Guaranteed Obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance.

SECTION 6. INDEMNITY; SUBROGATION AND SUBORDINATION.

(a) Indemnity and Subrogation. In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 6(c) hereof), the Borrower agrees that (i) in the event a payment shall be made by any Guarantor under this Guaranty in respect of any Obligation of the Borrower, the Borrower shall indemnify such Guarantor for the full amount of such payment and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment and (ii) in the event any assets of any Guarantor shall be sold pursuant to this Guaranty or any other Security Document to satisfy in whole or in part an Obligation of the Borrower, the Borrower shall indemnify such Guarantor in an amount equal to the greater of the book value or the fair market value of the assets so sold.

(b) Contribution and Subrogation. Each Guarantor (a "Contributing Guarantor") agrees (subject to Section 6(c) hereof) that, in the event a payment shall be made by any other Guarantor hereunder in respect of any Obligation or assets of any other Guarantor shall be sold pursuant to any Security Document to satisfy any Obligation owed to any Secured Party and such other Guarantor (the "Claiming Guarantor") shall not have been fully indemnified by the Borrower as provided in Section 6(a) hereof, the Contributing Guarantor shall indemnify the Claiming Guarantor in an amount equal to the amount of such payment or the greater of the book value or the fair market value of such assets, as applicable, in each case multiplied by a fraction of which the numerator shall be the net worth of such Contributing Guarantor on the date hereof and the denominator shall be the aggregate net worth of all the Guarantors on the date hereof (or, in the case of any Guarantor becoming a party hereto pursuant to Section 9.9 of the Credit Agreement, the date of the supplement hereto executed and delivered by such Guarantor). Any Contributing Guarantor making any payment to a Claiming Guarantor pursuant to this Section 6(b) shall be subrogated to the rights of such Claiming Guarantor under Section 6(a) hereof to the extent of such payment. The provisions of this Section 6(b) shall in no respect limit the obligations and liabilities of any Guarantor to the Collateral Agent and the other

Secured Parties, and each Guarantor shall remain liable to the Collateral Agent and the other Secured Parties for the full amount guaranteed by such Guarantor hereunder.

(c) Subordination. Notwithstanding any provision of this Guaranty to the contrary, all rights of the Guarantors under Sections 6(a) and 6(b) hereof and all other rights of indemnity, contribution or subrogation of any Guarantor under applicable law or otherwise shall be fully subordinated to the indefeasible Payment in Full. Notwithstanding any payment or payments made by any of the Guarantors hereunder or any set-off or appropriation or application of funds of any of the Guarantors by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of the Collateral Agent or any other Secured Party against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by any Secured Party for the payment of the Obligations until the indefeasible Payment in Full, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder until the indefeasible Payment in Full. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time prior to the indefeasible Payment in Full, such amount shall be held by such Guarantor in trust for the Collateral Agent and the other Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be paid to the Collateral Agent to be credited and applied against the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement. No failure on the part of the Borrower or any Guarantor to make the payments required by Sections 6(a) and 6(b) hereof (or any other payments required under applicable law or otherwise) shall in any respect limit the obligations and liabilities of any Guarantor with respect to its obligations hereunder, and each Guarantor shall remain liable for the full amount of the obligations of such Guarantor hereunder.

SECTION 7. GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS; INDEMNITY.

(a) The terms of Sections 13.12, 13.13 and 13.15 of the Credit Agreement with respect to governing law, submission of jurisdiction, venue and waiver of trial by jury are incorporated herein by reference, *mutatis mutandis*, and the parties hereto agree to such terms.

(b) Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5(d) hereof. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(c) to the extent that the Borrower would be required to do so under Section 13.5(b) of the Credit Agreement, each Guarantor agrees to indemnify the Administrative Agent and the other Indemnitees in accordance with the provisions of Section 13.5(b) of the Credit Agreement.

SECTION 8. RIGHT OF SET OFF.

After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to any Guarantor, any such notice being expressly waived by each Guarantor to the extent permitted by applicable Requirements of Law, against any amount owed by or any Obligation of the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of any Guarantor. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section 8 are in addition to other rights and remedies (including other rights of set off) that such Lender may have.

SECTION 9. ADDITIONAL SUBSIDIARIES.

Upon execution and delivery by the Collateral Agent and any Subsidiary of the Borrower that is required to become a party hereto by Section 9.11 of the Credit Agreement of an instrument in the form of Exhibit I hereto, such Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Guaranty. The rights and obligations of each party to this Guaranty shall remain in full force and effect notwithstanding the addition of any new party to this Guaranty. Each reference to "Guarantor" in this Guaranty shall be deemed to include such Subsidiary.

[Signature Pages Follow]

Case 4:23-34508 Document 1254-16 Filed in TXSB on 04/19/23 Page 1424 of 1759

IN WITNESS WHEREOF, the undersigned has caused this Guaranty to be executed and delivered as of the date first above written.

**SN EF UnSub, LP**

By: ____________________
Name: ____________________
Title: ____________________

**[Subsidiary Guarantors]**

Accepted and Agreed to:

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent

By: ____________________
Name: ____________________
Title: ____________________

Exhibit I
to Guaranty

SUPPLEMENT NO. _______ dated as of _______ (this "Supplement"), to the Guarantee Agreement dated as of [___________], 2017 (the "Guaranty"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each Subsidiary of the Borrower party thereto (the "Existing Guarantors") and JPMORGAN CHASE BANK, N.A., as collateral agent and administrative agent (in its capacity as collateral agent, the "Collateral Agent") for the Lenders (as defined therein).

A. Reference is made to the Credit Agreement dated as of [___________], 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders and agents party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Guaranty, as applicable.

C. The Borrower and the Existing Guarantors have entered into the Guaranty in order to induce the Secured Parties to make their respective Extensions of Credit. Section 9 of the Guaranty provides that additional Subsidiaries may become Guarantors under the Guaranty by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary of the Borrower (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Guarantor under the Guaranty in order to induce the Secured Parties to make their respective additional Extensions of Credit, and as consideration for Extensions of Credit previously made.

Accordingly, the Collateral Agent and the New Subsidiary agree as follows:

SECTION 1. In accordance with Section 9 of the Guaranty, the New Subsidiary by its signature below becomes a Guarantor under the Guaranty with the same force and effect as if originally named therein as a Guarantor and the New Subsidiary hereby agrees to all the terms and provisions of the Guaranty applicable to it as a Guarantor thereunder. In furtherance of the foregoing, the New Subsidiary (a) does hereby guarantee to the Collateral Agent the payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Guaranteed Obligations as set forth in the Guaranty and (b) if New Subsidiary is a Qualified Keepwell Provider, does hereby agree to perform all obligations of the Guaranty applicable to it in such capacity. Each reference to a "Guarantor" in the Guaranty and in this Supplement shall be deemed to include the New Subsidiary. The Guaranty is hereby incorporated herein by reference.

SECTION 2. The New Subsidiary represents and warrants to the Collateral Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (iii) implied covenants of good faith and fair dealing.

SECTION 3. This Supplement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract. This Supplement shall become effective when the Collateral Agent shall have received a counterpart of this Supplement that bears the signature of the New Subsidiary. Delivery of an executed signature page to this Supplement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. Except as expressly supplemented hereby, the Guaranty shall remain in full force and effect.

SECTION 5. **THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6. In the event any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Guaranty shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7. All communications and notices hereunder shall be in writing and given as provided in Section 5(d) of the Guaranty.

SECTION 8. The New Subsidiary agrees to reimburse the Collateral Agent in accordance with Section 13.5 of the Credit Agreement for its reasonable out-of-pocket expenses in connection with this Supplement, including the reasonable and documented fees, disbursements and other charges of counsel to the Collateral Agent.

[Remainder of page left intentionally blank.]

IN WITNESS WHEREOF, the New Subsidiary has duly executed this Supplement to the Guaranty as of the day and year first above written.

**[NAME OF NEW SUBSIDIARY]**

By: ____________________
Name: ____________________
Title: ____________________

**EXHIBIT D TO
CREDIT AGREEMENT**

**FORM OF
MORTGAGE/DEED OF TRUST**

[Attached]

WHEN RECORDED OR FILED,
PLEASE RETURN TO:
Simpson Thacher & Bartlett LLP
600 Travis Street, Suite 5400
Houston, TX 77002-3009
Attention: Austin Browne

*Space above for County Recorder's Use*

**DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT**

**FROM**

**SN EF UnSub, LP**

**as Grantor**

**TO**

**DARREN VANEK, AS TRUSTEE**
**FOR THE BENEFIT OF**

**JPMORGAN CHASE BANK, N.A.**
**as Collateral Agent and as Beneficiary,**
**for the benefit of itself**
**and the Secured Parties**

A CARBON, PHOTOGRAPHIC, OR OTHER REPRODUCTION OF THIS INSTRUMENT IS SUFFICIENT AS A FINANCING STATEMENT.

TO THE EXTENT PERMITTED BY LAW, A POWER OF SALE HAS BEEN GRANTED IN THIS INSTRUMENT. A POWER OF SALE MAY ALLOW THE TRUSTEE OR THE BENEFICIARY TO TAKE SOME OR ALL OF THE DEED OF TRUST PROPERTY AND SELL IT WITHOUT GOING TO COURT IN A FORECLOSURE ACTION UPON DEFAULT BY THE GRANTOR UNDER THIS INSTRUMENT.

THIS INSTRUMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS.

THIS INSTRUMENT SECURES PAYMENT OF FUTURE ADVANCES.

THIS INSTRUMENT COVERS PROCEEDS OF DEED OF TRUST PROPERTY.

THIS INSTRUMENT COVERS, AMONG OTHER THINGS, MINERALS, AS-EXTRACTED COLLATERAL AND OTHER SUBSTANCES OF VALUE WHICH MAY BE EXTRACTED FROM THE EARTH (INCLUDING WITHOUT LIMITATION OIL AND GAS) AND THE ACCOUNTS RELATED THERETO WHICH WILL BE FINANCED AT THE WELLHEADS OF THE WELL OR WELLS LOCATED ON THE PROPERTIES DESCRIBED IN EXHIBIT A HERETO. THIS FINANCING STATEMENT IS TO BE FILED OR FILED FOR RECORD, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF THE RECORDERS OF THE COUNTIES LISTED ON THE EXHIBIT HERETO. THE GRANTOR HAS AN INTEREST OF RECORD IN THE REAL ESTATE CONCERNED, WHICH INTEREST IS DESCRIBED IN THE EXHIBIT ATTACHED HERETO.

PORTIONS OF THE DEED OF TRUST PROPERTY ARE GOODS WHICH ARE OR ARE TO BECOME AFFIXED TO OR FIXTURES ON THE LAND DESCRIBED IN OR REFERRED TO IN THE EXHIBIT HERETO. THIS FINANCING STATEMENT IS TO BE FILED FOR RECORD OR RECORDED, AMONG OTHER PLACES, IN THE REAL ESTATE RECORDS OR SIMILAR RECORDS OF EACH COUNTY IN WHICH SAID LAND OR ANY PORTION THEREOF IS LOCATED. THE GRANTOR IS THE OWNER OF A RECORD INTEREST IN THE REAL ESTATE CONCERNED. THIS INSTRUMENT IS ALSO TO BE INDEXED IN THE INDEX OF FINANCING STATEMENTS.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | ARTICLE I<br>DEFINITIONS | |
| Section 1.01. | Terms Defined Above | 1 |
| Section 1.02. | UCC and Other Defined Terms. | 1 |
| Section 1.03. | Definitions | 2 |
| | ARTICLE II<br>GRANT OF LIEN AND SECURED OBLIGATIONS | |
| Section 2.01. | Grant of Liens | 3 |
| Section 2.02. | Grant of Security Interest | 4 |
| Section 2.03. | Secured Obligations | 5 |
| Section 2.04. | Fixture Filing, As-Extracted Collateral, Etc. | 5 |
| Section 2.05. | Pro Rata Benefit | 5 |
| Section 2.06. | Excluded Properties | 5 |
| | ARTICLE III<br>ASSIGNMENT OF AS-EXTRACTED COLLATERAL | |
| Section 3.01. | Assignment | 5 |
| Section 3.02. | No Modification of Payment Obligations | 6 |
| Section 3.03. | Rights and Title of Consignee | 6 |
| | ARTICLE IV<br>REPRESENTATIONS, WARRANTIES AND COVENANTS | |
| Section 4.01. | Title | 6 |
| Section 4.02. | First Priority Liens | 7 |
| Section 4.03. | Defend Title | 7 |
| Section 4.04. | Not a Foreign Person | 7 |
| Section 4.05. | Revenue and Cost Bearing Interest | 7 |
| | ARTICLE V<br>RIGHTS AND REMEDIES | |
| Section 5.01. | Event of Default | 7 |
| Section 5.02. | Foreclosure and Sale | 7 |
| Section 5.03. | Substitute Trustees and Agents | 8 |
| Section 5.04. | Judicial Foreclosure; Receivership | 9 |
| Section 5.05. | Foreclosure for Installments | 9 |
| Section 5.06. | Separate Sales | 9 |

| | | |
|---|---|---|
| Section 5.07. | Possession of Deed of Trust Property | 9 |
| Section 5.08. | Occupancy After Foreclosure | 9 |
| Section 5.09. | Remedies Cumulative, Concurrent and Nonexclusive | 10 |
| Section 5.10. | Discontinuance of Proceedings | 10 |
| Section 5.11. | No Release of Obligations | 10 |
| Section 5.12. | Release of and Resort to Collateral | 10 |
| Section 5.13. | Waiver of Redemption, Notice and Marshalling of Assets, Etc. | 10 |
| Section 5.14. | Application of Proceeds | 10 |
| Section 5.15. | Resignation of Operator | 11 |
| Section 5.16. | Exculpation | 11 |
| Section 5.17. | Payment of Expenses; Indemnity | 11 |

ARTICLE VI
THE TRUSTEE

| | | |
|---|---|---|
| Section 6.01. | Duties, Rights, and Powers of Trustee | 12 |
| Section 6.02. | Successor Trustee | 12 |
| Section 6.03. | Retention of Moneys | 12 |

ARTICLE VII
MISCELLANEOUS

| | | |
|---|---|---|
| Section 7.01. | Instrument Construction. | 13 |
| Section 7.02. | Releases | 13 |
| Section 7.03. | Invalidity | 13 |
| Section 7.04. | Successors and Assigns | 13 |
| Section 7.05. | Satisfaction of Prior Encumbrance | 13 |
| Section 7.06. | Application of Payments to Certain Obligations | 13 |
| Section 7.07. | Nature of Covenants | 13 |
| Section 7.08. | Notices | 14 |
| Section 7.09. | Counterparts | 14 |
| Section 7.10. | GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL | 14 |
| Section 7.11. | Financing Statement; Fixture Filing | 15 |
| Section 7.12. | Execution of Financing Statements | 15 |
| Section 7.13. | Debtor's Interests | 15 |
| Section 7.14. | Exculpation Provisions | 15 |
| Section 7.15. | Hedge Banks | 15 |
| Section 7.16. | Headings | 16 |
| Section 7.17. | Survival | 16 |
| Section 7.18. | Non-Judicial Foreclosure in Texas | 16 |
| Section 7.19. | ENTIRE AGREEMENT | 16 |

| | | |
|---|---|---|
| Exhibit A | Oil and Gas Properties | |

**THIS DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT** (this "Deed of Trust") is entered into as of **March 1, 2017** (the "Effective Date") by **SN EF UnSub, LP** (the "Grantor"), a Delaware limited partnership, in favor of (a) **DARREN VANEK**, as Trustee for the benefit of **JPMORGAN CHASE BANK, N.A.**, as Collateral Agent under the Credit Agreement and Collateral Agreement referred to below (in such capacity and together with its successors and assigns, the "Beneficiary") and the Secured Parties, with respect to all Deed of Trust Properties located in the State of Texas and (b) the Beneficiary for its benefit and the benefit of the other Secured Parties with respect to all UCC Collateral.

## RECITALS

1. The Grantor, as Borrower (in such capacity, the "Borrower"), the Lenders party thereto from time to time, JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and an Issuing Bank, and each other Issuing Bank from time to time party thereto, have entered into a Credit Agreement, dated as of March 1, 2017 (as amended, restated, amended and restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), providing for the making of Loans to and the issuance of Letters of Credit for the account of the Borrower.

2. One or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit").

3. In accordance with the terms of the Credit Agreement, the Borrower, certain present and future Subsidiaries of the Borrower constituting Guarantors, and the Collateral Agent may enter into a Guarantee Agreement (such Guarantee Agreement, as it may be amended, restated, modified, and/or supplemented from time to time, the "Guarantee Agreement") pursuant to which, under the terms and conditions stated therein, the Guarantors guarantee the Obligations and the Borrower undertakes certain other obligations including a guarantee of certain obligations.

4. The Beneficiary and the Secured Parties have conditioned their obligations to make Extensions of Credit under the Secured Transaction Documents upon the execution and delivery by the Grantor of this Deed of Trust, and the Grantor has agreed to enter into this Deed of Trust to secure the Obligations.

5. Therefore, in order to comply with the terms and conditions of the Secured Transaction Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor hereby agrees as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. Terms Defined Above. As used in this Deed of Trust, each term defined above has the meaning indicated above.

Section 1.02. UCC and Other Defined Terms. Each capitalized term used in this Deed of Trust and not defined in this Deed of Trust shall have the meaning ascribed to such term in the Credit Agreement. Any capitalized term not defined in either this Deed of Trust or the Credit Agreement shall have the meaning ascribed to such term in the Applicable UCC (for avoidance of doubt, those terms include Accounts, As-Extracted Collateral, Deposit Account, Fixtures, General Intangibles, Goods, Instruments, Inventory, Proceeds and Supporting Obligations). The rules of construction and other interpretive provisions specified in Sections 1.2 of the Credit Agreement shall apply to this Deed of Trust, including terms defined in the preamble and recitals to this Deed of Trust. The use of the phrase "subject to" as used in connection with Permitted Encumbrances or otherwise and the permitted existence of any Permitted Encumbrances or any other Liens shall not be interpreted to expressly or impliedly subordinate any Liens granted in favor of the Trustee, the Beneficiary or any other Secured Party as there is no intention to subordinate the Liens granted

in favor of the Beneficiary and the other Secured Parties. No provision of this Deed of Trust or any other Credit Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

Section 1.03. Definitions.

"Accounts and Contract Rights" means all Accounts (including accounts in the form of joint interest billings under applicable operating agreements), contract rights and general intangibles derived from or pertaining to (a) the ownership, operation and development of the Collateral or (b) the production, processing, treating, sale, purchase, exchange or transportation of Hydrocarbons, including all accounts and proceeds accruing to Grantor attributable to the sale of Hydrocarbons or produced from the Collateral or any units or pooled interest units in which all or a portion of the Collateral forms a part.

"Applicable UCC" means the provisions of the Uniform Commercial Code presently in effect in the jurisdiction in which the relevant UCC Collateral is situated or which otherwise is applicable to the creation, perfection or priority of the Liens described herein or the rights and remedies of Beneficiary under this Deed of Trust.

"Collateral" means, collectively, all the Deed of Trust Property and all the UCC Collateral.

"Deed of Trust Property" means the Oil and Gas Properties and other properties, rights, titles, interests, estates and assets described in Section 2.01(a) through Section 2.01(e).

"Event of Default" has the meaning assigned to such term in Section 5.01.

"Future Advances" means future obligations and future advances that the Beneficiary or any other Secured Party may make pursuant to any Secured Transaction Document.

"Hydrocarbon Interests" means all rights, titles, interests and estates and the lands and premises covered or affected thereby now or hereafter acquired by the Grantor in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, fee interests, surface interests, mineral fee interests, mineral servitudes, executive rights, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" means (a) all oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom and all other minerals, including those which may be produced and saved from or attributable to the Oil and Gas Properties and (b) all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests or other properties constituting Oil and Gas Properties.

"Obligations" means (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Agreement, in each case, entered into with the Borrower or any of its Restricted Subsidiaries, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the maturity of Loans and L/C Obligations and the commencement by or against any Credit Party or any Affiliate thereof in any proceeding under any bankruptcy or insolvency law naming such Person, the Borrower or its Restricted Subsidiaries as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding and (b) any amounts advanced or expended by the Administrative Agent in connection with the "Cure Right" under and as defined in each of the Management Services Agreement and/or Joint Development Agreement. Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document. Notwithstanding the foregoing, Excluded Swap Obligations shall not constitute Obligations.

“Oil and Gas Properties” means (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization agreements, pooling agreements and declarations of pooled or unitized units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of any Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

“Payment in Full” means all the Obligations (other than (a) Hedging Obligations in respect of any Secured Hedge Agreements, (b) Cash Management Obligations in respect of any Secured Cash Management Agreements and (c) any contingent or indemnification obligations not then due and owing) have been paid in full in cash or immediately available funds and the Lenders and any other Secured Parties have no further commitment to lend under the Credit Agreement, the aggregate Total Exposure has been reduced to zero ($0.00), the aggregate Commitments have been terminated in full, and each Issuing Bank has no further obligations to issue Letters of Credit under the Credit Agreement.

“Permitted Encumbrances” means all Liens permitted under Section 10.2 of the Credit Agreement.

“Post-Default Rate” means the post-default rate per annum set forth in Section 2.8(c) of the Credit Agreement, but in no event to exceed the Highest Lawful Rate.

“Property” means any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

“Secured Transaction Documents” means the Credit Agreement, this Deed of Trust, any other Security Document, any Secured Hedging Agreement, any Secured Cash Management Agreement, the Guarantee Agreement, the Collateral Agreement, and any other Credit Document, including any such document entered into after the date hereof.

“Specified Parties” means the Trustee (and its Related Parties), the Beneficiary and each other Indemnitee.

“Trustee” means Darren Vanek of Harris County, Texas, whose address for notice hereunder is 712 Main St, 5th Floor, Houston, TX 77002 and any successors and substitutes in trust hereunder.

“UCC Collateral” means the property and other assets described in Section 2.02.

## ARTICLE II
## GRANT OF LIEN AND SECURED OBLIGATIONS

Section 2.01. Grant of Liens. To secure payment and performance of the Obligations, the Grantor for, and in consideration of, the promises and debts and trusts hereinafter mentioned does by these presents hereby GRANT, BARGAIN, SELL, ASSIGN, MORTGAGE WITH POWER OF SALE, TRANSFER and CONVEY to the Trustee, for the use and benefit of the Beneficiary and the Secured Parties, all the Properties, rights, titles and interests and estates listed in clauses (a) through

(e) below in this Section 2.01, which are located in, under or which cover, concern or relate to Properties located in the State of Texas, TO HAVE AND TO HOLD unto the Trustee forever to secure the Obligations:

(a) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to any Oil and Gas Properties, including those described on Exhibit A;

(b) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to all geological, geophysical, engineering, accounting, title, legal and other technical or business data concerning any Oil and Gas Properties, the Hydrocarbons or any other item of property which are in the possession of the Grantor, and all books, files, records, magnetic media, computer records and other forms of recording or obtaining access to such data;

(c) all rights, titles, interests and estates now owned or hereafter acquired by the Grantor in and to all Hydrocarbons;

(d) any Property, including any Oil and Gas Properties, that may from time to time hereafter, by delivery or by writing of any kind, be subject to the Liens hereof by the Grantor or by anyone on the Grantor's behalf; and the Trustee and/or the Beneficiary are hereby authorized to receive the same at any time as additional security hereunder; and

(e) all of the Properties, including any Oil and Gas Properties, rights, titles, interests and estates of every nature whatsoever now owned or hereafter acquired by the Grantor, including (i) any Properties, rights, titles, interests and estates as the same may be enlarged by the discharge of any payments out of production or by the removal of any charges or Permitted Encumbrances to which any Oil and Gas Properties or other Properties, rights, titles, interests or estates are subject, (ii) all rights of the Grantor to Liens securing payment of proceeds from the sale of production from any Oil and Gas Properties, together with any and all renewals and extensions of any of such related Properties, rights, titles, interests or estates and (iii) all contracts and agreements supplemental to, amending or in substitution for the contracts and agreements described or mentioned above.

For the avoidance of doubt, it is the intent of the Grantor that all Properties, rights, titles, interests and estates of the nature set forth and described in clauses (a) through (e) in this Section 2.01 which are located in, under or which cover, concern or relate to any Property, right, title, interest and estate in the State of Texas shall be subject to the Lien of this Deed of Trust and thus be "Deed of Trust Property" as such term is used in this Deed of Trust even if (i) the Properties, rights, titles, interests and estates on Exhibit A shall be incorrectly described or (ii) a description of all or a portion of such Properties, rights, titles, interests and estates are omitted or limited in any manner whatsoever.

Notwithstanding any provision in this Deed of Trust to the contrary, in no event is any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) included in the definition of "Deed of Trust Property" and no Building or Manufactured (Mobile) Home is hereby encumbered by this Deed of Trust.

Any fractions or percentages specified on Exhibit A in referring to the Grantor's interest are solely for purposes of the warranties made by the Grantor pursuant to Section 4.01 and 4.05 and shall in no manner limit the quantum of interest affected by this Section 2.01 with respect to any Oil and Gas property now owned or hereafter acquired by the Grantor.

Section 2.02. Grant of Security Interest. To further secure the Obligations, the Grantor hereby pledges, assigns, transfers and grants to the Beneficiary, for the benefit of the Secured Parties, a security interest in and to all of the Grantor's rights, titles and interests in and to the following Property of the Grantor (whether now owned or hereafter acquired by operation of law or otherwise):

(a) all Accounts and Contract Rights;

(b) all As-Extracted Collateral, including from or attributable or relating to the Deed of Trust Property;

(c) all books and records pertaining to the Oil and Gas Properties;

(d) all Fixtures;

(e) all Hydrocarbons; and

(f) to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all collateral security, guarantees and other Supporting Obligations given with respect to any of the foregoing.

Section 2.03. Secured Obligations. This Deed of Trust is executed and delivered by the Grantor to secure and enforce the Obligations.

Section 2.04. Fixture Filing, As-Extracted Collateral, Etc. Without in any manner limiting the generality of any of the other provisions of this Deed of Trust: (a) some portions of the goods described or to which reference is made herein are or are to become Fixtures on, under or related to the land described or to which reference is made herein or on Exhibit A; (b) the security interests created hereby under applicable provisions of the Applicable UCC will attach to all As-Extracted Collateral and all other Hydrocarbons; (c) this Deed of Trust is to be filed of record in the real estate records or other appropriate records as a financing statement; and (d) the Grantor is the record owner of the real estate or interests in the real estate comprised of the Deed of Trust Property.

Section 2.05. Pro Rata Benefit. This Deed of Trust is executed and granted for the pro rata benefit of the Beneficiary and the Secured Parties, as set forth in Section 5.14, to secure the Obligations until Payment in Full has occurred.

Section 2.06. Excluded Properties. Notwithstanding anything herein to the contrary, in no event shall the Collateral include, and the Grantor shall not be deemed to have granted a lien on or security interest in any of the Grantor's right, title or interest in any Property constituting "Excluded Assets" (as such term is defined in the Credit Agreement) but only to the extent and for so long as such Property constitutes "Excluded Assets". For the avoidance of doubt, nothing in this Section 2.6 shall be deemed to negate the requirement in the Credit Agreement that the Collateral Coverage Minimum be satisfied.

## ARTICLE III
## ASSIGNMENT OF AS-EXTRACTED COLLATERAL

Section 3.01. Assignment.

(a) In order to further secure the Obligations, the Grantor has absolutely and unconditionally assigned, transferred, conveyed and granted a security interest, and does hereby absolutely and unconditionally assign, transfer, convey and grant a security interest unto the Beneficiary for the benefit of the Secured Parties in and to:

(i) all of its As-Extracted Collateral located in, from or attributable or relating to the Deed of Trust Properties located in each county where this Deed of Trust is filed, including without limitation, all As-Extracted Collateral relating to the Hydrocarbon Interests, the Hydrocarbons and all products obtained or processed therefrom;

(ii) the revenues and proceeds now and hereafter attributable to such Deed of Trust Properties, including the Hydrocarbons, and said products and all payments in lieu thereof, such as "take or pay" payments or settlements; and

(iii) all amounts and proceeds hereafter payable to or to become payable to the Grantor or now or hereafter relating to any part of such Deed of Trust Properties and all amounts, sums, monies, revenues and income which become payable to the Grantor from, or with respect to, any of the Deed of Trust Properties, present or future, now or hereafter constituting a part of the Hydrocarbon Interests.

(b) Subject to Section 13.21 of the Credit Agreement and Section 3.01(f) the Hydrocarbons and products are to be delivered into pipe lines connected with the Deed of Trust Property, or to the purchaser thereof, to the credit of the Beneficiary, for its benefit and the benefit of the Secured Parties, free and clear of all taxes, charges, costs and expenses; and all such revenues and proceeds shall be paid directly to the Beneficiary, at its offices in Houston, Texas, with no duty or obligation of any party paying the same to inquire into the rights of the Beneficiary to receive the same, what application is made thereof, or as to any other matter.

(c) Subject to Section 13.21 of the Credit Agreement the Grantor agrees to perform all such acts, and to execute all such further assignments, transfers and division orders and other instruments as may be reasonably required or desired by the Beneficiary, after receipt of a written request from the Beneficiary, in order to have said proceeds and revenues so paid to the Beneficiary. In addition to any and all rights of a secured party under Sections 9.607 and 9.609 of the Applicable UCC, the Beneficiary is fully authorized to receive and receipt for said revenues and proceeds; to endorse and cash any and all checks and drafts payable to the order of the Grantor or the Beneficiary for the account of the Grantor received from or in connection with said revenues or proceeds and to hold the proceeds thereof in a Deposit Account with the Beneficiary, a Lender or other acceptable commercial bank as additional collateral securing the Obligations; and to execute transfer and division orders in the name of the Grantor, or otherwise, with warranties binding the Grantor. All proceeds received by the Beneficiary pursuant to this grant and assignment shall be applied as provided in Section 5.14.

(d) The Beneficiary shall not be liable for any delay, neglect or failure to effect collection of any proceeds or to take any other action in connection therewith or hereunder; but the Beneficiary shall have the right, at its election, if an Event of Default shall have occurred and be continuing, after written notice is provided to the Grantor from the Beneficiary, in the name of the Grantor or otherwise, to prosecute and defend any and all actions or legal proceedings deemed advisable by the Beneficiary in order to collect such funds and to protect the interests of the Beneficiary and/or the Grantor, with all out-of-pocket costs, expenses and attorneys' fees incurred in connection therewith being paid by the Grantor.

(e) The Grantor hereby appoints the Beneficiary as its attorney-in-fact to pursue any and all rights of the Grantor to Liens in the Hydrocarbons securing payment of proceeds of runs attributable to the Hydrocarbons which power of attorney shall be coupled with an interest and shall be irrevocable until Payment in Full (it being understood that no rights shall be exercised under such power of attorney unless an Event of Default has occurred and is continuing).

(f) Notwithstanding the foregoing, until such time as an Event of Default has occurred and is continuing, Beneficiary hereby grants to Grantor a license to sell, receive and receipt for proceeds from the sale of Hydrocarbons. This license will terminate automatically upon an Event of Default (and upon prior written notice from the Beneficiary) and for so long as the same continues and if such Event of Default shall cease to exist or cease to continue, such license shall be automatically reinstated upon such Event of Default's ceasing to exist or cease to continue.

(g) Each Mortgagor does hereby specifically agree that third-parties shall be entitled to rely, and shall be fully protected in relying, upon any written notice by the Mortgagee that an Event of Default has occurred and is continuing for the purposes of clause (f) above.

Section 3.02. No Modification of Payment Obligations. Nothing herein contained shall modify or otherwise alter the obligation of the Grantor to make prompt payment of all amounts constituting Obligations when and as the same become due regardless of whether the proceeds of the As-Extracted Collateral and Hydrocarbons are sufficient to pay the same and the rights provided in accordance with the foregoing assignment provision shall be cumulative of all other security of any and every character now or hereafter existing to secure payment of the Obligations. Nothing in this Article III is intended to be an acceptance of collateral in satisfaction of the Obligations.

Section 3.03. Rights and Title of Consignee. In addition to the rights, titles and interests hereby conveyed pursuant to Section 2.01, the Grantor hereby grants to the Beneficiary the Grantor's Liens given to interest owners as secured parties to secure the obligations of the first purchasers of Hydrocarbons to pay the purchase price, including those rights provided in Section 9.343 of the Applicable UCC.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

The Grantor hereby represents, warrants and covenants as follows:

Section 4.01. Title. To the extent of the undivided interests specified on Exhibit A, the Grantor has good and defensible title to the Hydrocarbon Interests and has valid title to all of its UCC Collateral except to the extent it would not

result in a Material Adverse Effect. The Collateral is free and clear of all Liens except Permitted Encumbrances.

Section 4.02. First Priority Liens. (a) With respect to the Deed of Trust Property, upon the filing of a fully executed and duly acknowledged counterpart of this Deed of Trust in the appropriate real estate records of the offices of the County Clerks of each county in the State of Texas where any of the Deed of Trust Property is located, such filing will provide constructive notice to third parties of the contents of this Deed of Trust with respect to the Deed of Trust Property as of the date of that recording and will perfect the deed of trust Lien on the Deed of Trust Property, (b) with respect to the UCC Collateral, upon the filing of a fully executed and duly acknowledged counterpart of this Deed of Trust in the appropriate real estate records of the offices of the County Clerks of each county in the State of Texas where any of the UCC Collateral is located, such filing will result in the perfection of security interests with respect to the UCC Collateral constituting Fixtures and As-Extracted Collateral relating to the Deed of Trust Property (and effective as set forth in Section 7.11) and (c) the security interests and Liens granted pursuant to this Deed of Trust are prior to all other Liens on the Collateral other than Permitted Encumbrances to the extent permitted by the Credit Agreement (it being understood that there is no intent to subordinate any Liens created hereunder to any other Liens).

Section 4.03. Defend Title. This Deed of Trust is, and always will be kept, a legal, valid and, subject to any bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law), enforceable first priority Lien upon the Collateral; provided that Permitted Encumbrances may exist, but no intent to subordinate the priority of the Liens created hereby is intended or inferred by such existence. Other than any Permitted Encumbrances, the Grantor will warrant and defend the title to the Collateral against the claims and demands of all other Persons whomsoever and will maintain and preserve the Lien created hereby (and its priority) until Payment in Full (provided that Permitted Encumbrances may exist as (and with the priority) permitted by the Credit Agreement). If (a) an adverse claim be made against or a cloud develop upon the title to any part of the Collateral other than a Permitted Encumbrance or (b) any Person, including the holder of a Permitted Encumbrance, shall challenge the priority or validity of the Liens created by this Deed of Trust, then the Grantor agrees to promptly defend against such adverse claim, take appropriate action to remove such cloud or subordinate such Permitted Encumbrance, in each case, at the Grantor's sole cost and expense. The Grantor further agrees that the Beneficiary may take such other action as it deems advisable to protect and preserve its interests in the Collateral, and in such event the Grantor will indemnify the Beneficiary against any and all costs, attorneys' fees and other expenses which it may incur in defending against any such adverse claim or taking action to remove any such cloud.

Section 4.04. Not a Foreign Person. The Grantor is not a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e. the Grantor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined in the Code and any regulations promulgated thereunder).

Section 4.05. Revenue and Cost Bearing Interest. The Grantor's ownership of the Hydrocarbon Interests and the undivided interests therein as specified on Exhibit A will, prior to giving full effect to all Permitted Encumbrances and any Dispositions not prohibited by the Credit Agreement, afford the Grantor not less than those net interests (expressed as a fraction, percentage or decimal) in the production from or which is allocated to such Hydrocarbon Interest specified as Net Revenue Interest (as defined and specified on Exhibit A) on attached Exhibit A and will cause the Grantor to bear not more than that portion (expressed as a fraction, percentage or decimal), specified as Working Interest on Exhibit A, of the costs of drilling, developing and operating the wells identified on Exhibit A except to the extent of any proportionate corresponding increase in the Net Revenue Interest.

**ARTICLE V**
**RIGHTS AND REMEDIES**

Section 5.01. Event of Default. An Event of Default under the Credit Agreement shall be an "Event of Default" under this Deed of Trust.

Section 5.02. Foreclosure and Sale.

(a) If an Event of Default shall occur and be continuing, to the extent provided by applicable law, the Beneficiary

shall have the right and option to proceed with foreclosure by proceeding, or directing the Trustee to proceed with foreclosure and to sell all or any portion of such Deed of Trust Property at one or more sales, as an entirety or in parcels, at such place or places in otherwise such manner and upon such notice as may be required by law, or, in the absence of any such requirement, as the Beneficiary may deem appropriate, and to make conveyance to the purchaser or purchasers. Where the Deed of Trust Property is situated in more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by law), and all such Deed of Trust Property may be sold in any such jurisdiction and any such notice shall designate the jurisdiction where such Deed of Trust Property is to be sold. Nothing contained in this Section 5.02 shall be construed so as to limit in any way any rights to sell the Deed of Trust Property or any portion thereof by private sale if and to the extent that such private sale is permitted under the laws of the applicable jurisdiction or by public or private sale after entry of a judgment by any court of competent jurisdiction so ordering. The Grantor hereby irrevocably appoints the Beneficiary, with full power of substitution, to be the attorney-in-fact of the Grantor and in the name and on behalf of the Grantor to execute and deliver any deeds, transfers, conveyances, assignments, assurances and notices which the Grantor ought to execute and deliver and do and perform any and all such acts and things which the Grantor ought to do and perform under the covenants herein contained and generally, to use the name of the Grantor in the exercise of all or any of the powers hereby conferred on the Beneficiary. At any such sale: (i) whether made under the power herein contained or any other legal enactment, or by virtue of any judicial proceedings or any other legal right, remedy or recourse, it shall not be necessary for the Trustee or the Beneficiary, as appropriate, to have physically present, or to have constructive possession of, the Deed of Trust Property (the Grantor hereby covenanting and agreeing to deliver any portion of the Deed of Trust Property not actually or constructively possessed by the Trustee or the Beneficiary immediately upon his, her or its demand) and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually present and delivered to purchaser at such sale, (ii) each instrument of conveyance executed by the Trustee or the Beneficiary shall contain a general warranty of title, binding upon the Grantor and its successors and assigns, (iii) each and every recital contained in any instrument of conveyance made by the Trustee or the Beneficiary shall conclusively establish (except as between the Grantor and the Beneficiary) the truth and accuracy of the matters recited therein, including, without limitation, nonpayment of the Obligations, advertisement and conduct of such sale in the manner provided herein and otherwise by law and appointment of any successor trustee hereunder, (iv) any and all prerequisites to the validity thereof shall be conclusively presumed to have been performed, (v) the receipt of the Trustee, the Beneficiary or of such other party or officer making the sale shall be a sufficient discharge to the purchaser or purchasers for its purchase money and no such purchaser or purchasers, or its assigns or personal representatives, shall thereafter be obligated to see to the application of such purchase money, or be in any way answerable for any loss, misapplication or nonapplication thereof, (vi) to the fullest extent permitted by law, the Grantor shall be completely and irrevocably divested of all of its right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the property sold and such sale shall be a perpetual bar both at law and in equity against the Grantor, and against any and all other Persons claiming or to claim the property sold or any part thereof, by, through or under the Grantor, and (vii) to the extent and under such circumstances as are permitted by law, the Beneficiary may be a purchaser at any such sale, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the Obligations (in the order of priority set forth in Section 5.14) in lieu of cash payment. Anything in this Section 5.02(a) to the contrary notwithstanding, the Beneficiary agrees that it will not exercise any rights under the power of attorney provided for in this Section 5.02(a) unless an Event of Default has occurred and is continuing.

(b) If an Event of Default shall occur and be continuing, then (i) the Beneficiary shall be entitled to all of the rights, powers and remedies afforded a secured party by the Applicable UCC with reference to the UCC Collateral or (ii) the Trustee or the Beneficiary may proceed as to any Collateral in accordance with the rights and remedies granted under this Deed of Trust or applicable law in respect of the Collateral. Such rights, powers and remedies shall be cumulative and in addition to those granted to the Trustee or the Beneficiary under any other provision of this Deed of Trust or under any other Credit Document or any Secured Transaction Document. Written notice mailed to the Grantor as provided herein at least ten (10) days prior to the date of public sale of any part of the Collateral which is personal property subject to the provisions of the Applicable UCC, or prior to the date after which private sale of any such part of the Collateral will be made, shall constitute reasonable notice.

Section 5.03. Substitute Trustees and Agents. The Trustee or the Beneficiary may appoint or delegate any one or more Persons as agent to perform any act or acts necessary or incident to any sale held by the Trustee or the Beneficiary, including the posting of notices (but, in the case of a non-judicial foreclosure proceeding, expressly excluding the conduct of the sale) but in the name and on behalf of the Trustee, the Beneficiary or their successor or substitute, as applicable. If the

Trustee or the Beneficiary or their successor or substitute shall have given notice of sale hereunder, any successor or substitute trustee or deed of trust/mortgagee agent thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute trustee or deed of trust/mortgagee agent conducting the sale.

Section 5.04. Judicial Foreclosure; Receivership; Failure to Perform. If an Event of Default has occurred and is continuing, the Beneficiary shall have the right and power to proceed by a suit or suits in equity or at law, whether for the specific performance of any covenant or agreement herein contained or in aid of the execution of any power herein granted, or for any foreclosure hereunder or for the sale of the Collateral under the judgment or decree of any court or courts of competent jurisdiction, or for the appointment of a receiver pending any foreclosure hereunder or the sale of the Collateral under the order of a court or courts of competent jurisdiction or under executory or other legal process, or for the enforcement of any other appropriate legal or equitable remedy. The Grantor agrees that if it fails to perform any act or to take any action which it is required to perform or take hereunder or pay any money which the Grantor is required to pay hereunder, the Beneficiary, in the Grantor's name or its own name, may, but shall not be obligated to, perform or cause to perform such act or take such action or pay such money, and any expenses so incurred by it and any money so paid by it shall be an obligation constituting an expense under Section 13.5(a) of the Credit Agreement owing by the Grantor to the Beneficiary and the Beneficiary, upon making such payment, shall be subrogated to all of the rights of the Person receiving such payment.

Section 5.05. Foreclosure for Installments. If an Event of Default has occurred and is continuing, the Beneficiary shall also have the option to proceed with foreclosure in satisfaction of any installments of the Obligations which have not been paid when due either through the courts or by directing the Trustee to proceed with foreclosure in satisfaction of the matured but unpaid portion of the Obligations as if under a full foreclosure, conducting the sale as herein provided and without declaring the entire principal balance and accrued interest and other Obligations then due; such sale may be made subject to the unmatured portion of the Obligations, and any such sale shall not in any manner affect the unmatured portion of the Obligations, but as to such unmatured portion of the Obligations this Deed of Trust shall remain in full force and effect just as though no sale had been made hereunder. It is further agreed that if an Event of Default has occurred and is continuing, several sales may be made hereunder without exhausting the right of sale for any unmatured part of the Obligations, it being the purpose hereof to provide for a foreclosure and sale of the security for any matured portion of the Obligations without exhausting the power to foreclose and sell the Deed of Trust Property for any subsequently maturing portion of the Obligations.

Section 5.06. Separate Sales. If an Event of Default has occurred and is continuing, the Collateral may be sold in one or more parcels and to the extent permitted by applicable law in such manner and order as the Beneficiary, in its sole discretion, may elect, it being expressly understood and agreed that the right of sale arising out of any Event of Default shall not be exhausted by any one or more sales.

Section 5.07. Possession of Deed of Trust Property. If an Event of Default shall have occurred and be continuing, then, to the extent permitted by applicable law, the Beneficiary shall have the right and power to enter into and upon and take possession of all or any part of the Collateral in the possession of the Grantor, its successors or assigns, or its or their agents or servants, and may exclude the Grantor, its successors or assigns, and all Persons claiming under the Grantor, and its or their agents or servants wholly or partly therefrom; and, to the extent permitted by applicable law, holding the same, the Beneficiary may use, administer, manage, operate and control the Collateral and conduct the business thereof to the same extent as the Grantor, its successors or assigns, might at the time do and may exercise all rights and powers of the Grantor, in the name, place and stead of the Grantor, or otherwise as the Beneficiary shall deem best.

Section 5.08. Occupancy After Foreclosure. In the event there is a foreclosure sale hereunder and at the time of such sale the Grantor or the Grantor's representatives, successors or assigns or any other Person claiming any interest in the Collateral by, through or under the Grantor, are occupying or using the Deed of Trust Property or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of either the landlord or tenant, or at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; to the extent permitted by applicable law, the purchaser at such sale shall, notwithstanding any language herein apparently to the contrary, have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will. In the event the tenant fails to surrender possession of said property upon demand, the purchaser shall be entitled to institute and maintain a summary action for possession of the Deed of

Trust Property (such as an action for forcible entry and detainer) in any court having jurisdiction.

Section 5.09. Remedies Cumulative, Concurrent and Nonexclusive. Every right, power, privilege and remedy herein given to the Trustee or the Beneficiary shall be cumulative and in addition to every other right, power and remedy herein specifically given or now or hereafter existing in equity, at law or by statute (including specifically those granted by the Applicable UCC in effect and applicable to the Collateral or any portion thereof). Each and every right, power, privilege and remedy whether specifically herein given or otherwise existing may be exercised from time to time and so often and in such order as may be deemed expedient by the Trustee or the Beneficiary, and the exercise, or the beginning of the exercise, or the abandonment, of any such right, power, privilege or remedy shall not be deemed a waiver of the right to exercise, at the same time or thereafter any other right, power, privilege or remedy. No delay or omission by the Trustee or the Beneficiary or any Secured Party in the exercise of any right, power or remedy shall impair any such right, power, privilege or remedy or operate as a waiver thereof or of any other right, power, privilege or remedy then or thereafter existing.

Section 5.10. Discontinuance of Proceedings. If the Trustee or the Beneficiary shall have proceeded to invoke any right, remedy or recourse permitted hereunder or under any Secured Transaction Document or available at law and shall thereafter elect to discontinue or abandon same for any reason, then it shall have the unqualified right so to do and, in such an event, the parties shall be restored to their former positions with respect to the Obligations, this Deed of Trust, the Credit Agreement, the Collateral and otherwise, and the rights, remedies, recourses and powers of the Trustee and the Beneficiary, as applicable, shall continue as if same had never been invoked.

Section 5.11. No Release of Obligations. Neither the Grantor, any Guarantor nor any other Person hereafter obligated for payment of all or any part of the Obligations shall be relieved of such obligation by reason of: (a) the failure of the Trustee to comply with any request of the Grantor, or any Guarantor or any other Person so obligated to foreclose the Lien of this Deed of Trust or to enforce any provision hereunder or under the Credit Agreement; (b) the release, regardless of consideration, of the Deed of Trust Property or any portion thereof or interest therein or the addition of any other property to the Deed of Trust Property; (c) any agreement or stipulation between any subsequent owner of the Deed of Trust Property and the Beneficiary extending, renewing, rearranging or in any other way modifying the terms of this Deed of Trust without first having obtained the consent of, given notice to or paid any consideration to the Grantor, any Guarantor or such other Person, and in such event the Grantor, Guarantor and all such other Person shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged in writing by the Beneficiary; or (d) by any other act or occurrence save and except if Payment in Full has occurred.

Section 5.12. Release of and Resort to Collateral. The Beneficiary may release, regardless of consideration, any part of the Collateral without, as to the remainder, in any way impairing, affecting, subordinating or releasing the Lien created in or evidenced by this Deed of Trust or its stature as a first and prior Lien in and to the Collateral, provided that Permitted Encumbrances to the extent permitted by the Credit Agreement may exist, and without in any way releasing or diminishing the liability of any Person liable for the repayment of the Obligations. For payment of the Obligations, the Beneficiary may resort to any other security therefor held by the Beneficiary or the Trustee in such order and manner as the Beneficiary may elect.

Section 5.13. Waiver of Redemption, Notice and Marshalling of Assets, Etc. To the fullest extent permitted by law, the Grantor hereby irrevocably and unconditionally waives and releases (a) all benefits that might accrue to the Grantor by virtue of any present or future moratorium law or other law exempting the Collateral from attachment, levy or sale on execution or providing for any appraisement, valuation, stay of execution, exemption from civil process, redemption or extension of time for payment and (b) any right to a marshalling of assets or a sale in inverse order of alienation. If any law referred to in this Deed of Trust and now in force, of which the Grantor or its successor or successors might take advantage despite the provisions hereof, shall hereafter be repealed or cease to be in force, such law shall thereafter be deemed not to constitute any part of the contract herein contained or to preclude the operation or application of the provisions hereof. If the laws of any state which provides for a redemption period do not permit the redemption period to be waived, the redemption period shall be specifically reduced to the minimum amount of time allowable by statute.

Section 5.14. Application of Proceeds. The proceeds of any sale of the Collateral or any part thereof and all other monies received in any proceedings for the enforcement hereof or otherwise, whose application has not elsewhere herein been

specifically provided for, shall be applied:

(a) first, to the payment of all reasonable expenses incurred by the Trustee or the Beneficiary incident to the enforcement of this Deed of Trust, the Credit Agreement or any other Secured Transaction Document to collect any portion of the Obligations (including, without limiting the generality of the foregoing, expenses of any entry or taking of possession, of any sale, of advertisement thereof, and of conveyances, and court costs, compensation of agents and employees, reasonable legal fees of the Trustee acting, if applicable), and to the payment of all other reasonable charges, expenses, liabilities and advances incurred or made by the Trustee or the Beneficiary under this Deed of Trust or in executing any trust or power hereunder, in each case, with respect to the Beneficiary, to the extent the Borrower would be required to make such payments pursuant to Section 13.5 of the Credit Agreement; and

(b) second, as set forth in Section 11.2 of the Credit Agreement.

Section 5.15. Resignation of Operator. In addition to all rights and remedies under this Deed of Trust, at law and in equity, if any Event of Default shall occur and the Trustee or the Beneficiary shall exercise any remedies under this Deed of Trust with respect to any portion of the Deed of Trust Property (or the Grantor shall transfer any Deed of Trust Property "in lieu of" foreclosure) whereupon the Grantor is divested of its title to any of the Collateral, the Beneficiary shall have the right to request that any operator of any Deed of Trust Property which is the Grantor to resign as operator under the joint operating agreement applicable thereto, and no later than 60 days after receipt by the Grantor of any such request, the Grantor shall resign (or, to the extent able to do so, cause such other Person acting as operator to resign), subject to the terms of such joint operating agreements, as operator of such Deed of Trust Property.

Section 5.16. Exculpation; Indemnity. THE SPECIFIED PARTIES SHALL NOT BE LIABLE, IN CONNECTION WITH ANY ACTION TAKEN, FOR ANY LOSS SUSTAINED BY THE GRANTOR RESULTING FROM AN ASSERTION THAT THE BENEFICIARY HAS RECEIVED FUNDS FROM THE PRODUCTION OF HYDROCARBONS CLAIMED BY THIRD PERSONS OR ANY ACT OR OMISSION OF ANY SPECIFIED PARTY IN ADMINISTERING, MANAGING, OPERATING OR CONTROLLING THE DEED OF TRUST PROPERTY **INCLUDING SUCH LOSS WHICH MAY RESULT FROM THE ORDINARY NEGLIGENCE OF A SPECIFIED PARTY UNLESS SUCH LOSS IS DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE DIRECTLY RESULTED FROM THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF SUCH SPECIFIED PARTY**. NO SPECIFIED PARTY WILL BE OBLIGATED TO PERFORM OR DISCHARGE ANY OBLIGATION, DUTY OR LIABILITY OF THE GRANTOR. THE GRANTOR AGREES TO PAY, AND TO SAVE THE INDEMNITEES HARMLESS FROM, ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WITH RESPECT TO THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE AND ADMINISTRATION OF THIS DEED OF TRUST TO THE EXTENT THE BORROWER WOULD BE REQUIRED TO DO SO PURSUANT TO SECTION 13.5 OF THE CREDIT AGREEMENT. THE LIABILITIES OF THE GRANTOR AS SET FORTH IN THIS SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST.

Section 5.17. Payment of Expenses; Indemnity.

(a) The Grantor agrees to pay or promptly reimburse the (i) Trustee for all advances, charges, out-of-pocket costs and expenses including, without limitation, all out-of-pocket costs and expenses of holding, preparing for sale and selling, collecting or otherwise realizing upon the Collateral and all out-of-pocket attorneys' fees, legal expenses and court costs incurred by the Trustee in connection with the exercise of its respective rights and remedies hereunder, including, without limitation, any advances, charges, costs and expenses that may be incurred in any effort to enforce any of the provisions of this Deed of Trust or any obligation of the Grantor in respect of the Collateral or in connection with (A) the preservation of the Lien of, or the rights of the Trustee under this Deed of Trust, (B) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such costs and expenses incurred in any bankruptcy, reorganization, workout or other similar proceeding, or (C) otherwise enforcing or preserving any rights under this Deed of Trust and (ii) the Beneficiary and the Secured Parties to the extent the Borrower would be required to do so pursuant to Section 13.5(a) of the Credit Agreement.

(b) THE GRANTOR AGREES TO PAY, AND TO SAVE THE SPECIFIED PARTIES HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES WITH RESPECT TO THE EXECUTION, DELIVERY, ENFORCEMENT, PERFORMANCE AND ADMINISTRATION OF THIS DEED OF TRUST TO THE EXTENT THE BORROWER WOULD BE REQUIRED TO DO SO PURSUANT TO SECTION 13.5(b) OF THE CREDIT AGREEMENT. FOR THE AVOIDANCE OF DOUBT, THE TRUSTEE AND ITS RELATED PARTIES SHALL BE DEEMED TO BE INDEMNITEES UNDER THE CREDIT AGREEMENT FOR PURPOSES OF THE FOREGOING INDEMNITY. THE GRANTOR HEREBY ASSENTS TO, RATIFIES AND CONFIRMS ANY AND ALL ACTIONS OF EACH SPECIFIED PARTY WITH RESPECT TO THE COLLATERAL TAKEN UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS DEED OF TRUST. **NOTWITHSTANDING THE FOREGOING, THE FOREGOING INDEMNITY (INCLUDING THE GRANTOR'S AGREEMENTS TO MAKE PAYMENTS AND HOLD THE TRUSTEE HARMLESS) APPLIES TO MATTERS THAT, IN WHOLE OR IN PART, ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE OF ANY TRUSTEE BUT NOT TO THE EXTENT CAUSED BY OR ARISING OUT OF THE GROSS NEGLIGENCE, BAD FAITH OR WILLFUL MISCONDUCT OF ANY TRUSTEE.**

## ARTICLE VI
## THE TRUSTEE

Section 6.01. Duties, Rights, and Powers of Trustee. The Trustee shall have no duty to see to any recording, filing or registration of this Deed of Trust or any other instrument in addition or supplemental thereto, or to give any notice thereof, or to see to the payment of or be under any duty in respect of any tax or assessment or other governmental charge which may be levied or assessed on the Deed of Trust Property, or any part thereof, or against the Grantor, or to see to the performance or observance by the Grantor of any of the covenants and agreements contained herein. The Trustee shall not be responsible for the execution, acknowledgment or validity of this Deed of Trust or of any instrument in addition or supplemental hereto or for the sufficiency of the security purported to be created hereby, and makes no representation in respect thereof or in respect of the rights of the Beneficiary. The Trustee shall have the right to advice of counsel upon any matters arising hereunder and shall be fully protected in relying as to legal matters on the advice of counsel. The Trustee shall not incur any personal liability hereunder except for the Trustee's own gross negligence or willful misconduct; and the Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder, believed by him in good faith to be genuine.

Section 6.02. Successor Trustee. The Trustee may resign by written notice addressed to the Beneficiary or be removed at any time with or without cause by an instrument in writing duly executed on behalf of the Beneficiary. In case of the death, resignation or removal of the Trustee, a successor may be appointed by the Beneficiary by instrument of substitution complying with any applicable Governmental Requirements, or, in the absence of any such requirement, without formality other than appointment and designation in writing. Written notice of such appointment and designation shall be given by the Beneficiary to the Grantor, but the validity of any such appointment shall not be impaired or affected by failure to give such notice or by any defect therein. Such appointment and designation shall be full evidence of the right and authority to make the same and of all the facts therein recited. Upon the making of any such appointment and designation, this Deed of Trust shall vest in the successor all the estate and title in and to all of the Deed of Trust Property, and the successor shall thereupon succeed to all of the rights, powers, privileges, immunities and duties hereby conferred upon the Trustee named herein, and one such appointment and designation shall not exhaust the right to appoint and designate an additional successor but such right may be exercised repeatedly until Payment in Full has occurred. To facilitate the administration of the duties hereunder, the Beneficiary may appoint multiple trustees to serve in such capacity or in such jurisdictions as the Beneficiary may designate.

Section 6.03. Retention of Moneys. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law) and the Trustee shall be under no liability for interest on any moneys received by him hereunder.

## ARTICLE VII
## MISCELLANEOUS

Section 7.01. Instrument Construction. This Deed of Trust may be construed as a mortgage, deed of trust, conveyance, assignment, security agreement, fixture filing, pledge, financing statement, hypothecation or contract, or any one or more of them, in order fully to effectuate the Lien hereof and the purposes and agreements herein set forth.

Section 7.02. Releases.

(a) Full Release. If Payment in Full has occurred, the Beneficiary shall forthwith cause release, satisfaction and discharge of this Deed of Trust to be entered upon the record at the expense of the Grantor and shall execute and deliver or cause to be executed and delivered such instruments of satisfaction and release as may be appropriate. Otherwise, this Deed of Trust shall remain and continue in full force and effect.

(b) Partial Release. If any of the Collateral shall be sold, transferred or otherwise Disposed of to a Person other than a Credit Party by the Grantor in a transaction permitted by the Credit Agreement (a fact as to which the Beneficiary may rely on upon a certificate of an Authorized Officer of the Grantor to establish), then the Beneficiary, at the request and sole expense of the Grantor, shall promptly execute and deliver to the Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on the Collateral; provided that, upon the request of the Beneficiary, the Grantor shall deliver to the Beneficiary a certification by the Grantor stating that (i) such transaction is in compliance with the Credit Documents and (ii) no Collateral other than the Collateral required to be released is being released.

(c) Possession of Notes. The Grantor acknowledges and agrees that possession of any Note (or any replacements of any said Note or other instrument evidencing any part of the Obligations) at any time by any Credit Party or other guarantor shall not in any manner extinguish the Obligations or this Deed of Trust, and the Grantor shall have the right to issue and reissue any of the Notes from time to time as its interest or as convenience may require, without in any manner extinguishing or affecting the Obligations or the Lien of this Deed of Trust.

Section 7.03. Invalidity. Any provision of this Deed of Trust held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 7.04. Successors and Assigns. The provisions of this Deed of Trust shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided that the Grantor may not assign, transfer or delegate any of its rights or obligations under this Deed of Trust without the prior written consent of the Beneficiary.

Section 7.05. Satisfaction of Prior Encumbrance. To the extent that proceeds of the Credit Agreement are used to pay Indebtedness secured by any outstanding Lien against the Deed of Trust Property then the parties agree that: (a) such proceeds have been advanced at the Grantor's request, and (b) the Beneficiary and the Lenders shall be subrogated to any and all rights and Liens owned by any owner or holder of such outstanding Liens, irrespective of whether said Liens are or have been released. It is expressly understood that, in consideration of the payment of such other Indebtedness, the Grantor hereby waives and releases all demands and causes of action for offsets and payments to, upon and in connection with such Indebtedness. This Deed of Trust is made with full substitution and subrogation of the Trustee and the Beneficiary and his or her successors in this trust and his and/or her and their assigns in and to all covenants and warranties by others heretofore given or made in respect of the Deed of Trust Property or any part thereof.

Section 7.06. Application of Payments to Certain Obligations. If any part of the Obligations cannot be lawfully secured by this Deed of Trust or if any part of the Deed of Trust Property cannot be lawfully subject to the Lien hereof to the full extent of the Obligations, then all payments made shall be applied on said Obligations first in discharge of that portion thereof which is not secured by this Deed of Trust.

Section 7.07. Nature of Covenants. The covenants and agreements herein contained shall constitute covenants

running with the land and interests covered or affected hereby and shall be binding upon the heirs, legal representatives, successors and assigns of the parties hereto.

Section 7.08. Notices. All notices, requests, consents, demands and other communications required or permitted hereunder shall be in writing and shall be deemed sufficiently given or furnished if delivered by registered or certified United States mail, postage prepaid, or by personal service (including express or courier service) at the addresses specified in Section 7.12 (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any such notice or communication shall be deemed to have been given either at the time of personal delivery or, in the case of delivery at the address and in the manner provided herein, upon receipt; provided that, service of notice as required by the laws of any state in which portions of the Deed of Trust Property may be situated shall for all purposes be deemed appropriate and sufficient with the giving of such notice.

Section 7.09. Counterparts. This Deed of Trust may be executed in several counterparts, all of which are identical, except that to facilitate recordation, if the Deed of Trust Property is situated in more than one county, descriptions of only those portions of the Deed of Trust Property located in the county in which a particular counterpart is recorded shall be attached as Exhibit A to such counterpart. Each of such counterparts shall for all purposes be deemed to be an original and all such counterparts shall together constitute but one and the same instrument. Complete copies of this Deed of Trust containing the entire Exhibit A have been retained by the Beneficiary.

Section 7.10. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a) THIS DEED OF TRUST SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(b) EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS DEED OF TRUST AND THE OTHER CREDIT DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE LOCATED IN NEW YORK COUNTY, AND APPELLATE COURTS FROM ANY THEREOF; PROVIDED THAT NOTHING CONTAINED HEREIN OR IN ANY OTHER CREDIT DOCUMENT WILL PREVENT ANY LENDER, THE COLLATERAL AGENT OR THE ADMINISTRATIVE AGENT FROM BRINGING ANY ACTION TO ENFORCE ANY AWARD OR JUDGMENT OR EXERCISE ANY RIGHT UNDER THE CREDIT DOCUMENTS OR AGAINST ANY COLLATERAL OR ANY OTHER PROPERTY OF ANY CREDIT PARTY IN ANY OTHER FORUM IN WHICH JURISDICTION CAN BE ESTABLISHED.

(c) EACH PARTY HEREBY (i) IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS DEED OF TRUST OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN; (ii) AGREES THAT NO OTHER PARTY HERETO SHALL HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES, OR DAMAGES RELATING TO THIS DEED OF TRUST OR ANY OTHER CREDIT DOCUMENT; AND (iii) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS DEED OF TRUST, THE CREDIT DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION 7.10.

(d) EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT (I) SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO BORROWER AT ITS ADDRESS SET FORTH IN SECTION 7.12 OR AT SUCH OTHER ADDRESS OF WHICH THE BENEFICIARY SHALL HAVE BEEN NOTIFIED PURSUANT THERETO AND (II) AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 7.11. Financing Statement; Fixture Filing. This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all Fixtures included within the Collateral and is to be filed or filed for record in the real estate records, mortgage records or other appropriate records of each jurisdiction where any part of the Deed of Trust Property (including fixtures) is located. This Deed of Trust shall also be effective as a financing statement covering As-Extracted Collateral included within the Collateral (including oil and gas and all other substances of value which may be extracted from the ground) and accounts financed at the wellhead or minehead of wells or mines located on the properties subject to the Applicable UCC and is to be filed for record in the real estate records, UCC records or other appropriate records of each jurisdiction where any part of the Deed of Trust Property is situated.

Section 7.12. Execution of Financing Statements. Pursuant to the Applicable UCC, the Grantor authorizes the Beneficiary, its counsel or its representative, at any time and from time to time, to file or record financing statements, continuation statements, amendments thereto and other filing or recording documents or instruments with respect to the Collateral without the signature of the Grantor in such form and in such offices as the Beneficiary reasonably determines appropriate to perfect the security interests of the Beneficiary under this Deed of Trust.

In that regard, the following information is provided:

| | |
|---|---|
| Name of Debtor/Grantor: | SN EF UnSub, LP |
| Address of Grantor: | **1000 Main Street, Suite 3000** |
| **Houston, Texas 77002** | |
| Attention: | **Tony Sanchez, III** |
| State of Formation/Location: | Delaware |
| Principal Place of Business of Debtor: | **Houston, Texas** |
| Name of Secured Party: | JPMorgan Chase Bank, N.A.,<br>as Beneficiary for the benefit of the Secured Parties |
| Address of Secured Party: | 712 Main St, 5th Floor, Houston, TX 77002 |
| Owner of Record of<br>Real Property: | Grantor/Debtor |

Section 7.13. Debtor's Interests. The Grantor has an interest of record in each item of real property constituting Deed of Trust Property hereunder.

Section 7.14. Exculpation Provisions. EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS DEED OF TRUST; AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS DEED OF TRUST; THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS DEED OF TRUST; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY. EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 7.15. Hedge Banks. For the avoidance of doubt, the benefit of this Deed of Trust relating to any Collateral securing the Hedging Obligations shall also extend to and be available to the Hedge Banks in respect of the Secured Hedge Agreements as set forth herein and in the Credit Agreement; provided, however, as set forth above, the Obligations do not include any Excluded Swap Obligations of the Grantor.

Section 7.16. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Deed of Trust and shall not affect the construction of, or be taken into consideration in interpreting, this Deed of Trust.

Section 7.17. Survival. THE AGREEMENTS AND LIABILITIES OF THE GRANTOR SET FORTH IN SECTION 5.16 SHALL SURVIVE THE TERMINATION OF THIS DEED OF TRUST. TO THE EXTENT THAT ANY PAYMENTS ON THE OBLIGATIONS OR PROCEEDS OF ANY COLLATERAL ARE SUBSEQUENTLY INVALIDATED, DECLARED TO BE FRAUDULENT OR PREFERENTIAL, SET ASIDE OR REQUIRED TO BE REPAID TO A TRUSTEE, DEBTOR IN POSSESSION, RECEIVER OR OTHER PERSON UNDER ANY BANKRUPTCY LAW, COMMON LAW OR EQUITABLE CAUSE, THEN TO SUCH EXTENT, THE OBLIGATIONS SO SATISFIED SHALL BE REVIVED AND CONTINUE AS IF SUCH PAYMENT OR PROCEEDS HAD NOT BEEN RECEIVED AND THE BENEFICIARY'S AND THE OTHER SECURED PARTIES' LIENS, SECURITY INTERESTS, RIGHTS, POWERS AND REMEDIES UNDER THIS DEED OF TRUST AND EACH SECURITY INSTRUMENT SHALL CONTINUE IN FULL FORCE AND EFFECT. IN SUCH EVENT, EACH SECURITY INSTRUMENT SHALL BE AUTOMATICALLY REINSTATED AND EACH GRANTOR SHALL TAKE SUCH ACTION AS MAY BE REASONABLY REQUESTED BY THE BENEFICIARY AND THE OTHER SECURED PARTIES TO EFFECT SUCH REINSTATEMENT.

Section 7.18. Non-Judicial Foreclosure in Texas. In furtherance of the foregoing set forth in Section 5.02, upon the occurrence of an Event of Default and during the continuation thereof, the Trustee, or his successor or substitute, is authorized and empowered and it shall be his special duty at the request of Beneficiary to sell the Deed of Trust Property or any part thereof situated in the State of Texas, at the courthouse of any county (whether or not the counties in which the Deed of Trust Property is located are contiguous, if the Deed of Trust Property is located in more than one county) in the State of Texas in which any part of the Deed of Trust Property is situated, at public auction to the highest bidder for cash between the hours of ten o'clock a.m. and four o'clock p.m. on the first Tuesday in any month (such sale must begin at the time stated in the notice of sale or not later than three hours after such time) or at such other place, time and date as provided by the statutes of the State of Texas then in force governing sales of real estate under powers of sale conferred by deed of trust (including Section 51.002 of the Texas Property Code, or if and to the extent that such statute is not in force and effect, as provided by any successor statute or statutes of the State of Texas), after having given notice of such sale in accordance with such statutes. Any sale made by Trustee hereunder may be as an entirety or in such parcels as Beneficiary may request. To the extent permitted by applicable law, any sale may be adjourned by announcement at the time and place appointed for such sale without further notice except as may be required by law. The sale by Trustee of less than the whole of the Deed of Trust Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Deed of Trust Property shall be sold; and, if the proceeds of such sale of less than the whole of the Deed of Trust Property shall be less than the aggregate of the Obligations and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Deed of Trust Property just as though no sale had been made; provided, however, that Grantor shall never have any right to require the sale of less than the whole of the Deed of Trust Property but Beneficiary shall have the right, at its sole election, to request Trustee to sell less than the whole of the Deed of Trust Property. Trustee may, after any request or direction by Beneficiary, sell not only the real property but also the UCC Collateral and other interests which are a part of the Deed of Trust Property, or any part thereof, as a unit and as a part of a single sale, or may sell any part of the Deed of Trust Property separately from the remainder of the Deed of Trust Property. It shall not be necessary for Trustee to have taken possession of any part of the Deed of Trust Property or to have present or to exhibit at any sale any of the Collateral. After each sale, Trustee shall make to the purchaser or purchasers at such sale good and sufficient conveyances in the name of Grantor, conveying the property so sold to the purchaser or purchasers with general warranty of title of Grantor, subject to the Permitted Encumbrances, and shall receive the proceeds of said sale or sales and apply the same as herein provided. Trustee or his successor or substitute may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices (but excluding the conduct of sale), but in the name and on behalf of Trustee, his successor or substitute. If Trustee or his successor or substitute shall have given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

Section 7.19. ENTIRE AGREEMENT. THIS DEED OF TRUST AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS

DEED OF TRUST, INCLUDING GRANTING OF LIENS AND SECURITY INTERESTS PURSUANT TO THIS DEED OF TRUST, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

[SIGNATURES BEGIN NEXT PAGE]

EXECUTED this ____ day of March, 2017, to be effective as of the Effective Date.

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

Case 4:23-34508-sn Document 1351-16 Filed 04/19/23 in TXSB on 06/22/20 Page 1452 of 1759

STATE OF TEXAS §
§
COUNTY OF HARRIS §

This instrument was acknowledged before me on this ___ day of March, 2017, by Cameron W. George, in his capacity as Chief Financial Officer and Treasurer of SN EF UnSub GP, LLC, the general partner of **SN EF UnSub, LP**, a Delaware limited partnership company, on behalf of said limited partnership.

Notary Public

Seal:

EXHIBIT A

to

DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT

Introduction

The capitalized terms used but not defined in this Exhibit A are used as defined in the Deed of Trust. For purposes of this Exhibit A the capitalized terms not defined in the Deed of Trust are as follows:

1. "Working Interest" or "Gross Working Interest" and "W.I." or "G.W.I." means an interest owned in an oil, gas and mineral lease that determines the cost bearing percentage of the owner of such interest.

2. "Net Revenue Interest" or "N.R.I." means an interest (expressed as a percentage or decimal fraction), determined net of all royalties, overriding royalties, production payments or other burdens payable out of production, in and to all Hydrocarbons produced and saved from or attributable to a Well. In the case of any Well listed in Exhibit A, the Net Revenue Interest specified for such Well shall mean the sum of the percentage or decimal fraction set forth after the words "Net Revenue Interest" in the portion applicable to such Well plus, in the case of any Well with respect to which a royalty interest and/or overriding royalty is stated in this Exhibit A and applicable to such Well, the percentage or decimal fraction set forth after the words "Royalty Interest" or "Overriding Royalty Interest" in each such portion of Exhibit A.

3. "Before Payout" or "BPO" means the Working Interest and/or Net Revenue Interest of a party before the point in time when the Well has recovered from production all costs as specified in underlying farmout, assignments or other documents in the chain of title, usually including costs of drilling, completing and equipping a well or wells plus costs of operating the well or wells during the recoupment period.

4. "After Payout" or "APO" means the Working Interest and/or Net Revenue Interest of a party after the point in time when the Well has recovered from production all costs as specified in the underlying farmout, assignments or other documents in the chain of title, usually including costs of drilling, completing and equipping a well or wells plus costs of operating the well or wells during the recoupment period.

5. "Well" means (a) any existing well identified in Exhibit A, including replacement well drilled in lieu thereof from which gas is now or hereafter produced and (b) any well at any time producing or capable of producing gas attributable to the Hydrocarbons as defined above, including any well which has been shut-in, has temporarily ceased production or on which workover, reworking, plugging and abandonment or other operations are being conducted or planned.

All references contained in this Exhibit A to the Oil and Gas Properties are intended to include references to (a) the volume or book and page, file, entry or instrument number of the appropriate records of the particular county in the State where each such lease or other instrument is recorded and (b) all valid and existing amendments, supplements and other modifications to such lease or other instrument of record in such county records regardless of whether such amendments, supplements and modifications are expressly described herein. A special reference is here made to each such lease or other instrument and the record thereof for a more particular description of the property and interests sought to be affected by the Deed of Trust and for all other purposes.

For recording purposes, in regards to each county portion to this Exhibit A, this Introduction may be attached to an original executed copy of the Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement to be separately filed of record in each county.

Case 4:19-34508 Document 1251-16 Filed in TXSB on 06/22/20 Page 204 of 385

SCHEDULE I

to

DEED OF TRUST, ASSIGNMENT OF AS-EXTRACTED COLLATERAL, SECURITY AGREEMENT, FIXTURE FILING AND FINANCING STATEMENT

[to be attached]

**EXHIBIT E TO**
**CREDIT AGREEMENT**

**FORM OF**
**COLLATERAL AGREEMENT**

[Attached]

**COLLATERAL AGREEMENT**

dated and effective as of
March 1, 2017,
among
SN EF UnSub, LP,
each Subsidiary of SN EF UnSub, LP, identified herein,

SN EF UnSub Holdings, LLC,
SN EF UnSub GP, LLC
and
JPMORGAN CHASE BANK, N.A.,
as Collateral Agent and Administrative Agent

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I. | | |
| DEFINITIONS | | 1 |
| Section 1.01. | Credit Agreement | 1 |
| Section 1.02. | Other Defined Terms | 1 |
| ARTICLE II. | | |
| PLEDGE OF SECURITIES | | 4 |
| Section 2.01. | Pledge of Credit Party Collateral | 4 |
| Section 2.02. | Pledge of Parent Collateral | 5 |
| Section 2.03. | Delivery of the Pledged Collateral | 5 |
| Section 2.04. | Representations, Warranties and Covenants | 6 |
| Section 2.05. | Limited Liability Company and Limited Partnership Interests | 7 |
| Section 2.06. | Registration in Nominee Name; Denominations | 8 |
| Section 2.07. | Voting Rights; Dividends and Interest, etc | 8 |
| ARTICLE III. | | |
| SECURITY INTERESTS IN PERSONAL PROPERTY | | 9 |
| Section 3.01. | Security Interest | 9 |
| Section 3.02. | Representations and Warranties | 11 |
| Section 3.03. | Covenants | 12 |
| Section 3.04. | Other Actions | 14 |
| Section 3.05. | Covenants Regarding Patent, Trademark and Copyright Collateral | 14 |
| Section 3.06. | Commercial Tort Claims | 14 |
| ARTICLE IV. | | |
| REMEDIES | | 14 |
| Section 4.01. | Remedies upon Default | 14 |
| Section 4.02. | Application of Proceeds | 15 |
| Section 4.03. | Grant of License to Use Intellectual Property | 15 |
| Section 4.04. | Securities Act, etc | 16 |
| ARTICLE V. | | |
| MISCELLANEOUS | | 16 |
| Section 5.01. | Notices | 16 |
| Section 5.02. | Security Interest Absolute | 16 |
| Section 5.03. | Limitation by Law | 17 |
| Section 5.04. | Binding Effect; Several Agreement | 17 |
| Section 5.05. | Successors and Assigns | 17 |
| Section 5.06. | Agent's Fees and Expenses; Indemnification | 17 |
| Section 5.07. | Agent Appointed Attorney-in-Fact | 17 |
| Section 5.08. | GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS | 18 |
| Section 5.09. | Waivers; Amendment | 19 |
| Section 5.10. | Severability | 19 |
| Section 5.11. | Counterparts | 19 |
| Section 5.12. | Headings | 19 |
| Section 5.13. | Termination or Release | 19 |
| Section 5.14. | Right of Set-off | 20 |
| Section 5.15. | Subordination | 20 |
| Section 5.16. | Limitation of Liability | 20 |
| Section 5.17. | Survival of Agreement | 20 |

EXHIBITS

| | |
|---|---|
| Exhibit I | Form of Supplement to the Collateral Agreement |
| Exhibit II | Form of Perfection Certificate |

<u>SCHEDULES</u>

| | |
|---|---|
| Schedule I | Subsidiary Parties |
| Schedule II | Pledged Stock; Debt Securities |
| Schedule III | Intellectual Property |
| Schedule IV | Securities Accounts |
| Schedule V | Deposit Accounts |
| Schedule VI | Commodity Accounts |
| Schedule VII | Commercial Tort Claims |

This **COLLATERAL AGREEMENT** dated and effective as of March 1, 2017 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement"), is among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each Subsidiary of the Borrower listed on Schedule I hereto and each Subsidiary of the Borrower that becomes a party hereto after the date hereof pursuant to Section 5.14 (each, a "Subsidiary Party"), SN EF Unsub Holdings, LLC, a Delaware limited liability company ("Holdings"), SN EF Unsub GP, LLC, a Delaware limited liability company ("Parent") and JPMORGAN CHASE BANK, N.A., as Collateral Agent (in such capacity, the "Agent" or the "Collateral Agent") and Administrative Agent for the Secured Parties.

WHEREAS, pursuant to the Credit Agreement, dated as of March 1, 2017 (as amended, restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), among the Borrower, JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent, and the Lenders and agents from time to time parties thereto, the Borrower will from time to time incur Loans and obligations under Letters of Credit;

WHEREAS, one or more Cash Management Banks or Hedge Banks have entered or may from time to time enter into Secured Cash Management Agreements or Secured Hedge Agreements, as applicable, with the Borrower and/or its Restricted Subsidiaries and one or more Cash Management Banks have provided or may from time to time provide Cash Management Services pursuant to Secured Cash Management Agreements to the Borrower and/or any of its Restricted Subsidiaries (the foregoing, together with the making of Loans and the issuance of Letters of Credit, collectively, the "Extensions of Credit");

WHEREAS, each Pledgor and Grantor is executing and delivering this Agreement pursuant to the terms of the Credit Agreement to induce the Administrative Agent, the Collateral Agent, the Issuing Banks, each Lender, each Hedge Bank that is party to any Secured Hedge Agreement, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each sub-agent appointed pursuant to Section 12.2 of the Credit Agreement by the Administrative Agent with respect to matters relating to the Credit Documents or by the Collateral Agent with respect to matters relating to any Security Document (collectively, the "Secured Parties") to make their respective Extensions of Credit to the Borrower;

WHEREAS, the Subsidiary Parties are Subsidiaries of the Borrower, will derive substantial benefits from each Extension of Credit to the Borrower and are willing to execute and deliver this Agreement in order to induce the Secured Parties to make their respective Extensions of Credit; and

WHEREAS, Parent is the general partner of the Borrower and Holdings is a limited partner of the Borrower and each of Parent and Holdings will derive substantial benefits from each Extension of Credit to the Borrower and are willing to execute and deliver this Agreement in order to induce the Secured Parties to make their respective Extensions of Credit.

Accordingly, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.01. Credit Agreement.

(a) Capitalized terms used in this Agreement and not otherwise defined herein have the respective meanings assigned thereto in the Credit Agreement. Terms used herein that are defined in Article 8 or Article 9 of the UCC (even where capitalized herein and not capitalized in the UCC) shall, unless otherwise defined herein, have the meanings ascribed to such terms in Article 8 or Article 9, as applicable of the UCC.

(b) The rules of construction specified in Sections 1.2 and 1.5 of the Credit Agreement also apply to this Agreement.

Section 1.02. Other Defined Terms.

As used in this Agreement, the following terms have the meanings specified below:
"Agent" means the party named as such in the preamble of this Agreement until a successor (including successors under

the Credit Agreement) replaces it and, thereafter, means such successor.

"Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Article 9 Collateral" has the meaning assigned to such term in Section 3.01.

"Borrower" has the meaning assigned to such term in the preamble of this Agreement.

"Collateral" means Article 9 Collateral and Pledged Collateral; provided that, for the avoidance of doubt, Collateral shall exclude any Property constituting an Excluded Asset while such Property constitutes an Excluded Asset.

"Collateral Agent" means the party named as such in the preamble of this Agreement until a successor (including successors under the Credit Agreement) replaces it and, thereafter, means such successor.

"Commercial Tort Claims" means all commercial tort claims (as defined in Section 9-102(a)(13) of the UCC), now or hereafter held by any Grantor, including those listed in Schedule VII hereto.

"Commodity Accounts" means all commodity accounts (as defined in Section 9-102(a)(14) of the UCC) now or hereafter held by any Grantor, including those listed on Schedule VI hereto.

"Copyright License" means any written agreement, now or hereafter in effect, granting any right to any Grantor under any Copyright now or hereafter owned by any third party, and all rights of any Grantor under any such agreement (including any such rights that such Grantor has the right to license).

"Copyrights" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context of the definition of "Copyright License," any third party licensor): (a) all copyright rights in any work subject to the copyright laws of the United States, whether as author, assignee, transferee or otherwise, and (b) all registrations and applications for registration of any such copyright in the United States, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office, including those listed on Schedule III.

"Credit Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Credit Party Pledgor" means the Borrower and each Subsidiary Party.

"Credit Party Pledged Collateral" has the meaning assigned to such term in Section 2.01(a).

"Credit Party Pledged Stock" has the meaning assigned to such term in Section 2.01(a).

"Deposit Accounts" means all deposit accounts (as defined in Section 9-102(a)(29) of the UCC) now or hereafter held by any Grantor, including those listed on Schedule V hereto.

"Federal Securities Laws" has the meaning assigned to such term in Section 4.04.

"General Intangibles" means all "general intangibles" as defined in the UCC, including all causes of action and all other intangible personal property of any Grantor of every kind and nature (other than Accounts) now owned or hereafter acquired by any Grantor, including corporate or other business records, indemnification claims, contract rights (including rights under leases, whether entered into as lessor or lessee, swap agreements and other agreements), Intellectual Property, goodwill, registrations, franchises and tax refund claims.

"Grantor" means the Borrower and each Subsidiary Party.

"Intellectual Property" means all intellectual and similar property of every kind and nature now owned or hereafter acquired by any Grantor, including inventions, designs, Patents, Copyrights, Trademarks, Patent Licenses, Copyright Licenses,

Trademark Licenses, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information and all related documentation.

"Parent Pledged Collateral" has the meaning assigned to such term in Section 2.02(a).

"Parent Pledged Stock" has the meaning assigned to such terms in Section 2.02(a).

"Parent Pledgor" means each of SN EF UnSub GP, LLC and SN EF UnSub Holdings, LLC.

"Patent License" means any written agreement, now or hereafter in effect, granting to any Grantor any right to make, use or sell any invention covered by a Patent, now or hereafter owned by any third party (including any such rights that such Grantor has the right to license).

"Patents" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context of the definition of "Patent License," any third party licensor): (a) all patents of the United States, and all applications for patents of the United States, including those listed on Schedule III, and (b) all reissues, continuations, divisions, continuations-in-part or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Perfection Certificate" means a certificate substantially in the form of Exhibit II or another form reasonably acceptable to the Agent, completed and supplemented with the schedules and attachments contemplated thereby and duly executed by an Authorized Officer of the Borrower.

"Permitted Liens" means Liens expressly permitted by Section 10.2 of the Credit Agreement.

"Pledged Collateral" means the Credit Party Pledged Collateral and the Parent Pledged Collateral.

"Pledged Debt Securities" has the meaning assigned to such term in Section 2.01(a).

"Pledged Securities" means Pledged Debt Securities and Pledged Stock.

"Pledged Stock" means the Credit Party Pledged Stock and the Parent Pledged Stock.

"Pledgor" means each Credit Party Pledgor and each Parent Pledgor.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Property" means any and all tangible and intangible assets and properties, whether real, personal or mixed, including cash, securities, accounts and contract rights.

"Securities Accounts" means all securities accounts (as defined in Section 8-501 of the UCC or other applicable law) now or hereafter held by any Grantor, including those listed in Schedule IV hereto.

"Security Interest" has the meaning assigned to such term in Section 3.01.

"Subsidiary Party" has the meaning assigned to such term in the preamble of this Agreement.

"Trademark License" means any written agreement, now or hereafter in effect, granting to any Grantor any right to use any Trademark now or hereafter owned by any third party (including any such rights that such Grantor has the right to license).

"Trademarks" means all of the following now owned or hereafter acquired by any Grantor (or, as required in the context

of the definition of "Trademark License," any third party licensor): (a) all trademarks, service marks, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof (if any), and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in any State of the United States or any political subdivision thereof, and all renewals thereof, including those listed on Schedule III, and (b) all goodwill associated therewith or symbolized thereby.

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection or priority of security interests in any Collateral.

ARTICLE II.
PLEDGE OF SECURITIES

Section 2.01. Pledge of Credit Party Collateral. (a) As security for the payment and performance in full of the Obligations, each Credit Party Pledgor hereby assigns and pledges to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest in all of such Credit Party Pledgor's right, title and interest in, to and under (i) the Equity Interests directly owned by it (which such Equity Interests owned by each Credit Party Pledgor as of the date hereof are listed on Schedule II) and all other Equity Interests obtained in the future by such Credit Party Pledgor and any certificates, instruments or other documents representing all such Equity Interests (the properties and items described above in this clause (i) being, collectively, the "Credit Party Pledged Stock"); provided that the Credit Party Pledged Stock shall not include any Excluded Assets; (ii)(A) all evidences of Indebtedness for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or similar instruments, in each case currently issued or owed to such Credit Party Pledgor (which such evidences of Indebtedness and obligations owned by each Credit Party Pledgor as of the date hereof are listed on Schedule II), (B) all evidences of Indebtedness and obligations of the type referred to in clause (ii)(a) above in the future issued or owed to such Credit Party Pledgor and (C) the promissory notes and any other instruments, if any, evidencing such evidences of Indebtedness and obligations (such evidences of Indebtedness and obligations and other items described in clauses (ii)(A) through (C) above being, collectively, the "Pledged Debt Securities"); provided that Pledged Debt Securities shall not include any Excluded Asset; (iii) subject to Section 2.07, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the properties and items referred to in clauses (i) and (ii) above; (iv) subject to Section 2.07, all rights and privileges (including voting rights) of such Credit Party Pledgor with respect to the properties and items referred to in clauses (i), (ii) and (iii) above; and (v) all Proceeds of any of the foregoing (the properties and items referred to in clauses (i) through (v) above being collectively referred to as the "Credit Party Pledged Collateral").

TO HAVE AND TO HOLD the Credit Party Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

(a) The security interests granted in Section 2.01(a) are granted as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Credit Party Pledgor with respect to or arising out of the Credit Party Pledged Collateral.

Section 2.02. Pledge of Parent Collateral. (a) As security for the payment and performance in full of the Obligations, each Parent Pledgor hereby assigns and pledges to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, a security interest in all of such Parent Pledgor's right, title and interest in, to and under (i) the Equity Interests in the Borrower directly owned by it (which such Equity Interests owned by each Parent Pledgor as of the date hereof are listed on Schedule II) and all other Equity Interests in the Borrower obtained in the future by such Parent Pledgor and any certificates, instruments or other documents representing all such Equity Interests (the properties and items described above in this clause (i) being, collectively, the "Parent Pledged Stock"); provided that the Parent Pledged Stock shall not include any Excluded Assets; (ii) subject to

Section 2.07, all dividends, cash, distributions and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the properties and items referred to in clause (i) above; (iii) subject to Section 2.07, all rights and privileges (including voting rights) of such Parent Pledgor with respect to the properties and items referred to in clauses (i) and (ii) above; and (iv) all Proceeds of any of the foregoing (the properties and items referred to in clauses (i) through (iv) above being collectively referred to as the "Parent Pledged Collateral").

TO HAVE AND TO HOLD the Parent Pledged Collateral, together with all right, title, interest, powers, privileges and preferences pertaining or incidental thereto, unto the Agent, its successors and permitted assigns, for the benefit of the Secured Parties, forever; subject, however, to the terms, covenants and conditions hereinafter set forth.

(a) The security interests granted in Section 2.02(a) are as security only and shall not subject the Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Parent Pledgor with respect to or arising out of the Parent Pledged Collateral.

Section 2.03. Delivery of the Pledged Collateral.

(a) On the Closing Date, each Credit Party Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Credit Party Pledged Stock constituting certificated securities indicated on Schedule II as being owned by such Credit Party Pledgor as of the date hereof. Within 60 days after the Closing Date (or such longer time as the Agent shall permit in its sole discretion), each Credit Party Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Pledged Debt Securities indicated on Schedule II as being owned by such Credit Party Pledgor as of the date hereof to the extent such Pledged Debt Securities are required to be delivered pursuant to Section 2.03(c). Without prejudice to the foregoing sentence, each Credit Party Pledgor that after the Closing Date acquires any Credit Party Pledged Stock constituting certified securities or any Pledged Debt Securities shall promptly (and in any event within 45 days after its acquisition thereof (or such longer time as the Agent may permit in its sole discretion)) deliver or cause to be delivered to the Agent for the benefit of the Secured Parties, all such Credit Party Pledged Stock constituting certificated securities and all such Pledged Debt Securities that such Credit Party Pledgor has so acquired; provided, that, any such Pledged Debt Securities shall be required to be delivered to the extent set forth in Section 2.03(c).

(b) On the Closing Date, each Parent Pledgor agrees to deliver to the Agent for the benefit of the Secured Parties any and all Parent Pledged Stock constituting certificated securities and indicated on Schedule II as being owned by such Parent Pledgor as of the date hereof. Each Parent Pledgor that after the Closing Date acquires any Parent Pledged Stock constituting certificated securities shall promptly (and in any event within 45 days after its acquisition thereof (or such longer time as the Agent may permit in its sole discretion)) deliver or cause to be delivered to the Agent for the benefit of the Secured Parties, all such Parent Pledged Stock constituting certificated securities that such Parent Pledgor has so acquired.

(c) Each Credit Party Pledgor will cause any Pledged Debt Securities that are owed to such Credit Party Pledgor and that are evidenced by a promissory note or instrument to be pledged and delivered to the Agent, for the benefit of the Secured Parties, pursuant to the terms hereof; provided, that, except with respect to Intercompany Indebtedness, such request shall not apply to Pledged Debt Securities with a principal amount that does not exceed $500,000, individually or $1,000,000 in the aggregate.

(d) Upon delivery to the Agent, any Pledged Stock constituting certificated securities and any Pledged Debt Securities required to be delivered pursuant to the foregoing paragraphs (a) through (c) of this Section 2.03 shall be accompanied by stock or securities powers or note powers, as applicable, duly indorsed or executed in blank or other instruments of transfer reasonably satisfactory to the Agent and by such other instruments and documents as the Agent may reasonably request (other than instruments or documents governed by or requiring actions in any non-US jurisdiction related to Equity Interests of Foreign Subsidiaries). Each delivery of Pledged Stock constituting certificated securities and each delivery of Pledged Debt Securities shall be accompanied by a schedule describing the securities substantially in the form of Schedule II, which schedule shall be attached hereto as Schedule II (or a supplement to Schedule II, as applicable) and made a part hereof; provided that failure to attach any such schedule hereto shall not affect the validity of such pledge

of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(e) If any Pledged Stock listed in Schedule II as of the date hereof constitutes an uncertificated security (within the meaning of Article 8 of the UCC), the Pledgor or Pledgors thereof shall, within 60 days following the Closing Date (or such later date as the Agent may agree in its sole discretion), cause the issuer thereof to enter into a control agreement with such Pledgor or Pledgors and the Agent wherein such issuer agrees to comply with instructions with respect to such Pledged Stock originated by the Agent without further consent of such Pledgor or Pledgors or any other Person, such agreement to be in form and substance reasonably satisfactory to the Agent and sufficient to cause the Agent's security interest in such Pledged Stock to be perfected by control within the meaning of Article 8 of the UCC. If, after the Closing Date, any Pledgor acquires Pledged Stock constituting an uncertificated security, such Pledgor shall cause the issuer thereof, within 45 days after request by the Agent (or such later date as the Agent may agree in its sole discretion) to enter into a control agreement as described in the preceding sentence with respect to such uncertificated Pledged Stock (and making the agreements described in the preceding sentence), such agreement to be in form and substance reasonably satisfactory to the Agent and sufficient to cause the Agent's security interest in such Pledged Stock to be perfected by control within the meaning of Article 8 of the UCC.

Section 2.04. Representations, Warranties and Covenants. Each Pledgor represents and warrants to, and covenants with, the Agent, for the benefit of the Secured Parties, that:

(a) As of the date hereof or the date of the last supplement to Schedule II, Schedule II correctly sets forth (i) the issued and outstanding Equity Interests owned by each Pledgor and (ii) all evidences of Indebtedness for borrowed money and obligations evidenced by bonds, debentures, notes, loan agreements or similar instruments issued to or owned by such Pledgor. As of the date hereof or the date of the last supplement to Schedule II, the Pledged Stock and the Pledged Debt Securities described in Schedule II include all of the Equity Interests and all evidences of Indebtedness and obligations that are required to be pledged in order to satisfy the provisions of the Credit Agreement and that are required to be delivered to the Agent pursuant to the provisions of the Credit Agreement and pursuant to Section 2.03(a), Section 2.03(b) or Section 2.03(c), as applicable.

(b) The Pledged Stock, to the best of each Pledgor's knowledge, has been duly and validly authorized and issued by the issuers thereof and are fully paid and nonassessable.

(c) Except for the Liens granted hereunder and the Liens permitted under Section 10.2 of the Credit Agreement, each Pledgor (i) is and, subject to any transfers made in compliance with the Credit Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule II as owned by such Pledgor, (ii) holds the same free and clear of all Liens, other than Permitted Liens, will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral other than pursuant to a transaction permitted by the Credit Agreement and other than Permitted Liens, and (iii) subject to the rights of such Pledgor under the Credit Documents to dispose of Pledged Collateral, will use commercially reasonable efforts to defend its title or interest thereto or therein and the priority thereof against any Lien that is not otherwise permitted by Section 10.2 of the Credit Agreement (including with respect to its priority relative to the Liens created hereunder), however arising, of all Persons.

(d) Other than (i) as set forth in Schedule II, (ii) restrictions and limitations imposed or permitted by the Credit Documents or securities laws generally and (iii) transfer restrictions that exist at the time of the acquisition of Equity Interests in such Person, the Pledged Collateral is and will continue to be freely transferable and assignable, and none of the Pledged Collateral is or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law, memorandum of association or articles of association provisions or contractual restriction of any nature that could prohibit, impair, delay or otherwise affect in any manner material and adverse to the Secured Parties, the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Agent of rights and remedies hereunder other than under applicable Requirements of Law.

(e) Each Pledgor has the power and authority to pledge the Pledged Collateral pledged by it hereunder

in the manner hereby done or contemplated.

(f) Other than as set forth in the Credit Agreement or the schedules thereto, no consent or approval of any Governmental Authority, any securities exchange or any other person was or is necessary to the validity of the pledge effected hereby, other than (i) filings and registrations necessary to perfect the Liens on the Collateral granted by the Credit Parties and by the Parent Pledgors in favor of the Agent for the benefit of the Secured Parties and (ii) such as have been obtained and are in full force and effect.

(g) By virtue of the execution and delivery by the Pledgors of this Agreement, when (i) any Pledged Stock constituting certificated securities and any Pledged Debt Securities constituting promissory notes or other instruments are delivered to the Agent, for the benefit of the Secured Parties, in accordance with this Agreement (including the applicable indorsements and documents described in Section 2.03(d)), the Agent will obtain, for the benefit of the Secured Parties, a legal, valid and perfected first lien upon and security interest in such Pledged Stock and Pledged Debt Securities (perfected by control with respect to such certificated Pledged Stock and by possession with respect to such Pledged Debt Securities), as security for the payment and performance of the Obligations, (ii) any Pledged Stock constituting uncertificated securities becomes subject to a control agreement in accordance with Section 2.03 hereof, the Agent will obtain, for the benefit of the Secured Parties, a legal, valid and perfected first lien upon and security interest in such Pledged Stock and Pledged Debt Securities (perfected by control with respect to such certificated Pledged Stock and by possession with respect to such Pledged Debt Securities), as security for the payment and performance of the Obligations and (iii) a financing statement in proper form has been filed in the appropriate filing offices in respect of any Pledged Collateral constituting Investment Property, Instruments or General Intangibles, then the Agent (without limitation to any perfection accomplished pursuant to Section 2.04(g)(i)) will obtain, for the benefit of the Secured Parties, a legal, valid and perfected lien upon and security interest in such Pledged Collateral, subject only to Permitted Liens, as security for the payment and performance of the Obligations.

(h) The pledge effected hereby is effective to vest in the Agent, for the benefit of the Secured Parties, the rights of the Pledgors in the Pledged Collateral to the extent intended hereby.

(i) No Pledged Securities are being held in or credited to a securities account as of the Closing Date. No Pledgor shall deposit any Pledged Securities in, or cause or allow any Pledged Securities to be credited to or held as a financial asset in, any securities account without the prior written consent of the Agent, which consent may be predicated, without limitation, upon the Agent's having control under the UCC or other applicable law of such securities account and the security entitlements carried therein, for the benefit of the Secured Parties, pursuant to a control agreement in form and substance reasonably satisfactory to the Agent between the Agent, the relevant Pledgor and the relevant securities intermediary.

Notwithstanding anything to the contrary in this Agreement, the representations, warranties and covenants made by any relevant Pledgor in this Agreement with respect to the creation, perfection or priority (as applicable) of the security interest granted in favor of the Agent (pursuant to this Agreement) shall be deemed not to apply to Excluded Assets.

Section 2.05. Limited Liability Company and Limited Partnership Interests.

(a) Each Pledgor shall cause each interest in any limited liability company or limited partnership controlled by any Pledgor, pledged hereunder and represented by a certificate, to be a "security" within the meaning of Article 8 of the UCC, and shall cause each such interest to be, at all times hereafter, represented by a certificate unless and until such interest is no longer such a "security" and the Pledgor complies with Section 2.05(b).

(b) Each Pledgor shall not permit any interest in any limited liability company or limited partnership controlled by a Pledgor, pledged hereunder and not represented by a certificate to be a "security" within the meaning of Article 8 of the UCC, and the Pledgors shall at no time elect to treat any such interest as a "security" within the meaning of Article 8 of the UCC or issue any certificate representing such interest, unless prior to such election, the applicable Pledgor provides notification to the Agent of such election and delivers, as applicable, any such certificate to the Agent

pursuant to the terms hereof (it being understood, for avoidance of doubt, that there shall be no uncertificated Article 8 "securities").

Section 2.06. Registration in Nominee Name; Denominations. If an Event of Default shall have occurred and be continuing, (a) the Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to have the Pledged Securities registered in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), or hold the Pledged Securities in the name of the applicable Pledgor, indorsed or assigned in blank in favor of the Agent, and (b) each Pledgor will promptly give to the Agent copies of any written notices or other written communications received by it with respect to Pledged Securities registered in the name of such Pledgor. If an Event of Default shall have occurred and be continuing, the Agent shall have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any purpose consistent with this Agreement, to the extent permitted by the documentation governing such Pledged Securities. Each Pledgor shall use its commercially reasonable efforts to cause any Subsidiary that is not a party to this Agreement to comply with a request by the Agent, pursuant to this Section 2.06, to exchange certificates or instruments representing Pledged Securities of such Subsidiary for certificates or instruments of smaller or larger denominations.

Section 2.07. Voting Rights; Dividends and Interest, etc.

(a) Unless and until an Event of Default shall have occurred and be continuing and the Agent shall have given notice to the relevant Pledgors of the Agent's intention to exercise its rights hereunder:

(i) Each Pledgor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement, the Credit Agreement and the other Credit Documents.

(ii) The Agent shall promptly execute and deliver to each Pledgor, or cause to be executed and delivered to such Pledgor, all such proxies, powers of attorney and other instruments as such Pledgor may reasonably request for the purpose of enabling such Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to subparagraph (i) above.

(iii) Each Pledgor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral pledged by such Pledgor to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and otherwise paid or distributed in accordance with, the terms and conditions of the Credit Agreement, the other Credit Documents, and applicable laws; provided that any noncash dividends, interest, principal or other distributions that would constitute Pledged Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral, and, if received by any Pledgor in certificated form, shall be promptly (and in any event within 45 days of their receipt (or such longer time as the Agent shall permit in its sole discretion)) delivered to the Agent, for the benefit of the Secured Parties, in the same form as so received (and, if reasonably requested by the Agent, indorsed in blank or in a manner reasonably satisfactory to the Agent). So long as no Default or Event of Default has occurred and is continuing, the Agent shall promptly deliver to each relevant Pledgor any Pledged Securities in its possession if requested to be delivered to the issuer thereof in connection with any exchange or redemption of such Pledged Securities permitted by the Credit Agreement in accordance with this Section 2.07(a)(iii).

(b) After the occurrence and during the continuance of an Event of Default and upon notice by the Agent to the relevant Pledgors of the Agent's intention to exercise its rights hereunder, all rights of any Pledgor to dividends, interest, principal or other distributions that such Pledgor is authorized to receive pursuant to paragraph (a)(iii) of this Section 2.07 shall cease, and all such rights shall thereupon become vested, for the benefit of the Secured Parties, in the Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions; provided that, the Agent shall have the right from time to time following and during the continuance of an Event of Default to permit the Pledgors to receive and retain such amounts. All dividends, interest, principal or other distributions received by any Pledgor contrary to the provisions of this Section 2.07 shall not be

commingled by such Pledgor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Agent, for the benefit of the Secured Parties, and shall be forthwith delivered to the Agent, for the benefit of the Secured Parties, in the same form as so received (indorsed in a manner reasonably satisfactory to the Agent). Any and all money and other property paid over to or received by the Agent pursuant to the provisions of this paragraph (b) shall be retained by the Agent in an account to be established by the Agent upon receipt of such money or other property and shall be applied in accordance with the provisions of Section 4.02. After all Events of Default have been cured or waived and the Borrower has delivered to the Agent a certificate to that effect, the Agent shall promptly repay to each Pledgor (without interest) all dividends, interest, principal or other distributions that such Pledgor would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section 2.07 and that remain in such account.

(c) Upon the occurrence and during the continuance of an Event of Default and after notice by the Agent to the relevant Pledgors of the Agent's intention to exercise its rights hereunder, subject to applicable Requirements of Law, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.07, and the obligations of the Agent under paragraph (a)(ii) of this Section 2.07, shall cease, and all such rights shall thereupon become vested in the Agent, for the benefit of the Secured Parties, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers; provided that the Agent shall have the right from time to time, following and during the continuance of an Event of Default to permit the Pledgors to exercise such rights. After all Events of Default have been cured or waived and the Borrower has delivered to the Agent a certificate to that effect, all rights of any Pledgor to exercise the voting and/or consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.07, and the obligations of the Agent under paragraph (a)(ii) of this Section 2.07, shall in each case be reinstated.

(d) Any notice given by the Agent to the Pledgors suspending their rights under paragraph (a) of this Section 2.07 (i) shall be in writing, (ii) may be given to one or more of the Pledgors at the same or different times and (iii) may suspend the rights of the Pledgors under paragraph (a)(i) or paragraph (a)(iii) in part without suspending all such rights (as specified by the Agent in its sole and absolute discretion) and without waiving or otherwise affecting the Agent's rights to give additional notices from time to time suspending other rights so long as an Event of Default has occurred and is continuing.

## ARTICLE III.
## SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01. Security Interest.

(a) As security for the payment and performance in full of the Obligations, each Grantor hereby assigns and pledges to the Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all right, title and interest in or to any and all of the following assets and properties now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(i) all Accounts;

(ii) all Chattel Paper;

(iii) all cash and Deposit Accounts;

(iv) all Documents;

(v) all Equipment;

(vi) all Fixtures;

(vii) all General Intangibles;

(viii) all Goods;

(ix) all Instruments;

(x) all Intellectual Property;

(xi) all Inventory;

(xii) all Investment Property, Securities Accounts and Commodity Accounts;

(xiii) all Letters of Credit and Letter of Credit Rights;

(xiv) all minerals, oil, gas and As-Extracted Collateral;

(xv) all motor vehicles;

(xvi) all books and records pertaining to the Article 9 Collateral;

(xvii) all Commercial Tort Claims; and

(xviii)substitutions, replacements, accessions, products and proceeds (including insurance proceeds, licenses, royalties, income, payments, claims, damages and proceeds of suit) and to the extent not otherwise included, all proceeds, Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing.

Notwithstanding anything to the contrary in this Agreement, Article 9 Collateral does not include any Property that constitutes an Excluded Asset while such Property constitutes on Excluded Asset, and the representations, warranties and covenants made by any relevant Grantor in this Agreement with respect to Article 9 Collateral shall not be construed to mean or imply that Article 9 Collateral includes any Excluded Asset or that the Security Interest exists in any Excluded Assets, while any such Property is an Excluded Asset.

(b) Each Grantor and Pledgor hereby irrevocably authorizes the Agent at any time and from time to time to file in any relevant jurisdiction any initial financing statements (including fixture filings) with respect to the Collateral or any part thereof and amendments thereto that contain the information required by Article 9 of the UCC for the filing of any financing statement or amendment, including (i) whether such Grantor or Pledgor is an organization, the type of organization and any organizational identification number issued to such Grantor or Pledgor, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates and (iii) a description of collateral that describes such property in any other manner as the Agent may reasonably determine is necessary or advisable to ensure the perfection of the security interest in the Collateral granted under this Agreement, including describing such property as “all assets” or “all property” or words of similar effect. Each Grantor and each Pledgor agrees to provide such information to the Agent promptly upon any reasonable request, including any updates to the Schedules hereto to reflect any additional applicable property not listed thereon.

The Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office or any similar office in any other country) such documents as may be necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest granted by each Grantor in Article 9 Collateral consisting of United States Patents, United States registered Trademarks and United States registered Copyrights, without the signature of any Grantor, and naming any Grantor or the Grantors as debtors and the Agent as secured party.

(c) The Security Interest is granted as security only and shall not subject the Agent or any other Secured

Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Article 9 Collateral.

Section 3.02. Representations and Warranties. The Grantors jointly and severally represent and warrant to the Agent and the Secured Parties that:

(a) Each Grantor and Pledgor has good and valid rights in and title (except as otherwise permitted under any Credit Document) to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Agent the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained and is in full force and effect or has otherwise been disclosed herein or in the Credit Agreement and the Schedules thereto.

(b) The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein, including the exact legal name of each Grantor and Pledgor, is correct and complete, in all material respects, as of the Closing Date. Uniform Commercial Code financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations containing a description of the Article 9 Collateral and the Parent Pledged Collateral have been prepared by the Agent based upon the information provided to the Agent in the Perfection Certificate for filing in each governmental, municipal or other office specified in the Perfection Certificate (or specified by notice from the Borrower to the Agent after the Closing Date in the case of filings, recordings or registrations required by Section 9.13 of the Credit Agreement), and constitute all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of United States Patents, United States registered Trademarks and United States registered Copyrights) that are necessary to publish notice of and protect the validity of and to establish a legal, valid and perfected security interest in favor of the Agent (for the benefit of the Secured Parties) in respect of all Article 9 Collateral and Parent Pledged Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States (or any political subdivision thereof) and its territories and possessions, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary in any such jurisdiction, except as provided under applicable law with respect to the filing of continuation statements or amendments. Each Grantor represents and warrants that a fully executed agreement in the form hereof (or a short form hereof which form shall be reasonably acceptable to the Agent) containing a description of all Article 9 Collateral consisting of Intellectual Property with respect to registered United States Patents (and Patents for which registration applications are pending), registered United States Trademarks (and Trademarks for which registration applications are pending) and registered United States Copyrights (and Copyrights for which registration applications are pending) has been delivered to the Agent for recording with the United States Patent and Trademark Office and the United States Copyright Office pursuant to 35 U.S.C. § 261, 15 U.S.C. § 1060 or 17 U.S.C. § 205 and the regulations thereunder, as applicable, to protect the validity of and to establish a legal, valid and perfected security interest in favor of the Agent, for the benefit of the Secured Parties, in respect of all Article 9 Collateral consisting of such Intellectual Property in which a security interest may be perfected by recording with the United States Patent and Trademark Office and the United States Copyright Office, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary (other than such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of Patents, Trademarks and Copyrights (or registration or application for registration thereof) acquired or developed after the Closing Date).

(c) The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Obligations, (ii) subject to the filings described in Section 3.02(b), a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the Uniform Commercial Code or other applicable law in such jurisdictions and (iii) subject to Section 3.02(b), a security interest that shall be perfected in all Article 9 Collateral in which a security interest may be perfected upon the recording of this Agreement (or a short form hereof) with the United States Patent and Trademark Office and the United States Copyright Office, as applicable. The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral other than Liens permitted under Section 10.2 of the Credit Agreement.

(d) The Article 9 Collateral is owned by the Grantors and Pledgors free and clear of any Lien, other than Liens permitted under Section 10.2 of the Credit Agreement. None of the Grantors or Pledgors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Article 9 Collateral, (ii) any assignment in the nature of a security interest in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office or (iii) any assignment in the nature of a security interest in which any Grantor and Pledgor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for Liens permitted under Section 10.2 of the Credit Agreement. None of the Grantors has entered into any control agreement with respect to any Deposit Account, Securities Account or Commodity Account (in each case other than Excluded Accounts) that would grant control (pursuant to Section 9-104 of the UCC with respect to a Deposit Account, Section 8-106 of the UCC or other applicable law with respect to a Securities Account and Section 9-106(b) of the UCC with respect to a Commodity Account) of such Deposit Account, such Securities Account (or any security entitlement carved therein) or Commodity Account (or any commodity contract carried therein) to any Person other than the Agent for the benefit of the Secured Parties.

(e) As of the date hereof, the Deposit Accounts, Commodity Accounts and Securities Accounts listed in Schedule IV, Schedule V and Schedule VI, respectively, are all of the those types of accounts maintained by the Grantors.

(f) As of the date hereof the Commercial Tort Claims listed in Schedule VII hereof are all of the Commercial Tort claims with an individual value in excess of $250,000 held by the Grantors.

Section 3.03. Covenants.

(a) Each Grantor and each Pledgor agrees that if it effects or permits any change referred to in Section 9.1(o)(ii) of the Credit Agreement it will ensure that all filings have been made, or will have been made within any applicable statutory period, under the Uniform Commercial Code or otherwise that are required in order for the Agent at all times following such change to have a valid, legal and perfected first priority security interest (subject to Liens permitted under Section 10.2 of the Credit Agreement) in all the Article 9 Collateral, for the benefit of the Secured Parties.

(b) Subject to the rights of such Grantor under the Credit Documents to dispose of Collateral, each Grantor shall, at its own expense, upon the reasonable request of the Agent, use commercially reasonable efforts to defend title to the Article 9 Collateral against all persons and to defend the Security Interest of the Agent, for the benefit of the Secured Parties, in the Article 9 Collateral and the priority thereof against any Lien that is not otherwise permitted under Section 10.2 of the Credit Agreement to exist or have such priority; provided that, nothing in this Agreement shall prevent any Grantor from discontinuing the operation or maintenance of any of its assets or properties if such discontinuance is (i) determined by such Grantor to be desirable in the conduct of its business and (ii) permitted by the Credit Documents.

(c) Each Grantor and each Pledgor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement and the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith.

Without limiting the generality of the foregoing, each Grantor authorizes the Agent, with prompt notice thereof to the Grantors, to supplement this Agreement by supplementing Schedule III or adding additional schedules hereto to specifically identify any asset or item that may constitute Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses; provided that any Grantor shall have the right, exercisable within 90 days after it has been notified by the Agent of the specific identification of any such Collateral, to advise the Agent in writing of any inaccuracy of the representations

and warranties made by such Grantor hereunder with respect to such Article 9 Collateral. Each Grantor agrees that it will use its commercially reasonable efforts to take such action as shall be necessary in order that the representations and warranties set forth in Section 3.02(b) will be true and correct with respect to such Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses within 90 days after the date it has been notified by the Agent of the specific identification of such Copyrights, Patents, Trademarks, Copyright Licenses, Patent Licenses or Trademark Licenses.

(d) (i) After the occurrence of an Event of Default and during the continuance thereof, the Agent shall have the right to verify under reasonable procedures the validity, amount, quality, quantity, value, condition and status of, or any other matter relating to, the Article 9 Collateral, including, in the case of Accounts or Article 9 Collateral in the possession of any third person, by contacting Account Debtors or the third person possessing such Article 9 Collateral for the purpose of making such a verification and each Grantor shall furnish all such assistance and information as Agent may reasonably request in connection with any such verification. The Agent shall have the right to share any information it gains from such inspection or verification with any Secured Party.

(i) The Agent hereby authorizes each Grantor to collect such Grantor's Accounts and the Agent may curtail or terminate said authority at any time after written notice is provided by the Agent to such Grantor after the occurrence and during the continuance of an Event of Default.

(ii) At the Agent's written request at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall deliver to the Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Accounts, including all original orders, invoices and shipping receipts.

(e) At its option, the Agent may discharge any past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral or Pledged Collateral and that is not a Permitted Lien, and may pay for the maintenance and preservation of the Article 9 Collateral or Pledged Collateral to the extent any Grantor or Pledgor, as applicable fails to do so as required by the Credit Agreement or this Agreement, and each Grantor and each Pledgor jointly and severally agrees to reimburse the Agent on demand for any reasonable payment made or any reasonable expense incurred by the Agent pursuant to the foregoing authorization; provided, however, that nothing in this Section 3.03(e) shall be interpreted as excusing any Grantor or Pledgor from the performance of, or imposing any obligation on the Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor or Pledgor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Credit Documents.

(f) Each Grantor and each Pledgor (rather than the Agent or any Secured Party) and each shall remain liable for the observance and performance of all the conditions and obligations to be observed and performed by it under each contract, agreement or instrument relating to the Article 9 Collateral or to the Pledged Collateral (including under the organizational or governing documents or agreements of any issuer of Pledged Securities) and each Grantor and each Pledgor jointly and severally agrees to indemnify and hold harmless the Agent and the Secured Parties from and against any and all liability for such performance.

(g) During the continuance of an Event of Default, none of the Grantors will, without the Agent's prior written consent (which consent shall not be unreasonably withheld), grant any extension of the time of payment of any Accounts included in the Article 9 Collateral, compromise, compound or settle the same for less than the full amount thereof, release, wholly or partly, any person liable for the payment thereof or allow any credit or discount whatsoever thereon, other than extensions, credits, discounts, compromises or settlements granted or made in the ordinary course of business and consistent with prudent business practices, except as permitted by the Credit Agreement.

(h) Each Grantor irrevocably makes, constitutes and appoints the Agent (and all officers, employees or agents designated by the Agent) as such Grantor's true and lawful agent (and attorney-in-fact) for the purpose, during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto. In the event that any

Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required by the Credit Documents or to pay any premium in whole or part relating thereto, the Agent may, without waiving or releasing any obligation or liability of the Grantors hereunder or any Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Agent reasonably deems advisable. All sums disbursed by the Agent in connection with this Section 3.03(h), including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable, upon demand, by the Grantors to the Agent and shall be additional Obligations secured hereby.

Section 3.04. Other Actions. In order to further ensure the attachment, perfection and priority of, and the ability of the Agent to enforce, for the benefit of the Secured Parties, the Agent's security interest in the Article 9 Collateral, each Grantor agrees, in each case at such Grantor's own expense, to take the following actions with respect to the following Article 9 Collateral:

(a) Instruments and Tangible Chattel Paper. If any Grantor shall at any time own or acquire any Instruments or Tangible Chattel Paper evidencing individually an amount in excess of $500,000 (or in the aggregate in excess of $1,000,000), such Grantor shall promptly (and in any event within 30 days of its acquisition (or such longer period as the Agent may agree to)) notify the Agent and promptly endorse, assign and deliver the same to the Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Agent may from time to time reasonably request.

Section 3.05. Covenants Regarding Patent, Trademark and Copyright Collateral. Except as permitted by the Credit Agreement:

(a) Each Grantor, either itself or through any agent, employee, licensee or designee, shall upon the reasonable request of the Agent, execute and deliver any and all agreements, instruments, documents and papers as the Agent may reasonably request to evidence the Agent's security interest in such Patent, Trademark or Copyright.

(b) Upon and during the continuance of an Event of Default, at the request of the Agent, each Grantor shall use commercially reasonable efforts to obtain all requisite consents or approvals from the licensor under each Copyright License, Patent License or Trademark License to effect the assignment of all such Grantor's right, title and interest thereunder to (in the Agent's sole discretion) the designee of the Agent or the Agent.

Section 3.06. Commercial Tort Claims. If after the Closing Date any Grantor acquires any Commercial Tort Claim with an individual value in excess of $250,000, such Grantor shall promptly provide to the Agent notice of the acquisition of such Commercial Tort Claim, such notice to (i) describe such Commercial Tort Claim in sufficient detail such that, in the judgment of the Agent, such description will constitute an adequate description under Section 9-108 of the UCC, and (ii) identify any such Commercial Tort Claim that constitutes an Excluded Asset. The foregoing notice shall supplement, and shall be deemed to constitute a part of, Schedule VII.

ARTICLE IV.
REMEDIES

Section 4.01. Remedies upon Default. Upon the occurrence and during the continuance of an Event of Default, subject to applicable Requirements of Law, each Pledgor and Grantor agrees to deliver each item of Collateral to the Agent on demand, and it is agreed that the Agent shall have the right to take any of or all the following actions at the same or different times: (a) with respect to any Article 9 Collateral consisting of Intellectual Property, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Article 9 Collateral by the applicable Pledgors to the Agent or to license or sublicense, whether general, special or otherwise, and whether on an exclusive or a nonexclusive basis, any such Article 9 Collateral throughout the world on such terms and conditions and in such manner as the Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers thereunder cannot be obtained), (b) with or without legal process and with or without prior notice or demand for performance, to take possession of the Article 9 Collateral and without liability for trespass to the applicable Pledgor or Grantor to enter any premises where the Article 9

Collateral may be located for the purpose of taking possession of or removing the Article 9 Collateral and (c) generally, to exercise any and all rights afforded to a secured party under the applicable Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, each Pledgor and Grantor agrees that the Agent shall have the right, subject to the requirements of applicable law, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Agent shall deem appropriate. The Agent shall be authorized in connection with any sale of a security (if it deems it advisable to do so) pursuant to the foregoing to restrict the prospective bidders or purchasers to persons who represent and agree that they are purchasing such security for their own account, for investment, and not with a view to the distribution or sale thereof. Upon consummation of any such sale of Collateral pursuant to this Section 4.01, the Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely, free from any claim or right on the part of any Pledgor or Grantor, and each Pledgor and Grantor hereby waives and releases (to the extent permitted by law) all rights of redemption, stay, valuation and appraisal that such Pledgor or Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Agent shall give the applicable Pledgors and Grantors 10 days' written notice (which each Pledgor and Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Agent's intention to make any sale of Collateral. At any such sale, the Collateral, or the portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Agent may (in its sole and absolute discretion) determine. The Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In the case of any sale of all or any part of the Collateral made on credit or for future delivery, the Collateral so sold may be retained by the Agent until the sale price is paid by the purchaser or purchasers thereof, but the Agent shall not incur any liability in the event that any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in the case of any such failure, such Collateral may be sold again upon notice given in accordance with provisions above. At any public (or, to the extent permitted by law, private) sale made pursuant to this Section 4.01, any Secured Party may bid for or purchase for cash (or, in accordance with Section 12.14 of the Credit Agreement, credit bid), free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Pledgor or Grantor (all such rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Pledgor or Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Agent shall be free to carry out such sale pursuant to such agreement and no Pledgor or Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. To the extent provided in this Section 4.01, any sale that complies with such provisions shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the Uniform Commercial Code as in effect in the State of New York or its equivalent in other jurisdictions.

Section 4.02. Application of Proceeds. Upon the occurrence and during the continuance of an Event of Default, the Agent shall promptly apply the proceeds, moneys or balances of any collection or sale of Collateral, as well as any Collateral consisting of cash, in accordance with Section 11.12 of the Credit Agreement.

The Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the purchase money by the Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Agent or such officer or be answerable in any way for the misapplication thereof.

Section 4.03. Grant of License to Use Intellectual Property. For the purpose of enabling the Agent to exercise rights and remedies under this Agreement at such time as the Agent shall be lawfully entitled to exercise such rights and remedies, each Grantor and Pledgor grants (such grant effective solely after the occurrence and during the continuance of an Event of Default) to (in the Agent's sole discretion) a designee of the Agent or the Agent, for the benefit of the Secured Parties, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Pledgor or Grantor) to use, license or sublicense any of the Article 9 Collateral consisting of Intellectual Property now owned or hereafter acquired by such Pledgor or Grantor, wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof, the right to prosecute and maintain all Intellectual Property and the right to sue for past infringement of the Intellectual Property; provided, however, that nothing in this Section 4.03 shall require Grantors or Pledgors to grant any license that is prohibited by any rule of law, statute or regulation, or is prohibited by, or constitutes a breach or default under or results in the termination of, any contract, license, instrument or other agreement with an unaffiliated third party, to the extent permitted by the Credit Agreement, with respect to such Intellectual Property Collateral; and provided, further, that such licenses to be granted hereunder with respect to Trademarks shall be subject to the maintenance of quality standards with respect to the goods and services on which such Trademarks are used sufficient to preserve the validity of such Trademarks. For the avoidance of doubt, the use of such license by the Agent may be exercised, at the option of the Agent, only during the continuation of an Event of Default. Furthermore, each Grantor and Pledgor hereby grants to the Agent an absolute power of attorney to sign, upon the occurrence and during the continuance of any Event of Default, any document which may be required by the United States Copyright Office or the United States Patent and Trademark Office or any state office in order to effect an absolute assignment of all right, title and interest in each Patent, Trademark or Copyright, and to record the same.

Section 4.04. Securities Act, etc. In view of the position of the Pledgors in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar federal statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Collateral permitted hereunder. Each Pledgor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Agent if the Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable Blue Sky or other state securities laws or similar laws analogous in purpose or effect. Each Pledgor acknowledges and agrees that in light of such restrictions and limitations, the Agent, in its sole and absolute discretion, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws or, to the extent applicable, Blue Sky or other state securities laws and (b) may approach and negotiate with a single potential purchaser to effect such sale. Each Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Agent shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Agent, in its sole and absolute discretion, may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a single purchaser were approached. The provisions of this Section 4.04 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Agent sells.

ARTICLE V.
MISCELLANEOUS

Section 5.01. Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 13.2 of the Credit Agreement (whether or not then in effect), as such address may be changed by written notice to the Agent and the Borrower. All communications and notices hereunder to any Pledgor or Grantor shall be given to it in care of the Borrower, with such notice to be given as provided in Section 13.2 of the Credit Agreement (whether or not then in effect).

Section 5.02. Security Interest Absolute. All rights of the Agent hereunder, the Security Interest, the security interest

in the Pledged Collateral and all obligations of each Pledgor and Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Credit Document, any agreement with respect to any of the Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Credit Document, or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Pledgor or Grantor in respect of the Obligations or this Agreement (other than a defense of Payment in Full).

Section 5.03. Limitation by Law. All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable Requirements of Law, and all the provisions of this Agreement are intended to be subject to all applicable Requirements of Law that may be controlling and to be limited to the extent necessary so that they shall not render this Agreement invalid, unenforceable, in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable law or regulation.

Section 5.04. Binding Effect; Several Agreement. This Agreement shall become effective as to any party to this Agreement when a counterpart hereof executed on behalf of such party shall have been delivered to the Agent and a counterpart hereof shall have been executed on behalf of the Agent, and thereafter shall be binding upon such party and the Agent and their respective permitted successors and assigns, and shall inure to the benefit of such party, the Agent and the other Secured Parties and their respective permitted successors and assigns, except that no Grantor or Pledgor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except with the prior written consent of the Administrative Agent. This Agreement shall be construed as a separate agreement with respect to each party and may be amended, modified, supplemented, waived or released in accordance with Section 5.09.

Section 5.05. Successors and Assigns. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Pledgor or Grantor or the Agent that are contained in this Agreement shall bind and inure to the benefit of their respective permitted successors and assigns. The Agent hereunder shall at all times be the same person that is the "Collateral Agent" under the Credit Agreement. Written notice of resignation by the "Collateral Agent" pursuant to the Credit Agreement shall also constitute notice of resignation as the Agent under this Agreement. Upon the acceptance of any appointment as the "Collateral Agent" under the Credit Agreement by a successor "Collateral Agent", that successor "Collateral Agent" shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent pursuant hereto.

Section 5.06. Agent's Fees and Expenses; Indemnification.

(a) The parties hereto agree that the Agent shall be entitled to reimbursement of its expenses incurred hereunder and indemnification as provided in Section 13.5 of the Credit Agreement.

(b) Any such amounts payable as provided hereunder shall be additional Obligations secured hereby and by the other Security Documents. The provisions of this Section 5.06 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Credit Document, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Credit Document, or any investigation made by or on behalf of the Agent or any other Secured Party.

Section 5.07. Agent Appointed Attorney-in-Fact. Each Pledgor and Grantor hereby appoints the Agent the attorney-in-fact of such Pledgor or Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest (it being understood that no rights shall be exercised under such power of attorney unless an Event of Default has occurred and is continuing). Without limiting the generality of the foregoing, subject to applicable Requirements of Law, the Agent shall have the right, upon the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Agent's

name or in the name of such Pledgor or Grantor, (a) to receive, indorse, assign or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof, (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to ask for, demand, sue for, collect, receive and give acquittance for any and all moneys due or to become due under and by virtue of any Collateral; (d) to sign the name of any Pledgor or Grantor on any invoice or bill of lading relating to any of the Collateral; (e) to send verifications of Accounts to any Account Debtor; (f) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (g) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (h) to notify, or to require any Pledgor or Grantor to notify, Account Debtors to make payment directly to the Agent; and (i) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Pledgor or Grantor for any act or failure to act hereunder, except for their own or their Related Parties' gross negligence, bad faith, or willful misconduct.

Section 5.08. GOVERNING LAW; JURISDICTION; VENUE; WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.

(a) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b) THE TERMS OF SECTIONS 13.13 AND 13.15 OF THE CREDIT AGREEMENT ARE INCORPORATED HEREIN BY REFERENCE, *MUTATIS MUTANDIS*, AND THE PARTIES HERETO AGREE TO SUCH TERMS.

(c) EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED IN SECTION 5.01. NOTHING IN THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVICE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 5.09. Waivers; Amendment.

(a) No failure or delay by the Agent, any Issuing Bank, any Lender or any other Secured Party in exercising any right, power or remedy hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy, or any abandonment or discontinuance of steps to enforce such a right, power or remedy, preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The rights, powers and remedies of the Agent, any Issuing Bank, the Lenders or any other Secured Party hereunder and under the other Credit Documents are cumulative and are not exclusive of any rights, powers or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Credit Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.09, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan or the issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Agent, any Lender, any Issuing Bank or any other Secured Party may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof or of any other Security Document may be waived, amended, supplemented or modified except pursuant to an agreement or agreements in writing entered into by the Agent and the Credit Party or Credit Parties with respect to which such waiver, amendment, supplement or modification is to apply, subject to any consent required in accordance with Section 13.1 of the Credit Agreement. The Agent may conclusively rely on a certificate of an Authorized Officer of the Borrower as to whether any amendment contemplated by this Section 5.09(b) is permitted.

Section 5.10. Severability. In the event any one or more of the provisions contained in this Agreement or in any other Credit Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby. The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 5.11. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract, and shall become effective as provided in Section 5.04. Delivery of an executed counterpart to this Agreement by facsimile or electronic transmission shall be as effective as delivery of a manually signed original.

Section 5.12. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 5.13. Termination or Release.

(a) This Agreement, the pledges made herein, the Security Interest and all other security interests granted hereby shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors and/or Grantors upon Payment in Full.

(b) A Subsidiary Party shall automatically be released from its obligations hereunder and/or the security interests in any Collateral shall in each case be automatically released upon the occurrence of any of the circumstances set forth in Section 13.17 of the Credit Agreement, in each case, to the extent Section 13.17 provides for such automatic release, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to any applicable Subsidiary Party.

(c) In connection with any termination or release pursuant to paragraph (a), or (b) of this Section 5.13,

the Agent shall execute and deliver to any Pledgor or Grantor, at such Pledgor's or Grantor's expense, all documents that such Pledgor or Grantor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral that may be in the possession of the Agent and has not theretofore been sold or otherwise applied or released pursuant to this Agreement (it being understood that the Agent may rely conclusively on a certificate delivered to it by a Responsible Officer of the Grantor upon its reasonable request that any Disposition was done in compliance with the terms of the Credit Documents). Any execution and delivery of documents pursuant to this Section 5.13 shall be without recourse to or warranty by the Agent. In connection with any release pursuant to paragraph (a) or (b) above, the Pledgors or Grantors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements. Upon the receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the Borrower, the Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Agreement or the Security Documents. Upon the request of the Agent, the Grantor shall have delivered to the Agent a certification by an Authorized Officer of the Grantor stating that (i) any Disposition giving rise to any such termination or release was in compliance with the Credit Documents and (ii) no Collateral other than the Collateral required to be released is being released from Liens hereunder.

(d) Additional Subsidiaries. Upon execution and delivery by the Agent and any Subsidiary that is required to become a party hereto by Section 9.9 of the Credit Agreement of an instrument in the form of Exhibit I hereto, such Subsidiary shall become a Subsidiary Party hereunder with the same force and effect as if originally named as a Subsidiary Party herein. The execution and delivery of any such instrument shall not require the consent of any other party to this Agreement. The rights and obligations of each party to this Agreement shall remain in full force and effect notwithstanding the addition of any new party to this Agreement.

Section 5.14. Right of Set-off. After the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders and Issuing Banks provided by Requirements of Law, each Lender, each Issuing Bank and their respective Affiliates, at any time, shall have the right, without prior notice to any Grantor, any such notice being expressly waived by the Grantors to the extent permitted by applicable Requirements of Law, against any amount due and payable by the Borrower or any Restricted Subsidiary hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, such Issuing Bank or any of their respective Affiliates, branches or agencies thereof to or for the credit or the account of the any Grantor. Each Lender or Issuing Bank agrees promptly to notify the Borrower (and the Restricted Subsidiaries, if applicable) and the Administrative Agent after any such set-off and application made by such Lender, such Issuing Bank or their respective Affiliates; provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of each Lender under this Section 5.15 are in addition to other rights and remedies (including other rights of set off) that such Lender may have.

Section 5.15. Subordination. Notwithstanding any provision of this Agreement to the contrary, all rights of the Grantors and Pledgors (other than the Borrower) to indemnity, contribution or subrogation under applicable law or otherwise shall be fully subordinated to the Payment in Full of the Obligations. No failure on the part of the Borrower or any other Grantor or Pledgor to make the payments required under applicable law or otherwise shall in any respect limit the obligations and liabilities of any Grantor or Pledgor with respect to its obligations hereunder, and each Grantor or Pledgor shall remain liable for the full amount of the obligations of such Grantor or Pledgor hereunder. Each Grantor and Pledgor (other than the Borrower) hereby agrees all Indebtedness owed to it by any other Grantor or Pledgor shall be subordinated in accordance with the terms of the Intercompany Note.

Section 5.16. Limitation of Liability. The parties agree that, notwithstanding any provision hereof to the contrary, the maximum liability of each Grantor and each Pledgor hereunder shall in no event exceed the amount which can be secured by such Grantor or Pledgor under applicable federal and state law relating to the insolvency of debtors.

Section 5.17. Survival of Agreement. All covenants, agreements, representations and warranties made by the

Grantors and the Pledgors hereunder and in the other Credit Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Credit Documents, the making of any Loans and issuance of any Letters of Credit and the provision of services under Secured Cash Management Agreements or Secured Hedge Agreements, regardless of any investigation made by any Secured Party or on its behalf and notwithstanding that any Secured Party may have had notice or knowledge of any Default at the time any credit is extended under the Credit Agreement, and shall continue in full force and effect as long as this Agreement has not been terminated or released pursuant to Section 5.13 above.

**[Signature Pages Follow]**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**SN EF UNSUB HOLDINGS, LLC**

By: /s/ Eduardo A. Sanchez
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB GP, LLC**

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**JPMORGAN CHASE BANK, N.A.,**
as Collateral Agent and Administrative Agent

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer

Schedule I
to the Collateral Agreement

**Subsidiary Parties**

1. None.

Schedule II
to the Collateral Agreement

**Pledged Stock; Debt Securities**

A. Pledged Stock

| Loan Party | Issuer | Type of Equity Interest[5] | Certificate Number/ Uncertificated | Number of Shares Owned (Common Shares Unless Noted Otherwise) | Percentage of Ownership | Percentage of Ownership Pledged |
|---|---|---|---|---|---|---|
| SN EF UnSub Holdings, LLC | SN EF UnSub, LP | Partnership Interest | N/A | 100% | 100% | 100% |
| SN EF UnSub GP, LLC | SN EF UnSub, LP | Non-Economic General Partner Interest | N/A | N/A | 100% | 100% |

B. Pledged Debt Securities

| Loan Party | Debtor | Description of Indebtedness | Outstanding Principal Amount | Excluded Asset (Y/N) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

[5] If Equity interest is an interest in a limited partnership or an interest in a limited liability company, indicate whether or not the interest is a "security" under Article 8 of the UCC.

<u>Schedule III</u>
to the Collateral Agreement

**Intellectual Property**

**Copyright**

None.

**Patents**

None.

**Trademarks**

None.

Schedule IV
to the Collateral Agreement

**Securities Accounts**

None.

Schedule V
to the Collateral Agreement

**Deposit Accounts**

| | |
|---|---|
| **Entity:** | **SN EF UnSub, LP** |
| **Institution:** | **JPMorgan Chase Bank, N.A.** |
| **Account No.:** | **110958532** |
| **Type:** | **Deposit** |
| **Tax ID:** | **36-4855302** |

Schedule VI
to the Collateral Agreement

**Commodity Accounts**

None.

<u>Schedule VII</u>
to the Collateral Agreement

**<u>Commercial Tort Claims</u>**

None.

Exhibit I
to the Collateral Agreement

SUPPLEMENT NO. ______ dated as of ____________________ (this "Supplement"), to the Collateral Agreement dated as of March 1, 2017 (as heretofore amended and/or supplemented, the "Collateral Agreement"), among SN EF UnSub, LP, a Delaware limited liability company (the "Borrower"), each Subsidiary Party party thereto, SN EF UnSub Holdings LLC, SN EF UnSub GP, LLC and JPMORGAN CHASE BANK, N.A., as Collateral Agent (in such capacity, the "Agent") and Administrative Agent for the Secured Parties.

A. Reference is made to the Credit Agreement dated as of March 1, 2017 (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders and agents party thereto from time to time, the Agent and the other parties named therein.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the Collateral Agreement referred to therein.

C. The Pledgors and Grantors have entered into the Collateral Agreement in order to induce the Lenders to make Loans and each Issuing Bank to issue Letters of Credit. Section 5.14 of the Collateral Agreement provides that additional Subsidiaries may become Subsidiary Parties under the Collateral Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Subsidiary Party under the Collateral Agreement in order to induce the Lenders to make additional Loans and each Issuing Bank to issue additional Letters of Credit and as consideration for Loans previously made and Letters of Credit previously issued.

Accordingly, the Agent and the New Subsidiary agree as follows:

SECTION 1. In accordance with Section 5.14 of the Collateral Agreement, the New Subsidiary by its signature below becomes a Subsidiary Party and a Pledgor and Grantor under the Collateral Agreement with the same force and effect as if originally named therein as a Subsidiary Party and a Pledgor and Grantor, and the New Subsidiary hereby (a) agrees to all the terms and provisions of the Collateral Agreement applicable to it as a Subsidiary Party and Pledgor and Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Pledgor and Grantor thereunder are true and correct in all material respects on and as of the date hereof. In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of the Obligations, does hereby create and grant to the Agent, its successors and assigns, for the benefit of the Secured Parties, their successors and assigns, a security interest in and Lien on all the New Subsidiary's right, title and interest in and to the Collateral of the New Subsidiary; provided that, for the avoidance of doubt, Collateral shall exclude any Property constituting an Excluded Asset while such Property constitutes an Excluded Asset. Each reference to a "Subsidiary Party" or a "Pledgor" or a "Grantor" in the Collateral Agreement shall be deemed to include the New Subsidiary. The Collateral Agreement is hereby incorporated herein by reference.

SECTION 2. The New Subsidiary represents and warrants to the Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to (a) the effects of bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or other similar laws affecting creditors' rights generally, (b) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) and (c) implied covenants of good faith and fair dealing.

SECTION 3. This Supplement may be executed in two or more counterparts, each of which shall constitute an original but all of which when taken together shall constitute but one contract. This Supplement shall become effective when the Agent shall have received a counterpart of this Supplement that bears the signature of the New Subsidiary. Delivery of an executed signature page to this Supplement by facsimile or electronic transmission shall be as effective as delivery of a manually signed counterpart of this Supplement.

SECTION 4. The New Subsidiary hereby represents and warrants that (a) set forth on Schedule I attached hereto is a true and correct schedule of the percentage owned by the New Subsidiary of the issued and outstanding Equity Interests issued

by each Restricted Subsidiary of the New Subsidiary (including all Pledged Stock), and all evidences of Indebtedness for borrowed money and obligations evidenced by bonds, debentures, notes, loan agreements or similar instruments issued to or owned by the New Subsidiary (including all Pledged Debt Securities), in each case set forth in this clause (a) owned by the New Subsidiary as of the date hereof, (b) set forth on Schedule II attached hereto is a true and correct schedule of all Intellectual Property constituting United States registered Trademarks, Patents and Copyrights as of the date hereof, (c) set forth on Schedule III hereto is a true and complete schedule of all Securities Accounts of the New Subsidiary as of the date hereof, (d) set forth on Schedule IV hereto is a true and complete schedule of all Deposit Accounts of the New Subsidiary as of the date hereof, (e) set forth on Schedule V hereto is a true and complete schedule of all Commodity Accounts of the New Subsidiary as of the date hereof, (f) set forth on Schedule VI hereto is a true and complete schedule of all Commercial Tort Claims of the New Subsidiary as of the date hereof, and (g) set forth under its signature hereto, is the true and correct legal name of the New Subsidiary, its jurisdiction of formation and organizational ID number as of the date hereof.

SECTION 5. Except as expressly supplemented hereby, the Collateral Agreement shall remain in full force and effect.

SECTION 6. **THIS SUPPLEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 7. In the event any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Collateral Agreement shall not in any way be affected or impaired thereby.

SECTION 8. All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the Collateral Agreement.

SECTION 9. The New Subsidiary agrees to reimburse the Agent for its reasonable out-of-pocket expenses in connection with this Supplement to the extent consistent with Section 13.5 of the Credit Agreement, including the reasonable fees, disbursements and other charges of counsel for the Agent.

IN WITNESS WHEREOF, the New Subsidiary has duly executed this Supplement to the Collateral Agreement as of the day and year first above written.

**[Name of New Subsidiary]**

By: ____________________
Name: ____________________
Title: ____________________

Schedule I
to Supplement No. __ to the
Collateral Agreement

**Pledged Stock; Debt Securities**

A. Pledged Stock

| Loan Party | Issuer | Type of Equity Interest[6] | Certificate Number/ Uncertificated | Number of Shares Owned (Common Shares Unless Noted Otherwise) | Percentage of Ownership | Percentage of Ownership Pledged |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

B. Pledged Debt Securities

| Loan Party | Debtor | Description of Indebtedness | Outstanding Principal Amount | Excluded Asset (Y/N) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

[6] If Equity interest is an interest in a limited partnership or an interest in a limited liability company, indicate whether or not the interest is a "security" under Article 8 of the UCC.

Schedule II
to Supplement No. __ to the
Collateral Agreement

**Intellectual Property**

**Copyright**

**Patents**

**Trademarks**

<u>Schedule III</u>
to Supplement No. __ to the
Collateral Agreement

**<u>Securities Accounts</u>**

Schedule IV
to Supplement No. __ to the
Collateral Agreement

**Deposit Accounts**

<u>Schedule V</u>
to Supplement No. __ to the
Collateral Agreement

**<u>Commodity Accounts</u>**

Schedule VI
to Supplement No. __ to the
Collateral Agreement

**Commercial Tort Claims**

Exhibit II
to the Collateral Agreement

**Form of Perfection Certificate**

See attached.

**PERFECTION CERTIFICATE**

Reference is made to (i) the Credit Agreement dated as of March 1, 2017 (as amended, restated, amended and restated, modified, waived and/or supplemented from time to time, the "Credit Agreement"), among SN EF UnSub, LP (the "Company" or the "Borrower"), JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent and the Lenders and agents from time to time parties thereto and (ii) the Collateral Agreement dated as of March 1, 2017 (the "Collateral Agreement"), among the Borrower, the Subsidiary Parties (as defined therein), Holdings (as defined therein), Parent (as defined therein, and together with Holdings, collectively, the "Parent Pledgors") and JPMorgan Chase Bank, N.A., as Collateral Agent. Capitalized terms used but not defined herein have the meanings assigned in the Credit Agreement or the Collateral Agreement, as applicable.

The undersigned, an Authorized Officer of the Borrower, an Authorized Officer of Holdings and an Authorized Officer of Parent, hereby certify on the Closing Date to the Collateral Agent, Administrative Agent and each other Secured Party on behalf of the Credit Parties and the Parent Pledgors as applicable (the Credit Parties and the Parent Pledgors being, collectively, the "Relevant Parties") as follows:

SECTION 1. Names. (a) Set forth on Schedule 1(a) is, as of the Closing Date, (i) the exact legal name of each Relevant Party, as such name appears in its certificate of organization or like document (ii) each other legal name such Relevant Party has had in the past five years, together with the date of the relevant name change, (iii) each other name used by each Relevant Party on any filings with the Internal Revenue Service at any time within the five years preceding the date hereof and (iv) to its knowledge, all other names or trade names under which it currently conducts business.

(a) Except as set forth on Schedule 1(b) and for the Acquisition, no Relevant Party has changed its identity or corporate structure or entered into a similar reorganization in any way within the past five years. Changes in identity or corporate structure would include mergers, consolidations and acquisitions of all or substantially all of the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) a Person or other acquisitions of material assets outside the ordinary course of business, as well as any change in the form, nature or jurisdiction of organization or otherwise. With respect to any such change that has occurred within the past five years, Schedules 1(a), 1(b) and 2 set forth the information required by Sections 1 and 2 of this Perfection Certificate as to each acquiree or constituent party to such merger, consolidation or acquisition. Except as set forth in Schedule 1(b), no Credit Party has changed its jurisdiction of organization at any time during the past twelve months.

(b) Set forth on Schedule 1(c) is the exact legal name of each direct and indirect Subsidiary of the Borrower, as such name appears in its certificate of organization or like document as of the Closing Date.

SECTION 2. Jurisdictions and Locations. Except as set forth on Schedule 2, as of the Closing Date, each Relevant Party is a registered organization and set forth on Schedule 2 is (i) the jurisdiction of organization and the form of organization of each Relevant Party, (ii) the organizational identification number, if any, of such Relevant Party assigned by such jurisdiction and (iii) the address of the chief executive office of such Relevant Party.

SECTION 3. Stock Ownership and other Equity Interests. Set forth on Schedule 3 is, as of the Closing Date, a true and correct list, of all the issued and outstanding stock, partnership interests, limited liability company membership interests or other equity interest of the Borrower and the Borrower's Subsidiaries, and the record owners of such stock, partnership interests, membership interests or other equity interests, (a) specifying the issuer and certificate number (if any) of, and the number and percentage of ownership represented by, such equity interests and setting forth the percentage of such equity interests pledged under the Collateral Agreement and the other information to be shown in Schedule 3, and (b) if any such equity interest constitutes an Excluded Asset, identifying such equity interest as such.

SECTION 4. Debt Instruments. Set forth on Schedule 4 is, as of the Closing Date, a true and correct list, for each Credit Party, of all evidences of Indebtedness for borrowed money and all obligations evidenced by bonds, notes, debentures, loan agreements or similar instruments owned by such Credit Party as of the date hereof, including those that are required to be pledged under the Credit Agreement and the Security Documents, other than the Intercompany Note, stating if such indebtedness

is pledged under the Collateral Agreement and to the extent applicable, specifying the creditor and debtor thereunder and the outstanding principal amount thereof, and if any such indebtedness constitutes an Excluded Asset, identifying such indebtedness as such.

SECTION 5. Real Property. Set forth on (a) Schedule 5(a) is a true and correct list, for each Credit Party, of all real property owned by such Credit Party located in the United States as of the Closing Date and (b) Schedule 5(b) is a true and correct list, for each Credit Party, of all real property leased by such Credit Party located in the United States as of the Closing Date.

SECTION 6. Intellectual Property. (a) Set forth on Schedule 6(a) is a true and correct list, with respect to each Credit Party, of all United States patents and patent applications owned by such Credit Party as of the Closing Date (except, for the avoidance of doubt, as otherwise indicated on Schedule 6(a)), including the name of the owner, title, registration or application number of any registrations or applications.

(a) Set forth on Schedule 6(b) is a true and correct list, with respect to each Credit Party, of all United States trademark registrations and applications owned by such Credit Party as of the Closing Date (except, for the avoidance of doubt, as otherwise indicated on Schedule 6 (b)), including the name of the registered owner and the registration or application number of any registrations and applications.

(b) Set forth on Schedule 6(c) is a true and correct list, with respect to each Credit Party, of all United States copyright registrations and applications owned by such Credit Party as of the Closing Date (except, for the avoidance of doubt, as otherwise indicated on Schedule 6 (c)), including the name of the registered owner, title and the registration or serial number of any copyright registrations.

If any property listed in Schedule 6(a), 6(b) or 6(c), as applicable, constitutes an Excluded Asset, such Schedule shall identify such property as such.

SECTION 7. Letters of Credit. Set forth on Schedule 7 is a true and correct list of all Letters of Credit issued in favor of each Credit Party, as beneficiary thereunder, as of the Closing Date.

SECTION 8. Securities Accounts. Set forth in Schedule 8 is a true and correct list, for each Credit Party, of all Securities Accounts held by such Credit Party as of the Closing Date, specifying for each such Securities Account, the type of the Account, the name of the Account, the Account number and the name and the address of the securities intermediary maintaining such Account, and if such Securities Account constitutes an Excluded Account, identifying such Account as such.

SECTION 9. Deposit Accounts. Set forth in Schedule 9 is a true and correct list, for each Credit Party, of all Deposit Accounts held by such Credit Party as of the Closing Date, specifying for each such Deposit Account, the type of the Account, the name of the Account, the Account number and the name and the address of the bank maintaining such Account, and if such Deposit Account constitutes an Excluded Account, identifying such Account as such.

SECTION 10. Commodity Accounts. Set forth in Schedule 10 is a true and correct list, for each Credit Party, of all Commodity Accounts held by such Credit Party as of the Closing Date, specifying for each such Commodity Account, the type of the Account, the name of the Account, the Account number and the name and the address of the commodity intermediary maintaining such Account, and if such Commodity Account constitutes an Excluded Account, identifying such Account as such.

SECTION 11. Commercial Tort Claims. Set forth in Schedule 11 is a true and correct list, with respect to each Credit Party, of Commercial Tort Claims held by such Credit Party as of the Closing Date, specifying the Credit Party/plaintiff, the defendant and a description of the claim adequate for perfection under Section 9-108 of the UCC and, if any such Commercial Tort Claim constitutes an Excluded Asset, identifying such Commercial Tort Claim as such.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned has caused this Perfection Certificate to be executed and delivered as of the date first above written.

**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**SN EF UNSUB, LLC**

By: /s/ Eduardo A. Sanchez
Name: Eduardo A. Sanchez
Title: President

**SN EF UNSUB GP, LLC**

By: /s/ Cameron W. George
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

Case 4:19-34508 Document 1354-16 Filed in TXSB on 06/28/20 Page 1247 of 1765

Accepted and Agreed to:

**JPMORGAN CHASE BANK, N.A.,**
as Administrative Agent

By: /s/ Darren Vanek
Name: Darren Vanek
Title: Authorized Officer

**Schedule 1(a)**
**Legal and Other Names**

None.

**Schedule 1(b)**
**Changes in Identity, Corporate Structure and Jurisdiction of Organization**

None.

**Schedule 1(c)**
**Subsidiaries**

None.

**Schedule 2**

**Jurisdiction and Locations**

| Relevant Party | Jurisdiction & Form of Organization | Organizational ID Number | Chief Executive Office |
|---|---|---|---|
| **SN EF UNSUB, LP** | Delaware, limited partnership | 6257670 | 1000 Main Street, Suite 3000, Houston, Texas 77002 |
| **SN EF UNSUB HOLDINGS, LLC** | Delaware, limited liability company | 6257548 | 1000 Main Street, Suite 3000, Houston, Texas 77002 |
| **SN EF UNSUB GP, LLC** | Delaware, general partnership | 6257546 | 1000 Main Street, Suite 3000, Houston, Texas 77002 |

**Schedule 3**

DESCRIPTION OF EQUITY INTERESTS ISSUED BY RESTRICTED SUBSIDIARIES

| EQUITY INTERESTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **PLEDGOR** | **ISSUER** | **TYPE OF EQUITY INTEREST** | **PAR VALUE** | **CERTIFICATE NO (S).** | **NUMBER OF SHARES** | **EQUITY INTEREST OWNED BY PLEDGOR AS A PERCENTAGE OF ALL OUTSTANDING EQUITY INTERESTS ISSUED BY ISSUER** | **EQUITY INTEREST PLEDGED BY PLEDGOR AS A PERCENTAGE OF TOTAL EQUITY INTEREST OWNED BY PLEDGOR IN ISSUER** |
| SN EF UnSub Holdings, LLC | SN EF UnSub, LP | Partnership Interest | N/A | N/A | N/A | 100% | 100% |
| SN EF UnSub GP, LLC | SN EF UnSub, LP | Non-Economic General Partner Interest | N/A | N/A | N/A | 100% | 100% |

**Schedule 4**

**Debt Instruments**

None.

**Schedule 5(a)**

**Owned Real Property**

None.

Case 19-34508 Document 1354-17 Filed in TXSB on 11/23/20 Page 255 of 385

**Schedule 5(b)**
**Leased Real Property**

See attached, which will be applicable to the Borrower as of the Closing Date.

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2019 | TX | Dimmit | 329 | 131 | 7000 |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | TX | Dimmit | 385 | 752 | 14931 |
| BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | TX | Dimmit | 387 | 582 | 15240 |
| JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | TX | Dimmit | 399 | 695 | 17211 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | TX | Dimmit | 399 | 709 | 17215 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | TX | Dimmit | 399 | 712 | 17216 |
| ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2014 | TX | Dimmit | 406 | 729 | 18412 |
| MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2014 | TX | Dimmit | 417 | 612 | 19856 |
| KINGDON R HUGHES FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2014 | TX | Dimmit | 425 | 589 | 21253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 445 | 620 | 24591 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 445 | 628 | 24593 |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | 05/31/2015 | TX | Dimmit | 445 | 624 | 24592 |
| SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 445 | 636 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 445 | 632 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 667 | 26041 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 654 | 26037 |
| NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 664 | 26040 |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 660 | 26039 |
| MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 648 | 26035 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 630 | 26029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 642 | 26033 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 651 | 26036 |
| MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 627 | 26028 |
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 636 | 26031 |
| ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 645 | 26034 |
| DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 456 | 469 | 26264 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 639 | 26032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 657 | 26038 |
| CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 454 | 633 | 26030 |
| UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 461 | 254 | 26955 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | TX | Dimmit | 463 | 89 | 27233 |
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | TX | Dimmit | 463 | 85 | 27232 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2019 | TX | Dimmit | 329 | 397 | 7052 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2019 | TX | Dimmit | 338 | 617 | 8649 |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | TX | Dimmit | 409 | 226 | 18821 |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | TX | Dimmit | 409 | 229 | 18822 |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | TX | Dimmit | 409 | 232 | 18823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2019 | TX | Dimmit | 335 | 276 | 8081 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2010 | TX | Dimmit | 338 | 621 | 8650 |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | 05/06/2010 | 05/06/2018 | TX | Dimmit | 387 | 585 | 15241 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | 05/01/2017 | TX | Dimmit | 343 | 325 | 9442 |
| ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | TX | Dimmit | 496 | 197 | 31626 |
| JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | TX | Dimmit | 496 | 194 | 31625 |
| SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | TX | Dimmit | 500 | 6 | 32007 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2012 | TX | Dimmit | 338 | 631 | 8652 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2010 | TX | Dimmit | 338 | 636 | 8653 |
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2010 | TX | Dimmit | 338 | 626 | 8651 |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | TX | Dimmit | 385 | 255 | 14820 |
| MARY MARSHALL SMITH TRUST FBO MARGARET M MURDOCK | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | TX | Dimmit | 385 | 262 | 14821 |
| ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | 02/08/1973 | TX | Dimmit | 27 | 384 | 113502 |
| FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | 02/13/1973 | TX | Zavala | 3 | 172 | 113530 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | 03/01/1978 | TX | Zavala | 3 | 251 | 113554 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | TX | Zavala | 3 | 578 | 113797 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | TX | Zavala | 3 | 582 | 113798 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | TX | Zavala | 3 | 586 | 113799 |
| ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | TX | Zavala | 3 | 590 | 113800 |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | 01/09/1979 | TX | Dimmit<br>Zavala | 29<br>4 | 86<br>425 | 129<br>114336 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | 05/06/1974 | TX | Dimmit | 29 | 322 | 114642 |
| MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | 05/16/1974 | TX | Dimmit | 29 | 332 | 114666 |
| G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | TX | Dimmit | 29 | 355 | 114678 |
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | TX | Dimmit | 29 | 377 | 114700 |
| L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | TX | Dimmit | 29 | 381 | 114700-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | TX | Dimmit | 29 | 366 | 114736 |
| RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | 06/06/1974 | TX | Dimmit | 29 | 359 | 114737 |
| JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | TX | Dimmit | 29 | 469 | 114826 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | TX | Dimmit | 30 | 10 | 114829 |
| ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | TX | Dimmit | 31 | 330 | 693 |
| LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | 06/26/1975 | TX | Dimmit | 31 | 464 | 841 |
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | TX | Dimmit | 33 | 505 | 2577 |
| PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | 11/10/1976 | TX | Dimmit | 39 | 193 | 1997 |
| MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | TX | Dimmit | 147 | 136 | 779 |
| CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | TX | Dimmit | 37 | 257 | 300984 |
| OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | TX | Dimmit<br>Zavala | 97<br>55 | 145<br>185 | 1086<br>46827 |
| B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | TX | Dimmit | 29 | 293 | T16318 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | 05/30/1994 | TX | Zavala | 57 | 53 | NA |
| ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | TX | Zavala | 57 | 68 | 48131 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | TX | Zavala | 57 | 65 | 48130 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | TX | Zavala | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | 02/08/1987 | TX | Dimmit | 82 | 666 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | TX | Dimmit | 82 | 671 | 546 |
| MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | TX | Dimmit | 82 | 676 | |
| I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | 04/01/1980 | TX | Dimmit | 33 | 122 | 800045 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | TX | Dimmit | 30 | 460 | 800046 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | TX | Dimmit | 30 | 270 | 229 |
| SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | 04/18/1975 | TX | Dimmit | 30 | 495 | 458 |
| ERIN BAIN JONES | W W OATMAN | 05/11/1970 | 05/11/1975 | TX | Dimmit | 31 | 186 | 4150 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2019 | TX | Webb | 2329 | 707 | 960221 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | 329 | 484 | 7078 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | 329 | 394 | 7051 |
| MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | 460<br>329 | 233<br>487 | 79160<br>7079 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit<br>LaSalle | 329<br>330<br>458<br>460 | 138<br>379<br>515<br>230 | 7002<br>7250<br>78892<br>79159 |
| DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | 11/05/2008 | 11/04/2011 | TX | Dimmit | 354 | 171 | 11322 |
| HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | 08/17/2018 | TX | Dimmit | 398 | 26 | 16937 |
| RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2018 | TX | Dimmit | 394 | 189 | 16294 |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 397 | 32 | 16768 |
| JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 397 | 26 | 16766 |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 397 | 35 | 16769 |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 397 | 38 | 16770 |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | TX | Dimmit | 397 | 29 | 16767 |
| BECKY DEWAN | ANADARKO E&P COMPANY LP | 11/16/2010 | 11/16/2018 | TX | Dimmit | 405 | 560 | 18184 |
| CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | 05/11/2019 | TX | Dimmit | 425 | 586 | 21252 |
| CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 492 | 764 | 31322 |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 492 | 759 | 31321 |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 492 | 754 | 31320 |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | TX | Dimmit | 492 | 750 | 31319 |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | 10/15/2019 | TX | Webb | 2435 | 504 | 977956 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | 10/15/2019 | TX | Webb | 2484 | 238 | 986336 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | TX | Webb | 2583 | 185 | 1003979 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | TX | Webb | 2583 | 182 | 1003978 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | TX | Maverick | 1041 | 67 | 144189 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | TX | Maverick | 1073 | 94 | 147028 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | TX | Maverick<br>Webb | 1041<br>2435 | 74<br>507 | 144190<br>977957 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | TX | Maverick<br>Webb | 1073<br>2528 | 108<br>616 | 147031<br>993897 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | 10/15/2019 | TX | Webb<br>Dimmit | 2435<br>339 | 499<br>561 | 977955<br>8823 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 06/09/2014 | TX | Maverick<br>Webb | 1067<br>2509 | 161<br>755 | 146519<br>990517 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | TX | Maverick | 1067 | 185 | 146523 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | TX | Maverick | 1067 | 173 | 146521 |
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | 03/01/2010 | TX | Maverck<br>Dimmit<br>Webb | 1076<br>369<br>2791 | 419<br>459<br>132 | 147391<br>12859<br>1044021 |
| DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | 02/01/2014 | TX | Maverick<br>Dimmit<br>Webb | 1281<br>405<br>3073 | 101<br>367<br>569 | 164624<br>18144<br>1098663 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | TX | Dimmit | 344 | 6 | 9540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2018 | TX | Dimmit | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | 04/03/2018 | TX | Dimmit | 439 | 695 | 23611 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | TX | Dimmit | 343 | 690 | 9504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2005 | 12/22/2008 | TX | Dimmit<br>Maverick | 332<br>1012 | 649<br>222 | 7649<br>141603 |



009384

Leases

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| EWING ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 09/20/2006 | 09/20/2009 | TX | Dimmit | 344 | 1 | 9539 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | 09/29/2009 | TX | Dimmit | 343 | 844 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | TX | Dimmit | 429 | 83 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | TX | Dimmit | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | TX | Dimmit | 430 | 766 | 22087 |
| SARAH JANE HENDERSON STRONSKY | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 470 | 833 | 28385 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 470 | 837 | 28386 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 471 | 1 | 28887 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 470 | 829 | 28384 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 471 | 5 | 28388 |
| ST TX MF-107481& DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | TX | Dimmit | 336 | 199 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | TX | Maverick<br>Webb | 1041<br>339 | 60<br>550 | 144183<br>8821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | TX | Maverick<br>Webb | 1073<br>344 | 99<br>128 | 147023<br>15489 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | TX | Dimmit | 344 | 46 | 9545 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | 06/14/2014 | TX | Dimmit | 423 | 49 | 20796 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2020 | TX | Dimmit | 445 | 66 | 24499 |
| AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 439 | 678 | 23607 |
| SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 439 | 674 | 23606 |
| THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 439 | 682 | 23608 |
| HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 439 | 670 | 23605 |
| RALPH H GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2018 | TX | Dimmit | 449 | 521 | 25265 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2021 | TX | Dimmit | 453 | 531 | 25849 |
| KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | 08/21/2021 | TX | Dimmit | 495 | 204 | 31491 |
| GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | TX | Dimmit | 495 | 208 | 31492 |
| CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | TX | Dimmit | 495 | 212 | 31493 |
| BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | TX | Dimmit | 495 | 216 | 31494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2016 | TX | Dimmit | 491 | 516 | 31083 |
| JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | TX | Dimmit | 504 | 77 | 32389 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | TX | Dimmit | 343 | 694 | 9505 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 08/03/2010 | 08/03/2017 | TX | Dimmit | 393 | 379 | 16162 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | TX | Dimmit | 393 | 398 | 16168 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | 08/03/2020 | TX | Dimmit | 393 | 382 | 16163 |
| MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | TX | Dimmit | 393 | 395 | 16167 |
| PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2018 | TX | Dimmit | 395 | 525 | 16565 |
| GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | 07/28/2020 | TX | Dimmit | 395 | 522 | 16564 |
| JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | TX | Dimmit | 395 | 528 | 16566 |
| MILDRED PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | TX | Dimmit | 420 | 759 | 20412 |
| LUCILLE J SWANSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | TX | Dimmit | 420 | 757 | 20411 |
| DENNIS PAT VANWEY ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2020 | TX | Dimmit | 420 | 762 | 20413 |
| HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | TX | Dimmit | 426 | 580 | 21449 |
| MARIE PREYSZ SCHOONOVER ET AL RECEIVERSH | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | TX | Dimmit | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2014 | TX | Dimmit | 429 | 541 | 21885 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2018 | TX | Dimmit | 445 | 70 | 24500 |
| BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | 08/22/2018 | TX | Dimmit | 456 | 530 | 26278 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | 11/14/2018 | TX | Dimmit | 505 | 738 | 32601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | 12/10/2018 | TX | Dimmit | 505 | 734 | 32600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | TX | Dimmit | 505 | 741 | 32602 |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | 10/15/2011 | TX | Webb | 2672 | 185 | 1020907 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | 12/31/2013 | TX | Webb | 2668 | 642 | 1020289 |
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | 07/31/2015 | TX | Webb | 2750 | 95 | 1036351 |
| ST TX MF-110291 & SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2009 | 03/06/2011 | TX | Dimmit | 369 | 468 | 12860 |
| G E LIGHT III TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit<br>LaSalle | 379<br>492 | 830<br>207 | 13825<br>84338 |
| GEORGE E LIGHT JR AND SARAH LIGHT TRUST1 | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit<br>LaSalle | 379<br>492 | 836<br>213 | 13826<br>84339 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit<br>LaSalle | 379<br>492 | 825<br>202 | 13824<br>84337 |
| ST TX M-110600 (PSL) -CHAPARRAL WILDLIFE | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | 01/28/2013 | TX | Dimmit<br>LaSalle | 391<br>513 | 488<br>32 | 15860<br>87603 |
| GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit | 380 | 11 | 13830 |
| GEORGE E LIGHT JR & SARAH LIGHT TRUST 1 | ST MARY LAND AND EXLPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit | 380 | 7 | 13829 |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit | 380 | 16 | 13831 |
| GEORGE E LIGHT III, BILLIE RAE LIGHT TR | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit | 380 | 1 | 13828 |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | TX | Dimmit | 379 | 840 | 13827 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | 10/15/2019 | TX | Dimmit | 382 | 13 | 14190 |
| MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | 02/23/2019 | TX | Dimmit | 383 | 654 | 14548 |
| DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | 04/30/2013 | TX | Dimmit | 385 | 526 | 14884 |
| CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | 05/06/2015 | TX | Dimmit | 387 | 456 | 15211 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | 06/29/2017 | TX | Dimmit | 388 | 648 | 15418 |
| MAUREEN RUSSO | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 389 | 719 | 15602 |
| MARTIN SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 393 | 388 | 16165 |
| PAUL L SHEEHAN | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 393 | 401 | 16169 |
| WILLIAM N SHEEHAN III | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 391 | 286 | 15828 |
| CATHY WIRE | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 391 | 649 | 15876 |
| IDA E SHEEHAN FORD | ANADARKO E&P COMPANY LP | 05/21/2010 | 05/21/2018 | TX | Dimmit | 393 | 728 | 16234 |
| ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2018 | TX | Dimmit | 450 | 641 | 25465 |
| CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2018 | TX | Dimmit | 450 | 637 | 25464 |
| MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | 08/15/2018 | TX | Dimmit | 455 | 623 | 26168 |
| SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | TX | Dimmit | 457 | 363 | 26401 |
| GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 390 | 550 | 15691 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 392 | 481 | 15990 |
| ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 392 | 484 | 15991 |
| ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 393 | 405 | 16170 |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 393 | 392 | 16166 |
| REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 393 | 408 | 16171 |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 393 | 411 | 16172 |
| DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | TX | Dimmit | 394 | 192 | 16295 |
| MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | 03/10/2018 | TX | Dimmit | 392 | 487 | 15992 |
| BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | 05/12/2018 | TX | Dimmit | 392 | 490 | 15993 |
| SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | TX | Dimmit | 395 | 565 | 16572 |
| TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | TX | Dimmit | 402 | 198 | 17629 |
| MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 785 | 22244 |
| MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 777 | 22242 |
| ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 769 | 22240 |
| ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 761 | 22238 |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 745 | 22234 |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 753 | 22236 |
| CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2018 | TX | Dimmit | 431 | 737 | 22232 |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 729 | 22230 |
| VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 809 | 22250 |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | 09/19/2019 | TX | Dimmit | 431 | 801 | 22248 |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | TX | Dimmit | 431 | 793 | 22246 |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | 08/24/2013 | TX | Dimmit | 393 | 385 | 16164 |
| BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | 07/09/2017 | TX | Dimmit | 393 | 414 | 16173 |
| MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2018 | TX | Dimmit | 393 | 318 | 16140 |
| KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2017 | TX | Dimmit | 394 | 147 | 16284 |
| BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | 03/25/2016 | TX | Dimmit | 409 | 667 | 18878 |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | TX | Dimmit | 410 | 828 | 19044 |
| ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | TX | Dimmit | 410 | 831 | 19045 |
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | 05/10/2016 | TX | Dimmit | 418 | 591 | 20043 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2016 | TX | Dimmit | 423 | 615 | 20919 |
| NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | TX | Dimmit | 439 | 702 | 23613 |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | TX | Dimmit | 439 | 714 | 23616 |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | TX | Dimmit | 439 | 698 | 23612 |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | TX | Dimmit | 439 | 710 | 23615 |
| SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | TX | Dimmit | 439 | 706 | 23614 |
| PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | 06/27/2016 | TX | Dimmit | 482 | 325 | 30186 |
| CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | TX | Dimmit | 482 | 322 | 30185 |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | TX | Dimmit | 482 | 310 | 30181 |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | TX | Dimmit | 482 | 313 | 30182 |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | TX | Dimmit | 482 | 316 | 30183 |
| BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | TX | Dimmit | 482 | 307 | 30180 |
| EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | 05/01/2016 | TX | Dimmit | 482 | 319 | 30184 |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | TX | Dimmit | 500 | 316 | 32057 |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | TX | Dimmit | 502 | 65 | 32199 |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | TX | Dimmit | 512 | 193 | 33490 |
| JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 512 | 196 | 33491 |
| PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | TX | Dimmit | 516 | 704 | 34283 |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | TX | Dimmit | 516 | 701 | 34282 |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | TX | Dimmit | 515 | 582 | 34081 |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | TX | Dimmit | 515 | 579 | 34080 |
| KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | 04/06/2017 | TX | Dimmit | 517 | 546 | 34428 |
| NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 512 | 199 | 33492 |
| SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | TX | Dimmit | 515 | 576 | 34079 |
| WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | TX | Dimmit | 515 | 573 | 34078 |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 512 | 190 | 33489 |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 519 | 136 | 34644 |
| JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 519 | 128 | 34642 |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 519 | 132 | 34643 |
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 519 | 120 | 34640 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | 05/22/2016 | TX | Dimmit | 493 | 598 | 31425 |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 519 | 124 | 34641 |
| J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | 04/23/2017 | TX | Dimmit | 517 | 543 | 34427 |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | TX | Dimmit | 515 | 570 | 34077 |
| SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | TX | Dimmit | 519 | 821 | 34793 |
| ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | TX | Dimmit | 519 | 833 | 34796 |
| HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | TX | Dimmit | 519 | 825 | 34794 |
| JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | TX | Dimmit | 526 | 255 | 35599 |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | TX | Dimmit | 526 | 251 | 35598 |
| DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | TX | Dimmit | 519 | 829 | 34795 |
| ST TX M-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2015 | TX | Dimmit | 392<br>396 | 363<br>579 | 15971<br>16714 |
| BRAZORIA COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | 08/01/2010 | 08/01/2014 | TX | Dimmit | 392 | 370 | 15972 |
| DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 76 | 16475 |
| VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 73 | 16474 |
| SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 70 | 16473 |
| MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 67 | 16472 |
| MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 64 | 16471 |
| JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 61 | 16470 |
| JOAN MAYS | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 58 | 16469 |
| GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 52 | 16467 |
| DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | TX | Dimmit | 395 | 45 | 16465 |
| GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | 06/27/2014 | TX | Dimmit | 418 | 157 | 19936 |
| RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | TX | Dimmit | 416 | 589 | 19712 |
| JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | TX | Dimmit | 416 | 595 | 19714 |
| SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | TX | Dimmit | 416 | 592 | 19713 |
| BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | TX | Dimmit | 423 | 460 | 20887 |
| FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | TX | Dimmit | 423 | 463 | 20888 |
| MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | TX | Dimmit | 423 | 466 | 20889 |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | TX | Dimmit | 423 | 469 | 20890 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | TX | Dimmit | 423 | 457 | 20886 |
| EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | 06/07/2014 | TX | Dimmit | 423 | 453 | 20885 |
| DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | 08/30/2014 | TX | Dimmit | 420 | 224 | 20343 |
| SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | 08/02/2014 | TX | Dimmit | 420 | 221 | 20342 |
| CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | TX | Dimmit | 423 | 438 | 20881 |
| SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | TX | Dimmit | 423 | 441 | 20882 |
| MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | TX | Dimmit | 423 | 445 | 20883 |
| PHYLLIS E. MCELHENEY TRUST DTD 7/30/1992 | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2014 | TX | Dimmit | 425 | 311 | 21184 |
| R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | TX | Dimmit | 423 | 449 | 20884 |
| IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | TX | Dimmit | 427 | 390 | 21529 |
| JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | 10/31/2014 | TX | Dimmit | 427 | 407 | 21533 |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | TX | Dimmit | 427 | 412 | 2153 |
| JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | 10/10/2014 | TX | Dimmit | 427 | 399 | 21531 |
| BERTRICE F SCRIBNER MARCH 1988 TRUST | ANADARKO E&P COMPANY LP | 10/26/2011 | 10/26/2014 | TX | Dimmit | 427 | 394 | 21530 |
| JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | TX | Dimmit | 427 | 404 | 21532 |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | 01/19/2015 | TX | Dimmit | 433 | 125 | 22468 |
| DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | TX | Dimmit | 436 | 141 | 22996 |
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | TX | Dimmit | 436 | 125 | 22992 |
| DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | TX | Dimmit | 436 | 121 | 22991 |
| CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | TX | Dimmit | 436 | 133 | 22994 |
| GEORGE L SPRINGMAN REVOCABLE TRUST DTD | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | TX | Dimmit | 436 | 129 | 22993 |
| LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | TX | Dimmit | 436 | 145 | 22997 |
| DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | TX | Dimmit | 436 | 137 | 22995 |
| MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | 03/07/2015 | TX | Dimmit | 436 | 118 | 22990 |
| M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | TX | Dimmit | 439 | 749 | 23626 |
| MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | TX | Dimmit | 439 | 757 | 23628 |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | TX | Dimmit | 439 | 745 | 23625 |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | TX | Dimmit | 439 | 753 | 23627 |
| MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | TX | Dimmit | 442 | 304 | 24054 |
| KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | 10/22/2015 | TX | Dimmit | 457 | 360 | 26400 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| TEXAS LAND AND MINERAL COMPANY LLC ET AL | ANADARKO E&P COMPANY LP | 11/20/2012 | 11/20/2015 | TX | Dimmit | 458 | 290 | 26535 |
| GARY KOEHNE ET AL HEIRS RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 05/17/2013 | 05/17/2016 | TX | Dimmit | 478 | 227 | 29445 |
| MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | 08/02/2017 | TX | Dimmit | 392 | 360 | 15970 |
| EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 398 | 029 | 16938 |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 398 | 33 | 16939 |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 398 | 037 | 16940 |
| MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 398 | 041 | 16941 |
| KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 399 | 706 | 17214 |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 399 | 691 | 17210 |
| EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 399 | 702 | 17213 |
| JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 399 | 698 | 17212 |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 399 | 483 | 17170 |
| DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | TX | Dimmit | 400 | 113 | 17276 |
| SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | 07/14/2014 | TX | Dimmit | 399 | 715 | 17217 |
| DENNI DAVIS WASHBURN | ANADARKO E&P COMPANY LP | 11/08/2010 | 05/08/2017 | TX | Dimmit | 400 | 342 | 17324 |
| MARIE S MIEGEL | ANADARKO E&P COMPANY LP | 11/08/2010 | 05/08/2017 | TX | Dimmit | 400 | 348 | 17325 |
| ST TX MF-112121 & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 09/01/2010 | 09/01/2013 | TX | La Salle | 530 | 251 | 90198 |
| JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | 11/19/2019 | TX | Dimmit | 405 | 557 | 18183 |
| MARIEANNE HOLLARN AKA MARIANNE DUNAWAY | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2019 | TX | Dimmit | 410 | 169 | 18939 |
| JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2019 | TX | Dimmit | 410 | 163 | 18937 |
| ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | 02/03/2019 | TX | Dimmit | 412 | 384 | 19214 |
| CLARA SELF HARRIS | ANADARKO E&P COMPANY LP | 02/01/2012 | 02/01/2017 | TX | Dimmit | 433 | 143 | 22473 |
| ROBERT CHARLES VIVION | ANADARKO E&P COMPANY LP | 01/20/2012 | 01/20/2017 | TX | Dimmit | 431 | 722 | 22228 |
| GAY NELL WILLIAMS | ANADARKO E&P COMPANY LP | 02/01/2012 | 02/01/2017 | TX | Dimmit | 433 | 155 | 22476 |
| EARLENE HARRIS FOGLE | ANADARKO E&P COMPANY LP | 01/20/2012 | 01/20/2017 | TX | Dimmit | 433 | 151 | 22475 |
| RONNY O WARD | ANADARKO E&P COMPANY LP | 02/01/2012 | 02/01/2017 | TX | Dimmit | 433 | 147 | 22474 |
| HENRY LYNN HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2017 | TX | Dimmit | 433 | 129 | 22469 |
| JULIE ANN HARRIS RICE | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2017 | TX | Dimmit | 433 | 132 | 22470 |
| BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2020 | TX | Dimmit | 433 | 136 | 22471 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DEBRA HARRIS MOORE | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2017 | TX | Dimmit | 433 | 139 | 22472 |
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | 03/08/2018 | TX | Dimmit | 439 | 721 | 23618 |
| NITA SUE SANDERS | ANADARKO E&P COMPANY LP | 03/08/2012 | 03/08/2018 | TX | Dimmit | 439 | 724 | 23619 |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 03/08/2012 | 03/08/2018 | TX | Dimmit | 439 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 450 | 657 | 25469 |
| RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 450 | 669 | 25472 |
| SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 08/15/2012 | 08/15/2018 | TX | Dimmit | 450 | 661 | 25470 |
| VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 450 | 649 | 25467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | 07/12/2018 | TX | Dimmit | 450 | 673 | 25473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 450 | 665 | 25471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | 07/17/2017 | TX | Dimmit | 450 | 653 | 25468 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 455 | 118 | 26085 |
| MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2019 | TX | Dimmit | 467 | 91 | 27796 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 12/15/2014 | TX | Dimmit | 403 | 403 | 17810 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | 06/08/2016 | TX | Dimmit | 419 | 106 | 20117 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 06/15/2015 | TX | Dimmit | 403 | 409 | 17812 |
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | 11/05/2013 | TX | Dimmit | 403 | 400 | 17809 |
| WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 12/15/2016 | TX | Dimmit | 403 | 406 | 17811 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | 09/23/2015 | TX | Dimmit | 402<br>415 | 201<br>461 | 17630<br>19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | TX | Dimmit | 406 | 384 | 18328 |
| ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 406 | 388 | 18329 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 406 | 396 | 18331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | TX | Dimmit | 406 | 400 | 18332 |
| GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 406 | 392 | 18330 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | TX | Dimmit | 406 | 356 | 18321 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 406 | 364 | 18323 |
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | TX | Dimmit | 406 | 376 | 18326 |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 406 | 372 | 18325 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2016 | TX | Dimmit | 406 | 368 | 18324 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | TX | Dimmit | 406 | 360 | 18322 |
| PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 406 | 744 | 18416 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 406 | 380 | 18327 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 408 | 385 | 18688 |
| SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 408 | 389 | 18689 |
| BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 406 | 740 | 18415 |
| RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 406 | 732 | 18413 |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | TX | Dimmit | 406 | 736 | 18414 |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 408 | 393 | 18690 |
| DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | TX | Dimmit | 408 | 381 | 18687 |
| DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 418 | 148 | 19933 |
| BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | TX | Dimmit | 418 | 154 | 19935 |
| KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 418 | 151 | 19934 |
| JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | 09/22/2016 | TX | Dimmit | 422 | 387 | 20698 |
| ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 422 | 391 | 20699 |
| SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | 07/26/2016 | TX | Dimmit | 425 | 695 | 21287 |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | 11/25/2016 | TX | Dimmit | 401 | 548 | 17517 |
| EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | 02/25/2017 | TX | Dimmit | 406 | 681 | 18405 |
| RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2015 | TX | Dimmit | 445 | 640 | 24596 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2014 | TX | Dimmit | 405 | 563 | 18185 |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | 11/18/2015 | TX | Dimmit | 406 | 196 | 18282 |
| JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | 03/10/2016 | TX | Dimmit | 408 | 378 | 18686 |
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | 03/21/2011 | 03/21/2014 | TX | Dimmit | 406 | 724 | 18411 |
| JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2016 | TX | Dimmit | 409 | 664 | 18877 |
| GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | TX | Dimmit | 409 | 680 | 18882 |
| TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | TX | Dimmit | 409 | 677 | 18881 |
| CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | 04/20/2018 | TX | Dimmit | 409 | 674 | 18880 |
| JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | TX | Dimmit | 409 | 671 | 18879 |
| MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | 08/01/2014 | TX | Dimmit | 422 | 395 | 20700 |
| RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | TX | Dimmit | 427 | 735 | 21605 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | 04/02/2015 | TX | Dimmit | 445 | 61 | 24498 |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | 04/12/2015 | TX | Dimmit | 443 | 152 | 24176 |
| LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 646 | 23600 |
| ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 627 | 23596 |
| ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 651 | 23601 |
| JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 637 | 23598 |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | TX | Dimmit | 442 | 832 | 24143 |
| BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 656 | 23602 |
| MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 661 | 23603 |
| ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | TX | Dimmit | 435 | 797 | 22943 |
| MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | 06/06/2015 | TX | Dimmit | 445 | 56 | 24497 |
| LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 439 | 641 | 23599 |
| WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | 04/23/2015 | TX | Dimmit | 439 | 632 | 23597 |
| MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | TX | Dimmit | 456 | 521 | 26276 |
| DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | 01/22/2016 | TX | Dimmit | 465 | 235 | 27497 |
| FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | 09/08/2020 | TX | Dimmit | 427 | 741 | 21607 |
| JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | 11/02/2020 | TX | Dimmit | 427 | 738 | 21606 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | 01/31/2021 | TX | Dimmit | 435 | 803 | 22945 |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2018 | TX | Dimmit | 435 | 800 | 22944 |
| KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 453 | 539 | 25851 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | TX | Dimmit | 429 | 54 | 21790 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | TX | Dimmit | 429 | 64 | 21792 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | TX | Dimmit | 429 | 59 | 21791 |
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | TX | Dimmit | 429 | 69 | 21793 |
| JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2019 | TX | Dimmit | 433 | 114 | 22463 |
| MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | TX | Dimmit | 433 | 105 | 22460 |
| FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | TX | Dimmit | 433 | 111 | 22462 |
| JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | TX | Dimmit | 433 | 108 | 22461 |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2014 | TX | Dimmit | 432 | 480 | 22358 |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2014 | TX | Dimmit | 432 | 490 | 22360 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2014 | TX | Dimmit | 432 | 485 | 22359 |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2014 | TX | Dimmit | 432 | 475 | 22357 |
| MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2020 | TX | Dimmit | 437 | 511 | 23258 |
| GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2020 | TX | Dimmit | 437 | 505 | 23256 |
| LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2020 | TX | Dimmit | 437 | 508 | 23257 |
| DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | 01/01/2013 | TX | Dimmit | 379 | 258 | 13696 |
| RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | TX | Dimmit | 438 | 412 | 23402 |
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | TX | Dimmit | 438 | 409 | 23401 |
| JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | 03/29/2015 | TX | Dimmit | 438 | 407 | 23399 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | TX | Dimmit | 430 | 780 | 22089 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | TX | Dimmit | 430 | 759 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2015 | TX | Dimmit | 445 | 644 | 24597 |
| S AND C PROPERTIES | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2015 | TX | Dimmit | 445 | 654 | 24599 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2015 | TX | Dimmit | 445 | 649 | 24598 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | 07/10/2018 | TX | Dimmit | 450 | 645 | 25466 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | 06/01/2014 | TX | Dimmit | 444 | 569 | 24432 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | 04/30/2015 | TX | Dimmit | 442 | 828 | 24142 |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 439 | 691 | 23610 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | 01/24/2021 | TX | Dimmit | 432 | 700 | 22401 |
| ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | 04/27/2018 | TX | Dimmit | 445 | 74 | 24501 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | 05/01/2016 | TX | Dimmit | 439 | 666 | 23604 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 455 | 556 | 26162 |
| JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 455 | 563 | 26163 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | TX | Dimmit | 455 | 569 | 26164 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | TX | Dimmit | 455 | 550 | 26161 |
| JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2021 | TX | Dimmit | 455 | 575 | 26165 |
| MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | TX | Dimmit | 458 | 295 | 26536 |

Leases

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | 06/25/2018 | TX | Dimmit | 453 | 535 | 25850 |
| KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | TX | Dimmit | 456 | 505 | 26272 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | TX | Dimmit | 456 | 501 | 26271 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 459 | 512 | 26722 |
| MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | 10/16/2018 | TX | Dimmit | 459 | 528 | 26726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 459 | 524 | 26725 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 459 | 520 | 26724 |
| JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | 08/29/2018 | TX | Dimmit | 459 | 516 | 26723 |
| LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | TX | Dimmit | 455 | 655 | 26176 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | TX | Dimmit | 455 | 659 | 26177 |
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | TX | Dimmit | 455 | 663 | 26178 |
| THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | TX | Dimmit | 455 | 651 | 26175 |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 455 | 647 | 26174 |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | TX | Dimmit | 455 | 643 | 26173 |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 455 | 639 | 26172 |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | TX | Dimmit | 455 | 631 | 26170 |
| MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 452 | 794 | 25771 |
| SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 452 | 806 | 25774 |
| GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 452 | 802 | 25773 |
| CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 452 | 810 | 25775 |
| MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | TX | Dimmit | 455 | 627 | 26169 |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | TX | Dimmit | 452 | 786 | 25769 |
| MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 452 | 790 | 25770 |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2018 | TX | Dimmit | 452 | 798 | 25772 |
| SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 455 | 635 | 26171 |
| JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | 03/05/2016 | TX | Dimmit | 470 | 825 | 28383 |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | 03/07/2019 | TX | Dimmit | 469 | 63 | 28143 |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | TX | Dimmit | 469 | 55 | 28141 |
| SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | TX | Dimmit | 469 | 59 | 28142 |
| MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 474 | 280 | 28929 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 474 | 268 | 28926 |
| JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | 05/20/2016 | TX | Dimmit | 478 | 127 | 29425 |
| EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | 05/16/2018 | TX | Dimmit | 474 | 260 | 28924 |
| MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 474 | 256 | 28923 |
| MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 87 | 29417 |
| VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 92 | 29418 |
| RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 122 | 29424 |
| B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 117 | 29423 |
| JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 102 | 29420 |
| RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 97 | 29419 |
| AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 107 | 29421 |
| JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 478 | 112 | 29422 |
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | TX | Dimmit | 474 | 272 | 28927 |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | TX | Dimmit | 474 | 276 | 28928 |
| KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | TX | Dimmit | 474 | 264 | 28925 |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | 10/21/2018 | TX | Dimmit | 498 | 593 | 31859 |
| ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | TX | Dimmit | 498 | 597 | 31860 |
| JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | 09/26/2018 | TX | Dimmit | 498 | 589 | 31858 |
| MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | TX | Dimmit | 498 | 585 | 31857 |
| KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | TX | Dimmit | 498 | 581 | 31856 |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | 09/25/2018 | TX | Dimmit | 498 | 573 | 31854 |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | 10/02/2018 | TX | Dimmit | 498 | 577 | 31855 |
| LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | TX | Dimmit | 498 | 569 | 31853 |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | TX | Dimmit | 498 | 564 | 31852 |
| JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | 09/23/2018 | TX | Dimmit | 498 | 560 | 31851 |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | TX | Dimmit | 498 | 556 | 31850 |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | TX | Dimmit | 498 | 552 | 31849 |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | TX | Dimmit | 498 | 544 | 31847 |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | TX | Dimmit | 498 | 548 | 31848 |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | 09/10/2018 | TX | Dimmit | 498 | 540 | 31846 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | 08/07/2018 | TX | Dimmit | 498 | 532 | 31844 |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | TX | Dimmit | 498 | 536 | 31845 |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Dimmit | 498 | 529 | 31843 |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Dimmit | 498 | 524 | 31842 |
| MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2018 | TX | Dimmit | 498 | 520 | 31841 |
| ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Dimmit | 498 | 516 | 31840 |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Dimmit | 498 | 512 | 31839 |
| GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | TX | Dimmit | 498 | 601 | 31861 |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | TX | Dimmit | 500 | 798 | 32161 |
| KATHRYN KUNC | ANADARKO E&P COMPANY LP | 06/26/2012 | 06/26/2018 | TX | Dimmit | 457 | 209 | 26377 |
| HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | TX | Dimmit | 457 | 45 | 26336 |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | 06/15/2018 | TX | Dimmit | 457 | 217 | 26379 |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | 10/11/2018 | TX | Dimmit | 457 | 213 | 26378 |
| CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | 10/17/2018 | TX | Dimmit | 455 | 545 | 26160 |
| SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | 10/26/2015 | TX | Dimmit | 459 | 498 | 26719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | 01/16/2016 | TX | Dimmit | 462 | 418 | 27144 |
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | TX | Dimmit | 459 | 504 | 26720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | TX | Dimmit | 459 | 508 | 26721 |
| JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | TX | Dimmit | 459 | 494 | 26718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 11 | 27214 |
| EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 1 | 27212 |
| MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 6 | 27213 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 813 | 27206 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 828 | 27209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 838 | 27211 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 818 | 27207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 16 | 27215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 823 | 27208 |
| ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 21 | 27216 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 462 | 833 | 27210 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 337 | 27263 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 332 | 27262 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 327 | 27261 |
| JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 463 | 342 | 27264 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2019 | TX | Dimmit | 465 | 107 | 27477 |
| DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 466 | 121 | 27616 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 466 | 127 | 27617 |
| GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 466 | 133 | 27618 |
| LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 466 | 145 | 27620 |
| DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 466 | 139 | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | 08/01/2015 | TX | Dimmit | 498 | 608 | 31863 |
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | 04/25/2019 | TX | Dimmit | 473 | 112 | 28765 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2016 | TX | Dimmit | 476 | 288 | 29147 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2019 | TX | Dimmit | 476 | 292 | 29148 |
| ANIMAL HUMANE SOCIETY OF HENNEPIN COUNTY | ANADARKO E&P ONSHORE LLC | 04/30/2013 | 04/30/2016 | TX | Dimmit | 476 | 298 | 29150 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | 10/03/2018 | TX | Dimmit | 474 | 251 | 28919 |
| SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 573 | 31746 |
| RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 588 | 31749 |
| REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 578 | 31747 |
| SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2018 | TX | Dimmit | 498 | 605 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | 03/12/2019 | TX | Dimmit | 487 | 772 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | 09/19/2015 | TX | Dimmit | 498 | 612 | 31864 |
| JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | TX | Dimmit | 498 | 617 | 31866 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | TX | Dimmit | 498 | 614 | 31865 |
| LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 498 | 626 | 31870 |
| RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 498 | 629 | 31871 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 498 | 622 | 31868 |
| CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | TX | Dimmit | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | TX | Dimmit | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 500 | 792 | 32159 |
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 511 | 675 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 511 | 678 | 33418 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 511 | 684 | 33420 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | 12/04/2018 | TX | Dimmit | 511 | 681 | 33419 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 511 | 669 | 33415 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | 12/13/2016 | TX | Dimmit | 378 | 674 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | 02/06/2017 | TX | Dimmit | 508 | 167 | 32959 |
| JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | TX | Dimmit | 499 | 837 | 32005 |
| YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | TX | Dimmit | 500 | 1 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 512 | 370 | 33520 |
| WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 512 | 365 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | 05/20/2019 | TX | Dimmit | 518 | 9 | 34494 |
| EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | TX | Dimmit | 517 | 829 | 34489 |
| BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | 05/21/2019 | TX | Dimmit | 517 | 837 | 34491 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | TX | Dimmit | 519 | 483 | 34716 |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | 06/18/2019 | TX | Dimmit | 519 | 487 | 34717 |
| LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | 06/19/2019 | TX | Dimmit | 523 | 492 | 35222 |
| CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | TX | Dimmit | 523 | 496 | 35223 |
| RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | TX | Dimmit | 523 | 500 | 35224 |
| DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | 05/08/2019 | TX | Dimmit | 518 | 5 | 34493 |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | TX | Dimmit | 517 | 833 | 34490 |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | 05/19/2019 | TX | Dimmit | 518 | 1 | 34492 |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | TX | Dimmit | 519 | 507 | 34722 |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | TX | Dimmit | 519 | 499 | 34720 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | TX | Dimmit | 519 | 479 | 34715 |
| JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | TX | Dimmit | 519 | 491 | 34718 |
| BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | TX | Dimmit | 517 | 821 | 34487 |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | TX | Dimmit | 517 | 825 | 34488 |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | TX | Dimmit | 519 | 514 | 34724 |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | TX | Dimmit | 517 | 817 | 34486 |
| SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | 06/12/2019 | TX | Dimmit | 519 | 495 | 34719 |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | TX | Dimmit | 519 | 503 | 34721 |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | TX | Dimmit | 525 | 90 | 35423 |
| JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | 06/10/2019 | TX | Dimmit | 519 | 511 | 34723 |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | TX | Dimmit | 506 | 55 | 32616 |
| JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | 12/05/2018 | TX | Dimmit | 506 | 58 | 32617 |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | 11/22/2018 | TX | Dimmit | 506 | 61 | 32618 |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | TX | Dimmit | 506 | 64 | 32619 |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | TX | Dimmit | 506 | 68 | 32620 |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | TX | Dimmit | 506 | 74 | 32622 |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 78 | 32623 |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 82 | 32624 |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 86 | 32625 |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 90 | 32626 |
| SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 94 | 32627 |
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 104 | 32629 |
| VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | TX | Dimmit | 506 | 113 | 32631 |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 117 | 32632 |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | TX | Dimmit | 511 | 687 | 33421 |
| GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 511 | 695 | 33423 |
| JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 511 | 699 | 33424 |
| MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | 01/27/2019 | TX | Dimmit | 511 | 703 | 33425 |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | 02/14/2019 | TX | Dimmit | 511 | 707 | 33426 |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | 11/26/2018 | TX | Dimmit | 511 | 711 | 33427 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 511 | 714 | 33428 |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | TX | Dimmit | 511 | 718 | 33429 |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | TX | Dimmit | 511 | 722 | 33430 |
| JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | 02/18/2019 | TX | Dimmit | 511 | 726 | 33431 |
| JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | TX | Dimmit | 511 | 730 | 33432 |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | 02/12/2019 | TX | Dimmit | 517 | 767 | 34473 |
| ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | TX | Dimmit | 527 | 817 | 35845 |
| EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | 11/19/2018 | TX | Dimmit | 506 | 71 | 32621 |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 506 | 98 | 32628 |
| BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | TX | Dimmit | 506 | 109 | 32630 |
| JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | Dimmit | 511 | 691 | 33422 |
| ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | TX | Dimmit | 515 | 189 | 33970 |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | TX | Dimmit | 515 | 184 | 33969 |
| EDMUND SEVERN OLSEN III | ANADARKO E&P ONSHORE LLC | 06/10/2014 | 06/10/2017 | TX | Dimmit | 528 | 1 | 35851 |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | TX | Dimmit | 516 | 284 | 34192 |
| TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | TX | Dimmit | 516 | 272 | 34190 |
| JOHN MICHAEL VESTAL JR TRUST U/W/O LO | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | TX | Dimmit | 516 | 278 | 34191 |
| MARISSA LOUISE VESTAL TRUST U/W/O LOUISE | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | TX | Dimmit | 516 | 266 | 34189 |
| CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2019 | TX | Dimmit | 530 | 749 | 36343 |
| A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2019 | TX | Dimmit | 530 | 752 | 36344 |
| RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2019 | TX | Dimmit | 530 | 756 | 36345 |
| RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2019 | TX | Dimmit | 530 | 759 | 36346 |
| WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | 10/02/2019 | TX | Dimmit | 530 | 737 | 36339 |
| PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | TX | Dimmit | 530 | 734 | 36338 |
| REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | TX | Dimmit | 530 | 743 | 36341 |
| ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | 10/08/2019 | TX | Dimmit | 530 | 740 | 36340 |
| LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | 10/14/2019 | TX | Dimmit | 530 | 746 | 36342 |
| THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | 10/28/2019 | TX | Dimmit | 530 | 731 | 36337 |
| SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | 10/20/2019 | TX | Dimmit | 530 | 728 | 36336 |
| LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2019 | TX | Dimmit | 530 | 762 | 36347 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 532 | 751 | 36646 |
| ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | TX | Dimmit | 526 | 263 | 35601 |
| BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | TX | Dimmit | 526 | 259 | 35600 |
| SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | 06/16/2019 | TX | Dimmit | 527 | 28 | 35705 |
| CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | TX | Dimmit | 527 | 36 | 35707 |
| JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | TX | Dimmit | 525 | 364 | 35477 |
| KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | TX | Dimmit | 525 | 368 | 35478 |
| HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | TX | Dimmit | 525 | 360 | 35476 |
| RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | TX | Dimmit | 525 | 356 | 35475 |
| KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | TX | Dimmit | 527 | 40 | 35708 |
| FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | 08/04/2019 | TX | Dimmit | 527 | 32 | 35706 |
| TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2019 | TX | Dimmit | 534 | 310 | 36857 |
| AMFAR THE FOUNDATION FOR AIDS RESEARCH | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2017 | TX | Dimmit | 534 | 313 | 36858 |
| TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | TX | Dimmit | 534 | 307 | 36856 |
| GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | 06/11/2019 | TX | Dimmit | 527 | 821 | 35846 |
| RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | TX | Dimmit | 527 | 825 | 35847 |
| NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE LLC | 07/22/2014 | 07/22/2019 | TX | Dimmit | 527 | 829 | 35848 |
| JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | TX | Dimmit | 522 | 312 | 35105 |
| CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | TX | Dimmit | 532 | 357 | 36601 |
| BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | 09/11/2019 | TX | Dimmit | 532 | 367 | 36604 |
| JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | TX | Dimmit | 532 | 370 | 36605 |
| RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | 10/09/2019 | TX | Dimmit | 532 | 374 | 36606 |
| HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | 09/30/2019 | TX | Dimmit | 532 | 377 | 36607 |
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | TX | Dimmit | 532 | 380 | 36608 |
| CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | TX | Dimmit | 532 | 383 | 36609 |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 532 | 386 | 36610 |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 532 | 389 | 36611 |
| JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 532 | 392 | 36612 |
| BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | 10/21/2019 | TX | Dimmit | 532 | 395 | 36613 |
| JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | TX | Dimmit | 532 | 398 | 36614 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | TX | Dimmit | 532 | 403 | 36615 |
| DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 532 | 406 | 36616 |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | 09/22/2019 | TX | Dimmit | 532 | 409 | 36617 |
| SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | 10/13/2019 | TX | Dimmit | 532 | 364 | 36603 |
| GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | 10/27/2019 | TX | Dimmit | 532 | 361 | 36602 |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | 08/14/2019 | TX | Dimmit | 527 | 837 | 35820 |
| JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | 07/23/2019 | TX | Dimmit | 527 | 833 | 35849 |
| MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | TX | Dimmit | 523 | 830 | 35256 |
| JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | 12/16/2017 | TX | Dimmit | 536 | 382 | 37176 |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | TX | Dimmit | 536 | 388 | 37178 |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | 05/29/2019 | TX | Dimmit | 536 | 385 | 37177 |
| MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | TX | Dimmit | 536 | 391 | 37179 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | TX | Dimmit | 517 | 763 | 34472 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | TX | Dimmit | 517 | 759 | 34471 |
| WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | 02/04/2020 | TX | Dimmit | 539 | 360 | 37658 |
| RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | 02/23/2020 | TX | Dimmit | 539 | 366 | 37660 |
| CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | 02/09/2020 | TX | Dimmit | 539 | 363 | 37659 |
| FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | 11/13/2017 | TX | Dimmit | 534 | 714 | 36928 |
| LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2017 | TX | Dimmit | 534 | 717 | 36929 |
| GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | TX | Dimmit | 534 | 720 | 36930 |
| STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | TX | Dimmit | 531 | 199 | 36394 |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | 02/10/2018 | TX | Dimmit | 538 | 505 | 37545 |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | 01/20/2018 | TX | Dimmit | 538 | 509 | 37546 |
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | 11/18/2017 | TX | Dimmit | 538 | 792 | 37593 |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | 09/04/2017 | TX | Dimmit | 528 | 179 | 35886 |
| MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | TX | Dimmit | 528 | 175 | 35885 |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | 04/07/2018 | TX | Dimmit | 542 | 345 | 38066 |
| CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2020 | TX | Dimmit | 541 | 421 | 37944 |
| STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2020 | TX | Dimmit | 541 | 424 | 37945 |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | 02/25/2018 | TX | Dimmit | 539 | 765 | 37708 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | TX | Dimmit | 542 | 220 | 38040 |
| DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | TX | Dimmit | 542 | 217 | 38039 |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | TX | Dimmit | 537 | 75 | 37289 |
| ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | TX | Dimmit | 537 | 78 | 37290 |
| JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | TX | Dimmit | 537 | 81 | 37291 |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | TX | Dimmit | 537 | 84 | 37292 |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | TX | Dimmit | 537 | 87 | 37293 |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | TX | Dimmit | 537 | 90 | 37294 |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | 01/05/2020 | TX | Dimmit | 537 | 93 | 37295 |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2015 | TX | Dimmit | 537 | 96 | 37296 |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 537 | 99 | 37297 |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 537 | 102 | 37298 |
| 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 537 | 105 | 37299 |
| LESLIE EDDIE VIVION AND NANCY JOE VIVION ARDOIN | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | 12/21/2012 | TX | Dimmit | 379 | 498 | 13745 |
| MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | TX | Dimmit | 544 | 260 | 38286 |
| RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | TX | Dimmit | 545 | 525 | 38438 |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 522 | 38437 |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 519 | 38436 |
| BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 528 | 38439 |
| AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 534 | 38441 |
| LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | 05/19/2018 | TX | Dimmit | 545 | 516 | 38435 |
| LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | TX | Dimmit | 545 | 531 | 38440 |
| LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | 04/15/2018 | TX | Dimmit | 545 | 546 | 38445 |
| LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 543 | 38444 |
| JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 540 | 38443 |
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 537 | 38442 |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | TX | Dimmit | 545 | 549 | 38446 |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 545 | 814 | 38474 |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 544 | 123 | 38274 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | TX | Dimmit | 544 | 117 | 38272 |
| PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | TX | Dimmit | 544 | 105 | 38268 |
| RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 544 | 120 | 38273 |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 544 | 102 | 38267 |
| CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 544 | 126 | 38275 |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 544 | 114 | 38271 |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 544 | 99 | 38266 |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 544 | 111 | 38270 |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 544 | 108 | 38269 |
| DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | TX | Dimmit | 547 | 115 | 38601 |
| DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | 02/05/2018 | TX | Dimmit | 542 | 279 | 38053 |
| AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | TX | Dimmit | 544 | 756 | 38359 |
| LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | 11/11/2019 | TX | Dimmit | 544 | 753 | 38358 |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 546 | 207 | 38507 |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 546 | 204 | 38506 |
| STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 546 | 216 | 38510 |
| WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 546 | 213 | 38509 |
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 546 | 210 | 38508 |
| MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | 05/01/2018 | TX | Dimmit | 545 | 243 | 38397 |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | 05/20/2018 | TX | Dimmit | 547 | 121 | 38603 |
| STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 547 | 118 | 38602 |
| WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | TX | Dimmit | 548 | 622 | 38850 |
| SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | TX | Dimmit | 548 | 477 | 38833 |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | TX | Dimmit | 549 | 470 | 38927 |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | TX | Dimmit | 548 | 471 | 38831 |
| BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2017 | TX | Dimmit | 548 | 474 | 38832 |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | 06/08/2018 | TX | Dimmit | 550 | 372 | 39027 |
| WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | TX | Dimmit | 550 | 369 | 39026 |
| DANIEL JOSEPH BYRD F/K/A HERBERT ESTILLE SISK, III | ANADARKO E&P ONSHORE LLC | 07/09/2015 | 07/09/2018 | TX | Dimmit | 551 | 752 | 39233 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | TX | Dimmit | 553 | 582 | 39410 |
| LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | 11/03/2019 | TX | Dimmit | 553 | 588 | 39412 |
| JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | 12/18/2017 | TX | Dimmit | 552 | 441 | 39279 |
| MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | 06/25/2020 | TX | Dimmit | 548 | 735 | 38868 |
| DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 551 | 321 | 39162 |
| MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 551 | 324 | 39163 |
| DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR GAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | 07/17/2020 | TX | Dimmit | 551 | 318 | 39161 |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 551 | 312 | 39159 |
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | 07/07/2020 | TX | Dimmit | 549 | 725 | 38967 |
| JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | 07/02/2020 | TX | Dimmit | 549 | 728 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 553 | 585 | 39411 |
| BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | 08/04/2020 | TX | Dimmit | 555 | 335 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 08/17/2015 | 08/17/2018 | TX | Dimmit | 555 | 13 | 39591 |
| DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | 05/21/2018 | TX | Dimmit | 556 | 589 | 39852 |
| SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | TX | Dimmit | 556 | 592 | 39853 |
| LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | TX | Dimmit | 557 | 385 | 39960 |
| GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | TX | Dimmit | 558 | 601 | 40106 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 555 | 422 | 39661 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2020 | TX | Dimmit | 555 | 428 | 39663 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 555 | 425 | 39662 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | 08/10/2020 | TX | Dimmit | 555 | 431 | 39664 |
| RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2018 | TX | Dimmit | 556 | 436 | 39815 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | 08/13/2020 | TX | Dimmit | 556 | 433 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 559 | 379 | 40156 |
| JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 559 | 376 | 40155 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 559 | 439 | 40165 |
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2018 | TX | Dimmit | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 559 | 448 | 40168 |

**Leases**

| Lessor | Lessee | Effective Date | Expiration | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2018 | TX | Dimmit | 563 | 557 | 40854 |
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | TX | Dimmit | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | TX | Dimmit | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | 07/19/2019 | TX | Dimmit | 577 | 454 | 42708 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 457 | 658 | 26430 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/4/2012 | TX | Dimmit | 455 | 217 | 26098 |
| DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/5/2007 | TX | Dimmit | | | |
| RIO BRAVO LAND CO ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/29/2007 | TX | Maverick<br>Dimmit | 1042<br>339 | 294<br>557 | 1042<br>8822 |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 6/9/2006 | TX | Maverick<br>Webb | | | |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2006 | TX | Dimmit | 356 | 172 | 11716 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/22/2010 | TX | Dimmit<br>La Salle | 430<br>619 | 310<br>173 | 22005<br>97908 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2010 | TX | Dimmit | 432 | 749 | 22412 |
| HUGH A FITZSIMONS III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/5/2009 | TX | Dimmit | | | |
| LABANDERA RANCH LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/23/2009 | TX | Dimmit | 408 | 567 | 18727 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 415 | 167321 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 420 | 167322 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | | |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | | |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | | |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 140 | 17282 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 82 | 17269 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/6/2010 | TX | Dimmit | 399 | 219 | 17115 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/22/2010 | TX | Dimmit | 397 | 749 | 16909 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2010 | TX | Dimmit | 399 | 432 | 17163 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/19/2011 | TX | Dimmit | 401 | 10 | 17420 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 258 | 17641 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 267 | 17642 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/3/2011 | TX | Dimmit | 403 | 744 | 17886 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Surface/Subsurface Wellbore | 3/3/2011 | TX | Dimmit | 403 | 744 | 17887 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 280 | 164790 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 290 | 164791 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 486 | 165124 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 497 | 165125 |
| DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 86 | 18791 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 107 | 166036 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 96 | 166035 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 85 | 166034 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2011 | TX | Maverick | 1313 | 159 | 167779 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | O/G LSE-Surface Rights/Rentals | 12/1/2011 | TX | Dimmit | | | |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | | |
| STATE OF TEXAS | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Webb | | | |
| B L STANLEY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/15/2008 | TX | Webb | | | |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | | |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | | |
| WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/1/2009 | TX | Webb | | | |
| FITZSIMONS ENTITY ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/22/2005 | TX | Maverick | 1348 | 125 | 171232 |
| MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 59 | 23169 |
| RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/29/2009 | TX | Dimmit | | | |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 55 | 23167 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 57 | 23168 |
| WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | | | |
| RIO BRAVO LAND CO | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/7/2011 | TX | Maverick | 1308 | 408 | 167320 |
| WILLIAM K SPARKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/13/2011 | TX | Dimmit | 419 | 161 | 20130 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 239 | 21160 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 230 | 21159 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | | | |
| PRIME OPERATING COMPANY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/22/2011 | TX | Dimmit | | | |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 210 | 169188 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 221 | 169189 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1327 | 229 | 169190 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1336 | 5 | 170026 |
| B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/28/2010 | TX | Webb | 3225 | 480 | 1127253 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 131 | 23504 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 140 | 23505 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/22/2012 | TX | Dimmit<br>Dimmit | 445<br>467 | 672<br>227 | 26180<br>27820 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 677<br>234 | 26181<br>27821 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 682<br>241 | 26182<br>27822 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/20/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 687<br>248 | 26183<br>27823 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 692<br>255 | 26184<br>27824 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit | 455 | 246 | 26102 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | La Salle | 660 | 161 | 101081 |
| ALBERT WILEY BLAKEWAY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2012 | TX | Dimmit | 444 | 127 | 24352 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/13/2012 | TX | Dimmit | 444 | 271 | 24380 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Webb<br>Dimmit | 3365<br>440 | 294<br>689 | 1154340<br>23799 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 102 | 20635 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 111 | 20636 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 462 | 23075 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 254 | 23529 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 263 | 23530 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/23/2011 | TX | Dimmit | 409 | 693 | 18884 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/10/2011 | TX | Dimmit | 403 | 735 | 17885 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 683 | 18883 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/19/2012 | TX | Dimmit | 435 | 342 | 22839 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/18/2012 | TX | Dimmit | 442 | 413 | 24073 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 444 | 278 | 24381 |
| B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/1/2011 | TX | Webb | 3305 | 219 | 1142843 |
| RANCHO ENCANTADO LP (unrecorded letter agreement) | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/12/2011 | TX | Dimmit | | | unrecorded |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 371 | 171206 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 361 | 171205 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 351 | 171204 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/10/2011 | TX | Dimmit | 450 | 511 | 25438 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Dimmit | 450 | 502 | 25437 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/31/2011 | TX | Dimmit | 450 | 154 | 25365 |
| WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3255 | 547 | 1133279 |
| WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3294 | 556 | 1140805 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/20/2012 | TX | Dimmit | 459 | 339 | 26690 |
| MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/5/2012 | TX | Dimmit | 455 | 228 | 26100 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Dimmit | 451 | 23 | 25503 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 455 | 223 | 26099 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Webb | 3371 | 851 | 1155535 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 716 | 26189 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Maverick | 1382 | 344 | 174552 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/15/2012 | TX | Dimmit | 459 | 303 | 26684 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Dimmit | 459 | 308 | 26685 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 257 | 26104 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 253 | 26103 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/19/2012 | TX | Dimmit | 459 | 297 | 26683 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 706 | 26188 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 240 | 26101 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 667 | 26179 |
| RUDOLFO SANTOSCOY | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 448 | 361 | 25060 |
| M.P.T. | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/1/2012 | TX | Dimmit | 448 | 400 | 25066 |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/25/2012 | TX | Dimmit | 448 | 413 | 25068 |
| LEONARD SCARCELLA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 448 | 370 | 25061 |
| JOHN MARK FACHORN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/6/2012 | TX | Dimmit | 448 | 376 | 25062 |
| REGINA LYNN ANDREWS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/8/2012 | TX | Dimmit | 448 | 394 | 25065 |
| RITA JO FRAILICKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 388 | 25064 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| RENEE DAWN MEDINA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/16/2012 | TX | Dimmit | 448 | 382 | 25063 |
| STEVEN ROSS FACHORN ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 468 | 86 | 27962 |
| RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/10/2012 | TX | Dimmit | 462 | 657 | 27192 |
| WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3390 | 329 | 1159311 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1340 | 312 | 170484 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Dimmit | 468 | 92 | 27963 |
| CHARLES NOLAN SMITH ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/13/2014 | TX | Dimmit | 509 | 73 | 33051 |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 471 | 23076 |
| TEJAS SALES INTERNATIONAL LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 406 | 25067 |
| DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit (road bore) | 2/14/2013 | TX | Dimmit | | | unrecorded |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/26/2013 | TX | Dimmit | 469 | 471 | 28196 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 240 | 28286 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 252 | 28287 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 230 | 28285 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/10/2013 | TX | Dimmit | 466 | 26 | 27607 |
| ROGERS DENTONIO RANCH LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/24/2013 | TX | Dimmit | 465 | 344 | 27513 |
| MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/22/2013 | TX | Dimmit | 465 | 352 | 27514 |
| DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 3/7/2013 | TX | Dimmit | | | |
| WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/15/2013 | TX | Dimmit | 469 | 479 | 28197 |
| MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 470 | 799 | 28378 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 709 | 28968 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 699 | 28967 |
| 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/15/2013 | TX | Dimmit | 473 | 794 | 28876 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 828 | 28880 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 814 | 28878 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 787 | 28875 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 807 | 28877 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 835 | 28881 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick<br>Dimmit | 1405<br>475 | 117<br>541 | 176560<br>29061 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick | 1408 | 69 | 176831 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 478 | 80 | 29416 |
| THOMAS R BURANUM ET UX | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/25/2013 | TX | Dimmit | | | |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/11/2013 | TX | Dimmit | 480 | 800 | 29869 |
| SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/21/2013 | TX | Dimmit | 465 | 225 | 27496 |
| THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/25/2013 | TX | Dimmit | 473 | 406 | 28814 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 380 | 30016 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 390 | 30017 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 195 | 29541 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 186 | 29540 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 168 | 29538 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 177 | 29539 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 661 | 27444 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 670 | 27445 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 614 | 28348 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 623 | 28349 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 632 | 28350 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Webb | 3488 | 4 | 1178545 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 494 | 297 | 30365 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 484 | 290 | 30364 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/24/2011 | TX | Dimmit | 489 | 416 | 30856 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/9/2013 | TX | Dimmit | 490 | 63 | 30944 |
| RANCHO ENCANTADO LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/17/2013 | TX | Dimmit | 490 | 74 | 30945 |
| FAITH RANCH LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 1418 | 225 | 177752 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/8/2013 | TX | Maverick | 1418 | 249 | 177754 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 11/25/2013 | TX | Webb | 3566 | 35 | 1192139 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/30/2013 | TX | Webb | 3526 | 510 | 1185584 |
| WORTHEY PROPERTIES LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/12/2013 | TX | Webb | 3526 | 521 | 1185585 |
| B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb | 3526 | 535 | 1185586 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/19/2013 | TX | Maverick | 1418 | 235 | 177753 |
| 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/6/2013 | TX | Dimmit<br>Maverick | 490<br>1430 | 81<br>290 | 30946<br>178836 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Dimmit | 496 | 434 | 31664 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2013 | TX | Dimmit | 496 | 441 | 31665 |
| EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 526 | 30409 |
| EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 517 | 30408 |
| EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 508 | 30407 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2013 | TX | Dimmit | 503 | 46 | 32347 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2014 | TX | Dimmit | 504 | 505 | 32454 |
| COTULLA LAND & INVESTMENTS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb<br>Dimmit | 3545<br>503 | 625<br>1 | 1188987<br>32342 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/25/2013 | TX | Dimmit | 503 | 15 | 32343 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Maverick | 1442 | 142 | 179874 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/17/2014 | TX | Dimmit | 506 | 413 | 32694 |
| WORTHEY PROPERTIES LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2014 | TX | Webb | 3575 | 243 | 1193975 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 28 | 32930 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 21 | 32929 |
| BEINHORN JR FAMILY LIMTED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/6/2014 | TX | Dimmit | 508 | 35 | 32931 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | La Salle | 775 | 18 | 110443 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/7/2014 | TX | Maverick | 1447 | 251 | 180393 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 261 | 180394 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/13/2014 | TX | Webb | 3582 | 516 | 1195064 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | Dimmit | 512 | 586 | 33538 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 512 | 593 | 33539 |
| SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/15/2014 | TX | Dimmit | 514 | 784 | 33917 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Dimmit | 508 | 169 | 32960 |
| | | | | | La Salle | 792 | 468 | 111976 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/21/2014 | TX | Dimmit | 517 | 52 | 34335 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 820 | 1203865 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 800 | 1203864 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Dimmit | 513 | 599 | 33732 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit | 513 | 663 | 33734 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 49 | 112408 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 56 | 112409 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit | 513 | 624 | 33733 |
| | | | | | Webb | 3639 | 843 | 1205581 |
| COMANCHE MAVERICK RANCH INVESTMENTS LP | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 11/25/2013 | TX | Maverick | 1437 | 50 | |
| INDIO FAITH LAND CO LLC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 270 | 180395 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2014 | TX | Dimmit | 520 | 781 | 34922 |
| BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Webb | 3672 | 306 | 1211604 |
| | | | | | Dimmit | 570 | 539 | 41799 |
| RANCHO ENCANTADO LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/29/2014 | TX | Dimmit | | | |
| FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 759 | 34471 |
| FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 763 | 34472 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 526 | 461 | 35624 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2014 | TX | Dimmit | 539 | 191 | 37635 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2014 | TX | Dimmit | 539 | 198 | 37636 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 107 | 37894 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 100 | 37893 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 540 | 754 | 37862 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 0540 | 0761 | 37863 |
| DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/12/2012 | TX | Dimmit | 531 | 108 | 36379 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/5/2013 | TX | Dimmit | 529 | 510 | 36137 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 531 | 103 | 36378 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 124 | 35721 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 117 | 35720 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 131 | 35722 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/11/2014 | TX | Dimmit | 526 | 456 | 35623 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 98 | 35719 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/29/2012 | TX | Dimmit | 537 | 604 | 37418 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 537 | 599 | 37417 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/19/2012 | TX | Dimmit | 537 | 616 | 37420 |

| Lessor/Grantor | Lessee/Grantee | Agreement Type | Effective Date | State | County | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/23/2015 | TX | Webb | 3752 | 159 | 1226326 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/2/2014 | TX | Dimmit | 529 | 517 | 36138 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/26/2012 | TX | Dimmit | 537 | 609 | 37419 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/14/2014 | TX | Dimmit | 529 | 505 | 36136 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/23/2015 | TX | Dimmit | 540 | 768 | 37864 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/11/2015 | TX | Dimmit | 541 | 114 | 37895 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2014 | TX | La Salle | 863 | 313 | 118002 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/20/2015 | TX | Webb | 3781 | 231 | 1231539 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2015 | TX | Dimmit | 547 | 806 | 38733 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/30/2015 | TX | Dimmit | 546 | 449 | 38520 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/5/2015 | TX | Dimmit | 546 | 466 | 38522 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2015 | TX | Dimmit | 552 | 352 | 39268 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 476 | 40713 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 496 | 40717 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 481 | 40714 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 491 | 40716 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 486 | 40715 |
| BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2015 | TX | Dimmit | 560 | 49 | 40299 |
| BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Surface Use Agreement | 11/15/2010 | TX | Dimmit | | | |
| ST TX DOT 664-141 (driveway access to office off US 277) | ANADARKO PETROLEUM CORPORATION | Right of Way/Easement/Facility | 12/7/2011 | TX | Dimmit | | | unrecorded |
| ADELA A SMITH FAMILY LIMITED PARTNERSHIP | KERR-MCGEE OIL & GAS ONSHORE LP | Right of Way/Easement/Facility | 1/1/2011 | TX | Dimmit | 427 | 335 | 21522 |
| CHARLES W WILSON SR ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 5/11/1994 | TX | Dimmit | 251 | 497 | 731 |
| CHARLES H BARRIER ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 6/1/1994 | TX | Dimmit | 251 | 499 | 731 |

**Schedule 6(a)**

**U.S. Patents**

None.

Case 4:19-34508 Document 1254-16 Filed in TXSB on 06/22/20 Page 294 of 375

**Schedule 6(b)**

**U.S. Trademarks**

None.

**Schedule 6(c)**

**U.S. Copyrights**

None.

**Schedule 7**

**Letters of Credit**

None.

**Schedule 8**

**Securities Accounts**

None.

Schedule 9

Deposit Accounts

| | |
|---|---|
| **Entity:** | **SN EF UnSub, LP** |
| **Institution:** | **JPMorgan Chase Bank, N.A.** |
| **Account No.:** | **110958532** |
| **Type:** | **Deposit** |
| **Tax ID:** | **36-4855302** |

Schedule 10

Commodity Accounts

None.

**Schedule 11**

**Commercial Tort Claims**

None.

**EXHIBIT F TO**
**CREDIT AGREEMENT**

**[FORM OF]**
**ASSIGNMENT AND ASSUMPTION**[1]

This Assignment and Assumption (this "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any participations in L/C Obligations included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender under the Credit Agreement) against any person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: ___________________________

2. Assignee: ___________________________

3. Is Assignee a Lender/an Affiliate of a Lender/an "Approved Fund"/Is this an "assignment of the entire remaining amount of the assigning Lender's Commitment or Loans"? Yes: No:
   Specify if "Yes": __________________________.

4. Borrower: SN EF UnSub, LP, a Delaware limited partnership (the "Borrower").

5. Administrative Agent: JPMorgan Chase Bank, N.A., as the Administrative Agent, under the Credit Agreement.

6. Credit Agreement: Credit Agreement, dated as of March [●], 2017 among SN EF UnSub, LP, the Borrower, the Lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto.

---

[1] To be used in the case of any sale, assignment or transfer by a Lender to an assignee other than the Borrower or the Borrower's Subsidiaries and their respective Affiliates.

7. Assigned Interest:

| Commitments / Loans | Aggregate Amount of Commitments of all Lenders | Amount of Commitments / Loans Assigned | Percentage Assigned of Commitments of all Lenders[2] |
|---|---|---|---|
| Commitments / Loans | $ | $ | % |

Effective Date: ________________, 20___ [TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR].

9. Notice and Wire Instructions:

**[NAME OF ASSIGNOR]**

Notices:

______________________
______________________
______________________
Attention:
Facsimile:

with a copy to:

______________________
______________________
______________________
Attention:
Facsimile:

Wire Instructions:

**[NAME OF ASSIGNEE]**

Notices:

______________________
______________________
______________________
Attention:
Facsimile:

with a copy to:

______________________
______________________
______________________
Attention:
Facsimile:

Wire Instructions:

[2] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders thereunder.

The terms set forth in this Assignment and Assumption are hereby agreed to:

**ASSIGNOR**

[NAME OF ASSIGNOR]

By: ____________________________
Name:
Title:

**ASSIGNEE**

[NAME OF ASSIGNEE]

By: ____________________________
Name:
Title:

Case 4:19-34508 Document 1254-16 Filed in TXSB on 06/22/20 Page 503 of 3769

Accepted and Consented to:

JPMORGAN CHASE BANK, N.A., as Administrative Agent

By: ______________________________
Name:
Title:

JPMORGAN CHASE BANK, N.A., as Issuing Bank

By: ______________________________
Name:
Title:

CITIBANK, N.A., as Issuing Bank

By: ______________________________
Name:
Title:

[INSERT NAME], as Issuing Bank

By: ______________________________
Name:
Title:

[SN EF UNSUB, LP, as Borrower][1]

By: ______________________________
Name:
Title:

[1] Borrower's consent shall not be required if such assignment is to a Lender, affiliate of a Lender or an Approved Fund or if an Event of Default under Section 11.1 or Section 11.5 of the Credit Agreement has occurred and is continuing.

**ANNEX 1**

**STANDARD TERMS AND CONDITIONS FOR**
**ASSIGNMENT AND ASSUMPTION**

1. *Assignor*. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Credit Document, other than as to the matters set forth in this Section 1, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or other Affiliates or any other person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or other Affiliates or any other person of any of their respective obligations under any Credit Document.

2 *Assignee*. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it is not the Borrower, a Subsidiary of the Borrower, a natural person, a Disqualified Institution or a Defaulting Lender and otherwise satisfies all other requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 9.1(a)-(b) thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (vi) if it is a Non-U.S. Lender, attached to this Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender and, based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

3. *Payments*. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

4. *General Provisions*. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by fax or other electronic delivery shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

[Remainder of page intentionally left blank]

**EXHIBIT G TO**
**CREDIT AGREEMENT**

**FORM OF NOTE**

___________, ____

FOR VALUE RECEIVED, the undersigned, a Delaware limited partnership (the "Borrower"), hereby promises to pay to _____________________ or registered assigns (the "Lender"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of each Loan from time to time made by the Lender to the Borrower under that certain Credit Agreement, dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, extended, supplemented or otherwise modified in writing from time to time, the "Agreement," the terms defined therein being used herein as therein defined), among the Borrower, SN EF UnSub, LP, a Delaware limited partnership, the Lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and each other Issuing Bank from time to time party thereto.

The Borrower promises to pay interest on the unpaid principal amount of each Loan from the date of such Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. All payments of principal and interest shall be made to the Administrative Agent for the ratable account of the Lender in Dollars in immediately available funds at the Administrative Agent's Office. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in Section 2.8(c) of the Agreement. This Note is subject to mandatory prepayments and to voluntary prepayments and to all other terms and conditions as provided in the Agreement.

This Note is one of the promissory notes referred to in the Agreement and is entitled to the benefits thereof. This Note is also entitled to the benefits of the other Credit Documents and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. Loans made by the Lender shall be evidenced by an account or accounts maintained by the Lender and by the Register and subaccounts maintained by the Administrative Agent in accordance with the Agreement. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

No failure to exercise and no delay in exercising, on the part of the Administrative Agent, any right, remedy, power or privilege hereunder or under the Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or thereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. A waiver by the Administrative Agent of any right,

remedy, power or privilege hereunder or under any Credit Document on any one occasion shall not be construed as a bar to any right or remedy that the Administrative Agent would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers and privileges provided by law.

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**IN WITNESS WHEREOF**, this Note is executed as of the date set forth above.

SN EF UNSUB, LP

By: ______________________________
Name:
Title:

LOANS AND PAYMENTS WITH RESPECT THERETO

| Date | Type of Loan Made | Amount of Loan Made | End of Interest Period | Amount of Principal or Interest Paid This Date | Outstanding Principal Balance This Date | Notation Made By |
|---|---|---|---|---|---|---|
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |
| ___ | ___ | ___ | ___ | ___ | ___ | ___ |

**EXHIBIT H TO**
**CREDIT AGREEMENT**

**GLOBAL INTERCOMPANY NOTE**

[●], 2017

FOR VALUE RECEIVED, each of the undersigned, to the extent a borrower from time to time from any other entity listed on the signature pages hereto (each, in such capacity, an "**Issuer**"), hereby promises to pay on demand to such other entity listed below (each, in such capacity as lender to the applicable Issuer, a "**Holder**" and, together with each Issuer, a "**Note Party**"), in immediately available funds in the currencies as shall be agreed upon from time to time, at such location as the applicable Holder shall from time to time designate, the unpaid principal amount of all loans and advances or other credit extensions made by such Holder to such Issuer. Each Issuer promises also to pay interest on the unpaid principal amount of all such loans and advances or other credit extensions in like money at said location from the date of such loans and advances until paid at such rate per annum as shall be agreed upon from time to time by the applicable Issuer and the applicable Holder.

With respect to any Issuer and any Holder between whom loans, advances or other credit extensions exist as of the date of this Note (such loans, advances or other credit extensions, "**Existing Obligations**"), (a) if any Existing Obligation is evidenced by a promissory note or other instrument or agreement in existence as of the date hereof (an "**Existing Note**"), it is agreed to between such Issuer and such Holder that the obligations under such Existing Note are hereafter to be evidenced by this Note and (b) it is agreed to between such Issuer and such Holder that the agreements in existence as of the date hereof with respect to any Existing Obligation (including agreements contained in any Existing Note) as to principal, amortization, currency, payment location and interest rate (if any) will continue to have effect under this Note until modified by agreement between such Issuer and such Holder.

Reference is hereby made to the Credit Agreement dated as of March [●], 2017 (as amended, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "**Credit Agreement**") among SN EF UnSub, LP, a Delaware limited partnership (the "**Borrower**"), the Lenders party thereto from time to time (collectively, the "**Lenders**" and individually, a "**Lender**"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "**Agent**") and the other parties party thereto. Capitalized terms used herein and not otherwise defined shall have the meanings assigned thereto in the Credit Agreement.

Upon the earlier to occur of (x) the commencement of any bankruptcy, reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar proceeding of any jurisdiction relating to the applicable Issuer or (y) any exercise of remedies (including the termination of the Commitments) pursuant to Section 11 of the Credit Agreement, the unpaid principal amount of all loans and advances evidenced by this note (the "**Note**") shall become immediately due and payable without presentment, demand, protest or notice of any kind in connection with this Note. This Note is subject to the terms of the Credit Agreement, and shall be pledged by each applicable Holder that is a Credit Party pursuant to the Collateral Agreement. The applicable Issuer hereby acknowledges and agrees that the Secured Parties may, pursuant to the Collateral Agreement as in effect from time to time, exercise all rights provided therein with respect to this Note.

The indebtedness evidenced by this Note owed by any Issuer shall rank pari passu in right of payment with any other obligation of such Issuer, except as provided in the immediately succeeding sentence. The indebtedness evidenced by this Note owed by any Issuer that is a Credit Party to any Holder that is not a Credit Party shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to (i) all Obligations of the Borrower or such Issuer under the Credit Agreement and (ii) all other Indebtedness of the Borrower or such Issuer or any guaranty other than Indebtedness that by its terms expressly provides that it shall not be Senior Indebtedness hereunder (such obligations and such Indebtedness and other indebtedness and obligations in connection with any renewal, refunding, restructuring or refinancing thereof, including interest thereon accruing after the commencement of any proceedings referred to in clause (i) below, whether or not such interest is an allowed claim in such proceeding, being hereinafter collectively referred to as "**Senior Indebtedness**"):

(i) In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization

or other similar proceedings in connection therewith, relative to any Issuer or to its creditors, as such, or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of such Issuer, whether or not involving insolvency or bankruptcy, then (x) the holders of Senior Indebtedness shall be paid in full in cash in respect of all amounts constituting Senior Indebtedness (other than (A) contingent indemnification obligations and (B) Obligations under Cash Management Agreements and Hedge Agreements) and no Letter of Credit shall remain outstanding (unless the Letter of Credit Exposure of the L/C Obligations related thereto has been Cash Collateralized, back-stopped by a letter of credit reasonably satisfactory to the applicable Issuing Bank or deemed reissued under another agreement reasonably acceptable to the applicable Issuing Bank) before any Holder is entitled to receive (whether directly or indirectly), or make any demands for, any payment on account of this Note and (y) until the holders of Senior Indebtedness are paid in full in cash in respect of all amounts constituting Senior Indebtedness (other than (A) contingent indemnification obligations and (B) Obligations under Cash Management Agreements and Hedge Agreements), any payment or distribution to which such Holder would otherwise be entitled (other than a payment or distribution in (A) equity securities or (B) debt securities of such Issuer that are subordinated, to at least the same extent as this Note, to the payment of all Senior Indebtedness then outstanding (such Indebtedness being hereinafter referred to as "**Restructured Debt Securities**")) shall be made to the holders of Senior Indebtedness;

(ii) if any Event of Default occurs and is continuing and the Borrower has received notice that the Agent is exercising remedies in respect thereof (provided that notice shall be deemed to have been received by the Borrower upon the occurrence of an Event of Default pursuant to Section 11.5 of the Credit Agreement) then no payment or distribution of any kind or character shall be made by or on behalf of the Issuer or any other Person on its behalf with respect to this Note; and

(iii) if any payment or distribution of any character, whether in cash, securities or other property (other than Restructured Debt Securities), in respect of this Note shall (despite these subordination provisions) be received by any Holder in violation of clause (i) or (ii) above before all Senior Indebtedness shall have been paid in full in cash (other than (A) contingent indemnification obligations and (B) Obligations under Cash Management Agreements and Hedge Agreements), such payment or distribution shall be held in trust for the benefit of, and shall be paid over or delivered to, the holders of Senior Indebtedness (or their representatives), ratably according to the respective aggregate amounts remaining unpaid thereon, to the extent necessary to pay all Senior Indebtedness in full in cash.

To the fullest extent permitted by law, no present or future holder of Senior Indebtedness shall be prejudiced in its right to enforce the subordination of this Note by any act or failure to act on the part of any Issuer or by any act or failure to act on the part of such holder or any trustee or agent for such holder. Each Holder and each Issuer hereby agree that the subordination of this Note is for the benefit of the Agent and the Lenders and the Agent and the Lenders are obligees under this Note to the same extent as if their names were written herein as such and the Agent may, on behalf of itself and the Lenders, proceed to enforce the subordination provisions herein.

Notwithstanding the foregoing, nothing contained in the subordination provisions set forth above is intended to or will impair, as between each Issuer and each Holder, the obligations of such Issuer, which are absolute and unconditional, to pay to such Holder the principal of and interest on this Note as and when due and payable in accordance with its terms, or is intended to or will affect the relative rights of such Holder and other creditors of such Issuer other than the holders of Senior Indebtedness.

Each Holder is hereby authorized to record all loans and advances or other credit extensions made by it to any Issuer (all of which shall be evidenced by this Note), and all repayments or prepayments thereof, in its books and records, such books and records constituting prima facie evidence of the accuracy of the information contained therein. For the avoidance of doubt, this Note as between each Issuer and each Holder contains additional terms to any intercompany loan agreement between them and this Note does not in any way replace such intercompany loans between them nor does this Note in any way change the principal amount of any intercompany loans between them.

Upon execution and delivery after the date hereof by the Borrower or any subsidiary of the Borrower of a counterpart signature page hereto, such subsidiary shall become a Note Party hereunder with the same force and effect as if

originally named as a Note Party hereunder. The rights and obligations of each Note Party hereunder shall remain in full force and effect notwithstanding the addition of any new Note Party as a party to this Note.

Each Issuer hereby waives presentment, demand, protest or notice of any kind in connection with this Note. All payments under this Note shall be made without offset, counterclaim or deduction of any kind.

Indebtedness governed by this Note shall be maintained in "registered form" within the meaning of Section 163(f) of the Internal Revenue Code of 1986, as amended. An Issuer or its designee (which shall, at the Agent's request, be the Agent, acting solely for these purposes as non-fiduciary agent of the Issuer) shall record the transfer of the right to payments of principal and interest on the indebtedness governed by this Note to holders of the Senior Indebtedness in a register (the "Register"), and no such transfer shall be effective until entered in the Register.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

[SEPARATE SIGNATURE PAGES TO BE ATTACHED]

Case 4:19-34508 Document 1254-16 Filed in TXSB on 06/22/20 Page 150 of 375

**EACH AS ISSUER AND HOLDER:**

SN EF UNSUB, LP

By: ____________________
Name:
Title:

[●]

By: ____________________
Name:
Title:

[●]

By: ____________________
Name:
Title:

[●]

By: ____________________
Name:
Title:

**FORM OF SOLVENCY CERTIFICATE**

**SOLVENCY CERTIFICATE**

March [●], 2017

Pursuant to that certain Credit Agreement dated as of the date hereof (as amended, restated, modified, waived and/or supplemented from time to time, "**Credit Agreement**") by and among SN EF UNSUB, LP, a Delaware limited partnership (the "**Borrower**"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, and the lenders and agents from time to time party thereto, the undersigned hereby certifies, solely in such undersigned's capacity as [ ] of the Borrower, and not individually, as follows:

As of the date hereof, after giving effect to the consummation of the Transactions, including the making of the Loans under the Credit Agreement on the date hereof, and after giving effect to the application of the proceeds of such Loans:

1. The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise;

2. The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured;

3. The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured; and

4. The Borrower and its Subsidiaries, on a consolidated basis, are not engaged in, and are not about to engage in, business for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that would reasonably be expected to become an actual and matured liability. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

The undersigned is familiar with the business and financial position of the Borrower and its Subsidiaries. In reaching the conclusions set forth in this Certificate, the undersigned has made such other investigations and inquiries as the undersigned has deemed appropriate, having taken into account the nature of the particular business anticipated to be conducted by the Borrower and its Subsidiaries after consummation of the Transactions contemplated by the Credit Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned has executed this Certificate in such undersigned's capacity as chief financial officer of the Borrower, on behalf of the Borrower, and not individually, as of the date first stated above.

SN EF UNSUB, LP

By: ______________________________
Name:
Title:

**EXHIBIT J-1**

**FORM OF NON-BANK TAX CERTIFICATE**
**(For Non-U.S. Lenders That Are Not Treated As Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each lender from time to time party thereto (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and the other parties party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 5.4(e)(i) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payments in connection with any Credit Document are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and deliver promptly to the Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which payment is to be made by the Borrower or the Administrative Agent to the undersigned, or in either of the two calendar years preceding each such payment.

[Signature Page Follows]

[Non-U.S. Lender]

By: ____________________________
Name:
Title:

[Address]

Dated: , 20[ ]

**EXHIBIT J-2**

**FORM OF NON-BANK TAX CERTIFICATE**
**(For Non-U.S. Lenders That Are Treated As Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each lender from time to time party thereto (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and the other parties party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 5.4(e)(i) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of payments on such Loan(s) (as well as any note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Credit Document, neither the undersigned nor any of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a bank within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Credit Document are effectively connected with the conduct of a U.S. trade or business by the undersigned or its direct or indirect partners/members claiming the benefit of the portfolio interest exemption.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform the Borrower and the Administrative Agent in writing and deliver promptly to the Borrower and the Administrative Agent an updated certificate or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

[Signature Page Follows]

[Non-U.S. Lender]

By: ______________________________
Name:
Title:

[Address]

Dated: , 20[ ]

**EXHIBIT J-3**

**FORM OF NON-BANK TAX CERTIFICATE**
**(For Non-U.S. Participants That Are Not Treated As Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each lender from time to time party thereto (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and the other parties party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 5.4(e)(i) and Section 13.6(c) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (v) no payments in connection with any Credit Document are effectively connected with the undersigned's conduct of a U.S. trade or business.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. person status on IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its inability to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

[Signature Page Follows]

Case 4:19-34508 Document 1254-16 Filed 04/19/23 in TXSB Page 1572 of 1759

[Non-U.S. Participant]

By: ______________________________
Name:
Title:

[Address]

Dated: , 20[ ]

**EXHIBIT J-4**

**FORM OF NON-BANK TAX CERTIFICATE**
**(For Non-U.S. Participants That Are Treated As Partnerships For U.S. Federal Income Tax Purposes)**

Reference is made to the Credit Agreement dated as of March [●], 2017 (as amended, restated, amended and restated, refinanced, supplemented or otherwise modified from time to time, the "Credit Agreement"), among SN EF UnSub, LP, a Delaware limited partnership (the "Borrower"), each lender from time to time party thereto (collectively, the "Lenders"), JPMorgan Chase Bank, N.A., as the Administrative Agent, the Collateral Agent and an Issuing Bank and the other parties party thereto. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Credit Agreement.

Pursuant to the provisions of Section 5.4(e)(i) and Section 13.6(c) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of payments on such participation, (iii) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a bank within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code, (v) none of its direct or indirect partners/members claiming the benefit of the portfolio interest exemption is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Code, and (vi) no payments in connection with any Credit Document are effectively connected with the conduct of a U.S. trade or business by the undersigned or its direct or indirect partners/members claiming the benefit of the portfolio interest exemption.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, (or applicable successor IRS Form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, or if a lapse in time or change in circumstances renders the information on this certificate obsolete, expired or inaccurate in any material respect, the undersigned shall promptly so inform such Lender in writing and deliver promptly to such Lender an updated certificate or other appropriate documentation (including any new documentation reasonably requested by such Lender) or promptly notify such Lender in writing of its inability to do so, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding each such payment.

[Signature Page Follows]

[Non-U.S. Participant]

By: ______________________________
Name:
Title:

[Address]

Dated: , 20[ ]

**EXHIBIT K TO**
**CREDIT AGREEMENT**

**FORM OF NOTICE OF PURCHASE ELECTION**

NOTICE OF PURCHASE ELECTION

[●], 20[__]

To: JPMorgan Chase Bank, N.A.,
as Administrative Agent

SN EF UnSub, LP, the Administrative Agent and certain Lenders and other agents have heretofore entered into a Credit Agreement, dated as of March [1], 2017 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Credit Agreement.

This Notice of Purchase Election is being delivered pursuant to Section 13.6(b)(vii) of the Credit Agreement.

Please be advised that [GSO] irrevocably agrees to acquire all of the rights and obligations under the Credit Agreement of the Lenders in accordance with Section 13.6(b)(vii) of the Credit Agreement.

Very truly yours,

[GSO]

By: ____________________
Name:
Title:

**EXHIBIT L TO**
**CREDIT AGREEMENT**

**FORM OF GSO PREFERRED EQUITY DOCUMENTATION**

[On file with Administrative Agent]

**EXHIBIT M-1 TO**
**CREDIT AGREEMENT**

**LEGAL OPINION OF KIRKLAND & ELLIS LLP**

[Attached]

KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue

New York, New York 10022

(212) 446-4800

Facsimile:
(212) 446-4900

www.kirkland.com

March 1, 2017

To the Agent
and each of the Lenders under the
Credit Agreement (referred to below)
on the date hereof (the "Lenders"):

Re: Credit Agreement dated as of March 1, 2017, by and among SN EF UNSUB, LP, a Delaware limited partnership (the "Borrower"), the financial institutions from time to time party thereto as lenders (the "Lenders"), and JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent for the Lenders (in such capacity, the "Agent") (such credit agreement herein referred to as the "Credit Agreement")

Ladies and Gentlemen:

We are issuing this opinion letter in our capacity as counsel to and at the request of the Borrower, SN EF UnSub Holdings, LLC ("Holdings") and SN EF UnSub GP, LLC ("Parent") in respect of the Credit Agreement. References herein to the "Covered Parties" means the Borrower, Holdings and Parent.

The opinions expressed herein are being provided pursuant to Section 6.1(d) of the Credit Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Credit Agreement (with references herein to the Credit Agreement and each document defined therein meaning the Credit Agreement and each such document as executed and delivered on the date hereof). The Lenders and the Agent are sometimes referred to in this opinion letter as "you".

In connection with the preparation of this letter, we have, among other things, reviewed executed counterparts of:

(a) the Credit Agreement;

(b) the Notes delivered to the Lenders on the date hereof; and

(c) the Collateral Agreement.

We have also reviewed unfiled copies of UCC Form-1 Financing Statements naming each Covered Party, as debtor, and the Agent, as secured party, copies of which are attached hereto on Exhibit 1 (the "Financing Statement") to be filed in the Uniform Commercial Code filing office of the Secretary of State of Delaware (the "UCC Filing Office").

References in this opinion letter to the "New York UCC" mean the Uniform Commercial Code as in effect on the date hereof in the State of New York. For purposes hereof, (a) the documents listed in items (a) through (c) above (each in the form reviewed by us for purposes of this opinion letter) are called the "Operative Documents" and (b) the document listed in item (c) (in the form reviewed by us for purposes of this opinion letter) is called the "Security Document". The term "Organizational Documents" whenever used in the letter means the certificate of limited partnership or formation, as applicable, of each Covered

Party, and the partnership agreement or limited liability company agreement, as applicable, of the each Covered Party, as in effect on the date hereof.

Subject to the assumptions, qualifications, exclusions and other limitations which are identified in this opinion letter, we advise you, and with respect to each legal issue addressed in this opinion letter, it is our opinion, that:

1. Each Covered Party is a limited partnership or limited liability company, as applicable, existing and in good standing under the Delaware Revised Uniform Limited Partnership Act ("DRULPA") or the Delaware Limited Liability Company Act ("DLLCA"), as applicable. For purposes of this opinion, we have relied exclusively upon certificates issued by a governmental authority in the relevant jurisdiction, and such opinions are not intended to provide any conclusion or assurance beyond that conveyed by those certificates.

2. Each Covered Party has the limited partnership or limited liability company, as applicable, power to execute, deliver and perform its obligations under the Operative Documents to which it is a party.

3. Each Covered Party has taken the limited partnership or limited liability company, as applicable, action necessary to authorize its execution, delivery and performance of the Operative Documents to which it is a party.

4. Each Operative Document has been duly executed and delivered on behalf of each Covered Party that is a party thereto.

5. Each of the Operative Documents is a valid and binding obligation of each Covered Party that is a party thereto and is enforceable against such Covered Party in accordance with its terms.

6. The execution and delivery by any Covered Party of the Operative Documents to which it is a party, and the performance by any Covered Party of the Operative Documents to which it is a party, and the granting of any security interests pursuant to any Security Document to which it is a party, will not (i) constitute a violation of the Organizational Documents of such Covered Party or (ii) constitute a violation of any applicable provision of existing State of New York law or United States federal statutory law or published governmental regulation applicable to such Covered Party, in each case to the extent covered by this opinion letter, or any applicable provision of the DRULPA or DLLCA, as applicable.

7. No consent, approval, authorization or order of, or filing with, any United States federal or New York governmental authority or body or any Delaware governmental agency or body acting pursuant to the DRULPA or DLLCA, as applicable, is required in order for any Covered Party to obtain the right to execute and deliver any Operative Document, or perform its obligations under, any Operative Document to which it is a party, except for (i) those obtained or made prior to the date hereof, (ii) filings required for the perfection of security interests granted under the Security Document or to release existing liens, (iii) consents, approvals, authorizations, orders or filings required in connection with the ordinary course of conduct by the Covered Parties of their respective businesses and ownership or operation by the Covered Parties of their respective assets in the ordinary course of business (as to which we express no opinion), (iv) those that may be required under federal securities laws and regulations or state "blue sky" laws and regulations (as to which we express no opinion) or any other laws, regulations or governmental requirements which are excluded from the coverage of this opinion letter and (v) consents, approvals, authorizations, orders or filings that may be required by any banking, insurance or other regulatory statutes to which you may be subject (as to which we express no opinion).

8. The Borrower is not an "investment company" required to be registered as such under the Investment Company Act of 1940, as amended, or the rules and regulations thereunder.

9. The Collateral Agreement creates a valid security interest in favor of the Agent, for the benefit of the Secured Parties in the "Collateral" (as defined in the Collateral Agreement) of each Covered Party described therein in which a security interest may be created under Article 9 of the New York UCC (the "Code Collateral").

10. Upon the filing in the UCC Filing Office of the Financing Statements, together with the payment of all filing and recordation fees associated therewith, the Agent will have a perfected security interest (for the benefit of the Secured

Parties) in that portion of the Code Collateral of the Covered Parties in which a security interest can be perfected by the filing of a Uniform Commercial Code financing statement in the Delaware UCC Filing Office.

11. Assuming application of the proceeds of the Loans as contemplated by the Credit Agreement and, for purposes of Regulation X of the Board of Governors of the Federal Reserve System, no Lender or Agent is subject to Regulation T of the Board of Governors of the Federal Reserve System, the execution and delivery of the Credit Agreement by the Borrower and the making of the Loans under the Credit Agreement will not violate Regulation U or X of the Board of Governors of the Federal Reserve System.

With your consent, we have assumed for purposes of this letter and the opinions herein:

(a) that each document we have reviewed for purposes of this letter is accurate and complete, each such document that is an original is authentic, each such document that is a copy conforms to an authentic original, and all signatures on each such document are genuine, and that all natural persons who have signed any document have the legal capacity to do so;

(b) that each Operative Document and every other agreement we have examined for purposes of this letter has been duly authorized, executed and delivered by the parties thereto and constitutes a valid and binding obligation of each party to that document, enforceable against each such party in accordance with its respective terms and that each such party has satisfied all legal requirements that are applicable to such party to the extent necessary to entitle such party to enforce such agreement and that each party to any Operative Document is in good standing and duly incorporated or organized under the laws of its jurisdiction of organization (except that we make no such assumption in this paragraph (b) with respect to the Covered Parties;

(c) there are no agreements or understandings among the parties, written or oral (other than the Operative Documents), and there is no usage of trade or course of prior dealing among the parties that would, in either case, define, supplement or qualify the terms of the Operative Documents; and

(d) that the status of the Operative Documents as legally valid and binding obligations of the parties is not affected by any (i) breaches of, or defaults under, agreements or instruments, (ii) violations of statutes, rules, regulations or court or governmental orders, or (iii) failures to obtain required consents, approvals or authorizations from, or make required registrations, declarations or filings with, governmental authorities, provided that we make no such assumption to the extent we have opined as to such matters with respect to the Covered Parties herein.

In addition, for purposes of this letter and the opinions herein we have also assumed with your consent: (i) each Covered Party has the requisite rights to any Collateral existing on the date hereof and will have the requisite rights to each item of Collateral arising after the date hereof, (ii) value (as defined in Section 1-204 of the New York UCC) has been given by you to the Covered Parties for the security interests and other rights in and assignments of Collateral described in or contemplated by the Operative Documents, and (iii) all information regarding the secured party on the Financing Statements is accurate and complete in all respects.

In preparing this letter, we have relied without any independent verification upon: (i) information contained in certificates obtained from governmental authorities; (ii) factual information represented to be true in the Operative Documents; (iii) factual information provided to us in a support certificate signed by the Covered Parties; (iv) factual information we have obtained from such other sources as we have deemed reasonable; and (v) we have examined the originals or copies certified to our satisfaction, of such Organizational Documents and other partnership or limited liability company, as applicable, records of the Covered Parties as we deem necessary for or relevant to our opinions. We have assumed without investigation that the information upon which we have relied is accurate and does not omit disclosures necessary to prevent such information from being misleading.

The terms "knowledge," "actual knowledge" and "aware" whenever used in this letter with respect to our firm mean conscious awareness at the time this letter is delivered on the date it bears by the lawyers with Kirkland & Ellis LLP at that time who spent substantial time representing the Covered Parties in connection with the Operative Documents (herein called our "Designated Transaction Lawyers").

Each opinion (an "enforceability opinion") in this letter that any particular contract is a valid and binding obligation, is enforceable in accordance with its terms or creates a security interest is subject to: (i) applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and judicially developed doctrines in this area such as substantive consolidation and equitable subordination; (ii) the effect of general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity); (iii) an implied covenant of good faith and fair dealing; and (iv) other commonly recognized statutory and judicial constraints on enforceability including statutes of limitations. "General principles of equity" include but are not limited to: principles limiting the availability of specific performance and injunctive relief; principles which limit the availability of a remedy under certain circumstances where another remedy has been elected; principles requiring reasonableness, good faith and fair dealing in the performance and enforcement of an agreement by the party seeking enforcement; principles which may permit a party to cure a material failure to perform its obligations; and principles affording equitable defenses such as waiver, laches and estoppel.

Each enforceability opinion is also subject to the qualification that certain provisions of the Operative Documents may not be enforceable in whole or in part, although the inclusion of such provisions does not render the Operative Documents invalid, and the Operative Documents and the law of the State of New York contain adequate remedial provisions for the practical realization of the rights and benefits afforded thereby.

Each enforceability opinion is further subject to the effect of rules of law that may render guaranties or other similar instruments or agreements unenforceable under circumstances where your actions, failures to act or waivers, amendments or replacement of the Operative Documents (i) so radically change the essential nature of the terms and conditions of the guaranteed obligations and the related transactions that, in effect, a new relationship has arisen between you and the Covered Parties which is substantially and materially different from that presently contemplated by the Operative Documents, (ii) release the primary obligor, or (iii) impair the guarantor's recourse against the primary obligor.

We also express no opinion regarding the enforceability of the so-called "fraudulent conveyance or fraudulent transfer savings clauses" and any similar provisions in any Operative Document, to the extent such provisions purport to limit the amount of the obligations of any party or the right to contribution of any other party with respect to such obligations.

We render no opinion regarding the validity, binding effect or enforceability of any Operative Document with respect to any Covered Party to the extent such Operative Document involves any obligation (including any guaranty) of such Covered Party with respect to any "swap" (as such term is defined in the Commodity Exchange Act) if such Covered Party is not an "eligible contract participant" (as such term is defined in the Commodity Exchange Act) at the time such obligation is incurred by such Covered Party.

We render no opinion with regard to usury or other laws limiting or regulating the maximum amount of interest that may be charged, collected, received or contracted for other than the internal laws of the State of New York, and without limiting the foregoing, we expressly disclaim any opinion as to the usury or other such laws of any other jurisdiction (including laws of other states made applicable through principles of Federal preemption or otherwise) which may be applicable to the transactions contemplated by the Operative Documents.

Our opinions regarding the creation and perfection of security interests are subject to the effect of (i) the limitations on the existence and perfection of security interests in proceeds resulting from the operation of Section 9-315 of the New York UCC and (ii) certain provisions of the Bankruptcy Code, including Section 547 with respect to preferential transfers and Section 552 with respect to any Collateral acquired by a Covered Party subsequent to the commencement of a case under the Bankruptcy Code with respect to such Covered Party.

We express no opinion (i) as to the priority of any security interest, (ii) as to what law governs perfection of the security interests granted in the Collateral, (iii) regarding the perfection of any security interest in money, letter of credit rights, Collateral of a type represented by a certificate of title, any property for which a federal statute or treaty provides for registration or specifies a place of filing different from that specified in Section 9-501 of any applicable Uniform Commercial Code commercial tort claims, crops, farm products, timber to be cut, as-extracted collateral, or consumer goods and (iv) the effectiveness of any supergeneric description of the Collateral in any Security Document.

Nothing contained in this letter covers or otherwise addresses any of the following types of provisions which may be contained in the Operative Documents:

(i) provisions mandating contribution towards judgments or settlements among various parties;

(ii) waivers of benefits and rights to the extent they cannot be waived under applicable law;

(iii) provisions providing for penalties, liquidated damages, acceleration of future amounts due (other than principal) without appropriate discount to present value, late charges, prepayment charges, interest upon interest, or increased interest rates upon default;

(iv) provisions which might require indemnification or contribution in violation of general principles of equity or public policy, including, without limitation, indemnification or contribution obligations which arise out of the failure to comply with applicable state or federal securities laws;

(v) agreements to submit to the jurisdiction of any particular court or other governmental authority (either as to personal or subject matter jurisdiction), except to the extent such submission to the courts of the State of New York is made in compliance with the statutory laws of the State of New York; provisions restricting access to courts; waiver of service of process requirements which would otherwise be applicable; waiver of the right to a jury trial and provisions otherwise purporting to affect the jurisdiction and venue of courts;

(vi) choice-of-law provisions, except to the extent such choice of law of New York law as the governing law is made in compliance with the statutory laws of the State of New York;

(vii) provisions regarding arbitration;

(viii) covenants not to compete;

(ix) provisions that authorize you to set off and apply any deposits at any time held, and any other indebtedness at any time owing, by you to or for the account of any Covered Party, or

(x) requirements in the Operative Documents specifying that provisions thereof may only be waived in writing.

Except as expressly otherwise set forth in this letter, our advice on every legal issue addressed in this letter is based exclusively on the internal laws of the State of New York or the Federal law of the United States which, in each case, in our experience is generally applicable both to general business organizations which are not engaged in regulated business activities and to transactions of the type contemplated in the Operative Documents between the Covered Parties, on the one hand, and you, on the other hand (but without our having made any special investigation as to any other laws), except that we express no opinion or advice as to any law or legal issue (a) which might be violated by any misrepresentation or omission or a fraudulent act, or (b) to which any Covered Party may be subject as a result of your legal or regulatory status, your sale or transfer of the Loans or interests therein or your involvement in the transactions contemplated by the Operative Documents.

Our opinions in paragraphs 9 and 10 are limited to Article 9 of the New York UCC, or Article 9 of the Uniform Commercial Code as adopted in Delaware, as the case may be.

For purposes of the opinions expressed in paragraph 10 with respect to the Covered Parties, we have reviewed the statutory provisions of the Uniform Commercial Code as adopted in Delaware, as set forth in the Commerce Clearing House, Inc. Secured Transactions Guide as supplemented through January 24, 2017 (the "Guide") and, with respect to such Covered Parties, our opinions in such paragraph 10 are based solely on such review and on the assumption that such statutory provisions are given the same interpretation and application in Delaware as the corresponding provisions of the New York Uniform Commercial Code are given in New York.

For purposes of paragraphs 1 through 4 and 6(i) and 7 our opinions are based on the DRULPA or DLLCA, as applicable (without regard to judicial interpretation thereof or rules or regulations promulgated thereunder), as published by Aspen Publishers, Inc., as supplemented through January 24, 2017 with respect to the DLLCA and as published online and on the date hereof at http://www.lexisnexis.com, with respect to the DRULPA. We note however that we are not admitted to practice law in the State of Delaware, and without limiting the forgoing we expressly disclaim any opinions regarding Delaware contract law or general Delaware law that may be incorporated expressly or by operation of law into the DLLCA or DRULPA or into any Organizational Document entered into pursuant thereto.

None of the opinions or other advice contained in this letter considers or covers: (i) any federal or state securities (or “blue sky”) laws or regulations (other than our opinion in paragraph 8 regarding the Investment Company Act) or Federal Reserve Board margin regulations (other than our opinion in paragraph 11) or (ii) federal or state antitrust and unfair competition laws and regulations, pension and employee benefit laws and regulations, compliance with fiduciary duty requirements, federal and state environmental, land use and subdivision, tax, racketeering (e.g., RICO), health and safety (e.g., OSHA), and labor laws and regulations, federal and state laws, regulations and policies concerning national and local emergency, possible judicial deference to acts of sovereign states and criminal and civil forfeiture laws, and other federal and state statutes of general application to the extent they provide for criminal prosecution (e.g., mail fraud and wire fraud statutes).

We also express no opinion regarding any laws relating to terrorism or money laundering, including Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) (the “Terrorism Executive Order”) or any related enabling legislation or any other similar executive order (collectively with the Terrorism Executive Order, the “Executive Orders”), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the “Patriot Act”), any sanctions and regulations promulgated under authority granted by the Trading with the Enemy Act, 50 U.S.C. App. 1-44, as amended from time to time, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, as amended from time to time, the Iraqi Sanctions Act, Publ. L. No. 101-513; United Nations Participation Act, 22 U.S.C. § 287c, as amended from time to time, the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa-9, as amended from time to time, The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, as amended from time to time, The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, as amended from time to time, and The Foreign Narcotics Kingpin Designation Act, Publ. L. No. 106-120, as amended from time to time.

We express no opinion as to what law might be applied by any other courts to resolve any issue addressed in this letter. We advise you that issues addressed by this letter may be governed in whole or in part by other laws, but we express no opinion as to whether any relevant difference exists between the laws upon which our opinions are based and any other laws which may actually govern.

This opinion letter speaks as of the time of its delivery on the date it bears. We do not assume any obligation to provide you with any subsequent opinion or advice by reason of any fact about which our Designated Transaction Lawyers did not have actual knowledge at that time, by reason of any change subsequent to that time in any law covered by any of our opinions, or for any other reason.

You may rely upon this letter only for the purpose served by the provision in the Credit Agreement cited in the second paragraph of this opinion letter in response to which it has been delivered. Without our written consent: (i) no person other than you may rely on this opinion letter for any purpose; (ii) this opinion letter may not be cited or quoted in any financial statement, prospectus, private placement memorandum or other similar document; (iii) this opinion letter may not be cited or quoted in any other document or communication which might encourage reliance upon this opinion letter by any person or for any purpose excluded by the restrictions in this paragraph; and (iv) copies of this opinion letter may not be furnished to anyone for purposes of encouraging such reliance. Notwithstanding the foregoing, financial institutions which subsequently become Lenders in accordance with the terms of Section 13.6 of the Credit Agreement may rely on this opinion letter as of the time of its delivery on the date hereof as if this letter were addressed to them.

Sincerely,

/s/ Kirkland & Ellis LLP

KIRKLAND & ELLIS LLP

**EXHIBIT 1**

UCC Financing Statements

[redacted]

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Print Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:

1a. ORGANIZATION'S NAME
**SN EF UnSub GP, LLC**

OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

1c. MAILING ADDRESS **1000 Main Street, Suite 3000*** | CITY **Houston** | STATE **TX** | POSTAL CODE **77002** | COUNTRY **USA**

2. DEBTOR'S NAME:

2a. ORGANIZATION'S NAME

OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

3. SECURED PARTY'S NAME

3a. ORGANIZATION'S NAME
**JPMorgan Chase Bank, N.A., as Agent**

OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

3c. MAILING ADDRESS **MC: NY1-C413, 4 Chase Metrotech Center** | CITY **Brooklyn** | STATE **NY** | POSTAL CODE **11245-0001** | COUNTRY **USA**

4. COLLATERAL:
**All assets.**

5.

6a. 6b.

7. ALTERNATIVE DESIGNATION (if applicable)

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State *c/o Sanchez Energy Corporation 509265/2015**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11) International Association of Commercial Administrators (IACA)



009454

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Print Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME: **SN EF UnSub, LP** | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS: **1000 Main Street, Suite 3000*** | CITY: **Houston** | STATE: **TX** POSTAL CODE: **77002** | COUNTRY: **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME: **JPMorgan Chase Bank, N.A., as Agent** | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS: **MC: NY1-C413, 4 Chase Metrotech Center** | CITY: **Brooklyn** | STATE: **NY** POSTAL CODE: **11245-0001** | COUNTRY: **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**All assets.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State *c/o Sanchez Energy Corporation 509265/2015**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11) International Association of Commercial Administrators (IACA)

[redacted]

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Print Reset

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME: **SN EF UnSub Holdings, LLC** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS: **1000 Main Street, Suite 3000*** | CITY: **Houston** | STATE: **TX** | POSTAL CODE: **77002** | COUNTRY: **USA** |

2. DEBTOR'S NAME

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME: **JPMorgan Chase Bank, N.A., as Agent** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS: **MC: NY1-C413, 4 Chase Metrotech Center** | CITY: **Brooklyn** | STATE: **NY** | POSTAL CODE: **11245-0001** | COUNTRY: **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Filed with: Delaware Secretary of State** ***c/o Sanchez Energy Corporation** **509265/2015**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11) International Association of Commercial Administrators (IACA)

**EXHIBIT M-2 TO
CREDIT AGREEMENT**

**LEGAL OPINION OF KIRKLAND & ELLIS LLP**

[Attached]

March 1, 2017

To the Purchasers
under the Agreement (referred to below) and

to the Agent and each of the Lenders under the

Partnership Credit Agreement (referred to below)
on the date hereof:

Re: (i) Amended and Restated Securities Purchase Agreement, dated as of February 28, 2017, by and among Sanchez Energy Corporation, a Delaware corporation ("SN"), SN UR Holdings, LLC, a Delaware limited liability company ("SN GP Member"), SN EF UnSub Holdings, LLC, a Delaware limited liability company ("Common Unit Purchaser"), SN EF UnSub, LP, a Delaware limited partnership (the "Partnership"), SN EF UnSub GP, LLC, a Delaware limited liability company and the general partner of the Partnership (the "General Partner", and together with SN, SN GP Member, Common Unit Purchaser and the Partnership, the "Company Parties"), Intrepid Private Equity V-A, LLC, a Delaware limited liability company, GSO ST Holdings Associates LLC, a Delaware limited liability company ("GSO Associates") and GSO ST Holdings LP, a Delaware limited partnership ("GSO Holdings", and together with GSO Associates, the "Purchasers") (such agreement herein referred to as the "Agreement"); and (ii) Credit Agreement, dated as of March 1, 2017, by and among the Partnership, the lenders party thereto (the "Lenders") and JPMorgan Bank, as administrative agent (the "Administrative Agent") (such agreement herein referred to as the "Partnership Credit Agreement")

Ladies and Gentlemen:

We are issuing this opinion letter in our capacity as counsel to and at the request of the Company Parties in respect of the Agreement.

The opinions expressed herein are being provided pursuant to Section 2.06(a)(vii) of the Agreement and Section 6.1(d)(ii) of the Partnership Credit Agreement. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Agreement (with references herein to the Agreement and each document defined therein meaning the Agreement and each such document as executed and delivered on the date hereof). The Purchasers are sometimes referred to in this opinion letter as "you".

In connection with the preparation of this letter, we have, among other things, reviewed executed counterparts of:

a) the Agreement;

b) that certain Commitment Letter by and between GSO Capital Partners LP and the Partnership;

c) that certain Commitment Letter by and between GSO Capital Opportunities Fund III LP, GSO Capital Solutions Fund II LP, GSO Harrington Credit Alpha Fund (Cayman) L.P., GSO Credit Alpha Fund LP, GSO Energy Select Opportunities Fund LP, GSO Energy Partners-A LP, GSO Energy Partners-B LP, GSO Energy Partners-C LP, GSO Energy Partners-C II LP and GSO Energy Partners-D LP and the Partnership;

d) that certain GSO Warrant Agreement to Purchase SN Common Stock, by and between SN and the GSO Funds party thereto;

e) that certain Management Services Agreement, by and between Sanchez Oil & Gas Corporation ("SOG") and the Partnership;

f) that certain GSO Registration Rights Agreement, by and between SN and the GSO Funds party thereto;

g) that certain GSO Voting Agreement, by and between SN and the GSO Funds party thereto;

h) that certain GSO Non-Solicitation Agreement, by and among GSO Capital Partners LP, SN and SOG;

i) that certain Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement"), between SN EF Maverick, LLC, as Marketer and the Partnership, as Producer, and solely for purposes of Section 8.15 and 8.16 therein, SN;

j) that certain Purchase and Sale Agreement, (the "Purchase and Sale Agreement") by and among Anadarko E&P Onshore LLC, a Delaware limited liability company ("AEP"), Kerr-McGee Oil & Gas Onshore LP, a Delaware limited partnership ("KMOG", and collectively with AEP, "Seller"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), the Partnership, Aguila Production, LLC, a Delaware limited liability company ("AqCo" and collectively with Maverick and Partnership, "Buyer") and solely for purposes of Section 15.22 and Schedule 13.4(a) therein, SN;

k) that certain Letter Agreement, by and among the Seller, Buyer and solely for purposes of Section 15.22 and Schedule 13.4(a) of the Purchase and Sale Agreement, SN;

l) that certain Joint Development Agreement, by and between Gavilan Resources, LLC (f/k/a Aguila Production, LLC), Maverick, Partnership and solely with respect to Section 2.2, Section 4.5 and Article VII, SN;

m) that certain Development Agreement, among AEP and KMOG, as Anadarko, Maverick, the Partnership and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), as the Drilling Parties, and solely for purposes of Section 4.15 therein, SN;

n) that certain Transition Services Agreement, between AEP and Maverick;

o) Amended and Restated Agreement of Limited Partnership of Partnership, by and between the Partnership, General Partner, as the general partner and the limited partners party thereto;

p) Amended and Restated Limited Liability Company Agreement of General Partner, by and between General Partner, GSO Associates, and SN GP Member;

q) the Partnership Credit Agreement;

r) the Notes (as defined in the Partnership Credit Agreement) delivered to the Lenders on the date hereof; and

s) the Collateral Agreement (as defined in the Partnership Credit Agreement).

For purposes hereof, the documents listed in items (a) through (s) above (each in the form reviewed by us for purposes of this opinion letter) are called the "Operative Documents".

For purposes herein, the "Debt Documents" shall mean:

a) that certain Second Amended and Restated Credit Agreement, dated as of June 30, 2014 among SN, as borrower, the lenders party thereto and Royal Bank of Canada as administrative agent, as amended by that certain First Amendment to Second Amended and Restated Credit Agreement, dated as of September 9, 2014, as amended by that certain Second Amendment to Second Amended and Restated Credit Agreement, dated as of March 31, 2015, as amended by that certain Third Amendment to Second Amended and Restated Credit Agreement, dated as of July 20, 2015, as amended by that certain Fourth Amendment to Second Amended and Restated Credit Agreement, dated as of September 29, 2015, as amended by that certain Fifth Amendment to Second Amended and Restated Credit Agreement, dated as of October 30, 2015, as amended by that certain Sixth Amendment to Second Amended and Restated Credit Agreement, dated as of January 22, 2016 and as amended by that certain Seventh Amendment to Second Amended and Restated Credit Agreement, dated as of March 18, 2016;

b) that certain Amended and Restated Security and Pledge Agreement, dated as of June 30, 2014 among SN, the guarantors party thereto and Royal Bank of Canada, as administrative agent;

c) that certain 6.125% Senior Secured Notes Due 2023 Indenture dated June 27, 2014 among SN, the guarantors party thereto, and U.S. Bank National Association, as trustee; and

d) that certain 7.75% Senior Notes Due 2021 Indenture dated June 13, 2013 among SN, the guarantors party thereto, and U.S. Bank National Association, as trustee, as supplemented by that certain First Supplemental Indenture, dated as of September 11, 2013 and as further supplemented by that certain Second Supplemental Indenture, dated as of June 2, 2014.

Subject to the assumptions, qualifications, exclusions and other limitations which are identified in this opinion letter, we advise you, and with respect to each legal issue addressed in this opinion letter, it is our opinion, that:

1. The execution and delivery by any Company Party of the Operative Documents to which it is a party, and the performance by any Company Party of the Operative Documents to which it is a party, will not constitute a breach or violation of, with respect to any Company Party, or result in the creation of any lien upon or security interest in any Company Party's properties pursuant to, the Debt Documents, provided that we express no opinion with respect to breaches, violations or defaults under any cross-default provision or with respect to any financial covenants or tests in any such agreement or instrument.

With your consent, we have assumed for purposes of this letter and the opinions herein:

(a) that each document we have reviewed for purposes of this letter is accurate and complete, each such document that is an original is authentic, each such document that is a copy conforms to an authentic original, and all signatures on each such document are genuine, and that all natural persons who have signed any document have the legal capacity to do so;

(b) that each Operative Document and every other agreement we have examined for purposes of this letter has been duly authorized, executed and delivered by the parties thereto and constitutes a valid and binding obligation of each party to that document, enforceable against each such party in accordance with its respective terms and that each such party has satisfied all legal requirements that are applicable to such party to the extent necessary to entitle such party to enforce such agreement and that each party to any Operative Document is in good standing and duly incorporated or organized under the laws of its jurisdiction of organization;

(c) there are no agreements or understandings among the parties, written or oral (other than the Operative Documents and the Debt Documents), and there is no usage of trade or course of prior dealing among the parties that would, in either case, define, supplement or qualify the terms of the Operative Documents; and

(d) that immediately prior to giving effect to the Agreement, each of the Operative Documents, including, without limitation the Purchase and Sale Agreement and the Marketing Agreement, as such documents exist, have not been amended or otherwise modified, and each such agreement is in full force and effect and enforceable in accordance with its terms against all parties thereto and all parties thereto were, on the execution date thereof, existing and in good standing in their respective jurisdictions of organization.

In preparing this letter, we have relied without any independent verification upon: (i) information contained in certificates obtained from governmental authorities; (ii) factual information represented to be true in the Operative Documents; (iii) factual information provided to us in a support certificate signed by each of the Company Parties; and (iv) factual information we have obtained from such other sources as we have deemed reasonable and we have examined the originals or copies certified to our satisfaction of such other limited liability or partnership records of the Company Parties as we deem necessary for or relevant to our opinions. We have assumed without investigation that the information upon which we have relied is accurate and does not omit disclosures necessary to prevent such information from being misleading.

The terms "knowledge," "actual knowledge" and "aware" whenever used in this letter with respect to our firm mean

conscious awareness at the time this letter is delivered on the date it bears by the lawyers with Kirkland & Ellis LLP at that time who spent substantial time representing the Company Parties in connection with the Operative Documents (herein called our "Designated Transaction Lawyers").

Except as expressly otherwise set forth in this letter, our advice on every legal issue addressed in this letter is based exclusively on the internal laws of the State of New York or the Federal law of the United States which, in each case, in our experience is generally applicable both to general business organizations which are not engaged in regulated business activities and to transactions of the type contemplated in the Operative Documents between the Company Parties, on the one hand, and you and the other parties thereto, on the other hand (but without our having made any special investigation as to any other laws) and the Debt Documents, except that we express no opinion or advice as to any law or legal issue (a) which might be violated by any misrepresentation or omission or a fraudulent act, or (b) to which any Company Party may be subject as a result of your legal or regulatory status, your sale or transfer of the Loans (as defined in the Partnership Credit Agreement) or interests therein or your involvement in the transactions contemplated by the Operative Documents.

For purposes of our opinion, we have assumed that the Operative Documents governed by the internal laws of Delaware are governed by the internal laws of New York.

None of the opinions or other advice contained in this letter considers or covers: (i) any federal or state securities (or "blue sky") laws or regulations or Federal Reserve Board margin regulations or (ii) federal or state antitrust and unfair competition laws and regulations, pension and employee benefit laws and regulations, compliance with fiduciary duty requirements, federal and state environmental, land use and subdivision, tax, racketeering (e.g., RICO), health and safety (e.g., OSHA), and labor laws and regulations, federal and state laws, regulations and policies concerning national and local emergency, possible judicial deference to acts of sovereign states and criminal and civil forfeiture laws, and other federal and state statutes of general application to the extent they provide for criminal prosecution (e.g., mail fraud and wire fraud statutes).

We also express no opinion regarding any laws relating to terrorism or money laundering, including Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001) (the "Terrorism Executive Order") or any related enabling legislation or any other similar executive order (collectively with the Terrorism Executive Order, the "Executive Orders"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56, the "Patriot Act"), any sanctions and regulations promulgated under authority granted by the Trading with the Enemy Act, 50 U.S.C. App. 1-44, as amended from time to time, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, as amended from time to time, the Iraqi Sanctions Act, Publ. L. No. 101-513; United Nations Participation Act, 22 U.S.C. § 287c, as amended from time to time, the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa-9, as amended from time to time, The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, as amended from time to time, The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, as amended from time to time, and The Foreign Narcotics Kingpin Designation Act, Publ. L. No. 106-120, as amended from time to time.

We express no opinion as to what law might be applied by any other courts to resolve any issue addressed in this letter. We advise you that issues addressed by this letter may be governed in whole or in part by other laws, but we express no opinion as to whether any relevant difference exists between the laws upon which our opinions are based and any other laws which may actually govern.

This opinion letter speaks as of the time of its delivery on the date it bears. We do not assume any obligation to provide you with any subsequent opinion or advice by reason of any fact about which our Designated Transaction Lawyers did not have actual knowledge at that time, by reason of any change subsequent to that time in any law covered by any of our opinions, or for any other reason.

You may rely upon this letter only for the purpose served by the provision in the Agreement cited in the second paragraph of this opinion letter in response to which it has been delivered. Without our written consent: (i) no person other than you may rely on this opinion letter for any purpose; (ii) this opinion letter may not be cited or quoted in any financial statement, prospectus, private placement memorandum or other similar document; (iii) this opinion letter may not be cited or quoted in any other document or communication which might encourage reliance upon this opinion letter by any person or for

any purpose excluded by the restrictions in this paragraph; and (iv) copies of this opinion letter may not be furnished to anyone for purposes of encouraging such reliance. Notwithstanding the foregoing, the opinion in this letter may be relied upon by the JPMorgan National Association, in its capacity as Administrative Agent under the Partnership Agreement and the Lenders party thereto to the same extent as if this letter was addressed to them.

Sincerely,

/s/ Kirkland & Ellis LLP

KIRKLAND & ELLIS LLP

**EXHIBIT M-3 TO
CREDIT AGREEMENT**

**LEGAL OPINION OF AKIN GUMP STRAUSS HAUER & FELD LLP**

[Attached]

Akin Gump
STRAUSS HAUER & FELD LLP

March 1, 2017

GSO ST Holdings LP
GSO ST Holdings Associates LLC
JPMorgan Chase Bank, N.A.,
as Administrative Agent
under the First Lien Credit Agreement (defined below)

Re: The Opinion Parties (defined below)

Ladies and Gentlemen:

Solely for purposes of rendering the opinions expressed herein we have acted as special counsel to Sanchez Energy Corporation, a Delaware corporation ("***SN***"), SN EF UnSub Holdings, LLC, a Delaware limited liability company (the "***Common Unit Purchaser***"), SN UR Holdings, LLC, a Delaware limited liability company (the "***GP Member***"), SN EF UnSub GP, LLC, a Delaware limited liability company (the "***GP***"), and SN EF UnSub, LP, a Delaware limited partnership (the "***Partnership***" and, together with the GP Member, the Common Unit Purchaser and the GP, the "***Opinion Parties***"), in connection with the Amended and Restated Securities Purchase Agreement dated February 28, 2017 (the "***Purchase Agreement***") by and among SN, the GP Member, the Common Unit Purchaser, the Partnership, the GP, Intrepid Private Equity V-A, LLC, a Delaware limited liability company ("***Intrepid***"), GSO ST Holdings Associates LLC, a Delaware limited liability company ("***GSO Associates***"), and GSO ST Holdings LP, a Delaware limited partnership ("***GSO Holdings***"). This opinion is being rendered at the request of SN pursuant to Section 2.06(a)(viii)(b) of the Purchase Agreement and Section 6.1(d)(iii) of the First Lien Credit Agreement (the "***First Lien Credit Agreement***") dated March 1, 2017 among the Partnership, as the borrower, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the "***FLCA Administrative Agent***"), collateral agent (in such capacity, the "***FLCA Collateral Agent***"), and the lenders party thereto (the "***FLCA Lenders***") and others. All capitalized terms used in this letter, without definition, have the meanings assigned to them in the Purchase Agreement.

In connection with this letter, we have examined executed originals or copies of executed originals of the Purchase Agreement and each of the following documents (such following documents, collectively, the "***SN Debt Documents***"):

(a) Indenture, dated as of June 13, 2013, among SN, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee, as supplemented by the First Supplemental Indenture, dated as of September 11, 2013, by and among SN, SN TMS, LLC, the existing guarantors and U.S. Bank National Association as trustee, and the Second Supplemental Indenture, dated as of June 2, 2014, by and among SN, SN Catarina, LLC, the existing guarantors and U.S. Bank National Association as trustee (as so supplemented, the "***2013 Indenture***");

(b) Indenture, dated as of June 27, 2014, among SN, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee (the "***2014 Indenture***" and, together with the 2013 Indenture, the "***Indentures***"); and

(c) Second Amended and Restated Credit Agreement dated as of June 30, 2014 among SN, Royal Bank of Canada, as Administrative Agent, and the subsidiary guarantors, lenders and others named therein, as amended by (i) the First Amendment dated as of September 9, 2014, (ii) the Second Amendment dated as of March 31, 2015, (iii) the Third Amendment dated as of July 20, 2015; (iv) the Fourth Amendment dated as of September 29, 2015, (v) the Fifth Amendment dated as of October 30, 2015, (vi) the Sixth Amendment dated as of January 22, 2016, and (vii) the Seventh Amendment dated as of March 18, 2016 (as so amended, the "***Credit Agreement***").

In addition, we have examined the following documents (collectively, the "***Due Diligence Documents***"):

(i) the Amended and Restated Certificate of Limited Partnership of the Partnership dated March 1, 2017;

(ii) the Amended and Restated Agreement of Limited Partnership of the Partnership dated March 1, 2017;

(iii) the Amended and Restated Certificate of Formation of the GP dated March 1, 2017;

(iv) the Amended and Restated Limited Liability Company Agreement of the GP dated March 1, 2017;

(v) the Amended and Restated Certificate of Formation of Common Unit Purchaser dated March 1, 2017;

(vi) the Amended and Restated Limited Liability Company Agreement of Common Unit Purchaser dated March 1, 2017;

(vii) the Certificate of Formation of the GP Member dated December 21, 2015;

(viii) the Limited Liability Company Agreement of the GP Member dated December 21, 2015;

(ix) SN's Restated Certificate of Incorporation effective as of May 28, 2013;

(x) SN's Certificate of Designations of Series C Junior Participating Preferred Stock;

(xi) SN's Amended and Restated Bylaws;

(xii) certificates executed by the officers of SN on behalf of SN, including the certificates designating, or evidencing the designation of, each of the Opinion Parties as "Unrestricted Subsidiaries" under and as defined in the applicable SN Debt Documents attached hereto as Annex I, Annex II and Annex III, which certificates include copies of the resolutions of the Board of Directors of SN designating each of the Opinion Parties as an Unrestricted Subsidiary of SN under the applicable SN Debt Document (collectively, the "***Certificates***"); and

(xiii) the documents listed on Exhibit A (such documents, together with the Purchase Agreement, in each case, as in effect on the date hereof, the "***Transaction Documents***").

We have examined originals or certified copies of such corporate records of SN and other certificates and documents of officials of SN, public officials and others as we have deemed appropriate for purposes of this letter, except where a statement is qualified as to knowledge or awareness, in which case we have not made any inquiry, as specified below. As to various questions of fact relevant to this letter, we have relied, without independent investigation, upon the Certificates and other Due Diligence Documents, certificates of public officials, certificates of officers of SN and representations and warranties of SN and the Opinion Parties in the Transaction Documents, all of which we assume to be true, correct and complete. We wish to inform you that our knowledge is necessarily limited due to the limited scope of our review. In addition, we have made no inquiry of the Partnership, the Common Unit Purchaser, the GP, the Common Unit Purchaser Parent, SN or any other person or entity, including governmental authorities ("***Person***"), regarding, and have conducted no review of, any judgments, orders, decrees, franchises, licenses, certificates, permits or other public records or agreements to which any such Person or any of their subsidiaries is a party other than the Transaction Documents, the SN Debt Documents and the Due Diligence Documents.

We have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity to authentic original documents of all copies submitted to us as conformed, certified or reproduced copies. In our examination of documents, we have also assumed the legal capacity of natural persons, the corporate or other power and due authorization of each Person not a natural person to execute and deliver such documents and to consummate the transactions contemplated thereby, the due execution and delivery of each such document by all parties thereto (other than, solely with respect to the Certificates, SN), and that each such document constitutes the valid and binding obligation of each party thereto, enforceable against such party in accordance with its terms.

Based upon the foregoing and subject to the assumptions, exceptions, qualifications and limitations set forth herein, we are of the opinion that, as of the date hereof, (i) each of the Opinion Parties has been designated an Unrestricted Subsidiary under and pursuant to each of the SN Debt Documents and (ii) as such, no Opinion Party is required to become a "Guarantor" under and as defined in the respective SN Debt Document, (x) immediately after and, as a consequence of such Opinion Party entering into any Transaction Document to which it (or any other Opinion Party) is a party, or (y) as a consequence of such Opinion Party performing its obligations under such Transaction Document (in accordance with its terms).

The opinions and other matters in this letter are qualified in their entirety and subject to the following:

A. We express no opinion as to the laws of any jurisdiction other than the Included Laws. We have made no special investigation or review of any published constitutions, treaties, laws, rules or regulations or judicial or administrative decisions ("***Laws***"), other than a review of (i) the Laws of the State of New York, (ii) the Delaware General Corporate Law, (iii) the Delaware Act, (iv) the DRULPA and (v) the Federal Laws of the United States of America. For purposes of this opinion, the term "***Included Laws***" means the items described in clauses (i), (ii), (iii), (iv) and (v) of the preceding sentence that are, in our experience, normally applicable to transactions of the type contemplated in the Transaction Documents and the SN Debt Documents. The term Included Laws specifically excludes (a) Laws of any counties, cities, towns, municipalities and special political subdivisions and any agencies thereof; (b) zoning, land use, building and construction Laws; (c) Federal Reserve Board margin regulations; (d) any commodities, environmental, labor, pension, employee benefit, antiterrorism, money laundering, insurance, antitrust, or intellectual property Laws; (e) tax laws; (f) state or United States Federal securities Laws; and (g) any Laws that may be applicable to SN and its subsidiaries by virtue of the particular nature of the business of SN and its subsidiaries, including, without limitation, the laws regulating the acquisition, exploitation, exploration, development, production and transportation of oil and natural gas.

B. This letter and the matters addressed herein are as of the date hereof or such earlier date as is specified herein, and we undertake no, and hereby disclaim any, obligation to advise you of any change in any matter set forth herein, whether based on a change in the Law, a change in any fact relating to SN, the Common Unit Purchaser, the GP Member, the GP, the Partnership, or any other Person, or any other circumstance. This letter is limited to the matters expressly stated herein and no opinions are to be inferred or may be implied beyond the opinions expressly set forth herein.

C. We have assumed that no, and we express no opinion as to whether any, provision in the Transaction Documents purporting to provide that SN, any guarantor under the SN Debt Documents or any other subsidiary of SN other than an Unrestricted Subsidiary (each, an "***SN Person***") has joint and several liability with the Partnership or any other Person (in either case, an "***Other Person***") constitutes (i) a "guarantee" or "other contingent obligation" of any SN Person with respect to any indebtedness or other liability of any Other Person, (ii) a direct or indirect obligation of any SN Person (x) to subscribe for additional equity interests, (y) to maintain or preserve any Other Person's financial condition or (z) to cause any Other Person to achieve any specified levels of operating results or (iii) a "guarantee" by or "other contingent liability of" any Other Person with respect to any indebtedness or other liability any SN Person, in each case, within the meanings of such terms under any applicable SN Debt Document. We have also assumed that (x) none of, and we express no opinion as to whether, the obligations of SN EF Maverick, LLC with respect to hedging transactions under or pursuant to Section 11.9 of the APC/KM PSA constitute Indebtedness under and as defined in each of the Indentures and (y) each Opinion Party has met, and continues to meet, the requirements of an "Unrestricted Subsidiary" as defined in each of the SN Debt Documents since being designated an Unrestricted Subsidiary (other than as a consequence of such Opinion Party (I) entering into any Transaction Document to which it (or any other Opinion Party) is a party, or (II) performing its obligations under such Transaction Document in accordance with its terms).

D. Except with respect to the Transaction Documents (which are addressed in Paragraph C above, in Paragraph F below and in our opinion paragraph above), we have assumed that no SN Person or Opinion Party has entered into any agreement or taken any action, which agreement or action would constitute a failure of any Opinion Party to meet the requirements as an "Unrestricted Subsidiary," or that would otherwise require any Opinion Party to be a "Restricted Subsidiary," under and as defined in each of the respective SN Debt Documents. We are not aware of nor is there known to us any, and to our actual knowledge there is no, agreement entered into or action taken by any SN Person or any Opinion Party that could constitute such a failure or that could otherwise so require any Opinion Party to be a "Restricted Subsidiary," other than (x) the

Case 4:19-34508 Document 1254-16 Filed in TXSB on 06/22/20 Page 543 of 575

Transaction Documents (which are addressed in Paragraph C above, in Paragraph F below and in our opinion paragraph above) and (y) the Basic Documents constituting the Credit Facility and the Senior Debt (to which clause (y) we express no opinion). The phrases "known to us," "to our actual knowledge" and similar phrases mean the conscious awareness of facts or other information by lawyers currently in our firm actively involved in negotiating and preparing the Transaction Documents and do not require or imply (a) any examination of this firm's, such lawyer's or any other person's or entity's files, (b) that any inquiry be made of the client, any lawyer (other than the lawyers described above), or any other person or entity, or (c) any review or examination of any agreements, documents, certificates, instruments or other papers (including, but not limited to, the exhibits and schedules to the Transaction Documents and the Due Diligence Documents and the various papers referred to in or contemplated by the Transaction Documents and the Due Diligence Documents and the respective exhibits and schedules thereto) other than the Transaction Documents and the Due Diligence Documents.

E. We understand other counsel are addressing the issue as to whether, and we have assumed that, and express no opinion as to whether, the execution and delivery by each of SN, the "Restricted Subsidiaries" of SN under and as defined in any SN Debt Document and the Opinion Parties of the Transaction Documents to which it is a party do not, and the consummation by each of SN, such "Restricted Subsidiaries" and the Opinion Parties of the transactions contemplated by under each such Transaction Documents to which it is a party will not, breach or result in a default under any SN Debt Document.

F. We express no opinion with respect to the fairness of the Transaction Documents (whether individually or collectively) or any other matter, and in rendering the opinions expressed herein, we have assumed, with your consent, that a court of competent jurisdiction would find all such matters were entirely fair to SN and any Person constituting a "Restricted Subsidiary" of SN under and as defined in any SN Debt Document and, thus, as to any such matter involving an agreement, contract, arrangement or understanding with an Opinion Party, no less favorable to SN or such Restricted Subsidiary than that obtainable from non-Affiliates of SN. We have assumed that no fraud, dishonesty, forgery, coercion, duress or breach of fiduciary duty exists or will exist with respect to any of the matters relevant to the opinions expressed in this letter.

G. We express no opinion as to (i) the compliance of the transactions contemplated by the Transaction Documents with any Laws applicable to any party or (except to the extent that we opine above) any agreements of any party; (ii) the financial condition or solvency of SN, the Common Unit Purchaser, the Common Unit Purchaser Parent, the GP, the Partnership, or any other Person; (iii) the ability (financial or otherwise) of SN, the Common Unit Purchaser, the Common Unit Purchaser Parent, the GP, the Partnership, or any other Person to meet their respective obligations under any Transaction Document; (iv) the enforceability of any Transaction Document; (v) the value of any security provided to secure the payment or obligations contemplated by any Transaction Document; (vi) the conformity of the Transaction Documents to any term sheet or commitment letter; or (vii) except as expressly set forth in this letter, any other matter in respect of or connection with the Transaction Documents, the Opinion Parties or any of their respective Affiliates.

This letter is solely for the benefit of GSO Associates, GSO Holdings, the FLCA Administrative Agent, the FLCA Collateral Agent and the FLCA Lenders and no other Persons shall be entitled to rely upon this letter. Without our prior written consent, this letter may not be quoted in whole or in part or otherwise referred to in any document and may not be furnished or otherwise disclosed to or used by any other Person, except for (i) delivery of copies hereof to counsel for the addressees hereof and to the FLCA Collateral Agent and the FLCA Lenders and their respective counsel, head offices and prospective transferees, (ii) inclusion of copies hereof in a closing file, (iii) use hereof in any legal proceeding arising out of the transactions contemplated by the Purchase Agreement filed by an addressee hereof against this law firm or in which any addressee hereof is a defendant and (iv) where required by applicable Law or competent Governmental Authority.

Very truly yours,

/s/ Akin Gump Straus Hauer & Feld, LLP

AKIN GUMP STRAUSS HAUER & FELD, LLP

**Exhibit A**

1. the APC/KM PSA
2. the Management Services Agreement
3. the Joint Development Agreement
4. the Hydrocarbons Marketing Agreement
5. the GSO Warrant Agreement
6. the GSO Registration Rights Agreement
7. the Equity Commitment Letters
8. the GSO Voting Agreement
9. the GSO Non-Solicitation Agreement
10. the SN Letter Agreement
11. the Partnership Agreement
12. the GP LLC Agreement
13. the Drilling Commitment Agreement

**Annex I**

**Credit Agreement Designation Certificate**

**[See attached.]**

**OFFICER'S CERTIFICATE**

**SANCHEZ ENERGY CORPORATION**

**January 11, 2017**

The undersigned, Howard J. Thill, hereby certifies that he is the duly elected, qualified and acting Executive Vice President and Chief Financial Officer of Sanchez Energy Corporation, a Delaware corporation (the "***Company***"), and, in connection with that certain Second Amended and Restated Credit Agreement (as amended, the "***Credit Agreement***") dated June 30, 2014 among the Company, SN Palmetto, LLC (f/k/a SEP Holdings III, LLC), SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Royal Bank of Canada, as Administrative Agent, and the other financial institutions party thereto, further certifies (on behalf of the Company and not in his individual capacity) that:

1. Each of SN EF UnSub Holdings, LLC, a Delaware limited liability company ("***Holdings***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***LP***"), is a Subsidiary of the Company.

2. The Board of Directors of the Company, by resolutions duly adopted by it, which resolutions have not been modified or amended and remain in full force and effect as of the date hereof and are attached hereto as Annex I, has designated each of Holdings, GP and LP as an Unrestricted Subsidiary.

3. The designation of each of Holdings, GP and LP as an Unrestricted Subsidiary is in compliance with the terms of the definition of Unrestricted Subsidiary as set forth in the Credit Agreement.

The terms which are capitalized herein shall, unless otherwise defined, have the same meanings set forth in the Credit Agreement. This officer's certificate is given pursuant to Section 8.16(b) of the Credit Agreement and the definition of Unrestricted Subsidiary in the Credit Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has signed this Officer's Certificate as of the date first set forth above.

**SANCHEZ ENERGY CORPORATION**

By: /s/ Howard J. Thill
Name: Howard J. Thill
Title: Executive Vice President and Chief Financial Officer

Received and acknowledged by:

Royal Bank of Canada, as Administrative Agent

By: ____________________
Name:
Title:

<u>**Annex I**</u>

**Credit Agreement**

**WHEREAS**, the Board has determined that it is in the best interest of the Company that, for purposes of the Credit Agreement, each of SN EF UnSub Holdings, LLC, a Delaware limited liability company (the "***Common Unit Purchaser***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***Unsub***"), be designated as an "Unrestricted Subsidiary," as such term is defined in the Credit Agreement.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the Credit Agreement, the Board designates each of the Common Unit Purchaser, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the Credit Agreement until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the Credit Agreement, the Board, on behalf of the Company and in the Company's capacity as the sole member of SN UR Holdings, LLC, a Delaware limited liability company (including in its capacity as (i) the sole member of the Common Unit Purchaser and (ii) the sole member of GP (including in its capacity as the general partner of UnSub)) hereby designates each of the Common Unit Purchaser, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the Credit Agreement until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**Annex II**

**2013 Indenture Designation Certificates**

**[See attached.]**

**SANCHEZ ENERGY CORPORATION**

**Officers' Certificate**

**January 11, 2017**

Delaware Trust Company
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808
Attention: Trust Administration
Facsimile: (302) 636-8666

This Officers' Certificate is delivered to and filed with you in accordance with Section 4.18 and the definition of "Unrestricted Subsidiary" appearing in Section 1.01 of that certain Indenture, dated as of June 13, 2013 (the "***Original Indenture***"), as supplemented by that certain First Supplemental Indenture, dated as of September 11, 2013 (the "***First Supplemental Indenture***"), and that certain Second Supplemental Indenture, dated as of June 2, 2014 (the "Second Supplemental Indenture", and the Original Indenture as supplemented by the First Supplemental Indenture and the Second Supplemental Indenture, the "***Indenture***"), among Sanchez Energy Corporation (the "***Company***"), the Guarantors party thereto and Delaware Trust Company, as successor trustee (the "***Trustee***") relating to the Company's 7.75% Senior Notes due 2021. All capitalized terms used in this certificate, without definition, have the meanings assigned to them in the Indenture.

Each of the undersigned, in his or her capacity as an officer of the Company, hereby certifies on behalf of the Company that:

(1) Such undersigned officer has read Sections 1.01, 4.07, 4.11 and 4.18 of the Indenture and the definitions and other provisions related thereto.

(2) The statements contained herein are based upon an examination by such undersigned of the Indenture and such corporate records, agreements, documents and other instruments as such undersigned has deemed relevant and necessary as the basis for the statements set forth herein.

(3) SN EF UnSub Holdings, LLC, a Delaware limited liability company ("***Holdings***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***LP***"), have no Indebtedness other than Non-Recourse Debt owing to any Person other than the Company or any of its Restricted Subsidiaries, except for any such Indebtedness that is subject to a guarantee by the Company or Restricted Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(4) Except as permitted by Section 4.11 of the Indenture, none of Holdings, GP and LP, as of the date hereof, are parties to any agreement, contract, arrangement or understanding, taken as a whole with all of its other agreements, contracts, arrangements and understandings, with the Company or any Restricted Subsidiary of the Company, except for any such agreement, contract, arrangement or understanding the terms of which are no less favorable to the Company or any such Restricted Subsidiary than those that might have been obtained at the time from Persons who are not Affiliates of the Company, except for any agreement, contract, arrangement or understanding with the Company or Restricted Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(5) Neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests in any of Holdings, GP or LP or (b) to maintain or preserve any of Holdings', GP's or LP's financial condition or to cause any of Holdings, GP or LP to achieve any specified levels of operating results, except for any equity subscription or credit support obligation of the Company or Restricted

Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(6) None of Holdings, GP or LP has guaranteed or otherwise become an obligor on any Indebtedness of the Company or any of its Restricted Subsidiaries.

(7) Attached as Annex I hereto are resolutions duly adopted by the Board of Directors of the Company (the "***Board***") on January 11, 2017 designating each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture; and such resolutions have not been modified or amended and remain in full force and effect as of the date hereof.

(8) Such undersigned officer is a Company Officer involved in or otherwise familiar with the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary.

(9) Such undersigned officer has made such examination or investigation as is necessary to enable the undersigned to express an informed opinion as to whether or not all conditions and covenants, if any, provided for in the Indenture with respect to the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied.

(10) In the opinion of such undersigned officer, all conditions and covenants, if any, provided for in the Indenture relating to the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied and each such designation was permitted by the Indenture. Without limiting the foregoing, such designation complied with the conditions of Section 4.18 and was permitted by Section 4.07 of the Indenture.

**[Signature page to follow]**

IN WITNESS WHEREOF, the undersigned, in their respective capacities as officers of the Company, have duly executed this Officers' Certificate on behalf of the Company as of the date first set above.

**SANCHEZ ENERGY CORPORATION**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

By: /s/ Eduardo A. Sanchez
Name: Eduardo A. Sanchez
Title: President

**Annex I**

**2013 Indenture**

**WHEREAS**, the Board has determined that it is in the best interest of the Company that, for purposes of the 2013 Indenture, each of SN EF UnSub Holdings, LLC, a Delaware limited liability company (the "***Common Unit Purchaser***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***"), be designated as an "Unrestricted Subsidiary," as such term is defined in the 2013 Indenture.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2013 Indenture, the Board designates each of the Common Unit Purchaser, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2013 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of SN UR Holdings, LLC, a Delaware limited liability company (including in its capacity as (i) the sole member of the Common Unit Purchaser and (ii) the sole member of GP (including in its capacity as the general partner of UnSub)), hereby designates each of the Common Unit Purchaser, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**SANCHEZ ENERGY CORPORATION**

**Officers' Certificate**

**February 8, 2016**

U.S. Bank National Association
5555 San Felipe, Suite 1150
Houston, Texas 77056
Attention Corporate Trust Services
Facsimile No.: (713) 235-9213

This Officers' Certificate is delivered to and filed with you in accordance with Section 4.18 and the definition of "Unrestricted Subsidiary" appearing in Section 1.01 of that certain Indenture, dated as of June 13, 2013 (the "***Original Indenture***"), as supplemented by that certain First Supplemental Indenture, dated as of September 11, 2013 (the "***First Supplemental Indenture***"), and that certain Second Supplemental Indenture, dated as of June 2, 2014 (the "Second Supplemental Indenture", and the Original Indenture as supplemented by the First Supplemental Indenture and the Second Supplemental Indenture, the "***Indenture***"), among Sanchez Energy Corporation (the "***Company***"), the Guarantors party thereto and U.S. Bank National Association, as trustee (the "***Trustee***") relating to the Company's 7.75% Senior Notes due 2021. All capitalized terms used in this certificate, without definition, have the meanings assigned to them in the Indenture.

Each of the undersigned, in his or her capacity as an officer of the Company, hereby certifies on behalf of the Company that:

(1) The undersigned officer has read Sections 1.01, 4.07, 4.10, 4.11 and 4.18 of the Indenture and the definitions and other provisions related thereto.

(2) The statements contained herein are based upon an examination by the undersigned of the Indenture and such corporate records, agreements, documents and other instruments as the undersigned has deemed relevant and necessary as the basis for the statements set forth herein.

(3) SN UR Holdings, LLC, a Delaware limited liability company ("***Holdings***"), and SN Terminal, LLC, a Delaware limited liability company ("***Terminal***"), have no Indebtedness other than Non-Recourse Debt owing to any Person other than the Company or any of its Restricted Subsidiaries.

(4) Except as permitted by Section 4.11 of the Indenture, Holdings and Terminal, as of the date hereof, are not parties to any agreement, contract, arrangement or understanding, taken as a whole with all of its other agreements, contracts, arrangements and understandings, with the Company or any Restricted Subsidiary of the Company the terms of which are no less favorable to the Company or any such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company.

(5) Neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligations (a) to subscribe for additional Equity Interests in Holdings or Terminal or (b) to maintain or preserve Holdings' or Terminal's financial condition or to cause Holdings or Terminal to achieve any specified levels of operating results.

(6) Neither Holdings nor Terminal has guaranteed or otherwise become an obligor on any Indebtedness of the Company or any of its Restricted Subsidiaries.

(7) Pursuant to (i) the Limited Liability Company Agreement of Holdings and (ii) that certain Equity Interests Assignment Agreement dated February 8, 2016, the Company is making an Investment in Holdings as a result of the receipt of non-cash consideration from a transaction made pursuant to and in compliance with Section 4.10 of the Indenture, which constitutes a Permitted Investment.

(8) Attached as Annex I hereto are resolutions duly adopted by the Board of Directors of the Company (the "***Board***") on January 19, 2016 designating Holdings and Terminal as Unrestricted Subsidiaries for purposes of the Indenture; and such resolutions have not been modified or amended and remain in full force and effect as of the date hereof.

(9) Each of the undersigned is a Company Officer involved in or otherwise familiar with the designation of each of Holdings and Terminal as an Unrestricted Subsidiary.

(10) The undersigned officer has made such examination or investigation as is necessary to enable the undersigned to express an informed opinion as to whether or not all conditions and covenants, if any, provided for in the Indenture with respect to the designation of each of Holdings and Terminal as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied.

(11) In the opinion of the undersigned officer, all conditions and covenants, if any, provided for in the Indenture relating to the designation of each of Holdings and Terminal as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied and each such designation was permitted by the Indenture.

**[Signature page to follow]**

IN WITNESS WHEREOF, the undersigned, in their respective capacities as officers of the Company, have duly executed this Officers' Certificate on behalf of the Company as of the date first set above.

**SANCHEZ ENERGY CORPORATION**

By: /s/ G. Gleeson Van Riet
Name: G. Gleeson Van Riet
Title: Senior Vice President and Chief Financial Officer

By: /s/ Kirsten A. Hink
Name: Kirsten A. Hink
Title: Senior Vice President and Chief Accounting Officer

<u>**Annex I**</u>

**Indenture**

**WHEREAS**, the Board has determined that it is in the best interest of the Company that, for purposes of the Indentures, each of Holdings and Terminal be designated as an "Unrestricted Subsidiary," as such term is defined in each respective Indenture.

**NOW, THEREFORE, BE IT RESOLVED**, that, for purposes of and in accordance with the 2013 Indenture, the Board designates Holdings to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2013 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of Holdings, designates Terminal to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board designates Holdings to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of Holdings, designates Terminal to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**Annex III**

**2014 Indenture Designation Certificates**

**[See attached.]**

**SANCHEZ ENERGY CORPORATION**

**Officers' Certificate**

**January 11, 2017**

Delaware Trust Company
2711 Centerville Road, Suite 400
Wilmington, Delaware 19808
Attention: Trust Administration
Facsimile: (302) 636-8666

This Officers' Certificate is delivered to and filed with you in accordance with Section 4.18 and the definition of "Unrestricted Subsidiary" appearing in Section 1.01 of that certain Indenture, dated as of June 27, 2014 (the "***Indenture***"), among Sanchez Energy Corporation (the "***Company***"), the Guarantors party thereto and Delaware Trust Company, as successor trustee (the "***Trustee***") relating to the Company's 6.125% Senior Notes due 2023. All capitalized terms used in this certificate, without definition, have the meanings assigned to them in the Indenture.

Each of the undersigned, in his or her capacity as an officer of the Company, hereby certifies on behalf of the Company that:

(1) Such undersigned officer has read Sections 1.01, 4.07, 4.11 and 4.18 of the Indenture and the definitions and other provisions related thereto.

(2) The statements contained herein are based upon an examination by such undersigned of the Indenture and such corporate records, agreements, documents and other instruments as such undersigned has deemed relevant and necessary as the basis for the statements set forth herein.

(3) SN EF UnSub Holdings, LLC, a Delaware limited liability company ("***Holdings***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***LP***"), have no Indebtedness other than Non-Recourse Debt owing to any Person other than the Company or any of its Restricted Subsidiaries, except for any such Indebtedness that is subject to a guarantee by the Company or Restricted Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(4) Except as permitted by Section 4.11 of the Indenture, none of Holdings, GP and LP, as of the date hereof, are parties to any agreement, contract, arrangement or understanding, taken as a whole with all of its other agreements, contracts, arrangements and understandings, with the Company or any Restricted Subsidiary of the Company, except for any such agreement, contract, arrangement or understanding the terms of which are no less favorable to the Company or any such Restricted Subsidiary than those that might have been obtained at the time from Persons who are not Affiliates of the Company, except for any agreement, contract, arrangement or understanding with the Company or Restricted Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(5) Neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligation (a) to subscribe for additional Equity Interests in any of Holdings, Maverick, GP or LP or (b) to maintain or preserve any of Holdings', GP's or LP's financial condition or to cause any of Holdings, GP or LP to achieve any specified levels of operating results, except for any equity subscription or credit support obligation of the Company or Restricted Subsidiary that constitutes an Investment in any of Holdings, GP or LP that has been effected as a Restricted Payment, Permitted Payment or Permitted Investment that complies with Section 4.07 of the Indenture.

(6) None of Holdings, GP or LP has guaranteed or otherwise become an obligor on any Indebtedness of the Company or any of its Restricted Subsidiaries.

(7) Attached as Annex I hereto are resolutions duly adopted by the Board of Directors of the Company (the "***Board***") on January 11, 2017 designating each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture; and such resolutions have not been modified or amended and remain in full force and effect as of the date hereof.

(8) Such undersigned officer is a Company Officer involved in or otherwise familiar with the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary.

(9) Such undersigned officer has made such examination or investigation as is necessary to enable the undersigned to express an informed opinion as to whether or not all conditions and covenants, if any, provided for in the Indenture with respect to the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied.

(10) In the opinion of such undersigned officer, all conditions and covenants, if any, provided for in the Indenture relating to the designation of each of Holdings, GP and LP as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied and each such designation was permitted by the Indenture. Without limiting the foregoing, such designation complied with the conditions of Section 4.18 and was permitted by Section 4.07 of the Indenture.

**[Signature page to follow]**

IN WITNESS WHEREOF, the undersigned, in their respective capacities as officers of the Company, have duly executed this Officers' Certificate on behalf of the Company as of the date first set above.

**SANCHEZ ENERGY CORPORATION**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

By: /s/ Eduardo A. Sanchez
Name: Eduardo A. Sanchez
Title: President

**Annex I**

**2014 Indenture**

**WHEREAS**, the Board has determined that it is in the best interest of the Company that, for purposes of the 2014 Indenture, each of SN EF UnSub Holdings, LLC, a Delaware limited liability company (the "***Common Unit Purchaser***"), SN EF UnSub GP, LLC, a Delaware limited liability company ("***GP***"), and SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***"), be designated as an "Unrestricted Subsidiary," as such term is defined in the 2014 Indenture.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board designates each of the Common Unit Purchaser, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of SN UR Holdings, LLC, a Delaware limited liability company (including in its capacity as (i) the sole member of the Common Unit Purchaser and (ii) the sole member of GP (including in its capacity as the general partner of UnSub)), hereby designates each of Holdings, GP and UnSub to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**SANCHEZ ENERGY CORPORATION**

**Officers' Certificate**

**February 8, 2016**

U.S. Bank National Association
5555 San Felipe, Suite 1150
Houston, Texas 77056
Attention Corporate Trust Services
Facsimile No.: (713) 235-9213

This Officers' Certificate is delivered to and filed with you in accordance with Section 4.18 and the definition of "Unrestricted Subsidiary" appearing in Section 1.01 of that certain Indenture, dated as of June 27, 2014 (the "***Indenture***"), among Sanchez Energy Corporation (the "***Company***"), the Guarantors party thereto and U.S. Bank National Association, as trustee (the "***Trustee***") relating to the Company's 6.125% Senior Notes due 2023. All capitalized terms used in this certificate, without definition, have the meanings assigned to them in the Indenture.

Each of the undersigned, in his or her capacity as an officer of the Company, hereby certifies on behalf of the Company that:

(1) The undersigned officer has read Sections 1.01, 4.07, 4.10, 4.11 and 4.18 of the Indenture and the definitions and other provisions related thereto.

(2) The statements contained herein are based upon an examination by the undersigned of the Indenture and such corporate records, agreements, documents and other instruments as the undersigned has deemed relevant and necessary as the basis for the statements set forth herein.

(3) SN UR Holdings, LLC, a Delaware limited liability company ("***Holdings***"), and SN Terminal, LLC, a Delaware limited liability company ("***Terminal***"), have no Indebtedness other than Non-Recourse Debt owing to any Person other than the Company or any of its Restricted Subsidiaries.

(4) Except as permitted by Section 4.11 of the Indenture, Holdings and Terminal, as of the date hereof, are not parties to any agreement, contract, arrangement or understanding, taken as a whole with all of its other agreements, contracts, arrangements and understandings, with the Company or any Restricted Subsidiary of the Company the terms of which are no less favorable to the Company or any such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company.

(5) Neither the Company nor any of its Restricted Subsidiaries has any direct or indirect obligations (a) to subscribe for additional Equity Interests in Holdings or Terminal or (b) to maintain or preserve Holdings' or Terminal's financial condition or to cause Holdings or Terminal to achieve any specified levels of operating results.

(6) Neither Holdings nor Terminal has guaranteed or otherwise become an obligor on any Indebtedness of the Company or any of its Restricted Subsidiaries.

(7) Pursuant to (i) the Limited Liability Company Agreement of Holdings and (ii) that certain Equity Interests Assignment Agreement dated February 8, 2016, the Company is making an Investment in Holdings as a result of the receipt of non-cash consideration from a transaction made pursuant to and in compliance with Section 4.10 of the Indenture, which constitutes a Permitted Investment.

(8) Attached as Annex I hereto are resolutions duly adopted by the Board of Directors of the Company (the "***Board***") on January 19, 2016 designating Holdings and Terminal as Unrestricted Subsidiaries for purposes of the Indenture; and such resolutions have not been modified or amended and remain in full force and effect as

of the date hereof.

(9) Each of the undersigned is a Company Officer involved in or otherwise familiar with the designation of each of Holdings and Terminal as an Unrestricted Subsidiary.

(10) The undersigned officer has made such examination or investigation as is necessary to enable the undersigned to express an informed opinion as to whether or not all conditions and covenants, if any, provided for in the Indenture with respect to the designation of each of Holdings and Terminal as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied.

(11) In the opinion of the undersigned officer, all conditions and covenants, if any, provided for in the Indenture relating to the designation of each of Holdings and Terminal as an Unrestricted Subsidiary for purposes of the Indenture have been satisfied and each such designation was permitted by the Indenture.

[Signature page to follow]

IN WITNESS WHEREOF, the undersigned, in their respective capacities as officers of the Company, have duly executed this Officers' Certificate on behalf of the Company as of the date first set above.

**SANCHEZ ENERGY CORPORATION**

By: /s/ G. Gleeson Van Riet
Name: G. Gleeson Van Riet
Title: Senior Vice President and Chief Financial Officer

By: /s/ Kirsten A. Hink
Name: Kirsten A. Hink
Title: Senior Vice President and Chief Accounting Officer

<u>**Annex I**</u>

**Indenture**

**WHEREAS**, the Board has determined that it is in the best interest of the Company that, for purposes of the Indentures, each of Holdings and Terminal be designated as an "Unrestricted Subsidiary," as such term is defined in each respective Indenture.

**NOW, THEREFORE, BE IT RESOLVED**, that, for purposes of and in accordance with the 2013 Indenture, the Board designates Holdings to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2013 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of Holdings, designates Terminal to be an "Unrestricted Subsidiary" as defined in the 2013 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board designates Holdings to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**RESOLVED FURTHER**, that, for purposes of and in accordance with the 2014 Indenture, the Board, on behalf of the Company and in the Company's capacity as the sole member of Holdings, designates Terminal to be an "Unrestricted Subsidiary" as defined in the 2014 Indenture until such time as the Company, acting through one or more Officers and without need to obtain further authorization from the Board, deems it necessary, desirable or appropriate to change such designation.

**EXHIBIT N-1 TO**
**CREDIT AGREEMENT**

**FORM OF THE JOINT DEVELOPMENT AGREEMENT**

[On file with Administrative Agent]

**EXHIBIT N-2 TO**
**CREDIT AGREEMENT**

**FORM OF THE MANAGEMENT SERVICES AGREEMENT**

[On file with Administrative Agent]

**EXHIBIT N-3 TO
CREDIT AGREEMENT**

**FORM OF THE BORROWER'S LPA**

[On file with Administrative Agent]

**EXHIBIT N-4 TO
CREDIT AGREEMENT**

**FORM OF THE PARENT LLCA**

[On file with Administrative Agent]

**EXHIBIT N-5 TO**
**CREDIT AGREEMENT**

**FORM OF THE DEVELOPMENT AGREEMENT**

[On file with Administrative Agent]

**EXHIBIT N-6 TO
CREDIT AGREEMENT**

**FORM OF THE MARKETING AGREEMENT**

[On file with Administrative Agent]

**EXHIBIT N-7 TO**
**CREDIT AGREEMENT**

**FORM OF THE SIDE LETTER AGREEMENT**

[On file with Administrative Agent]

**Schedule 1.1(a)**

**Commitments**

| Lender | Commitment | Borrowing Base Amount at Closing | % of Total | L/C Commitment | % of Total |
|---|---|---|---|---|---|
| **JPMorgan Chase Bank, N.A.** | $54,545,454.55 | $36,000,000.00 | 10.91% | $25,000,000.00 | 50.00% |
| **Citibank, N.A.** | $54,545,454.55 | $36,000,000.00 | 10.91% | $25,000,000.00 | 50.00% |
| **Capital One, National Association** | $37,878,787.88 | $25,000,000.00 | 7.58% | $0.00 | 0.00% |
| **Royal Bank of Canada** | $37,878,787.88 | $25,000,000.00 | 7.58% | $0.00 | 0.00% |
| **BMO Harris Bank, NA** | $33,333,333.33 | $22,000,000.00 | 6.67% | $0.00 | 0.00% |
| **ING Capital LLC** | $33,333,333.33 | $22,000,000.00 | 6.67% | $0.00 | 0.00% |
| **SunTrust Bank** | $33,333,333.33 | $22,000,000.00 | 6.67% | $0.00 | 0.00% |
| **ABN AMRO Capital USA LLC** | $27,272,727.27 | $18,000,000.00 | 5.45% | $0.00 | 0.00% |
| **Canadian Imperial Bank of Commerce, New York Branch** | $27,272,727.27 | $18,000,000.00 | 5.45% | $0.00 | 0.00% |
| **Fifth Third Bank** | $27,272,727.27 | $18,000,000.00 | 5.45% | $0.00 | 0.00% |
| **Natixis, New York Branch** | $27,272,727.27 | $18,000,000.00 | 5.45% | $0.00 | 0.00% |
| **PNC Bank, National Association** | $27,272,727.27 | $18,000,000.00 | 5.45% | $0.00 | 0.00% |
| **BOKF, NA dba Bank of Texas** | $19,696,969.70 | $13,000,000.00 | 3.94% | $0.00 | 0.00% |
| **Citizens Bank, N.A.** | $19,696,969.70 | $13,000,000.00 | 3.94% | $0.00 | 0.00% |
| **Comerica Bank** | $19,696,969.70 | $13,000,000.00 | 3.94% | $0.00 | 0.00% |
| **The Huntington National Bank** | $19,696,969.70 | $13,000,000.00 | 3.94% | $0.00 | 0.00% |
| **TOTAL** | $500,000,000.00 | $330,000,000.00 | 100.00% | $50,000,000.00 | 100.00% |

**Schedule 1.1(e)**

**Closing Date Subsidiary Guarantors**

None.

**Schedule 8.4**

**Litigation**

None.

**Schedule 8.11**

**Subsidiaries**

None.

**Schedule 8.13**

**Properties**

None.

**Schedule 8.16**

**Closing Date Gas Imbalance**

None.

**Schedule 8.17**

**Closing Date Marketing Agreements**

| Type of Agreement | Date | Entity | Other Party | Term | Notes |
|---|---|---|---|---|---|
| Hydrocarbon Purchase and Marketing Agreement | January 12, 2017 | SN EF UnSub, LP<br><br>Sanchez Energy Corporation (Solely for Sections 8.15 and 8.16) | SN EF Maverick, LLC | Earlier to occur of (i) date of termination of both Springfield Agreements[10] and (ii) December 31, 2034 | N/A |

[10] To be executed at the end of the marketing transition period to replace existing agreements between APC and Springfield.

**Schedule 8.18**

**Closing Date Hedge Agreements of Borrower**

ISDA Master Agreement dated as of March 1, 2017 by and between JPMorgan Chase Bank, N.A. and SN EF UnSub, LP

ISDA Master Agreement dated as of March 1, 2017 by and between Citibank, N.A. and SN EF UnSub, LP

| Counterparty | Trade Date | Counterparty Trade ID | Type | Effective Date | Termination Date | Notional Volume | Units | Fixed Price | MTM ($MM) | Credit Support Agreements |
|---|---|---|---|---|---|---|---|---|---|---|
| JPMorgan | Jan. 13, 2017 | 8500012F/3FCX / E12F-RX76 | Swap/NG-HH | Apr. 1, 2017 | Sep. 30, 2018 | 20,241,000 | MMBtu | $3.260 | $5.8 | None |
| Citi | Feb. 21, 2017 | 36313712 / OLNAM36313712 | Swap/NG-HH | Oct. 1, 2018 | Mar. 31, 2020 | 15,561,000 | MMBtu | $2.820 | $(0.8) | None |
| JPMorgan | Jan. 13, 2017 | 85000F9-3NULM / EF9-2DAZP8 | Swap/CL-WTI | Apr. 1, 2017 | Sep. 30, 2018 | 3,417,000 | Bbls | $55.85 | $4.2 | None |
| Citi | Feb. 21, 2017 | 36313651 / OLNAM36313651 | Swap/CL-WTI | Oct. 1, 2018 | Mar. 31, 2020 | 2,541,000 | Bbls | $53.52 | $0.0 | None |

Note: Trades shown above novated to Borrower effective March 1, 2017. Mark-to-market (MTM) values shown as of February 24, 2017.

**Schedule 10.1**

**Closing Date Indebtedness**

None.

**Schedule 10.2(d)**

**Closing Date Liens**

None.

**Schedule 10.5(c)**

**Closing Date Investments**

None.

**Schedule 10.8**

**Closing Date Negative Pledge Agreements**

None.

**Schedule 13.2**

**Notice Addresses**

| Entity | Notice Addresses |
|---|---|
| Borrower: | SN EF UnSub, LP<br>c/o Sanchez Energy Corporation<br><br>Address:<br>1000 Main Street, Suite 3000<br>Houston, Texas 77002<br><br>Telephone: 713-783-8000<br><br>Email: Garrick Hill <ghill@sanchezog.com><br><br>With a copy to:<br>Mary Kogut<br><br>Address:<br>600 Travis Street, Suite 3300<br>Houston, Texas 77002<br><br>Telephone: 713-835-3650<br><br>Email: Mary.kogut@kirkland.com |
| Administrative Agent: | JPMorgan Chase Bank, N.A.<br>Attn: Darren Vanek<br><br>Address:<br>712 Main Street, 5th Floor<br>Houston, Texas 77002<br><br>Telephone: 713-216-0844<br><br>Email: darren.m.vanek@jpmorgan.com<br><br>*With a copy to:*<br>*Matthew Einbinder*<br><br>*Address:*<br>*600 Travis Street, Suite 5400*<br>*Houston, Texas 77002*<br><br>*Telephone: 713-821-5620*<br><br>*Email:* MEinbinder@stblaw.com |

# Exhibit Q

10-Q 1 sn-20190930x10q.htm 10-Q

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 1-35372**

# Sanchez Energy Corporation

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **45-3090102** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000 Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 783-8000**

(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares of Registrant's common stock, par value $0.01 per share, outstanding as of November 4, 2019: 100,154,182

---

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Form 10-Q**
**For the Quarterly Period Ended September 30, 2019**

**Table of Contents**


| | | |
|---|---|---|
| | **PART I** | |
| Item 1. | Financial Statements | 9 |
| | Condensed Consolidated Balance Sheets as of September 30, 2019 (Unaudited) and December 31, 2018 | 9 |
| | Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 10 |
| | Condensed Consolidated Statements of Stockholders' Deficit for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 11 |
| | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 13 |
| | Notes to the Condensed Consolidated Financial Statements (Unaudited) | 14 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 4. | Controls and Procedures | 79 |
| | **PART II** | |
| Item 1. | Legal Proceedings | 79 |
| Item 1A. | Risk Factors | 80 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 80 |
| Item 3. | Defaults Upon Senior Securities | 80 |
| Item 4. | Mine Safety Disclosures | 81 |
| Item 5. | Other Information | 81 |
| Item 6. | Exhibits | 82 |
| **SIGNATURES** | | 83 |

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this Quarterly Report on Form 10-Q that address activities, events or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. These statements relate to certain assumptions made based on management's experience, perception of historical trends and technical analyses, current conditions, anticipated future developments and other factors we believe to be appropriate and reasonable. When used in this Quarterly Report on Form 10-Q, words such as "will," "potential," "believe," "estimate," "intend," "expect," "may," "should," "anticipate," "could," "plan," "predict," "forecast," "budget," "guidance," "project," "profile," "model," "strategy," "future" or their negatives or the statements that include these words or other similar words that convey the uncertainty of future events or outcomes, are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. In particular, statements, express or implied, concerning the outcome of the Chapter 11 Cases (as defined below), our restructuring plans and our ability to increase our financial flexibility, future operating results and returns or our ability to replace or increase reserves, increase production or generate income or cash flows, service our debt and other obligations and repay or otherwise refinance such obligations when due or at maturity, operational and commercial benefits of our partnerships, expected benefits from acquisitions, and our strategic relationship with Sanchez Midstream Partners LP ("SNMP") are forward-looking statements. Forward-looking statements are not guarantees of performance. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. Although we believe that the expectations reflected in our forward-looking statements are reasonable and are based on reasonable assumptions, there can be no assurance that these assumptions are accurate or that any of these expectations will be achieved (in full or at all) or will prove to have been correct. Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- risks and uncertainties associated with the Chapter 11 Cases, including our ability to develop, confirm and consummate a plan of reorganization under Chapter 11 or an alternative restructuring transaction, which may be necessary to continue as a going concern;
- our ability to maintain relationships with suppliers, customers, employees and other third parties as a result of our filing of the Bankruptcy Petitions (as defined below);
- our ability to obtain sufficient financing to allow us to emerge from bankruptcy and execute our business plan post-emergence;
- the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases;
- our ability to obtain Bankruptcy Court (as defined below) approval of the various motions and forms of orders, including with respect to our DIP Facility (as defined below), and risks associated with third-party motions in the Chapter 11 Cases, which may interfere with our ability to confirm and consummate a plan of reorganization or an alternative restructuring transaction;
- the potential adverse effects of the Chapter 11 Cases on our liquidity and results of operations;
- increased professional fees and advisory costs to execute a reorganization;
- the timing and extent of changes in prices of, and demand for, crude oil and condensate, natural gas liquids ("NGLs"), natural gas and related commodities;
- our ability to comply with the financial and other covenants in our debt instruments, including our DIP Facility, to service and repay our debt, and to address our liquidity needs, particularly if commodity prices remain volatile and/or depressed;
- the extent to which we are able to pursue drilling plans and acquisitions that are successful in maintaining and economically developing our acreage, producing and replacing reserves and achieving anticipated production levels;

- our ability to realize the benefits of our various acquired assets, fully identify and address existing and potential issues or liabilities and accurately estimate reserves, production and costs with respect to such assets;
- the extent to which our current low share price, our listing in the over-the-counter market rather than on a national securities exchange and our ongoing Chapter 11 Cases will impair our access to the equity markets and ability to obtain financing;
- our ability to utilize the services, personnel and other assets of Sanchez Oil & Gas Corporation (“SOG”) pursuant to an existing services agreement (the “Services Agreement”);
- SOG’s ability to attract and retain personnel and other resources to perform its obligations under the Services Agreement;
- the realized benefits of our partnerships and joint ventures, including our transactions with SNMP and our partnership with affiliates of The Blackstone Group Inc. (“Blackstone”);
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may, therefore, be imprecise;
- the extent to which we can optimize reserve recovery and economically develop our properties utilizing horizontal and vertical drilling, advanced completion technologies, hydraulic stimulation and other techniques;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the effectiveness of our internal control over financial reporting;
- the availability, creditworthiness and performance of our counterparties, including financial institutions, operating partners and other parties;
- the extent to which requests for credit assurances from our contractual counterparties could have a material adverse effect on our business, financial condition and results of operations;
- the extent to which minimum volume commitments or “take-or-pay” obligations in excess of our oil and natural gas deliveries to, or transportation needs from, our contractual counterparties due to reduced activity levels or otherwise could have a material adverse effect on our business, financial condition and results of operations;
- results of litigation filed against us or other legal proceedings or out-of-court contractual disputes to which we are party or for which we owe an indemnity;
- competition in the oil and natural gas exploration and production industry generally and with respect to the marketing of oil, natural gas and NGLs, acquisition of leases and properties, attraction and retention of employees and other personnel, procurement of equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- the extent to which our production, revenue and cash flow from operating activities are derived from oil and natural gas assets which are concentrated in a single geographic area;

- developments in oil-producing and natural gas-producing countries, the actions of the Organization of Petroleum Exporting Countries ("OPEC") and other factors affecting the supply and pricing of oil and natural gas;
- the extent to which third parties operate our oil and natural gas properties successfully and economically;
- our ability to manage the financial risks where we share with more than one party the costs of drilling, equipping, completing and operating wells, including with respect to the Comanche Assets (as defined in "Item 1. Notes to the Condensed Consolidated Financial Statements—Note 14. Stockholders' and Mezzanine Equity");
- the use of competing energy sources, the development of alternative energy sources and potential economic implications and other effects therefrom;
- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage, including losses related to sabotage, terrorism or other malicious intentional acts (including cyber-attacks) that disrupt operations;
- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic stimulation and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws, regulations, restrictions and guidelines with respect to derivatives, hedging activities and commercial lending standards; and
- the other factors described under "Part I, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," "Part II, Item 1A. Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q and in our other public filings with the Securities and Exchange Commission (the "SEC").

In light of these risks, uncertainties and assumptions, the events anticipated by our forward-looking statements may not occur, and, if any of such events do, we may not have correctly anticipated the timing of their occurrence or the extent of their impact on our actual results. Accordingly, you should not place any undue reliance on any of our forward-looking statements. Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to correct or update any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by applicable law. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

## GLOSSARY OF SELECTED OIL AND NATURAL GAS TERMS

The following includes a description of the meanings of some of the oil and natural gas industry terms used in this Quarterly Report on Form 10-Q. The definitions “development costs,” “development project,” “development well,” “economically producible,” “field,” “possible reserves,” “probable reserves,” “production costs,” “proved area,” “reservoir,” “resources,” and “unproved properties” have been excerpted from the applicable definitions contained in Rule 4-10(a) of Regulation S-X.

***American Petroleum Institute (“API”) gravity:*** A system of classifying oil based on its specific gravity, whereby the greater the gravity, the lighter the oil.

***Bbl:*** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

***Boe:*** One barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Boe of oil.

***Boe/d:*** One Boe per day.

***Btu:*** One British thermal unit, the quantity of heat required to raise the temperature of a one-pound mass of water by one degree Fahrenheit.

***completion:*** The process of treating a drilled well followed by the installation of permanent equipment for the production of oil or natural gas, or in the case of a dry hole, the reporting of abandonment to the appropriate agency.

***condensate:*** A liquid hydrocarbon with an API gravity of 50-100°.

***developed acreage:*** The number of acres that are allocated or assignable to producing wells or wells capable of production.

***development costs:*** Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and natural gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to: (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves; (ii) drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly; (iii) acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems; and (iv) provide improved recovery systems.

***development project:*** A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

***development well:*** A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

***differential:*** An adjustment to the price of oil or natural gas from an established spot market price to reflect differences in the quality and/or location of oil or natural gas.

***dry hole:*** A well found to be incapable of producing hydrocarbons in sufficient quantities such that proceeds from the sale of such production would exceed production expenses and taxes.

***economically producible:*** The term economically producible, as it relates to a resource, means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

***field:*** An area consisting of a single reservoir or multiple reservoirs, all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The field name refers to both the surface and the underground productive formations.

***gross acres or gross wells:*** The total acres or wells, as the case may be, in which we have a working interest.

***horizontal development:*** A drilling technique used in certain formations where a well is drilled vertically to a certain depth and then drilled at a right angle within a specified interval.

***independent exploration and production company:*** A company whose primary line of business is the exploration and production of oil and natural gas.

***MBbls:*** One thousand Bbls.

***MBoe:*** One thousand Boe.

***Mcf:*** One thousand cubic feet of natural gas.

***MMBbls:*** One million Bbls.

***MMBoe:*** One million Boe.

***MMBtu:*** One million British thermal units.

***MMcf:*** One million cubic feet of natural gas.

***natural gas liquids ("NGLs"):*** The combination of ethane, propane, butane, natural gasolines and other components that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.

***net acres or net wells:*** Gross acres or wells, as the case may be, multiplied by our working interest ownership percentage.

***net production:*** Production that is owned by us less royalties and production due others.

***NYMEX:*** New York Mercantile Exchange.

***operator:*** The individual or company responsible for the exploration and/or production of an oil or natural gas well or lease.

***possible reserves:*** Additional reserves that are less certain to be recovered than probable reserves.

***probable reserves:*** Additional reserves that are less certain to be recovered than proved reserves but that, in sum with proved reserves, are as likely as not to be recovered.

***production costs:*** Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

***proved area:*** The part of a property to which proved reserves have been specifically attributed.

***proved developed reserves:*** Reserves that can be expected to be recovered through existing wells with existing equipment and operating methods.

***proved developed non-producing reserves***: Reserves that are expected to be recovered from completion intervals which are open at the time of the estimate but which have not yet started producing, wells which were shut-in for market conditions or pipeline connections, or wells not capable of production for mechanical reasons; reserves that are expected to be recovered from zones in existing well which will require additional completion work or future re-completion prior to start production.

***proved oil and natural gas reserves:*** The estimated quantities of oil, natural gas and NGLs that geological and engineering data demonstrate with reasonable certainty to be commercially recoverable in future years from known reservoirs under existing economic and operating conditions.

***proved undeveloped reserves ("PUDs"):*** Proved reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion.

***realized price:*** The cash market price less all expected quality, transportation and demand adjustments.

***recompletion:*** The action of reentering an existing wellbore to redo or repair the original completion in order to increase the well's productivity.

***reserve:*** That part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination.

***reservoir:*** A porous and permeable underground formation containing a natural accumulation of producible oil and/or natural gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

***resources:*** Resources are quantities of oil and natural gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable and another portion may be considered unrecoverable. Resources include both discovered and undiscovered accumulations.

***spacing:*** The distance between wells producing from the same reservoir. Spacing is often expressed in terms of feet (e.g., 600 foot well-spacing) and is often established by regulatory agencies.

***trend:*** A geographic area with hydrocarbon potential.

***undeveloped acreage:*** Lease acreage on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

***unproved properties:*** Properties with no proved reserves.

***volatile oil:*** A quality of oil with an API gravity of 42-55° with a natural gas-to-oil ratio of 900-3,500 cubic feet per barrel.

***working interest:*** An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

***WTI:*** West Texas Intermediate oil.

**PART I—FINANCIAL INFORMATION**

**Item 1. Financial Statements**

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Balance Sheets**
**(in thousands, except par value and share amounts)**

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 179,538 | $ 197,613 |
| Oil and natural gas receivables | 69,290 | 87,222 |
| Joint interest billings receivables | 10,979 | 33,263 |
| Accounts receivable - related entities | 10,161 | 6,099 |
| Fair value of derivative instruments | 6,263 | 15,714 |
| Other current assets | 24,679 | 33,070 |
| Total current assets | 300,910 | 372,981 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 3,864,327 | 3,792,431 |
| Unproved oil and natural gas properties | 299,456 | 328,643 |
| Total oil and natural gas properties | 4,163,783 | 4,121,074 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,947,558) | (1,761,949) |
| Total oil and natural gas properties, net | 2,216,225 | 2,359,125 |
| Other assets: | | |
| Fair value of derivative instruments | 9,346 | 12,102 |
| Right of use assets, net | 280,139 | — |
| Investments (includes investment in SNMP measured at fair value of $0.8 million and $3.9 million as of September 30, 2019 and December 31, 2018, respectively) | 12,200 | 16,664 |
| Other assets | 43,990 | 59,088 |
| Total assets | $ 2,862,810 | $ 2,819,960 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Other payables | 16,739 | 74,628 |
| Accrued liabilities: | | |
| Capital expenditures | 7,232 | 61,970 |
| Other | 66,298 | 102,728 |
| Fair value of derivative instruments | 700 | 706 |
| Short term debt | — | 304 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,961 | 75,581 |
| Total current liabilities | 296,796 | 348,299 |
| Long term debt, net of premium, discount and debt issuance costs | 166,956 | 2,395,408 |
| Asset retirement obligations | 49,183 | 46,175 |
| Fair value of derivative instruments | — | 366 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 3,085,032 | 2,811,655 |
| Commitments and contingencies (Note 17) | | |
| Mezzanine equity: | | |
| Preferred units ($1,000 liquidation preference, 500,000 units authorized, issued and outstanding as of September 30, 2019 and December 31, 2018) | 474,857 | 452,828 |
| Stockholders' deficit: | | |
| Preferred stock ($0.01 par value, 15,000,000 shares authorized; 619,503 and 1,838,985 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 4.875% Convertible Perpetual Preferred Stock, Series A; 2,466,013 and 3,527,830 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 6.500% Convertible Perpetual Preferred Stock, Series B) | 31 | 53 |
| Common stock ($0.01 par value, 300,000,000 shares authorized; 100,154,824 and 87,328,424 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively) | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (2,069,822) | (1,812,884) |
| Total stockholders' deficit | (697,079) | (444,523) |
| Total liabilities and stockholders' deficit | $ 2,862,810 | $ 2,819,960 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **REVENUES:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ 362,424 | $ 473,178 |
| Natural gas liquid sales | 22,675 | 69,995 | 92,891 | 175,833 |
| Natural gas sales | 26,572 | 39,460 | 100,932 | 122,330 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 162,546 | 277,710 | 574,350 | 788,251 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 74,740 | 75,594 | 231,441 | 225,186 |
| Exploration expenses | 164 | 2,698 | 4,983 | 3,247 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 9,867 | 15,221 | 34,682 | 42,898 |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 22,906 | 4,259 |
| General and administrative expenses | 20,915 | 21,312 | 66,266 | 73,199 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 198,214 | 193,125 | 606,644 | 554,802 |
| Operating income (loss) | (35,668) | 84,585 | (32,294) | 233,449 |
| Other income (expense): | | | | |
| Interest income | 221 | 1,130 | 1,447 | 3,400 |
| Other income (expense) | (12,829) | (7,677) | (13,785) | 2,467 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (22,884) | (44,154) | (111,998) | (132,664) |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | (20,827) | (142,384) |
| Total other expense | (22,292) | (78,987) | (145,163) | (267,653) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Income (loss) before income taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | (112,448) | 5,598 | (232,755) | (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Net loss per common share - basic and diluted | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |
| Weighted average number of shares used to calculate net loss attributable to common stockholders - basic and diluted | 97,395 | 82,073 | 95,272 | 81,597 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | Deficit |
| **BALANCE, December 31, 2018** | 1,839 | $ 18 | 3,528 | $ 35 | 87,329 | $ 881 | $ 1,367,427 | $ (1,812,884) | $ (444,523) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 42,499 | 42,499 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 7,898 | 79 | 3,908 | (2,516) | 1,471 |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,033) | (7,033) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (270) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (1,059) | (11) | (1,017) | (10) | 4,837 | 48 | (27) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 141 | — | 141 |
| Net loss | — | — | — | — | — | — | — | (67,342) | (67,342) |
| **BALANCE, March 31, 2019** | 780 | 7 | 2,511 | 25 | 99,794 | 1,007 | 1,371,450 | (1,859,776) | (487,287) |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,325) | (2,325) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,358) | (7,358) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (81) | 4 | (4) | — | — |
| Exchange of preferred stock for common stock | (155) | (1) | — | — | 363 | 2 | (1) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 158 | — | 158 |
| Net loss | — | — | — | — | — | — | — | (52,965) | (52,965) |
| **BALANCE, June 30, 2019** | 625 | 6 | 2,511 | 25 | 100,076 | 1,013 | 1,371,603 | (1,934,924) | (562,277) |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,312) | (2,312) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,638) | (7,638) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (38) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (5) | — | (45) | — | 117 | 2 | (2) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 96 | — | 96 |
| Net loss | — | — | — | — | — | — | — | (112,448) | (112,448) |
| **BALANCE, September 30, 2019** | 620 | $ 6 | 2,466 | $ 25 | 100,155 | $ 1,014 | $ 1,371,698 | $ (2,069,822) | $ (697,079) |

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit (Continued)**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | Deficit |
| **BALANCE, December 31, 2017** | 1,839 | $ 18 | 3,528 | $ 35 | 83,985 | $ 845 | $ 1,362,118 | $ (1,832,156) | $ (469,140) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 22,739 | 22,739 |
| Issuance of common stock | — | — | — | — | 100 | 1 | 565 | — | 566 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 805 | 8 | 3,979 | (3,987) | — |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Distributions - SN UnSub Preferred Units | — | — | — | — | — | — | — | 2,592 | 2,592 |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (5,930) | (5,930) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 283 | 4 | (4) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (375) | — | (375) |
| Net loss | — | — | — | — | — | — | — | (4,815) | (4,815) |
| **BALANCE, March 31, 2018** | **1,839** | **18** | **3,528** | **35** | **85,173** | **858** | **$ 1,366,283** | **(1,834,057)** | **(466,863)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,189) | (6,189) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 2,625 | 26 | (26) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 4,651 | — | 4,651 |
| Net loss | — | — | — | — | — | — | — | (34,987) | (34,987) |
| **BALANCE, June 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,798** | **884** | **1,370,908** | **(1,891,720)** | **(519,875)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,458) | (6,458) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (268) | (1) | 1 | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (1,398) | — | (1,398) |
| Net loss | — | — | — | — | — | — | — | 5,598 | 5,598 |
| **BALANCE, September 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,530** | **$ 883** | **$ 1,369,511** | **$ (1,909,067)** | **$ (538,620)** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 22,906 | 4,259 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 20,827 | 142,384 |
| Net cash settlements paid on commodity derivative contracts | (5,799) | (69,317) |
| (Gain) loss on other derivatives | (276) | 5,262 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Amortization of debt issuance costs | 8,275 | 12,706 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 41,305 | 1,982 |
| Accounts receivable - related entities | (4,062) | (3,365) |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 59,218 | 17,595 |
| Other current liabilities | (20,519) | (12,531) |
| Other assets and liabilities, net | 5,330 | (2,225) |
| Net cash provided by operating activities | 99,750 | 249,526 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (114,655) | (452,296) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Acquisition of oil and natural gas properties | — | 2,834 |
| Payments for purchases of other assets | (761) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,788 |
| Net cash used in investing activities | (110,217) | (453,822) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | (18,327) | (103,262) |
| Financing costs, including costs related to DIP Facility | (9,505) | (12,995) |
| Preferred dividends paid | — | (11,961) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred unit distributions paid | (37,500) | (22,408) |
| Net cash (used in) provided by financing activities | (7,608) | 388,534 |
| (Decrease) increase in cash and cash equivalents | (18,075) | 184,238 |
| Cash and cash equivalents, beginning of period | 197,613 | 184,434 |
| Cash and cash equivalents, end of period | $ 179,538 | $ 368,672 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | |
| Change in asset retirement obligations | $ 129 | $ 1,532 |
| Change in accrued capital expenditures | (54,871) | 24,652 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 | — |
| **SUPPLEMENTAL DISCLOSURE:** | | |
| Cash paid for interest | $ 84,803 | $ 120,775 |
| Cash paid for reorganization items | $ 9,521 | $ — |

The accompanying notes are an integral part of these condensed consolidated financial statements

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Notes to the Condensed Consolidated Financial Statements**

**(Unaudited)**

**Note 1. Organization and Business**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed in "—Note 3. Chapter 11 Cases," we are currently operating our business as "debtors-in-possession" in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

**Liquidity**

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions on the Petition Date (as defined below), prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

The accompanying condensed consolidated financial statements are unaudited and were prepared from the Company's records. The condensed consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP" or "U.S. GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. The Company derived the condensed consolidated balance sheet as of December 31, 2018 from the audited financial statements filed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Annual Report"). Because this is an interim period filing presented using a condensed format, it does not include all of the disclosures required by U.S. GAAP. These condensed consolidated financial statements should be read in connection with the consolidated financial statements and notes thereto included in the 2018 Annual Report, which contains a summary of the Company's significant accounting policies and other disclosures. In the opinion of management, these financial statements include the adjustments and accruals, all of which are of a normal recurring nature, which are necessary for a fair presentation of the results for the interim periods. These interim results are not necessarily indicative of results to be expected for the entire year.

As of September 30, 2019, the Company's significant accounting policies are consistent with those discussed in "—Note 2. Basis of Presentation and Summary of Significant Accounting Policies," in the notes to the Company's consolidated financial statements contained in the 2018 Annual Report with the addition of the following:

***Leases***

The Company determines if a contractual arrangement is a lease at inception. Operating leases are included in right of use ("ROU") assets, short term lease liabilities and long term lease liabilities in the condensed consolidated balance sheets.

ROU assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Operating lease ROU assets and lease liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As most of the Company's leases do not provide an implicit rate, the Company's estimated incremental borrowing rate based on the information available at commencement date is used in determining the present value of lease payments, and the implicit rate is used when readily determinable. The operating lease ROU asset also includes any lease payments made and excludes lease incentives. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

We have lease agreements with lease and non-lease components, which are accounted for as a single lease component.

***Bankruptcy Accounting***

As further discussed in "—Note 3. Chapter 11 Cases," on August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The condensed consolidated financial statements have been prepared as if the Company is a going concern and reflect the application of Accounting Standards Codification 852 "Reorganizations" ("ASC 852"). ASC 852 requires that the financial statements, for periods subsequent to the filing of the Bankruptcy Petitions, distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Accordingly, certain expenses, gains and losses that are realized or incurred in the bankruptcy proceedings are recorded in "Reorganization items" on the Company's condensed consolidated statements of operations. In addition, prepetition

unsecured and under-secured obligations that may be impacted by the bankruptcy reorganization process have been classified as "Liabilities subject to compromise" on the Company's condensed consolidated balance sheet at September 30, 2019. These liabilities are reported at the amounts expected to be allowed as claims by the Bankruptcy Court, although they may be settled for less. The Company has not taken a view with respect to the ultimate recoveries or payments under these agreements or on account of these liabilities in the presentation of such amounts on the financial statements.

The accompanying condensed consolidated financial statements do not purport to reflect or provide for the consequences of the Chapter 11 Cases. In particular, the condensed consolidated financial statements do not purport to show: (i) the realizable value of assets on a liquidation basis or their availability to satisfy liabilities; (ii) the amount of prepetition liabilities that may be allowed for claims or contingencies, or the status and priority thereof; (iii) the effect on stockholders' deficit accounts of any changes that may be made to the Company's capitalization; or (iv) the effect on operations of any changes that may be made to the Company's business. While operating as debtors-in-possession under Chapter 11 of the Bankruptcy Code, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities in amounts other than those reflected on the Company's condensed consolidated financial statements, subject to the approval of the Bankruptcy Court or otherwise as permitted in the ordinary course of business. Further, a plan of reorganization could materially change the amounts and classifications on the Company's historical condensed consolidated financial statements.

***Principles of Consolidation***

The Company's condensed consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

***Use of Estimates***

The accompanying condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative ("G&A") expenses. Actual results could differ materially from those estimates.

***Recent Accounting Pronouncements***

In June 2018, the FASB issued ASU 2018-07 "Compensation – Stock Compensation (ASC 718) – Improvements to Nonemployee Share-Based Payment Accounting," which expands the scope of ASC 718, Compensation – Stock Compensation, to include share-based payment transactions for acquiring goods and services from nonemployees. We adopted this ASU effective January 1, 2019, which resulted in our remeasurement of the value of our outstanding unvested awards as of January 1, 2019 and changed the way we value our equity-classified equity awards going forward. Adoption of the standard did not have a material impact on our condensed consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13 "Financial Instruments – Credit Losses (ASC 326): Measurement of Credit Losses on Financial Instruments." This ASU modifies the impairment model to utilize an expected loss methodology in place of the currently used incurred loss methodology, which will result in the more timely recognition of losses, if applicable. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2019, and earlier adoption is permitted. We are currently in the process of evaluating the impact of adoption of this guidance on our condensed consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02 "Leases (ASC 842)," effective for annual and interim periods for public companies beginning after December 15, 2018, with a modified retrospective approach to be used for implementation. The standard updates the previous lease guidance by requiring the recognition of a ROU asset and lease liability on the statement of financial position for all leases with lease terms of more than 12 months. The lease liability represents the discounted obligation to make future minimum lease payments and the corresponding ROU asset represents the lessee's right to use, or control the use of, a specified asset for the lease term. Recognition, measurement and presentation of expenses and cash flows arising from a lease will depend on classification as an operating or a finance lease. The Company adopted this standard effective January 1, 2019. We elected the package of practical expedients permitting us to not reassess under the new standard our prior conclusions regarding lease identification, lease classification and initial direct costs, the practical expedient to not separate lease and non– lease components for all of our existing lessee arrangements, and to elect an accounting policy to not apply the recognition requirements of ASC 842 to our short term leases. We did not elect the practical expedient for use of hindsight in determining the lease term and assessing impairment of our ROU assets. Adoption of ASC 842 resulted in the recognition of ROU assets and lease liabilities for operating leases on the balance sheet and the derecognition of the deferred gain previously recorded on a sale-leaseback transaction as a cumulative effect adjustment to retained earnings on January 1, 2019. Amounts recognized at January 1, 2019 for operating leases were as follows (in thousands):

| | December 31, 2018 | Adjustments due to Topic 842 | January 1, 2019 |
|---|---|---|---|
| ROU assets | $ — | $ 344,472 | $ 344,472 |
| Short term lease liabilities | — | 99,693 | 99,693 |
| Other current liabilities | 75,581 | (23,720) | 51,861 |
| Long term lease liabilities | — | 246,746 | 246,746 |
| Other long term liabilities | 21,407 | (20,745) | 662 |
| Accumulated deficit | (1,812,884) | 42,499 | (1,770,385) |

No impact was recorded to the condensed consolidated statement of operations related to the adoption of Topic 842.

**Note 3. Chapter 11 Cases**

***Voluntary Reorganization Under Chapter 11***

On the Petition Date, the Debtors filed the Bankruptcy Petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer the Chapter 11 Cases under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below) and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub (as defined below), its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 Cases and are classified as "non-Debtors".

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until

confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves a Debtor of performing its future obligations under such executory contract or unexpired leases but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtor's estate(s) for such damages. Generally, the assumption of an executory contract or unexpired lease requires a Debtor to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtors in this quarterly report, including where applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the

common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable, is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the “DIP Facility”) among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the “DIP Lenders”), and Wilmington Savings Fund Society, FSB (“WSFS”), as administrative agent and collateral agent (the “DIP Agent”). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the “Secured Noteholders”) or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court’s entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company’s ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the “Amendment”). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors’ entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the “Final DIP Order”) and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors’ business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the “New Money DIP Loans”), backstopped by certain Secured Noteholders (the “Backstop Lenders”), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court’s interim order (the “Interim DIP Order”); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the “Roll-Up Loans” and, together with the New Money DIP Loans, the “DIP Loans”);

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors’ emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;
- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;
- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;
- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);
- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;
- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with a variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and
- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Liabilities Subject to Compromise***

The Company's condensed consolidated balance sheet includes amounts classified as "Liabilities subject to compromise," which represent prepetition liabilities that have been allowed, or that the Company anticipates will be allowed, as claims in its Chapter 11 Cases. The amounts represent the Company's current estimate of known or potential obligations to be resolved in connection with the Chapter 11 Cases. The differences between the liabilities the Company has estimated and the claims filed, or to be filed, will be investigated and resolved in connection with the claims resolution process. The Company will continue to evaluate these liabilities throughout the Chapter 11 Cases and adjust amounts as necessary. Such adjustments may be material.

The following table summarizes the components of liabilities subject to compromise included on the condensed consolidated balance sheet (in thousands):

| | September 30, 2019 |
|---|---|
| 7.75% Notes, due June 2021 | $ 600,000 |
| 6.125% Notes, due January 2023 | 1,150,000 |
| Credit Agreement[(1)] | 7,922 |
| 7.25% Senior Secured Notes, due February 2023 | 500,000 |
| Accounts payable | 22,349 |
| Other payables | 18,329 |
| Accrued interest payable | 65,371 |
| Other accrued expenses | 34,135 |
| Liabilities subject to compromise | $ 2,398,106 |

(1) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.

***Prepetition Restructuring Charges***

Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our consolidated statements of operations.

Prepetition restructuring charges, which primarily consisted of professional, consulting and legal fees related to the Chapter 11 Cases, were $18.2 million and $41.9 million for the three and nine months ended September 30, 2019, respectively. There were no prepetition restructuring charges for the three or nine months ended September 30, 2018.

***Reorganization Items***

The Company has incurred and is expected to continue to incur substantial costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statements of operations (in thousands):

| | Three and Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items[1] | $ 55,321 |

(1) Includes $9.5 million of cash paid for reorganization items.

***Interest Expense***

The Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date. The contractual interest on liabilities subject to compromise not reflected in the condensed consolidated statements of operations was approximately $21.1 million, representing interest expense from the Petition Date through September 30, 2019. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Debtor Financial Statements***

Condensed consolidated financial statements of the Debtors are set forth below. These condensed consolidated financial statements exclude the financial statements of the non-Debtors. Transactions and balances of receivables and payables between Debtors are eliminated in consolidation. However, the Debtors' condensed consolidated balance sheet includes receivables from and payables to related non-Debtors.

**Debtors**[1]
**Condensed Consolidated Balance Sheets (Unaudited)**
**(in thousands)**

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,959 | $ 194,723 |
| Oil and natural gas receivables | 42,778 | 55,083 |
| Joint interest billings receivables | 10,969 | 33,261 |
| Fair value of derivative instruments | 367 | 5,154 |
| Other current assets | 20,978 | 28,617 |
| Total current assets | 249,051 | 316,838 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 2,947,641 | 2,890,471 |
| Unproved oil and natural gas properties | 205,121 | 236,931 |
| Total oil and natural gas properties | 3,152,762 | 3,127,402 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,651,441) | (1,526,988) |
| Total oil and natural gas properties, net | 1,501,321 | 1,600,414 |
| Other assets: | | |
| Right of use assets, net | 280,139 | — |
| Investments | 4,921 | 9,384 |
| Investments in subsidiaries | 338,097 | 337,475 |
| Other assets | 31,631 | 45,524 |
| Total assets | $ 2,405,160 | $ 2,309,635 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Accounts payable - related entities | 7,745 | 8,707 |
| Other payables | 16,230 | 74,595 |
| Accrued liabilities: | | |
| Capital expenditures | 5,194 | 54,317 |
| Other | 46,909 | 87,656 |
| Fair value of derivative instruments | 700 | 307 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,962 | 75,581 |
| Total current liabilities | 282,606 | 333,545 |
| Long term debt, net of premium, discount and debt issuance costs | — | 2,213,223 |
| Asset retirement obligations | 34,456 | 32,432 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 2,889,159 | 2,600,607 |
| Stockholders' deficit: | | |
| Preferred stock | 31 | 53 |
| Common stock | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (1,856,742) | (1,659,333) |
| Total stockholders' deficit | (483,999) | (290,972) |
| Total liabilities and stockholders' deficit | $ 2,405,160 | $ 2,309,635 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors**[(1)]
**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands)**

| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|---|---|
| **REVENUES:** | | | | |
| Oil sales | $ 69,597 | $ 113,183 | $ 242,064 | $ 323,019 |
| Natural gas liquid sales | 15,506 | 49,332 | 65,170 | 119,961 |
| Natural gas sales | 17,941 | 27,674 | 69,713 | 83,640 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 110,327 | 197,201 | 395,050 | 543,530 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 51,196 | 47,262 | 154,064 | 138,322 |
| Exploration expenses | 146 | 2,668 | 4,724 | 3,171 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 6,424 | 10,683 | 23,332 | 29,162 |
| Depreciation, depletion, amortization and accretion | 39,211 | 47,799 | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 9,597 | 3,103 | 18,206 | 3,543 |
| General and administrative expenses | 21,424 | 19,386 | 60,854 | 66,522 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 152,901 | 138,140 | 448,602 | 386,030 |
| Operating income (loss) | (42,574) | 59,061 | (53,552) | 157,500 |
| Other income (expense): | | | | |
| Interest income | 220 | 1,129 | 1,442 | 3,397 |
| Other income (expense) | (12,814) | (8,217) | (13,527) | 1,186 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (19,591) | (40,659) | (101,693) | (121,856) |
| Equity in net earnings of subsidiaries | 14,025 | 8,273 | 621 | 12,470 |
| Net (gains) losses on commodity derivatives | 2,774 | (13,989) | (10,748) | (88,429) |
| Total other expense | (15,386) | (53,463) | (123,905) | (191,704) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Net income (loss) before taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors[1]**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 18,206 | 3,543 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 10,748 | 88,429 |
| Net cash settlements paid on commodity derivative contracts | (3,559) | (55,147) |
| (Gain) loss on other derivatives | (308) | 7,141 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Equity in net earnings of subsidiaries | (621) | (12,470) |
| Amortization of debt issuance costs | 5,386 | 9,859 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 35,686 | 75 |
| Accounts receivable - related entities | (962) | 9,259 |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 54,915 | 12,980 |
| Other current liabilities | (20,518) | (12,532) |
| Other assets and liabilities, net | 5,260 | (2,390) |
| Net cash provided by operating activities | 17,834 | 140,820 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (91,375) | (379,321) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Payments for purchases of other assets | (736) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,642 |
| Net cash used in investing activities | (86,912) | (383,827) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | — | (95,000) |
| Financing costs, including borrowings under DIP Facility | (9,410) | (12,484) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred dividends paid | — | (11,961) |
| Net cash provided by (used in) financing activities | 48,314 | 419,715 |
| (Decrease) increase in cash and cash equivalents | (20,764) | 176,708 |
| Cash and cash equivalents, beginning of period | 194,723 | 171,052 |
| Cash and cash equivalents, end of period | $ 173,959 | $ 347,760 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (each term as defined below). Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement (as defined below). See "—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of the Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 4. Revenue Recognition**

***Revenue from Contracts with Customers***

We account for revenue from contracts with customers in accordance with ASC 606. The unit of account in ASC 606 is a performance obligation, which is a promise in a contract to transfer to a customer either a distinct good or service (or bundle of goods or services) or a series of distinct goods or services provided over a period of time. ASC 606 requires that a contract's transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is to be allocated to each performance obligation in the contract based on relative standalone selling prices and recognized as revenue when (point in time) or as (over time) the performance obligation is satisfied.

*Disaggregation of Revenue*

We recognized revenue of $162.5 million and $277.7 million for the three months ended September 30, 2019 and 2018, respectively, and revenue of $574.4 million and $788.3 million for the nine months ended September 30, 2019 and 2018, respectively. We disaggregate revenue in our income statement based on product type, and we further disaggregate our revenue related to sales and marketing activities.

*Oil, Natural Gas and NGL Revenues*

We recognize revenue from the sale of oil, natural gas and NGLs in the period that the performance obligations are satisfied. Our performance obligations are primarily comprised of the delivery of oil, natural gas or NGLs at a delivery point. Each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable and represents a distinct performance obligation to which the transaction price is allocated. Performance obligations are satisfied at a point in time once control of the product has been transferred to the customer through delivery of oil, natural gas and NGLs.

*Sales and Marketing Revenue*

Beginning in 2018, we entered into commodity purchase transactions with certain third parties and then subsequently sold the purchased commodity as separate revenue streams. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. We retain control of the purchased hydrocarbons prior to delivery to the purchaser. The Company has concluded that we are the principal in these arrangements and therefore we recognize revenue on a gross basis as Sales and Marketing Revenues, with costs to purchase and transport the commodity presented as Sales and Marketing Expenses, in each case within our consolidated statement of operations. Contracts to sell the third-party hydrocarbons are the same contracts as those for which we sell our produced hydrocarbons, and as such, we do not recognize this revenue any differently than our oil, natural gas and NGL revenue discussed previously.

*Remaining Performance Obligations*

Several of our sales contracts contain multiple performance obligations as each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable. For these contracts, we have taken the optional exception under ASC 606-10-50-14A(b) which is available only for wholly unsatisfied performance obligations for which the criteria in ASC 606-10-32-40 have been met. Under this exception, neither estimation of variable consideration nor disclosure of the transaction price allocated to the remaining performance obligations is required. Revenue is alternatively recognized in the period that control of the commodity is transferred to the customer and the respective variable component of the total transaction price is resolved.

For forms of variable consideration that are not associated with a specific volume and thus do not meet the allocation exception, estimation is required. Examples of such variable consideration consist of deficiency payments, late payment fees, truck rejection charges, inflation adjustments and imbalance penalties; however, these items are immaterial to our condensed consolidated financial statements and/or have a low probability of occurrence. As significant reversals of revenue due to this variability are not probable, no estimation is required.

*Contract Balances*

Under our sales contracts, we invoice customers after our performance obligations have been satisfied, at which point payment is unconditional. Accordingly, our contracts do not give rise to contract assets or liabilities under ASC 606. At September 30, 2019 and December 31, 2018, our receivables from contracts with customers were $69.3 million and $87.2 million, respectively.

**Note 5. Cash and Cash Equivalents**

As of September 30, 2019 and December 31, 2018, cash and cash equivalents consisted of the following (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Cash at banks | $ 179,265 | $ 66,426 |
| Money market funds | 273 | 131,187 |
| Total cash and cash equivalents | $ 179,538 | $ 197,613 |

Our cash includes funds held in deposit accounts with highly rated banks, and our cash equivalents include funds held in stable and highly liquid money market accounts with major financial institutions.

**Note 6. Oil and Natural Gas Properties**

*Impairment of Oil and Natural Gas Properties* —The Company recorded a proved property impairment of $4.3 million during the nine months ended September 30, 2019. The Company did not record proved property impairments during the three months ended September 30, 2019 or the three and nine months ended September 30, 2018. Changes in

production rates, levels of reserves, future development costs, and other factors will impact the Company's actual impairment analyses in future periods.

*Unproved Properties*—The Company recorded impairment to our unproved oil and natural gas properties of $9.8 million and $18.6 million for the three and nine months ended September 30, 2019, respectively, and $3.1 million and $4.3 million for the three and nine months ended September 30, 2018, respectively, due to acreage expirations from changes in the development plan.

**Note 7. Debt**

As of September 30, 2019 and December 31, 2018, the Company's outstanding debt consisted of the following (in thousands):

| | Interest Rate | Maturity Date | September 30, 2019 | December 31, 2018 |
|---|---|---|---|---|
| **Short Term Debt:** | | | | |
| Debtor-in-possession financing[1] | Variable | June 11, 2020 | $ 50,000 | $ — |
| SR Credit Agreement[2][3] | Variable | - | $ — | $ 304 |
| Total short term debt | | | $ 50,000 | $ 304 |
| **Long Term Debt:** | | | | |
| 7.75% Notes | 7.75% | June 15, 2021 | $ 600,000 | $ 600,000 |
| SN UnSub Credit Agreement[2] | Variable | March 1, 2022 | 150,000 | 167,500 |
| 4.59% Non-Recourse Subsidiary Term Loan[2] | 4.59% | August 31, 2022 | 3,527 | 3,803 |
| SR Credit Agreement[2] | Variable | October 31, 2022 | 22,941 | 23,187 |
| 6.125% Notes | 6.125% | January 15, 2023 | 1,150,000 | 1,150,000 |
| Credit Agreement[4] | Variable | February 14, 2023[5] | 7,922 | — |
| 7.25% Senior Secured Notes | 7.25% | February 15, 2023[6] | 500,000 | 500,000 |
| | | | 2,434,390 | 2,444,490 |
| Unamortized discount on Additional 7.75% Notes[7] | | | — | (2,222) |
| Unamortized premium on Additional 6.125% Notes[7] | | | — | 1,090 |
| Unamortized discount on 7.25% Senior Secured Notes[7] | | | — | (4,241) |
| Unamortized debt issuance costs[7] | | | (9,512) | (43,709) |
| Total long term debt | | | 2,424,878 | 2,395,408 |
| Less liabilities subject to compromise[8] | | | (2,257,922) | — |
| Total long term debt not subject to compromise | | | $ 166,956 | $ 2,395,408 |

(1) Incurred interest at a weighted-average rate of approximately 10.1% for the postpetition period ended September 30, 2019.
(2) Represents debt instruments which are non-recourse to Sanchez Energy Corporation and its restricted subsidiaries.
(3) Incurred interest at a weighted-average rate of approximately 5.9% and 6.9% for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively.
(4) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.



009540

(5) The Credit Agreement would mature on the earlier of (i) February 14, 2023 or (ii) the 91st day prior to the scheduled maturity of any "material indebtedness," which is defined to include, without limitation, any indebtedness arising in connection with the 7.75% Notes, 6.125% Notes or the 7.25% Senior Secured Notes. The 7.75% Notes would mature on June 15, 2021; therefore, the Credit Agreement would, as of September 30, 2019, mature on March 15, 2021.
(6) The 7.25% Senior Secured Notes would mature on February 15, 2023, unless on October 10, 2022 either (i) some or all of the 6.125% Notes are still outstanding and have not been defeased or (ii) there is outstanding indebtedness of Sanchez Energy Corporation or any of its restricted subsidiaries that was used to purchase, repurchase, redeem, defease or otherwise acquire or retire for value the 6.125% Notes, and such indebtedness under this clause (ii) has a final maturity date that is earlier than May 17, 2023, in which case of either clause (i) or clause (ii), the 7.25% Senior Secured Notes would mature on October 14, 2022.
(7) Approximately $30.4 million in net discounts, premiums and debt issuance costs were reclassified as reorganization items in connection with the filing of the Bankruptcy Petitions.
(8) The Company's 7.75% Notes, 6.125% Notes, Credit Agreement, and 7.25% Senior Secured Notes were classified as liabilities subject to compromise at September 30, 2019.

The components of interest expense are as follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Interest on SR Credit Agreement | $ (342) | $ (360) | $ (917) | $ (1,188) |
| Interest on Senior Notes | (17,704) | (38,296) | (94,299) | (110,158) |
| Interest and commitment fees on SN UnSub Credit Agreement | (1,952) | (2,131) | (6,383) | (6,634) |
| Interest on Non-Recourse Subsidiary Term Loan | (31) | (46) | (116) | (140) |
| Interest, commitment fees and letter of credit fees on Credit Agreement | (106) | (32) | (389) | (726) |
| Interest on DIP Facility | (600) | — | (600) | — |
| Amortization of debt issuance costs | (1,961) | (2,873) | (8,275) | (12,706) |
| Amortization of discounts and premium on Senior Notes | (188) | (416) | (1,019) | (1,112) |
| Total interest expense | $ (22,884) | $ (44,154) | $ (111,998) | $ (132,664) |

On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes to continue ongoing discussions with certain of its bondholders and other stakeholders regarding a restructuring transaction. The indenture governing the 6.125% Notes provided for a 30-day grace period, which expired on August 14, 2019, to make the scheduled interest payment before such non-payment constituted an event of default under the indenture, which would have entitled the trustee under such indenture or the holders of at least 25% in aggregate principal amount of the outstanding 6.125% Notes to accelerate the maturity thereof. Such event of default would have triggered events of default under the Company's indentures governing the 7.75% Notes, the 7.25% Senior Secured Notes and the Credit Agreement. The Debtors filed the Bankruptcy Petitions prior to expiration of the grace period. Further, the Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date.

***Credit Facilities***

*DIP Facility*

"—Note 3. Chapter 11 Cases" for information on the Company's DIP Facility.

*Third Amended and Restated Credit Agreement*

On February 14, 2018, the Company entered into a revolving credit facility, providing for a $25 million first-out senior secured working capital and letter of credit facility (the "Credit Agreement"), which amended and restated the Company's previous credit facility in its entirety.

On July 10, 2019, the Company borrowed the remaining $7.9 million available under the Credit Agreement. Additionally, on January 10, 2019, a standby letter of credit was issued on our behalf by the lender under the Credit Agreement in the amount of approximately $17.1 million. This letter of credit, as of September 30, 2019, remains

outstanding and is undrawn but is currently proposed to be cash collateralized subject to entry of the Final DIP Order. Further, subject to entry of the Final DIP Order, a portion of the proceeds from the DIP Facility will be used to pay off all $7.9 million of borrowings outstanding under the Credit Agreement and cash collateralize the approximate $17.1 million letter of credit issued under our Credit Agreement. The automatic stay under the Bankruptcy Code does not apply to letters of credit issued under the Credit Agreement and third-party beneficiaries may draw on the letter of credit if permitted by its terms.

The filing of the Bankruptcy Petitions also constituted an event of default which automatically accelerated the Company's obligations under the Credit Agreement. However, under the Bankruptcy Code, the lenders under the Credit Agreement are stayed from taking any action against the Company as a result of these defaults.

During the existence of an event of default and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement. In addition, as discussed above, subject to entry of the Final DIP Order, we anticipate paying off the borrowings outstanding under the Credit Agreement in full.

*SN UnSub Credit Agreement*

On March 1, 2017, SN UnSub entered into a credit agreement for a $500 million revolving credit facility with a maturity date of March 1, 2022 (the "SN UnSub Credit Agreement").

On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, SN UnSub would be required at its election to repay the deficiency within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement. Inability to do so would have a material adverse effect on SN UnSub's liquidity, financial condition and results of operations.

As of September 30, 2019, SN UnSub was in compliance with the covenants of the SN UnSub Credit Agreement.

*SR Credit Agreement*

In 2017, we acquired SR Acquisition I, LLC ("SRAI"). On November 16, 2018, SRAI's credit facility was amended and restated to convert the outstanding revolving loan to a term loan and extend the maturity date to October 31, 2022 (the "SR Credit Agreement"). As of September 30, 2019, there was approximately $22.9 million outstanding under the SR Credit Agreement, and SRAI was in compliance with the financial covenants of the SR Credit Agreement.

***Senior Notes***

*7.75% Senior Notes Due 2021*

On June 13, 2013, the Company completed a private offering of $400 million in aggregate principal amount of the 7.75% senior notes that would mature on June 15, 2021 (the "Original 7.75% Notes"). On September 18, 2013, we issued an additional $200 million in aggregate principal amount of our 7.75% senior notes due 2021 (the "Additional 7.75% Notes," and together with the Original 7.75% Notes, the "7.75% Notes") in a private offering at an issue price of 96.5% of the principal amount of the Additional 7.75% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.75% Notes. However, under the Bankruptcy Code, holders of the 7.75% Notes are stayed from taking any action against the Company as a result of the default.

*6.125% Senior Notes Due 2023*

On June 27, 2014, the Company completed a private offering of $850 million in aggregate principal amount of the 6.125% senior notes that would mature on January 15, 2023 (the "Original 6.125% Notes"). On September 12, 2014, we issued an additional $300 million in aggregate principal amount of our 6.125% senior notes due 2023 (the "Additional 6.125% Notes," and together with the Original 6.125% Notes, the "6.125% Notes," and together with the 7.75% Notes and the 7.25% Senior Secured Notes, the "Senior Notes") in a private offering at an issue price of 100.75% of the principal amount of the Additional 6.125% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 6.125% Notes. However, under the Bankruptcy Code, holders of the 6.125% Notes are stayed from taking any action against the Company as a result of the default.

*7.25% Senior Secured First Lien Notes due 2023*

On February 14, 2018, the Company completed a private offering to eligible purchasers of $500 million in aggregate principal amount of 7.25% senior secured first lien notes due 2023 (the "7.25% Senior Secured Notes") at an issue price of 99.0% of the principal amount.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.25% Senior Secured Notes. However, under the Bankruptcy Code, holders of the 7.25% Senior Secured Notes are stayed from taking any action against the Company as a result of the default.

**Note 8. Derivative Instruments**

Hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. As of September 30, 2019, all of our derivative contracts were with lenders, affiliates of lenders or other secured counterparties. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited.

The following table presents open derivative positions for the periods indicated as of September 30, 2019:

| | October 1 - December 31, 2019 | 2020 | 2021 |
|---|---|---|---|
| **Oil positions:** | | | |
| Fixed price swaps (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 580,000 | 1,105,860 | 650,400 |
| Average price ($/Bbl) | $ 52.41 | $ 55.29 | $ 54.23 |
| **Natural gas positions:** | | | |
| Fixed price swaps (NYMEX Henry Hub): | | | |
| Hedged volume (MMBtu) | 3,362,000 | 6,934,150 | 4,212,000 |
| Average price ($/MMBtu) | $ 2.87 | $ 2.67 | $ 2.56 |

The following table sets forth a reconciliation of the changes in fair value of the Company's commodity derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018 (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of commodity derivatives, beginning of period | $ 21,194 | $ (54,255) |
| Net losses on oil derivatives | (28,167) | (9,878) |
| Net gains (losses) on natural gas derivatives | 6,266 | (17,897) |
| Net settlements paid (received) on commodity derivative contracts: | | |
| Oil | 13,479 | 100,120 |
| Natural gas | (3,689) | 3,104 |
| Fair value of commodity derivatives, end of period | $ 9,083 | $ 21,194 |

*Embedded Derivatives:* In 2017, the Company entered into certain contracts for the purchase of sand and fractionation services that contain provisions that must be bifurcated from the contract and valued as derivatives. In the fourth quarter 2018, the Company amended certain of these contracts, removing the respective embedded derivative components, and as of September 30, 2019, all remaining embedded derivative contracts expired or had been terminated. The embedded derivatives were historically valued using a Monte Carlo simulation model which utilizes observable inputs, including the NYMEX WTI oil price and NYMEX Henry Hub natural gas price at various points in time. The Company marked these derivatives to market and, as a result, recorded a loss of approximately $1.1 million for the three months ended September 30, 2018. The Company did not record any gains or losses for the three months ended September 30, 2019 as the contracts had expired or terminated. For the nine months ended September 30, 2019 and 2018, the Company recorded a gain of approximately $0.3 million and a loss of $7.1 million, respectively. Any gains or losses related to embedded derivatives are recorded as a component of other income (expense) in the consolidated statement of operations.

*Earnout Derivative:* We are entitled to receive earnout payments from SNMP based on natural gas delivered above a threshold volume and a tariff at certain pipeline delivery points. These payments were deemed to be a derivative. The resulting earnout derivative was valued through the use of a Monte Carlo simulation model which utilized observable inputs, such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios. For the nine months ended September 30, 2019, the Company recorded an immaterial net gain due to settlement gains, which were partially offset by mark-to-market losses. The Company did not record any gains or losses for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded approximate net gains of $0.4 million and $1.9 million, respectively, primarily related to mark-to-market gains. Any gains or losses related to the earnout derivative are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

The following table sets forth a reconciliation of the changes in fair value of the Company's embedded and earnout derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of other derivatives, beginning of period | $ 5,550 | $ (1,551) |
| Gain on embedded derivatives | 308 | 1,243 |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Fair value of other derivatives, end of period | $ 5,826 | $ 5,550 |

***Balance Sheet Presentation***

The Company nets derivative assets and liabilities by commodity for counterparties where a legal right to such netting exists. Therefore, the Company's derivatives are presented on a net basis as "Fair value of derivative instruments" on the condensed consolidated balance sheets. The following information summarizes the gross fair values

of derivative instruments, presenting the impact of offsetting derivative assets and liabilities on the Company's consolidated balance sheets (in thousands):

| | September 30, 2019 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 6,389 | $ (126) | $ 6,263 |
| Long term asset | 9,361 | (15) | 9,346 |
| Total asset | $ 15,750 | $ (141) | $ 15,609 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 826 | $ (126) | $ 700 |
| Long term liability | 15 | (15) | — |
| Total liability | $ 841 | $ (141) | $ 700 |

| | December 31, 2018 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 16,302 | $ (588) | $ 15,714 |
| Long term asset | 12,178 | (76) | 12,102 |
| Total asset | $ 28,480 | $ (664) | $ 27,816 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 1,294 | $ (588) | $ 706 |
| Long term liability | 442 | (76) | 366 |
| Total liability | $ 1,736 | $ (664) | $ 1,072 |

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 9. Investments**

A subsidiary of the Company owns 1,500,000 shares of Class A Common Stock of Lonestar Resources US Inc. ("Lonestar"). As of September 30, 2019, we believe this ownership represents approximately 6% of Lonestar's outstanding shares of common stock. The Company accounts for the investment in Lonestar as an investment in equity securities measured at fair value in the condensed consolidated balance sheets at the end of each reporting period. The Company recorded a gain of $0.6 million and a loss of $1.4 million related to the investment in Lonestar for the three and nine months ended September 30, 2019, respectively, and the Company recorded a loss of $1.0 million and a gain of $5.7 million related to the investment in Lonestar for the three and nine months ended September 30, 2018, respectively. Any gains or losses related to the investment in Lonestar are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

A subsidiary of the Company owns 100 Class A Units of Gavilan Resources Holdco, LLC ("GRHL"). Tranches representing 20% of the Class A Units vest on each of the first five anniversaries from March 1, 2017. The Class A Units are entitled to distributions from Available Cash, as defined in and subject to the provisions of the GRHL amended and restated limited liability company agreement. The Company accounts for the investment in GRHL as a cost method

investment. As of September 30, 2019, the carrying value of the investment in GRHL was $7.3 million. The Company did not record any earnings or distributions from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019.

A subsidiary of the Company owns 2,272,727 common units of SNMP. As of September 30, 2019, we believe this ownership represents approximately 11.3% of SNMP's outstanding common units. The Company elected the fair value option to account for its interest in SNMP and records the equity investment at fair value at the end of each reporting period. For the three and nine months ended September 30, 2019, the Company recorded losses of $4.3 million and $3.1 million, respectively, related to the investment in SNMP. In addition, for the nine months ended September 30, 2019, the Company recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units. The Company did not record any dividend income from quarterly distributions on the SNMP common units for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded losses related to the investment in SNMP of approximately $10.7 million and $9.1 million, respectively. Further, for the three and nine months ended September 30, 2018, we recorded dividend income of approximately $1.0 million and $3.2 million, respectively. Any gains or losses and dividend income related to the investment in SNMP are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

**Note 10. Fair Value of Financial Instruments**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

***Fair Value on a Recurring Basis***

The following tables set forth, by level within the fair value hierarchy, the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of September 30, 2019 and December 31, 2018 (in thousands):

| | As of September 30, 2019 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 273 | $ — | $ — | $ 273 |
| *Equity investments:* | | | | |
| Investment in SNMP | 841 | — | — | 841 |
| Investment in Lonestar | 4,080 | — | — | 4,080 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 5,919 | — | 5,919 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 3,164 | — | 3,164 |
| *Other:* | | | | |
| Earnout derivative asset | — | — | 5,826 | 5,826 |
| Total | $ 5,194 | $ 9,083 | $ 5,826 | $ 20,103 |

| | As of December 31, 2018 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 131,187 | $ — | $ — | $ 131,187 |
| *Equity investments:* | | | | |
| Investment in SNMP | 3,909 | — | — | 3,909 |
| Investment in Lonestar | 5,475 | — | — | 5,475 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 20,608 | — | 20,608 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 586 | — | 586 |
| *Other:* | | | | |
| Embedded derivative instruments | — | (308) | — | (308) |
| Earnout derivative asset | — | — | 5,858 | 5,858 |
| Total | $ 140,571 | $ 20,886 | $ 5,858 | $ 167,315 |

(1) Level 1 measurements are fair value measurements which use quoted market prices (unadjusted) in active markets for identical assets or liabilities. We use Level 1 inputs when available, as Level 1 inputs generally provide the most reliable evidence of fair value.

(2) Level 2 measurements are fair value measurements which use inputs, other than quoted prices included within Level 1, which are observable for the asset or liability, either directly or indirectly.

(3) Level 3 measurements are fair value measurements which use unobservable inputs and require management to make certain assumptions in the determination of value.

*Financial Instruments*: The Level 1 instruments presented in the tables above consist of money market funds and time deposits included in cash and cash equivalents on the Company's condensed consolidated balance sheets at September 30, 2019 and December 31, 2018. The Company's money market funds and time deposits represent cash equivalents held with banks and financial institutions. The Company identified the money market funds and time deposits as Level 1 instruments, as money market funds have daily liquidity, there are active markets for the underlying investments and quoted prices for the underlying investments can be obtained. In addition, the Level 1 instruments include the Company's equity investments in SNMP and Lonestar which are publicly traded companies.

The Company's commodity derivative instruments consist of swaps as of September 30, 2019 and December 31, 2018 as shown in the table above. The fair values of the Company's derivatives are based on third-party pricing models which utilize inputs that are either readily available in the public market, such as forward curves, or can be corroborated from active markets of broker quotes, and therefore are classified as Level 2. Derivative instruments are also subject to the risk that counterparties will be unable to meet their obligations. Such non-performance risk is considered in the valuation of the Company's derivative instruments, but to date has not had a material impact on estimates of fair values. Significant changes in the quoted forward prices for commodities and changes in market volatility generally lead to corresponding changes in the fair value measurement of the Company's derivative instruments.

There were no commodity derivative instruments classified as Level 3 as of September 30, 2019 or December 31, 2018.

*Embedded Derivatives:* The Company believes that substantially all of the inputs required to calculate the embedded derivatives are observable in the marketplace throughout the term of these derivative instruments or supported by observable levels at which transactions are executed in the marketplace, and are, therefore, classified as Level 2 inputs.

*Earnout Derivative:* These payments were deemed to be a derivative which utilize observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios.

The following table sets forth a reconciliation of changes in the fair value of the Company's earnout derivative instruments classified as Level 3 in the fair value hierarchy (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Beginning balance | $ 5,858 | $ — |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Ending balance | $ 5,826 | $ 5,858 |

***Fair Value on a Non-Recurring Basis***

In connection with the voluntary conversions by certain holders of shares of the Company's 4.875% Convertible Perpetual Preferred Stock, Series A (the "Series A Preferred Stock") and 6.500% Convertible Perpetual Preferred Stock, Series B (the "Series B Preferred Stock") into shares of the Company's common stock in February, March, June, July and September 2019, the Company issued common stock according to the conversion rate established by the Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. The fair value of the common stock issued is based on the price of the Company's common stock on the date of issuance. There were no conversions of Series A Preferred Stock or Series B Preferred Stock into shares of the Company's common stock during the nine months ended September 30, 2018. As there is an active market for the Company's common stock, the Company has designated this fair value measurement as Level 1. For further information, see "—Note 14. Stockholders' and Mezzanine Equity."

The Company recorded proved property impairments of $4.3 million and $6.6 million during the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively, related to oil and natural gas properties in the TMS. The carrying value of the impaired proved properties was reduced to a fair value of $11.0 million and $10.5 million for the nine months ended September 30, 2019 and year ended December 31, 2018, respectively, estimated using inputs characteristic of a Level 3 fair value measurement.

***Fair Value of Other Financial Instruments***

The carrying amounts of our oil and natural gas receivables, accounts payable not subject to compromise and accrued liabilities approximate fair value due to their highly liquid nature. The registered 7.75% Notes and 6.125% Notes are traded in an active market, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair values of the 7.75% Notes and 6.125% Notes were $37.8 million and $74.1 million, respectively, and were calculated using quoted market prices based on trades of such debt as of that date. The 7.25% Senior Secured Notes are traded in an active market under Rule 144A by institutional investors, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair value of the 7.25% Senior Secured Notes was $369.3 million and was calculated using quoted market prices based on observed trades of such debt as of that date.

We believe that the carrying values of long term debt for the Credit Agreement, SN UnSub Credit Agreement and SR Credit Agreement approximate their fair values because the interest rates on the debt approximate market interest rates for debt with similar terms. These debts are classified as Level 2 inputs in the fair value hierarchy and represent the amounts at which the instruments could be valued in an exchange during a current transaction between willing parties.

**Note 11. Asset Retirement Obligations**

The changes in the asset retirement obligation for the nine months ended September 30, 2019 and the year ended December 31, 2018 were as follows (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Abandonment liability, beginning of period | $ 46,175 | $ 36,098 |
| Liabilities incurred during period | 275 | 1,965 |
| Divestitures | (147) | (158) |
| Revisions | — | 5,077 |
| Accretion expense | 2,879 | 3,193 |
| Abandonment liability, end of period | $ 49,183 | $ 46,175 |

**Note 12. Related Party Transactions**

*Sanchez Oil and Gas Corporation*

Expenses allocated to the Company from SOG for G&A expenses and oil and natural gas production expenses for the three months ended September 30, 2019 and 2018 were $17.3 million and $15.3 million, respectively, and expenses allocated to the Company for G&A expenses and oil and natural gas production expenses for the nine months ended September 30, 2019 and 2018 were $52.6 million and $48.8 million, respectively.

As of September 30, 2019 and December 31, 2018, the Company had a net receivable from SOG and its affiliates of $10.2 million and $6.1 million, respectively, which is reflected as "Accounts receivable—related entities" in the condensed consolidated balance sheets. The net receivable as of September 30, 2019 and December 31, 2018 consists primarily of advances related to G&A expenses and other costs paid to SOG in the ordinary course.

*Sanchez Midstream Partners*

As of September 30, 2019 and December 31, 2018, the Company had a net payable to SNMP of approximately $3.8 million and $6.1 million, respectively, that consists primarily of fees associated with oil and natural gas gathering and transportation services.

**Note 13. Accrued Liabilities and Other Current Liabilities**

The following information summarizes accrued liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Capital expenditures | $ 7,232 | $ 61,970 |
| Other: | | |
| General and administrative expenses | 20,635 | 19,460 |
| Production taxes | 2,483 | 5,157 |
| Ad valorem taxes | 6,655 | 445 |
| Lease operating expenses | 34,782 | 24,138 |
| Interest payable | 376 | 47,866 |
| Other accrued liabilities | 1,367 | 5,662 |
| Total accrued liabilities | $ 73,530 | $ 164,698 |

The following information summarizes other payables as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Revenue payable | $ 14,963 | $ 71,296 |
| Production tax payable | 448 | 3,443 |
| Other | 1,328 | (111) |
| Total other payables | $ 16,739 | $ 74,628 |

The following information summarizes other current liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Operated prepayment liability | $ 31,921 | $ 51,844 |
| Deferred gain on Western Catarina Midstream Divestiture - short term | — | 23,720 |
| Phantom compensation payable - short term | 40 | 17 |
| Total other current liabilities | $ 31,961 | $ 75,581 |

**Note 14. Stockholders' and Mezzanine Equity**

*Series A Preferred Stock*

Each share of Series A Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.325 shares of common stock per share of Series A Preferred Stock (which is equal to an initial conversion price of $21.51 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 1,440,343 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series A Preferred Stock.

The annual dividend on each share of Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock.

*Series B Preferred Stock*

Each share of Series B Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock (which is equal to an initial conversion price of $21.40 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 5,763,071 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series B Preferred Stock.

The annual dividend on each share of Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series B Preferred Stock.

*Preferred Stock Conversions*

On February 12, 2019, 72,500 shares of Series A Preferred Stock converted into 168,563 shares of our common stock and 245,832 shares of Series B Preferred Stock converted into 574,510 shares of our common stock at the election of the holders thereof. From March 6 to March 8, 2019, 563,832 shares of Series A Preferred Stock converted into 1,310,914 shares of our common stock and 770,986 shares of Series B Preferred Stock converted into 1,801,798 shares of our common stock, at the election of the holders thereof. On March 26, 2019, 422,222 shares of Series A Preferred Stock converted into 981,667 shares of our common stock, at the election of the holders thereof. As of June 14, 2019, 155,929 shares of Series A Preferred Stock converted into 362,535 shares of our common stock, at the election of the holders thereof. On July 29, 2019, 5,000 shares of Series A Preferred Stock converted into 11,625 shares of our common stock, at the election of the holder thereof. On September 30, 2019, 45,000 shares of Series B Preferred Stock converted into 105,165 shares of our common stock, at the election of the holder thereof.

Through the conversions, each of the holders effectively waived their rights to any accrued and unpaid dividends thereon under the conversion terms set forth in Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. As a result, the Company has reduced its quarterly dividend accruals on its Series A Preferred Stock and Series B Preferred Stock by approximately $1.6 million as compared to the amount that would have been payable based on the number of shares outstanding prior to these conversions.

*SN UnSub Preferred Unit Issuance*

On March 1, 2017, the Company, through two of its subsidiaries, SN UnSub and SN Maverick, along with Gavilan Resources, LLC (“Gavilan”), an entity controlled by The Blackstone Group Inc., completed the acquisition of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing an approximate 49% average working interest therein (the “Comanche Assets,” with such acquisition, the “Comanche Acquisition”).

At the closing of the Comanche Acquisition, certain funds managed or advised by GSO Capital Partners L.P. (“GSO”) purchased 485,000 preferred units of SN UnSub and Intrepid Private Equity V-A LLC purchased 15,000 preferred units of SN UnSub (in aggregate, the “SN UnSub Preferred Units”). The SN UnSub Preferred Units are accounted for as mezzanine equity in the condensed consolidated balance sheet consisting of the following as of September 30, 2019 and December 31, 2018, respectively, (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Mezzanine equity, beginning balance | $ 452,828 | $ 427,512 |
| Accretion of discount | 22,029 | 25,316 |
| Dividends accrued | 37,500 | 50,000 |
| Dividends prepaid [1] | — | (2,592) |
| Dividends/distributions paid [1] | (37,500) | (47,408) |
| Mezzanine equity, ending balance | $ 474,857 | $ 452,828 |

(1) In 2017, tax distributions of approximately $2.6 million were paid in excess of the accrued dividend. The excess distribution was offset against a portion of the dividend accrued during the three months ended March 31, 2018.

*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net loss per share for the three and nine months ended September 30, 2019 and 2018 (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic and dilutive net loss per share(1)(2) | 97,395 | 82,073 | 95,272 | 81,597 |
| **Net loss per common share - basic and diluted** | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |

(1) The three and nine months ended September 30, 2018 exclude 1,840,007 and 2,591,553 shares, respectively, of weighted average restricted stock and 12,520,179 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

(2) The three and nine months ended September 30, 2019 exclude 433,369 and 942,551 shares, respectively, of weighted average restricted stock and 7,306,402 and 8,757,574 shares, respectively, of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

**Note 15. Stock-Based Compensation**

The Company’s Third Amended and Restated Long Term Incentive Plan (the “LTIP”) allows for grants of stock options, stock appreciation rights, restricted shares, phantom stock, other stock based awards or stock awards, or any combination thereof.

Effective January 1, 2019, the Company records stock-based compensation expense for awards granted in accordance with the provisions of ASU 2018-07 “Compensation - Stock Compensation (ASC 718) - Improvements to Nonemployee Share-Based Payment Accounting,” which expands the scope of ASC 718, “Compensation – Stock Compensation,” to include share-based payment transactions for acquiring goods and services from nonemployees. Pursuant to this standard, stock-based compensation expense is based on the grant-date fair value of our stock awards and is recognized over the vesting period using the straight-line method. As a result of our adoption of ASU 2018-07, the Company remeasured the value of our outstanding unvested awards as of January 1, 2019. This did not have a material impact on our financial statements.

During the three and nine months ended September 30, 2019, the Company did not issue any shares of restricted common stock pursuant to the LTIP.

During the three months ended September 30, 2019, the Company did not issue any shares of phantom stock pursuant to the LTIP. During the nine months ended September 30, 2019, the Company issued an immaterial number of shares of phantom stock pursuant to the LTIP to certain employees of SOG, with whom the Company has a services agreement. These shares of phantom stock vest in equal annual amounts over a three year period.

For the 2018 performance period applicable to our performance phantom stock awards granted in 2017 (the “Performance Awards”), 0% of the target shares were awarded.

For the 2018 performance period applicable to our cash-settled performance-based phantom stock awards and stock-settled performance-based phantom stock awards granted in 2018 (together, the "PBPS Awards"), 71% of the target shares were awarded, equating to 419,430 cash-settled awards and 419,430 stock-settled awards. Stock-based compensation expense for these awards was calculated in accordance with ASC 718 and is being amortized over the vesting period.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Restricted stock awards, directors | $ — | $ 305 | $ 42 | $ 932 |
| Restricted stock awards, non-employees | 45 | (862) | 270 | 1,957 |
| Performance awards | 51 | (842) | 83 | (12) |
| Phantom stock awards | (101) | (2,652) | (40) | 1,467 |
| Total stock-based compensation expense | $ (5) | $ (4,051) | $ 355 | $ 4,344 |

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was approximately $0.3 million of unrecognized compensation cost related to the non-vested restricted shares outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated restricted stock outstanding. The cost is expected to be recognized over an average period of approximately 1.5 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated phantom stock ("PAPS") and phantom stock outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the estimated per share price of the common stock underlying the Performance Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the Performance Awards. The cost is estimated to be recognized over a weighted average period of approximately 2.3 years.

Based on the estimated per share price of the common stock underlying the PBPS Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the PBPS Awards. The cost is estimated to be recognized over a weighted average period of approximately 1.1 years.

A summary of the status of the non-vested restricted shares for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested common stock, beginning of period | 2,714 | 5,767 | 5,024 | 4,897 |
| Granted | — | 146 | — | 3,303 |
| Vested | (51) | (59) | (2,164) | (2,218) |
| Forfeited | (24) | (414) | (221) | (542) |
| Non-vested common stock, end of period | 2,639 | 5,440 | 2,639 | 5,440 |

As of September 30, 2019, approximately 8.4 million shares remained available for future issuance to participants under the LTIP.

A summary of the status of the non-vested phantom stock and PAPS for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested phantom stock and PAPS, beginning of period | 2,857 | 5,888 | 5,125 | 3,589 |
| Granted | — | 253 | 7 | 3,905 |
| Vested | (60) | (46) | (1,874) | (1,197) |
| Forfeited | (58) | (465) | (519) | (667) |
| Non-vested phantom stock and PAPS, end of period | 2,739 | 5,630 | 2,739 | 5,630 |

**Note 16. Income Taxes**

The Company used a year-to-date effective tax rate method for recording income taxes for the nine month periods ended September 30, 2019 and 2018. This method is based on our determination at September 30, 2019 and 2018 that due to our valuation allowance position, the income tax provision does not materially change by using a year-to-date effective tax rate method as compared to an estimated full year annual effective tax rate method. Further, for the period ended September 30, 2018, a small change in our estimated ordinary income could have resulted in a large change in the estimated annual effective tax rate. We will use this year-to-date effective tax rate method each quarter until such time a return to the annualized effective tax rate method is deemed material or appropriate.

The Company's effective tax rate for the nine months ended September 30, 2019 and 2018 was approximately 0% and 0%, respectively. The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 21% and the Company's effective tax rates is related to the valuation allowance on deferred tax assets.

The Company provides for deferred income taxes on the difference between the tax basis of an asset or liability and its carrying amount in the financial statements in accordance with authoritative guidance for accounting for income taxes. This difference will result in taxable income or deductions in future years when the reported amount of the asset or liability is recovered or settled, respectively. In recording deferred income tax assets, the Company considers whether it is more likely than not that some portion or all of the deferred income tax assets will be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those deferred income tax assets would be deductible. The Company believes that after considering all the available objective evidence, both positive and negative, historical and prospective, with greater weight given to historical evidence, management is not able to determine that it is more likely than not that the deferred tax assets will be realized and, therefore, has established a valuation allowance to reduce the deferred tax assets as of September 30, 2019. The Company will continue to assess the valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

At September 30, 2019, the Company had no material uncertain tax positions.

**Note 17. Commitments and Contingencies**

*Stockholder Derivative Litigation*

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain of the Company's directors (Armato et al. v. A.R. Sanchez, Jr. et al., No. 2018-0642, the "Derivative Action"). The complaint alleges breach of fiduciary duty, unjust enrichment and waste of corporate assets against directors of the Company based on purportedly excessive compensation of the Company's non-employee directors. On October 22, 2018, the Company and defendant directors filed an answer to the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. On August 16, 2019 a suggestion of bankruptcy was filed in the Derivative Action by the Company, and there has been no activity in the case since that time. Given the status and the preliminary state of the Derivative Action, the Company is unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution. The complaint does not specify damages sought.

From time to time, the Company may be involved in lawsuits or other legal proceedings that arise in the normal course of its business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

*Catarina Drilling Commitment*

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. The lease also creates a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. During the commitment period ending June 30, 2019, the Company drilled 13 wells that may be counted toward the next annual drilling commitment period, which began on July 1, 2019. Furthermore, our 2019 capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

*Comanche Drilling Commitment*

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we and Gavilan are jointly and severally liable for a default fee of $0.2 million for each well we do not timely complete and equip. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position.

*Palmetto Drilling Commitment*

Marathon Oil EF LLC ("Marathon") is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

*Volume Commitments*

As is common in our industry, the Company is party to certain oil and natural gas gathering and transportation and natural gas processing agreements that obligate us to deliver a specified volume of production over a defined time horizon. If not fulfilled, the Company is subject to deficiency payments to our midstream counterparties. As of September 30, 2019, the Company had approximately $406.3 million in future commitments related to oil and natural gas gathering and transportation agreements ($140.6 million for 2019 through 2021, $128.8 million from 2022 through 2024, and $136.9 million under commitments expiring after December 31, 2024, in the aggregate) and approximately $40.5 million in future commitments related to natural gas processing agreements ($39.8 million for 2019 through 2021,

and $0.7 million from 2022 through 2024, in the aggregate) that are not recorded in the accompanying condensed consolidated balance sheets.

For the three and nine months ended September 30, 2019, the Company incurred expenses related to deficiency fees of approximately $3.6 million and $7.5 million, respectively, and for the three and nine months ended September 30, 2018, the Company incurred expenses related to deficiency fees of approximately $1.6 million and $3.8 million, respectively. These expenses are reported on the condensed consolidated statements of operations in the "Oil and natural gas production expenses" line item. We expect to incur additional expenses related to our volume commitments in connection with our reduced capital activity.

*Loss Contingencies*

To the extent we are able to assess the likelihood of a negative outcome for a contingency, whether it be the loss or impairment of an asset or the incurrence of a liability, our assessments of such likelihood range from remote to probable. If we determine that a negative outcome is probable and the amount of loss is reasonably estimable, we accrue an undiscounted liability equal to the estimated amount. If a range of probable loss amounts can be reasonably estimated and no amount within the range is a better estimate than any other amount, then we accrue an undiscounted liability equal to the minimum amount in the range. In addition, we estimate legal fees that we expect to incur associated with loss contingencies and accrue those costs when they are material and probable of being incurred.

We do not record a contingent liability when the likelihood of loss is probable but the amount cannot be reasonably estimated or when the likelihood of loss is believed to be only reasonably possible or remote. For contingencies where an unfavorable outcome is reasonably possible and the impact would be material to our consolidated financial statements, we disclose the nature of the contingency and, where feasible, an estimate of the possible loss or range of loss.

For the three and nine months ended September 30, 2019, we recorded a loss on impairment of a prepaid asset of $11.8 million.

*Other Commitments and Contingencies*

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company's bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business, notwithstanding the filing of the Bankruptcy Petitions. In addition, the filing of the Bankruptcy Petitions may allow the Company to assume, assign or reject certain commitments as executory contracts. See "—Note 3. Chapter 11 Cases" for additional information.

**Note 18. Condensed Consolidating Financial Information**

The Company's 7.75% Notes and 6.125% Notes have been registered with the SEC and are guaranteed by all of the Company's subsidiaries, except for SN UR Holdings, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN UnSub GP, SN UnSub Holdings, SN UnSub, SN Capital, LLC, Sanchez Resources, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC and SR TMS, LLC which are unrestricted subsidiaries of the Company. As of September 30, 2019 such guarantor subsidiaries were 100% owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

Rule 3-10 of Regulation S-X requires that, in lieu of providing separate financial statements for subsidiary guarantors, condensed consolidating financial information be provided where the subsidiaries have guaranteed the debt of a registered security, where the guarantees are full, unconditional and joint and several and where the voting interest of the subsidiaries are 100% owned by the registrant.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiary guarantors to distribute funds to the Company by dividends or loans.

The following is a presentation of condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) in

accordance with Rule 3-10 of Regulation S-X and should be read in conjunction with the condensed consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

The guarantor subsidiaries, along with non-guarantor subsidiary SN UR Holdings, LLC in addition to Sanchez Energy Corporation, constitute Debtors in the Chapter 11 Cases. Although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code. See "—Note 3. Chapter 11 Cases" and "—Note 7. Debt" for additional information.

A summary of the condensed consolidated guarantor balance sheets as of September 30, 2019 and December 31, 2018 is presented below (in thousands):

| | September 30, 2019 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 243,889 | $ 122,817 | $ 106,561 | $ (172,357) | $ 300,910 |
| Total oil and natural gas properties, net | 60 | 1,498,844 | 717,321 | — | 2,216,225 |
| Investment in subsidiaries | 1,609,093 | — | (7,278) | (1,601,815) | — |
| Other assets | 52,146 | 259,623 | 33,906 | — | 345,675 |
| **Total Assets** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 77,254 | $ 202,889 | $ 189,010 | $ (172,357) | $ 296,796 |
| Long term liabilities | 2,370,695 | 235,861 | 181,680 | — | 2,788,236 |
| Mezzanine equity | — | — | 474,857 | — | 474,857 |
| Total stockholders' equity (deficit) | (542,761) | 1,442,534 | 4,963 | (1,601,815) | (697,079) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |

| Assets | December 31, 2018<br>Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total current assets | $ 473,062 | $ 69,934 | $ 146,765 | $ (316,780) | $ 372,981 |
| Total oil and natural gas properties, net | 36 | 1,600,378 | 758,711 | — | 2,359,125 |
| Investment in subsidiaries | 1,577,054 | — | (7,280) | (1,569,774) | — |
| Other assets | 22,917 | 10,307 | 54,630 | — | 87,854 |
| **Total Assets** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 155,396 | $ 282,719 | $ 226,964 | $ (316,780) | $ 348,299 |
| Long term liabilities | 2,203,546 | 51,211 | 208,599 | — | 2,463,356 |
| Mezzanine equity | — | — | 452,828 | — | 452,828 |
| Total stockholders' equity (deficit) | (285,873) | 1,346,689 | 64,435 | (1,569,774) | (444,523) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |

A summary of the condensed consolidated guarantor statements of operations for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, 2019<br>Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total revenues | $ — | $ 110,327 | $ 52,219 | $ — | $ 162,546 |
| Total operating costs and expenses | (35,928) | (116,966) | (45,410) | 90 | (198,214) |
| Other income (expense) | (27,494) | 1,533 | 3,759 | (90) | (22,292) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (118,743) | (5,106) | 10,568 | — | (113,281) |
| | | | | | |
| Income tax benefit | (833) | — | — | — | (833) |
| Equity in income (loss) of subsidiaries | 5,462 | — | — | (5,462) | — |
| **Net income (loss)** | $ (112,448) | $ (5,106) | $ 10,568 | $ (5,462) | $ (112,448) |

| | Three Months Ended September 30, 2018<br>Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total revenues | $ — | $ 197,203 | $ 80,507 | $ — | $ 277,710 |
| Total operating costs and expenses | (16,717) | (126,573) | (49,969) | 134 | (193,125) |
| Other income (expense) | (52,165) | 794 | (27,482) | (134) | (78,987) |
| **Income (loss) before income taxes** | (68,882) | 71,424 | 3,056 | — | 5,598 |
| | | | | | |
| Equity in income (loss) of subsidiaries | 74,480 | — | — | (74,480) | — |
| **Net income (loss)** | $ 5,598 | $ 71,424 | $ 3,056 | $ (74,480) | $ 5,598 |

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 395,050 | $ 179,300 | $ — | $ 574,350 |
| Total operating costs and expenses | (90,587) | (358,005) | (158,412) | 360 | (606,644) |
| Other income (expense) | (123,907) | 2,188 | (23,084) | (360) | (145,163) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (269,815) | 39,233 | (2,196) | — | (232,778) |
| Income tax benefit | (23) | — | — | — | (23) |
| Equity in income (loss) of subsidiaries | 37,037 | — | — | (37,037) | — |
| **Net income (loss)** | $ (232,755) | $ 39,233 | $ (2,196) | $ (37,037) | $ (232,755) |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 543,529 | $ 244,722 | $ — | $ 788,251 |
| Total operating costs and expenses | (56,967) | (334,408) | (163,833) | 406 | (554,802) |
| Other income (expense) | (200,124) | (4,469) | (62,654) | (406) | (267,653) |
| **Income (loss) before income taxes** | (257,091) | 204,652 | 18,235 | — | (34,204) |
| Equity in income (loss) of subsidiaries | 222,887 | — | — | (222,887) | — |
| **Net income (loss)** | $ (34,204) | $ 204,652 | $ 18,235 | $ (222,887) | $ (34,204) |

A summary of the condensed consolidated guarantor statements of cash flows for the nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (166,502) | $ 233,600 | $ 32,652 | $ — | $ 99,750 |
| Net cash provided by (used in) investing activities | 109,510 | (81,169) | (34,665) | (103,893) | (110,217) |
| Net cash provided by (used in) financing activities | 48,315 | (159,599) | (217) | 103,893 | (7,608) |
| **Net increase (decrease) in cash and cash equivalents** | (8,677) | (7,168) | (2,230) | — | (18,075) |
| **Cash and cash equivalents, beginning of period** | 68,762 | 58,429 | 70,422 | — | 197,613 |
| **Cash and cash equivalents, end of period** | $ 60,085 | $ 51,261 | $ 68,192 | $ — | $ 179,538 |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (175,586) | $ 326,068 | $ 99,044 | $ — | $ 249,526 |
| Net cash provided by (used in) investing activities | (136,290) | (396,492) | (58,365) | 137,325 | (453,822) |
| Net cash provided by (used in) financing activities | 419,714 | 128,026 | (21,881) | (137,325) | 388,534 |
| **Net increase (decrease) in cash and cash equivalents** | 107,838 | 57,602 | 18,798 | — | 184,238 |
| **Cash and cash equivalents, beginning of period** | 86,937 | 29,046 | 68,451 | — | 184,434 |
| **Cash and cash equivalents, end of period** | $ 194,775 | $ 86,648 | $ 87,249 | $ — | $ 368,672 |

**Note 19. Variable Interest Entities ("VIE")**

The Company's investment in GRHL represents a VIE that could expose the Company to losses limited to the estimated fair value of the investment. The carrying amounts of the investment in GRHL, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was in each case approximately $7.3 million. The Company did not record any earnings from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019. The Company determined that Blackstone is the primary beneficiary of the VIE as the Company has no significant voting rights in GRHL under the LLC Agreement and no power over decisions related to the business activities of GRHL, other than operation of the properties.

The Company's investment in SNMP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time. The carrying amounts of the investment in SNMP, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was approximately $0.8 million and $3.9 million, respectively.

Below is a comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Beginning balance | $ 11,189 | $ 32,507 |
| Gain (loss) from change in fair value of investment in SNMP | (3,068) | (21,318) |
| Maximum exposure to loss | $ 8,121 | $ 11,189 |

**Note 20. Leases**

We determine if an arrangement is a lease at inception. To the extent that we determine an arrangement represents a lease, we classify that lease as an operating lease or a finance lease. We currently do not have any finance leases. We capitalize our operating leases on our consolidated balance sheet through a ROU asset and a corresponding lease liability. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Short term leases that have an initial term of one year or less are not capitalized but are disclosed below. Short term lease costs exclude expenses related to leases with a lease term of one month or less.

Our operating leases are reflected as operating lease ROU assets, short term operating lease liabilities and long term operating lease liabilities on our consolidated balance sheet. Operating lease ROU assets and liabilities are recognized at the commencement date of an arrangement based on the present value of lease payments over the lease term. In addition to the present value of lease payments, the operating lease ROU asset also includes any lease payments

made to the lessor prior to lease commencement less any lease incentives and initial direct costs incurred. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term.

***Nature of Leases***

We lease property including corporate and field offices and facilities, vehicles, field equipment, and midstream gathering and processing facilities to support our operations. A more detailed description of our significant lease types is included below.

*Midstream Gathering and Processing Facilities*

We engage in various types of transactions with midstream entities to gather and/or process our products, leveraging integrated systems and facilities wholly owned by the midstream counterparty. Under certain of these arrangements, we utilize substantially all of the underlying gathering system or processing facility capacity and we have, therefore, concluded that those underlying assets meet the definition of an identified asset. These contracts have non-cancellable lease terms of approximately four to 17 years and continue thereafter on a renewable basis subject to termination by either party with notice. Consequently, certain of our gathering and/or processing contracts represent an operating lease of the underlying midstream system or facilities with a lease term that equals the primary non-cancellable contract term.

*Real Estate*

We rent space from third parties for our corporate and field office locations and lease acreage for general corporate purposes. Our office and acreage lease agreements are structured with non-cancellable lease terms of three to 10 years. We have concluded that these agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

*Field Equipment and Vehicles*

We enter into daywork contracts for drilling rigs with third parties to support our drilling activities. Our drilling rig arrangements are typically structured with a term that is in effect until drilling operations are completed on a specified well or well pad in accordance with the development plan. Upon mutual agreement with the contractor, we typically have the option to extend the contract term for additional wells or well pads by providing thirty days' notice prior to the end of the original contract term. We have concluded that our drilling rig arrangements represent operating leases with lease terms of six to 18 months. For those arrangements with terms of less than one year, we have determined those arrangements to be short term operating leases. Due to the continuously evolving nature of our drilling schedules and the potential volatility in commodity prices in an annual period, our strategy to enter into shorter term drilling rig arrangements allows us the flexibility to respond to changes in our operating and economic environment. We exercise our discretion in choosing to extend or not extend contracts on a rig-by-rig basis depending on the conditions present at the time the contract expires. At the time of contract commencement, we have determined we cannot conclude with reasonable certainty if we will choose to extend the contract beyond its original term. Pursuant to the successful efforts method of accounting, our net share of these costs is capitalized as part of oil and natural gas properties on the balance sheet as incurred.

We rent compressors from third parties to facilitate the downstream movement of our production from our drilling operations to market. Our compressor arrangements typically have non-cancellable lease terms of 12 to 24 months and continue thereafter on a month-to-month basis subject to termination by either party with thirty days' notice. We have concluded that our compressor arrangements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

We rent our vehicle fleet for our drilling and operations personnel. Our vehicle agreements have non-cancellable lease terms of 18 months. We have concluded that our vehicle agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

***Significant Judgments***

*Discount Rate*

Our leases typically do not provide an implicit rate. Accordingly, we are required to use our estimated incremental borrowing rate in determining the present value of lease payments based on the information available at commencement date. Our estimated incremental borrowing rate reflects a reasonable projection of the interest that we would expect to pay to borrow, on a collateralized basis, over a similar term, an amount equal to the lease payments in a similar economic environment. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

*Practical Expedients and Accounting Policy Elections*

Certain of our lease arrangements include lease and non-lease components. For all existing asset classes with multiple component types, we have utilized the practical expedient to not separate lease and non-lease components. Accordingly, we account for the lease and non-lease components in an arrangement as a single lease component.

In addition, for all existing asset classes, we have elected an accounting policy to not apply the recognition requirements of Topic 842 to our short term leases. Accordingly, we recognize lease payments related to our short term leases in our statement of operations, which has not changed from our prior recognition.

The following are components of our lease expense for the three and nine months ended September 30, 2019, the majority of which are included in oil and natural gas production expenses on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 | Nine Months Ended September 30, 2019 |
|---|---|---|
| Operating lease expense | $ 25,069 | $ 74,997 |
| Short term and variable lease expense | 4,688 | 20,657 |
| Total lease expense | $ 29,757 | $ 95,654 |
| | | |
| Operating lease cost[(1)] | $ 3,118 | $ 6,175 |
| Short term lease cost[(1)] | 191 | 1,187 |
| Variable lease cost[(1)] | — | 65 |
| Total lease cost | $ 3,309 | $ 7,427 |

(1) Represents capital expenditures related to the use of drilling rigs for the three and nine months ended September 30, 2019 which are capitalized as part of oil and natural gas properties on our condensed consolidated balance sheets.

Other information related to our operating leases are as follows (in thousands, except lease term and discount rate):

| | Nine Months Ended September 30, 2019 |
|---|---|
| Operating cash flows from operating leases | $ 95,654 |
| Investing cash flows from operating leases | 7,427 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 |
| Amortization of ROU assets | (81,509) |
| | |
| Weighted average remaining lease term (years) | 3.1 |
| Weighted average discount rate | 10% |

As of September 30, 2019, minimum future payments, including imputed interest, for our long term operating leases under ASC 842 are as follows (in thousands):

| | | |
|---|---|---|
| October 1, 2019 through December 31, 2019 | $ | 34,228 |
| 2020 | | 119,293 |
| 2021 | | 80,513 |
| 2022 | | 60,269 |
| 2023 | | 26,847 |
| Thereafter | | 9,797 |
| Total lease payments | | 330,947 |
| Less: Imputed interest | | 47,463 |
| Total lease liabilities | $ | 283,484 |

As of December 31, 2018, undiscounted minimum future payments for our long term operating leases under ASC 840 were as follows (in thousands):

| | | |
|---|---|---|
| 2019 | $ | 100,640 |
| 2020 | | 84,472 |
| 2021 | | 52,499 |
| 2022 | | 31,682 |
| 2023 | | 11,631 |
| Thereafter | | 8,467 |
| Total lease payments | $ | 289,391 |

**Note 21. Subsequent Events**

On October 22, 2019, the Debtors filed a motion for entry of an order authorizing rejection of an office sublease. The Bankruptcy Court has not yet ruled on the motion.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing in Part I, Item 1 of this Quarterly Report on Form 10-Q and information contained in our 2018 Annual Report. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, beliefs and expected performance. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed below, we are currently operating our business as debtors-in-possession in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions (as defined below) on August 11, 2019, prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

***Voluntary Reorganization Under Chapter 11***

On August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer all of the Debtors' chapter 11 cases (the "Chapter 11 Cases") under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below), and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub, its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 cases and are classified as "non-Debtors."

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the holders of the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

For the duration of the Company's Chapter 11 Cases, the Company's operations and ability to develop and execute its business plan are subject to the risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019. As a result of these risks and uncertainties, the number, amount or composition, as applicable, of the Company's stock and stockholders, assets, liabilities, officers and/or directors could be significantly different following the outcome of the Chapter 11 Cases, and the description of the Company's operations, properties and capital plans included in this quarterly report may not accurately reflect its operations, properties and capital plans following the Chapter 11 Cases.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves the Debtors of performing their future obligations under such executory contract or unexpired lease but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtors' estate for such damages. Generally, the assumption of an executory contract or unexpired lease requires the Debtors to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtor in this quarterly report, including where

applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions, that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under its Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties

terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;

- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;

- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;

- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);

- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;

- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and

- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the Senior Secured 7.25% Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***Derivative Contracts***

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Bankruptcy Petitions, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***Basis of Presentation***

The condensed consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Core Properties***

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of September 30, 2019, we had assembled approximately 435,000 gross (233,000 net) leasehold acres.

In 2017, we acquired approximately 252,000 gross (61,000 net) acres in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (the “Comanche Acquisition”), representing a 24% working interest in the asset, which we refer to as the Comanche area.

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing on September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. As of August 31, 2018, the Company had achieved a 30-well bank at Comanche that was applied toward the annual development commitment for the period that extended from September 1, 2018 to August 31, 2019. The Company completed and equipped an additional 63 wells at Comanche between September 1, 2018 and August 31, 2019, resulting in a total of 93 wells that were applied toward the annual development commitment of 60 wells. Accordingly, the Company has met its annual development commitment for the period September 1, 2018 to August 31, 2019, and has completed and equipped 30 wells that can be applied toward the development commitment for the period September 1, 2019 to August 31, 2020. The Company completed and equipped an additional six wells at Comanche between September 1, 2019 and September 30, 2019. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position. SN Maverick is currently engaged in a disagreement with Gavilan Resources, LLC (“Gavilan”), an entity controlled by Blackstone, regarding operations of the Comanche Assets under the joint development agreement with Gavilan (the “JDA”). Among other things, Gavilan has asserted that SN Maverick is in default of the JDA and Gavilan has the right to take over operations of the Comanche Assets. Although SN Maverick disputes Gavilan’s assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan, if Gavilan prevails in the disagreement, SN Maverick would lose its rights to operate the Comanche Assets and certain rights of SN Maverick under the JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the JDA. Arbitration regarding this dispute was initiated by Gavilan with the American Arbitration Association on February 18, 2019, seeking, among other things, a declaration that SN Maverick is in default under the JDA, and the Company submitted its answer and counterclaims on February 26, 2019 seeking, among other things, a declaration that Gavilan is in default under the JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations. On the Petition Date, the arbitrator was notified by letter of the filing of the Bankruptcy Petitions and of the automatic stay under the Bankruptcy Code.

We have approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas representing a 100% working interest, which we refer to as the Catarina area.

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. For the commitment period ending June 30, 2019, the Company drilled a total of 63 wells toward the annual drilling commitment of 50 wells. Accordingly, the Company met all of its 50-well annual drilling commitment for the period July 1, 2018 to June 30, 2019 and initiated a bank of 13 wells that will be counted toward the next annual drilling commitment period. We drilled four additional wells in the Catarina area during the third quarter 2019, bringing our total to 17 wells toward the commitment period July 1, 2019 to June 30, 2020. Furthermore, our 2019 drilling activities from July 1, 2019 to the present date and our capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

We have approximately 58,000 net acres in Dimmit, Frio, La Salle, and Zavala counties, Texas, which we refer to as the Maverick area, which we believe lies in the black oil window.

We have approximately 7,600 net acres in Gonzales County, Texas, which we refer to as the Palmetto area, which we believe lies in the volatile oil window.

Marathon Oil EF LLC ("Marathon") is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

***Tuscaloosa Marine Shale***

As of September 30, 2019, we owned approximately 12,400 net acres in the TMS. Although TMS development is currently challenged due to well costs and commodity prices, we believe that the TMS play may offer significant future development potential as changes in technology, commodity prices and service costs occur.

***Recent Developments***

Please see the first paragraph under "*Business Overview*," "*—Voluntary Reorganization Under Chapter 11*" and "*—DIP Facility*" above, in addition to the other matters discussed above regarding our Bankruptcy Petitions and related matters.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term is defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of

termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Outlook***

We and other companies in our industry face significant risks related to business operations, the prices we receive for our production, competition for employees and capital, and other factors which could materially impact our results of operations and financial condition. Although commodity and capital markets showed signs of improvement, oil prices experienced a significant decline in the fourth quarter 2018 and have remained volatile in 2019 through the present date. As a result, we continue to manage our business for the potential of ongoing commodity price volatility. This volatility has significantly influenced our industry and operating environment in the past, and we believe it may again in the future. We face continuing uncertainty with respect to the demand for our products, commodity prices, service availability and costs, and our ability to fund capital projects, along with significant challenges associated with our financial position. The Company set its 2019 capital budget at a range of $100 million to $150 million for development and optimization activities in our core areas, which represents a substantial reduction from capital expenditures of approximately $593 million in 2018. We generally seek to remain flexible in our business strategy to make changes to this estimated capital budget as the commodity markets and our overall financial and business position evolve over time. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In November 2018, we engaged Moelis & Company LLC as financial advisor to explore strategic alternatives to strengthen our balance sheet and maximize the value of the Company. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes for a 30-day grace period which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. On the Petition Date, prior to the expiration of the grace period, the Company and other Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility on an interim basis. Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company and the other Debtors, their creditors or other stakeholders, or at all.

**Results of Operations**

***Three Months Ended September 30, 2019 Compared to Three Months Ended September 30, 2018***

**Net Production and Revenues from Production**

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Three Months Ended September 30, | | Decrease 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 1,926 | 2,300 | (374) | (16)% |
| Natural gas liquids (MBbls) | 2,029 | 2,473 | (444) | (18)% |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | (13)% |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | (16)% |
| **Average Sales Price Excluding Derivatives[1]:** | | | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 | $ (15.07) | (21)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.33 | 3.00 | (0.67) | (22)% |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 | $ (12.33) | (32)% |
| **Average Sales Price Including Derivatives[2]:** | | | | |
| Oil ($ per Bbl) | $ 53.64 | $ 55.19 | $ (1.55) | (3)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.55 | 3.19 | (0.64) | (20)% |
| Oil equivalent ($ per Boe) | $ 26.49 | $ 34.29 | $ (7.80) | (23)% |
| **Revenues from Production[1][3]:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ (55,227) | (34)% |
| Natural gas liquids sales | 22,675 | 69,995 | (47,320) | (68)% |
| Natural gas sales | 26,572 | 39,460 | (12,888) | (33)% |
| Total revenues from production | $ 155,263 | $ 270,698 | $ (115,435) | (43)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Three Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 917 | 1,011 |
| Catarina | 672 | 891 |
| Maverick | 220 | 347 |
| Palmetto | 95 | 25 |
| TMS / Other | 22 | 26 |
| Total | 1,926 | 2,300 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 807 | 932 |
| Catarina | 1,191 | 1,531 |
| Maverick | 4 | 3 |
| Palmetto | 27 | 7 |
| Total | 2,029 | 2,473 |
| **Natural gas (MMcf)** | | |
| Comanche | 4,644 | 4,895 |
| Catarina | 6,589 | 8,235 |
| Maverick | 20 | 10 |
| Palmetto | 151 | 34 |
| Total | 11,404 | 13,174 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 5,856 | 6,969 |
| Average daily production (Boe/d) | 63,652 | 75,750 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 |
| Natural gas liquids ($ per Bbl) | $ 11.17 | $ 28.30 |
| Natural gas ($ per Mcf) | $ 2.33 | $ 3.00 |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.76 | $ 10.85 |
| Production and ad valorem taxes | $ 1.68 | $ 2.18 |
| General and administrative expenses | $ 3.57 | $ 3.06 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 9.75 |
| Impairment of oil and natural gas properties | $ 1.67 | $ 0.45 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 6,969 MBoe for the three months ended September 30, 2018 to 5,856 MBoe for the three months ended September 30, 2019, primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 2,498 | 1,701 | 2,758 |
| Catarina | 460 | 2,961 | 441 | 3,795 |
| Palmetto | 81 | 147 | 86 | 38 |
| Maverick | 66 | 227 | 66 | 352 |
| TMS / Other | 46 | 23 | 47 | 26 |
| Total | 2,435 | 5,856 | 2,341 | 6,969 |

For the three months ended September 30, 2019 and 2018, 33% of our production was oil, 35% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $155.3 million and $270.7 million for the three months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas for the three months ended September 30, 2019 decreased $55.2 million, $47.3 million and $12.9 million, respectively, as compared to the three months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues***. The Company recorded sales and marketing revenues of $7.3 million and $7.0 million during the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the three months ended September 30, 2018 to the three months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Three Months Ended September 30, | | | Three Months Ended | Revenue |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | September 30, 2018 Average Sales Price | Decrease from Production |
| Oil (MBbls) | 1,926 | 2,300 | (374) | $ 70.11 | $ (26,220) |
| NGLs (MBbls) | 2,029 | 2,473 | (444) | $ 28.30 | $ (12,567) |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | $ 3.00 | $ (5,302) |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | $ 38.84 | $ (44,089) |

| | Average Sales Price per Unit Three Months Ended September 30, | | | Three Months Ended | Revenue |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | September 30, 2019 Production Volume | Decrease from Price |
| Oil (MBbls) | $ 55.04 | $ 70.11 | $ (15.07) | 1,926 | $ (29,007) |
| NGLs (MBbls) | $ 11.17 | $ 28.30 | $ (17.13) | 2,029 | $ (34,753) |
| Natural gas (MMcf) | $ 2.33 | $ 3.00 | $ (0.67) | 11,404 | $ (7,586) |
| Total oil equivalent (MBoe) | $ 26.51 | $ 38.84 | $ (12.33) | 5,856 | $ (71,346) |

Additionally, a 10% increase or decrease in our average realized sales prices for the three months ended September 30, 2019, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $15.5 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Three Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 74,740 | $ 75,594 | $ (854) | (1)% |
| Exploration expenses | 164 | 2,698 | (2,534) | (94)% |
| Sales and marketing expenses | 6,672 | 7,239 | (567) | (8)% |
| Production and ad valorem taxes | 9,867 | 15,221 | (5,354) | (35)% |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | (10,080) | (15)% |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 6,644 | * |
| General and administrative expenses(1) | 20,915 | 21,312 | (397) | (2)% |
| Prepetition restructuring charges | 18,231 | — | 18,231 | * |
| Total operating costs and expenses | 198,214 | 193,125 | 5,089 | 3 % |
| | | | | |
| Interest income | 221 | 1,130 | (909) | (80)% |
| Other expense | (12,829) | (7,677) | (5,152) | 67 % |
| Interest expense | (22,884) | (44,154) | 21,270 | (48)% |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | 41,486 | * |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (833) | — | (833) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.1 million and non-cash stock-based compensation benefit $1.4 million for the three months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses decreased to $74.7 million ($12.76 per Boe) for the three months ended September 30, 2019, as compared to $75.6 million ($10.85 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the three months ended September 30, 2018, the Company recognized a benefit of approximately $5.9 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $81.5 million ($11.70 per Boe). The decrease in oil and natural gas production expenses from the three months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the three months ended September 30, 2019 is primarily attributable to a decrease in production. The increase in oil and natural gas production expenses per Boe for the three months ended September 30, 2019 compared to the three months ended September 30, 2018 is primarily related to a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $0.2 million and $2.7 million during the three months ended September 30, 2019 and 2018, respectively. The decrease in our exploration expenses for the three months ended September 30, 2019 as compared to the same period in 2018 was primarily due to a decrease in activity leading to reduced exploratory geological and geophysical seismic costs.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $6.7 million and $7.2 million for the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in

support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $9.9 million ($1.68 per Boe) and $15.2 million ($2.18 per Boe) for the three months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the third quarter 2019 compared to the same period in 2018 was primarily due to the decrease in production taxes based on the corresponding decrease in revenue during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $10.0 million from $67.9 million ($9.75 per Boe) for the three months ended September 30, 2018 to $57.9 million ($9.88 per Boe) for the three months ended September 30, 2019. The decrease in expense represented an approximate $10.8 million decrease from lower production which was partially offset by a $0.8 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We did not record proved property impairments for the three months ended September 30, 2019 or 2018. We recorded impairment of $9.8 million and $3.1 million to our unproved oil and natural gas properties for the three months and ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $20.9 million ($3.57 per Boe) for the three months ended September 30, 2019 compared to $21.3 million ($3.06 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $18.2 million for the three months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the three months ended September 30, 2018.

***Other Expense.*** For the three months ended September 30, 2019 and 2018, respectively, other expense totaled $12.8 million compared to other expense of $7.7 million for the three months ended September 30, 2018. The other expense during the three months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset. Additionally, we experienced a loss of $4.3 million associated with the decrease in fair value of the investment in SNMP, which was partially offset by a gain of $0.6 million associated with the increase in fair value of the investment in Lonestar. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets, and we experienced losses of $10.7 million and $1.0 million associated with the decreases in fair value of the investments in Lonestar and SNMP, respectively. Additionally, for the three month period ended September 30, 2019, we recorded $2.4 million of income from equipment rentals, we did not record any dividend income from the SNMP common units and we did not experience any gains or losses on embedded derivatives. For the three months ended September 30, 2018, we recorded income from equipment rentals of $3.0 million, dividend income of $1.1 million from the SNMP common units, and a loss on embedded derivatives of $1.1 million.

***Interest Expense.*** For the three months ended September 30, 2019, interest expense totaled $22.9 million and included $2.0 million in amortization of debt issuance costs. For the three months ended September 30, 2018, interest expense totaled $44.2 million and included $2.9 million in amortization of debt issuance costs. As of the Petition Date we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-

annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the three months ended September 30, 2019, we recognized a net gain of $13.2 million on our commodity derivative contracts, which included mark-to-market gains on unsettled oil derivatives of $15.8 million and mark-to-market losses on unsettled natural gas derivatives of $2.5 million. In addition, during the three months ended September 30, 2019, we experienced net settlement losses of $0.1 million, which included settlement losses of $2.7 million on our oil derivative contracts and settlement gains of $2.6 million on our natural gas derivative contracts. The mark-to-market gains and losses were a result of the decreases and increases, respectively, in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses and gains during the period were primarily a result of increases and decreases, respectively, in commodity prices from the time the positions were entered into until the time of settlement. During the three months ended September 30, 2018, we recognized a net loss of $28.3 million on our commodity derivative contracts, which included mark-to-market gains on our oil derivative contracts of $6.0 million and mark-to-market losses on our natural gas derivative contracts of $2.5 million. In addition, during the three months ended September 30, 2018, we experienced settlement losses on our oil derivative contracts of $34.3 million partially offset by settlement gains of $2.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the three months ended September 30, 2019, the Company recorded an income tax benefit of $0.8 million, and our effective tax rate was approximately 0.7%. The Company did not record an income tax expense or benefit for the three months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

*Nine Months Ended September 30, 2019 Compared to Nine Months Ended September 30, 2018*

**Net Production and Revenues from Production**

The following table summarizes net production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 6,375 | 7,198 | (823) | (11)% |
| Natural gas liquids (MBbls) | 6,539 | 7,363 | (824) | (11)% |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | (11)% |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | (11)% |
| **Average Sales Price Excluding Derivatives[1]:** | | | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 | $ (8.89) | (14)% |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.75 | 2.96 | (0.21) | (7)% |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 | $ (6.71) | (19)% |
| **Average Sales Price Including Derivatives[2]:** | | | | |
| Oil ($ per Bbl) | $ 55.08 | $ 53.75 | $ 1.33 | 2 % |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.82 | 3.16 | (0.34) | (11)% |
| Oil equivalent ($ per Boe) | $ 28.78 | $ 32.32 | $ (3.54) | (11)% |
| **Revenues from Production[1][3]:** | | | | |
| Oil sales | $ 362,424 | $ 473,178 | $ (110,754) | (23)% |
| Natural gas liquids sales | 92,891 | 175,833 | (82,942) | (47)% |
| Natural gas sales | 100,932 | 122,330 | (21,398) | (17)% |
| Total revenues from production | $ 556,247 | $ 771,341 | $ (215,094) | (28)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 2,962 | 3,350 |
| Catarina | 2,435 | 2,491 |
| Maverick | 713 | 1,201 |
| Palmetto | 203 | 82 |
| TMS / Other | 62 | 74 |
| Total | 6,375 | 7,198 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 2,543 | 2,993 |
| Catarina | 3,931 | 4,325 |
| Maverick | 13 | 20 |
| Palmetto | 52 | 25 |
| Total | 6,539 | 7,363 |
| **Natural gas (MMcf)** | | |
| Comanche | 14,176 | 16,429 |
| Catarina | 22,123 | 24,716 |
| Maverick | 73 | 94 |
| Palmetto | 285 | 134 |
| Total | 36,657 | 41,373 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 19,024 | 21,457 |
| Average daily production (Boe/d) | 69,685 | 78,597 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 |
| Natural gas liquids ($ per Bbl) | $ 14.21 | $ 23.88 |
| Natural gas ($ per Mcf) | $ 2.75 | $ 2.96 |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.17 | $ 10.49 |
| Production and ad valorem taxes | $ 1.82 | $ 2.00 |
| General and administrative expenses | $ 3.48 | $ 3.41 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 8.83 |
| Impairment of oil and natural gas properties | $ 1.20 | $ 0.20 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 21,457 MBoe for the nine months ended September 30, 2018 to 19,024 MBoe for the nine months ended September 30, 2019 primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 7,868 | 1,701 | 9,082 |
| Catarina | 460 | 10,053 | 441 | 10,935 |
| Palmetto | 81 | 738 | 86 | 129 |
| Maverick | 66 | 303 | 66 | 1,237 |
| TMS / Other | 46 | 63 | 47 | 74 |
| Total | 2,435 | 19,025 | 2,341 | 21,457 |

For the nine months ended September 30, 2019 and 2018, 34% of our production was oil, 34% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $556.2 million and $771.3 million for the nine months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas decreased $110.8 million, $82.9 million and $21.4 million, respectively, as compared to the nine months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues.*** The Company recorded sales and marketing revenues of $18.1 million and $16.9 million during the nine months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the nine months ended September 30, 2018 to the nine months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Nine Months Ended September 30, | | | Nine Months Ended September 30, 2018 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Average Sales Price | from Production |
| Oil (MBbls) | 6,375 | 7,198 | (823) | $ 65.74 | $ (54,102) |
| NGLs (MBbls) | 6,539 | 7,363 | (824) | $ 23.88 | $ (19,678) |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | $ 2.96 | $ (13,944) |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | $ 35.95 | $ (87,724) |

| | Average Sales Price per Unit Nine Months Ended September 30, | | | Nine Months Ended September 30, 2019 | Revenue Increase/(Decrease) |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Production Volume | from Price |
| Oil (MBbls) | $ 56.85 | $ 65.74 | $ (8.89) | 6,375 | $ (56,652) |
| NGLs (MBbls) | $ 14.21 | $ 23.88 | $ (9.67) | 6,539 | $ (63,264) |
| Natural gas (MMcf) | $ 2.75 | $ 2.96 | $ (0.21) | 36,657 | $ (7,454) |
| Total oil equivalent (MBoe) | $ 29.24 | $ 35.95 | $ (6.71) | 19,024 | $ (127,370) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $55.6 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 231,441 | $ 225,186 | $ 6,255 | 3 % |
| Exploration expenses | 4,983 | 3,247 | 1,736 | 53 % |
| Sales and marketing expenses | 16,591 | 16,498 | 93 | 1 % |
| Production and ad valorem taxes | 34,682 | 42,898 | (8,216) | (19)% |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 | (1,595) | (1)% |
| Impairment of oil and natural gas properties | 22,906 | 4,259 | 18,647 | * |
| General and administrative expenses(1) | 66,266 | 73,199 | (6,933) | (9)% |
| Prepetition restructuring charges | 41,855 | — | 41,855 | * |
| Total operating costs and expenses | 606,644 | 554,802 | 51,842 | 9 % |
| | | | | |
| Interest income | 1,447 | 3,400 | (1,953) | (57)% |
| Other income (expense) | (13,785) | 2,467 | (16,252) | * |
| Gain on sale of oil and natural gas properties | — | 1,528 | (1,528) | * |
| Interest expense | (111,998) | (132,664) | 20,666 | (16)% |
| Net losses on commodity derivatives | (20,827) | (142,384) | 121,557 | (85)% |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (23) | — | (23) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.4 million and $2.9 million for the nine months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses increased to approximately $231.4 million ($12.17 per Boe) for the nine months ended September 30, 2019 as compared to $225.2 million ($10.49 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the nine months ended September 30, 2018, the Company recognized a benefit of approximately $17.8 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $243.0 million ($11.32 per Boe). The decrease in oil and natural gas production expenses from the nine months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the nine months ended September 30, 2019 is primarily attributable to a decrease in production. The decrease in oil and natural gas production expenses was slightly offset by an increase in transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina. The increase in oil and natural gas production expenses per Boe for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 is primarily related to an increase in marketing and transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina during January and April 2019 and a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $5.0 million and $3.2 million during the nine months ended September 30, 2019 and 2018, respectively. The increase in our exploration expenses for the nine months ended September 30, 2019 as compared to the same period in 2018 was due to an increase in our exploratory geological and geophysical seismic costs and an increase in our delay rentals for the first half of 2019.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $16.6 million and $16.5 million for the nine months ended September 30, 2019 and 2018, respectively. We believe an



009582

opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $34.7 million ($1.82 per Boe) and $42.9 million ($2.00 per Boe) for the nine months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the first nine months of 2019 compared to the same period in 2018 was primarily due to the corresponding decrease in revenues during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $1.6 million from $189.5 million ($8.83 per Boe) for the nine months ended September 30, 2018 to $187.9 million ($9.88 per Boe) for the nine months ended September 30, 2019. The decrease in expense represented an approximate $21.5 million decrease from lower production which was partially offset by a $19.9 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We recorded a proved property impairment of $4.3 million for the nine months ended September 30, 2019. We did not record a proved property impairment for the nine months ended September 30, 2018. We recorded impairment of $18.6 million and $4.3 million to our unproved oil and natural gas properties for the nine months ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $66.3 million ($3.48 per Boe) for the nine months ended September 30, 2019 compared to $73.2 million ($3.41 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount. Additionally, we experienced a decrease in our stock-based compensation expense for the three months ended September 30, 2019 as compared to the same period in 2018 resulting from a decrease in the Company's stock price. Offsetting these decreases, we experienced increases in salaries and wages resulting from employee retention and executive compensation programs.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $41.9 million for the nine months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the nine months ended September 30, 2018.

***Other Income (Expense).*** For the nine months ended September 30, 2019, other expense totaled $13.8 million compared to other income of $2.5 million for the nine months ended September 30, 2018. The other expense during the nine months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset and $1.2 million in shortfall and idle rig costs. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets or idle rig costs. Additionally, for the nine months ended September 30, 2019 we experienced losses of $3.1 million and $1.4 million associated with the decreases in fair value of the investments in SNMP and Lonestar, respectively. For the nine months ended September 30, 2018, we experienced a loss of $9.1 million and a gain of $5.7 million associated with the decreases and increases in fair value of the investments in SNMP and Lonestar, respectively. Further, we received $2.6 million in income from equipment rentals during the nine months ended September 30, 2019 as compared to $7.3 million for the comparable period of 2018, we experienced a gain on our embedded derivative contracts of $0.3 million for the nine months ended September 30, 2019 as compared to a loss of $7.1 million for the comparable period of 2018, and we recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units as compared to $3.2 million for the comparable period of 2018.

***Interest Expense.*** For the nine months ended September 30, 2019, interest expense totaled $112.0 million and included $8.3 million in amortization of debt issuance costs. For the nine months ended September 30, 2018, interest

expense totaled $132.7 million and included $12.7 million in amortization of debt issuance costs. As of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the nine months ended September 30, 2019, we recognized a net loss of $20.8 million on our commodity derivative contracts, which included net losses of $8.7 million associated with the settlements of commodity derivative contracts and mark-to-market losses of $12.1 million on unsettled commodity derivative contracts. The mark-to-market losses were a result of the increase in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses during the period were primarily a result of increases in commodity prices from the time the positions were entered into until the time of settlement. During the nine months ended September 30, 2018, we recognized a net loss of $142.4 million on our commodity derivative contracts, which included mark-to-market losses on oil and natural gas derivative contracts of $50.0 million and $14.5 million, respectively. In addition, during the nine months ended September 30, 2018 we experienced settlement losses on our oil commodity derivative contracts of $86.3 million, which were partially offset by settlement gains of $8.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the nine months ended September 30, 2019, the Company recorded an income tax benefit of less than $0.1 million and our effective tax rate was approximately 0%. The Company did not record an income tax expense or benefit for the nine months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in accordance with U.S. GAAP requires our management to select and apply accounting policies that provide the framework to report our results of operations and financial position. The selection and application of those policies requires our management to make difficult subjective or complex judgments concerning reported amounts of revenue and expenses during the reporting period and the reported amounts of assets and liabilities at the date of the financial statements. As a result, there exists the likelihood that materially different amounts would be reported under different conditions or using different assumptions.

As of September 30, 2019, our critical accounting policies were consistent with those discussed in our 2018 Annual Report.

**Use of Estimates**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of G&A expenses. Actual results could differ materially from those estimates.

**Liquidity and Capital Resources**

The primary source of liquidity and capital resources to fund our development program and other obligations has been cash flow from operations, available cash on hand and proceeds from borrowings and securities issuances. Operating cash flows, however, are largely dependent on oil and natural gas prices and differentials, sales volumes and costs. Oil and natural gas prices declined significantly during the fourth quarter 2018 and have remained low in 2019 through the present date. These lower commodity prices, in addition to reduced production levels from our decreased capital expenditures budget, have negatively impacted revenues, earnings and cash flows, and sustained low oil and natural gas prices have had and will continue to have a material and adverse effect on our liquidity position and our ability to raise additional funds through financing transactions. On the Petition Date, the Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases—Voluntary Reorganization Under Chapter 11" and above in "—Business Overview—Voluntary Reorganization Under Chapter 11" for additional information.

As of September 30, 2019, we had approximately $179.5 million in cash and cash equivalents and $90.0 million in available borrowing capacity under the SN UnSub Credit Agreement, resulting in aggregate liquidity of approximately $269.5 million. Borrowings under the DIP Facility are not available to SN UnSub or our other non-Debtor subsidiaries, and borrowings under the SN UnSub Credit Agreement are not available to the Debtors or any other non-Debtor subsidiary other than SN UnSub.

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (approximately $2.3 billion in aggregate principal). We do not have sufficient liquidity to pay such accelerated amounts. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt. The significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described under "Business Overview" raise substantial doubt about the Company's ability to continue as a going concern. See above under "Business Overview" for a description of these and other developments. In addition, during the existence of an event of default under the Credit Agreement and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement (although, as noted below, we anticipate paying off the Credit Agreement in full subject to final approval of the Bankruptcy Court).

Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, we would be required at our election to repay the deficiency

within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement, in which case we may not be able to satisfy the liquidity requirements of SN UnSub.

The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders entered into the Amendment. By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the Final DIP Order and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders.

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility will be sufficient to fund our anticipated 2019 operating needs. However, there can be no assurance that the Company's cash flows, cash on hand and any financing we are able to obtain through the DIP Facility will be sufficient to continue to fund its operations or to allow the Company to continue as a going concern until a Chapter 11 plan of reorganization is confirmed by the Bankruptcy Court or an alternative restructuring transaction is approved by the Bankruptcy Court and consummated. In addition, if we are required under the Final DIP Order to pay the past due interest, and to continue making the semi-annual interest payments due, under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases, or we fail to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity required to maintain undeveloped leasehold positions as discussed above, then that requirement or failure to negotiate could further limit our flexibility in planning for, or reacting to, changes in our business and the oil and natural gas exploration and production industry and could have a material adverse effect on our business, financial condition or results of operations. We have incurred significant professional fees and other costs in connection with our evaluation of strategic alternatives and preparation for the Chapter 11 Cases and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 Cases. The Company's long-term liquidity requirements, the adequacy of its capital resources and its ability to continue as a going concern are difficult to predict at this time and ultimately cannot be determined until a Chapter 11 plan of reorganization has been confirmed, if at all, by the Bankruptcy Court. The Debtors are subject to such liquidity risks as well as the other risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019.

We continuously evaluate our current and projected capital spending, operating activities and funding requirements, with consideration of realized commodity prices and the results of our operations and may make further adjustments to our capital expenditures and related financing plans as warranted.

**Cash Flows**

Our cash flows for the nine months ended September 30, 2019 and 2018 (in thousands) are as follows:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Cash Flow Data:** | | |
| Net cash provided by operating activities | $ 99,750 | $ 249,526 |
| Net cash used in investing activities | $ (110,217) | $ (453,822) |
| Net cash (used in) provided by financing activities | $ (7,608) | $ 388,534 |

***Net Cash Provided by Operating Activities.*** Net cash provided by operating activities was $99.8 million for the nine months ended September 30, 2019 compared to cash provided by operating activities of $249.5 million for the same period in 2018. This decrease was primarily related to lower revenues from lower production and lower realized prices.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company has historically partially mitigated by entering into commodity derivative contracts. Production volume changes also impact cash flow, costs related to operations and debt service.

***Net Cash Used in Investing Activities.*** Net cash flows used in investing activities totaled $110.2 million for the nine months ended September 30, 2019 compared to $453.8 million for the same period in 2018. Capital expenditures incurred for drilling and leasehold activities for the nine months ended September 30, 2019 totaled $61.2 million, and cash paid for capital expenditures was $114.7 million. The capital expenditures incurred are primarily associated with bringing 48 gross wells on-line during the first three quarters of 2019. The difference between expenditures incurred and paid during the period is due to timing of payments associated with higher activity levels during the fourth quarter 2018. We also received $5.2 million from the sale of certain other assets. During the nine months ended September 30, 2018, capital expenditures incurred for drilling and leasehold activities totaled $479.0 million and cash paid for capital expenditures was $452.3 million. The capital expenditures incurred are primarily associated with bringing 172 gross wells on-line. In addition, we received $2.8 million related to the post-closing adjustments for the Comanche Acquisition during the nine months ended September 30, 2018.

***Net Cash Used in or Provided by Financing Activities.*** Net cash flows used in financing activities totaled $7.6 million for the nine months ended September 30, 2019 compared net cash flows provided by financing activities of $388.5 million for the same period in 2018. During the nine months ended September 30, 2019, we had borrowings of $50.0 million under our DIP Facility and $7.9 million under our Credit Facility. Additionally, we made payments of $18.3 million on the SN UnSub Credit Agreement and our other debt agreements and made payments of $37.5 million for distributions to holders of the SN UnSub Preferred Units. During the nine months ended September 30, 2018, we issued $500 million in 7.25% Senior Secured Notes (before discounts of $5.1 million) and had incremental borrowings of $45 million. Additionally, we made repayments on our prior credit facility of $95 million and payments on the SN UnSub Credit Agreement of $8.0 million. We also made payments of $22.4 million for distributions to holders of the SN UnSub Preferred Units and paid dividends on our Series A and B Preferred Stock of $12.0 million.

**Off-Balance Sheet Arrangements**

As of September 30, 2019, we did not have any off-balance sheet arrangements.

**Commitments and Contractual Obligations**

Refer to "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

There have been no material changes in our contractual obligations during the nine months ended September 30, 2019, other than those disclosed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to a variety of market risks, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our primary market risk exposure relates to the prices we receive for our oil, natural gas and NGL production. The prices we ultimately realize for our oil, natural gas and NGLs are based on a number of variables, including prevailing index prices attributable to our production and certain differentials to those index prices. Pricing for oil, natural gas and NGLs is volatile and unpredictable, and this volatility is expected to continue in the future. In addition, the prices we receive for our oil, natural gas and NGLs depend on many factors outside of our control, such as the supply and demand for oil, natural gas and NGLs, the relative strength of the global economy, the actions of OPEC and international sanctions against countries such as Iran and Venezuela.

To reduce the impact on the Company's business and results of operations from fluctuations in the prices we receive for oil, natural gas and NGLs, and to protect the economics of property acquisitions at the time of execution, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These transactions may include fixed price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price, up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed price swaps by agreeing to increase the notional quantity hedged or extend the notional quantity settlement period under a fixed price swap at the counterparty's election on a designated date. The market for NGL hedging has historically been constrained in terms of price, tenor, liquidity and availability of counterparties. The Company does not currently have any NGL hedges in place. We continue to assess our exposure to NGL price volatility and the NGL hedging market in general and may seek to enter into derivatives in the future on a portion of our projected NGL production. In addition, from time to time, the Company may evaluate strategies to unwind, terminate, cancel, restructure or otherwise modify its existing commodity derivatives, as applicable, in connection with the ongoing assessment of its general risk profile, including projected future production levels, covenant and other compliance requirements, its overall financial position and other considerations.

These hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Please refer to Note 8, "Derivative Instruments" for a description of all of our derivatives covering anticipated future production as of September 30, 2019.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon conditions in the commodity and financial markets at the time we enter into these transactions, which may result in higher or lower hedge prices for oil, natural gas and NGLs under these contracts, if any, as compared to the hedge prices under our current contracts. Accordingly, our hedging strategy may not protect us from significant or sustained declines in the prices of oil, natural gas and NGLs for future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases during periods for which we have hedged our production. As such, our hedging strategy may not prove effective in adequately protecting us from changes in the prices of oil, natural gas and NGLs that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

At September 30, 2019, the fair value of our commodity derivative contracts was a net asset of approximately $9.1 million. A 10% increase or decrease in the oil and natural gas index prices above the September 30, 2019 prices

would result in a decrease or increase, respectively, in the fair value of our commodity derivative contracts of $15.1 million. On a consolidated basis as of September 30, 2019, the Company has hedged approximately 580,000 Bbls of its remaining 2019 oil production and 3,362,000 MMBtu of its remaining 2019 natural gas production. As of September 30, 2019, SN UnSub's production represents approximately 68% of the hedged oil volumes and approximately 73% of the hedged natural gas volumes.

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited. For further information, see "Part II, Item 1A. Risk Factors—We have significant exposure to fluctuations in commodity prices since only a portion of our estimated future production is covered by commodity derivatives and we may not be able to enter into commodity derivatives covering our estimated future production on favorable terms or at all" included in our Form 10-Q for the quarter ended June 30, 2019.

**Credit Risk**

Our credit risk relates primarily to trade receivables and financial derivative instruments. Credit exposure for each customer is monitored for outstanding balances and current activity. For derivatives entered into as part of our hedging program, we are subject to counterparty credit risk to the extent the counterparty is unable to meet its settlement commitments. We may also be exposed to credit risk due to the concentration of our customers in the energy industry, as our customers may be similarly affected by prolonged changes in economic and industry conditions, or by the sale of our oil and natural gas production to a limited number of purchasers.

We actively manage this credit risk by selecting counterparties that we believe to be highly creditworthy and continuing to monitor their financial position. Concentration of credit risk is regularly reviewed to ensure that counterparty credit risk is adequately diversified.

As of September 30, 2019, the substantial majority of our credit exposure was with investment grade counterparties. We believe exposure to losses related to credit risk at September 30, 2019 was not material, which is consistent with all periods presented.

**Interest Rate Risk**

As of September 30, 2019, we had $50.0 million outstanding under the DIP Facility, $7.9 million outstanding under the Credit Agreement, $150.0 million outstanding under the SN UnSub Credit Agreement and $22.9 million outstanding under the SR Credit Agreement, all of which carry variable interest rates. The DIP Facility, with respect to the New Money DIP Loans, bears interest at a variable rate, and the Roll-Up Loans, if and when approved, will bear interest at a fixed rate. Our Senior Notes bear interest at fixed interest rates. As of September 30, 2019, a one percent change in the interest rates on the SN UnSub Credit Agreement would result in an approximately $1.5 million change in annual interest expense, and a one percent change in the interest rates on the SR Credit Agreement or DIP Facility would be insignificant. Further, as of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise. We believe our exposure to interest-related losses at September 30, 2019 was not material.

We currently do not have any interest rate derivative contracts in place. We continue to assess our exposure to fluctuating interest rates and may seek to enter into interest rate derivatives in the future on a portion of our variable rate indebtedness.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15 promulgated pursuant to the Securities Exchange Act of 1934, as amended (the “Exchange Act”). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in reports that we file or submit under the Exchange Act is appropriately recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls**

There was no change in our internal control over financial reporting during the three months ended September 30, 2019 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. The adoption of ASC 842, Leases, required the implementation of new controls and the modification of certain accounting processes. The impact of these changes was not material to the Company’s internal control over financial reporting.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings**

For a description of our material pending legal proceedings as of September 30, 2019, please refer to (i) “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies.” and (ii) the “Business Overview” of “Part I, Item 2. Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business notwithstanding the filing of the Bankruptcy Petitions. If a Chapter 11 plan of reorganization is confirmed, it will provide for the treatment of claims against the Company’s bankruptcy estates, including prepetition liabilities that have not otherwise been satisfied or addressed during the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions

that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

**Item 1A. Risk Factors**

Carefully consider the risk factors under the caption “Risk Factors” under Part I, Item 1A in our 2018 Annual Report and under Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019, together with all of the other information included in this Quarterly Report on Form 10-Q and in our other public filings, press releases, and public discussions with our management. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may materially adversely affect our business, financial condition or results of operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

*Unregistered Sales of Equity Securities*

None.

*Repurchase of Equity Securities*

| Period | Total number of shares withheld[1] | Average Price per share | Total number of shares repurchased as part of publicly announced plans | Maximum number of shares that may yet be repurchased under the plan |
|---|---|---|---|---|
| July 1, 2019 - July 31, 2019 | 1,362 | $ 0.11 | — | — |
| August 1, 2019 - August 31, 2019 | 10,480 | $ 0.08 | — | — |
| September 1, 2019 - September 30, 2019 | 1,227 | $ 0.02 | — | — |
| Total | 13,069 | $ 0.08 | — | — |

(1) Represents shares that were purchased by the Company to satisfy employee tax withholding obligations that arose upon the vesting of restricted stock awards

**Item 3. Defaults Upon Senior Securities**

See “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases— Covenant Violations” which is incorporated in this item by reference.

The annual dividend on each share of our Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series A Preferred Stock as of the date of filing of this report is approximately $1.4 million.

The annual dividend on each share of our Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series B Preferred Stock as of the date of filing of this report is approximately $7.4 million.

Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock, Series B Preferred Stock or common stock.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

**EXHIBIT INDEX**

| | | |
|---|---|---|
| 3.1 | | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013 (File No. 001-35372) and incorporated herein by reference). |
| 3.2 | | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015 (File No. 001-35372) and incorporated herein by reference). |
| 3.3 | | Amended and Restated Bylaws, dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011 (File No. 001-35372) and incorporated herein by reference). |
| 10.1(a) | | Senior Secured Debtor-in-Possession Term Loan Credit Agreement dated as of August 16, 2019, among Sanchez Energy Corporation, a debtor and debtor-in-possession under Chapter 11 of Bankruptcy Code, as borrower, the several lenders from time to time parities thereto, and Wilmington Savings Fund Society, FSB as administrative Agent and collateral agent. |
| 10.2(a) | | Tolling Agreement dated August 10. 2019, by and among SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF Maverick, LLC, Sanchez Energy Corporation, GSO ST Holdings Associates LLC, and GSO ST Holdings LP. |
| 10.3(a) | | First Amendment to Senor Secured Debtor-in-Possession Term Loan Credit Agreement dated September 24, 2019, by and among Sanchez Energy Corporation, the required lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent. |
| 31.1(a) | | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2(a) | | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1(b) | | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2(b) | | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 101.INS(a) | — | XBRL Instance Document. |
| 101.SCH(a) | — | XBRL Taxonomy Extension Schema Document. |
| 101.CAL(a) | — | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF(a) | — | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB(a) | — | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE(a) | — | XBRL Taxonomy Extension Presentation Linkbase Document |

(a) Filed herewith.

(b) Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on November 8, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ Kirsten A. Hink
Kirsten A. Hink
*Senior Vice President and Chief Accounting Officer*
(Duly Authorized Officer)

By: /s/ Cameron W. George
Cameron W. George
*Executive Vice President and Chief Financial Officer*
(Principal Financial Officer)

# EXHIBIT 33

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC AND SN EF UNSUB, LP TO DEBTORS' ASSUMPTION OF THE RATIFICATION AGREEMENT**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC, the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], of the Ratification and Assumption Agreement (the "Ratification Agreement") made as of April 1, 2018, by UnSub, SN EF Maverick, LLC ("Maverick"), and Carnero G&P LLC ("Carnero").[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] To the extent executory, GSO and UnSub object to the assumption of the Memorandum of Agreement, dated as of April 1, 2018, by UnSub, Maverick and Carnero. Moreover, GSO and UnSub reserve the right to argue that the Ratification Agreement is not executory.

1. GSO and UnSub are filing this objection simultaneously with the *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC and SN EF UnSub, LP To Debtors' Rejection of the Comanche Agreements* (the "Comanche Rejection Opposition") (Docket No. 1352) and, to avoid duplicative pleadings, incorporate by reference the objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* (Docket No. 1309), which they intend to file prior to the hearing on June 25, 2020 (the "Settlement Agreement Opposition").

2. The Debtors seek to assume the Ratification Agreement as part of their overall scheme to implement the Settlement Agreement. But the Ratification Agreement cannot be assumed because it will serve no purpose in the future. The Debtors appear to believe that the Ratification Agreement stands for the proposition that UnSub's hydrocarbons are committed to Carnero for processing. This is incorrect.

3. As we will set forth more fully in the Settlement Agreement Opposition, the Debtors' presumption that the Ratification Agreement dedicates UnSub's hydrocarbons to Carnero is flawed for two reasons. First, without the Marketing Agreement, the Debtors have no contractual rights to deliver UnSub's hydrocarbons. Assumption of the Ratification Agreement does nothing to change that; indeed, the Ratification Agreement is meaningless once the Marketing Agreement is rejected because UnSub's obligations under the Ratification Agreement are entirely derivative of its obligations under the Marketing Agreement. Second, even if the Marketing Agreement remains in place, UnSub's volumes are not dedicated to Carnero until the term of the Brasada contract ends (*i.e.*, 2034) unless there is an earlier termination in accordance with the Firm Gas Gathering, Processing and Purchase Agreement between Maverick and Carnero (the

Case 20-33948 Document 356 Filed 08/20/20 Page 3 of 5

"GGPA"). Rejection of the Brasada contract (or any agreement for that matter) does not amount to a termination and thus does not trigger this "springing dedication" in the GGPA. Accordingly, the Debtors' assumption of the Ratification Agreement is of no practical effect.

4. The Debtors have made it clear throughout this process that the restructuring of the existing Comanche midstream arrangement sits at the bottom of their to-do list. That is not surprising, given that they own just 6-8% of the Comanche working interests. Their priorities lie elsewhere—namely, the Catarina working interests, which they own in their entirety. Consequently, it is imperative that UnSub is able to control the flow of its hydrocarbons, and to contract freely with midstream counterparties, especially if the Court approves the rejection of the Marketing Agreement (and the suite of other contracts that are integrated with the Marketing Agreement). The Court should therefore not permit assumption of the Ratification Agreement.

5. It is in all parties' interest to adjudicate this dispute in the near term. GSO and UnSub intend work with the Debtors and Carnero to establish a timely and efficient process to resolve disputes over UnSub's ability to control its hydrocarbons. We believe that process will conclusively show that UnSub maintains full control of its hydrocarbons upon the rejection of the Marketing Agreement and that, even if the Marketing Agreement is assumed, UnSub's hydrocarbons are not committed to Carnero without its consent—which the Debtors have never sought much less obtained.

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny assumption of the Ratification Agreement.

[*Remainder of page intentionally blank*]

Dated: June 22, 2020
Houston, Texas

*/s/ Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (pending *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**<u>Certificate of Service</u>**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on June 22, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

# EXHIBIT 34

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered)<br>Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE AGENCY AGREEMENTS**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* (Docket No. 1326), of the Retained Marketing Contracts Services Agreement, by and between SN EF Maverick, LLC ("Maverick") and SN Catarina, LLC, collectively, as Provider, and Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, and Anadarko Energy Services Company, collectively, as Recipient, as amended (the "Marketing Agency Agreement") and the Retained Midstream

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Contracts Services Agreement, by and between Maverick, as Provider, and Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, together, as Recipient, as amended (the "Midstream Agency Agreement," and together with the Marketing Agency Agreement, the "Agency Agreements").

**PRELIMINARY STATEMENT**

In the Debtors' settlement motion (the "Settlement Motion") (Docket No. 1309), the Debtors sought approval of a settlement agreement (the "Settlement Agreement") in which Maverick promised to reject the Agency Agreements. The Settlement Agreement contemplated that, by rejecting the Agency Agreements, the Debtors would move the gas generated by the Comanche Assets—which are owned by various working interest owners including Maverick and UnSub—to Carnero G&P LLC ("Carnero") for processing. This rejection promise was a key part of the deal the Debtors struck with the other parties to the Settlement Agreement: in exchange for moving the Comanche gas volumes to Carnero, the Debtors would receive lower gas-processing rates from Carnero on gas produced by the Catarina Assets—which are wholly owned by Debtor entities other than Maverick.

In discovery leading up to the hearing on the Settlement Motion, it became apparent there was no process in place to ensure that Maverick's interests were protected. No fiduciary had Maverick's best interests at heart. Rather, the same fiduciary was making decisions for all the Debtors collectively, including Maverick. This fatally infected the Settlement Agreement and the rejection of the Agency Agreements, which benefitted the other Debtors at Maverick's expense. Under the Settlement Agreement, Maverick has to do all the heavy lifting—rejecting the Agency Agreements—while the Debtors reap the rewards. This cannot be a proper exercise of Maverick's business judgment. The Court should not permit rejection of the Agency Agreements.

**REQUEST FOR LEAVE TO FILE OUT OF TIME**

1. GSO and UnSub acknowledge that objections to assumption and rejection were due on June 22, and respectfully request leave to file this Objection out of time.

2. The standard for leave to file out of time, which requires "excusable neglect" under Federal Rule of Civil Procedure 6(b) and Bankruptcy Rule 9006(b), "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Blake* v. *Peake*, No. CIV.A. H-04-1068, 2008 WL 5114655, at *1 (S.D. Tex. Dec. 3, 2008). "Relevant factors include: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Blake*, 2008 WL 5114655, at *1.

3. GSO and UnSub's request plainly satisfies this standard. First, there will be no prejudice to the Debtors from accepting this Objection out of time. Other parties have already objected to the Agency Agreements. (*See* Docket No. 1355.) Moreover, the Debtors are familiar with, and no doubt already preparing to address, the substantive issues raised in this Objection, which concern whether Maverick's interests were taken into account when the decision was made to have Maverick reject the Agency Agreements. This issue was briefed in connection with the Settlement Motion and discussed at the motion hearing. The Court's order granting the motion requires the Debtors to further address this issue at a future hearing. (Docket No. 1415 ¶ 10.)

4. Second, the delay of less than three weeks will have no meaningful impact on the judicial proceedings concerning assumption and rejection. The Debtor has not yet filed responses to the assumption/rejection objections. And again, the issues raised in this Objection are ones the Debtors must address anyway pursuant to the Court's order of June 30.

5. Third, the reason for the delay was not in control of GSO and UnSub. Neither is a party to the Agency Agreements, and in the ordinary course, they would take no position on assumption or rejection of those agreements. But discovery on the Settlement Motion, which was ongoing when the assumption/rejection objection deadline passed, revealed the factual predicate of this Objection. The Debtors completed their document production early in the morning on Sunday, June 21, 2020—the day before the rejection/assumption objection deadline. Over the next three days, three depositions were conducted leading up to the hearing—including a deposition of the Debtors' representative, Mr. Meghji, on June 22, the day of the deadline. These documents and depositions showed there was no process to consider how rejecting the Agency Agreements would affect Maverick's interests, as distinct from the other Debtors'.

6. Finally, GSO and UnSub have acted in good faith in bringing these issues to the attention of the other parties and the Court. All the parties are well aware of GSO and UnSub's position that the Debtors failed to advance Maverick's interests in entering into the Settlement Agreement. GSO and UnSub are filing this Objection to make clear that they object to Maverick's rejection of the Agency Agreements insofar as it is contrary to the interests of Maverick and the other Comanche working interest owners, including UnSub.

**BACKGROUND**

7. The Agency Agreements obligate Maverick to perform obligations of Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (collectively, "Anadarko") under certain midstream contracts. (*See* Docket No. 1309 at 8 n.7.) Among these obligations is delivery of gas produced by the Comanche Assets to the Brasada gas processing plant. The Comanche Assets are owned by multiple working interest owners including Maverick, UnSub, and others.

8. The Debtors' position is that, by virtue of rejection of the Agency Agreement, the Comanche gas volumes will no longer be committed to Brasada and will instead flow to Carnero

under a preexisting agreement between Maverick and Carnero. As Mr. Meghji explained at his deposition: "In simple terms, the rejection of those contracts triggers the ratification agreements whereby the volumes go from Brasada to Carnero as per the ratifications that had been signed by all -- effectively, by all the working interest partners for Comanche to direct the volumes to go to Carnero." (Meghji Dep. Tr. at 47:7–12.) GSO and UnSub disagree with the Debtors' position, for reasons we have explained elsewhere and do not repeat in this Objection.

9. Whether the Debtors are right or wrong about the effect of rejecting the Agency Agreements, one thing is clear: delivering the Comanche gas is the key benefit of the Settlement Agreement to the Debtors' counterparties to the agreement, including Carnero. Mr. Meghji agreed at his deposition that this is the "principal benefit" the Debtors are providing. (Meghji Dep. Tr. at 132:5–6.)

10. If they can deliver this benefit, the Debtors will receive rate reductions—effectively, a volume discount—from Carnero and other midstream service providers. Mr. Meghji stated in his deposition that "there is significant additional financial benefit [of the Settlement Agreement] from the reduction in rates to the debtors, which amounts to significant dollars going forward." (Meghji Dep. Tr. at 51:18–21.)

11. Critically, these rate reductions represent tremendous benefits for the Catarina Assets, but minimal benefits for Comanche. As explained in the Debtors' March 2020 business plan, the Debtors have a 100% working interest in Catarina, but Maverick has only a 6% economic interest in the Comanche. (*See* Sanchez Energy Business Plan (Mar. 2020) at 22, 23, *available at* https://www.sec.gov/Archives/edgar/data/1528837/000110465920043897/tm2011997d2_ex99-1.pdf.) Unsurprisingly, the Debtors sought to maximize their Catarina assets by using their leverage over the Comanche, in which they have a very small stake.

12. At his deposition, Mr. Meghji asserted that the Comanche working interest owners will receive a benefit of $7 million from lower rates at Carnero. (Meghji Dep. Tr. at 123:19–23.) Even if this assertion is true—and to be clear, it has not yet been meaningfully tested—Maverick's 6% share of this benefit would be $420,000, virtually nothing compared to the benefits the other Debtors will get from lower Catarina rates.

13. In fact, the Settlement Agreement affirmatively harms Maverick by making it more difficult to obtain a better deal for the Comanche. Before entering into the Settlement Agreement, the Debtors never even tried to negotiate an optimal result for Comanche. As Mr. Meghji has admitted, GSO urged him multiple times to renegotiate rates with the Comanche's current midstream provider, but the Debtors never did so. (Meghji Dep. Tr. at 59:24–60:17, 136:23–25.) This was extremely harmful because the Comanche needs a comprehensive midstream solution for gathering, processing, and transportation. The Settlement Agreement offers only somewhat lower processing rates, which make up only a minority of the Comanche midstream costs.

14. A true fiduciary to Maverick would have tried to maximize its value by achieving the best possible midstream deal for the Comanche. Instead, Mr. Meghji applied the maxim "do no harm." When asked what process he used to ensure the settlement was fair to Maverick (as distinct from the other Debtors), Mr. Meghji responded: "We looked at the impact of entering into this Settlement Agreement and essentially wanted ***to make sure that they were no worse off*** and better off, if possible. And given what I've just explained to you, that they are actually better off as a result of this agreement, I felt like that was -- ***did not cause any harm to Maverick*** and its working interest holders." (Meghji Dep. Tr. at 124:7–14.)

## OBJECTION

15. The Court should deny Maverick's request to reject the Agency Agreements because it is contrary to Maverick's interests. The other Debtors are reaping the rewards from

Maverick's rejection of the Brasada agreement, leaving Maverick with just a small tip for its efforts. Meanwhile, the Debtors' myopic focus on the Settlement Agreement has caused them to overlook other opportunities, including promising negotiations with the Debtors' current midstream providers (Occidental Petroleum Corporation and Western Midstream Partners LP) and other potential midstream providers that could provide a much better deal for Comanche. This failure to pursue other options has affirmatively harmed Maverick.

16. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309).

17. While the rejection of the Agency Agreements may well be a sound exercise of the other Debtors' business judgment, it is a disastrous exercise of Maverick's. That is hardly surprising, because no one had Maverick's best interests at heart when the Debtors inked the Settlement Agreement committing them to reject the Agency Agreements. As Mr. Meghji admitted, he simply tried to ensure that Maverick was not harmed by rejecting the Agency Agreements to enrich the other Debtors. "Do no harm" is not the correct standard for a fiduciary;

Case 23-19-34508 Document 1246 Filed 04/13/23 in TXSB Page 8 of 10

in any event, the Debtors' failure to pursue other options did harm Maverick. The Court should not permit the other Debtors to use rejection to advance their interests in a way that does not meaningfully benefit, and in fact harms, Maverick.

[*Remainder of page intentionally blank*]

## CONCLUSION

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Agency Agreements, and grant such other and further relief as the Court may deem just and proper.

Dated: July 14, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**Certificate of Service**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on July 14, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

Case 4:23-cv-04587 Document 1-465 Filed on 11/13/23 in TXSD Page 1742 of 1759

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE AGENCY AGREEMENTS**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* (Docket No. 1326), of the Retained Marketing Contracts Services Agreement, by and between SN EF Maverick, LLC ("Maverick") and SN Catarina, LLC, collectively, as Provider, and Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, and Anadarko Energy Services Company, collectively, as Recipient, as amended (the "Marketing Agency Agreement") and the Retained Midstream

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Contracts Services Agreement, by and between Maverick, as Provider, and Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, together, as Recipient, as amended (the "Midstream Agency Agreement," and together with the Marketing Agency Agreement, the "Agency Agreements").

## PRELIMINARY STATEMENT

In the Debtors' settlement motion (the "Settlement Motion") (Docket No. 1309), the Debtors sought approval of a settlement agreement (the "Settlement Agreement") in which Maverick promised to reject the Agency Agreements. The Settlement Agreement contemplated that, by rejecting the Agency Agreements, the Debtors would move the gas generated by the Comanche Assets—which are owned by various working interest owners including Maverick and UnSub—to Carnero G&P LLC ("Carnero") for processing. This rejection promise was a key part of the deal the Debtors struck with the other parties to the Settlement Agreement: in exchange for moving the Comanche gas volumes to Carnero, the Debtors would receive lower gas-processing rates from Carnero on gas produced by the Catarina Assets—which are wholly owned by Debtor entities other than Maverick.

In discovery leading up to the hearing on the Settlement Motion, it became apparent there was no process in place to ensure that Maverick's interests were protected. No fiduciary had Maverick's best interests at heart. Rather, the same fiduciary was making decisions for all the Debtors collectively, including Maverick. This fatally infected the Settlement Agreement and the rejection of the Agency Agreements, which benefitted the other Debtors at Maverick's expense. Under the Settlement Agreement, Maverick has to do all the heavy lifting—rejecting the Agency Agreements—while the Debtors reap the rewards. This cannot be a proper exercise of Maverick's business judgment. The Court should not permit rejection of the Agency Agreements.

**REQUEST FOR LEAVE TO FILE OUT OF TIME**

1. GSO and UnSub acknowledge that objections to assumption and rejection were due on June 22, and respectfully request leave to file this Objection out of time.

2. The standard for leave to file out of time, which requires "excusable neglect" under Federal Rule of Civil Procedure 6(b) and Bankruptcy Rule 9006(b), "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Blake* v. *Peake*, No. CIV.A. H-04-1068, 2008 WL 5114655, at *1 (S.D. Tex. Dec. 3, 2008). "Relevant factors include: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Blake*, 2008 WL 5114655, at *1.

3. GSO and UnSub's request plainly satisfies this standard. First, there will be no prejudice to the Debtors from accepting this Objection out of time. Other parties have already objected to the Agency Agreements. (*See* Docket No. 1355.) Moreover, the Debtors are familiar with, and no doubt already preparing to address, the substantive issues raised in this Objection, which concern whether Maverick's interests were taken into account when the decision was made to have Maverick reject the Agency Agreements. This issue was briefed in connection with the Settlement Motion and discussed at the motion hearing. The Court's order granting the motion requires the Debtors to further address this issue at a future hearing. (Docket No. 1415 ¶ 10.)

4. Second, the delay of less than three weeks will have no meaningful impact on the judicial proceedings concerning assumption and rejection. The Debtor has not yet filed responses to the assumption/rejection objections. And again, the issues raised in this Objection are ones the Debtors must address anyway pursuant to the Court's order of June 30.

5. Third, the reason for the delay was not in control of GSO and UnSub. Neither is a party to the Agency Agreements, and in the ordinary course, they would take no position on assumption or rejection of those agreements. But discovery on the Settlement Motion, which was ongoing when the assumption/rejection objection deadline passed, revealed the factual predicate of this Objection. The Debtors completed their document production early in the morning on Sunday, June 21, 2020—the day before the rejection/assumption objection deadline. Over the next three days, three depositions were conducted leading up to the hearing—including a deposition of the Debtors' representative, Mr. Meghji, on June 22, the day of the deadline. These documents and depositions showed there was no process to consider how rejecting the Agency Agreements would affect Maverick's interests, as distinct from the other Debtors'.

6. Finally, GSO and UnSub have acted in good faith in bringing these issues to the attention of the other parties and the Court. All the parties are well aware of GSO and UnSub's position that the Debtors failed to advance Maverick's interests in entering into the Settlement Agreement. GSO and UnSub are filing this Objection to make clear that they object to Maverick's rejection of the Agency Agreements insofar as it is contrary to the interests of Maverick and the other Comanche working interest owners, including UnSub.

**BACKGROUND**

7. The Agency Agreements obligate Maverick to perform obligations of Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (collectively, "Anadarko") under certain midstream contracts. (*See* Docket No. 1309 at 8 n.7.) Among these obligations is delivery of gas produced by the Comanche Assets to the Brasada gas processing plant. The Comanche Assets are owned by multiple working interest owners including Maverick, UnSub, and others.

8. The Debtors' position is that, by virtue of rejection of the Agency Agreement, the Comanche gas volumes will no longer be committed to Brasada and will instead flow to Carnero

under a preexisting agreement between Maverick and Carnero. As Mr. Meghji explained at his deposition: "In simple terms, the rejection of those contracts triggers the ratification agreements whereby the volumes go from Brasada to Carnero as per the ratifications that had been signed by all -- effectively, by all the working interest partners for Comanche to direct the volumes to go to Carnero." (Meghji Dep. Tr. at 47:7–12.) GSO and UnSub disagree with the Debtors' position, for reasons we have explained elsewhere and do not repeat in this Objection.

9. Whether the Debtors are right or wrong about the effect of rejecting the Agency Agreements, one thing is clear: delivering the Comanche gas is the key benefit of the Settlement Agreement to the Debtors' counterparties to the agreement, including Carnero. Mr. Meghji agreed at his deposition that this is the "principal benefit" the Debtors are providing. (Meghji Dep. Tr. at 132:5–6.)

10. If they can deliver this benefit, the Debtors will receive rate reductions—effectively, a volume discount—from Carnero and other midstream service providers. Mr. Meghji stated in his deposition that "there is significant additional financial benefit [of the Settlement Agreement] from the reduction in rates to the debtors, which amounts to significant dollars going forward." (Meghji Dep. Tr. at 51:18–21.)

11. Critically, these rate reductions represent tremendous benefits for the Catarina Assets, but minimal benefits for Comanche. As explained in the Debtors' March 2020 business plan, the Debtors have a 100% working interest in Catarina, but Maverick has only a 6% economic interest in the Comanche. (*See* Sanchez Energy Business Plan (Mar. 2020) at 22, 23, *available at* https://www.sec.gov/Archives/edgar/data/1528837/000110465920043897/tm2011997d2_ex99-1.pdf.) Unsurprisingly, the Debtors sought to maximize their Catarina assets by using their leverage over the Comanche, in which they have a very small stake.

12. At his deposition, Mr. Meghji asserted that the Comanche working interest owners will receive a benefit of $7 million from lower rates at Carnero. (Meghji Dep. Tr. at 123:19–23.) Even if this assertion is true—and to be clear, it has not yet been meaningfully tested—Maverick's 6% share of this benefit would be $420,000, virtually nothing compared to the benefits the other Debtors will get from lower Catarina rates.

13. In fact, the Settlement Agreement affirmatively harms Maverick by making it more difficult to obtain a better deal for the Comanche. Before entering into the Settlement Agreement, the Debtors never even tried to negotiate an optimal result for Comanche. As Mr. Meghji has admitted, GSO urged him multiple times to renegotiate rates with the Comanche's current midstream provider, but the Debtors never did so. (Meghji Dep. Tr. at 59:24–60:17, 136:23–25.) This was extremely harmful because the Comanche needs a comprehensive midstream solution for gathering, processing, and transportation. The Settlement Agreement offers only somewhat lower processing rates, which make up only a minority of the Comanche midstream costs.

14. A true fiduciary to Maverick would have tried to maximize its value by achieving the best possible midstream deal for the Comanche. Instead, Mr. Meghji applied the maxim "do no harm." When asked what process he used to ensure the settlement was fair to Maverick (as distinct from the other Debtors), Mr. Meghji responded: "We looked at the impact of entering into this Settlement Agreement and essentially wanted ***to make sure that they were no worse off*** and better off, if possible. And given what I've just explained to you, that they are actually better off as a result of this agreement, I felt like that was -- ***did not cause any harm to Maverick*** and its working interest holders." (Meghji Dep. Tr. at 124:7–14.)

## OBJECTION

15. The Court should deny Maverick's request to reject the Agency Agreements because it is contrary to Maverick's interests. The other Debtors are reaping the rewards from

Maverick's rejection of the Brasada agreement, leaving Maverick with just a small tip for its efforts. Meanwhile, the Debtors' myopic focus on the Settlement Agreement has caused them to overlook other opportunities, including promising negotiations with the Debtors' current midstream providers (Occidental Petroleum Corporation and Western Midstream Partners LP) and other potential midstream providers that could provide a much better deal for Comanche. This failure to pursue other options has affirmatively harmed Maverick.

16. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309).

17. While the rejection of the Agency Agreements may well be a sound exercise of the other Debtors' business judgment, it is a disastrous exercise of Maverick's. That is hardly surprising, because no one had Maverick's best interests at heart when the Debtors inked the Settlement Agreement committing them to reject the Agency Agreements. As Mr. Meghji admitted, he simply tried to ensure that Maverick was not harmed by rejecting the Agency Agreements to enrich the other Debtors. "Do no harm" is not the correct standard for a fiduciary;

in any event, the Debtors' failure to pursue other options did harm Maverick. The Court should not permit the other Debtors to use rejection to advance their interests in a way that does not meaningfully benefit, and in fact harms, Maverick.

[*Remainder of page intentionally blank*]

**CONCLUSION**

WHEREFORE, GSO and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Agency Agreements, and grant such other and further relief as the Court may deem just and proper.

Dated: July 14, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

**MCCLOSKEY ROBERSON, PLLC**
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

**Certificate of Service**

I hereby certify that the foregoing pleading was served on all parties registered to receive notice through the Court's CM/ECF system on July 14, 2020.

/s/ *Thomas A. Woolley*
Thomas A. Woolley, III

# EXHIBIT 35

ENTERED
06/30/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

Upon consideration of the *Emergency Motion of the Debtors Pursuant to Section 365(A) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [DKT. # 1309] (the "Motion")[2], seeking among other things:

(1) Authorization to enter into and perform under a Settlement Agreement with certain of the Debtors' existing midstream and marketing service providers;

(2) Approval of the Debtors' assumption, in accordance with the Settlement Agreement, of (a) the Carnero Agreements, as amended by the Carnero Agreement Amendment, and (b) the Catarina Gathering Agreement, as amended by the Catarina Gathering Amendment (collectively, the "***Assumed Agreements***");

(3) Authorization to enter into the New Seco Pipeline Agreements;

and upon consideration of the evidence admitted and representations made on the record at the hearing on the Motion held on June 29, 2020 (the "Hearing"); and all objections to the Motion

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis, LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 700 Milam, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

having been withdrawn, resolved, or overruled on the merits; and this Court having considered the legal and factual bases for the relief requested in the Motion; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Hearing.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

C. Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. Proper, sufficient, and adequate notice of the Motion and the Hearing have been given in accordance with the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is necessary.

E. The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, and the transactions proposed in the Settlement Agreement are reasonable and appropriate under the circumstances, and the Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justification for the transactions proposed by the Settlement Agreement and (ii)

compelling circumstances for approval of the transactions contemplated as part of the Settlement Agreement pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019. The terms of the Settlement Agreement are fair and reasonable, falling above the lowest point in the range of reasonableness, and are in the best interests of the Debtors' estates and their stakeholders as a whole.

F. Based upon the evidence and arguments made at the Hearing, this Court has weighed the probability of success in litigation, the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it. This Court has also taken into account the paramount interest of creditors and, based on all of the foregoing, has determined that the relief requested in the Motion is fair and equitable, in the best interests of the Debtors and their estates as a whole, and should be approved in all respects.

G. In the absence of the Settlement Agreement, the Debtors and their estates face considerable litigation expense, risk, and delay. The disputes between the Settlement Parties involve numerous legal and factual issues, and judicial resolution of these disputes will require extensive and costly briefing and discovery. Even if the Debtors were successful in litigating their alleged claims against the other Settlement Parties, any judgment obtained may be subject to appeal with no guarantee as to the ultimate outcome. Moreover, there is no doubt that the Settlement Parties' combined legal spend during a protracted litigation process would be substantial and further forestall any return of value to the Debtors and their stakeholders. The Settlement Agreement, however, resolves the Settlement Parties' disputes now without the need for costly, uncertain litigation.

H. The Settlement Agreement and the transactions contemplated thereby were negotiated, proposed, and entered into by the Settlement Parties, each of whom were represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

1. The Settlement Agreement is approved in its entirety, and the Debtors are authorized to enter into and perform under the Settlement Agreement and take all actions necessary to effectuate the terms of the Settlement Agreement.

2. In accordance with the Settlement Agreement, the Debtors hereby assume, pursuant to section 365 of the Bankruptcy Code, the Assumed Agreements. Effective as of the Closing Date, each of the Assumption Agreements will be deemed amended by the applicable Amendment Agreement and ratified for all purposes under the Plan. The Debtors are authorized to perform thereunder, in each case subject to and in accordance with the terms of the Settlement Agreement.

3. To the extent applicable, the Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to enter into and perform under the New Seco Pipeline Agreements.

4. The Settlement Parties are authorized to take such steps and actions as may be necessary or appropriate to implement the terms of the Settlement Agreement and this Order.

5. Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)), the terms and conditions of this Order shall be effective and enforceable upon its entry.

6. As part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to the Settlement Agreement or this Order.

7. Nothing in the Settlement Agreement or this Order requires any Other Comanche Working Interest Holder to deliver to and transport its hydrocarbons through the SECO Pipeline to the extent such Other Comanche Working Interest Holder's consent is necessary and such consent has not been obtained. This same principle applies to other matters related to the Settlement Agreement on which an Other Comanche Working Interest Holder's consent is necessary and consent has not been obtained.

8. Nothing in this Order impairs, modifies, prejudices, or otherwise affects rights of Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries), Eagle Ford TX LP, Mitsui E&P Texas LP, Gavilan Resources LLC, and GSO ST Holdings LP and each of its affiliates, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, SN EF UnSub LP, SN EF UnSub Holdings, LLC and each of their respective affiliates (collectively, the "Comanche Non-Ops"), with respect to each of the Comanche Non-Ops' contracts, including, but not limited to, each of the Comanche Non-Ops' production marketing agreements with SN Maverick (as assignee of Anadarko E&P Onshore LLC) (the "<u>PMAs</u>"). For the avoidance of doubt and notwithstanding anything to the contrary in this Order, nothing in this Order shall constitute a finding that SN Maverick has or has not acted in a manner consistent with its obligations to act in good faith and in a commercially reasonable manner under the circumstances (as set forth in such PMAs) in its performance under the PMAs.

9. Notwithstanding anything to the contrary in this Order, this Order shall not waive, limit, impair, operate to preclude, or otherwise impact in any manner any claims or causes of action arising out of, in connection with, or related to (in any manner) the Settlement Agreement.

10. Any determination by SN Maverick as to whether to assume or reject a contract must be:

a. made by a fiduciary for SN Maverick;

b. made by the fiduciary after the fiduciary has exercised sufficient due diligence to determine whether the assumption or rejection is in the best interest of SN Maverick;

c. in the best interest of SN Maverick; and

d. considered after notice and hearing.

11. If all or any portion of the $8,000,000 must be refunded, SN Maverick will be liable for the return only of that portion of the $8,000,000 actually received by SN Maverick.

12. Any party-in-interest that has standing to object to the relief sough in ECF No. 1309 will continue to have standing to object to any motion by SN Maverick to assume or reject a contract that is filed in accordance with this order.

13. Any rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee under the Comanche Joint Development Agreement, in accordance with its terms, if required under the terms of the Comanche Joint Development Agreement; or (ii) otherwise by Order of this Court.

14. Notwithstanding anything to the contrary in this Order, the Motion, the Assumed Agreements, the New Seco Pipeline Agreements or the Settlement Agreement (including the Amendment to the Settlement Agreement), (i) the Debtors and Reorganized Debtors shall continue to comply with all executory contracts and unexpired leases until they are assumed or rejected as set forth in paragraphs 23 and 24 of the Confirmation Order and (ii) the Settlement Agreement (including the Amendment to the Settlement Agreement) and this Order does not modify or impact any rights or defenses of any Counterparty (as defined in the Confirmation Order) in connection with any objection to the assumption or rejection of any executory contracts or unexpired leases (and to prosecute any timely filed objection) under the Plan or Confirmation Order.

15. Nothing in this Order shall alter in any way the rights of the Lien-Related Litigation Creditor Representative (as defined in the Plan) under the terms of the Plan.

Signed: June 30, 2020

Marvin Isgur
United States Bankruptcy Judge