IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |

| | | |
|---|---|---|
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ENTERPRISE PRODUCTS PARTNERS LLC'S RESPONSE IN OPPOSITION TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**

(Relates to Dkt. No. 63)

This dispute involves a party attempting to obtain access to its direct competitor's most commercially sensitive confidential information. Carnero G&P, LLC ("Carnero") asks this Court to grant no fewer than six of its business representatives access to Enterprise Products Operating

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

LLC's ("Enterprise") confidential information, even though Enterprise and Carnero are direct competitors. Carnero baselessly asserts that its business representatives require access to Enterprise's confidential information so Carnero's lawyers can better understand the factual allegations in a complaint Carnero *already* filed or, alternatively, so that Carnero can salvage its claims from dismissal by amending its complaint yet again. Despite the importance Carnero attaches to obtaining access to Enterprise's confidential information, Carnero fails to offer a *scintilla* of testimony or proof demonstrating that its business representatives require access to this information for the reasons Carnero sets forth. Nor does Carnero acknowledge that the Agreed Protective Order already affords Carnero the relief it seeks. For these reasons, and for those set forth below, the Court should deny Carnero's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material ("Motion"), at least as the Motion pertains to Enterprise's confidential information.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Not even five months after agreeing to a protective order, ("Agreed Protective Order"),[2] Carnero seeks to amend that same protective order to allow certain representatives from TPL SouthTex Processing Company LP ("Targa") and Evolve Transition Infrastructure LP, who Carnero dubs as its "business representatives," access to Highly Confidential Material.[3] Among the Highly Confidential Material that Carnero would like to place in the hands of its "business representatives" is confidential information belonging to Enterprise, a direct competitor of Carnero and Targa.[4] Specifically, Carnero's proposed amendment to the Agreed Protective Order would

---

[2] *See* Dkt. No. 16.

[3] Dkt. No. 63 at 5-6, 8.

[4] *See* Affidavit of Zachary Strait ("Strait Affidavit") at ¶¶ 4-5, 7, attached hereto as Exhibit 1.

permit six of Carnero's business representatives access to the Y-Grade Purchase and Sales Agreement between Enterprise Products Operating LLC and SN EF Maverick, LLC, effective as of December 21, 2021.[5] The terms of the Y-Grade Purchase and Sales Agreement are of immense commercial value to Enterprise's competitors and, as such, the agreement is confidential.[6] In fact, "the Y-Grade Purchase and Sales Agreement is one of the most sensitive documents pertaining to Enterprise's business."[7] Thus, the Y-Grade Purchase and Sales Agreement has been marked as Highly Confidential Material under the Agreed Protective Order.

The Agreed Protective Order specifically addresses Carnero's business representatives' access to "Highly Confidential Material," which the Agreed Protective Order defines as material such as "trade secrets, sensitive financial or business information, or material prepared by . . . industry advisors, financial advisors, accounting advisors, experts, or by . . . consultants (and their respective staff)" that "is of such a nature that a risk of competitive injury would be created if such . . . [m]aterial were disclosed to persons *other than* those identified in Paragraph 8 of this Order."[8] Carnero's "business representatives" are *not* identified in Paragraph 8 of the Agreed Protective Order. And notably, Paragraph 9 of the Agreed Protective Order explicitly *prohibits* Highly Confidential Material from being disclosed to Carnero's business representatives. *Id.* at 8-9 ("Notwithstanding anything in this Order to the contrary, Highly Confidential Material disclosed by any Producing Party (other than Carnero) to Carnero shall not be disclosed to any employee, officer, director, member, or partner of TPL SouthTex Processing Company LP, Sanchez

---

[5] *See* Dkt. No. 63 at 2-4. For a more detailed description of the significance and value of the Y-Grade Purchase and Sales Agreement between Enterprise Products Operating LLC and SN EF Maverick, LLC, effective as of December 21, 2021, see the Strait Affidavit (Ex. 1).

[6] Strait Affidavit, at ¶¶ 4-5, 7-9.

[7] *Id.* at ¶ 8.

[8] Dkt. No. 16 at 5 (emphasis added).

Midstream Partners, LP., Evolve Transition Infrastructure LP, or any other member or holder of equity or similar rights in Carnero.").

Carnero, without any supporting affidavits or other evidence, says the amendment to the Agreed Protective Order that it requests is necessary to assist Carnero's lawyers with "investigat[i]ng and support[ing] factual assertions and legal argument as well as . . . mak[ing] business decisions relating to its claims and this lawsuit."[9] Yet, the absence of this assistance did not prevent Carnero from making the factual and legal representations to the Court contained in its Second Amended Complaint, which it filed in July 2022.[10] On August 24, 2022, Defendants asked the Court to dismiss Carnero's Second Amended Complaint pursuant to their Sealed Motion for Judgment on the Pleadings.[11] That motion is pending before the Court. The Court has set a briefing schedule for Defendants' Motion for Judgment on Pleadings ("Defendants' Motion") and has indicated that Carnero may seek leave to amend its complaint for a third time only if certain conditions are satisfied and presumably *after* the Court rules on Defendants' Motion.[12]

---

[9] Dkt. No. 63 at 5.

[10] "By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief." FED. R. BANKR. P. 9011(b) (footnote omitted); *see also* FED. R. CIV. P. 11(b).

[11] *See* Dkt. No. 67.

[12] *See* Dkt. No. 57 at 2.

## II.
## ARGUMENT AND AUTHORITIES

### A. The Agreed Protective Order may be amended only for *good* cause.

Carnero's Motion, although labeled as a request to provide certain of its business representatives access to "Highly Confidential Material," is, in reality, a request to amend the Agreed Protective Order. Indeed, the Agreed Protective Order already says who may and may not view Highly Confidential Material.[13] Among those who *may not* view Highly Confidential Material are Carnero's "business representatives."[14] These are precisely the individuals for whom Carnero now requests access to Highly Confidential Information.[15] That amounts to a request to amend the Agreed Protective Order.

As the party moving to amend the Agreed Protective Order, Carnero bears the burden of demonstrating "good cause" for amending the Agreed Protective Order.[16] "'Good cause' in this context requires 'changed circumstances or new situations' warranting modification of a protective order." *Peoples*, 2008 WL 2571900, at *3 (citing *Murata Mfg. Co., Ltd. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 180 (N.D. Ill. 2006); *accord Morales*, 807 F.3d at 723 (quoting *Peoples*, 2008 WL

---

[13] Dkt. No. 16 at 7-9.

[14] *Id.* at 8-9.

[15] *See* Dkt. No. 63 at 5-6, 8.

[16] Dkt. No. 16 at 16. This Court has discretion to approve or reject modifications to the Agreed Protective Order. *Peoples v. Aldine Indep. Sch. Dist.*, No. CIV. A. 06-2818, 2008 WL 2571900, at *2 (S.D. Tex. June 19, 2008) (Rosenthal, J.) ("A court has discretion to modify a protective order it has entered as long as the order remains in effect." (citing, *inter alia*, *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir.1990)). In determining whether to modify a protective order, courts often consider four factors, one of which is whether good cause supports the requested modification. *See, e.g.,* ("In [the civil] context, courts consider four factors when determining whether to modify a protective order: '[ (]1) the nature of the protective order[;] (2) the foreseeability, at the time of issuance of the order, of the modification requested[;] (3) the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification.' " *United States v. Morales,* 807 F.3d 717, 723 (5th Cir. 2015) (quoting *Peoples*, 2008 WL 2571900, at *2). Here, the Agreed Protective Order, to which the parties (including Carnero) agreed and the Court approved, expressly requires that the party requesting a modification show good cause for the modification. *See* Dkt. No. 16 at 16. Carnero does not show there is good cause for the modification it requests, let alone that the other three factors weigh in favor of modifying the Agreed Protective Order. *See generally* Dkt. No. 63.

2571900, at *3). "In determining whether the moving party has established good cause, 'the court must weigh that party's need for modification against the other party's need for protection, and ought to factor in the availability of alternatives to better achieve both sides' goals.'" *Peoples*, 2008 WL 2571900, at *3 (quoting *Murata*, 234 F.R.D. at 180). For the reasons set forth below, Carnero has failed to meet its burden of demonstrating that good cause exists to amend the Agreed Protective Order to grant its business representatives access to Highly Confidential Material belonging to Enterprise.

**B. Carnero fails to offer testimony or proof to support amending the Agreed Protective Order in the manner it requests.**

Carnero *says* its business representatives require access to Highly Confidential Material belonging to Enterprise because its "outside counsel and in-house counsel must rely upon the knowledge, experience, and expertise of the client—the Carnero business people—for information as to the facts underlying Carnero's claims and arguments and to guide the litigation."[17] And Carnero apparently "*believes* [its] Business Representatives possess the commercial knowledge necessary (i) to assist outside counsel and in-house counsel to understand and represent the facts relating to Carnero's claims and arguments; and (ii) to understand and direct the general objectives and significant decisions concerning this lawsuit based on their review of the Highly Confidential Material" and "that with the redactions allowed by the Scheduling and Disclosure Order and the limited list of authorized Business Representatives within Carnero's owners, Defendants face minimal commercial or competitive risk from the Business Representatives' review of the Highly Confidential Material."[18] But in the context of modifying a protective order, beliefs and bald assertions are insufficient to obtain the modification that is requested; instead, testimony, proof, or

[17] Dkt. No. 63 at 5.

[18] *Id.* (emphasis added).

evidence is required to obtain that modification. *See Allergan, Inc. v. Teva Pharm. USA*, No. 2:15-CV-1455-WCB, 2017 WL 772486, at *6 (E.D. Tex. Feb. 28, 2017) (denying party's motion to amend the existing protective order where the moving party "present[ed] no *evidence* of changed circumstances or new situations . . . ." (emphasis added)); *Lewis v. Tex. Instruments Inc. Employee Health Benefits Plan*, No. 3:12-CV-4577-L-BN, 2014 WL 2815692, at *3 (N.D. Tex. June 23, 2014) ("Plaintiff's mere allegations, without more, are not sufficient to establish good cause for modification of the protective order."); *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) ("The quality of the counsel representing Intel and the *lack of any evidence* indicating Intel will be prejudiced in prosecuting its case *undermines* Intel's contention that they have good cause to modify the Protective Order." (emphases added)); *cf. In re Terra Intern., Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (noting that "good cause" requirement to obtain a protective order could not be satisfied absent supporting affidavits or evidence because "a district court may not grant a protective order solely on the basis of 'stereotyped and conclusory statements.'" (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir.1978))); *see also* 8A Charles Alan Wright & Arthur R. Miller, FED. PRAC. & PROC. CIV. § 2035 (3d ed.) ("The courts have insisted on a *particular and specific demonstration of fact*, as distinguished from stereotyped and conclusory statements, in order to establish good cause." (emphasis added)).

Yet Carnero offers no proof showing that (1) a change of circumstances or new situations, (2) that its business representatives require access to Enterprise's Highly Confidential Material for the reasons Carnero clams, and (3) that Enterprise will not suffer harm if the Court approves the amendment to the Agreed Protective Order that Carnero requests. Such testimony in support of the requested relief could have come in the form of an affidavit from a Carnero business representative, much like the affidavit Enterprise attached to this Response in opposition to

Canero's Motion. Carnero's failure to offer proof in support of the amendment to the Agreed Protective Order that it proposes disqualifies it from obtaining the relief it requests.

**C. Discovery is neither proper nor required at the Motion for Judgment on the Pleadings stage of the litigation.**

Even if Carnero offered the necessary evidence in support of the relief it requests—which it did not—ordering discovery at this early stage of the litigation is nevertheless inappropriate. As indicated above, the Court is presently considering Defendants' Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). Conducting discovery related to a Rule 12(c) motion to dismiss is unnecessary. *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009) ("Because the court is directed to look solely at the allegations on the face of the pleadings, discovery would not assist the Plaintiffs in defending the 12(c) motion."); *Porter v. Valdez*, 424 Fed. Appx. 382, 385 (5th Cir. 2011) (*per curiam*) (stating that the Rule 12(c) "inquiry focuses on the allegations in the complaint, *not* whether plaintiffs have pleaded sufficient facts to succeed on the merits.") (emphasis in original). Thus, it is no surprise courts have flatly stated that ordering discovery for purposes of a Rule 12(c) motion is inappropriate. *See USA Parking Sys., LLC v. E. Gateway Cmty. Coll.*, No. 4:20CV1967, 2022 WL 312230, at *16 (N.D. Ohio Feb. 1, 2022) ("Discovery is not only unnecessary for a Rule 12(c) motion, it is inappropriate." (citing, *inter alia*, *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020)); *Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Engineers*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014) ("Finally, the claims regarding alternatives, equal protection, and Asphalt Green's claims were subject to the City's Rule 12(c) motion, and discovery was thus inappropriate."). And the fact a plaintiff may not know whether or not his or her claim is true is insufficient justification to order discovery in the face of a Rule 12(c) motion. *See Aguiniga v. Delgado*, No. 3:15CV562-DPJ-FKB, 2016 WL 3620728, at *4 (S.D. Miss. June 28, 2016).

The manner in which courts treat discovery for purposes of a Rule 12(b)(6) motion to dismiss is also instructive here. Indeed, "[a] motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008) (citing *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004)); *accord Ackerson*, 589 F.3d at 209. And thus, unsurprisingly, ordering discovery for purposes of a Rule 12(b)(6) motion to dismiss is also generally inappropriate and unnecessary. *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 782 (5th Cir. 2007) ("[A] 12(b)(6) inquiry focuses on the allegations in the pleadings, not whether a plaintiff actually has sufficient evidence to succeed on the merits." (citing *Muhammad v. Dallas County Cmty. Supervision & Corr. Dep't*, 479 F.3d 377, 379 (5th Cir. 2007)); *Presqriber, LLC v. Amazing Charts, LLC*, No. 6:14-CV-439, 2014 WL 12622323, at *2-3 (E.D. Tex. Sept. 9, 2014); *Encompass Office Sols., Inc. v. Ingenix, Inc.*, No. 4:10-CV-96, 2010 WL 2639563, at *1 (E.D. Tex. June 28, 2010); *cf. Smallwood v. Illinois Cent. R. Co.*, 385 F.3d 568, 574 (5th Cir. 2004) ("We emphasize that any piercing of the pleadings should not entail substantial hearings. Discovery by the parties should not be allowed except on a tight judicial tether, sharply tailored to the question at hand, and only after a showing of its necessity.").

Here, Carnero essentially requests discovery, while a Rule 12(c) motion is pending, to better understand the factual allegations made in a complaint Carnero *already* filed or to salvage its complaint from dismissal. Ordering such discovery at this stage of the litigation is inappropriate and, therefore, the Court should deny the Motion.

**D. The Agreed Protective Order sufficiently provides Carnero with the relief it seeks.**

As discussed above, Carnero asserts, without any supporting affidavits or other evidence, that its business representatives require access to Highly Confidential Material belonging to

Enterprise so that Carnero's lawyers can better understand and develop Carnero's case.[19] But that need, assuming it is true, can be satisfied without adopting the amendment to the Agreed Protective Order that Carnero requests. Indeed, the Agreed Protective Order provides that Highly Confidential Material "may be given, shown, made available to, or communicated . . . to . . . professionals retained under Sections 328 and 1103 of the Bankruptcy Code, industry advisors, financial advisors, accounting advisors, experts, and consultants (and their respective staff) that are retained by the signatories to this Order or a Party who has signed Exhibit A in connection with the Disputes . . . ."[20] Thus, Carnero may retain experts who may review Highly Confidential Information to assist Carnero with developing its case, but those experts cannot be Carnero's "business representatives." *Id.* at 7–9. In sum, the Agreed Protective Order strikes a reasonable balance; it affords Carnero the expertise it needs to develop and prosecute its case while shielding commercially sensitive confidential information belonging to Carnero's direct competitors from those with an interest in using that information to benefit Carnero at the expense of the competitor. Thus, there is good cause *not* to amend the Agreed Protective Order in the way Carnero requests.

**E. The Court should not grant a direct competitor of Enterprise access to Enterprise's Highly Confidential Material.**

Enterprise has shown: (1) that Carnero has failed to satisfy its burden of demonstrating that it is entitled to the relief it requests; (2) the relief it requests is inappropriate at this stage of the litigation; (3) and, even if it were appropriate, the Agreed Protective Order already affords Carnero a suitable alternative to the relief it requests. In addition to these reasons, all of which individually are a basis for denying Carnero's Motion, the type of information Carnero seeks from Enterprise provides yet another justification for denying its Motion.

---

[19] *See* Dkt. No. 63 at 5-6.

[20] Dkt. No. 16 at 7.

As noted above, Carnero, a direct competitor of Enterprise, seeks access to Enterprise's confidential information.[21] Not only is this information confidential, it is also some of the *most commercially sensitive* information belonging to Enterprise.[22]

Courts are generally hesitant to require disclosure of an entity's commercially sensitive confidential information to a direct competitor. *See A. H. Robins Co. v. Fadely*, 299 F.2d 557, 561 (5th Cir. 1962) ("There is no true privilege against discovery of trade secrets or other 'confidential' business information, but the courts nevertheless will exercise their discretion to avoid unnecessary disclosure of such information, particularly where the action is between ***competitors.***" (emphasis added; citation and quotations omitted)); *In re Stewart Title Co.*, No. H-09-247, 2009 WL 1708079, at *2 (S.D. Tex. June 17, 2009) ("Moreover, the Court is concerned that Stewart Title is a non-party who would be entrusting the confidentiality of its documents to parties who do not represent its interests. Such concern, although perhaps not dispositive on its own, lend weight to the arguments for quashing discovery."); *see also Volunteer Energy Services, Inc. v. Option Energy, LLC*, No. 1:11-CV-554, 2012 WL 13018688, at *1 (W.D. Mich. Feb. 23, 2012) (denying motion to comply with a subpoena where the subpoena sought proprietary, competitive, and sensitive information from a "direct competitor."); *In re Vitamins Antitrust Litig.*, 267 F.Supp.2d 738, 741-742 (S.D. Ohio 2003) (sustaining motion to quash subpoena and denying motion to compel party seeking production where party sought disclosure of a direct competitor's trade secrets); *cf. Grand River Enterprises Six Nations, Ltd. v. King*, No. 02 CIV. 5068(JFK), 2009 WL 330213, at *6 (S.D.N.Y. Feb. 9, 2009) ("The likelihood that Plaintiff's experts will perform consulting work for the OPMs' competitors and the high cost of assembling the FTC Data mean

[21] *See generally* Dkt. No. 63; Strait Affidavit at ¶¶ 4, 7.

[22] *See* Strait Affidavit at, ¶¶ 7-9.

that the OPMs have a strong interest in protecting the materials." (emphasis added)); *BASF Corp. v. United States*, 321 F.Supp.2d 1373, 1380-81 (C.I.T. 2004).

Here, because Carnero and Targa are direct competitors of Enterprise, the Court should not grant Carnero's business representatives (three of which are affiliated with Targa) access to Enterprise's commercially sensitive confidential information, even if those business representatives sign a confidentiality agreement. *See BASF Corp.*, 321 F. Supp.2d at 1380 (citing *A. Hirsh, Inc. v. United States*, 657 F. Supp. 1297, 1304 (C.I.T. 1987)); *see also Symantec Corp. v. Acronis Corp.*, No. 11-5310 EMC (JSC), 2012 WL 3582974, at *3 (N.D. Cali. Aug. 20. 2012) ("[T]here is a tangible risk that [the opposing party's consultant] will not be able to separate the highly confidential information he gleans from reviewing Defendant's source code ***with his consulting and publication work in that same technical field*** . . . ." (emphasis added)). In sum, the risk that Carnero's business representatives will use Enterprise's confidential information to gain a competitive edge to Enterprise's detriment is simply too significant, and Carnero fails to substantiate the harm it will suffer if its business representatives are denied access to this information. For this reason as well, the Court should deny the Motion.

**F. Alternatively, Carnero's Motion is premature and should be denied.**

Carnero's Motion lacks merit for the foregoing reasons and should be denied on those bases. Alternatively, the Court should deny the Motion because it is premature to grant Carnero the relief it seeks. Specifically, Carnero has *already* filed a Second Amended Complaint, and Defendants' Motion for Judgment on the Pleadings is *pending* before the Court. The Court has indicated Carnero may be permitted file an amended complaint *after* the Court has held a hearing, and presumably ruled on, Defendants' Motion.[23]

---

[23] *See* Dkt. No. 57 at 2.

Carnero fails to sufficiently explain why it needs to amend its complaint before the Court rules on Defendants' Motion or why it would need to amend its complaint if the Court denies Defendants' Motion. In sum, it is premature for the Court to grant Carnero discovery to amend its complaint before the Court determines whether the operative complaint withstands Defendants' Motion. Considering the harm Enterprise will suffer if Carnero's business representatives are given access to its confidential information and the untimeliness of Carnero's request, the Court should also deny Carnero's Motion on this alternative basis.

## III.
## CONCLUSION AND PRAYER

For the foregoing reasons, Enterprise respectfully requests that the Court deny the Motion, to the extent granting Carnero the relief it seeks would provide its business representatives with access to the Y-Grade Purchase and Sales Agreement between Enterprise Products Operating LLC and SN EF Maverick, LLC, effective as of December 21, 2021.

Respectfully submitted,

Hicks Thomas LLP

*/s/ Paul L. Mitchell*

Paul L. Mitchell
State Bar No. 14217920
SDTX No. 7495
pmitchell@hicks-thomas.com
Justin R. Braga
Texas Bar No. 24127228
SDTX No. 3710609
jbraga@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: 713.547.9100
Fax: 713.547.9150

ATTORNEYS FOR NON-PARTY
ENTERPRISE PRODUCTS PARTNERS LLC

**CERTIFICATE OF SERVICE**

I certify that on September 12, 2022, a true and correct copy of Enterprise Products Partners LLC's Response in Opposition to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material was served using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Paul L. Mitchell*
Paul L. Mitchell

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et. al.*, | § | Chapter 11 |
| | § | Case No. 19-34508 |
| *Reorganized Debtors.* | § | (Jointly Administered) |
| | § | |
| CARNERO G&P, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF MAVERICK, LLC, *et. al.*, | § | Adversary No. 22-03035 |
| | § | |
| *Defendants.* | § | |
| | § | |

**AFFIDAVIT OF ZACHARY STRAIT**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned notary, personally appeared Zachary Strait, the affiant, whose identity is known to me and, after being duly sworn, stated as follows:

1. "My name is Zachary Strait. I am over 18 years of age, of sound mind, and am otherwise fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and those facts are true and correct.

2. I am Vice President, Unregulated NGL Commercial at Enterprise Products Operating LLC ("Enterprise"). In that role I am responsible for negotiating and overseeing the negotiation of natural gas liquids ("NGL") purchase and sales agreements.

3. I am familiar with Carnero G&P, LLC ("Carnero"). Carnero is a joint venture of Targa Resources Corp. or one of its affiliates ("Targa") and Evolve Transition Infrastructure LP. Carnero is owned 50% by Targa and is operated by Targa.

4. Carnero is a direct competitor of Enterprise in the Eagle Ford shale. Carnero, like Enterprise and in competition with Enterprise, is in the business of gathering, processing, and purchasing NGLs in the Eagle Ford shale. Carnero owns, and Targa operates, the Silver Oak II Gas Processing Plant and the Raptor Gas Processing facility. Carnero also owns, and Targa operates, the high-pressure gathering pipeline located in La Salle, Dimmitt, and Webb Counties, Texas, which is in the Eagle Ford shale. Enterprise or its affiliates own and operate numerous assets in the Eagle Ford Shale, including an extensive gas gathering system, the Eagle Ford NGL



EXHIBIT
1

Pipeline, the Yoakum, Thompsonville, Shoup, Gilmore, and Armstrong gas plants, and the Shoup and Armstrong fractionators.

5. Targa is also a direct competitor of Enterprise. Targa, like Enterprise and in competition with Enterprise, is in the business of gathering, transportation, fractionating, and purchasing NGLs in virtually every basin in the United States in which Enterprise operates.

6. I am also familiar with the Y-Grade Purchase and Sales Agreement dated December 21, 2021, between Enterprise, as buyer, and SN EF Maverick, LLC, as seller (the "Y-Grade Purchase and Sales Agreement"), because I negotiated the terms of that agreement. Y-grade is an NGL mixture that has been through field processing but has not been through NGL fractionation.

7. Enterprise takes reasonable measures to maintain the confidentiality of its NGL purchase and sales agreements. Enterprise's NGL purchase and sales agreements are not publicly available. All of Enterprise's NGL purchase and sales agreements contain confidentiality provisions. For example, section 11.3 of the Y-Grade Purchase and Sales Agreement contains comprehensive confidentiality provisions designed to protect both Enterprise and its counterparty.

8. Disclosure of the Y-Grade Purchase and Sales Agreement to Carnero's and/or Targa's commercial representatives would create a substantial risk of competitive injury to Enterprise and would give Carnero and Targa a significant competitive advantage by providing them insight and the ability to undercut Enterprise in the market by learning the manner in which Enterprise allocates risk and structures its NGL purchase and sales transactions, including how the gas dedication is structured and the specific representations and warranties that Enterprise requires from its counterparties. The manner in which Enterprise negotiates and structures its NGL purchase and sales agreements was developed through many years of active market participation and negotiation. It is reflective of Enterprise's commercial history, its risk tolerance and allocation, and its placement of value. It could not be easily duplicated by a competitor without access to documents such as the Y-Grade Purchase and Sales Agreement that would disclose Enterprise's methods. That is why the Y-Grade Purchase and Sales Agreement is one of the most sensitive documents pertaining to Enterprise's business.

9. Accordingly, disclosure of the Y-Grade Purchase and Sales Agreement to commercial representatives of Carnero, even with the financial terms redacted, would cause immediate, significant, and irreparable harm to Enterprise."

FURTHER AFFIANT SAYETH NOT.

Zachary Strait

SUBSCRIBED AND SWORN TO before me on the 8 day of September, 2022.

Notary Public – State of Texas

KATHERINE CAMPBELL
Notary Public, State of Texas
Comm. Expires 04-..-2025
Notary ID 129346304

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ORDER DENYING CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**

Came on for consideration the Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material (ECF#63, hereafter the "Motion") filed by Carnero G&P, LLC. The Court has considered the motion, the responses filed by the parties and the third-party owners of the highly confidential materials at issue, any replies, the evidence submitted, the

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

arguments of counsel, and the applicable law, and concludes that the Motion should be and is hereby DENIED.

Signed: ______________________________, 2022.

______________________________
**Marvin Isgur**
**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| Debtors. | § | (Jointly Administered) |
| CARNERO G&P, LLC, | § | |
| Plaintiff, | § | Adversary No. 22-03035 |
| v. | § | |
| SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC., | § | |
| Defendants. | § | |

**THE WES PARTIES' MOTION FOR LEAVE TO INTERVENE FOR LIMITED PURPOSE OF OBJECTING TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**

[Relates to Docket No. 63]

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**[2]

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Western Midstream Partners, LP ("**WES**") and its subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**," and collectively with WES and WGR, the "**WES Parties**"), for their Motion (the "**Motion**") for Leave to Intervene for Limited Purpose of Objecting to Plaintiff Carnero G&P, LLC's ("**Carnero**") Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material [Docket No. 63] (the "**Motion to Modify Protective Order**"), so that the WES Parties may protect their confidential commercial information, respectfully represent:

## INTRODUCTION

1. Through its Motion to Modify Protective Order, Carnero seeks to disclose the WES Parties' sensitive and confidential commercial information to the people the WES Parties are most concerned about, and who were specifically omitted from the original list of persons entitled to review such information in the *Stipulated Protective Order* [Docket No. 16] (the "**Protective**

[2] The WES Parties request that the Court set this matter for a hearing, if required, at the same time as Carnero's underlying Motion to Modify Protective Order (as defined herein).

**Order**"): commercial representatives of the WES Parties' direct competitors.[3] The WES Contracts (as defined in the Objection) were marked "Highly Confidential Material" pursuant to the Protective Order and were produced by the WES Parties' counterparties subject thereto. Although the WES Contracts have been redacted to remove pricing information, the unredacted portions of the documents still contain highly sensitive terms relating to, among other things, the WES Parties' allocation of risks and costs in the operation of their midstream assets, as set forth more fully in the Objection.

2. If granted, however, the Motion to Modify Protective Order would dramatically change the rules upon which the WES Parties have relied in consenting to the disclosure of their most sensitive business information in this litigation. On the merits—which will be discussed in the Objection—the Motion to Modify Protective Order appears to be unnecessary, and nothing more than a pretext to disclose the WES Parties' commercial information to competitors. Regardless, however, the matter of disclosing the WES Parties' confidential commercial information is clearly an issue that directly impacts the WES Parties and their business operations. The Court should, therefore, grant the WES Parties leave to intervene, on a limited basis, to oppose this landmark change to the Protective Order, so that they may protect their confidential commercial information from disclosure.

## ARGUMENT

### A. Legal Standard

3. Intervention is "a procedure by which an outsider with an interest in a lawsuit may come in [even] though [it] has not been named as a party by the existing litigants." *See La. State*

[3] Filed concurrently herewith is the *WES Parties' Objection to Carnero G&P's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (the "**Objection**"), with accompanying Declaration of Craig W. Collins, detailing the risk of competitive injury to the WES Parties that would result were the Court to grant the Motion to Modify Protective Order.

*Conf. of NAACP v. La.*, Civ. Act. No. 19-479, 2022 WL 2663850, at *3 (M.D. La. July 11, 2022) (slip op) (quoting Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1901 (3d ed. 2007)).

4. First, "a would-be intervenor must establish that he has Article III standing if, inter alia, he is not seeking any relief that is also being sought by at least one subsisting party with standing to do so." *League of Un. Latin Am. Citizens [LULAC], Dist. 19 v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011) (internal citations omitted). "Constitutional standing ensures the plaintiff has suffered a cognizable injury that satisfies Article III's case or controversary requirement." *Infinity Emergency Mgmt. Grp., LLC v. Neighbors Health System, Inc. (In re Neighbors Legacy Holdings, Inc.)*, No. 18-33836, 2022 WL 4073663, at *5 (Bankr. S.D. Tex. Sept. 2, 2022). "The three well-known components of standing are injury in fact, causation, and redressability." *La. State Conf.*, 2022 WL 2663850, at *3 (quoting *LULAC*, 659 F.3d at 428).

5. The would-be intervenor must then satisfy the four-part test set forth in Federal Rule of Civil Procedure 24(a). *See La. State Conf.*, 2022 WL 2663850, at *3. "To intervene of right under Federal Rule of Civil Procedure 24(a), a putative intervenor must show that '(1) the application . . . [was] timely'; (2) that it has 'an interest relating to the property or transaction which is the subject of the action'; (3) that it is 'so situated that the disposition of the action may, as a practical matter, impair or impede [its] ability to protect that interest'; and, finally, (4) that its interest is 'inadequately represented by the existing parties to the suit.'" *Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1017 (5th Cir. 2022) (internal quotations omitted); *see also* Fed. R. Civ. P. 24(a)(2); Fed. R. Bankr. P. 7024 (adopting Rule 24). "Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). "The inquiry 'is a flexible one, and a practical analysis of the facts and circumstances of each case is appropriate.'" *Id*. (citations omitted).

6. Rule 24(a) permits intervention for a limited purpose and applicants are not required to join the case for any and all purposes or in order to bring or defend a cause of action. *See Swoboda v. Manders*, 665 F. App'x 312, 315 (5th Cir. 2016) (permitting intervention to protect documents subject to work product privilege); *Energy Gulf States La. v. U.S. E.P.A.*, 817 F.3d 198, 206 (5th Cir. 2016) (granting intervention to permit non-party to resolve document-production and FOIA-related dispute); *Brumfield*, 749 F.3d at 341, 346 (granting intervention as of right "for the limited purpose of opposing the motion for permanent injunction"); *LULAC*, 2022 WL 2663850 at *2 ("However, neither Plaintiffs nor Defendants cite to any cases in which a motion to intervene was denied because it was for a limited purpose, and a review of case law in this Circuit easily contradicts the Parties' claims.") (collecting cases for limited intervention); *La. State Conf.*, 2022 WL 2663850, at *8.

**B. Article III Standing**

7. The WES Parties have Article III standing to protect their confidential and sensitive commercial information. *See, e.g.*, *J.D. Fields & Co., Inc. v. Nucor-Yamato Steel Co.*, No. 4:12-cv-00754, 2015 WL 12696208, at *3 (E.D. Ark. June 15, 2015) (collecting cases permitting intervention for limited purpose of protecting confidential commercial information). Further, causation and injury in fact are easily satisfied: granting the Motion to Modify Protective Order would result in injury in fact to the WES Parties by disclosing sensitive commercial information to top-level decision makers at a direct competitor (Carnero). In turn, these top-level decision makers at Carnero also work for two other competitors of the WES Parties.

8. As addressed in greater detail in the Objection, the litigants in this matter have already agreed to be bound by the Protective Order, which provides that any documents designated as "Highly Confidential Material" are "of such a nature that a risk of competitive injury would be created if such Discovery Material were disclosed to persons other than those identified in

Paragraph 8 of this Order[.]" *See* Protective Order ¶ 3(b) (treatment of Highly Confidential Material). Carnero now seeks—interestingly, without attempting to confer in advance or even provide so much as a "heads up call" to the undersigned counsel—to remove these protections. The requested modification to the Protective Order is significant, affecting not only documents belonging to the current litigants, but also those documents in the litigants' care, custody and control which contain *non-parties'* confidential information, thus placing the WES Parties' "trade secrets, sensitive financial or business information, or material prepared by its industry advisors, financial advisors, accounting advisors, experts, or by its consultants" in the hands of a direct competitor. Protective Order ¶ 3(b). This is exactly the type of injury in fact courts have often considered when ruling on a motion to intervene.

9. Redressability "is satisfied if it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *La. State Conf.*, 2022 WL 2663850, at *5 (quoting *LULAC*, 659 F.3d at 431 (internal citations omitted)). Here, the WES Parties' potential injury—disclosure of confidential and sensitive commercial information—can be prevented by the Court denying the Motion to Modify Protective Order. The Protective Order was heavily negotiated by multiple parties and was intended to permit the plaintiff and defendants to fully litigate their claims with the support of experienced in-house and outside counsel. *Id.* The WES Parties have closely monitored this litigation to ensure that their confidential commercial information remains protected from direct competitors. Maintaining limits on disclosure to this narrow class of recipients prevents Carnero's key decision makers, those individuals responsible for bidding against and competing with the WES Parties, from obtaining, reviewing, and learning from the WES Contracts. *See id.* Carnero now seeks to remove these protections. The WES

Parties, therefore, should be permitted to intervene on a limited basis, to seek redress for any potential future injury and oppose the Motion to Modify Protective Order.

**C. Intervention as of Right under Federal Rule of Civil Procedure 24(a)**

**1. The Motion Is Timely**

10. The Motion is timely. "Timeliness is to be determined from all the circumstances and the point to which [a] suit has progressed is . . . not solely dispositive[.]" *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1012 (2022) (cleaned up) (quoting *NAACP v. New York*, 413 U.S. 345, 365-66 (1973)). Generally, filing a motion to intervene as soon as a potential intervenor realizes its interests are not adequately protected is sufficient to meet the timeliness requirement. *Id.* (citing *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)).

11. Such is the case here, as the WES Parties have filed this Motion within the objection period specified in the Motion to Modify Protective Order itself (along with a timely merits objection). Further, no order has been entered and no parties will be prejudiced by the WES Parties' intervention for this limited purpose. *See Swoboda*, 665 F. App'x at 314 (finding intervention to protect trade secret timely when filed two months after order entered denying motion for reconsideration of order requiring production of alleged attorney-client privileged documents); *see also LULAC*, 2022 WL 2663850, at *6 (noting that prejudice is measured by the delay in seeking intervention "not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation") (quoting *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994)).

**2. The WES Parties Have an Interest in Protecting Their Confidential Commercial Information and Denying Intervention Will Impair Their Ability to Protect the Same**

12. The WES Parties obviously have an interest in protecting their own confidential business information. Indeed, "trade secrets and proprietary information are the very type of interest the protection of which justifies intervention under Rule 24(a)." *Northrup Grumman Info. Techn. Inc. v. United States*, 74 Fed. Cl. 407, 414 (2006) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04 (1984) (holding that trade secrets are a valid property interest, entitled to Fifth Amendment protection); *see also J.D. Fields & Co.*, 2015 WL 12696208, at *3 (granting applicant's motion to intervene "for the limited purpose of protecting its confidential pricing information" which the plaintiff was attempting to obtain through a motion to compel purchase orders from the defendant); *Armour of Am. v. United States*, 70 Fed. Cl. 240, 244 (2006); *Appleton v. F.D.A.*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (interest in litigation where federal records containing applicant's trade secrets and confidential information were sought under discovery requests).

13. By the same token, denying the WES Parties' request to intervene will directly impair their ability to protect their confidential information. *See Northrup Grumman*, 74 Fed. Cl. at 415. Once Carnero's business representatives learn the WES Parties' commercial information, the metaphorical toothpaste cannot be put back in the tube. Carnero's key decision makers cannot un-read what they have read and cannot un-learn or un-see what they have learned and seen. As in *Northrup Grumman*, the denial of the right to intervene may result in the WES Parties' inability to challenge subsequent motions to seal or unseal documents containing their confidential information; similarly, intervention would permit them to continue to protect their rights not only in response to the Motion to Modify Protective Order but any subsequent motions regarding sealed

records containing confidential information. *See id.*; *see also Appleton*, 310 F. Supp. 2d at 197 ("disclosures resulting from the disposition of this action [involving applicants' trade secrets] could impair the applicants' ability to protect their trade secrets or confidential information").

**3. No Parties to the Litigation Can Sufficiently Protect the WES Parties' Interest in Their Confidential Information**

14. The WES Parties possess a unique interest in protecting their own confidential information from disclosure to a direct competitor. *See, e.g.*, *Bush v. Viterna*, 740 F.2d 350, 357-58 (5th Cir. 1984) (collecting cases in which applicant's interest was inadequately represented by parties to suit); *see also Swoboda*, 665 F. App'x at 315 (finding intervention appropriate because the applicant-intervenor had a defense not available to the present defendant). The burden for establishing that other parties "may be" inadequate to protect the WES Parties' interests "should be treated as minimal." *See Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972).

15. The WES Parties' position with respect to their own confidential information is different from that of the Producer Group.[4] *See Swoboda*, 665 F. App'x at 314-15 (finding that the parties stood in different shoes because the applicant "has a defense not available to the present defendant"). While the Producer Group is currently bound to protect the WES Parties' confidential information pursuant to the confidentiality provisions in the WES Contracts themselves, the WES Parties' interests are intrinsic to their competition in the market. *See* Objection ¶¶ 37-38; *see also Appleton*, 310 F. Supp. 2d at 197 (distinguishing between litigant's interest in "responding appropriately to the plaintiff's request," plaintiff's interest in disclosure, and "applicants' interest in protecting their trade secrets and confidential information").[5] Additionally, unlike the Producer

[4] As used herein, the term "Producer Group" means Defendants SN EF UnSub LP, Eagle Ford TX LP, Javelin EF L.P. f/k/a Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.

[5] Likewise, the Producer Group's opposition to the Motion to Modify Protective Order is insufficient to adequately represent the WES Parties' position with respect to their own documents. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 737 (D.C. Cir. 2003) ("Moreover, even 'a shared general agreement . . . does not necessarily ensure

Group, the WES Parties are in direct competition with Carnero as well as Carnero's two joint venture partners, as discussed in the Objection. As such, the WES Parties should be permitted to intervene and represent their own interests before the Court.

## CONCLUSION

16. The Wes Parties have Article III standing to protect their confidential commercial information and otherwise satisfy each element of Federal Rule of Civil Procedure 24(a), adopted by Bankruptcy Rule 7024, for intervention (on a limited basis) as a matter of right.

**WHEREFORE**, the WES Parties respectfully request that the Court enter an order (i) granting the WES Parties the right to intervene for the limited purpose of protecting their confidential commercial information during this litigation and (ii) granting such other relief as may be just and proper.

Respectfully submitted this 12th day of September, 2022.

**GRAY REED**

By: */s/ Lydia R. Webb*
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

**COUNSEL FOR THE WES PARTIES**

agreement in all particular respects,' and 'the tactical similarity of the present legal contentions of the parties does not assure adequacy of representation or necessarily preclude the intervenor from the opportunity to appear in its own behalf." (citations omitted) (cleaned up)).

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that on the 12th day of September, 2022, she conferred with counsel to Carnero and counsel to the Producer Group. Mesquite Energy, Inc., SN EF Maverick, LLC, and SN EF UnSub LP are unopposed to the relief requested herein. Counsel to Carnero indicated that it would be unable to respond prior to the time this Motion was filed. The remaining members of the Producer Group have not responded as of the time this Motion was filed.

*/s/ Lydia R. Webb*
Lydia R. Webb

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of September, 2022, she caused the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice.

*/s/ Lydia R. Webb*
Lydia R. Webb

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | § | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | § | Adversary No. 22-03035 |

**ORDER GRANTING THE WES PARTIES' MOTION FOR LEAVE TO INTERVENE FOR LIMITED PURPOSE OF OBJECTING TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**
[Relates to Docket No. ___]

Upon consideration of the *Motion for Leave to Intervene for Limited Purpose of Objecting to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* [Docket No. ___] (the "**Motion**") filed by Western Midstream Partners, LP

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

("**WES**") and its subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**," and together with WES and WGR, the "**WES Parties**"), Federal Rule of Civil Procedure 24(a) and Bankruptcy Rule 7024 and all applicable rules; after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, ORDERED, AND ADJUDGED:**[2]

1. The WES Parties have Article III standing to protect their confidential commercial information, if any, in this adversary proceeding.

2. The WES Parties have satisfied the Rule 24(a) requirements to intervene as a matter of right.

   a. The WES Parties' Motion is timely, having been filed within twenty-one days of the filing of the *Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* [Docket No. 63] by Carnero G&P, LLC ("**Carnero's Motion**").

   b. The WES Parties' have an interest relating to the property or transaction that is the subject of Carnero's Motion, which includes, *inter alia*, the WES Parties' contract and pricing information which have been designated under the Protective Order as "Highly Confidential Material." *See* Docket No. 16.

   c. Disposition of Carnero's Motion without the WES Parties' participation would impair or impede the WES Parties' ability to protect their confidential commercial information both in response to Carnero's Motion and any subsequent motions regarding the relevant documents.

[2] Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

d. The WES Parties have met their burden to establish that their interest is inadequately represented by the existing parties to the suit due to the WES Parties' interest in protecting their own confidential business information and competitiveness.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

The Motion is **GRANTED**. The WES Parties are permitted to intervene for the limited purpose of asserting their rights to protect their confidential commercial information.

SIGNED ON _______, 2022.

HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 22-03035 |

**THE WES PARTIES' OBJECTION TO CARNERO G&P'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**
[Relates to Docket No. 63]

Western Midstream Partners, LP ("**WES**") and its subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**," and collectively with WES and WGR, the "**WES Parties**"), for their Objection (the "**Objection**") to Plaintiff Carnero G&P, LLC's ("**Carnero**") Motion to Authorize Carnero Business Representatives to Review Highly

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Confidential Material [Docket No. 63] (the "**Motion to Modify Protective Order**"), respectfully represent:[2]

## INTRODUCTION

1. Rather than being honest and transparent with the Court, Carnero instead engages in sleight of hand in its attempt to fundamentally alter the terms of the *Stipulated Protective Order* [Docket No. 16] (the "**Protective Order**") in its Motion to Modify Protective Order. Namely, the Protective Order provides that the Highly Confidential Material disclosed pursuant thereto may only be given to the parties' outside counsel, Protective Order ¶ 8, and "***shall not be disclosed to any employee, officer, director, member, or partner of [Targa], [Evolve], or any other member or holder of equity or similar rights in Carnero***," Protective Order ¶ 9 (emphasis added). This language was carefully and extensively negotiated among the direct parties to this adversary proceeding with input from the WES Parties. Carnero, however—without even so much as a phone call or an email to the WES Parties in advance—now unabashedly asks this Court to help it circumvent its own agreed-to commitments under the Protective Order and hand over the WES Parties' Highly Confidential Material ***to precisely the parties to which the Protective Order intentionally foreclosed disclosure***: commercial representatives of the WES Parties' direct competitors. And, the WES Parties submit, without any valid (or real) basis to do so.

2. The Motion to Modify Protective Order would dramatically change the rules upon which the WES Parties have relied in consenting to the disclosure of their most sensitive business information in this litigation. Carnero's justification for renouncing the assurances it drafted and agreed to less than five (5) months ago is the purported necessity of having its ***commercial***

---

[2] The WES Parties file this Objection subject to entry of a Court order on their *Motion for Leave to Intervene for Limited Purpose of Objecting to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (the "**Motion to Intervene**"), filed contemporaneously herewith.

***representatives*** assist its in-house lawyers and highly capable outside counsel in understanding its own claims asserted in the Second Amended Complaint. Putting aside the Rule 11 implications of this reasoning,[3] this highly disruptive alteration to the Protective Order undermines the legitimate competitive interests of the WES Parties, as well as those similarly situated.

3. Carnero contends that the WES Parties would not be harmed by this additional disclosure in light of the existing redactions to the WES Documents (as defined below). However, as set forth more fully in the *Declaration of Craig W. Collins in Support of the WES Parties' Objection to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (the "**Collins Declaration**"), filed contemporaneously herewith, the WES Parties would risk significant competitive injury were the Court to grant the Motion to Modify Protective Order.

4. The Motion to Modify Protective Order should be denied.

## FACTUAL BACKGROUND

### I. WES's Assets in South Texas and the WES Contracts

5. WES is a publicly traded midstream service provider with assets located across some of the most active and productive basins in the United States. Collins Declaration ¶ 3. In particular, the WES Parties own and operate two assets in the Eagle Ford Shale in South Texas:

[3] Any pleading filed by Carnero necessarily is a certification that to the best of its counsel's "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Bankr. P. 9011(b). That Carnero ***only now*** seeks an assist to help in-house and outside counsel "properly and fully assess the factual and legal bases for Carnero's claims and legal arguments," Motion to Modify Protective Order ¶ 2, is a breathtaking admission. Carnero then doubles-down on its failure to properly investigate its own claims before filing the Second Amended Complaint when, in paragraph 12 of the Motion to Modify Protective Order, it contends it has been or will be somehow "hampered" in its "ability to work with its outside counsel and in-house counsel to investigate and support factual assertions and legal argument as well as to make business decisions relating to its claims and this lawsuit" unless its commercial people can see the WES Parties' highly confidential commercial information. The extensive negotiations over the Protective Order and the express requirements of Rule 9011 notwithstanding, Carnero's request is nothing more than an obvious pretext to access the WES Parties' highly confidential information.

the Brasada gas processing complex located in La Salle County, Texas ("**Brasada**") and the Springfield oil and gas gathering system located in Webb, Dimmit and La Salle Counties, Texas (the "**Springfield Gathering System**"). Collins Declaration ¶ 4.

6. Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**"), SN EF Maverick, LLC ("**Maverick**"), Mitsui E&P LP, Javelin EF L.P. f/k/a Venado EF L.P., Eagle Ford TX LP, and SN EF UnSub LP (collectively, with Mesquite and Maverick, the "**Producer Group**") have each dedicated their production from the Comanche Field in South Texas to (i) Brasada for natural gas processing through at least June 30, 2033 and (ii) the Springfield Gathering System for oil and gas gathering through at least December 31, 2034.[4] Collins Declaration ¶ 5.

7. This dedication was accomplished through a series of agreements, including:

a. that certain Gas Processing Agreement dated February 27, 2012 between WGR, as processor, and Anadarko E&P Onshore LLC ("**Anadarko**"), as supplier, which agreement was subsequently amended four times (the Gas Processing Agreement together with the amendments are collectively called, the "**Brasada Agreement**").[5]

b. that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated June 1, 2017 between Springfield, as gatherer, and Mesquite, as shipper (the "**Springfield OGA**").[6]

c. that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Springfield, as gatherer, and Mesquite, as shipper (the "**Springfield GGA**" and together with Springfield OGA, the "**Springfield Agreements**").[7]

Collins Declaration ¶¶ 6-7.

---

[4] Mesquite, via its subsidiary Mesquite Comanche Holdings, LLC ("**MCom**"), acquired the acreage previously owned by Gavilan Resources LLC ("**Gavilan**") out of Gavilan's chapter 11 cases, which is also subject to the same dedications and commitments to the WES Parties.

[5] When Mesquite acquired the Comanche Field acreage from Anadarko in 2017, WGR did not consent to the assignment of the Brasada Agreement. As a result, Maverick and Anadarko entered into an agency agreement whereby Maverick acts as Anadarko's agent for purposes of performing under the Brasada Agreement.

[6] The other members of the Producer Group and MCom are either bound by (i) the Springfield OGA or (ii) substantially similar oil gathering agreements.

[7] The other members of the Producer Group and MCom are either bound by (i) the Springfield GGA or (ii) substantially similar gas gathering agreements.

8. During the course of the above-captioned chapter 11 cases, extensive litigation ensued amongst the WES Parties, Mesquite, Maverick and certain other parties in connection with the rejection of multiple midstream agreements, including the Springfield Agreements. Eventually, on December 17, 2021, Mesquite, Maverick, and the WES Parties, among others, entered into that certain Master Settlement Agreement that resolved those disputes. Collins Declaration ¶ 8.

9. As part of the settlement, the WES Parties entered into certain amendments and agreements that memorialized their ongoing relationship with the Producer Group. Specifically:

a. Springfield and Mesquite entered into amendments to the Springfield Agreements (the "**Springfield Amendments**").

b. WGR, Anadarko and Maverick entered into a fifth amendment to the Brasada Agreement (the "**Brasada Amendment**").

c. Springfield and Maverick entered into that certain Firm Intrastate Transportation Service Agreement (the "**Residue Gas Agreement**"). The Residue Gas Agreement governs the transportation of residue gas from Brasada back to Springfield to fuel the compressors on the Springfield Gathering System.

Collins Declaration ¶¶ 9-10.

10. The Springfield Agreements, the Brasada Agreement, the Springfield Amendments, the Brasada Amendment and the Residue Gas Agreement are collectively referred to herein as the "**WES Contracts**."

11. The WES Contracts are highly structured contracts that contain material, nonpublic, proprietary and confidential business information that includes, but is not limited to (i) pricing, (ii) term and termination rights, (iii) dedication and related information, (iv) construction terms, (v) the timing and nature of investing and deploying capital, (vi) receipt and delivery points for hydrocarbons, as well as the physical capabilities and limitations of the WES Parties' facilities, (vii) quality specifications, (viii) volume and capacity requirements, (ix) loss provisions, (x)

volume allocations and financial settlement calculations, and (xi) commercial, financial, physical, and liability risk allocations. Collins Declaration ¶ 18.

12. Moreover, the WES Contracts contain confidentiality provisions that limit their disclosure to non-parties. Pursuant to these confidentiality provisions, the disclosing party must obtain the non-disclosing party's consent to disclosure in situations not explicitly set forth therein. Collins Declaration ¶ 19.

13. The WES Contracts define the relationship between the WES Parties and the Producer Group. How the myriad toggles and switches that could be flipped in any midstream agreement come together in the WES Contracts paints a picture of how the WES Parties uniquely serve the Producer Group, and how the parties collectively chose to allocate the risks and costs of operating the Springfield Gathering System and Brasada amongst them. Indeed, even the structure of the WES Contracts themselves is bespoke and confidential. Collins Declaration ¶ 21.

## II. Carnero, Targa and Evolve Directly Compete with the WES Parties

14. Carnero is a joint venture owned 50% by a subsidiary of Targa Resources Corp. ("**Targa**") and 50% by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**Evolve**").

15. Carnero, Targa and Evolve own and operate their own gathering and processing facilities in the same geographic area of South Texas as the Springfield Gathering System and Brasada:

a. Carnero owns and operates the Raptor gas processing plant in La Salle County, Texas – the same county where Brasada is located and situated adjacent to Brasada. Carnero also operates a natural gas gathering pipeline that is generally between the Springfield Gathering System and Brasada.

b. In addition to its interest in the Carnero JV, Targa independently operates its own natural gas pipelines throughout South Texas and across the same three-county area as the Springfield Gathering System. Targa also owns and operates two gas processing plants – Silver Oak I and Silver Oak II – both of which are

located in Bee County, Texas and are connected to natural gas pipelines originating in the general vicinity of the Springfield Gathering System.

c. In addition to its interest in the Carnero JV, Evolve operates an oil and gas gathering system servicing Mesquite's Catarina acreage located in Dimmit and Webb Counties, Texas.

Collins Declaration ¶ 13.

16. Carnero, Targa and Evolve directly compete with the WES Parties for the gathering and processing of hydrocarbons produced in the Eagle Ford Shale located in South Texas. Collins Declaration ¶ 14.

17. Indeed, Carnero already has a proven track record of competing with the WES Parties for the opportunity to provide midstream services for the same hydrocarbons, as evidenced by, among other things, the "top lease" Carnero executed with the Producer Group for natural gas produced from the Comanche Field that is currently dedicated to the WES Parties.[8] Collins Declaration ¶ 15.

18. In addition, as a major midstream service provider, Targa competes with other WES-owned and operated assets to provide gathering and processing services in other major basins like the Delaware Basin located in West Texas. Just recently, Targa acquired Lucid Energy, with midstream assets adjacent to WES along the Texas and New Mexico border, and which directly competes with WES in the most prolific oil and gas producing basin in the United States. Collins Declaration ¶ 16.

**III. Disclosure of the WES Contracts Pursuant to the Protective Order**

19. On May 11, 2022, the Producer Group filed their *Motion for Judgment on the Pleadings* [Docket No. 19] and attached the WES Contracts in support.

[8] This is the so-called "GGPA" that is the subject of this litigation, *see* Motion to Modify Protective Order ¶ 2.

20. Prior to filing the Motion for Judgment on the Pleadings and consistent with the confidentiality provisions in the WES Contracts and the Protective Order, counsel to Mesquite contacted counsel to the WES Parties to obtain the WES Parties' consent to disclosure of the WES Contracts. The Producer Group designated the WES Contracts as Highly Confidential Material pursuant to the Protective Order. The WES Parties further redacted the WES Contracts to remove sensitive, nonpublic business information. The WES Parties relied on the language of the Protective Order in consenting to the disclosure of the WES Contracts in connection with the Motion for Judgment on the Pleadings, specifically that (i) the WES Contracts would only be disclosed to Carnero's outside counsel, and (ii) commercial representatives at Carnero, Targa and Evolve would not be given access to the WES Contracts. Collins Declaration ¶ 22.

21. In early June 2022, Carnero requested that the Highly Confidential Material attached to the Motion for Judgment on the Pleadings be disclosed to Carnero's in-house counsel. At a status conference on June 13, 2022, the Court ordered that (i) Carnero may disclose the Highly Confidential Material, including the WES Contracts, to certain in-house counsel on a professionals'-eyes-only basis, subject to the Protective Order, and (ii) parties should limit redactions of the Highly Confidential Material to pricing and rate information. *See* Scheduling and Disclosure Order [Docket No. 41]. The WES Parties revised the redactions to the WES Contracts in accordance with Scheduling and Disclosure Order. The Scheduling and Disclosure Order explicitly provides that the Protective Order was not otherwise altered. *See* Scheduling and Disclosure Order ¶ 2.

22. On June 24, 2022, Carnero filed its *Motion to Compel Removal of Redactions* [Docket No. 44] (the "**Motion to Compel**"), seeking to remove certain redactions to (i) the Springfield GGA and (ii) the Residue Gas Agreement. Counsel to the WES Parties requested a

conference with counsel to Carnero to discuss the Motion to Compel. Following the conference, Carnero withdrew the Motion to Compel, without prejudice. *See* Docket No. 46.

23. Carnero now—without any advance communications with the WES Parties—seeks authority to disclose the Highly Confidential Material, including the WES Contracts, to the following commercial personnel (collectively, the "**Business Representatives**"):

| Name | Organization | Role as Described in Motion to Modify Protective Order | Additional Information |
|---|---|---|---|
| Pat J. McDonie | Targa | Carnero Board Member | President – Gathering & Processing at Targa since 2018;[9] |
| John Coonce | Targa | Carnero Board Member | Senior Vice President, Commercial and Business Development at Targa since 2015;[10] Field Gathering & Processing contact for South Texas[11] |
| Scott Smith | Targa | Commercial Representative, Carnero (but not responsible for South Texas) | Vice President, Commercial at Targa since 2015[12] |
| John Steen | Evolve | Carnero Board Member | Senior Operating Partner at Stonepeak Infrastructure Partners and Chairman of the Board at Evolve[13] |
| Michael Bricker | Evolve | Carnero Board Member | Managing Director and Principal at Stonepeak since 2017 and Board Member at Evolve[14] |
| Claire Campbell | Evolve | In-house Counsel at Stonepeak Partners LP | n/a |

[9] https://www.targaresources.com/about-us/management.
[10] https://www.linkedin.com/in/john-coonce-0b9b5b8/
[11] https://www.targaresources.com/contact/gathering-processing-contacts
[12] https://www.linkedin.com/in/scott-smith-0559643/
[13] https://evolvetransition.com/about-us/leadership/
[14] https://evolvetransition.com/about-us/leadership/

## OBJECTION

24. Courts weigh four factors when considering whether a modification to a protective order is appropriate: "(1) the nature of the protective order, (2) the foreseeability, at the time of issuance of the order, of the modification requested, (3) the parties' reliance on the order; and most significantly (4) whether good cause exists for the modification." *Oldendorff Carriers GMBH & Co., KG v. Grand China Shipping (Hong Kong) Co., Ltd.*, No. C-12-074, 2013 WL 1867604, at *2 (S.D. Tex. April 22, 2013) (citing *Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 179 (N.D. Ill. 2006)); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, No. MDL-1446, 2009 WL 3247432, at *3 (S.D. Tex. Sept. 29, 2009). Here, all four factors weigh against granting Carnero's Motion to Modify Protective Order.

### I. Nature of the Protective Order: Carnero Negotiated and Agreed to the Protective Order and Its Protection of Highly Confidential Material from the Business Representatives

25. "When evaluating the nature of a protective order, courts consider 'its scope and whether it was court imposed or stipulated by the parties.'" *Peoples v. Aldine Indep. Sch. Dist.*, No. 06-2818, 2008 WL 2571900, at *2 (S.D. Tex. June 19, 2008). "A party's prior consent to the protective order will weigh against its motion for modification." *Id.*; *see also A.T.T. v. Grady*, 594 F.2d 594, 597 (7th Cir. 1978) ("Where a protective order is agreed to by the parties before its presentation to the court, there is a higher burden on the movant to justify the modification of the order.")

26. Protective orders generally fall into one of three categories: specific, umbrella or blanket. *Enron*, 2009 WL 3247432, at *2. The Protective Order in this case is a blanket protective order, which allows the parties to protect those documents that they believe to contain confidential commercial information and that are usually agreed to by the parties and approved by the courts.

*See id.* Although blanket protective orders are "moderately susceptible to modification," *U.S. v. Ocwen Loan Servicing LLC*, No. 4:12-CV-543, 2016 WL 278968, at *3 (E.D. Tex. Jan. 22, 2016), Carnero and the Producer Group negotiated and agreed to the terms of the Protective Order. Specifically, Carnero recognized, and agreed, that the Highly Confidential Material should not be seen by "any employee, officer, director, member, or partner of [Targa], [Evolve], or any other member or holder of equity or similar rights in Carnero." Protective Order ¶ 9.

27. The fact that Carnero stipulated to the Protective Order undermines the relief now requested in the Motion to Modify Protective Order and weighs against modification. *Reedhycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc.*, Nos. 6:06-cv-222, 6:07-cv-251, 2009 WL 10184564, at *2 (E.D. Tex. Apr. 8, 2009) ("The [moving] parties agreed to the entry of the Protective Order. The first factor weighs against modification.").

## II. <u>Foreseeability of the Modification Requested</u>: Carnero's Desire for the Business Representatives to Have Access to the Highly Confidential Material Was Foreseeable When Carnero Agreed to the Protective Order

28. When determining foreseeability, the court looks to "whether the need for modification was foreseeable at the time the parties negotiated the original stipulated protective order." *Oldendorff*, 2013 WL 1867604, at *3 (citing *Murata*, 234 F.R.D. at 180). "[A] party's oversight in not negotiating a provision in a protective order considering a matter which should have been reasonably foreseeable at the time of the agreement has been held not to constitute good cause for relief from the protective order." *Id.*

29. In its Original Petition dated January 27, 2022, Carnero alleged that the Producer Group breached their agreements with Carnero by modifying and/or extending "the commercial terms of or applicable to the Existing Commitments [including the WES Contracts]" via the settlement reached with the WES Parties in December 2021. *See* Docket No. 1-4 at pp. 21, 23.

Upon information and belief, Carnero made such allegations without the benefit having seen the WES Contracts.

30. At the status conference held on June 13, 2022 where Carnero initially sought to modify the Protective Order, Carnero's counsel stated he was trying to "bridge the gap on the issue of our commercial people at Carnero seeing the documents by proposing that in-house counsel be . . . allowed to simply because in-house counsel is who has been part of this transaction from the beginning." *See* Docket No. 37 at 6:14-17.

31. After Carnero's in-house counsel were given access to the Highly Confidential Material on a professionals'-eyes-only basis, Carnero sought leave to amend its complaint. In its *Reply in Support of Its Emergency Motion for Leave to File Second Amended Complaint* (the "**Reply**"), Carnero recognized that it "has been unable to involve directly any of its commercial decision-makers for input in this case" and it "could not allow even a single business decision-maker to read the Second Amended Complaint; it could only describe generally the contents to its business representatives." Reply ¶ 5. Carnero telegraphed that it would be filing the Motion to Modify Protective Order so that the Business Representatives could have access to the Highly Confidential Material "so they can participate in refining Carnero's claims." *Id.*

32. In light of the foregoing and the sophistication of the parties, Carnero's desire to involve its Business Representatives in this litigation was foreseeable and should have been taken into account by Carnero when stipulating to the Protective Order in April 2022. The fact of the matter is that Carnero's claims have ***always*** implicated the WES Contracts. Presumably, Carnero's Business Representatives were involved in preparing the Original Petition, since Carnero's company agreement "gives Targa the right to control the litigation and Evolve absolute consultation rights for material matters involving Carnero." Motion to Modify Protective Order

¶ 15. Carnero could have and should have foreseen that those Business Representatives would want to continue to be involved with this litigation after entry of the Protective Order, including but not limited to understanding and directing "the general objective and significant decisions concerning this lawsuit." Motion to Modify Protective Order ¶ 16. Carnero nonetheless specifically agreed to exclude the Business Representatives from accessing the Highly Confidential Material in the Protective Order. The fact that Carnero no longer likes the terms to which it stipulated (aka, "buyer's remorse") does not justify deviation from those terms now, especially since the WES Parties relied on such assurances when consenting to disclosure of the Highly Confidential Material in the first place. This factor weighs against modification.

## III. Reliance: The WES Parties Relied on the Protective Order in Agreeing to Disclose the WES Contracts

33. "The reliance factor focuses on 'the extent to which the party resisting the modification relied on the protective order in affording access to discovered materials.'" *Peoples*, 2008 WL 2571900, at *2 (quoting *Murata*, 234 F.R.D. at 180). Courts have found it "presumptively unfair . . . to modify protective orders which assure confidentiality and upon which the parties have reasonably relied." *Id.* (quoting *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005); *see also Bayer AG v. Barr Lab., Inc.,* 162 F.R.D. 456, 467 (S.D.N.Y. 1995) (stating that a party "must know that they can rely on protective orders to protect sensitive commercial information from disclosure to competitors").

34. The WES Parties relied on the Protective Order and the protections afforded to Highly Confidential Material when consenting to the disclosure of the WES Contracts in the first place. Collins Declaration ¶ 22. As discussed more fully below and in the Collins Declaration, Carnero, Targa and Evolve are the WES Parties' direct competitors in South Texas and other markets. Consequently, the WES Parties ***would never have consented*** to the disclosure of the

WES Contracts ***but for*** the assurance that such documents would only be revealed to Carnero's outside counsel and would not be disclosed, ***under any circumstances***, to commercial representatives at Carnero, Targa and Evolve. Moreover, the WES Parties ***would never have agreed*** to limit the redactions of the WES Contracts to only pricing and rate information if they knew that those documents would ultimately end up in the hands of the Business Representatives. This factor weighs against modification.

## IV. <u>Good Cause</u>: There Is No Good Cause to Modify the Protective Order; Rather, Good Cause Exists for Continued Protection of the WES Contracts under the Protective Order

35. Even if Carnero could succeed in carrying its burden to satisfy the three factors listed above—which it cannot—there is no good cause to modify the Protective Order. Good cause requires "changed circumstances or new situations" warranting modification of a protective order. *Peoples*, 2008 WL 2571900, at *3 (quoting *Murata*, 234 F.R.D. at 180). In evaluating whether good cause for modification exists, "the court must weigh [the moving] party's need for modification against the other party's need for protection, and ought to factor in the availability of alternative to better achieve both sides' goals." *Id.* (quoting *Murata*, 234 F.R.D. at 180). To demonstrate good cause, the movant must present "a specific demonstration of fact rather than mere conclusory statements." *Caraway v. Chesapeake Expl. LLC*, 269 F.R.D. 627, 628 (E.D. Tex. 2010) (quoting *Resolution Tr. Corp. v. Worldwide Ins. Mgmt. Corp.*, 147 F.R.D. 125, 127 (N.D. Tex. 1992)).

36. Conversely, the existence of confidential information that, if disclosed, would potentially harm the disclosing party's competitive standing, as well as the disclosing party's reliance upon confidentiality clauses contained in such documents, is sufficient to establish good cause to maintain continued confidentiality pursuant to a protective order. *Oldendorff*, 2013 WL

1867604, at *4 (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (noting that courts have denied access to court records when they might be used "as sources of business information that might harm a litigant's competitive standing"); *Ocwen*, 2016 WL 278968, at *4 (denying modification of protective order because good cause existed to maintain confidential designation of material and foreclose additional disclosure in light of risk of competitive injury).[15]

37. Here, the WES Contracts contain highly confidential and sensitive business information and are additionally protected by their own self-contained confidentiality provisions. Collins Declaration ¶¶ 18-21. Contrary to Carnero's conclusory statements in the Motion to Modify Protective Order, if the WES Contracts were disclosed to the Business Representatives, the WES Parties unquestionably suffer the risk of competitive injury.[16] Collins Declaration ¶¶ 23-27. Although the WES Contracts Carnero seeks to disclose to the Business Representatives have been redacted to remove pricing information, the remaining unredacted portions of the WES Contracts contain highly sensitive terms. Collins Declaration ¶ 23. This confidential information reflects, among other things, the WES Parties' allocation of risks and costs in the operation of their midstream assets – *i.e.*, the very "secret sauce" the Protective Order serves to protect. *Id.*

38. Midstream companies do not just compete on price when it comes to negotiating gathering and processing services. Collins Declaration ¶ 27. Allowing the Business Representatives—individuals whose work likely entails formulating bids and contracts with producers in a manner competitive to WES—to see how the WES Parties structure their midstream agreements gives Carnero, Targa and Evolve a profoundly unfair and improper advantage over the WES Parties. Collins Declaration ¶ 24. The WES Parties, Carnero, Targa and Evolve all compete

---

[15] The WES Parties acknowledge that, because the Protective Order is a blanket protective order, they have the burden to establish good cause to maintain the existing protections thereunder. *Enron*, 2009 WL 3247432, at *3.

[16] The WES Parties' argument about risk of competitive injury with respect to the six named Business Representatives applies equally to any other commercial representative at Carnero, Targa and Evolve.

in the same South Texas market and, as stated previously, the WES Parties also compete with Targa in other markets. Collins Declaration ¶¶ 16, 25. The Eagle Ford Shale is a particularly active market, and producers are currently seeking gathering and processing services. *Id.* Given that hydrocarbons are a finite commodity, competition is fierce among midstream service providers to secure long-term customer commitments. Collins Declaration ¶ 26.

39. The WES Parties' need for protection from the real and present risk of competitive injury outweighs Carnero's need to modify the Protective Order to give the Business Representatives access to the WES Contracts, especially since Carnero is already competently represented by in-house and outside counsel.[17] As a result, the WES Parties have established good cause to maintain the existing protections for the WES Contracts under the Protective Order.

40. Moreover, Carnero's argument that it would be hampered from participating meaningfully in this litigation absent granting the Business Representatives access to the WES Contracts is unavailing. *See, e.g.*, *Bayer*, 162 F.R.D. at 465. In *Bayer*, the court denied a similar request to modify a stipulated protective order to permit the moving party's in-house counsel to access confidential materials. *Id.* at 464. The protective order in place limited disclosure of confidential materials to outside counsel. *Id.* The party seeking modification to the protective order argued that it was necessary for its in-house counsel to access the confidential materials so that she may "evaluate the testimony and demeanor of key witnesses," and "consult with outside counsel regarding strategy." *Id.* The party further argued that if its in-house counsel could not

[17] The WES Parties also respectfully submit that whether the WES Contracts somehow run afoul of the GGPA (they do not) can easily be determined by reference to the unredacted provisions already in the possession of Carnero's various counsel. The business terms do not bear on the legal issues surrounding any alleged breach of the GGPA by the Producer Group.

actively participate in the litigation, its "right to control its own defense [would be] severely hampered." *Id.*

41. The *Bayer* court held that such reasoning did not constitute "good cause" to modify the protective order. First, the party was represented by sophisticated outside counsel, which the party did not contend was unable to adequately represent its interest in the litigation. *Id.* at 465. Second, the protective order contained a mechanism whereby the confidential designation could be challenged and in-house counsel could be given access to materials redesignated as non-confidential. *Id.* This procedure was deemed adequate to balance the party's interest in having its in-house counsel participate in the litigation without exposing confidential information to a competitor's employee. *Id.*

42. Here, the Court has already modified the Protective Order to give Carnero's in-house counsel access to the Highly Confidential Material, redacted ***only*** for pricing and rate information. Carnero has not suggested that its in-house counsel and outside counsel are not capable of handling this litigation where Highly Confidential Material is involved. Rather, Carnero's request appears to be one of convenience. The fact that Carnero couches the Business Representatives as board members and other "senior" staff, does not offset the fact that these are high-ranking ***commercial representatives*** who are actively engaged in negotiating transactions and contractual relationships for the WES Parties' competitors. Carnero's "convenience" in preparing part of its case does not warrant this 180-degree change to the critical confidentiality protections contained in the Protective Order. This factor weighs against modification.

## CONCLUSION

43. The Motion to Modify Protective Order is nothing more than another step in Carnero's march to secure access to the WES Parties' Highly Confidential Material, despite the

agreed-upon terms of the Protective Order to the contrary. Carnero has failed to establish that the Protective Order should be modified to allow the Business Representatives to access the WES Contracts, and indeed, the evidence supports a finding that the existing protections for the WES Contracts under the Protective Order should be maintained.

**WHEREFORE**, the WES Parties respectfully request that the Court enter an order (i) denying the Motion to Modify Protective Order and (ii) granting the WES Parties such other and further relief as may be just and proper.

Respectfully submitted this 12th day of September, 2022.

**GRAY REED**

By: */s/ Lydia R. Webb*
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

**COUNSEL FOR THE WES PARTIES**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 12th day of September, 2022, she caused the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice.

*/s/ Lydia R. Webb*
Lydia R. Webb

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 22-03035 |

**DECLARATION OF CRAIG W. COLLINS IN SUPPORT OF THE WES PARTIES' OBJECTION TO CARNERO G&P'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**

I, Craig W. Collins, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am Senior Vice President and Co-Chief Operating Officer of Western Midstream Partners, LP ("**WES**"). I also hold the titles of Senior Vice President and Co-Chief Operating Officer for WES subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**"). I am over twenty-one years of age, of sound mind, and have never been convicted

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

of a crime involving a dishonest act or false statement. This declaration is based on my personal knowledge and my review of the records of WES, WGR, and Springfield (collectively, WES, Springfield, and WGR are the "**WES Parties**") and all facts stated in this declaration are true and correct to the best of my knowledge.

2. I submit this declaration in support of the WES Parties' Objection (the "**Objection**") to *Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* [Docket No. 63] (the "**Motion**"). I am authorized to submit this declaration on behalf of the WES Parties.

**WES's Assets and Commitments in South Texas**

3. WES is a publicly traded midstream service provider with assets located across some of the most active and productive basins in the United States. The WES Parties are engaged in the business of gathering, compressing, treating, processing and transporting natural gas; gathering, stabilizing and transporting condensate, natural gas liquids (NGLs) and crude oil; and gathering and disposing of produced water for their customers.

4. The WES Parties own and operate two assets in the Eagle Ford Shale in South Texas: the Brasada gas processing complex located in La Salle County, Texas ("**Brasada**") and the Springfield oil and gas gathering system located in Webb, Dimmit and La Salle Counties, Texas (the "**Springfield Gathering System**").

5. Through a number of agreements, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**"), SN EF Maverick, LLC ("**Maverick**"), Mitsui E&P LP, Javelin EF L.P, f./k/a Venado EF L.P., Eagle Ford TX LP, and SN EF UnSub LP (collectively, with Mesquite and Maverick the "**Producer Group**") have each dedicated their production from the Comanche Field

in South Texas to (i) Brasada through at least June 30, 2033 and (ii) the Springfield Gathering System through at least December 31, 2034.[2]

6. On February 27, 2012, WGR, as processor, and Anadarko E&P Onshore LLC ("**Anadarko**"), as supplier, entered into that certain Gas Processing Agreement, which agreement was subsequently amended four times (the Gas Processing Agreement together with all amendments is referred to herein as the "**Brasada Agreement**"). When Mesquite acquired the Comanche Field acreage from Anadarko in 2017, WGR did not consent to the assignment of the Brasada Agreement. As a result, Maverick and Anadarko entered into an agency agreement whereby Maverick acts as Anadarko's agent for purposes of performing under the Brasada Agreement.

7. On June 1, 2017, Springfield, as gatherer, and Mesquite, as shipper, entered into: (i) a Second Amended and Restated Lease Dedication and Oil Gathering Agreement (the "**Springfield OGA**"),[3] and (ii) a Second Amended and Restated Lease Dedication and Gas Gathering Agreement (the "**Springfield GGA**" and together with Springfield OGA, the "**Springfield Agreements**").[4]

8. During the course of the chapter 11 cases, extensive litigation ensued among the WES Parties, Mesquite and certain other parties in connection with the rejection of multiple midstream agreements, including the Springfield Agreements. Eventually, on December 17, 2021,

---

[2] Mesquite, via its subsidiary Mesquite Comanche Holdings, LLC ("**MCom**"), acquired the acreage previously owned by Gavilan Resources LLC ("**Gavilan**") out of Gavilan's chapter 11 cases, which is also subject to the same dedications and commitments to the WES Parties.

[3] The other members of the Producer Group and MCom are either bound by (i) the Springfield OGA or (ii) substantially similar oil gathering agreements.

[4] The other members of the Producer Group and MCom are either bound by (i) the Springfield GGA or (ii) substantially similar gas gathering agreements.

Mesquite, Maverick, and the WES Parties, among others, entered into that certain Master Settlement Agreement that resolved those disputes.

9. On the same day, as part of the settlement, Springfield and Mesquite entered into amendments to the Springfield Agreements (the "**Springfield Amendments**") and WGR, Anadarko and Maverick entered into a fifth amendment to the Brasada Agreement (the "**Brasada Amendment**").

10. Also on the same day, as part of the settlement, Springfield and Maverick entered into that certain Firm Intrastate Transportation Service Agreement (the "**Residue Gas Agreement**"). The Residue Gas Agreement governs the transportation of residue gas from Brasada back to Springfield to fuel the compressors on the Springfield Gathering System.

11. The Springfield Agreements, the Brasada Agreement, the Springfield Amendments, the Brasada Amendment and the Residue Gas Agreement are collectively referred to herein as the "**WES Contracts**."

**Carnero, Targa and Evolve Directly Compete with the WES Parties**

12. Upon information and belief, Carnero G&P, LLC ("**Carnero**" or the "**Carnero JV**") is a joint venture owned 50% by a subsidiary of Targa Resources Corp. ("**Targa**") and 50% by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**Evolve**").

13. Carnero, Targa and Evolve own and operate their own gathering and processing facilities in the same geographic area of South Texas as the Springfield Gathering System and Brasada:

a. Carnero owns and operates the Raptor gas processing plant in La Salle County, Texas – the same county where Brasada is located and situated adjacent to Brasada. Carnero also operates a natural gas gathering pipeline that is generally between the Springfield Gathering System and Brasada.

b. In addition to its interest in the Carnero JV, Targa independently operates its own natural gas pipelines throughout South Texas and across the same three-

county area as the Springfield Gathering System. Targa also owns and operates two gas processing plants – Silver Oak I and Silver Oak II – both of which are located in Bee County, Texas and are connected to natural gas pipelines originating in the general vicinity of the Springfield Gathering System.

c. In addition to its interest in the Carnero JV, Evolve operates an oil and gas gathering system servicing Mesquite's Catarina acreage located in Dimmit and Webb Counties, Texas.

14. Carnero, Targa and Evolve directly compete with the WES Parties for the gathering and processing of hydrocarbons produced in the Eagle Ford Shale located in South Texas.

15. Indeed, Carnero already has a proven track record of competing with the WES Parties for the opportunity to provide midstream services for the same hydrocarbons, as evidenced by, among other things, the "top lease" Carnero executed with the Producer Group for natural gas produced from the Comanche Field that is currently dedicated to the WES Parties.

16. In addition, as a major midstream service provider, Targa competes with other WES-owned and operated assets to provide gathering and processing services in other major basins like the Delaware Basin located in West Texas. Just recently, Targa acquired Lucid Energy, with midstream assets adjacent to WES along the Texas and New Mexico border, and which directly competes with WES in the most prolific oil and gas producing basin in the United States.

**The WES Parties Would Suffer the Risk of Competitive Injury if the WES Contracts Were Disclosed to the Business Representatives**

17. I am informed that by the Motion, Carnero seeks authority to disclose the WES Contracts, among other things, to six commercial representatives from Targa and Evolve (the "**Business Representatives**").

18. The WES Contracts are highly structured contracts that contain material, nonpublic proprietary and confidential business information that includes, but is not limited to (i) pricing, (ii) term and termination rights, (iii) dedication and related information, (iv) construction terms, (v) the timing and nature of investing and deploying capital, (vi) receipt and delivery points for

hydrocarbons, as well as the physical capabilities and limitations of the WES Parties' facilities, (vii) quality specifications, (viii) volume and capacity requirements, (ix) loss provisions, (x) volume allocations and financial settlement calculations, and (xi) commercial, financial, physical, and liability risk allocations.

19. The WES Contracts also contain confidentiality provisions that limit their disclosure to non-parties. Pursuant to these confidentiality provisions, the disclosing party must obtain the non-disclosing party's consent to disclosure in situations not explicitly set forth in the confidentiality provision.

20. In the industry, midstream agreements are closely guarded, complex documents. While midstream agreements may contain certain common features and provisions, how those provisions work together to form the relationship between the midstream company and producer is unique. For example, while all gathering agreements contain provisions for the loss of hydrocarbons in connection with the operation of the applicable gathering system, how those losses are allocated can vary widely. Are losses actual or fixed? Are losses subject to a cap or unlimited? While these are not rate or pricing provisions, the allocation of losses impacts the customer relationship and is an important component in the negotiation of a midstream agreement. Disclosure of that information to third parties could, and would, place the midstream provider (here, the WES Parties) at a competitive disadvantage.[5]

21. The WES Contracts define the relationship between the WES Parties and the Producer Group. How the myriad toggles and switches that could be flipped in any midstream agreement come together in the WES Contracts paints a picture of how the WES Parties uniquely serve the Producer Group and how the parties collectively chose to allocate the risks and costs of

[5] Such disadvantage would carry across all markets where the WES Parties compete with Carnero, Targa or Evolve, not just the South Texas region.

operating the Springfield Gathering System and Brasada amongst them. Indeed, even the structure of the WES Contracts themselves is bespoke and confidential.

22. The WES Parties relied on the language of the Stipulated Protective Order [Docket No. 16] in consenting to the disclosure of the WES Contracts in connection with the Producer Group's Motion for Judgment on the Pleadings [Docket No. 19], specifically that (i) the WES Contracts would only be disclosed to Carnero's outside counsel and (ii) commercial representatives at Carnero, Targa and Evolve would not be given access to the WES Contracts.

23. If the WES Contracts were disclosed to the Business Representatives, the WES Parties would suffer the risk of significant competitive injury. Although the WES Contracts Carnero seeks to disclose to the Business Representatives have been redacted to remove pricing information, the remaining unredacted portions of the WES Contracts contain highly sensitive terms, as described above. This confidential information reflects, among other things, the WES Parties' allocation of risks and costs in the operation of their midstream assets.

24. Allowing the Business Representatives—individuals whose work likely entails formulating bids and contracts with producers in a manner competitive to WES—to see how the WES Parties structure their midstream agreements gives Carnero, Targa and Evolve a profoundly unfair and improper advantage over the WES Parties when it comes to competing for new volumes, both in South Texas and other areas where they compete.

25. The Eagle Ford Shale in South Texas is an active, growing energy market, albeit with only a limited number of established producers and midstream providers. Oil and gas producers are currently investing capital in drilling wells in South Texas, resulting in an increase in anticipated production from the area where the WES Parties' facilities—and the facilities owned by Carnero, Targa and Evolve—are located. Those same producers may be actively seeking

gathering and/or processing services for that production. The WES Parties, Carnero, Targa and Evolve would be competing to provide such gathering and/or processing services, as well as retaining their existing customer relationships.

26. Hydrocarbons are a finite commodity. Over time, reserves decline and there are less and less hydrocarbons that can be economically produced. As a result, it is critical to any midstream company's business model to obtain long-term customer commitments to try to ensure the midstream company earns a return on the capital it invests in its facilities.

27. As described above, midstream companies do not just compete on price when it comes to negotiating gathering and processing services. If the Business Representatives were allowed to review the WES Contracts, Carnero, Targa, and Evolve would essentially have the WES Parties' playbook when it comes to structuring their midstream agreements and would use that information to try to undercut the WES Parties for available volumes, both in South Texas and in other areas where they compete. And if Carnero, Targa, and Evolve were to use that unfair advantage to secure new, long-term acreage dedications from producers, there very well may not be any additional volumes for the WES Parties to compete for upon the expiration of those agreements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on September 12, 2022.

/s/ *Craig W. Collins*
Craig W. Collins

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | § | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | § | Adversary No. 22-03035 |

**MOTION FOR LEAVE TO INTERVENE FOR LIMITED PURPOSE OF OBJECTING TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**
(Related Docket Nos. 63)

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE**

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Non-party ETC Texas Pipeline Ltd. ("ETC"), by and through its undersigned counsel, files this Motion for Leave to Intervene for Limited Purpose of Objecting ("Motion to Intervene") to Carnero G&P, LLC's ("Carnero") *Motion to Authorize Carnero Business Representatives to Review Highly Confidential Materials* (the "Motion") [Docket No. 63]. In support of this Motion to Intervene, ETC states as follows:

## PRELIMINARY STATEMENT[2]

Months after entry of the Stipulated Protective Order (the "Protective Order") setting forth the guidelines for the production of confidential and highly confidential documents, pursuant to which ETC consented to the disclosure of the Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP ("Anadarko") and ETC and related amendments (the "Agreement"), Carnero seeks authority to disseminate the terms of the Agreement to ETC's direct competitors.

[2] Capitalized terms used but not defined in this Motion to Intervene shall have the meanings ascribed to such terms in the *Objection to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material and Motion for Protective Order* (the "Objection"), filed contemporaneously herewith.

ETC has not participated in this adversary proceeding (this "Adversary Proceeding") or the Debtors' Chapter 11 Cases, but in order to protect its commercial interests, ETC is compelled to file this Motion to Intervene to prevent Carnero from disclosing the Agreement to ETC's direct competitors.

ETC respectfully requests that this Court grant ETC leave to intervene to oppose the dissemination of commercial sensitive information in order to avoid commercial injury. Contemporaneously herewith, ETC files its Objection, which sets forth the substantive grounds for why Carnero's Motion should be denied. As set forth in the Objection, the Motion directly affects ETC, its property, and its business interests. Consequently, ETC's Motion to Intervene is justified.

## ARGUMENT

### A. Legal Standard

1. Pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, as incorporated by Rule 7024 of the Federal Rules of Bankruptcy Procedure, a party has a right to intervene in a proceeding as a matter of right if (1) the application for intervention is timely; (2) the applicant has an interest relating to the property or transaction which is the subject of the action; (3) the applicant is situated such that the disposition of the action may impair or impede its ability to protect that interest; and (4) the applicant's interest is inadequately represented by the existing parties to the proceeding. *Entergy Gulf States Louisiana, L.L.C. v. U.S. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016); Fed. R. Civ. P. 24(a)(2); Fed. R. Bankr. P. 7024 (adopting Fed. R. Civ. P. 24). "The inquiry . . . 'is a flexible one, which focuses on the particular facts and circumstances surrounding each application,' and 'intervention of right must be measured by a practical rather than technical yardstick.'" *Id.* (quoting *Edwards v. City of Hous.*, 78 F.3d 983, 999 (5th Cir. 1996)).

"The rule 'is to be liberally construed,' with 'doubts resolved in favor of the proposed intervenor.'" *Id.* (quoting *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir. 2009)).

2. Furthermore, a party seeking to intervene must establish that it "has Article III standing if, inter alia, he is not seeking any relief that is 'also being sought by at least one subsisting party with standing to do so.'" *La. State Conf. of NAACP v. La.*, No. 19-479-JWD-SDJ, 2022 WL 2663850, at *3 (M.D. La. July 11, 2022 (quoting *League of United Latin Am. Citizens [LULAC], Dist. 19 v. City of Boerne*, 659 F.3d 421, 428 (5th Cir. 2011)). The three parts of standing include injury in fact, causation, and redressability. *Id.*

3. Intervention for a limited purpose allows an interested party to participate in a case without joining the case for any and all purposes. *See, e.g.*, *Entergy Gulf States La.*, 817 F.3d at 206 (authorizing intervention to enable non-party to address discovery dispute); *Swoboda v. Manders*, 665 F. App'x 312, 315 (5th Cir. 2016) (authorizing intervention to resolve discovery dispute); *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (granting intervention to oppose motion); *LULAC*, 659 F.3d at 427, 440 (granting intervention to oppose modified consent decree).

**B. ETC's Application for Intervention is Timely.**

4. Courts generally consider four factors in evaluating the timeliness of an application to intervene, including (1) the length of time applicants knew or should have known of their interest in the case; (2) prejudice to existing parties caused by applicants' delay; (3) prejudice to applicants if their motion is denied; and (4) any unusual circumstances. *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994).

5. ETC is promptly moving for intervention within the objection period of the Motion. Carnero filed its Motion on August 22, 2022. The relief sought in the Motion directly affects ETC's interests. ETC is filing this Motion to Intervene twenty-one days from the date of the

Motion. Because there is no delay, the second factor is inapplicable. However, for the sake of completeness, ETC states that no other parties involved in the Adversary Proceeding would be prejudiced by the intervention. The Court has not yet heard argument on the Motion. Nor has there been a ruling on the Motion.

6. If this Motion to Intervene is denied, ETC would suffer great prejudice because there are no parties in the Adversary Proceeding that have an interest in protecting the proprietary information contained in the Agreement. Lastly, ETC does not believe any unusual circumstances exist that should weigh against granting this Motion to Intervene.

**C. ETC Has an Interest in Protecting the Commercially Sensitive Information Contained in the Agreement. Without Intervention, ETC Will Be Unable to Protect that Interest, Resulting in Significant Commercial Harm.**

7. As explained in greater detail in ETC's Objection, ETC has a direct interest in protecting its confidential information, the disclosure of which to ETC's direct competitors would cause substantial competitive injury to ETC. Protecting proprietary information of the sort contained in the Agreement is exactly the type of interest that justifies intervention under Rule 24(a) of the Federal Rules of Civil Procedure. *See Armour of America v. United States*, 70 Fed. Cl. 240, 243-44 (2006) ("The . . . confidential proprietary information that [movant] seeks to protect . . . constitute[s] a property interest of [movant]. Given that [movant] is a direct competitor of [predecessor-in-interest], [movant] stands to suffer significant harm . . . as a result of disclosures during discovery. Hence, the interest . . . is directly related to the extent of protection afforded by any protective order issued by the Court."); 7C Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1908, at 272 (2d ed. 1986) (citing *Diaz v. Southern Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970)) ("Interests in property are the most elementary type of right that Rule 24(a) is designed to protect.").

8. The information contained in the Agreement relates to the rate, capacity, penalties, charges for unused pipe capacity, receipt points, and other information that could be harmful to ETC if it were disclosed to its direct competitors. Even a slight change in contract terms and conditions can affect ETC's business relationships with its customers, as well as revenue and profitability. Gas gathering agreements with oil and gas operators and producers generally contain sensitive commercial information, including fees, fuels, recoveries, penalties for noncompliance, risk transfer provisions, and other commercial and negotiated contract terms that vary based on a multitude of factors and are highly customized for each customer and situation. The amount of money involved in these agreements is substantial, sometimes exceeding $50 million on an annual basis. Even slight changes on certain negotiated terms can result in substantial changes to the expenses/revenues of either company.

9. Absent intervention, ETC's ability to protect its confidential information would be significantly impaired. Once the sensitive commercial information reaches ETC's direct competitors, the harm will have occurred and will not be able to be undone. If this occurs, ETC will be unable to later challenge subsequent motions concerning the Agreement. Conversely, granting this Motion to Intervene will enable ETC to continue to protect its interests beyond the Motion.

### D. Absent Intervention, ETC's Interest in Protecting its Proprietary Information Would be Inadequately Represented by the Existing Parties in the Adversary Proceeding.

10. ETC's interest in protecting its proprietary information from dissemination to its direct competitors is unique to ETC. No existing party in the Adversary Proceeding is in a position to further ETC's interest. Carnero, as the Plaintiff, is the party requesting the proprietary information to share with its Business Representatives (Carnero's owners). Carnero and Carnero's owners are ETC's competitors. The Defendants, who are not parties to the Agreement, similarly

have no interest in protecting ETC's commercially sensitive information. The Defendants are not in competition with Carnero or Carner's owners. The Defendants stand in different shoes from ETC. Even though the Defendants have a duty to protect ETC's confidential information, ETC has an inherent interest in protecting its standing in the market. *See Appleton v. F.D.A.*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (distinguishing between the applicants' interest in protecting its trade secrets and confidential information and the plaintiff's interest in appropriately responding to litigant's request).

**E. ETC Has Standing to Intervene.**

11. The three components of standing are injury in fact, causation, and redressability. *Mims v. Steward Title Guar. Co.*, 590 F.3d 298, 302 (5th Cir. 2009). To establish injury in fact, the applicant must have more than a "generalized grievance." *LULAC*, 659 F.3d at 428. Here, ETC would be injured if it did not have an opportunity to respond to Carnero's Motion seeking to disclose ETC's proprietary information to ETC's direct competitors. There can be no doubt that if the Agreement reached the hands of Carnero and its direct competitors, ETC's business relationships with its customers, as well as its revenue and profitability, would be at risk. ETC's standing in the market would also be at risk of impairment.

12. To establish causation, the applicant need not establish proximate causation. Rather, it only must demonstrate that the injury would be "fairly traceable" to the defendant." *Id.* at 431. *See also Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Here, ETC's injury would be directly caused by the disclosure of the Agreement to Carnero and its owners.

13. Lastly, the redressability requirement is satisfied if it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *LULAC*, 659 F.3d at 431. The Court granting ETC's Motion to Intervene would enable ETC to respond and object to

Carnero's Motion. Carnero's Motion seeks authority to disclose the Agreement to its Business Representatives. ETC opposes such disclosure. In order to voice its opposition, ETC needs to be able to present its arguments to this Court. ETC would be unable to do so absent intervention.

14. Based on the foregoing, ETC believes that it has standing to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, and should be permitted to do so on a limited basis to oppose Carnero's Motion and to protect its interests.

## CONCLUSION

15. ETC believes it has established each of the elements of Rule 24(a) of the Federal Rules of Civil Procedure, as adopted by Bankruptcy Rule 7024, for intervention on a limited basis as a matter of right. In addition, ETC has established that it has Article III standing to intervene.

**WHEREFORE**, ETC respectfully requests that the Court enter an order (i) granting ETC the right to intervene for the limited purpose of objecting to Carnero's Motion and (ii) granting such other relief as may be just and proper.

Dated: September 12, 2022

Respectfully submitted,

*/s/ John Mitchell*

John E. Mitchell, SBN: 00797095
Yelena E. Archiyan, SBN: 24119035
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl St., Suite 1100
Dallas, TX 75201
Telephone: (214) 765-3600
Facsimile: (214) 765-3602
Email: john.mitchell@katten.com
yelena.archiyan@katten.com

**Counsel for ETC Texas Pipeline Ltd.**

**CERTIFICATE OF CONFERENCE**

I hereby certify that on September 12, 2022, the undersigned engaged with counsel for the Plaintiff and counsel for the Defendants in this Adversary Proceeding. Counsel for the Plaintiff, Mesquite Energy, Inc., SN EF Maverick, LLC, Mitsui & E&P Texas LP, and SN EF UnSub LP are unopposed to this Motion to Intervene. The remaining Defendants have not responded as of the time this Motion to Intervene was filed.

*/s/ Yelena Archiyan*
Yelena Archiyan

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2022, I caused a true and correct copy of the foregoing document to be served by the Court's Electronic Case Filing (ECF) System for the Unites States Bankruptcy Court for the Southern District of Texas.

*/s/ Yelena E. Archiyan*
Yelena E. Archiyan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| Debtors. | § | (Jointly Administered) |
| CARNERO G&P, LLC, | § | |
| Plaintiff, | § | Adversary No. 22-03035 |
| v. | § | |
| SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC., | § | |
| Defendants. | § | |

**ORDER GRANTING ETC TEXAS PIPELINE LTD.'S MOTION FOR LEAVE TO INTERVENE FOR LIMITED PURPOSE OF OBJECTING TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**
(Related Docket No. __)

Upon consideration of the *Motion for Leave to Intervene for Limited Purpose of Objecting to Carnero Business Representatives to Review Highly Confidential Material* [Docket No. __] (the

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

"Motion to Intervene")[2] filed ETC Texas Pipeline Ltd. ("ETC") pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, Rule 7024 of the Federal Rules of Bankruptcy Procedure, and all other applicable rules; after due deliberation and consideration; and for good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED, AND ADJUDGED:**[3]

a. ETC has satisfied the Rule 24(a) of the Federal Rules of Civil Procedure requirements to intervene as a matter of right.

b. ETC's Motion to Intervene is timely.

c. ETC has an interest in protecting the commercially sensitive information contained in the Agreement, and absent intervention, ETC would be unable to protect that interest, resulting in the potential for significant commercial harm.

d. Absent intervention, ETC's interest in protecting its commercially sensitive information would be inadequately represented by the existing parties in the Adversary Proceeding.

e. ETC has Article III standing to protect its commercially sensitive information in this Adversary Proceeding.

**IT IS HEREBY ORDERED:**

The Motion to intervene is GRANTED and ETC is authorized to intervene for the limited purpose of objecting to Carnero's Motion. ETC shall not be considered a party to this Adversary Proceeding for any other purpose.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion to Intervene.
[3] Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, made applicable to this Adversary Proceeding pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure.

SIGNED ON ____________, 2022

______________________________________
Honorable Marvin Isgur
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>Adversary No. 22-03035 |

**NON-PARTY ETC TEXAS PIPELINE LTD.'S OBJECTION TO CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL AND MOTION FOR PROTECTIVE ORDER**
(Related Docket Nos. 16, 41, 63)

**To the Honorable Marvin Isgur, United States Bankruptcy Judge**:

Non-party ETC Texas Pipeline Ltd. ("ETC"), by and through its undersigned counsel, files this Objection to Carnero G&P, LLC's ("Carnero") *Motion to Authorize Carnero Business Representatives to Review Highly Confidential Materials* (the "Motion") [Docket No. 63] and

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

hereby objects to such Motion and moves for a protective order pursuant to Bankruptcy Code § 107(b) and Bankruptcy Rules 7026[2] and 9018 of the Federal Rules of Bankruptcy Procedure (this "Objection"). In support of this Objection, ETC states as follows:

## PRELIMINARY STATEMENT[3]

What began as a lawsuit between Carnero and the Defendants (together, the "Parties") in this adversary proceeding (the "Adversary Proceeding") now threatens to become an unnecessary dissemination of ETC's proprietary information to ETC's direct competitors. ETC has been cooperative since the inception of this Adversary Proceeding and has not only executed and agreed to be bound by the Stipulated Protective Order (the "Protective Order"), which enabled Carnero's outside counsel to review the proprietary information, but also offered to work with Carnero in an effort to reach an alternative amicable resolution to Carnero's request for sharing the Agreement with Carnero's Business Representatives. ETC's outreach went unanswered by Carnero and thus, this Objection became necessary.

## BACKGROUND

1. At issue here is that certain Gathering & Processing Agreement, dated April 1, 2011 between Anadarko E&P Company LP ("Anadarko") and ETC and related amendments (the "Agreement"). Neither the Debtors nor Carnero is a party to the Agreement. Instead, the Debtors (following emergence from the Chapter 11 Cases, the Reorganized Debtors)/Defendants act as Anadarko's "agent" under the Agreement. While ETC is not a party to this Adversary Proceeding, nor did it make an appearance in the Debtors' Chapter 11 Cases (because any claims ETC had were against Anadarko, not the Debtors), ETC understands that Carnero's claims in this Adversary

[2] Incorporating Rule 26 of the Federal Rules of Civil Procedure.

[3] Capitalized terms used but not defined in this Objection shall have the meanings ascribed to such terms in the Motion.

Proceeding relate to an alleged breach of the Parties' Firm Gas Gathering, Processing, and Purchase Agreement dated April 1, 2018 (the "GGPA"), pursuant to which the Defendants dedicated certain assets to Carnero and agreed to deliver such assets to Carnero, "subject only to the Existing Commitments as they 'exist[ed] on the Effective Date of the GGPA for the 'then-current terms of such Existing Commitment.'" Plaintiff's Original Petition, ¶ 42 [Docket No. 1-4]. One of those Existing Commitments was to ETC pursuant to the Agreement.

2. Carnero alleges that post-confirmation, instead of rejecting the Existing Commitments as contemplated by the Parties, the Defendants entered into agreements that modified or extended the terms of the Existing Commitments in a manner that violated the GGPA.[4] *Id.* at ¶ 25. Notably, the Agreement was already provided (willingly) by ETC to Carnero's outside counsel pursuant to the Protective Order with *only* the pricing terms redacted. And presumably, all Carnero's outside counsel needs to do is confirm that the Agreement has not been modified or extended (it has not).

3. Carnero has not articulated what information contained in the Agreement would assist with its assessment of its claims against the Defendants under the GGPA such that full disclosure of the Agreement to Carnero and its two separate owners is necessary. In its Motion, Carnero claims that its business representatives, defined as three representatives from each of Carnero's 50% owners, TPL SouthTex Processing Company LP and Evolve Transition Infrastructure LP (collectively, the "Business Representatives"), Motion at ¶ 15, need access to the Agreement "to properly and fully assess the factual and legal basis for Carnero's claims and legal arguments." Motion at 2. No other basis for the production of ETC's Agreement was articulated

[4] Interestingly, while Carnero was able to negotiate a complex set of agreements that presumably modified or extended the Existing Commitments without having seen or reviewed the agreements that encompass the Existing Commitments, now that Carnero is in litigation, it claims it needs access to those agreements to investigate and support Carnero's factual assertions and legal argument with respect to the breach of those agreements. Motion at ¶ 12.

in the Motion. Nor has any been given separately by Carnero's counsel to ETC's counsel. There simply is no need, nor can one be articulated.

## LEGAL STANDARD

4. The Federal Rules of Civil Procedure generally provide that parties may obtain discovery "regarding any nonprivileged matter *that is relevant* to any party's claim or defense." Fed. R. Civ. P. 26(b)(1) (emphasis added). The party seeking discovery bears the burden of articulating the relevancy of a particular request. "[D]iscovery has limits and . . . these limits grow more formidable as the showing of need decreases." 8A Arthur R. Miller, Mary Kay Kane, Richard Marcus & Adam N. Steinman, *Federal Practice and Procedure* § 2036 (3d ed. 2013) (quoting *United Air Lines, Inc. v. United States*, 26 F.R.D. 213, 219 n.6 (D. Del. 1960)). The fact that the material at issue belongs to a non-party increases the showing required of the requesting party and is a factor weighing against disclosure. *See In re Fosamax Prods. Liability Litig.*, No. 06-MD-1789, 2009 WL 2395899, at *3 (S.D.N.Y. Aug. 4, 2009) ("In general, third parties are afforded more sympathy in weighing the burden of discovery because they have no personal stake in the litigation."); *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 72, 74 (S.D.N.Y. 2007) (court must weigh the probative value of the information sought against the burden imposed on non-parties); *BNSF Railway Co. v. Panhandle Northern Railroad LLC*, No. 4:16-cv-01061-O, 2018 WL 4076487, at *3 (N.D. Tex. Jan. 11, 2018) (noting that the value of non-party documents in a breach of contract action does not outweigh the harm to the non-parties).

5. In addition, where the material sought contains trade secrets or other highly confidential commercial information, a court must balance the requesting party's need for the material against the producing party's interest in protecting its proprietary information. *In re Subpoenas to Plains All Am. Pipeline, L.P.*, No. H-13-2975, 2014 WL 204447, at *4 (S.D. Tex.

Jan. 17, 2014). *See also Echostar Commc'ns Corp. v. News Corp.*, 180 F.R.D. 391, 394 (D. Colo. 1998) (holding that requesting party must establish that "disclosure of the trade secrets is both relevant and necessary" and refusing to require disclosure of trade secret information) (internal quotations omitted).

6. A court has wide discretion to decide what discovery restrictions may be appropriate in a particular case, *see* 8A Arthur R. Miller, Mary Kay Kane, Richard Marcus & Adam N. Steinman, *Federal Practice and Procedure* § 2036 (discussing discovery limitations and a district court's discretion), and the resisting party's privacy interests in the documents should be given due consideration. Rule 26(c) of the Federal Rules of Civil Procedure provides, for example, that a court may, for good cause, issue an order protecting a person from the impacts of discovery efforts. Fed. R. Civ. P. 26(c).

7. Furthermore, Bankruptcy Code § 107(b) states that, on request of a party in interest, "the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development or commercial information." 11 U.S.C. § 107(b)(1). Further, Rule 9018 of the Federal Rules of Bankruptcy Procedure states that "the court may make any order which justice requires . . . to protect . . . any entity in respect of a trade secret or other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018.

8. A court enjoys creative license when crafting this protection. A non-exclusive sampling of the types of orders permitted include (i) forbidding the disclosure of discovery altogether; (ii) forbidding inquiry into certain matters or limiting the scope of disclosure or discovery to certain matters; and (iii) requiring that a trade secret or other confidential commercial information not be revealed or be revealed only in a specified way. *See* Fed. R. Civ. P. 26(c)(1).

9. Lastly, where a party seeks to modify a protective order once it has been entered, a court is guided by four factors when assessing whether modification is appropriate, including "'(1) the nature of the protective order, (2) the foreseeability, at the time of issuance of the order, of the modification requested, (3) the parties' reliance on the order[,] and most significantly (4) whether good cause exists for the modification.'" *Oldendorff Carriers GmbH & Co., KG v. Grand China Shipping (Hong Kong) Co., Ltd.*, C.A. No. C-12-074, 2013 WL 1867604, at *2 (S.D. Tex. Apr. 22, 2013) (quoting *Murata Mfg. Co. v. Bel Fuse, Inc.*, 234 F.R.D. 175, 179 (N.D. Ill. 2006)). To the extent good cause was shown for the issuance of the original protective order, the burden is on the party seeking modification to show good cause for modification. *In re Enron Corp. Secs., Derivative & ERISA Litig.*, No. H-01-3624, 2009 WL 3247432, at *3 (S.D. Tex. Sept. 29, 2009).

**OBJECTION**

10. Carnero's Business Representatives should not be granted access to an agreement to which neither they nor Carnero nor the Defendants are a party, and the disclosure of which appears to be wholly irrelevant to Carnero's claims against the Defendants. Additionally, by seeking access to the Agreement, Carnero is seeking to expand the scope of the Protective Order, which was an agreed order signed by the Court and meant to guide the discovery process in this Adversary Proceeding. The Protective Order strikes an appropriate balance between protecting a non-party's interests, here ETC, in protecting its commercially sensitive information with the need for Carnero to advance its claims. To expand the scope of the Protective Order would grant Carnero and its Business Representatives an unfair competitive advantage vis-à-vis ETC for no valid reason.

11. *First*, as a threshold matter, Carnero has not articulated to this Court the relevance of the *specific terms* of the Agreement to Carnero's claims or defenses. *See* Fed. R. Civ. P.

26(b)(1). Absent this articulation, the inquiry should end and a protective order should issue. *See* 8A Arthur R. Miller, Mary Kay Kane, Richard Marcus & Adam N. Steinman, *Federal Practice and Procedure* § 2036 (limits on discovery grow more formidable as the requesting party's showing of need decreases; even very slight inconveniences may be unreasonable if there is an inadequate showing of need or articulation of relevance).

12. As Carnero itself states, its claims under the GGPA arise "from the post-confirmation, post-effective date amendments to the Existing Commitments." Motion at ¶ 3. Consequently, it follows that an Existing Commitment is relevant only to the extent it was amended, modified or extended post-confirmation. Whether or not an Existing Commitment was amended, modified or extended post-confirmation is easily ascertainable by Carnero's legal counsel. This determination does not require the expertise of Carnero's Business Representatives to review the Existing Commitments.

13. To be certain for this Court, the Agreement has not been amended, modified or extended following the Debtors' confirmation. The only relevance Carnero has attempted to articulate is Carnero's desire to have the Business Representatives (*i.e.* its owners) investigate and support Carnero's factual assertions and legal argument. *Id.* at ¶ 12. Carnero has made no attempt to articulate why it believes its request to share the entirety of the Agreement, including terms irrelevant to whether the Agreement was amended, modified or extended, justifies production of ETC's confidential information to ETC's direct competitors.

14. *Second*, the fact that the material at issue belongs to a non-party increases the showing required of the requesting party and is a factor weighing against disclosure. *In re Fosamax*, No. 06-MD-1789, 2009 WL 2395899, at *3 (non-parties are generally afforded more protections from discovery requests "because they have no personal stake in the litigation"); *In re*

*Biovail Corp. Sec. Litig.*, 247 F.R.D. at 74 ("the Court must weigh the probative value of the information against the burden of production on said non-parties"). As cannot be over emphasized, ETC is not a party to this Adversary Proceeding. As such, it has no stake in this lawsuit. It has no interest in its outcome. However, ETC does have a substantial business interest in preventing the disclosure of its business terms to its competitors. The disclosure of such business terms would work an unfair competitive advantage in favor of Carnero and its Business Representatives.

15. *Third*, the information at issue is the propriety and confidential commercial information of ETC, and therefore entitled to heightened protection. Factors courts consider when determining if commercial information should be protected as trade secrets include, for example, (i) the extent to which information is known outside the business; (ii) measures taken to guard secrecy of information; and (iii) the value of information to business and its competitors. *See N. Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999). Each of these factors counsels that ETC's information is to be protected.

16. The information at issue includes information related to the rate, capacity, penalties, charges for unused pipe capacity, receipt points, and other information that could be harmful to ETC if it were disclosed to its direct competitors. Even a slight change in contract terms and conditions can affect ETC's business relationships with its customers, as well as revenue and profitability. Gas gathering agreements with oil and gas operators and producers contain sensitive commercial information, including fees, fuels, recoveries, penalties for noncompliance, risk transfer provisions, and other commercial and negotiated contract terms that vary based on a multitude of factors and are highly customized for each customer and situation. The amount of money involved in these agreements is substantial, sometimes exceeding $50 million on an annual

basis. Even slight changes on certain negotiated terms can result in substantial changes to the expenses/revenues of either company.

17. As Carnero and its owners can appreciate, having negotiated the Protective Order, this information is highly confidential, and disclosure or misuse could damage ETC's competitive standing in the industry, as well as its customer relationships. The details of this information are not known outside of ETC, except for the counterparty to the Agreement, Anadarko. The value of the information to ETC is extraordinary, as would be its value to ETC's competitors, hence ETC's strong concern over production in this Adversary Proceeding to Carnero, outside of the protections afforded by the Protective Order. Accordingly, ETC's documents and information are entitled to the protections of trade secrets or confidential commercial information.

18. Because the Agreement contains protected trade secrets, the Court must balance Carnero's need for the information with ETC's interest in protecting its proprietary documents. *Echostar Comm. Corp.*, 180 F.R.D. at 394 (requesting party must establish "that disclosure of the trade secrets is both relevant and necessary") (citations omitted). Carnero cannot demonstrate a substantial need for the terms of the Agreement, which is of, at best, marginal relevancy to its action. *Grand River Enterprises Six Nations, Ltd. v. King*, No. 02 Civ 5068, 2009 WL 222160, at *5 (S.D.N.Y. Jan. 30, 2009) (refusing to compel discovery under such conditions). The potential harm to ETC from disclosure of the Agreement to Carnero's Business Representatives is real and substantial.

19. Carnero's owners are direct competitors of ETC. ETC expended significant time, money, and resources negotiating the Agreement with Anadarko. The negotiation of this Agreement and future such contracts should not be jeopardized through the production of ETC's confidential business dealings with another customer. If the Agreement is disclosed, Carnero and

its owners would be blessed with a windfall of new, usable, and valuable information they would not otherwise have at their disposal for the negotiation of future contracts with ETC's potential customers.

20. ETC respectfully requests that this Court deny Carnero's Motion based on a balancing of the alleged relevancy of the Agreement on Carneros' claims against the Defendants to the potential harm to ETC if the Agreement were disclosed to the Business Representatives. ETC further requests that the Court enter a protective order prohibiting the Defendants from producing the Agreement to Carnero outside the confines of the Protective Order. *See* Fed. R. Civ. P. 26(c)(1)(G) (expressly acknowledging that a court may issue a protective order requiring that a trade secret or other confidential commercial information not be revealed).

21. What began as a lawsuit between Carnero and the Defendants has led to the disclosure of the Agreement to Carnero's outside counsel pursuant to the Protective Order. ETC reluctantly agreed to that disclosure, subject to the understanding that the information would be available to a select group of parties. Now, Carnero, ostensibly at the request of the Business Representatives, comes before the Court asking for yet another level of disclosure, a step further removed from the Protective Order and unnecessary to the litigation.

22. In seeking an expansion of the Protective Order, Carnero is effectively attempting to modify an existing protective order. Modification of a protective order already in effect requires consideration of four factors. *Oldendorff Carriers*, No. C-12-074, 2013 WL 1867604, at *2. *First*, a court must assess the nature of the original protective order. The relevant inquiry is the protective order's scope and whether it was court imposed or stipulated to by the parties. Here, the Protective Order was stipulated to by the parties. Indeed, it is titled "Stipulated Protective Order" and was executed by the Reorganized Debtors and the Parties to the Adversary Proceeding. In addition,

any other person or entity may become bound by the Protective Order upon execution of Exhibit A attached thereto. *Oldendorff* cautions that "courts should be more hesitant to modify narrowly defined orders that pertain to 'a specific type of identified information,' as opposed to blanket confidentiality orders." *Oldendorff*, No. C-12-074, 2013 WL 1867604, at *3 (citing *Murata*, 234 F.R.D. at 179). Here, the Protective Order governs the disclosure and exchange of information produced in connection with a Dispute, in response to or in connection with any discovery requests. The term "Dispute" is defined as the Debtors' Chapter 11 Cases and two adversary proceedings, including this Adversary Proceeding. While it may seem that the Protective Order's scope is broad, it is broad only as to the litigating parties. Non-parties, including ETC, are not bound by the Protective Order at all, absent them signing on voluntarily. Here, ETC did sign on to the Protective Order based on the belief and with the understanding that the Agreement would be disclosed only to Carnero's outside counsel. Had there been any indication that Carnero would subsequently seek to push the boundaries even further and disclose the Agreement to ETC's competitors, using the Protective Order as the mechanism for doing so, ETC would have refused to execute the Protective Order. By executing it, it agreed to share the Agreement with Carneros' outside counsel only.

23. *Second*, a court must consider whether the need for modification of the original order was foreseeable at the time the parties negotiated it. *Oldendorff*, No. C-12-074, 2013 WL 1867604, at *3 (citing *Murata*, 234 F.R.D. at 180). Paragraph 30 of the Protective Order states that a Party may move to amend the Protective Order *upon good cause* shown. As explained throughout this Objection, Carnero has not shown good cause to expand or modify the Protective Order. ETC could not have reasonably foreseen that its reluctant cooperation with the Protective

Order by consenting to the disclosure of the Agreement to Carnero's outside counsel would lead to further requests for disclosure to ETC's direct competitors.

24. *Third*, the court must evaluate whether the parties relied on the original protective order. *Oldendorff*, No. C-12-074, 2013 WL 1867604, at *3 (citing *Murata*, 234 F.R.D. at 180). "It is presumptively unfair . . . to modify protective orders which assure confidentiality and upon which the parties have reasonably relied." *Id.* (quoting *AT&T Corp. v. Spring Corp.*, 407 F.3d 560, 562 (2d Cir. 2005)) (internal citations and quotations omitted). ETC most certainly relied on the Protective Order when it signed it, believing that disclosure of the Agreement to Carnero's outside counsel would be the extent of the Agreement's disclosure. ETC did not expect that Carnero would next request to share the Agreement with ETC's competitors.

25. *Fourth*, the court must evaluate whether good cause for modification exists. "[T]he court must weigh [the] need for modification against [the] need for protection, and ought to factor in the availability of alternatives to better achieve both . . . goals." *Oldendorff*, No. C-12-074, 2013 WL 1867604, at *3 (citing *Murata*, 234 F.R.D. at 180) (alternations and omissions in original) (internal citations and quotations omitted). In *Oldendorff*, the court found that the need for modification was apparent because the documents did "not appear to contain confidential information." *Id*. at *4. This is not the case here. As discussed throughout this Objection, the Agreement contains important commercially sensitive information, which, if disclosed, would cause commercial injury to ETC. The injury greatly outweighs any benefit of disclosure in light of the fact that the Agreement has not been modified, extended, or amended.

26. Lastly, in an effort to resolve this issue and save the Court's time, ETC offered to discuss with Carnero an alternative resolution to the disclosure of the entire Agreement. That offer went ignored.

27. Carnero has not shown that the Agreement's specific terms are relevant to its lawsuit, and absent such showing, the Agreement should not be produced. In any event, the relevance is at most nominal and is outweighed by ETC's strong interest in maintaining the confidentiality of its commercially sensitive information. The Court enjoys broad discretion to restrict discovery, as justice requires, to prevent abuse of the discovery rules. ETC asks the Court to exercise that discretion here.

## CONCLUSION

For these reasons, ETC respectfully requests that the Court grant ETC's request for a protective order prohibiting the disclosure of the Agreement to Carnero.

Dated: September 12, 2022

Respectfully submitted,

*/s/ John Mitchell*

John E. Mitchell, SBN: 00797095
Yelena E. Archiyan, SBN: 24119035
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl St., Suite 1100
Dallas, TX 75201
Telephone: (214) 765-3600
Facsimile: (214) 765-3602
Email: john.mitchell@katten.com
yelena.archiyan@katten.com

**Counsel for ETC Texas Pipeline Ltd.**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ENTERPRISE PRODUCTS OPERATING LLC'S UNOPPOSED MOTION FOR LEAVE TO INTERVENE FOR THE LIMITED PURPOSE OF OPPOSING CARNERO G&P, LLC'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW HIGHLY CONFIDENTIAL MATERIAL**

(Relates to Dkt. Nos. 63 & 70)

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

**THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED ANGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE THERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**[2]

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Pursuant to Federal Rule of Civil Procedure 24, non-party Enterprise Products Operating LLC's ("Enterprise") files this motion for leave to intervene for the limited purpose of opposing Carnero G&P, LLC's ("Carnero") Motion to Authorize Carnero Business Representatives to View Highly Confidential Material[3] (hereafter "Motion"). In support of this motion, Enterprise would respectfully show the Court as follows:

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Carnero has asked this Court to amend the agreed protective order in this case to allow no fewer than six of its business representatives access to Enterprise Products Operating LLC's ("Enterprise") confidential information, even though Enterprise and Carnero are direct competitors and Enterprise is also a direct competitor of TPL SouthTex Processing Company LP ("Targa"), Carnero's parent company.

Among the materials that Carnero would like to place in the hands of its business representatives is the Y-Grade Purchase and Sales Agreement between Enterprise Products Operating LLC and SN EF Maverick, LLC, effective as of December 21, 2021, which has been marked as Highly Confidential Material under the Agreed Protective Order. The terms and

[2] Enterprise respectfully requests that the Court set this matter for hearing along with the motions for limited intervention filed by Western Midstream Partners and its subsidiaries (collectively "WES") (ECF#71) and ETC Texas Pipeline Ltd. ("ETC") (ECF#74).
[3] ECF#63.

structure of the Y-Grade Purchase and Sales Agreement are of immense commercial value to Enterprise's competitors. In fact, as shown in Enterprise's response to Carnero's Motion,[4] the Y-Grade Purchase and Sales Agreement is one of the most sensitive documents pertaining to Enterprise's business.

Accordingly, should such be necessary, Enterprise respectfully requests leave to intervene in this adversary proceeding for the limited purpose of opposing Carnero's motion and protecting its highly confidential trade secrets from disclosure to the commercial representatives of its direct competitors.

## II.
## ARGUMENT AND AUTHORITIES

### A. Legal Standards for Intervention Pursuant to Rule 24(a).

The legal standards for intervention have been thoroughly and ably briefed by both the WES Parties[5] and ETC,[6] and Enterprise will not burden the Court with further repetitive briefing on general requirements for intervention.

### B. Enterprise Has Standing to Intervene.

Enterprise would be injured by disclosure if its highly confidential information to business representatives of its competitors, Enterprise's injury would be directly caused by the relief that Carnero seeks in its Motion, and Enterprise's potential injury can be prevented by the Court denying Carnero's Motion. Accordingly, Enterprise has Article III standing to intervene.

### C. Enterprise Meets the Four-Part Test for Intervention in Rule 24(a).

Enterprise's motion is timely, Enterprise has an interest in protecting its highly confidential business information that is the subject of Carnero's Motion, the disposition of Carnero's Motion

[4] ECF#70.
[5] ECF#71.
[6] ECF#74.

would impair or impede Enterprise's ability to protect its highly confidential information from disclosure to direct competitors, and the other parties to this action simply do not share Enterprise's interest in protecting its confidential, competitive information. Accordingly, Enterprise meets all of the requirements of Rule 24(a)(2).

**D. Alternatively, Enterprise Satisfies the Test for Permissive Intervention Under Rule 24(b).**

Alternatively, Enterprise satisfies the requirements for permissive intervention under Federal Rule of Civil Procedure 24(b). Permissive intervention is available "when (1) [a] timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 n.2 (5th Cir. 1989). In determining the appropriateness of permissive intervention, the Fifth Circuit has instructed courts to also assess whether "the intervenors are adequately represented by other parties and whether they are likely to contribute significantly to the development of the underlying factual issues." *Id.* at 189. Here, Enterprise's motion is timely, Enterprise's ability to protect its confidential information raises a common issue in this litigation, and Enterprise's intervention will not unduly delay or prejudice the parties. Moreover, as indicated above, Enterprise's interests are not adequately represented by other parties to this litigation, and Enterprise is uniquely qualified to address issues concerning its confidential information with the Court. Accordingly, Enterprise also satisfies all of the requirements for permissive intervention pursuant to Rule 24(b).

## III.
## CONCLUSION AND PRAYER

For the foregoing reasons, Enterprise respectfully requests that the Court grant Enterprise leave to intervene for the limited purpose of opposing Carnero's Motion.

Respectfully submitted,

Hicks Thomas LLP

*/s/ Paul L. Mitchell*

Paul L. Mitchell
State Bar No. 14217920
SDTX No. 7495
pmitchell@hicks-thomas.com
Justin R. Braga
Texas Bar No. 24127228
SDTX No. 3710609
jbraga@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: 713.547.9100
Fax: 713.547.9150

ATTORNEYS FOR NON-PARTY
ENTERPRISE PRODUCTS OPERATING LLC

## CERTIFICATE OF CONFERENCE

I certify that on September 12, 2022, I conferred with Amy C. Falcon, counsel for Carnero, regarding the relief requested in this motion and was advised that this motion is UNOPPOSED.

*/s/ Paul L. Mitchell*
Paul L. Mitchell

**CERTIFICATE OF SERVICE**

I certify that on September 13, 2022, a true and correct copy of Enterprise Products Partners LLC's Unopposed Motion for Leave to Intervene for the Limited Purpose of Opposing Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material was served using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Paul L. Mitchell*
Paul L. Mitchell

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |

| | | |
|---|---|---|
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ORDER GRANTING ENTERPRISE PRODUCTS**
**<u>OPERATING LLC'S MOTION FOR LIMITED INTERVENTION</u>**

Came on for consideration the Unopposed Motion for Leave to Intervene filed by Enterprise Products Operating LLC ("Enterprise"). The Court has considered the motion and concludes that Enterprise has shown that it has Article III standing to intervene and that the requirements of Federal Rule of Civil Procedure 24(a) have been satisfied. Accordingly,

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

Enterprise's motion is hereby GRANTED and Enterprise is permitted to intervene for the limited purpose of asserting its right to protect its confidential information.

**Signed: ______________________________**, 2022.

______________________________
**Marvin Isgur**
**United States Bankruptcy Judge**

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| SN EF Maverick, LLC, and Mesquite | § | |
| Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

# Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to Defendants' Motion for Judgment on the Pleadings Under Seal and (II) Granting Related Relief

[Relates to Dkt. No. 78]

**Emergency relief has been requested. Relief is requested not later than 5:00 p.m. (CT) on September 16, 2022.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") states as follows in support of this motion (this "Motion"):

## Emergency Relief Requested

1. Carnero seeks entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing Carnero to file its *Objection to Defendants' Motion for Judgment on the Pleadings* **(**"Objection") under seal; and (b) granting related relief.

2. Carnero requests emergency consideration of this Motion to preserve the confidentiality of the information contained in the Objection.

## Jurisdiction And Venue

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Local Rule 9037-1, and the Court's *Protective Order* (Doc. No. 42).

## Background

5. On August 24, 2022 Defendants filed a Motion for Judgment on the Pleadings [Dkt. 67] attaching numerous exhibits [Dkt. 67-2 through 67-13] that Defendants both stamped Highly Confidential under the April 29, 2022 Protective Order [Dkt. 16] and redacted (the "Redacted Exhibits"). In accordance with the Protective Order, Defendants filed the Redacted Exhibits under seal.

6. In its Objection, Carnero cites and quotes certain portions of those Redacted Exhibits to support its arguments. To maintain confidentiality of the Redacted Exhibits, Carnero seeks authority to file the Objection Removal of Redactions under seal.

**Basis for Relief**

7. The Bankruptcy Code provides strong support for sealing the Objection. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect parties from potential harm that may result from the disclosure of certain confidential information. *See* 11 U.S.C. § 107(b) ("On request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information" or "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title"); *see In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) ("The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."). Although section 107(b) of the Bankruptcy Code is an exception to the general rule, its application in a bankruptcy proceeding is appropriate. *See In re 50-Off Stores, Inc.*, 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) ("[T]he very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world.").

8. Further, Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code. Specifically, Bankruptcy Rule 9018 provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information," or "to protect an entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." FED. R. BANKR. P. 9018. Additionally, the Sealing Order, which governs the filing of sealed documents, provides, in relevant part, that "[c]oncurrently with the filing of a sealed document, a motion to seal must be filed electronically," and "[a]fter reviewing the motion to seal, the Court may order appropriate relief." Sealing Order, ¶ 2(d).

9. Carnero also submits that the Objection may involve commercial information that may be protected by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett* (*In re Faucett)*, 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors.'" (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). Rather, section 107(b) of the Bankruptcy Code is "designed to protect business

entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Id.* (quoting *In re Glob. Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003)).

10. Here, the Objection references and quotes information that may be commercially sensitive information regarding the terms the Redacted Exhibits. Thus, under section 107(b) of the Bankruptcy Code, sealing the Objection is appropriate. Specifically, the Objection contains detailed contractual information stamped Highly Confidential under the Protective Order and that is not typically disclosed to the public or to competitors. Accordingly, the Objection has been filed under seal.

11. In light of the foregoing, Carnero respectfully requests that the Court enter an order authorizing the Objection to be filed under seal.

**Notice**

12. Notice of this Motion shall be given to any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, Carnero submits that no other or further notice need be provided.

WHEREFORE, Carnero respectfully requests that the Court (i) enter the Proposed Order substantially in the form attached hereto and (ii) grant Carnero such other and further relief as is just, proper, and equitable.

Dated: September 14, 2022

Respectfully submitted,

**PORTER HEDGES LLP**

By: *<u>/s/ Joshua W. Wolfshohl</u>*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on September 14, 2022, a true and complete copy of the foregoing was duly served to all registered ECF users appearing in the case.

*<u>/s/ Joshua W. Wolfshohl</u>*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to Defendants' Motion for Judgment on the Pleadings Under Seal and (II) Granting Related Relief**

[Relates to Dkt. No. 78]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Objection to Defendants' Motion for Judgment on the Pleadings* (the "Objection") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Objection, and having heard the statements of counsel regarding the relief requested

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Objection under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Objection is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___________________, 2022.
Houston, Texas

____________________________________
HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 22-03035 |

**THE WES PARTIES'**
**WITNESS AND EXHIBIT LIST FOR SEPTEMBER 19, 2022 HEARING**

Western Midstream Partners, LP ("**WES**") and its subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**," and collectively with WES and WGR, the "**WES Parties**"), file this Witness and Exhibit List for the hearing to be held on September 19, 2022, at 10:00 a.m. (prevailing Central Time) (the "**Hearing**").

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

## WITNESSES

The WES Parties may call any of the following witnesses at the Hearing:

1. Craig W. Collins, Vice President and Co-Chief Officer of Western Midstream Partners, LP (via declaration or live testimony);
2. Any witness called or listed by any other party in interest;
3. Any witness necessary to lay the foundation for the admission of exhibits; and
4. Any rebuttal and/or impeachment witnesses as necessary.

## EXHIBITS

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER HEARING |
|---|---|---|---|---|---|---|---|
| 1. | *Declaration of Craig W. Collins in Support of the WES Parties' Objection to Carnero G&P's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* [Docket No. 73] | | | | | | |
| 2. | Any document or pleading filed with the Court in the above-captioned cases. | | | | | | |
| 3. | Any exhibit necessary for impeachment and/or rebuttal purposes. | | | | | | |
| 4. | Any exhibit identified or offered by any other party. | | | | | | |

## RESERVATION OF RIGHTS

The WES Parties reserve the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserve the right to supplement or otherwise edit this Witness and Exhibit List prior to the hearing.

Respectfully submitted this 15th day of September, 2022.

**GRAY REED**

By: */s/ Lydia R. Webb*
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

**COUNSEL FOR THE WES PARTIES**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 15th day of September, 2022, she caused the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice.

*/s/ Lydia R. Webb*
Lydia R. Webb

EXHIBIT
1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | § | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | § | Adversary No. 22-03035 |

**DECLARATION OF CRAIG W. COLLINS IN SUPPORT OF THE WES PARTIES' OBJECTION TO CARNERO G&P'S MOTION TO AUTHORIZE CARNERO BUSINESS REPRESENTATIVES TO REVIEW <u>HIGHLY CONFIDENTIAL MATERIAL</u>**

I, Craig W. Collins, declare as follows pursuant to 28 U.S.C. § 1746:

1. I am Senior Vice President and Co-Chief Operating Officer of Western Midstream Partners, LP ("**WES**"). I also hold the titles of Senior Vice President and Co-Chief Operating Officer for WES subsidiaries WGR Operating, LP ("**WGR**") and Springfield Pipeline LLC ("**Springfield**"). I am over twenty-one years of age, of sound mind, and have never been convicted

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

of a crime involving a dishonest act or false statement. This declaration is based on my personal knowledge and my review of the records of WES, WGR, and Springfield (collectively, WES, Springfield, and WGR are the "**WES Parties**") and all facts stated in this declaration are true and correct to the best of my knowledge.

2. I submit this declaration in support of the WES Parties' Objection (the "**Objection**") to *Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* [Docket No. 63] (the "**Motion**"). I am authorized to submit this declaration on behalf of the WES Parties.

**WES's Assets and Commitments in South Texas**

3. WES is a publicly traded midstream service provider with assets located across some of the most active and productive basins in the United States. The WES Parties are engaged in the business of gathering, compressing, treating, processing and transporting natural gas; gathering, stabilizing and transporting condensate, natural gas liquids (NGLs) and crude oil; and gathering and disposing of produced water for their customers.

4. The WES Parties own and operate two assets in the Eagle Ford Shale in South Texas: the Brasada gas processing complex located in La Salle County, Texas ("**Brasada**") and the Springfield oil and gas gathering system located in Webb, Dimmit and La Salle Counties, Texas (the "**Springfield Gathering System**").

5. Through a number of agreements, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**"), SN EF Maverick, LLC ("**Maverick**"), Mitsui E&P LP, Javelin EF L.P, f./k/a Venado EF L.P., Eagle Ford TX LP, and SN EF UnSub LP (collectively, with Mesquite and Maverick the "**Producer Group**") have each dedicated their production from the Comanche Field

in South Texas to (i) Brasada through at least June 30, 2033 and (ii) the Springfield Gathering System through at least December 31, 2034.[2]

6. On February 27, 2012, WGR, as processor, and Anadarko E&P Onshore LLC ("**Anadarko**"), as supplier, entered into that certain Gas Processing Agreement, which agreement was subsequently amended four times (the Gas Processing Agreement together with all amendments is referred to herein as the "**Brasada Agreement**"). When Mesquite acquired the Comanche Field acreage from Anadarko in 2017, WGR did not consent to the assignment of the Brasada Agreement. As a result, Maverick and Anadarko entered into an agency agreement whereby Maverick acts as Anadarko's agent for purposes of performing under the Brasada Agreement.

7. On June 1, 2017, Springfield, as gatherer, and Mesquite, as shipper, entered into: (i) a Second Amended and Restated Lease Dedication and Oil Gathering Agreement (the "**Springfield OGA**"),[3] and (ii) a Second Amended and Restated Lease Dedication and Gas Gathering Agreement (the "**Springfield GGA**" and together with Springfield OGA, the "**Springfield Agreements**").[4]

8. During the course of the chapter 11 cases, extensive litigation ensued among the WES Parties, Mesquite and certain other parties in connection with the rejection of multiple midstream agreements, including the Springfield Agreements. Eventually, on December 17, 2021,

[2] Mesquite, via its subsidiary Mesquite Comanche Holdings, LLC ("**MCom**"), acquired the acreage previously owned by Gavilan Resources LLC ("**Gavilan**") out of Gavilan's chapter 11 cases, which is also subject to the same dedications and commitments to the WES Parties.
[3] The other members of the Producer Group and MCom are either bound by (i) the Springfield OGA or (ii) substantially similar oil gathering agreements.
[4] The other members of the Producer Group and MCom are either bound by (i) the Springfield GGA or (ii) substantially similar gas gathering agreements.

Mesquite, Maverick, and the WES Parties, among others, entered into that certain Master Settlement Agreement that resolved those disputes.

9. On the same day, as part of the settlement, Springfield and Mesquite entered into amendments to the Springfield Agreements (the "**Springfield Amendments**") and WGR, Anadarko and Maverick entered into a fifth amendment to the Brasada Agreement (the "**Brasada Amendment**").

10. Also on the same day, as part of the settlement, Springfield and Maverick entered into that certain Firm Intrastate Transportation Service Agreement (the "**Residue Gas Agreement**"). The Residue Gas Agreement governs the transportation of residue gas from Brasada back to Springfield to fuel the compressors on the Springfield Gathering System.

11. The Springfield Agreements, the Brasada Agreement, the Springfield Amendments, the Brasada Amendment and the Residue Gas Agreement are collectively referred to herein as the "**WES Contracts**."

**Carnero, Targa and Evolve Directly Compete with the WES Parties**

12. Upon information and belief, Carnero G&P, LLC ("**Carnero**" or the "**Carnero JV**") is a joint venture owned 50% by a subsidiary of Targa Resources Corp. ("**Targa**") and 50% by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**Evolve**").

13. Carnero, Targa and Evolve own and operate their own gathering and processing facilities in the same geographic area of South Texas as the Springfield Gathering System and Brasada:

a. Carnero owns and operates the Raptor gas processing plant in La Salle County, Texas – the same county where Brasada is located and situated adjacent to Brasada. Carnero also operates a natural gas gathering pipeline that is generally between the Springfield Gathering System and Brasada.

b. In addition to its interest in the Carnero JV, Targa independently operates its own natural gas pipelines throughout South Texas and across the same three-

county area as the Springfield Gathering System. Targa also owns and operates two gas processing plants – Silver Oak I and Silver Oak II – both of which are located in Bee County, Texas and are connected to natural gas pipelines originating in the general vicinity of the Springfield Gathering System.

c. In addition to its interest in the Carnero JV, Evolve operates an oil and gas gathering system servicing Mesquite's Catarina acreage located in Dimmit and Webb Counties, Texas.

14. Carnero, Targa and Evolve directly compete with the WES Parties for the gathering and processing of hydrocarbons produced in the Eagle Ford Shale located in South Texas.

15. Indeed, Carnero already has a proven track record of competing with the WES Parties for the opportunity to provide midstream services for the same hydrocarbons, as evidenced by, among other things, the "top lease" Carnero executed with the Producer Group for natural gas produced from the Comanche Field that is currently dedicated to the WES Parties.

16. In addition, as a major midstream service provider, Targa competes with other WES-owned and operated assets to provide gathering and processing services in other major basins like the Delaware Basin located in West Texas. Just recently, Targa acquired Lucid Energy, with midstream assets adjacent to WES along the Texas and New Mexico border, and which directly competes with WES in the most prolific oil and gas producing basin in the United States.

**The WES Parties Would Suffer the Risk of Competitive Injury if the WES Contracts Were Disclosed to the Business Representatives**

17. I am informed that by the Motion, Carnero seeks authority to disclose the WES Contracts, among other things, to six commercial representatives from Targa and Evolve (the "**Business Representatives**").

18. The WES Contracts are highly structured contracts that contain material, nonpublic proprietary and confidential business information that includes, but is not limited to (i) pricing, (ii) term and termination rights, (iii) dedication and related information, (iv) construction terms, (v) the timing and nature of investing and deploying capital, (vi) receipt and delivery points for

hydrocarbons, as well as the physical capabilities and limitations of the WES Parties' facilities, (vii) quality specifications, (viii) volume and capacity requirements, (ix) loss provisions, (x) volume allocations and financial settlement calculations, and (xi) commercial, financial, physical, and liability risk allocations.

19. The WES Contracts also contain confidentiality provisions that limit their disclosure to non-parties. Pursuant to these confidentiality provisions, the disclosing party must obtain the non-disclosing party's consent to disclosure in situations not explicitly set forth in the confidentiality provision.

20. In the industry, midstream agreements are closely guarded, complex documents. While midstream agreements may contain certain common features and provisions, how those provisions work together to form the relationship between the midstream company and producer is unique. For example, while all gathering agreements contain provisions for the loss of hydrocarbons in connection with the operation of the applicable gathering system, how those losses are allocated can vary widely. Are losses actual or fixed? Are losses subject to a cap or unlimited? While these are not rate or pricing provisions, the allocation of losses impacts the customer relationship and is an important component in the negotiation of a midstream agreement. Disclosure of that information to third parties could, and would, place the midstream provider (here, the WES Parties) at a competitive disadvantage.[5]

21. The WES Contracts define the relationship between the WES Parties and the Producer Group. How the myriad toggles and switches that could be flipped in any midstream agreement come together in the WES Contracts paints a picture of how the WES Parties uniquely serve the Producer Group and how the parties collectively chose to allocate the risks and costs of

[5] Such disadvantage would carry across all markets where the WES Parties compete with Carnero, Targa or Evolve, not just the South Texas region.

operating the Springfield Gathering System and Brasada amongst them. Indeed, even the structure of the WES Contracts themselves is bespoke and confidential.

22. The WES Parties relied on the language of the Stipulated Protective Order [Docket No. 16] in consenting to the disclosure of the WES Contracts in connection with the Producer Group's Motion for Judgment on the Pleadings [Docket No. 19], specifically that (i) the WES Contracts would only be disclosed to Carnero's outside counsel and (ii) commercial representatives at Carnero, Targa and Evolve would not be given access to the WES Contracts.

23. If the WES Contracts were disclosed to the Business Representatives, the WES Parties would suffer the risk of significant competitive injury. Although the WES Contracts Carnero seeks to disclose to the Business Representatives have been redacted to remove pricing information, the remaining unredacted portions of the WES Contracts contain highly sensitive terms, as described above. This confidential information reflects, among other things, the WES Parties' allocation of risks and costs in the operation of their midstream assets.

24. Allowing the Business Representatives—individuals whose work likely entails formulating bids and contracts with producers in a manner competitive to WES—to see how the WES Parties structure their midstream agreements gives Carnero, Targa and Evolve a profoundly unfair and improper advantage over the WES Parties when it comes to competing for new volumes, both in South Texas and other areas where they compete.

25. The Eagle Ford Shale in South Texas is an active, growing energy market, albeit with only a limited number of established producers and midstream providers. Oil and gas producers are currently investing capital in drilling wells in South Texas, resulting in an increase in anticipated production from the area where the WES Parties' facilities—and the facilities owned by Carnero, Targa and Evolve—are located. Those same producers may be actively seeking

gathering and/or processing services for that production. The WES Parties, Carnero, Targa and Evolve would be competing to provide such gathering and/or processing services, as well as retaining their existing customer relationships.

26. Hydrocarbons are a finite commodity. Over time, reserves decline and there are less and less hydrocarbons that can be economically produced. As a result, it is critical to any midstream company's business model to obtain long-term customer commitments to try to ensure the midstream company earns a return on the capital it invests in its facilities.

27. As described above, midstream companies do not just compete on price when it comes to negotiating gathering and processing services. If the Business Representatives were allowed to review the WES Contracts, Carnero, Targa, and Evolve would essentially have the WES Parties' playbook when it comes to structuring their midstream agreements and would use that information to try to undercut the WES Parties for available volumes, both in South Texas and in other areas where they compete. And if Carnero, Targa, and Evolve were to use that unfair advantage to secure new, long-term acreage dedications from producers, there very well may not be any additional volumes for the WES Parties to compete for upon the expiration of those agreements.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on September 12, 2022.

/s/ *Craig W. Collins*
Craig W. Collins

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>Adversary No. 22-03035 |

**WITNESS AND EXHIBIT LIST**
**<u>FOR HEARING SCHEDULED FOR SEPTEMBER 19, 2022</u>**

Non-party ETC Texas Pipeline Ltd. ("<u>ETC</u>"), by and through its undersigned counsel, hereby submits its Witness and Exhibit List identifying those individuals who may be called as witnesses and exhibits that may be introduced at the hearing scheduled for **September 19, 2022 at 10:00 a.m.** (prevailing Central Time) (the "<u>Hearing</u>").

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

## WITNESSES

ETC designates the following individuals who may be called as witnesses at the Hearing:

1) Todd McEuen, Vice President of Commercial Operations for Energy Transfer LP;

2) Any witness called or listed by any other party;

3) Any witness necessary to lay the foundation for the admission of exhibits; and

4) Any witness necessary for rebuttal or impeachment.

## EXHIBITS

ETC may offer into evidence any one or more of the following exhibits:

| EXHIBIT | DESCRIPTION | MARKED | OFFERED | OBJECTION | ADMITTED | WITHDRAWN | DISPOSITION AFTER HEARING |
|---|---|---|---|---|---|---|---|
| 1. | Any document or pleading filed in the above-captioned cases | | | | | | |
| 2. | Any exhibit necessary for impeachment and/or rebuttal purposes | | | | | | |
| 3. | Any exhibit identified or offered by any other party | | | | | | |
| 4. | Any demonstrative used for argument or to highlight exhibits set forth above | | | | | | |

## RESERVATION OF RIGHTS

ETC reserves the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above.

ETC further reserves the right to supplement or amend this Witness and Exhibit List at any time prior to or at the Hearing to add witnesses and/or exhibits as necessary.

Dated: September 15, 2022

Respectfully submitted,

*/s/ John Mitchell*

John E. Mitchell, SBN: 00797095
Yelena E. Archiyan, SBN: 24119035
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl St., Suite 1100
Dallas, TX 75201
Telephone: (214) 765-3600
Facsimile: (214) 765-3602
Email: john.mitchell@katten.com
yelena.archiyan@katten.com

**Counsel for ETC Texas Pipeline Ltd.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2022, I caused a true and correct copy of the foregoing document to be served by the Court's Electronic Case Filing (ECF) System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Yelena E. Archiyan*
Yelena E. Archiyan

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |

| | | |
|---|---|---|
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ENTERPRISE PRODUCTS OPERATING LLC'S WITNESS**
**AND EXHIBIT LIST FOR THE SEPTEMBER 19, 2022 HEARING**

Enterprise Products Operating LLC ("Enterprise") files this Witness and Exhibit List for the hearing to be held on September 19, 2022, at 10:00 a.m. (CDT) before the Honorable Marvin Isgur at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Avenue, Houston, Texas 77002 (the "Hearing").

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

## WITNESSES

1. Zachary Strait, Vice President, Unregulated NGL Commercial, Enterprise Products Operating LLC (via affidavit or live testimony);

2. Any witness called or listed by any other party in interest;

3. Any witness necessary to lay the foundation for the admission of exhibits; and

4. Any rebuttal and/or impeachment witnesses as necessary.

## EXHIBITS

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER HEARING |
|---|---|---|---|---|---|---|---|
| 1 | Affidavit of Zachary Strait filed as Exhibit 1 to ECF#70, Enterprise's response in opposition to Carnero G&P, LLC's ("Carnero") motion to authorize Carnero business representatives to review highly confidential material (ECF#63) | | | | | | |
| 2 | August 9, 2022 letter from Paul L. Mitchell to counsel for Carnero G&P, LLC objecting to the disclosure of the redacted Y-Grade Purchase and Sales Agreement dated December 21, 2021, to any business representatives of Carnero G&P, LLC | | | | | | |
| 3 | Any document or pleading filed with the Court in the above-captioned cases. | | | | | | |
| 4 | Any exhibit necessary for impeachment and/or rebuttal purposes. | | | | | | |
| 5 | Any exhibit identified or offered by any other party. | | | | | | |

Enterprise reserves the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserves the right to supplement or otherwise edit this Witness and Exhibit List prior to or during the hearing.

Respectfully submitted,

HICKS THOMAS LLP

*/s/ Paul L. Mitchell*
Paul L. Mitchell
State Bar No. 14217920
SDTX No. 7495
pmitchell@hicks-thomas.com
Justin R. Braga
Texas Bar No. 24127228
SDTX No. 3710609
jbraga@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: 713.547.9100
Fax: 713.547.9150

ATTORNEYS FOR NON-PARTY ENTERPRISE PRODUCTS OPERATING LLC

**CERTIFICATE OF SERVICE**

I certify that on September 15, 2022, a true and correct copy of Enterprise Products Operating LLC's Witness and Exhibit List was served using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Paul L. Mitchell*
Paul L. Mitchell

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et. al.*, | § | |
| | § | Chapter 11 |
| | § | Case No. 19-34508 |
| *Reorganized Debtors.* | § | (Jointly Administered) |
| | § | |
| | § | |
| CARNERO G&P, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF MAVERICK, LLC, *et. al.*, | § | Adversary No. 22-03035 |
| | § | |
| *Defendants.* | § | |
| | § | |

**AFFIDAVIT OF ZACHARY STRAIT**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned notary, personally appeared Zachary Strait, the affiant, whose identity is known to me and, after being duly sworn, stated as follows:

1. "My name is Zachary Strait. I am over 18 years of age, of sound mind, and am otherwise fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and those facts are true and correct.

2. I am Vice President, Unregulated NGL Commercial at Enterprise Products Operating LLC ("Enterprise"). In that role I am responsible for negotiating and overseeing the negotiation of natural gas liquids ("NGL") purchase and sales agreements.

3. I am familiar with Carnero G&P, LLC ("Carnero"). Carnero is a joint venture of Targa Resources Corp. or one of its affiliates ("Targa") and Evolve Transition Infrastructure LP. Carnero is owned 50% by Targa and is operated by Targa.

4. Carnero is a direct competitor of Enterprise in the Eagle Ford shale. Carnero, like Enterprise and in competition with Enterprise, is in the business of gathering, processing, and purchasing NGLs in the Eagle Ford shale. Carnero owns, and Targa operates, the Silver Oak II Gas Processing Plant and the Raptor Gas Processing facility. Carnero also owns, and Targa operates, the high-pressure gathering pipeline located in La Salle, Dimmitt, and Webb Counties, Texas, which is in the Eagle Ford shale. Enterprise or its affiliates own and operate numerous assets in the Eagle Ford Shale, including an extensive gas gathering system, the Eagle Ford NGL



EXHIBIT 1

Pipeline, the Yoakum, Thompsonville, Shoup, Gilmore, and Armstrong gas plants, and the Shoup and Armstrong fractionators.

5. Targa is also a direct competitor of Enterprise. Targa, like Enterprise and in competition with Enterprise, is in the business of gathering, transportation, fractionating, and purchasing NGLs in virtually every basin in the United States in which Enterprise operates.

6. I am also familiar with the Y-Grade Purchase and Sales Agreement dated December 21, 2021, between Enterprise, as buyer, and SN EF Maverick, LLC, as seller (the "Y-Grade Purchase and Sales Agreement"), because I negotiated the terms of that agreement. Y-grade is an NGL mixture that has been through field processing but has not been through NGL fractionation.

7. Enterprise takes reasonable measures to maintain the confidentiality of its NGL purchase and sales agreements. Enterprise's NGL purchase and sales agreements are not publicly available. All of Enterprise's NGL purchase and sales agreements contain confidentiality provisions. For example, section 11.3 of the Y-Grade Purchase and Sales Agreement contains comprehensive confidentiality provisions designed to protect both Enterprise and its counterparty.

8. Disclosure of the Y-Grade Purchase and Sales Agreement to Carnero's and/or Targa's commercial representatives would create a substantial risk of competitive injury to Enterprise and would give Carnero and Targa a significant competitive advantage by providing them insight and the ability to undercut Enterprise in the market by learning the manner in which Enterprise allocates risk and structures its NGL purchase and sales transactions, including how the gas dedication is structured and the specific representations and warranties that Enterprise requires from its counterparties. The manner in which Enterprise negotiates and structures its NGL purchase and sales agreements was developed through many years of active market participation and negotiation. It is reflective of Enterprise's commercial history, its risk tolerance and allocation, and its placement of value. It could not be easily duplicated by a competitor without access to documents such as the Y-Grade Purchase and Sales Agreement that would disclose Enterprise's methods. That is why the Y-Grade Purchase and Sales Agreement is one of the most sensitive documents pertaining to Enterprise's business.

9. Accordingly, disclosure of the Y-Grade Purchase and Sales Agreement to commercial representatives of Carnero, even with the financial terms redacted, would cause immediate, significant, and irreparable harm to Enterprise."

FURTHER AFFIANT SAYETH NOT.

Zachary Strait

SUBSCRIBED AND SWORN TO before me on the 8 day of September, 2022.

Notary Public – State of Texas

KATHERINE CAMPBELL
Notary Public, State of Texas
Comm. Expires 04-[illegible]-2025
Notary ID 129346304

**HICKS THOMAS LLP**
A REGISTERED LIMITED LIABILITY PARTNERSHIP

2300 ZTC ENERGY PLAZA
700 LOUISIANA STREET
HOUSTON, TEXAS 77002

**PAUL L. MITCHELL**
713.547.9193

TELEPHONE: 713.547.9100
FACSIMILE: 713.547.9150

E-MAIL ADDRESS
PMITCHELL@HICKS-THOMAS.COM

August 9, 2022

***VIA EMAIL***
Mr. Joshua W. Wolfshohl
jwolfshohl@porterhedges.com
Mr. Aaron J. Power
apower@porterhedges.com
Mr. Eugene M. Nettles
enettles@porterhedges.com
Ms. Amy C. Falcon
afalcon@porterhedges.com
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002

Re: *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 22-03035, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division

Dear Counsel:

I represent non-party Enterprise Products Operating LLC ("Enterprise"). I am writing to provide notice that Enterprise is opposed to any business representatives of Carnero G&P, LLC having access to the redacted Y-Grade Purchase and Sales Agreement dated December 21, 2021.

Please let me know if you have any questions.

Sincerely,

Paul L. Mitchell

{00324062.DOCX}

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |

| | | |
|---|---|---|
| | § | |
| Carnero G&P, LLC, | § | Adversary No. 22-03035 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas, LP, SN EF Maverick LLC, and Mesquite Energy, Inc. | § § § § | |
| | § | |
| Defendants. | § | |

**ENTERPRISE PRODUCTS OPERATING LLC'S FIRST AMENDED WITNESS AND EXHIBIT LIST FOR THE SEPTEMBER 19, 2022 HEARING**

Enterprise Products Operating LLC ("Enterprise") files this First Amended Witness and Exhibit List for the hearing to be held on September 19, 2022, at 10:00 a.m. (CDT) before the Honorable Marvin Isgur at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Avenue, Houston, Texas 77002 (the "Hearing").

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

**WITNESSES**

1. Zachary Strait, Vice President, Unregulated NGL Commercial, Enterprise Products Operating LLC (via affidavit or live testimony);

2. Any witness called or listed by any other party in interest;

3. Any witness necessary to lay the foundation for the admission of exhibits; and

4. Any rebuttal and/or impeachment witnesses as necessary.

**EXHIBITS**

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER HEARING |
|---|---|---|---|---|---|---|---|
| 1 | Affidavit of Zachary Strait filed as Exhibit 1 to ECF#70, Enterprise's response in opposition to Carnero G&P, LLC's ("Carnero") motion to authorize Carnero business representatives to review highly confidential material (ECF#63) | | | | | | |
| 2 | August 9, 2022 letter from Paul L. Mitchell to counsel for Carnero G&P, LLC objecting to the disclosure of the redacted Y-Grade Purchase and Sales Agreement dated December 21, 2021, to any business representatives of Carnero G&P, LLC | | | | | | |
| 3 | Email Chain May 6-9, 2022, regarding Enterprise's confidential redacted agreements being marked "Highly Confidential" under the Agreed Protective Order and filed under seal | | | | | | |
| 4 | Any document or pleading filed with the Court in the above-captioned cases | | | | | | |
| 5 | Any exhibit necessary for impeachment and/or rebuttal purposes | | | | | | |
| 6 | Any exhibit identified or offered by any other party | | | | | | |

Enterprise reserves the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserves the right to supplement or otherwise edit this Witness and Exhibit List prior to or during the hearing.

Respectfully submitted,

Hicks Thomas LLP

*/s/ Paul L. Mitchell*

Paul L. Mitchell
State Bar No. 14217920
SDTX No. 7495
pmitchell@hicks-thomas.com
Justin R. Braga
Texas Bar No. 24127228
SDTX No. 3710609
jbraga@hicks-thomas.com
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: 713.547.9100
Fax: 713.547.9150

ATTORNEYS FOR NON-PARTY
ENTERPRISE PRODUCTS OPERATING LLC

**CERTIFICATE OF SERVICE**

I certify that on September 16, 2022, a true and correct copy of Enterprise Products Operating LLC's First Amended Witness and Exhibit List was served using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Paul L. Mitchell*
Paul L. Mitchell

Case 22-03035 Document 13-1 Filed in TXSB on 09/13/22 Page 1 of 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| SANCHEZ ENERGY CORPORATION, *et. al.*, | § | Chapter 11 |
| | § | Case No. 19-34508 |
| *Reorganized Debtors.* | § | (Jointly Administered) |
| | § | |
| CARNERO G&P, LLC, | § | |
| *Plaintiff,* | § | |
| v. | § | |
| SN EF MAVERICK, LLC, *et. al.*, | § | Adversary No. 22-03035 |
| *Defendants.* | § | |

**AFFIDAVIT OF ZACHARY STRAIT**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned notary, personally appeared Zachary Strait, the affiant, whose identity is known to me and, after being duly sworn, stated as follows:

1. "My name is Zachary Strait. I am over 18 years of age, of sound mind, and am otherwise fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and those facts are true and correct.

2. I am Vice President, Unregulated NGL Commercial at Enterprise Products Operating LLC ("Enterprise"). In that role I am responsible for negotiating and overseeing the negotiation of natural gas liquids ("NGL") purchase and sales agreements.

3. I am familiar with Carnero G&P, LLC ("Carnero"). Carnero is a joint venture of Targa Resources Corp. or one of its affiliates ("Targa") and Evolve Transition Infrastructure LP. Carnero is owned 50% by Targa and is operated by Targa.

4. Carnero is a direct competitor of Enterprise in the Eagle Ford shale. Carnero, like Enterprise and in competition with Enterprise, is in the business of gathering, processing, and purchasing NGLs in the Eagle Ford shale. Carnero owns, and Targa operates, the Silver Oak II Gas Processing Plant and the Raptor Gas Processing facility. Carnero also owns, and Targa operates, the high-pressure gathering pipeline located in La Salle, Dimmitt, and Webb Counties, Texas, which is in the Eagle Ford shale. Enterprise or its affiliates own and operate numerous assets in the Eagle Ford Shale, including an extensive gas gathering system, the Eagle Ford NGL


EXHIBIT 1

Pipeline, the Yoakum, Thompsonville, Shoup, Gilmore, and Armstrong gas plants, and the Shoup and Armstrong fractionators.

5. Targa is also a direct competitor of Enterprise. Targa, like Enterprise and in competition with Enterprise, is in the business of gathering, transportation, fractionating, and purchasing NGLs in virtually every basin in the United States in which Enterprise operates.

6. I am also familiar with the Y-Grade Purchase and Sales Agreement dated December 21, 2021, between Enterprise, as buyer, and SN EF Maverick, LLC, as seller (the "Y-Grade Purchase and Sales Agreement"), because I negotiated the terms of that agreement. Y-grade is an NGL mixture that has been through field processing but has not been through NGL fractionation.

7. Enterprise takes reasonable measures to maintain the confidentiality of its NGL purchase and sales agreements. Enterprise's NGL purchase and sales agreements are not publicly available. All of Enterprise's NGL purchase and sales agreements contain confidentiality provisions. For example, section 11.3 of the Y-Grade Purchase and Sales Agreement contains comprehensive confidentiality provisions designed to protect both Enterprise and its counterparty.

8. Disclosure of the Y-Grade Purchase and Sales Agreement to Carnero's and/or Targa's commercial representatives would create a substantial risk of competitive injury to Enterprise and would give Carnero and Targa a significant competitive advantage by providing them insight and the ability to undercut Enterprise in the market by learning the manner in which Enterprise allocates risk and structures its NGL purchase and sales transactions, including how the gas dedication is structured and the specific representations and warranties that Enterprise requires from its counterparties. The manner in which Enterprise negotiates and structures its NGL purchase and sales agreements was developed through many years of active market participation and negotiation. It is reflective of Enterprise's commercial history, its risk tolerance and allocation, and its placement of value. It could not be easily duplicated by a competitor without access to documents such as the Y-Grade Purchase and Sales Agreement that would disclose Enterprise's methods. That is why the Y-Grade Purchase and Sales Agreement is one of the most sensitive documents pertaining to Enterprise's business.

9. Accordingly, disclosure of the Y-Grade Purchase and Sales Agreement to commercial representatives of Carnero, even with the financial terms redacted, would cause immediate, significant, and irreparable harm to Enterprise."

FURTHER AFFIANT SAYETH NOT.

Zachary Strait

SUBSCRIBED AND SWORN TO before me on the 8 day of September, 2022.

Notary Public – State of Texas

KATHERINE CAMPBELL
Notary Public, State of Texas
Comm Expires 04-..-2025
Notary ID 129346304

# HICKS THOMAS LLP

A REGISTERED LIMITED LIABILITY PARTNERSHIP

2300 ZTC ENERGY PLAZA
700 LOUISIANA STREET
HOUSTON, TEXAS 77002

**PAUL L. MITCHELL**
713.547.9193

TELEPHONE: 713.547.9100
FACSIMILE: 713.547.9150

E-MAIL ADDRESS
PMITCHELL@HICKS-THOMAS.COM


August 9, 2022

***VIA EMAIL***
Mr. Joshua W. Wolfshohl
jwolfshohl@porterhedges.com
Mr. Aaron J. Power
apower@porterhedges.com
Mr. Eugene M. Nettles
enettles@porterhedges.com
Ms. Amy C. Falcon
afalcon@porterhedges.com
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002

Re: *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 22-03035, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division

Dear Counsel:

I represent non-party Enterprise Products Operating LLC ("Enterprise"). I am writing to provide notice that Enterprise is opposed to any business representatives of Carnero G&P, LLC having access to the redacted Y-Grade Purchase and Sales Agreement dated December 21, 2021.

Please let me know if you have any questions.

Sincerely,

Paul L. Mitchell

**Paul Mitchell**

| | |
|---|---|
| **From:** | Shindi, Andrew N. <AShindi@willkie.com> |
| **Sent:** | Monday, May 9, 2022 4:48 PM |
| **To:** | 'Crawford, Elizabeth'; Mesquite Carnero; Bretschneider, Joseph |
| **Cc:** | Strait, Zach; Taylor, James; Ballard, Franklin; Weitzel, Harry; Paul Mitchell |
| **Subject:** | RE: Mesquite/Enterprise - Notice re Filing Enterprise Agreements as Exhibits |

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Elizabeth,

Great! Thank you very much for the confirmation.

Best,
Andrew

**Andrew N. Shindi**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8944 | Fax: +1 212 728 9944
ashindi@willkie.com | vCard | www.willkie.com bio

---

**From:** Crawford, Elizabeth <escrawford@eprod.com>
**Sent:** Monday, May 9, 2022 5:27 PM
**To:** Shindi, Andrew N. <AShindi@willkie.com>; Mesquite Carnero <MesquiteCarnero@willkie.com>; Bretschneider, Joseph <JBretschneider@willkie.com>
**Cc:** Strait, Zach <zsstrait@eprod.com>; Taylor, James <JKTAYLOR@eprod.com>; Ballard, Franklin <FOBALLARD@eprod.com>; Weitzel, Harry <hweitzel@eprod.com>; Paul Mitchell <pmitchell@hicks-thomas.com>
**Subject:** RE: Mesquite/Enterprise - Notice re Filing Enterprise Agreements as Exhibits

***** EXTERNAL EMAIL *****

Yes, the Y-Grade Purchase and Sale Agreement may be provided in the redacted form and filed under seal designated as “Highly Confidential.”

Elizabeth

---

**From:** Shindi, Andrew N. <AShindi@willkie.com>
**Sent:** Monday, May 9, 2022 3:04 PM
**To:** Crawford, Elizabeth <escrawford@eprod.com>; Mesquite Carnero <MesquiteCarnero@willkie.com>; Bretschneider, Joseph <JBretschneider@willkie.com>
**Cc:** Strait, Zach <zsstrait@eprod.com>; Taylor, James <JKTAYLOR@eprod.com>; Ballard, Franklin <FOBALLARD@eprod.com>; Weitzel, Harry <hweitzel@eprod.com>; Paul Mitchell <pmitchell@hicks-thomas.com>
**Subject:** [EXTERNAL] RE: Mesquite/Enterprise - Notice re Filing Enterprise Agreements as Exhibits

[Use caution with links/attachments]

Hello Elizabeth,

Thank you very much for your email. We will submit the Enterprise Transportation Services Agreement and the Enterprise Purchase Agreement as "Highly Confidential" pursuant to the Protective Order without any redactions.

We also intend on disclosing the Y-Grade Purchase and Sale Agreement, and we will do so in the redacted form that you provided and file it under seal designated as "Highly Confidential." Please confirm that we have your consent to disclose the Y-Grade Purchase and Sale Agreement.

Best Regards,
Andrew

**Andrew N. Shindi**
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8944 | Fax: +1 212 728 9944
ashindi@willkie.com | vCard | www.willkie.com bio

---

**From:** Crawford, Elizabeth <escrawford@eprod.com>
**Sent:** Monday, May 9, 2022 2:39 PM
**To:** Shindi, Andrew N. <AShindi@willkie.com>; Mesquite Carnero <MesquiteCarnero@willkie.com>; Bretschneider, Joseph <JBretschneider@willkie.com>
**Cc:** Strait, Zach <zsstrait@eprod.com>; Taylor, James <JKTAYLOR@eprod.com>; Ballard, Franklin <FOBALLARD@eprod.com>; Weitzel, Harry <hweitzel@eprod.com>; Paul Mitchell <pmitchell@hicks-thomas.com>
**Subject:** RE: Mesquite/Enterprise - Notice re Filing Enterprise Agreements as Exhibits

***** EXTERNAL EMAIL *****

Andrew and Joe,

Further to your below email, Enterprise acknowledges that each of the following agreements are to be provided under the Protective Order. Enterprise requests that each such agreement be filed under "seal" and provided to counsel for Carnero as "Highly Confidential." Enterprise does not request or require any of the terms of such agreements to be redacted prior to disclosure under the Protective Order.

- Enterprise Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko dated as of March 1, 2012

- Enterprise Purchase Agreement between Anadarko and Enterprise Products Operating LLC effective March 1, 2012

In the event that the parties request the disclosure of the Y-Grade Purchase and Sales Agreement between Enterprise Products Operating LLC and SN EF Maverick, LLC, Enterprise requests that such agreement be (a) provided in the redacted form attached to this email, (b) be filed under "seal", and (c) be provided to counsel for Carnero as "Highly Confidential."

Please do not hesitate to contact me if you should require any additional information with respect to this matter.

Regards,

Elizabeth Crawford

---

**From:** Shindi, Andrew N. <AShindi@willkie.com>
**Sent:** Friday, May 6, 2022 1:15 PM
**To:** Crawford, Elizabeth <escrawford@eprod.com>
**Cc:** Mesquite Carnero <MesquiteCarnero@willkie.com>
**Subject:** [EXTERNAL] Mesquite/Enterprise - Notice re Filing Enterprise Agreements as Exhibits

[Use caution with links/attachments]

Ms. Crawford,

As you may be aware, SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP (collectively, the "Defendants"), are involved in litigation against Carnero G&P, LLC ("Carnero"). Adv. Pro. No. 22-03035 (MI) (Bankr. S.D. Tex. 2022) & Adv. Pro. No. 21-04419 (MI) (Bankr. S.D. Texas 2021).

The Defendants believe all of Carnero's allegations in the litigation are without merit. In connection with the litigation, the Bankruptcy Court has entered a stipulated protective order, a copy of which is attached (the "Protective Order"), to govern and protect the disclosure of confidential information in the litigation. To protect their respective rights under applicable law, the Defendants intend to file one or more pleadings on or after Monday, May 9, 2022, in the litigation and will attach to their pleadings the following agreements to which you and/or one of your affiliates may be a party:

- Enterprise Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko dated as of March 1, 2012

- Enterprise Purchase Agreement between Anadarko and Enterprise Products Operating LLC effective March 1, 2012

We will circulate the version and form of each agreement listed above that will be attached to the pleading. You will shortly receive an FTP link from the Willkie HelpDesk containing the agreements.

Pursuant to the Protective Order, each agreement will be filed under "seal" and provided to counsel for Carnero as "Highly Confidential". Consistent with all applicable confidentiality obligations, we wanted to provide you with advance notice of our intent to file and serve the agreements as indicated. If you have any questions or concerns, please let us know before 3pm ET on Monday, May 9, 2022. After that time, we will be filing the pleadings and agreements, as indicated.

Best Regards,
Andrew

**Andrew N. Shindi**
**Willkie Farr & Gallagher LLP**

787 Seventh Avenue | New York, NY 10019-6099
Direct: +1 212 728 8944 | Fax: +1 212 728 9944
ashindi@willkie.com | vCard | www.willkie.com bio

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

---

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

---

**Important Notice:** This email message is intended to be received only by persons entitled to receive the confidential information it may contain. Email messages to clients of Willkie Farr & Gallagher LLP presumptively contain information that is confidential and legally privileged; email messages to non-clients are normally confidential and may also be legally privileged. Please do not read, copy, forward or store this message unless you are an intended recipient of it. If you have received this message in error, please forward it back. Willkie Farr & Gallagher LLP is a limited liability partnership organized in the United States under the laws of the State of Delaware, which laws limit the personal liability of partners.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,[1]<br><br>Debtors. | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| CARNERO G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, AND MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>Adversary No. 22-03035 |

**DECLARATION OF TODD MCEUEN**

I, Todd McEuen, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am the Vice President of Commercial Operations for Energy Transfer LP ("ET"), the parent company of ETC Texas Pipeline, Ltd. ("ETC"), the party that holds the Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP ("Anadarko") and ETC and related amendments (the "Agreement"). I have held this position since 2016. In

[1] The debtors in these Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "**Debtors**"). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

connection with my work, I am involved in the negotiation of gas gathering agreements with oil and gas operators and producers. I have personal knowledge of how slight changes in contract terms and conditions can affect ET's business relationship with its customers, as well as its revenue and profitability. The following is based on my personal knowledge, and if called upon to testify regarding same, I could do so competently.

**A. The Agreement**

2. ETC and Anadarko entered into the Agreement on April 1, 2011. Neither the Debtors nor Carnero G&P, LLC ("Carnero") is a party to the Agreement.

3. Prior to the filing of the Debtors' Chapter 11 Cases, Anadarko sought to assign the Agreement to the Debtors. However, ETC did not consent to such assignment, and instead, Anadarko and the Debtors agreed to an arrangement pursuant to which the Debtors serve as Anadarko's agent under the Agreement. This arrangement did not modify the parties to the Agreement.

4. The Agreement contains a confidentiality provision which expressly prohibits the disclosure of information contained in the Agreement to third parties.

5. Upon information and belief, and as otherwise advised by counsel, the Agreement has not been amended, modified or extended since the Defendants emerged from their Chapter 11 Cases.

6. Upon information and belief, and as otherwise advised by counsel, the Agreement is still active and has not expired or terminated.

**B. The Chapter 11 Cases and the Adversary Proceeding**

7. ETC did not participate in either the Chapter 11 Cases or in this Adversary Proceeding.

8. I became aware, through counsel, that Carnero requested a copy of the Agreement to share with its outside counsel pursuant to that certain Stipulated Protective Order (the "Protective Order").

9. While ETC was hesitant to consent to the disclosure of the Agreement because Carnero (and its owners separately) is a competitor of ETC, it did so in the spirit of full cooperation, with the understanding that the Agreement would be shared only with Carnero's outside counsel and not any of Carnero's commercial representatives.

10. Upon information and belief, and as otherwise advised by counsel, Carnero is owned 50% by each of Targa Resource Corp., or one of its affiliates or subsidiary companies ("Targa"), and Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("Evolve") (together, the "Business Representatives"). The Business Representatives are also ETC's direct competitors.

11. Carnero and the Business Representatives, together and separately, own and operate gas gathering and processing assets in the Eagle Ford shale area of South Texas, and Targa owns and operates gas gathering and processing assets in the Permian Basin of West Texas. In South Texas, Carnero and the Business Representatives are direct competitors of ETC for new business opportunities and for potential business arising as existing contracts terminate or expire. In the Permian Basin of West Texas, Targa is also a direct competitor of ETC for the provision of gas gathering and processing services, similar to those contained in the Agreement.

**C. Disclosure of the Agreement**

12. I understand that Carnero is requesting permission to share the Agreement with its Business Representatives and their respective commercial representatives.

13. If the Agreement were shared with ETC's direct competitors, including the Business Representatives, ETC would suffer significant competitive injury.

14. The Agreement contains terms relating to rates, capacity, penalties, charges for unused pipe capacity, receipt points, recoveries, pressures, fuel, escalations, and other information that would be harmful to ETC if it were disclosed to its direct competitors.

15. Slight changes in contract terms and conditions can affect ETC's business relationships with its customers, as well as revenue and profitability. Gas gathering agreements with oil and gas operators and producers contain sensitive commercial information, including fees, fuels, recoveries, pressures, penalties for noncompliance, risk transfer provisions, and other commercial and negotiated contract terms that vary based on a multitude of factors and are highly customized for each customer and situation. The amount of money involved in these agreements is substantial. Even slight changes in certain negotiated terms can result in substantial changes to the expenses, revenues, and margins of either company.

16. The foregoing terms are not known outside of ETC, except for Anadarko, the counterparty to the Agreement. ETC expended significant time, money, and resources negotiating the Agreement with Anadarko. Disclosure of these terms could damage ETC's competitive standing in the industry and disadvantage it against Carnero and the Business Representatives, as well as damage as its customer relationships. The negotiation of this Agreement and future such contracts would be jeopardized through the production of ETC's confidential business dealings and contractual arrangement with another customer.

17. For the reasons stated above, disclosure of the Agreement to ETC's direct competitors, including Carnero, Targa, Evolve, and their commercial representatives, would cause irreparable harm to ETC.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: September 17, 2022

*/s/ Todd McEuen*
Todd McEuen

**APPEAL, APPEAL_NAT**

**U.S. Bankruptcy Court**
**Southern District of Texas (Houston)**
**Adversary Proceeding #: 22-03035**

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Date Filed:* 02/28/22
*Date Removed From State:* 02/28/22

*Nature[s] of Suit:* 01 Determination of removed claim or cause

***Plaintiff***
-----------------------
**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
Ste 3600
Houston, TX 77002
713-226-6681
Email: afalcon@porterhedges.com
*LEAD ATTORNEY*

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6609
Fax : 713-226-6209
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-228-1331
Email: jwolfshohl@porterhedges.com
*LEAD ATTORNEY*

V.

***Defendant***
-----------------------
**SN EF UnSub, LP**
1111 Bagby Street

represented by **Paul M Basta**
Paul, Weiss, Rifkind, Wharton & Garrison

Suite 2050
Houston, TX 77002

1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com
*LEAD ATTORNEY*

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com
*LEAD ATTORNEY*

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3740
Email: mtattnall@paulweiss.com
*LEAD ATTORNEY*

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 T.C. Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Eagle Ford TX LP**
5599 San Felipe Road
Suite 725
Houston, TX 77056

represented by **Julia Frost-Davies**
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02115
617-341-7700
Email: julia.frost-davies@morganlewis.com
*LEAD ATTORNEY*

**Amy L Kyle**
Morgan Lewis & Bockius LLP
One Federal St

Boston, MA 02115
617-951-8288
Email: amy.kyle@morganlewis.com
*LEAD ATTORNEY*

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5455
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
100 Louisiana Street
Houston, TX 770002
713-890-5460
Email: jared.wilkerson@morganlewis.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Venado EF L.P.**
13215 Bee Cave Pkwy.
Suite B-350
Austin, TX 78738
***aka* Javelin EF L.P.**

represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com
*LEAD ATTORNEY*

**Conor P. McNamara**
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 N. LaSalle
Chicago, IL 60654
312-86202000
Email: conor.mcnamara@kirkland.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mitsui E&P Texas LP**
1300 Post Oak Blvd.
Suite 1800
Houston, TX 77056

represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 5900
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4618
Email: mquejada@sidley.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**SN EF Maverick, LLC**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
Foley & Lardner LLP
1000 Louisiana Street
Suite 2000
Houston, Tx 77002
713-276-5086
Email: sbeausoleil@foley.com

**Joseph Bretschneider**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Email: jbretschneider@willkie.com
*LEAD ATTORNEY*

**Sara Ann Brown**
Thompson Coburn LLP
2100 Ross Avenue
Ste 3200
Dallas, TX 75201
972-629-7100
Fax : 972-629-7171
Email: sbrown@thompsoncoburn.com

**Dennis Jenkins**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Fax : 212-728-8111
Email: djenkins@willkie.com
*LEAD ATTORNEY*

**James G Munisteri**
Foley Gardere
1000 Louisiana Street
Ste 2000
Houston, TX 77002
713-276-5500
Fax : 713-276-5555

Email: jmunisteri@foley.com

**Mark T. Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

***Defendant***

-----------------------

**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
(See above for address)

**Joseph Bretschneider**
(See above for address)
*LEAD ATTORNEY*

**Sara Ann Brown**
(See above for address)

**Dennis Jenkins**
(See above for address)
*LEAD ATTORNEY*

**James G Munisteri**
(See above for address)

**Mark T. Stancil**
(See above for address)
*LEAD ATTORNEY*

***Defendant***

-----------------------

**Mesquite Comanche Holdings, LLC**
c/o Registered Agent -
C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

represented by **Sharon Marie Beausoleil**
(See above for address)

**James G Munisteri**
(See above for address)

***Intervenor***

-----------------------

**ETC Texas Pipeline Ltd.**
1300 Main Street
Suite 2000
Houston, TX 77002

represented by **Yelena Archiyan**
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
214.765.3657
Email: yelena.archiyan@katten.com

**John E. Mitchell**
Katten Muchin Rosenman
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
469-627-7017
Email: john.mitchell@katten.com

| Filing Date | # | Docket Text |
|---|---|---|
| 09/19/2022 | 90 | Courtroom Minutes. Time Hearing Held: 10:00 am - 10:40 am. Appearances: Joshua Wolfshohl and Amy Falcon for the Plaintiff. Conor McNamara for Javelin EF L.P. Jason Brookner and Lydia Webb for Western Midstream Partners, LP. Paul Mitchell and Justin Braga for Enterprise Products Operating, LLC. John Mitchell for ETC Texas Pipeline, Ltd. Mark Stancil for Mesquite Energy, Inc. Duston McFaul and Megan Quejada for Defendant Mitsui E&P Texas LP. Sean Mitchell for SN EF UnSub, LP. David Whittlesey for Eagle Ford Midstream. The Court orders that the hearing on 51 will not include any matter on damages. The Court will presume for the purposes of that hearing that changes that invade Carnero's rights could produce damages. If there are changes that invade Carnero's rights that could produce damages, the Court will revisit at that time whether, how, and who would receive that information on the business side of Carnero and work on providing adequate protection from the entities whose business information is potentially subject to compromise. (Related document(s):63 Generic Motion, 71 Motion to Intervene, 74 Motion to Intervene, 77 Motion to Intervene) (TylerLaws) (Entered: 09/19/2022) |

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| CARNERO G&P, LLP | § CASE NO. 22-03035-ADV |
| | § HOUSTON, TEXAS |
| v | § MONDAY, |
| | § SEPTEMBER 19, 2022 |
| SN EF UNSUB, L.P., ET AL | § 10:00 A.M. TO 10:40 A.M. |

**MOTION HEARING**

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak; no log notes.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR PLAINTIFF CARNERO G&P, LLP: | PORTER HEDGES, LLP<br>Joshua W. Wolfshohl, Esq.<br>Amy Coates Falcon, Esq.<br>1000 Main Street, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR WESTERN MIDSTREAM AFFILIATES: | GRAY REED & McGRAW, LLP<br>Jason Brookner, Esq.<br>Lydia R. Webb, Esq.<br>Jonathan Hyman, Esq.<br>1300 Post Oak Blvd.<br>Suite 2000<br>Houston, TX 77056<br>469-320-6111 |
| FOR ENTERPRISE PRODUCTS PARTNERS, LLC: | HICK THOMAS, LLP<br>Paul L. Mitchell, Esq.<br>Justin R. Braga, Esq.<br>700 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-547-9100 |
| FOR MESQUITE ENERGY, INC. f/k/a SANCHEZ ENERGY CORPORATION: | WILLKE FARR & GALLAGHER, LLP<br>Mark T. Stancil, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS, LP: | SIDLEY AUSTIN, LLP<br>Duston K. McFaul, Esq.<br>Maegan Quejada, Esq.<br>1000 Louisiana Street<br>Suite 5900<br>Houston, TX 77002<br>713-495-4500 |
| FOR CROWN EAGLE ENERGY f/k/a SN EF UNSUB, LP: | PAUL WEISS RIFKIND WHARTON & GARRISON, LLP<br>Sean A. Mitchell, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3740 |

APPEARANCES (CONTINUED)

| | |
|---|---|
| FOR EAGLE FORD MIDSTREAM, LP: | SHEARMAN & STERLING, LLP<br>David Whittlesey, Esq.<br>300 W. 6th Street, Suite 2250<br>Austin, TX 78701<br>512-647-1900 |
| FOR CHATOWIN EF, LP f/k/a VENADO EF, LP: | KIRKLAND & ELLIS, LLP<br>Conor P. McNamara, Esq.<br>300 N. Lasalle<br>Chicago, IL 60654<br>312-862-3993 |

**HOUSTON, TEXAS; MONDAY, SEPTEMBER 19, 2022; 10:00 A.M.**

THE COURT: Please be seated.

(Pause in the proceedings.)

THE COURT: All right. We are here in the Carnero versus SN Adversary Proceeding 22-3035. Let's go ahead and take appearances in court. If you wish to appear on the phone, please press five star one time on your phone.

Mr. Wolfshohl?

MR. WOLFSHOHL: Good morning, Your Honor. Joshua Wolfshohl and Amy Falcon for Carnero, and we also have Mr. Matt Hawthorne, who's in-house counsel at Targa, in the courtroom.

THE COURT: Thank you.

MR. BROOKNER: Good morning, Your Honor. Jason Brookner, Lydia Webb and Jonathan Hyman for the West parties, along with our co-Chief Operating Officer, Craig Collins, who is also our declarant and witness today.

THE COURT: Thank you. Good morning, Mr. Brookner.

MR. P. MITCHELL: Your Honor, Paul Mitchell and Justin Braga for Enterprise Products Partners, LLC.

THE COURT: Thank you. Good morning.

MR. J. MITCHELL: Good morning, Your Honor. John Mitchell, Katten Muchin, for ETC Texas Pipeline, otherwise known as Energy Transfer. On video with me is my colleague, Ms. Yelena Archiyan. Also, we hope to get on video Mr. Todd

McEuen, who is our declarant and a representative of Energy Transfer. He's dialing in and he's having trouble with the video system, but they're working on it as we speak. It's --

THE COURT: All right.

MR. J. MITCHELL: -- I don't think it's on your end, I think it's on their firewall, and my apologies, but he's working on it.

THE COURT: No problem. We can take our time on that. The one thing if they're listening that usually ties it up, is if somebody's been on Zoom earlier.

MR. J. MITCHELL: Okay.

THE COURT: Unless they get Zoom or any other one of these platforms the camera is then owned by the prior platform. Until you completely exit it --

MR. J. MITCHELL: Okay.

THE COURT: -- this one won't capture it. So he might have them look at that if they're listening.

MR. J. MITCHELL: Okay. Ms. Archiyan is listening right now, I'm sure she'll communicate with our witness. Thank you.

THE COURT: Thank you.

Mr. Stancil?

MR. STANCIL: Good morning, Your Honor. Mark Stancil for Mesquite Energy, Inc.

THE COURT: Good morning.

Mr. McFaul?

MR. McFAUL: Yes, good morning, Your Honor. Duston McFaul and Maegan Quejada of Sidley Austin for Mitsui E&P.

THE COURT: To add confusion, the third Mr. Mitchell to appear in today's proceeding.

(Laughter.)

THE COURT: Mr. Mitchell.

MR. S. MITCHELL: Good morning, Your Honor. Sean Mitchell, Paul Weiss, on behalf of Crown Eagle Energy formerly known SN EF UnSub, LP.

THE COURT: Good morning.

From 512-695-2400?

MR. WHITTLESEY: Yes, Your Honor, this is David Whittlesey from Shearman & Stirling on behalf of Eagle Ford Midstream.

THE COURT: Good morning.

MR. WHITTLESEY: Thank you.

THE COURT: Mr. McNamara?

MR. McNAMARA: Good morning, Your Honor. Conor McNamara on behalf of Chatowin EF (phonetic), LP formerly Venado.

THE COURT: So it's good to see everybody this morning. I am approaching this a little bit differently than you all may be, and I want to back up a step and see if I'm missing something that might make sense for everybody.

In the motion that precipitates this meeting, that is the motion for judgment on the pleadings, there are two primary allegations. One is that nothing in the agreements that are at issue terminates any of the agreements. For that one I have no idea why counsel can't review it to see if it actually terminates the agreement and why anyone senior might need to -- or why any business person might need to review it.

But the other important allegation is a pleading in the alternative, and this is the one I want to think about the most, which says it doesn't matter whether the agreements were amended or not, any amendment to the agreement would not give Carnero any rights. And then the second half of that says, and if we're wrong about that, the amendments are not of a nature that would give them any rights.

Only the latter might in any way say that a business person would need to be involved, i.e. are the changes of a nature that might cause concern. But then I don't understand why changes that would adversely affect Carnero would trigger anything. And I need to understand that better from a legal argument point of view. Material changes between the parties perhaps, but those we don't need the business people involved then, I don't think. So I need to understand how a material change that might adversely affect Carnero could then result in some rights to Carnero under the agreements, and I'm well short of having that information at this point.

So I want to know from the movants on the motion why at this stage, other than for the question of termination, whether the agreements actually contain a termination provision for which Mr. Wolfshohl is perfectly capable with no assistance in determining whether they have a termination. Why will ever need to review those agreements, if you're right on the first part of the hypothesis, which is it doesn't matter what the amendments say, it wouldn't give Carnero any rights.

So I'm asking whether those can be withdrawn at this stage, subject to being re-offered later, until we get through those legal questions. They would be offered solely for the purpose initially of whether they have a termination provision in them. So why do the movants need those agreements right now? You might need it if you lose Step 1, but I don't see why if you win Step 1, you'd never need the agreements.

I'm talking to the movant, not you --

UNIDENTIFIED SPEAKER: I believe it's on the motion for (indiscernible).

THE COURT: -- the movant on the motions to dismiss for judgment on the pleadings. I don't know why I need those agreements, other than for the termination question.

MR. STANCIL: Your Honor, this is Mark Stancil for Mesquite. As sort of the primary movant I want to make sure I understand the Court's question. So we don't believe that

it's really a question of termination, but I think that's part of it. We don't believe the amendments extend the agreement, which is I think -- which is how I'm understanding your comment about termination, that, you know, there's a threshold question as to whether the agreements, the amendments in question somehow extend the amendments.

I believe there's a separate set of arguments that have been made by Carnero that even though or even if the amendments were not extended in the amendments there are certain things in the amendments that the -- that are done that injure them in some way. We don't -- we think it's obvious on the face of the documents that they don't.

And I don't understand how ever looking at the agreements would be necessary because we ought be comparing the original Carnero GGPA agreement, what right it does and doesn't create, with the amendments, and I'm not sure how in-house business people are positioned to evaluate whether their legal rights are affected --

THE COURT: So why -- so why do you --

MR. STANCIL: -- but I didn't want to --

THE COURT: -- why do I need to consider those agreements other than for extension and termination rights at this stage? I might need to look at them later as this thing develops, but why can't you proceed with your motion without prejudice to whether you can later introduce them in a similar

motion at which point we might need to cross this bridge? Why can't you proceed with your motion without worrying about that question -- those other questions?

MR. STANCIL: Well, we believe -- that question may be better directed at Mr. Wolfshohl as the Plaintiff because we believe the Court could rule in favor of us and grant motion -- grant our motion for judgment on the pleadings just on the face of what's in front of you, but I think Mr. Wolfshohl's going to tell you --

THE COURT: No, you --

MR. STANCIL: -- something different.

THE COURT: -- you attached all these agreements to your motion.

MR. STANCIL: Uh-huh.

THE COURT: Can you withdraw --

MR. STANCIL: Yes.

THE COURT: -- can you withdraw them?

MR. STANCIL: I don't think so, Your Honor, because there are allegations in the complaint that say that certain of these amendments that are in these agreements constitute locking schemes or ways that injure Carnero, and we believe that on the face of those agreements we're entitled to complete judgment. So I -- they didn't -- they should have attached them perhaps to their complain, but, you know, these are -- these are --

THE COURT: No, but in your --

MR. STANCIL: -- the essence of their allegations.

THE COURT: -- in your motion to dismiss you're telling me that it doesn't matter what the amendments say so long as they say certain things which have to do with timing and therefore the business people don't need to read them. So other than the timing issues what are you offering the agreements to show me? If you're offering them to show me that changes that you have done can't possibly injure Carnero, then I need to understand why they don't get to talk to their own people about how it might injure their business operations.

But if -- I don't think that's the heart of your motion. I think that's in your motion, but it's not the heart of your motion. And I want to know whether you can continue with your motion withdrawing that part of it. No matter what his allegations are you're telling me you win anyway.

MR. STANCIL: Well, maybe I should back up a step then, Your Honor. We have one part of our motion that says the entire lawsuit is preempted or foreclosed by orders of the Court in the bankruptcy. I'm going to set aside, that has nothing to do with extension of the agreements. That just has to do with whether this allegation comes too late.

THE COURT: But if you -- but if you --

MR. STANCIL: Within their --

THE COURT: -- if you win that, you don't need the agreements. Right?

MR. STANCIL: Oh, that's -- that's correct, Your Honor.

THE COURT: So at least there was one way where I don't need to cross this bridge, to the next way.

MR. STANCIL: Absolutely. There are then within the complaint filed by Carnero a series of arguments they make, some pertain to (indiscernible) what they consider a de facto extension of the term of the agreements. But certain of them have nothing to do with the term of the agreements and they allege things, you know, they think we have entered into agreements that infringe on certain of their rights for say delivery points and things like that. But those go right to the term of the amendments.

It's really on the face of their complaint. In certain respects they say they have rights that were injured wholly and apart from the duration or term of the agreements, they said they had rights that were injured by these amendments, and we say that's wrong. So we need to show them the amendments, put those in front of the Court and say, See, they didn't have this right before, and they don't have this right, this right isn't affected by the agreements and here's how it works.

THE COURT: Then the question -- why do you need to

address the question of what -- with respect to whatever is in the amendments that cause injury or not?

MR. STANCIL: Because their complaint just describes the amendments.

THE COURT: I understand --

MR. STANCIL: Their complaint alleges that --

THE COURT: Then you're going to allege that the agreement, not that it doesn't injure them, but it doesn't factually do what you're saying. You're not going to defend --

MR. STANCIL: Correct --

THE COURT: -- the injury question. Right?

MR. STANCIL: No, well, Your Honor, actually we think they're related. In certain respects it doesn't do what they say, but in other respects they didn't have a right under their own agreements to complain about what they're complaining about. So if I -- maybe this will be a little more vivid with an example. There's a dispute about where certain natural gas liquids would be delivered when their agreement kicks in.

As we've explained in our motion, the agreement, the GGPA that they're suing on, says we will deliver them to you at the existing delivery point. Well, their complaint says that they have the right to take them at other places. Now that is -- that's an agreement that -- well, pardon me, that's

an argument that they're making that we need to show you the GGPA, their contract, because it doesn't say what they say, and we need to show you the amendments because even if they think it features some rights they have, we have to show you that the amendment doesn't foreclose the kinds of changes that they're saying are improperly foreclosed.

THE COURT: So you can demonstrate under the argument you just made that you haven't changed the delivery point for example, and then I don't worry about whether a change in the delivery point injures Carnero because there hasn't been one. But if you lose and you have changed a delivery point, they then need to prove whether there has been damages or not. For that they might need to consult their business people.

So I'm trying to understand whether we can't bifurcate your motion into things where I believe if you're correct on everything you put in your motion, you win without ever crossing the injury issue. Right?

MR. STANCIL: You're -- let me -- I should add one point I think that kind of gets to why we attached all of these as well, which -- and we've been asked this for over a year, and so my concern with bifurcation, I mean I -- if Your Honor were agreeing with us that we would win without getting into that level, obviously that would be perfect, but --

THE COURT: Well, you might -- no, I'm not at all,

you may need to do that.

MR. STANCIL: No, I understand.

THE COURT: You may need to get into that level later, and what I'm trying to tell you is, if -- we need to figure out whether this has injured Carnero as opposed to whether there are factual changes in what can occur that might result in an injury, I have a hard time thinking I'm not going to let, not six business people, but some business people look at this because they're the ones that best know if there's an injury. But you're telling me you can win before we ever get to the injury question.

MR. STANCIL: Yes, Your Honor. So first of all Mesquite has not taken a position on the disclosure either way, we are fine with whatever the Court orders. It's the other counterparties to the agreements that are prepared to speak to that, and I'll let them do that.

The point I was making is our client is very concerned about any further delay in these proceedings because they are basically being held hostage by this litigation. And they are -- we have pushed as hard as we can to get them everything we can get them with our own -- with unilateral consent.

And my concern about bifurcation is simply that this would be leverage for Carnero down the road to -- but I also don't understand -- one last point, I haven't understood

Mr. Wolfshohl to say he needs this information only for purposes of damages. But if that is his -- if that's his representation, that would be a different -- my understanding was that he thought they needed to be reviewed for possible breach as well.

THE COURT: Well, reviewing them to see if you have made a change in your example in the delivery point, you either have or you haven't and the lawyers can figure that out. But if you have made a change in the delivery point, there is a persuasive argument on their side that they need to figure out what that means from a business point of view. That's why --

MR. STANCIL: Your Honor, I think --

THE COURT: -- I'm suggesting you limit what you're doing here at this stage. Maybe not limiting it permanently.

MR. STANCIL: I think I should probably hand the podium to those who have skin in that game as to whether and what purpose this information would serve, because I don't -- again, we're not taking a position on this, we're fine with whatever the Court orders, our only --

THE COURT: Well, yeah, but I'm --

MR. STANCIL: -- position really --

THE COURT: -- I'm thinking of limiting you in matters that won't allow you to go to that in Round 1 and that may cause some delay. But I've got people that have very

legitimate, from what I can see, very legitimate business concerns in terms of what I've read so far about the disclosure of this information.

That may not stop it from getting disclosed. I'm not going to allow Carnero to go in blind as to whether they have had business injuries. But it -- we're premature on that question, and your desire for rush for speed I don't think is as important right now as the invasion of other people's confidential corporate information or Carnero's right to defend what they're doing.

Let me go to Mr. Wolfshohl and see why we can't first figure out whether there are changes that might result in injury and then let you explore whether they, in fact, do cause injury if that becomes relevant, because right now I don't know if there are changes that might result in injury.

MR. WOLFSHOHL: I think, Your Honor, I'm mean, look, I'm not sure if what you're contemplating is them refiling the motion in a way -- or carving it out of it, the concepts that you're talking about carving out of it. That is the biggest issue that we're facing is what you've identified, which is the injury issue. We feel strong on the arguments that there was an actual change, that there was certain breaches that constitute actual breaches of the GGPA. But the biggest issue for having decision -- business decision makers is, in fact, the injury part.

I don't know how you -- based on the way that the motion for judgment on the pleadings is drafted, it seems complicated to carve that out. But if carving that out is the approach that Your Honor suggests, we're prepared to argue --

THE COURT: I mean I think I can order a bifurcation and say I am ordering that I'm going to try damages in Step 1 period. It's reserved. I don't know why I need to say anything beyond that I'm not going to try damages.

I'm going to still listen to the argument if I'm wrong about that, but we would simply put an order in that said, Damages will not be an issue at the initial hearing until a liability issue might exist that could give rise to damages. And then I'm going to hear from all these objecting parties as to why we shouldn't defer this decision. But that would sooner result --

MR. STANCIL: Your Honor --

THE COURT: Mr. Stancil?

MR. STANCIL: Yes, sir. I think we're actually then closer than I had understood. I'm flipping in the Table of Contents of our motion for judgment on the pleadings, I don't -- I'm not recalling any counts or arguments that we have that don't go to the threshold question of liability, was there a breach or was there not a breach.

We may -- I suppose there are -- maybe if there's an argument we've made in support of one of them that I think I

understand, but if Your Honor is suggesting that we would adjudicate the 12(c) and simply decide whether there was a breach or not a breach, or whether the claim can go forward or not go forward, and that should we get to a question of damages, that's a different kettle of fish.

THE COURT: Yeah, well, so normally proof of a breach would also require proof of damages, and so I understand why that might be there. But I think I can exclude that from consideration at this point and consider only if the predicate facts exist that might give rise to damages. And if the predicate facts exist that might give rise to damages, we have a much harder question to answer, but I don't want to turn over material now until we get there.

Mr. Wolfshohl?

MR. WOLFSHOHL: Your Honor, I think -- I mean and this -- these are -- this is a complicated structure and --

THE COURT: Yep.

MR. WOLFSHOHL: -- I think you're sort of hitting on that. I don't think we would be opposed to that approach, but I want to make sure that it's clear that it's without prejudice to -- if we're focused on the breaches issues, because this isn't just binary, that we will probably -- I can't tell you just sitting here, I'm thinking on my feet and looking at all the different claims that have been made --

THE COURT: Right.

MR. WOLFSHOHL: -- but if we still feel like there's an issue, we may raise it --

THE COURT: It's going to be without prejudice.

MR. WOLFSHOHL: -- in the context of the hearing.

THE COURT: It's going to be without prejudice to --

MR. WOLFSHOHL: Right.

THE COURT: -- either side coming back. But I want to take, and I know Mr. Stancil created an example you don't have to deal with, but I'm going to still live with his example just as one, if he can demonstrate that here is no change in the delivery point done by the amendments, then it's -- there's no point in looking at whether a change in the delivery point causes damages. Right?

MR. WOLFSHOHL: I disagree with that specifically because I think that there -- it's more nuanced than just a question of whether there's a change. But conceptually I understand what you're saying.

THE COURT: Okay.

MR. WOLFSHOHL: What I'm saying is the -- it may not be as simple as was there a change in the delivery point, but did the characteristics of what, you know, what other parties an do with respect to delivery points and the characterization of the delivery point as to whether it's interruptible or not, those things affect that, so it's not just a simple question. But --

THE COURT: Fair -- fair enough.

MR. WOLFSHOHL: -- it is around the same issue, and I think you're sort of hitting on it, and, yeah, I mean as long as we're not, you know, prejudicing our rights to be able to argue that, you know, this is so tied to a damage issue or a fact issue, which I think we've raised in the response to the motion for judgment on the pleadings anyway.

THE COURT: So let me hear all the parties that want to keep the information away from Mr. Wolfshohl's business folks, whether the bifurcation -- I know it's a delay and I know everybody's ready for today's hearing, but whether that doesn't resolve what we're here about in an orderly way.

MS. WEBB: Thank you, Your Honor. Lydia Webb of Gray Reed on behalf of the West parties. Obviously we are not a party to this litigation and so I'm not really here to wade into how this Court wants to structure, how it wants to proceed on that. Our obvious concern is disclosure of our confidential information, and we take what, you know, Your Honor says serious when it comes to an injury here and whether the Carnero business people need, in fact, to see our documents in connection to determining whether it was an injury.

But what I would point the Court to is, Paragraph 8(b) of the protective order already provides a mechanism for Carnero to analyze this injury issue without putting my client

at risk of having to --

THE COURT: Why do I need --

MS. WEBB: -- disclose --

THE COURT: -- to cross this bridge today?

MS. WEBB: I'm aware of that, Your Honor, I just --

THE COURT: Well, I want to know whether --

MS. WEBB: -- we care very --

THE COURT: -- whether your client has any objection to me not crossing the bridge today. I understand your argument. I don't want to cross the bridge because he didn't file the pleading that he's trying to respond to, somebody else filed it.

MS. WEBB: Sure.

THE COURT: Why do I need to cross the bridge today?

MS. WEBB: And, Your Honor, again, we are not a party to this litigation, we're just concerned about protecting our confidential information. So if you're saying that our confidential information is not being disclosed at this time, so long --

THE COURT: Today.

MS. WEBB: -- as we reserve our rights to come and raise the fact that there are less drastic measures in order to make sure that Carnero is able to assert its rights, then I think that we are okay with proceeding as the Court proposes.

THE COURT: Thank you.

Anyone else?

MR. P. MITCHELL: Your Honor, Paul Mitchell --

MR. WHITTLESEY: Your Honor, David Whittlesey -- I'm sorry, go ahead, Paul.

MR. P. MITCHELL: No, no. Your Honor, we have no problem with the Court proceeding in that manner, so long as, you know, we receive appropriate notice if there's another request to disclose them. And maybe what Your Honor can do to make sure we do is to -- all three of us have moved for limited intervention just to address this very specific confidentiality issue. If those three motions were granted today and we would get notices and the like and keep up with the litigation, that way we'd have an opportunity to appear if this ever -- this issue ever arises again, which is may not.

THE COURT: Anyone else?

MR. WHITTLESEY: Your Honor, David Whittlesey on behalf of Eagle Ford Midstream. We didn't file a motion to intervene, but we have no problem with what the Court suggests just so long if the (indiscernible) are going to be potentially given to the business people later and we would want to have an opportunity to object at that time.

THE COURT: Thank you.

MR. J. MITCHELL: Your Honor, Energy Transfer would highly encourage the Court if there's a way to structure this such that you don't have to order the production of our

documents to our competitors and proceed forward and kick this on down the road to a later date, we think that's a good solution. With respect to intervention you could grant it or you could just delay that, and I think you could certainly order the other parties to the adversaries to give us notice if this is relevant at the appropriate time.

THE COURT: Yeah, things are just --

MR. J. MITCHELL: Up to Your Honor.

THE COURT: -- in my mind. I think that I can direct, and I think this will solve the problem, that parties can appear as noticed parties and that they'll then get CMECF notice and they can -- I'll grant leave to anyone that wants to do that today, that way you get notice. You won't technically be an intervenor but I don't think you need to technically be an intervenor because I'm going to listen to what you have to say about your information.

MR. J. MITCHELL: That's perfect with us, Your Honor. We really don't want to intervene, we just want to make sure we can be heard on the issue. Thank you.

THE COURT: Okay. Anyone else?

MR. S. MITCHELL: Your Honor?

THE COURT: Mr. Mitchell?

MR. S. MITCHELL: Yes, Sean Mitchell -- for the Record Sean Mitchell on behalf of Crown Eagle Energy. Your Honor, my client is in the same boat with Mr. Stancil, we

haven't taken a position on whether the information should be handed over or not.

I just have a I suppose a clarifying question, I guess the procedural posture of where we are now. So as I understand it -- well, I guess my question is, does Carnero need the -- or do the business people need the information for the purposes of assessing whether there is breach given that there is a pending 12(c) motion on file, this is coming up even after Carnero has opposed our motion for (indiscernible).

THE COURT: So I'm going to find that at this stage they -- because a breach might include damages, I'm not going to find they never need it for a breach, but for the purpose of the bifurcated hearing that we are not going to disclose the documents to the business people for the purpose of determining whether there is the predicate for a breach. Does that work?

MR. STANCIL: Your Honor, this is Mark Stancil, may I ask what I hope is another clarifying question? And this may just -- this will principally address our delay concern I think. If Your Honor will recall, in July there was an order on timing for this 12(c) motion and we had worked out language, and it grants -- when we're talking about leave for -- leave to further amend the complaint, that Carnero could seek it based on newly discovered evidence within 30 days, upon a showing of compelling circumstances, or as I

think is principally relevant here, consultation with Carnero's decision makers within 30 days of the date on which the Court authorizes sharing of professional eyes only information with its decision makers.

And maybe this is a question for Mr. Wolfshohl, but if -- if we're not talking about starting another 30-day amendment clock down the road, then I think our concerns are substantially, if not entirely, addressed. But if Mr. Wolfshohl is going to argue that later he needs disclosure and then invoke this provision to try to amend his complaint yet again, that's our principally -- principal concern.

MR. WOLFSHOHL: Your Honor, you're not ordering for this stuff to get disclosed to my business decision makers so I mean this -- that hasn't triggered, I mean that's the whole point of what we argued. And when you entered the order you adopted part of what we were asking for, so I don't see how that could --

THE COURT: I think that's right, but to clarify, Mr. Stancil, if we go through this Round 1 and you lose on Round 1 so that there's a potential that the damages matter, if I then order the disclosure to his business people, that could trigger a 30 days. Right?

MR. STANCIL: That's one concern. The other concern would be if we win on the 12(c) or are poised to win, and then there are requests for additional disclosures and then there's

a new theory in the complaint, that we then have -- this is the one that we're -- we're trying to get this litigated so that we can move on --

THE COURT: Yeah, so I --

MR. STANCIL: -- on that --

THE COURT: -- so I don' t see why I need to change the order then, and I don't think Mr. Wolfshohl's asking me to.

MR. WOLFSHOHL: I'm not.

THE COURT: I'll leave that order intact.

MR. STANCIL: Your Honor, just so I can understand if I won or lost that issue, I apologize, I'm just a little confused by what Mr. Wolfshohl represented.

THE COURT: If you --

MR. STANCIL: I don't --

THE COURT: -- if we later order disclosure to his business folks, that opens his 30-day window no matter when I issue that order.

MR. STANCIL: Well, okay, then I understand -- I understand Your Honor's decision. I think that is our principal concern is that this will never end. But I had thought if you were concerned about damages, that that wouldn't be in support of a new amendment for a new complaint, but it would be in support of argument as to why they are or are not injured. But that's our principal concern is that if

we have the suite of alleged breaches in front of us, we'll take them on.

THE COURT: All right. I am -- I find that it is premature to determine whether information should be turned over or not to business people on the Carnero side. I find that there are legitimate concerns raised as to the disclosure of confidential information which is, in fact, confidential to the Carnero business folks and therefore the Court should structure the hearings and the timing of the Court's decisions to avoid that question if possible.

Accordingly I am ordering that the hearing on the motion to dismiss that was filed as a motion for a judgment on the pleadings at ECF 51, the hearing will not include any matter on damages, and I will presume for the purposes of that hearing that changes that invade Carnero's rights could produce damages.

And if there are changes that invade Carnero's rights that could produce damages, we will at that time revisit whether and how and who would receive that information on the business side of Carnero, and work on providing adequate protection for the entities whose business information is potentially subject to compromise.

That will be done by today's docket entry. I will note that six people is far too many, if we ever get there. It isn't going to six people. I don't see why the

consultation parties would have any ability to see that information. It's the non-consultation side that I would be worrying about. But we're not there yet because we could grant potentially the judgment on the pleadings without ever having to worry about the damages section. That's the way I'm scheduling it.

Is there anything else we ought to accomplish today -- and all parties' rights are reserved.

And finally any party that wants to receive notice pleading that isn't currently on the CMECF notice list, please file a request for notice and I'm going to instruct Ms. Do to add you to the notice list. If anyone is currently on the notice list from what they've previously filed, they are to remain on the notice list and don't need to file anything new.

And I will go through that the notice list currently includes the following entities, so that you don't have to look this up, the notice list includes Yelena Archiyan on behalf of ETC; Sarah Ann Brown on behalf of Mesquite and on behalf of SN EF; Sidney Corry on behalf of Venado; Andrew Ehrlich on behalf of SN EF; Andy Coats on behalf of Carnero; Duston McFaul on behalf of Mitsui E&P Texas, LP; John Mitchell on behalf of ETC Texas Pipeline Limited; and on behalf -- and then Paul Mitchell on behalf of Enterprise Products Operating, LLC; James Munisteri on behalf of Mesquite Comanche Holdings, LLC, and on behalf of Mesquite Energy, Inc., and on behalf of

SN EF Maverick; Michelle Hector on behalf of Eagle Ford TX, LP; Maegan Quejada on behalf of Mitsui E&P Texas, LP; Lydia Webb on behalf of Springfield Pipeline, LLC and on behalf of WGR Operating, LP and on behalf of Western Midstream Partners; Jared Wilkerson on behalf of Eagle Ford, TX, LP; Joshua Wolfshohl on behalf of Carnero G&P; and Thomas Wooley on behalf of SN EF UnSub.

If you are on that list, you don't need to do anything, you'll continue to receive notice. If you're not, please file a request for notice and Ms. Do will add you.

Mr. Wolfshohl?

MR. WOLFSHOHL: Just a clarification, Your Honor, because I didn't hear it whenever you were providing your ruling. You had talked earlier in the hearing, you had asked Mr. Stancil why do you need the documents to support the motion for judgment on the pleadings, and my understanding from what you're ordering is your motion is not going to rely on those documents and that they will proceed with the motion for judgment on the pleadings based on what's been pled.

THE COURT: No, no, I'm bifurcating his motion.

MR. WOLFSHOHL: Okay.

THE COURT: So if it turns out that this becomes relevant, we then will cross the bridge later. But it'll be the same motion.

MR. WOLFSHOHL: Okay. So --

MR. STANCIL: Your Honor, my --

THE COURT: Hold on.

MR. STANCIL: -- the bifurcation --

THE COURT: Hold on, hold on. Hold on, let Mr. Wolfshohl finish.

Go ahead, Mr. Wolfshohl.

MR. WOLFSHOHL: I'm just trying to understand, when you bifurcated, I mean how are we going -- because the arguments are so intertwined and because there are 35 to 40 --

THE COURT: I bifurcated --

MR. WOLFSHOHL: -- exhibits.

THE COURT: It's a fact hearing, it's an evidentiary hearing. I'm not going to take in any evidence of damages or not. Right? It's an evidentiary hearing, that's what I'm bifurcating.

MR. McFAUL: Your Honor --

MR. STANCIL: Your Honor, it's a motion for judgment on the pleadings, so I think -- I think we believe it -- I don't think it is a fact hearing, I think we would be relying on the agreements, but I think we do need to describe and reference the agreements to the Court in order to ascertain whether there is a breach. I heard the Court's order to say that we can't rely on the agreements to say, and therefore even if there's a breach, there's no damages, or if it would otherwise be a breach in the absence of damages. So I'm

afraid I'm a little confused.

THE COURT: So by saying it's a factual hearing I mean it is a factual hearing relying on the documents, but the documents are going to come in because they're reference in the pleadings initially. So, yes, we're going to be able to look at the documents, but what we're going to worry about is whether there is a breach that might cause damages. If there is no breach that might cause damages, damages are irrelevant. If there is a breach that might cause damages, then damages will be relevant if that's part of the proof that you need to make to win your judgment on the pleadings.

MR. STANCIL: Understood. Thank you.

MR. McFAUL: And you answered my question, Your Honor. This is Duston McFaul for Mitsui. There's a lot of reference to the documents and I just wanted to make sure that we were limiting that to the documents disclosure of which is being objected to.

THE COURT: Well, there may be documents, and I haven't looked through the entire exhibit list, that are correctly referenceable to which no objection has been filed, but it includes all documents --

MR. McFAUL: Right.

THE COURT: -- to which an objection has -- a disclosure objection is being lodged. There may be additional ones, I don't know.

MR. WOLFSHOHL: And that actually raises a good question, Your Honor. We were in discussions with various other parties about the disclosure of documents, other than the ones that the objectors specifically objected to. We filed our motion, objectors objected to their specific documents. There are a handful of documents that no one objected to the disclosure of. Is there any issue with uploading an order that just provides that those can be disclosed in accordance with the protective order? I mean I think that we're in agreement generally with a number of the people that are on the phone and I don't know if anybody that's in here --

THE COURT: If there are stipulations on some documents, they can be turned over and reviewed, that's all fine with me. But without a stipulation I'm not going to guess at what that order might say.

MR. WOLFSHOHL: Sure, of course. No, we would have to provide the, yeah, necessary --

THE COURT: Yeah, just get everybody to sign off on it.

MR. WOLFSHOHL: Okay.

THE COURT: Okay. All right. We're in recess till eleven o'clock. Thank you.

MR. STANCIL: Thank you, Your Honor.

(Hearing adjourned 10:40 a.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

/S./ MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #66336*

*DATE FILED: SEPTEMBER 21, 2022*

# <u>Exhibit Nos. 36 & 37</u>

## Defendants' Reply in Support of Their Motion for Judgment on the Pleadings

## [Filed Under Seal at Doc. No. 99]

# EXHIBIT 36

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | (VIA TELEPHONE)<br>PAUL, WEISS, RIFKIND,<br>WHARTON AND GARRISON<br>Justin Ward, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3000 |
| | MCLOSKEY ROBERSON, PLLC<br>Thomas Woolley, Esq.<br>945 Heights Blvd<br>Houston, TX 77008<br>713-337-3910 |
| FOR CARNERO G&P, LLC: | PORTER HEDGES LLP<br>Joshua Wolfshohl, Esq.<br>Amy Falcon, Esq.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR MESQUITE ENERGY, INC. | FOLEY GARDERE<br>James G. Munisteri, Esq.<br>Sara Brown, Esq.<br>1000 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-276-5500 |
| | (VIA TELEPHONE)<br>WILLKIE FARR AND GALLAGHER LLP<br>Mark Stancil, Esq.<br>Dennis Jenkins, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS LP: | SIDLEY AUSTIN LLP<br>Duston McFaul, Esq.<br>Maegan Quejada<br>1000 Louisiana St<br>Suite 6000<br>Houston, TX 77002<br>713-495-4500 |

APPEARANCES (CONT'D):

FOR EAGLE FORD TX LP: (VIA TELEPHONE)
MORGAN, LEWIS AND BOCKIUS LLP
Julia Frost Davies, Esq.
One Federal Street
Boston, MA 02215
617-341-7700

FOR VENADO EF L.P. (VIA TELEPHONE)
KIRKLAND AND ELLIS LLP
Sydney Corry, Esq.
609 Main Street
Houston, TX 77002
253-455-6202

(Please also see Electronic Appearances.)

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Plaintiff's: Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant's bear the burden to establish jurisdiction and we don't think that they can, Your Honor.

Most of Carnero's claims in the dec action don't reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that's not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you've got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it's ever rejected under L. That's a big step that may or may not be a fatal step. But if you can take away K and L, it's going to change the discussion, I think, that we're going to have today. I'm just -- I'll let the other side speak up about this, but that's what I'm reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren't going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we're coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we've been here several times, we don't know exactly what's going to happen. I'm just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That's not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I'm getting to on how I think it's more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that's what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I'm asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor's no longer obligated under those existing commitments and I just don't see how that could be -- fall under Your Honor's jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I'm not necessarily saying there's anything wrong with this, but I'm not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don't know -- first of all, I don't know if they're going to seek rejection. I don't know if I'm going to approve rejection. I don't know if I'm going to approve rejection if I say it's conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I'm going to do before I do it, before I know what I'm going to do, and to say anytime I act under 365, here's the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we're doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I'm not sure I'm going to be able to get the right people on the phone immediately, I'm wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

Case 4:21-cv-00508 Document 32-8 Filed 04/19/21 Page 21 of 219



fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

/S/ MARY D. HENRY

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*
*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
*JTT TRANSCRIPT #64921*
*DATE FILED: DECEMBER 13, 2021*

# EXHIBIT 37

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Debtors.[1] | ) | (Jointly Administered) |

**LIMITED OBJECTION AND RESERVATION
OF RIGHTS OF GAVILAN RESOURCES, LLC TO
ASSUMPTION AND REJECTION OF CONTRACTS UNDER
THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Gavilan Resources, LLC ("**Gavilan**") by and through undersigned counsel submits this limited objection and reservation of rights (the "**Objection**") to the proposed assumption and rejection of contracts under the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1205] (the "**Plan**") filed by Sanchez Energy Corporation and its debtor affiliates in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") and pursuant to the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1212] (as amended by the *Order Granting Emergency Motion Modifying Paragraph 17 of the Order Approving Disclosure Statement and Confirming Second*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

*Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1267], the "**Confirmation Order**"), and the *Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1326] (the "**Executory Contract Notice**"), and respectfully states as follows:

**BACKGROUND**

*A. Gavilan And The Comanche Assets*

1. Gavilan is a private company in the business of acquiring, developing, and producing oil and natural gas assets in the Eagle Ford shale play in south Texas. In March 2017, Gavilan, along with non-Debtor SN EF UnSub LP ("**UnSub**") and Debtor SN EF Maverick, LLC ("**SN Maverick**") (together with Debtor Sanchez Energy Corporation, "**Sanchez**" or the "**Debtors**"), purchased certain assets in the Eagle Ford shale, known as the Comanche assets (the "**Comanche Assets**"), for approximately $2.3 billion from Anadarko Petroleum ("**Anadarko**"). Gavilan paid Anadarko 50% of the purchase price, roughly $1.13 billion, and acquired 50% of all of Anadarko's interest in the Comanche Assets. UnSub paid Anadarko $744 million for the other 50% of Anadarko's proved developed producing ("**PDP**") assets, and 20% of Anadarko's proved developed non-producing ("**PDNP**") assets and proved undeveloped ("**PUD**") assets. SN Maverick paid Anadarko $394 million for the remaining 30% of Anadarko's PDNP and PUD assets.

2. Gavilan, Sanchez, and UnSub, either as part of the transaction with Anadarko or immediately thereafter, became party to a number of agreements and obtained rights with respect to others related to the operations and management of the Comanche Assets. These agreements range from joint operating agreements ("**JOAs**"), pooling agreements, marketing agreements, to

the Joint Development Agreement ("**JDA**") – the subject of the Operatorship Dispute (defined below) currently pending before this Court. In addition to the contracts to which Gavilan is a direct party, certain Debtor contracts inure to the benefit of Gavilan and cannot be modified without the consent of Gavilan. For example, each of the marketing agreements between Gavilan and Sanchez requires Gavilan's approval for certain new, or changes to existing, processing, treating, transportation or similar or related agreements.

*B. The Operatorship Dispute, The Plan And The Debtors' Executory Contracts*

3. As referenced above, Gavilan, Sanchez, and UnSub are parties to the JDA. Sanchez was in Default (as defined in the JDA), for two independent reasons, under the JDA for months – before Sanchez filed its own chapter 11 cases. Sanchez disputed the Defaults, forcing Gavilan to confirm the Defaults through a contractually mandated arbitration process. Gavilan started arbitration proceedings in February 2019.

4. In August 2019, before the conclusion of the arbitration, the Debtors and certain affiliates filed the above-captioned Chapter 11 Cases. Following the commencement of the Debtors' Chapter 11 Cases, Gavilan sought relief from the automatic stay to continue the arbitration. In December 2019 and January 2020, Gavilan and the Debtors agreed to move the arbitration proceedings to these Chapter 11 Cases so that the dispute among the parties, the "Operatorship Dispute," could finally be resolved. The Operatorship Dispute is styled as *Gavilan Resources, LLC v. SN EF Maverick, LLC, et al.*, Adv. Proc. No. 20-03021. Trial on the Operatorship Dispute concluded on June 5, 2020 and, as of the date hereof, the matter remains under consideration by the Court.

5. On April 30, 2020, the Court confirmed the Plan proposed by the Debtors, but the Debtors left unresolved issues related to assumption and rejection of numerous contracts, including

those with, and otherwise affecting, Gavilan. The Debtors' lists of proposed contracts to be assumed or rejected have been filed, and amended, on a number of occasions. The Executory Contract Notice is the last filed list. Exhibit B to the Executory Contract Notice is the list of executory contracts that the Debtors intend to reject, while Exhibit C to the same is the list of the executory contracts that the Debtors intend to assume. On June 7, 2020, Gavilan requested additional information regarding certain of the contracts listed in the Executory Contract Notice and, on June 20, 2020, reiterated that request and made additional requests for information relevant to this Objection and the Debtors' proposed assumption or rejection (the "**Informal Requests**"). As of the time of this filing, Gavilan has not received a response to the Informal Requests.

*C. Gavilan's Chapter 11 Cases*

6. On May 15, 2020, Gavilan and its affiliated debtors each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Gavilan's and its debtor affiliate's cases (the "**Gavilan Cases**") are being jointly administered under *In re Gavilan Resources, LLC*, Case No. 20-32656 (Bankr. S.D. Tex. 2020). At the request of Gavilan, the automatic stay was lifted in the Gavilan Cases for the limited purpose of allowing Gavilan and Sanchez to prosecute their asserted claims to a final judgment in the Operatorship Dispute, and for no other reason.

## OBJECTION

7. Pursuant to sections 365 and 362[2] of the Bankruptcy Code, Gavilan files this limited Objection and reservation of rights with respect to the Debtors' proposed rejection and assumption of any contracts to which Gavilan is a party or in which Gavilan has an interest (the "**Contracts**").

[2] The automatic stay imposed in the Gavilan Cases has not been modified or otherwise lifted and the Debtors in these Chapter 11 Cases have made no attempt to do so. Gavilan is reserving all rights to seek enforcement of the automatic

*A. Whether Assumption Or Rejection Is Supported By The Debtors' Business Judgment Cannot Be Determined Until Resolution Of The Operatorship Dispute*

8. The Debtors' proposed assumption or rejection of the Contracts is not appropriate at this stage of these Chapter 11 Cases because the resolution of the Operatorship Dispute remains under consideration by the Court. Operatorship of the Comanche Assets is a central issue in both these Chapter 11 Cases as well as the Gavilan Cases. Each of the parties agrees that the right to operate the Comanche Assets is an important right, and the decision by the Court on the Operatorship Dispute, no matter the outcome, will most assuredly cause each of the parties to review its options, including with respect to the assumption or rejection of the Contracts, and adjust its strategies to maximize the value of all involved bankruptcy estates.

9. Pursuant to section 365(a) of the Bankruptcy Code, a trustee or debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The standard by which a debtor's decision to reject or assume an executory contract is reviewed is the business judgment rule. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019); *see also Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying the business judgement rule). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Bartlinski v. Sanchez*, 39 F. Supp. 3d 862, 866 (S.D. Tex. 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). "In applying the business judgment rule in deciding whether to grant a debtor's motion to reject a contract a court is not adjured to blindly accept, but rather only to show proper

stay in the Gavilan Cases to the extent the proposed treatment of any Contract impermissibly affects Gavilan's rights thereunder.

deference to the business judgment of the debtor's management." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 426 (Bankr. N.D. Tex. 2009) (citing *In re Richmond Leasing*, 762 F.2d at 1309). Furthermore, "[i]n reviewing a trustee's or debtor-in-possession's decision to assume [or reject] an executory contract …, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession." *Id.* at 427 (quoting *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993) (alteration in original)).

10. Indeed, the Debtors have yet to make a showing that the assumption or rejection of the Contracts, much less the assumption or rejection of each of the contracts listed in the Executory Contract Notice, is an appropriate application of the Debtors' business judgment, especially as it relates to the Comanche Assets. Moreover, however deferential the business judgment rule may be to the Debtors, it would be difficult to contend that the Debtors' management has made an informed decision regarding whether to assume or reject the Contracts, without considering the impact of this Court's ruling in the Operatorship Dispute. Operatorship of the Comanche Assets is a key component of the value of the Comanche Assets. Without the Operatorship Dispute being decided, the Debtors will not be able to make a convincing case that the decisions under section 365 are adequately "informed" and in "good faith." Accordingly, the Debtors' proposed rejection and assumption of the Contracts should not be considered until the Operatorship Dispute is resolved.

*B. The Debtors Have Not Satisfied The Requirements Of Section 365(b)*

11. As referenced above, the Debtors propose to assume several of the Contracts with Gavilan. Pursuant to section 365(b) of the Bankruptcy Code,

> [i]f there has been a default in an executory contract or unexpired lease of the debtor, the [debtor-in-possession] may not assume such contract or lease unless, … the [debtor-in-possession]—
>
> > (A) cures, or provides adequate assurance that the [debtor-in-possession] will promptly cure, such default [subject to certain exceptions] …;
> >
> > (B) compensates, or provides adequate assurance that the [debtor-in-possession] will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

12. While there is no set definition of "adequate assurance of future performance," courts have assessed numerous factors in the analysis. "[T]o determine if the debtor in possession has provided adequate assurance of future performance, we have held that courts must look to factual conditions, including consideration of whether the debtor's financial data indicated its ability to generate an income stream sufficient to meet its obligations, the general economic outlook in the debtor's industry, and the presence of a guarantee." *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 438-39 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also In re Richmond Leasing*, 762 F.2d at 1310 (discussing the same factors) (citations omitted).

13. As an initial matter, the Debtors have not responded to Gavilan's Informal Requests for additional information regarding the Contracts, and Gavilan is in the process of reviewing ongoing discovery in connection with the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a*

*Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended* [Docket No. 1309] (the "**Settlement Motion**"). Accordingly, Gavilan reserves the right to supplement this Objection based on additional information provided by the Debtors.

14. In addition, as described in the Settlement Motion, the Debtors have proposed to reject certain of the processing and transportation agreements currently handling Gavilan's production even though the Debtors are also proposing to assume the Gavilan marketing agreements which require Gavilan's consent to modify such processing and transportation arrangements. This proposed result appears untenable under the Bankruptcy Code. If the Debtors are allowed to reject, and thus breach, such processing and transportation agreements, among others, the Debtors cannot purport to be in compliance with, and thus assume, Gavilan's marketing agreements.

15. Based on this and other facts currently available to Gavilan, including the Debtors' apparent lack of liquidity[3] and ongoing uncertainty regarding the proposed go-forward management of the Debtors, Gavilan objects to the proposed assumption of the Contracts until such time as the Debtors can cure any existing defaults and provide adequate assurance of future performance under the Contracts the Debtors propose to assume.

## RESERVATION OF RIGHTS

16. Based on the foregoing, Gavilan reserves the right to amend or supplement this Objection, raise additional objections to the Debtors' proposed treatment of the Contracts, seek

[3] As part of Sanchez's proposed Settlement Agreement (as defined in the Settlement Motion), Sanchez will immediately receive $8 million upon Court approval of the Settlement Agreement. This, they say, is "crucial to providing the needed liquidity." Settlement Motion, ¶ 3. They further state that the relief requested in the Settlement Motion and Settlement Agreement is "critical to the occurrence of the Effective Date." *Id.* at ¶ 4.

formal discovery, and to seek any other or further relief. In addition, because Gavilan is a debtor in the Gavilan Cases, Gavilan reserves all rights to assume or reject its own executory contracts pursuant to section 365 of the Bankruptcy Code, including certain of those contracts which the Debtors purport to assume or reject pursuant to the Plan and Confirmation Order, and to seek enforcement of the automatic stay in the Gavilan Cases.

**CONCLUSION**

Based on the foregoing, Gavilan respectfully requests that the Court defer the Debtors' requests to reject or assume the Contracts until a more appropriate time, and grant such other and further relief as the Court may deem just and proper.

Dated: June 22, 2020
Houston, Texas

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez (TX 15776275)
Brenda Funk (TX 24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Emails: Alfredo.Perez@weil.com;
Brenda.Funk@weil.com

\- and -

Garrett Fail (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Garrett.Fail@weil.com

*Proposed Attorneys for Gavilan Resources, LLC*

Case 19-34054 Document 1348 Filed 06/22/20 Page 10 of 10

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, a true and correct copy of the foregoing objection was served by e-mail on the parties who receive electronic notice in these cases pursuant to the Court's ECF filing system.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| SN EF Maverick, LLC, and Mesquite | § | |
| Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Carnero's Exhibit List for**
**<u>Motion for Judgment on the Pleadings Hearing on October 5, 2022</u>**
(Relates to Doc. Nos. 53, 67, 78)

Carnero G&P LLC files this witness list (the "Exhibit List") for the hearing scheduled for October 5, 2022 at 1:30 p.m. (CST) before the Honorable Marvin Isgur at the United States Bankruptcy Court for the Southern District of Texas, Courtroom 404, 515 Rusk Avenue, Houston, Texas 77002 (the "Hearing").

---

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite600, Houston, Texas 77002.

**Exhibits**

Carnero may offer into evidence any one or more of the following exhibits:

| Dkt. No. | Description | MARK | OFFER | OBJECT | ADMIT | W/D | Disposition After Trial |
|---|---|---|---|---|---|---|---|
| 68-1 | Carnero GGPA & Amendment | | | | | | |
| 68-15 | UnSub GGPA Ratification Agreement | | | | | | |
| 68-16 | Eagle Ford GGPA Ratification Agreement | | | | | | |
| 68-17 | Venado GGPA Ratification Agreement | | | | | | |
| 68-18 | Gavilan GGPA Ratification Agreement | | | | | | |
| 68-19 | Mitsui Letter Agreement regarding GGPA | | | | | | |
| 68-13 | Marketing Agency Agreement | | | | | | |
| 68-14 | Midstream Agency Agreement | | | | | | |
| 68-21 | Notice of Filing Gavilan APA | | | | | | |
| | Any pleading or other document filed with the Court on the docket of the above-captioned chapter 11 cases or in *In re Gavilan Resources, LLC*, Case No. 20-32656, In the United States Bankruptcy Court for the Southern District of Texas Houston Division | | | | | | |
| | Any exhibit necessary to rebut the evidence or testimony of any witness offered or designated by any other party | | | | | | |
| | Any exhibit listed by any other party | | | | | | |

Carnero reserves the right to further amend or supplement the Exhibit List at any time prior to or during the Hearing.

Dated: October 3, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *_/s/ Joshua W. Wolfshohl_*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

***Attorneys for Plaintiff Carnero G&P, LLC***

**Certificate of Service**

I hereby certify that on October 3, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*_/s/ Joshua W. Wolfshohl_*
Joshua W. Wolfshohl