**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI)<br><br>**Hearing Date**: October 5, 2022<br>**Hearing Time**: 1:30 PM<br>**Location**: Courtroom 404<br>515 Rusk St.<br>Houston, Texas 77002<br>**Judge Presiding**: Marvin Isgur |

**DEFENDANTS' COMBINED WITNESS AND EXHIBIT LIST**

**[Relates to Docket Nos. 67, 78, & 99]**

Pursuant to Bankruptcy Local Rule 9013-2, Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Mesquite Comanche Holdings, LLC ("MCom"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

collectively as the "WIPs"), and Crown Eagle Energy LP (f/k/a SN EF UnSub, LP) ("UnSub" and, together with Maverick, Mesquite, MCom, and the WIPs, the "Defendants") submit the following combined Witness and Exhibit List for the hearing scheduled on **October 5, 2022, at 1:30 p.m. (CT)**, before the Honorable Marvin Isgur, United States Bankruptcy Judge, 515 Rusk St., Courtroom 404, Houston, Texas 77002. Parties may participate in the hearing either in person or by an audio and video connection.[2]

## Witness List

1. Any witness designated or called by any party; and
2. Any witness required for rebuttal.

The Defendants reserve the right to modify, amend, or supplement this Witness and Exhibit List at their discretion at any time prior to hearing on these matters.

[*Remainder of Page Left Intentionally Blank*]

[2] Entries on the docket of the main bankruptcy case will be cited as, "Dkt. No. __", while citations to the adversary proceedings are as follows:

- the "Second Carnero Action" (this lawsuit, captioned above) is cited as "Carnero II Dkt. No. __";
- the "Declaratory Action" (*SN EF Maverick, LLC, et al.,* v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI)) is cited as "Decl. Action Dkt. No. __ "; and
- the "First Carnero Action" (*Carnero G&P, LLC* v. *SN EF UnSub LP, et al.*, Adv. Pro. No. 21-03908 (MI)) is cited as "Carnero I Dkt. No. __".

**Exhibit List**[3]

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 1. | GGPA and GGPA Amendment | | | | |
| 2. | Second Amended Chapter 11 Plan (Dkt. No. 1205) | | | | |
| 3. | Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief (Dkt. No. 1118) | | | | |

[3] Defendants have designated Exhibits 6–12, 20, and 26 as "Highly Confidential," and will admit them into the record pursuant to the *Stipulated Protective Order* entered by this Court on April 29, 2022 (Carnero II Dkt. No. 16). Exhibits 1–35 on this table were attached to Defendants' *Motion for Judgment on the Pleadings*. (Carnero II Dkt. Nos. 67 & 68). Exhibits 36 and 37 were attached to Defendants' *Reply In Support of Motion for Judgment on the Pleadings* (Carnero II Dkt. No. 99 & 100). Exhibit 38 was attached to Plaintiff Carnero G&P LLC's *Objection to Defendants' Motion for Judgment on the Pleadings* (Carnero II Dkt. No. 78).

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 4. | Order Approving Disclosure Statement and Confirming Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Entities (Dkt. No. 1212) | | | | |
| 5. | Order Granting Emergency Motion Modifying Paragraph 17 of the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (Dkt. No. 1263) | | | | |
| 6. | Master Settlement Agreement and Exhibits | | | | |
| 7. | The Brasada Gas Processing Agreement, dated as of February 27, 2012 & Amendments Nos. 1–4 | | | | |
| 8. | Individual Transaction Confirmation to ETC Processing Agreement, dated as of April 1, 2011 & Amendments | | | | |
| 9. | Firm NGPA Section 311 Gas Transportation Agreement & Firm Intrastate Transportation Agreement | | | | |

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 10. | Enterprise Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko, dated as of March 1, 2012 | | | | |
| 11. | Enterprise Purchase Agreement between Anadarko and Enterprise Products Operating LLC, effective as of March 1, 2012 | | | | |
| 12. | Comanche PSA with Amendments 1–3 | | | | |
| 13. | Retained Marketing Contracts Services Agreement and Amendments Nos. 1 & 2 | | | | |
| 14. | Retained Midstream Contracts Services Agreement by and among SN EF Maverick LLC, Anadarko E&P Onshore LLC, and Kerr-McGee Oil & Gas Onshore LP, dated as of June 1, 2017 | | | | |

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 15. | Ratification and Assumption Agreement by and among SN EF UnSub, LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018 | | | | |
| 16. | Ratification and Assumption Agreement by and among Eagle Ford TX LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018 | | | | |
| 17. | Ratification and Assumption Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018 | | | | |
| 18. | Ratification and Assumption Agreement by and among Gavilan and Carnero G&P, LLC, dated as of April 1, 2018 | | | | |
| 19. | Letter Agreement by and among Mitsui E&P Texas LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018 | | | | |

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 20. | Gavilan Purchase and Marketing Agreements | | | | |
| 21. | Gavilan Asset and Purchase Agreement (Dkt. No. 366) | | | | |
| 22. | Gavilan Stipulation (Dkt. No. 1758) | | | | |
| 23. | Gavilan Sale Order (Dkt. No. 361) | | | | |
| 24. | WIP PMA Assumption Order (Dkt. No. 2201) | | | | |
| 25. | Stipulation and Agreed Order (Dkt. No. 2253) | | | | |
| 26. | Mesquite – UnSub Hydrocarbons Purchase and Marketing Agreement, dated as of December 17, 2021 | | | | |
| 27. | Original Carnero Petition (Carnero I Dkt. No. 1-4) | | | | |
| 28. | Oxy and Wes Objection to Settlement (Dkt. No. 1314) | | | | |
| 29. | Venado, Eagle Ford, and Mitsui Objection to Settlement (Dkt. No. 1351) | | | | |
| 30. | UnSub Objection to Settlement (Dkt. No. 1373) | | | | |

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 31. | Oxy Supplemental Objection to Settlement (Dkt. No. 1381) | | | | |
| 32. | UnSub Objection to Assumption of Contracts (Dkt. No. 1354) | | | | |
| 33. | UnSub Objection to Assumption of Ratification Agreement (Dkt. No. 1356) | | | | |
| 34. | UnSub Objection to Rejection of Agency Agreements (Dkt. No. 1465) | | | | |
| 35. | Order Approving Settlements and Assumption (Dkt. No. 1415) | | | | |
| 36. | December 7, 2021 Hearing Transcript on Carnero's Motion to Remand (Carnero I Dkt. No. 32) | | | | |
| 37. | Gavilan Objection (Dkt. No. 1346) | | | | |
| 38. | May 23, 2022 Hearing Transcript on Carnero's Motion to Remand (Carnero II Dkt. No. 33) | | | | |
| 39. | Certificate of Authenticity of Business Records Pursuant to Rule of Evidence 902(11) | | | | |

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| | Any rebuttal or impeachment exhibits | | | | |
| | Any demonstrative exhibits | | | | |
| | Any exhibit identified or offered by any other party | | | | |
| | Any pleadings or exhibits previously filed on this Court's docket | | | | |

Respectfully submitted on October 3, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC Mesquite Energy, Inc., & Mesquite Comanche Holdings, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 3, 2022, a true and correct copy of the foregoing Exhibit and Witness List were served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

# EXHIBIT 1

*Execution Version*

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i or (ii will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s, the Treating Facility, the Delivery Point(s and the Plant(s, Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c or Section 6.6(e.

"Cashout Price" for any Month means (i if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i Emissions or (ii the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i Producer and (ii each of SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s.

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s" means the inlet flange of the custody transfer meter(s owned by the Redelivery Pipeline(s at the Residue Gas Delivery Point(s, as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii Gathering L&U, plus (iii Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s connecting the Receipt Point(s to the Plant(s.

"Governmental Authority" means: (i the United States of America; (ii any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1 Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73 psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a. The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c.

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s" means the processing plant(s at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s, including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income; (ii the T&F Fee; and (iii any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i and (iii above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges.

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000 and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s" means the inlet flange of the custody transfer meter(s on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s.

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c.

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant.

"Taxes" means taxes, fees, or charges (including penalties and interest thereon now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s. Theoretical Gallons will be determined by multiplying: (i the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities.

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c.

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1 year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1 year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP or Released Well shall again be subject to the dedication hereunder as of the end of such one (1 year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3 years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells or Released Well (and associated Dedicated Acreage included in the proration unit for such well, as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e to retain all liquids (and title to such liquids separated from Producer's Gas by the use of conventional lease separators prior to delivery of Producer's Gas to Carnero at the Receipt Point(s, provided that Producer will not be permitted to remove or recover hydrocarbons from Producer's Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer's Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer's obligations are as follows:

(a Subject to Sections 3.1(c, 3.1(d, 3.1(e and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5;

(b Notwithstanding Section 3.1(a, to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of Producer's acquisition (collectively, the "Existing Commitments", such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure, Carnero may, within sixty (60 Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10% of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a the Maximum Daily Quantity, or (b the Maximum Receipt Capacity for the Receipt Point(s, as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c.

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corporation that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s. Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s.

**Section 4.2** Delivery Point(s. Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s.

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder, and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s at the pressures existing in the Redelivery Pipeline(s, from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s for the account of Producer on any Day differs from the Scheduled Quantity(ies for such Receipt Point(s, then Carnero shall only be obligated to deliver at the Delivery Point(s on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i no obligation to accept variations from a uniform hourly rate of flow, and (ii the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice, as applicable:

[redacted]

[redacted]

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees" shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any between the Consumer Price Index (All Urban Consumers (CPI-U; U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS" (the "CPI" for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10 calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30 Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24 Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB", or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time, two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1 the Receipt Quantity, and (2 the Delivery Quantity.

(a Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

<u>Table B</u>

| <u>Imbalance Percentage</u> | <u>Cashout Percentage</u> |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) <u>Imbalance Indemnity</u>. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) <u>Safety</u>. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** <u>Producer's Control</u>. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO.

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s. Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i while such Gas is within Carnero's control and possession; or (ii to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER.

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT, CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO. CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero's disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate, which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero's sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term" and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term".

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer



LEGAL_US_W # 90381908.20
HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER
009894

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

## ARTICLE 14
## FAILURE TO PAY; REMEDIES

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b if Producer fails to post credit assurance as required pursuant to Section 5.8(e, and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e;

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d if delivered personally, upon the date of actual delivery; and (e if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly.

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY. THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement, and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives" in the following circumstances:

(a to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f to independent certified public accountants for purposes of obtaining a financial audit; and

(g as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s. This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period from the earlier of (i the date such Change in Law becomes effective or (ii the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*





HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: ______________________________

Title: ______________________________



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: Antonio R. Sanchez, III

Title: Chief Executive Officer


HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

Case 4:22-cv-03035 Document 68-1 Filed in TXSD on 03/24/22 Page 4 of 70

# EXHIBIT A

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Receipt Point(s; Delivery Point(s**

**<u>Receipt Point(s</u>**

| *Meter Number* | *Receipt Point* | *Maximum Receipt Capacity (MMcf/d)* |
|---|---|---|
| 4043654 | Maverick CDP | 235 MMcfd |
| 4043653 | Highway 83 – Carnero CDP | 75 MMcfd |
| 2048026 | Highway 83 – T2 CDP* | 75 MMcfd |

**<u>Delivery Point(s)</u>**

| *Meter Number(s)* | *Residue Gas Delivery Point(s)* | |
|---|---|---|
| 4034034 | Western | 115 MMcfd |
| TBD*** | Eagle Ford Midstream Pipeline (NET)** | 150 MMcfd |
| 4034036 | SECO | 250 MMcfd |
| 02-T2-09-8090 | TPL SouthTex Transmission Company LP* | 35 MMcfd |
| 02-T2-09-3630 | TPL SouthTex Transmission Company LP* | 35 MMcfd |

*Deliveries to Silver Oak II Plant only

**Potential future Delivery Point – there is no current interconnect

***Meter number not currently available

**EXHIBIT B**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**FEES**

Gathering Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s pursuant to the terms set forth in Section 3.4 of the Agreement at the same fees, the Gathering Fee shall be $0.15 MMBtu (based on MMBtu received at the Receipt Point(s and subject to adjustment in accordance with Section 5.9 of the Agreement.

Treating Fee (based on $CO_2$ content and Mcf as determined at the Receipt Point(s:

| | |
|---|---|
| If $CO_2$ content is 2.00% or less | no fee |
| If $CO_2$ content is greater than 2.0% | **To be determined when service is required.** |

| | |
|---|---|
| Compression Fee: | **To be determined when compression is required** |

Processing Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement, the Processing Fee shall be $0.253 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Gathering and Processing Fees for Excess Gas: The Gathering Fee, Treating Fee, Compression Fee, and Processing Fee set forth above shall apply with respect to the Firm Volumes (as determined with respect to the then-effective MDQ) and the Priority Interruptible volumes that Carnero accepts under the terms of Section 3.4 of the Agreement. Carnero may refuse to accept any Excess Gas for gathering and processing under this Agreement due to lack of available capacity on the Carnero System. All Excess Gas that Carnero does not accept from Producer shall be, at Producer's sole discretion, temporarily released from the dedication hereunder, subject to the following paragraph.

Producer will give Carnero not less than one hundred twenty (120) days prior written notice and the applicable production projections and forecast, identifying the scope, source and nature of the applicable volumes in reasonable detail (the "Excess Gas Notice") in the event Producer anticipates delivering volumes of Excess Gas on a continuing basis for which Carnero has insufficient capacity on the Carnero System and which Carnero does not accept. Within forty-five (45) days following delivery of Producer's Excess Gas Notice, Carnero may, acting in its sole discretion, propose to accept Excess Gas at adjusted gathering and processing fees (the "Adjusted Gathering, Treating, Compression and Processing Fees"), mutually agreed between the parties that are reflective of: (i) Carnero's capital expenditures (including a reasonable return

on investment with respect to such expenditures; and (ii any incremental expenses, fees or other costs, in each case, with respect to the receipt, gathering, processing and redelivery (including delivery of contractually allocated Residue Gas and Plant Products of Producer's Gas. Within ninety (90 days following receipt of Producer's Excess Gas Notice, Producer and Carnero shall negotiate in good faith to arrive at mutually agreeable Adjusted Gathering, Treating, Compression and Processing Fees and an incremental maximum daily quantity, including the period during which such fees will be effective. If Producer and Carnero are unable to agree on the Adjusted Gathering, Treating, Compression and Processing Fees during the Negotiation Period, then Producer may enter into negotiations with a third party for the gathering, processing or redelivery of the Excess Gas. Once Producer has substantially negotiated definitive agreements with a third party, such that all commercial terms (and terms allocating risk have been finally determined (the "Third Party Offer", Producer will provide such agreements to Carnero and offer to Carnero, by irrevocable written notice, the option to enter into such agreements, with such changes as are necessary to reflect usage of Carnero's facilities and Carnero shall have 30 days after receipt of the Third Party Offer to elect to accept the Third Party Offer, except that the Receipt Point(s and Redelivery Point(s shall be the same as the Receipt and Redelivery Point(s set forth under this Agreement. In the event that Carnero declines to accept the Third Party Offer, Producer may thereafter elect to cause such Excess Gas to be permanently released from dedication under this Agreement; provided that in no event will Excess Gas be released under this provision if such release would cause (or be reasonably expected to cause Producer to not be able to deliver the then existing MDQ hereunder.

**EXHIBIT C**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Allocations**

1. Allocation of Producer's Condensate. A share of Condensate recovered by Carnero upstream of the Plant(s will be allocated to Producer each Month in accordance with the following formula:

$$\text{Producer's Share of Condensate} = AC \times \frac{PHV}{THV}$$

Where:

AC = the aggregate volume of Condensate delivered from the Carnero System for such Month;

PHV = the total MMBtus attributable to the C5+ component of Producer's Gas gathered and received at all Receipt Point(s) during such Month; and

THV = the total MMBtus attributable to the C5+ component of all Gas gathered and received in the Carnero System upstream of the Plant(s) during such Month.

2. Allocation of Producer's Products.

(a) In the event Producer has elected Full Recovery Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated in paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 90% |
| Propane | 96% |
| Butanes plus | 99% |

(b) In the event Producer has elected Ethane Rejection Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated under paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 35% |
| Propane | 94% |
| Butanes plus | 99% |

(c) At Carnero's election, Carnero may implement a different allocation methodology that it determines, in good faith, provides for a reasonable allocation of Plant Products.

3. Residue Gas. Producer's allocated share of Residue Gas for all Receipt Point(s) under this Agreement will be the quantity of Producer's Gas, in MMBtus, as measured at all Receipt Point(s), minus each of the following: (i) FL&U, (ii) shrinkage attributable to Producer's Condensate and (iii) Product Shrinkage. Plant Fuel, Gathering L&U and Compression Fuel (each as comprising a part of FL&U), Product Shrinkage and shrinkage attributable to Producer's Condensate will be determined as follows.

(a) Producer's share of Plant Fuel, stated in MMBtus, will be determined each Month by multiplying the actual quantity of MMBtus utilized or incurred in the operation of the Plant(s) for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee), use requirements and Gas lost as a result of, but not limited to, leakage, venting or flaring, discrepancies due to meter inaccuracies or variations of temperature and/or pressure at the Plant(s), as well as any Gas that is otherwise unaccounted for in the Plant(s) by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas delivered to the inlet of the Plant(s) during that Month, and (ii) the denominator of which is the total MMBtus attributable to all Gas delivered to the inlet of the Plant(s) during such Month.

(b) Producer's share of Gathering L&U, stated in MMBtus, will be determined each Month by multiplying the actual Gas that is lost and Gas that is unaccounted for in the Gathering System (which is the total MMBtus attributable to all Gas received into the Gathering System, less the total MMBtus attributable to all Gas delivered to facilities downstream of the Gathering System, less Compression Fuel and less shrinkage attributable to Condensate), by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) and transported on the Gathering System during that Month, and (ii) the denominator of

which is the total MMBtus attributable to all Gas received into and transported on the Gathering System during such Month.

(c) Producer's share of Compression Fuel, stated in MMBtus, will be determined each Month by multiplying the actual fuel in MMBtus used by Carnero in the operation of the compression facilities by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) during that Month that require compression at the compression facilities, and (ii) the denominator of which is the total MMBtus attributable to all Gas received into the Carnero System during such Month that require compression at the compression facilities.

(d) Producer's allocated share of product shrinkage (the "Product Shrinkage") for each Month will be the aggregate Btus determined by multiplying the gallons of each Plant Product, by component, of Producer's Products at all Receipt Point(s) by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145*, and superseding revisions thereof, and as adjusted to 60º Fahrenheit and a 14.73 psia pressure base.

(e) Producer's allocated share of shrinkage attributable to Producer's Condensate will be calculated by Carnero each Month by multiplying the number of gallons of each component of Condensate attributable to Producer's Gas by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145,* and superseding revisions thereof, and as adjusted to 60° Fahrenheit and a 14.73 psia pressure base. The aggregate Btu of all such components will constitute the shrinkage attributable to Producer's Condensate hereunder.





HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**EXHIBIT D**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**DEDICATED ACREAGE**

**For SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is all of Maverick, Webb, Dimmit and LaSalle Counties, Texas.**

**For each Comanche Producer other than SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is such Comanche Producer's existing right, title and interest as of the Effective Date (excluding any after acquired interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce Gas therefrom located in the area circled in red in the below diagram, excluding Mexico.**








HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

Case 22-03035 Document 68-1 Filed in TXSB on 08/24/22 Page 54 of 70

**EXHIBIT E**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**MEMORANDUM OF AGREEMENT**

THIS MEMORANDUM OF Agreement (this "Memorandum" is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date", among SN EF Maverick, LLC, a Delaware limited liability company ("Producer", and Carnero G&P LLC, a Delaware limited liability company ("Carnero".

**RECITALS**

WHEREAS, on the Effective Date, Producer and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "Agreement" under which Carnero agreed to provide gas gathering and gas processing services to Producer for its benefit and for the benefit of certain other producers;

WHEREAS, Producer and Carnero desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreement and certain provisions contained therein.

1. **Term**. The term of the Agreement commenced on the Effective Date and continues in effect until the fifteenth anniversary of such date (the "Primary Term" and will continue year-to-year thereafter unless the Agreement is terminated by Carnero or Producer upon at least 90 days' written notice to the other Party prior to the expiration of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreement, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreement and shall deliver thereunder to Carnero (the "Dedication" 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreement or otherwise excluded as provided in the Agreement owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage" or a pooled unit that contains acreage within the Dedicated Acreage, excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released or excluded from the Dedication in accordance with the Agreement (such gas, the "Dedicated Gas".

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, treat, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreement.

4. **Covenant Running with the Land**. So long as the Agreement is in effect, such Agreement shall (i be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns.

5. **Incorporation of Terms**. The terms and conditions of the Agreement are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreement in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreement.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Producer and Carnero have signed this Memorandum as of the date first above written, but effective as of the Effective Date.

**CARNERO:**
**CARNERO G&P LLC**

By:____________________________
Name:__________________________
Title:___________________________

**PRODUCER:**
**SN EF MAVERICK, LLC**

By:____________________________
Name:__________________________
Title:___________________________

**THIS INSTRUMENT PREPARED BY:**

_________________
_________________
_________________
Attention: _________

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

Case 22-03035 Document 68-1 Filed in TXSB on 06/24/22 Page 58 of 70

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED INSTRUMENTS**

See attached.

**EXHIBIT F**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**EXISTING COMMITMENTS**

Residue Gas Commitment Agreements

1. Firm Gas Transportation Agreement dated October 1, 2012 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any

2. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any

3. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any

4. Firm Intrastate Gas Transportation Agreement dated March 01, 2013 between Anadarko E&P Onshore, LLC and Springfield Pipeline, LLC and associated amendments if any

5. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

6. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

7. Firm Transportation Agreement dated October 05, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

11. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

Natural Gas Liquids Commitment Agreements

1. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

2. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

3. Firm Transportation Agreement dated October 01, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

4. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

5. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

6. Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any
7. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

# EXHIBIT G

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## TRANSPORTATION AND FRACTIONATION FEE

A. For the first four (4) Contract Years during the Term, T&F Fee (expressed in cents per gallon) shall mean the following:

T&F Fee (expressed in cents per gallon) = (Combined T&F Fee) + (.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

B. Beginning on the fourth (4th) anniversary of the Effective Date and continuing for the remainder of the Term, the T&F Fee shall be comprised of each of the following components:

(i) <u>Transportation Fee</u>: means the actual out-of-pocket cost for transportation of Producer's Products, including any (i) pipeline transportation or exchange fees; (ii) truck and tank car rental fees incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product; and (iii) any other out-of-pocket costs incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product (other than take or pay fees or demand charges), plus (ii) <u>Fractionation Fee</u> (expressed in cents per gallon) = (Base Fractionation Fee) + [(.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

where:

*<u>Combined T&F Fee</u>* means 6.0 cents per gallon of Plant Product or Additional Plant Product

*<u>Base Fractionation Fee</u>* means 6.0 cents per gallon of Plant Product or Additional Plant Product, adjusted annually beginning on the 5th anniversary of the Effective Date by multiplying the then effective Base Fractionation Fee by the FERC Index

*<u>FERC Index</u>* means the FERC Oil Pipeline Index "Multiplier to Use", as published by the Federal Energy Regulatory Commission pursuant to 18 CFR 342.3, or its successor index then in effect.

*<u>Gas Price</u>* means the sum of (i) the Houston Ship Channel-Index (HSC) as published in the first issue of such Month of INSIDE FERC's GAS MARKET REPORT (or any replacement thereof mutually agreeable to the Parties if it is no longer published), expressed in $/MMBtu, plus (ii) a market differential expressed in $/MMBtu, which is currently $0.15/MMBtu. Producer acknowledges that the market differential represents Carnero's best approximation of the costs reasonably to be incurred by a fractionator of all natural gas fuel being delivered to the fractionator in relation to the HSC Index, and





HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 009921

*Execution Version*

**AMENDMENT TO**

**FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT**

This Amendment to Firm Gas Gathering, Processing and Purchase Agreement, (this "Amendment"), is effective as of the 1st day of April, 2018 (the "Effective Date") and is entered into by and among SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC (collectively the "Producers") and Carnero G&P LLC ("Carnero"). Carnero and each Producer are each referred to herein individually as a "Party" and collectively as the "Parties".

**Recitals**

A. Effective as of the Effective Date, SN EF Maverick, LLC and Carnero entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (the "FGGPPA").

B. Also effective as of the Effective Date, each of the other Producers ratified the FGGPPA pursuant to a Ratification Agreement, by and among such Producer, Carnero and SN EF Maverick, LLC (each, a "Ratification Agreement").

C. The Parties desire to amend the FGGPPA as set forth herein.

**Agreement**

For and in consideration of the foregoing and the mutual covenants and agreements contained herein and in the FGGPPA and the Ratification Agreements, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Amendment of FGGPPA. The FGGPPA is hereby amended as follows:

(a) The following definitions are inserted in Section 1.1 of the FGGPPA in appropriate alphabetic order:

"“Carnero Group” has the meaning set forth in Section 7.1."

"“Producer Group” has the meaning set forth in Section 7.2."

(b) Section 7.1 of the FGGPPA is deleted and replaced with the following:

"Section 7.1 Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully

responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination arising from: (i) such Gas while such Gas is within Producer's control and possession; (ii) the failure of Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof; or (iii) the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "CARNERO GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO GROUP)."

(c) Section 7.2 of the FGGPPA is deleted and replaced with the following:

"Section 7.2 Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, arising from: (i) such Gas while such Gas is within Carnero's control and possession (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof); or (ii) the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "PRODUCER GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING





HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP)."

2. Effectiveness. All matters contemplated in this Amendment will become effective, for all purposes, as of the Effective Date.

3. Effect on FGGPPA and Ratification Agreements. Except as expressly amended by this Amendment, the FGGPPA remains in full force and effect. The Parties acknowledge and agree that this Amendment shall in no manner impair or affect the validity or enforceability of the FGGPPA or any Ratification Agreement.

4. Counterparts. This Amendment may be executed in any number of counterparts (including by .pdf or other electronic means), each of which shall be an original but all of which together shall constitute one instrument.

**[Signature Pages Follow]**

The Parties have executed this Amendment as of the day and year first above written.

**CARNERO G&P LLC**

By: ______________________

Name: Patrick J. McDonie

Title: President

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

**SN EF MAVERICK, LLC**

By: ______________________

Name: Antonio R. Sanchez, III

Title: Chief Executive Officer

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

Case 22-03035 Document 68-1 Filed in TXSB on 08/24/22 Page 67 of 70

**EAGLE FORD TX LP**

By: ______________________

Name: Joo hyo Lee

Title: Treasury and Commercial Manager

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________

Name: Cameron W. George

Title: Chief Financial Officer and Treasurer



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER 

**GAVILAN RESOURCES, LLC**

By: ______________________________

Name: David E. Roberts Jr.

Title: Chief Executive Officer

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

**VENADO EF L.P.**

By: _______________________

Name: Stacy Shivers

Title: VP of Operations

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**<u>SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES</u>**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ........ 1**
A. Defined Terms ........ 1
B. Rules of Interpretation ........ 11
C. Computation of Time ........ 12
D. Governing Law ........ 12
E. Reference to Monetary Figures ........ 12
F. Reference to the Debtors or the Reorganized Debtors ........ 12
G. Controlling Document ........ 12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........ 12**
A. Administrative Claims ........ 12
B. Professional Fee Claims ........ 13
C. Priority Tax Claims ........ 14
D. Statutory Fees ........ 14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........ 14**
A. Formation of Debtor Group for Convenience Purposes Only ........ 14
B. Classification of Claims and Interests ........ 15
C. Treatment of Classes of Claims and Interests ........ 15
D. Special Provision Governing Unimpaired Claims ........ 18
E. Elimination of Vacant Classes ........ 18
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ........ 18
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........ 19
H. Intercompany Interests ........ 19
I. Subordinated Claims and Interests ........ 19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........ 19**
A. General Settlement of Claims, Interests, and Causes of Action ........ 19
B. Restructuring Transactions ........ 19
C. Sources of Consideration for Plan of Reorganization Distributions ........ 20
D. Lien-Related Litigation ........ 21
E. Continuation of Gavilan Proceeding ........ 22
F. Corporate Existence ........ 22
G. Vesting of Assets in the Reorganized Debtors ........ 22
H. Corporate Action ........ 23
I. New Organizational Documents ........ 23
J. Directors and Officers of Reorganized SN ........ 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ........ 23
L. Management Incentive Plan ........ 24
M. Effectuating Documents; Further Transactions ........ 24
N. Preservation of Causes of Action ........ 24
O. Exemption from Registration Requirements ........ 24
P. Cancellation of Instruments, Certificates, and Other Documents ........ 25
Q. Section 1146(a) Exemption ........ 25
R. DIP Agent Fees and Expenses ........ 26
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 26**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ........ 26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 27
D. Indemnification Obligations ........ 28
E. Insurance Policies ........ 28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........ 28
G. Contracts and Leases After the Petition Date ........ 28
H. Reservation of Rights ........ 28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........ 29**
A. Distributions on Account of Claims Allowed as of the Effective Date ........ 29
B. Rights and Powers of the Disbursing Agent ........ 29
C. Special Rules for Distributions to Holders of Disputed Claims ........ 29

TABLE OF CONTENTS (CONT'D)

**Page**


D. Delivery of Distributions ....30
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....34**
A. Allowance of Claims ....34
B. Claims Administration Responsibilities ....34
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....35
E. Time to File Objections to Claims ....35
F. Disallowance of Claims ....35
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....36**
A. Discharge of Claims and Termination of Interests ....36
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....37
E. Release of Liens ....37
F. Reimbursement or Contribution ....38
G. Recoupment ....38
H. Subordination Rights ....38

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**
A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....39
D. Effect of Non-Occurrence of Conditions to Consummation ....39
E. Substantial Consummation ....39

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**
A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....40**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**
A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....42
D. Payment of Statutory Fees ....42
E. Reservation of Rights ....42
F. Successors and Assigns ....42
G. Service of Documents ....43
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....44
J. Plan Supplement ....44
K. Non-Severability ....44
L. Votes Solicited in Good Faith ....44
M. Closing of Chapter 11 Cases ....44
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

63. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

64. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

65. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

66. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

67. "*Gavilan*" means Gavilan Resources, LLC.

68. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

69. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

70. "*Holder*" means an entity holding a Claim or Interest, as applicable.

71. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

73. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

74. "*Indemnified Parties"* means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date; (ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

75. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

76. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

77. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

78. “*Interest*” means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

79. “*Lien*” has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. “*Lien Challenge Complaint*” means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

81. “*Lien-Related Litigation*” means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order’s treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors’ Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

82. “*Lien-Related Litigation Creditor Representative*” means a representative, as selected by the Creditors’ Committee, of general unsecured creditors in the Lien-Related Litigation.

83. “*Management Incentive Plan*” means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

84. “*New Common Stock*” means the common stock of Reorganized SN to be issued pursuant to the Plan.

85. “*New Executive Employment Agreements*” means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

86. “*New Organizational Documents*” means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders’ Agreement, if any.

87. “*New Stockholders’ Agreement*” means the stockholder or similar agreement, if any, with respect to the New Common Stock.

88. “*Non-Participating Professional*” means any Professional that is not a Participating Professional on or before the Confirmation Date.

89. “*Notice of Assumption*” means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

90. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

92. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

93. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

94. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

95. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

96. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

97. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

98. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

99. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

100. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

102. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

103. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

104. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

Case 23-04005-87 Document 6893-9 Filed in TXSB on 03/24/20 Page 19 of 48

105. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

106. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

107. "*Professional Fee Settlement Reserve Amount*" means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

108. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

109. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

111. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

112. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

113. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

114. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

115. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

116. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

117. "*Sanchez Parties*" means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

118. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by

the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

120. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

121. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

123. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

124. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

125. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

126. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

127. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

128. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

129. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

130. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

131. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

132. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

133. "*SN*" means Sanchez Energy Corporation.

134. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

135. "*SOG*" means Sanchez Oil & Gas Corporation.

136. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

137. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

138. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

139. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

140. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

141. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

142. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

143. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders,

rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and

the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. <u>Final Fee Applications</u>

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided*

that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any

Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New

Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Confirmation Date by the Bankruptcy Court according to the following timeline:

- Phase 1: The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- Phase 2: If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Effective Date.

- Phase 3: If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- Post-Effective Date Equity Distribution Allocations: The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ

Case 21-30037 Document 189 Filed in TXSB on 04/20/22 Page 108 of 300

professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity

Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected

Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned**

**shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory

or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in

the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be

distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery

on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. <u>Claims Payable by Insurance Carriers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including <u>Article VIII</u>), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest

shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

### C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or**

**(3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of

Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

Case 22-90037 Document 135 Filed in TXSB on 04/20/22 Page 42 of 48

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 3

United States Bankruptcy Court Southern - Texas
ENTERED
04/09/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 1110** |

**ORDER APPROVING DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION; (III) APPROVING THE FORM OF BALLOT, AND NOTICES IN CONNECTION THEREWITH; (VI) SCHEDULING CERTAIN DATES WITH RESPECT THERETO; AND (V) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") (i) conditionally approving the adequacy of the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement");

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

(ii) approving the Solicitation and Voting Procedures; (iii) approving the Voting Record Date; (iv) approving the manner and form of the Solicitation Packages and the materials contained therein; (v) approving the Non-Voting Status Notices; (vi) approving the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan; (vii) approving the Voting and Tabulation Procedures; (viii) approving the Combined Hearing Notice; (ix) scheduling certain dates and deadlines related thereto; and (x) granting related relief; all as more fully set forth in the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of the cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore; it is HEREBY ORDERED THAT:

1. Omitted.

2. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## I. CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT.

3. The Disclosure Statement, attached as **Schedule 1**, is hereby conditionally approved as providing Holders of Claims and Interests entitled to vote on the Plan with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1121(a)(1).

4. The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction and exculpation provisions contained in Articles VIII.B and C of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II. APPROVAL OF THE SOLICITATION AND VOTING PROCEDURES.

5. The Debtors shall solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached as **Schedule 2**, which are hereby approved in their entirety.

## III. APPROVAL OF THE MATERIALS AND TIMELINE FOR SOLICITING VOTES AND THE PROCEDURES FOR CONFIRMING THE PLAN AND FOR APPROVING THE DISCLOSURE STATEMENT ON A FINAL BASIS.

### A. Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

6. Cause exists to shorten the deadlines set forth by Bankruptcy Rule 2002(b). The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept, and voting on, the Plan, as well as filing objections to the Plan and Disclosure Statement and approving the Disclosure Statement and confirming the Plan:

| | |
|---|---|
| Voting Record Date | April 8, 2020 |
| Solicitation Deadline | April 13, 2020 |
| Voting Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Response Deadline | April 29, 2020 at 12:00 p.m., prevailing Central Time |
| Deadline to File Voting Report | April 29, 2020 at 12:00 p.m., prevailing Central Time |

| | |
|---|---|
| Combined Hearing Date | April 30, 2020, at 9:00 a.m., prevailing Central Time, or such other time as may be scheduled by the Court |

**B. Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

7. In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits), the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those Holders of Claims in the Voting Class entitled to vote on the Plan as of the Voting Record Date shall include the following, the form of each of which is hereby approved:

(a) a copy of the Solicitation and Voting Procedures attached as **Schedule 2**;[2]

(b) an appropriate form of Ballot attached as **Schedule 3A, 3B, 3C, and 3D**; and

(c) the Combined Hearing Notice attached as **Schedule 4**.

8. The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

9. The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline. Such service shall satisfy the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Bankruptcy Local Rules.

---

[2] The Debtors will use commercially reasonable efforts to ensure that any Holder of a Claim who has filed duplicate Claims or Interests against the Debtors (whether against the same or multiple Debtors) receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim.

10. The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to Holders of Claims entitled to vote on the Plan in electronic format. On or before the Solicitation Deadline, the Debtors shall provide (i) complete Solicitation Packages (other than Ballots) to the U.S. Trustee and (ii) the Order (in electronic format) and the Combined Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

11. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the corresponding materials received in electronic format (to be provided at the Debtors' expense).

12. The Balloting Agent is authorized to assist the Debtors in (i) distributing the Solicitation Packages; (ii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims or Interests; (iii) responding to inquiries from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; and (iv) if necessary, contacting creditors and equity holders regarding the Plan.

13. The Balloting Agent is also authorized to accept Ballots via electronic online transmission through a customized online balloting portal on the Debtors' case website. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

**C. Approval of the Combined Hearing Notice.**

14. The Combined Hearing Notice, substantially in the form attached as **Schedule 4** filed by the Debtors and served upon parties in interest in these chapter 11 cases on or before the Solicitation Deadline, constitutes adequate and sufficient notice of the hearing to consider

adequacy of the Disclosure Statement and approval of the Plan, the manner in which a copy of the Plan can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

15. The Combined Hearing Notices provide Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the exculpation and injunction provisions contained in Article VIII.B and C of the Plan and the effect thereof.

**D. Approval of the Form of Notices to Non-Voting Classes.**

16. Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes because such Holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Deadline, the Balloting Agent shall mail (first class, postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, and 7 | Unimpaired-Presumed to Accept | Will receive a notice, substantially in the form attached hereto as **<u>Schedule 5A</u>** in lieu of a Solicitation Package. |
| 8, 9 and 10 | Impaired-Deemed to Reject | Will receive a notice, substantially in the form attached hereto as **<u>Schedule 5B</u>** in lieu of a Solicitation Package. |

17. The Debtors are not required to provide the Holders of Class 6 Intercompany Claims with a Solicitation Package or any other type of notice in connection with solicitation.

18. The Debtors are not required to mail Solicitation Packages or other solicitation materials to (i) Holders of Claims or Interests that have already been paid in full during these chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant

Case 23-90337 Document 1319 Filed in TXSB on 04/19/20 Page 139 of 300

to an order previously entered by this Court or (ii) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

**E. Approval of Notices to Contract and Lease Counterparties.**

19. The Debtors shall mail a notice of assumption or rejection of any Executory Contracts or Unexpired Leases (and any corresponding Cure Claims), substantially in the forms attached hereto as **Schedule 6** and **Schedule 7**, to the applicable counterparties to the Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan prior to the Combined Hearing. The deadline for objections to the Cure Claims and/or the assumption or rejection of Executory Contracts or Unexpired Leases is May 20, 2020.

**F. Approval of the Procedures for Filing Objections to the Plan.**

20. Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, must (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the nature and amount of the Claim against or Interest in the Estates or property of the Debtors; (iv) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (v) be filed with the Court.

21. The Debtors (and other parties in support of the Plan) may file a reply to any objections to Confirmation of the Plan and a memorandum in support of Confirmation by April 29, 2020, at 12:00 p.m., prevailing Central Time.

## IV. MISCELLANEOUS.

22. The Debtors' rights are reserved to modify, revoke, or withdraw the Plan in accordance with the provisions of Article X of the Plan.

23. Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

24. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

26. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

27. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

28. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

29. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: April 09, 2020

Marvin Isgur
United States Bankruptcy Judge

## Schedule 1

## Disclosure Statement

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Jason P. Rubin (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: jsavin@akingump.com

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
Email: mcavenaugh@jw.com
efreeman@jw.com

Dated: April 9, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

Case 22-90055 Document 68-3 Filed in TXSB on 04/14/22 Page 1 of 253

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.**

**THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION,**

---

2 Terms shall have the meaning ascribed to them, if any, elsewhere in this Disclosure Statement.

**MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCE AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED**

**THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- **BUSINESS STRATEGY;**
- **THE AMOUNT OF OIL AND NATURAL GAS THE DEBTORS PRODUCE;**
- **OIL, NATURAL GAS AND NATURAL GAS LIQUIDS ("NGLs") RESERVES;**
- **THE DEBTORS' ABILITY TO REPLACE RESERVES AND INCREASE RESERVE VALUE;**
- **THE DEBTORS' DRILLING LOCATIONS AND THEIR ABILITY TO CONTINUE DEVELOPMENT ACTIVITIES AT ECONOMICALLY ATTRACTIVE COSTS;**
- **THE DEBTORS' ABILITY TO DIVEST NON-CORE ASSETS AT ECONOMICALLY ATTRACTIVE PRICES;**
- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**
- **OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;**
- **THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;**
- **AVAILABILITY AND TERMS OF CAPITAL;**
- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**
- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**
- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**
- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**
- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**
- **PLANS, OBJECTIVES, AND EXPECTATIONS;**
- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY; AND**
- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING: THE OUTCOME OF THE CHAPTER 11 CASES; RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES, INCLUDING THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN OR TO DEVELOP, CONFIRM AND CONSUMMATE AN ALTERNATIVE RESTRUCTURING TRANSACTION IF THE PLAN IS NOT CONFIRMED, WHICH MAY BE NECESSARY TO CONTINUE AS A GOING CONCERN; THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, CUSTOMERS, EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILINGS; EACH DEBTOR'S**

ABILITY TO OBTAIN SUFFICIENT FINANCING TO ALLOW IT TO EMERGE FROM BANKRUPTCY AND EXECUTE ITS BUSINESS PLAN POST-EMERGENCE; THE LENGTH OF TIME THAT THE DEBTORS WILL OPERATE UNDER CHAPTER 11 PROTECTION AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES; RISKS ASSOCIATED WITH THIRD PARTY MOTIONS IN THE CHAPTER 11 CASES, WHICH MAY INTERFERE WITH THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE A PLAN OF REORGANIZATION; THE POTENTIAL ADVERSE EFFECTS OF THE CHAPTER 11 CASES ON THE DEBTORS' LIQUIDITY AND RESULTS OF OPERATIONS; INCREASED ADVISORY COSTS TO EXECUTE A REORGANIZATION; THE TIMING AND EXTENT OF CHANGES IN PRICES OF, AND DEMAND FOR, COMMODITIES; THE EXTENT TO WHICH THE DEBTORS' DRILLING PLANS ARE SUCCESSFUL; EACH DEBTOR'S ABILITY TO REPLACE THE RESERVES IT PRODUCES; EACH DEBTOR'S ABILITY TO SATISFY ITS CAPITAL EXPENDITURE, DEBT SERVICE AND OTHER FUNDING REQUIREMENTS THROUGH INTERNALLY GENERATED CASH FLOWS, ASSET SALES AND OTHER ACTIVITIES; THE ACCURACY OF RESERVE ESTIMATES; AND OTHER FACTORS DESCRIBED IN THIS DISCLOSURE STATEMENT OR THE PLAN.**

**SEE "RISK FACTORS" IN THE ANNUAL REPORT OF SANCHEZ ENERGY CORPORATION ("SN") ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2018 FOR A FURTHER DESCRIPTION OF ADDITIONAL RISK FACTORS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE DEBTORS' OPERATING PERFORMANCE, AND SEE SN'S OTHER FILINGS WITH THE SEC FOR ADDITIONAL DISCLOSURES REGARDING RISKS AND FORWARD-LOOKING STATEMENTS.**

# TABLE OF CONTENTS

Page


**I. INTRODUCTION. ..... 1**

**II. PRELIMINARY STATEMENT. ..... 1**

**III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN. ..... 3**

A. What is chapter 11? ..... 3
B. Why are the Debtors sending me this Disclosure Statement? ..... 4
C. Am I entitled to vote on the Plan? ..... 4
D. What will I receive from the Debtors if the Plan is consummated? ..... 4
E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim? ..... 7
F. Are any regulatory approvals required to consummate the Plan? ..... 10
G. What happens to my recovery if the Plan is not confirmed or does not go effective? ..... 10
H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ..... 10
I. Is there potential litigation related to the Plan? ..... 10
J. How will the preservation of the Causes of Action impact my recovery under the Plan? ..... 11
K. Will there be releases and exculpation granted to parties in interest as part of the Plan? ..... 11
L. How do I vote for or against the Plan? ..... 13
M. What is the deadline to vote on the Plan? ..... 14
N. When is the Confirmation Hearing set to occur? ..... 14
O. What is the purpose of the Confirmation Hearing? ..... 14
P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..... 15
Q. Do the Debtors recommend voting in favor of the Plan? ..... 15
R. Who supports the Plan? ..... 15

**IV. THE DEBTORS' PLAN. ..... 16**

A. The Plan. ..... 16
B. Cancellation of Instruments, Certificates, and Other Documents. ..... 25
C. Section 1146(a) Exemption. ..... 25
D. DIP Agent Fees and Expenses. ..... 26

**V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW. ..... 26**

A. The Company's Corporate History. ..... 26
B. The Debtors' Assets. ..... 27
C. The Debtors' Prepetition Capital Structure. ..... 29

**VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES. ..... 33**

A. First Day Relief. ..... 33
B. Other Procedural and Administrative Motions. ..... 33
C. Schedules and Statements. ..... 34
D. Establishment of a Claims Bar Date. ..... 34
E. The GSO Tolling Agreement. ..... 35
F. Investigation of Related Party Transactions. ..... 35

G. Litigation Matters. 36
H. Retention of Professionals. 39
I. Rejection and Assumption of Executory Contracts and Unexpired Leases. 40
J. Appointment and Retention of Chief Restructuring Officer. 40
K. Appointment of Examiner. 40
L. Exclusivity. 41
M. Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts. 41
N. Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property. 41
O. DIP Motion. 42
P. Analysis of Lien Perfection Regarding Secured Notes. 42
Q. Creditors' Committee Claim Objection. 43
R. Creditors' Committee Related Party Transaction Standing Motion. 44
S. Shared Services. 44
T. Analysis of the Debtors' Midstream and Marketing Contract Review. 44
U. Postpetition Restructuring Process. 45

**VII. RISK FACTORS. 46**

A. Bankruptcy Law Considerations. 46
B. Risks Related to Recoveries under the Plan. 49
C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses. 52

**VIII. SOLICITATION AND VOTING PROCEDURES. 60**

A. Holders of Claims and Interests Entitled to Vote on the Plan. 61
B. Voting Record Date. 61
C. Voting on the Plan. 61
D. Ballots Not Counted. 62

**IX. CONFIRMATION OF THE PLAN. 62**

A. Requirements for Confirmation of the Plan. 62
B. Best Interests of Creditors/Liquidation Analysis. 63
C. Feasibility. 63
D. Acceptance by Impaired Class. 64
E. Confirmation without Acceptance by All Impaired Classes. 64
F. Valuation of the Debtors. 65

**X. CERTAIN SECURITIES LAW MATTERS. 65**

A. New Common Stock. 65
B. Issuance and Resale of New Common Stock Under the Plan. 66

**XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. 69**

A. Introduction. 69
B. Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors. 70
C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. 73
D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. 77
E. Information Reporting and Backup Withholding. 80

**XII. RECOMMENDATION. .......... 82**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Corporate Organization Chart |
| EXHIBIT C | Liquidation Analysis |
| EXHIBIT D | Financial Projections |
| EXHIBIT E | Valuation Analysis |

# I. INTRODUCTION.

Sanchez Energy Corporation ("SN") and its debtor affiliates, as debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors"), and its non-debtor subsidiaries and certain affiliates (collectively, the "Non-Debtor Affiliates," and together with the Debtors, the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates [Docket No. [●] (the "Plan"), filed contemporaneously herewith.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 Plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES. ACCORDINGLY, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# II. PRELIMINARY STATEMENT.

SN, a publicly-owned Delaware corporation headquartered in Houston, Texas, is, together with its direct and indirect Debtor and non-Debtor subsidiaries, an independent oil and natural gas exploration and production ("E&P") company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources. SN was formed by the Sanchez Group[2] in August 2011 and completed its initial public offering ("IPO") in December 2011. SN's common stock (the "Existing SN Common Stock") subsequently traded on the New York Stock Exchange (the "NYSE") until the opening of trading on February 20, 2019 when the NYSE suspended the trading of the Existing SN Common Stock and commenced delisting proceedings. As a result of delisting proceedings initiated by the NYSE, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date). The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit B**. As set forth therein, SN is either the direct or indirect parent company of each of the other Debtors.

The sustained decline and volatility in commodity prices have weighed heavily on the energy industry globally and, in particular, on U.S. independent oil and natural gas producers such as the Debtors. The E&P industry has been challenged by low oil and natural gas prices for years. Beginning in 2014, oil prices declined precipitously from a price of more than $100 per barrel, and continued to languish throughout 2015 into the start of 2016, ultimately reaching a 13-year low of approximately $26 per barrel in February 2016. Oil prices made a slight rebound in 2017, only to decline again in the second half of 2018. The extreme volatility continued in 2019 through early 2020, and oil prices trended downward beginning in late January 2020. Even more recently, the coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial and consumer activity and travel and social distancing restrictions that are expected to continue and may expand in the near future. Disagreements between the Organization of Petroleum Exporting Countries ("OPEC") and Russia in early March 2020 have caused additional historic price declines and volatility. Oil prices fell to a four-year low

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan will govern.

[2] The "Sanchez Group" comprises Sanchez Oil & Gas Corporation and certain other affiliated entities.

in March 2020 below $20 per barrel, and have somewhat abated to the high $20 to low $30 per barrel range over the first several trading sessions in April 2020 in response to headlines regarding potential further OPEC actions. This market downturn has negatively impacted and continues to negatively impact the volume and discounted future net cash flows of the Debtors' estimated proved reserves, and the prolonged price volatility also has caused the Debtors to incur losses related to their commodity hedging arrangements, the last of which expired as of January 31, 2020. Additionally, the Debtors' revenue, profitability, and cash flow depend on the prices of and demand for oil, natural gas, and NGLs, and continued low and volatile commodity prices have significantly and adversely affected the Debtors' financial results and prospects for long-term operation under their current capital structure. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crisis, reflecting fears of a global recession and potential further global economic damage from the coronavirus pandemic, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

Deteriorating commodity market conditions have impacted energy companies throughout the industry and around the world. Companies throughout the oil and natural gas industry have endured the effects of this downward trend, and the Debtors are no exception. Specifically, U.S. independent E&P companies like the Debtors have suffered enormously, as their revenues are generated from the sale of oil and natural gas. Many U.S. oil and natural gas companies have filed for chapter 11 bankruptcy protection over the last few years, which is an indicator of difficult and unsustainable market conditions. In addition, many other oil and natural gas companies have defaulted on their debt obligations, negotiated covenant relief with creditors to avoid defaulting, or have pursued out-of-court restructurings.

The Company's success depends on receiving market-based prices for its oil and natural gas production that allow the Company to generate a profit after accounting for capital expenditures and costs. Additionally, the Company depends upon the vitality of the midstream and downstream companies that comprise its customer base to purchase and transport its hydrocarbons to the market. Similar to the Company, these other companies and the physical markets have also experienced detrimental impacts and disruptions caused by the price downturn and supply imbalance.

Operating their businesses in light of the extended downturn in commodity prices has negatively impacted the Company's liquidity. The Company's cash position has declined steadily through 2017, 2018, and 2019. As of August 11, 2019 (the "Petition Date"), the Debtors had a total of approximately $91 million in cash. The Debtors' cash on hand in addition to the Debtors' DIP financing has been, and will continue to be, used to fund operations during the Chapter 11 Cases.

On a prepetition basis, SN, as borrower, and certain of the Debtor entities which constitute restricted subsidiaries (the "Restricted Subsidiaries") under the Credit Agreement (as defined below), as guarantors, had an approximately $17.1 million issued and undrawn letter of credit under the $25 million first-out senior secured working capital and letter of credit facility (the "First-Out Senior Secured Revolving Credit Facility") pursuant to the Third Amended and Restated Credit Agreement (the "Credit Agreement") dated as of February 14, 2018 with Royal Bank of Canada ("RBC"), as administrative agent. This letter of credit was drawn by the beneficiary thereof on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral (as defined below). On January 28, 2020, in conjunction with the closing of the DIP Facility (as defined below), SN used its available cash, including net proceeds of the borrowings under the DIP Facility, to pay off all $7.9 million of borrowings and the additional $17.1 million in such reimbursement obligations, together with $0.7 million in accumulated fees and interest on such amounts since the Petition Date.

In addition to liquidity concerns, the Debtors faced impending maturities of their 7.75% Senior Notes[3] at a time when the Company was navigating dire financial circumstances. Any attempt to re-finance that maturity would likely have been extremely difficult in the environment at that time under the Debtors' existing capital structure, shown below as of the Petition Date.

As of the Petition Date, the Existing SN Common Stock was trading at $0.08 per share, with a total market capitalization of $7.5 million. As detailed herein, SN struggled prepetition to maintain compliance with the NYSE's listing standards when the average closing price per share of the Existing SN Common Stock fell below $1.00, and SN's average market capitalization fell below $50 million. On January 3, 2019, SN was notified in writing by the NYSE that it was out of compliance with the NYSE's continued listing standards requiring that a company maintain an average market capitalization of $50 million over a consecutive 30 trading day period, which subsequently caused the NYSE to initiate delisting proceedings of the Existing SN Common Stock. As a result, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date).

This confluence of circumstances, and the related adverse effects and negative prospects for satisfying their future financial obligations, directly caused the Debtors to commence these Chapter 11 Cases. To protect their residual values and to successfully restructure their businesses in light of these challenges, the Debtors have been actively implementing strategies designed to maximize liquidity and preserve capital. Specifically, in the past several years the Debtors have substantially reduced personnel, divested a number of assets, and implemented numerous technical processes to further develop assets to increase production. The Debtors also significantly reduced drilling and development activity and reduced their capital expenditures from approximately $593 million in 2018 to $83 million in 2019.

The Plan provides for a comprehensive restructuring of the Debtors' outstanding indebtedness and equity interests through a plan of reorganization.

The formulation of the Plan is a significant achievement for the Debtors. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders. The Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code

[3] SN has issued and outstanding $600 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "7.75% Senior Notes"), $1,150 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "6.125% Senior Notes" and together with the 7.75% Senior Notes, the "Senior Unsecured Notes"), and $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes," and together with the Senior Unsecured Notes, the "Notes").

provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| Classified Claims Against and Interests In the Debtors | | | | |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:<br>i. payment in full in Cash;<br>ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br>iii. reinstatement of such Other Secured Claim; or<br>iv. other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:<br>i. Cash in an amount equal to such Allowed Other Priority Claim; or<br>ii. such other treatment rendering such Other Priority Claim Unimpaired. | $0 | 100% |
| 3 | DIP Claims | In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of | $ 151.4 MM | 11%-53% |

[4] The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed, as well as other factors related to the Debtors' business operations and general economic conditions.

Case 22-34005 Document 68-3 Filed in TXSB on 08/13/20 Page 25 of 253

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims or Interests ($MM) | Projected Recovery Under the Plan |
| | | an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:<br>i. the DIP Equity Distribution on the Effective Date; and<br>ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code. | | |
| 4 | Secured Notes Claims | In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code | $ 450 MM | 0%-TBD |
| 5 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code. | $1.815 MM | 0%-TBD |
| 6 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:<br>i. Reinstated;<br>ii. compromised;<br>iii. released, or<br>iv. offset, contributed, and/or distributed to the applicable Debtor. | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims or Interests ($MM) | Projected Recovery Under the Plan |
| 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 8 | Existing SN Preferred Interests | On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 9 | Existing SN Common Interests | On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 10 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim. | N/A | 0% |

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1. Administrative Claims.

Except as otherwise provided in Article II.A of the Plan and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

**2. Professional Fee Claims.**

**A. Professional Fee Settlement.**

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly,

any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

**B. Final Fee Applications.**

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "Draft Report Review Period"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

**3. Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**4. Statutory Fees.**

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### F. Are any regulatory approvals required to consummate the Plan?

There are not expected to be any known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 63, and the Liquidation Analysis attached hereto as **Exhibit C**.

### H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After the Plan is confirmed, there are conditions that need to be satisfied or waived so that the Plan can be Consummated and go effective. *See* Article IX of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion on the confirmation procedures.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for such Allowed Claims in accordance with the applicable Class on the date the Plan becomes effective, *i.e.*, the "Effective Date," or as soon as reasonably practicable thereafter, unless the Plan provides otherwise.

### I. Is there potential litigation related to the Plan?

Parties in interest may object to the Plan being confirmed, which potentially gives rise to litigation. In the event that it becomes necessary to confirm the Plan over a Class's objection to or vote to reject the Plan, the Debtors may seek to confirm the Plan notwithstanding such objecting Class's dissent. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan that an impaired class has rejected, if it determines that the plan meets certain requirements for confirmation.

The Bankruptcy Court has established **April 27, 2020, at 5:00 p.m. prevailing Central Time**, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**J. How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

**K. Will there be releases and exculpation granted to parties in interest as part of the Plan?**

The Plan proposes to exculpate the Exculpated Parties, but will not grant any other releases. The exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations with respect to the Plan. The exculpation provisions not only benefit the Exculpated Parties, but also the Debtors' post-emergence enterprise as a whole.

The Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. In addition, many of the

Exculpated Parties are entitled to indemnification by the Debtors, which indemnification obligations are expressly preserved under the Plan. Accordingly, each of the Exculpated Parties warrants the benefit of the exculpation provisions.

**1. Exculpation.**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**2. Injunction.**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any**

**manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

**3. Release of Liens.**

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

**L. How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. Additional information on the voting process is contained in Article VIII below, entitled "Solicitation and Voting Procedures."

| BALLOTS |
| --- |
| The Balloting Agent[5] must **actually receive** ballots on or before the Voting Deadline, which is **April 27, 2020, at 5:00 p.m., prevailing Central Time**, either (i) via the online portal, https://cases.primeclerk.com/sanchezenergy or (ii) at the following address:<br><br>**Sanchez Ballot Processing**<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165<br><br>or (iii) if permitted under the instructions accompanying your ballot, via email to sanchezballots@primeclerk.com<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors at:<br><br>(844) 232-0067 (U.S. and Canada toll free) or (917) 942-6393 (international) |

### M. What is the deadline to vote on the Plan?

The Voting Deadline is April 27, 2020, at 5:00 p.m. (prevailing Central Time).

### N. When is the Confirmation Hearing set to occur?

On April [9], 2020, the Bankruptcy Court entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (VI) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. #] (the "Scheduling Order"). As part of the Scheduling Order, the Bankruptcy Court has scheduled a Combined Hearing to consider the adequacy of this Disclosure Statement and Confirmation of the Plan for April 30, 2020, at 9:00 a.m. (prevailing Central Time) (the "Combined Hearing"). The Combined Hearing may be adjourned from time to time without further notice.

In addition, pursuant to the Scheduling Order, objections to Confirmation or the adequacy of this Disclosure Statement must be filed and served on the Debtors, and certain other parties, by no later than April 27, 2020, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and is incorporated herein by reference.

### O. What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain

[5] "Balloting Agent" refers to the Claims, Noticing and Solicitation Agent with respect to the performance of its solicitation activities.

Case 20-34005 Document 811-8 Filed in TXSB on 04/14/22 Page 34 of 253

limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

The Combined Hearing will consider the adequacy of this Disclosure Statement, as well as Confirmation of the Plan.

### P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Balloting Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
**Sanchez Ballot Processing**
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

*By electronic mail at:*
sanchezballots@primeclerk.com

*By telephone (toll free) at:*
(844) 232-0067 (U.S. and Canada)
(917) 942-6393 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Balloting Agent at http://cases.primeclerk.com/sanchezenergy (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

To the extent that you have questions about your rights pursuant to the Plan or the Disclosure Statement, you should seek the advice of your own counsel.

### Q. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### R. Who supports the Plan?

The Plan is the product of a negotiated settlement reached through mediation. The Plan is supported by the Debtors and the Secured Ad Hoc Group.

## IV. THE DEBTORS' PLAN.

### A. The Plan.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Plan contains the following provisions:

#### 1. Sources of Consideration for Plan of Reorganization Distributions.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

#### 2. Issuance and Distribution of New Common Stock.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2 of the Plan. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

### 3. Distribution of Post-Effective Date Equity Distribution.

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

### 4. Lien-Related Litigation.

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; provided that in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection

with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

### 5. Continuation of Gavilan Proceeding.

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

### 6. Corporate Existence.

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

### 7. Vesting of Assets in the Reorganized Debtors.

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 8. Corporate Action.

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have

occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 9. New Organizational Documents.

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

### 10. Directors and Officers of Reorganized SN.

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

### 11. Retention of Current Workforce by Reorganized SN; Severance Payments.

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by

SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

### 12. Management Incentive Plan.

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

### 13. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

### 14. Preservation of Causes of Action.

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the

Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

**15. Distributions.**

**(i) Distributions on Account of Claims Allowed as of the Effective Date.**

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

**(ii) Rights and Powers of the Disbursing Agent.**

**(a) Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(b) Expenses Incurred On or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**(iii) Special Rules for Distributions to Holders of Disputed Claims.**

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to

Case 22-90018 Document 613-9 Filed in TXSB on 01/24/23 Page 41 of 252

Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

**16. Executory Contracts and Unexpired Leases.**

**(i) Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in Article V of the Plan, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

**(ii) Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy

Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**(iii) Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**17. Exemption from Registration Requirements.**

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**18. Conditions Precedent.**

**(i) Conditions Precedent to the Effective Date of the Plan.**

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

(1) the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

(2) the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

(3) the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

(4) the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

Case 22-90058 Document 13-1 Filed in TXSB on 09/24/22 Page 44 of 253

(5) the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

(6) the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

(7) the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

**(ii) Waiver of Conditions.**

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may only be waived only by the Debtors, with the consent of the DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**(iii) Effect of Non-Occurrence of Conditions to Consummation.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**(iv) Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**B. Cancellation of Instruments, Certificates, and Other Documents.**

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

**C. Section 1146(a) Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the

Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D. DIP Agent Fees and Expenses.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

### A. The Company's Corporate History.

SN was formed by certain members of the Sanchez Group in August 2011 and completed its IPO in December 2011. SN is engaged in the development and production of onshore domestic oil and natural gas properties, with a particular focus on the horizontal development of the Eagle Ford Shale in South Texas.

Concurrently with the IPO, the Debtors acquired certain assets in the Eagle Ford Shale, where they continued to expand their presence, predominantly in the western portion, and as of December 31, 2019, hold approximately 415,000 gross (215,000 net) acres (collectively, the "Eagle Ford Assets"). The Debtors' core acreage position, which is large and strategically concentrated within an approximately 40-mile radius, provides a unique competitive advantage by offering the potential for significant synergies of scale. These synergies include the opportunity to derive cost savings in connection with the positioning of rigs and equipment, shared resources for in-field gathering, water and water transportation, more efficient drilling processes and field operations, substantial asset-level knowledge, and enhanced pricing based on the close proximity to attractive markets along the U.S. Gulf Coast. In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, also hold certain other producing properties and

undeveloped acreage, including in the Tuscaloosa Marine Shale (the "TMS") in Mississippi and Louisiana as well as other locations in Louisiana and Texas.[6]

In connection with the IPO, the Debtors entered into certain agreements with Sanchez Oil & Gas Corporation ("SOG"), a full-service oil and natural gas operating company founded in 1972 and privately owned by members of the Sanchez family. These agreements govern SOG's performance of various services, on a pass-through cost basis, that support the Debtors' operations, including, among other things, general and administrative, reserve engineering, operational, and geological and geophysical services. Additionally, pursuant to these arrangements, SOG has granted the Debtors unrestricted access to certain extensive seismic and other data developed or licensed by SOG. Moreover, as a result of the Debtors' shared services arrangements with SOG (collectively, the "Shared Services"), all individuals comprising the Debtors' workforce, including their executive officers, are SOG employees, as the Debtors do not have any employees of their own.

SN's direct and indirect subsidiaries total 22 (including the Non-Debtor Affiliates).

The Debtors are highly experienced and historically proven low-cost operators for many types of onshore oil and natural gas assets, and the Debtors act as operators for most of their oil and natural gas assets. While the Debtors' businesses primarily involve the operation of unconventional oil and natural gas properties (e.g., shale assets) using advanced horizontal drilling and completion techniques, with a current focus on the Eagle Ford Shale, they are also highly experienced in operating conventional assets using traditional development methods. Indeed, the Debtors are currently one of the largest and most active operators in the Eagle Ford Shale and have vast amounts of experience and technical expertise in all facets of the oil and natural gas E&P industry, and, therefore, are well-positioned as industry leading operators.

### B. The Debtors' Assets.

As of December 31, 2019, approximately 94% of the Debtors' net acreage was held by production and/or continuous operations. Leases that are not held by production and/or continuous operations represent approximately 14,000 net acres (all in the Eagle Ford Shale) of which approximately 6,000 net acres are set to expire in 2020, approximately 6,900 net acres are set to expire in 2021 and approximately 1,100 net acres are set to expire in 2022 and beyond. Of the 6,000 net Eagle Ford acres set to expire in 2020, approximately 5,100 net acres are subject to two-year extension options, which would permit the Debtors to extend the primary term of those leases into 2022. The typical oil and natural gas lease agreement covering the Debtors' properties provides for the payment of royalties to the mineral owner for all oil and natural gas produced from any well drilled on the lease premises. The lessor royalties and other leasehold burdens on the majority of the Debtors' wells range from approximately 20%-28%, resulting in a net revenue interest ranging from approximately 72%-80%.[7]

#### 1. The Eagle Ford Assets.

##### (i) The Catarina Assets.

On June 30, 2014, the Debtors acquired certain Eagle Ford Shale properties of Royal Dutch Shell plc, which included approximately 106,000 net acres in Dimmit, La Salle, and Webb Counties, Texas

---

[6] All acreage figures discussed herein exclude interests held by the Debtors in certain undeveloped acreage in Louisiana and Texas.

[7] For more details on the agreements and arrangements governing the Debtors' oil and natural gas business, see the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings and (II) Granting Related Relief* and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses and (C) Shipping and Warehousing Claims and (II) Granting Related Relief.*

representing a unique single block of acreage on one ranch in the Western Eagle Ford (the "Catarina Assets"). The Debtors have a drilling commitment with respect to the Catarina Assets that requires them to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 (subject to certain well banking rights) and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Debtor SN Operating, LLC ("SN Operating") is the operator of the Catarina Assets, and Debtor SN Catarina, LLC ("SN Catarina") holds 100% of the working interests in the Catarina Assets.

**(ii) The Comanche Assets.**

On March 1, 2017, SN EF Maverick, LLC ("SN Maverick") and SN UnSub, along with Gavilan Resources, LLC ("Gavilan"), an unaffiliated entity controlled by The Blackstone Group Inc. ("Blackstone"), completed the acquisition of approximately 318,000 gross (155,000 net) acres largely adjacent and in many areas adjoining to the Catarina Assets, comprising (i) 252,000 gross (122,000 net) Eagle Ford Shale acres and (ii) 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing, in the aggregate, an approximately 49% average working interest therein (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") for an adjusted purchase price of approximately $2.1 billion in cash (the "Comanche Acquisition"). In connection with the closing of the Comanche Acquisition, SN, SN Maverick, SN UnSub, and Gavilan entered into a joint development agreement regarding the operation of the Comanche Assets (the "Comanche JDA"). Simultaneously therewith, SN, SN Maverick, SN UnSub, Gavilan, and Anadarko also entered into a development agreement (the "Anadarko Development Agreement") which, among other things, sets forth certain minimum annual drilling obligations on the Comanche Assets as described below.

Collectively, SN Maverick and SN UnSub represent a working interest of approximately 24% in the Comanche Assets (the "SN Comanche Assets"). Upon closing of the Comanche Acquisition, the SN Comanche Assets were further divided between SN Maverick and SN UnSub, whereby SN UnSub retained a 100% interest in the estimated proved developed producing reserves (essentially all of the producing wells) at the acquisition closing, and a 40% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development, while SN Maverick retained the remaining 60% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development (in each case represented as a percentage of the SN Comanche Assets). Accordingly, through SN Maverick, the Debtors have a working interest estimated at approximately 15% in new wells that were developed post-acquisition (*e.g.*, 60% interest in the post-acquisition development attributable to the approximately 24% total working interest of the SN Comanche Assets).

SN Maverick is the operator of all of the Comanche Assets under various operating agreements, and operates existing wells and manages and performs drilling and completion activities of new wells, on behalf of itself and the other working interest partners: SN UnSub, Gavilan, and third parties Venado Oil and Gas, LLC, Korea National Oil Corporation, and Mitsui E&P USA, LLC.

As noted above, the Debtors have a development commitment under the Anadarko Development Agreement, which the Debtors are also obligated to satisfy under the Comanche JDA, with respect to the Comanche Assets that, in addition to other requirements in the leases that must be met in order to maintain the Debtors' acreage position, requires the Debtors to complete and equip 60 wells in each annual period (subject to certain well banking rights) commencing on September 1, 2017 and continuing for five years thereafter until September 1, 2022 or, with Gavilan, pay jointly to Anadarko a cash penalty amounting to $200,000 per well for the failure to do so. The Debtors are currently in compliance with their drilling and development commitments with respect to the Comanche Assets. As explained in more detail below, the Comanche JDA is currently the subject of a pending dispute between SN Maverick and Gavilan.

In aggregate, the Catarina Assets and the Comanche Assets represent a substantial and geologically diverse land position, which stretches approximately 70 miles from west to east in four counties in South Texas.

**2. The Maverick Assets.**

The Debtors have approximately 40,000 net acres in Dimmit, Frio, La Salle, and Zavala Counties, Texas (the "Maverick Assets"). The Debtors have a drilling commitment that requires the Debtors to drill and complete three Eagle Ford wells by June 1, 2020 in order to maintain access to approximately 2,000 net undeveloped acres. The Debtors cannot provide assurance that their current and future drilling plans along with selected lease extensions will address the majority of their leases subject to potential expiration with respect to the Maverick Assets in 2020 and beyond. SN Operating is the operator of the Maverick Assets, and Debtor SN Cotulla Assets, LLC holds 100% of the working interests in the Maverick Assets.

**3. The Palmetto Assets.**

The Debtors have approximately 7,600 net acres in Gonzales County, Texas (the "Palmetto Assets") near the prolific Karnes Trough, which is located in the eastern portion of the Eagle Ford Shale and generally considered to be the core area of the basin. Marathon Oil Corporation is the operator of the Palmetto Assets, in which Debtor SN Palmetto, LLC owns a non-operated working interest (approximately 50% of future development). Marathon Oil Corporation drilled four gross wells for the 2019 commitment period, and completed ten gross wells, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain the Debtors' Palmetto acreage position. Rather than participating in such operations as a consenting working interest partner, the Debtors elected to not participate and, instead, reserve and retain an overriding royalty interest in and to production from such wells as provided for in the applicable joint operating agreement. The Debtors cannot provide assurance that current and future drilling plans along with selected lease extensions will address the majority of leases subject to potential expiration with respect to the Palmetto Assets in 2020 and beyond.

**4. The TMS and Other Assets.**

In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, hold other producing properties and undeveloped acreage, including in the TMS located in Mississippi and Louisiana as well as other locations in Louisiana and Texas. Successful and economic TMS development has been and continues to be challenged due to high well costs and low commodity prices.

**C. The Debtors' Prepetition Capital Structure.**

As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $2.3 billion. Prior to the Petition Date, SN had issued approximately 3.12 million shares of Existing SN Preferred Stock (as defined below) that remained outstanding immediately prior to the Petition Date with a liquidation preference of $50 per share and approximately 100 million shares of outstanding Existing SN Common Stock. The Existing SN Preferred Stock is currently trading on the over-the-counter markets under ticker symbol "SNZYQ" and "SCAZQ." The Existing SN Common Stock is currently trading on the over-the-counter markets under ticker symbol "SNECQ." The primary components of the Debtors' consolidated funded debt obligations outstanding and equity interests as of the Petition Date are as follows:

| Obligation | Maturity | Principal Amount |
|---|---|---|
| **First-Out Senior Secured Revolving Credit Facility** | 2023 | $25,000,000 |
| **7.25% Senior Secured Notes** | 2023 | $500,000,000 |
| **Aggregate Secured Debt:** | | **$525,000,000** |
| **7.75% Senior Notes** | 2021 | $600,000,000 |
| **6.125% Senior Notes** | 2023 | $1,150,000,000 |
| **Aggregate Unsecured Debt:** | | **$1,750,000,000** |
| **Aggregate Total Debt:** | | **$2,275,000,000** |

### 1. First-Out Senior Secured Revolving Credit Facility.

As of the Petition Date, SN, as borrower, and the Restricted Subsidiaries[8] under the Credit Agreement, as guarantors, had outstanding $25 million in aggregate principal amount, including approximately $17.1 million issued and undrawn letter of credit under the First-Out Senior Secured Revolving Credit Facility pursuant to the Credit Agreement. The letter of credit was drawn on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral. In addition, as of the Petition Date, the Debtors had approximately $400,000 in obligations under cash-settled commodity hedging arrangements with certain counterparties that were secured on a pari passu basis with the obligations under the First-Out Senior Secured Revolving Credit Facility, pursuant to the terms of the Credit Agreement and the CTA (as defined below).

Although secured by the Shared Collateral (as defined below) with the 7.25% Senior Secured Notes (as defined below), the obligations under the Credit Agreement and specified hedging and cash management obligations had, pursuant to the terms of the CTA, "first-out" status as to proceeds of the Shared Collateral and thus the 7.25% Senior Secured Notes were, to the extent of the value of the collateral securing the Credit Agreement, subject to the discharge of the obligations under the Credit Agreement and such specified hedging and cash management obligations. In connection with the Final DIP Order and entry into the amended and restated DIP Facility on January 28, 2020, on January 31, 2020 the Debtors used approximately $25.7 million from the proceeds of the initial borrowing made under the DIP Facility on August 19, 2019, which included $0.7 million in accumulated fees and interest on such amounts since the Petition Date, to pay off the Credit Agreement in full (the "Discharge"), and the Credit Agreement terminated as of such date.

### 2. The 7.25% Senior Secured Notes.

On February 14, 2018, SN issued $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes") under an indenture among SN, as issuer, the

[8] The Restricted Subsidiaries consist of Debtors SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, and SN EF Maverick, LLC. Unrestricted subsidiaries (collectively, the "Unrestricted Subsidiaries,") consist of Debtors SN UR Holdings, LLC, Sanchez Resources, LLC, SN UnSub Holdings and non-Debtors SN Capital, LLC, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN EF UnSub GP, LLC, SR TMS, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC, and SN EF UnSub, LP.

guarantors party thereto, Delaware Trust Company ("Delaware Trust"), as trustee and RBC, as collateral trustee (as supplemented by a First Supplemental Indenture dated as of April 3, 2018, the "7.25% Senior Secured Notes Indenture"). The Restricted Subsidiaries are guarantors of the 7.25% Senior Secured Notes. The 7.25% Senior Secured Notes and the guarantees thereto were intended to be secured on a first-priority basis by substantially all of the assets of SN and the Restricted Subsidiaries. However, pursuant to a collateral trust agreement among SN, RBC, as the first-out representative, Delaware Trust, as the first lien representative, and RBC, as collateral trustee, dated as of February 14, 2018 (the "CTA"), repayment of the 7.25% Senior Secured Notes was subject to the "first-out" obligations under the Credit Agreement and certain hedging and cash management arrangements permitted under the Credit Agreement to the extent of the value of, certain shared collateral described in more detail below (the "Shared Collateral"). Following the Discharge, the 7.25% Senior Secured Notes and the guarantees are secured on a first-priority basis, subject in priority only to permitted collateral liens and to "first-out" obligations under the CTA, if any, and as set forth in the Final DIP Order. The Shared Collateral consists of: (i) SN's and the Restricted Subsidiaries' oil and natural gas properties with proved reserves; (ii) 100% of the equity interest of the Restricted Subsidiaries and any of their future direct material subsidiaries that qualify as Restricted Subsidiaries; and (iii) substantially all of SN's and the Restricted Subsidiaries' other material personal property, but in each case excluding, among other things, deposit accounts, oil and natural gas properties with no proved reserves, equity interests in SN UnSub and other existing and future subsidiaries designated as "Unrestricted Subsidiaries." The 7.25% Senior Secured Notes are senior to all unsecured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing the 7.25% Senior Secured Notes and the guarantees thereto. Following the Discharge, Wilmington Savings Fund Society, FSB ("WSFS"), as trustee under the Indenture, replaced RBC as the "Controlling Priority Lien Representative" under the CTA. Subsequently, Wilmington Trust, National Association, was appointed by WSFS (as permitted under the CTA) to replace RBC as the collateral trustee under the Indenture pursuant to the Successor Collateral Trustee Agreement, dated as of January 31, 2020, between the Company, WSFS and Wilmington Trust, National Association.

### 3. The 7.75% Senior Notes.

On June 13, 2013, SN issued $400 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Original 7.75% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "7.75% Senior Notes Indenture"). On September 18, 2013, SN issued an additional $200 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Additional 7.75% Senior Notes" and together with the Original 7.75% Senior Notes, the "7.75% Senior Notes") in a private offering, as permitted under the 7.75% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 7.75% Notes. The 7.75% Senior Notes are unsecured obligations and rank equally in right of payment with all of existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

### 4. The 6.125% Senior Notes.

On June 27, 2014, SN issued $850 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Original 6.125% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "6.125% Senior Notes Indenture"). On September 12, 2014, SN also issued an additional $300 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Additional 6.125% Notes" and together with the Original 6.125% Senior Notes, the "6.125% Senior Notes") in a private offering, as permitted under the 6.125% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 6.125% Senior Notes. The 6.125% Senior Notes are unsecured

obligations and rank equally in right of payment with all existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

### 5. The Debtors' Equity Interests.

#### (i) Preferred Stock.

On September 17, 2012, SN issued 3,000,000 shares of Series A Convertible Perpetual Preferred Stock ("Series A Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 619,503 shares of Series A Preferred Stock were issued and outstanding. The annual dividend rate for each share of Series A Preferred Stock is 4.875%. The Series A Preferred Stock currently trades over-the-counter in the OTC Pink market. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by SN's board of directors (the "Board"). The liquidation preference for each share of Series A Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.325 shares of Existing SN Common Stock per share of Series A Preferred Stock, subject to certain specified adjustments.

On March 26, 2013, SN issued 4,500,000 shares of Series B Convertible Perpetual Preferred Stock ("Series B Preferred Stock," and together with the Series A Preferred Stock, the "Existing SN Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 2,466,013 shares of Series B Preferred Stock were issued and outstanding. The Series B Preferred Stock currently trades over-the-counter in the OTC Pink market. The annual dividend rate for each share of Series A Preferred Stock is 6.500%. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by the Board. The liquidation preference for each share of Series B Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.337 shares of Existing SN Common Stock per share of Series B Preferred Stock, subject to certain specified adjustments.

The Board suspended the dividends on the Series A Preferred Stock and the Series B Preferred Stock, beginning with the three-month period ending March 31, 2019.

#### (ii) Common Stock.

There are approximately 100 million shares of Existing SN Common Stock issued and outstanding, along with outstanding warrants to purchase 8.5 million shares of Existing SN Common Stock at an exercise price of $10 per share. The Existing SN Common Stock traded on the NYSE until its delisting in 2019. The Existing SN Common Stock currently trades over-the-counter on the OTC Pink market. SN has never paid dividends on its Existing SN Common Stock. As of the Petition Date, members of the Sanchez family, SOG and other affiliated entities collectively owned approximately 10% of the Existing SN Common Stock.

On July 28, 2015, in order to protect the Debtors' tax attributes, the Debtors adopted an "NOL Rights Plan" that operates to dilute the holdings of certain parties that acquire Existing SN Common Stock without the approval of the Board. As of December 31, 2018, the Debtors estimate that they had federal consolidated net operating losses ("NOLs") in the amount of approximately $1.9148 billion.[9]

Despite these efforts to preserve equity value, on February 20, 2019, the NYSE notified the Company that it had initiated delisting proceedings against the Existing SN Common Stock because the Debtors' average market capitalization over a consecutive 30 trading day period fell below the NYSE's

[9] The Debtors also have an additional $106 million in state NOLs in Montana, Mississippi, Louisiana, Kansas and Oklahoma.

minimum $50 million threshold. The Existing SN Common Stock now trades exclusively on over-the-counter markets under the ticker symbol "SNECQ."

**(iii) Warrants.**

In connection with the Comanche Acquisition, SN issued warrants to the GSO Funds to purchase approximately 1.9 million shares in the aggregate of Existing SN Common Stock. Such warrants will expire March 1, 2032 in accordance with the terms of the applicable warrant agreement. In addition, SN issued warrants to three affiliates of Blackstone to purchase 6.5 million shares of Existing SN Common Stock pursuant to three separate warrant agreements, which will expire by their terms on March 1, 2022. In March 2019, the Debtors were notified that the GSO Funds and Blackstone affiliates donated all of the foregoing warrants to various charitable organizations. In the aggregate, the Debtors have 8.5 million warrants which remain outstanding.

## VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A. First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (collectively, the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Cameron W. George, Executive Vice President and Chief Financial Officer of Sanchez Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"). At a hearing on August 13, 2019, the Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions.

On September 9, 2019, the Debtors held their "second day" hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including: (i) notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock; (ii) authority to continue to pay certain compensation obligations; (iii) authority to provide adequate assurance for future utility services; (iv) authority to continue prepetition insurance coverage and renew or enter into new insurance policies; (v) authority to pay certain taxes and fees; (vi) authority to pay certain prepetition claims; and (vii) authority to continue using the Debtors' cash management system and maintain existing bank accounts.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/sanchezenergy.

### B. Other Procedural and Administrative Motions.

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion. On September 9, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Used in the Ordinary Course of Business Effective Nunc Pro Tunc* [Docket No. 277] (the "OCP Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief

requested in the OCP Motion [Docket No. 412]. On October 8, 2019, the Bankruptcy Court entered an amended order including (a) revisions to the OCP Cap and OCP Case Cap (each as defined therein), (b) additional language regarding procedures with respect to contingency fees paid to certain OCPs and (c) certain revisions to the OCP List (as defined in the OCP Motion) [Docket No. 443].

- Interim Compensation Motion. On September 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 273] (the "Interim Compensation Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 412] (the "Interim Compensation Order").

- Motion to Extend Removal Deadlines. On October 7, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 436]. On November 6, 2019, the Bankruptcy Court entered an order enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including March 8, 2020 [Docket No. 562]. On February 10, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 913]. On March 4, 2020, the Bankruptcy Court entered an order further enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including July 6, 2020 [Docket No. 1009].

- Record Date Motion. On October 4, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* [Docket No. 433] (the "Record Date Motion"). On November 7, 2019, the Bankruptcy Court entered an order granting the relief requested in the Record Date Motion [Docket No. 566].

- Claims Objection Procedures. On January 10, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Omnibus Claims Objection Procedures and Filing of Substantive Omnibus Claims Objections* [Docket No. 807] (the "Claims Objection Procedures"). On January 31, 2020, the Bankruptcy Court entered an order granting the relief requested in the Claims Objection Procedures Motion [Docket No. 898].

### C. Schedules and Statements.

On September 24, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "SOFAs and Schedules") [Docket Nos. 374-395]. Consistent with ongoing disclosure requirements, on October 4, 2019, the Debtors subsequently filed amended schedules E/F for certain of the filing entities.

### D. Establishment of a Claims Bar Date.

On October 24, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 520] (the "Bar Date Motion"). By the Bar Date Motion, the Debtors sought entry

of an order by the Bankruptcy Court that establishes January 10, 2020, as the general claims bar date and February 7, 2020 as the governmental claims bar date, before which any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim. On November 21, 2019, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion and establishing the bar dates therein [Docket No. 617].

### E. The GSO Tolling Agreement.

Prior to the Petition Date, on August 10, 2019, SN entered into a tolling agreement (the "Tolling Agreement"), along with SN UR Holdings, SN UnSub Holdings, SN Maverick (together with the Company, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP ("GSO LP" and, together with GSO LLC, the "GSO Parties").

On August 29, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Performance of Obligations Under Tolling Agreement and (II) Limited Modification of the Automatic Stay* [Docket No. 239], and on September 19, 2019, the Bankruptcy Court entered an order authorizing the Debtors' performance of their obligations under the Tolling Agreement [Docket No. 352].

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "GP LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any such Investor Redemption Event will be tolled during the Tolling Period.

The Tolling Agreement will expire on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the GP LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary Chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; or (2) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

### F. Investigation of Related Party Transactions.

On November 9, 2018, the Board established a standing special committee (the "Special Committee") pursuant to Article V, Section 5.1 of SN's Amended and Restated By-Laws. The Special Committee is comprised of two disinterested and independent directors—Eugene I. Davis (Chairman) and

Adam C. Zylman (Member). The Board initially assigned the Special Committee the task of considering, evaluating, or negotiating strategic and/or financial alternatives for the Company, including a potential sale, restructuring, reorganization, or other transaction.

Subsequently, the Board also delegated to the Special Committee the exclusive power and authority to conduct an investigation into, and pursue or resolve as it determines to be in the best interests of SN, potential causes of action SN may have against affiliated entities or individuals, including SOG, Sanchez Midstream Partners LP ("SNMP"), and SN's directors and officers, in connection with any actual or potential related party transaction (the "Investigation"). The Special Committee retained Ropes & Gray LLP ("Ropes") as its counsel in connection with the Investigation. Alvarez & Marsal North America, LLC ("A&M") and Moelis, as advisors to SN, assisted Ropes with regards to certain aspects of the Investigation.

In connection with the Investigation, Ropes collected emails from twenty-three current or former executives, directors, or employees of SOG and/or SN, consisting of approximately 3.6 million documents. In addition to the email collection, Ropes submitted multiple sets of targeted diligence requests to SOG and SN, comprising more than forty requests, seeking documents relevant to the Investigation, including transaction documents, board materials and minutes, and other documents. SOG and SN fully cooperated with the diligence requests and produced approximately 1,500 responsive documents. Ropes also conducted 25 interviews—with Sanchez family members, all current named executive officers, three former CFOs, all current and former members of the Audit and Compensation Committees, internal and external counsel, including counsel to the Audit and Compensation Committees, and the CEO of SNMP.

Upon completion of the Investigation, Ropes prepared and delivered to the Special Committee a comprehensive report concerning its investigation into various actual or potential related party transactions and subsequently evaluated certain other transactions and potential claims.

### G. Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases. Significantly, the Debtors are engaged in various litigations matters, certain of which are the subject of adversary proceedings pending in these Chapter 11 Cases, as discussed further below.

#### 1. The Derivative Action.

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain SN directors (*Armato et al. v. A.R. Sanchez, Jr. et al.*, No. 2018-0642, the "Derivative Action"). The Derivative Action complaint, which does not specify damages sought, alleges breach of fiduciary duty, unjust enrichment, and waste of corporate assets against directors of SN based on purportedly excessive compensation of SN's non-employee directors. On October 22, 2018, SN and defendant directors filed an answer in the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. The Derivative Action remains

in its preliminary stages. As a result, the Debtors are unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution.

### 2. The Comanche JDA Dispute.

SN Maverick is currently engaged in a disagreement with Gavilan regarding operations of the Comanche Assets under the Comanche JDA with Gavilan. Among other things, Gavilan has asserted that SN Maverick is in default of the Comanche JDA and Gavilan has the right to take over operations of the Comanche Assets. SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan. However, if Gavilan prevails in the disagreement, SN Maverick would potentially lose its rights to operate the Comanche Assets and certain rights under the Comanche JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the Comanche JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the Comanche JDA. SN Maverick disputes that Gavilan has the ability to invoke the division of operatorship provision under the Comanche JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the Comanche JDA, could have a material adverse effect on the Debtors' business, financial condition or results of operations.

Gavilan served its initial arbitration demand against SN Maverick on February 18, 2019. SN Maverick and SN answered that demand and served their counterclaim against Gavilan on February 26, 2019. The American Arbitration Association appointed an arbitrator on April 8, 2019. On August 23, 2019, Gavilan filed *Gavilan Resources, LLC's Motion for Relief from the Automatic Stay to Allow Completion of Arbitration* [Docket No. 222] ("Gavilan Lift Stay Motion"), seeking relief from the automatic stay to allow the arbitration to proceed. On September 12, 2019, the Debtors filed an Objection to the Gavilan Lift Stay Motion [Docket No. 292]. The Secured Ad Hoc Group and the Creditors' Committee each filed a joinder to the Debtors' objection [Docket Nos. 670 and 673, respectively].

The arbitration was initially set for hearing the week of October 14, 2019. A hearing on the Gavilan Lift Stay Motion was set for September 19, 2019, and then reset to be heard on December 12, 2019. At the hearing on December 12, 2019, the parties agreed that (a) the arbitration and the underlying dispute should be resolved by the Bankruptcy Court with a trial to begin on March 9, 2020 at 8:30 am (CT), (b) the matter, including discovery, continued to be stayed until January 23, 2020, (c) pre-trial briefing by Gavilan and the Debtors was due on March 2, 2020, and (d) the Bankruptcy Court conducted a pre-trial conference on March 3, 2020. On March 9, 2020, the Bankruptcy Court began the trial on the Comanche JDA Dispute. On March 10, the parties agreed to continue the remainder of the trial to engage in settlement negotiations. On March 12, the Bankruptcy Court held a status conference to discuss the status of the settlement discussions. The Bankruptcy Court scheduled a further status conference regarding settlement discussions for March 18, 2020. On March 24, 2020, the Bankruptcy Court cancelled the hearing on the Gavilan Lift Stay Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1086]. On April 2, 2020, Gavilan filed *Gavilan Resources' Emergency Motion for Status Conference on Schedule to Consider Dispositive Legal Issues and, if Necessary, to Resume Trial* [Docket No. 38] requesting a status conference in the adversary proceeding. The Bankruptcy Court held a status conference on the matter on April 7, 2020, at which the Bankruptcy Court ruled in part in favor of Gavilan. The Bankruptcy Court will set a trial schedule for the matter at the next status conference currently scheduled for May 5, 2020.

### 3. Dimension Litigation.

In December 2017, Dimension Energy Services, LLC ("Dimension") commenced *Dimension Energy Services, LLC v. Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, and Sanchez*

*Midstream Partners, LP*, Cause No. 2017-85247 (the "Dimension State Court Action") in the 165th Judicial District, Harris County, Texas (the "Dimension State Court") against SN and non-debtor SOG. Dimension alleges claims for breach of the Master Services Agreement (the "Dimension MSA") between Dimension and SOG, fraud, quantum meruit/unjust enrichment, violations of the Texas Prompt Payment Act, and foreclosure of liens based on a pipeline construction project (the "Project"). On February 9, 2018, SOG and SN answered and asserted a counterclaim against Dimension for breach of the Dimension MSA based on Dimension's failure to substantiate additional payments for increased work costs and failure to pay subcontractors, which led to various liens being placed on the Project and lawsuits against SOG, including the Sunbelt Litigation. Dimension later filed its First Amended Original Petition adding non-debtor SNMP as a defendant. Non-debtor SNMP signed the work order at issue in the Dimension State Court Action and owns the property that is subject to the liens for which Dimension is seeking foreclosure.

On September 5, 2019, Dimension filed an adversary proceeding (Case No. 19-03606) against SN seeking to remove the Dimension State Court Action. SN filed a motion to remand the proceeding back to the state court on October 7, 2019. [Adv. Docket No. 7]. The Court heard arguments on the motion on November 4, 2019, and issued an order remanding the adversary proceeding. [Adv. Docket No. 14].

On January 21, 2010, Dimension filed *Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 856] (the "Dimension Lift Stay Motion"). On February 11, 2020, the parties filed a *Stipulation and Agreed Order Resolving Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 923] (the "Dimension Agreed Order") modifying the automatic stay to permit Dimension to continue the Dimension State Court Action starting February 28, 2020. The Court entered the Dimension Agreed Order on February 12, 2020 [Docket. No. 933]. The Dimension State Court set the trial for February 1, 2021.

### 4. Sunbelt Litigation.

Dimension hired several sub-subcontractors to complete the pipeline Project, including (1) Sunbelt Tractor & Equipment Company ("Sunbelt") and (2) Swan Transportation Service, Ltd. ("Swan"). Sunbelt filed lawsuits in Webb County and LaSalle County, Texas, to recover unpaid amounts from Dimension and foreclose on subcontractor liens against SOG, SNMP, and SN. *Sunbelt Tractor v. Dimension Energy Servs., et al.*, Cause No. 2018-CV-I00165-D1 (49th Judicial District Court of Webb County, Texas); *Sunbelt Tractor v. Dimension Energy Servs., et al*., Cause No. 18-08-00177-CVL (81st Judicial District Court of LaSalle County, Texas) (the "Sunbelt State Court Actions"). Swan also filed a lawsuit in Smith County, Texas, but that case has been resolved. *Swan Transp. v. Dimension Energy Servs., et al.*, Cause No. 18-0244-B (114th Judicial District Court of Smith County, Texas).

On October 25, 2019, Sunbelt filed an adversary proceeding (Case No. 19-03641) against SN seeking to remove the Sunbelt State Court Actions. The Debtors and Sunbelt filed an agreed order remanding the actions on November 22, 2019 [Adv. Docket No. 11] (the "Sunbelt Agreed Order"). The Court entered the Sunbelt Agreed Order on December 12, 2019 [Adv. Docket No. 12]. Sunbelt has since non-suited SN in the Sunbelt State Court Actions.

### 5. Automatic Stay Motions.

Following commencement of the Chapter 11 Cases, certain litigation counterparties have filed, or may file in the future, requests to modify or lift the automatic stay to continue pursuing prepetition litigation against the Debtors. The Debtors also filed one motion relating to the automatic stay. In addition to the Gavilan Lift Stay Motion and the Dimension Lift Stay Motion described above, the following motions have been filed to lift the automatic stay:

**(i) Fernandez Lift Stay Motion**

On September 30, 2019, Ricardo Fernandez ("Fernandez") filed the *Motion for Relief from the Automatic Stay* [Docket No. 410] (the "Fernandez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, non-debtor SOG, non-Debtor SNMP, and Scientific Drilling International, Inc. On December 10, 2019, the parties filed a *Stipulation and Agreed Order Resolving Ricardo Fernandez's Motion for Relief from the Stay* [Docket No. 717] (the "Fernandez Agreed Order"). The Fernandez Agreed Order modified the automatic stay so as to limit discovery against SN and non-Debtor SOG and limited Fernandez's recovery to insurance proceeds. The Court entered the Fernandez Agreed Order on December 12, 2019 [Docket No. 728].

**(ii) Valdez Lift Stay Motion.**

On August 30, 2019, Marco Valdez filed the *Marco Valdez's Motion for Relief from the Automatic Stay* [Docket No. 246] (the "Valdez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, SN Operating, non-debtor SOG, non-Debtor SNMP, and other non-debtor parties. On October 16, 2019, Debtors filed the *Objection of the Debtors to Marco Valdez's Motion for Relief from the Stay* [Docket No. 471] (the "Debtors' Valdez Objection"), and non-debtor SOG filed a *Response of Sanchez Oil & Gas Corporation to Marco Valdez's Motion for Relief from Stay* [Docket No. 472]. On December 5, 2019, the hearing for the Valdez Lift Stay Motion was adjourned and has not yet been reset. *See Sixth Notice of Reset Hearing on Marco Valdez's Motion for Relief from Stay* [Docket No. 682]. On January 2, 2020, Valdez filed *Plaintiffs' Motion to Sever Bankrupt Defendants Sanchez Energy Corporation and SN Operating, LLC* (the "Valdez Motion to Sever") in the Valdez state court action. *Marco Valdez v. RDZ Oilfield Lease Services, Inc. et al.*, Cause No. 18-10-13542-DCV (293rd District Court of Dimmit County, Texas). The Valdez Motion to Sever has yet not been set for hearing or ruled upon by the state court judge.

**(iii) Terra Lift Stay Motion.**

On February 18, 2020, Debtors filed the *Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket No. 975] (the "Terra Lift Stay Motion"), seeking an order allowing a state court action and interlocutory appeal involving Terra Energy Partners LLC and certain individual defendants to proceed or, alternatively, lifting the automatic stay. On March 16, 2020, the parties filed, and the Bankruptcy Court entered, a *Stipulation and Agreed Order Resolving the Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket Nos. 1045, 1047] (the "Terra Agreed Order"). The Terra Agreed Order modified the automatic stay to permit certain individual defendants to continue to judgment or other resolution to determine the amount of attorneys' fees and sanctions which may be awarded, if any, by the state court pursuant to its order dated September 25, 2018, as well as any attorney's fees or costs, if any, that may be awarded to those certain individual defendants in connection with the state court action.

**H. Retention of Professionals.**

Beginning on the Petition Date, the Debtors filed applications to retain the following professionals:

- Akin Gump Strauss Hauer & Feld (Co-Counsel) [Docket No. 268];
- Jackson Walker (Co-Counsel) [Docket No. 269];

- Alvarez & Marsal (Financial Advisor) [Docket No. 270];
- Moelis & Company (Investment Banker) [Docket No. 271];
- Ropes & Gray (Counsel to Special Committee of Sanchez Energy Corporation Board of Directors) [Docket No. 272];
- Prime Clerk (Claims and Noticing Agent) [Docket No. 13];
- KPMG (Audit and Tax Consultant) [Docket No. 283];
- Gibbs & Bruns (Special Litigation Counsel) [Docket No. 284]; and
- Richards Layton & Finger (Special Counsel to the Audit Committee) [Docket No. 1012].

### I. Rejection and Assumption of Executory Contracts and Unexpired Leases.

#### 1. Motion to Reject Shell Sublease.

On October 22, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Shell Sublease Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 504]. On November 15, 2019, the Bankruptcy Court entered an order authorizing rejection of the Shell Sublease Agreement [Docket No. 592].

#### 2. Motion to Reject Cornerstone Master Agreement.

On October 27, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Cornerstone Master Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 533], seeking to reject a human capital management software agreement. On November 20, 2019, the Bankruptcy Court entered an order authorizing rejection of the Cornerstone Master Agreement *nunc pro tunc* to October 27, 2019 [Docket No. 608].

#### 3. Motion to Reject Lease Participation Agreement.

On January 3, 2020, the Debtors filed a motion to reject the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Lease Participation Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 781]. On January 28, 2020, the Bankruptcy Court entered an order authorizing rejection of the Lease Participation Agreement effective *nunc pro tunc* to January 3, 2020 [Docket No. 890].

### J. Appointment and Retention of Chief Restructuring Officer.

On November 15, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Retention of M-III Advisory Partners, LP and (B) Designation of Mohsin Y. Meghji as Chief Restructuring Officer; and (II) Granting Related Relief* [Docket No. 593], seeking to retain M-III Advisory Partners, LP ("M-III") and to designate Mohsin Y. Meghji ("Mr. Meghji") as the Debtors' Chief Restructuring Officer ("CRO"). On December 9, 2019, the Bankruptcy Court entered an order retaining M-III and designating Mr. Meghji as the Debtors' CRO [Docket No. 704].

### K. Appointment of Examiner.

On November 26, 2019, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Emergency Motion, Pursuant to Sections 105(a), 1104(c), 1106(b), and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2007.1, For Entry of an Order Appointing an Examiner with Power to Prosecute* [Docket No. 638] (the "Examiner Motion"). On December 12, 2019, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint an

examiner [Docket No. 735]. The Examiner Motion has been adjourned at the request of the Ad Hoc Group of Unsecured Noteholders and is currently set for a status conference on April 16, 2020, to determine if the Ad Hoc Group of Unsecured Noteholders will continue to prosecute the Examiner Motion.

**L. Exclusivity.**

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 694]. On January 8, 2020, the Bankruptcy Court entered an order extending the Debtors' exclusivity period to March 9, 2020 [Docket No. 800]. On February 26, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*, seeking to further extend the Debtors' exclusive plan filing and solicitation period to June 8, 2020 [Docket No. 694] ("Exclusivity Motion"). On March 20, 2020, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Objection to Debtors' Second Motion to Extend Exclusivity Periods to File Chapter 11 Plan and Solicit Acceptances* [Docket No. 1061] opposing an extension of exclusivity. On March 24, 2020, the Secured Ad Hoc Group filed a *Statement of the Secured Ad Hoc Group Regarding Debtors' Second Motion for Entry of an Order to Extend their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1088] supporting a short extension of exclusivity to April 30, 2020. That same day, the Bankruptcy Court cancelled the hearing on the Exclusivity Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1087].

**M. Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts.**

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 693]. On February 3, 2020, the Bankruptcy Court entered an order extending the deadline within which the Debtors may assume or reject unexpired leases of non-residential real property and executory contracts to March 9, 2020 [Docket No. 904]. Additionally, the Debtors are party to three unexpired leases of nonresidential real property for: (i) their corporate headquarters in Houston, Texas; (ii) their field office in Carrizo Springs, Texas; and (iii) their office in San Antonio, Texas (collectively, the "Office Leases"). The Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* (the "Office Lease Motion"), seeking approval of stipulations with the landlords for each of these leases, which provide for an extension of the time within which the Debtors must assume or reject the three Office Leases to the earlier of (a) June 30, 2020, and (b) the effective date of a confirmed plan of reorganization, without prejudice to the rights of the Debtors to seek additional extensions of time to assume or reject the Office Leases. [Docket No. 1001]. On March 24, 2020, the Bankruptcy Court entered the *Order Approving Stipulations Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* [Docket No. 1081] approving the Office Lease Motion.

**N. Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property.**

On March 6, 2020, the Debtors filed the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Assumption of Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* (the "Rejection Motion"), seeking authority to assume certain unexpired oil and natural gas leases and related surface leases, rights of way, easements and other similar types of surface access agreements [Docket No. 1016]. No objections to the Rejection Motion have been Filed. Certain informal objections are in the process of being resolved.

**O. DIP Motion.**

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing* Limited *Use of Cash Collateral; (II) Obtaining Postpetition Credit Secured by Senior Liens; (III) Granting Adequate Protection; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 15] (the "DIP Motion"), seeking approval of the DIP Facility in an aggregate amount of $350 million (including a roll-up of $175 million of obligations arising under the Secured Notes Indenture held by the DIP Lenders) (the "DIP Facility"), provided by the Secured Ad Hoc Group (the "DIP Lenders").

The Debtors received objections to the DIP Motion from each of: (a) the Creditors' Committee [Docket No. 300], (b) the Ad Hoc Group of Unsecured Noteholders [Docket No. 301], (c) certain Texas taxing authorities [Docket No. 295], (d) certain equity security holders [Docket No. 297], (e) M. Light Acomb Materials LLC [Docket No. 330], and (f) Tulsa Inspection Resource, LLC [Docket No. 332]. On August 13, 2019, over the unresolved objections of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the DIP facility on an interim basis, which authorized the Debtors to access an interim draw of $50 million [Docket No. 97].

On September 19, 2019, the Court withheld approval of the DIP Motion on a final basis. Following hard-fought negotiations with the Debtors' various creditor constituencies, the Debtors requested that the final hearing on the DIP Motion be scheduled for January 22, 2020, and filed a revised proposed final DIP order on January 10, 2020 [Docket No. 808], and a further revised proposed final DIP order on January 21, 2020 (the "Further Revised Proposed Final DIP Order") [Docket No. 857]. The Further Revised Proposed Final DIP Order (a) reduced the aggregate principal amount of the new money component of DIP Facility from $175 million to $150 million and (b) reduced the roll-up amount from $175 to $50 million.

On January 21, 2020, the Creditors' Committee filed the only remaining objection to the DIP Motion, concerning the DIP Facility maturity date [Docket No. 858]. At the final hearing on January 22, 2020, after modifying the final order to resolve the Creditors' Committee's limited objection, the Court granted the DIP Motion on a final basis [Docket No. 865].

**P. Analysis of Lien Perfection Regarding Secured Notes.**

**1. The Correction Instruments**

In April 2018, the initial collateral trustee or an agent of the initial collateral trustee recorded a series of Amended and Restated Mortgages, Deeds of Trust, Security Agreements, Financing Statements, and Assignments of Production (the "Deeds of Trust") with respect to the collateral pledged in support of the Secured Notes and the other secured obligations. Certain of the Deeds of Trust contained errors in the description of the county, book numbers, page numbers and instrument numbers in the official county records.

In June and July 2019, the Secured Ad Hoc Group, acting through its designated landman agent, delivered for recording notices of correction and correction affidavits (the "Correction Instruments") in at least nine counties in Texas pursuant to section 5.028 of the Texas Property Code to make certain corrections to the original Deeds of Trust, including to add, correct, or clarify the recording data for instruments referenced in the Correction Instruments, and to correct land descriptions and add land descriptions to certain conveyances.

**2. The Lien Investigation and the Creditors' Committee Lien Challenge Standing Motion**

Prior to the Petition Date, the Debtors, through their professionals and led by Jackson Walker, began a review and investigation of the Liens which purport to secure the Secured Notes, with a particular focus on the effect and validity of the Correction Instruments discussed above and the particular deficiencies which were the subject of such Correction Instruments (the "Lien Investigation").

The Lien Investigation, which continued following the Petition Date, revealed that the Debtors' estates have colorable claims or causes of action (i) that certain of the Deeds of Trust did not provide adequate notice to third parties of the underlying security interest, and are insufficient under Texas Property Code § 13.002 to perfect the security interests, and (ii) to the extent that the Correction Instruments had the effect of perfecting the Secured Noteholders' otherwise unperfected Liens in the underlying collateral, the Correction Instruments are avoidable transfers under 11 U.S.C. §§ 544, 547, and 548 (the "Potential Claims").

On January 24, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 875] (the "Lien Challenge Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve the Potential Claims. Following a hearing on February 20, the Court entered the *Order Resolving Committee's Standing Motion* [Docket No. 984] (the "Lien Challenge Standing Motion Order"). The Lien Challenge Standing Motion Order provides that the Debtors retain the exclusive right to file a lien challenge complaint in an adversary proceeding through March 10, 2020. If the Debtors do not file such a complaint by that time, the exclusive right to file such a complaint will vest with the Creditors' Committee. The Lien Challenge Standing Motion Order further provides that if the Debtors file a motion under Bankruptcy Rule 9019 in respect of any lien challenge adversary proceeding, the complaint in respect of such adversary proceeding will be abated pending a ruling on such motion. The Debtors, through their co-counsel, Jackson Walker, filed an adversary proceeding pursuing the Potential Claims under case number 20-03057 on March 10, 2020 [Docket No. 1026].

### Q. Creditors' Committee Claim Objection.

On March 10, 2020, the Creditors' Committee filed *The Official Committee of Unsecured Creditors' Objection to Claim Number 216 Filed by Wilmington Savings Fund Society, FSB As Indenture Trustee on Behalf of the 7.25% Senior Secured First Lien Notes* [Docket No. 1027] (the "Creditors' Committee Claim Objection"). By the Creditors' Committee Claim Objection, the Creditors' Committee seeks disallowance of claim number 216, filed by WSFS, as Indenture Trustee on behalf of the holders of the 7.25% Senior Secured Notes, asserting a secured claim against the Debtors' estates in "the aggregate principal amount of not less than $500,000,000.00, plus any other amounts owing under the Claim Documents (as defined in the proof of claim), including, without limitation all accumulated and unpaid interest, fees, premiums, and expenses, plus contingent unliquidated claims as described" therein ("Claim Number 216"). The Creditors' Committee Claim Objection is based on the following grounds: (a) Claim Number 216 should be disallowed in its entirety pursuant to section 502(d) of the Bankruptcy Code because the holders of the 7.25% Senior Secured Notes are in possession of transfers avoidable under section 547 of the Bankruptcy Code and of property recoverable under section 550 of the Bankruptcy Code; (b) Claim Number 216 should be disallowed to the extent that it seeks to recover any unamortized original issue discount ("OID") associated with the 7.25% Senior Secured Notes because such OID constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code; (c) Claim Number 216 should be disallowed to the extent it seeks recovery of any make-whole premium because the 7.25% Senior Secured Notes were accelerated upon the Debtors' chapter 11 filing and the 7.25% Senior Secured Notes Indenture does not provide for the payment of make-whole premiums upon or after acceleration; and (d) Claim Number 216 should be disallowed to the extent it seeks to recover any make-whole premium because

such premium constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code. The response deadline for the Creditors' Committee Claim Objection is April 9, 2020.

### R. Creditors' Committee Related Party Transaction Standing Motion.

On March 13, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1032] (the "Related Party Transactions Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve certain claims and causes of action on behalf of the Debtors' estates against SNMP, SN Catarina, SOG, and certain of Sanchez Midstream Partners GP LLC's and SOG's officers and directors (the "Proposed Defendants"). The proposed claims that the Creditors' Committee seeks to assert include: (i) recharacterization of a transaction between SN and SNMP as a disguised financing arrangement (in the alternative, avoidance of the Catarina Arrangement (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer); (ii) breach of fiduciary duty against certain of the Proposed Defendants in connection with the approval of the Catarina Arrangement and Catarina Gathering Agreement Amendment (both as defined in the Related Party Transactions Standing Motion); (iii) avoidance of payments made as a result of increased rates payable for water and gas delivered through the gathering system subject to the Catarina Arrangement as constructively fraudulent transfers; (iv) avoidance of the Carnero Sale (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer; (v) avoidance of excessive compensation payments made by SN to certain Sanchez family members as constructively fraudulent transfers; (vi) breach of fiduciary duty against Antonio R. Sanchez, III; (vii) breach of fiduciary duty against certain of the Proposed Defendants in connection with allowing SN to enter into and continue the Lease Participation Agreement between SN and SOG; and (viii) breach of contract against SOG in connection with SOG's failure to perform its obligations under a services agreement between SOG and SN. The hearing on the Related Party Transactions Standing Motion is continued to a date to be determined [Docket No. 1091].

### S. Shared Services.

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Shared Services Arrangements* [Docket No. 10] (the "Shared Services Motion"), seeking to continue performing under certain shared services arrangements with SOG. On August 16, 2019, the Court entered an order approving certain of the relief requested in the Shared Services Motion on an interim basis [Docket No. 189]. The Court entered subsequent interim orders on September 11, 2019 [Docket No. 287] and October 23, 2019 [Docket No. 510].

The Debtors entered into negotiations with the Creditors' Committee regarding the Shared Services Motion and were able to negotiate a form of agreed upon final order. On December 2, 2019, the Ad Hoc Group of Unsecured Noteholders filed an objection to the Shared Services Motion [Docket No. 660]. On December 12, 2019, after resolving the objection of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the Shared Services Motion on a final basis [Docket No. 733].

### T. Analysis of the Debtors' Midstream and Marketing Contract Review.

As the operator of substantially all of the Debtors' assets, the Debtors have a complex midstream and marketing contract program that governs their gathering, processing and marketing of hydrocarbons. Since the Petition Date, the Debtors have undertaken an extensive review of their midstream and marketing contracts in order to develop an actionable midstream strategy that will maximize value of the Debtors' estates for the benefit of their stakeholders. In connection with confirmation of the Plan, the Debtors or the

Reorganized Debtors, as applicable, anticipate seeking to reject and/or renegotiate certain of their midstream and marketing contracts in order to maximize value for the Debtors estates.

### U. Postpetition Restructuring Process.

#### 1. Negotiations with Creditors.

Following the appointment of the Debtors' CRO, the Debtors embarked on the intensive process of revising their business plan to account for current market conditions. This process required the Debtors' newly appointed CRO to take on the substantial task of learning about all elements of the Debtors' complex business and operations and consumed substantially all of the months of December and January.

On January 26, 2020, the Debtors shared their business plan and an illustrative restructuring term sheet for a proposed a plan of reorganization with each of the Creditors' Committee, the advisors for the Secured Ad Hoc Group, and the Ad Hoc Group of Unsecured Noteholders. To aid negotiations, on February 23 and 24, 2020, the Debtors entered into confidentiality agreements with (a) eight members of the Secured Ad Hoc Group and (b) three members of the Ad Hoc Unsecured Noteholder Group. On February 25, 2020 the Debtors met with the Creditors' Committee, Secured Ad Hoc Group and Ad Hoc Group of Unsecured Noteholders to further advance plan negotiations. On March 11, 2020, SN filed a Form 8-K disclosing a presentation regarding its proposed business plan and related materials, as required under the terms of the confidentiality agreements with members of the Ad Hoc Unsecured Noteholder Group.

Despite their best efforts, the Debtors were unable to obtain consensus on a plan of reorganization before the unprecedented disruption in the financial markets in mid-March due to the COVID-19 pandemic and the Russian-Saudi oil price war. To reach a comprehensive resolution in light of the foregoing, the Debtors requested that the key creditor groups participate in a mediation conducted by the Bankruptcy Court. On March 26, 2020, the Honorable Chief Judge David R. Jones was appointed as a mediator in the Chapter 11 Cases [Docket No. 1068]. Mediation commenced on March 27, 2020, and continued several days, ultimately resulting in an agreement between the Debtors and the Secured Ad Hoc Group, which agreement is embodied in the Plan.

#### 2. Notice of Default under DIP Facility.

On March 27, 2020, WSFS filed the *Notice of Filing of Enforcement Notice in Accordance with Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(B)* [Docket No. 1098] (the "Enforcement Notice"). The Enforcement Notice referenced a default under the DIP Facility, terminated all remaining New Money Commitments and declared all Obligations and DIP Obligations (as defined the DIP Order) immediately due and payable after the requisite notice and cure period set forth in the DIP Order. On March 27, 2020, WSFS delivered a "Carve-Out Trigger Notice" (as defined the DIP Order) indicating that a Termination Event had occurred, and, among other things, placing a cap of $5 million dollars on professional fees incurred by "Debtor Professionals" and "Committee Professionals" (each as defined in the DIP Order) after the first business day following delivery of the Carve-Out Trigger Notice. In accordance with the DIP Order, upon receipt of the Carve-Out Trigger Notice, the Debtors funded the Carve-Out Reserves for the payment of all unpaid Allowed Professional Fees. On March 27, 2020, the Secured Ad Hoc Group filed the *Emergency Motion of the Secured Ad Hoc Group for Entry of an Order Suspending Interim Compensation Order* [Docket No. 1099] ("Emergency Interim Comp Motion"), asking the Bankruptcy Court to immediately suspend the Interim Compensation Order and require the Debtors to pay professional fees no more than once every 120 days. On March 30, 2020, the Secured Ad Hoc Group (i) cancelled the hearing on the Emergency Interim

Comp Motion and abated the Emergency Interim Comp Motion [Docket No. 1102], and (ii) abated the Enforcement Notice [Docket No. 1103].

## VII. RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation. For additional risk factors that may affect the Debtors' restructuring, please refer to the Debtors' publicly available filings with the SEC.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A. Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

#### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 cases, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 52. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no

Case 22-34008 Document 6813-9 Filed in TXSB on 08/28/20 Page 199 of 300

guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Bankruptcy Court has issued an order extending the Debtors' exclusive period to propose a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

#### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

#### 8. The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

#### 9. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. Occurrence of the Effective Date is, among other things, contingent upon the Requisite DIP Lenders being satisfied, in the exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient operating cash flow to operate in the ordinary course of business. There is no assurance that the Effective Date conditions will be satisfied quickly after the Confirmation Date, if at all.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11. Injunctions and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain injunctions, exculpations, and a release of liens. The injunctions and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

The exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts. Additionally, the directors and officers of the Debtors, who are Exculpated Parties, have contributed significant efforts to the Debtors' reorganization by maintaining the Debtors' operations, guiding the Debtors through difficult financial circumstances, and facilitating a value-maximizing restructuring transaction in the midst of contentious Chapter 11 cases. The Plan's exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries under the Plan.

### 1. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results.

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "Financial Projections"). The Financial Projections are attached hereto as **Exhibit D**. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Reorganized Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not

be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. A Liquid Trading Market for the New Common Stock May Not Develop.

There can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

### 3. The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date.

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to Holders of certain Classes of Claims. Holders of Claims or Interests (as applicable) that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

### 4. Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities.

To the extent that shares of the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock. *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

### 5. Restricted Securities or Securities Held by "Underwriters" Under Section 1145(b) of the Bankruptcy Code Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies.

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate

of the issuer during the preceding three months may resell restricted securities after a six-month holding period (if the issuer is a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and has been for the past 90 days (a "Reporting Issuer")) unless certain current public information regarding the issuer is not available at the time of sale, in which case (or if the issuer is not a Reporting Issuer) the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period (or one year, if the issuer is not a Reporting Issuer) but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

As the New Common Stock may be held by fewer than 300 holders, the Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension. The New Organizational Documents or the New Stockholders' Agreement, if any, may include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require any Reorganized Debtors to continue or resume filing periodic or other reports pursuant to the Exchange Act. These restrictions may adversely impact the value of the shares of New Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares, at a time when they may wish to do so.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

#### 6. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review Article X of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 69, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

#### 7. The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting. However, even an effective system of internal control over financial reporting, no matter how well designed, has inherent limitations, including the possibility of human error, circumvention of controls or overriding of controls and, therefore, can provide only reasonable assurance with respect to reliable financial reporting. Furthermore, the effectiveness of a system of internal control over financial reporting in future periods can change as conditions change. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. If the Debtors or the Reorganized Debtors, as applicable, fail to maintain the adequacy of their internal controls, they may be unable to provide financial information in a timely and reliable manner within the time periods required for their financial reporting under SEC rules and regulations, the terms of the agreements governing the Debtors' indebtedness, or as otherwise required. Any such difficulties or failure could materially adversely affect the Debtors' or Reorganized Debtors' business, results of operations, and financial condition. Further, the Debtors or Reorganized Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect their businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses.

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service their Indebtedness.

The Reorganized Debtors' ability to meet their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay their debt as it comes due and/or fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

If the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Reorganized Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Reorganized Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections

contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

#### 4. The Debtors' Substantial Liquidity Needs May Impact Revenue.

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate cash on hand; (b) their ability to generate cash flow from operations; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions, commodity prices and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

#### 5. Market Conditions for Oil, Natural Gas, and NGLs are Highly Volatile. A Sustained Decline in Prices for These Commodities Could Adversely Affect the Debtors' Revenue, Cash Flows, Profitability, and Growth.

The prices for oil, natural gas and NGLs fluctuate widely in response to a variety of factors that are beyond the Debtors' control, such as:

- domestic and foreign supply of and demand for oil, natural gas and NGLs;
- weather conditions and the occurrence of natural disasters, pandemics, epidemics, and outbreaks of disease such as the recent coronavirus, which may reduce demand for oil, NGLs and natural gas because of reduced global or national economic activity;
- overall domestic and global economic conditions;
- political and economic conditions in countries producing oil, natural gas and NGLs, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;

- actions of OPEC and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on prices for oil, natural gas and NGLs;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting the Debtors' ability to apply hydraulic fracturing to the Debtors' wells, and taxation;
- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of production and transportation facilities for oil, natural gas and NGLs;
- the availability of refining capacity; and
- the price and availability of, and consumer demand for, alternative fuels.

Governmental actions may also affect prices for oil, natural gas and NGLs. In the past, prices for oil, natural gas and NGLs have been extremely volatile, and the Debtors expect this volatility to continue. Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. Although oil prices rebounded somewhat in 2017, they declined again in the fourth quarter of 2018 and remained lower through 2019 and into 2020 and trended downward beginning in late January 2020. Even more recently, the recent coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial activity and travel restrictions that are expected to continue and expand in the near future. Disagreements between OPEC and Russia in early March 2020 have caused additional price declines and volatility, and oil prices fell to a four-year low in March 2020. Such downward volatility has negatively affected the amount of the Debtors' net estimated proved reserves and the Standardized Measure of discounted future net cash flows of the Debtors' net estimated proved reserves. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crises, reflecting fears of a global recession and potential further global economic damage from the coronavirus, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

In addition, the Debtors' revenue, profitability and cash flows depend upon the prices of and demand for oil, natural gas and NGLs, and continued price volatility and low commodity prices, or a sustained drop in prices could continue to negatively affect the Debtors' financial results and further impede the Debtors' growth. In particular, sustained declines in commodity prices have and will:

- limit the Debtors' ability to enter into commodity derivative contracts at attractive prices;
- reduce the value and quantities of the Debtors' reserves, because declines in prices for oil, natural gas and NGLs would reduce the amount of oil, natural gas and NGLs that the Debtors can economically produce;
- reduce the amount of cash available to fund capital expenditures;

- limit the Debtors' ability to borrow money or raise additional capital; and
- make it uneconomical for the Debtors' and their operating partners to commence or continue production levels of oil, natural gas and NGLs.

### 6. The Debtors' Derivative Risk Management Activities Could Result in Financial Losses or Reduced Income.

To mitigate the effect of commodity price volatility on the Debtors' net cash provided by operating activities, support the Debtors' annual capital budgeting and expenditure plans and reduce commodity price risk associated with certain capital projects, the Debtors have historically entered into derivative contracts covering a portion of the Debtors' production. The Debtors terminated their derivative contracts postpetition, but the Reorganized Debtors may decide to engage in post-emergence hedging activities following the reorganization, and certain of the non-Debtor subsidiaries that report on a consolidated basis with the Debtors may have or enter into derivative agreements or continue to engage in hedging activities. These derivative arrangements will be subject to mark to market accounting treatment, and the changes in fair market value of the contracts will be reported in the Reorganized Debtors' statements of operations each quarter, which may result in significant non-cash gains or losses. These derivative contracts may also expose the Reorganized Debtors to risk of financial loss (or reduced income) in certain circumstances, including when:

- production is less than the contracted derivative volumes, in which case the Reorganized Debtors might be forced to satisfy all or a portion of their hedging obligations without the benefit of the cash flow from the Reorganized Debtors' sale of the underlying physical commodity;
- the counterparty to the derivative contract defaults on its contractual obligations;
- there is a widening of price basis differentials between delivery points for the Reorganized Debtors' production and the delivery point assumed in the hedge instrument, which limits the effectiveness of the hedge itself; or
- the derivative contracts limit the benefit the Reorganized Debtors would otherwise receive from increases in commodity prices.

Such financial losses (or reduced income) could materially impact our liquidity, business, financial condition and results of operations.

### 7. The Debtors are Subject to Complex Federal, State, Local and Other Laws and Regulations that Could Adversely Affect the Cost, Manner or Feasibility of Conducting their Operations. In Addition, the Third Parties on Whom the Debtors Rely for Gathering and Transportation Services are also Subject to Complex Federal, State and Other Laws that Could Adversely Affect the Cost, Manner or Feasibility of Conducting the Debtor's Business.

The Debtors' oil and natural gas development and production operations are subject to complex and stringent laws and regulations. To conduct operations in compliance with these laws and regulations, the Debtors must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. The Debtors may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, the Debtors' costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become

Case 22-90018 Document 68-3 Filed in TXSB on 03/28/22 Page 207 of 300

applicable to their operations. Failure to comply with such laws and regulations, as interpreted and enforced, could have a material adverse effect on their business, financial condition and results of operations.

In addition, the operations of the third parties on whom the Debtors rely for gathering and transportation services are also subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that the Debtors pay for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom the Debtors rely could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**8. The Debtors' Operations are Subject to Operational Hazards and Unforeseen Interruptions for Which the Debtors May Not Be Adequately Insured.**

There are a variety of operating risks inherent in the Debtors' wells and other operating properties and facilities, such as leaks, explosions, mechanical problems, natural disasters, pandemics, epidemics and outbreaks of disease, all of which could cause substantial financial losses. Any of these or other similar occurrences could result in the disruption of the Debtors' operations, substantial repair costs, personal injury or loss of human life, significant damage to property, environmental pollution, impairment of the Debtors' operations and substantial revenue losses. The location of the Debtors' wells and other operating properties and facilities near populated areas, including residential areas, commercial business centers and industrial sites, could significantly increase the level of damages resulting from these risks.

Insurance against all operational risks is not available to the Debtors. The Debtors are not fully insured against all risks, including development and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable. Additionally, the Debtors may elect not to obtain insurance if the Debtors believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs or on commercially reasonable terms. Changes in the insurance markets due to weather, adverse economic conditions, and the aftermath of the Macondo well incident in the Gulf of Mexico have made it more difficult for the Debtors to obtain certain types of coverage. As a result, the Debtors may not be able to obtain the levels or types of insurance the Debtors would otherwise have obtained prior to these market changes, and the Debtors cannot be sure the insurance coverage the Debtors do obtain will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**9. The Reorganized Debtors May Be Adversely Affected by Potential Litigation.**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10. The Loss of Key Personnel Could Adversely Affect the Reorganized Debtors' Operations.

The Reorganized Debtors' operations will depend on a relatively small group of key management personnel, including the Reorganized Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Reorganized Debtors may experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Reorganized Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Reorganized Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect.

### 11. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 12. The Debtors' Estimated Reserves and Future Production Rates are Based on Many Assumptions that May Prove to Be Inaccurate. Any Material Inaccuracies in These Reserve Estimates or Underlying Assumptions Will Materially Affect the Quantities and Present Value of the Debtors' Estimated Reserves.

Numerous uncertainties are inherent in estimating reserves of oil, natural gas and NGLs and future production. It is not possible to measure underground accumulations of oil, natural gas and NGLs in an exact way. Reserve engineering is complex, requiring subjective estimates of underground accumulations of oil, natural gas and NGLs and assumptions concerning future prices for oil, natural gas and NGLs, future production levels and operating and development costs. In estimating the Debtors' reserves of oil, natural gas and NGLs, the Debtors and their independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- prices for oil, natural gas and NGLs;
- future production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;
- the accuracy and reliability of the underlying engineering and geologic data; and
- the availability of funds.

If these assumptions prove to be incorrect, the Debtors' estimates of their reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery and the Debtors' estimates of the future net cash flows from their estimated reserves could change significantly.

The Debtors' Standardized Measure is calculated using unhedged prices for oil, natural gas and NGLs and is determined in accordance with the rules and regulations of the SEC. Over time, the Debtors may make material changes to reserve estimates to take into account changes in their assumptions and the results of actual development and production.

The reserve estimates the Debtors make for wells or fields that do not have a lengthy production history are less reliable than estimates for wells or fields with lengthy production histories. A lack of production history may contribute to inaccuracy in our estimates of proved reserves, future production rates and the timing of development expenditures.

**13. The Debtors' Estimated Reserves of Oil, Natural Gas and NGLs Will Naturally Decline Over Time, and the Debtors May Be Unable To Develop, Find or Acquire Additional Reserves to Replace Their Current and Future Production at Acceptable Costs, Which Would Adversely Affect Their Business, Financial Condition and Results of Operations.**

The Debtors' future reserves of oil, natural gas and NGLs, production volumes and cash flows depend on their success in efficiently developing their current reserves and economically finding or acquiring additional recoverable reserves. The Debtors' estimated reserves of oil, natural gas and NGLs will naturally decline over time as they are produced. The Debtors' success depends, in part, on their ability to economically develop, find or acquire additional reserves to replace their own current and future production. If the Debtors are unable to do so, or if expected development is delayed, reduced or cancelled, their production and reserves will continue to decline. To the extent cash flows from operations and external sources of capital remain limited or become unavailable, the Debtors' ability to make the necessary capital investments needed to maintain or expand their asset base of oil and natural gas reserves may be diminished. Over the long term, a continuing decline in their production and reserves would further reduce their liquidity and ability to satisfy their debt obligations by negatively affecting their cash flows from operations and the value of their assets.

**14. The Debtors' Identified Drilling Location Inventories are Scheduled out over Several Years, Making Them Susceptible to Uncertainties that Could Materially Alter the Occurrence or Timing of Their Drilling.**

The Debtors' management has specifically identified and scheduled drilling locations as an estimation of their future drilling activities on their existing acreage. Developing these identified drilling locations represents a significant part of the Debtors' long term business strategy. The Debtors' ability to drill and develop these locations depends on a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, prices for oil, natural gas and NGLs, costs, drilling results, the outcome of the Chapter 11 Cases and other factors. In connection with the Chapter 11 Cases, the Debtors may revise their capital budget or development plan due to the aforementioned uncertainties or other reasons, including in connection with ongoing negotiations or discussions with their various stakeholders as part of the Chapter 11 Cases. Because of these uncertainties, the Debtors do not know if the numerous potential drilling locations they have identified will ever be drilled or if they will be able to produce oil, natural gas or NGLs from these or any other potential drilling locations. As such, the Debtors' actual drilling activities may materially differ from those presently identified, which could adversely affect their business, financial condition and results of operations.

### 15. Developing and Producing Oil, Natural Gas and NGLs are Costly and High Risk Activities With Many Uncertainties That Could Adversely Affect the Debtors' Business, Financial Condition and Results Of Operations.

The cost of developing, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well. Additionally, drilling wells with no or sub-economic levels of production (dry holes) will negatively impact the Debtors' financial position. In addition, the Debtors' use of 2D and 3D seismic data and visualization techniques to identify subsurface structures and hydrocarbon indicators do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures and requires additional pre development expenditures. Furthermore, the Debtors' development and production operations may be curtailed, delayed or canceled as a result of other factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor or other services;
- composition of sour gas, including sulfur and mercaptan content;
- unexpected operational events and conditions;
- reductions in prices for oil, natural gas and NGLs;
- increases in severance taxes;
- adverse weather conditions and natural disasters, pandemics, epidemics, and outbreaks of disease;
- facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of the Debtors' facilities and equipment due to the highly corrosive nature of sour gas;
- title problems;
- pipe or cement failures, casing collapses or other downhole failures;
- compliance with ever changing environmental and other governmental requirements;
- environmental hazards, such as chemical or hydrocarbon leaks or spills, salt water leaks or spills, pipeline ruptures, discharges of toxic gases or other releases of hazardous substances;
- lost or damaged oilfield development and service tools;
- unusual or unexpected geological formations and pressure or irregularities in formations;
- loss of drilling fluid circulation;
- fires, blowouts, surface craterings and explosions;
- uncontrollable flows of oil, natural gas, NGLs or well fluids;

- loss of leases due to incorrect payment of royalties;
- limited availability of financing on acceptable terms, or at all; and
- other hazards, including those associated with sour gas such as an accidental discharge of hydrogen sulfide gas, that could also result in personal injury and loss of life, pollution and suspension of operations.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their' investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their business, financial condition and results of operations.

The Debtors routinely apply hydraulic fracturing techniques in many of their drilling and completion operations. Hydraulic fracturing has become subject to increased public scrutiny and recent changes in federal and state law, as well as proposed legislative changes, could significantly restrict the use of hydraulic fracturing. Such laws could make it more difficult or costly for us to perform fracturing to stimulate production from dense subsurface rock formations and, in the event of local prohibitions against commercial production of natural gas, may preclude their ability to drill wells. In addition, such laws could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. If hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, the Debtors' fracturing activities could become subject to additional permitting requirements and result in permitting delays, financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, more stringent plugging and abandonment requirements and potential increases in costs.

Additionally, hydraulic fracturing, drilling, transportation and processing of hydrocarbons bear an inherent risk of loss of containment. Potential consequences include loss of reserves, loss of production, loss of economic value associated with the affected wellbore, contamination of soil, ground water, and surface water, as well as potential fines, penalties or damages associated with any of the foregoing consequences.

## VIII. SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order [Docket No. #].

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER [DOCKET NO. #] FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims and Interests Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims in Class 3, Class 4 and Class 5 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, 9 or 10.

### B. Voting Record Date.

**The Voting Record Date is April 8, 2020**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C. Voting on the Plan.

**The Voting Deadline is April 27, 2020 at 5:00 p.m. (prevailing Central Time)**. Holders of DIP Claims in Class 3, Secured Notes Claims in Class 4, and General Unsecured Claims in Class 5 should submit their ballots such that it is **actually received** by the Balloting Agent by the Voting Deadline. To be counted as votes to accept or reject the Plan, all votes must be submitted pursuant to the instructions and deadlines set forth on the ballot.

Case 22-34008 Document 638-9 Filed in TXSB on 01/24/22 Page 213 of 300

**DELIVERY OF BALLOTS**

1. All Ballots should be sent to:

   (a) if by U.S. Postal Service, courier or personal delivery, to:

   **Sanchez Ballot Processing**
   **c/o Prime Clerk LLC**
   **One Grand Central Place**
   **60 East 42nd Street, Suite 1440**
   **New York, NY 10165**

   (b) if permitted pursuant to the instructions accompanying your ballot, via electronic mail, to: sanchezballots@primeclerk.com.

2. Ballots may also be submitted via the e-ballot system at https://cases.primeclerk.com/sanchezenergy. To have their votes to accept or reject the Plan counted, Holders of Claims in Classes 3, 4, and 5 must properly execute, complete, and deliver their ballots according to the instructions so that it is actually received by the Balloting Agent no later than the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE BALLOTING AGENT AT (844) 232-0067 (U.S. and Canada) or (917) 942 6393 (International). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

### D. Ballots Not Counted.

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

## IX. CONFIRMATION OF THE PLAN.

### A. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the

Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**B. Best Interests of Creditors/Liquidation Analysis.**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the material going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**C. Feasibility.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D. Acceptance by Impaired Class.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[10]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims or interests in that class, counting only those claims or interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. There are no Classes of Interests entitled to vote on the Plan.

Pursuant to Article III.F of the Plan, if a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

### E. Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

If any impaired class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. Subject to the requirements of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same

[10] A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100% of the amount of the allowed claims or interests in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## X. CERTAIN SECURITIES LAW MATTERS.

### A. New Common Stock.

As discussed herein, the Plan provides for the Reorganized Debtors to issue New Common Stock to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

The Debtors believe that the New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Stock pursuant to the Plan is, and subsequent transfers of the New Common Stock issued pursuant to section 1145 of the Bankruptcy Code by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

**RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM**

Case 22-90018 Document 681-3 Filed in TXSB on 01/24/23 Page 86 of 253

**REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

### B. Issuance and Resale of New Common Stock Under the Plan.

#### 1. Issuance under Section 1145 of the Bankruptcy Code, Private Placement Exemptions.

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**RECIPIENTS OF THE NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW**.

#### 2. Resale of New Common Stock; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more

intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock.

Resales of the New Common Stock by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act. Generally, Rule 144 promulgated under the Securities Act would permit the public sale of securities received by such Person if the required holding period for "restricted securities" has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is, or within the three months prior to the sale has been, an affiliate of the issuer. In addition, Rule 144 provides an exemption for the public resale of "control securities" (i.e., securities that are not restricted securities but held by an affiliate or a person that was an affiliate within the past three months) if certain conditions are met. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the three months preceding the sale may resell restricted securities after a six-month holding period if the issuer is a Reporting Issuer (or a 12-month holding period if the issuer is not a Reporting Issuer) if at the time of the sale there is available certain current public information regarding the issuer (or without regard to the current public information requirement after the 12-month holding period). Adequate current public information is available for a Reporting Issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Exchange Act during the twelve months (or for such shorter period that the issuer was required to file such reports) preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension and the current public information requirement may not be satisfied in future periods.

An affiliate may resell (i) restricted securities after the applicable holding period or (ii) control securities if, in each case, at the time of the sale certain current public information regarding the issuer is

available. As noted above, the Debtors currently expect that Reorganized SN may not be a Reporting Issuer and, as a result, this current public information requirement may not be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of securities sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that such securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of securities except in certain situations. Third, if the sale involves more than 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to New Common Stock, if any, issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (whether held by non-affiliates or affiliates) until at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, after the Effective Date. Accordingly, holders of any such New Common Stock will be required to hold such New Common Stock for at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, and, thereafter, to sell New Common Stock only in accordance with the applicable requirements of Rule 144, unless such New Common Stock is registered under the Securities Act (or is otherwise resold pursuant to an exemption from registration under the Securities Act).

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN OR WHO MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Class 3 DIP Claims, Class 4 Secured Note Claims, and Class 5 General Unsecured Claims, and it does not address the U.S. federal income tax consequences to all other Holders of Claims or Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or Interests who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including a beneficial owner of Claims or Interests) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more

Case 20-34008 Document 318 Filed in TXSB on 04/14/20 Page 221 of 300

United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of Claims or Interests are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.

#### 1. Effects of Restructuring on the Debtors.

As of December 31, 2019, the Debtors estimate that they have approximately $1.93 billion of federal NOL carryforwards and $318 million of interest deductions deferred under section 163(j) of the Tax Code ("163(j) Deductions"). The Debtors may generate additional tax attributes, potentially including 163(j) Deductions, prior to the Effective Date in 2020. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income, and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year. Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the Tax Code. However, just enacted Coronavirus Air, Relief and Economic Security Act ("CARES Act") made several changes with respect to NOL's and related components of same as follows:

- NOL's arising in taxable years beginning after Dec. 31, 2017 and before Jan. 1, 2021 can be carried back to each of the five tax years preceding the tax year of such loss.

- The 80% taxable income limitation on NOL deduction is temporarily repealed so that for tax years beginning before 2021 taxpayers can take an NOL deduction equal to 100% of taxable income and for tax years beginning after 2021, taxpayers will be able to take a 100% deduction of NOLs arising in tax years prior to 2018 and a deduction limited to 80% of modified taxable income for NOLs arising in tax years after 2017.

- Repeals certain limits on claiming any refundable corporate minimum tax credit of a corporation and provides for an election claim a tentative carryback refund claim of any such credit for 2018.

- Temporarily and retroactively increases the deductibility of certain interest expense.

The Debtors have not yet determined the impact, if any, of these changes on its financial and tax situation including the amount of any NOL's and refundable corporate minimum tax credit which can be carried back to prior tax years and which might survive the reduction of such tax attributes upon confirmation of the Plan.

**(i) Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, the Debtors will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of the New Common Stock, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable (but not depletable) assets pursuant to section 108(b)(5) of the Tax Code. Although not free from doubt, in the absence of contrary guidance, it appears to be the case that the 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize COD Income; however, the exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, however, the Debtors expect that the amount of such COD Income will reduce some of their NOLs and tax credits allocable to taxable periods prior to the Effective Date pursuant to section 108 of the Tax Code. Depending on the amount of COD Income, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

**(ii) Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, net unrealized built-in losses, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or

consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10.0 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

**(a) General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.63 percent for April 2020 but which may decline due to the recent precipitous drop in yields). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(b) Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or

(ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claims will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims as "securities" for U.S. federal income tax purposes.

#### 1. U.S. Federal Income Tax Consequences to the Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 3 DIP Claims, each Holder thereof will receive its Pro Rata share of the DIP Equity Distribution; and the Post-Effective Date Equity Distribution allocated, if any, to the DIP Claims based upon the outcome of the Lien-Related Litigation to the DIP Claims in an amount determined in the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 4 Secured Notes Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 5 General Unsecured Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Whether and to what extent the U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim pursuant to the Plan depends, in part, on whether the exchange qualifies as a tax-free recapitalization pursuant to Section 368(e)(1)(E) of the Tax Code (a "Tax-Free Exchange") or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition. If Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims qualify as a "security" of the Company, then the Holders of Class 3 DIP Claim, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims, as applicable, would be treated as receiving its distribution under the Plan in a "recapitalization", and therefore a Tax-Free Exchange for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (i) the fair market value of property not entitled to be received tax-free under section 354 of the Tax Code; and (ii) the difference between (1) the fair market value of all consideration received pursuant to the Plan and (2) such Holder's adjusted basis, if any, in such Allowed Claim. The Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (a) the tax basis of the Allowed Claim surrendered by such Holder increased by (b) gain recognized (if any) by such Holder, allocated between the non-cash consideration received in accordance with the respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the consideration received should include the holding period for the exchanged Allowed Claim. The holding period for any other property received should begin on the day following the receipt of such property.

If the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims do not qualify as a "security" of the Debtors, then the Holders of the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims, as applicable, will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the Holder should recognize gain or loss in an amount equal to the difference, if any, between the fair market value of all the consideration received and the Holder's adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The holding period for the property received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the Holder should obtain a tax basis in the property received equal to its fair market value.

### 2. Accrued Interest.

A portion of the consideration received by U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be able to recognize a deductible loss to the extent that any accrued interest

on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 3. Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Class 4 Secured Notes Secured Claim, Allowed Class 5 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID (as defined below), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

U.S. federal income tax laws enacted in December 2017 added section 451 of the Tax Code. This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market

discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

**4. Net Investment Income Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

**5. Limitation on Use of Capital Losses.**

A U.S. Holder of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Secured Claim, and Allowed Class 5 General Unsecured Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**6. U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock.**

**(i) Dividends on New Common Stock.**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

#### (ii) Sale, Redemption, or Repurchase of New Common Stock.

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above under Section Limitation on Use of Capital Losses.

## D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

### 1. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Holders of Class 5 General Unsecured Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

### 2. Gain Recognition.

Any gain realized by a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 3. Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.

#### (i) Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below under "FIRPTA" and "FATCA," dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to

such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**(ii) Sale, Redemption, or Repurchase of New Common Stock.**

Subject to the discussion below under "FIRPTA," "FATCA" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) the Reorganized Debtors is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. Holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed below under "FIRPTA."

**5. FIRPTA.**

Under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), gain or loss of a foreign person on a disposition of a United States real property interest ("USRPI") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("USRPHC"). Any class of stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "5% Public Shareholder Exception").

If the common stock of the corporation were not considered regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, the Non-U.S. Holder (regardless of the percentage of common stock owned) would be subject to U.S. federal income tax on a taxable disposition of the common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

The Debtors expect that SN will be a USRPHC. Accordingly, the New Common Stock Stock will be treated as USRPI, unless a Non-U.S. Holder qualifies for the 5% Public Shareholder Exception.

Following the Effective Date, SN may take steps to create a market for the New Common Stock, but no assurance can be given that SN will take such steps or, that if they do, SN's action will permit certain Non-U.S. Holders to rely on the 5% Public Shareholder Exception.

### 6. FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and U.S.-source interest (including OID)), and also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source income or dividends that occurs after December 31, 2018.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS OR INTERESTS PURSUANT TO THE PLAN.**

### E. Information Reporting and Backup Withholding.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**F. Recent and Possible Future Legislative Tax Changes.**

The just enacted CARES Act made a variety of tax and other changes in addition to those outlined the preceding discussion at Section XI.B.1., *Effects of Restructuring on the Debtors,* which may have material consequences to both the Debtors and Holders. Additionally, Congress and the President are discussing additional legislation which could further impact the Debtors and Holders. The consequences of the new CARES Act, implementation of same and any future legislative changes is not known at this time and could materially impact Debtors and Holders as well as suppliers and customers of the Debtors.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF CLASS 3 DIP CLAIMS, CLASS 4 SECURED NOTES CLAIMS, AND CLASS 5 GENERAL UNSECURED CLAIMS IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII. RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 9, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

Case 20-34035 Document 681 Filed in TXSB on 04/29/20 Page 102 of 153

**Exhibit A**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 6, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ..... 1**

A. Defined Terms ..... 1
B. Rules of Interpretation ..... 11
C. Computation of Time ..... 12
D. Governing Law ..... 12
E. Reference to Monetary Figures ..... 12
F. Reference to the Debtors or the Reorganized Debtors ..... 12
G. Controlling Document ..... 12

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ..... 13**

A. Administrative Claims ..... 13
B. Professional Fee Claims ..... 13
C. Priority Tax Claims ..... 14
D. Statutory Fees ..... 14

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ..... 15**

A. Formation of Debtor Group for Convenience Purposes Only ..... 15
B. Classification of Claims and Interests ..... 15
C. Treatment of Classes of Claims and Interests ..... 15
D. Special Provision Governing Unimpaired Claims ..... 19
E. Elimination of Vacant Classes ..... 19
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ..... 19
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..... 19
H. Intercompany Interests ..... 19
I. Subordinated Claims and Interests ..... 19

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ..... 20**

A. General Settlement of Claims, Interests, and Causes of Action ..... 20
B. Restructuring Transactions ..... 20
C. Sources of Consideration for Plan of Reorganization Distributions ..... 20
D. Lien-Related Litigation ..... 21
E. Continuation of Gavilan Proceeding ..... 22
F. Corporate Existence ..... 22
G. Vesting of Assets in the Reorganized Debtors ..... 22
H. Corporate Action ..... 22
I. New Organizational Documents ..... 22
J. Directors and Officers of Reorganized SN ..... 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ..... 23
L. Management Incentive Plan ..... 23
M. Effectuating Documents; Further Transactions ..... 23
N. Preservation of Causes of Action ..... 23
O. Exemption from Registration Requirements ..... 24
P. Cancellation of Instruments, Certificates, and Other Documents ..... 24
Q. Section 1146(a) Exemption ..... 25
R. DIP Agent Fees and Expenses ..... 25

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 25**

A. Assumption or Rejection of Executory Contracts and Unexpired Leases ..... 25
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ..... 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ..... 26
D. Indemnification Obligations ..... 27
E. Insurance Policies ..... 27
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ..... 28
G. Contracts and Leases After the Petition Date ..... 28
H. Reservation of Rights ..... 28

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..... 28**

A. Distributions on Account of Claims Allowed as of the Effective Date ..... 28
B. Rights and Powers of the Disbursing Agent ..... 29
C. Special Rules for Distributions to Holders of Disputed Claims ..... 29

TABLE OF CONTENTS (CONT'D)

**Page**


D. Delivery of Distributions ....29
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33
**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....33**
A. Allowance of Claims ....33
B. Claims Administration Responsibilities ....33
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....34
E. Time to File Objections to Claims ....34
F. Disallowance of Claims ....34
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35
**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....35**
A. Discharge of Claims and Termination of Interests ....35
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....36
E. Release of Liens ....37
F. Reimbursement or Contribution ....37
G. Recoupment ....37
H. Subordination Rights ....37
**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**
A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....38
D. Effect of Non-Occurrence of Conditions to Consummation ....38
E. Substantial Consummation ....38
**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**
A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39
**ARTICLE XI. RETENTION OF JURISDICTION ....39**
**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**
A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....41
D. Payment of Statutory Fees ....41
E. Reservation of Rights ....41
F. Successors and Assigns ....42
G. Service of Documents ....42
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....43
J. Plan Supplement ....43
K. Non-Severability ....43
L. Votes Solicited in Good Faith ....43
M. Closing of Chapter 11 Cases ....43
N. Waiver or Estoppel ....44

**<u>INTRODUCTION</u>**

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in <u>Article I.A</u> hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544,545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. “*Disclosure Statement*” means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. “*Disclosure Statement Order*” means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on [●], 2020 [Docket No. [●]].

48. “*Disputed*” means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. “*Distribution Date*” means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. “*DTC*” means Depository Trust Company.

51. “*Effective Date*” means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. “*Entity*” means as defined in section 101(15) of the Bankruptcy Code.

53. “*Estate*” means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. “*Exculpated Parties*” means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors’ Committee; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. “*Exculpation Claims*” has the meaning set forth in Article VIII.B.

56. “*Executory Contract*” means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. “*Existing Interests*” means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. “*Existing SN Common Interests*” means Interests in SN arising from or related to the Existing SN Common Stock.

59. “*Existing SN Common Stock*” means the shares of common stock issued by SN.

60. “*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. “*Existing SN Preferred Stock*” means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*Fee Examiner*" means a fee examiner selected by the Reorganized Debtors and appointed by an order of the Bankruptcy Court, which may be in the Confirmation Order, to review each of the Final Fee Applications of the Non-Participating Professionals and to issue the Fee Examiner Report as provided in Article II.B.

63. "*Fee Examiner Report*" means the report and recommendation with respect to the Final Fee Applications of each of the Non-Participating Professionals prepared by the Fee Examiner in accordance with Article II.B.

64. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

65. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

66. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

67. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

68. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

69. "*Gavilan*" means Gavilan Resources, LLC.

70. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

71. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

72. "*Holder*" means an entity holding a Claim or Interest, as applicable.

73. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

75. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

76. "*Indemnified Parties"* means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date;

(ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

77. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

78. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

79. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

80. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

81. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

82. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

83. "*Lien-Related Litigation*" means all litigation related to challenges to the scope or validity of the liens of the Prepetition Secured Parties (as defined in the Final DIP Order) or DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims, (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code and (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

84. "*Lien-Related Litigation Creditor Representative*" means a representative selected by the Creditors' Committee.

85. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

86. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

87. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

88. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

89. “*New Stockholders’ Agreement*” means the stockholder or similar agreement, if any, with respect to the New Common Stock.

90. “*Non-Participating Professional*” means any Professional that is not a Participating Professional on or before the Confirmation Date.

91. “*Notice of Assumption*” means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

92. “*Notice of Rejection*” means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

93. “*Other Priority Claim*” means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

94. “*Other Secured Claim*” means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

95. “*Participating Professionals*” means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

96. “*Person*” means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

97. “*Petition Date*” means the date on which the Debtors commenced the Chapter 11 Cases.

98. “*Plan*” means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

99. “*Plan Supplement*” means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

100. “*Post-Carve-Out Trigger Notice Reserve*” has the meaning ascribed to it in the Final DIP Order.

101. “*Post-Effective Date Equity Distribution*” means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

102. “*Pre-Carve-Out Trigger Notice Reserve*” has the meaning ascribed to it in the Final DIP Order.

103. “*Priority Tax Claims*” means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

104. “*Pro Rata*” means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that

Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

105. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

107. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

108. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

109. "*Professional Fee Settlement Reserve Amount*" means $22.8 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

110. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

111. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

112. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

113. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

114. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

115. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

116. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

117. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

118. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

119. "*Sanchez Parties*" means A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

120. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

121. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

122. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

123. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

124. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

125. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

126. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

127. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

128. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

129. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

130. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

131. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

132. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

133. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

134. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

135. "*SN*" means Sanchez Energy Corporation.

136. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

137. "*SOG*" means Sanchez Oil & Gas Corporation.

138. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

139. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

140. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

141. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

142. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

143. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

144. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

145. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to

Case 23-90085 Document 681 Filed in TXSB on 03/29/23 Page 124 of 253

Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to

the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. <u>Final Fee Applications</u>

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "*Draft Report Review Period*"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the

earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided* that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with <u>Article III.E</u> below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of

an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. <u>Class 4 — Secured Notes Claims</u>

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 — General Unsecured Claims</u>

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. <u>Class 6 — Intercompany Claims</u>

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant

to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. <u>Class 7 — Intercompany Interests</u>

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 — Existing SN Preferred Interests</u>

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. <u>Class 9 — Existing SN Common Interests</u>

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Section 510(b) Claims</u>

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. <u>Issuance and Distribution of New Common Stock</u>

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is

intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock

as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required,

each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and

may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated

in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed

Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of

future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a

change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common

Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable

Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity,

including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims,

regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any**

**further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.**

**The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but

before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

**ARTICLE IX.**
**DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule

of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicated, decide, or resolve any motions, adversary proceedings, contested or litigation matters, and any other matters involving the Lien-Related Litigation, SOG or SNMP;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 6, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# Exhibit B

## Corporate Organization Chart

# Organizational Chart

SANCHEZ ENERGY CORPORATION




1. As of March 8, 2019.
2. GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.

© 2017 Sanchez Energy Corporation

**Exhibit C**

**Liquidation Analysis**

# Liquidation Analysis

## I. Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the Bankruptcy Court would: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated by chapter 7; and (3) compare each such Holder's Liquidation Distribution to the distribution under the Plan (the "Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The analysis (the "Liquidation Analysis") is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION. ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

## II. Basis of Presentation

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding. Any recoveries on account of non-Debtor affiliates would be recovered, after payment of non-Debtor claims, by the parent Entity according to the corporate structure.

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about April 30, 2020 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' unaudited pro forma, consolidated balance sheets as of December 31, 2019, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. The Liquidation Analysis was prepared on an unconsolidated basis.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the Debtors' assets and distribute the cash proceeds, net of liquidation related costs, to Holders of Claims and Interests in accordance with applicable bankruptcy and non-bankruptcy law.

The Liquidation Analysis assumes that all cash, excluding cash held by SN EF Maverick LLC., would be immediately distributed to the DIP Lenders. The Trustee would then utilize cash generated by the conversion of working capital to fund ongoing operations for the estate wind down period. The recovery

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan").

Case 4:22-cv-00358 Document 8-9 Filed on 04/29/22 in TXSD Page 287 of 300

by the DIP Lenders does not account for any potential discount related to a hold back or carve out for potential P&A liability of the reserves. Such discount could be significant.

The Liquidation Analysis assumes the continuation of production for the three months following a conversion to chapter 7 to allow a reasonable amount of time for the sale of producing assets; however, post-Conversion revenue and production related disbursements would be included in the final sale price as post-Effective Date working capital adjustments. The Liquidation Analysis further assumes negative operating cash flows during the initial wind-down period prior to sale of assets as production receivables and joint interest billing ("JIB") receivables would be collected from pre-Conversion produced oil and gas.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist absent a liquidation, including potential administrative expense Claims, including for any unpaid amounts under the shared services agreements for such items as severance and any unpaid compensation and bonuses payable to SOG employees who performed services for the Debtors, and Claims for Executory Contract and Unexpired Lease rejection damages. Some of these Claims could be significant.

The Liquidation Analysis assumes recoveries on account of retained Causes of Action, including, but not limited to, claims against the Sanchez Parties, SOG, or SNMP, based upon estimates from counsel of net recoveries to the Estates. For purposes of comparison of the Plan and this Liquidation Analysis, however, any recovery on account of such claims would increase the Plan Distribution (which is based upon entitlements pursuant to section 726 of the Bankruptcy Code) and Liquidation Distribution by equivalent amounts, meaning that, in no event will Holders of Claims or Interests receive more in a Chapter 7 liquidation than in a Plan scenario.

Further, the Liquidation Analysis also assumes that the prepetition secured creditors prevail in the Lien-Related Litigation. Once again, however, because the Lien-Related Litigation is preserved by the Plan and the Plan Distributions are based upon entitlement pursuant to section 726 of the Bankruptcy Code, the outcome of the Lien-Related Litigation would not result in Holders of Claims or Interests receiving more in a Chapter 7 liquidation than in a Plan scenario. Accordingly, the assumption regarding the Lien-Related Litigation should have no impact on the "best interests" test.

The Debtors have assumed that a liquidation would occur over an approximately six-month time period during which the Trustee would sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the Estates. In an actual liquidation, the process and length of wind-down could be materially longer and more expensive than assumed herein and thereby significantly reduce the actual recoveries shown herein.

For example, the potential for Priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to Holders of Claims and Interests. Also, in the context of a liquidation, there would likely be a myriad of potential offset claims, particularly with respect to JIB receivables, that would take time to reconcile and resolve. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were in fact to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

Pursuant to Bankruptcy Code section 1129, no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. Further, Trustee fees, Professional Fee Claims, Administrative Claims, and Priority Claims, among other such Claims that may arise in a liquidation scenario, would have to be paid in full from the Liquidation Proceeds prior to proceeds being made available to the Holders of Unsecured Claims.

The Liquidation Analysis does not include estimates for the tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

## III. Liquidation Process

The Debtors' liquidation would be conducted in Chapter 7 cases with the Trustee managing the Estates to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors in accordance with the priority scheme dictated in Chapter 7. The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, marketed and sold in order to maximize value to the Estates;
- costs related to the liquidation process, such as post-Conversion Date operating disbursements and Estate wind-down costs including professional fees, Trustee fees, and other administrative fees; and
- distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme dictated in Chapter 7.

## IV. Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

- <u>Certain Administrative Expense Claims</u>: Includes fees and expenses of certain professionals retained in the Debtors' Chapter 7 cases, the Trustee's fees, and critical post-Petition Date disbursements required for the maintenance of the Debtors' assets until the sale date;
- <u>Superpriority Secured Claims</u>: Includes outstanding balances owed under the DIP Facility and professional Carve-Out pursuant to the DIP Order;
- <u>Secured Claims</u>: Includes claims relating to the Debtors' prepetition Secured Notes;
- <u>Administrative and Priority Expense Claims</u>: Includes claims for postpetition accounts payable, postpetition accrued expenses, certain accrued / unpaid Professional Fee Claims not covered by the Carve-Out, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;
- <u>Unsecured Claims</u>: Any non-secured, non-priority debt, including Unsecured Notes, deficiency claims related to Secured Notes, prepetition trade payables, Intercompany Claims, and various other General Unsecured Claims.

## V. Conclusion

As summarized in the below table and subsequent detailed analysis, the Debtors have determined that upon the Effective Date, the Plan will provide all creditors and equity security holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under

Chapter 7 of the Bankruptcy Code, and therefore believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

The Best Interests Test Summary in the below table compares the Plan creditor recoveries against those estimated in the low and high cases of the Liquidation Analysis.

**Best Interests Test Summary**

| | Recovery Estimates | | |
|---|---|---|---|
| | Plan of | Chapter 7 Liquidation | |
| **Claims:** | **Reorganization** | **Low** | **High** |
| Administrative Claims | 100% | 0% | 0% |
| Priority Tax Claims | 100% | 0% | 0% |
| Class 1: Other Secured Claims | 100% | 0% | 0% |
| Class 2: Other Priority Claims | 100% | N/A | N/A |
| Class 3: DIP Claims | 11% to 53% | 21% | 21% |
| Class 4: Secured Notes Claims | 0% to TBD | 0% | 0% |
| Class 5: General Unsecured Claims | 0% to TBD | 0% | 0% |
| Class 6: Intercompany Claims | N/A | 0% | 0% |
| Class 7: Intercompany Interests | N/A | 0% | 0% |
| Class 8: Existing SN Preferred Interests | 0% | 0% | 0% |
| Class 9: Existing SN Common Interests | 0% | 0% | 0% |
| Class 10: Section 510(b) Claims | 0% | 0% | 0% |

Case 20-32035 Document 613 Filed in TXSB on 04/29/20 Page 152 of 253

## Liquidation Summary

| Asset Recovery Summary | | Balance Sheet As of 12/31/19 | Adjustments | Pro Forma As of 4/30/20 | Potential Recovery: Recovery Estimate % Low | Mid | High | Recovery Estimate $ Low $ | Mid $ | High $ |
|---|---|---|---|---|---|---|---|---|---|---|
| *$ in Millions* | | | | | | | | | | |
| Cash | [A] | $ 153.4 | $ (111.4) | $ 42.0 | 100% | 100% | 100% | $ 42.0 | $ 42.0 | $ 42.0 |
| AR | [B] | 59.6 | 4.1 | 63.7 | 100% | 100% | 100% | 63.7 | 63.7 | 63.7 |
| O&G Assets | [C] | 828.8 | (696.4) | 132.4 | 36% | 45% | 53% | 48.2 | 59.3 | 70.4 |
| PP&E | [D] | 34.9 | - | 34.9 | 2% | 4% | 6% | 0.6 | 1.4 | 2.1 |
| Other Assets | [E] | 268.1 | (259.1) | 9.0 | 6% | 13% | 19% | 0.6 | 1.2 | 1.7 |
| Investments | [F] | 4.6 | (3.3) | 1.3 | 100% | 100% | 100% | 1.3 | 1.3 | 1.3 |
| Investments in Subsidiaries | [G] | 204.0 | - | 204.0 | - | - | - | - | - | - |
| Intercompany Receivables | [H] | (9.4) | 168.7 | 159.3 | 0% | 0% | 0% | 0.4 | 0.4 | 0.4 |
| **Total Asset Value** | | $ 1,544.1 | $ (897.5) | $ 646.6 | **24%** | **26%** | **28%** | $ 156.9 | $ 169.3 | $ 181.7 |
| *Net Encumbered Proceeds* | | | | | | | | *119.6* | *131.8* | *143.9* |
| *Net Unencumbered Proceeds* | | | | | | | | *37.3* | *37.6* | *37.8* |
| **Total Asset Recovery** | | | | | | | | **$ 156.9** | **$ 169.3** | **$ 181.7** |
| Liquidation Adjustments: | | | | | | | | | | |
| Chapter 7 Trustee | [I] | | | | | | | (3.4) | (3.8) | (4.2) |
| Chapter 7 Professional Fees | [I] | | | | | | | (8.1) | (8.1) | (8.1) |
| Purchase Price Adjustments | [I] | | | | | | | (4.6) | (4.6) | (4.6) |
| Post Conversion Cash Flow | [I] | | | | | | | (137.2) | (137.2) | (137.2) |
| Wind Down Costs | [I] | | | | | | | (14.1) | (14.1) | (14.1) |
| Total Liquidation Adjustments | | | | | | | | (167.4) | (170.3) | (173.2) |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after Liquidation Adjustments** | | | | | | | | **$ -** | **$ -** | **$ -** |

| Claims Recovery Summary | | Claims Low | Claims Mid | Claims High | Potential Recovery of Claims: Recovery Estimate % Low | Mid | High | Recovery Estimate $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| Class 3: DIP Claims | [J] | $ 151.4 | $ 151.4 | $ 151.4 | 21% | 21% | 21% | $ 32.1 | $ 32.1 | $ 32.1 |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after DIP Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 4: Secured Notes Claims | [K] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 1: Other Secured Claims | [K] | - | - | - | - | - | - | - | - | - |
| Total Secured Claims | | $ 450.0 | $ 450.0 | $ 450.0 | - | - | - | $ - | $ - | $ - |
| **Proveeds Available after Secured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Administrative Claims | [L] | 5.9 | 5.9 | 5.9 | - | - | - | - | - | - |
| Priority Tax Claims | [L] | - | - | - | - | - | - | - | - | - |
| Class 2: Other Priority Claims | [L] | - | - | - | - | - | - | - | - | - |
| Total Administrative and Priority Claims | | $ 5.9 | $ 5.9 | $ 5.9 | - | - | - | $ - | $ - | $ - |
| **Proceeds Available to Unsecured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 5: General Unsecured Claims | [M] | 1,815.3 | 1,815.3 | 1,815.3 | - | - | - | - | - | - |
| Class 4: Secured Notes Claims (Deficiency) | [M] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 6: Intercompany Claims | [M] | TBD | TBD | TBD | - | - | - | - | - | - |
| Total Unsecured Claims | | $ 2,265.3 | $ 2,265.3 | $ 2,265.3 | - | - | - | $ - | $ - | $ - |
| **Net Proceeds Remaining** | | | | | | | | **$ -** | **$ -** | **$ -** |

Case 20-34035 Document 631-8 Filed in TXSB on 04/29/20 Page 152 of 153

**<u>Specific Notes to the Liquidation Analysis</u>**

**<u>Gross Liquidation Proceeds</u>**

**A. Cash and Cash Equivalents**

- Cash consists of cash held in bank accounts and highly liquid investment securities that have original maturities of three months or less.

- According to the 13 week cash forecast, Sanchez cash balances are estimated as of April 30, 2020 to be:

    - Sanchez Energy Corporation: $6.3mm
    - SN UR Holdings LLC: $27.7mm
    - SN EF Maverick: $29.4mm

- The cash balance will further be increased by $2.0mm related to cash disbursements withheld on account of administrative expenses offset by an additional $4.0mm of Post-Trigger Carve out payments not accounted for in the 13 week cash forecast.

- All projected cash and equivalents are assumed to be 100% recoverable.

**B. Accounts Receivable**

- Accounts receivable balances are based on the Debtors' estimated unaudited pro forma accounts receivable as of the Conversion Date.

- Accounts receivable includes amounts due from purchasers of the Debtors' oil and gas production, joint interest billings, and miscellaneous receivables.

- Accounts receivable balances have an estimated recovery of 100%.

**C. Oil & Gas Assets**

- Given the daily production and depletion of the oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prudent, prompt, and broad marketing of the assets over a three-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets.

- The liquidation value of the Debtors' Oil & Gas Reserves is based on a present value analysis of the Debtors' reserves, based on a reserves plan which includes all costs associated with maintaining the Debtors' leases. Proved Developed Producing Reserves ("**PDP**") are viewed as having the highest realizable value of the Debtors' reserve categories, followed by Proved Undeveloped Reserves ("**PUD**"), which reflect a higher recovery risk (compared to PDP) and are discounted accordingly. Other reserve categories are discounted at higher discount factors to account for the risk associated with the likelihood of recovery of probable and possible reserves.

- In assessing the reasonableness of the estimates provided by the above-mentioned present value analysis, the results were compared to two supplementary data points. First, the Liquidation Analysis high case is generally in line with recent going-concern transactions for comparable assets in the Eagle Ford. Additionally, valuation factors presented in the latest Society of Petroleum Evaluation Engineers ("**SPEE**") discount rate survey imply that the values obtained in the Liquidation Analysis high case generally correspond to the lower end recovery value if reserve adjusted discount rates ("**RADRs**") from the survey were applied. These SPEE discount rates reflect respondent petroleum engineers' assumptions when evaluating a target acquisition price or value of a going-concern asset.

- Given the nature of a going-concern sale versus a liquidation, it would be expected that each of these going-concern metrics would, on-average, exceed the values that could be obtained in a liquidation scenario. As each of these independently derived data points generally exceeds or overlaps the higher end of the values provided by the Liquidation Analysis, the reasonableness of the Liquidation Analysis outcomes are favorably supported.

- Based on the methodology outlined above, a sale of the Debtors' Oil & Gas Reserves implies a liquidation value in the range of $48.2mm to $70.4mm. This liquidation value provides for a blended recovery in the range of 36% to 53% of the April 30, 2020 pro forma PV-10 of proved reserves.

**D. Other PP&E**

- "Other PP&E" includes the Debtors' facilities, computers, software, and other PP&E.

- For purposes of the Liquidation Analysis, the recovery of "Other PP&E" is estimated to be 2% to 6% of pro forma net book value.

**E. Other Assets**

- "Other Assets" includes prepaid expenses, deposits, and unsold crude inventory. Recoveries are estimated to be 6% to 19% pro forma net book value.

**F. Investments**

- "Investments" consists of investments in publicly traded entities including SNMP and Lonestar Resources. Pro forma values are based on closing share prices as of 3/30/2020. Recoveries are estimated to be 100% pro forma market values.

**G. Investments in Subsidiary**

- "Investment in Subsidiary" includes Sanchez's investment in its Non-Debtor affiliates. No recoveries are expected.

**H. Intercompany Receivables**

- "Intercompany Receivables" includes intercompany balances between debtor and non-debtor entities. No recoveries are expected.

**Liquidation Adjustments**

## I. Liquidation Adjustments

- "Liquidation Adjustments" consists of Post-Conversion Receipts and Disbursements, Chapter 7 Trustee Fees, Chapter 7 Professional Fees, and Mineral Payments.

- "Chapter 7 Trustee Fees" includes the maximum compensation as allowed by Section 326 of the Bankruptcy Code, or 25% of the initial $5,000 disbursed, 10% of anything between $5,001 and $50,000, 5% of anything between $50,001 and $1,000,000, and 3% of any amount over $1,000,000.

- "Chapter 7 Professional Fees" include estimates for outside legal counsel, investment banking professionals, and other professionals required and retained by the Trustee during the wind-down period. Legal professionals are assumed to charge on an hourly basis for assistance with asset monetization, Estate wind-down, and administration of the claims reconciliation and related processes. To maximize the value of the Estates, it is assumed that the Trustee would retain an investment banking firm to lead the asset sale process. The investment banking firm is assumed to charge a flat nominal monthly fee and a transaction fee equal to 1% of oil and gas asset sale value.

- "Causes of Action" includes estimated investigation claims value from $0 to $5.0 mm.

- "Purchase Price Adjustments" includes assumed liabilities related to Oil & Gas Assets which would serve as a reduction to sale proceeds as a purchaser of the Oil & Gas Assets. Adjustments are primarily related to revenue in suspense, accrued ad valorem tax, and prepayments from Gavilan and UnSub, and are offset by prepayments to Springfield LLC and line-fill. The Liquidation Analysis estimates Purchase Price Adjustments to be $4.6mm.

- "Post-Conversion Cash Flow" includes cash disbursements from operations from May 1, 2020 through September 30, 2020. The Liquidation Analysis assumes that operations will continue during the sale process and any short-term pre-Conversion liabilities, including accrued capital expenditures, lease operating expenses, gathering expenses, royalty and working interest, and production tax would be satisfied prior to sale of the Oil & Gas Assets. Receipts related to Pre-Conversion activity are accounted for in the recovery of Accounts Receivable. The Liquidation Analysis assumes that the Bankruptcy Court would authorize the Debtors, through a lien or joint interest billing motion and order, to make Post-Conversion Disbursements necessary to maintain the value of their assets.

- "Wind-Down Costs" include the Post-Conversion estate administration expenses and consist primarily of the regularly occurring general and administrative costs (such as facilities' rent, telephone, internet, office supplies, etc.) which will be required to operate the Debtors' businesses for the six-month asset monetization and Estate wind-down period.

**Claims:**

## J. Class 3: DIP Claims

- "Class 3: DIP Claims" include principal and accrued interest of $151.4mm on account of the DIP Facility. DIP Claims would be increased by any additional professional fees of the DIP Lenders' advisors, which are not included in this claim amount.

Case 4:22-cv-03008 Document 13-9 Filed 09/30/22 Page 294 of 300

**K. Secured Claims - Class 4: Secured Notes Claims and Class 1: Other Secured Claims**

- "Class 4: Secured Notes Claims" includes $450.0 mm of Secured Notes Claims plus $17.7mm of accrued prepetition interest.

- The Liquidation Analysis assumes that no "Class 1: Other Secured Claims" would exist at Conversion as any Pre-Conversion operating expenses are accounted for in Post-Conversion Cash Flow.

**L. Administrative & Priority Claims - Administrative Claims, Priority Tax Claims, and Class 2: Other Priority Claims**

- "Administrative Claims" consist of unpaid postpetition expenses as of the Conversion Date not included in Post-Conversion Cash Flow and are estimated to be $5.9mm

- The Liquidation Analysis assumes that no additional "Priority Tax Claims" would exist as of the Conversion Date as severance tax and ad-valorem tax are included in purchase price adjustments and Post-Conversion Cash Flow.

- The Liquidation Analysis assumes no additional "Class 2: Other Priority Claims" as of the Conversion Date.

**M. Unsecured Claims - Class 5: Unsecured Claims and Class 6: Intercompany Claims**

- "Class 5: Unsecured Claims" includes the following:
  - $606.4mm of principal and accrued interest on account of 7.75% Senior Notes due 2021
  - $1,189.3mm of principal and accrued interest on account of 6.125% Senior Notes due 2023.
  - $19.6mm of general unsecured claims of the Debtor. General unsecured claims do not include certain rejection claims related to marketing and midstream contracts which could significantly increase the total unsecured claims.

- "Class 6: Intercompany Claims" are to be determined.

# <u>Exhibit D</u>

## Financial Projections

## Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized Debtors for the periods ending December 31, 2020 through December 31, 2023 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized Debtors, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil, natural gas, and natural gas liquids. Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices;
2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;
3. the timing and amount of future production of oil and natural gas;
4. changes in the availability and cost of capital;
5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;
6. proved and unproved drilling locations and future drilling plans; and
7. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of Reorganized Sanchez future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

Case 19-34508 Document 813-9 Filed in TXSB on 01/24/20 Page 298 of 300

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

## I. OVERVIEW

The Debtors are a publicly-traded Houston, Texas-based independent oil and natural gas company engaged in the exploration, development, production, and acquisition of oil and natural gas properties in the United States, more specifically in Texas.

## II. ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

## III. REORGANIZED SANCHEZ ENERGY PRO FORMA BALANCE SHEET FOR THE PERIODS ENDING DECEMBER 31, 2020 THROUGH DECEMBER 31, 2023

The Debtor's opening balance sheet was prepared utilizing the preliminary, unaudited December 31, 2019 balance sheet and projected results of operations and cash flows over the projected period to the assumed emergence date of April 30, 2020. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan. The reorganized pro forma balance sheets for the periods ending December 31, 2020 through December 31, 2023 contain certain pro forma adjustments as a result of consummation of the Plan. The reorganized pro forma balance sheets include the debt and other obligations of Reorganized Sanchez Energy that remain outstanding after the Effective Date that will be paid in the ordinary course of operations. The estimated pro forma adjustments regarding the equity value of Reorganized Sanchez Energy, its assets, or estimates of its liabilities as of the Effective Date will be based upon the fair value of its assets and liabilities as of that date, which could be materially different than the values assumed in the foregoing estimates.[1]

---

[1] The above pro forma balance sheet assumes a mid-point TEV of Reorganized Sanchez of $80 million for purpose of determining the fair value of the assets on the Effective Date.

## IV. METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Debtors' operating divisions. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

## V. ASSUMPTIONS

The Financial Projections include projected financial statements for 2020–2023 assuming that the Effective Date of the Plan is April 30, 2020 (the "Emergence Date"). The Financial Projections include consolidated financial statements for Debtor entities only. Further, the Financial Projections assume specific midstream contract rejections, but no renegotiation of remaining midstream contracts. There is also an assumption of $2.6M for causes of action, which is an estimate provided by Counsel; Actual recoveries may materially differ with an estimated range of $0 - $5M.

## VI. GENERAL ASSUMPTIONS

### A. Exit Financing

The Financial Projections assume no exit financing. The Financial Projections do not estimate any borrowings over the forecast period, however post-emergence financing will be available to fund working capital and general corporate needs, as necessary.

### B. Total Revenue

Total revenue consists of production revenue and other revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids. The Financial Projections make no assumption for Reorganized Sanchez Energy hedge revenue.

### C. Commodity Pricing

Commodity pricing is based on March 27, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil, natural gas, and NGL/petrochemicals. Management estimates realized pricing based on forecasted oil and gas differentials for each producing area and includes select gathering, processing, and transportation ("GPT") offsets against sold volumes.

| | Fiscal Year | | | |
|---|---|---|---|---|
| | 2020 [2] | 2021 | 2022 | 2023 |
| **REALIZED PRICING** | | | | |
| Oil ($/Bbl) | $ 27.12 | $ 33.60 | $ 36.45 | $ 38.37 |
| Gas ($/Mcf) | $ 1.93 | $ 2.35 | $ 2.29 | $ 2.31 |
| NGLs ($/Bbl) | $ 6.37 | $ 7.71 | $ 8.63 | $ 8.89 |

**D. Operating Expenses**

Operating expenses consist of lease operating expenses, transportation expenses, processing fees, pre-drilling, workover, and other non-operating expenses.

Lease operating expenses ("LOE") for Reorganized Sanchez Energy reserves are forecasted at the well level and are expected to range from approximately $12.12 to $13.20 per boe over the Projection Period.

**E. Production and Property Taxes**

Production and property taxes includes severance and ad valorem taxes, and are forecasted at the well level based on tax rates applicable in the jurisdiction of production.

**F. Cash General and Administrative Expenses**

Cash general and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company requirements. The Reorganized Debtors' projected G&A expenses are based on the current development and operational plans, and exclude non-cash expenses.

**G. Capital Expenditures**

Capital expenditures include capital expenditures related to developing and optimizing oil & gas properties, capitalized engineering expenses, and expenditures to acquire properties. The Company's capital budget for 2020 is $12 million, of which $11 million is dedicated to drilling and completing wells and $1 million is for workovers, leasing, and other capital projects. Of the $12 million drilling and completion budget, all capital expenditures are for Comanche.

**H. Changes In Working Capital**

Management projects a change in net working capital during the year ending December 31, 2020 of $11.1 million. Annual working capital changes for FY 2021 through 2023 are expected to be a source of cash totaling $4.1 million.

**I. Cash Interest & Fees**

The current plan does not provide for a financing facility upon exit and therefore does not contemplate any post-Effective Date interest.