"**Hydrocarbons**" means hydrocarbons from the Assets, as well as the co-working interest owner's hydrocarbons from the Assets. In the context of the Raptor Agreement, Hydrocarbons shall mean gas, if any, purchased by AESC at the tailgate of the Raptor Plant.

"**KMOG**" shall have the meaning as set out in the preamble.

"**Month**" means the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

"**NET**" shall have the meaning as set out in Section 9.20.

"**NET Agreements**" shall have the meaning as set out in Section 9.20.

"**Non-Defaulting Party**" shall have the meaning as set out in Section 8.1(a).

"**Obligations**" shall have the meaning as set out in Section 9.18.

"**Operational Services**" means any and all services set forth hereunder which are not Accounting Services.

"**Parties**" shall have the meaning as set out in the preamble.

"**Production Marketing Agreements**" means those certain agreements set forth on Exhibit B, which is attached hereto and incorporated herein for all purposes.

"**Provider**" shall have the meaning as set out in the preamble.

"**PSA**" shall have the meaning as set out in the recitals.

"**Raptor Agreement**" shall have the meaning as set out in Section 9.18.

"**Recipient**" shall have the meaning as set out in the preamble.

"**Retained Marketing Contracts**" means the Commodity Contract(s) and the Transportation Agreement(s) collectively.

"**Sanchez Anadarko Contract(s)**" means the purchase and/or buy/sell agreement(s) entered into by and between Provider and Recipient pursuant to Sections 3.1 (a)-(c) as applicable.

"**Seller Indemnified Parties**" shall have the meaning as set out in the PSA.

"**SN Parent**" shall have the meaning as set out in the preamble.

"**SN Parent Guaranty**" shall have the meaning as set out in Section 9.18.

"**Taxes**" shall have the meaning as set out in Section 7.2.

"**Term**" shall have the meaning as set out in Article VI of this Agreement.

"**<u>Transportation Agreement(s)</u>**" means a contract(s) for processing, treating, gathering, transportation or storage service entered into by and between Recipient and a Carrier that has been retained by Recipient, as identified on <u>Exhibit A</u> hereto.

"**<u>UnSub</u>**" shall have the meaning as set out in the recitals.

"**<u>Western Gas Entities</u>**" shall mean Western Gas Equity Holdings, LLC, Western Gas Equity Partners, LP, Western Gas Holdings, LLC, Western Gas Partners, LP, and the direct and indirect subsidiaries of Western Gas Partners, LP.

"**<u>Wyman</u>**" shall have the meaning as set out in <u>Section 9.19</u>.

"**<u>Wyman Hedge(s)</u>**" shall have the meaning as set out in <u>Section 9.19</u>.

## ARTICLE II. APPOINTMENT OF AGENT

**2.1 <u>Provider as Agent</u>**. Recipient hereby appoints Provider to serve as its exclusive agent to manage and administer the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement (if applicable), and the Transportation Agreement(s) with respect to the specific duties set forth in Article III throughout the Term of this Agreement. Provider shall have no authority to undertake actions on behalf of Recipient that are beyond the scope of the authorizations stated in this Agreement. Recipient does not appoint Provider to act as its general agent, or as an agent for any other purpose other than the express authorizations granted in this Agreement. In no event shall Provider, in its capacity as agent or otherwise, take title to the Hydrocarbons being transported under the Transportation Agreements if such Transportation Agreement requires the shipper to have title to any such Hydrocarbons being transported unless such Transportation Agreement shall first have been permanently assigned by Recipient to Provider in accordance with Schedule 13.4 of the PSA.

**2.2 <u>Implementing Notices</u>**. Recipient shall provide each Carrier with notice under the applicable Transportation Agreement of the appointment of Provider as agent in time for Provider to administer and manage the contracts for which it has been given management and administrative authority, and Recipient agrees to also provide such notice to any counterparty to any of the Commodity Contract(s) that requests or requires such notice. Recipient further agrees to take any and all actions necessary to facilitate such appointment, including but not limited to executing documents required by the Carrier.

## ARTICLE III. PERFORMANCE OBLIGATIONS

**3.1 <u>Provider's Specific Responsibilities</u>**. Provider shall provide the following services under the terms of this Agreement:

(a) Where warranty of title is required under the applicable Commodity Contract or Transportation Agreement and where not prohibited under the terms of the Commodity Contract or Transportation Agreement, Recipient will engage in a buy/sell transaction in which Recipient each Month will purchase from Provider Hydrocarbons at a mutually agreed point upstream of the receipt point on the applicable Carrier's system at an agreed upon contract price set forth in a

written notice from Recipient to Provider and Recipient will agree to resell an equivalent volume (and to the extent applicable an equivalent grade), less fuel, loss allowance and other allowances as applicable, of Hydrocarbons to Provider at the same stated price after the point of delivery under the applicable Commodity Contract or Transportation Agreement (with Provider being liable for the payment of any and all transportation charges and all related fees, charges, or surcharges related to transportation of Hydrocarbons from the point of receipt to the point of delivery by the applicable Carrier that would otherwise have been due and payable by Recipient). To the extent there are any other amounts deducted from the amounts that would otherwise be payable to Recipient, Provider shall bear sole responsibility for those deductions;

(b) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed point upstream of the facilities of the applicable Carrier at a mutually agreed price, and Provider shall nominate and schedule such Hydrocarbons to which the Recipient has title to the appropriate delivery point(s) as specified in the applicable Commodity Contract or Transportation Agreement. Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(b) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(c) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed upon point downstream after transportation at a mutually agreed upon price and Provider shall nominate and schedule such Hydrocarbons to the appropriate delivery point(s) as specified in the applicable Transportation Agreement, and from and to the delivery point(s) thereafter on Recipient's behalf set forth in the applicable Commodity Contract(s). Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(c) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(d) Prepare and submit daily and monthly nominations, as applicable, to facilitate Recipient's receipt and/or delivery of such Hydrocarbons at the applicable delivery and/or receipt point(s) under the Transportation Agreement(s), the Commodity Contract(s), the Raptor Agreement, and/or the Sanchez Anadarko Contracts;

(e) On each Day, manage the receipts and deliveries of Hydrocarbons with the applicable Carriers so as to minimize Imbalance Charges, if possible;

(f) Manage any critical day events or operational issues affecting the Carriers or any other industry developments or circumstances of which Provider has become aware that may have a material effect on the transportation of the Hydrocarbons made the subject of the Commodity Contract(s), the Raptor Agreement, and/or the Sanchez Anadarko Contracts. Without limiting the foregoing, Provider shall immediately notify Recipient of any exercise of emergency response rights under any Production Marketing Agreement;

(g) Balance transportation activities in accordance with the terms and conditions of the applicable Commodity Contract(s), the Raptor Agreement, the Sanchez Anadarko Contracts and/or Transportation Agreement(s);

(h) Take any and all actions necessary to ensure that no modifications, alterations, revisions, or amendments are made to the Commodity Contract(s) or Transportation Agreement(s) without the prior written consent of Recipient, which would in any manner expand, increase, or alter Recipient's obligations to any Carrier, or would otherwise be detrimental in any manner to Recipient with respect to Recipient's obligations under any Commodity Contract(s) or Transportation Agreement(s);

(i) Take any and all actions necessary to ensure that no modifications, alterations, revisions, extensions or amendments to any joint operating agreement, Production Marketing Agreement, or any related agreement are made by Provider which would in any manner expand, increase, or alter Recipient's obligations in any detrimental manner under any Commodity Contract(s), the Sanchez Anadarko Contract(s), the Raptor Agreement, or Transportation Agreement(s). Without limiting the foregoing, Provider shall not, during the term of this Agreement, enter into any new commitment agreement under any Production Marketing Agreement or joint operating agreement that would, in any manner, restrict, minimize, reduce or limit the Hydrocarbons being transported and/or sold under any of the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), and/or the Raptor Agreement that are subject to this Agreement, including but not limited to any new transportation or transportation-related agreements that would provide for new pipeline or terminal connections or alternate transportation paths that would provide for the potential diversion of Hydrocarbons otherwise subject to the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), and/or the Raptor Agreement. In addition, Provider shall maintain all Production Marketing Agreements in full force and effect during the Term of this Agreement and shall not enter into any material modifications of any such Production Marketing Agreement in the absence of the express prior written consent of Recipient, which may be withheld in Recipient's sole discretion;

(j) Provider shall during the Term of this Agreement, take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Marketing Contracts, including all Hydrocarbons attributable to Provider, UnSub and AcqCo. If during the Term of this Agreement any co-working interest owner elects to take its product in-kind during the Term of this Agreement, Provider shall provide immediate notice to Recipient; provided that Provider shall ensure that none of Provider, UnSub or AcqCo elect to take its product in-kind during the term of this Agreement;

(k) Maintain an ongoing familiarity with the terms of the Transportation Agreements, including any pipeline tariffs and governing documents applicable thereto, including, without limitation, all provisions relating to scheduling, nominations, audit rights, quality specifications and confidentiality;

(l) Maintain an ongoing familiarity with the terms of the Commodity Contracts, including, without limitation, all provisions relating to invoicing, payment, audit rights, quality specifications, compliance with applicable Laws and ethics obligations set forth in the Commodity Contracts;

(m) Receive and pay any and all invoices related to the purchase and sale of Hydrocarbons pursuant to this Agreement, including but not limited to the Sanchez Anadarko Contracts, the Raptor Agreement, and the Commodity Contract(s) (as well as providing copies of invoices and

payments related to the same to Recipient, with such invoices necessarily reflecting the quantities of Gas sold and delivered thereunder along with the contract price, or otherwise separately provide such information to Recipient if it is not reflected on the invoice);

(n) Receive and pay any and all invoices related to payments owed to the Carriers;

(o) Provider will immediately provide to Recipient notice of any potential events of default received from any of the counterparties to any of the Commodity Contract(s) or the Transportation Agreement(s). Such notice must be provided no later than two (2) Business Days prior to the applicable timeline set forth for curing the applicable event of default in the relevant Commodity Contract(s) or Transportation Agreement(s);

(p) For avoidance of doubt, it is the mutual intent of the Parties that Provider will meet and serve all Recipient's performance obligations under each of the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, and/or the Transportation Contract(s) for the full term of this Agreement;

(q) Provider shall take commercially reasonable steps to resolve any title warranty issues jointly with Recipient during the Term of this Agreement, but notwithstanding the foregoing, Provider shall be responsible for any and all charges, damages, costs, fees, expenses or penalties related to any breach of such title warranty issues that occur under any Commodity Contract(s) and/or the Transportation Agreement(s);

(r) Provider shall during the Term of this Agreement take any and all actions necessary to ensure that Provider fulfills its obligations under the Retained Marketing Contracts before meeting any future commitments Provider may enter pursuant to any Production Marketing Agreement; and

(s) Provider shall not consent to the assignment of any Production Marketing Agreement by a co-working interest owner in the absence of the prior written consent of Recipient, which shall not be unreasonably withheld.

**3.2 Recipient's Responsibilities**. In order to enable Provider to perform its duties and obligations under this Agreement, Recipient shall:

(a) Take all actions in a timely manner required to effectuate Provider's responsibilities, such as executing applicable agency agreements with the Carriers, in order to enable Provider to provide the services provided for under this Agreement and entering into the Sanchez Anadarko Contracts;

(b) Take any and all actions necessary with any Carrier to ensure that no modifications, alterations, revisions, or amendments are made to the Transportation Agreement(s) without the prior written consent of Provider, which would in any manner expand, increase, or alter Provider's obligations to the Recipient under this Agreement, or would otherwise be detrimental in any manner to Provider with respect to Provider's obligations under this Agreement; and

(c) Comply with the provisions of Sections 3.1(a)-(c) to the extent applicable to Recipient.

**3.3** **Balancing Services**. "Balancing" shall mean the services provided by Provider with respect to managing Recipient's Hydrocarbons made the subject of the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement and/or Transportation Agreement(s) and resulting financial outcomes related to Hydrocarbon nominations, and actual deliveries of Hydrocarbons pursuant to any applicable Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, or Transportation Agreement(s). Any economic consequences (including any liabilities, costs, gains, losses, damages, Imbalance Charges or other charges) arising under this Agreement (including the consequences of the Balancing), shall be borne solely by the Provider. Provider shall indemnify, defend and hold Recipient harmless from any and all claims and/or demands related to Balancing Services.

**3.4** **Risk Allocation/Responsibility for Losses**. Notwithstanding anything else to the contrary in this Agreement, the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, and/or the Transportation Agreement(s), Provider shall be responsible for any liabilities, costs, losses, damages, Imbalance Charges or other charges of any nature whatsoever with respect to Provider's provision of services under this Agreement, necessarily including Provider's assumption of all risk of (i) the failure of the Provider to deliver or receive (or to cause to be delivered or received) Hydrocarbons at the applicable receipt and/or delivery point(s) under the Commodity Contract(s), the Raptor Agreement and/or the Sanchez Anadarko Contracts, (ii) the curtailment, interruption or the unavailability of the transportation capacity, including under the Transportation Agreement(s), as well as upstream/downstream of the receipt and/or delivery points(s), due to an event of force majeure or otherwise, either in whole or in part, and (iii) the failure of the Hydrocarbons to be transported and delivered to the receipt and/or delivery point(s) for any reason whatsoever.

**3.5** **Responsibility for Charges**. **THE PARTIES AGREE AND UNDERSTAND THAT THE PARTIES HAVE AGREED TO ENTER INTO THIS AGREEMENT AS A RESULT OF CREDIT/ASSIGNMENT ISSUES RELATED TO THE PSA, AND ACCORDINGLY THE PARTIES FULLY INTEND FOR THE PROVIDER TO BE RESPONSIBLE FOR ANY AND ALL CHARGES, FEES, SURCHARGES, LIABILITIES, COSTS, LOSSES, EXPENSES, DAMAGES, IMBALANCE CHARGES OR OTHER CHARGES OF ANY NATURE WHATSOEVER ARISING FROM OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS, THE WYMAN HEDGE(S), THE RAPTOR AGREEMENT, AND/OR THE TRANSPORTATION AGREEMENT(S), IRRESPECTIVE OF THE CAUSE OR CAUSES OF THE FOREGOING, INCLUDING WHETHER THE CAUSE OR CAUSES ARE DERIVED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, PROVIDER, INVITEES AND/OR THIRD PARTIES.**

**3.6** **Indemnity.**

**(A) PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND RECIPIENT AND EACH OF THE SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY CLAIMS, CHARGES, FEES, DAMAGES, LOSSES, EXPENSES, LIABILITIES, FINES, PENALTIES OF ANY TYPE OR DESCRIPTION,**

**(SPECIFICALLY INCLUDING FINES, PENALTIES OR DISGORGEMENT OF PROFITS ASSOCIATED WITH THE FAILURE TO COMPLY WITH ANY REGULATIONS, ORDERS, OR STATUTES) AND COSTS (INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS OF LITIGATION) (COLLECTIVELY "CLAIMS") ARISING OUT OF, RELATING TO OR RESULTING FROM THE PROVIDER'S PERFORMANCE OR LACK OF PERFORMANCE OF THE SERVICES HEREUNDER, NECESSARILY INCLUDING CLAIMS ARISING UNDER OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS, THE WYMAN HEDGE(S), THE RAPTOR AGREEMENT, AND/OR THE TRANSPORTATION AGREEMENT(S), AND EVEN IF SUCH CLAIMS ARE BASED UPON THE NEGLIGENCE (WHETHER JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE) OF THE RECIPIENT OR ANY OF THE SELLER INDEMNIFIED PARTIES. THE INDEMNITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE REGARDLESS OF FAULT, MEANING WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY: (i) THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, THE SELLER INDEMNIFIED PARTIES, PROVIDER, INVITEES AND/OR THIRD PARTIES; AND/OR (ii) A PRE-EXISTING DEFECT, WHETHER PATENT OR LATENT, OF THE PREMISES OF RECIPIENT'S PROPERTY OR THE PROPERTY OF THE SELLER INDEMNIFIED PARTIES (INCLUDING THE ASSETS), INVITEES AND/OR THIRD PARTIES. FOR THE AVOIDANCE OF DOUBT, ALL REFERENCES TO PROVIDER LIABILITY HEREIN SHALL MEAN SNEF AND SN CATARINA, WHICH ENTITIES SHALL BE JOINT AND SEVERALLY LIABLE FOR ANY AND ALL OBLIGATIONS HEREUNDER.**

**(B) All claims for indemnification for Claims will be asserted and resolved according to the procedures set forth in Section 8.9 of the PSA, which shall apply *mutatis mutandis* to this Agreement.**

## ARTICLE IV. AUDIT RIGHTS

**4.1 Audit Rights**. A Party shall have the right, at its own expense, upon reasonable written notice to the other Party and at reasonable times on any Business Day, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Agreement. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to this Agreement. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within one year after the Month that the service activities made the subject of the invoices or billings is performed. All retroactive adjustments under this section

shall be paid in full by the Party owing payment within thirty (30) Days of the written notice after the substantiation of such inaccuracy.

## ARTICLE V. ACCOUNT STATEMENTS

On or before the 10th Day of each Month, Provider shall deliver, or cause to be delivered to Recipient a statement that sets out for the previous Month a detailed calculation showing all purchases and sales (identifying both the volume and value of each such purchase or sale transaction) made pursuant to this Agreement, as well as all fees, charges and similar expenses invoiced by and/or paid to any Carrier (identifying invoiced and paid amounts separately). At the same time, Provider shall deliver, or cause to be delivered, to Recipient a statement that sets out for the previous Month an aging of payables and receivables for the previous Month.

In addition, on March 1, June 1, September 1 and December 1 of each Calendar Year during the term (or, if March 1, June 1, September 1 and December 1 of a given year do not fall on Business Days, the next Business Day following each such date), Provider shall deliver or cause to be delivered to Recipient a list of all remaining commitments (including future demand charges or fees) associated with the Retained Marketing Contracts, separately stated by for each such Retained Marketing Contract.

## ARTICLE VI. TERM.

Subject to any other applicable provision of this Agreement, the Retained Marketing Contract services to be provided under this Agreement shall commence on the date of termination of the Marketing Transition Services Agreement as defined in the PSA and shall terminate on the earlier to occur of (i) the date that this Agreement is terminated as the result of any Event of Default, (ii) the date that coincides with the termination date of the Retained Marketing Contract with the longest term, and (iii) the date that coincides with Provider (or one of its Affiliates) obtaining consent to assign the last remaining Retained Marketing Contract from the counterparty thereunder (the periods from the effective date until the termination of the services under (i), (ii) or (iii) collectively being the "Term").

Each Party's obligations regarding payment and indemnification hereunder shall survive the termination or expiration of this Agreement for a period of time equal to the time for which the applicable statute of limitations applies.

## ARTICLE VII. TAXES

**7.1 Tax Matters**. Each Party shall report to the Internal Revenue Service or any other applicable taxing authority, all information relevant to the economic benefits and burdens related to this Agreement and shall maintain the necessary records for such tax reporting. **Provider shall indemnify, defend and hold Recipient harmless as to any costs or liabilities claimed against or incurred by Recipient in connection with this Agreement, including claims for Taxes made by Third Parties or entities, including Governmental Bodies, arising out of the activities made the subject of this Agreement.** References to "costs" in connection with this section shall include all reasonable and necessary attorneys' fees and expenses, consultants' fees, travel expenses, and court costs, including costs incurred to enforce the indemnity obligations.

**7.2 Responsibility Taxes**. Provider shall be solely responsible for all taxes, fees, levies, penalties, licenses or charges imposed by any Governmental Body (collectively "Taxes") that are currently imposed on the sale and delivery or purchase and receipt of the Hydrocarbons under the Commodity Contract(s), the Raptor Agreement and/or the Sanchez Anadarko Contracts, as well as any Taxes attributable to the pipeline capacity under the Transportation Agreements and any Taxes related to the Wyman Hedge(s).

## ARTICLE VIII. DEFAULT AND REMEDIES

**8.1 Events of Default**. The following actions or inactions by the applicable Party (the "Defaulting Party") shall constitute an "Event of Default" under this Agreement:

(a) Breach of any material obligation under this Agreement, if such breach is not cured by the Defaulting Party within ten (10) Business Days after written notice of such breach from the other non-defaulting Party (the "Non-Defaulting Party");

(b) The Bankruptcy of a Party; and

(c) Provider's action or inaction results in a material breach of any of the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), or the Raptor Agreement, if such breach is not cured within the shorter of (i) the applicable deadline in the Retained Marketing Contract(s), or (ii) five (5) Days following written notice from Recipient; provided, however, that if the Provider does not provide the notice within the required two (2) Business Days' notice period set forth in this Agreement, the otherwise applicable time to cure shall be shortened by the amount of time not provided to Recipient.

**8.2 Remedies**. If an Event of Default has occurred and is continuing, the Non-Defaulting Party may suspend performance on written notice to the Defaulting Party and, at its election, terminate this Agreement on written notice to the Defaulting Party. The Non-Defaulting Party must elect to terminate this Agreement within five (5) Business Days of the Event of Default or re-commence performance. During any time that Provider suspends performance in accordance with this section, it shall have no obligation to perform any services of any nature under this Agreement, until such time as Recipient has remedied the breach and provided notice thereof to Provider. During any such suspension hereunder, Recipient may notify the Carriers under the Transportation Agreement(s) that a Third Party other than Provider will handle daily nominations and scheduling of the affected Hydrocarbons until further notice. In the event Provider resumes performance either as a result of electing not to terminate this Agreement or by informing Recipient in writing that it rescinds its suspension of performance, Recipient shall take all necessary steps with the Carriers under the Transportation Agreement(s) to facilitate Provider's performance under this Agreement. Termination of this Agreement shall not preclude or limit the Non-Defaulting Party from pursuing any other remedies available at law or in equity in respect of the Event of Default under this Agreement, including the pursuit of damages.

If Provider shall fail to pay any amounts due under a Commodity Contract or Transportation Agreement even prior to an Event of Default occurring, Recipient may in its sole discretion terminate instructions to counterparties under Commodity Contracts and/or Transportation Agreements to make any direct payments to Provider until Recipient has recouped in full any

Case 4:23-cv-03587 Document 3-11 Filed 08/19/23 in TXSD Page 10 of 80

and all amounts that Recipient may be required to pay due to Provider's failure to pay any amount when due.

If this Agreement is terminated prior to the date that coincides with the termination date of the Retained Marketing Contract with the longest term, Provider shall ensure that any of its Hydrocarbons along with the Hydrocarbons of Provider's co-working interest owners governed by the Production Marketing Agreements will be sold to Recipient until the date of expiration of the Retained Marketing Contract with the longest term to enable Recipient to mitigate Recipient's losses under the Retained Marketing Contracts. All such sales by Provider to Recipient shall be under terms and conditions no less favorable than those set forth in the Commodity Contract(s) at the time of the termination.

## ARTICLE IX. MISCELLANEOUS

**9.1 No Partnership or Joint Venture.** Nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture between the Parties, and each Party shall be liable individually and severally for its own obligations under this Agreement. Both Parties agree that their relationship is strictly as one of principal and agent, as limited by the provisions of this Agreement and to the express purposes set forth herein.

**9.2 Compliance**. Provider shall comply with (i) the nomination and scheduling requirements of Carriers on the terms and conditions set forth in this Agreement, (ii) the Transportation Agreements and the applicable tariffs or governing documents, and (iii) all applicable Laws affecting the transportation, purchase and sale of Hydrocarbons that are related to this Agreement. Without limiting the generality of the foregoing and subject to Section 3.6 of this Agreement, if during the term of this Agreement any Governmental Body should determine that the obligations and duties contemplated in this Agreement cannot be performed in accordance with applicable Laws, wholly or in part, the Parties shall immediately suspend performance under this Agreement. Provider and Recipient shall, within five (5) Business Days of such a determination, meet to determine whether this Agreement can be revised so that the services contemplated herein can be performed fully in accordance with applicable Laws. In the absence of a superseding written agreement between the Parties following such event and following such meeting, this Agreement shall terminate prospectively with no damages being owed by either Party to the other Party from the date of termination forward, except for any amounts owed under this Agreement which relate to a period of time prior to termination under this Section 9.2. For the avoidance of doubt, any claims for damages, civil penalties, disgorgement of profit or similar Claims accruing prior to Termination of this Agreement shall survive and shall be subject to Section 3.6 of this Agreement, which shall survive termination of this Agreement.

**9.3 Further Assurances**. The Parties agree to execute and deliver such additional instruments or documents as may be necessary to carry out the purposes of this Agreement.

**9.4 Assignment**. Neither Party may assign, convey or otherwise transfer this Agreement whether through sale, merger, consolidation, reorganization, restructuring or otherwise, to any Affiliate or any Third Party without the express written consent of the other Party. Any attempted assignment, conveyance or transfer of this Agreement in violation of this section shall

be void and of no force and effect. This Agreement shall inure to the benefit of and bind the respective successors, heirs, representatives and permitted assigns of the Parties.

**9.5** **Governing Law and Jurisdiction**. This Agreement shall be governed by the terms and conditions set forth in Section 15.13 of the PSA, which shall apply mutatis mutandis to this Agreement.

**9.6** **Notices**. Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

**If to Recipient:**

Anadarko Energy Services Company
Attention: Tammy Campbell
9950 Woodloch Forest Drive
12th Floor
The Woodlands, TX 77380
Email: Tammy.Campbell@anadarko.com

**If to Provider:**

SN EF Maverick, LLC
Attention: Scott Wike
1000 Main Street
Suite 3000
Houston, TX 77002
Email: swike@sanchezog.com

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person provided such delivery is received by 5:00 p.m. on a Business Day, and if not the next Business Day, (ii) on the next Business Day after placed with an overnight delivery service when designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the receipt of such facsimile as evidenced by the sending Party's proof of successful transmission, provided that such facsimile is received at Recipient's location by 5:00 p.m. on a Business Day, and if not, by the next Business Day. Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States, but such notice shall not be effective until ten (10) Days after such notice is provided to the other Party in the manner set forth hereinabove.

**9.7** **Authority to Execute**. Each of the Parties to this Agreement represents and warrants that, as of the Effective Date, (i) it has full and complete authority to enter into and perform this Agreement; (ii) the person who executes this Agreement on its behalf has full and complete authority to do so and is empowered to bind it thereby; and (iii) it is not insolvent and has not sought protection from its creditors in Bankruptcy and is not otherwise the subject of Bankruptcy.

**9.8** **Miscellaneous**. This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Each Party's delivery of an executed counterpart signature page by facsimile or e-mail is as effective as executing and delivering this Agreement in the presence of the other Party. The headings and subheadings contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement between the Parties and shall not be used to construe or interpret the provisions of this Agreement. Each provision of this Agreement is intended to be severable. If any provision of this Agreement is determined to be illegal, invalid or unenforceable, for any reason, then, insofar as is practical and feasible, the remaining portions of this Agreement shall be deemed to be in full force and effect as if such invalid provision was not

contained herein. Except as expressly otherwise provided in this Agreement, all covenants, indemnities, representations, warranties, acknowledgments, agreements, rights and obligations of the Parties under this Agreement, that are capable of having effect after the termination of this Agreement for any reason, shall survive and remain in full force and effect beyond, and not be affected by, the termination of this Agreement.

**9.9 <u>Waiver</u>.** One or more waivers of any provision of this Agreement by a Party shall not be construed as a waiver of a subsequent breach or requirement of the same provision, and the consent by a Party to or approval of any act or omission by a Party requiring the other Party's consent or approval shall not be deemed to waive or render unnecessary such other Party's consent to or approval of any subsequent similar act or omission by such Party. Any and all waivers of this Agreement shall only be binding on a Party to the extent that the waiver is in writing.

**9.10 <u>Entirety and Amendments</u>**. This Agreement constitutes the entire agreement between the Parties regarding the services to be provided under this Agreement, and supersedes and replaces any prior and contemporaneous communications, understandings and agreements between Recipient and Provider related to such subject matter, whether written or verbal, express or implied. No modification, amendment, supplementation or alteration of the terms and provisions of this Agreement shall be or become effective except by written amendment executed by the duly authorized representative of the Parties.

**9.11 <u>Definitions</u>.** To the extent that any defined terms used in this Agreement are not otherwise defined herein, they shall have the definition set forth in the PSA.

**9.12 <u>Confidentiality</u>**. <u>Section 12.2</u> of the PSA shall apply mutatis mutandis to this Agreement.

**9.13 <u>Conspicuousness</u>**. The Parties agree that provisions in this Agreement in "bold" or "all caps" type satisfy any requirements of the "express negligence rule" and any other requirements at law or in equity that provisions be conspicuously marked or highlighted.

**9.14 <u>Laws.</u>** The Parties agree to comply with all Laws applicable to this Agreement and the services provided hereunder, and Recipient agrees that it shall not require or request Provider to perform any action that is in violation of applicable Laws or omit to perform any action that Provider reasonably believes is required under applicable Laws.

**9.15 <u>Standard of Care/Performance.</u>** Provider shall perform all services to be provided in all material respects in accordance with applicable Laws and applicable contracts, and with respect to the Commodity Contract(s) and the Transportation Agreement(s) in a manner which is similar in nature, quality and timeliness to the manner in which such services were provided by Recipient's personnel immediately prior to the Closing. The services shall be performed with the standard of care, skill, prudence and diligence normally provided by a reasonably prudent operator in the performance of similar services in similar jurisdictions in the oil and gas industry.

**9.16 <u>Sanchez Anadarko Contracts</u>**. Provider and Recipient shall enter into the Sanchez Anadarko Contracts on terms and conditions materially consistent with the Commodity Contract(s) to which they apply (i.e., being entered into to avoid warranty of title issues), it being

the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Sanchez Anadarko Contracts, any and all gap risk shall be borne by Provider. Provided, further, than in instances where the Sanchez Anadarko Contracts are being entered into to avoid title warranty issues related to Transportation Agreements(s) which do not also involve an associated Commodity Contract(s), the terms and conditions of the Sanchez Anadarko Contract shall be based on industry standard terms and conditions (e.g., NAESB with no Special Provisions, Recipient's Paper (e.g., crude oil purchases and sales); provided, however, that any and all contractual gap risk between Provider's contract(s) with any subsequent downstream purchaser(s) of such Hydrocarbons shall be borne exclusively by Provider.

**9.17 Survival**. All remedies set forth in Section 8.2, and the provisions of Sections 3.4, 3.5, and 3.6 shall survive the termination of this Agreement until the expiration of the applicable statute of limitations.

**9.18 SN Parent Guaranty**. For good and valuable consideration, and to induce Recipient to enter into this Agreement, SN Parent hereby absolutely, unconditionally and irrevocably guarantees to Recipient the punctual and complete performance of all obligations of Provider under this Agreement (the "Obligations"). The guaranty set out in this Section 9.18 (the "SN Parent Guaranty") shall remain in full force and effect until Provider has fully discharged all of the Obligations. Upon default by Provider of any of the Obligations, Recipient may proceed directly against SN Parent without proceeding against Provider or any other Person or pursuing any other remedy. Recipient may, without notice to, or consent of, SN Parent, (a) extend or alter, together with Provider, the time, manner, place or terms of payment or performance of the Obligations, (b) waive, or, together with Provider, amend the terms of this Agreement, (c) release Provider from any or all of the Obligations, or (d) release any other guaranty or security for the Obligations, without in any way releasing or discharging SN Parent from liability hereunder. SN Parent waives any defenses (but not rights of set-off or counterclaims) which it may have with respect to the performance of the Obligations, other than defenses that Provider would have under the terms of this Agreement. SN Parent further waives notice of the acceptance of this SN Parent Guaranty, presentment, demand, protest, and notices of protest, nonpayment, default or dishonor of the Obligations. SN Parent represents and warrants that (x) it has the full power and authority to enter into and perform the SN Parent Guaranty, (y) there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to SN Parent's knowledge, threatened against SN Parent, and SN Parent is not insolvent or generally not paying its debts as they become due, and (z) the execution, delivery and performance by SN Parent of this SN Parent Guaranty has been duly and validly authorized and approved by all necessary corporate action on the part of SN Parent, and this SN Parent Guaranty constitutes the legal, valid and binding obligation of SN Parent, enforceable against SN Parent in accordance with its terms.

**9.19 Wyman Hedges**. Under the terms of that certain Transaction Confirmation No. 312537 dated November 3, 2016, by and between Recipient and Wyman-Gordon ("Wyman") which is one of the Commodity Contracts, Wyman has the right to request that the Contract Price be converted to a fixed price. To the extent that Wyman exercises its right to do so, and Recipient and Wyman thereafter agree to a fixed price for all or any portion of the Contract Quantity thereunder, Provider understands and appreciates that the Recipient will enter into a financial

derivative transaction(s) with a Third Party(ies) to hedge the fixed price risk associated with Wyman's election (such resulting financial transaction(s) being the "Wyman Hedge(s)"). Accordingly, the Parties agree that Provider shall be responsible for the financial costs, expenses and impacts of the Wyman Hedge(s) under this Agreement, whether arising from the natural expiration of the Wyman Hedge(s), or the financial exposure calculated and/or resulting from the early termination of the transaction comprising the Commodity Contract.

**9.20 Intentionally left blank**

**9.21 Raptor Agreement**. At Recipient's sole discretion, Provider and Recipient may enter into a gas purchase and sale agreement(s) (i) whereby Recipient will purchase gas at the tailgate of the Raptor plant upon mutually agreeable terms and (ii) whereby Recipient shall sell gas back to Provider less fuel lost and unaccounted for on mutually agreeable terms and at mutually agreement point(s) (individually or collectively (i) and/or (ii) are referred to herein as the "Raptor Agreement"), it being the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Raptor Agreement, any and all gap risk shall be borne by Provider. Provided, further, that any and all contractual gap risk between Recipient's contract with any subsequent downstream transporter and downstream purchaser of such Hydrocarbons shall be borne exclusively by Provider. For the avoidance of doubt, the Raptor Agreement shall not be assigned.

[*Signature page follows*]

# EXHIBIT A

## Retained Contracts

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| | Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| | Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| | Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| TPT4205 | Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| | Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE)(TPT Tranche 3) | 12/13/2013 |
| | Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |

## NASEB Contract Confirmations

| Gas Sales | | Volume (MMBtu/d) | End Date | Asset | Contract action |
|---|---|---|---|---|---|
| | Techgen (221544) | 30,000 | 9/31/2021 | Maverick Basin | Assignment |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 | Maverick Basin | Assignment |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 | Maverick Basin | Assignment |

## Exhibit B

### Production Marketing Agreements[1]

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| 20022 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| 20021 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| 20032 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Crude Oil Production Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Crude Oil Production Marketing Agreement | 10/1/2010 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |

[1] All Production Marketing Agreements listed on this "Exhibit B" have been assigned to SN EF Maverick , LLC pursuant to that certain Downstream Marketing Agreements Assumption Agreement, dated June 1, 2017, by and between Anadarko Energy Services Company and SN EF Maverick, LLC.

IN WITNESS WHEREOF, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** BTKk DR

**Name:** Brian T Kuck
**Title:** VP
**Date:** 5-30-17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** BTKk DR

**Name:** Brian T. Kuck
**Title:** VP
**Date:** 5.30.17

**ANADARKO ENERGY SERVICES COMPANY**

By: BTKk DR
Name: Brian T. Kuck
Title: VP

**SN EF MAVERICK, LLC**

By: [signature]
Name: JOHN HAPP
Title: SVP Marketing & Midstream

**SANCHEZ ENERGY CORPORATION**

By: [signature]
Name: SVP Marketing & Midstream
Title: John Happ

# FIRST AMENDMENT TO THE RETAINED MARKETING CONTRACTS SERVICES AGREEMENT

This First Amendment to the Retained Marketing Contracts Services Agreement (the "Amendment") is effective as of June 28, 2017 (the "Effective Date") by and among SN EF Maverick, LLC ("SNEF") and SN Catarina, LLC ("SN Catarina") (collectively SNEF and SN Catarina are referred to herein as "Provider") and Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), and Anadarko Energy Services Company ("AESC") (collectively AEP, KMOG and AESC are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18 of the Agreement (as defined hereinafter), Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

## RECITALS

**WHEREAS**, SNEF and Recipient entered into that certain Retained Marketing Contracts Services Agreement on or about June 1, 2017 (the "Agreement");

**WHEREAS**, SN Catarina failed to sign the Agreement and desires to ratify the Agreement; and

**WHEREAS**, the Parties desire to amend the Agreement by adding provisions related to the NET Agreements, among other amendments.

**NOW, THEREFORE**, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. Ratification. SN Catarina hereby ratifies, confirms and approves the Agreement in its entirety.

2. Section 1.1. The following changes shall be made to the definitions section of the Agreement:

   a. The definition of "**NET**" shall be deleted in its entirety and replaced with: "'**NET**' shall mean Eagle Ford Midstream, LP."

   b. The definition of "NET Agreements" shall be deleted in its entirety and replaced with: "'**NET Agreements**' shall mean the Assigned Agreements (as defined in the Assignment Agreement)."

   c. The cross reference in the definition of "**Raptor Agreement**" shall be changed from "Section 9.18" to "Section 9.21".

3. Section 19.18. Section 19.18 of the Agreement shall be amended by adding the following sentence at the end of the paragraph: "The Parties agree that the SN Parent Guaranty shall be amended to cover Provider's obligations set forth under Section 9.20 of this Agreement."

4. Section 9.20. Section 9.20 of the Agreement shall be deleted in its entirety and replaced with the following:

"**Section 9.20 NET Agreements**. The Parties agree that to the extent that Provider is in breach of and/or failed to timely perform its obligations under (i) that certain Assignment and Consent to Assignment Agreement dated June 28, 2017 (the "Assignment Agreement") by and between Recipient, as assignor, Provider, as assignee, and Eagle Ford Midstream, LP, as the consenting party, and/or (ii) the Assigned Agreements, as defined in such Assignment Agreement, then an Event of Default shall also be deemed to have occurred under this Agreement and Recipient shall be afforded any and all rights available to it under this Agreement, at law or in equity as a result of such Event of Default."

5. Miscellaneous.

a. Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth for such terms in the Agreement.

b. Entire Agreement/Conflicts. Except as expressly set forth in this Amendment, the terms and conditions of the Agreement, are hereby ratified, confirmed and approved in their entirety and shall continue in full force and effect. This Amendment constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto. Should there be any conflict between this Amendment and the Agreement, the terms and conditions of this Amendment will control.

c. Governing Law. This Amendment will be governed by the governing law and jurisdiction as stated in the Agreement.

d. Counterparts. This Amendment may be executed in one or more counterparts, and by electronic signature (whether by facsimile, e-mail .pdf, DocuSign or otherwise), and each executed counterpart shall be deemed an original and all of which, together, shall constitute one and the same instrument.

(signature page follows)

**IN WITNESS WHEREOF**, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** Vice President

**ANADARKO ENERGY SERVICES COMPANY**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** **Vice President**

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** Vice President

**SN EF MAVERICK, LLC**

**By:** ______________________

**Name:**
**Title:**

**SN CATARINA, LLC**

**By:** ______________________

**Name:**
**Title:**

**SANCHEZ ENERGY CORPORATION**

**By:** ______________________

**Name:**
**Title:**

**IN WITNESS WHEREOF**, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** Vice President

**ANADARKO ENERGY SERVICES COMPANY**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** **Vice President**

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** Vice President

**SN EF MAVERICK, LLC**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & Midstream

**SN CATARINA, LLC**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & Midstream

**SANCHEZ ENERGY CORPORATION**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & MIDSTREAM

**SECOND AMENDMENT TO THE**
**RETAINED MARKETING CONTRACTS SERVICES AGREEMENT**

This Second Amendment to the Retained Marketing Contracts Services Agreement (the "Amendment") is effective as of September 15, 2015 ("Effective Date") by and among SN EF Maverick, LLC ("SNEF") and SN Catarina, LLC ("SN Catarina") (collectively, SNEF and SN Catarina are referred to herein as "Provider") and Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), and Anadarko Energy Services Company ("AESC") (collectively AEP, KMOG and AESC are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18, Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

**RECITALS**

**WHEREAS,** Provider and Recipient entered into that certain Retained Marketing Contracts Services Agreement effective on or about June 1, 2017, as amended and ratified by the First Amendment dated June 28, 2017 (collectively, the "Agreement");

**WHEREAS,** one of the Retained Marketing Contracts has been assigned from AESC to SNEF effective as of September 15, 2017, pursuant to the Consent to Assignment and Release Agreement by and among, AESC, SNEF, and Techgen SA de CV dated September 12, 2017 (the "Assignment"); and

**WHEREAS,** the Parties desire to amend the Agreement by modifying Exhibit A to reflect the Assignment.

**NOW, THEREFORE,** for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1. Exhibit A. The NAESB Contract Confirmations table on Exhibit A shall be amended by removing the line referencing the Techgen Transaction Confirmation with number 221544 (the "Techgen Assigned Agreement").

2. Conflicts. Should there be any conflict between this Amendment and the Agreement, the terms and conditions of this Amendment will control. For the avoidance of doubt, nothing herein is intended to modify or alter or terminate any Party's rights or obligations or any indemnity, risk allocation, responsibility for charges, or other similar provision in the Agreement related to the Techgen Assigned Agreement which arose or accrued or relates to the period of time prior to the effective date of the Assignment. Notwithstanding anything to the contrary in this Amendment, nothing in this Amendment is intended to conflict with or modify Providers' assumption of the Assumed Obligations (as defined in the PSA) under the PSA and Providers' indemnities therefor, and the Parties agree that as of the effective date of the Assignment, the Techgen Assigned

Agreement shall be Assumed Obligations under the PSA. In the event of a conflict between the Amendment and the PSA, the terms of the PSA shall control.

3. Miscellaneous.

a. Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth for such terms in the Agreement.

b. Entire Agreement. Except as expressly set forth in this Amendment, the terms and conditions of the Agreement, are hereby ratified, confirmed and approved in their entirety and shall continue in full force and effect. This Amendment constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

c. Governing Law. This Amendment will be governed by the governing law and jurisdiction as stated in the Agreement.

d. Counterparts. This Amendment may be executed in one or more counterparts, and by electronic signature (whether by facsimile, e-mail .pdf, DocuSign or otherwise), and each executed counterpart shall be deemed an original and all of which, together, shall constitute one and the same instrument.

(signature page follows)

**IN WITNESS WHEREOF**, and with the intent to be legally bound, the Parties hereto have caused this Amendment to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** ______________________

**Name:** Brian T. Kuck
**Title:** Vice President
Corporate Development
**Date:** 9/26/17

**ANADARKO ENERGY SERVICES COMPANY**

**By:** ______________________

**Name:** Kevin Kelly
**Title:** General Manager, Southern Gas and NGL Marketing
**Date:** 9/26/17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** ______________________

**Name:** Brian T. Kuck
**Title:** Vice President
**Date:** 9/26/17

**SN EF MAVERICK, LLC**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

**SN CATARINA, LLC**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

**SANCHEZ ENERGY CORPORATION**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

# EXHIBIT 14

*Execution Version*

# RETAINED MIDSTREAM CONTRACTS SERVICES AGREEMENT

This Retained Midstream Contracts Services Agreement (the "Agreement") is entered as of the Effective Date defined below by and among SN EF Maverick, LLC ("Provider") and Anadarko E&P Onshore LLC ("AEP") and Kerr-McGee Oil & Gas Onshore LP ("KMOG") (collectively AEP and KMOG are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18, Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

WHEREAS, pursuant to Schedule 13.4 of that certain Purchase and Sale Agreement dated effective July 1, 2016 (as the same may be amended from time to time, the "PSA") by and among Provider and Recipient, Provider shall serve as midstream agent on behalf of Recipient and its Affiliates with respect to Retained Midstream Contracts as of the date of termination of the Marketing Transition Services Agreement (as that term is defined in the PSA); and

WHEREAS, the Parties are entering into this Agreement to provide for the specific terms and conditions under which Provider shall perform Recipient's obligations with respect to such Retained Midstream Contracts.

NOW, THEREFORE, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I. DEFINITIONS AND INTERPRETATION

**1.1 Definitions**. The following terms when used herein shall have the meanings set forth below.

"**Accounting Services**" means those services to be performed hereunder which are set forth in Section 3.1(m).

"**AcqCo**" shall mean Gavilan Resources, LLC.

"**AEP**" shall have the meaning as set out in the preamble.

"**Agreement**" shall have the meaning as set out in the preamble.

"**Affiliate**" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, another Person; *provided*, *however*, that the Western Gas Entities shall not be deemed to be Affiliates of Recipient. The term "***control***" and its derivatives with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Balancing**" shall have the meaning as set out in Section 3.3.

"**Bankruptcy**" means with respect to any Party, (i) the filing by such Party of a petition or the commencement of, or the acquiescence in the commencement of, a proceeding or cause of action under any bankruptcy, insolvency or similar law providing for protection from its creditors, or a Party having any such proceeding or cause of action filed or commenced against it; (ii) the seeking by such Party of the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; (iii) the making of an assignment or any general arrangement for the benefit of its creditors, (iv) such Party admitting its inability to pay its debts as they fall due, (v) such Party becoming bankrupt or insolvent (however documented or evidenced), or (vi) such Party making a general assignment for the benefit of its creditors.

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"**Carrier**" means any one, as applicable, of the pipelines (or storage facilities), including gathering systems, identified in the applicable Transportation Agreement(s).

"**Claims**" shall have the meaning as set out in Section 3.6.

"**Commodity Contract(s)**" means a contract(s) for the purchase and sale of Hydrocarbons entered into by and between Recipient and a Third Party(ies) that has been retained by Recipient, as identified on Schedule 1.1(b) of the PSA.

"**Day**" means a period of 24 consecutive hours, starting at 9:00 a.m. Central Clock Time on any calendar day.

"**Defaulting Party**" shall have the meaning as set out in Section 8.1.

"**Effective Date**" means the date on which the Marketing Transition Services Agreement (as defined in the PSA) terminates.

"**Event of Default**" shall have the meaning as set out in Section 8.1.

"**Governmental Body**" means any instrumentality, subdivision, court, administrative agency, commission, official or other governmental authority of the United States or any other country or any state, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any administrative, executive, judicial, legislative, police, regulatory, taxing, importing or other governmental or quasi-governmental body.

"**Hydrocarbons**" means hydrocarbons from the Assets, as well as the co-working interest owner's hydrocarbons from the Assets.

"**KMOG**" shall have the meaning as set out in the preamble.

"**Month**" means the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

"**Non-Defaulting Party**" shall have the meaning as set out in Section 8.1(a).

"**Obligations**" shall have the meaning as set out in Section 9.18.

"**Operational Services**" means any and all services set forth hereunder which are not Accounting Services.

"**Parties**" shall have the meaning as set out in the preamble.

"**Production Marketing Agreements**" means those certain agreements set forth on Exhibit A, which is attached hereto and incorporated herein for all purposes.

"**Provider**" shall have the meaning as set out in the preamble.

"**PSA**" shall have the meaning as set out in the recitals.

"**Recipient**" shall have the meaning as set out in the preamble.

"**Retained Midstream Contracts**" means the Commodity Contract(s) and the Transportation Agreement(s) collectively.

"**Sanchez Anadarko Contract(s)**" means the purchase and/or buy/sell agreement(s) entered into by and between Provider and Recipient pursuant to Sections 3.1 (a)-(c) as applicable.

"**Seller Indemnified Parties**" shall have the meaning as set out in the PSA.

"**SN Parent**" shall have the meaning as set out in the preamble.

"**SN Parent Guaranty**" shall have the meaning as set out in Section 9.18.

"**Taxes**" shall have the meaning as set out in Section 7.2.

"**Term**" shall have the meaning as set out in Article VI of this Agreement.

"**Transportation Agreement(s)**" means a contract(s) for processing, treating, gathering, transportation or storage service entered into by and between Recipient and a Carrier that has been retained by Recipient, as identified on Schedule 1.1(b) of the PSA.

"**Unsub**" shall mean SN EF Unsub, LP.

"**Western Gas Entities**" shall mean Western Gas Equity Holdings, LLC, Western Gas Equity Partners, LP, Western Gas Holdings, LLC, Western Gas Partners, LP, and the direct and indirect subsidiaries of Western Gas Partners, LP.

## ARTICLE II. APPOINTMENT OF AGENT

**2.1 Provider as Agent**. Recipient hereby appoints Provider to serve as its exclusive agent to manage and administer the Commodity Contract(s) and the Transportation Agreement(s) with respect to the specific duties set forth in Article III throughout the Term of this Agreement.

Provider shall have no authority to undertake actions on behalf of Recipient that are beyond the scope of the authorizations stated in this Agreement. Recipient does not appoint Provider to act as its general agent, or as an agent for any other purpose other than the express authorizations granted in this Agreement. In no event shall Provider, in its capacity as agent or otherwise, take title to the Hydrocarbons being transported under the Transportation Agreements if such Transportation Agreement requires the shipper to have title to any such Hydrocarbons being transported unless such Transportation Agreement shall first have been permanently assigned by Recipient to Provider in accordance with Schedule 13.4 of the PSA.

**2.2 Implementing Notices**. Recipient shall provide each Carrier with notice under the applicable Transportation Agreement of the appointment of Provider as agent in time for Provider to administer and manage the contracts for which it has been given management and administrative authority, and Recipient agrees to also provide such notice to any counterparty to any of the Commodity Contract(s) that requests or requires such notice. Recipient further agrees to take any and all actions necessary to facilitate such appointment, including but not limited to executing documents required by the Carrier.

## ARTICLE III. PERFORMANCE OBLIGATIONS

**3.1 Provider's Specific Responsibilities**. Provider shall provide the following services under the terms of this Agreement**:**

(a) Where warranty of title is required under the applicable Commodity Contract or Transportation Agreement and where not prohibited under the terms of the Commodity Contract or Transportation Agreement, Recipient will engage in a buy/sell transaction in which Recipient each Month will purchase from Provider Hydrocarbons at a mutually agreed point upstream of the receipt point on the applicable Carrier's system at an agreed upon contract price set forth in a written notice from Recipient to Provider and Recipient will agree to resell an equivalent volume (and to the extent applicable an equivalent grade), less fuel, loss allowance and other allowances as applicable, of Hydrocarbons to Provider at the same stated price after the point of delivery under the applicable Commodity Contract or Transportation Agreement (with Provider being liable for the payment of any and all midstream services charges and all related fees, charges, or surcharges related to transportation of Hydrocarbons from the point of receipt to the point of delivery by the applicable Carrier that would otherwise have been due and payable by Recipient). To the extent there are any other amounts deducted from the amounts that would otherwise be payable to Recipient, Provider shall bear sole responsibility for those deductions;

(b) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed point upstream of the facilities of the applicable Carrier at a mutually agreed price, and Provider shall nominate and schedule such Hydrocarbons to which the Recipient has title to the appropriate delivery point(s) as specified in the applicable Commodity Contract or Transportation Agreement. Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(b) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(c) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed upon point downstream after transportation at a mutually agreed upon price and Provider shall nominate and schedule such Hydrocarbons to the appropriate delivery point(s) as specified in the applicable Transportation Agreement, and from and to the delivery point(s) thereafter on Recipient's behalf set forth in the applicable Commodity Contract(s). Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(c) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(d) Prepare and submit daily and monthly nominations, as applicable, to facilitate Recipient's receipt and/or delivery of such Hydrocarbons at the applicable delivery and/or receipt point(s) under the Transportation Agreement(s), the Commodity Contract(s) and/or the Sanchez Anadarko Contracts;

(e) On each Day, manage the receipts and deliveries of Hydrocarbons with the applicable Carriers so as to minimize Imbalance Charges, if possible;

(f) Manage any critical day events or operational issues affecting the Carriers or any other industry developments or circumstances of which Provider has become aware that may have a material effect on the transportation of the Hydrocarbons made the subject of the Commodity Contract(s) and/or the Sanchez Anadarko Contracts. Without limiting the foregoing, Provider shall immediately notify Recipient of any exercise of emergency response rights under any Production Marketing Agreement;

(g) Balance transportation activities in accordance with the terms and conditions of the applicable Commodity Contract(s), the Sanchez Anadarko Contracts and/or the Transportation Agreement(s);

(h) Take any and all actions necessary to ensure that no modifications, alterations, revisions, or amendments are made to the Commodity Contract(s) or the Transportation Agreement(s) without the prior written consent of Recipient, which would in any manner expand, increase, or alter Recipient's obligations to any Carrier, or would otherwise be detrimental in any manner to Recipient with respect to Recipient's obligations under any Commodity Contract(s) or Transportation Agreement(s);

(i) Take any and all actions necessary to ensure that no modifications, alterations, revisions, extensions or amendments to any joint operating agreement, Production Marketing Agreement, or any related agreement are made by Provider which would in any manner expand, increase, or alter Recipient's obligations in any detrimental manner under any Commodity Contract(s) or Transportation Agreement(s). Without limiting the foregoing, Provider shall not, during the term of this Agreement, enter into any new commitment agreement under any Production Marketing Agreement or joint operating agreement that would, in any manner, restrict, minimize, reduce or limit the Hydrocarbons being transported and/or sold under any of the Retained Midstream Contracts that are subject to this Agreement, including but not limited to any new transportation or transportation-related agreements that would provide for new pipeline or terminal connections or alternate transportation paths that would provide for the potential

diversion of Hydrocarbons otherwise subject to the Retained Midstream Contracts. In addition, Provider shall maintain all Production Marketing Agreements in full force and effect during the Term of this Agreement and shall not enter into any material modifications of any such Production Marketing Agreement in the absence of the express prior written consent of Recipient, which may be withheld in Recipient's sole discretion;

(j) Provider shall during the Term of this Agreement take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Midstream Contracts, including all Hydrocarbons attributable to Provider, UnSub and AcqCo. If during the Term of this Agreement any co-working interest owner elects to take its production in-kind during the Term of this Agreement, Provider shall provide immediate notice to Recipient; provided that Provider shall ensure that none of Provider, UnSub or AcqCo elect to take its production in-kind during the term of this Agreement;

(k) Maintain an ongoing familiarity with the terms of the Transportation Agreements, including any pipeline tariffs and governing documents applicable thereto, including, without limitation, all provisions relating to scheduling, nominations, audit rights, quality specifications and confidentiality;

(l) Maintain an ongoing familiarity with the terms of the Commodity Contracts, including, without limitation, all provisions relating to invoicing, payment, audit rights, quality specifications, compliance with applicable Laws and ethics obligations set forth in the Commodity Contracts;

(m) Receive and pay any and all invoices related to the purchase and sale of Hydrocarbons pursuant to this Agreement including but not limited to the Sanchez Anadarko Contracts (as well as providing copies of invoices and payments related to the same to Recipients), in addition to making all payments owed to the Carriers;

(n) Provider will immediately provide to Recipient notice of any potential events of default received from any of the counterparties to any of the Commodity Contract(s) or the Transportation Agreement(s). Such notice must be provided no later than two Business Days prior to the applicable timeline set forth for curing the applicable event of default in the relevant Commodity Contract(s) or Transportation Agreement(s);

(o) For avoidance of doubt, it is the mutual intent of the Parties that Provider will meet and serve all Recipient's performance obligations under each of the Commodity Contract(s) and/or the Transportation Contract(s) for the full term of this Agreement;

(p) Provider shall take commercially reasonable steps to resolve any title warranty issues jointly with Recipient during the Term of this Agreement, but notwithstanding the foregoing, Provider shall be responsible for any and all charges, damages, costs, fees, expenses or penalties related to any breach of such title warranty issues that occur under any Commodity Contract(s) and/or the Transportation Agreement(s);

(q) Provider shall during the Term of this Agreement take any and all actions necessary to ensure that Provider fulfills its obligations under the Retained Midstream Contracts before

meeting any future commitments Provider may enter pursuant to any Production Marketing Agreement; and

(r) Provider shall not consent to the assignment of any Production Marketing Agreement by a co-working interest owner in the absence of the prior written consent of Recipient, which shall not be unreasonably withheld.

**3.2 Recipient's Responsibilities**. In order to enable Provider to perform its duties and obligations under this Agreement, Recipient shall:

(a) Take all actions in a timely manner required to effectuate Provider's responsibilities, such as executing applicable agency agreements with the Carriers, in order to enable Provider to provide the services provided for under this Agreement and entering into the Sanchez Anadarko Contracts;

(b) Take any and all actions necessary with any Carrier to ensure that no modifications, alterations, revisions, or amendments are made to the Transportation Agreement(s) without the prior written consent of Provider, which would in any manner expand, increase, or alter Provider's obligations to the Recipient under this Agreement, or would otherwise be detrimental in any manner to Provider with respect to Provider's obligations under this Agreement; and

(c) Comply with the provisions of Sections 3.1(a)-(c) to the extent applicable to Recipient.

**3.3 Balancing Services**. "Balancing" shall mean the services provided by Provider with respect to managing Recipient's Hydrocarbons made the subject of the Commodity Contract(s), the Sanchez Anadarko Contracts and/or Transportation Agreement(s) and resulting financial outcomes related to Hydrocarbon nominations, and actual deliveries of Hydrocarbons pursuant to any applicable Commodity Contract(s), the Sanchez Anadarko Contracts or the Transportation Agreement(s). Any economic consequences (including any liabilities, costs, gains, losses, damages, Imbalance Charges or other charges) arising under this Agreement (including the consequences of the Balancing), shall be borne solely by the Provider. Provider shall indemnify, defend and hold Recipient harmless from any and all claims and/or demands related to Balancing Services.

**3.4 Risk Allocation/Responsibility for Losses**. Notwithstanding anything else to the contrary in this Agreement, the Commodity Contract(s), the Sanchez Anadarko Contracts and/or the Transportation Agreement(s), Provider shall be responsible for any liabilities, costs, losses, damages, Imbalance Charges or other charges of any nature whatsoever with respect to Provider's provision of services under this Agreement, necessarily including Provider's assumption of all risk of (i) the failure of the Provider to deliver or receive (or to cause to be delivered or received) Hydrocarbons at the applicable receipt and/or delivery point(s) under the Commodity Contract(s) and/or the Sanchez Anadarko Contracts, (ii) the curtailment, interruption or the unavailability of the transportation capacity, including under the Transportation Agreement(s), as well as upstream/downstream of the receipt and/or delivery points(s), due to an event of force majeure or otherwise, either in whole or in part, and (iii) the failure of the

Case 4:22-cv-03035 Document 68-34 Filed in TXSD on 08/24/22 Page 9 of 19

Hydrocarbons to be transported and delivered to the receipt and/or delivery point(s) for any reason whatsoever.

**3.5 <u>Responsibility for Charges</u>. THE PARTIES AGREE AND UNDERSTAND THAT THE PARTIES HAVE AGREED TO ENTER INTO THIS AGREEMENT AS A RESULT OF CREDIT/ASSIGNMENT ISSUES RELATED TO THE PSA, AND ACCORDINGLY THE PARTIES FULLY INTEND FOR THE PROVIDER TO BE RESPONSIBLE FOR ANY AND ALL CHARGES, FEES, SURCHARGES, LIABILITIES, COSTS, LOSSES, EXPENSES, DAMAGES, IMBALANCE CHARGES OR OTHER CHARGES OF ANY NATURE WHATSOEVER ARISING FROM OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS AND/OR THE TRANSPORTATION AGREEMENT(S), IRRESPECTIVE OF THE CAUSE OR CAUSES OF THE FOREGOING, INCLUDING WHETHER THE CAUSE OR CAUSES ARE DERIVED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT PROVIDER OR INVITEES AND/OR THIRD PARTIES.**

**3.6 <u>Indemnity</u>.**

**(A) PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND RECIPIENT AND EACH OF THE SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY CLAIMS, CHARGES, FEES, DAMAGES, LOSSES, EXPENSES, LIABILITIES, FINES, PENALTIES OF ANY TYPE OR DESCRIPTION, (SPECIFICALLY INCLUDING FINES, PENALTIES OR DISGORGEMENT OF PROFITS ASSOCIATED WITH THE FAILURE TO COMPLY WITH ANY REGULATIONS, ORDERS, OR STATUTES) AND COSTS (INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS OF LITIGATION) (COLLECTIVELY "<u>CLAIMS</u>") ARISING OUT OF, RELATING TO OR RESULTING FROM THE PROVIDER'S PERFORMANCE OR LACK OF PERFORMANCE OF THE SERVICES HEREUNDER, NECESSARILY INCLUDING CLAIMS ARISING UNDER OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS AND/OR THE TRANSPORTATION AGREEMENT(S), AND EVEN IF SUCH CLAIMS ARE BASED UPON THE NEGLIGENCE (WHETHER JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE) OF THE RECIPIENT OR ANY OF THE SELLER INDEMNIFIED PARTIES. THE INDEMNITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE REGARDLESS OF FAULT, MEANING WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY: (i) THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, THE SELLER INDEMNIFIED PARTIES, PROVIDER, INVITEES AND/OR THIRD PARTIES; AND/OR (ii) A PRE-EXISTING DEFECT, WHETHER PATENT OR LATENT, OF THE PREMISES OF RECIPIENT'S PROPERTY OR THE**

**PROPERTY OF THE SELLER INDEMNIFIED PARTIES (INCLUDING THE ASSETS), INVITEES AND/OR THIRD PARTIES.**

**(B) All claims for indemnification for Claims will be asserted and resolved according to the procedures set forth in Section 8.9 of the PSA, which shall apply *mutatis mutandis* to this Agreement.**

## ARTICLE IV. AUDIT RIGHTS

**4.1 Audit Rights**. A Party shall have the right, at its own expense, upon reasonable written notice to the other Party and at reasonable times on any Business Day, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Agreement. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to this Agreement. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within one year after the Month that the service activities made the subject of the invoices or billings is performed. All retroactive adjustments under this section shall be paid in full by the Party owing payment within thirty (30) Days of the written notice after the substantiation of such inaccuracy.

## ARTICLE V. ACCOUNT STATEMENTS

On or before the 10th Day of each Month, Provider shall deliver, or cause to be delivered to Recipient a statement that sets out for the previous Month a detailed calculation showing all purchases and sales (identifying both the volume and value of each such purchase or sale transaction) made pursuant to this Agreement, as well as all fees, charges and similar expenses invoiced by and/or paid to any Carrier (identifying invoiced and paid amounts separately). At the same time, Provider shall deliver, or cause to be delivered, to Recipient a statement that sets out for the previous Month an aging of payables and receivables for the previous Month. ]

In addition, on March 1, June 1, September 1 and December 1 of each Calendar Year during the term (or, if March 1, June 1, September 1 and December 1 of a given year do not fall on Business Days, the next Business Day following each such date), Provider shall deliver or cause to be delivered to Recipient a list of all remaining commitments (including future demand charges or fees) associated with the Retained Midstream Contracts, separately stated by for each such Retained Midstream Contract.

## ARTICLE VI. TERM.

Subject to any other applicable provision of this Agreement, the Retained Midstream Contract services to be provided under this Agreement shall commence on the date of termination of the Marketing Transition Services Agreement as defined in the PSA and shall terminate on the earlier to occur of (i) the date that this Agreement is terminated as the result of any Event of Default, (ii) the date that coincides with the termination date of the Retained Midstream Contract with the longest term, and (iii) the date that coincides with Provider (or one of its Affiliates) obtaining consent to assign the last remaining Retained Midstream Contract from the

counterparty thereunder (the periods from the effective date until the termination of the services under (i), (ii) or (iii) collectively being the "Term").

Each Party's obligations regarding payment and indemnification hereunder shall survive the termination or expiration of this Agreement for a period of time equal to the time for which the applicable statute of limitations applies.

## ARTICLE VII. TAXES

**7.1 Tax Matters**. Each Party shall report to the Internal Revenue Service or any other applicable taxing authority, all information relevant to the economic benefits and burdens related to this Agreement and shall maintain the necessary records for such tax reporting. **Provider shall indemnify, defend and hold Recipient harmless as to any costs or liabilities claimed against or incurred by Recipient in connection with this Agreement, including claims for Taxes made by Third Parties or entities, including Governmental Bodies, arising out of the activities made the subject of this Agreement.** References to "costs" in connection with this section shall include all reasonable and necessary attorneys' fees and expenses, consultants' fees, travel expenses, and court costs, including costs incurred to enforce the indemnity obligations.

**7.2 Responsibility Taxes**. Provider shall be solely responsible for all taxes, fees, levies, penalties, licenses or charges imposed by any Governmental Body (collectively "Taxes") that are currently imposed on the sale and delivery or purchase and receipt of the Hydrocarbons under the Commodity Contract(s) and/or the Sanchez Anadarko Contracts, as well as any Taxes attributable to the pipeline capacity under the Transportation Agreements.

## ARTICLE VIII. DEFAULT AND REMEDIES

**8.1 Events of Default**. The following actions or inactions by the applicable Party (the "Defaulting Party") shall constitute an "Event of Default" under this Agreement:

(a) Breach of any material obligation under this Agreement , if such breach is not cured by the Defaulting Party within ten (10) Business Days after written notice of such breach from the other non-defaulting Party (the "Non-Defaulting Party");

(b) The Bankruptcy of a Party; and

(c) Provider's action or inaction results in a material breach of any of the Retained Midstream Contracts, if such breach is not cured within the shorter of (i) the applicable deadline in the Retained Midstream Contract(s), or (ii) five (5) Days following written notice from Recipient; provided, however, that if the Provider does not provide the notice within the required two (2) Business Days' notice period set forth in this Agreement, the otherwise applicable time to cure shall be shortened by the amount of time not provided to Recipient.

**8.2 Remedies**. If an Event of Default has occurred and is continuing, the Non-Defaulting Party may suspend performance on written notice to the Defaulting Party and, at its election, terminate this Agreement on written notice to the Defaulting Party. The Non-Defaulting Party must elect to terminate this Agreement within five (5) Business Days of the Event of Default or re-commence performance. During any time that Provider suspends performance in accordance

with this section, it shall have no obligation to perform any services of any nature under this Agreement, until such time as Recipient has remedied the breach and provided notice thereof to Provider. During any such suspension hereunder, Recipient may notify the Carriers under the Transportation Agreement(s) that a Third Party other than Provider will handle daily nominations and scheduling of the affected Hydrocarbons until further notice. In the event Provider resumes performance either as a result of electing not to terminate this Agreement or by informing Recipient in writing that it rescinds its suspension of performance, Recipient shall take all necessary steps with the Carriers under the Transportation Agreement(s) to facilitate Provider's performance under this Agreement. Termination of this Agreement shall not preclude or limit the Non-Defaulting Party from pursuing any other remedies available at law or in equity in respect of the Event of Default under this Agreement, including the pursuit of damages.

If Provider shall fail to pay any amounts due under a Commodity Contract or Transportation Agreement even prior to an Event of Default occurring, Recipient may in its sole discretion terminate instructions to counterparties under Commodity Contracts and/or Transportation Agreements to make any direct payments to Provider until Recipient has recouped in full any and all amounts that Recipient may be required to pay due to Provider's failure to pay any amount when due.

If this Agreement is terminated prior to the date that coincides with the termination date of the Retained Midstream Contract with the longest term, Provider shall ensure that any of its Hydrocarbons along with the Hydrocarbons of Provider's co-working interest owners governed by the Production Marketing Agreements will be sold to Recipient until the date of expiration of the Retained Midstream Contract with the longest term to enable Recipient to mitigate Recipient's losses under the Retained Midstream Contracts. All such sales by Provider to Recipient shall be under terms and conditions no less favorable than those set forth in the Commodity Contract(s) at the time of the termination.

## ARTICLE IX. MISCELLANEOUS

**9.1 No Partnership or Joint Venture.** Nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture between the Parties, and each Party shall be liable individually and severally for its own obligations under this Agreement. Both Parties agree that their relationship is strictly as one of principal and agent, as limited by the provisions of this Agreement and to the express purposes set forth herein.

**9.2 Compliance**. Provider shall comply with (i) the nomination and scheduling requirements of Carriers on the terms and conditions set forth in this Agreement, (ii) the Transportation Agreements and the applicable tariffs or governing documents, and (iii) all applicable Laws affecting the transportation, purchase and sale of Hydrocarbons that are related to this Agreement. Without limiting the generality of the foregoing and subject to Section 3.6 of this Agreement, if during the term of this Agreement any Governmental Body should determine that the obligations and duties contemplated in this Agreement cannot be performed in accordance with applicable Laws, wholly or in part, the Parties shall immediately suspend performance under this Agreement. Provider and Recipient shall, within five (5) Business Days of such a determination, meet to determine whether this Agreement can be revised so that the services contemplated herein can be performed fully in accordance with applicable Laws. In the absence

of a superseding written agreement between the Parties following such event and following such meeting, this Agreement shall terminate prospectively with no damages being owed by either Party to the other Party from the date of termination forward, except for any amounts owed under this Agreement which relate to a period of time prior to termination under this Section 9.2. For the avoidance of doubt, any claims for damages, civil penalties, disgorgement of profit or similar Claims accruing prior to Termination of this Agreement shall survive and shall be subject to Section 3.6 of this Agreement, which shall survive termination of this Agreement.

**9.3 Further Assurances**. The Parties agree to execute and deliver such additional instruments or documents as may be necessary to carry out the purposes of this Agreement.

**9.4 Assignment**. Neither Party may assign, convey or otherwise transfer this Agreement whether through sale, merger, consolidation, reorganization, restructuring or otherwise, to any Affiliate or any Third Party without the express written consent of the other Party. Any attempted assignment, conveyance or transfer of this Agreement in violation of this section shall be void and of no force and effect. This Agreement shall inure to the benefit of and bind the respective successors, heirs, representatives and permitted assigns of the Parties.

**9.5 Governing Law and Jurisdiction**. This Agreement shall be governed by the terms and conditions set forth in Section 15.13 of the PSA, which shall apply mutatis mutandis to this Agreement.

**9.6 Notices**. Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

| **If to Recipient:** | **If to Provider:** |
|---|---|
| Anadarko Energy Services Company<br>Attention: Tammy Campbell<br>9950 Woodloch Forest Drive<br>12th Floor<br>The Woodlands, TX 77380<br>Email: Tammy.Campbell@anadarko.com | SN EF Maverick, LLC<br>Attention: Scott Wike<br>1000 Main Street<br>Suite 3000<br>Houston, TX 77002<br>Email: swike@sanchezog.com |

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person provided such delivery is received by 5:00 p.m. on a Business Day, and if not the next Business Day, (ii) on the next Business Day after placed with an overnight delivery service when designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the receipt of such facsimile as evidenced by the sending Party's proof of successful transmission, provided that such facsimile is received at Recipient's location by 5:00 p.m. on a Business Day, and if not, by the next Business Day. Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States, but such notice shall not be effective until ten (10) Days' after such notice is provided to the other Party in the manner set forth hereinabove.

**9.7 Authority to Execute**. Each of the Parties to this Agreement represents and warrants that, as of the Effective Date, (i) it has full and complete authority to enter into and perform this

Case 4:22-cv-03085 Document 68-14 Filed in TXSD on 08/24/22 Page 14 of 19

Agreement; (ii) the person who executes this Agreement on its behalf has full and complete authority to do so and is empowered to bind it thereby; and (iii) it is not insolvent and has not sought protection from its creditors in Bankruptcy and is not otherwise the subject of Bankruptcy.

**9.8** **<u>Miscellaneous</u>**. This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Each Party's delivery of an executed counterpart signature page by facsimile or e-mail is as effective as executing and delivering this Agreement in the presence of the other Party. The headings and subheadings contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement between the Parties and shall not be used to construe or interpret the provisions of this Agreement. Each provision of this Agreement is intended to be severable. If any provision of this Agreement is determined to be illegal, invalid or unenforceable, for any reason, then, insofar as is practical and feasible, the remaining portions of this Agreement shall be deemed to be in full force and effect as if such invalid provision was not contained herein. Except as expressly otherwise provided in this Agreement, all covenants, indemnities, representations, warranties, acknowledgments, agreements, rights and obligations of the Parties under this Agreement, that are capable of having effect after the termination of this Agreement for any reason, shall survive and remain in full force and effect beyond, and not be affected by, the termination of this Agreement.

**9.9** **<u>Waiver</u>.** One or more waivers of any provision of this Agreement by a Party shall not be construed as a waiver of a subsequent breach or requirement of the same provision, and the consent by a Party to or approval of any act or omission by a Party requiring the other Party's consent or approval shall not be deemed to waive or render unnecessary such other Party's consent to or approval of any subsequent similar act or omission by such Party. Any and all waivers of this Agreement shall only be binding on a Party to the extent that the waiver is in writing.

**9.10** **<u>Entirety and Amendments</u>**. This Agreement constitutes the entire agreement between the Parties regarding the services to be provided under this Agreement, and supersedes and replaces any prior and contemporaneous communications, understandings and agreements between Recipient and Provider related to such subject matter, whether written or verbal, express or implied. No modification, amendment, supplementation or alteration of the terms and provisions of this Agreement shall be or become effective except by written amendment executed by the duly authorized representative of the Parties.

**9.11** **<u>Definitions</u>.** To the extent that any defined terms used in this Agreement are not otherwise defined herein, they shall have the definition set forth in the PSA.

**9.12** **<u>Confidentiality</u>**. Section 12.2 of the PSA shall apply mutatis mutandis to this Agreement.

**9.13** **<u>Conspicuousness</u>**. The Parties agree that provisions in this Agreement in "bold" or "all caps" type satisfy any requirements of the "express negligence rule" and any other requirements at law or in equity that provisions be conspicuously marked or highlighted.

**9.14 Laws.** The Parties agree to comply with all Laws applicable to this Agreement and the services provided hereunder, and Recipient agrees that it shall not require or request Provider to perform any action that is in violation of applicable Laws or omit to perform any action that Provider reasonably believes is required under applicable Laws.

**9.15 Standard of Care/Performance.** Provider shall perform all services to be provided in all material respects in accordance with applicable Laws and applicable contracts, and with respect to the Commodity Contract(s) and the Transportation Agreement(s) in a manner which is similar in nature, quality and timeliness to the manner in which such services were provided by Recipient's personnel immediately prior to the Closing. The services shall be performed with the standard of care, skill, prudence and diligence normally provided by a reasonably prudent operator in the performance of similar services in similar jurisdictions in the oil and gas industry.

**9.16 Sanchez Anadarko Contracts.** Provider and Recipient shall enter into the Sanchez Anadarko Contracts on terms and conditions materially consistent with the Commodity Contract(s) to which they apply (i.e., being entered into to avoid warranty of title issues), it being the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Sanchez Anadarko Contracts, any and all gap risk shall be borne by Provider. Provided, further, than in instances where the Sanchez Anadarko Contracts are being entered into to avoid title warranty issues related to Transportation Agreements(s) which do not also involve an associated Commodity Contract(s), the terms and conditions of the Sanchez Anadarko Contract shall be based on industry standard terms and conditions (e.g., NAESB with no Special Provisions, Recipient's Paper (e.g., crude oil purchases and sales); provided, however, that any and all contractual gap risk between Provider's contract(s) with any subsequent downstream purchaser(s) of such Hydrocarbons shall be borne exclusively by Provider.

**9.17 Survival.** All remedies set forth in Section 8.2, and the provisions of Sections 3.4, 3.5, and 3.6 shall survive the termination of this Agreement until the expiration of the applicable statute of limitations.

**9.18 SN Parent Guaranty.** For good and valuable consideration, and to induce Recipient to enter into this Agreement, SN Parent hereby absolutely, unconditionally and irrevocably guarantees to Recipient the punctual and complete performance of all obligations of Provider under this Agreement (the "Obligations"). The guaranty set out in this Section 9.18 (the "SN Parent Guaranty") shall remain in full force and effect until Provider has fully discharged all of the Obligations. Upon default by Provider of any of the Obligations, Recipient may proceed directly against SN Parent without proceeding against Provider or any other Person or pursuing any other remedy. Recipient may, without notice to, or consent of, SN Parent, (a) extend or alter, together with Provider, the time, manner, place or terms of payment or performance of the Obligations, (b) waive, or, together with Provider, amend the terms of this Agreement, (c) release Provider from any or all of the Obligations, or (d) release any other guaranty or security for the Obligations, without in any way releasing or discharging SN Parent from liability hereunder. SN Parent waives any defenses (but not rights of set-off or counterclaims) which it may have with respect to the performance of the Obligations, other than defenses that Provider would have under the terms of this Agreement. SN Parent further waives notice of the acceptance of this SN Parent Guaranty, presentment, demand, protest, and notices of protest,

nonpayment, default or dishonor of the Obligations. SN Parent represents and warrants that (x) it has the full power and authority to enter into and perform the SN Parent Guaranty, (y) there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to SN Parent's knowledge, threatened against SN Parent, and SN Parent is not insolvent or generally not paying its debts as they become due, and (z) the execution, delivery and performance by SN Parent of this SN Parent Guaranty has been duly and validly authorized and approved by all necessary corporate action on the part of SN Parent, and this SN Parent Guaranty constitutes the legal, valid and binding obligation of SN Parent, enforceable against SN Parent in accordance with its terms.

[*Signature page follows*]

IN WITNESS WHEREOF, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** ______________________

**Name:** Brian T. Kuck
**Title:** Vice President

**Date:** 6-1-17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** ______________________
**Name:** Brian T. Kuck
**Title:** Vice President

**Date:** 6-1-17

[*Signature Page to Midstream Agency Agreement*]

**SN EF MAVERICK, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SANCHEZ ENERGY CORPORATION**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

# EXHIBIT A

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| | Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| 9142-100 | Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |

# EXHIBIT 15

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**SN EF UnSub LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

______________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF UnSub GP, LLC, the general partner of SN EF UnSub LP, a Delaware limited partnership, on behalf of said partnership.

______________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

______________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

**All of Producer's right, title and interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce gas therefrom located in Maverick, Webb, Dimmit and LaSalle Counties, Texas, including the instruments listed on the attached Exhibit A.**

# EXHIBIT 16

**RATIFICATION AND ASSUMPTION AGREEMENT**

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case solely with respect to Producer's Share of such representations and warranties and obligations and subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, or otherwise satisfy Producer's Share of such payment or obligation; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

Case 22-03035 Document 68-36 Filed in TXSB on 06/24/22 Page 3 of 13

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Termination. This Agreement shall terminate in its entirety upon the earlier to occur of (i) termination of GGPA, or (ii) the mutual written agreement between Parties. Upon termination Producer shall not have any further obligations or liability under this Agreement beyond that prescribed in the GGPA.

10. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Eagle Ford TX LP**

By:________________________________
Name: Joohyo Lee
Title: Treasury and Commercial Manager

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Case 4:23-03085 Document 68-1 Filed in TXSB on 08/24/23 Page 1 of 13

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**Eagle Ford TX LP**

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by ________________, _____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by ________________, _____________ of Eagle Ford TX LP, a Texas limited partnership, on behalf of said partnership.

_____________________________________
Notary Public, State of Texas

STATE OF ____________________
COUNTY OF ____________________

This instrument was acknowledged before me on ____________, 2018 by ________________, _____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_____________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 17

## RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as such term is defined in the GGPA). In addition, if Carnero seeks payment directly from Producer as

permitted in Section 5.8(c) of the GGPA, Producer will have the rights provided in Sections 5.10 and 5.11 of the GGPA to dispute such invoices and audit the records applicable to such invoices.

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: [signature]
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Venado EF L.P.**

By:____________________________
Name:
Title:

**Carnero G&P LLC**

By:____________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By: Venado EF GP LLC, its general partner

By:______________________________
Name: Stacy L. Shivers
Title: Vice President – Operations

**Carnero G&P LLC**

By:______________________________
Name:
Title:

Case 4:23-cv-00587 Document 1-11 Filed 04/19/23 in TXSD Page 75 of 80

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Venado EF L.P.**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

______________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Venado EF L.P., a Delaware limited partnership, on behalf of said partnership.

______________________________________
Notary Public, State of Texas

STATE OF ____________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

______________________________________
Notary Public, State of _____________