# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 18

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is dated May 22, 2018, to be effective as of April 1, 2018, by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

Case 4:22-cv-03587 Document 38-1 Filed on 06/14/23 in TXSD Page 3 of 12

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

Case 4:22-cv-03035 Document 68-3 Filed in TXSD on 08/24/22 Page 5 of 12

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name: David E. Roberts Jr.
Title: Chief Executive Officer

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

Case 4:22-cv-03035 Document 38-1 Filed in TXSB on 08/24/22 Page 8 of 12

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is dated May ____, 2018, to be effective as of April 1, 2018 (the "Effective Date"), by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

Case 4:22-cv-30058 Document 3-18 Filed in TXSB on 07/24/22 Page 9 of 12

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Case 22-03005 Document 68-3 Filed in TXSB on 06/24/22 Page 10 of 12

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ____________________________________
Name:
Title:

**Gavilan Resources, LLC**

By: ____________________________________
Name:
Title:

**Carnero G&P LLC**

By: ____________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of _____________

Case 4:22-cv-00537 Document 1-1 Filed 01/06/22 Page 12 of 120

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED ACREAGE**

**Maverick, Webb, Dimmit and LaSalle Counties, Texas**

**The area circled in red in the below diagram**



# EXHIBIT 19

MEPTX
Mitsui E&P Texas LP

SN EF Maverick, LLC
1000 Main St. Suite 3000
Houston, TX 77002
Attn: John Happ

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: Patrick McDonie

Attn: Mr. John Happ and Mr. Patrick McDonie

RE: Retained Take-In-Kind Rights of Mitsui E&P Texas LP in Volumes Committed to the Raptor Gas Processing Facility in La Salle County, Texas

This Letter Agreement ("Agreement") is hereby entered into by and among Mitsui E&P Texas LP, a Texas Limited Partnership ("Mitsui") and SN EF Maverick, LLC, a Delaware Limited Liability Company ("Sanchez") and Carnero G&P LLC, a Delaware Limited Liability Company ("Carnero"), dated this ___ day of April, 2018 and effective as of April 1, 2018 ("Effective Date"). Mitsui, Sanchez and Carnero may be referred to herein individually as "Party", or collectively as "Parties.

Whereas, Mitsui and Sanchez are now parties to that certain Maverick Natural Gas Liquids Marketing Agreement dated effective January 1st, 2012, and that certain Maverick Residue Gas Marketing Agreement dated effective January 1st, 2012 (the "PMAs"), and said PMAs give broad powers to Sanchez as a marketer of Mitsui's share of gas and natural gas liquids (collectively, "Products") produced from the contract areas of seventeen joint operating agreements to which both Mitsui and Sanchez are parties ("Comanche Area"), and said marketing powers include the ability to enter into certain contracts with third parties covering the gathering, treating, processing, transportation, etc., of Mitsui's Products ("Commitment Agreements").

Whereas, if Mitsui rejects a Commitment Agreement per the PMAs, then said Commitment Agreement is deemed a "Rejected Commitment Agreement" under the PMAs, and Mitsui retains the right to take-in-kind its Products as to any excess volumes over and above the volumes committed pursuant to that particular Rejected Commitment Agreement.

Whereas, Sanchez is now considering entering into a Firm Gas Gathering Processing and Purchase Agreement with Carnero for gas produced from the Comanche Area ("the FGGPPA"), and the FGGPPA would be considered a new Commitment Agreement under the PMAs requiring a written election by Mitsui to either approve or reject the FGGPPA.

Whereas, prior to the inception of the FGGPPA, Mitsui rejected a Commitment Agreement dated September 1st, 2016 committing an aggregate of 299,000 MMBtus/day in volumes in the Comanche Area to the Brasada gas processing plant currently owned by WGR Operating, LP in La Salle County, Texas, resulting in Mitsui's ability to take its Products in-kind as to any volumes in excess of the 299,000 MMBtus/day committed to the Brasada plant ("Mitsui Excess Production").

Now, therefore, in consideration of the premises and covenants contained herein, the Parties hereby agree as follows:

1. In accordance with the election procedures provided for in the PMAs, Mitsui shall hereby agree to grant in writing via a ballot its consent to, and acceptance of, Sanchez entering into the FGGPPA with Carnero, resulting in the FGGPPA becoming a Commitment Agreement under the PMAs. However, irrespective of the FGGPPA's status as an accepted Commitment Agreement under the PMAs and of any terms of the PMAs to the contrary, subject to Paragraph 2. below, Mitsui shall retain its right to take the Mitsui Excess Production in-kind throughout the "Initial Term" of the FGGPPA (as said term is defined in the FGGPPA).

2. Notwithstanding Mitsui's retained right to take the Mitsui Excess Production in-kind pursuant to Paragraph 1. above, and subject to Paragraph 3. below, Mitsui hereby agrees and promises to not exercise its right to take the Mitsui Excess Production in-kind during the entire Initial Term of the FGGPPA, to the extent such Mitsui Excess Production would be dedicated to the FGGPPA under the terms thereof as if Mitsui had ratified the FGGPPA as a Comanche Producer (as defined in the FGGPPA).

3. It is hereby understood by the Parties that if, during the Initial Term, the FGGPPA is subsequently amended or the terms thereof waived by Sanchez and Carnero without Mitsui's prior written consent (but excluding elections or actions expressly contemplated by Section 2.1 (to the extent providing for connection of Additional CGPs, new wells or Released Wells within the Dedicated Acreage), Section 3.1 (to the extent providing for releases of volumes of Gas), Section 3.3(a) (to the extent authorizing reductions in MDQ), Section 3.7 (relating to ethane rejection/recovery elections), Section 5.9 (to the extent providing for annual adjustments in fees), Section 10.1(c) (to the extent providing for modification of specifications based upon specifications of Redelivery Pipelines or T2 Pipeline) and Section 10.4(b)(vii) (to the extent adopting revised GPA standards) of the FGGPPA), and said amendment or waiver is:

a. Adverse or disadvantageous to Mitsui's interests or the marketing of Mitsui's Products as determined by Mitsui in its reasonable discretion, when such amendment or waiver addresses:

i. Fees (other than implementation of the existing annual adjustment in Section 5.9);

ii. Purchase price for Plant Products, Additional Plant Products and Condensate;

iii. Imbalance cash out arrangements and the Cashout Price;

iv. Treatment of disputed billing statements and audit rights;

v. Plant Products, Additional Plant Products and Condensate allocation procedures in Exhibit C;

vi. Change to the Dedicated Acreage (other than as a result of lease termination);

vii. Elimination of any Receipt Point or Delivery Point;

viii. Change to the Maximum Daily Quantity, or Maximum Receipt Capacity for any Receipt Point, other than pursuant to Section 3.3;

ix. Alteration of Carnero's obligations described in Section 3.2 or 11.5;

x. Procedures, costs and standards for connection of new wells and Additional CGPs as set out in Section 2.1;

xi. Producer's reservations in Section 2.3;

xii. Treatment of Subject Volumes not accepted, as described in Section 3.1(c) or Producer's Gas volumes not accepted as a result of Force Majeure or other reasons under Sections 3.1(d), (e) and (f) and Section 11.4, or otherwise;

xiii. Priorities, whether under Section 3.3(b), Section 3.5, or otherwise; or

xiv. Term of the Agreement; or

b. materially adverse or materially disadvantageous to Mitsui's interests or the marketing of Mitsui's Products in cases other than those set forth in Paragraph 3(a),

(each such amendment or waiver, an "Amendment"), then Sanchez and Carnero may proceed with the Amendment; however Paragraph 2. above shall no longer have any force or effect, and Mitsui shall again have the right to take the Mitsui Excess Production in-kind. This right to take-in-kind by Mitsui shall take effect sixty (60) days from the effective date of any Amendment which Mitsui did not consent to in writing. Notwithstanding the preceding, before exercising its right to take in kind under this Agreement, Mitsui shall send notice to Sanchez and Carnero, and Sanchez and Carnero shall have thirty (30) days following receipt of notice (which may fall within the sixty (60) day period noted above) in which to retract the Amendment, revise the Amendment so it does not apply in any manner to Mitsui and Mitsui's Products, or reach an alternate solution accepted by Mitsui in writing, in which case the right to take in kind shall no longer apply with respect to that specific Amendment (without prejudice to Mitsui's rights with respect to any subsequent proposed amendment or waiver). If sixty (60) days have passed since the effective date of the relevant Amendment, and the thirty (30) day cure period for Sanchez and Carnero under the preceding sentence has passed

Case 22-90035 Document 83-19 Filed in TXSB on 08/24/22 Page 5 of 9

without resolution, then Mitsui is free to commence taking the Mitsui Excess Production in kind, notwithstanding any provisions of the PMAs to the contrary..

4. Provided that the consent requirement of Paragraph 3. above is complied with at all times, in the event the PMAs expire, in whole or in part, prior to the expiration of the Initial Term of the FGGPPA, then Mitsui agrees that Sanchez can continue to market Mitsui's Products to the extent necessary and required by the FGGPPA throughout the entire Initial Term of the FGGPPA and Mitsui will execute a mutually-acceptable form of agreement with Sanchez providing for such rights.

5. Provided that the consent requirement of Paragraph 3. above is complied with at all times, Mitsui agrees that, without prejudice to any other rights it may have against Sanchez for any default or failure to perform its duties and obligations under the PMAs with respect to the FGGPPA ("Default"), Mitsui will not suspend deliveries of gas under, or otherwise suspend performance under, or terminate, any PMA in a manner that would impact Sanchez's performance of or ability to perform its then-existing commitments under the FGGPPA due to any default by Sanchez that is capable of being cured by Carnero without first notifying Carnero in writing of the details of any such Default with reasonable specificity, providing Carnero a copy of the applicable PMA, and providing Carnero 30 days (or in the case of a payment default, 10 business days) following Carnero's receipt of such notice to cure such Default on behalf of Sanchez. If Carnero, in its sole discretion, cures the Default within such 30-day (or in the case of a payment default, 10 business day) period in accordance with the terms of the applicable PMA, the Default will be deemed cured in accordance with the applicable PMA and Mitsui will not have any further right (to the extent arising due to that cured Default) to suspend performance under, or otherwise terminate, the applicable PMA.

6. So long as Mitsui is not exercising its right to take Mitsui Excess Production in-kind and the FGGPPA is still in effect, Carnero agrees that, without prejudice to any other rights it may have in respect of any default by Sanchez under the FGGPPA, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA in a manner that would impact Mitsui's production, marketing and sale of Products, or ability to produce, market and sell Products, due to any default by Sanchez that is capable of being cured by Mitsui without first notifying Mitsui in writing of the nature and details of such default with reasonable specificity and providing Mitsui 30 days (or in the case of a payment default, 10 business days) following Mitsui's receipt of such notice to cure such default, including the right to step into the position of Sanchez and assume the obligations and responsibilities of Sanchez hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share of such responsibilities and obligations. If Mitsui, in its sole discretion, cures the default within such 30 day (or in the case of a payment default, 10 business day) period in accordance with the terms of the FGGPPA, then as to Mitsui, the default will be deemed cured in accordance with the FGGPPA and Sanchez and Carnero will not (to the extent arising due to the cured default) suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA with respect to Mitsui's Producer's Share. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Comanche

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:____________________

Its: SVP & COO

Dated: May 9th, 2018

SN EF Maverick, LLC

By:____________________

Its:____________________

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:__________________________

Its:__________________________

Dated:________________________

SN EF Maverick, LLC

By: Antonio R. Sanchez, III

Its: Chief Executive Officer

Dated:______________________________

Carnero G&P LLC

By:__________________________________

Its:__________________________________

Dated:______________________________

Dated:____________________________

Carnero G&P LLC

By: [signature] GPS

Its: President

Dated:____________________________

# EXHIBIT 20

# (FILED UNDER SEAL)

# EXHIBIT 21

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**NOTICE OF FILING OF ASSET AND PURCHASE AGREEMENT**

**PLEASE TAKE NOTICE** that, on October 16, 2020, the Court entered the *Order (A) Approving Sale of Debtors' Assets, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 361] (the "**Sale Order**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file, in accordance with the Sale Order, the final and executed Asset and Purchase Agreement between the Debtors and Mesquite Energy, Inc., attached hereto as **Exhibit A**.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Dated: October 16, 2020
Houston, Texas

*/s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Brenda Funk (24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com
Brenda.Funk@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Garrett A. Fail (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Ray.Schrock@weil.com
Garrett.Fail@weil.com

*Attorneys for Debtors and Debtors in Possession*



010454

## Certificate of Service

I hereby certify that on October 16, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

# Exhibit A

## Asset and Purchase Agreement

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 16, 2020**

**by and between**

**GAVILAN RESOURCES, LLC and**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC,**

**as Sellers**

**and**

**MESQUITE ENERGY, INC.,**

**as Buyer**

# TABLE OF CONTENTS


Page

**ARTICLE I DEFINITIONS** ....................................................................................1

Section 1.01 *Definitions* ....................................................................................1

**ARTICLE II PURCHASE AND SALE** ....................................................................................1

Section 2.01 *Purchase and Sale of the Assets* ....................................................................................1
Section 2.02 *Excluded Assets* ....................................................................................4
Section 2.03 *Consideration* ....................................................................................5
Section 2.04 *Adjustments to the Purchase Price* ....................................................................................5
Section 2.05 *Closing* ....................................................................................10
Section 2.06 *Final Settlement Statement* ....................................................................................12
Section 2.07 *Post-Closing Payments* ....................................................................................14
Section 2.08 *No Duplicative Effect; Methodologies* ....................................................................................14
Section 2.09 *Purchase Price Deposit* ....................................................................................15
Section 2.10 *Division of Hydrocarbons* ....................................................................................15
Section 2.11 *Division of Expenses; Burdens* ....................................................................................16
Section 2.12 *Preferential Purchase Rights* ....................................................................................16
Section 2.13 *Consents to Assign* ....................................................................................17
Section 2.14 *Consents for Leases and Purchased Contracts* ....................................................................................19
Section 2.15 *Assets Sold "As Is, Where Is"* ....................................................................................19
Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos* ....................................................................................20

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS** ....................................................................................20

Section 3.01 *Organization* ....................................................................................20
Section 3.02 *Authority and Authorization* ....................................................................................20
Section 3.03 *Enforceability* ....................................................................................21
Section 3.04 *Conflicts* ....................................................................................21
Section 3.05 *Material Contracts* ....................................................................................21
Section 3.06 *Approvals* ....................................................................................23
Section 3.07 *Environmental Matters* ....................................................................................23
Section 3.08 *Well Status* ....................................................................................24
Section 3.09 *Imbalances* ....................................................................................24
Section 3.10 *Litigation* ....................................................................................24
Section 3.11 *Hedging* ....................................................................................24
Section 3.12 *Intellectual Property* ....................................................................................25
Section 3.13 *Insurance Coverage* ....................................................................................25
Section 3.14 *Taxes* ....................................................................................25
Section 3.15 *Letters of Credit* ....................................................................................25
Section 3.16 *Outstanding Obligations* ....................................................................................25
Section 3.17 *Preferential Purchase Rights* ....................................................................................26
Section 3.18 *Broker* ....................................................................................26
Section 3.19 *[Reserved]* ....................................................................................26
Section 3.20 *Working Interest Payments* ....................................................................................26

Section 3.21 *[Reserved]* ....26
Section 3.22 *[Reserved]* ....26
Section 3.23 *FCPA; Sanctions* ....26

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ....27**

Section 4.01 *Organization* ....27
Section 4.02 *Authorization and Authority* ....27
Section 4.03 *Enforceability* ....27
Section 4.04 *Conflicts* ....27
Section 4.05 *Broker* ....27
Section 4.06 *Financial Ability* ....28
Section 4.07 *Approvals* ....28
Section 4.08 *Litigation* ....28
Section 4.09 *Bankruptcy* ....28
Section 4.10 *Investor Status; Investigation* ....28
Section 4.11 *Qualification* ....29
Section 4.12 *No Other Representations* ....29

**ARTICLE V COVENANTS OF SELLERS ....30**

Section 5.01 *Operating Covenants* ....30
Section 5.02 *Operatorship* ....31
Section 5.03 *Assumption and Rejection of Executory Contracts and Leases* ....32
Section 5.04 *Access.* ....34

**ARTICLE VI COVENANTS OF BUYER ....35**

Section 6.01 *Access; Data Retention* ....35

**ARTICLE VII COVENANTS OF BUYER AND SELLERS ....36**

Section 7.01 *Commercially Reasonable Efforts; Further Assurances* ....36
Section 7.02 *Bankruptcy Proceedings* ....36
Section 7.03 *Public Announcements* ....38
Section 7.04 *Confidentiality* ....39
Section 7.05 *Audits and Other Tax Proceedings* ....39
Section 7.06 *Employee Matters* ....39
Section 7.07 *Tax Matters; Apportionment of Tax Liability* ....40
Section 7.08 *Supplemental Disclosures* ....42
Section 7.09 *Replacement of Existing Letters of Credit* ....42

**ARTICLE VIII CONDITIONS TO CLOSING ....43**

Section 8.01 *Conditions to Obligations of Buyer and Sellers* ....43
Section 8.02 *Conditions to Obligation of Buyer* ....43
Section 8.03 *Conditions to Obligation of Sellers* ....44

**ARTICLE IX TERMINATION ....44**

Section 9.01 *Grounds for Termination* ....44
Section 9.02 *Effect of Termination* ....46

**ARTICLE X CASUALTY LOSS** .......... **49**

Section 10.01 *Casualty Loss* .......... 49

**ARTICLE XI RESERVED** .......... **49**

**ARTICLE XII RESERVED** .......... **49**

**ARTICLE XIII SURVIVAL AND INDEMNIFICATION** .......... **49**

Section 13.01 *Survival; Limited Recourse Against Sellers* .......... 49
Section 13.02 *Indemnification by Buyer* .......... 50
Section 13.03 *Indemnification Procedures* .......... 51
Section 13.04 *Express Negligence* .......... 52
Section 13.05 *Tax Treatment of Indemnity Payments* .......... 52
Section 13.06 *Sole and Exclusive Remedy* .......... 52

**ARTICLE XIV MISCELLANEOUS** .......... **52**

Section 14.01 *Notices* .......... 52
Section 14.02 *Amendments and Waivers* .......... 54
Section 14.03 *Expenses* .......... 54
Section 14.04 *Successors and Assigns/Liquidating Trust* .......... 54
Section 14.05 *Governing Law* .......... 54
Section 14.06 *Jurisdiction* .......... 55
Section 14.07 *Waiver of Jury Trial* .......... 55
Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries.* .......... 55
Section 14.09 *Entire Agreement* .......... 55
Section 14.10 *Severability* .......... 55
Section 14.11 *Specific Performance* .......... 56
Section 14.12 *Certain Acknowledgements and Limitations* .......... 56
Section 14.13 *Disclosure Schedules* .......... 56
Section 14.14 *Preparation of Agreement* .......... 57
Section 14.15 *No Recourse* .......... 57

# EXHIBITS, ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES

## Exhibits

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Assignment and Bill of Sale |
| Exhibit C | Form of Assumption Agreement |
| Exhibit D | Form of Seller Certificate |
| Exhibit E-1 | Form of Seller FIRPTA Certificate – Resources |
| Exhibit E-2 | Form of Seller FIRPTA Certificate – ManagementCo |
| Exhibit F | Form of Buyer Certificate |
| Exhibit G | Form of Post-Closing Escrow Agreement |
| Exhibit H | Form of Release Agreement |
| Exhibit I | Special Warranty |

## Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Purchased Contracts |
| Annex D | Permits |

## Schedules

| | |
|---|---|
| Schedule 1.01 | Allocated Values |
| Schedule 2.02(k) | Excluded Contracts and Other Assets |
| Schedule 5.03(a) | 365 Schedule |
| Schedule 5.03(b) | Desired 365 Contracts |
| Schedule 7.06 | Seller Employees |
| Schedule 8.02(d) | Specified Required Consents |

## Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05(a) | Material Contracts |
| Disclosure Schedule 3.05(b) | Material Contract Defaults |
| Disclosure Schedule 3.06(a) | Approvals |
| Disclosure Schedule 3.07 | Environmental Matters |
| Disclosure Schedule 3.08 | Well Status |
| Disclosure Schedule 3.09 | Imbalances |
| Disclosure Schedule 3.10 | Litigation |
| Disclosure Schedule 3.12 | Intellectual Property |
| Disclosure Schedule 3.13 | Insurance Coverage |
| Disclosure Schedule 3.14 | Taxes |
| Disclosure Schedule 3.16 | Outstanding Obligations |

| | |
|---|---|
| Disclosure Schedule 3.17 | Preferential Purchase Rights |
| Disclosure Schedule 3.20 | Working Interest Payments |
| Disclosure Schedule 3.22 | No Violation of Laws |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") dated as of October 16, 2020 (the "Execution Date"), is entered into by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers"). Buyer and Sellers are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## WITNESETH:

**WHEREAS**, on May 15, 2020 (the "Petition Date"), each Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "Bankruptcy Cases");

**WHEREAS**, on June 9**,** 2020, the Bankruptcy Court entered the Bid Procedures Order (which has been further modified as described in the definition thereof);

**WHEREAS**, pursuant to section 363 of the Bankruptcy Code and upon the terms and conditions set forth herein, effective as of the Effective Time, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire from Sellers, the Assets, and, in connection therewith, the Parties desire for Buyer to assume the Assumed Liabilities; and

**WHEREAS**, Sellers' ability and obligation to consummate the Transactions are subject to, among other things, the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 *Definitions*. The capitalized terms used but not defined herein and defined in Exhibit A shall have the meanings set forth in Exhibit A hereto, which is incorporated herein by reference.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01 *Purchase and Sale of the Assets*. Subject to the terms and conditions and for the consideration herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers agree to sell, assign, convey and deliver to Buyer, and Buyer agrees to purchase and acquire from Sellers at the Closing, to the extent permitted under section 363 and 365 of the Bankruptcy Code after giving effect to the Bid Procedures Order and the Sale Order, all of Sellers' right, title and interest in and to the properties and interests described below, other than the Excluded Assets (collectively, the "Assets"):

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Sellers in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Sellers as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Sellers' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties": the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time ("Effective Time Hydrocarbons") and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Sellers to Buyer, and subject to the payment by Buyer of any fees required as a condition to the assignment thereof to Buyer, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided, however,* that (1) Buyer's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement *(provided* that Sellers shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Buyer only to the same extent as such rights are vested in Sellers, and (3) after the Closing, Buyer shall provide Sellers with access to, and Sellers shall have the right to receive copies of, the Data as provided in Article VI;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (collectively, the "Purchased Contracts");

(h) Permits. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights, (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

Section 2.02 *Excluded Assets*. Notwithstanding the foregoing provisions of this Article II, any assets of Sellers that are not described or otherwise identified as Assets in Section 2.01, together with all of the following assets, shall not constitute Assets and shall not be sold, assigned or conveyed to Buyer pursuant to this Agreement (such assets as described herein below, the "Excluded Assets"):

(a) all cash and cash equivalents of Sellers;

(b) all corporate and financial records of Sellers to the extent they relate to Sellers' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Sellers arising under this Agreement;

(f) all of the matters listed on Disclosure Schedule 3.10 (other than (i) item 1 of Disclosure Schedule 3.10 and (ii) item 45 of Disclosure Schedule 3.10 to the extent such item does not relate to the Contracts or other assets listed on Schedule 2.02(k)), and all rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Sellers attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Sellers under Section 7.07;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Sellers' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Schedule 2.02(k);

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Sellers, other than the Equipment;

(o) all assets excluded pursuant to the express terms of this Agreement, including Section 2.12(d), Section 2.13 or Section 5.03;

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 2.01(e), Section 2.01(f)(ii) and Section 2.01(h), in each case, that are not assignable to Buyer pursuant to this Agreement after giving effect to the Bid Procedures Order and the Sale Order (*provided* that Sellers have used commercially reasonable efforts to obtain any necessary consents to assignment with respect thereto in accordance with this Agreement);

(r) all engagements and similar letters and agreements with Sellers' legal advisors, it being agreed that Buyer shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Sellers or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii); and

(t) any assets or properties otherwise expressly identified as Excluded Assets under this Agreement.

Section 2.03 *Consideration*. As consideration for the Assets, Buyer shall pay or deliver to Sellers in accordance with this Agreement, Fifty Million Dollars ($50,000,000.00) in cash (the "Purchase Price") and assume all Assumed Liabilities in accordance with this Agreement. The Purchase Price shall be paid as provided in Section 2.05 and shall be subject to adjustment as provided in Section 2.04, Section 2.06, Section 2.12, Section 2.13 and Section 7.07. The Purchase Price, as increased or reduced, as applicable, in accordance with this Agreement, is referred to as the "Adjusted Purchase Price".

Section 2.04 *Adjustments to the Purchase Price*. Adjustments to the Purchase Price shall be made according to this Section 2.04, as applied in accordance with GAAP (as applied on a basis consistent for the periods covered).

(a) Upward Adjustments. The Purchase Price shall be adjusted upward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses paid or borne by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), whether paid by (or applied as an offset against amounts (including Suspended Revenue Receivables) due and payable to) Sellers prior to the Closing Date or after the Closing Date but prior to the determination of the Adjusted Purchase Price, to the extent attributable to the period on or after the Effective Time; *provided, however,* that to the extent that any Property Expenses would be deemed to be an upward adjustment pursuant to this Section 2.04(a)(i) but such expenses have not been paid by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), no upward adjustment to the Purchase Price shall be made but instead the obligation to perform and pay when due with respect to such Property Expense shall be an Assumed Liability;

(ii) to the extent not covered in Section 2.04(a)(i), an amount equal to all prepaid Property Expenses attributable to the Assets to the extent related to periods on or after the Effective Time that were paid or borne by Sellers as of the Closing, including without limitation, prepaid drilling and/or completion costs, insurance costs through Closing and prepaid utility charges;

(iii) to the extent the proceeds thereof are not received by Sellers or any of their Affiliates as of the Closing Date, an amount equal to the value of Sellers' interest in the Effective Time Hydrocarbons, to be calculated as follows: the value shall be the product of (A) the volume of marketable Effective Time Hydrocarbons (attributable to Sellers' interest) as of the Effective Time as shown by the gauging reports prepared by Sellers as of the Effective Time (absent any manifest errors), *multiplied by* (B) the price that would have been received by Sellers with respect to such Effective Time Hydrocarbons if such Effective Time Hydrocarbons were sold at the Effective Time pursuant to the contract price in effect as of the Effective Time, or, if there is no contract price in effect, the posted price in the field in which such Hydrocarbons were produced in effect as of the Effective Time, in each case, net of the following (without duplication of any such amounts that are taken into account in determining the contract price, if applicable): (1) Non-Income Taxes and Burdens paid or payable out of such proceeds or otherwise borne by Buyer and not taken into account for purposes of Section 2.04(b)(v); and (2) expenses (other than Property Expenses) incurred or payable to Third Parties under Applicable Contracts in earning or receiving such proceeds;

(iv) an amount equal to any Imbalance Adjustment Amount owed to Sellers by a Third Party;

(v) the amount of Non-Income Taxes allocated to Buyer pursuant to Section 7.07 but paid or borne by Sellers or any of their Affiliates;

(vi) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(a)(i) or Section 2.04(a)(ii), the amount of Cure Costs, if any, by which the Purchase Price is to be increased pursuant to Section 5.03, but only to the extent such Cure Costs are Property Expenses which were incurred after the Effective Time;

(vii) [Reserved]; and

(viii) any other adjustment expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(b) Downward Adjustments. The Purchase Price shall be adjusted downward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses attributable to the Assets to the extent related to periods prior to the Effective Time that are actually paid or economically borne by Buyer, including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement;

(ii) an amount equal to all proceeds actually received by Sellers and attributable to the sale of Hydrocarbons produced from or allocable to the Oil and Gas Properties (excluding any Excluded Assets) during the Interim Period, net of the following (without duplication of any such amounts previously deducted from the proceeds paid to Sellers): (A) amounts paid or borne by Sellers as Burdens on such production; (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds; and (C) applicable Non-Income Taxes paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v);

(iii) the Allocated Value of any Oil and Gas Property excluded from the Assets pursuant to Section 2.12(a), Section 2.12(d) or Section 2.13;

(iv) an amount equal to the absolute value of any Imbalance Adjustment Amount owed by Sellers to a Third Party;

(v) the amount of Non-Income Taxes allocated to Sellers or any of their Affiliates pursuant to Section 7.07 but paid or borne by Buyer;

(vi) [Reserved];

(vii) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(b)(i), an amount equal to all Excess Cure Costs, if any, paid or economically borne by Buyer;

(viii) if applicable, the amount of the Suspended Revenue Receivables (provided that either (A) a corresponding increase to the Purchase Price is made for

Property Expenses attributable to periods from and after the Effective Time that are payable by Sellers under the operating agreements under which such Suspended Revenue Receivables are payable or (B) Buyer has paid or economically borne the Property Expenses described in clause (A), including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement, by payment of Cure Costs or otherwise); and

(ix) any other amount expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(c) Tax Adjustments/Apportionment of Prepaid Expense Items; Withholding.

(i) To adjust the Purchase Price for the apportionment of Non-Income Taxes and Tax refunds, the Parties agree to adjust the Purchase Price, downward or upward, as appropriate, pursuant to the provisions of Section 7.07.

(ii) For purposes of the Purchase Price, to the extent not otherwise expressly provided for under Section 2.04(a) and Section 2.04(b), any Property Expenses with respect to the Oil and Gas Properties that are paid or payable on an annual, quarterly, monthly or other regular periodic basis and relate to a period before or after the Effective Time ("Prorated Expense Items") shall be prorated as of the Effective Time and apportioned, such that Buyer will receive the economic benefit or burden, as applicable, of all such items on and after the Effective Time and Sellers shall receive the economic benefit or burden, as applicable, of all such items for the period prior to the Effective Time. After the Closing Date, (x) if Buyer receives any bills or accounts or any reimbursement for prepaid Property Expenses in relation to Prorated Expense Items that are attributable in whole to the period prior to the Effective Time, then Buyer shall promptly forward the same to Sellers (for payment, in the case of any such bills or accounts), (y) if Sellers receive any bills or accounts or any reimbursement for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in whole to the period on or after the Effective Time, then Sellers shall promptly forward the same to Buyer (for payment, in the case of any such bills or accounts) and (z) if Buyer or Sellers receive any bills or accounts or any reimbursements for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in part to the period prior to the Effective Time, and in part to the period on and after the Effective Time, the amount thereof shall be apportioned between Sellers, on the one hand, and Buyer, on the other hand, respectively, as of the Effective Time, based on the number of days in such period falling prior to the Effective Time, on the one hand, and on and after the Effective Time, on the other hand. In the case of bills or accounts referred to in clause (z), the party receiving the same shall be required to pay only such portion of such bill or account for which it is responsible in accordance with this Section 2.04(c)(ii).

(iii) Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Sellers pursuant to this

Agreement such amounts as may be required to be deducted or withheld therefrom under any Applicable Law. The Parties shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any such deduction or withholding. To the extent such amounts are so deducted or withheld, and timely remitted to the applicable Governmental Authority in accordance with Applicable Law, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

(d) Closing Statement.

(i) Sellers shall prepare and deliver to Buyer, not less than five (5) Business Days before the Closing Date, a statement (the "Closing Statement") setting forth the adjustments to the Purchase Price provided in this Section 2.04, using estimates where actual amounts are not known at such time, and Sellers' calculation of the estimated Adjusted Purchase Price; such estimated Adjusted Purchase Price (as such may be modified pursuant to any changes proposed by Buyer and accepted by Sellers) shall be referred to as the "Closing Date Adjusted Purchase Price." The Closing Statement shall be prepared by Sellers in good faith in accordance with this Agreement, including Section 2.08 and shall include reasonable supporting detail for each adjustment or estimate included therein. If Buyer has any questions or disagreements regarding the Closing Statement, then, upon written request by Buyer, at least two (2) Business Days prior to the Closing Date, Sellers and Buyer shall in good faith attempt to resolve any disagreements, and Sellers shall afford Buyer the opportunity to examine the Closing Statement and Sellers' calculation of the Closing Date Adjusted Purchase Price, and shall provide to Buyer such additional supporting schedules, analyses, workpapers or other data on which the Closing Statement is based or from which the Closing Statement is derived as are reasonably requested by Buyer. If (A) Buyer and Sellers agree on changes to the Closing Statement based on such discussions, then the Closing Date Adjusted Purchase Price shall be paid at Closing based on such changes; or (B) Buyer and Sellers do not agree on changes to the Closing Statement, then the Closing Date Adjusted Purchase Price shall be paid at the Closing based on the amounts set forth in the Closing Statement; *provided, however*, that in the case of clause (B), appropriate adjustments to the Purchase Price shall be made after the Closing pursuant to Section 2.06.

(ii) Sellers will include in the Closing Statement Sellers' good faith calculation of the prorations provided for in Section 2.04(c). If final bills or accounts in relation to any Prorated Expense Items referred to in Section 2.04(c) are not available or have not been issued prior to that date for any Prorated Expense Item, Sellers shall estimate the amount of each such item in good faith and in accordance with customary industry practices, and such estimate shall be reflected in the Closing Statement. The amount payable by Buyer at the Closing will be increased or decreased to reflect the net amount owing between the Parties as shown on the Closing Statement, using such estimates where necessary. Final adjustment between the Parties as to any item used in the preparation of the Closing Statement

in accordance with this Section 2.04 shall be made in accordance with Section 2.06 and Section 7.07.

(e) If, prior to Closing, Sellers discover an error in the Imbalances set forth in Disclosure Schedule 3.09, then the Purchase Price shall be adjusted at Closing pursuant to Section 2.04(a)(iv) or Section 2.04(b)(iv), as applicable, and Disclosure Schedule 3.09 will be deemed amended immediately prior to Closing to reflect the Imbalances for which the Purchase Price is so adjusted.

Section 2.05 *Closing*. The closing of the purchase and sale of the Assets, the assumption by Buyer of the Assumed Liabilities and the other transactions contemplated herein (the "Closing") shall take place at the offices Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1700, Houston, Texas 77002, on October 30, 2020 (the "Target Closing Date"); *provided* that, if the conditions to Closing set forth in Article VIII have not yet been satisfied or waived as of the Target Closing Date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), then the Closing shall occur on November 30, 2020 if the conditions to Closing set forth in Article VIII have been satisfied or waived as of such date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), or at such other time or place as Buyer and Sellers may agree in writing. At and as of the Closing:

(a) Pursuant to section 363 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, assign and convey all Assets (other than Excluded Assets) to Buyer Free and Clear;

(b) Buyer shall assume, and from and after the Closing, shall perform and pay when due, all Assumed Liabilities; *provided* that Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any Liability or obligation of Sellers that are not expressly Assumed Liabilities (referred to herein collectively as the "Excluded Liabilities");

(c) Sellers shall deliver (or cause to be delivered) to Buyer the following instruments, each dated as of the Closing Date, properly executed by an authorized officer or representative of each Seller or signatory party thereto and, where appropriate, acknowledged:

(i) executed counterparts to an Assignment and Bill of Sale in the form of Exhibit B (the "Assignment and Bill of Sale") in sufficient counterparts for recording in the real property records in each county where the Oil and Gas Properties are located;

(ii) executed counterparts to letters in lieu of division orders or other appropriate designation of assignment, on forms prepared by Sellers and reasonably acceptable to Buyer, directing all operators of the Oil and Gas Properties and/or purchasers of production to make payment to Buyer of proceeds attributable to production from the Oil and Gas Properties from and after the Effective Time, for

delivery by Buyer to such operators and/or purchasers of production (collectively, the "Letters in Lieu");

(iii) executed counterparts to an Assumption Agreement between Sellers and Buyer in the form of Exhibit C (the "Assumption Agreement");

(iv) executed counterparts to the Post-Closing Escrow Agreement;

(v) a certificate in the form of Exhibit D;

(vi) a certificate in the form of Exhibit E-1 or Exhibit E-2, as applicable;

(vii) an executed counterpart of the Closing Statement;

(viii) duly executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interests over the Assets, in each case, securing indebtedness for borrowed money of Sellers or any of their respective Affiliates;

(ix) the Release Agreement (and Sellers shall cause Gavilan Resources Holdings, LLC and Gavilan Resources HoldCo, LLC to execute and deliver a counterpart of the Release Agreement to Buyer at the Closing); and

(x) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Sellers at or prior to the Closing;

(d) Buyer shall deliver to Sellers executed counterparts of the following instruments each dated as of the Closing Date, properly executed by an authorized officer or representative of Buyer and, where appropriate, acknowledged:

(i) a certificate in the form of Exhibit F;

(ii) the Assignment and Bill of Sale;

(iii) the Assumption Agreement;

(iv) the Post-Closing Escrow Agreement;

(v) the Letters in Lieu;

(vi) an executed counterpart of the Closing Statement;

(vii) the Release Agreement (and Buyer shall cause SN EF Maverick to execute and deliver a counterpart of the Release Agreement to Sellers at the Closing); and

(viii) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Buyer at or prior to the Closing; and

(e) Buyer shall deliver an amount equal to the Closing Date Adjusted Purchase Price, *less* the amount of the Deposit Escrow Funds, by wire transfer of immediately available funds, to one or more accounts designated by Sellers.

Section 2.06 *Final Settlement Statement.*

(a) As soon as practical and, in any event, no later than ninety (90) calendar days after the Closing Date, Resources shall prepare and deliver to Buyer a statement (the "Final Settlement Statement") setting forth the adjustments to the Purchase Price in accordance with Section 2.04. The Final Settlement Statement shall be prepared in good faith in accordance with this Agreement and on a basis consistent with the preparation of the Closing Statement as described in Section 2.04(d), and shall set forth Resources' calculation of the Adjusted Purchase Price and include reasonable supporting detail for each adjustment included therein.

(b) Following the delivery of the Final Settlement Statement, Resources shall afford Buyer the opportunity to examine the Final Settlement Statement and Resources' calculation of the Adjusted Purchase Price, and such supporting schedules and analyses as are reasonably necessary and appropriate in connection with such review. Resources shall cooperate with Buyer in such examination, including responding to questions asked by Buyer, and Resources shall make available to Buyer any records under Sellers' control or otherwise available to Sellers that are requested by Buyer in connection with such review.

(c) If, within fifteen (15) calendar days following delivery of the Final Settlement Statement to Buyer, Buyer has not delivered to Resources written notice (the "Objection Notice") of Buyer's objections to the Final Settlement Statement or Resources' calculation of the Adjusted Purchase Price (which Objection Notice in order to be valid must contain a statement describing in reasonable detail the items objected to, the basis of such objections and Buyer's calculation of the amount(s) for the items objected to that Buyer asserts should be used for purposes of the Final Settlement Statement), then the Adjusted Purchase Price as set forth in such Final Settlement Statement shall be deemed final and conclusive. In addition, any of Resources' calculations of the Adjusted Purchase Price as set forth in the Final Settlement Statement which are not objected to in the Objection Notice shall be deemed final and conclusive.

(d) If Buyer delivers the Objection Notice satisfying Section 2.06(c) above, within such fifteen (15)-day period, then Resources and Buyer shall endeavor in good faith to resolve the objections of Buyer set forth in the Objection Notice for a period not to exceed fifteen (15) calendar days from the date of delivery of the Objection Notice. If at the end of such fifteen (15)-day period there are any objections that remain in dispute, then either Buyer or Resources may require by written notice to the other that the remaining objections in dispute be submitted for resolution to an independent accounting firm to be selected jointly by Buyer and Resources within the ten (10) calendar days following a written request by Buyer or Resources or, if Buyer and Resources are unable to mutually agree within such ten (10)-day period, such accounting firm shall be the Houston, Texas office of PricewaterhouseCoopers ("PwC") (such jointly selected

accounting firm or PwC (the "Referee"). The Referee's engagement shall be limited to the resolution of disputed amounts set forth in the Final Settlement Statement that have been identified by Buyer in the Objection Notice, which resolution shall be in accordance with this Agreement and no other matter relating to the Final Settlement Statement shall be subject to determination by the Referee except to the extent affected by resolution of the disputed amounts. In connection with the engagement of the Referee, each of Buyer and Resources shall execute any engagement, indemnity and other agreement as the Referee shall require as a condition to such engagement. If PwC is unable or unwilling to serve as the Referee and Buyer and Resources are unable to agree upon the designation of a Person as substitute arbitrator, then Buyer or Resources, or either of them, may in writing request the Bankruptcy Court to appoint the substitute referee; *provided* that such Person so appointed shall be a national or regional accounting firm with no current or prior material relationships with Buyer or Sellers or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities.

(e) The Referee shall determine such items of the calculation of the Adjusted Purchase Price as are disputed within thirty (30) calendar days after the objections that remain in dispute are submitted to it.

(f) If any disputed items are submitted to the Referee for resolution, (i) each of Buyer and Resources shall furnish to the Referee such workpapers and other documents and information relating to such disputed items as the Referee may request and are available to that Party or its Affiliates (or its independent public accountants) and will be afforded the opportunity to present to the Referee any materials relating to the determination of the matters in dispute and to discuss such determination with the Referee prior to any written notice of determination hereunder being delivered by the Referee; (ii) the Referee shall not assign a value to such objection that is greater than the greatest value for such objection claimed by either Party or less than the smallest value for such objection claimed by either Party; (iii) the determination by the Referee of items of the calculation of the Adjusted Purchase Price, as applicable, as set forth in a written notice delivered to Resources and Buyer by the Referee, shall be made in accordance with this Agreement and shall be binding and conclusive on the Parties and shall constitute an arbitral award that is final, binding and unappealable (absent manifest error or fraud) and upon which a judgment may be entered by a court having jurisdiction thereof; and (iv) the fees and expenses of the Referee (the "Audit Fees") shall be paid by and apportioned one-half by Buyer and one-half by Sellers.

(g) Upon agreement of Buyer and Resources to the Adjusted Purchase Price set forth in the Final Settlement Statement, or upon final determination by the Referee of the disputed items set forth in the Objection Notice, as the case may be (such date of determination being the "Cut-Off Date"), the Final Settlement Statement (as adjusted pursuant to such agreement or determination by the Referee) will be deemed final and binding on the Parties. From and after the Closing Date, Sellers (and, after formation of a Liquidating Trust, if applicable, the Liquidating Trustee) shall retain in the Post-Closing Escrow Account a portion of the Closing Date Adjusted Purchase Price equal to the greater of (x) an amount equal to five percent (5%) of the unadjusted Purchase Price or (y) any unresolved amounts with respect to the Closing Statement disputed by Buyer in good faith in accordance with Section 2.04(d) (as applicable, the "Settlement Statement Escrow Amounts") as a cash reserve for the express purpose of fulfilling Sellers' obligations under this Section 2.06 and Section 2.07, and any claims against the Special Warranty, until the Cut-Off

Date and, if a payment is due by Sellers pursuant to Section 2.07(b), the date that such payment is made pursuant to Section 2.07(b).

Section 2.07 *Post-Closing Payments.*

(a) If the Closing Date Adjusted Purchase Price is less than the Adjusted Purchase Price determined in accordance with Section 2.06 (the amount by which the Adjusted Purchase Price exceeds the Closing Date Adjusted Purchase Price herein referred to as the "Closing Amount Shortfall"), then (i) Buyer shall pay to Sellers the amount of the Closing Amount Shortfall within five (5) Business Days of the final determination of the Adjusted Purchase Price in accordance with Section 2.06 and (ii) Sellers and Buyer shall jointly instruct the Escrow Agent to disburse to Sellers from the Post-Closing Escrow Account all of the Settlement Statement Escrow Amounts.

(b) If the Adjusted Purchase Price determined in accordance with Section 2.06 is less than the Closing Date Adjusted Purchase Price (the amount by which the Closing Date Adjusted Purchase Price exceeds the Adjusted Purchase Price herein referred to as the "Closing Amount Overpayment"), then Sellers and Buyer shall jointly instruct the Escrow Agent to disburse from the Post-Closing Escrow Account (i) to Buyer, a portion of the Settlement Statement Escrow Amounts equal to the Closing Amount Overpayment and (ii) if the Closing Amount Overpayment is less than the Settlement Statement Escrow Amounts, to Sellers the remaining portion of the Settlement Statement Escrow Amounts. Notwithstanding anything in this Agreement to the contrary, in no event shall Sellers be liable to Buyer for any Closing Amount Overpayment or any claims against the Special Warranty for any amounts other than out of amounts in the Post-Closing Escrow Account.

(c) Sellers shall pay to Buyer, and Buyer shall pay to Sellers, as applicable, any post-Closing payments as may be required herein, including pursuant to Section 2.10, Section 2.11, or Section 7.07. Notwithstanding the foregoing, (i) subject to the following clause (ii), neither Party shall be obligated to account for or remit to the other Party any Property Expenses, Burdens or proceeds (including Hydrocarbon proceeds) attributable to the Assets after the date that is thirty (30) days following the date the final Adjusted Purchase Price is agreed by the Parties or finally determined by the Referee in accordance with Section 2.06 and (ii) if Buyer receives after the Closing any Suspended Revenue Receivables for which an adjustment to the Purchase Price is made pursuant to Section 2.04(b)(viii), Buyer shall pay such Suspended Revenue Receivables to Sellers within three (3) Business Days after Buyer's receipt of same.

Section 2.08 *No Duplicative Effect; Methodologies*. The provisions of Section 2.04, Section 2.06, this Section 2.08 and of any other Transaction Document shall apply in such a manner so as not to give the components and calculations duplicative effect to any item of adjustment and the Parties covenant and agree that no amount shall be (or is intended to be) included, in whole or in part (either as an increase or reduction) more than once in the calculation of (including any component of) the Adjusted Purchase Price, or any other calculated amount pursuant to this Agreement if the effect of such additional inclusion (either as an increase or reduction) would be to cause such amount to be overstated or understated for purposes of such calculation. "Earned" and "incurred", as used in this Agreement, shall be interpreted in accordance with GAAP and COPAS standards, as applied by Sellers consistent with past practice, subject to

the other provisions in this Section 2.08; *provided* if not determinable pursuant to the foregoing, the date an item or work is ordered is not the date of a transaction or incurrence for settlement purposes in the Closing Statement or Final Settlement Statement and otherwise under this Agreement, as applicable, but rather the date on which the item ordered is delivered to the job site, or the date on which the work ordered is performed, is the relevant date, regardless of when the applicable invoice was sent (i.e., on an accrual basis). The Parties acknowledge and agree that, if there is a conflict between a determination, calculation, methodology, procedure or principle set forth in the definitions contained in this Agreement, as applicable, on the one hand, and those provided by GAAP or COPAS, on the other hand, (i) the determination, calculation, methodology, procedure or principle set forth in this Agreement, as applicable, shall control to the extent that the matter is specifically provided for in this Agreement and (ii) the determination, calculation, methodology, procedure or principle prescribed by GAAP or COPAS, as applied by Sellers consistent with past practice, shall control to the extent the matter is not so addressed in this Agreement, as applicable, or requires reclassification as an asset or liability to be included in a line item or specific adjustment.

Section 2.09 *Purchase Price Deposit.*

(a) Escrow Deposit. Buyer previously deposited into the Escrow Account an amount equal to Eight Million Dollars ($8,000,000) (such amount, together with any interest earned thereon, the "Deposit Escrow Funds").

(b) Distribution of Deposit Escrow Funds. The Deposit Escrow Funds shall be distributed as follows:

(i) if the Closing occurs, the Deposit Escrow Funds shall be applied as a credit towards the Closing Date Adjusted Purchase Price as provided in Section 2.05(e) and Sellers shall deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to deliver to one or more accounts designated by Sellers the Deposit Escrow Funds; and

(ii) if this Agreement is terminated prior to Closing for any reason, the Deposit Escrow Funds shall be delivered in accordance with Section 9.02.

Section 2.10 *Division of Hydrocarbons*. After the Closing, all Buyer Hydrocarbons and Effective Time Hydrocarbons shall be owned by Buyer and all Seller Hydrocarbons shall be owned by Sellers. To the extent Sellers have sold Hydrocarbons (other than Seller Hydrocarbons) which constitute Assets and the Purchase Price has not been adjusted pursuant to Section 2.04(b)(i) for the proceeds of such sales, Sellers shall deliver such proceeds received after Closing (without duplication of any such amounts previously deducted from the proceeds paid to Sellers, net of (A) amounts payable as Burdens on such production paid or borne by Sellers, (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v)) to Buyer promptly upon Sellers' receipt thereof. To the extent Buyer actually receives proceeds or other income from the sale of any Seller Hydrocarbons, Buyer shall deliver such proceeds (without duplication of any such amounts previously deducted from

the proceeds paid to Buyer, net of (A) amounts payable as Burdens on such production paid or borne by Buyer, (B) expenses (other than Property Expenses) incurred by Buyer to Third Parties in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Buyer and not reimbursed to Buyer by a Third Party and not taken into account for purposes of Section 2.04(b)(v)) to Sellers promptly upon Buyer's receipt thereof.

Section 2.11 *Division of Expenses; Burdens*. For purposes of determining the amount of the adjustments to the Purchase Price provided for in Section 2.04, the principles set forth in this Section 2.11 shall apply except as expressly provided otherwise in this Agreement. Subject to Section 2.04(c)(ii) with respect to any Prorated Expense Items, as between Buyer and Sellers, (i) all Property Expenses attributable to periods prior to the Effective Time and Burdens attributable to the Assets on the production of Hydrocarbons prior to the Effective Time, other than Assumed Liabilities shall be borne by Sellers and (ii) all Property Expenses attributable to periods from and after the Effective Time and Burdens (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A) attributable to Assets on the production of Hydrocarbons from and after the Effective Time), shall be borne by Buyer. For purposes of allocating production (and expenses, Burdens and proceeds with respect thereto) under this Agreement, (a) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the pipeline connecting into the storage facilities into which they are transported from the lands covered by the applicable Well, or if there are no storage facilities, when they pass through the LACT meter or similar meter at the entry point into the pipelines through which they are transported from such lands and (b) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the delivery point sales meters or similar meters at the entry point into the pipelines through which they are transported from such lands. Sellers shall utilize reasonable interpolative procedures to arrive at an allocation of production when exact meter readings (including gas production meters or sales meters) or gauging and strapping data is not available.

Section 2.12 *Preferential Purchase Rights.*

(a) Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Preferential Purchase Right with respect to any Oil and Gas Property a notice in compliance with the contractual provisions applicable to such Preferential Purchase Right and requesting a waiver thereof. If a bona fide Preferential Purchase Right with respect to any Oil and Gas Property is exercised prior to the Closing, such Oil and Gas Property and the related Contracts (solely to the extent related to such Oil and Gas Property) shall be excluded from the Assets conveyed to Buyer at the Closing, the affected Oil and Gas Property will be deemed to be an Excluded Asset, the Purchase Price shall be reduced by an amount equal to the Allocated Value for such Oil and Gas Property and related Contracts (or portions thereof), and Sellers shall be entitled to retain all proceeds received for the affected Oil and Gas Property and related Contracts (or portion thereof) from the Person exercising such Preferential Purchase Right.

(b) Buyer shall purchase at the Closing all Oil and Gas Property burdened by a Preferential Purchase Right that has not been exercised as of the Closing Date, regardless of whether the time period for the exercise of such right has expired, and no reduction of the Purchase Price paid at the Closing shall be made with respect thereto. If, for any reason, such Preferential

Purchase Right is successfully exercised by the holder thereof after the Closing, Buyer shall be entitled to retain all proceeds paid for the affected Oil and Gas Property by the holder of the relevant Preferential Purchase Right, and Sellers shall have no liability with respect to such affected Oil and Gas Property and no adjustment to the Purchase Price shall be made with respect thereto.

(c) To the extent any Asset is subject to a valid and enforceable Preferential Purchase Right in favor of a Third Party, Buyer and Sellers agree that the portion of the consideration to be paid under this Agreement allocable to each such Asset is the Allocated Value of such Asset, *plus* the assumption of the Assumed Liabilities related to such Asset.

(d) If prior to Closing any Person asserts that it is the beneficiary of a Preferential Purchase Right with respect to any Oil and Gas Property and objects to the sale of such Oil and Gas Property to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale of such Oil and Gas Property free and clear of such right (as applicable to the sale to Buyer pursuant to this Agreement) to Buyer (by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction), then, at Buyer's option, such Oil and Gas Property shall be excluded from the Assets and the Purchase Price shall be reduced by the Allocated Value of such Oil and Gas Property.

Section 2.13 *Consents to Assign*. Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Applicable Schedule 3.06(a) Consent with respect to each Lease and any Purchased Contract that is not a 365 Contract (for which notices regarding 365 Contracts are addressed in Section 5.03) a notice in compliance with the contractual provisions applicable to such Applicable Schedule 3.06(a) Consent seeking such holder's consent to the transactions contemplated hereby and any such other notice as necessary to permit the assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement upon entry of the Sale Order (a "Consent Notice"). With respect to each Consent (A) relating to a Contract for which the counterparty's consent to assignment would be required for such Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code or (B) that burdens a Lease, but which Consent is not set forth on Disclosure Schedule 3.06 and is discovered by Sellers (including, if applicable, any such Consent that is identified by Buyer) prior to Closing, all such Consents shall thereafter be Applicable Schedule 3.06(a) Consents and Sellers shall send to the holder of each such Consent a Consent Notice.

(a) If Sellers fail to obtain an Applicable Schedule 3.06(a) Consent prior to Closing and (A) with respect to any Lease or Purchased Contract that is not a 365 Contract, (1) the failure to obtain such Applicable Schedule 3.06(a) Consent would cause the assignment of the Assets affected thereby to Buyer to be void or voidable, or (2) the failure to obtain such Applicable Schedule 3.06(a) Consent could reasonably result in the termination of such Lease or Purchased Contract under the express terms thereof upon the purported assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement or (B) with respect to any Lease or Purchased Contract, a party holding such Applicable Schedule 3.06(a) Consent right has objected to the assignment of the affected Asset in accordance with the terms of the relevant Applicable Schedule 3.06(a) Consent right or based on any anti-assignment or consent to assign provision contained in such Lease or Purchased Contract (each Consent as to which clause (A) or (B) is

applicable, a "Required Consent"), then, unless the Bankruptcy Court has entered an order approving (or in the case of clause (B), such objection is resolved to permit) the sale and assignment of the affected Asset to Buyer pursuant to this Agreement without obtaining such Required Consent, the Assets (or portions thereof) affected by such un-obtained Required Consent shall be excluded from the Assets to be assigned to Buyer at Closing (and shall be considered Excluded Assets hereunder) and the Purchase Price shall be reduced by the Allocated Value(s) of such Assets (or portions thereof) so excluded. In the event that any such Required Consent with respect to any such excluded Asset (or portion thereof) is obtained during the Post-Closing Consent Period (or if during the Post-Closing Consent Period the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear (as applicable to the sale of the affected Assets to Buyer pursuant to this Agreement) of such Required Consent), then, (1) Sellers shall so notify Buyer and (2) on the tenth (10th) Business Day after the date such Consent is obtained and Sellers shall assign the Assets (or portions thereof) that were so excluded as a result of such previously un-obtained Consent to Buyer pursuant to an instrument in substantially the same form as the Assignment and Bill of Sale (and such Assets (or portions thereof) shall no longer be considered Excluded Assets hereunder) and, contemporaneously with said assignment, Buyer shall pay by wire transfer in same day funds to Sellers, to one or more accounts designated by Sellers, the amount by which the Purchase Price was reduced at Closing with respect to such excluded Assets (or portions thereof), subject to any adjustment in the allocable portion of the Purchase Price affecting such Asset (or portions thereof) pursuant to Section 2.04 and Buyer shall assume all Assumed Liabilities with respect thereto.

(b) If Sellers fail to obtain a Consent prior to Closing and such Consent is not a Required Consent (or if prior to Closing the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear of such Required Consent), then the Assets (or portions thereof) subject to such un-obtained Consent shall nevertheless be assigned by Sellers to Buyer at Closing as part of the Assets and Buyer shall be deemed to have assumed any and all Liabilities for the failure to obtain any such Consent as part of the Assumed Liabilities hereunder and Buyer shall have no claim against the Seller Indemnified Parties from any Liability for, the failure to obtain such Consent.

(c) Prior to Closing and until the earlier to occur of (x) the effective date of the Plan and (y) the one hundred twentieth (120th) day after Closing (the period from Closing until the earlier of clause (x) or (y), the "Post-Closing Consent Period"), with respect to any un-obtained Required Consents with respect to which the Bankruptcy Court shall not have entered an order providing that (A) such Required Consent is not required to consummate the sale and assignment of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (B) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement free and clear of such Required Consent, Sellers shall use their commercially reasonable efforts to obtain all Consents; *provided, however,* that Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Consent. Buyer shall use its commercially reasonable efforts (without any obligation to incur any Liability, pay money

or provide any other consideration) to assist and cooperate with Sellers in furtherance of Sellers' efforts pursuant to this Section 2.13(c).

Section 2.14 *Consents for Leases and Purchased Contracts*. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required Consents in respect of the assumption and/or assignment of any Lease or Purchased Contract if (a) Sellers have properly served under the Bankruptcy Code notice of assumption and assignment on the counterparty to such Lease or Purchased Contract, (b) any objections to assumption and/or assignment of such Lease or Purchased Contracts filed by such counterparty have been withdrawn or overruled (including pursuant to the Sale Order or other order of the Bankruptcy Court), and (c) pursuant to the Sale Order, Sellers are authorized to assume and/or assign such Leases or Purchased Contracts to Buyer Free and Clear pursuant to section 365 of the Bankruptcy Code or otherwise.

Section 2.15 *Assets Sold "As Is, Where Is".*

(a) BUYER ACKNOWLEDGES AND AGREES THAT THE ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE AND THAT, EXCEPT AS SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT SELLERS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ASSETS BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH ASSETS IN THE CONDITION EXISTING ON THE CLOSING DATE "AS IS, WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE.

(b) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, AND WITHOUT LIMITING THE GENERALITY OF SECTION 2.15(a), SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE PURCHASED ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (vi) THE CONDITION,

QUALITY, SUITABILITY OR MARKETABILITY OF THE ASSETS, INCLUDING THE MARKETABILITY OF ANY HYDROCARBONS, (vii) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF SELLERS OR THIRD PARTIES WITH RESPECT TO THE ASSETS, AND (ix) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY AFFILIATE OF BUYER, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO. ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF SELLERS IS PROVIDED TO BUYER AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK.

Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos*. BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON OR THEREFROM. ADDITIONALLY, THE ASSETS, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR REMEDIATION, REMOVING, TRANSPORTING AND DISPOSING OF ASBESTOS, NORM, HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE ASSET. With respect to the Assets actually acquired by Buyer at Closing hereunder, Buyer assumes all liability for the assessment, remediation, removal, transportation and disposal of these materials and associated activities after the Closing (other than any Excluded Liabilities).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, represent and warrant to Buyer as follows, except as set forth in the Disclosure Schedule (and subject to Section 14.13):

Section 3.01 *Organization*. Each Seller is an entity duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of the jurisdiction of its organization. Each Seller is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect.

Section 3.02 *Authority and Authorization*. Each Seller has full power and authority to carry on its business as presently conducted and to enter into this Agreement and the other

Transaction Documents to which such Seller is or will be a party and, subject to the entry of the Bid Procedures Order and the entry of the Sale Order, to perform its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party, and the performance by each Seller of its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite limited liability company action on the part of such Seller.

Section 3.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of each Seller and (assuming due authorization, execution and delivery thereof by Buyer), subject to requisite Bankruptcy Court approval, will constitute the legal, valid and binding obligation of each Seller enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization or moratorium statutes, or other similar Applicable Laws affecting the rights of creditors generally or equitable principles (collectively, "Equitable Limitations"). At the Closing, all other Transaction Documents required hereunder to be executed and delivered by each Seller shall be duly executed and delivered and (assuming due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of such Seller enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations, subject to the entry of the Sale Order and provided no stay exists with respect to the Sale Order.

Section 3.04 *Conflicts*. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party does not, and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which such Seller is or will be a party shall not, (a) violate or be in conflict with, or require the consent (other than consents that have been obtained) of any Person or entity under, any provision of such Seller's Organizational Documents, (b) subject to the entry of the Bid Procedures Order and the Sale Order and obtaining the consents described on Disclosure Schedule 3.06, conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both would constitute a default) or give rise to any right of termination, cancellation or acceleration under any agreement or instrument to which such Seller is a party or by which any of the Oil and Gas Properties are bound, (c) subject to the entry of the Bid Procedures Order and the Sale Order, violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to any Seller or the Oil and Gas Properties or (d) result in the creation of any Lien on any of the Oil and Gas Properties, other than Permitted Liens.

Section 3.05 *Material Contracts.*

(a) Disclosure Schedule 3.05(a) sets forth a complete list, as of the Execution Date, of all Applicable Contracts of the type described below and any and all amendments, extensions, or other modifications thereof and thereto (each, other than any such Contract that is an Excluded Asset or an Excluded Liability, a "Material Contract"):

(i) any Applicable Contract that constitutes a lease under which a Seller is the lessor or the lessee of real or personal property (other than any Lease) that

(A) cannot be terminated by Sellers without penalty upon ninety (90) days' or less notice and (B) involves an annual base rental of more than $25,000;

(ii) any Contract with any Affiliate of Sellers that will be binding on Buyer or the Oil and Gas Properties after the Closing;

(iii) any Applicable Contract that is a Hydrocarbon purchase and sale, transportation, gathering, treating, processing, compression or similar Contract that is not terminable without penalty on ninety (90) days' or less notice;

(iv) any Contract to sell, lease or otherwise dispose of any Sellers' interests in any of the Oil and Gas Properties;

(v) any tax partnership agreement or joint venture Contract;

(vi) any joint or unit operating agreement to which any Seller's interests in any of the Oil and Gas Properties is subject;

(vii) any Contract providing for an "earnout," "back-in" working interest, or other contingent payment or interest;

(viii) any Contract for drilling or well workover services or other well services agreement, rig Contracts or fracturing services Contracts;

(ix) any Contract for the providing, use, processing and/or analysis of seismic or geophysical data;

(x) any development Contract, participation Contract, exploration Contract, farm-in Contract, farm-out Contract, area of mutual interest Contract or similar Contract;

(xi) any Contract containing any preferential purchase rights, rights of purchase, rights of first offer, right of first refusal or other similar rights affecting the Oil and Gas Properties;

(xii) any Contract, the primary purpose of which is to provide indemnity rights;

(xiii) any Contract that includes non-competition restrictions, non-solicitation or no-hire obligations;

(xiv) any Contract that can reasonably be expected to result in aggregate payments by or on behalf of Sellers or aggregate revenues paid to Sellers, in each case, of more than One Hundred Thousand Dollars ($100,000.00) during the current or any subsequent fiscal year or Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate over the term of such Contract (in each case, based solely on the terms thereof);

(xv) any Contract that contains mandatory drilling requirements with respect to the Oil and Gas Properties, which obligations have not yet been fulfilled; or

(xvi) any Applicable Contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of financial obligation, bond, letter of credit or similar financial Contract.

(b) Except as set forth on Disclosure Schedule 3.05(b), (i) subject to entry of the Sale Order and payment of all Cure Costs, all of the Material Contracts are in full force and effect and no Seller nor, to Sellers' Knowledge, any other party to any such Material Contract is in material breach of or material default, or with the lapse of time or the giving of notice, or both, would be in material breach or material default, with respect to any of its obligations thereunder; and (ii) (A) except as set forth on Disclosure Schedule 3.05(b), as of the Execution Date, Sellers have made available to Buyer (electronically or otherwise) copies of all Material Contracts listed on Disclosure Schedule 3.05(a) and, (B) to Sellers' Knowledge, such copies are complete and accurate copies of such Material Contracts.

Section 3.06 *Approvals*.

(a) Disclosure Schedule 3.06(a) contains a complete and accurate list or description of all approvals, consents, filings and notifications required to be obtained, made or given by Sellers, after giving effect to the entry of the Bid Procedures Order and the Sale Order, for the consummation of the Transactions (each, a "Consent"), other than (i) for Preferential Purchase Rights, (ii) under Contracts that are terminable without cost upon not greater than thirty (30) days' notice, and (iii) any approvals, consents, filings and notifications of or with any Governmental Authority of the type customarily obtained, made or given after Closing.

(b) [Reserved]

Section 3.07 *Environmental Matters*.

(a) Except as set forth on Disclosure Schedule 3.07, Sellers have not entered into any agreements with or consents from any Governmental Authority and, to Sellers' Knowledge, are not subject to any order, decree or judgments issued against Sellers, with respect to the Assets, by a Governmental Authority, in each case, in existence as of the Execution Date and based on any material violation of, or Liability under, Environmental Laws, including any such violations or Liabilities that relate to the future use of any of the Assets or that presently require any material remedial or other corrective action with respect to any Asset. As of the Execution Date, (a) to Sellers' Knowledge, with respect to the Assets, neither Sellers nor any Third Party operator of the Oil and Gas Properties has released, disposed or arranged for disposal of, transported, treated, stored or exposed any Person to, any Hazardous Substances and (b) Sellers have not received written notice from any Person of any release, event, condition or disposal of any Hazardous Substances (for which all required remediation has not already been completed) concerning any of the Assets, in each case of clauses (a) or (b) that would (i) materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) result in any material liability of Sellers to any

Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(b) Except as set forth on Disclosure Schedule 3.07, no Seller has received any written notice from any Governmental Authority in the two-year period immediately preceding the Execution Date alleging that a violation of Environmental Law has occurred at any Asset that remains unresolved as of the Execution Date.

(c) To Sellers' Knowledge, except as set forth on Disclosure Schedule 3.07, as of the Execution Date, no Hazardous Substances are present, or have been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or have escaped on, in, from, under or in connection with the Assets such as to cause a condition or circumstance that (i) as of the Execution Date, materially interferes with or prevents material compliance, or would reasonably be expected to materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) has resulted or would reasonably be expected to result in any material liability of Sellers to any Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(d) All reports, studies or other material documents addressing the environmental conditions at the Oil and Gas Properties that are in Sellers' possession have been made available for Buyer's review.

This Section 3.07 shall constitute Sellers' sole representation and warranty as to Environmental Claims, compliance with Environmental Laws or environmental conditions of or affecting the Oil and Gas Properties

Section 3.08 *Well Status*. As of the Execution Date, except as set forth on Disclosure Schedule 3.08, to Sellers' Knowledge, there are no Wells located on the Oil and Gas Properties that: (i) were required by Applicable Law or Lease to be plugged and abandoned that have not been plugged and abandoned in accordance in all material respects with all Applicable Laws; or (ii) have been plugged and abandoned but have not been plugged and abandoned in accordance in all material respects with all Applicable Laws.

Section 3.09 *Imbalances*. To Sellers' Knowledge, Disclosure Schedule 3.09 sets forth all Imbalances with respect to the Oil and Gas Properties as of the date(s) shown on Disclosure Schedule 3.09.

Section 3.10 *Litigation*. Except as set forth in Disclosure Schedule 3.10, as of the Execution Date, there is no Proceeding pending or, to Sellers' Knowledge, threatened in writing against any Seller (a) with respect to the Assets, (b) that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions or (c) that affects or impairs the execution, delivery or performance by any Seller of this Agreement or any other Transaction Document to which any Seller is or will be a party.

Section 3.11 *Hedging*. There are no futures, hedges, swaps, collars, puts, calls, floors, caps, options or other Contracts that are intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in the price of commodities, including Hydrocarbons, that have been

entered into by any Seller or are otherwise binding on the Assets that will be binding on the Assets at any time following the Closing Date.

Section 3.12 *Intellectual Property*. Except as set forth on Disclosure Schedule 3.12, Sellers do not own any Intellectual Property related to or used in connection with the ownership of the Oil and Gas Properties.

Section 3.13 *Insurance Coverage*. Disclosure Schedule 3.13 sets forth a list of all material insurance policies and fidelity bonds of Sellers in effect as of the Execution Date relating to the Oil and Gas Properties.

Section 3.14 *Taxes*. Except as set forth on Disclosure Schedule 3.14, to Sellers' Knowledge:

(a) (i) all Tax Returns with respect to any material amount of Non-Income Taxes have, to the extent required by Applicable Law to be filed (taking into account extensions of time within which to file), been filed when due in accordance with all Applicable Law, (ii) as of the time of filing, such Tax Returns were true and complete in all material respects; and (iii) each Seller has paid (or has had paid on its behalf) or has withheld and remitted to the appropriate Taxing Authority all Taxes due and payable with respect to such filed Tax Returns;

(b) there are no liens for Taxes on the Assets, other than statutory liens for Taxes that are not yet due and payable;

(c) there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Non-Income Taxes;

(d) no claim has been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns with respect to Non-Income Taxes that Seller is or may be subject to taxation by that jurisdiction with respect to Non-Income Taxes;

(e) there is no claim, audit, action, suit, proceeding or investigation pending against or with respect to any Seller in respect of any material amount of Non-Income Taxes; and

(f) no Oil and Gas Property is subject to any tax partnership agreement or provisions requiring a partnership income tax return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code (the "Code").

This Section 3.14 shall constitute Sellers' sole representation and warranty as to Tax matters.

Section 3.15 *Letters of Credit.* As of the Execution Date, there are no Existing Letters of Credit posted by Sellers.

Section 3.16 *Outstanding Obligations*. As of the Execution Date, except as described on Disclosure Schedule 3.16, there are no existing commitments or obligations for which Sellers have outstanding any unfunded amount under an authorization for expenditure in excess, individually

or in the aggregate, of $50,000 (net to Sellers' interests) for drilling, completing, equipping, maintaining, deepening, side tracking, reworking, plugging and abandonment or other costs or expenses arising from or relating to the ownership of the Oil and Gas Properties.

Section 3.17 *Preferential Purchase Rights*. Except as set forth on Disclosure Schedule 3.17, there are no preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights or other similar rights that are applicable to the transfer of the Assets in connection with the Transactions (the "Preferential Purchase Rights").

Section 3.18 *Broker*. Other than amounts as may be payable by Sellers for which Buyer shall have no liability, no broker, finder, investment banker or other similar person is or will be, in connection with the transactions contemplated by this Agreement or the other Transaction Documents, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of Sellers.

Section 3.19 *[Reserved]*.

Section 3.20 *Working Interest Payments*. Except for any Cure Costs or as set forth on Disclosure Schedule 3.20, all joint interest billings, cash calls, invoices or other Working Interest payments attributable to Sellers' interest in the Oil and Gas Properties have been timely and properly paid.

Section 3.21 *[Reserved]*.

Section 3.22 *[Reserved]*.

Section 3.23 *FCPA; Sanctions.*

(a) In the past five (5) years, neither the Sellers or any of their Subsidiaries, any of their respective directors or officers, or, to Sellers' Knowledge, any agent or employee of the Sellers or any of their Subsidiaries or other Person acting for or on behalf or at the direction of any of the Sellers or any of their Subsidiaries have:

(i) directly or indirectly, (1) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (2) made any unlawful payment to any government official, (3) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment, nor (4) otherwise violated any applicable Anti-Corruption Laws; nor

(ii) been a Sanctioned Person nor has transacted business, directly or knowingly indirectly, with any Sanctioned Person nor otherwise violated Sanctions.

(b) In the past five (5) years, neither the Sellers nor any of their Subsidiaries have received any notice or communication that alleges that the Sellers or any of their Subsidiaries, or any representative or other Person acting for or on behalf or at the direction thereof may have violated any Anti-Corruption Laws or Sanctions.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.01 *Organization*. Buyer is a corporation duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of Delaware. Buyer is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

Section 4.02 *Authorization and Authority*. Buyer has full power and authority to carry on its business as presently conducted, to enter into this Agreement and the other Transaction Documents to which Buyer is or will be a party, to purchase the Assets on the terms described in this Agreement and to perform its other obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party, and the performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite action on the part of Buyer.

Section 4.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by Sellers) constitutes a legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms, except as enforceability may be limited by Equitable Limitations. At the Closing all other Transaction Documents required hereunder to be executed and delivered by Buyer shall be duly executed and delivered and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of Buyer enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations.

Section 4.04 *Conflicts*. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party does not, and the consummation by Buyer of the transactions contemplated by this Agreement and the other Transaction Documents to which Buyer is or will be a party shall not, (a) violate or be in conflict with, or require the consent of any Person under, any provision of Buyer's Organizational Documents, (b) conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both, would constitute a default) under any agreement or instrument to which Buyer is a party or is bound, or (c) violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to Buyer.

Section 4.05 *Broker*. No broker, finder investment banker or other similar Person is or will be, in connection with the transactions contemplated by this Agreement or any other Transaction Documents, entitled to any brokerage, finders or other fee or compensation based on any arrangement or agreement made by or on behalf of Buyer.

Section 4.06 *Financial Ability*. As of the Execution Date, Buyer has sufficient funds committed and unconditionally available to it to perform all of Buyer's obligations under this Agreement, including without limitation to pay the Adjusted Purchase Price in accordance with the terms of this Agreement and to assume the Assumed Liabilities. Buyer's ability to consummate the transactions contemplated hereby is not contingent upon its ability to secure any financing or to complete any public or private placement of securities prior to or upon Closing.

Section 4.07 *Approvals*. There are no approvals, consents, filings or notifications required to be obtained, made or given by Buyer as a condition to or in connection with the performance by Buyer of its obligations under this Agreement or any other Transaction Documents to which Buyer is or will be a party or the consummation by Buyer of the transactions contemplated by this Agreement or such other Transaction Documents.

Section 4.08 *Litigation*. There are no Proceedings pending to which Buyer is a party or, to Buyer's Knowledge, which have been threatened against Buyer which affect the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which Buyer is or will be a party, the performance by Buyer of its obligations under this Agreement or such other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.09 *Bankruptcy*. There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to Buyer's Knowledge, threatened against Buyer.

Section 4.10 *Investor Status; Investigation.*

(a) The Assets are being acquired by Buyer for investment purposes only, for Buyer's own account and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the 1933 Act.

(b) Buyer is an "accredited investor" as defined in Regulation D promulgated under the 1933 Act. Buyer acknowledges that the sale of the Assets has not been registered under the 1933 Act or any state or foreign securities laws and that the Assets may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c) Buyer has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Assets. Buyer is knowledgeable of the oil and gas business and of the usual and customary practices of oil and gas producers, including those in the areas where the Assets are located. Further, Buyer is capable of making such investigation, inspection, review and evaluation of the Assets as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Assets, their value, operation and suitability.

(d) Buyer has had the opportunity to examine all aspects of the Assets that Buyer has deemed relevant and has had access to all information requested by Buyer with respect to the Assets in order to enter into this Agreement. In connection with the Transactions, Buyer has had the opportunity to ask such questions of, and has received sufficient answers from, the Representatives of Sellers and obtain such additional information about the Assets as Buyer deems necessary to enter into this Agreement.

(e) Buyer confirms, acknowledges and agrees that Buyer is relying entirely upon the representations and warranties of Sellers in this Agreement, as well as Buyer's own investigations and inspections of the books, records and assets of Sellers, including the Assets, prior to the execution of this Agreement in entering into this Agreement and proceeding with the Transactions on the terms as set forth herein. Buyer acknowledges and agrees that, other than the express representations and warranties of Sellers set forth in Article III, in the certificates delivered by Sellers at Closing and the Special Warranty, any description of Sellers, their businesses, operations and assets (including the Oil and Gas Properties) in this Agreement, the Disclosure Schedules or any other Transaction Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by Sellers in respect of the accuracy of any description. In deciding to enter into this Agreement, and to consummate the Transactions, other than the express representations and warranties of Sellers set forth in Article III, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis and not on any other disclosure or representation made by, or any duty to disclose on the part of, Sellers or Sellers' Representatives.

Section 4.11 *Qualification*. At the Closing, Buyer (or an Affiliate of Buyer to which the Oil and Gas Properties are assigned at Closing) will be qualified to own and, where applicable, Buyer or its designating operating Affiliate will be qualified to assume operatorship of, the Oil and Gas Properties in all jurisdictions where the Oil and Gas Properties are located. The consummation of the transactions contemplated by this Agreement will not cause Buyer or its applicable Affiliate to be disqualified as such an owner or operator. To the extent required by the applicable state and federal Governmental Authorities, as of Closing Buyer (or, if applicable (as contemplated by Section 5.02), Buyer's operating Affiliate) will have such lease bonds, area-wide bonds or any other surety bonds or insurance policies in each case as required by, and in accordance with, any Governmental Authorities with jurisdiction over the ownership or operatorship of such Oil and Gas Properties or any operating agreement or joint operating agreement applicable to such Oil and Gas Properties.

Section 4.12 *No Other Representations*. No Seller nor any other Person (on behalf of any Seller or otherwise) has made or is making any representation or warranty whatsoever, express or implied, at law or in equity, with respect to Sellers, the Assets, this Agreement or the transactions contemplated by this Agreement other than the representations and warranties expressly set forth in Article III (as modified by the Disclosure Schedules), and Buyer is not relying on and has not relied on any representation or warranty other than those representations or warranties set forth in Article III (as modified by the Disclosure Schedules) and any reliance by Buyer on any representation or warranty other than those representations and warranties set forth in Article III (as modified by the Disclosure Schedules) is hereby expressly disclaimed.

## ARTICLE V
## COVENANTS OF SELLERS

Section 5.01 *Operating Covenants*. From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (u) as required by this Agreement or any other Transaction Document, (v) as required by any Applicable Law or any Governmental Authority (including by order or directive of the Bankruptcy Court), (w) to the extent related solely to Excluded Assets and/or Excluded Liabilities, (x) for renewal of expiring insurance coverage in the Ordinary Course of Business, (y) for emergency operations or (z) as otherwise consented to in writing by Buyer:

(a) Sellers will:

(i) maintain or cause its Affiliates to maintain the books of account and records relating to the Assets in the usual, regular and ordinary manner, in accordance with its usual accounting practices;

(ii) give written notice to Buyer as soon as is practicable of any material damage or casualty to or destruction or condemnation of any Oil and Gas Property of which Sellers have Knowledge;

(iii) use reasonable best efforts to maintain insurance coverage on the Assets in the amounts and types described on Disclosure Schedule 3.13;

(iv) take such actions, at Buyer's expense (so long as such expenses are reasonable and documented expenses and do not exceed a maximum of $250,000, without prior consent of Buyer, and so long as such expenses would not have been incurred absent direction from Buyer), as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any final resolution or guarantee any outcome of any such actions);

(v) give appropriate notice to counterparties to the Maverick Basin Area Participation Agreement with respect to any co-sell rights or other similar rights thereunder;

(vi) not take any action to enforce any rights against Buyer or any of its Affiliates under the JDA or take any enforcement actions with respect to any related orders (except in cooperation with Buyer or a Buyer Affiliate); *provided* that, the Parties acknowledge and agree that, notwithstanding anything otherwise provided in this Agreement, all rights between them are preserved pending the occurrence of the Closing and the Parties shall be entitled to take any and all actions as such Party deems necessary or appropriate to preserve such rights (including with respect to the Applicable Contracts and the JDA);

(vii) if requested by Buyer, object to proofs of claim relating to oil and gas properties identified by Buyer, with reasonable legal fees and expenses related thereto paid by Buyer; and

(viii) notify and consult with Buyer of any election that Sellers are required or have the right to make with respect to the Oil and Gas Properties under any joint operating agreement, marketing or purchase contract, area of mutual interest agreement or farmout agreement, specifying the nature and time period associated with such election;

(b) no Seller shall:

(i) sell, lease or otherwise transfer any Oil and Gas Property, or otherwise voluntarily divest or relinquish any right or Asset, other than (A) sales of Hydrocarbons in the Ordinary Course of Business, (B) sales or other dispositions of materials, supplies, machinery, equipment, improvements or other personal property or fixtures which are obsolete and have been replaced with an item of equal suitability and (C) dispositions of Excluded Assets;

(ii) enter into, assume or acquire any Contract that if entered into prior to the Execution Date would be required to be listed in Disclosure Schedule 3.05(a) other than (A) Contracts for the sale of Hydrocarbons in the Ordinary Course of Business, not to exceed thirty (30) days in duration or terminable without penalty on thirty (30)-days' or less notice or (B) in connection with an Alternative Transaction (subject to the remaining provisions of this Agreement);

(iii) amend or modify in any material respect or terminate (other than termination or expiration in accordance with its terms) any Purchased Contract, Lease, Permit or any 365 Contract that could become a Purchased Contract;

(iv) settle any suit or litigation or waive any material Claims, in each case, relating or attributable to the Assets and affecting the period from and after the Effective Time for which Buyer will be responsible for all or any portion;

(v) grant or create any right to Consent to the disposition of, or Preferential Purchase Rights with respect to, any of the Assets;

(vi) make any elections or take any other actions that would require the Sellers (or, after Closing, Buyer) to take its share of Hydrocarbon production produced from or attributable to the Assets in-kind;

(vii) change the methods of accounting or accounting practice by Sellers, except as required by concurrent changes in Applicable Law or GAAP as agreed to by its independent public accountants; or

(viii) authorize, agree or commit to do any of the foregoing.

Section 5.02 *Operatorship*. Buyer acknowledges and agrees that Sellers cannot and do not covenant, represent or warrant that Buyer (or, if applicable, Buyer's operating Affiliate) shall become or have the right to become successor operator of any Oil and Gas Properties and that the Oil and Gas Properties may be subject to operating or other agreements that govern the right to operate the Oil and Gas Properties and the appointment of a successor operator. The failure of

Buyer (or an Affiliate of Buyer) to be designated as operator of any Oil and Gas Property or to have obtained the consents required therefor as of the Closing shall not cause the failure of any other condition to Closing or otherwise affect Buyer's obligations under Section 2.05.

Section 5.03 *Assumption and Rejection of Executory Contracts and Leases.*

(a) Schedule 5.03(a) (as may be amended from time to time or supplemented with written notice to Buyer) sets forth each 365 Contract and Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract (and if no Cure Cost is estimated to be payable in respect of any 365 Contract, the amount of such Cure Cost designated for such 365 Contract shall be "$0.00") (as such schedules may from time to time be amended or supplemented with written notice to Buyer, the "365 Schedule").

(b) Subject to Buyer's rights under Section 5.03(d) below to subsequently amend such designations, Schedule 5.03(b) sets forth a complete list of the 365 Contracts listed on the 365 Schedule that Buyer desires to be assumed by Sellers and transferred and conveyed to Buyer as a Purchased Contract, which shall include each Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule (collectively, and as further modified by Buyer pursuant to the provisions of this Section 5.03(b), the "Desired 365 Contracts"). Any 365 Contracts that are not Desired 365 Contracts shall be an Excluded Asset for all purposes and, for the avoidance of doubt, Buyer shall have no liability on account of any 365 Contracts that are not Desired 365 Contracts.

(c) Promptly following the Execution Date (to the extent not previously filed), Sellers shall file the 365 Schedule with the Bankruptcy Court and deliver a written notice, in a form acceptable to Buyer, of the proposed assignments of the Desired 365 Contracts and the proposed Cure Costs for each Desired 365 Contract (consistent with Sellers' good faith estimates set forth on Schedule 5.03(a)) to all non-debtor parties of the Desired 365 Contracts, which notice shall notify each non-debtor party to such Desired 365 Contract of (i) the proposed Cure Cost for such Desired 365 Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. To the extent that any formal or informal objections are received from such non-debtor parties in response to such notice, Sellers shall (A) promptly provide Buyer with written notice of any objection that is not filed publicly on the Bankruptcy Court's docket, and (B) take all reasonably necessary actions to resolve (excluding providing any payment of Cure Costs unless agreed to and funded by Buyer, without limiting Seller's retention of responsibility for any Excess Cure Costs) such disputes with the applicable non-debtor party; *provided* that any and all such resolutions with respect to any Desired 365 Contract shall be reasonably acceptable to Buyer.

(d) Notwithstanding the foregoing, at any time prior to the Designation Deadline (or, solely for the purpose of clause (i) below, if any 365 Contract is first identified to Buyer by Sellers after the Designation Deadline and prior to the Closing Date, within one (1) Business Day prior to the Closing Date), (i) Buyer may, in its absolute and sole discretion, designate any 365 Contract that has not been rejected as a Desired 365 Contract and upon receipt of any such notice Sellers shall use commercially reasonable efforts to effect the assumption of such 365 Contract by Sellers in accordance with the Bankruptcy Code, *provided* that, any Cure Cost on account of such 365 Contract shall be acceptable to Buyer in its sole discretion, and, if Sellers are successful in effecting such assumption as of Closing, such 365 Contract shall become

a Desired 365 Contract and transferred and conveyed to Buyer as a Purchased Contract at Closing, or (ii) Buyer may revise Schedule 5.03(b) by excluding one or more Desired 365 Contracts at any time prior to the Designation Deadline and upon such exclusion such Contract shall constitute an Excluded Asset; *provided, however,* that Buyer may not exclude from Schedule 5.03(b) any Desired 365 Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule. If a Desired 365 Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Desired 365 Contract that has not been resolved to the satisfaction of Buyer, in Buyer's sole discretion, prior to the Designation Deadline, then, unless otherwise agreed to by Buyer and Sellers, the Designation Deadline shall be extended (but only with respect to such Desired 365 Contract) to no later than the earliest of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Sellers, (B) the date on which such 365 Contract is deemed rejected by operation of sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, or (C) the date required by the Bankruptcy Court and set forth in the Sale Order. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(d).

(e) If Buyer exercises its rights in Section 5.03(d) above to designate a 365 Contract (including a 365 Contract that was a Desired 365 Contract immediately before such designation) as an Excluded Asset, there shall be no change in the Purchase Price as a result of such designation or change in designation.

(f) Notwithstanding anything in this Agreement to the contrary, Sellers shall not reject any 365 Contracts without the prior written consent of Buyer in its sole discretion; *provided* that, after the Designation Deadline, Sellers may reject 365 Contracts (other than Desired 365 Contracts) without the consent of Buyer so long as such 365 Contracts were identified to Buyer in writing prior to the Designation Deadline. In the event that Sellers identify (whether before or after the Designation Deadline) any additional 365 Contracts capable of being assumed or rejected that were not previously identified as such, Sellers shall promptly notify Buyer of (i) such 365 Contracts and (ii) Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract by supplementing Schedule 5.03(a) as required by Section 5.03(a). For the avoidance of doubt and subject to Section 5.03(d), Buyer may, in its sole discretion, designate each such additional 365 Contract as a Desired 365 Contract or Excluded Asset pursuant to this Section 5.03(f), notwithstanding the passage of the Designation Deadline. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(f).

(g) Notwithstanding anything in this Agreement to the contrary, including Section 5.03(d) above, Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule shall at all times constitute Desired 365 Contracts and shall be assigned to Buyer at the Closing.

(h) Buyer shall provide adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Sellers and assigned to Buyer at or prior to the Closing in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement; *provided* that Buyer shall cooperate with Sellers in providing such adequate assurance of future performance of all of the Desired 365 Contracts and Buyer acknowledges that such cooperation may require Buyer to provide reasonably necessary

information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts, and Sellers' obligation to assume and assign such Desired 365 Contracts is subject to the cooperation and providing of such information and commitment by Buyer.

(i) At the Closing, subject to Section 5.03(j), (i) the Purchase Price shall be increased by, pursuant to section 365 of the Bankruptcy Code, if applicable section 1123(b)(2) of the Bankruptcy Code, and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A), 365(b)(1)(B) and 1123(b)(2) of the Bankruptcy Code, as applicable, or any other applicable provision of the Bankruptcy Code to effectuate the assumption and assignment of the Desired 365 Contracts (such costs or expenses, if any, the "Cure Costs") with respect to the Desired 365 Contracts actually paid by Sellers prior to Closing if, and only to the extent that, Sellers have provided evidence of such pre-payment prior to Closing (the "Pre-Paid Cure Costs") and (ii) Buyer (and not Sellers) shall pay all Cure Costs with respect to the Desired 365 Contracts that are not Pre-Paid Cure Costs. Notwithstanding the foregoing, if any Desired 365 Contract is subject to a dispute as to Cure Costs that has not been resolved as of Closing and such Desired 365 Contract is assigned to Buyer (at or after Closing) then, upon resolution of such Cure Costs, Buyer shall pay such Cure Costs; *provided* that, any and all resolutions of disputes related to Cure Costs for any Desired 365 Contract shall be acceptable to Buyer in Buyer's reasonable discretion; *provided, further*, that Buyer retains any and all rights under Section 5.03(d) of this Agreement with respect to the 365 Contracts.

(j) Notwithstanding anything to the contrary in this Agreement, including in this Section 5.03, the Purchase Price shall not be increased by, and Buyer shall not be required to pay, (and Sellers shall retain and be responsible for) the amount of any Excess Cure Costs.

(k) Notwithstanding anything in this Agreement to the contrary, after the Closing, in the event that any Springfield Gathering Contract or the JDA is not assumed and/or assigned to Buyer, (i) Sellers (or a responsible Person appointed by Sellers), at Buyer's expense, shall take all actions as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any guarantee of any outcome of any such actions), and such Springfield Gathering Contract and/or the JDA, as applicable, shall not constitute Excluded Assets unless otherwise so designated as such in writing by the Buyer and (ii) if such actions are not promptly taken by Sellers (or the applicable responsible Person) following Buyer's request, Sellers hereby grant Buyer a limited power of attorney to take actions in Sellers stead to effectuate the purposes of this Section 5.03(k); *provided* that, nothing in this Section 5.03(k) shall (x) require any Seller to be a going concern or otherwise remain in existence for any period after the Closing or (y) prohibit any Seller from liquidating and dissolving at any time after the Closing and, upon such liquidation and dissolution, such Seller shall no longer be obligated to perform the covenants set forth in this Section 5.03(k).

Section 5.04 *Access.*

(a) Each Seller shall afford to Buyer and its authorized representatives from the Execution Date until the Closing Date, during normal business hours, reasonable access to the

Assets (subject to the terms, conditions and restrictions of agreements related to Assets to which such Seller is a party and the consent of the operator, as applicable), appropriate Seller personnel and to such Seller's title, Leases, Contracts, environmental and legal materials, books, records, statements and operating data and information relating to the Assets available as of the Execution Date and that becomes available to any Seller at any time prior to the Closing Date, together with the opportunity to make copies of such books, records and other documents at Buyer's expense, and will furnish to Buyer such other information in Sellers' possession with respect to the Assets as Buyer may reasonably request; *provided, however*, that all such information shall be held in confidence by Buyer in accordance with the terms of the Confidentiality Agreement; *provided, further,* that in no event shall Sellers be obligated to provide (i) access or information in violation of Applicable Law, (ii) any information (other than title opinions, runsheets or similar information) the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound; *provided* that the applicable Seller has used its reasonable efforts to protect the privilege or to obtain a waiver of the applicable contractual obligation, or (iii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications, except to the extent required in the Bid Procedures Order.

(b) BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD EACH SELLER, EACH OF THEIR SUCCESSORS, THEIR AFFILIATES AND ALL OF THEIR RESPECTIVE DIRECTORS AND OFFICERS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES CAUSED DIRECTLY OR INDIRECTLY BY THE ACTS OR OMISSIONS OF BUYER, BUYER'S AFFILIATES OR ANY PERSON ACTING ON BUYER'S OR ITS AFFILIATE'S BEHALF IN CONNECTION WITH ANY DUE DILIGENCE CONDUCTED PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY SITE VISITS CONDUCTED PURSUANT TO SECTION 5.04(a), EXCEPTING ONLY LIABILITIES TO THE EXTENT ACTUALLY RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SELLER OR ANY SELLER INDEMNIFIED PARTIES. Buyer shall comply with all rules, regulations, policies and instructions reasonably required by Sellers, or any Third Party operator of any Assets, which are provided to Buyer regarding Buyer's actions while upon, entering or leaving any Asset, including any insurance requirements that Sellers may reasonably impose, or any such Third Party operator may impose, on contractors authorized to perform work on any Asset owned or operated by Sellers (or any such Third Party operator, as applicable).

## ARTICLE VI
## COVENANTS OF BUYER

Section 6.01 *Access; Data Retention*. Buyer agrees that, following the Closing, and subject to Applicable Law and any confidentiality restrictions to Third Parties, and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Subsidiaries to) upon advance written request give to Sellers and their Representatives reasonable access during normal business hours to the Data (unless Sellers were permitted to retain a copy of such Data as part of the Excluded Records) pertaining to any and all periods prior to and including the Closing Date as Sellers and their Representatives may reasonably request and to make copies of the same (at Sellers' sole cost and expense) in connection with (a) the preparation of Tax Returns or

information returns, (b) reports or other obligations by Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases (including objecting to proofs of claims or administrative expense claims), (d) preparing the Final Settlement Statement and any other matters contemplated by Section 2.06 and (e) any final determination of any audit or examination, Proceeding or determination. Buyer shall (and shall cause its Subsidiaries to) preserve all such Data for a period of three (3) years after the Closing; *provided, however,* that Buyer shall have the right at any time after the second (2nd) anniversary of the Closing Date to request in writing that Sellers take any such Data and, if Sellers do not agree to take such Data within ninety (90) Business Days after receipt of the request, Buyer (or its Subsidiaries, as applicable) may dispose of such records.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLERS

Section 7.01 *Commercially Reasonable Efforts; Further Assurances*. Subject to the terms and conditions of this Agreement, and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions; *provided* that the Parties understand and agree that the commercially reasonable efforts of any Party, and the reasonable best efforts of Buyer, shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions; *provided*, *further* that this Section 7.01 shall not (a) limit or affect the obligation of any Party to perform its obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to Third Parties not otherwise required under this Agreement. Sellers and Buyer agree to execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

Section 7.02 *Bankruptcy Proceedings.*

(a) Sellers shall take such actions as may be reasonably necessary to (i) obtain entry of the Sale Order as soon as reasonably practicable following completion of the Auction and (ii) consummate the Transactions, in each case, in accordance with this Agreement.

(b) Each Seller and Buyer acknowledge that this Agreement and the sale of the Assets and assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval. Each Seller and Buyer acknowledge that (i) to obtain such approval and to satisfy Sellers' fiduciary duties to all applicable stakeholders in accordance with Applicable Law, each Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction, (ii) Buyer must provide adequate assurance of future performance as may be required under section 365 of the Bankruptcy Code with respect to the Purchased Contracts, and (iii) to the extent such adequate assurance of future performance is not provided with respect

to an Purchased Contract, then such Purchased Contract will be excluded from the Assets and included in the Excluded Assets.

(c) In the event an objection is filed, an appeal is taken or a stay pending appeal is requested, from either the Bid Procedures Order, the Sale Order or any other order reasonably necessary in connection with the Transactions, as applicable, Sellers shall promptly notify Buyer of such objection, appeal or stay request and shall provide to Buyer promptly a copy of the related objection, notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with an objection or any appeal from either of such orders and Sellers agree to take all action as may be reasonably necessary and appropriate to defend against such appeal, petition or motion and Buyer shall cooperate in such efforts.

(d) From and after the Execution Date and until the Closing, no Seller shall take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bid Procedures Order. If Buyer is the Successful Bidder at the Auction, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(e) From and after the Execution Date and until the Closing, at least one (1) Business Day prior to the filing thereof, to the extent reasonably practicable under the circumstances, Sellers shall deliver to Buyer, and make reasonable efforts to consult and cooperate with Buyer, regarding (i) any pleadings, motions, notices, statements, applications, schedules, reports or other papers to be filed with the Bankruptcy Court in relation to the implementation of the Transactions, (ii) any discovery taken in connection with the seeking entry of the Sale Order (including any depositions) and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(f) Without limiting the requirements of Section 7.02(a) through Section 7.02(e), from and after the Execution Date until the Closing, Sellers and the Buyer agree to:

(i) support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(ii) to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Transactions, support and take all steps reasonably necessary and desirable to address any such impediment;

(iii) negotiate in good faith and use commercially reasonable efforts to execute and deliver the definitive documents and any other required agreements to effectuate and consummate the Transactions;

(iv) consult and negotiate in good faith with material stakeholders and their advisors regarding the execution of definitive documents and the implementation of the Transactions; and

(v) take such actions as reasonably requested by the other Party to abate, suspend or toll any existing adversarial proceedings or litigation among the Parties or any of their Affiliates, consistent with the purposes of the Release Agreement.

(g) Without limiting the requirements of Section 7.02(a) through Section 7.02(f), from and after the Execution Date and through the Closing or the termination of this Agreement in accordance with its terms, Seller agrees to:

(i) upon reasonable request of Buyer, inform legal counsel to Buyer as to: (A) the status and progress of the Transactions; and (B) the status of obtaining any necessary authorizations (including any consents) from each secured lender, any competent judicial body, Governmental Authority, banking, taxation, supervisory, or regulatory body, as applicable; and

(ii) inform legal counsel to Buyer as soon as reasonably practicable after becoming aware of: (A) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Transactions; and (B) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any Person in respect of any Seller.

(h) Notwithstanding anything to the contrary in this Agreement, including this Section 7.02, each Seller's obligations hereunder are subject in all respects to its obligations as a debtor in possession, including its fiduciary obligations to its bankruptcy estate, and nothing in this Agreement shall require any manager, director or officer of a Seller to violate their fiduciary duties to such Seller or its estate. No action or inaction on the part of any manager, director or officer of a Seller that such manager, director or officer reasonably believes, based on and consistent with the written advice of outside counsel, is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement; *provided, however,* that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

(i) INTENTIONALLY OMITTED

(j) The Deposit Escrow Funds shall be applied as provided in this Agreement or returned to Buyer in accordance with this Agreement and the Bid Procedures. Any instructions provided by Sellers to the Escrow Agent in respect of the Deposit Escrow Funds shall be consistent with this Agreement and the Bid Procedures.

Section 7.03 *Public Announcements*. Sellers and Buyer agree that, prior to Closing, the consent (as to both form and content), not to be unreasonably withheld, of the other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions, except to the extent that such press release or other public announcement is required in connection with the Auction, the Bid Procedures Order or by Applicable Law; *provided* that Sellers shall be permitted to issue a press release or make a public announcement upon the execution of this Agreement to announce such execution of this Agreement and will provide Buyer with a copy of such press release or public

announcement at least one (1) business day in advance of its release and provide Buyer with a reasonable opportunity to comment on the same. From the Closing until one (1) month after the Closing, Buyer and Resources will provide each other a copy, at least one (1) business day in advance of its release (to the extent reasonably practicable under the circumstances), of any press release or other public announcement with respect to this Agreement, the other Transaction Documents or the Transactions that Buyer or Resources proposes to issue or make in advance of its release and provide the other with a reasonable opportunity to comment on the same (*provided* that the issuing Party shall not be required to accept or incorporate the other Party's comments), except to the extent that such press release or other public announcement is required by Applicable Law and such prior notice is not practicable given the circumstances giving rise to the requirement to issue such release.

Section 7.04 *Confidentiality*. The Parties acknowledge that Buyer (or its Affiliates) and Resources previously executed the Confidentiality Agreement. Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail. The Parties acknowledge and understand that this Agreement may be filed with the Bankruptcy Court and may be made available by Sellers to Auction Participants if this Agreement is selected as the Initial Highest Bid pursuant to the Bid Procedures Order. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.04 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by Sellers or their Affiliates in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

Section 7.05 *Audits and Other Tax Proceedings.* Resources shall control the conduct of any audit, litigation or other administrative or judicial proceeding with respect to Non-Income Taxes (each a "Tax Proceeding") for any Seller Tax Period; *provided*, that Buyer may participate in such Tax Proceeding and no such Tax Proceeding that could have an adverse Tax impact on Buyer or the Assets shall be settled without the consent of Buyer, such consent not to be unreasonably withheld. Resources and Buyer shall jointly control the conduct of any Tax Proceeding for any Straddle Tax Period. Each Party shall promptly provide the other Parties with notice regarding the commencement of any Tax Proceeding for any Seller Tax Period or Straddle Tax Period and shall cooperate fully as and to the extent reasonably requested by the other Parties in connection therewith. Neither Party shall enter into any settlement or agreement of compromise with respect to any Tax Proceeding for any Straddle Tax Period without the prior written consent of the other Parties, such approval may not be unreasonably withheld, conditioned or delayed.

Section 7.06 *Employee Matters.*

(a) Pursuant to Section 6 of the Confidentiality Agreement, Buyer is subject to certain restrictions on the solicitation and hiring of the employees of Sellers and their Affiliates. However, Sellers agree that, (i) solely during the period beginning on the Execution Date and ending on the earlier to occur of (A) the Closing Date and (B) the termination of this Agreement, Buyer or one of its Affiliates may make offers of employment to any or all of the employees of Sellers or their Affiliates listed on Schedule 7.06 (each such employee, a "Seller Employee" and

each such offer, an "Employment Offer"); *provided, however,* that any such Employment Offer must comply with Section 7.06(b), and (ii) if, and only if, the Closing has occurred, Buyer or its applicable Affiliate(s) may hire any employee of Sellers or their Affiliates pursuant to any Employment Offer made in compliance with Section 7.06(a)(i).

(b) Within five (5) days after the execution of this Agreement, Buyer shall deliver to Sellers written notice setting forth a list of the Seller Employee(s) to which Buyer is potentially interested in making an Employment Offer, and within three (3) days after receipt of such notice Sellers will deliver to Buyer a schedule (the "Compensation Schedule") of the base salary or base wage, as applicable, of each Seller Employee listed in such notice for reference purposes only. Each Employment Offer shall be on terms determined by Buyer in its sole discretion (including with respect to compensation and irrespective of the base salary or base wage as set forth on the Compensation Schedule) and shall be subject to and conditioned upon the occurrence of the Closing, and any employment by Buyer or its Affiliates of any employee of Sellers or their Affiliates shall not become effective prior to the Closing. A copy of any Employment Offer shall be delivered to Sellers at least one (1) Business Day prior to being delivered to the applicable employee. Buyer shall provide to Sellers, not later than the Closing Date, the names of each Seller Employee who has then accepted an Employment Offer from Buyer or any of its Affiliates (each Seller Employee who accepts such an offering being a "Continuing Employee") and the names of the Seller Employees who have then declined an Employment Offer from Buyer or its Affiliates. Each Continuing Employee shall, as of the Closing Date (if he or she is still employed by Sellers or their Affiliate), be terminated by Sellers or their Affiliate, as applicable (and Sellers shall and shall cause their Affiliates to release such Continuing Employee from all non-compete or similar restrictions that would restrict or be violated in any way by, such Continuing Employee's activities as an employee of Buyer or its Affiliate) and become an employee of Buyer or its Affiliate.

(c) Sellers shall reasonably assist Buyer and its Affiliates, as applicable, in communicating with the employees of Sellers and their Affiliates regarding potential employment with Buyer or its Affiliates; *provided* that, Buyer shall coordinate with a Person designated by Sellers in discussing Employment Offers with the Seller Employees and shall not directly communicate with any Seller Employee regarding potential employment by Buyer or its Affiliates other than as directed or consented to by such designee.

(d) Buyer acknowledges that, except for solicitations expressly permitted by Section 7.06(a)(i) and hiring expressly permitted by Section 7.06(a)(ii), Buyer remains subject to the restrictions on the solicitation of the employees of Sellers and their Affiliates contained in Section 6 of the Confidentiality Agreement.

Section 7.07 *Tax Matters; Apportionment of Tax Liability.*

(a) Non-Income Taxes. All Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period before the Effective Time shall be for Sellers' account and all Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period after and including the Effective Time shall be for Buyer's account. All real estate, personal property, and similar ad valorem Taxes (and any refunds thereof) assessed with respect to the Assets for 2020 shall be prorated based on the number of full days in such period that occur before the Effective Time, on the one hand, and the number of days in such period that occur on

or after the date on which the Effective Time occurs, on the other hand. All Non-Income Taxes (and any refunds thereof) attributable to the production of Hydrocarbons shall be deemed attributable to the period during which such production occurred. All other Non-Income Taxes (and refunds thereof) with respect to the Assets shall be allocated between Sellers and Buyer as though the 2020 taxable period ended as of the close of business on the day before the date on which the Effective Time occurs, and all such Non-Income Taxes with respect to the Assets attributable to taxable periods ending as of the close of business on the day before the date on which the Effective Time occurs shall be for Sellers' account and all such Non-Income Taxes with respect to the Assets attributable to taxable periods beginning on or after the date on which the Effective Time occurs shall be for Buyer's account. The apportionment of Non-Income Taxes (and any refunds thereof) with respect to the Assets between the Parties shall take place in the Closing Statement and the Final Settlement Statement using estimates of such Non-Income Taxes (and refunds thereof) if actual numbers are not available. If estimates of Non-Income Taxes with respect to the Assets are used in the Closing Statement and the Final Settlement Statement to apportion Non-Income Taxes, upon determination of the actual amount of such Non-Income Taxes, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Non-Income Tax that is allocable to such Party under this Section 7.07(a). If estimates of such refunds are used in the Closing Statement and the Final Settlement Statement to apportion such refunds, upon determination of the actual amount of such refunds, timely payments will be made from one Party to the other to the extent necessary to cause each Party to receive the benefit of such refunds that are allocable to such Party under this Section 7.07(a).

(b) Tax Returns. Sellers agree to file all Tax Returns for Non-Income Taxes applicable to the Assets that become due prior to the Closing Date, and Buyer agrees to file all other Tax Returns for Non-Income Taxes with respect to any tax period beginning prior to the Effective Time that become due on or after the Closing Date. The Party not filing the Tax Return agrees to provide the filing party with appropriate information that is necessary to file any required Tax Returns. The Party filing a Tax Return for a taxable period beginning before the Effective Time and ending after the Effective Time shall provide the other Party with a copy of such Tax Return at least fifteen (15) days prior to the due date thereof for such Party's review and comment.

(c) Transfer Taxes. Buyer shall be liable for and shall indemnify Sellers for any sales, use, transfer, documentary, stamp, registration or similar Taxes due as a result of the transfer of the Assets pursuant to this Agreement ("Transfer Taxes"). If required by Applicable Law, Sellers shall, in accordance with Applicable Law, calculate and remit any Transfer Taxes that are required to be paid as a result of the transfer of the Assets to Buyer and Buyer shall promptly reimburse Sellers therefor. If Sellers receive notice that any Transfer Taxes are due, Sellers shall promptly forward a copy of such notice to Buyer for handling.

(d) Purchase Price Allocation. Sellers shall provide to Buyer a statement (the "Allocation") allocating the Purchase Price and any Assumed Liabilities or other items that are treated as additional consideration for Tax purposes among the Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder within ninety (90) days after the Closing Date. Such allocation shall become conclusive and binding on the Parties fifteen (15) days after timely delivery by Sellers unless Buyer objects in writing to the Allocation. If Buyer objects, the Parties shall use commercially reasonable efforts to resolve any disputes within fifteen (15) days after Sellers' receipt of written notice of Buyer's objection. Any unresolved disputes

shall be submitted to the Referee or an accounting firm selected pursuant to the procedures in Section 2.06(d) (the "Accounting Firm"). The resolution of the dispute by the Accounting Firm shall be conclusive and binding on all Parties and the Allocation shall be updated to reflect such resolution. Sellers and Buyer shall use commercially reasonable efforts to update the Allocation in a manner consistent with section 1060 of the Code following any adjustment to the Purchase Price pursuant to this Agreement. Sellers and Buyer shall, and shall cause their Affiliates to, report consistently with the Allocation, as adjusted, in all Tax Returns, including IRS Form 8594, which Buyer and Sellers shall file with the Internal Revenue Service or any other Governmental Authority and neither Sellers nor Buyer shall take any position in any such Tax Return that is inconsistent with the Allocation, as adjusted, in each case, unless required to do so by a determination as defined in section 1313(a) of the Code. Sellers and Buyer agree to promptly advise each other regarding the existence of any tax audit, controversy or litigation related to the Allocation.

Section 7.08 *Supplemental Disclosures*. Prior to the Closing, Sellers shall have the right to supplement or amend the Disclosure Schedules relating to the representations and warranties of Sellers set forth in Article III with respect to any matter hereafter arising or discovered which, if existing (or in the case of any representation or warranty qualified by Sellers' Knowledge, known) at the Execution Date, would have been required to be set forth or described in Sellers' Disclosure Schedules. In the event that Sellers supplement or amend their Disclosure Schedules pursuant to the preceding sentence, Sellers shall deliver a copy of the amendment or supplement (in either case, the "Supplemental Disclosure") to Buyer and the relevant Disclosure Schedule will be deemed to be amended or supplemented as described in the Supplemental Disclosure as of the Execution Date if such matter arose after the Execution Date; *provided* that such Supplemental Disclosure shall be disregarded for purposes of determining whether Buyer's condition to Closing specified in Section 8.02(a) has been satisfied or for determining any remedies available under this Agreement. If a Supplemental Disclosure would result in (or contribute to) the failure of Buyer's condition to Closing specified in Section 8.02(a) to be satisfied at the Closing, Buyer may terminate this Agreement pursuant to Section 9.01(d)(ii), subject to the terms of Section 9.01. Any termination of this Agreement pursuant to Section 9.01(d)(ii) shall be Buyer's sole remedy for a breach of a representation and warranty disclosed by a Supplemental Disclosure that results from a matter that arose after the Execution Date.

Section 7.09 *Replacement of Existing Letters of Credit*. The Parties acknowledge that none of the Existing Letters of Credit, if any, posted by Sellers with Governmental Authorities and relating to the Assets are to be transferred to Buyer. On or before Closing, Buyer shall use commercially reasonable efforts to obtain, or cause to be obtained in the name of Buyer (or Buyer's designated operating Affiliate), replacements for any Existing Letters of Credit to the extent necessary (and then only in the amounts that are necessary) to consummate the Transactions contemplated by this Agreement. Buyer may also provide evidence that such replacements are not necessary as a result of existing bonds, letters of credit or guarantees that Buyer has previously posted as long as such existing bonds, letters of credit or guarantees are adequate to secure the cancellation of the Existing Letters of Credit at Closing. Notwithstanding the foregoing, in the event Buyer is unable to obtain any such bonds, letters of credit and guarantees prior to Closing, the Parties shall nonetheless proceed with Closing and Buyer shall indemnify and hold Sellers harmless for any failure to obtain such bonds, letters of credit and guarantees.

ARTICLE VIII
CONDITIONS TO CLOSING

Section 8.01 *Conditions to Obligations of Buyer and Sellers*. The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction (or, in the case of clauses (b) and (c) of this Section 8.01, waiver by each to the extent permitted under Applicable Law) of each of the following conditions:

(a) no Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b) all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained (other than those actions or filings that are customarily obtained after the Closing); and

(c) no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect which prohibits, restrains or enjoins the consummation of the Transactions; *provided* that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to prevent the entry of such injunction, order, decree or judgment.

Section 8.02 *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a) (i) each Seller shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date; (ii) the Fundamental Representations shall be true and correct in all respects at and as of the Closing Date as if made at and as of the Closing Date (other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date); and (iii) the representations and warranties of Sellers set forth in Article III of this Agreement (other than the Fundamental Representations) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date *(provided,* that, in each case, for purposes of this Section 8.02(a)(iii), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded), except, for purposes of this Section 8.02(a)(iii), for those failures to be true and correct that, individually or in the aggregate, do not constitute a Seller Material Adverse Effect;

(b) the Sale Order shall have been entered by the Bankruptcy Court and such order shall be a Final Order and in full force and effect;

(c) Intentionally omitted;

(d) the Required Consents set forth on <u>Schedule 8.02(d)</u> (the "<u>Specified Required Consents</u>") shall have been obtained by Sellers, or the Bankruptcy Court shall have entered an order approving or permitting (or resolving any objection so as to permit) the sale and assignment of the Assets subject to such Specified Required Consent to Buyer Free and Clear of such Specified Required Consent (as applicable to the sale and assignment of the Assets to Buyer pursuant to this Agreement);

(e) Intentionally omitted; and

(f) Sellers shall have delivered each of the items required by <u>Section 2.05(c)</u> to be delivered by Sellers at the Closing.

Section 8.03 *Conditions to Obligation of Sellers*. The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a) (i) Buyer shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date and (ii)(A) the representations and warranties of Buyer contained in this Agreement (other than the representations and warranties contained in <u>Section 4.06</u> and <u>Section 4.10</u>) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date (*provided,* that, in each case, for purposes of this <u>Section 8.03(a)(ii)(A)</u>, in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Buyer Material Adverse Effect or similar materiality qualifiers shall be disregarded), except for those failures to be true and correct that, individually or in the aggregate, do not constitute a Buyer Material Adverse Effect; and (B) the representations and warranties of Buyer contained in <u>Section 4.06</u> and <u>Section 4.10</u> shall be true and correct in all respects at and as of the Closing Date, as if made at and as of such date;

(b) the Sale Order shall have been entered by the Bankruptcy Court and each such order shall be a Final Order and in full force and effect; and

(c) Buyer shall have delivered each of the items required by <u>Section 2.05(d)</u>, and made each of the payments required by <u>Section 2.05(e)</u> to be made by Buyer at the Closing.

## ARTICLE IX
## TERMINATION

Section 9.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Sellers and Buyer;

(b) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if the Closing shall not have been consummated on or before November 30, 2020 (the "End Date"), unless extended by mutual written agreement of the Parties;

(c) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if:

(i) a Governmental Authority of competent jurisdiction shall have issued an order, injunction or judgment or law that permanently restrains, prohibits, enjoins or declares illegal the transactions contemplated by this Agreement and such order, injunction or judgment becomes final and non-appealable; or

(ii) the Bankruptcy Court enters an order dismissing, or converting to a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Cases, where such order was not requested, encouraged or supported by Sellers and Buyer;

(d) by Buyer upon written notice by Buyer to Sellers if:

(i) if Buyer is selected as the Successful Bidder at the Auction, at any time if Sellers file any motion, document, or pleading with the Bankruptcy Court to approve any Alternative Transaction, or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Sellers shall have breached any of their representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.02 and (A) such breach is not waived in writing by Buyer (subject to Sellers' right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Buyer to Resources specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Resources' receipt of such written notice from Buyer; or

(iii) [Reserved];

(iv) [Reserved];

(v) the Sale Order is amended, modified, vacated, reversed, or terminated without the prior written consent of Buyer;

(vi) [Reserved]; or

(vii) any condition set forth in Section 8.01 or Section 8.02 that has not been waived by Buyer shall have become incapable of being satisfied by the End Date;

*provided* that each deadline set forth in clauses (i) and (ii) of this Section 9.01(d) shall be subject to the Bankruptcy Court's docket, and accordingly, (A) shall be deemed extended through the date

of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (B) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, Sellers are unable to conclude such hearing(s) prior to such deadline and (C) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (A) and (B), cannot be complied with prior to such deadline; or

(e) by Sellers upon written notice by Sellers to Buyer if:

(i) the Bankruptcy Court shall have approved any Alternative Transaction or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Buyer shall have breached any of its representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.03 and (A) such breach is not waived in writing by Sellers (subject to Buyer's right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Sellers to Buyer specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Buyer's receipt of such written notice from Sellers; or

(iii) any condition set forth in Section 8.01 or Section 8.03 that has not been waived by Sellers shall have become incapable of being satisfied by the End Date.

Notwithstanding the foregoing, (x) Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are then in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the condition to closing set forth in clauses (i) and (ii) of Section 8.02(a) shall not be satisfied or (B) such breach or failure to perform or comply by Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred, and (y) Buyer shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyer is then in breach of its representations and warranties or shall have failed to perform or comply with any of its covenants and agreements such that either (A) the condition to closing set forth in Section 8.03(a) shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.

Section 9.02 *Effect of Termination.*

(a) If the obligation to close the transactions contemplated by this Agreement is terminated pursuant to any provision of Section 9.01, then, except for the provisions of Section 5.04(b), Section 7.04, this Section 9.02 and Article XIV and such of the defined terms on Exhibit

A necessary to give context to the surviving provisions, this Agreement shall forthwith become void and the Parties shall have no liability or obligation hereunder.

(b) If Sellers are entitled to terminate this Agreement pursuant to (i) Section 9.01(e)(ii), (ii) Section 9.01(e)(iii) as a result of Buyer's Willful Breach of this Agreement or (iii) Section 9.01(b) and, in the case of clause (iii), (A) Buyer is then in Willful Breach of this Agreement, or (B) Buyer has failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.02 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Sellers (or waived by Buyer), (2) each Seller is ready, willing and able to perform its obligations under Section 2.05, and (3) Buyer nevertheless fails to close, then, in each such event, Sellers shall be entitled to, at their option, (x) obtain specific performance in lieu of termination or (y) terminate this Agreement and receive a distribution of the Deposit Escrow Funds (or if Buyer terminates this Agreement pursuant to Section 9.01(b) at a time when Sellers had the right to terminate this Agreement and receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall be entitled to a distribution of the Deposit Escrow Funds) as liquidated damages for such termination (the Parties agree that the foregoing liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date, shall not serve as a penalty and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Sellers). Sellers agree that, to the fullest extent permitted by Applicable Law, Sellers' rights set forth in the preceding sentence shall be the sole and exclusive remedies of Sellers (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if the Closing does not occur as a result of the termination of this Agreement in the circumstances described in this Section 9.02(b). Nothing herein shall be construed to prohibit Sellers from first seeking specific performance in accordance with the penultimate sentence of this Section 9.02(b), but thereafter terminating this Agreement and receiving a distribution of the Deposit Escrow Funds as liquidated damages in lieu of fully prosecuting its claim for specific performance. Each Party acknowledges that the remedies at law of Sellers for a breach or threatened breach of this Agreement by Buyer as contemplated pursuant to this Section 9.02(b) may be inadequate and, in recognition of this fact, Sellers, without posting any bond or the necessity or proving the inadequacy as a remedy of monetary damages, and in addition to all other remedies that may be available, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available. If at any time Sellers are entitled to receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(c) If at any time after the Sale Hearing, Buyer is entitled to terminate this Agreement pursuant to (i) Section 9.01(d)(ii) as a result of a Seller's Willful Breach of this Agreement or (ii) Section 9.01(b) and, in the case of clause (ii), (A) a Seller is then in Willful Breach of this Agreement, or (B) Sellers have failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.03 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Buyer (or waived by Sellers), (2) Buyer is ready, willing and able to perform its obligations under Section 2.05, and (3) Sellers nevertheless fails to close, or if Sellers terminate this Agreement pursuant to either Section 9.01(b) at a time when Buyer had the right to terminate this Agreement for the reasons

described in this Section 9.01(c), then, in each such event, Buyer shall be entitled to (x) terminate this Agreement (in which event Buyer shall be entitled to a return of the Deposit Escrow Funds) and seek to recover its actual, direct damages up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds or (y) subject to entry of the Sale Order, obtain specific performance in lieu of termination. Sellers agree that, to the extent Buyer is entitled to recover its actual, direct damages (up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds) pursuant to an order of the Bankruptcy Court, any such amounts shall be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, and that Sellers shall not contest the characterization of such amounts as administrative expenses. Buyer agrees that, to the fullest extent permitted by Applicable Law, Buyer's rights set forth in the preceding sentence shall be the sole and exclusive remedies of Buyer (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if Buyer has the right to terminate this Agreement in the circumstances described in this Section 9.02(c).

(d) Subject to and without limiting Section 9.01(c), if at any time after the Sale Hearing (i) Sellers terminate this Agreement pursuant to Section 9.01(e)(i) or (ii) Buyer terminates this Agreement pursuant to Section 9.01(d)(i), then in any such case, in addition to returning to Buyer the Deposit Escrow Funds, Sellers shall reimburse and pay to Buyer an amount equal to the reasonable and documented out of pocket expenses incurred by Buyer in connection with the Transactions, up to a maximum of $750,000 (the "Expense Reimbursement"), which Expense Reimbursement shall be payable within ten (10) days following such termination. Notwithstanding anything contained herein to the contrary, Buyer agrees that, upon any termination of this Agreement under circumstances where the Expense Reimbursement is payable by Sellers and such Expense Reimbursement is paid in full to Buyer by Sellers, Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recover, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against Sellers or any of their respective Representatives, equityholders or Affiliates in connection with this Agreement or the Transactions and Sellers and their respective Representatives, equityholders and Affiliates shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Transactions. Sellers' obligation to pay the Expense Reimbursement, as provided herein, shall constitute an administrative expense Claim against any Seller under section 503(b) or 507(a)(2) of the Bankruptcy Code.

(e) If this Agreement is terminated prior to the Closing by Sellers or by Buyer pursuant to Section 9.01 other than under the circumstances described in Section 9.02(b), within two (2) Business Days after such termination, Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(f) Subject to this Section 9.02, upon the termination of this Agreement, neither Party shall have any other liability or obligation hereunder, and Sellers shall be free to immediately enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any Person without any restriction under this Agreement.

## ARTICLE X
## CASUALTY LOSS

Section 10.01 *Casualty Loss.*

(a) Notwithstanding anything herein to the contrary, Buyer shall assume all risk of loss with respect to the Assets from and after the Effective Time, including with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of any Asset due to ordinary wear and tear.

(b) As used herein, the term "Casualty Loss" means any destruction by fire, blowout, storm or other casualty or any taking in condemnation or expropriation or under the right of eminent domain, in each case with respect to all or any material portion of the Oil and Gas Properties to the extent such destruction or taking occurred during the Interim Period. If any Casualty Loss occurs during the Interim Period, notwithstanding such Casualty Loss, Buyer shall acquire all Oil and Gas Properties that suffer such Casualty Loss and all rights to receive all unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss, and reduce the Purchase Price by an amount equal to all sums paid to Sellers prior to Closing as insurance proceeds, awards or other payments arising out of such Casualty Loss and Sellers shall not voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Buyer; *provided, however,* that Sellers shall reserve and retain (and Buyer shall assign to Sellers) all rights, title, interests and claims against Third Parties for the recovery of Sellers' costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims or other rights against Third Parties with respect to any such Casualty Loss.

## ARTICLE XI
## RESERVED

## ARTICLE XII
## RESERVED

## ARTICLE XIII
## SURVIVAL AND INDEMNIFICATION

Section 13.01 *Survival; Limited Recourse Against Sellers.*

(a) Other than the Special Warranty, the representations and warranties of Sellers contained herein and in any certificate or other writing delivered by Sellers pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability (whether arising in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which any entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims)) thereafter in respect thereof. The Special Warranty shall survive the Closing until the Cut-Off Date. Each of the covenants of Sellers contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in

accordance with this Agreement or, (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant. The intended effect of termination of representations, warranties, covenants and agreements is to bar, from and after the date of termination, any claim or cause of action based on (x) the alleged inaccuracy of such representation or breach of such warranty or (y) such alleged breach or failure to fulfill such covenant or agreement; *provided* that if a written notice of any claim with respect to any covenant to be performed after Closing is given to Sellers prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

(b) Except with respect to any Excluded Assets or Excluded Liabilities and without limiting the Special Warranty, Buyer shall have no recourse against any Seller Indemnified Party or any of their Affiliates or their respective lenders or creditors from and after Closing for any Losses relating to the Assets or this Agreement (including title and environmental matters) or Sellers' breach of any representations and warranties, covenants or other provision of this Agreement, subject to Buyer's rights under Section 14.11 with respect to those covenants of Sellers the performance of which is to take place after Closing, as contemplated by Section 13.01(a).

(c) Subject to Section 13.01(a), the remainder of this Agreement shall survive the Closing without time limit. Representations, warranties, covenants, obligations and agreements of Sellers shall be of no further force and effect after the date of their expiration as set forth in Section 13.01(a). For the avoidance of doubt, nothing in this Agreement shall prohibit Sellers from ceasing operations or winding up its affairs following the Closing.

(d) Any representation and warranty insurance policy obtained by Buyer in connection with the transactions contemplated by this Agreement shall include a complete and unconditional (except in cases of fraud) waiver of subrogation and contribution rights against all of the Seller Indemnified Parties, and neither Buyer nor any of its Affiliates shall amend or waive such waiver in any respect without the prior written consent of Sellers.

Section 13.02 *Indemnification by Buyer*. From and after Closing, Buyer hereby assumes and agrees to release, defend, indemnify and hold Sellers and their Affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors (collectively, the "Seller Indemnified Parties") harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from:

(a) any breach of any representation or warranty of Buyer set forth in Article IV, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer pursuant to this Agreement;

(b) any breach of any covenant or other agreement on the part of Buyer under this Agreement;

(c) the Assumed Liabilities;

(d) any Buyer Taxes; and

(e) any other indemnity obligations of Buyer and its Affiliates expressly set forth in this Agreement.

Section 13.03 *Indemnification Procedures.*

(a) In the event that any Proceedings shall be instituted or that any claim or demand shall be asserted by any Indemnified Party in respect of which payment may be sought under Section 13.02 (an "Indemnification Claim"), the Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnifying Party. The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder. If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the Indemnified Party of its intent to do so. If the Indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the Indemnifying Party shall assume the defense of any Indemnification Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided, however,* that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and *provided, further,* that the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Indemnification Claim. The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 13.03 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. If the Indemnifying Party makes any payment on any Indemnification Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Indemnification Claim.

(b) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter.

Section 13.04 *Express Negligence*. THE INDEMNIFICATION, RELEASE, ASSUMED LIABILITIES, WAIVER AND LIMITATION OF LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY; *PROVIDED*, *HOWEVER*, SUCH PROVISIONS SHALL NOT APPLY TO LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES. BUYER AND SELLERS ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

Section 13.05 *Tax Treatment of Indemnity Payments*. Sellers and Buyer agree to treat any indemnity payment made pursuant to this Article XIII as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes. Any indemnity payment under this Article XIII shall be treated as an adjustment to the value of the asset upon which the underlying Indemnification Claim was based, unless a final determination (within the meaning of section 1313 of the Code) with respect to the Indemnified Party or any of its Affiliates causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

Section 13.06 *Sole and Exclusive Remedy*. Except for the post-Closing payments contemplated in Section 2.07 and Section 7.07(a), the Special Warranty, the remedies provided in this Article XIII and in Section 14.11 shall be the sole and exclusive legal and equitable remedies of the Parties, from and after the Closing, with respect to this Agreement and the transactions contemplated hereby, and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which such entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims), it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the Parties to the fullest extent permitted by law. No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Sellers or any of their Affiliates (the "Seller Non-Party Group") shall have any liability for any obligations or liabilities of Sellers under this Agreement of or for any Claim based on, in respect of, or by reason of, the transactions contemplated hereby.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.01 *Notices*. All notices and communications which are required or may be given to a Party hereunder shall be in writing, addressed as indicated below and shall be deemed to have been duly given upon the earliest of: (a) if by personal delivery, then the date of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then the next Business Day, (b) if sent by U.S. certified mail, postage prepaid, return receipt requested, then the date shown as received on the return notice, (c) if sent by email, with delivery receipt to sender or upon an affirmative reply by email by the

intended recipient that such email was received, or (d) if by Federal Express overnight delivery (or other reputable overnight delivery service), the date shown on the notice of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then on the next Business Day:

if to Buyer, to:

Mesquite Energy, Inc.
Pennzoil Place
700 Milam Street, Suite 600
Houston, Texas 77002
Attention: Gregory Kopel
Executive Vice President and General Counsel
Email: gkopel@mesquite-energy.com

with a copy to:

Foley & Lardner, LLP
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Attention: Timothy Spear
Email: tspear@foley.com

if to Sellers, to:

c/o Gavilan Resources Holdings, LLC
920 Memorial City Way, Suite 1400
Houston, Texas 77024
Attention: General Counsel
Email: john.zabaneh@gavilanresources.com

with a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Rodney L. Moore
Samuel C. Peca
Email: rodney.moore@weil.com
samuel.peca@weil.com

The Parties may change the identity, address and email addresses to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this Section 14.01.

Section 14.02 *Amendments and Waivers.*

(a) Any provision of this Agreement may be amended or waived if but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No waiver by any Party of any condition, or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation, or warranty. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 14.03 *Expenses*. Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 14.04 *Successors and Assigns/Liquidating Trust.*

(a) Subject to Section 14.04(b), the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; *provided* that neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto; *provided, however,* that Sellers may assign their respective rights and obligations under this Agreement to any liquidating trust or other representative of Sellers created or appointed pursuant to a Bankruptcy Court order; and *provided, further*, that Buyer may assign its rights and obligations under this Agreement to any Affiliate of Buyer without prior consent of Sellers, but no such transfer or assignment will release Buyer of its obligations hereunder or enlarge, alter or change any obligation of Sellers to Buyer.

(b) If a Liquidating Trust is established, from and after the formation of the Liquidating Trust all rights and obligations of Sellers under this Agreement shall accrue to and be for the benefit of an shall be exercisable by the Liquidating Trust, as provided by any order of the Bankruptcy Court and the Liquidating Trustee shall be entitled to exercise all of the rights of Sellers under this Agreement.

Section 14.05 *Governing Law.* EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT, THE TRANSACTION DOCUMENTS, AND ANY OTHER DOCUMENT OR INSTRUMENT DELIVERED PURSUANT HERETO, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICTS OF LAW OR PRINCIPLE THAT

MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.

Section 14.06 *Jurisdiction*. Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement and the Transaction Documents (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01.

Section 14.07 *Waiver of Jury Trial*. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when all Parties shall have received a counterpart hereof signed by all of the other Parties. Until and unless all Parties have received a counterpart hereof signed by the other Parties, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns prior to Closing; *provided, however,* (a) the Seller Indemnified Parties are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Article XIII, (b) the Seller Non-Party Group are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Section 13.06 and (c) the Buyer Non-Recourse Parties are intended to be, and shall be, third party beneficiaries of Section 14.15. From and after the establishment of the Liquidating Trust, the Liquidating Trustee shall be a third party beneficiary of Sellers' rights under this Agreement.

Section 14.09 *Entire Agreement*. This Agreement, the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 14.10 *Severability*. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable,

the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in. terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 14.11 *Specific Performance*. Without limiting Sellers' rights under Section 9.02(b), the Parties agree that, from and after Closing, irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (without posting any bond or other undertaking) or to enforce specifically the performance of the terms and provisions hereof in addition to any other remedy to which they are entitled at law or in equity.

Section 14.12 *Certain Acknowledgements and Limitations.*

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents. No implied obligation of good faith or fair dealing shall require any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation of good faith or fair dealing.

(b) WITHOUT LIMITING SECTION 13.03(b), UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), SPECIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), PUNITIVE, INCIDENTAL, SPECULATIVE, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY) OF ANY KIND ARISING UNDER, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT (EXCEPT TO THE EXTENT INDEMNIFIABLE PURSUANT TO ARTICLE XIII BECAUSE PAYABLE BY SELLERS OR ANY SELLER INDEMNIFIED PARTY TO A THIRD PARTY).

Section 14.13 *Disclosure Schedules*. All references to Schedules and Disclosure Schedules in Article III of this Agreement refer to Schedules contained in the Disclosure Schedule. The information in the Disclosure Schedule constitutes exceptions, qualifications and/or supplements to particular representations or warranties of Sellers as set forth in this Agreement. The Disclosure Schedule shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the Ordinary Course of Business of, or required to be disclosed by, Sellers

or constitutes, individually or in the aggregate, a Seller Material Adverse Effect. Capitalized terms used in the Disclosure Schedule that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Disclosure Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement. The statements in each Schedule of the Disclosure Schedule qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedule is apparent on its face.

Section 14.14 *Preparation of Agreement*. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 14.15 *No Recourse*. Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, each Seller, on behalf of itself and its Affiliates and their respective representatives and the Seller Indemnified Parties, covenants, agrees and acknowledges that no Person other than Buyer (and its successors or assignees, as applicable) has any obligation hereunder and that, neither Sellers, their respective Affiliates or their respective representatives, or any Seller Indemnified Parties, shall have any right of recovery under this Agreement or any other Transaction Document against, and no personal liability under this Agreement or any Transaction Document shall attach to, any of Buyer's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including Buyer, a "Buyer Non-Recourse Party"), through Sellers or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of Sellers or any Seller Indemnified Party against any Buyer Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

GAVILAN RESOURCES, LLC

By: ________________________________
Name: Dave Roberts
Title: Chief Executive Officer

GAVILAN RESOURCES
MANAGEMENT SERVICES, LLC

By: ________________________________
Name: Dave Roberts
Title: Chief Executive Officer

BUYER:

MESQUITE ENERGY, INC.

By: ______________________________
Name: Cameron W. George
Title: Chief Executive Officer

Case 22-90032 Document 862-1 Filed in TXSB on 06/24/22 Page 70 of 83

**<u>Exhibit A</u>**
**Definitions**

"<u>1933 Act</u>" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"<u>365 Contracts</u>" means all Applicable Contracts and other executory contracts and unexpired leases to which a Seller is a party that relate to the Assets, in each case that may be assumed by one or more Sellers pursuant to section 365 of the Bankruptcy Code.

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Allocated Value</u>" means, with respect to any Oil and Gas Property, the value of Sellers' interest therein as set forth on <u>Schedule 1.01(a)</u>. If any Oil and Gas Property is not set forth on <u>Schedule 1.01(a)</u> or, if no value is set forth on <u>Schedule 1.01(a)</u> with respect to such Oil and Gas Property, the Allocated Value of such Oil and Gas Property shall be zero.

"<u>Alternative Transaction</u>" means, other than the Transactions or any transactions effected in the Ordinary Course of Business, any (a) sale, transfer or other disposition, directly or indirectly, of all or substantially all of the assets of Sellers (except any such sale, transfer or other disposition to the extent permitted by <u>Section 5.01(b)</u>), (b) issuance, sale, transfer or other disposition, in each case by any Seller, of any class of equity securities, ownership interests or voting securities of any Seller, (c) merger, consolidation, recapitalization, business combination or other similar transaction involving any Seller, (d) the consummation of any state court foreclosure action as to a material portion of the Assets or (e) successful credit bid transaction with respect to the Assets.

"<u>Anti-Corruption Laws</u>" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, applicable anti-bribery legislation enacted by member states of the European Union and signatories implementing the OECD Convention Combating Bribery of Foreign Officials, and other similar laws and regulations applicable to the Sellers or their subsidiaries from time to time.

"<u>Applicable Contracts</u>" means (a) all Contracts (*provided* that, for clarity, any "Operating Agreement" or "Joint Operating Agreement" identified on the 365 Schedule shall be deemed a Contract for purposes of this definition) to which a Seller is a party or is bound to the extent covering, attributable to or relating to any of the Assets or to which an Oil and Gas Property is subject or bound, including, without limitation, operating agreements, crude oil, condensate and natural gas purchase and sale agreements, gathering agreements, transportation agreements, marketing, disposal or injection agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, exploration agreements, development agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements, confidentiality agreements and any other similar contracts, agreements and instruments, and all amendments thereto, and (b) all ROW Interests, including without

limitation, in the case of each of clause (a) and clause (b) of this definition, those Contracts and ROW Interests described on Annex C.

"Applicable Law" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, order, injunction or judgment adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Applicable Schedule 3.06(a) Consent" means any Consent required to be set forth on Disclosure Schedule 3.06(a) (irrespective of whether such Consent is actually listed on Disclosure Schedule 3.06(a)) (a) relating to an Applicable Contract for which the counterparty's consent to assignment would be required for such Applicable Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code, or (b) that burdens a Lease.

"Assigned Contracts" means the Desired 365 Contracts and all other Applicable Contracts that are not 365 Contracts (other than Excluded Assets).

"Assumed Liabilities" means:

(a) all Property Expenses to the extent attributable to the Assets and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is increased pursuant to Section 2.04(a));

(b) all Liabilities (other than Property Expenses) that attach to or run with the Assets (excluding any personal Liabilities of Sellers or their Affiliates that are not attached to the Assets), to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Effective Time;

(c) other than the Excluded Environmental Liabilities, all Liabilities under, associated with or appurtenant to the Assets with respect to Environmental Claims, whether arising on, before or after the Effective Time, including without limitation those related to the control, storage, handling, or discharge of all materials, substances and wastes from the Assets (including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes);

(d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Assets, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits;

(e) Taxes allocated to Buyer pursuant to Section 7.07(a) and Section 7.07(c);

(f) all Liabilities related to the payment of Burdens (i) attributable to Buyer Hydrocarbons (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A)), (ii) attributable to Effective Time Hydrocarbons to the extent not paid or borne by Sellers as of Closing and (iii) arising out of, in connection with or attributable to the failure to pay or report, or mispayment or underpayment of, any Burdens attributable to Seller Hydrocarbons to the extent (and only to the extent) that Buyer realizes the economic benefit of such non-payment, mispayment or underpayment (but excluding any and all Liabilities related to

items 3 through 44 of Disclosure Schedule 3.10 or the facts or allegations forming the basis thereof, to the extent attributable to Seller Hydrocarbons);

(g) all of Sellers' Liabilities under the Leases and the Purchased Contracts arising on or after the Effective Time (excluding any default penalties, charges or interest pertaining to breaches, defaults or non-performance under such Leases or Purchased Contracts prior to Closing), subject to the immediately preceding clause (f);

(h) all of Sellers' Liabilities with respect to Imbalances with Third Parties attributable to the Assets; and

(i) all Liabilities with respect to the Cure Costs required to be paid by Buyer in accordance with Section 5.03(i);

*provided, however,* that notwithstanding anything to the contrary in clauses (a) through (i) above, the Assumed Liabilities shall not include (i) Seller Taxes, (ii) any Liabilities pertaining to the Excluded Assets, (iii) any Liabilities discharged or from which the Assets are otherwise released as of the Closing in accordance with the Sale Order, (iv) any Excluded Environmental Liability, (v) any Excess Cure Costs, (vi) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, (vii) claims, investigations, administrative proceedings, arbitration or litigation arising out of or resulting from actual or claimed personal injury; illness or death; other torts; private rights of action given under any Applicable Law; or violation of any Applicable Law, or (viii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters, each of which clauses (i) - (viii) shall be deemed an Excluded Liability.

"Auction" means the auction for the sale of the Assets to be conducted in accordance with the Bid Procedures.

"Auction Participant" has the meaning set forth in the Bid Procedures Order.

"Avoidance Action" means any claim, right or cause of action of Sellers arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"Bid Procedures" means the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order.

"Bid Procedures Order" means the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* entered by the Bankruptcy Court on June 9, 2020 [Docket No. 115] in the Bankruptcy Cases, as amended by the *Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 215], the *Revised Order Pursuant to 11 U.S.C. §§ 363*

*and 105(a) for Modification of Sales Process* [Docket No. 268] entered on July 29, 2020, and the *Corrected Revised Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 278] entered on August 14, 2020 (as may be amended, supplemented or modified from time to time).

"Burden" means any and all Royalties, reversionary interests, net profits interests, production payments and other burdens upon, measured by or payable out of production.

"Business Day" means any day, excluding Saturdays, Sundays or legal holidays, on which commercial banks are open for business in New York, NY and Houston, TX.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a party.

"Buyer's Knowledge" means the actual knowledge of the executive officers of Buyer.

"Buyer Taxes" means any Taxes that are apportioned to Buyer under Section 7.07.

"Claim" means a claim against any Seller as defined in Bankruptcy Code section 101(5).

"Closing Date" means the date of the Closing.

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement between Resources and Buyer dated September 28, 2020.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Contract" means any contract or agreement, but excluding, however, (a) any Lease, easement, right-of-way (including any ROW Interest) or other instrument, in each case, creating any oil and gas mineral interests or other real property interests, or (b) any Permit.

"Deposit Escrow Agreement" means that certain Escrow Agreement dated as of the Execution Date, by and among Sellers, Buyer and the Escrow Agent.

"Designation Deadline" means 5:00 p.m. (Central Prevailing Time) on the date that is two (2) Business Days prior to the Closing Date.

"Disclosure Schedule" means the letter dated as of the Execution Date, executed by Sellers and delivered to Buyer on the Execution Date in connection with the execution and delivery of this Agreement, which letter is identified therein as the Disclosure Schedule for purposes of this Agreement.

"Effective Time" means 7:00 a.m. (Central Prevailing Time) on April 1, 2020.

"Environmental Claim" means any obligation (whether presently existing or that would exist with the passage of time, giving of notice or both) to affect cleanup or remediation under, or resolve noncompliance with, any Environmental Law and any Liability associated with or arising

therefrom. For the avoidance of doubt, (a) the fact that a Well is no longer capable of producing sufficient quantities of oil or gas to continue to be classified as a "producing well" shall not form the basis of an Environmental Claim, (b) the fact that a pipe is temporarily not in use shall not form the basis of an Environmental Claim and (c) except with respect to personal property (i) that causes or has caused contamination of the environment (including air, soil, surface water or groundwater) or (ii) the use or condition of which is a violation of Environmental Law, the physical condition of any surface or subsurface personal property, including water or oil tanks, separators or other ancillary equipment, shall not form the basis of an Environmental Claim.

"<u>Environmental Law</u>" means any Applicable Law or any agreement with any Governmental Authority relating to human health and safety, pollution, protection of the environment or to pollutants, contaminants, wastes, chemicals, materials or toxic or other Hazardous Substances. The term "Environmental Laws" does not include good or desirable operating practices or standards that may be employed or adopted by other oil and gas well operators or recommended, but not required, by a Governmental Authority.

"<u>Escrow Account</u>" means the escrow account established pursuant to the Deposit Escrow Agreement.

"<u>Escrow Agent</u>" means that certain Third Party that is a party, as escrow agent, to the Deposit Escrow Agreement and the Post-Closing Escrow Agreement, as applicable.

"<u>Excess Cure Costs</u>" means (i) any Cure Costs attributable to any period prior to the Effective Time (whether constituting a Property Expense or otherwise) and (ii) any Cure Costs with respect to the JDA (to the extent the JDA is a Desired 365 Contract) or with respect to Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule (which are required to be Desired 365 Contracts), in each case, that do not constitute Property Expenses attributable to the period on or after the Effective Time, as determined (for purposes of this <u>clause (ii)</u>) disregarding any Cure Costs described in <u>clause (i)</u> above.

"<u>Excluded Environmental Liabilities</u>" means all Liabilities relating to, associated with or appurtenant to (i) the migration, disposal, or transportation (or arrangement therefor) of any Hazardous Substances by or on behalf of Sellers off the premises of the Assets; and (ii) any fines or penalties relating to violations of Environmental Law, in each case resulting from facts or circumstances existing or occurring on or prior to the Petition Date.

"<u>Excluded Records</u>" means any items that are (a) Tax records that relate to the business of Sellers generally, (b) not transferable without payment of additional consideration (unless Buyer has agreed in writing to pay such additional consideration), (c) employee files and personnel records and employment benefits files and records (other than, in each case, for any Continuing Employees), (d) legal records and legal files of Sellers, including all work product of and attorney-client communications with Sellers' legal counsel or any other documents or instruments, in each case that may be protected by an attorney-client privilege (but excluding any title opinions or environmental, health and safety reports, or any such records that relate to the Assumed Liabilities), (e) reserve reports, valuations, and estimates of any quantities of Hydrocarbons or the valuation thereof with respect to the Assets, and any Hydrocarbon or other Hydrocarbon pricing assumptions, forward Hydrocarbon or other pricing estimates, Hydrocarbon or price decks, or

Hydrocarbon or pricing studies related thereto, (f) economic projections, (g) data, correspondence, materials, documents, descriptions or records relating to the Auction, marketing, sales negotiation or sale of any of the Assets, including the existence or identities of any prospective inquirers, bidders or prospective purchasers of any of the Assets, any bids received from and records of negotiations with any such prospective purchasers and any analyses of such bids by any Person, (h) correspondence between or among any Seller or its Affiliate or their respective representatives, and any prospective purchaser other than Buyer, and correspondence between any Seller or its Affiliates or any of their respective representatives with respect to any of the bids, the prospective purchasers or the Transactions, or (i) copies of the Data that relate to both the Assets and any Excluded Assets.

"Existing Letters of Credit" means all performance bonds, surety bonds, letters of credit, guarantees, security deposits and similar assurances in effect as of the Execution Date that relate to the Oil and Gas Properties.

"Expenses" means any and all notices, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties and expenses, including attorneys' and other professionals' fees and disbursements incident to the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (a) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (b) with respect to which no stay shall be in effect.

"Free and Clear" means free and clear of all claims, encumbrances, Liens or Liabilities other than the Assumed Liabilities and Permitted Liens, in each case to the maximum extent permitted by section 363(f) of the Bankruptcy Code.

"Fundamental Representations" means the representations of Sellers set forth in Section 3.01, Section 3.02, Section 3.03, Section 3.04 and Section 3.18.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, administrative body, agency or official, including any political subdivision thereof, or any tribal authority.

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including petroleum, its derivatives, by-products and other Hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

Case 23-90086 Document 863-1 Filed in TXSB on 06/16/23 Page 67 of 123

"Imbalance" or "Imbalances" means any over-production, under-production, over-delivery, underdelivery or similar imbalance of Hydrocarbons produced from or allocated to the Oil and Gas Properties, regardless of whether such over-production, under-production, over-delivery, underdelivery or similar imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"Imbalance Adjustment Amount" means the product of (a) any Imbalance allocated to the Oil and Gas Properties as of the Effective Time *multiplied by* (b) the Imbalance Price (which product shall be a positive number if such Imbalance is owed to Sellers by a Third Party and a negative number if such Imbalance is owed by Sellers to a Third Party).

"Imbalance Price" means the settlement price applicable to the Hydrocarbons that are the subject of the Imbalance under the applicable balancing agreement or, if no balancing agreement applies (or if the applicable balancing agreement does not provide for cash settlement), the market price for such Hydrocarbons as of the Effective Time.

"Indemnified Party" means a Party entitled to indemnification under Article XIII, whether on behalf of itself or, with respect to Sellers, any of the Seller Indemnified Parties.

"Indemnifying Party" means a Party from whom indemnification is sought under Article XIII by an Indemnified Party.

"Initial Highest Bid" has the meaning set forth in the Bid Procedures Order.

"Intellectual Property" means inventions and invention, disclosures; patents and patent applications (including statutory invention registrations); trademarks, service marks, logos, trade dress, trade names, Web addresses, domain names, and other indicia of commercial source or origin, including registrations and applications for registration thereof, and goodwill associated with any of the foregoing; copyrights, including registrations and applications for registration thereof; trade secrets, know-how, software, formulae, customer lists, data (including seismic data), processes, protocols, specifications, analyses, plans, techniques, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as notebooks, samples, studies and summaries); and other proprietary rights and intellectual property.

"Interim Period" means the period commencing at the Effective Time and ending at 7:00 a.m. (Central Prevailing Time) on the Closing Date.

"JDA" means that certain Joint Development Agreement dated March 1, 2017, by and among SN EF Maverick, LLC, SN EF Unsub, LP and Gavilan Resources, LLC (as amended).

"Liability" means any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured.

"Lien" means, with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and

other consensual or non-consensual lien, whenever granted and including without limitation those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code.

"Liquidating Trust" means a liquidating or similar trust as may be established with respect to Sellers' estates in conjunction with the Bankruptcy Cases.

"Liquidating Trustee" means the Trustees or other representative of the Liquidating Trust.

"Net Revenue Interest" or "net revenue interest" means the percentage share in all oil, gas and other Hydrocarbons produced from or allocated to a Conveyed Well or Lease after giving effect to all Burdens applicable thereto.

"Maverick Basin Area Participation Agreement" means that certain Maverick Basin Area Participation Agreement by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP Texas dated as of March 17, 2011 but effective as of January 1, 2011, as amended if amended.

"Non-Income Tax" means any Tax imposed on or with respect to the Assets other than any U.S. federal income tax, income tax imposed by any state or subdivision of the U.S., franchise tax (including the Texas Margin Tax) or Transfer Tax, but including any property tax, severance tax, production tax and sales and use tax.

"Oil and Gas Interests" means (a) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (b) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (c) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (d) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Seller has an ownership interest.

"Oil and Gas Lease" means any contract or agreement pursuant to which Sellers lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

"Ordinary Course of Business" means the ordinary course of business of Sellers, consistent in all material respects with past custom and practice of Sellers, including reasonable and prudent changes in response to the COVID-19 pandemic and governmental actions related thereto. Without limiting the effect of the foregoing, the term "Ordinary Course of Business" as used herein shall be no broader than the term "ordinary course of business" as used in section 363 of the Bankruptcy Code.

"Organizational Documents" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"Permits" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

"Person" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"Plan" means, if applicable, the joint plan of reorganization of Sellers under chapter 11 of the Bankruptcy Court with respect to the Bankruptcy Cases.

"Post-Closing Escrow Account" means the escrow account with respect to the Settlement Statement Escrow Amounts pursuant to the Post-Closing Escrow Agreement.

"Post-Closing Escrow Agreement" means that certain Escrow Agreement by and among Sellers, Buyer and the Escrow Agent, dated as of the Closing Date, and substantially in the form of Exhibit G attached hereto.

"Proceeding" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"Property Expenses" means all expenses, charges, capital expenses, joint interest billings, lease operating expenses, exploration expenses, production expenses, development expenses, drilling expenses, workover expenses, marketing fees and expenses, gathering, treating, transportation and processing fees and expenses, and any other exploration or development expenditures charged or incurred under applicable Oil and Gas Leases, operating agreements or other Purchased Contracts, that are attributable to the ownership, maintenance and operation of Sellers' interest in the Oil and Gas Properties during the period in question, and shall expressly include without limitation (a) all capital expenditures, including drilling costs, reworking costs, shut-in royalties and all other capital expenditures incurred in connection with the development, exploration, operation and maintenance of the Oil and Gas Properties during the Interim Period (and, for such amounts incurred after the Execution Date, only insofar as such amounts are incurred in accordance with the terms of this Agreement); (b) amounts paid under the Purchased Contracts (excluding any default penalties, charges or interest); and (c) overhead charges charged by Third Parties with respect to Oil and Gas Properties; *provided* that Property Expenses shall not include any costs, expenses or other Liabilities for or attributable to: (i) personal injury or death, property damage, torts, breach of

contract or violation of any Applicable Law; (ii) obligations relating to the abandonment or plugging of Wells, dismantling or decommissioning facilities, closing pits and restoring the surface around such Wells, facilities and pits; (iii) obligations with respect to Imbalances; (iv) obligations to pay Burdens or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets; (v) obligations with respect to hedging Contracts; (vi) obligations with respect to Taxes; (vii) amounts (if any) incurred to obtain any Required Consent; (viii) any amounts incurred to cure or attempt to cure any breaches of this Agreement or any Casualty Loss; (ix) deficiency payments; (x) any costs to maintain credit support associated with the Assets (including any Existing Letters of Credit); (xi) any Party's Expenses incurred in connection with negotiating this Agreement or consummating the Transaction; (xii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters; (xiii) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, and (xiv) claims for indemnification or reimbursement from any Third Party with respect to costs of the types described in the preceding clauses (i) through (xiii), whether such claims are made pursuant to contract or otherwise

"Release Agreement" means a Release Agreement substantially in the form of Exhibit H attached hereto.

"Representatives" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"ROW Interests" means all contracts and agreements pursuant to which Sellers hold any interest in any easement, right-of-way, license, crossing right and other subsurface interest (other than the Leases) used or held for use in connection with the ownership or operation of the Oil and Gas Properties, including the gathering or transportation of Hydrocarbons produced therefrom.

"Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

"Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

"Sale Hearing" has the meaning set forth in the Bid Procedures Order.

"Sale Order" means an order or orders of the Bankruptcy Court in the form and containing such terms, to the extent such terms pertain to the transactions contemplated by this Agreement, as are reasonably acceptable to Buyer and Sellers, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions; *provided* that, such order may be the Confirmation Order.

"Sanctioned Person" means at any time any Person: (a) listed on any Sanctions-related list of designated or blocked persons; (b) resident in or organized under the laws of a country or territory that is the subject of comprehensive restrictive Sanctions (including Cuba, Iran, North Korea, Syria, and the Crimea region); or (c) majority-owned (in the aggregate) or controlled by any of the foregoing.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the United States, (ii) the United Nations Security Council, (iii) the European Union, (iv) the United Kingdom, and (v) the respective governmental institutions of any of the foregoing including, without limitation, Her Majesty's Treasury, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of Commerce, and the U.S. Department of State.

"Seller Material Adverse Effect" means a material adverse effect on (a) the ownership or value (as determined relative to the Purchase Price) of the Oil and Gas Properties, taken as a whole, as currently owned and used as of the Execution Date or (b) the ability of Sellers to perform their respective obligations under the Transaction Documents or consummate the Transactions; *provided* that any such material adverse effect that results from any of the following matters shall not be taken into account in determining whether a material adverse effect has occurred under clause (a) or clause (b) of this definition: (i) entering into this Agreement or the announcement of the Transactions; (ii) changes in financial or securities markets generally; (iii) changes in general economic or political conditions in the United States or worldwide, except to the extent disproportionately affecting Sellers or the Assets; (iv) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Assets are located, including, but not limited to, changes in the market price of oil and natural gas; (v) acts of God, including hurricanes, storms or other naturally occurring events; (vi) acts or failures to act of Governmental Authorities, except as a result of any action or inaction by or on behalf of Sellers; (vii) matters disclosed on any Exhibit or Annex or in the Disclosure Schedule (but subject in all instances to Section 7.08 with respect to any Supplemental Disclosures); (viii) actions taken or omissions made after the Execution Date as expressly required under this Agreement or taken or omitted with the express written consent of Buyer; (ix) any epidemic, pandemic or disease outbreak (including the COVID-19 virus) or hostilities, terrorist activities or war or any similar disorder and, in each case, governmental actions related thereto; (x) matters that are cured or no longer exist by the earlier of Closing and the termination of this Agreement, including matters to the extent a purchase price adjustment is provided for under this Agreement; (xi) any change in laws or in GAAP and any interpretations thereof from and after the Execution Date; (xii) Casualty Losses; (xiii) any reclassification or recalculation of reserves in the Ordinary Course of Business; (xiv) natural declines in well performance; (xv) the commencement or pendency of the Bankruptcy Cases; (xvi) the departure of officers or directors of Sellers after the Execution Date; (xvii) any objections in the Bankruptcy Court to (A) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of any Seller and any related plan of reorganization or disclosure statement or (C) the Bid Procedures or the sale motion; and (xviii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit Sellers from consummating the Transactions) or any actions or omissions of Sellers in compliance therewith.

"Seller Tax Period" means any Tax period for which only Sellers are apportioned Taxes under Section 7.07.

"Seller Taxes" means any Taxes that are apportioned to Sellers under Section 7.07.

"Sellers' Knowledge" means the actual knowledge of Dave Roberts, George Fairchild, John Zabaneh, Joe Ketzner and Jeff Mobley.

"Special Warranty" means the special warranty of Acceptable Title described on Exhibit I.

"Springfield Gathering Contracts" means (a) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC, (b) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC and (c) that certain Springfield Gathering Assumption Agreement dated as June 1, 2017, by and among Sanchez Energy Corporation, Anadarko E&P Onshore, LLC and Kerr-Mcgee Oil & Gas Onshore, LP.

"Straddle Tax Period" means any Tax period for which both Sellers and Buyer are apportioned Taxes under Section 7.07.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"Successful Bidder" has the meaning set forth in the Bid Procedures Order.

"Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under this Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

"Tax" means (a) any tax, levy, unclaimed property and escheat obligation, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), and (b) any liability for any of the foregoing that arises by reason of a contract, assumption, transferee or successor liability, operation of Applicable Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxing Authority" has the meaning set forth in the definition of Tax.

"Third Party" means any Person other than a Party or its Affiliates.

"Transaction Documents" means this Agreement, the Assignment and Bill of Sale, the Assumption Agreement, any other agreement between or among Buyer and any Seller that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents and instruments entered into by Buyer, on the one hand, and a Seller, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the transactions contemplated hereby (as each such document, agreement and instrument may be amended, supplemented or modified).

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of Assets Free and Clear for the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement and the other Transaction Documents.

"Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

"Willful Breach" means, with respect to any Party, that such Party knowingly does one or more of the following: (a) such Party willfully and intentionally breaches in any material respect (by refusing to perform or taking an action prohibited) any material pre-Closing covenant, obligation or agreement applicable to such Party, or (b) such Party willfully and intentionally causes any of its representations or warranties under this Agreement to not be true and correct in all material respects after the Execution Date and prior to the Closing Date. For clarity, if a Party is obligated hereunder to use its commercially reasonable efforts to perform an action or to achieve a result, the failure to use such commercially reasonable efforts would constitute a willful and intentional breach of this Agreement.

"Working Interest" or "working interest" means a fraction or percentage of the costs and expenses associated with the maintenance, exploration, development, operation and abandonment of any Lease or Conveyed Well, but without regard to the effect of any Burdens.

(b) Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| 365 Schedule | 5.03(a) |
| Acceptable Title | Exhibit I |
| Accounting Firm | 7.07(d) |
| Adjusted Purchase Price | 2.03 |
| Agreement | Preamble |
| Allocation | 7.07(d) |
| Asset | 2.01 |
| Assignment and Bill of Sale | 2.05(c)(i) |
| Assumption Agreement | 2.05(c)(iii) |
| Audit Fees | 2.06(f) |
| Bankruptcy Cases | Recitals |
| Buyer | Preamble |
| Buyer Hydrocarbons | 2.01(d) |
| Buyer Non-Recourse Party | 14.15 |
| Casualty Loss | 10.01(b) |
| Chosen Courts | 14.06 |
| Closing | 2.05 |
| Closing Amount Overpayment | 2.07(b) |
| Closing Amount Shortfall | 2.07(a) |
| Closing Date Adjusted Purchase Price | 2.04(d)(i) |

| Term | Section |
|---|---|
| Closing Statement | 2.04(d)(i) |
| Code | 3.14(f) |
| Compensation Schedule | 7.06(b) |
| Consent | 3.06 |
| Consent Notice | 2.13 |
| Continuing Employee | 7.06(b) |
| Conveyed Wells | 2.01(b) |
| Cure Costs | 5.03(i) |
| Cut-Off Date | 2.06(g) |
| Data | 2.01(f) |
| Defect Deductible | Exhibit I |
| Defect Excess | Exhibit I |
| Deposit Escrow Funds | 2.09(a) |
| Desired 365 Contracts | 5.03(b) |
| Effective Time Hydrocarbons | 2.01(d) |
| Employment Offer | 7.06(a) |
| End Date | 9.01(b) |
| Equipment | 2.01(c) |
| Equitable Limitations | 3.03 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.05(b) |
| Execution Date | Preamble |
| Expense Reimbursement | 9.02(d) |
| Final Settlement Statement | 2.06(a) |
| Indemnification Claim | 13.03(a) |
| Lands | 2.01(a) |
| Leases | 2.01(a) |
| Letters in Lieu | 2.05(c)(ii) |
| Loss | 13.02 |
| Losses | 13.02 |
| ManagementCo | Preamble |
| Material Contract | 3.05(a) |
| Objection Notice | 2.06(c) |
| Oil and Gas Properties | 2.01(a) |
| Parties | Preamble |
| Party | Preamble |
| Permitted Liens | Exhibit I |
| Petition Date | Recitals |
| Post-Closing Consent Period | 2.13(c) |
| Preferential Purchase Rights | 3.17 |
| Pre-Paid Cure Costs | 5.03(i) |
| Prorated Expense Items | 2.04(c)(ii) |
| Purchase Price | 2.03 |
| Purchased Contracts | 2.01(g) |
| PwC | 2.06(d) |

| **Term** | **Section** |
|---|---|
| Referee | 2.06(d) |
| Required Consent | 2.13(a) |
| Resources | Preamble |
| Seller | Preamble |
| Seller Employee | 7.06(a) |
| Seller Hydrocarbons | 2.02(d) |
| Seller Indemnified Parties | 13.02 |
| Seller Non-Party Group | 13.06 |
| Sellers | Preamble |
| Settlement Statement Escrow Amounts | 2.06(g) |
| Supplemental Disclosure | 7.08 |
| Tax Proceeding | 7.05 |
| Taxing Authority | Exhibit A |
| Title Defect | Exhibit I |
| Title Well | Exhibit I |
| Transfer Taxes | 7.07(c) |

(c) *References and Rules of Construction. The* words “hereof”, “herein” and “hereunder” and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Annexes, Exhibits and Schedules are to Articles, Sections, Annexes, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words “include”, “includes” or “including” are used in this Agreement, they shall be deemed to be followed by the words “without limitation”, whether or not they are in fact followed by those words or words of like import. “Writing”, “written” and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to “law”, “laws” or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word “or” will have the inclusive meaning represented by the phrase “and/or.” The phrase “and/or” when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. “Shall” and “will” have equal force and effect. The word “extent” in the phrase “to the extent” shall mean the degree or proportion to which a subject or other things extends, and such phrase shall not mean simply “if.” References to any date shall mean such date in Houston, Texas and for purposes of calculating the time period in which any notice or action is to be given or undertaken

hereunder, such period shall be deemed to begin at 12:01 a.m. on the applicable date in Houston, Texas. If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. **THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.**

**Exhibit B**

**ASSIGNMENT AND BILL OF SALE**

THE STATE OF [____________]

COUNTY OF [____________]

THIS ASSIGNMENT AND BILL OF SALE (this "Assignment and Bill of Sale") is executed and delivered by Gavilan Resources, LLC, a Delaware limited liability company, and Gavilan Resources Management Services, LLC, a Delaware limited liability company (each an "Assignor" and collectively, the "Assignors"), each with an address of c/o Gavilan Resources Holdings, LLC, 920 Memorial City Way, Suite 1400, Houston, Texas 77024, to Mesquite Energy, Inc., a Delaware corporation ("Assignee"), with an address of 700 Milam Street, Suite 600, Houston, Texas 77002, and is made to be effective as of 7:00 a.m., April 1, 2020, Central Prevailing Time (the "Effective Time"). Reference is made to that certain Asset Purchase Agreement, dated October 16, 2020, by and between Assignors, as Sellers, and Assignee, as Buyer (the "Purchase Agreement"). All capitalized terms used herein that are not otherwise defined herein shall have the meanings attributed to such terms in the Purchase Agreement.

1. For and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors hereby transfer and convey to Assignee all of their respective right, title and interest, if any, in and to the properties and interests described in clauses (a) through (k) below (the "Assets") in their "as is" and "where is" condition and without warranty of title of any kind:

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Assignors in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Assignors as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Assignors' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties"; the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Assignors to Assignee, all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Assignors to Assignee, and subject to the payment by Assignee of any fees required as a condition to the assignment thereof to Assignee, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided*, *however*, that (1) Assignee's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (*provided* that Assignors shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to

pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Assignee only to the same extent as such rights are vested in Assignors, and (3) after the Closing, Assignee shall provide Assignors with access to, and Assignors shall have the right to receive copies of, the Data as provided in Article VI of the Purchase Agreement;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (the "Purchased Contracts"), including those Assigned Contracts set forth on Annex C hereto;

(h) Permits. To the extent assignable by Assignors to Assignee, all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights. (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

2. Notwithstanding anything to the contrary in the Purchase Agreement or elsewhere in this Assignment and Bill of Sale, the "Assets" shall not include any rights with respect to any Excluded Assets. "Excluded Assets" means all of the following assets:

(a) all cash and cash equivalents of Assignors;

(b) all corporate and financial records of Assignors to the extent they relate to Assignors' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Assignors arising under the Purchase Agreement;

(f) all of the matters listed on Annex E[1] (other than (i) item 1 of Annex E and (ii) item 45 of Annex E to the extent such item does not relate to the Contracts or other assets listed on Annex F) rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Assignors attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Assignors under Section 7.07 of the Purchase Agreement;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Assignors' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Annex F hereto[2];

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Assignors, other than the Equipment;

[1] Note to Draft: Annex E to include all matters listed on Disclosure Schedule 3.10 of the Purchase Agreement.

[2] Note to Draft: Annex F to include a list of any Contracts or other assets listed on Schedule 2.02(k) of the Purchase Agreement.

(o) all assets excluded pursuant to the express terms of the Purchase Agreement, including those assets listed on Annex G hereto[3];

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 1(e), Section 1(f)(ii) and Section 1(h) of this Assignment and Bill of Sale, in each case, that are not assignable to Assignee pursuant to the Purchase Agreement after giving effect to the Bid Procedures Order and the Sale Order;

(r) all engagements and similar letters and agreements with Assignors' legal advisors, it being agreed that Assignee shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Assignors or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii) of the Purchase Agreement; and

(t) any assets or properties otherwise expressly identified as Excluded Assets under the Purchase Agreement.

3. Assignors warrant Acceptable Title to the Title Wells included within the Assets unto Assignee, its successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Assignors, but not otherwise, subject to the Permitted Liens, and only as to claims raised by Assignee in writing to Assignors pursuant to the notice provisions of the Purchase Agreement prior to the Cut-Off Date. Assignors hereby assign to Assignee all rights, claims and causes of action on title warranties given or made by Assignors' respective predecessors with respect to the Title Wells, and Assignee is specifically subrogated to all rights which Assignors may have against their predecessors with respect to the Title Wells, to the extent Assignors may legally transfer such rights and grant such subrogation.

4. For purposes of this Assignment and Bill of Sale, the following terms shall be defined as follows:

(a) "Avoidance Action" means any claim, right or cause of action of Assignors arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

(b) "Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other

[3] Note to Draft: Annex G to include a list of any assets excluded pursuant to Section 2.12(d), Section 2.13 or Section 5.03 of the Purchase Agreement.

hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

(c) "Oil and Gas Interests" means (i) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (ii) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (iii) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (iv) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Assignor has an ownership interest.

(d) "Oil and Gas Lease" means any contract or agreement pursuant to which Assignors lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

(e) "Permits" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

(f) "Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

(g) "Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

(h) "Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under the Purchase Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

(i) "Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of

Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

5. On May 15, 2020, each Assignor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and these cases have been jointly administered for procedural purposes only under Case No. 20-32656 (MI). On [__], 2020, the Bankruptcy Court entered an order (the "Order"), authorizing the Assignors to sell the Assets, a certified copy of which Order is attached hereto as Exhibit A and incorporated herein for all purposes by this reference. This Assignment and Bill of Sale is made pursuant to the Order.

6. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflicts of law or principle that might refer to construction of such provisions to the laws of another jurisdiction. Each Assignor and Assignee agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01 of the Purchase Agreement. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS ASSIGNMENT AND BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. This Assignment and Bill of Sale is expressly subject to the terms and conditions of the Purchase Agreement, which terms are hereby incorporated into this Assignment and Bill of Sale by reference for all purposes. In the event of a conflict between the terms of this Assignment and Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8. Each of Assignors and Assignee agree (a) to furnish upon request to each other such further information, (b) to execute, acknowledge, and deliver to each other such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Assignment and Bill of Sale and the Purchase Agreement and the documents referred to in this Assignment and Bill of Sale and the Purchase Agreement.

9. If any term, provisions, covenant or restriction contained in this Assignment and Bill of Sale is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment and Bill of Sale shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Assignment and Bill of Sale a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

10. This Assignment and Bill of Sale may be executed in any number of counterparts, and all counterparts so executed shall constitute one Assignment and Bill of Sale, binding upon all of the parties hereto, notwithstanding that all the parties are not signatory to the original or same counterpart.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Bill of Sale, to be effective at the Effective Time.

ASSIGNORS:

**GAVILAN RESOURCES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on _______________, 2020, by [_____________________], as [_____________________] of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on _______________, 2020, by [_____________________], as [_____________________] of Gavilan Resources Management Services, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**Annex A**

**Leases**

[To be attached]

**Annex B**

**<u>Conveyed Wells</u>**

[To be attached]