| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 |

1. Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
3. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
4. Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.
5. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
6. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

**<u>Disclosure Schedule 3.05(b)</u>**
**Material Contract Defaults**

(i)

1. Default under the Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Default under the Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.

(ii)

1. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
2. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
3. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
4. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

Case 22-90356 Document 63-21 Filed in TXSB on 10/26/22 Page 403 of 433

# .Disclosure Schedule 3.06(a)

## Approvals

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0616001-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0616002-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0619001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0623001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 01/02/2007 | Assignment: Consent required. |
| T0623002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0623005-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 10/02/2008 | Assignment: Consent required. |
| T0626002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0619003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2010 | Assignment: Consent required. |
| T0626001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619015-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0622001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0619006-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | DIANA M STUMBERG ET AL | 11/05/2008 | Assignment: Consent required. |
| T0618001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0618003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0621001-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | EWING ENTERPRISES LIMITED PARTNERSH | 09/20/2006 | Assignment: Consent required. |
| T0621005 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT | 04/30/2014 | Assignment: Consent required. |
| T0621011 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT T | 04/30/2014 | Assignment: Consent required. |
| T0621001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | FITZSIMONS OIL AND GAS MANAGEMENT T | 12/22/2005 | Assignment: Consent required. |
| T0617002-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | G E LIGHT III TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617001-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT III, BILLIE RAE LIGHT TR | 10/29/2009 | Assignment: Consent required. |
| T0621001-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | LA BANDERA RANCH LP | 09/29/2006 | Assignment: Consent required. |
| T0617001-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | LIGHT MINERAL TRUST | 10/29/2009 | Assignment: Consent required. |
| T0618003-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 10/25/2005 | Assignment: Consent required. |
| T0620002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET | 03/06/2006 | Assignment: Consent required. |
| T0616001-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0616002-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0620001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 03/06/2006 | Assignment: Consent required. |
| T0620003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 03/06/2006 | Assignment: Consent required. |
| T0618003-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | THE SOUTH TEXAS CHILDRENS HOME | 10/25/2005 | Assignment: Consent required. |
| T0618005-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618010 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618014 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 03/06/2006 | Assignment: Consent required. |
| T0624001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | WORTHEY PROPERTIES LTD | 03/01/2009 | Assignment: Consent required. |
| T0624002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | B L STANLEY LTD | 10/15/2008 | Assignment: Consent required. |
| T0617002-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | LIGHT MINERAL TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617002-003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-004 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-003 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | RANCHO ENCANTADO LP | 10/29/2009 | Assignment: Consent required. |
| T0617001-005 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | GEORGE E LIGHT III ET AL | 10/29/2009 | Assignment: Consent required. |
| T0616005 | Lease - Oil, Gas and Minerals | ROSETTA RESOURCES OPERATING LP | LESLIE EDDIE VIVION AND NANCY JOE V | 12/21/2009 | Assignment: Consent required. |
| T0621001-004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | KATHLEEN FITZSIMONS LOVE ET AL | 01/17/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0621001-005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | JACKSON BENJAMIN LOVE JR | 01/17/2012 | Assignment: Consent required. |
| T0620007 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | STATE OF TEXAS MF-111277 | 07/20/2010 | Assignment: Consent required. |
| 1141199000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/4/2012 | Assignment: Consent required. |
| 1138496000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III | 3/5/2007 | Assignment: Consent required. |
| 1139504000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2006 | Assignment: Consent required. |
| 1139555000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/22/2010 | Assignment: Consent required. |
| 1139556000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/21/2010 | Assignment: Consent required. |
| 1139557000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | HUGH A FITZSIMONS III | 11/5/2009 | Assignment: Consent required. |
| 1139825000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139839000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139840000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139841000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/1/2011 | Assignment: Consent required. |
| 1140225000 | O/G LSE-Surface Rights/Rentals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2011 | Assignment: Consent required. |
| 1140226000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 12/1/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140230000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 12/1/2011 | Assignment: Consent required. |
| 1140231000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WORTHEY PROPERTIES LTD | 3/1/2009 | Assignment: Consent required. |
| 1140232000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | FITZSIMONS ENTITY ET AL | 12/22/2005 | Assignment: Consent required. |
| 1140233000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET AL | 3/6/2006 | Assignment: Consent required. |
| 1140235000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 3/6/2006 | Assignment: Consent required. |
| 1140236000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 3/6/2006 | Assignment: Consent required. |
| 1140237000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 3/6/2006 | Assignment: Consent required. |
| 1140411000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140412000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140413000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140469000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140663000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/22/2012 | Assignment: Consent required. |
| 1140664000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140665000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140666000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/20/2012 | Assignment: Consent required. |
| 1140667000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140742000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140744000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140767000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/13/2012 | Assignment: Consent required. |
| 1140768000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/29/2011 | Assignment: Consent required. |
| 1140807000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1141016000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 2/10/2011 | Assignment: Consent required. |
| 1141017000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/29/2011 | Assignment: Consent required. |
| 1141018000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/31/2011 | Assignment: Consent required. |
| 1141135000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 12/20/2012 | Assignment: Consent required. |
| 1141139000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 9/5/2012 | Assignment: Consent required. |
| 1141175000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/1/2012 | Assignment: Consent required. |
| 1141181000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141182000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141198000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/15/2012 | Assignment: Consent required. |
| 1141200000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141201000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/3/2012 | Assignment: Consent required. |
| 1141202000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/3/2012 | Assignment: Consent required. |
| 1141203000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/19/2012 | Assignment: Consent required. |
| 1141204000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141205000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141206000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141446000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1141544000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1141300000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/26/2013 | Assignment: Consent required. |
| 1141429000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | ROGERS DENTONIO RANCH LTD | 2/24/2013 | Assignment: Consent required. |
| 1141430000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 2/22/2013 | Assignment: Consent required. |
| 1141433000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | 2/15/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141434000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 4/1/2013 | Assignment: Consent required. |
| 1141447000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141448000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141449000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141450000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141451000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141498000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/1/2013 | Assignment: Consent required. |
| 1141543000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/11/2013 | Assignment: Consent required. |
| 1141705000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141706000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141733000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 7/24/2011 | Assignment: Consent required. |
| 1141740000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/9/2013 | Assignment: Consent required. |
| 1141743000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/8/2013 | Assignment: Consent required. |
| 1141771000 | Surface License / Permit | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141872000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 9/30/2013 | Assignment: Consent required. |
| 1141879000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/19/2013 | Assignment: Consent required. |
| 1141887000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/1/2013 | Assignment: Consent required. |
| 1141888000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 10/1/2013 | Assignment: Consent required. |
| 1142037000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/1/2013 | Assignment: Consent required. |
| 1142038000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/1/2014 | Assignment: Consent required. |
| 1142040000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |
| 1142041000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2013 | Assignment: Consent required. |
| 1142142000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 1/17/2014 | Assignment: Consent required. |
| 1142148000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142149000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142151000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BEINHORN JR FAMILY LIMTED PARTNERSHIP | 2/6/2014 | Assignment: Consent required. |
| 1142152000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142153000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/7/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1142154000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142394000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 4/21/2014 | Assignment: Consent required. |
| 1142397000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142398000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142399000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142400000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1142401000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142402000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142558000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1340261000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 6/1/2014 | Assignment: Consent required. |
| 1347518000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |
| 1347530000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1349965000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1350515000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2014 | Assignment: Consent required. |
| 1350568000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2014 | Assignment: Consent required. |
| 1350582000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2015 | Assignment: Consent required. |
| 1350613000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 3/1/2015 | Assignment: Consent required. |
| 1351039000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 2/12/2012 | Assignment: Consent required. |
| 1351042000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/5/2013 | Assignment: Consent required. |
| 1351043000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1351044000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351045000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351046000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351047000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/11/2014 | Assignment: Consent required. |
| 1351064000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351250000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/29/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1351252000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2012 | Assignment: Consent required. |
| 1351254000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/19/2012 | Assignment: Consent required. |
| 1351255000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/23/2015 | Assignment: Consent required. |
| 1351256000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/2/2014 | Assignment: Consent required. |
| 1351258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/26/2012 | Assignment: Consent required. |
| 1351259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/14/2014 | Assignment: Consent required. |
| 1351260000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/23/2015 | Assignment: Consent required. |
| 1351285000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/11/2015 | Assignment: Consent required. |
| 1352817000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2014 | Assignment: Consent required. |
| 1352868000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/20/2015 | Assignment: Consent required. |
| 1354527000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 5/1/2015 | Assignment: Consent required. |
| 1354911000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/30/2015 | Assignment: Consent required. |
| 1360670000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2015 | Assignment: Consent required. |
| 1140772000 | Right of Way/Easement/ Facility | KERR-MCGEE OIL & GAS ONSHORE LP | ADELA A SMITH FAMILY LIMITED PARTNERSHIP | 1/1/2011 | Assignment: Notice and fee required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| HIGH PRESSURE GAS LIFT AGMT - CHIP EAST | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | February 26, 2015 | Assignment: Consent required. |
| Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | October 5, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | October 12, 2010 | Assignment: Consent required. |
| SOUTH TEXAS CHILDRENS HOME 10/12/10 (Letter Agmt) | Letter Agreement | Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | October 14, 2010 | Assignment: Consent required. |
| Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | Letter Agreement | Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | January 1, 2011 | Assignment: Consent required. |
| High Pressure Gas Lift Agrmt/ Chupadera | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | May 27, 2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agreement | Marketing | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | February 21, 2017 | Assignment: Consent required. |
| Crude Oil Production Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Natural Gas Liquids Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Residue Gas Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Second Amended and Restated Lease Dedication and Oil Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Second Amended and Restated Lease Dedication and Gas Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Joint 3D Seismic Acquisition Agreement (FOGMT) | Seismic | Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | Seismic | Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Non-Exclusive Data Use License and Access Agreement (providing access to well cores) | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |
| Purchase and Sale Agreement | | Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | January 12, 2017 | Assignment: Consent required. |
| Letter Agmt RECIPROCAL DATA EXCHANGE/CONFD. CHK | Seismic | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required. |
| Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | Seismic | Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | July 9, 2018 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | Seismic | Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina South | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina West | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift Agmt - Cat North | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | January 6, 2015 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Joint Development Agreement | Development Agreement | Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |
| Geophysical and Seismic Data Use Agreement | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | April 15, 2018 | Assignment: Consent required. |
| Development Agreement | Marketing | Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Firm Gas Gathering, Processing and Purchase Agreement | Marketing | Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC<br>Carnero G&P LLC | April 1, 2018 | Assignment: Consent potentially required.[4] |
| Ratification and Assumption Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC; Carnero G&P LLC | May 22, 2018 | Assignment: Consent potentially required.[5] |
| Firm Intrastate Gas Transportation Services Agreement | Marketing | Anadarko E&P Onshore LLC | Springfield Pipeline LLC | March 1, 2013 | Assignment: Notice required |

[4] Consent not required if (i) party acquiring all or substantially all of the assets of assigning party is directly or indirectly subject to the agreement or (ii) assignment is in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage, provided that the credit assurance requirements are continuously complied with by Producer and its assignee prior to and after any assignment by Producer. See Sec. 13.1(a)

[5] Consent requirement is identical to Firm Gas Gathering, Processing and Purchase Agreement consent requirement immediately above.

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Gathering, Processing and Purchasing Agreement (Dedication) | Marketing | Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | September 1, 2008 | Assignment: Notice required |
| Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | Letter Agreement | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required |
| Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | Seismic | Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | May 21, 2012 | Assignment: Consent required |
| IHS Community of Best Practices Agreement | Data sharing | Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | July 30, 2014 | Assignment: Consent required |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | Data sharing | Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | August 20, 2015 | Assignment: Consent required |
| Purchase/Sale Agmt | Purchase Agreement | Anadarko E&P Onshore LLC | TXCO Resources Inc. et al<br>Newfield Exploration Company | January 10, 2010 | Assignment: Consent required |

**<u>Disclosure Schedule 3.07</u>**
**Environmental Matters**

None.

Case 22-90056 Document 683-1 Filed in TXSB on 08/16/22 Page 425 of 433

# Disclosure Schedule 3.08

**Well Status**

None.

<u>**Disclosure Schedule 3.09**</u>
**Imbalances**

None.

# Disclosure Schedule 3.12
## Intellectual Property

| Party Name | Counterparty | Title of Contract | Date of Contract |
|---|---|---|---|
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Venado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |

**<u>Disclosure Schedule 3.14</u>**
**Taxes**

None.

**<u>Disclosure Schedule 3.17</u>**
**Preferential Purchase Rights**

1. Tag-Along Right provided in Maverick Basin Area Participation Agreement dated as of January 1, 2011, by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP.
2. Tag-Along Right and Right of First Offer provided in Joint Development Agreement, dated March 1, 2017, by and among Gavilan Resources, LLC, SN EF Maverick, LLC, SN EN Unsub, LP and Sanchez Energy Corporation (solely with respect to Section 2.2, 4.2, 4.5 and Article VII).

<u>**Disclosure Schedule 3.20**</u>

**Working Interest Payments**

None.

## Disclosure Schedule 3.22
## Violations of Applicable Laws

None.

# EXHIBIT 22

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION REGARDING LIMITED OBJECTION AND RESERVATION OF RIGHTS OF GAVILAN RESOURCES, LLC TO ASSUMPTION AND REJECTION OF CONTRACTS UNDER SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

[Related to Dkt. No. 1346]

This *Stipulation Regarding Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Stipulation") is made between Gavilan Resources, LLC ("Gavilan"), SN EF Maverick, LLC ("SN Maverick"), and Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) ("Mesquite"),

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

(Gavilan, SN Maverick, and Mesquite are each a "Party" and collectively the "Parties" to this Stipulation).

**RECITALS**

WHEREAS, the Parties have been involved in disputes concerning the Joint Development Agreement dated March 1, 2017 (as amended or supplemented) ("JDA") and the right to serve as operator under certain joint operating agreements;

WHEREAS, the Parties are involved in the following pending matters:

(a) Case No. 19-34508, *In re Sanchez Energy Corporation, et al*., pending in this Court ("Sanchez Bankruptcy Case"), involving the contested matter of the motion to reject, *inter alia*, the JDA ("JDA Rejection Matter") [*See* Dkt No. 1346];

(b) Case No. 20-32656, *In re Gavilan Resources, LLC, et al*., pending in this Court ("Gavilan Bankruptcy Case");

(c) Adversary Proceeding No. 20-03021, *Gavilan Resources, LLC v. SN EF Maverick, LLC, et al.*) (filed in the Sanchez Bankruptcy Case) ("Gavilan-SN Maverick Adversary Proceeding"), in which this Court entered a Final Judgment on July 13, 2020 (the "July 2020 Judgment") [Dkt. No. 90], finding that SN Maverick committed two Defaults (as defined in the JDA) under the JDA;

(d) Adversary Proceeding No. 20-03378, *SN EF Maverick, LLC v. Gavilan Resources, LLC* (pending in the Gavilan Bankruptcy Case) ("SN Maverick-Gavilan Adversary Proceeding");

(e) Adversary Proceeding No. 20-03307, *Gavilan Resources, LLC* v. *SN EF Maverick, LLC* (filed in the Gavilan Bankruptcy Case) ("Gavilan Dec Action"), in which this Court entered a Final Declaratory Judgment (the "August 2020 Judgment") [Dkt. No. 15], which confirmed that SN Maverick is presently the operator under the applicable joint operating agreements and affords



4828-2564-2704.4

010887

Gavilan the right to cause SN Maverick to resign as operator and to designate itself or its successor as the operator under the applicable joint operating agreements, subject to the terms of those operating agreements;

(f) Case No. 4:20-cv-2640, *SN EF Maverick, LLC et al. v. Gavilan Resources, LLC* (pending in the United States District Court for the Southern District of Texas) ("District Court Case"), which is the appeal of the July 2020 Judgment;

WHEREAS, Gavilan has a pending *Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* ("Gavilan Objection") to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, dated April 30, 2020 (as amended or supplemented from time to time, the "Sanchez Plan");

WHEREAS, on October 16, 2020 in the Gavilan Bankruptcy Case, the Court entered an order approving the sale of Gavilan's assets to Mesquite or its designee [Dkt. 361, Gavilan Bankruptcy Case] (the "Sale Order"), which incorporated the executed Asset Purchase Agreement between Gavilan and Mesquite (the "APA") [Dkt. No. 366, Gavilan Bankruptcy Case];

WHEREAS, upon the closing of the APA, Gavilan no longer owns the assets for which the August 2020 Judgment states it has the right to designate itself or its successor as the operator;

WHEREAS, as of closing of the APA, Mesquite or its designee, as applicable, is Gavilan's successor to those assets;

WHEREAS, as of closing, Mesquite or its designee maintain the right to direct Gavilan or Gavilan's successor as it concerns the treatment of the JDA;

WHEREFORE, in connection with the APA, the Parties executed a Release Agreement (the "Release"), which among other things, (i) releases and forever discharges rights, claims, and causes of action in connection with the JDA and operator dispute of the Parties, including their affiliates, which includes SN Maverick and (ii) requires the Parties to transfer, assign, or otherwise dispose of any right or interest each Party may have in any Claims (as defined in the Release);

WHEREAS, in connection with the APA and Release, the Parties agreed to dismiss with prejudice all pending litigation between them, including the Gavilan-SN Maverick Adversary Proceeding, the SN Maverick-Gavilan Adversary Proceeding, the Gavilan Dec Action, and the District Court Case, and

WHEREAS, also in connection with the APA and the Release, the Parties agreed to resolve the JDA Rejection Matter.

**STIPULATION**

NOW THEREFORE, the Parties agree and stipulate as follows:

1. Gavilan withdraws with prejudice the Gavilan Objection, including, but not limited to, any objections to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

2. Gavilan consents to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

Date: November 12, 2020



4828-2564-2704.4

010889

**AGREED AND ACCEPTED**:

FOLEY & LARDNER LLP

*/s/ John P. Melko*
John P. Melko
State Bar No. 13919600
Email: jmelko@foley.com
Sharon M. Beausoleil
State Bar No. 24025245
Email: sbeausoleil@foley.com
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone: 713-276-5500
Facsimile: 713-276-5555

and

MORRISON & FOERSTER LLP

Jamie A. Levitt (admitted Pro hac vice)
Michael D. Birnbaum (admitted Pro hac vice)
James E. Hough (admitted Pro hac vice)
Dennis L. Jenkins (admitted Pro hac vice)
Brett H. Miller (admitted Pro hac vice)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: jlevitt@mofo.com
mbirnbaum@mofo.com
jhough@mofo.com
djenkins@mofo.com
brettmiller@mofo.com

**ATTORNEY FOR REORGANIZED DEBTORS**

WEIL, GOTSHAL & MANGES LLP

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez (TX 15776275)
Brenda Funk (TX 24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: 713-546-5000
Facsimile: 713-224-9511
Emails: Alfredo.Perez@weil.com; Brenda.Funk@weil.com

**ATTORNEYS FOR GAVILAN RESOURCES, LLC**

# EXHIBIT 23

ENTERED
10/16/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| | § | |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | **Re: Docket No. 99** |

**ORDER (A) APPROVING SALE OF DEBTORS' ASSETS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

Upon the motion, dated June 4, 2020 [Docket No. 99] (the "**Motion**"),[2] of Gavilan Resources, LLC ("**Gavilan**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") seeking an order (a) approving sale of Debtors' assets, (b) authorizing assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Bid Procedures (as defined herein), or the APA (as defined herein), as applicable.

such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion, and this Court having entered the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (as further amended and modified, the "**Bid Procedures Order**"); and the Auction having been held in accordance with the *Notice of Amended Bid Procedures Order Dates and Reset Video/Telephonic Sale Hearing* [Docket No. 294] on September 29, 2020 and concluding on October 2, 2020, and Mesquite Energy, Inc. (together with any affiliate of Mesquite Energy, Inc., to which the Oil and Gas Properties are assigned at Closing pursuant to the APA, the "**Buyer**") having been chosen as the Successful Bidder for the Assets; and upon the Buyer and the Debtors having agreed to the terms of that certain Asset and Purchase Agreement (together with all ancillary documents, as may be amended, modified, or supplemented, the "**APA**");[3] and this Court having reviewed the *Declaration of Kevin Bonebrake in Support of Approval of and Entry into Sale Transaction* [Docket No. 329]; and this Court having conducted a hearing on October 8, 2020 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this order (the "**Sale Order**"), including the objections to the Motion filed by the Oxy Parties [Docket No. 332] (the "**Oxy Objection**") and the WES Parties [Docket No. 333] (the "**WES Objection**") (with the "Oxy Parties" and the "WES Parties" each as defined as set forth in the Oxy Objection and the WES Objection, respectively); and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction (as defined in the Sale Notice), APA, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits except as set forth herein; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and this Court having determined

---

[3] A copy of the APA is attached hereto as **Exhibit I**.

that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.

C. **Venue**. Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules and the *Procedures for Complex Cases in the Southern District of Texas*.

E. **Notice and Opportunity to Object**. Notice of the Motion, the Bid Procedures, the assumption and/or assignment of the Desired 365 Contracts, the APA, the Auction, the Sale Hearing, and the deadlines related thereto, including any subsequent modifications, was provided to: (i) the United States Trustee for the Southern District of Texas; (ii) counsel for the Administrative Agent to the First Lien Secured Lenders; (iii) counsel for the Second Lien Ad Hoc Group; (iv) counsel for the Administrative Agent for the Second Lien Lenders; (v) all affected federal, state, and local regulatory and taxing authorities; (vi) the U.S. Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the counterparties to the 365 Contracts and all Leases and other applicable contracts, (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (x) all parties entitled to notice pursuant to Local Rule 9013-1(d) (collectively, the "**Sale Notice Parties**"), all in accordance with and as provided by the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (the "**Bid Procedures Order**"). *See* Affidavit of Service of Angharad Bowdler [Docket No. 143]. The Debtors also posted the Sale Notice on Epiq Corporate Restructuring LLC's website (https://dm.epiq11.com/case/gavilan/info). With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice in the *News Gram*, published in Maverick County, Texas, the *Laredo Morning Times*, published in Webb County, Texas, the *Carrizo Springs Javelin*, published in Dimmit County, Texas, the *Zavala County Sentinel*, published in Zavala County, Texas, the *San Antonio Express News*, published in Bexar County, Texas, and the *Frio-Nueces Current*, published in Frio and La Salle Counties, Texas, in June 2020, was sufficient and reasonably calculated under the circumstances to reach such entities. *See* Affidavits Regarding Publication [Docket Nos. 261–66]. Service and publication of the Sale Notice was appropriate, in full compliance with the Bid Procedures Order, and reasonably

Case 20-32056 Document 335-1 Filed on 10/16/20 in TXSB Page 5 of 35

calculated to provide all Sale Notice Parties with good and sufficient notice of the Sale Transaction and the APA by and between the Debtors and the Buyer, and provided a reasonable opportunity to object, and no further notice need be provided.

F. Service and publication of the Sale Notice was provided to all parties in interest, including those with one or more alleged preferential purchase rights listed on Disclosure Schedule 3.17 of the APA, including the Tag-Along Right provided in the Maverick Basin Area Participation Agreement and the Tag-Along Right and Right of First Offer provided in the Joint Development Agreement (the "**Preferential Purchase Rights**"), and those with one or more rights based on any alleged approval or consent right or anti-assignment provision contained in an Applicable Contract, Lease, or other Purchased Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object, all as described more fully in sections 2.12–2.14 of the APA. *See* Affidavit of Service of Angharad Bowdler of Epiq Corporate Restructuring, LLC [Docket No. 143].

G. The Debtors served notice substantially in the form of the *Notice of Designation of Successful Bid and Back-up Bid* [Docket No. 311] (the "**Post-Auction Notice**") on all parties entitled to receive such notice under the Bid Procedures Order and applicable rules. *See* Affidavit of Service of Angharad Bowdler [Docket No. 316]. Service of the Post-Auction Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the conclusion of the Auction and the identity of the Successful Bid.

H. The Debtors filed the Assumption and Assignment Notice and posted it on the case website at (https://dm.epiq11.com/case/gavilan/info). Service of the Assumption and Assignment Notice on all counterparties to the 365 Contracts and all parties on the Rule 2002 Notice List was appropriate and good and sufficient notice of the proposed assumption and

assignment of the Desired 365 Contracts, the applicable Cure Amounts (as defined in the Bid Procedures) related thereto, and the procedures for objecting thereto, and no other or further notice is necessary. All counterparties to 365 Contracts that are Desired 365 Contracts have had an adequate opportunity to object to the assumption and assignment of such 365 Contracts and the Cure Amounts related thereto.

I. The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures, the Bid Procedures Order, the APA, the assumption and/or assignment to the Buyer of the Assets (including the Desired 365 Contracts, the Leases, and the Other Purchased Contracts) the Auction, the Sale Hearing, the Sale Transaction, the Cure Amounts, the deadlines to submit an objection, and all other deadlines related thereto, is or shall be required.

J. **Assets Property of the Estate**. The Assets sought to be sold and assigned by the Debtors to the Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

K. **Sufficiency of Marketing**. The Debtors and their professionals, (i) marketed the Assets and conducted the marketing and sale process as set forth in, and in accordance with, the Motion and the Bid Procedures and (ii) conducted a fair and open sale process. The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Assets, and the process conducted by the Debtors (with the assistance of their advisors) pursuant to the Bid Procedures Order and the Bid Procedures obtained the highest or best value for the Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Assets. Based upon the record of these proceedings, all creditors and other

parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Assets, seek to exercise any alleged Preferential Purchase Rights, or submit an objection to the assumption and/or assignment of any Asset, as the case may be. The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

L. **APA**. On October 2, 2020, the Debtors and the Buyer agreed to the terms of the APA, attached hereto as **Exhibit I**. The transaction contemplated by the APA constituted a Qualifying Bid and the Buyer constituted a Qualified Bidder and ultimately Successful Bidder, each in accordance with the Bid Procedures.

M. **Bid Procedures**. The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Assets, and represent the best method for maximizing the value of the Debtors' estates. The Debtors conducted the sale process (including the Auction) without collusion and in accordance with the Bid Procedures.

N. **Auction**. The Auction began on September 29, 2020 and concluded on October 2, 2020. A total of four parties participated in the Auction. Following the bidding, the Debtors determined the highest, or otherwise best bid and designated the Buyer as the Successful Bidder.

O. On October 2, 2020, the Debtors filed the Post-Auction Notice identifying the Buyer as the Successful Bidder for the Assets in accordance with the Bid Procedures Order. *See* Docket No. 311. As established by the record of the Sale Hearing, the bidding and related

procedures established by the Bid Procedures Order have been complied with in all material respects by the Debtors and the Buyer and all of its affiliates.

P. **Corporate Authority**. Subject to and giving effect to the entry of this Order, the Debtors (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale Transaction.

Q. **Sound Business Purpose; Sale Highest or Best Offer**. Entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, creditors, and all parties in interest. This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Assets to the Buyer pursuant to the terms and conditions set forth in the APA. Additionally (i) the total consideration provided by the Buyer for the Assets as reflected in the APA is the highest or best offer for the Assets, (ii) the APA and the Closing thereon presents the best opportunity to realize the maximum value of the Assets and avoid a decline and devaluation of the Assets, (iii) there is risk of deterioration of the value of the Assets if the Sale Transaction is not consummated promptly, (iv) the APA and the consummation of the Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative, and (v) the Debtors' entry into the APA and consummation of the Sale Transaction is reasonable and appropriate under the circumstances.

R. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for consummating the Sale Transaction prior to, and outside of, a plan of reorganization. The Debtors' decision to enter into the APA and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers. Because the entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

S. **Arm's-Length Sale and Buyer's Good Faith**. The APA was negotiated and is undertaken by the Debtors and Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Assets and (ii) willingly subjected its bid to the Bid Procedures. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been disclosed and the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. As a result of the foregoing, the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed

or modified on appeal, and the Buyer has proceeded in good faith in all respects in connection with the Sale Transaction specifically and these chapter 11 cases generally.

T. **<u>No Fraudulent Transfer</u>**. The total consideration provided by the Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.004-006 (West 2019), and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyer have entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

U. **<u>Free and Clear Transfer Required by Buyer</u>**. If the Debtors did not sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than the Assumed Liabilities (as defined in Exhibit A to the APA) and Permitted Liens (as defined in Exhibit I to the APA), to the extent provided in the APA, such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale Transaction. The Buyer would not have submitted a bid, entered into the APA, and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests if the Sale Transaction and the assignment of the Assets, including the Purchased Contracts and Leases, to the Buyer were not free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA.

V. As of the Closing, pursuant and subject to the terms of the APA and this Sale Order, the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Buyer with all of the Debtors' rights, title, and interests in the Assets free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.

W. **Satisfaction of Section 363(f) Standards**. The Debtors are authorized to sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than Assumed Liabilities and Permitted Liens in accordance with the terms of the APA (with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) because, with respect to each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability in the Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of claims, encumbrances, Liens or

Liabilities who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Creditors or other persons or entities asserting a claim, encumbrance, Lien or Liability in or against the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability. Those holders of claims, encumbrances, Liens or Liabilities who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code by having their claims, encumbrances, Liens or Liabilities, if any, in each instance against the Debtors, their estates, or any of the Assets (other than Preferential Purchase Rights) attach to the proceeds of the Sale Transaction ultimately attributable to the Assets in which such holder alleges a claim, encumbrance, Lien or Liability, with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

X. **No Successor Liability**. Neither the Buyer nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; *provided* that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of

any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

Y. **Purchase Price Allocation**. Pursuant to the APA, the allocation of the Purchase Price and any Assumed Liabilities contemplated thereby after the Closing (the "**Allocation**") is a reasonable resolution of the issues among the Debtors and the Buyer with respect to the Allocation and shall constitute a good faith compromise and settlement of all claims, encumbrances, Liens or Liabilities in connection with the Allocation. The Motion shall be deemed a motion to approve the good faith compromise and settlement of all such claims, encumbrances, Liens or Liabilities, and the entry of the Sale Order shall constitute the Court's approval of such compromise and settlement, as well as a finding by the Court that such settlement and compromise is a valid exercise of the Debtors' business judgment, fair, equitable, reasonable and in the best interests of the Debtors and their estates.

Z. **Assigned Contracts and Leases**. Subject to paragraph 25 herein, each and every provision of the Assigned Contracts and Leases or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract or Lease has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Contracts or Leases that did not, or do not as permitted under paragraph 25 of this Sale Order, timely file an objection to the assumption and/or assignment of the Assigned Contract(s) or Lease(s) to which they are a counterparty are deemed to consent to the assumption and/or assignment by the Debtors of their Assigned Contract or Lease to the Buyer, and the Buyer shall

enjoy all of the rights and benefits under each such Assigned Contract or Lease as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to the Buyer in accordance with the terms of the APA, the Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts or Leases prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts or Leases other than as to any Excluded Liabilities thereunder. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Assigned Contracts and Leases to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and/or assignment of the Assigned Contracts and Leases is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assigned Contracts and Leases being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and/or assignment is reasonable and an enhancement to the value of the Debtors' estates.

AA. **Cure/Adequate Assurance**. Pursuant to the APA, the Cure Costs (other than Excess Cure Costs), if any, will be paid by the Buyer in accordance with the terms of the APA. The Buyer has demonstrated adequate assurance of future performance of each 365 Contract listed on the 365 Schedule that is an Assigned Contract within the meaning of section 365 of the Bankruptcy Code, by the Buyer or any of its permitted assignees to which such 365 Contract is assumed and assigned by the Debtors, including a commitment of performance with respect to the

Desired 365 Contracts from and after the Closing. The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such 365 Contracts that are Assigned Contracts. The Buyer's payment of Cure Costs in accordance with the terms of the APA and commitment under the APA of performance with respect to the Desired 365 Contracts from and after the Closing shall constitute adequate assurance of future performance under such 365 Contracts. Except as set forth herein, any objections to the Cure Costs with respect to the Desired 365 Contracts are hereby overruled. The Debtors are authorized to resolve any pending Cure Disputes (as defined in the Bid Procedures) without need for further order of the Court. To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective 365 Contract(s) to the Buyer and to have waived any other defaults or breaches. Notwithstanding the Cure Cost (including Cure Costs assigned no value) with respect to any particular Assigned Contract with, one or more of, Eagle Ford TX LP, Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF LP and its subsidiaries), Mitsui E&P Texas LP, or SN EF UnSub, LP (collectively, the "**WI Owner Contracts**"), and notwithstanding anything to the contrary in this or any other Order, as part of the adequate assurance for assumption and assignment of such WI Owner Contracts, (i) all obligations attributable to Gavilan arising under any such WI Owner Contracts in the ordinary course of business (including without limitation obligations arising from audits, balance of payments, true-ups, joint-interest billings, or other adjustments or reconciliations of the respective interests of the contract counterparties, collectively the "**Ordinary Course Obligations**"), whether arising before or after the Petition Date, shall be honored in the ordinary

course of business and paid by Buyer in accordance with the terms of the applicable WI Owner Contracts, and (ii) all rights attributable to Gavilan arising under any such WI Owner Contracts for Ordinary Course Obligations, whether arising before or after the Petition Date, shall accrue to the benefit of Buyer. The Court finds that with respect to all 365 Contracts that are Assigned Contracts, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each 365 Contract that is an Assigned Contract to be assumed and assigned to the Buyer as of the Closing.

BB. **Assets Assignable**. Each and every provision of the documents governing the Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been, or (subject to and in accordance with paragraph 25 of this Sale Order) will be (in accordance with paragraph 25 of this Sale Order), satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code in respect of the assignment pursuant to the Sale Transaction.

CC. **No Sub Rosa Plan**. The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan. The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

DD. **Final Order**. Time is of the essence in consummating the Sale Transaction. In order to maximize the value of the Debtors' Assets, it is essential that the sale and assignment of the Debtors' Assets occur within the time constraints set forth in the APA and the Bid Procedures Order. This Sale Order constitutes a final order within the meaning of

28 U.S.C. § 158(a). Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the transactions contemplated by the APA at any time subject to the terms and conditions of the APA.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. **Objections Overruled**. All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2. **Approval**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the APA, the other Transaction Documents, the sale, assignment, conveyance and deliverance by the Debtors of all of the Debtors' right, title, and interest in and to the Assets to the Buyer as of the Closing are hereby approved, and the Debtors are authorized and directed to consummate the Sale Transaction, including the sale, assignment, conveyance and deliverance of all of the Debtors' right, title, and interest in, to, and under the Assets to the Buyer free and clear of any and all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Debtors' obligations to consummate the Sale Transaction set forth in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Buyer are each hereby authorized and directed to take any and all actions necessary or

appropriate to (i) consummate the Sale Transaction, (ii) enter into the Transaction Documents, (iii) assume and/or assign the Assigned Contracts, including the Desired 365 Contracts (as defined in the APA) listed on the 365 Schedule, all other Applicable Contracts (as defined in the APA) that are not 365 Contracts, and Leases subject to paragraph 25 of this Sale Order, (iv) perform the obligations of the Debtors under the APA, the other Transaction Documents, and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the APA and consummate, implement, and close fully the Sale Transaction and the other transactions contemplated thereby prior to or after the Closing without further order of this Court, and (v) enforce the terms of this Sale Order. The Buyer and the Debtors shall have no obligation to consummate the Sale Transaction except as is contemplated by and provided for in the APA. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Transaction Document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

3. **Binding Effect of Sale Order**. This Sale Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of claims, encumbrances, Liens or Liabilities in, against, or on all or any portion of the Assets (whether known or unknown), the Buyer and respective successors and permitted assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered and/or a

Liquidating Trust is formed in these chapter 11 cases, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that all rights and obligations of the Debtors under this Sale Order and the APA shall accrue to, and be for the benefit of, and shall be exercisable by, the Liquidating Trust, as provided by any order of the Bankruptcy Court, and the Liquidating Trustee shall be entitled to exercise all of the rights of the Debtors under the APA.

4. The APA, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyer, to the extent of any conflict between this Sale Order or the APA and such future plan or order, the terms of this Sale Order and the APA shall control.

5. **No Material Modifications**. The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

6. **Transfer of Assets Free and Clear**. The Buyer shall assume and be liable for only the Assumed Liabilities and Permitted Liens pursuant to the terms of the APA. For purposes of this Sale Order, "Lien," and "Liability" shall mean:

(i) with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, whenever granted and including, without limitation, those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code (each, a "**Lien**" and collectively, "**Liens**");

(ii) any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured (each a "**Liability**" and collectively, "**Liabilities**");

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all claims, encumbrances, Liens and Liabilities (other than the Assumed Liabilities, Permitted Liens, and Preferential Purchase Rights) shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7. **No Bulk Sales**. No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Sale Order.

8. **Valid Transfer**. Effective upon the Closing, the transfer to the Buyer of the Debtors' right, title, and interest in the Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Assets, and vests with, or will vest in, the Buyer all right, title, and interest of the Debtors in the Assets, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens).

9. **Transfer of Title**. Upon the Closing, this Sale Order shall be construed and shall constitute, for any and all purposes, a full and complete general assignment, conveyance, and

transfer of all of the Debtors' right, title, and interest in the Assets pursuant to the terms of the APA, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order; *provided, however,* that pursuant to Section 2.15(b) of the APA, except as and to the extent expressly set forth in the APA or referenced in Section 2.15 of the APA, the Debtors expressly disclaim any representation or warranty, express, statutory or implied, as to title to any of the Assets.

10. **Governmental Authorization to Effectuate Sale and Assignments**. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect,

regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

11. **Authorization to Assign**. Notwithstanding any provision of any contract governing the Assets, including any Assigned Contract or Lease to be assumed and/or assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Assigned Contract or Lease, at or after the Closing, the Debtors are authorized to (i) assign the Assets to the Buyer and (ii) assume and/or assign the Assigned Contracts and Leases to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in the APA or as otherwise provided by a separate order of this Court.

(i) There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Assets or the assumption and/or assignment of the Assigned Contracts and Leases.

(ii) The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are 365 Contracts to be assumed and assigned to the Buyer as of Closing. Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and/or assign any Assigned Contract or Lease, no Debtor shall be required by the Court to assume and/or assign any Assigned Contract or Lease, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract or Lease.

(iii) Subject to paragraphs 13 and 25 of this Sale Order, in respect of the assignment pursuant to the Sale Transaction, any provisions in any of the Assigned Contracts and Leases that prohibit or condition the assignment of such Assigned Contract and Lease on the consent of a non-Debtor counterparty to such Assigned Contract or Lease thereto or allow the non-Debtor counterparty to such Assigned Contract and Lease to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract and Lease, shall constitute unenforceable anti-assignment provisions which are

expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

(iv) The Debtors' assumption and/or assignment of the Assigned Contracts and Leases is subject to the consummation of the Sale Transaction with the Buyer. To the extent that an objection by a counterparty to any Assigned Contract related to the applicable Cure Cost, is not resolved prior to the Closing, the Buyer may, without any further approval of the Court or notice to any party, elect to (a) not have the Debtors assume and/or assign such Assigned Contract to it, or (b) have the Debtors postpone the assumption and/or assignment of such Assigned Contract until the resolution of such objection; *provided*, *however,* that the Debtors, the Buyer, and the relevant non-debtor counterparty under each Assigned Contract that is a 365 Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Cure Costs without further order of, or notice to, this Court, with any such agreed upon Cure Costs being paid to the appropriate counterparty by the Debtors as a condition subsequent to such assumption and/or assignment of the relevant Assigned Contract.

12. **Assigned Contracts and Leases**. Subject to the provisions of this Sale Order and in accordance with the APA, the Debtors are authorized to assign, pursuant to the APA, all Assigned Contracts, Leases and other Assets, including Assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements) free and clear of all claims, encumbrances, Liens or Liabilities (other than any (i) Assumed Liabilities and (ii) Permitted Liens other than Consent Rights and Preferential Purchase Rights as applicable to the Transaction). As of the Closing, the Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts and Leases, including any 365 Contracts to be assumed and assigned to the Buyer, first arising and attributable to the time period occurring on or after the Effective Time (as defined in the APA) and shall have all rights thereunder.

(i) Upon Closing, (a) all defaults (monetary and non-monetary) under the Assigned Contracts that are 365 Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Buyer with respect to amounts first arising or accruing, during, or attributable or related to, the period before Closing with respect

to such Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Buyer, or the Assets that any additional amounts are due or defaults exist under such Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Effective Time (other than claims against Buyer with respect to the Assumed Liabilities, claims arising from Ordinary Course Obligations, and rights attributable to Gavilan for Ordinary Course Obligations).

(ii) Upon assumption of those Assigned Contracts and Leases to be assumed by the Debtors and/or assigned to the Buyer as of the Closing, such Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Assigned Contract or Lease or other restrictions prohibiting assignment or transfer. To the extent any Assigned Contract or Lease is assumed and/or assigned to the Buyer under this Sale Order, such assumption and/or assignment will not take effect until the Closing. Furthermore, other than the Assigned Contracts and Leases, no other contract shall be deemed assumed by the Debtors and/or assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract or Lease shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Assigned Contract or Lease.

(iii) All counterparties to the 365 Contracts to be assumed and assigned to Buyer as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

Notwithstanding the foregoing, the Debtors may, at the Buyer's direction, amend the list of 365 Contracts to be assumed and assigned to Buyer under the APA to add or remove any 365 Contract to or from such list prior to the Closing of the Sale Transaction in accordance with the terms of the APA.

13. **Exclusion of Audit Rights**. Notwithstanding anything in the Sale Motion and this Sale Order to the contrary, any sale or transfer of oil and gas leases, or assumption and assignment of executory contracts, shall be subject to the ongoing audit rights contained in such

Case 23-90020 Document 363-15 Filed in TXSB on 06/13/23 Page 68 of 300

leases and contracts. Claim numbers 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 10008, and 10010 in the bankruptcy case of *Gavilan Resources, LLC, et al.* (20-32656 (MI)), which are based on the ongoing data exchange between SN EF Maverick, LLC and the claimants, are the liability of the estate of *Gavilan Resources, LLC* (20-32656 (MI)) to the extent that such are money damages for the Pre-Effective Time (as defined in the APA) and do not impact lease termination issues. To the extent such are for the Post-Effective Time (as defined in the APA) or impact lease termination issues, such are the liability of the Buyer. The Royalty Owners (as defined in Docket Nos. 307 and 309) and Briscoe Ranch, Inc. consent to the Sale, but the consent rights of the Royalty Owners, Briscoe Ranch, Inc., and Lessors (identified in paragraph 25 of this Sale Order) are preserved and their consent to the assignment under the Sale Transaction shall not be deemed a consent to future assignments (other than the Sale Transaction). The current consent is to the Buyer in this Sale Transaction, and conditioned on the current operator SN EF Maverick LLC remaining the operator. All parties reserve their rights.

14. **No Successor Liability**. Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Debtors, or (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; provided that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any

entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15. **Release of Interests**. Effective upon the Closing, this Sale Order (i) is and shall be effective as a determination that all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated (with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Buyer, and all recorded claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) against the Assets shall be deemed stricken from such entities records, official and otherwise.

16. **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing claims, encumbrances, Liens or Liabilities against or on the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) that the person or entity has or may assert with respect to the Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets. The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all claims, encumbrances, Liens or Liabilities against the Assets (other than the Assumed Liabilities and Permitted Liens). This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

17. **Surrender of Possession**. Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Buyer free and clear of all claims, encumbrances, Liens or Liabilities, except for the Assumed Liabilities and Permitted Liens, with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the APA).

18. **Allocation of Assets**. The Buyer is hereby authorized in connection with the consummation of the Sale Transaction to allocate the Assets, including the Assigned Contracts and Leases, among its affiliates in a manner as it in its sole discretion deems appropriate, and to assign any of the Assets, including the Assigned Contracts and Leases, to its affiliates with all of the rights and protections accorded to the Buyer under this Sale Order and the APA with respect thereto, in each case, to the extent permitted by, and in accordance with, the terms of the APA.

19. **Exculpation**. Because the entry into the APA and the other Transaction Documents, and the consummation of the Sale Transaction constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall neither have, nor incur, any liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20. **Indemnification by Buyer**. From and after Closing, the Buyer shall release, defend, indemnify and hold Sellers and their affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses based upon, attributable to or resulting from:

a. any breach of any representation or warranty of Buyer, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer;

b. any breach of any covenant or other agreement on the part of Buyer under the APA;

c. the Assumed Liabilities;

d. any Buyer Taxes (as defined in the APA); and

e. any other indemnity obligations of Buyer and its affiliates expressly set forth in the APA.

21. **<u>Governmental Liabilities</u>**: Nothing in this Sale Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order. Nothing in this Sale Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

22. **<u>Texas Ad Valorem Taxes</u>**. Notwithstanding any other provisions of this Order or the APA, the 2020 ad valorem taxes of Dimmit County (the "**Certain Texas Taxing Entity**") attributable to the Assets (as defined in the APA) are Permitted Liens, as defined in the APA. To the extent not paid prior to or at Closing, the Buyer assumes full responsibility for the 2020 ad valorem taxes attributable to the Assets and shall be responsible for paying the ad valorem taxes attributable to the Assets in full, in the ordinary course of business, when due. Any proration to the Seller shall be credited to the Buyer at closing or on terms agreed upon by the Buyer and Seller in accordance with the APA. Any dispute regarding the proration of the ad valorem taxes

between the Buyer and Seller shall have no effect on the Buyer's responsibility to pay the 2020 ad valorem taxes attributable to the Assets. The Certain Texas Taxing Entity shall retain its liens against the Assets until paid in full, including any applicable penalties or interest.

23. **Prohibition of Actions Against Buyer**. Except for the Assumed Liabilities and Permitted Liens, or as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors. Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities, all persons and entities shall be, and hereby are, forever barred and estopped from (i) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Assets to the Buyer in accordance with the terms of this Sale Order and the APA and (ii) asserting, prosecuting, or otherwise pursuing, whether in law or in

equity, in any judicial, administrative, arbitral or other proceeding, any claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever against the Buyer and its successors, designees, assigns, or property, or the Assets conveyed under this Sale Order in accordance with the APA. Without limiting the foregoing, each person or entity who holds or is the beneficiary of a Preferential Purchase Right or Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction, free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens), and from asserting any alleged Preferential Purchase Rights with respect to the Sale Transaction, and (ii) deemed to consent to and approve the transfer, sale, and assumption and/or assignment of the Debtors' right, title, and interest in, to and under such Assets free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens).

24. **Sale Proceeds**. The cash proceeds may be used by the Debtors in a manner consistent with the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Granting Related Relief* (the "**Cash Collateral Order**") [Docket No. 116] as may be amended. At Closing, the proceeds shall be used for (i) working capital, general corporate purposes and administrative costs and expenses of the Debtors incurred in the chapter 11 cases, subject to the terms of the Cash Collateral Order and in accordance with the Budget, subject to a Permitted Variance (each as defined in the Cash Collateral Order); (ii) adequate protection payments to the RBL Administrative

Agents and the other RBL Secured Parties (each as defined in the Cash Collateral Order); and (iii) adequate protection payments to the Second Lien Lenders (including the reasonable and documented fees, costs and expenses incurred by Fried Frank) for any amounts that have been incurred or accrued through the date of entry of this Sale Order in accordance with the Cash Collateral Order. This provision is without prejudice to the rights of the administrative agent to seek payment from the proceeds.

25. **Mineral Lessor Objections**. Notwithstanding anything herein to the contrary, objections filed by mineral lessors, including Miramar Holdings, LP (Docket No. 328), Janey Briscoe Marmion GST Trust (Docket No. 330), and Rancho La Cochina Minerals, Ltd. (Docket No. 331) (each a "**Lessor**", and collectively, the "**Lessors**"), are overruled without prejudice. The Lessors shall have until **October 15, 2020 at 5:00 p.m. (prevailing Central Time)** to assert any objections solely with respect to their asserted consent rights. To the extent a hearing is necessary, a hearing may be self-calendared for **October 19, 2020 at 10:30 a.m. (prevailing Central Time)**. Briscoe Ranch, Inc.'s objection, filed at Docket No. 327, is deemed moot as Briscoe Ranch, Inc. consents to the Sale Transaction.

26. **Provisions Related to UnSub (Docket No. 338)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The currently pending litigation in respect of the Comanche Agreements (as defined therein and which include the JDA) in *GSO ST Holdings LP v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, Adv. Pro. No. 20-03197 (MI) (Bankr. S.D. Tex.) and in *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex.) (such litigation, the "**Existing Litigation**") may continue.

(ii) The entry of this Sale Order shall not limit or curtail the Court's ability to fashion relief in the Existing Litigation.

(iii) Notwithstanding anything in the Sale Order or the APA, the rights of the parties to the Existing Litigation as to whether (i) the execution of the Release Agreement (as defined in the APA) constitutes a breach of the JDA; or (ii) a transfer of operatorship or the absence thereof under the terms of the JDA and joint operating agreements, including with respect to any argument that a transfer is or is not required, shall be preserved (or denied) in all respects consistent with the record.

(iv) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(v) Any determination made by a final, non-appealable order in the Existing Litigation as to (A) whether the JDA or the Development Agreement is a covenant running with the land or an equitable servitude, or (B) whether any of the Comanche Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

27. **Provisions Related to the Oxy Objection and the WES Objection (Docket Nos. 332 and 333)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The Buyers', SN EF Maverick's, the Oxy Parties', WES Parties' and Gavilan's (collectively, the "Parties-in-Interest" and each a "Party-in-Interest") agreement, as reflected in this Sale Order, to resolve objections to the Sale Motion or Sale Transaction will not be used against or prejudice such Parties-in-Interest in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (as defined below).

(ii) Nothing in this Sale Order or the APA will in any way modify, inhibit, or impair any Party-in-Interest's rights to or ability to assert any claims, rights, objections, arguments, and/or defenses in the adversary proceeding captioned *Occidental Petroleum Corp. et al. v. Sanchez Energy Corp*., Adv. Case No. 20-3198 (Bankr. S.D. Tex. June 22, 2020) (the "**Sanchez Adversary**") or in the related rejection objection (the "**Sanchez Rejection Dispute**") pending in the bankruptcy cases captioned *In re Sanchez Energy Corp*., Case No. 19-34508 (Bankr. S.D. Tex. Aug. 11, 2019) (the "**Sanchez Chapter 11 Case**"); and any such rights to or ability to assert such claims, rights, objections, arguments, and/or defenses in the Sanchez Adversary or in the Sanchez Rejection Dispute shall be unaffected by the granted relief as described herein.

(iii) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(iv) The Assets being sold will remain subject to any covenants, servitudes or similar agreements which the Oxy Parties and WES Parties contend are covenants running with the land or equitable servitudes and any agreements integrated with contracts assumed by the Debtors and assigned to the Buyer (collectively, the "**Agreements**"), in each case, only to the extent (A) such Agreements are being contested in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (defined below), as applicable, and (B) the Court determines in a final, non-appealable order such Assets are required by applicable law to remain subject to such Agreements.

(v) Any determination made by a final, non-appealable order in the Sanchez Adversary as to (A) whether the Development Agreement[4] is a covenant running with the land or an equitable servitude, or (B) to the extent that they are identical, whether any of the Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

(vi) Nothing in this order modifies, inhibits or impairs any party's rights or ability to assert any claims, rights, objections, arguments, and/or defenses regarding the Gavilan Springfield Agreements, including but not limited to the matters raised by the WES Dispute.

(vii) Nothing in this Sale Order or the APA shall be deemed or in any way constitute an adjudication of the *Application for Allowance and Payment of Administrative Expense Claim* filed by Springfield Pipeline LLC and appearing at Docket No. 287 in these chapter 11 cases.

28. **No Interference**. Following the Closing, no holder of a claim, encumbrance, Lien or Liability in or against the Debtors or the Assets shall interfere with the Buyer's title to or use and enjoyment of the Assets based on or related to such claim, encumbrance, Lien or Liability; *provided that* this paragraph shall not apply to, and shall not prejudice the WES

[4] The Development Agreement is that certain Development Agreement dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sn EF Maverick, LLC, Sn EF UnSub LP, Gavilan Resources LLC (f/k/.a Aguila Production, LLC) and Sanchez Energy Corporation.

[5] The "Gavilan Springfield Agreements" are (i) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC and (ii) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC.

Case 4:22-cv-03587 Document 36-31 Filed on 05/16/23 in TXSD Page 78 of 300

Parties' prosecution and the Court's ability to adjudicate whether the Gavilan Springfield Agreements are covenants running with the land or equitable servitudes (the "**WES Dispute**"), the Sanchez Adversary, or the Sanchez Rejection Dispute, and further, should the Court resolve (i) all or any portion of the WES Dispute or (ii) any claims or arguments in the Sanchez Adversary or the Sanchez Rejection Dispute, in the Oxy Parties' or WES Parties' favor, the same shall not constitute an "interference" with the Buyer's title to, or use and enjoyment of, the Assets.

29. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to (i) compel delivery of the Assets or performance of other obligations owed to the Buyer, (ii) compel performance of obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the APA or the Sale Transaction, including, but not limited to, the WES Dispute, (iv) interpret, implement, and enforce the provisions of this Sale Order, (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyer to evidence the release of any claims, encumbrances, Liens or Liabilities in the Assets, (vi) protect the Buyer and its affiliates against (a) any claims, encumbrances, Liens or Liabilities in or against the Debtors or the Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in their possession, and (vii) protect the Debtors and their affiliates against any liabilities (other than any liabilities retained by the Debtors under the APA) in any way relating to the Assets arising on or after the Closing Date other than to the Buyer pursuant to the APA.

30. **Immediate Effect**. Notwithstanding the provisions set forth in Rule 60004(h) of the Bankruptcy Rules, this Sale Order shall be immediately effective and enforceable and its provisions shall be self-executing. The Debtors and the Buyer are free to close the Sale Transaction under the APA at any time in accordance with the terms of the APA.

31. **Good Faith Purchaser**. The Sale Transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Assets to the Buyer (including the assumption and assignment by the Debtors of any of the 365 Contracts), unless such authorization is duly stayed pending such appeal. The Buyer is a buyer in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

32. There has been no showing that the Debtors or the Buyer engaged in any action or inaction that would cause or permit the Sale Transaction and underlying transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

33. **Excluded Assets Held in Trust**. The assets sold pursuant to this Sale Order and the terms of the APA shall not include unclaimed property held in trust by the Seller, as defined pursuant to Texas state unclaimed property laws, including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

34. **Inconsistencies with Prior Orders, Pleadings, or Agreements**. To the extent of any conflict between the APA and this Sale Order, the terms of the Sale Order shall govern. To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading

in these chapter 11 cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.

35. **Subsequent Orders and Plan Provisions**. Unless otherwise agreed to by the Debtors and the Buyer, this Sale Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or any subsequent order(s) of this Court.

36. **Backup Bid APA**. In the event the Debtors proceed with the Backup Bid, the Debtors shall file and serve a notice of filing of an Asset Purchase Agreement for the Backup Bid (the "**Backup Bid APA**"), and a proposed order approving the sale pursuant to the Backup Bid APA, to all interested parties, and shall seek from the Court a hearing on the Backup Bid APA following a reasonable objection period.

37. **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

38. **Satisfaction of Conditions Precedent**. Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale Transaction have been satisfied or waived in accordance with the terms of the APA.

39. **Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Signed: October 16, 2020

Marvin Isgur
United States Bankruptcy Judge

## Exhibit I

**APA**

Exhibit "A" will be filed by Notice on the CM/ECF docket sheet later today and is incorporated in this Order by reference.

# EXHIBIT 24

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 06, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) **Re: Docket Nos. 1326 and 2071** |

**STIPULATION AND AGREED ORDER AUTHORIZING ASSUMPTION OF COMANCHE NON-OPS' PRODUCTION MARKETING AGREEMENTS**

On October 14, 2021, Venado EF L.P., Eagle Ford TX LP, and Mitsui E&P Texas LP (collectively, the "Comanche Non-Ops") filed the *Limited Objection and Reservation of Rights of Comanche Non-Ops with Respect to Assumption of Production Marketing Agreements* [Docket No. 2071] (the "Objection"), objecting on a limited basis to the assumption by Reorganized Debtor SN EF Maverick, LLC ("Maverick" and together with the Comanche Non-Ops, the "Parties") of the executory contracts listed on Exhibit 1 attached hereto (collectively, the "PMAs"), pursuant to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").[2]

The Comanche Non-Ops and Maverick, by and through their respective counsel, have agreed to the entry of this stipulation and agreed order ("Order") by this Court, without trial or

1 The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2 Capitalized terms used but not herein defined shall have the meanings ascribed to them in Plan.

adjudication of any issue of fact or law. The Parties having requested that the Court enter this Order, it is therefore ORDERED, ADJUDGED, AND DECREED as follows:[3]

## FINDINGS

A. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

B. The Comanche Non-Ops each own certain working interests in oil and gas properties in South Texas, referred to as the "Comanche Assets".

C. The Comanche Non-Ops[4] entered into their respective PMAs with Anadarko Energy Services Company and Anadarko E&P Onshore LLC (collectively, "Anadarko") between 2010 and 2012, pursuant to which, the Comanche Non-Ops agreed to sell, and Anadarko agreed to purchase the Comanche Non-Ops' oil and gas production associated with the Comanche Assets and thereafter arrange for the gathering, treating, transportation, marketing and/or sale of its own (and its affiliates') production volumes together with those of the Comanche Non-Ops.

D. Maverick, SN EF UnSub, LP ("UnSub"), and Gavilan Resources, LLC ("Gavilan"), the predecessor in interest to Mesquite Comanche Holdings, LLC ("MCom"), purchased Anadarko's working interest in the Comanche Assets in 2017 (the "Comanche Purchase Transaction").[5]

---

3 Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

4 References to "Comanche Non-Ops" in this paragraph refer to the Comanche Non-Ops and/or their respective predecessors in interest in the Comanche Assets, as applicable.

5 As of December 3, 2021, Maverick, UnSub, MCom, and the Comanche Non-Ops own all the working interests in the Comanche Assets.

E. Pursuant to the Comanche Purchase Transaction, Maverick became and continues to be the operator of the Comanche Assets pursuant to applicable joint operating agreements, and Anadarko assigned the PMAs to Maverick.

F. The PMAs facilitate Maverick's efficient operation of the Comanche Assets and also enable the Reorganized Debtors to maximize the value of the Comanche Assets for themselves and all the other working interest owners of the Comanche Assets by, among other things, allowing Maverick to negotiate the gathering, treating, processing, and transportation of the oil and gas production from the Comanche Assets on an aggregate basis, including production of the Reorganized Debtors and the Comanche Non-Ops. Currently, the Reorganized Debtors sell the Comanche Non-Ops' oil and gas production through certain agreements (the "Agency Agreements") with Occidental Petroleum Corporation, Western Midstream Partners LP, and their respective affiliates (collectively, "Oxy/WES"). The Reorganized Debtors have also been engaged in ongoing litigation with Oxy/WES with respect to rejection or assumption of the Agency Agreements (the "Oxy/WES Litigation").

G. Consistent with this Court's *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. 1110] ("Solicitation Procedures Order") and the Plan and Confirmation Order, on or about May 29, 2020, prior to the Plan's Effective Date, the Debtors listed each of the PMAs on the Schedule of Assumed Executory Contracts and Unexpired Leases, as contracts to be assumed under the Plan; and the PMAs have remained on that schedule ever since.

H. The "Contract Objection Deadline" for the Comanche Non-Ops to object to the proposed assumption of their respective PMAs—originally set in the Confirmation Order as May 20, 2020—was extended multiple times, consistent with the Confirmation Order and with the mutual consent of the parties, to October 14, 2021.

I. From the Effective Date of the Plan through the date of this Order, each of the PMAs is, and has at all relevant times been, an Executory Contract.

J. As set forth in the Objection, the Comanche Non-Ops raised issues with respect to adequate assurances for the assumption of the PMAs under section 365 of the Bankruptcy Code.

K. As of the Effective Date of the Plan, no Cure Claims with respect to the PMAs existed.

L. The Debtors' and Reorganized Debtors' decision, as applicable, to assume the PMAs is a reasonable exercise of the Debtors' and Reorganized Debtors', as applicable, business judgment and is consistent with the process for assuming agreements set forth in the Plan, the Confirmation Order, and otherwise applicable law.

**ASSUMPTION**

**IT IS FURTHER ORDERED that**:

1. The Comanche Non-Ops hereby withdraw the Objection.

2. For purposes of clarification, nothing in this Order is intended to alter the rights of the Comanche Non-Ops, if any, to receive copies of, or notices with respect to, any new or amendments to existing "Commitment Agreements" (as such term is defined in the applicable PMAs), if any, in connection with the settlement of the Oxy/WES Litigation, in each case to the extent required by the terms of the applicable PMAs. For the avoidance of doubt, the following agreements, which Maverick has informed the Comanche Non-Ops it intends to assume in

connection with the settlement of the Oxy/WES Litigation, are not "Commitment Agreements": (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation; and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as each may be assumed, amended, modified, or supplemented from time to time.

3. Maverick is authorized and directed to assume the PMAs, effective as of the Effective Date, pursuant to the Plan. All requirements for assumption of the PMAs, as of the Effective Date of the Plan, pursuant to the Plan and pursuant to 11 U.S.C. §§365 and 1123 are deemed satisfied.

4. Except as otherwise provided in this paragraph, all defaults, if any, arising under the PMAs on account of actions or inactions of any party to such PMAs as of the date of entry of this Order are hereby mutually waived, released, and discharged by the Parties; *provided, however,* the foregoing waiver, release, and discharge shall not constitute a waiver, release, or discharge of any default arising from or relating to Maverick's obligation to pay ordinary course amounts to each of the Comanche Non-Ops pursuant to a PMA for its respective production of hydrocarbons, solely relating to amounts not yet invoiced or otherwise paid by Maverick as the date of this Order for hydrocarbons either previously purchased by or delivered to Maverick (A) for gas and natural gas liquids, between September 1, 2021 and the date of this Order, and (B) for oil, between October 1, 2021, and the date of this Order. For the avoidance of doubt, notwithstanding the release, waiver, and discharge of defaults in this paragraph, the Comanche Non-Ops and Reorganized Debtors shall each retain their respective unexpired audit rights under the PMAs.

5. The PMAs shall remain in full force and effect and shall be binding upon each of the parties thereto in accordance with their terms, and the PMAs shall be enforceable in accordance with their terms pursuant to otherwise applicable law. For purposes of clarification, in connection with the entry of this Order, the Reorganized Debtors and the Comanche Non-Ops have not agreed to any amendments or modifications to the terms of the PMAs.

6. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7. Without further order of the Court, the Debtors and Reorganized Debtors, as applicable, and the Comanche Non-Ops are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, including, without limitation, the impact of the Debtors' or Reorganized Debtors', as applicable, assumption and/or rejection of any other executory contract on the parties' respective rights and obligations under the PMAs.

**IT IS SO ORDERED.**

Signed: December 06, 2021

Marvin Isgur
United States Bankruptcy Judge

**ACCCEPTED AND AGREED:**

*/s/* Aparna Yenamandra
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Aparna Yenamandra (admitted *pro hac vice*)
Conor P. McNamara (admitted *pro hac vice*)
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: conor.mcnamara@kirkland.com
aparna.yenamandra@kirkland.com

*Counsel to Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)*

*/s/* Duston McFaul
**SIDLEY AUSTIN LLP**
Duston McFaul (TX Bar No. 24003309)
Michael Fishel (TX Bar No. 24082998)
Maegan Quejada (TX Bar No. 24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 459-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

*Counsel to Mitsui E&P Texas LP*

*/s/* Julia Frost-Davis
**MORGAN LEWIS LLP**
Julia Frost-Davies (admitted *pro hac vice*)
Amy Kyle (admitted *pro hac vice*)
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

*Counsel to Eagle Ford TX LP*

*/s/* John P. Melko
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko.@foley.com
sbeausoleil@foley.com

*/s/* Jamie A. Levitt
**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

*/s/* Dennis L. Jenkins
**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**

**PRODUCTION MARKETING AGREEMENTS**

1) Maverick Crude Oil Production Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

2) Maverick Residue Gas Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP, as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated February 1, 2014

3) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

4) Maverick Oil Production Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

5) Maverick Residue Gas Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

6) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company), as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated as of February 1, 2014

7) Maverick Oil Production Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

8) Maverick Residue Gas Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

9) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

# EXHIBIT 25

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION AND AGREED ORDER**

This Stipulation and Agreed Order (the "Order") is made pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (applicable herein pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure), between (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline, LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.[2]

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

## RECITALS

**WHEREAS**, certain of the Parties are party to multiple agreements related to certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in the above-captioned Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], seeking to reject or assume the Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing the adversary proceeding captioned *Occidental Petroleum Corp. v. Sanchez Energy Corp.*, Adv. Pro. No. 20-03198 (S.D. Tex.) (the "OXY/WES Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Adv. Pro. No. 20-03198, Docket No. 46] and took matters under advisement;



4879-7488-3847.1

010942

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89-90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Adv. Pro. Docket No. 97] (the "Reconsideration Motion") in the OXY/WES Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order to find that the Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, the Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to this Order (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to this Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan;[3] (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of the OXY/WES Adversary Proceeding; and (v) dismissal of the Appeal; and

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

[3] Certain of the agreements identified in Schedules 1 and 2 to the Complaint were previously assumed by the applicable Debtor(s) in connection with the *Stipulation of Dismissal and Agreed Order* [Docket No. 1973] and the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* [Docket No. 2201].

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon the occurrence of all of the following events: (a) entry by this Court on the docket of these Chapter 11 Cases; (b) the entry by this Court of the Stipulation of Dismissal in the form attached hereto as Exhibit 3 (the "AP Dismissal Stipulation") in the OXY/WES Adversary Proceeding; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. The Parties are deemed to agree, and it is hereby found, that, as of the Order Effective Date, each of the Assumed Comanche Agreements is an Executory Contract that is capable of assumption pursuant to the Plan and each of the Rejected Comanche Agreements is an Executory Contact that is capable of rejection pursuant to the Plan; *provided, however*, consistent with the Partial Rejection Order, characterization of the Springfield Agreements as Executory Contracts does not alter or otherwise impact the real property interests granted to Springfield in the Springfield Agreements.

5. It is hereby found, and each of the Parties hereby agrees, that each applicable Mesquite Entity, as a Reorganized Debtor, is and shall be entitled, pursuant to the Plan and 11

U.S.C. §§365 and 1123, to assume each of the Assumed Comanche Agreements and to reject each of the Rejected Comanche Agreements, and all requirements for assumption or rejection, as applicable, pursuant to the Plan, the Confirmation Order, any other Orders of this Court in these proceedings or relating proceedings, and 11 U.S.C. §§365 and 1123 are hereby deemed satisfied.

6. All objections to the assumption and rejection of the Assumed Comanche Agreements and Rejected Comanche Agreements as contemplated by this Order, including but not limited to the Rejection Objection, are hereby deemed withdrawn or overruled, with prejudice, and all related contested matters are dismissed.

7. On the Order Effective Date, each of the applicable Mesquite Entities is hereby authorized and directed to assume each of the Assumed Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the assumption of the Assumed Comanche Agreements, in each case to the extent required by the Settlement effective as of the Effective Date of the Plan.

8. On the Order Effective Date, each of the applicable Debtors is hereby authorized to reject each of the Rejected Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the rejection of the Rejected Comanche Agreements, with such rejections being effective as of the Effective Date of the Plan.

9. As between the Parties, upon assumption pursuant to the Settlement and this Order, each of the Assumed Comanche Agreements, including the Springfield Agreements, as each may be amended, shall remain in full force and effect, and be binding upon each of the parties thereto in accordance with their respective terms and otherwise applicable law.

10. As a condition to assumption of the Springfield Agreements, Mesquite shall pay to Springfield Pipeline LLC (i) $51,832,780.72 in the aggregate and (ii) an amount equal to all unpaid

amounts, if any, (x) invoiced and (y) due and payable in the ordinary course of business between December 17, 2021 and the effective date of the Settlement pursuant to the Springfield Agreements and/or any applicable gas or oil gathering agreements with Gavilan Resources, LLC, in each case only as required by the Settlement (the "Springfield Cure Amount"). As a condition to assumption of the Assumed Comanche Agreements to which the Occidental Entities or Eagle Ford Midstream, LP are a party, Mesquite shall pay to the Occidental Entities and Eagle Ford Midstream, LP $0 on account of defaults occurring prior to December 1, 2021 and shall pay all amounts due and owing under the such agreements from and after December 1, 2021 in the ordinary course of business (the "OXY Cure Amount"). Other than the Springfield Cure Amount and the OXY Cure Amount, no Cure Claims with respect to the Assumed Comanche Agreements exist or shall otherwise be due or payable in connection with the assumption of the Assumed Comanche Agreements, and no adequate assurances for assumption of the Assumed Comanche Agreements shall be required by this Order or the Plan as a condition to the assumptions contemplated hereby. As between the Parties, subject to payment of the Springfield Cure Amount and the OXY Cure Amount, the Debtors and Reorganized Debtors shall also be deemed to be in compliance with each of the Assumed Comanche Agreements through the date of this Order for all purposes of the Confirmation Order.

11. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12. Each Party is to bear its own costs, expenses and attorneys' fees.

13. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Signed: December 21, 2021

Marvin Isgur
United States Bankruptcy Judge

4879-7488-3847.1

**IT IS SO ORDERED.**

This Order is issued subject to entry of an order in Appeal No. 4:21-CV-1734 authorizing the undersigned judge to enter the order signed on this date in adversary proceeding 20-3198.

Case 20-33900 Document 3243 Filed in TXSB on 04/21/21 Page 9 of 10

**STIPULATED AND AGREED AS TO FORM AND CONTENT:**

*/s/ Lydia R. Webb*

**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

*/s/ Thomas MacWright*

**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*

**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**
**ASSUMED COMANCHE AGREEMENTS**

1) Second Amended and Restated Lease Dedication and Gas Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017 as amended and supplemented, from time to time*

2) Second Amended and Restated Lease Dedication and Oil Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017, as amended and supplemented, from time to time, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated as of August 14, 2017*

3) Agreement to Amend Gas Gathering Agreements, dated June 1, 2017 between Springfield Pipeline LLC, Sanchez Energy Corporation and Gavilan Resources, LLC

4) The Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017*

5) The Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil& Gas Onshore LP and Sanchez Energy Corporation*

6) Purchase and Sale Agreement, dated January 12, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation, as amended, including by that Amendment to Purchase and Sale Agreement, dated as of March 1, 2017, that Second Amendment to Purchase and Sale Agreement, dated effective as of March 1, 2017 and that Third Amendment to Purchase and Sale Agreement, dated June 28, 2017*

7) Assignment and Consent to Assignment Agreement, dated effective as of June 28, 2017 by and among Anadarko Energy Services Company, SN EF Maverick, LLC and Eagle Ford Midstream, LP

8) Firm Intrastate Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm Intrastate Gas Transportation Agreement, dated as of June 27, 2016

9) Firm NGPA Section 311 Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of

* Assumed as amended pursuant to terms of the Settlement Agreement.

Anadarko Energy Services Company), as amended, including by that First Amendment to Firm NGPA Section 311 Gas Transportation Agreement, dated as of June 27, 2016.

10) Joint Operating Agreement, dated effective as of March 1, 2017 by and between SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF UnSub, LP and Gavilan Resources, LLC

11) Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 between Anadarko E&P Onshore LLC, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

12) Non-Exclusive Seismic Data Use License, dated March 1, 2017 by and between Anadarko Petroleum Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

13) Springfield Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sanchez Energy Corporation, and Gavilan Resources, LLC

14) Downstream Marketing Agreements Assumption Agreement, dated as of June 1, 2017 by and between Anadarko Energy Services Company and SN EF Maverick, LLC

15) Specified Midstream Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and SN EF Maverick, LLC

16) Amended and Restated Marketing Transition Services Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Anadarko E&P Onshore LLC and Sanchez Energy Corporation

17) Specified Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC

18) Firm Intrastate Gas Transportation Services Agreement, dated March 1, 2013, by and between Springfield Pipeline LLC and SN EF Maverick (as assignor of Anadarko E&P Onshore LLC), including any Attachment to Firm Intrastate Gas Transportation Service Agreement

**EXHIBIT 2**
**REJECTED COMANCHE AGREEMENTS**

1) Development Agreement, dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

2) Memorandum of Development Agreement (Dimmit County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

3) Memorandum of Development Agreement (La Salle County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

4) Memorandum of Development Agreement (Maverick County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

5) Memorandum of Development Agreement (Webb County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

6) Memorandum of Development Agreement (Zavala County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

**EXHIBIT 3**
**FORM OF AP DISMISSAL STIPULATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Debtors.[1] | ) | (Jointly Administered) |
| OCCIDENTAL PETROLEUM CORP., ANADARKO PETROLEUM CORPORATION, ANADARKO E&P ONSHORE LLC, ANADARKO ENERGY SERVICES COMPANY, KERR-MCGEE OIL & GAS ONSHORE LP, WESTERN MIDSTREAM PARTNERS LP, WGR OPERATING, LP, and SPRINGFIELD PIPELINE, LLC, | ) | |
| Plaintiffs, | ) | Adv. Proc. No. 20-03198 |
| v. | ) | |
| SANCHEZ ENERGY CORPORATION, SN CATARINA, LLC, and SN EF MAVERICK, LLC, | ) | |
| Defendants. | ) | |

**STIPULATION OF DISMISSAL AND AGREED ORDER**

This Stipulation of Dismissal and Agreed Order (the "Order")[2] is made, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure(applicable herein pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure), between (i) Plaintiffs Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Plaintiffs Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Defendants Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.

**RECITALS**

**WHEREAS**, certain of the Parties are party to a number of agreements related certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in their Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1326] seeking to reject or assume certain Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Case No. 19-34508, Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");



4861-9531-9303.1

010955

Case 19-34508 Document 2441 Filed 04/30/21 in TXSB Page 16 of 20

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing this adversary proceeding (this "Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89, 90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Docket No. 97] (the "Reconsideration Motion") in this Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order, to find that the

Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Court's Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, such Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to the *Stipulation and Agreed Order* (the "Contested Matter Order")[3] filed in the Debtors' Chapter 11 cases (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to the Contested Matter Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of this Adversary Proceeding; and (v) dismissal of the Appeal;

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

[3] The form of Contested Matter Order is attached hereto as Exhibit 1.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon (a) its approval and entry by this Court on the docket for this Adversary Proceeding; (b) entry of the Contested Matter Order by this Court in the Debtors' Chapter 11 cases; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. As of the Order Effective Date, except to the extent expressly set forth in this Order otherwise, this Adversary Proceeding, including Counts I, II, III, IV, and V, is dismissed, with prejudice.

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

5. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order and to effectuate the relief granted pursuant to this Order.

6. Each Party is to bear its own costs, expenses, and attorneys' fees.

7. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**IT IS SO ORDERED.**

Signed: __________________, 2021

______________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

Case 23-90088 Document 8241-15 Filed in TXSB on 08/08/23 Page 20 of 20

**ACCCEPTED AND AGREED:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

/s/ *Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

# EXHIBIT 26

# (FILED UNDER SEAL)

# EXHIBIT 27

7/30/2021 9:07 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 55852780
By: Cecilia Thayer
Filed: 7/30/2021 9:07 AM

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC,<br>Plaintiff,<br>v.<br><br>SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, and MESQUITE ENERGY, INC.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br><br>HARRIS COUNTY, TEXAS<br><br><br><br><br>___ JUDICIAL DISTRICT |

## Plaintiff's Original Petition

Plaintiff CARNERO G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UNSUB, LP ("UnSub"), EAGLE FORD TX LP ("Eagle Ford"), VENADO EF L.P. ("Venado"), MITSUI E&P TEXAS LP ("Mitsui"), and MESQUITE ENERGY, INC. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

6. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

7. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

8. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

9. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute

provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

10. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief and attorney's fees and costs.

## VI. Factual Background

11. This is a dispute over the meaning of three contracts arising from oil and gas operations on the "Comanche Assets" in the Western Eagle Ford Shale.

**The Comanche Assets**

12. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**The Comanche Assets Acquisition**

13. In January, 2017, SN EF Maverick, LLC ("Maverick") (a subsidiary of Sanchez Energy Corporation ("Sanchez")) and various co-investors, including Gavilan Resources, LLC ("Gavilan")[1] and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets. The transaction closed on March 1, 2017.

[1] Gavilan Resources, LLC filed for bankruptcy on May 15, 2020, and later sold its interests in the Comanche Assets to Maverick (now known as Mesquite Energy, Inc., as explained below) in or about October 2020. As a result, the Plaintiff has not named Gavilan as a defendant.

**Comanche Assets Existing Commitments Dedications**

14. At the time of the Comanche Assets acquisition, the acreage conveyed to Maverick, Gavilan, and UnSub was dedicated by Anadarko for gathering and processing to other midstream providers pursuant to agreements that prevent, in part, the delivery of gas to other service providers (the "Existing Commitments").[2] Anadarko retained these Existing Commitments under the terms of the March 1, 2017 Comanche Assets acquisition agreements, specifically the Retained Midstream Contracts Services Agreement among Maverick, as "Provider," and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP, collectively as the "Recipient" (the "Midstream Agency Agreement"). The Midstream Agency Agreement required Provider to act as Recipient's agent for delivering gas on behalf of Recipient under the retained Existing Commitments.

15. Maverick, UnSub, and the WIPS never became parties to the underlying Existing Commitments. The Midstream Agency Agreement is the only agreement that required Maverick to deliver gas from the Comanche Assets to the Recipient for delivery under the Anadarko-retained Existing Commitments. UnSub and the WIPs never became parties to the Midstream Agency Agreement.

**Comanche Assets Marketing Agreement**

16. UnSub and Maverick agreed that Maverick would buy UnSub's share of the oil and gas produced by the Comanche Assets under the terms of a Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement") dated as of January 12, 2017. The Marketing Agreement

---

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time that Carnero, Mesquite and UnSub entered into the Ratification Agreement referenced herein.

is the only agreement that linked UnSub's gas from the Comanche Assets to the Existing Commitments.

**Comanche Assets Dedication to Carnero**

17. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). The GGPA obligates Maverick to deliver certain "Dedicated Gas" produced by the Comanche Assets (i.e., the "Dedicated Acreage") to Carnero. Section 3.1(b) of the GGPA excludes certain gas that is committed to other service providers under the Existing Commitments until the obligation to deliver gas thereunder terminates or expires. In addition, Section 3.1(b) of the GGPA requires Mesquite, as successor to Maverick, to terminate the obligation to deliver gas under any Existing Commitment at the earliest possible time.

18. UnSub, Maverick, and Carnero entered into a Ratification Agreement (the "UnSub Ratification Agreement") on the same day that Maverick and Carnero entered into the GGPA. Gavilan, Eagle Ford and Venado also executed ratification agreements in substantially the same form as UnSub's Ratification Agreement. These agreements together with the UnSub Ratification Agreement are collectively referred to as the "Ratification Agreements". As a consequence of the various Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have the same obligations as Maverick to terminate their delivery obligations under any Existing Commitments at the earliest possible time. Mitsui signed a Letter Agreement dated effective April 1, 2018 ("Letter Agreement"), that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA.

19. At the same time they signed the GGPA and the various Ratification Agreements and the Letter Agreement, Unsub, Eagle Ford, Venado, Maverick, Gavilan, and Carnero entered

into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment") dated effective April 1, 2018.

20. Through the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado ratified and confirmed the GGPA in all respects and each agreed to assume all obligations of *a Producer* (as defined in the GGPA) under the GGPA in all respects. Specifically, the various Ratification Agreements each provide:

a. **Section 2** – "Producer [UnSub, Eagle Ford, and Venado each] hereby *ratifies and confirms the GGPA in all respects, and agrees that Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] will assume all the obligations of a* ***'Producer' (as defined in the GGPA)*** *under the GGPA in all respects and make all the representations and warranties of a 'Producer' under the GGPA."* [Emphasis Added.]

b. **Section 4** - "*Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA…*[3] *and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA….*" [Emphasis added.]

c. **Section 6** – UnSub, Gavilan, Eagle Ford, and Venado each appointed Maverick as its "Producer's Representative"—"its agent and attorney-in-fact with respect to all matters under the GGPA," including receipt of notices and delivery of nominations as set forth in Article VI of the GGPA.

21. The GGPA provides that a "Producer" (as defined in the GGPA)—(which includes UnSub, Gavilan, Eagle Ford, and Venado per the various Ratification Agreements)—has the following obligations:

a. **Section 3.1(b)** – Producer's Gas that is subject to "Existing Commitments" is excluded from the dedication under Section 3.1(b) of the GGPA, *but only until* "*the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System … or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right*

[3] Venado's Ratification Agreement omits the language that is omitted in this quote ("(including with respect to after acquired interests)").

*at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1*." [Emphasis added].

22. Based on these provisions in the GGPA and the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have *all* the obligations of Producers under the GGPA, including the obligation to comply with the terms of Section 3.1(b) of the GGPA. These obligations specifically include the obligation, upon termination of any Existing Commitment preventing delivery of their gas to Carnero, to deliver all gas previously subject to such Existing Commitment to Carnero for Carnero to gather, process, and purchase. Further, UnSub, Gavilan, Eagle Ford, and Venado appointed Maverick as their representative for purposes of delivering nominations with respect to all of their gas from the Comanche Assets under the GGPA. Under the Letter Agreement, Mitsui authorized Mesquite to market the gas from Mitsui's interest in the Comanche Assets under the GGPA.

**Maverick's Bankruptcy**

23. Maverick and certain of its affiliates (collectively, the "Sanchez Debtors") filed chapter 11 bankruptcy petitions on August 11, 2019 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") [Case No. 19-34508, jointly administered]. On April 30, 2020, the Bankruptcy Court entered an order confirming the Sanchez Debtors' Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1205, Case No. 19-34508] (the "Plan"). As part of the Plan confirmation process, Maverick assumed the GGPA. Upon the effective date of the Plan, Mesquite became the successor to Maverick.

24. On June 28, 2021, the Bankruptcy Court entered a Stipulation of Dismissal and Agreed Order confirming the agreed rejection of the Marketing Agreement and the assumption of the UnSub Ratification Agreement by Mesquite (the "Rejection-Assumption Order"). The rejection of the Marketing Agreement terminated Mesquite's right to UnSub's gas and triggered

the obligation under Section 3.1 of the GGPA and the UnSub Ratification Agreement for UnSub to deliver its gas to Carnero for gathering, processing, and purchase.

25. Mesquite commenced proceedings to reject the Midstream Agency Agreement, which would terminate any delivery obligation thereunder, as well as under each Existing Commitment. Termination of Mesquite's delivery obligation under the Existing Commitments (which Mesquite and UnSub, Eagle Ford, and Venado must undertake at the earliest possible time) requires the delivery of Mesquite's, UnSub's, and the WIPs' gas to Carnero under the GGPA and the Ratification Agreements. On information and belief, the WIPs are causing Mesquite to withdraw its rejection of the Midstream Agency Agreement and/or to enter into new midstream agreement(s) in violation of the GGPA and the Ratification Agreements, which would prevent delivery of the WIPs' gas to Carnero.

26. Additionally, the Rejection-Assumption Order indicates that UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement. On information and belief, UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (including the Existing Commitments) to prevent delivery of UnSub's gas to Carnero. On information and belief, the WIPs are taking a similar position that would prevent delivery of their gas to Carnero. These actions are in derogation of Carnero's rights under the GGPA, the various Ratification Agreements, and the Letter Agreement. If such agreement(s) are consummated, it will be a material breach of the UnSub Ratification Agreement and the GGPA. Additionally, UnSub's statements and actions in the Bankruptcy Court confirm that it does not intend to comply with the terms of the UnSub Ratification Agreement and the GGPA.

## VII. <u>Causes of Action</u>

### A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are affected by those contracts. Carnero may have determined any question of construction or validity arising under those contracts and obtain a declaration of rights, status, or other legal relations under the GGPA, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to its Ratification Agreement and the GGPA, all of UnSub's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(b) Pursuant to their respective Ratification Agreements and the GGPA, all of Eagle Ford's and Venado's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(c) Pursuant to the Letter Agreement and the GGPA, all of Mitsui's gas from the Comanche Assets is dedicated to Carnero;

(d) Their respective Ratification Agreements and the GGPA require UnSub, Eagle Ford, Venado, and Mesquite to exercise any and all options or rights at the earliest possible time to terminate any Existing Commitments (as defined in Section 3.1(b) of the GGPA);

(e) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), UnSub and Mesquite must tender for delivery all of their gas from the Comanche Assets to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(f) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Eagle Ford and Venado must tender for delivery all of their gas from the Comanche Assets

to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(g) The GGPA and the Letter Agreement require that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Mitsui must tender for delivery all of its gas from the Comanche Assets to Mesquite for delivery to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(h) In their respective Ratification Agreements UnSub, Eagle Ford, and Venado designate Mesquite their Producer's Representative with respect to all matters arising under the GGPA;

(i) In the Letter Agreement, Mitsui designates Mesquite as its marketer with respect to Mitsui's gas from the Comanche Assets to be processed through the GGPA;

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the Ratification Agreements, the Letter Agreement, and the GGPA.

**B. Attorney's Fees**

38. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code § 37.009 and as allowed by the GGPA and Ratification Agreements or other applicable agreement or statutory provision.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: July 30, 2021.

Case 4:22-cv-00587 Document 1-4 Filed 02/09/22 Page 13 of 15

Respectfully submitted,

**PORTER HEDGES LLP**

By: *__/s/ Eugene M. Nettles__*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

# EXHIBIT 28

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al*.[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**PRELIMINARY OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This preliminary objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation ("**APC**"), Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**") and Kerr-McGee Oil and Gas Onshore LP ("**KMOG**," and together with APC, AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**"). In support of their objection, the Oxy Parties and the WES Parties (collectively, the "**Objecting Parties**") respectfully

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

represent as follows:

## PRELIMINARY OBJECTION

1. The Settlement Motion seeks to expedite approval of a settlement agreement with insider parties (the "**Settlement Agreement**")[2] that could conceivably result in the Debtors' breach of certain agreements with the Objecting Parties and a violation of this Court's recently-entered Confirmation Order. The Settlement Motion was filed Saturday evening (June 6) and was not served on the Objecting Parties until Monday (June 8) around noon Eastern Time. At the Debtors' request the Court set the Settlement Motion for hearing on June 18, 2020. Approval of the Settlement Motion, which is an insider transaction subject to heightened review, will require discovery and briefing on a complicated set of issues, most notably, whether the Settlement Agreement subverts the Confirmation Order. In seeking such relief, the Debtors provide no compelling justification for rushing approval of the Settlement Agreement. Therefore, the Objecting Parties request that the hearing scheduled for June 18, 2020 be adjourned and re-set to provide parties in interest no less than the standard 21-day objection period.

2. *First*, there is no "emergency" within the meaning of Local Rule 9013-1(i).[3] To date, the Debtors have taken an unhurried approach to dealing with their midstream arrangements and contracts. The Objecting Parties are parties to a number of interrelated agreements with the Debtors (collectively, the "**Agreements**") arising from the 2017 sale of the Comanche assets by AEP and KMOG to certain of the Debtors (and other non-Debtor buyers, including Gavilan Resources, LLC). As a result of this transaction, Anadarko assigned most of the leases and other Comanche assets to the Debtors and the other buyers. Anadarko, however, could not transfer certain key midstream and downstream contracts to Sanchez and

---

[2] Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Settlement Agreement.

[3] As provided by Local Bankruptcy Rule 9013-1(i) with respect to emergency motions: "The motion must include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency. The motion seeking an emergency hearing must be certified for its accuracy by the party seeking the emergency relief or by its counsel."

the other buyers because the counterparties did not consent to assignment. Instead, these agreements were retained by Anadarko (the "**Retained Agreements**"). As these contracts were critical to the operation and value of the Comanche assets, and in light of Anadarko's continuing obligations under such contracts, the parties entered into agency agreements (the "**Agency Agreements**") whereby certain of the Debtors committed to act as Anadarko's agent (with all attendant duties that position entails) under such contracts so that such Debtors would receive the benefits of, and in exchange bear the burdens under, the Retained Agreements.

3. Throughout the entire ten (10) months that these Chapter 11 Cases have been pending, the Debtors continued to benefit from and rely on the Agency Agreements and Retained Agreements to process, market, and transport (and thus monetize) production from certain of their oil and gas leases. It was not until the eve of the Confirmation Hearing that the Debtors provided notice of their intent to reject many, but not all, of the Agreements. The Objecting Parties intend to object to the rejection of the Agreements by the June 22 deadline (the "**Contract Objection Deadline**") and commence an adversary proceeding concomitantly therewith to address the many state law issues required to adjudicate such objection (including issues relating to covenants running with the land and integration of contracts).

4. To confirm the Plan and allow the Debtors to exit chapter 11, the Debtors proposed an atypical structure by which they could continue to delay their midstream and marketing operational restructuring until after the effective date of the Plan. Specifically, the Plan established a post-confirmation deadline for counterparties to file objections to rejection or assumption and provided that such objections had to be adjudicated by the Court prior to such contracts being deemed assumed or rejected. Notably, in order to avoid litigation over the unusual aspect of their chosen plan structure, the Debtors and Reorganized Debtors agreed, in the Confirmation Order, that they would continue to perform their obligations under the Agreements until such time as any objection to rejection of such Agreements was resolved by

an order of this Court. *See* Docket No. 1212 at ¶ 24. At that time the Debtors and the DIP Lenders were fully aware of what their obligations would be under those contracts (because they had been performing them for years) and fully appreciated that rejection or assumption of their midstream and marketing contracts was going to be hotly contested and would, at a minimum, require significant discovery and litigation.

5. Despite knowing all of that and having obtained the benefit of the Objecting Parties' non-objection to the Plan, the Debtors are now seeking to have this Court upend that deal and effectively modify the Confirmation Order on 12 days' notice. The Debtors' single justification for emergency relief is the expiration of the Professional Fee Settlement within the Plan—a deal the Debtors cut with estate professionals, all of whom owe fiduciary duties to the Debtors' estates and/or unsecured creditors and are subject to section 327 of the Bankruptcy Code. The Debtors claim that agreement expires on June 19 and, therefore, the Plan must go effective before the Debtors are forced to liquidate. In other words, the Debtors' proffered basis for this Court to expedite approval of an insider settlement that violates the Confirmation Order is that "certain" parties to the Professional Fee Settlement, Settlement Motion ¶ 46, are effectively threatening liquidation by refusing to provide sufficient runway to allow the Debtors to satisfy due process.

6. This Court may recall that the Debtors relied on a similar "emergency" to expedite confirmation and consummation of the Plan. Indeed, at a hearing on April 8, 2020 during which the Court scheduled the Confirmation Hearing for April 30, 2020, the Court specifically told all parties that the Plan would either be confirmed or not at such hearing, and that all parties should come "ready to close" that afternoon if the Plan was confirmed. Yet, more than a month later, the Plan has still not become effective. And, just as they did at the

Confirmation Hearing, the Debtors are claiming that their ability to exit chapter 11 is dependent on the emergency relief in the Settlement Motion.

7. It bears noting that while the DIP Lenders contacted several parties in these cases to discuss their proposed insider settlement (none of whom seem to have immediately seen its appeal), neither the Debtors nor the DIP Lenders discussed it with the Objecting Parties (the parties most immediately impacted by the relief sought). This is particularly frustrating given that just two days before the Settlement Motion was filed, counsels to the Objecting Parties spoke to counsel to the DIP Lenders and Reorganized Debtors regarding scheduling of the rejection disputes. At no point were the Objecting Parties informed of the proposed Settlement Agreement.

8. *Second,* there are significant legal and factual issues that need to be addressed before the Settlement Agreement can be approved. As noted above, it appears that, if approved, the Settlement Agreement would require the Debtors to breach their obligations under the Agency Agreements prior to this Court's resolution of the rejection objection. For example, section 2.3 of the Settlement Agreement requires certain Comanche gas volumes to be diverted to Seco Pipeline, LLC (a wholly-owned subsidiary of SNMP) in breach of the Agency Agreements. Such breach would be in direct violation of the requirements and obligations contained in the Confirmation Order for the Reorganized Debtors to continue performing under the Agreements, including the Agency Agreements.

9. Additionally, approval of the Settlement Agreement will require heightened scrutiny. Not only is it a transaction with the same insider parties that allegedly engaged in less than arms' length transactions with the Debtors prepetition, it also seeks to settle potentially valuable claims that were a focal point for the majority of these Chapter 11 Cases.

*See* Docket No. 1032-2 (Motion filed by the Unsecured Creditors' Committee seeking standing to assert various causes of action against SNMP and related parties).

10. In light of the complicated issues framed by the Settlement Motion, the Objecting Parties intend to take discovery with respect to several issues, including, (i) the impact the Settlement Agreement would have on the Debtors' or Reorganized Debtors' performance of the Agreements prior to their rejection (ii) the good-faith and arms' length nature of the transactions, and (iii) the Debtors' analysis of the value of the litigation claims being settled therein. The Objecting Parties, therefore, require sufficient time to conduct such discovery and prepare their objection. Additional time is also warranted given that the Objecting Parties are simultaneously preparing their objection to the rejection of the Agreements and related adversary complaint ahead of the June 22nd Contract Objection Deadline, which deadline the Debtors appear to be prohibited from extending under the terms of the Settlement Agreement.

11. Therefore, the Objecting Parties respectfully ask the Court to deny emergency consideration of the Settlement Motion, set the Settlement Motion on regular notice, provide the Objecting Parties until **June 27, 2020** to file an objection, and adjourn the hearing noticed for June 18, 2020 for a date after June 27.

**RESERVATION OF RIGHTS**

12. The Objecting Parties reserve the right to amend or supplement this Preliminary Objection, to respond to any arguments raised by the Debtors or other parties, to make any arguments at the hearing on the Settlement Motion, and to seek any other or further relief.

## CONCLUSION

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Debtors' request to expedite consideration of the Settlement Motion, set the same for a date after June 27, 2020, and grant such other and further relief as the Court may deem just and proper.

Dated: June 8, 2020

Respectfully submitted,

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**PRELIMINARY OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This preliminary objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation ("**APC**"), Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**") and Kerr-McGee Oil and Gas Onshore LP ("**KMOG**," and together with APC, AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**"). In support of their objection, the Oxy Parties and the WES Parties (collectively, the "**Objecting Parties**") respectfully

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

represent as follows:

## PRELIMINARY OBJECTION

1. The Settlement Motion seeks to expedite approval of a settlement agreement with insider parties (the "**Settlement Agreement**")[2] that could conceivably result in the Debtors' breach of certain agreements with the Objecting Parties and a violation of this Court's recently-entered Confirmation Order. The Settlement Motion was filed Saturday evening (June 6) and was not served on the Objecting Parties until Monday (June 8) around noon Eastern Time. At the Debtors' request the Court set the Settlement Motion for hearing on June 18, 2020. Approval of the Settlement Motion, which is an insider transaction subject to heightened review, will require discovery and briefing on a complicated set of issues, most notably, whether the Settlement Agreement subverts the Confirmation Order. In seeking such relief, the Debtors provide no compelling justification for rushing approval of the Settlement Agreement. Therefore, the Objecting Parties request that the hearing scheduled for June 18, 2020 be adjourned and re-set to provide parties in interest no less than the standard 21-day objection period.

2. *First*, there is no "emergency" within the meaning of Local Rule 9013-1(i).[3] To date, the Debtors have taken an unhurried approach to dealing with their midstream arrangements and contracts. The Objecting Parties are parties to a number of interrelated agreements with the Debtors (collectively, the "**Agreements**") arising from the 2017 sale of the Comanche assets by AEP and KMOG to certain of the Debtors (and other non-Debtor buyers, including Gavilan Resources, LLC). As a result of this transaction, Anadarko assigned most of the leases and other Comanche assets to the Debtors and the other buyers. Anadarko, however, could not transfer certain key midstream and downstream contracts to Sanchez and

[2] Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Settlement Agreement.

[3] As provided by Local Bankruptcy Rule 9013-1(i) with respect to emergency motions: "The motion must include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency. The motion seeking an emergency hearing must be certified for its accuracy by the party seeking the emergency relief or by its counsel."

the other buyers because the counterparties did not consent to assignment. Instead, these agreements were retained by Anadarko (the "**Retained Agreements**"). As these contracts were critical to the operation and value of the Comanche assets, and in light of Anadarko's continuing obligations under such contracts, the parties entered into agency agreements (the "**Agency Agreements**") whereby certain of the Debtors committed to act as Anadarko's agent (with all attendant duties that position entails) under such contracts so that such Debtors would receive the benefits of, and in exchange bear the burdens under, the Retained Agreements.

3. Throughout the entire ten (10) months that these Chapter 11 Cases have been pending, the Debtors continued to benefit from and rely on the Agency Agreements and Retained Agreements to process, market, and transport (and thus monetize) production from certain of their oil and gas leases. It was not until the eve of the Confirmation Hearing that the Debtors provided notice of their intent to reject many, but not all, of the Agreements. The Objecting Parties intend to object to the rejection of the Agreements by the June 22 deadline (the "**Contract Objection Deadline**") and commence an adversary proceeding concomitantly therewith to address the many state law issues required to adjudicate such objection (including issues relating to covenants running with the land and integration of contracts).

4. To confirm the Plan and allow the Debtors to exit chapter 11, the Debtors proposed an atypical structure by which they could continue to delay their midstream and marketing operational restructuring until after the effective date of the Plan. Specifically, the Plan established a post-confirmation deadline for counterparties to file objections to rejection or assumption and provided that such objections had to be adjudicated by the Court prior to such contracts being deemed assumed or rejected. Notably, in order to avoid litigation over the unusual aspect of their chosen plan structure, the Debtors and Reorganized Debtors agreed, in the Confirmation Order, that they would continue to perform their obligations under the Agreements until such time as any objection to rejection of such Agreements was resolved by

an order of this Court. *See* Docket No. 1212 at ¶ 24. At that time the Debtors and the DIP Lenders were fully aware of what their obligations would be under those contracts (because they had been performing them for years) and fully appreciated that rejection or assumption of their midstream and marketing contracts was going to be hotly contested and would, at a minimum, require significant discovery and litigation.

5. Despite knowing all of that and having obtained the benefit of the Objecting Parties' non-objection to the Plan, the Debtors are now seeking to have this Court upend that deal and effectively modify the Confirmation Order on 12 days' notice. The Debtors' single justification for emergency relief is the expiration of the Professional Fee Settlement within the Plan—a deal the Debtors cut with estate professionals, all of whom owe fiduciary duties to the Debtors' estates and/or unsecured creditors and are subject to section 327 of the Bankruptcy Code. The Debtors claim that agreement expires on June 19 and, therefore, the Plan must go effective before the Debtors are forced to liquidate. In other words, the Debtors' proffered basis for this Court to expedite approval of an insider settlement that violates the Confirmation Order is that "certain" parties to the Professional Fee Settlement, Settlement Motion ¶ 46, are effectively threatening liquidation by refusing to provide sufficient runway to allow the Debtors to satisfy due process.

6. This Court may recall that the Debtors relied on a similar "emergency" to expedite confirmation and consummation of the Plan. Indeed, at a hearing on April 8, 2020 during which the Court scheduled the Confirmation Hearing for April 30, 2020, the Court specifically told all parties that the Plan would either be confirmed or not at such hearing, and that all parties should come "ready to close" that afternoon if the Plan was confirmed. Yet, more than a month later, the Plan has still not become effective. And, just as they did at the

Confirmation Hearing, the Debtors are claiming that their ability to exit chapter 11 is dependent on the emergency relief in the Settlement Motion.

7. It bears noting that while the DIP Lenders contacted several parties in these cases to discuss their proposed insider settlement (none of whom seem to have immediately seen its appeal), neither the Debtors nor the DIP Lenders discussed it with the Objecting Parties (the parties most immediately impacted by the relief sought). This is particularly frustrating given that just two days before the Settlement Motion was filed, counsels to the Objecting Parties spoke to counsel to the DIP Lenders and Reorganized Debtors regarding scheduling of the rejection disputes. At no point were the Objecting Parties informed of the proposed Settlement Agreement.

8. *Second,* there are significant legal and factual issues that need to be addressed before the Settlement Agreement can be approved. As noted above, it appears that, if approved, the Settlement Agreement would require the Debtors to breach their obligations under the Agency Agreements prior to this Court's resolution of the rejection objection. For example, section 2.3 of the Settlement Agreement requires certain Comanche gas volumes to be diverted to Seco Pipeline, LLC (a wholly-owned subsidiary of SNMP) in breach of the Agency Agreements. Such breach would be in direct violation of the requirements and obligations contained in the Confirmation Order for the Reorganized Debtors to continue performing under the Agreements, including the Agency Agreements.

9. Additionally, approval of the Settlement Agreement will require heightened scrutiny. Not only is it a transaction with the same insider parties that allegedly engaged in less than arms' length transactions with the Debtors prepetition, it also seeks to settle potentially valuable claims that were a focal point for the majority of these Chapter 11 Cases.

Case 20-30587 Document 1315 Filed in TXSB on 06/08/20 Page 6 of 7

*See* Docket No. 1032-2 (Motion filed by the Unsecured Creditors' Committee seeking standing to assert various causes of action against SNMP and related parties).

10. In light of the complicated issues framed by the Settlement Motion, the Objecting Parties intend to take discovery with respect to several issues, including, (i) the impact the Settlement Agreement would have on the Debtors' or Reorganized Debtors' performance of the Agreements prior to their rejection (ii) the good-faith and arms' length nature of the transactions, and (iii) the Debtors' analysis of the value of the litigation claims being settled therein. The Objecting Parties, therefore, require sufficient time to conduct such discovery and prepare their objection. Additional time is also warranted given that the Objecting Parties are simultaneously preparing their objection to the rejection of the Agreements and related adversary complaint ahead of the June 22nd Contract Objection Deadline, which deadline the Debtors appear to be prohibited from extending under the terms of the Settlement Agreement.

11. Therefore, the Objecting Parties respectfully ask the Court to deny emergency consideration of the Settlement Motion, set the Settlement Motion on regular notice, provide the Objecting Parties until **June 27, 2020** to file an objection, and adjourn the hearing noticed for June 18, 2020 for a date after June 27.

**RESERVATION OF RIGHTS**

12. The Objecting Parties reserve the right to amend or supplement this Preliminary Objection, to respond to any arguments raised by the Debtors or other parties, to make any arguments at the hearing on the Settlement Motion, and to seek any other or further relief.

## CONCLUSION

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Debtors' request to expedite consideration of the Settlement Motion, set the same for a date after June 27, 2020, and grant such other and further relief as the Court may deem just and proper.

Dated: June 8, 2020

Respectfully submitted,

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner

# EXHIBIT 29

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1309 |

**LIMITED OBJECTION OF VENADO OIL & GAS, LLC, AND ITS DIRECT AND INDIRECT SUBSIDIARIES, EAGLE FORD TX LP, AND MITSUI E&P TEXAS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries), Eagle Ford TX LP, and Mitsui E&P Texas LP (collectively, the "Comanche Non-Ops"), by and through the undersigned counsel, hereby submit this limited objection (this "Objection") to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "Settlement Motion"). In support of this Objection, the Comanche Non-Ops respectfully state as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

## Limited Objection

1. The Comanche Non-Ops are non-operating working interest owners representing, in the aggregate, an approximately 50 percent working interest in the Comanche Assets (as defined in the Settlement Motion).

2. Debtor SN EF Maverick LLC ("SN Maverick") is currently the designated operator of the Comanche acreage. In addition, and pursuant to certain production marketing agreements between SN Maverick (as assignee of Anadarko E&P Onshore LLC and Anadarko Energy Services Company) and each of the Comanche Non-Ops (with respect to each Comanche Non Op, its "PMA"), SN Maverick or its designated marketing affiliate markets each of the Comanche Non-Ops' respective oil, residue gas, and natural gas liquids produced from the oil and gas wells located on the Comanche acreage. As they indicated to this Court, the Debtors intend to assume the PMAs and continue marketing production on behalf of the Comanche Non-Ops upon the Debtors' emergence from the bankruptcy cases. *See Notice of Filing of Third Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1293].

3. The Comanche Non-Ops have sought to work constructively with the Debtors in the background of these bankruptcy cases to establish a mutually beneficial marketing plan for the Comanche acreage following the conclusion of the Debtors' bankruptcy cases. However, given the potential impact of the Debtors' Settlement Motion, the Comanche Non-Ops are now compelled to file this Objection to the Settlement Motion, and respectfully submit that the Settlement Motion should be denied unless and until (i) the Debtors provide sufficient information for the Court and parties in interest to evaluate the propriety of the Settlement, as described herein, and (ii) the Debtors demonstrate that the transactions contemplated by the Settlement Motion, and

the discontinuation of existing agreements, are consistent with the Debtors' duties to the Comanche Non-Ops under their respective PMAs.

4. The Comanche Non-Ops agree with the other objecting parties[2] that the Debtors' proposed settlement (the "Settlement") improperly presumes the resolution of a number of issues related to the Debtors' unusual assumption and rejection process, many of which raise complex factual questions that potentially necessitate discovery. The Comanche Non-Ops are concerned by the insider nature of the transactions proposed in the Settlement, especially whether certain of the proposed agreements with insiders were made at arms'-length and on prevailing market terms (or not).

5. As other objections have pointed out, the Settlement clearly favors the Debtors' Catarina operations over their Comanche operations, and is premised on using the Comanche Non-Ops' valuable production volumes to benefit the Debtors' Catarina operations. The Comanche Non-Ops seek to understand, and believe the Court should consider, how the Debtors and the insider parties to the Settlement arrived at the agreed-upon commercial terms and rates for the various proposed agreements, how those commercial terms and rates compare to prevailing market terms, and to what extent the Debtors sought better market terms from other parties, if at all. Moreover, the Settlement Motion fails to address the risks or potential negative impact that

---

2 *See Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1320]; *Joinder of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP* to *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No 1316].

discontinuing the rejected agreements and entering into new agreements may have on the Comanche Non-Ops' interests under the PMAs, which require the Debtors to act in good faith and in a manner that is commercially reasonable under the circumstances in marketing the Comanche Non-Ops' hydrocarbons. Each of these questions is directly relevant to whether the Settlement is in "the paramount interest of creditors" or "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion," *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917–18 (5th Cir. 1995), and the Settlement Motion notably lacks any answers to those questions. Indeed, the Comanche Non-Ops struggle to understand how they can meaningfully assess the Settlement without this information, and the Comanche Non-Ops respectfully submit that the Settlement should not be approved absent a showing that the Debtors acted in good faith and in a manner that is commercially reasonable under the circumstances.

6. The Comanche Non-Ops further believe that the Settlement implicates crucial substantive rights of a number of parties in interest, including the Comanche Non-Ops' rights under their respective PMAs with the Debtors, to make certain elections in the event the Debtors materially modify the manner in which the Comanche Non-Ops' hydrocarbons are processed, transported, marketed, and sold. To date, the Debtors have made no meaningful attempt to engage with the Comanche Non-Ops regarding the terms of these new agreements that implicate the Comanche Non-Ops' volumes. Further, the Debtors have failed to provide sufficient information for the Comanche Non-Ops to even determine whether the election rights under the PMAs referenced above could be triggered by the Settlement.

7. The Comanche Non-Ops look forward to a constructive and fulsome dialogue with the Debtors and other parties in interest on the issues raised in the Settlement and the Debtors'

assumption and rejection process generally. But the process required to resolve the myriad issues stemming from the Settlement must include more information from the Debtors for the Court and parties in interest to be in a position to consider and evaluate the full range of implications of the Settlement.

**Reservation of Rights**

8. The Comanche Non-Ops reserve the right to amend or supplement this Objection, raise additional objections to the Settlement Motion, including, among other things, to the nature of releases provided under the Settlement, and to seek any other or further relief. Further, to the extent that the Settlement implicates the Comanche Non-Ops' respective rights under the PMAs, each of the Comanche Non-Ops reserves any and all such rights.

**Conclusion**

9. The Comanche Non-Ops respectfully request that the Court deny the Debtors' request to approve the Settlement Motion unless and until the Debtors provide sufficient information for the Court and parties in interest to evaluate the propriety of the Settlement, and grant such other and further relief as the Court may deem just and proper.

[*Remainder of page intentionally left blank*]

Dated: June 22, 2020
Houston, Texas

/s/ *Jonathan G.C. Fombonne*
Jonathan G.C. Fombonne (TX Bar No. 24102702)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main St.
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: jonathan.fombonne@kirkland.com

- and -

Aparna Yenamandra (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: aparna.yenamandra@kirkland.com

*Counsel to Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)*

Julia Frost-Davies (admitted *pro hac vice*)
Amy Kyle (admitted *pro hac vice*)
**MORGAN LEWIS LLP**
One Federal Street
Boston, MA 02110 - 1726
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

*Counsel to Eagle Ford TX LP*

Duston McFaul (24003309)
Michael Fishel (24082998)
Maegan Quejada (24105999)
**SIDLEY AUSTIN LLP**
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: mquejada@sidley.com

*Attorneys for Mitsui*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, a true and correct copy of the foregoing objection was served by e-mail on the parties who receive electronic notice in these cases pursuant to the Court's ECF filing system.

/s/ *Jonathan G.C. Fombonne*

# EXHIBIT 30

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, et al.,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1309 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC AND SN EF UNSUB, LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC, the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this Objection to *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* (the "Settlement Motion") [Docket No. 1309].

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**PRELIMINARY STATEMENT**

In the Settlement Motion, the Debtors propose to overhaul the midstream charges for their Comanche and Catarina assets. But in order for their proposed settlement to close, they need the consent of UnSub. If the Debtors' attempt to reject the Marketing Agreement (defined below) with UnSub fails, as it should, that document would require UnSub's consent to moving UnSub's volumes of hydrocarbons to a different midstream processor. And if the Debtors succeed in rejection, they lose the contractual ability to control UnSub's volumes altogether. Either way, UnSub's consent to the settlement will be necessary, and proceeding down this path without it is futile and senseless.

But the Debtors did not seek UnSub's consent in advance of filing the motion because they know UnSub will not and cannot consent to this deal: it is fundamentally unfair, representing an effort to benefit some of the Debtors at the expense not only of UnSub but also of the other Comanche working interest owners—including SN EF Maverick, LLC ("Maverick"), which is itself one of the Debtors. The Debtors have candidly admitted that what this settlement represents is an attempt to reduce Catarina midstream rates (in which certain Debtors have a 100% ownership of the working interest) in exchange for shifting Comanche hydrocarbons (in which one Debtor, Maverick, has a working interest).

The Court should not approve a settlement that not only is incapable of being consummated in its current form, but also creates an economic framework for the marketer and operator of the Comanche assets to work *against* the interests of the Comanche working interest owners, in violation of Sanchez's duties as debtor-in-possession. Indeed, discovery has shown that Maverick gave *no* consideration to how to potentially maximize value from its hydrocarbons (and those of the other Comanche working interest owners), separate and apart from trading them for concessions on the Catarina midstream arrangements. This is not surprising, given the

governance failures: the evidence is undisputed that there was no thought given to Maverick's rights and remedies as distinct from those of the other Debtors and that Maverick's assumption and rejection decisions necessary to consummate the transaction are not in the best interest of Maverick.

GSO and UnSub therefore respectfully request that the Court deny the Settlement Motion.

## BACKGROUND[2]

### A. Sanchez's Comanche and Catarina Assets

1. The Settlement Motion concerns the midstream charges for the Debtors' two principal oil-and-gas assets: the Comanche assets and the Catarina assets. While Sanchez Energy Corporation ("Sanchez") has served as the operator for both assets, it has very different economic interests in each: Sanchez has only a small minority working interest in Comanche—which it holds indirectly through Maverick—but 100% of the Catarina working interests. (*See* UnSub Ex. A at 22–23.)

2. The Comanche field consists of 1,738 wells and currently produces, on a gross basis, approximately 51,700 barrels of oil per day and 369 million cubic feet of gas per day of gas. (*See id.* at 23) Sanchez has a working interest of around 15% in approximately 300 of the Comanche wells, but no working interest or economic stake in the remaining 1,500 wells, resulting in an overall interest of around 6% in Comanche's total production. (*See* UnSub Ex. A at 23.)[3]

---

2 This background statement of facts relies on the following: the Settlement Motion ("Mot.") and exhibits thereto (each cited as "Mot. Ex. __"); the exhibits attached to this Objection (each cited as "UnSub Ex").

3 Sanchez also has a common-equity interest in UnSub; however, that interest, which is subordinated to UnSub's RBL debt and GSO's preferred-equity interest, is out of the money.

Despite its small economic interest in Comanche hydrocarbons and no economic interest in more than two-thirds of the wells of the Comanche field, Sanchez serves as the operator of the Comanche field (although its position as operator is now the subject of dispute). (*See* UnSub Ex. B at 59.)

3. The Catarina asset consists of 457 PDP wells, and currently produces, on a gross basis, approximately 7,500 barrels of oil per day and 115 million cubic feet of gas per day. (*See* UnSub Ex. A at 22.) Sanchez has a 100% working interest in the Catarina assets and is the operator. (*See* UnSub Ex. A at 22.)

4. Sanchez receives gathering and midstream services for its Catarina assets from Sanchez Midstream Partners LP ("SNMP") and affiliated entities, including Carnero G&P LLC ("Carnero"), a joint venture of SNMP. (*See* UnSub Ex. C at 29.) As its name suggests, SNMP is a related party to Sanchez: while Sanchez and SNMP are publicly traded, both were founded by members of the Sanchez family, who long served as directors and officers of both companies. (*See id.* (identifying SNMP as a related party).) SNMP and its affiliates have imposed unilateral rate increases in respect of the Catarina assets that the Debtors believe are improper and have resulted in litigation. (*See* Mot. ¶ 27, at 18.)

5. Though it has only a minority working interest in the Comanche field, Sanchez has entered into agreements with the other working interest owners that give it a qualified authority to make midstream decisions for the entire Comanche relating to Sanchez's role as operator (which is in dispute). These agreements include the Hydrocarbons Purchase and Marketing Agreement by and between Maverick and UnSub, dated as of January 12, 2017 (the "Marketing Agreement"), as well as the Joint Development Agreement by and among Gavilan Resources, LLC ("Gavilan"), Maverick, UnSub, and Sanchez, dated as of March 1, 2017 (the "JDA"). Section 2.2 of the Marketing Agreement requires UnSub's consent before Sanchez materially alters the midstream

contracts that affect UnSub. (*See* UnSub Ex. D ("MA") § 2.2.) Section 3.1(h) of the JDA requires the unanimous approval of Gavilan, Maverick, and UnSub before approving or amending midstream contracts. (*See* UnSub Ex. E ("JDA") § 3.1(h).)

**B. Current Midstream Costs in the Comanche**

6. The Comanche working interest owners face midstream fees for gathering, processing and transportation. Gathering fees make up the majority of such midstream costs for both oil and gas.

7. Today, the gathering and processing fees paid by the Comanche working interest owners reflect above-market rates. Those high fees, combined with low oil and gas prices, threaten the long-term sustainability of oil and gas drilling in Comanche. Solving this problem requires a comprehensive restructuring of the Comanche midstream rates, including, most significantly, the rates under gathering agreements between Sanchez and Springfield Pipeline LLC ("Springfield"), a 50% owned subsidiary of Western Midstream Partners, LP (with its affiliates, "Western"). Western is by far the most significant midstream provider to the Comanche field.

8. The gathering agreements with Springfield are particularly concerning because they impose fixed demand charges even as production and prices decline. First, due to the pricing under the Springfield gathering agreements, it is not economical to operate the Comanche assets at the current gas production levels. Second, with regard to the future, oil and gas companies often manage lower prices by reducing their exploitation of existing wells and their development of new wells. But that is not feasible, because Springfield fixed demand charges are contractually scheduled to increase, and without volumes from new wells, Sanchez will be forced to cover increasing fixed demand charges from a production base in decline. This causes per-unit charges to escalate, leading to an economic "death spiral." Comanche operating margins are already slim, and any increase in per-unit charges would result in no material new drilling activity and could

potentially lead to the shutting-in of PDP production. The only away to avoid this outcome for Sanchez and the other Comanche working interest owners is to negotiate material amendments to the midstream contracts with Western.

9. GSO has repeatedly told Sanchez the importance of restructuring the midstream agreements with Western, including the Springfield gathering rates, and sent multiple formal proposals for how to do so. These overtures went unheeded. Regrettably, Sanchez has not even attempted to negotiate with Western on these gathering fees. Nor has Sanchez requested Western make a proposal for processing—or a combined proposal on processing and gathering together. Nor has Sanchez requested proposals from third parties for new processing or transportation arrangements for the Comanche field. Any reasonable operator focused on the Comanche assets would have engaged with Western, its predominant midstream provider, on a comprehensive solution to the midstream arrangements, including potentially a continued commitment of Comanche volumes to processing at the Brasada processing plant (in which Western has a 100% ownership interest) in return for much needed rate concessions under the agreements with Western and Springfield.

**C. The Proposed Settlement**

10. Instead of negotiating required rate reductions with Western, Sanchez has negotiated the Settlement Agreement with SNMP and its affiliates, obtaining rate reductions for its Catarina assets by leveraging its rights as marketer of the Comanche hydrocarbons pursuant to its marketing agreements with Comanche working interest owners (including the Marketing Agreement with UnSub). Put bluntly, Sanchez is selling out the Comanche working interest owners to benefit its Catarina assets. And it is doing so in order to settle claims brought by insiders who have been taking advantage of the Debtors by imposing what the Debtors themselves call improper rate hikes.

11. In the Settlement Motion, the Debtors seek approval of a proposed transaction in which Sanchez would receive (i) approximately $10 million up front, including contribution of a disputed administrative expense claim of nearly $2 million by Seco Pipeline, LLC ("Seco"), (ii) rate reductions on gathering services for Catarina assets that are still in excess of current market rates and reductions for processing and fractionation services that are contingent on obtaining consents from Comanche working interest owners, and (iii) releases from the Settlement Parties (as defined in footnote 5 of the Settlement Motion). (*See* Mot. ¶¶ 19–20, at 10–15.)

12. In exchange for these questionable benefits, Sanchez has agreed to direct over 350 million cubic feet of gas per day from the Comanche field—where it is currently processed by Western and other processors—to SNMP for processing. (*See id.* ¶¶ 15, 29, at 8, 19.) Sanchez proposes to do this by rejecting its current agreements with Western and other processors (together, the "Non-Carnero Processing Agreements"). (*See id.* ¶ 15 n.7, at 8.)[4] Rejecting the Non-Carnero Processing Agreements, the settlement presupposes, would cause gas produced by the Comanche assets to become deliverable to Carnero for processing under the Firm Gas Gathering, Processing and Purchase Agreement ("GGPA") dated April 1, 2018, between Maverick and Carnero. Further, the Carnero rates on incremental volumes are no better for Comanche than those provided in 2018, when commodity prices and margins were far higher, despite several available options and excess capacity of processing in the Eagle Ford. Thus, in order to settle unjustifiable rate hikes imposed

[4] The relevant Sanchez entity—Maverick—is not a named party to these processing agreements, but rather has agreed to take over the obligations of the named parties, Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, under a services agreement with them. (Mot. ¶ 15 n.7, at 8.) So as a technical matter, Sanchez rejecting the services agreement, not the Non-Carnero Processing Agreements themselves. (*See id.*) But this technical distinction makes no difference to our analysis.

by insiders, the Debtors are rewarding SNMP with additional above-market business at the expense of the Comanche working interest owners.

13. This is not a disputed point. The Chief Restructuring Officer of the Debtors candidly admitted at his deposition that the principal benefit to the Debtors from the proposed settlement is the reduced midstream rates, and the principal benefit to the settlement counterparties, SNMP and Targa, is the additional volumes they secured from the Comanche assets. (Deposition Transcript of Mohsin Meghji dated June 22, 2020, at 130:21-132:6.)

14. To be clear, the Debtors did not even *try* to pursue a course that might maximize value for the Comanche working interest owners (including Maverick, a debtor). (Meghji Tr. at 26:4-8.) Indeed, Mr. Meghji, testified that he approved the proposed settlement on behalf of Maverick without doing *any* analysis to determine what additional consideration Maverick (and the other Comanche working interest owners) might achieve had they re-negotiated the Comanche midstream contracts separate and apart from the Catarina rate negotiation. (Meghji Tr. 136:2-18.)

## ARGUMENT

15. The Court should deny the Settlement Motion and reject the proposed settlement. The "Court should only approve the settlement when the settlement is 'fair and equitable and in the best interest of the estate.'" *Connecticut General Life Ins. Co.* v. *United Companies Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). This settlement is not just inequitable, but unlawful and will be unable to close. Put simply, the settlement is Sanchez's attempt to exercise control over UnSub's hydrocarbons in violation of UnSub's contract and property rights. The Marketing Agreement and JDA—which Sanchez has improperly sought to reject—require UnSub's consent for the new midstream arrangements effectuated by the Settlement Agreement. Alternatively, in the absence of these agreements, Sanchez would have no right to market UnSub's property without its consent. UnSub does not—and will not—consent to



011008

Case 19-34508 Document 1215 Filed in TXSB on 06/24/20 Page 19 of 65

the proposed settlement, because it benefits Sanchez's Catarina assets at the expense of UnSub and the other Comanche working interest owners. In light of all this, the settlement does not pass muster under Bankruptcy Rule 9019(a), as it (a) cannot be closed without UnSub's consent (which will not be forthcoming), (b) provides largely illusory benefits to the Debtors, (c) provides SNMP restated above market rates, and (d) seeks to disadvantage Maverick in order to benefit the other Debtors.

## I. The proposed settlement requires UnSub's consent, whether or not the Marketing Agreement and JDA are rejected.

16. Sanchez cannot close the transactions contemplated by the settlement without UnSub's consent under the Marketing Agreement and the JDA, as the settlement itself acknowledges. As such, if Sanchez fails in its efforts to reject the Marketing Agreement and the JDA, UnSub's consent is required. On the other hand, if it succeeds in rejecting these contracts, Sanchez no longer has a contractual right to commit UnSub's hydrocarbons, and the settlement cannot be closed for that reason.

### A. New midstream arrangements or modifications to existing ones require UnSub's consent under the Marketing Agreement and the JDA.

17. In the Settlement Agreement, Sanchez proposes to lock UnSub's gas into two new midstream arrangements. First, by rejecting the Non-Carnero Processing Agreements, Sanchez seeks to move the Comanche gas from Western to Carnero for processing. Second, it seeks to enter into a new pipeline agreement with Seco Pipeline, which the Settlement Motion refers to as the "New Comanche-Seco Agreement."

18. While Sanchez has sought to reject the Marketing Agreement and the JDA (*see* Docket No. 1188, at 92, 116), the confirmation order provides that they shall remain in place until UnSub's objection to rejection (filed yesterday) is resolved (*see* Docket No. 1212 ¶ 17, at 10–11).

And they will continue to remain in place because—for reasons UnSub explained in its objection to rejection and the related adversary proceeding—they are not subject to rejection.[5]

19. The Marketing Agreement and the JDA both independently obligate Sanchez to obtain UnSub's consent before altering the Comanche midstream arrangements as proposed in the Settlement Motion.

20. Section 2.2 of the Marketing Agreement requires UnSub's "prior written consent" before Sanchez may, among other things, "(1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to [UnSub's] Hydrocarbons, . . . or (b) otherwise have an adverse effect, in any material respect, on [UnSub] . . . [or] (2) enter into any contract with an Affiliate of [Maverick] that is on terms materially less favorable to [UnSub] than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of [UnSub] that are in excess of $20 million in any calendar year." (MA § 2.2.) "Midstream Contracts" are defined to include certain specified contracts—including the Non-Carnero Processing Agreements—as well as "any gathering, processing, transportation or sales agreements entered into after the Effective Date [of the Marketing Agreement], including any amendments thereto, relating to [UnSub's] Interests and the Hydrocarbons produced therefrom." (MA Annex I.) Maverick's "Affiliates" are expressly defined to include "all member[s] of the Sanchez family." (*Id.*)

---

[5] More specifically, as UnSub has explained in its brief opposing rejection and related adversary proceeding, the Marketing Agreement and JDA cannot be rejected in bankruptcy. Among other reasons, such agreements are component parts of a single integrated contract containing covenants that run with the land that are not subject to rejection.

21. This language covers both Sanchez's rejection of the Non-Carnero Processing Agreements and its entry into the New Comanche-Seco Agreement, both of which require UnSub's consent.

22. Consider first Sanchez's rejection of the Non-Carnero Processing Agreements. Rejection under § 365 constitutes a breach. 11 U.S.C. § 365(g); *Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 139 S. Ct. 1652, 1662 (2019). By definition, this breach excuses each other party's performance—otherwise, there would be no "executory" contract subject to rejection in the first place. *See In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994). Thus, by rejecting these agreements, Sanchez loses its ability to insist on the other parties' performance and thereby "waive[s] any material rights" it has under the Non-Carnero Processing Agreements, which are "Material Contracts" within the meaning of the MA. (MA § 2.2, Annex I, and Exhibit B.) As a result, Sanchez cannot take the suggested actions without UnSub's consent.

23. UnSub's consent is also required to enter into the New Comanche-Seco Agreement. Entry into this agreement, as part of the proposed restructuring of Sanchez's midstream operations, has a material "adverse effect" on UnSub for the reasons explained below. (*See infra* Section II.) Moreover, Seco Pipeline is a wholly-owned subsidiary of SNMP, which, in turn, is an affiliate of Sanchez Oil & Gas Corporation, Sanchez's "Affiliate" as defined under the Marketing Agreement. (UnSub Ex. G (SNMP 2019 10-K) at 41; MA Annex I.) As a result, the agreement must be on terms as materially favorable as "could have been obtained . . . in an arm's length transaction with a Third Party." (MA § 2.2.)

24. There appears to have been no market test of the New Comanche-Seco Agreement or Carnero, and so there is no reason to believe it is as favorable to UnSub as an arm's-length transaction with a third party would be. In fact, UnSub has received unsolicited proposals from

competing midstream providers offering the same services provided by Carnero and Seco for significantly lower rates. Finally, the New Comanche-Seco Agreement cannot be assessed in isolation, because this agreement is part of a package deal involving processing at Carnero. Thus, to assess whether the New Comanche-Seco Agreement has an adverse impact, one must compare to the but-for world in which Sanchez sought to renegotiate the Springfield gathering agreements, the Brasada processing agreement, and agreements with midstream providers downstream of the Brasada plant—which it is now undisputed it did not seek to do.

25. The same result obtains under the JDA. Section 3.2 of the JDA lists various actions that Sanchez can undertake only with the unanimous consent of all three parties—Sanchez, Gavilan, and UnSub. (*See* JDA § 3.2.) These actions include "approving or amending of any Material Contracts" (*id.* § 3.2(h)), which are defined to include all "gathering agreements, processing agreements, [or] transportation agreements, . . . in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000" (*id.* Annex I).

26. Here, the Non-Carnero Processing Agreements, the purported commitment of additional volumes under the Carnero GGPA, and the New Comanche-Seco Agreement are all "Material Contracts" as they are "processing" and "transportation" agreements worth more than $1 million. Sanchez cannot "approv[e]" the New Comanche-Seco Agreement without UnSub's permission.[6] And while Sanchez is not formally "amending" the Non-Carnero Processing Agreements or the Carnero GGPA, its rejection of the Non-Carnero Processing Agreements and the purported commitment of additional volumes under the Carnero GGPA effectively eliminates the processors' obligation to perform, materially amending the relationship between the parties.

---

[6] That is because UnSub has a representative on the Operating Committee, appointed pursuant to the JDA, which must unanimously approve any of the actions listed in Section 3.2.

27. In sum, there are multiple, independent reasons why Sanchez must obtain UnSub's consent before it could close the transactions contemplated by the proposed settlement, assuming the Marketing Agreement and JDA remain in place and are not rejected (as we submit they cannot be).

**B. Alternatively, if the Marketing Agreement and the JDA were rejected, then Sanchez would have no right to market UnSub's hydrocarbons to Carnero or anyone else.**

28. Of course, Sanchez has sought to reject the Marketing Agreement and the JDA, even though they are part of one integrated contract that runs with the land. It cannot do so, as UnSub demonstrated in its objection to rejection of these contracts. But assuming Sanchez could reject these contracts, rejection would simply provide yet another reason why the settlement cannot go forward without UnSub's consent.

29. UnSub owns an ~18% working interest in the Comanche assets. That means, of course, that UnSub owns ~18% of the hydrocarbons produced by the Comanche assets. It is fundamental that Sanchez cannot do anything with UnSub's property without its consent. Here, Sanchez can lawfully transport and sell UnSub's hydrocarbons solely by virtue of the Marketing Agreement—which Sanchez seeks to reject. Thus, without the Marketing Agreement, Sanchez could not enter into new midstream arrangements affecting UnSub's hydrocarbons without its consent.

30. Nonetheless, in the Settlement Motion, Sanchez attempts to identify a way to make an end-run around UnSub's property rights. As the motion explains, Sanchez and Maverick—which, despite its interest in the Comanche assets, has been enlisted by the other Debtors in their effort to undermine and degrade the value of those assets—seek to assume certain "Assumption Agreements," which include various "Ratification Agreements" related to the GGPA between Maverick and Carnero. (*See, e.g.*, Mot. ¶ 20, at 15; Mot. Ex A § 1.1, at 3 (definition of

"Assumption Agreements").) UnSub and other Comanche working interest owners entered into these agreements at the time Sanchez entered into the GGPA with Carnero. Sanchez appears to be operating under the mistaken assumption that UnSub's entry into one of these Ratification Agreements means that, with or without the Marketing Agreement, UnSub's gas can be shifted to Carnero for processing. Not so. Basic principles of contract interpretation and bankruptcy law provide that UnSub's gas volumes will not shift to Carnero as the Debtors expect.

31. As an initial matter, the Ratification Agreement (UnSub Ex. H ("RA")) is relevant *only* insofar as Sanchez seeks to shift additional gas to Carnero. It cannot support the other parts of the proposed settlement, including the New Comanche-Seco Agreement, which plainly requires UnSub's consent insofar as it affects UnSub's property interest in its hydrocarbons. That alone would render the settlement unable to close, regardless of whether the Marketing Agreement and JDA were rejected or if they were retained.

32. Moreover, the Ratification Agreement, by its terms, does not permit UnSub's gas to be processed by Carnero absent the Marketing Agreement. In the Ratification Agreement, UnSub agreed to do two things: to "assume all the obligations of [Maverick] ***under the GGPA***" and "confirm" the GGPA's dedication of its gas interests "to Carnero and to the performance of the GGPA, ***as provided in the GGPA***," which is being assumed by the Debtors. (RA §§ 2, 4 (*emphasis added*).) On its face, this language simply required UnSub to live up to Maverick's obligations under the GGPA in the event Maverick could not.

33. Maverick's obligations under the GGPA, however, *are limited to gas it has the right to control or market through arrangements such as the Marketing Agreement*. The GGPA obligates Maverick to deliver certain "Dedicated Gas" to Carnero. (UnSub Ex. I § 3.1(a).) "Dedicated Gas" is defined as "Producer's Gas" generated from certain specified land, and

"Producer's Gas" is defined as "all Gas that is owned ***or controlled*** by Producer [*i.e.*, Maverick] ***or which Producer has the right to market***." (*Id.* § 1.1 at 4, 6.) Thus, once Maverick cannot "control" or "market" any gas owned by a third party, it ceases to be "Dedicated Gas" subject to the delivery obligation in the GGPA. This result is eminently sensible, because Maverick cannot promise to deliver gas to which it has no legal entitlement.

34. As a result, the only thing UnSub ratified in the Ratification Agreement was Maverick's obligation to deliver UnSub's gas ***if the Marketing Agreement remained in place***.

35. Section 3 of the Ratification Agreement provides decisive support for this reading. Under Section 3, Carnero has the right to "cure" Maverick's breach of any agreement with UnSub (including the Marketing Agreement) by stepping into Maverick's shoes and performing Maverick's obligations to UnSub—in which case UnSub loses its right "to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement." (RA § 3.) This provision would be wholly unnecessary—and in fact pointless—if UnSub had to continue performing under the Ratification Agreement and GGPA even if Maverick breached the Marketing Agreement. Such a reading would be contrary to Texas law (which governs the Ratification Agreement, *see* RA § 7), under which "[i]nterpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage." *U.S. Metals, Inc.* v. *Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24 n.5 (Tex. 2015); *see also Smith* v. *Davis*, 453 S.W.2d 340, 345 (Tex. Civ. App. 1970) ("[A]n interpretation that gives effect to all parts of an instrument and a reasonable meaning to all its provisions will be [p]referred to one that leaves a part of a writing useless."). Instead, the only reasonable interpretation of the Ratification Agreement is that UnSub's obligations remain operative only so long as the Marketing Agreement stays in force.

36. Further confirmation is provided by a Letter Agreement entered into by Maverick and UnSub on March 23, 2018, contemporaneously with the Ratification Agreement. (UnSub Ex. J.) In the letter, Maverick explained that it was requesting UnSub's consent—pursuant to Section 2.2 of the Marketing Agreement—to enter into the GGPA, and requested that UnSub also enter into the Ratification Agreement. (*Id.* at 1.) Section 3 of the Letter Agreement then provided:

> The parties acknowledge that UnSub's production that will be subject to the FGGPA will continue to be sold by UnSub to Maverick ***pursuant to the terms of the [Marketing] Agreement***. Unless otherwise set forth in the Ratification Agreement, the FGGPPA or this letter agreement, if there is any conflict between the terms of the [Marketing] Agreement and the Ratification Agreement, the terms of the [Marketing] Agreement will govern.

(*Id.* § 3, at 2.)

37. This language confirmed what the text and structure of the Ratification Agreement, as well as common sense, provide: Maverick cannot deliver UnSub's gas to Carnero under the GGPA unless Maverick retains the right, under the Marketing Agreement, to do so. Indeed, the Marketing Agreement was the predicate for Maverick's request that UnSub execute the Ratification Agreement. Thus, if the Marketing Agreement is rejected, Sanchez and Carnero have no basis to process UnSub's gas, and they must seek UnSub's consent to do so.

38. Finally, even if the GGPA somehow continued to bind UnSub even without the Marketing Agreement, rejecting the Non-Carnero Processing Agreements would not be effective in shifting UnSub's gas volumes from Western to Carnero. As discussed, Section 3.1(a) of the GGPA obligates Maverick to deliver "Dedicated Gas" to Carnero for processing. (*Id.* § 3.1(a).) Section 3.2(b) carves out from this obligation any gas that must be delivered to other processors until "the end of the then-current term" of each relevant Non-Carnero Processing Agreement. (*Id.* § 3.2(b).) The term of the Brasada contract ends in 2034. As a result, until 2034, the minimum volumes specified in those agreements are not subject to the Carnero agreement.

39. While Sanchez appears to be taking the position that rejecting the Non-Carnero Processing Agreement will make the gas volumes committed to Western automatically shift to Carnero, that is mistaken. Rejection is breach, not termination. *Mission*, 139 S. Ct. at 1659. As a result, rejection of the Western agreements does not cause the agreement to end or otherwise bring forward the "end of the []current term" of the agreement, meaning the gas committed to Western does not become subject to the Carnero agreement. Thus, Sanchez cannot use rejection to turn UnSub's property into a bargaining chip, trading it to Carnero for better rates on Sanchez's Catarina gas volumes. For all of these reasons, the settlement will be unable to close if the Debtors succeed in rejecting the Marketing Agreement and JDA.

### C. Under the Settlement Agreement, closing is conditioned on obtaining the consent of UnSub and the other Comanche Working Interest Owners.

40. The closing of the transactions contemplated by the Settlement Agreement is conditioned on UnSub and the other Comanche working interest owners having delivered all consents required to consummate the transaction.

41. In Section 3.3.1(e) of the proposed settlement agreement, Sanchez represents and warrants that:

> there are no other agreements to which any of the Debtors is a party or by which any of the Debtors is bound that would reasonably be expected, following the Closing Date, to prevent or materially restrict the Debtors from delivering gas produced from the Comanche Acreage to Carnero G&P under the Comanche FGGPA (and the various Ratification Agreements by and among Carnero G&P, SN Maverick, and each of the Other Comanche Working Interest Holders pursuant to which the Other Comanche Working Interest Holders ratified the Comanche FGGPA).

(Mot. Ex. A § 3.1.1(e), at 15.)

42. That is, Sanchez represents in Section 3.3.1(e) that it can deliver the gas owned by the other Comanche working interest owners. However, as set forth above, the consent of UnSub

and the other Comanche working owners remains outstanding, which means that the other parties can terminate the Settlement Agreement. (Mot. Ex. A §§ 4.2.1, 5.1.2, at 16, 18.)

43. Moreover, Seco Pipeline's obligation to close is also conditioned on obtaining UnSub's consent: it depends on Sanchez having confirmed "that it has obtained all necessary consents under existing contractual arrangements and/or has otherwise secured all necessary contractual agreements from all Other Comanche Working Interest Holders in order to ensure the delivery for transportation and redelivery by Seco Pipeline in accordance with the terms of the New Comanche-Seco Agreement." (Mot. Ex. A § 4.5.2.)

44. Without UnSub's consent, the conditions precedent to the proposed settlement fail at the outset, meaning it will likely never be consummated. To be sure, the other parties to the agreement ***could*** excuse Sanchez's failure to meet these conditions precedent. But this just means the proposed settlement agreement is, in reality, an option contract in the hands of Sanchez's counterparties.

45. Even if Sanchez's counterparties did choose to waive these conditions precedent, a lack of consent from UnSub (and other Comanche working interest owners) would cause the settlement to become significantly less favorable to Sanchez, potentially resulting in Sanchez paying the same rates to Carnero it did before the settlement agreement. One of the amendments to the Catarina processing contract between Sanchez and Carnero is a new Exhibit G, which provides that the price for processing Catarina gas will increase to the extent that any of the Comanche gas is not delivered to Carnero. (Mot. Ex. C, Annex IV.) In effect, Exhibit G is a liquidated damages clause: it acknowledges that Sanchez is promising to deliver ***all*** of the Comanche gas to Carnero—which, of course, it can only do with the Comanche working interest owners' consent—and provides that Sanchez must compensate Carnero (in the words of Exhibit

G, “keep Carnero economically whole”) if it cannot do so. If none of the Comanche working interest owners consent to the movement of their volumes from Brasada to Carnero, then it appears that there would be no rate reduction under the Carnero contract for the Catarina assets. Therefore, the purported rate reductions are illusory and dependent on actions that Sanchez cannot control.

* * *

46. For all these reasons, the proposed settlement cannot be consummated without UnSub’s consent. And for reasons we will now explain, UnSub does not consent to the settlement.

**II. UnSub does not consent to the proposed settlement because it is unfair to UnSub and the other Comanche working interest owners.**

47. UnSub does not—and cannot—consent to the proposed settlement structure. That is because, instead of achieving an optimal outcome for the Comanche working interest owners, it sacrifices their interests to benefit its Catarina assets.

48. As the proposed settlement demonstrates, Sanchez’s economic objectives are not aligned with those of the other Comanche working interest owners. While Sanchez controls the Comanche field in its (disputed) role as operator, Sanchez has only a small economic interest in the Comanche oil and gas produced and no economic interest in over a majority of the wells in the field. Rather, Sanchez’s economic interest is concentrated in its Catarina assets.

49. For that reason, Sanchez has bargained for rate reductions for Catarina while leaving in place materially above-market Comanche rates that jeopardize the viability of the Comanche field without attempting to negotiate with Western or solicit third party proposals; rather it is seeking to move volumes to Carnero, at the same rates that were agreed to in 2018, when commodity prices were higher, industry conditions were generally more favorable, and profit margins in the Comanche were higher. Given excess processing capacity in the Eagle Ford, Sanchez could have used the opportunity to seek proposals from Western or other third-party

processors but is instead ***using Comanche volumes*** to take negotiating leverage away from the Comanche working interest owners and, once again, achieve rate reductions only for Catarina.

50. UnSub has long believed, and has repeatedly told Sanchez, that the solution to the problems facing UnSub and Sanchez lies in negotiating the best midstream prices it can for the Comanche Assets. To do so, Sanchez must be willing to engage with its largest midstream counterparty and owner of the Springfield gathering system and Brasada processing plant that service the Comanche—Western—to negotiate better rates.

51. Yet Sanchez has never negotiated with Western or solicited third party proposals, despite UnSub's repeated requests that Sanchez do so. Instead of seeking improved, comprehensive midstream arrangements with Western, the primary midstream provider in the Comanche field, Sanchez is simply entering into arrangements with two entities affiliated with SNMP: Carnero and Seco Pipeline – in order to settle previous damage done by insider, affiliate actions. All the settlement accomplishes is lower gas gathering fees (although the gathering rates remain above-market) and contingent lower processing fees for Catarina, while harming the Comanche working interest owners. If the settlement goes forward as currently structured, Sanchez will have locked the Comanche owners into an inadequate deal that forecloses it from seeking a better one with Western or a third party.

52. Thus, instead of preserving its current leverage with Western to negotiate a comprehensive resolution, or preserving its ability to enter into a deal with a third party, Sanchez has, for all intents and purposes, abandoned its comparatively smaller Comanche interest in favor of improving the rates at Catarina (where it holds a substantially larger working interest).

### III. The proposed settlement cannot be approved under Rule 9019(a).

53. In light of the foregoing, there are three independent reasons why the settlement cannot be approved under Rule 9019(a), which requires any settlement be "fair and equitable and in the best interest of the estate." *Connecticut General Life Ins.*, 68 F.3d at 917.

54. *First*, the settlement is not lawful because it is predicated on a violation of UnSub's contract and property rights: Sanchez is seeking permission to move UnSub's hydrocarbons, with or without rejection of the Marketing Agreement and JDA, UnSub's consent is required—and it has not been given. A settlement that violates a party's legal rights cannot be "fair and equitable" under any standard. "To the extent a proposed settlement includes provisions, the enforcement of which would be illegal or against public policy, it matters not whether the settlement is in the best interests of the estate." *In re Telcar Grp., Inc.*, 363 B.R. 345, 357 (Bankr. E.D.N.Y. 2007); *see also In re Levine*, 287 B.R. 683, 690 (Bankr. E.D. Mich. 2002) (explaining that bankruptcy judges' "independent duty to preserve the integrity of the judiciary would prevent [them] from giving judicial approval to an agreement which is otherwise unlawful"). And a "party simply cannot, through an agreement approved by a court, secure authority to engage in an activity which is not otherwise permitted by law." *Levine*, 287 B.R. at 691. The Court should not put its imprimatur on an agreement that is predicated on violating UnSub's contract and property rights to benefit other creditors.

55. *Second*, the settlement is not "in the best interest of the estate" because, without UnSub's consent, the supposed benefits to the Debtors' estates are illusory. As explained above, Sanchez cannot satisfy the representations, warranties, and conditions precedent set forth in the Settlement Agreement unless UnSub and the other Comanche working interest owners consent. UnSub does not consent. Therefore, the Settlement Agreement is really just an option contract that Carnero and Seco Pipeline can choose to exercise if they wish—giving them leverage to

negotiate another agreement, less favorable to the estate, between now and closing. And even if the proposed settlement does make it past closing, Sanchez will have to pay higher rates if it cannot deliver UnSub's gas (or the other Comanche working interest owners')—which is precisely what will occur without UnSub's (or the other owners') consent. As a result, there is no guarantee that the supposed benefits to the Debtors' estates will ever materialize. The Court should not approve a contract whose benefits are liable to vanish into thin air.

56. *Finally*, even if the Court found a benefit to ***some*** Debtors, there is at least one Debtor that is harmed by the proposed settlement—Maverick, which is being recruited to further these transactions. Furthermore Maverick's actions—which are against its own interest—form the lynchpin of the proposed transaction: it is Maverick that is the principal party-in-interest in respect of the Non-Carnero Processing Agreements, and, thus it is Maverick that is the key Debtor party that must dutifully pursue rejection of these agreements or else Debtors will be obligated to return the funds received from Carnero under the settlement. Moreover, Maverick is enlisted to take other key actions, such as committing to assume the Ratification Agreement and other agreements in furtherance of diverting the Comanche volumes. Here, Maverick is key to actions to effectuate the settlement and the transactions contemplated thereby, but as further discussed below, there is no demonstrated value ***to Maverick***. To be approved under Rule 9019(a), a settlement must be "in the best interest of the estate." *Connecticut General Life Ins.*, 68 F.3d at 917. Absent substantive consolidation, the Court must preserve the integrity of *each* Debtor's estate, which remains separate. *See, e.g.*, *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 692 (Bankr. S.D. Tex. 2009); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 359 (S.D.N.Y. 2007); *cf. Irving Tanning Co.* v. *Kaplan*, 876 F.3d 384, 391 (1st Cir. 2017) (holding that "each [debtor] entity needs to be evaluated separately" for purposes of fraudulent-transfer claim). That standard was not upheld here.

57. Although settlements under Rule 9019 can only be approved if they are "in the best interest of the estate," the Debtors' Chief Restructuring Officer, Mohsin Meghji, who negotiated the settlement agreement on behalf of the Debtors, testified that in pursuing the settlement, he "essentially wanted to make sure that" Maverick was "no worse off, and better off, if possible" in determining whether the settlement was fair to Maverick. (Meghji Tr. 124:8–10.) Indeed, Mr. Meghji confirmed that the "standard [he] was focused on" was "making sure that given all the agreements in place and all the agreements that [Maverick] had – at a minimum, [Maverick was] no worse off." (*Id.* at 124:21–24.)

58. This is the wrong standard. By merely considering whether Maverick would be made "no worse off" under the terms of the proposed settlement, the Debtors failed to consider the "best interest of the estate," which is the standard that must be met for the settlement to be approved. The Court should not approve a settlement that was crafted according to a standard that fails to meet the minimum requirements of Rule 9019.

59. Indeed, as Mr. Meghji's testimony suggests, there is no conceivable benefit to ***Maverick's*** estate from the proposed settlement, as Maverick is not involved in the core disputes underlying the settlement. To the contrary: as Debtors candidly admitted in discovery, the proposed settlement seeks to use the Comanche, where Maverick's interests lie, as leverage to benefit Catarina, where Maverick has no stake. Unsurprisingly, a majority of Maverick's constituents have objected to this deal, and "a bankruptcy court may not ignore creditors' overwhelming opposition to a settlement." *Connecticut General Life Ins.*, 68 F.3d at 918. The Court should not accept a settlement that harms one Debtor to benefit the others.

## CONCLUSION

60. WHEREFORE, GSO and UnSub respectfully request that the Court deny the Settlement Motion.

Dated: June 24, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

MCCLOSKEY ROBERSON, PLLC
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

# Exhibit A

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

Results Driven. Manufacturing Focused.







# Sanchez Energy Business Plan

March 2020

SANCHEZ ENERGY CORPORATION

011026

www.sanchezenergycorp.com

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Management Representatives

**Mo Meghji**
*Chief Restructuring Officer*

**Cam George**
*Executive Vice President and Chief Financial Officer*

**Greg Kopel**
*Executive Vice President, General Counsel and Secretary*

**Mike Blincow**
*Vice President, Production*

**Scott Dunlap**
*Vice President, Drilling and Completions*

**Holly Griffin**
*Director, Asset Development*

**Cham King**
*Director, Finance and Business Development*

**Scott Wike**
*Director, Marketing*

**Cheyne Hermes**
*Manager, Corporate Finance and Strategy*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Table of Contents


I. Executive Summary 4

II. Business Plan and Financial Projections 8

III. Asset Development Plan 20

IV. Midstream 26

V. Corporate G&A 29

Appendix

A. PDP Reference Case 32

B. Other Supporting Items 34

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# I. Executive Summary

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Approach and Summary

**The Sanchez Energy management team and advisors ("SN," or the "Company") have been working diligently on a revised business plan, with the goal of maximizing value for stakeholders by focusing on (1) disciplined and optimized capital spend, (2) preservation of optionality for longer-term value realization (with key decision points clearly identified), (3) a simplified and reduced overhead cost structure and (4) a comprehensive midstream solution**

- **Approach and Objectives:**
  - The Company has put together the principal "building blocks" of a proposed, going concern business plan for the future owners of the Company, with a primary focus on asset development, midstream and corporate overhead expenses
  - The Company has explored three cases that bookend possible scenarios for the development of the asset base
    - The <u>Option Preservation Case</u> assumes drilling at Catarina to hold the lease through June 2021 (but no longer) and full participation/operatorship at Comanche
    - The <u>Accelerated Completions Case</u> assumes completing the drilled but uncompleted wells ("DUCs") at Catarina, full participation/operatorship at Comanche and no further participation in future drilling across the rest of the asset base
    - The <u>PDP Reference Case</u> assumes completing the drilled but uncompleted wells at Catarina, no participation in future drilling across the rest of the asset base and loss of Comanche operatorship
    - The Company and its advisors are exploring any combination or variants of these cases that maximize value and optionality
  - This process has included significant review, diligence and revisions to the Company's previous plan, with work still ongoing to identify additional upside
  - <u>*All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments*</u>
  - <u>*Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation*</u>
- **Key Building Blocks:**
  1. <u>Asset Development</u>
     - Catarina:
       - Option Preservation Case: Retain unique, single ~106,000 acre Catarina lease through 2021 by satisfying current leasehold commitments, but no further drilling after June 2020 (all locations are uneconomic at current prices, and continued activity at historical levels would require a substantial commodity recovery)
       - Accelerated Completions Case: Complete remaining 31 DUCs
     - Comanche: Retain operatorship of entire, multi-lease asset and focus development on highest rate of return opportunities (~50-80 wells per year)
     - At the request of the CRO, the Company's reserves, engineering and development plan assumptions were independently reviewed by the Debtor advisors' technical and E&P teams
       - The technical and E&P teams did not find any variances that would materially change assumptions
       - Feedback has also been solicited from creditor groups, with viable suggestions to be further considered and, if appropriate, incorporated
     - The overarching focus is on a near-term path to free cash flow generation while preserving longer term option value/upside where economically justified
       - We believe this can be achieved through disciplined capital spend on high-graded inventory and leasehold retention wells only
     - See asset development section for additional detail on operational strategy

011030

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Approach and Summary *(continued)*

- **Key Building Blocks *(continued)*:**
  2. Midstream and Marketing
     - A contract-by-contract financial model was created by SN's midstream team, with no involvement from Sanchez Midstream Partners LP ("SNMP") related personnel, to help inform midstream optimization strategy
       - A comprehensive analysis regarding the value of midstream contract optimization is ongoing
     - The SECO pipeline contract with SNMP was terminated on January 13, 2020 (30-day notice provided to SNMP)
  3. Corporate G&A
     - A revised G&A plan has been created and evaluated on a bottom-up basis by the Company and its advisors

# Business Plan Approach and Summary *(continued)*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

- **Preliminary Conclusions:**
  - Preliminary analysis indicates higher asset value under the Option Preservation and Accelerated Completions Cases when compared to the PDP Reference Case
  - The Company believes a going concern business model that drills only economic or leasehold retention wells (as part of a near-term option preservation strategy) provides the best opportunity to maximize value for stakeholders
  - While the intentions and preferences of creditors are likely to shape the longer-term business plan, the Company believes a focused operating business provides stakeholders with potential upside opportunities for NAV accretion, as opposed to the PDP Reference Case
  - The material building blocks of the preliminary business plans are subject to additional input and consideration from the future owners of SN (whether they be the creditors or a new buyer), and therefore the assumptions used in these plans are subject to change

- **Open Issues, Ongoing Business Initiatives and Next Steps:**
  1. Net asset value figures contained throughout the presentation have been prepared using the Company's corporate model and corresponding ARIES database, both of which are subject to continuous review and revision by the Company
  2. Ryder Scott is reviewing PDP and PUD forecasts for the Company's year end reserve report
  3. Further legal and financial analysis on midstream strategy
  4. Potential negotiation with Catarina landowner
  5. Discussions with creditor groups around optimal development plan assumptions
  6. Potential capital structure at emergence (e.g., DIP refinancing, reinstated debt, etc.), which is not addressed by the current business plan
  7. Address issues of all other key stakeholders and counterparties, such as Sanchez Oil & Gas Corporation ("SOG"), Gavilan Resources LLC ("Gavilan"), SNMP, GSO Capital Partners, etc.
  8. The business plan may be further revised based on ongoing analysis in the context of maximizing value for the estate

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# II. Business Plan and Financial Projections

# Business Plan Assumptions

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## The Company and its advisors have conducted a thorough review of business plan assumptions

| Assumption | Commentary |
|---|---|
| Commodity Prices | ◆ Strip pricing as of 2/11/20<br>◆ Realized prices vs. benchmark prices (WTI and Henry Hub): oil (~93%-98%), natural gas (~100%) and NGLs (~15% of WTI oil price) |
| Midstream/Marketing | ◆ Option Preservation, Accelerated Completions and PDP Reference Cases assume current contracts remain in place (i.e., status quo)<br>◆ SECO contract terminated with 30-day notice to SNMP in January 2020<br>◆ Interruptible gathering rates at Eastern Catarina are held flat at current rate of $1.50/Mcf |
| Corporate G&A | ◆ Projected G&A profile is illustrative; assumes streamlined cost structure, renegotiated office lease and elimination of all non-core expenses under private company emergence assumption<br>◆ Gross G&A projection in the Option Preservation and Accelerated Completions Cases is reduced to approximately $35-$40MM, before adjustment for COPAS recovery<br>◆ The operator of oil and gas properties is generally entitled to receive COPAS recovery for reimbursement of expenses incurred on behalf of the other working interest owners of those properties; COPAS recovery to SN from operating Comanche is governed by the JOA and assumed at approximately $950 per well; 3% annual escalation of COPAS reimbursement based on 10-year historical average |
| Other Operating Expenses/Taxes | ◆ Based on 12-month historical averages for each asset from the lease operating statements (“LOS”)<br>◆ Ad valorem and severance tax rates are based on latest county estimates as a percentage of production |
| Catarina | ◆ Option Preservation Case: Meet drilling requirement (24 additional wells) by June 2020; hold Catarina lease through June 2021; complete all drilled but uncompleted wells (“DUCs”) over the next ~18 months<br>◆ Accelerated Completions Case: complete remaining DUCs by June 2020 |
| Comanche | ◆ High-graded and optimized development schedule for Comanche drilling (~50-80 wells per year for next 6-8 years)<br>◆ Focus on highest IRR wells within each type curve area, while meeting lease obligations; retains all material leases<br>◆ Ring-fenced, non-debtor subsidiary SN EF UnSub, LP (“UnSub”) continues to self-fund its portion of new Comanche development spend |
| Other Assets | ◆ Maverick – undeveloped wells uneconomic at current commodity prices; plan assumes PDP only resulting in significant lease expirations<br>◆ Palmetto – non-consent 2020 development capital (10 wells with unproven type curves with net cost to SN of ~$40 million); potential upside from future option to participate in years 2021+ once well economics have been demonstrated. Non-consenting 2020 development program does not forfeit opportunity to participate in 2021+ development wells<br>◆ Other non-core assets include the Company’s Tuscaloosa Marine Shale (“TMS”) assets and assets operated by others (“OBO”) |
| Well Economics | ◆ Assumes current authorization for expenditure (“AFE”) estimates based on average lateral length<br>◆ Corporate model calculates the cost of every well with specific adjustments for lateral length<br>◆ Well costs supported by historical averages |

011034

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# NAV (PV-10) Analysis and Comparison

- **All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments**
- **Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation**

*$ millions*

| Option Preservation Case | | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $149 | $186 | $283 | $417 | $551 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$288** | **$357** | **$541** | **$795** | **$1,048** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$193** | **$262** | **$446** | **$700** | **$953** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$198** | **$269** | **$463** | **$728** | **$993** |

| Accelerated Completions Case | | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$336** | **$396** | **$571** | **$806** | **$1,042** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$241** | **$301** | **$476** | **$711** | **$947** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$246** | **$308** | **$493** | **$739** | **$986** |

| PDP Reference Case | | | | | |
|---|---|---|---|---|---|
| **Summary NAV Analysis[1][7]** | **$50/$2.50** | **Strip[2]** | **$60/$2.50** | **$70/$2.50** | **$80/$2.50** |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4][8] | ($19) | ($12) | $21 | $61 | $100 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$268** | **$308** | **$452** | **$637** | **$821** |
| Total G&A[5] | *($223)* | *($223)* | *($223)* | *($223)* | *($223)* |
| **Asset Value (Post-G&A)** | **$45** | **$85** | **$230** | **$414** | **$599** |

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Valuation excludes estimated cash at emergence. Estimated at approximately $27MM for SN Operating and UR Holdings accounts.*

*(2) Strip pricing as of 2/11/20.*

*(3) The estimated split of PV-10 at strip between Central/Eastern and Western Catarina in the Option Preservation Case is 52% ($157MM) and 48% ($142MM), respectively. The estimated PV-10 split ignores field level expenses that are allocated to the entire field (PV-10 -$101MM) and non-D&C capital (-$12MM). The estimated total production split between Central/Eastern and Western Catarina is 43% and 57%, respectively. Note that blended marketing and LOE rates are applied to all wells. For the Accelerated Completions and PDP Reference Cases, the PV-10 split is Central/Eastern 47% ($158MM) and Western 53% ($181MM).*

*(4) Includes Springfield marketing bands.*

*(5) Represents 30-year PV-10 of corporate G&A. Includes COPAS recovery PV-10 impact of ~$245MM (Option Preservation), ~$245mm (Accelerated Completions) and $6MM (PDP Reference) for each scenario. Of the COPAS recovery PV-10 impact in the Option Preservation and Accelerated Completions cases, ~21% is attributable to UnSub and ~79% to 3rd parties.*

*(6) Assumes 50% non-operated participation in remaining economic type curve areas (estimated 11 well inventory) if initial 2020 well results are in-line with Marathon expectations; wells are assumed to be drilled and completed during 2021-2023 and are not included in Option Preservation, Accelerated Completions or PDP Blowdown Reference Case.*

*(7) Excludes any estimated upside from Palmetto participation as the blowdown case assumes no further D&C capital investment. Potential upside if another operator executes SN's current development plan.*

*(8) Assumes no development activity as another operator's plan/budget cannot be forecasted.*

021035

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Illustrative and Preliminary NAV (PV-10) Sensitivities

## PV-10 for Option Preservation Case, Accelerated Completions Case and PDP Case at Various Price Decks(1) (2)(3)

*($ in millions)*

| | | Oil Price (WTI) – Option Preservation | | | | |
|---|---|---|---|---|---|---|
| | | $50 | Strip(4) | $60 | $70 | $80 |
| Gas Price (HH) | $2.25 | $158 | $199 | $412 | $665 | $919 |
| | Strip(4) | $189 | $262 | $443 | $696 | $950 |
| | $2.50 | $193 | $233 | $446 | $700 | $953 |
| | $2.75 | $227 | $268 | $481 | $734 | $988 |
| | $3.00 | $262 | $302 | $515 | $769 | $1,022 |

| | | Oil Price (WTI) – Accelerated Completions | | | | |
|---|---|---|---|---|---|---|
| | | $50 | Strip(4) | $60 | $70 | $80 |
| Gas Price (HH) | $2.25 | $209 | $247 | $444 | $679 | $914 |
| | Strip(4) | $237 | $301 | $472 | $708 | $943 |
| | $2.50 | $241 | $279 | $476 | $711 | $947 |
| | $2.75 | $273 | $311 | $508 | $744 | $979 |
| | $3.00 | $305 | $343 | $541 | $776 | $1,011 |

| | | Oil Price (WTI) – PDP Reference Case | | | | |
|---|---|---|---|---|---|---|
| | | $50 | Strip(4) | $60 | $70 | $80 |
| Gas Price (HH) | $2.25 | $18 | $46 | $202 | $387 | $571 |
| | Strip(4) | $40 | $85 | $225 | $409 | $594 |
| | $2.50 | $45 | $73 | $230 | $414 | $599 |
| | $2.75 | $73 | $101 | $257 | $442 | $626 |
| | $3.00 | $100 | $128 | $285 | $469 | $654 |

011036

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Mt. Belvieu Propane is assumed to proportionately increase with WTI (32% of WTI); this results in average realized SN NGL basket pricing of approximately 15% of WTI.*
*(2) Asset values after G&A (excludes Palmetto participation).*
*(3) Values excludes estimated cash at emergence.*
*(4) Strip pricing as of 2/11/20.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case Financial Projections (Accrual)



| *$ millions* | 2017A | 2018A | 2019E[(1)] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,070 | 11,891 | 11,520 | 12,391 | 9,871 | 8,959 | 8,551 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 70,384 | 72,356 | 71,344 | 76,633 | 62,844 | 54,925 | 51,322 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,193 | 13,553 | 13,367 | 14,357 | 11,847 | 10,410 | 9,789 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **35,993** | **37,503** | **36,778** | **39,520** | **32,193** | **28,523** | **26,893** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.51 | $48.66 | $49.00 | $48.39 | $48.70 | $49.22 | $49.71 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.33 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.32 | $9.08 | $8.79 | $9.33 | $9.51 | $9.61 | $9.58 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $83 | $124 | $207 | $219 | $175 | $161 | $156 |
| Gas Revenue | 121 | 121 | 87 | 20 | 33 | 52 | 65 | 55 | 49 | 46 |
| NGL Revenue | 117 | 160 | 81 | 17 | 26 | 43 | 49 | 41 | 37 | 34 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$119** | **$183** | **$302** | **$333** | **$271** | **$246** | **$236** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (32) | (30) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (86) | (144) | (145) | (122) | (103) | (92) |
| Production Taxes | (18) | (30) | (18) | (5) | (7) | (12) | (13) | (11) | (10) | (10) |
| Ad Valorem Taxes | (5) | (10) | (10) | (2) | (4) | (6) | (7) | (6) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX [(2)] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$15** | **$54** | **$69** | **$121** | **$88** | **$84** | **$86** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *13%* | *29%* | *23%* | *36%* | *32%* | *34%* | *37%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(129)* | *$(233)* | *$(212)* | *$(183)* | *$(162)* | *$(150)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(70) | $(79) | $(149) | $(113) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(55)** | **$(25)** | **$(80)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(115)** | **$(25)** | **$(141)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(3)] | | | | | | *12,857* | *13,815* | *10,388* | *8,301* | *7,036* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*
*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*
*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*
*(3) Production volumes from ARIES database may not tie exactly to the company model.*

011037

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case 2020E Financial Projections (Accrual)

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,819 | 11,392 | 10,993 | 10,614 | 10,097 | 13,294 | 13,388 | 12,566 | 11,896 | 11,389 | 11,520 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,779 | 71,511 | 69,886 | 68,105 | 64,354 | 74,784 | 79,188 | 75,921 | 73,337 | 70,914 | 71,344 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,706 | 13,412 | 13,114 | 12,780 | 12,080 | 13,997 | 14,803 | 14,207 | 13,735 | 13,286 | 13,367 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,822** | **36,723** | **35,755** | **34,745** | **32,903** | **39,756** | **41,389** | **39,427** | **37,854** | **36,494** | **36,778** |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.88 | $48.05 | $48.34 | $48.57 | $48.77 | $48.51 | $48.53 | $48.68 | $48.76 | $48.77 | $49.00 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.94 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.20 | $8.12 | $8.71 | $8.96 | $9.19 | $9.36 | $9.53 | $9.71 | $8.79 |
| Oil Revenue | $19 | $15 | $16 | $16 | $16 | $15 | $15 | $20 | $19 | $19 | $17 | $17 | $207 |
| Gas Revenue | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 52 |
| NGL Revenue | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 43 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$24** | **$23** | **$23** | **$29** | **$28** | **$28** | **$26** | **$27** | **$302** |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (12) | (12) | (12) | (11) | (11) | (13) | (13) | (13) | (12) | (12) | (144) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (12) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (6) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX [(1)] | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$2** | **$2** | **$2** | **$6** | **$10** | **$9** | **$9** | **$8** | **$9** | **$69** |
| *EBITDA Margin (%)* | *22%* | *9%* | *11%* | *10%* | *10%* | *8%* | *27%* | *34%* | *33%* | *33%* | *32%* | *33%* | *23%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(20)* | *$(20)* | *$(21)* | *$(21)* | *$(21)* | *$(17)* | *$(19)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(233)* |
| Capex | $(8) | $(22) | $(16) | $(14) | $(10) | $(36) | $(20) | $(7) | $(3) | $(3) | $(5) | $(4) | $(149) |
| **Adjusted EBITDAX Less Capex** | **$(2)** | **$(20)** | **$(14)** | **$(12)** | **$(7)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(80)** |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(28)** | **$(22)** | **$(21)** | **$(33)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(141)** |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(2)] | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *13,478* | *12,522* | *12,078* | *13,931* | *12,793* | *12,664* | *11,808* | *12,857* |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

011038

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Accelerated Completions Case Financial Projections (Accrual)

| *$ millions* | 2017A | 2018A | 2019E[(1)] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,949 | 8,658 | 8,212 | 8,001 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,128 | 79,765 | 76,396 | 64,498 | 55,569 | 50,308 | 47,897 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,515 | 14,919 | 14,299 | 12,118 | 10,505 | 9,558 | 9,157 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,910** | **41,155** | **39,291** | **32,817** | **28,425** | **26,154** | **25,140** |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.66 | $48.89 | $49.36 | $49.82 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.33 | $9.47 | $9.57 | $9.54 |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $177 | $154 | $148 | $146 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 49 | 45 | 43 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 36 | 33 | 32 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$273** | **$239** | **$226** | **$221** |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (92) | (149) | (131) | (112) | (96) | (87) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (10) | (9) | (9) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (5) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX [(2)] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$63** | **$82** | **$79** | **$68** | **$73** | **$78** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *32%* | *25%* | *29%* | *29%* | *32%* | *35%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(136)* | *$(240)* | *$(194)* | *$(171)* | *$(153)* | *$(143)* |
| Capex | $(485) | $(512) | $(62) | $(97) | $(28) | $(125) | $(38) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(78)** | **$35** | **$(43)** | **$41** | **$18** | **$26** | **$31** |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$35** | **$(104)** | **$41** | **$18** | **$26** | **$31** |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(3)] | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

011039

# Accelerated Completions Case 2020E Financial Projections (Accrual)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,644 | 11,623 | 12,428 | 12,009 | 15,829 | 13,954 | 12,858 | 12,432 | 11,933 | 11,509 | 12,259 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,040 | 71,719 | 78,922 | 74,899 | 90,310 | 85,047 | 80,876 | 78,045 | 75,643 | 73,279 | 76,396 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,570 | 13,451 | 14,781 | 14,033 | 16,869 | 15,890 | 15,115 | 14,599 | 14,161 | 13,722 | 14,299 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,387** | **37,027** | **40,363** | **38,525** | **47,749** | **44,019** | **41,452** | **40,039** | **38,701** | **37,444** | **39,291** |
| | | | | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| | | | | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.90 | $48.02 | $48.18 | $48.40 | $48.25 | $48.45 | $48.57 | $48.69 | $48.76 | $48.76 | $48.90 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.93 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.23 | $8.14 | $8.77 | $8.98 | $9.19 | $9.36 | $9.54 | $9.72 | $8.80 |
| | | | | | | | | | | | | | |
| Oil Revenue | $19 | $15 | $16 | $17 | $19 | $17 | $24 | $21 | $19 | $19 | $17 | $17 | $219 |
| Gas Revenue | 4 | 4 | 4 | 4 | 5 | 4 | 6 | 5 | 5 | 5 | 5 | 6 | 56 |
| NGL Revenue | 4 | 3 | 3 | 3 | 4 | 3 | 5 | 4 | 4 | 4 | 4 | 4 | 46 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$27** | **$25** | **$34** | **$31** | **$28** | **$28** | **$27** | **$27** | **$322** |
| | | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (11) | (11) | (13) | (12) | (15) | (14) | (13) | (13) | (12) | (12) | (149) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (13) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (7) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX [(1)] | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$3** | **$4** | **$4** | **$13** | **$11** | **$9** | **$9** | **$9** | **$9** | **$82** |
| *EBITDA Margin (%)* | *23%* | *10%* | *12%* | *12%* | *15%* | *14%* | *37%* | *35%* | *33%* | *33%* | *33%* | *34%* | *25%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(19)* | *$(20)* | *$(21)* | *$(23)* | *$(22)* | *$(21)* | *$(20)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(240)* |
| | | | | | | | | | | | | | |
| Capex | $(8) | $(16) | $(21) | $(5) | $(46) | $(6) | $(1) | $(5) | $(3) | $(3) | $(5) | $(4) | $(125) |
| **Adjusted EBITDAX Less Capex** | **$(1)** | **$(14)** | **$(19)** | **$(2)** | **$(42)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(43)** |
| | | | | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(22)** | **$(28)** | **$(11)** | **$(68)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(104)** |
| | | | | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(2)] | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *15,761* | *14,295* | *15,367* | *14,924* | *13,728* | *13,579* | *12,640* | *13,779* |
| | | | | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

011040

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case Provides Commodity Price Upside

**A going concern company best positions the assets for future rebound in commodity prices or monetization**




011041

*Note: Assumes strip pricing as of 2/11/20.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Key Ongoing Business Initiatives

**Immediate steps have been taken to delay capital spend, optimize operations and reduce costs; the Company is focused on key ongoing business initiatives to maximize asset value**

| | |
|---|---|
| **Asset Development** | ◆ **The drilling program at Catarina was thoroughly reviewed, with timing for continued activity pushed approximately one month, from early January to early February 2020; the existing rig was moved from Catarina to Comanche during the first week of January; as part of this review, the Company's drilling schedule was optimized, resulting in an overall lower rig count**<br>◆ The revised development plan has been designed to preserve the asset base and maintain optionality while minimizing near-term capital outlay<br>◆ The business plan assumes drilling only economic wells (minimum threshold of 20% IRR[(1)]), unless certain wells are required to be drilled to retain a major lease under CDC obligations – if the Accelerated Completions Case were to be adopted, the remaining DUC inventory would be completed with no further development activity in Catarina after June 2020<br>◆ The Company currently has 3 rigs across the entire asset base (1 at Catarina and 2 at Comanche); however, not all are active<br>◆ In the event that the Company pursues a plan that involves the drilling of additional wells in Catarina, that plan would result in 2 active rigs at Catarina and 1 at Comanche |
| **Midstream** | ◆ **The SECO midstream contract was terminated on January 13, 2020, with 30-day notice provided to SNMP**<br>◆ Midstream contract optimization opportunities are being evaluated, with consideration of commercial, economic and legal implications<br>◆ Value accretion to both SN and SNMP may be available through the Debtors' midstream optimization strategy; any value that may be captured by SNMP will be addressed through a comprehensive renegotiation (with the goal of capturing maximum value for SN and providing infill gathering rate certainty in Eastern Catarina) |
| **Corporate G&A** | ◆ **Non-essential overhead expenses, such as the company ranch participation, have been rejected or eliminated, saving approximately $2MM per annum on a run-rate basis; additional cost savings may be realized in the near-term through ongoing G&A review and contract renegotiation and/or rejection**<br>◆ Corporate G&A has been thoroughly reviewed by management, with a proposed plan to reduce overhead expenses from approximately $75MM (~$3.00/Boe) in 2019 to an average of approximately $19MM consolidated G&A after COPAS reimbursement (~$1.50/Boe) from 2021 through 2025 |
| **Asset Lease Preservation** | ◆ Catarina: TBD<br>◆ All major leases at Comanche are being reviewed on a case-by-case basis |

011042

*Note:*
*(1) IRR calculated at $50 oil/$2.50 gas/$14 NGL price deck.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Key Near Term Operational Decisions (2020)

**Outlined below are key operational decisions over the next 12 months**

| Category | Decision |
|---|---|
| **Catarina** | **Option Preservation**<br>◆ Drill remaining 24 wells required in the 2019-2020 lease period – *Project Capital: $45.0MM*<br>◆ Complete 5 DUCs scheduled in February – *Project Capital: $11.8MM completions + $1.3MM infrastructure and non-D&C*<br>◆ Complete 18 DUCs scheduled in June – *Project Capital: $45.6MM completions + $4.7MM infrastructure and non-D&C*<br>◆ Drill required wells for 2020-2021 lease term – *Source rigs for contract, September 2020 spud for 2-rig program*<br>◆ Leaves 31 DUCs to be completed in 2021 – *Project Capital: $66.2MM completions + $8.0MM infrastructure and non-D&C*<br><br>**Accelerated Completions**<br>◆ Complete 31 DUCs scheduled through June<br>◆ *Project Capital: $1.9MM drilling (Feb/Mar 2020 only) + $73.9MM completions + $8.0MM infrastructure and non-D&C* |
| **Comanche** | ◆ Renegotiate lease in La Bandera/FOGMT – *Current lease terms expire in April 2020*<br>◆ Drill required wells for 2020-2021 lease terms – *Source rigs for contract*<br>◆ Renegotiate lease in Maund – *Current lease terms expire in March 2021* |
| **Midstream/ Marketing** | ◆ TBD |

011043

# Potential Risks and Upsides to the Proposed Business Plan

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| | Risk/Considerations |
|---|---|
| **Commodity Prices** | ◆ Further degradation in commodity prices, realizations or differentials |
| **Loss of Comanche Operatorship** | ◆ No longer in control of development plan and capital spend<br>◆ Lose ability to collect COPAS from working interest partners and would have to reimburse new operator<br>◆ Likely lower value in a monetization given lack of control |
| **Midstream Rates** | ◆ Interruptible gathering rate on Eastern Catarina could be increased by SNMP<br>◆ Comanche infield gathering rates could increase with cost of service model if volumes significantly decline |
| **G&A Plan** | ◆ The proposed reduction in G&A corresponds to a reduction in required drilling operations per the business plan<br>◆ Talent retention may be difficult |

| | Potential Upside to Business Plan Forecast |
|---|---|
| **Commodity Prices** | ◆ Improvement in commodity prices, realizations or differentials<br>◆ Improved commodity prices would also unlock additional inventory that can be drilled at economic returns |
| **Contract Optimization** | ◆ TBD |
| **Type Curve Outperformance** | ◆ The Company has outperformed production by ~5% compared to its original 2019 budget<br>◆ Many of the Company's type curves have been recently refreshed at year-end based on new well data |
| **Palmetto** | ◆ If Marathon's 2020 development test is successful, the Company could participate in future development<br>◆ If Marathon's tests are not successful, the Company would still participate in cash flow sharing through an Overriding Royalty Interest ("ORRI") election that requires no capital spend on projects proposed in the first 8 months of a given lease year (1% override that converts to a 17.5% working interest after 1.0x payout) |
| **Catarina Lease CDC Relief** | ◆ While unlikely, if landowners are willing to provide near-term relief on drilling requirements, the Company could realize significant value from avoiding uneconomic wells and redirecting budgeted capex dollars towards completion activity |

011044

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408



# III. Asset Development Plan

# Asset Development Approach and Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**A comprehensive asset development assessment was completed since the last business plan presentation**

| | |
|---|---|
| **Strategy** | ◆ Previous mandate focused on holding assets together and preventing lease expiration as the primary driving objective<br>◆ Current strategy focuses on economic drilling and preserving optionality in the most cost-effective manner |
| **Asset Summary** | ◆ ~435,000 gross (~233,000 net) acres in the Eagle Ford<br>◆ More than half of net acreage is held by production and annual/continuous drilling obligations<br>◆ Diversified, lower decline production from significant PDP base with over 2,200 wells (on a gross basis) |
| **Catarina Type Curves** | ◆ Catarina type curves were reviewed and refreshed in Q4 2019 with the benefit of an additional 12 months of production history<br>◆ Type curve boundaries adjusted to incorporate similar well performance, rock properties, fluid properties and seismic characteristics<br>◆ As a result, significant inventory was lost and others shifted from South Central Catarina to Central Catarina, with no remaining "legacy" South Central locations |
| **Comanche Type Curves** | ◆ Utilized recent well performance results with wider well spacing and larger completion designs to refine type curves<br>◆ Identified and incorporated into forecast material changes to some type curves from development plan changes<br>◆ Inventory was reduced as a result of increased well spacing and removal of uneconomic targets/infill locations |
| **Inventory** | ◆ Complete refresh of inventory based on current development planning and spacing assumptions<br>◆ Created map layers that tie individual sticks on a map to model and ARIES |
| **Drilling and Completion Costs** | ◆ Updated to incorporate lower unit costs (sand and horsepower) and drilling and completion efficiencies (7.5 stages/day)<br>◆ Approximately ~12%-15% per well savings incorporated into business plan vs. 2019 budgeted costs |
| **Engineering and Financial Diligence** | ◆ The Debtor advisors' engineering team evaluated and performed diligence on the geological and technical aspects of the business plan<br>◆ The Debtor advisors reviewed the cost and expense assumptions for each asset<br>◆ Creditor feedback on development plan is being considered and may be incorporated where appropriate and value maximizing |

011046

# Catarina Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




**E35-E36 (East)**
- 5 DUCs Drilled Q418
- $10.8MM required to frac
- AVG 26% IRR* at $50 WTI

**A44-A45 (West)**
- 18 DUCs Drilled Q418 - Q319
- $47.2 MM required to frac
- AVG 35% IRR* at $50 WTI

**E37-E39 (East)**
- 7 DUCs Drilled Q419
- 4 Remain to be drilled
- $32.8 MM required to Finish drilling and Frac
- AVG 26% IRR* at $50 WTI

*Considers drilling capital on DUC inventory sunk
† Dashed lines denote East and Solid lines denote West

## Lease Summary

- ~106,000 gross / net acres
- EF wet gas / condensate window
- Annual lease term July 1-June 30
- 50-well annual drilling commitment
- 100% WI and 75% NRI
- Oil/Gas/NGL: 24%/37%/40%
- **2019 Production:** ~35,000 Boe/d
- **PDP Count:** 457 wells
- **Current DUC Inventory:** 30 wells
- **Total Planned 2020 Spuds / TTP:**
  - **Option Preservation**: 24 wells / 23 wells
  - **Accelerated Completions**: 1 well / 31 wells

## Rig – Completion Schedule

**Option Preservation**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling *Well Count* | | 4 | 6 | 6 | 5 | 3 | | | | | | | | | |
| Online *Well Count* | | | 5 | | | | 10 | 8 | | | | | | 17 | 14 |

**Accelerated Completions**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling *Well Count* | | 1 | | | | | | | | | | | | | |
| Online *Well Count* | | | 5 | 8 | | 18 | | | | | | | | | |

*Gross

## Inventory Analysis

| TC Area | Development Plan: Drilled | AVG IRR @ $50 | Wells |
|---|---|---|---|
| CATWSO-A | 6 | 45% | 6 |
| CATC-C | 5 | 26% | 11 |
| CATW-A | 18 | 20% | 29 |
| CATWSO-C | 16 | 12% | 45 |
| CATSW-C | 6 | 13% | 51 |
| CATNW-C | 3 | 0% | 54 |
| CATSC-C | - | - | - |
| CATW-C | - | - | - |
| CATNC-C | - | - | - |
| CATNW-A | - | - | - |
| CATC5 - TIER1 | - | - | - |
| CATC5 - TIER2 | - | - | - |
| CATC5 - TIER3 | - | - | - |
| CATE-B | - | - | - |
| **Total** | 54 | | |

| TC Area | Undeveloped Inventory: Count | WTI for 20% IRR | Cumulative Wells |
|---|---|---|---|
| CATC5 - TIER1 | 12 | $65 | 12 |
| CATNW-A | 16 | 68 | 28 |
| CATWSO-C | 12 | 71 | 40 |
| CATWSO-A | 9 | 74 | 49 |
| CATNC-C | 44 | 76 | 93 |
| CATC5 - TIER2 | 12 | 76 | 105 |
| CATNW-C | 17 | 77 | 122 |
| CATSW-C | 35 | 82 | 157 |
| CATC-C | 28 | 84 | 185 |
| CATC5 - TIER3 | 16 | 84 | 201 |
| CATW-A | 1 | 89 | 202 |
| CATE-B | 152 | 107 | 354 |
| **Total** | 354 | | |

## Asset Level Cash Flow

Option Preservation




Accelerated Completions



# Comanche Asset Overview



CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




## Inventory Analysis

| TC Area | Developed Inventory Count | Developed Inventory AVG IRR @ $50 | Cumulative Wells |
|---|---|---|---|
| AREA-3-2 | 20 | 52% | 20 |
| AREA-5-7 | 28 | 52% | 48 |
| AREA-3-1B | 34 | 50% | 82 |
| AREA-3-1A | 41 | 47% | 123 |
| AREA-7-1 | 40 | 47% | 163 |
| AREA-7-2 | 33 | 41% | 196 |
| AREA-3-3S | 23 | 40% | 219 |
| AREA-3-3 | 75 | 37% | 294 |
| AREA-4-1 | 46 | 33% | 340 |
| AREA-5-1 | 11 | 27% | 351 |
| AREA-3-3_UEFAC_Gen10 | 21 | 22% | 372 |
| AREA-3-4 | 41 | 21% | 413 |
| AREA-5-3 | 9 | 17% | 422 |
| CATNW | 5 | 16% | 427 |
| AREA-2-1 | 7 | 6% | 434 |
| AREA-3-4_UEFAC | 4 | 3% | 438 |
| AREA-3-1C | 6 | 2% | 444 |
| AREA 1 | - | - | - |
| AREA 2-2 | - | - | - |
| AREA 2-3 | - | - | - |
| AREA-3-1B_UEFAC | - | - | - |
| AREA-3-2_UEFB | - | - | - |
| AREA-3-3_UEFAC_Gen2 | - | - | - |
| AREA 4-2 | - | - | - |
| AREA 5-2 | - | - | - |
| AREA 5-4 | - | - | - |
| AREA 6-1 | - | - | - |
| MAVERICK | - | - | - |
| Total | 444 | | |

| TC Area | Undeveloped Inventory Count | WTI for 20% IRR | Cumulative Wells |
|---|---|---|---|
| AREA 7-1 | 4 | $32 | 4 |
| AREA-7-2 | 1 | 35 | 5 |
| AREA-3-2 | 1 | 45 | 6 |
| AREA 3-1B | 12 | 51 | 18 |
| MAVERICK | 46 | 52 | 64 |
| AREA-3-3S | 1 | 52 | 65 |
| AREA 3-3 | 11 | 56 | 76 |
| AREA-5-1 | 11 | 61 | 87 |
| CATNW | 12 | 61 | 99 |
| AREA-5-3 | 31 | 62 | 130 |
| AREA-5-7 | 6 | 63 | 136 |
| AREA-3-3_UEFAC_Gen10 | 108 | 67 | 244 |
| AREA-5-2 | 37 | 68 | 281 |
| AREA-3-1A | 5 | 75 | 286 |
| AREA-6-1 | 12 | 79 | 298 |
| AREA-2-3 | 94 | 82 | 392 |
| AREA-3-3 | 14 | 82 | 406 |
| AREA-3-1C | 22 | 83 | 428 |
| AREA-4-2 | 81 | 83 | 509 |
| AREA-4-1 | 194 | 86 | 703 |
| AREA-3-4 | 38 | 90 | 741 |
| AREA-2-1 | 100 | 91 | 841 |
| AREA-2-2 | 118 | 93 | 959 |
| AREA-3-2_UEFB | 93 | 97 | 1,052 |
| AREA-1 | 67 | 99 | 1,119 |
| AREA-5-4 | 63 | 100 | 1,182 |
| AREA-3-2_UEFB | 1 | 119 | 1,183 |
| AREA-3-4_UEFAC | 282 | 130 | 1,465 |
| AREA-3-3_UEFAC_Gen2 | 217 | 311 | 1,682 |
| AREA-3-1B_UEFAC | 26 | 312 | 1,708 |
| Total | 1,708 | | |

## Lease Summary

- ~250,000 gross / ~61,000 net acres
- EF volatile oil / condensate gas window
- 23 separate lease commitments
- ~40-60 well per year drilling commitment
- **2019 Production:** ~28,000 Boe/d
- **Gross PDP Count:** 1,738 wells
- **Total Planned 2020 Spuds:** 55 wells
- **Total Planned 2020 TTP**: 57 wells
- Average ~24% WI and ~18% NRI; Restricted average ~6% WI and ~4% NRI
- Oil/Gas/NGL: 37%/30%/33%; Restricted Oil/Gas/NGL: 45%/26%/29%

## Rig – Completion Schedule

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling Well Count | 11 | 3 | 2 | 5 | | 5 | 3 | 4 | 3 | 6 | 9 | 4 | 7 | 4 | |
| Online Well Count | 3 | 13 | 3 | 6 | 3 | | 1 | | 11 | 7 | 3 | 7 | 8 | 18 | 3 |

*Gross

## Asset Level Cash Flow (Restricted)




*Note: Development plan counts are as of 1/1/20 and Comanche's maverick type curve area is largely exploratory with no wells on lease. Individual wells that appear economic at lower prices are isolated and have certain physical operational hinderances to drilling.*



011048

# Palmetto Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




**Barnhart G Pad**
**TTP-ed:** May 2019

**Barnhart 100-103H**
**TTP-ed:** November 2019

**Barnhart 104-107H**
**Spud:** February 2020
**Complete:** Summer 2020

**Barnhart 108-111H**
**Spud:** April 2020
**Complete:** Summer 2020

**Barnhart 48H – 49H**
**Spud:** Q3 2020
**Complete:** Q4 2020

## Inventory Analysis

| TC Area | Target | Development Plan: Drilled | Development Plan: Avg. IRR @ $50 | Undeveloped Inventory: Count | Undeveloped Inventory: Avg. IRR @ $55 |
|---|---|---|---|---|---|
| BHM | LEF B | - | - | 17 | 10% |
| BHM – 10,000’ | LEF B | 8 | 18% | 23 | 18% |
| BHN | LEF B | - | - | 27 | 2% |
| BHS R1 | LEF B | - | - | 21 | 9% |
| BHS R2 | LEF B | 2 | 6% | 13 | 6% |
| BHS R3 | LEF B | - | - | 11 | 0% |
| | **Total** | 10 | | 112 | |

011049

## Lease Summary

- ~15,500 gross / ~7,500 net acres
- EF black oil window
- Annual drilling commitment based on WTI
- Average 50% WI and 36.35% NRI
- Oil/Gas/NGL: 69%/15%/16%
- **2019 Production:** ~1,000 Boe/d
- **Gross PDP Count:** 83 wells
- **Total Planned 2020 Spuds**(1): 10 wells
- **Total Planned 2020 TTP**(1): 10 wells

## Rig – Completion Schedule(1)

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Drilling** *Well Count* | | | | | | | | | | | | | | | |
| **Online** *Well Count* | | | | | | | | | | | | | | | |

## Asset Level Cash Flow




(1) *Marathon (operator) intends to drill and complete 10 wells in 2020. Due to near term considerations, SN has elected not to participate in 8 of 10, without leasehold risk. Remaining elections pending.*
(2) *Represents gross well economics; new money returns on these 8 wells, net of SN’s ORRI, is approximately 25%.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Maverick Asset Overview

## Asset Map




## Lease Summary

- ~62,000 gross / ~40,000 net acres
- ~24,316 net acres held by production
- EF volatile oil / black oil
- 100% WI and 75% NRI
- Oil/Gas/NGL: 97%/2%/2%
- **2019 Production:** ~2,600 Boe/d
- **Gross PDP Count:** 79 wells
- **Total Planned 2020 Spuds:** 0 wells
- **Total Planned 2020 TTP**: 0 wells

## Rig – Completion Schedule

| | 2020 | | | | | | | | | | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR |
| **Drilling** *Well Count* | | | | | | | | | | | | | | | |
| **Online** *Well Count* | | | | | | | | | | | | | | | |

## Inventory Analysis

| | | Inventory Summary | | | |
|---|---|---|---|---|---|
| TC Area | Target | Development | Count | HBP | WTI for 20% IRR |
| HAUSSER | LEF B | 0 | 5 | 5 | $62 |
| NORTH DIMMIT | LEF B | 0 | 55 | 4 | $64 |
| VOTAW | LEF B | 0 | 42 | 29 | $66 |
| HOLDSWORTH | LEF B | 0 | 50 | 7 | $67 |
| HARGIS | LEF B | 0 | 23 | 23 | $73 |
| PETRO PARDS | LEF B | 0 | 119 | 76 | $75 |
| | **Total** | | 294 | 144 | |

011050

## Asset Level Cash Flow




*Note: Maverick asset is largely exploratory with minimal activity in the last year and type curves would need further risking if considering development.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408



# IV. Midstream

# Illustrative Catarina Marketing Diagram

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Diagrams below represent the flow of hydrocarbons from Catarina**

## Gas Marketing




## Oil Marketing




011052

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Illustrative Comanche Marketing Diagram

## Diagrams below represent the flow of hydrocarbons from Comanche




011053

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408



# V. Corporate G&A

# COPAS Overview



CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## General Summary

- The Council of Petroleum Accountants Societies (“COPAS”) is a non-profit professional organization established in 1961 that outlines accounting guidelines and practices within the North American petroleum industry
- Base overhead rates that an operator can charge out to working interest partners must be agreed upon in the various Joint Operating Agreements (“JOA”) between SN and its various counterparties. However, COPAS accounting procedures provide for the annual adjustment of the fixed rate overhead for drilling and producing wells
- COPAS does not publish or recommend any specific overhead rates or overhead surveys, as the rates are derived through negotiation among the parties to an agreement

## COPAS at SN

- JOAs that SN is party to are subject to the adjustment rates that COPAS releases on an annual basis
- With SN being the operator of the Comanche assets, SN is able to charge the other working interest partners monthly
- The amounts that SN can charge out to working interest parties depend entirely on the well count, irrespective of changes in the Company’s expenses
- A charge to the Company’s working interest partners is reflected as a credit to G&A on SN’s books and records

## COPAS in Business Plan Model

- The business plan forecast calculates the average of the last 10 years of rate adjustments released by COPAS, which is approximately 3%
- The current average amount that SN is able to charge out to working interest partners is $950 per well, each month
- Beginning with the $950 monthly rate per well, the model assumes that the chargeable rate will increase at ~3% annually, as in the last ten years
- In a blowdown scenario where SN gives up operatorship, SN would then incur an additional expense per the JOA, instead of a receipt

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Appendix

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# A. PDP Reference Case

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# PDP Reference Case: Historical and Financial Projections (Accrual)

| $ millions | 2017A | 2018A | 2019E[1] | Pre-Emergence Jan-May 2020E | Post-Emergence Jun-Dec 2020E | Full Year 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,724 | 7,243 | 5,958 | 5,125 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,109 | 79,748 | 76,379 | 63,919 | 50,995 | 43,261 | 37,926 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,511 | 14,916 | 14,296 | 11,999 | 9,562 | 8,105 | 7,101 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,903** | **41,149** | **39,285** | **32,376** | **25,304** | **21,273** | **18,547** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.64 | $48.68 | $49.00 | $49.35 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.43 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.34 | $9.60 | $9.80 | $9.88 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $173 | $129 | $107 | $93 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 45 | 38 | 34 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 34 | 29 | 26 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$268** | **$207** | **$174** | **$152** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (27) | (27) |
| Marketing | (108) | (131) | (160) | (58) | (91) | (149) | (131) | (108) | (89) | (78) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (8) | (7) | (6) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (4) | (4) | (3) |
| Corporate G&A | (114) | (87) | (89) | (26) | (25) | (51) | (17) | (17) | (18) | (18) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (25) | (111) | (17) | (17) | (18) | (18) |
| Reconciling Items to EBITDAX [2] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$52** | **$70** | **$74** | **$40** | **$29** | **$20** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *26%* | *22%* | *27%* | *19%* | *17%* | *13%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(148)* | *$(252)* | *$(194)* | *$(167)* | *$(145)* | *$(132)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(97) | $(27) | $(124) | $(12) | $(1) | $(1) | $(1) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(79)** | **$25** | **$(54)** | **$62** | **$39** | **$28** | **$19** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$25** | **$(115)** | **$62** | **$39** | **$28** | **$19** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [3] | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$(1)* | *$5* | *$(5)* | *$(5)* | *$(6)* | *$(6)* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$4* | *$5* | *$5* | *$5* | *$5* |

011058

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# B. Other Supporting Items

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# UnSub Historical Financials (and 4Q19 Estimates)

| SN UNSUB | 1Q 17 | 2Q 17 | 3Q 17 | 4Q 17 | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (MBbl) | 300 | 836 | 756 | 819 | 890 | 769 | 680 | 737 | 741 | 689 | 635 | 626 |
| Gas (MMcf) | 1,862 | 5,011 | 5,067 | 4,517 | 4,677 | 4,438 | 3,803 | 3,942 | 3,758 | 3,751 | 3,596 | 3,498 |
| NGL (MBbl) | 266 | 858 | 904 | 776 | 847 | 791 | 714 | 735 | 688 | 688 | 627 | 606 |
| **Total Production (Mboe)** | **877** | **2,529** | **2,504** | **2,348** | **2,516** | **2,300** | **2,027** | **2,129** | **2,055** | **2,002** | **1,862** | **1,815** |
| Oil (Boed) | 9,686 | 9,183 | 8,213 | 8,901 | 9,884 | 8,450 | 7,386 | 8,007 | 8,235 | 7,569 | 6,907 | 6,805 |
| Gas (Mcfd) | 60,077 | 55,066 | 55,072 | 49,101 | 51,969 | 48,764 | 41,335 | 42,844 | 41,754 | 41,223 | 39,083 | 38,022 |
| NGL (Boed) | 8,583 | 9,432 | 9,830 | 8,432 | 9,408 | 8,693 | 7,758 | 7,991 | 7,643 | 7,560 | 6,814 | 6,582 |
| **Total Production (Boed)** | **28,281** | **27,794** | **27,222** | **25,517** | **27,953** | **25,271** | **22,034** | **23,138** | **22,837** | **21,999** | **20,235** | **19,724** |
| **Commodity Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $48.20 | $48.20 | $48.20 | $55.40 | $62.87 | $67.88 | $69.08 | $58.81 | $54.90 | $59.82 | $56.44 | $56.94 |
| Gas ($/mcf) | $3.00 | $3.00 | $3.00 | $2.93 | $3.00 | $2.80 | $2.99 | $3.64 | $3.15 | $2.64 | $2.23 | $2.40 |
| NGL ($/bbl) | $0.44 | $0.44 | $21.37 | $22.84 | $20.95 | $23.21 | $28.40 | $21.26 | $27.82 | $22.78 | $18.29 | $20.95 |
| **Realized Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $42.97 | $42.19 | $42.47 | $53.46 | $60.21 | $63.92 | $68.46 | $57.44 | $55.21 | $60.61 | $55.16 | $53.39 |
| Gas ($/mcf) | $2.66 | $3.06 | $2.99 | $2.77 | $3.04 | $2.85 | $3.10 | $4.01 | $3.20 | $2.61 | $2.40 | $2.47 |
| NGL ($/bbl) | $15.64 | $16.08 | $20.98 | $21.94 | $22.20 | $22.07 | $28.95 | $20.39 | $17.11 | $13.38 | $11.44 | $13.78 |
| Oil Revenue | $12,901 | $35,257 | $32,090 | $43,783 | $53,562 | $49,148 | $46,519 | $42,312 | $40,913 | $41,748 | $35,053 | $33,421 |
| Gas Revenue | $4,951 | $15,338 | $15,127 | $12,520 | $14,197 | $12,665 | $11,786 | $15,794 | $12,035 | $9,806 | $8,632 | $8,652 |
| NGL Revenue | $4,162 | $13,806 | $18,973 | $17,022 | $18,800 | $17,458 | $20,664 | $14,989 | $11,768 | $9,203 | $7,169 | $8,348 |
| **Oil, Gas, & NGL Revenue** | **$22,014** | **$64,401** | **$66,190** | **$73,324** | **$86,559** | **$79,271** | **$78,969** | **$73,095** | **$64,716** | **$60,757** | **$50,854** | **$50,421** |
| Hedge Gain / (Loss) | $0 | $5,350 | $5,713 | $1,408 | ($3,843) | ($5,788) | ($6,883) | ($5,550) | ($1,522) | ($2,220) | $286 | ($577) |
| LOE | $1,676 | $3,816 | $5,540 | $5,844 | $8,511 | $7,076 | $7,832 | $9,094 | $10,539 | $7,684 | $7,158 | $6,986 |
| Marketing | $8,216 | $22,894 | $23,693 | $21,990 | $20,982 | $20,809 | $19,600 | $20,116 | $17,359 | $17,107 | $15,903 | $16,711 |
| Operating Expenses | $9,892 | $26,710 | $29,233 | $27,834 | $29,492 | $27,885 | $27,432 | $29,210 | $27,897 | $24,791 | $23,060 | $23,697 |
| Production Taxes | $865 | $2,288 | $2,501 | $2,421 | $3,004 | $2,824 | $2,839 | $2,593 | $2,231 | $2,135 | $1,670 | $1,644 |
| Ad Valorem Taxes | $388 | $1,163 | $1,948 | $1,240 | $1,536 | $1,613 | $1,583 | $911 | $1,668 | $1,671 | $1,671 | $1,092 |
| Total G&A | $3,786 | $1,978 | $1,786 | $1,551 | $1,813 | $1,479 | $1,370 | $1,370 | $1,921 | $1,149 | $869 | $77 |
| Reconciling Items to EBITDAX | ($0) | $192 | $0 | ($0) | ($0) | ($388) | $388 | ($0) | ($39) | ($0) | ($0) | $0 |
| **Adjusted EBITDAX** | **$7,083** | **$37,804** | **$36,435** | **$41,687** | **$46,870** | **$39,295** | **$39,249** | **$33,461** | **$29,437** | **$28,791** | **$23,870** | **$23,335** |
| Interest Expense | $756 | $2,299 | $2,352 | $2,232 | $2,301 | $2,202 | $2,131 | $2,201 | $2,283 | $2,147 | $1,952 | $1,795 |
| Preferred Dividends / Tax Distributions | $16,466 | $10,950 | $8,347 | $8,497 | $9,908 | $12,500 | $12,500 | $12,500 | $0 | $12,500 | $25,000 | $12,500 |
| **Discretionary Cash Flow** | **($10,138)** | **$24,555** | **$25,736** | **$30,958** | **$34,661** | **$24,593** | **$24,618** | **$18,760** | **$27,154** | **$14,144** | **($3,082)** | **$9,039** |
| Total Capex | $1,463 | $16,762 | $18,312 | $33,202 | $25,193 | $20,521 | $19,662 | $18,218 | $5,396 | $5,442 | $6,687 | $4,130 |
| **Free Cash Flow (before A&D)** | **($11,601)** | **$7,794** | **$7,424** | **($2,244)** | **$9,468** | **$4,072** | **$4,957** | **$542** | **$21,757** | **$8,702** | **($9,770)** | **$4,909** |
| Acquistions / Divestitures | ($673,500) | $0 | $0 | $1,984 | $2,980 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other / Working Capital Adjustment** | $0 | ($13,036) | $11,067 | $1,739 | ($3,944) | $7,675 | ($4,776) | ($17,199) | ($1,952) | $2,589 | ($1,086) | $3,914 |
| **Free Cash Flow (after A&D)** | **($685,101)** | **($5,242)** | **$18,491** | **$1,479** | **$8,504** | **$11,747** | **$180** | **($16,657)** | **$19,805** | **$11,292** | **($10,856)** | **$8,824** |

011060

** Q4 2019 financials not finalized and subject to change.

* Reflects true-up to actual historical cash & RBL balances. This does not forecast a change in future working capital balances.

# Historical EBITDAX Reconciliation – Restricted Group

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| (In Thousands) | 2017 Consolidated SN FY | 2017 Restricted Group (Model) FY | 2018 Consolidated SN FY | 2018 Restricted Group (Model) FY |
|---|---|---|---|---|
| **Adjusted EBITDAX:** | | | | |
| Net income (loss) | $ 43,191 | $ (6,851) | $ 85,205 | $ (22,501) |
| Adjusted by: | | | | |
| Interest expense | 128,189 | 120,550 | 165,233 | 156,398 |
| Amortization of debt costs [1] | 11,975 | 8,880 | 12,625 | 8,819 |
| Net losses (gains) on commodity derivative contracts [2] | 6,099 | 7,986 | 27,756 | 32,316 |
| Net settlements paid on commodity derivative contracts | 13,140 | 670 | (103,205) | (81,141) |
| Exploration expense | 5,755 | 5,755 | 3,295 | 3,284 |
| Depreciation, depletion, amortization and accretion [1] | 177,153 | 125,696 | 262,481 | 197,388 |
| Impairment of oil and natural gas properties [1] | 39,499 | 39,499 | 14,386 | 14,337 |
| Stock-based compensation [1] | 22,909 | 22,909 | 792 | 792 |
| Acquisition and divestiture costs included in G&A | 30,526 | 30,334 | 778 | 778 |
| Income tax expense (benefit) | (2,336) | (2,336) | - | - |
| Gains on sale of oil and natural gas properties | - | - | (1,528) | (1,528) |
| Gains on disposal of assets | (81,955) | (81,955) | - | - |
| Loss on impairment of other assets | - | - | - | - |
| Impairment of right of use assets | - | - | - | - |
| Accrued amount for executive bonuses included in G&A | - | - | - | - |
| (Gains) losses on embedded derivatives | 1,551 | 1,551 | (700) | (700) |
| (Gains) losses on investments | 871 | 871 | 21,798 | 21,798 |
| Amortization of deferred gain on Catarina Midstream sale | (23,718) | (23,718) | (23,720) | (23,720) |
| Interest income | (836) | (836) | (4,351) | (4,351) |
| **Adjusted EBITDAX** | **$ 372,013** | **$ 249,004** | **$ 460,845** | **$ 301,969** |

011061

(1) *Represent non-cash adjustments to net income.*
(2) *Includes cash received and non-cash (gains) losses.*

# Historical EBITDAX Reconciliation – UnSub

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *($ millions)* | 1Q 2017 | 2Q 2017 | 3Q 2017 | 4Q 2017 | 1Q 2018 | 2Q 2018 | 3Q 2018 | 4Q 2018 |
|---|---|---|---|---|---|---|---|---|
| **Adjusted EBITDA:** | | | | | | | | |
| Net income | $ 18.8 | $ 31.2 | $ 4.5 | $ (4.5) | $ 17.4 | $ (0.3) | $ 13.2 | $ 77.5 |
| Plus: | | | | | | | | |
| Interest expense | 0.8 | 2.3 | 2.4 | 2.2 | 2.3 | 2.2 | 2.1 | 2.2 |
| Net (gains) losses on commodity derivative contracts[1] | (19.1) | (20.9) | 14.4 | 23.7 | 14.2 | 25.5 | 14.3 | (58.5) |
| Net settlements received on commodity derivative contracts | 0.0 | 5.3 | 5.7 | 1.4 | (3.8) | (5.8) | (6.9) | (5.5) |
| Depreciation, depletion, amortization and accretion[2][3] | 6.1 | 19.0 | 8.5 | 17.8 | 15.9 | 16.8 | 15.5 | 16.9 |
| Acquisition costs included in general and administrative expense | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of debt issuance costs[3] | 0.3 | 0.9 | 0.9 | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 |
| Income tax benefit | 0.2 | (0.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Impairment of oil and natural gas properties[3] | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Exploration expense | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Adjusted EBITDA** | **$ 7.1** | **$ 37.8** | **$ 36.4** | **$ 41.7** | **$ 46.9** | **$ 39.3** | **$ 39.2** | **$ 33.5** |

011062

*(1) Includes cash received and non-cash (gains) losses.*
*(2) Adjusted from prior period presentation due to conversion to successful efforts from full cost method during Q3 2017.*
*(3) Represent non-cash adjustments to net income.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Option Preservation Case)

## Pricing (As of 2/11/20)

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub Gas ($/MMBtu) | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

## Commodity Price Realizations

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| Oil (% WTI) | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| Gas (% Henry Hub) | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| NGL (% Mt B Propane) | 52% | 43% | 69% | 63% | 62% | - | - |

## Lease Operating Expense




## G&A




011063

Note: Strip pricing sourced from Capital IQ as of 2/11/20.

# Business Plan Assumptions (Option Preservation Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




011064

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Option Preservation Case)



## Capital Expenditures




## Well Costs[1]




011065

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

# Business Plan Assumptions (Accelerated Completions Case)



## Pricing (As of 2/11/20)

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| WTI Oil ($/Bbl) | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub Gas ($/MMBtu) | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

## Commodity Price Realizations

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| Oil (% WTI) | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| Gas (% Henry Hub) | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| NGL (% Mt B Propane) | 52% | 43% | 69% | 63% | 62% | - | - |

## Lease Operating Expense




## G&A




011066

Note: Strip pricing sourced from Capital IQ as of 2/11/20.

# Business Plan Assumptions (Accelerated Completions Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




011067

*Note: In comparison, PDP reference case drilling and completion activity is comprised of the following: Drilling – 1 well in Catarina (2020), 66 wells in Comanche (55 in 2020 and 11 in 2021), Completions - 31 wells in Catarina (all in 2020), 80 wells in Comanche (57 in 2020 and 23 in 2021)*

# Business Plan Assumptions (Accelerated Completions Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Capital Expenditures**




**Well Costs(1)**




011068

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

# Forecast Liquidity



CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Similar Liquidity Profile at Exit in Option Preservation, Accelerated Completions, and PDP Reference Scenarios




**PDP Reference scenario does not assume full conversion to non-operated cash based forecast*

- Liquidity at 5/31/2020 of $24.0MM in the Option Preservation scenario, $27.9MM in the Accelerated Completion scenario, and $27.4MM in a PDP Reference scenario.
- Cash Flows include:
  - Payment of accrued DIP interest at 5/31/2020 and exit fees of 1.5% of total new money commitment (~$1.8MM)
  - 1L adequate protection paid during case ($36MM) and accrued adequate protection paid on 5/31/2020 ($9.4MM)
  - Payment of all accrued & unpaid professional fees and success fees (~38.3MM)
- DIP commitment is $150MM of new money and $50MM of 1st lien roll-up to be refinanced upon exit
- No additional disbursements associated with emergence are included in this forecast

011069

# Sanchez Energy Organizational Structure (Pre-Petition)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




*Notes:*

(1) *GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.*

# Comanche Ownership Structure

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




011071

*Note: Percentages shown represent interest in future development.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual NYMEX WTI Oil Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $53.86 | $51.26 | $50.24 | $50.07 | $50.30 | $50.79 | $51.09 | $51.24 | $51.20 | $51.20 | $51.20 |
| Strip as of 12/15/2019 | $58.05 | $53.99 | $51.92 | $51.16 | $51.08 | $51.32 | $51.52 | $51.62 | $51.58 | $51.58 | $51.58 |
| Strip as of 12/31/2019 | $58.83 | $54.38 | $52.09 | $51.31 | $51.44 | $52.07 | $52.57 | $52.84 | $52.84 | $52.84 | $52.84 |
| Strip as of 1/15/2020 | $56.71 | $53.33 | $51.57 | $51.01 | $51.15 | $51.66 | $52.09 | $52.34 | $52.36 | $52.36 | $52.36 |
| Strip as of 2/11/2020 | $50.76 | $50.89 | $50.96 | $51.32 | $51.69 | $52.04 | $52.22 | $52.38 | $52.40 | $52.40 | $52.40 |

011072

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual NYMEX Henry Hub Gas Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $2.27 | $2.41 | $2.44 | $2.48 | $2.54 | $2.58 | $2.63 | $2.72 | $2.80 | $2.91 | $3.01 |
| Strip as of 12/15/2019 | $2.29 | $2.45 | $2.45 | $2.48 | $2.52 | $2.57 | $2.61 | $2.69 | $2.75 | $2.84 | $2.92 |
| Strip as of 12/31/2019 | $2.29 | $2.42 | $2.42 | $2.46 | $2.49 | $2.53 | $2.55 | $2.60 | $2.65 | $2.69 | $2.75 |
| Strip as of 1/15/2020 | $2.25 | $2.43 | $2.44 | $2.47 | $2.51 | $2.55 | $2.57 | $2.63 | $2.67 | $2.71 | $2.77 |
| Strip as of 2/11/2020 | $2.04 | $2.36 | $2.41 | $2.45 | $2.47 | $2.49 | $2.49 | $2.52 | $2.55 | $2.59 | $2.65 |

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual Mt. Belvieu Propane Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $21.35 | $21.31 | $21.75 | $22.13 | $22.27 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 |
| Strip as of 12/15/2019 | $21.57 | $22.15 | $22.62 | $22.97 | $23.11 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 |
| Strip as of 12/31/2019 | $19.04 | $20.16 | $20.86 | $21.24 | $21.38 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 |
| Strip as of 1/15/2020 | $19.40 | $20.45 | $20.86 | $21.24 | $21.38 | $21.27 | $21.79 | $21.79 | $21.79 | $21.79 | $21.79 |
| Strip as of 2/11/2020 | $17.26 | $18.39 | $18.85 | $19.27 | $19.43 | $19.35 | $19.41 | $19.33 | $19.33 | $19.33 | $19.33 |

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 1-35372**

# Sanchez Energy Corporation
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **45-3090102** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000 Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 783-8000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐ Accelerated filer ☒ Non-accelerated filer ☐ Smaller reporting company ☐ Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares of Registrant's common stock, par value $0.01 per share, outstanding as of November 4, 2019: 100,154,182

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Form 10-Q**
**For the Quarterly Period Ended September 30, 2019**

**Table of Contents**


**PART I**

| | | |
|---|---|---|
| Item 1. | Financial Statements | 9 |
| | Condensed Consolidated Balance Sheets as of September 30, 2019 (Unaudited) and December 31, 2018 | 9 |
| | Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 10 |
| | Condensed Consolidated Statements of Stockholders' Deficit for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 11 |
| | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 13 |
| | Notes to the Condensed Consolidated Financial Statements (Unaudited) | 14 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 4. | Controls and Procedures | 79 |

**PART II**

| | | |
|---|---|---|
| Item 1. | Legal Proceedings | 79 |
| Item 1A. | Risk Factors | 80 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 80 |
| Item 3. | Defaults Upon Senior Securities | 80 |
| Item 4. | Mine Safety Disclosures | 81 |
| Item 5. | Other Information | 81 |
| Item 6. | Exhibits | 82 |
| **SIGNATURES** | | 83 |

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this Quarterly Report on Form 10-Q that address activities, events or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. These statements relate to certain assumptions made based on management's experience, perception of historical trends and technical analyses, current conditions, anticipated future developments and other factors we believe to be appropriate and reasonable. When used in this Quarterly Report on Form 10-Q, words such as "will," "potential," "believe," "estimate," "intend," "expect," "may," "should," "anticipate," "could," "plan," "predict," "forecast," "budget," "guidance," "project," "profile," "model," "strategy," "future" or their negatives or the statements that include these words or other similar words that convey the uncertainty of future events or outcomes, are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. In particular, statements, express or implied, concerning the outcome of the Chapter 11 Cases (as defined below), our restructuring plans and our ability to increase our financial flexibility, future operating results and returns or our ability to replace or increase reserves, increase production or generate income or cash flows, service our debt and other obligations and repay or otherwise refinance such obligations when due or at maturity, operational and commercial benefits of our partnerships, expected benefits from acquisitions, and our strategic relationship with Sanchez Midstream Partners LP ("SNMP") are forward-looking statements. Forward-looking statements are not guarantees of performance. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. Although we believe that the expectations reflected in our forward-looking statements are reasonable and are based on reasonable assumptions, there can be no assurance that these assumptions are accurate or that any of these expectations will be achieved (in full or at all) or will prove to have been correct. Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- risks and uncertainties associated with the Chapter 11 Cases, including our ability to develop, confirm and consummate a plan of reorganization under Chapter 11 or an alternative restructuring transaction, which may be necessary to continue as a going concern;
- our ability to maintain relationships with suppliers, customers, employees and other third parties as a result of our filing of the Bankruptcy Petitions (as defined below);
- our ability to obtain sufficient financing to allow us to emerge from bankruptcy and execute our business plan post-emergence;
- the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases;
- our ability to obtain Bankruptcy Court (as defined below) approval of the various motions and forms of orders, including with respect to our DIP Facility (as defined below), and risks associated with third-party motions in the Chapter 11 Cases, which may interfere with our ability to confirm and consummate a plan of reorganization or an alternative restructuring transaction;
- the potential adverse effects of the Chapter 11 Cases on our liquidity and results of operations;
- increased professional fees and advisory costs to execute a reorganization;
- the timing and extent of changes in prices of, and demand for, crude oil and condensate, natural gas liquids ("NGLs"), natural gas and related commodities;
- our ability to comply with the financial and other covenants in our debt instruments, including our DIP Facility, to service and repay our debt, and to address our liquidity needs, particularly if commodity prices remain volatile and/or depressed;
- the extent to which we are able to pursue drilling plans and acquisitions that are successful in maintaining and economically developing our acreage, producing and replacing reserves and achieving anticipated production levels;

- our ability to realize the benefits of our various acquired assets, fully identify and address existing and potential issues or liabilities and accurately estimate reserves, production and costs with respect to such assets;
- the extent to which our current low share price, our listing in the over-the-counter market rather than on a national securities exchange and our ongoing Chapter 11 Cases will impair our access to the equity markets and ability to obtain financing;
- our ability to utilize the services, personnel and other assets of Sanchez Oil & Gas Corporation ("SOG") pursuant to an existing services agreement (the "Services Agreement");
- SOG's ability to attract and retain personnel and other resources to perform its obligations under the Services Agreement;
- the realized benefits of our partnerships and joint ventures, including our transactions with SNMP and our partnership with affiliates of The Blackstone Group Inc. ("Blackstone");
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may, therefore, be imprecise;
- the extent to which we can optimize reserve recovery and economically develop our properties utilizing horizontal and vertical drilling, advanced completion technologies, hydraulic stimulation and other techniques;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the effectiveness of our internal control over financial reporting;
- the availability, creditworthiness and performance of our counterparties, including financial institutions, operating partners and other parties;
- the extent to which requests for credit assurances from our contractual counterparties could have a material adverse effect on our business, financial condition and results of operations;
- the extent to which minimum volume commitments or "take-or-pay" obligations in excess of our oil and natural gas deliveries to, or transportation needs from, our contractual counterparties due to reduced activity levels or otherwise could have a material adverse effect on our business, financial condition and results of operations;
- results of litigation filed against us or other legal proceedings or out-of-court contractual disputes to which we are party or for which we owe an indemnity;
- competition in the oil and natural gas exploration and production industry generally and with respect to the marketing of oil, natural gas and NGLs, acquisition of leases and properties, attraction and retention of employees and other personnel, procurement of equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- the extent to which our production, revenue and cash flow from operating activities are derived from oil and natural gas assets which are concentrated in a single geographic area;

- developments in oil-producing and natural gas-producing countries, the actions of the Organization of Petroleum Exporting Countries ("OPEC") and other factors affecting the supply and pricing of oil and natural gas;
- the extent to which third parties operate our oil and natural gas properties successfully and economically;
- our ability to manage the financial risks where we share with more than one party the costs of drilling, equipping, completing and operating wells, including with respect to the Comanche Assets (as defined in "Item 1. Notes to the Condensed Consolidated Financial Statements—Note 14. Stockholders' and Mezzanine Equity");
- the use of competing energy sources, the development of alternative energy sources and potential economic implications and other effects therefrom;
- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage, including losses related to sabotage, terrorism or other malicious intentional acts (including cyber-attacks) that disrupt operations;
- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic stimulation and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws, regulations, restrictions and guidelines with respect to derivatives, hedging activities and commercial lending standards; and
- the other factors described under "Part I, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," "Part II, Item 1A. Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q and in our other public filings with the Securities and Exchange Commission (the "SEC").

In light of these risks, uncertainties and assumptions, the events anticipated by our forward-looking statements may not occur, and, if any of such events do, we may not have correctly anticipated the timing of their occurrence or the extent of their impact on our actual results. Accordingly, you should not place any undue reliance on any of our forward-looking statements. Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to correct or update any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by applicable law. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

**GLOSSARY OF SELECTED OIL AND NATURAL GAS TERMS**

The following includes a description of the meanings of some of the oil and natural gas industry terms used in this Quarterly Report on Form 10-Q. The definitions "development costs," "development project," "development well," "economically producible," "field," "possible reserves," "probable reserves," "production costs," "proved area," "reservoir," "resources," and "unproved properties" have been excerpted from the applicable definitions contained in Rule 4-10(a) of Regulation S-X.

***American Petroleum Institute ("API") gravity:*** A system of classifying oil based on its specific gravity, whereby the greater the gravity, the lighter the oil.

***Bbl:*** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

***Boe:*** One barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Boe of oil.

***Boe/d:*** One Boe per day.

***Btu:*** One British thermal unit, the quantity of heat required to raise the temperature of a one-pound mass of water by one degree Fahrenheit.

***completion:*** The process of treating a drilled well followed by the installation of permanent equipment for the production of oil or natural gas, or in the case of a dry hole, the reporting of abandonment to the appropriate agency.

***condensate:*** A liquid hydrocarbon with an API gravity of 50-100°.

***developed acreage:*** The number of acres that are allocated or assignable to producing wells or wells capable of production.

***development costs:*** Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and natural gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to: (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves; (ii) drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly; (iii) acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems; and (iv) provide improved recovery systems.

***development project:*** A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

***development well:*** A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

***differential:*** An adjustment to the price of oil or natural gas from an established spot market price to reflect differences in the quality and/or location of oil or natural gas.

***dry hole:*** A well found to be incapable of producing hydrocarbons in sufficient quantities such that proceeds from the sale of such production would exceed production expenses and taxes.

***economically producible:*** The term economically producible, as it relates to a resource, means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

***field:*** An area consisting of a single reservoir or multiple reservoirs, all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The field name refers to both the surface and the underground productive formations.

***gross acres or gross wells:*** The total acres or wells, as the case may be, in which we have a working interest.

***horizontal development:*** A drilling technique used in certain formations where a well is drilled vertically to a certain depth and then drilled at a right angle within a specified interval.

***independent exploration and production company:*** A company whose primary line of business is the exploration and production of oil and natural gas.

***MBbls:*** One thousand Bbls.

***MBoe:*** One thousand Boe.

***Mcf:*** One thousand cubic feet of natural gas.

***MMBbls:*** One million Bbls.

***MMBoe:*** One million Boe.

***MMBtu:*** One million British thermal units.

***MMcf:*** One million cubic feet of natural gas.

***natural gas liquids ("NGLs"):*** The combination of ethane, propane, butane, natural gasolines and other components that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.

***net acres or net wells:*** Gross acres or wells, as the case may be, multiplied by our working interest ownership percentage.

***net production:*** Production that is owned by us less royalties and production due others.

***NYMEX:*** New York Mercantile Exchange.

***operator:*** The individual or company responsible for the exploration and/or production of an oil or natural gas well or lease.

***possible reserves:*** Additional reserves that are less certain to be recovered than probable reserves.

***probable reserves:*** Additional reserves that are less certain to be recovered than proved reserves but that, in sum with proved reserves, are as likely as not to be recovered.

***production costs:*** Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

***proved area:*** The part of a property to which proved reserves have been specifically attributed.

***proved developed reserves:*** Reserves that can be expected to be recovered through existing wells with existing equipment and operating methods.

***proved developed non-producing reserves***: Reserves that are expected to be recovered from completion intervals which are open at the time of the estimate but which have not yet started producing, wells which were shut-in for market conditions or pipeline connections, or wells not capable of production for mechanical reasons; reserves that are expected to be recovered from zones in existing well which will require additional completion work or future re-completion prior to start production.

***proved oil and natural gas reserves:*** The estimated quantities of oil, natural gas and NGLs that geological and engineering data demonstrate with reasonable certainty to be commercially recoverable in future years from known reservoirs under existing economic and operating conditions.

***proved undeveloped reserves ("PUDs"):*** Proved reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion.

***realized price:*** The cash market price less all expected quality, transportation and demand adjustments.

***recompletion:*** The action of reentering an existing wellbore to redo or repair the original completion in order to increase the well's productivity.

***reserve:*** That part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination.

***reservoir:*** A porous and permeable underground formation containing a natural accumulation of producible oil and/or natural gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

***resources:*** Resources are quantities of oil and natural gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable and another portion may be considered unrecoverable. Resources include both discovered and undiscovered accumulations.

***spacing:*** The distance between wells producing from the same reservoir. Spacing is often expressed in terms of feet (e.g., 600 foot well-spacing) and is often established by regulatory agencies.

***trend:*** A geographic area with hydrocarbon potential.

***undeveloped acreage:*** Lease acreage on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

***unproved properties:*** Properties with no proved reserves.

***volatile oil:*** A quality of oil with an API gravity of 42-55° with a natural gas-to-oil ratio of 900-3,500 cubic feet per barrel.

***working interest:*** An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

***WTI:*** West Texas Intermediate oil.

## PART I—FINANCIAL INFORMATION

### Item 1. Financial Statements

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Balance Sheets**
**(in thousands, except par value and share amounts)**

| | September 30, 2019 (Unaudited) | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 179,538 | $ 197,613 |
| Oil and natural gas receivables | 69,290 | 87,222 |
| Joint interest billings receivables | 10,979 | 33,263 |
| Accounts receivable - related entities | 10,161 | 6,099 |
| Fair value of derivative instruments | 6,263 | 15,714 |
| Other current assets | 24,679 | 33,070 |
| Total current assets | 300,910 | 372,981 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 3,864,327 | 3,792,431 |
| Unproved oil and natural gas properties | 299,456 | 328,643 |
| Total oil and natural gas properties | 4,163,783 | 4,121,074 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,947,558) | (1,761,949) |
| Total oil and natural gas properties, net | 2,216,225 | 2,359,125 |
| Other assets: | | |
| Fair value of derivative instruments | 9,346 | 12,102 |
| Right of use assets, net | 280,139 | — |
| Investments (includes investment in SNMP measured at fair value of $0.8 million and $3.9 million as of September 30, 2019 and December 31, 2018, respectively) | 12,200 | 16,664 |
| Other assets | 43,990 | 59,088 |
| Total assets | $ 2,862,810 | $ 2,819,960 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Other payables | 16,739 | 74,628 |
| Accrued liabilities: | | |
| Capital expenditures | 7,232 | 61,970 |
| Other | 66,298 | 102,728 |
| Fair value of derivative instruments | 700 | 706 |
| Short term debt | — | 304 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,961 | 75,581 |
| Total current liabilities | 296,796 | 348,299 |
| Long term debt, net of premium, discount and debt issuance costs | 166,956 | 2,395,408 |
| Asset retirement obligations | 49,183 | 46,175 |
| Fair value of derivative instruments | — | 366 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 3,085,032 | 2,811,655 |
| Commitments and contingencies (Note 17) | | |
| Mezzanine equity: | | |
| Preferred units ($1,000 liquidation preference, 500,000 units authorized, issued and outstanding as of September 30, 2019 and December 31, 2018) | 474,857 | 452,828 |
| Stockholders' deficit: | | |
| Preferred stock ($0.01 par value, 15,000,000 shares authorized; 619,503 and 1,838,985 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 4.875% Convertible Perpetual Preferred Stock, Series A; 2,466,013 and 3,527,830 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 6.500% Convertible Perpetual Preferred Stock, Series B) | 31 | 53 |
| Common stock ($0.01 par value, 300,000,000 shares authorized; 100,154,824 and 87,328,424 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively) | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (2,069,822) | (1,812,884) |
| Total stockholders' deficit | (697,079) | (444,523) |
| Total liabilities and stockholders' deficit | $ 2,862,810 | $ 2,819,960 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **REVENUES:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ 362,424 | $ 473,178 |
| Natural gas liquid sales | 22,675 | 69,995 | 92,891 | 175,833 |
| Natural gas sales | 26,572 | 39,460 | 100,932 | 122,330 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 162,546 | 277,710 | 574,350 | 788,251 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 74,740 | 75,594 | 231,441 | 225,186 |
| Exploration expenses | 164 | 2,698 | 4,983 | 3,247 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 9,867 | 15,221 | 34,682 | 42,898 |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 22,906 | 4,259 |
| General and administrative expenses | 20,915 | 21,312 | 66,266 | 73,199 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 198,214 | 193,125 | 606,644 | 554,802 |
| Operating income (loss) | (35,668) | 84,585 | (32,294) | 233,449 |
| Other income (expense): | | | | |
| Interest income | 221 | 1,130 | 1,447 | 3,400 |
| Other income (expense) | (12,829) | (7,677) | (13,785) | 2,467 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (22,884) | (44,154) | (111,998) | (132,664) |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | (20,827) | (142,384) |
| Total other expense | (22,292) | (78,987) | (145,163) | (267,653) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Income (loss) before income taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | (112,448) | 5,598 | (232,755) | (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Net loss per common share - basic and diluted | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |
| Weighted average number of shares used to calculate net loss attributable to common stockholders - basic and diluted | 97,395 | 82,073 | 95,272 | 81,597 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | Deficit |
| **BALANCE, December 31, 2018** | 1,839 | $ 18 | 3,528 | $ 35 | 87,329 | $ 881 | $ 1,367,427 | $ (1,812,884) | $ (444,523) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 42,499 | 42,499 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 7,898 | 79 | 3,908 | (2,516) | 1,471 |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,033) | (7,033) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (270) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (1,059) | (11) | (1,017) | (10) | 4,837 | 48 | (27) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 141 | — | 141 |
| Net loss | — | — | — | — | — | — | — | (67,342) | (67,342) |
| **BALANCE, March 31, 2019** | **780** | **7** | **2,511** | **25** | **99,794** | **1,007** | **1,371,450** | **(1,859,776)** | **(487,287)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,325) | (2,325) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,358) | (7,358) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (81) | 4 | (4) | — | — |
| Exchange of preferred stock for common stock | (155) | (1) | — | — | 363 | 2 | (1) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 158 | — | 158 |
| Net loss | — | — | — | — | — | — | — | (52,965) | (52,965) |
| **BALANCE, June 30, 2019** | **625** | **6** | **2,511** | **25** | **100,076** | **1,013** | **1,371,603** | **(1,934,924)** | **(562,277)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,312) | (2,312) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,638) | (7,638) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (38) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (5) | — | (45) | — | 117 | 2 | (2) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 96 | — | 96 |
| Net loss | — | — | — | — | — | — | — | (112,448) | (112,448) |
| **BALANCE, September 30, 2019** | **620** | **$ 6** | **2,466** | **$ 25** | **100,155** | **$ 1,014** | **$ 1,371,698** | **$ (2,069,822)** | **$ (697,079)** |

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit (Continued)**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | |
| **BALANCE, December 31, 2017** | 1,839 | $ 18 | 3,528 | $ 35 | 83,985 | $ 845 | $ 1,362,118 | $ (1,832,156) | $ (469,140) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 22,739 | 22,739 |
| Issuance of common stock | — | — | — | — | 100 | 1 | 565 | — | 566 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 805 | 8 | 3,979 | (3,987) | — |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Distributions - SN UnSub Preferred Units | — | — | — | — | — | — | — | 2,592 | 2,592 |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (5,930) | (5,930) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 283 | 4 | (4) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (375) | — | (375) |
| Net loss | — | — | — | — | — | — | — | (4,815) | (4,815) |
| **BALANCE, March 31, 2018** | **1,839** | **18** | **3,528** | **35** | **85,173** | **858** | **$ 1,366,283** | **(1,834,057)** | **(466,863)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,189) | (6,189) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 2,625 | 26 | (26) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 4,651 | — | 4,651 |
| Net loss | — | — | — | — | — | — | — | (34,987) | (34,987) |
| **BALANCE, June 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,798** | **884** | **1,370,908** | **(1,891,720)** | **(519,875)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,458) | (6,458) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (268) | (1) | 1 | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (1,398) | — | (1,398) |
| Net loss | — | — | — | — | — | — | — | 5,598 | 5,598 |
| **BALANCE, September 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,530** | **$ 883** | **$ 1,369,511** | **$ (1,909,067)** | **$ (538,620)** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 22,906 | 4,259 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 20,827 | 142,384 |
| Net cash settlements paid on commodity derivative contracts | (5,799) | (69,317) |
| (Gain) loss on other derivatives | (276) | 5,262 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Amortization of debt issuance costs | 8,275 | 12,706 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 41,305 | 1,982 |
| Accounts receivable - related entities | (4,062) | (3,365) |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 59,218 | 17,595 |
| Other current liabilities | (20,519) | (12,531) |
| Other assets and liabilities, net | 5,330 | (2,225) |
| Net cash provided by operating activities | 99,750 | 249,526 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (114,655) | (452,296) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Acquisition of oil and natural gas properties | — | 2,834 |
| Payments for purchases of other assets | (761) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,788 |
| Net cash used in investing activities | (110,217) | (453,822) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | (18,327) | (103,262) |
| Financing costs, including costs related to DIP Facility | (9,505) | (12,995) |
| Preferred dividends paid | — | (11,961) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred unit distributions paid | (37,500) | (22,408) |
| Net cash (used in) provided by financing activities | (7,608) | 388,534 |
| (Decrease) increase in cash and cash equivalents | (18,075) | 184,238 |
| Cash and cash equivalents, beginning of period | 197,613 | 184,434 |
| Cash and cash equivalents, end of period | $ 179,538 | $ 368,672 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | |
| Change in asset retirement obligations | $ 129 | $ 1,532 |
| Change in accrued capital expenditures | (54,871) | 24,652 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 | — |
| **SUPPLEMENTAL DISCLOSURE:** | | |
| Cash paid for interest | $ 84,803 | $ 120,775 |
| Cash paid for reorganization items | $ 9,521 | $ — |

The accompanying notes are an integral part of these condensed consolidated financial statements



011088

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Notes to the Condensed Consolidated Financial Statements**

**(Unaudited)**

**Note 1. Organization and Business**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed in "—Note 3. Chapter 11 Cases," we are currently operating our business as "debtors-in-possession" in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

**Liquidity**

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions on the Petition Date (as defined below), prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

The accompanying condensed consolidated financial statements are unaudited and were prepared from the Company's records. The condensed consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP" or "U.S. GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. The Company derived the condensed consolidated balance sheet as of December 31, 2018 from the audited financial statements filed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Annual Report"). Because this is an interim period filing presented using a condensed format, it does not include all of the disclosures required by U.S. GAAP. These condensed consolidated financial statements should be read in connection with the consolidated financial statements and notes thereto included in the 2018 Annual Report, which contains a summary of the Company's significant accounting policies and other disclosures. In the opinion of management, these financial statements include the adjustments and accruals, all of which are of a normal recurring nature, which are necessary for a fair presentation of the results for the interim periods. These interim results are not necessarily indicative of results to be expected for the entire year.

As of September 30, 2019, the Company's significant accounting policies are consistent with those discussed in "—Note 2. Basis of Presentation and Summary of Significant Accounting Policies," in the notes to the Company's consolidated financial statements contained in the 2018 Annual Report with the addition of the following:

***Leases***

The Company determines if a contractual arrangement is a lease at inception. Operating leases are included in right of use ("ROU") assets, short term lease liabilities and long term lease liabilities in the condensed consolidated balance sheets.

ROU assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Operating lease ROU assets and lease liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As most of the Company's leases do not provide an implicit rate, the Company's estimated incremental borrowing rate based on the information available at commencement date is used in determining the present value of lease payments, and the implicit rate is used when readily determinable. The operating lease ROU asset also includes any lease payments made and excludes lease incentives. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

We have lease agreements with lease and non-lease components, which are accounted for as a single lease component.

***Bankruptcy Accounting***

As further discussed in "—Note 3. Chapter 11 Cases," on August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The condensed consolidated financial statements have been prepared as if the Company is a going concern and reflect the application of Accounting Standards Codification 852 "Reorganizations" ("ASC 852"). ASC 852 requires that the financial statements, for periods subsequent to the filing of the Bankruptcy Petitions, distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Accordingly, certain expenses, gains and losses that are realized or incurred in the bankruptcy proceedings are recorded in "Reorganization items" on the Company's condensed consolidated statements of operations. In addition, prepetition

unsecured and under-secured obligations that may be impacted by the bankruptcy reorganization process have been classified as “Liabilities subject to compromise” on the Company’s condensed consolidated balance sheet at September 30, 2019. These liabilities are reported at the amounts expected to be allowed as claims by the Bankruptcy Court, although they may be settled for less. The Company has not taken a view with respect to the ultimate recoveries or payments under these agreements or on account of these liabilities in the presentation of such amounts on the financial statements.

The accompanying condensed consolidated financial statements do not purport to reflect or provide for the consequences of the Chapter 11 Cases. In particular, the condensed consolidated financial statements do not purport to show: (i) the realizable value of assets on a liquidation basis or their availability to satisfy liabilities; (ii) the amount of prepetition liabilities that may be allowed for claims or contingencies, or the status and priority thereof; (iii) the effect on stockholders’ deficit accounts of any changes that may be made to the Company’s capitalization; or (iv) the effect on operations of any changes that may be made to the Company’s business. While operating as debtors-in-possession under Chapter 11 of the Bankruptcy Code, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities in amounts other than those reflected on the Company’s condensed consolidated financial statements, subject to the approval of the Bankruptcy Court or otherwise as permitted in the ordinary course of business. Further, a plan of reorganization could materially change the amounts and classifications on the Company’s historical condensed consolidated financial statements.

***Principles of Consolidation***

The Company’s condensed consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

***Use of Estimates***

The accompanying condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative (“G&A”) expenses. Actual results could differ materially from those estimates.

***Recent Accounting Pronouncements***

In June 2018, the FASB issued ASU 2018-07 “Compensation – Stock Compensation (ASC 718) – Improvements to Nonemployee Share-Based Payment Accounting,” which expands the scope of ASC 718, Compensation – Stock Compensation, to include share-based payment transactions for acquiring goods and services from nonemployees. We adopted this ASU effective January 1, 2019, which resulted in our remeasurement of the value of our outstanding unvested awards as of January 1, 2019 and changed the way we value our equity-classified equity awards going forward. Adoption of the standard did not have a material impact on our condensed consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13 “Financial Instruments – Credit Losses (ASC 326): Measurement of Credit Losses on Financial Instruments.” This ASU modifies the impairment model to utilize an expected loss methodology in place of the currently used incurred loss methodology, which will result in the more timely recognition of losses, if applicable. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2019, and earlier adoption is permitted. We are currently in the process of evaluating the impact of adoption of this guidance on our condensed consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02 "Leases (ASC 842)," effective for annual and interim periods for public companies beginning after December 15, 2018, with a modified retrospective approach to be used for implementation. The standard updates the previous lease guidance by requiring the recognition of a ROU asset and lease liability on the statement of financial position for all leases with lease terms of more than 12 months. The lease liability represents the discounted obligation to make future minimum lease payments and the corresponding ROU asset represents the lessee's right to use, or control the use of, a specified asset for the lease term. Recognition, measurement and presentation of expenses and cash flows arising from a lease will depend on classification as an operating or a finance lease. The Company adopted this standard effective January 1, 2019. We elected the package of practical expedients permitting us to not reassess under the new standard our prior conclusions regarding lease identification, lease classification and initial direct costs, the practical expedient to not separate lease and non– lease components for all of our existing lessee arrangements, and to elect an accounting policy to not apply the recognition requirements of ASC 842 to our short term leases. We did not elect the practical expedient for use of hindsight in determining the lease term and assessing impairment of our ROU assets. Adoption of ASC 842 resulted in the recognition of ROU assets and lease liabilities for operating leases on the balance sheet and the derecognition of the deferred gain previously recorded on a sale-leaseback transaction as a cumulative effect adjustment to retained earnings on January 1, 2019. Amounts recognized at January 1, 2019 for operating leases were as follows (in thousands):

| | December 31, 2018 | Adjustments due to Topic 842 | January 1, 2019 |
|---|---|---|---|
| ROU assets | $ — | $ 344,472 | $ 344,472 |
| Short term lease liabilities | — | 99,693 | 99,693 |
| Other current liabilities | 75,581 | (23,720) | 51,861 |
| Long term lease liabilities | — | 246,746 | 246,746 |
| Other long term liabilities | 21,407 | (20,745) | 662 |
| Accumulated deficit | (1,812,884) | 42,499 | (1,770,385) |

No impact was recorded to the condensed consolidated statement of operations related to the adoption of Topic 842.

**Note 3. Chapter 11 Cases**

***Voluntary Reorganization Under Chapter 11***

On the Petition Date, the Debtors filed the Bankruptcy Petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer the Chapter 11 Cases under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below) and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub (as defined below), its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 Cases and are classified as "non-Debtors".

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until

confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves a Debtor of performing its future obligations under such executory contract or unexpired leases but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtor's estate(s) for such damages. Generally, the assumption of an executory contract or unexpired lease requires a Debtor to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtors in this quarterly report, including where applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the

common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable, is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;
- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;
- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;
- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);
- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;
- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with a variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and
- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Liabilities Subject to Compromise***

The Company's condensed consolidated balance sheet includes amounts classified as "Liabilities subject to compromise," which represent prepetition liabilities that have been allowed, or that the Company anticipates will be allowed, as claims in its Chapter 11 Cases. The amounts represent the Company's current estimate of known or potential obligations to be resolved in connection with the Chapter 11 Cases. The differences between the liabilities the Company has estimated and the claims filed, or to be filed, will be investigated and resolved in connection with the claims resolution process. The Company will continue to evaluate these liabilities throughout the Chapter 11 Cases and adjust amounts as necessary. Such adjustments may be material.

The following table summarizes the components of liabilities subject to compromise included on the condensed consolidated balance sheet (in thousands):

| | September 30, 2019 |
|---|---|
| 7.75% Notes, due June 2021 | $ 600,000 |
| 6.125% Notes, due January 2023 | 1,150,000 |
| Credit Agreement[(1)] | 7,922 |
| 7.25% Senior Secured Notes, due February 2023 | 500,000 |
| Accounts payable | 22,349 |
| Other payables | 18,329 |
| Accrued interest payable | 65,371 |
| Other accrued expenses | 34,135 |
| Liabilities subject to compromise | $ 2,398,106 |

(1) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.

***Prepetition Restructuring Charges***

Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our consolidated statements of operations.

Prepetition restructuring charges, which primarily consisted of professional, consulting and legal fees related to the Chapter 11 Cases, were $18.2 million and $41.9 million for the three and nine months ended September 30, 2019, respectively. There were no prepetition restructuring charges for the three or nine months ended September 30, 2018.

***Reorganization Items***

The Company has incurred and is expected to continue to incur substantial costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statements of operations (in thousands):

| | Three and Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items(1) | $ 55,321 |

(1) Includes $9.5 million of cash paid for reorganization items.

***Interest Expense***

The Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date. The contractual interest on liabilities subject to compromise not reflected in the condensed consolidated statements of operations was approximately $21.1 million, representing interest expense from the Petition Date through September 30, 2019. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Debtor Financial Statements***

Condensed consolidated financial statements of the Debtors are set forth below. These condensed consolidated financial statements exclude the financial statements of the non-Debtors. Transactions and balances of receivables and payables between Debtors are eliminated in consolidation. However, the Debtors' condensed consolidated balance sheet includes receivables from and payables to related non-Debtors.

**Debtors[(1)]**
**Condensed Consolidated Balance Sheets (Unaudited)**
**(in thousands)**

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,959 | $ 194,723 |
| Oil and natural gas receivables | 42,778 | 55,083 |
| Joint interest billings receivables | 10,969 | 33,261 |
| Fair value of derivative instruments | 367 | 5,154 |
| Other current assets | 20,978 | 28,617 |
| Total current assets | 249,051 | 316,838 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 2,947,641 | 2,890,471 |
| Unproved oil and natural gas properties | 205,121 | 236,931 |
| Total oil and natural gas properties | 3,152,762 | 3,127,402 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,651,441) | (1,526,988) |
| Total oil and natural gas properties, net | 1,501,321 | 1,600,414 |
| Other assets: | | |
| Right of use assets, net | 280,139 | — |
| Investments | 4,921 | 9,384 |
| Investments in subsidiaries | 338,097 | 337,475 |
| Other assets | 31,631 | 45,524 |
| Total assets | $ 2,405,160 | $ 2,309,635 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Accounts payable - related entities | 7,745 | 8,707 |
| Other payables | 16,230 | 74,595 |
| Accrued liabilities: | | |
| Capital expenditures | 5,194 | 54,317 |
| Other | 46,909 | 87,656 |
| Fair value of derivative instruments | 700 | 307 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,962 | 75,581 |
| Total current liabilities | 282,606 | 333,545 |
| Long term debt, net of premium, discount and debt issuance costs | — | 2,213,223 |
| Asset retirement obligations | 34,456 | 32,432 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 2,889,159 | 2,600,607 |
| Stockholders' deficit: | | |
| Preferred stock | 31 | 53 |
| Common stock | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (1,856,742) | (1,659,333) |
| Total stockholders' deficit | (483,999) | (290,972) |
| Total liabilities and stockholders' deficit | $ 2,405,160 | $ 2,309,635 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors**[1]
**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **REVENUES:** | | | | |
| Oil sales | $ 69,597 | $ 113,183 | $ 242,064 | $ 323,019 |
| Natural gas liquid sales | 15,506 | 49,332 | 65,170 | 119,961 |
| Natural gas sales | 17,941 | 27,674 | 69,713 | 83,640 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 110,327 | 197,201 | 395,050 | 543,530 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 51,196 | 47,262 | 154,064 | 138,322 |
| Exploration expenses | 146 | 2,668 | 4,724 | 3,171 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 6,424 | 10,683 | 23,332 | 29,162 |
| Depreciation, depletion, amortization and accretion | 39,211 | 47,799 | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 9,597 | 3,103 | 18,206 | 3,543 |
| General and administrative expenses | 21,424 | 19,386 | 60,854 | 66,522 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 152,901 | 138,140 | 448,602 | 386,030 |
| Operating income (loss) | (42,574) | 59,061 | (53,552) | 157,500 |
| Other income (expense): | | | | |
| Interest income | 220 | 1,129 | 1,442 | 3,397 |
| Other income (expense) | (12,814) | (8,217) | (13,527) | 1,186 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (19,591) | (40,659) | (101,693) | (121,856) |
| Equity in net earnings of subsidiaries | 14,025 | 8,273 | 621 | 12,470 |
| Net (gains) losses on commodity derivatives | 2,774 | (13,989) | (10,748) | (88,429) |
| Total other expense | (15,386) | (53,463) | (123,905) | (191,704) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Net income (loss) before taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors**[1]
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 18,206 | 3,543 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 10,748 | 88,429 |
| Net cash settlements paid on commodity derivative contracts | (3,559) | (55,147) |
| (Gain) loss on other derivatives | (308) | 7,141 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Equity in net earnings of subsidiaries | (621) | (12,470) |
| Amortization of debt issuance costs | 5,386 | 9,859 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 35,686 | 75 |
| Accounts receivable - related entities | (962) | 9,259 |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 54,915 | 12,980 |
| Other current liabilities | (20,518) | (12,532) |
| Other assets and liabilities, net | 5,260 | (2,390) |
| Net cash provided by operating activities | 17,834 | 140,820 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (91,375) | (379,321) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Payments for purchases of other assets | (736) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,642 |
| Net cash used in investing activities | (86,912) | (383,827) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | — | (95,000) |
| Financing costs, including borrowings under DIP Facility | (9,410) | (12,484) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred dividends paid | — | (11,961) |
| Net cash provided by (used in) financing activities | 48,314 | 419,715 |
| (Decrease) increase in cash and cash equivalents | (20,764) | 176,708 |
| Cash and cash equivalents, beginning of period | 194,723 | 171,052 |
| Cash and cash equivalents, end of period | $ 173,959 | $ 347,760 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (each term as defined below). Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement (as defined below). See "—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of the Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 4. Revenue Recognition**

***Revenue from Contracts with Customers***

We account for revenue from contracts with customers in accordance with ASC 606. The unit of account in ASC 606 is a performance obligation, which is a promise in a contract to transfer to a customer either a distinct good or service (or bundle of goods or services) or a series of distinct goods or services provided over a period of time. ASC 606 requires that a contract's transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is to be allocated to each performance obligation in the contract based on relative standalone selling prices and recognized as revenue when (point in time) or as (over time) the performance obligation is satisfied.

*Disaggregation of Revenue*

We recognized revenue of $162.5 million and $277.7 million for the three months ended September 30, 2019 and 2018, respectively, and revenue of $574.4 million and $788.3 million for the nine months ended September 30, 2019 and 2018, respectively. We disaggregate revenue in our income statement based on product type, and we further disaggregate our revenue related to sales and marketing activities.

*Oil, Natural Gas and NGL Revenues*

We recognize revenue from the sale of oil, natural gas and NGLs in the period that the performance obligations are satisfied. Our performance obligations are primarily comprised of the delivery of oil, natural gas or NGLs at a delivery point. Each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable and represents a distinct performance obligation to which the transaction price is allocated. Performance obligations are satisfied at a point in time once control of the product has been transferred to the customer through delivery of oil, natural gas and NGLs.

*Sales and Marketing Revenue*

Beginning in 2018, we entered into commodity purchase transactions with certain third parties and then subsequently sold the purchased commodity as separate revenue streams. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. We retain control of the purchased hydrocarbons prior to delivery to the purchaser. The Company has concluded that we are the principal in these arrangements and therefore we recognize revenue on a gross basis as Sales and Marketing Revenues, with costs to purchase and transport the commodity presented as Sales and Marketing Expenses, in each case within our consolidated statement of operations. Contracts to sell the third-party hydrocarbons are the same contracts as those for which we sell our produced hydrocarbons, and as such, we do not recognize this revenue any differently than our oil, natural gas and NGL revenue discussed previously.

*Remaining Performance Obligations*

Several of our sales contracts contain multiple performance obligations as each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable. For these contracts, we have taken the optional exception under ASC 606-10-50-14A(b) which is available only for wholly unsatisfied performance obligations for which the criteria in ASC 606-10-32-40 have been met. Under this exception, neither estimation of variable consideration nor disclosure of the transaction price allocated to the remaining performance obligations is required. Revenue is alternatively recognized in the period that control of the commodity is transferred to the customer and the respective variable component of the total transaction price is resolved.

For forms of variable consideration that are not associated with a specific volume and thus do not meet the allocation exception, estimation is required. Examples of such variable consideration consist of deficiency payments, late payment fees, truck rejection charges, inflation adjustments and imbalance penalties; however, these items are immaterial to our condensed consolidated financial statements and/or have a low probability of occurrence. As significant reversals of revenue due to this variability are not probable, no estimation is required.

*Contract Balances*

Under our sales contracts, we invoice customers after our performance obligations have been satisfied, at which point payment is unconditional. Accordingly, our contracts do not give rise to contract assets or liabilities under ASC 606. At September 30, 2019 and December 31, 2018, our receivables from contracts with customers were $69.3 million and $87.2 million, respectively.

**Note 5. Cash and Cash Equivalents**

As of September 30, 2019 and December 31, 2018, cash and cash equivalents consisted of the following (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Cash at banks | $ 179,265 | $ 66,426 |
| Money market funds | 273 | 131,187 |
| Total cash and cash equivalents | $ 179,538 | $ 197,613 |

Our cash includes funds held in deposit accounts with highly rated banks, and our cash equivalents include funds held in stable and highly liquid money market accounts with major financial institutions.

**Note 6. Oil and Natural Gas Properties**

*Impairment of Oil and Natural Gas Properties* —The Company recorded a proved property impairment of $4.3 million during the nine months ended September 30, 2019. The Company did not record proved property impairments during the three months ended September 30, 2019 or the three and nine months ended September 30, 2018. Changes in

production rates, levels of reserves, future development costs, and other factors will impact the Company's actual impairment analyses in future periods.

*Unproved Properties*—The Company recorded impairment to our unproved oil and natural gas properties of $9.8 million and $18.6 million for the three and nine months ended September 30, 2019, respectively, and $3.1 million and $4.3 million for the three and nine months ended September 30, 2018, respectively, due to acreage expirations from changes in the development plan.

**Note 7. Debt**

As of September 30, 2019 and December 31, 2018, the Company's outstanding debt consisted of the following (in thousands):

| | Interest Rate | Maturity Date | September 30, 2019 | December 31, 2018 |
|---|---|---|---|---|
| **Short Term Debt:** | | | | |
| Debtor-in-possession financing[1] | Variable | June 11, 2020 | $ 50,000 | $ — |
| SR Credit Agreement[2][3] | Variable | - | $ — | $ 304 |
| Total short term debt | | | $ 50,000 | $ 304 |
| **Long Term Debt:** | | | | |
| 7.75% Notes | 7.75% | June 15, 2021 | $ 600,000 | $ 600,000 |
| SN UnSub Credit Agreement[2] | Variable | March 1, 2022 | 150,000 | 167,500 |
| 4.59% Non-Recourse Subsidiary Term Loan[2] | 4.59% | August 31, 2022 | 3,527 | 3,803 |
| SR Credit Agreement[2] | Variable | October 31, 2022 | 22,941 | 23,187 |
| 6.125% Notes | 6.125% | January 15, 2023 | 1,150,000 | 1,150,000 |
| Credit Agreement[4] | Variable | February 14, 2023[5] | 7,922 | — |
| 7.25% Senior Secured Notes | 7.25% | February 15, 2023[6] | 500,000 | 500,000 |
| | | | 2,434,390 | 2,444,490 |
| Unamortized discount on Additional 7.75% Notes[7] | | | — | (2,222) |
| Unamortized premium on Additional 6.125% Notes[7] | | | — | 1,090 |
| Unamortized discount on 7.25% Senior Secured Notes[7] | | | — | (4,241) |
| Unamortized debt issuance costs[7] | | | (9,512) | (43,709) |
| Total long term debt | | | 2,424,878 | 2,395,408 |
| Less liabilities subject to compromise[8] | | | (2,257,922) | — |
| Total long term debt not subject to compromise | | | $ 166,956 | $ 2,395,408 |

(1) Incurred interest at a weighted-average rate of approximately 10.1% for the postpetition period ended September 30, 2019.
(2) Represents debt instruments which are non-recourse to Sanchez Energy Corporation and its restricted subsidiaries.
(3) Incurred interest at a weighted-average rate of approximately 5.9% and 6.9% for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively.
(4) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.

(5) The Credit Agreement would mature on the earlier of (i) February 14, 2023 or (ii) the 91st day prior to the scheduled maturity of any "material indebtedness," which is defined to include, without limitation, any indebtedness arising in connection with the 7.75% Notes, 6.125% Notes or the 7.25% Senior Secured Notes. The 7.75% Notes would mature on June 15, 2021; therefore, the Credit Agreement would, as of September 30, 2019, mature on March 15, 2021.

(6) The 7.25% Senior Secured Notes would mature on February 15, 2023, unless on October 10, 2022 either (i) some or all of the 6.125% Notes are still outstanding and have not been defeased or (ii) there is outstanding indebtedness of Sanchez Energy Corporation or any of its restricted subsidiaries that was used to purchase, repurchase, redeem, defease or otherwise acquire or retire for value the 6.125% Notes, and such indebtedness under this clause (ii) has a final maturity date that is earlier than May 17, 2023, in which case of either clause (i) or clause (ii), the 7.25% Senior Secured Notes would mature on October 14, 2022.

(7) Approximately $30.4 million in net discounts, premiums and debt issuance costs were reclassified as reorganization items in connection with the filing of the Bankruptcy Petitions.

(8) The Company's 7.75% Notes, 6.125% Notes, Credit Agreement, and 7.25% Senior Secured Notes were classified as liabilities subject to compromise at September 30, 2019.

The components of interest expense are as follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Interest on SR Credit Agreement | $ (342) | $ (360) | $ (917) | $ (1,188) |
| Interest on Senior Notes | (17,704) | (38,296) | (94,299) | (110,158) |
| Interest and commitment fees on SN UnSub Credit Agreement | (1,952) | (2,131) | (6,383) | (6,634) |
| Interest on Non-Recourse Subsidiary Term Loan | (31) | (46) | (116) | (140) |
| Interest, commitment fees and letter of credit fees on Credit Agreement | (106) | (32) | (389) | (726) |
| Interest on DIP Facility | (600) | — | (600) | — |
| Amortization of debt issuance costs | (1,961) | (2,873) | (8,275) | (12,706) |
| Amortization of discounts and premium on Senior Notes | (188) | (416) | (1,019) | (1,112) |
| Total interest expense | $ (22,884) | $ (44,154) | $ (111,998) | $ (132,664) |

On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes to continue ongoing discussions with certain of its bondholders and other stakeholders regarding a restructuring transaction. The indenture governing the 6.125% Notes provided for a 30-day grace period, which expired on August 14, 2019, to make the scheduled interest payment before such non-payment constituted an event of default under the indenture, which would have entitled the trustee under such indenture or the holders of at least 25% in aggregate principal amount of the outstanding 6.125% Notes to accelerate the maturity thereof. Such event of default would have triggered events of default under the Company's indentures governing the 7.75% Notes, the 7.25% Senior Secured Notes and the Credit Agreement. The Debtors filed the Bankruptcy Petitions prior to expiration of the grace period. Further, the Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date.

***Credit Facilities***

*DIP Facility*

"—Note 3. Chapter 11 Cases" for information on the Company's DIP Facility.

*Third Amended and Restated Credit Agreement*

On February 14, 2018, the Company entered into a revolving credit facility, providing for a $25 million first-out senior secured working capital and letter of credit facility (the "Credit Agreement"), which amended and restated the Company's previous credit facility in its entirety.

On July 10, 2019, the Company borrowed the remaining $7.9 million available under the Credit Agreement. Additionally, on January 10, 2019, a standby letter of credit was issued on our behalf by the lender under the Credit Agreement in the amount of approximately $17.1 million. This letter of credit, as of September 30, 2019, remains

outstanding and is undrawn but is currently proposed to be cash collateralized subject to entry of the Final DIP Order. Further, subject to entry of the Final DIP Order, a portion of the proceeds from the DIP Facility will be used to pay off all $7.9 million of borrowings outstanding under the Credit Agreement and cash collateralize the approximate $17.1 million letter of credit issued under our Credit Agreement. The automatic stay under the Bankruptcy Code does not apply to letters of credit issued under the Credit Agreement and third-party beneficiaries may draw on the letter of credit if permitted by its terms.

The filing of the Bankruptcy Petitions also constituted an event of default which automatically accelerated the Company's obligations under the Credit Agreement. However, under the Bankruptcy Code, the lenders under the Credit Agreement are stayed from taking any action against the Company as a result of these defaults.

During the existence of an event of default and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement. In addition, as discussed above, subject to entry of the Final DIP Order, we anticipate paying off the borrowings outstanding under the Credit Agreement in full.

*SN UnSub Credit Agreement*

On March 1, 2017, SN UnSub entered into a credit agreement for a $500 million revolving credit facility with a maturity date of March 1, 2022 (the "SN UnSub Credit Agreement").

On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, SN UnSub would be required at its election to repay the deficiency within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement. Inability to do so would have a material adverse effect on SN UnSub's liquidity, financial condition and results of operations.

As of September 30, 2019, SN UnSub was in compliance with the covenants of the SN UnSub Credit Agreement.

*SR Credit Agreement*

In 2017, we acquired SR Acquisition I, LLC ("SRAI"). On November 16, 2018, SRAI's credit facility was amended and restated to convert the outstanding revolving loan to a term loan and extend the maturity date to October 31, 2022 (the "SR Credit Agreement"). As of September 30, 2019, there was approximately $22.9 million outstanding under the SR Credit Agreement, and SRAI was in compliance with the financial covenants of the SR Credit Agreement.

***Senior Notes***

*7.75% Senior Notes Due 2021*

On June 13, 2013, the Company completed a private offering of $400 million in aggregate principal amount of the 7.75% senior notes that would mature on June 15, 2021 (the "Original 7.75% Notes"). On September 18, 2013, we issued an additional $200 million in aggregate principal amount of our 7.75% senior notes due 2021 (the "Additional 7.75% Notes," and together with the Original 7.75% Notes, the "7.75% Notes") in a private offering at an issue price of 96.5% of the principal amount of the Additional 7.75% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.75% Notes. However, under the Bankruptcy Code, holders of the 7.75% Notes are stayed from taking any action against the Company as a result of the default.

*6.125% Senior Notes Due 2023*

On June 27, 2014, the Company completed a private offering of $850 million in aggregate principal amount of the 6.125% senior notes that would mature on January 15, 2023 (the "Original 6.125% Notes"). On September 12, 2014, we issued an additional $300 million in aggregate principal amount of our 6.125% senior notes due 2023 (the "Additional 6.125% Notes," and together with the Original 6.125% Notes, the "6.125% Notes," and together with the 7.75% Notes and the 7.25% Senior Secured Notes, the "Senior Notes") in a private offering at an issue price of 100.75% of the principal amount of the Additional 6.125% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 6.125% Notes. However, under the Bankruptcy Code, holders of the 6.125% Notes are stayed from taking any action against the Company as a result of the default.

*7.25% Senior Secured First Lien Notes due 2023*

On February 14, 2018, the Company completed a private offering to eligible purchasers of $500 million in aggregate principal amount of 7.25% senior secured first lien notes due 2023 (the "7.25% Senior Secured Notes") at an issue price of 99.0% of the principal amount.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.25% Senior Secured Notes. However, under the Bankruptcy Code, holders of the 7.25% Senior Secured Notes are stayed from taking any action against the Company as a result of the default.

**Note 8. Derivative Instruments**

Hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. As of September 30, 2019, all of our derivative contracts were with lenders, affiliates of lenders or other secured counterparties. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited.

The following table presents open derivative positions for the periods indicated as of September 30, 2019:

| | October 1 - December 31, 2019 | 2020 | 2021 |
|---|---|---|---|
| **Oil positions:** | | | |
| Fixed price swaps (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 580,000 | 1,105,860 | 650,400 |
| Average price ($/Bbl) | $ 52.41 | $ 55.29 | $ 54.23 |
| **Natural gas positions:** | | | |
| Fixed price swaps (NYMEX Henry Hub): | | | |
| Hedged volume (MMBtu) | 3,362,000 | 6,934,150 | 4,212,000 |
| Average price ($/MMBtu) | $ 2.87 | $ 2.67 | $ 2.56 |

The following table sets forth a reconciliation of the changes in fair value of the Company's commodity derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018 (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of commodity derivatives, beginning of period | $ 21,194 | $ (54,255) |
| Net losses on oil derivatives | (28,167) | (9,878) |
| Net gains (losses) on natural gas derivatives | 6,266 | (17,897) |
| Net settlements paid (received) on commodity derivative contracts: | | |
| Oil | 13,479 | 100,120 |
| Natural gas | (3,689) | 3,104 |
| Fair value of commodity derivatives, end of period | $ 9,083 | $ 21,194 |

*Embedded Derivatives:* In 2017, the Company entered into certain contracts for the purchase of sand and fractionation services that contain provisions that must be bifurcated from the contract and valued as derivatives. In the fourth quarter 2018, the Company amended certain of these contracts, removing the respective embedded derivative components, and as of September 30, 2019, all remaining embedded derivative contracts expired or had been terminated. The embedded derivatives were historically valued using a Monte Carlo simulation model which utilizes observable inputs, including the NYMEX WTI oil price and NYMEX Henry Hub natural gas price at various points in time. The Company marked these derivatives to market and, as a result, recorded a loss of approximately $1.1 million for the three months ended September 30, 2018. The Company did not record any gains or losses for the three months ended September 30, 2019 as the contracts had expired or terminated. For the nine months ended September 30, 2019 and 2018, the Company recorded a gain of approximately $0.3 million and a loss of $7.1 million, respectively. Any gains or losses related to embedded derivatives are recorded as a component of other income (expense) in the consolidated statement of operations.

*Earnout Derivative:* We are entitled to receive earnout payments from SNMP based on natural gas delivered above a threshold volume and a tariff at certain pipeline delivery points. These payments were deemed to be a derivative. The resulting earnout derivative was valued through the use of a Monte Carlo simulation model which utilized observable inputs, such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios. For the nine months ended September 30, 2019, the Company recorded an immaterial net gain due to settlement gains, which were partially offset by mark-to-market losses. The Company did not record any gains or losses for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded approximate net gains of $0.4 million and $1.9 million, respectively, primarily related to mark-to-market gains. Any gains or losses related to the earnout derivative are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

The following table sets forth a reconciliation of the changes in fair value of the Company's embedded and earnout derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of other derivatives, beginning of period | $ 5,550 | $ (1,551) |
| Gain on embedded derivatives | 308 | 1,243 |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Fair value of other derivatives, end of period | $ 5,826 | $ 5,550 |

***Balance Sheet Presentation***

The Company nets derivative assets and liabilities by commodity for counterparties where a legal right to such netting exists. Therefore, the Company's derivatives are presented on a net basis as "Fair value of derivative instruments" on the condensed consolidated balance sheets. The following information summarizes the gross fair values

of derivative instruments, presenting the impact of offsetting derivative assets and liabilities on the Company's consolidated balance sheets (in thousands):

| | September 30, 2019 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 6,389 | $ (126) | $ 6,263 |
| Long term asset | 9,361 | (15) | 9,346 |
| Total asset | $ 15,750 | $ (141) | $ 15,609 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 826 | $ (126) | $ 700 |
| Long term liability | 15 | (15) | — |
| Total liability | $ 841 | $ (141) | $ 700 |

| | December 31, 2018 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 16,302 | $ (588) | $ 15,714 |
| Long term asset | 12,178 | (76) | 12,102 |
| Total asset | $ 28,480 | $ (664) | $ 27,816 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 1,294 | $ (588) | $ 706 |
| Long term liability | 442 | (76) | 366 |
| Total liability | $ 1,736 | $ (664) | $ 1,072 |

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 9. Investments**

A subsidiary of the Company owns 1,500,000 shares of Class A Common Stock of Lonestar Resources US Inc. ("Lonestar"). As of September 30, 2019, we believe this ownership represents approximately 6% of Lonestar's outstanding shares of common stock. The Company accounts for the investment in Lonestar as an investment in equity securities measured at fair value in the condensed consolidated balance sheets at the end of each reporting period. The Company recorded a gain of $0.6 million and a loss of $1.4 million related to the investment in Lonestar for the three and nine months ended September 30, 2019, respectively, and the Company recorded a loss of $1.0 million and a gain of $5.7 million related to the investment in Lonestar for the three and nine months ended September 30, 2018, respectively. Any gains or losses related to the investment in Lonestar are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

A subsidiary of the Company owns 100 Class A Units of Gavilan Resources Holdco, LLC ("GRHL"). Tranches representing 20% of the Class A Units vest on each of the first five anniversaries from March 1, 2017. The Class A Units are entitled to distributions from Available Cash, as defined in and subject to the provisions of the GRHL amended and restated limited liability company agreement. The Company accounts for the investment in GRHL as a cost method

investment. As of September 30, 2019, the carrying value of the investment in GRHL was $7.3 million. The Company did not record any earnings or distributions from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019.

A subsidiary of the Company owns 2,272,727 common units of SNMP. As of September 30, 2019, we believe this ownership represents approximately 11.3% of SNMP's outstanding common units. The Company elected the fair value option to account for its interest in SNMP and records the equity investment at fair value at the end of each reporting period. For the three and nine months ended September 30, 2019, the Company recorded losses of $4.3 million and $3.1 million, respectively, related to the investment in SNMP. In addition, for the nine months ended September 30, 2019, the Company recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units. The Company did not record any dividend income from quarterly distributions on the SNMP common units for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded losses related to the investment in SNMP of approximately $10.7 million and $9.1 million, respectively. Further, for the three and nine months ended September 30, 2018, we recorded dividend income of approximately $1.0 million and $3.2 million, respectively. Any gains or losses and dividend income related to the investment in SNMP are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

**Note 10. Fair Value of Financial Instruments**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

***Fair Value on a Recurring Basis***

The following tables set forth, by level within the fair value hierarchy, the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of September 30, 2019 and December 31, 2018 (in thousands):

| | As of September 30, 2019 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 273 | $ — | $ — | $ 273 |
| *Equity investments:* | | | | |
| Investment in SNMP | 841 | — | — | 841 |
| Investment in Lonestar | 4,080 | — | — | 4,080 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 5,919 | — | 5,919 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 3,164 | — | 3,164 |
| *Other:* | | | | |
| Earnout derivative asset | — | — | 5,826 | 5,826 |
| Total | $ 5,194 | $ 9,083 | $ 5,826 | $ 20,103 |

| | As of December 31, 2018 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 131,187 | $ — | $ — | $ 131,187 |
| *Equity investments:* | | | | |
| Investment in SNMP | 3,909 | — | — | 3,909 |
| Investment in Lonestar | 5,475 | — | — | 5,475 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 20,608 | — | 20,608 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 586 | — | 586 |
| *Other:* | | | | |
| Embedded derivative instruments | — | (308) | — | (308) |
| Earnout derivative asset | — | — | 5,858 | 5,858 |
| Total | $ 140,571 | $ 20,886 | $ 5,858 | $ 167,315 |

(1) Level 1 measurements are fair value measurements which use quoted market prices (unadjusted) in active markets for identical assets or liabilities. We use Level 1 inputs when available, as Level 1 inputs generally provide the most reliable evidence of fair value.

(2) Level 2 measurements are fair value measurements which use inputs, other than quoted prices included within Level 1, which are observable for the asset or liability, either directly or indirectly.

(3) Level 3 measurements are fair value measurements which use unobservable inputs and require management to make certain assumptions in the determination of value.

*Financial Instruments*: The Level 1 instruments presented in the tables above consist of money market funds and time deposits included in cash and cash equivalents on the Company's condensed consolidated balance sheets at September 30, 2019 and December 31, 2018. The Company's money market funds and time deposits represent cash equivalents held with banks and financial institutions. The Company identified the money market funds and time deposits as Level 1 instruments, as money market funds have daily liquidity, there are active markets for the underlying investments and quoted prices for the underlying investments can be obtained. In addition, the Level 1 instruments include the Company's equity investments in SNMP and Lonestar which are publicly traded companies.

The Company's commodity derivative instruments consist of swaps as of September 30, 2019 and December 31, 2018 as shown in the table above. The fair values of the Company's derivatives are based on third-party pricing models which utilize inputs that are either readily available in the public market, such as forward curves, or can be corroborated from active markets of broker quotes, and therefore are classified as Level 2. Derivative instruments are also subject to the risk that counterparties will be unable to meet their obligations. Such non-performance risk is considered in the valuation of the Company's derivative instruments, but to date has not had a material impact on estimates of fair values. Significant changes in the quoted forward prices for commodities and changes in market volatility generally lead to corresponding changes in the fair value measurement of the Company's derivative instruments.

There were no commodity derivative instruments classified as Level 3 as of September 30, 2019 or December 31, 2018.

*Embedded Derivatives:* The Company believes that substantially all of the inputs required to calculate the embedded derivatives are observable in the marketplace throughout the term of these derivative instruments or supported by observable levels at which transactions are executed in the marketplace, and are, therefore, classified as Level 2 inputs.

*Earnout Derivative:* These payments were deemed to be a derivative which utilize observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios.

The following table sets forth a reconciliation of changes in the fair value of the Company's earnout derivative instruments classified as Level 3 in the fair value hierarchy (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Beginning balance | $ 5,858 | $ — |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Ending balance | $ 5,826 | $ 5,858 |

***Fair Value on a Non-Recurring Basis***

In connection with the voluntary conversions by certain holders of shares of the Company's 4.875% Convertible Perpetual Preferred Stock, Series A (the "Series A Preferred Stock") and 6.500% Convertible Perpetual Preferred Stock, Series B (the "Series B Preferred Stock") into shares of the Company's common stock in February, March, June, July and September 2019, the Company issued common stock according to the conversion rate established by the Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. The fair value of the common stock issued is based on the price of the Company's common stock on the date of issuance. There were no conversions of Series A Preferred Stock or Series B Preferred Stock into shares of the Company's common stock during the nine months ended September 30, 2018. As there is an active market for the Company's common stock, the Company has designated this fair value measurement as Level 1. For further information, see "—Note 14. Stockholders' and Mezzanine Equity."

The Company recorded proved property impairments of $4.3 million and $6.6 million during the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively, related to oil and natural gas properties in the TMS. The carrying value of the impaired proved properties was reduced to a fair value of $11.0 million and $10.5 million for the nine months ended September 30, 2019 and year ended December 31, 2018, respectively, estimated using inputs characteristic of a Level 3 fair value measurement.

***Fair Value of Other Financial Instruments***

The carrying amounts of our oil and natural gas receivables, accounts payable not subject to compromise and accrued liabilities approximate fair value due to their highly liquid nature. The registered 7.75% Notes and 6.125% Notes are traded in an active market, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair values of the 7.75% Notes and 6.125% Notes were $37.8 million and $74.1 million, respectively, and were calculated using quoted market prices based on trades of such debt as of that date. The 7.25% Senior Secured Notes are traded in an active market under Rule 144A by institutional investors, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair value of the 7.25% Senior Secured Notes was $369.3 million and was calculated using quoted market prices based on observed trades of such debt as of that date.

We believe that the carrying values of long term debt for the Credit Agreement, SN UnSub Credit Agreement and SR Credit Agreement approximate their fair values because the interest rates on the debt approximate market interest rates for debt with similar terms. These debts are classified as Level 2 inputs in the fair value hierarchy and represent the amounts at which the instruments could be valued in an exchange during a current transaction between willing parties.

**Note 11. Asset Retirement Obligations**

The changes in the asset retirement obligation for the nine months ended September 30, 2019 and the year ended December 31, 2018 were as follows (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Abandonment liability, beginning of period | $ 46,175 | $ 36,098 |
| Liabilities incurred during period | 275 | 1,965 |
| Divestitures | (147) | (158) |
| Revisions | — | 5,077 |
| Accretion expense | 2,879 | 3,193 |
| Abandonment liability, end of period | $ 49,183 | $ 46,175 |

**Note 12. Related Party Transactions**

*Sanchez Oil and Gas Corporation*

Expenses allocated to the Company from SOG for G&A expenses and oil and natural gas production expenses for the three months ended September 30, 2019 and 2018 were $17.3 million and $15.3 million, respectively, and expenses allocated to the Company for G&A expenses and oil and natural gas production expenses for the nine months ended September 30, 2019 and 2018 were $52.6 million and $48.8 million, respectively.

As of September 30, 2019 and December 31, 2018, the Company had a net receivable from SOG and its affiliates of $10.2 million and $6.1 million, respectively, which is reflected as "Accounts receivable—related entities" in the condensed consolidated balance sheets. The net receivable as of September 30, 2019 and December 31, 2018 consists primarily of advances related to G&A expenses and other costs paid to SOG in the ordinary course.

*Sanchez Midstream Partners*

As of September 30, 2019 and December 31, 2018, the Company had a net payable to SNMP of approximately $3.8 million and $6.1 million, respectively, that consists primarily of fees associated with oil and natural gas gathering and transportation services.

**Note 13. Accrued Liabilities and Other Current Liabilities**

The following information summarizes accrued liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Capital expenditures | $ 7,232 | $ 61,970 |
| Other: | | |
| General and administrative expenses | 20,635 | 19,460 |
| Production taxes | 2,483 | 5,157 |
| Ad valorem taxes | 6,655 | 445 |
| Lease operating expenses | 34,782 | 24,138 |
| Interest payable | 376 | 47,866 |
| Other accrued liabilities | 1,367 | 5,662 |
| Total accrued liabilities | $ 73,530 | $ 164,698 |

The following information summarizes other payables as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Revenue payable | $ 14,963 | $ 71,296 |
| Production tax payable | 448 | 3,443 |
| Other | 1,328 | (111) |
| Total other payables | $ 16,739 | $ 74,628 |

The following information summarizes other current liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Operated prepayment liability | $ 31,921 | $ 51,844 |
| Deferred gain on Western Catarina Midstream Divestiture - short term | — | 23,720 |
| Phantom compensation payable - short term | 40 | 17 |
| Total other current liabilities | $ 31,961 | $ 75,581 |

**Note 14. Stockholders' and Mezzanine Equity**

*Series A Preferred Stock*

Each share of Series A Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.325 shares of common stock per share of Series A Preferred Stock (which is equal to an initial conversion price of $21.51 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 1,440,343 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series A Preferred Stock.

The annual dividend on each share of Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock.

*Series B Preferred Stock*

Each share of Series B Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock (which is equal to an initial conversion price of $21.40 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 5,763,071 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series B Preferred Stock.

The annual dividend on each share of Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series B Preferred Stock.

*Preferred Stock Conversions*

On February 12, 2019, 72,500 shares of Series A Preferred Stock converted into 168,563 shares of our common stock and 245,832 shares of Series B Preferred Stock converted into 574,510 shares of our common stock at the election of the holders thereof. From March 6 to March 8, 2019, 563,832 shares of Series A Preferred Stock converted into 1,310,914 shares of our common stock and 770,986 shares of Series B Preferred Stock converted into 1,801,798 shares of our common stock, at the election of the holders thereof. On March 26, 2019, 422,222 shares of Series A Preferred Stock converted into 981,667 shares of our common stock, at the election of the holders thereof. As of June 14, 2019, 155,929 shares of Series A Preferred Stock converted into 362,535 shares of our common stock, at the election of the holders thereof. On July 29, 2019, 5,000 shares of Series A Preferred Stock converted into 11,625 shares of our common stock, at the election of the holder thereof. On September 30, 2019, 45,000 shares of Series B Preferred Stock converted into 105,165 shares of our common stock, at the election of the holder thereof.

Through the conversions, each of the holders effectively waived their rights to any accrued and unpaid dividends thereon under the conversion terms set forth in Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. As a result, the Company has reduced its quarterly dividend accruals on its Series A Preferred Stock and Series B Preferred Stock by approximately $1.6 million as compared to the amount that would have been payable based on the number of shares outstanding prior to these conversions.

*SN UnSub Preferred Unit Issuance*

On March 1, 2017, the Company, through two of its subsidiaries, SN UnSub and SN Maverick, along with Gavilan Resources, LLC (“Gavilan”), an entity controlled by The Blackstone Group Inc., completed the acquisition of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing an approximate 49% average working interest therein (the “Comanche Assets,” with such acquisition, the “Comanche Acquisition”).

At the closing of the Comanche Acquisition, certain funds managed or advised by GSO Capital Partners L.P. (“GSO”) purchased 485,000 preferred units of SN UnSub and Intrepid Private Equity V-A LLC purchased 15,000 preferred units of SN UnSub (in aggregate, the “SN UnSub Preferred Units”). The SN UnSub Preferred Units are accounted for as mezzanine equity in the condensed consolidated balance sheet consisting of the following as of September 30, 2019 and December 31, 2018, respectively, (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Mezzanine equity, beginning balance | $ 452,828 | $ 427,512 |
| Accretion of discount | 22,029 | 25,316 |
| Dividends accrued | 37,500 | 50,000 |
| Dividends prepaid [(1)] | — | (2,592) |
| Dividends/distributions paid [(1)] | (37,500) | (47,408) |
| Mezzanine equity, ending balance | $ 474,857 | $ 452,828 |

(1) In 2017, tax distributions of approximately $2.6 million were paid in excess of the accrued dividend. The excess distribution was offset against a portion of the dividend accrued during the three months ended March 31, 2018.

*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net loss per share for the three and nine months ended September 30, 2019 and 2018 (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic and dilutive net loss per share[(1)(2)] | 97,395 | 82,073 | 95,272 | 81,597 |
| **Net loss per common share - basic and diluted** | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |

(1) The three and nine months ended September 30, 2018 exclude 1,840,007 and 2,591,553 shares, respectively, of weighted average restricted stock and 12,520,179 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

(2) The three and nine months ended September 30, 2019 exclude 433,369 and 942,551 shares, respectively, of weighted average restricted stock and 7,306,402 and 8,757,574 shares, respectively, of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

**Note 15. Stock-Based Compensation**

The Company’s Third Amended and Restated Long Term Incentive Plan (the “LTIP”) allows for grants of stock options, stock appreciation rights, restricted shares, phantom stock, other stock based awards or stock awards, or any combination thereof.

Effective January 1, 2019, the Company records stock-based compensation expense for awards granted in accordance with the provisions of ASU 2018-07 “Compensation - Stock Compensation (ASC 718) - Improvements to Nonemployee Share-Based Payment Accounting,” which expands the scope of ASC 718, “Compensation – Stock Compensation,” to include share-based payment transactions for acquiring goods and services from nonemployees. Pursuant to this standard, stock-based compensation expense is based on the grant-date fair value of our stock awards and is recognized over the vesting period using the straight-line method. As a result of our adoption of ASU 2018-07, the Company remeasured the value of our outstanding unvested awards as of January 1, 2019. This did not have a material impact on our financial statements.

During the three and nine months ended September 30, 2019, the Company did not issue any shares of restricted common stock pursuant to the LTIP.

During the three months ended September 30, 2019, the Company did not issue any shares of phantom stock pursuant to the LTIP. During the nine months ended September 30, 2019, the Company issued an immaterial number of shares of phantom stock pursuant to the LTIP to certain employees of SOG, with whom the Company has a services agreement. These shares of phantom stock vest in equal annual amounts over a three year period.

For the 2018 performance period applicable to our performance phantom stock awards granted in 2017 (the “Performance Awards”), 0% of the target shares were awarded.

For the 2018 performance period applicable to our cash-settled performance-based phantom stock awards and stock-settled performance-based phantom stock awards granted in 2018 (together, the "PBPS Awards"), 71% of the target shares were awarded, equating to 419,430 cash-settled awards and 419,430 stock-settled awards. Stock-based compensation expense for these awards was calculated in accordance with ASC 718 and is being amortized over the vesting period.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Restricted stock awards, directors | $ — | $ 305 | $ 42 | $ 932 |
| Restricted stock awards, non-employees | 45 | (862) | 270 | 1,957 |
| Performance awards | 51 | (842) | 83 | (12) |
| Phantom stock awards | (101) | (2,652) | (40) | 1,467 |
| Total stock-based compensation expense | $ (5) | $ (4,051) | $ 355 | $ 4,344 |

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was approximately $0.3 million of unrecognized compensation cost related to the non-vested restricted shares outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated restricted stock outstanding. The cost is expected to be recognized over an average period of approximately 1.5 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated phantom stock ("PAPS") and phantom stock outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the estimated per share price of the common stock underlying the Performance Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the Performance Awards. The cost is estimated to be recognized over a weighted average period of approximately 2.3 years.

Based on the estimated per share price of the common stock underlying the PBPS Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the PBPS Awards. The cost is estimated to be recognized over a weighted average period of approximately 1.1 years.

A summary of the status of the non-vested restricted shares for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested common stock, beginning of period | 2,714 | 5,767 | 5,024 | 4,897 |
| Granted | — | 146 | — | 3,303 |
| Vested | (51) | (59) | (2,164) | (2,218) |
| Forfeited | (24) | (414) | (221) | (542) |
| Non-vested common stock, end of period | 2,639 | 5,440 | 2,639 | 5,440 |

As of September 30, 2019, approximately 8.4 million shares remained available for future issuance to participants under the LTIP.

A summary of the status of the non-vested phantom stock and PAPS for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested phantom stock and PAPS, beginning of period | 2,857 | 5,888 | 5,125 | 3,589 |
| Granted | — | 253 | 7 | 3,905 |
| Vested | (60) | (46) | (1,874) | (1,197) |
| Forfeited | (58) | (465) | (519) | (667) |
| Non-vested phantom stock and PAPS, end of period | 2,739 | 5,630 | 2,739 | 5,630 |

**Note 16. Income Taxes**

The Company used a year-to-date effective tax rate method for recording income taxes for the nine month periods ended September 30, 2019 and 2018. This method is based on our determination at September 30, 2019 and 2018 that due to our valuation allowance position, the income tax provision does not materially change by using a year-to-date effective tax rate method as compared to an estimated full year annual effective tax rate method. Further, for the period ended September 30, 2018, a small change in our estimated ordinary income could have resulted in a large change in the estimated annual effective tax rate. We will use this year-to-date effective tax rate method each quarter until such time a return to the annualized effective tax rate method is deemed material or appropriate.

The Company's effective tax rate for the nine months ended September 30, 2019 and 2018 was approximately 0% and 0%, respectively. The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 21% and the Company's effective tax rates is related to the valuation allowance on deferred tax assets.

The Company provides for deferred income taxes on the difference between the tax basis of an asset or liability and its carrying amount in the financial statements in accordance with authoritative guidance for accounting for income taxes. This difference will result in taxable income or deductions in future years when the reported amount of the asset or liability is recovered or settled, respectively. In recording deferred income tax assets, the Company considers whether it is more likely than not that some portion or all of the deferred income tax assets will be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those deferred income tax assets would be deductible. The Company believes that after considering all the available objective evidence, both positive and negative, historical and prospective, with greater weight given to historical evidence, management is not able to determine that it is more likely than not that the deferred tax assets will be realized and, therefore, has established a valuation allowance to reduce the deferred tax assets as of September 30, 2019. The Company will continue to assess the valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

At September 30, 2019, the Company had no material uncertain tax positions.

**Note 17. Commitments and Contingencies**

*Stockholder Derivative Litigation*

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain of the Company's directors (Armato et al. v. A.R. Sanchez, Jr. et al., No. 2018-0642, the "Derivative Action"). The complaint alleges breach of fiduciary duty, unjust enrichment and waste of corporate assets against directors of the Company based on purportedly excessive compensation of the Company's non-employee directors. On October 22, 2018, the Company and defendant directors filed an answer to the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. On August 16, 2019 a suggestion of bankruptcy was filed in the Derivative Action by the Company, and there has been no activity in the case since that time. Given the status and the preliminary state of the Derivative Action, the Company is unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution. The complaint does not specify damages sought.

From time to time, the Company may be involved in lawsuits or other legal proceedings that arise in the normal course of its business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

*Catarina Drilling Commitment*

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. The lease also creates a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. During the commitment period ending June 30, 2019, the Company drilled 13 wells that may be counted toward the next annual drilling commitment period, which began on July 1, 2019. Furthermore, our 2019 capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

*Comanche Drilling Commitment*

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we and Gavilan are jointly and severally liable for a default fee of $0.2 million for each well we do not timely complete and equip. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position.

*Palmetto Drilling Commitment*

Marathon Oil EF LLC ("Marathon") is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

*Volume Commitments*

As is common in our industry, the Company is party to certain oil and natural gas gathering and transportation and natural gas processing agreements that obligate us to deliver a specified volume of production over a defined time horizon. If not fulfilled, the Company is subject to deficiency payments to our midstream counterparties. As of September 30, 2019, the Company had approximately $406.3 million in future commitments related to oil and natural gas gathering and transportation agreements ($140.6 million for 2019 through 2021, $128.8 million from 2022 through 2024, and $136.9 million under commitments expiring after December 31, 2024, in the aggregate) and approximately $40.5 million in future commitments related to natural gas processing agreements ($39.8 million for 2019 through 2021,

and $0.7 million from 2022 through 2024, in the aggregate) that are not recorded in the accompanying condensed consolidated balance sheets.

For the three and nine months ended September 30, 2019, the Company incurred expenses related to deficiency fees of approximately $3.6 million and $7.5 million, respectively, and for the three and nine months ended September 30, 2018, the Company incurred expenses related to deficiency fees of approximately $1.6 million and $3.8 million, respectively. These expenses are reported on the condensed consolidated statements of operations in the “Oil and natural gas production expenses” line item. We expect to incur additional expenses related to our volume commitments in connection with our reduced capital activity.

*Loss Contingencies*

To the extent we are able to assess the likelihood of a negative outcome for a contingency, whether it be the loss or impairment of an asset or the incurrence of a liability, our assessments of such likelihood range from remote to probable. If we determine that a negative outcome is probable and the amount of loss is reasonably estimable, we accrue an undiscounted liability equal to the estimated amount. If a range of probable loss amounts can be reasonably estimated and no amount within the range is a better estimate than any other amount, then we accrue an undiscounted liability equal to the minimum amount in the range. In addition, we estimate legal fees that we expect to incur associated with loss contingencies and accrue those costs when they are material and probable of being incurred.

We do not record a contingent liability when the likelihood of loss is probable but the amount cannot be reasonably estimated or when the likelihood of loss is believed to be only reasonably possible or remote. For contingencies where an unfavorable outcome is reasonably possible and the impact would be material to our consolidated financial statements, we disclose the nature of the contingency and, where feasible, an estimate of the possible loss or range of loss.

For the three and nine months ended September 30, 2019, we recorded a loss on impairment of a prepaid asset of $11.8 million.

*Other Commitments and Contingencies*

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business, notwithstanding the filing of the Bankruptcy Petitions. In addition, the filing of the Bankruptcy Petitions may allow the Company to assume, assign or reject certain commitments as executory contracts. See “—Note 3. Chapter 11 Cases” for additional information.

**Note 18. Condensed Consolidating Financial Information**

The Company’s 7.75% Notes and 6.125% Notes have been registered with the SEC and are guaranteed by all of the Company’s subsidiaries, except for SN UR Holdings, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN UnSub GP, SN UnSub Holdings, SN UnSub, SN Capital, LLC, Sanchez Resources, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC and SR TMS, LLC which are unrestricted subsidiaries of the Company. As of September 30, 2019 such guarantor subsidiaries were 100% owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

Rule 3-10 of Regulation S-X requires that, in lieu of providing separate financial statements for subsidiary guarantors, condensed consolidating financial information be provided where the subsidiaries have guaranteed the debt of a registered security, where the guarantees are full, unconditional and joint and several and where the voting interest of the subsidiaries are 100% owned by the registrant.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiary guarantors to distribute funds to the Company by dividends or loans.

The following is a presentation of condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) in

accordance with Rule 3-10 of Regulation S-X and should be read in conjunction with the condensed consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

The guarantor subsidiaries, along with non-guarantor subsidiary SN UR Holdings, LLC in addition to Sanchez Energy Corporation, constitute Debtors in the Chapter 11 Cases. Although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code. See "—Note 3. Chapter 11 Cases" and "—Note 7. Debt" for additional information.

A summary of the condensed consolidated guarantor balance sheets as of September 30, 2019 and December 31, 2018 is presented below (in thousands):

| | September 30, 2019 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 243,889 | $ 122,817 | $ 106,561 | $ (172,357) | $ 300,910 |
| Total oil and natural gas properties, net | 60 | 1,498,844 | 717,321 | — | 2,216,225 |
| Investment in subsidiaries | 1,609,093 | — | (7,278) | (1,601,815) | — |
| Other assets | 52,146 | 259,623 | 33,906 | — | 345,675 |
| **Total Assets** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 77,254 | $ 202,889 | $ 189,010 | $ (172,357) | $ 296,796 |
| Long term liabilities | 2,370,695 | 235,861 | 181,680 | — | 2,788,236 |
| Mezzanine equity | — | — | 474,857 | — | 474,857 |
| Total stockholders' equity (deficit) | (542,761) | 1,442,534 | 4,963 | (1,601,815) | (697,079) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |

| | December 31, 2018 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 473,062 | $ 69,934 | $ 146,765 | $ (316,780) | $ 372,981 |
| Total oil and natural gas properties, net | 36 | 1,600,378 | 758,711 | — | 2,359,125 |
| Investment in subsidiaries | 1,577,054 | — | (7,280) | (1,569,774) | — |
| Other assets | 22,917 | 10,307 | 54,630 | — | 87,854 |
| **Total Assets** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 155,396 | $ 282,719 | $ 226,964 | $ (316,780) | $ 348,299 |
| Long term liabilities | 2,203,546 | 51,211 | 208,599 | — | 2,463,356 |
| Mezzanine equity | — | — | 452,828 | — | 452,828 |
| Total stockholders' equity (deficit) | (285,873) | 1,346,689 | 64,435 | (1,569,774) | (444,523) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |

A summary of the condensed consolidated guarantor statements of operations for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total revenues | $ — | $ 110,327 | $ 52,219 | $ — | $ 162,546 |
| Total operating costs and expenses | (35,928) | (116,966) | (45,410) | 90 | (198,214) |
| Other income (expense) | (27,494) | 1,533 | 3,759 | (90) | (22,292) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (118,743) | (5,106) | 10,568 | — | (113,281) |
| | | | | | |
| Income tax benefit | (833) | — | — | — | (833) |
| Equity in income (loss) of subsidiaries | 5,462 | — | — | (5,462) | — |
| **Net income (loss)** | $ (112,448) | $ (5,106) | $ 10,568 | $ (5,462) | $ (112,448) |

| | Three Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total revenues | $ — | $ 197,203 | $ 80,507 | $ — | $ 277,710 |
| Total operating costs and expenses | (16,717) | (126,573) | (49,969) | 134 | (193,125) |
| Other income (expense) | (52,165) | 794 | (27,482) | (134) | (78,987) |
| **Income (loss) before income taxes** | (68,882) | 71,424 | 3,056 | — | 5,598 |
| | | | | | |
| Equity in income (loss) of subsidiaries | 74,480 | — | — | (74,480) | — |
| **Net income (loss)** | $ 5,598 | $ 71,424 | $ 3,056 | $ (74,480) | $ 5,598 |

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 395,050 | $ 179,300 | $ — | $ 574,350 |
| Total operating costs and expenses | (90,587) | (358,005) | (158,412) | 360 | (606,644) |
| Other income (expense) | (123,907) | 2,188 | (23,084) | (360) | (145,163) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (269,815) | 39,233 | (2,196) | — | (232,778) |
| Income tax benefit | (23) | — | — | — | (23) |
| Equity in income (loss) of subsidiaries | 37,037 | — | — | (37,037) | — |
| **Net income (loss)** | $ (232,755) | $ 39,233 | $ (2,196) | $ (37,037) | $ (232,755) |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 543,529 | $ 244,722 | $ — | $ 788,251 |
| Total operating costs and expenses | (56,967) | (334,408) | (163,833) | 406 | (554,802) |
| Other income (expense) | (200,124) | (4,469) | (62,654) | (406) | (267,653) |
| **Income (loss) before income taxes** | (257,091) | 204,652 | 18,235 | — | (34,204) |
| Equity in income (loss) of subsidiaries | 222,887 | — | — | (222,887) | — |
| **Net income (loss)** | $ (34,204) | $ 204,652 | $ 18,235 | $ (222,887) | $ (34,204) |

A summary of the condensed consolidated guarantor statements of cash flows for the nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (166,502) | $ 233,600 | $ 32,652 | $ — | $ 99,750 |
| Net cash provided by (used in) investing activities | 109,510 | (81,169) | (34,665) | (103,893) | (110,217) |
| Net cash provided by (used in) financing activities | 48,315 | (159,599) | (217) | 103,893 | (7,608) |
| **Net increase (decrease) in cash and cash equivalents** | (8,677) | (7,168) | (2,230) | — | (18,075) |
| **Cash and cash equivalents, beginning of period** | 68,762 | 58,429 | 70,422 | — | 197,613 |
| **Cash and cash equivalents, end of period** | $ 60,085 | $ 51,261 | $ 68,192 | $ — | $ 179,538 |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (175,586) | $ 326,068 | $ 99,044 | $ — | $ 249,526 |
| Net cash provided by (used in) investing activities | (136,290) | (396,492) | (58,365) | 137,325 | (453,822) |
| Net cash provided by (used in) financing activities | 419,714 | 128,026 | (21,881) | (137,325) | 388,534 |
| **Net increase (decrease) in cash and cash equivalents** | 107,838 | 57,602 | 18,798 | — | 184,238 |
| **Cash and cash equivalents, beginning of period** | 86,937 | 29,046 | 68,451 | — | 184,434 |
| **Cash and cash equivalents, end of period** | $ 194,775 | $ 86,648 | $ 87,249 | $ — | $ 368,672 |

**Note 19. Variable Interest Entities ("VIE")**

The Company's investment in GRHL represents a VIE that could expose the Company to losses limited to the estimated fair value of the investment. The carrying amounts of the investment in GRHL, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was in each case approximately $7.3 million. The Company did not record any earnings from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019. The Company determined that Blackstone is the primary beneficiary of the VIE as the Company has no significant voting rights in GRHL under the LLC Agreement and no power over decisions related to the business activities of GRHL, other than operation of the properties.

The Company's investment in SNMP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time. The carrying amounts of the investment in SNMP, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was approximately $0.8 million and $3.9 million, respectively.

Below is a comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Beginning balance | $ 11,189 | $ 32,507 |
| Gain (loss) from change in fair value of investment in SNMP | (3,068) | (21,318) |
| Maximum exposure to loss | $ 8,121 | $ 11,189 |

**Note 20. Leases**

We determine if an arrangement is a lease at inception. To the extent that we determine an arrangement represents a lease, we classify that lease as an operating lease or a finance lease. We currently do not have any finance leases. We capitalize our operating leases on our consolidated balance sheet through a ROU asset and a corresponding lease liability. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Short term leases that have an initial term of one year or less are not capitalized but are disclosed below. Short term lease costs exclude expenses related to leases with a lease term of one month or less.

Our operating leases are reflected as operating lease ROU assets, short term operating lease liabilities and long term operating lease liabilities on our consolidated balance sheet. Operating lease ROU assets and liabilities are recognized at the commencement date of an arrangement based on the present value of lease payments over the lease term. In addition to the present value of lease payments, the operating lease ROU asset also includes any lease payments

made to the lessor prior to lease commencement less any lease incentives and initial direct costs incurred. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term.

***Nature of Leases***

We lease property including corporate and field offices and facilities, vehicles, field equipment, and midstream gathering and processing facilities to support our operations. A more detailed description of our significant lease types is included below.

*Midstream Gathering and Processing Facilities*

We engage in various types of transactions with midstream entities to gather and/or process our products, leveraging integrated systems and facilities wholly owned by the midstream counterparty. Under certain of these arrangements, we utilize substantially all of the underlying gathering system or processing facility capacity and we have, therefore, concluded that those underlying assets meet the definition of an identified asset. These contracts have non-cancellable lease terms of approximately four to 17 years and continue thereafter on a renewable basis subject to termination by either party with notice. Consequently, certain of our gathering and/or processing contracts represent an operating lease of the underlying midstream system or facilities with a lease term that equals the primary non-cancellable contract term.

*Real Estate*

We rent space from third parties for our corporate and field office locations and lease acreage for general corporate purposes. Our office and acreage lease agreements are structured with non-cancellable lease terms of three to 10 years. We have concluded that these agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

*Field Equipment and Vehicles*

We enter into daywork contracts for drilling rigs with third parties to support our drilling activities. Our drilling rig arrangements are typically structured with a term that is in effect until drilling operations are completed on a specified well or well pad in accordance with the development plan. Upon mutual agreement with the contractor, we typically have the option to extend the contract term for additional wells or well pads by providing thirty days' notice prior to the end of the original contract term. We have concluded that our drilling rig arrangements represent operating leases with lease terms of six to 18 months. For those arrangements with terms of less than one year, we have determined those arrangements to be short term operating leases. Due to the continuously evolving nature of our drilling schedules and the potential volatility in commodity prices in an annual period, our strategy to enter into shorter term drilling rig arrangements allows us the flexibility to respond to changes in our operating and economic environment. We exercise our discretion in choosing to extend or not extend contracts on a rig-by-rig basis depending on the conditions present at the time the contract expires. At the time of contract commencement, we have determined we cannot conclude with reasonable certainty if we will choose to extend the contract beyond its original term. Pursuant to the successful efforts method of accounting, our net share of these costs is capitalized as part of oil and natural gas properties on the balance sheet as incurred.

We rent compressors from third parties to facilitate the downstream movement of our production from our drilling operations to market. Our compressor arrangements typically have non-cancellable lease terms of 12 to 24 months and continue thereafter on a month-to-month basis subject to termination by either party with thirty days' notice. We have concluded that our compressor arrangements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

We rent our vehicle fleet for our drilling and operations personnel. Our vehicle agreements have non-cancellable lease terms of 18 months. We have concluded that our vehicle agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

***Significant Judgments***

*Discount Rate*

Our leases typically do not provide an implicit rate. Accordingly, we are required to use our estimated incremental borrowing rate in determining the present value of lease payments based on the information available at commencement date. Our estimated incremental borrowing rate reflects a reasonable projection of the interest that we would expect to pay to borrow, on a collateralized basis, over a similar term, an amount equal to the lease payments in a similar economic environment. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

*Practical Expedients and Accounting Policy Elections*

Certain of our lease arrangements include lease and non-lease components. For all existing asset classes with multiple component types, we have utilized the practical expedient to not separate lease and non-lease components. Accordingly, we account for the lease and non-lease components in an arrangement as a single lease component.

In addition, for all existing asset classes, we have elected an accounting policy to not apply the recognition requirements of Topic 842 to our short term leases. Accordingly, we recognize lease payments related to our short term leases in our statement of operations, which has not changed from our prior recognition.

The following are components of our lease expense for the three and nine months ended September 30, 2019, the majority of which are included in oil and natural gas production expenses on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 | Nine Months Ended September 30, 2019 |
|---|---|---|
| Operating lease expense | $ 25,069 | $ 74,997 |
| Short term and variable lease expense | 4,688 | 20,657 |
| Total lease expense | $ 29,757 | $ 95,654 |
| | | |
| Operating lease cost[(1)] | $ 3,118 | $ 6,175 |
| Short term lease cost[(1)] | 191 | 1,187 |
| Variable lease cost[(1)] | — | 65 |
| Total lease cost | $ 3,309 | $ 7,427 |

(1) Represents capital expenditures related to the use of drilling rigs for the three and nine months ended September 30, 2019 which are capitalized as part of oil and natural gas properties on our condensed consolidated balance sheets.

Other information related to our operating leases are as follows (in thousands, except lease term and discount rate):

| | Nine Months Ended September 30, 2019 |
|---|---|
| Operating cash flows from operating leases | $ 95,654 |
| Investing cash flows from operating leases | 7,427 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 |
| Amortization of ROU assets | (81,509) |
| | |
| Weighted average remaining lease term (years) | 3.1 |
| Weighted average discount rate | 10% |

As of September 30, 2019, minimum future payments, including imputed interest, for our long term operating leases under ASC 842 are as follows (in thousands):

| | | |
|---|---|---|
| October 1, 2019 through December 31, 2019 | $ | 34,228 |
| 2020 | | 119,293 |
| 2021 | | 80,513 |
| 2022 | | 60,269 |
| 2023 | | 26,847 |
| Thereafter | | 9,797 |
| Total lease payments | | 330,947 |
| Less: Imputed interest | | 47,463 |
| Total lease liabilities | $ | 283,484 |

As of December 31, 2018, undiscounted minimum future payments for our long term operating leases under ASC 840 were as follows (in thousands):

| | | |
|---|---|---|
| 2019 | $ | 100,640 |
| 2020 | | 84,472 |
| 2021 | | 52,499 |
| 2022 | | 31,682 |
| 2023 | | 11,631 |
| Thereafter | | 8,467 |
| Total lease payments | $ | 289,391 |

**Note 21. Subsequent Events**

On October 22, 2019, the Debtors filed a motion for entry of an order authorizing rejection of an office sublease. The Bankruptcy Court has not yet ruled on the motion.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing in Part I, Item 1 of this Quarterly Report on Form 10-Q and information contained in our 2018 Annual Report. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, beliefs and expected performance. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed below, we are currently operating our business as debtors-in-possession in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions (as defined below) on August 11, 2019, prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

***Voluntary Reorganization Under Chapter 11***

On August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer all of the Debtors' chapter 11 cases (the "Chapter 11 Cases") under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below), and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub, its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 cases and are classified as "non-Debtors."

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the holders of the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

For the duration of the Company's Chapter 11 Cases, the Company's operations and ability to develop and execute its business plan are subject to the risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019. As a result of these risks and uncertainties, the number, amount or composition, as applicable, of the Company's stock and stockholders, assets, liabilities, officers and/or directors could be significantly different following the outcome of the Chapter 11 Cases, and the description of the Company's operations, properties and capital plans included in this quarterly report may not accurately reflect its operations, properties and capital plans following the Chapter 11 Cases.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves the Debtors of performing their future obligations under such executory contract or unexpired lease but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtors' estate for such damages. Generally, the assumption of an executory contract or unexpired lease requires the Debtors to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtor in this quarterly report, including where

applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions, that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under its Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties

terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;

- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;

- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;

- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);

- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;

- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and

- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the Senior Secured 7.25% Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***Derivative Contracts***

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Bankruptcy Petitions, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***Basis of Presentation***

The condensed consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Core Properties***

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of September 30, 2019, we had assembled approximately 435,000 gross (233,000 net) leasehold acres.

In 2017, we acquired approximately 252,000 gross (61,000 net) acres in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (the "Comanche Acquisition"), representing a 24% working interest in the asset, which we refer to as the Comanche area.

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing on September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. As of August 31, 2018, the Company had achieved a 30-well bank at Comanche that was applied toward the annual development commitment for the period that extended from September 1, 2018 to August 31, 2019. The Company completed and equipped an additional 63 wells at Comanche between September 1, 2018 and August 31, 2019, resulting in a total of 93 wells that were applied toward the annual development commitment of 60 wells. Accordingly, the Company has met its annual development commitment for the period September 1, 2018 to August 31, 2019, and has completed and equipped 30 wells that can be applied toward the development commitment for the period September 1, 2019 to August 31, 2020. The Company completed and equipped an additional six wells at Comanche between September 1, 2019 and September 30, 2019. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position. SN Maverick is currently engaged in a disagreement with Gavilan Resources, LLC ("Gavilan"), an entity controlled by Blackstone, regarding operations of the Comanche Assets under the joint development agreement with Gavilan (the "JDA"). Among other things, Gavilan has asserted that SN Maverick is in default of the JDA and Gavilan has the right to take over operations of the Comanche Assets. Although SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan, if Gavilan prevails in the disagreement, SN Maverick would lose its rights to operate the Comanche Assets and certain rights of SN Maverick under the JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the JDA. Arbitration regarding this dispute was initiated by Gavilan with the American Arbitration Association on February 18, 2019, seeking, among other things, a declaration that SN Maverick is in default under the JDA, and the Company submitted its answer and counterclaims on February 26, 2019 seeking, among other things, a declaration that Gavilan is in default under the JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations. On the Petition Date, the arbitrator was notified by letter of the filing of the Bankruptcy Petitions and of the automatic stay under the Bankruptcy Code.

We have approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas representing a 100% working interest, which we refer to as the Catarina area.

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. For the commitment period ending June 30, 2019, the Company drilled a total of 63 wells toward the annual drilling commitment of 50 wells. Accordingly, the Company met all of its 50-well annual drilling commitment for the period July 1, 2018 to June 30, 2019 and initiated a bank of 13 wells that will be counted toward the next annual drilling commitment period. We drilled four additional wells in the Catarina area during the third quarter 2019, bringing our total to 17 wells toward the commitment period July 1, 2019 to June 30, 2020. Furthermore, our 2019 drilling activities from July 1, 2019 to the present date and our capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

We have approximately 58,000 net acres in Dimmit, Frio, La Salle, and Zavala counties, Texas, which we refer to as the Maverick area, which we believe lies in the black oil window.

We have approximately 7,600 net acres in Gonzales County, Texas, which we refer to as the Palmetto area, which we believe lies in the volatile oil window.

Marathon Oil EF LLC (“Marathon”) is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

***Tuscaloosa Marine Shale***

As of September 30, 2019, we owned approximately 12,400 net acres in the TMS. Although TMS development is currently challenged due to well costs and commodity prices, we believe that the TMS play may offer significant future development potential as changes in technology, commodity prices and service costs occur.

***Recent Developments***

Please see the first paragraph under “*Business Overview*,” “*—Voluntary Reorganization Under Chapter 11*” and “*—DIP Facility*” above, in addition to the other matters discussed above regarding our Bankruptcy Petitions and related matters.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the “Tolling Agreement”) among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC (“SN UnSub Holdings”), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the “Sanchez Parties”), GSO ST Holdings Associates LLC (“GSO LLC”) and GSO ST Holdings LP (together with GSO LLC, the “GSO Parties”).

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017 (the “LLC Agreement”), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term is defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the “Tolling Period”): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days’ written notice prior to commencement of a voluntary chapter 11 proceeding (a “Proceeding”) by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the “Initial Petition Date”), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the “Order Deadline”), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of

termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Outlook***

We and other companies in our industry face significant risks related to business operations, the prices we receive for our production, competition for employees and capital, and other factors which could materially impact our results of operations and financial condition. Although commodity and capital markets showed signs of improvement, oil prices experienced a significant decline in the fourth quarter 2018 and have remained volatile in 2019 through the present date. As a result, we continue to manage our business for the potential of ongoing commodity price volatility. This volatility has significantly influenced our industry and operating environment in the past, and we believe it may again in the future. We face continuing uncertainty with respect to the demand for our products, commodity prices, service availability and costs, and our ability to fund capital projects, along with significant challenges associated with our financial position. The Company set its 2019 capital budget at a range of $100 million to $150 million for development and optimization activities in our core areas, which represents a substantial reduction from capital expenditures of approximately $593 million in 2018. We generally seek to remain flexible in our business strategy to make changes to this estimated capital budget as the commodity markets and our overall financial and business position evolve over time. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In November 2018, we engaged Moelis & Company LLC as financial advisor to explore strategic alternatives to strengthen our balance sheet and maximize the value of the Company. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes for a 30-day grace period which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. On the Petition Date, prior to the expiration of the grace period, the Company and other Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility on an interim basis. Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company and the other Debtors, their creditors or other stakeholders, or at all.

**Results of Operations**

***Three Months Ended September 30, 2019 Compared to Three Months Ended September 30, 2018***

**Net Production and Revenues from Production**

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Three Months Ended September 30, | | Decrease 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 1,926 | 2,300 | (374) | (16)% |
| Natural gas liquids (MBbls) | 2,029 | 2,473 | (444) | (18)% |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | (13)% |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | (16)% |
| **Average Sales Price Excluding Derivatives[1]:** | | | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 | $ (15.07) | (21)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.33 | 3.00 | (0.67) | (22)% |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 | $ (12.33) | (32)% |
| **Average Sales Price Including Derivatives[2]:** | | | | |
| Oil ($ per Bbl) | $ 53.64 | $ 55.19 | $ (1.55) | (3)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.55 | 3.19 | (0.64) | (20)% |
| Oil equivalent ($ per Boe) | $ 26.49 | $ 34.29 | $ (7.80) | (23)% |
| **Revenues from Production[1][3]:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ (55,227) | (34)% |
| Natural gas liquids sales | 22,675 | 69,995 | (47,320) | (68)% |
| Natural gas sales | 26,572 | 39,460 | (12,888) | (33)% |
| Total revenues from production | $ 155,263 | $ 270,698 | $ (115,435) | (43)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 |
|---|---|---|
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 917 | 1,011 |
| Catarina | 672 | 891 |
| Maverick | 220 | 347 |
| Palmetto | 95 | 25 |
| TMS / Other | 22 | 26 |
| Total | 1,926 | 2,300 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 807 | 932 |
| Catarina | 1,191 | 1,531 |
| Maverick | 4 | 3 |
| Palmetto | 27 | 7 |
| Total | 2,029 | 2,473 |
| **Natural gas (MMcf)** | | |
| Comanche | 4,644 | 4,895 |
| Catarina | 6,589 | 8,235 |
| Maverick | 20 | 10 |
| Palmetto | 151 | 34 |
| Total | 11,404 | 13,174 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 5,856 | 6,969 |
| Average daily production (Boe/d) | 63,652 | 75,750 |
| **Average sales price [1]:** | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 |
| Natural gas liquids ($ per Bbl) | $ 11.17 | $ 28.30 |
| Natural gas ($ per Mcf) | $ 2.33 | $ 3.00 |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.76 | $ 10.85 |
| Production and ad valorem taxes | $ 1.68 | $ 2.18 |
| General and administrative expenses | $ 3.57 | $ 3.06 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 9.75 |
| Impairment of oil and natural gas properties | $ 1.67 | $ 0.45 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 6,969 MBoe for the three months ended September 30, 2018 to 5,856 MBoe for the three months ended September 30, 2019, primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 2,498 | 1,701 | 2,758 |
| Catarina | 460 | 2,961 | 441 | 3,795 |
| Palmetto | 81 | 147 | 86 | 38 |
| Maverick | 66 | 227 | 66 | 352 |
| TMS / Other | 46 | 23 | 47 | 26 |
| Total | 2,435 | 5,856 | 2,341 | 6,969 |

For the three months ended September 30, 2019 and 2018, 33% of our production was oil, 35% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $155.3 million and $270.7 million for the three months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas for the three months ended September 30, 2019 decreased $55.2 million, $47.3 million and $12.9 million, respectively, as compared to the three months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues***. The Company recorded sales and marketing revenues of $7.3 million and $7.0 million during the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the three months ended September 30, 2018 to the three months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Three Months Ended September 30, | | | Three Months Ended | Revenue |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | September 30, 2018 Average Sales Price | Decrease from Production |
| Oil (MBbls) | 1,926 | 2,300 | (374) | $ 70.11 | $ (26,220) |
| NGLs (MBbls) | 2,029 | 2,473 | (444) | $ 28.30 | $ (12,567) |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | $ 3.00 | $ (5,302) |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | $ 38.84 | $ (44,089) |

| | Average Sales Price per Unit Three Months Ended September 30, | | | Three Months Ended | Revenue |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | September 30, 2019 Production Volume | Decrease from Price |
| Oil (MBbls) | $ 55.04 | $ 70.11 | $ (15.07) | 1,926 | $ (29,007) |
| NGLs (MBbls) | $ 11.17 | $ 28.30 | $ (17.13) | 2,029 | $ (34,753) |
| Natural gas (MMcf) | $ 2.33 | $ 3.00 | $ (0.67) | 11,404 | $ (7,586) |
| Total oil equivalent (MBoe) | $ 26.51 | $ 38.84 | $ (12.33) | 5,856 | $ (71,346) |

Additionally, a 10% increase or decrease in our average realized sales prices for the three months ended September 30, 2019, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $15.5 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Three Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 74,740 | $ 75,594 | $ (854) | (1)% |
| Exploration expenses | 164 | 2,698 | (2,534) | (94)% |
| Sales and marketing expenses | 6,672 | 7,239 | (567) | (8)% |
| Production and ad valorem taxes | 9,867 | 15,221 | (5,354) | (35)% |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | (10,080) | (15)% |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 6,644 | * |
| General and administrative expenses[1] | 20,915 | 21,312 | (397) | (2)% |
| Prepetition restructuring charges | 18,231 | — | 18,231 | * |
| Total operating costs and expenses | 198,214 | 193,125 | 5,089 | 3 % |
| | | | | |
| Interest income | 221 | 1,130 | (909) | (80)% |
| Other expense | (12,829) | (7,677) | (5,152) | 67 % |
| Interest expense | (22,884) | (44,154) | 21,270 | (48)% |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | 41,486 | * |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (833) | — | (833) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.1 million and non-cash stock-based compensation benefit $1.4 million for the three months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses decreased to $74.7 million ($12.76 per Boe) for the three months ended September 30, 2019, as compared to $75.6 million ($10.85 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the three months ended September 30, 2018, the Company recognized a benefit of approximately $5.9 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $81.5 million ($11.70 per Boe). The decrease in oil and natural gas production expenses from the three months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the three months ended September 30, 2019 is primarily attributable to a decrease in production. The increase in oil and natural gas production expenses per Boe for the three months ended September 30, 2019 compared to the three months ended September 30, 2018 is primarily related to a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $0.2 million and $2.7 million during the three months ended September 30, 2019 and 2018, respectively. The decrease in our exploration expenses for the three months ended September 30, 2019 as compared to the same period in 2018 was primarily due to a decrease in activity leading to reduced exploratory geological and geophysical seismic costs.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $6.7 million and $7.2 million for the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in

support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $9.9 million ($1.68 per Boe) and $15.2 million ($2.18 per Boe) for the three months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the third quarter 2019 compared to the same period in 2018 was primarily due to the decrease in production taxes based on the corresponding decrease in revenue during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $10.0 million from $67.9 million ($9.75 per Boe) for the three months ended September 30, 2018 to $57.9 million ($9.88 per Boe) for the three months ended September 30, 2019. The decrease in expense represented an approximate $10.8 million decrease from lower production which was partially offset by a $0.8 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We did not record proved property impairments for the three months ended September 30, 2019 or 2018. We recorded impairment of $9.8 million and $3.1 million to our unproved oil and natural gas properties for the three months and ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $20.9 million ($3.57 per Boe) for the three months ended September 30, 2019 compared to $21.3 million ($3.06 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $18.2 million for the three months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the three months ended September 30, 2018.

***Other Expense.*** For the three months ended September 30, 2019 and 2018, respectively, other expense totaled $12.8 million compared to other expense of $7.7 million for the three months ended September 30, 2018. The other expense during the three months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset. Additionally, we experienced a loss of $4.3 million associated with the decrease in fair value of the investment in SNMP, which was partially offset by a gain of $0.6 million associated with the increase in fair value of the investment in Lonestar. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets, and we experienced losses of $10.7 million and $1.0 million associated with the decreases in fair value of the investments in Lonestar and SNMP, respectively. Additionally, for the three month period ended September 30, 2019, we recorded $2.4 million of income from equipment rentals, we did not record any dividend income from the SNMP common units and we did not experience any gains or losses on embedded derivatives. For the three months ended September 30, 2018, we recorded income from equipment rentals of $3.0 million, dividend income of $1.1 million from the SNMP common units, and a loss on embedded derivatives of $1.1 million.

***Interest Expense.*** For the three months ended September 30, 2019, interest expense totaled $22.9 million and included $2.0 million in amortization of debt issuance costs. For the three months ended September 30, 2018, interest expense totaled $44.2 million and included $2.9 million in amortization of debt issuance costs. As of the Petition Date we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-

annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the three months ended September 30, 2019, we recognized a net gain of $13.2 million on our commodity derivative contracts, which included mark-to-market gains on unsettled oil derivatives of $15.8 million and mark-to-market losses on unsettled natural gas derivatives of $2.5 million. In addition, during the three months ended September 30, 2019, we experienced net settlement losses of $0.1 million, which included settlement losses of $2.7 million on our oil derivative contracts and settlement gains of $2.6 million on our natural gas derivative contracts. The mark-to-market gains and losses were a result of the decreases and increases, respectively, in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses and gains during the period were primarily a result of increases and decreases, respectively, in commodity prices from the time the positions were entered into until the time of settlement. During the three months ended September 30, 2018, we recognized a net loss of $28.3 million on our commodity derivative contracts, which included mark-to-market gains on our oil derivative contracts of $6.0 million and mark-to-market losses on our natural gas derivative contracts of $2.5 million. In addition, during the three months ended September 30, 2018, we experienced settlement losses on our oil derivative contracts of $34.3 million partially offset by settlement gains of $2.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the three months ended September 30, 2019, the Company recorded an income tax benefit of $0.8 million, and our effective tax rate was approximately 0.7%. The Company did not record an income tax expense or benefit for the three months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

*Nine Months Ended September 30, 2019 Compared to Nine Months Ended September 30, 2018*

**Net Production and Revenues from Production**

The following table summarizes net production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 6,375 | 7,198 | (823) | (11)% |
| Natural gas liquids (MBbls) | 6,539 | 7,363 | (824) | (11)% |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | (11)% |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | (11)% |
| **Average Sales Price Excluding Derivatives(1):** | | | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 | $ (8.89) | (14)% |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.75 | 2.96 | (0.21) | (7)% |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 | $ (6.71) | (19)% |
| **Average Sales Price Including Derivatives(2):** | | | | |
| Oil ($ per Bbl) | $ 55.08 | $ 53.75 | $ 1.33 | 2 % |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.82 | 3.16 | (0.34) | (11)% |
| Oil equivalent ($ per Boe) | $ 28.78 | $ 32.32 | $ (3.54) | (11)% |
| **Revenues from Production(1)(3):** | | | | |
| Oil sales | $ 362,424 | $ 473,178 | $ (110,754) | (23)% |
| Natural gas liquids sales | 92,891 | 175,833 | (82,942) | (47)% |
| Natural gas sales | 100,932 | 122,330 | (21,398) | (17)% |
| Total revenues from production | $ 556,247 | $ 771,341 | $ (215,094) | (28)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 2,962 | 3,350 |
| Catarina | 2,435 | 2,491 |
| Maverick | 713 | 1,201 |
| Palmetto | 203 | 82 |
| TMS / Other | 62 | 74 |
| Total | 6,375 | 7,198 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 2,543 | 2,993 |
| Catarina | 3,931 | 4,325 |
| Maverick | 13 | 20 |
| Palmetto | 52 | 25 |
| Total | 6,539 | 7,363 |
| **Natural gas (MMcf)** | | |
| Comanche | 14,176 | 16,429 |
| Catarina | 22,123 | 24,716 |
| Maverick | 73 | 94 |
| Palmetto | 285 | 134 |
| Total | 36,657 | 41,373 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 19,024 | 21,457 |
| Average daily production (Boe/d) | 69,685 | 78,597 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 |
| Natural gas liquids ($ per Bbl) | $ 14.21 | $ 23.88 |
| Natural gas ($ per Mcf) | $ 2.75 | $ 2.96 |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.17 | $ 10.49 |
| Production and ad valorem taxes | $ 1.82 | $ 2.00 |
| General and administrative expenses | $ 3.48 | $ 3.41 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 8.83 |
| Impairment of oil and natural gas properties | $ 1.20 | $ 0.20 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 21,457 MBoe for the nine months ended September 30, 2018 to 19,024 MBoe for the nine months ended September 30, 2019 primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 7,868 | 1,701 | 9,082 |
| Catarina | 460 | 10,053 | 441 | 10,935 |
| Palmetto | 81 | 738 | 86 | 129 |
| Maverick | 66 | 303 | 66 | 1,237 |
| TMS / Other | 46 | 63 | 47 | 74 |
| Total | 2,435 | 19,025 | 2,341 | 21,457 |

For the nine months ended September 30, 2019 and 2018, 34% of our production was oil, 34% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $556.2 million and $771.3 million for the nine months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas decreased $110.8 million, $82.9 million and $21.4 million, respectively, as compared to the nine months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues.*** The Company recorded sales and marketing revenues of $18.1 million and $16.9 million during the nine months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the nine months ended September 30, 2018 to the nine months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Nine Months Ended September 30, | | | Nine Months Ended September 30, 2018 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Average Sales Price | from Production |
| Oil (MBbls) | 6,375 | 7,198 | (823) | $ 65.74 | $ (54,102) |
| NGLs (MBbls) | 6,539 | 7,363 | (824) | $ 23.88 | $ (19,678) |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | $ 2.96 | $ (13,944) |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | $ 35.95 | $ (87,724) |

| | Average Sales Price per Unit Nine Months Ended September 30, | | | Nine Months Ended September 30, 2019 | Revenue Increase/(Decrease) |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Production Volume | from Price |
| Oil (MBbls) | $ 56.85 | $ 65.74 | $ (8.89) | 6,375 | $ (56,652) |
| NGLs (MBbls) | $ 14.21 | $ 23.88 | $ (9.67) | 6,539 | $ (63,264) |
| Natural gas (MMcf) | $ 2.75 | $ 2.96 | $ (0.21) | 36,657 | $ (7,454) |
| Total oil equivalent (MBoe) | $ 29.24 | $ 35.95 | $ (6.71) | 19,024 | $ (127,370) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $55.6 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 231,441 | $ 225,186 | $ 6,255 | 3 % |
| Exploration expenses | 4,983 | 3,247 | 1,736 | 53 % |
| Sales and marketing expenses | 16,591 | 16,498 | 93 | 1 % |
| Production and ad valorem taxes | 34,682 | 42,898 | (8,216) | (19)% |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 | (1,595) | (1)% |
| Impairment of oil and natural gas properties | 22,906 | 4,259 | 18,647 | * |
| General and administrative expenses[1] | 66,266 | 73,199 | (6,933) | (9)% |
| Prepetition restructuring charges | 41,855 | — | 41,855 | * |
| Total operating costs and expenses | 606,644 | 554,802 | 51,842 | 9 % |
| | | | | |
| Interest income | 1,447 | 3,400 | (1,953) | (57)% |
| Other income (expense) | (13,785) | 2,467 | (16,252) | * |
| Gain on sale of oil and natural gas properties | — | 1,528 | (1,528) | * |
| Interest expense | (111,998) | (132,664) | 20,666 | (16)% |
| Net losses on commodity derivatives | (20,827) | (142,384) | 121,557 | (85)% |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (23) | — | (23) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.4 million and $2.9 million for the nine months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses increased to approximately $231.4 million ($12.17 per Boe) for the nine months ended September 30, 2019 as compared to $225.2 million ($10.49 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the nine months ended September 30, 2018, the Company recognized a benefit of approximately $17.8 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $243.0 million ($11.32 per Boe). The decrease in oil and natural gas production expenses from the nine months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the nine months ended September 30, 2019 is primarily attributable to a decrease in production. The decrease in oil and natural gas production expenses was slightly offset by an increase in transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina. The increase in oil and natural gas production expenses per Boe for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 is primarily related to an increase in marketing and transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina during January and April 2019 and a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $5.0 million and $3.2 million during the nine months ended September 30, 2019 and 2018, respectively. The increase in our exploration expenses for the nine months ended September 30, 2019 as compared to the same period in 2018 was due to an increase in our exploratory geological and geophysical seismic costs and an increase in our delay rentals for the first half of 2019.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $16.6 million and $16.5 million for the nine months ended September 30, 2019 and 2018, respectively. We believe an

opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $34.7 million ($1.82 per Boe) and $42.9 million ($2.00 per Boe) for the nine months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the first nine months of 2019 compared to the same period in 2018 was primarily due to the corresponding decrease in revenues during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $1.6 million from $189.5 million ($8.83 per Boe) for the nine months ended September 30, 2018 to $187.9 million ($9.88 per Boe) for the nine months ended September 30, 2019. The decrease in expense represented an approximate $21.5 million decrease from lower production which was partially offset by a $19.9 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We recorded a proved property impairment of $4.3 million for the nine months ended September 30, 2019. We did not record a proved property impairment for the nine months ended September 30, 2018. We recorded impairment of $18.6 million and $4.3 million to our unproved oil and natural gas properties for the nine months ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $66.3 million ($3.48 per Boe) for the nine months ended September 30, 2019 compared to $73.2 million ($3.41 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount. Additionally, we experienced a decrease in our stock-based compensation expense for the three months ended September 30, 2019 as compared to the same period in 2018 resulting from a decrease in the Company's stock price. Offsetting these decreases, we experienced increases in salaries and wages resulting from employee retention and executive compensation programs.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $41.9 million for the nine months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the nine months ended September 30, 2018.

***Other Income (Expense).*** For the nine months ended September 30, 2019, other expense totaled $13.8 million compared to other income of $2.5 million for the nine months ended September 30, 2018. The other expense during the nine months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset and $1.2 million in shortfall and idle rig costs. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets or idle rig costs. Additionally, for the nine months ended September 30, 2019 we experienced losses of $3.1 million and $1.4 million associated with the decreases in fair value of the investments in SNMP and Lonestar, respectively. For the nine months ended September 30, 2018, we experienced a loss of $9.1 million and a gain of $5.7 million associated with the decreases and increases in fair value of the investments in SNMP and Lonestar, respectively. Further, we received $2.6 million in income from equipment rentals during the nine months ended September 30, 2019 as compared to $7.3 million for the comparable period of 2018, we experienced a gain on our embedded derivative contracts of $0.3 million for the nine months ended September 30, 2019 as compared to a loss of $7.1 million for the comparable period of 2018, and we recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units as compared to $3.2 million for the comparable period of 2018.

***Interest Expense.*** For the nine months ended September 30, 2019, interest expense totaled $112.0 million and included $8.3 million in amortization of debt issuance costs. For the nine months ended September 30, 2018, interest

expense totaled $132.7 million and included $12.7 million in amortization of debt issuance costs. As of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the nine months ended September 30, 2019, we recognized a net loss of $20.8 million on our commodity derivative contracts, which included net losses of $8.7 million associated with the settlements of commodity derivative contracts and mark-to-market losses of $12.1 million on unsettled commodity derivative contracts. The mark-to-market losses were a result of the increase in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses during the period were primarily a result of increases in commodity prices from the time the positions were entered into until the time of settlement. During the nine months ended September 30, 2018, we recognized a net loss of $142.4 million on our commodity derivative contracts, which included mark-to-market losses on oil and natural gas derivative contracts of $50.0 million and $14.5 million, respectively. In addition, during the nine months ended September 30, 2018 we experienced settlement losses on our oil commodity derivative contracts of $86.3 million, which were partially offset by settlement gains of $8.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the nine months ended September 30, 2019, the Company recorded an income tax benefit of less than $0.1 million and our effective tax rate was approximately 0%. The Company did not record an income tax expense or benefit for the nine months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in accordance with U.S. GAAP requires our management to select and apply accounting policies that provide the framework to report our results of operations and financial position. The selection and application of those policies requires our management to make difficult subjective or complex judgments concerning reported amounts of revenue and expenses during the reporting period and the reported amounts of assets and liabilities at the date of the financial statements. As a result, there exists the likelihood that materially different amounts would be reported under different conditions or using different assumptions.

As of September 30, 2019, our critical accounting policies were consistent with those discussed in our 2018 Annual Report.