**Use of Estimates**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of G&A expenses. Actual results could differ materially from those estimates.

**Liquidity and Capital Resources**

The primary source of liquidity and capital resources to fund our development program and other obligations has been cash flow from operations, available cash on hand and proceeds from borrowings and securities issuances. Operating cash flows, however, are largely dependent on oil and natural gas prices and differentials, sales volumes and costs. Oil and natural gas prices declined significantly during the fourth quarter 2018 and have remained low in 2019 through the present date. These lower commodity prices, in addition to reduced production levels from our decreased capital expenditures budget, have negatively impacted revenues, earnings and cash flows, and sustained low oil and natural gas prices have had and will continue to have a material and adverse effect on our liquidity position and our ability to raise additional funds through financing transactions. On the Petition Date, the Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases—Voluntary Reorganization Under Chapter 11" and above in "—Business Overview—Voluntary Reorganization Under Chapter 11" for additional information.

As of September 30, 2019, we had approximately $179.5 million in cash and cash equivalents and $90.0 million in available borrowing capacity under the SN UnSub Credit Agreement, resulting in aggregate liquidity of approximately $269.5 million. Borrowings under the DIP Facility are not available to SN UnSub or our other non-Debtor subsidiaries, and borrowings under the SN UnSub Credit Agreement are not available to the Debtors or any other non-Debtor subsidiary other than SN UnSub.

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (approximately $2.3 billion in aggregate principal). We do not have sufficient liquidity to pay such accelerated amounts. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt. The significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described under "Business Overview" raise substantial doubt about the Company's ability to continue as a going concern. See above under "Business Overview" for a description of these and other developments. In addition, during the existence of an event of default under the Credit Agreement and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement (although, as noted below, we anticipate paying off the Credit Agreement in full subject to final approval of the Bankruptcy Court).

Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, we would be required at our election to repay the deficiency

within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement, in which case we may not be able to satisfy the liquidity requirements of SN UnSub.

The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders entered into the Amendment. By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the Final DIP Order and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders.

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility will be sufficient to fund our anticipated 2019 operating needs. However, there can be no assurance that the Company's cash flows, cash on hand and any financing we are able to obtain through the DIP Facility will be sufficient to continue to fund its operations or to allow the Company to continue as a going concern until a Chapter 11 plan of reorganization is confirmed by the Bankruptcy Court or an alternative restructuring transaction is approved by the Bankruptcy Court and consummated. In addition, if we are required under the Final DIP Order to pay the past due interest, and to continue making the semi-annual interest payments due, under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases, or we fail to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity required to maintain undeveloped leasehold positions as discussed above, then that requirement or failure to negotiate could further limit our flexibility in planning for, or reacting to, changes in our business and the oil and natural gas exploration and production industry and could have a material adverse effect on our business, financial condition or results of operations. We have incurred significant professional fees and other costs in connection with our evaluation of strategic alternatives and preparation for the Chapter 11 Cases and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 Cases. The Company's long-term liquidity requirements, the adequacy of its capital resources and its ability to continue as a going concern are difficult to predict at this time and ultimately cannot be determined until a Chapter 11 plan of reorganization has been confirmed, if at all, by the Bankruptcy Court. The Debtors are subject to such liquidity risks as well as the other risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019.

We continuously evaluate our current and projected capital spending, operating activities and funding requirements, with consideration of realized commodity prices and the results of our operations and may make further adjustments to our capital expenditures and related financing plans as warranted.

**Cash Flows**

Our cash flows for the nine months ended September 30, 2019 and 2018 (in thousands) are as follows:

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **Cash Flow Data:** | | |
| Net cash provided by operating activities | $ 99,750 | $ 249,526 |
| Net cash used in investing activities | $ (110,217) | $ (453,822) |
| Net cash (used in) provided by financing activities | $ (7,608) | $ 388,534 |

***Net Cash Provided by Operating Activities.*** Net cash provided by operating activities was $99.8 million for the nine months ended September 30, 2019 compared to cash provided by operating activities of $249.5 million for the same period in 2018. This decrease was primarily related to lower revenues from lower production and lower realized prices.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company has historically partially mitigated by entering into commodity derivative contracts. Production volume changes also impact cash flow, costs related to operations and debt service.

***Net Cash Used in Investing Activities.*** Net cash flows used in investing activities totaled $110.2 million for the nine months ended September 30, 2019 compared to $453.8 million for the same period in 2018. Capital expenditures incurred for drilling and leasehold activities for the nine months ended September 30, 2019 totaled $61.2 million, and cash paid for capital expenditures was $114.7 million. The capital expenditures incurred are primarily associated with bringing 48 gross wells on-line during the first three quarters of 2019. The difference between expenditures incurred and paid during the period is due to timing of payments associated with higher activity levels during the fourth quarter 2018. We also received $5.2 million from the sale of certain other assets. During the nine months ended September 30, 2018, capital expenditures incurred for drilling and leasehold activities totaled $479.0 million and cash paid for capital expenditures was $452.3 million. The capital expenditures incurred are primarily associated with bringing 172 gross wells on-line. In addition, we received $2.8 million related to the post-closing adjustments for the Comanche Acquisition during the nine months ended September 30, 2018.

***Net Cash Used in or Provided by Financing Activities.*** Net cash flows used in financing activities totaled $7.6 million for the nine months ended September 30, 2019 compared net cash flows provided by financing activities of $388.5 million for the same period in 2018. During the nine months ended September 30, 2019, we had borrowings of $50.0 million under our DIP Facility and $7.9 million under our Credit Facility. Additionally, we made payments of $18.3 million on the SN UnSub Credit Agreement and our other debt agreements and made payments of $37.5 million for distributions to holders of the SN UnSub Preferred Units. During the nine months ended September 30, 2018, we issued $500 million in 7.25% Senior Secured Notes (before discounts of $5.1 million) and had incremental borrowings of $45 million. Additionally, we made repayments on our prior credit facility of $95 million and payments on the SN UnSub Credit Agreement of $8.0 million. We also made payments of $22.4 million for distributions to holders of the SN UnSub Preferred Units and paid dividends on our Series A and B Preferred Stock of $12.0 million.

**Off-Balance Sheet Arrangements**

As of September 30, 2019, we did not have any off-balance sheet arrangements.

**Commitments and Contractual Obligations**

Refer to "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

There have been no material changes in our contractual obligations during the nine months ended September 30, 2019, other than those disclosed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to a variety of market risks, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our primary market risk exposure relates to the prices we receive for our oil, natural gas and NGL production. The prices we ultimately realize for our oil, natural gas and NGLs are based on a number of variables, including prevailing index prices attributable to our production and certain differentials to those index prices. Pricing for oil, natural gas and NGLs is volatile and unpredictable, and this volatility is expected to continue in the future. In addition, the prices we receive for our oil, natural gas and NGLs depend on many factors outside of our control, such as the supply and demand for oil, natural gas and NGLs, the relative strength of the global economy, the actions of OPEC and international sanctions against countries such as Iran and Venezuela.

To reduce the impact on the Company's business and results of operations from fluctuations in the prices we receive for oil, natural gas and NGLs, and to protect the economics of property acquisitions at the time of execution, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These transactions may include fixed price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price, up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed price swaps by agreeing to increase the notional quantity hedged or extend the notional quantity settlement period under a fixed price swap at the counterparty's election on a designated date. The market for NGL hedging has historically been constrained in terms of price, tenor, liquidity and availability of counterparties. The Company does not currently have any NGL hedges in place. We continue to assess our exposure to NGL price volatility and the NGL hedging market in general and may seek to enter into derivatives in the future on a portion of our projected NGL production. In addition, from time to time, the Company may evaluate strategies to unwind, terminate, cancel, restructure or otherwise modify its existing commodity derivatives, as applicable, in connection with the ongoing assessment of its general risk profile, including projected future production levels, covenant and other compliance requirements, its overall financial position and other considerations.

These hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Please refer to Note 8, "Derivative Instruments" for a description of all of our derivatives covering anticipated future production as of September 30, 2019.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon conditions in the commodity and financial markets at the time we enter into these transactions, which may result in higher or lower hedge prices for oil, natural gas and NGLs under these contracts, if any, as compared to the hedge prices under our current contracts. Accordingly, our hedging strategy may not protect us from significant or sustained declines in the prices of oil, natural gas and NGLs for future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases during periods for which we have hedged our production. As such, our hedging strategy may not prove effective in adequately protecting us from changes in the prices of oil, natural gas and NGLs that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

At September 30, 2019, the fair value of our commodity derivative contracts was a net asset of approximately $9.1 million. A 10% increase or decrease in the oil and natural gas index prices above the September 30, 2019 prices

would result in a decrease or increase, respectively, in the fair value of our commodity derivative contracts of $15.1 million. On a consolidated basis as of September 30, 2019, the Company has hedged approximately 580,000 Bbls of its remaining 2019 oil production and 3,362,000 MMBtu of its remaining 2019 natural gas production. As of September 30, 2019, SN UnSub's production represents approximately 68% of the hedged oil volumes and approximately 73% of the hedged natural gas volumes.

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited. For further information, see "Part II, Item 1A. Risk Factors—We have significant exposure to fluctuations in commodity prices since only a portion of our estimated future production is covered by commodity derivatives and we may not be able to enter into commodity derivatives covering our estimated future production on favorable terms or at all" included in our Form 10-Q for the quarter ended June 30, 2019.

**Credit Risk**

Our credit risk relates primarily to trade receivables and financial derivative instruments. Credit exposure for each customer is monitored for outstanding balances and current activity. For derivatives entered into as part of our hedging program, we are subject to counterparty credit risk to the extent the counterparty is unable to meet its settlement commitments. We may also be exposed to credit risk due to the concentration of our customers in the energy industry, as our customers may be similarly affected by prolonged changes in economic and industry conditions, or by the sale of our oil and natural gas production to a limited number of purchasers.

We actively manage this credit risk by selecting counterparties that we believe to be highly creditworthy and continuing to monitor their financial position. Concentration of credit risk is regularly reviewed to ensure that counterparty credit risk is adequately diversified.

As of September 30, 2019, the substantial majority of our credit exposure was with investment grade counterparties. We believe exposure to losses related to credit risk at September 30, 2019 was not material, which is consistent with all periods presented.

**Interest Rate Risk**

As of September 30, 2019, we had $50.0 million outstanding under the DIP Facility, $7.9 million outstanding under the Credit Agreement, $150.0 million outstanding under the SN UnSub Credit Agreement and $22.9 million outstanding under the SR Credit Agreement, all of which carry variable interest rates. The DIP Facility, with respect to the New Money DIP Loans, bears interest at a variable rate, and the Roll-Up Loans, if and when approved, will bear interest at a fixed rate. Our Senior Notes bear interest at fixed interest rates. As of September 30, 2019, a one percent change in the interest rates on the SN UnSub Credit Agreement would result in an approximately $1.5 million change in annual interest expense, and a one percent change in the interest rates on the SR Credit Agreement or DIP Facility would be insignificant. Further, as of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise. We believe our exposure to interest-related losses at September 30, 2019 was not material.

We currently do not have any interest rate derivative contracts in place. We continue to assess our exposure to fluctuating interest rates and may seek to enter into interest rate derivatives in the future on a portion of our variable rate indebtedness.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15 promulgated pursuant to the Securities Exchange Act of 1934, as amended (the “Exchange Act”). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in reports that we file or submit under the Exchange Act is appropriately recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls**

There was no change in our internal control over financial reporting during the three months ended September 30, 2019 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. The adoption of ASC 842, Leases, required the implementation of new controls and the modification of certain accounting processes. The impact of these changes was not material to the Company’s internal control over financial reporting.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings**

For a description of our material pending legal proceedings as of September 30, 2019, please refer to (i) “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies.” and (ii) the “Business Overview” of “Part I, Item 2. Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business notwithstanding the filing of the Bankruptcy Petitions. If a Chapter 11 plan of reorganization is confirmed, it will provide for the treatment of claims against the Company’s bankruptcy estates, including prepetition liabilities that have not otherwise been satisfied or addressed during the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions

that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

**Item 1A. Risk Factors**

Carefully consider the risk factors under the caption “Risk Factors” under Part I, Item 1A in our 2018 Annual Report and under Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019, together with all of the other information included in this Quarterly Report on Form 10-Q and in our other public filings, press releases, and public discussions with our management. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may materially adversely affect our business, financial condition or results of operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

*Unregistered Sales of Equity Securities*

None.

*Repurchase of Equity Securities*

| Period | Total number of shares withheld[1] | Average Price per share | Total number of shares repurchased as part of publicly announced plans | Maximum number of shares that may yet be repurchased under the plan |
|---|---|---|---|---|
| July 1, 2019 - July 31, 2019 | 1,362 | $ 0.11 | — | — |
| August 1, 2019 - August 31, 2019 | 10,480 | $ 0.08 | — | — |
| September 1, 2019 - September 30, 2019 | 1,227 | $ 0.02 | — | — |
| Total | 13,069 | $ 0.08 | — | — |

(1) Represents shares that were purchased by the Company to satisfy employee tax withholding obligations that arose upon the vesting of restricted stock awards

**Item 3. Defaults Upon Senior Securities**

See “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases— Covenant Violations” which is incorporated in this item by reference.

The annual dividend on each share of our Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series A Preferred Stock as of the date of filing of this report is approximately $1.4 million.

The annual dividend on each share of our Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series B Preferred Stock as of the date of filing of this report is approximately $7.4 million.

Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock, Series B Preferred Stock or common stock.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

**EXHIBIT INDEX**

| | | |
|---|---|---|
| 3.1 | | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013 (File No. 001-35372) and incorporated herein by reference). |
| 3.2 | | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015 (File No. 001-35372) and incorporated herein by reference). |
| 3.3 | | Amended and Restated Bylaws, dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011 (File No. 001-35372) and incorporated herein by reference). |
| 10.1(a) | | Senior Secured Debtor-in-Possession Term Loan Credit Agreement dated as of August 16, 2019, among Sanchez Energy Corporation, a debtor and debtor-in-possession under Chapter 11 of Bankruptcy Code, as borrower, the several lenders from time to time parities thereto, and Wilmington Savings Fund Society, FSB as administrative Agent and collateral agent. |
| 10.2(a) | | Tolling Agreement dated August 10. 2019, by and among SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF Maverick, LLC, Sanchez Energy Corporation, GSO ST Holdings Associates LLC, and GSO ST Holdings LP. |
| 10.3(a) | | First Amendment to Senor Secured Debtor-in-Possession Term Loan Credit Agreement dated September 24, 2019, by and among Sanchez Energy Corporation, the required lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent. |
| 31.1(a) | | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2(a) | | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1(b) | | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2(b) | | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 101.INS(a) | — | XBRL Instance Document. |
| 101.SCH(a) | — | XBRL Taxonomy Extension Schema Document. |
| 101.CAL(a) | — | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF(a) | — | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB(a) | — | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE(a) | — | XBRL Taxonomy Extension Presentation Linkbase Document |

(a) Filed herewith.

(b) Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on November 8, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ Kirsten A. Hink
Kirsten A. Hink
*Senior Vice President and Chief Accounting Officer*
(Duly Authorized Officer)

By: /s/ Cameron W. George
Cameron W. George
*Executive Vice President and Chief Financial Officer*
(Principal Financial Officer)

# Exhibit C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-K/A

**(Amendment No. 1)**

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 1-35372**

# Sanchez Energy Corporation

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **45-3090102**<br>(I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>(Address of principal executive offices) | **77002**<br>(Zip Code) |

Registrant's telephone number, including area code **(713) 783-8000**

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |
| Rights to purchase Series C Junior Participating Preferred Stock, par value $0.01 per share | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Registrant as of June 30, 2018: $284,800,499

Number of shares of Registrant's common stock outstanding as of February 26, 2019: 95,866,121.

**Documents Incorporated By Reference:**

None.

011160

Table of Contents

**Explanatory Note**

This Amendment No. 1 to Form 10-K (this "***Amendment***") amends the Annual Report on Form 10-K for the fiscal year ended December 31, 2018 originally filed on March 1, 2019 (the "***Original Filing***") by Sanchez Energy Corporation, a Delaware corporation ("***Sanchez Energy***," the "***Company***," "***we***," "***our***," "***us***" or similar terms). We are filing this Amendment to present the information required by Part III of Form 10-K as we do not believe our definitive proxy statement will be filed within 120 days of the end of our fiscal year ended December 31, 2018.

In addition, as required by Rule 12b-15 under the Securities Exchange Act of 1934, as amended, new certifications by our principal executive officer and principal financial officer are filed as exhibits to this Amendment under Item 15 of Part IV hereof.

Except as described above, no other changes have been made to the Original Filing. The Original Filing continues to speak as of the date of the Original Filing, and we have not updated the disclosures contained therein to reflect any events which occurred at a date subsequent to the filing of the Original Filing.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | **PART III** | |
| **Item 10.** | Directors, Executive Officers and Corporate Governance | 1 |
| **Item 11.** | Executive Compensation | 5 |
| **Item 12.** | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 26 |
| **Item 13.** | Certain Relationships and Related Transactions, and Director Independence | 27 |
| **Item 14.** | Principal Accountant Fees and Services | 31 |
| | **PART IV** | |
| **Item 15.** | Exhibits, Financial Statement Schedules | 32 |
| **Signatures** | | 33 |


In Sanchez Energy's filings with the Securities and Exchange Commission ("***SEC***"), information is sometimes "incorporated by reference." This means that we refer you to information previously filed with the SEC that should be considered as part of the particular filing. As provided under SEC regulations, the "Compensation Committee Report" contained in this Amendment specifically is not incorporated by reference into any other filings with the SEC and shall not be deemed to be "filed" with the SEC. In addition, this Amendment includes several website addresses. Those website addresses are intended to provide inactive, textual references only. The information on those websites is not part of this Amendment.

Table of Contents

## PART III

**Item 10.** ***Directors, Executive Officers and Corporate Governance***

**Directors and Executive Officers**

As of the filing of this Amendment with the SEC, the Board of Directors of the Company (the "***Board***") and the executive officers of the Company are:

| Name | Age | Position |
|---|---|---|
| A. R. Sanchez, Jr. | 76 | Executive Chairman of the Board |
| Antonio R. Sanchez, III | 45 | President and Chief Executive Officer and Director |
| T. Brian Carney(1)(2)(3) | 53 | Director |
| M. Gregory Colvin | 59 | Director |
| Eugene I. Davis(4) | 64 | Director |
| Gilbert A. Garcia(1)(2)(3) | 55 | Director |
| Alan G. Jackson(1) | 75 | Director |
| Sean M. Maher(1)(2)(3) | 45 | Director |
| Robert V. Nelson, III(1)(2)(3) | 43 | Director |
| Adam C. Zylman(4) | 44 | Director |
| Patricio D. Sanchez | 38 | Executive Vice President |
| Cameron W. George | 38 | Executive Vice President and Chief Financial Officer |
| Gregory B. Kopel | 47 | Executive Vice President, General Counsel and Secretary |
| Kirsten A. Hink | 52 | Senior Vice President and Chief Accounting Officer |

(1) Member of the Nominating and Corporate Governance Committee.
(2) Member of the Audit Committee.
(3) Member of the Compensation Committee.
(4) Member of the Special Committee (as defined below).

The Board currently consists of ten members. The directors are divided into three classes serving staggered three-year terms. Messrs. Garcia, Maher and Nelson are designated as Class I directors, and their terms of office expire on the date of the Company's next annual meeting of stockholders. Messrs. Carney, Colvin and Jackson are designated as Class II directors, and their terms of office expire on the date of the Company's 2020 annual meeting of stockholders. Messrs. Sanchez, Jr., Sanchez, III, Davis and Zylman are designated as Class III directors, and their terms of office expire on the date of the Company's 2021 annual meeting of stockholders.

Set forth below is biographical information about each of the Company's directors and executive officers as of the filing of this Amendment as well as the primary individual experience, qualifications, attributes and skills of each of our directors that led to the Nominating and Corporate Governance Committee's and Board's conclusion that such director should serve as a member of the Board.

***A. R. Sanchez, Jr.*** has served as our Executive Chairman of the Board since November 2012. Mr. Sanchez, Jr. is the co-founder, Chief Executive Officer and Chairman of the Board of Directors of Sanchez Oil & Gas Corporation ("***SOG***"), a privately owned full service oil and natural gas operating company founded in 1972 engaged in the exploration and development of oil and natural gas assets primarily in South Texas, Louisiana and the onshore Gulf Coast areas on behalf of certain of its affiliates. SOG is an affiliate of the Company. Mr. Sanchez, Jr. received his Bachelor of Arts and Doctor of Jurisprudence degrees from St. Mary's University in San Antonio, Texas. Mr. Sanchez, Jr. currently serves as president and director for the A. R. "Tony" and Maria J. Sanchez Family Foundation. He is also a director and stockholder of International Bancshares Corporation (NASDAQ: IBOC) ("***International Bancshares***"), a member of the Board of Visitors and Membership/Board Development Task Force at the University of Texas MD Anderson Cancer Center, a member of the Board of Advisors at Rice University's Baker Institute and a member of the Board of Trustees at Baylor College of Medicine. Because Mr. Sanchez, Jr. has over 46 years of experience in the oil and natural gas industry as well as a comprehensive understanding of oil and natural gas operations, we believe that Mr. Sanchez, Jr. is qualified to

serve as a director of the Company. Mr. Sanchez, Jr. is the father of Mr. Sanchez, III, our President and Chief Executive Officer and member of the Board and Mr. P. Sanchez, our Executive Vice President.

***Antonio R. Sanchez, III*** has served as our President and Chief Executive Officer since October 2018, and prior to that as our Chief Executive Officer since our formation in August 2011 and has been directly involved in the oil and natural gas industry for over 18 years. Mr. Sanchez, III served as our Chairman of the Board from August 2011 to November 2012 and continues to be a member of our Board. Mr. Sanchez, III served as our President from August 2011 until October 2015. Mr. Sanchez, III is also co-president of SOG, which he joined in October 2001. In his capacity as an officer of SOG, Mr. Sanchez, III manages all aspects of its daily operations, including exploration, production, engineering and land management. In addition, Mr. Sanchez, III is a member of the board of directors of Sanchez Midstream Partners GP LLC ("***SNMP GP***"), the general partner of Sanchez Midstream Partners LP (NYSE: SNMP) ("***SNMP***"). From 1999 to 2001, Mr. Sanchez, III worked in a variety of positions, including sales and marketing, product development and investor relations, at Zix Corporation (NASDAQ: ZIXI), a publicly traded encryption technology company listed on the Nasdaq Global Market. Mr. Sanchez, III was a member of the board of directors of Zix Corporation from May 2003 until June 2014. From 1997 to 1999, Mr. Sanchez, III was an investment banker specializing in mergers and acquisitions with J.P. Morgan Securities Inc. He earned a Bachelor of Business Administration degree from Georgetown University with a concentration in accounting and finance and a minor in economics and a Master of Business Administration degree from Harvard Business School. Mr. Sanchez, III has significant experience managing oil and natural gas operations and serving as a member of the board of directors of a publicly traded company as well as extensive knowledge of the energy industry. For these reasons, we believe that Mr. Sanchez, III is qualified to serve as a director of the Company. Mr. Sanchez, III is the son of Mr. Sanchez, Jr., our Executive Chairman of the Board, and the brother of Mr. P. Sanchez, our Executive Vice President.

***T. Brian Carney*** has served as our director since May 2015 and is a member of our Nominating and Corporate Governance Committee, our Compensation Committee and our Audit Committee. Mr. Carney is an attorney from Midland, Texas, where he has practiced law at the Law Office of Brian Carney since 1992. His practice focuses on litigation in both state and federal courts. Mr. Carney graduated from the University of Oklahoma with a Bachelor of Business Administration in Finance, and he received his Doctor of Jurisprudence from Oklahoma City University in 1991. We believe that Mr. Carney is well-qualified to serve as a member of our Board due to his legal background and experience.

***M. Gregory Colvin*** has served as our director since March 2012. Since April 2018, Mr. Colvin has also served as a director of Pure Acquisition Corp (NASDAQ: PACQ). Mr. Colvin was the Managing Partner, Chief Operating Officer and Head of Investor Relations of Sankofa Capital, an investment management firm, which he co-founded, from December 2011 to December 2016. From 2007 until he joined Sankofa Capital, Mr. Colvin was a licensed broker originating and raising capital for private equity and hedge fund clients. From 1997 to 2006, Mr. Colvin was a Managing Director of the Private Funds Group at Donaldson, Lufkin & Jenrette Securities Corp. and Credit Suisse LLC. Mr. Colvin started his professional career with Stephens Inc. specializing in placing primary and secondary fixed income products to institutional investors. From January 1, 2017 through the present, Mr. Colvin has managed his personal investments. Mr. Colvin received his Bachelor of Science in Business Administration degree from the University of Arkansas. Mr. Colvin currently serves on the advisory board of the Sam M. Walton College of Business at the University of Arkansas. We believe that Mr. Colvin is well-qualified to serve as a member of our Board. In addition to his extensive experience in leadership positions at large financial institutions, Mr. Colvin has a substantive understanding of the upstream oil and natural gas industry and a financial background that gives him the ability to understand and analyze our business and our opportunities.

***Eugene I. Davis*** has served as our director since October 2018 and Chairman of our Special Committee. Mr. Davis is the Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC, a private consulting firm specializing in turnaround management, merger and acquisition consulting, hostile and friendly takeovers, proxy contests and strategic planning, which Mr. David founded in 1997. Since forming PIRINATE, Mr. David has advised, managed, sold, liquidated and served as chief executive officer, chief restructuring officer, chairman or committee chairman of a number of businesses operating in diverse sectors. Before forming PIRINATE, Mr. Davis served as President, Vice Chairman and a director of Emerson Radio Corporation from 1990 to 1997. He also served as Chief Executive Officer and Vice Chairman of Sport Supply Group, Inc., a direct-mail marketer of sports equipment, from 1996 to 1997. Mr. Davis began his career in 1980 as an attorney and international negotiator with Exxon Corporation and Standard Oil Company (Indiana) and was in private practice from 1984 to 1992. Mr. Davis currently serves as a director of the following public companies: Seadrill Limited (NYSE: SDRL), Montage Resources Corporation (NYSE: MR) and Verso Corporation (NYSE: VRS), where he serves as Co-Chairman. In addition, Mr. Davis served on the board of directors of VICI Properties Inc. (NYSE: VICI) until April 2019 but has decided not to stand for re-election. Mr. Davis holds a bachelor's degree from Columbia College, a Master of International Affairs degree in international law and organization from the School of International Affairs of Columbia University, and a Juris Doctorate from Columbia University School of Law. We believe Mr. Davis is well-qualified to serve as a member of our Board due to his professional experiences, which have provided Mr. Davis with significant knowledge about strategic planning, mergers and acquisitions, finance, accounting, capital structure and board practices. In addition, Mr. Davis has served as a director of numerous public and private companies providing him with a wide range of experiences on which he can draw while serving as a director.

***Gilbert A. Garcia*** has served as our director since December 2011 and is a Co-Chair of our Audit Committee, Chairman of our Compensation Committee and a member of our Nominating and Corporate Governance Committee. Mr. Garcia is the Managing

Partner of Garcia Hamilton & Associates, L.P., an institutional asset management firm, which he joined in 2002 and where he supervises all facets of the firm's investment decisions. Prior to joining Garcia Hamilton & Associates, L.P., Mr. Garcia worked at two other institutional asset management firms, Smith Graham & Company, where Mr. Garcia was most recently the Chief Investment Officer, and Cisneros Asset Management, where he was most recently President. Mr. Garcia started his professional career with Salomon Brothers specializing in mortgage-backed securities. Mr. Garcia received his Bachelor of Arts degree in Economics from Yale University. We believe that Mr. Garcia is well-qualified to serve as a member of our Board. In addition to his professional experience, Mr. Garcia also has extensive experience serving in leadership positions of community organizations, including as the Chairman of the Metropolitan Transit Authority of Harris County, Texas. We believe that Mr. Garcia's executive experience, including through his service on community organizations, provides valuable financial and management experience that is critical to his ability to identify, understand and address the challenges and opportunities that we face as a public company.

***Alan G. Jackson*** has served as our director since November 2012 and is the Chairman of our Nominating and Corporate Governance Committee. Mr. Jackson is the Senior Commercial Producer at IBC Insurance Agency, Ltd. ("***IBC***"). Mr. Jackson is the former co-owner of Inscorp, Inc., a leading commercial insurance agent/brokerage in South Texas, which was acquired by IBC in 2009. Mr. Jackson received his Bachelor of Business Administration degree from Texas A&M University at Kingsville, Texas, and is a graduate of the University of Texas, McCombs School of Business' Management Development Program. We believe that Mr. Jackson is well-qualified to serve as a member of our Board because of his experience working with many land and mineral owners and their representative brokers, bankers and attorneys and with many oil and natural gas operators, non-operators, investors, service companies and logistics carriers in the energy industry throughout South Texas, including the Eagle Ford Shale.

***Sean M. Maher*** has served as our director since November 2014 and is Co-Chair of our Audit Committee and a member of our Compensation Committee and our Nominating and Corporate Governance Committee. Mr. Maher is the Senior Portfolio Manager of RCH Energy, an investment management firm, which he joined in June 2008. From 2006 until joining RCH Energy, Mr. Maher was an Executive Director at Morgan Stanley and the Head of Master Limited Partnership and Integrated Natural Gas Research. From 2001 to 2006, Mr. Maher was a member of the Integrated Oils and Independent Refining Equity Research team for Morgan Stanley. From 1999 to 2001, Mr. Maher was an analyst in the Energy Investment Banking team at Morgan Stanley. Mr. Maher began his career at Morgan Stanley in 1997 within the Financial Reporting and Controllers Group that covered the Investment Banking business, including Mergers and Acquisitions, Equity Capital Markets, Debt Capital Markets and Private Equity. Mr. Maher received both his Bachelor of Business Administration in Finance and his Master of Business Administration in Finance and Accounting degrees from Saint Bonaventure University. We believe that Mr. Maher is well-qualified to serve as a member of our Board due to his extensive financial and energy experience.

***Robert V. Nelson, III*** has served as director since August 2016 and is a member of our Compensation Committee, our Nominating and Corporate Governance Committee, and our Audit Committee. Until April 2019, Mr. Nelson served as the President of Waste Disposal Services for NRC Group Holdings Corp. (NYSE: NRCG) ("***NRCG***"), an NYSE American listed provider of environmental, compliance and waste management services, following the business combination and sale of National Response Corporation ("***NRC***") and Sprint Energy Services ("***Sprint***") in October 2018. Prior to this, Mr. Nelson served as the President and Chief Executive Officer of Sprint from July 2017 until its merger with NRC and as the Chief Operating Officer of Sprint from September 2016 to July 2017. Mr. Nelson currently manages his personal investments. From February 2016 through August 2016, Mr. Nelson managed personal investments. Prior to this, after the sale of Nabors Completion & Production Services, Mr. Nelson was most recently with C&J Energy Services Ltd. (NYSE: CJES) ("***C&J***") from March 2015 to January 2016, where he was Vice President of Corporate Operational Development. Prior to joining C&J, Mr. Nelson served in positions of increasing responsibility with Nabors Industries Ltd. (NYSE: NBR) ("***Nabors***") and its subsidiaries from 2006 to March 2015. He began in Corporate Development followed by assignments in Treasury, Nabors Drilling USA, and finally in Nabors Well Services as Vice President and General Manager of the South Texas Region for Nabors Completion and Production Services. Mr. Nelson worked for UBS before beginning his career at Nabors. He holds a Bachelor of Arts degree from the University of Texas at Austin and a Master of Business Administration degree from Rice University's Jones Graduate School of Business. We believe that Mr. Nelson is well-qualified to serve as a member of our Board due to his extensive experience that spans all areas of oil and natural gas exploration, drilling and production, including with respect to operations in the Eagle Ford Shale, our core area of focus. We also believe Mr. Nelson's unique service sector insight and perspective will greatly benefit the Board and management as we work to continuously improve operations and develop our plans for the future.

***Adam C. Zylman*** has served as our director since October 2018 and is a member of our Special Committee. Mr. Zylman is the President and Chief Executive Officer of Sunland Capital LLC, a privately-owned holding company that invests in energy, industrial and infrastructure service companies, which Mr. Zylman co-founded in 2009. During his career, Mr. Zylman has been involved in dozens of new platform company recapitalizations and add-on acquisition transactions as well as the successful sale or initial public offering of several companies. Prior to co-founding Sunland Capital, Mr. Zylman spent more than a decade in private equity and investment banking at SCF Partners and Merrill Lynch's Global Energy & Power Group, respectively. Mr. Zylman graduated summa cum laude with a Bachelor of Arts in Economics and Managerial Studies from Rice University and is a member of the Houston Chapter of the Young Presidents'

Organization. We believe Mr. Zylman is well-qualified to serve as a member of our Board due to his extensive experience in recapitalizations, private equity investments and investment banking.

***Patricio D. Sanchez*** has served as our Executive Vice President since November 2016. Mr. P. Sanchez also serves as President & Chief Operating Officer and a director of SNMP GP, which positions he has held since March 2017 and June 2015, respectively. Mr. P. Sanchez served as Chief Operating Officer of Sanchez Production Partners GP, LLC from May 2015 through March 2017, when he was appointed President & Chief Operating Officer. Mr. P. Sanchez has served as co-president of SOG since June 2014 and served as Executive Vice President prior to that from April 2010 to June 2014. Mr. P. Sanchez has also been the managing member of Santerra Holdings, LLC, an oil and natural gas production company, since February 2012. Mr. P. Sanchez holds a Bachelor of Arts from Bentley College and a Masters in Energy and Mineral Resources from the University of Texas at Austin. Mr. P. Sanchez is the brother of Mr. Sanchez, III, the Company's President and Chief Executive Officer and member of the Board, and the son of Mr. Sanchez, Jr., the Executive Chairman of the Board.

***Cameron W. George*** has served as our Executive Vice President and Chief Financial Officer since March 2019. In this role, he oversees the Company's finance, accounting, treasury, investor relations, corporate reserves and business development activities. Previously he served as our Interim Chief Financial Officer from October 2018 until his current appointment, and as Senior Vice President — Capital Markets of SOG since May 2016. Mr. George has more than 15 years of industry and investment banking experience. Prior to joining SOG, he served in positions of increasing responsibility at Linn Energy, LLC (NASDAQ: LINE) from August 2005 to May 2016, most recently as the Director of Finance, and was an investment banker in the energy group at RBC Capital Markets. Mr. George graduated summa cum laude with business honors and received a Bachelor of Business Administration from Southern Methodist University.

***Gregory B. Kopel*** has served as our Executive Vice President, General Counsel and Secretary since March 2019 and prior to that he served as our Senior Vice President, General Counsel and Secretary from December 2015 to March 2018. Prior to joining the Company, Mr. Kopel focused on energy transactions, with an emphasis on mergers and acquisitions and joint ventures as Vice President and Associate General Counsel at Breitburn Energy Partners LP (NASDAQ: BBEP) from April 2013 to December 2015 and in corporate legal positions at Linn Energy LLC from June 2010 to April 2013 and Occidental Petroleum Corporation from December 2005 to June 2010. Mr. Kopel began his legal career working at two international law firms. Mr. Kopel earned a B.A. in Government at the University of Texas at Austin, and a J.D. at the University of Houston.

***Kirsten A. Hink*** has served as our Senior Vice President and Chief Accounting Officer since January 2015, and previously served as our Vice President and Principal Accounting Officer since March 2012. Prior to joining us, Ms. Hink served as the Controller of Vanguard Natural Resources, LLC (NASDAQ: VNR) from January 2011 to February 2012, where she oversaw the company's financial reporting and accounting. From January 2010 to December 2010, she served as Assistant Controller of Mariner Energy, Inc., where she managed the revenue and production reporting as well as assisted with financial and bankruptcy reporting for the Edge Petroleum Corporation properties that were acquired by Mariner. She served as the Chief Accounting Officer for Edge from July 2008 through December 2009 and the Vice President and Controller for Edge from October 2003 through July 2008, where she oversaw the preparation of Edge's financial statements. Prior to that time she served as Controller of Edge from December 2000 to October 2003 and Assistant Controller of Edge from June 2000 to December 2000. Edge filed for Chapter 11 bankruptcy protection in October 2009. Before joining Edge, she served as Controller of Benz Energy Inc., an oil and natural gas exploration company, from June 1998 to June 2000. Ms. Hink received a Bachelor of Science in Accounting degree from Trinity University. Ms. Hink is a Certified Public Accountant in the State of Texas.

**Section 16(a) Beneficial Ownership Reporting Compliance**

The executive officers and directors of the Company and persons who beneficially own more than 10% of the Company's common stock are required to file reports with the SEC, disclosing the amount and nature of their beneficial ownership in common stock, as well as changes in that ownership. Based solely on its review of reports and written representations that the Company has received, the Company believes that all required reports were timely filed during 2018.

**Code of Business Conduct and Ethics**

The Board has adopted a Code of Business Conduct and Ethics applicable to our employees (including those employees of SOG that provide services to us), directors and officers, in accordance with the applicable rules of the SEC. Any waiver of this code may be made only by our Board. In accordance with the rules of the SEC, we will provide any person, without charge and upon request, with a copy of our Code of Business Conduct and Ethics. Requests should be directed to us at 1000 Main Street, Suite 3000, Houston, Texas 77002, Attention: Secretary. The Code of Business Conduct and Ethics is also available, and we will disclose any amendments to or waivers of the Code of Business Conduct and Ethics, on our website at www.sanchezenergycorp.com. The information on our website is not incorporated by reference into this Amendment.

Table of Contents

**Audit Committee**

The Board has a separately-designated standing audit committee established in accordance with Section 3(a)(58)(A) of Securities Exchange Act of 1934 (the "***Exchange Act***"). Our Audit Committee currently consists of a total of four directors, Messrs. Garcia (Co-Chairperson), Maher (Co-Chairperson), Carney and Nelson, each of whom the Board has determined to be an "independent director" as defined by the New York Stock Exchange (the "***NYSE***") rules and Rule 10A-3 of the Exchange Act. The Board has determined that each member of the Audit Committee is "financially literate" as required by the NYSE rules. Additionally, the Board has determined that Mr. Garcia is an "Audit Committee Financial Expert" as defined by the Exchange Act. Stockholders should understand that this designation is a disclosure requirement of the SEC related to Mr. Garcia's experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Mr. Garcia any duties, obligations or liability that are greater than those generally imposed on him as a member of the Audit Committee and the Board, and his designation as an Audit Committee Financial Expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board.

**Item 11.** ***Executive Compensation***

**Compensation Discussion and Analysis**

***Introduction***

This Compensation Discussion & Analysis ("***CD&A***") explains our executive compensation program for our named executive officers listed below. This CD&A also describes the Compensation Committee's process for making such pay decisions, as well as its rationale for specific decisions related to fiscal 2018, and certain decisions made with respect to 2019 compensation matters. Except as expressly noted below, the CD&A relates to our 2018 compensation program, process and rationale.

| Named Executive Officer | Position |
|---|---|
| A. R. Sanchez, Jr. | Executive Chairman of the Board |
| Antonio R. Sanchez, III | President and Chief Executive Officer |
| Patricio D. Sanchez | Executive Vice President |
| Howard J. Thill | Former Executive Vice President and Chief Financial Officer(1) |
| Christopher D. Heinson | Former Senior Vice President and Chief Operating Officer(2) |
| Cameron W. George | Executive Vice President and Chief Financial Officer |
| Gregory B. Kopel | Executive Vice President, General Counsel and Secretary |

(1) Mr. Howard J. Thill resigned from the Company effective as of October 26, 2018.
(2) Mr. Christopher D. Heinson resigned from the Company effective as of July 9, 2018.

***Background on Our Organizational Structure***

Before reviewing our CD&A, it is important to understand our organizational structure and how it impacts our executive compensation program. Initially we note that management and the Board have the added benefit of Mr. Sanchez, Jr., the Company's full time Executive Chairman, who has a deep understanding of the cycles and challenges of the oil and natural gas industry from his over 46 years of experience in the industry. The close working relationship between the Executive Chairman and the President and Chief Executive Officer gives the Board and the Company's stockholders a strong leadership team that can address issues quickly and seamlessly. Second, all of our executive officers are employed by SOG and provide services both to us and other affiliates of SOG (SOG together with its affiliates (other than the Company), the "***Sanchez Group***") in their capacity as employees of SOG. Except as described below, our Compensation Committee determined and approved the base salary and annual bonus amounts for the services our named executive officers provided to us as well as equity awards granted under the Third Amended and Restated 2011 Long Term Incentive Plan (the "***Plan***") discussed in this CD&A. SOG pays all base salary and annual bonus amounts to our named executive officers and, pursuant to the services agreement between us and SOG, we reimburse SOG for the portion of compensation expenses (including base salary, benefits and annual bonuses) attributable to services provided to our business. We estimate that during 2018, our named executive officers other than Mr. P. Sanchez dedicated approximately 100% of their professional time to providing services to us. We estimate that during 2018, Mr. P. Sanchez dedicated approximately 43% of his professional time to providing services to us.

***Our Compensation Program and Philosophy for 2018***

We are committed to paying-for-performance and our executive compensation philosophy seeks to (i) motivate Sanchez Group employees to perform at the highest level consistent with our core values, (ii) reward those high performing employees and (iii) retain and attract top talent. More particularly, the cash and benefit portions of our executive compensation program were

designed to attract and retain individuals with the background and skills necessary to successfully execute our business model in a demanding environment, and to reward success in reaching performance goals. Our equity award program sought to ensure that a substantial portion of each named executive officer's compensation was directly tied to our performance, which further aligns the interests of our named executive officers with those of our stockholders.

***Elements of 2018 Executive Compensation***

There are three primary elements of compensation that were used in our 2018 executive compensation program: (1) base salaries, (2) annual cash bonuses and (3) long-term equity incentive awards. Annual cash bonuses and equity incentive awards represent the at-risk elements of compensation intended to drive performance. They are also flexible in application and can be tailored to meet our objectives for the applicable year. Prior to 2018, we did not have any specific policies regarding the allocation of compensation between either long- or short-term compensation, or cash and non-cash compensation. In 2018, we adopted a compensation program that required 50% of our named executive officers' long-term equity awards to be directly linked to the achievement of specific performance goals. The determination of each named executive officer's cash bonus reflects his relative contribution to achieving or exceeding annual Company goals, while the overall long-term incentive award determination is based on his expected contribution in respect of long-term performance objectives.

| Element | Objective | Key Features |
| --- | --- | --- |
| **Base Salaries**<br>**(only fixed component)** | • Provide base compensation that is competitive for each position to reward and motivate individual performance | • Targeted to be in a competitive range compared to similarly situated executives at our peer companies<br>• Increased or decreased depending on responsibility, experience and skill of each executive and their respective position |
| **Annual Cash Bonuses**<br>**(at risk, performance based)** | • Reward executives for the achievement of short-term Company objectives<br>• Fosters a results-driven pay-for-performance culture | • Variable compensation payable only in connection with achievement of strategic and financial goals<br>• Rewards individual contributions to Company success |
| **Long-Term Equity Incentive Awards**<br>**(at risk, performance based)** | • Align executive interests with those of our stockholders<br>• Tie value of compensation to long-term share price performance<br>• Reinforce executive retention<br>• Provide share ownership opportunities | • The value of time-vested restricted stock and phantom stock granted increases or decreases as the value of our shares increases or decreases, incentivizing our executives to build long-term sustainable growth<br>• The value of performance-based awards is based on the level of achievement of the performance objective(s) during the performance period<br>• Multi-year vesting periods, which encourage long-term retention |

***Our 2018 Decision-Making Process***

The Compensation Committee has historically overseen the executive compensation program for our named executive officers and oversaw the compensation outlined in this Amendment, except as described in the following paragraph. The Compensation Committee is comprised of independent, non-employee members of the Board. The Compensation Committee worked very closely with its independent consultant and management to examine the effectiveness of the Company's executive compensation program throughout the year. Details of the Compensation Committee's authority and responsibilities are specified in its charter, which is available on the Company's website at http://investor.sanchezenergycorp.com/phoenix.zhtml?c=248475&p=irol-govHighlights. The information on our website is not incorporated by reference into this Amendment or the Original Filing.

Table of Contents

On November 9, 2018, the Board established the special committee of the Board (the "***Special Committee***") to, among other things, recommend approval of (subject to ultimate approval by the Board or the Compensation Committee, as applicable) any bonuses, incentive plans or other equity or equity-linked or cash compensation plans or awards to or for officers, employees or other service providers or consultants of the Company that may be related to or arise from any strategic transaction or that the Special Committee determines are necessary and appropriate to incentivize performance by such persons. Subsequently, on March 20, 2019, the Board delegated to the Special Committee the exclusive power and authority to (i) negotiate and approve, in its sole discretion, employment agreements and other similar agreements with SOG employees on behalf of the Company, including our named executive officers, and (ii) consider, evaluate and approve, in its sole discretion, one or more cash and/or equity executive incentive plans for SOG employees, including our named executive officers, regarding their services to the Company and its subsidiaries.

***The Role of the Compensation Committee***. For 2018 compensation, the Compensation Committee reviewed, assessed and monitored the performance, and reviewed the design and function, of the Company's incentive compensation arrangements to ensure that any risk-taking incentives were consistent with regulatory guidance and the safety and soundness of the organization. The Compensation Committee was responsible for assessing and approving the total compensation paid to the Chief Executive Officer and other named executive officers. The Compensation Committee was responsible for determining whether the compensation paid to each of these executives was fair, reasonable and competitive, and whether the compensation program served the interests of the Company's stockholders.

***Role of the Executive Officers in Setting Executive Compensation***. The Executive Chairman and Chief Executive Officer made recommendations to the Compensation Committee for each of the named executive officers based on the Executive Chairman's and Chief Executive Officer's assessment of each executive's personal performance, as well as the achievement of the overall Company goals for the fiscal year. The Compensation Committee reviewed the recommendations, made adjustments as it determined appropriate and approved compensation at its sole discretion.

***Role of the Compensation Consultant***. In November 2017, Pearl Meyer, LLC ("***Pearl Meyer***"), a leading independent compensation consulting firm, was engaged as the Compensation Committee's independent compensation consultant to assist the Compensation Committee in re-assessing the Company's executive compensation programs and in guiding the Compensation Committee in its actions impacting 2018 executive compensation. The Compensation Committee retained Pearl Meyer as its compensation consultant pursuant to its charter, which grants the Compensation Committee the authority to retain a compensation consultant. Pearl Meyer's tasks for 2018 were to:

- Review and develop an appropriate peer group of companies for executive market compensation practices;
- Review the Company's current compensation levels and proposals for 2018;
- Conduct a competitive market analysis of executive compensation for our named executive officers;
- Conduct a competitive market analysis of compensation for our outside directors;
- Provide an update on executive compensation trends and developments;
- Provide consulting on other matters pertaining to executive compensation as requested by the Compensation Committee; and
- Provide guidance and recommendations for assessing 2018 and ongoing compensation practices.

The Compensation Committee did not direct Pearl Meyer to perform its services in any particular manner or under any particular method.

The Compensation Committee evaluates its compensation consultant annually to determine its independence. The Compensation Committee determined that no conflicts of interest exist with respect to Pearl Meyer's consulting services for 2018. The factors considered by the Compensation Committee in conducting this analysis are as follows:

- The provision of other services to us by Pearl Meyer, if any;
- The amount of fees received from us by Pearl Meyer as a percentage of Pearl Meyer's total revenue;
- The policies and procedures of Pearl Meyer that are designed to prevent conflicts of interest;
- Any business or personal relationship of Pearl Meyer or its consultants with a member of the Compensation Committee;
- Any stock of the Company owned by Pearl Meyer's consultants;
- Any business or personal relationship of Pearl Meyer or its consultants with any of our executive officers; and
- Submission of a formal declaration by Pearl Meyer confirming its independence.

***Use of Market Data and Peer Comparisons***. Each year the Compensation Committee reviews and revises, as it determines appropriate, the peer group companies with which we compete for executive talent so that we could use compensation types and levels paid across the peer group as a reference point for assessing the allocated portion of executive compensation set by the Compensation Committee as well as the type, volume and terms of our equity compensation grants for the year. In late 2017, the Compensation Committee, working with Pearl Meyer and our management, established a new peer group that was used to assess compensation norms for the annual review of 2018 salaries and the formulation of the 2018 grants under the Plan, among other matters.

Based upon (1) industry surveys SOG participates in each year, (2) Pearl Meyer's database, (3) survey data from 2017 proxy filings of comparably-sized companies and (4) a market review conducted by Pearl Meyer in late 2017, the Compensation Committee established the following peer group, which the Compensation Committee believes more closely matches the Company's revenue and revenue projections than the peer group previously used by the Company.

| | | |
|---|---|---|
| Cabot Oil and Gas Corp. | EP Energy Corporation | Oasis Petroleum Inc. |
| Carrizo Oil & Gas Inc. | Halcon Resources Corp | Resolute Energy Corp. |
| Cimarex Energy Co. | Laredo Petroleum Inc. | SM Energy Company |
| Comstock Resources, Inc. | Matador Resources Co. | WPX Energy, Inc. |
| Denbury Resources, Inc. | Murphy Oil Corporation | |
| Diamondback Energy Inc. | Newfield Exploration Co. | |

The Compensation Committee reviewed data regarding both total compensation and each element of compensation paid to similarly situated executives at the peer group companies and data from an E&P compensation survey prepared by Pearl Meyer and other market data when evaluating compensation paid to our named executive officers and our equity grant types and amounts. Our Compensation Committee believes that providing compensation opportunities within a competitive range of our peer group will ensure we can attract and retain talented executive officers with the expertise and dedication required for our Company to excel.

***The Executive Compensation Program in Detail***

Provided below is a review of the Compensation Committee's determinations of base salary, annual cash bonuses and long-term equity incentive stock awards for our named executive officers for 2018 and 2019 through the date of this Amendment.

***Base Salary***. Our Compensation Committee establishes base salary levels for each of our named executive officers. The Compensation Committee reviews the named executive officers' base salaries on an annual basis and makes adjustments as necessary to maintain a competitive executive compensation structure. Our Compensation Committee also reviews and adjusts, as appropriate, base salaries in connection with a promotion or other change in responsibility of our named executive officers.

For 2018, the Compensation Committee elected to leave base salary levels for our Executive Chairman and President and Chief Executive Officer unchanged from 2017. The Compensation Committee elected to increase the base salaries of our former Executive Vice President and Chief Financial Officer and former Senior Vice President and Chief Operating Officer from $450,000 to $475,000 and $412,000 to $450,000, respectively, to better align these executives' compensation with those in similar roles at our peers. In addition, Mr. P. Sanchez's base salary was increased by the Compensation Committee from $250,000 to $300,000 from 2017 to 2018 due to his expanding involvement at the Company, including his assistance on closing the Comanche Acquisition (as defined in the Original Filing) and management of SN EF UnSub (as defined below) and the increased percentage of his time spent on our matters.

For 2019, in February 2019 the Compensation Committee elected to increase the base salary levels for our Executive Chairman, President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary from 2018 and leave the Executive Vice President's base salary level the same as it was in 2018. The Compensation Committee determined that Messrs. Sanchez, Jr. and Sanchez, III's base salaries should be increased due to their efforts related to the Company's restructuring and transformation processes as well as the fact that their salaries had not been increased since 2014 and fell within the bottom quartile of the Company's peer group, among other reasons. The Compensation Committee determined the increase in Mr. George's salary was warranted given the increase in responsibilities he assumed with the Interim Chief Financial Officer role and his efforts related to restructuring the balance sheet, among other reasons. The Compensation Committee determined the increase in Mr. Kopel's salary was warranted to better align his compensation with those in similar roles at our peers, his efforts related to the Company's restructuring and transformation processes and increased responsibilities at the Company, among other reasons.

Table of Contents

| Name | 2017 Base Salary | 2018 Base Salary | 2019 Base Salary |
|---|---|---|---|
| A. R. Sanchez, Jr. | $ 650,000 | $ 650,000 | $ 750,000 |
| Antonio R. Sanchez, III | 650,000 | 650,000 | 750,000 |
| Patricio D. Sanchez | 250,000 | 300,000(1) | 300,000(1) |
| Howard J. Thill | 450,000 | 392,708(2) | — |
| Christopher D. Heinson | 412,000(3) | 246,813(3) | — |
| Cameron W. George | — | 425,000(4) | 475,000 |
| Gregory B. Kopel | — | 393,750(5) | 412,000 |

(1) During 2017, 2018 and 2019, slightly less than half of Mr. P. Sanchez's base salary was or will be allocated to us. The amounts reported above for 2017, 2018 and 2019 reflect only that portion of his base salary attributable to us.

(2) Mr. Thill resigned from the Company effective as of October 26, 2018. During 2018, Mr. Thill's base salary was increased to $475,000 per year effective as of February 16, 2018. The salary reported above for Mr. Thill for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Executive Vice President and Chief Financial Officer in 2018.

(3) Mr. Heinson resigned from the Company effective as of July 9, 2018. During 2018, Mr. Heinson's base salary was set at $450,000 per year. The salary reported above for Mr. Heinson for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Senior Vice President and Chief Operating Officer in 2018.

(4) Mr. George was appointed as our Executive Vice President and Chief Financial Officer on March 19, 2019 and previously served as our Interim Chief Financial Officer from October 26, 2018 until March 19, 2019. His fiscal year 2018 base salary was $425,000 per year. Prior to his appointment as our Interim Chief Financial Officer, Mr. George provided services to us in his capacity as Senior Vice President — Capital Markets of SOG. The salary reported for 2018 above includes the salary he received from us in both his capacity as our Interim Chief Financial Officer and his capacity as Senior Vice President — Capital Markets of SOG.

(5) During 2018, Mr. Kopel's base salary was increased to $400,000 effective as of February 16, 2018.

***Annual Cash Bonus Awards***. Annual cash bonus awards are determined based on qualitative assessment of financial and individual performance achievements. The Compensation Committee and SOG review bonus awards for our named executive officers annually to determine award payments for the current fiscal year.

With regard to the annual cash bonus awards made for 2018, the Compensation Committee and SOG took a number of factors into account in making its award decisions, including:

- Certain operational metrics including the year-over-year increases in production, proved reserves, total assets and revenues and well performance;
- The Company's safety record;
- Work associated with the Company's restructuring and transformation processes;
- The size of the Company's asset base and production profile;
- Bonus opportunities and actual bonuses paid by the Company's peer group and competitors, including competitive bonus plans' payout opportunity ranges; and
- Individual performance of each of the named executive officers.

These efforts and the outcomes above were reviewed and considered, along with, and in consideration of, the challenges that the Company faced in 2018, to determine the bonus awards to our named executive officers. The Compensation Committee, in reviewing and determining the actual bonuses to be paid, with the input of Pearl Meyer, took into account the current base pay levels of our most senior executives in determining these awards, recognizing such base salaries are below the market median for comparable positions in the Company's peer group and no long-term equity awards were granted for 2019. Based on the foregoing, in February 2019, the Compensation Committee elected to award 2018 annual cash bonuses of $1,700,000 to our Executive Chairman and President and Chief Executive Officer, a reduction of $500,000 from the amount of their 2017 annual bonuses, 2018 annual cash bonuses of $650,000 and $500,000 to our Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary, respectively, an increase of $150,000 and $40,000, respectively, from the amount of their 2017 annual bonuses, and a 2018 annual cash bonus of $625,000 to our Executive Vice President, a reduction of $625,000 from the amount of his 2017 annual bonus.

***Long-Term Incentive Plan***. We adopted the Plan in order to have the flexibility to grant equity and equity-based awards to employees (including Sanchez Group employees), officers, consultants and directors who perform services for us. Each of our named executive officers is eligible to receive awards under the Plan, which is administered by the Compensation Committee.

Our Plan allows for the grant of restricted shares, phantom shares, share options, share appreciation rights and other share-based awards. The purpose of awards under our Plan is to provide additional incentive compensation to individuals providing services to us and to align the economic interests of such individuals with the interests of our stockholders. Our Plan limits the number of shares that may be delivered under the Plan to 17,239,790 shares of our common stock plus, upon the issuance of additional shares of common stock after April 15, 2016, an additional number of shares equal to 15% of such issuance or such lesser number determined by the Compensation Committee.

**2017 Plan Awards**. In March 2017, we granted our named executive officers target phantom shares of performance phantom stock units (the "***2017 Performance Awards***"), which are payable in shares of our common stock. The 2017 Performance Awards were intended to vest (if at all) in equal annual increments over a five-year period ranging from 0% to 200% of the target phantom shares granted based on our share price relative to the share price appreciation of the S&P Oil & Gas Exploration & Production Select Industry Index during a specified period.

In February 2018 and February 2019, the Compensation Committee determined that the threshold level of the applicable performance conditions was not met for either year, and therefore no payments were made under the 2017 Performance Awards for those measurement periods.

**2018 Plan Awards**. In late 2017 and early 2018, as part of Pearl Meyer's review of the types of equity incentive plans in place in the competitive market with management and the Compensation Committee, it was determined that the use of operational and financial measures reflecting the Company's long-term performance would provide more line-of-sight criteria for compensation and, therefore, a more direct link between these performance outcomes, equity performance and compensation opportunities. Following working sessions, strategy discussions and reviews of other programs in the industry, the Compensation Committee decided to modify the Company's long-term incentive program. Working with the Compensation Committee and Pearl Meyer, management developed measures with formal long-term performance goals that are both operational and financial.

A new long-term incentive program was implemented by the Compensation Committee in early 2018 that: (1) increases the percentage of the total grants under the Plan that are represented by stock-settled and cash-settled performance-based phantom stock awards (the "***2018 PSUs***"); (2) incorporates financial and operating performance measures that directly or indirectly impact the balance sheet and net value of the Company and (3) uses other metrics that are within the control or line-of-sight of our management.

Under this approach, 50% of our named executive officers' long-term equity awards for 2018 are directly linked to the achievement of specific performance goals. The awards linked to specific performance goals are in the form of the 2018 PSUs, the value of which is based upon the achievement of defined goals measured for each calendar year for a three-year performance period (January 1, 2018 through December 31, 2020). The Compensation Committee believed that this more structured and measurable performance-based equity program would better align management with shareholder interests. After careful consideration, the Compensation Committee established the following operating and financial metrics it believes drive greater returns and value for our stockholders, which are the metrics used in determining the final value of the 2018 PSUs granted in 2018: our leverage ratio, our reserve replacement ratio, operating costs and safety (each a "***2018 Award Performance Condition***" and, collectively, the "***2018 Award Performance Conditions***").

**Leverage Ratio**. With the volatility surrounding oil prices, investors are very keen on companies being able to deleverage, which made this metric a top priority, together with its planned management and reduction over time. We believe that improving the leverage ratio will demonstrate our progress in strengthening the balance sheet. Under the 2018 PSUs, the "Leverage Metric" is calculated as the Company's net debt to EBITDAX ratio, subject to adjustments for acquisitions, divestitures and non-recurring items.

**Reserve Replacement Ratio**. As an unconventional shale oil and natural gas company operating in a constantly depleting asset base or region, it is crucial for the Company to continue to organically replace its production with proved future reserves. Under the 2018 PSUs, "Reserve Replacement" is calculated using the Company's reserve replacement ratio subject to adjustment for acquisitions and divestitures.

**Operating Cost**. Minimizing operating costs is crucial to improving the Company's margins and driving cash flows. Reducing costs per barrel and other measures reflects directly on our production efficiency and profitability. We have set goals intended to maintain or increase these margins by lowering our costs to deliver hydrocarbons. Under the 2018 PSUs, "LOE/Boe" is calculated by dividing the Company's production expense by production, subject to adjustment for acquisitions, divestitures and non-recurring items.

**Safety**. To ensure management does what it can to create a safe work environment with limited incidents given our large operated position and multiple partners, we have established specific long-term goals related to the Company's total recordable injury rate. Under the 2018 PSUs, "TRIR" is calculated by SOG's total recordable injuries related to performance of services for the Company multiplied by 200,000 and divided by the number of labor hours at SOG for services to the Company.

The number of target 2018 PSUs that vest, if any, is determined by the level of achievement of 2018 Award Performance Conditions for each of the calendar year periods (each such year, a "***Measurement Period***") during a three-year period commencing on January 1, 2018 and ending on December 31, 2020. Within 60 days of the end of each of the three Measurement Periods, the level of achievement of each 2018 Award Performance Condition is determined and the results for each 2018 Award Performance Condition are weighted 30%, other than safety, which is weighted at 10%, to determine the number of target PSUs earned during the Measurement Period. The overall results of the target 2018 PSUs earned during each of the three Measurement Periods are weighted

Table of Contents

33.33% to determine the number of target 2018 PSUs earned during the entire three-year performance period. Subject to certain exceptions set forth in the applicable agreements, the 2018 PSU recipient must be employed by us on the applicable vesting date in order to become vested in the applicable portion of the 2018 PSUs.

The remaining 50% of our named executive officers' long term equity awards for 2018 was equally divided between (i) restricted shares of our common stock and (ii) phantom stock equal to a share of our common stock and payable only in cash. The awards vest in equal installments over a three-year period.

In determining the grant values of the equity awards, our Compensation Committee compared grant values of long-term awards to executives with similar positions at the Company's peer group that are between the 25% and 75% percentile of the peer group, reviewed and considered competitive market analysis of executive compensation prepared by Pearl Myer and considered the performance of each of our named executive officers.

The table below shows the values approved by the Compensation Committee in 2018.

**2018 Individual Targeted Grant Value Award Amount**

| Named Executive Officers | Targeted Grant Value Award Amount | |
|---|---|---|
| A. R. Sanchez, Jr. | $ | 6,500,000 |
| Antonio R. Sanchez, III | $ | 6,500,000 |
| Patricio D. Sanchez | $ | 3,250,000 |
| Howard J. Thill | $ | 2,400,000 |
| Christopher D. Heinson | $ | 2,400,000 |
| Cameron W. George | $ | 2,000,000 |
| Gregory B. Kopel | $ | 1,500,000 |

During the year ended December 31, 2018, our named executive officers were granted shares of restricted stock, phantom stock and 2018 PSUs consisting of performance cash-settled phantom shares and performance stock-settled phantom shares as indicated in the following table:

| Award Recipient | Vesting Schedule | Number of Shares Granted During 2018 |
|---|---|---|
| A. R. Sanchez, Jr. (1) | | |
| *Restricted Stock* | 3 year | 506,231 |
| *Phantom Stock* | 3 year | 506,231 |
| *Performance Cash Settled Phantom* | 3 year | 506,230 |
| *Performance Stock-Settled Phantom* | 3 year | 506,230 |
| Antonio R. Sanchez, III (2) | | |
| *Restricted Stock* | 3 year | 506,231 |
| *Phantom Stock* | 3 year | 506,231 |
| *Performance Cash-Settled Phantom* | 3 year | 506,230 |
| *Performance Stock-Settled Phantom* | 3 year | 506,230 |
| Patricio D. Sanchez (3) | | |
| *Restricted Stock* | 3 year | 253,116 |
| *Phantom Stock* | 3 year | 253,115 |
| *Performance Cash-Settled Phantom* | 3 year | 253,115 |
| *Performance Stock-Settled Phantom* | 3 year | 253,115 |
| Howard J. Thill (4) | | |
| *Restricted Stock* | 3 year | 186,916 |
| *Phantom Stock* | 3 year | 186,916 |
| *Performance Cash-Settled Phantom* | 3 year | 186,916 |
| *Performance Stock-Settled Phantom* | 3 year | 186,916 |

| | | |
|---|---|---|
| Christopher D. Heinson (5) | | |
| *Restricted Stock* | 3 year | 186,916 |
| *Phantom Stock* | 3 year | 186,916 |
| *Performance Cash-Settled Phantom* | 3 year | 186,916 |
| *Performance Stock-Settled Phantom* | 3 year | 186,916 |
| Cameron W. George (6) | | |
| *Restricted Stock* | 3 year | 155,764 |
| *Phantom Stock* | 3 year | 155,763 |
| *Performance Cash-Settled Stock* | 3 year | 155,763 |
| *Performance Stock-Settled Phantom* | 3 year | 155,763 |
| Gregory B. Kopel (7) | | |
| *Restricted Stock* | 3 year | 116,823 |
| *Phantom Stock* | 3 year | 116,823 |
| *Performance Cash-Settled Phantom* | 3 year | 116,822 |
| *Performance Stock-Settled Phantom* | 3 year | 116,822 |

(1) Includes 506,231 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period on the first three anniversaries of the grant date and 2018 PSUs consisting of 506,230 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(2) Includes 506,231 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period on the first three anniversaries of the grant date and 2018 PSUs consisting of 506,230 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(3) Includes 253,116 shares of restricted stock and 253,115 shares of phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 253,115 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(4) Includes 186,916 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 186,916 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions. In connection with Mr. Thill's resignation from the Company, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock (which included the 186,916 restricted shares awarded to Mr. Thill in 2018) and 245,250 shares of phantom stock (which included the 186,916 phantom shares awarded to Mr. Thill in 2018) granted under the Plan. In connection with Mr. Thill's resignation from the Company, Mr. Thill became vested in the 186,916 restricted shares and the 186,916 phantom shares awarded to Mr. Thill in 2018 under the Plan; the 2018 PSUs granted to Mr. Thill in 2018 under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."

(5) Includes 186,916 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 186,916 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions. In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

(6) Includes 155,764 shares of restricted stock and 155,763 shares of phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 155,763 shares of performance cash-settled phantom stock granted and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(7) Includes 116,823 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 116,822 shares of performance cash-settled phantom stock granted and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period for the 2018 PSUs, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

**2019 Plan Awards**. After review and discussions with Pearl Meyer and management, the Compensation Committee determined not to grant any long-term equity awards to our named executive officers under the Company's long-term incentive program for 2019.

***Other Practices, Policies and Guidelines***

***Clawback Policy***. Our Board has adopted a clawback policy under which our Board has the right to cause the reimbursement by a current or former executive officer of the Company of certain incentive compensation if the compensation was predicated upon

the achievement of certain financial results that were subsequently the subject of a required restatement of the Company's financial statements. Incentive compensation subject to the policy includes all cash, equity or equity-based awards made pursuant to the Plan or any other formal or informal plan, adopted currently or in the future. Our Board may exercise this right regardless of the occurrence or absence of any fraud or responsibility on the part of any current or former executive officer.

***Stock Ownership and Retention Policy***. In April 2016, our Board adopted a formal written stock ownership and retention policy applicable to our non-executive directors and certain of our executive officers. The policy requires our non-executive directors and certain of our executive officers to acquire and retain a minimum level of stock ownership within five years of the effective date of the guidelines or their appointment as executive officers or directors, whichever is later. Our Executive Chairman and Chief Executive Officer must acquire and retain shares of our common stock equal to at least five times their annual base salary; our Chief Financial Officer and Chief Operating Officer must acquire and retain shares of our common stock equal to at least three times their annual base salary; and our directors who are not also executive officers must acquire and retain shares of our common stock equal to at least five times their annual retainer. Until the applicable minimum level of stock ownership is achieved, the executive officers or directors must retain all net shares obtained through the Plan (after payment of taxes and exercise price, if applicable). The stock ownership and retention policy provides that any failure to comply with the policy may be taken into account by the Company and the Compensation Committee in connection with compensation decisions, promotion opportunities and other related events to the extent that the Company and the Compensation Committee determine appropriate.

***Severance and Change in Control Benefits***. Other than the severance and Change in Control benefits provided under the Plan and our award agreements discussed in "Potential Payments Upon Termination or Change in Control," we do not provide any severance or change of control benefits to our executive officers. We view the limited benefits that we do provide as necessary to attract and retain executive talent in a highly competitive market and provide continuity of management in the event of an actual or contemplated change of control.

***Other Benefits***. SOG does not maintain a defined benefit pension plan for its executive officers because it believes such plans primarily reward longevity rather than performance. SOG provides a basic benefits package generally to all employees, which includes a 401(k) plan and health, disability and life insurance. SOG employees who provide services to us under the service agreement remain entitled to these benefits from SOG.

***Employment Agreements***

Neither SOG nor the Company entered into any employment agreements with any of our named executive officers during the fiscal years addressed in the Summary Compensation Table.

***Tax and Accounting Considerations***

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "***Code***") generally provides that a public company may not deduct compensation paid in excess of $1 million during any fiscal year to a "covered employee". Prior to January 1, 2018, there was an exception to the Section 162(m) deduction limit for certain compensation meeting the requirements for "qualified performance-based compensation". Pursuant to the Tax Cuts and Jobs Act of 2017, as of January 1, 2018, the $1 million annual deduction limitation under Section 162(m) applies to compensation paid in a fiscal year to any individual who serves as the Chief Executive Officer, Chief Financial Officer or qualifies as one of the other three most highly compensated executive officers in 2017 or any later calendar year, and the exception under Code Section 162(m) for qualified performance-based compensation was eliminated. Although we did not award qualified performance-based compensation (within the meaning of Section 162(m) of the Code) prior to 2018, the Compensation Committee takes the potential tax deductibility of compensation into consideration under Section 162(m) of the Code into consideration, along with many other factors, when making compensation decisions.

Equity awards granted to our named executive officers are considered awards to non-employees, and, for the year ended December 31, 2018, the Company accounted for these awards at fair value in accordance with the provisions of FASB ASC Topic 505-50, "*Equity-Based Payments to Non-Employees*." See Note 8, "*Stock-Based Compensation*," to the Consolidated Financial Statements included under "Item 8. Financial Statements and Supplementary Data" in our Original Filing for additional detail and assumptions.

***Relation of 2018 Compensation Policies and Practices to Risk Management***

SOG's and our compensation policies and practices are designed to provide rewards for short-term and long-term performance, both on an individual basis and at the entity level. In general, optimal financial and operational performance, particularly in a competitive business, requires some degree of risk-taking. Accordingly, the use of compensation as an incentive for performance can foster the potential for management and others to take unnecessary or excessive risks to reach performance thresholds that qualify them for additional compensation.

Table of Contents

From a risk management perspective, our policy is to conduct our commercial activities within pre-defined risk parameters that are closely monitored and are structured in a manner intended to control and minimize the potential for unwarranted risk-taking. We also routinely monitor and measure the execution and performance of our projects and acquisitions relative to expectations.

SOG's and our compensation arrangements and our Plan contain a number of design elements that serve to minimize the incentive for taking unwarranted risk to achieve short-term, unsustainable results. Those elements include delaying the rewards and subjecting such rewards to forfeiture for terminations related to violations of its risk management policies and practices or of our Code of Business Conduct and Ethics.

In combination with our risk-management practices, we do not believe that risks arising from our or SOG's compensation policies and practices for individuals providing services to us are reasonably likely to have a material adverse effect on us.

**Compensation Committee Report**

The Compensation Committee of our Board of Directors has reviewed and discussed the Compensation Discussion and Analysis set forth above with management. Based on this review and discussion, the Compensation Committee of our Board of Directors has approved the Compensation Discussion and Analysis for inclusion in this Amendment.

Compensation Committee of
the Board of Directors of
Sanchez Energy Corporation

Gilbert A. Garcia, Chairperson
T. Brian Carney, Member
Sean Maher, Member
Robert V. Nelson, III, Member

***Summary Compensation Table***

The following table shows information concerning the annual compensation for services provided to us by our named executive officers during the fiscal years ended December 31, 2018, 2017 and 2016. All amounts included in the table below were determined by our Compensation Committee and paid by SOG, except awards of restricted stock, phantom stock, performance accelerated restricted stock, performance accelerated phantom stock, performance cash-settled phantom stock and performance stock-settled phantom stock granted under our Plan, which were granted by our Compensation Committee alone. The amounts reported in the table below represent only amounts paid for services provided to us and do not include amounts paid by SOG to our named executive officers for services provided to other entities, including SOG.

| Name and Principal Position | Year | Salary (1) | Bonus (2) | Stock Awards (3) | All Other Compensation (4)(5) | Total |
|---|---|---|---|---|---|---|
| **A. R. Sanchez, Jr.** | 2018 | $ 650,000 | $ 1,700,000 | $ 7,036,604 | $ 117,942 | $ 9,504,546 |
| *Executive Chairman of the Board* | 2017 | $ 650,000 | $ 2,200,000 | $ 10,534,272 | $ 59,252 | $ 13,443,524 |
| | 2016 | $ 650,000 | $ 2,000,000 | $ 4,902,279 | $ 77,172 | $ 7,629,451 |
| **Antonio R. Sanchez, III** | 2018 | $ 650,000 | $ 1,700,000 | $ 7,036,604 | $ 236,351 | $ 9,622,955 |
| *President and Chief Executive Officer* | 2017 | $ 650,000 | $ 2,200,000 | $ 10,534,272 | $ 204,083 | $ 13,588,355 |
| | 2016 | $ 650,000 | $ 2,000,000 | $ 3,676,709 | $ 75,480 | $ 6,402,189 |
| **Patricio D. Sanchez** | 2018 | $ 300,000 | $ 625,000 | $ 3,518,302 | $ 149,473 | $ 4,592,775 |
| *Executive Vice President* | 2017 | $ 250,000 | $ 1,250,000 | $ 3,722,352 | $ 21,584 | $ 5,243,936 |
| **Howard J. Thill** | 2018 | $ 392,708 | $ — | $ 2,598,132 | $ 1,506,331 | $ 4,497,171 |
| *Former Executive Vice President and Chief Financial Officer* | 2017 | $ 450,000 | $ 800,000 | $ 2,394,000 | $ 100,030 | $ 3,744,030 |
| | 2016 | $ 103,125 | $ 250,000 | $ 2,929,500 | $ 1,016 | $ 3,283,641 |
| **Christopher D. Heinson** | 2018 | $ 246,813 | $ — | $ 2,598,132 | $ 25,963 | $ 2,870,909 |
| *Former Senior Vice President and Chief Operating Officer* | 2017 | $ 412,000 | $ 650,000 | $ 3,511,438 | $ 17,791 | $ 4,591,229 |
| | 2016 | $ 400,000 | $ 600,000 | $ 3,695,000 | $ 18,636 | $ 4,713,636 |
| **Cameron W. George** | 2018 | $ 425,000 | $ 650,000 | $ 2,165,109 | $ 38,099 | $ 3,278,208 |
| *Executive Vice President and Chief Financial Officer* | | | | | | |
| **Gregory B. Kopel** | 2018 | $ 393,750 | $ 500,000 | $ 1,623,833 | $ 39,505 | $ 2,557,088 |
| *Executive Vice President, General Counsel and Secretary* | | | | | | |

(1) Mr. P. Sanchez was appointed as Executive Vice President of the Company effective November 3, 2016 and became a named executive officer in 2017. During 2017 and 2018, slightly less than half of Mr. P. Sanchez's base salary was allocated to us. The amounts reported for Mr. P. Sanchez above for 2017 and 2018 reflect only that portion of his base salary attributable to us. Mr. Thill was appointed as our Executive Vice President and Chief Financial Officer on October 10, 2016 and resigned effective as of October 26, 2018. Mr. Thill's base salary was increased to $475,000 per year effective as of February 16, 2018. The salaries reported above for Mr. Thill for 2016 and 2018 reflect the base salaries he was actually paid for services provided to us during his partial years as our Executive Vice President and Chief Financial Officer in 2016 and 2018, respectively. Mr. Heinson resigned effective as of July 9, 2018. During 2018, Mr. Heinson's base salary was set at $450,000 per year. The salary reported above for Mr. Heinson for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Senior Vice President and Chief Operating Officer in 2018. Mr. George was appointed as our Executive Vice President and Chief Financial Officer on March 19, 2019 and previously served as our Interim Chief Financial Officer from October 26, 2018 until March 19, 2019. His fiscal year 2018 base salary was $425,000 per year. Prior to his appointment as our Interim Chief Financial Officer, Mr. George provided services to us in his capacity as Senior Vice President — Capital Markets of SOG. The salary reported for Mr. George for 2018 above includes the salary he received from us in both his capacity as our Interim Chief Financial Officer and his capacity as Senior Vice President — Capital Markets of SOG. During 2018, Mr. Kopel's base salary was increased to $400,000 effective as of February 16, 2018.

(2) On February 19, 2019, our Compensation Committee awarded each of Messrs. Sanchez, Jr. and Sanchez, III a cash bonus of $1,700,000, Mr. George a cash bonus of $650,000, Mr. P. Sanchez a cash bonus of $625,000 and Mr. Kopel a cash bonus of $500,000 for their work and efforts during 2018, which are reported as 2018 compensation in the table above in accordance with SEC rules. On February 16, 2018, our Compensation Committee awarded each of Messrs. Sanchez, Jr. and Sanchez, III a cash bonus of $2,200,000, Mr. P. Sanchez a cash bonus of $1,250,000 and each of Messrs. Thill and Heinson a cash bonus of $650,000 for their work and efforts during 2017, which are reported as 2017 compensation in the table above in accordance with SEC rules. In 2017, Mr. Thill also received one-half of a $300,000, or $150,000, sign-on bonus, which was paid in January 2017, and is included in his 2017 compensation in the table above. Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill and Heinson received cash bonuses of $2,000,000, $2,000,000, $1,000,000, $100,000 and $200,000, respectively, in January 2017 based on 2016 performance, which is reported at 2016 compensation in the table above in accordance with SEC rules. Mr. Heinson also received a $400,000 cash bonus in December 2016 based on 2016 performance, which is also reflected in the 2016 compensation in the table above, and Mr. Thill received one-half of a $300,000, or $150,000, sign-on bonus in 2016, which is included in his 2016 compensation in the table above.

(3) The amounts reported in this column reflect the aggregate grant date fair value of awards granted, if any, under our Plan for fiscal years 2018, 2017 and 2016, computed in accordance with Financial Accounting Standard Board ("FASB") Accounting Standards Codification ("ASC") Topic 718, excluding estimated forfeitures. The grant date values of the 2018 PSUs granted in 2018, assuming that the highest level of 2018 Award Performance Conditions will be achieved, were as follows: Mr. Sanchez, Jr.—$6,661,987; Mr. Sanchez, III—$6,661,987; Mr. P. Sanchez—$3,330,993; Mr. George—$2,049,841; Mr. Thill—$2,459,815; Mr. Heinson—$2,459,815; and Mr. Kopel—$1,573,378. The grant date values of the 2017 Performance Awards granted in 2017, assuming that the highest level of performance conditions will be achieved, were as follows: Mr. Sanchez, Jr.—$9,326,740; Mr. Sanchez, III—$9,326,740; Mr. Heinson—$3,108,926; and Mr. P. Sanchez—$3,295,663. Stock-based compensation expenses are recorded in the Company's financial statements in accordance with FASB ASC 505-50, "Equity-Based Payments to Non-Employees."

(4) In fiscal year 2018, "All Other Compensation" (i) for Mr. Sanchez, Jr., consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs and medical insurance costs; (ii) for Mr. Sanchez, III, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs, medical insurance costs and country club dues; (iii) for Messrs. George, Heinson and Kopel, consisted of parking costs allocated to us by SOG, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs and medical insurance costs; (iv) for Mr. Thill, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs, medical insurance costs and $1,451,260 paid to Mr. Thill in connection with his resignation from the Company; and (v) for Mr. P. Sanchez, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, group term life insurance costs, disability insurance costs and medical insurance costs. In fiscal year 2017, "All Other Compensation" (i) for Messrs. Sanchez, Jr., Sanchez, III and Thill, consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs and group term life insurance costs; (ii) for Mr. P. Sanchez, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group and group term life insurance costs; and (iii) for Mr. Heinson, consisted of the parking costs allocated to us by SOG, 401(k) matching contribution costs and group term life insurance costs. In fiscal year 2016, "All Other Compensation" (i) for Mr. Sanchez, III, consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group and group term life insurance costs; (ii) for Mr. Sanchez, Jr. consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs and group term life insurance; (iii) for Mr. Heinson, consisted of the parking costs allocated to us by SOG, 401(k) matching contribution costs and group term life insurance; and (iv) for Mr. Thill, consisted of the parking costs allocated to us by SOG and group term life insurance. For additional information regarding the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, see footnote 5 below.

Table of Contents

(5) Pursuant to the Company's aircraft policy, our named executive officers and directors are permitted to use aircraft owned or provided by the Company or a member of the Sanchez Group for uses deemed by SEC rules to constitute personal usage of such aircraft. We calculate the aggregate incremental cost of such personal usage as set forth below.

- For aircraft owned by the Company or a member of the Sanchez Group, we calculate the aggregate incremental cost of personal usage by multiplying the number of hours of such personal usage by the average variable operating cost per hour of the aircraft, which we derive based on the costs of fuel, maintenance, landing, parking and catering costs, certain taxes and certain other miscellaneous fees and costs. Because our corporate aircraft are used primarily for business travel, we do not include in this figure fixed costs for such aircraft that generally do not change with use.
- For aircraft provided (but not owned) by the Company or a member of the Sanchez Group, we calculate the aggregate incremental cost of personal usage by calculating the percentage of the total hours the aircraft was used by Company personnel that were for personal purposes, and multiplying this ratio against the total cost of such aircraft to the Company or such member of the Sanchez Group.
- For trips that involve mixed personal and business usage, we determine the aggregate incremental cost attributable to personal use by subtracting the aggregate incremental cost of a "business-only" trip from the total aggregate incremental cost of the whole trip (both personal and business).

In 2018, we incurred aggregate incremental costs of $81,758, $182,103, $143,783 and $20,153 for personal use of aircraft owned or provided by the Company or a member of the Sanchez Group by Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Thill, respectively.

***2018 Grants of Plan-Based Awards***

The following table sets forth certain information with respect to stock awards granted under our Plan to our named executive officers in 2018.

| Name | Grant Date | Estimate Future Payouts under Equity Incentive Plan Awards(1) | | | All Other Stock Awards: Number of Shares of Stock or Units # (2) | Grant Date Fair Value of Stock and Option Awards (3) |
|---|---|---|---|---|---|---|
| | | Threshold # | Target # | Maximum # | | |
| A. R. Sanchez, Jr. | 04/17/2018 | — | — | — | 506,231(4) | $ 1,852,805 |
| | 04/17/2018 | — | — | — | 506,231(5) | $ 1,852,805 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| Antonio R. Sanchez, III | 04/17/2018 | — | — | — | 506,231(4) | $ 1,852,805 |
| | 04/17/2018 | — | — | — | 506,231(5) | $ 1,852,805 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| Patricio D. Sanchez | 04/17/2018 | — | — | — | 253,116(4) | $ 926,405 |
| | 04/17/2018 | — | — | — | 253,115(5) | $ 926,401 |
| | 04/17/2018 | 63,279 | 253,115 | 506,230 | — | $ 832,748 |
| | 04/17/2018 | 63,279 | 253,115 | 506,230 | — | $ 832,748 |
| Howard J. Thill (6) | 04/17/2018 | — | — | — | 186,916(4) | $ 684,113 |
| | 04/17/2018 | — | — | — | 186,916(5) | $ 684,113 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| Christopher D. Heinson (7) | 04/17/2018 | — | — | — | 186,916(4) | $ 684,113 |
| | 04/17/2018 | — | — | — | 186,916(5) | $ 684,113 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| Cameron W. George | 04/17/2018 | — | — | — | 155,764(4) | $ 570,096 |
| | 04/17/2018 | — | — | — | 155,763(5) | $ 570,093 |
| | 04/17/2018 | 38,941 | 155,763 | 311,526 | — | $ 512,460 |
| | 04/17/2018 | 38,941 | 155,763 | 311,526 | — | $ 512,460 |
| Gregory B. Kopel | 04/17/2018 | — | — | — | 116,823(4) | $ 427,572 |
| | 04/17/2018 | — | — | — | 116,823(5) | $ 427,572 |
| | 04/17/2018 | 29,206 | 116,822 | 233,644 | — | $ 384,344 |
| | 04/17/2018 | 29,206 | 116,822 | 233,644 | — | $ 384,344 |

(1) Represents the range of possible stated payouts to our named executive officers related 2018 PSUs granted to our named executive officers under the Plan during 2018. Vesting of these 2018 PSUs occurs over a three-year performance period beginning January 1, 2018 and ending

Table of Contents

December 31, 2020, generally subject to each executive's continuous service with the Company through each vesting date. Although the "Threshold" column includes the stated threshold payment under the awards, application of straight-line interpolation as contemplated in the applicable award agreements could result in such 2018 PSUs vesting (if at all) in equal annual increments ranging from 0% to 200% of the target based on achievement of the 2018 Award Performance Conditions. For each of the three Measurement Periods, the level of achievement of each 2018 Award Performance Condition is determined and the results for each 2018 Award Performance Condition are weighted 30%, other than safety, which is weighted at 10%, to determine the number of target 2018 PSUs earned during that specific Measurement Period. The overall results of the target 2018 PSUs earned during each of the three Measurement Periods are weighted 33.33% to determine the number of target 2018 PSUs earned during the entire three-year performance period. With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

(2) Represents the number of restricted stock and phantom stock awards granted to our named executive officers under the Plan during 2018.

(3) Reflects the aggregate grant date fair value of the restricted awards, phantom awards and 2018 PSUs granted under the Plan in 2018, calculated in accordance with FASB ASC Topic 718. For the 2018 PSUs, which are subject to performance-based conditions, the amounts shown in the "Target" column reflect satisfaction of the 2018 Award Performance Conditions such that 100% of the target shares are awarded, the amounts shown in the "Threshold" column represent the minimum stated amount, if any, payable for a certain level of performance under the 2018 Award Performance Conditions, and the amounts shown in the "Maximum" column refers to the maximum payout possible for a certain level of performance under the 2018 Award Performance Conditions (provided, that the Compensation Committee has the discretion to modify payouts up to the maximum payout amount and interpolate on a straight-line basis between 0% and the stated threshold, target and maximum payout amounts). Stock-based compensation expenses are recorded in the Company's financial statements in accordance with FASB ASC 505-50, "Equity-Based Payments to Non-Employees."

(4) Represents the number of restricted stock awards vesting in equal annual increments over a three-year period.

(5) Represents the number of phantom stock awards vesting in equal annual increments over a three-year period.

(6) In connection with Mr. Thill's resignation from the Company, Mr. Thill became vested in the 186,916 restricted shares and the 186,916 phantom shares awarded to Mr. Thill in 2018 under the Plan; the 2018 PSUs granted to Mr. Thill in 2018 under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."

(7) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards, including all of those unvested awards granted to him in 2018 under the Plan.

***Narrative Disclosure to the Summary Compensation Table and Grants of Plan Based Awards Table***

***2018 Grants***. In 2018, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,231, 506,231, 253,116, 186,916, 186,916, 155,764 and 116,823, respectively, shares of restricted stock, which vest in equal installments over three years, in each case generally subject to continuous service with us through each vesting date. In 2018, we also granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,231, 506,231, 253,115, 186,916, 186,916, 155,763 and 116,823, respectively, shares of phantom stock, which vest in equal installments over three years, in each case generally subject to continuous service with us through each vesting date.

In addition, pursuant to our new Plan program, 50% of our named executive officers' long-term incentive awards were in the form of 2018 PSUs. In 2018, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,230, 506,230, 253,115, 186,916, 186,916, 155,763 and 116,822, respectively, target phantom shares of both performance cash settled phantom shares and performance stock-settled phantom shares. The performance cash settled phantom shares are payable in cash and the performance stock-settled phantom shares are payable in shares of our common stock. The 2018 PSUs will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions. Subject to certain exceptions set forth in the applicable agreements, the 2018 PSU recipient must be employed by us on the applicable vesting date in order to become vested in the applicable portion of the 2018 PSUs.

Recipients of shares of restricted stock have all the rights of a stockholder in us, including the right to receive dividends thereon if and when distributions are made by us to our stockholders. Recipients of our other awards do not have voting rights.

Pursuant to our award agreements governing our Plan awards during 2018, during the vesting period, our 2018 Plan awards are subject to restrictions on transferability and forfeiture. Our awards subject to vesting generally vest on a pro-rata basis on each remaining vesting date subject to acceleration of the restricted stock and phantom stock upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (each as defined in the respective award agreements and described further below). However, upon the occurrence of any of such events, 2018 PSU awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the 2018 Award Performance Conditions. Except as described in the preceding sentence, upon any termination for any or no reason, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the awarded shares become vested, all unvested awarded shares will be forfeited.

With respect to any named executive officer, shares of restricted stock and phantom stock granted in 2018 vest in substantially equal installments and the forfeiture restrictions will lapse on the first, second and third anniversaries of the date of grant

so long as the award recipient remains in our continuous service (subject, in the case of the 2018 PSUs, to satisfaction of the 2018 Award Performance Conditions). With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period for the 2018 PSUs, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

Please see the section titled "Potential Payments Upon Termination or Change in Control" for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson's Plan awards in connection with their respective resignations from the Company in 2018.

***2017 Grants***. In 2017, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 245,234, 245,234, 86,655, 100,000, 81,745, 100,000 and 50,000, respectively, shares of both restricted stock and phantom stock, which vest in equal installments over five years for each of Messrs. Sanchez, Jr., Sanchez, III and P. Sanchez and in equal installments over three years for Messrs. Thill, Heinson, George and Kopel.

In addition, in 2017, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Heinson 245,234, 245,234, 86,655 and 81,745 shares of the 2017 Performance Awards, respectively. These 2017 Performance Awards are payable in shares of our common stock. The 2017 Performance Awards will vest (if at all) in equal annual increments over a five-year period ranging from 0% to 200% of the target 2017 Performance Awards granted based on the performance conditions outlined in the award agreement, subject to the officer's continuous service with us through each vesting date.

Recipients of shares of restricted stock have all the rights of a stockholder in us, including the right to receive dividends thereon if and when distributions are made by us to our stockholders. Recipients of our other awards do not have voting rights.

Pursuant to our award agreements governing our Plan awards during 2017, during the vesting period, our awards are subject to restrictions on transferability and forfeiture. Our 2017 Plan awards subject to vesting generally vest on a pro-rata basis on each remaining vesting date subject to acceleration of the restricted stock and phantom stock upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (each as defined in the respective award agreements and described further below). However, upon the occurrence of any of such events, the 2017 Performance Awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the applicable performance conditions. Except as described in the preceding sentence, upon any termination for any or no reason, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the awarded shares become vested, all unvested awarded shares will be forfeited.

With respect to any named executive officer, shares of restricted stock and phantom stock awards granted in 2017 vest in substantially equal installments and the forfeiture restrictions will lapse on the first, second and third anniversaries of the date of grant or the first, second, third, fourth and fifth anniversaries of the date of grant, depending upon the terms of the applicable award, so long as the award recipient remains in our continuous service (subject, in the case of the performance phantom stock, to satisfaction of the applicable performance conditions). For the 2017 and 2018 performance periods applicable to our 2017 Performance Awards, 0% of the target shares were awarded in 2018 or 2019.

Please see the section titled "Potential Payments Upon Termination or Change in Control" for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson's Plan awards in connection with their respective resignations from the Company in 2018.

***2016 Grants***. In January 2016, we granted Mr. Heinson and Kopel 100,000 and 75,000 shares of restricted stock, respectively. In February 2016, we granted Messrs. Sanchez, III and Sanchez, Jr. 403,095 and 537,460 shares of restricted stock and 403,095 and 537,460 shares of phantom stock, respectively. In April 2016, we granted Mr. P. Sanchez 100,000 shares of restricted stock and 100,000 shares of phantom stock and Mr. Heinson an additional 100,000 shares of restricted stock and 200,000 shares of phantom stock. In June 2016, we granted Mr. George 100,000 shares of restricted stock. In connection with Mr. Thill's appointment as Executive Vice President and Chief Financial Officer in October 2016, we granted him 175,000 shares of restricted stock and 175,000 shares of phantom stock.

The restricted stock and phantom shares vest with respect to 33.33% of the number of restricted stock and phantom shares granted on each of the first three anniversaries of the date of grant (in each case, subject to certain forfeiture and vesting conditions.

Additionally, in February 2016, we granted Messrs. Sanchez, III and Sanchez, Jr. 207,654 and 276,872 shares of performance accelerated restricted stock and 207,654 and 276,872 shares of performance accelerated phantom stock, respectively. In April 2016, we granted Messrs. Heinson and P. Sanchez 100,000 and 100,000 shares of performance accelerated restricted stock and 100,000 and 100,000 shares of performance accelerated phantom stock, respectively.

Table of Contents

The performance accelerated restricted stock and performance accelerated phantom stock are payable in cash, which cliff vest in five years or earlier if the common stock closing price equals or exceeds certain benchmarks.

Because the adjusted closing price of our common stock for each day in a fifteen-day trading period equaled or exceeded an amount equal to 200% of the adjusted closing price of our stock on February 18, 2016, the performance accelerated restricted stock and performance accelerated phantom stock awards granted to Messrs. Sanchez, Jr. and Sanchez, III vested on February 18, 2017. Because the adjusted closing price of our common stock for each day in a fifteen-day trading period equaled or exceeded an amount equal to 150% of the adjusted closing price of our common stock on April 15, 2016, 50% of the performance accelerated phantom stock awards granted to Messrs. Heinson and P. Sanchez vested on the first anniversary of the grant date, April 15, 2017. If the adjusted closing price of our common stock for each day in a fifteen-day trading period equals or exceeds an amount equal to 200% of the adjusted closing price of our common stock on April 15, 2016, the remainder of the performance accelerated phantom stock awards granted to Mr. P. Sanchez will vest on such date, to the extent unvested as of such date (otherwise, the remaining 50,000 phantom shares will vest on April 15, 2021, subject to certain forfeiture and vesting procedures).

Please see the section titled “Potential Payments Upon Termination or Change in Control” for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson’s Plan awards in connection with their respective resignations from the Company in 2018.

***2018 Outstanding Equity Awards at Fiscal Year-End***

The following table sets forth information concerning outstanding equity awards held by each of our named executive officers as of December 31, 2018.

| Name | Grant Date | Number of Shares of Stock or Equivalents That Have Not Vested (1) | Market Value of Shares of Stock That Have Not Vested (2) | Equity Incentive Plan Awards: Number of Unearned Shares or Other Rights that Have Not Vested (#) (1) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares or Other Rights that Have not Vested (2) |
|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | 04/17/2018 | 506,231(3) | $ 136,682 | — | $ — |
| | 04/17/2018 | 506,231(4) | $ 136,682 | — | $ — |
| | 04/17/2018 | — | $ — | 506,230(5) | $ 136,682 |
| | 04/17/2018 | — | $ — | 506,230(6) | $ 136,682 |
| | 03/01/2017 | 196,188(7) | $ 52,971 | — | $ — |
| | 03/01/2017 | 196,188(8) | $ 52,971 | — | $ — |
| | 03/01/2017 | — | $ — | 196,187(9) | $ 52,971 |
| | 02/18/2016 | 179,154(3) | $ 48,372 | — | $ — |
| | 02/18/2016 | 179,154(4) | $ 48,372 | — | $ — |
| Antonio R. Sanchez, III | 04/17/2018 | 506,231(3) | $ 136,682 | — | $ — |
| | 04/17/2018 | 506,231(4) | $ 136,682 | — | $ — |
| | 04/17/2018 | — | $ — | 506,230(5) | $ 136,682 |
| | 04/17/2018 | — | $ — | 506,230(6) | $ 136,682 |
| | 03/01/2017 | 196,188(7) | $ 52,971 | — | $ — |
| | 03/01/2017 | 196,188(8) | $ 52,971 | — | $ — |
| | 03/01/2017 | — | $ — | 196,187(9) | $ 52,971 |
| | 02/18/2016 | 134,365(3) | $ 36,279 | — | $ — |
| | 02/18/2016 | 134,365(4) | $ 36,279 | — | $ — |
| Patricio D. Sanchez | 04/17/2018 | 253,116(3) | $ 68,341 | — | $ — |
| | 04/17/2018 | 253,115(4) | $ 68,341 | — | $ — |
| | 04/17/2018 | — | $ — | 253,115(5) | $ 68,341 |
| | 04/17/2018 | — | $ — | 253,115(6) | $ 68,341 |
| | 03/01/2017 | 69,324(7) | $ 18,717 | — | $ — |
| | 03/01/2017 | 69,324(8) | $ 18,717 | — | $ — |
| | 03/01/2017 | — | $ — | 69,324(9) | $ 18,718 |
| | 04/15/2016 | 33,334(3) | — | — | $ 9,000 |
| | 04/15/2016 | 50,000(10) | — | — | $ 13,500 |
| | 04/15/2016 | 33,334(4) | — | — | $ 9,000 |
| | 04/15/2016 | 50,000(11) | — | — | $ 13,500 |
| Howard J. Thill (12) | 04/17/2018 | — | $ — | 186,916(5) | $ 50,467 |
| | 04/17/2018 | — | $ — | 186,916(6) | $ 50,467 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Christopher D. Heinson (13) | — | — | $ | — | — | $ | — |
| Cameron W. George | 04/17/2018 | 155,764(3) | $ | 42,056 | — | $ | — |
| | 04/17/2018 | 155,763(4) | $ | 42,056 | — | $ | — |
| | 04/17/2018 | — | $ | — | 155,763(5) | $ | 42,056 |
| | 04/17/2018 | — | $ | — | 155,763(6) | $ | 42,056 |
| | 03/01/2017 | 66,667(3) | $ | 18,000 | — | $ | — |
| | 03/01/2017 | 66,667(4) | $ | 18,000 | — | $ | — |
| | 06/01/2016 | 33,334(3) | $ | 9,000 | — | $ | — |
| Gregory B. Kopel | 04/17/2018 | 116,823(3) | $ | 31,542 | — | $ | — |
| | 04/17/2018 | 116,823(4) | $ | 31,542 | — | $ | — |
| | 04/17/2018 | — | $ | — | 116,822(5) | $ | 31,542 |
| | 04/17/2018 | — | $ | — | 116,822(6) | $ | 31,542 |
| | 03/01/2017 | 33,334(3) | $ | 9,000 | — | $ | — |
| | 03/01/2017 | 33,334(4) | $ | 9,000 | — | $ | — |
| | 01/01/2016 | 25,000(3) | $ | 6,750 | — | $ | — |

(1) The forfeiture conditions and the accelerated vesting conditions applicable to these awards are described under the sections titled "Potential Payments Upon Termination or Change in Control" and "Narrative Disclosure to the Summary Compensation Table and Grants of Plan Based Awards Table."

(2) The market value of the unvested shares of restricted stock, phantom stock, performance accelerated restricted stock, performance accelerated phantom stock, 2017 Performance Awards and 2018 PSUs constituting performance cash-settled phantom stock and performance stock-settled phantom stock was calculated by multiplying the number of shares outstanding as of December 31, 2018 by $0.27, the closing price of our common stock on December 31, 2018, the closing trading date in 2018.

(3) These restricted shares will vest as to 33.33% of the total number of restricted shares granted on each of the first three anniversaries of the date of grant.

(4) These phantom shares will vest as to 33.33% of the total number of phantom shares granted on each of the first three anniversaries of the date of grant and are payable in cash.

(5) These cash settled phantom shares will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions and are payable in cash.

(6) These performance stock-settled phantom shares will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions.

(7) These restricted shares will vest as to 20% of the total number of restricted shares granted on each of the first five anniversaries of the date of grant.

(8) These phantom shares will vest as to 20% of the total number of phantom shares granted on each of the first five anniversaries of the date of grant and are payable in cash.

(9) These performance phantom shares granted and payable in common stock vesting in equal annual installments over a five-year period, subject to satisfaction of the applicable performances conditions.

(10) These performance accelerated restricted shares cliff vest on the fifth anniversary of their grant subject to an early acceleration trigger based upon the price of our common stock.

(11) These performance accelerated phantom shares cliff vest on the fifth anniversary of their grant subject to an early acceleration trigger based upon the price of our common stock.

(12) In connection with Mr. Thill's resignation from the company, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. His 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."

(13) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

***2018 Stock Vested at Fiscal Year-End***

The following table provides information on the value realized by each of the named executive officers as a result of our stock awards that vested from January 1, 2018 through December 31, 2018.

Table of Contents

| Name | Cash Settled: Number of Phantom Shares Acquired on Vesting (1) | Cash Settled: Value Realized On Vesting (2) | Stock-Settled: Number of Shares Acquired on Vesting (3) | Stock-Settled: Value Realized on Vesting (4) | Aggregate Value Realized on Vesting (5) |
|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | 228,199 | $ 770,270 | 444,866 | $ 1,931,605 | $ 2,701,876 |
| Antonio R. Sanchez, III | 183,411 | $ 614,856 | 333,411 | $ 1,418,856 | $ 2,033,712 |
| Patricio D. Sanchez | 50,664 | $ 174,845 | 50,664 | $ 177,178 | $ 352,023 |
| Howard J. Thill (6) | 336,916 | $ 692,258 | 336,916 | $ 692,258 | $ 1,384,516 |
| Christopher D. Heinson | 83,016 | $ 294,205 | 166,349 | $ 699,038 | $ 993,243 |
| Cameron W. George | 33,333 | $ 100,999 | 66,666 | $ 234,664 | $ 335,663 |
| Gregory B. Kopel | 16,666 | $ 50,498 | 41,666 | $ 183,248 | $ 233,746 |

(1) The amounts in this column represent the number of phantom shares held by each of the named executive officers that vested during 2018, which are payable in cash upon vesting.
(2) The amount in this column represents the product of the number of phantom shares that vested during 2018 and the closing price of our common stock on the date of vesting.
(3) The amount in this column represents the number of restricted shares held by each of the named executive officers that vested during 2018.
(4) The amounts in this column represent the product of the number of shares of restricted stock that vested during 2018 and the closing sale price of our common stock on the date of vesting.
(5) The amount in this column represents the sum of the amounts realized during 2018 on the vesting of both the cash-settled and stock-settled awards.
(6) In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill became vested in 245,250 shares of restricted stock and 245,250 shares of phantom granted under the Plan, which is reflected in the table above.

***Pension Benefits***

Currently, we do not, and do not intend to, provide pension benefits to our named executive officers. SOG may revisit this policy in the future.

***Nonqualified Deferred Compensation***

Currently, we do not, and do not intend to, sponsor or adopt a nonqualified deferred compensation plan. SOG may revisit this policy in the future.

***Settlement of Vested Cash-Settled Phantom Stock Awards***

With respect to the shares of phantom stock issued under the Plan and the performance cash-settled phantom stock awards (and excluding the 2017 Performance Awards and the performance share-settled phantom stock awards) that become vested as of a given vesting date, the Company will pay an amount of cash equal to (x) the fair market value of one share of our common stock as of the vesting date multiplied by (y) the aggregate number of the phantom shares that become vested on the applicable vesting date. Our performance phantom stock awards are payable in shares of common stock on any given vesting date.

***Potential Payments Upon Termination or Change in Control***

Other than the accelerated vesting of our Plan awards upon the occurrence of certain events pursuant to the Plan and applicable award agreements, as of December 31, 2018, we did not provide any severance or change of control benefits to our executive officers. We view the limited benefits that we do provide as necessary to attract and retain executive talent in a highly competitive market and to ensure continuity of management in the event of an actual or contemplated change of control.

***2016 Grants***

The restricted stock, performance accelerated restricted stock, phantom stock and performance accelerated phantom stock awards granted in 2016 under the Plan automatically vest upon the occurrence of the following events (each term of which is defined below under "—Defined Terms"): a Change of Control, a Qualifying Termination, or the executive's death or Disability.

***2017 and 2018 Grants***

The restricted stock and phantom stock awards granted in 2017 and 2018 under the Plan automatically vest upon the occurrence of the following events (each term of which is defined below under "—Defined Terms"): a Change of Control, a Qualifying Termination, or the executive's death or Disability.

Table of Contents

The 2017 Performance Awards and 2018 PSUs generally vest on a pro-rata basis on each remaining vesting date, provided that upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (i) the 2017 Performance Awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the applicable performance conditions and (ii) the 2018 PSU awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the 2018 Award Performance Conditions.

***Mr. Heinson & Mr. Thill***

In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan and became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. In connection with Mr. Thill's resignation, the Company and Mr. Thill entered into the Confidential Separation Agreement and General Release (the "***Separation Agreement***") dated October 26, 2018. Pursuant to the Separation Agreement, Mr. Thill received a payment of $451,260 with regard to such vested phantom stock described herein. Furthermore, Mr. Thill's 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein. See "Item 11. Executive Compensation—Compensation Disclosure and Analysis—The Executive Compensation Program in Detail—Long-Term Incentive Plan—2018 Plan Awards" and "—Settlement of Vested Cash-Settled Phantom Stock Awards."

***Forfeiture of Unvested Awards***

Other than provided above, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the named executive officers' awarded shares become vested, all unvested awarded shares will be forfeited.

***Defined Terms***

With respect to the Plan awards issued in 2016, 2017 and 2018 and described above, a "***Qualifying Termination***" is generally defined in the respective awards agreements as a termination by us or one of our affiliates, other than due to (i) the executive's commission of, conviction for, or plea of guilty or nolo contendere to a felony, or other material act or omission involving dishonesty or fraud, or (ii) gross negligence or willful malfeasance. A "***Disability***" is defined in the Plan generally as an illness or injury that lasts at least six months and is expected to be permanent and renders the executive unable to carry out his duties.

With respect to the Plan awards issued in 2017 and 2018 as described above, a "***Constructive Termination***" means, with respect to any executive, (i) the assignment of a duty or duties to him that are not commensurate with the position he holds as of the grant date or the material reduction in his duties; provided, that, the foregoing occurs without his consent, and provided, further, that, the executive has provided notice to another executive officer of the Company, with a copy to the Board, within 30 days after the initial occurrence of the event set forth in clause (i) of his intention to terminate his Continuous Service (as defined in the respective award agreements) due to a Constructive Termination, the Company has failed to cure such event to his reasonable satisfaction within 30 days after receipt of notice thereof, and the executive actually terminates Continuous Service within 7 days following the expiration of such cure period or (ii) any reduction in his title or position that he holds as of his grant date without his consent; provided, further, that, the executive has provided notice to another executive officer of the Company, with a copy to the Board, within 30 days after such reduction of his intention to terminate his Continuous Service due to a Constructive Termination, the Company has failed to cure such reduction to his reasonable satisfaction within 30 days after receipt of notice thereof, and he actually terminates Continuous Service within 7 days following the expiration of such cure period. For the avoidance of doubt, grounds for him to terminate Continuous Service due to a Constructive Termination shall not exist if the events in (i) or (ii) above occur while the executive controls, directly or indirectly, the Board or such events are initiated at his direction (in which case consent shall be deemed to have been given by the executive).

Pursuant to the applicable award agreements, awards granted under our Plan will generally vest and/or become exercisable, as applicable, upon a Change of Control. With respect to our shares of phantom stock awards consisting of our 2017 Performance Awards and our 2018 PSUs, the executive will vest in the greater of (x) the number of unvested phantom shares based on actual results determined as if the date of the Change of Control is the last day of each remaining measurement period or (y) the target number of unvested phantom shares for each remaining measurement period; vesting of the amounts determined under (x) or (y) for the executive's respective awards must be settled within 15 days of the Change in Control. Under our Plan, a "***Change of Control***" will be deemed to have occurred upon one or more of the following events: (i) any "person" or "group" within the meaning of those terms as used in Sections 13(d) and 14(d)(2) of the Exchange Act, other than a Sanchez Group Member (as defined in the Plan), becomes the beneficial owner, by way of merger, consolidation, recapitalization, reorganization or otherwise, of 50% or more of the combined voting power of the equity interests in the Company; (ii) the stockholders of the Company approve and implement, in one or

Table of Contents

a series of transactions, a plan of complete liquidation of the Company; or (iii) the sale or other disposition by the Company of all or substantially all of its assets in one or more transactions to any person other than a Sanchez Group Member.

***Estimated Payments Upon Termination or Change of Control Events***

The following table quantifies our best estimates as to the amounts that each of our named executive officers would potentially be entitled to receive upon a change of control event, or one of the above-described termination events, as applicable. The values of the potential payments are calculated assuming that such termination event occurred on December 31, 2018 and using our closing stock price on such date of $0.27. The value of the benefit that each of our named executive officers would actually receive cannot be determined until a change of control or a termination event has occurred. Therefore, such amounts should be considered "forward-looking statements." We have assumed for purposes of the table below that the Company has not used its discretion to accelerate any awards that do not accelerate pursuant to their terms.

| Name | Change of Control | Qualifying Termination (3) | Constructive Termination (3) | Death (3) | Disability (3) |
|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | $ 802,385 | $ 476,050 | $ 476,050 | $ 476,050 | $ 476,050 |
| Antonio R. Sanchez, III | $ 778,199 | $ 451,864 | $ 451,864 | $ 451,864 | $ 451,864 |
| Patricio D. Sanchez | $ 374,516 | $ 201,116 | $ 174,116 | $ 201,116 | $ 201,116 |
| Howard J. Thill (1) | $ — | $ — | $ — | $ — | $ — |
| Christopher D. Heinson (2) | $ — | $ — | $ — | $ — | $ — |
| Cameron W. George | $ 213,224 | $ 129,112 | $ 129,112 | $ 129,112 | $ 129,112 |
| Gregory B. Kopel | $ 150,918 | $ 87,834 | $ 87,834 | $ 87,834 | $ 87,834 |

(1) In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. Upon the execution of the Separation Agreement, Mr. Thill received a payment of $451,260 with regard to such vested phantom stock. Mr. Thill's 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein. See "Item 11. Executive Compensation—Compensation Disclosure and Analysis—The Executive Compensation Program in Detail—Long-Term Incentive Plan—2018 Plan Awards" and "—Settlement of Vested Cash-Settled Phantom Stock Awards."

(2) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, Mr. Heinson forfeited all of his unvested awards.

(3) With respect to our (i) 2017 Performance Awards and (ii) 2018 PSUs consisting of awards of performance stock-settled phantom shares and performance cash-settled phantom shares, upon a Qualifying Termination, Constructive Termination, death or Disability of the named executive officer, such outstanding awards in (i) and (ii) will vest on a pro-rata basis on the remaining vesting dates, subject to the satisfaction of (x) the applicable performance conditions with respect to the 2017 Performance Awards and (y) the 2018 Award Performance Conditions with respect to the 2018 PSUs. Because it is not possible to predict actual performance for the 2019-2021 measuring periods, our estimates of potential payments upon the occurrence of such event do not include payments under such 2017 Performance Awards or 2018 PSUs.

***2018 Director Compensation***

We have not and do not expect to pay our directors who are also our officers any additional amounts for their service to us in their capacities as directors. Accordingly, Messrs. Sanchez, Jr. and Sanchez, III do not receive additional compensation for their service as a director. Their compensation is reported in the section titled "Summary Compensation Table." Our current compensation package for our non-employee directors consists of both cash and equity compensation.

The Board-approved compensation for our non-employee directors for fiscal 2018 was as follows:

- an annual cash retainer fee of $75,000;
- cash payments of $1,000 for each Board and/or committee meeting attended via teleconference and cash payments of $1,500 for each Board and/or committee meeting attended in person;
- a committee chair fee for each chair of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee of $20,000, $15,000 and $10,000, respectively;
- a grant of restricted stock awards under the Plan; and
- reimbursement for travel and miscellaneous expenses incurred to attend meetings of our Board or its committees.

On November 9, 2018, the Board established a Special Committee. The Board appointed Messrs. Davis and Zylman to the Special Committee and appointed Mr. Davis as chairman of the Special Committee. In connection with the formation of the Special Committee, the Board established a $25,000 per month chair fee for the Special Committee.

In April 2019, the Board approved an annual cash retainer of $175,000 to our non-employee directors, representing an annual fixed retainer package of $70,000 and a cash-based award in lieu of restricted stock in the amount of $105,000. However, Mr. Davis

will continue to receive an annual cash retainer of $75,000 and will not receive grants of restricted stock, consistent with his compensation arrangements for fiscal year 2018.

Each director, received the prorated amounts of the annual cash retainer fee and committee chair fee, as applicable, for the period of fiscal 2018 during which such director served as a member of the Board and, as applicable, as a committee chair. Each director also received cash payment of $1,000 or $1,500, respectively, for the Board meetings and committee meetings that such director attended.

In connection with their service to the Company as directors, 50,762 shares of restricted stock under the Plan were granted to Messrs. Carney, Colvin, Garcia, Jackson, Maher and Nelson on June 1, 2018. Each of these grants will vest on the one-year anniversary of its date of grant. In connection with Mr. Zylman's appointment to the Board on October 26, 2018, the Compensation Committee of the Board awarded 66,937 shares of restricted stock to Mr. Zylman pursuant to the Plan, which will vest on June 1, 2019. Mr. Davis was not awarded any restricted stock in connection with his appointment to the Board.

Notwithstanding such vesting period for the directors' restricted stock, upon the occurrence of a Change of Control, the shares of restricted stock will vest automatically. Moreover, in the event of a director's death, disability, termination or removal, all unvested shares will be forfeited; however, in the event of the respective director's death, the Compensation Committee may, but is not obligated to, accelerate the vesting of any or all of his shares of restricted stock. Further, notwithstanding the above, pursuant to the terms of the applicable restricted stock agreement, the Compensation Committee may, at its sole discretion, choose to accelerate the vesting of an award of restricted shares at any time.

Table of Contents

The following table provides information concerning the compensation of our non-employee directors for the fiscal year ended December 31, 2018.

| Name | Fees Earned or Paid in Cash (1) | Stock Awards (2) | All Other Compensation (3) | Total |
|---|---|---|---|---|
| T. Brian Carney | $ 115,500(4) | $ 203,556 | $ 105,845 | $ 424,900 |
| M. Gregory Colvin | $ 94,500(5) | $ 203,556 | $ 22,055 | $ 320,111 |
| Eugene I. Davis | $ 68,062(6) | $ —(6) | $ — | $ 271,618 |
| Gilbert A. Garcia | $ 147,000(7) | $ 203,556 | $ — | $ 350,556 |
| Alan G. Jackson | $ 106,000(8) | $ 203,556 | $ 21,986 | $ 331,541 |
| Sean M. Maher | $ 135,500(9) | $ 203,556 | $ 30,015 | $ 369,071 |
| Robert V. Nelson, III | $ 115,500(10) | $ 203,556 | $ — | $ 319,056 |
| Adam C. Zylman | $ 25,562(11) | $ 117,809(11) | $ — | $ 229,118 |

(1) Includes annual cash retainer fee, Board and committee meeting fees and committee chair fees, as applicable, for each non-employee director earned during fiscal 2018.
(2) The amounts reported in the "Stock Awards" column reflect the aggregate grant date fair value of restricted stock awards granted under our Plan for fiscal 2017, computed in accordance with FASB ASC Topic 718. See Note 8, "Stock-Based Compensation," to the Consolidated Financial Statements included under "Item 8. Financial Statements and Supplementary Data" in our Original Filing for additional detail regarding assumptions. As of December 31, 2018, Messrs. Carney, Colvin, Garcia, Jackson, Maher, Nelson each had 50,762 shares of restricted stock outstanding and Mr. Zylman had 66,937 shares of restricted stock outstanding.
(3) In fiscal 2018, "All Other Compensation" for Mr. Carney included group term life insurance costs and medical insurance costs paid by us on behalf of the director and the aggregate incremental cost of the personal use of aircraft owned or provided by the Company in the amount of $96,576; for Mr. Jackson included group term life insurance costs and medical insurance costs paid by us on behalf of the director; for Mr. Maher included the aggregate incremental cost of the personal use of aircraft owned or provided by the Company in the amount of $30,015; and for Mr. Colvin included medical insurance costs paid by us on behalf of the director. For additional information regarding the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, see footnote 5 to the "Summary Compensation Table" above.
(4) Mr. Carney attended a total of 36 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings in person or telephonically and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.
(5) Mr. Colvin attended a total of 17 formal Board meetings and took action by unanimous written consent 10 times on behalf of the Board in fiscal 2018.
(6) Mr. Davis was appointed to the Board on October 26, 2018. Mr. Davis attended a total of 11 formal Board and Special Committee meetings of the Board in fiscal 2018.
(7) Mr. Garcia attended a total of 33 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.
(8) Mr. Jackson attended a total of 17 formal Board and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 11 times on behalf of the Board and Nominating and Corporate Governance Committee in fiscal 2018.
(9) Mr. Maher attended a total of 36 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.
(10) Mr. Nelson attended a total of 37 formal Board, Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.
(11) Mr. Zylman was appointed to the Board on October 26, 2018. Mr. Zylman attended a total of 11 formal Board and Special Committee meetings in fiscal 2018.

**Compensation Committee Interlocks and Insider Participation**

As described above, the compensation decisions regarding our executive officers, other than awards under our Plan, are made by SOG, subject to the ability of our Audit Committee to review, verify and dispute the reasonableness of such compensation pursuant to procedures set forth in the services agreement.

None of our executive officers serves, or has served, during the last completed fiscal year, on the compensation committee or board of directors of any other company that has one or more executive officers serving on our Compensation Committee or the Board.

Table of Contents

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

**Securities Authorized for Issuance Under Equity Compensation Plan**

For information regarding securities authorized for issuance under an equity compensation plan, please see "Item 5. Part II" of the Original Filing.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain information regarding the beneficial ownership of common stock as of April 23, 2019 by (i) each person who is known by the Company to own beneficially more than 5% of the outstanding shares of common stock, (ii) each named executive officer of the Company, (iii) each director of the Company and (iv) all directors and executive officers as a group. The list of persons named in the table below is derived from our review of Form 3, Form 4, Form 5, Schedule 13D and Schedule 13G filings made with the SEC as of April 23, 2019. Unless otherwise noted, the mailing address of each person or entity named below is 1000 Main Street, Suite 3000, Houston, Texas 77002. "Beneficial Ownership" is a term broadly defined by the SEC in Rule 13d-3 under the Exchange Act. Beneficial ownership includes those shares of common stock held by someone who has investment and/or voting authority over such shares or has the right to acquire such shares within 60 days. The ownership includes common stock that is held directly and also common stock held indirectly through a relationship, a position as a trustee, or under a contract or understanding.

| Beneficial holders | Number of shares beneficially held | Percentage of beneficial ownership (1) |
|---|---|---|
| **5% Stockholders:** | | |
| None | | |
| **Directors and named executive officers:** | | |
| A. R. Sanchez, Jr. (2) | 6,256,408 | 6.27% |
| Antonio R. Sanchez, III (3) | 3,044,930 | 3.05% |
| Patricio D. Sanchez (4) | 1,255,906 | 1.26% |
| Cameron W. George (5) | 297,792 | *% |
| Gregory B. Kopel (6) | 217,176 | *% |
| T. Brian Carney (7) | 95,625 | *% |
| M. Gregory Colvin (8) | 192,506 | *% |
| Eugene I. Davis | — | —% |
| Gilbert A. Garcia (9) | 161,466 | *% |
| Alan G. Jackson (10) | 143,045 | *% |
| Sean M. Maher (11) | 116,940 | *% |
| Robert V. Nelson, III (12) | 91,280 | *% |
| Adam C. Zylman (13) | 66,937 | *% |
| **All directors and executive officers as a group (14 persons)** | 10,534,330 | 10.55% |

*Denotes less than 1% beneficially owned.

(1) Based upon an aggregate of 99,828,592 shares outstanding as of April 23, 2019. Total shares outstanding include shares of restricted stock subject to forfeiture conditions.

(2) SOG directly owns 799,472 of these shares. SOG is managed by Mr. Sanchez, Jr. and other members of the Sanchez family. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by SOG. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. Each of the following trusts (the "***Trusts***") directly owns 371,836 of these shares, except 1988 Trust No. 13, which owns 175,036 of these shares: (i) 1988 Trust No. 11: co-trustee/beneficiary Mr. Sanchez, III; (ii) 1988 Trust No. 12: co-trustee/beneficiary Ana Lee Sanchez Jacobs; (iii) 1988 Trust No. 13: co-trustee/beneficiary Eduardo Sanchez; and (iv) 1988 Trust No. 14: co-trustee/beneficiary Mr. P. Sanchez. Mr. Sanchez, Jr. is a co-trustee, along with the respective co-trustees and beneficiaries listed next to the name of the Trust above, of each of the Trusts set forth above. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by the Trusts. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The Alicia M. Sanchez Charitable Lead Annuity Trust ("***CLAT***") directly owns 26,213 of these shares. Mr. Sanchez, Jr. is the sole trustee of CLAT. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interests therein. Sanexco, Ltd. ("***Sanexco***") directly owns 707,333 of these shares. Sanexco is controlled by its general partner, Sanchez Management Corporation ("***SMC***"), which is managed by Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by Sanexco. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. San Juan Oil & Gas No. 2, Ltd. ("***San Juan***") directly owns 707,333 of these shares. San Juan is controlled by its general partner, SMC, which is managed by Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by San Juan. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. AEP Ltd. Partnership ("***AEP***") directly owns 474,800 of these shares. AEP is controlled by its general partner, Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to

share voting and dispositive power over the shares of common stock held by AEP. Mr. Sanchez, Jr. disclaims beneficial ownership of the shares of common stock held by AEP except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. Sanchez, Jr. has sole voting and dispositive power over 2,250,713 shares (1,663,741 shares of common stock and 586,972 shares of restricted common stock).

(3) SOG directly owns 799,472 of these shares. SOG is managed by Mr. Sanchez, III and other members of the Sanchez family. Mr. Sanchez, III may be deemed to share voting and dispositive power over the shares of common stock held by SOG. Mr. Sanchez, III disclaims beneficial ownership of the shares of common stock held by SOG except to the extent of his pecuniary interests therein. 1988 Trust No. 11 directly owns 371,836 of these shares. Mr. Sanchez, III is a co-trustee, along with Mr. Sanchez, Jr., and beneficiary of 1988 Trust No. 11. Mr. Sanchez, III may be deemed to share voting and dispositive power over the shares of common stock held by 1988 Trust No. 11. Mr. Sanchez, III disclaims beneficial ownership of the shares of common stock held by 1988 Trust No. 11 except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. Sanchez, III has sole voting and dispositive power over 1,873,622 shares (1,286,650 shares of common stock and 586,972 shares of restricted common stock).

(4) 1988 Trust No. 14 directly owns 371,836 of these shares. Mr. P. Sanchez is a co-trustee, along with Mr. Sanchez, Jr., and beneficiary of 1988 Trust No. 14. Mr. P. Sanchez may be deemed to share voting and dispositive power over the shares of common stock held by 1988 Trust No. 14. Mr. P. Sanchez disclaims beneficial ownership of the shares of common stock held by 1988 Trust No. 14 except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. P. Sanchez has sole voting and dispositive power over 884,070 shares (562,161 shares of common stock and 321,909 shares of restricted common stock).

(5) Includes 200,443 shares of restricted common stock.

(6) Includes 124,008 shares of restricted common stock.

(7) Includes 50,762 shares of restricted common stock and 500 shares are held by one child.

(8) Includes 50,762 shares of restricted common stock and 16,204 shares are held by three children

(9) Includes 50,762 shares of restricted common stock.

(10) Includes 50,762 shares of restricted common stock. 21,600 shares are held by Mr. Jackson's wife. Mr. Jackson disclaims beneficial ownership of the shares of common stock held by his wife.

(11) Includes 50,762 shares of restricted common stock.

(12) Includes 50,762 shares of restricted common stock.

(13) Includes 66,937 shares of restricted common stock.

**Item 13.** ***Certain Relationships and Related Transactions, and Director Independence***

**Transactions with Related Persons**

***Related Party Transaction Policy***

A "***Related Party Transaction***" is a transaction, arrangement or relationship in which we or any of our subsidiaries was, is or will be a participant, the amount of which involved exceeds $120,000, and in which any related person (as defined below) had, has or will have a direct or indirect material interest. Pursuant to the Company's related party transactions policy, a "related person" means:

- any person who is, or at any time during the applicable period was, one of our executive officers or one of our directors or is currently one of our nominees for director;
- any person who is known by us to be the beneficial owner of more than 5% of our common stock;
- any immediate family member of any of the foregoing persons, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of a director, director nominee, executive officer or a beneficial owner of more than 5% of our common stock, and any person (other than a tenant or employee) sharing the household of such director, director nominee, executive officer or beneficial owner of more than 5% of our common stock;
- any entity in which any of the foregoing persons serves as an executive officer or principal or in a similar position, or, in the case of a partnership, serves as a general partner or holds any position other than that of a limited partner;
- any entity in which any of the foregoing persons owns, together with all other foregoing persons, 10% or more of the equity interest, or in the case of a partnership, 10% or more of an interest; or
- any entity in which any of the foregoing persons is employed if (a) the person is directly involved in the negotiation of the Related Party Transaction or will share or have primary responsibility at such entity for the performance of the Related Party Transaction, or (b) the person's compensation from the entity is directly tied to the Related Party Transaction.

The purposes of this policy are to identify, review, assess and, if deemed appropriate, approve Related Party Transactions. Pursuant to our related party transactions policy, the Audit Committee reviews all material facts of all Related Party Transactions and either approves or disapproves entry into the Related Party Transaction, subject to certain limited exceptions. In determining whether the Related Party Transaction is fair to the Company, the Audit Committee takes into account, among other factors, the following:

- whether there are demonstrable business reasons for the transaction;
- whether the transaction is material to the Company;

Table of Contents

- the benefits that accrue to the Company as a result of the transaction;
- whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances;
- the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director is a partner, stockholder or executive officer);
- the extent of the related person's interest in the transaction;
- the role the related person played in arranging the transaction;
- the availability of other sources for comparable products or services;
- whether it is a single transaction or a series of ongoing, related transactions; and
- whether entering into the transaction would be consistent with the Code of Business Conduct and Ethics.

Our related party transaction policy also requires that all Related Party Transactions required to be disclosed in our filings with the SEC be so disclosed in accordance with applicable laws, rules and regulations. There were no Related Party Transactions since the beginning of our last fiscal year that are required to be reported in "Transactions with Related Persons" where the procedures described above did not require review, approval or ratification or where these procedures were not followed.

The description below of agreements with various members of the Sanchez Group, our directors and executive officers and certain significant stockholders is a summary and, with respect to each such agreement, is qualified by reference to the terms of the agreement, each of which, if required, was filed as an exhibit to our 2018 10-K. We encourage you to read the full text of these filed agreements. These agreements have been negotiated among affiliated parties and, consequently, are not the result of arm's length negotiations. The prices and other terms of these agreements may be less favorable to us than those we could have obtained in arm's length negotiations with unaffiliated third parties for similar services or under similar agreements.

***International Bank of Commerce***

Mr. Sanchez, Jr., our Executive Chairman of the Board, is a director and greater than 10% stockholder of International Bancshares, the parent of IBC, which provides insurance brokerage services on a commission basis to the Company and its affiliates. For the fiscal year ended December 31, 2018, the Company and its affiliates paid IBC premiums of approximately $2.9 million.

***Sanchez Oil & Gas Corporation***

SOG, headquartered in Houston, Texas, is a privately owned full service oil and natural gas operating company engaged in the exploration and development of oil and natural gas assets primarily in the South Texas, Louisiana and onshore Gulf Coast areas on behalf of certain of its affiliates, including the Company, pursuant to existing management services agreements. Eduardo A. Sanchez and Ana Lee Sanchez Jacobs, immediate family members of the Executive Chairman of the Board, the President and Chief Executive Officer and an Executive Vice President of the Company, collectively with such individuals (the "***SN Members***"), either directly or indirectly, own 100% of the equity interests in SOG. In addition, Mr. Sanchez, Jr. is the sole member of the board of directors and chief executive officer of SOG, Mr. Sanchez, III and Mr. P. Sanchez are Co-Presidents of SOG, Ana Lee Sanchez Jacobs is an Executive Vice President of SOG, Cameron W. George is Executive Vice President — Chief Financial Officer of SOG, Gregory B. Kopel is Executive Vice President — General Counsel of SOG and Kirsten Hink is Sr. Vice President — Chief Accounting Officer of SOG.

Concurrently with the closing of our initial public offering ("***IPO***"), we entered into a services agreement with SOG pursuant to which, among other things, specified employees of SOG, including our executive officers, provide certain services to us with respect to our business under the direction, supervision and control of SOG. Salaries and associated benefits of SOG employees are allocated to the Company based on a fixed percentage that is reviewed periodically and adjusted, if needed, based on a detailed analysis of actual time spent by the professional staff on Company projects and activities. Our Audit Committee is able to review, verify and dispute the reasonableness of such allocated costs pursuant to procedures set forth in the services agreement. General and administrative expenses such as office rent, utilities, supplies and other overhead costs, are allocated on the same percentages as the SOG employee salaries. We reimburse SOG for the provision of services to us, including those provided by our executive officers, at a price equal to SOG's cost of providing such services, including all direct costs and indirect administrative and overhead costs (including the allocable portion of salary, bonus, incentive compensation and other amounts paid to persons that provide the services on SOG's behalf) allocated in accordance with SOG's regular and consistent accounting practices, including for any such costs arising from amounts paid directly by other members of the Sanchez Group on SOG's behalf or borrowed by SOG from other members of the Sanchez Group, in each case in connection with the performance by SOG of services on our behalf. We also reimburse SOG for sales, use or other taxes, or other fees or assessments imposed by law in connection with the provision of services to us (other than income, franchise or margin taxes measured by SOG's net income or margin and other than any gross receipts or other privilege taxes imposed on SOG) and for any costs and expenses arising from or related to the engagement or retention of third-party service providers. Expenses allocated to the Company by SOG for general and administrative expenses and oil and natural gas production expenses for the year ended December 31, 2018 were $64.9 million. As of December 31, 2018, the Company had a net receivable from SOG and

certain other members of the Sanchez Group of $6.1 million, which consisted primarily of advances paid related to leasehold and other costs paid to SOG.

Under the services agreement, we are entitled to indemnification for certain liabilities, and are required to indemnify SOG and its affiliates for certain liabilities. SOG is required to indemnify us for third-party infringement or misappropriation claims relating to the services performed by SOG or the data or other information provided to us or used by SOG in connection with the services, the related seismic, geological and geophysical licensing agreement or our operations based on the services provided by SOG. We, on the other hand, are otherwise required to indemnify SOG and its affiliates from liabilities relating to the services or products provided to us by SOG or our agreements with SOG, to the extent not directly caused by the gross negligence or willful misconduct of SOG or its affiliates. The initial term of the services agreement was for five years and expired in December 2016. The services agreement has continued on a year-to-year basis from December 2016. The term automatically extends for additional 12-month periods unless either party provides 180-days written notice otherwise prior to the expiration of the applicable 12-month period. Either party may terminate the agreement at any time upon 180-days written notice.

***Sanchez Midstream Partners LP***

Mr. Sanchez, III, the son of Mr. Sanchez, Jr. and brother of Eduardo A. Sanchez and Mr. P. Sanchez, is the Company's President and Chief Executive Officer and is a member of the board of directors of both the Company and of SNMP GP. Mr. P. Sanchez, an Executive Vice President of the Company, is the president & chief operating officer and a director of SNMP GP. Mr. Eduardo A. Sanchez, our former President, is also a member of the board of directors of SNMP GP. Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Eduardo A. Sanchez all directly or indirectly own certain equity interests in the Company and SNMP. Mr. Sanchez, Jr., Mr. Sanchez, III, Eduardo A. Sanchez and Mr. P. Sanchez beneficially own approximately 0.80%, 3.01%, 3.00% and 4.14%, respectively, of the SNMP common units outstanding as of December 31, 2018 and, together with Ana Lee Sanchez Jacobs, indirectly own 100% of SNMP GP.

***SNMP Units***. On November 22, 2016, we purchased 2,272,727 common units of SNMP from SNMP for $25 million in a private placement that closed concurrently with SNMP's public offering of approximately 6.5 million common units. From January 1, 2018 through April 24, 2019, we received approximately $3.8 million in distributions on our SNMP common units.

***SECO Pipeline***. On September 1, 2017, SN Catarina, LLC ("***SN Catarina***") entered into an agreement with Seco Pipeline, LLC ("***Seco Pipeline***"), a wholly owned subsidiary of SNMP, whereby Seco Pipeline transports certain quantities of natural gas on a firm basis for $0.22 per MMBtu delivered on or after September 1, 2017. This agreement had an initial term of one month that expired on September 30, 2017, but the agreement continues month-to-month thereafter unless terminated by either party. The Company paid Seco Pipeline an aggregate of approximately $6.8 million for transportation services for the fiscal year ended December 31, 2018.

***Carnero JV Gathering and Processing***. In May 2018, SNMP executed a series of agreements (the "***Carnero G&P Transaction***") with an affiliate of Targa Resources Corp. ("***Targa***") pursuant to which, among other matters, the parties merged their respective 50% interests in Carnero Gathering, LLC ("***Carnero Gathering***") and Carnero Processing, LLC to form an expanded 50/50 joint venture in South Texas, Carnero G&P LLC ("***Carnero G&P***"). Effective April 1, 2018, SN EF Maverick, LLC, a subsidiary of the Company ("***SN Maverick***"), and Carnero G&P entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "***Carnero Gas Gathering Agreement***") and other related documentation providing for certain natural gas gathering, treating and processing services in exchange for an approximately 315,000 gross acreage dedication from SN Maverick and its working interest partners in our Comanche area. Additionally, effective April 1, 2018, and in connection with the Carnero G&P Transaction, SN Catarina and an affiliate of Targa also amended their existing firm gas gathering agreement and firm gas processing agreement, which were subsequently assigned by the Targa counterparty to Carnero G&P. SN Maverick paid approximately $7.1 million to Carnero under the predecessor agreements in place from January 1, 2018 through March 31, 2018; SN Maverick paid approximately $14.9 million to Carnero G&P pursuant to the Carnero Gas Gathering Agreement from April 1, 2018 through December 31, 2018. However, the gathering and processing fees paid from SN Maverick to Carnero G&P pursuant to the Carnero Gas Gathering Agreement were netted against NGLs (as defined in the Original Filing) and natural gas proceeds from SN Maverick to Carnero. Therefore, there were no outgoing payments to Carnero G&P during the year ended December 31, 2018. In addition, on January 4, 2019, we caused an irrevocable letter of credit to be issued for the benefit of Carnero G&P in an aggregate face amount of approximately $17.1 million as credit assurance under the terms of the gathering and processing agreements with Carnero G&P.

In July 2016, SN Midstream, LLC, a wholly owned subsidiary of the Company ("***SN Midstream***"), sold its membership interests in Carnero Gathering to SNMP in exchange for cash and the assumption by SNMP of membership interests constituting 50% of the outstanding membership interests in Carnero Gathering. As part of the conveyance, SNMP was required to pay SN Midstream a monthly "earnout" based on receipt of natural gas. For the fiscal year ended December 31, 2018, the Company received approximately $67,260 for earnouts in 2018.

***Catarina Gathering***. As of December 31, 2018, the Company had a net payable to SNMP of approximately $6.1 million that consists primarily of accruals for fees associated with a Firm Gathering and Processing Agreement (the "***Gathering Agreement***"), dated October 14, 2015, with an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas, has been dedicated for gathering by a wholly owned subsidiary of SNMP. In addition, for the first five years of the Gathering Agreement, SN Catarina is required to meet a minimum quarterly volume delivery commitment of 10,200 Bbl per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. SN Catarina is required to pay gathering and processing fees of $0.96 per barrel for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through the gathering system, in each case, subject to an annual escalation for a positive increase in the consumer price index. In addition, SN Catarina has, under certain circumstances, a right of first refusal during the term of the agreement and afterwards with respect to dispositions by Catarina Midstream of its ownership interest in the gathering system. See "Item 7. "Management's Discussion & Analysis of Financial Condition and Results of Operations—Commitments and Contractual Obligations" in the Original Filing for additional information regarding the Gathering Agreement. On June 30, 2017, the Gathering Agreement was amended to, among other things, provide for an additional, incremental infrastructure fee payable to SNMP of $1.00 per barrel of water delivered by SNMP on or after April 1, 2017 through and including March 31, 2018. Since March 31, 2018, the Company and SNMP have agreed to continue the incremental fee on a month-to-month basis.

***Blackstone, Gavilan, GSO***

On March 1, 2017, the Company, SN EF Maverick, SN EF UnSub, LP, a subsidiary of the Company ("***SN UnSub***"), and Gavilan Resources, LLC ("***Gavilan***" and, together with SN Maverick and SN UnSub, the "***Buyers***"), an entity controlled by affiliates of The Blackstone Group L.P. ("***Blackstone***"), completed the closing of the transactions contemplated by the purchase and sale agreement (the "***Purchase Agreement***") among the Buyers and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP (together, the "***Sellers***"). At the closing, the Buyers collectively purchased all of the right, title and interest of the Sellers in the Comanche asset for aggregate consideration of approximately $2.1 billion, subject to customary purchase price adjustments. In addition, on March 1, 2017, we entered into a number of transactions with entities affiliated or associated with GSO Capital Partners LP ("***GSO***"), certain funds managed or advised by GSO (the "***GSO Funds***") and/or Blackstone. In connection with the closing of the transactions contemplated by the Purchase Agreement, pursuant to an Interim Investors Agreement, dated as of January 12, 2017, among the Company, SN Maverick, Blackstone Capital Partners VII L.P. and Blackstone Energy Partners II L.P. we issued to entities controlled by affiliates of Blackstone warrants (expiring on March 1, 2022) to purchase an aggregate of 6.5 million shares of our common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments, and pursuant to a Securities Purchase Agreement, dated as of January 12, 2017, among the Company, SN UnSub, SN EF UnSub GP, LLC, the general partner of SN UnSub (the "***SN UnSub General Partner***"), SN UR Holdings, SN EF UnSub Holdings, LLC, a subsidiary of SN UR Holdings, GSO ST Holdings Associates LLC ("***GSO Associates LLC***"), and GSO ST Holdings LP ("***GSO Associates LP***") (which was amended and restated on February 28, 2017 to add Intrepid Private Equity V-A, LLC as an additional party thereto): (i) GSO Associates LP purchased 485,000 preferred units of SN UnSub for $485,000,000; (ii) GSO Associates LLC purchased 1 Class B Unit in SN UnSub General Partner for nominal consideration; and (iii) the GSO Funds received (a) 1,455,000 shares of the Company's common stock and (b) warrants (expiring on March 1, 2032) to purchase 1,940,000 shares of the Company's common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments. As of March 2019, to the Company's knowledge, Blackstone's controlled affiliates have disposed of the Company warrants referenced above and the GSO Funds have disposed of the Company warrants and shares of common stock referenced above.

During the year ended December 31, 2018, GSO Associates LP was entitled to receive approximately $48.5 million in preferred distributions from SN UnSub, which amount was offset by approximately $2.5 million of cash distributions related to certain tax obligations paid to GSO during 2017, resulting in approximately $46.0 million in cash distributions being paid to GSO Associates LP during 2018.

We entered into a management services agreement between Gavilan Holdco (as defined in the Original Filing) and SN Comanche Manager, LLC ("***Manager***"), a wholly owned subsidiary of the Company, pursuant to which Manager serves as manager of Gavilan Holdco's business and provides comprehensive general, administrative, business and financial services at a price equal to Manager's actual cost of providing such services (including an "administrative fee" equal to 2% of SOG's total general and administrative ("***G&A***") costs), continuing until the occurrence of one or more events giving Manager or Gavilan Holdco the right to terminate the agreement. At the closing of the Comanche Acquisition, Gavilan Holdco paid $1.0 million to Manager under the agreement. The management services agreement provides that Manager may not bill more than $500,000 of G&A costs per month to Gavilan Holdco (subject to reasonable adjustments that are consistent with market terms as a result of an increase in actual G&A costs incurred, and based upon a reasonable allocation of such costs). Gavilan Holdco paid Manager approximately $6.0 million under the agreement for the fiscal year ended December 31, 2018. On February 28, 2019, Gavilan Holdco sent us a notice of partial termination of the management services agreement, but did not purport to terminate the agreement in its entirety. Furthermore, we are currently in a disagreement with Gavilan Holdco regarding charges invoiced to Gavilan during calendar year 2018 as well as charges invoiced to Gavilan Holdco through February 2019. We also entered into a back-to-back management arrangement between Manager and SOG, on substantially the same terms and conditions as the services agreement with Gavilan Holdco referred to above, pursuant to which

Table of Contents

Manager delegated to SOG, and SOG agreed to perform for and on behalf of Manager, Manager's duties and obligations under such services agreement; Manager is required to remit amounts received directly from Gavilan Holdco to SOG, including the $1.0 million paid at closing to Manager, and to pay SOG the 2% administrative fee referred to above. For the fiscal year ended December 31, 2018 we paid SOG an additional approximately $6.0 million under the back-to-back agreement. In addition, we entered into a management services agreement between SOG and SN UnSub pursuant to which SOG serves as manager of SN UnSub's oil and natural gas properties and provides comprehensive general, administrative, business and financial services at a price equal to SOG's actual cost of providing such services (including an "administrative fee" equal to 2% of SOG's total G&A costs), with an initial term expiring on March 1, 2024 (subject to earlier termination as provided therein), renewing automatically for additional one-year terms thereafter unless either SN UnSub or SOG delivers written notice to the other of its desire not to renew the term at least 180 days prior to such anniversary date. SOG was not able to allocate G&A costs to SN UnSub in excess of $5 million per calendar year through March 1, 2019 and may not thereafter allocate in excess of $10 million per calendar year. For the fiscal year ended December 31, 2018 we paid SOG approximately $5.5 million under this agreement.

We entered into a crude oil production marketing agreement, a residue gas marketing agreement and a natural gas liquids marketing agreement between Gavilan and SN Maverick wherein Gavilan, subject to certain take-in-kind rights, agrees to sell all production from the Comanche asset to SN Maverick and SN Maverick purchases all such production from Gavilan, transports and sells such production pursuant to SN Maverick's downstream arrangements, and remits to Gavilan its proportionate share of the sale proceeds. The agreements are each for a primary term through December 31, 2022, with automatic year-to-year renewals thereafter unless terminated by either party. For year ended December 31, 2018, we remitted approximately $262.1 million in proceeds to Gavilan under these agreements from aggregate marketing revenues of approximately $322.7 million attributable to Gavilan's 50% share of the working interest acquired from the Sellers in the Comanche Acquisition. These agreements include a reconciliation mechanism that provides for estimated upfront payments by us with subsequent reconciliations in later months and, as a result, the reported amount includes both the estimated prepayments made by us for the post-transition services period as well as additional payments by us to make up for any shortfalls for the post-transition services period. The remitted amounts are net of certain expenses and costs incurred by us or the Sellers and/or their respective affiliates.

For additional information regarding related party transactions, see Note 7—"Stockholders' and Mezzanine Equity" and Note 10—"Related Party Transactions" in the notes to the audited consolidated financial statements in the Original Filing, as well as our Risk Factors in the Original Filing, including the Risk Factor titled "*We may lose our rights to the Sanchez Group's technological database, including its 3D and 2D seismic data, under certain circumstances*" and the Risk Factors on pages 36 and 37 of the Original Filing related to the JDA (as defined in the Original Filing) and our agreements with Blackstone and GSO, or their respective affiliates.

**Director Independence**

Our Board has determined that each of Messrs. Carney, Colvin, Davis, Garcia, Jackson, Maher, Nelson and Zylman are "independent directors" as defined by the rules of the NYSE and, that each of Messrs. Garcia, Carney, Maher and Nelson are "independent directors," as defined by applicable NYSE and Exchange Act rules, for purposes of each committee on which they serve, including our Audit Committee.

**Item 14. *Principal Accountant Fees and Services***

**Audit and Other Fees**

The table below sets forth the fees billed by KPMG, the Company's current independent registered public accounting firm, for the fiscal years presented:

| Fiscal Year | Audit Fees(1) | Audit-Related Fees(2) | Tax Fees(3) | All Other Fees(4) |
|---|---|---|---|---|
| Fiscal year ended December 31, 2018 | $ 2,327,465 | $ — | $ 222,686 | $ — |
| Fiscal year ended December 31, 2017 | $ 3,277,000 | $ — | $ 374,000 | $ — |

(1) Audit fees represent fees for professional services provided by our principal accountant in connection with the audit of our consolidated financial statements, the quarterly reviews of financial statements included in our Form 10-Q filings, the reviews of other statutory or regulatory filings and assistance with and review of documents filed with the SEC.
(2) Audit-related fees are fees for assurance and related services that are reasonably related to the performance by our principal accountant of the audit or review of our financial statements that are not audit fees.
(3) Tax fees include fees for professional services performed by our principal accountant for tax compliance, including the preparation of tax returns, and tax advice and tax planning.
(4) All other fees include the aggregate fees for products and services provided by our principal accountant that are not reported under "Audit Fees," "Audit-Related Fees" or "Tax Fees." There were no other fees incurred during the years ended December 31, 2018 and 2017.

Table of Contents

The charter of the Audit Committee requires that the Audit Committee review and pre-approve the plan and scope of KPMG's audit, tax and other services. The Audit Committee pre-approved 100% of the services described above under the captions "Audit Fees," "Audit-Related Fees," "Tax Fees" and "All Other Fees."

**PART IV**

**Item 15.** ***Exhibits and Financial Statement Schedules***

(3) Exhibits:

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

b. The exhibits listed in the Exhibit Index of the Original Filing and the following exhibits filed with this Amendment:

| Exhibit No. | Description of Exhibit |
|---|---|
| 31.3(a) | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.4(a) | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |

(a) Filed herewith.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on April 29, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ ANTONIO R. SANCHEZ, III
Antonio R. Sanchez, III
*President and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ ANTONIO R. SANCHEZ, III<br>Antonio R. Sanchez, III | President and Chief Executive Officer (Principal Executive Officer) | April 29, 2019 |
| *<br>Cameron W. George | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | April 29, 2019 |
| *<br>Kirsten A. Hink | Senior Vice President and Chief Accounting Officer (Principal Accounting Officer) | April 29, 2019 |
| *<br>A. R. Sanchez, Jr. | Executive Chairman of the Board of Directors | April 29, 2019 |
| *<br>Gilbert A. Garcia | Director | April 29, 2019 |
| *<br>Greg Colvin | Director | April 29, 2019 |
| *<br>Alan G. Jackson | Director | April 29, 2019 |
| *<br>Sean M. Maher | Director | April 29, 2019 |
| *<br>Brian Carney | Director | April 29, 2019 |
| *<br>Robert V. Nelson, III | Director | April 29, 2019 |
| *<br>Eugene I. Davis | Director | April 29, 2019 |
| *<br>Adam C. Zylman | Director | April 29, 2019 |

* The undersigned, by signing his name hereto, does execute this Amendment No. 1 to the Annual Report on Form 10-K of Sanchez Energy Corporation on behalf of the above-named officers and directors of the registrant pursuant to the Power of Attorney executed by such officers and/or directors on the signature pages to the report previously filed on March 1, 2019.

/s/ ANTONIO R. SANCHEZ, III
Antonio R. Sanchez, III
*President and Chief Executive Officer*

# Exhibit D

**HYDROCARBONS PURCHASE AND MARKETING AGREEMENT**

**Between**

**SN EF MAVERICK, LLC**

**and**

**SN EF UNSUB, LP**

**Dated as of January 12, 2017**

---

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1. | Specific Definitions | 1 |
| 1.2. | Construction | 1 |
| ARTICLE II PURCHASE AND SERVICES | | 2 |
| 2.1. | Purchase by Marketer | 2 |
| 2.2. | Limitations | 2 |
| 2.3. | Standard of Care | 2 |
| 2.4. | Repurchase Right | 2 |
| 2.5. | Reporting | 3 |
| 2.6. | Right to Cure | 3 |
| ARTICLE III PRICE AND PAYMENT | | 3 |
| 3.1. | Price | 3 |
| 3.2. | Statements and Payments | 3 |
| 3.3. | Audit Rights | 4 |
| 3.4. | Statement Errors | 4 |
| 3.5. | Setoff and Recoupment | 4 |
| 3.6. | Deposit of Producer's Proceeds and Security Interest. | 5 |
| ARTICLE IV WARRANTY OF TITLE | | 6 |
| 4.1. | Title Warranties | 6 |
| 4.2. | Title and Risk of Loss | 6 |
| ARTICLE V FORCE MAJEURE | | 7 |
| 5.1. | Suspension of Obligations | 7 |
| 5.2. | Definition of Force Majeure | 7 |
| ARTICLE VI TAXES | | 7 |
| 6.1. | Taxes | 7 |
| 6.2. | Reimbursement | 7 |
| ARTICLE VII TERM AND TERMINATION | | 7 |
| 7.1. | Term and Termination | 7 |
| 7.2. | Early Termination | 7 |
| 7.3. | Effect of Termination | 8 |
| ARTICLE VIII GENERAL PROVISIONS | | 8 |
| 8.1. | Waivers | 8 |
| 8.2. | Assignment; Binding Effect | 8 |
| 8.3. | Joinder | 8 |
| 8.4. | Governing Law; Severability | 9 |
| 8.5. | Further Assurances | 9 |
| 8.6. | Counterparts | 9 |
| 8.7. | Notices | 9 |
| 8.8. | Remedies | 10 |
| 8.9. | Disputes | 10 |
| 8.10. | Expenses | 11 |
| 8.11. | Third Party Beneficiaries | 11 |
| 8.12. | Conflict | 12 |
| 8.13. | Subchapter K | 12 |
| 8.14. | Entire Agreement; Integrated Transaction | 12 |
| 8.15. | Sanchez Support | 12 |
| Annex I | Definitions | |
| Exhibit A | Springfield Agreements Allocable Share | |
| Exhibit B | Midstream Contracts | |

# HYDROCARBONS PURCHASE AND MARKETING AGREEMENT

This **HYDROCARBONS PURCHASE AND MARKETING AGREEMENT** (this "Agreement"), dated as of January 12, 2017 (the "Effective Date"), is between SN EF Maverick, LLC, a Delaware limited liability company ("Marketer"), SN EF UnSub, LP, a Delaware limited partnership ("Producer"), and solely for purposes of Sections 8.15 and 8.16 hereof, Sanchez Energy Corporation, a Delaware corporation ("Sanchez"). Each of Marketer and Producer is referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A. The Parties entered into that certain Purchase and Sale Agreement, dated effective as of July 1, 2016, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko"), Aguila Production, LLC ("Aguila"), and the Parties, (together with any purchase agreement that may be entered into with Korea National Oil Corporation ("KNOC") pursuant to certain tag-along rights, the "Purchase Agreement"), pursuant to which Aguila and the Parties collectively purchased all of the working interests of Anadarko and KNOC to the extent that it exercises its tag-along rights, collectively in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas (collectively, the "Assets").

B. Marketer desires to purchase from Producer, and Producer desires to sell to Marketer, the oil, gas and other Hydrocarbons produced from and attributable to the Working Interests in the Assets acquired by Producer under the Purchase Agreement as well as other Working Interests acquired by Producer after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts (such interests, "Producer's Interests"), which Marketer will gather, process, transport, market and sell, as applicable, on the terms and conditions set forth in this Agreement and the Midstream Contracts.

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1. Specific Definitions. Capitalized terms used in this Agreement have the meanings assigned to such terms in Annex I.

1.2. Construction. Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular includes the plural, and the plural includes the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof refer to the corresponding article, section or subdivision of this Agreement unless specific reference is made to articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

## ARTICLE II
## PURCHASE AND SERVICES

2.1. Purchase by Marketer. On each Day during the Term, Producer shall sell and deliver to Marketer, and Marketer shall purchase and receive from Producer, at the Receipt Points, all Hydrocarbons produced from and attributable to Producer's Interests, in accordance with the terms and conditions of this Agreement, other than Producer's Reserved Hydrocarbons.

2.2. Limitations. Marketer shall not, without Producer's prior written consent (such consent not to be unreasonably withheld) and only to the extent relating to or affecting Producer's Hydrocarbons, (1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to Producer's Hydrocarbons, (ii) impose minimum volume, take or pay, demand charges, reservation fees, or deficiency payments obligations or extensions thereof, or (iii) fix prices for the resale of Producer's Hydrocarbons for a term longer than six months (or that cannot be terminated without penalty upon six months' notice or less) or (b) otherwise have an adverse effect, in any material respect, on Producer, in each case, except to the extent the items set forth in in clauses (a) or (b) are required by Law, (2) enter into any contract with an Affiliate of Marketer that is on terms materially less favorable to Producer than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of Producer that are in excess of $20 million in any calendar year or (3) enter into any Midstream Contract after the Effective Date if such contract (a) is not also applicable to Sanchez's Hydrocarbons and Aguila's Hydrocarbons on a proportional basis (based upon reasonable forecasts of anticipated production that pertain to the Midstream Contract) or (b) has not been expressly approved by the independent members of the Sanchez board of directors or by the working interest owners that are subject to production marketing agreements or elections applicable to such Midstream Contract; *provided* that, if Producer does not consent or object in writing to Marketer's written request to undertake any of the actions described in preceding clauses (1) through (3) within 10 Business Days of Producer's receipt of such written request from Marketer, Producer shall be deemed to have consented to such action for purposes of this Section 2.2.

2.3. Standard of Care. Marketer shall purchase and provide services for Producer's Hydrocarbons delivered hereunder in accordance with all applicable Laws and in compliance with the terms of the applicable Midstream Contracts, and shall use commercially reasonable efforts to (a) obtain market rates in the area under any new contracts for the resale of Producer's Hydrocarbons, and (b) avoid any imbalances or scheduling variances and any penalty charges associated therewith under the Midstream Contracts. Producer's Hydrocarbons must be gathered, processed, transported and sold on terms and conditions no less favorable to Producer than the terms and conditions applicable to Sanchez's Hydrocarbons.

2.4. Repurchase Right. From and after April 1, 2023, for so long as the Springfield Agreements are in force and effect, Producer shall have the right for any Month, exercisable from time to time upon written notice to Marketer at least ten (10) days prior to the first day of such Month, to repurchase from Marketer at the applicable Delivery Point (as defined in the applicable Springfield Agreement) all volumes of Producer's Hydrocarbons delivered to Marketer at the Receipt Points in such Month less any LAUF or Line Fill deducted under the Springfield Agreements. If Producer exercises the repurchase right for any Month as to all or part of Producer's Hydrocarbons, then (a) Marketer shall redeliver, or cause to be redelivered, such volumes of Producer's Hydrocarbons to Producer at such applicable Delivery Point and transfer title to such Producer's Hydrocarbons to Producer at such applicable Delivery Point and (b) Producer shall pay Marketer an amount equal to Producer's Allocable Share of the Springfield Agreements for that Month attributable to such Hydrocarbons repurchased by Producer in such month. Notwithstanding the above, if Marketer has entered into Midstream Contracts that are attributable to Producer's Hydrocarbons and such contracts were approved by Producer prior to the exercise of its repurchase right hereunder, then Producer will not be entitled to exercise its repurchase rights

hereunder for the portion of Producer's Hydrocarbons committed to such approved Midstream Contracts during the term of such Midstream Contracts.

2.5. Reporting. Marketer shall consult with and provide reports to Producer on a quarterly basis regarding marketing activities concerning Producer's Hydrocarbons. Such reports will contain such information, details, and supporting documentation as Producer may reasonably request, and shall include (a) a schedule identifying the markets into which each of Producer's Hydrocarbons and Sanchez's Hydrocarbons are being sold and the realized net back pricing being received by each, broken down by sales point and by each Midstream Contract, (b) amendments to any of the Midstream Contracts pursuant to which Producer's Hydrocarbons are being gathered, processed, transported or sold, (c) upon request from Producer, any reports or other information provided to Marketer under the terms of any of the Midstream Contracts and (d) any material issues or disputes arising under such agreements. In addition to the foregoing reporting requirements, and the provisions of Section 2.6, prior to the Redemption Date, Marketer shall promptly deliver to GSO copies of all material notices delivered to Marketer under any Marketing Contract and Midstream Contract by the applicable counterparty with respect to Producer's Hydrocarbons.

2.6. Right to Cure. If Marketer defaults in the performance of any of its obligations under the Midstream Contracts, or upon the occurrence or non-occurrence of any event or condition under the Midstream Contracts that would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable the applicable counterparty to terminate or suspend its obligations or exercise any other right or remedy under such contracts or under applicable Law (a "Marketer Event"), then Marketer shall (a) promptly notify Producer of such Marketer Event, (b) use its commercially reasonable efforts to cause the applicable counterparty to allow Producer to cure such Marketer Event with respect to Producer's Hydrocarbons, and (c) use its commercially reasonable efforts to continue to perform each of Marketer's other obligations under the Midstream Contracts.

**ARTICLE III**
**PRICE AND PAYMENT**

3.1. Price. For each Month, in full consideration for Marketer's purchase of Producer's Hydrocarbons hereunder, Marketer shall pay to Producer an amount equal to (i) the payments received by Marketer from Third Parties upon the resale of Producer's Hydrocarbons and all constituents thereof (including any residue gas, condensate, and natural gas liquids, as applicable) during such Month after being gathered, treated, transported, and processed under the Midstream Contracts less (ii) Producer's Allocable Share of Midstream Charges for such Month less any actual or estimated deductions for the amounts set forth in Section 3.2(c)(ii) and (iii) (such amount, the "Net Amount"). Positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information.

3.2. Statements and Payments.

(a) Statements and Payments. Marketer shall pay to Producer the Net Amount for any given Month consistent with Marketer's normal business practice under similar circumstances, on or before the date that is 10 days after the date on which Marketer actually receives readily available funds for Producer's Hydrocarbons sold by Marketer or its Affiliates for such calendar Month from the applicable purchasers of such Producer's Hydrocarbons (such date, the "Due Date"), along with a detailed statement describing such amounts payable to Producer hereunder in such Month.

(b) Late Payments. Any amounts not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date to but excluding the date the delinquent amount is paid in full.

(c) Collection and Payment. Marketer shall use commercially reasonable efforts to (i) collect all production funds from the purchasers of such Producer's Hydrocarbons, (ii) arrange for the timely payment of severance taxes to any Governmental Authorities, (iii) make timely payment to royalty owners and third party working interest owners, and (iv) remit to Partnership its net proceeds from the sale of Producer's Hydrocarbons after making all necessary or appropriate allocations and distributions in connection with the receipt of such proceeds in accordance with Section 3.1. The Parties recognize that the calculation and payment of severance taxes and royalty payments set forth above may be based upon estimates at the time of the payment of the Net Amount in accordance with Section 3.1 and that positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information regarding actual severance tax and royalty payments.

(d) Notices. Marketer shall provide written notice to Producer not less than five Business Days prior to entering into, amending, or terminating any Midstream Contract.

3.3. Audit Rights. Upon not less than 10 Days' prior written notice to the other Party, either Party or its or representative, at reasonable times during business hours and at its own expense, may audit the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge or computation made under or pursuant to this Agreement.

3.4. Statement Errors. If an error is discovered in the amount shown to be due on any statement rendered by Marketer hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than 30 Days after the discovery of the error. If a dispute arises as to the amount payable in any invoice rendered hereunder, the disputed statement must nevertheless be paid in full, but payment will not waive the payor's right to dispute such statement in accordance with this Section 3.4. Any invoice dispute or statement adjustment must be in writing and must state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment must be made within 15 Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date to but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two years after the date on which the statement is rendered. The provisions of Section 3.3 and this Section 3.4 will survive the termination of this Agreement for the later of (a) 24 Months following the date on which such termination occurred, or (b) until a dispute initiated within such 24-Month period is finally resolved.

3.5. Setoff and Recoupment. Upon the occurrence of either or both of (a) an Event of Default of a Party, or (b) a circumstance under clauses (a), (b), (c) of Section 3.6(a), either Party may with respect to Section 3.5(a) and Producer may with respect to Section 3.5(b), in its sole discretion and without limiting any other rights or remedies, undertake any one or all of the following actions: (i) such Party may exercise recoupment by retaining, freezing, holding, and/or liquidating any proceeds that would otherwise be payable to the other Party to satisfy and apply to any amounts owed by such other Party under this Agreement or applicable Law as of the time of such recoupment or at any later time; and/or (ii) such Party may exercise setoff by retaining, freezing, holding, and liquidating any proceeds that would be otherwise deliverable or payable to such other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from such other Party to the other Party under this Agreement or applicable Law as of the time of the setoff or offset or at any later time. Should a Party elect to exercise its rights under this Section 3.5, such Party shall notify the other Party in writing, within 10 Days of such recoupment, setoff, and/or offset; provided, however, such Party will not be required to provide such other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party hereby agrees to (x) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable Law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (y) not oppose a motion by a Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 3.5, that any recoupment exercised as provided for herein will be considered to be within a

single transaction. The rights granted to the Parties pursuant to this Section 3.5 are in addition to any rights of recoupment, setoff, and/or offset the Parties may be otherwise entitled.

3.6. Deposit of Producer's Proceeds and Security Interest.

(a) Deposit of Producer Proceeds. If (a) an Investor Redemption Event occurs, (b) Marketer has failed to pay amounts owed to Producer under this Agreement within five (5) days of the applicable Due Date or (c) Producer otherwise has reasonable grounds for insecurity regarding the performance by Marketer of any obligation under this Agreement (with clause (c) being a "Basis For Requesting Assurance"), then, within 10 Business Days after written notice from Producer, Marketer and its Affiliates will direct all purchasers of Producer's Hydrocarbons to deposit amounts owed by such purchasers for Producer's Hydrocarbons into (a) a bank account or accounts designated by Producer (in which case Producer shall remit to Marketer Producer's Allocable Share of Midstream Charges or any other costs owed by Producer to Marketer) or (b) a mutually agreed escrow account (in which case Producer shall be entitled to receive amounts due each month under Section 3.1 and Marketer shall be entitled to the remainder of the amounts from such account). A Basis for Requesting Assurance will include, without limitation, any reasonable grounds for insecurity with respect to the performance of Marketer and/or any grounds that might constitute a basis for requesting adequate assurance of performance under Section 2.609 of the Uniform Commercial Code.

(b) Security Interest. Marketer is marketing Producer Hydrocarbon's on Producer's behalf and holding all proceeds from the sale of Producer's Hydrocarbons in trust on behalf of Producer. In addition, Producer retains, and Marketer grants to Producer, a first priority lien and security interest (subject to Permitted Liens (as defined below)) on (a) all of Producer's Hydrocarbons purchased under this Agreement, (b) all proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer and (c) all accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer (the "Collateral"). Marketer shall have the right to resell all of Producer's Hydrocarbons without obtaining a release of the lien or other permission from Producer. Upon the resale of Producer's Hydrocarbons, the lien and security interests retained and granted above shall be completely and automatically released by Producer without the need for execution of any document or instrument and, in lieu thereof, shall affix to the proceeds and accounts receivable resulting from the resale of Producer's Hydrocarbons to such purchasers. Producer may enforce its lien and security interest and exercise any and all of the rights and remedies available to a secured party under the Uniform Commercial Code, in addition to all of the rights and remedies otherwise provided by Law. Producer may file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Marketer, in each case where permitted by Law, and may take any and all other actions necessary to secure its interest in the Collateral. In addition, Marketer agrees that from time to time it will promptly execute and deliver all instruments and documents, and take all further actions, that Producer may reasonably request as being necessary or desirable to perfect and protect the security interest granted or purported to be granted hereby or to enable Producer to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Marketer will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as Producer may request as being necessary or desirable in order to perfect and preserve the security interests granted or purported to be granted hereby. The lien and security interest granted herein are in addition to any statutory or common law liens on Producer's Hydrocarbons in favor of Producer. Marketer warrants that, except as set forth in the sentence after this sentence, it has not consensually granted and will not consensually grant any liens or security interests on the Collateral to any other Person. Without affecting any priority of the liens and security interests on the Collateral granted to it under this Agreement or arising pursuant to Section 9.343 of the Texas Business and Commerce Code, Producer agrees and acknowledges that Marketer may, as security for the "Obligations" as defined in the Credit Agreement (defined below) and any refinancing thereof or as security for any obligations under any junior lien indebtedness that is subject to a security grant consistent with such Credit Agreement or the refinancing thereof, grant a security interest over all of Marketer's assets, including, without limitation, Producer's Hydrocarbons purchased under

this Agreement, any deposit account of Marketer in which proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer may be deposited and any accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer. As used in the preceding sentence, "Credit Agreement" means the Second Amended and Restated Credit Agreement among Sanchez, as borrower, Royal Bank of Canada, as administrative agent, and others, as amended to date and as the same may hereafter be amended, modified, refinanced, replaced, restated or supplemented. As used in this Section 3.6(b), "Permitted Liens" means (a) liens for taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like liens arising by operation of law incident to the exploration, development, operation and maintenance of oil and gas properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (c) Liens (as defined in the Credit Agreement) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board (as defined in the Credit Agreement) and no such deposit account is intended by the Borrower (as defined in the Credit Agreement) or any of its Subsidiaries (as defined in the Credit Agreement) to provide collateral to the depository institution and (d) judgment liens.

3.7. Marketing Transition Services Agreement. Pursuant to the terms of the Marketing Transition Services Agreement, the Provider (as that term is defined in such agreement) will provide Marketer certain marketing transition services, including the purchase and sale of Producer's Hydrocarbons. For avoidance of doubt, the Parties agree that the billing and payment provisions set forth in this Article III will apply during the period in which the Marketing Transition Services Agreement is in effect, including the payment of amounts to Producer for the resale of Producer's Hydrocarbons and the allocation of demand charges under the Midstream Contracts.

## ARTICLE IV
## WARRANTY OF TITLE

4.1. Title Warranties.

(a) Producer represents and warrants to Marketer that Producer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Marketer hereunder, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes, subject to the performance by the Manager of its obligations under the MSA.

(b) If Producer elects to repurchase Producer's Hydrocarbons under Section 2.4, then Marketer shall represent and warrant to Producer that Marketer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Producer under Section 2.4, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes.

4.2. Title and Risk of Loss. Title to and risk of loss of Producer's Hydrocarbons purchased by Marketer from Producer hereunder will pass from Producer to Marketer at the inlet of Springfield's measurement facilities at the Receipt Points under the Springfield Agreements or at such other receipt points as the Parties agree. As between the Parties, title to and risk of loss of Producer's Hydrocarbons shall remain with Marketer thereafter unless such Producer's Hydrocarbons are repurchased by Producer under Section 2.4, in which case title to and

risk of loss of any such repurchased Producer's Hydrocarbons shall pass to Producer at the applicable Delivery Points under the Springfield Agreements or at such other delivery points as the Parties agree.

**ARTICLE V**
**FORCE MAJEURE**

5.1. Suspension of Obligations. If either Producer or Marketer is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Party, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder), so far as they are affected by such Force Majeure, will be suspended during the continuance of any inability so caused, but for no longer period, and such cause must be remedied with all reasonable dispatch.

5.2. Definition of Force Majeure. The term "Force Majeure" means any event or circumstance not reasonably within the control of the Party claiming suspension declared as Force Majeure by a counterparty to any of the Midstream Contracts.

**ARTICLE VI**
**TAXES**

6.1. Taxes. Manager under the MSA shall pay, on behalf of Producer, to the appropriate taxing authorities severance and other Taxes levied on Producer's Hydrocarbons prior to the delivery of such Producer's Hydrocarbons to the Receipt Points hereunder. Marketer or its Affiliates shall pay any and all Taxes levied on Producer's Hydrocarbons after title to such Hydrocarbons has transferred to Marketer.

6.2. Reimbursement. If Marketer or any of its Affiliates pays or remits any Tax for or on behalf of Producer, including severance Taxes on production, then Marketer may deduct such amounts in determining the Net Amount due hereunder as shown on the Monthly statement described in Section 3.2.

**ARTICLE VII**
**TERM AND TERMINATION**

7.1. Term and Termination. The term of this Agreement will commence on the Effective Date and, unless otherwise agreed by the Parties or earlier terminated in accordance with this Section 7.2, will continue until the earlier of (i) the date of termination of both Springfield Agreements and (ii) December 31, 2034 (the "Term").

7.2. Early Termination.

(a) Either Party may terminate this Agreement effective immediately upon notice to the other Party if the other Party (or its Affiliates, with respect to Marketer) (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer in a court of competent jurisdiction seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of all or any substantial part of such its assets or properties; or (vii) is liquidated and dissolved; or

(b) Either Party may terminate this Agreement upon notice to the other Party if (i) such other Party is in material breach of this Agreement and such breach is not remedied within 30 days after such other Party's receipt of such notice or (ii) all of the Midstream Contracts are terminated or otherwise no longer in full force and effect; provided that Marketer may not terminate this Agreement pursuant to this Section 7.1(b) (x) if at the time of such breach, Sanchez and its Affiliates hold a majority of the board of directors of SN EF UnSub, GP or (y) such breach was caused by a breach of Manager under the MSA; or

(c) Following an Investor Redemption Event, Producer may terminate this Agreement in whole or in part by written notice to Marketer, provided that Producer may not terminate its obligation related to the Springfield Agreements (including to pay to Marketer Producer's Allocable Share of the Springfield Agreements) without Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain if requested by Producer.

7.3. Effect of Termination. The expiration or termination of this Agreement, for any reason, will not release either Party from any obligation or Liability to the other Party, including any payment obligation, that has already accrued hereunder. Following early termination under Sections 7.2(a), 7.2(b), or 7.2(c) upon Producer's request, Marketer and its Affiliates shall use commercially reasonable efforts to work with Producer and the applicable counterparties to partially assign, or to enter into replacements for, any of the Midstream Contracts identified by Producer to assist in the continued delivery of Producer's Hydrocarbons following the termination of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1. Waivers. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

8.2. Assignment; Binding Effect. Neither Party may assign its rights or interests under this Agreement, or delegate any duties or obligations hereunder, without the prior written consent of the other Party, which consent may be withheld by the other Party in its sole discretion; *provided* that consent is not required for an assignment of rights or interests under this Agreement by a Party (a) to an Affiliate of a Party (without releasing the assigning Party of its obligations under this Agreement) or (b) subject to obtaining Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain, to a Third Party in connection with a conveyance of all or a part of Producer's Interests. This Agreement is binding upon and inures to the benefit of the Parties and their respective legal representatives, successors, and permitted assigns.

8.3. Joinder. Marketer shall cause any of its Affiliates that acquire or own Working Interests in jointly owned properties with Producer after the Effective Date to ratify and become a party to this Agreement by an amendment executed and delivered by the Parties and such Affiliate or Affiliates.

8.4. Governing Law; Severability.

(a) **THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED AND WILL BE CONSTRUED, INTERPRETED AND GOVERNED PURSUANT TO AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES THAT , IF APPLIED, MIGHT PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement, or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will not be affected thereby and that provision will be enforced to the greatest extent permitted by applicable Law.

8.5. Further Assurances. Subject to the terms and conditions set forth in this Agreement, each of the Parties shall use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

8.6. Counterparts. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, will be deemed an original, and all of which will constitute but one and the same instrument.

8.7. Notices. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement must be in writing and sent to the address of the Party set forth below, or to such other more recent address of which the sending Party actually has received written notice. Any notice or communication provided to Producer pursuant to this Agreement shall be provided concurrently to GSO by electronic email:

(a) if to Marketer, to:

SN EF Maverick, LLC
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

(b) if to Producer, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

prior to Redemption Date, with a copy to (which shall not constitute notice):
GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com
With a copy to:
Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com
(c) if to Sanchez, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

Each such notice or other communication must be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

8.8. Remedies. Except as provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party will be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties shall not assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

8.9. Disputes.

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR

PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), WILL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES MUST BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY WILL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL WILL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN WILL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

8.10. Expenses. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.11. Third Party Beneficiaries.

(a) Prior to the Redemption Date, GSO and its Affiliates shall be express third party beneficiaries of Producer's rights under this Agreement. Other than as set forth in the preceding sentence or in clause (b) below, the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns, and this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities or obligations are owed by a Party, or (b) any liquidator, trustee or creditor acting on behalf of any Party, and no such creditor or any other Person will have any rights under this Agreement.

(b) Subject to clause (a) above, notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith may be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

8.12. Conflict. In the event of a conflict between the terms of this Agreement and the terms of any joint operating agreement applicable to the Producer Interests, the terms of this Agreement will control as between the Parties.

8.13. Subchapter K. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code.

8.14. Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its

Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

8.15. Sanchez Support. Sanchez is executing this Agreement to evidence its agreement to cause Marketer to perform and comply with Marketer's obligations under Section 3.1, Section 3.2, Section 3.6, and Section 8.3. Sanchez hereby guarantees the performance of Marketer under such provisions and agrees to be directly liable to Producer under such provisions in the event of any breach by Marketer.

8.16. Fees to Marketer and Sanchez. In consideration for (a) certain services provided by Marketer to Producer, Producer hereby agrees to pay to Marketer an annual fee equal to $50,000 and (b) certain services provided by Sanchez to Producer, Producer hereby agrees to pay to Sanchez an annual fee equal to $50,000, which such fees, in the case of preceding clauses (a) and (b), shall be due and payable by Producer to Marketer and Sanchez, as applicable, on the Effective Date and each one year anniversary of the Effective Date.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**SN EF MAVERICK, LLC:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UnSub GP, LLC, its general partner
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Solely for purposes of Sections 8.15 and 8.16,**
**SANCHEZ ENERGY CORPORATION:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

## Annex I

### Defined Terms

As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" (including its derivatives and similar terms) means possessing the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise. Notwithstanding the foregoing, Marketer and its Affiliates, on the one hand, and Producer and its Affiliates, on the other hand, will not be considered Affiliates of one another. For purposes of this Agreement, Sanchez Oil & Gas Corporation and its Affiliates, including all member of the Sanchez family, shall be deemed to be Affiliates of Marketer.

"Agreement" has the meaning set forth in the preamble.

"Aguila" has the meaning set forth in the recitals.

"Aguila's Hydrocarbons" means the Hydrocarbons, including all constituencies thereof, produced from the interests acquired by Aguila under the Purchase Agreement.

"Anadarko" has the meaning set forth in the recitals.

"Assets" has the meaning set forth in the recitals.

"Basic Documents" has the meaning given to such term in the Securities Purchase Agreement.

"Basis for Requesting Assurance" has the meaning set forth in Section 3.6(a).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"Central Time" means Central Standard time, as adjusted for Central Daylight time.

"Claims" means all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

"Collateral" has the meaning given to such term in Section 3.6.

"Day" or "Daily" means a period of 24 hours, commencing at 7:00 a.m., Central Time, on a calendar day and ending at 7:00 a.m., Central Time, on the next succeeding calendar day.

"Delivery Point" means the "Delivery Points" as defined and listed in the Springfield Agreements, and any future Delivery Point thereunder.

"Due Date" has the meaning set forth in Section 3.2(a).

"Effective Date" has the meaning set forth in the preamble.

"Event of Default" means, in respect of any Party, the failure to remedy, within 30 days of receipt of written notice thereof from any other Party, the material non-performance of or material non-compliance with any agreements, obligations or undertakings of such Party contained in this Agreement.

"Force Majeure" has the meaning set forth in Section 5.2.

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means GSO ST Holdings LP, a Delaware limited partnership.

"Hydrocarbons" means oil, gas, natural gas liquids, condensate, and other gaseous and liquid hydrocarbons, or any combination of the foregoing.

"Interest Rate" means an annual rate of interest equal to 2% above the prime rate published by *The Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

"Investor Redemption Event" has the meaning set forth in the LP Agreement.

"Joint Development Agreement" means the Joint Development Agreement to be entered into, among Producer, Aguila, and Marketer at the time of the closing pursuant to the Purchase Agreement.

"KNOC" has the meaning given to such term in the recitals.

"LAUF" means lost, unaccounted for, fuel and other losses of Producer's Hydrocarbons in connection with the services provided under an applicable Midstream Contract, in each case to the extent provided under the applicable Midstream Contract.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Line Fill" means line fill and tank bottom inventory and working tank inventory requirements, in each case required to be delivered to the applicable counterparty under a Midstream Contract.

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"LP Agreement" means the Amended and Restated Agreement of Limited Partnership of SN EF Unsub, LP to be entered into at the time of the closing pursuant to the Purchase Agreement, as may be amended.

"Manager" means the Manager under the MSA.

"Marketer" has the meaning set forth in the preamble.

"Marketing Transition Services Agreement" means the Marketing Transition Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement by and among Marketer, Anadarko Energy Services Company, Kerr-McGeee Oil & Gas Onshore LP and Anadarko E&P Onshore LLC and Sanchez Energy Corporation solely for purposes of defined provisions in the agreement, pursuant to which certain marketing transition services will be provided to Marketer.

"Midstream Contracts" means the contracts listed on Exhibit B hereto, including any amendments thereto, and any gathering, processing, transportation or sales agreements entered into after the Effective Date, including any amendments thereto, relating to the Producer's Interests and the Hydrocarbons produced therefrom.

"Month" or "Monthly" means a period of time beginning at 7:00 a.m., Central Time on the first Day of a calendar month and ending at 7:00 a.m., Central Time on the first Day of the next succeeding calendar month.

"MSA" means the Management Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement between Sanchez Oil & Gas Corporation and Producer.

"Net Amount" has the meaning set forth in Section 3.1.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 8.11(b).

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Producer" has the meaning set forth in the preamble.

"Producer's Allocable Share of Midstream Charges" means the sum of Producer's Allocable Share of the Springfield Agreements, plus Producer's Allocable Share of the Other Contracts.

"Producer's Allocable Share of the Other Contracts" means, for all Midstream Contracts other than the Springfield Agreements, a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to the counterparties under such Midstream Contracts during a Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to the counterparties under such Midstream Contracts during such Month, multiplied by the sum of (a) any deficiency payments or other similar fees, payments, or penalties resulting from failure to achieve minimum volume obligations that are paid by Marketer under such Midstream Contracts, (b) any commodity charges, and LAUF and Line Fill volumes incurred under such contracts that are borne by Marketer under such contracts and (c) any other amounts invoiced to Marketer under such Midstream Contracts. Notwithstanding the foregoing, (1) other than with respect to the Firm Intrastate Transportation Agreement dated January 17, 2012 between Eagle Ford Midstream, LP and Anadarko Energy Services and Transportation Services Agreement dated March 1, 2012 between Enterprise Products

Operating LLC and Anadarko Energy Services Company for the Intrastate Movement of NGLs, Producer shall not be obligated to bear any deficiency payment or other similar feeds, payments or penalties in (a) above in an amount greater than 40% of any such payments, fees or penalties that are attributable to the aggregate volume of Producer's Hydrocarbons and Marketer's and its Affiliates' Hydrocarbons produced from the Producer Interests and Sanchez's Interests and (2) Marketer shall not terminate or amend the obligation of other producers under producer marketing agreements or elections applicable to such Midstream Contracts that would increase Producer's Allocable Share of the Other Contracts in any material respect without the consent of Producer.

"Producer's Allocable Share of the Springfield Agreements" means, for as long as Marketer remains a party to the Springfield Agreements, the sum of: (i) the product of the Allocable Springfield Demand Rate in the applicable Month multiplied by the Monthly Minimum Volume Commitment (as defined in each of the Springfield Agreements) under each Springfield Agreement for such Month; (ii) the product of the Allocable Springfield Commodity Rate in the applicable Month multiplied by the volumes of Producer's Hydrocarbons delivered under each Springfield Agreement during such Month; (iii) any LAUF and Line Fill volumes retained by Springfield under the terms of the Springfield Agreements that are attributable to Producer's Hydrocarbons delivered under the Springfield Agreements; and (iv) any other amounts invoiced to Marketer under Article VII of the Springfield Agreements and attributable to Producer's Hydrocarbons being delivered under the Springfield Agreements. For purposes of this definition, (a) "Allocable Springfield Demand Rate" in any Month shall be equal to the applicable Demand Rate (as defined in each of the Springfield Agreements) multiplied by a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to Springfield under each applicable Springfield Agreement during such Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to Springfield under each applicable Springfield Agreement during such Month and (c) the Allocable Springfield Commodity Rate in any Month shall be equal to the applicable Commodity Rate (as defined in each of the Springfield Agreements); *provided* that, in any given Month, if the Total Allocable Rate for such Month is (x) greater than the "Max Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be equal to the product of the "Max Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month or (y) less than the "Min Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be the product of the "Min Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month.

"Producer's Hydrocarbons" means the Hydrocarbons produced from and attributable to Producer's Interests, including all constituencies thereof.

"Producer's Interests" has the meaning set forth in the recitals.

"Purchase Agreement" has the meaning set forth in the recitals.

"Receipt Points" means (i) the "Receipt Points" as defined and listed in the Springfield Agreements, and any future Receipt Point thereunder and (ii) for Hydrocarbons that are not delivered to Springfield, the first point at which Marketer delivers such Hydrocarbons from the wellhead to the facilities of a counterparty under a Midstream Contract.

"Redemption Date" is defined in the MSA.

"Representative" means officers, directors, employees, and other representatives of the referenced entity and its Affiliates.

"Reserved Hydrocarbons" means the volumes of Hydrocarbons that Producer does not deliver under the Springfield Agreements that are associated with field and other similar uses of Producer that are expressly reserved or excepted from the definition of Dedicated Production thereunder.

"Sanchez" has the meaning set forth in the preamble.

"Sanchez's Hydrocarbons" the Hydrocarbons produced from Sanchez's Interests, including all constituencies thereof.

"Sanchez's Interests" means the interests in the Assets acquired by Marketer under the Purchase Agreement as well as other Working Interests acquired by Marketer or its Affiliates after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts.

"Springfield" means Springfield Pipeline LLC, or its permitted successors or assigns as party to the Springfield Agreements.

"Springfield Agreements" means (1) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield and Sanchez, and (2) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and Sanchez, in each case to be entered into at the termination of the Marketing Transition Services Agreement and as each such contract may be amended from time to time.

"Taxes" means all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"Term" has the meaning set forth in Section 7.1.

"Third Party" means any Person other than a Party or one of their Affiliates.

"Total Allocable Rate" means, for any given Month, the rate calculated separately for each of the Springfield Agreements equal to (a) the Producer's Allocable Share of the Springfield Agreement divided by (b) the total volumes of Producer's Hydrocarbons delivered to Springfield under such Springfield Agreement during such Month.

"Securities Purchase Agreement" the Securities Purchase Agreement, dated January 12, 2017, among Producer, Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub GP, LLC, SN EF UnSub Holdings, LLC, GSO ST Holdings Associates LLC and GSO ST Holdings LP.

"Working Interest" means with respect to any lease or well or wellpad, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease, well, or wellpad.

*　　*　　*

**Exhibit A**

**Springfield Agreements Allocable Share**

| | **WES Gas Fee ($/mcf)** | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 1.14 | 1.80 |
| 2017 | 1.04 | 1.58 |
| 2018 | 0.94 | 1.37 |
| 2019 | 0.86 | 1.20 |
| 2020 | 0.85 | 1.17 |
| 2021 | 0.87 | 1.21 |
| 2022 | 0.83 | 1.12 |
| 2023 | 0.80 | 1.04 |
| 2024 | 0.77 | 0.98 |
| 2025 | 0.73 | 0.89 |
| 2026 | 0.71 | 0.84 |
| 2027 | 0.69 | 0.79 |
| 2028 | 0.69 | 0.78 |
| 2029 | 0.68 | 0.76 |
| 2030 | 0.68 | 0.75 |
| 2031 | 0.70 | 0.78 |
| 2032 | 0.71 | 0.80 |
| 2033 | 0.72 | 0.81 |
| 2034 | 0.72 | 0.81 |

| | WES Oil Fee ($/bbl) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 2.41 | 3.67 |
| 2017 | 2.05 | 2.90 |
| 2018 | 1.82 | 2.42 |
| 2019 | 1.71 | 2.18 |
| 2020 | 1.74 | 2.22 |
| 2021 | 1.73 | 2.19 |
| 2022 | 1.73 | 2.15 |
| 2023 | 1.65 | 1.97 |
| 2024 | 1.55 | 1.76 |
| 2025 | 1.54 | 1.71 |
| 2026 | 1.53 | 1.68 |
| 2027 | 1.54 | 1.67 |
| 2028 | 1.53 | 1.64 |
| 2029 | 1.54 | 1.63 |
| 2030 | 1.56 | 1.66 |
| 2031 | 1.59 | 1.70 |
| 2032 | 1.61 | 1.73 |
| 2033 | 1.63 | 1.75 |
| 2034 | 1.64 | 1.76 |

**Exhibit B**

**Midstream Contracts**

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation | 10/1/2010 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| Anadarko E&P Company LP | Texas Pipleline LLC (Howard) | Firm Transportation (gas) | 10/5/2010 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| Anadarko Energy Services Company | Flint Hills Resources, LP | Crude Oil Supply Agreement (Sales Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | Arrowhead Gathering Company, L.P. | Crude Oil Throughput and Deficiency Agreement (TPT Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 2) | 6/28/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Pipeline, LP | Crude Oil T&D (NuStar) (TPT Tranche 2) | 7/2/2012 |
| Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE) (TPT Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Plains Marketing, LP | Crude Oil Purchase Contract | 4/1/2014 |
| Anadarko E&P Onshore LLC | Shell Trading (US) Compnay | Crude Sales Contract | 12/1/2016 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Condensate Stabilization Agreement | 7/1/2014 |
| Anadarko E&P Onshore LLC | Plains South Texas Gathering LLC | Shipping Agreement | 5/1/2014 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Transportation Service Agmnt | 3/1/2013 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Gas Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Oil Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 1) | 9/1/2010 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 2) | 2/1/2011 |
| Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |
| Anadarko E&P Onshore LLC | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Shoup) | 3/1/2013 |
| Anadarko E&P Onshore LLC | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2017 |
| Anadarko E&P Company LP | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2011 |
| Anadarko E&P Onshore LLC | Texas Pipeline LLC | NGL Bank Service Agreement | 7/25/2013 |
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation Agreement for NGPA Section 311 Service, No. 9138E | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | Purchase Contract | 10/13/2016 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Master Terminal Services Agreement | 7/2/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Terminal Services Schedule No. Anadarko E&P Company LP – 001 | 7/2/2012 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Gas Gathering (Clear Springs) | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 9/9/2015 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P | Gas Processing Agreement | 8/1/2012 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement | 8/1/2015 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purch. Agreement | 9/1/2008 |
| Anadarko E&P Company LP | Trimac Transportation Central Inc. | Crude Trucking | 3/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | NGL Marketing | 10/13/2016 |

**NAESB Contract Confirmations**

| Gas Sales | Counterparty | Volume (MMBtu/d) | End Date |
|---|---|---|---|
| | Air Liquide (255602) | 12,500 | 3/31/2017 |
| | Air Liquide (255604) | 12,500 | 3/31/2017 |
| | Diamond Shamrock (248974) | 6,045 | 8/31/2017 |
| | Kinder Morgan (255681) | 10,000 | 3/31/2017 |
| | Repsol (244011) | 25,000 | 3/31/2017 |
| | Repsol (255144) | 10,000 | 3/31/2017 |
| | Techgen (221544) | 30,000 | 9/31/2021 |
| | Valero (248973) | 12,060 | 8/31/2017 |
| | Valero (248975) | 4,020 | 8/31/2017 |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 |

# Exhibit E

EX-10.9 21 sn-20170331ex1098e1ee4.htm EX-10.9

**Exhibit 10.9**

**JOINT DEVELOPMENT AGREEMENT**

**By and Among**

**GAVILAN RESOURCES, LLC,**

**SN EF MAVERICK, LLC,**

**SN EF UNSUB, LP,**

**and**

**SANCHEZ ENERGY CORPORATION, but solely with respect to Section 2.2, Section 4.2, Section 4.5 and Article VII**

**Dated as of March 1, 2017**

---

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 | SPECIFIC DEFINITIONS | 1 |
| 1.2 | CONSTRUCTION | 1 |
| ARTICLE II WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES | | 2 |
| 2.1 | WORKING INTEREST | 2 |
| 2.2 | REPRESENTATIONS AND WARRANTIES | 2 |
| ARTICLE III OPERATING COMMITTEE; BUDGETS AND WORK PLAN | | 2 |
| 3.1 | MANAGEMENT BY OPERATING COMMITTEE | 2 |
| 3.2 | FUNCTION OF THE OPERATING COMMITTEE | 2 |
| 3.3 | OPERATING COMMITTEE | 4 |
| 3.4 | MEETINGS OF THE OPERATING COMMITTEE | 5 |
| 3.5 | QUORUM AND VOTING | 6 |
| 3.6 | DEADLOCK MECHANISMS | 7 |
| 3.7 | BUDGETS AND WORK PLAN; AFES AND APPROVED OPERATIONS | 8 |
| 3.8 | OPERATORSHIP UNDER THE OPERATING AGREEMENT | 11 |
| 3.9 | DEFAULT | 18 |
| ARTICLE IV TRANSFER; EXIT OPPORTUNITIES | | 19 |
| 4.1 | RESTRICTIONS ON THE TRANSFER OF INTERESTS | 19 |
| 4.2 | TAG-ALONG RIGHT | 21 |
| 4.3 | RIGHT OF FIRST OFFER | 24 |
| 4.4 | INITIAL PUBLIC OFFERING | 26 |
| 4.5 | SALE TRANSACTION | 26 |
| ARTICLE V ADDITIONAL COVENANTS | | 34 |
| 5.1 | INFORMATION RIGHTS | 34 |
| 5.2 | AREA OF MUTUAL INTEREST | 35 |
| 5.3 | SPACING PROTECTIONS | 38 |
| 5.4 | COOPERATION | 40 |
| ARTICLE VI TERM AND TERMINATION | | 40 |
| 6.1 | TERM AND TERMINATION | 40 |
| 6.2 | EFFECT OF TERMINATION | 41 |
| ARTICLE VII GENERAL PROVISIONS | | 41 |
| 7.1 | ENTIRE AGREEMENT | 41 |
| 7.2 | WAIVERS | 41 |
| 7.3 | ASSIGNMENT; BINDING EFFECT | 42 |
| 7.4 | GOVERNING LAW; SEVERABILITY | 42 |
| 7.5 | FURTHER ASSURANCES | 42 |
| 7.6 | COUNTERPARTS | 42 |
| 7.7 | CONFIDENTIAL INFORMATION | 43 |
| 7.8 | NO THIRD PARTY BENEFICIARIES | 44 |
| 7.9 | NON-SOLICITATION | 45 |
| 7.10 | NOTICES | 45 |
| 7.11 | REMEDIES | 47 |
| 7.12 | DISPUTES | 48 |

| | | |
|---|---|---|
| 7.13 | EXPENSES | 49 |
| 7.14 | NO RECOURSE | 49 |
| 7.15 | CONFLICT | 50 |
| 7.16 | SUBCHAPTER K | 50 |
| 7.17 | RELATIONSHIP OF SN AND SN UNSUB | 50 |
| 7.18 | OPERATING COMMITTEE; AFFILIATES | 51 |
| 7.19 | FORCE MAJEURE | 51 |

| | |
|---|---|
| Annex I | Definitions |
| Annex II | Representatives |
| Annex III | Working Interests |
| Annex IV | Approved Financial Advisor Arbiters |
| Annex V | Existing Producing Wells |
| Annex VI | Existing Drilled and Uncompleted Wells |
| Annex VII | Restricted Areas |

| | |
|---|---|
| Exhibit A | [Intentionally omitted] |
| Exhibit B | Form of Operating Agreement |
| Exhibit C | Area of Mutual Interest |
| Exhibit D | Form of Assignment |
| Exhibit E | Form of Memorandum of Joint Development Agreement |
| Exhibit F | Form of Notice of Termination of the Joint Development Agreement |

**1. JOINT DEVELOPMENT AGREEMENT**

This **JOINT DEVELOPMENT AGREEMENT** (this "Agreement"), is entered into as of March 1, 2017 (the "Effective Date"), by and between SN EF Maverick, LLC, a Delaware limited liability company ("SN"), SN EF UnSub, LP, a Delaware limited partnership ("SN UnSub"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Blackstone"), and, solely for the purposes of Section 2.2, Section 4.2, Section 4.5 and Article VII, Sanchez Energy Corporation, a Delaware corporation ("Sanchez Energy"). Each of SN, SN UnSub, Sanchez Energy (with respect to the provisions of this Agreement to which it is a party) and Blackstone are referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS**

**WHEREAS**, the Parties and, solely for the purposes of Section 15.22 thereof, Sanchez Energy, entered into that certain Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko") and the Parties (the "Purchase Agreement"), pursuant to which the Parties collectively purchased all of the Working Interests of Anadarko comprising an undivided fifty percent (50%) Working Interest in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas, as described in more detail in Annex III; and

**WHEREAS**, the Parties desire to enter into this Agreement in connection with the transactions and conveyances contemplated by the Purchase Agreement to, among other things, provide for certain capital planning, operatorship, transfer, and economic rights between the Parties with respect to the development, operation, and maintenance of the Assets and the Parties' interests therein.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

**1.1 Specific Definitions.** Capitalized terms used in this Agreement shall be given the meanings ascribed to such terms on Annex I.

**1.2 Construction.** Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular shall include the plural, and the plural shall include the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections, or

subdivisions thereof shall refer to the corresponding article, section, or subdivision thereof of this Agreement unless specific reference is made to such articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder," and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.

**ARTICLE II**
**WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES**

**2.1** **Working Interest.** As of the Effective Date, the Parties each own the Working Interests in each of the Leases as set forth on Annex III.

**2.2** **Representations and Warranties**. Each of the Parties, severally and not jointly, solely in respect of itself and not another Party, hereby represents and warrants to the other Parties as follows as of the Effective Date: (a) such Party is duly formed, validly existing, and in good standing under the laws of its jurisdiction of formation, (b) such Party has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver and perform this Agreement, (c) such Party has duly executed and delivered this Agreement and this Agreement is legal, valid, and binding with respect to such Party and is enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, or similar laws affecting creditors' rights generally, (d) except to the extent contemplated herein, no permit, consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or Third Party (collectively, "Consents") is required in connection with the execution, delivery, or performance by such Party of this Agreement, or to consummate any transactions contemplated hereby that have not been obtained or waived prior to the Effective Date, and (e) *provided*, that the Consents are obtained, the authorization, execution, delivery, and performance of this Agreement by such Party does not, and will not, breach or conflict with or constitute a default under (A) such Party's organizational documents or (B) any agreement or arrangement to which such Party is a party or by which it is otherwise bound.

**ARTICLE III**
**OPERATING COMMITTEE; BUDGETS AND WORK PLAN**

**3.1** **Management by Operating Committee**. The Parties hereby establish an operating committee composed of representatives (each, a "Representative") from the Parties duly appointed in accordance with this Article III (the "Operating Committee"). The Operating Committee shall exercise its rights and carry out its duties over the Assets in compliance with this Agreement.

**3.2** **Function of the Operating Committee**. The Parties agree that, among the Parties, the timing, scope and budgeting of operations on the Assets (other than with respect to the Initial Budget and Work Plan) and amendments to the Initial Budget and Work Plan shall be ultimately

approved by the Operating Committee. To the extent permitted or allowed under the applicable Operating Agreement, the Operator shall, in its own discretion and in accordance with the applicable Operating Agreement, propose, approve, and undertake any actions or decisions pursuant to such applicable Operating Agreement unless Unanimous Consent of the Operating Committee is required under this Agreement. The Operating Committee shall have no authority over the ownership of any interest in an Asset, which authority shall remain exclusively with the Party holding such ownership interest, subject to the other terms of this Agreement, including Article IV. The matters set forth below shall require the Unanimous Consent of the Operating Committee, and each Party agrees that it will not take or knowingly facilitate, and will cause its Controlled Affiliates and shall use its reasonable best efforts to cause its other Affiliates not to take or knowingly facilitate, any action under any applicable Operating Agreement or otherwise with respect to the Assets contemplated by clauses (a) through (h) of this Section 3.2 without the Unanimous Consent of the Operating Committee.

(a) approving any Subsequent Budget and Work Plan;

(b) making any amendments or modifications of the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan; *provided*, that, any increase to the aggregate amount of expenditures in the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan (as applicable) shall not require Unanimous Consent of the Operating Committee so long as such increase would not exceed the approved budgeted amount by more than ten percent (10%) and is otherwise consistent with the applicable Approved Budget;

(c) approving any AFE with respect to an Approved Operation to the extent that all AFEs issued for such Approved Operation exceed one hundred twenty percent (120%) of the budgeted amount for such Approved Operation in an Approved Budget; *provided*, *however*, that any AFEs so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(d) approving any E&D Operations or S&A Operations proposed by a Third Party unless previously authorized pursuant to an Approved Budget; *provided*, *however*, that any such E&D Operations or S&A Operations that are so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(e) designating a new Operator (other than as provided in Section 3.8(e) or Section 3.8(f));

(f) commencing or settling litigation related to the Assets that affect or would reasonably be expected to affect all Parties with respect to their ownership of the Working Interests, if the claims or settlements at issue exceed, or would reasonably be expected to exceed, a total of $2,000,000 in the aggregate or otherwise involve any equitable relief, or request for equitable relief, related to the Assets;

(g) amending this Agreement or any applicable Operating Agreement; and

(h) approving or amending of any Material Contracts.

(i) In the event that the Operating Committee approves any matter under Section 3.2 by Unanimous Consent, each Party shall take, and shall cause its Affiliates to take, such actions within such Party's Control under an applicable Operating Agreement that are reasonably necessary to effectuate such approved matter (and shall not knowingly take any action that could reasonably be expected to subvert, or otherwise materially interfere with the effectuation of such approved matter, including by encouraging Third Party Working Interest holders under an Operating Agreement to submit alternative or competing proposals against those proposals approved by the Operating Committee pursuant to this Section 3.2). Without limiting the generality of the foregoing but subject to Section 3.7(c), each Party will vote its respective Working Interests under an applicable Operating Agreement in favor of, and make appropriate elections with respect to, and the Operator will make proposals for the activities contemplated by, matters that have been approved by the necessary consents required by this Section 3.2 as provided hereunder, and are otherwise in accordance with the terms of this Agreement and any applicable Operating Agreement. Once a matter is approved pursuant to the applicable Operating Agreement, the Joint Exploration Agreement, and the Participation Agreement, the provisions of such other agreements shall control the implementation of such matter other than as expressly set forth in this Agreement.

**3.3 Operating Committee.**

(a) *Composition.*

(i) The Operating Committee shall consist of six (6) natural persons.

(ii) SN shall have the right to appoint two (2) Representatives and SN UnSub shall have the right to appoint one (1) Representative (each, a "Sanchez Representative"), *provided*, *however*, at any time following a Qualified Foreclosure Transfer, the Qualified Foreclosure Transferee shall have the right to appoint one (1) Representative (the "Qualified Foreclosure Transferee Representative") and SN shall have the right to appoint two (2) Representatives (which such two (2) Representatives shall then be the only Sanchez Representatives hereunder), and SN UnSub will no longer have the right to appoint a Representative. Notwithstanding anything in this Agreement to the contrary, (a) SN shall have the right to direct the vote of each Sanchez Representative appointed by SN, (b) SN UnSub will have the right to direct the vote of the Sanchez Representative appointed by SN UnSub, and (c) the Qualified Foreclosure Transferee shall have the right to direct the vote of the Qualified Foreclosure Transferee Representative. Notwithstanding anything to the contrary in this Agreement, at any time that SN is in Default, the Sanchez Representative appointed by SN UnSub shall be an investment professional affiliated with GSO for so long as GSO owns any interest in SN UnSub.

(iii) Blackstone shall have the right to appoint three (3) Representatives (each, a "Blackstone Representative"). Notwithstanding anything in this Agreement to the contrary, Blackstone shall have the right to direct the vote of each Blackstone Representative.

(iv) The initial Representatives are set forth on Annex II.

(v) Each Representative may vote by delivering his or her written proxy to another Representative. A Representative shall serve until such Representative resigns or is removed as provided in Section 3.3(b).

(b) *Resignation; Removal and Vacancies*. Any Representative may resign at any time by giving written notice to the Operating Committee. The resignation of any Representative shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Sanchez Representative may be removed at any time, with or without cause, by (and only by) SN (if such Sanchez Representative was appointed by SN) or SN UnSub (if such Sanchez Representative was appointed by SN UnSub). Any Blackstone Representative may be removed at any time, with or without cause, by (and only by) Blackstone. Any Qualified Foreclosure Transferee Representative may be removed at any time, with or without cause, by (and only by) the Qualified Foreclosure Transferee. The removal of a Representative shall be effective only upon receipt of notice thereof by the remaining Representatives and by SN, SN UnSub, Blackstone, or the Qualified Foreclosure Transferee, as applicable. Any vacancy in the number of Representatives occurring for any reason shall be filled promptly by the appointment of a new Representative by (i) SN, with respect to a Sanchez Representative appointed by SN, (ii) SN UnSub, with respect to a Sanchez Representative appointed by SN UnSub, (iii) Blackstone, with respect to a Blackstone Representative, and (iv) the Qualified Foreclosure Transferee, with respect to the Qualified Foreclosure Transferee Representative. The appointment of a new Representative is effective upon receipt of notice thereof by or at such time as shall be specified in such notice to the remaining Representatives.

**3.4 Meetings of the Operating Committee.**

(a) Regular meetings of the Operating Committee shall be held on a regular basis, but not less than monthly, at such times or places as may be determined by the Operating Committee. Special meetings of the Operating Committee may be called by any of the Representatives, subject to the requirements listed under Section 3.4(b). Each Party shall use reasonable best efforts, in good faith, to cause its designated Representatives to attend each regular or special meeting of the Operating Committee. The Operating Committee and the Operator shall hold bi-monthly conference calls on the 1st and the 15th of each month (or if any such dates are not a Business Day, the immediately following Business Day) to discuss the daily drilling operations, the production reports required to be provided pursuant to Section 5.1(a) and other operational updates during regular business hours, and the Operator shall otherwise provide the Parties with full access to, and shall make its personnel available upon reasonable prior notice to discuss with the Operating Committee such matters; *provided*, that upon the reasonable request by any Party, the Operating Committee and Operator will hold additional conference calls not to exceed one conference call per week.

(b) Notice of the time and place of any regular meeting of the Operating Committee shall be in accordance with the meeting schedule approved by the Operating

Committee or as otherwise agreed to by the Parties. Special meetings of the Operating Committee may be called by any Party by providing notice to the Representatives at least three (3) days prior to such meeting. Special meetings of the Operating Committee to deal with emergencies may be called by a Party providing at least twelve (12) hours' notice prior to the meeting, so long as each Representative provides written confirmation of receipt of notice or waives notice (including by attending the emergency meeting). Written notice of meetings of the Operating Committee, including the purpose of the meeting for special (including emergency) meetings, shall be given to each Representative with the notice of the meeting. Any Representative may waive notice of any meeting by the execution of a written waiver prior or subsequent to such meeting. The attendance of a Representative at any meeting shall constitute a waiver of notice of such meeting, except where a Representative attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction or voting of any business or matter because the meeting has not been lawfully called or convened. Notice may be given by electronic mail to an electronic mail address provided in writing by a Representative, by facsimile to a facsimile number provided in writing by a Representative, by personal delivery, or by national reputable courier service such as Federal Express or United Parcel Service to an address specified in writing by a Representative.

(c) The Operating Committee may adopt whatever rules and procedures relating to its activities as it may deem appropriate; *provided*, that such rules and procedures shall not be inconsistent with or violate the provisions of this Agreement; and *provided*, *further*, that such rules and regulations shall permit Representatives to participate in meetings (and the representatives of the Parties to observe) by telephone, video conference or the like, or by written proxy, and such participation shall be deemed attendance for purposes of determining whether a Quorum is present.

(d) At each regular meeting of the Operating Committee, the Operator shall update the Operating Committee on the operational performance of the Assets being operated by the Operator, including by presenting relevant quality, health, safety and environmental metrics regarding operations.

**3.5 Quorum and Voting.**

(a) At all meetings of the Operating Committee, the presence of a majority of the Representatives (including at least one (1) Sanchez Representative appointed by SN, one (1) Blackstone Representative and either the Sanchez Representative appointed by SN UnSub or the Qualified Foreclosure Transferee Representative, as applicable) shall be necessary and sufficient to constitute a quorum of the Operating Committee for the transaction of business (a "Quorum").

(b) Each Representative shall be entitled to one (1) vote on each matter to be voted upon by the Operating Committee.

(c) All actions and approvals of the Operating Committee listed in Section 3.2(a)-(h) shall be approved and passed at a meeting at which a Quorum is present by Unanimous Consent.

(d) Any Representative may participate in a meeting of the Operating Committee via conference telephone or any communications equipment that allows all Representatives and other individuals participating in the meeting to communicate with each other.

(e) Any action required or permitted to be taken at any meeting of the Operating Committee may be taken without a meeting or a vote, if consents in writing, setting forth the action so taken, are signed by Representatives constituting Unanimous Consent. Each written consent shall bear the date and signature of each Representative who signs the consent.

**3.6 Deadlock Mechanisms.**

(a) If any matter or proposal requiring Unanimous Consent for approval by the Operating Committee (i) is brought before the Operating Committee and such matter or proposal is not approved by Unanimous Consent or (ii) would have been brought before the Operating Committee, but for the fact that a Quorum was not present at three (3) consecutive meetings called for the purpose of approving such matter or proposal, then any Representative(s), by written notice to the other Representatives may call a meeting of the Operating Committee to reconsider such matter or proposal. Such meeting shall be held when, where and as reasonably specified in such notice, but not less than three (3) Business Days nor more than seven (7) Business Days after such notice has been delivered. If such meeting is called and held as provided in the immediately preceding sentence and the matter or proposal is offered at such meeting again and (A) is not approved by Unanimous Consent or (B) a Quorum is not present at such Operating Committee meeting, then any Representative(s) may within three (3) Business Days thereafter, declare a deadlock (a "Deadlock") by giving written notice to the other Representatives containing a brief description of the nature of the issue subject to such Deadlock (a "Deadlock Notice"). A Deadlock may also be declared as provided in Section 5.3(e)(ii). All Deadlocks shall be subject to the provisions of Section 3.6(b) and, if applicable, mediation, in accordance with Section 3.6(c).

(b) Within ten (10) Business Days after the receipt of a Deadlock Notice, a designated senior executive from each Party shall meet in good faith effort to reach an accord that will end the Deadlock. If a decision is not made by common accord that ends the Deadlock within ten (10) Business Days after the date of such meeting, any Representative(s) may declare a final Deadlock (a "Final Deadlock") by providing written notice to the other Representative (a "Final Deadlock Notice"). Notwithstanding anything in this Agreement to the contrary, if the designated senior executive of any Party is unwilling or unable to meet with the designated senior representative of any other Party, then any Representative(s) may immediately invoke the provisions of Section 3.6(c).

(c) If within ten (10) Business Days following receipt of a Final Deadlock Notice, the matter or proposal subject to such Final Deadlock remains in contention, then any Representative may subject the matter or proposal to non-binding mediation, which process shall be conducted as promptly as reasonably practicable, and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such non-binding mediation.

**3.7 Budgets and Work Plan; AFEs and Approved Operations.**

(a) *Initial Budget and Work Plan.* On the Effective Date, the Parties approved an Initial Budget and Work Plan (as may be amended from time to time by Unanimous Consent under Section 3.2(a), the "Initial Budget and Work Plan"), which sets forth estimates of the amounts to be incurred by the Operator (subject to authorization required under an applicable Operating Agreement) to conduct (x) the activities approved in such Initial Budget and Work Plan and (y) other operations related to the Assets contemplated by such Initial Budget and Work Plan, in each case, from the Effective Date through the second (2nd) anniversary of the execution of the Purchase Agreement (such activities and operations being the "Initial Approved Operations"). Each AFE issued by the Operator to implement an Approved Operation shall be deemed an Approved AFE in accordance with Section 3.2(c) and each Party shall consent to such Approved AFEs under any applicable Operating Agreement. Operator shall promptly issue supplements to any Approved AFE that it reasonably anticipates will exceed the estimated expenditures thereunder by one hundred twenty percent (120%) of the budgeted amount subject to approval by Unanimous Consent of the Operating Committee.

(b) *Subsequent Budgets and Work Plans*.

(i) The Operator shall prepare and submit to the Operating Committee for approval no later than October 1, 2018, and every October 1 thereafter, (A) a proposal for E&D Operations and S&A Operations to be conducted by the Operator during the subsequent twelve (12) month period and (B) a proposed budget (together, a "Subsequent Budget and Work Plan") which sets forth in reasonable detail the projects and activities (the "Subsequent Proposed Operations") and estimated amounts expected to be incurred by the Operator during the subsequent twelve (12) month period to conduct (x) the Subsequent Proposed Operations and (y) other estimated operating expenses related to the Assets. For the avoidance of doubt the expiration of an Approved Budget shall not affect any Approved Operation in such Approved Budget which is not yet complete. In the event that there is more than one Operator as a result of a Division of Operatorship or any other reason, then the applicable Post-Division Operators shall cooperate in good faith to submit such proposals to the Operating Committee as contemplated above.

(ii) The Operating Committee shall work in good faith to approve or disapprove of the Subsequent Budget and Work Plan no later than forty-five (45) days prior to the expiration date of the Approved Budget then in effect. Upon approval, the Subsequent Budget and Work Plan shall become the Approved Budget (all Subsequent Proposed Operations, as may be approved or amended by the Operating Committee, shall become "Subsequent Approved Operations").

(iii) If the Operating Committee approves the Subsequent Budget and Work Plan, then the Operator shall (A) use its reasonable best efforts to propose to Working Interest holders under any applicable Operating Agreement and put into effect such Subsequent Approved Operations in accordance with the Approved Budgets and (B) incur

costs and expenses in accordance with the Approved Budget, in each case to the extent such actions are approved by the required vote under the applicable Operating Agreement.

(iv) If the Operating Committee fails to approve a Subsequent Budget and Work Plan by the expiration date of the Approved Budget then in effect, and such Approved Budget is (A) the Initial Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith (as among the Representatives and between the Operating Committee and the Operator, as applicable) for a six (6) month period following the expiration of the Initial Budget and Work Plan, or (B) any Subsequent Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith for a three (3) month period following the expiration of the applicable Approved Budget (as applicable, the "Budget Negotiation Period"). During the Budget Negotiation Period, until a Subsequent Budget and Work Plan is approved by the Operating Committee and agreed to by the Operator, the most recent Approved Budget shall remain in effect as between the Parties, subject to a ten percent (10%) increase for each line item of the then-existing Approved Budget during the Budget Negotiation Period, after which all activities shall cease if a Subsequent Budget and Work Plan is not approved; *provided*, that, during the Budget Negotiation Period, the Operator shall use its reasonable best efforts to (A) for the first three months during a Budget Negotiation Period, continue to engage in E&D Operations and S&A Operations which were approved pursuant to Approved Budgets (but for the avoidance of doubt, except as specifically approved by the Operating Committee pursuant to Section 3.2, the Operator shall not be authorized to engage in any E&D Operations or S&A Operations not included in an Approved Budget) (*provided*, that after such Budget Negotiation Period, no new E&D Operations and S&A Operations may be initiated regardless of whether they were previously included in an Approved Budget), (B) take such actions as may be necessary to comply with the APC Well Commitment and satisfy continuous drilling obligations and otherwise maintain the Leases in accordance with their terms, and (C) incur costs and expenses in the ordinary course of business in amounts consistent with the most recent Approved Budget, including with respect to producing wells pursuant to any applicable Operating Agreement, in each case to the extent such actions are approved by the required vote or are otherwise permissible under the applicable Operating Agreement.

(c) *Approval of Additional Activities.* From time to time, SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee may present to the Operating Committee, E&D Operations and S&A Operations proposed to be undertaken with respect to the Assets that were not included in an Approved Budget.

(i) For any new E&D Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional E&D Proposal"), SN, SN UnSub or Blackstone or, if applicable, the Qualified Foreclosure Transferee, shall present to the Operating Committee and the Operator (A) proposed revisions to the Approved Budget in respect of such activities, (B) the surface location and objective formation of each vertical and lateral wellbore included in the Additional E&D Proposal, (C) the proposed spud and completion dates for each such wellbore, (D) relevant seismic/geophysical and reservoir

data, anticipated oil, gas, and liquids ratios, initial production and estimated ultimate recovery figures, decline curves, and the drilling and completion design for each proposed well, (E) the total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by well, (F) an AFE in respect of such Additional E&D Proposal, and (G) any other information reasonably requested by the Operating Committee and the Operator. The Operating Committee and the Operator shall evaluate such Additional E&D Proposal and such portion of the Additional E&D Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the applicable Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.2 and Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(ii) For any new S&A Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional S&A Proposal"), SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee shall present to the Operating Committee and the Operator, (A) proposed revisions to the Approved Budget in respect of such activities, (B) the proposed date of commencement of such activities and the proposed development and construction program for each included project (including the proposed timing and project scheduling), (C) the anticipated upside/cost saving for each included project and total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by project, (D) an AFE in respect of such Additional S&A Proposal, (E) any relevant data from any prior or comparable operations undertaken by SN, Blackstone or, if applicable, the Qualified Foreclosure Transferee or third parties relevant to the cost/benefit analysis of the proposed project(s), and (F) any other information reasonably requested by the Operating Committee or the Operator. The Operating Committee and the Operator shall evaluate such Additional S&A Proposal and such portion of the Additional S&A Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(d) *Timely Payment Commitment*. Notwithstanding anything in the applicable Operating Agreements to the contrary, on or before the 15th day of each month, Operator shall provide the other Party(ies) an invoice ("Monthly Invoice") for (i) such Party(ies) proportionate share of all projected cash outlays for the following month ("Estimated Cash Outlays") and (ii) any adjustments to the previously sent invoices so that the amount ultimately paid by a Party for a given month is equal to the actual amounts expended by Operator for such month ("True-Up Amount") (e.g., Operator will send a Monthly Invoice on or before June 15 and such Monthly Invoice will consist of the Estimated Cash Outlays for July plus or minus a True-Up Amount (if any) to reconcile the Estimated Cash Outlays for May). Each Party shall pay the Monthly Invoice on or before the last day of the month in which the Monthly Invoice was delivered to such Party.

(e) *APC Well Commitment; Other Required Actions.* Unless otherwise approved by the Operating Committee by Unanimous Consent, Operator will propose wells necessary to the meet the APC Well Commitment and avoid any financial penalty thereunder and shall be authorized to take any other action to the extent necessary to meet any continuous drilling obligations under any Lease. To the extent Operator does not propose such wells when required pursuant to the foregoing sentence, any Party is permitted to propose wells under any applicable Operating Agreements in order to ensure such APC Well Commitment is satisfied to the extent that failure to propose wells at such point in time would reasonably be likely to result in financial penalty under the APC Well Commitment. Further, any Party shall be permitted to propose the taking of any other action reasonably required to meet any continuous drilling obligations under any Lease.

**3.8 Operatorship Under the Operating Agreement.**

(a) As of the Effective Date, the Parties acknowledge and agree that SN is designated as the operator of the Assets pursuant to, and in accordance with, the Operating Agreements (in such capacity, "Sanchez Operator"). As contemplated by this Agreement, Blackstone or its designee, including a buyer or its designee in connection with a Sale Transaction may succeed to SN's status as operator of some or all of the Assets (in such capacity, "Blackstone Operator") and, in that event, Sanchez Operator may thereafter succeed to Blackstone Operator's status as operator of some or all of the Assets. Sanchez Operator and Blackstone Operator shall be referred to interchangeably as the "Operator," and each reference to the "Operator" herein means either Sanchez Operator or Blackstone Operator, depending on which of such parties holds the operatorship of the Assets in question following the receipt of all Required Operatorship Consents. For the avoidance of doubt, the term "Operator" does not include any successor Third Party operator of the Assets other than Blackstone Operator once such successor Third Party operator has obtained all Required Operatorship Consents with respect to any applicable Lease, Wellpad or other Asset. None of the Operating Committee or the Parties, by virtue of their ownership of an interest in the Assets, shall have any power, authority, or any Control over the day-to-day operation or management of the Assets, which authority and obligations reside with the Operator pursuant to the Operating Agreements. The Operator shall use its reasonable best efforts to execute an Approved Budget as agreed upon by the Parties pursuant to this Agreement and act under each Operating Agreement consistently with this Agreement, including with respect to carrying out the development plan and budget as set forth in an Approved Budget; *provided*, *however*, notwithstanding anything to the contrary herein, if this Agreement and the express requirements of the Operator under an Operating Agreement directly conflict, the Operator shall comply with such Operating Agreement to the extent necessary to avoid violating the terms of such Operating Agreement; *provided*, *further*, that Operator shall use reasonable best efforts to follow the estimated detailed drilling and completion specifications set forth in each Approved Budget but immaterial deviations shall not require an amendment of the applicable Approved Budget or an approval by Unanimous Consent of the Operating Committee nor shall such immaterial deviations be considered a default or breach of the Operator's obligations under this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, including the Operating Committee's actions pursuant to Section 3.2, if any Party reasonably believes there is any emergency involving actual or imminent loss of life, material damage to any of the Assets or the environment, or substantial and immediate financial loss, such Party may, in the sole exercise of its discretion, act for and on behalf of the Parties (including by causing the Operator to take such actions) in any manner reasonably necessary or useful under the circumstances without the necessity of giving prior notice to the other Parties or receiving any approval or consent from the Operating Committee or any Party. In the event that any Party takes any action pursuant to this Section 3.8(b) without the prior approval of the Operating Committee, such Party shall promptly (but in all events within twenty-four (24) hours) notify the Operating Committee of the taking of such actions.

(c) Without the prior written consent of Blackstone, SN UnSub, and if applicable, the Qualified Foreclosure Transferee, except as required to implement a transfer of operatorship required by this Agreement, SN (in its capacity as Sanchez Operator) shall not resign or attempt to resign as the operator under any Operating Agreement or take or omit to take any action that would effectively or constructively result in the termination of its status as operator under any Operating Agreement.

(d) In the event of a transfer of operatorship under any Operating Agreement in accordance with Section 3.8(f), the Alternate Operator or its designee as successor operator shall, as a condition to such transfer, be deemed to become a party to this Agreement as Operator under such Operating Agreement and be bound by the terms hereof in the same capacity as Operator, *mutatis mutandis*, and if not a Party to this Agreement, such operator shall be required to execute a joinder of this Agreement to such effect, and the Defaulting Operator shall be automatically discharged from all further obligations as the Operator under this Agreement with respect to any such Operating Agreement and the Assets subject to such Operating Agreement.

(e) *Division of Operatorship.* The following rights and procedures shall apply if (i) the Operating Committee is unable to approve a Subsequent Budget and Work Plan within the Budget Negotiation Period or (ii) either Blackstone or SN otherwise elects to cause a Division of Operatorship pursuant to this Section 3.8(e) for any reason during a Budget Negotiation Period or, as applicable, in the event that an Equitable Partition is to be consummated pursuant to Section 4.5, then, upon the expiration of such Budget Negotiation Period or at any time during such Budget Negotiation Period:

(i) Either Blackstone or SN shall have the right to cause a division of operatorship (a "Division of Operatorship") pursuant to which, subject to the terms of the applicable Operating Agreements and the other provisions of this Section 3.8(e), the rights to operatorship pursuant to applicable Operating Agreements for the Wellpads shall be divided between Blackstone Operator and Sanchez Operator on a geographic Wellpad-by-Wellpad basis approximating an alternating, checkerboard pattern (or such other pattern as may be mutually agreed by SN and Blackstone), such that once the Division of Operatorship is completed, such Division of Operatorship shall (A) result in Blackstone Operator and Sanchez Operator each having rights to operatorship pursuant to applicable

Operating Agreements over a number of Wellpads that constitute approximately fifty percent (50%) of the aggregate Fair Market Value of (x) the Working Interests underlying all the Wellpads and (y) the Existing Producing Wells and related offset locations and sections, and (B) evenly (or as evenly as commercially practicable) distribute to Blackstone Operator and Sanchez Operator: (1) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (2) producing wells and current production, (3) remaining reserves, (4) potential future well locations, and (5) operatorship of the Existing Producing Wells and related offset locations and sections (an "Equitable Division") and (6) in the case of an Alternative Equitable Partition, such other criteria set forth in Section 4.5(a). Upon the election of any Party to cause a Division of Operatorship, SN and Blackstone shall negotiate in good faith for a period of forty-five (45) days to designate by area, and based on substantially equal geographic divisions, all Wellpads under the Leases based on customary industry practices and their respective reserve reports covering the previous twelve (12) month period and agree upon an Equitable Division. If, following such forty-five (45) day period, SN and Blackstone are unable to agree upon an Equitable Division, each of them shall retain an independent, Third Party financial advisor or investment bank with expertise in valuing oil and gas assets in the Eagle Ford Shale (a "Financial Advisor") to determine an Equitable Division which will largely be based on such Party's engineering and geological reserve reports for the last twelve (12) month period and taking into account the then current strip pricing forecast. Sanchez and Blackstone shall each present the results of its Financial Advisor and provide its associated reserve reporting, including reasonable supporting information, after a period of thirty (30) days to the other Party and each such Party shall have ten (10) days to review the proposal of such other Party. If SN and Blackstone are unable to agree upon an Equitable Division after the period described in the preceding sentence, then SN and Blackstone shall choose within ten (10) Business Days a third Financial Advisor and an engineering and geological advisor to audit the reserve reports of SN and Blackstone (the "Reserve Auditor") from among the entities listed on Annex IV (or if SN and Blackstone are unable to agree on a Reserve Auditor and/or the third Financial Advisor within a reasonable timeframe, they shall cause the other Financial Advisors to choose a third Financial Advisor and Reserve Auditor from among the entities listed on Annex IV within the subsequent five (5) Business Day period) to determine an Equitable Division which shall (A) be based on the provisions set forth in this Section 3.8(e), (B) reflect the Equitable Division proposals by the two (or three, in the case of an Equitable Partition) Financial Advisors (unless such proposal is not consistent with the terms herein in which case such proposal will be rejected and not considered), (C) be rendered as promptly as practicable (but in any event no later than thirty (30) days after the appointment of such Financial Advisor and Reserve Auditor), and (D) be binding on the Parties. The Parties shall cooperate to provide all relevant information reasonably requested by such third Financial Advisor in connection with the determination of a final Equitable Division, including the audit of the Reserve Auditor of the reserve reports provided by SN and Blackstone. With respect to each applicable Operating Agreement, the Party (or its designee) who had operatorship prior to the Division of Operatorship shall be referred to as the "Pre-Division Operator," the Party who is awarded

operatorship pursuant to such Division of Operatorship (or where applicable pursuant to an Equitable Partition) shall be referred to as the "Post-Division Operator," and the other Party to such Division of Operatorship shall be referred to as the "Post-Division Non-Operator." For the avoidance of doubt, in the case of an Equitable Partition pursuant to Section 4.5(a), the provisions of this Section 3.8(e)(i) shall be deemed and interpreted to include SN UnSub as a participant in the Equitable Partition evaluation and determination process, such that GSO (acting on behalf of SN Unsub, as contemplated in Section 4.5 (i)) shall have full rights to participate equally with SN and Blackstone in determining the Equitable Partition in a manner consistent with the terms and conditions of Section 4.5(a) and this Section 3.8(e), including the right to appoint a Financial Advisor and Reserve Auditor.

(ii) Following the final resolution of an Equitable Division pursuant to Section 3.8(e)(i) or an Equitable Partition pursuant to Section 4.5, each Party shall use its reasonable best efforts to take or cause to be taken all actions required to obtain as promptly as practicable any necessary consents or amendments required for a change in operatorship (the "Required Operatorship Consents") under the Leases, Operating Agreements and any other Material Contracts, including all purchase, marketing, transportation, storage, processing and/or sales contracts, related to the Wellpads or Leases reasonably identified by a Party and any other actions reasonably necessary or desirable to effect a Division of Operatorship or an Equitable Partition, including any required notices or filings with applicable Governmental Authorities. If any such required consent or amendment for a Wellpad or Lease is not obtained by the time an Equitable Division or an Equitable Partition, respectively, has been finalized pursuant to Section 3.8(e)(i), then the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment and until such consent or amendment is obtained (or until such other time as the Post-Division Operator reasonably determines that it has the right and capability to assume operatorship), the Pre-Division Operator shall maintain formal rights of operatorship for such Wellpad or Lease and the Post-Division Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad or Lease based on customary terms and conditions, whereby the Post-Division Operator shall have the right to physically conduct all operations, and/or (B) direct the Pre-Division Operator in its exercise of all rights of a reasonable operator with respect to such Wellpad or Lease as though the Post-Division Operator had been appointed as successor operator for such Wellpad or Lease, to the extent (in either case (A) or (B)) reasonably consistent with the Pre-Division Operator's duties as operator under the applicable Operating Agreement, in which case the Pre-Division Operator shall remain the operator with respect to the applicable Asset and carry out all directions of the Post-Division Operator and not take any action under an Operating Agreement unless approved by the Post-Division Operator or required under the applicable Operating Agreement.

(iii) Upon the consummation of an Equitable Division, the Parties shall use their reasonable best efforts to (A) (1) cause all existing Operating Agreements to be terminated to the extent any such Operating Agreements apply to multiple Wellpads

allocated to both SN and Blackstone in connection with an Equitable Division and (2) execute and cause Third Party Working Interest holders in such Wellpads to execute, in place of each terminated Operating Agreement, the Form Operating Agreement (and agree to any reasonable modifications that may be requested by any such Third Party Working Interest holder to such Form Operating Agreement that are reasonably necessary to obtain any required approval), attached hereto as Exhibit B, for each individual Wellpad allocated to a Party pursuant to a Division of Operatorship or (B) with respect to any Wellpad that is subject to an Operating Agreement relating only to such Wellpad, take such action as may be necessary to obtain the required approval to transfer operatorship rights to the applicable Post-Division Operator as successor operator under such Operating Agreement. Additionally, each Post-Division Operator shall provide the other Parties on an annual basis with an approved one (1) year budget and work plan and a three (3) year budgeted forecast regarding the development of each Party's respective Assets for which such Post-Division Operator has been allocated rights of operatorship pursuant to a Division of Operatorship or an Equitable Partition.

(iv) Notwithstanding anything else to the contrary in this Agreement, at any time that a Non-Defaulting Party or its designee has rights to operatorship over one hundred percent (100%) of the Leases or Wellpads, or following the date upon which any Operator Default Event (as defined below) has occurred and is not cured as provided in Section 3.9, the Defaulting Party or its Affiliates shall no longer have the right to elect to cause a Division of Operatorship pursuant to this Section 3.8(e).

(v) Following a Division of Operatorship or an Equitable Partition, if a Post-Division Operator under any Operating Agreement elects to sell or otherwise transfer all of its interest in the assets covered by such Operating Agreement to a Third Party, and if such Third Party desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Non-Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for such Third Party to be selected as the successor operator, including a Third Party buyer in connection with a Sale Transaction or following an Equitable Partition. In all other circumstances in which a Post-Division Operator resigns (other than as a result of a transfer of operatorship to an Affiliate) or is removed as operator under an Operating Agreement, if the Post-Division Non-Operator desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for the Post-Division Non-Operator as successor operator. This Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten (10) years.

(vi) Promptly following the date of this Agreement, upon the request of Blackstone, the Parties shall use their good faith efforts to engage the Third Party owners of Working Interests in the Leases and enter into new joint operating agreements for each Wellpad consistent in all material respects with the existing Operating Agreements, in

addition to any modifications upon which the Parties may agree, in order to facilitate an orderly Division of Operatorship if and when pursued pursuant to this Agreement.

(vii) Blackstone will indemnify SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee, for all damages incurred by such Parties (a) to the Consenting Parties or any other parties whose consent is required under any applicable Operating Agreements arising out of any litigation brought by the Consenting Parties under the Consent Agreement as a result of the consummation of an Equitable Division or an Equitable Partition and (b) to counterparties from whom a Required Operatorship Consent is required in connection with effecting a Division of Operatorship or an Equitable Partition without having obtained any Required Operatorship Consents, which in either case shall include all reasonable legal expenses. In connection with any such litigation pursuant to which Blackstone is obligated to indemnify SN and SN UnSub under this Section 3.8(e)(vii), Blackstone shall have the right to control the defense on behalf of Blackstone, SN, SN UnSub and their respective Affiliates and SN, SN UnSub or, if applicable, the Qualified Foreclosure Transferee, and their respective Affiliates shall reasonably cooperate in connection with such defense; *provided*, that the appointment of counsel by Blackstone shall be subject to the consent of SN, not to be unreasonably withheld, conditioned or delayed, and SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee shall have the right to participate in connection with the defense of any such litigation. In connection with the consummation and implementation of an Equitable Division or an Equitable Partition, the Parties will use their respective commercially reasonable efforts to cooperate with the Consenting Parties to provide for an orderly transition of operatorship and consult with the consenting parties in connection with the implementation of such transition, in each case, in order to maintain an amicable working relationship with the Consenting Parties.

(f) *Transfer of Operatorship Generally*. Effective immediately upon the occurrence of any of the following: (i) Operator is removed as operator pursuant to the terms of any applicable Operating Agreement, (ii) Operator suffers a Specified Event of Default under a Specified Credit Agreement, (iii) Operator resigns as operator under any applicable Operating Agreement with or without the consent of the other parties thereto, (iv) Operator commits an act of gross negligence or willful misconduct with respect to its duties under an applicable Operating Agreement ("Negligent Operator Action"); *provided*, that notice of any Negligent Operator Action must be given to Operator detailing the alleged acts by Operator and Operator shall have a thirty (30) day period from receipt of such notice to cure any such Negligent Operator Action, unless the Negligent Operator Action concerns an ongoing operation being conducted, in which case, Operator must cure such Negligent Operator Action within forty-eight (48) hours of its receipt of the notice; (v) SN or any of its Affiliates breaches in any material respect its obligations under Section 4.5 or (vi) either Party while acting as Operator has committed a Default under this Agreement (any such event described in the preceding clauses (i) through (vi), collectively, an "Operator Default Event"), the operatorship of the applicable Assets (which, in cases (i), (iii), and (iv) above, for avoidance of doubt, shall mean only those Assets covered by the applicable Operating Agreement) and the right to serve as, or to designate, the operator of such Assets under the applicable Operating Agreement(s) shall, subject to the terms of such Operating Agreement(s),



011241

be transferred to Blackstone (if SN is then the Operator) or SN (if Blackstone is then the Operator), as applicable (the "Alternate Operator") or its designated Affiliate or a qualified Third Party operator capable of operating the Assets and selected by the Alternate Operator (a "Third Party Operator"). The Operator who is replaced as a result of such Event of Default (the "Defaulting Operator") shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to) use their reasonable best efforts to (i) take all actions required (at the reasonable direction of the Alternate Operator to effectuate such transfer, including voting its and its Affiliates' interests for an election of the Alternate Operator, its designee or a Third Party Operator, including through one or a series of related transactions, in each case to the extent permitted under the applicable Operating Agreement, (ii) obtain any necessary consents or amendments otherwise required for a change in operatorship under the Leases and applicable Operating Agreements and any other applicable Material Contracts including all Required Operatorship Consents, and (iii) carry out any other actions reasonably necessary to effect such transfer of operatorship. In the event the operatorship of an Asset is transferred to the Alternate Operator, its designee or a Third Party Operator pursuant to this Section 3.8(f), the Alternate Operator shall (and shall cause the successor operator, if other than the Alternate Operator, to), defend, indemnify and hold harmless the Defaulting Operator from all claims, Losses and damages raised by any Third Party related to the applicable Operating Agreements with respect to which operatorship has been transferred to the extent resulting from, pertaining to or arising from the operation of the applicable Assets by the Alternate Operator, its designee or the Third Party Operator from and after the date of such transfer of operatorship of the applicable Assets. The Alternate Operator shall (and shall cause the successor operator, if other than such Alternate Operator to) also use its reasonable best efforts to comply with all requirements of an operator under the applicable Operating Agreement or applicable law. In connection with any transfer of operatorship pursuant to this Section 3.8, the Parties shall use their reasonable best efforts to ensure that the new Operator shall have access to all assets relating to the Assets in which the Parties all hold an ownership interest in the same manner as the Defaulting Operator had prior to any such operatorship transfer, to the extent that a Division of Operatorship has not occurred or this Agreement has not been terminated. If any required consent or amendment required to effect the transfer of operatorship under any applicable Operating Agreement or any required consent or amendment for any other Material Contract related to a Lease or Wellpad for which operatorship is to be transferred, in each case as contemplated by this Section 3.8(f), is not obtained, including all Required Operatorship Consents, then until such consent or amendment is obtained (or until such other time as the Alternate Operator reasonably determines that it has the right and capability to assume operatorship), (i) the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment, (ii) the Defaulting Operator shall maintain formal rights of operatorship for such applicable Lease or Wellpad, and (iii) the Alternate Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad based on customary terms and conditions, whereby the Alternate Operator shall have the right to physically conduct all operations, and/or (B) direct the Defaulting Operator in its exercise of all rights of an operator with respect to such Wellpad as though such Alternate Operator had been appointed as successor operator for such Wellpad to the extent reasonably consistent with the Defaulting Operator's express duties as operator under the applicable Operating Agreement, in which case the Defaulting Operator shall remain the operator

with respect to the applicable Asset and carry out all directions of the Alternate Operator and not take any action under an Operating Agreement unless approved by the Alternate Operator or expressly required under the applicable Operating Agreement. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the transfer of operatorship and the rights related thereto described in this Section 3.8(f) shall be triggered automatically upon the occurrence of an Operator Default Event and shall not be affected in any respect by any change in, or cure of, an Operator Default Event.

**3.9 Default.**

(a) *Remedy Upon Default*. For so long as SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee is in Default (a "Defaulting Party"), (i) its rights under Section 3.2 (Function of the Operating Committee), Section 3.7(b) (Subsequent Budgets and Work Plans), Section 3.8(e) (Operatorship) (such that a Defaulting Party shall not have the right to elect to cause a Division of Operatorship), Section 4.1(a) (Permitted Transfers) (such that a Defaulting Party shall not have a right to Transfer its Asset Interest to a Third Party even after the expiration of the three year limitation in Section 4.1(a), without the prior written consent of the Parties not in Default (the "Non-Defaulting Parties") and *provided*, *however*, that such Default shall not affect rights regarding Permitted Liens), Section 4.2 (Tag-Along Rights), Section 4.3 (Right of First Offer), Section 4.5 (Sale Transaction) (such that if Blackstone is the Defaulting Party, it shall not have a right to compel the other Parties to participate in a Sale Transaction,), and Section 5.2 (Area of Mutual Interest) shall be suspended and any control rights associated with such provisions shall revert to the benefit of the Non-Defaulting Parties in percentages equal to their proportionate share of an AMI acquisition pending such cure or resolution of such Default and in connection therewith, the Representative(s) appointed by the Defaulting Party shall lose all voting rights with respect to the Operating Committee, and the affirmative vote of the Representatives who have not lost voting rights shall be the only votes required for any action to be taken by the Operating Committee (and shall be deemed to constitute Unanimous Consent); *provided*, that, (i) such rights shall not be suspended in the event the Party alleged to be in Default is contesting such allegation in good faith, pursuant to a binding arbitration process in accordance with Section 7.12(c), which shall be conducted as promptly as reasonably practicable (and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such process), and (ii) the Operating Committee shall not have the authority to bind the Defaulting Party and its Affiliates to Subsequent Budgets and Work Plans or to any increases to the then-existing Approved Budget except to the extent that all such increases in the aggregate do not exceed such Approved Budget by more than ten percent (10%). A Default shall not be deemed to be continuing after the Defaulting Party has (i) cured such Default, (ii) entered into and satisfied its obligations under a binding written settlement with the Non-Defaulting Parties related to such Default, or (iii) satisfied its obligations, if any, arising from any arbitration or judicial proceeding related to such Default.

(i) Any reasonable, documented legal fees and other out-of-pocket costs of each Party to a dispute governed under this Section 3.9 shall be borne solely by the non-prevailing Party, as determined in connection with the relevant proceedings and, the prevailing Party in such proceedings shall be entitled, in addition to such other relief

as may be granted, to reimbursement of such reasonable legal fees and costs from the non-prevailing Party.

(ii) Any monetary award granted to a Party in connection with a dispute governed under this Section 3.9 shall include interest accruing daily at a rate of 1.1% per month, compounding monthly, from the date upon which it is determined the applicable state of Default began, until the Party in Default has satisfied in full its obligations arising from the arbitration proceedings (including the payment of such interest amount).

(b) *Remedy Not Exclusive.* The rights of the Non-Defaulting Party set forth in this Section 3.9 or elsewhere in this Agreement shall be in addition to such other rights and remedies that may exist at Law, in equity or under contract on account of such Default.

## ARTICLE IV
## TRANSFER; EXIT OPPORTUNITIES

**4.1 Restrictions on the Transfer of Interests.**

(a) *Permitted Transfers.* Each Party may Transfer all or part of such Party's rights, title and interest to any Asset or related assets in the Core Area acquired after the Effective Date and held directly or indirectly by any of the Parties (an "Asset Interest"), including such Party's Working Interests, only in accordance with applicable Law and the provisions of this Agreement, including this Article IV. Prior to the third (3rd) anniversary of the Effective Date, except for transfers to Permitted Transferees and Foreclosure Transfers, none of the Parties shall be permitted to Transfer all or any portion of such Party's Asset Interests without the prior written consent of the non-transferring Parties (each, a "Non-Transferring Party"), which consent may be given or withheld in the sole discretion of such Party. Any purported Transfer in breach of the terms of this Agreement shall be null and void *ab initio,* and the Non-Transferring Party shall not recognize any such prohibited Transfer. Any Party who Transfers or attempts to Transfer any Asset Interests (the "Transferring Party") except in compliance herewith shall be liable to, and shall indemnify and hold harmless, the Non-Transferring Parties for all costs, expenses, damages, and other Liabilities resulting therefrom. No Party shall place or allow to be placed any Lien on any of its Asset Interests other than Permitted Liens. "Permitted Liens" means (i) Liens granted by the Parties and/or subsidiary guarantors under any Applicable Credit Agreement or any security document (including any mortgaged or deeds of trust) entered into in connection therewith (so long as such Applicable Credit Agreement and such security documents are not, after the Effective Date, amended, restated, modified, renewed, refunded, replaced or refinanced in a manner that restricts the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive (including in a manner that would adversely impact the exercise of any Party's rights under this Article IV) than the restrictions imposed by such Applicable Credit Agreement or security document on the Effective Date (or provided for by the applicable form of security document in a form agreed to as of the Effective Date as set forth in such Applicable Credit Agreement)) (ii) Liens under or required by an applicable Operating Agreement, (iii) statutory Liens securing amounts not yet due and payable or which are being contested in good faith, (iv) judgment Liens that are bonded for appeal or will be paid by insurance, (v) all overriding royalty

and net profits interests affecting the Assets on the Effective Date, (vi) Liens securing hedging related to the Assets, (vii) Liens related to debt financing arrangements that do not restrict the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive than the restrictions imposed by Liens that were in place on the Effective Date under other debt arrangements of such Party or its Affiliates, (viii) Liens related to marketing or midstream arrangements, (ix) any volumetric production payment transaction affecting a Party's Asset Interest, *provided* such volumetric production payment transaction shall be released in connection with a Sale Transaction, (x) all cashiers', landlords', workmens', repairmens', mechanics', materialmens', warehousemens' and carriers' Liens and other similar Liens imposed by Law, in each case, incurred in the ordinary course of business, (xi) pledges, deposits or other Liens securing the performance of bids, trade contracts, leases or statutory obligations in each case, incurred in the ordinary course of business, (xii) purchase money Liens incurred in the ordinary course of business, (xiii) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of any of the Asset Interests, (xiv) encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution (which in no event shall burden any Working Interests), or (xv) encumbrances arising out of, under or in connection with applicable securities Laws (which in no event shall burden any Working Interests and which shall be removed prior to the consummation of any Sale Transaction) or custodial arrangements with custodians of securities (which in no event shall burden any Working Interests).

(b) *Effect of Permitted Transfer*. Any Permitted Transferee must satisfy and comply with all requirements of a transferee of a Working Interest under any applicable Operating Agreement. Any Permitted Transferee to which any Asset Interests are Transferred hereunder shall be bound by, and sign on to and join, this Agreement, and shall become a Party for all purposes hereof and be bound by all provisions to which the Party that Transferred Asset Interests to it was or remains bound, *provided* that if a Permitted Transferee does not acquire all or substantially all Asset Interests of a Transferring Party hereunder, then it should obtain no rights under Article III. No Transfer of an Asset Interest shall relieve the Transferring Party of any obligations accruing prior to such Transfer under this Agreement or the applicable Operating Agreement. In a Foreclosure Transfer with respect to the Asset Interests of UnSub (a "Qualified Foreclosure Transfer"), the UnSub Agent or any designated special purpose vehicle established by the UnSub Agent, and in each case, any Permitted Transferee thereof (the "Qualified Foreclosure Transferee") (a) shall be bound by, and sign on to and join, this Agreement, (b) shall become a Party (and replace SN UnSub as a Party) for all purposes hereof and (c) each other Party shall be deemed to consent to the Qualified Foreclosure Transferee becoming a Party; *provided*, *however*, that if such Foreclosure Transfer covers less than all or substantially all of SN UnSub's Asset Interests, then unless otherwise agreed by SN UnSub and the Permitted Transferee, such Qualified Foreclosure Transferee shall not succeed to SN UnSub's rights under Article III. Except as provided in Section 6.2 or in a Foreclosure Transfer, if a Transfer is made to a Third Party in manner permitted by this Agreement or otherwise with the consent of the Non-Transferring Parties, then this Agreement shall terminate upon the consummation of such Transfer but only

with respect to the Asset Interest transferred (and this Agreement will remain in effect with respect to the remainder of the Asset Interests).

(c) *Expenses.* The Transferring Party shall bear all costs and expenses incurred in connection with any Transfer of all or any portion of its Asset Interests. Any transfer or similar taxes arising as a result of such Transfer shall be paid by the Transferring Party.

(d) *Certain Indirect Transfers*. Except for Transfers to Permitted Transferees, no Party shall indirectly Transfer any Asset Interests to the extent such Party is not permitted to Transfer Asset Interests directly pursuant to the terms hereof and any indirect Transfer shall be structured and consummated in such a manner that the Non-Transferring Party shall be provided the same rights and protections as it would have had if such Transfer were structured as a direct Transfer of such Asset Interests pursuant to the terms hereof; *provided*, *however*, that the sale of any Equity Interest in a Qualified Foreclosure Transferee to the extent necessary or desirable to comply with Law (including any bank regulatory requirements) shall not be subject to the restrictions set forth in Section 4.1(a). Notwithstanding anything in this Agreement to the contrary, a Transfer resulting from any change in control or transfer of ownership interests in Sanchez Energy shall not be treated as a Transfer under this Article IV unless such Transfer constitutes a Change of Control in which case Section 4.2 shall apply.

**4.2 Tag-Along Right.**

(a) Other than in connection with an IPO as contemplated by Section 4.4 and in connection with a Foreclosure Transfer, if at any time after the third (3rd) anniversary of the Effective Date and prior to an IPO of such Party (as defined herein), a Party proposes to Transfer all or any portion of its Asset Interests, whether in a single or series of related transactions, that constitute greater than thirty-five percent (35%) of such Party's total Asset Interests held as of the Effective Date to a Third Party purchaser or purchasers (a "Proposed Sale"), after complying with Section 4.3, the Transferring Party shall furnish to the other Parties (the "Non-Initiating Parties") a written notice of such Proposed Sale (the "Tag-Along Notice") and provide the Non-Initiating Parties the opportunity to participate in such Proposed Sale on the terms described in this Section 4.2 to the extent of their respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice will include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Asset Interests to be Transferred, (B) the name of the proposed transferee (the "Proposed Transferee"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable Assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed Transfer date, if known, which date shall not be less than forty-five (45) Business Days after delivery of such Tag-Along Notice*;* and

(ii) an invitation to the Non-Initiating Party to participate in such Proposed Sale at the same per Working Interest percentage price per applicable Asset, for

the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party will deliver or cause to be delivered to the Non-Initiating Party copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) A Non-Initiating Party must exercise the tag-along rights provided by this Section 4.2 within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "Tag-Along Offer") to the Transferring Party indicating its desire to exercise its tag-along rights hereunder. If the Non-Initiating Party does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, the Non-Initiating Party shall be deemed to have waived its rights under this Section 4.2 with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to Transfer the applicable Asset Interests (as defined in Section 4.5(a)) to the Proposed Transferee without the participation of such Non-Initiating Party, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable Asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If one or more Non-Initiating Parties elects to participate in the Proposed Sale pursuant to this Section 4.2, (i) the consideration to be received by the Parties in such sale (a "Tag-Along Transaction") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Leases, Wellpads, and other applicable Assets and other interests included by the Parties (collectively, the "Tag Interests"), as agreed by the Parties or as otherwise determined pursuant to the valuation process set forth in Section 4.5(c), taking into account (in either case) the Parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party buyer (but only to the extent that all Parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, *provided*, that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Parties in the Proposed Sale; and (ii) the Non-Initiating Parties shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one Party is Transferring Working Interests and the other Party is Transferring Equity Interests holding Working Interests, and such other distinctions as may be applicable to the Parties or their interests in the Leases, Wellpads, and other applicable Assets); *provided*, that (A) no Party shall be liable for the breach of any covenant by any other Party, (B) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, and (C) in no event shall a Non-Initiating Party be responsible for any Liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by such Non-Initiating Party in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act, and any Non-Initiating Party exercises its tag-along rights hereunder in connection with such Proposed Sale, if the

Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that each Non-Initiating Party, as applicable, will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) The offer of a Non-Initiating Party contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, such Non-Initiating Party shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Asset Interest Transferred, as the Transferring Party; *provided*, *however*, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to such Non-Initiating Party than those set forth in the Tag-Along Notice, such Non-Initiating Party shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from such Party's obligations.

(e) If a Party exercises its rights under this Section 4.2, the closing of the sale of each Party's Asset Interest in the Tag-Along Transaction will take place concurrently, other than in connection with a Change of Control. If the closing with the Proposed Transferee (whether or not the Non-Initiating Party has exercised its rights under this Section 4.2) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on Transfer contained herein shall again be in effect with respect to such Asset Interest and proposed Transfer.

(f) The costs of any transactions contemplated by this Section 4.2 shall be deducted pro rata from the proceeds to be paid to each Party in connection with such transaction, other than in connection with a Change of Control, in which case each Party participating in a Tag Transaction shall bear its own costs and expenses.

(g) Notwithstanding anything in this Agreement to the contrary, the Parties agree that a Change of Control with respect to Sanchez Energy shall be treated as a Transfer pursuant to this Section 4.2, provided that (i) a Tag Notice in such circumstances shall be given no later than two (2) Business Days following the public announcement of definitive documentation providing for a Change of Control, (ii) such Change of Control may be consummated prior to the consummation of the acquisition of the Non-Initiating Party's Tag Interests (which at the election of the Non-Initiating Party may be effected as an asset sale or as the sale of Equity Interests of an entity directly or indirectly owning the Assets of the Non-Initiating Party (provided that the Proposed Transferee shall not be required to assume any indebtedness for borrowed money and such entity shall have had no material business operations since its formation other than as related to the Assets)), (iii) the Proposed Transferee and the Non-Initiating Party shall enter into a purchase

agreement providing for the acquisition of the Non-Initiating Party's Tag Interests no later than twenty five (25) Business Days after the Non-Initiating Party's acceptance of a Tag Offer, which purchase agreement shall be substantially similar in all material respects to the terms and conditions of the Purchase Agreement, and (iv) the purchase price to be paid for the Non-Initiating Party's Tag Interests shall be determined based on the Fair Market Value of such Tag Interests in accordance with Section 4.5(f), subject to any applicable purchase price adjustments set forth in the purchase agreement referenced in the foregoing clause (iii). Sanchez Energy shall use its reasonable best efforts to cause a proposed transferee to comply with the terms of this Section 4.2(g); provided that in any consensual transaction between Sanchez Energy and a proposed transferee that results in a Change of Control, including a transaction where the board of directors of Sanchez Energy approve such transaction, Sanchez Energy shall cause such transferee to comply with this Section 4.2(g).

**4.3 Right of First Offer.**

(a) Other than in connection with an IPO as contemplated by Section 4.4, or in connection with a Foreclosure Transfer, and subject to the terms of any applicable Operating Agreement, if any Party proposes to Transfer any of the Asset Interests held by such Party, including Blackstone pursuant to Section 4.5 (a "ROFO Transferor") to a Third Party purchaser, the ROFO Transferor agrees that, before entering into negotiations with a Third Party, the Transferring Party will first provide notice (a "ROFO Notice") to the other Parties (the "ROFO Recipients") that the ROFO Transferor proposes to pursue such a transaction. Each such ROFO Notice will invite the ROFO Recipient to submit to the ROFO Transferor an offer in writing (a "ROFO Offer"), which offer shall (i) be irrevocable and in good faith, (ii) be for all cash (except SN may choose to fund a ROFO Offer with cash or SN Common Stock or a combination thereof) (any such ROFO Offer including SN Common Stock as consideration an "SN Equity Financed Offer")), (iii) specify in reasonable detail the material terms and conditions of such offer (including as set forth in Section 4.3(b) with respect to a SN Equity Financed Offer), (iv) shall provide for a closing date of no longer than ninety (90) days from the execution of a definitive purchase agreement and provide for no holdback or escrow of purchase price, and (v) shall remain open for acceptance by the ROFO Transferor for thirty (30) days after the ROFO Transferor's receipt of such ROFO Offer, to purchase from the ROFO Transferor one hundred percent (100%) of the Asset Interests that are the subject of the ROFO Notice, which at the sole election of the ROFO Transferor may be structured as a purchase of Working Interests or Equity Interests of an entity holding Asset Interests (the "ROFO Interests"). The ROFO Offer shall be submitted to the ROFO Transferor within thirty (30) days after the ROFO Recipient's receipt of the ROFO Notice and shall include a proposed definitive purchase agreement that such ROFO Recipient is prepared to execute upon the acceptance by the ROFO Transferor of the ROFO Offer. Upon the receipt by the ROFO Transferor of any ROFO Offer, the ROFO Transferor and the applicable ROFO Recipient shall negotiate in good faith for a period of thirty (30) days regarding the ROFO Offer. In the event the Parties are unable to reach agreement during such period, the ROFO Transferor may elect by notice to such ROFO Recipient submitted at any time during the 30-day period following such negotiation period to accept or reject the ROFO Offer (it being understood that a failure of the ROFO Transferor to submit an unqualified acceptance notice within such 30-day period shall constitute a rejection of the ROFO Offer). If the ROFO Transferor timely submits an

acceptance notice, the ROFO Transferor and the applicable ROFO Recipient shall in good faith negotiate a definitive purchase and sale agreement (which shall include the terms and conditions set forth in the ROFO Offer) and use their reasonable best efforts to consummate the purchase and sale of the ROFO Interests as promptly as practicable and in any event within ninety (90) days from the execution of a definitive purchase agreement. If only one ROFO Recipient timely submits a ROFO Offer, the ROFO Transferor may effectuate the sale of all the ROFO Interests to such ROFO Recipient alone. If neither ROFO Recipient timely submits a ROFO Offer or any ROFO Offer is rejected (or deemed rejected as described above) by the ROFO Transferor, the ROFO Transferor may effectuate a sale of all the ROFO Interests to a Third Party so long as (i) if a ROFO Offer was made, the Transfer price is at least one hundred percent (100%) of the offer price set forth in such ROFO Offer (taking into account Section 4.3(b) below) and the other terms and conditions offered to the Third Party are not materially more favorable to the Third Party than those of such ROFO Offer; and (ii) the execution of definitive documentation for the sale of such ROFO Interests to such Third Party shall occur no later than two hundred and seventy (270) days after a rejection (or deemed rejection) of such ROFO Offer.

(b) In connection with any SN Equity Financed Offer:

(i) the determination of the value of SN Common Stock included in a SN Equity Financed Offer shall (i) apply an appropriate illiquidity discount, which may take into account, as applicable, the discounts applied to comparable private placements or block trades of comparable size as compared to the applicable market price of such securities and/or discounts applied to publicly traded common equity used as acquisition currency by relevant valuation methodologies customarily used by leading financial valuation firms in similar circumstances and (ii) be discounted for any adverse liquidity effects that are attributable to the payment of any applicable taxes associated with the receipt of such SN Common Stock, in each case (i) and (ii), as reasonably determined by the ROFO Transferor, *provided*, that no discount with respect to clause (ii) shall apply if the SN Equity Financed Offer includes a portion of cash consideration equal to or greater than the expected aggregate amount of tax payable by the ROFO Transferor, including Blackstone and any of its direct and indirect equity owners as a result of the consummation of such SN Equity Financed Offer and assuming that the aggregate amount of such tax shall be computed using an assumed tax rate equal to the highest maximum combined marginal federal, state and local income tax rates applicable to an individual or corporate taxpayer resident in New York, NY;

(ii) the ROFO Offer shall provide for a fixed value, including a fixed value for the portion of consideration represented by SN Common Stock, payable upon closing, unless otherwise agreed to by the ROFO Transferor;

(iii) if the ROFO Transferor would beneficially own on a pro forma basis (calculated in accordance with clause (vi) below) more than twenty percent (20%) of the outstanding SN Common Stock, Sanchez Energy shall provide representation rights for the Sanchez Energy Board of Directors to the ROFO Transferor approximately equal to its pro

forma beneficial ownership percentage of SN Common Stock following the consummation of any ROFO Offer pursuant to documentation reasonably acceptable to Blackstone;

(iv) no Event of Default (as such term may be then defined under the SN Credit Agreement) shall have occurred under the SN Credit Agreement;

(v) Sanchez Energy shall have a rating equal to or higher than "B3" (or the equivalent) by Moody's or its successors, or an equivalent rating by S&P or Fitch, Inc. (or either of its successors);

(vi) the resulting share issuance will not cause the ROFO Transferor to beneficially own more than thirty-five percent (35%) of outstanding SN Common Stock on a pro forma basis excluding any SN Common Stock owned prior to the Effective Date or issued to Blackstone or GSO pursuant to this Agreement after the Effective Date;

(vii) the SN Common Stock shall be listed on the New York Stock Exchange or the NASDAQ Stock Market (or their respective successors); and

(viii) the SN Common Stock to be issued to the ROFO Transferor shall be entitled to the benefits of a registration rights agreement substantially similar in form and substance to the Registration Rights Agreement.

**4.4 Initial Public Offering**. Notwithstanding anything to the contrary herein, at any time following the third (3rd) anniversary of the Effective Date, any Party shall have the right to consummate an initial public offering of a vehicle that includes its respective Working Interests in the Assets at the time such IPO is initiated ("IPO"). The Party planning to carry out the IPO (the "IPO Party") may elect to exercise such right by delivering written notice of such election (an "IPO Notice") to the other Parties (each a "Non-IPO Party"). Each Non-IPO Party shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to), following receipt of an IPO Notice, cooperate and take such actions as are reasonably requested by the IPO Party or its Affiliates to help facilitate any such IPO, and the IPO Party shall reimburse each Non-IPO Party and its Affiliates for their reasonable out-of-pocket costs and expenses incurred in connection therewith.

**4.5 Sale Transaction.**

Subject to the limitations and conditions set forth in this Section 4.5 and the Right of First Offer set forth in Section 4.3:

(a) If at any time after the third (3rd) anniversary of the Effective Date (or within nine (9) months following the termination of this Agreement), Blackstone elects, pursuant to a Bona Fide Offer, to pursue a Transfer to a Third Party (other than GSO or any of its Affiliates) pursuant to the terms of such Bona Fide Offer (the "Sale Transaction Transferee") of all or substantially all of the Working Interests and other Assets acquired by Blackstone pursuant to the Purchase Agreement and all related assets in the Core Area acquired after the Effective Date and

then held directly or indirectly by Blackstone and its Affiliates (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads) (other than with respect to Excluded AMI Transactions (as defined in Section 5.2)), or all of the Equity Interests of any entity directly or indirectly owning all of such Working Interests and other Assets and related assets (a "Sale Transaction," which shall include a Sale Transaction Equitable Partition and the consummation of the sale contemplated thereby, but not an Alternative Equity Partition), and *provided*, that (i) Blackstone is not the Operator of all of the Assets, (ii) SN or any of its Affiliates is the Operator of any of the Assets and (iii) SN, SN UnSub and any of their respective Affiliates that then own any interests in the Asset Interests have not unconditionally agreed in writing to vote their applicable interests to support the designation of the Third Party who has made such Bona Fide Offer as operator under the applicable Operating Agreements, Blackstone shall, subject to Section 4.5, including Sections 4.5(h) and 4.5(i), have the right to compel Sanchez Energy, SN, SN UnSub, and their respective Affiliates to sell or otherwise convey to the Sale Transaction Transferee all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of SN and its Affiliates related to the Leases and/or Wellpads ("SN Operatorship Rights")) within an area of land comprising seventy-five percent (75%) of the Fair Market Value of the Core Area (the "Included Percentage") (*provided*, that if the transfer of such land would result in Sanchez Energy transferring all or substantially all of its assets pursuant to applicable Law, then such applicable percentage of Fair Market Value shall be such lesser percentage that would not constitute all or substantially all of the assets of Sanchez Energy pursuant to applicable Law, but in no event shall such percentage be lower than sixty-six percent (66%)) (it being agreed that for purposes of this Section 4.5, the Core Area shall not include any acreage for which a Party or any of its Affiliates does not then own Working Interests) (such area, the "Included Sale Transaction Area," and the remainder of the Core Area, the "Excluded Sale Transaction Area" and such remaining percentage, the "Excluded Percentage") to be determined as provided below in this Section 4.5(a), and in connection and contemporaneously with such Sale Transaction, Blackstone shall convey (and if applicable, cause its Affiliates to convey) all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads ("Blackstone Operatorship Rights")) within the Excluded Sale Transaction Area to SN and SN UnSub. Upon the election by Blackstone to pursue a Sale Transaction, SN, SN UnSub, and Blackstone shall negotiate in good faith for a period of forty-five (45) days to agree upon and designate the Included Sale Transaction Area and the Excluded Sale Transaction Area, based on substantially proportionate geographic divisions and customary industry practices and their respective reserve reports covering the previous twelve (12) month period, such that the Included Sale Transaction Area comprises the Included Percentage and the Excluded Sale Transaction Area comprises the Excluded Percentage, respectively, of the aggregate Fair Market Value of the Core Area (a "Sale Transaction Equitable Partition") in addition to an alternative partition such that the Included Sale Transaction Area comprises Assets in the Core Area equal to fifty percent (50%) of the aggregate Fair Market Value of the Core Area (or if at such time the relative ownership percentages of SN and its Affiliates and Blackstone and its Affiliates in the Core Area are not 50%/50%, then the percentage of the Fair Market Value owned in the Core Area by Blackstone and its Affiliates as compared to SN and its Affiliates) (such percentage, the "Blackstone Percentage") and the Excluded Sale Transaction Area comprises

that percentage of Assets in the Core Area equal to one hundred percent (100%) less the Blackstone Percentage (an "Alternative Equitable Partition" and together with a Sale Transaction Equitable Partition, each an "Equitable Partition"). An Equitable Partition shall (i) proportionately distribute to SN and SN UnSub, on the one hand, and the Sale Transaction Transferee or Blackstone, as applicable, on the other hand, in the same proportion and with substantially similar characteristics as each Party held in the Core Area, prior to the Equitable Partition, the following: (A) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (B) producing wells and current production (including substantially similar decline profiles and cash flow profiles), proved developed non-producing acreage and undeveloped acreage, (C) remaining reserves, (D) potential future well locations, and (E) allocation of exposure to demand charges, minimum volume commitments and commodity charges (and other similar costs and obligations) under the midstream and marketing agreements in place in the Core Area; (ii) seek to allocate the entirety of a Lease and the acreage governed by an applicable joint operating agreement into either the Included Sale Transaction Area or the Excluded Sale Transaction Area; (iii) take into account any other relevant factors, including, if applicable, a prior Division of Operatorship, and any restrictions on assignment of the applicable Working Interests and other Assets and, subject to the other express provisions of this Section 4.5, seek to mitigate any such restrictions if they are reasonably likely to impede or delay an Equitable Partition and (iv) in the case of an Alternative Equitable Partition, in no event shall SN UnSub have lower values of PDP PV-10 or projected cash flow from PDP reserves after such Alternative Equitable Partition (*provided*, that any assignments and conveyances among the Parties under an Alternative Equitable Partition shall be on terms substantially similar to the assignment and conveyance terms under the Purchase Agreement). If, following such forty-five (45) day period, SN, SN UnSub, and Blackstone are unable to agree upon an Equitable Partition, then the Equitable Partition shall be decided by Financial Advisors and Reserve Auditor(s) using the same process as provided for an Equitable Division pursuant to Section 3.8(e)(i), *mutatis mutandis* (but with such modifications as may be necessary to determine a Sale Transaction Equitable Partition and an Alternative Equitable Partition in accordance with this Section 4.5, including in order to include SN UnSub as a party to such process), and after the final determination of the Equitable Partition by the Financial Advisors and upon the execution of definitive documentation as required to carry out the Sale Transaction or the Alternative Equitable Partition, as applicable, pursuant to this Section 4.5, the Parties hereto and their Affiliates shall use their respective reasonable best efforts to effectuate the applicable Equitable Partition as promptly as practicable (for no additional consideration other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied). In order to facilitate an efficient and orderly Sale Transaction process, Blackstone may elect to initiate (and cause Sanchez Energy to participate in) the determination of the Equitable Partition upon the delivery by Blackstone of a ROFO Notice, and from such time as a ROFO Notice is provided until the time that a Sale Transaction or Alternative Equitable Partition is consummated as provided for in this Section 4.5, neither SN nor its Affiliates shall initiate a Division of Operatorship. In the event that Blackstone is unable to cause Sanchez Energy, SN, SN UnSub and/or their respective Affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in this Section 4.5, then Blackstone shall have the right to effectuate an Alternative Equitable Partition, whereby Blackstone shall be entitled to all Assets of

the Parties in the Included Sale Transaction Area and SN and SN UnSub shall be entitled to all Assets of the Parties in the Excluded Sale Transaction Area (in each case as such areas are determined pursuant to this Section 4.5(a) with respect to an Alternative Equitable Partition, for no consideration payable other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied), and the Parties shall use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the Parties shall use their respective reasonable best efforts to cause Blackstone or its designee (or if applicable a Sale Transaction Transferee) to become operator under each joint operating agreement applicable to the Assets included in the Included Sale Transaction Area and cause SN or its designee to become operator under each joint operating agreement applicable to the Assets included in the Excluded Sale Transaction Area, and in the event that such operatorship is not vested in the applicable party prior to the time that a Sale Transaction Equitable Partition (which shall be consummated as of the closing of a Sale Transaction or as promptly as practicable thereafter) or Alternative Equitable Partition is otherwise ready to be completed, then the principles of Section 3.8(e) shall apply, *mutatis mutandis*, as though the party to whom operatorship should be transferred were the Post-Division Operator and the Party or its Affiliate that is the operator under an applicable joint operatorship were the Pre-Division Operator (including, without limitation, Section 3.8(e)(ii)), and, if necessary, the Pre-Division Operator shall maintain a sufficient minimal interest so as to not effect an automatic resignation of operatorship under the applicable operating agreements.

(b) Each of Blackstone, Sanchez Energy, SN and SN UnSub and each of their applicable Affiliates shall consent to such Sale Transaction or to carry out an Alternative Equitable Partition and will cooperate in good faith and use reasonable best efforts to obtain all necessary approvals and authorizations from its and its subsidiaries' shareholders (including holders of any preferred equity interests), Board of Directors or other governing bodies, joint venture partners and lenders (including, for the avoidance of doubt, consent from lenders to an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, and regardless of whether any restriction or limitation in any financing arrangement that is otherwise permitted by this Section 4.5), as applicable, and will cooperate in good faith and use reasonable best efforts to remove all Permitted Liens (other than the Permitted Liens described in clauses (iv) and (xii) of the definition thereof) from the applicable Assets and other interests to be conveyed in a Sale Transaction or Alternative Equitable Partition and to take or cause to be taken all other reasonable actions, including seeking any necessary consents required for assignment of interests in the Assets and related interests to be conveyed in a Sale Transaction or Alternative Equitable Partition or a change in operatorship to the applicable purchaser in a Sale Transaction or in an Alternative Equitable Partition or any other actions reasonably necessary or desirable to cause the consummation of such Sale Transaction on the terms of the Bona Fide Offer and in order to maximize the value to be realized by the Parties in connection with a Sale Transaction or otherwise to effect an Alternative Equitable Partition. For the avoidance of doubt, the preceding sentence shall not be construed to require Sanchez Energy, SN or SN UnSub to restructure its ownership of the Assets, provided that, subject to the terms of this Agreement, none of Blackstone, Sanchez

Energy, SN and SN UnSub nor any of their Affiliates shall take any action for the purpose of preventing or materially impeding the consummation of a Sale Transaction or an Alternative Equitable Partition. Notwithstanding anything in Section 4.5 or this Agreement to the contrary, (i) Blackstone's rights to compel a Sale Transaction or an Alternative Equitable Partition and (ii) the obligations of Sanchez Energy, SN, SN UnSub, and their respective Affiliates to consent to such transaction, are subject to (a) compliance by SN, SN UnSub and their respective Affiliates with the requirements under each of their debt financing arrangements as of the Effective Date (as the same may be amended and together with any new debt financing arrangement, in each case that shall have been established in good faith and for valid business purposes and on market terms); *provided*, that Sanchez Energy, SN, SN UnSub and their respective Affiliates shall use their respective reasonable best efforts to ensure that any new debt financing arrangement or amendment of an existing financing arrangement entered into after the Effective Date shall not expressly restrict an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, (b) compliance with all of the provisions of this Section 4.5 or (c) required landowner consents, midstream consents or other third party consents.

(c) [Intentionally Omitted]

(d) Subject to the limitations and conditions of this Section 4.5, the Parties will execute the agreement negotiated by Blackstone in connection with such a Sale Transaction (a "Sale Transaction Agreement") and will take such other actions as may be reasonably requested by Blackstone to effect such Sale Transaction; *provided*, *however*, that (i) Sanchez Energy, SN, SN UnSub or their Affiliates bound hereby, as applicable, shall only be required to make the same (or substantially similar in all material respects) representations, warranties and covenants and the same indemnities as Blackstone agrees to make in connection with the Sale Transaction (unless expressly contemplated otherwise in this Section 4.5), except that in no event shall any Party be required to agree to any non-competition or non-solicitation covenant in connection with the Sale Transaction or to make any representation or warranty that would be inaccurate when made without the ability to provide disclosure against such representation or warranty, (ii) no Party shall be liable for the breach of any covenants of any other Party, (iii) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, (iv) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations in connection with the Sale Transaction and related to the Assets shall be shared by the Parties pro rata on a several (but not joint) basis in proportion to the proceeds received by each Party in the Sale Transaction, (v) no Party shall have aggregate liability relating to the representations and warranties (and related indemnities) or other indemnification obligations in excess of the purchase price (nor shall any Party have aggregate liability with respect to the breach of non-fundamental or tax-related representations and warranties (and related indemnities) in excess of twenty-five percent (25%) of the purchase price to be received in the Sale Transaction by such Party without such Party's consent, which may be withheld by such Party in its sole discretion) and (vi) any escrow or other holdback of proceeds shall be allocated on a pro rata basis among the applicable Parties.

(e) In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than twenty-five (25%) in value of publicly traded securities, subject to the following: in connection with such a Sale Transaction (i) if the form of consideration is a combination of cash and securities, the portion of such consideration that is cash shall be the greater percentage of (A) seventy-five (75%) percent cash and (B) the percentage of cash necessary for Sanchez Energy, SN and its Affiliates to meet any debt financing covenants which are then in existence (up to one hundred percent (100%) cash requirements) (*provided*, that Blackstone or its applicable Affiliate may elect to take a higher percentage of equity consideration in a Sale Transaction than the other participating sale parties in order to satisfy the requirements of this clause (i)), (ii) subject to the preceding clause (i), all Parties shall be allocated the same form of consideration, or if any Parties are given an option as to the form and amount of consideration to be received, all Parties will be given the same option and (iii) the consideration to be received by the Parties in a Sale Transaction will be calculated by taking the aggregate proceeds from such Sale Transaction (excluding all out-of-pocket costs incurred by the Parties in connection with such Sale Transaction, which shall be borne by the Parties in proportion to their respective rights to the aggregate sale proceeds; *provided*, that any agreements with accountants, attorneys, investment bankers or other such professional service firms in connection with a Sale Transaction shall be negotiated at arms-length and be at prevailing market rates and *provided*, *further*, that SN shall have the right to consent to any investment bank hired to direct the Sale Transaction process, such consent not to be unreasonably withheld, conditioned or delayed) and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Assets and other interests included by Blackstone, SN and SN UnSub and their respective Affiliates in the Sale Transaction (collectively, the "Drag Interests"), as agreed by the Parties or as otherwise determined pursuant to an Equitable Partition.

(f) For purposes of Section 4.5(e) and Section 4.2(b), in the event the applicable Parties (for purposes of this paragraph, collectively, the "Dispute Parties") disagree as to the relative Fair Market Value of the Drag Interests or Tag Interests, as applicable, included by each Party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days) (it being agreed that an Equitable Partition determined in accordance with Section 4.5(a) shall be final and binding on the Parties), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in the Eagle Ford Shale (the "Valuation Firm") to determine the relative Fair Market Value (on a percentage basis) of the Drag Interests or Tag Interests, as applicable, included by each Party. In the event that Blackstone has not effected a Division of Operatorship, any determination of the Fair Market Value shall assume that Blackstone holds rights to operatorship of such portion of the Assets as though an Equitable Division had been consummated. The Valuation Firm shall be selected by the Dispute Parties from among the parties included on Annex IV and if the Dispute Parties are unable to agree then SN in the case of a Sale Transaction or Blackstone in the case of a Proposed Sale shall choose. The Dispute Parties shall each cooperate fully with the Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable

but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; *provided*, *however*, if the dispute relates to Tag Interests, the Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Drag Interests (the "Final Valuation") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall be split equally between the Parties based on their respective proportionate amount of Working Interests to be conveyed in the applicable transaction, and the Parties shall provide, and shall cause their Controlled Affiliates, and shall use their reasonable best efforts to cause their other Affiliates to provide, all information available to them that may be reasonably requested by the Valuation Firm.

(g) In connection with a Sale Transaction, if reasonably requested by the applicable buyer, Sanchez Energy, if the Sanchez Operator remains the Operator for any Wellpads or Leases, shall use its commercially reasonable efforts to enter into a customary transition services agreement with the purchaser at the closing of such Sale Transaction, or Sanchez Energy shall cause any applicable Affiliate or entity then providing management services to Sanchez Energy and capable of providing transition services to enter into such agreement, which transition services agreement shall be substantially similar in all material respects to the transition services agreement with Affiliates of Anadarko pursuant to the Purchase Agreement, *provided*, that the term shall be no more than two months and Sanchez Energy or its Affiliate shall be entitled to earn a mark-up of ten percent (10%) over cost on all services provided thereunder.

(h) Notwithstanding anything contained in this Section 4.5 to the contrary but, with respect to SN UnSub, subject to Section 4.5(i), (i) there shall be no liability or obligation on behalf of Blackstone or its Affiliates if such entities determine, for any reason, not to consummate a Sale Transaction or an Equitable Partition, and Blackstone shall be permitted to discontinue at any time any Sale Transaction or Equitable Partition initiated by Blackstone by providing written notice to SN and SN UnSub and (ii) Blackstone may not cause Sanchez Energy, SN, SN UnSub and their respective Affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN, SN UnSub and their respective Affiliates in such Sale Transaction (including distributions of cash on hand at SN and SN UnSub that are made to SN and UnSub in connection with such sale) would be greater than or equal to the sum (the "Required Return Sum"), without duplication, of (A) (x) the amount of capital which was invested, borrowed, used or otherwise provided in connection with the financing, acquisition, ownership or operation of the Assets, and any related assets (including for the avoidance of doubt, any assets being retained by SN or Unsub in the Sale Transaction) less all distributions previously made on account of any equity capital invested by Parties other than GSO (or its Affiliates), (y) payments by the relevant Person and its Affiliates arising under or related to the redemption, repayment or refinancing of any securities, credit facilities, financial vehicles, debentures, notes, guarantees or liabilities procured to carry out any and all transactions contemplated under the Purchase Agreement or this Agreement, in each case, that are required as a result of the consummation of a Sale Transaction and (z) disbursements, fees or costs reasonably incurred or to be incurred by the relevant Person and its Affiliates to suspend, reassign, demobilize, stack, terminate, sell off and restructure all

applicable personnel, equipment and operations related, directly or indirectly, to the Assets in connection with such Sale Transaction, (B) the amount of capital GSO (or its Affiliates) invested in SN UnSub, (C) the Base Preferred Return Amount as required under the SN UnSub Partnership Agreement and (D) the outstanding indebtedness for borrowed money of SN and SN UnSub upon such applicable date of determination (net of any cash and cash equivalents of SN and SN UnSub as of such date) to the extent that a buyer in connection with a Sale Transaction does not assume or directly repay such outstanding indebtedness; *provided*, for purposes of the foregoing subparts (A) through (D), that such equity or debt that is amended, incurred or established following the Effective Date is done so in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such equity or debt; *provided*, *further*, that with the written consent of GSO, the Required Return Sum will be adjusted downward equitably to reflect the percentage of Assets actually to be transferred in a Sale Transaction by SN and SN UnSub as compared to the Assets acquired by SN and SN UnSub pursuant to the Purchase Agreement. In addition, (i) a fair and reasonable allocation of the proceeds from a proposed Sale Transaction between SN and SN UnSub shall be made in the reasonable judgment, in good faith and for valid business purposes, of Sanchez Energy, SN and SN UnSub (in accordance with their then existing debt arrangements) and (ii) in no event shall SN or SN UnSub be compelled to enter into a Sale Transaction unless, after the application of the proceeds from such Sale Transaction, after satisfying the conditions in the foregoing subpart (i), the proceeds payable to SN UnSub shall be an amount sufficient to return to its equity holders one hundred percent (100%) of the equity invested in SN UnSub.

(i) Notwithstanding anything in this Section 4.5 or this Agreement to the contrary, prior to the Redemption Date, without the prior written consent of GSO, SN UnSub shall not (and shall not be required to), and no Party shall cause SN UnSub to participate in any transfer or disposition (or enter into definitive documentation providing for any transfer or disposition) of any of its Working Interests or other Assets (or any portion thereof) under this Section 4.5 (other than an Alternative Equitable Partition), and Blackstone shall not have the right to compel a Sale Transaction with respect to SN UnSub's Working Interests and Assets (or any portion thereof), unless (i) such transfer or disposition complies with the terms and conditions of SN UnSub's debt financing arrangements applicable as of the Effective Date and such other debt financing arrangements that as amended, or as incurred or established following the Effective Date in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such debt, (ii) the Preferred Units receive an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full of all outstanding Preferred Units, pursuant to and in compliance with the SN UnSub GP LLC Agreement and SN UnSub Partnership Agreement, less any debt incurred, Preferred Units or Common Units issued by SN UnSub in connection with funding of properties outside of the AMI and (iii) GSO has the right to act on behalf of, and enforce all rights of, SN UnSub in connection with this Section 4.5. For the avoidance of doubt and for purposes of clarity, an Alternative Equitable Partition is intended to provide SN UnSub with substantially similar characteristics and value, after giving effect to such Alternative Equitable Partition, as SN UnSub held in the Core Area prior to the Alternative Equitable Partition, in accordance with the procedures in Section 4.5(a).

**ARTICLE V**
**ADDITIONAL COVENANTS**

**5.1 Information Rights.**

(a) Notwithstanding anything to the contrary in the Operating Agreements (but, for the avoidance of doubt, in addition to the information and data required to be provided to the Parties pursuant any Operating Agreement), Operator shall provide the Parties, in electronic format, with the following information and reports with respect to the Assets reasonably promptly after such information becomes available to Operator or could have been prepared without incurring unreasonable time and cost by Operator or any of its Affiliates:

(i) daily volumes for oil, gas, condensate, and water, choke size and tubing, casing, and flowing pressure;

(ii) monthly lease operating expense statement;

(iii) monthly oil, gas, and condensate sales reports;

(iv) drilling and workover reports, which shall include the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and hydrocarbon information, casing and cementation tallies, and estimated cumulative costs;

(v) daily drilling (including completion, stimulation, testing, artificial lifting, daily mud reports, mud logging, directional drilling, etc.) reports;

(vi) copies of all completion and plugging reports;

(vii) to the extent permissible, copies of all seismic data and reports, well tests, core data, microseismic, and associated analysis reports;

(viii) to the extent Operator prepares or receives such information, (A) geological and geophysical, reservoir engineering, drilling and well completion studies, development schedules, and annual progress reports on development projects and (B) well performance reports;

(ix) copies of written notices provided by Governmental Authorities or any Third Party regarding material violations or potential material violations of applicable Law;

(x) copies of all material reports provided by Operator to, or filings made by Operator with, any Governmental Authority relating to material violations or potential material violations of applicable Law;

(xi) copies of any material correspondence between Operator and any Governmental Authority relating to material violations or potential material violations of applicable law;

(xii) to the extent not included in clauses (i)-(xi) above, all material information, data, projections, interpretative data and analysis, operating plans, records, and analysis utilized by Operator in preparing (including the basis for proposing) a Subsequent Budget and Work Plan; and

(xiii) to the extent not included in clauses (i)-(xii) above, as soon as reasonably practicable following a request from a Party, all information reasonably requested by a Party for any purposes, including in connection with satisfying or complying with information requests and disclosure requirements in respect of financing or other capital market activities, including requests from current and prospective lenders and investors, rating agencies, securities exchanges, and Governmental Authorities.

(b) The information described in Section 5.1(a) shall be stored on a commercially available secure, third-party electronic database and document sharing platform and made available to each Party ("VDR"). Such VDR shall be Intralinks, Merrill Datasite, or another VDR platform that is mutually agreeable to the Parties. The VDR shall be maintained by Operator and such expenses shall be shared equally amongst the Parties.

**5.2 Area of Mutual Interest.**

(a) The Parties hereby establish an Area of Mutual Interest ("AMI"), commencing on the Effective Date of this Agreement and covering lands depicted on Exhibit C attached hereto, plus a 4-mile halo in any direction from the perimeter of such lands (excluding, however, any properties owned by SN and its Affiliates as of the Effective Date within the lands depicted on Exhibit C, which shall not be included within the AMI nor otherwise be subject to this Agreement). The AMI shall terminate and have no further force and effect on the earlier of (i) the date that is five (5) years after the Effective Date, or (ii) the date on which this Agreement is terminated in its entirety in accordance with Section 6.1.

(b) For purposes of this Section 5.2, an "Acquisition" shall mean any acquisition of, or agreement or option to acquire, rights, title or interests to any oil and gas properties covering lands within the AMI by a Party or any of its Affiliates (which in the case of Blackstone, for the avoidance of doubt, shall include HoldCo), subject to Section 5.2(h), between the Effective Date and the expiration of the AMI pursuant to Section 5.2(a). Such Acquisition whether acquired directly or indirectly, shall include without limitation, oil and gas leases, options to lease, farm-ins, options to farm-in, acreage contributions, bottom hole agreements or exploratory agreements. If an Acquisition includes lands located within the AMI and lands located outside the boundaries of the AMI, the Acquisition shall be deemed to include only the lands located inside the AMI, unless the Parties agree otherwise.

(c) All Acquisitions must be reported by the acquiring Party to the non-acquiring Parties thirty (30) days prior to the actual closing date of such Acquisition. Such notification shall include, but is not be limited to, a description of the interest acquired, the area covered, the terms of the Acquisition and the cost (including brokerage fees), and a copy of the proposed agreement for the Acquisition.

(d) For purposes of this Section 5.2, the proportionate shares of Blackstone, SN, and SN UnSub or the Qualified Foreclosure Transferee, if applicable, in the right to participate in an Acquisition shall be fifty percent (50%), thirty percent (30%), and twenty percent (20%), respectively. Each non-acquiring Party will have twenty (20) days after receipt of the notice to furnish the acquiring Party with written notice of its election to acquire, or cause its subsidiary to acquire, its proportionate share of the Acquisition for its proportionate share of the purchase price (or cash equal to fair equivalent value if the Acquisition was made for non-cash consideration); *provided*, *however*, that if Blackstone or its Affiliates is the acquiring Party, SN UnSub may assign its right to participate in such Acquisition to SN, or SN may assign its right to participate in such Acquisition to SN UnSub, in which case SN and SN UnSub shall provide a joint written notice evidencing SN's (or SN UnSub's) election to acquire both shares and SN UnSub's (or SN's) agreement to such election; *provided*, *further*, that if SN, SN Unsub or their respective Affiliates is the acquiring party, Blackstone shall have the right to assign its right to participate in such Acquisition to HoldCo, or, subject to the prior written consent of SN in its sole discretion, any other Affiliate. Failure of a Party to provide a written notice of its election within the twenty (20) day period will be deemed an election not to acquire its proportionate share of the Acquisition which will thereafter no longer be subject to the AMI provisions under this Agreement or any applicable Operating Agreement. Further, if neither non-acquiring Party elects to acquire its proportionate share of an Acquisition, the properties acquired in such Acquisition shall not be subject to this Agreement.

(e) If a non-acquiring Party elects to acquire its proportionate share (or, if applicable, SN elects to acquire both its share and SN UnSub's share or SN UnSub elects to acquire both its share and SN's share) of the Acquisition, such non-acquiring Party shall promptly (within ten (10) days of giving its notice) pay for its proportionate share(s) of the Acquisition, and the acquiring Party, within three (3) Business Days of receipt of that payment from the non-acquiring Party for its share(s) of the Acquisition cost, shall deliver (or cause its Affiliates to deliver) to the non-acquiring Party an assignment of the non-acquiring Party's proportionate share(s) of the Acquisition. Assignments pursuant to the AMI shall not contain any reservations in favor of the acquiring Party (or its Affiliates), other than the reservations burdening the Acquisition as of the date of the Acquisition by the acquiring Party (or its Affiliates). Such assignments shall be prepared in accordance with Exhibit D and be properly executed and notarized for recording purposes.

(f) The acquiring Party shall have the right to serve as operator pursuant to an applicable Operating Agreement for an Acquisition that such acquiring Party brings to the other Party pursuant to this Section 5.2 (to the extent permitted by such Operating Agreement); *provided*, that, prior to the occurrence of an Operator Default Event of SN, SN shall be entitled to serve as Operator for any Acquisitions within the Core Area and any oil and gas leasehold interests

covering lands within the Core Area shall be subject to the terms and conditions of this Agreement as though it were an Asset (and shall be deemed to be included in the definition of "Asset" for all purposes hereunder) and added to Annex III accordingly.

(g) If any Party is in Default, any other Party may (*provided*, that such other Party is not in Default) elect, by written notice, to have the terms of this Section 5.2 not restrict the activities of such other Party or any of its Affiliates during the period that the Default is continuing (*provided*, that a Party may thereafter continue to own and develop assets acquired during the applicable period) and any assets acquired by a Non-Defaulting Party during a Default shall be offered only to the other Non-Defaulting Party under this Section 5.2 and the Defaulting Party shall not be deemed to own or in any way otherwise be entitled to any rights or benefits in respect thereof.

(h) Notwithstanding the foregoing, the provisions set forth in this Section 5.2 shall not in any way limit or apply to (i) the activities of any Affiliate of SN or SN UnSub not Controlled by SN or SN UnSub, as applicable (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy), or (ii) (A) the activities of any Affiliate of Blackstone in its business other than the private equity investments made by the "Blackstone Capital Partners VI," "Blackstone Capital Partners VII," "Blackstone Energy Partners I," and/or "Blackstone Energy Partners II" investment funds (collectively, the "Blackstone Funds") affiliated with or managed by Blackstone Management Partners L.L.C., (B) the activities of GSO Capital Partners L.P. or any investment funds or vehicles managed by GSO Capital Partners L.P. or any portfolio companies or other investments of GSO Capital Partners L.P., or (C) the acquisition by any investment funds or vehicles managed by Blackstone Management Partners L.L.C. or any of its Affiliates to the extent such transaction represents the acquisition of any securities of an entity owning an interest in the AMI if such class of securities being acquired are listed on a national securities exchange and such acquisition does not provide for voting interests in excess of twenty-five percent (25%) of such entity, *provided*, that in each of clauses (ii)(A), (B) and (C), (y) Blackstone does not Control or have the right to Control any of the Persons mentioned in clauses (ii)(A), (B) or (C) above, and (z) any of such Persons does not act at the direction of or with encouragement from Blackstone with respect to any matters contemplated by this Section 5.2. For the avoidance of doubt, if any of the actions prohibited under clauses (y) or (z) above occurs, the respective Persons mentioned in clauses (ii)(A), (B) or (C) above shall be subject to, and their activities shall be limited in accordance with, this Section 5.2; provided, however, that for the avoidance of doubt, portfolio companies of GSO Capital Partners L.P. for which neither GSO Capital Partners L.P. nor its Affiliates have majority board control shall not be subject to the AMI provisions of this Section 5.2 notwithstanding the foregoing. The transactions and other activities excluded by this Section 5.2(h) from the other provisions of this Section 5.2 shall be referred to herein as "Excluded AMI Transactions."

(i) Agreement Memorandum. The Parties hereby agree to execute and promptly file a memorandum of this Agreement in the real property records of Maverick, Dimmit, Webb, and LaSalle Counties substantially in the form attached hereto as Exhibit E.

**5.3 Spacing Protections.**

(a) *Limited Restricted Zone.* With respect to each well drilled on lands in the AMI after the Effective Date but prior to the Redemption Date, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Limited Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Limited Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Limited Spacing Restrictions").

(b) *Full Restricted Zone*. Except for Exception Wells as provided below, with respect to each well drilled on lands in the AMI after the Effective Date but prior to the earlier of (x) the fifth (5th) anniversary of the Effective Date, (y) the Redemption Date, or (z) mutual agreement of the Parties to modify these restrictions, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Full Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Full Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Full Spacing Restrictions").

(c) *Illustration*. Illustrations of the Limited Restricted Zone and Full Restricted Zones are shown in Annex VII attached hereto.

(d) *Exceptions to Full Spacing Restrictions*. Notwithstanding the foregoing, the Operator may drill and complete up to thirty (30) wells (the "Exception Wells") in the areas in the AMI shown in Annex VII that do not comply with the Full Spacing Restrictions as long as such Exception Wells comply with the Limited Spacing Restrictions.

(e) *Modifications to Full Restricted Zone*.

(i) *Notice*. Any Party may request that the Full Restricted Zone be modified by giving written notice to the other Parties if (1) twenty (20) Exception Wells have been drilled and completed, (2) at least six (6) Exception Wells have been drilled and completed in each AMI Test Area subject to the proposed modification of the Full Restricted Zone (the "Test Wells"), and (3) the Test Wells have been producing for at least six (6) months. Such written notice shall include a description of the proposed modifications to the Full Restricted Zone and reasonably detailed technical information and data from such requesting Party's consulting reservoir engineers supporting such modifications to the Full Restricted Zone (the "Proposed Modifications"). Each Party shall work in good faith to review the Proposed Modifications and all supporting information. The Proposed Modifications may not contain spacing restrictions that are less restrictive or protective in either the horizontal or vertical plane than those in the Limited Restricted Zone. If the other Parties (and their respective consulting engineers) agree that the Proposed Modifications will not lead to any material reduction in value to each Party's respective Asset base, then the Full Spacing Restrictions shall be modified pursuant to the Proposed Modifications until such time that the Parties agree to subsequent Proposed Modification.

(ii) *Failure to Agree*. If the other Parties (and their respective consulting engineers) fail to agree that the Proposed Modifications will not lead to any reduction in value to each Party's respective Asset base within 30 days after the date of the first notice provided in Section 5.3(e)(i), then any Party may within seven (7) Business Days thereafter, declare a Deadlock by providing a Deadlock Notice to the other Parties. Thereafter, such Deadlock shall be subject to the provisions of Section 3.6(b) and, if applicable, non-binding mediation, in accordance with Section 3.6(c). For the avoidance of doubt, as it relates to this Section 5.3, any decision on behalf of SN UnSub prior to the Redemption Date shall require the approval of the Class B Member of SN UnSub.

(iii) *Amendment*. Prior to drilling offset wells pursuant to such Proposed Modifications, then this Annex VII shall be amended to reflect the Proposed Modifications to the Full Restricted Zone agreed to by the Parties hereunder.

(f) *Covenants Running with the Land and Assumption*. The obligations of the Parties in this Section 5.3 are covenants running with the land and shall be binding upon the Parties and their successors and assigns. For the avoidance of doubt, the Parties agree that the obligations in this Section 5.3 will burden the lands in the AMI and create a privity of estate between the Parties. It is the Parties' express intent that such obligations will not be subject to rejection in the event of any bankruptcy involving any Party or any successor or assign to any of the leases, lands,

or wells that are subject to this Agreement. Each Party agrees to cause its successors and assigns to expressly assume the obligations under this Section 5.3 in connection with any Transfer of all or part of its Assets.

(g) *Existing Producing Wells and Drilled and Uncompleted Wells*. The restrictions listed in this Section 5.3 shall apply solely to wells that are drilled and completed within the Limited Restricted Zone or the Full Restricted Zone of an Existing Wellpad and shall not apply to the Existing Drilled and Uncompleted Wells.

(h) *Applicability to Blackstone*. Notwithstanding anything in Section 5.3, Blackstone shall not be subject to either the Full Spacing Restrictions or the Limited Spacing Restrictions in Section 5.3 after 5 years following the Effective Date.

**5.4 Cooperation**. The Parties agree to cooperate, and to cause their Affiliates to cooperate, with one another in connection with the arrangement of any debt financing related to the Assets as may be reasonably requested by a Party. Any reasonable, out-of-pocket expenses incurred by a Party and its Affiliates in providing reasonable cooperation to a Party in accordance with this Section 5.4 shall be reimbursed by the Party seeking such cooperation.

**ARTICLE VI**
**TERM AND TERMINATION**

**6.1 Term and Termination**. Subject to Section 6.2, the term of this Agreement shall commence on the Effective Date and continue until the earliest of:

(a) termination by mutual written agreement of each Party;

(b) the eighth anniversary of the Effective Date;

(c) with respect to any interest in the Assets transferred (other than pursuant to a Permitted Transfer or a Foreclosure Transfer) to a Third Party (which for the avoidance of doubt shall not include Sanchez Production Partners LP, Sanchez Oil & Gas Corporation or its Affiliates, any Permitted Holder or any other entity Controlled by any Permitted Holder), upon the consummation of such transfer but only with respect to the interest transferred (and this Agreement will remain in effect with respect to the remainder of the Assets), subject to Section 4.1(b) and the provisions that survive pursuant to Section 6.2 and which are assigned in connection with a Transfer pursuant to Section 7.3;

(d) termination by any Party in its sole discretion after a Division of Operatorship or an Alternative Equitable Partition is completed, but only within thirty (30) days after the consummation of the Alternative Equitable Partition or final Equitable Division resulting therefrom; and

(e) termination by a Non-Defaulting Party in its sole discretion following a Default, but only within thirty (30) days after such Default.

Following the termination of this Agreement in accordance with this Section 6.1, upon the written request of any Party, the Parties agree to execute and file for record a notice of termination of this Agreement in the form attached hereto as Exhibit G.

**6.2 Effect of Termination**. The expiration or termination of this Agreement, for any reason, shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) has already accrued hereunder, (ii) comes into effect due to the expiration or termination of the Agreement, or (iii) otherwise survives the expiration or termination of this Agreement. Notwithstanding anything in this Agreement to the contrary, (i) the right of Blackstone to pursue a Sale Transaction and/or an Equitable Division pursuant to Section 4.5 (and the provisions set forth in Article VII as they may relate to Section 4.5) shall survive termination due to Division of Operatorship for the later of (A) a period of nine (9) months following the consummation of such Division of Operatorship (it being understood that in the event an Alternative Equitable Partition is to be completed, then the parties shall complete such Alternative Equitable Partition regardless of whether such nine (9) month period has expired) or (B) five (5) months after determination of a final and binding Equitable Partition in accordance with Section 4.5; (ii) the information rights set forth in Section 5.1 shall survive a termination due to a Division of Operatorship indefinitely or until neither Blackstone, SN, nor any of their Affiliates (or any designee thereof) operates any of the Assets, (iii) Section 3.8(e)(i) shall survive for a period of six months following a termination resulting from a sale by SN, or any other Affiliate thereof serving as Operator, to a Third Party, or following a termination under Section 6.1(d), (iv) Section 3.8(e)(ii) and Section 3.8(e)(iii) and the penultimate sentence of Section 3.8(e) shall survive termination indefinitely until all Required Operatorship Consents are obtained (including to the extent a Division of Operatorship is effected following termination of the Agreement pursuant to the immediately preceding clause (iii)), provided that the last sentence of Section 3.8(e)(iii) shall survive the termination of this Agreement in any event for a period of ten years; (v) the provisions of Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten years; and (vi) the spacing restrictions in Section 5.3 shall survive termination until the dates set forth in Section 5.3 .

## ARTICLE VII
## GENERAL PROVISIONS

**7.1 Entire Agreement**. This Agreement, the Operating Agreements and the Purchase Agreement, constitute the entire agreement with respect to the subject matter covered hereby and supersede (i) all prior oral or written proposals, term sheets or agreements, (ii) all contemporaneous oral proposals or agreements, and (iii) all previous negotiations and all other communications or understandings between the Parties with respect to the subject matter hereof.

**7.2 Waivers**. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement shall be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, shall not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**7.3** **Assignment; Binding Effect**. Subject to the terms and conditions hereunder, each Party may assign its rights or interests under this Agreement, or delegate any duties hereunder, without the prior written consent of the other Party, *provided*, that such assignment or delegation is made in connection with the conveyance by a Party or its Affiliate of (i) all its interest in an Asset to a Third Party, (ii) all or some of its interests in an Asset to an Affiliate, in each case in accordance with the terms of this Agreement or (iii) otherwise in connection with a Sale Transaction, including, for the avoidance of doubt, all rights set forth in Section 3.8(e)(ii) (including with respect to the survival period of such provision as set forth under Section 6.2). This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns; *provided*, *however*, that in the case of only a partial assignment by a Party of their rights or interests under this Agreement to an Affiliate or Permitted Transferee, such Affiliate or Permitted Transferee shall not succeed to such transferring Party's rights under Article III, unless otherwise agreed by the Parties and such Affiliate or Permitted Transferee.

**7.4** **Governing Law; Severability.**

(a) **This Agreement has been executed and delivered and shall be construed, interpreted and governed pursuant to and in accordance with the laws of the State of Texas, without regard to any conflict of Laws principles which, if applied, might permit or require the application of the Laws of another jurisdiction.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by applicable Law.

**7.5** **Further Assurances**. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use its reasonable best efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

**7.6** **Counterparts**. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument.

**7.7 <u>Confidential Information.</u>**

(a) The Parties acknowledge that they and their respective appointed Representatives (if any) shall receive information from or regarding Assets in the nature of trade secrets or that otherwise is confidential information or proprietary information (as further defined below in this <u>Section 7.7(a)</u>, "<u>Confidential Information</u>"), the release of which would be damaging to the Parties or Persons with which the Parties conduct business. Each Party shall hold in strict confidence, and shall require that such Party's appointed Representatives (if any) hold in strict confidence, any Confidential Information that such Party or such Party's appointed Representative receives, and each Party shall not, and each Party shall require that such Party's appointed Representatives agree not to, disclose such Confidential Information to any Person other than another Party or Representative, or use such information for any purpose other than to evaluate, analyze, and keep apprised of the Assets and such Party's interest therein, except for disclosures (i) to comply with any Laws (including applicable stock exchange or quotation system requirements), ***provided***, that, if permitted by applicable Law, a Party or Representative must notify all the Parties promptly of any disclosure of Confidential Information which is required by Law, and any such disclosure of Confidential Information shall be to the minimum extent required by Law, (ii) to Affiliates, partners, members, stockholders, investors, directors, officers, employees, agents, attorneys, consultants, lenders, professional advisers or representatives of the Party or Representative or their Affiliates; *provided*, that such Party or Representative shall be responsible for assuring such Affiliates,' partners,' members,' stockholders,' investors,' directors,' officers,' employees,' agents,' attorneys,' consultants,' lenders,' professional advisers' and representatives' compliance with the terms hereof (and such Party or Representative, as applicable, shall be liable for any non-compliance by such Persons as if such Persons were bound as a Party hereto), except to the extent any such Person who is not an Affiliate, partner, member, stockholder, director, officer or employee has agreed in writing addressed to all the Parties to be bound by customary undertakings with respect to confidential and proprietary information similar to this <u>Section 7.7(a)</u>, (iii) to Persons to which that Party's Asset Interests may be Transferred as permitted by this Agreement, but only if the recipients of such information have agreed to be bound by customary confidentiality and non-use undertakings similar to this <u>Section 7.7(a)</u>, (iv) of information that a Party or Representative also has received from a source independent of another Party or Representative and that such Party or Representative reasonably believes such source obtained such information without breach of any obligation of confidentiality to another Party, Representative or any of their Affiliates, (v) that have been or become independently developed by a Party, a Representative or their Affiliates, or on their behalf without using any of the Confidential Information, (vi) that are or become generally available to the public (other than as a result of a prohibited disclosure by such Party or Representative or Persons for which such Party or Representative is responsible for under clause (ii) above), (vii) in connection with any proposed Transfer of all or part the Working Interests of a Party, the proposed sale of all or substantially all of a Party or its direct or indirect parent or the proposed debt or equity financing of a Party or its direct or indirect parent, to Persons to which such interest may be directly or indirectly transferred or which may provide such debt or equity financing (and their respective advisors or representatives), but only if the recipients of such information have agreed to be bound by customary undertakings with respect to confidential and proprietary information similar to this

Section 7.7(a) (unless, in the case of advisors or representatives, such Persons are otherwise bound by a duty of non-disclosure and non-use with respect to confidential and proprietary information), (viii) to Third Parties to the extent necessary for a Person to provide services in connection with its capacity as Operator, as applicable, or (ix) to the extent the non-disclosing Parties shall have consented to such disclosure in writing. The Parties agree that breach of the provisions of this Section 7.7(a) by such Party or such Party's appointed Representative (if any) would cause irreparable injury to the non-disclosing Parties for which monetary damages (or other remedy at Law) would be inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Party or Representative to comply with such provisions and (ii) the uniqueness of the Assets and the confidential nature of the Confidential Information. Accordingly, the Parties agree that the provisions of this Section 7.7(a) may be enforced by any Party by temporary or permanent injunction (without the need to post bond or other security, therefor), specific performance or other equitable remedy and by any other rights or remedies that may be available at law or in equity. The term "Confidential Information" shall include any information pertaining to the identity of the Parties and the Assets, which is not available to the public, whether written, oral, electronic, visual form or in any other media, including, such information that is proprietary, confidential or concerning the Parties ownership and operation of the Assets or related matter, including any actual or proposed operations or development project or strategies, other operations and business plans, actual or projected revenues and expenses, finances, contracts and books and records. Notwithstanding the foregoing, Blackstone and its Affiliates may make disclosures to its direct and indirect limited partners and members such information (including Confidential Information) as is customarily provided to current or prospective limited partners in private equity funds sponsored or managed by Affiliates of Blackstone, *provided*, that if such Persons are receiving Confidential Information such Persons are bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a). In the event that a Party wishes to issue a press release relating in any respect to the Assets that in the opinion of such Party does not contain Confidential Information, each Party shall be consulted and have a reasonable amount of time to review and comment upon such proposed press release prior to its issuance. Notwithstanding anything herein to the contrary, in the event a Party has approved or been consulted with respect to any disclosures as required hereunder, the other Party, its Representatives or its Affiliates shall be entitled to make disclosures substantially similar (as to form and content) to those prior disclosures that the non-disclosing Party has approved or been consulted with respect to, as applicable.

(b) The Parties acknowledge and agree that none of the Parties shall furnish or otherwise provide a copy of this Agreement (or any part hereof) to any Person (other than the Parties, their Representatives, and Affiliates, and their respective representative(s) and adviser(s)), unless (i) otherwise agreed in writing by each of the Parties, (ii) required by applicable Laws (and if required by applicable Laws, a copy of the applicable portions of this Agreement shall be furnished only to the extent necessary to comply with such applicable Laws), (iii) by any Party, as required to implement any of the hedging arrangements and financings, and (iv) in compliance with clauses (i)-(ix) of Section 7.7(a), as if this Agreement were Confidential Information.

**7.8 No Third Party Beneficiaries**. Except as set forth in Section 7.14, except for the UnSub Agent in respect of the Cure Right and rights of a Qualified Foreclosure Transferee, and

except for the rights of GSO under Section 4.5 (which may be enforced by GSO) the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns. Except for the foregoing, this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities, or obligations are owed by a Party, or (b) any liquidator, trustee, or creditor acting on behalf of any Party, and no such creditor or any other Person shall have any rights under this Agreement.

**7.9** __**Non-Solicitation**__. For a period from and after the date hereof until the date that is sixty (60) months after the termination of this Agreement Blackstone shall not, and Blackstone shall cause entities that are Controlled Affiliates of the Blackstone Funds not to, directly or indirectly, (i) solicit, induce or encourage any such employee or officer of the SN, SN UnSub or any of their respective Affiliates to leave their respective positions of employment with SN, SN UnSub and/or or any of their respective Affiliates, (ii) hire or employ any of such employees or officers, whether as a consultant or otherwise, or (iii) hire or employ any such former employee or officer, whether as a consultant or otherwise, within six (6) months of such person's final employment date with SN, SN UnSub or or any of their respective Affiliates; *provided*, that this Section 7.9 shall not preclude Blackstone or any of its Affiliates from soliciting for employment or hiring any such employee, agent or contractor who has been terminated (and not rehired) by SN, SN UnSub or any of their respective Affiliates. Notwithstanding anything in this Agreement to the contrary, a breach of this Section 7.9 shall not be considered for purposes of determining a Default hereunder unless the breach was effected with the knowledge of a private equity professional of the Blackstone Funds and the action underlying such breach would violate the terms of this Section 7.9, or alternatively if Sanchez Energy is able to establish a sustained pattern of breaches of this Section 7.9, and in each case provided that Blackstone take such steps necessary to immediately terminate such employee unless otherwise waived in writing by Sanchez Energy.

**7.10** __**Notices**__. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement shall be in writing and sent to the address of the Party (or Person) set forth below, or to such other more recent address of which the sending Party actually has received written notice:

(a) if to SN, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Greg Kopel
Electronic Mail: gkopel@sanchezog.com

and with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 43rd Floor
Houston, TX 77002
Fax: 713-236-0822

Attn: David Elder
Michael J. Byrd
Electronic Mail: delder@akingump.com
mbyrd@akingump.com

(b) if to SN UnSub, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Tel: 713.756.2782

with a copy to:

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: crichardson@andrewskurth.com

(c) if to Blackstone, to:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Electronic Mail: acconcia@blackstone.com

and with copies to:

Blackstone Management Partners L.L.C.
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia

Electronic Mail: acconcia@blackstone.com

and

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail: andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com
and

(d) if to the UnSub Agent, to:

JPMorgan Chase Bank, N.A.
712 Main Street, 12th Floor South
Houston, TX 77002
Attention:Darren Vanek
Electronic Mail: darren.m.vanek@jpmorgan.com

and with a copy to (which shall not constitute notice):

Each such notice or other communication shall be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

**7.11** **Remedies**. Except as provided herein, the rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party shall be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

**7.12** **Disputes.**

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL

CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) Notwithstanding anything contained in Section 7.12(a), in the event a Party wishes to contest whether it is in Default (the "Contesting Party"), such Party shall provide the Non-Defaulting Parties with its written objection within fifteen (15) days after receipt of a notice of Default (the "Objection Notice"). In such event, a representative of the Contesting Party and each of the Non-Defaulting Parties shall meet and use good faith efforts to mutually agree on a resolution. If such representatives are unable to resolve the disagreement within fifteen (15) days after receipt of the Objection Notice, then the disagreement shall be resolved by arbitration, which arbitration proceedings shall be held in Houston, Texas and conducted pursuant to the Rules for Commercial Arbitration promulgated by the American Arbitration Association, to the extent such rules do not conflict with the terms of this Section 7.12(c). In connection therewith, the arbitrator shall be selected by mutual agreement of the parties to such dispute, or absent such agreement, within ten (10) Business Days of becoming aware that such agreement cannot be made as to the selection of the arbitrator, by the American Arbitration Association. The arbitrator shall not have worked as an employee, consultant, independent contractor or outside counsel for any of the Parties to such dispute or any of their respective Affiliates during the ten (10) year period preceding the arbitration or have any financial interest in the dispute or any assets or businesses of the parties to such dispute. The arbitrator's determination shall be made within fifteen (15) Business Days after submission of the matters in dispute and, absent manifest error, shall be final and binding upon the Parties to such dispute, without right of appeal. In making its determination, the arbitrator shall be and remain at all times wholly impartial, and, once appointed, the arbitrator shall have no *ex parte* communications with any of the Parties to the dispute concerning the arbitration or the underlying dispute.

**7.13 Expenses**. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**7.14 No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees, and acknowledges

that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder, or member of any Party (or any of their successors or permitted assignees), or any Affiliate thereof, or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, general or limited partner, stockholder, manager, or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract, or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation, or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

**7.15** **Conflict**. In the event of a conflict between the terms of this Agreement and the terms of any Operating Agreement applicable to the Assets, the terms of this Agreement shall control as among the Parties.

**7.16** **Subchapter K**. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code

**7.17** **Relationship of SN and SN UnSub**. Notwithstanding anything herein to the contrary, (a) the obligations under this Agreement of SN, on the one hand, and SN UnSub, on the other hand, are several and such obligations shall not be deemed "joint and several," (b) SN shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN UnSub, and (c) SN UnSub shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN. Furthermore, and for the avoidance of doubt, no Party shall be responsible in any way for the performance of the obligations of any other Party under this Agreement. Nothing contained herein, and no action taken by any Party pursuant thereto, shall be deemed to constitute or form a partnership, association, joint venture or any other kind of group or entity, or create a presumption that a Party is in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement. Each Party shall be entitled to independently protect and enforce its rights, in equity, contract or law, including, the rights arising out of this Agreement, and it shall

not be necessary for any other Party to be joined as an additional party in any proceeding for such purpose.

**7.18** **Operating Committee; Affiliates**. To the extent that this Agreement expressly purports to require any Representative of a Party or the Operating Committee to take any action or refrain from taking any action, each such Party agrees to use its reasonable best efforts to cause its Representative(s) and the Operating Committee, as applicable, to take such action or refrain from taking such action, as applicable. To the extent this Agreement purports to require a Party to require any of its Affiliates to take any action or refrain from taking any action, each such Party shall only be required to use its reasonable best efforts to cause an Affiliate not Controlled by it (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy) to take such action or refrain from taking such action, as applicable.

**7.19** **Force Majeure**. If any Party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to indemnify or make money payments or furnish security, that Party shall give to all other Parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the Party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as used in this Section, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other event, circumstance or cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the Party claiming suspension. The affected Party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the Party concerned.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Joint Development Agreement as of the date first set forth above.

**SANCHEZ ENERGY CORPORATION:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UNSUB GP, LLC,
its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**GAVILAN RESOURCES, LLC:**

By: /s/ Angelo Acconcia
Name: Angelo Acconcia
Title: President

**Annex I**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"Acquisition" has the meaning set forth in Section 5.2(b).

"Additional E&D Proposal" has the meaning set forth in Section 3.7(c)(i).

"Additional S&A Proposal" has the meaning set forth in Section 3.7(c)(ii).

"AFE" means a written description and cost estimate of a proposed activity or operation accompanying a proposal for such activity or operation made pursuant to an Operating Agreement and forwarded to the Operating Committee by Operator pursuant to an Operating Agreement. Any AFE that proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which the Parties are permitted to make separate elections under the terms of the relevant Operating Agreement.

"Affiliate" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in the Partnership or the General Partner result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Alternate Operator" has the meaning set forth in Section 3.8(f).

"Alternative Equitable Partition" has the meaning set forth in Section 4.5(a).

"AMI" has the meaning set forth in Section 5.2(a).

"Anadarko" has the meaning set forth in the recitals.

"APC Well Commitment" means wells required to be drilled pursuant to that certain Development Agreement, dated as of the date hereof, by and among Anadarko, SN, SN UnSub and Blackstone.

"Applicable Credit Agreement" means, in the case of (i) SN, the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy, as borrower, Royal Bank of Canada, as administrative agent and the other financial institutions party thereto from time to time, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "SN Credit Agreement"), (ii) SN UnSub, that certain Credit Agreement, among SN UnSub, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent, and an issuing bank, the banks, financial institutions and other lending institutions from time to time parties as lenders thereto, dated as the date hereof, as amended, restated, amended and restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "UnSub Credit Agreement"), (iii) Blackstone, (x) that certain Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent and (y) that certain Second Lien Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and Citibank, N.A., as administrative agent and collateral agent, and (iv) a Third Party Operator, any of such Third Party Operator's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "Third Party Credit Agreement"), and (v) a Qualified Foreclosure Transferee, any of such Qualified Foreclosure Transferee's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time.

"Approved AFE" means an AFE approved by the Operating Committee pursuant to Section 3.2(g) or deemed approved under Section 3.7(c).

"Approved Budget" means the Initial Budget and Work Plan, any Subsequent Budget and Work Plan approved under Section 3.7(b)(ii), and any amendment to the Initial Budget and Work Plan or approved Subsequent Budget and Work Plan approved as provided under Section 3.2.

"Approved Operation" means an Initial Approved Operation and any Subsequent Approved Operation.

"Area of Mutual Interest" has the meaning set forth in Section 5.2(a).

"Asset Interest" has the meaning set forth in Section 4.1(a).

"Assets" means collectively, the right, title and interest in and to the assets included in the term "Asset" as used in the Purchase Agreement.

"Base Preferred Return Amount" has the meaning give to such term in the SN UnSub Partnership Agreement as in effect as of the Effective Date.

"Blackstone" has the meaning set forth in the preamble.

"Blackstone Funds" has the meaning set forth in Section 5.2(h).

"Blackstone Operator" has the meaning set forth in Section 3.8(a).

"Blackstone Operatorship Rights" has the meaning set forth in Section 4.5(a).

"Blackstone Percentage" has the meaning set forth in Section 4.5(a).

"Blackstone Representative" has the meaning set forth in Section 3.3(a)(iii).

"Board of Directors" means the board of directors of SN.

"Bona Fide Offer" means a bona fide offer received by Blackstone from a Third Party that was obtained or marketed by Blackstone through a bona fide arms-length process (it being understood that such process need not be a broadly marketed process, but could be a direct negotiation and offer from a single party) designed to achieve the fair market value for the Working Interests, Assets and/or other related assets, or Equity Interests, as applicable, related to such offer. For the avoidance of doubt, a Bona Fide Offer will be deemed not to include a Foreclosure Transfer.

"Budget Negotiation Period" has the meaning set forth in Section 3.7(b)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"BX Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Capital Expenditures" means any expenditure by a Party that is required to be capitalized for purposes of such Party's financial statements in accordance with GAAP.

"Change of Control" means, with respect to Sanchez Energy, any of the following transactions: (a) a merger, consolidation or other reorganization, unless securities representing more than thirty-five percent (35%) of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Persons who beneficially owned Sanchez Energy's outstanding voting securities immediately prior to such transaction; or (b) any transaction or series of transactions pursuant to which any "person" or "group" (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934) becomes directly or indirectly the beneficial owner of any of Sanchez Energy's securities possessing more than sixty-five percent (65%) of the total combined voting power of Sanchez's securities (as measured in terms of the power to vote with respect to the election of its board of directors) outstanding immediately after the consummation of such transaction or series of transactions, whether such transaction involves a direct issuance from Sanchez Energy or the acquisition of outstanding securities held by one or more of Sanchez Energy's existing stockholders; excluding, in each case of (a) or (b) above, any transaction with a Permitted Transferee or a Permitted Holder.

"Confidential Information" has the meaning set forth in Section 7.7(a).

"Consents" has the meaning set forth in Section 2.2.

"Consent Agreement" means that certain Consent to Assignment of Interest dated December 24, 2016, from Briscoe Ranch, Inc. et al. to Sanchez Energy and Anadarko E&P Onshore LLC.

"Consenting Parties" means Briscoe Ranch, Inc., Miramar Holdings, L.P., Rancho la Cochina Minerals, Ltd., Janey Briscoe Marmion GST Trust, and El Pescado Minerals, Ltd.

"Contesting Party" has the meaning set forth in Section 7.12(c).

"Control" (including its derivatives and similar terms) means, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Core Area" means the area marked in blue on Exhibit C.

"Cure Right" has the meaning set forth in the definition of "Default".

"Deadlock" has the meaning set forth in Section 3.6(a).

"Deadlock Notice" has the meaning set forth in Section 3.6(a).

"Default" means, in respect of any Party, the failure by such Party or any of its Affiliates to remedy, within thirty (30) days of receipt of a Default Notice from any other Party, the material non-performance or material non-compliance with a material provision of this Agreement by such Party or any of its Affiliates (provided, however, that UnSub and SN shall not be considered to be "Affiliates" for the purposes of this definition of "Default", such that a Default by SN (or by SN's

Affiliates other than SN UnSub) shall not be deemed to be a default by SN UnSub, and a Default by SN UnSub shall not be deemed to be a Default by SN); provided, however, in the event of a failure by UnSub, the UnSub Agent shall also have the right (but not the obligation) to remedy any such failure within such thirty (30) day time period (the "Cure Right").

"Default Notice" means a written notice from a Party containing a detailed description of the basis of a claim that another Party has materially failed to perform or materially failed to comply with this Agreement, including specific references to the provisions in this Agreement that such Party has materially failed to comply with or perform; *provided*, *however*, in the event of an alleged failure by UnSub, such written notice shall also be delivered to the administrative agent under the UnSub Credit Agreement (the "UnSub Agent") substantially concurrently with delivery to UnSub.

"Defaulting Operator" has the meaning set forth in Section 3.8(f).

"Defaulting Party" has the meaning set forth in Section 3.9(a).

"Dispute Parties" has the meaning set forth in Section 4.5(f).

"Division of Operatorship" has the meaning set forth in Section 3.8(e)(i).

"Drag Interests" has the meaning set forth in Section 4.5(e).

"E&D Operations" means all activities and operations related to subsurface exploration and development of the Assets (including all drilling, reworking, plugging back, shutting-in, completing, re-completing, re-fracturing, stimulation, acidization, enhanced recovery operations, plugging and abandonment operations) as well as construction of wellpads and installation and operation of wellsite facilities.

"Effective Date" has the meaning set forth in the preamble.

"Equitable Division" has the meaning set forth in Section 3.8(e)(i).

"Equitable Partition" has the meaning set forth in Section 4.5(a).

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock and any commitments with respect thereto, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, equity interests or other partnership/limited liability company interests, and any commitments with respect thereto, and (c) any other direct or indirect equity ownership or participation in a Person.

"Estimated Cash Outlays" has the meaning set forth in Section 3.7(d).

"Excluded AMI Transactions" has the meaning set forth in Section 5.2(h).

"Excluded Percentage" has the meaning set forth in Section 4.5(a).

"Excluded Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Existing Drilled and Uncompleted Wells" means the oil and gas wells listed in Annex VI.

"Existing Producing Wells" means the oil and gas wells listed in Annex V.

"Existing Wellpad" means, as of any date of determination, each then-existing wellpad with average daily production in excess of 300 BOE/D over the prior twelve-month period under the Leases pursuant to which the Parties (including their respective Affiliates) retain any Working Interests.

"Fair Market Value" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"Final Deadlock" has the meaning set forth in Section 3.6(b).

"Final Deadlock Notice" has the meaning set forth in Section 3.6(b).

"Final Valuation" has the meaning set forth in Section 4.5(f).

"Financial Advisor" has the meaning set forth in Section 3.8(e)(i).

"Foreclosure Transfer" means any assignment, transfer, conveyance, exchange or any other alienation resulting from any judicial or non-judicial foreclosure by the holder of a security interest or other encumbrance or any Transfer to the holder of a security interest or other encumbrance in connection with a workout, bankruptcy, restructuring or similar arrangement, including in each case to the extent effectuated pursuant to Sections 363 or 1129 of the U.S. Bankruptcy Code.

"Form Operating Agreement" means the form of AAPL Joint Operating Agreement attached hereto as Exhibit B.

"Full Restricted Zone" means, for each Existing Producing Well, a three dimensional area in the shape of a rectangular prism, defined by the following: the rectangular subsurface zone extending perpendicularly (i) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (ii) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Full Spacing Restrictions" has the meaning set forth in Section 5.3(b)(iv).

"Future Wellpads" means all prospective wellpads for acreage under the Leases on which there are no Existing Wellpads based on customary industry practices and the reserve report for each Party covering the previous twelve (12) month period.

"GAAP" means those generally accepted accounting principles and practices that are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means ST Holdings L.P.

"HoldCo" means Gavilan Resources HoldCo, LLC (f/k/a Aguila Production HoldCo, LLC).

"Included Percentage" has the meaning set forth in Section 4.5(a).

"Included Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Initial Approved Operations" has the meaning set forth in Section 3.7(a).

"Initial Budget and Work Plan" has the meaning set forth in Section 3.7(a).

"IPO" has the meaning set forth in Section 4.4.

"IPO Notice" has the meaning set forth in Section 4.4.

"IPO Party" has the meaning set forth in Section 4.4.

"Joint Exploration Agreement" means the Joint Exploration Agreement, dated to be effective as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended from time to time.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Leases" means, collectively, the oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other rights included in the term "Leases" as used in the Purchase Agreement.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Lien" shall have the meaning ascribed to "Encumbrance" in the Purchase Agreement.

"Limited Restricted Zone" means, for each Existing Producing Well, two overlapping three dimensional areas, each in the shape of a rectangular prism, defined by the following: (i) the rectangular subsurface zone extending perpendicularly (A) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 90 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well; and (ii) the rectangular subsurface zone extending perpendicularly (A) 275 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Limited Spacing Restrictions" has the meaning set forth in Section 5.3(a)(iv).

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"Material Contracts" means any contract related to E&D Operations or S&A Operations or otherwise relating to the Assets, including drilling and completion agreements, gathering agreements, processing agreements, transportation agreements, supply agreements, disposal agreements, electric supply agreements or marketing or sales agreements, in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000; provided, however, that contracts which are contemplated by any marketing agreements by and between SN or UnSub, as applicable, or any of their Affiliates, on the one hand, and Blackstone and any of its Affiliates, on the other hand, shall not be deemed Material Contracts hereunder.

"Monthly Invoice" has the meaning set forth in Section 3.7(d).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Negligent Operator Action" has the meaning set forth in Section 3.8(f).

"Non-Defaulting Party" has the meaning set forth in Section 3.9(a).

"Non-Initiating Party" has the meaning set forth in Section 4.2(a).

"Non-IPO Party" has the meaning set forth in Section 4.4.

"Non-Transferring Party" has the meaning set forth in Section 4.1(a).

"Objection Notice" has the meaning set forth in Section 7.12(c).

"Operating Agreement" means any Joint Operating Agreement for any of the Leases and, to the extent applicable, the Joint Exploration Agreement and Participation Agreement as it may relate to a Party's ownership of any interest in a Lease.

"Operating Committee" has the meaning set forth in Section 3.1.

"Operator" has the meaning set forth in Section 3.8(a).

"Operator Default Event" has the meaning set forth in Section 3.8(f).

"Participation Agreement" means that certain Maverick Basin Area Participation Agreement, dated effective January 1, 2011, by and between Anadarko and Eagle Ford TX LP.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 7.14.

"Permitted Holders" means (a) Antonio R. Sanchez, III and A.R. Sanchez, Jr., (b) any spouse or descendant of any individual named in (a), or (c) any other natural person who is related to, or who has been adopted by, any such individual or such individual's spouse referenced in (a)-(b) above within the second degree of kinship, or (d) any Person Controlled, directly or indirectly, by any of the Persons referenced in clauses (a)-(c) above, individually or collectively by one or more of such Persons.

"Permitted Liens" has the meaning set forth in Section 4.1(a).

"Permitted Transferee" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person. For purposes of this Agreement, (i) Sanchez Production Partners LP and its Controlled Affiliates shall be deemed to be a Permitted Transferee of SN, except with respect to Section 4.2 for which purposes Sanchez Production Partners LP and its Controlled Affiliates shall not be deemed to be a Permitted Transferee of Sanchez, (ii) Permitted Holders shall be a Permitted Transferee of SN; and (iii) SN and SN UnSub shall each be treated as a Permitted Transferee of each other.

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Post-Division Non-Operator" has the meaning set forth in Section 3.8(e)(i).

"Post-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Pre-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Preferred Units" has the meaning give to such term in the SN UnSub Partnership Agreement.

"Proposed Modifications" has the meaning set forth in Section 5.3(e)(i).

"Proposed Sale" has the meaning set forth in Section 4.2(a).

"Proposed Transferee" has the meaning set forth in Section 4.2(a)(i).

"Purchase Agreement" has the meaning set forth in the recitals.

"Qualified Foreclosure Transfer" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee Representative" has the meaning set forth in Section 3.3(a)(ii).

"Quorum" has the meaning set forth in Section 3.5(a).

"Redemption Date" means the date of redemption of all outstanding Preferred Units in cash under the SN UnSub Partnership Agreement, as such agreement may be amended from time to time, issued as of the Effective Date pursuant to that certain Securities Purchase Agreement dated as of January 12, 2017, by and among Sanchez Energy, SN UR Holdings, LLC, a Delaware limited liability company; SN EF UnSub Holdings, LLC, a Delaware limited liability company; SN UnSub; SN EF UnSub GP, LLC, a Delaware limited liability company; GSO ST Holdings Associates LLC, a Delaware limited liability company; and GSO ST Holdings LP, a Delaware limited partnership.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and between HoldCo and Sanchez Energy.

"Representative" has the meaning set forth in Section 3.1.

"Required Operatorship Consents" has the meaning set forth in Section 3.8(e)(ii).

"Required Return Sum" has the meaning set forth in Section 4.5(h).

"Reserve Auditor" has the meaning set forth in Section 3.8(e)(i).

"ROFO Interests" has the meaning set forth in Section 4.3(a).

"ROFO Notice" has the meaning set forth in Section 4.3(a)

"ROFO Offer" has the meaning set forth in Section 4.3(a).

"ROFO Recipient" has the meaning set forth in Section 4.3(a).

"ROFO Transferor" has the meaning set forth in Section 4.3(a).

"S&A Operations" means any and all activities and operations associated with development and operation of the Assets other than E&D Operations, including, without limitation, procurement, construction, and operation of non-wellsite surface facilities such as water supply, storage, gathering and disposal facilities; electric power facilities; lease roads, frac ponds, and central tank batteries; gathering, treating, compression, dehydration, stabilization, and fractionation facilities; in each case, insofar as such operations are not otherwise dedicated to third-parties pursuant to existing contractual commitments burdening the Assets.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"Sale Transaction" has the meaning set forth in Section 4.5(a).

"Sale Transaction Agreement" has the meaning set forth in Section 4.5(d).

"Sale Transaction Equitable Partition" has the meaning set forth in Section 4.5(a).

"Sale Transaction Transferee" has the meaning set forth in Section 4.5(a).

"Sanchez Energy" means Sanchez Energy Corporation, a Delaware corporation, or for purposes of Section 4.3, any issuer of SN Common Stock.

"Sanchez Operator" has the meaning set forth in Section 3.8(a).

"Sanchez Representative" has the meaning set forth in Section 3.3(a)(ii).

"SN" has the meaning set forth in the preamble.

"SN Common Stock" means shares of common stock of Sanchez Energy, par value $0.01 per share, and any class of stock or other securities resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any liquidation, dissolution or winding up of Sanchez Energy, and any shares or other securities issued in respect of SN Common Stock in connection with any exchange for or replacement of such shares of SN Common Stock, recapitalization, merger, consolidation, conversion or similar transaction.

"SN Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"SN Equity Financed Offer" has the meaning set forth in Section 4.3(a).

"SN Operatorship Rights" has the meaning set forth in Section 4.5(a).

"SN UnSub" has the meaning set forth in the preamble.

"SN UnSub Partnership Agreement" means that certain Amended and Restated Agreement of Limited Partnership of SN UnSub, dated as of the Effective Date.

"SN UnSub GP LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated as of the Effective Date.

"Specified Credit Agreement" means if Operator is (i) SN, the SN Credit Agreement, (ii) BX, the BX Credit Agreement, or (iii) a Third Party, a Third Party Credit Agreement.

"Specified Event of Default" means an Event of Default as such may be defined from time to time under a Specified Credit Agreement, and as a result of such Event of Default, Operator's obligations thereunder have been accelerated prior to their stated maturity and the obligations which have been so accelerated exceed $20,000,000.

"Subsequent Approved Operations" has the meaning set forth in Section 3.7(b)(ii) and Section 3.7(c).

"Subsequent Budget and Work Plan" has the meaning set forth in Section 3.7(b)(i).

"Subsequent Proposed Operations" has the meaning set forth in Section 3.7(b)(i).

"Tag-Along Notice" has the meaning set forth in Section 4.2(a).

"Tag-Along Offer" has the meaning set forth in Section 4.2(b).

"Tag-Along Transaction" has the meaning set forth in Section 4.2(b).

"Tag Interests" has the meaning set forth in Section 4.2(b).

"Test Wells" has the meaning set forth in Section 5.3(e)(i).

"Third Party" means any Person other than a Party or one of their Affiliates or a Permitted Holder.

"Third Party Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Third Party Operator" has the meaning set forth in Section 3.8(f).

"Transfer" (including its derivatives and similar terms) means, with respect to an Asset Interest, a direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance,

exchange, bequest, devise, gift or any other alienation, including, except to the extent constituting Permitted Liens, any pledge or grant of a security interest (in each case, with or without consideration and whether by operation of Law or otherwise, including, by merger or consolidation) of any rights, interests or obligations with respect to all or any portion of such Asset Interest.

"Transferring Party" has the meaning set forth in Section 4.1(a).

"True-Up Amount" has the meaning set forth in Section 3.7(d).

"Unanimous Consent" means (x) the affirmative vote of all of the Representatives of a Party not then in Default in attendance at a duly called and convened meeting of the Operating Committee, which for the avoidance of doubt (assuming no Party is in Default) shall include the affirmative vote of at least one (1) Sanchez Representative appointed by SN, at least one (1) Blackstone Representative, and, either (1) Sanchez Representative appointed by SN UnSub or, if applicable, the Qualified Foreclosure Transferee Representative, or (y) the affirmative written consent in lieu of a meeting executed by all of the Representatives of Parties not in Default then constituting the Operating Committee.

"UnSub Agent" has the meaning set forth in the definition of "Default Notice".

"UnSub Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Valuation Firm" has the meaning set forth in Section 4.5(f).

"VDR" has the meaning set forth in Section 5.1(b).

"Wellpads" means, collectively, the Existing Wellpads and the Future Wellpads.

"Working Interest" means with respect to any lease or well or wellpad relating to the Assets, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

*    *    *

Case 4:23-cv-00587 Document 673-16 Filed on 04/19/23 in TXSD Page 143 of 200

**Annex II**
**Representatives**

**Sanchez Representatives:**
Tony Sanchez III
Eduardo Sanchez
Chris Heinson

**Blackstone Representatives:**
Angelo Acconcia
Gary Levin
Dave Roberts

**Annex III**
**Working Interests**

(*see attached*)

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2009 | 10/15/2018 | TX | Dimmit | 9416.779 | 3,346.014 | 4,[illegible] | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | Below San Miguel | | Y | 319 | 232 | 7000 |
| JEANNE E LUPTON | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | TX | Dimmit | 80.000 | 3.000 | 2.500 | 0.60000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | | 752 | 14911 |
| BETTY E THON | ANADARKO E&P COMPANY LP | 04/16/2010 | 04/16/2015 | TX | Dimmit | 80.000 | 3.333 | 1.667 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 387 | 582 | 15246 |
| [illegible] PRITCHETT | ANADARKO E&P COMPANY LP | 08/04/2010 | 08/04/2014 | TX | Dimmit | 158.630 | 17.[illegible] | 8.[illegible] | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 398 | 695 | 17714 |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2014 | TX | Dimmit | 159.630 | 11.526 | 6.263 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 399 | 709 | 17716 |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/28/2010 | 08/28/2014 | TX | Dimmit | 159.630 | 12.526 | 6.263 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 399 | 722 | 17739 |
| ROBERT T [illegible] ET UX | ANADARKO E&P COMPANY LP | 01/11/2011 | 01/11/2014 | TX | Dimmit | 80.000 | 30.000 | 15.000 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 406 | 779 | 18412 |
| [illegible] OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 04/18/2011 | 02/28/2014 | TX | Dimmit | 168.630 | 5.077 | 1.889 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | Surface to base of Eagle Ford | Survey/Unit | N | 417 | 611 | 19806 |
| [illegible] FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2014 | TX | Dimmit | 159.630 | 16.238 | 8.119 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | Surface to base of Eagle Ford | Survey/Unit | N | 425 | 389 | 12253 |
| JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 80.000 | 1.667 | 0.833 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 445 | 626 | 24633 |
| JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 80.000 | 1.667 | 0.833 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 445 | 628 | 24634 |
| BETTY LOU GLASON | ANADARKO E&P COMPANY LP | 05/11/2012 | 05/11/2015 | TX | Dimmit | 80.000 | 3.000 | 1.500 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 445 | 624 | 24582 |
| SANDRA J [illegible] | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 80.000 | 1.667 | 0.833 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 445 | 530 | 24595 |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | TX | Dimmit | 80.000 | 1.667 | 0.833 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | | N | 446 | 532 | 24594 |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2011 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 667 | 16693 |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.199 | 0.100 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 434 | 694 | 16027 |
| MELVA LOUISA PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2011 | 08/21/2015 | TX | Dimmit | 159.630 | 0.499 | 0.249 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 694 | 24046 |
| DANIEL J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2011 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 660 | 16039 |
| MARGARET E MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2011 | 08/21/2015 | TX | Dimmit | 159.630 | 9.577 | 4.788 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 646 | 16033 |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.166 | 0.083 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 642 | 16029 |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.166 | 0.083 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 642 | 16013 |
| APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 651 | 16026 |
| [illegible] SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.199 | 0.100 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 617 | 16018 |
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 526 | 20031 |
| ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 7.462 | 3.731 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 645 | 16034 |
| DONALD R PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 665 | 16204 |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.166 | 0.083 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 649 | 16032 |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.166 | 0.083 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 637 | 16038 |
| KATHLEEN J [illegible] | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 0.050 | 0.025 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 459 | 632 | 16030 |
| [illegible] | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | TX | Dimmit | 159.630 | 2.499 | 0.249 | 0.50000000 | 0.10000000 | 0.10000000 | 0.25000000 | All Depths | Survey/Unit | N | 461 | 259 | 16992 |
| [illegible] [redacted] | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | TX | Dimmit | 80.000 | 5.000 | 2.500 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 468 | 85 | 17219 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Contract Depths 8/1/2016 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 80.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 80.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE IV ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | 15341 |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Release | Y | [illegible] | [illegible] | [illegible] |
| ELIZABETH L SIMMONS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES ARTHUR [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE IV ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Lack of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Lack of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 60.000 | 0.50000000 | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO MARGARET M [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 40.000 | 20.000 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| ALVIN BLALACK JR ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| FLOYD B PORTER | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| MINNIE HELEN [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Release | N | [illegible] | [illegible] | [illegible] |
| O A BOYD ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] RI | [illegible] WI | [illegible] RI | Current Depths 8/1/2016 | Comments Act. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/11/1969 | 05/11/1974 | TX | Dimmit | 164.710 | 82.355 | 54.903 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 377 | 114730 |
| L STEBACH ET AL | SUN OIL COMPANY | 03/13/1969 | 03/13/1974 | TX | Dimmit | 164.710 | 82.355 | 54.903 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 332 | 114709-A |
| LILLIAN SPEAS ET AL | SUN OIL COMPANY | 09/19/1969 | 09/19/1978 | TX | Dimmit | 41.120 | 41.[illegible] | 27.[illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 594 | 114736 |
| RUTH W HOLLINGSHEAD ET AL | SUN OIL COMPANY | 06/04/1969 | 06/04/1974 | TX | Dimmit | 82.750 | 82.750 | 55.167 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 559 | 114727 |
| JAMES T MINK | SUN OIL COMPANY | 09/16/1968 | 09/16/1978 | TX | Dimmit | 15.060 | 15.060 | 10.040 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 469 | 114820 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1978 | TX | Dimmit | 41.420 | 41.420 | 27.613 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 10 | 114827 |
| ALFREDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | TX | Dimmit | 43.870 | 21.935 | 14.623 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 31 | 560 | 895 |
| LARRY D [illegible] | SUN OIL COMPANY | 08/26/1970 | 08/26/1975 | TX | Dimmit | 22.100 | 22.100 | 14.733 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 33 | 464 | 841 |
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | TX | Dimmit | 26.160 | 4.374 | 2.916 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 33 | [illegible] | [illegible] |
| PAUL J [illegible] ET UX | SUN OIL COMPANY | 11/15/1971 | 11/15/1976 | TX | Dimmit | 28.160 | 1.458 | 0.972 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 35 | 154 | 1997 |
| MARY M [illegible] | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 147 | 136 | 775 |
| CHARLES B NICHOLS SR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 37 | 227 | [illegible] |
| LEILA B KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | [illegible] | N | [illegible] | [illegible] | [illegible] |
| A M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | TX | Dimmit | 720.000 | 720.000 | 480.000 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | [illegible] | N | 25 | [illegible] | [illegible] |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/[illegible]/1989 | [illegible]/1994 | TX | Zavala | 162.400 | 162.400 | 108.267 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | [illegible] | [illegible] |
| ROY L BROWN III | SUN OPERATING LIMITED PARTNERSHIP | [illegible]/1989 | [illegible]/1994 | TX | Zavala | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | [illegible] | [illegible] |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 09/[illegible]/1989 | 09/29/1994 | TX | Zavala | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | [illegible] | [illegible] |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/[illegible]/1989 | 06/[illegible]/1994 | TX | Zavala | [illegible] | [illegible] | [illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| BETTY SUE PRICE [illegible] ET VIR | FOX AND HOLLAND | [illegible]/1982 | [illegible]/1987 | TX | Dimmit | [illegible] | [illegible] | 271.[illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | [illegible] | [illegible] | |
| ROBERT PRICE ET UX | FOX & HOLLAND | [illegible]/1982 | [illegible]/1987 | TX | Dimmit | [illegible] | [illegible] | 271.[illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] PRICE [illegible] ET VIR | FOX & HOLLAND | [illegible]/1982 | [illegible]/1987 | TX | Dimmit | [illegible] | [illegible] | 271.[illegible] | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | [illegible] | [illegible] | |
| [illegible] TAYLOR | ROBERT C SINCLAIR | [illegible]/1975 | [illegible]/1980 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| [illegible] M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | [illegible]/1970 | [illegible]/1980 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ARMSTRONG | J W DOAK | [illegible]/1970 | [illegible]/1975 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | W W [illegible] | [illegible]/1970 | [illegible]/1975 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| BROOCE RANCH INC | ANADARKO E&P COMPANY LP | 10/[illegible]/2010 | 10/[illegible]/2013 | TX | [illegible] | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | 0.15000000 | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| BROOCE FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | 0.15000000 | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BROOCE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | 0.15000000 | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BROOCE [redacted] ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | [illegible] | 0.15000000 | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |

011295

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | Undivid WI | SN WI | Gavilan WI | Current Depths 9/1/2016 | Comments Re: a. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SARAH M STOMBERG ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | assessment | Y | [illegible] | [illegible] | [illegible] |
| [illegible] FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RANDALL J [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| JANET LOUISE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KENNETH M [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| RICHARD E [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CONLEY EUGENE [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CHERYL LYNN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| JAMES SCOTT [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| CHAD ALAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KAREN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | partial assn | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | partial assn | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Webb Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |

Items highlighted in yellow were excluded from the Closing because the relevant consent was not obtained.

---

011296

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cu Net | WI | Unsub WI | NI WI | Gauber WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| DOUGLAS W HAMER PUZELLE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Dimmit Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | partial Assn. Depths | N | [illegible] | [illegible] | [illegible] |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 10.000 | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM H [illegible] FAMILY LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | released | Y | [illegible] | [illegible] | [illegible] |
| FITZSIMMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | 1 | [illegible] |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN FITZSIMMONS LOVE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SARAH JANE HENDERSON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| [illegible] RANCH LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] FOUNDATION | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUBREY [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SARAH [illegible] SCOTT BURGE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SCOTT [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

011297

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | Unzyk WI | SN WI | Stanton WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| KENNETH A [illegible] ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GLADYS ELAINE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| CLAUDE F [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| BRIAN K [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JESSICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| LAWRENCE [illegible] GATES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| KAREN [illegible] GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| PATRICIA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GEORGE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JAY M GATES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| MILDRED PATTERSON ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LUCILLE [illegible] ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| DENNIS PAT [illegible] ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| HAROLD [illegible] ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| MARIE [illegible] SCHOONOVER ET AL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| BARRY LEE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |

011298

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit-LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit-LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit-LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit-LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled Eagle Ford | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| BROOKE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments A/L & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SHARON [illegible] HEBERN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WEST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELAINE D [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT RACHAEL STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| REBECCA ANN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOROTHY LYNNE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| BRANDON CHRISTOPHER [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| SANDRA D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| TRACI W [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| SHARON W WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| JAMES E WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH F [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA [illegible] HUBBARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| TYLER J WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Title Failure [illegible] ac | N | [illegible] | [illegible] | [illegible] |
| SCOTT M FLEMING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RAY WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA FELTON LINDSAY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANDREA CARROLL SIMMONS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Ext. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LOCKESBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| NORMA [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SHARON CHANEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| PAMELA SUE WILLIAMS [illegible] TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | [illegible] | [illegible] | [illegible] | [illegible] |
| CHET L STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| EVELYN G [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| KEITH C STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| PATRICIA L LANE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| KATHLEEN [illegible] SUSAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| NELDA J BRASHEAR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| GARY L GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] JAMES [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] TOPHAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| MARY SUZANNE PATTERSON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 4/1/2016 | Comments Am. u. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HARRY E COOPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES W BRANCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] COUNTY OIL AND GAS CORPORATION | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BENNETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] INSURANCE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unleased WI | NRI | Gastar WI | Current Depths 9/1/2016 | Comments Ant. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

011303

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unsub WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] ET AL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TAYLOR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN D. SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM SCHALLHORN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANN SCHALLHORN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] & BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | La Salle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' [illegible] (Eagle Ford) | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH MARSHALL [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT CHARLES [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] NELL WILLIAMS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] D WARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LYNN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JULIE ANN HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HARRIS [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | Gavilan WI | Current Depths 9/1/2016 | Comments Act. s. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | 03/08/2012 | 03/08/2018 | TX | Dimmit | 80.000 | 1.770 | 0.635 | 0.50000000 | 0.12000000 | 0.15000000 | 0.23000000 | All Depths | | N | 439 | 721 | 23613 |
| RITA SUE SANDERS | ANADARKO E&P COMPANY LP | 01/09/2012 | 01/09/2018 | TX | Dimmit | 80.000 | 1.270 | 0.635 | 0.50000000 | 0.10000000 | 0.17000000 | 0.23000000 | All Depths | | N | 478 | 779 | 13619 |
| ALICE LAMB COMPTON | ANADARKO E&P COMPANY LP | 04/08/2012 | 08/08/2018 | TX | Dimmit | 80.000 | 1.270 | 0.635 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 479 | 718 | 23617 |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 456 | 617 | 23469 |
| RUBY LEE HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 457 | 668 | 23472 |
| SHERRI LYNN WEATHERHEAD | ANADARKO E&P COMPANY LP | 08/15/2012 | 08/15/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.05000000 | 0.15000000 | 0.25000000 | All Depths | | N | 456 | 661 | 23470 |
| VONNETA ANN LEONARD | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 456 | 646 | 23467 |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | 07/12/2018 | TX | Dimmit | 80.000 | 3.820 | 1.900 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 450 | 672 | 23473 |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 07/24/2012 | 07/24/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 456 | 665 | 23471 |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | 07/17/2012 | 07/17/2017 | TX | Dimmit | 86.900 | 1.858 | 0.929 | 0.50000000 | 0.12000000 | 0.15000000 | 0.25000000 | All Depths | | N | 456 | 654 | 23466 |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 07/24/2013 | 07/24/2018 | TX | Dimmit | 80.300 | 0.048 | 0.024 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 458 | 118 | 24695 |
| MARY HELEN WINDHAM SEARS ETUX | ANADARKO E&P ONSHORE LLC | 10/11/2013 | 10/11/2018 | TX | Dimmit | 80.300 | 1.664 | 0.832 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 447 | 91 | 17796 |
| WILL ALSTON BENNOCK | ANADARKO E&P COMPANY LP | 11/14/2010 | 12/18/2014 | TX | Dimmit | 21.520 | 72.880 | 48.600 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Base of San Miguel | [illegible] | Y | 402 | 403 | 17510 |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2013 | 06/08/2016 | TX | Dimmit | 81.500 | 9.170 | 4.885 | 0.50000000 | 0.10000000 | 0.25000000 | 0.75000000 | All Depths | [illegible] | N | 419 | 328 | 20517 |
| SIDA ALSTON BENNOCK | ANADARKO E&P COMPANY LP | 12/15/2010 | 06/15/2015 | TX | Dimmit | 19.400 | 19.860 | 13.767 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Base of San Miguel | [illegible] | Y | 402 | 408 | 17812 |
| MARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | 11/05/2013 | TX | Dimmit | 40.200 | 40.200 | 13.400 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Eagle Ford Only | [illegible] | Y | 401 | 408 | 17800 |
| WILL ALSTON BENNOCK | ANADARKO E&P COMPANY LP | 12/15/2010 | 12/15/2014 | TX | Dimmit | 46.500 | 40.090 | 15.200 | 0.50000000 | 0.10000000 | 0.15000000 | 0.75000000 | All Depths | | Y | 443 | 406 | 17511 |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | 06/13/2012 | 06/13/2015 | TX | Dimmit | 160.000 | 20.000 | 10.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 402 415 | 221 461 | 17830 19563 |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | TX | Dimmit | 160.000 | 66.667 | 33.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 408 | 398 | 18223 |
| ALICE KOEHLER | ANADARKO E&P COMPANY LP | 03/17/2013 | 03/17/2016 | TX | Dimmit | 160.000 | 2.222 | 1.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 188 | 18109 |
| DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 160.000 | 2.222 | 1.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 408 | 399 | 19331 |
| PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 160.000 | 4.337 | 1.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 400 | 18221 |
| GLADYS LISTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 160.000 | 2.222 | 1.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 408 | 382 | 18100 |
| FRANK VANCE | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/15/2016 | TX | Dimmit | 160.000 | 5.000 | 2.500 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 356 | 18111 |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 160.000 | 6.667 | 3.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 344 | 18123 |
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | TX | Dimmit | 160.000 | 6.667 | 3.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 401 | 376 | 18129 |
| CAROL JEAN MAXFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 160.000 | 6.667 | 3.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 372 | 18125 |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2016 | TX | Dimmit | 160.000 | 6.667 | 3.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 368 | 18124 |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | TX | Dimmit | 160.000 | 5.600 | 2.800 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 408 | 368 | 18427 |
| FLORA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | TX | Dimmit | 160.000 | 5.000 | 2.500 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 408 | 394 | 18311 |
| IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 160.000 | 2.222 | 1.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 406 | 380 | 18117 |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | TX | Dimmit | 160.000 | 6.667 | 3.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | 402 | 395 | 18600 |

011305

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 4/1/2016 | Comments Ref. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAN METCALF | ANADARKO E&P COMPANY LP | 09/16/2011 | 09/16/2016 | TX | Dimmit | 160.000 | 2.000 | 0.750 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 402 | [illegible] | [illegible] |
| BLANCHE C. KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | TX | Dimmit | 160.000 | 2.222 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| RUTH KINCHAMON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 1.500 | 0.750 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | 10.000 | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DORIS GABEL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | 10.000 | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DAN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | 1.500 | 0.750 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| BILL M SANCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| KATHY TERRY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | 1.500 | 0.750 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| JUDY ORTTEN TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 160.000 | 2.222 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 412 | [illegible] | [illegible] |
| ANNA M WING | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 2.222 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| SHARON DAUGHTERY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| CARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| ROADEN FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 7.400 | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| GLORIA DELGADO | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUSTIN PRESBYTERIAN THEOLOGICAL SEMINARY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 17.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 477 | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RALPH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTHA KIMBLE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ERNEST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co-Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 6/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JENNIFER BUSBY GEORGE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 17.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN T ALLEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BUSBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROY VAUGHN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA BUSBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM KEITH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MEREDITH B TRAM | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID TRAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 13.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AMY WAY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] CONTRACTING INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| ANNE GATLIN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] INVESTMENTS LTD | [illegible] COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| ANDREA [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | Sanchez WI | Current Depths [illegible] | Comments (i.e. Descriptions) | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN FITZSIMMONS LOVE ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] PROPERTIES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] MINERAL TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANNE BETTY HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HENRY PETER [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] RICHARD FRITZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BELL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANN FRITZ ALBERT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARGARET T [illegible] REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SHANNON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHRYN A [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GARDNER [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MAURICE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| HELEN [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GARDNER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LAWRENCE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | [illegible] | Net | [illegible] | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 6/1/2016 | Comments Art. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Survey | Net | Co. Net | WI | Upside WI | NV WI | Anchor WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LYNN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CYPRESS ATLANTIC LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

011310

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 6/1/2016 | Comment Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN L WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/24/2012 | 10/24/2015 | TX | Dimmit | 10.000 | 5.000 | 0.500 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 459 | [illegible] | 15719 |
| SUZANNE L FOCHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | 01/16/2016 | TX | Dimmit | 10.000 | 5.000 | 2.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 816 | 17144 |
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/15/2012 | 10/05/2018 | TX | Dimmit | 50.000 | 8.438 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 455 | 596 | 15720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | TX | Dimmit | 50.000 | 8.333 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 459 | 400 | 15721 |
| JANET RUTH STEWART [illegible] | ANADARKO E&P COMPANY LP | 10/05/2012 | 10/05/2018 | TX | Dimmit | 50.000 | 8.333 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 459 | 404 | 15718 |
| DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.833 | 0.278 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 460 | 11 | 17314 |
| EDWARD L FRETWELL JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 1.667 | 0.784 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 1 | 17312 |
| MARTHA LEIX | ANADARKO E&P ONSHORE LLC | 01/09/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.833 | 0.278 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 461 | 8 | 17313 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.278 | 0.093 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 811 | 17206 |
| LINDA J MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 816 | 17209 |
| STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.833 | 0.278 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 830 | 17311 |
| DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 818 | 17207 |
| RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.833 | 0.278 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 10 | 17215 |
| ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 823 | 17208 |
| ALISON MCMINCH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.833 | 0.278 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 463 | 11 | 17316 |
| EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 462 | 840 | 17241 |
| CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 464 | 197 | 17762 |
| ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.278 | 0.093 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 465 | 811 | 17362 |
| GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 1.250 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 463 | 427 | 17361 |
| A.B. BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | TX | Dimmit | 10.000 | 0.278 | 0.093 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 463 | 391 | 17264 |
| WHITE TAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 01/11/2013 | 01/11/2016 | TX | Dimmit | 10.000 | 10.000 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 465 | 427 | 17477 |
| DENNIS E LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 466 | 122 | 17846 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 466 | 127 | 17847 |
| GARY L LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 10.000 | 3.333 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 466 | 134 | 17848 |
| LINDA K [illegible] | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 10.000 | 3.333 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 466 | 139 | 17850 |
| DEBRA J BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | TX | Dimmit | 10.000 | 3.333 | 1.111 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | 466 | 139 | 17819 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | 08/01/2015 | TX | Dimmit | 10.000 | 10.000 | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 458 | 608 | 15563 |
| THOMAS E BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2011 | 04/25/2014 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | 412 | 152 | 13748 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2016 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 476 | 189 | 19987 |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2019 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 476 | 181 | 19996 |
| ANIMAL HUMANE SOCIETY OF ARLINGTON COUNTY | ANADARKO E&P ONSHORE LLC | 04/05/2013 | 04/05/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 476 | 298 | 19930 |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | 10/03/2018 | TX | Dimmit | 60.000 | 60.000 | 20.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 474 | 251 | 20813 |

011311

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Undiv WI | [illegible] | [illegible] WI | Current Depths 4/1/2016 | Comments Art. a. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SAMUEL EICHHORN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| [illegible] LIVING TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | survey/unit | Y | [illegible] | [illegible] | [illegible] |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| NANCY VAN ZILYNE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| JANICE CAROL WEATHERFORD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ROBERT [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA MEISTER [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHRYN MEISTER [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAROL [illegible] MEISTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVEN [illegible] MEISTER ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] L WASHBURN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT W [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE T SMITH ET UX | [illegible] RESOURCES COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] FARM LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Need to check [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] SMITH JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHERINE [illegible] HARPER TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILL [illegible] HARPER TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWARD ROBERTSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co-Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 9/1/2016 | Comments Act. + Description | Assignment Restriction | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BETTE RUBY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA ROBINSON KELLY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CARLTON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICHARD JOSEPH ROBINSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOUGLAS R ROBINSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MONTY LLOYD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES MARSHALL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA B [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTINE ANN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 20.000 | 0.417 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JACK C ATKIN III | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] FLOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON MAY KINCAID | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

011313

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Undivided WI | NRI | Gastar WI | Current Depths 8/1/2016 | Comments Act. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| VICKI LOU ROLAND | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY NESTLER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GREGORY P DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH JAMES LORENZO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY ALLENE HARRISON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA LARSEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JULIE ANN NASBITT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWIN T [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BEVERLY JOAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN MICHAEL LORENZO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT JAMES [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDMUND SEVERN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 1 | [illegible] |
| ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN MICHAEL VESTAL JR TRUST [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARISSA LOUISE VESTAL TRUST [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAROLYN WROUGHTON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] WROUGHTON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

011314

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 9/1/2016 | Comments Inc. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | Undiv WI | DH WI | [illegible] WI | Current Depths 8/1/2016 | Comments Art. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel |  | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] San Miguel |  | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths |  | N | [illegible] | [illegible] | [illegible] |

011316

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 8/1/2016 | Comment Act. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA DAUGHERTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENICE SUTTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY WATTS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARTHA GATES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 9/1/2016 | Comment Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANGELA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAUDINE FEAGUE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MODENA FARMS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA FARRIS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LESLIE EVANS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CALEB GLENN FARMS TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEBORAH J PUTNAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DANNY WAYNE [illegible] JR. ET AL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AARON [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LORI GRAY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVEN HILL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM B [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HOLDINGS LP ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| FRANK E GENE POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEPHEN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM ALLAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA RUTH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTTY J POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WAYNE MOODY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

011318

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | RI | Unocal WI | SN WI | Sanchez WI | Current Depths 9/1/2016 | Comments & Lx Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DANIEL JOSEPH [illegible] F/K/A HERBERT ESTILLE [illegible] | ANADARKO E&P ONSHORE LLC | 07/09/2013 | 07/09/2018 | TX | Dimmit | 160.000 | 3.111 | 1.556 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | 702 | [illegible] |
| ANNABELLE [illegible] | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | TX | Dimmit | 10.700 | 0.160 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LLOYD T ELLIOTT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | 11/03/2019 | TX | Dimmit | 10.000 | 0.139 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| IAN MILTON [illegible] | ANADARKO E&P ONSHORE LLC | 10/18/2014 | 10/18/2017 | TX | Dimmit | 10.000 | 0.188 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 552 | 441 | [illegible] |
| MARGARET L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 80.000 | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS L LINDSAY | ANADARKO E&P ONSHORE LLC | 07/11/2015 | 07/11/2020 | TX | Dimmit | 80.000 | 2.664 | 1.332 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| MOLLIE A [illegible] | ANADARKO E&P ONSHORE LLC | 07/11/2015 | 07/11/2020 | TX | Dimmit | 80.000 | 2.664 | 1.332 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| DEBORAH K [illegible] | ANADARKO E&P ONSHORE LLC | 07/11/2015 | 07/11/2020 | TX | Dimmit | 80.000 | 2.664 | 1.332 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| LEAKE EXPLORATION LLC BY ARTHUR DAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | 07/17/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 551 | [illegible] | [illegible] |
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 80.000 | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JERRY R [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 80.000 | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.721 | 0.181 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 552 | [illegible] | [illegible] |
| BARBARA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DANNY P [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA [illegible] | ANADARKO E&P ONSHORE LLC | 11/04/2014 | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] W TAYLOR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | 4.000 | 1.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 461 | [illegible] |
| RODNEY J [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 0.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | 461 | [illegible] |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEANETTE L [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

011319

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | UnSub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. v. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2018 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 80.000 | 0.667 | 0.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2018 | TX | Dimmit | 80.000 | 1.250 | 0.625 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 563 | 557 | 40854 |
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.179 | 0.090 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | 07/19/2019 | TX | Dimmit | 1639.310 | 273.218 | 204.914 | 0.75000000 | 0.15000000 | 0.22500000 | 0.37500000 | All Depths | | Y | 577 | 454 | 42708 |

**Annex IV**
**Approved Financial Advisor Arbiters**

Financial Advisors:
Evercore
Jefferies
Citigroup
Royal Bank of Canada
J.P. Morgan
Credit Suisse
Morgan Stanley
Tudor, Pickering, Holt & Co.

Reserve Auditors:
Ryder Scott
W.D. Von Gonten & Co.
Netherland Sewell & Associates
Cawley, Gillespie & Associates
DeGolyer and MacNaughton

**Annex V**
**Existing Producing Wells**

(*see attached*)

---

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BEINHORN RANCH 10H | 4212733880 |
| BEINHORN RANCH 11H | 4212734113 |
| BEINHORN RANCH 12H | 4212734114 |
| BEINHORN RANCH 13H | 4212734260 |
| BEINHORN RANCH 14H | 4212734259 |
| BEINHORN RANCH 15H | 4212734261 |
| BEINHORN RANCH 16H | 4212734997 |
| BEINHORN RANCH 17H | 4212734998 |
| BEINHORN RANCH 18H | 4212734999 |
| BEINHORN RANCH 19H | 4212734330 |
| BEINHORN RANCH 1H | 4212733624 |
| BEINHORN RANCH 20H | 4212734328 |
| BEINHORN RANCH 21H | 4212734115 |
| BEINHORN RANCH 22H | 4212734329 |
| BEINHORN RANCH 23H | 4212734383 |
| BEINHORN RANCH 24H | 4212734384 |
| BEINHORN RANCH 25H | 4212734385 |
| BEINHORN RANCH 26H | 4212734386 |
| BEINHORN RANCH 27H | 4212735001 |
| BEINHORN RANCH 28H | 4212735000 |
| BEINHORN RANCH 29H | 4212735018 |
| BEINHORN RANCH 2H | 4212733644 |
| BEINHORN RANCH 30H | 4212735020 |
| BEINHORN RANCH 31H | 4212735019 |
| BEINHORN RANCH 32H | 4212735022 |
| BEINHORN RANCH 33H | 4212735032 |
| BEINHORN RANCH 34H | 4212735033 |
| BEINHORN RANCH 35H | 4212735035 |
| BEINHORN RANCH 36H | 4212735034 |
| BEINHORN RANCH 37H | 4212736214 |
| BEINHORN RANCH 38H | 4212736219 |
| BEINHORN RANCH 39H | 4212736220 |
| BEINHORN RANCH 3H | 4212733664 |
| BEINHORN RANCH 40H | 4212736221 |
| BEINHORN RANCH 41H | 4212736223 |
| BEINHORN RANCH 42H | 4212736224 |
| BEINHORN RANCH 43H | 4212736225 |
| BEINHORN RANCH 44H | 4212736226 |
| BEINHORN RANCH 4H | 4212733690 |
| BEINHORN RANCH 5H | 4212733760 |
| BEINHORN RANCH 6H | 4212733761 |
| BEINHORN RANCH 7H | 4212733871 |
| BEINHORN RANCH 8H | 4212733872 |
| BEINHORN RANCH 9H | 4212733879 |
| BEINHORN RANCH UNIT A 10H | 4212736291 |
| BEINHORN RANCH UNIT A 11H | 4212736289 |
| BEINHORN RANCH UNIT A 12H | 4212736294 |
| BEINHORN RANCH UNIT A 1H | 4212736275 |
| BEINHORN RANCH UNIT A 2H | 4212736276 |
| BEINHORN RANCH UNIT A 3H | 4212736277 |
| BEINHORN RANCH UNIT A 4H | 4212736278 |
| BEINHORN RANCH UNIT A 5H | 4212736282 |
| BEINHORN RANCH UNIT A 6H | 4212736286 |
| BEINHORN RANCH UNIT A 7H | 4212736287 |
| BEINHORN RANCH UNIT A 8H | 4212736290 |
| BEINHORN RANCH UNIT A 9H | 4212736288 |
| BOYD, GG 1H | 4212733750 |
| BRISCOE CARLA RANCH 10H | 4212733733 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH 11H | 4212733735 |
| BRISCOE CARLA RANCH 12H | 4212733736 |
| BRISCOE CARLA RANCH 13H | 4212733875 |
| BRISCOE CARLA RANCH 14H | 4212733876 |
| BRISCOE CARLA RANCH 15H | 4212733874 |
| BRISCOE CARLA RANCH 16H | 4212734133 |
| BRISCOE CARLA RANCH 17H | 4212734134 |
| BRISCOE CARLA RANCH 18H | 4212734135 |
| BRISCOE CARLA RANCH 19H | 4212733889 |
| BRISCOE CARLA RANCH 1H | 4212733681 |
| BRISCOE CARLA RANCH 20H | 4212733890 |
| BRISCOE CARLA RANCH 21H | 4212733891 |
| BRISCOE CARLA RANCH 22H | 4212733885 |
| BRISCOE CARLA RANCH 23H | 4212733893 |
| BRISCOE CARLA RANCH 24H | 4212733894 |
| BRISCOE CARLA RANCH 25H | 4212733895 |
| BRISCOE CARLA RANCH 26H | 4212734948 |
| BRISCOE CARLA RANCH 27H | 4212734949 |
| BRISCOE CARLA RANCH 28H | 4212734969 |
| BRISCOE CARLA RANCH 29H | 4212734959 |
| BRISCOE CARLA RANCH 2H | 4212733666 |
| BRISCOE CARLA RANCH 30H | 4212734960 |
| BRISCOE CARLA RANCH 31H | 4212734961 |
| BRISCOE CARLA RANCH 32H | 4212734967 |
| BRISCOE CARLA RANCH 33H | 4212734962 |
| BRISCOE CARLA RANCH 34H | 4212734963 |
| BRISCOE CARLA RANCH 3H | 4212733705 |
| BRISCOE CARLA RANCH 4H | 4212733706 |
| BRISCOE CARLA RANCH 5H | 4212734946 |
| BRISCOE CARLA RANCH 6H | 4212734947 |
| BRISCOE CARLA RANCH 7H | 4212733855 |
| BRISCOE CARLA RANCH 8H | 4212733856 |
| BRISCOE CARLA RANCH 9H | 4212733857 |
| BRISCOE CATARINA N UNIT A 10H | 4212735923 |
| BRISCOE CATARINA N UNIT A 1H | 4212735930 |
| BRISCOE CATARINA N UNIT A 2H | 4212735931 |
| BRISCOE CATARINA N UNIT A 3H | 4212735932 |
| BRISCOE CATARINA N UNIT A 4H | 4212735933 |
| BRISCOE CATARINA N UNIT A 5H | 4212735934 |
| BRISCOE CATARINA N UNIT A 6H | 4212735919 |
| BRISCOE CATARINA N UNIT A 7H | 4212735920 |
| BRISCOE CATARINA N UNIT A 8H | 4212735921 |
| BRISCOE CATARINA N UNIT A 9H | 4212735922 |
| BRISCOE CATARINA NORTH 100H | 4212736732 |
| BRISCOE CATARINA NORTH 101H | 4212736733 |
| BRISCOE CATARINA NORTH 102H | 4212736734 |
| BRISCOE CATARINA NORTH 103H | 4212736735 |
| BRISCOE CATARINA NORTH 10H | 4212733930 |
| BRISCOE CATARINA NORTH 11H | 4212733932 |
| BRISCOE CATARINA NORTH 12H | 4212733931 |
| BRISCOE CATARINA NORTH 133H | 4212736869 |
| BRISCOE CATARINA NORTH 134H | 4212736870 |
| BRISCOE CATARINA NORTH 135H | 4212736866 |
| BRISCOE CATARINA NORTH 136H | 4212736867 |
| BRISCOE CATARINA NORTH 13H | 4212733937 |
| BRISCOE CATARINA NORTH 14H | 4212733938 |
| BRISCOE CATARINA NORTH 15H | 4212733939 |
| BRISCOE CATARINA NORTH 16H | 4212733947 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 17H | 4212733948 |
| BRISCOE CATARINA NORTH 18H | 4212733949 |
| BRISCOE CATARINA NORTH 19H | 4212735063 |
| BRISCOE CATARINA NORTH 1H | 4212733687 |
| BRISCOE CATARINA NORTH 20H | 4212734155 |
| BRISCOE CATARINA NORTH 21H | 4212734156 |
| BRISCOE CATARINA NORTH 22H | 4212734157 |
| BRISCOE CATARINA NORTH 23H | 4212734128 |
| BRISCOE CATARINA NORTH 24H | 4212734129 |
| BRISCOE CATARINA NORTH 25H | 4212734130 |
| BRISCOE CATARINA NORTH 26H | 4212734174 |
| BRISCOE CATARINA NORTH 27H | 4212734175 |
| BRISCOE CATARINA NORTH 28H | 4212734176 |
| BRISCOE CATARINA NORTH 29H | 4212734206 |
| BRISCOE CATARINA NORTH 2H | 4212733995 |
| BRISCOE CATARINA NORTH 30H | 4212734208 |
| BRISCOE CATARINA NORTH 31H | 4212734209 |
| BRISCOE CATARINA NORTH 32H | 4212735064 |
| BRISCOE CATARINA NORTH 33H | 4212735070 |
| BRISCOE CATARINA NORTH 34H | 4212735066 |
| BRISCOE CATARINA NORTH 35H | 4212734221 |
| BRISCOE CATARINA NORTH 36H | 4212734222 |
| BRISCOE CATARINA NORTH 37H | 4212734223 |
| BRISCOE CATARINA NORTH 39H | 4212734226 |
| BRISCOE CATARINA NORTH 3H | 4212734001 |
| BRISCOE CATARINA NORTH 40H | 4212734228 |
| BRISCOE CATARINA NORTH 41H | 4212734229 |
| BRISCOE CATARINA NORTH 42H | 4212734230 |
| BRISCOE CATARINA NORTH 43H | 4212734231 |
| BRISCOE CATARINA NORTH 44H | 4212734343 |
| BRISCOE CATARINA NORTH 45H | 4212734344 |
| BRISCOE CATARINA NORTH 46H | 4212734375 |
| BRISCOE CATARINA NORTH 47H | 4212734376 |
| BRISCOE CATARINA NORTH 48H | 4212734377 |
| BRISCOE CATARINA NORTH 49H | 4212734378 |
| BRISCOE CATARINA NORTH 4H | 4212733804 |
| BRISCOE CATARINA NORTH 50H | 4212734563 |
| BRISCOE CATARINA NORTH 51H | 4212734564 |
| BRISCOE CATARINA NORTH 52H | 4212734565 |
| BRISCOE CATARINA NORTH 53H | 4212734566 |
| BRISCOE CATARINA NORTH 54H | 4212734567 |
| BRISCOE CATARINA NORTH 55H | 4212734568 |
| BRISCOE CATARINA NORTH 56H | 4212734578 |
| BRISCOE CATARINA NORTH 57H | 4212734579 |
| BRISCOE CATARINA NORTH 58H | 4212734580 |
| BRISCOE CATARINA NORTH 59H | 4212734581 |
| BRISCOE CATARINA NORTH 5H | 4212733805 |
| BRISCOE CATARINA NORTH 60H | 4212734582 |
| BRISCOE CATARINA NORTH 61H | 4212734583 |
| BRISCOE CATARINA NORTH 62H | 4212734866 |
| BRISCOE CATARINA NORTH 63H | 4212734869 |
| BRISCOE CATARINA NORTH 64H | 4212734870 |
| BRISCOE CATARINA NORTH 65H | 4212734871 |
| BRISCOE CATARINA NORTH 66H | 4212734874 |
| BRISCOE CATARINA NORTH 67H | 4212734875 |
| BRISCOE CATARINA NORTH 68H | 4212734876 |
| BRISCOE CATARINA NORTH 69H | 4212734891 |
| BRISCOE CATARINA NORTH 6H | 4212733806 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 70H | 4212734890 |
| BRISCOE CATARINA NORTH 71H | 4212734894 |
| BRISCOE CATARINA NORTH 72H | 4212734936 |
| BRISCOE CATARINA NORTH 73H | 4212734930 |
| BRISCOE CATARINA NORTH 74H | 4212734932 |
| BRISCOE CATARINA NORTH 75H | 4212734933 |
| BRISCOE CATARINA NORTH 76H | 4212735159 |
| BRISCOE CATARINA NORTH 77H | 4212735168 |
| BRISCOE CATARINA NORTH 78H | 4212735169 |
| BRISCOE CATARINA NORTH 79H | 4212735170 |
| BRISCOE CATARINA NORTH 7H | 4212733825 |
| BRISCOE CATARINA NORTH 80H | 4212735171 |
| BRISCOE CATARINA NORTH 81H | 4212735172 |
| BRISCOE CATARINA NORTH 82H | 4212735173 |
| BRISCOE CATARINA NORTH 83H | 4212735174 |
| BRISCOE CATARINA NORTH 84H | 4212735816 |
| BRISCOE CATARINA NORTH 85H | 4212735817 |
| BRISCOE CATARINA NORTH 86H | 4212735818 |
| BRISCOE CATARINA NORTH 87H | 4212735819 |
| BRISCOE CATARINA NORTH 88H | 4212735820 |
| BRISCOE CATARINA NORTH 89H | 4212735821 |
| BRISCOE CATARINA NORTH 8H | 4212733826 |
| BRISCOE CATARINA NORTH 90H | 4212736722 |
| BRISCOE CATARINA NORTH 91H | 4212736723 |
| BRISCOE CATARINA NORTH 92H | 4212736724 |
| BRISCOE CATARINA NORTH 93H | 4212736725 |
| BRISCOE CATARINA NORTH 94H | 4212736726 |
| BRISCOE CATARINA NORTH 95H | 4212736727 |
| BRISCOE CATARINA NORTH 96H | 4212736728 |
| BRISCOE CATARINA NORTH 97H | 4212736729 |
| BRISCOE CATARINA NORTH 98H | 4212736730 |
| BRISCOE CATARINA NORTH 99H | 4212736731 |
| BRISCOE CATARINA NORTH 9H | 4212733829 |
| BRISCOE CATARINA RANCH 100H | 4212735430 |
| BRISCOE CATARINA RANCH 101H | 4212735431 |
| BRISCOE CATARINA RANCH 102H | 4212735471 |
| BRISCOE CATARINA RANCH 103H | 4212735472 |
| BRISCOE CATARINA RANCH 104H | 4212735473 |
| BRISCOE CATARINA RANCH 105H | 4212735474 |
| BRISCOE CATARINA RANCH 106H | 4212735475 |
| BRISCOE CATARINA RANCH 107H | 4212735476 |
| BRISCOE CATARINA RANCH 108H | 4212735199 |
| BRISCOE CATARINA RANCH 10H | 4212733677 |
| BRISCOE CATARINA RANCH 11H | 4212734363 |
| BRISCOE CATARINA RANCH 12H | 4212734364 |
| BRISCOE CATARINA RANCH 13H | 4212733680 |
| BRISCOE CATARINA RANCH 14H | 4212734365 |
| BRISCOE CATARINA RANCH 15H | 4212734366 |
| BRISCOE CATARINA RANCH 16H | 4212733790 |
| BRISCOE CATARINA RANCH 17H | 4212733791 |
| BRISCOE CATARINA RANCH 18H | 4212733792 |
| BRISCOE CATARINA RANCH 19H | 4212733780 |
| BRISCOE CATARINA RANCH 1H EAGLEF | 4212733398 |
| BRISCOE CATARINA RANCH 20H | 4212733781 |
| BRISCOE CATARINA RANCH 21H | 4212733782 |
| BRISCOE CATARINA RANCH 22H | 4212734315 |
| BRISCOE CATARINA RANCH 23H | 4212734316 |
| BRISCOE CATARINA RANCH 24H | 4212734317 |

**Existing Producing Wells**

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 25H | 4212734318 |
| BRISCOE CATARINA RANCH 26H | 4212734319 |
| BRISCOE CATARINA RANCH 27H | 4212734320 |
| BRISCOE CATARINA RANCH 28H | 4212734367 |
| BRISCOE CATARINA RANCH 29H | 4212734368 |
| BRISCOE CATARINA RANCH 2H | 4212733612 |
| BRISCOE CATARINA RANCH 31H | 4212734388 |
| BRISCOE CATARINA RANCH 32H | 4212734389 |
| BRISCOE CATARINA RANCH 33H | 4212734390 |
| BRISCOE CATARINA RANCH 34H | 4212734432 |
| BRISCOE CATARINA RANCH 35H | 4212734433 |
| BRISCOE CATARINA RANCH 36H | 4212734436 |
| BRISCOE CATARINA RANCH 37H | 4212734434 |
| BRISCOE CATARINA RANCH 38H | 4212734439 |
| BRISCOE CATARINA RANCH 39H | 4212734440 |
| BRISCOE CATARINA RANCH 3H | 4212733646 |
| BRISCOE CATARINA RANCH 40H | 4212734441 |
| BRISCOE CATARINA RANCH 41H | 4212734443 |
| BRISCOE CATARINA RANCH 42H | 4212734442 |
| BRISCOE CATARINA RANCH 43H | 4212734444 |
| BRISCOE CATARINA RANCH 44H | 4212734446 |
| BRISCOE CATARINA RANCH 45H | 4212734448 |
| BRISCOE CATARINA RANCH 46H | 4212734754 |
| BRISCOE CATARINA RANCH 47H | 4212734755 |
| BRISCOE CATARINA RANCH 48H | 4212734756 |
| BRISCOE CATARINA RANCH 49H | 4212734757 |
| BRISCOE CATARINA RANCH 4H | 4212733684 |
| BRISCOE CATARINA RANCH 50H | 4212734758 |
| BRISCOE CATARINA RANCH 51H | 4212734774 |
| BRISCOE CATARINA RANCH 52H | 4212734775 |
| BRISCOE CATARINA RANCH 53H | 4212734778 |
| BRISCOE CATARINA RANCH 54H | 4212734777 |
| BRISCOE CATARINA RANCH 55H | 4212734776 |
| BRISCOE CATARINA RANCH 56H | 4212735214 |
| BRISCOE CATARINA RANCH 57H | 4212735215 |
| BRISCOE CATARINA RANCH 58H | 4212735216 |
| BRISCOE CATARINA RANCH 59H | 4212735188 |
| BRISCOE CATARINA RANCH 5H | 4212735292 |
| BRISCOE CATARINA RANCH 60H | 4212735190 |
| BRISCOE CATARINA RANCH 61H | 4212735184 |
| BRISCOE CATARINA RANCH 62H | 4212735183 |
| BRISCOE CATARINA RANCH 63H | 4212735185 |
| BRISCOE CATARINA RANCH 64H | 4212735186 |
| BRISCOE CATARINA RANCH 65H | 4212735193 |
| BRISCOE CATARINA RANCH 66H | 4212735194 |
| BRISCOE CATARINA RANCH 67H | 4212735195 |
| BRISCOE CATARINA RANCH 68H | 4212735196 |
| BRISCOE CATARINA RANCH 69H | 4212735197 |
| BRISCOE CATARINA RANCH 6H | 4212733749 |
| BRISCOE CATARINA RANCH 70H | 4212735198 |
| BRISCOE CATARINA RANCH 71H | 4212735217 |
| BRISCOE CATARINA RANCH 72H | 4212735218 |
| BRISCOE CATARINA RANCH 73H | 4212735219 |
| BRISCOE CATARINA RANCH 74H | 4212735293 |
| BRISCOE CATARINA RANCH 75H | 4212735296 |
| BRISCOE CATARINA RANCH 76H | 4212735297 |
| BRISCOE CATARINA RANCH 77H | 4212735298 |
| BRISCOE CATARINA RANCH 78H | 4212735299 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 79H | 4212735300 |
| BRISCOE CATARINA RANCH 7H | 4212733723 |
| BRISCOE CATARINA RANCH 80H | 4212735301 |
| BRISCOE CATARINA RANCH 81H | 4212735302 |
| BRISCOE CATARINA RANCH 82H | 4212735303 |
| BRISCOE CATARINA RANCH 83H | 4212735304 |
| BRISCOE CATARINA RANCH 84H | 4212735305 |
| BRISCOE CATARINA RANCH 85H | 4212735331 |
| BRISCOE CATARINA RANCH 86H | 4212735332 |
| BRISCOE CATARINA RANCH 87H | 4212735330 |
| BRISCOE CATARINA RANCH 88H | 4212735345 |
| BRISCOE CATARINA RANCH 89H | 4212735346 |
| BRISCOE CATARINA RANCH 8H | 4212733724 |
| BRISCOE CATARINA RANCH 90H | 4212735340 |
| BRISCOE CATARINA RANCH 91H | 4212735341 |
| BRISCOE CATARINA RANCH 92H | 4212735342 |
| BRISCOE CATARINA RANCH 93H | 4212735343 |
| BRISCOE CATARINA RANCH 94H | 4212735344 |
| BRISCOE CATARINA RANCH 95H | 4212735425 |
| BRISCOE CATARINA RANCH 96H | 4212735427 |
| BRISCOE CATARINA RANCH 97H | 4212735426 |
| BRISCOE CATARINA RANCH 98H | 4212735428 |
| BRISCOE CATARINA RANCH 99H | 4212735429 |
| BRISCOE CATARINA RANCH 9H | 4212733674 |
| BRISCOE CATARINA SOUTH 10H | 4212734455 |
| BRISCOE CATARINA SOUTH 11H | 4212734456 |
| BRISCOE CATARINA SOUTH 12H | 4212734457 |
| BRISCOE CATARINA SOUTH 13H | 4212734459 |
| BRISCOE CATARINA SOUTH 14H | 4212734458 |
| BRISCOE CATARINA SOUTH 15H | 4212734460 |
| BRISCOE CATARINA SOUTH 16H | 4212735312 |
| BRISCOE CATARINA SOUTH 17H | 4212735313 |
| BRISCOE CATARINA SOUTH 18H | 4212735314 |
| BRISCOE CATARINA SOUTH 19H | 4212735316 |
| BRISCOE CATARINA SOUTH 1H | 4212733783 |
| BRISCOE CATARINA SOUTH 20H | 4212735322 |
| BRISCOE CATARINA SOUTH 21H | 4212735323 |
| BRISCOE CATARINA SOUTH 22H | 4212735324 |
| BRISCOE CATARINA SOUTH 23H | 4212735325 |
| BRISCOE CATARINA SOUTH 24H | 4212735362 |
| BRISCOE CATARINA SOUTH 25H | 4212735363 |
| BRISCOE CATARINA SOUTH 26H | 4212735364 |
| BRISCOE CATARINA SOUTH 27H | 4212735365 |
| BRISCOE CATARINA SOUTH 28H | 4212735459 |
| BRISCOE CATARINA SOUTH 29H | 4212735515 |
| BRISCOE CATARINA SOUTH 2H | 4212733784 |
| BRISCOE CATARINA SOUTH 30H | 4212735460 |
| BRISCOE CATARINA SOUTH 31H | 4212735461 |
| BRISCOE CATARINA SOUTH 32H | 4212735463 |
| BRISCOE CATARINA SOUTH 33H | 4212735462 |
| BRISCOE CATARINA SOUTH 34H | 4212735481 |
| BRISCOE CATARINA SOUTH 35H | 4212735484 |
| BRISCOE CATARINA SOUTH 36H | 4212735510 |
| BRISCOE CATARINA SOUTH 37H | 4212735511 |
| BRISCOE CATARINA SOUTH 38H | 4212735513 |
| BRISCOE CATARINA SOUTH 39H | 4212735512 |
| BRISCOE CATARINA SOUTH 3H | 4212733785 |
| BRISCOE CATARINA SOUTH 40H | 4212735532 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA SOUTH 41H | 4212735533 |
| BRISCOE CATARINA SOUTH 42H | 4212735534 |
| BRISCOE CATARINA SOUTH 43H | 4212735535 |
| BRISCOE CATARINA SOUTH 44H | 4212735536 |
| BRISCOE CATARINA SOUTH 45H | 4212735557 |
| BRISCOE CATARINA SOUTH 46H | 4212735561 |
| BRISCOE CATARINA SOUTH 47H | 4212735562 |
| BRISCOE CATARINA SOUTH 48H | 4212735563 |
| BRISCOE CATARINA SOUTH 49H | 4212735693 |
| BRISCOE CATARINA SOUTH 4H | 4212733769 |
| BRISCOE CATARINA SOUTH 50H | 4212735694 |
| BRISCOE CATARINA SOUTH 51H | 4212735695 |
| BRISCOE CATARINA SOUTH 52H | 4212735696 |
| BRISCOE CATARINA SOUTH 53H | 4212735698 |
| BRISCOE CATARINA SOUTH 54H | 4212735700 |
| BRISCOE CATARINA SOUTH 55H | 4212735699 |
| BRISCOE CATARINA SOUTH 56H | 4212735701 |
| BRISCOE CATARINA SOUTH 57H | 4212735706 |
| BRISCOE CATARINA SOUTH 58H | 4212735707 |
| BRISCOE CATARINA SOUTH 59H | 4212735708 |
| BRISCOE CATARINA SOUTH 5H | 4212733770 |
| BRISCOE CATARINA SOUTH 60H | 4212735709 |
| BRISCOE CATARINA SOUTH 61H | 4212736439 |
| BRISCOE CATARINA SOUTH 62H | 4212736440 |
| BRISCOE CATARINA SOUTH 63H | 4212736441 |
| BRISCOE CATARINA SOUTH 64H | 4212736442 |
| BRISCOE CATARINA SOUTH 65H | 4212736443 |
| BRISCOE CATARINA SOUTH 66H | 4212736444 |
| BRISCOE CATARINA SOUTH 67H | 4212736417 |
| BRISCOE CATARINA SOUTH 68H | 4212736418 |
| BRISCOE CATARINA SOUTH 69H | 4212736419 |
| BRISCOE CATARINA SOUTH 6H | 4212733771 |
| BRISCOE CATARINA SOUTH 70H | 4212736420 |
| BRISCOE CATARINA SOUTH 71H | 4212736421 |
| BRISCOE CATARINA SOUTH 72H | 4212736410 |
| BRISCOE CATARINA SOUTH 73H | 4212736411 |
| BRISCOE CATARINA SOUTH 74H | 4212736412 |
| BRISCOE CATARINA SOUTH 75H | 4212736413 |
| BRISCOE CATARINA SOUTH 76H | 4212736414 |
| BRISCOE CATARINA SOUTH 77H | 4212736393 |
| BRISCOE CATARINA SOUTH 78H | 4212736394 |
| BRISCOE CATARINA SOUTH 79H | 4212736395 |
| BRISCOE CATARINA SOUTH 7H | 4212733952 |
| BRISCOE CATARINA SOUTH 80H | 4212736396 |
| BRISCOE CATARINA SOUTH 81H | 4212736397 |
| BRISCOE CATARINA SOUTH 82H | 4212736426 |
| BRISCOE CATARINA SOUTH 83H | 4212736427 |
| BRISCOE CATARINA SOUTH 8H | 4212733951 |
| BRISCOE CATARINA SOUTH 9H | 4212733953 |
| BRISCOE CATARINA WEST 10H | 4212733682 |
| BRISCOE CATARINA WEST 116H | 4212736645 |
| BRISCOE CATARINA WEST 117H | 4212736646 |
| BRISCOE CATARINA WEST 118H | 4212736647 |
| BRISCOE CATARINA WEST 119H | 4212736648 |
| BRISCOE CATARINA WEST 120H | 4212736649 |
| BRISCOE CATARINA WEST 121H | 4212736654 |
| BRISCOE CATARINA WEST 125H | 4212736651 |
| BRISCOE CATARINA WEST 126H | 4212736652 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 127H | 4212736653 |
| BRISCOE CATARINA WEST 128H | 4212736655 |
| BRISCOE CATARINA WEST 129H | 4212736656 |
| BRISCOE CATARINA WEST 12H | 4212733753 |
| BRISCOE CATARINA WEST 130H | 4212736657 |
| BRISCOE CATARINA WEST 131H | 4212736658 |
| BRISCOE CATARINA WEST 132H | 4212736659 |
| BRISCOE CATARINA WEST 13H | 4212733762 |
| BRISCOE CATARINA WEST 14H | 4212733763 |
| BRISCOE CATARINA WEST 15H | 4212733777 |
| BRISCOE CATARINA WEST 16H | 4212733778 |
| BRISCOE CATARINA WEST 17H | 4212733779 |
| BRISCOE CATARINA WEST 18H | 4212734166 |
| BRISCOE CATARINA WEST 19H | 4212734167 |
| BRISCOE CATARINA WEST 1H (EAGLEF | 4212733421 |
| BRISCOE CATARINA WEST 20H | 4212734169 |
| BRISCOE CATARINA WEST 21H | 4212734170 |
| BRISCOE CATARINA WEST 22H | 4212734171 |
| BRISCOE CATARINA WEST 23H | 4212734172 |
| BRISCOE CATARINA WEST 24H | 4212734335 |
| BRISCOE CATARINA WEST 25H | 4212734336 |
| BRISCOE CATARINA WEST 26H | 4212734337 |
| BRISCOE CATARINA WEST 27H | 4212734338 |
| BRISCOE CATARINA WEST 28H | 4212734340 |
| BRISCOE CATARINA WEST 29H | 4212734339 |
| BRISCOE CATARINA WEST 2H | 4212733615 |
| BRISCOE CATARINA WEST 30H | 4212734682 |
| BRISCOE CATARINA WEST 31H | 4212734684 |
| BRISCOE CATARINA WEST 32H | 4212734685 |
| BRISCOE CATARINA WEST 33H | 4212734686 |
| BRISCOE CATARINA WEST 34H | 4212734687 |
| BRISCOE CATARINA WEST 35H | 4212734689 |
| BRISCOE CATARINA WEST 36H | 4212734690 |
| BRISCOE CATARINA WEST 37H | 4212734693 |
| BRISCOE CATARINA WEST 38H | 4212734694 |
| BRISCOE CATARINA WEST 39H | 4212734695 |
| BRISCOE CATARINA WEST 40H | 4212734696 |
| BRISCOE CATARINA WEST 41H | 4212734697 |
| BRISCOE CATARINA WEST 42H | 4212734717 |
| BRISCOE CATARINA WEST 43H | 4212734720 |
| BRISCOE CATARINA WEST 44H | 4212734718 |
| BRISCOE CATARINA WEST 45H | 4212734719 |
| BRISCOE CATARINA WEST 46H | 4212734722 |
| BRISCOE CATARINA WEST 47H | 4212734725 |
| BRISCOE CATARINA WEST 48H | 4212734726 |
| BRISCOE CATARINA WEST 49H | 4212734727 |
| BRISCOE CATARINA WEST 4H | 4212733629 |
| BRISCOE CATARINA WEST 50H | 4212734728 |
| BRISCOE CATARINA WEST 51H | 4212735780 |
| BRISCOE CATARINA WEST 52H | 4212735781 |
| BRISCOE CATARINA WEST 53H | 4212735782 |
| BRISCOE CATARINA WEST 54H | 4212735783 |
| BRISCOE CATARINA WEST 55H | 4212735784 |
| BRISCOE CATARINA WEST 56H | 4212735785 |
| BRISCOE CATARINA WEST 57H | 4212735786 |
| BRISCOE CATARINA WEST 58H | 4212735787 |
| BRISCOE CATARINA WEST 59H | 4212735788 |
| BRISCOE CATARINA WEST 5H | 4212733637 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 60H | 4212735789 |
| BRISCOE CATARINA WEST 61H | 4212735790 |
| BRISCOE CATARINA WEST 62H | 4212735793 |
| BRISCOE CATARINA WEST 63H | 4212735794 |
| BRISCOE CATARINA WEST 64H | 4212735795 |
| BRISCOE CATARINA WEST 65H | 4212735796 |
| BRISCOE CATARINA WEST 66H | 4212735825 |
| BRISCOE CATARINA WEST 67H | 4212735834 |
| BRISCOE CATARINA WEST 68H | 4212735836 |
| BRISCOE CATARINA WEST 69H | 4212735835 |
| BRISCOE CATARINA WEST 6H | 4212733648 |
| BRISCOE CATARINA WEST 70H | 4212735837 |
| BRISCOE CATARINA WEST 71H | 4212735859 |
| BRISCOE CATARINA WEST 72H | 4212735860 |
| BRISCOE CATARINA WEST 73H | 4212735861 |
| BRISCOE CATARINA WEST 74H | 4212735862 |
| BRISCOE CATARINA WEST 75H | 4212735882 |
| BRISCOE CATARINA WEST 76H | 4212735883 |
| BRISCOE CATARINA WEST 77H | 4212735885 |
| BRISCOE CATARINA WEST 78H | 4212735886 |
| BRISCOE CATARINA WEST 79H | 4212735888 |
| BRISCOE CATARINA WEST 7H | 4212733643 |
| BRISCOE CATARINA WEST 80H | 4212735889 |
| BRISCOE CATARINA WEST 81H | 4212735890 |
| BRISCOE CATARINA WEST 82H | 4212735891 |
| BRISCOE CATARINA WEST 8H | 4212733685 |
| BRISCOE CATARINA WEST 90H | 4212736881 |
| BRISCOE CATARINA WEST 93H | 4212736884 |
| BRISCOE CATARINA WEST 96H | 4212736887 |
| BRISCOE CATARINA WEST 9H | 4212733801 |
| BRISCOE CHIP EAST RANCH 10H | 4212734152 |
| BRISCOE CHIP EAST RANCH 11H | 4212734478 |
| BRISCOE CHIP EAST RANCH 12H | 4212734479 |
| BRISCOE CHIP EAST RANCH 13H | 4212734480 |
| BRISCOE CHIP EAST RANCH 14H | 4212734153 |
| BRISCOE CHIP EAST RANCH 15H | 4212734481 |
| BRISCOE CHIP EAST RANCH 16H | 4212734482 |
| BRISCOE CHIP EAST RANCH 17H | 4212734483 |
| BRISCOE CHIP EAST RANCH 18H | 4212734507 |
| BRISCOE CHIP EAST RANCH 19H | 4212734508 |
| BRISCOE CHIP EAST RANCH 1H | 4212733768 |
| BRISCOE CHIP EAST RANCH 20H | 4212734509 |
| BRISCOE CHIP EAST RANCH 21H | 4212734510 |
| BRISCOE CHIP EAST RANCH 22H | 4212734511 |
| BRISCOE CHIP EAST RANCH 23H | 4212734512 |
| BRISCOE CHIP EAST RANCH 24H | 4212734522 |
| BRISCOE CHIP EAST RANCH 25H | 4212734523 |
| BRISCOE CHIP EAST RANCH 26H | 4212734524 |
| BRISCOE CHIP EAST RANCH 27H | 4212736184 |
| BRISCOE CHIP EAST RANCH 28HR | 4212736283 |
| BRISCOE CHIP EAST RANCH 29H | 4212736186 |
| BRISCOE CHIP EAST RANCH 2H | 4212733772 |
| BRISCOE CHIP EAST RANCH 30H | 4212736188 |
| BRISCOE CHIP EAST RANCH 31H | 4212736206 |
| BRISCOE CHIP EAST RANCH 32H | 4212736207 |
| BRISCOE CHIP EAST RANCH 33H | 4212736236 |
| BRISCOE CHIP EAST RANCH 34H | 4212736237 |
| BRISCOE CHIP EAST RANCH 3H | 4212733773 |

## Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CHIP EAST RANCH 4H | 4212733852 |
| BRISCOE CHIP EAST RANCH 5H | 4212733853 |
| BRISCOE CHIP EAST RANCH 6H | 4212733854 |
| BRISCOE CHIP EAST RANCH 7H | 4212734095 |
| BRISCOE CHIP EAST RANCH 8H | 4212734096 |
| BRISCOE CHIP EAST RANCH 9H | 4212734151 |
| BRISCOE CHIP EAST UNIT B 1H | 4212736168 |
| BRISCOE CHIP EAST UNIT B 2H | 4212736169 |
| BRISCOE CHIP EAST UNIT B 3H | 4212736170 |
| BRISCOE CHIP EAST UNIT B 4H | 4212736171 |
| BRISCOE CHIP EAST UNIT B 5H | 4212736172 |
| BRISCOE CHIP EAST UNIT B 6H | 4212736173 |
| BRISCOE CHIP EAST UNIT E 1H | 4212737052 |
| BRISCOE CHIP EAST UNIT E 2H | 4212737053 |
| BRISCOE CHIP EAST UNIT E 3H | 4212737054 |
| BRISCOE CHUPADERA RANCH 1 | 4247939786 |
| BRISCOE CHUPADERA RANCH 10H | 4247941266 |
| BRISCOE CHUPADERA RANCH 11H | 4247941267 |
| BRISCOE CHUPADERA RANCH 12H | 4247941985 |
| BRISCOE CHUPADERA RANCH 13H | 4247941986 |
| BRISCOE CHUPADERA RANCH 14H | 4247941987 |
| BRISCOE CHUPADERA RANCH 15H | 4247941988 |
| BRISCOE CHUPADERA RANCH 16H | 4247941989 |
| BRISCOE CHUPADERA RANCH 17H | 4247941990 |
| BRISCOE CHUPADERA RANCH 18H | 4247941994 |
| BRISCOE CHUPADERA RANCH 19H | 4247941998 |
| BRISCOE CHUPADERA RANCH 20H | 4247942001 |
| BRISCOE CHUPADERA RANCH 21H | 4247942000 |
| BRISCOE CHUPADERA RANCH 22H | 4247942002 |
| BRISCOE CHUPADERA RANCH 23H | 4247942003 |
| BRISCOE CHUPADERA RANCH 24H | 4247942686 |
| BRISCOE CHUPADERA RANCH 25H | 4247942687 |
| BRISCOE CHUPADERA RANCH 26H | 4247942589 |
| BRISCOE CHUPADERA RANCH 27H | 4247942691 |
| BRISCOE CHUPADERA RANCH 28H | 4247942692 |
| BRISCOE CHUPADERA RANCH 29H | 4247942693 |
| BRISCOE CHUPADERA RANCH 2H | 4247941322 |
| BRISCOE CHUPADERA RANCH 30H | 4247942694 |
| BRISCOE CHUPADERA RANCH 31HR | 4247943008 |
| BRISCOE CHUPADERA RANCH 32H | 4247942696 |
| BRISCOE CHUPADERA RANCH 33H | 4247942697 |
| BRISCOE CHUPADERA RANCH 34H | 4247942700 |
| BRISCOE CHUPADERA RANCH 35H | 4247942701 |
| BRISCOE CHUPADERA RANCH 36H | 4247942702 |
| BRISCOE CHUPADERA RANCH 37H | 4247942703 |
| BRISCOE CHUPADERA RANCH 38H | 4247942704 |
| BRISCOE CHUPADERA RANCH 39H | 4247942705 |
| BRISCOE CHUPADERA RANCH 3H | 4247941212 |
| BRISCOE CHUPADERA RANCH 40H | 4247942706 |
| BRISCOE CHUPADERA RANCH 41H | 4247942707 |
| BRISCOE CHUPADERA RANCH 42H | 4247942708 |
| BRISCOE CHUPADERA RANCH 43H | 4247942711 |
| BRISCOE CHUPADERA RANCH 4H | 4247941211 |
| BRISCOE CHUPADERA RANCH 5H | 4247941219 |
| BRISCOE CHUPADERA RANCH 6H | 4247941220 |
| BRISCOE CHUPADERA RANCH 7H | 4247941226 |
| BRISCOE CHUPADERA RANCH 8H | 4247941255 |
| BRISCOE CHUPADERA RANCH 9H | 4247941256 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 100H | 4228334450 |
| BRISCOE COCHINA EAST RANCH 101H | 4228334453 |
| BRISCOE COCHINA EAST RANCH 102H | 4228334469 |
| BRISCOE COCHINA EAST RANCH 103H | 4212736101 |
| BRISCOE COCHINA EAST RANCH 104H | 4212736102 |
| BRISCOE COCHINA EAST RANCH 105H | 4212736117 |
| BRISCOE COCHINA EAST RANCH 106H | 4212736105 |
| BRISCOE COCHINA EAST RANCH 107H | 4212736106 |
| BRISCOE COCHINA EAST RANCH 108H | 4212736108 |
| BRISCOE COCHINA EAST RANCH 109H | 4212736109 |
| BRISCOE COCHINA EAST RANCH 10H | 4212733678 |
| BRISCOE COCHINA EAST RANCH 110H | 4212736110 |
| BRISCOE COCHINA EAST RANCH 111H | 4212736112 |
| BRISCOE COCHINA EAST RANCH 112H | 4212736115 |
| BRISCOE COCHINA EAST RANCH 113H | 4212736116 |
| BRISCOE COCHINA EAST RANCH 114H | 4212736086 |
| BRISCOE COCHINA EAST RANCH 115H | 4212736087 |
| BRISCOE COCHINA EAST RANCH 116H | 4212736088 |
| BRISCOE COCHINA EAST RANCH 117H | 4212736090 |
| BRISCOE COCHINA EAST RANCH 118H | 4212736092 |
| BRISCOE COCHINA EAST RANCH 119H | 4212736093 |
| BRISCOE COCHINA EAST RANCH 11H | 4212733837 |
| BRISCOE COCHINA EAST RANCH 120H | 4212736094 |
| BRISCOE COCHINA EAST RANCH 121H | 4212736095 |
| BRISCOE COCHINA EAST RANCH 122H | 4212736097 |
| BRISCOE COCHINA EAST RANCH 123H | 4212736098 |
| BRISCOE COCHINA EAST RANCH 124H | 4212736099 |
| BRISCOE COCHINA EAST RANCH 125H | 4212736100 |
| BRISCOE COCHINA EAST RANCH 126H | 4212736103 |
| BRISCOE COCHINA EAST RANCH 127H | 4228334853 |
| BRISCOE COCHINA EAST RANCH 128H | 4228334854 |
| BRISCOE COCHINA EAST RANCH 129H | 4228334855 |
| BRISCOE COCHINA EAST RANCH 12H | 4212733838 |
| BRISCOE COCHINA EAST RANCH 130H | 4228334856 |
| BRISCOE COCHINA EAST RANCH 131H | 4228334857 |
| BRISCOE COCHINA EAST RANCH 132H | 4228334858 |
| BRISCOE COCHINA EAST RANCH 13H | 4212733839 |
| BRISCOE COCHINA EAST RANCH 163H | 4212736709 |
| BRISCOE COCHINA EAST RANCH 164H | 4212736708 |
| BRISCOE COCHINA EAST RANCH 165H | 4212736710 |
| BRISCOE COCHINA EAST RANCH 16H | 4212733914 |
| BRISCOE COCHINA EAST RANCH 17H | 4212733916 |
| BRISCOE COCHINA EAST RANCH 188H | 4228335665 |
| BRISCOE COCHINA EAST RANCH 189H | 4228335666 |
| BRISCOE COCHINA EAST RANCH 18H | 4212733968 |
| BRISCOE COCHINA EAST RANCH 190H | 4228335667 |
| BRISCOE COCHINA EAST RANCH 19H | 4212733990 |
| BRISCOE COCHINA EAST RANCH 1H | 4212733620 |
| BRISCOE COCHINA EAST RANCH 20H | 4212733994 |
| BRISCOE COCHINA EAST RANCH 21H | 4212733991 |
| BRISCOE COCHINA EAST RANCH 22H | 4212735204 |
| BRISCOE COCHINA EAST RANCH 23H | 4212735203 |
| BRISCOE COCHINA EAST RANCH 24H | 4212735081 |
| BRISCOE COCHINA EAST RANCH 25H | 4212735072 |
| BRISCOE COCHINA EAST RANCH 26H | 4212735086 |
| BRISCOE COCHINA EAST RANCH 27H | 4212735087 |
| BRISCOE COCHINA EAST RANCH 28H | 4212735205 |
| BRISCOE COCHINA EAST RANCH 29H | 4212735206 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 2H | 4212733621 |
| BRISCOE COCHINA EAST RANCH 30H | 4212735207 |
| BRISCOE COCHINA EAST RANCH 31H | 4212734098 |
| BRISCOE COCHINA EAST RANCH 32H | 4212734107 |
| BRISCOE COCHINA EAST RANCH 33H | 4212735208 |
| BRISCOE COCHINA EAST RANCH 34H | 4212735223 |
| BRISCOE COCHINA EAST RANCH 35H | 4212735210 |
| BRISCOE COCHINA EAST RANCH 36H | 4212735211 |
| BRISCOE COCHINA EAST RANCH 37H | 4212735213 |
| BRISCOE COCHINA EAST RANCH 38H | 4212735228 |
| BRISCOE COCHINA EAST RANCH 39H | 4212735229 |
| BRISCOE COCHINA EAST RANCH 3H | 4212733667 |
| BRISCOE COCHINA EAST RANCH 40H | 4228334138 |
| BRISCOE COCHINA EAST RANCH 41H | 4228334147 |
| BRISCOE COCHINA EAST RANCH 42H | 4228334154 |
| BRISCOE COCHINA EAST RANCH 43H | 4228334156 |
| BRISCOE COCHINA EAST RANCH 44H | 4228334157 |
| BRISCOE COCHINA EAST RANCH 45H | 4228334158 |
| BRISCOE COCHINA EAST RANCH 46H | 4228334163 |
| BRISCOE COCHINA EAST RANCH 47H | 4228334164 |
| BRISCOE COCHINA EAST RANCH 48H | 4228334165 |
| BRISCOE COCHINA EAST RANCH 49H | 4228334166 |
| BRISCOE COCHINA EAST RANCH 4H | 4212733668 |
| BRISCOE COCHINA EAST RANCH 50H | 4228334167 |
| BRISCOE COCHINA EAST RANCH 51H | 4228334168 |
| BRISCOE COCHINA EAST RANCH 52H | 4228334173 |
| BRISCOE COCHINA EAST RANCH 53H | 4228334174 |
| BRISCOE COCHINA EAST RANCH 54H | 4228334175 |
| BRISCOE COCHINA EAST RANCH 55H | 4228334176 |
| BRISCOE COCHINA EAST RANCH 56H | 4228334177 |
| BRISCOE COCHINA EAST RANCH 57H | 4228334225 |
| BRISCOE COCHINA EAST RANCH 58H | 4228334226 |
| BRISCOE COCHINA EAST RANCH 59H | 4228334227 |
| BRISCOE COCHINA EAST RANCH 5H | 4212733669 |
| BRISCOE COCHINA EAST RANCH 60H | 4228334228 |
| BRISCOE COCHINA EAST RANCH 61H | 4212734486 |
| BRISCOE COCHINA EAST RANCH 62H | 4212734487 |
| BRISCOE COCHINA EAST RANCH 63H | 4212734488 |
| BRISCOE COCHINA EAST RANCH 64H | 4212734489 |
| BRISCOE COCHINA EAST RANCH 65H | 4212734492 |
| BRISCOE COCHINA EAST RANCH 66H | 4212734494 |
| BRISCOE COCHINA EAST RANCH 67H | 4228333013 |
| BRISCOE COCHINA EAST RANCH 68H | 4228333015 |
| BRISCOE COCHINA EAST RANCH 69H | 4228333016 |
| BRISCOE COCHINA EAST RANCH 6H | 4212733670 |
| BRISCOE COCHINA EAST RANCH 70H | 4228333017 |
| BRISCOE COCHINA EAST RANCH 71H | 4228333018 |
| BRISCOE COCHINA EAST RANCH 72H | 4228333019 |
| BRISCOE COCHINA EAST RANCH 73H | 4228334307 |
| BRISCOE COCHINA EAST RANCH 74H | 4228334308 |
| BRISCOE COCHINA EAST RANCH 75H | 4228334309 |
| BRISCOE COCHINA EAST RANCH 76H | 4228334310 |
| BRISCOE COCHINA EAST RANCH 77H | 4228334312 |
| BRISCOE COCHINA EAST RANCH 78H | 4228334313 |
| BRISCOE COCHINA EAST RANCH 79H | 4228334362 |
| BRISCOE COCHINA EAST RANCH 7H | 4212733662 |
| BRISCOE COCHINA EAST RANCH 80H | 4228334363 |
| BRISCOE COCHINA EAST RANCH 81H | 4228334364 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 82H | 4228334365 |
| BRISCOE COCHINA EAST RANCH 83H | 4228334392 |
| BRISCOE COCHINA EAST RANCH 84H | 4228334393 |
| BRISCOE COCHINA EAST RANCH 85H | 4228334394 |
| BRISCOE COCHINA EAST RANCH 86H | 4228334395 |
| BRISCOE COCHINA EAST RANCH 87H | 4228334396 |
| BRISCOE COCHINA EAST RANCH 88H | 4228334399 |
| BRISCOE COCHINA EAST RANCH 89H | 4228334400 |
| BRISCOE COCHINA EAST RANCH 8H | 4212733671 |
| BRISCOE COCHINA EAST RANCH 90H | 4228334401 |
| BRISCOE COCHINA EAST RANCH 91H | 4228334402 |
| BRISCOE COCHINA EAST RANCH 92H | 4228334403 |
| BRISCOE COCHINA EAST RANCH 93H | 4228334404 |
| BRISCOE COCHINA EAST RANCH 94H | 4228334406 |
| BRISCOE COCHINA EAST RANCH 95H | 4228334407 |
| BRISCOE COCHINA EAST RANCH 96H | 4228334408 |
| BRISCOE COCHINA EAST RANCH 97H | 4228334409 |
| BRISCOE COCHINA EAST RANCH 98H | 4228334410 |
| BRISCOE COCHINA EAST RANCH 99H | 4228334451 |
| BRISCOE COCHINA EAST RANCH 9H | 4212733672 |
| BRISCOE COCHINA STATE UNIT A-1H | 4228332330 |
| BRISCOE COCHINA STATE UNIT B-1H | 4228332331 |
| BRISCOE COCHINA WEST RANCH 101H | 4212736914 |
| BRISCOE COCHINA WEST RANCH 102H | 4212736916 |
| BRISCOE COCHINA WEST RANCH 103H | 4212736917 |
| BRISCOE COCHINA WEST RANCH 104H | 4212736915 |
| BRISCOE COCHINA WEST RANCH 105H | 4212736918 |
| BRISCOE COCHINA WEST RANCH 11H | 4212733759 |
| BRISCOE COCHINA WEST RANCH 12H | 4212733859 |
| BRISCOE COCHINA WEST RANCH 16H | 4212734116 |
| BRISCOE COCHINA WEST RANCH 17H | 4212734118 |
| BRISCOE COCHINA WEST RANCH 18H | 4212734117 |
| BRISCOE COCHINA WEST RANCH 19H | 4212734831 |
| BRISCOE COCHINA WEST RANCH 1B | 4212735773 |
| BRISCOE COCHINA WEST RANCH 1E | 4212735779 |
| BRISCOE COCHINA WEST RANCH 1H | 4212733658 |
| BRISCOE COCHINA WEST RANCH 20H | 4212734833 |
| BRISCOE COCHINA WEST RANCH 21H | 4212734832 |
| BRISCOE COCHINA WEST RANCH 22H | 4212734445 |
| BRISCOE COCHINA WEST RANCH 23H | 4212734447 |
| BRISCOE COCHINA WEST RANCH 24H | 4212734449 |
| BRISCOE COCHINA WEST RANCH 25H | 4212734450 |
| BRISCOE COCHINA WEST RANCH 26H | 4212734451 |
| BRISCOE COCHINA WEST RANCH 27H | 4212734452 |
| BRISCOE COCHINA WEST RANCH 28H | 4212734834 |
| BRISCOE COCHINA WEST RANCH 29H | 4212734836 |
| BRISCOE COCHINA WEST RANCH 2H | 4212733696 |
| BRISCOE COCHINA WEST RANCH 30H | 4212734837 |
| BRISCOE COCHINA WEST RANCH 39H | 4212734472 |
| BRISCOE COCHINA WEST RANCH 3H | 4212733699 |
| BRISCOE COCHINA WEST RANCH 40H | 4212734473 |
| BRISCOE COCHINA WEST RANCH 41H | 4212734474 |
| BRISCOE COCHINA WEST RANCH 42H | 4212734475 |
| BRISCOE COCHINA WEST RANCH 43H | 4212734476 |
| BRISCOE COCHINA WEST RANCH 44H | 4212734477 |
| BRISCOE COCHINA WEST RANCH 47H | 4212735548 |
| BRISCOE COCHINA WEST RANCH 48H | 4212735549 |
| BRISCOE COCHINA WEST RANCH 49H | 4212735550 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA WEST RANCH 4H | 4212733700 |
| BRISCOE COCHINA WEST RANCH 50H | 4212735551 |
| BRISCOE COCHINA WEST RANCH 51H | 4212735552 |
| BRISCOE COCHINA WEST RANCH 52H | 4212735624 |
| BRISCOE COCHINA WEST RANCH 53H | 4212735626 |
| BRISCOE COCHINA WEST RANCH 54H | 4212735627 |
| BRISCOE COCHINA WEST RANCH 55H | 4212735628 |
| BRISCOE COCHINA WEST RANCH 56H | 4212735630 |
| BRISCOE COCHINA WEST RANCH 57H | 4212735629 |
| BRISCOE COCHINA WEST RANCH 58H | 4212735631 |
| BRISCOE COCHINA WEST RANCH 59H | 4212735632 |
| BRISCOE COCHINA WEST RANCH 5H | 4212733903 |
| BRISCOE COCHINA WEST RANCH 60H | 4212735633 |
| BRISCOE COCHINA WEST RANCH 61H | 4212735634 |
| BRISCOE COCHINA WEST RANCH 62H | 4212735636 |
| BRISCOE COCHINA WEST RANCH 63H | 4212735635 |
| BRISCOE COCHINA WEST RANCH 64H | 4212735640 |
| BRISCOE COCHINA WEST RANCH 65H | 4212735642 |
| BRISCOE COCHINA WEST RANCH 66H | 4212735643 |
| BRISCOE COCHINA WEST RANCH 67H | 4212735644 |
| BRISCOE COCHINA WEST RANCH 68H | 4212736138 |
| BRISCOE COCHINA WEST RANCH 69H | 4212736139 |
| BRISCOE COCHINA WEST RANCH 6H | 4212733904 |
| BRISCOE COCHINA WEST RANCH 70H | 4212736148 |
| BRISCOE COCHINA WEST RANCH 71H | 4212736140 |
| BRISCOE COCHINA WEST RANCH 72H | 4212736141 |
| BRISCOE COCHINA WEST RANCH 73H | 4212736142 |
| BRISCOE COCHINA WEST RANCH 74H | 4212736143 |
| BRISCOE COCHINA WEST RANCH 75H | 4212736144 |
| BRISCOE COCHINA WEST RANCH 76H | 4212736145 |
| BRISCOE COCHINA WEST RANCH 77H | 4212736146 |
| BRISCOE COCHINA WEST RANCH 7H | 4212733905 |
| BRISCOE COCHINA WEST RANCH 88H | 4212736263 |
| BRISCOE COCHINA WEST RANCH 89H | 4212736264 |
| BRISCOE COCHINA WEST RANCH 90H | 4212736265 |
| BRISCOE COCHINA WEST RANCH 91H | 4212736266 |
| BRISCOE COCHINA WEST RANCH 92H | 4212736267 |
| BRISCOE COCHINA WEST RANCH 93H | 4212736268 |
| BRISCOE COCHINA WEST RANCH 94H | 4212736269 |
| BRISCOE COCHINA WEST RANCH 95H | 4212736270 |
| BRISCOE EAST DELGADO UNIT A 10H | 4212735752 |
| BRISCOE EAST DELGADO UNIT A 11H | 4212735753 |
| BRISCOE EAST DELGADO UNIT A 12H | 4212735754 |
| BRISCOE EAST DELGADO UNIT A 13H | 4212735755 |
| BRISCOE EAST DELGADO UNIT A 14H | 4212735756 |
| BRISCOE EAST DELGADO UNIT A 15H | 4212735757 |
| BRISCOE EAST DELGADO UNIT A 1H | 4212735716 |
| BRISCOE EAST DELGADO UNIT A 2H | 4212735717 |
| BRISCOE EAST DELGADO UNIT A 3H | 4212735718 |
| BRISCOE EAST DELGADO UNIT A 4H | 4212735719 |
| BRISCOE EAST DELGADO UNIT A 5H | 4212735720 |
| BRISCOE EAST DELGADO UNIT A 6H | 4212735724 |
| BRISCOE EAST DELGADO UNIT A 7H | 4212735725 |
| BRISCOE EAST DELGADO UNIT A 8H | 4212735726 |
| BRISCOE EAST DELGADO UNIT A 9H | 4212735727 |
| BRISCOE ECKHARDT-SWONKE UNIT 1H | 4212735241 |
| BRISCOE ECKHARDT-SWONKE UNIT 2H | 4212735243 |
| BRISCOE ECKHARDT-SWONKE UNIT 3H | 4212735244 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE ECKHARDT-SWONKE UNIT 4H | 4212735245 |
| BRISCOE ECKHARDT-SWONKE UNIT 5H | 4212735246 |
| BRISCOE ECKHARDT-SWONKE UNIT 6H | 4212735249 |
| BRISCOE ECKHARDT-SWONKE UNIT 7H | 4212735250 |
| BRISCOE FRIDAY RANCH 18H | 4212734158 |
| BRISCOE FRIDAY RANCH 19H | 4212734193 |
| BRISCOE FRIDAY RANCH 1H | 4212733689 |
| BRISCOE FRIDAY RANCH 20H | 4212734194 |
| BRISCOE FRIDAY RANCH 21H | 4212734195 |
| BRISCOE FRIDAY RANCH 22H | 4212734196 |
| BRISCOE FRIDAY RANCH 23H | 4212735385 |
| BRISCOE FRIDAY RANCH 24H | 4212735389 |
| BRISCOE FRIDAY RANCH 25H | 4212734807 |
| BRISCOE FRIDAY RANCH 26H | 4212734810 |
| BRISCOE FRIDAY RANCH 27H | 4212734808 |
| BRISCOE FRIDAY RANCH 28H | 4212734812 |
| BRISCOE FRIDAY RANCH 29H | 4212734813 |
| BRISCOE FRIDAY RANCH 2H | 4212733708 |
| BRISCOE FRIDAY RANCH 30H | 4212734815 |
| BRISCOE FRIDAY RANCH 31H | 4212734817 |
| BRISCOE FRIDAY RANCH 32H | 4212734816 |
| BRISCOE FRIDAY RANCH 33H | 4212734818 |
| BRISCOE FRIDAY RANCH 34H | 4212734820 |
| BRISCOE FRIDAY RANCH 35H | 4212735387 |
| BRISCOE FRIDAY RANCH 36H | 4212735388 |
| BRISCOE FRIDAY RANCH 37H | 4212735392 |
| BRISCOE FRIDAY RANCH 38H | 4212735391 |
| BRISCOE FRIDAY RANCH 39H | 4212735393 |
| BRISCOE FRIDAY RANCH 3H | 4212733709 |
| BRISCOE FRIDAY RANCH 40H | 4212735394 |
| BRISCOE FRIDAY RANCH 41HR | 4212736456 |
| BRISCOE FRIDAY RANCH 42HR | 4212736457 |
| BRISCOE FRIDAY RANCH 43H | 4212736166 |
| BRISCOE FRIDAY RANCH 44H | 4212736167 |
| BRISCOE FRIDAY RANCH 45H | 4212736208 |
| BRISCOE FRIDAY RANCH 46HR | 4212736356 |
| BRISCOE FRIDAY RANCH 47H | 4212736218 |
| BRISCOE FRIDAY RANCH 4H | 4212733720 |
| BRISCOE FRIDAY RANCH 5H | 4212733721 |
| BRISCOE FRIDAY RANCH 6H | 4212733722 |
| BRISCOE FRIDAY RANCH 7H | 4212733755 |
| BRISCOE FRIDAY RANCH 8H | 4212733756 |
| BRISCOE FRIDAY RANCH 9H | 4212733757 |
| BRISCOE FRIDAY RANCH UNIT A 1H | 4212736196 |
| BRISCOE FRIDAY RANCH UNIT A 2H | 4212736197 |
| BRISCOE FRIDAY RANCH UNIT A 3H | 4212736198 |
| BRISCOE FRIDAY RANCH UNIT A 4H | 4212736199 |
| BRISCOE FRIDAY RANCH UNIT A 5H | 4212736200 |
| BRISCOE FRIDAY RANCH UNIT A 6H | 4212736201 |
| BRISCOE FRIDAY RANCH UNIT B 10H | 4212734273 |
| BRISCOE FRIDAY RANCH UNIT B 11H | 4212734275 |
| BRISCOE FRIDAY RANCH UNIT B 12H | 4212734274 |
| BRISCOE FRIDAY RANCH UNIT B 13H | 4212734276 |
| BRISCOE FRIDAY RANCH UNIT B 14H | 4212734309 |
| BRISCOE FRIDAY RANCH UNIT B 15H | 4212734310 |
| BRISCOE FRIDAY RANCH UNIT B 16H | 4212734311 |
| BRISCOE FRIDAY RANCH UNIT B 17H | 4212734313 |
| BRISCOE FRIDAY RANCH UNIT C 10H | 4212736898 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE FRIDAY RANCH UNIT C 11H | 4212736899 |
| BRISCOE FRIDAY RANCH UNIT C 1H | 4212736901 |
| BRISCOE FRIDAY RANCH UNIT C 2H | 4212736902 |
| BRISCOE FRIDAY RANCH UNIT C 3H | 4212736903 |
| BRISCOE FRIDAY RANCH UNIT C 4H | 4212736904 |
| BRISCOE FRIDAY RANCH UNIT C 5H | 4212736905 |
| BRISCOE FRIDAY RANCH UNIT C 6H | 4212736906 |
| BRISCOE FRIDAY RANCH UNIT C 7H | 4212736895 |
| BRISCOE FRIDAY RANCH UNIT C 8H | 4212736896 |
| BRISCOE FRIDAY RANCH UNIT C 9H | 4212736897 |
| BRISCOE FRIDAY SMITH 1H | 4212733984 |
| BRISCOE FRIDAY SMITH 2H | 4212733985 |
| BRISCOE FRIDAY SMITH 3H | 4212733986 |
| BRISCOE METCALF UNIT 1H | 4212737136 |
| BRISCOE METCALF UNIT 2H | 4212737138 |
| BRISCOE METCALF UNIT 3H | 4212737137 |
| BRISCOE METCALF UNIT 4H | 4212737139 |
| BRISCOE METCALF UNIT 5H | 4212737140 |
| BRISCOE METCALF UNIT 6H | 4212737141 |
| BRISCOE SPRINGMAN UNIT A 1H | 4212735278 |
| BRISCOE SPRINGMAN UNIT A 2H | 4212735279 |
| BRISCOE SPRINGMAN UNIT A 3H | 4212735280 |
| BRISCOE SPRINGMAN UNIT A 4H | 4212735281 |
| BRISCOE SPRINGMAN UNIT A 5H | 4212735283 |
| BRISCOE SPRINGMAN UNIT A 6H | 4212735282 |
| BRISCOE SPRINGMAN UNIT A 7H | 4212735284 |
| BRISCOE SPRINGMAN UNIT B 1H | 4212735285 |
| BRISCOE SPRINGMAN UNIT B 2H | 4212735286 |
| BRISCOE SPRINGMAN UNIT B 3H | 4212735287 |
| BRISCOE SPRINGMAN UNIT B 4H | 4212735288 |
| BRISCOE SPRINGMAN UNIT B 5H | 4212735289 |
| BRISCOE SPRINGMAN UNIT B 6H | 4212735290 |
| BRISCOE THON UNIT 1H | 4212735405 |
| BRISCOE THON UNIT 2H | 4212735407 |
| BRISCOE THON UNIT 3H | 4212735408 |
| BRISCOE THON UNIT 4H | 4212735406 |
| BRISCOE THON UNIT 5H | 4212735409 |
| CAGE 1TV | 4232333297 |
| CAGE 2TV | 4232333332 |
| CAGE 3TV | 4232333336 |
| CAGE 4RB | 4232333355 |
| CAGE 5TV | 4232333376 |
| CAGE 6TV | 4232333377 |
| CAGE 7TV | 4232333383 |
| CAGE 8TV | 4232333384 |
| CAGE 9TV | 4232333412 |
| CHAPARRAL WILDLIFE STATE 10H | 4212734800 |
| CHAPARRAL WILDLIFE STATE 11H | 4212734802 |
| CHAPARRAL WILDLIFE STATE 12H | 4212734805 |
| CHAPARRAL WILDLIFE STATE 13H | 4212734803 |
| CHAPARRAL WILDLIFE STATE 19H | 4212736430 |
| CHAPARRAL WILDLIFE STATE 20H | 4212736431 |
| CHAPARRAL WILDLIFE STATE 21H | 4212736432 |
| CHAPARRAL WILDLIFE STATE 22H | 4212736433 |
| CHAPARRAL WILDLIFE STATE 23H | 4212736434 |
| CHAPARRAL WILDLIFE STATE 24H | 4212737047 |
| CHAPARRAL WILDLIFE STATE 25H | 4212737048 |
| CHAPARRAL WILDLIFE STATE 26H | 4212737050 |

Case 4:23-cv-03358 Document 1 Filed on 09/08/23 in TXSD Page 419 of 500

Existing Producing Wells

| WELL NAME | API |
|---|---|
| CHAPARRAL WILDLIFE STATE 27H | 4212737049 |
| CHAPARRAL WILDLIFE STATE 28H | 4212737051 |
| CHAPARRAL WILDLIFE STATE 4H | 4212734793 |
| CHAPARRAL WILDLIFE STATE 5H | 4212734794 |
| CHAPARRAL WILDLIFE STATE 6H | 4212734795 |
| CHAPARRAL WILDLIFE STATE 7H | 4212734796 |
| CHAPARRAL WILDLIFE STATE 8H | 4212734797 |
| CHAPARRAL WILDLIFE STATE 9H | 4212734798 |
| DENTONIO STATE 22 UNIT 10H | 4212735712 |
| DENTONIO STATE 22 UNIT 11H | 4212735714 |
| DENTONIO STATE 22 UNIT 12H | 4212735715 |
| DENTONIO STATE 22 UNIT 1H | 4212735679 |
| DENTONIO STATE 22 UNIT 2H | 4212735680 |
| DENTONIO STATE 22 UNIT 3H | 4212735681 |
| DENTONIO STATE 22 UNIT 4H | 4212735682 |
| DENTONIO STATE 22 UNIT 5H | 4212735686 |
| DENTONIO STATE 22 UNIT 6H | 4212735687 |
| DENTONIO STATE 22 UNIT 7H | 4212735688 |
| DENTONIO STATE 22 UNIT 8H | 4212735689 |
| DENTONIO STATE 22 UNIT 9H | 4212735711 |
| DENTONIO WHITE 23 UNIT 10H | 4212734923 |
| DENTONIO WHITE 23 UNIT 11H | 4212734924 |
| DENTONIO WHITE 23 UNIT 12H | 4212734931 |
| DENTONIO WHITE 23 UNIT 13H | 4212734927 |
| DENTONIO WHITE 23 UNIT 14H | 4212734926 |
| DENTONIO WHITE 23 UNIT 15H | 4212734928 |
| DENTONIO WHITE 23 UNIT 1H | 4212734549 |
| DENTONIO WHITE 23 UNIT 2H | 4212734550 |
| DENTONIO WHITE 23 UNIT 3H | 4212734551 |
| DENTONIO WHITE 23 UNIT 4H | 4212734552 |
| DENTONIO WHITE 23 UNIT 5H | 4212734553 |
| DENTONIO WHITE 23 UNIT 6H | 4212734554 |
| DENTONIO WHITE 23 UNIT 7H | 4212734938 |
| DENTONIO WHITE 23 UNIT 8H | 4212734940 |
| DENTONIO WHITE 23 UNIT 9H | 4212734941 |
| DIAMOND H RANCH 10H | 4212734751 |
| DIAMOND H RANCH 11H | 4212735057 |
| DIAMOND H RANCH 12H | 4212735201 |
| DIAMOND H RANCH 13H | 4212735403 |
| DIAMOND H RANCH 14H | 4212735646 |
| DIAMOND H RANCH 15H | 4212735647 |
| DIAMOND H RANCH 16H | 4212735648 |
| DIAMOND H RANCH 17H | 4212735649 |
| DIAMOND H RANCH 18H | 4212735651 |
| DIAMOND H RANCH 19H | 4212736475 |
| DIAMOND H RANCH 1H | 4212733561 |
| DIAMOND H RANCH 20H | 4212736482 |
| DIAMOND H RANCH 21H | 4212736483 |
| DIAMOND H RANCH 22H | 4212736474 |
| DIAMOND H RANCH 23H | 4212736484 |
| DIAMOND H RANCH 2H | 4212733693 |
| DIAMOND H RANCH 3H | 4212733819 |
| DIAMOND H RANCH 4H | 4212733892 |
| DIAMOND H RANCH 5H | 4212734314 |
| DIAMOND H RANCH 6H | 4212734150 |
| DIAMOND H RANCH 7H | 4212734408 |
| DIAMOND H RANCH 8H | 4212734410 |
| DIAMOND H RANCH 9H | 4212734610 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| DIAMOND H STATE 10H | 4212736436 |
| DIAMOND H STATE 11H | 4212736338 |
| DIAMOND H STATE 12H | 4212736339 |
| DIAMOND H STATE 13H | 4212736340 |
| DIAMOND H STATE 15H | 4212734896 |
| DIAMOND H STATE 16H | 4212735101 |
| DIAMOND H STATE 17H | 4212735192 |
| DIAMOND H STATE 18H | 4212735093 |
| DIAMOND H STATE 19H | 4212735655 |
| DIAMOND H STATE 1H | 4212733657 |
| DIAMOND H STATE 20H | 4212735652 |
| DIAMOND H STATE 21H | 4212735653 |
| DIAMOND H STATE 22H | 4212735654 |
| DIAMOND H STATE 2H | 4212733694 |
| DIAMOND H STATE 3H | 4212733786 |
| DIAMOND H STATE 4H | 4212733878 |
| DIAMOND H STATE 5H | 4212734312 |
| DIAMOND H STATE 6H | 4212734144 |
| DIAMOND H STATE 7H | 4212734395 |
| DIAMOND H STATE 8H | 4212734403 |
| DIAMOND H STATE 9H | 4212734603 |
| DIAMOND H STATE UNIT A 1H | 4212735396 |
| DIAMOND H STATE UNIT A 2H | 4212735398 |
| DIAMOND H STATE UNIT B 10H | 4212737092 |
| DIAMOND H STATE UNIT B 11H | 4212737094 |
| DIAMOND H STATE UNIT B 12H | 4212737093 |
| DIAMOND H STATE UNIT B 13H | 4212737095 |
| DIAMOND H STATE UNIT B 1H | 4212737075 |
| DIAMOND H STATE UNIT B 2H | 4212737076 |
| DIAMOND H STATE UNIT B 3H | 4212737080 |
| DIAMOND H STATE UNIT B 4H | 4212737077 |
| DIAMOND H STATE UNIT B 5H | 4212737081 |
| DIAMOND H STATE UNIT B 6H | 4212737082 |
| DIAMOND H STATE UNIT B 7H | 4212737083 |
| DIAMOND H STATE UNIT B 8H | 4212737084 |
| DIAMOND H STATE UNIT B 9H | 4212737085 |
| DIAMOND H STATE UNIT D 10H | 4212737063 |
| DIAMOND H STATE UNIT D 11H | 4212737064 |
| DIAMOND H STATE UNIT D 7H | 4212737061 |
| DIAMOND H STATE UNIT D 8H | 4212737057 |
| DIAMOND H STATE UNIT D 9H | 4212737062 |
| FOGMT 10SP | 4212735238 |
| FOGMT 11SP | 4212735242 |
| FOGMT 12SP | 4212735240 |
| FOGMT 13SP | 4212734995 |
| FOGMT 14SP | 4212735002 |
| FOGMT 15SP | 4212735003 |
| FOGMT 16SP | 4212735419 |
| FOGMT 17SP | 4212735420 |
| FOGMT 18SP | 4212736350 |
| FOGMT 19SP | 4212736351 |
| FOGMT 1SP | 4212733411 |
| FOGMT 20SP | 4212736352 |
| FOGMT 21SP | 4212736353 |
| FOGMT 22SP | 4212736354 |
| FOGMT 23SP | 4212736355 |
| FOGMT 24SP | 4212735438 |
| FOGMT 25SP | 4212735441 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| FOGMT 26SP | 4212735439 |
| FOGMT 27SP | 4212735440 |
| FOGMT 28SP | 4212735926 |
| FOGMT 29SP | 4212735927 |
| FOGMT 2SP | 4212733460 |
| FOGMT 30SP | 4212735928 |
| FOGMT 31SP | 4212735929 |
| FOGMT 32SP | 4212735948 |
| FOGMT 33SP | 4212735949 |
| FOGMT 34SP | 4212735950 |
| FOGMT 35SP | 4212735910 |
| FOGMT 36SP | 4212735911 |
| FOGMT 37SP | 4212735909 |
| FOGMT 38SP | 4212736581 |
| FOGMT 39SP | 4212736582 |
| FOGMT 3SH | 4212733592 |
| FOGMT 40SP | 4212736583 |
| FOGMT 41SP | 4212736584 |
| FOGMT 42SP | 4212736585 |
| FOGMT 43SP | 4212736517 |
| FOGMT 44SP | 4212736518 |
| FOGMT 45SP | 4212736519 |
| FOGMT 46SP | 4212736520 |
| FOGMT 47SP | 4212736521 |
| FOGMT 4SP | 4212733628 |
| FOGMT 54SP | 4212737018 |
| FOGMT 55SP | 4212737211 |
| FOGMT 5SH | 4212733654 |
| FOGMT 6SH | 4212733695 |
| FOGMT 7SP | 4212733910 |
| FOGMT 8SP | 4212734491 |
| FOGMT 9SP | 4212734490 |
| FOGMT E 1SP | 4212734996 |
| FOGMT E 2SP | 4212734992 |
| FOGMT F 1SP | 4212734993 |
| FOGMT G 1SP | 4212734994 |
| FOGMT UNIT A 10H | 4212736669 |
| FOGMT UNIT A 1H | 4212736660 |
| FOGMT UNIT A 2H | 4212736661 |
| FOGMT UNIT A 3H | 4212736662 |
| FOGMT UNIT A 4H | 4212736663 |
| FOGMT UNIT A 5H | 4212736664 |
| FOGMT UNIT A 6H | 4212736665 |
| FOGMT UNIT A 7H | 4212736666 |
| FOGMT UNIT A 8H | 4212736667 |
| FOGMT UNIT A 9H | 4212736668 |
| LA BANDERA RANCH 10H | 4212737135 |
| LA BANDERA RANCH 1H | 4212733618 |
| LA BANDERA RANCH 2H | 4212733634 |
| LA BANDERA RANCH 3H | 4212733673 |
| LA BANDERA RANCH 4H | 4212733740 |
| LA BANDERA RANCH 5H | 4212733809 |
| LA BANDERA RANCH 6H | 4212733909 |
| LA BANDERA RANCH 7H | 4212734204 |
| LA BANDERA RANCH 8H | 4212734402 |
| LA BANDERA RANCH 9H | 4212734629 |
| LA BANDERA RANCH UNIT A 1H | 4212735117 |
| LA BANDERA RANCH UNIT A 2H | 4212735091 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| LA BANDERA RANCH UNIT A 3H | 4212735113 |
| LA BANDERA RANCH UNIT A 4H | 4212735555 |
| LA BANDERA RANCH UNIT A 5H | 4212735556 |
| LA BANDERA RANCH UNIT A 6H | 4212735558 |
| LA BANDERA RANCH UNIT A 7H | 4212736331 |
| LA BANDERA RANCH UNIT A 8H | 4212736332 |
| LA BANDERA RANCH UNIT B 1H | 4212736586 |
| LA BANDERA RANCH UNIT B 2H | 4212736587 |
| LA BANDERA RANCH UNIT B 3H | 4212736588 |
| LA BANDERA RANCH UNIT B 4H | 4212736589 |
| LA BANDERA RANCH UNIT B 5H | 4212736590 |
| LA BANDERA RANCH UNIT B 6H | 4212736531 |
| LA BANDERA RANCH UNIT B 7H | 4212736532 |
| LA BANDERA RANCH UNIT B 8H | 4212736533 |
| LA BANDERA RANCH UNIT B 9H | 4212736534 |
| LLOYD BRISCOE 1H | 4232333452 |
| LLOYD BRISCOE 2H | 4232333451 |
| LLOYD BRISCOE 3H | 4232333450 |
| MAUND RANCH 18 UNIT 1H | 4212736795 |
| MAUND RANCH 18 UNIT 2H | 4212736796 |
| MAUND RANCH 18 UNIT 3H | 4212736799 |
| MAUND RANCH 18 UNIT 4H | 4212736800 |
| MAUND RANCH 18 UNIT 5H | 4212736801 |
| MAUND RANCH 18 UNIT 6H | 4212736803 |
| MAUND RANCH 18 UNIT 7H | 4212736804 |
| MAUND RANCH 18 UNIT 8H | 4212736805 |
| MAUND RANCH 18 UNIT 9H | 4212736806 |
| MAUND RANCH 19 UNIT 2H | 4212733999 |
| MAUND RANCH 19 UNIT 3H | 4212734387 |
| MAUND RANCH 19 UNIT 4H | 4212734264 |
| MAUND RANCH 19 UNIT 5H | 4212735553 |
| MAUND RANCH 19 UNIT 6H | 4212735554 |
| MAUND RANCH 23 UNIT 10H | 4212735496 |
| MAUND RANCH 23 UNIT 11H | 4212735497 |
| MAUND RANCH 23 UNIT 12H | 4212735498 |
| MAUND RANCH 23 UNIT 1H | 4212735432 |
| MAUND RANCH 23 UNIT 2H | 4212735433 |
| MAUND RANCH 23 UNIT 3H | 4212735435 |
| MAUND RANCH 23 UNIT 4H | 4212735437 |
| MAUND RANCH 23 UNIT 5H | 4212735436 |
| MAUND RANCH 23 UNIT 6H | 4212735434 |
| MAUND RANCH 23 UNIT 7H | 4212735494 |
| MAUND RANCH 23 UNIT 8H | 4212735493 |
| MAUND RANCH 23 UNIT 9H | 4212735495 |
| MAUND RANCH 26 UNIT 10H | 4212736133 |
| MAUND RANCH 26 UNIT 1H | 4212736124 |
| MAUND RANCH 26 UNIT 2H | 4212736123 |
| MAUND RANCH 26 UNIT 3H | 4212736125 |
| MAUND RANCH 26 UNIT 4H | 4212736126 |
| MAUND RANCH 26 UNIT 5H | 4212736127 |
| MAUND RANCH 26 UNIT 6H | 4212736128 |
| MAUND RANCH 26 UNIT 7H | 4212736129 |
| MAUND RANCH 26 UNIT 8H | 4212736130 |
| MAUND RANCH 26 UNIT 9H | 4212736131 |
| MAUND RANCH 27 UNIT 1H | 4212737107 |
| MAUND RANCH 27 UNIT 2H | 4212737108 |
| MAUND RANCH 27 UNIT 3H | 4212737103 |
| MAUND RANCH 27 UNIT 4H | 4212737104 |

**Existing Producing Wells**

| WELL NAME | API |
|---|---|
| MAUND RANCH 27 UNIT 5H | 4212737105 |
| MAUND RANCH 27 UNIT 6H | 4212737106 |
| MAUND RANCH 27 UNIT 7H | 4212733866 |
| MAUND RANCH 27 UNIT 8H | 4212737109 |
| MAUND RANCH 27 UNIT 9H | 4212737110 |
| RANCHO ENCANTADO 10H | 4212734911 |
| RANCHO ENCANTADO 11H | 4212734915 |
| RANCHO ENCANTADO 12H | 4212734161 |
| RANCHO ENCANTADO 13H | 4212734162 |
| RANCHO ENCANTADO 14H | 4212734943 |
| RANCHO ENCANTADO 15H | 4212734944 |
| RANCHO ENCANTADO 16H | 4212734945 |
| RANCHO ENCANTADO 17H | 4212734181 |
| RANCHO ENCANTADO 18H | 4212734182 |
| RANCHO ENCANTADO 19H | 4212734183 |
| RANCHO ENCANTADO 1H | 4212733729 |
| RANCHO ENCANTADO 20H | 4212734184 |
| RANCHO ENCANTADO 21H | 4212734185 |
| RANCHO ENCANTADO 22H | 4212734211 |
| RANCHO ENCANTADO 23H | 4212734213 |
| RANCHO ENCANTADO 24H | 4212734214 |
| RANCHO ENCANTADO 25H | 4212734215 |
| RANCHO ENCANTADO 26H | 4212734217 |
| RANCHO ENCANTADO 27H | 4212734218 |
| RANCHO ENCANTADO 28H | 4212734331 |
| RANCHO ENCANTADO 29H | 4212735328 |
| RANCHO ENCANTADO 30H | 4212735329 |
| RANCHO ENCANTADO 31H | 4212735334 |
| RANCHO ENCANTADO 32H | 4212735335 |
| RANCHO ENCANTADO 33H | 4212735336 |
| RANCHO ENCANTADO 34H | 4212735981 |
| RANCHO ENCANTADO 35H | 4212735982 |
| RANCHO ENCANTADO 36H | 4212735985 |
| RANCHO ENCANTADO 37H | 4212735987 |
| RANCHO ENCANTADO 38H | 4212735988 |
| RANCHO ENCANTADO 3H | 4212733833 |
| RANCHO ENCANTADO 4H | 4212733834 |
| RANCHO ENCANTADO 5H | 4212733835 |
| RANCHO ENCANTADO 6H | 4212733964 |
| RANCHO ENCANTADO 7H | 4212733961 |
| RANCHO ENCANTADO 8H | 4212733965 |
| RANCHO ENCANTADO 9H | 4212734910 |
| RANCHO ENCANTADO UNIT A 39H | 4212737069 |
| RANCHO ENCANTADO UNIT A 40H | 4212737068 |
| RANCHO ENCANTADO UNIT A 41H | 4212737066 |
| RANCHO ENCANTADO UNIT A 42H | 4212737067 |
| RANCHO ENCANTADO UNIT A 43H | 4212737065 |
| ROGERS DENTONIO 16 UNIT 1H | 4212734425 |
| ROGERS DENTONIO 16 UNIT 2H | 4212734426 |
| ROGERS DENTONIO 16 UNIT 3H | 4212734431 |
| ROGERS DENTONIO 16 UNIT 4H | 4212735412 |
| ROGERS DENTONIO 16 UNIT 5H | 4212735416 |
| ROGERS DENTONIO 16 UNIT 6H | 4212735417 |
| ROGERS DENTONIO 16 UNIT 7H | 4212735413 |
| ROGERS DENTONIO 16 UNIT 8H | 4212735414 |
| ROGERS DENTONIO 16 UNIT 9H | 4212735415 |
| ROGERS DENTONIO 31 UNIT 1H | 4212737035 |
| ROGERS DENTONIO 31 UNIT 2H | 4212737036 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| ROGERS DENTONIO 31 UNIT 3H | 4212737037 |
| ROGERS DENTONIO 31 UNIT 4H | 4212737038 |
| ROGERS DENTONIO 31 UNIT 5H | 4212737039 |
| ROGERS DENTONIO 31 UNIT 6H | 4212737040 |
| ROGERS DENTONIO 32 UNIT 10H | 4212736006 |
| ROGERS DENTONIO 32 UNIT 1H | 4212735997 |
| ROGERS DENTONIO 32 UNIT 2H | 4212735998 |
| ROGERS DENTONIO 32 UNIT 3H | 4212735999 |
| ROGERS DENTONIO 32 UNIT 4H | 4212736000 |
| ROGERS DENTONIO 32 UNIT 5H | 4212736001 |
| ROGERS DENTONIO 32 UNIT 6H | 4212736002 |
| ROGERS DENTONIO 32 UNIT 7H | 4212736003 |
| ROGERS DENTONIO 32 UNIT 8H | 4212736004 |
| ROGERS DENTONIO 32 UNIT 9H | 4212736005 |
| ROGERS DENTONIO 33 UNIT 10H | 4212736022 |
| ROGERS DENTONIO 33 UNIT 11H | 4212736023 |
| ROGERS DENTONIO 33 UNIT 1H | 4212736013 |
| ROGERS DENTONIO 33 UNIT 2H | 4212736014 |
| ROGERS DENTONIO 33 UNIT 3H | 4212736015 |
| ROGERS DENTONIO 33 UNIT 4H | 4212736016 |
| ROGERS DENTONIO 33 UNIT 5H | 4212736017 |
| ROGERS DENTONIO 33 UNIT 6H | 4212736018 |
| ROGERS DENTONIO 33 UNIT 7H | 4212736019 |
| ROGERS DENTONIO 33 UNIT 8H | 4212736020 |
| ROGERS DENTONIO 33 UNIT 9H | 4212736021 |
| ROGERS DENTONIO RANCH 12H | 4212734249 |
| ROGERS DENTONIO RANCH 13H | 4212734251 |
| ROGERS DENTONIO RANCH 14H | 4212734136 |
| ROGERS DENTONIO RANCH 15H | 4212734137 |
| ROGERS DENTONIO RANCH 16H | 4212734252 |
| ROGERS DENTONIO RANCH 1H | 4212733636 |
| ROGERS DENTONIO RANCH 2H | 4212733679 |
| ROGERS DENTONIO RANCH 3H | 4212733845 |
| ROGERS DENTONIO RANCH 4H | 4212733846 |
| ROGERS DENTONIO RANCH 5H | 4212733847 |
| ROGERS DENTONIO RANCH 6H | 4212733864 |
| SOUTH SPUR RANCH 1H | 4212733633 |
| SOUTH SPUR RANCH 2H | 4212733865 |
| SOUTH SPUR STATE 1H | 4212733660 |
| SOUTH SPUR STATE 2H | 4212733686 |
| SOUTH SPUR STATE 3H | 4212733827 |
| SOUTH SPUR STATE 4H | 4212733828 |
| SOUTH SPUR STATE 5H | 4212734465 |
| SOUTH SPUR STATE 6H | 4212734464 |
| SOUTH SPUR STATE 7H | 4212734466 |
| SOUTH SPUR UNIT A 1H | 4212734104 |
| SOUTH SPUR UNIT A 2H | 4212734216 |
| SOUTH SPUR UNIT A 3H | 4212734453 |
| SOUTH SPUR UNIT A 4H | 4212734675 |
| SOUTH SPUR UNIT A 5H | 4212734677 |
| SOUTH SPUR UNIT A 6H | 4212734676 |
| SOUTH SPUR UNIT A 7H | 4212735478 |
| SOUTH SPUR UNIT A 8H | 4212735479 |
| SOUTH SPUR UNIT A 9H | 4212735480 |
| STANLEY RANCH 10H | 4247941428 |
| STANLEY RANCH 11H | 4247941429 |
| STANLEY RANCH 12H | 4247941430 |
| STANLEY RANCH 13H | 4247941431 |

011344

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STANLEY RANCH 14H | 4247941432 |
| STANLEY RANCH 15H | 4247941433 |
| STANLEY RANCH 16H | 4247941434 |
| STANLEY RANCH 17H | 4247941422 |
| STANLEY RANCH 18H | 4247941424 |
| STANLEY RANCH 19H | 4247941423 |
| STANLEY RANCH 1H | 4247940742 |
| STANLEY RANCH 20H | 4247941426 |
| STANLEY RANCH 21H | 4247941129 |
| STANLEY RANCH 22H | 4247941130 |
| STANLEY RANCH 23H | 4247941131 |
| STANLEY RANCH 24H | 4247941231 |
| STANLEY RANCH 25H | 4247941241 |
| STANLEY RANCH 26H | 4247942383 |
| STANLEY RANCH 27H | 4247942384 |
| STANLEY RANCH 28H | 4247942293 |
| STANLEY RANCH 29H | 4247942161 |
| STANLEY RANCH 2H | 4247940940 |
| STANLEY RANCH 30H | 4247942449 |
| STANLEY RANCH 31H | 4247942450 |
| STANLEY RANCH 3H | 4247941051 |
| STANLEY RANCH 43H | 4247941907 |
| STANLEY RANCH 44H | 4247941960 |
| STANLEY RANCH 45H | 4247942456 |
| STANLEY RANCH 46H | 4247942458 |
| STANLEY RANCH 47H | 4247942457 |
| STANLEY RANCH 48H | 4247941719 |
| STANLEY RANCH 49H | 4247941723 |
| STANLEY RANCH 4H | 4247941053 |
| STANLEY RANCH 50H | 4247941722 |
| STANLEY RANCH 51H | 4247941727 |
| STANLEY RANCH 52H | 4247941728 |
| STANLEY RANCH 53H | 4247941729 |
| STANLEY RANCH 54H | 4247941696 |
| STANLEY RANCH 55H | 4247941693 |
| STANLEY RANCH 56H | 4247941695 |
| STANLEY RANCH 57H | 4247941683 |
| STANLEY RANCH 58H | 4247941684 |
| STANLEY RANCH 59H | 4247941685 |
| STANLEY RANCH 5H | 4247941054 |
| STANLEY RANCH 60H | 4247941660 |
| STANLEY RANCH 61H | 4247941661 |
| STANLEY RANCH 62H | 4247941663 |
| STANLEY RANCH 63H | 4247942875 |
| STANLEY RANCH 6H | 4247941421 |
| STANLEY RANCH 7H | 4247941435 |
| STANLEY RANCH 8H | 4247941436 |
| STANLEY RANCH 9H | 4247941437 |
| STUMBERG RANCH 10H | 4212734233 |
| STUMBERG RANCH 11H | 4212734235 |
| STUMBERG RANCH 12H | 4212734234 |
| STUMBERG RANCH 16H | 4212734369 |
| STUMBERG RANCH 17H | 4212734370 |
| STUMBERG RANCH 18H | 4212734371 |
| STUMBERG RANCH 19H | 4212734611 |
| STUMBERG RANCH 1H | 4212733717 |
| STUMBERG RANCH 20H | 4212734612 |
| STUMBERG RANCH 21H | 4212734613 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STUMBERG RANCH 22H | 4212734614 |
| STUMBERG RANCH 23H | 4212734615 |
| STUMBERG RANCH 24H | 4212734616 |
| STUMBERG RANCH 25H | 4212734619 |
| STUMBERG RANCH 26H | 4212734620 |
| STUMBERG RANCH 27HR | 4212734710 |
| STUMBERG RANCH 28H | 4212734623 |
| STUMBERG RANCH 29H | 4212734624 |
| STUMBERG RANCH 2H | 4212733719 |
| STUMBERG RANCH 30H | 4212734665 |
| STUMBERG RANCH 31H | 4212734668 |
| STUMBERG RANCH 32H | 4212734666 |
| STUMBERG RANCH 33H | 4212734667 |
| STUMBERG RANCH 34H | 4212734670 |
| STUMBERG RANCH 35H | 4212734669 |
| STUMBERG RANCH 36H | 4212735772 |
| STUMBERG RANCH 37H | 4212735774 |
| STUMBERG RANCH 38H | 4212735775 |
| STUMBERG RANCH 39H | 4212735776 |
| STUMBERG RANCH 3H | 4212733725 |
| STUMBERG RANCH 40H | 4212735827 |
| STUMBERG RANCH 41H | 4212735829 |
| STUMBERG RANCH 42H | 4212735830 |
| STUMBERG RANCH 43H | 4212735831 |
| STUMBERG RANCH 44H | 4212735832 |
| STUMBERG RANCH 45H | 4212735833 |
| STUMBERG RANCH 46H | 4212735838 |
| STUMBERG RANCH 47H | 4212735839 |
| STUMBERG RANCH 48H | 4212735840 |
| STUMBERG RANCH 49H | 4212735841 |
| STUMBERG RANCH 4HR | 4212733933 |
| STUMBERG RANCH 50H | 4212735842 |
| STUMBERG RANCH 51H | 4212735843 |
| STUMBERG RANCH 52HR | 4212737120 |
| STUMBERG RANCH 5H | 4212733934 |
| STUMBERG RANCH 6H | 4212733935 |
| STUMBERG RANCH 7H | 4212733979 |
| STUMBERG RANCH 8H | 4212733977 |
| STUMBERG RANCH 9H | 4212733978 |
| STUMBERG RANCH UNIT A 1H | 4212735519 |
| STUMBERG RANCH UNIT A 2H | 4212735520 |
| STUMBERG RANCH UNIT A 3H | 4212735521 |
| STUMBERG RANCH UNIT A 4H | 4212735540 |
| STUMBERG RANCH UNIT A 5H | 4212735541 |
| STUMBERG RANCH UNIT A 6H | 4212735542 |
| STUMBERG RANCH UNIT A 7H | 4212735543 |
| STUMBERG RANCH UNIT B 1H | 4212735611 |
| STUMBERG RANCH UNIT B 2H | 4212735612 |
| STUMBERG RANCH UNIT B 3H | 4212735613 |
| STUMBERG RANCH UNIT B 4H | 4212735614 |
| STUMBERG RANCH UNIT B 5H | 4212735615 |
| STUMBERG RANCH UNIT B 6H | 4212735616 |
| STUMBERG RANCH UNIT B 7H | 4212735617 |
| STUMBERG RANCH UNIT C 11H | 4212736836 |
| STUMBERG RANCH UNIT C 12H | 4212736837 |
| STUMBERG RANCH UNIT C 13H | 4212736835 |
| STUMBERG RANCH UNIT C 14H | 4212736838 |
| STUMBERG RANCH UNIT C 15H | 4212736839 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| TOVAR WEST-LLOYD 34 B UNIT 1H | 4232333420 |
| TOVAR WEST-LLOYD 34 UNIT 1H | 4232333351 |
| TOVAR WEST-LLOYD 63 A UNIT 1H | 4232333389 |
| TOVAR WEST-LLOYD 63 B UNIT 1H | 4232333400 |
| TOVAR WEST-LLOYD 69 A UNIT 1H | 4232333411 |
| TOVAR WEST-LLOYD 75 A UNIT 1H | 4232333360 |
| TOVAR WEST-LLOYD 77 UNIT 1H | 4232333348 |
| TOVAR WEST-LLOYD 79 A UNIT 1H | 4232333390 |
| TOVAR WLC A UNIT 1H | 4232333415 |
| TOVAR WLC A UNIT 2H | 4232333417 |
| TOVAR WLC A UNIT 3H | 4232333416 |
| TOVAR WLC A UNIT 4H | 4232333435 |
| TOVAR WLC A UNIT 5H | 4232333436 |
| TOVAR WLC A UNIT 6H | 4232333437 |
| TOVAR WLC B UNIT 1H | 4232333438 |
| TOVAR WLC B UNIT 2H | 4232333439 |
| TOVAR WLC B UNIT 3H | 4232333440 |
| WORTHEY RANCH 10H | 4247941107 |
| WORTHEY RANCH 11H | 4247941500 |
| WORTHEY RANCH 12H | 4247941501 |
| WORTHEY RANCH 13H | 4247941502 |
| WORTHEY RANCH 14H | 4247941482 |
| WORTHEY RANCH 15H | 4247941483 |
| WORTHEY RANCH 16H | 4247941484 |
| WORTHEY RANCH 17H | 4247941132 |
| WORTHEY RANCH 18H | 4247941133 |
| WORTHEY RANCH 19H | 4247941134 |
| WORTHEY RANCH 1H | 4247940755 |
| WORTHEY RANCH 20H | 4247941376 |
| WORTHEY RANCH 21H | 4247941377 |
| WORTHEY RANCH 22H | 4247941378 |
| WORTHEY RANCH 23H | 4247941487 |
| WORTHEY RANCH 24H | 4247941488 |
| WORTHEY RANCH 25H | 4247941489 |
| WORTHEY RANCH 26H | 4247941515 |
| WORTHEY RANCH 27H | 4247941517 |
| WORTHEY RANCH 28H | 4247941518 |
| WORTHEY RANCH 29H | 4247941521 |
| WORTHEY RANCH 2H | 4247940941 |
| WORTHEY RANCH 30H | 4247942341 |
| WORTHEY RANCH 31H | 4247942342 |
| WORTHEY RANCH 32H | 4247942344 |
| WORTHEY RANCH 34H | 4247942437 |
| WORTHEY RANCH 35H | 4247942438 |
| WORTHEY RANCH 36H | 4247942440 |
| WORTHEY RANCH 37H | 4247942436 |
| WORTHEY RANCH 38H | 4247941356 |
| WORTHEY RANCH 39H | 4247942339 |
| WORTHEY RANCH 3H | 4247941119 |
| WORTHEY RANCH 40H | 4247942340 |
| WORTHEY RANCH 41H | 4247942347 |
| WORTHEY RANCH 42H | 4247942346 |
| WORTHEY RANCH 43H | 4247941906 |
| WORTHEY RANCH 44H | 4247942160 |
| WORTHEY RANCH 45H | 4247942484 |
| WORTHEY RANCH 46H | 4247942485 |
| WORTHEY RANCH 47H | 4247942486 |
| WORTHEY RANCH 48H | 4247942487 |

### Existing Producing Wells

| WELL NAME | API |
|---|---|
| WORTHEY RANCH 49H | 4247942488 |
| WORTHEY RANCH 4H | 4247941120 |
| WORTHEY RANCH 50H | 4247942489 |
| WORTHEY RANCH 51H | 4247942491 |
| WORTHEY RANCH 53H | 4247942480 |
| WORTHEY RANCH 54H | 4247942482 |
| WORTHEY RANCH 55H | 4247942483 |
| WORTHEY RANCH 56H | 4247942016 |
| WORTHEY RANCH 57H | 4247942131 |
| WORTHEY RANCH 5H | 4247940971 |
| WORTHEY RANCH 6H | 4247941108 |
| WORTHEY RANCH 7H | 4247941194 |
| WORTHEY RANCH 8H | 4247940983 |
| WORTHEY RANCH 9H | 4247941019 |