[illegible]

**Annex VI**
**Existing Drilling and Uncompleted Wells**

(*see attached*)

---

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH UNIT A 1H | 4212736445 |
| BRISCOE CARLA RANCH UNIT A 2H | 4212736446 |
| BRISCOE CARLA RANCH UNIT A 3H | 4212736447 |
| BRISCOE CARLA RANCH UNIT A 4H | 4212736450 |
| BRISCOE CARLA RANCH UNIT A 5H | 4212736449 |
| BRISCOE CARLA RANCH UNIT B 1H | 4212736464 |
| BRISCOE CARLA RANCH UNIT B 2H | 4212736465 |
| BRISCOE CARLA RANCH UNIT B 3H | 4212736466 |
| BRISCOE CARLA RANCH UNIT B 4H | 4212736468 |
| BRISCOE CARLA RANCH UNIT B 5H | 4212736467 |
| BRISCOE CARLA RANCH UNIT B 6H | 4212736469 |
| BRISCOE CARLA RANCH UNIT B 7H | 4212736470 |
| BRISCOE CATARINA NORTH 104H | 4212736819 |
| BRISCOE CATARINA NORTH 105H | 4212736820 |
| BRISCOE CATARINA NORTH 106H | 4212736810 |
| BRISCOE CATARINA NORTH 107H | 4212736809 |
| BRISCOE CATARINA NORTH 108H | 4212736811 |
| BRISCOE CATARINA NORTH 109H | 4212736812 |
| BRISCOE CATARINA NORTH 110H | 4212736813 |
| BRISCOE CATARINA NORTH 111H | 4212736814 |
| BRISCOE CATARINA NORTH 112H | 4212736815 |
| BRISCOE CATARINA NORTH 113H | 4212736816 |
| BRISCOE CATARINA NORTH 114H | 4212736817 |
| BRISCOE CATARINA NORTH 115H | 4212736818 |
| BRISCOE CATARINA NORTH 116H | 4212736821 |
| BRISCOE CATARINA NORTH 117H | 4212736822 |
| BRISCOE CATARINA NORTH 118H | 4212736823 |
| BRISCOE CATARINA NORTH 119H | 4212736826 |
| BRISCOE CATARINA NORTH 120H | 4212736828 |
| BRISCOE CATARINA NORTH 121H | 4212736827 |
| BRISCOE CATARINA NORTH 122H | 4212736829 |
| BRISCOE CATARINA NORTH 123H | 4212736830 |
| BRISCOE CATARINA NORTH 124H | 4212736831 |
| BRISCOE CATARINA NORTH 125H | 4212736832 |
| BRISCOE CATARINA NORTH 126H | 4212736833 |
| BRISCOE CATARINA NORTH 127H | 4212736834 |
| BRISCOE CATARINA NORTH 128H | 4212736862 |
| BRISCOE CATARINA NORTH 129H | 4212736863 |
| BRISCOE CATARINA NORTH 130H | 4212736864 |
| BRISCOE CATARINA NORTH 131H | 4212736865 |
| BRISCOE CATARINA NORTH 132H | 4212736868 |
| BRISCOE CATARINA WEST 83H | 4212736874 |
| BRISCOE CATARINA WEST 84H | 4212736875 |
| BRISCOE CATARINA WEST 85H | 4212736876 |
| BRISCOE CATARINA WEST 86H | 4212736877 |
| BRISCOE CATARINA WEST 87H | 4212736878 |
| BRISCOE CATARINA WEST 88H | 4212736879 |
| BRISCOE CATARINA WEST 89H | 4212736880 |
| BRISCOE CATARINA WEST 91H | 4212736882 |
| BRISCOE CATARINA WEST 92H | 4212736883 |
| BRISCOE CATARINA WEST 94H | 4212736886 |
| BRISCOE CATARINA WEST 95H | 4212736885 |
| BRISCOE CATARINA WEST 97H | 4212736888 |
| BRISCOE COCHINA EAST RANCH 133H | 4228334859 |
| BRISCOE COCHINA EAST RANCH 134H | 4228334860 |
| BRISCOE COCHINA EAST RANCH 135H | 4228334861 |
| BRISCOE COCHINA EAST RANCH 136H | 4228334862 |
| BRISCOE COCHINA EAST RANCH 137H | 4228334863 |

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 138H | 4228334864 |
| BRISCOE COCHINA EAST RANCH 139H | 4228334865 |
| BRISCOE COCHINA EAST RANCH 140H | 4228334866 |
| BRISCOE COCHINA EAST RANCH 141H | 4228334867 |
| BRISCOE COCHINA EAST RANCH 142H | 4228334868 |
| BRISCOE COCHINA EAST RANCH 143H | 4228334869 |
| BRISCOE COCHINA EAST RANCH 144H | 4228334870 |
| BRISCOE COCHINA EAST RANCH 145HR | 4228335149 |
| BRISCOE COCHINA EAST RANCH 146H | 4228334872 |
| BRISCOE COCHINA EAST RANCH 147H | 4228334873 |
| BRISCOE COCHINA WEST RANCH 100H | 4212736330 |
| BRISCOE COCHINA WEST RANCH 10H | 4212734822 |
| BRISCOE COCHINA WEST RANCH 13H | 4212734823 |
| BRISCOE COCHINA WEST RANCH 14H | 4212734825 |
| BRISCOE COCHINA WEST RANCH 15H | 4212734824 |
| BRISCOE COCHINA WEST RANCH 31H | 4212734882 |
| BRISCOE COCHINA WEST RANCH 32H | 4212734883 |
| BRISCOE COCHINA WEST RANCH 33H | 4212734889 |
| BRISCOE COCHINA WEST RANCH 34H | 4212734884 |
| BRISCOE COCHINA WEST RANCH 35H | 4212734885 |
| BRISCOE COCHINA WEST RANCH 36H | 4212735038 |
| BRISCOE COCHINA WEST RANCH 37H | 4212735039 |
| BRISCOE COCHINA WEST RANCH 38H | 4212735041 |
| BRISCOE COCHINA WEST RANCH 45H | 4212735042 |
| BRISCOE COCHINA WEST RANCH 46H | 4212735492 |
| BRISCOE COCHINA WEST RANCH 78H | 4212736250 |
| BRISCOE COCHINA WEST RANCH 79H | 4212736253 |
| BRISCOE COCHINA WEST RANCH 80H | 4212736254 |
| BRISCOE COCHINA WEST RANCH 81H | 4212736255 |
| BRISCOE COCHINA WEST RANCH 82H | 4212736256 |
| BRISCOE COCHINA WEST RANCH 83H | 4212736257 |
| BRISCOE COCHINA WEST RANCH 84H | 4212736258 |
| BRISCOE COCHINA WEST RANCH 85H | 4212736259 |
| BRISCOE COCHINA WEST RANCH 86H | 4212736260 |
| BRISCOE COCHINA WEST RANCH 87H | 4212736261 |
| BRISCOE COCHINA WEST RANCH 8H | 4212734821 |
| BRISCOE COCHINA WEST RANCH 96H | 4212736326 |
| BRISCOE COCHINA WEST RANCH 97H | 4212736327 |
| BRISCOE COCHINA WEST RANCH 98H | 4212736328 |
| BRISCOE COCHINA WEST RANCH 99H | 4212736329 |
| BRISCOE COCHINA WEST RANCH 9H | 4212734826 |
| CARLA SOUTH SPUR UNIT A 1H | 4212736476 |
| CARLA SOUTH SPUR UNIT A 2H | 4212736480 |
| CARLA SOUTH SPUR UNIT A 3H | 4212736481 |
| ROGERS DENTONIO 31 UNIT 10H | 4212737044 |
| ROGERS DENTONIO 31 UNIT 11H | 4212737045 |
| ROGERS DENTONIO 31 UNIT 7H | 4212737041 |
| ROGERS DENTONIO 31 UNIT 8H | 4212737042 |
| ROGERS DENTONIO 31 UNIT 9H | 4212737043 |
| SOUTH SPUR RANCH 3H | 4212736374 |
| SOUTH SPUR RANCH 4H | 4212736375 |
| SOUTH SPUR UNIT B 10H | 4212736684 |
| SOUTH SPUR UNIT B 1H | 4212736676 |
| SOUTH SPUR UNIT B 2H | 4212736677 |
| SOUTH SPUR UNIT B 3H | 4212736678 |
| SOUTH SPUR UNIT B 4H | 4212736679 |
| SOUTH SPUR UNIT B 5H | 4212736680 |
| SOUTH SPUR UNIT B 6H | 4212736681 |

### Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| SOUTH SPUR UNIT B 7H | 4212736682 |
| SOUTH SPUR UNIT B 8H | 4212736683 |
| SOUTH SPUR UNIT B 9H | 4212736936 |
| STUMBERG RANCH 53H | 4212737219 |
| STUMBERG RANCH 54H | 4212737222 |
| STUMBERG RANCH 55H | 4212737220 |
| STUMBERG RANCH 56H | 4212737221 |
| STUMBERG RANCH UNIT C 10H | 4212736700 |
| STUMBERG RANCH UNIT C 1H | 4212736690 |
| STUMBERG RANCH UNIT C 2H | 4212736691 |
| STUMBERG RANCH UNIT C 3H | 4212736692 |
| STUMBERG RANCH UNIT C 4H | 4212736693 |
| STUMBERG RANCH UNIT C 5H | 4212736694 |
| STUMBERG RANCH UNIT C 6H | 4212736696 |
| STUMBERG RANCH UNIT C 7H | 4212736697 |
| STUMBERG RANCH UNIT C 8H | 4212736698 |

**<u>Annex VII</u>**
**Restricted Areas**



**Exhibit A**

[Intentionally omitted]

---

**Exhibit B**

**Form Operating Agreement**

(*see attached*)

---

**Exhibit B**

**to Joint Development Agreement, dated as of December 29, 2016,**
**by and among [SN Restricted Sub, SN Unsub, and Blackstone NewCo]**

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT
**HORIZONTAL MODIFICATIONS**

**OPERATING AGREEMENT**

**DATED**

_____________ , ________ ,
*Year*

**OPERATOR** ______________________________________________

**CONTRACT AREA** See Exhibit "A" attached

**COUNTY ~~OR PARISH~~ OF** [Maverick, Dimmitt, Webb, LaSalle] **, STATE OF** Texas

**COPYRIGHT 2013 – ALL RIGHTS RESERVED**
**AMERICAN ASSOCIATION OF PROFESSIONAL LANDMEN, 4100 FOSSIL CREEK BLVD. FORT WORTH, TEXAS, 76137, APPROVED FORM.**
**A.A.P.L. NO. 610 - 1989 (Horz.)**

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**TABLE OF CONTENTS**


| Article | Title | Page |
|---|---|---|
| I. | **DEFINITIONS** | 1 |
| II. | **EXHIBITS** | 3 |
| III. | **INTERESTS OF PARTIES** | 4 |
| | ~~A. OIL AND GAS INTERESTS~~ | 4 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 4 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 4 |
| IV. | **TITLES** | 5 |
| | A. TITLE EXAMINATION | 5 |
| | B. LOSS OR FAILURE OF TITLE | 6 |
| | ~~1. Failure of Title~~ | 6 |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | 6 |
| | 3. ~~Other~~ All Losses | 7 |
| | ~~4. Curing Title~~ | 7 |
| V. | **OPERATOR** | 7 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 7 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 8 |
| | 1. Resignation or Removal of Operator | 8 |
| | 2. Selection of Successor Operator | 8 |
| | 3. Effect of Bankruptcy | 8 |
| | C. EMPLOYEES AND CONTRACTORS | 9 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 9 |
| | 1. Competitive Rates and Use of Affiliates | 9 |
| | 2. Discharge of Joint Account Obligations | 9 |
| | 3. Protection from Liens | 9 |
| | 4. Custody of Funds | 9 |
| | 5. Access to Contract Area and Records | 9 |
| | 6. Filing and Furnishing Governmental Reports | 10 |
| | 7. Drilling and Testing Operations | 10 |
| | 8. Cost Estimates | 10 |
| | 9. Insurance | 10 |
| VI. | **DRILLING AND DEVELOPMENT** | 10 |
| | ~~A. INITIAL WELL~~ | 10 |
| | B. SUBSEQUENT OPERATIONS | 11 |
| | 1. Proposed Operations | 11 |
| | 2. Operations by Less Than All Parties | 11 |
| | 3. Stand-By Costs | 14 |
| | 4. Deepening | 14 |
| | 5. Sidetracking | 15 |
| | 6. Order of Preference of Operations | 16 |
| | 7. Conformity to Spacing Pattern | 16 |
| | 8. Paying Wells | 16 |
| | 9. Spudder Rigs | 16 |
| | 10 Multi-Well Pads | 17 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 17 |
| | 1. Completion | 17 |
| | 2. Rework, Recomplete or Plug Back | 18 |
| | D. OTHER OPERATIONS | 18 |
| | E. ABANDONMENT OF WELLS | 18 |
| | 1. Abandonment of Dry Holes | 18 |

| Article | Title | Page |
|---|---|---|
| | 2. Abandonment of Wells That Have Produced | 19 |
| | 3. Abandonment of Non-Consent Operations | 20 |
| | F. TERMINATION OF OPERATIONS | 20 |
| | G. TAKING PRODUCTION IN KIND | 20 |
| | (Option 1) Gas Balancing Agreement | 20 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | 21 |
| **VII.** | **EXPENDITURES AND LIABILITY OF PARTIES** | 22 |
| | A. LIABILITY OF PARTIES | 22 |
| | B. LIENS AND SECURITY INTERESTS | 22 |
| | C. ADVANCES | 23 |
| | D. DEFAULTS AND REMEDIES | 24 |
| | 1. Suspension of Rights | 24 |
| | 2. Suit for Damages | 24 |
| | 3. Deemed Non-Consent | 24 |
| | 4. Advance Payment | 25 |
| | 5. Costs and Attorneys' Fees | 25 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 25 |
| | F. TAXES | 25 |
| **VIII.** | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 26 |
| | A. SURRENDER OF LEASES | 26 |
| | B. RENEWAL OR EXTENSION OF LEASES | 26 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 27 |
| | D. ASSIGNMENT; ~~MAINTENANCE OF UNIFORM INTEREST~~ | 27 |
| | E. WAIVER OF RIGHTS TO PARTITION | 28 |
| | ~~F. PREFERENTIAL RIGHT TO PURCHASE~~ | 28 |
| **IX.** | **INTERNAL REVENUE CODE ELECTION** | 29 |
| **X.** | **CLAIMS AND LAWSUITS** | 29 |
| **XI.** | **FORCE MAJEURE** | 29 |
| **XII.** | **NOTICES** | 30 |
| **XIII.** | **TERM OF AGREEMENT** | 30 |
| **XIV.** | **COMPLIANCE WITH LAWS AND REGULATIONS** | 31 |
| | A. LAWS, REGULATIONS AND ORDERS | 31 |
| | B. GOVERNING LAW | 31 |
| | C. REGULATORY AGENCIES | 31 |
| **XV.** | **MISCELLANEOUS** | 32 |
| | A. EXECUTION | 32 |
| | B. SUCCESSORS AND ASSIGNS | 32 |
| | C. COUNTERPARTS | 32 |
| | D. SEVERABILITY | 32 |
| **XVI.** | **OTHER PROVISIONS (Attached)** | 33 |
| | ~~A. CONFLICT OF TERMS~~ | 33 |
| | ~~B. OPERATOR'S DUTY~~ | 33 |
| | ~~C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS~~ | 33 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ________________________________________, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a / well capable of producing ~~producer of~~ Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the ~~D~~deepest Zone proposed in the associated AFE, whichever is the lesser. ~~When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.~~ "Deepen" shall not refer or apply to operations for the Extension of a Lateral.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean

(i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

~~K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~ [Intentionally Omitted.]

L. The term "Lateral" shall mean that portion of a wellbore / of a Horizontal Well between the point at which the wellbore initially penetrates the objective Zone and the Terminus. ~~that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth~~.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any ~~routine repair or maintenance work~~ Workover or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" shall mean the

directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized only for drilling all or part of the vertical component of a Horizontal Well; a rig used only for setting conductor pipe shall not be considered a Spudder Rig.

W. The term "Terminus" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. See Article XVI for additional definitions.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

X A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

~~B. Exhibit "B," Form of Lease.~~

X C. Exhibit "C," Accounting Procedure.

X D. Exhibit "D," Insurance.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

X E. Exhibit "E," Gas Balancing Agreement.

X F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

X G. Exhibit "G," Tax Partnership.

X H. Other: Form of Memorandum of Operating Agreement

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

~~**A. Oil and Gas Interests:**~~

~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations / conducted hereunder ~~on the Contract Area~~ shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter. See also Article XVI.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area / except Subsequently Created Interests created by other parties hereto. ~~up to, but not in excess of, ___________ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.~~

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.



011362

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**
**TITLES**

**A. Title Examination**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and outside landmen for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) / title curative and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

/ The Operator ~~Each party~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests / included in the Contract Area ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, / landmen, or consultants which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct

charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions. No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney / or the Operator or title has been accepted by all of the Drilling Parties in such well.

~~**B. Loss or Failure of Title:**~~

~~1.~~ Failure of Title~~: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

2. Loss by Non-Payment or Erroneous Payment of Amount Due: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:

(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;

(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,

(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.

3. Other Losses: All losses of Leases or Interests committed to this agreement, other than those set forth in Articles IV.B.1. and IV.B.2. above, shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

4. Curing Title: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.

**ARTICLE V.**
**OPERATOR**

**A. Designation and Responsibilities of Operator:**

_____________________________________________ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations / conducted hereunder on the Contract Area as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators,

Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this 27 agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred / in connection with operations authorized or approved hereunder except such as may result from gross negligence or willful misconduct. See also Article XVI.

**B. Resignation or Removal of Operator and Selection of Successor:** See Article XVI.

~~1.~~ Resignation or Removal of Operator: ~~Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

~~Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non- Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.~~

~~2.~~ Selection of Successor Operator: ~~Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.~~

~~3.~~ Effect of Bankruptcy: ~~If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

~~majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."~~

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined / by the Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by aAffiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non- Operator funds as herein specifically provided. ~~Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.~~

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each / Consenting Party ~~Non-Operator~~ or its duly authorized representative, at ~~the Non-Operator~~'its sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account / hereunder, ~~on the Contract Area~~ and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner / unreasonably interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Consenting Party ~~Non-~~Operator upon request copies of

any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C." or other agreement of the parties. See also Article XVI.

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator will promptly advise Non-Operators of ~~the date on which the well is spudded, or~~ the date on which drilling operations are commenced.

(b) Operator will send to / the Consenting Parties ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well as they ~~Non-Operators~~ shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator may ~~shall~~ adequately test all Zones encountered / that fall within the Contract Area and which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

**ARTICLE VI.**
**DRILLING AND DEVELOPMENT**

~~**A. Initial Well:**~~

~~On or before the ________ day of _______, ____________, Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)): and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due~~

~~diligence to The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area ~~other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation as outlined in an AFE. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) include estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may

be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations ~~on the Contract Area~~ pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non- Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty

and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)___100____% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non- Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in ~~the well from the beginning of~~ the proposed operations; and

(ii)___300____% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated ~~therein~~ in the proposed operation. See Article XVI.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non- consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____300_____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non- Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non- Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back, / Extension or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial

Objective"). / A Vertical ~~Such w~~Well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

~~This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.~~

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth

at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." See Article XVI with respect to Extension operations.

~~This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.~~

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone , unless agreed to by all Consenting Parties in the well, or approved as an exception to the then-existing spacing patterns by the appropriate regulatory agency.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, / Extension or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (*i.e.* proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed 10 days only upon notice and the affirmative vote of not less than 51 % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than 51 % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless 51 % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties in ~~of~~ each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐√Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of a Horizontal ~~the~~ Well, including tankage and/or surface facilities. For any Horizontal Well subject to this Agreement, Completion operations shall be included in the proposed drilling operations for such well.

☐√Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall

constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option 1 shall apply to all Horizontal Wells.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of One Hundred Thousand Dollars ($ 100,000 ) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of One Hundred Thousand Dollars ($ 100,000 ). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform / Workovers ~~repair work~~ or undertake the installation of artificial lift equipment ~~or ancillary production facilities such as salt water disposal wells~~ or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by~~e~~ those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 75 % of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled / Sidetracked, or Deepened pursuant to Article VI.B.~~2.~~, any well which has been drilled / Sidetracked, or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties/ then owning an interest in the well.. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within / thirty (30) days, or if a rig is on location, forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within / thirty (30) days, or forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) / (as applicable)after delivery of notice of the proposed plugging shall take over the well as of the end of such ~~forty-eight (48) hour~~ notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any / party may propose that a well which has been completed as a producer ~~shall not~~ be plugged and abandoned / which shall require ~~without~~ the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well. Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material / but free and clear of Subsequently Created Interests, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production~~. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non- abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B.~~" The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion, / Extension or plugging of a well, ~~including but not limited to the Initial Well,~~ such operation shall not be terminated without consent of parties bearing 51 % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Gas / production available for ~~sales~~ to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ ~~Option No. 2: No Gas Balancing Agreement:~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.~~

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non- taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of~~



011379

~~such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of

said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests, ~~or~~ fees / or other financial obligations hereunder, or upon the improper use of funds by ~~the Operator~~ / a party, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within / thirty (30) ~~fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment

shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged ~~as a dry hole~~, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting / Consenting ~~p~~Parties in proportion to their interests, and the non-defaulting / Consenting ~~p~~Parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non- Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the / Operator for and on behalf of the joint account, unless otherwise agreed by the parties in writing from time to time. ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least ~~five (5)~~ ten (10) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non- Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless ~~all~~ it ~~parties~~ agrees to

abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment / acquired by the parties hereunder and used exclusively for the surrendered lease, ~~which may be located thereon~~ and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby / or lands pooled therewith, such lease to be on ~~the~~ a form / mutually agreed by the parties. ~~attached hereto as Exhibit "B."~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation / to be conducted hereunder ~~on the Contract Area~~, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

**D. Assignment~~; Maintenance of Uniform Interest~~:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after the~~y~~ / Operator has~~ve~~ received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. / Except as otherwise provided herein, the transferring party shall be relieved of liability for the cost and expense of operations attributable to the transferred interest which are conducted after the expiration of the 30-day period above; *provided* that ~~N~~no assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an approved operation conducted hereunder in which such party has agreed to participate~~ prior to making such assignment~~, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations. / The transferee shall be jointly and severally liable with its transferor for payment of its share of the costs and expenses attributable to an approved operation in which its transferor had agreed to participate.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~**F. Preferential Right to Purchase:**~~

~~☐ (Optional: Check if applicable)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after notice is~~

~~delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

## ARTICLE IX.
## INTERNAL REVENUE CODE ELECTION

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income. / For federal income tax purposes, the parties agree that any gas imbalances will be reported under the cumulative gas balancing method as defined in Treasury Regulations § 1.761-2(d)(3).

## ARTICLE X.
## CLAIMS AND LAWSUITS

Operator may settle any single / or related aggregate uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed One Hundred Thousand Dollars Dollars ($ 100,000 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount / Operator shall promptly notify Non-Operators, and, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

## ARTICLE XI.
## FORCE MAJEURE

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon,

the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, ~~telegram, telex, telecopier or any other form o~~ r facsimile, postage or charges prepaid / each of which may also be delivered by attachment to electronic mail ("Email Notice"), and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the ~~telecopy,~~ facsimile / number or email address ~~or telex machine~~ of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier ~~or telegraph~~ service, or upon transmittal by ~~telex, telecopy or~~ facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, ~~telex, telecopy or other~~ facsimile / or Email Notice within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.
/ Each Email Notice shall clearly state that it is a notice or response to a notice under this agreement. An Email Notice shall be deemed delivered only when affirmatively acknowledged by email reply from the recipient (automatic delivery receipts do not qualify). If the receiving party fails or declines to affirmatively acknowledge an Email Notice, then the transmitting party shall be required to deliver notice and confirm receipt by one of the other methods provided above.

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐√ Option No. 1: So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

~~☐ Option No. 2: In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is~~

capable of production, and for an additional period of ______ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re- completing, Plugging Back or Reworking operations are commenced within ____________________ days from the date of abandonment of said well. "Abandonment" for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

**ARTICLE XIV.**
**COMPLIANCE WITH LAWS AND REGULATIONS**

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited o matters of performance, non- performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Texas______shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from / liability above and beyond its proportionate share of any and all losses, damages, injuries, Claims and causes of action arising out of, incident to our resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of / any governmental agency having jursidiction the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies to the extent such interpretation or application was made in good faith and does not constitute gross negligence / or willful misconduct. Each No-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or

application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

**ARTICLE XV.**
**MISCELLANEOUS**

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area. ~~or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:~~

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would ~~have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same~~.

☐ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each ~~party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i)~~.

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**E. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Articles I through XV of this agreement, and the provisions of Article XVI, the provisions of Article XVI shall govern.

**ARTICLE XVI.**
**OTHER PROVISIONS (Attached)**

~~**A. Conflict of Terms:**~~

~~Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.~~

~~**B. Operator's Duty:**~~

~~Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.~~

~~**C. Priority of Operations – Horizontal Wells:**~~

~~Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:~~

~~First: Testing, coring or logging;~~

~~Second: Complete drilling operations of all proposed Laterals;~~

~~Third: Extend or Deepen a Lateral;~~

~~Fourth: Kick out and drill an additional Lateral in the same Zone;~~

Fifth: Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal ~~to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;~~

~~Sixth: Sidetrack; and~~

~~Seventh: Plug and abandon as provided for in Article VI.E~~

Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.

IN WITNESS WHEREOF, this agreement shall be effective as of the ______________ day of __________, ______. ____________________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles __________, have been made to the form.

**ATTEST OR WITNESS:**

**OPERATOR**

By

Type or print name

Title

Date

Tax ID or S.S. No.

**NON-OPERATORS**

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

Date

Tax ID or S.S. No.

~~ACKNOWLEDGMENTS~~

~~Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~Individual acknowledgment:~~
~~State of~~ ______________ ~~)~~
~~) ss.~~
~~County of~~ ______________ ~~)~~

~~This instrument was acknowledged before me on~~

______________ ~~by~~ ______________.

~~(Seal, if any)~~

______________

~~Title (and Rank)~~ ______________

~~My commission expires~~ ______________

~~Acknowledgment in representative capacity:~~
~~State of~~ ______________ ~~)~~
~~) ss.~~
~~County of~~ ______________ ~~)~~

~~This instrument was acknowledged before me on~~

______________ ~~by~~ ______________ ~~as~~ ______________ ~~of~~ ______________

~~(Seal, if any)~~

______________

~~Title (and Rank)~~ ______________

~~My commission expires~~ ______________

**Article XVI to Operating Agreement**

**(Other Provisions)**

A. Additional Definitions:

1. The term "**Affiliate**" shall mean, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in [the Partnership or the General Partner] result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.
2. The term "**Agreement**" and the phrase "**this agreement**" shall each mean this Operating Agreement, as amended from time to time.
3. The term "**Associated Agreements**" means, collectively, the JDA, MSA, JEA and LLCA, inclusive of all exhibits and schedules, and all other contracts, documents, and instruments entered into by and among the parties in connection with operations and activities under this Agreement, in each case, to the extent in effect and applicable as of the time of reference hereunder.
4. The term "**Business Day**" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Houston, Texas and New York, New York are open for business.
5. The term "**Control**" (including its derivatives and similar terms) shall mean, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.
6. The term "**Extension**" or "**Extend**" shall mean an operation related to a Horizontal Well whereby a Lateral is drilled in the same Zone to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) the Displacement to which the Lateral was drilled pursuant to a previous proposal.
7. The term "**JDA**" shall mean that certain Joint Development Agreement dated as of March 1, 2017, by and between SN EF Maverick, LLC ("**SN**"), Aguila Production, LLC ("**Aguila**"), and SN EF UnSub, LP ("**UnSub**"), as the same may be amended from time to time.
8. The term "**JEA**" shall mean that certain Joint Exploration Agreement, dated as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended.
9. The term "**LLCA**" shall mean the Limited Liability Company Agreement of Aguila Production, LLC, as the same may be amended from time to time.

10. The term “**MSA**” shall mean that certain Management Services Agreement, dated as of March 1, 2017, by and among SN, Aguila, and Unsub, as the same may be amended from time to time.

11. The term “**RRC**” shall mean the Railroad Commission of Texas or its applicable successor agency or agencies.

12. The term “**Workover**” shall mean routine maintenance and repair work performed on a well but does not include a Rework operation.

B. Amendments to Exhibit “A”: The Operator shall amend Exhibit “A” from time to time in order to correct mistakes therein or to reflect changes in ownership within the Contract Area. Operator's duty to amend Exhibit “A” shall be subject to the following:

1. If such amendment is a correction of the initial Exhibit “A,” it shall be effective retroactively as of the effective date of this Agreement. If such amendment reflects a change occurring after the effective date of this Agreement, it shall be effective retroactively as of the effective date of such change. In either event, if the amendment changes the interests of any parties in the Contract Area, the accounts of the affected parties shall be thus adjusted.

2. If a proposed amendment to Exhibit “A” involves only one of the parties, Operator shall amend Exhibit “A” upon the written consent of such affected party.

3. If a proposed amendment to Exhibit “A” results in an increase or decrease in the percentage of ownership of one or more parties, Operator shall amend Exhibit “A” upon the written consent of all affected parties.

4. If any party affected by a proposed amendment to Exhibit “A” fails to give written consent to such amendment, Operator may nevertheless make such amendment in order to conform Exhibit “A” to ownership as reflected in an opinion issued by a licensed attorney, who is neither any employee of a party that is affected by the amendment, nor of any Affiliate of such party. Such amendment shall be binding upon the parties until and unless determined otherwise pursuant to Article XVI.B.6.

5. Whenever an amendment is made to Exhibit “A,” Operator shall promptly furnish each party with a copy of the amended Exhibit “A,” together with a copy of the attorney's opinion upon which such amendment is based, when applicable, irrespective of whether such party is affected by the amendment.

6. Any party who has not consented to an amendment to Exhibit “A” may pursue litigation as to the validity of the basis for the amendment in a court of competent jurisdiction, by joining all other affected parties as parties to such litigation. If such litigation results in a determination which is contrary to the amendment, Operator shall conform Exhibit “A” to such determination, retroactive to the effective date determined pursuant to Article XVI.B.1 and the accounts of the affected parties shall be thus adjusted.

C. Operator's Limited Agency Authority:

Notwithstanding the provisions of Article V.A., Non-Operators hereby designate and appoint Operator as their agent and attorney-in-fact for the sole purpose of executing, filing for RRC approval, and recording a declaration of pooling or communitization agreement to effectuate the pooling or communitization of the Oil and Gas Leases (to the extent permitted under the terms and conditions thereof) and/or Oil and Gas Interests to conform with the spacing rules or a spacing order of the RRC. However, said agency authority shall only be exercised by Operator after providing written notice (including a copy of the proposed pooling declaration or communitization agreement) to the Non-Operators, and shall be binding upon any Non-Operator failing to provide to Operator a written objection within ten (10) Business Days after receipt of such notice.

D. Third Party Operator:

The Operator shall own an interest in the Contract Area except as provided in this Article XVI.D and subject to the provisions of Article XVI.E.5. A qualified non-owning operator ("**Third Party Operator**") may serve as Operator to the extent authorized by, and subject to the applicable terms and conditions of, (i) the JDA, and/or (ii) a separate agreement of the parties hereto. Unless the JDA or such separate agreement provides otherwise, as a condition precedent to serving as Operator hereunder, the putative Third Party Operator must agree to be bound by all terms and conditions of this Agreement that would be applicable to it as Operator.

E. Resignation or Removal of Operator and Selection of Successor:

1. *Voluntary Resignation*: The Operator may resign at any time by giving written notice thereof to the Non-Operators.

2. *Deemed Resignation of Operator*: If, after the effective date of this agreement, (i) Operator terminates its legal existence, (ii) Operator and its Affiliates no longer own an interest in the Contract Area, or (iii) Operator is no longer capable of serving as Operator, then Operator shall be deemed to have resigned without any action by Non-Operators, except for the selection of a successor Operator. A change of a corporate name or business entity type of Operator shall not be deemed a resignation of Operator.

3. *Effect of Bankruptcy*: If Operator becomes insolvent, bankrupt, or is placed in receivership, it shall be deemed to have resigned without any action of Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor-in-possession, or by a trustee in bankruptcy, shall be deemed a resignation by Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator, and the federal bankruptcy court shall be selected as a member of the operating committee and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

4. *Removal of Operator*: Except as provided in Article XVI.E.5, an Operator that has not voluntarily resigned and is not deemed to have resigned may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be effective until a written notice has been delivered to Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall include, but not be limited to, Operator's (i) gross negligence or willful misconduct, (ii) material breach of or inability to meet the standards of operation contained in Article V.A, (iii) material failure to perform its obligations or duties under this Agreement, or (iv) without limiting the generality of the foregoing, Operator's intentional conduct of an approved operation in a manner that substantially deviates from the specifications of the AFE and/or proposal associated with such approved operation on more than two (2) occasions in any 365-day period other than as permitted in Article XVI.H.2.

5. *Third Party Operator*: Unless the parties have agreed otherwise, a Third Party Operator may be removed at any time, with or without cause, by the affirmative vote of parties owning a majority interest based on ownership as shown on Exhibit "A." Moreover if good cause (as defined in Article XVI.E.4) exists for

removal of such Third Party Operator, the Third Party Operator may be removed by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of any Non-Operator that (i) is an Affiliate of such Third Party Operator, and/or (ii) initiated the appointment of the Third Party Operator under Article XVI.D.

6. *Selection of Successor Operator*: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected by the affirmative vote of one (1) or more parties owning a majority interest based on ownership as shown on Exhibit "A" including the vote(s) of the former Operator and/or any transferee(s) of the former Operator's interest, to the extent that they are owners within the Contract Area; *provided*, however, if any Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. In the event that such vote results in a tie, the candidate supported by the former Operator or the majority of its transferee(s) shall become the successor Operator. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor Operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

7. *Effective Time of Resignation or Removal of Operator*: In the event of the resignation or removal of Operator, pursuant to any of Articles XVI.E.1-5, such resignation shall become effective upon the earlier of:

   a. the time and date that a successor Operator has been selected pursuant to Article XVI.E.6, and assumes the duties of Operator; or

   b. 7:00 A.M. on the first day of the calendar month following the expiration of ninety (90) days after (i) the giving of notice of resignation by Operator, (ii) the event deemed to be Operator's resignation, or (iii) action by the Non-Operators to remove Operator.

   Thereafter, the former Operator shall be bound by the terms hereof as a Non-Operator to the extent it continues to be a party hereto.

F. Proposals for Vertical Wells: Any proposal for the drilling of, or other operation in, a Vertical Well shall include:

1. Notice that the proposed operation is for a Vertical Well;

2. Drilling and Completion plans specifying the proposed:

   i. depth;

   ii. surface location, and if deviated, bottom hole location;

   iii. objective Zone;

   iv. utilization and scheduling of rig(s) for drilling and Completion;

   v. stimulation operations, staging, and sizing; and

3. Estimating drilling and Completion costs as set forth in the AFE.

G. Non-Consenting Party's Access to Location and Records:

1. *Generally*: With the exception of information required to be furnished by Operator pursuant to Article VI.B.2(d) or Article XVI.G.2, a Non-Consenting Party is neither entitled by virtue of this agreement to, nor may compel Operator or any Consenting Party to provide, access to the well location, or information and reports (or parts thereof) solely relating to such non-consented operation, until the earlier of full recoupment by the Consenting Parties of the amounts provided for in Article VI.B.2(b)(i) or two (2) years following the date the non-consented operation was commenced. Thereafter, Operator shall promptly furnish such access, information, and reports upon receipt of a written request from the Non-Consenting Party.

2. *Payout Audit*: Except as provided in Article VII.D.1, prior to a payout, a Non- Consenting Party shall be entitled to review the joint account records pertaining to a non-consented operation to the extent necessary to conduct an audit of the payout account. Any such review shall be conducted in accordance with Exhibit "C" or other agreement of the parties.

H. Operator's Implementation of Approved Proposals:

1. *Drilling Horizontal Wells*: For any Horizontal Well drilled under this Agreement, Operator shall drill such well to the Objective Zone(s) and drill the Lateral in the Zone(s) to the proposed Displacement unless drilling operations are terminated pursuant to Article VI.F or modified pursuant to this Article XVI.H.

2. *Extensions*: If, in the event that during actual drilling operations on the Lateral of a Horizontal Well, and prior to reaching the Displacement specified in the approved proposal for such well (the "**Approved Displacement**") Operator desires to Extend the Lateral more than twenty percent (20%) (measured in feet) beyond the Approved Displacement, Operator shall give the Consenting Parties written notice of such intent to Extend, together with the estimated costs, not less than 24 hours before Operator anticipates reaching the Approved Displacement. Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the Extension within 48 hours of receipt of such notice, Operator shall not Extend the Lateral beyond the Approved Displacement and will proceed with Completion in accordance with the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the Extension shall be deemed approved and binding upon all Consenting Parties.[1]

[1] NTD: This Extension provision was added in the 2015 JOA form recently approved by the AAPL.

3. *Other Deviations*: If Operator, in its reasonable judgment, determines that a deviation from an approved proposal other than an Extension is necessary or appropriate based upon information derived from facts and circumstances determined subsequent to the commencement of the operations relating to such proposal (including, without limitation, revision of the original proposed Completion staging and design), Operator shall immediately upon making such determination notify the Consenting Parties of the proposed modification (including all appropriate detail on the basis, cost, and design thereof). Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the proposed modification within 48 hours of receipt of such notice, Operator shall not undertake the modification and will proceed with the operation as specified in the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the proposed modification shall be deemed approved and binding upon all Consenting Parties.[2]

H. Non-Operator Materials: Each Non-Operator hereby agrees to provide Operator with all documentation, affidavits, reports or other materials in its possession as required by Operator to perform those tasks to be undertaken by Operator hereunder, or as may be required by regulations and laws of the governmental authorities having jurisdiction over operations in the Contract Area. Non-Operator Liability for Site Visits:

J. Non-Operator Liability for Site Visits:

EACH NON-OPERATOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OPERATOR, ITS AFFILIATES, AND ITS AND THEIR RESPECTIVE MANAGERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CONTRACTORS AND SUBCONTRACTORS FROM AND AGAINST ANY AND ALL LIABILITY FOR INJURY TO SUCH NON-OPERATOR'S OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS, RESULTING FROM OR IN ANY WAY RELATING TO THE PRESENCE OF ANY SUCH OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS AT OR IN THE VICINITY OF ANY WELL LOCATION OR PRODUCTION FACILITY ON THE CONTRACT AREA OR FROM ANY SUCH PERSON'S TRAVELING TO OR FROM SUCH LOCATION OR FACILITY, OTHER THAN ANY SUCH INJURY AND RESULTING LIABILITY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR.

K. Liability of Non-Consenting Parties:

Notwithstanding anything herein to the contrary, any party who elects or is deemed to have elected not to participate in any proposed operation, as set out in this Agreement, shall not be relieved of (i) any obligations accruing prior to its election or deemed election not to participate or (ii) any obligation with respect to any other operation in which such party is participating or has participated.

L. Right to Set-Off or Recoupment; Netting:

Operator (or any non-defaulting Non-Operator if Operator is the party in default) may take any action to which it may be entitled or pursue any remedy to collect the amounts in default, together with all damages suffered by the non-defaulting parties as a result of the default plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in the COPAS Accounting Procedure attached as Exhibit "C" (without duplication of any interest charges permitted under the Development Agreement), together with reasonable attorneys' fees and court costs related thereto. Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have and be entitled to exercise all rights and remedies of recoupment, setoff and any similar doctrines, and the exercise of such rights and remedies shall be in addition to all other rights and remedies. Without limiting the foregoing, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the additional right to notify the purchaser or purchasers of the defaulting party's Oil and Gas production, and recoup or collect any amounts in default out of the proceeds from the sale of the defaulting party's share of Oil and Gas production until the amount owed has been paid in full. In addition, Operator (or any non-defaulting Non-Operator if Operator is the party in default) may, by notice to a defaulting party, suspend the right of such defaulting party to take and sell or dispose of its share of Oil and Gas production until such default has been cured. With respect to any amount owed pursuant to this Agreement by a defaulting party, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the right, from time to time, to recoup from, and to offset against, proceeds from the sale of such defaulting party's share of Oil and Gas production until payment in full of all amounts owing by such defaulting party, and to remit to such defaulting party a net check in the amount of any such net proceeds to which the defaulting party is then entitled. Any purchaser of such production shall be entitled to rely on Operator's (or any non-defaulting Non-Operator if Operator is the party in default) statement concerning the amount owed by the defaulting party. For the avoidance of doubt, in the event Operator is the party in default, any Non-Operator may cause Operator, by delivering notice to Operator, to exercise the remedies set forth in this Article XVI.L. with respect to Operator's interest covered by this Agreement.

M. Separate Measurement Costs:

In the event separate measurement of production is required, the party creating the necessity for such separate measuremnt shall alone bear the cost of purchase, installation and operation of such measurement facilities.

N. Agreement Subject to Associated Agreements:

The rights, obligations and remedies of the parties under this Agreement are subject to a the provisions of the Associated Agreements, to the extent that such remain in effect as of the time of reference hereunder. To the extent there is a conflict between the terms of this Agreement and any provisions of the Associated Agreements that remain effective, the terms of the Associated Agreements shall control.

O. Headings:

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions of this Agreement.

P. Confidentiality of Information:

No party to this Agreement shall use, publish, disseminate or otherwise disclose, directly or indirectly, any trade secrets, proprietary information or confidential information, including, without limitation, the identity of a party or Affiliates thereof (collectively, the "Confidential Information") that should come into the possession of such party other than: (i) as necessary for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements; (ii) to an Affiliate or representative; (iii) in presentations made by Operator in the ordinary course of business at investor or industry conferences; ***provided*** that Operator shall not use the name of any Non-Operator or its Affiliates or disclose any provisions of this Agreement or the Associated Agreements in such conferences; or (iv) to the extent a party is required to disclose such Confidential Information (A) pursuant to applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), (B) due to a subpoena or court order or other legal process or (C) in order to enforce its rights under this Agreement or the Associated Agreements; provided that each party may disclose Confidential Information to its prospective and current direct or indirect investors or equity or debt financing sources, advisors and bona fide prospective transferees so long as such parties are subject to a customary confidentiality agreement or duty of confidentiality with respect to the Confidential Information. Each party shall, and shall cause each of its Affiliates, and its and their respective directors, officers, members, partners, investors, employees, representatives and agents (i) to comply with this Article XVI.P, (ii) to refrain from using any Confidential Information other than for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements and (iii) to refrain from disclosing any Confidential Information to a person known to be a competitor of the other party (for the avoidance of doubt, this clause (iii) should not restrict any disclosure in accordance with the proviso in the immediately preceding sentence). If a party is required by law or court order to disclose information that would otherwise be Confidential Information under this Agreement, such party shall immediately notify, to the extent permitted under applicable law, the other parties of such notice and provide each party the opportunity to resist such disclosure by appropriate proceedings.

Q. Media Releases:

1. The parties shall consult with each other with regard to all press releases and other public announcements concerning this Agreement or operations on the Contract Area. Except as expressly permitted in Article XVI.P, without the prior written approval from the other parties hereto, no party will issue, or permit

any Affiliate or representative of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement, the Associated Agreements or the activities contemplated hereby or thereby, in each case except where such release or statement is (i) required by applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), or (ii) limited to previously released publicly available information, which press releases or statements will not be restricted by this Article XVI.Q. Notwithstanding anything to the contrary in Article XVI.Q.1 or Article XVI.P, in the event of any emergency which imminently and materially endangers property, lives or the environment, Operator may issue such press releases or public announcements as it deems reasonably necessary in light of the circumstances and will promptly provide Non-Operators with a copy of any such press release or announcement, if commercially feasible, prior to such press releases or public announcements being released or made.

2. Notwithstanding anything contained herein to the contrary, except as may be required by applicable law or the applicable rules and regulations of any governmental agency or stock exchange, no party shall issue any press release or make any other public announcement (excluding announcements (which shall not include technical data) to limited partners or investors of a party given in the ordinary course of business of such party) that makes reference to the name of another party or such party's Affiliates without the prior written consent of such party, which consent shall not be unreasonably withheld. In no event shall any of the principals or officers of a party be identified in any press releases or public announcements by another party without such party's consent.

R. Memorandum of Operating Agreement:

The parties agree to execute simultaneously herewith the Memorandum of Operating Agreement in the form and language set forth in Exhibit "H", which is attached hereto and made a part hereof. The parties agree to execute amendments of same, from time to time, to accurately reflect the Contract Area covered by this Agreement and the current working interests of the parties. Such memoranda may be recorded as deemed appropriate by any party, including in the records of the relevant counties and in any other jurisdictions where the filing of a financing statement (or similar instrument) is necessary to perfect the security interests granted in this Agreement.

S. Severability:

It is the intent of the parties that the provisions contained in this Agreement shall be severable. If any provisions of this Agreement, in whole or in part, are held invalid, illegal or incapable of being enforced as a matter of law or public policy, such holding shall not affect the other portions of this Agreement, and all other such portions shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

T. Governing Law; Venue; Jury Waiver:

THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION (EXCEPT THAT, WITH RESPECT TO ISSUES RELATING TO REAL PROPERTY FOR PROPERTIES LOCATED IN A

SPECIFIC STATE, THE LAWS OF SUCH STATE SHALL GOVERN). THE PARTIES AGREE THAT THE APPROPRIATE, EXCLUSIVE AND CONVENIENT FORUM FOR ANY DISPUTES BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT, THE ASSOCIATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE IN ANY FEDERAL OR STATE COURT WITH SUBJECT MATTER JURISDICTION LOCATED IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS SOLELY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY ASSOCIATED AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**Exhibit " C "**
**ACCOUNTING PROCEDURE**
**JOINT OPERATIONS**

Attached to and made part of that certain Operating Agreement dated [ ] , by and among [ ] as Operator, and [ ], as Non- Operators
.

**I. GENERAL PROVISIONS**

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

**1. DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** / has the meaning set forth in the Agreement. ~~means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50% ) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.~~

**"Agreement"** means the operating agreement~~, farmout agreement, or other contract~~ between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to: 44

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
- part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication~~

facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of Offshore Facilities, Shore Base Facilities, fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

**2. STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within / thirty (30) ~~fifteen (15)~~ days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within / thirty (30) ~~fifteen (15)~~ days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within / thirty (30) ~~fifteen (15)~~ days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or Discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

COPAS 2005 Accounting Procedure
Recommended by COPAS

**4. ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

**5. EXPENDITURE AUDITS**

A. Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

COPAS 2005 Accounting Procedure
Recommended by COPAS

A timely filed written exception or audit report containing written exceptions (hereinafter “written exceptions”) shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with The additional deadlines in Section I.5.B or I.5.C, the Operator’s waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator’s response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company’s follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company’s position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month’s written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator’s office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party’s written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations

reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

~~E. ☐ ***(Optional Provision – Forfeiture Penalties)*** *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non- Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*~~

**6. APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of __all__ (__100%__) / of the Parties ~~or more Parties, one of which is the Operator, having a combined working interest of at least percent ( %)~~, which approval shall be binding on all Parties, ~~provided, however, approval of at least one (1) Non-Operator shall be required~~.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

**II. DIRECT CHARGES**

The Operator shall charge the Joint Account with the following items:

**1. RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2. LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on ~~Shore Base Facilities, Offshore Facilities, or other~~ facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, ~~or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category~~.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of

transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

COPAS 2005 Accounting Procedure
Recommended by COPAS

copas

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities~~, Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed ___twelve___ percent (___12___%) per annum; provided, however, depreciation shall not be charged when the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_100,000.00___ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_100,000.00___ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

/ Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys / and landment for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable / to the Joint Account ~~to the extent permitted as a direct charge in the Agreement~~.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges / to the extent Operator handles such tax matters on behalf of the Joint Account ~~unless approved by the Parties pursuant to Section I.6.A (*General Matters*)~~.

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration
- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

Case 4:23-cv-00095-O Document 137-3-1 Filed 08/30/2024 Page 196 of 250



Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1. OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

☐ **(Alternative 2)** Percentage Basis, Section III.1.C.

A. TECHNICAL SERVICES

*(i)* Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.

*(ii)* Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates / provided that, offsite geosteering costs shall be charged direct to the Joint Account.

☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.

☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

copas

COPAS 2005 Accounting Procedure
Recommended by COPAS

Drilling Well Rate per month $ 7,000.00 (prorated for less than a full month)

Producing Well Rate per month $ 700.00

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. ~~Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first.~~ No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor

described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 (“Adjustment of Overhead Rates”).

~~C. OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate ____ percent ( ___ ) % of the cost of development of the Joint Property, exclusive of costs rovided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate ____ percent ( ____ % ) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator’s expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

COPAS 2005 Accounting Procedure
Recommended by COPAS

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3. AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished

by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally

available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service

rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.
- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.
- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25% ) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

**EXHIBIT "D"**

**Attached to and made a part of that certain Joint Operating Agreement dated effective _______, by and among ____________, as Operator, and _______________, as Non-Operators.**

The Operator shall carry insurance at the expense of and for the benefit of the joint account covering Operator's operations upon the Contract Area subject to the Operating Agreement to which this Exhibit "D" is attached as follows:

a) Workers' compensation insurance: In compliance with the workers' compensation laws of the State of Texas, including employer's liability with minimum limits of $[●].

b) Commercial general liability insurance: A limit of $[●] each occurrence for bodily injuries, $[●] aggregate. Property damage liability limit being $[●] each occurrence, $[●] aggregate.

c) Business automobile liability insurance. Limits of bodily injury $[●] each person; $[●] each occurrence; property damage $[●] each occurrence.

During drilling operations, Operator shall also carry Operator's Extra Expense insurance including coverage for well seepage, pollution, cleanup and containment and evacuation expenses. The limit of such insurance is $[●] for any one occurrence.

The insurance provided for herein for the benefit of the joint account provides for certain deductibles and or retentions to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of a deductible and/or retention, said deductible/retention amount shall be a direct charge to the joint account.

No other insurance will be required other than as set forth above. Premiums associated with the insurance for the benefit of the joint account shall be charged to the joint account. Any party may at its own expense acquire such other insurance it deems proper to protect itself against any claims, losses, damages or destruction arising out of operations hereunder.

Operator and each Non-Operator agree to mutually waive subrogation in favor of each other on all insurance carried by each party and/or obtain such waiver from the insurance carrier if so required by the insurance contract.

~~INSTRUCTIONS FOR USE OF GAS BALANCING AGREEMENT FORM~~

~~GENERAL~~

~~This Gas Balancing Agreement form is intended to be used as Exhibit "E" to the 1977, 1982 and 1989 A.A.P.L. Form 610 Model Form Operating Agreements. It is also generally suitable for use with other forms of operating agreements. However, before using this form, both it and the operating agreement in question should be reviewed and revised as required to ensure consistency.~~

~~If this form is used as an exhibit to an A.A.P.L. Form 610 Model Form Operating Agreement or other operating agreement, the provisions in Section 15 (Counterparts), the "IN WITNESS WHEREOF" paragraph on page 6 and the signature lines and acknowledgments on page 7 should be omitted.~~

~~This Gas Balancing Agreement may also be executed as a separate agreement for properties covered by an existing operating agreement where there is no gas balancing agreement or where the one employed is deemed inadequate. In that event, the properties subject to the form will have to be described, and the provisions of Section 15 (Counterparts), the "IN~~

~~WITNESS WHEREOF" on page 6 and the signature lines and acknowledgments will have to be employed.~~

~~The description of the area covered by the Agreement may be included in the definition of the Balancing Area in Section 1.02. Care should be taken in drafting this description, however, because it may be desirable to cover more than one Balancing Area. Such a definition might, for example, read as follows:~~

> ~~Each well subject to that Operating Agreement dated______, covering _________ that produces gas or is allocated a share of gas production. If a single well is completed in two or more reservoirs, such well shall be considered a separate well with respect to, but only with respect to, each reservoir from which the gas production is not commingled in the wellbore.~~

~~This Gas Balancing Agreement contains both "alternative" and "optional" provisions. In the case of alternative provisions, it will generally be necessary to select one alternative in order to make the Gas Balancing Agreement effective. Provisions which are designated as optional (or as Option 1, 2, etc.) may or may not be used.~~ **~~Note that, in order for an Alternative or Option to be selected and effective, it must be checked. If, however, an Alternative is not selected, "Alternative 1" in each instance will be deemed to have been adopted by the Parties, but if an Option is not selected, it will not form a part of the Gas Balancing Agreement. See Section 12.6.~~**

HEADING ~~- Indicate the applicable Operating Agreement and other information. If the Gas Balancing Agreement is to be used without an Operating Agreement, the heading on page 1 should be modified appropriately, and the following references to the "Operating Agreement" should be deleted or modified appropriately: Section 1.12; Section 7.1; Section 9; Section 12.4; Section 13.1; and Section 13.2.~~

SECTION 1.02 ~~- Select the Balancing Area to be used, or insert a description of the Balancing Area. As a general rule, the use of a mineral lease as a Balancing Area will only be appropriate in certain situations involving offshore wells.~~

SECTION 1.16 ~~- This definition should be used only if one of the optional seasonal limitation provisions in Section 4.2 is employed. The specific months during which makeup is to be restricted should be included,~~ e.g.~~, "the months of November, December, and the following January and February."~~

SECTION 2.1 ~~- The parties should decide whether the basis of balancing in the Balancing Area will be in Mcfs or MMBtus. One of the two Alternatives stipulated MUST be selected to avoid an automatic election that Alternative 1 applies.~~

SECTION 2.2 ~~- Since most gas is now decontrolled, the primary purpose of this provision is to provide for separate application of the form to different price categories in the event that price controls are imposed in the future by governmental entity.~~

SECTION 3.5 ~~- This provision is intended to limit Overproduction in order to keep a Party from getting too far out of balance. It should be noted that this Section will only have an impact if a Party owns less than a 1/3 working interest in the Balancing Area, since under it a party owning a 1/3 interest will be entitled to take 300%, x 1/3 = 100%.~~

SECTION 4.1 ~~- Select the number of days' notification that an Underproduced Party must give prior to making up Gas. Also, indicate the percentage of each Overproduced Parties' Gas that Underproduced Parties will be allowed to make up. The percentages should be identical.~~

SECTION 4.2 ~~- The form sets out two Options for imposing seasonal limitations on making up Gas. It should be noted that it is NOT required that any seasonal limitation be included. If Option 1 is selected, select the number of months prior to the Winter Period that will be used to determine how much Gas an Underproduced Party may make up during the Winter Period. This number and the number of months in the Winter Period (as defined in Section 1.16) should add up to 12 or less. If Option 2 is selected, indicate the percentage of an Overproduced Party's Gas that an Underproduced Party may make up during the Winter Period. This percentage should be lower than the percentage set out in Section 4.1.~~

SECTION 4.3 ~~- Select the percentage of an Overproduced Party's Gas which it should be required to make available for make up once it has produced all of its share of ultimately recoverable reserves. This percentage should be greater than the percentage set out in Section 4.1.~~

SECTION 6.2 - One of the two Alternatives stipulated **MUST** be selected as the basis upon which Royalty is to be calculated and paid in order to avoid an automatic election that Alternative 1 applies.

SECTION 7.3 - One of the two Alternatives stipulated for payment of amounts due under a cash settlement **MUST** be selected in order to avoid an automatic election that Alternative 1 applies. Note that Section 7.3.1 is optional, and may **ONLY** be used with Section 7.3, Alternative 2.

SECTION 7.4 - One of the two alternatives stipulated for determining proceeds received by an Overproduced Party for cash settlement purposes **MUST** be selected in order to avoid an automatic election that Alternative 1 applies.

SECTION 7.5.1 through 7.5.2 - Before selecting any of these provisions, the Parties should review the relevant gas processing arrangements for the Gas. Section 7.5.2, Option 1, contemplates that all wellhead MMBtus of Overproduction(will be valued at the gas price per MMBtu received by the Overproduced Party, without regard to whether any of the gas may have been processed. Section 7.5.2, Option 2, on the other hand, would include any enhanced or impaired values resulting from processing in calculating a valuation for the Overproduction. Note that if Section 7.5.2, Option 1, is selected, and residue gas to be sold on an MMBtu basis, it will be necessary to measure the number of MMBtus produced at the well (even if the parties have elected to balance on Mcfs), in order to determine the total value of Overproduction.

SECTION 7.7 - Select the interest rate payable for unpaid amounts owed pursuant to a cash settlement.

SECTION 7.9 - In the event that the parties anticipate that Overproduction may be subject to a potential refund by an appropriate governmental authority, the Parties may choose this provision.

SECTION 7.10 - If the Parties adopt this provision, an Overproduced Party may make a cash settlement with Underproduced Parties for all or part of outstanding gas imbalances as often as once every twenty-four (24) months.

SECTION 8 - Select the number of days' prior notification required for well tests, as well as the length of such tests.

SECTION 12.9 - Select the appropriate method for computing and reporting income to the Internal Revenue Service based on the "entitlements" or "sales" methods.

SECTION 13 - The purpose of this Section is to stipulate the rights of Parties in the event that any Party sells, exchanges, transfers or assigns its interest in the Balancing Area. Section 13.2 gives the Underproduced Party an option to demand a cash settlement if an Overproduced Party sells its interest, and the number of days' notice and response should be selected to implement this procedure.

SECTION 14 - This provision is intended to provide the Parties an opportunity to modify or supplement any of the Gas balancing Agreement's provisions.

SECTION 15 - This provision is to be utilized ONLY if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, Section 15 should be omitted. Otherwise, the Parties must determine the appropriate Percentage Interest which must execute the form to make it effective and the date by which such interests must execute it.

SIGNATURE ELEMENT - The "IN WITNESS WHEREOF," signature and attest/witness elements are ONLY to be utilized if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, the "IN WITNESS WHEREOF," signature and attest/witness elements should be omitted. Otherwise, these items should be completed in an appropriate fashion, and any appropriate amendment made to the heading of the Gas Balancing Agreement.

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**OPERATING AGREEMENT DATED** ______________________ **BY AND BETWEEN** ______________, as Operator ______________ **AND** , as Non Operators ______________ **("OPERATING AGREEMENT") RELATING TO THE AREA,** [Maverick, Dimmit, Webb, LaSalle] **COUNTY/PARISH, STATE OF** Texas.

**1. DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one):**

☐ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

☑ all of the acreage and depths subject to the Operating Agreement.

☐ ______________________________

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

~~1.16 ☐ **(Optional)** "Winter Period" shall mean the month(s) of ______________________ in one calendar year and the month(s) of ______________________ in the succeeding calendar year.~~

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ☑ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to



011431

meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances~~, but in no event for a period in excess of one year~~. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following atleast __twenty__ (__20__) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying __twenty-five__ percent (__25__%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than __twenty-five__ percent (__25__%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 1) Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ( ) months immediately preceding the Winter Period.~~

~~4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 2) Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than percent ( %) of its Full Share of Current Production for Makeup Gas during the Winter Period.~~

4.3 ☑ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to _________________________ percent (__100__%) of such Overproduced Party's Full Share of Current Production.

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within ninety (90) ~~forty-five (45~~) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

~~6.2 ☐ **(Alternative 1 - Entitlements)** Each Party shall pay or cause to be paid all Royalty due with respect to Royalty owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.~~

~~6.2.1 ☐ **(Optional - For use only with Section 6.2 - Alternative 1 - Entitlement)** Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

6.2 ☑ **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.



011433

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within / ninety (90) ~~sixty (60)~~ days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☑ **(Alternative I - Direct Party-to-Party Settlement)** Within/ ninety (90)~~sixty (60)~~ days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.4 ☐ **(Alternative 2 - Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any / post-production expenses, such as reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

~~7.5.1 ☐ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.~~

~~7.5.2 ☐ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ☑ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

7.7 Interest compounded at the rate of prime+one percent(1%) ~~percent (_____%)~~ per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8 In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

~~7.9 ☐ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.~~

7.10 ☑ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.

**8. TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after thirty (30) days' prior written notice to the Operator and shall last no longer than seventy-two (72) hours.

**9. OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10. LIQUIDS**

The / Operator shall market and settle, for the joint account, liquid hydrocarbons recovered with Gas production by field equipment and the Parties shall share proportionately in and own all liquid hydrocarbons ~~recovered with Gas by field equipment operated for the joint account~~ in accordance with their Percentage Interests in the Balancing Area.

**11. AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12. MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

~~12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.~~

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service **(select one)** ~~— as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or~~ ☑ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations _____.



011437

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall cause its assignee or other transferee to assume its obligations hereunder.

13.2 ☑ **(Optional - Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least fifteen (15) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within thirty (30) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**14. OTHER PROVISIONS**

~~**15. COUNTERPARTS**~~

~~This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a percent ( %) therein fail(s) to execute this Agreement on or before, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

~~IN WITNESS WHEREOF, this Agreement shall be effective as of the day of ___________, ____.~~

| ATTEST OR WITNESS: | OPERATOR |
|---|---|
| | BY: |
| | Type or print name |
| | Title |
| | Date |
| | Tax ID or S.S. No. |
| | NON-OPERATORS |
| | BY: |
| | Type or print name |
| | Title |
| | Date |
| | Tax ID or S.S. No. |
| | BY: |
| | Type or print name |
| | Title |
| | Date |
| | Tax ID or S.S. No. |

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ______________ )

______________________ ) ss.

County of ______________ )

This instrument was acknowledged before me on ______________________________________

by

(Seal, if any)

Title (and Rank)

My commission expires:

Acknowledgment in representative capacity:

State of ______________ )
______________________ ) ss.
County of ______________ )

This instrument was acknowledged before me on ________________ by ________ as ________ of ________. (Seal, if any)

Title (and Rank)

My commission expires:

**EXHIBIT "F"**
**Attached to and made a part of that certain Operating Agreement dated**
**effective ________, by and among __________, as Operator,**
**and _________________, as Non-Operators.**

**NON-DISCRIMINATION AND CERTIFICATION OF**
**NON-SEGREGATED FACILITIES**

One or more parties to the attached Operating Agreement may be a Government Contractor as defined by law and therefore be required to obtain certification of compliance with certain applicable federal laws, orders, and regulations vendors, suppliers, parties, contractors, and subcontractors with whom they do business.

To ensure compliance with such requirements, Operator hereby agrees to materially comply with the following provisions contained in the Code of Federal Regulations (to the extent such provisions are applicable to Operator and unless Operator is exempted by applicable law), which are incorporated herein by reference: 41 C.F.R. § 60 - 1.4(a) (Equal Employment Opportunity); 41 C.F.R. § 60-741.5(a) (Equal Employment Opportunity for Workers with Disabilities); 41 C.F.R. 60-300.5(a) (Equal Opportunity for Disabled and Other Protected Veterans);

In addition, Operator hereby certifies that it: (a) has developed a written Affirmative Action Compliance Program consistent with the rules and regulations published by the Department of Labor in 41 C.F.R. § 60; (b) files an annual Employer Information Report EEO-1 Standard Form 100 in accordance with 41 C.F.R. § 60-1.7; and (c) that it does not, and will not maintain any facilities for employees in a segregated manner or permit its employees to perform their services at any location under its control, where segregated facilities are maintained, in accordance with 41 C.F.R. § 60-1.8.

**Exhibit "H"**

**Attached to and made a part of that certain Joint Operating Agreement dated [_______], by and among [______], as Operator and [___________________], as Non-Operators**

**MODEL FORM RECORDING SUPPLEMENT TO OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between _____, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated ______ (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding

royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of

production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. Other provisions.

~~_______, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

IN WITNESS WHEREOF, this agreement shall be effective as of the _______ day of _______, _______.

**OPERATOR**

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**NON-OPERATORS**

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

**ATTEST OR WITNESS**

By: ________________
**Type or Print Name**
Title: ________________
Date: ________________
Address: ________________

ACKNOWLEDGMENTS

NOTE:

The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual Acknowledgment

State of ____ §

____ § ss.

County of ____ §

This instrument was acknowledged before me on ____ by (Seal, if any) ____

Title (and Rank)

My commission expires:

Acknowledgment in Representative Capacity

State of ____ §

§ ss.

County of ____ §

This instrument was acknowledged before me on ____ by ____ as ____ of ____.

(Seal, if any)

____

Title (and Rank) ____

My commission expires: ____

**ACKNOWLEDGEMENTS**

State of Texas §

§ ss.

County of Harris §

This instrument was acknowledged before me on ______ by ______ as [ ] of ______.

(Seal, if any) ______

Title (and Rank) ______

My commission expires: ______

State of Texas §

§ ss.

County of ______ §

This instrument was acknowledged before me on ______ by ______ as [ ] of ______.

(Seal, if any) ______

Title (and Rank) ______

My commission expires: ______

**Exhibit C**

**AMI & Core Area**



**Exhibit D**

**Form of Assignment**

**CONVEYANCE, ASSIGNMENT AND BILL OF SALE**

This **CONVEYANCE, ASSIGNMENT AND BILL OF SALE** ("Conveyance") is executed this ___ day of _________, 20__ (the "Execution Date"), and made effective as of 9:00 A.M., Eastern Time, on the ___ day of _________, 20__ (the "Effective Time") by and between ________________, a ______________, having as its address _______________ ("Assignor"), and ________________, a ______________, having as its address _______________ ("Assignee"). Assignor, on the one hand, and Assignee, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein shall have the meanings set forth in that certain Joint Development Agreement dated as of January [●], 2017, by and between SN EF Maverick, LLC ("SN"), SN EF UnSub, LP ("SN UnSub"), and Aguila Production, LLC ("Blackstone") (the "Joint Development Agreement").

**ARTICLE I**
**GRANTING AND RESERVATION CLAUSES; HABENDUM CLAUSE**

1.1 **Grant**. Assignor, for and in consideration of $10.00, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, transfers, bargains, sells, conveys, assigns and delivers unto Assignee an undivided [●] percent of all of Assignor's existing right, title and interest in and to the following, but only with respect to the rights and obligations arising thereunder from and after the Effective Time and less and except the Excluded Assets (as hereinafter defined) (the "Assigned Assets"):

(a) [________][1]

[1] NTD: Definition of "Assigned Assets" to conform to the specific Acquisition under the Joint Development Agreement giving rise to this Conveyance, and any conveyancing instruments included in such transaction, in order to transfer Assignee its proportionate interest in all such assets.

1.2 **Habendum**. TO HAVE AND TO HOLD the Assigned Assets, together with all rights and appurtenances in any way belonging thereto, unto Assignee and its respective successors and assigns forever, subject, however, to the terms and conditions of this Conveyance, including Section 3.1.

**ARTICLE II**
**SPECIAL WARRANTY; DISCLAIMERS; TARGET FORMATION**

2.1 **Special Warranty**. Assignor hereby warrants and forever defends all and singular title to the Assigned Assets unto Assignee, its successors and assigns, solely against all and singular persons claiming or to claim the same or any part thereof, by, through or under Assignor or any of Assignor's affiliates, but not otherwise.

2.2 **Disclaimers**.

(a) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, (I) ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) ASSIGNOR EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE OR ANY OF ITS AFFILIATES,

EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ASSIGNOR OR ANY OF ITS AFFILIATES).

(b) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSIGNED ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION RELATING TO THE ASSIGNED ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSIGNED ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSIGNED ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSIGNED ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSIGNED ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSIGNED ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY ASSIGNOR OR THIRD PARTIES WITH RESPECT TO THE ASSIGNED ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS CONVEYANCE OR THE JOINT DEVELOPMENT AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING HERETO AND THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THIS CONVEYANCE, ASSIGNOR FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSIGNED ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT, AS BETWEEN ASSIGNOR AND ASSIGNEE, ASSIGNEE WILL BE DEEMED TO BE OBTAINING THE ASSIGNED ASSETS IN THEIR PRESENT STATUS, CONDITION, ENVIRONMENTAL CONDITION AND STATE OF REPAIR, “AS IS” AND “WHERE IS” WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE).

(c) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT, ASSIGNOR HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSIGNED ASSETS, AND NOTHING IN THIS CONVEYANCE, THE JOINT DEVELOPMENT AGREEMENT OR OTHERWISE WILL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY.

(d) THE PARTIES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 2.2 ARE “*CONSPICUOUS*” DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

2.3 **Subrogation**. Assignor hereby assigns to Assignee all rights, claims and causes of action under title warranties given or made by Assignor's predecessors in interest with respect to the Assigned Assets, and Assignee is specifically subrogated to all rights which Assignor may have against such predecessors in interest with respect to the Assigned Assets, to the extent Assignor may legally transfer such rights and grant such subrogation.

**ARTICLE III**
**ASSUMED OBLIGATIONS**

3.1 **Assumed Obligations**. Without limiting and except for Assignee's rights under Section 2.1 or in the Joint Development Agreement, Assignee hereby assumes and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations, expenses and liabilities, known or unknown, arising from, based upon or associated with the Assigned Assets, including obligations, expenses and liabilities relating in any manner to the use, ownership or operation of the Assigned Assets. [2]

[2] NTD: Section 3.1 herein to be revised as necessary to make clear that Assignee hereby assumes its proportionate share of the obligations incurred by Assignor under the Acquisition.

**ARTICLE IV**
**MISCELLANEOUS**

4.1 **Joint Development Agreement**. This Conveyance is delivered pursuant to, and hereby made subject to, the terms and conditions of the Joint Development Agreement. In the event that any provision of this Conveyance (other than any term defined herein) is construed to conflict with any provision of the Joint Development Agreement, the provisions of the Joint Development Agreement (other than with respect to terms defined herein) shall be deemed controlling to the extent of such conflict.

4.2 **Further Cooperation**. After the date hereof, Assignor and Assignee shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer, and shall take such other actions as any Party may reasonably request, to convey and deliver the Assigned Assets to Assignee.

4.3 **Successors and Assigns**. The provisions of this Conveyance shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

4.4 **GOVERNING LAW AND WAIVER OF JURY TRIAL**. THIS CONVEYANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, IN EACH CASE EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS CONVEYANCE.

4.5 **Exhibits**. All exhibits and attachments hereto are hereby made a part hereof and incorporated herein by this reference. References in such exhibits and attachments to instruments on file in the public records are notice of such instruments for all purposes. Unless provided otherwise, all recording references in such exhibits and schedules are to the appropriate records (the real property records, oil and gas records or other appropriate records) of the county in which the Assigned Assets are located.

4.6 **Captions**. The captions and article and section numbers in this Conveyance are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Conveyance.

4.7 **Counterparts**. This Conveyance may be executed in one or more originals, but all of which together shall constitute one and the same instrument. An executed original of this Conveyance containing complete copies of all exhibits is being filed of record in the county in which the Assigned Assets are located.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the authorized representatives of Assignor and Assignee have executed this Conveyance to be made effective for all purposes as of the Effective Time.

**ASSIGNOR**:

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNEE**:

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNOR:**

**THE STATE OF __________ §**

**COUNTY OF ________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

_______________________________________
Notary Public, State of _______________

My commission expires: ________________________________

**ASSIGNEE:**

**THE STATE OF _____________ §**

**COUNTY OF ___________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

_______________________________________
Notary Public, State of _______________________

My commission expires: ________________________________

Case 4:23-cv-05085 Document 1-37 Filed 12/19/23 Page 109 of 250

ASSIGNOR’S ADDRESS:

[●]
[●]
[●]
Attention: [●]

ASSIGNEE’S ADDRESS:

[●]
[●]
[●]
Attention: [●]

THIS INSTRUMENT PREPARED BY/WHEN RECORDED RETURN TO:

[●]
[●]
Attention: [●]

**EXHIBIT** [●]

ATTACHED TO AND MADE A PART OF THAT CERTAIN CONVEYANCE BETWEEN [●] AND [●]
[●]

**Exhibit E**

**Form of Memorandum of Joint Development Agreement**

***Final Form***

**MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT**

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of January [●], 2017 (the "Effective Date"), is by and between Aguila Production, LLC, a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of January [●], 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, and LaSalle Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | SN EF Maverick, LLC<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To Investor: | Aguila Production, LLC<br>345 Park Avenue, 43rd Floor<br>New York, New York 10154<br>Attention: Angelo Acconcia<br>Telephone: (713) 400-8210<br>Electronic Mail:<br>acconcia@blackstone.com |
| With a copy to: | Kirkland & Ellis LLP<br>600 Travis St., Suite 3300<br>Houston, Texas 77002<br>Attention: Andrew Calder, P.C.<br>Rhett Van Syoc<br>Electronic Mail:<br>andrew.calder@kirkland.com<br>hett.vansyoc@kirkland.com |

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Aguila Production, LLC
a Delaware limited liability company

By: ______________________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Aguila Production, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________________
Notary Public, State of ______________________

Sanchez Energy Corporation
a Delaware corporation

By: ______________________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

______________________________
Notary Public, State of ______________________

SN EF Maverick, LLC
a Delaware limited liability company

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________
Notary Public, State of

Case 4:23-cv-03085 Document 137-35 Filed 03/30/24 in TXSD Page 447 of 652

SN EF UnSub, LP
a Delaware limited partnership

By: ______________________________________
Name:
Title:
Date:

STATE OF __________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by __________________, as ________________ of SN EF Maverick, LLC, a Delaware limited partnership, on behalf of such limited partnership.

______________________________________
Notary Public, State of ________________________

**Exhibit F**
**Form of Notice of Termination of the Joint Development Agreement**

**NOTICE OF TERMINATION**

**WHEREAS**, Aguila Production, LLC, Sanchez Energy Corporation, SN EF Maverick, LLC and SN EF UnSub, LP (collectively, the "Parties") are parties to that certain Joint Development Agreement, dated January [●], 2017 (the "Terminated Agreement") a memorandum of which is recorded at ***[describe recording information for all memo(s) filed of record]***;

**WHEREAS**, pursuant to Section 6.1 of the Terminated Agreement, the Parties may terminate the Terminated Agreement; and

**NOW, THEREFORE**, the Parties wish to provide notice of termination effective as of [●].

1. Termination. The Terminated Agreement shall be terminated effective [●]. As of [●], [●] shall have no further claims, of any nature, on [●] in relation to the Terminated Agreement; provided, however, the termination described herein shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) accrued under the Terminated Agreement prior to the effective date hereof, (ii) comes into effect due to the expiration or termination of the Terminated Agreement or (iii) otherwise survives the expiration or termination of the Terminated Agreement.

[*Remainder of page intentionally left blank. Signature pages follow.*]

Sincerely,

| | | |
|---|---|---|
| **AGUILA PRODUCTION, LLC:** | [●] | |
| | By: | |
| | Name: | |
| | Title: | |
| **SANCHEZ ENERGY CORPORATION:** | [●] | |
| | By: | |
| | Name: | |
| | Title: | |
| **SN EF MAVERICK, LLC:** | [●] | |
| | By: | |
| | Name: | |
| | Title: | |
| **SN EF UNSUB, LP:** | [●] | |
| | By: | |
| | Name: | |
| | Title: | |

**THE STATE OF ____________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by __________________, __________________ of [●], a [●].

________________________________________
Notary Public, State of ______________________

My commission expires: ________________________________

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

________________________________________
Notary Public, State of ________________________

My commission expires: ________________________________

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

Notary Public, State of ______________________________

My commission expires: ________________________________

**THE STATE OF ____________________ §**

**COUNTY OF ______________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

______________________________________________
Notary Public, State of ______________________________

My commission expires: ______________________________

# Exhibit G

10-K 1 snmp-20191231x10k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

☒

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2019**

**OR**

☐

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to .**
**Commission File Number 001-33147**

## Sanchez Midstream Partners LP

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware**<br>**(State of organization)** | **11-3742489**<br>**(I.R.S. Employer Identification No.)** |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>**(Address of Principal Executive Offices)** | **77002**<br>**(Zip Code)** |

**(713) 783-8000**
**(Registrant's Telephone Number, Including Area Code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Units representing limited partner interests | SNMP | NYSE American |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☒ Smaller reporting company ☒ Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

**The aggregate market value of Sanchez Midstream Partners LP common units held by non-affiliates as of June 28, 2019 was approximately $24,442,184 based upon the NYSE American closing price as of such date.**

Common units outstanding on March 13, 2020: 19,975,193 common units.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 53 |
| Item 2. | Properties | 53 |
| Item 3. | Legal Proceedings | 53 |
| Item 4. | Mine Safety Disclosures | 53 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity, Related Unitholder Matters and Issuer Purchases of Equity Securities | 54 |
| Item 6. | Selected Financial Data | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 70 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 72 |
| | PART III | |
| Item 10. | Managers, Executive Officers and Corporate Governance | 72 |
| Item 11. | Executive Compensation | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Unitholder Matters | 80 |
| Item 13. | Certain Relationships and Related Transactions, and Manager Independence | 82 |
| Item 14. | Principal Accounting Fees and Services | 85 |
| | PART IV | |
| Item 15. | Exhibits and Financial Statement Schedules | 86 |
| Item 16. | Form 10-K Summary | 91 |
| | Signatures | 92 |

Table of Contents

**COMMONLY USED DEFINED TERMS**

As used in this Annual Report on Form 10-K (this “Form 10-K”), unless the context indicates or otherwise requires, the following terms have the following meanings:

- “Sanchez Midstream Partners,” “SNMP,” “the Partnership,” “we,” “us,” “our” or like terms refer collectively to Sanchez Midstream Partners LP (formerly Sanchez Production Partners LP), its consolidated subsidiaries and, where the context provides, the entities in which we have a 50% ownership interest.
- “Bbl” means one barrel of 42 U.S. gallons of oil.
- “Bcf” means one billion cubic feet of natural gas.
- “Board” means the board of directors of our general partner.
- “Boe” means one barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Bbl of oil.
- “Boe/d” means one Boe per day.
- “GHGs” mean greenhouse gases.
- “MBbl” means one thousand barrels of oil or other liquid hydrocarbons.
- “MBbl/d” means one thousand barrels of oil or other liquid hydrocarbons per day.
- “MBoe” means one thousand Boe.
- “Mcf” means one thousand cubic feet of natural gas.
- “MMBbl” means one million barrels of oil or other liquid hydrocarbons.
- “MMBoe” means one million Boe.
- “MMBtu” means one million British thermal units.
- “MMcf” means one million cubic feet of natural gas.
- “MMcf/d” means one million cubic feet of natural gas per day.
- “NGLs” refers to the combination of ethane, propane, butane, natural gasolines and other components that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.
- “our general partner” refers to Sanchez Midstream Partners GP LLC (formerly Sanchez Production Partners GP LLC), our general partner.
- “Sanchez Energy” refers to Sanchez Energy Corporation (OTC Pink: SNECQ) and its consolidated subsidiaries.
- “SOG” refers to Sanchez Oil & Gas Corporation, an entity that provides operational support to us.
- “SP Holdings” or “Manager” refers to SP Holdings, LLC, the sole member of our general partner.

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Form 10-K contains “forward-looking statements” as defined by the United States Securities and Exchange Commission (the “SEC”) that are subject to a number of risks and uncertainties, many of which are beyond our control. These statements may include discussions about our business strategy; the ability of our customers to meet their drilling and development plans on a timely basis, or at all, and perform under gathering, processing and other agreements; our financing strategy; our acquisition strategy; our ability to make distributions; our future operating results; the ability of our partners to perform under our joint ventures; our future capital expenditures; and our plans, objectives, expectations, forecasts, outlook and intentions.

All of these types of statements, other than statements of historical fact included in this Form 10-K, are forward-looking statements. These forward-looking statements may be found in Part II, Item 7. and other items within this Form 10-K. In some cases, forward-looking statements can be identified by terminology such as “may,” “could,” “should,” “expect,” “plan,” “project,” “intend,” “anticipate,” “believe,” “estimate,” “predict,” “potential,” “pursue,” “target,” “continue,” the negative of such terms or other comparable terminology.

The forward-looking statements contained in this Form 10-K are largely based on our expectations, which reflect estimates and assumptions made by the management of our general partner. These estimates and assumptions reflect our best judgment based on currently known market conditions and other factors. Although we believe such estimates and assumptions to be reasonable, they are inherently uncertain and involve a number of risks and uncertainties that are beyond our control. In addition, management’s assumptions about future events may prove to be inaccurate.

Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- the resolution of the pending Sanchez Energy Chapter 11 Case (as defined in “Part I, Item 1A. Risk Factors”) and its impact on our business, results of operations and financial condition;
- our ability to successfully execute our business, acquisition and financing strategies;
- the ability of our customers to meet their drilling and development plans on a timely basis, or at all, and perform under gathering, processing and other agreements;
- the creditworthiness and performance of our counterparties, including financial institutions, operating partners, customers and other counterparties;
- our ability to extend, replace or refinance our Credit Agreement (defined below);
- our ability to grow enterprise value;
- the ability of our partners to perform under our joint ventures;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- our ability to utilize the services, personnel and other assets of Manager pursuant to the Services Agreement (as defined below);
- Manager’s ability to retain personnel to perform its obligations under its shared services agreement with SOG;
- our ability to access the credit and capital markets to obtain financing on terms we deem acceptable, if at all, and to otherwise satisfy our capital expenditure requirements;
- the timing and extent of changes in prices for, and demand for, natural gas, NGLs and oil;

- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may, therefore, be imprecise;
- competition in the oil and natural gas industry for employees and other personnel, equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- the extent to which our assets operated by others are operated successfully and economically;
- our ability to compete with other companies in the oil and natural gas industry;
- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic fracturing and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws and regulations with respect to derivatives and hedging activities;
- the use of competing energy sources and the development of alternative energy sources;
- unexpected results of litigation filed against us;
- disruptions due to extreme weather conditions, such as extreme rainfall, hurricanes or tornadoes;
- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage; and
- the other factors described under "Part I, Item 1A. Risk Factors" in this Form 10-K and any updates to those factors set forth in our subsequent Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

Management cautions all readers that the forward-looking statements contained in this Form 10-K are not guarantees of future performance, and we cannot assure any reader that such statements will be realized or the forward-looking events and circumstances will occur. Actual results may differ materially from those anticipated or implied in forward-looking statements. The forward-looking statements speak only as of the date made, and other than as required by law, we do not intend to publicly update or revise any forward-looking statements as a result of new information, future events or otherwise. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

# PART I

## Item 1.Business

### Overview

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development and ownership of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. We also own production assets in Texas and Louisiana. We have entered into a shared services agreement (the "Services Agreement") with Manager, pursuant to which Manager provides operational services to us including overhead, technical, administrative, marketing, accounting, operation, information systems, financial, compliance, insurance, acquisition, disposition and financing services. Manager owns our general partner and all of our incentive distribution rights. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Our common units are currently listed on the NYSE American under the symbol "SNMP."

### Our Relationship with Sanchez Energy, Manager and SOG

We believe that our relationship with Sanchez Energy and associated acreage dedications, provide us with a long range strategic advantage. As of March 13, 2020, Sanchez Energy owned approximately 11.4% of our outstanding common units. Since March 2015, we have completed three midstream asset acquisitions and two working interest acquisitions from Sanchez Energy. Pursuant to a right-of-first-offer, Sanchez Energy has agreed to offer us the right to acquire any midstream assets that it desires to sell. However, Sanchez Energy is under no obligation to sell any assets to us or to accept any offer for its assets that we may choose to make.

Manager is the sole member of our general partner, and has an interest in us through its ownership of all of our incentive distribution rights. To perform the scope of work defined in the Services Agreement, Manager has entered into a shared services agreement with SOG, which also has a shared services agreement in place with Sanchez Energy. We believe that our relationships with Manager and SOG provide us with a cost-effective means of operating our assets. SOG, which was formed in 1972, has a senior management team that averages over 20 years of industry experience. SOG has drilled or participated in over 4,000 wells, directly and through joint ventures, and has successfully built and operated extensive midstream and gathering assets associated with its exploration and production assets. We leverage SOG's extensive expertise and experience to execute on our business strategy.

### Business Strategy

Our primary business objective is to create long-term value by generating stable and predictable cash flows that allow us to make, maintain and grow our cash distributions per common unit over time through the safe and reliable operation of our assets. We plan to achieve this objective by executing the following business strategy:

- grow our business by acquiring fee-based midstream and other energy-related assets with minimal maintenance capital requirements and low overhead costs to increase unitholder value;
- support stable cash flows by aligning our asset base and operations with SOG's operational platform and Sanchez Energy's asset base;
- focus on stable, fixed-fee businesses;
- grow our business through increased throughput; and
- maintain financial flexibility and a strong capital structure.

Our business strategy is subject to risks, please read "Part I, Item 1A. Risk Factors."

**Business Segments**

Our business activities are conducted under two operating segments for which we provide information in our consolidated financial statements for the years ended December 31, 2019 and 2018. These two segments are based on the nature of the operations that are undertaken by each segment and are our:

- midstream business, which includes Western Catarina Midstream, the Carnero JV and Seco Pipeline (each as defined below); and
- production business, which includes non-operated oil and natural gas interests located in the Eagle Ford Shale in South Texas and in other areas of Texas and Louisiana.

For information about our segments' revenues, profits and losses and total assets, see Note 18 "Reporting Segments" of our Notes to Consolidated Financial Statements.

**Midstream Business**

*Western Catarina Midstream*

In October 2015, we acquired (the "Catarina Transaction") a gathering system from Sanchez Energy ("Western Catarina Midstream"), which is located on the western portion of Sanchez Energy's approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas (such net acreage is collectively referred to herein as "Sanchez Energy's Catarina Asset," and the western portion of such net acreage is individually referred to herein as "Western Catarina"). Western Catarina Midstream consists of approximately 150 miles of gathering pipelines, four main gathering and processing facilities, including stabilizers, storage tanks, compressors and dehydration units, and other related assets in Western Catarina, which are located in Dimmit and Webb counties, Texas, and services upstream production from assets located in the Eagle Ford Shale in South Texas. The gathering lines range in diameter from 4 to 12 inches, with a capacity of 200 MMcf/d for natural gas, and 40 MBbl/d for crude oil and NGLs. There are four main gathering and processing facilities, which include eight stabilizers of 5,000 Bbls per day, approximately 25,000 Bbls of storage capacity, pressurized storage for NGLs, approximately 18,000 horsepower of compression and approximately 300 MMcf/d of dehydration capacity. The gathering system is currently used solely to support the gathering, processing and transportation of natural gas, NGLs and crude oil produced by Sanchez Energy at Sanchez Energy's Catarina Asset. The gathering system has oil interconnects with the Plains All American Pipeline, L.P. header system delivered to the Gardendale terminal, and to all four takeaway pipelines to Corpus Christi, and natural gas interconnects with Southcross Energy Partners, L.P., Kinder Morgan Inc., Energy Transfer Partners, L.P. and Targa Resources Corp.

In conjunction with the Catarina Transaction, we entered into a 15-year firm gas gathering and processing agreement with Sanchez Energy, pursuant to which Sanchez Energy agreed to tender all of its crude oil, natural gas and other hydrocarbon-based product volumes on approximately 35,000 dedicated acres in Western Catarina for processing and transportation through Western Catarina Midstream, with the potential to tender additional volumes outside of the dedicated acreage (the "Gathering Agreement").

All of the revenues from Western Catarina Midstream are currently earned from Sanchez Energy. During the first five years of the term of the Gathering Agreement (or through 2020), Sanchez Energy is required to meet a minimum quarterly volume delivery commitment for oil and natural gas, subject to certain adjustments. In addition, Sanchez Energy is required to pay contractually agreed upon gathering and processing fees for oil and natural gas volumes tendered through Western Catarina Midstream. In June 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that was delivered to Western Catarina Midstream through March 31, 2018. Since March 31, 2018, we have agreed with Sanchez Energy to continue adding the incremental infrastructure fee on a month-to-month basis.

During the year ended December 31, 2019, Sanchez Energy transported average daily production through Western Catarina Midstream of approximately 11.1 MBbls/d of oil, 131.7 MMcf/d of natural gas and 5.5 MBbls/d of water. The average age of the Western Catarina Midstream assets is approximately nine years, and such assets have an average expected life of approximately 21 additional years.

*Carnero JV*

In May 2018, we executed a series of agreements with Targa Resources Corp. (NYSE: TRGP) ("Targa") and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering, LLC ("Carnero Gathering") and Carnero Processing, LLC ("Carnero Processing") (the "Carnero JV Transaction") to form an expanded 50 / 50 joint venture in South Texas, Carnero G&P, LLC ("Carnero JV"), (2) Targa contributed 100% of the equity interest in the Silver Oak II Gas Processing Plant located in Bee County, Texas ("Silver Oak II"), to Carnero JV, which expanded the processing capacity of the joint venture from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the 45 miles of high pressure natural gas gathering pipelines owned by Carnero Gathering that connect Western Catarina Midstream to nearby pipelines and the Raptor Gas Processing Facility (the "Carnero Gathering Line") to Carnero JV resulting in the joint venture owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, (4) the Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's acreage in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (such acreage is collectively referred to herein as "Sanchez Energy's Comanche Asset") pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche non-operated working interest owners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the 260 MMcf/d cryogenic natural gas processing plant in La Salle County, Texas (the "Raptor Gas Processing Facility.")

*Seco Pipeline*

In August 2017, we completed construction of a 100% owned and operated 30-mile natural gas pipeline with 400 MMcf/d capacity that is designed and used to transport dry gas from the Raptor Gas Processing Facility to multiple markets in South Texas (the "Seco Pipeline"). The Seco Pipeline provides upstream producers with optionality to southern gas markets and creates the potential to export natural gas to premium priced markets in Mexico. On September 1, 2017, we entered into a firm transportation service agreement with Sanchez Energy to transport certain quantities of Sanchez Energy's natural gas on a firm basis through the Seco Pipeline for $0.22 per MMBtu delivered on or after September 1, 2017 (the "Seco Pipeline Transportation Agreement"). The Seco Pipeline Transportation Agreement had an initial term of one month and renewed automatically on a month-to-month basis. On January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. During the year ended December 31, 2019, Sanchez Energy transported average daily production through Seco Pipeline of approximately 1.9 MMcf/d of natural gas. The Seco Pipeline has an expected life of approximately 40 years.

*Title to Properties*

Title to Western Catarina Midstream and the Seco Pipeline assets are either owned in fee or derived from leases, easements, rights-of-way, permits or licenses from landowners or governmental authorities, permitting the use of such land for our operations. We have no knowledge of any challenge to the underlying fee title of any material lease, easement, right-of-way, permit or license that is held by us or to the title to any material lease, easement, right-of-way, permit or lease we own, and we believe that we have satisfactory title to all of the material leases, easements, rights-of-way, permits and licenses with respect to all Western Catarina Midstream and Seco Pipeline assets.

**Production Business**

Our total estimated proved reserves at December 31, 2019, were approximately 3.0 MMBoe, all of which were classified as proved developed, with 11% being natural gas, 14% being NGLs, and 75% being oil. At December 31, 2019, we owned approximately 44 net producing wells. Our total average proved reserve-to-production ratio is approximately 10 years and our portfolio decline rate is 12% based on our estimated proved reserves at December 31, 2019.

Below is a description of our operations and our oil and natural gas properties by basin at December 31, 2019:

*Locations*

Of our reserves, 99% were located in the Eagle Ford Shale on non-operated properties. Production during the year ended December 31, 2019 on these properties was 306.1 MBoe and approximately 2,955.2 MBoe of estimated proved reserves were held at December 31, 2019. All of these reserves were classified as proved developed, with 11% being natural gas, 14% being NGLs, and 75% being oil.

The remaining reserves were located on non-operated properties in Louisiana. During the year ended December 31, 2019, production on Louisiana properties was 2.9 MBoe, and approximately 44.1 MBoe of estimated proved reserves were held at December 31, 2019, all of which were classified as proved developed with 100% being oil.

*Operations*

We do not currently operate any of our production assets. The Eagle Ford Shale properties are operated by either SOG, Sanchez Energy or Marathon Oil Company and the Louisiana properties are operated by SOG.

*Proved Reserves of Natural Gas, NGLs, and Oil*

The following table reflects our estimates for proved natural gas, NGLs and oil reserves based on the SEC definitions that were used to prepare our financial statements for the periods presented. The standardized measure values shown in the table are not intended to represent the current market values of our estimated proved reserves.

| **Reserve data:** | **2019** | **2018** |
|---|---|---|
| Estimated proved reserves: | | |
| Oil (MMBbl) | 2.2 | 2.5 |
| Natural gas (MMcf) | 2.1 | 2.7 |
| NGLs (MMBbl) | 0.4 | 0.5 |
| Total proved reserves (MMBoe) | 3.0 | 3.5 |
| Estimated proved developed reserves: | | |
| Oil (MMBbl) | 2.2 | 2.5 |
| Natural gas (MMcf) | 2.1 | 2.7 |
| NGLs (MMBbl) | 0.4 | 0.5 |
| Total proved developed reserves (MMBoe) | 3.0 | 3.5 |
| Proved developed reserves as a percent of total reserves | 100% | 100% |
| Standardized measure ($ in millions)(a) | $ 38.4 | $ 52.2 |

(a) Standardized measure is the present value of estimated future net revenues to be generated from the production of proved reserves. It is determined using SEC-required prices and costs in effect as of the time of estimation without giving effect to non-property related expenses (such as general and administrative expenses or debt service costs) and discounted using an annual discount rate of 10%. Our standardized measure does not include the impact of derivative transactions or future federal income taxes because we are not subject to federal income taxes. Future prices received for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. The standardized measure shown should not be considered the current market value of our reserves. The 10% discount factor used to calculate present value, which is required, is not necessarily the most appropriate discount rate. The present value, no matter what discount rate is used, is materially affected by assumptions as to timing of future production, which may prove to be inaccurate. Please read "Part I, item 1A. Risk Factors."

Our 2019 estimates of total proved reserves decreased 0.5 MMBoe from 2018 due to production and revisions of previous estimates of 0.3 MMBoe and 0.2 MMBoe, respectively.

As of December 31, 2019, we had no remaining proved undeveloped reserves in our reserves base.

We expect to make minimal capital expenditures related to recompletion of existing wells during the year ending December 31, 2020.

At December 31, 2019 and December 31, 2018, Ryder Scott Co. LP ("Ryder Scott"), an independent oil and natural gas engineering firm, prepared estimates of all our proved reserves. We used these estimates of our proved reserves to prepare our financial statements. Ryder Scott maintains a degreed staff of highly competent technical personnel. The average experience level of Ryder Scott's technical staff of engineers, geoscientists and petrophysicists exceeds 20 years, including five to 15 years with a major oil company. The engineering information presented in their report was overseen

by Mr. Eric Nelson, P.E. Mr. Nelson is an experienced reservoir engineer having been a practicing petroleum engineer since 2002. He has more than 13 years of experience in reserves evaluation with Ryder Scott. He has a Bachelor of Science degree in Chemical Engineering from the University of Tulsa and Master of Business Administration degree from the University of Texas. Mr. Nelson is a Registered Professional Engineer in the State of Texas. Our activities with Ryder Scott are coordinated by a reservoir engineer employed by us who has approximately 38 years of experience in the oil and natural gas industry and an engineering degree from the University of Tennessee and a Master of Business Administration from the University of New Orleans. He is a member of the Society of Petroleum Engineers. He has prior reservoir engineering and reserves management experience at Exxon Mobil Corporation, Dominion Resources and Hilcorp Energy. He has extensive experience in managing oil and natural gas reserves processes. He serves as the key technical person reviewing the reserve reports prepared by Ryder Scott prior to review by the Audit Committee and approval by the Board.

*Production and Price History*

The following table sets forth information regarding net production of natural gas, NGLs and oil and certain price and cost information for each of the periods indicated:

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 | Variance | |
|---|---|---|---|---|
| **Net production:** | | | | |
| Natural gas (MMcf) | 231 | 434 | (203) | (47%) |
| Oil production (MBbl) | 228 | 296 | (68) | (23%) |
| NGLs (MBbl) | 42 | 71 | (29) | (41%) |
| Total production (MBoe) | 309 | 439 | (130) | (30%) |
| Average daily production (Boe/d) | 847 | 1,203 | (356) | (30%) |
| **Average sales prices:** | | | | |
| Natural gas price per Mcf with hedge settlements | $ 2.24 | $ 2.30 | $ (0.06) | (3%) |
| Natural gas price per Mcf without hedge settlements | $ 1.84 | $ 2.39 | $ (0.55) | (23%) |
| Oil price per Bbl with hedge settlements | $ 62.94 | $ 62.64 | $ 0.30 | 0% |
| Oil price per Bbl without hedge settlements | $ 59.40 | $ 67.14 | $ (7.74) | (12%) |
| NGL price per Bbl without hedge settlements | $ 12.83 | $ 24.07 | $ (11.24) | (47%) |
| Total price per Boe with hedge settlements | $ 49.86 | $ 48.41 | $ 1.45 | 3% |
| Total price per Boe without hedge settlements | $ 46.94 | $ 51.52 | $ (4.58) | (9%) |
| **Average unit costs per Boe:** | | | | |
| Field operating expenses [(a)] | $ 21.04 | $ 17.82 | $ 3.22 | 18% |
| Lease operating expenses | $ 19.03 | $ 15.31 | $ 3.72 | 24% |
| Production taxes | $ 2.01 | $ 2.51 | $ (0.50) | (20%) |
| Depreciation, depletion and amortization | $ 12.76 | $ 10.93 | $ 1.83 | 17% |

(a) Field operating expenses include lease operating expenses and production taxes.

*Existing Wells*

The following table sets forth information at December 31, 2019, relating to the existing wells in which we owned a working interest as of that date. Gross wells are the total number of producing wells in which we have an interest, and net wells are the sum of our fractional working interests owned in gross wells.

| | Natural Gas | | Oil | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Operated | — | — | — | — |
| Non-operated | — | — | 91 | 44 |
| Total | — | — | 91 | 44 |

We did not convert any proved undeveloped wells into proved producing wells in 2019.

*Drilling Activity*

With respect to oil and natural gas wells drilled and completed during the years ended December 31, 2019 and 2018, the information should not be considered indicative of future performance, nor should it be assumed that there is necessarily any correlation between the number of productive wells drilled, quantities of reserves found or economic value. Productive wells are those that are capable of producing commercial quantities of oil or natural gas, regardless of whether they produce a reasonable rate of return. No exploratory wells were drilled on any of our properties during the years ended December 31, 2019 or 2018. During the years ended December 31, 2019 and 2018, there were no wells drilled and there were no wells in progress.

*Developed and Undeveloped Acreage*

The following table sets forth information related to our leasehold acreage as of December 31, 2019.

| | Developed Acreage(a) | | Undeveloped Acreage(b) | |
|---|---|---|---|---|
| | Gross(c) | Net(d) | Gross(c) | Net(d) |
| Total | 702 | 140 | — | — |

(a) Developed acres are acres pooled within or assigned to productive wells/units.
(b) Undeveloped acres are acres on which wells have not been drilled or acres that have not been pooled into a productive unit.
(c) A gross acre is an acre in which a working interest is either fully or partially leased. The number of gross acres may include minerals not under lease as a result of leasing some but not all joint mineral owners under any given tract.
(d) A net acre is deemed to exist when the sum of the fractional ownership working interests in gross acres equals one. The number of net acres is the sum of the fractional working interests owned in gross acres expressed as whole numbers and fractions thereof.

*Leases*

Most of our reserves are comprised of wellbore rights only. We have a small lease position of less than 150 net acres in Louisiana.

**Marketing and Major Customers**

Our oil and natural gas production in Texas and Louisiana is marketed by the operators of our properties.

Sanchez Energy accounted for 86% and 71% of our total revenue for the years ended December 31, 2019 and 2018, respectively. We are highly dependent upon Sanchez Energy as our most significant customer, and we expect to derive a substantial portion of our revenue from Sanchez Energy in the foreseeable future. Accordingly, we are indirectly subject to the business risks of Sanchez Energy. Any development that materially and adversely affects Sanchez Energy's operations or financial condition could have a material adverse impact on us. Additional information regarding our relationship with Sanchez Energy is provided in "Part III, Item 13. Certain Relationships and Related Transactions, and Manager Independence." For additional information on the risks associated with our relationship with Sanchez Energy, please read "Part I, Item 1A. Risk Factors."

**Markets and Competition**

We operate in a competitive environment for acquiring properties, marketing oil, NGLs and natural gas and retaining trained personnel. Many of our competitors have substantially greater financial, technical and personnel resources than us. As a result, our competitors may be able to outbid us for assets, more competitively price their gathering and transportation services and oil and natural gas production, or utilize superior technical resources than our financial or personnel resources permit. Our ability to acquire additional assets will depend on our ability to evaluate and select suitable assets and to consummate transactions in a competitive environment.

The natural gas gathering, compression, treating and transportation business is very competitive. Upon such time that we seek to obtain customers in addition to Sanchez Energy for Western Catarina Midstream, our competitors will include other midstream companies, producers and intrastate and interstate pipelines. Competition for volumes is primarily based on reputation, commercial terms, reliability, service levels, location, available capacity, capital expenditures and fuel efficiencies.

Neither SOG nor any of its related companies are restricted from competing with us. Additional information regarding our relationship with SOG is provided in "Part III, Item 13. Certain Relationships and Related Transactions, and Manager Independence."

**Governmental Regulation**

*Environmental Laws*

Our operations are subject to stringent and complex federal, state and local laws and regulations governing environmental protection as well as the discharge of materials into the environment. These laws and regulations may, among other things:

- require the acquisition of various permits before drilling commences;
- restrict the types, quantities and concentrations of various substances, including water and waste, that can be released into the environment;
- limit or prohibit activities on lands lying within wilderness, wetlands and other protected areas; and
- require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells.

These laws, rules and regulations may also restrict the rate of oil and natural gas production below the rate that would otherwise be possible in the absence of such regulations. The regulatory burden on the oil and natural gas industry increases the cost of doing business in the industry and consequently affects profitability. In addition, federal, state and local authorities frequently revise environmental laws and regulations, and any changes that result in more stringent and costly waste handling, disposal and cleanup requirements for the oil and natural gas industry could have a significant impact on our operating costs.

Environmental laws and regulations that could have a material impact on the oil and natural gas industry and our operations include the following:

*Waste Handling*

The Resource Conservation and Recovery Act ("RCRA") and comparable state laws regulate the generation, transportation, treatment, storage, disposal and cleanup of hazardous wastes and non-hazardous wastes. With the approval of the federal Environmental Protection Agency ("EPA"), the individual states can administer some or all of the provisions of RCRA, and some states have adopted their own, more stringent requirements. Drilling fluid, produced water and most other wastes associated with the exploration, development and production of oil and natural gas are currently regulated under RCRA's non-hazardous waste provisions. Although we do not believe that the current costs of managing any of our wastes are material under presently applicable laws, any future reclassification of oil and natural gas exploration, development and production wastes as hazardous wastes, could increase our costs to manage and dispose of wastes.

*Comprehensive Environmental Response, Compensation and Liability Act*

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), also known as the Superfund law, can impose joint and several liability, without regard to fault or legality of conduct, on classes of persons who are considered to be responsible for the release of a hazardous substance into the environment. These persons can include the owners or operators of the site where the release occurred, and anyone who disposed of, or arranged for the disposal of, a hazardous substance released at the site. Under CERCLA, such persons may be subject to joint and several liability for the costs of cleaning up the hazardous substances that have been released into the environment, including response costs, alternative water supplies, damages to natural resources and the costs of certain health studies. In addition, it is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by the hazardous substances released into the environment. Each state also has environmental cleanup laws analogous to CERCLA.

We currently own, lease or operate numerous properties that have been used for oil and natural gas production for a number of years. Although we believe that operating and waste disposal practices utilized in the past with respect to these properties were typical for the industry at the time, hazardous substances, wastes or hydrocarbons may have been released on or under the properties owned or leased by us, or on or under other locations, including off-site locations, where such substances have been taken for disposal. In addition, these properties have been operated by third parties or by previous owners or operators whose practices, including the treatment and disposal or release of hazardous substances, wastes or hydrocarbons were not under our control. These properties and the substances disposed or released on them may be subject to CERCLA, RCRA and analogous state laws. Under such laws, we could be required to remove previously disposed substances and wastes, remediate contaminated property or perform remedial plugging or pit closure operations to prevent future environmental harm.

*Water Discharges*

The Federal Water Pollution Control Act (the "Clean Water Act"), and comparable state laws, impose restrictions and strict controls with respect to the discharge of pollutants, including spills and leaks of produced water and other oil and natural gas wastes, into waters of the United States. The discharge of pollutants into regulated waters is prohibited, except in accordance with the terms of a permit issued by the EPA or an analogous state agency. Federal and state regulatory agencies can impose administrative, civil and criminal penalties, impose investigatory or remedial obligations and issue injunctions limiting or preventing our operations for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations.

*Oil Pollution Act*

The Oil Pollution Act of 1990 amended the Clean Water Act in large part due to the Exxon Valdez incident. Under the Oil Pollution Act, the EPA was directed to promulgate regulations which would create a comprehensive prevention, response, liability and compensation program to deal with oil discharged into United States navigable waters. The Oil Pollution Act imposes ongoing requirements on owners and operators of facilities that handle certain quantities of crude oil, including the preparation of oil spill response plans and proof of financial responsibility to cover environmental cleanup and restoration costs that could be incurred in connection with a spill. The Oil Pollution Act imposes liability for removal costs and damages resulting from an incident in which oil is discharged into navigable waters and establishes liability for damages for injuries to, or loss of, natural resources.

*Air Emissions*

The Clean Air Act, and comparable state laws, regulate emissions of various air pollutants through air emissions permitting programs and the imposition of other requirements. In addition, the EPA has developed, and continues to develop, stringent regulations governing emissions of toxic air pollutants at specified sources. In October 2015, the EPA finalized rules that lower the National Ambient Air Quality Standard ("NAAQS") for ozone from 75 parts per billion ("ppb") to 70 ppb, and the EPA published a final rule in July 2018 completing the final designations. States can also impose air emissions limitations that are more stringent than the federal standards imposed by the EPA. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with air permits or other requirements of the Clean Air Act and associated state laws and regulations. Rules restricting air emissions may require a number of modifications to our operations, including the installation of new equipment. Compliance with such rules could result in significant costs, including increased capital expenditures and operating costs, and could adversely impact our operating results. However, we believe that our operations will not be materially adversely affected by any such requirements, and the requirements are not expected to be any more burdensome to us than to other similarly situated companies. We believe that our operations are in substantial compliance with federal and state air emission standards.

*Climate Change*

While the U.S. Congress has from time to time considered legislation to reduce emissions of GHGs, there has not been significant activity in the form of adopted legislation to reduce GHG emissions at the federal level in recent years. In the absence of such federal climate legislation, the EPA has used existing Clean Air Act authority to regulate GHGs. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis. In addition, in June 2016, the EPA published New Source Performance Standards ("NSPS") Subpart

OOOOa standards that require new, modified or reconstructed facilities in the oil and natural gas sector to reduce methane gas and volatile organic compound emissions. However, in June 2017, the EPA published a proposed rule to stay portions of the Subpart OOOOa standards for two years. In September 2018, the EPA issued proposed revisions to the NSPS applicable to new and modified oil and gas sources, which would reduce the monitoring obligations for wells and compressor stations. Further in October 2018, the EPA issued a draft report which includes a template designed to assist with compliance. Until the rules are finalized, the implementation of the 2016 rules remains uncertain. A number of state and regional efforts have also emerged that are aimed at tracking and/or reducing GHG emissions by means of cap and trade programs that typically require major sources of GHG emissions, such as electric power plants, to possess and acquire emission allowances which permit corresponding GHG emissions. Furthermore, the U.S. is currently a party to the Paris Agreement adopted in December 2015 to reduce global GHG emissions. However, in June 2017, President Trump announced that the United States plans to withdraw from the Paris Agreement in accordance with the Agreement's four-year exit process and to seek negotiations either to reenter the Paris Agreement on different terms or establish a new framework agreement. In August 2017, the U.S. Department of State officially informed the United Nations of the intent of the United States to withdraw from the Paris Agreement and in November 2019 began the formal process of withdrawl.

*Hydraulic Fracturing*

Hydraulic fracturing is an important and common practice that is used to stimulate production of hydrocarbons. The process involves the injection of water, sand and chemicals under pressure into formations to fracture the surrounding rock and stimulate production. The process is typically regulated by state oil and natural gas commissions. However, the EPA has asserted federal regulatory authority over certain hydraulic fracturing practices and has finalized a study of the potential environmental impacts of hydraulic fracturing activities, finding that under certain circumstances, the "water cycle" activities associated with hydraulic fracturing may impact drinking water resources. In 2014, the EPA released an Advanced Notice of Proposed Rulemaking seeking public comment on its plans to issue regulations under the Toxic Substances Control Act of 1976 to require companies to disclose information regarding chemicals used in hydraulic fracturing. Further, the Department of the Interior has released final regulations governing hydraulic fracturing on federal oil and natural gas leases which require lessees to file for approval of well stimulation work before commencement of operations and require well operators to disclose the trade names and purposes of additives used in the fracturing fluids. The states in which we operate have also adopted disclosure requirements related to fracturing fluids. Legislation has been introduced, but not adopted, in Congress to provide for federal regulation of hydraulic fracturing and to require disclosure of the chemicals used in the fracturing process. In addition, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances. Currently, no states in which we utilize hydraulic fracturing have adopted these regulations. At this time, it is not possible to accurately estimate how potential future laws or regulations addressing hydraulic fracturing would impact our business.

*Endangered Species*

The federal Endangered Species Act ("ESA") was established to protect endangered and threatened species. Pursuant to the ESA, if a species is listed as threatened or endangered, restrictions may be imposed on activities adversely affecting that species' habitat. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. The U.S. Fish and Wildlife Service ("FWS") may designate critical habitat and suitable habitat areas that it believes are necessary for the survival of a threatened or endangered species. A critical habitat or suitable habitat designation could result in further material restrictions and may materially delay or prohibit land access for development. Moreover, as a result of a settlement approved by the U.S. District Court for the District of Columbia in September 2011, the FWS was required to make a determination on the listing of more than 250 species as endangered or threatened under the ESA by the end of the agency's 2017 fiscal year. The designation of previously unprotected species as threatened or endangered in areas where we operate could cause us to incur increased costs arising from species protection measures or could result in limitations on our activities.

*Gathering System Regulation*

Regulation of gathering facilities may affect certain aspects of our business and the market for our services. Historically, the transportation and sale for resale of natural gas in interstate commerce have been regulated by agencies of the U.S. federal government, primarily the Federal Energy Regulatory Commission ("FERC"). The FERC regulates

interstate natural gas transportation rates, terms and conditions of service, which affects the marketing of natural gas that we produce, as well as the revenues we receive for sales of our natural gas.

The transportation and sale for resale of natural gas in interstate commerce are regulated primarily under the Natural Gas Act ("NGA"), and by regulations and orders promulgated under the NGA by the FERC. In certain limited circumstances, intrastate transportation, gathering, and wholesale sales of natural gas may also be affected directly or indirectly by laws enacted by the U.S. Congress and by FERC regulations.

Section 1(b) of the NGA exempts natural gas gathering facilities from regulation by the FERC under the NGA. We believe that the natural gas pipelines in our gathering systems meet the traditional tests that the FERC has used to establish whether a pipeline is a gathering pipeline not subject to FERC jurisdiction. However, the distinction between FERC-regulated transmission services and federally unregulated gathering services has been the subject of substantial litigation and varying interpretations. In addition, the FERC determines whether facilities are gathering facilities on a case-by-case basis, so the classification and regulation of our natural gas gathering facilities are subject to change based on future determinations by the FERC, the courts, or the U.S. Congress. If the FERC were to determine that an individual gathering system is not exempt from FERC regulation and the pipelines associated with such gathering system provide interstate transportation, the rates for, and terms and conditions of, services provided by such gathering system would be subject to regulation by the FERC. Such regulation could decrease revenue, increase operating costs, and, depending upon the facility in question, could adversely affect results of operations and cash flows. If any of our facilities were found to have provided services or otherwise operated in violation of the NGA or the NGPA, this could result in the imposition of civil penalties as well as a requirement to disgorge charges collected for such service in excess of the cost-based rate established by the FERC.

Gathering services, which may occur upstream of transmission service subject to FERC jurisdiction, is regulated by the states. State regulation of gathering facilities generally includes various safety, environmental and, in some circumstances, nondiscriminatory take requirements and complaint-based rate regulation. Our purchasing and gathering operations are subject to ratable take and common purchaser statutes in the State of Texas. The ratable take statute generally requires gatherers to take, without undue discrimination, natural gas production that may be tendered to the gatherer for handling. Similarly, the common purchaser statute generally requires gatherers to purchase without undue discrimination as to source of supply or producer. These statutes are designed to prohibit discrimination in favor of one producer over another producer or one source of supply over another source of supply. These statutes have the effect of restricting our right as an owner of gathering facilities to decide with whom we contract to purchase or transport gas.

The Railroad Commission of Texas ("TRRC") requires gatherers to file reports, obtain permits, make books and records available for audit and provide service on a nondiscriminatory basis. Shippers and producers may file complaints with the TRRC to resolve grievances relating to natural gas gathering access and rate discrimination.

While our gathering systems have not been regulated by the FERC under the NGA, the U.S. Congress may enact legislation or the FERC may adopt regulations that may subject certain of our otherwise non-FERC jurisdictional facilities to further regulation. Changes in law and to FERC policies and regulations may adversely affect the availability and reliability of firm and/or interruptible transportation service on interstate pipelines, and we cannot predict what future action FERC will take. We do not believe, however, that any regulatory changes will affect us in a way that materially differs from the way they will affect other natural gas gatherers with which we compete. Failure to comply with those regulations in the future could subject us to civil penalty liability.

The Energy Policy Act of 2005 ("EPAct 2005"), amended the NGA to add an anti-market manipulation provision which makes it unlawful for any entity to engage in prohibited behavior to be prescribed by the FERC, and furthermore provides the FERC with additional civil penalty authority. The EPAct 2005 provided the FERC with the power to assess daily civil penalties for violations of the NGA and the Natural Gas Policy Act ("NGPA"). The civil penalty provisions are applicable to entities that engage in the sale of natural gas for resale in interstate commerce. In Order No. 670, the FERC promulgated rules implementing the anti-market manipulation provision of the EPAct 2005. The rules make it unlawful, in connection with the purchase or sale of natural gas subject to the jurisdiction of the FERC, or the purchase or sale of transportation services subject to the jurisdiction of the FERC, for any entity, directly or indirectly, to: (1) use or employ any device, scheme or artifice to defraud; (2) make any untrue statement of material fact or omit to make any such statement necessary to make the statements made not misleading; or (3) engage in any act or practice that operates as a fraud or

deceit upon any person. The anti-market manipulation rule does not apply to activities that relate only to intrastate or other non-jurisdictional sales or gathering, but does apply to activities of gas pipelines and storage companies that provide interstate services, as well as otherwise non-jurisdictional entities to the extent the activities are conducted "in connection with" gas sales, purchases or transportation subject to FERC jurisdiction.

*Pipeline Safety Regulation*

We are subject to regulation by the United States Department of Transportation ("DOT") through the Pipelines and Hazardous Materials Safety Administration ("PHMSA"), pursuant to the Hazardous Liquid Pipeline Safety Act of 1979, as amended ("HLPSA") and comparable state statutes with respect to design, installation, inspection, testing, construction, operation, replacement and maintenance of pipeline facilities. HLPSA, as amended, governs he design, installation, testing, construction, operation, replacement and management of crude oil pipeline facilities and also covers petroleum and petroleum products, including NGLs and condensate, and requires any entity that owns or operates pipeline facilities to comply with such regulations, to permit access to and copying of records and to file certain reports and provide information as required by the U.S. Secretary of Transportation. These regulations include potential fines and penalties for violations. We believe that we are in compliance in all material respects with these HLPSA regulations.

Our natural gas pipelines are subject to regulation by PHMSA pursuant to the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") and the Pipeline Safety Improvement Act of 2002 ("PSIA"), as reauthorized and amended by the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006 ("PIPES Act"). The NGPSA regulates safety requirements in the design, construction, operation and maintenance of gas pipeline facilities, while the PSIA establishes mandatory inspections for all U.S. oil and natural gas transmission pipelines in high-consequence areas ("HCAs").

PHMSA has developed regulations that require pipeline operators to implement integrity management programs, including more frequent inspections and other measures to ensure pipeline safety in HCAs. The regulations require operators, including us, to:

- perform ongoing assessments of pipeline integrity;
- identify and characterize applicable threats to pipeline segments that could impact HCAs;
- improve data collection, integration and analysis;
- repair and remediate pipelines as necessary; and
- implement preventive and mitigating actions.

The HLPSA has been amended by the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 ("2011 Pipeline Safety Act") and the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016 ("2016 Pipeline Safety Act The 2011 Pipeline Safety Act increased the penalties for safety violations, established additional safety requirements for newly constructed pipelines and required studies of safety issues that could result in the adoption of new regulatory requirements by PHMSA for existing pipelines. The 2011 Pipeline Safety Act doubled the maximum administrative fines for safety violations from $100,000 to $200,000 for a single violation and from $1 million to $2 million for a related series of violations, but provided that these maximum penalty caps do not apply to certain civil enforcement actions. Effective April 27, 2017, to account for inflation, those maximum civil penalties were increased to $213,268 per day, with a maximum of $2,132,679 for a series of violations. The 2016 Pipeline Safety Act extended PHMSA's statutory mandate through 2019. The 2016 Pipeline Safety Act also empowers PHMSA to address imminent hazards by imposing emergency restrictions, prohibitions and safety measures on owners and operators of hazardous liquid pipeline facilities without prior notice or an opportunity for a hearing. PHMSA issued interim regulations in October 2016 to implement the agency's expanded authority to address unsafe pipeline conditions or practices that pose an imminent hazard to life, property, or the environment.

PHMSA regularly revises its pipeline safety regulations and has published advanced notices of proposed rulemakings and notices of proposed rulemaking to solicit comments on the need for changes to its natural gas and liquid pipeline safety regulations. In the past few years, PHMSA issued advisory bulletins providing guidance on applicable

regulatory requirements, including those that must be followed for the abandonment of a pipeline; aspects of overall pipeline integrity, including the need for corrosion-control systems on buried and insulated pipeline segments, to conduct in-line inspections for all threats, and to ensure in-line inspection tool findings are accurate and verified; the need of owners and operators of natural gas facilities to take appropriate steps to prevent damage to pipeline facilities from accumulated snow or ice; actions pipeline operators should consider taking to ensure the integrity of pipelines in the event of severe flooding or hurricane damage; notice of construction; flow reversal procedures; product changes and conversion; integrity management program evaluation metrics; and incident response plans. Further changes to PHMSA's rules are expected in the future.

For example, in July 2015, PHMSA issued a notice of proposed rulemaking proposing, among other things, to extend operator qualification requirements to operators of certain natural gas gathering lines and to add a specific timeframe for operators' notifications of accidents or incidents. In January 2017, PHMSA issued a final rule adding a specific timeframe for operators' notifications of accidents or incidents but delayed final action on the operator qualification proposals until a later date. The final rule became effective March 24, 2017. In addition, in October 2015, PHMSA issued a notice of proposed rulemaking proposing changes to its hazardous liquid pipeline safety regulations, including to extend: (i) reporting requirements to all onshore or offshore, regulated or unregulated hazardous liquid gathering lines; and (ii) certain integrity management periodic assessment and remediation requirements to regulated onshore gathering lines. On January 13, 2017, PHMSA issued a final rule amending its regulations to impose new reporting requirements for certain unregulated pipelines, including all hazardous liquid gathering lines. The final rule also significantly extends and expands the reach of certain integrity management requirements, regardless of the pipeline's proximity to HCAs. However, this final rule remains subject to review and approval by the new administration, pursuant to a memorandum issued by the White House to heads of federal agencies. It is unclear whether the final rule will be revised and when it will be implemented. In April 2016, PHMSA issued a notice of proposed rulemaking that would expand integrity management requirements and impose new pressure requirements on currently regulated gas transmission pipelines and would also significantly expand the regulation of gas gathering lines, subjecting previously unregulated pipelines to requirements regarding damage prevention, corrosion control, public education programs, maximum allowable operating pressure limits and other requirements. On October 1, 2019, PHMSA issued its final rule which will become effective July 1, 2020. While we cannot predict the outcome of legislative or regulatory initiatives, such regulatory changes and any legislative changes could have a material effect on our operations, particularly by extending more stringent and comprehensive safety regulations (such as integrity management requirements) to pipelines and gathering lines not previously subject to such requirements. While we expect any legislative or regulatory changes to allow us time to become compliant with new requirements, costs associated with compliance may have a material effect on our operations.

Furthermore, DOT regulations have incorporated by reference the American Petroleum Institute Standard 653 ("API 653") as the industry standard for the inspection, repair, alteration and reconstruction of storage tanks. API 653 requires regularly scheduled inspection and repair of such tanks. These periodic tank maintenance requirements may result in significant and unanticipated capital and operating expenditures for repairs or upgrades deemed necessary to ensure the continued safe and reliable operation of our storage tanks.

States are largely preempted by federal law from regulating pipeline safety for interstate lines but most are certified by the DOT to assume responsibility for enforcing intrastate pipeline regulations and inspection of intrastate pipelines. For example, in Texas the Pipeline Safety Department of the TRRC inspects and enforces the pipeline safety regulations for intrastate pipelines, including gathering lines. States may adopt stricter standards for intrastate pipelines than those imposed by the federal government for interstate lines; however, states vary considerably in their authority and capacity to address pipeline safety. State standards may include more stringent requirements for facility design and management in addition to requirements for pipelines. We do not anticipate any significant difficulty in complying with applicable state laws and regulations. Our pipelines have ongoing inspection and compliance programs designed to keep the facilities in compliance with pipeline safety and pollution control requirements.

We have incorporated all existing requirements into our programs by the required regulatory deadlines and are continually incorporating the new requirements into procedures and budgets. We expect to incur increasing regulatory compliance costs, based on the intensification of the regulatory environment and upcoming changes to regulations as outlined above. In addition to regulatory changes, costs may be incurred when there is an accidental release of a commodity gathered on our system, or a regulatory inspection identifies a deficiency in our required programs.

*Other Laws and Regulation*

We are subject to the requirements of the federal Occupational Safety and Health Act ("OSHA"), and comparable state laws. These laws and the implementing regulations strictly govern the protection of the health and safety of employees. The OSHA hazard communications standard, OSHA Process Safety Management, the EPA community right-to-know regulations under Title III of CERCLA and similar state laws require that we organize and/or disclose information about hazardous materials used or produced in our operations. We believe that we are in substantial compliance with these applicable requirements.

We believe that we are in substantial compliance with existing environmental laws and regulations applicable to our current operations and that our continued compliance with existing requirements should not have a material adverse impact on our financial condition and results of operations. As of December 31, 2019, we had no accrued environmental obligations. We are not aware of any environmental issues or claims that will require material capital expenditures or that will otherwise have a material impact on our financial position or results of operations. However, we cannot predict how future environmental laws and regulations may impact our operations, and therefore, cannot provide assurance that the passage of more stringent laws or regulations in the future will not have a negative impact on our financial condition, results of operations or cash flows.

**Employees**

We do not have any employees. In connection with providing the services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties, (ii) reimbursement for all allocated overhead costs, as well as any direct third-party costs incurred and (iii) for each asset acquisition, disposition or financing, a fee not to exceed 2% of the value of such transaction.

As of March 13, 2020, nine (9) employees were employed by SOG with their primary function being to provide services for us, all of which were full-time employees.

None of SOG's employees are subject to a collective bargaining agreement.

**Offices**

Our principal executive offices are located at 1000 Main Street, Suite 3000, Houston, Texas 77002. Our telephone number is (713) 783-8000.

**Available Information**

Our internet address is http://www.sanchezmidstream.com. We make our website content available for informational purposes only. It should not be relied upon for investment purposes, nor is it incorporated by reference in this Form 10-K. We make available free of charge on or through our website our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. The SEC maintains an internet website that contains these reports at http://www.sec.gov.

**Item 1A. Risk Factors**

*Our business involves a high degree of risk. Limited partner interests are inherently different from the capital stock of a corporation, although many of the business risks to which we are subject are similar to those that would be faced by a corporation engaged in a similar business. You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Form 10-K, including the financial statements and the related notes appearing at the end of this Form 10-K. If any of the following risks, or any risk described elsewhere in this Form 10-K, were to occur, our business, financial condition or results of operations could be adversely affected. If any of the following risks, or any risk described elsewhere in this Form 10-K, were to occur, our business, financial condition or results of operations could be adversely affected. The risks below are not the only ones facing the Partnership. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. This Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below. Also, please read "Cautionary Note Regarding Forward-Looking Statements."*

The risk factors in this Form 10-K are grouped into the following categories:

- Risks Related to Our Midstream Business;
- Risks Related to Our Production Business;
- Risks Related to Our Midstream and Production Businesses;
- Risks Related to Financing and Credit Environment;
- Risks Related to Our Cash Distributions;
- Risks Related to Regulatory Compliance;
- Risks Inherent in an Investment and Our Common Units; and
- Tax Risks.

**Risks Related to Our Midstream Business**

***Because the majority of our total revenue, including substantially all of our revenue stemming from the operation of our midstream business, is derived from Sanchez Energy, the filing of voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code by Sanchez Energy and certain of its subsidiaries could have a material and adverse impact on us.***

Sanchez Energy accounted for approximately 86% of our total revenue and substantially all of our midstream business revenue for the year ended December 31, 2019. We are dependent on Sanchez Energy as our only current customer for utilization of Western Catarina Midstream, and as our primary customer for utilization of our other midstream assets. We expect that a majority of revenues relating to these assets will be derived from Sanchez Energy for the foreseeable future.

On August 11, 2019, Sanchez Energy Corporation and certain of its subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, jointly administered Case No. 19-34508 (the "Sanchez Energy Chapter 11 Case"). As a result, we are subject to an increased risk of non-payment, non-performance and/or underutilization of our midstream assets by Sanchez Energy. While Sanchez Energy Corporation has stated it intends to continue to operate in the normal course and intends to interact with its commercial counterparties as usual, no assurances can be given as to the timing or outcome of the bankruptcy process. Through December 31, 2019, we did not experience any significant losses as a result of non-performance. However, as disclosed herein, Sanchez Energy terminated the Seco Pipeline Transportation

Agreement effective on February 12, 2020. Any development that materially and adversely affects Sanchez Energy’s operations or financial condition could have a material and adverse impact on us.

On March 13, 2020, the official committee of unsecured creditors in the Sanchez Energy Chapter 11 Case (the “Unsecured Committee”) filed a motion titled *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors’ Estate and for Related Relief* (the “March 13 Motion”). The relief sought in the March 13 Motion is to grant the Unsecured Committee derivative standing to prosecute claims that Sanchez Energy allegedly has against the Partnership and others, including, but not limited to, claims to recharacterize or avoid the Catarina Transaction, the Carnero Gathering Transaction (as defined in Note 12 “Investments” of our Notes to Consolidated Financial Statements), and the Carnero Processing Transaction (as defined in Note 12 “Investments” of our Notes to Consolidated Financial Statements). While we do not believe these claims have any merit, if such claims are filed and prosecuted, the cost to defend against such claims and any judgment entered against us could have a material and adverse impact on our business, financial condition and operating results.

***Because of the natural decline in production from existing wells, our success depends, in part, on Sanchez Energy’s ability to replace declining production. Any decrease in volumes of natural gas, NGLs and oil that Sanchez Energy produces or any decrease in the number of wells that Sanchez Energy completes could reduce throughput volumes that could adversely affect our business and operating results.***

The volumes that support our facilities depend on the level of production from wells connected to our facilities, which may be less than expected and will naturally decline over time. To the extent Sanchez Energy reduces its activity or otherwise ceases to drill and complete wells, especially on Sanchez Energy’s Catarina Asset, revenues for our gathering and processing services will be directly and adversely affected. In addition, volumes from completed wells will naturally decline and our cash flows associated with these wells will also decline over time. In order to maintain or increase throughput levels on our facilities, we must obtain new sources of natural gas, NGLs and oil from Sanchez Energy or other third parties. The primary factors affecting our ability to obtain additional sources of natural gas, NGLs and oil include (i) the success of Sanchez Energy’s drilling activity in our areas of operation, (ii) Sanchez Energy’s acquisition of additional acreage and (iii) our ability to obtain additional dedications of acreage from Sanchez Energy or new dedications of acreage from other third parties.

We have no control over Sanchez Energy’s or other producers’ levels of development and completion activity in our areas of operation, the amount of reserves associated with wells connected to our facilities or the rate at which production from a well declines. We have no control over Sanchez Energy or other producers or their development plan decisions, which are affected by, among other things:

- the availability and cost of capital;
- prevailing and projected prices for natural gas, NGLs and oil;
- demand for natural gas, NGLs and oil;
- levels of reserves;
- geologic considerations;
- environmental or other governmental regulations, including the availability and maintenance of drilling permits and the regulation of hydraulic fracturing; and
- the costs of producing natural gas, NGLs and oil and the availability and costs of drilling rigs and other equipment.

Under the terms of the lease covering Sanchez Energy’s Catarina Asset, Sanchez Energy is subject to annual drilling and development requirements. For example, at the present time, the lease requires Sanchez Energy to drill 50 wells per year (with the ability to bank up to 30 wells from a prior period). The pending Sanchez Energy Chapter 11 Case has resulted in significant delays to the drilling program on Sanchez Energy’s properties, including Sanchez Energy’s Catarina

Asset, and failure to drill the required number of wells could result in forfeiture of acreage not held by production during the current fiscal year. In addition, Sanchez has various drilling obligations under the leases covering Sanchez Energy's Comanche Asset. If Sanchez Energy fails to meet these drilling obligations, Sanchez Energy could forfeit its acreage under the applicable lease not held by production. Such a forfeiture could impact Sanchez Energy's ability to develop additional acreage and replace declining production.

Fluctuations in energy prices can also greatly affect the development of reserves. Declines in commodity prices could have a negative impact on Sanchez Energy's development and production activity, and if sustained, could lead Sanchez Energy to materially reduce its drilling and completion activities. Sustained reductions in development or production activity in our areas of operation could lead to reduced utilization of our services.

Due to these and other factors, even if reserves are known to exist in areas served by our facilities, Sanchez Energy and other producers may choose not to develop, or be prohibited from developing, those reserves. If reductions in development activity result in our inability to maintain the current levels of throughput on our facilities, those reductions could reduce our revenue and cash flows and adversely affect our ability to pay cash distributions to Stonepeak Catarina Holdings LLC ("Stonepeak Catarina"), as the holder of all of our Class C preferred units representing limited partner interests (the "Class C Preferred Units"). Restrictions under our Credit Agreement and our partnership agreement currently prohibit us from paying distributions to our common unitholders.

***The Gathering Agreement contains provisions that can reduce the stability in cash flows that the agreement was designed to achieve.***

The Gathering Agreement is designed to generate stable cash flows for us over the life of the minimum volume commitment contract term while also minimizing direct commodity price risk. Under the minimum volume commitment, subject to certain adjustments, Sanchez Energy has agreed to ship a minimum volume of natural gas and NGLs on Western Catarina Midstream or, in some cases, to pay a minimum monetary amount, over certain periods during the term of the minimum volume commitment, which is the first five years of the 15-year term of the Gathering Agreement (or through 2020). In addition, the Gathering Agreement also includes a minimum quarterly quantity, which is a total amount of natural gas and NGLs that Sanchez Energy must flow on Western Catarina Midstream (or an equivalent monetary amount) each quarter during the minimum volume commitment term. If Sanchez Energy's actual throughput volumes are less than its minimum volume commitment for the applicable period, it must extend the minimum volume commitment term on a nominal volume basis, but to no longer than the original five years (subject to certain exceptions), or, in some cases, make a shortfall payment to us at the end of that contract quarter, as applicable. The amount of the shortfall payment is based on the difference between the actual throughput volume shipped, processed or offset through an extension of the minimum volume commitment term for the applicable period and the minimum volume commitment for the applicable period, multiplied by the applicable fee. To the extent that Sanchez Energy's actual throughput volumes are above its minimum volume commitment for the applicable period, the Gathering Agreement contains provisions that allow Sanchez Energy to use the excess volumes as a credit to shorten the minimum volume commitment term, but to no less than four years. Through December 31, 2019, natural gas volumes from Sanchez Energy have shortened the primary terms of the volume commitments by 197 days, while the minimum oil volume commitment is no longer in effect.

Under certain circumstances, it is possible that the combined effect of the minimum volume commitment provisions could result in our receiving substantially reduced revenues or cash flows from Sanchez Energy in a given period. In the most extreme circumstances:

- we could incur operating expenses with substantially reduced corresponding revenues from Sanchez Energy; or
- Sanchez Energy could cease shipping throughput volumes at a time when its aggregate minimum volume commitment has been satisfied with previous throughput volume shipments.

If either of these circumstances were to occur, it would have a material adverse effect on our results of operations and financial condition and cash flows and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Interruptions in operations at our facilities or facilities that Targa operates on behalf of the Carnero JV may adversely affect operations and cash flows available for distribution to Stonepeak Catarina.***

Any significant interruption at any of our facilities or the facilities that Targa operates on behalf of the Carnero JV, or in our ability or Targa's ability on behalf of the Carnero JV, as applicable, to gather, treat or process natural gas, NGLs and oil, would adversely affect operations and cash available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units. Operations at impacted facilities could be partially or completely shut down, temporarily or permanently, as the result of circumstances not within our control, such as:

- unscheduled turnarounds or catastrophic events at physical plants or pipeline facilities;
- restrictions imposed by governmental authorities or court proceedings;
- labor difficulties that result in a work stoppage or slowdown;
- a disruption or decline in the supply of resources necessary to operate a facility;
- damage to facilities resulting from natural gas, NGLs and oil that do not comply with applicable specifications; and
- inadequate transportation or market access to support production volumes, including lack of availability of pipeline capacity.

***We may not be able to attract additional third-party volumes, which could limit our ability to grow and would increase our dependence on Sanchez Energy.***

Part of our long-term growth strategy includes identifying additional opportunities to offer gathering, processing and transportation services to other third parties. Our ability to increase throughput on our facilities and any related revenue from third parties is subject to numerous factors beyond our control, including competition from third parties and the extent to which we have available capacity when requested by third parties. To the extent that we lack available capacity on our facilities for third-party volumes, we may not be able to compete effectively with third-party gathering or processing systems for additional volumes. In addition, some of our competitors for third-party volumes have greater financial resources and access to larger supplies of oil and natural gas than those available to us, which could allow those competitors to price their services more aggressively than us. Moreover, the underlying lease for the properties on which Western Catarina Midstream is located restricts Western Catarina Midstream to the handling of hydrocarbons produced on the properties covered by the lease.

We may not be able to attract material third-party service opportunities. Our efforts to attract new unaffiliated customers may be adversely affected by (i) our relationship with Sanchez Energy, certain rights that it has under applicable agreements and with respect to Western Catarina Midstream the fact that a substantial portion of the capacity of the facility will be necessary to service Sanchez Energy's production and development and completion schedule, (ii) the current nature of our facilities, (iii) our desire to provide services pursuant to fee-based contracts and (iv) the existence of current and future dedications to other gatherers by potential third-party customers. As a result, we may not have the capacity or ability to provide services to third parties, or potential third-party customers may prefer to obtain services pursuant to other forms of contractual arrangements under which we would be required to assume direct commodity exposure.

***All of our midstream assets are located in the Eagle Ford Shale in Texas, making us vulnerable to risks associated with operating in one major geographic area.***

All of our midstream assets are located in the Eagle Ford Shale in Texas. As a result of this concentration, we may be disproportionately exposed to the impact of regional supply and demand factors, delays or interruptions of production from wells in this area caused by governmental regulation, market limitations or interruption of the processing or transportation of natural gas, NGLs or oil.

Table of Contents

***We do not intend to obtain independent evaluations of reserves of natural gas, NGLs and oil reserves connected to Western Catarina Midstream on a regular or ongoing basis; therefore, in the future, volumes of natural gas, NGLs and oil on the gathering system could be less than we anticipate.***

We have not obtained and do not intend to obtain independent evaluations of the reserves of natural gas, NGLs and oil, including those of Sanchez Energy, connected to Western Catarina Midstream on a regular or ongoing basis. Moreover, even if we did obtain independent evaluations of the reserves of natural gas, NGLs and oil connected to Western Catarina Midstream, such evaluations may prove to be incorrect. Oil and natural gas reserve engineering requires subjective estimates of underground accumulations of oil and natural gas and assumptions concerning future oil and natural gas prices, future production levels and operating and development costs.

Accordingly, we may not have accurate estimates of total reserves dedicated to some or all of Western Catarina Midstream or the anticipated life of such reserves. If the total reserves or estimated life of the reserves connected to Western Catarina Midstream are less than we anticipate and we are unable to secure additional sources of natural gas, NGLs and oil, it could have a material adverse effect on our business, results of operations and financial condition and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***A shortage of equipment and skilled labor in the Eagle Ford Shale could reduce equipment availability and labor productivity and increase labor and equipment costs, which could have a material adverse effect on our business and results of operations.***

Gathering and processing services require special equipment and laborers skilled in multiple disciplines, such as equipment operators, mechanics and engineers, among others. Decreased levels of production and shrinking margins from lower commodity prices may result in shortages of equipment and skilled labor in the Eagle Ford Shale, as companies seek to deploy their resources in more profitable basins. If we experience shortages of necessary equipment or skilled labor in the future, our labor and equipment costs and overall productivity could be materially and adversely affected. If our equipment or labor prices increase or if we experience materially increased health and benefit costs for employees, our results of operations could be materially and adversely affected.

***Distributions we receive from the Carnero JV may fluctuate from quarter to quarter as Targa, the operator, has certain discretion over the amount and timing of distributions, which could adversely affect our ability to pay cash distributions.***

We received approximately $17.2 million in cash from the Carnero JV in the form of distributions during the year ended December 31, 2019. Targa, as the operator of the Carnero JV, has certain rights which permit it to affect the amount and timing of distributions to us. For example, Targa has certain discretion with regard to cash reserves and working capital adjustments that may cause the amount of our distributions to fluctuate from quarter-to-quarter. Fluctuations in the amount and timing of distributions from the Carnero JV could adversely affect our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our participation in joint ventures exposes us to liability or harm to our reputation resulting from failures by our partner.***

In May 2018, we executed a series of agreements with Targa and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering and Carnero Processing to form an expanded 50 / 50 joint venture in South Texas, Carnero JV, (2) Targa contributed 100% of the equity interest in Silver Oak II to Carnero JV, which expanded the processing capacity of the joint venture from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the Carnero Gathering Line to Carnero JV resulting in the joint venture owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, and (4) Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. We and Targa are jointly and severally liable for all liabilities and obligations of the Carnero JV. If Targa fails to perform or is financially unable to bear its portion of required capital contributions or other obligations, including liabilities stemming from claims or lawsuits, we could be required to make additional investments, provide additional services or pay more than our proportionate share of a liability to make up for Targa's shortfall. Further, if we are unable to adequately address Targa's performance issues, Sanchez Energy, the main customer on the facilities, may terminate its agreements, which could result in legal liability to us, harm our reputation and reduce cash flows generated from the Carnero Gathering Line and the Raptor Gas Processing Facility.

***Increased competition from other companies that provide gathering services could have a negative impact on the demand for our services, which could adversely affect our financial results.***

Our ability to flow a sufficient volume of throughput prior to and after the expiration of the Gathering Agreement to maintain current revenues and cash flows could be adversely affected by the activities of our competitors. Our facilities compete primarily with other gathering and processing systems. Some competitors have greater financial resources than us and may now, or in the future, have access to greater supplies of natural gas, NGLs and oil than we do. Some of these competitors may expand or construct facilities that would create additional competition for the services that we provide to Sanchez Energy or other future customers. In addition, Sanchez Energy or other future customers may develop their own facilities instead of using our midstream assets. Moreover, Sanchez Energy and its affiliates are not limited in their ability to compete with us outside of the dedicated areas.

All of these competitive pressures could make it more difficult for us to retain Sanchez Energy as a customer and/or attract new customers as we seek to expand our business, which could have a material adverse effect on our business, financial condition, results of operations and ability to make cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***If third-party pipelines or other midstream facilities interconnected to our facilities become partially or fully unavailable, our operating margin, cash flows and ability to pay cash distributions could be adversely affected.***

Our facilities connect to other pipelines or facilities owned and operated by unaffiliated third parties. The continuing operation of third-party pipelines, compressor stations and other midstream facilities is not within our control. These pipelines, plants and other midstream facilities may become unavailable because of testing, turnarounds, line repair, maintenance, reduced operating pressure, lack of operating capacity, regulatory requirements and curtailments of receipt or deliveries due to insufficient capacity or because of damage from severe weather conditions or other operational issues. In addition, if the costs to us to access and transport on these third-party pipelines significantly increase, our profitability could be reduced. If any such increase in costs occurs or if any of these pipelines or other midstream facilities become unable to receive or transport natural gas, NGLs or oil, our operating margin, cash flows and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units could be adversely affected.

***We do not own the land on which Western Catarina Midstream or the Seco Pipeline is located, which could result in disruptions to our operations.***

We do not own the land on which Western Catarina Midstream or the Seco Pipeline is located, and we are, therefore, subject to the possibility of more onerous terms or increased costs to retain necessary land use if we do not have valid rights-of-way or if such rights-of-way lapse or terminate. We currently have certain rights to construct and operate our

pipelines on land owned by third parties for a specific period of time and may need to obtain other rights in the future from third parties and governmental agencies to continue these operations or expand Western Catarina Midstream or the Seco Pipeline. Our loss of these rights or inability to obtain additional rights, through our inability to renew or obtain right-of-way contracts or otherwise, could have a material adverse effect on our business, results of operations, financial condition and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our right-of-first-offer with Sanchez Energy for midstream assets is subject to risks and uncertainty, and thus may not enhance our ability to grow our business.***

Pursuant to a right-of-first-offer, Sanchez Energy has agreed to offer us the right to purchase midstream assets that it desires to transfer to any unaffiliated person through 2030. Sanchez Energy is under no obligation to sell any assets to us or to accept any offer for its assets that we may choose to make. Furthermore, for a variety of reasons, we may decide not to exercise this right when it becomes available.

The acquisition of additional assets in connection with the exercise of our right-of-first-offer will depend upon, among other things, our ability to agree on the price and other terms of the sale, our ability to obtain financing on acceptable terms for the acquisition of such assets and our ability to acquire such assets on the same or better terms than third parties. We can offer no assurance that we will be able to successfully acquire any assets pursuant to this right-of-first-offer.

***Our operations could be disrupted if our or SOG's information systems are hacked or fail, causing increased expenses and loss of revenue.***

We face various security threats, including cybersecurity threats to gain unauthorized access to sensitive information or to render data systems unusable, threats to the security of our facilities and infrastructure, Sanchez Energy's facilities and infrastructure or other third-party facilities and infrastructure, such as pipelines. The potential for such security threats has subjected our operations to increased risks that could have a material adverse effect on our business.

Our business is increasingly dependent on technology infrastructure, certain critical financial, accounting and other data processing systems and other communications and information systems, including such systems of SOG that we utilize pursuant to the Services Agreement. These systems include data network and telecommunications, internet access, our website, and various computer hardware equipment and software applications, including those that are critical to the safe operations of our assets. We process transactions on a daily basis and rely upon the proper functioning of computer systems. These systems are subject to damage or interruption from a number of potential sources including natural disasters, software viruses or other malware, power failures, cybersecurity threats to gain unauthorized access to sensitive information, cyber-attacks, which may render data systems unusable, and physical threats to the security of our and SOG's facilities and infrastructure or third-party facilities and infrastructure. If a key system were hacked or otherwise interfered with by an unauthorized access, or were to fail or experience unscheduled downtime for any reason, even if only for a short period, our financial results could be affected adversely.

Additionally, we rely on information systems across our operations, including the management of processes and transactions. A material disruption to any information systems at our operating locations, or at Sanchez Energy's or another third-party's pipelines, terminals or operating locations, may cause disruptions to our operations.

Cyber-attacks against us or others in our industry could result in additional regulations, and U.S. government warnings have indicated that infrastructure assets, including pipelines, may be specifically targeted by certain groups. These attacks include, without limitation, malicious software, ransomware, attempts to gain unauthorized access to data, and other electronic security breaches. These attacks may be perpetrated by state-sponsored groups, "hacktivists", criminal organizations or private individuals (including employee malfeasance). Current efforts by the federal government and any potential future regulations could lead to increased regulatory compliance costs, insurance coverage cost or capital expenditures. We cannot predict the potential impact to our business or the energy industry resulting from additional regulations.

Further, our business interruption insurance may not compensate us adequately for losses that may occur. We do not carry insurance specifically for cybersecurity events; however, certain of our insurance policies may allow for coverage

of associated damages resulting from such events. If we were to incur a significant liability for which we were not fully insured, it could have a material adverse effect on our financial position, results or operations and cash flows. In addition, the proceeds of any such insurance may not be paid in a timely manner and may be insufficient if such an event were to occur.

**Risks Related to Our Production Business**

***Market conditions for natural gas, NGLs and oil are highly volatile. A sustained decline in prices for these commodities could adversely affect our revenue, cash flows, profitability and growth.***

Prices for natural gas, NGLs and oil fluctuate widely in response to a variety of factors that are beyond our control, such as:

- domestic and foreign supply of and demand for natural gas, NGLs and oil;
- weather conditions and the occurrence of natural disasters;
- overall domestic and global economic conditions;
- political and economic conditions in countries producing natural gas, NGLs and oil, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;
- actions of the Organization of Petroleum Exporting Countries ("OPEC") and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on prices for natural gas, NGLs and oil;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting our ability to apply hydraulic fracturing to our wells, and taxation;
- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of production and transportation facilities for natural gas, NGLs and oil;
- events that impact global market demand, including impacts from global health epidemics and concerns, such as the coronavirus;
- the availability of refining capacity; and
- the price and availability of, and consumer demand for, alternative fuels.

Given that natural gas, NGLs and oil are global commodities, prices can also be significantly influenced by developments in other countries and markets, particularly in key consumption markets like China. For example, the ongoing coronavirus outbreak in China and other locations across the globe has resulted in a meaningful drop in the demand for crude oil and other petroleum products. Ultimately this can lead to a reduction in demand for the services we provide.

Governmental actions may also affect prices for natural gas, NGLs and oil. In the past, prices for natural gas, NGLs and oil have been extremely volatile, and we expect this volatility to continue. NYMEX WTI 12 month strip price for

crude oil was down more than ten percent at the end of fiscal 2019 and the NYMEX Henry Hub 12 month natural gas strip price was down approximately eight percent at the end of fiscal 2019, each when compared with fiscal 2018. Such downward volatility has negatively affected the amount of our net estimated proved reserves and has negatively affected the standardized measure of discounted future net cash flows of our net estimated proved reserves. For the years ended December 31, 2019 and 2018, we did not record impairment on our oil and natural gas properties.

In addition, our revenue, profitability and cash flows depend upon the prices of and demand for natural gas, NGLs and oil, and continued price volatility and low commodity prices, or a sustained drop in prices could negatively affect our financial results and impede our growth. In particular, sustained declines in commodity prices will:

- limit our ability to enter into commodity derivative contracts at attractive prices;
- reduce the value and quantities of our reserves, because declines in prices for natural gas, NGLs and oil would reduce the amount of natural gas, NGLs and oil that we can economically produce;
- reduce the amount of cash flows available for capital expenditures;
- limit our ability to borrow money; and
- make it uneconomical for our operating partners to commence or continue production levels of natural gas, NGLs and oil.

***Drilling for and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect our business, financial condition, results of operation, operating cash flows and any ability to pay cash distributions.***

Drilling activities are subject to many risks, including the risk that commercially productive reservoirs will not be discovered. Drilling for oil and natural gas can be uneconomic, not only from dry holes, but also from productive wells that do not produce sufficient revenues to be commercially viable. In addition, drilling and producing operations may be curtailed, delayed or cancelled as a result of other factors, including:

- the high cost, shortages or delivery delays of drilling rigs, equipment, labor and other services;
- unexpected operational events and drilling conditions;
- adverse weather conditions;
- facility or equipment malfunctions;
- title problems;
- piping, casing or cement failures;
- compliance with environmental and other governmental requirements;
- unusual or unexpected geological formations;
- loss or damage to oilfield drilling and service tools;
- loss of drilling fluid circulation;
- formations with abnormal pressures;
- environmental hazards, such as natural gas leaks, oil spills, compressor incidents, pipeline ruptures and discharges of toxic gases;

- water pollution;
- fires;
- accidents or natural disasters;
- blowouts, craterings and explosions;
- uncontrollable flows of oil, natural gas or well fluids;
- loss or theft of data due to cyber-attacks; and
- third party operations.

Any of these events can increase costs or restrict the ability to drill wells and conduct operations. Any delay in the drilling program or significant increase in costs could impact our ability to generate sufficient cash flows to operate our business. Increased costs could include losses from personal injury or loss of life; damage to or destruction or loss of property, natural resources, equipment, and data; pollution; environmental contamination; loss of wells; and regulatory penalties.

***Unless we replace the reserves that we produce, our existing reserves will decline, which could adversely affect our production and adversely affect our cash from operations and our ability to pay distributions to our unitholders.***

Producing oil and natural gas reservoirs are characterized by declining production rates that vary based on the reservoir characteristics and other factors. The rate of decline of our reserves and production included in our reserve report at the end of the most recently completed fiscal year will change if production from our existing wells declines in a different manner than we have estimated and may change when we make acquisitions and under other circumstances. The rate of decline may also be greater than we have estimated due to decreased capital spending or lack of available capital to make capital expenditures. Our future oil and natural gas reserves and production and, therefore, our cash flows and income, are highly dependent on our success in efficiently developing and exploiting our current reserves and economically acquiring additional recoverable reserves, as we do not intend to drill new wells. We may not be able to develop or acquire additional reserves to replace our current and future production at acceptable costs, which could adversely affect our business, financial condition, results of operations and ability to pay distributions to our unitholders.

***Our estimated reserves are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves.***

It is not possible to measure underground accumulations of oil and natural gas in an exact way. Oil and natural gas reserve engineering requires subjective estimates of underground accumulations of oil and natural gas and assumptions concerning future oil and natural gas prices, production levels and operating and development costs. Our independent reserve engineers do not independently verify the accuracy and completeness of information and data furnished by us. In estimating our level of oil and natural gas reserves, we and our independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- future oil and natural gas prices;
- production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;
- the accuracy and reliability of the underlying engineering and geologic data; and

- the availability of funds.

If these assumptions prove to be incorrect, our estimates of reserves, the economically recoverable quantities of oil and natural gas attributable to any particular group of properties, the classifications of reserves based on risk or recovery and our estimates of the future net cash flows from our reserves could change significantly.

Our standardized measure is calculated using unhedged oil and natural gas prices and is determined in accordance with the rules and regulations of the SEC (except for the impact of income taxes as we are not a taxable entity). Over time, we may make material changes to reserve estimates to take into account changes in our assumptions and the results of actual drilling and production.

The reserve estimates that we make for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories. A lack of production history may contribute to inaccuracies in our estimates of proved reserves, future production rates and the timing of development expenditures.

***The present value of future net cash flows from our estimated proved reserves is not necessarily the same as the current market value of our estimated oil and natural gas reserves.***

We base the estimated discounted future net cash flows from our estimated proved reserves on prices and costs in effect on the day of the estimate. However, actual future net cash flows from our oil and natural gas properties also will be affected by factors such as:

- the actual prices that are received for oil and natural gas;
- actual operating costs in producing oil and natural gas;
- the amount and timing of actual production;
- the amount and timing of capital expenditures;
- supply of and demand for oil and natural gas; and
- changes in governmental regulations or taxation.

The timing of both production and the incurrence of expenses in connection with the development and production of oil and natural gas properties will affect the timing of actual future net cash flows from proved reserves, and thus, their actual present value. In addition, the 10% discount factor used when calculating our discounted future net cash flows in compliance with the Financial Accounting Standard Board's Accounting Standards may not be the most appropriate discount factor based on interest rates in effect from time to time and risks associated with us or the oil and natural gas industry in general. Any material inaccuracies in these reserve estimates or underlying assumptions could materially affect the quantities and present value of our reserves, which could adversely affect our business, results of operations, financial condition and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Future price declines or downward reserve revisions may result in write-downs of our asset carrying values, which could adversely affect our results of operations and limit our ability to borrow funds.***

Declines in oil and natural gas prices may result in our having to make substantial downward adjustments to our estimated proved reserves. If this occurs, or if our estimates of development costs increase or production data factors change, accounting rules may require us to write-down, as a noncash charge to earnings, the carrying value of our properties for impairments. We capitalize costs to acquire, find and develop our oil and natural gas properties under the successful efforts accounting method. We are required to perform impairment tests on our assets periodically and whenever events or circumstances warrant a review of our assets. To the extent such tests indicate a reduction of the estimated useful life or estimated future cash flows of our assets, the carrying value may not be recoverable and therefore would require a write-down. We have incurred impairment charges in the past and may do so again in the future. Any impairment could be substantial and have a material adverse effect on our results of operations in the period incurred and our ability to

borrow funds under our Credit Agreement, which in turn may adversely affect our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***We depend on certain key customers for sales of our oil and natural gas. To the extent these and other customers reduce the volumes of oil or natural gas they purchase from us and are not replaced by new customers, our revenues and cash available for distribution could decline.***

Our oil and natural gas production in Texas and Louisiana is marketed by the operators of our properties. To the extent these or other customers reduce the volumes of oil and natural gas that they purchase from us and are not replaced by new customers, or the market prices for oil and natural gas decline in our market areas, our revenues and cash available for distribution could decline.

***Seasonal weather conditions may adversely affect our ability to conduct production activities.***

Oil and natural gas operations are often adversely affected by seasonal weather conditions, primarily during periods of severe weather or rainfall, and during periods of extreme cold. Power outages and other damages resulting from tornados, ice storms, flooding and other strong storms or weather events may prevent wells from being operated in an optimal manner. These weather conditions may reduce oil and natural gas production, which could impact or reduce our future operating cash flows.

***Shortages of drilling rigs, supplies, oilfield services, equipment and crews could delay operations and reduce our future operating cash flows and cash available to make future investments or to pay cash distributions.***

Higher oil and natural gas prices generally increase the demand for drilling rigs, supplies, services, equipment and crews, and can lead to shortages of, and increasing costs for, drilling equipment, services and personnel. Shortages of, or increasing costs for, experienced drilling crews and equipment and services could restrict the ability to conduct the operations. Any significant increase in operating costs could reduce our revenues, operating cash flows and cash available to make future investments or to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our oil and natural gas properties may be exposed to unanticipated water disposal or processing costs.***

Where water produced from properties fails to meet the quality requirements of applicable regulatory agencies or wells produce water in excess of the applicable volumetric permit limit, the wells may have to be shut in or upgraded for water handling or treatment. The costs to treat or dispose of this produced water may increase if any of the following occur:

- permits cannot be renewed or obtained from applicable regulatory agencies;
- water of lesser quality or requiring additional treatment is produced;
- the wells produce excess water; or
- new laws and regulations require water to be disposed of or treated in a different manner.

***We may be unable to compete effectively with larger companies in the oil and natural gas industry, which may adversely affect our ability to generate sufficient revenue to allow us to pay cash distributions.***

The oil and natural gas industry is intensely competitive with respect to acquiring productive properties, marketing oil and natural gas and securing equipment and trained personnel, and we compete with other companies that have greater resources. Many of our competitors are major independent oil and natural gas companies and possess and employ financial, technical and personnel resources substantially greater than ours. Those companies may be able to develop and acquire more productive properties than our financial and personnel resources permit. Our ability to acquire additional properties will be dependent on our ability to evaluate, select and finance the acquisition of suitable properties and our ability to consummate transactions in a highly competitive environment. Factors that affect our ability to acquire properties include availability of desirable acquisition targets, staff and resources to identify and evaluate properties and available funds.

Many of our larger competitors not only drill for and produce oil and natural gas, but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for oil and natural gas properties and evaluate, bid for and purchase a greater number of properties than our financial or human resources permit. In addition, there is substantial competition for investment capital in the oil and natural gas industry. Our inability to compete effectively with other companies could have a material adverse effect on our business activities, financial condition, results of operations and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

**Risks Related to Our Midstream and Production Businesses**

***As a non-operator, our development of successful operations relies extensively on third-parties, including SOG, Sanchez Energy and Targa, which could adversely affect our business, financial condition and results of operations.***

We have only participated in wells, leasehold acreage and midstream assets operated by third parties, including SOG, Sanchez Energy and Targa. The success of our business operations depends on the success of such operators. If our operators are not successful in the development, exploitation, production and operating activities relating to our midstream and production businesses, or are unable or unwilling to perform, it could adversely affect our business, financial condition and results of operations.

The insolvency of an operator of any of our properties or assets, the failure of an operator of any of our properties or assets to adequately perform operations or an operator's breach of applicable agreements could reduce our production and revenue and result in our liability to governmental authorities for compliance with environmental, safety and other regulatory requirements, to the operator's suppliers and vendors and to royalty owners under oil and gas leases jointly owned with the operator or another insolvent owner.

Our operators will make decisions in connection with their operations (subject to their contractual and legal obligations), which may not be in our best interests and could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Financing and Credit Environment**

***Our Credit Agreement has substantial restrictions and financial covenants and requires periodic borrowing base redeterminations.***

We depend on our Credit Agreement (as defined below) for future capital needs. The Credit Agreement restricts our ability to obtain additional financing, make investments, lease equipment, sell assets and engage in business combinations. We are also required to comply with certain financial covenants and ratios. Our ability to comply with these restrictions and covenants in the future is uncertain and will be affected by the levels of cash flows from our operations and events or circumstances beyond our control, including events and circumstances that may stem from the condition of financial markets and commodity price levels. Our failure to comply with any of the restrictions and covenants under the Credit Agreement could result in an event of default, which could cause all of our existing indebtedness to become immediately due and payable. Each of the following is also an event of default:

- failure to pay any principal when due or any interest, fees or other amount prior to the expiration of certain grace periods;
- a representation or warranty made under the loan documents or in any report or other instrument furnished thereunder is incorrect when made;
- failure to perform or otherwise comply with the covenants in the Credit Agreement or other loan documents, subject, in certain instances, to certain grace periods;
- any event that permits or causes the acceleration of the indebtedness;
- bankruptcy or insolvency events involving us or our subsidiaries;

- certain changes in control as specified in the covenants to the Credit Agreement;
- the entry of, and failure to pay, one or more adverse judgments in excess of $2.5 million or one or more non-monetary judgments that could reasonably be expected to have a material adverse effect and for which enforcement proceedings are brought or that are not stayed pending appeal; and
- specified events relating to our employee benefit plans that could reasonably be expected to result in liabilities in excess of $2.5 million in any year.

The Credit Agreement will mature on September 30, 2021. We may not be able to renew or replace the facility at similar borrowing costs, terms, covenants, restrictions or borrowing base, or with similar debt issue costs.

The amount available for borrowing at any one time under the Credit Agreement is limited to the separate borrowing bases associated with our oil and natural gas properties and our midstream assets. The borrowing base for the credit available for the upstream oil and natural gas properties is re-determined semi-annually in the second and fourth quarters of the year, and may be re-determined at our request more frequently and by the lenders, in their sole discretion, based on reserve reports as prepared by petroleum engineers, using, among other things, the oil and natural gas pricing prevailing at such time. The borrowing base for the credit available for our midstream properties is equal to the rolling four quarter EBITDA of our midstream operations multiplied by 4.5. Outstanding borrowings in excess of our borrowing base must be repaid or we must pledge other oil and natural gas properties as additional collateral. We may elect to pay any borrowing base deficiency in three equal monthly installments such that the deficiency is eliminated in a period of three months. Any increase in our borrowing base must be approved by all of the lenders.

Our Credit Agreement contains a condition to borrowing and a representation that no material adverse effect has occurred, which includes, among other things, a material adverse change in, or material adverse effect on the business, operations, property, liabilities (actual or contingent) or condition (financial or otherwise) of us and our subsidiaries who are guarantors taken as a whole. If a material adverse effect were to occur, we would be prohibited from borrowing under the Credit Agreement and we would be in default under the Credit Agreement, which could cause all of our existing indebtedness to become immediately due and payable.

***We may not be able to extend, replace or refinance our Credit Agreement on terms reasonably acceptable to us, or at all, which could materially and adversely affect our business, liquidity, cash flows and prospects.***

Our Credit Agreement matures on September 30, 2021. We may not be able to extend, replace or refinance our existing Credit Agreement on terms reasonably acceptable to us, or at all, with our existing syndicate of banks or with replacement banks. In addition, we may not be able to access other external financial resources sufficient to enable us to repay the debt outstanding under our Credit Agreement upon its maturity. Any of the foregoing could materially and adversely affect our business, liquidity, cash flows and prospects.

***Changes in LIBOR reporting practices or the method in which LIBOR is determined may adversely affect the market value of our current or future debt obligations, including obligations under our Credit Agreement.***

As of March 13, 2020, we had approximately $144.0 million of debt outstanding under our Credit Agreement that bears interest at variable rates that use the London Interbank Offered Rate ("LIBOR"), as a benchmark rate. On July 27, 2017, the Financial Conduct Authority (the "FCA"), which regulates LIBOR, announced that it intends to stop persuading or compelling banks to submit LIBOR quotations after 2021. It is unclear whether LIBOR will cease to exist or if new methods of calculating LIBOR will be established such that it continues to exist after 2021, or whether any alternative benchmark rate will attain market acceptance as a replacement for LIBOR. It is not possible to predict the further effect of the rules of the FCA, any changes in the methods by which LIBOR is determined or any other reforms to LIBOR that may be enacted in the United Kingdom, the European Union or elsewhere. Any such developments may cause LIBOR to perform differently than in the past, or cease to exist. In addition, any other legal or regulatory changes made by the FCA, the European Commission or any other successor governance or oversight body, or future changes adopted by such body, in the method by which LIBOR is determined or the change from LIBOR to an alternative benchmark rate may result in, among other things, a sudden or prolonged increase or decrease in LIBOR, a delay in the publication of LIBOR, and changes in the rules or methodologies in LIBOR, which may discourage market participants from continuing to administer

or to participate in LIBOR's determination, and, in certain situations, could result in LIBOR no longer being determined and published.

Under our Credit Agreement, if (a) the administrative agent determines that reasonable means do not exist for ascertaining LIBOR and such circumstances are unlikely to be temporary, (b) the supervisor for the administrator of LIBOR or another governmental authority having jurisdiction over the administrative agent has made a public statement identifying a date after which LIBOR shall no longer be used, or (c) new syndicated loans have started to adopt a new benchmark interest rate, then we will be required to negotiate an amendment to our Credit Agreement with the administrative agent. The use of the alternative benchmark interest rate under any such amendment may result in interest obligations which are more than or do not otherwise correlate over time with the payments that would have been made on such debt if LIBOR was available in its current form. Further, the same costs and risks that may lead to the discontinuation or unavailability of LIBOR may make one or more of the alternative methods impossible or impracticable to determine. At this time, it is not possible to predict the effect of any establishment of any alternative benchmark rate(s) and we cannot predict what alternative benchmark rate(s) will be utilized. Any new benchmark rate will likely not replicate LIBOR exactly, and any changes to benchmark rates may have an uncertain impact on our cost of funds under our Credit Agreement. Any of these proposals or consequences could have a material adverse effect on our financing costs.

***We will be required to make substantial capital expenditures to increase our asset base. If we are unable to obtain needed capital or financing on satisfactory terms, our ability to pay cash distributions may be diminished or our financial leverage could increase.***

In order to increase our asset base, we will need to make expansion capital expenditures. If we do not make sufficient or effective expansion capital expenditures, we will be unable to expand our business operations which may diminish our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units. To fund our expansion capital expenditures and investment capital expenditures, we will be required to use cash from our operations or incur borrowings. Such uses of cash from our operations will reduce cash available for distribution. Alternatively, we may sell additional common units or other securities to fund our capital expenditures. Our ability to obtain bank financing or our ability to access the capital markets for future equity or debt offerings may be limited by our or Sanchez Energy's financial condition at the time of any such financing or offering and the covenants in our existing debt agreements, as well as by general economic conditions, contingencies and uncertainties that are beyond our control. Even if we are successful in obtaining the necessary funds, the terms of such financings could implement restrictions or limitations on our ability to pay cash distributions. For example, our Credit Agreement currently prohibits us from making distributions to our common unitholders. In addition, incurring additional debt may significantly increase our interest expense and financial leverage, and issuing additional limited partner interests may result in significant unitholder dilution and would increase the aggregate amount of cash required to make or maintain cash distributions to our unitholders in the future, if any, which could materially decrease our ability to pay cash distributions. None of our general partner, Sanchez Energy or any of their respective affiliates is committed to providing any direct or indirect support to fund our growth.

***Our Credit Agreement restricts us from paying any distributions on our outstanding common units.***

We do not have the ability to pay distributions to our common unitholders under our Credit Agreement other than in certain limited circumstances set forth in the Credit Agreement. We have obtained waivers of Credit Agreement limitations in the past and may need to do so in the future.

***Our ability to access the capital and credit markets to raise capital and borrow on favorable terms will be affected by disruptions in the capital and credit markets, which could adversely affect our operations, our ability to make acquisitions and our ability to pay cash distributions.***

Disruptions in the capital and credit markets could limit our ability to access these markets or significantly increase our cost to borrow. Some lenders may increase interest rates, enact tighter lending standards, refuse to refinance existing debt at maturity on favorable terms or at all and may reduce or cease to provide funding to borrowers. If we are unable to access the capital markets on favorable terms, our ability to make acquisitions and pay cash distributions could be affected.

***We are exposed to credit risk in the ordinary course of our business activities.***

We are exposed to risks of loss in the event of nonperformance by our customers, vendors, lenders in our Credit Agreement and counterparties to our hedging arrangements. Some of our customers, vendors, lenders and counterparties may be highly leveraged and subject to their own operating and regulatory risks. For example, our largest customer, Sanchez Energy Corporation, who accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectfully, along with certain of its subsidiaries filed the Sanchez Energy Chapter 11 Case in August of 2019. Despite our credit review and analysis, we may experience financial losses in our dealings with these and other parties with whom we enter into transactions as a normal part of our business activities. Any nonpayment or nonperformance by our customers, vendors, lenders or counterparties could have a material adverse impact on our business, financial condition, results of operations or ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our future debt levels may limit our flexibility to obtain additional financing and pursue other business opportunities.***

We may incur substantial additional indebtedness in the future under our Credit Agreement or otherwise. Our future indebtedness could have important consequences to us, including:

- our ability to obtain additional financing, if necessary, for working capital, maintenance and investment capital expenditures, acquisitions or other purposes may be impaired or such financing may not be available on favorable terms;
- covenants and financial tests contained in our existing and future credit and debt instruments may affect our flexibility in planning for and reacting to changes in our business, including possible acquisition opportunities;
- increased cash flows required to make principal and interest payments on our indebtedness could reduce the funds that would otherwise be available to fund operations, capital expenditures, future business development or any cash distributions; and
- our debt level may make us more vulnerable than our competitors with less debt to competitive pressures or a downturn in our business or the economy generally.

Our ability to service our debt will depend upon, among other things, our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond our control. If our operating results are not sufficient to service our current or future debt, we will be forced to take actions such as reducing or delaying business activities, acquisitions, investments and/or capital expenditures, selling assets, restructuring or refinancing our indebtedness, or seeking additional equity capital or bankruptcy protection. We may not be able to affect any of these remedies on satisfactory terms or at all.

***Periods of inflation or stagflation, or expectations of inflation or stagflation, could increase our costs and adversely affect our business and operating results.***

During periods of inflation or stagflation, our costs of doing business could increase, including increases in the variable interest rates that we pay on amounts we borrow under our Credit Agreement. As we have hedged a large percentage of our expected production volumes for 2020, the cash flows generated by that future hedged production will be capped. If any of our operating, administrative or capital costs were to increase as a result of inflation or increase in the cost of goods and services, such a cap could have a material adverse effect on our business, financial condition, results of operations, and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***An increase in interest rates may cause the market price of our common units to decline and may increase our borrowing costs.***

Like all equity investments, an investment in our common units is subject to certain risks. In exchange for accepting these risks, investors may expect to receive a higher rate of return than would otherwise be obtainable from lower-risk investments. Accordingly, as interest rates rise, the ability of investors to obtain higher risk-adjusted rates of return by purchasing government-backed debt or other interest-bearing securities may cause a corresponding decline in demand for

riskier investments generally, including equity investments such as publicly-traded limited partnership interests. Reduced demand for our common units resulting from investors seeking other more favorable investment opportunities may cause the trading price of our common units to decline.

Higher interest rates may also increase the borrowing costs associated with our Credit Agreement. If our borrowing costs were to increase, our interest payments on our debt may increase, which would reduce the amount of cash available for our operating or capital activities or for any cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

**Risks Related to Our Cash Distributions**

***Our partnership agreement prohibits us from making certain distributions until all of the Class C Preferred Units are redeemed and, as a result, our ability to make, maintain and grow cash distributions is dependent on our ability to redeem the Class C Preferred Units.***

Under the terms of our partnership agreement, until the first quarter in which no Class C Preferred Units remain outstanding, we are not permitted to declare or make any distributions, redemptions or repurchases in respect of, among other partnership interests, our common units. Beginning January 1, 2021, our partnership agreement provides us with the ability to redeem the Class C Preferred Units without a premium to the liquidation preference of the Class C Preferred Units. If we are unable to access the capital markets on favorable terms or otherwise secure debt or equity financing to redeem the Class C Preferred Units, our ability to redeem the Class C Preferred Units and then to make, maintain and grow cash distributions to unitholders will be materially adversely affected.

***Our Credit Agreement restricts us from paying any distributions on our outstanding common units.***

We do not have the ability to pay distributions to our common unitholders under our Credit Agreement other than in certain limited circumstances set forth in the Credit Agreement.

***If we do not complete expansion projects or make and integrate acquisitions, our future growth may be limited.***

Our ability to enhance our financial position depends, in part, on our ability to complete expansion projects and make acquisitions that result in an increase in cash generated. We may be unable to complete successful, accretive expansion projects or acquisitions for any of the following reasons:

- an inability to identify attractive expansion projects or acquisition candidates or we are outbid by competitors;
- an inability to obtain necessary rights-of-way or governmental approvals, including from regulatory agencies;
- an inability to successfully integrate the businesses that we develop or acquire;
- an inability to obtain financing for such expansion projects or acquisitions on economically acceptable terms, or at all;
- incorrect assumptions about volumes, reserves, revenues and costs, including synergies and potential growth; or
- an inability to secure adequate customer commitments to use the newly developed or acquired facilities.

***We may not have sufficient available cash from operations to pay our quarterly cash distributions to Stonepeak Catarina following the establishment of cash reserves and the payment of fees and expenses.***

The amount of available cash from which we may pay distributions is defined in both our Credit Agreement and our partnership agreement. The amount of available cash that we distribute is subject to the definition of operating surplus in our partnership agreement and principally depends upon the amount of cash that we generate from our operations, which

will fluctuate from quarter to quarter based on numerous factors described in this Form 10-K, including this Item 1A."Risk Factors." These and other factors that affect that amount that we can distribute include:

- the amount of revenue generated from our midstream facilities;
- the amount of oil, natural gas and water that we produce;
- the demand for and the price at which we are able to sell our oil and natural gas production;
- the results of our hedging activity;
- the level of our operating costs;
- the costs that we incur to acquire midstream assets and oil and natural gas properties;
- whether we are able to continue our development activities at economically attractive costs;
- the borrowing base under our Credit Agreement as determined by our lenders;
- the amount of our indebtedness outstanding;
- the level of our interest expense, which depends on the amount of our indebtedness and the interest payable thereon;
- the amount of working capital required to operate our business and our ability to make working capital borrowings under our Credit Agreement;
- fluctuations in our working capital needs;
- the amount of cash reserves established by the Board for the proper conduct of our business; and
- the level of our maintenance capital expenditures.

As a result of these factors, we may not have sufficient available cash to pay a quarterly cash distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units. The amount of available cash that we could distribute from our operating surplus in any quarter to our unitholders may fluctuate significantly from quarter to quarter.

***The amount of cash that we may have available for distribution depends primarily upon our operating cash flows and not solely on our profitability.***

The amount of cash that we have available for distribution depends primarily upon our operating cash flows, including cash from reserves and working capital (which may include short-term borrowings), and not solely on our profitability, which is affected by non-cash items. As a result, we may be unable to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units even when we record net income, and we may pay cash distributions during periods when we incur net losses.

***Oil and natural gas prices are very volatile. If commodity prices decline significantly for a temporary or prolonged period, our cash from operations may decline and may adversely impact our ability to invest in new midstream facilities, our financial condition and our profitability.***

Our revenue, profitability and operating cash flows depend in part upon the prices and demand for oil and natural gas, and a drop in prices can significantly affect our financial results and impede our growth. Changes in oil and natural gas prices have a significant impact on the value of our reserves and on our operating cash flows and may also impact the fees generated by us from our midstream facilities. In particular, declines in commodity prices will directly reduce the value of our reserves, our operating cash flows, our ability to borrow money or raise capital and our ability to pay cash distributions and may indirectly reduce the cash flows from our midstream facilities. Prices for oil and natural gas may

Table of Contents

fluctuate widely in response to relatively minor changes in the supply of and demand for oil and natural gas, market uncertainty and a variety of additional factors that are beyond our control, such as:

- the domestic and foreign supply of and demand for oil and natural gas;
- the price and level of foreign imports of oil and natural gas;
- the level of consumer product demand;
- weather conditions;
- overall domestic and global economic conditions;
- political and economic conditions in oil and natural gas producing countries, including those in West Africa, the Middle East and South America;
- the ability of members of OPEC to agree to and maintain oil price and production controls;
- the impact of U.S. dollar exchange rates on oil and natural gas prices;
- technological advances affecting energy consumption;
- domestic and foreign governmental regulations and taxation;
- the impact of energy conservation efforts;
- the costs, proximity and capacity of oil and natural gas pipelines and other transportation facilities;
- the price and availability of alternative fuels; and
- the increase in the supply of natural gas due to the development of natural gas.

In the past, the prices of oil and natural gas have been extremely volatile, and we expect this volatility to continue.

***Our operations require capital expenditures, which will reduce the amount of cash that we may have available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units.***

We will need to make capital expenditures to maintain our facilities and infrastructure over the long-term. These expenditures could increase as a result of, among others:

- changes in labor and material costs;
- changes in leasehold and right-of-way costs; and
- government regulations relating to safety, taxation and the environment.

Our capital expenditures will vary from quarter to quarter and will reduce the amount of cash that we may have available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Each quarter we are required to deduct estimated maintenance capital expenditures from operating surplus, which may result in less cash available for distribution than if actual maintenance capital expenditures were deducted.***

Our partnership agreement requires us to deduct estimated, rather than actual, maintenance capital expenditures from operating surplus. The amount of estimated maintenance capital expenditures deducted from operating surplus will be subject to review and potential change by the Board at least once a year. In years when our estimated maintenance capital expenditures are higher than actual maintenance capital expenditures, the amount of cash available for distribution will be

lower than if actual maintenance capital expenditures were deducted from operating surplus. If we underestimate the appropriate level of estimated maintenance capital expenditures, we may have less cash available for distribution in future periods when actual capital expenditures begin to exceed our previous estimates. If we do not set aside sufficient cash reserves or have available sufficient sources of financing and make sufficient expenditures to maintain our asset base, we will be unable to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our hedging activities could result in financial losses and involve other risks, which may adversely affect our ability to pay cash distributions.***

To achieve more predictable cash flows and to reduce our exposure to adverse fluctuations in the prices of oil and natural gas, our current practice is to hedge, subject to the terms of our Credit Agreement, a significant portion of our expected production volumes for 2020. As a result, we will continue to have direct commodity price exposure on the unhedged portion of our production volumes. The extent of our commodity price exposure is related largely to the effectiveness and scope of our hedging activities. For example, the derivative instruments that we utilize are generally based on posted market prices, which may differ significantly from the actual oil and natural gas prices that we realize in our operations.

Our actual future production may be significantly higher or lower than we estimated at the time we entered into hedging transactions for such period. If the actual amount is higher than we estimate, we will have greater commodity price exposure than we intended. If the actual amount is lower than the nominal amount that is subject to our derivative financial instruments, we might be forced to satisfy all or a portion of our derivative transactions without the benefit of the cash flows from our sale or purchase of the underlying physical commodity, which may result in a substantial diminution of our liquidity. As a result of these factors, our hedging activities may not be as effective as we intend in reducing the volatility of our cash flows, and in certain circumstances may actually increase the volatility of our cash flows. In addition, our hedging activities are subject to the following risks:

- a counterparty may not perform its obligation under the applicable derivative instrument;
- there may be a change in the expected differential between the underlying commodity price in the derivative instrument and the actual price received; and
- the steps that we take to monitor our derivative financial instruments may not detect and prevent violations of our risk management policies and procedures.

As a result of the Dodd-Frank Wall Street Reform and Consumer Protection Act and other legislation, hedging transactions and many of our contract counterparties have come under increasing governmental oversight and regulations in recent years. Although we cannot predict the ultimate impact of these laws or other proposed laws and the related rulemaking, some of which is ongoing, existing or future regulations may adversely affect the cost and availability of our hedging arrangements, including by causing our counterparties, which include lenders under our Credit Agreement, to curtail or cease their derivative activities.

***Acquisitions involve potential risks that could adversely impact our future growth and our ability to pay cash distributions.***

Any acquisition involves potential risks, including, among other things:

- the risk of title defects discovered after closing;
- inaccurate assumptions about revenues and costs, including synergies;
- significant increases in our indebtedness and working capital requirements;
- an inability to transition and integrate successfully or timely the businesses we acquire;

- the cost of transition and integration of data systems and processes;
- potential environmental problems and costs;
- the assumptions of unknown liabilities;
- limitations on rights to indemnity from the seller;
- the diversion of management's attention from other business concerns;
- increased demands on existing personnel and on our organizational structure;
- disputes arising out of acquisitions;
- customer or key employee losses of the acquired businesses; and
- the failure to realize expected growth or profitability.

The scope and cost of these risks may ultimately be materially greater than estimated at the time of the acquisition. Furthermore, our future acquisition costs may be higher than those we have achieved historically. Any of these factors could adversely impact our future growth and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Inadequate insurance could have a material adverse impact on our business, financial condition and results of operations.***

We ordinarily maintain insurance against certain losses and liabilities arising from our operations; however, insurance against all operational risks is not available to us. In addition, we may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could therefore occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. The occurrence of an event that is not fully covered by insurance could have a material adverse impact on our business, financial condition and results of operations.

**Risks Related to Regulatory Compliance**

***Potential regulatory actions could increase our operating or capital costs and delay our operations or otherwise alter the way we conduct our business.***

Our business activities are subject to extensive federal, state, and local regulations. Changes to existing regulations or new regulations may unfavorably impact us, our suppliers or our customers. In the United States, legislation that directly impacts the oil and natural gas industry has been proposed covering areas such as emission reporting and reductions, hydraulic fracturing of wells, the repeal of certain oil and natural gas tax incentives and tax deductions and the treatment and disposal of produced water. The EPA has also ruled that carbon dioxide, methane and other greenhouse gases endanger human health and the environment. This allows the EPA to adopt and implement regulations restricting greenhouse gases under existing provisions of the federal Clean Air Act. In addition, provisions of the Dodd-Frank Act, which regulate financial derivatives, may impact our ability to enter into derivatives or require burdensome collateral or reporting requirements. These and other potential regulations could increase our costs, reduce our liquidity, impact our ability to hedge our future oil and natural gas sales, delay our operations or otherwise alter the way that we conduct our business, negatively impacting our financial condition, results of operations and cash flows.

We are subject to federal, state, and local laws and regulations as interpreted and enforced by governmental authorities possessing jurisdiction over various aspects of the production and transportation of oil and natural gas. The possibility exists that any new laws, regulations or enforcement policies could be more stringent than existing laws and could significantly increase our compliance costs. If we are not able to recover the resulting costs from insurance or through increased revenues, our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units could be adversely affected.

***Our failure to obtain or maintain necessary permits could adversely affect our operations.***

Our operations are subject to complex and stringent laws and regulations. In order to conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. Failure or delay in obtaining regulatory approvals or leases could have a material adverse effect on our ability to develop our properties. In addition, regulations regarding conservation practices and the protection of correlative rights affect our operations by limiting the quantity of oil and natural gas we may produce and sell.

***Increased regulation of hydraulic fracturing could result in reductions or delays in the production of natural gas, NGLs and oil by Sanchez Energy, which could reduce the throughput on our facilities and adversely impact our revenues.***

A substantial portion of Sanchez Energy's production of natural gas, NGLs and oil is being developed from unconventional sources, such as shale formations. These reservoirs require hydraulic fracturing completion processes to release the liquids and natural gas from the rock so it can flow through casing to the surface. Hydraulic fracturing is a well stimulation process that utilizes large volumes of water and sand (or other proppant) combined with fracturing chemical additives that are pumped at high pressure to crack open previously impenetrable rock to release hydrocarbons. Hydraulic fracturing is typically regulated by state oil and gas commissions and similar agencies. Various studies are currently underway by the EPA and other federal and state agencies concerning the potential environmental impacts of hydraulic fracturing activities. For example, the EPA issued an advanced notice of proposed rulemaking under the Toxic Substances Control Act in 2014 requesting comments related to disclosures for hydraulic fracturing chemicals. At the same time, certain environmental groups have suggested that additional laws may be needed to more closely and uniformly regulate the hydraulic fracturing process, and legislation has been proposed by some members of the U.S. Congress to provide for such regulation. We cannot predict whether any such legislation will ever be enacted and if so, what its provisions would be. If additional levels of regulation and permits were required through the adoption of new laws and regulations at the federal or state level, that could lead to delays and process prohibitions that could reduce the volumes of liquids and natural gas that move through our facilities, which in turn could materially adversely affect our revenues and results of operations.

***We may incur significant liability under, or costs and expenditures to comply with, environmental and worker health and safety regulations, which are complex and subject to frequent change.***

As an owner, lessee or operator of gathering pipelines and compressor stations, we are subject to various stringent federal, state and local laws and regulations relating to the discharge of materials into, and protection of, the environment. Numerous governmental authorities, such as the EPA and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, oftentimes requiring difficult and costly response actions. These laws and regulations may impose numerous obligations that are applicable to our and our customer's operations, including the acquisition of permits to conduct regulated activities, the incurrence of capital or operating expenditures to limit or prevent releases of materials from our or our customers' operations, the imposition of specific standards addressing worker protection, and the imposition of substantial liabilities and remedial obligations for pollution or contamination resulting from our and our customer's operations. Failure to comply with these laws, regulations and permits may result in joint and several, strict liability and the assessment of administrative, civil and criminal penalties, the imposition of remedial obligations, and the issuance of injunctions limiting or preventing some or all of our operations. Private parties, including the owners of the properties through which our facilities pass and facilities where wastes resulting from our operations are taken for reclamation or disposal, may also have the right to pursue legal actions to enforce compliance, as well as to seek damages for non-compliance, with environmental laws and regulations or for personal injury or property damage. We may not be able to recover all or any of these costs from insurance, the operators of our facilities and properties or other third parties. In addition, we may experience a delay in obtaining or be unable to obtain required permits, which may interrupt our operations and limit our growth and revenues, which in turn could affect our profitability. There is no assurance that changes in or additions to public policy regarding the protection of the environment will not have a significant impact on our operations and profitability.

The operation of our facilities also poses risks of environmental liability due to leakage, migration, releases or spills from our facilities to surface or subsurface soils, surface water or groundwater. Certain environmental laws impose strict as well as joint and several liability for costs required to remediate and restore sites where hazardous substances,

hydrocarbons, or solid wastes have been stored or released. We may be required to remediate contaminated properties currently or formerly operated by us or facilities of third parties that received waste generated by our operations regardless of whether such contamination resulted from the conduct of others or from consequences of our own actions that were in compliance with all applicable laws at the time those actions were taken. In addition, claims for damages to persons or property, including natural resources, may result from the environmental, health and safety impacts of our operations. Moreover, public interest in the protection of the environment has increased dramatically in recent years. The trend of more expansive and stringent environmental legislation and regulations applied to the oil and natural gas industry could continue, resulting in increased costs of doing business and consequently affecting profitability.

***We may incur significant costs and liabilities as a result of pipeline integrity management program testing and any related pipeline repair or preventative or remedial measures.***

The DOT has adopted regulations requiring pipeline operators to develop integrity management programs for transportation pipelines located where a leak or rupture could do the most harm in HCAs. The regulations require operators to:

- perform ongoing assessments of pipeline integrity;
- identify and characterize applicable threats to pipeline segments that could impact a high consequence area;
- improve data collection, integration and analysis;
- repair and remediate the pipeline as necessary; and
- implement preventive and mitigating actions.

The 2011 Pipeline Safety Act, among other things, increases the maximum civil penalty for pipeline safety violations and directs the Secretary of Transportation to promulgate rules or standards relating to expanded integrity management requirements, automatic or remote-controlled valve use, excess flow valve use, leak detection system installation and testing to confirm the material strength of pipe operating above 30% of specified minimum yield strength in high consequence areas. Should our facilities fail to comply with DOT or comparable state regulations, we could be subject to substantial penalties and fines.

PHMSA has also published advanced notices of proposed rulemaking and notices of proposed rulemaking to solicit comments on the need for changes to its safety regulations as well as advisory bulletins. In April 2016, PHMSA issued a notice of proposed rulemaking that would expand integrity management requirements and impose new pressure requirements on currently regulated gas transmission pipelines and would also significantly expand the regulation of gas gathering lines, subjecting previously unregulated pipelines to requirements regarding damage prevention, corrosion control, public education programs, maximum allowable operating pressure limits and other requirements. In addition, in 2012, PHMSA issued an advisory bulletin providing guidance on the verification of records related to pipeline maximum allowable operating pressure, which could result in additional requirements for the pressure testing of pipelines or the reduction of maximum operating pressures. The adoption of these and other laws or regulations that apply more comprehensive or stringent safety standards could require us to install new or modified safety controls, pursue new capital projects, or conduct maintenance programs on an accelerated basis, all of which could require us to incur increased operational costs that could be significant. While we cannot predict the outcome of legislative or regulatory initiatives, such legislative and regulatory changes could have a material effect on our cash flows. Please read "Item 1. Business—Governmental Regulation—Pipeline Safety Regulation" for more information.

***Because we handle oil, natural gas and other petroleum products in our business, we may incur significant costs and liabilities in the future resulting from a failure to comply with new or existing environmental regulations.***

The operations of our wells, gathering systems, processing facilities, pipelines and other facilities are subject to stringent and complex federal, state and local environmental laws and regulations. Failure to comply with these laws and regulations may trigger a variety of administrative, civil and criminal enforcement measures, including the assessment of monetary penalties, the imposition of remedial requirements and the issuance of orders enjoining future operations. There

is an inherent risk that we may incur environmental costs and liabilities due to the nature of our business and the substances we handle. Certain environmental statues, including RCRA, CERCLA and analogous state laws and regulations, impose strict, joint and several liability for costs required to clean up and restore sites where hazardous substances have been disposed of or otherwise released. In addition, an accidental release from one of our facilities could subject us to substantial liabilities arising from environmental cleanup and restoration costs, claims made by neighboring landowners and other third parties for personal injury and property damage and fines or penalties for related violations of environmental laws or regulations.

Moreover, the possibility exists that stricter laws, regulations or enforcement policies could significantly increase our compliance costs and the cost of any remediation that may become necessary, and these costs may not be recoverable from insurance.

**Risks Inherent in an Investment in Our Common Units**

***Our general partner and its affiliates will have conflicts of interest with us. They will not owe any fiduciary duties to us or our common unitholders, but instead will owe us and our common unitholders limited contractual duties, and they may favor their own interests to the detriment of us and our other common unitholders.***

Manager, an affiliate of SOG, owns and controls our general partner and appoints all but two of the directors of our general partner. Although our general partner has a duty to manage us in a manner that is not adverse to us and our unitholders, the directors and officers of our general partner have a fiduciary duty to manage our general partner in a manner that is beneficial to Manager and its affiliates. Conflicts of interest will arise between SOG, Manager and their affiliates, including our general partner, on the one hand, and us and our unitholders, on the other hand. In resolving these conflicts of interest, our general partner may favor its own interests and the interests of Manager and its affiliates over our interests and the interests of our unitholders. These conflicts include the following situations, among others:

- Neither our partnership agreement nor any other agreement requires Manager and its affiliates to pursue a business strategy that favors us or utilizes our assets. The directors and officers of Manager and its affiliates have a fiduciary duty to make these decisions in the best interests of the members of Manager and its affiliates, which may be contrary to our interests. Manager and its affiliates may choose to shift the focus of its investment and growth to areas not served by our assets.

- Our general partner is allowed to take into account the interests of parties other than us, such as SOG, Manager and their affiliates, in resolving conflicts of interest.

- Manager and its affiliates may be constrained by the terms of their respective debt instruments from taking actions, or refraining from taking actions, that may be in our best interests.

- Our partnership agreement replaces the fiduciary duties that would otherwise be owed by our general partner with contractual standards governing its duties, limit our general partner's liabilities and restrict the remedies available to our unitholders for actions that, without such limitations, might constitute breaches of fiduciary duty.

- Except in limited circumstances, our general partner has the power and authority to conduct our business without unitholder approval.

- Disputes may arise under our commercial agreements with Manager, SOG and their affiliates.

- Our general partner determines the amount and timing of asset purchases and sales, borrowings, issuances of additional partnership units and the creation, reduction or increase of cash reserves, each of which can affect the amount of cash available for distribution.

- Our general partner determines the amount and timing of any capital expenditures and whether a capital expenditure is classified as a maintenance capital expenditure, which will reduce operating surplus, or an

Table of Contents

expansion or investment capital expenditure, which will not reduce operating surplus. This determination can affect the amount of cash that is distributed.

- Our general partner determines which costs incurred by it are reimbursable by us, the amount of which is not limited by our partnership agreement.
- Our general partner may cause us to borrow funds in order to permit the payment of cash distributions, even if the purpose or effect of the borrowing is to make incentive distributions.
- Our partnership agreement permits us to classify up to $20.0 million as operating surplus, even if it is generated from asset sales, non-working capital borrowings or other sources that would otherwise constitute capital surplus. This cash may be used to fund distributions to Manager as the holder of the incentive distribution rights.
- Our partnership agreement does not restrict our general partner from causing us to pay it or its affiliates for any services rendered to us or entering into additional contractual arrangements with any of these entities on our behalf.
- Our general partner intends to limit its liability regarding our contractual and other obligations.
- Our general partner and its controlled affiliates may exercise their right to call and purchase all of the common units not owned by them if they own more than 80% of our common units.
- Our general partner controls the enforcement of the obligations that it and its affiliates owe to us, including the obligations of SOG and its affiliates under their commercial agreements with us.
- Our general partner decides whether to retain separate counsel, accountants or others to perform services for us.
- Our general partner may elect to cause us to issue common units to Manager in connection with a resetting of the target distribution levels related to our incentive distribution rights without the approval of the Conflicts Committee or our unitholders. This election may result in lower distributions to our common unitholders in certain situations.

***Our general partner has a limited call right that may require unitholders to sell their common units at an undesirable time or price.***

If at any time our general partner and its controlled affiliates hold more than 80% of any class of outstanding limited partner interests, then our general partner will have the right, which it may assign or transfer in whole or in part to any of its controlled affiliates or to us, but not the obligation to acquire all, but not less than all, of such class of limited partner interests held by unaffiliated persons at a price equal to the greater of (1) the average of the daily closing price of our common units over the 20 trading days preceding the date three days before notice of exercise of the limited call right is first mailed and (2) the highest per-unit price paid by our general partner or any of its controlled affiliates for common units during the 90-day period preceding the date such notice is first mailed. As a result, unitholders may be required to sell their common units at an undesirable time or price and may not receive any return or a negative return on their investment. Unitholders may also incur tax liability upon a sale of their units. Our general partner is not obligated to obtain a fairness opinion regarding the value of the common units to be repurchased by it upon exercise of the limited call right. There is no restriction in our partnership agreement that prevents our general partner from causing us to issue additional common units and then exercising its limited call right.

If our general partner exercised its limited call right, the effect would be to take us private and, if the units were subsequently deregistered, we would no longer be subject to the reporting requirements of the Exchange Act.

***The standstill in the Board Representation and Standstill Agreement among us, our general partner and Stonepeak Catarina will expire upon the earlier of the occurrence of a material breach of our partnership agreement and the date of which all Class C Preferred Units have been redeemed.***

In connection with our August 2019 issuance of Class C Preferred Units to Stonepeak Catarina, an affiliate of Stonepeak Infrastructure Partners ("Stonepeak"), we entered into that certain Amended and Restated Board Representation and Standstill Agreement (the "Representation and Standstill Agreement"), among us, our general partner and Stonepeak Catarina. The Representation and Standstill Agreement includes a standstill provision pursuant to which Stonepeak Catarina, as the holder of all of our outstanding Class C Preferred Units, agreed that it and its affiliates would refrain from, among other things: (i) acquiring beneficial ownership of additional common units, Class C Preferred Units or other Partnership Interests (as defined in our partnership agreement); (ii) acquiring any debt or assets us or of our subsidiaries; (iii) engaging in any hostile takeover activities with respect to us or our general partner, including any merger, consolidation, recapitalization, business combination, partnership, joint venture, acquisition or similar transaction involving us or our general partner or any of our respective affiliates or properties (excluding Sanchez Energy and its properties); (iv) entering into any transaction the effect of which would be to "short" any of our securities; (v) forming, jointing or participating in any "group" (within the meaning of Section 13(d) of the Exchange Act) with respect to any voting securities of us or our affiliates in respect of any action otherwise prohibited pursuant to the standstill; (vi) calling (or participation in the calling of) a meeting of our partner for the purpose of removing (or approving the removal of) of Sanchez Midstream Partners GP LLC as our general partner and/or electing a successor general partner; (vii) "soliciting" any "proxies" (as such terms are used in the rules and regulation of the SEC) or voting for or in support of (A) the removal of Sanchez Midstream Partners GP LLC as our general partner or (B) the election of any successor general partner, or taking any action the direct effect or purpose of which would be to induce our partners to vote or provide proxies that may be voted in favor of any action contemplated by either of (A) or (B) of this subsection; (viii) seeking to advise of influence any person (within the meaning of Section 13(d)(3) if the Exchange Act) with respect to the voting of any Partnership Interest in connection with the removal (or approving the removal) of Sanchez Midstream Partners GP LLC as our general partner and/or the election of a successor general partner; (ix) issuing, inducing or assisting in the publication of any press release, media report or other publication in connection with the potential or proposed removal of Sanchez Midstream Partners GP LLC as our general partner and/or the election of a successor general partner for the Partnership; (x) advising, assisting or encouraging any third party to do any of the foregoing; or (xi) if Sanchez Midstream Partners GP LLC is removed as our general partner in violation of our partnership agreement, then participating in any way in the management, ownership and/or control of the successor general partner or the successor general partner's operation of us, other than participation by directors designated to the Board by Stonepeak Catarina in connection with the fulfillment of their duties as directors.

***SOG and its affiliates may compete with us.***

SOG and its affiliates may compete with us. As a result, SOG and its affiliates have the ability to acquire and operate assets that directly compete with our assets.

***Manager may not allocate corporate opportunities to us.***

Pursuant to the terms of our partnership agreement, the doctrine of corporate opportunity, or any analogous doctrine, does not apply to our general partner or any of its affiliates, including Manager and its executive officers and directors. Any such person or entity that becomes aware of a potential transaction, agreement, arrangement or other matter that may be an opportunity for us does not have any duty to communicate or offer such opportunity to us. Any such person or entity will not be liable to us or to any limited partner for breach of any fiduciary duty or other duty by reason of the fact that such person or entity pursues or acquires such opportunity for itself, directs such opportunity to another person or entity or does not communicate such opportunity or information to us. This may create actual and potential conflicts of interest between us and affiliates of our general partner and result in less than favorable treatment of us and our common unitholders.

***Our partnership agreement permits our general partner to redeem any partnership interests held by a limited partner who is an ineligible holder.***

If our general partner, with the advice of counsel, determines that our not being treated as an association taxable as a corporation or otherwise taxable as an entity for U.S. federal income tax purposes, coupled with the tax status (or lack of proof thereof) of one or more of our limited partners, has, or is reasonably likely to have, a material adverse effect on the maximum applicable rates chargeable to customers by us or our subsidiaries, or we become subject to federal, state or local laws or regulations that create a substantial risk of cancellation or forfeiture of any property that we have an interest in because of the nationality, citizenship or other related status of any limited partner, our general partner may redeem the units held by the limited partner at their current market price. In order to avoid any material adverse effect on rates charged or cancellation or forfeiture of property, our general partner may require each limited partner to furnish information about their U.S. federal income tax status or nationality, citizenship or related status. If a limited partner fails to furnish information about their U.S. federal income tax status or nationality, citizenship or other related status after a request for the information or our general partner determines after receipt of the information that the limited partner is not an eligible holder, our general partner may elect to treat the limited partner as an ineligible holder. An ineligible holder assignee does not have the right to direct the voting of their units and may not receive distributions in kind upon our liquidation.

***The market price of our common units may fluctuate significantly, and you could lose all or part of your investment.***

The market price of our common units may be influenced by many factors, some of which are beyond our control, including:

- the resolution of the Sanchez Energy Chapter 11 Case;
- provisions in our Credit Agreement which currently prohibit us from paying distributions to our common unitholders other than in certain limited circumstances set forth in our Credit Agreement;
- our quarterly or annual earnings or those of other companies in our industry;
- announcements by us or our competitors of significant contracts or acquisitions;
- changes in accounting standards, policies, guidance, interpretations or principles;
- general economic conditions, including interest rates and governmental policies impacting interest rates;
- the failure of securities analysts to cover our common units or changes in financial estimates by analysts;
- future sales of our common units; and
- other factors described in this proxy statement/prospectus and the documents incorporated herein.

***Our partnership agreement replaces our general partner's fiduciary duties to our common unitholders with contractual standards governing its duties.***

Our partnership agreement contains provisions that eliminate the fiduciary standards to which our general partner would otherwise be held by state fiduciary duty law and replace those duties with several different contractual standards. For example, our partnership agreement permits our general partner to make a number of decisions in its individual capacity, as opposed to in its capacity as our general partner, free of any duties to us and our unitholders other than the implied contractual covenant of good faith and fair dealing, which means that a court will fill gaps under the partnership agreement to enforce the reasonable expectations of the partners, but only where the language in the partnership agreement does not provide for a clear course of action. This provision entitles our general partner to consider only the interests and factors that it desires and relieves it of any duty or obligation to give any consideration to any interest of, or factors affecting, us, our affiliates or our limited partners. Examples of decisions that our general partner may make in its individual capacity include:

- how to allocate business opportunities among us and its other affiliates;

- whether to exercise its limited call right;
- whether to seek approval of the resolution of a conflict of interest by the Conflicts Committee; and
- whether or not to consent to any merger or consolidation of the partnership or amendment to the partnership agreement.

***Our partnership agreement restricts the remedies available to our common unitholders for actions taken by our general partner that might otherwise constitute breaches of fiduciary duty.***

The effect of eliminating fiduciary standards in our partnership agreement is that the remedies available to unitholders for actions taken by our general partner that might otherwise constitute breaches of fiduciary duty under state fiduciary duty law will be significantly restricted. For example, our partnership agreement provides that:

- whenever our general partner, the Board or any committee thereof (including the Conflicts Committee) makes a determination or takes, or declines to take, any other action in their respective capacities, our general partner, the Board and any committee thereof (including the Conflicts Committee), as applicable, is required to make such determination, or take or decline to take such other action, in good faith, and under our partnership agreement, a determination, other action or failure to act by our general partner and any committee thereof (including the Conflicts Committee) will be deemed to be in good faith unless the general partner, the Board or any committee thereof (including the Conflicts Committee) believed that such determination, other action or failure to act was adverse to the interests of the partnership or, with regard to certain determinations by the Board relating to the conflict transactions described below, the Board did not believe that the specified standards were met, and, except as specifically provided by our partnership agreement, neither our general partner, the Board nor any committee thereof (including the Conflicts Committee) will be subject to any other or different standard imposed by our partnership agreement, Delaware law, or any other law, rule or regulation, or at equity;
- our general partner will not have any liability to us or our unitholders for decisions made in its capacity as a general partner so long as such decisions are made in good faith;
- our general partner and its officers and directors will not be liable for monetary damages to us or our limited partners resulting from any act or omission unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that our general partner or its officers and directors, as the case may be, acted in bad faith or, in the case of a criminal matter, acted with knowledge that the conduct was criminal; and
- our general partner will not be in breach of its obligations under the partnership agreement (including any duties to us or our unitholders) if a transaction with an affiliate or the resolution of a conflict of interest is:
    - approved by the Conflicts Committee of the Board, although our general partner is not obligated to seek such approval;
    - approved by the vote of a majority of the outstanding common units, excluding any common units owned by our general partner and its affiliates;
    - determined by the Board to be on terms no less favorable to us than those generally being provided to or available from unrelated third parties; or
    - determined by the Board to be fair and reasonable to us, taking into account the totality of the relationships among the parties involved, including other transactions that may be particularly favorable or advantageous to us.

In connection with a situation involving a transaction with an affiliate or a conflict of interest, any determination by our general partner or the Conflicts Committee must be made in good faith. If an affiliate transaction or the resolution of a conflict of interest is not approved by our common unitholders or the Conflicts Committee and the Board determine that the resolution or course of action taken with respect to the affiliate transaction or conflict of interest satisfies either of the

standards set forth in the third and fourth sub-bullets above, then it will be presumed that, in making its decision, the Board acted in good faith, and in any proceeding brought by or on behalf of any limited partner or the partnership challenging such determination, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption.

Furthermore, if any limited partner, our general partner or any person holding any beneficial interest in us brings any claims, suits, actions or proceedings (including, but not limited to, those asserting a claim of breach of a fiduciary duty) and such person does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then such limited partner, our general partner or person holding any beneficial interest in us shall be obligated to reimburse us and our "affiliates," as defined in Section 1.1 of our partnership agreement (including our general partner, the directors and officers of our general partner, SOG and Manager) for all fees, costs and expenses of every kind and description, including, but not limited to, all reasonable attorney's fees and other litigation expenses, that the parties may incur in connection with such claim, suit, action or proceeding.

***Our partnership agreement includes exclusive forum, venue and jurisdiction provisions and limitations regarding claims, suits, actions or proceedings. By taking ownership of a common unit, a limited partner is irrevocably consenting to these provisions and limitations regarding claims, suits, actions or proceedings and submitting to the exclusive jurisdiction of Delaware courts.***

Our partnership agreement is governed by Delaware law. Our partnership agreement includes exclusive forum, venue and jurisdiction provisions designating Delaware courts as the exclusive venue to the fullest extent permitted by applicable law for most claims, suits, actions and proceedings involving us or our officers, directors and employees and limitations regarding claims, suits, actions or proceedings. By taking ownership of a common unit, a limited partner is irrevocably consenting to these provisions and limitations regarding claims, suits, actions or proceedings and submitting to the exclusive jurisdiction of Delaware courts. If a dispute were to arise between a limited partner and us or our officers, directors or employees, the limited partner may be required to pursue its legal remedies in Delaware, which may be an inconvenient or distant location and which is considered to be a more corporate-friendly environment. Furthermore, if any limited partner, our general partner or person holding any beneficial interest in us brings any claims, suits, actions or proceedings (including, but not limited to, those asserting a claim of breach of a fiduciary duty) and such person does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then such limited partner, our general partner or person holding any beneficial interest in us shall be obligated to reimburse us and our affiliates, (as defined in our partnership agreement, which includes our general partner, the directors and officers of our general partner, SOG and Manager) for all fees, costs and expenses of every kind and description, including, but not limited to, all reasonable attorneys' fees and other litigation expenses, that the parties may incur in connection with such claim, suit, action or proceeding. This provision may have the effect of increasing a unitholder's cost of asserting a claim and therefore, discourage lawsuits against us and our general partner's directors and officers. Because fee-shifting provisions such as these are relatively new developments in corporate and partnership law, the enforceability of such provisions are uncertain; in addition, future legislation could restrict or limit this provision of our partnership agreement and its effect of saving us and our affiliates from fees, costs and expenses incurred in connection with claims, actions, suits or proceedings.

Table of Contents

***Holders of our common units will have limited voting rights and will not be entitled to elect our general partner or its directors.***

Our common unitholders have limited voting rights on matters affecting our business and, therefore, limited ability to influence management's and our general partner's decisions regarding our business. Common unitholders will have no right on an annual or ongoing basis to elect our general partner or the Board. Rather, the Board will be appointed by Manager. Furthermore, if common unitholders are dissatisfied with the performance of our general partner, they will have little ability to remove our general partner. As a result of these limitations, the price at which our common units will trade could be diminished because of the absence or reduction of a takeover premium in the trading price. Our partnership agreement also contains provisions limiting the ability of common unitholders to call meetings or to acquire information about our operations, as well as other provisions limiting our common unitholders' ability to influence the manner or direction of management.

***Our partnership agreement restricts the voting rights of common unitholders owning 20% or more of our common units.***

Common unitholders' voting rights are further restricted by a provision of our partnership agreement providing that any units held by a person that owns 20% or more of any class of units then outstanding, other than our general partner, its affiliates, Stonepeak Catarina, their transferees and persons who acquired such units with the prior approval of the Board, cannot vote on any matter.

***Our general partner interest or the control of our general partner may be transferred to a third-party without unitholder consent.***

Our general partner is able to transfer its general partner interest to a third party in a merger or in a sale of all or substantially all of any assets it may own without the consent of our common unitholders. Furthermore, there is no restriction in the partnership agreement on the ability of Manager to transfer its membership interest in our general partner to a third party. The new members of our general partner would then be in a position to replace the directors and officers of our general partner in order to control the decisions taken by the Board or such officers.

***The incentive distribution rights held by Manager may be transferred to a third party without unitholder consent.***

Manager is able to transfer its incentive distribution rights to a third party at any time without the consent of our common unitholders. If Manager transfers its incentive distribution rights to a third party but retains its ownership interest in our general partner, our general partner may not have the same incentive to grow our partnership and increase quarterly distributions to unitholders over time as it would if Manager had retained ownership of the incentive distribution rights. For example, a transfer of incentive distribution rights by Manager could reduce the likelihood of SOG or its affiliates accepting offers made by us relating to assets owned by it or its affiliates, as they would have less of an economic incentive to grow our business, which in turn would impact our ability to grow our asset base.

***We are able to issue additional units without common unitholder approval, which would dilute unitholder interests.***

Our partnership agreement does not limit the number of additional limited partner interests, including limited partner interests that rank senior to our common units that we may issue at any time without the approval of our common unitholders. The issuance by us of additional common units or other equity securities of equal or senior rank will have the following effects:

- our existing limited partners' proportionate ownership interest in us will decrease;
- the amount of cash available for distribution on each limited partnership interest may decrease;
- because the amount payable to holders of incentive distribution rights is based on a percentage of the total cash available for distribution, the distributions to holders of incentive distribution rights will increase even if the per unit distribution on common units remains the same;
- the ratio of taxable income to distributions may increase;

Table of Contents

- the relative voting strength of each previously outstanding limited partner interest may be diminished; and
- the market price of our common units may decline.

***Our general partner intends to limit its liability regarding our obligations.***

Our general partner intends to limit its liability under contractual arrangements so that the counterparties to such arrangements have recourse only against our assets and not against our general partner or its assets. Our general partner may therefore cause us to incur indebtedness or other obligations that are nonrecourse to our general partner. Our partnership agreement permits our general partner to limit its liability, even if we could have obtained more favorable terms without the limitation on liability. In addition, we are obligated to reimburse or indemnify our general partner to the extent that it incurs obligations on our behalf. Any such reimbursement or indemnification payments would reduce the amount of cash otherwise available for distribution to our unitholders.

***Manager, or any transferee holding a majority of the incentive distribution rights, may elect to cause us to issue common units to it in connection with a resetting of the minimum quarterly distribution and the target distribution levels related to the incentive distribution rights, without the approval of the Conflicts Committee of our general partner or our unitholders. This election may result in lower distributions to our common unitholders in certain situations.***

The holder or holders of a majority of the incentive distribution rights, which is currently Manager, has the right, at any time when such holders have received incentive distributions at the highest level to which they are entitled (35.5%) for each of the prior four consecutive fiscal quarters (and the amount of each such distribution did not exceed adjusted operating surplus for each such quarter), to reset the minimum quarterly distribution and the initial target distribution levels at higher levels based on our cash distribution at the time of the exercise of the reset election. Following a reset election, the minimum quarterly distribution will be reset to an amount equal to the average cash distribution per unit for the two fiscal quarters immediately preceding the reset election (such amount is referred to as the "reset minimum quarterly distribution"), and the target distribution levels will be reset to correspondingly higher levels based on percentage increases above the reset minimum quarterly distribution. Manager has the right to transfer the incentive distribution rights at any time, in whole or in part, and any transferee holding a majority of the incentive distribution rights will have the same rights as Manager with respect to resetting target distributions.

In the event of a reset of the minimum quarterly distribution and the target distribution levels, the holders of the incentive distribution rights will be entitled to receive, in the aggregate, the number of common units equal to that number of common units which would have entitled the holders to an average aggregate quarterly cash distribution in the prior two quarters equal to the distributions on the incentive distribution rights in the prior two quarters. We anticipate that Manager would exercise this reset right in order to facilitate acquisitions or internal growth projects that would not otherwise be sufficiently accretive to cash distributions per common unit. It is possible, however, that Manager or a transferee could exercise this reset election at a time when it is experiencing, or expects to experience, declines in the cash distributions that it receives related to its incentive distribution rights and may therefore desire to be issued common units rather than retain the right to receive incentive distribution payments based on target distribution levels that are less certain to be achieved in the then-current business environment. This risk could be elevated if our incentive distribution rights have been transferred to a third party. As a result, a reset election may cause our common unitholders to experience dilution in the amount of cash distributions that they would have otherwise received had we not issued common units to Manager in connection with resetting the target distribution levels.

***Your liability may not be limited if a court finds that unitholder action constitutes control of our business.***

A general partner of a partnership generally has unlimited liability for the obligations of the partnership, except for those contractual obligations of the partnership that are expressly made without recourse to the general partner. Our partnership is organized under Delaware law, and we conduct business in and outside of Delaware. The limitations on the liability of holders of limited partner interests for the obligations of a limited partnership have not been clearly established

in some of the other states in which we do business. You could be liable for any and all of our obligations as if you were a general partner if a court or government agency were to determine that:

- we were conducting business in a state but had not complied with that particular state's partnership statute; or
- your right to act with other unitholders to remove or replace our general partner, to approve some amendments to our partnership agreement or to take other actions under our partnership agreement constitute "control" of our business.

***Unitholders may have liability to repay distributions that were wrongfully distributed to them.***

Under certain circumstances, unitholders may have to repay amounts wrongfully returned or distributed to them. Under Section 17-607 of the Delaware Revised Uniform Limited Partnership Act (the "Delaware Act"), we may not make a distribution to you if the distribution would cause our liabilities to exceed the fair value of our assets. Delaware law provides that for a period of three years from the date of an impermissible distribution, limited partners who received the distribution and who knew at the time of the distribution that it violated Delaware law will be liable to the limited partnership for the distribution amount. Transferees of common units are liable both for the obligations of the transferor to make contributions to the partnership that were known to the transferee at the time of transfer and for those obligations that were unknown if the liabilities could have been determined from the partnership agreement. Neither liabilities to partners on account of their partnership interest nor liabilities that are non-recourse to the partnership are counted for purposes of determining whether a distribution is permitted.

***The NYSE American does not require a publicly traded limited partnership like us to comply with certain of its corporate governance requirements.***

Because we are a publicly traded limited partnership, the NYSE American does not require us to have a majority of independent directors on the Board or to establish a compensation committee or a nominating and corporate governance committee. Accordingly, unitholders will not have the same protections afforded to certain corporations that are subject to all of the NYSE American corporate governance requirements.

**Tax Risks**

***Our tax treatment depends on our status as a partnership for U.S. federal income tax purposes, as well as our not being subject to a material amount of entity-level taxation by states and localities. If the Internal Revenue Service ("IRS") were to treat us as a corporation for U.S. federal income tax purposes or if we were otherwise subject to a material amount of entity-level taxation, then our cash available for distribution would be substantially reduced.***

The anticipated after-tax economic benefit of an investment in our common units depends largely on us being treated as a partnership for U.S. federal income tax purposes. Despite the fact that we are a limited partnership under Delaware law, we will be treated as a corporation for U.S. federal income tax purposes unless we satisfy a "qualifying income" requirement. Based on our current operations, we believe that we satisfy the qualifying income requirement and will continue to be treated as a partnership for U.S. federal income tax purposes. Failure to meet the qualifying income requirement or a change in current law could cause us to be treated as a corporation for U.S. federal income tax purposes or otherwise subject us to taxation as an entity. We have not requested, and do not plan to request, a ruling from the IRS with respect to our treatment as a partnership for U.S. federal income tax purposes.

If we were treated as a corporation for U.S. federal income tax purposes, we would pay U.S. federal income tax on our taxable income at the corporate income tax rate, and we would also likely pay additional state and local income taxes at varying rates. Distributions to unitholders would generally be taxed again as corporate dividends (to the extent of our current and accumulated earnings and profits as determined for U.S. federal income tax purposes), and no income, gains, losses, deductions or credits recognized by us would flow through to the unitholders. Because a tax would be imposed on us as a corporation, our cash available for distribution to our unitholders would be reduced.

At the state level, several states have been evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise and other forms of taxation. Imposition of a material amount of any these taxes

in the jurisdictions in which we own assets or conduct business could substantially reduce the cash available for distribution to our unitholders.

If we were treated as a corporation for U.S. federal income tax purposes or otherwise subjected to a material amount of entity-level taxation, there would be a material reduction cash flows and after-tax return to our unitholders likely causing a substantial reduction in the value of our common units.

Our partnership agreement provides that if a law is enacted or existing law is modified or interpreted in a manner that subjects us to taxation as a corporation or otherwise subjects us to entity-level taxation for U.S. federal, state or local income tax purposes, the minimum quarterly distribution and the target distributions may be adjusted to reflect the impact of that law on us.

***The tax treatment of publicly traded partnerships or an investment in our common units could be subject to potential legislative, judicial or administrative changes and differing interpretations, possibly on a retroactive basis.***

The present U.S. federal income tax treatment of publicly traded partnerships, including us, or an investment in our common units may be modified by administrative or legislative changes or differing judicial interpretation at any time. For example, from time to time members of the U.S. Congress have proposed and considered substantive changes to the existing U.S. federal income tax laws that would affect publicly traded partnerships. In addition, the Treasury Department has issued, and in the future may issue, regulations interpreting those laws that affect publicly traded partnerships. We believe the income that we treat as qualifying satisfies the requirements under current regulations. However, there can be no assurance that there will not be further changes to U.S. federal income tax laws or the Treasury Department's interpretation of the qualifying income rules in a manner that could impact our ability to qualify as a partnership for U.S. federal income tax purposes in the future.

We are unable to predict whether legislation or other tax-related proposals will ultimately be enacted. Any modification to the U.S. federal income tax laws and interpretations thereof may or may not be applied retroactively and could make it more difficult or impossible for us to meet the exception for certain publicly traded partnerships to be treated as a partnership for U.S. federal income tax purposes. Any such change could negatively impact the value of an investment in our common units.

***Our common unitholders' share of our income will be taxable to them even if they do not receive any cash distributions from us.***

Common unitholders are required to pay U.S. federal income and other taxes and, in some cases, state and local income taxes, on their share of our taxable income, whether or not they receive cash distributions from us. Our Credit Agreement and partnership agreement currently prohibit us from paying distributions to our common unitholders. As a result, for the foreseeable future our common unitholders will not receive cash distributions from us equal to their share of our taxable income or even equal to the actual tax liability due from them with respect to that income.

***If the IRS contests the U.S. federal income tax positions we take, the market for our common units may be adversely impacted, and our cash available for distribution might be substantially reduced.***

We have not requested a ruling from the IRS with respect to our treatment as a partnership for U.S. federal income tax purposes or any other matter affecting us. The IRS may adopt positions that differ from the positions we take. It may be necessary to resort to administrative or court proceedings to sustain some or all of the positions we take, and a court may disagree with some or all of those positions. Any contest with the IRS may materially and adversely impact the market for our common units and the price at which they trade. In addition, our costs of any contest with the IRS will result in a reduction in cash available for distribution and thus will be borne indirectly by our unitholders.

Pursuant to legislation applicable for partnership tax years beginning after 2017 if the IRS makes audit adjustments to our partnership tax returns, it may assess and collect any taxes (including any applicable penalties or interest) resulting from such audit adjustments directly from us. To the extent possible under these new rules, our general partner may elect to either pay the taxes (including any applicable penalties and interest) directly to the IRS in the year in which the audit is completed, or, if we are eligible, issue a revised information statement to each current and former unitholder with respect to an audited and adjusted partnership tax return. Although our general partner may elect to have our current and former

unitholders take such audit adjustment into account and pay any resulting taxes (including applicable penalties or interest) in accordance with their interests in us during the tax year under audit, there can be no assurance that such election will be practical, permissible or effective in all circumstances. If we make payments of taxes and any penalties and interest directly to the IRS in the year in which the audit is completed, our cash available for distribution might be substantially reduced, in which case our current unitholders may bear some or all of the tax liability resulting from such audit adjustment even if the unitholders did not own units in us during the tax year under audit.

***Tax gain or loss on the disposition of our common units could be more or less than expected.***

If a common unitholder sells common units, the unitholder will recognize gain or loss equal to the difference between the amount realized and its tax basis in those common units. Because distributions in excess of a unitholder's allocable share of our net taxable income decrease the unitholder's tax basis in its common units, the amount, if any, of such prior excess distributions with respect to the common units a unitholder sells will, in effect, become taxable income to the unitholder if the unitholder sells such common units at a price greater than its tax basis in those common units, even if the price received is less than its original cost. Furthermore, a substantial portion of the amount realized, whether or not representing gain, may be taxed as ordinary income due to potential recapture items, including depreciation, depletion and intangible drilling cost recapture. In addition, because the amount realized may include a unitholder's share of our liabilities, a unitholder that sells common units may incur a tax liability in excess of the amount of cash received from the sale.

***Unitholders may be subject to limitations on their ability to deduct interest expense we incur.***

Our ability to deduct business interest expense is limited for U.S. federal income tax purposes to an amount equal to the sum of our business interest income and 30% of our "adjusted taxable income" during the taxable year, computed without regard to any business interest income or expense, and in the case of taxable years beginning before 2022, any deduction allowable for depreciation, amortization, or depletion. Business interest expense that we are not entitled to fully deduct will be allocated to each unitholder as excess business interest and can be carried forward by the unitholder to successive taxable years and used to offset any excess taxable income allocated by us to the unitholder. Any excess business interest expense allocated to a unitholder will reduce the unitholder's tax basis in its partnership interest in the year of the allocation even if the expense does not give rise to a deduction to the unitholder in that year.

***Tax-exempt entities face unique tax issues from owning common units that may result in adverse tax consequences to them.***

Investment in common units by tax-exempt entities, including employee benefit plans and individual retirement accounts (known as IRAs), raises issues unique to them. For example, virtually all of our income allocated to organizations exempt from U.S. federal income tax, including IRAs and other retirement plans, will be unrelated business taxable income and will be taxable to them. Tax-exempt entities with multiple unrelated trades or businesses cannot aggregate losses from one unrelated trade or business to offset income from another to reduce total unrelated business taxable income. As a result, it may not be possible for tax-exempt entities to utilize losses from an investment in us to offset unrelated business taxable income from another unrelated trade or business and vice versa. Tax-exempt entities should consult a tax advisor before investing in our common units.

***Non-U.S. unitholders will be subject to U.S. federal income taxes and withholding with respect to income and gain from owning our common units.***

Non-U.S. persons are generally taxed and subject to U.S. federal income tax filing requirements on income effectively connected with a U.S. trade or business. Income allocated to our unitholders and any gain from the sale of our units will generally be considered to be "effectively connected" with a U.S. trade or business. As a result, distributions to a non-U.S. unitholder will be subject to withholding at the highest applicable effective tax rate and a non-U.S. unitholder who sells or otherwise disposes of a common unit will also be subject to U.S. federal income tax on the gain realized from the sale or disposition of that unit.

The Internal Revenue Code also imposes a U.S. federal income tax withholding obligation of 10% of the amount realized upon a non-U.S. person's sale or exchange of an interest in a partnership that is engaged in a U.S. trade or business.

However, application of this withholding rule to dispositions of publicly traded partnership interests has been suspended by the IRS until regulations or other guidance have been issued. It is not clear when or if such regulations or guidance will be issued. Non-U.S. persons should consult a tax advisor before investing in our common units.

***We treat each purchaser of our common units as having the same tax benefits without regard to the common units purchased. The IRS may challenge this treatment, which could adversely affect the value of our common units.***

Because we cannot match transferors and transferees of common units, we have adopted depletion, depreciation and amortization positions that may not conform with all aspects of existing U.S. Treasury regulations. A successful IRS challenge to those positions could adversely affect the amount of tax benefits available to our unitholders. A successful IRS challenge also could affect the timing of these tax benefits or the amount of gain on the sale of common units and could have a negative impact on the value of our common units or result in audits of and adjustments to our unitholders' tax returns.

***We prorate our items of income, gain, loss and deduction between transferors and transferees of common units each month based upon the ownership of our common units on the first day of each month, instead of on the basis of the date a particular common unit is transferred. The IRS may challenge this treatment, which could change the allocation of items of income, gain, loss and deduction among our unitholders.***

We prorate our items of income, gain, loss and deduction between transferors and transferees of common units each month based upon the ownership of our common units on the first day of each month, instead of on the basis of the date a particular common unit is transferred. Although Treasury regulations allow publicly traded partnerships to use a similar monthly simplifying convention, these regulations do not specifically authorize all aspects of our proration method. If the IRS were to successfully challenge our proration method, we may be required to change the allocation of items of income, gain, loss and deduction among our unitholders.

***A unitholder whose common units are the subject of a securities loan (e.g., a loan to a "short seller" to cover a short sale of common units) may be considered as having disposed of those common units. If so, the unitholder would no longer be treated for U.S. federal income tax purposes as a partner with respect to those common units during the period of the loan and may recognize gain or loss from the disposition.***

Because a unitholder whose common units are loaned to a "short seller" to cover a short sale of common units may be considered as having disposed of the loaned common units, the unitholder may no longer be treated for U.S. federal income tax purposes as a partner with respect to those common units during the period of the loan to the short seller, and the unitholder may recognize gain or loss from such disposition. Moreover, during the period of the loan to the short seller, any of our income, gain, loss or deduction with respect to those common units may not be reportable by the unitholder and any distributions received by the unitholder as to those common units could be fully taxable as ordinary income. Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a loan to a short seller are urged to consult with their tax advisor about whether it is advisable to modify any applicable brokerage account agreements to prohibit their brokers from loaning their common units.

***We have adopted certain valuation methodologies in determining a unitholder's allocations of income, gain, loss and deduction. The IRS may challenge these methodologies or the resulting allocations, and such a challenge could adversely affect the value of our common units.***

In determining the items of income, gain, loss and deduction allocable to our unitholders, we routinely determine the fair market value of our assets. Although we may from time to time consult with professional appraisers regarding valuation matters, we make many fair market value estimates ourselves using a methodology based on the market value of our common units as a means to determine the fair market value of our assets. The IRS may challenge these valuation methods and the resulting allocations of income, gain, loss and deduction.

A successful IRS challenge to these methods or allocations could adversely affect the timing, character or amount of taxable income or loss being allocated to our unitholders. It also could affect the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of our common units or result in audit adjustments to our unitholders' tax returns without the benefit of additional deductions.

***As a result of investing in our common units, our unitholders may become subject to state and local taxes and return filing requirements in jurisdictions where we operate or own or acquire properties.***

In addition to U.S. federal income taxes, our unitholders will likely be subject to other taxes, including state and local income taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in which we do business or own property now or in the future, even if they do not reside in any of those jurisdictions. Our unitholders will likely be required to file state and local income tax returns and pay state and local income taxes in some or all of these various jurisdictions. Furthermore, our unitholders may be subject to penalties for failure to comply with those requirements. It is the responsibility of each unitholder to file all U.S. federal, state and local tax returns that may be required of such unitholder.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

A description of our properties is included in "Part I, Item 1. Business," and is incorporated herein by reference.

The obligations under our Credit Agreement are secured by mortgages on substantially all of our assets. See "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Credit Agreement," in this Form 10-K for additional information concerning our Credit Agreement.

**Item 3. Legal Proceedings**

From time to time we may be the subject of lawsuits and claims arising in the ordinary course of business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition.

To date, no claims relating to the Sanchez Energy Chapter 11 Case have been filed against us. However, on March 13, 2020, the Unsecured Committee filed the March 13 Motion. The relief sought in the March 13 Motion is to grant the Unsecured Committee derivative standing to prosecute claims that Sanchez Energy allegedly has against the Partnership and others, including, but not limited to, claims to recharacterize or avoid the Catarina Transaction, the Carnero Gathering Transaction and the Carnero Processing Transaction. While we do not believe these claims have any merit, if such claims are filed and prosecuted, the cost to defend against such claims and any judgment entered against us could have a material and adverse impact on our business, financial condition and operating results. For additional information about the Sanchez Energy Chapter 11 Case please see https://cases.primeclerk.com/sanchezenergy and dm.epiq11.com/case/sanchez/info. Information contained on these websites, however, is not incorporated into or otherwise a part of this Form 10-K.

**Item 4. Mine Safety Disclosures**

Not applicable.

## PART II

**Item 5. Market for Registrant's Common Equity, Related Unitholder Matters and Issuer Purchases of Equity Securities**

Our common units are listed on the NYSE American under the symbol "SNMP."

**Holders**

The number of unitholders of record of our common units was approximately 53 on March 13, 2020, which does not include beneficial owners whose shares are held by a clearing agency, such as a broker or a bank.

**Distributions**

*Rationale for Our Cash Distribution Policy*

Our partnership agreement requires us to distribute all of our available cash quarterly. Our cash distribution policy reflects a fundamental judgment that our unitholders generally will be better served by our distributing rather than retaining our available cash. However, other than the requirement in our partnership agreement to distribute all of our available cash each quarter, we have no legal obligation to make quarterly cash distributions in any amount, and our general partner has considerable discretion to determine the amount of our available cash each quarter. Our partnership agreement generally defines "available cash" as cash on hand at the end of a quarter after the payment of expenses, less the amount of cash reserves established by our general partner to provide for the conduct of our business and to comply with applicable law, any of our debt instruments or other agreements or to provide for future distributions to our unitholders for any one or more of the next four quarters. Our available cash may also include, if our general partner so determines, all or any portion of the cash on hand immediately prior to the date of distribution of available cash for the quarter resulting from working capital borrowings made subsequent to the end of such quarter. Because we are not subject to an entity-level federal income tax, we expect to have more cash to distribute to our unitholders than would be the case if we were subject to entity-level federal income tax. If we do not generate sufficient available cash from our operations, we may, but are under no obligation to, borrow funds to pay distributions to our unitholders.

*Limitations on Cash Distributions and Our Ability to Change Our Cash Distribution Policy*

There is no guarantee that we will make quarterly cash distributions to our unitholders. We do not have a legal or contractual obligation to pay quarterly distributions or any other distributions except as provided in our partnership agreement. Our cash distribution policy may be changed at any time and is subject to certain restrictions and uncertainties, including the following:

- Until the first quarter in which no Class C Preferred Units remain outstanding, we are not permitted to declare or make any distributions in respect to our common units.
- Our cash distribution policy is subject to restrictions on distributions under our Credit Agreement, which contains financial tests that we must meet and covenants that we must satisfy. Should we be unable to meet these financial tests or satisfy these covenants or if we are otherwise in default under our Credit Agreement, we will be prohibited from making cash distributions notwithstanding our cash distribution policy.
- Our general partner has the authority to establish cash reserves for the prudent conduct of our business and for future cash distributions to our unitholders, and the establishment of or increase in those reserves could result in a reduction in cash distributions from levels we currently anticipate pursuant to our stated cash distribution policy. Our partnership agreement does not set a limit on the amount of cash reserves that our general partner may establish. Any decision to establish cash reserves made by our general partner in good faith will be binding on our unitholders.
- Prior to making any distribution on our common units, and pursuant to the Services Agreement, we will pay Manager an administrative fee and reimburse our general partner and its affiliates, including Manager, for all direct and indirect expenses that they incur on our behalf. Neither our partnership agreement nor the Services

Agreement limits the amount of expenses for which our general partner and its affiliates may be reimbursed. These expenses may include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our general partner by its affiliates. Our partnership agreement provides that our general partner will determine in good faith the expenses that are allocable to us. The reimbursement of expenses and payment of fees, if any, to our general partner and its affiliates may impact our ability to pay distributions to our unitholders.

- While our partnership agreement requires us to distribute all of our available cash, our partnership agreement, including the provisions requiring us to make cash distributions contained therein, may be amended with the consent of our general partner and the approval of a majority of the outstanding common units (including common units held by Sanchez Energy and its affiliates, if any).

- Even if our cash distribution policy is not modified or revoked, the decisions regarding the amount of distributions to pay under our cash distribution policy and whether to pay any distribution are determined by our general partner, taking into consideration the terms of our partnership agreement.

- Under Section 17-607 of the Delaware Act, we may not make a distribution if the distribution would cause our liabilities to exceed the fair value of our assets.

- We may lack sufficient cash to pay distributions to our unitholders due to a shortfall in cash flows attributable to a number of operational, commercial or other factors as well as increases in our operating or general and administrative expenses, principal and interest payments on our outstanding debt, tax expenses, working capital requirements or anticipated cash needs.

- If we make distributions out of capital surplus, as opposed to operating surplus, any such distributions would constitute a return of capital and would result in a reduction in the minimum quarterly distribution and the target distribution levels. We do not anticipate that we will make any distributions from capital surplus.

- Our ability to make distributions to our unitholders depends on the performance of our assets and subsidiaries and the ability of our subsidiaries to distribute cash to us. The ability of our subsidiaries to make distributions to us may be restricted by, among other things, the provisions of future indebtedness, applicable state laws and other laws and regulations.

**General Partner Interest**

Our general partner owns a non-economic general partner interest in us, which does not entitle it to receive cash distributions. However, our general partner may in the future own common units or other equity interests in us and will be entitled to receive distributions on any such interests.

**Incentive Distribution Rights**

All of the incentive distribution rights are held by Manager. Incentive distribution rights represent the right to receive increasing percentages (13%, 23% and 35.5%) of quarterly distributions from operating surplus after the minimum quarterly distribution and the target distribution levels have been achieved.

For any quarter in which we have distributed cash from operating surplus to our common unitholders in an amount equal to the minimum distribution and distributed cash from surplus to the outstanding common units to eliminate any cumulative arrearages in payment of the minimum quarterly distribution, then we will distribute any additional cash from operating surplus for that quarter among the unitholders and the incentive distribution rights holders in the following manner:

| | | Marginal Percentage Interest in Distributions | |
|---|---|---|---|
| | **Total Quarterly Distribution Per Common Unit** | **Common Unitholders** | **Manager (as Holder of Incentive Distribution Rights)** |
| Minimum Quarterly Distribution | up to $0.50 | 100.00% | 0.00% |
| First Target Distribution | above $0.50 up to $0.575 | 100.00% | 0.00% |
| Second Target Distribution | above $0.575 up to $0.625 | 87.00% | 13.00% |
| Third Target Distribution | above $0.625 up to $0.875 | 77.00% | 23.00% |
| Thereafter | above $0.875 | 64.50% | 35.50% |

Manager's right to receive incentive distributions is reduced by a percentage equal to the number of common units held by Sanchez Energy and its affiliates resulting from the common unit issuance made to SN UR Holdings, LLC, a subsidiary of Sanchez Energy, in November 2016, divided by all common units outstanding as of the time of distribution.

**Securities Authorized for Issuance Under Equity Compensation Plans**

See "Part III, Item 12. Security Ownership of Certain Benefits Owners and Management and Related Unitholder Matters" for information regarding our equity compensation plan as of December 31, 2019.

**Recent Sales of Unregistered Securities**

In connection with providing services under the Services Agreement for the year ended December 31, 2019, the Partnership issued 2,576,760 common units to Manager. See Note 14 "Related Party Transactions" of our Notes to Consolidated Financial Statements for additional information related to the Services Agreement. The issuance of these common units was exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to section 4(a)(2) thereof as a transaction by an issuer not involving a public offering.

**Purchases of Equity Securities by Us and our Affiliates**

No common units were repurchased by us during the fourth-quarter 2019.

**Default Upon Senior Securities**

There were no defaults on senior securities for the years ended December 31, 2019 or 2018.

**Item 6. Selected Financial Data**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required by this Item.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with the financial statements and the summary of significant accounting policies and notes included herein this Form 10-K. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, forecasts, guidance, beliefs and expected performance. The "forward-looking statements" are dependent upon events, risks and uncertainties that may be outside our control. Our actual results could differ materially from those discussed in these "forward-looking statements". Please read "Cautionary Note Regarding Forward-Looking Statements."*

***Overview***

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development, ownership and operation of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. Our assets include our wholly-owned Western Catarina Midstream gathering system, our wholly-owned Seco Pipeline, and a 50% interest in the Carnero JV, a 50/50 joint venture operated by Targa that owns the Carnero Gathering Line, Raptor Gas Processing Facility, and Silver Oak II, and reversionary working interests and other production assets in Texas and Louisiana. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Manager owns our general partner and all of our incentive distribution rights. Our common units are currently listed on the NYSE American under the symbol "SNMP."

**Significant Operational Factors in 2019**

Some key highlights of our business activities for the year ended December 31, 2019 were:

- On Western Catarina Midstream, the Partnership implemented two tariff rate increases on throughput volumes from approximately 71,000 net acres on Sanchez Energy's Catarina Asset which are not currently dedicated under the Gathering Agreement; and
- For the year ended December 31, 2019, we reduced cash related general and administrative expense by $2.6 million, or 20%, compared to the same period 2018.

**How We Evaluate Our Operations**

We evaluate our business on the basis of the following key measures:

- our throughput volumes on gathering systems upon those assets;
- our operating expenses; and
- our Adjusted EBITDA, a non-GAAP financial measure (for a reconciliation of Adjusted EBITDA to the most comparable GAAP financial measure please read "Non-GAAP Financial Measures—Adjusted EBITDA").

*Throughput Volumes*

Following the Catarina Transaction, our management began to analyze our performance based on the aggregate amount of throughput volumes on the gathering system. We must connect additional wells or well pads within Sanchez Energy's Catarina Asset, which consists of approximately 106,000 net acres in Dimmit, La Salle and Webb counties in Texas, in order to maintain or increase throughput volumes on Western Catarina Midstream. Our success in connecting additional wells is impacted by successful drilling activity by Sanchez Energy on the acreage dedicated to Western Catarina Midstream, our ability to secure volumes from Sanchez Energy from new wells drilled on non-dedicated acreage, our ability to attract hydrocarbon volumes currently gathered by our competitors and our ability to cost-effectively construct or acquire new infrastructure. Construction of the Seco Pipeline was completed in August 2017, and throughput volumes are dependent on gas processed at the Raptor Gas Processing Facility and demand for dry gas in markets in South Texas.

Future throughput volumes on the pipeline are dependent on execution of a new transportation agreement with Sanchez Energy or execution of an agreement with a third party.

*Operating Expenses*

Our management seeks to maximize Adjusted EBITDA, a non-GAAP financial measure, in part by minimizing operating expenses. These expenses are or will be comprised primarily of field operating costs (which generally consists of lease operating expenses, labor, vehicles, supervision, transportation, minor maintenance, tools and supplies expenses, among other items), compression expense, ad valorem taxes and other operating costs, some of which will be independent of our oil and natural gas production or the throughput volumes on the midstream gathering system, but fluctuate depending on the scale of our operations during a specific period.

*Non-GAAP Financial Measures—Adjusted EBITDA*

To supplement our financial results and guidance presented in accordance with U.S. generally accepted accounting principles ("GAAP"), we use Adjusted EBITDA, a non-GAAP financial measure, in this Form 10-K. We believe that non-GAAP financial measures are helpful in understanding our past financial performance and potential future results, particularly in light of the effect of various transactions effected by us. We define Adjusted EBITDA as net income (loss) adjusted by: (i) interest (income) expense, net, which includes interest expense, interest expense net (gain) loss on interest rate derivative contracts, and interest (income); (ii) income tax expense (benefit); (iii) depreciation, depletion and amortization; (iv) asset impairments; (v) accretion expense; (vi) (gain) loss on sale of assets; (vii) unit-based compensation expense; (viii) unit-based asset management fees; (ix) distributions in excess of equity earnings; (x) (gain) loss on mark-to-market activities; (xi) commodity derivatives settled early; (xii) (gain) loss on embedded derivatives; and (xiii) acquisition and divestiture costs.

Adjusted EBITDA is used as a quantitative standard by our management and by external users of our financial statements such as investors, research analysts, our lenders and others to assess: (i) the financial performance of our assets without regard to financing methods, capital structure or historical cost basis; (ii) the ability of our assets to generate cash sufficient to pay interest costs and support our indebtedness; and (iii) our operating performance and return on capital as compared to those of other companies in our industry, without regard to financing or capital structure.

We believe that the presentation of Adjusted EBITDA provides useful information to investors in assessing our financial condition and results of operations. The GAAP measure most directly comparable to Adjusted EBITDA is net income (loss). Our non-GAAP financial measure of Adjusted EBITDA should not be considered as an alternative to GAAP net income (loss). Adjusted EBITDA has important limitations as an analytical tool because it excludes some but not all items that affect net income (loss). Adjusted EBITDA should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. Because Adjusted EBITDA may be defined differently by other companies in our industry, our definition of Adjusted EBITDA may not be comparable to similarly titled measures of other companies, thereby diminishing its utility.

Table of Contents

The following table sets forth a reconciliation of Adjusted EBITDA to net income (loss), its most directly comparable GAAP performance measure, for each of the periods presented (in thousands):

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| Net income (loss) | $ (51,142) | $ 15,691 |
| Adjusted by: | | |
| Interest expense, net | 39,789 | 10,961 |
| Income tax expense | 202 | 190 |
| Depreciation, depletion and amortization | 25,333 | 25,987 |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| Gain on sale of assets | — | (3,186) |
| Unit-based compensation expense | 1,351 | 1,938 |
| Unit-based asset management fees | 7,321 | 8,646 |
| Distributions in excess of equity earnings | 11,352 | 9,754 |
| Gain on mark-to-market activities | (1,183) | (3,229) |
| Acquisition and divestiture costs | — | 2,150 |
| Adjusted EBITDA | $ 65,668 | $ 69,399 |

***Significant Operational Factors***

*Throughput.* The following table sets forth selected throughput data pertaining to the Midstream segment for the years ended December 31, 2019 and 2018:

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| Western Catarina Midstream: | | |
| Oil (MBbls/d) | 11.1 | 12.8 |
| Natural gas (MMcf/d) | 131.7 | 157.2 |
| Water (MBbls/d) | 5.5 | 11.0 |
| Seco Pipeline: | | |
| Natural gas (MMcf/d) | 1.9 | 35.4 |

*Production.* Our production for the year ended December 31, 2019 was approximately 309 MBoe, or an average of 847 Boe/d, compared to approximately 439 MBoe, or an average of 1,203 Boe/d, for the same period in 2018.

*Capital Expenditures.* For the year ended December 31, 2019, we spent approximately $0.5 million in capital expenditures, consisting of $0.5 million related to the development of Western Catarina Midstream and less than $0.1 million related to the development of the Seco Pipeline. For the year ended December 31, 2018, we spent approximately $2.0 million in capital expenditures, consisting of $1.4 million related to the development of Western Catarina Midstream and $0.6 million related to the development of the Seco Pipeline.

*Hedging Activities.* For the year ended December 31, 2019, the non-cash mark-to-market loss for our commodity derivatives was approximately $4.7 million, compared to a gain of $2.7 million for the same period in 2018.

**Results of Operations by Segment**

***Midstream Operating Results***

The following table sets forth the selected financial and operating data pertaining to the Midstream segment for the periods indicated (in thousands):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Variance | |
| **Revenues:** | | | | |
| Gathering and transportation sales | $ 6,825 | $ 6,651 | $ 174 | 3% |
| Gathering and transportation lease revenues | 59,090 | 53,025 | 6,065 | 11% |
| Total gathering and transportation sales | 65,915 | 59,676 | 6,239 | 10% |
| **Operating costs:** | | | | |
| Lease operating expenses | 1,499 | 1,145 | 354 | 31% |
| Transportation operating expenses | 11,553 | 12,316 | (763) | (6%) |
| Depreciation and amortization | 21,391 | 21,189 | 202 | 1% |
| Asset impairments | 32,119 | — | 32,119 | NM [(a)] |
| Accretion expense | 326 | 299 | 27 | 9% |
| Total operating expenses | 66,888 | 34,949 | 31,939 | 91% |
| **Other income:** | | | | |
| Earnings from equity investments | 2,831 | 12,859 | (10,028) | (78%) |
| **Operating income** | $ 1,858 | $ 37,586 | $ (35,728) | (95%) |

(a) Variances deemed to be Not Meaningful "NM."

*Gathering and transportation sales.* Gathering and transportation sales increased by approximately $0.2 million to approximately $6.8 million for the year ended December 31, 2019, compared to approximately $6.7 million during the same period in 2018.

*Gathering and transportation lease revenues.* Gathering and transportation lease revenues increased by approximately $6.1 million, or 11%, to approximately $59.1 million for the year ended December 31, 2019, compared to approximately $53.0 million during the same period in 2018. This increase was primarily the result of an increase in the rate charged for natural gas transported on Western Catarina Midstream that was produced from outside the dedicated acreage under the Gathering Agreement.

*Lease operating expenses.* Lease operating expenses, which include ad valorem taxes, increased approximately $0.4 million, or 31%, to approximately $1.5 million for the year ended December 31, 2019, compared to approximately $1.1 million during the same period in 2018.

*Transportation operating expenses.* Our transportation operating expenses generally consist of gathering and transportation operating expenses, labor, vehicles, supervision, minor maintenance, tools, supplies, and integrity management expenses. Our transportation operating expense decreased approximately $0.8 million, or 6%, to approximately $11.6 million for the year ended December 31, 2019, compared to approximately $12.3 million during the same period in 2018.

*Depreciation and amortization expense.* Gathering and transportation assets are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 5 to 15 years for equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets. Our depreciation and amortization expense increased approximately $0.2 million, or 1%, to approximately $21.4 million for the year ended December 31, 2019, compared to approximately $21.2 million during the same period in 2018.

*Impairment expense.* For the year ended December 31, 2019, our non-cash impairment charge was approximately $32.1 million, to impair the Seco Pipeline. We received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective as of February 12, 2020. See Note 21 "Subsequent Events" of our Notes to

Table of Contents

Consolidated Financial Statements for additional information on the termination of the Seco Pipeline Transportation Agreement. We did not record impairment on our gathering and transportation assets during the year ended December 31, 2018.

*Earnings from equity investments.* Earnings from equity investments decreased approximately $10.0 million, or 78%, to approximately $2.8 million for the year ended December 31, 2019, compared to approximately $12.9 million for the same period in 2018. This decrease in earnings was primarily the result of lower throughput during the year ended December 31, 2019.

***Production Operating Results***

The following tables set forth the selected financial and operating data pertaining to the Production segment for the periods indicated (in thousands, except net production and average sales and costs):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Variance | |
| **Revenues:** | | | | |
| Natural gas sales at market price | $ 424 | $ 1,037 | $ (613) | (59%) |
| Natural gas hedge settlements | 94 | (37) | 131 | NM [(a)] |
| Natural gas mark-to-market activities | 165 | (47) | 212 | NM [(a)] |
| Natural gas total | 683 | 953 | (270) | (28%) |
| Oil sales | 13,543 | 19,872 | (6,329) | (32%) |
| Oil hedge settlements | 807 | (1,330) | 2,137 | NM [(a)] |
| Oil mark-to-market activities | (4,838) | 2,730 | (7,568) | NM [(a)] |
| Oil total | 9,512 | 21,272 | (11,760) | (55%) |
| NGL sales | 539 | 1,709 | (1,170) | (68%) |
| Total revenues | 10,734 | 23,934 | (13,200) | (55%) |
| **Operating costs:** | | | | |
| Lease operating expenses | 5,879 | 6,719 | (840) | (13%) |
| Production taxes | 621 | 1,104 | (483) | (44%) |
| Gain on sale of assets | — | (3,186) | 3,186 | NM [(a)] |
| Depreciation, depletion and amortization | 3,942 | 4,798 | (856) | (18%) |
| Accretion expense | 200 | 198 | 2 | 1% |
| Total operating expenses | 10,642 | 9,633 | 1,009 | 10% |
| **Operating income** | $ 92 | $ 14,301 | $ (14,209) | (99%) |

(a) Variances deemed to be Not Meaningful "NM."

Table of Contents

| | Years Ended December 31, 2019 | 2018 | Variance | |
|---|---|---|---|---|
| **Net production:** | | | | |
| Natural gas (MMcf) | 231 | 434 | (203) | (47%) |
| Oil production (MBbl) | 228 | 296 | (68) | (23%) |
| NGLs (MBbl) | 42 | 71 | (29) | (41%) |
| Total production (MBoe) | 309 | 439 | (130) | (30%) |
| Average daily production (Boe/d) | 847 | 1,203 | (356) | (30%) |
| **Average sales prices:** | | | | |
| Natural gas price per Mcf with hedge settlements | $ 2.24 | $ 2.30 | $ (0.06) | (3%) |
| Natural gas price per Mcf without hedge settlements | $ 1.84 | $ 2.39 | $ (0.55) | (23%) |
| Oil price per Bbl with hedge settlements | $ 62.94 | $ 62.64 | $ 0.30 | 0% |
| Oil price per Bbl without hedge settlements | $ 59.40 | $ 67.14 | $ (7.74) | (12%) |
| NGL price per Bbl without hedge settlements | $ 12.83 | $ 24.07 | $ (11.24) | (47%) |
| Total price per Boe with hedge settlements | $ 49.86 | $ 48.41 | $ 1.45 | 3% |
| Total price per Boe without hedge settlements | $ 46.94 | $ 51.52 | $ (4.58) | (9%) |
| **Average unit costs per Boe:** | | | | |
| Field operating expenses [(a)] | $ 21.04 | $ 17.82 | $ 3.22 | 18% |
| Lease operating expenses | $ 19.03 | $ 15.31 | $ 3.72 | 24% |
| Production taxes | $ 2.01 | $ 2.51 | $ (0.50) | (20%) |
| Depreciation, depletion and amortization | $ 12.76 | $ 10.93 | $ 1.83 | 17% |

(a) Field operating expenses include lease operating expenses (average production costs) and production taxes.

*Production,* For the year ended December 31, 2019, 74% of our production was oil, 14% was NGLs and 12% was natural gas compared to the year ended December 31, 2018, where 67% of our production was oil, 16% was NGLs and 17% was natural gas. The production mix between the periods has shifted to a higher oil production as a result of multiple asset divestitures in 2018 that were rich in natural gas. Combined production has decreased by 130 MBoe for the year ended December 31, 2019, primarily due to the closings during 2018 of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture.

*Sales of natural gas, NGLs and oil.* Unhedged oil sales decreased $6.3 million, or 32%, to $13.5 million for the year ended December 31, 2019, compared to approximately $19.9 million for the same period in 2018. Sales of NGLs decreased approximately $1.2 million, or 68%, to $0.5 million for the year ended December 31, 2019, compared to approximately $1.7 million for the same period in 2018. Unhedged natural gas sales decreased approximately $0.6 million, or 59%, to approximately $0.4 million for the year ended December 31, 2019, compared to approximately $1.0 million for the same period in 2018. The total decrease in sales of natural gas, NGLs and oil for the year ended December 31, 2019 was primarily the result of the same factors described under "Production" above as well as a decrease in average sales prices.

Including hedges and mark-to-market activities, our total production-related revenue decreased approximately $13.2 million for the year ended December 31, 2019, compared to the same period in 2018. This decrease was primarily the result of approximately $7.6 million of losses on oil mark-to-market activities and a decrease in oil sales of approximately $6.3 million.

The following tables provide an analysis of the impacts of changes in production volumes and average realized prices between the periods on our unhedged revenues for the year ended December 31, 2019 compared to the year ended December 31, 2018 (in thousands, except average sales prices and volumes):

| | 2019 Average Sales Price | 2018 Average Sales Price | Average Sales Price Difference | 2019 Volume | Revenue Decrease due to Price |
|---|---|---|---|---|---|
| Natural gas (MMcf) | $ 1.84 | $ 2.39 | $ (0.55) | 231 | $ (127) |
| Oil (MBbl) | $ 59.40 | $ 67.14 | $ (7.74) | 228 | $ (1,765) |
| NGLs (MBbl) | $ 12.83 | $ 24.07 | $ (11.24) | 42 | $ (472) |
| Total oil equivalent (MBoe) | $ 46.94 | $ 51.52 | $ (4.58) | 309 | $ (2,364) |

| | 2019 Production Volume | 2018 Production Volume | Production Volume Difference | 2018 Average Sales Price | Revenue Decrease due to Production |
|---|---|---|---|---|---|
| Natural gas (MMcf) | 231 | 434 | (203) | $ 2.39 | $ (485) |
| Oil (MBbl) | 228 | 296 | (68) | $ 67.14 | $ (4,565) |
| NGLs (MBbl) | 42 | 71 | (29) | $ 24.07 | $ (698) |
| Total oil equivalent (MBoe) | 309 | 439 | (130) | $ 51.52 | $ (5,748) |

A 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2019 by approximately $1.5 million.

*Hedging and mark-to-market activities.* We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in oil and natural gas revenues. For the year ended December 31, 2019, the non-cash mark-to-market losses were approximately $4.7 million, compared to gains of approximately $2.7 million for the same period in 2018. The 2019 non-cash mark-to-market loss resulted from higher future expected oil prices compared to the settlement prices on our oil fixed price basis swaps. Cash settlements received for our commodity derivatives were approximately $0.9 million for the year ended December 31, 2019, compared to settlements paid of approximately $1.4 million for the year ended December 31, 2018.

*Field operating expenses.* Our field operating expenses generally consist of lease operating expenses, labor, vehicles, supervision, transportation, minor maintenance, tools and supplies expenses, as well as production and ad valorem taxes.

*Lease operating expenses.* Lease operating expenses decreased approximately $0.8 million, or 13%, to approximately $5.9 million for the year ended December 31, 2019, compared to $6.7 million for the same period in 2018. This decrease in operating expenses was primarily due to the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture that closed during 2018.

*Depreciation, depletion and amortization expense.* Depreciation, depletion and amortization expense includes the depreciation, depletion and amortization of acquisition costs and equipment costs. Depletion is calculated using units-of-production under the successful efforts method of accounting. Assuming other variables remain constant, as the production of natural gas, NGLs and oil increases or decreases, our depletion expense would increase or decrease as well, respectively.

Our depreciation, depletion and amortization expense for the year ended December 31, 2019 was approximately $3.9 million, compared to approximately $4.8 million for the same period in 2018. The decrease was primarily the result of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture that closed during 2018. Our non-oil and natural gas properties are depreciated using the straight-line basis.

*Impairment expense.* For the years ended December 31, 2019 and 2018, we did not record impairment on our oil and natural gas properties.

**Consolidated Earnings Results**

The following table sets forth the reconciliation of segment operating income to net income (loss) for periods indicated (in thousands):

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 | Variance | |
|---|---|---|---|---|
| **Reconciliation of segment operating income to net income (loss):** | | | | |
| Total production operating income | $ 92 | $ 14,301 | $ (14,209) | (99%) |
| Total midstream operating income | 1,858 | 37,586 | (35,728) | (95%) |
| Total segment operating income | 1,950 | 51,887 | (49,937) | (96%) |
| General and administrative expense | (17,610) | (23,653) | 6,043 | (26%) |
| Unit-based compensation expense | (1,351) | (1,938) | 587 | (30%) |
| Interest expense, net | (39,789) | (10,961) | (28,828) | NM [(a)] |
| Other income | 5,860 | 546 | 5,314 | NM [(a)] |
| Income tax expense | (202) | (190) | (12) | 6% |
| **Net income (loss)** | $ (51,142) | $ 15,691 | $ (66,833) | NM [(a)] |

(a) Amounts Variances deemed to be Not Meaningful "NM"

*General and administrative expenses.* General and administrative expenses include indirect costs billed by Manager in connection with the Services Agreement, field office expenses, professional fees and other costs not directly associated with field operations. General and administrative expenses, inclusive of unit-based compensation expense, decreased approximately $6.0 million, or 26%, to approximately $17.6 million for the year ended December 31, 2019, compared to approximately $23.7 million for the same period in 2018. The decrease was primarily the result of reduced salaries and wages, as well as reduced asset management fees.

*Unit-based compensation expense.* Unit-based compensation expense decreased approximately $0.6 million, or 30%, to approximately $1.4 million for the year ended December 31, 2019, compared to approximately $1.9 million for the same period in 2018. This decrease was the result of a substantial decline in the price of our common units on the NYSE American during the two year period ended December 31, 2019.

*Interest expense, net.* Interest expense increased approximately $28.8 million, to approximately $39.8 million for the year ended December 31, 2019, compared to approximately $10.9 million for the same period in 2018. This increase was the result of the issuance of the Class C Preferred Units and the Warrant on August 2, 2019. The accrual of distributions on the Class C Preferred Units as well as the mark-to-market impact of the Warrant are charges to interest expense. Cash interest expense for the year ended December 31, 2019 was approximately $9.2 million compared to approximately $10.2 million for the same period in 2018. See Note 17. "Partner's Capital" of our Notes to Consolidated Financial Statements for additional information related to Class C Preferred Units and the Warrant.

*Other income (expense).* Other income was approximately $5.9 million for the year ended December 31, 2019, compared to approximately $0.5 million for the same period in 2018, resulting from changes in the fair value measurement of the earnout derivative.

*Income tax expense*. Income tax expense was approximately $0.2 million for the years ended December 31, 2019, and 2018, respectively.

**Liquidity and Capital Resources**

As of December 31, 2019, we had approximately $5.1 million in cash and cash equivalents and $15.0 million available for borrowing under the Credit Agreement in effect on such date, as discussed further below. During the years ended December 31, 2019 and 2018, we paid approximately $9.2 million and $9.8 million, respectively, in cash for interest on borrowings under our Credit Agreement, of which approximately $0.2 million was related to the fee on undrawn commitments during the year ended December 31, 2019.

Our capital expenditures during the year ended December 31, 2019 were funded with cash on hand. In the future, capital and liquidity are anticipated to be provided by operating cash flows, borrowings under our Credit Agreement and proceeds from the issuance of additional common units or other limited partner interests. We expect that the combination of these capital resources will be adequate to meet our short-term working capital requirements, long-term capital expenditures program and quarterly cash distributions, if any.

We expect that our future cash requirements relating to working capital, maintenance capital expenditures and quarterly cash distributions, if any to our partners will be funded from cash flows internally generated from our operations. Our expansion capital expenditures will be funded by borrowings under our Credit Agreement or from potential capital market transactions. However, there can be no assurance that operations and other capital resources will provide cash in sufficient amounts to maintain our current debt level, planned levels of capital expenditures, operating expenses or any cash distributions that we may make to unitholders.

*Credit Agreement*

We have entered into a credit facility with Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto as amended by the Ninth Amendment to Third Amended and Restated Credit Agreement (the "Credit Agreement"). The Credit Agreement provides a quarterly amortizing term loan of $155.0 million (the "Term Loan") and a maximum revolving credit amount of $20.0 million (the "Revolving Loan"). The Term Loan and Revolving Loan both have a maturity date of September 30, 2021. Borrowings under the Credit Agreement are secured by various mortgages of both midstream and upstream properties that we own as well as various security and pledge agreements among us, certain of our subsidiaries and the administrative agent.

Borrowings under the Credit Agreement are available for limited direct investment in oil and natural gas properties, midstream properties, acquisitions, and working capital and general business purposes. The Credit Agreement has a sub-limit of up to $2.5 million which may be used for the issuance of letters of credit. Pursuant to the Credit Agreement, the initial aggregate commitment amount under the Term Loan is $155.0 million, subject to quarterly $10.0 million principal and other mandatory prepayments. The borrowing base is equal to the sum of the rolling four quarter EBITDA of our midstream operations and the amount of distributions received from the Carnero JV multiplied by 4.5 or a lower number dependent upon natural gas volumes flowing through Western Catarina Midstream. Outstanding borrowings in excess of our borrowing base must be repaid within 45 days. As of December 31, 2019, the borrowing base under the Credit Agreement was $235.5 million and we had $150.0 million of debt outstanding, consisting of $145.0 million under the Term Loan and $5.0 million under the Revolving Loan. We are required to make mandatory payments of outstanding principal on the Term Loan of $10 million per fiscal quarter. The maximum revolving credit amount is $20.0 million which left us with $15.0 million in unused borrowing capacity at December 31, 2019. There were no letters of credit outstanding under our Credit Agreement as of December 31, 2019.

At our election, interest for borrowings under the Credit Agreement are determined by reference to (i) the London interbank offered rate ("LIBOR") plus an applicable margin between 2.50% and 3.00% per annum based on net debt to EBITDA or (ii) a domestic bank rate ("ABR") plus an applicable margin between 1.50% and 2.00% per annum based on net debt to EBITDA plus (iii) a commitment fee of 0.500% per annum based on the unutilized maximum revolving credit. Interest on the borrowings for ABR loans and the commitment fee are generally payable quarterly. Interest on the borrowings for LIBOR loans are generally payable at the applicable maturity date.

The Credit Agreement contains various covenants that limit, among other things, our ability to incur certain indebtedness, grant certain liens, merge or consolidate, sell all or substantially all of our assets, make certain loans, acquisitions, capital expenditures and investments, and pay distributions.

In addition, we are required to maintain the following financial covenants:

- current assets to current liabilities of at least 1.0 to 1.0 at all times; and
- senior secured net debt to consolidated adjusted EBITDA for the last twelve months, as of the last day of any fiscal quarter, of not greater than 3.5 to 1.0.

The Credit Agreement also includes customary events of default, including events of default relating to non-payment of principal, interest or fees, inaccuracy of representations and warranties when made or when deemed made, violation of covenants, cross-defaults, bankruptcy and insolvency events, certain unsatisfied judgments, loan documents not being valid and a change in control. A change in control is generally defined as the occurrence of one of the following events: (i) our existing general partner ceases to be our sole general partner or (ii) certain specified persons shall cease to own more than 50% of the equity interests of our general partner or shall cease to control our general partner. If an event of default occurs, the lenders will be able to accelerate the maturity of the Credit Agreement and exercise other rights and remedies.

Our partnership agreement prohibits us from paying any distributions on our common units until we have redeemed all of the Class C Preferred Units. Following such redemption, the Credit Agreement further limits our ability to pay distributions to unitholders.

At December 31, 2019, we were in compliance with the financial covenants contained in the Credit Agreement. We monitor compliance on an ongoing basis. If we are unable to remain in compliance with the financial covenants contained in our Credit Agreement or maintain the required ratios discussed above, the lenders could call an event of default and accelerate the outstanding debt under the terms of the Credit Agreement, such that our outstanding debt could become then due and payable. We may request waivers of compliance from the violated financial covenants from the lenders, but there is no assurance that such waivers would be granted.

***Sources of Debt and Equity Financing***

As of December 31, 2019, we had $5.0 million of debt outstanding under the Revolving Loan, leaving us with $15.0 million in unused borrowing capacity. There were no letters of credit outstanding under our Credit Agreement at December 31, 2019. Our Credit Agreement matures on September 30, 2021.

In April 2017, we issued 84,577 common units in registered offerings for gross proceeds of approximately $1.3 million pursuant to a shelf registration statement originally filed with the SEC on March 6, 2015, as supplemented by that certain prospectus supplement filed with the SEC on April 6, 2017.

***Open Commodity Hedge Positions***

We periodically enter into hedging arrangements to reduce the impact of oil and natural gas price volatility on our operations. By removing the price volatility from a significant portion of our projected 2020 oil and natural gas production, we have mitigated, but not eliminated, the potential effects of changing prices on our cash flows. While mitigating the negative effects of falling commodity prices, these derivative contracts also limit the benefits we might otherwise receive from increases in commodity prices. These derivative contracts also limit our ability to have additional cash flows to fund higher severance taxes, which are usually based on market prices for oil and natural gas. Our operating cash flows are also impacted by the cost of oilfield services. In the event of inflation increasing service costs or administrative expenses, our hedging program will limit our ability to have increased operating cash flows to fund these higher costs. Increases in the market prices for oil and natural gas will also increase our need for working capital as our commodity hedging contracts cash settle prior to our receipt of cash from our sales of the related commodities to third parties.

It is our policy to enter into derivative contracts only with counterparties that are creditworthy financial institutions deemed by management as competent and competitive market makers. All of our derivatives are currently collateralized by the assets securing our Credit Agreement and therefore currently do not require the posting of cash collateral. This is significant since we are able to lock in sales prices on a substantial amount of our expected 2020 production without posting cash collateral based on price changes prior to the hedges being cash settled.

The following tables as of December 31, 2019, summarize, for the periods indicated, our hedges currently in place through December 31, 2020. All of these derivatives are accounted for as mark-to-market activities.

*MTM Fixed Price Swaps—NYMEX (Henry Hub)*

| | Three Months Ended (volume in MMBtu) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 105,104 | $ 2.85 | 102,008 | $ 2.85 | 99,136 | $ 2.85 | 96,200 | $ 2.85 | 402,448 | $ 2.85 |

*MTM Fixed Price Basis Swaps–West Texas Intermediate (WTI)*

| | Three Months Ended (volume in Bbls) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 52,776 | $ 53.50 | 50,960 | $ 53.50 | 49,224 | $ 53.50 | 47,624 | $ 53.50 | 200,584 | $ 53.50 |

***Operating Cash Flows***

We had net cash flows provided by operating activities for the year ended December 31, 2019, of approximately $58.0 million, compared to net cash flows provided by operating activities of approximately $66.9 million for the same period in 2018. This decrease was primarily related to the impact of lower average commodity prices between the periods resulting in lower production for the period of approximately $5.7, as well as a decrease of approximately $2.4 million.

Our operating cash flows are subject to many variables, the most significant of which is the volume of oil and natural gas transported through our midstream assets, volatility of oil and natural gas prices and our level of production of oil and natural gas. Oil and natural gas prices are determined primarily by prevailing market conditions, which are dependent on regional and worldwide economic activity, weather and other factors beyond our control. Our future operating cash flows will depend on oil and natural gas transported through our midstream assets, as well as the market prices of oil and natural gas and our hedging program.

***Investing Activities***

We had net cash flows used in investing activities for the year ended December 31, 2019 of approximately $1.4 million, consisting of approximately $1.0 million related to midstream activities, including pipeline construction, and contributions to Carnero JV totaling approximately $0.2 million.

Our net cash flows provided by investing activities for the year ended December 31, 2018 were approximately $2.3 million, consisting of approximately $2.5 million related to midstream activities, including pipeline construction, and contributions to Carnero JV totaling approximately $2.8 million. These outflows were offset by approximately $7.7 million related to proceeds from sales of oil and natural gas properties.

***Financing Activities***

Net cash flows used in financing activities was approximately $54.4 million for the year ended December 31, 2019. During the year ended December 31, 2019, we distributed (i) approximately $17.7 million to Stonepeak Catarina, as the holder of all of our previously outstanding Class B Preferred Units and, starting with the distribution for the quarter ended June 30, 2019, the holder of all of our outstanding Class C Preferred Units, and (ii) approximately $5.2 million to our common unitholders. Additionally, we paid approximately $0.2 million in costs associated with the Exchange (as defined herein) and repaid $34.0 million of borrowings under the Credit Agreement.

Net cash flows used in financing activities were approximately $66.6 million for the year ended December 31, 2018. During the year ended December 31, 2018, we distributed approximately $33.3 million to Stonepeak Catarina, as the holder of all of our outstanding Class B Preferred Units, and approximately $23.2 million to our common unitholders.

Additionally, we paid approximately $0.1 million in offering costs and repaid $11.0 million of borrowings under the Credit Agreement.

**Off-Balance Sheet Arrangements**

As of December 31, 2019, we had no off-balance sheet arrangements with third parties, and we maintain no debt obligations that contained provisions requiring accelerated payment of the related obligations in the event of specified levels of declines in credit ratings.

**Credit Markets and Counterparty Risk**

We actively monitor the credit exposure and risks associated with our counterparties. Additionally, we continue to monitor global credit markets to limit our potential exposure to credit risk where possible. Our primary credit exposures result from the generation of substantially all of our midstream business segment revenues from a single customer, Sanchez Energy, the sale of oil and natural gas and our use of derivatives. On August 11, 2019, the Sanchez Energy Chapter 11 Case was filed. No assurances can be given as to the timing or outcome of this process. As of December 31, 2019, we had no past due receivables from Sanchez Energy, and through December 31, 2019, we have not suffered any significant losses with our counterparties as a result of nonperformance. However, on January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. Given our midstream focus, our primary credit exposure relates to the creditworthiness of the counterparties under our gathering and processing agreements. Sanchez Energy, whose earned revenues contribute to our midstream segment, accounted for 86% of total revenue for the year ended December 31, 2019. Any development that materially and adversely affects Sanchez Energy's operations or financial condition could have a material adverse impact on us, including but not limited to impairment losses on fixed assets. For additional information on the risks associated with our relationships with Sanchez Energy, please read "Part I, Item 1A. Risk Factors."

Certain key counterparty relationships are described below:

*Derivative Counterparties*

As of December 31, 2019, our derivatives were with ING, Comerica and Royal Bank of Canada, all of whom are lenders in our Credit Agreement. All of our derivatives are currently collateralized by the assets securing our Credit Agreement and therefore currently do not require the posting of cash collateral. As of December 31, 2019, each of these financial institutions had an investment grade credit rating.

*Credit Agreement*

As of December 31, 2019, the banks and their percentage commitments in our Credit Agreement were: Royal Bank of Canada (13%), BBVA USA f/k/a Compass Bank (12%), Trust Bank f/k/a SunTrust Bank (12%), Capital One, National Association (12%), Comerica Bank (12%), Citibank, N.A. (9%), Credit Suisse AG, Cayman Islands (9%), ING Capital LLC (9%), CIT Bank, N.A. (9%) and Macquarie Investments US Inc (5%). As of December 31, 2019, each of these financial institutions had an investment grade credit rating.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of the financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the calculation of depletion and impairment of oil and natural gas properties, the fair value of commodity derivative contracts and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative expenses. Actual results could differ materially from those estimates.

The policies disclosed included the accounting for oil and natural gas properties, oil and natural gas reserve quantities, revenue recognition and hedging activities. Please read Note 2 "Basis of Presentation and Summary of Significant Accounting Policies" to the consolidated financial statements for a discussion of additional accounting policies and estimates made by management.

***Oil and Natural Gas Properties***

We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties. Under this method of accounting, costs relating to the development of proved areas are capitalized when incurred.

Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold and proved property acquisition costs using all proved reserves. As more fully described in Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements, proved reserves estimates are subject to future revisions when additional information becomes available.

All other properties, including gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

Estimated asset retirement costs are recognized when the asset is acquired or placed in service. Costs associated with oil and natural gas properties are amortized over proved reserves using the units-of-production method. Costs associated with gathering and transportation assets are depreciated using the straight-line method over the useful lives of the asset. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

Oil and natural gas properties are reviewed for impairment when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. Cash flow estimates for the impairment testing are based on third party reserve reports and exclude derivative instruments. Refer to Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements for additional information.

Gathering and transportation assets are reviewed for impairment when facts or circumstances indicate that their carrying value may not be recoverable. Asset recoverability is measured by comparing the carrying value of the asset or asset group with its expected future pre-tax undiscounted cash flows. These cash flow estimates require us to make projections and assumptions for many years into the future for pricing, demand, competition, operating cost and other factors. If the carrying amount exceeds the expected future undiscounted cash flows, we recognize an impairment equal to the excess of net book value over fair value. The determination of the fair value using present value techniques requires us to make projections and assumptions regarding the probability of a range of outcomes and the rates of interest used in the present value calculations. Any changes we make to these projections and assumptions could result in significant revisions to our evaluation of recoverability of our gathering and transportation assets and the recognition of additional impairments. Refer to Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements for additional information.

***Reserves of Natural Gas, NGLs and Oil***

Our estimate of proved reserves is based on the quantities of natural gas, NGLs and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Management estimates the proved reserves attributable to our ownership based on various factors, including consideration of the reserve report prepared by Ryder Scott, an independent oil and natural gas consulting firm. On an annual basis, our proved reserve estimates and the reserve report prepared by Ryder

Scott are reviewed by the Audit Committee and the Board. Our financial statements for 2019 and 2018 were prepared using Ryder Scott's estimates of our proved reserves.

Reserves and their relation to estimated future net cash flows impact our depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The accuracy of our reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Our proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the actual quantities of oil and natural gas eventually recovered.

**Recent Accounting Pronouncements and Accounting Changes**

See Note 2 "Basis of Presentation and Summary of Significant Accounting Policies" to our consolidated financial statements included in this report for information on new accounting pronouncements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required by this Item.

**Item 8. Financial Statements and Supplementary Data**

The information required by this Item is included in this report as set forth in the "Index to Consolidated Financial Statements" beginning on page F-1 of this Form 10-K and is incorporated by reference herein.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, with the Partnership have been detected. These inherent limitations include error by personnel in executing controls due to faulty judgment or simple mistakes, which could occur in situations such as when personnel performing controls are new to a job function or when inadequate resources are applied to a process. Additionally, controls can be circumvented by the individual acts of some persons or by collusion of two or more people.

The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no absolute assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions or personnel, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including the principal executive officer and principal financial officer of our general partner, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Form 10-K. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file under the Exchange Act is accumulated and communicated to our management, including the principal executive officer and principal financial officer of our general partner, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. The principal executive officer and principal financial officer of our general partner have concluded that our current disclosure controls and procedures were effective as of December 31, 2019 at the reasonable assurance level.

*Changes in Internal Control over Financial Reporting*

During the three months ended December 31, 2019, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Reports of Management*

*Financial Statements*

The management of our general partner is responsible for the information and representations in our financial statements. We prepare the financial statements in accordance with accounting principles generally accepted in the United States of America based upon available facts and circumstances and management's best estimates and judgments of known conditions.

The Audit Committee, which consists of three independent directors, meets periodically with management, our internal auditor and KPMG LLP to review the activities of each in discharging their responsibilities. Our internal auditor and KPMG LLP have free access to the Audit Committee.

*Management's Report on Internal Control Over Financial Reporting*

Our management, under the direction of the principal executive officer and principal financial officer of our general partner, is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) of the Exchange Act.

Our system of internal control over financial reporting is designed to provide reasonable assurance to our management and the Board regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America.

The management of our general partner conducted an evaluation of the effectiveness of our internal control over financial reporting using the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). As noted in the COSO framework, an internal control system, no matter how well conceived and operated, can provide only reasonable-not absolute-assurance to management and the Board regarding achievement of an entity's financial reporting objectives. Based upon the evaluation under this framework, management concluded that our internal control over financial reporting was effective as of December 31, 2019.

*Report of Independent Registered Public Accounting Firm*

Please see Report of Independent Public Accounting Firm under "Part II, Item 8. Financial Statements and Supplementary Data" of this Form 10-K.

**Item 9B. Other Information**

None.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The following table shows information for members of the Board and the executive officers of our general partner as of March 13, 2020. All of the directors of our general partner are elected by Manager, as the sole member of our general partner, except for two persons who are appointed by Stonepeak Catarina pursuant to the Representation and Standstill Agreement. Members of the Board hold office until their successors have been elected or qualified or until the earlier of their death, incapacity, resignation or removal. Executive officers hold office at the discretion of, and may be removed by, the Board.

| Name | Age | Position with Sanchez Midstream Partners LP |
|---|---|---|
| Alan S. Bigman | 52 | Independent Director |
| Kirsten A. Hink | 53 | Chief Accounting Officer |
| Jack Howell | 33 | Director |
| Richard S. Langdon | 69 | Independent Director |
| G.M. Byrd Larberg | 67 | Independent Director |
| Antonio R. Sanchez, III | 46 | Director; Chairman of the Board |
| Eduardo A. Sanchez | 40 | Director |
| Patricio D. Sanchez | 39 | Director; President & Chief Operating Officer |
| Luke R. Taylor | 42 | Director |
| Charles C. Ward | 59 | Chief Financial Officer & Secretary |
| Gerald F. Willinger | 52 | Director; Chief Executive Officer |

*Alan S. Bigman* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in July 2014. Mr. Bigman is an independent member of the Conflicts Committee of our general partner and is the Chair of the Audit Committee of our general partner. Mr. Bigman currently serves as an independent non-executive director and chairman of the audit committee of a $1.5 billion dollar privately held chemicals company. His extensive board experience also includes Basell Polyolefins, an international chemical producer and predecessor of LyondellBasell, where he served as a non-executive director before his appointment as Chief Financial Officer, and Svyazinvest, then Russia’s largest telecom company, as well as several others. Mr. Bigman’s executive experience includes fourteen years in positions with Access Industries, a privately-held, U.S.-based industrial group, and in senior positions with its portfolio companies. From June 1996 to March 1998, Mr. Bigman was Senior Vice President of Access Industries, overseeing strategic investments. From March 1998 until September 2003, Mr. Bigman served as Vice President and Director of Corporate Finance of Tyumen Oil Company (TNK), a major Russian oil and gas producer and refiner, where he raised over $5 billion to finance the growth of the company from its privatization in 1997 through a sale of a 50% stake to British Petroleum (BP) in 2003, creating TNK-BP, a $20 billion joint venture. From 2003 to 2004, he served as Vice President and Director of Corporate Finance for SUAL, a large Russian aluminum smelter, where he reorganized the finance function and executed strategic merger transactions. From September 2004 until December 2005, Mr. Bigman rejoined Access Industries as Senior Vice President. In January 2006, Mr. Bigman was appointed Chief Financial Officer of Basell Polyolefins, an international chemicals company based in The Netherlands, where he served through 2007 and co-led the acquisition of Lyondell to create one of the largest global chemical companies. In January 2008 Mr. Bigman was appointed Chief Financial Officer of LyondellBasell Industries, the successor company to Basell Polyolefins and Lyondell. LyondellBasell's US operations filed for bankruptcy in January 2009. Mr. Bigman continued to serve as Chief Financial Officer until August 2009, and worked for the company in a project role through March 2010. From 2011 through 2012, he served on a project basis as Director, Capital Markets and M&A of KCAD Deutag, an oilfield services company based in Aberdeen, UK, where he was responsible for reorganizing and staffing the company’s finance, corporate development and tax functions.

*Kirsten A. Hink* was elected Chief Accounting Officer of our general partner in May 2015. Mrs. Hink has served as Senior Vice President and Chief Accounting Officer of Sanchez Energy since January 2015, and she previously served as Sanchez Energy's Vice President and Principal Accounting Officer from March 2012. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Mrs. Hink has served as Senior Vice President – Chief Accounting Officer of SOG since March 2016. Prior to joining Sanchez Energy, Mrs. Hink served as Controller of Vanguard Natural Resources, LLC from January 2011 to February 2012. From January 2010 to December 2010, she served as Assistant Controller of Mariner Energy, Inc. She served as the Chief Accounting Officer for Edge Petroleum Corporation, or Edge, from July 2008 through December 2009 and the Vice President and Controller for Edge from October 2003 through July 2008. Prior to that time, she served as Controller of Edge from December 31, 2000 to October 2003 and Assistant Controller of Edge from June 2000 to December 2000. Edge filed for bankruptcy in October 2009. Mrs. Hink is a Certified Public Accountant in the State of Texas.

*Jack Howell* was elected as a member of the Board in October 2015. Mr. Howell is a Senior Managing Director at Stonepeak and a member of Stonepeak's Executive Committee. Mr. Howell has been with Stonepeak since 2015. Prior to joining Stonepeak, Mr. Howell covered the oil and gas sector for Davidson Kempner, a hedge fund that focuses on distressed investments, from 2014 to 2015. Prior to Davidson Kempner, Mr. Howell worked for Denham Capital, an energy-focused private equity firm from 2011 to 2014. Mr. Howell started his career as an Analyst in Credit Suisse's oil and gas investment banking group. Mr. Howell holds a Bachelor of Arts degree in Plan II Honors and Business Economics, Phi Beta Kappa, from the University of Texas at Austin.

*Richard S. Langdon* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in December 2006. Mr. Langdon is an independent member of the Audit Committee and the Conflicts Committee. Mr. Langdon is currently the Executive Vice President and Chief Financial Officer of Altamont Energy LLC, a privately held exploration and production company. Mr. Langdon previously served as the President and Chief Executive Officer of Badlands Energy, Inc., a privately held exploration and production company ("Badlands Energy"), and its publicly traded predecessor entity, Gasco Energy, Inc. ("Gasco"), from May 2013 to October 2018. Mr. Langdon also served as a director of Badlands Energy and its predecessor, Gasco since 2003. Badlands Energy filed for bankruptcy in August 2017. In addition to his Badlands Energy titles, Mr. Langdon also served as Debtor-in-Possession for Badlands Energy, Inc from August 2017 to October 2018. Mr. Langdon also currently serves on the board of directors, as chairman of the audit committee and as a member of the compensation committee of Gulfslope Energy, Inc., which capacities he has served in since March 2014. Mr. Langdon was the President and Chief Executive Officer of KMD Operating Company LLC ("KMD Operating"), a privately held production company, from November 2011 until December 2015 and Matris Exploration Company L.P., a privately held production company, from July 2004 until the merger of Matris Exploration into KMD Operating in November 2011, which merger was effective January 2011. Mr. Langdon also served as President and Chief Executive Officer of Sigma Energy Ventures, LLC, a privately held production company, from November 2007 until November 2013. From 1997 until 2002, Mr. Langdon served as Executive Vice President and Chief Financial Officer of EEX Corporation, a publicly traded exploration and production company that merged with Newfield Exploration Company in 2002. Prior to that, he held various positions with the Pennzoil Companies from 1991 to 1996, including Executive Vice President—International Marketing—Pennzoil Products Company; Senior Vice President—Business Development—Pennzoil Company; and Senior Vice President—Commercial & Control—Pennzoil Exploration & Production Company.

*G. M. Byrd Larberg* was elected as a member of the Board in March 2015. He was previously a director of Sanchez Production Partners LLC, having been first elected in July 2014. Mr. Larberg is an independent member of the Audit Committee and is the Chair of the Conflicts Committee. Mr. Larberg served as a member of the board of directors of Horizon Energy, a private Exploration Company with both domestic and international focus, from 2017 to 2019. From 2010 to 2012, Mr. Larberg served as a member of the board of directors of Risco Resources, a small independent exploration company headquartered in Jakarta, Indonesia, which was sold in 2012. Mr. Larberg served as a member of the board of directors of 3GIG, an exploration-focused software firm headquartered in Houston, Texas, from 2008 to 2013 and now serves as an advisor to the board. He is active on the board of directors of the Houston Metropolitan YMCA and was previously chairman of the board. He was a member of the board of directors of Meridian Resources, a Houston-based exploration company, from 2007 until it was acquired by Alta Mesa in 2010. Mr. Larberg began his career at Shell Exploration and Production Company as a geologist in 1976. Over the next 21 years, he held various leadership positions within various Shell entities, and served as Vice President of Exploration and Production, Africa and Latin America for Pecten International, an affiliate of Shell Oil Company, from 1993 to 1996. Mr. Larberg left Shell and joined Burlington

Resources in 1998. From 1998 to 2006, Mr. Larberg held several key positions at Burlington Resources, beginning as Vice President of Exploration for Burlington Resources International. In 2000, Mr. Larberg was elected Executive Vice President and Chief Operating Officer of Burlington Resources International, a position he held until 2003, when he moved to the corporate office as Vice President of Geosciences. In this capacity, he was responsible for technical excellence for the geology and geophysical ("G&G") programs across the company, G&G technology business development, and management of the company-wide exploration portfolio. Mr. Larberg retired from Burlington Resources in April 2006 following the company's purchase by ConocoPhillips. Mr. Larberg was a director of Duma Hydrocarb Energy Corporation, a publicly traded production company, for a brief period in 2014. He occasionally consults in the areas of technical and portfolio management for exploration companies, and has provided such consulting services to a number of companies including Pemex, Maersk, ONGC, Ecopetrol, Repsol, HOCOL and the Kuwait National Petroleum Company.

*Antonio R. Sanchez, III* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in August 2013. Mr. Sanchez, III is Chairman of the Board. He currently serves as the President & Chief Executive Officer of Sanchez Energy and has been a member of Sanchez Energy's board of directors since its formation in August 2011. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. He has been directly involved in the oil and gas industry for over 13 years. Mr. Sanchez, III is also the Co-President of SOG, which he joined in October 2001. He was the President of SEP Management I, LLC and was a Managing Director of Sanchez Energy Partners I, LP until their dissolution in December 2016. In his capacities as a director and officer of these companies, Mr. Sanchez, III has managed all aspects of their daily operations, including exploration, production, finance, capital markets activities, engineering and land management. From 1997 to 1999, Mr. Sanchez, III was an investment banker specializing in mergers and acquisitions with J.P. Morgan Securities Inc. From 1999 to 2001, Mr. Sanchez, III worked in a variety of positions, including sales and marketing, product development and investor relations, at Zix Corporation, a publicly traded encryption technology company (NASDAQ: ZIXI). Mr. Sanchez, III was also a member of the board of directors of Zix Corporation from May 2003 to June 2014.

*Eduardo A. Sanchez* was elected as a member of the Board in June 2015. Mr. Sanchez served as president of Sanchez Energy from October 2015 to November 2017, President and Chief Executive Officer of Sanchez Resources, LLC from February 2010 until November 2017, co-president of SOG from July 2014 to November 2017, and chief executive officer of Sanchez Oil & Gas Mexico Holdings, LLC from August 2015 to December 2017. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Prior to his work at Sanchez Resources, LLC, Mr. Sanchez worked at Commonwealth Associates, Inc. focusing on private equity and debt placements in small and midsize market capitalization businesses including those in the energy sector.

*Patricio D. Sanchez* was elected President & Chief Operating Officer of our general partner in March 2017, Chief Operating Officer of our general partner in May 2015 and as a member of the Board in June 2015. Mr. Sanchez has served as co-president of SOG since June 2014 and prior to that from April 2010 to June 2014 as an Executive Vice President. Mr. Sanchez has served as an Executive Vice President of Sanchez Energy since November 2016. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Mr. Sanchez has also been the managing member of Santerra Holdings, LLC, an oil and gas production company, since February 2012. Mr. Sanchez has managed many aspects of these companies' daily operations, including exploration, production, finance, capital markets activities, engineering and land management.

*Luke R. Taylor* was elected as a member of the Board in October 2015. Mr. Taylor has served as a Senior Managing Director with Stonepeak since August 2011 and serves as a member of Stonepeak's Executive Committee. Mr. Taylor has been investing across the infrastructure space for over 15 years and sits on the boards of Lineage Logistics, Golar Power and Ironclad Energy Partners, and is a former director of Paradigm Energy Partners, Tidewater Holdings, Carlsbad Desalination Project, Casper Crude to Rail and Northstar Renewable Power. Prior to joining Stonepeak, Mr. Taylor was a Senior Vice President with Macquarie Capital based in New York. Mr. Taylor has a Bachelor of Commerce and a Master of Business (Distinction) from the University of Otago (New Zealand).

*Charles C. Ward* was elected Chief Financial Officer & Secretary of our general partner in March 2015. He previously served as Chief Financial Officer and Treasurer of Sanchez Production Partners LLC from March 2008 until its conversion to a limited partnership in March 2015 and Secretary from July 2014 until March 2015. Mr. Ward also served as a Vice President of Constellation Energy Commodities Group, Inc. from November 2005 until December 2008. Prior to that time, he was a Vice President of Enron Creditors Recovery Corp. from March 2002 to November 2005.

*Gerald F. Willinger* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in August 2013. Mr. Willinger was elected Interim Chief Executive Officer of our general partner in April 2015 and Chief Executive Officer in December 2015. Mr. Willinger has served as a Managing Director of Sanchez Capital Advisors, LLC since February 2010 and as Executive Vice President of SOG since 2014. Mr. Willinger was also a co-founder, officer and director of Sanchez Resources from February 2010 to November 2017 when Sanchez Resources was acquired by Sanchez Energy Corporation. From 1998 to 2000, Mr. Willinger was an investment banker with Goldman, Sachs & Co. Mr. Willinger served in various private equity investment management roles at MidOcean Partners, LLC and its predecessor entity, DB Capital Partners, LLC, from 2000 to 2003 and at the Cypress Group, LLC from 2003 to 2006. Prior to joining Sanchez Capital Advisors, LLC, Mr. Willinger was a Senior Analyst for Silver Point Capital, LLC, a credit-opportunity fund, from 2006 to 2009.

Messrs. Howell and Taylor were elected as members of the Board in October 2015 pursuant a Board Representation and Standstill Agreement, by and among us, our general partner and Stonepeak Catarina, which was subsequently amended and restated by that certain Amended and Restated Board Representation and Standstill Agreement, dated as of August 2, 2019, by and among us, our general partner and Stonepeak Catarina (as amended and restated, the "Representation and Standstill Agreement"). Pursuant to the Representation and Standstill Agreement, we and our general partner agreed to permit Stonepeak Catarina to designate two persons to serve on the Board. The right to designate one Board member will immediately terminate on such date as Stonepeak Catarina no longer owns at least 25% of the Partnership's outstanding Class C Preferred Units issued to it; and the right to designate the second Board member will immediately terminate on such date as Stonepeak Catarina does not hold any issued and outstanding Class C Preferred Units. Stonepeak Catarina also has the right to appoint the three independent members to the Board if all of the Class C Preferred Units have not been redeemed by December 31, 2021, with such right continuing until all Class C Preferred Units have been redeemed.

Messrs. Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez are brothers.

**Qualifications of the Board of Directors**

The sole member of our general partner elects all of the members of the Board, except for two members designated by Stonepeak Catarina pursuant to the Representation and Standstill Agreement. The following sets forth the specific experience, qualifications, attributes and skills that led the sole member of our general partner to conclude that the persons appointed by it should serve as directors:

Mr. Bigman brings considerable financial, managerial, transaction and corporate governance experience to the Board. During his career, he has held management positions of increasing responsibility in major energy corporations throughout the world where he has successfully lead financings, financial restructurings, mergers and acquisitions involving companies focused on various aspects of the hydrocarbon value chain. With respect to energy finance, as Vice President and Director of Corporate Finance for TNK, a leading Russian oil and gas producer, he raised capital to finance the growth of the company from its privatization in 1997 through a sale of a 50% stake to British Petroleum (BP) in 2003, creating TNK-BP, a $20 billion joint venture. In the area of corporate governance, Mr. Bigman served on the board of directors of Basell Polyolefins, where he was a member of the audit and compensation committees, which is beneficial for our board operations. He has also served on several international boards, including the board of Svyazinvest, Russia's largest telecommunications holding company, and JKX Oil and Gas, a UK public company focused on international oil and gas assets.

Mr. Langdon brings considerable financial and managerial experience in the energy industry to the Board as well as his entrepreneurial abilities, all of which are valuable to the Board. He has served as the Chief Financial Officer of EEX Corporation, a publicly traded production company that merged with Newfield Exploration. He has also held significant commercial positions with the Pennzoil Companies, including roles in business development and marketing. He was also the founder and owner of two privately held oil and gas companies. Mr. Langdon has extensive experience in finance and accounting that adds significant value to the board's oversight role of our financial reporting. He has prior public company board and audit committee experience, which is beneficial for our board operations, and served as the chairman of the audit committee of Gasco until he was named Gasco's President and Chief Executive Officer.

Mr. Larberg brings significant technical, operational and financial management experience in the oil and natural gas industry to the Board. His background provides a unique perspective on the dynamics of the oil and natural gas

production industry. He has considerable governance experience, having previously served on the boards of several other companies. Taken together, this wealth of experience is invaluable to our board.

Mr. Sanchez, III brings substantial oil and gas/energy industry experience in both public and private entities to the Board. In his current capacity as President & Chief Executive Officer of Sanchez Energy and as a member of the board of directors of Sanchez Energy, he brings the perspective of leading a publicly-traded upstream company. In his current capacity as Co-President of SOG, he brings particular expertise in operating multiple oil and natural gas entities through a shared service model.

Mr. Eduardo Sanchez brings substantial oil and gas/energy industry experience in both public and private entities to the Board. Through his past experience as the President of Sanchez Energy and co-president of SOG, he brings the perspective of leading a publicly-traded upstream company and particular expertise in operating multiple oil and natural gas entities through a shared service model.

Mr. Patricio Sanchez brings substantial oil and gas/energy industry experience in both public and private entities to the Board. As an Executive Vice President at Sanchez Energy, he brings the perspective of leading a publicly-traded upstream company. In his current capacity as Co-President of SOG, he brings particular expertise in operating multiple oil and gas entities through a shared service model.

Mr. Willinger brings substantial experience in risk management, finance and negotiated transactions in the energy industry to the Board. He has a valuable perspective on master limited partnerships, which provides the Board with unique insights into master limited partnership management and growth opportunities. In addition, he brings an expansive network of both private and public capital providers, which is useful for the Board when evaluating possible capital sources.

The following sets forth the specific experience, qualifications, attributes and skills that led the holders of our Class C Preferred Units to conclude that the persons appointed by them should serve as directors:

Mr. Howell brings extensive oil and gas investing experience, along with experience in oil and gas transaction financings and mergers and acquisitions to the Board.

Mr. Taylor brings significant investment experience in energy and infrastructure companies, along with experience in finance and mergers and acquisitions to the Board.

**Committees of the Board of Directors**

The Board has two standing committees: the Audit Committee and the Conflicts Committee. We do not have a compensation committee, but rather the Board approves executive officer salary changes and bonuses and equity grants to directors, executive officers, employees and service providers.

*Audit Committee*

As described in its charter, the Audit Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent public accountants to audit our financial statements, including assessing the independent auditor's qualifications and independence, and establishes the scope of, and oversees, the annual audit. The Audit Committee also approves any other services provided by public accounting firms. The Board has delegated to the Audit Committee the review and approval of our decision to enter into derivative transactions and our exemption from the swap clearing and swap execution requirements of the Dodd-Frank Act. The Audit Committee provides assistance to the Board in fulfilling its oversight responsibility to the unitholders, the investment community and others relating to the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent auditor's qualifications and independence and the performance of our internal audit function. The Audit Committee oversees our system of disclosure controls and procedures and system of internal controls regarding financial, accounting, legal compliance and ethics that management and the Board established. In doing so, it is the responsibility of the Audit Committee to maintain free and open communication between the committee and our independent auditors, the internal accounting function and our management.

Table of Contents

Messrs. Bigman (Chair), Langdon and Larberg are members of the Audit Committee. The Board has determined that Mr. Bigman is an "audit committee financial expert" as that term is defined in the applicable rules of the SEC and that he is "independent" as defined in applicable NYSE American listing standards.

*Conflicts Committee*

The Board has appointed a standing Conflicts Committee composed of the independent directors, Messrs. Larberg, (Chair), Bigman and Langdon, to review specific matters that the Board believes may involve conflicts of interest. The Conflicts Committee will review and evaluate the proposal, negotiate as the Conflicts Committee deems appropriate the terms of the proposal and determine if the resolution of a conflict of interest is fair and reasonable to us. If the Conflicts Committee approves a conflict of interest proposal, the proposal is then recommended to the entire Board. The members of the Conflicts Committee may not be security holders, officers or employees of our general partner, directors, officers, or employees of affiliates of the general partner or holders of any ownership interest in us other than common units or other publicly traded units and must meet the independence standards established by the NYSE American, the Exchange Act and other federal securities laws. If any resolution or course of action by our general partner or its affiliates with respect to a conflict of interest is approved by the Conflicts Committee, then such resolution or course of action shall be permitted and deemed approved by all of our partners, and shall not constitute a breach of our partnership agreement, or of any duty stated or implied by law or equity.

**Other**

We maintain on our website, http://www.sanchezmidstream.com, a copy of the Audit Committee charter as well as copies of the Corporate Governance Guidelines and Code of Business Conduct and Ethics that are applicable to us and our general partner. Copies of these documents are also available in print and may be obtained without charge, upon written request, by emailing our investor relations group at ir@sanchezmidstream.com. Our Code of Business Conduct and Ethics applies to our general partner's principal executive officer, principal financial officer and principal accounting officer, among others. We intend to post any changes to or waivers of our Code of Business Conduct and Ethics for the executive officers of our general partner on our website.

**Certifications**

The NYSE American requires the Chief Executive Officer of each listed company to certify annually that he is not aware of any violation by a listed company of the NYSE American's corporate governance listing standards, qualifying the certification to the extent necessary. In accordance with the rules of the NYSE American, we last provided such a certification on March 18, 2019. The certifications of the Chief Executive Officer and Chief Financial Officer of our general partners required by Sections 302 and 906 of the Sarbanes-Oxley Act have been included as exhibits to this Form 10-K.

**Item 11. Executive Compensation**

Our general partner has the sole responsibility for conducting our business and for managing our operations, and its Board makes decisions on our behalf. The executive officers of our general partner are employed by SOG and manage the day-to-day affairs of our business.

**Summary Compensation Table**

The following table sets forth the compensation of our named executive officers (which are the chief executive officer and the two next most highly compensated officers of our general partner) for 2019 and 2018:

| Name and Principal Position | Year | Salary [a] | Cash Bonus [b] | Unit Awards [c] | All Other Compensation [d] | Total |
|---|---|---|---|---|---|---|
| **Gerald F. Willinger** | 2019 | $ 600,000 | $ 750,000 | $ 1,502,953 | $ 60,229 | $ 2,913,182 |
| Chief Executive Officer [e] | 2018 | $ 600,000 | $ 750,000 | $ 1,799,980 | $ 128,994 | $ 3,278,974 |
| **Patricio D. Sanchez** | 2019 | $ 400,000 | $ — | $ — | $ 19,273 | $ 419,273 |
| President & Chief Operating Officer [e] | 2018 | $ 400,000 | $ — | $ 1,299,989 | $ 52,043 | $ 1,752,032 |
| **Charles C. Ward** | 2019 | $ 375,000 | $ 350,000 | $ 635,864 | $ 45,367 | $ 1,406,231 |
| Chief Financial Officer and Secretary [e] | 2018 | $ 275,000 | $ 350,000 | $ 849,995 | $ 40,476 | $ 1,515,471 |

(a) On January 30, 2019, the Board increased Mr. Ward's base salary from $275,000 to $375,000 effective as of January 1, 2019.
(b) On August 2, 2019, the Board approved the Partnership's entry into Executive Agreements (defined below) with each of Messrs. Willing and Ward. The Executive Agreements contain annual cash bonuses ranges for each of Messrs. Willinger and Ward and also stipulate that, for the 2019 annual cash bonus, 50% of such bonuses were required to be paid no later than September 30, 2019 with the remainder to be paid no later than March 31, 2020. Pursuant to this requirement in the Executive Agreements, Messrs. Willinger and Ward were paid cash bonuses of $375,000 and $175,000 respectively, on September 30, 2019, as part of their 2019 annual cash bonus. Pursuant to the Executive Agreements (as defined below), we will pay Messrs. Ward and Willinger the remaining 50% of their 2019 annual cash bonuses on or before March 31, 2020.
(c) The amounts reported in this column reflect the aggregate grant date fair value of awards granted, if any, under our Plan for fiscal years 2019 and 2018, computed in accordance with FASB ASC Topic 718, excluding estimated forfeitures. See Note 15 "Unit-Based Compensation," to the Consolidated Financial Statements included under "Part II, Item 8. Financial Statements and Supplementary Data" for additional detail regarding these figures. On March 4, 2019, the Board awarded Messrs. Willinger and Ward long-term incentive awards, which were paid in the form of restricted units under the Plan that vest in equal installments over three years.
(d) The amount in this column reflects the amount of matching contributions made under our 401k plan; parking cost paid for our executive officers; the cost of life insurance, accidental death and dismemberment insurance, and health insurance for our executive officers; and for those executive officers who also serve as directors, this column includes cash fees they received for service as a director.
(e) Our named executive officers are eligible to participate in benefit plans such as medical, dental, vision, life and disability insurance, 401k and flexible spending accounts on the same terms as all employees or service providers.

**Executive Agreements**

On August 2, 2019, our general partner entered into Executive Services Agreements with each of Messrs. Willinger and Ward (each, an "Executive Agreement" and, collectively, the "Executive Agreements"). The Executive Agreements were approved by the Board on August 2, 2019. Each respective Executive Agreement provides (i) that the applicable executive will continue to serve in his current executive officer position with our general partner and provide services to us and our general partner during the applicable term, (ii) for an annual base salary (Mr. Willinger: $600,000 and Mr. Ward: $375,000), (iii) for an annual cash bonus equal to a percentage of the annual base salary (Mr. Willinger: 100%-150% and Mr. Ward: 75%-125%) based on a qualitative assessment of financial and individual performance achievements, and (iv) for eligibility to receive awards under our Plan or any successor thereto and to participate in any long-term incentive programs available generally to the executive officers of our general partner, as determined in the sole discretion of the Board. Under each Executive Agreement, in the event of the applicable executive's termination as an officer of the general partner due to (a) such executive's death or "disability," (b) the general partner terminating such executive without "cause," or (c) such executive terminating for "good reason" (as such terms are defined in the Executive Agreements), such executive (or such executive's designated beneficiaries, as applicable) will be entitled to receive payment of: (i) any accrued but unpaid then-current annual base salary through the date of termination, (ii) any unpaid annual bonus for the year prior to the year of termination and (iii) a pro-rated annual bonus for the year of termination. In addition, such executive will also be entitled to receive the following severance payments or benefits in the event of: (1) the general partner terminating such executive without "cause" (2) such executive terminating for "good reason" or (3)(A) the general partner terminating such executive without "cause," (B) such executive's death or "disability," or (C) such executive terminating for any reason, in the case of (A)-(C), during a period beginning 60 days prior to and ending two years following a Change in Control (as defined in the Executive Agreements) such executive will be entitled to receive (w) a lump-sum cash payment equal to two times such executive's then-current annual base salary plus two times the largest annual bonus paid (or due to be paid) to such executive for the year in which the termination occurs or any year in the three calendar year period immediately preceding the date of termination, (x) payment of the COBRA premiums for such

Table of Contents

executive and such executive's eligible dependents during the COBRA continuation period, (y) to the extent not yet paid to such executive, a lump-sum cash payment equal to all outstanding amounts owed to such executive for services performed for or on behalf of us and our general partner, the amount of such executive's annual bonus for the last full year during which such executive performed services for us and our general partner, and the amount of such executive's annual bonus for the current year, based on such executive's annual bonus for such last full year (pro-rated to the date of termination), and (z) immediate vesting in full, as of the date of such Change in Control, of any units awarded to such executive under our Plan.

**Outstanding Equity Awards at Fiscal Year-End 2019**

The following table sets forth the outstanding equity awards and their market value using the closing price of our common units on NYSE American at December 31, 2019 for the named executive officers:

| Name | Number of Units Not Vested | Fair Market Value of Units Not Vested(a) |
|---|---|---|
| Gerald F. Willinger | 576,185 (b) | $ 172,856 |
| Patricio D. Sanchez | — | $ — |
| Charles C. Ward | 248,665 (b) | $ 74,600 |

(a) Amounts are based on the closing price of our common units of $0.30 as reported on the NYSE American on December 31, 2019.
(b) Reflects restricted units granted under the Plan on April 6, 2018, which units either vest on the first anniversary of the grant date or vest pro-rata over a three-year period and on their first anniversary, respectively, as well as units granted under the Plan on March 4, 2019, which units vest pro-rata over a three year period. See footnote (c) to the Summary Compensation Table for additional information on the vesting schedule for these units. Except in connection with a change in control (as defined in the Plan) or in the discretion of the board of directors of our general partner, any unvested restricted units will be forfeited upon such time as the holder is no longer an officer, employee, consultant or director of us, our general partner, any of their affiliates or any other person performing bona fide services for us.

**Compensation of Directors**

For the year ended December 31, 2019, compensation for the independent directors of the Board consisted of:

- a cash retainer of $10,000, payable quarterly on the last day of each fiscal quarter;
- an equity grant of $100,000 of fully vested common units on March 31 of each year;
- a $1,500 fee for each meeting of the Board and $1,000 for each substantive meeting of the Audit Committee and $3,500 for each substantive meeting of the Conflicts Committee attended by a member thereof;
- a cash retainer of $3,500 for the Chair of the Audit Committee and $2,500 for the Chair of the Conflicts Committee, each payable quarterly on the last day of each fiscal quarter; and
- eligibility for independent directors to participate in health benefits generally available to all employees and reimbursement for up to $500,000 of life and accidental death and dismemberment insurance.

Directors designated by Stonepeak, officers of our general partner and any director with ownership interests in SP Holdings, LLC, were not eligible for the 2019 director compensation program outlined above. However, on January 30, 2019, the Board approved a long-term incentive award for Mr. A. Sanchez, which was paid in the form of 210,970 restricted units under the Plan that vest in equal installments over three years.

The following table sets forth a summary of the 2019 compensation for the directors except for Messrs. Willinger and P. Sanchez whose director compensation is included above under "—Summary Compensation Table":

| | Director Compensation | | | |
|---|---|---|---|---|
| Name | Fees Earned or Paid in Cash | Unit Awards (a) | All Other Compensation (b) | Total |
| Alan S. Bigman | $ 69,500 | $ 99,990 | $ 21,155 | $ 190,645 |
| Jack Howell (c) | $ — | $ — | $ — | $ — |
| Richard S. Langdon | $ 55,500 | $ 99,990 | $ 1,020 | $ 156,510 |
| G. M. Byrd Larberg | $ 62,000 | $ 99,990 | $ 15,681 | $ 177,671 |
| Antonio R. Sanchez, III (d) | $ — | $ 578,058 | $ — | $ 578,058 |
| Eduardo A. Sanchez (d) | $ — | $ — | $ — | $ — |
| Luke R. Taylor (c) | $ — | $ — | $ — | $ — |

(a) The amounts shown in this column for Messrs. Bigman, Langdon and Larberg represent the aggregate grant date fair value of the units granted under the Plan to Messrs. Bigman, Langdon and Larberg, computed in accordance with FASB ASC Topic 718, based on the $2.18 closing price per common unit on April 1, 2019. The amount shown in this column for Mr. A. Sanchez represents the aggregate grant date fair value of the units granted under the Plan to Mr. A. Sanchez, computed in accordance with FASB ASC Topic 718, based on the $2.74 closing price per common unit on March 4, 2019.
(b) All other compensation includes amounts for health, vision, dental, basic life and/or accidental death and dismemberment insurance premium fees paid by us for the director.
(c) As appointees of the holders of the Class C Preferred Units, Messrs. Howell and Taylor were not entitled to any compensation under our 2019 Board compensation program.
(d) As individuals with ownership interests in SP Holdings, Mr. A. Sanchez and Mr. E. Sanchez and Mr. P. Sanchez where not entitled to any compensation under our 2019 board compensation program, however, as noted above, Mr. A. Sanchez was awarded restricted units by the Board outside of the 2019 Board compensation program.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Unitholder Matters**

The following table sets forth the beneficial ownership of our units, as of March 13, 2020, held by:

- each unitholder known by us to beneficially own more than 5% of our outstanding units;
- each of the directors of the Board;
- each of our general partner's named executive officers (as such term is defined by the SEC); and
- the directors and executive officers of our general partner as a group.

The list of persons named in the table below is derived from our review of Form 3, Form 4, Form 5, Schedule 13D and Schedule 13G filings made with the SEC as of March 13, 2020. The amounts and percentage of common units and Class C Preferred Units beneficially owned are reported on the basis of the SEC rules governing the determination of beneficial ownership of securities. Under the SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares "voting power," which includes the power to vote or to direct the voting of such security, and/or "investment power," which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Under these rules, more than one person may be deemed a beneficial owner of the same securities, and a person may be deemed a beneficial owner of securities as to which he has no economic interest.

Percentage of total units beneficially owned is based on 19,975,193 common units and 34,297,357 Class C Preferred Units outstanding as of March 13, 2020, the number of common units beneficially owned and the number of Class C Preferred Units beneficially owned is based upon ownership as of March 13, 2020, unless otherwise specified. Except as indicated by footnote, to our knowledge the persons named in the table below have sole voting and investment power with respect to all units shown as beneficially owned by them, subject to community property laws where applicable.

| | Common Units Beneficially Owned | | Class C Preferred Units Beneficially Owned | | Percentage of Total Units Beneficially |
|---|---|---|---|---|---|
| **Name and address of Beneficial Owner**[(1)] | **Number** | **Percentage** | **Number** | **Percentage** | **Owned** |
| Stonepeak Catarina Holdings, LLC[(2)] | 2,312,100 | 10.6 % | 34,297,357 | 100 % | 65.2 % |
| SN UR Holdings, LLC[(3)] | 2,272,727 | 11.4 % | — | — | 4.2 % |
| Invesco. Ltd[(4)] | 1,758,705 | 8.8 % | — | — | 3.2 % |
| Alan S. Bigman[(5)] | 77,254 | * | — | — | * |
| Kirsten A. Hink | 23,933 | * | — | — | * |
| Jack Howell | — | — | — | — | — |
| Richard S. Langdon | 81,827 | * | — | — | * |
| G. M. Byrd Larberg | 76,096 | * | — | — | * |
| Antonio R. Sanchez, III[(6)] | 1,337,508 | 6.7 % | — | — | 2.5 % |
| Eduardo A. Sanchez | 1,141,846 | 5.7 % | — | — | 2.1 % |
| Patricio D. Sanchez | 1,291,574 | 6.4 % | — | — | 2.4 % |
| Luke R. Taylor | — | — | — | — | — |
| Charles C. Ward | 381,048 | 1.9 % | — | — | * |
| Gerald F. Willinger | 1,104,614 | 5.5 % | — | — | 2.0 % |
| All directors and executive officers as a group (11 persons) | 5,515,700 | 27.6 % | — | — | 10.2 % |

* Less than 1%

(1) Unless otherwise set forth below, the address of all beneficial owners is c/o Sanchez Midstream Partners LP, 1000 Main Street, Suite 3000, Houston, Texas 77002.

(2) Ownership data as reported (i) on Schedule 13D/A filed on August 6, 2019 by Stonepeak Catarina Holdings LLC, Stonepeak Catarina Upper Holdings LLC, Stonepeak Infrastructure Fund (Orion AIV) LP, Stonepeak Associates LLC, Stonepeak GP Holdings LP, Stonepeak GP Investors LLC, Stonepeak GP Investors Manager LLC, Michael Dorrell and Trent Vichie (the "Stonepeak Beneficial Owners"), and (ii) publicly disclosed information regarding distributions of Class C Preferred PIK Units issued to Stonepeak Catarina Holdings LLC following the effective date of the Exchange, consisting of 939,327 Class C Preferred PIK Units issued on August 30, 2019, 1,007,820 Class C Preferred PIK Units issued on November 29, 2019 and 1,039,314 Class C Preferred PIK Units issued on February 28, 2020. The number of common units disclosed in the Schedule 13D/A includes 1,918,809 common units that the Stonepeak Beneficial Owners currently have the right to acquire within the next 60 days upon exercise of a Warrant held by Stonepeak Catarina Holdings LLC, such common units are not included for any other person on this table in accordance with Rule 13d-3(d)(1)(i) under the Exchange Act. The principal business address of each reporting person in the Schedule 13D/A is 55 Hudson Yards, 550 W. 34th St., 48th Floor, New York, NY 10001. The Schedule 13D/A filing lists each filing person as having shared voting and dispositive power over the common units and the Class C Preferred Units.

(3) Ownership data as reported on Schedule 13D filed on November 28, 2016 by SN UR Holdings, LLC and Sanchez Energy Corporation. The principal business address of each filing reporting person is 1000 Main Street, Suite 3000, Houston, Texas 77002. The filing lists each filing person as having shared voting and dispositive power over the common units.

(4) Ownership data as reported on a Schedule 13G filing dated February 13, 2020 by Invesco Ltd. The principle business address of the reporting person is 1555 Peachtree Street NE, Suite 1800, Atlanta, GA 30309. The filing lists the reporting person as having sole voting and dispositive power over the common units.

(5) Of these common units, 1,000 are held by Mr. Bigman's minor children.

(6) Of these common units, 35,320 are owned directly by SOG. SOG is managed by Mr. Sanchez and other members of the Sanchez family. Mr. Sanchez shares voting and dispositive power over the securities controlled by SOG. Mr. Sanchez disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein.

**Equity Compensation Plan Information**

The following table reflects our equity compensation plan information for our only equity compensation plan, the Sanchez Midstream Partners LP Long-Term Inventive Plan (the "Plan"), as of December 31, 2019:

| Plan Category | Number of Securities to be issued upon exercise of outstanding options, warrants, and rights | Weighted-average exercise price of outstanding options, warrants, and rights | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $ — | 840,811 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | $ — | 840,811 |

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

**Manager**

We are controlled by our general partner, Sanchez Midstream Partners GP LLC. The sole member of our general partner is Manager, which has no officers. The sole manager and member of Manager is SP Capital Holdings, LLC, which has no officers. The co-managers of SP Capital Holdings, LLC are Antonio R. Sanchez, III, a member of the Board and the Chairman of the Board; Eduardo A. Sanchez, a member of the Board; Patricio D. Sanchez, a member of the Board and the President and Chief Operation Officer of our general partner; and their father, Antonio R. Sanchez, Jr. SP Capital Holdings, LLC is owned by Antonio R. Sanchez, III (26%), Eduardo A. Sanchez (26%), and Patricio D. Sanchez (26%), along with their sister, Ana Lee Sanchez Jacobs (18%), and their father, Antonio R. Sanchez, Jr (4%).

In connection with providing the services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties other than our assets located in the Mid-Continent region, (ii) reimbursement for all allocated overhead costs as well as any direct third-party costs incurred and (iii) for each asset acquisition, asset disposition and financing, a fee not to exceed 2% of the value of such transaction. Prior to August 2, 2019 each of these fees, not including the reimbursement of costs, was paid in cash unless Manager elected for such fee to be paid in our equity. However, on August 2, 2019, we and Manager entered into a letter agreement providing that until such time as we redeem all of our issued and outstanding Class C Preferred Units, Manager will elect to receive its fees, not including reimbursement of costs, in common units rather than cash. In addition, on November 8, 2019, we and Manager entered into an additional letter agreement providing that during the period beginning with the fiscal quarter ended September 30, 2019 and continuing until the end of the fiscal quarter after the fiscal quarter in which we redeem all of our issued and outstanding Class C Preferred Units (the "Tolling Period"), Manager agrees to delay receipt of its fees, not including reimbursement of costs. During the Tolling Period, we are required to keep an accurate ledger of the dollar amount of the fee applicable to each quarter within the Tolling Period and the daily closing price of our common units on the NYSE. Following the end of the Tolling Period we will provide a notice to Manager including such ledgers and pay the accrued fees within thirty days of delivery of such notice. The Services Agreement has a ten-year term and will be automatically renewed for an additional ten years unless we or Manager provide notice of termination to the other with at least 180 days' notice. For the fees earned during the three months ended March 31, 2019 and June 30, 2019, Manager elected to receive 1,789,010 common units equal to approximately $3.9 million, in lieu of cash. For the fees earned during the three months ended September 30, 2019 and December 31, 2019, pursuant to the November 8, 2019 letter agreement, Manager did not receive any fees, other than reimbursement of its costs. However, pursuant to the requirements under the November 8, 2019 letter agreement, we have determined that the fees earned during the three months ended September 30, 2019 and December 31, 2019, are approximately $1.9, and $1.5 million, respectively. During the years ended December 31, 2019 and 2018, we incurred costs of approximately $7.3 million and $8.6 million, respectively, to Manager under the Services Agreement.

**SOG**

SOG provides services to us through a contractual relationship with SP Holdings. Antonio R. Sanchez, III and Patricio D. Sanchez are Co-Presidents of SOG; Antonio R. Sanchez, Jr. is the Chief Executive Officer and sole director of SOG; Ana Lee Sanchez Jacobs is an Executive Vice President of SOG; and Gerald F. Willinger is an Executive Vice President of SOG. The controlling owners of SOG are Antonio R. Sanchez, Jr. and Santig, Ltd. The general partner of Santig, Ltd. is Sanchez Management Corporation, which is owned 100% by Antonio R. Sanchez, Jr. Antonio R. Sanchez, Jr. is Chairman and President of Sanchez Management Corporation and Antonio R. Sanchez, III is Executive Vice President of Sanchez Management Corporation. For the years ended December 31, 2019 and 2018, SOG received $0.2 million and $0.3 million, respectively, as a result of its Services Agreement with SP Holdings.

**Sanchez Energy**

Since January 1, 2015, we have completed three midstream acquisitions and two working interest acquisitions from Sanchez Energy. Antonio R. Sanchez, Jr., the father of Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez, is a director and Executive Chairman of the board of directors of Sanchez Energy, Antonio R. Sanchez, III, is a director and President and Chief Executive Officer of Sanchez Energy, Eduardo A. Sanchez is the former President of Sanchez Energy and Patricio D. Sanchez is an Executive Vice President of Sanchez Energy. The employees of SOG, including Kirsten A. Hink, our Chief Accounting Officer, provide common services to both us and Sanchez Energy. The beneficial ownership of Sanchez Energy's common stock as of March 13, 2020 by Antonio R. Sanchez, Jr., Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez was 6.1%, 3.0%, 1.1% and 1.2%, respectively. As of March 13, 2020, Sanchez Energy indirectly, through one of its wholly owned subsidiaries, beneficially owned approximately 11.4% of the outstanding common units of SNMP.

We entered into the Gathering Agreement with Sanchez Energy in October 2015. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $59.4 million and $57.9 million, respectively, pursuant to the terms of the Gathering Agreement. On June 30, 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that is delivered through the gathering system through March 31, 2018. Subsequent to the conclusion of the incremental infrastructure fee amendment, the parties have agreed to continue the incremental infrastructure fee on a month-to-month basis. On January 1, 2019 and April 1, 2019, the Partnership increased the Western Catarina Midstream tariff rate for throughput volumes that are outside of the dedicated acreage under the Gathering Agreement.

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering's delivery points from Sanchez Energy and other producers. For the years ended December 31, 2019 and 2018, we made earnout payments to Sanchez Energy of $32.0 thousand and $64.0 thousand, respectively.

In September 2017, we entered into the Seco Pipeline Transportation Agreement. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $6.8 million and $7.2 million, respectively, pursuant to the terms of such agreement. On January 13, 2020, we received written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

In May 2018, the Carnero JV, which is operated by Targa, received a dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the Raptor Gas Processing Facility.

**Stonepeak**

*Class B Preferred Unit Issuance*

In accordance with our partnership agreement, in December 2016, we issued an additional 9,851,996 Class B Preferred Units to Stonepeak. Stonepeak disagreed with our calculation of the additional Class B Preferred Units due under our partnership agreement and in January 2017, we and Stonepeak entered into a settlement agreement to settle the disputed calculation. Pursuant to the settlement agreement, and in accordance with Section 5.4 of our partnership agreement then in effect, we issued 1,704,446 Class B Preferred Units to Stonepeak in a privately negotiated transaction as consideration for the Settlement Agreement, with the “Class B Preferred Unit Price” under our partnership agreement being established at $11.29 per Class B Preferred Unit.

In July 2018, the Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part in Class B Preferred PIK Units. Accordingly, the Partnership declared a cash distribution of $0.2258 per Class B Preferred Unit and an aggregate distribution of 310,009 Class B Preferred PIK Units, which was paid on August 31, 2018 to Stonepeak.

*Class C Preferred Unit Issuance*

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and a warrant exercisable for junior securities (the “Warrant”) in a privately negotiated transaction (the “Exchange”). In connection with the Exchange, the Partnership entered into (i) the Third Amended and Restated Agreement of Limited Partnership of the Partnership (the “Amended Partnership Agreement) to set forth the terms of the Class C Preferred Units, (ii) the Amended and Restated Registration Rights Agreement with Stonepeak relating to the registered resale of common units issuable upon the exercise of the Warrant, and (iii) the Amended and Restated Board Representation and Standstill Agreement with Stonepeak. In addition, on August 2, 2019, the Partnership’s general partner entered into Amendment No. 3 to its Limited Liability Company Agreement to provide certain changes necessary in connection with the Exchange.

On August 8, 2019, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership’s common units. As required by the Amended Partnership Agreement, the Board declared a second quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 939,327 Class C Preferred PIK Units, paid on August 30, 2019 to holders of record on August 20, 2019.

On October 30, 2019, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership’s common units. As required by the Amended Partnership Agreement, the Board declared a third quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 1,007,820 Class C Preferred PIK Units, paid on November 29, 2019 to holders of record on November 20, 2019.

*Warrant*

On August 2, 2019, in connection with the Exchange, Stonepeak Catarina received the Warrant. The Warrant may be exercised at any time and from time to time during the period beginning on August 2, 2019 and ending on the later of the seventh anniversary of such date and the date thirty days after the date on which all of the Class C Preferred Units have been redeemed for a number of Junior Securities (as such term is defined in the Warrant) equal to 10% of each applicable class of Junior Securities then outstanding as of the exercise date. No exercise price will be payable in connection with the exercise of the Warrant.

**Item 14. Principal Accounting Fees and Services**

We engaged our principal accountant, KPMG LLP ("KPMG"), to audit our financial statements and perform other professional services for the fiscal years ended December 31, 2019 and 2018.

*Audit Fees*. The aggregate fees billed for the financial statement audit or services provided in connection with statutory or regulatory filings for the years ended December 31, 2019 and 2018 were $978,885 and $1,192,912, respectively.

*Audit-Related Fees*. There were no audit-related fees billed by KPMG for the years ended December 31, 2019 and 2018.

*Tax Fees*. There were no tax fees billed by KPMG for the years ended December 31, 2019 and 2018.

*All Other Fees*. There were no other fees billed by KPMG for the years ended December 31, 2019 and 2018.

**Audit Committee Pre-Approval Policies and Practices**

The Audit Committee must pre-approve any audit and permissible non-audit services performed by our independent registered public accounting firm. In addition, the Audit Committee has oversight responsibility to ensure that the independent registered public accounting firm is not engaged to perform certain enumerated non-audit services, including, but not limited to, bookkeeping, financial information system design and implementation, appraisal or valuation services, internal audit outsourcing services and legal services. The Audit Committee has adopted an audit and non-audit services pre-approval policy, which sets forth the procedures and the conditions pursuant to which services proposed to be performed by the independent registered public accounting firm must be approved. Pursuant to the policy, all services must be reviewed and approved and the chairman of the Audit Committee has been delegated the authority to specifically pre-approve services, which pre-approval is subsequently reviewed with the committee. All of the services described as Audit Fees, Audit-Related Fees, Tax Fees and All Other Fees were approved by the Audit Committee.

## PART IV

### Item 15. Exhibits and Financial Statement Schedules

(a) The following documents are filed as a part of this Form 10-K:

1. Financial Statements:

See Item 8. Financial Statements and Supplementary Data.

2. Financial Statement Schedules:

None.

3. Exhibits Required by Item 601 of Regulation S-K.

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

(b) The following exhibits are filed or furnished with this Form 10-K or incorporated by reference:

On June 2, 2017 we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP.

| Exhibit Number | Description |
|---|---|
| 2.1 | Contribution Agreement, dated as of August 9, 2013, by and between Constellation Energy Partners LLC and Sanchez Energy Partners I, LP (incorporated herein by reference to Exhibit 2.1 to the Current Report on Form 8-K field by Constellation Energy Partners LLC on August 9, 2013, File No. 001-33147). |
| 2.2 | Purchase and Sale Agreement, dated as of March 31, 2015, between SEP Holdings III, LLC, Sanchez Production Partners LP and SEP Holdings IV, LLC (incorporated herein by reference to Exhibit 2.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on April 1, 2015, File No. 001-33147). |
| 2.3 | Purchase and Sale Agreement, dated as of September 25, 2015, by and among Sanchez Energy Corporation, SN Catarina, LLC and Sanchez Production Partners LP (incorporated herein by reference to Exhibit 2.1 the Current Report on Form 8-K filed by Sanchez Production Partners LP on September 29, 2015, File No. 001-33147). |
| 2.4 | Purchase and Sale Agreement by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP, dated July 5, 2016 (incorporated by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 12, 2016, File No. 001-33147). |
| 2.5 | Purchase and Sale Agreement, dated October 6, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |

| | |
|---|---|
| 2.6 | Purchase and Sale Agreement, dated October 6, 2016, by and among SN Cotulla Assets, LLC, SN Palmetto, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |
| 2.7 | Purchase and Sale Agreement, dated October 6, 2016, by and among Sanchez Energy Corporation, SN Terminal, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.3 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |
| 2.8 | Membership Interest Purchase and Sale Agreement, dated May 10, 2017, between Sanchez Midstream Partners LP (f/k/a Sanchez Production Partners LP) and Exponent Energy, LLC (incorporated by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.9 | Purchase and Sale Agreement, dated June 30, 2017, between SEP Holdings IV, LLC and Sendero Petroleum, LLC (incorporated by reference to Exhibit 2.2 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.10 | Amendment No. 1 to Purchase and Sale Agreement, dated July 31, 2017, between SEP Holdings IV, LLC and Sendero Petroleum, LLC (incorporated by reference to Exhibit 2.3 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.11 | Purchase and Sale Agreement between Sanchez Midstream Partners LP and Dallas Petroleum Group, LLC dated October 12, 2017 (incorporated by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on November 14, 2017, File No. 001-33147). |
| 2.12 | Agreement to Purchase Oil and Gas Interests between SEP Holdings IV, LLC and EP Energy E&P Company, L.P., dated April 30, 2018 (incorporated herein by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on May 10, 2018, File No. 001-33147). |
| 3.1 | Certificate of Conversion of Sanchez Production Partners LLC (incorporated herein by reference to Exhibit 4.1 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.2 | Certificate of Limited Partnership of Sanchez Production Partners LP (incorporated herein by reference to Exhibit 4.2 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.3 | Certificate of Amendment to Certificate of Limited Partnership (incorporated herein by reference to Exhibit 3.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on June 2, 2017, File No. 001-33147). |
| 3.4 | Third Amended and Restated Agreement of Limited Partnership of Sanchez Production Partners LP (incorporated herein by reference to Exhibit 3.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 3.5 | Certificate of Formation of Sanchez Production Partners GP LLC (incorporated by reference to Exhibit 4.4 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.6 | Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 4.5 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |

| | |
|---|---|
| 3.7 | Amendment No. 1 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 3.1 to the Quarterly Report on Form 10-Q/A filed by Sanchez Production Partners LP on September 3, 2015, File No. 001-33147). |
| 3.8 | Amendment No. 2 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 3.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 3.9 | Amendment No. 3 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC, dated August 2, 2019 (incorporated herein by reference to Exhibit 3.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on August 5, 2019, File No. 001-33147). |
| 4.1 | Registration Rights Agreement, dated November 22, 2016, between Sanchez Production Partners LP and SN UR Holdings, LLC (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 22, 2016, File No. 001-33147). |
| 4.2 | Amended and Restated Registration Rights Agreement, dated August 2, 2019, by and among Sanchez Midstream Partners LP and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 4.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 4.3* | Description of Registrant Securities. |
| 10.1 | Purchase Agreement, dated November 16, 2016, between Sanchez Production Partners LP and SN UR Holdings, LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 22, 2016, File No. 001-33147). |
| 10.2 | Third Amended and Restated Credit Agreement, dated as of March 31, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on April 1, 2015, File No. 001-33147). |
| 10.3 | Amendment and Waiver of Third Amended and Restated Credit Agreement, dated as of August 12, 2015, between Sanchez Production Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 14, 2015, File No. 001-33147). |
| 10.4 | Joinder, Assignment and Second Amendment to Third Amended and Restated Credit Agreement, dated as of October 14, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.3 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 10.5 | Third Amendment to Third Amended and Restated Credit Agreement, dated as of November 12, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 13, 2015, File No. 001-33147). |

| | |
|---|---|
| 10.6 | Fourth Amendment to Third Amended and Restated Credit Agreement among Sanchez Production Partners LP, the guarantors party thereto, each of the lenders party thereto, and Royal Bank of Canada, as administrative agent and collateral agent, dated July 5, 2016 (incorporated by reference to Exhibit 10.3 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 12, 2016, File No. 001-33147). |
| 10.7 | Fifth Amendment to the Third Amended and Restated Credit Agreement dated as of April 17, 2017, between Sanchez Production Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2017, File No. 001-33147). |
| 10.8 | Sixth Amendment to the Third Amended and Restated Credit Agreement dated as of November 7, 2017, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on November 14, 2017, File No. 001-33147). |
| 10.9 | Seventh Amendment to the Third Amended and Restated Credit Agreement dated as of February 5, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.11 to the Annual Report on Form 10-K filed by Sanchez Midstream Partners LP on March 12, 2018, File No. 001-33147). |
| 10.10 | Eighth Amendment to the Third Amended and Restated Credit Agreement dated as of May 7, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on May 10, 2018, File No. 001-33147). |
| 10.11 | Ninth Amendment to the Third Amended and Restated Credit Agreement dated as of May 7, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on November 25, 2019, File No. 001-33147). |
| 10.12* | Summary Compensation of Executive Officers of Sanchez Midstream Partners GP LLC. |
| 10.13* | Summary Compensation of Directors of Sanchez Midstream Partners GP LLC. |
| 10.14 | Amended and Restated Shared Services Agreement, dated as of March 6, 2015, between SP Holdings, LLC and Sanchez Production Partners LP (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2015, File No. 001-33147). |
| 10.15 | Contract Operating Agreement, dated May 8, 2014, between Constellation Energy Partners LLC and Sanchez Oil & Gas Corporation (incorporated herein by reference to Exhibit 10.2 to the Current Report on Form 8-K filed by Constellation Energy Partners LLC on May 8, 2014, File No. 001-33147). |
| 10.16 | Geophysical Seismic Data Use License Agreement, dated May 8, 2014, between Constellation Energy Partners, LLC, certain subsidiaries thereof, and Sanchez Oil & Gas Corporation (incorporated herein by reference to Exhibit 10.4 to the Current Report on Form 8-K filed by Constellation Energy Partners LLC on May 8, 2014, File No. 001-33147). |

| | |
|---|---|
| 10.17 | Amendment One to License Agreement, dated as of March 6, 2015, by and among Sanchez Oil and Gas Corporation, Sanchez Production Partners LP and SEP Holdings IV, LLC (incorporated herein by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2015, File No. 001-33147). |
| 10.18 | Firm Gathering and Processing Agreement, dated as of October 14, 2015, by and between Catarina Midstream, LLC and SN Catarina, LLC (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 10.19 | Amendment No. 1 to Firm Gathering and Processing Agreement by and between SN Catarina, LLC and Catarina Midstream, LLC, dated June 30, 2017 (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 10.20+ | Sanchez Production Partners LP Long-Term Incentive Plan (incorporated herein by reference to Exhibit 4.6 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 10.21+ | Form of Award Agreement Relating to Restricted Units (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on December 3, 2015, File No. 001-33147). |
| 10.22+ | Form of Award Agreement Relating to Restricted Units (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on March 28, 2017, File No. 001-33147). |
| 10.23 | Settlement Agreement and Release, effective January 25, 2017, by and between Stonepeak Catarina Holdings LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on January 27, 2017, File No. 001-33147). |
| 10.24+ | Form of Award Agreement Relating to Restricted Units incorporated by reference to Exhibit 10.24 to the Annual Report on Form 10-K filed by Sanchez Midstream Partners LP on March 7, 2019, File No. 001-33147. |
| 10.25 | Amended and Restated Board Representation and Standstill Agreement, dated August 2, 2019, by and among Sanchez Midstream Partners LP, Sanchez Midstream Partners GP LLC and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 10.26+ | Form of Executive Services Agreement (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners on August 8, 2019, File No. 001-33147). |
| 10.27 | Warrant Exercisable for Junior Securities, dated August 2, 2019, by and between Sanchez Midstream Partners LP and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 10.2 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 21.1* | List of subsidiaries of Sanchez Midstream Partners LP. |

| | |
|---|---|
| 23.1* | Consent of KPMG LLP. |
| 23.2* | Consent of Ryder Scott Co. LP. |
| 31.1* | Certification of Chief Executive Officer of Sanchez Midstream Partners GP LLC pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Chief Financial Officer and Secretary of Sanchez Midstream Partners GP LLC pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer of Sanchez Midstream Partners GP LLC pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Chief Financial Officer and Secretary of Sanchez Midstream Partners GP LLC pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1* | Report of Ryder Scott Co. LP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Schema Document |
| 101.CAL* | XBRL Calculation Linkbase Document |
| 101.LAB* | XBRL Label Linkbase Document |
| 101.PRE* | XBRL Presentation Linkbase Document |
| 101.DEF* | XBRL Definition Linkbase Document |

* Filed herewith
\+ Management contract or compensatory plan or arrangement.

**Item 16. Form 10-K Summary**

None.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant, has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

| | | |
|---|---|---|
| | | Sanchez Midstream Partners LP |
| | By: | Sanchez Midstream Partners GP LLC, its general partner |
| Date: March 13, 2020 | By | /s/ Gerald F. Willinger |
| | Name | **Gerald F. Willinger** |
| | Title | **Chief Executive Officer** |

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below, constitutes and appoints Gerald F. Willinger and Charles C. Ward, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

This report has been signed below by the following persons on behalf of the general partner of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Antonio R. Sanchez, III<br>**Antonio R. Sanchez, III** | Director; Chairman of the Board | March 13, 2020 |
| /s/ Gerald F. Willinger<br>**Gerald F. Willinger** | Director; Chief Executive Officer<br>(Principal Executive Officer) | March 13, 2020 |
| /s/ Charles C. Ward<br>**Charles C. Ward** | Chief Financial Officer & Secretary<br>(Principal Financial Officer) | March 13, 2020 |
| /s/ Patricio D. Sanchez<br>**Patricio D. Sanchez** | Director; President & Chief Operating Officer<br>(Principal Operating Officer) | March 13, 2020 |
| /s/ Kirsten A. Hink<br>**Kirsten A. Hink** | Chief Accounting Officer<br>(Principal Accounting Officer) | March 13, 2020 |
| /s/ Alan S. Bigman<br>**Alan S. Bigman** | Director | March 13, 2020 |
| /s/ Jack Howell<br>**Jack Howell** | Director | March 13, 2020 |
| /s/ Richard S. Langdon<br>**Richard S. Langdon** | Director | March 13, 2020 |
| /s/ G. M. Byrd Larberg<br>**G. M. Byrd Larberg** | Director | March 13, 2020 |
| /s/ Eduardo A. Sanchez<br>**Eduardo A. Sanchez** | Director | March 13, 2020 |
| /s/ Luke R. Tayler<br>**Luke R. Taylor** | Director | March 13, 2020 |

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Sanchez Midstream Partners LP and Subsidiaries: | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Operations | F-3 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Cash Flows | F-5 |
| Consolidated Statements of Changes in Partners' Capital | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Partners of Sanchez Midstream Partners LP and the Board of Directors of Sanchez Midstream Partners GP LLC
Sanchez Midstream Partners LP:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Sanchez Midstream Partners LP and subsidiaries (the Partnership) as of December 31, 2019 and 2018, the related consolidated statements of operations, changes in partners' capital, and cash flows for each of the years in the two-year period ended December 31, 2019, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Partnership as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Partnership is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/KPMG LLP

We have served as the Partnership's auditor since 2013.

Houston, Texas
March 13, 2020

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Operations**
**(In thousands, except unit data)**

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| **Revenues** | | |
| Natural gas sales | $ 683 | $ 953 |
| Oil sales | 9,512 | 21,272 |
| Natural gas liquid sales | 539 | 1,709 |
| Gathering and transportation sales | 6,825 | 6,651 |
| Gathering and transportation lease revenues | 59,090 | 53,025 |
| **Total revenues** | 76,649 | 83,610 |
| **Expenses** | | |
| **Operating expenses** | | |
| Lease operating expenses | 7,378 | 7,864 |
| Transportation operating expenses | 11,553 | 12,316 |
| Production taxes | 621 | 1,104 |
| General and administrative expenses | 17,610 | 23,653 |
| Unit-based compensation expense | 1,351 | 1,938 |
| Gain on sale of assets | — | (3,186) |
| Depreciation, depletion and amortization | 25,333 | 25,987 |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| **Total operating expenses** | 96,491 | 70,173 |
| **Other (income) expense** | | |
| Interest expense, net | 39,789 | 10,961 |
| Earnings from equity investments | (2,831) | (12,859) |
| Other income | (5,860) | (546) |
| **Total other (income) expenses** | 31,098 | (2,444) |
| **Total expenses** | 127,589 | 67,729 |
| **Income (loss) before income taxes** | (50,940) | 15,881 |
| Income tax expense | 202 | 190 |
| **Net income (loss)** | (51,142) | 15,691 |
| Preferred unit paid-in-kind distributions | (14,409) | (3,500) |
| Preferred unit distributions | (8,838) | (33,425) |
| Preferred unit amortization | (1,708) | (2,358) |
| Deemed contribution | 103,773 | — |
| **Net income (loss) attributable to common unitholders - Basic** | 27,676 | (23,592) |
| Mark-to-market on Warrant | (3,244) | — |
| **Net income (loss) attributable to common unitholders - Diluted** | $ 24,432 | $ (23,592) |
| **Net income (loss) per unit** | | |
| Common units - Basic | $ 1.46 | $ (1.55) |
| Common units - Diluted | $ 1.23 | $ (1.55) |
| Weighted average units outstanding | | |
| Common units - Basic | 18,939,145 | 15,264,284 |
| Common units - Diluted | 19,810,679 | 15,264,284 |

See accompanying notes to consolidated financial statements.

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Balance Sheets**
**(In thousands, except unit data)**

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 5,099 | $ 2,934 |
| Accounts receivable | 133 | 277 |
| Accounts receivable - related entities | 6,719 | 6,700 |
| Prepaid expenses | 1,193 | 931 |
| Fair value of commodity derivative instruments | 226 | 3,044 |
| **Total current assets** | 13,370 | 13,886 |
| **Oil and natural gas properties and related equipment** | | |
| Oil and natural gas properties, equipment and facilities (successful efforts method) | 112,476 | 112,173 |
| Gathering and transportation assets | 186,941 | 186,406 |
| Less: accumulated depreciation, depletion, amortization and impairment | (144,189) | (100,245) |
| **Oil and natural gas properties and equipment, net** | 155,228 | 198,334 |
| **Other assets** | | |
| Intangible assets, net | 145,246 | 158,706 |
| Fair value of commodity derivative instruments | — | 876 |
| Equity investments | 100,311 | 114,465 |
| Other non-current assets | 285 | 418 |
| **Total assets** | $ 414,440 | $ 486,685 |
| **LIABILITIES AND PARTNERS' CAPITAL** | | |
| **Current liabilities** | | |
| Accounts payable and accrued liabilities | $ 5,347 | $ 4,678 |
| Accounts payable and accrued liabilities - related entities | 631 | 5,641 |
| Royalties payable | 359 | 359 |
| Short-term debt, net of debt issuance costs | 39,374 | — |
| Fair value of commodity derivative instruments | 985 | 6 |
| Other liabilities | — | 125 |
| **Total current liabilities** | 46,696 | 10,809 |
| **Other liabilities** | | |
| Long term accrued liabilities - related entities | 4,892 | — |
| Asset retirement obligation | 6,898 | 6,200 |
| Long-term debt, net of debt issuance costs | 109,437 | 178,582 |
| Class C Preferred Units | 281,688 | — |
| Other liabilities | 629 | 5,857 |
| **Total other liabilities** | 403,544 | 190,639 |
| **Total liabilities** | 450,240 | 201,448 |
| **Commitments and contingencies (See Note 13)** | | |
| **Mezzanine equity** | | |
| Class B Preferred Units, zero and 31,310,896 units issued and outstanding as of December 31, 2019 and 2018, respectively | — | 349,857 |
| **Partners' deficit** | | |
| Common units, 20,087,462 and 16,486,239 units issued and outstanding as of December 31, 2019 and 2018, respectively | (35,800) | (64,620) |
| **Total partners' deficit** | (35,800) | (64,620) |
| **Total liabilities and partners' deficit** | $ 414,440 | $ 486,685 |

See accompanying notes to consolidated financial statements.

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (51,142) | $ 15,691 |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and depletion | 11,873 | 12,527 |
| Amortization of debt issuance costs | 1,266 | 783 |
| Accretion of Class C discount | 13,129 | — |
| Class C distribution accrual | 19,309 | — |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| Distributions from equity investments | 17,227 | 24,946 |
| Equity earnings in affiliate | (2,831) | (12,859) |
| Gain on sale of assets | — | (3,186) |
| Mark-to-market on Warrant | (3,244) | — |
| Net loss (gain) on commodity derivative contracts | 3,772 | (1,316) |
| Net cash settlements received (paid) on commodity derivative contracts | 1,101 | (1,326) |
| Unit-based compensation | 1,351 | 1,938 |
| Gain on earnout derivative | (5,856) | (546) |
| Amortization of intangible assets | 13,460 | 13,460 |
| **Changes in Operating Assets and Liabilities:** | | |
| Accounts receivable | (6) | (377) |
| Accounts receivable - related entities | (23) | 6,389 |
| Prepaid expenses | (262) | 1,739 |
| Other assets | 83 | 82 |
| Accounts payable and accrued liabilities | 6,378 | 13,719 |
| Accounts payable and accrued liabilities- related entities | (122) | (5,333) |
| Royalties payable | — | (12) |
| Other long-term liabilities | (123) | 126 |
| Net cash provided by operating activities | 57,985 | 66,942 |
| **Cash flows from investing activities:** | | |
| Development of oil and natural gas properties | (131) | (11) |
| Proceeds from sale of assets | — | 7,692 |
| Construction of gathering and transportation assets | (1,063) | (2,533) |
| Contributions to equity affiliates | (242) | (2,838) |
| Net cash provided by (used in) investing activities | (1,436) | 2,310 |
| **Cash flows from financing activities:** | | |
| Payments for offering costs | — | (50) |
| Payments for Class C Preferred Unit Exchange | (238) | — |
| Proceeds from issuance of debt | 4,000 | 2,000 |
| Repayment of debt | (34,000) | (11,000) |
| Distributions to common unitholders | (5,216) | (23,243) |
| Class B Preferred Unit cash distributions | (17,675) | (33,338) |
| Units tendered by SOG employees for tax withholdings | (218) | — |
| Debt issuance costs | (1,037) | (1,008) |
| Net cash used in financing activities | (54,384) | (66,639) |
| Net increase in cash and cash equivalents | 2,165 | 2,613 |
| Cash and cash equivalents, beginning of period | 2,934 | 321 |
| Cash and cash equivalents, end of period | $ 5,099 | $ 2,934 |
| **Supplemental disclosures of cash flow information:** | | |
| Change in accrued capital expenditures | $ 528 | $ 525 |
| Cash paid during the period for income taxes | $ 138 | $ — |
| Cash paid during the period for interest | $ 9,159 | $ 9,763 |

See accompanying notes to consolidated financial statements.

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Changes in Partners' Capital**
**(In thousands, except unit data)**

| | Common Units | | Total |
|---|---|---|---|
| | Units | Amount | Capital |
| **Partners' Deficit, December 31, 2017** | 14,965,134 | $ (29,308) | $ (29,308) |
| Unit-based compensation programs | 531,561 | 1,938 | 1,938 |
| Issuance of common units, net of offering costs of $0.1 million | 989,544 | 9,585 | 9,585 |
| Cash distributions to common unit holders | — | (23,243) | (23,243) |
| Distributions - Class B Preferred Units | — | (39,283) | (39,283) |
| Net income | — | 15,691 | 15,691 |
| **Partners' Deficit, December 31, 2018** | 16,486,239 | $ (64,620) | $ (64,620) |
| Adoption of accounting standards | — | (181) | (181) |
| Preferred unit exchange | — | 103,773 | 103,773 |
| Unit-based compensation programs | 1,109,880 | 1,531 | 1,531 |
| Units tendered by SOG employees for tax withholdings | (85,417) | (218) | (218) |
| Common units issued for asset management fee | 2,576,760 | 5,228 | 5,228 |
| Cash distributions to common unitholders | — | (5,216) | (5,216) |
| Distributions - Class B Preferred Units | — | (24,955) | (24,955) |
| Net loss | — | (51,142) | (51,142) |
| **Partners' Deficit, December 31, 2019** | 20,087,462 | $ (35,800) | $ (35,800) |

See accompanying notes to consolidated financial statements.

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**DECEMBER 31, 2019 and 2018**

**1. ORGANIZATION AND BUSINESS**

***Organization***

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development, ownership and operation of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines, and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. We also own production assets in Texas and Louisiana. We have entered into the Services Agreement with Manager, the sole member of our general partner, pursuant to which Manager provides services we require to conduct our business, including overhead, technical, administrative, marketing, accounting, operational, information systems, financial, compliance, insurance, acquisition, disposition and financing services. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Manager owns our general partner and all of our incentive distribution rights. Our common units are currently listed on the NYSE American under the symbol "SNMP."

**2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

***Basis of Presentation***

Accounting policies used by us conform to accounting principles generally accepted in the United States of America ("GAAP). The accompanying financial statements include the accounts of us and our wholly-owned subsidiaries. All intercompany accounts and transactions have been eliminated in consolidation. Our business consists of two reportable segments: Production and Midstream. Midstream includes Western Catarina Midstream, the Carnero JV and Seco Pipeline. Production consists of our oil and natural gas properties in Texas and Louisiana. Our management evaluates performance based on these two business segments.

***Recent Accounting Pronouncements***

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB"), which are adopted by us as of the specified effective date. Unless otherwise discussed, management believes that the impact of recently issued standards, which are not effective, will not have a material impact on our consolidated financial statements upon adoption.

In August 2018, the FASB issued Accounting Standards Update ("ASU") 2018-13 "Fair Value Measurement (ASC 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurements," which modifies the disclosure requirements on fair value measurements. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2019. We do not anticipate the adoption of this standard to have a material impact on our consolidated financial statements.

In June 2018, the FASB issued ASU 2018-07 "Compensation - Stock Compensation (Topic 718) - Improvements to Nonemployee Share-Based Payment Accounting," which expands the scope of Topic 718, "Compensation – Stock Compensation", to include share-based payment transactions for acquiring goods and services from nonemployees. We adopted this ASU effective January 1, 2019, which resulted in the remeasurement of our outstanding unvested awards as of January 1, 2019 and changed the expense recorded for equity awards going forward. The adoption of this standard resulted in an approximately $0.2 million charge to retained earnings.

In June 2016, the FASB issued ASU No. 2016-13, "Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments." This ASU modifies the impairment model to utilize an expected loss methodology in place of the currently used incurred loss methodology, which will result in more timely recognition of

losses. Additionally, in November 2019, the FASB issued ASU 2019-10 "Financial Instruments – Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates," which changed the effective date for certain issuers to annual and interim periods in fiscal years beginning after December 15, 2022, and earlier adoption is permitted. We are currently in the process of evaluating the impact of adoption of this guidance on our consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02 "Leases (Topic 842)," effective for annual and interim periods for public companies beginning after December 15, 2018. Additionally, in July 2018, the FASB issued ASU 2018-10, "Codification Improvements to Topic 842 (Leases)," which provides narrow amendments to clarify how to apply certain aspects of ASU 2016-02. The Partnership elected the practical expedients disclosed in ASU 2018-10. The effective date in ASU 2018-10 is the same as that of ASU 2016-02. The standards update the previous lease guidance by requiring the recognition of a right-of-use asset and lease liability on the statement of financial position for those leases previously classified as operating leases under the old guidance. In addition, ASU 2016-02 updates the criteria for a lessee's classification of a finance lease. The Partnership adopted this standard effective January 1, 2019. The adoption of this standard did not have a material impact on our consolidated financial statements.

Other accounting standards that have been issued by the FASB or other standards-setting bodies are not expected to have a material impact on the Partnership's financial position, results of operations and cash flows.

***Use of Estimates***

The consolidated financial statements are prepared in conformity with GAAP, which requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. These estimates and the underlying assumptions affect the amounts of assets and liabilities reported, disclosures about contingent assets and liabilities and reported amounts of revenues and expenses. The estimates that are particularly significant to our financial statements include estimates of our reserves of natural gas, NGLs and oil; future cash flows from oil and natural gas properties; depreciation, depletion and amortization; asset retirement obligations; certain revenues and operating expenses; fair values of derivatives; and fair values of assets and liabilities. As fair value is a market-based measurement, it is determined based on the assumptions that market participants would use. These estimates and assumptions are based on management's best judgment using the data available. Management evaluates its estimates and assumptions on an on-going basis using historical experience and other factors, including the current economic environment, which management believes to be reasonable under the circumstances. Such estimates and assumptions are adjusted when facts and circumstances dictate. As future events and their effects cannot be determined with precision, actual results could differ from the estimates. Any changes in estimates resulting from continuing changes in the economic environment will be reflected in the financial statements in future periods.

***Revenue Recognition***

*Midstream*

We account for revenue from contracts with customers in accordance with ASC 606 and ASC 842 for our midstream segment. The Seco Pipeline Transportation Agreement is our only contract that we account for using ASC 606. Under the Seco Pipeline Transportation Agreement, we agreed to provide transportation services of certain quantities of natural gas from the receipt point to the delivery point. Each MMBtu of natural gas transported is distinct and the transportation services performed on each distinct molecule of product is substantially the same in nature. As such, we applied the series guidance and treat these services as a single performance obligation satisfied over time using volumes delivered as the measure of progress. Additionally, Seco Pipeline Transportation Agreement contains variable consideration in the form of volume variability. As the distinct goods or services (rather than the series) are considered for the purpose of allocating variable consideration, we have taken the optional exception under ASC 606. Under this exception, revenue is alternatively recognized in the period that control is transferred to the customer and the respective variable component of the total transaction price is resolved.

The Gathering Agreement (as defined in Note 14 "Related Party Transactions") was classified as an operating lease at inception and is accounted for under ASC 842, as Sanchez Energy controls the physical use of the property under the lease. Revenues relating to the Gathering Agreement is recognized in the period service is provided. Under this

arrangement, the Partnership receives a fee or fees for services provided. The revenue the Partnership recognizes from gathering and transportation services is generally directly related to the volume of oil and natural gas that flows through its systems.

*Production*

Our oil, natural gas, and NGL revenue is marketed and sold on our behalf by the respective asset operators. We are not party to the contracts with the third-party customers. However, we are party to joint operating agreements, which we account for under ASC 808, and revenues and expenses for these arrangements is recognized based on the information provided to us by the operators.

We additionally recognize and present changes in the fair value of our commodity derivative instruments within natural gas sales and oil sales in the consolidated statements of operations, which is accounted for under ASC 815, "Derivatives and Hedging".

*Accounts Receivable, Net*

Our accounts receivable are primarily from our contractual agreements with Sanchez Energy and its subsidiaries, operators of our oil and natural gas properties and counterparties to our financial instruments. Oil receivables are generally collected within 30 days after the end of the month. Natural gas receivables are generally collected within 60 days after the end of the month. We review all outstanding accounts receivable balances and record a reserve for amounts that we expect will not be fully recovered. Actual balances are not applied against the reserves until substantially all collection efforts have been exhausted. Our allowance for doubtful accounts was $0.4 million as of December 31, 2019 and 2018.

*Concentration of Credit Risk and Accounts Receivable*

Financial instruments that potentially subject us to a concentration of credit risk consist of cash and cash equivalents, accounts receivable and derivative financial instruments. We place our cash with high credit quality financial institutions. We place our derivative financial instruments with financial institutions that participate in our Credit Agreement and maintain an investment grade credit rating. Substantially all of our accounts receivable are due from operators of our oil and natural gas properties. These sales are generally unsecured and, in some cases, may carry a parent guarantee. We routinely assess the financial strength of our customers. Bad debt expense is recognized on an account-by-account review and when recovery is not probable. We have no off-balance-sheet credit exposure related to our operations or customers.

Sanchez Energy accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectively. We are highly dependent upon Sanchez Energy as our most significant customer, and we expect to derive a substantial portion of our revenue from Sanchez Energy in the foreseeable future. Accordingly, we are indirectly subject to the business risks of Sanchez Energy.

***Income Taxes***

SNMP and each of its wholly-owned subsidiary LLCs are treated as a partnership for federal and state income tax purposes. All of our taxable income or loss, which may differ considerably from net income or loss reported for financial reporting purposes, is passed through to the federal income tax returns of our members. As such, no federal income tax for these entities has been provided for in the accompanying financial statements.

***Earnings per Unit***

Net income (loss) per common unit for the period is based on any distributions that are made to the unitholders (common units) plus an allocation of undistributed net income (loss) based on provisions of the Amended Partnership Agreement, divided by the weighted average number of common units outstanding. The two-class method dictates that net income (loss) for a period be reduced by the amount of distributions and that any residual amount representing undistributed net income (loss) be allocated to common unitholders and other participating unitholders to the extent that each unit may share in net income (loss) as if all of the income for the period had been distributed in accordance with the Amended Partnership Agreement. Unit-based awards granted but unvested are eligible to receive distributions. The underlying unvested restricted unit awards are considered participating securities for purposes of determining net income

(loss) per unit. Undistributed income is allocated to participating securities based on the proportional relationship of the weighted average number of common units and unit-based awards outstanding. Undistributed losses (including those resulting from distributions in excess of net income) are allocated to common units based on provisions of the Amended Partnership Agreement. Undistributed losses are not allocated to unvested restricted unit awards as they do not participate in net losses. Distributions declared and paid in the period are treated as distributed earnings in the computation of earnings per common unit even though cash distributions are not necessarily derived from current or prior period earnings.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, asset life, inflation and the credit-adjusted risk-free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset and is included in accretion expense in the our consolidated statements of operations.

To estimate the fair value of an asset retirement obligation, the Partnership employs a present value technique, which reflects certain assumptions, including its credit-adjusted risk-free interest rate, inflation rate, the estimated settlement date of the liability and the estimated current cost to settle the liability. Changes in timing or to the original estimate of cash flows will result in changes to the carrying amount of the liability.

***Oil and Natural Gas Properties***

We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties. Under this method of accounting, costs relating to the development of proved areas are capitalized when incurred.

Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold costs using all proved reserves. Acquisition costs of proved properties are amortized on the basis of all proved reserves, developed and undeveloped, and capitalized development costs (including wells and related equipment and facilities) are amortized on the basis of proved developed reserves. As more fully described in Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements, proved reserves estimates are subject to future revisions when additional information becomes available.

All other properties, including the gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

Estimated asset retirement costs are recognized when the asset is acquired or placed in service, and are amortized over proved reserves using the units-of-production method. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

Oil and natural gas properties are reviewed for impairment when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. Cash flow estimates for the impairment testing are based on third party reserve reports and exclude derivative instruments. Refer to Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements for additional information.

***Reserves of Natural Gas, NGLs and Oil***

Our estimate of proved reserves is based on the quantities of natural gas, NGLs and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Management estimates the proved reserves attributable to our ownership based on various factors, including consideration of the reserve report prepared by Ryder Scott, an independent oil and natural gas consulting firm. On an annual basis, our proved reserve estimates and the reserve report prepared by Ryder Scott are reviewed by the Audit Committee and the Board. Our financial statements for 2019 and 2018 were prepared using Ryder Scott's estimates of our proved reserves.

Reserves and their relation to estimated future net cash flows impact our depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The accuracy of our reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Our proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the actual quantities of oil and natural gas eventually recovered.

***Unit-Based Compensation***

The Partnership records unit-based compensation expense for awards granted in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 718, "Compensation—Stock Compensation." Unit-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

***Investments***

We follow the equity method of accounting when we do not exercise control over the investee, but we can exercise significant influence over the operating and financial policies of the investee. Under this method, our equity investments are carried originally at our acquisition cost, increased by our proportionate share of the investee's net income and by contributions made, and decreased by our proportionate share of the investee's net losses and by distributions received. We evaluate our equity investments for impairment when evidence indicates the carrying amount of our investment is no longer recoverable. Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the equity method investee to sustain an earnings capacity that would justify the carrying amount of the investment. When the estimated fair value of an equity investment is less than its carrying value and the loss in value is determined to be other than temporary, we recognize the excess of the carrying value over the estimated fair value as an impairment loss within earnings from equity investments in our consolidated statements of operations.

***Earnout Derivative***

As part of the Carnero Gathering Transaction (defined in Note 12 "Investments"), we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. The earnout derivative is accounted for under ASC 815, and we measure its fair value through the use of a Monte Carlo simulation model which utilized observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios.

**3. REVENUE RECOGNITION**

***Revenue from Contracts with Customers***

We account for revenue from contracts with customers in accordance with ASC 606. The unit of account in ASC 606 is a performance obligation, which is a promise in a contract to transfer to a customer either a distinct good or service (or bundle of goods or services) or a series of distinct goods or services provided over a period of time. ASC 606 requires

that a contract's transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is to be allocated to each performance obligation in the contract based on relative standalone selling prices and recognized as revenue when (point in time) or as (over time) the performance obligation is satisfied.

*Disaggregation of Revenue*

We recognized revenue of $76.6 and $83.6 million for the years ended December 31, 2019 and 2018, respectively. We disaggregate revenue based on type of revenue and product type. In selecting the disaggregation categories, we considered a number of factors, including disclosures presented outside the financial statements, such as in our earnings release and investor presentations, information reviewed internally for evaluating performance, and other factors used by the Partnership or the users of its financial statements to evaluate performance or allocate resources. We have concluded that disaggregating revenue by type of revenue and product type appropriately depicts how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors.

Midstream Segment

The Seco Pipeline Transportation Agreement is the only contract that we account for under ASC 606. The Catarina Midstream Gathering Agreement (as defined in Note 14 "Related Party Transactions") is classified as an operating lease and is accounted for under ASC 842, "Leases", and is reported as gathering and transportation lease revenue in our consolidated statements of operations. Both of these contracts are further discussed in Note 14 "Related Party Transactions."

We account for income from our unconsolidated equity method investments as earnings from equity investments in our consolidated statements of operations. Earnings from these equity method investments are further discussed in Note 12 "Investments."

Production Segment

Our oil, natural gas, and NGL revenue is marketed and sold on our behalf by the respective asset operators. We are not party to the contracts with the third-party customers. However, we are party to joint operating agreements, which we account for under ASC 808 and revenues for these arrangements is recognized based on the information provided to us by the operators.

We additionally recognize and present changes in the fair value of our commodity derivative instruments within natural gas sales and oil sales in the consolidated statements of operations, which is accounted for under ASC 815, "Derivatives and Hedging".

*Performance Obligations*

Under the Seco Pipeline Transportation Agreement, we agreed to provide transportation services of certain quantities of natural gas from the receipt point to the delivery point. Each MMBtu of natural gas transported is distinct and the transportation services performed on each distinct molecule of product is substantially the same in nature. We applied the series guidance and treat these services as a single performance obligation satisfied over time using volumes delivered as the measure of progress. The Seco Pipeline Transportation Agreement requires payment within 30 days following the calendar month of delivery.

The Seco Pipeline Transportation Agreement contains variable consideration in the form of volume variability. As the distinct goods or services (rather than the series) are considered for the purpose of allocating variable consideration, we have taken the optional exception under ASC 606 which is available only for wholly unsatisfied performance obligations for which the criteria in ASC 606 have been met. Under this exception, neither estimation of variable consideration nor disclosure of the transaction price allocated to the remaining performance obligations is required. Revenue is alternatively recognized in the period that control is transferred to the customer and the respective variable component of the total transaction price is resolved.

For forms of variable consideration that are not associated with a specific volume (such as late payment fees) and thus do not meet allocation exception, estimation is required. These fees, however, are immaterial to our consolidated financial statements and have a low probability of occurrence. As significant reversals of revenue due to this variability are not probable, no estimation is required.

*Contract Balances*

Under our sales contracts, we invoice customers after our performance obligations have been satisfied, at which point payment is unconditional. Accordingly, our contracts do not give rise to contract assets or liabilities under ASC 606. At December 31, 2019, and 2018 our accounts receivable from contracts with customers were $1.1 million and $0.6 million, respectively, and are presented within accounts receivable – related entities on the consolidated balance sheets.

**4. ACQUISITIONS AND DIVESTITURES**

*Louisiana Divestiture*

In September 2018, we entered into a purchase and sale agreement to sell certain non-operated production assets located in Louisiana for cash consideration of approximately $1.3 million (the “Louisiana Divestiture”). The Louisiana Divestiture closed on October 22, 2018 and we recorded a gain of approximately $0.6 million on the sale.

*Briggs Divestiture*

In April 2018, we entered into a purchase and sale agreement to sell specified wellbores and related assets and interests in La Salle County Texas (the “Briggs Assets”) for a base purchase price of approximately $4.5 million which, after giving effect to purchase price adjustments, was reduced to approximately $4.2 million in cash consideration (the “Briggs Divestiture”). In addition, other than limited obligations that we retained, the buyer agreed to assume all obligations relating to the Briggs Assets, including all plugging and abandonment costs, that may arise on or after March 1, 2018. The Briggs Divestiture closed on April 30, 2018 and we recorded a gain of approximately $1.8 million on the sale.

*Cola Divestiture*

In April 2018, we entered into multiple purchase and sale agreements to sell certain non-operated production assets located in Oklahoma for total cash consideration of approximately $1.0 million (collectively, the “Cola Divestiture”). The Cola Divestitures were all closed by May 8, 2018 and we recorded a total gain of approximately $1.1 million on the sale.

**5. FAIR VALUE MEASUREMENTS**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurements are classified and disclosed in one of the following categories:

**Level 1**: Measured based on unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities. Active markets are considered those in which transactions for the assets or liabilities occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

**Level 2:** Measured based on quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability. Substantially all of these inputs are observable in the marketplace throughout the term of the instrument, can be derived from observable data, or supported by observable levels at which transactions are executed in the marketplace.

**Level 3**: Measured based on prices or valuation models that require inputs that are both significant to the fair value measurement and less observable from objective sources (i.e., supported by little or no market activity).

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

The following table summarizes the fair value of our assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2019 (in thousands):

| | Fair Value Measurements at December 31, 2019 | | | |
|---|---|---|---|---|
| | Active Markets for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Fair Value |
| Commodity derivative instrument | | | | |
| Derivative liability | $ — | $ (759) | $ — | $ (759) |
| Midstream derivative instrument | | | | |
| Earnout derivative liability | — | — | — | — |
| Other liabilities | | | | |
| Warrant | — | (629) | — | (629) |
| Total | $ — | $ (1,388) | $ — | $ (1,388) |

The following table summarizes the fair value of our assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2018 (in thousands):

| | Fair Value Measurements at December 31, 2018 | | | |
|---|---|---|---|---|
| | Active Markets for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Fair Value |
| Commodity derivative instrument | | | | |
| Derivative assets | $ — | $ 3,914 | $ — | $ 3,914 |
| Midstream derivative instrument | | | | |
| Earnout derivative liability | — | — | (5,856) | (5,856) |
| Total | $ — | $ 3,914 | $ (5,856) | $ (1,942) |

As of December 31, 2019 and 2018, the estimated fair value of cash and cash equivalents, accounts receivable, other current assets and current liabilities approximated their carrying value due to their short-term nature.

*Fair Value on a Non-Recurring Basis*

The Partnership follows the provisions of Topic 820-10 for nonfinancial assets and liabilities measured at fair value on a non-recurring basis. The fair value measurements of assets acquired and liabilities assumed are based on inputs that are not observable in the market and therefore represent Level 3 inputs under the fair value hierarchy. We periodically review oil and natural gas properties and related equipment for impairment when facts and circumstances indicate that their carrying values may not be recoverable.

A reconciliation of the beginning and ending balances of the Partnership's asset retirement obligations is presented in Note 10 ‘‘Asset Retirement Obligation.’’

*Class C Preferred Units* – As part of the Exchange (defined in Note 17 "Partners' Capital"), Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and the Warrant in a privately negotiated transaction. The Class C Preferred Units were measured using valuation techniques that convert a future obligation to a single discounted amount. We have therefore classified the fair value measurements of the Class C Preferred units as Level 2 and are presented within "Class C Preferred Units" on the Consolidated Balance Sheets.

*Seco Pipeline* – We recorded a non-cash impairment charge of $32.1 million to impair the Seco Pipeline. The carrying value of the Seco Pipeline was reduced to a fair value of zero, estimated based on an inputs characteristic of a Level 3 fair value measurement.

The fair value of the Seco Pipeline was measured using probabilistic valuation techniques that convert future cash flows to a single discounted amount. Significant inputs to the valuation of the Seco Pipeline include estimates of: (i) future operating and development costs; (ii) estimated future cash flows; and (iii) a market-based weighted average cost of capital rate. These inputs require significant judgments and estimates by the Partnership's management at the time of the valuation and are the most sensitive and subject to change.

*Fair Value of Financial Instruments*

The estimated fair value amounts of financial instruments have been determined using available market information and valuation methodologies described below. We prioritize the use of the highest level inputs available in determining fair value such that fair value measurements are determined using the highest and best use as determined by market participants and the assumptions that they would use in determining fair value.

*Credit Agreement* – We believe that the carrying value of our Credit Agreement (defined in Note 7 "Debt") approximates its fair value because the interest rates on the debt approximate market interest rates for debt with similar terms. The debt is classified as a Level 2 input in the fair value hierarchy and represents the amount at which the instrument could be valued in an exchange during a current transaction between willing parties. The Credit Agreement is discussed further in Note 7 "Debt."

*Derivative Instruments* – The income valuation approach, which involves discounting estimated cash flows, is primarily used to determine recurring fair value measurements of our derivative instruments classified as Level 2 inputs. Our commodity derivatives are valued using the terms of the individual derivative contracts with our counterparties, expected future levels of oil and natural gas prices and an appropriate discount rate. Our interest rate derivatives are valued using the terms of the individual derivative contracts with our counterparties, expected future levels of the LIBOR interest rates and an appropriate discount rate. We did not have any interest rate derivatives as of December 31, 2019.

*Warrant* – As part of the Exchange, the Partnership issued to Stonepeak the Warrant which entitles the holder to receive junior securities representing ten percent of junior securities deemed outstanding when exercised. The Warrant expires on the later of August 2, 2026 or 30 days following the full redemption of the Class C Preferred Units. There is no strike price associated with the exercise of the Warrant. The Warrant is valued using ten percent of the junior securities deemed outstanding and the common unit price as of the balance sheet date. We have therefore classified the fair value measurements of the Warrant as Level 2 and is presented within other liabilities on the consolidated balance sheets.

*Earnout Derivative* – As part of the Carnero Gathering Transaction (defined in Note 12 "Investments"), we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. The earnout derivative was valued through the use of a Monte Carlo simulation model which utilized observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios. We have therefore classified the fair value measurements of the earnout derivative as Level 3 inputs.

The following table sets forth a reconciliation of changes in the fair value of the Partnership's embedded and earnout derivatives classified as Level 3 in the fair value hierarchy (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | **2019** | **2018** |
| Beginning balance | $ (5,856) | $ (6,402) |
| Gain on earnout derivative | 5,856 | 546 |
| Ending balance | $ — | $ (5,856) |
| Gain included in earnings related to derivatives still held as of December 31, 2019 and December 31, 2018 | $ 5,856 | $ 546 |

Table of Contents

**6. DERIVATIVE AND FINANCIAL INSTRUMENTS**

To reduce the impact of fluctuations in oil and natural gas prices on our revenues, we periodically enter into derivative contracts with respect to a portion of our projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These hedging activities are intended to support oil and natural gas prices at targeted levels and to manage exposure to oil and natural gas price fluctuations. It is never our intention to enter into derivative contracts for speculative trading purposes.

Under Topic 815, "Derivatives and Hedging", all derivative instruments are recorded on the consolidated balance sheets at fair value as either short-term or long-term assets or liabilities based on their anticipated settlement date. We will net derivative assets and liabilities for counterparties where we have a legal right of offset. Changes in the derivatives' fair values are recognized currently in earnings unless specific hedge accounting criteria are met. We have not elected to designate any of our current derivative contracts as hedges; however, changes in the fair value of all of our derivative instruments are recognized in earnings and included in natural gas sales and oil sales in the consolidated statements of operations.

As of December 31, 2019, we had the following derivative contracts in place, all of which are accounted for as mark-to-market activities:

*MTM Fixed Price Swaps – NYMEX (Henry Hub)*

| | Three Months Ended (volume in MMBtu) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 105,104 | $ 2.85 | 102,008 | $ 2.85 | 99,136 | $ 2.85 | 96,200 | $ 2.85 | 402,448 | $ 2.85 |

*MTM Fixed Price Basis Swaps – West Texas Intermediate (WTI)*

| | Three Months Ended (volume in Bbls) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 52,776 | $ 53.50 | 50,960 | $ 53.50 | 49,224 | $ 53.50 | 47,624 | $ 53.50 | 200,584 | $ 53.50 |

The following table sets forth a reconciliation of the changes in fair value of the Partnership's commodity derivatives for the years ended December 31, 2019 and 2018 (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Beginning fair value of commodity derivatives | $ 3,914 | $ 1,231 |
| Net gain (loss) on crude oil derivatives | (4,031) | 1,400 |
| Net gain (loss) on natural gas derivatives | 259 | (84) |
| Net settlements paid (received) on derivative contracts: | | |
| Oil | (807) | 1,330 |
| Natural gas | (94) | 37 |
| Ending fair value of commodity derivatives | $ (759) | $ 3,914 |

The effect of derivative instruments on our consolidated statements of operations was as follows (in thousands):

| Derivative Type | Location of Gain (Loss) in Income | Years Ended December 31, 2019 | 2018 |
|---|---|---|---|
| Commodity – Mark-to-Market | Oil sales | $ (4,031) | $ 1,400 |
| Commodity – Mark-to-Market | Natural gas sales | 259 | (84) |
| | | $ (3,772) | $ 1,316 |

Derivative instruments expose us to counterparty credit risk. Our commodity derivative instruments are currently contracted with three counterparties. We generally execute commodity derivative instruments under master agreements which allow us, in the event of default, to elect early termination of all contracts with the defaulting counterparty. If we choose to elect early termination, all asset and liability positions with the defaulting counterparty would be net cash settled at the time of election. We include a measure of counterparty credit risk in our estimates of the fair values of derivative instruments. As of December 31, 2019 and 2018, the impact of non-performance credit risk on the valuation of our derivative instruments was not significant.

*Earnout Derivative*

Refer to Note 5 "Fair Value Measurements".

**7. DEBT**

***Credit Agreement***

We have entered into a credit facility with Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (as amended by the Ninth Amendment to Third Amended and Restated Credit Agreement (the "Credit Agreement"). The Credit Agreement provides a quarterly amortizing term loan of $155.0 million (the "Term

Loan") and a maximum revolving credit amount of $20.0 million (the "Revolving Loan"). The Term Loan and Revolving Loan both have a maturity date of September 30, 2021. Borrowings under the Credit Agreement are secured by various mortgages of both midstream and upstream properties that we own as well as various security and pledge agreements among us, certain of our subsidiaries and the administrative agent.

Borrowings under the Credit Agreement are available for limited direct investment in oil and natural gas properties, midstream properties, acquisitions, and working capital and general business purposes. The Credit Agreement has a sub-limit of up to $2.5 million which may be used for the issuance of letters of credit. Pursuant to the Credit Agreement, the initial aggregate commitment amount under the Term Loan is $155.0 million, subject to quarterly $10.0 million principal and other mandatory prepayments. The initial borrowing base under the Credit Agreement was $235.5 million. The borrowing base is equal to the sum of the rolling four quarter EBITDA of our midstream operations and the amount of distributions received from the Carnero JV multiplied by 4.5 or a lower number dependent upon natural gas volumes flowing through Western Catarina Midstream. Outstanding borrowings in excess of our borrowing base must be repaid within 45 days. As of December 31, 2019, the borrowing base under the Credit Agreement was $235.5 million and we had $150.0 million of debt outstanding, consisting of $145.0 million under the Term Loan and $5.0 million under the Revolving Loan. We are required to make mandatory amortizing payments of outstanding principal on the Term Loan of $10 million per fiscal quarter. The maximum revolving credit amount is $20.0 million leaving us with $15.0 million in unused borrowing capacity. There were no letters of credit outstanding under our Credit Agreement as of December 31, 2019.

At our election, interest for borrowings under the Credit Agreement are determined by reference to (i) the LIBOR plus an applicable margin between 2.50% and 3.00% per annum based on net debt to EBITDA or (ii) a domestic bank rate ("ABR") plus an applicable margin between 1.50% and 2.00% per annum based on net debt to EBITDA plus (iii) a commitment fee of 0.500% per annum based on the unutilized maximum revolving credit. Interest on the borrowings for ABR loans and the commitment fee are generally payable quarterly. Interest on the borrowings for LIBOR loans are generally payable at the applicable maturity date.

The Credit Agreement contains various covenants that limit, among other things, our ability to incur certain indebtedness, grant certain liens, merge or consolidate, sell all or substantially all of our assets, make certain loans, acquisitions, capital expenditures and investments, and pay distributions to unitholders.

In addition, we are required to maintain the following financial covenants:

- current assets to current liabilities of at least 1.0 to 1.0 at all times; and
- senior secured net debt to consolidated adjusted EBITDA for the last twelve months, as of the last day of any fiscal quarter, of not greater than 3.5 to 1.0.

The Credit Agreement also includes customary events of default, including events of default relating to non-payment of principal, interest or fees, inaccuracy of representations and warranties when made or when deemed made, violation of covenants, cross-defaults, bankruptcy and insolvency events, certain unsatisfied judgments, loan documents not being valid and a change in control. A change in control is generally defined as the occurrence of one of the following events: (i) our existing general partner ceases to be our sole general partner or (ii) certain specified persons shall cease to own more than 50% of the equity interests of our general partner or shall cease to control our general partner. If an event of default occurs, the lenders will be able to accelerate the maturity of the Credit Agreement and exercise other rights and remedies.

At December 31, 2019, we were in compliance with the financial covenants contained in the Credit Agreement. We monitor compliance on an ongoing basis. If we are unable to remain in compliance with the financial covenants contained in our Credit Agreement or maintain the required ratios discussed above, the lenders could call an event of default and accelerate the outstanding debt under the terms of the Credit Agreement, such that our outstanding debt could become then due and payable. We may request waivers of compliance from the violated financial covenants from the lenders, but there is no assurance that such waivers would be granted.

*Debt Issuance Costs*

As of December 31, 2019 and 2018, our unamortized debt issuance costs were approximately $1.2 million and $1.4 million, respectively. These costs are amortized to interest expense in our consolidated statements of operations over the life of our Credit Agreement. Amortization of debt issuance costs recorded during the years ended December 31, 2019 and 2018 were approximately $1.3 million and $0.8 million, respectively.

**8. OIL AND NATURAL GAS PROPERTIES AND RELATED EQUIPMENT**

Gathering and transportation assets consist of the following (in thousands):

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Gathering and transportation assets** | | |
| Midstream assets | $ 186,941 | $ 186,406 |
| Less: Accumulated depreciation, amortization and impairment | (74,648) | (34,598) |
| Total gathering and transportation assets, net | $ 112,293 | $ 151,808 |

Oil and natural gas properties consist of the following (in thousands):

| | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Oil and natural gas properties and related equipment** | | |
| Proved property | $ 112,476 | $ 112,173 |
| Less: Accumulated depreciation, depletion, amortization and impairments | (69,541) | (65,647) |
| **Total oil and natural gas properties and equipment, net** | $ 42,935 | $ 46,526 |

*Oil and Natural Gas Properties.* We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties.

*Proved Reserves.* Accounting rules require that we price our oil and natural gas proved reserves at the preceding twelve-month average of the first-day-of-the-month reference prices as adjusted for location and quality differentials. Such SEC-required prices are utilized except where different prices are fixed and determinable from applicable contracts for the remaining term of those contracts. Our proved reserve estimates exclude the effect of any derivatives we have in place.

Our estimate of proved reserves is based on the quantities of natural gas, NGLs, and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Proved reserves are calculated based on various factors, including consideration of an independent reserve engineers' report on proved reserves and an economic evaluation of all of our properties on a well-by-well basis. The process used to complete the estimates of proved reserves at December 31, 2019 and 2018 is described in detail in Note 20 "Supplemental Information on Oil and Natural Gas Producing Activities."

Reserves and their relation to estimated future net cash flows impact depletion and impairment calculations. As a result, adjustments to depletion and impairments are made concurrently with changes to reserve estimates. The accuracy of reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered.

*Depreciation, Depletion and Amortization.* Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold and proved property acquisition costs using all proved reserves. Acquisition costs of proved properties are amortized on the basis of all proved reserves, developed and undeveloped, and capitalized development costs (including wells and related equipment and facilities) are amortized on the basis of proved developed reserves.

All other properties, including the gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

*Impairment of Oil and Natural Gas Properties and Other Non-Current Assets.* Oil and natural gas properties are reviewed for impairment on a field-by-field basis when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. The cash flow estimates are based upon third-party reserve reports using future expected oil and natural gas prices adjusted for basis differentials. Other significant inputs, besides reserves, used to determine the fair values of proved properties include estimates of: (i) future operating and development costs; (ii) future commodity prices; and (iii) a market-based weighted average cost of capital rate. These inputs require significant judgments and estimates by the Partnership's management at the time of the valuation and are the most sensitive and subject to change. Cash flow estimates for impairment testing exclude derivative instruments.

Depreciation, depletion and amortization consisted of the following (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Depreciation, depletion and amortization of oil and natural gas-related assets | $ 3,942 | $ 4,798 |
| Depreciation and amortization of gathering and transportation related assets | 7,931 | 7,729 |
| Amortization of intangible assets | 13,460 | 13,460 |
| Total Depreciation, depletion and amortization | $ 25,333 | $ 25,987 |

The recoverability of gathering and transportation assets is evaluated when facts or circumstances indicate that their carrying value may not be recoverable. Asset recoverability is measured by comparing the carrying value of the asset or asset group with its expected future pre-tax undiscounted cash flows. These cash flow estimates require us to make projections and assumptions for many years into the future for pricing, demand, competition, operating cost and other factors. If the carrying amount exceeds the expected future undiscounted cash flows, we recognize an impairment equal to the excess of net book value over fair value. The determination of the fair value using present value techniques requires us to make projections and assumptions regarding the probability of a range of outcomes and the rates of interest used in the present value calculations. Any changes we make to these projections and assumptions could result in significant revisions to our evaluation of recoverability of our gathering and transportation assets and the recognition of additional impairments. Upon disposition or retirement of gathering and transportation assets, any gain or loss is recorded to operations.

On January 13, 2020, we received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. For the year ended December 31, 2019, we recorded a non-cash charge of $32.1 million, to impair the Seco Pipeline. For the year ended December 31, 2018, we recorded no impairment charges.

*Asset Retirement Obligation.* As described in Note 10 "Asset Retirement Obligation," estimated asset retirement costs are recognized when the asset is acquired or placed in service. Costs associated with oil and natural gas properties

Table of Contents

are amortized over proved developed reserves using the units-of-production method. Costs associated with gathering and transportation assets are depreciated using the straight-line method over the useful lives of the asset. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

*Exploration and Dry Hole Costs.* Exploration and dry hole costs represent abandonments of drilling locations, dry hole costs, delay rentals, geological and geophysical costs and the impairment, amortization and abandonment associated with leases on our unproved properties. All such costs on oil and natural gas properties relating to unsuccessful exploratory wells are charged to expense as incurred. We recorded no exploration or dry hole costs for the years ended December 31, 2019 and 2018.

*Materials and Supplies.* Materials and supplies consist of well equipment, parts and supplies. They are valued at the lower of cost or market, using either the specific identification or first-in first-out method, depending on the inventory type. Materials and supplies are capitalized as used in the development or support of our oil and natural gas properties.

## 9. PROVISION FOR INCOME TAXES

Publicly traded partnerships like ours are treated as corporations unless they have 90% or more in qualifying income (as that term is defined in the Internal Revenue Code). We satisfied this requirement in each of the years ended December 31, 2019 and 2018 and, as a result, are not subject to federal income tax. However, our partners are individually responsible for paying federal income taxes on their share of our taxable income. Net earnings for financial reporting purposes may differ significantly from taxable income reportable to our unitholders as a result of differences between the tax basis and financial reporting basis of certain assets and liabilities and other factors. We do not have access to information regarding each partner's individual tax basis in our limited partner interests.

Provision for income taxes reflects franchise tax obligations in the state of Texas (the "Texas Margin Tax"). Deferred income tax assets and liabilities are recognized for temporary differences between the assets and liabilities of our tax paying entities for financial reporting and tax purposes.

Our federal and state income tax provision (benefit) is summarized below:

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Current: | | |
| Federal | $ — | $ — |
| State | 328 | 64 |
| Total current | 328 | 64 |
| Deferred: | | |
| Federal | — | — |
| State | (126) | 126 |
| Total deferred | (126) | 126 |
| Total provision for income taxes | $ 202 | $ 190 |

Table of Contents

A reconciliation of the provision for (benefit from) income taxes with amounts determined by applying the statutory U.S. federal income tax rate to income (loss) before income taxes is as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Pre-tax net book income (loss) | $ (50,940) | $ 15,881 |
| Texas Margin Tax [(a)] | 126 | 267 |
| Return to accrual | 76 | 9 |
| Valuation allowance | — | (86) |
| Provision for income taxes | $ 202 | $ 190 |
| Effective income tax rate | (0.40%) | 1.20% |

(a) Although the Texas Margin Tax is not considered a state income tax, it has the characteristics of an income tax since it is determined by applying a tax rate to a base that considers our Texas-sourced revenues and expenses.

The following table presents the significant components of deferred tax assets and deferred tax liabilities at the dates indicated (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Deferred tax assets (liabilities): | | |
| Derivative assets | $ (23) | $ (15) |
| Depreciable, depletable property, plant and equipment | 21 | (112) |
| Other | 2 | 1 |
| Deferred tax assets (liabilities): | — | (126) |
| Valuation allowance | — | — |
| Total deferred tax assets (liabilities) | $ — | $ (126) |

Deferred tax assets which required valuation allowances were related to assets sold in 2018. Therefore, the valuation allowance is no longer necessary and was removed as of December 31, 2018.

As of December 31, 2019 and 2018, the Partnership had no material uncertain tax positions.

The Partnership files income tax returns in the U.S. and various state jurisdictions. The Partnership is no longer subject to examination by federal income tax authorities prior to 2016. State statutes vary by jurisdiction.

**10. ASSET RETIREMENT OBLIGATION**

We recognize the fair value of a liability for an ARO in the period in which it is incurred if a reasonable estimate of fair value can be made. Each period, we accrete the ARO to its then present value. The associated asset retirement cost (“ARC”) is capitalized as part of the carrying amount of our oil and natural gas properties, equipment and facilities or gathering and transportation assets. Subsequently, the ARC is depreciated using the units-of-production method for production assets and the straight-line method for midstream assets. The AROs recorded by us relate to the plugging and abandonment of oil and natural gas wells and decommissioning of oil and natural gas gathering and other facilities.

Inherent in the fair value calculation of ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. To the extent future revisions to these assumptions result in adjustments to the recorded fair value of the existing ARO, a corresponding adjustment is made to the ARC capitalized as part of the oil and natural gas properties, equipment and facilities or gathering and transportation assets.

Table of Contents

The following table is a reconciliation of the ARO (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Asset retirement obligation, beginning balance | $ 6,200 | $ 6,074 |
| Liabilities added from escalating working interests | 172 | 288 |
| Sales | — | (613) |
| Revisions to cost estimates | — | (46) |
| Accretion expense | 526 | 497 |
| Asset retirement obligation, ending balance | $ 6,898 | $ 6,200 |

Additional AROs increase the liability associated with new oil and natural gas wells and other facilities as these obligations are incurred. Abandonments of oil and natural gas wells and other facilities reduce the liability for AROs. In 2019 and 2018, there were no significant expenditures for abandonments and there were no assets legally restricted for purposes of settling existing AROs. During the year ended December 31, 2018, obligations were sold as part of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture.

**11. INTANGIBLE ASSETS**

Intangible assets are comprised of customer and marketing contracts. The intangible assets balance includes $145.2 million related to the Gathering Agreement with Sanchez Energy that was entered into as part of the Western Catarina Midstream transaction. Pursuant to the 15-year agreement, Sanchez Energy tenders all of its crude oil, natural gas and other hydrocarbon-based product volumes on 35,000 dedicated acres in the Western Catarina of the Eagle Ford Shale in Texas for processing and transportation through Western Catarina Midstream, with a right to tender additional volumes outside of the dedicated acreage. These intangible assets are being amortized using the straight-line method over the 15 year life of the agreement.

Amortization expense for the years ended December 31, 2019 and 2018 was $13.5 million, respectively. These costs are amortized to depreciation, depletion, and amortization expense in our consolidated statement of operations. Intangible assets as of December 31, 2019 and 2018 are detailed below (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Beginning balance | $ 158,706 | $ 172,166 |
| Amortization | (13,460) | (13,460) |
| Ending balance | $ 145,246 | $ 158,706 |

**12. INVESTMENTS**

In July 2016, we completed a transaction pursuant to which we acquired from Sanchez Energy a 50% interest in Carnero Gathering, LLC (“Carnero Gathering”), a joint venture that was 50% owned and operated by Targa Resources Corp. (NYSE: TRGP) (“Targa”), for an initial payment of approximately $37.0 million and the assumption of remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million as of the acquisition date (the “Carnero Gathering Transaction”). The fair value of the intangible asset for the contractual customer relationship related to Carnero Gathering was valued at approximately $13.0 million. This amount is being amortized over a contract term of 15 years and decreases earnings from equity investments in our consolidated statements of operations. As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. See Note 5 “Fair Value Measurements” for further discussion of the earnout derivative.

In November 2016, we completed a transaction pursuant to which we acquired from Sanchez Energy a 50% interest in Carnero Processing, LLC (“Carnero Processing”), a joint venture that was 50% owned and operated by Targa, for aggregate cash consideration of approximately $55.5 million and the assumption of remaining capital contribution commitments to Carnero Processing, estimated at approximately $24.5 million as of the date of acquisition (the “Carnero Processing Transaction”).

In May 2018, we executed a series of agreements with Targa and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering and Carnero Processing (the “Carnero JV Transaction”) to form an expanded 50 / 50 joint venture in South Texas, within Carnero G&P, LLC (“the Carnero JV”), (2) Targa contributed 100% of the equity interest in the Silver Oak II Gas Processing Plant (“Silver Oak II”), located in Bee County Texas, to the Carnero JV, which expands the processing capacity of the Carnero JV from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the 45 miles of high pressure natural gas gathering pipelines owned by Carnero Gathering that connect Western Catarina Midstream to nearby pipelines and the Raptor Gas Processing Facility (the “Carnero Gathering Line”) to the Carnero JV resulting in the Carnero JV owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, (4) the Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy’s Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the Carnero JV limited by the capacity of the Raptor Gas Processing Facility. As a result of the Carnero JV Transaction we now record our share of earnings and losses from the Carnero JV using the Hypothetical Liquidation at Book Value (“HLBV”) method of accounting. The HLBV is a balance-sheet approach that calculates the amount we would have received if the Carnero JV were liquidated at book value at the end of each measurement period. The change in our allocated amount during the period is recognized in our consolidated statements of operations. In the event of liquidation of the Carnero JV, available proceeds are first distributed to any priority return and unpaid capital associated with Silver Oak II, and then to members in accordance with their capital accounts.

As of December 31, 2019, the Partnership had paid approximately $124.1 million for its investment in the Carnero JV related to the initial payments and contributed capital. The Partnership has accounted for this investment using the equity method. Targa is the operator of the Carnero JV and has significant influence with respect to the normal day-to-day capital and operating decisions. We have included the investment balance in the equity investments caption on our consolidated balance sheets. For the year ended December 31, 2019, the Partnership recorded earnings of approximately $4.0 million in equity investments from the Carnero JV, which was offset by approximately $1.2 million related to the amortization of the contractual customer intangible asset. We have included these equity method earnings in the earnings from equity investments line within the consolidated statements of operations. Cash distributions of approximately $17.2 million were received during the year ended December 31, 2019.

Summarized financial information of unconsolidated entities is as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Sales | $ 159,508 | $ 321,607 |
| Total expenses | 145,837 | 290,073 |
| Net income | $ 13,671 | $ 31,534 |

**13. COMMITMENTS AND CONTINGENCIES**

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. This earnout has an approximate value of zero as of December 31, 2019. For the year ended December 31, 2019 payments totaling approximately $32.0 thousand were made. For the year ended December 31, 2018, natural gas received did not exceed the threshold.

**14. RELATED PARTY TRANSACTIONS**

*Sanchez-Related Agreements*

We are controlled by our general partner. The sole member of our general partner is Manager, which has no officers. The sole manager and member of Manager is SP Capital Holdings, LLC, which has no officers. The co-managers of SP

Capital Holdings, LLC are Antonio R. Sanchez, III, a member of and Chairman of the Board; Eduardo A. Sanchez, a member of the Board; Patricio D. Sanchez, a member of the Board and the President and Chief Operating Officer of our general partner; and their father, Antonio R. Sanchez, Jr. SP Capital Holdings, LLC is owned by Antonio R. Sanchez, III, Eduardo A. Sanchez , and Patricio D. Sanchez, along with their sister, Ana Lee Sanchez Jacobs, and Antonio R. Sanchez, Jr. In May 2014, we entered into the Services Agreement with Manager pursuant to which Manager provides services that we require to operate our business, including overhead, technical, administrative, marketing, accounting, operational, information systems, financial, compliance, insurance, and acquisition, disposition and financing services. In connection with providing services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties other than our assets located in the Mid-Continent region, (ii) reimbursement for all allocated overhead costs as well as any direct third-party costs incurred and (iii) for each asset acquisition, asset disposition and financing, a fee not to exceed 2% of the value of such transaction. Each of these fees, not including the reimbursement of costs, is paid in cash unless Manager elects for such fee to be paid in our equity with the exception of the following modified payment terms under the Services Agreement. In November 2019, a letter agreement was executed modifying the payment terms under the Services Agreement beginning with the fee for the quarter ended September 30, 2019. Under the modified terms, payment is being withheld until such time as all issued and outstanding Class C Units have been redeemed. Following the redemption of all issued and outstanding Class C Units the fee will be paid in our equity. As of December 31, 2019, the amount owed under the Services Agreement was $4.9 million and is presented within long term accrued liabilities - related entities on the consolidated balance sheet. If all Class C Units had been redeemed on December 31, 2019, we would issue approximately 11.4 million common units to Manager to settle the portion of the liability related to the November 2019 letter agreement. During the years ended December 31, 2019 and 2018, we incurred costs of approximately $7.3 million and $8.6 million, respectively, to Manager under the Services Agreement. Manager utilizes SOG to provide the services under the Services Agreement. The Services Agreement has a ten-year term and will be automatically renewed for an additional ten years unless both Manager and the Partnership provide notice of termination to the other with at least 180 days' notice.

SOG, headquartered in Houston, Texas, is a private full-service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates. SOG has successfully built and operated extensive midstream and gathering assets associated with its aforementioned development activities. The Chairman of the Board, Antonio R. Sanchez, III, the President and Chief Operating Officer of our general partner as well as one of our directors, Patricio D. Sanchez, one of our directors, Eduardo A. Sanchez, along with their immediate family members Ana Lee Sanchez Jacobs and Antonio R. Sanchez, Jr., collectively, either directly or indirectly, own a majority of the equity interests of SOG. In addition, Antonio R. Sanchez, III and Patricio D. Sanchez are Co-Presidents of SOG; Antonio R. Sanchez, Jr. is the Chief Executive Officer and sole director of SOG; Ana Lee Sanchez Jacobs is an Executive Vice President of SOG; and Gerald F. Willinger is an Executive Vice President of SOG.

*Sanchez-Related Transactions*

We have entered into several transactions with Sanchez Energy since January 1, 2018.

In conjunction with the acquisition of Western Catarina Midstream, we entered into a 15-year gas gathering agreement with Sanchez Energy, pursuant to which Sanchez Energy agreed to tender all of its crude oil, natural gas and other hydrocarbon-based product volumes on approximately 35,000 dedicated acres in the Western Catarina area of the Eagle Ford Shale in Texas for processing and transportation through Western Catarina Midstream, with the potential to tender additional volumes outside of the dedicated acreage (the "Gathering Agreement"). During the first five years of the term of the Gathering Agreement, Sanchez Energy is required to meet a minimum quarterly volume delivery commitment of 10,200 Bbls per day of oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. Sanchez Energy is required to pay gathering and processing fees of $0.96 per Bbl for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through Western Catarina Midstream, in each case, subject to an annual escalation for a positive increase in the consumer price index. On June 30, 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that is delivered through the gathering system through March 31, 2018, and have subsequently agreed to continue the incremental infrastructure fee on a month-to-month basis. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $59.1 million and $57.9 million, respectively, pursuant to the terms of the gathering and processing agreement.

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering's delivery points from Sanchez Energy and other producers. For the year ended December 31, 2019, payments totaling approximately $32.0 thousand were made. For the year ended December 31, 2018, natural gas did not exceed the threshold.

In September 2017, we entered into the Seco Pipeline Transportation Agreement. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $6.8 million and $7.2 million, respectively, pursuant to the terms of that agreement. On January 13, 2020, we received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

In May 2018, the Carnero JV, which is operated by Targa, received a dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the Raptor Gas Processing Facility.

As of December 31, 2019 and 2018, the Partnership had a net receivable from related parties of approximately $6.7 million, respectively, which are included in accounts receivable – related entities in the consolidated balance sheets. As of December 31, 2019 and 2018, the Partnership also had a net payable to related parties of approximately $5.5 million, and $5.6 million, respectively. The net receivable/payable as of December 31, 2019 consist primarily of revenues receivable from oil and natural gas production and transportation, offset by costs associated with that production and transportation.

Sanchez Energy is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas where it has assembled approximately 415,000 gross leasehold acres (215,000 net acres). The Chairman of the Board, Antonio R. Sanchez, III, is Sanchez Energy's Chief Executive Officer and a member of its board of directors. A member of the Board, Eduardo A. Sanchez, is the former President of Sanchez Energy. The President and Chief Operating Officer of our general partner, Patricio D. Sanchez, who is also a member of the Board, is an Executive Vice President of Sanchez Energy. Antonio R. Sanchez, Jr., the father of Antonio R. Sanchez, III, Eduardo A. Sanchez, and Patricio D. Sanchez, is the Executive Chairman of the board of directors of Sanchez Energy. Antonio R. Sanchez, Jr., Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez beneficially own 6.1%, 3.0%, 1.1% and 1.2%, respectively, of Sanchez Energy's shares outstanding as of March 13, 2020. As of March 13, 2020, Sanchez Energy indirectly, through one of its wholly owned subsidiaries, beneficially owns approximately 11.4% of the outstanding common units of SNMP. The employees of SOG, including Kirsten A. Hink, our Chief Accounting Officer, provide services to both us and Sanchez Energy.

**15. UNIT-BASED COMPENSATION**

The Sanchez Midstream Partners LP Long-Term Incentive Plan allows for restricted common unit grants. Restricted common unit activity under the Plan during the period is presented in the following table:

As of December 31, 2019, 840,811 common units remained available for future issuance to participants under the LTIP.

| | Number of Restricted Units | | Weighted Average Grant Date Fair Value Per Unit |
|---|---|---|---|
| Outstanding at December 31, 2017 | 283,138 | $ | 14.64 |
| Granted | 622,534 | | 11.94 |
| Vested | (301,005) | | 13.60 |
| Returned/Cancelled | (90,973) | | 12.77 |
| Outstanding at December 31, 2018 | 513,694 | $ | 12.31 |

| | | | |
|---|---|---|---|
| Granted | 1,129,173 | | 2.35 |
| Vested | (382,690) | | 8.50 |
| Returned/Cancelled | (104,710) | | 12.04 |
| Outstanding at December 31, 2019 | 1,155,467 | $ | 3.86 |

In April 2019, the Partnership issued 137,613 restricted common units pursuant to the LTIP to certain directors of the Partnership's general partner that vested immediately on the date of grant. In March 2019, the Partnership issued 991,560 restricted common units pursuant to the LTIP to certain officers and directors of the Partnership's general partner that vest over three years from the date of grant. The unit-based compensation expense for the awards was based on the fair value on the day before the grant date.

In April 2018, the Partnership issued 63,630 restricted common units pursuant to the LTIP to certain directors of the Partnership's general partner that vested immediately on the date of grant. In April 2018, the Partnership issued 244,813 and 314,091 restricted common units pursuant to the LTIP to executives that vest on the first anniversary of the date of grant and to non-executive employees that vest over three years from the date of grant, respectively.

**16. DISTRIBUTIONS TO UNITHOLDERS**

The table below reflects the payment of cash distributions on common units relating to the years ended December 31, 2019 and 2018.

| Three months ended | | Distribution per unit | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|---|
| March 31, 2018 | $ | 0.4508 | May 8, 2018 | May 22, 2018 | May 31, 2018 |
| June 30, 2018 | $ | 0.4508 | August 8, 2018 | August 21, 2018 | August 31, 2018 |
| September 30, 2018 | $ | 0.1500 | November 9, 2018 | November 20, 2018 | November 30, 2018 |
| December 31, 2018 | $ | 0.1500 | February 7, 2019 | February 20, 2019 | February 28, 2019 |
| March 31, 2019 | $ | 0.1500 | May 3, 2019 | May 22, 2019 | May 31, 2019 |

The table below reflects the payment of distributions on Class B Preferred Units relating to the years ended December 31, 2019 and 2018.

| Three months ended | | Cash distribution per unit | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|---|
| March 31, 2018 | $ | 0.28225 | May 8, 2018 | May 22, 2018 | May 31, 2018 |
| June 30, 2018 [(a)] | $ | 0.22580 | August 8, 2018 | August 21, 2018 | August 31, 2018 |
| September 30, 2018 | $ | 0.28225 | November 9, 2018 | November 20, 2018 | November 30, 2018 |
| December 31, 2018 | $ | 0.28225 | February 7, 2019 | February 20, 2019 | February 28, 2019 |
| March 31, 2019 | $ | 0.28225 | May 3, 2019 | May 22, 2019 | May 31, 2019 |

(a) The Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part in Class B Preferred PIK Units. Accordingly, the Partnership declared a cash distribution of $0.2258 per Class B Preferred Unit and an aggregate distribution of 310,009 Class B Preferred PIK Units, which was paid on August 31, 2018 to holders of record on August 21, 2018.

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units (the "Class C Preferred Units"). Following the Exchange, no distribution was declared with respect to the Class B Preferred Units.

The table below reflects the payment of distributions on Class C Preferred Units related to the periods indicated.

| Three months ended | Class C Preferred PIK distribution | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|
| June 30, 2019 | 939,327 | August 8, 2019 | August 20, 2019 | August 30, 2019 |
| September 30, 2019 | 1,007,820 | October 30, 2019 | November 29, 2019 | November 20, 2019 |

| | | | | |
|---|---|---|---|---|
| December 31, 2019 | 1,039,314 | February 13, 2020 | February 28, 2020 | February 20, 2020 |

**17. PARTNERS' CAPITAL**

*Outstanding Units*

As of December 31, 2019, we had no Class B Preferred Units outstanding, 33,258,043 Class C Preferred Units outstanding and 20,087,462 common units outstanding, which included 1,155,467 unvested restricted common units issued under the LTIP.

*Common Unit Issuances*

The following table shows the common units issued by the Partnership in 2018 and 2019 to SP Holdings in connection with providing services under the Services Agreement:

| Three months ended | Common units | Date of issuance |
|---|---|---|
| December 31, 2017 | 210,978 | March 15, 2018 |
| March 31, 2018 | 220,214 | May 31, 2018 |
| June 30, 2018 | 224,342 | September 10, 2018 |
| September 30, 2018 | 334,010 | November 30, 2018 |
| December 31, 2018 | 787,750 | March 8, 2019 |
| March 31, 2019 | 887,269 | May 23, 2019 |
| June 30, 2019 | 901,741 | August 2, 2019 |

*Class B Preferred Unit Offering*

On October 14, 2015, pursuant to that certain Class B Preferred Unit Purchase Agreement dated September 25, 2015 between the Partnership and Stonepeak, the Partnership sold and Stonepeak purchased 19,444,445 of the Partnership's newly created Class B Preferred Units (the "Class B Preferred Units") in a privately negotiated transaction for an aggregate cash purchase price of $18.00 per Class B Preferred Unit, which resulted in gross proceeds to the Partnership of $350.0 million. The Partnership used the net proceeds to pay a portion of the consideration for the Catarina Transaction, along with the payment to Stonepeak of a fee equal to 2.25% of the consideration paid for the Class B Preferred Units.

Under the terms of our partnership agreement, holders of the Class B Preferred Units received a quarterly distribution, at the election of the Board, of 10.0% per annum if paid in full in cash or 12.0% per annum if paid in part cash (8.0% per annum) and in part Class B Preferred PIK Units (4.0% per annum), as defined in the Second Amended and Restated Agreement of Limited Partnership of the Partnership (the "Amended Partnership Agreement"). Distributions were to be paid on or about the last day of each of February, May, August and November after the end of each quarter.

In accordance with the partnership agreement, on December 6, 2016, we issued an additional 9,851,996 Class B Preferred Units to Stonepeak. On January 25, 2017, the Partnership and Stonepeak entered into a Settlement Agreement and Mutual Release (the "Settlement Agreement") to settle a dispute arising from the calculation of an adjustment to the number of Class B Preferred Units pursuant to Section 5.10(g) of the Amended Partnership Agreement. Pursuant to the Settlement Agreement, and in accordance with Section 5.4 of the Amended Partnership Agreement, the Partnership issued 1,704,446 Class B Preferred Units to Stonepeak in a privately negotiated transaction as partial consideration for the Settlement Agreement, with the "Class B Preferred Unit Price" being established at $11.29 per Class B Preferred Unit. Pursuant to the terms of the Amended Partnership Agreement, the Class B Preferred Units were convertible at any time, at the option of Stonepeak, into common units of the Partnership, subject to the requirement to convert a minimum of $17.5 million of Class B Preferred Units. The issuance of the Class B Preferred Units pursuant to the Settlement Agreement was made in reliance upon an exemption from the registration requirements of the Securities Act of 1933 pursuant to Section 4(a)(2) thereof.

The Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part Class B Preferred PIK Units in accordance with the partnership agreement. Accordingly, the Partnership issued 310,009 Class B Preferred PIK Units on August 31, 2018, to Stonepeak.

The Class B Preferred Units are accounted for as mezzanine equity in the consolidated balance sheet consisting of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Mezzanine equity, beginning balance | $ 349,857 | $ 343,912 |
| Amortization of discount | 1,708 | 2,358 |
| Distributions | 23,247 | 36,925 |
| Distributions paid | (17,675) | (33,338) |
| Class B Preferred Unit exchange | (357,137) | — |
| Mezzanine equity, ending balance | $ — | $ 349,857 |

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and a warrant exercisable for junior securities (the “Warrant”).

*Class C Preferred Units*

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and the Warrant in a privately negotiated transaction (the “Exchange”). In connection with the Exchange, the Partnership entered into (i) the Third Amended and Restated Agreement of Limited Partnership of the Partnership (the “Amended Partnership Agreement) to set forth the terms of the Class C Preferred Units, (ii) the Amended and Restated Registration Rights Agreement with Stonepeak relating to the registered resale of common units issuable upon the exercise of the Warrant, and (iii) the Amended and Restated Board Representation and Standstill Agreement with Stonepeak.

Under the terms of the Amended Partnership Agreement, commencing with the quarter ended on September 30, 2019, the holders of the Class C Preferred Units will receive a quarterly distribution of 12.5% per annum payable in cash. To the extent that Available Cash (as defined in the Amended Partnership Agreement) is insufficient to pay the distribution in cash, all or a portion of the distribution may be paid in Class C Preferred PIK Units. Commencing with the quarter ending March 31, 2022, the distribution rate will increase to 14% per annum. Distributions are to be paid on or about the last day of each of February, May, August and November following the end of each quarter and are charged to interest expense in our consolidated statements of operations.

The Exchange was accounted for as an extinguishment with the difference between the book value of the redeemed instrument and the fair value of the new instrument being considered a deemed contribution to common equity of approximately $103.8 million. The Class C Preferred Units are accounted for as a long-term liability on the consolidated balance sheet consisting of the following (in thousands):

Table of Contents

| | | December 31, 2019 |
|---|---|---|
| Class C Preferred Units | | |
| Private placement of Class C Preferred Units | $ | 353,500 |
| Discount | | (104,250) |
| Amortization of discount | | 13,129 |
| Distributions | | 19,309 |
| Class C Preferred Units, ending balance | $ | 281,688 |

*Warrant*

On August 2, 2019, in connection with the Exchange, the Partnership issued to Stonepeak the Warrant which entitles the holder to receive junior securities representing ten percent of junior securities deemed outstanding when exercised. The Warrant expires on the later of August 2, 2026 or 30 days following the full redemption of the Class C Preferred Units. There is no strike price associated with the exercise of the Warrant. The Warrant is accounted for as a liability in accordance with ASC 480 and is presented within other liabilities on the consolidated balance sheet. Changes in the fair value of the Warrant are charged to interest expense in our consolidated statements of operations.

*Earnings per Unit*

Net income (loss) per common unit for the period is based on any distributions that are made to the unitholders (common units) plus an allocation of undistributed net income (loss), based on the provisions of the Amended Partnership Agreement, divided by the weighted average number of common units outstanding. The two-class method dictates that net income (loss) for a period be reduced by the amount of distributions and that any residual amount representing undistributed net income (loss) be allocated to common unitholders and other participating unitholders to the extent that each unit may share in net income (loss) as if all of the net income for the period had been distributed in accordance with the Amended Partnership Agreement. Unit-based awards granted but unvested are eligible to receive distributions. The underlying unvested restricted unit awards are considered participating securities for purposes of determining net income (loss) per unit. Undistributed income is allocated to participating securities based on the proportional relationship of the weighted average number of common units and unit-based awards outstanding. Undistributed losses (including those resulting from distributions in excess of net income) are allocated to common units based on provisions of the Amended Partnership Agreement. Undistributed losses are not allocated to unvested restricted unit awards as they do not participate in net losses. Distributions declared and paid in the period are treated as distributed earnings in the computation of earnings per common unit even though cash distributions are not necessarily derived from current or prior period earnings.

The Partnership's general partner does not have an economic interest in the Partnership and, therefore, does not participate in the Partnership's net income.

**18. REPORTING SEGMENTS**

"Midstream" and "Production" best describe the operating segments of the businesses that we separately report. The factors used to identify these reporting segments are based on the nature of the operations that are undertaken by each segment. The Midstream segment operates the gathering, processing and transportation of natural gas, NGLs and crude oil. The Production segment operates to produce crude oil and natural gas. These segments are broadly understood across the petroleum and petrochemical industries.

These functions have been defined as the operating segments of the Partnership because they are the segments (1) that engage in business activities from which revenues are earned and expenses are incurred; (2) whose operating results are regularly reviewed by the Partnership's chief operating decision maker ("CODM") to make decisions about resources to be allocated to the segment and to assess its performance; and (3) for which discrete financial information is available. Operating segments are evaluated for their contribution to the Partnership's consolidated results based on operating income, which is defined as segment operating revenues less expenses.

The following tables present financial information for each operating segment for the periods indicated based on our operating segments (in thousands):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | Production | Midstream | Production | Midstream |
| **Segment revenues** | | | | |
| Natural gas sales | $ 683 | $ — | $ 953 | $ — |
| Oil sales | 9,512 | — | 21,272 | — |
| Natural gas liquid sales | 539 | — | 1,709 | — |
| Gathering and transportation sales | — | 6,825 | — | 6,651 |
| Gathering and transportation lease revenues | — | 59,090 | — | 53,025 |
| **Total segment revenues** | 10,734 | 65,915 | 23,934 | 59,676 |
| **Segment operating costs** | | | | |
| Lease operating expenses | 5,879 | 1,499 | 6,719 | 1,145 |
| Transportation operating expenses | — | 11,553 | — | 12,316 |
| Production taxes | 621 | — | 1,104 | — |
| Gain on sale of assets | — | — | (3,186) | — |
| Depreciation, depletion and amortization | 3,942 | 21,391 | 4,798 | 21,189 |
| Asset impairments | — | 32,119 | — | — |
| Accretion expense | 200 | 326 | 198 | 299 |
| **Total segment operating costs** | 10,642 | 66,888 | 9,633 | 34,949 |
| **Segment other income** | | | | |
| Earnings from equity investments | — | 2,831 | — | 12,859 |
| **Total segment other income** | — | 2,831 | — | 12,859 |
| **Segment operating income** | $ 92 | $ 1,858 | $ 14,301 | $ 37,586 |

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Reconciliation of segment operating income to net income (loss)** | | |
| Total production operating income | $ 92 | $ 14,301 |
| Total midstream operating income | 1,858 | 37,586 |
| Total segment operating income | 1,950 | 51,887 |
| General and administrative expense | (17,610) | (23,653) |
| Unit-based compensation expense | (1,351) | (1,938) |
| Interest expense, net | (39,789) | (10,961) |
| Other income | 5,860 | 546 |
| Income tax expense | (202) | (190) |
| **Net income (loss)** | $ (51,142) | $ 15,691 |

The following table summarizes the total assets and capital expenditures by operating segment as of December 31, 2019 and 2018 (in thousands):

| | December 31, 2019 | | | |
|---|---|---|---|---|
| | Production | Midstream | Corporate [(a)] | Total |
| **Other financial information** | | | | |
| Total assets | $ 45,550 | $ 362,961 | $ 5,929 | $ 414,440 |
| Capital expenditures[(b)] | $ 130 | $ 775 | $ — | $ 905 |

| | December 31, 2018 | | | |
|---|---|---|---|---|
| | Production | Midstream | Corporate [(a)] | Total |
| **Other financial information** | | | | |
| Total assets | $ 53,556 | $ 429,523 | $ 3,606 | $ 486,685 |
| Capital expenditures[(b)] | $ 11 | $ 4,856 | $ — | $ 4,867 |

(a) Corporate assets not reviewed by the CODM on a segment basis consists of cash, certain prepaid expenses, office furniture and other assets.
(b) Inclusive of capital contributions made to equity method investments.

Revenue from Sanchez Energy earned in our Midstream segment accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectively. Because all remaining production properties are non-operated, there are no customers in the Production segment that exceed 10% of the Partnership's consolidated revenue.

**19. VARIABLE INTEREST ENTITIES**

The Partnership's investment in the Carnero JV represents a variable interest entity ("VIE") that could expose the Partnership to losses. The amount of losses the Partnership could be exposed to from the Carnero JV is limited to the capital investment of approximately $100.3 million.

As of December 31, 2019, the Partnership had invested approximately $124.1 million in the Carnero JV and no debt has been incurred by the Carnero JV. We have included this VIE in other assets, equity investments on the balance sheet.

Below is a tabular comparison of the carrying amounts of the assets and liabilities of the VIE and the Partnership's maximum exposure to loss as of December 31, 2019 and 2018 (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Acquisitions, earnout and capital investments | $ 128,140 | $ 127,899 |
| Earnings in equity investments | 25,976 | 23,144 |
| Distributions received | (53,805) | (36,578) |
| Maximum exposure to loss | $ 100,311 | $ 114,465 |

**20. SUPPLEMENTAL INFORMATION ON OIL AND NATURAL GAS PRODUCING ACTIVITIES (UNAUDITED)**

The Supplementary Information on Oil and Natural Gas Producing Activities is presented as required by the appropriate authoritative guidance. The supplemental information includes capitalized costs related to oil and natural gas producing activities; costs incurred for the acquisition of oil and natural gas producing activities, exploration and development activities and the results of operations from oil and natural gas producing activities.

Supplemental information is also provided for per unit production costs; oil and natural gas production and average sales prices; the estimated quantities of proved oil and natural gas reserves; the standardized measure of discounted future net cash flows associated with proved reserves and a summary of the changes in the standardized measure of discounted future net cash flows associated with proved reserves.

***Costs***

The following table sets forth our capitalized costs as of December 31, 2019 and 2018 (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Capitalized costs at the end of the period:** | | |
| Oil and natural gas properties and related equipment (successful efforts method) | | |
| Proved property | $ 112,476 | $ 112,173 |
| Less: Accumulated depreciation, depletion, amortization and impairments | (69,541) | (65,647) |
| Oil and natural gas properties and equipment, net | $ 42,935 | $ 46,526 |

(a) Capitalized costs include the cost of equipment and facilities for our oil and natural gas producing activities. Proved property costs include capitalized costs for leaseholds holding proved reserves; development wells and related equipment and facilities (including uncompleted development well costs); and support equipment. Unproved property costs include capitalized costs for oil and natural gas leaseholds where proved reserves do not exist.