Table of Contents

The following table sets forth costs incurred for oil and natural gas producing activities for the years ended December 31, 2019 and 2018 (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Costs incurred for the period:** | | |
| Acquisition of properties | | |
| Proved | $ — | $ — |
| Development costs | 131 | 11 |
| Oil and natural gas properties and equipment, net | $ 131 | $ 11 |

The development costs for the years ended December 31, 2019 and 2018 primarily represent costs related to recompletions.

We had no exploration and dry hole costs in 2019 and 2018.

***Results of Operations***

The revenues and expenses associated directly with oil and natural gas producing activities are reflected in the Consolidated Statements of Operations. All of our oil and natural gas producing activities are located in the United States.

***Net Proved Reserves of Natural Gas, NGLs and Oil***

The following table sets forth information with respect to changes in proved developed and undeveloped reserves. This information excludes reserves related to royalty and net profit interests. All of our reserves are located in the United States.

| | Total (MMBoe) | Oil (in MMBoe) | Natural Gas (in MMBoe) | Natural Gas Liquids (in MMBoe) |
|---|---|---|---|---|
| Net proved reserves | | | | |
| December 31, 2017 | 5,265 | 3,246 | 1,109 | 910 |
| Sales of reserves in place | (1,105) | (272) | (322) | (511) |
| Revisions of previous estimates | (268) | (199) | (261) | 192 |
| Production | (439) | (296) | (72) | (71) |
| December 31, 2018 | 3,453 | 2,479 | 454 | 520 |
| Sales of reserves in place | — | — | — | — |
| Revisions of previous estimates | (145) | (10) | (67) | (68) |
| Production | (309) | (228) | (39) | (42) |
| December 31, 2019 | 2,999 | 2,241 | 348 | 410 |
| | | | | |
| Proved developed reserves: | | | | |
| December 31, 2018 | 3,453 | 2,479 | 454 | 520 |
| December 31, 2019 | 2,999 | 2,241 | 348 | 410 |

***Reserves and Related Estimates***

Our estimate of proved reserves is based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters.

Our year end December 31, 2019 and 2018, proved reserve estimates were 3.0 MMBoe and 3.5 MMBoe, respectively. Reserve estimates for those periods were prepared by, Ryder Scott, an independent petroleum engineering firm, and are used for the applicable disclosures in our financial statements.

Our 2019 estimates of total proved reserves decreased 0.5 MMBoe from 2018 due to production of 0.3 MMBoe and revisions of previous estimates of 0.2 MMBoe. For proved reserves, the production weighted average product price over

the remaining lives of the properties used in our reserve report were: $59.55 per Bbl for oil, $13.68 per Bbl for NGLs and $2.66 per Mcf for natural gas.

Our 2018 estimates of total proved reserves decreased 1.8 MMBoe from 2017 primarily due to a decrease in reserves of 1.1 MMBoe due to the Louisiana Divestiture, Briggs Divestiture and Cola Divestiture. For proved reserves, the production weighted average product price over the remaining lives of the properties used in our reserve report were: $66.95 per Bbl for oil, $23.00 per Bbl for NGLs and $3.21 per Mcf for natural gas.

***Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Oil and Natural Gas Reserves, Including a Reconciliation of Changes Therein***

The following table sets forth the standardized measure of the discounted future net cash flows attributable to our proved oil and natural gas reserves. Certain information concerning the assumptions used in computing the valuation of proved reserves and their inherent limitations are discussed below.

Future cash inflows are calculated by applying the SEC-required prices of oil and natural gas relating to our proved reserves to the year-end quantities of those reserves. Future cash inflows exclude the impact of our hedging program. Future development and production costs represent the estimated future expenditures (based on year-end costs) to be incurred in developing and producing the proved reserves, assuming continuation of existing economic conditions. In addition, asset retirement obligations are included within future production and development costs. There are no future income tax expenses because the Partnership is a non-taxable entity.

The assumptions used to compute estimated future cash inflows do not necessarily reflect expectations of actual revenues or costs or their present values. In addition, variations from expected production rates could result directly or indirectly from factors outside of our control, such as unexpected delays in development, changes in prices or regulatory or environmental policies. The reserve valuation further assumes that all reserves will be disposed of by production; however, if reserves are sold in place, additional economic considerations could also affect the amount of cash eventually realized.

The following table summarizes the standardized measure of estimated discounted future cash flows from the oil and natural gas properties (in thousands):

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| Future cash inflows | $ 144,628 | $ 186,675 |
| Future production costs | (80,007) | (99,187) |
| Future estimated development costs | (3,400) | (4,043) |
| Future net cash flows | 61,221 | 83,445 |
| 10% annual discount for estimated timing of cash flows | (22,871) | (31,199) |
| Standardized measure of discounted estimated future net cash flows related to proved oil and natural gas reserves | $ 38,350 | $ 52,246 |

The following table summarizes the principal sources of change in the standardized measure of estimated discounted future net cash flows (in thousands):

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| Beginning of the period | $ 52,246 | $ 56,697 |
| Sales and transfers of oil and natural gas, net of production costs | (8,006) | (14,795) |
| Net changes in prices and production costs related to future production | (7,330) | 17,392 |
| Changes in development costs | 35 | 207 |
| Revisions of previous quantity estimates | (1,942) | (4,203) |
| Purchases and sales of reserves in place | — | (5,423) |
| Accretion discount | 5,225 | 5,670 |
| Change in production rates, timing, and other | (1,878) | (3,299) |
| Standardized measure of discounted future net cash flows related to proved oil and natural gas reserves | $ 38,350 | $ 52,246 |

**21. SUBSEQUENT EVENTS**

On February 13, 2020, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership's common units. As required by the Amended Partnership Agreement, the Board declared a fourth quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 1,039,314 Class C Preferred PIK Units, which was paid on February 28, 2020 to holders of record on February 20, 2020.

On January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

Since December 31, 2019, the Partnership paid $6.0 million in principal outstanding under the Credit Agreement resulting in total debt outstanding of $144.0 million under the Credit Agreement as of March 13, 2020.

# Exhibit H

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name: Patrick J. McDonie
Title: President

# Exhibit I

*Execution Version*

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i) or (ii) will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a) Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b) Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s), the Treating Facility, the Delivery Point(s) and the Plant(s), Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c) or Section 6.6(e).

"Cashout Price" for any Month means (i) if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii) if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i) of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i) the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii) the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv) any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i) Emissions or (ii) the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i) Producer and (ii) each of SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee) and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s).

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s)" means the inlet flange of the custody transfer meter(s) owned by the Redelivery Pipeline(s) at the Residue Gas Delivery Point(s), as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s) to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i) Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii) Gathering L&U, plus (iii) Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas) and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s) connecting the Receipt Point(s) to the Plant(s).



011611

"Governmental Authority" means: (i) the United States of America; (ii) any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii) any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1) Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73) psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a). The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s) and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i) for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii) for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas) used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s)" means the processing plant(s) at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s), including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i) Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income); (ii) the T&F Fee; and (iii) any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i) and (iii) above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges)).

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000) and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s)" means the inlet flange of the custody transfer meter(s) on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s) less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s).

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s)" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu) confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c).

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities) to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant).

"Taxes" means taxes, fees, or charges (including penalties and interest thereon) now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s). Theoretical Gallons will be determined by multiplying: (i) the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii) the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities).

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c).

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1) year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1) year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be subject to the dedication hereunder as of the end of such one (1) year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3) years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) or Released Well (and associated Dedicated Acreage included in the proration unit for such well), as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d) to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e) to retain all liquids (and title to such liquids) separated from Producer’s Gas by the use of conventional lease separators prior to delivery of Producer’s Gas to Carnero at the Receipt Point(s), provided that Producer will not be permitted to remove or recover hydrocarbons from Producer’s Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s) in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer) will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer’s Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer’s obligations are as follows:

(a) Subject to Sections 3.1(c), 3.1(d), 3.1(e) and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5);

(b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer’s acquisition (collectively, the “Existing Commitments”), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent “evergreen” or “renewal” terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure), Carnero may, within sixty (60) Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10%) of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b) Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a) the Maximum Daily Quantity, or (b) the Maximum Receipt Capacity for the Receipt Point(s), as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s) to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c).

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corp that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s). Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s).

**Section 4.2** Delivery Point(s). Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s).

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s) at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i) 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii) 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder), and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s) at the pressures existing in the Redelivery Pipeline(s), from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s) for the account of Producer on any Day differs from the Scheduled Quantity(ies) for such Receipt Point(s), then Carnero shall only be obligated to deliver at the Delivery Point(s) on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i) no obligation to accept variations from a uniform hourly rate of flow, and (ii) the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

Case 23-90055 Document 1373-8 Filed in TXSB on 08/21/20 Page 22 of 45

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting) as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice), as applicable:

Payments to Carnero:
For the account of: Carnero G&P LLC
Bank: Wells Fargo
ABA: 121000248
Account Number: 4122586654

Payments to Producer:
For the account of: SN EF Maverick, LLC
Bank: SunTrust Bank
ABA: 061000104
Account Number: 1000205698318

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees")) shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any) between the Consumer Price Index (All Urban Consumers (CPI-U); U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS") (the "CPI")) for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10) calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30) Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24) Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB"), or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time), two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s) and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1) the Receipt Quantity, and (2) the Delivery Quantity.

(a) Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b) Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c) If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d) Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset) at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout



011631

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO).

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i) while such Gas is within Carnero's control and possession; or (ii) to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof), the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER).

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT), CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO). CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S) WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b) Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero's disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate), which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero's sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term") and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term").

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, <u>Orifice Metering of Natural Gas</u>, ANSI/API 2530, latest revision or AGA Report #9, <u>Measurement of Gas by Multi-path Ultrasonic Meters</u>.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,



011639

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or



011641

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

# ARTICLE 14
# FAILURE TO PAY; REMEDIES

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a) if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b) if Producer fails to post credit assurance as required pursuant to Section 5.8(e), and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e);

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III) WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a) if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b) if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c) if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d) if delivered personally, upon the date of actual delivery; and (e) if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly).

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A) ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B) FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY)). THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement), and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives") in the following circumstances:

(a) to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b) to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c) as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d) to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e) to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f) to independent certified public accountants for purposes of obtaining a financial audit; and

(g) as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s) under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s). This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period) from the earlier of (i) the date such Change in Law becomes effective or (ii) the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements) to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: ___________________________

Title: ____________________________

# Exhibit J

SANCHEZ
ENERGY CORPORATION

March 23, 2018

**<u>Via U.S. Certified Mail and E-Mail</u>**
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: James O'Connor

Re: Hydrocarbons Purchase and Marketing Agreement

Ladies and Gentlemen:

Reference is made to the Hydrocarbons Purchase and Marketing Agreement by and between SN EF Maverick, LLC ("Maverick") and SN EF UnSub, LP ("Owner") dated January 12, 2017 (the "Agreement").

As we have discussed, Maverick has been pursuing negotiations towards finalizing a long-term commercial arrangement for gas volumes originating from the Comanche acreage that will benefit Maverick and all working interest partners. This letter serves as notice to Owner under the Agreement that Maverick requests Owner's consent pursuant to Section 2.2 of the Agreement in connection with Maverick's entering into the Firm Gas Gathering, Processing and Purchase Agreement with Carnero G&P LLC ("Carnero"), a Midstream Contract as such term is defined under the Agreement, which is attached to this notice as Exhibit A (the "Comanche FGGPPA"). In addition, Maverick requests that Owner execute and notarize the attached ratification agreement and memorandum thereof (collectively, the "Ratification Documents"), with Owner's counterparts to be deemed held in escrow by Maverick until (and automatically released and delivered to Maverick and Carnero, with no further action, upon) Maverick and Carnero's execution of the Comanche FGGPPA, in substantially the form attached hereto as Exhibit A.

We respectfully request your written consent in connection with Maverick entering into the Comanche FGGPPA and your execution, notarization and delivery of the Ratification Documents as soon as reasonably practicable, but in any event within the ten (10) days of your receipt of this notice.

In connection with this written consent, the parties agree as follows:

1. This consent shall apply to the terms of the FGGPA as in effect on this date and any material amendments, waivers, extensions or termination of the FGGPA would require the further approval of UnSub (such approval not to be unreasonably withheld).

2. Maverick represents that each of the Comanche Producers (as such term is defined in the FGGPA) will be subject to the same FGGPA and to the extent that any more favorable terms under the FGGPA are offered to any Comanche Producer (other than UnSub) after the date of this letter, that Maverick will cooperate to obtain the same terms to UnSub.

3. The parties acknowledge that UnSub's production that will be subject to the FGGPA will continue to be sold by UnSub to Maverick pursuant to the terms of the Agreement. Unless otherwise set forth in the Ratification Agreement, the FGGPPA or this letter agreement, if there is any conflict between the terms of the Agreement and the Ratification Agreement, the terms of the Agreement will govern.

4. Pursuant to Section 5.8(c) of the FGGPA, Canero has the right to directly invoice UnSub for amounts owed under the FGGPA for UnSub's production being delivered under the FGGPA. For avoidance of doubt, there will be no deductions from the purchase price to be paid to UnSub pursuant to subsection (ii) of Section 3.1 of the Agreement to the extent of any such amounts are paid by UnSub directly to Carnero under the FGGPA.

[Signature Page and Election Follows]

As always, please feel free to reach out if you have any questions or concerns.

Best regards,

________________________________

The undersigned hereby makes the following irreversible election regarding the Comanche FGGPPA and the Ratification Documents:

☐ **Owner hereby approves of Maverick entering into the Comanche FGGPPA and hereby delivers to Maverick contemporaneously herewith original executed and notarized counterparts to the Ratification Documents.**

☐ **Pursuant to Section 2.2 of the Agreement, Owner hereby rejects granting its approval.**

Sincerely,

______________________________________

SN EF UnSub, LP
By: SN EF UnSub GP, LLC, its general partner

Name:
Title:



1000 MAIN STREET, SUITE 3000, HOUSTON, TX 77002
TEL: (713) 783-8000 ♦ FAX: (713) 756-2784
WWW.SANCHEZENERGYCORP.COM

Enclosure

Copies by electronic mail to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: James O'Connor
Electronic Mail: joconnor@sanchezog.com

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III

# EXHIBIT 31

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al*.[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This supplemental objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**"), and Kerr-McGee Oil & Gas Onshore LP ("**KMOG**," and together with AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**").

By the Settlement Motion, the Debtors seek expedited approval of a settlement

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

agreement (the "**Settlement Agreement**") between the Debtors and various non-debtor insider parties, including Catarina Midstream, LLC, Sanchez Midstream Partners LP ("**SNMP**"), Seco Pipeline, LLC, and TPL SouthTex Processing Company LP ("**Targa**", and collectively, the "**Sanchez Midstream Parties**"). On June 8, 2020, the Oxy Parties and the WES Parties (the "**Objecting Parties**") filed a preliminary objection to the Settlement Motion (the "**Preliminary Objection**") objecting to the Settlement Agreement and requesting that the Settlement Motion be heard on regular notice. [Docket No. 1314]. In support of this Supplement Objection, the Objecting Parties respectfully represent as follows:

## PRELIMINARY STATEMENT

Through discovery, the Objecting Parties have learned what truly transpired in the weeks leading up to confirmation of the Debtors' Plan,[2] and why that Plan has not been consummated. Since mid-April, the DIP lenders have been threatening to force these cases into chapter 7 in the absence of the deal now embodied in the Settlement Agreement.[3] Unbeknownst to the Court and parties, such settlement was an unstated condition to the effectiveness of the Plan at the time of the April 30th confirmation hearing. Even though the settlement negotiations were still in their infancy at that time, the DIP Lenders pushed the Court to confirm the Plan on an emergency basis, claiming that the cases would convert if the Debtors could not emerge by April 30.[4] Faced with this alleged emergency, the Court instructed the parties to come "ready to close" on April 30 if the Plan was confirmed.[5] Almost two months later, the Debtors still

---

2 The "Plan" refers to the *Second Amended Joint Chapter 11 Plan of Sanchez Energy Corporation and its Affiliated Debtors* [Docket No. 1198].

3 *See* Transcript of the Deposition of Joe Bob Perkins dated June 24, 2020 ("**Perkins Dep. Tr**.") at 95:7-25; 129:6-130:18 (discussing "messaging" that without a deal the case would convert to chapter 7).

4 *See* Perkins Dep. Tr. 134:16-24.

5 *See* Transcript of Deposition of Moshi Meghji dated June 22, 2020 ("**Meghij Dep. Tr.**") at 33:15-19 ("Q: So going into the confirmation hearing on April 30th, you didn't have any expectation that the plan was going to go effective that day, right? A: That day? Q: Yes, sir. A: No, I don't recall having that understanding or assumption."); *see also Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* Docket. No. 1110 at ¶ 2 ("However, the Debtors must satisfy certain conditions to make this all possible, including confirmation of the Plan *and emergence not later than April 30, 2020*.") (emphasis added); Meghji, Dep. Tr. at 158:16-24; 160:2-161:8.

have not emerged from chapter 11, and the DIP Lenders now insist that they will not close on the confirmed Plan without entry into and approval of the Settlement Motion.[6] Apparently, the DIP Lenders believe the Plan is not (and never was) feasible without the $10 million of liquidity provided by the Settlement Agreement,[7] notwithstanding that oil prices have nearly doubled since the confirmation date. But neither the DIP Lenders nor the Debtors raised any concerns regarding the Debtors' feasibility at the April 30th confirmation hearing. And while discovery demonstrated the Debtors knew long before confirmation that the Objecting Parties' many agreements would be rejected,[8] they chose to wait until the literal eve of confirmation to schedule such agreements for rejection – asking this Court to approve an unorthodox procedure, on the basis of the purported emergency, to delay all assumption and rejection disputes until after confirmation and consummation of the Plan.

For their part, the Sanchez Midstream Parties, the non-debtor counterparties to the Settlement Agreement, have been pushing the Debtors to obtain expedited approval of the Settlement Agreement seeking to usurp the value of the Objecting Parties' contracts with the Debtors. Citing "deal fatigue" as their basis to refuse to have the Settlement Motion heard on regular notice,[9] the Sanchez Midstream Parties' real goal seems to be approving the Settlement Agreement before other alternatives materialize. Through affirmative covenants that they insisted upon in the Settlement Agreement, the Sanchez Midstream Parties are forcing the Debtors to pursue rejection of the Objecting Parties' agreements (the "**Comanche Agreements**") at all costs and, in the meantime, foreclosing the Debtors from pursuing a consensual renegotiation with the Objecting Parties and the working interest owners in the

---

6 *See* Meghji, Dep. Tr. at 93:20-94:10; 37:2-22 (testifying that "the DIP lenders' financing commitment [needed for the Plan to go effective] is effectively conditional on the Midstream settlement getting approved").

7 *See* Meghji, Dep. Tr. 26:15-23 (testifying that the receipt of the cash on closing of the Settlement Agreement was a key "component" to make the debtors' plan feasible).

8 *See* Meghji, Dep. Tr. at 58:12-59:16 (testifying that the Debtors had always intended to reject the Comanche Agreements well before they filed the rejection schedule in April).

9 *See* Perkins, Dep. Tr. at 132:24-134:24 (explaining that "negotiations had been tough," they wanted to "get things done with certainty and as quickly as possible," and there was therefore reluctance to extending the hearing date).

Comanche field. In fact, the Sanchez Midstream Parties are not only actively requiring the Debtors to reject the Comanche Agreements, *but are also paying the Debtors $10 million to do so*.

The Debtors meanwhile appear to have completely sidestepped their obligations to the Objecting Parties (as fiduciaries under the Agency Agreements), the other Comanche working interest owners (as operator of the Comanche assets), and the SN Maverick estate. The Debtors' focus appears to be on appeasing the DIP Lenders and taking whatever actions they believe are necessary to emerge from chapter 11, even if doing so means abusing their position as operator of the Comanche fields and pursuing a fruitless and costly litigation path against the Objecting Parties and Comanche working interest owners.

## OBJECTION

1. The Objecting Parties object to the Settlement Motion for three reasons. ***First***, the Settlement Agreement locks the Debtors (and, potentially, the Comanche working interest holders) into a deal that is premised on lengthy and expensive litigation and, in the meantime, prevents the Debtors from pursuing a consensual transaction with the Objecting Parties that could resolve such litigation. This was by design, as the lack of a "fiduciary out" in the Settlement Agreement was not an oversight. Targa's Executive Chairman and immediately former CEO, Joe Bob Perkins, insisted that the Settlement Agreement expressly require the Debtors to (i) list and maintain the Comanche Agreements on the rejected list and (ii) diligently pursue such rejection.[10] When concerns were raised that this Court would not approve such conditions if they violated the Debtors' fiduciary duties, Mr. Perkins testified that he was not

[10] *See* Perkins, Depo. Tr. at 42:16- 43:23, 44:7-14; *see also* Settlement Agreement § 2.2.1.

concerned with the Debtors' "fiduciary whatever" and was focused only on obtaining the benefits of his business deal.[11]

2. While it is a duty for all debtors in chapter 11, retaining the option to pursue a better deal is particularly important here. Not only are the Debtors unlikely to prevail in their rejection efforts (which fruitless pursuit will cause the estate and other parties to waste millions of dollars in legal fees), *but they have never explored with the Objecting Parties the prospect of a re-negotiation of the Comanche Agreements* (despite requests from the other Comanche working interest holders that they do so). Indeed, the Debtors admit to knowing for months prior to confirmation that they would be seeking to reject or renegotiate the Comanche Agreements, but neither informed the Objecting Parties of their intent to reject (until the literal eve of confirmation) nor initiated discussions regarding a potential consensual solution. Moreover, as discussed further below, the irony of this situation is that a fiduciary out is the only thing that may be able to save the Debtors from a breach of fiduciary duty on the Agency Agreements (and avoid numerous claims against the DIP Lenders and the Sanchez Midstream Parties).

3. ***Second***, discovery made clear that the Objecting Parties may have claims against the Sanchez Midstream Parties and the DIP Lenders for a variety of matters concerning the Settlement Agreement. The Settlement Agreement is premised on the Debtors rejecting certain agreements with the Objecting Parties relating to the Debtors' 2017 acquisition from Anadarko of certain working interests in mineral leases in an area referred to as "Comanche" in South Texas. Such agreements include two agency agreements (the "**Agency Agreements**"), pursuant to which certain Debtors committed to act as Anadarko's agent and fiduciary under certain key midstream and downstream contracts for which the counterparties did not consent to assignment to Sanchez. As Anadarko's divestiture of the Comanche assets

[11] *See* Perkins Depo. Tr. at 47:17-20.

made it impossible for it to meet its minimum volume obligations under such agreements, the Debtors agreed, as an integral part of the overall sale, to act as Anadarko's agent, and perform all of Anadarko's obligations, under such agreements.

4. Now, many of the same people (including Tony Sanchez III) that were involved in negotiating and agreeing to the Comanche Agreements on behalf of the Debtors are working on behalf of SNMP and requiring (and paying for) the Debtors to breach those fiduciary and contractual obligations. Given the potential for future litigation among various non-debtors, the Objecting Parties simply seek to ensure that if the Court enters an order approving the Settlement Motion, it be entirely without prejudice to, and in no way impact, any such litigation To ensure that, the Objecting Parties request that the below language be included in any order approving the Settlement Motion:

> Notwithstanding anything to the contrary in this Order, this Order shall not waive, limit, impair, operate to preclude, or otherwise impact in any manner any claims or causes of action arising out of, in connection with, or related to (in any manner) the Settlement Agreement (including the negotiation and performance of the Settlement Agreement) or the rejection of any executory contracts identified in the Settlement Agreement against Sanchez Midstream Partners GP LLC, Sanchez Midstream Partners LP, Catarina Midstream LLC, Seco Pipeline, LLC, Carnero G&P LLC, TPL Southtex Processing Company LP, or TPL SouthTex Pipeline Company LLC or any of the DIP Lenders (as defined in the Plan) or their respective current or former officers, directors, members, managers, partners, representatives, employees, agents and assigns, including, without limitation, any claims for aiding and abetting breach of fiduciary duty, conspiracy to commit breach of fiduciary duty or tortious interference with contract (and nothing contained in this Order shall create a justification or privilege for any alleged interference).

5. ***Third,*** as set forth in the Preliminary Objection, the Objecting Parties are concerned that the Debtors, in entering into the Settlement Agreement and obtaining court approval thereof, are seeking to avoid their obligations under the Confirmation Order to continue performance under the Comanche Agreements until an order is entered resolving all rejection disputes.[12] In an attempt to address this concern, the Debtors, in their reply to the

[12] Docket No. 1212 ¶¶ 23-24.



4813-7209-3121.1

Objecting Parties' Preliminary Objection, stipulated that they will continue to perform on all executory contracts until they are assumed or rejected as set forth in the Confirmation Order.[13] While the Debtors and the Objecting Parties appear to be in agreement on this point, the Objecting Parties request that the below language be included in any order approving the Settlement Agreement so that it is binding on all parties:

> Notwithstanding anything to the contrary in this Order, the Motion, the Assumed Agreements, the New Seco Pipeline Agreements or the Settlement Agreement (including the Amendment to the Settlement Agreement), (i) the Debtors and Reorganized Debtors shall continue to comply with all executory contracts and unexpired leases until they are assumed or rejected as set forth in paragraphs 23 and 24 of the Confirmation Order and (ii) the Settlement Agreement (including the Amendment to the Settlement Agreement) and this Order does not modify or impact any rights or defenses of any Counterparty (as defined in the Confirmation Order) in connection with any objection to the assumption or rejection of any executory contracts or unexpired leases (and to prosecute any timely filed objection) under the Plan or Confirmation Order.

Inclusion of this language simply gives effect to the stipulation that the Debtors have offered and ensures that neither the Settlement Agreement, nor any order approving it, are in conflict with the Confirmation Order.

**CONCLUSION**

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Settlement Motion, and grant any other related relief as the Court otherwise deems just and proper.

*[remainder of page intentionally left blank]*

---

[13] Docket No. 1325 p. 2 ("For the avoidance of doubt, the Debtors expressly stipulate that, as set forth in paragraphs 23 and 24 of the Confirmation Order, the Debtors are required to continue to comply with all contracts until they are assumed or rejected.").

Respectfully submitted this 25th day of June, 2020.

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
Jonathan M. Hyman (Texas Bar No. 24032455)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 25th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner

# EXHIBIT 32

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1326 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC, SN EF UNSUB GP, LLC, AND SN EF UNSUB, LP TO DEBTORS' REJECTION OF THE COMANCHE AGREEMENTS**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 2

BACKGROUND ........ 4

A. The Comanche Transaction ........ 4

B. Recordation of the Joint Development Agreement and Drilling Commitment Agreement ........ 10

C. The Joint Development Agreement and Sanchez's Status as Operator ........ 11

D. The LLC Agreement and Governance of UnSub ........ 12

E. The Marketing Agreement and the Springfield Agreements ........ 13

OBJECTION ........ 17

I. The Debtors Cannot Reject the Comanche Agreements Because They Constitute an Indivisible Contract that Contains Covenants Running with the Land ........ 17

A. The Comanche Agreements Are Part of One Integrated Contract that Must Be Accepted or Rejected Together ........ 17

B. The Inseverable Comanche Agreements Contain Covenants Running with the Land ........ 25

II. Rejection of the Marketing Agreement Is Not a Sensible Exercise of the Debtors' Business Judgment ........ 29

CONCLUSION ........ 34

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alta Mesa Res., Inc.*,
No. 19-35133, 2019 WL 7580122 (Bankr. S.D. Tex. Dec. 20, 2019) ..............................25, 28

*Am. Ref. Co.* v. *Tidal W. Oil Corp.*,
264 S.W. 335 (Tex. Civ. App. 1924) ..............................27

*In re Badlands Energy, Inc.*,
608 B.R. 854 (Bankr. D. Colo. 2019) ..............................25, 28

*In re Buffets Holdings, Inc.*,
387 B.R. 115 (Bankr. D. Del. 2008) ..............................23

*Cont'l Warranty, Inc.* v. *Warner*,
108 F. Supp. 3d 250 (D. Del. 2015) ..............................19

*In re DeVries*,
No. 11-43165-DML-7, 2014 WL 4294540 (Bankr. N.D. Tex. Aug. 27, 2014) ..............................23

*In re Dickinson Theatres, Inc.*,
No. 12-22602, 2012 WL 4867220 (Bankr. D. Kan. Oct. 12, 2012) ..............................20

*In re Energytec, Inc.*,
739 F.3d 215 (5th Cir. 2013) ..............................25

*In re Foothills Texas, Inc.*,
476 B.R. 143 (Bankr. D. Del. 2012) ..............................18

*In re Houston Bluebonnet, LLC*,
No. 16-34850, 2020 WL 930111 (Bankr. S.D. Tex. Feb. 21, 2020) ..............................25, 27

*In re Houston Reg'l Sports Network, L.P.*,
547 B.R. 717 (Bankr. S.D. Tex. 2016) ..............................21

*In re Indep. Am. Real Estate, Inc.*,
146 B.R. 546 (Bankr. N.D. Tex. 1992) ..............................18, 21, 24

*Inwood N. Homeowners' Ass'n, Inc.* v. *Harris*,
736 S.W.2d 632 (Tex. 1987) ..............................25

*Johnson* v. *Walker*,
824 S.W.2d 184 (Tex. App. 1991) ..............................18

*Jones* v. *Kelley*,
614 S.W.2d 95 (Tex. 1981) ..............................22

## TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*,
139 S. Ct. 1652 (2019) .......... 30

*MJR Oil & Gas 2001 LLC* v. *AriesOne, LP*,
558 S.W.3d 692 (Tex. App. 2018) .......... 26

*In re Murexco Petroleum, Inc.*,
15 F.3d 60 (5th Cir. 1994) .......... 30

*In re Nat'l Gypsum Co.*,
208 F.3d 498 (5th Cir. 2000) .......... 24

*Norman* v. *Elkin*,
338 F. Supp. 3d 361 (D. Del. 2018) .......... 19

*In re Oregon Arena Corp.*,
No. 304-31605-ELP11, 2006 WL 488713 (D. Or. Feb. 28, 2006) .......... 21, 22, 24

*In re Orion Pictures Corp.*,
4 F.3d 1095 (2d Cir. 1993) .......... 29

*Petroleum Expl. Int'l, S.A.* v. *Canrig Drilling Techs., Ltd.*,
No. 08-cv-1283, 2009 WL 4716043 (S.D. Tex. Dec. 7, 2009) .......... 18, 19, 20

*In re Pilgrim's Pride Corp.*,
403 B.R. 413 (Bankr. N.D. Tex. 2009) .......... 29

*In re Plaza*,
363 B.R. 517 (Bankr. S.D. Tex. 2007) .......... 18

*Richmond Leasing Co.* v. *Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) .......... 29

*In re Sabine Oil & Gas Corp.*,
550 B.R. 59 (Bankr. S.D.N.Y. 2016) .......... 25

*Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*,
83 F.3d 735 (5th Cir. 1996) .......... 18, 23

*Matter of T & H Diner, Inc.*,
108 B.R. 448 (D.N.J. 1989) .......... 24

*In re Teligent, Inc.*,
268 B.R. 723 (Bankr. S.D.N.Y. 2001) .......... 24

**<u>TABLE OF AUTHORITIES</u>**
**(Continued)**

**<u>Page(s)</u>**

*In re Trinity Coal Corp.*,
514 B.R. 526 (Bankr. E.D. Ky. 2014) ............................................................21, 22, 24

*In re Wagstaff Minnesota, Inc.*,
No. BR 11-43073, 2012 WL 10623 (D. Minn. Jan. 3, 2012) ..................................................24

STATUTES

11 U.S.C. § 365 ..........................................................................................................25, 29

Tex. Prop. Code § 13.002 ..........................................................................................................28

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC ("Unsub GP"), the general partner of SN EF UnSub, LP ("UnSub"), UnSub GP, and UnSub, by and through the undersigned counsel, hereby submit this objection to the Debtors' proposed treatment, pursuant to the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], of the following agreements:[2] the Hydrocarbons Purchase and Marketing Agreement by and between SN EF Maverick, LLC ("Maverick") and UnSub, dated as of January 12, 2017; the Letter Agreement among Sanchez Energy Corporation ("Sanchez"), Maverick and UnSub, dated January 12, 2017; the Joint Development Agreement by and among Gavilan Resources, LLC, Maverick, UnSub, and Sanchez, dated as of March 1, 2017; the Memorandum of the Joint Development Agreement; the Development Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Maverick, UnSub, and Gavilan Resources, LLC, dated March 1, 2017; the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017; the Amended and Restated Securities Purchase Agreement among Sanchez, SN UR Holdings, LLC, SN EF UnSub GP, LLC, UnSub, SN EF Unsub Holdings, LLC, GSO, and Intrepid Private Equity V-A, LLC, dated February 28, 2017; and the Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LLP, Maverick, UnSub, and Aguila Production, LLC, dated January 12, 2017.

2 These agreements, and other supporting documents, are attached to this Objection as exhibits. Each exhibit is cited as "Ex. __."

**PRELIMINARY STATEMENT**

In 2017, Sanchez entered into a $2 billion transaction to purchase a 49% working interest (the "Anadarko Interest") in over 300,000 gross acres of oil and gas rights known as the "Comanche Assets." Sanchez did not have the financial ability to undertake this purchase itself, and so brought in outside investors and other partners to consummate the Comanche Transaction. Given the large purchase price, the scope of the assets, and the multiple parties involved, the transaction was complex, requiring numerous interrelated agreements. Sanchez made its investment through two entities: Maverick, an unrestricted, wholly owned subsidiary of Sanchez that is one of the Debtors, and UnSub, an unrestricted, partially-owned, bankruptcy-remote subsidiary that served as a joint investment vehicle for Sanchez and GSO and is not one of the Debtors.

Among these interrelated agreements (the "Comanche Agreements") are: the Purchase and Sale Agreement that governed the sale of the Anadarko Interest; the Securities Purchase Agreement that governed the terms by which GSO made its investment in UnSub; the Joint Development Agreement that set forth the terms for how the buyers of the Anadarko Interest would operate them; the Marketing Agreement, in which UnSub agreed to Sanchez (through Maverick) marketing its share of hydrocarbons in exchange for a share of the net proceeds after deducting certain specified costs; and the Letter Agreement that set forth additional terms of the relationship between UnSub and Maverick.

The Debtors have now scheduled most, but not all, of the Comanche Agreements for rejection. This is not permitted for two reasons:

*First*, all of the documents effectuating the Comanche Transaction constitute—by express agreement of the parties—a single, indivisible contract, described in the Marketing Agreement as "unseverable." Indeed, the Debtors have waived any argument to the contrary. In

several of these agreements—including three the Debtors now purport to reject: the Securities Purchase Agreement, the Letter Agreement, and the Marketing Agreement—Sanchez stated in clear and unambiguous terms that it "waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents [a term defined to include the Comanche Agreements] are anything other than a true single agreement relating to such matters." As a result, the Debtors must accept or reject the entire suite of interrelated agreements together. And that makes sense, not just as a formal matter, but as a practical one, given the cross references throughout the agreements and interrelated nature of the agreements.

But the Debtors are seeking to assume one of the Comanche Agreements—the LLC Agreement governing the management of UnSub—and reject the remaining documents. This attempt to "cherry pick" from an indivisible agreement is clearly not allowed. Further, the Debtors cannot reject any of the integrated documents comprising the Comanche Agreements because several of the agreements include covenants running with the land. A debtor may not reject an agreement with a covenant that "runs with the land" because such a covenant creates a real property interest that is not extinguished through bankruptcy. As detailed below, each of the factors that courts examine to determine whether a covenant runs with the land is easily satisfied. And because these agreements are part of an inseverable whole, the only alternative available to the Debtors is assumption of the Comanche Agreements in their entirety—including the LLC Agreement.

*Second*, the Debtors' rejection of the Comanche Agreements—which by operation of law constitutes a breach—represents a disastrous exercise of the Debtors' business judgment. While the business judgment standard is no doubt deferential, there are limits, and the rejection of these agreements exceeds them. The negative effects of such a breach could include, among other

things, Sanchez's liability for Maverick and UnSub's entire share of the Comanche midstream costs, Sanchez's loss of operatorship over the Comanche Assets, and a potential default under UnSub's credit agreement, which could permit UnSub's reserve-based lenders to foreclose upon Sanchez's entire stake in UnSub's reserves. The harm that would befall the Debtors if their ill-conceived attempt to reject the Comanche Agreements were granted simply cannot be justified as an exercise of reasonable business judgment.

For these reasons, and as set forth in greater detail below, GSO and UnSub respectfully request that this Court deny rejection of the Comanche Agreements or, in the alternative, deny assumption of the LLC Agreement.

## BACKGROUND

### A. The Comanche Transaction

1. On January 12, 2017, Sanchez and its co-investors agreed to pay over $2 billion to purchase a 49% working interest in over 300,000 gross acres of oil and gas rights from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko"). This acreage—collectively called the "Comanche Assets"—is primarily located in the Western Eagle Ford Shale. (*See* Ex. A, Sanchez's Form 10-K for 2016, dated February 27, 2017 ("2016 10-K"), at 62.[3]) The transaction closed on March 1, 2017. (*See* Ex. B, Sanchez's Form 8-K dated March 6, 2017.[4])

2. As one might expect given the size and price of these assets, the purchase was a complex transaction requiring outside financing. Half of the overall purchase price for the

---

3 Available at https://www.sec.gov/Archives/edgar/data/1528837/000155837017001086/sn-20161231x10k.htm.

4 Available at https://www.sec.gov/Archives/edgar/data/1528837/000110465917014418/a17-7482_28k.htm.

Anadarko Interest was paid by Gavilan Resources, LLC ("Gavilan"), an entity controlled by The Blackstone Group, L.P. ("Blackstone"), which accordingly acquired half of the Anadarko Interest, representing an approximately 25% uniform working interest across the Comanche field. The other half of the Anadarko Interest, representing an approximately 25% working interest in the Comanche field (the "Maverick/UnSub Share"), was acquired by Maverick (a wholly-owned Sanchez subsidiary) and UnSub (a partially-owned, unrestricted Sanchez subsidiary). The Maverick/UnSub Share was divided unevenly between Maverick and UnSub: Maverick acquired none of proved developed producing ("PDP") assets and 60% of the undeveloped reserves, while UnSub acquired 100% of the PDP assets and 40% of the undeveloped reserves. (2016 10-K at 62.) UnSub paid a substantial purchase price for its share of the Maverick/UnSub Share, with $500 million contributed by GSO and its co-investors in exchange for preferred equity in UnSub, $100 million by Sanchez in subordinated common equity, and $175 million from the RBL lenders. (*See* Ex. A, 2016 10-K, at 64.)

3. Sanchez, Gavilan, and GSO negotiated terms for how the Comanche Assets would be developed and operated, as well as how the revenues and costs associated with the Comanche Assets would be allocated among the parties. Gavilan and UnSub were given a seat at the table alongside Sanchez when making certain decisions about operating the assets. Further, GSO agreed that UnSub's share of the oil and gas would be marketed by Maverick, subject to detailed provisions specifying how Sanchez's midstream production costs (especially pipeline costs) would be passed on to UnSub. The parties agreed that Sanchez would operate the Comanche Assets pursuant to the JDA and would also initially have control of a majority of UnSub's board of directors. But the parties were also careful not to give Sanchez unfettered control of UnSub,

building in a robust set of minority governance protections for UnSub, including the ability to take over UnSub's board under certain circumstances—which has since occurred.

4. This complex transaction by which Sanchez financed, purchased, and operated the Anadarko Interest (the "Comanche Transaction") was embodied in a number of agreements between multiple parties. These parties included the following, among others:

- Anadarko: the seller of the Anadarko Interest;
- Sanchez (a Debtor);
- Maverick (*i.e.*, SN EF Maverick, LLC) (a Debtor): the restricted, wholly-owned subsidiary of Sanchez through which Sanchez paid about 13% of the purchase price for the Anadarko Interest, and which acquired 30% of the proved developed nonproducing ("PDNP") reserves and 30% of the undeveloped reserves (but none of the PDP reserves);
- SN UR Holdings, LLC (a Debtor): the holding company for Sanchez's other unrestricted subsidiaries;
- UnSub (*i.e.*, SN EF UnSub, LP): an unrestricted, non-debtor subsidiary of Sanchez that paid a substantial part of the purchase price for the Anadarko Interest ($100 million coming from Sanchez, $500 million from GSO and its co-investors, and $175 million from UnSub's reserve-based lenders), and acquired 50% of the PDP reserves, 20% of the PDNP reserves, and 20% of the undeveloped reserves;
- SN EF UnSub GP, LLC ("UnSub GP"): UnSub's general partner, whose management board includes representation from both Sanchez and GSO;
- Gavilan (referred to in the transactional documents under its former name, Aguila Production, LLC): the Blackstone-controlled entity that paid about 50% of the purchase price for and received half of the Anadarko Interest; and
- GSO.

5. The agreements effecting the Comanche Transaction included the following, among others:

- A **Purchase and Sale Agreement** (dated January 12, 2017) in which Anadarko agreed to sell the Anadarko Interest to Maverick, UnSub, and Gavilan;

- A **Development Agreement** (dated March 1, 2017) (the "Drilling Commitment Agreement") between Anadarko and the three buyers (Maverick, UnSub, and Gavilan), in which the buyers promised to drill at least 60 wells per year on the Comanche Assets for five years;

- A **Securities Purchase Agreement** (initially dated January 12, 2017, and then amended and restated on February 28, 2017) in which GSO and a minority investor agreed to invest in the Comanche Assets through UnSub. The Sanchez parties to this agreement included Sanchez, Maverick, UnSub, and SN UR Holdings, LLC (the holding company for Sanchez's other unrestricted subsidiaries and one of the Debtors);

- A **Limited Liability Company Agreement** (dated March 1, 2017) (the "LLC Agreement") for UnSub GP, the entity that effectively controls the operations of UnSub. Sanchez initially had a majority of the seats on UnSub GP's management board, subject to substantial protections for GSO (discussed in greater detail below);

- The **Marketing Agreement** (dated January 12, 2017) between Maverick and UnSub, under which Maverick agreed to buy UnSub's share of the oil and gas produced by the Comanche Assets, and which set forth how much Maverick would pay UnSub for the oil and gas after taking into account costs, including certain midstream production costs (discussed in greater detail below);

- A **Letter Agreement** (dated January 12, 2017) between Maverick and UnSub, that laid out various other terms of the relationship between Maverick and UnSub;

- A **Joint Development Agreement** (dated March 1, 2017) among Sanchez, Maverick, UnSub, and Gavilan, which governs how decisions are made about developing and operating the Comanche Assets; and

- A **First Lien Credit Agreement** (dated March 1, 2017) (the "RBL Agreement") between UnSub and its reserve-based lenders.[5]

[5] In citations, we will refer to these agreements using the following abbreviations: the Purchase and Sale Agreement as the "PSA"; the Drilling Commitment Agreement (Ex. H) as the "DCA"; the Amended and Restated Securities Purchase Agreement (Ex. C) as "SPA"; the Marketing Agreement (Ex. D) as "MA"; the Letter Agreement (Ex. E) as "LA"; the Joint Development Agreement (Ex. G) as "JDA"; the LLC Agreement (Ex. F) as the "LLC Agmt."; and the RBL Agreement (Ex. P) as the "RBL Agmt."

6. All of the agreements effectuating the Comanche Transaction—the foregoing as well as several others—represent an intricate machinery, each piece necessary to carry out the expectations of the parties. The Securities Purchase Agreement was accordingly drafted to condition GSO's nearly half-billion-dollar investment on the execution of these agreements, attaching all of them as exhibits. (*See* SPA § 1.01.) To the extent not already executed on January 12, 2017, the date of signing, they all had to be executed by closing on March 1, 2017. (*See* SPA §§ 2.03–2.06.)

7. The agreements also made clear that they consisted of a single, integrated contract governing the Comanche Transaction. Each of the agreements set forth above (including all of the Comanche Agreements the Debtors seek to reject) are referred to as "Basic Documents," a term defined in the Securities Purchase Agreement (*see* SPA § 1.01) and incorporated by reference elsewhere.[6] The Marketing Agreement, Letter Agreement, LLC Agreement, and Securities Purchase Agreement each explained that they, together with all of the other Basic Documents, consist of a single, integrated contract:

> This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) **the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby**, (ii) **it waives, on behalf of itself and each of its Affiliates, any claim or defense**

[6] The Letter Agreement, LLC Agreement, and Marketing Agreement cross-reference the definition of "Basic Documents." (*See* MA Annex I; LLC Agmt. § 11.1; LA § 9.)

> **based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and** (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. **Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.**

(MA § 8.14 (emphasis added); *see also* LA § 14; LLC Agmt. § 12.3; SPA § 8.06 (substantially identical provisions).)

8. The Comanche Agreements are integrated not just as a formal legal matter, but as a practical, substantive matter. Their operative provisions repeatedly cross-reference each other. For example, the LLC Agreement contains several provisions that reference other Comanche Agreements, including by:

a. providing for the appointment of UnSub's representative to the operating committee formed by the Joint Development Agreement (LLC Agmt. § 5.7(a)(xxx));

b. requiring GSO's approval to "terminate, extend, amend, or modify" the Marketing Agreement (LLC Agmt. § 5.7(b)(xix));

c. requiring GSO's approval to amend the Joint Development Agreement in a manner unfavorable to UnSub (LLC Agmt. § 5.7(b)(xxi));

d. requiring GSO's approval on affiliate transactions, including those with Sanchez Midstream Partners, LP (LLC Agmt. § 5.7(b)(xiii)); and

e. requiring GSO's approval on various development and operational decisions for UnSub in relation to capital expenditures and non-consent decisions (LLC Agmt. § 5.7(b)(xxiv)–(xxvi).)

**B. Recordation of the Joint Development Agreement and Drilling Commitment Agreement**

9. Two agreements—the Joint Development Agreement and the Drilling Commitment Agreement—played a particularly important role in the Comanche Transaction. The three buyers (Maverick, UnSub, and Gavilan) entered into a Joint Development Agreement to establish the "capital planning, operatorship, transfer, and economic rights" with respect to the jointly-owned Comanche Assets. (JDA, Recitals.) Simultaneously, the buyers executed a Drilling Commitment Agreement with Anadarko to address Anadarko's concerns about the "near-term development" of the Comanche Assets. (DCA, Recitals.)

10. These agreements contained important covenants in relation to the Comanche Assets. The memorandum of record filed in the real property records associated with the JDA has a clear and unambiguous statement that all of the terms of the JDA are covenants running with the land. For example, in Section 5.3 ("Spacing Protections") of the Joint Development Agreement, the three buyers promised each other that they would ensure minimum spacing between wells drilled on the land. (JDA § 5.3.) And in Section 2.1 ("Drilling Commitments") of the Drilling Commitment Agreement, the buyers promised Anadarko that they would drill at least 60 wells per year on the land for the first five years "[a]s part of the consideration" for the acquisition of the Anadarko Interest. (DCA, Recitals; *see id.* §§ 2.1, 3.2.)

11. Both agreements expressly stated that these covenants run with the land. Section 5.3 of the Joint Development Agreement provided that it contains "covenants running with the land and shall be binding upon the Parties and their assigns," that these covenants "will burden

the lands" and "create a privity of estate between the Parties," and that "such obligations will not be subject to rejection in the event of any bankruptcy." (JDA § 5.3(f).) And Section 4.1 of the Drilling Commitment Agreement stated that the drilling commitments "shall be covenants running with the land." (DCA § 4.1.)

12. Because these documents created property rights, they were recorded in county property registries pursuant to Texas law. A memorandum of the Joint Development Agreement[7] was filed in Maverick, Webb, La Salle, and Dimmit Counties. It expressly memorialized the parties' intent that "the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land." (JDA Mem. § 7.) The Drilling Commitment Agreement was also recorded.

### C. The Joint Development Agreement and Sanchez's Status as Operator

13. The Joint Development Agreement had further importance to the Comanche Transaction by specifying how the Comanche Assets will be operated, including by providing for Sanchez's continuing role as operator of the assets.

14. The Comanche Assets are divided into approximately 18 different areas, each governed by a different Joint Operating Agreement (each, a "JOA"). The parties to each JOA are all the owners of working interests in that area. The Anadarko Interest—which represents approximately 50% of the Comanche field—is owned collectively by Maverick, UnSub, and Gavilan, and the remaining 50%—the portion of the Comanche field not previously owned by Anadarko—is owned by other working-interest holders.

15. Under each JOA, Sanchez has been appointed as the operator of the assets and is entitled to substantial compensation for performing that role—compensation that totals $20 million

---

[7] Cited as the "JDA Mem." (Ex. I).

for all the Comanche Assets. (*See, e.g.*, Ex. K, Exhibit 99.1 to Sanchez's Form 8-K, dated April 7, 2020, at 33.) Sanchez can, however, be removed as operator for "good cause" in a given area by a majority vote of the non-operating working-interest holders. Moreover, Sanchez automatically becomes ineligible to serve as operator if it no longer has any working interest in that area. (*See, e.g.*, Ex. L, JOA for the Maverick Basin Project § V(A)(1).)

16. Under the Joint Development Agreement, Maverick, UnSub, and Gavilan have agreed that they will vote their combined 50% working interest together under each JOA, retaining Sanchez as the operator and supporting Sanchez's decisions about how to develop and operate the assets. To the extent UnSub and Gavilan seek to influence Sanchez's decisions, they must do so through an operating committee established under the Joint Development Agreement, while presenting a united front to the other working-interest holders under each JOA. (*See* JDA §§ 3.2, 3.8.)

17. As described above, Maverick's and UnSub's ownership of the Maverick/UnSub Share is not uniform. The Debtors do not own any interest in approximately 1,500 of the 1,800 wells in the field because they did not acquire any of the PDP wells at closing.[8] In this vein, the Debtors, through Maverick, own an interest in just 300 of the total 1,800 wells in the Comanche field. Accordingly, the Debtor derives significant control and value through the JDA, and the JDA provides operational protections to Gavilan and UnSub to the extent Sanchez remains operator.

**D. The LLC Agreement and Governance of UnSub**

18. UnSub, a limited partnership, serves as a joint investment vehicle holding a share of the Comanche Assets purchased with investments from both Sanchez ($100 million) and GSO

[8] The Debtors also have a common-equity interest in UnSub; however, that interest, which is subordinated to UnSub's RBL debt and GSO's preferred-equity interest, is out of the money.

and its co-investors ($500 million), as well as RBL lenders ($175 million). The proper management of GSO's half-billion-dollar investment in UnSub was naturally of great concern to GSO in entering into the Comanche Transaction.

19. UnSub is managed by its general partner, UnSub GP—a limited liability company managed pursuant to the LLC Agreement. Even though GSO contributed vastly more equity to UnSub's purchase of its share of the Anadarko Interest than Sanchez did, it was understood that Sanchez—given its economic ownership of the common equity of UnSub and given it is in the business of operating oil and gas assets—would initially manage UnSub's business operations. Accordingly, the LLC Agreement establishes a management board that initially consisted of three Sanchez representatives and two GSO representatives. Nonetheless, in order to protect GSO's investment, the LLC Agreement permitted GSO to take over UnSub GP (and thus UnSub), and even transfer the assets or equity of UnSub, under certain conditions. Section 9.5 of the LLC Agreement defines several Investor Redemption Events. Following such an event, the composition of UnSub GP's board automatically changes to give GSO a majority of the seats—permitting GSO to take control of UnSub from Sanchez. (LLC Agmt. § 5.3(d).) Moreover, such an event gives GSO the right to pursue a merger of UnSub into any other business entity, a sale of all or any portion of Sanchez's membership interest in UnSub GP, or a sale of all of the assets of UnSub. (*Id.* § 9.5(a)(1)–(3).)

20. On May 1, 2020, GSO notified Sanchez that an Investor Redemption Event had previously occurred, and UnSub's board automatically expanded to give GSO a majority of the seats. (Ex. M, Letter from Marisa Beeney to Gregory Kopel, dated May 1, 2020.)

**E. The Marketing Agreement and the Springfield Agreements**

21. The Marketing Agreement also played a critical role in the Comanche Transaction by providing important economic protections for UnSub.

22. As noted above, the Marketing Agreement regulated how Sanchez would pay for UnSub's oil and gas and how Sanchez's midstream costs would be passed on to UnSub. UnSub has not entered into any midstream agreements itself; rather, Sanchez has entered into midstream agreements, and UnSub relies on Sanchez to market its volumes and remit net revenues to it, after Sanchez has deducted UnSub's share of the midstream charges. A major component of Sanchez's midstream costs came from pipeline agreements (the "Springfield Agreements") it entered into with Springfield Pipeline, LLC ("Springfield," a subsidiary of Western Gas Partners, LP).[9] These agreements contained minimum volume commitments, requiring Sanchez to deliver certain minimum quantities of oil and gas to Springfield's pipelines. (Springfield Oil Gathering Agmt., § 3(D)(ii)(a)); Springfield Gas Gathering Agmt. § 3(E)(i)(a).) The commitment levels effectively require Sanchez to deliver Maverick and UnSub's combined share of the oil and gas produced by the Comanche Assets to Springfield. Sanchez has warranted that it holds title to all productions to be delivered to Springfield—guaranteeing that it can deliver both Maverick's and UnSub's share—and it accesses UnSub's share through Maverick's right to market UnSub's hydrocarbons under the Marketing Agreement. (*See* Springfield Gas Gathering Agmt. § 12.1; Springfield Oil Gathering Agmt. § 13(H).) If it does not meet the minimum volume commitments, Sanchez incurs additional charges (which we will refer to as "midstream charges"). (*See* Springfield Oil Gathering Agmt., § 3(D)(ii)(a)); Springfield Gas Gathering Agmt. § 3(E)(i)(a).)

23. Importantly, these volume commitments increase over time and continue long into the future, reflecting Springfield's and Sanchez's expectations, when they entered into the

---

[9] We discuss here the two most important agreements between Springfield and Sanchez, the Second Amended and Restated Lease Dedication and Oil Gathering Agreement (Ex. N, cited as the "Springfield Oil Gathering Agmt.") and Second Amended and Restated Lease Dedication and Gas Gathering Agreement (Ex. O, cited as the "Springfield Gas Gathering Agmt.), both dated June 1, 2017.

Springfield Agreements, of rising production from drilling undeveloped acreage. In contrast, over time, the PDP wells that were producing at the time of the Comanche Transaction (assets purchased by, and allocated exclusively to, UnSub) will begin to run dry and experience declining production. Thus, in order to continue meeting its volume commitments, Sanchez had to develop and bring into production PDNP and undeveloped reserves that were not yet producing when the Anadarko Interest was acquired. If Sanchez failed to do so, the overall midstream charges of the Comanche field would increase relative to production levels, and Sanchez would incur midstream charges commensurate with its ownership of both developed and undeveloped reserves net of reimbursement from UnSub.

24. The Marketing Agreement determines how the midstream charges under the Springfield Agreements would be passed onto UnSub (and, ultimately, GSO)—a critically important subject, because the Maverick/UnSub Share was not divided evenly between Maverick and UnSub. Together, Maverick and UnSub acquired half of the Anadarko Share—that is, 50% of the PDP reserves, 50% of the PDNP reserves, and 50% of the undeveloped reserves of the Anadarko Share. But these reserves were allocated unevenly. UnSub acquired all of these PDP reserves (*i.e.*, the entire 50% of the Anadarko Share), but only a minority of the PDNP and undeveloped reserves: Maverick took 30% of the PDNP and undeveloped reserves of the Anadarko Share, while UnSub took the remaining 20% of the PDNP and undeveloped reserves of the Anadarko Share. As a result of this asset split, UnSub's production would be expected to modestly grow, remain flat, or decline over time, while Maverick's production would be expected to experience extremely high growth (from zero at the time of closing to a substantial level).

25. While this allocation of the reserves gave Sanchez (through Maverick) a greater share in the upside from future development and no initial production, it was foundational to the

transaction that midstream charges be allocated appropriately based on ownership of *both developed and undeveloped reserves* and that a portion of future midstream charges be satisfied from development of then undeveloped reserves; that Sanchez bear an appropriate share of midstream charges associated with its planned development as significant owner of undeveloped reserves and operator; and that UnSub would not bear an unreasonably high portion of the midstream charges if production levels were low as a result of Sanchez's failure to develop undeveloped reserves. If Sanchez chose not to tap into the PDNP and undeveloped reserves (or to do so slowly), overall production levels would be below expectations—causing higher per unit midstream charges under the Springfield Agreements. At the same time, the share of overall production attributable to the initial PDP reserves (all owned by UnSub) would remain high. If the resulting midstream charges were allocated between UnSub and Maverick purely on a pro rata basis by volume (which it was not), UnSub would disproportionately bear these cost increases. In effect, UnSub (and through it, GSO) would bear the costs that should rightfully be allocated to Sanchez given its higher share of undeveloped reserves and given its responsibility for the costs and risks of development of the undeveloped acreage.

26. To avoid such an outcome and realign Sanchez's incentives with UnSub's, Exhibit A to the Marketing Agreement contained a schedule of minimum and maximum rates, based on Sanchez' forecast, that UnSub would pay on its share of oil-and-gas production. (MA Ex. A; *see also* MA Annex I (definition of "Producer's Allocable Share of the Springfield Agreements").) If production was lower than expected, the maximum rate limited UnSub's exposure to the resulting midstream charges. By contrast, if production increased and average costs fell, the minimum rate would cause UnSub to take on more than its pro rata share of production costs. This structure was intended to allocate midstream charges appropriately among

the parties based on their respective shares of developed and undeveloped reserves, and provided Sanchez with upside in the event it beat expectations in developing the PDNP and undeveloped reserves.

27. This made the Marketing Agreement a critical component of the overall Comanche Transaction. Without the protections afforded by allocation of midstream charges under the Marketing Agreement, UnSub (and thus GSO) would have faced unacceptable risk of paying more than its fair share of the midstream charges and there never would have been a deal, because GSO would not have invested in UnSub.

28. UnSub's reserve-based lenders also would not have participated absent the Marketing Agreement. Indeed, the RBL Agreement included the Marketing Agreement as a "Material Contract," meaning that UnSub is prohibited from modifying or terminating it and that UnSub must give the lenders notice of any breach of the Marketing Agreement. (*See* RBL Agmt. §§ 1.1, 6.1(x), 9.1(n), 10.13(a).). UnSub's RBL lenders have included the Marketing Agreement in their determination of the borrowing base, and are permitted a special redetermination of lending value if the Marketing Agreement is rejected, potentially causing permanent damage to UnSub.

## OBJECTION

### I. The Debtors Cannot Reject the Comanche Agreements Because They Constitute an Indivisible Contract that Contains Covenants Running with the Land

#### A. The Comanche Agreements Are Part of One Integrated Contract that Must Be Accepted or Rejected Together

29. The Debtors seek to assume the LLC Agreement but reject the other agreements effectuating the Comanche Transaction. But they cannot do so. By the parties' express agreement, all of the agreements effectuating the Comanche Transaction—including the LLC Agreement—constituted a single, indivisible contract. Indeed, the plain language of the contracts estops the Debtors from characterizing the Comanche Agreements as severable from one another. Other



011690

factors typically consulted by Texas courts to evaluate severability—the subject matter of the agreement and the parties' conduct—only confirm this conclusion.

30. "The general rule in bankruptcy is that a contract must be assumed or rejected in its entirety"; a debtor cannot pick and choose, assuming some parts of a contract and rejecting others. *In re Plaza*, 363 B.R. 517, 522 (Bankr. S.D. Tex. 2007) (citing *Stewart Title Guar. Co.* v. *Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996)). State law determines whether a collection of agreements compromises one indivisible contract or many severable contracts. *In re Indep. Am. Real Estate, Inc.*, 146 B.R. 546, 550 (Bankr. N.D. Tex. 1992). Here, some of the agreements (including the Marketing Agreement) are governed by Texas law (*see* MA § 8.4(a)), while others (such as the Securities Purchase Agreement) are governed by Delaware law (*see* SPA § 3.10). The result under either state's law is the same.

31. Under Texas law, the "issue as to severability is whether or not the parties would have entered into the agreement absent the [severed] parts." *Stewart Title*, 83 F.3d at 739 (alteration in original) (quoting *McFarland* v. *Haby*, 589 S.W.2d 521, 524 (Tex. Civ. App. 1979), *writ refused n.r.e.* (Feb. 27, 1980). "If there is a single assent to a whole transaction involving several things, a contract is entire, but if there is a separate assent to each of the several things involved, it is divisible." *Johnson* v. *Walker*, 824 S.W.2d 184, 187 (Tex. App. 1991). In determining severability, Texas courts look to "(1) the intent of the parties; (2) the subject matter of the agreement; and (3) the conduct of the parties." *Petroleum Expl. Int'l, S.A.* v. *Canrig Drilling Techs., Ltd.*, No. 08-cv-1283, 2009 WL 4716043, at *1 (S.D. Tex. Dec. 7, 2009) (citing *Johnson*, 824 S.W.2d at 187). "The intent of the parties is the primary determinant." *Id.* (citing *Stewart Title*, 83 F.3d at 739). Indeed, the other factors—the agreement's subject matter and the parties' conduct—are relevant only because they may evidence the parties' intent. *See In re Foothills*

*Texas, Inc.*, 476 B.R. 143, 153 (Bankr. D. Del. 2012) (applying Texas law). "In construing a contract, its unambiguous language alone will generally be deemed to express the intent of the parties." *Petroleum Expl. Int'l*, 2009 WL 4716043, at *1 (quoting *Stewart Title*, 83 F.3d at 739).

32. The test under Delaware law is essentially the same. "Whether or not the terms of a contract are severable is purely a question of the intent of the parties." *Cont'l Warranty, Inc.* v. *Warner*, 108 F. Supp. 3d 250, 255 (D. Del. 2015) (quoting *Tracey* v. *Franklin*, 67 A.2d 56, 61 (Del. 1949)). "When determining the parties' intent regarding severability, Delaware courts ask whether the parties gave a single assent to the whole transaction or whether they assented separately to several things." *Id.* In undertaking this analysis, the court examines "the terms and subject matter of the contract, taken together with pertinent facts and circumstances surrounding the contract." *Norman* v. *Elkin*, 338 F. Supp. 3d 361, 374 (D. Del. 2018) (quoting *Kaplan* v. *Jackson*, No. 90C-JN-6, 1994 WL 45429, at *3 (Del. Super. Ct. Jan. 20, 1994)).

33. Here, the Court need look no further than the text of the agreements themselves, several of which unambiguously state that the Comanche Agreements constitute one indivisible contract. *See Petroleum Expl. Int'l*, 2009 WL 4716043, at *1 ("The Contract is not ambiguous, and the Court therefore looks to its language."). For example, Section 8.14 of the Marketing Agreement provides:

> This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an

unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

(MA § 8.14.) Section 14 of the Letter Agreement between Maverick and UnSub (the parties to the Marketing Agreement) has substantially the same language, as does Section 12.3 of the LLC Agreement (to which SN UR Holdings, LLC is a party) and Section 8.06 of the Securities Purchase Agreement (to which two of the other Debtors, Sanchez and SN UR Holdings, LLC, were parties). (*See* LA § 14; LLC Agmt. § 12.3; SPA § 8.06.) The "Basic Documents," as defined in all three agreements, comprise each of the Comanche Agreements—including, critically, the Joint Development Agreement and the Drilling Commitment Agreement. (*See* SPA § 1.01; LA § 9; MA Annex I.)

34. This unambiguous evidence of intent is sufficient ground to conclude that the Comanche Agreements were all parts of one indivisible contract. Another court, reviewing similar language, concluded that it "expressly and unambiguously states the [contract] is not divisible." *In re Dickinson Theatres, Inc.*, No. 12-22602, 2012 WL 4867220, at *2 (Bankr. D. Kan. Oct. 12, 2012); *Petroleum Expl. Int'l*, 2009 WL 4716043, at *1.

35. Indeed, this language not only provides irrefutable evidence of the parties' intent, but also estops the Debtors from characterizing any of the Comanche Agreements as severable from one another. Promissory estoppel bars attempts to escape from a promise when the following elements are met: "(1) a promise; (2) foreseeability of reliance thereon by the promisor; and (3) substantial reliance by the promisee to her detriment." *In re Houston Reg'l Sports Network, L.P.*, 547 B.R. 717, 753 (Bankr. S.D. Tex. 2016). In the Marketing Agreement, Letter Agreement, LLC Agreement and Securities Purchase Agreement, Maverick and the other Debtors promised not to challenge the indivisibility of the Comanche Agreements. These agreements expressly foresaw that UnSub, its investors (principally GSO) and its lenders would rely on the Debtors' promise, "a material inducement" to entering into the agreements, in their decision to enter into the Comanche Transaction. (MA § 8.14; LA § 14; LLC Agmt. § 12.3; SPA § 8.06.) And GSO did so rely when it made its substantial investment.

36. Because the language of the contract is clear, there is no need to consult the other two factors—the subject matter of the agreement and the parties' conduct—for further evidence of what the parties intended. But if consulted, these factors only further support the conclusion that the Comanche Agreements are indivisible from one another.

37. First, all of these agreements had the same subject matter: the effectuation of the Comanche Transaction. *Cf. In re Trinity Coal Corp.*, 514 B.R. 526, 531 (Bankr. E.D. Ky. 2014) (agreements integrated where "all relate[d] to the same subject matter, i.e., the operations of the parties' respective mining operations"); *In re Oregon Arena Corp.*, No. 304-31605-ELP11, 2006 WL 488713, at *1, *3 (D. Or. Feb. 28, 2006) (multiple agreements "encompass[ed] the same subject matter" where all "address[ed] the development and operation of [an arena] and related properties"); *Indep. Am. Real Estate*, 146 B.R. at 551 (multiple agreements indivisible where all

"refer[red] to the same subject matter, the development of shopping centers"). While the Comanche Transaction had many component parts and involved multiple parties, all were necessary for Sanchez to acquire the Anadarko Share. Sanchez did not have near enough capital to purchase those assets from Anadarko, and so it had to secure partners, including Gavilan and GSO. GSO's decision to invest was predicated on a carefully negotiated package of governance and economic rights and agreements regarding operation of the Comanche Assets and marketing of hydrocarbons the assets produce. Each of the Comanche Agreements played a role in the purchase, financing, and operation of the Anadarko Share, and without any one of them the transaction could not have occurred.

38. The conduct of the parties further supports the conclusion that the transaction documents are not severable. The parties executed all of the agreements—including the Purchase and Sale Agreement, the Securities Purchase Agreement, the Marketing Agreement, the Letter Agreement, and the Joint Development Agreement—contemporaneously: all of these agreements either were executed on January 12, 2017, or attached as exhibits to the Securities Purchase Agreement and executed by closing. This demonstrates the parties' understanding that all were part of a single, indivisible transaction. *See Jones* v. *Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) ("The general rule is that separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together."); *cf. Trinity Coal*, 514 B.R. at 531 (multiple agreements integrated where all "were executed contemporaneously on June 23, 2008," and transaction would be cancelled unless ancillary agreements, "models" of which were attached as exhibits, "were entered into at the Closing"); *Oregon Arena*, 2006 WL 488713, at *3 (multiple agreements formed single contract where all "were executed contemporaneously," "include[d] extensive cross

references to one another," and "[e]xecution of all the related agreements was a condition precedent to the closing of the Development Agreement"). This conduct makes plain that the Comanche Agreements were a package deal and that the parties would not "have entered into the [overall] agreement absent" any single component of the entire package. *Stewart Title*, 83 F.3d at 739. For example, the Marketing Agreement was of critical importance to GSO and UnSub. It is simply not plausible that GSO—an outside investor relying on Sanchez to develop the Comanche Assets—and thus UnSub would have participated in the Comanche Transaction without any agreement about how its hydrocarbons would be gathered, processed and sold into the market, and how it would be paid for its share of the oil and gas and how pipeline costs would be appropriately allocated between itself and Sanchez for their non-uniform interests. Likewise, Sanchez, Gavilan, and UnSub would not have entered into the Comanche Transaction without the Joint Development Agreement, which established Sanchez's operatorship of the Comanche Assets and Gavilan and UnSub's rights regarding operations. And Anadarko would not have sold the Anadarko Share without a firm commitment from the buyers that they would drill at least 60 wells per year on the land for the first five years, which was documented in the Drilling Commitment Agreement.

39. Where "the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out." *In re Buffets Holdings, Inc.*, 387 B.R. 115, 122 (Bankr. D. Del. 2008) (quoting *In re United Air Lines, Inc.*, 453 F.3d 463, 468, 470 (7th Cir. 2006)) (internal quotation marks omitted). In similar circumstances, courts across the country have found multiple, interrelated agreements designed to carry out a single transaction to be indivisible. *See In re DeVries*, No. 11-43165-DML-7, 2014 WL 4294540, at *11–12 (Bankr. N.D. Tex. Aug. 27, 2014) (multiple contemporaneous agreements related to governance of

business were "quintessential 'package deal'" and inseverable); *Trinity Coal*, 514 B.R. at 531–32 (agreements regarding easement and disposal of coal spoil inseverable from agreement to exchange coal property); *In re Wagstaff Minnesota, Inc.*, No. BR 11-43073, 2012 WL 10623 (D. Minn. Jan. 3, 2012) (various agreements relating to franchise restaurant stores inseverable from franchise agreement); *Oregon Arena*, 2006 WL 488713, at *2–5 (agreement to operate coliseum inseverable from agreement to develop property); *In re Teligent, Inc.*, 268 B.R. 723, 728–29 (Bankr. S.D.N.Y. 2001) (non-compete and non-disclosure agreements held inseverable from merger agreement); *Indep. Am. Real Estate*, 146 B.R. at 550–52 (profit-sharing and put-option agreements inseverable from agreements to develop shopping centers); *Matter of T & H Diner, Inc.*, 108 B.R. 448, 453–54 (D.N.J. 1989) (agreement to purchase restaurant inseverable from lease of underlying land). The same result should obtain here.

40. In sum, the Comanche Agreements constitute a single, inseverable contract that must be accepted or rejected together. The Debtors thus cannot assume the LLC Agreement while rejecting the other Comanche Agreements. Indeed, it would be grossly unfair to permit Sanchez to avoid the promises it made UnSub and GSO under the Marketing Agreement while retaining the benefits it received from GSO under the other agreements, including the LLC Agreement (which initially gave Sanchez control of UnSub GP and, through it, UnSub). Sanchez must take the benefits of the Comanche Transaction "*cum onere*," accepting "both the obligations and the benefits of the executory contract." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000). Accordingly, the Bankruptcy Code and the case law mandates that the Debtors assume *all of* the Comanche Agreements or, in the alternative, reject the LLC Agreement. But, as discussed immediately below, the Comanche Agreements are not even capable of rejection and must therefore be assumed in their entirety.

**B. The Inseverable Comanche Agreements Contain Covenants Running with the Land**

41. The Comanche Agreements cannot be rejected, because they contain covenants running with the land that cannot be rejected through bankruptcy. "[U]nder Section 365, it is not possible for a debtor to reject a covenant that 'runs with the land,' since such a covenant creates a property interest that is not extinguished through bankruptcy." *In re Badlands Energy, Inc.*, 608 B.R. 854, 875 (Bankr. D. Colo. 2019) (quotation marks omitted); *accord In re Alta Mesa Res., Inc.*, No. 19-35133, 2019 WL 7580122, at *5 (Bankr. S.D. Tex. Dec. 20, 2019).

42. For a covenant to run with the land, it must: (1) touch and concern the land; (2) relate to a thing in existence or specifically bind the parties and their assigns; (3) be intended by the original parties to run with the land; (4) the successor to the burden must have notice. *In re Houston Bluebonnet, LLC*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) (citing *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013)); *Inwood N. Homeowners' Ass'n, Inc.* v. *Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Additionally, Texas law likely requires privity of estate between the parties when the covenant is made. *In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 69 (Bankr. S.D.N.Y. 2016) (discussing that it is unclear but likely that privity is required). The inseverable Comanche Agreements clearly satisfy this standard.

43. Factor three—the parties' intent—is easily established because two of the Comanche Agreements expressly state an intent to run with the land. *See Energytec*, 739 F.3d at 221. The first is the Joint Development Agreement, as well as the summary memorandum of that agreement filed in the Texas property records for Maverick, Webb, La Salle, and Dimmit Counties. Each of these documents expressly and unambiguously states that provisions of the Joint Development Agreement are covenants running with the land. Section 5.3 of the Joint Development Agreement—which requires Sanchez to, among other things, put minimum spacing

between wells on certain specified land—expressly states that it contains "covenants running with the land and shall be binding upon the Parties and their assigns," that these covenants "will burden the lands" and "create a privity of estate between the Parties," and that "such obligations will not be subject to rejection in the event of any bankruptcy." (JDA § 5.3(f).) Under well-settled Texas law, when a covenant is unambiguous, "the instrument alone will be deemed to express the intention of the parties." *See MJR Oil & Gas 2001 LLC* v. *AriesOne, LP*, 558 S.W.3d 692, 700 (Tex. App. 2018) (quoting *City of Pinehurst* v. *Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). And if there were any doubt, it would be erased by Section 7 of each summary memorandum, which provides:

> It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement ***be covenants running with the land*** during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

(JDA Mem. § 7 (emphasis added).)

44. The Drilling Commitment Agreement, another one of the Basic Documents (*see* SPA § 1.01), also expressly and unambiguously states it runs with the land. In the agreement, the three buyers of the Anadarko Share (Maverick, UnSub, and Gavilan) promised Anadarko that they would drill at least 60 wells on the acquired land per year for a period of five years. (*See* DCA §§ 2.1, 3.1.) In Section 4.1 of the agreement, the parties expressly agreed that these drilling obligations were covenants running with the land:

> The obligations of the Drilling Parties under this Agreement are partial consideration for Anadarko's conveyance of the Assets to the

> Drilling Parties under the Assignments, and such obligations touch and concern the Leases and lands and obligations related thereto, being things in existence, and shall ***be covenants running with the land***. Such obligations shall burden each Drilling Party's interest, and the interest of any permitted successor or assign of such Drilling Party, in and to the Leases and the lands related thereto, for the benefit of Anadarko.

(DCA § 4.1 (emphasis added).) Here too, the parties' intent was clear.

45. The remaining elements are also easily satisfied. First, the parties were in privity of estate because, as simultaneous purchasers (and in Anadarko's case, a seller) of the Anadarko Share, they created the covenants in connection with a conveyance of their property interest in the Anadarko Share, including as "partial consideration for Anadarko's conveyance of the Assets to the Drilling Parties under the Assignments." (DCA, § 4.1); *see Houston Bluebonnet*, 2020 WL 930111, at *17 ("Under the [privity] requirement, the covenant must be made between parties who are in . . . a mutual or successive relationship to the same rights of property."). To touch and concern the land, it is enough that the covenants required the Parties to commit to certain minimum drilling obligations on the lands, as covered by the Comanche Transaction agreements. *See Am. Ref. Co.* v. *Tidal W. Oil Corp.*, 264 S.W. 335, 338 (Tex. Civ. App. 1924) ("[A] condition in the nature of a covenant binding the grantee to perform certain duties with reference to the land itself runs with the land."). The covenants, by the terms therein, also relate to a thing in existence—the Parties' property interests acquired in the Comanche Transaction—and expressly bind the Parties and their successors and assigns. (*See* DCA, § 4.1; JDA Mem., § 7); *Houston Bluebonnet, LLC*, 2020 WL 930111, at *12. The final element, notice to successors, is also satisfied because the Debtors were themselves parties to these agreements and had actual notice; in any event, they have constructive notice because the parties properly recorded memoranda of the Joint Development Agreement and Drilling Commitment Agreement in the appropriate county property-records

Case [illegible] Document [illegible] Filed in TXSB on [illegible] Page [illegible]

offices. (JDA Mem.; Ex. J, DCA Mem.); *see* Tex. Prop. Code § 13.002 (providing that recording of memoranda constitutes constructive notice to any successors).

46. In sum, the Comanche Agreements satisfy all the requirements for covenants running with the land under Texas law, and the Debtors have no basis to assert otherwise. For that reason, all these agreements—which, as set forth above, constitute one indivisible contract—cannot be rejected by the Debtors. *See Badlands Energy*, 608 B.R. at 875; *Alta Mesa*, 2019 WL 7580122, at *5.

47. We note that Debtors' assumption of the Comanche Agreements, which include the LLC Agreement, will not change the current governance of UnSub under the LLC Agreement. As mentioned above, at least one Investor Redemption Event has already occurred, and as a result, the board automatically expanded, with GSO appointing a majority of the seats on UnSub's board. While Paragraph 20 of the Confirmation Order entered on April 29 (Docket No. 1212) provides for release and satisfaction of claims and defaults under assumed agreement, an Investor Redemption Event is not a claim or default under the LLC Agreement. As a result, assumption of the LLC Agreement will not restore the prior composition of UnSub's board, permit the Debtors to regain control of UnSub, nor impair other Investor Redemption events from occurring in the future.

* * *

48. To summarize: the Debtors are required to assume all of the Comanche Agreements because they are not capable of rejection. And even if the Court finds that the Comanche Agreements are capable of rejection, the Debtors cannot cherry pick some agreements for assumption, while rejecting others. Accordingly, the Comanche Agreements must be assumed in their entirety, or, in the alternative, rejected in their entirety—including the LLC Agreement.

## II. Rejection of the Marketing Agreement Is Not a <u>Sensible Exercise of the Debtors' Business Judgment</u>

49. Rejection of the Comanche Agreements would also cause the Debtors to default on a number of their core contractual obligations, exposing the estate to enormous risk.

50. A debtor's decision to assume or reject an executory contract is subject to the Court's review under the "business judgment" standard. *See* 11 U.S.C. § 365(a); *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985). A "bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate" to assume or reject it. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Court should not "blindly accept" a debtor's decision to reject a contract, but rather "must ensure the decision-making process used by a debtor in possession in exercising its powers under the [Bankruptcy] Code is a sensible one." *In re Pilgrim's Pride Corp.*, 403 B.R. 413, 427 (Bankr. N.D. Tex. 2009) (citing *In re Orion Pictures Corp.*, 4 F.3d at 1099; *Richmond Leasing Co.*, 762 F.2d at 1309). Courts "should consider 'the risks of the proposed transaction, the available alternatives, and the danger of prejudice to the objecting parties.'" *Id.* (quoting *Richmond Leasing Co.*, 762 F.2d at 1312 n.11).

51. While this test is undoubtedly deferential, the Debtors' proposed rejection of the Comanche Agreements fails it. First, without the Marketing Agreement, Sanchez has no means to market UnSub's hydrocarbons to meet the commitments under any of its midstream obligations, including minimum volume requirements under the Springfield Agreements, exposing Sanchez to midstream charges that Sanchez will be unable to defray (by marketing UnSub's hydrocarbons). Sanchez does not appear to have any means of meeting these obligations, absent the Marketing Agreement. Second, rejecting (and breaching) the Joint Development Agreement will undermine

the value of (and perhaps even jeopardize) Sanchez's operatorship of the Comanche Assets and Sanchez's value in the Comanche assets. Third, rejection of the Marketing Agreement results in a substantial risk of default under UnSub's RBL Agreement.

52. ***First***, without the Marketing Agreement, Sanchez will not be able to purchase and thereby deliver UnSub's hydrocarbons through the Springfield gathering systems, exposing Sanchez to midstream charges under the Springfield Agreements. And Sanchez will also lose the ability to pass on any of the midstream charges to UnSub (which the Marketing Agreement permits as deductions from the revenue payments Sanchez makes to UnSub), having to bear them all itself. Without access to UnSub's hydrocarbons, Sanchez will struggle to meet the minimum-volume commitments in the Springfield Agreements, exposing itself to liabilities well in excess of its share of production. Nonetheless, despite GSO and UnSub's repeated urging, Sanchez has done hardly anything to renegotiate the Springfield Agreements. Nor has Sanchez explored other midstream improvements for the Comanche field (other than high-cost commitments under the proposed settlement agreement pending before the Court that benefit Sanchez's Catarina interests), which is almost inexplicable—UnSub has received unsolicited proposals from midstream providers interested in servicing the Comanche field, but Sanchez has shown no interest in such proposals.[10]

53. ***Second***, by rejecting the Joint Development Agreement, the Debtors have constructively breached it. *See Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019) ("[R]ejection is a breach."). Such a breach would excuse performance of the Joint Development Agreement by the other parties, UnSub and Gavilan. *See In re Murexco Petroleum,*

---

[10] Instead, Sanchez appears to have focused on striking the deal reflected in the settlement motion pending before the Court (Docket No. 1309), which GSO and UnSub will oppose in the coming days.

*Inc.*, 15 F.3d 60, 62–63 (5th Cir. 1994) (by definition, breach of executory contract subject to rejection "excus[es] the performance of the other party").

54. A breach of the Joint Development Agreement could impair Sanchez's ability to operate the Comanche Assets—and more likely even eliminate it entirely, causing substantial harm to Sanchez including by causing Sanchez to lose substantial payments it receives in its role as operator. Under the agreement, Maverick, UnSub, and Gavilan have promised to vote their combined 50% working interest together under each JOA within the Comanche Assets—including by voting to retain Sanchez as operator and to support Sanchez's decisions about how to develop and operate the assets. (*See* JDA §§ 3.2, 3.8.) If UnSub and Gavilan were freed of their obligations under the Joint Development Agreement, they would no longer have to support Sanchez's decision about drilling.

55. Without the support of UnSub and Gavilan, Sanchez—left with only the working interest of about 8% of the Comanche Assets that it owns through Maverick, and without any direct ownership in 1,500 wells (the PDP wells at closing) —would effectively lose operational control. The other working-interest holders could frustrate Sanchez's drilling plan by submitting alternative well proposals. (*See* JOA for the Maverick Basin Project § VI(B)(1).) Or they could seek to remove Sanchez as operator, for example if Sanchez ever sought to transfer its interest. (*See id.* § VI(B)(2).) They could also withhold consent from Sanchez's drilling proposals, which UnSub and Gavilan would not be required to fund absent the JDA. In that instance, Sanchez alone would have to bear the full cost of developing the wells it drills (*see id.*)—something that is not economical for an operator with a working interest of only about 8%. Indeed, it is unusual for an operator to own such a small share of the overall working interest and without any direct ownership of 1,500 wells in the field.

56. Loss of some or all of its operatorship would have a direct financial impact on Sanchez, which—like other oil and gas operators—receives substantial payments from other working-interest owners in exchange for its work as operator. Moreover, this outcome would place Sanchez in an economically untenable position and impede its ability to effectively plan capital budgets, implement drilling plans, and otherwise perform as operator of the Comanche Assets. Thus, without UnSub's and Gavilan's cooperation, Sanchez's operatorship is an exercise in futility. Sanchez acknowledges as much in its most recent 10-Q: "Loss of operatorship of some portion or all of the Comanche Assets, or a finding that [] Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations." (Ex. Q, Sanchez's Form 10-Q for 3Q 2019, dated Nov. 8, 2019, at 59.)[11] These risks to the value of Sanchez's operatorship provide yet another reason why rejection of the Comanche Agreements is not a sound exercise of business judgment.

57. ***Third***, the Debtors' rejection of the Comanche Agreements could lead to a default under UnSub's RBL Agreement. The RBL Agreement provides that any Material Contract—defined to include the Joint Development Agreement, the Drilling Commitment Agreement, the Marketing Agreement, and the Letter Agreement—can only be replaced on the same terms as the existing agreement. (RBL Agmt., §§ 1.1, 10.13(b).) Presumably, the Debtors have rejected all these agreements because they intend either to negotiate replacement agreements with materially different terms or to walk away from them entirely. UnSub's reserve-based lenders could argue that this constitutes a default by UnSub under the RBL Agreement (RBL Agmt. § 11.3(a)), which

---

11 Available at https://www.sec.gov/Archives/edgar/data/1528837/000155837019010632/sn-20190930x10q.htm.

would permit them to foreclose upon UnSub's assets, likely wiping out Sanchez's entire stake in UnSub, including UnSub's reserves.

58. As the examples above illustrate, rejection of the Comanche Agreements is not a sound exercise of business judgment. Rejecting these agreements would expose the Debtors to damaging consequences, creating enormous risk of loss for the bankruptcy estate.

59. The Court should accordingly disapprove of the Debtors' rejection of the Comanche Agreements as an unsound exercise of business judgment.

[*Remainder of page intentionally blank*]

## CONCLUSION

WHEREFORE, GSO, UnSub GP, and UnSub respectfully request for all of the reasons stated above that this Court deny rejection of the Comanche Agreements or, in the alternative, deny assumption of the LLC Agreement, and grant such other and further relief as the Court may deem just and proper.

Dated: June 22, 2020
Houston, Texas

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6648
Facsimile: (713) 226-6248
Email: jhiggins@porterhedges.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (pending *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (pending *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub GP and UnSub*

# Exhibit A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2016**
**or**
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**
**Commission file number: 1-35372**

## Sanchez Energy Corporation
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **45-3090102**<br>(I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>(Address of principal executive offices) | **77002**<br>(Zip Code) |

Registrant's telephone number, including area code **(713) 783-8000**
Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |
| Rights to purchase Series C Junior Participating Preferred Stock, par value $0.01 per share | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Registrant as of June 30, 2016: $392,858,811

Number of shares of Registrant's common stock outstanding as of February 24, 2017: 78,648,272.

**Documents Incorporated By Reference:**

Portions of the Registrant's definitive proxy statement for its 2017 Annual Meeting of Stockholders or an amendment to this Form 10-K, which will be filed with the Securities and Exchange Commission within 120 days of December 31, 2016, are incorporated by reference into Part III of this report for the year ended December 31, 2016.

011709

**SANCHEZ ENERGY CORPORATION**
**FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2016**

**Table of Contents**


| | | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 27 |
| Item 1B. | Unresolved Staff Comments | 51 |
| Item 2. | Properties | 51 |
| Item 3. | Legal Proceedings | 51 |
| Item 4. | Mine Safety Disclosures | 51 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 52 |
| Item 6. | Selected Financial Data | 55 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 61 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 78 |
| Item 8. | Financial Statements and Supplementary Data | 79 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| Item 9A. | Controls and Procedures | 80 |
| Item 9B. | Other Information | 81 |
| | PART III | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 82 |
| Item 11. | Executive Compensation | 82 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 82 |
| Item 13. | Certain Relationships and Related Transactions and Director Independence | 82 |
| Item 14. | Principal Accountant Fees and Services | 82 |
| Glossary of Selected Oil and Natural Gas Terms | | 83 |
| | PART IV | |
| Item 15. | Exhibits, Financial Statement Schedules | 87 |
| Item 16. | Form 10-K Summary | 93 |
| Signatures | | 94 |
| Index to Consolidated Financial Statements | | F-1 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this Annual Report on Form 10-K that address activities, events, conditions or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. These statements are based on certain assumptions we made based on management's experience, perception of historical trends and technical analyses, current conditions, anticipated future developments and other factors believed to be appropriate and reasonable by management. When used in this Annual Report on Form 10-K, words such as "will," "potential," "believe," "estimate," "intend," "expect," "may," "should," "anticipate," "could," "plan," "predict," "project," "profile," "model," "strategy," "future" or their negatives or the statements that include these words or other words that convey the uncertainty of future events or outcomes, are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. In particular, statements, express or implied, concerning our future operating results and returns, our strategy and plans or view of the market, or our ability to replace or increase reserves, increase production, or generate income or cash flows are forward-looking statements. Forward-looking statements are not guarantees of performance. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. Although we believe that the expectations reflected in our forward-looking statements are reasonable and are based on reasonable assumptions, no assurance can be given that these assumptions are accurate or that any of these expectations will be achieved (in full or at all) or will prove to have been correct. Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- the timing and extent of changes in prices for, and demand for, crude oil and condensate, natural gas liquids ("NGLs"), natural gas and related commodities;
- our ability to successfully execute our business and financial strategies;
- our ability to utilize the services, personnel and other assets of Sanchez Oil & Gas Corporation ("SOG") pursuant to existing services agreements;
- our ability to replace the reserves we produce through drilling and property acquisitions;
- our ability to close our recently announced Comanche Acquisition, including the related financing transactions;
- the realized benefits of the acreage acquired in our various acquisitions, including our pending Comanche Acquisition, and other assets and liabilities assumed in connection therewith;
- our ability to successfully integrate the assets acquired in our pending Comanche Acquisition, if consummated, into our operations;
- the realized benefits of our partnership with affiliates of The Blackstone Group, L.P.;
- the realized benefits of our joint ventures;
- the realized benefits of our transactions with Sanchez Production Partners LP ("SPP");
- the extent to which our drilling plans are successful in economically developing our acreage in, and to produce reserves and achieve anticipated production levels from, our existing and future projects;
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may therefore be imprecise;

- the extent to which we can optimize reserve recovery and economically develop our plays utilizing horizontal and vertical drilling, advanced completion technologies and hydraulic fracturing;
- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the credit worthiness and performance of our counterparts, including financial institutions, operating partners and other parties;
- competition in the oil and natural gas exploration and production industry in the marketing of crude oil, natural gas and NGLs and for the acquisition of leases and properties, employees and other personnel, equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- our ability to access the credit and capital markets to obtain financing on terms we deem acceptable, if at all, and to otherwise satisfy our capital expenditure requirements;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic fracturing and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws and regulations with respect to derivatives and hedging activities;
- developments in oil-producing and natural gas-producing countries, the actions of the Organization of Petroleum Exporting Countries (“OPEC”) and other factors affecting the supply of oil and natural gas;
- our ability to effectively integrate acquired crude oil and natural gas properties into our operations, fully identify existing and potential problems with respect to such properties and accurately estimate reserves, production and costs with respect to such properties;
- the extent to which our crude oil and natural gas properties operated by others are operated successfully and economically;
- the use of competing energy sources and the development of alternative energy sources;
- unexpected results of litigation filed against us;
- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage; and
- the other factors described under “Item 1A. Risk Factors” in this Annual Report on Form 10-K and any updates to those factors set forth in our subsequent Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

In light of these risks, uncertainties and assumptions, the events anticipated by our forward-looking statements may not occur, and, if any of such events do, we may not have correctly anticipated the timing of their occurrence or the extent of their impact on our actual results. Accordingly, you should not place any undue reliance on any of our forward-looking statements. Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to correct or update any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by applicable law. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

## PART I

### Item 1. *Business*

### Overview

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities. We have included definitions of some of the oil and natural gas terms used in this Annual Report on Form 10-K in the "Glossary of Selected Oil and Natural Gas Terms."

Listed below is a table of our significant consummated transactions since January 1, 2014:

| Transaction | Transaction Date | Transaction Effective Date | Core Area | Net Acreage Acquired | Net Acreage Remaining at 12/31/16 | (Purchase) / Disposition Price (millions) |
|---|---|---|---|---|---|---|
| Cotulla Disposition | 12/14/2016 | 6/1/2016 | Cotulla, Eagle Ford | N/A | N/A | $ 161 * |
| Carnero Processing Disposition | 11/22/2016 | 11/22/2016 | N/A | N/A | N/A | $ 56 |
| Production Asset Transaction | 11/22/2016 | 7/1/2016 | Palmetto and Cotulla, Eagle Ford | N/A | N/A | $ 26 |
| Carnero Gathering Disposition | 7/5/2016 | 7/5/2016 | N/A | N/A | N/A | $ 37 |
| Western Catarina Midstream Divestiture | 10/14/2015 | 10/14/2015 | Catarina, Eagle Ford | N/A | N/A | $ 346 |
| Palmetto Disposition | 3/31/2015 | 1/1/2015 | Palmetto, Eagle Ford | N/A | N/A | $ 83 |
| Catarina Acquisition | 6/30/2014 | 1/1/2014 | Catarina, Eagle Ford | 106,100 | 106,100 | $ (557) |

* On December 14, 2016, we completed the initial closing of the Cotulla Disposition for cash consideration of approximately $153.5 million. Subsequently, a second closing on an additional portion of the assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings.

On December 14, 2016, the Company completed the initial closing of the Cotulla Disposition (as defined in "Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures") for cash consideration of approximately $153.5 million. Subsequent to December 31, 2016, a second closing on an additional portion of the Cotulla Assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings. The assets sold included (based on the Company's internal estimates) estimated net proved reserves, as of the effective date of June 1, 2016, of approximately 6.9 MMBoe. Proved developed reserves are estimated to account for approximately 90% of the total net proved reserves. As of the effective date of June 1, 2016, the Cotulla Assets consisted of approximately 15,000 net acres with 112 gross (93 net) wells producing approximately 3,000 Boe/d.

On November 22, 2016, the Company completed the disposition of its 50% equity interests in Carnero Processing, LLC ("Carnero Processing") to SPP, a joint venture that is 50% owned by Targa Resources Corp. (NYSE: TRGP) ("Targa"). The Company received aggregate cash consideration of

approximately $55.5 million and SPP agreed to assume approximately $246 million of the Company's remaining capital contribution commitments in connection

with the acquisition (the "Carnero Processing Disposition"). The purchase price was determined through arm's length negotiations between the Company and SPP, including independent committees of both entities.

On November 22, 2016, the Company also completed the Production Asset Transaction (as defined in "Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures") cash consideration of $25.6 million after $1.4 million in normal and customary closing adjustments. The purchase price was determined through arm's length negotiations between the Company and SPP, including independent committees of both entities. The Production Asset Transaction included the disposition of working interests in 23 producing Eagle Ford wellbores located in Dimmit and Zavala counties in South Texas together with escalating working interests in an additional 11 producing wellbores located in the Palmetto Field in Gonzales County, Texas to SPP. The effective date of the Production Asset Transaction was July 1, 2016.

On July 5, 2016, the Company completed the disposition of its 50% equity interest in Carnero Gathering, LLC ("Carnero Gathering") a joint venture that is 50% owned by Targa, to SPP for an initial payment of approximately $37.0 million and the assumption by SPP of the Company's remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million as of that date (the "Carnero Gathering Disposition"). In addition, SPP is required to pay the Company an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering's delivery points from the Company and other producers. Carnero Gathering owns a total of approximately 45 miles (10 miles of which remain under construction as of December 31, 2016) of high pressure natural gas gathering pipelines that currently connect SPP's Western Catarina Midstream system to nearby pipelines in South Texas. The Carnero Gathering System is designed to directly connect to a cryogenic natural gas processing plant in South Texas that is expected to be operational in the spring of 2017. The Company's 50% equity interest in this processing plant was conveyed to SPP in the Carnero Processing Disposition.

On October 14, 2015, the Company completed the Western Catarina Midstream Divestiture (as defined in "Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures") for an adjusted purchase price of $345.8 million in cash. In connection with the closing of the Western Catarina Midstream Divestiture, the Company entered into a Firm Gathering and Processing Agreement (the "Gathering Agreement") on October 14, 2015 for an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas will be dedicated for gathering by Catarina Midstream, LLC ("Catarina Midstream"). In addition, for the first five years of the Gathering Agreement, SN Catarina, LLC will be required to meet a minimum quarterly volume delivery commitment of 10,200 barrels per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments.

On March 31, 2015, we completed the Palmetto Disposition (as defined in "Item 8. Financial Statements and Supplementary Data —Note 3, Acquisitions and Divestitures") for an adjusted purchase price of approximately $83.4 million. The effective date of the transaction was January 1, 2015. The aggregate average working interest percentage initially conveyed was 18.25% per wellbore and, upon January 1 of each subsequent year after the closing, the working interest of the purchaser, a wholly owned subsidiary of SPP, will automatically increase in incremental amounts according to the purchase agreement until January 1, 2019, at which point the purchaser will own a 47.5% working interest, and we will own a 2.5% working interest in each of the wellbores.

On June 30, 2014, we completed our acquisition of 106,000 net contiguous acres in Dimmit, LaSalle and Webb Counties, Texas (the "Catarina Acquisition") in the Eagle Ford Shale with an effective date of January 1, 2014. All proved reserves in the Catarina area are covered under lease acreage that is held by production, which acreage amounted to approximately 29,000 acres. Under the lease we have a 100% working interest and 75% net revenue interest in the lease acreage over the Eagle Ford Shale formation from the top of the Austin Chalk formation to the base of the Buda Lime formation. The 77,000 acres of undeveloped acreage that were included in the Catarina Acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and

other lease obligations. Our current capital budget and plans include drilling at least the minimum annual well requirement necessary to maintain access to such undeveloped acreage.

**Our Business Strategies**

Our primary business objective is to increase reserves, production and cash flows at an attractive return on invested capital. Our business strategy is currently focused on exploiting long-life, unconventional oil, condensate, NGL and natural gas reserves from the Eagle Ford Shale as well as other projects that directly enhance the profitability of our oil and gas development activities. Key elements of our business strategy include:

- ***Efficiently develop our Eagle Ford Shale leasehold positions.*** We intend to efficiently drill and develop our acreage position to maximize the value of our resource potential. At December 31, 2016, approximately 67% of our proved reserves were proved undeveloped. As of December 31, 2016, we had 473 net wells, and had identified over 3,000 net locations, for potential future drilling in our Eagle Ford Shale area that will be our primary targets in the near term. In 2017, we plan to invest between $395 million and $440 million on development drilling and completion in the Eagle Ford Shale, which represents 100% of our 2017 drilling and completion budget and 93% of our total 2017 capital budget.

- ***Enhance returns by focusing on operational and cost efficiencies.*** We are focused on the improvement of our operating measures and have significant experience in successfully converting early-stage resource opportunities into cost-efficient development projects. We believe the magnitude and concentration of our acreage within our core project areas provide us with the opportunity to capture economies of scale, including the ability to directly procure goods and services from manufacturers, drill multiple wells from a single pad, utilize centralized production and fluid handling facilities and implement a line-management approach to improve efficiencies in drilling and completions. In addition, we focus on midstream and other projects that serve our production and add optionality to end markets, ultimately enhancing our realized prices.

- ***Adopt and employ leading drilling and completion techniques.*** We are focused on enhancing our drilling and completion techniques to maximize recovery of reserves. Industry methods with respect to drilling and completion have significantly evolved over the last several years, resulting in increased initial production rates and recoverable hydrocarbons per well through the implementation of longer laterals, more tightly spaced fracture stimulation stages and large proppant volumes. We evaluate industry drilling results and monitor the results of other operators to improve our operating practices, and we expect our drilling and completion techniques to continue to evolve.

- ***Leverage our relationship with our affiliates to expand unconventional assets.*** SOG, headquartered in Houston, Texas, is a private full service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates. The Company refers to SOG and its affiliates (but excluding the Company), collectively, as the "Sanchez Group." Various members of the Sanchez Group have drilled or participated in over 3,000 wells, directly and through joint ventures, and have invested substantial amounts of capital in the oil and natural gas industry since 1972. During this period, they have carefully cultivated relationships with mineral and surface rights owners in and around our core areas and compiled an extensive technological database that we believe gives us a competitive advantage in acquiring additional leasehold positions in these areas. We have unrestricted access to the proprietary portions of the technological database related to our properties and SOG is otherwise required to interpret and use the database for our benefit. We plan to leverage our affiliates' expertise, industry relationships and size to opportunistically expand reserves and our leasehold positions in the Eagle Ford Shale and other onshore unconventional oil, condensate, NGL and natural gas resources.

- ***Pursue strategic acquisitions to grow our leasehold position in the Eagle Ford Shale and seek opportunistic entry into new basins.*** We believe that we will be able to identify and acquire additional acreage and producing assets in the Eagle Ford Shale at attractive valuations by leveraging our longstanding relationships in and knowledge of South Texas. We also plan to selectively target additional

domestic basins that would allow us to employ our strategies on attractive acreage positions that we believe are similar to our Eagle Ford Shale acreage.

- ***Maintain substantial financial liquidity and flexibility.*** As of December 31, 2016, we had a liquidity position of approximately $800 million, consisting of approximately $500 million of cash and cash equivalents and $300 million of availability under our undrawn Second Amended and Restated Credit Agreement (defined in "Item 8. Financial Statements and Supplementary Data —Note 5, Long-Term Debt"), which had a $350 million borrowing base (with a $300 million aggregate elected commitment amount). We evaluate our level of operating activity in light of both actual commodity prices and changes we are able to make to our costs of operations and, based upon this evaluation, adjust our capital spending program as appropriate. In addition, we expect to continue to regularly review acquisition opportunities from third parties or other members of the Sanchez Group. We have entered into and intend to continue executing hedging transactions for a significant portion of our expected production to achieve more predictable cash flow and to reduce our exposure to adverse fluctuations in oil and natural gas prices.

**Our Competitive Strengths**

We believe the following competitive strengths will allow us to successfully execute our business strategies:

- ***Geographically concentrated leasehold position in leading North American unconventional oil resource trends.*** We have assembled a current leasehold position of approximately 278,000 net acres in the Eagle Ford Shale, which we believe to be one of the highest rates of return unconventional oil and natural gas formations in North America. In addition to further leveraging our base of technical expertise in our project areas, our geographically concentrated acreage position allows us to establish economies of scale with respect to drilling, production, operating and administrative costs, in addition to further leveraging our base of technical expertise in our project areas. We believe that our recent well results and offset operator activity in and around our project areas have significantly de-risked our acreage position such that there are low geologic risks and ample repeatable drilling opportunities across our core operating areas.

- ***Proven low cost operator.*** We are recognized as one of the lowest cost operators in the Eagle Ford Shale. We utilize a combination of initiatives that have improved the efficiency of our operations and reduced the cost of sourcing goods and services. The Company has implemented systems and processes that provide complete transparency for our well program across our organization thereby eliminating drag and waste on repetitive tasks. We have also segmented and optimized each step in drilling and completing a well. In addition, our supply chain management team takes a rigorous and methodical approach to reducing the total delivered costs of purchased good and services by examining costs on their most granular level. Goods and services are commonly sourced directly from suppliers, eliminating the middleman and their markups. Additionally, we constantly review the value chain for opportunities to internally provide services in order to further reduce, or provide sustainability in, current costs.

- ***Demonstrated ability to drive liquids production and reserves growth.*** Our average production for the full year 2016 was approximately 53,350 Boe/d, substantially all of which was from the Eagle Ford Shale. This compares to approximately 52,600 Boe/d for the full year 2015. Our total proved reserves at December 31, 2016 were 192.8 MMBoe, an increase of approximately 51% over the prior year.

- ***Large oil-weighted multi-year drilling inventory.*** We have an inventory of over 3,000 net locations for potential future drilling on our acreage position in the oil, natural gas and condensate, or black oil and volatile oil and gas, windows of the Eagle Ford Shale.

- ***Experienced management and strong technical team.*** Our team is comprised of individuals with a long history in the oil and natural gas business, and a number of our key executives have prior experience as members of public company management teams. Furthermore, members of the Sanchez Group have a 40-plus year operating history in the areas in which we operate, providing us with extensive knowledge of the basins and the ability to leverage longstanding relationships with mineral owners. Through SOG, we have access to an experienced staff of oil and natural gas professionals including geophysicists, geologists, drilling and completion engineers, production and reservoir engineers and technical support personnel. SOG's technical team has significant experience and expertise in applying the most sophisticated

technologies used in conventional and unconventional resource style plays including 3-D seismic interpretation capabilities, horizontal drilling, comprehensive multi-stage hydraulic fracture stimulation programs and other exploration, production and processing technologies. We believe this technical expertise is integral to successful exploitation of our assets, including defining new core producing areas in emerging plays.

**Core Properties**

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest and have over 3,300 gross (3,050 net) locations for potential future drilling. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale.

In our Catarina area, we have approximately 106,000 net acres in Dimmit, LaSalle and Webb Counties, Texas with a 100% working interest. We anticipate drilling, completion and facilities costs on our acreage to be between $2.9 million and $3.3 million per well based on our current estimates and historical well costs. Current Estimated Ultimate Recovery (“EUR”) per well in Catarina is expected to range between 400 MBoe and 1,200 MBoe. We have identified between 1,300 and 1,650 gross and net locations for potential future drilling on our Catarina acreage. For the year 2017, we plan to spend $160 million to $170 million to spud 49 net wells and complete 53 net wells in our Catarina area.

In our Maverick area, we have approximately 100,000 net acres in Dimmit, Frio, LaSalle, Zavala, and McMullen Counties, Texas with an average working interest of approximately 96%. We believe that our Maverick acreage lies in the black oil window, where we anticipate drilling, completion and facilities costs on our acreage to be between $3.0 million and $4.0 million per well based on our current estimates and historical well costs. Current EUR per well in Maverick is expected to range between 300 MBoe and 400 MBoe. We have identified up to 1,100 gross (1,000 net) locations based on 75 acre well-spacing for potential future drilling on our Maverick area. For the year 2017, we plan to spend $100 million to $110 million to spud 35 net wells and complete 35 net wells in our Maverick area.

In our Javelina area, we have approximately 39,500 net acres in LaSalle and Webb Counties, Texas with an average working interest of 100%. Our Javelina acreage encompasses proven Eagle Ford down-dip areas. We currently anticipate drilling, completion and facilities costs on our acreage to be between $6.0 million and $7.5 million per well based on our current estimates. We expect average EUR per well in Javelina to range between 1,500 MBoe and 2,500 MBoe. We have identified up to 265 gross (265 net) locations based on 120 acre well-spacing for potential future drilling on our Javelina area. For the year 2017, we do not plan to drill any wells in this area.

In our Palmetto area, we have approximately 8,000 net acres in Gonzales County, Texas with an average working interest of approximately 49%. We believe that our Palmetto acreage lies in the volatile oil window where we anticipate drilling, completion and facilities costs on our acreage to be between $5.5 and $6.0 million per well based on our current estimates and historical well costs. Current EUR per well in Palmetto is expected to range between 500 MBoe and 600 MBoe. We have identified up to 295 gross (143 net) locations based on 40 acre well-spacing for potential future drilling in our Palmetto area. For the year 2017, we plan to spend $5 million to $10 million to spud 2 net wells and complete three net wells in our Palmetto area.

In our Marquis area, we have approximately 21,000 net acres, the majority of which are in southwest Fayette and northeast Lavaca Counties, Texas with a 100% working interest. We believe that our Marquis acreage lies in the volatile oil window, where we anticipate drilling, completion and facilities costs on our acreage to be between $4.0 million and $5.0 million per well based on our current estimates and historical well costs. Current EUR per well in Marquis is expected to range between 275 MBoe and 375 MBoe. We have identified up to 200 gross and net locations based on 60 acre well-spacing for potential future drilling on our Marquis acreage. For the year 2017, we do not have any planned capital spending on drilling and completions in our Marquis area.

### *Tuscaloosa Marine Shale*

In August 2013, we acquired approximately 40,000 net undeveloped acres in what we believe to be the core of the TMS for cash and shares of our common stock (the "TMS Transaction"). In connection with the TMS Transaction, we established an area of mutual interest ("AMI") in the TMS with SR Acquisition I, LLC ("SR"), a subsidiary of our affiliate Sanchez Resources, LLC ("Sanchez Resources"), which included a carry on drilling costs for up to 6 gross (3 net) wells. As part of the TMS Transaction, we acquired all of the working interests in the AMI owned at closing from three sellers (two third parties and one related party of the Company, SR), resulting in our owning an undivided 50% working interest across the AMI through the TMS formation.

Total consideration for the transactions consisted of approximately $70 million in cash and the issuance of 342,760 common shares of the Company, valued at approximately $7.5 million. The total cash consideration provided to SR, an affiliate of the Company, was $14.4 million, before consideration of any well carries. The acquisitions were accounted for as the purchase of assets at cost at the acquisition date. We also committed, as a part of the total consideration, to carry SR for its 50% working interest in an initial 3 gross (1.5 net) TMS wells to be drilled within the AMI (the "Initial Well Carry") with an option to drill an additional 6 gross (3 net) TMS wells ("Additional Wells") within the AMI. In August 2015, after completing the Initial Well Carry, the Company signed an agreement with SR whereby the Company paid SR approximately $8 million in lieu of drilling the remaining two Additional Wells (the "Buyout Agreement"). The Buyout Agreement stipulates that SN has earned full rights to all acreage stated in the TMS Transaction and effectively terminates any future well carry commitments.

As of December 31, 2016, the AMI held rights to approximately 98,000 (64,000 net) acres, of which we owned approximately 45,600 net acres. The TMS development is currently challenged due to high well costs and depressed commodity prices. We believe that the TMS play has significant development potential and still has significant upside as changes in technology, commodity prices, and service prices occur. The average remaining lease term on the acreage is over 2 years, giving us ample time to allow other industry participants to further de-risk the play.

## Oil and Natural Gas Reserves and Production

### *Internal Controls*

Our estimated reserves at December 31, 2016 were prepared by Ryder Scott Company, L.P. ("Ryder Scott"), our independent third-party reserve engineers pursuant to their report dated January 24, 2017, which is filed as an exhibit to this Annual Report on Form 10-K. We expect to continue to have our reserve estimates prepared semi-annually by Ryder Scott. Our internal professional staff works closely with Ryder Scott to ensure the integrity, accuracy and timeliness of data that is furnished to them for their reserve estimation process. All of the reserve information maintained in our reserve engineering database is provided to the external engineers. In addition, we provide Ryder Scott other pertinent data, such as seismic information, geologic maps, well logs, production tests, material balance calculations, well performance data, operating procedures and relevant economic criteria. We make all requested information, as well as our pertinent personnel, available to the external engineers as part of their evaluation of our reserves. The estimated proved reserves attributable to the Comanche Assets (as defined in "Item 1A. Risk Factors—*There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.*") are as of June 30, 2016, are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition (as defined in "Item 1A. Risk Factors—*There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.*") and have not been independently verified or estimated.

### *Technology Used to Establish Reserves*

Under the rules of the Securities and Exchange Commission (the "SEC"), proved reserves are those quantities of oil and natural gas that by analysis of geoscience and engineering data can be estimated with reasonable certainty to be economically producible from a given date forward from known reservoirs, and under existing economic conditions, operating methods and government regulations. The term "reasonable certainty" implies a high

degree of confidence that the quantities of oil and natural gas actually recovered will equal or exceed the estimate. Reasonable certainty can be established using techniques that have been proven effective by actual production from projects in the same reservoir or

an analogous reservoir or by other evidence using reliable technology that establishes reasonable certainty. Reliable technology is a grouping of one or more technologies (including computational methods) that has been field tested and has been demonstrated to provide reasonably certain results with consistency and repeatability in the formation being evaluated or in an analogous formation.

To establish reasonable certainty with respect to our estimated proved reserves, Ryder Scott employed technologies that have been demonstrated to yield results with consistency and repeatability. The technologies and economic data used in the estimation of our reserves include, but are not limited to, electrical logs, radioactivity logs, core analyses, geologic maps and available downhole and production data, seismic data and well test data. Reserves attributable to producing wells with sufficient production history were estimated using appropriate decline curves or other performance relationships. Reserves attributable to producing wells with limited production history and for undeveloped locations were estimated using performance from analogous wells in the surrounding area and geologic data to assess the reservoir continuity. These wells were considered to be analogous based on production performance from the same formation and completion using similar techniques.

***Qualifications of Responsible Technical Persons***

*Internal SOG Engineers.* Daniel Furbee is the technical person primarily responsible for overseeing the preparation of our reserve estimates. Mr. Furbee has over a decade of industry experience with positions of increasing responsibility in engineering and evaluations with companies such as Baker Hughes and LINN Energy. He holds a Bachelor of Science Petroleum Engineering degree from Marietta College and a Masters of Business Administration from the University of Houston. Mr. Furbee is a Registered Professional Engineer in the State of Texas.

*Independent Reserve Engineers.* Ryder Scott is an independent oil and natural gas consulting firm. No director, officer or key employee of Ryder Scott has any financial ownership in any member of the Sanchez Group or us. Ryder Scott's compensation for the required investigations and preparation of its report is not contingent upon the results obtained and reported, and Ryder Scott has not performed other work for SOG or us that would affect its objectivity. The engineering information presented in Ryder Scott's report was overseen by Michael F. Stell, P.E. Mr. Stell is an experienced reservoir engineer having been a practicing petroleum engineer since 1981. He has more than 24 years of experience in reserves evaluation with Ryder Scott. He has a Bachelor of Science degree in Chemical Engineering from Purdue University and Master of Science degree in Chemical Engineering from University of California - Berkeley. Mr. Stell is a Registered Professional Engineer in the State of Texas.

***Estimated Proved Reserves***

The following table presents the estimated net proved oil and natural gas reserves attributable to our properties and the standardized measure amounts associated with the estimated proved reserves attributable to our properties as of December 31, 2016, based on a reserve report prepared by Ryder Scott, our independent reserve engineers. The standardized measure amounts shown in the table are not intended to represent the current market value of our estimated oil and natural gas reserves.

| | As of December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Oil (MMBbl) | Natural Gas Liquids (MMBbl) | Natural Gas (Bcf) | Total Estimated Proved Reserves (MMBoe) (2) | PV-10 (in millions) |
| Reserve Data [1]: | | | | | |
| Estimated proved reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 48.3 | 57.5 | 410.9 | 174.3 | $ 392.2 |
| Maverick | 11.3 | 0.2 | 1.1 | 11.7 | 90.1 |
| Palmetto | 3.0 | 0.6 | 3.6 | 4.2 | 10.3 |
| Marquis | 1.8 | 0.4 | 1.6 | 2.4 | 17.9 |
| Total Eagle Ford | 64.4 | 58.7 | 417.2 | 192.6 | 510.5 |
| TMS | 0.2 | — | — | 0.2 | 2.9 |
| Total | 64.6 | 58.7 | 417.2 | 192.8 | $ 513.4 |
| Standardized Measure (in millions) [1][3] | | | | | $ 513.4 |
| | | | | | |
| Estimated proved developed reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 12.1 | 20.4 | 146.0 | 56.8 | $ 267.5 |
| Maverick | 3.9 | 0.2 | 1.1 | 4.3 | 60.1 |
| Palmetto | 0.3 | 0.1 | 0.4 | 0.5 | 5.4 |
| Marquis | 1.8 | 0.4 | 1.6 | 2.4 | 17.9 |
| Total Eagle Ford | 18.1 | 21.1 | 149.1 | 64.0 | 350.9 |
| TMS | 0.2 | — | — | 0.2 | 2.9 |
| Total | 18.3 | 21.1 | 149.1 | 64.2 | $ 353.8 |
| | | | | | |
| Estimated proved undeveloped reserves by project area: | | | | | |
| Eagle Ford | | | | | |
| Catarina | 36.2 | 37.1 | 264.9 | 117.5 | $ 124.7 |
| Maverick | 7.4 | — | — | 7.4 | 30.0 |
| Palmetto | 2.7 | 0.5 | 3.2 | 3.7 | 4.9 |
| Marquis | — | — | — | — | — |
| Total Eagle Ford | 46.3 | 37.6 | 268.1 | 128.6 | 159.6 |
| TMS | — | — | — | — | — |
| Total | 46.3 | 37.6 | 268.1 | 128.6 | $ 159.6 |

(1) Our estimated net proved reserves and related standardized measure were determined using index prices for oil and natural gas, without giving effect to commodity derivative contracts, held constant throughout the life of our properties. The unweighted arithmetic average first-day-of-the-month

prices for the prior twelve months were $42.75/Bbl for WTI Cushing oil, $[illegible]/Bbl for NGLs and $2.49/MMBtu for Henry Hub natural gas at December 31, 2016. These prices were adjusted by lease for quality, transportation fees, geographical differentials, marketing bonuses or deductions and other factors affecting the price realized at the wellhead. For the year ended December 31, 2016, the average realized prices for oil, NGLs and natural gas were $37.95 per Bbl, $13.72 per Bbl and $2.50 per Mcf, respectively. For a description of our commodity derivative contracts, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations—Operating Costs and Expenses—Commodity Derivative Transactions" and "Item 7. Management's Discussion and

Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Derivative Instruments."

(2) One Boe is equal to six Mcf of natural gas or one Bbl of oil or NGLs based on a rough energy equivalency. This is a physical correlation and does not reflect a value or price relationship between the commodities.

(3) Standardized measure is calculated in accordance with Accounting Standards Codification ("ASC"), Topic 932, Extractive Activities—Oil and Gas. For further information regarding the calculation of the standardized measure, see "Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)" included in "Item 8. Financial Statements and Supplementary Data."

The data in the table above represents estimates only. Oil, NGLs and natural gas reserve engineering is inherently a subjective process of estimating underground accumulations of oil, NGLs and natural gas that cannot be measured exactly. The accuracy of any reserve estimate is a function of the quality of available data and engineering and geological interpretation and judgment. Accordingly, reserve estimates may vary from the quantities of oil, NGLs and natural gas that are ultimately recovered. For a discussion of risks associated with reserve estimates, please read "Item 1A. Risk Factors—Our estimated reserves and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves."

Future prices realized for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. The standardized measure amounts shown above should not be construed as the current market value of our estimated oil and natural gas reserves. The 10% discount factor used to calculate standardized measure, which is required by Financial Accounting Standard Board ("FASB") pronouncements, is not necessarily the most appropriate discount rate. The present value, no matter what discount rate is used, is materially affected by assumptions as to timing of future production, which may prove to be inaccurate.

***Development of Proved Undeveloped Reserves***

None of our proved undeveloped reserves ("PUD") at December 31, 2016 are scheduled to be developed on a date more than five years from the date the reserves were initially booked as proved undeveloped. Historically, our drilling and development programs were substantially funded from capital contributions, cash flow from operations and the issuance of debt and equity securities. Based on our current expectations of our cash flows and drilling and development programs, which includes drilling of proved undeveloped locations, we believe that we can fund the drilling of our current inventory of proved undeveloped locations and our expansions and extensions in the next five years from our cash on hand combined with cash flow from operations and utilization of available borrowing capacity under our credit facility.

At a pace of approximately 30 wells per rig per year, our current 293 PUD drilling locations will all be developed within the next five years by running an average gross rig count of two rigs. As of December 31, 2016, we were running two active rigs and have an approved annual budget that allows for approximately six rigs to be run through 2017. For a more detailed discussion of our liquidity position, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources."

As of December 31, 2016, we identified 293 gross (282 net) PUD drilling locations which we anticipate drilling within the next five years. The table below details the activity in our PUD locations from December 31, 2015 to December 31, 2016:

| | Net Oil (MBbl) | Net Natural Gas Liquids (MBbl) | Net Natural Gas (MMcf) | Net Volume (MBoe) |
|---|---|---|---|---|
| PUDs as of December 31, 2015 | 30,048 | 15,995 | 101,564 | 62,971 |
| Revisions of previous estimates | | | | |
| Revisions due to price change | (15,372) | (10,603) | (67,150) | (37,167) |
| Technical revisions | (451) | 241 | 3,589 | 388 |
| Extensions and discoveries | 37,381 | 34,482 | 246,300 | 112,913 |
| Purchases | — | — | — | — |
| Divestitures | (1,137) | (81) | (479) | (1,298) |
| Conversion to proved developed reserves during the year | (4,137) | (2,428) | (15,688) | (9,180) |
| PUDs as of December 31, 2016 | 46,332 | 37,606 | 268,136 | 128,627 |

Excluding acquisitions, we expect to make capital expenditures related to drilling and completion of wells of approximately $265 million to $290 million during the year ended December 31, 2017. We plan to spend approximately 80% to 88% of these capital expenditures on development of PUDs in 2017. Technical revisions of PUD estimates are the result of changes in forecasted performance. There are net positive changes on our PUD forecast driven by better performance on our Catarina asset. As a result of price change, 131 PUD locations were removed. The total PUD volume impacted by price changes are 37.2 MMBoe as a result of locations that were removed from our Catarina, Cotulla, Marquis and Palmetto assets.

For more information about our historical costs associated with the development of proved undeveloped reserves, please read “Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)” included in “Item 8. Financial Statements and Supplementary Data.”

***Reconciliation of PV-10 to Standardized Measure***

PV-10 is derived from the Standardized Measure of discounted future net cash flows, which is the most directly comparable financial measure in accordance with accounting principles generally accepted in the United States of America (“U.S. GAAP”). PV-10 is a computation of the Standardized Measure on a pre-tax basis. PV-10 is equal to the Standardized Measure at the applicable date, before deducting future income taxes, discounted at 10%. We believe that the presentation of PV-10 is relevant and useful to investors because it presents the discounted future net cash flows attributable to our estimated net proved reserves prior to taking into account future corporate income taxes, and it is a useful measure for evaluating the relative monetary significance of our oil and natural gas properties. Further, investors may utilize the measure as a basis for comparison of the relative size and value of our reserves to other companies. We use this measure when assessing the potential return on investment related to our oil and natural gas properties. PV-10, however, is not a substitute for the Standardized Measure. Our PV-10 measure and the Standardized Measure do not purport to present the fair value of our oil and natural gas reserves.

The following table provides a reconciliation of PV-10 to the Standardized Measure at December 31, 2016 for our proved reserves (in millions):

| | Proved Reserves |
|---|---|
| PV-10 | $ 513.4 |
| Present value of future income taxes discounted at 10% | — |
| Standardized Measure (1) | $ 513.4 |

(1) Standardized measure is calculated in accordance with ASC Topic 932, Extractive Activities—Oil and Gas. For further information regarding the calculation of the standardized measure, see “Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited)” included in “Item 8. Financial Statements and Supplementary Data.”

 

***Production, Revenues and Price History***

The following table sets forth information regarding combined net production of oil, NGLs, and natural gas and certain price and cost information attributable to our properties for each of the periods presented:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Production:** | | | |
| **Oil - MBbl** | | | |
| Catarina | 3,615 | 3,210 | 847 |
| Maverick | 858 | 396 | 168 |
| Cotulla | 810 | 1,436 | 1,868 |
| Palmetto | 351 | 606 | 1,255 |
| Marquis | 693 | 1,448 | 1,910 |
| TMS | 44 | 69 | 32 |
| Total | 6,371 | 7,165 | 6,080 |
| **Natural gas liquids - MBbl** | | | |
| Catarina | 5,475 | 5,066 | 1,580 |
| Maverick | 14 | 5 | 6 |
| Cotulla | 237 | 326 | 486 |
| Palmetto | 78 | 139 | 267 |
| Marquis | 156 | 218 | 251 |
| TMS | — | — | — |
| Total | 5,960 | 5,754 | 2,590 |
| **Natural gas - MMcf** | | | |
| Catarina | 40,544 | 33,775 | 9,244 |
| Maverick | 93 | 42 | 52 |
| Cotulla | 1,393 | 2,075 | 3,067 |
| Palmetto | 494 | 774 | 1,491 |
| Marquis | 656 | 901 | 974 |
| TMS | 9 | 27 | — |
| Total | 43,189 | 37,594 | 14,828 |
| **Net production volumes:** | | | |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 11,141 |
| Average daily production (Boe/d) | 53,358 | 52,560 | 30,523 |
| **Average Sales Price [1]:** | | | |
| Oil ($ per Bbl) | $ 37.95 | $ 42.98 | $ 88.64 |
| Natural gas liquids ($ per Bbl) | $ 13.72 | $ 11.99 | $ 25.86 |
| Natural gas ($ per Mcf) | $ 2.50 | $ 2.63 | $ 4.06 |
| Oil equivalent ($ per Boe) | $ 22.09 | $ 24.80 | $ 59.79 |
| **Average unit costs per Boe:** | | | |
| Oil and natural gas production expenses | $ 8.43 | $ 8.16 | $ 8.40 |
| Production and ad valorem taxes | $ 1.01 | $ 1.40 | $ 3.39 |
| General and administrative expense | $ 5.64 | $ 3.87 | $ 5.72 |
| Adjusted G&A per Boe [2][3] | $ 3.32 | $ 2.89 | $ 4.40 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Depreciation, depletion, amortization and accretion | $ | 8.18 | $ | 17.96 | $ | 30.35 |
| Impairment of oil and natural gas properties | $ | 8.66 | $ | 71.15 | $ | 19.19 |

---

(1) Excludes the impact of derivative instruments.

Case 19-34508 Document 1853-21 Filed in TXSB on 06/24/20 Page 629 of 1725

(2) For the years ended December 31, 2016, 2015 and 2014, Adjusted general and administrative ("G&A") expense excludes stock-based compensation expense of approximately $37.1 million ($1.90 per Boe), $14.8 million ($0.77 per Boe) and $12.8 million ($1.15 per Boe), respectively.

(3) For the years ended December 31, 2016, 2015 and 2014, Adjusted G&A expense excludes acquisition and divestiture costs included in G&A expense of $8.1 million ($0.42 per Boe), $3.8 million ($0.20 per Boe) and $1.8 million ($0.16 per Boe), respectively.

The table above in addition to other areas throughout this Annual Report on Form 10-K contains disclosures of G&A expenses excluding expenses related to stock-based compensation expense and certain costs related to acquisitions and divestitures, which is referred to as "Adjusted G&A." Adjusted G&A is a "non-GAAP financial measure," as defined in SEC rules. Please see "Item 6. Selected Financial Data -- Non-GAAP Financial Measures," for a reconciliation of G&A and G&A per Boe to Adjusted G&A and Adjusted G&A per Boe, respectively.

***Drilling Activities***

The following table sets forth information with respect to wells drilled and completed during the periods indicated. The information should not be considered indicative of future performance, nor should a correlation be assumed between the number of productive wells drilled, quantities of reserves found or economic value. At December 31, 2016, 25 gross (22 net) wells were in various stages of completion.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| | Gross | Net | Gross | Net | Gross | Net |
| **Development wells:** | | | | | | |
| Productive | 67.0 | 64.0 | 128.0 | 108.0 | 115.0 | 82.0 |
| Dry [(1)] | 1.0 | 1.0 | — | — | — | — |
| **Exploratory wells:** | | | | | | |
| Productive | — | — | 8.0 | 8.0 | 6.0 | 5.5 |
| Dry | — | — | — | — | — | — |
| **Total wells:** | | | | | | |
| Productive | 67.0 | 64.0 | 136.0 | 116.0 | 121.0 | 87.5 |
| Dry [(1)] | 1.0 | 1.0 | — | — | — | — |

(1) The Company encountered mechanical malfunctions during drilling and was unable to complete the well.

The following table sets forth information at December 31, 2016 relating to the productive wells in which we owned a working interest as of that date. Productive wells consist of producing wells and wells capable of production, including natural gas wells awaiting pipeline connections to commence deliveries and oil wells awaiting connection to production facilities. Gross wells are the total number of producing wells in which we own an interest, and net wells are the sum of our fractional working interests owned in gross wells.

| | Oil | | Natural Gas | | Total | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| Operated by us | 158.0 | 116.4 | 333.0 | 333.0 | 491.0 | 449.4 |
| Non-operated | 119.0 | 22.9 | 1.0 | 0.3 | 120.0 | 23.2 |
| Total | 277.0 | 139.3 | 334.0 | 333.3 | 611.0 | 472.6 |

***Developed and Undeveloped Acreage***

The following table sets forth information as of December 31, 2016 relating to our leasehold acreage. Acreage related to royalty, overriding royalty and other similar interests is excluded from this summary.

| | Developed Acreage | | Undeveloped Acreage | | Total Acreage | |
|---|---|---|---|---|---|---|
| | Gross | Net | Gross | Net | Gross | Net |
| Catarina | 26,400 | 26,400 | 79,651 | 79,651 | 106,051 | 106,051 |
| Maverick | 6,375 | 5,911 | 104,307 | 96,715 | 110,682 | 102,626 |
| Javelina | — | — | 39,506 | 39,506 | 39,506 | 39,506 |
| Marquis | 4,140 | 4,140 | 17,337 | 17,337 | 21,477 | 21,477 |
| Palmetto | 3,200 | 1,554 | 13,474 | 6,543 | 16,674 | 8,097 |
| Total Eagle Ford | 40,115 | 38,005 | 254,275 | 239,752 | 294,390 | 277,757 |
| TMS | 1,000 | 711 | 63,147 | 44,928 | 64,147 | 45,639 |
| Other | 2,908 | 727 | - | - | 2,908 | 727 |
| Total | 44,023 | 39,443 | 317,422 | 284,680 | 361,445 | 324,123 |

As of December 31, 2016, approximately 58% of our acreage was held by production. As of December 31, 2016, we have leases that were not held by production and not impaired representing 8,768 net acres (all which were in the Eagle Ford Shale) expiring in 2017, 15,539 net acres (all of which were in the Eagle Ford Shale) expiring in 2018, and 105,859 net acres (94,088 of which were in the Eagle Ford Shale) expiring in 2019 and beyond. We anticipate that our current and future drilling plans along with selected lease extensions will address the majority of our leases expiring in the Eagle Ford Shale in 2017 and beyond. In addition to these lease expirations, we also have a continuous development obligation in our Catarina area that requires us to drill, but not complete, (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120 day period in order to maintain rights to any future undeveloped acreage.

***Delivery Commitments***

We have made commitments to certain purchasers to deliver a portion of our natural gas production from our Catarina area.

As of December 31, 2016, in our Catarina area, we have three contracts that require us to deliver portions of our natural gas, with delivery requirements through 2020, 2021 and 2022, respectively. Under our contract expiring in 2020, we are required to deliver 207 Bcf of natural gas through the Catarina Midstream gathering facilities. Under our contract expiring in 2021, we are required to deliver approximately 79 Bcf of natural gas. Under our contract expiring in 2021, which begins in 2017, we are required to deliver approximately 228 Bcf of natural gas. During 2016, we recorded expenses related to deficiencies on delivery commitments of approximately $1.6 million. These amounts were recorded to natural gas production expenses in our consolidated statement of operations and were not considered material to the financial statement line item or to the consolidated financial statements as a whole. We do not expect to have additional expenses in 2017 related to deficiencies on our natural gas delivery commitments.

Also in our Catarina area, we have one contract that requires us to deliver a portion of our oil production through the Catarina Midstream gathering facilities. This contract expires in 2020 and requires us to deliver approximately 15 MMBbls of oil. We do not expect to have additional expenses in 2017 related to deficiencies on our oil delivery commitments.

**Operations**

***Oil and Natural Gas Leases***

The typical oil and natural gas lease agreement covering such properties provides for the payment of royalties to the mineral owner for all oil and natural gas produced from any well drilled on the lease premises. The lessor royalties

and other leasehold burdens on our Eagle Ford properties range from 20.8% to 36.7%, resulting in a net revenue interest to us ranging from 63.3% to 79.2%.

***Marketing and Major Customers***

For the year ended December 31, 2016, purchases by three of our customers accounted for more than 10% (33%, 20%, and 14%, respectively) of our total revenues. The three customers, who are not affiliates of the Company, purchased oil, NGLs and natural gas production from us pursuant to existing marketing agreements with terms that are currently on "evergreen" status and renew on a month-to-month basis until either party gives 30-day advance written notice of non-renewal.

Since the oil, NGLs and natural gas that we sell are commodities for which there are a large number of potential buyers and because of the adequacy of the infrastructure to transport oil, NGLs and natural gas in the areas in which we operate, if we were to lose one or more customers, we believe that we could readily procure substitute or additional customers such that our production volumes would not be materially affected for any significant period of time.

***Hedging Activities***

We enter into commodity derivative contracts with unaffiliated third parties to achieve more predictable cash flows and to reduce our exposure to short-term fluctuations in oil and natural gas prices. For a more detailed discussion of our hedging activities, please read "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Results of Operations—Operating Costs and Expenses—Commodity Derivative Transactions," "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates—Derivative Instruments" and "Item 7A. Quantitative and Qualitative Disclosures about Market Risk."

***Competition***

We operate in a highly competitive environment for leasing and acquiring properties and in securing trained personnel. Our competitors specifically include major and independent oil and natural gas companies that operate in our project areas. These competitors include, but are not limited to, Carrizo Oil & Gas, Inc., Chesapeake Energy Corporation, EOG Resources, Inc., Marathon Oil Corporation, SM Energy Company and Noble Energy, Inc. Many of our competitors possess and employ financial, technical and personnel resources substantially greater than ours, which can be particularly important in the areas in which we operate. As a result, our competitors may be able to pay more for productive oil and natural gas properties and exploratory prospects, as well as evaluate, bid for and purchase a greater number of properties and prospects than our financial or personnel resources permit. Our ability to acquire additional properties and to find and develop reserves will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. In addition, there is substantial competition for capital available for investment in the oil and natural gas industry.

We are also affected by the competition for and the availability of equipment, including drilling rigs, completion equipment and materials. We are unable to predict when, or if, shortages of such equipment may occur or how they would affect our development and exploitation programs.

***Title to Properties***

Prior to completing an acquisition of producing oil and natural gas properties, we perform title reviews on significant leases, and depending on the materiality of properties, we may obtain a title opinion or review previously obtained title opinions. As a result, title examinations have been obtained on a significant portion of our properties. After an acquisition, we review the assignments from the seller for scrivener's and other errors and execute and record corrective assignments as necessary.

As is customary in the oil and natural gas industry, we initially conduct only a cursory review of the titles to our properties on which we do not have proved reserves. Prior to the commencement of drilling operations on those properties, we conduct a thorough title examination and perform curative

work with respect to significant defects. To the

extent title opinions or other investigations reflect title defects on those properties, we are typically responsible for curing any title defects at our expense. We generally will not commence drilling operations on a property until we have cured any material title defects on such property.

We believe that we have satisfactory title to all of our material assets. Although title to these properties is subject to encumbrances in some cases, such as customary interests generally retained in connection with the acquisition of real property, customary royalty interests and contract terms and restrictions, liens under operating agreements, liens related to environmental liabilities associated with historical operations, liens for current taxes and other burdens, easements, restrictions and minor encumbrances customary in the oil and natural gas industry, we believe that none of these liens, restrictions, easements, burdens and encumbrances will materially detract from the value of these properties or from our interest in these properties or materially interfere with our use of these properties in the operation of our business. In addition, we believe that we have obtained sufficient rights-of-way grants and permits from public authorities and private parties for us to operate our business in all material respects as described in this Annual Report on Form 10-K.

### *Seasonal Nature of Business*

Generally, but not always, the demand for natural gas decreases during the summer months and increases during the winter months, resulting in seasonal fluctuations in the price we receive for our natural gas production. Seasonal anomalies such as mild winters or hot summers sometimes lessen this fluctuation. In addition, certain natural gas users utilize natural gas storage facilities and purchase some of their anticipated winter requirements during the summer, which can lessen seasonal demand fluctuations.

## Environmental Matters and Regulation

### *General*

Our operations are subject to stringent and complex federal, state and local laws and regulations governing environmental protection as well as the discharge of materials into the environment or otherwise relating to protection of the environment or occupational health and safety. Numerous governmental agencies, such as the Environmental Protection Agency (the "EPA") and the Texas Railroad Commission ("Commission"), issue regulations, which often require difficult and costly compliance measures that carry substantial administrative, civil and criminal penalties and may result in injunctive obligations for failure to comply. These laws and regulations may, among other things (i) require the acquisition of permits to conduct exploration, drilling and production operations; (ii) restrict the types, quantities and concentration of various substances that can be released into the environment or injected into formations in connection with oil and natural gas drilling, production and transportation activities; (iii) govern the sourcing and disposal of water used in the drilling and completion process; (iv) limit or prohibit drilling or injection activities on certain lands lying within wilderness, wetlands, seismically active areas, and other protected areas; (v) require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells; (vi) result in the suspension or revocation of necessary permits, licenses and authorizations; (vii) impose substantial liabilities for pollution resulting from drilling and production operations; and (viii) require that additional pollution controls be installed. Any failure to comply with these laws and regulations may result in the assessment of administrative, civil, and criminal penalties, the imposition of corrective or remedial obligations, and the issuance of orders enjoining performance of some or all of our operations. Furthermore, liability under such laws and regulations is often strict (i.e., no showing of "fault" is required) and can be joint and several.

These laws and regulations may also restrict the rate of oil and natural gas production below the rate that would otherwise be possible. The regulatory burden on the oil and natural gas industry increases the cost of doing business in the industry and consequently affects profitability. Additionally, The U.S. Congress and federal and state agencies frequently revise environmental laws and regulations, and any changes that result in more stringent and costly waste handling, disposal and cleanup requirements for the oil and natural gas industry could have a significant impact on our operating costs.

The trend in environmental regulation has been to place more restrictions and limitations on activities that may affect the environment. Any changes in environmental laws and regulations or re-interpretation of enforcement policies that result in more stringent and costly waste handling, storage transport, disposal, or remediation requirements could have a material adverse effect on our financial position and results of operations. Moreover, accidental releases or spills may occur in the course of our operations, and we could incur significant costs and liabilities as a result of such releases or spills, including any third-party claims for damage to property, natural resources or persons. While we believe that we are in substantial compliance with existing laws and regulations and that continued compliance with existing requirements will not materially affect us, there is no assurance that this situation will continue in the future.

The following is a summary of the more significant existing environmental, health and safety laws and regulations to which our business operations are subject and for which compliance may have a material adverse impact on our capital expenditures, results of operations or financial position.

***Hazardous Substances and Waste Handling***

Our operations are subject to environmental laws and regulations relating to the management and release of hazardous substances, solid and hazardous wastes and petroleum hydrocarbons. These laws generally regulate the generation, storage, treatment, transportation and disposal of solid and hazardous waste and may impose strict and, in some cases, joint and several liability for the investigation and remediation of affected areas where hazardous substances may have been released or disposed. The Comprehensive Environmental Response, Compensation and Liability Act, as amended, or CERCLA, also known as the Superfund law, and comparable state laws impose liability, without regard to fault or legality of conduct, on classes of persons considered to be responsible for the release, deemed “responsible parties,” of a “hazardous substance” into the environment. These persons include the current owner or operator of the site where the release occurred, past owners or operators at the time a hazardous substance was released at the site, and anyone who disposed or arranged for the disposal of a hazardous substance released at the site. Under CERCLA, such persons are subject to strict liability that, in some circumstances, may be joint and several for the costs of cleaning up the hazardous substances that have been released into the environment, for damages to natural resources and for the costs of certain health studies. CERCLA also authorizes the EPA and, in some instances, third parties to act in response to threats to the public health or the environment and to seek to recover the costs they incur from the responsible classes of persons. It is not uncommon for neighboring landowners and other third parties to file common law-based claims for personal injury and property damage allegedly caused by hazardous substances or other pollutants released into the environment. We generate materials in the course of our operations that may be regulated as hazardous substances, and despite the “petroleum exclusion” of Section 101(14) of CERCLA, which currently encompasses natural gas, we may nonetheless handle hazardous substances within the meaning of CERCLA, or similar state statutes, in the course of our ordinary operations and, as a result, may be jointly and severally liable under CERCLA for all or part of the costs required to clean up sites at which these hazardous substances have been released into the environment. In addition, we may have liability for releases of hazardous substances at our properties by prior owners or operators or other third parties.

The Resource Conservation and Recovery Act, as amended, or RCRA, and comparable state statutes and their implementing regulations, regulate the generation, transportation, treatment, storage, disposal and cleanup of hazardous and non-hazardous wastes. Under the auspices of the EPA, most states administer some or all of the provisions of RCRA, sometimes in conjunction with their own, more stringent requirements. Federal and state regulatory agencies can seek to impose administrative, civil and criminal penalties for alleged non-compliance with RCRA and analogous state requirements. Drilling fluids, produced waters, and most of the other wastes associated with the exploration, development, and production of oil or natural gas, if properly handled, are exempt from regulation as hazardous waste under Subtitle C of RCRA. These wastes, instead, are regulated under RCRA's less stringent solid waste provisions, state laws or other federal laws. It is possible, however, that certain oil and natural gas exploration, development and production wastes now classified as non-hazardous could be classified as hazardous wastes in the future and therefore be subject to more rigorous and costly disposal requirements. Indeed, legislation has been proposed from time to time in The U.S. Congress to re-categorize certain oil and natural gas exploration and production wastes as “hazardous wastes.” Also, in December 2016, the EPA agreed in a consent decree to review its regulations of oil and gas waste. It has until March 2019 to determine whether any revisions are necessary. Any such change could result in an increase in our costs

Case 22-34503 Document 18321 Filed in TXSB on 08/24/20 Page 79 of 1725

to manage and dispose of wastes, which could have a material adverse effect on our results of operations and financial position.

We currently own, lease, or operate numerous properties that have been used for oil and natural gas exploration, production and processing for many years. Although we believe that we are in substantial compliance with the requirements of CERCLA, RCRA, and related state and local laws and regulations, that we hold all necessary and up-to-date permits, registrations and other authorizations required under such laws and regulations and that we have utilized operating and waste disposal practices that were standard in the industry at the time, hazardous substances, wastes, or hydrocarbons may have been released on, under or from the properties owned or leased by us, or on, under or from other locations, including off-site locations, where such substances have been taken for disposal. In addition, some of our properties have been operated by third parties or by previous owners or operators whose treatment and disposal of hazardous substances, wastes, or hydrocarbons was not under our control. These properties and the substances disposed or released on, under or from them may be subject to CERCLA, RCRA and analogous state laws. Under such laws, we could be required to undertake response or corrective measures, which could include removal of previously disposed substances and wastes, cleanup of contaminated property or performance of remedial plugging or pit closure operations to prevent future contamination.

***Water and Other Water Discharges and Spills***

The Federal Water Pollution Control Act, as amended, also known as the Clean Water Act, the Safe Drinking Water Act, or the SDWA, the Oil Pollution Act of 1990, or the OPA, and analogous state laws, impose restrictions and strict controls with respect to the discharge of pollutants, including oil, produced waters and other hazardous substances, into federal and state waters. The discharge of pollutants into regulated waters is prohibited, except in accordance with the terms of a permit issued by EPA or an analogous state agency. The discharge of dredge and fill material in regulated waters, including wetlands, is also prohibited, unless authorized by a permit issued by the U.S. Army Corps of Engineers. The EPA has also adopted regulations requiring certain oil and natural gas exploration and production facilities to obtain individual permits or coverage under general permits for storm water discharges. Some states also maintain groundwater protection programs that require permits for discharges or operations that may impact groundwater conditions. The underground injection of fluids is subject to permitting and other requirements under state laws and regulation.

Furthermore, the EPA is examining regulatory requirements for “indirect dischargers” of wastewater – i.e., those that send their discharges to private or publicly owned treatment facilities, which treat the wastewater before discharging it to regulated waters. On June 28, 2016, the EPA published a final rule prohibiting the discharge of wastewater from onshore unconventional oil and gas extraction facilities to publicly owned wastewater treatment plants. The EPA is also conducting a study of private wastewater treatment facilities (also known as centralized waste treatment, or CWT, facilities) accepting oil and gas extraction wastewater. The EPA is collecting data and information related to the extent to which CWT facilities accept such wastewater, available treatment technologies (and their associated costs), discharge characteristics, financial characteristics of CWT facilities, and the environmental impacts of discharges from CWT facilities.

Costs may be associated with the treatment of wastewater or developing and implementing storm water pollution prevention plans, as well as for monitoring and sampling the storm water runoff from certain of our facilities. Obtaining permits also has the potential to delay the development of oil and natural gas projects. These same regulatory programs also limit the total volume of water that can be discharged, hence limiting the rate of development, and require us to incur compliance costs.

The OPA amends the Clean Water Act and establishes strict liability and natural resource damages liability for unauthorized discharges of oil into waters of the United States. The OPA is the primary federal law imposing oil spill liability. The OPA contains numerous requirements relating to the prevention of and response to petroleum releases into waters of the United States, including the requirement that operators of offshore facilities and certain onshore facilities near or crossing waterways must maintain certain significant levels of financial assurance to cover potential environmental cleanup and restoration costs. The OPA subjects owners of facilities to strict liability that, in some circumstances, may be joint and several for all containment and cleanup costs and certain other damages arising from a

release, including, but not limited to, the costs of responding to a release of oil to surface waters.

Pursuant to these laws and regulations, we may be required to obtain and maintain approvals or permits for the discharge of wastewater or storm water and the underground injection of fluids and are required to develop and implement spill prevention, control and countermeasure, or SPCC plans, in connection with on-site storage of significant quantities of oil. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations. We maintain all required discharge permits necessary to conduct our operations, and we believe we are in substantial compliance with their terms.

***Regulation of Hydraulic Fracturing***

Hydraulic fracturing is an important and common process used by oil and natural gas exploration and production operators in the completion of certain oil and natural gas wells whereby water, sand and chemicals are injected under pressure into subsurface formations to stimulate production of oil and/or natural gas. The federal Safe Drinking Water Act, or SDWA, regulates the underground injection of substances through the Underground Injection Control, or UIC, Program. Hydraulic fracturing is generally exempt from regulation under the UIC Program, and thus the hydraulic fracturing process is typically regulated by state oil and natural gas commissions. The EPA, however, has asserted federal regulatory authority over hydraulic fracturing involving diesel additives under the UIC Program. On February 12, 2014, the EPA published a revised UIC Program guidance for oil and natural gas hydraulic fracturing activities using diesel fuel. The guidance document describes how regulations of Class II wells, which are those wells injecting fluids associated with oil and natural gas production activities, may be tailored to address the purported unique risks of diesel fuel injection during the hydraulic fracturing process. Although the EPA is not the permitting authority for UIC Class II programs in Texas, Mississippi, and Louisiana, where we maintain acreage, the EPA is encouraging state programs to review and consider use of the above-mentioned guidance. In addition, the EPA plans to develop a Notice of Proposed Rulemaking by June 2018, which would describe a proposed mechanism - regulatory, voluntary, or a combination of both - to collect data on hydraulic fracturing chemical substances and mixtures. Furthermore, legislation to amend the SDWA to repeal the exemption for hydraulic fracturing from the definition of “underground injection” and require federal permitting and regulatory control of hydraulic fracturing, as well as legislative proposals to require disclosure of the chemical constituents of the fluids used in the fracturing process, have been proposed in recent sessions of The U.S. Congress.

The protection of groundwater quality is extremely important to us. We believe that we follow all state and federal regulations and apply industry standard practices for groundwater protection in our operations. These measures are subject to close supervision by state and federal regulators. Our policy and practice is to follow all applicable guidelines and regulations in the areas where we conduct hydraulic fracturing. Accordingly, we set surface casing strings below the deepest usable quality fresh water zones and cement them back to the surface in accordance with applicable regulations, potential lease requirements and other legal requirements to ensure protection of existing fresh water zones. Also, prior to commencing drilling operations for the production portion of the hole, the surface casing strings are pressure tested to ensure mechanical integrity.

Although not presently relevant to our current 2017 development plans, on March 26, 2015, the Bureau of Land Management (“BLM”) published a final rule governing hydraulic fracturing on federal and Indian lands. The rule requires public disclosure of chemicals used in hydraulic fracturing, implementation of a casing and cementing program, management of recovered fluids, and submission to BLM of detailed information about the proposed operation, including wellbore geology, the location of faults and fractures, and the depths of all usable water. On June 21, 2016, the United States District Court for Wyoming set aside the rule, holding that the BLM lacked Congressional authority to promulgate the rule. The BLM has appealed to the Tenth Circuit Court of Appeals.

Furthermore, there are certain governmental reviews either underway or being proposed that focus on environmental aspects of hydraulic fracturing practices. For example, on December 13, 2016, the EPA released a study examining the potential for hydraulic fracturing to impact drinking water resources finding that, under some circumstances, the use of water in hydraulic fracturing activities can impact drinking water resources. Also, on February 6, 2015, the EPA released a report with findings and recommendations related to public concern about induced seismic

activity from disposal wells. The report recommends strategies for managing and minimizing the potential for significant injection-induced seismic events. Other governmental agencies, including the U.S. Department of Energy, the U.S. Geological Survey, and the U.S. Government Accountability Office, have evaluated or are evaluating various other aspects of hydraulic fracturing.

These ongoing or proposed studies, depending on their degree of pursuit and any meaningful results obtained, could spur initiatives to further regulate hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells under the SDWA or other regulatory mechanism.

Also, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances or otherwise require the public disclosure of chemicals used in the hydraulic fracturing process. For example, in December 2011, the Commission adopted rules and regulations requiring that oil and gas operators publicly disclose the chemicals used in the hydraulic fracturing process. Also, in May 2013, the Commission adopted new rules governing well casing, cementing and other standards for ensuring that hydraulic fracturing operations do not contaminate nearby water resources. The new rules took effect in January 2014. Additionally, on October 28, 2014, the Commission adopted disposal well rule amendments designed, amongst other things, to require applicants for new disposal wells that will receive non-hazardous produced water and hydraulic fracturing flowback fluid to conduct seismic activity searches utilizing the U.S. Geological Survey. The searches are intended to determine the potential for earthquakes within a circular area of 100 square miles around a proposed, new disposal well. The disposal well rule amendments, which became effective on November 17, 2014, also clarify the Commission's authority to modify, suspend or terminate a disposal well permit if scientific data indicates a disposal well is likely to contribute to seismic activity. The Commission has used this authority to deny permits for waste disposal sites.

A number of lawsuits and enforcement actions have been initiated across the country alleging that hydraulic fracturing practices have induced seismic activity and adversely impacted drinking water supplies, use of surface water, and the environment generally. Several states and municipalities have adopted, or are considering adopting, regulations that could restrict or prohibit hydraulic fracturing in certain circumstances. These or any other new laws or regulations that significantly restrict hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells could make it more difficult or costly for us to drill and produce from conventional and tight formations as well as make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings.

Further federal, state and/or local laws governing hydraulic fracturing could result in additional permitting and financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements and also to attendant permitting delays and potential increases in costs. Such changes could cause us to incur substantial compliance costs, and compliance or the consequences of failure to comply by us could have a material adverse effect on our financial condition and results of operations. At this time, it is not possible to estimate the potential impact on our business that may arise if additional federal or state and/or local laws are enacted.

***Air Emissions***

The federal Clean Air Act, as amended, or the CAA, and comparable state laws, regulate emissions of various air pollutants through air emissions standards, construction and operating permitting programs and the imposition of other compliance requirements. In addition, the EPA has developed, and continues to develop, stringent regulations governing emissions of toxic air pollutants at specified sources. On August 16, 2012, the EPA published final rules that subject oil and natural gas production, processing, transmission, and storage operations to regulation under the New Source Performance Standards ("NSPS") and National Emission Standards for Hazardous Air Pollutants ("NESHAP") programs. The rule includes NSPS for completions of hydraulically fractured gas wells and establishes specific new requirements for emissions from compressors, controllers, dehydrators, storage vessels, natural gas processing plants and certain other equipment. The final rule seeks to achieve a 95% reduction in Volatile Organic Compounds ("VOCs") emitted by requiring the use of reduced emission completions or "green completions" on all hydraulically fractured wells constructed or refractured after January 1, 2015. The EPA received numerous requests for reconsideration of these rules from both industry and the environmental community, and court challenges to the rules were also filed. In response, the

EPA has issued, and will likely continue to issue, revised rules responsive to some of the requests for reconsideration. In particular, on May 12, 2016, the EPA amended its regulations to impose new standards for methane and VOC emissions for certain new, modified, and reconstructed equipment, processes, and activities across the oil and natural gas sector. On the same day, the EPA finalized a plan to implement its minor new source review program in Indian country for oil and natural gas production, and it issued for public comment an information request that will require companies to provide extensive information instrumental for the development of regulations to reduce methane emissions from existing oil and gas sources.

Also, on November 15, 2016, the BLM finalized a rule to reduce the flaring, venting and leaking of methane from oil and gas operations on federal and Indian lands. The rule requires operators to use currently available technologies and equipment to reduce flaring, periodically inspect their operations for leaks, and replace outdated equipment that vents large quantities of gas into the air. The rule also clarifies when operators owe the government royalties for flared gas. State and industry groups have challenged this rule in federal court, asserting that the BLM lacks authority to prescribe air quality regulations. In addition, Congress has taken certain initial steps to repeal the rule pursuant to the Congressional Review Act, though it remains uncertain whether the rule will ultimately be repealed.

These laws and regulations may require us to obtain pre-approval for the construction or modification of certain projects or facilities expected to produce or significantly increase air emissions, obtain and strictly comply with stringent air permit requirements or utilize specific equipment or technologies to control emissions. The need to obtain permits has the potential to delay the development of oil and natural gas projects, and our failure to comply with these requirements could subject us to monetary penalties, injunctions, conditions or restrictions on operations and, potentially, criminal enforcement actions. While we may be required to incur certain capital expenditures in the next few years for air pollution control equipment or other air emissions-related issues, we do not believe that such requirements will have a material adverse effect on our operations.

***Climate Change***

In recent years, federal, state and local governments have taken steps to reduce emissions of GHGs. The EPA has finalized a series of GHG monitoring, reporting and emission control rules for the oil and natural gas industry, and the U.S. Congress has, from time to time, considered adopting legislation to reduce emissions. Almost one-half of the states have already taken measures to reduce emissions of GHGs primarily through the development of GHG emission inventories and/or regional GHG cap-and-trade programs.

Furthermore, in December 2015, the United States participated in the 21st Conference of the Parties (COP-21) of the United Nations Framework Convention on Climate Change in Paris, France. The resulting Paris Agreement calls for the parties to undertake “ambitious efforts” to limit the average global temperature, and to conserve and enhance sinks and reservoirs of GHGs. The Agreement went into effect on November 4, 2016 and establishes a framework for the parties to cooperate and report actions to reduce GHG emissions. Also, on June 29, 2016, the leaders of the United States, Canada and Mexico announced an Action Plan to, among other things, boost clean energy, improve energy efficiency, and reduce greenhouse gas emissions. The Action Plan specifically calls for a reduction in methane emissions from the oil and gas sector by 40 to 45 percent by 2025. It remains unclear whether and how the results of the 2016 U.S. election could impact the regulation of greenhouse gas emissions at the federal and state level.

Restrictions on GHG emissions that may be imposed could adversely affect the oil and natural gas industry. The adoption of any legislation or regulations that otherwise limit emissions of GHGs from our equipment and operations, could require us to incur increased operating costs to monitor and report on GHG emissions or reduce emissions of GHGs associated with our operations, such as costs to purchase and operate emissions control systems, to acquire emissions allowances or comply with new regulatory requirements. Any GHG emissions legislation or regulatory programs applicable to power plants or refineries could also increase the cost of consuming, and thereby adversely affect demand for the oil and natural gas that we produce. Consequently, legislation and regulatory programs to reduce GHG emissions could have an adverse effect on our business, financial condition and results of operations.

In addition, claims have been made against certain energy companies alleging that GHG emissions from oil and natural gas operations constitute a public nuisance under federal and/or state common law. As a result, private individuals may seek to enforce environmental laws and regulations against

us and could allege personal injury or

property damages. While our business is not a party to any such litigation, we could be named in actions making similar allegations. An unfavorable ruling in any such case could significantly impact our operations and could have an adverse impact on our financial condition.

Moreover, there has been public discussion that climate change may be associated with extreme weather conditions such as more intense hurricanes, thunderstorms, tornados and snow or ice storms, as well as rising sea levels. Another possible consequence of climate change is increased volatility in seasonal temperatures. Some studies indicate that climate change could cause some areas to experience temperatures substantially colder than their historical averages. Extreme weather conditions can interfere with our production and increase our costs and damage resulting from extreme weather may not be fully insured. However, at this time, we are unable to determine the extent to which climate change may lead to increased storm or weather hazards affecting our operations.

***National Environmental Policy Act***

Oil and natural gas exploration, development and production activities on federal lands are subject to the National Environmental Policy Act, as amended, or NEPA. NEPA requires federal agencies, including the DOI, to evaluate major agency actions having the potential to significantly impact the environment. In the course of such evaluations, an agency will prepare an Environmental Assessment to evaluate the potential direct, indirect and cumulative impacts of a proposed project and, if necessary, will prepare a more detailed Environmental Impact Statement that may be made available for public review and comment. Currently, we have minimal exploration and production activities on federal lands. However, to the extent our current or future activities on federal lands are subject to the requirements of NEPA, this process has the potential to delay the receipt of governmental permits and the development of oil and natural gas projects. Authorizations under NEPA also are subject to protest, appeal or litigation, which can delay or halt projects.

***Endangered Species Act***

The Federal Endangered Species Act, or the ESA, and analogous state statutes restrict activities that may adversely threatened or endangered species or their habitat. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. Federal agencies are required to insure that any action authorized, funded or carried out by them is not likely to jeopardize the continued existence of listed species or modify their critical habitat. While some of our facilities on federal lands may be located in areas that are designated as habitat for endangered or threatened species, we believe that we are in substantial compliance with the ESA. The U.S. Fish and Wildlife Service may identify, however, previously unidentified endangered or threatened species or may designate critical habitat and suitable habitat areas that it believes are necessary for survival of a threatened or endangered species, which could cause us to incur additional costs or become subject to operating restrictions or bans in the affected areas.

***Occupational Safety and Health Act***

We are also subject to the requirements of OSHA and comparable state laws that regulate the protection of the health and safety of employees. In addition, OSHA's hazard communication standard requires that information be maintained about hazardous materials used or produced in our operations and that this information be provided to employees, state and local government authorities and citizens. We believe that our operations are in substantial compliance with the OSHA requirements.

***Other Regulation of the Oil and Natural Gas Industry***

The oil and natural gas industry is extensively regulated by numerous federal, state and local authorities. Legislation affecting the oil and natural gas industry is under constant review for amendment or expansion, frequently increasing the regulatory burden. Additionally, numerous departments and agencies, both federal and state, are authorized by statute to issue rules and regulations that are binding on the oil and natural gas industry and its individual members, some of which carry substantial penalties for failure to comply. Although the regulatory burden on the oil and natural gas industry increases our cost of doing business and, consequently, affects our profitability, these burdens generally do not affect us any differently or to any greater or lesser extent than they affect other companies in the oil and natural gas industry with similar types, quantities and locations of production.

***Drilling and Production***

Our operations are subject to various types of regulation at federal, state and local levels. These types of regulation include requiring permits for the drilling of wells, drilling bonds and reports concerning operations. Most states, and some counties and municipalities, in which we operate also regulate one or more of the following:

- the location of wells;
- the method of drilling and casing wells;
- the disclosure of the chemicals used in the hydraulic fracturing process;
- the surface use and restoration of properties upon which wells are drilled;
- the plugging and abandoning of wells; and
- notice to surface owners and other third parties.

State laws regulate the size and shape of drilling and spacing units or proration units governing the pooling of oil and natural gas properties. Some states allow forced pooling or integration of tracts to facilitate exploration, while other states rely on voluntary pooling of lands and leases. In some instances, forced pooling or unitization may be implemented by third parties and may reduce our interest in the unitized properties. In addition, state conservation laws establish maximum rates of production from oil and natural gas wells, generally prohibit the venting or flaring of natural gas and impose requirements regarding the ratability of production. These laws and regulations may limit the amount of oil and natural gas we can produce from our wells or limit the number of wells or the locations at which we can drill. Moreover, each state generally imposes a production or severance tax with respect to the production and sale of oil, natural gas and NGLs within its jurisdiction.

***Natural Gas Regulation***

The availability, terms and cost of transportation significantly affect sales of natural gas. The interstate transportation and sale for resale of natural gas is subject to federal regulation, including regulation of the terms, conditions and rates for interstate transportation, storage and various other matters, primarily by the Federal Energy Regulatory Commission, or FERC. Federal and state regulations govern the price and terms for access to natural gas pipeline transportation. FERC's regulations for interstate natural gas transmission in some circumstances may also affect the intrastate transportation of natural gas.

The FERC also possesses regulatory oversight over natural gas markets, including the purchase, sale and transportation activities of non-interstate pipelines and other natural gas market participants. FERC possesses substantial enforcement authority for violations of the Natural Gas Act, or NGA, including the ability to assess civil penalties, order disgorgement of profits and recommend criminal penalties. The Energy Policy Act of 2005 amended the NGA to grant FERC new authority to facilitate price transparency in markets for the sale or transportation of physical natural gas in interstate commerce, and to prohibit market manipulation. FERC's anti-manipulation regulations apply to FERC jurisdictional activities, which have been broadly construed by the FERC. Should we fail to comply with all applicable FERC-administered statutes, rules, regulations and orders, we could be subject to substantial civil and criminal penalties, including civil penalties of up to $1.0 million per day, per violation.

In 2008, FERC took additional steps to enhance its market oversight and monitoring of the natural gas industry. Order No. 704, as clarified in orders on rehearing, requires buyers and sellers of natural gas above a de minimis level, including entities not otherwise subject to FERC jurisdiction, to submit an annual report to FERC describing their wholesale physical natural gas transactions that use an index or that contribute to or may contribute to the formation of a gas index. The FERC also contemplated expanding the industry's reporting requirements. On November 15, 2012, the FERC issued a Notice of Inquiry seeking comments whether requiring quarterly reporting of every gas transaction within the FERC's jurisdiction that entails physical

delivery for the next day or the next month would provide useful information for improving natural gas market transparency. The FERC ultimately determined that imposing a quarterly

reporting requirement is not necessary at this time and exercised its discretion to terminate the Notice of Inquiry on November 17, 2015.

Although natural gas prices are currently unregulated, The U.S. Congress historically has been active in the area of natural gas regulation. We cannot predict whether new legislation to regulate natural gas might be proposed, what proposals, if any, might actually be enacted by The U.S. Congress or the various state legislatures, and what effect, if any, the proposals might have on the operations of our properties. Sales of condensate and NGLs are not currently regulated and are made at market prices.

***State Regulation***

The various states regulate the drilling for, and the production, gathering and sale of, oil and natural gas, including imposing severance taxes and requirements for obtaining drilling permits. For example, Texas currently imposes a 4.6% severance tax on oil production and a 7.5% severance tax on natural gas production. States also regulate the method of developing new fields, the spacing and operation of wells and the prevention of waste of natural gas resources. States may regulate rates of production and may establish maximum daily production allowables from natural gas wells based on market demand or resource conservation, or both. States do not regulate wellhead prices or engage in other similar direct economic regulation, but there can be no assurance that they will not do so in the future. The effect of these regulations may be to limit the amount of natural gas that may be produced from our wells and to limit the number of wells or locations we can drill.

The oil and natural gas industry is also subject to compliance with various other federal, state and local regulations and laws. Some of those laws relate to resource conservation and equal employment opportunity. We do not believe that compliance with these laws will have a material adverse effect on us.

**Employees**

We currently do not have any employees. Pursuant to our Services Agreement with SOG (the “Services Agreement”), SOG performs services for us, including the operation of our properties. Please also read “Item 8. Financial Statements and Supplementary Data —Note 9, Related Party Transactions.” As of December 31, 2016, SOG had approximately 235 employees, including 27 engineers, 13 geoscientists and 13 land professionals. None of these employees are represented by labor unions or covered by any collective bargaining agreement. We believe that SOG’s relations with its employees are satisfactory.

We also contract for the services of independent consultants involved in land, engineering, regulatory, accounting, financial and other disciplines as needed.

**Offices**

For our principal offices, we currently share offices with other members of the Sanchez Group under leases entered into by the Company covering approximately 90,000 square feet of office space in Houston, Texas at 1000 Main Street, Suite 3000, Houston, Texas 77002, expiring in 2025. In addition, SOG maintains offices in Laredo and San Antonio, Texas.

**Available Information**

We are required to file annual, quarterly and current reports, proxy statements and other information with the SEC. You may read and copy any documents filed by us with the SEC at the SEC’s Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. Our filings with the SEC are also available to the public from commercial document retrieval services and at the SEC’s website at http://www.sec.gov.

Our common stock is listed and traded on the New York Stock Exchange ("NYSE") under the symbol "SN." Our reports, proxy statements and other information filed with the SEC can also be inspected and copied at the New York Stock Exchange, 20 Broad Street, New York, New York 10005.

We also make available on our website at http://www.sanchezenergycorp.com all of the documents that we file with the SEC, free of charge, as soon as reasonably practicable after we electronically file such material with the SEC. Information contained on our website is not incorporated by reference into this Annual Report on Form 10-K.

**Item 1A. *Risk Factors***

*Our business involves a high degree of risk. You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Annual Report on Form 10-K, including the financial statements and the related notes appearing at the end of this Annual Report on Form 10-K. If any of the following risks, or any risk described elsewhere in this Annual Report on Form 10-K, actually occurs, our business, business prospects, financial condition, results of operations or cash flows could be materially adversely affected. The risks below are not the only ones facing the Company. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. This Annual Report on Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below. Also, please read "Cautionary Note Regarding Forward-Looking Statements."*

**Risks Related to Our Business**

***Market conditions for oil, natural gas and NGLs are highly volatile. A sustained decline in prices for these commodities could adversely affect our revenue, cash flows, profitability and growth.***

Prices for oil, natural gas and NGLs fluctuate widely in response to a variety of factors that are beyond our control, such as:

- domestic and foreign supply of and demand for oil, natural gas and NGLs;
- weather conditions and the occurrence of natural disasters;
- overall domestic and global economic conditions;
- political and economic conditions in oil, natural gas and NGL producing countries globally, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;
- actions of OPEC and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on oil, natural gas and NGL prices;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting our ability to apply hydraulic fracturing to our wells, and taxation;

- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of oil, natural gas and NGL pipelines and other transportation facilities;

- the availability of refining capacity; and

- the price and availability of, and consumer demand for, alternative fuels.

Governmental actions may also affect oil, natural gas and NGL prices. It is uncertain what impact the election of President Trump and the new Congress may have on the exploration for and production of oil, natural gas and NGLs. In the past, oil, natural gas and NGL prices have been extremely volatile, and we expect this volatility to continue. Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. The West Texas Intermediate posted price used to calculate the full cost ceiling in accordance with SEC rules declined from an annual high of $105.34 per Boe on July 1, 2014 to $69.00 per Boe on December 1, 2014, $41.85 per Boe on December 1, 2015 and $31.62 per Boe on February 1, 2016. Such volatility has negatively affected the amount of our net estimated proved reserves and has negatively affected the standardized measure of discounted future net cash flows of our net estimated proved reserves. We recorded a full cost ceiling test impairment after income taxes of $169 million for the year ended December 31, 2016, and we recorded a full cost ceiling impairment test impairment after income taxes of $1,365 million for the year ended December 31, 2015. The impact of lower commodity prices adversely affecting proved reserve values primarily contributed to the ceiling impairment. Changes in production rates, prices, levels of reserves, future development costs, transfers of unevaluated properties, and other factors will determine our actual ceiling test calculation and impairment analyses in future periods. The 12-month average commodity price could continue to decline, which could result in additional impairments being recorded during 2017.

In addition, our revenue, profitability and cash flow depend upon the prices of and demand for oil, natural gas and NGL reserves, and continued price volatility and low commodity prices, or a sustained drop in prices could negatively affect our financial results and impede our growth. In particular, sustained declines in commodity prices will:

- limit our ability to enter into commodity derivative contracts at attractive prices;

- reduce the value and quantities of our reserves, because declines in oil, natural gas and NGL prices would reduce the amount of oil, natural gas and NGLs that we can economically produce;

- reduce the amount of cash flow available for capital expenditures;

- limit our ability to borrow money or raise additional capital; and

- make it uneconomical for our operating partners to commence or continue production levels of oil, natural gas and NGLs.

***An increase in the differential between the NYMEX or other benchmark prices of oil, natural gas and NGLs and the wellhead price we receive for our production could adversely affect our business, financial condition and results of operations.***

The prices that we receive for our oil, natural gas and NGL production sometimes reflect differences between the relevant benchmark prices, such as NYMEX, that are used for calculating hedge positions. The difference between the benchmark price and the price we receive is called a basis differential. Increases in the basis differential between the benchmark prices for oil, natural gas and NGLs and the wellhead price we receive could adversely affect our business, financial condition and results of operations. We do not have or currently plan to have any commodity derivative contracts covering the amount of the basis differentials we experience in respect of our production. As such, we will be exposed to any increase in such differentials, which could adversely affect our business, financial condition and results of operations.

As of February 27, 2017, we had commodity derivative contracts in place covering approximately 36% and 98% of the mid-point of our estimated oil and natural gas production, respectively, for 2017. The contracts consist of swaps and put spreads covering crude oil and natural gas

production. In the future, we expect to continue to enter into commodity derivative contracts for a portion of our estimated production, which could result in net gains or losses on commodity derivatives. Our hedging strategy and future hedging transactions will be determined by our management,

which is not under any obligation to enter into commodity derivative contracts covering any specific portion of our production.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon oil, natural gas and NGL prices at the time we enter into these transactions, which may be substantially higher or lower than past or current oil, natural gas and NGL prices. Accordingly, our price hedging strategy may not protect us from significant declines in oil, natural gas and NGL prices realized for our future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases. As such, our hedging strategy may not protect us from changes in oil, natural gas and NGL prices that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

***Lower oil, natural gas and NGL prices have caused us to record ceiling limitation impairments, reducing our earnings and our stockholders' equity and further declines in commodity prices may cause us to record further impairments, which would reduce our earnings and stockholders' equity.***

We use the full-cost method of accounting and accordingly, we capitalize all costs associated with the acquisition, exploration and development of oil, natural gas and NGL properties, including unproved and unevaluated property costs. Under full cost accounting rules, the net capitalized cost of oil, natural gas and NGL properties may not exceed a "ceiling limit" that is based upon the present value of estimated future net revenues from net proved reserves, discounted at 10%, plus the lower of the cost or fair market value of unproved properties and other adjustments as required by SEC rules. If net capitalized costs of oil, natural gas and NGL properties exceed the ceiling limit, we must charge the amount of the excess to earnings, which could have a material adverse effect on our results of operations for the periods in which such charges are taken. This is called a "ceiling limitation impairment." The risk that we will experience a ceiling limitation impairment increases when oil, natural gas or NGL prices are depressed as in the current environment, if we have substantial downward revisions in estimated net proved reserves or if estimates of future development costs increase significantly. Based upon current price trends we could experience ceiling limitation impairments in future periods.

Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. Given this decline in commodity prices, the net book value of our oil and natural gas properties exceeded our ceiling amount using the WTI unweighted 12-month average price adjusted by lease for quality, transportation fees, geographical differentials, marketing bonuses or deductions and other factors affecting the price realized at the wellhead, resulting in a total write-downs of our oil and natural gas properties of $1,365 million after income taxes during 2015 and $169.0 million after income taxes during 2016. As ceiling test computations depend upon the calculated unweighted arithmetic average prices, it is difficult to predict the likelihood, timing and magnitude of any future impairments. However, a decline in 12-month average commodity prices could result in additional impairments recorded during 2017. A ceiling test write down would negatively affect our results of operations.

Costs associated with unevaluated properties are not initially subject to the ceiling test limitation. Rather, we assess all items classified as unevaluated property on a quarterly basis for possible impairment or reduction in value based upon our intentions, as approved by our board of directors and management, with respect to drilling on such properties, the remaining lease term, geological and geophysical evaluations, drilling results, the assignment of proved reserves, and the economic viability of development if proved reserves are assigned. These factors are significantly influenced by our expectations regarding future commodity prices, development costs, and access to capital at acceptable cost. During any period in which these factors indicate impairment, the cumulative drilling costs incurred to date for such property and all or a portion of the associated leasehold costs are transferred to the full cost pool and are then subject to amortization and the ceiling test limitation. Accordingly, a significant change in these factors, many of which are beyond our control, may shift a significant amount of cost from unevaluated properties into the full cost pool that is subject to amortization and the ceiling test limitation.

Lower oil and natural gas prices also reduces the amount of oil and natural gas that we can produce economically. Substantial and sustained decreases in oil and natural gas prices would render uneconomic a significant portion of our development and exploitation projects. This may result in our having to make downward adjustments to our estimated proved reserves. As a result, substantial and sustained declines in oil and natural gas prices may materially

and adversely affect our future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.

***The Company's derivative risk management activities could result in financial losses.***

To mitigate the effect of commodity price volatility on the Company's net cash provided by operating activities, support the Company's annual capital budgeting and expenditure plans and reduce commodity price risk associated with certain capital projects, the Company's strategy is to enter into derivative arrangements covering a portion of its oil, NGL and natural gas production. These derivative arrangements are subject to mark-to-market accounting treatment, and the changes in fair market value of the contracts are reported in the Company's statements of operations each quarter, which may result in significant non-cash gains or losses. After the current hedges expire, there is significant uncertainty that we will be able to put new hedges in place that will provide us with the same benefit. These derivative contracts may also expose the Company to risk of financial loss in certain circumstances, including when:

- production is less than the contracted derivative volumes, in which case we might be forced to satisfy all or a portion of our hedging obligations without the benefit of the cash flow from our sale of the underlying physical commodity;
- the counterparty to the derivative contract defaults on its contractual obligations;
- there is a widening of price basis differentials between delivery points for our production and the delivery point assumed in the hedge instrument; or
- the derivative contracts limit the benefit the Company would otherwise receive from increases in commodity prices.

Such financial losses could materially impact our liquidity, business, financial condition and results of operations.

***There can be no assurance that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.***

On January 12, 2017, the Company, through two of our subsidiaries, SN EF UnSub, LP ("SN UnSub") and SN EF Maverick, LLC ("SN Maverick"), along with an entity controlled by The Blackstone Group, L.P., Gavilan Resources, LLC ("Blackstone"), signed a purchase and sale agreement (the "Comanche Purchase Agreement") to acquire assets (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") for $2,275 million in cash, subject to customary closing adjustments (the "Comanche Acquisition"). The consummation of the Comanche Acquisition is subject to certain closing conditions, including conditions that must be met by Anadarko and that are beyond our control. In addition, under certain circumstances, we, Blackstone or Anadarko are able to terminate the Comanche Purchase Agreement. In addition, we may be required to seek or utilize additional or other financing sources to consummate the Comanche Acquisition, if we do not have sufficient liquidity at closing or if our anticipated financing sources, including the preferred unit investment by affiliates of GSO Capital Partners LP (individually or collectively, as the context requires, "GSO") in SN UnSub or the credit facility to be entered into by SN UnSub at the closing of the Comanche Acquisition, are not available, and we cannot assure you that such additional or other financing sources will be available on terms acceptable to us, or at all. There can be no assurances that the Comanche Acquisition will be consummated in the anticipated timeframe, on the terms described herein, or at all.

If the Comanche Acquisition is not consummated, under certain circumstances, we may be required to forfeit our approximate $56.9 million deposit under the Comanche Purchase Agreement. Furthermore, our stock price could be negatively impacted if we fail to complete the Comanche Acquisition.

There are a number of risks and uncertainties relating to the Comanche Acquisition. There can be no assurance that events will not intervene to delay or result in the failure to close the Comanche Acquisition. In addition, we, Blackstone and Anadarko have the ability to terminate the Comanche Purchase Agreement under certain circumstances. Failure to complete the Comanche Acquisition would prevent us from realizing the anticipated benefits of the Comanche Acquisition. We would also remain liable for significant transaction costs, including legal, accounting and financial advisory fees. In addition, the market price of our common stock may reflect various market assumptions as to whether the Comanche Acquisition will be completed. Consequently, the failure to complete or any delay in the closing of the Comanche Acquisition could result in a significant change in the market price of our common stock.

***The Comanche Acquisition or any other acquisition we may undertake involve risks associated with acquisitions and integration of acquired assets, and the intended benefits of the Comanche Acquisition or any other acquisition we may undertake may not be realized.***

The Comanche Acquisition or any other acquisition we may undertake involve risks associated with acquisitions and integrating acquired assets into existing operations, including that:

- our senior management's attention may be diverted from the management of daily operations of Catarina and our other legacy assets to the integration of the assets acquired in the Comanche Acquisition;
- we could incur significant unknown and contingent liabilities for which we have limited or no contractual remedies or insurance coverage;
- we may be unable to achieve the economies of scale that we expect from integrating the Comanche Assets or any other assets we may acquire into our existing operations;
- the assets acquired in the Comanche Acquisition or any other acquisition we may undertake may not perform as well as we anticipate; and
- unexpected costs, delays and challenges may arise in integrating the assets acquired in the Comanche Acquisition or any other acquisition we may undertake into our existing operations.

Even if we successfully integrate the assets acquired in the Comanche Acquisition or any other acquisition we may undertake into our operations, it may not be possible to realize the full benefits we anticipate or we may not realize these benefits within the expected timeframe. If we fail to realize the benefits we anticipate from the Comanche Acquisition or any other acquisition we may undertake, our business, results of operations and financial condition may be adversely affected.

***Under the terms of the lease with respect to the Catarina assets and under the terms of the Comanche Development Agreement, we are subject to annual drilling and development requirements and failure to comply with these requirements may result in loss of our interests in the Catarina area that are not held by production or sizable default payments to Anadarko, respectively.***

In order to protect our exploration and development rights in the Catarina area, we are required to drill 50 wells per year (measured from July 1 to June 30). If we fail to meet the minimum drilling commitment under the terms of the Catarina Lease, we could forfeit our acreage under the Catarina Lease and rights to develop land not held by production (excluding, in certain instances, associated rights such as midstream assets). If we drill more than 50 wells in a prescribed twelve month period, we may apply such additional wells (up to a maximum of 30 additional wells) toward the following prescribed twelve month period's 50-well requirements. In addition, the Catarina Lease requires us to go no longer than 120 days without spudding a well, and, under the terms of the Catarina Lease, failure to do so could result in the forfeiture of our acreage under the Catarina Lease and rights to develop land not held by production (excluding, in certain instances, acreage upon which associated midstream assets are located). Our drilling plans for our undeveloped leasehold acreage are subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs,

availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we cannot assure you that we will be able meet our obligations under the Catarina Lease. If the Catarina Lease expires, we will lose our right to develop the related properties on this acreage, which could adversely affect our business, financial condition and results of operations.

At the closing of the Comanche Acquisition, we will enter into a development agreement (the “Development Agreement”) with Anadarko pursuant to which we will commit to completing and equipping 60 wells per year for 5 years. If we complete and equip more than 60 wells in a year, we may apply such additional wells (up to a maximum of 30 additional wells) toward the following years’ 60-well requirements. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we must pay Anadarko a default fee of $200,000 for each well we fail to timely complete and equip. The drilling plan is subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we cannot assure you that we will be able meet our obligations under the Development Agreement following the closing of the Comanche Acquisition.

***Our agreements with Blackstone and GSO will restrict us from transferring our right, title and interest to the Comanche Assets.***

At the closing of the Comanche Acquisition, we will enter into a joint development agreement with Blackstone (the “JDA”) that provides for the administration, operation and transfer of the jointly-owned Comanche Assets. Under the terms of the JDA, except under limited circumstances, neither we nor Blackstone can transfer any of our rights, title or interest to any asset or related assets (including any working interests) prior to the third anniversary of the JDA. In addition, under our agreements with GSO, following the closing of the Comanche Acquisition, we will not be able to dispose of all or a substantial portion of the Comanche Assets without GSO’s consent. These restrictions may prohibit us from taking advantage of certain opportunities, including our ability to sell these assets, which may arise from time to time.

***The JDA will contain right of first offer (“ROFO”) and tag-along provisions that may hinder our ability to sell our interest in the Comanche Assets within our desired time frame or on our desired terms, and could delay or prevent an acquisition of us, even if the acquisition would be beneficial to our stockholders.***

Under the terms of the JDA, both parties have a ROFO in the event that the other party intends to sell or otherwise transfer its interests. In addition, the JDA provides both parties with a tag-along right in the event that the other party intends to sell at least 35% of its total interests to a third-party purchaser (including upon a change of control transaction involving us). These features could limit third-party offers, inhibit our ability to sell our interests or adversely affect the timing of any sale of our interests and our ability to obtain the highest price possible in the event that we decide to market or sell our interests. In addition, the tag-along provisions of the JDA may also frustrate or prevent any attempts by our stockholders or a third party to replace or remove our current management or to acquire an interest in or engage in other corporate transactions with us, by subjecting certain corporate change of control transactions to a tag-along provision pursuant to which a third party may be required to acquire Blackstone’s interest in the Comanche Assets if it desires to enter into a corporate transaction with us.

***Upon closing the Comanche Acquisition, we will enter into the JDA with Blackstone and amend and restate the limited partnership agreement of one of our subsidiaries, SN UnSub and the limited liability company agreement of SN UnSub’s general partner, SN EF UnSub GP, LLC, to admit GSO as a limited partner and member, respectively, therein, which involves risk.***

At the closing of the transactions contemplated by the Comanche Acquisition, we will enter into the JDA that provides for the administration, operation and transfer of the jointly-owned Comanche Assets. The JDA provides for the parties to establish an operating committee, which will control the timing, scope and budgeting of operations on the Comanche Assets (subject to certain exceptions). Although we will be designated as operator of the Comanche Assets

under the JDA, under certain circumstances we may be removed as operator and, furthermore, because we will not control the operating committee we will not have unilateral control over many key variables of the operation and development of the Comanche Assets, including the establishment of the budget and development plan for the Comanche Assets. There can be no assurance that Blackstone will continue its relationship with us in the future or that we will be able to pursue our stated strategies with respect to the Comanche Assets. Furthermore, Blackstone may (a) have economic or business interests or goals that are inconsistent with ours; (b) take actions contrary to our policies or objectives; (c) undergo a change of control; (d) experience financial and other difficulties; or (e) be unable or unwilling to fulfill their obligations under the JDA, which may affect our financial conditions or results of operations.

Under the amended and restated limited partnership agreement of SN UnSub and limited liability company agreement of SN UnSub's general partner, we will not be able to cause SN UnSub or its general partner to take or not to take certain actions unless GSO consents. GSO has committed to make a substantial investment (including contributions and other commitments) in SN UnSub at the closing of the Comanche Acquisition and, accordingly, has required that the relevant organizational documents of SN UnSub and its general partner contain certain features designed to provide it with the opportunity to participate in the management of SN UnSub and its general partner and to protect its investment in SN UnSub, as well as any other assets which may be substantially dependent on or otherwise affected by the activities of SN UnSub. These participation and protective features include a governance structure that consists of a board of directors of SN UnSub's general partner, only some of whom are appointed by us. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources."

In addition, at the closing of the Comanche Acquisition, we expect that SN UnSub, which is an "unrestricted subsidiary" (as further described in "Item 8. Financial Statements and Supplementary Data —Note 5. Long Term Debt"), will have entered into a $330 million senior secured reserve-based revolving credit facility with JPMorgan Chase Bank, N.A., Citibank, N.A. and certain of their affiliates (the "SN UnSub Credit Facility") or other alternate "stand alone" financing arrangement, which will limit its freedom to take certain actions. Thus, without the concurrence of GSO and/or the lenders under the SN UnSub Credit Facility or other financing arrangements, we will not be able to cause SN UnSub and its general partner to take or not to take certain actions, even though those actions may be in the best interest of SN UnSub, its general partner, or us. Furthermore, we, SN UnSub's lenders, GSO and Blackstone may have different or conflicting goals or interests which could make it more difficult or time-consuming to obtain any necessary approvals or consents to pursue activities that we believe to be in the best interests of our stockholders. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources."

***Our estimated reserves and future production rates are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves.***

Numerous uncertainties are inherent in estimating quantities of oil, natural gas and NGL reserves and future production. It is not possible to measure underground accumulations of oil, natural gas and NGLs in an exact way. Oil, natural gas and NGL reserve engineering is complex, requiring subjective estimates of underground accumulations of oil, natural gas and NGLs and assumptions concerning future oil, natural gas and NGL prices, future production levels and operating and development costs. In estimating our level of oil, natural gas and NGL reserves, we and our independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- the level of oil, natural gas and NGL prices;
- future production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;

- the accuracy and reliability of the underlying engineering and geologic data; and
- the availability of funds.

If these assumptions prove to be incorrect, our estimates of our reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery and our estimates of the future net cash flows from our estimated reserves could change significantly. For example, with other factors held constant, if the commodity prices used in our reserve report as of December 31, 2016 had decreased by 10%, then the standardized measure of our estimated proved reserves as of that date would have decreased by approximately $216.7 million, from approximately $513.4 million to approximately $296.7 million.

Our standardized measure is calculated using unhedged oil, natural gas and NGL prices and is determined in accordance with the rules and regulations of the SEC. Over time, we may make material changes to reserve estimates to take into account changes in our assumptions and the results of actual development and production.

The reserve estimates we make for wells or fields that do not have a lengthy production history are less reliable than estimates for wells or fields with lengthy production histories. A lack of production history may contribute to inaccuracy in our estimates of proved reserves, future production rates and the timing of development expenditures.

***Our estimated oil, natural gas and NGL reserves will naturally decline over time, and we may be unable to develop, find or acquire additional reserves to replace our current and future production at acceptable costs, which would adversely affect our business, financial condition and results of operations.***

Our future oil, natural gas and NGL reserves, production volumes, and cash flow depend on our success in developing and exploiting our current reserves efficiently and finding or acquiring additional recoverable reserves economically. Our estimated oil, natural gas and NGL reserves will naturally decline over time as they are produced. Our success depends on our ability to economically develop, find or acquire additional reserves to replace our own current and future production. If we are unable to do so, or if expected development is delayed, reduced or cancelled, the average decline rates will likely increase.

***The pro forma financial statements for the Comanche Acquisition and Carrizo Disposition are presented for illustrative purposes only and may not be an indication of our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition.***

The pro forma financial statements for the Comanche Acquisition and Carrizo Disposition included in our Current Reports on Form 8-K filed January 31, 2017 and January 9, 2017, respectively, are presented for illustrative purposes only, are based on various adjustments and assumptions, many of which are preliminary, and may not be an indication of our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition. Our actual financial condition and results of operations following the Comanche Acquisition may not be consistent with, or evident from, these pro forma financial statements and other statements relating to the Comanche Acquisition or the Carrizo Disposition. In addition, the assumptions used in preparing the pro forma financial data and estimates may not prove to be accurate, and other factors may affect our financial condition or results of operations following the Comanche Acquisition or the Carrizo Disposition. Therefore, investors should refer to our historical financial statements included in this Annual Report on Form 10-K when evaluating an investment in our common stock.

***Developing and producing oil, natural gas and NGLs are costly and high-risk activities with many uncertainties that could adversely affect our business, financial condition and results of operations.***

The cost of developing, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well. Additionally, drilling wells with no or sub-economic levels of oil, natural gas and NGL production (dry holes) will negatively impact our financial position. In addition, our use of 2D and 3D seismic data and visualization techniques to identify subsurface structures and hydrocarbon indicators do not enable the interpreter to

know whether hydrocarbons are, in fact, present in those structures and requires additional pre-development expenditures. Furthermore, our development and production operations may be curtailed, delayed or canceled as a result of other factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor or other services;
- composition of sour gas, including sulfur and mercaptan content;
- unexpected operational events and conditions;
- reductions in oil, natural gas and NGL prices;
- increases in severance taxes;
- adverse weather conditions and natural disasters;
- facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of our facilities and equipment due to the highly corrosive nature of sour gas;
- title problems;
- pipe or cement failures, casing collapses or other downhole failures;
- compliance with ever-changing environmental and other governmental requirements;
- environmental hazards, such as natural gas leaks, oil, natural gas and NGL spills, salt water spills, pipeline ruptures, discharges of toxic gases or other releases of hazardous substances;
- lost or damaged oilfield development and service tools;
- unusual or unexpected geological formations and pressure or irregularities in formations;
- loss of drilling fluid circulation;
- fires, blowouts, surface craterings and explosions;
- uncontrollable flows of oil, natural gas, NGL or well fluids;
- loss of leases due to incorrect payment of royalties;
- limited availability of financing at acceptable rates; and
- other hazards, including those associated with sour gas such as an accidental discharge of hydrogen sulfide gas, that could also result in personal injury and loss of life, pollution and suspension of operations.

If any of these factors were to occur with respect to a particular field, we could lose all or a part of our investment in the field, or we could fail to realize the expected benefits from the field, either of which could materially and adversely affect our business, financial condition and results of operations.

We routinely apply hydraulic fracturing techniques in many of our drilling and completion operations. Hydraulic fracturing has recently become subject to increased public scrutiny and recent changes in federal and state law, as well as proposed legislative changes, could significantly restrict the use of hydraulic fracturing. Such laws could make it more difficult or costly for us to perform fracturing to stimulate production from dense subsurface rock formations

and, in the event of local prohibitions against commercial production of natural gas, may preclude our ability to drill wells. In addition, such laws could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. If hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, our fracturing activities could become subject to additional permitting requirements and result in permitting delays, financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements, as well as potential increases in costs. Please read "—Federal and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays" and "Item 1. Business—Environmental Matters and Regulation—Water and Other Water Discharges and Spills."

Additionally, hydraulic fracturing, drilling, transportation and processing of hydrocarbons bear an inherent risk of loss of containment. Potential consequences include loss of reserves, loss of production, loss of economic value associated with the affected wellbore, contamination of soil, ground water, and surface water, as well as potential fines, penalties or damages associated with any of the foregoing consequences.

***Our acquisition, development and production operations require us to make substantial capital expenditures. Although we expect to fund our capital expenditure budget for 2017 using cash flow from operations and cash on hand, if our cash flow from operations turns out to be less than we currently expect and we are required, but are unable, to fund our remaining capital budget from other sources, such as borrowings under our credit facility and/or the issuance of debt or equity securities, our failure to obtain the funds that we need could have a material adverse effect on our business, financial condition and results of operations.***

The oil and natural gas industry in which we operate is capital intensive and we must make substantial capital expenditures in our business for the acquisition, development and production of oil, natural gas and NGL reserves. Our cash on hand, cash flows from operations, ability to borrow and access to capital markets are subject to a number of variables, many of which are beyond our control, including:

- our estimated proved oil, natural gas and NGL reserves;
- the amount of oil, natural gas and NGLs we produce;
- the prices at which we sell our production;
- the results of our hedging strategy;
- the costs of developing, producing, and transporting our oil, natural gas and NGL assets, including costs attributable to governmental regulation and taxation;
- our ability to acquire, locate and produce new reserves;
- fluctuations in our working capital needs;
- interest payments, debt service and dividend payment requirements;
- prevailing economic and capital markets conditions, especially for oil and gas companies;
- our financial condition; and
- the ability and willingness of banks and other lenders to lend to us.

Continued decreases in our revenues or the borrowing base under our revolving credit facility as a result of lower oil, NGL or natural gas prices, operating difficulties, declines in reserves or for any other reason, will adversely impact our ability to obtain the capital necessary to sustain our operations at current levels. In addition, we may be

unable to access the capital markets for debt or equity financing. If we are unsuccessful in obtaining the funds we need to fund our capital budget, we will be forced to reduce our capital expenditures, which in turn could lead to a decline in our production, revenues and our reserves, and could adversely affect our business, financial condition and results of operations.

***Our stock price has been volatile, and investors in our common stock could incur substantial losses.***

Our stock price has been volatile. For example, during the year ended December 31, 2016, our stock price had a low closing price of $2.29 per share and a high closing price per share of $9.78 per share. As a result of this volatility, investors may not be able to sell their common stock at or above the price at which they purchased their shares. The market price for our common stock may be influenced by many factors, including, but not limited to:

- the price of oil, NGLs and natural gas;
- the success of our exploration and development operations, and the marketing of any oil we produce;
- regulatory developments in the United States;
- the recruitment or departure of key personnel;
- quarterly or annual variations in our financial results or those of companies that are perceived to be similar to us;
- market conditions in the industries in which we compete and issuance of new or changed securities;
- analysts' reports or recommendations;
- the failure of securities analysts to cover our common stock or changes in financial estimates by analysts;
- the inability to meet the financial estimates of analysts who follow our common stock;
- our issuance of any additional securities;
- investor perception of our company and of the industry in which we compete; and
- general economic, political and market conditions.

***Certain of our undeveloped leasehold acreage is subject to leases that will expire over the next several years unless production is established on units containing the acreage or the leases are extended.***

Certain of our undeveloped leasehold acreage is subject to leases that will expire unless production in paying quantities is established during their primary terms or we obtain extensions of the leases. Our drilling plans for our undeveloped leasehold acreage are subject to change based upon various factors, including factors that are beyond our control, such as drilling results, oil, natural gas and NGL prices, the availability and cost of capital, drilling and production costs, availability of drilling services and equipment, gathering system and pipeline transportation constraints and regulatory approvals. Because of these uncertainties, we do not know if our undeveloped leasehold acreage will ever be drilled or if we will be able to produce crude oil, natural gas or NGLs from these or any other potential drilling locations. If our leases expire and we do not have them held by production, we will lose our right to develop the related properties on this acreage.

As of December 31, 2016, approximately 58% of our acreage was held by production. As of December 31, 2016, we have leases that were not held by production and not impaired representing 8,768 net acres (all which were in the Eagle Ford Shale) expiring in 2017, 15,539 net acres (all of which were in the Eagle Ford Shale) expiring in 2018, and 105,859 net acres (94,088 of which were in the Eagle Ford Shale) expiring in 2019 and beyond. While we anticipate that our current and future drilling plans will address the majority of our leases expiring in the Eagle Ford Shale in 2017, our actual drilling activities may materially differ from those presently identified, which could adversely affect our business, financial condition and results of operation.

***Our identified drilling location inventories are scheduled out over several years, making them susceptible to uncertainties that could materially alter the occurrence or timing of their drilling.***

Our management has specifically identified and scheduled drilling locations as an estimation of our future drilling activities on our existing acreage. These identified drilling locations represent a significant part of our growth strategy. Our ability to drill and develop these locations depends on a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, oil, NGL and natural gas prices, costs and drilling results. Because of these uncertainties, we do not know if the numerous potential drilling locations we have identified will ever be drilled or if we will be able to produce oil, NGL or natural gas from these or any other potential drilling locations. As such, our actual drilling activities may materially differ from those presently identified, which could adversely affect our business, financial condition and results of operations.

***We may be unable to compete effectively with larger companies, which may adversely affect our ability to generate revenue.***

The oil and natural gas industry is intensely competitive with respect to acquiring prospects and properties, marketing oil, NGLs and natural gas, and securing equipment and trained personnel. Many of our competitors are large independent oil and natural gas companies that possess and employ financial, technical and personnel resources substantially greater than those of the Sanchez Group. Those entities may be able to develop and acquire more properties than our financial or personnel resources permit. Our ability to acquire additional properties and to discover reserves in the future will depend on our ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment. Many of our larger competitors not only drill for and produce oil and natural gas but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for oil and natural gas properties and evaluate, bid for and purchase a greater number of properties than our financial, technical or personnel resources permit. In addition, there is substantial competition for investment capital in the oil and natural gas industry. These larger companies may have a greater ability to continue development activities during periods of low oil, NGL and natural gas prices and to absorb the burden of present and future federal, state, local and other laws and regulations. Furthermore, we may not be able to aggregate sufficient quantities of production to compete with larger companies that are able to sell greater volumes of production to intermediaries, thereby reducing the realized prices attributable to our production. Any inability to compete effectively with larger companies could have a material adverse impact on our business, financial condition and results of operations.

***Our operations are subject to operational hazards and unforeseen interruptions for which we may not be adequately insured.***

There are a variety of operating risks inherent in our wells and other operating properties and facilities, such as leaks, explosions, mechanical problems and natural disasters, all of which could cause substantial financial losses. Any of these or other similar occurrences could result in the disruption of our operations, substantial repair costs, personal injury or loss of human life, significant damage to property, environmental pollution, impairment of our operations and substantial revenue losses. The location of our wells and other operating properties and facilities near populated areas, including residential areas, commercial business centers and industrial sites, could significantly increase the level of damages resulting from these risks.

Insurance against all operational risks is not available to us. We are not fully insured against all risks, including development and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable. Additionally, we may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs or on commercially reasonable terms. Changes in the insurance markets due to weather, adverse economic conditions, and the aftermath of the Macondo well incident in the Gulf of Mexico have made it more difficult for us to obtain certain types of coverage. As a result, we may not be able to obtain the levels or types of insurance we would otherwise have obtained prior to these market changes,

and we cannot be sure the insurance coverage we do obtain will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on our business, financial condition and results of operations.

***Our lack of diversification increases the risk of an investment in us and we are vulnerable to risks associated with operating in one major contiguous area.***

Our current business focus is on the oil and natural gas industry in a limited number of properties, in the Eagle Ford Shale in South Texas and, to a lesser extent, the TMS in Southwest Mississippi and Southeast Louisiana. Larger companies have the ability to manage their risk by diversification. However, we currently lack diversification, in terms of both the nature and geographic scope of our business. For example, our Catarina assets, comprised of approximately 106,000 contiguous net acres in Dimmit, LaSalle and Webb Counties, Texas under the Catarina Lease (the “Catarina Lease”), represent approximately 90% of our proved reserves as of December 31, 2016, approximately 33% of our Eagle Ford acreage as of December 31, 2016 and, approximately 81% of our total production volumes for the year ended December 31, 2016. As a result, we will likely be impacted more acutely by factors affecting our industry or the regions in which we operate than we would if our business were more diversified, increasing our risk profile. In particular, we may be disproportionately exposed to the impact of delays or interruptions of production from wells in which we have an interest that are caused by transportation capacity constraints, curtailment of production, availability of equipment, facilities, personnel or services, significant governmental regulation, natural disasters, adverse weather conditions, plant closures for scheduled maintenance or interruption of transportation of oil or natural gas produced from wells in the Eagle Ford Shale. Due to the concentrated nature of our portfolio of properties, a number of our properties could experience any of the same conditions at the same time, resulting in a relatively greater impact on our results of operations than they might have on other companies that have a more diversified portfolio of properties. Such delays or interruptions could have a material adverse effect on our financial condition and results of operations.

***We cannot control activities on properties that we do not operate and are unable to control their proper operation and profitability.***

We do not operate all of the properties in which we own an ownership interest. As a result, we have limited ability to exercise influence over, and control the risks associated with, the operations of these non-operated properties. The failure of an operator of our wells to adequately perform operations, an operator’s breach of the applicable agreements or an operator’s failure to act in ways that are in our best interests could reduce our production, revenues and reserves. The success and timing of our drilling and development activities on properties operated by others therefore depend upon a number of factors outside of our control, including:

- the nature and timing of the operator’s drilling and other activities;
- the timing and amount of required capital expenditures;
- the operator’s geological and engineering expertise and financial resources;
- the approval of other participants in drilling wells; and
- the operator’s selection of suitable technology.

***Our ability to produce oil and natural gas could be impaired if we are unable to acquire adequate supplies of water for our drilling and completion operations or are unable to dispose of the water we use at a reasonable cost and within applicable environmental rules.***

Water is an essential component of oil and natural gas production during both the drilling and hydraulic fracturing processes. Drought conditions have persisted in our areas of operation in past years. These drought conditions have led governmental authorities to restrict the use of water, subject to

their jurisdiction, for hydraulic fracturing to protect local water supplies. If we are unable to obtain water to use in our operations, we may be unable to economically

produce oil and natural gas, which could have a material and adverse effect on our financial condition, results of operations and cash flows.

Furthermore, the Clean Water Act imposes restrictions and strict controls regarding the discharge of produced waters and other oil and natural gas waste into navigable waters. In addition, the underground injection of fluids is subject to permitting and other requirements under state laws and regulation. Public concerns regarding the potential impacts to groundwater and induced seismic activity have resulted in new requirements related to the underground injection and disposal of fluids. The EPA is also examining regulatory requirements for "indirect dischargers" of wastewater – i.e., those that send their discharges to private or publicly owned treatment facilities, which treat the wastewater before discharging it to regulated waters. Compliance with environmental regulations and permit requirements governing the discharge of underground injection of fluids and the withdrawal, storage and use of surface water or groundwater necessary for hydraulic fracturing of wells may increase our operating costs and cause delays, interruptions or termination of our operations, the extent of which cannot be predicted.

***We may lose our rights to the Sanchez Group's technological database, including its 3D and 2D seismic data, under certain circumstances.***

Pursuant to the Services Agreement, we have access to the unrestricted, proprietary portions of the technological database owned and maintained by the Sanchez Group and related to our properties, and SOG is otherwise required to interpret and use the database, to the extent relating to our properties, for our benefit under the Services Agreement. For a description of the Services Agreement see "Item 8. Financial Statements and Supplementary Data —Note 9, Related Party Transactions" in the notes to the consolidated financial statements in "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K. This database includes the 2D and 3D seismic data used for our exploration and development projects as well as the well logs, LAS files, scanned well documents and other well documents and software that are necessary for our daily operations. This information is critical for the operation and expansion of our business. Under certain circumstances, including if SOG provides at least 180 days' advance written notice of its desire to terminate the Services Agreement, the license agreement will terminate and we will lose our rights to this technological database unless members of the Sanchez Group permit us to retain some or all of these rights, which they may decline to do in their sole discretion. In such event, we are unlikely to be able to obtain rights to similar information under substantially similar commercial terms or to continue our business operations as proposed and our liquidity, business, financial condition and results of operations will be materially and adversely affected and it could delay or prevent an acquisition of us.

***If we do not purchase additional acreage or make acquisitions on economically acceptable terms, our future growth will be limited.***

Our ability to grow depends in part on our ability to make acquisitions on economically acceptable terms. We may be unable to make such acquisitions because we are:

- unable to identify attractive acquisition candidates or negotiate acceptable purchase contracts with their owners;
- unable to obtain financing for such acquisitions on economically acceptable terms; or
- outbid by competitors.

If we are unable to acquire properties containing estimated proved reserves, our total level of estimated proved reserves will decline as a result of our production.

***Any acquisitions we complete or geographic expansions we undertake will be subject to substantial risks that could have a negative impact on our business, financial condition and results of operations.***

Any acquisition involves potential risks, including, among other things:

- mistaken assumptions about estimated proved reserves, future production, revenues, capital expenditures, operating expenses and costs, including synergies, timing of expected development and the potential for expiration of underlying leaseholds;
- an inability to successfully integrate the assets or businesses we acquire;
- a decrease in our liquidity by using a significant portion of our cash and cash equivalents to finance acquisitions;
- a significant increase in our interest expense or financial leverage if we incur debt to finance acquisitions;
- the assumption of unknown liabilities, losses or costs for which we are not indemnified or for which any indemnity we receive is inadequate;
- the diversion of management's attention from other business concerns;
- mistaken assumptions about the overall cost of equity or debt;
- an inability to hire, train or retain qualified personnel to manage and operate our growing business and assets;
- facts and circumstances that could give rise to significant cash and certain non-cash charges; and
- customer or key employee losses at the acquired businesses.

Further, we may in the future expand our operations into new geographic areas with operating conditions and a regulatory environment that may not be as familiar to us as our existing project areas. As a result, we may encounter obstacles that may cause us not to achieve the expected results of any such acquisitions, and any adverse conditions, regulations or developments related to any assets acquired in new geographic areas may have a negative impact on our business, financial condition and results of operations.

Our decision to acquire a property will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic data and other information, the results of which are often inconclusive and subject to various interpretations. Our reviews of acquired properties are inherently incomplete because it generally is not feasible to perform an in-depth review of the individual properties involved in each acquisition, given time constraints imposed by sellers. Even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit a buyer to become sufficiently familiar with the properties to assess fully their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as groundwater contamination, are not necessarily observable even when an inspection is undertaken.

***We adopted the Rights Plan, which though it was designed to preserve the value of our NOLs, may discourage the acquisition and sale of large blocks of our common stock and may result in significant dilution for certain stockholders.***

On July 28, 2015, the Company entered into a net operating loss carryforwards ("NOLs") rights plan (the "Rights Plan") designed to preserve stockholder value and the value of our NOLs by acting as a deterrent to any person acquiring beneficial ownership of 4.9% or more of the Company's outstanding common stock without the approval of our board of directors. The Rights Plan may discourage existing 5% common stockholders from selling their interest in a single block, which may impact the liquidity of the Company's common stock, may deter institutional investors from investing in our common stock, and may deter potential acquirers from making premium offers to acquire the Company, factors which may depress the market price of our common stock. We can make no assurances the Rights Plan will be effective in meeting its intended objectives, including to deter a change in control and protecting or realizing NOLs.

***If we were to experience an ownership change, we could be limited in our ability to use net operating losses arising prior to the ownership change to offset future taxable income.***

As of December 31, 2016, we had NOLs of $1,200.9 million. If we were to experience an "ownership change," as determined under Section 382 of the Internal Revenue Code, our ability to offset taxable income arising after the ownership change with NOLs arising prior to the ownership change would be limited, possibly substantially. An ownership change would establish an annual limitation on the amount of our pre-change NOLs we could utilize to offset our taxable income in any future taxable year to an amount generally equal to the value of our stock immediately prior to the ownership change multiplied by the long-term tax-exempt rate. In general, an ownership change will occur if there is a cumulative increase in our ownership of more than 50 percentage points by one or more "5% shareholders" (as defined in the Internal Revenue Code) at any time during a rolling three-year period.

***Our business could be negatively impacted by security threats, including cyber-security threats, and other disruptions.***

As an oil and natural gas producer, we face various security threats, including cyber-security threats to gain unauthorized access to sensitive information or to render data or systems unusable, threats to the safety of our employees, threats to the security of our facilities and infrastructure or third-party facilities and infrastructure, such as processing plants and pipelines, and threats from terrorist acts. Cyber-security attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data, and other electronic security breaches that could lead to disruptions in critical systems, unauthorized release of confidential or otherwise protected information and corruption of data. Although we utilize various procedures and controls to monitor and protect against these threats and to mitigate our exposure to such threats, there can be no assurance that these procedures and controls will be sufficient in preventing security threats from materializing. If any of these events were to materialize, they could lead to losses of sensitive information, critical infrastructure, personnel or capabilities essential to our operations and could have a material adverse effect on our reputation, financial position, results of operations or cash flows.

***We may be able to incur substantially more debt. This could exacerbate the risks associated with our indebtedness.***

Despite our current level of indebtedness, we and our subsidiaries may be able to incur substantial additional indebtedness in the future, including under our credit facility and the UnSub Credit Facility. As of December 31, 2016, we had $1.71 billion of debt outstanding, net of premium, discount and debt issuance costs, all of which was attributable to our Senior Notes, and a borrowing base of $350 million (with an aggregate elected commitment amount of $300 million) under our credit facility for secured revolver borrowings. In connection with the Comanche Acquisition, we expect to incur additional indebtedness at the closing of the Comanche Acquisition under the UnSub Credit Facility, which is expected to be on substantially the same terms as our existing facility, conformed to current market conditions and non-recourse to our other assets. Our increased indebtedness could adversely affect our business. In particular, it could increase our vulnerability to sustained, adverse macroeconomic weakness, limit our ability to obtain further financing and limit our ability to pursue certain operational and strategic opportunities. If new debt is added to our current debt levels, the related risks that we and our subsidiaries now face could intensify.

***Our variable rate indebtedness subjects us to interest rate risk, which could cause our debt service obligations to increase significantly.***

We will be subject to interest rate risk in connection with borrowings under our credit facility and expect to be subject to interest rate risk with respect to the UnSub Credit Facility, which we intend to enter at the closing of the Comanche Acquisition, which bears or is expected to bear in the case of the UnSub Credit Facility interest at variable rates. Interest rate changes will not affect the market value of any debt incurred under such facilities, but could affect the amount of our interest payments, and accordingly, our future earnings and cash flows, assuming other factors are held constant. We currently do not have any interest rate hedging arrangements with respect to our existing credit facility, nor are any for any of our facilities contemplated in the future. A significant increase in prevailing interest rates that results in a substantial increase in the interest rates applicable to our indebtedness could substantially increase our interest expense and have a material adverse effect on our financial condition and results of operations.

*Restrictive covenants may adversely affect our operations.*

Our credit facility, the indenture governing the Senior Notes contains, and we believe that the UnSub Credit Facility that we expect to enter into at the closing of the Comanche Acquisition will contain, a number of restrictive covenants that impose significant operating and financial restrictions on us and may limit our ability to engage in acts that may be in our long-term best interest, including our ability, among other things, to:

- incur or assume additional debt or provide guarantees in respect of obligations of other persons;
- issue redeemable stock and preferred stock;
- pay dividends or distributions or redeem or repurchase capital stock;
- prepay, redeem or repurchase certain debt;
- make loans and investments;
- create or incur liens;
- restrict distributions from our subsidiaries;
- sell assets and capital stock of our subsidiaries;
- consolidate or merge with or into another entity, or sell all or substantially all of our assets; and
- enter into new lines of business.

A breach of the covenants under the indentures governing the Senior Notes, the covenants under our credit facility or the covenants under the UnSub Credit Facility could result in an event of default under the applicable indebtedness. An event of default may allow the creditors to accelerate the related debt and may result in an acceleration of any other debt that contains a cross-acceleration or cross-default provision (however, we expect that a default under our credit facility or the Senior Notes would not result in the acceleration of or default under the UnSub Credit Facility and that a default under the UnSub Credit Facility would not result in the acceleration of or default under our credit facility or Senior Notes). In addition, an event of default under our credit facility or the UnSub Credit Facility would permit the lenders under the relevant facility to terminate all commitments to extend further credit under that facility. If we were unable to repay those amounts, the lenders under our credit facility or the UnSub Credit Facility, as applicable, could proceed against the collateral granted to them to secure that debt.

***We have a substantial amount of indebtedness, and expect to incur additional indebtedness in connection with the Comanche Acquisition, which may adversely affect our cash flow and our ability to operate our business, remain in compliance with debt covenants and make payments on our debt.***

The aggregate amount of our outstanding indebtedness could have important consequences for us, including the following:

- any failure to comply with the obligations of any of our debt agreements, including financial and other restrictive covenants, could result in an event of default under the agreements governing such indebtedness;
- the covenants contained in our debt agreements limit our ability to borrow money in the future for acquisitions, capital expenditures or to meet

our operating expenses or other general corporate obligations and may limit our flexibility in operating our business,

- we may have a higher level of debt than some of our competitors, which may put us at a competitive disadvantage;
- we may be more vulnerable to economic downturns and adverse developments in our industry or the economy in general, especially extended or further declines in oil and natural gas prices; and
- our debt level could limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate.

After the closing of the Comanche Acquisition, we expect to have additional outstanding indebtedness under the UnSub Credit Facility, which is expected to be on substantially the same terms as our existing credit facility, conformed to current market conditions and non-recourse to our other assets. Our ability to meet our expenses and debt obligations will depend on our future performance, which will be affected by financial, business, economic, regulatory and other factors. We will not be able to control many of these factors, such as economic conditions and governmental regulation. We cannot be certain that our cash flow from operations will be sufficient to allow us to pay the principal and interest on our debt and meet our other obligations. If we do not have enough cash to service our debt, we may be required to refinance all or part of our existing debt, sell assets, borrow more money or raise equity. We may not be able to refinance our debt, sell assets, borrow more money or raise equity on terms acceptable to us, if at all.

***Because we have no plans to pay dividends on our common stock, investors must look solely to stock appreciation for a return on their investment in us.***

We do not anticipate paying any cash dividends on our common stock in the foreseeable future. We currently intend to retain all future earnings to fund the development and growth of our business. Any payment of future dividends will be at the discretion of our board of directors and will depend on, among other things, our earnings, financial condition, capital requirements, level of indebtedness, statutory and contractual restrictions applying to the payment of dividends and other considerations that our board of directors may deem relevant. Covenants contained in our credit facility, future credit facilities we may enter into, our indenture and the certificates of designations for our preferred stock restrict our ability to pay dividends on our common stock. In addition, the Delaware General Corporation Law (the “DGCL”) permits payment of dividends only out of a corporation’s surplus, which is defined as the excess of net assets (total assets less total liabilities) over a corporation’s capital as determined under the DGCL. If commodity prices continue to decline, the value of our net assets will also continue to decline and, accordingly, our ability to lawfully declare and pay dividends may also decline.  Investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize a return on their investment. Investors seeking cash dividends should not purchase our common stock.

***Federal and state legislative and regulatory initiatives relating to hydraulic fracturing could result in increased costs and additional operating restrictions or delays.***

Hydraulic fracturing is an important and common process used by oil and natural gas exploration and production operators in the completion of certain oil and natural gas wells whereby water, sand and chemicals are injected under pressure into subsurface formations to stimulate production of oil and/or natural gas. Hydraulic fracturing is generally exempt from federal regulation, and thus the process is typically regulated by state agencies. Nevertheless, the EPA has asserted federal regulatory authority over hydraulic fracturing involving diesel additives under the Underground Injection Control or UIC Program. In Texas, Louisiana and Mississippi, where we maintain acreage, the EPA is encouraging state programs to review and consider EPA guidance in these areas. In addition, the EPA plans to develop a Notice of Proposed Rulemaking by June 2018, which would describe a proposed mechanism – regulatory, voluntary, or a combination of both – to collect data on hydraulic fracturing chemical substances and mixtures.

On May 12, 2016, the EPA amended its regulations to impose new standards for methane and VOC emissions for certain new, modified, and reconstructed equipment, processes, and activities across the oil and natural gas sector. These standards, as well as any future laws and their implementing regulations, may require us to obtain pre-approval for the expansion or modification of existing facilities or the construction of new facilities expected to produce air

emissions, impose stringent air permit requirements, or mandate the use of specific equipment or technologies to control emissions.

Furthermore, there are certain governmental reviews either underway or being proposed that focus on environmental aspects of hydraulic fracturing practices. These ongoing or proposed studies, depending on their degree of pursuit and any meaningful results obtained, could spur initiatives to further regulate hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells. Also, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances or otherwise require the public disclosure of chemicals used in the hydraulic fracturing process, and a number of lawsuits and enforcement actions have been initiated across the country alleging that hydraulic fracturing practices have induced seismic activity and adversely impacted drinking water supplies, use of surface water, and the environment generally. These proceedings or regulations or any other new laws or regulations that significantly restrict hydraulic fracturing or the disposal of produced water and flowback fluid in underground injection wells could make it more difficult or costly for us to drill and produce from conventional or tight formations, increase our costs of compliance and doing business and make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings.

Further federal, state and/or local laws governing hydraulic fracturing could result in additional permitting and financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, plugging and abandonment requirements and also to attendant permitting delays and potential increases in costs. Such changes could cause us to incur substantial compliance costs, and compliance or the consequences of failure to comply by us could have a material adverse effect on our business, financial condition and results of operations. At this time, it is not possible to estimate the potential impact on our business that may arise if additional federal, state and/or local laws are enacted.

***We are subject to complex federal, state, local and other laws and regulations that could adversely affect the cost, manner or feasibility of conducting our operations. In addition, the third parties on whom we rely on for gathering and transportation services are also subject to complex federal, state and other laws that could adversely affect the cost, manner or feasibility of conducting our business.***

Our oil and natural gas development and production operations are subject to complex and stringent laws and regulations. To conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. We may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, our costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become applicable to our operations. Failure to comply with such laws and regulations, as interpreted and enforced, could have a material adverse effect on our business, financial condition and results of operations. Please read “Item 1. Business—Environmental Matters and Regulation” for a description of the laws and regulations that affect us.

In addition, the operations of the third parties on whom we rely for gathering and transportation services are also subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third-party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that we pay for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom we rely could have a material adverse effect on our business, financial condition and results of operations. Please read “Item 1. Business—Environmental Matters and Regulation” for a description of the laws and regulations that affect the third parties on whom we rely.

***Climate change legislation or regulations restricting emissions of greenhouse gases could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

In recent years, federal, state and local governments have taken steps to reduce emissions of GHGs. The EPA has finalized a series of GHG monitoring, reporting and emission control rules for the oil and natural gas industry, and the U.S. Congress has, from time to time, considered adopting legislation to reduce emissions. Almost one-half of the

states have already taken measures to reduce emissions of GHGs primarily through the development of GHG emission inventories and/or regional GHG cap-and-trade programs.

Furthermore, in December 2015, the United States participated in the 21st Conference of the Parties (COP-21) of the United Nations Framework Convention on Climate Change in Paris, France. The resulting Paris Agreement calls for the parties to undertake "ambitious efforts" to limit the average global temperature, and to conserve and enhance sinks and reservoirs of GHGs. The Agreement went into effect on November 4, 2016 and establishes a framework for the parties to cooperate and report actions to reduce GHG emissions. Also, on June 29, 2016, the leaders of the United States, Canada and Mexico announced an Action Plan to, among other things, boost clean energy, improve energy efficiency, and reduce GHG emissions. The Action Plan specifically calls for a reduction in methane emissions from the oil and gas sector by 40 to 45 percent by 2025. It remains unclear whether and how the results of the 2016 U.S. election could impact the regulation of GHG emissions at the federal and state level.

Restrictions on GHG emissions that may be imposed could adversely affect the oil and gas industry. The adoption of any legislation or regulations that otherwise limit emissions of GHGs from our equipment and operations could require us to incur increased operating costs, such as costs to monitor and report GHG emissions, purchase and operate emissions control systems to reduce emissions of GHGs associated with our operations, acquire emissions allowances or comply with new regulatory requirements. Any GHG emissions legislation or regulatory programs applicable to power plants or refineries could also increase the cost of consuming, and thus could adversely affect demand for the oil and natural gas that we produce. Consequently, legislation and regulatory programs to reduce GHG emissions could have an adverse effect on our business, financial condition and results of operations. Please read "Item 1. Business—Environmental Matters and Regulation."

In addition, claims have been made against certain energy companies alleging that GHG emissions from oil and natural gas operations constitute a public nuisance under federal and/or state common law. As a result, private individuals may seek to enforce environmental laws and regulations against us and could allege personal injury or property damages. While our business is not a party to any such litigation, we could be named in actions making similar allegations. An unfavorable ruling in any such case could significantly impact our operations and could have an adverse impact on our financial condition.

Moreover, there has been public discussion that climate change may be associated with extreme weather conditions such as more intense hurricanes, thunderstorms, tornadoes and snow or ice storms, as well as rising sea levels. Another possible consequence of climate change is increased volatility in seasonal temperatures. Some studies indicate that climate change could cause some areas to experience temperatures substantially colder than their historical averages. Extreme weather conditions can interfere with our production and increase our costs and damage resulting from extreme weather may not be fully insured. However, at this time, we are unable to determine the extent to which climate change may lead to increased storm or weather hazards affecting our operations.

***Our operations are subject to environmental and operational safety laws and regulations that may expose us to significant costs and liabilities.***

We may incur significant delays, costs and liabilities as a result of stringent and complex environmental, health and safety requirements applicable to our oil and natural gas development and production operations. These laws and regulations may impose numerous obligations applicable to our operations, including that they may (i) require the acquisition of permits to conduct exploration, drilling and production operations; (ii) restrict the types, quantities and concentration of various substances that can be released into the environment or injected into formations in connection with oil and natural gas drilling, production and transportation activities; (iii) govern the sourcing and disposal of water used in the drilling and completion process; (iv) limit or prohibit drilling or injection activities on certain lands lying within wilderness, wetlands, seismically active areas, and other protected areas; (v) require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells; (vi) result in the suspension or revocation of necessary permits, licenses and authorizations; (vii) impose substantial liabilities for pollution resulting from drilling and production operations; and (viii) require that additional pollution controls be installed. Numerous governmental authorities, such as the EPA and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, often requiring difficult and

costly compliance or corrective actions. Failure to comply with these laws and regulations may result in the assessment of sanctions, including administrative, civil or criminal penalties, the imposition of investigatory or remedial obligations, the suspension or revocation of necessary permits, licenses and authorizations, the requirement that additional pollution controls be installed and, in some instances, the issuance of orders limiting or prohibiting some or all of our operations. In addition, we may experience delays in obtaining or be unable to obtain required permits, which may delay or interrupt our operations and limit our growth and revenue. These laws and regulations are complex, change frequently and have tended to become increasingly stringent over time.

There is inherent risk of incurring significant environmental costs and liabilities in the performance of our operations due to our handling of petroleum hydrocarbons and wastes, because of air emissions and wastewater discharges related to our operations, and as a result of historical industry operations and waste disposal practices. Under certain environmental laws and regulations, we could be subject to strict and joint and several liability for the removal or remediation of previously released materials or property contamination regardless of whether we were responsible for the release or contamination or the operations were in compliance with all applicable laws at the time those actions were taken. Private parties, including the owners of properties upon which our wells are drilled and facilities where our petroleum hydrocarbons or wastes are taken for reclamation or disposal, also may have the right to pursue legal actions to enforce compliance as well as to seek damages for non-compliance with environmental laws and regulations or for personal injury or property or natural resource damages. In addition, the risk of accidental spills or releases could expose us to significant liabilities that could have a material adverse effect on our business, financial condition and results of operations. Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent or costly waste control, handling, storage, transport, disposal or cleanup requirements could require us to make significant expenditures to attain and maintain compliance and may otherwise have a material adverse effect on our competitive position, business, financial condition and results of operations. We may not be able to recover some or any of these costs from insurance. Please read “Item 1. Business—Environmental Matters and Regulation” for more information.

***Derivatives reform legislation and related regulations could have an adverse effect on our ability to hedge risks associated with our business.***

The July 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, provides for federal oversight of the over-the-counter derivatives market and entities that participate in that market and mandates that the Commodity Futures Trading Commission, or the CFTC, the SEC and certain federal regulators of financial institutions, or Prudential Regulators, adopt rules or regulations implementing the Dodd-Frank Act and providing definitions of terms used in the Dodd-Frank Act. The Dodd-Frank Act establishes margin requirements and requires clearing and trade execution practices for certain market participants and may result in certain market participants needing to curtail or cease their derivatives activities.

Although some of the rules necessary to implement the Dodd-Frank Act remain to be adopted, the CFTC, the SEC and the Prudential Regulators have issued many rules to implement the Dodd-Frank Act, including a rule, which we refer to as the “Mandatory Clearing Rule,” requiring clearing of hedges, or swaps, that are subject to it (currently, only certain interest rate and credit default swaps, which we do not presently have), a rule, which we refer to as the “End User Exception,” establishing an “end user” exception to the Mandatory Clearing Rule, a rule, which we refer to as the “Margin Rule,” setting forth collateral requirements in connection with swaps that are not cleared and also an exception to the Margin Rule for end users that are not financial end users, which exception we refer to as the “Non-Financial End User Exception,” and a rule, subsequently vacated by the United States District Court for the District of Columbia and remanded to the CFTC for further proceedings, imposing position limits. The CFTC proposed a new version of this rule with respect to which the comment period closed but no final rule was issued and has re-proposed a new version of such rule, which we refer to as the “Re-Proposed Position Limit Rule,” with respect to which the comment period is scheduled to close on February 28, 2017. The Re-Proposed Position Limit Rule provides an exemption from the position limits for swaps that constitute “bona fide hedging positions” within the definition of such term under the Re-Proposed Position Limit Rule, subject to the party claiming the exemption complying with the applicable filing, recordkeeping and reporting requirements of the Re-Proposed Position Limit Rule.

We qualify for the End User Exception and will utilize it if the Mandatory Clearing Rule is expanded to cover swaps in which we participate, we qualify for the Non-Financial End User Exception and will not be required to post margin under the Margin Rule and limits our existing and anticipated hedging positions constitute "bona fide hedging positions" under the Re-Proposed Position Limit Rule and we intend to do the filing, recordkeeping and reporting necessary to utilize the bona fide hedging position exemption under the Re-Proposed Position Limit Rule if and when it becomes effective, so we do not expect to be directly affected by any of such rules. However, most if not all of our hedge counterparties will be subject to mandatory clearing in connection with their hedging activities with parties who do not qualify for the End User Exception and will be required to post margin in connection with their hedging activities with other swap dealers, major swap participants, financial end users and other persons that do not qualify for the Non-Financial End User Exception. In addition, the European Union and other non-U.S. jurisdictions have enacted laws and regulations (including laws and regulations giving European Union financial authorities the power to write down amounts we may be owed on hedging agreements with counterparties subject to such laws and regulations and/or require that we accept equity interests in such counterparties in lieu of cash in satisfaction of such amounts), which we refer to collectively as "Foreign Regulations" which may apply to our transactions with counterparties subject to such Foreign Regulations. The Dodd-Frank Act, the rules which have been adopted and not vacated, and, to the extent that the Re-Proposed Position Limit Rule is ultimately effected, such proposed rule could significantly increase the cost of our derivative contracts, materially alter the terms of our derivative contracts, reduce the availability of derivatives to us that we have historically used to protect against risks that we encounter in our business, reduce our ability to monetize or restructure our existing derivative contracts, and increase our exposure to less creditworthy counterparties. The Foreign Regulations could have similar effects. If we reduce our use of derivatives as a result of the Dodd-Frank Act and regulations and Foreign Regulations, our results of operations may become more volatile and our cash flows may be less predictable, which could adversely affect our ability to plan for and fund capital expenditures. Finally, the Dodd-Frank Act was intended, in part, to reduce the volatility of oil and natural gas prices, which some legislators attributed to speculative trading in derivatives and commodity contracts related to oil and natural gas. Our revenues could therefore be adversely affected if a consequence of the Dodd-Frank Act and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on us, our financial condition, and our results of operations.

***We may incur more taxes and certain of our projects may become uneconomic if certain federal income tax deductions currently available with respect to oil and natural gas exploration and production are eliminated as a result of future legislation.***

In past years, legislation has been proposed from time to time that contains proposals to eliminate certain key U.S. federal income tax preferences currently available to oil and natural gas exploration and production companies. These proposals include, but are not limited to (i) the repeal of the percentage depletion allowance for oil and natural gas properties, (ii) the elimination of current deductions for intangible drilling and development costs, (iii) the elimination of the deduction for certain U.S. production activities and (iv) an extension of the amortization period for certain geological and geophysical expenditures. The Trump Administration has called for a comprehensive tax reform that would significantly change U.S. tax laws. It is unclear whether any of the foregoing proposals will actually be considered and enacted as part of tax reform legislation or how soon any such changes in law could become effective. The passage of any legislation as a result of these proposals or any other similar change in U.S. federal income tax law could eliminate and/or defer certain tax deductions that are currently available with respect to oil and natural gas exploration and production. Any such change could materially adversely affect our business, financial condition and results of operations by increasing the after-tax costs we incur which would in turn make it uneconomic to drill some locations if commodity prices are not sufficiently high, resulting in lower revenues and decreases in production and reserves.

***We are subject to anti-takeover provisions in our restated certificate of incorporation and amended and restated bylaws, our Rights Plan and Delaware law that could delay or prevent an acquisition of our company, even if the acquisition would be beneficial to our stockholders.***

Provisions in our restated certificate of incorporation and amended and restated bylaws may delay or prevent an acquisition of us. These provisions may also frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, who are responsible for appointing the members of our management team. Furthermore, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the DGCL, which prohibits, with some exceptions,

stockholders owning in excess of 15% of our outstanding voting stock from merging or combining with us. In addition, the Company entered into the Rights Plan on July 28, 2015. The Rights Plan is designed to preserve stockholder value and the value of our NOLs by acting as a deterrent to any person acquiring beneficial ownership of 4.9% or more of the Company's outstanding common stock without the approval of our board of directors. Although not intended for this purpose, the Rights Plan has an anti-takeover effect. For more information on possible risks associated with our rights plan, please see "*—We adopted the Rights Plan, which though it was designed to preserve the value of our NOLs, may discourage the acquisition and sale of large blocks of our common stock and may result in significant dilution for certain stockholders.*" Finally, our amended and restated bylaws establish advance notice requirements for nominations for election to our board of directors and for proposing matters that can be acted upon at stockholder meetings. Although we believe these provisions together provide an opportunity to receive higher bids by requiring potential acquirers to negotiate with our board of directors, they would apply even if an offer to acquire us may be considered beneficial by some stockholders.

***We are subject to legal proceedings and legal compliance risks.***

We, including our officers and directors, are involved in various legal proceedings from time to time. Certain of these legal proceedings may be a significant distraction to management and could expose our Company to significant liability, including damages, fines, penalties and attorneys' fees and costs, any of which could have a material adverse effect on our business and results of operations.

We discuss the risks and uncertainties related to our litigation in more detail below in "Item 3. Legal Proceedings" and in "Item 8. Financial Statements and Supplementary Data — Note 14, Commitments and Contingencies."

***We may have potential business conflicts of interest with members of the Sanchez Group regarding our past, ongoing and future relationships and the resolution of these conflicts may not be favorable to us.***

Conflicts of interest may arise between members of the Sanchez Group and us in a number of areas relating to our past, ongoing and future relationships, including:

- labor, tax, employee benefit, indemnification and other matters arising under agreements with SOG;
- employee recruiting and retention;
- business opportunities that may be attractive to both members of the Sanchez Group and us; and
- business transactions that we enter into with members of the Sanchez Group.

We may not be able to resolve any potential conflicts, and, even if we do so, the resolution may be less favorable to us than if we were dealing with an unaffiliated party.

Finally, in connection with our initial public offering ("IPO"), we entered into several agreements with members of the Sanchez Group. In addition, at the closing of the Comanche Acquisition, we expect to enter into management services agreements with SOG for it to perform various management service functions for SN UnSub and Blackstone and/or their affiliates. These agreements were or will be made in the context of a related party transaction. The terms of these agreements may be more or less favorable to us than if they had been negotiated with unaffiliated third parties.

***Pursuant to the terms of our restated certificate of incorporation, members of the Sanchez Group are not required to offer corporate opportunities to us, and our directors and officers may be permitted to offer certain corporate opportunities to members of the Sanchez Group before us.***

Our board of directors includes persons who are also directors and/or officers of members of the Sanchez Group. Our restated certificate of incorporation provides that:

- members of the Sanchez Group are free to compete with us in any activity or line of business;
- we do not have any interest or expectancy in any business opportunity, transaction, or other matter in which members of the Sanchez Group engage or seek to engage merely because we engage in the same or similar lines of business;
- to the fullest extent permitted by law, members of the Sanchez Group will have no duty to communicate their knowledge of, or offer, any potential business opportunity, transaction, or other matter to us, and members of the Sanchez Group are free to pursue or acquire such business opportunity, transaction, or other matter for themselves or direct the business opportunity, transaction, or other matter to its affiliates; and
- if any director or officer of any member of the Sanchez Group who is also one of our officers or directors becomes aware of a potential business opportunity, transaction, or other matter (other than one expressly offered to that director or officer in writing solely in his or her capacity as our director or officer), that director or officer will have no duty to communicate or offer that business opportunity to us, and will be permitted to communicate or offer that business opportunity to such member of the Sanchez Group and that director or officer will not, to the fullest extent permitted by law, be deemed to have (1) breached or acted in a manner inconsistent with or opposed to his or her fiduciary or other duties to us regarding the business opportunity or (2) acted in bad faith or in a manner inconsistent with our best interests or those of our stockholders.

***We depend on SOG to provide us with certain services for our business. The services that SOG provides to us may not be sufficient to meet our needs, and we may have difficulty finding replacement services or be required to pay increased costs to replace these services after our agreements with SOG expire.***

Certain services required by us for the operation of our business, including general and administrative services, geological, geophysical and reserve engineering, lease and land administration, marketing, accounting, operational services, information technology services, compliance, insurance maintenance and management of outside professionals, are provided by SOG pursuant to the Services Agreement. The services provided under the Services Agreement commenced on the date that the IPO closed and will terminate five years thereafter. The term automatically extends for additional 12-month periods and is terminable by either party at any time upon 180 days' written notice. See "Corporate Governance—Compensation Committee" in the proxy statement for the 2016 annual meeting of stockholders, which is incorporated by reference to this report. While these services are being provided to us by SOG, our operational flexibility to modify or implement changes with respect to such services or the amounts we pay for them is limited. After the expiration or termination of this agreement, we may not be able to replace these services or enter into appropriate third-party agreements on terms and conditions, including cost, comparable to those that we will receive from SOG under our agreements with SOG.

In addition, SOG may outsource some or all of these services to third parties, and a failure of all or part of SOG's relationships with its outsourcing providers could lead to delays in or interruptions of these services. Our reliance on SOG and others as service providers and on SOG's outsourcing relationships, and our limited ability to control certain costs, could have a material adverse effect on our business, financial condition and results of operations.

 

***Sector cost inflation could adversely affect our ability to execute our exploration and development plans on a timely basis and within our budget.***

Our industry is cyclical and third party oilfield materials, service and supply costs are also subject to supply and demand dynamics. During periods of decreasing levels of industry exploration and production, such as occurred in 2015 and 2016, the demand for, and cost of, drilling rigs and oilfield services decreases. Conversely, during periods of increasing levels of industry activity, the demand for, and cost of, drilling rigs and oilfield services increases.

In the second half of 2016, we witnessed a modest improvement in commodity prices. If this trend continues, and if the commodity price recovery is robust, we expect industry exploration and production activities to increase, resulting in higher demand for oilfield services and supplies, which could result in sector price inflation. In addition, the costs of such items could increase and their availability may become limited, particularly in basins of relatively higher activity.

***A portion of our total outstanding shares is held by members of the Sanchez Group and may be sold into the market at any time. In addition, if the Comanche Acquisition is consummated, Blackstone and GSO (or their affiliates) will receive a substantial number of our securities. This could cause the market price of our common stock to drop significantly, even if our business is doing well.***

As of February 7, 2017, members of the Sanchez Group owned, in the aggregate, approximately 15.0% of our outstanding common stock. There are also an additional 8,961,750 shares available for future issuance to our directors, officers and employees as restricted stock or stock option awards pursuant to our Amended and Restated 2011 Long Term Incentive Plan. These shares are eligible for resale in the public markets, subject to the volume, manner of sale and other limitations under Rule 144 of the Securities Act. In addition, at the closing of the transaction contemplated by the Comanche Acquisition, we will issue 1.5 million shares of common stock to GSO and warrants to purchase 2.0 million and 6.5 million shares of common stock, at an exercise price of $10.00 per share, to GSO and an affiliate of Blackstone, respectively, resulting in GSO and such Blackstone affiliate owning approximately 3.9% and 7.3% of our common stock, respectively, assuming that the warrants will be fully exercised at closing. Following the conclusion of a two-year lockup period, these shares will be eligible for resale in the public markets, subject to the volume, manner of sale and other limitations under Rule 144 of the Securities Act. In addition, under certain circumstances, members of the Sanchez Group, GSO and such Blackstone affiliate have the right to require us to register the resale of their shares. Moreover, we have registered all of the shares of our common stock that we may issue under our employee benefit plans. These shares can be freely sold in the public market upon issuance unless, pursuant to their terms, these stock awards have transfer restrictions attached to them. Sales of a substantial number of shares of our common stock, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

**Item 1B.** ***Unresolved Staff Comments***

None.

**Item 2.** ***Properties***

The information required by Item 2 is contained in Item 1. Business.

**Item 3.** ***Legal Proceedings***

The information required by this Item is set forth in “Item 8. Financial Statements and Supplementary Data —Note 14, Commitments and Contingencies.”

**Item 4.** ***Mine Safety Disclosures***

Not applicable

**PART II**

**Item 5.** ***Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities***

*Market for Registrant's Common Equity.* Shares of our common stock are traded on the NYSE under the symbol "SN." The following table sets forth the reported high and low sales prices of our common stock as reported by the NYSE for the periods indicated:

| | Common Stock | |
|---|---|---|
| | High | Low |
| 2016: | | |
| First Quarter | $ 6.35 | $ 2.06 |
| Second Quarter | $ 9.83 | $ 4.84 |
| Third Quarter | $ 9.49 | $ 5.64 |
| Fourth Quarter | $ 10.14 | $ 5.90 |

| | Common Stock | |
|---|---|---|
| | High | Low |
| 2015: | | |
| First Quarter | $ 16.14 | $ 7.66 |
| Second Quarter | $ 15.85 | $ 9.45 |
| Third Quarter | $ 9.95 | $ 4.48 |
| Fourth Quarter | $ 8.39 | $ 3.46 |

On February 24, 2017, the last sale price of our common stock, as reported on the NYSE, was $11.31 per share.

*Holders.* The number of holders of record of our common stock was approximately 31 on February 27, 2017, which does not include beneficial owners whose shares are held by a clearing agency, such as a broker or a bank.

*Preferred Dividends.* We pay preferred dividends quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by the Company's board of directors on our Series A and Series B Preferred Stock in the amounts of 4.875% and 6.50%, respectively. The Company may, at its option, pay dividends in cash and, subject to certain conditions, common stock or any combination thereof. As of December 31, 2016, we have paid approximately $56.8 million in dividends to holders of our Series A and Series B Preferred Stock since their respective issuances. The dividends accrued for the period from January 1 to March 31, 2016 were declared by the Board and paid in cash by the Company. The dividends accrued for the periods from April 1 to July 31, August 1 to September 30, and October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock.

We have not paid any cash dividends on our common equity since our inception. Although our future dividend policy is within the discretion of our board of directors and will depend upon various factors, including our results of operations, financial condition, capital requirements and investment opportunities, we do not anticipate declaring or paying any cash dividends to holders of our common stock in the foreseeable future. In addition, covenants contained in our credit facility, future credit facilities we may enter into, our indenture and the certificates of designations for our preferred stock restrict our ability to pay dividends on our common stock and the DGCL permits payment of dividends only out of a corporation's surplus, which is defined as the excess of net assets (total assets less total liabilities) over a corporation's capital as determined under the DGCL. We currently intend to retain future earnings to finance current operations and the future expansion of our business.

*Securities Authorized for Issuance Under Equity Compensation Plans.* The following table sets forth certain information as of December 31, 2016 regarding the Sanchez Energy Corporation Third Amended and Restated 2011 Long Term Incentive Plan (the "LTIP"). The LTIP was approved by our stockholders on May 24, 2016, which increased the number of the shares of our common stock available for incentive awards pursuant to the LTIP's predecessor, which was approved by our stockholders on May 21, 2015.

| | (a) Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | (b) Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | (c) Number of Securities Remaining Available For Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column (a)) |
|---|---|---|---|
| **Plan Category:** | | | |
| Equity Compensation Plans Approved by Stockholders | — | N/A | 6,669,005 (1) |
| Equity Compensation Plans Not Approved by Stockholders | N/A | N/A | N/A |
| **Total** | — | — | 6,669,005 |

(1) The maximum number of shares that may be delivered pursuant to the LTIP is limited to 17,239,790 shares plus an automatic increase equal to the lesser of (A) 15% of such issuance of additional Common Shares and (B) such lesser number of Common Shares as determined by the Board of Directors and Compensation Committee; provided, however, withheld to satisfy tax withholding obligations are not considered to be delivered under the LTIP.

*Recent Sales of Unregistered Securities.* All sales of unregistered securities within the last fiscal year have been previously reported in our Quarterly Reports on Form 10-Q and/or Current Reports on Form 8-K.

*Repurchases of Equity Securities.* Neither we nor any "affiliated purchaser" repurchased any of our equity securities in the quarter ended December 31, 2016.

**Comparative Stock Performance**

The performance graph below compares the cumulative total stockholder return for our common stock to that of the Standard and Poor's, or S&P, 500 Index and the S&P 500 Oil & Gas Exploration and Production Index for the period from December 31, 2011 to December 31, 2016. "Cumulative total return" means the change in share price during the measurement period divided by the share price at the beginning of the measurement period. The graph assumes an investment of $100 was made in the Company's common stock and in each of the S&P 500 Index and the S&P 500 Oil & Gas Exploration and Production Index at the closing market price on December 31, 2011.

**COMPARISON OF CUMULATIVE TOTAL RETURN
AMONG SANCHEZ ENERGY CORPORATION, THE S&P 500 INDEX,
AND THE S&P 500 OIL & GAS EXPLORATION AND PRODUCTION INDEX**




---

Note: The stock price performance of our common stock is not necessarily indicative of future performance.

*The above information under the caption "Comparative Stock Performance" shall not be deemed to be "soliciting material" or to be "filed" with the SEC, nor shall such information be incorporated by reference into any future filing under the Securities Act or the Exchange Act except to the extent that we specifically request that such information be treated as "soliciting material" or specifically incorporate such information by reference into such a filing.*

**Item 6. *Selected Financial Data***

The selected financial data table below shows our historical consolidated financial data as of and for each of the five years in the period ended December 31, 2016. The selected financial data is derived from our audited historical financial statements.

The selected financial data should be read together with "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Item 8. Financial Statements and Supplementary Data" included in this Annual Report on Form 10-K.

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (in thousands, except per share amounts) | | | | |
| **REVENUES:** | | | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 | $ 290,322 | $ 42,377 |
| Natural gas liquids sales | 81,744 | 69,011 | 66,989 | 13,013 | 15 |
| Natural gas sales | 107,816 | 98,797 | 60,188 | 11,085 | 766 |
| Total revenues | 431,326 | 475,779 | 666,064 | 314,420 | 43,158 |
| **OPERATING COSTS AND EXPENSES:** | | | | | |
| Oil and natural gas production expenses | 164,567 | 156,528 | 93,581 | 35,669 | 3,401 |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 | 17,334 | 2,124 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | 134,845 | 15,922 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| General and administrative (1) | 110,081 | 74,160 | 63,692 | 47,951 | 37,239 |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 | 235,799 | 58,686 |
| Operating income (loss) | (191,761) | (1,491,351) | (80,914) | 78,621 | (15,528) |
| Other income (expense): | | | | | |
| Interest income | 856 | 442 | 193 | 187 | 74 |
| Other income (expense) | 134 | (2,605) | 96 | (52) | — |
| Gain on disposal of assets | 112,294 | — | — | — | — |
| Interest expense | (126,973) | (126,399) | (89,800) | (30,934) | (99) |
| Earnings from equity investments | 3,466 | — | — | — | — |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 | (16,938) | (742) |
| Total other income (expense) | (63,372) | 44,324 | 47,694 | (47,737) | (767) |
| Income (loss) before income taxes | (255,133) | (1,447,027) | (33,220) | 30,884 | (16,295) |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) | 3,986 | — |
| **Net income (loss)** | (256,958) | (1,454,627) | (21,791) | 26,898 | (16,295) |
| Less: | | | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) | (18,525) | (2,112) |
| Net income allocable to participating securities(2)(3) | — | — | — | (364) | — |
| **Net income (loss) attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) | $ 8,009 | $ (18,407) |
| Net income (loss) per common share - basic and diluted | $ (4.63) | $ (25.70) | $ (1.06) | $ 0.22 | $ (0.56) |
| Weighted average number of shares used to calculate net income (loss) attributable to common stockholders - basic and diluted (4) | 58,900 | 57,229 | 52,338 | 36,379 | 33,000 |

(1) Includes stock based compensation expense of $37.1 million, $14.8 million, $12.8 million, $[illegible] million and $[illegible] million for the years ended December 31, 2016, 2015, 2014, 2013 and 2012, respectively. Also includes acquisition and divestiture costs of $8.1 million, $3.8 million, $1.8 million and $4.1 million for the years ended December 31, 2016, 2015, 2014 and 2013, respectively.

(2) The Company's restricted shares of common stock are participating securities.

(3) For the years ended December 31, 2016, 2015, 2014 and 2012 no losses were allocated to participating restricted stock because such securities do not have a contractual obligation to share in the Company's losses.

(4) The year ended December 31, 2016 excludes 2,113,462 shares of weighted average restricted stock and 12,554,481 shares of common stock resulting from an assumed conversion of the Company's Series A Convertible Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2015 excludes 2,663,010 shares of weighted average restricted stock and 12,529,314 shares of common stock resulting from an assumed conversion of the Company's Series A Convertible Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2014 excludes 1,732,888 shares of weighted average restricted stock and 13,527,738 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2013 excludes 757,963 shares of weighted average restricted stock and 14,979,225 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive. The year ended December 31, 2012 excludes 184,230 shares of weighted average restricted stock and 1,992,857 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock from the calculation of the denominator for diluted earnings per common share as these shares were anti-dilutive.

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (in thousands) | | | | |
| **Balance Sheet Data:** | | | | | |
| Working capital | $ 385,808 | $ 499,112 | $ 412,798 | $ 54,061 | $ 15,671 |
| Total assets [(1)] | $ 1,286,280 | $ 1,501,304 | $ 2,994,000 | $ 1,602,465 | $ 426,574 |
| Long term debt, net of premium, discount and debt issuance costs[(1)] | $ 1,712,767 | $ 1,705,927 | $ 1,698,095 | $ 573,452 | $ — |
| Total stockholders' equity (deficit) | $ (696,140) | $ (456,169) | $ 999,587 | $ 857,309 | $ 366,743 |

(1) As a result of the adoption of ASU 2015-03 on a retrospective basis as of the quarter ended December 31, 2016, the total assets and long term debt, net of premium, discount and debt issuance costs as of December 31, 2015, 2014 and 2013 were reduced by approximately $41.0 million, $48.2 million and $19.8 million, respectively. These retrospective changes are reflected in the total assets and long term debt, net of premium, discount and debt issuance costs amounts in the table above. See further discussion on the adoption of ASU 2015-03 in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt."

| | | 2016 | | 2015 | | 2014 | | 2013 | | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Year Ended December 31, (in thousands) | | | | | | | | | |
| **Cash Flow Data:** | | | | | | | | | | |
| Net cash provided by operating activities | $ | 181,251 | $ | 272,025 | $ | 415,335 | $ | 189,261 | $ | 29,072 |
| Net cash used in investing activities | $ | (108,637) | $ | (294,331) | $ | (1,361,264) | $ | (1,093,363) | $ | (181,427) |
| Net cash provided by (used in) financing activities | $ | (5,745) | $ | (16,360) | $ | 1,266,112 | $ | 1,007,286 | $ | 139,661 |

**Non-GAAP Financial Measures**

***Adjusted EBITDA***

We present adjusted EBITDA attributable to common stockholders (“Adjusted EBITDA”) in addition to our reported net income (loss) in accordance with U.S. GAAP. Adjusted EBITDA is a non-GAAP financial measure that is used as a supplemental financial measure by our management and by external users of our financial statements, such as investors, commercial banks and others, to assess our operating performance as compared to that of other companies in our industry, without regard to financing methods, capital structure or historical costs basis. It is also used to assess our ability to incur and service debt and fund capital expenditures.

We define Adjusted EBITDA as net income (loss):

- Plus:
  - Interest expense, including net losses (gains) on interest rate derivative contracts;
  - Net losses (gains) on commodity derivative contracts;
  - Net settlements received (paid) on commodity derivative contracts;
  - Depreciation, depletion, and amortization and accretion;
  - Impairment of oil and natural gas properties;
  - Stock-based compensation expense;
  - Acquisition and divestiture costs included in general and administrative;
  - Income tax expense (benefit); and
  - Certain other items that we deem appropriate.
- Less:
  - Gain on disposal of assets;

- Amortization of deferred gain on Western Catarina Midstream Divestiture;
- Interest income; and
- Certain other items that we deem appropriate.

Our Adjusted EBITDA should not be considered an alternative to net income (loss), operating income (loss), cash flows provided by (used in) operating activities or any other measure of financial performance or liquidity presented in accordance with U.S. GAAP. Our Adjusted EBITDA may not be comparable to similarly titled measures of another company because all companies may not calculate Adjusted EBITDA in the same manner.

The following table presents a reconciliation of our net income (loss) to Adjusted EBITDA (in thousands):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Net income (loss)** | $ (256,958) | $ (1,454,627) | $ (21,791) | $ 26,898 | $ (16,295) |
| Plus: | | | | | |
| Interest expense | 126,973 | 126,399 | 89,800 | 30,934 | 99 |
| Net losses (gains) on commodity derivative contracts | 53,149 | (172,886) | (137,205) | 16,938 | 742 |
| Net settlements received (paid) on commodity derivative contracts | 135,600 | 142,468 | 5,600 | (5,787) | 2,749 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | 134,845 | 15,922 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in general and administrative | 8,130 | 3,814 | 1,808 | 4,129 | — |
| Write off of joint venture receivable, non-recurring | — | 2,251 | — | — | — |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) | 3,986 | — |
| Less: | | | | | |
| Gain on disposal of assets | (112,294) | — | — | — | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,812) | (3,086) | — | — | — |
| Premiums on commodity derivative contracts[1] | — | — | (718) | (2,838) | (3,059) |
| Interest income | (856) | (443) | (193) | (190) | (74) |
| **Adjusted EBITDA** | $ 306,653 | $ 375,893 | $ 490,633 | $ 226,666 | $ 25,626 |

(1) This amount has been reduced by premiums associated with derivatives that settled during the respective periods, which may include premiums accrued but not yet paid as of the end of the quarter based on timing of cash settlement payments with counterparties.

The following table presents a reconciliation of net cash provided by operating activities to Adjusted EBITDA (in thousands):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| **Net cash provided by operating activities** | $ 181,251 | $ 272,025 | $ 415,335 | $ 189,261 | $ 29,072 |
| Net change in operating assets and liabilities | 5,190 | (27,961) | (6,238) | 12,334 | (3,806) |
| Cash reimbursements received for operating leasehold improvements | — | (2,648) | — | — | — |
| Interest expense, net [1] | 117,645 | 117,723 | 79,850 | 23,584 | (74) |
| Settlements on commodity derivative contracts, non-cash | (11,093) | 11,466 | (122) | (2,642) | 434 |
| Loss on inventory market adjustment | (649) | — | — | — | — |
| Distributions from equity investments | (930) | — | — | — | — |
| Earnings from equity investments | 3,466 | — | — | — | — |
| Income tax expense | 1,825 | 158 | — | — | — |
| Write off of joint venture receivable, non-cash | — | 2,251 | — | — | — |

| | | | | | |
|---|---|---|---|---|---|
| Acquisition and divestiture costs included in general and administrative | [illegible] | [illegible] | [illegible] | [illegible]4,129 | — |
| Gain (loss) on investment in SPP | 1,818 | (935) | — | — | — |
| **Adjusted EBITDA** | $ 306,653 | $ 375,893 | $ 490,633 | $ 226,666 | $ 25,626 |

(1) This amount includes cash interest expense on our Senior Notes and credit agreements, net of interest income.

***Adjusted Earnings (Loss)***

We present adjusted earnings (loss) attributable to common stockholders ("Adjusted Earnings (Loss)"), in addition to our reported net income (loss) in accordance with U.S. GAAP. This information is provided because management views the exclusion of the items included in our definition of Adjusted Earnings (Loss) below as helpful for decision making by identifying operating trends that could otherwise be masked by these items and highlighting the impact that commodity price volatility has on our results. In addition, management believes the exclusion of the items included in our definition of Adjusted Earnings (Loss) below will help investors compare results between periods, identify operating trends and understand how the volatility of commodity prices impacts the Company's results. We define Adjusted Earnings (Loss) as net income (loss):

Less:

- Preferred stock dividends; and
- Certain other items that we deem appropriate.

Plus:

- Net losses (gains) on commodity derivative contracts;
- Net settlements received (paid) on commodity derivative contracts;
- Impairment of oil and natural gas properties;
- Stock-based compensation expense;
- Acquisition and divestiture costs included in general and administrative;
- Gain on disposal of assets;
- Amortization of deferred gain on Western Catarina Midstream Divestiture;
- Certain other items that we deem appropriate; and
- Tax impact of adjustments to net income (loss).

The following table presents a reconciliation of our net income (loss) to Adjusted Earnings (Loss) (in thousands, except per share data):

| | Year Ended December 31, 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| **Net income (loss)** | $ (256,958) | $ (1,454,627) | $ (21,791) | $ 26,898 | $ (16,295) |
| Less: Preferred stock dividends | (15,948) | (16,008) | (33,590) | (18,525) | (2,112) |
| **Net income (loss) attributable to common shares and participating securities** | (272,906) | (1,470,635) | (55,381) | 8,373 | (18,407) |
| Plus: | | | | | |
| Non-cash preferred stock dividends associated with conversion | — | 48 | 17,297 | — | — |
| Non-cash write off of joint venture receivables | — | 2,251 | — | — | — |
| Net losses (gains) on commodity derivatives contracts | 53,149 | (172,886) | (137,205) | 16,938 | 742 |
| Net settlements received (paid) on commodity derivative contracts | 135,600 | 142,468 | 5,600 | (5,787) | 2,749 |
| Premiums on commodity derivative contracts [(1)] | — | — | (718) | (2,838) | (3,059) |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in general and administrative | 8,130 | 3,814 | 1,808 | 4,129 | — |
| Gain on disposal of assets | (112,294) | — | — | — | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,812) | (3,086) | — | — | — |
| Tax impact of adjustments to net income (loss) [(2)] | 260 | 12,385 | (33,081) | (3,898) | — |
| **Adjusted Earnings (Loss)** | 3,263 | (105,810) | 24,984 | 34,668 | 7,567 |
| **Adjusted Earnings allocable to participating securities**[(3)] | (321) | — | (1,157) | (1,513) | (221) |
| **Adjusted Earnings (Loss) attributable to common stockholders** | $ 2,942 | $ (105,810) | $ 23,827 | $ 33,155 | $ 7,346 |
| Weighted average number of shares used to calculate net income (loss) attributable to common stockholders - basic and diluted | 58,900 | 57,229 | 52,338 | 36,379 | 33,000 |

(1) This amount has been reduced by premiums associated with derivatives that settled during the respective periods, which may include premiums accrued but not yet paid as of the end of the quarter based on timing of cash settlement payments with counterparties.

(2) The tax impact is computed by utilizing the Company's effective tax rate on the adjustments to reconcile net income (loss) to Adjusted Earnings (loss).

(3) The Company's restricted shares of common stock are participating securities.

Adjusted Earnings (Loss) is not intended to represent cash flows for the period, nor is it presented as a substitute for net income (loss), operating income (loss), cash flows provided by (used in) operating activities or any other measure of financial performance or liquidity presented in accordance with U.S. GAAP.

***Adjusted G&A and Adjusted G&A per Boe***

We present Adjusted G&A expense in addition to our reported G&A expense in accordance with U.S. GAAP. Adjusted G&A is reported herein because this measure is commonly used by management, analysts and investors as an indicator of cost management and operating efficiency on a comparable basis from period to period. In addition, management believes Adjusted G&A per Boe is used by analysts and others in valuation, comparison and investment recommendations of companies in the oil and gas industry to allow for analysis of G&A spend without regard to stock-based compensation programs which can vary substantially from company to company. Adjusted G&A per Boe should not be considered as an alternative to, or more meaningful than, total G&A per Boe as determined in accordance with U.S. GAAP and may not be comparable to other similar titled measures of other companies. We define Adjusted G&A as G&A:

Less:

- Stock-based compensation expense; and
- Certain costs related to acquisitions and divestitures.

The following table presents a reconciliation of our G&A to Adjusted G&A (in thousands, except per Boe data):

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2015 | 2014 | 2013 | 2012 |
| | (in thousands, except per Boe data) | | | | |
| General and administrative expense | $ 110,081 | $ 74,160 | $ 63,692 | $ 47,951 | $ 37,239 |
| Stock-based compensation expense included in G&A | 37,090 | 14,831 | 12,843 | 17,751 | 25,542 |
| Acquisition and divestiture costs included in G&A | 8,130 | 3,814 | 1,808 | 4,129 | - |
| Adjusted G&A | $ 64,861 | $ 55,515 | $ 49,041 | $ 26,071 | $ 11,697 |
| **Average unit costs per Boe:** | | | | | |
| General and administrative expense | $ 5.64 | $ 3.87 | $ 5.72 | $ 12.39 | $ 79.43 |
| Stock-based compensation expense included in G&A | $ 1.90 | $ 0.77 | $ 1.15 | $ 4.58 | $ 54.48 |
| Acquisition and divestiture costs included in G&A | $ 0.42 | $ 0.20 | $ 0.16 | $ 1.07 | $ - |
| Adjusted G&A per Boe | $ 3.32 | $ 2.89 | $ 4.40 | $ 6.73 | $ 24.95 |

**Item 7. *Management's Discussion and Analysis of Financial Condition and Results of Operations***

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes set forth in "Item 8. Financial Statements and Supplementary Data," our consolidated financial data set forth in "Item 6. Selected Financial Data" and the risk factors identified in "Item 1A. Risk Factors" of this Annual Report on Form 10-K.*

*Our estimated proved reserve information as of December 31, 2016 contained in this Annual Report on Form 10-K is based on a report prepared by Ryder Scott Company, L.P. ("Ryder Scott"), our independent reserve engineers. Estimated reserve information for the Comanche Assets contained in this Annual Report on Form 10-K is based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the*

*Comanche Acquisition and has not been independently verified or estimated. Unless otherwise specified in this Annual Report on Form 10-K, the information in this Annual Report on Form 10-K does not give effect to the Comanche Acquisition.*

 

*Certain items in our discussion below are forward-looking statements. These forward looking statements involve risks and uncertainties. A number of factors could cause actual results to differ materially from those implied or expressed in such forward-looking statements. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation, a Delaware corporation formed in 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the TMS in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale.

On January 12, 2017, the Company, through two of our subsidiaries, SN UnSub and SN Maverick, along with Blackstone signed the Comanche Purchase Agreement to acquire the Comanche Assets from Anadarko for $2,275 million in cash, subject to customary closing adjustments. The Comanche Assets are primarily located in the Western Eagle Ford Shale and are expected to significantly expand our asset base and production. The Comanche Assets consist of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) Pearsall Shale acres, with an approximate 49% average working interest therein, contain, as of June 30, 2016, approximately 300 MMBoe of proved reserves (70% liquids, 75% proved developed), and had production of approximately 67,000 Boe/d (70% liquids) as of December 31, 2016. The estimated proved reserves attributable to the Comanche Assets are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition and have not been independently verified or estimated. The Comanche Purchase Agreement provides that SN UnSub will pay approximately 37% of the purchase price (including through a $100 million cash contribution from the Company) and SN Maverick will pay approximately 13% of the purchase price and SN UnSub and SN Maverick would acquire half of the 49% working interest in and to the Comanche Assets in the aggregate (and approximately 50% and 0%, respectively, of the estimated total proved developed producing reserves, 20% and 30%, respectively, of the estimated total proved developed non-producing reserves, and 20% and 30%, respectively, of the total proved undeveloped reserves), and Blackstone will pay 50% of the purchase price and would acquire the remaining half of the 49% working interest in and to the Comanche Assets (approximately 50% of the estimated total proved developed producing reserves, proved developed non-producing reserves and proved undeveloped reserves). We expect to close the Comanche Acquisition during the first quarter of 2017. The effective date of the transaction is July 1, 2016. A working interest owner (the "Tag Owner") held a tag right, exercisable until February 12, 2017, to sell its interest in the Comanche Assets (which is approximately one-half Anadarko's interest) on substantially the same terms and conditions as Anadarko. However, the Tag Owner elected to waive its tag right. The estimated proved reserves attributable to the Comanche Assets are as of June 30, 2016, are based on our internal evaluation and interpretation of reserve and other information provided to us in the course of our due diligence with respect to the Comanche Acquisition and have not been independently verified or estimated.

For the year 2017, we plan to invest substantially all of our 2017 capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities.

For further discussion of our business, including a description of various acquisitions completed during the periods presented in the consolidated financial statements, refer to "Item 1. Business—Overview."

***Basis of Presentation***

The consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Our Properties***

We and our predecessor entities have a long history in the Eagle Ford Shale, where we have assembled approximately 278,000 net leasehold acres with an average working interest of approximately 94%. Using approximately 75 acre well-spacing for our Maverick area, approximately 120 acre well-spacing for our Javelina area, approximately 40 acre well-spacing for our Palmetto area, approximately 60 acre well-spacing for our Marquis area and approximately 75 acre well-spacing for our Catarina area, and assuming 80% of the acreage is drillable for our Maverick, Javelina, Marquis and Catarina areas, and 90% of the acreage is drillable for our Palmetto area, we believe that there could be over 3,300 potential gross (3,050 net) locations for potential future drilling in the Eagle Ford Shale. Pro forma for the pending Comanche Acquisition, we will have assembled approximately 339,000 net leasehold acres with an approximate 61% average working interest as of December 31, 2016, and will have over 7,300 potential gross (4,050 net) Eagle Ford locations for potential drilling. Our average well-spacing for the Comanche area is planned to be 600 foot apparent spacing (in zone), with plans for multi-bench development of two to four Eagle Ford targets across our acreage position.

The TMS development is currently challenged due to high well costs and depressed commodity prices. We believe that the TMS play has significant development potential and may offer upside opportunity as changes in technology, commodity prices, and service prices occur. The average remaining lease term on the acreage is over 2 years, giving us ample time to allow other industry participants to further de-risk the play. Using approximately 250 acre well-spacing for our TMS area and assuming 80% of the acreage is drillable, we believe that there are up to 200 gross (150 net) locations for potential future drilling.

In total, pro forma for the pending Comanche Acquisition, we believe that there are over 7,500 potential gross (4,200 net) Eagle Ford and TMS locations for future drilling. Consistent with other operators in this area, we perform multi-stage hydraulic fracturing up to 30 stages on each well depending upon the length of the lateral section. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale.

For further discussion of our properties, including a description of recent well results in our core operating areas, refer to “Item 1. Business—Core Properties.”

***Recent Developments***

*Comanche Acquisition*

As noted above in “Item 7. Management’s Discussion and Analysis—Business Overview”, the Company, through two of our subsidiaries, SN UnSub and SN Maverick, along with Blackstone, signed the Comanche Purchase Agreement to acquire the Comanche Assets from Anadarko for $2,275 million in cash, subject to customary closing adjustments. The Comanche Assets are primarily located in the Western Eagle Ford Shale and are projected to more than double our gross drilling inventory as of December 31, 2016, add 132 gross drilled but uncompleted wells and provide a path for strong growth within projected cash flow. With the Comanche Assets strategically located adjacent to our existing Catarina assets, we anticipate substantial operating synergies and other benefits arising from the scale and concentration of our expanded Eagle Ford position. Our continued focus on the Western Eagle Ford, expertise at multi-bench development and efficient cost structure provide us with opportunities to create significant value from the Comanche Assets. With the potential to duplicate the cost structure of our Catarina and Maverick operations throughout the Comanche Assets, we expect to further improve operating efficiencies while enhancing our capability to achieve sustainability of well cost reductions over time.

In connection with the pending Comanche Acquisition, on January 12, 2017, SN UnSub, JPMorgan Chase Bank, N.A., Citibank, N.A., and certain of their affiliates entered into a debt financing commitment letter for the SN UnSub Credit Facility.

*Interim Investors Agreement*

In connection with the execution of the Comanche Purchase Agreement, on January 12, 2017, we and Blackstone entered into an Interim Investors Agreement to govern the relationship between us and Blackstone pending

the closing of the transactions contemplated by the Comanche Purchase Agreement and provide for certain agreements to be entered into among us and Blackstone and their affiliates in connection with the closing of the Comanche Acquisition.

*Securities Purchase Agreement*

As part of the financing for the acquisition of the Comanche Assets, on January 12, 2017, we and GSO entered into a Securities Purchase Agreement (the "SPA"). The SPA provides that, at the closing of the transactions contemplated by the Comanche Purchase Agreement and subject to the other terms and conditions provided therein, (i) SN EF UnSub Holdings, LLC, the limited partner of SN UnSub, will purchase 100,000 common units of SN UnSub for $100 million and GSO will purchase at least 500,000 preferred units of SN UnSub for $500 million plus, at GSO's sole election, additional preferred units if SN UnSub intends to incur senior debt other than pursuant to the SN UnSub Credit Facility, if there is an unsuccessful syndication of the SN UnSub Credit Facility, or the availability under the SN UnSub Credit Facility as of the closing will be less than $65 million (the "Debt Replacement Units"), and (ii) GSO will purchase one common unit in SN UnSub's general partner for nominal consideration. In addition, GSO has committed, pursuant to the terms and conditions of the SPA, to purchase additional preferred units (and, at its sole option, additional Debt Replacement Units).

*2017 Capital Program*

Our 2017 capital budget is focused on the development of our approximately 339,000 net acres in the Eagle Ford Shale, inclusive of net acreage attributable to the pending Comanche Acquisition. In 2017, we plan to invest $395 million to $440 million, or 100%, of our drilling and completion budget to complete 144 net Eagle Ford Shale wells. We also plan to invest $30 million to $35 million for facilities, leasing and seismic activities. This 2017 capital budget of $425 million to $475 million represents an increase of approximately 64% over our budgeted 2016 capital investment of $250 million to $300 million. The increase in our 2017 capital budget is attributable to the planned development of new locations expected to be added through the Comanche Acquisition. Capital allocation to the Catarina, Maverick and Palmetto assets remains unchanged as a result of the Comanche Acquisition, and is generally in line with 2016 activity levels.

The following table presents summary data for each of our project areas as of December 31, 2016, pro forma for the Comanche Acquisition as well as our drilling and completion budget for 2017 fiscal year:

| | | | | Identified Drilling Locations (2) | | 2017 Capital Expenditure Budget | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Net Acreage | Average Working Interest (1) | Operator | Gross | Net | Net Wells Spud | Net Wells Completed | Drilling & Completion ("D&C") Capital (in millions) | % of Operating Capital | % of D&C Capital |
| Catarina | 106,051 | 100% | Sanchez Energy | 1,400 | 1,400 | 49 | 53 | $160 - $170 | 35% | 37% |
| Comanche | 61,262 | 23% | Sanchez Energy | 4,000 | 1,000 | 30 | 53 | $130 - $150 | 32% | 35% |
| Maverick | 102,626 | 96% | Sanchez Energy | 1,100 | 1,000 | 35 | 35 | $100 - $110 | 24% | 26% |
| Javelina | 39,506 | 100% | Sanchez Energy | 300 | 300 | - | - | $0 | 0% | 0% |
| Palmetto | 8,097 | 49% | Marathon | 300 | 150 | 2 | 3 | $5 - $10 | 2% | 2% |
| Marquis | 21,477 | 100% | Sanchez Energy | 200 | 200 | - | - | $0 | 0% | 0% |
| Total Eagle Ford | 339,019 | 61% | | 7,300 | 4,050 | 116 | 144 | $395 - $440 | 93% | 100% |
| TMS | 45,639 | 71% | Sanchez Oil and Gas | 200 | 150 | - | - | $0 | 0% | 0% |
| Other | 727 | 25% | Sanchez Energy | - | - | - | - | $0 | 0% | 0% |
| Total | 385,385 | 62% | | 7,500 | 4,200 | 116 | 144 | $395 - $440 | 93% | 100% |
| Facilities, Leasing and Seismic | | | | | | | | $30 - $35 | 7% | |
| Total Capital Budget | | | | | | | | $425 - $475 | 100% | |

(1) Average working interests reflect the Company's average working interests in the leases it holds.

(2) Using approximately 75 acre well-spacing for our Maverick area, approximately 150 acre well-spacing for our Javelina area, approximately 40 acre well-spacing for our Palmetto area, approximately 60 acre well-spacing for our Marquis area and approximately 75 acre well-spacing for our Catarina and assuming 80% of the acreage is drillable for our Maverick, Javelina, Marquis and Catarina areas, and 90% of the acreage is drillable for our Palmetto area, we believe that there could be over 3,300 potential gross (3,050 net) locations for potential future drilling in the Eagle Ford Shale. Following the completion of the pending Comanche Acquisition, we believe that we will have

over 7,300 gross (4,050 net) locations for potential future drilling in the Eagle Ford Shale. Our average well-spacing for the Comanche area is planned to be 600 foot apparent spacing (in zone), with plans for multi-bench development of two to four Eagle Ford targets across our acreage position, providing approximately 4,000 potential gross (1,000 net) locations. Using approximately 250 acre well-spacing for our TMS area and assuming 80% of the acreage is drillable, we believe that there are up to 200 gross (150 net) locations for potential future drilling. In total, pro forma for the pending Comanche Acquisition, we believe that there are over 7,500 potential gross (4,200 net) Eagle Ford and TMS locations for future drilling.

In our Comanche area, pro forma for the pending Comanche Acquisition, we have approximately 61,000 net acres in Dimmit, Webb, La Salle and Maverick Counties, Texas with a 24% working interest. We anticipate drilling, completion and facilities costs on our acreage to average approximately $3.2 million per well based on our current estimates. Current EUR per well in Comanche is expected to range between 600 MBoe and 700 MBoe. We have identified between 4,000 and 1,000 gross and net Eagle Ford locations for potential future drilling on our Comanche acreage. For the year 2017, we plan to spend between $130 million to $150 million to complete 53 net wells, 32 of which were drilled by the previous operator.

*Common Equity Offering*

On February 6, 2017, the Company completed an underwritten public offering of 10,000,000 shares of the Company's common stock at a price of $12.50 per share ($11.7902 per share, net of underwriting discounts). The Company granted the Underwriters a 30-day option to purchase up to an additional 1,500,000 shares of the Company's common stock on the same terms, which was exercised in full on February 1, 2017. The Company received net proceeds of approximately $135.9 million (after deducting underwriting discounts) from the sale of the shares of common stock. The Company intends to use the net proceeds of the offering for general corporate purposes, including working capital.

***Outlook***

Although capital markets have shown signs of improvement recently, our operating environment continues to be influenced by commodity price volatility. As a result, we face persistent uncertainty with respect to the future of our industry, which may continue into future years. In this environment, the Company plans to carefully manage its capital spending and operating activities in order to preserve liquidity. The Company maintains significant operational and financial flexibility to respond to changes in market and operating conditions, and our capital budget remains at all times subject to adjustment.

We expect to use a portion of our cash on hand, internally generated cash flows from operations, and funds raised through the strategic sale of certain non-core assets, to fund our 2017 capital expenditures, and currently project no borrowings under the Second Amended and Restated Credit Agreement for purposes of our development activity at our planned level of capital spending. We will continuously evaluate our capital spending and operating activities in light of realized commodity prices and the results of our operations, and may make further adjustments to our capital spending program as warranted, subject to our obligations under the JDA following the expected closing of the Comanche Acquisition. In addition, we will continuously review acquisition and divestiture opportunities involving third parties, SPP and/or other members of the Sanchez Group.

The average oil price (WTI Cushing) used in the SEC pricing methodology for calculating the PV-10 and Standardized Measures and for performing impairment tests under the full cost method, calculated as the unweighted arithmetic average of the first day of the month price for each month within the 12 month period ended December 31, 2016 was $42.75 per barrel and the average natural gas price, at Henry Hub, and calculated in the same manner, was $2.49 per MMBtu. At these price levels, SEC prices for oil and natural gas have decreased approximately 15% and 4%, respectively, since December 31, 2015, but have increased approximately 3% and 9%, respectively, since September 30, 2016.

As a result of less favorable commodity prices adversely impacting our proved reserve values, and the impact of commodity price volatility on our future drilling opportunities, we recorded a full cost ceiling test impairment after

income taxes of $169.0 million for the year ended December 31, 2016. While there is a possibility that the Company will incur additional impairments to our full cost pool in 2017, factors impacting the full cost ceiling test impairment calculation have not yet been determined. Based upon known improvements in the current NYMEX forward prices, we believe that there is a reasonable likelihood of an increase in the average 12 month trailing first-day-of-the-month pricing in the first quarter of 2017.

**Results of Operations**

***Revenue and Production***

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Year Ended December 31, | | | Increase (Decrease) | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2016 vs 2015 | | 2015 vs 2014 | |
| | 2016 | 2015 | 2014 | $ | % | $ | % |
| **Net Production:** | | | | | | | |
| Oil (MBbl) | 6,370 | 7,165 | 6,080 | (795) | (11)% | 1,085 | 18 % |
| Natural gas liquids (MBbl) | 5,960 | 5,754 | 2,590 | 206 | 4 % | 3,164 | 122 % |
| Natural gas (MMcf) | 43,189 | 37,594 | 14,828 | 5,595 | 15 % | 22,767 | 154 % |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 11,141 | 345 | 2 % | 8,043 | 72 % |
| **Average Sales Price Excluding Derivatives[(1)]:** | | | | | | | |
| Oil ($ per Bbl) | $ 37.95 | $ 42.98 | $ 88.64 | $ (5.03) | (12)% | $ (45.66) | (52)% |
| Natural gas liquids ($ per Bbl) | 13.72 | 11.99 | 25.86 | 1.73 | 14 % | (13.87) | (54)% |
| Natural gas ($ per Mcf) | 2.50 | 2.63 | 4.06 | (0.13) | (5)% | (1.43) | (35)% |
| Oil equivalent ($ per Boe) | $ 22.09 | $ 24.80 | $ 59.79 | $ (2.71) | (11)% | $ (34.99) | (59)% |
| **Average Sales Price Including Derivatives[(2)]:** | | | | | | | |
| Oil ($ per Bbl) | $ 55.37 | $ 60.28 | $ 89.26 | $ (4.91) | (8)% | $ (28.98) | (32)% |
| Natural gas liquids ($ per Bbl) | 13.72 | 11.99 | 25.86 | 1.73 | 14 % | (13.87) | (54)% |
| Natural gas ($ per Mcf) | 3.07 | 3.12 | 4.13 | (0.05) | (2)% | (1.01) | (24)% |
| Oil equivalent ($ per Boe) | $ 29.03 | $ 32.23 | $ 60.22 | $ (3.20) | (10)% | $ (27.99) | (46)% |
| **REVENUES[(1)]:** | | | | | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 | $ (66,205) | (21)% | $ (230,916) | (43)% |
| Natural gas liquids sales | 81,744 | 69,011 | 66,989 | 12,733 | 18 % | 2,022 | 3 % |
| Natural gas sales | 107,816 | 98,797 | 60,188 | 9,019 | 9 % | 38,609 | 64 % |
| Total revenues | $ 431,326 | $ 475,779 | $ 666,064 | $ (44,453) | (9)% | $ (190,285) | (29)% |

(1) Excludes the realized impact of derivative instruments.

(2) Includes the realized impact of derivative instruments.

*Net Production.* Production increased from 19,184.4 MBoe in 2015 to 19,528.7 MBoe in 2016 due to our drilling program in 2016. The number of gross wells producing at year end and the production for the periods were as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | | 2015 | | 2014 | |
| | # Wells | MBoe | # Wells | MBoe | # Wells | MBoe |
| Catarina | 333 | 15,847 | 287 | 13,905 | 193 | 3,967 |
| Maverick | 36 | 888 | 24 | 409 | 18 | 182 |
| Cotulla | 49 | 1,279 | 121 | 2,108 | 111 | 2,865 |
| Palmetto | 76 | 511 | 72 | 874 | 64 | 1,771 |
| Marquis | 103 | 958 | 103 | 1,816 | 90 | 2,324 |
| TMS | 14 | 46 | 14 | 73 | 9 | 32 |
| Total | 611 | 19,529 | 621 | 19,184 | 485 | 11,141 |

In 2016, 33% of our production was oil, 30% was NGLs and 37% was natural gas compared to 2015 production that was 37% oil, 30% NGLs and 33% natural gas. In 2014, 55% of our production was oil, 23% NGLs and 22% natural gas. The change in production mix during the year ended December 31, 2016 was due to the increase in production from the producing properties in Catarina that have a higher proportion of NGL and natural gas production as compared to oil production from this area. Throughout the year ended December 2016, production from Catarina continued to increase in proportion to the total production, and as such, a higher proportion of NGL and natural gas was produced as compared to oil.

*Revenues.* Oil, NGL and natural gas sales revenues totaled approximately $431.3 million, $475.8 million, and $666.1 million for the years ended December 31, 2016, 2015 and 2014, respectively. Oil revenue for the year ended December 31, 2016 decreased $66.2 million, while revenues from NGL and natural gas sales revenue for the year ended December 31, 2016 increased $12.8 million and $9.0 million, respectively, as compared to the year ended December 31, 2015.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from the year ended December 31, 2015 to the year ended December 31, 2016 (in thousands, except average sales price):

| | 2016 Production Volume | 2015 Production Volume | Production Volume Difference | 2015 Average Sales Price | Revenue Increase/(Decrease) due to Production |
|---|---|---|---|---|---|
| Oil (MBbl) | 6,370 | 7,165 | (795) | $ 42.98 | $ (34,140) |
| Natural gas liquids (MBbl) | 5,960 | 5,754 | 206 | $ 11.99 | $ 2,470 |
| Natural gas (MMcf) | 43,189 | 37,594 | 5,595 | $ 2.63 | $ 14,704 |
| Total oil equivalent (MBoe) | 19,529 | 19,184 | 345 | $ 24.80 | $ (16,966) |

| | 2016 Average Sales Price | 2015 Average Sales Price | Average Sales Price Difference | 2016 Production Volume | Revenue Increase/(Decrease) due to Price |
|---|---|---|---|---|---|
| Oil (MBbl) | $ 37.95 | $ 42.98 | $ (5.03) | 6,370 | $ (32,065) |
| Natural gas liquids (MBbl) | $ 13.72 | $ 11.99 | $ 1.73 | 5,960 | $ 10,263 |
| Natural gas (MMcf) | $ 2.50 | $ 2.63 | $ (0.13) | 43,189 | $ (5,685) |
| Total oil equivalent (MBoe) | $ 22.09 | $ 24.80 | $ (2.71) | 19,529 | $ (27,487) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2016 by $43.1 million.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from the year ended December 31, 2014 to the year ended December 31, 2015 (in thousands, except average sales price):

| | 2015 Production Volume | 2014 Production Volume | Production Volume Difference | 2014 Average Sales Price | Revenue Increase/(Decrease) due to Production |
|---|---|---|---|---|---|
| Oil (MBbl) | 7,165 | 6,080 | 1,085 | $ 88.64 | $ 96,176 |
| Natural gas liquids (MBbl) | 5,754 | 2,590 | 3,164 | $ 25.86 | $ 81,834 |
| Natural gas (MMcf) | 37,594 | 14,828 | 22,766 | $ 4.06 | $ 92,412 |
| Total oil equivalent (MBoe) | 19,184 | 11,141 | 8,043 | $ 59.79 | $ 270,422 |

| | 2015 Average Sales Price | 2014 Average Sales Price | Average Sales Price Difference | 2015 Production Volume | Revenue Increase/(Decrease) due to Price |
|---|---|---|---|---|---|
| Oil (MBbl) | $ 42.98 | $ 88.64 | $ (45.66) | 7,165 | $ (327,092) |
| Natural gas liquids (MBbl) | $ 11.99 | $ 25.86 | $ (13.87) | 5,754 | $ (79,812) |
| Natural gas (MMcf) | $ 2.63 | $ 4.06 | $ (1.43) | 37,594 | $ (53,803) |
| Total oil equivalent (MBoe) | $ 24.80 | $ 59.79 | $ (34.99) | 19,184 | $ (460,707) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2015 by $47.6 million.

***Operating Costs and Expenses***

The table below presents a detail of operating costs and expenses for the periods indicated (in thousands except percentages):

| | Year Ended December 31, | | | Increase (Decrease) | | | |
|---|---|---|---|---|---|---|---|
| | | | | 2016 vs 2015 | | 2015 vs 2014 | |
| | 2016 | 2015 | 2014 | $ | % | $ | % |
| **OPERATING COSTS AND EXPENSES:** | | | | | | | |
| Oil and natural gas production expenses | $ 164,567 | $ 156,528 | $ 93,581 | $ 8,039 | 5 % | $ 62,947 | 67 % |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 | (7,237) | (27)% | (10,917) | (29)% |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 | (184,812) | (54)% | 6,475 | 2 % |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 | (1,195,954) | (88)% | 1,151,179 | * |
| General and administrative [(1)] | 110,081 | 74,160 | 63,692 | 35,921 | 48 % | 10,468 | 16 % |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 | (1,344,043) | (68)% | 1,220,152 | 163 % |
| | | | | | | | |
| Interest income and other income (expense) | 990 | (2,163) | 289 | 3,153 | * | (2,452) | * |
| Interest expense | (126,973) | (126,399) | (89,800) | 574 | (0)% | 36,599 | (41)% |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 | (226,035) | (131)% | 35,681 | 26 % |
| Income tax benefit (expense) | (1,825) | (7,600) | 11,429 | 5,775 | (76)% | (19,029) | * % |

*   Not meaningful.

(1)Includes stock-based compensation expense of $37.1 million, $14.8 million and $12.8 million for the years ended December 31, 2016, 2015 and 2014,

respectively, and includes acquisition and divestiture costs of $8.1 million, $3.8 million and $1.8 million for the years ended December 31, 2016, 2015 and 2014, respectively.

Case 19-34508 Document 1853-21 Filed in TXSB on 08/24/20 Page 173 of 1725

*Oil and Natural Gas Production Expenses.* Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Such costs also include field personnel costs, utilities, chemical additives, salt water disposal, maintenance, repairs and occasional well workover expenses related to our oil and natural gas properties. Our oil and natural gas production expenses increased 5% to $164.6 million for the year ended December 31, 2016, as compared to $156.5 million for the same period in 2015 and $93.6 million for the same period in 2014. The increase in oil and natural gas production expenses from 2014 to 2016 is directly attributable to our increased production activities in the Eagle Ford Shale, as a result of increased drilling in our Catarina acreage, acquired in 2014. In addition, there was an increase in gathering and transportation costs primarily related to the Gathering Agreement with SPP that began in October 2015. Our average production expenses increased from $8.16 per Boe during the year ended December 31, 2015 to $8.43 per Boe for the year ended December 31, 2016. This increase was due primarily to the increase in gathering and transportation costs, which had an increased from $3.93 per Boe for the year ended December 31, 2015 to $6.29 per Boe for the year ended December 31, 2016. While we expect our oil and natural gas production expenses to increase as we add producing wells, we expect to continue our efficient operation of our properties, and do not expect significant increases in our average production expenses per Boe.

*Production and Ad Valorem Taxes.* Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach by a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $19.6 million, $26.9 million and $37.8 million for the years ended December 31, 2016, 2015 and 2014, respectively. The tax decrease from 2015 to 2016 is attributable to the decrease in revenues of 9% between the periods and the decrease in appraised property values from the sustained decline in commodity prices and decrease in drilling activity during the current period. This tax decrease from 2014 to 2015 was attributable to the decrease in revenues of 29% between the periods and the decrease in appraised property values due to the decline in commodity prices between the periods. Our average production and ad valorem taxes decreased from $1.40 per Boe during the year ended December 31, 2015 to $1.01 per Boe for the year ended December 31, 2016. This decrease in rate is attributable to the decrease in expense by 27% from 2015 to 2016 coupled with the increase in production volumes by 2% from 2015 to 2016. In addition, the majority of our horizontal wells are characterized as tight gas wells, which apply a reduced production tax rate after certification from the state regulatory body. Until the Company receives the proper certification, the normal production tax rates are applied to the wells, and once the certification is approved, the reduced rates are applied and tax credits are received from the state. The timing of receipt of the certifications and tax credits vary from well to well.

*Depreciation, Depletion, Amortization, and Accretion.* Depletion, depreciation, amortization, and accretion ("DD&A") reflects the systematic expensing of the capitalized costs incurred in the acquisition, exploration and development of oil and natural gas properties. We use the full-cost method of accounting and accordingly, we capitalize all costs associated with the acquisition, exploration and development of oil and natural gas properties, including unproved and unevaluated property costs. Internal costs are capitalized only to the extent they are directly related to acquisition, exploration and development activities and do not include any costs related to production, selling or general corporate administrative activities. Capitalized costs of oil and natural gas properties are amortized using the units of production method based upon production and estimates of proved oil and natural gas reserve quantities. Unproved and unevaluated property costs are excluded from the amortizable base used to determine DD&A expense.

Our DD&A expense for the year ended December 31, 2016 decreased to $159.8 million ($8.18 per Boe) from $344.6 million ($17.96 per Boe) in 2015 and $338.1 million in 2014 ($30.35 per Boe). The majority of the decrease in DD&A is related to a decrease in the depletion rate, resulting primarily from a decrease in the full-cost pool proved property amortization base as result of approximately $1,748 million of full-cost ceiling impairments recorded over the periods from the fourth quarter 2014 to the third quarter 2016. We did not record a full-cost ceiling impairment during the fourth quarter 2015 or fourth quarter 2016. This was slightly offset by an increase in production between the periods. Higher production in 2016 as compared to 2015 resulted in a $6.2 million increase in depletion expense and the change in depletion rate resulted in an offsetting $191.0 million decrease in depletion expense. Higher production in 2015 as compared to 2014 resulted in a $244.1 million increase in depletion expense and the change in depletion rate resulted in an offsetting $237.6 million decrease in depletion expense.

 

*Impairment of Oil and Natural Gas Properties.* We utilize the full cost method of accounting to account for our oil and natural gas exploration and development activities. Under this method of accounting, we are required on a quarterly basis to determine whether the book value of our oil and natural gas properties (excluding unevaluated properties) is less than or equal to the "ceiling," based upon the expected after tax present value (discounted at 10%) of the future net cash flows from our proved reserves. Any excess of the net book value of our oil and natural gas properties over the ceiling must be recognized as a non-cash impairment expense. We recorded a full cost ceiling test impairment after income taxes of $22.1 million, $87.4 million, and $59.6 million for the three months ended March 31, 2016, June 30, 2016, and September 30, 2016, respectively, and did not record a full cost ceiling impairment during the fourth quarter 2016. We recorded a full cost ceiling test impairment after income taxes of $441.5 million, $468.9 million, and $454.6 million for the three months ended March 31, 2015, June 30, 2015, and September 30, 2015, respectively, and did not record a full-cost ceiling impairment during the fourth quarter 2015. We recorded a full cost ceiling test impairment before income taxes of $213.8 million for the year ended December 31, 2014. The impact of less favorable commodity prices adversely affecting estimated proved reserve volumes and future estimated revenues was the main contributor to the ceiling impairments. Changes in production rates, levels of reserves, future development costs, transfers of unevaluated properties, and other factors will determine our actual ceiling test calculation and impairment analyses in future periods. Based upon known improvements in the current NYMEX forward prices, we believe that there is a reasonable likelihood of an increase in the average 12 month trailing first-day-of-the-month pricing in the first quarter of 2017.

If the simple average of oil and natural gas prices as of the first day of each month for the trailing 12-month period ended December 31, 2016 had been $2.78 per MMbtu for natural gas, $47.62 per Bbl of oil, and $24.70 per Bbl of NGL, while all other factors remained constant, our ceiling test limitation related to the net book value of our proved oil and natural gas properties would have increased by approximately $389.2 million and our net PUD and total proved reserves would have increased by approximately 4.8 MMBoe and 11.8 MMBoe, respectively. The aforementioned prices were calculated based on a 12-month simple average, which includes the oil and natural gas prices on the first day of the month for the 11 months ended February 2017 and the February 2017 prices were held constant for the remaining one month. This calculation of the impact of volatile commodity prices is prepared based on the presumption that all other inputs and assumptions are held constant with the exception of oil, natural gas, and NGL prices. Therefore, this calculation strictly isolates the impact of commodity prices on our ceiling test limitation and proved reserves. The impact of price is only a single variable in the estimation of our proved reserves and other factors noted above could have a significant impact on future reserves and the present value of future cash flows. There are numerous uncertainties inherent in the estimation of proved reserves and accounting for oil and natural gas properties in subsequent periods and this pro forma estimate should not be construed as indicative of our development plans or future results.

*General and Administrative Expenses.* Our G&A expenses, totaled $110.1 million for the year ended December 31, 2016 compared to $74.2 million and $63.7 million for the same periods in 2015 and 2014, respectively. This increase was due primarily to additional costs for added personnel at SOG performing services for the Company and for consulting services and increased fees for legal services during 2016. Our G&A expenses per Boe increased from $3.87 per Boe for the year ended December 31, 2015 to $5.64 per Boe for the year ended December 31, 2016. Our G&A expenses totaled $74.2 million ($3.87 per Boe) for the year ended December 31, 2015 compared to $63.7 million ($5.72 per Boe) for the same period in 2014. This increase was due primarily to additional costs for added personnel at SOG performing services for the Company and for consulting services and increased fees for legal services during 2015.

We recorded stock-based compensation expense of $37.1 million for the year ended December 31, 2016 as compared to expense of $14.8 million for the year ended December 31, 2015. The increase was due primarily to the increase in awards made during the year and the associated amortization recognized in addition to the increase in the stock price from period to period. We recorded stock-based compensation expense of $14.8 million and $12.8 million for the year ended December 31, 2015, and 2014, respectively. The increase from 2014 to 2015 was due primarily to the increase in awards made during the year and the associated amortization recognized offset by a decrease in the Company's stock price from period to period. The Company records stock-based compensation expense for awards granted to non-employees at fair value and the unvested awards are revalued each period, impacting the amortization over the remaining life of the awards.

We recorded costs associated with the Carnero Gathering Sale, Carnero Processing Sale, Production Asset Transaction, Cotulla Sale, and the pending Comanche Acquisition that are included in G&A of $8.1 million for the year ended December 31, 2016. We recorded costs associated with the Palmetto Disposition and the Western Catarina Midstream Divestiture that are included in G&A of $3.8 million for the year ended December 31, 2015. We recorded costs associated with the Catarina Acquisition of $1.8 million for the year ended December 31, 2014.

Adjusted G&A, excluding stock-based compensation expense and acquisition and divestiture costs included in G&A, totaled $64.9 million ($3.32 per Boe), $55.5 million ($2.89 per Boe), and $49.0 million ($4.40 per Boe) for the years ended December 31, 2016, 2015 and 2014, respectively.

*Interest Expense.* For the year ended December 31, 2016, interest expense totaled $127.0 million and included $7.8 million in amortization of debt issuance costs. This is compared to the year ended December 31, 2015, for which interest expense totaled $126.4 million and included $7.5 million in amortization of debt issuance costs. The interest expense incurred during the year ended December 31, 2016 is primarily related to the 7.75% Notes (as defined in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt") and 6.125% Notes (as defined in "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt").

For the year ended December 31, 2015, interest expense totaled $126.4 million and included $7.5 million in amortization of debt issuance costs. This is compared to the year ended December 31, 2014, for which interest expense totaled $89.8 million and included $9.0 million in amortization of debt issuance costs and write-offs of previously incurred debt issuance costs in connection with the unused senior unsecured bridge facility obtained as part of the Catarina Acquisition that expired. The interest expense incurred during the year ended December 31, 2015 is primarily related to the 7.75% Notes (as defined in Note 5, "Long-Term Debt") and 6.125% Notes (as defined in Note 5, "Long-Term Debt").

*Commodity Derivative Transactions.* We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the year ended December 31, 2016, we recognized a net loss of $53.1 million on our commodity derivative contracts, which included net gains of $135.6 million associated with the settlements of commodity derivative contracts, offset by mark to market losses of $188.7 million on unsettled commodity derivative contracts. The mark to market losses were a result of the increase in estimated future commodity prices as compared to the derivative settlement prices. The settlement gains realized during the period were primarily the result of decreases in commodity prices from the time the trades were entered until the time of cash settlement for trades that liquidated by their terms during the current period. During the year ended December 31, 2015, we recognized a net gain of $172.9 million on our commodity derivative contracts, which included net gains of $142.5 million associated with the settlements of commodity derivative contracts. During the year ended December 31, 2014, we recognized a net gain of $137.2 million on our commodity derivative contracts, which included net gains of $4.9 million associated with the settlements of commodity derivative contracts.

*Income tax expense.* For the year ended December 31, 2016, the Company recorded income tax expense of $1.8 million. Our effective tax rate for the year ended December 31, 2016 was (0.7)% as compared to a statutory rate of 35%. The difference between the statutory rate and the Company's effective tax rate is primarily related to the valuation allowance of approximately $86.6 million recorded during the period. For the year ended December 31, 2015, the Company recorded income tax expense of $7.6 million. Our effective tax rate for the year ended December 31, 2015 was (0.5)% as compared to a statutory rate of 35%. The difference between the statutory rate and the Company's effective tax rate is related to the valuation allowance of approximately $515 million recorded during the period. We expect our effective tax rate going forward to be approximately 0% as we have recorded a full valuation allowance against our net deferred tax assets.

**Liquidity and Capital Resources**

As of December 31, 2016, we had approximately $502 million in cash and cash equivalents and a $300 million in borrowing capacity at the aggregate elected commitment amount under the Second Amended and Restated Credit Agreement with a syndicate of 16 participating banks, resulting in availability liquidity of approximately $802 million.

The Company recently announced a new 2017 capital spending plan of approximately $425 million to $475 million. The new spending plan was approved in conjunction with the anticipated close of the Comanche Acquisition in March 2017 along with expected improvements in commodity prices during 2017. We may from time to time seek to retire or purchase our outstanding debt as well as our outstanding equity securities, both common stock and preferred stock, through cash purchases and/or exchanges for equity securities and/or debt securities, as applicable, in open market purchases, privately negotiated transactions or otherwise. Such repurchases or exchanges, if any, will depend on prevailing market conditions, our liquidity requirements, contractual restrictions and other factors. The amounts involved may be material.

For a description of current and previous credit agreements along with the indentures covering our Senior Notes refer to "Item 8. Financial Statements and Supplementary Data — Note 5, Long-Term Debt."

On February 6, 2017, we closed a firm commitment underwritten public offering of shares of our common stock and received net proceeds of approximately $135.9 million (after deducting underwriting discounts). We intend to use the net proceeds of the offering for general corporate purposes, including working capital.

Under the terms of SN UnSub's preferred unit financing with GSO, if consummated the preferred units held by GSO in SN UnSub will receive a quarterly dividend of 10.0% per annum on the preferred units, payable in cash or in kind at SN UnSub's election, provided that to the extent permitted under SN UnSub's debt arrangements, SN UnSub will be required to pay the quarterly dividend in cash. After the first anniversary of the closing of the Anadarko transactions, to the extent permitted under SN UnSub's debt arrangements, SN UnSub may apply all available cash to make additional payments towards the Base Return (as defined below) or redeem the preferred units. SN UnSub may not make cash distributions on the SN UnSub common units held by us until the preferred units are redeemed in full, and the preferred units would have priority over the common units, to the extent of the Base Return, upon a liquidation, a change of control or any redemption of the preferred units.

GSO will have the option to request SN UnSub to redeem the preferred units for the greater of (i) a 14.0% internal rate of return and (ii) a 1.50x return on investment (the "Base Return") following the seventh anniversary of issuance. If the preferred units are not so redeemed, GSO may cause a sale of the assets or equity of SN UnSub, or obtain majority control of SN UnSub's board of directors.

SN UnSub may at any time redeem the preferred units in whole or in part for cash for the Base Return.

GSO's approval is required for a number of actions by UnSub (unless the preferred units are redeemed at or prior to such actions), including:

- incurring additional debt or providing guarantees in respect of obligations of other persons;
- amending material debt instruments or the JDA;
- effecting a change of control, liquidation or dissolution;
- selling or acquiring assets or modifying hedging arrangements;
- issuing any additional capital stock;
- filing for bankruptcy; and
- incurring general and administrative costs in excess of $5 million.

In connection with the Comanche Acquisition, on January 12, 2017, SN UnSub, JPMorgan Chase Bank, N.A., Citibank, N.A., and certain of their affiliates entered into a debt commitment letter with respect to the SN UnSub Credit

Facility. The new facility is expected to be on substantially the same terms as our existing facility, conformed to current market conditions and non-recourse to our other assets.

**Cash Flows**

Our cash flows for the years ended December 31, 2016, 2015 and 2014 are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Cash Flow Data:** | | | |
| Net cash provided by operating activities | $ 181,251 | $ 272,025 | $ 415,335 |
| Net cash used in investing activities | $ (108,637) | $ (294,331) | $ (1,361,264) |
| Net cash provided by (used in) financing activities | $ (5,745) | $ (16,360) | $ 1,266,112 |

*Net Cash Provided by Operating Activities.* Net cash provided by operating activities was $181.3 million for the year ended December 31, 2016 compared to $272.0 million and $415.3 million for the same periods in 2015 and 2014, respectively. This decrease was related to the unfavorable impact of lower average commodity prices between the periods, partially offset by higher sales volumes.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company partially mitigates by entering into commodity derivatives. Sales volume changes also impact cash flow. The Company's cash flows from operating activities are also dependent on the costs related to continued operations and debt service.

*Net Cash Used in Investing Activities.* Net cash flows used in investing activities totaled $108.6 million for the year ended December 31, 2016 compared to $294.3 million and $1.4 billion for the same periods in 2015 and 2014, respectively. Capital expenditures for leasehold and drilling activities for the year ended December 31, 2016 totaled $313.3 million, primarily associated with bringing online 48 gross wells and expanding our acreage and asset development position in the Eagle Ford Shale through leasing. We spent approximately $36.5 million towards equity method investments prior to selling these investments in the Carnero Gathering Sale and Carnero Processing Sale (further discussed in Note 16, "Investments") for a combined cash inflow of approximately $92.5 million. In addition, we received cash of approximately $153.5 million for the Cotulla Sale, purchased common units of SPP for $25 million, and invested approximately $5.4 million in other assets.

For the year ended December 31, 2015, we incurred capital expenditures for leasehold and drilling activities of $656.1 million, primarily associated with bringing online 136 gross wells. We received total cash of approximately $427.6 million for the Palmetto Disposition and the Western Catarina Midstream Divestiture, while spending approximately $50.0 million towards equity method investments (further discussed in Note 16, "Investments") and $8.0 million for the Buyout Agreement (defined in Note 9, "Related Party Transactions" below). In addition, we invested $8.1 million in other assets.

For the year ended December 31, 2014, we incurred capital expenditures for leasehold and drilling activities of $791.3 million, primarily associated with bringing online 121 gross wells. We paid cash of $557.1 million for the oil and natural gas properties acquired in the Catarina Acquisition. We received cash of $0.7 million and $0.5 million as final settlement for the oil and natural gas properties acquired in the Cotulla and Wycross Acquisitions, respectively. In addition, we invested $14.1 million in other property and equipment.

*Net Cash Provided by (Used in) Financing Activities.* Net cash flows used in financing activities totaled $5.7 million for the year ended December 31, 2016 compared to $16.4 million net cash flows used in financing activities and $1.3 billion in cash provided by financing activities for the same period in 2015 and 2014, respectively.