During the year ended December 31, 2016, we made payments of $4.0 million for dividends on our Series A Preferred Stock and Series B Preferred Stock, and payments of approximately $1.7 million for deferred financing costs associated with the Sixth Amendment to the Second Amended and Restated Credit Agreement.

During the year ended December 31, 2015, we made payments of $16.0 million for dividends on our Series A Convertible Perpetual Preferred Stock and Series B Convertible Perpetual Preferred Stock.

During the year ended December 31, 2014, we received net proceeds from the issuance of common stock of $167.5 million, after deducting offering costs payable by us of $8.7 million. We also made payments of $16.3 million for dividends on our Series A Preferred Stock and Series B Preferred Stock. We received net proceeds of approximately $1.12 billion from the issuance of our 6.125% Notes, consisting of a face value of $1.15 billion, including the Additional 6.125% Notes which were issued at a premium to face value of $2.3 million, less debt issuance costs of $27.4 million. Other debt issuance costs for the year ended December 31, 2016 totaled $10.0 million. On May 12, 2014, the Company borrowed $100 million under the Amended and Restated Credit Agreement. The Company used proceeds from the issuance of the Original 6.125% Notes to repay the $100 million outstanding under the Amended and Restated Credit Agreement, in addition to funding a portion of the purchase price of the Catarina Acquisition.

**Commitments and Contractual Obligations**

Refer to "Item 8. Financial Statements and Supplementary Data — Note 14, Commitments and Contingencies" for a description of lawsuits pending against the Company.

During the year ended December 31, 2015, the Company entered into the Gathering Agreement with SPP as part of the Western Catarina Midstream Divestiture (defined below in "Item 8. Financial Statements and Supplementary Data — Note 3, Acquisitions and Divestitures") that provides a firm commitment of oil and natural gas volumes at a fixed gathering fee. The Gathering Agreement represents an operating lease of the Catarina midstream assets. The firm commitment term under the Gathering Agreement commenced on October 14, 2015 and continues until October 13, 2020. As of December 31, 2016, our contractual obligations included our Senior Notes, interest expense on our Senior Notes, asset retirement obligations, rent expense for our corporate offices, lease of the Catarina midstream assets and other long term lease payments. The following table summarizes our contractual obligations as of December 31, 2016 (in thousands):

| | Less than 1 year | 1 - 3 years | 3 - 5 years | More than 5 years | Total |
|---|---|---|---|---|---|
| Senior Notes | $ — | $ — | $ 600,000 | $ 1,150,000 | $ 1,750,000 |
| Interest expense (1) | 116,938 | 233,875 | 210,625 | 105,655 | 667,093 |
| Asset retirement obligations (2) | — | — | — | 25,087 | 25,087 |
| Office rent (3) | 5,213 | 10,680 | 11,038 | 18,741 | 45,672 |
| Midstream assets lease (4) | 41,928 | 83,857 | 32,854 | — | 158,639 |
| Other leases (5) | 1,791 | 3,583 | 3,584 | 3,131 | 12,089 |
| Total | $ 165,870 | $ 331,995 | $ 858,101 | $ 1,302,614 | $ 2,658,580 |

(1)Represents estimated interest payments that will be due under the $600 million 7.75% Notes and $1,150 million 6.125% Notes that will mature on June 15, 2021 and January 15, 2023, respectively.

(2)Amounts represent the present value of our estimate of future asset retirement obligations. Because these costs typically extend many years into the future, estimating these future costs requires management to make estimates and judgments that are subject to future revisions based upon numerous factors, including the rate of inflation, changing technology and the political and regulatory environment. See "Item 8. Financial Statements and Supplementary Data — Note 12, Asset Retirement Obligations."

(3)Represents payments due for leasing corporate office space in Houston, Texas. The lease began on November 1, 2014 and continues until March 31, 2025.

(4)Represents payments due with respect to firm commitment oil and natural gas volumes under the Gathering Agreement contract signed with SPP as part of the Western Catarina Midstream Divestiture. As part of this sale, the

Gathering Agreement represents an operating lease of the Catarina midstream assets. The firm commitment term under the Gathering Agreement commenced on October 14, 2015 and continues until October 13, 2020.

(5)Represents payments due for a ground lease agreement for land owned by the Calhoun Port Authority which commenced on August 25, 2014 and continues until August 25, 2024. Also represents payments due for an acreage lease agreement for a promotional ranch managed by the Company in Kenedy County, Texas which commenced on March 1, 2014 and continues until February 28, 2024.

In connection with the Catarina Acquisition, the 77,000 acres of undeveloped acreage that were included in the acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. Our current capital budget and plans include the drilling of at least the minimum number of wells required to maintain access to such undeveloped acreage.

The lease agreement for the acreage in Kenedy County, Texas includes a contractual requirement for the Company to spend a minimum of $4 million to make permanent improvements over the ten year life of the lease. The lease agreement does not specify the timing for such improvements to be made within the lease term. The Company has the right to terminate the lease obligation without penalty at any time with nine months advanced written notice and payment of any accrued leasehold expenses.

The Company's ground lease with the Calhoun Port Authority is terminable upon 180 days written notice by the Company to the lessor in addition to a $1 million termination payment.

**Off-Balance Sheet Arrangements**

As of December 31, 2016, we did not have any off-balance sheet arrangements.

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon consolidated financial statements that have been prepared in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses. Our significant accounting policies are described in "Item 8. Financial Statements and Supplementary Data — Note 2, Basis of Presentation and Summary of Significant Accounting Policies." When we prepare our financial statements, we review our estimates, including those related to oil, NGL and natural gas revenues, oil and natural gas properties, oil, NGL and natural gas reserves, fair value of derivative instruments, abandonment liabilities, income taxes, commitments and contingencies, depreciation, depletion and amortization, and full cost ceiling calculation. Our estimates are based on historical experience and various assumptions that we believe to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions. We believe the following critical accounting policies affect our more significant judgments and estimates used in the preparation of our consolidated financial statements.

***Oil and Natural Gas Properties***

The Company's oil and natural gas properties are accounted for using the full cost method of accounting. All direct costs and certain indirect costs associated with the acquisition, exploration and development of oil and natural gas properties are capitalized. Once evaluated, these costs, as well as the estimated costs to retire the assets, are included in the amortization base and amortized to depletion expense using the units-of-production method. Depletion is calculated based on estimated proved oil and natural gas reserves. Proceeds from the sale or disposition of oil and natural gas properties are

applied to reduce net capitalized costs unless the sale or disposition causes a significant change in the relationship between costs and the estimated quantities of proved reserves.

*Full Cost Ceiling Test*—Capitalized costs (net of accumulated depreciation, depletion and amortization and deferred income taxes) of proved oil and natural gas properties are subject to a full cost ceiling limitation. The ceiling limits these costs to an amount equal to the present value, discounted at 10%, of estimated future net cash flows from estimated proved reserves less estimated future operating and development costs, abandonment costs (net of salvage value) and estimated related future income taxes. In accordance with SEC rules, the oil and natural gas prices used to calculate the full cost ceiling are the 12-month average prices, calculated as the unweighted arithmetic average of the first-day-of-the-month price for each month within the 12-month period prior to the end of the reporting period, unless prices are defined by contractual arrangements. Prices are adjusted for "basis" or location differentials. Prices are held constant over the life of the reserves. If unamortized costs capitalized within the cost pool exceed the ceiling, the excess is charged to expense and separately disclosed during the period in which the excess occurs. Amounts thus required to be written off are not reinstated for any subsequent increase in the cost center ceiling. During the year ended December 31, 2016, the Company recorded a full cost ceiling test impairment after income taxes of $169.0 million. During the year ended December 31, 2015, the Company recorded a full cost ceiling test impairment after income taxes of $1,365 million. During the year ended December 31, 2014, the Company recorded a full cost ceiling test impairment before income taxes of $213.8 million.

*Depreciation, depletion, amortization and accretion*—DD&A is provided using the units-of-production method based upon estimates of proved oil, NGL and natural gas reserves with oil, NGL and natural gas production being converted to a common unit of measure based upon their relative energy content. All capitalized costs of oil and natural gas properties, including the estimated future costs to develop proved reserves, are amortized using the units-of-production method based on total proved reserves. Investments in unproved properties and major development projects are not amortized until proved reserves associated with the projects can be determined or until impairment occurs. If the results of an assessment indicate that the properties are impaired, the amount of the impairment is added to the capitalized costs to be amortized. Once the assessment of unproved properties is complete and when major development projects are evaluated, the costs previously excluded from amortization are transferred to the full cost pool and amortization begins. The amortizable base includes estimated future development costs and where significant, dismantlement, restoration and abandonment costs, net of estimated salvage value.

In arriving at depletion rates under the units-of-production method, the quantities of recoverable oil and natural gas reserves are established based on estimates made by internal and third party geologists and engineers, which require significant judgment as does the projection of future production volumes and levels of future costs, including future development costs. In addition, considerable judgment is necessary in determining when unproved properties become impaired and in determining the existence of proved reserves once a well has been drilled. All of these judgments may have significant impact on the calculation of depletion and impairment expense. At December 31, 2016, a 10% positive revision to proved reserves would decrease the depletion rate by approximately $0.67 per Boe and a 10% negative revision to proved reserves would increase the depletion rate by approximately $0.81 per Boe. Further, a 10% increase or decrease in estimated future development costs would increase or decrease the depletion rate by approximately $0.32 per Boe at December 31, 2016.

*Unproved Properties*—Costs associated with unproved properties and properties under development are excluded from the full cost amortization base until the properties have been evaluated. Additionally, the costs associated with seismic data, leasehold acreage, and wells currently drilling are also initially excluded from the amortization base. Unproved properties are identified on a project basis, with a project being an area in which significant leasehold interests are acquired within a contiguous area. Unproved properties are reviewed periodically by management and transferred into the full cost pool subject to amortization when management determines that a project area has been evaluated through drilling operations or thorough geologic evaluation, or through determination that the unproved leases will no longer be drilled upon prior to the lease expiration.

***Oil and Natural Gas Reserves***

The Company's most significant estimates relate to its proved oil, NGL and natural gas reserves. The estimates of oil, NGL and natural gas reserves as of December 31, 2016, 2015 and 2014 are based on reports prepared by a third party engineering firm, Ryder Scott.

Estimates of proved reserves are based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Ryder Scott has historically prepared a reserve and economic evaluation of the Company's properties, utilizing information provided to it by management and other information available, including information from the operators of the property.

The standards of the FASB and rules of the SEC permit the use of new technologies to determine proved reserve estimates if those technologies have been demonstrated empirically to lead to reliable conclusions about reserve volume estimates. These rules allow, but do not require, companies to disclose their probable and possible reserves to investors in documents filed with the SEC.

In addition, the disclosure guidelines require companies to report oil and natural gas reserves using an average price based upon the prior 12-month first-day-of-the-month price rather than a period-end price.

Reserves and their relation to estimated future net cash flows impact the depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The reserve estimates and the projected cash flows derived from these reserve estimates are prepared in accordance with SEC guidelines. The independent engineering firm noted above adheres to these guidelines when preparing their reserve reports. The accuracy of the reserve estimates is a function of many factors including the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions, and the judgments of the individuals preparing the estimates, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered. Additionally, with other factors held constant, if the commodity prices used in our reserve report as of December 31, 2016 had decreased by 10%, then the standardized measure of our estimated proved reserves as of that date would have decreased by approximately $216.7 million, from approximately $513.4 million to approximately $296.7 million.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, well life, inflation and credit-adjusted risk free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset. Upon settlement of the liability, any gain or loss is treated as an adjustment to the full cost pool.

***Income Taxes***

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities arise from the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary difference and carryforwards are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce the deferred tax asset to the amount more likely than not to be recovered.

Additionally, the Company is required to determine whether it is more likely than not (a likelihood of more than 50%) that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position in order to record any financial statement benefit. If that step is satisfied, then the Company must measure the tax position to determine the amount of benefit to recognize in the financial statements. The tax position is measured at the largest amount of benefit that has greater than a 50% likelihood

of being realized upon ultimate settlement. Any interest or penalties would be recognized as a component of income tax expense.

The Company applies significant judgment in evaluating its tax positions and estimating its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The actual outcome of these future tax consequences could differ significantly from these estimates, which could impact the Company's financial position, results of operations and cash flows. The Company does not have any material uncertain tax positions during the years ended December 31, 2016, 2015 or 2014.

***Stock-Based Compensation***

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of ASC 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

Awards granted to employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expense equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered.

For the restricted stock awards and phantom stock awards granted to non-employees, stock-based compensation expense is based on fair value re-measured at each reporting period and recognized over the vesting period using the straight-line method. Compensation expense for these awards will be revalued at each period end until vested.

***Revenue Recognition***

Oil, NGL and natural gas sales are recognized when production is sold to a purchaser at a fixed or determinable price, delivery has occurred, title has transferred, and collectability of the revenue is probable. Delivery occurs and title is transferred when production has been delivered to a pipeline, railcar or truck, or a tanker lifting has occurred. The sales method of accounting is used for oil, NGL and natural gas sales such that revenues are recognized based on our share of actual proceeds from the oil, NGLs and natural gas sold to purchasers. Oil and natural gas imbalances are generated on properties for which two or more owners have the right to take production "in-kind" and, in doing so, take more or less than their respective entitled percentage.

***Derivative Instruments***

At times we may utilize derivative instruments to manage our exposure to fluctuations in the underlying commodity prices for the products sold by us. The carrying amount of derivative assets and liabilities is reported on the balance sheet at the estimated fair value of the derivative instruments. Our management sets and implements all of our hedging policies, including volumes, types of instruments and counterparties, on a monthly basis. These derivative transactions are not designated as cash flow hedges. Accordingly, these derivative contracts are marked-to-market and any changes in the estimated value of derivative contracts held at the balance sheet date are recognized in the statement of operations as net gains (losses) on commodity derivatives.

**Item 7A.** ***Quantitative and Qualitative Disclosures about Market Risk***

We are exposed to market risk, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The term “market risk” refers to the risk of loss arising from adverse changes in oil, NGLs and natural gas prices and interest rates. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our major market risk exposure is in the pricing that we receive for our oil, NGL and natural gas production. Realized pricing is primarily driven by the prevailing market prices applicable to our oil, NGL and natural gas production. Pricing for oil, NGL and natural gas has been volatile and unpredictable for several years, and this volatility is expected to continue in the future. The prices we receive for our oil, NGL and natural gas production depend on many factors outside of our control, such as the strength of the global economy.

To reduce the impact of fluctuations in oil and natural gas prices on the Company’s revenues, or to protect the economics of property acquisitions, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or, through options, modify the future prices to be realized. These transactions may include price swaps whereby the Company will receive a fixed price for its production and pay a variable market price to the contract counterparty. Additionally, the Company may enter into collars, whereby it receives the excess, if any, of the fixed floor over the floating rate or pays the excess, if any, of the floating rate over the fixed ceiling price. In addition, the Company enters into option transactions, such as puts or put spreads, as a way to manage its exposure to fluctuating prices. These hedging activities are intended to support oil and natural gas prices at targeted levels and to manage exposure to oil and natural gas price fluctuations. It is never the Company’s intention to enter into derivative contracts for speculative trading purposes. Please refer to “Item 8. Financial Statements and Supplementary Data — Note 10, Derivative Instruments” for a description of all of our derivatives covering anticipated future production as of December 31, 2016. In connection with the pending Comanche Acquisition, we expect to hedge a portion of projected future production attributable to the pending Comanche Acquisition, using hedge transactions that are consistent with the Company’s current hedging strategy.

At December 31, 2016, the fair value of our commodity derivative contracts was a net liability of approximately $37.1 million (inclusive of approximately $2.1 million liability for premiums incurred but not paid). We have commodity derivative contracts in place covering approximately 35% of the mid-point of our total estimated oil production and approximately 99% of the mid-point of our total estimated natural gas production for 2017. A 10% increase in the oil and natural gas index prices above the December 31, 2016 prices would result in a decrease in the fair value of our commodity derivative contracts of $110.8 million; conversely, a 10% decrease in the oil and natural gas index prices would result in an increase of $108.5 million.

**Interest Rate Risk**

As of December 31, 2016, no amounts were outstanding under our Second Amended and Restated Credit Agreement. Our 7.75% Notes bear a fixed interest rate of 7.75% with an expected maturity date of June 15, 2021, and we had $600 million outstanding as of December 31, 2016. Our 6.125% Notes bear a fixed interest rate of 6.125% with an expected maturity date of January 15, 2023, and we had $1.15 billion outstanding as of December 31, 2016. We currently do not have any interest rate derivative contracts in place. If we incur significant debt with a risk of fluctuating interest rates in the future, we may enter into interest rate derivative contracts on a portion of our then outstanding debt to mitigate the risk of fluctuating interest rates.

**Item 8.** ***Financial Statements and Supplementary Data***

The information required by this Item is included in this report as set forth in the “Index to Consolidated Financial Statements” beginning on page F-1 of this Annual Report on Form 10-K and is incorporated by reference herein.

**Item 9.** ***Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

On June 19, 2015, the Company (i) dismissed BDO USA, LLP ("BDO") as the Company's independent registered public accounting firm and (ii) appointed KPMG LLP ("KPMG"), effective immediately, to serve as the Company's new independent registered public accounting firm to audit the Company's financial statements as of and for the fiscal year ending December 31, 2015. The Audit Committee of the Company pursuant to its charter exercised its sole authority to approve BDO's dismissal and KPMG's appointment as the Company's independent registered public accounting firm.

The report of BDO on the financial statements of the Company as of and for the fiscal year ended December 31, 2014 did not contain any adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope or accounting principles. During the Company's fiscal year ended December 31, 2014, and the interim period through June 19, 2015, (i) the Company had no disagreements with BDO on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to BDO's satisfaction, would have caused BDO to make reference to the subject matter of such disagreements in its reports on the financial statements of the Company for such years and (ii) there were no reportable events of the type described in Item 304(a)(1)(v) of Regulation S-K under the Securities Exchange Act of 1934, as amended, except the following material weakness:

1. In connection with the performance of its audit of the Company's financial statements for the year ended December 31, 2014, BDO reported that our internal control over financial reporting was not effective as of December 31, 2014 as a result of the identification of one material weakness related to an over-estimation of future development costs in the year-end reserve report. This material weakness was disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2014.

The Company provided BDO with a copy of the foregoing disclosure and requested that BDO furnish the Company with a letter addressed to the SEC stating whether or not BDO agreed with the statements above concerning BDO. In a letter attached to the Current Report on Form 8-K filed on June 23, 2015, BDO stated that it agreed with the aforementioned disclosure.

**Item 9A.** ***Controls and Procedures***

**Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures**

***Evaluation of Disclosure Controls and Procedures***

As required by Rule 13a-15(b) of the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. Based upon the evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were effective at December 31, 2016 at the reasonable assurance level.

***Management's Annual Report on Internal Control Over Financial Reporting and Attestation Report of the Registered Public Accounting Firm***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act). Even an effective system of internal control over financial reporting, no matter how well designed, has inherent limitations, including the

Case 19-34508 Document 1853-21 Filed in TXSB on 06/22/20 Page 157 of 1724

possibility of human error, circumvention of controls or overriding of controls and, therefore, can provide only reasonable assurance with respect to reliable financial reporting. Furthermore, the effectiveness of a system of internal control over financial reporting in future periods can change as conditions change. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2016. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (2013). Based on this assessment and such criteria, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

KPMG, an independent registered public accounting firm, has issued its report on the effectiveness of the Company's internal control over financial reporting at December 31, 2016. The report from KPMG is included in this Item 8 under the heading "Report of Independent Registered Public Accounting Firm."

**Report of Independent Registered Public Accounting Firm**

Please see Report of Independent Public Accounting Firm under "Item 8. Financial Statements and Supplementary Data" of this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting during the three months ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B.** ***Other Information***

None.

## PART III

**Item 10.** ***Directors, Executive Officers and Corporate Governance***

Information regarding our directors, executive officers and certain corporate governance items will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders, in either case, to be filed within 120 days after December 31, 2016, and is incorporated by reference to this report.

**Item 11.** ***Executive Compensation***

Information regarding executive compensation will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

Information regarding beneficial ownership and management and related stockholder matters will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 13.** ***Certain Relationships and Related Transactions, and Director Independence***

Information regarding certain relationships and related transactions and director independence will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**Item 14.** ***Principal Accountant Fees and Services***

Information regarding principal accounting fees and services will be included in an amendment to this Form 10-K or in the proxy statement for the 2017 annual meeting of stockholders and is incorporated by reference to this report.

**GLOSSARY OF SELECTED OIL AND NATURAL GAS TERMS**

The following includes a description of the meanings of some of the oil and natural gas industry terms used in this Annual Report on Form 10-K. The definitions "analogous reservoir," "development costs," "development project," "development well," "economically producible," "exploratory well," "field," "possible reserves," "probable reserves," "production costs," "proved area," "reservoir," "resources," and "unproved properties" have been excerpted from the applicable definitions contained in Rule 4-10(a) of Regulation S-X.

***American Petroleum Institute ("API") gravity:*** A system of classifying oil based on its specific gravity, whereby the greater the gravity, the lighter the oil.

***analogous reservoir:*** Analogous reservoirs, as used in resource assessments, have similar rock and fluid properties, reservoir conditions (depth, temperature, and pressure) and drive mechanisms, but are typically at a more advanced stage of development than the reservoir of interest and thus may provide concepts to assist in the interpretation of more limited data and estimation of recovery. When used to support proved reserves, analogous reservoir refers to a reservoir that shares all of the following characteristics with the reservoir of interest: (i) the same geological formation (but not necessarily in pressure communication with the reservoir of interest); (ii) the same environment of deposition; (iii) similar geologic structure; and (iv) the same drive mechanism.

***basin:*** A large depression on the earth's surface in which sediments accumulate.

***Bbl:*** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

***Bcf:*** One billion cubic feet of natural gas.

***black oil:*** A quality of oil with an API gravity of 40° or less and with a gas-to-oil ratio of 500 cubic feet per barrel or less.

***Boe:*** One barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Boe of oil.

***Boe/d:*** One Boe per day.

***btu:*** One British thermal unit, the quantity of heat required to raise the temperature of a one-pound mass of water by one degree Fahrenheit.

***completion:*** The process of treating a drilled well followed by the installation of permanent equipment for the production of oil or natural gas, or in the case of a dry hole, the reporting of abandonment to the appropriate agency.

***developed acreage:*** The number of acres that are allocated or assignable to producing wells or wells capable of production.

***development costs:*** Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and natural gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to: (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves; (ii) drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly; (iii) acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems; and (iv) provide improved recovery systems.

***development project:*** A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

***development well:*** A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

***differential:*** An adjustment to the price of oil or natural gas from an established spot market price to reflect differences in the quality and/or location of oil or natural gas.

***dry hole:*** A well found to be incapable of producing hydrocarbons in sufficient quantities such that proceeds from the sale of such production would exceed production expenses and taxes.

***economically producible:*** The term economically producible, as it relates to a resource, means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

***exploitation:*** A development or other project that may target proven or unproven reserves (such as probable or possible reserves), but that generally has a lower risk than that associated with exploration projects.

***exploratory well:*** A well drilled to find a new field or to find a new reservoir in a field previously found to be productive of oil or natural gas in another reservoir.

***field:*** An area consisting of a single reservoir or multiple reservoirs, all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The field name refers to the surface area, although it may refer to both the surface and the underground productive formations.

***gross acres or gross wells:*** The total acres or wells, as the case may be, in which we have working interest.

***horizontal drilling:*** A drilling technique used in certain formations where a well is drilled vertically to a certain depth and then drilled at a right angle within a specified interval.

***independent exploration and production company:*** A company whose primary line of business is the exploration and production of crude oil and natural gas.

***LLS:*** Louisiana light sweet crude.

***MBbl:*** One thousand Bbl.

***MBoe:*** One thousand Boe.

***Mcf:*** One thousand cubic feet of natural gas.

***MMBbl:*** One million Bbl.

***MMBoe:*** One million Boe.

***MMbtu:*** One million British thermal units.

***MMcf:*** One million cubic feet of natural gas.

***net acres or net wells:*** Gross acres or wells, as the case may be, multiplied by our working interest ownership percentage.

***net production:*** Production that is owned by us less royalties and production due others.

***net revenue interest:*** A working interest owner's gross working interest in production less the royalty, overriding royalty, production payment and net profits interests.

***NGLs:*** The combination of ethane, propane, butane and natural gasolines that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.

***NYMEX:*** New York Mercantile Exchange.

***operator:*** The individual or company responsible for the exploration and/or production of an oil or natural gas well or lease.

***possible reserves:*** Additional reserves that are less certain to be recovered than probable reserves.

***probable reserves:*** Additional reserves that are less certain to be recovered than proved reserves but that, in sum with proved reserves, are as likely as not to be recovered.

***production costs:*** Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

***productive well:*** A well that produces commercial quantities of hydrocarbons, exclusive of its capacity to produce at a reasonable rate of return.

***proved area:*** The part of a property to which proved reserves have been specifically attributed.

***proved developed reserves:*** Reserves that can be expected to be recovered through existing wells with existing equipment and operating methods.

***proved oil and natural gas reserves:*** The estimated quantities of oil, natural gas and NGLs that geological and engineering data demonstrate with reasonable certainty to be commercially recoverable in future years from known reservoirs under existing economic and operating conditions.

***proved undeveloped reserves:*** Proved reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion.

***realized price:*** The cash market price less all expected quality, transportation and demand adjustments.

***recompletion:*** The completion for production of an existing wellbore in another formation from that which the well has been previously completed.

***reserve:*** That part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination.

***reservoir:*** A porous and permeable underground formation containing a natural accumulation of producible oil and/or natural gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

***resources:*** Resources are quantities of oil and natural gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable and another portion may be considered unrecoverable. Resources include both discovered and undiscovered accumulations.

Case 22-34505 / 19-34508 Document 1853-21 / 685-21 Filed in TXSB on 06/22/22 / 05/24/20 Page 205 of 1725 / 105 of 1724

***spacing:*** The distance between wells producing from the same reservoir. Spacing is often expressed in terms of acres (e.g., 75 acre well-spacing) and is often established by regulatory agencies.

***standardized measure:*** The present value of estimated future after tax net revenue to be generated from the production of proved reserves, determined in accordance with the rules and regulations of the SEC (using prices and costs in effect as of the date of estimation), less future development, production and income tax expenses, and discounted at 10% per annum to reflect the timing of future net revenue. Standardized measure does not give effect to derivative transactions.

***trend:*** A geographic area with hydrocarbon potential.

***undeveloped acreage:*** Lease acreage on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

***unproved properties:*** Properties with no proved reserves.

***volatile oil:*** A quality of oil with an API gravity greater than 40° and with a gas-to-oil ratio of greater than 500 cubic feet per barrel.

***wellbore:*** The hole drilled by the bit that is equipped for oil or natural gas production on a completed well. Also called well or borehole.

***working interest:*** An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

***workover:*** Operations on a producing well to restore or increase production.

***WTI:*** West Texas Intermediate crude.

# PART IV

**Item 15.** ***Exhibits and Financial Statement Schedules***

a. The following documents are filed as a part of this Annual Report on Form 10-K or incorporated herein by reference:

(1) Financial Statements:

See Item 8. Financial Statements and Supplementary Data.

(2) Financial Statement Schedules:

None.

(3) Exhibits:

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

b. The following exhibits are filed or furnished with this Annual Report on Form 10-K or incorporated by reference:

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 2.1 | ** | Purchase and Sale Agreement, dated as of May 21, 2014, by and among SWEPI LP, Shell Gulf of Mexico Inc., as sellers, and Sanchez Energy Corporation, as buyer (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on May 22, 2014, and incorporated herein by reference). |
| 2.2 | ** | Purchase and Sale Agreement, dated as of March 31, 2015, by and among SEP Holdings III, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on April 1, 2015, and incorporated herein by reference). |
| 2.3 | ** | Purchase and Sale Agreement, dated as of September 25, 2015, by and among Sanchez Energy Corporation, SN Catarina, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on September 29, 2015, and incorporated herein by reference). |
| 2.4 | ** | Purchase and Sale Agreement, dated as of July 5, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on July 6, 2016, and incorporated herein by reference). |
| 2.5 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.6 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among SN Cotulla Assets, LLC, SN Palmetto, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (filed as Exhibit 2.2 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.7 | ** | Purchase and Sale Agreement, dated as of October 6, 2016, by and among Sanchez Energy Corporation, SN Terminal, LLC and Sanchez Production Partners LP (filed as Exhibit 2.3 to the Company's Current Report on Form 8-K on October 7, 2016, and incorporated herein by reference). |
| 2.8 | ** | Purchase and Sale Agreement, dated as of October 24, 2016, by and among SN Cotulla Assets, LLC, Carrizo (Eagle Ford) LLC, Carrizo Oil & Gas, Inc., and for the limited purposes set forth therein, Sanchez Energy Corporation (filed as Exhibit 2.1 on the Company's Current Report on Form 8-K on January 13, 2017, and incorporated herein by reference). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 2.9 ** | Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Aguila Production, LLC, and solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation (filed as Exhibit 2.1 to the Company's Current Report on Form 8-K on January 17, 2017, and incorporated herein by reference). |
| 3.1 | Certificate of Amendment of Amended and Restated Certificate of Incorporation of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on May 28, 2013, and incorporated herein by reference). |
| 3.2 | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 3.3 | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015, and incorporated herein by reference). |
| 3.4 | Amended and Restated Bylaws dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011, and incorporated herein by reference). |
| 4.1 | Form of Common Stock Certificate (filed as Exhibit 4.1 to Amendment No. 3 to the Company's Registration Statement on Form S-1 (File. No. 333-176613) on November 25, 2011, and incorporated herein by reference). |
| 4.2 | Indenture, dated as of June 13, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and U.S. Bank National Association as trustee (filed as Exhibit 4.1 to the Company's Current Report on Form 8- K on June 14, 2013 and incorporated herein by reference). |
| 4.3 | First Supplemental Indenture, dated as of September 11, 2013, by and among Sanchez Energy Corporation, SN TMS, LLC, the existing guarantors and U.S. Bank National Association as trustee (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on September 19, 2013 and incorporated herein by reference). |
| 4.4 | Registration Rights Agreement, dated as of June 13, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on June 14, 2013, and incorporated herein by reference). |
| 4.5 | Registration Rights Agreement, dated as of September 18, 2013, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 4.3 to the Company's Current Report on Form 8-K on September 13, 2013, and incorporated herein by reference). |
| 4.6 | Registration Rights Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Sanchez Energy Partners I, LP (filed as Exhibit 10.3 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 4.7 | Second Supplemental Indenture, dated as of June 2, 2014, by and among Sanchez Energy Corporation, SN Catarina, LLC, the existing guarantors and U.S. Bank National Association, as trustee (filed as Exhibit 4.6 to the Company's Registration Statement on Form S-4 (File No. 333-196660)on June 11, 2014, and incorporated herein by reference). |
| 4.8 | Indenture, dated as of June 27, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and U.S. Bank National Association, as trustee (filed as Exhibit 4.1 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |

| Exhibit No. | Description of Exhibit |
|---|---|
| 4.9 | Registration Rights Agreement, dated as of June 27, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein and RBC Capital Markets, LLC, as representative of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |
| 4.10 | Registration Rights Agreement, dated as of September 12, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 4.2 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 4.11 | Rights Plan dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as Rights Agent (including the form of Certificate of Designations of Series C Junior Participating Preferred Stock attached thereto as Exhibit A, the form of Right Certificate attached thereto as Exhibit B and the Summary of Rights attached thereto as Exhibit C) (filed as Exhibit 4.1 to the Company's Current Report on Form 8-K on July 29, 2015, and incorporated herein by reference). |
| 4.12 | Instrument of Resignation, Appointment and Acceptance (7.75% Senior Notes), dated as of May 20, 2016, by and among Sanchez Energy Corporation, Delaware Trust Company and U.S. Bank National Association (filed as Exhibit 4.1 to the Company's Quarterly Report on Form 10-Q on August 8, 2016, and incorporated herein by reference). |
| 4.13 | Instrument of Resignation, Appointment and Acceptance (6.125% Senior Notes), dated as of May 20, 2016, by and among Sanchez Energy Corporation, Delaware Trust Company and U.S. Bank National Association (filed as Exhibit 4.2 to the Company's Quarterly Report on Form 10-Q on August 8, 2016, and incorporated herein by reference). |
| 10.1 | Services Agreement, dated as of December 19, 2011, by and between Sanchez Oil & Gas Corporation and Sanchez Energy Corporation (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.2 | Geophysical Seismic Data Use License Agreement, dated as of December 19, 2011, by and among Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, SEP Holdings III, LLC and SN Marquis LLC (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.3 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Antonio R. Sanchez, III (filed as Exhibit 10.4 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.4 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Michael G. Long (filed as Exhibit 10.5 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.5 * | Indemnification Agreement, dated as of December 19, 2011, by and between Sanchez Energy Corporation and Gilbert A. Garcia (filed as Exhibit 10.6 to the Company's Current Report on Form 8-K on December 23, 2011, and incorporated herein by reference). |
| 10.6 * | Form of Restricted Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |
| 10.7 * | Form of Restricted Stock Agreement for Non-employee Directors (filed as Exhibit 10.2 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |
| 10.8 * | Form of Restricted Stock Agreement for Antonio R. Sanchez, III (filed as Exhibit 10.3 to the Company's Registration Statement on Form S-8 (File No. 333-178920) on January 6, 2012, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 10.9 | * | Indemnification Agreement, dated as of March 9, 2012, by and between Sanchez Energy Corporation and Greg Colvin (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 14, 2012, and incorporated herein by reference). |
| 10.10 | * | Indemnification Agreement, dated as of March 9, 2012, by and between Sanchez Energy Corporation and Kirsten A. Hink (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on March 14, 2012, and incorporated herein by reference). |
| 10.11 | * | Indemnification Agreement, dated as of November 27, 2012, by and between Sanchez Energy Corporation and A.R. Sanchez, Jr. (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 3, 2012, and incorporated herein by reference). |
| 10.12 | * | Indemnification Agreement, dated as of November 27, 2012, by and between Sanchez Energy Corporation and Alan G. Jackson (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on December 3, 2012, and incorporated herein by reference). |
| 10.13 | * | Indemnification Agreement, dated as of March 4, 2014, by and between Sanchez Energy Corporation and Christopher Heinson (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 6, 2014, and incorporated herein by reference). |
| 10.14 | | Purchase Agreement, dated as of June 13, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on June 16, 2014, and incorporated herein by reference). |
| 10.15 | | Second Amended and Restated Credit Agreement, dated as of June 30, 2014, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC, as loan parties, Royal Bank of Canada, as administrative agent, Capital One, National Association, as syndication agent, Compass Bank, SunTrust Bank as co-documentation agents, RBC Capital Markets as sole lead arranger and sole book runner, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on July 2, 2014, and incorporated herein by reference). |
| 10.16 | | Purchase Agreement, dated as of September 9, 2014, by and among Sanchez Energy Corporation, the subsidiary guarantors named therein, RBC Capital Markets, LLC and Credit Suisse Securities (USA), LLC, as representatives of the several initial purchasers named therein (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 10.17 | | First Amendment to Second Amended and Restated Credit Agreement, dated as of September 9, 2014, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC, as loan parties, Royal Bank of Canada, as administrative agent, Capital One, National Association, as syndication agent, Compass Bank, SunTrust Bank as co-documentation agents, RBC Capital Markets as sole lead arranger and sole book runner, and the lenders party thereto (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on September 15, 2014, and incorporated herein by reference). |
| 10.18 | * | Indemnification Agreement, dated as of November 4, 2014, by and between Sanchez Energy Corporation and Sean Maher (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on November 6, 2014, and incorporated herein by reference). |
| 10.19 | | Second Amendment to Second Amended and Restated Credit Agreement, dated as of March 31, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 1, 2015, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
| --- | --- | --- |
| 10.20 | * | Indemnification Agreement, dated as of May 5, 2015, by and between Sanchez Energy Corporation and Thomas Brian Carney (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on May 8, 2015, and incorporated herein by reference). |
| 10.21 | * | Indemnification Agreement, dated as of May 5, 2015, by and between Sanchez Energy Corporation and G. Gleeson Van Riet (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on May 8, 2015, and incorporated herein by reference). |
| 10.22 | * | Sanchez Energy Corporation Second Amended and Restated 2011 Long Term Incentive Plan (filed as Exhibit 99.1 to the Company's Current Report on Form 8-K on May 27, 2015, and incorporated herein by reference). |
| 10.23 | * | Indemnification Agreement, dated as of October 1, 2015, by and between Sanchez Energy Corporation and Eduardo Sanchez (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on October 6, 2015, and incorporated herein by reference). |
| 10.24 | | Third Amendment to Second Amended and Restated Credit Agreement, dated as of July 20, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 10.25 | | Fourth Amendment to Second Amended and Restated Credit Agreement, dated as of September 29, 2015, by and among Sanchez Energy Corporation, as borrower, SN Marquis LLC, SN Cotulla Assets LLC, SN Operating LLC, SN TMS, LLC, and SN Catarina LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the other agents and lenders party thereto (filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013, and incorporated herein by reference). |
| 10.26 | | Fifth Amendment to Second Amended and Restated Credit Agreement, dated as of October 30, 2015, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on November 4, 2015, and incorporated herein by reference). |
| 10.27 | | Sixth Amendment to Second Amended and Restated Credit Agreement, dated as of January 22, 2016, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on January 25, 2016, and incorporated herein by reference). |
| 10.28 | | Seventh Amendment to Second Amended and Restated Credit Agreement, dated as of March 18, 2016, by and among Sanchez Energy Corporation, as borrower, SEP Holdings III, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, and SN Catarina, LLC, as guarantors, Royal Bank of Canada, as administrative agent, and the lenders party thereto (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 21, 2016, and incorporated herein by reference). |
| 10.29 | (a) | Letter Agreement, dated as of December 9, 2016, by and among Royal Bank of Canada, as administrative agent under the Second Amended and Restated Credit Agreement, as amended, Sanchez Energy Corporation, as borrower and the other parties thereto. |
| 10.30 | * | Indemnification Agreement, dated as of December 14, 2015, by and between Sanchez Energy Corporation and Gregory B. Kopel (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on December 16, 2015, and incorporated herein by reference). |

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 10.31 | * | Indemnification Agreement, dated as of March 8, 2016, by and between Sanchez Energy Corporation and Garrick Hill (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on March 8, 2016, and incorporated herein by reference). |
| 10.32 | * | Form of Restricted Stock Award Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.33 | * | Form of Performance Accelerated Restricted Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.34 | * | Form of Phantom Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.35 | * | Form of Performance Accelerated Phantom Stock Agreement for Employees (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on April 21, 2016, and incorporated herein by reference). |
| 10.36 | * | Indemnification Agreement, dated as of August 2, 2016, by and between Sanchez Energy Corporation and Robert Nelson (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on August 3, 2016, and incorporated herein by reference). |
| 10.37 | * | Indemnification Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.38 | * | Restricted Stock Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.2 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.39 | * | Phantom Stock Agreement, dated as of October 10, 2016, by and between Sanchez Energy Corporation and Howard Thill (filed as Exhibit 10.3 on the Company's Current Report on Form 8-K on October 12, 2016, and incorporated herein by reference). |
| 10.40 | * | Indemnification Agreement, dated as of November 3, 2016, by and between Sanchez Energy Corporation and Patricio D. Sanchez (filed as Exhibit 10.1 on the Company's Current Report on Form 8-K on November 9, 2016, and incorporated herein by reference). |
| 10.41 | ** | Securities Purchase Agreement, dated as of January 12, 2017, by and among Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF UnSub, LP, SN EF UnSub GP, LLC, GSO ST Holdings Associates LLC, and GSO ST Holdings LP (filed as Exhibit 10.1 to the Company's Current Report on Form 8-K on January 17, 2017, and incorporated herein by reference). |
| 10.42 | ** | Interim Investors Agreement, dated as of January 12, 2017, by and among Sanchez Energy Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Aguila Production, LLC, Aguila Production HoldCo, LLC, Blackstone Capital Partners VII L.P., and Blackstone Energy Partners II L.P. (filed as Exhibit 10.2 to the Company's Current Report on Form 8-K on January 12, 2017, and incorporated herein by reference). |
| 16.1 | | Letter from BDO USA, LLP, dated as of June 23, 2015, regarding the change in certifying accountant (filed as Exhibit 16.1 to the Company's Current Report on Form 8-K on June 23, 2015, and incorporated herein by reference). |
| 21.1 | (a) | List of Subsidiaries of Sanchez Energy Corporation. |
| 23.1 | (a) | Consent of KPMG LLP. |

23.2 (a)

Case 22-03508 Document 685-21 Filed in TXSB on 06/24/20 Page 178 of 1725

| Exhibit No. | | Description of Exhibit |
|---|---|---|
| 23.3 | (a) | Consent of Ryder Scott Company, L.P. |
| 31.1 | (a) | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2 | (a) | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1 | (b) | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2 | (b) | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 99.1 | (a) | Ryder Scott Company, L.P. Summary of December 31, 2016 Reserves. |
| 101.INS | (a) | XBRL Instance Document. |
| 101.SCH | (a) | XBRL Taxonomy Extension Schema Document. |
| 101.CAL | (a) | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF | (a) | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB | (a) | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE | (a) | XBRL Taxonomy Extension Presentation Linkbase Document. |

(a) Filed herewith.

(b) Furnished herewith.

* Management contract or compensatory plan or arrangement.

** The exhibits and schedules to this agreement have been omitted form this filing pursuant to Item 601(b)(2) of Regulation S-K. The Company will furnish copies of such omitted exhibits and schedules to the SEC upon request.

**Item 16. *Form 10-K Summary***

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on February 27, 2017.

SANCHEZ ENERGY CORPORATION

By: /s/ Antonio R. Sanchez, III
Antonio R. Sanchez, III
*Chief Executive Officer*

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Antonio R. Sanchez, III and Howard J. Thill, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Antonio R. Sanchez, III<br>Antonio R. Sanchez, III | Chief Executive Officer | February 27, 2017 |
| /s/ Howard J. Thill<br>Howard J. Thill | Executive Vice President and Chief Financial Officer | February 27, 2017 |
| /s/ Kirsten A. Hink<br>Kirsten A. Hink | Senior Vice President and Chief Accounting Officer | February 27, 2017 |
| /s/ A. R. Sanchez, Jr.<br>A. R. Sanchez, Jr. | Executive Chairman of the Board of Directors | February 27, 2017 |
| /s/ Gilbert A. Garcia<br>Gilbert A. Garcia | Director | February 27, 2017 |
| /s/ Greg Colvin<br>Greg Colvin | Director | February 27, 2017 |
| /s/ Alan G. Jackson<br>Alan G. Jackson | Director | February 27, 2017 |
| /s/ Sean m. Maher | Director | February 27, 2017 |

| | | |
|---|---|---|
| /s/ Brian Carney<br>Brian Carney | Director | February 27, 2017 |
| /s/ Robert V. Nelson, III<br>Robert V. Nelson, III | Director | February 27, 2017 |

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

***Sanchez Energy Corporation***


| | |
|---|---|
| Reports of Independent Registered Public Accounting Firms | F-2 |
| *Consolidated Financial Statements:* | |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | F-5 |
| Consolidated Statements of Operations for the years ended December 31, 2016, 2015 and 2014 | F-6 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2016, 2015 and 2014 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2016, 2015 and 2014 | F-8 |
| Notes to Consolidated Financial Statements | F-10 |
| Supplemental Quarterly Financial Results (Unaudited) | F-54 |
| Supplementary Information on Oil and Natural Gas Exploration, Development and Production Activities (Unaudited) | F-56 |

Case 19-34508 Document 1853-21 Filed in TXSB on 06/24/20 Page 283 of 1725

Case 4:23-cv-00587 Document 3-19 Filed 04/19/23 in TXSD Page 42 of 300

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation:

We have audited the accompanying consolidated balance sheets of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the two-year period ended December 31, 2016. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2016, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Sanchez Energy Corporation's internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2017 expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

/s/ KPMG LLP

Houston, Texas
February 27, 2017



011890

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation:

We have audited Sanchez Energy Corporation's internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Sanchez Energy Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Sanchez Energy Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Sanchez Energy Corporation and subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, stockholders' equity (deficit), and cash flows for each of the years in the two-year period ended December 31, 2016, and our report dated February 27, 2017 expressed an unqualified opinion on those consolidated financial statements.

/s/ KPMG LLP

Houston, Texas
February 27, 2017

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Sanchez Energy Corporation
Houston, Texas

We have audited the accompanying consolidated statements of operations, stockholders' equity, and cash flows of Sanchez Energy Corporation (the "Company") for the year ended December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the results of operations and cash flows of Sanchez Energy Corporation for the year ended December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

/s/ BDO USA, LLP

Houston, Texas
March 2, 2015, except for Note 18, as to which the date is February 27, 2017

**Sanchez Energy Corporation**

**Consolidated Balance Sheets**

**(in thousands, except share and per share amounts)**

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 501,917 | $ 435,048 |
| Oil and natural gas receivables | 41,057 | 30,668 |
| Joint interest billings receivables | 496 | 1,259 |
| Accounts receivable - related entities | 6,401 | 3,697 |
| Fair value of derivative instruments | — | 172,494 |
| Other current assets | 12,934 | 23,452 |
| Total current assets | 562,805 | 666,618 |
| Oil and natural gas properties, at cost, using the full cost method: | | |
| Unproved oil and natural gas properties | 231,424 | 253,529 |
| Proved oil and natural gas properties | 3,164,115 | 2,914,867 |
| Total oil and natural gas properties | 3,395,539 | 3,168,396 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (2,736,951) | (2,412,293) |
| Total oil and natural gas properties, net | 658,588 | 756,103 |
| | | |
| Other assets: | | |
| Fair value of derivative instruments | — | 5,789 |
| Investments (Investment in SPP measured at fair value of $26.8 million and $0 as of December 31, 2016 and 2015, respectively) | 39,656 | 49,985 |
| Other assets | 25,231 | 22,809 |
| Total assets | $ 1,286,280 | $ 1,501,304 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 1,076 | $ 4,184 |
| Other payables | 2,251 | 2,004 |
| Accrued liabilities: | | |
| Capital expenditures | 35,154 | 51,983 |
| Other | 82,458 | 69,974 |
| Deferred premium liability | 2,079 | 24,548 |
| Fair value of derivative instruments | 31,778 | — |
| Other current liabilities | 22,201 | 14,813 |
| Total current liabilities | 176,997 | 167,506 |
| Long term debt, net of premium, discount and debt issuance costs | 1,712,767 | 1,705,927 |
| Asset retirement obligations | 25,087 | 25,907 |
| Fair value of derivative instruments | 3,236 | — |
| Other liabilities | 64,333 | 58,133 |
| Total liabilities | 1,982,420 | 1,957,473 |
| Commitments and contingencies (Note 14) | | |
| Stockholders' equity: | | |
| Preferred stock ($0.01 par value, 15,000,000 shares authorized; 1,838,985 shares issued and outstanding as of December 31, 2016 and 2015 of 4.875% Convertible Perpetual Preferred Stock, Series A; 3,527,830 and 3,532,330 shares issued and outstanding as of December 31, 2016 and 2015 of 6.500% Convertible Perpetual Preferred Stock, Series B, respectively) | 53 | 53 |
| Common stock ($0.01 par value, 150,000,000 shares authorized; 66,156,378 and 61,928,089 shares issued and outstanding as of December 31, 2016 and 2015, respectively) | 670 | 619 |
| Additional paid-in capital | 1,112,397 | 1,079,513 |
| Accumulated deficit | (1,809,260) | (1,536,354) |
| Total stockholders' equity (deficit) | (696,140) | (456,169) |
| Total liabilities and stockholders' equity (deficit) | $ 1,286,280 | $ 1,501,304 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

Table of Contents

**Sanchez Energy Corporation**

**Consolidated Statements of Operations**

**(in thousands, except per share amounts)**

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| **REVENUES:** | | | |
| Oil sales | $ 241,766 | $ 307,971 | $ 538,887 |
| Natural gas liquid sales | 81,744 | 69,011 | 66,989 |
| Natural gas sales | 107,816 | 98,797 | 60,188 |
| Total revenues | 431,326 | 475,779 | 666,064 |
| **OPERATING COSTS AND EXPENSES:** | | | |
| Oil and natural gas production expenses | 164,567 | 156,528 | 93,581 |
| Production and ad valorem taxes | 19,633 | 26,870 | 37,787 |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 |
| General and administrative (inclusive of stock-based compensation expense of $37,090, $14,831, and $12,843 and for 2016, 2015, and 2014, respectively) | 110,081 | 74,160 | 63,692 |
| Total operating costs and expenses | 623,087 | 1,967,130 | 746,978 |
| Operating loss | (191,761) | (1,491,351) | (80,914) |
| Other income (expense): | | | |
| Interest income | 856 | 442 | 193 |
| Other income (expense) | 134 | (2,605) | 96 |
| Gain on disposal of assets | 112,294 | — | — |
| Interest expense | (126,973) | (126,399) | (89,800) |
| Earnings from equity investments | 3,466 | — | — |
| Net gains (losses) on commodity derivatives | (53,149) | 172,886 | 137,205 |
| Total other income (expense) | (63,372) | 44,324 | 47,694 |
| Loss before income taxes | (255,133) | (1,447,027) | (33,220) |
| Income tax expense (benefit) | 1,825 | 7,600 | (11,429) |
| **Net loss** | (256,958) | (1,454,627) | (21,791) |
| Less: | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) |
| Net income allocable to participating securities | — | — | — |
| **Net loss attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) |
| | | | |
| Net loss per common share - basic and diluted | $ (4.63) | $ (25.70) | $ (1.06) |
| Weighted average number of shares used to calculate net loss attributable to common stockholders - basic and diluted | 58,900 | 57,229 | 52,338 |

The accompanying notes are an integral part of these consolidated financial statements.

## Sanchez Energy Corporation

## Consolidated Statements of Stockholders' Equity (Deficit)

### (in thousands)

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | (Deficit) |
| **BALANCE, December 31, 2013** | 3,000 | $ 30 | 4,500 | $ 45 | 46,369 | $ 464 | $ 867,108 | $ (10,338) | $ 857,309 |
| Common shares issued, net of offering costs of $8,731 | — | — | — | — | 5,000 | 50 | 167,469 | — | 167,519 |
| Preferred stock dividends | — | — | — | — | — | — | — | (16,293) | (16,293) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 1,673 | 17 | (17) | — | — |
| Exchange of preferred stock for common stock | (1,161) | (12) | (968) | (10) | 5,539 | 55 | 17,264 | (17,297) | — |
| Stock-based compensation | — | — | — | — | — | — | 12,843 | — | 12,843 |
| Net loss | — | — | — | — | — | — | — | (21,791) | (21,791) |
| **BALANCE, December 31, 2014** | 1,839 | 18 | 3,532 | 35 | 58,581 | 586 | 1,064,667 | (65,719) | 999,587 |
| Preferred stock dividends | — | — | — | — | — | — | — | (15,960) | (15,960) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 3,337 | 33 | (33) | — | — |
| Exchange of preferred stock for common stock | — | — | (4) | — | 10 | — | 48 | (48) | — |
| Stock-based compensation | — | — | — | — | — | — | 14,831 | — | 14,831 |
| Net loss | — | — | — | — | — | — | — | (1,454,627) | (1,454,627) |
| **BALANCE, December 31, 2015** | 1,839 | 18 | 3,528 | 35 | 61,928 | 619 | 1,079,513 | (1,536,354) | (456,169) |
| Preferred stock dividends | — | — | — | — | 967 | 10 | 7,964 | (15,948) | (7,974) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 4,092 | 41 | (41) | — | — |
| Stock-based compensation | — | — | — | — | — | — | 24,961 | — | 24,961 |
| Net loss | — | — | — | — | — | — | — | (256,958) | (256,958) |
| **BALANCE, December 31, 2016** | 1,839 | $ 18 | 3,528 | $ 35 | 66,987 | $ 670 | $ 1,112,397 | $ (1,809,260) | $ (696,140) |

The accompanying notes are an integral part of these consolidated financial statements.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements**

**Sanchez Energy Corporation**
**Consolidated Statements of Cash Flows**
**(in thousands)**

## Sanchez Energy Corporation

## Notes to the Consolidated Financial Statements (Continued)

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss | $ (256,958) | $ (1,454,627) | $ (21,791) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation, depletion, amortization and accretion | 159,760 | 344,572 | 338,097 |
| Impairment of oil and natural gas properties | 169,046 | 1,365,000 | 213,821 |
| Gain on disposal of assets | (112,294) | — | — |
| Stock-based compensation expense | 37,090 | 14,831 | 12,843 |
| Net (gains) losses on commodity derivative contracts | 53,149 | (172,886) | (137,205) |
| Net cash settlement received on commodity derivative contracts | 122,145 | 131,123 | 5,600 |
| Losses incurred on premiums for derivative contracts | 24,548 | (121) | (596) |
| Cash reimbursements received for operating leasehold improvements | — | 2,648 | — |
| (Gain) loss on investment in SPP | (1,818) | 935 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | (14,813) | (3,086) | — |
| Amortization of debt issuance costs | 7,840 | 7,529 | 9,002 |
| Accretion of debt discount, net | 633 | 703 | 755 |
| Deferred taxes | — | 7,443 | (11,429) |
| Loss on inventory market adjustment | 649 | — | — |
| Distributions from equity investments | 930 | — | — |
| Earnings from equity investments | (3,466) | — | — |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (9,626) | 60,480 | (26,971) |
| Other current assets | 1,504 | (450) | (21,633) |
| Accounts payable | (3,108) | (25,303) | (2,868) |
| Accounts receivable - related entities | (2,704) | (3,311) | (1,347) |
| Other payables | 247 | (2,290) | 1,522 |
| Accrued liabilities | 8,498 | 2,813 | 51,590 |
| Other current liabilities | — | (5,166) | 5,166 |
| Other liabilities | (1) | 1,188 | 779 |
| Net cash provided by operating activities | 181,251 | 272,025 | 415,335 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Payments for oil and natural gas properties | (313,342) | (656,136) | (791,260) |
| Payments for other property and equipment | (5,394) | (8,123) | (14,062) |
| Proceeds from sale of oil and natural gas properties | 179,143 | 427,571 | — |
| Acquisition of oil and natural gas properties | — | (7,658) | (555,942) |
| Investment in SPP | (25,000) | — | — |
| Purchases of investments | (36,502) | (49,985) | — |
| Sale of investments | 92,458 | — | — |
| Net cash used in investing activities | (108,637) | (294,331) | (1,361,264) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Proceeds from borrowings | 60,000 | — | 100,000 |
| Repayment of borrowings | (60,000) | — | (100,000) |
| Issuance of senior notes, net of premium and discount | — | — | 1,152,250 |
| Issuance of common stock | — | — | 176,250 |
| Payments for offering costs | — | — | (8,731) |
| Financing costs | (1,758) | (400) | (37,364) |
| Preferred dividends paid | (3,987) | (15,960) | (16,293) |
| Net cash provided by (used in) financing activities | (5,745) | (16,360) | 1,266,112 |
| Increase (decrease) in cash and cash equivalents | 66,869 | (38,666) | 320,183 |
| Cash and cash equivalents, beginning of period | 435,048 | 473,714 | 153,531 |
| Cash and cash equivalents, end of period | $ 501,917 | $ 435,048 | $ 473,714 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | | |
| Change in asset retirement obligations | $ (2,895) | $ (1,877) | $ 20,303 |
| Change in accrued capital expenditures | (16,829) | (110,744) | 75,843 |
| Capital expenditures in accounts payable | — | — | 14,545 |
| Common stock issued in exchange for preferred stock | — | 273 | 123,731 |
| **SUPPLEMENTAL DISCLOSURE:** | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Cash paid for taxes | $ | [illegible] | $ | 158 | $ | — |
| Cash paid for interest | $ | 118,498 | $ | 121,644 | $ | 48,064 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The accompanying notes are an integral part of these consolidated financial statements.

**Note 1. Organization and Business**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas. We also hold an undeveloped acreage position in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, which offers future upside opportunity. As of December 31, 2016, we have assembled approximately 278,000 net leasehold acres with an approximate 94% average working interest in the Eagle Ford Shale. Pro forma for the Comanche Acquisition (defined below), we will have assembled 339,000 net leasehold acres with an approximate 61% average working interest as of December 31, 2016. Following completion of the Comanche Acquisition, we will have over 7,000 gross (4,000 net) locations for potential future drilling. For the year 2017, we plan to invest substantially all of our capital budget in the Eagle Ford Shale. We continue to evaluate opportunities to increase both our acreage and our producing assets through acquisitions. Our successful acquisition of such assets will depend on both the opportunities and the financing alternatives available to us at the time we consider such opportunities. We have included definitions of some of the oil and natural gas terms used in this Annual Report on Form 10-K in the "Glossary of Selected Oil and Natural Gas Terms."

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

***Basis of Presentation***

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

***Recent Accounting Pronouncements***

In January 2017, the FASB issued Accounting Standards Update ("ASU") 2017-01 "Business Combinations (Topic 805) - Clarifying the Definition of a Business," which provides a new framework for determining whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2017. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In December 2016, the FASB issued Accounting Standards Update ASU 2016-19 "Technical Corrections and Improvements," which amends a number of Topics in the FASB ASC. The ASU is part of an ongoing FASB project to facilitate Codification updates for non-substantive technical corrections, clarifications, and improvements that are not expected to have a significant effect on accounting practice or create a significant administrative cost to most entities. The ASU will apply to all reporting entities within the scope of the affected accounting guidance. Most amendments are effective upon issuance (December 2016).

In November 2016, the FASB issued ASU 2016-18 "Statement of Cash Flows (Topic 230): Restricted Cash," which requires companies to include cash and cash equivalents that have restrictions on withdrawal or use in total cash and cash equivalents on the statement of cash flows. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2017. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

In October 2016, the FASB issued ASU 2016-16 "Income Taxes (Topic 740): Intra-Entity Transfers of Assets Other Than Inventory," which eliminates a current exception in U.S. GAAP to the recognition of the income tax effects of temporary differences that result from intra-entity transfers of non-inventory assets. The intra-entity exception is being eliminated under the ASU. The standard is required to be applied on a modified retrospective basis and will be effective beginning with the first quarter of 2018. Early adoption is permitted, and the Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15 "Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments". This ASU is intended to clarify the presentation of cash receipts and payments in specific situations. The amendments in this ASU are effective for financial statements issued for annual periods beginning after December 15, 2017, including interim periods within those annual periods, and early application is permitted. The Company does not anticipate that ASU 2016-15 will have a material effect on its consolidated and condensed financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09 "Improvements to Employee Share-Based Payment Accounting," effective for annual and interim periods for public companies beginning after December 15, 2016, with a cumulative-effect and prospective approach to be used for implementation. ASU 2016-09 changes several aspects of the accounting for share-based payment award transactions including accounting for income taxes, classification of excess tax benefits on the statement of cash flows, forfeitures, minimum statutory tax withholding requirements and classification of employee taxes paid on the statement of cash flows when an employer withholds shares for tax-withholding purposes. The Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02 "Leases (Topic 842)," effective for annual and interim periods for public companies beginning after December 15, 2018, with a modified retrospective approach to be used for implementation. The standard updates the previous lease guidance by requiring the recognition of a right-to-use asset and lease liability on the statement of financial position for all leases with lease terms of more than 12 months. The lease liability represents the discounted obligation to make future minimum lease payments and corresponding right-of-use asset on the balance sheet for most leases. Recognition, measurement and presentation of expenses and cash flows arising from a lease will depend on classification as a finance or operating lease. The Company has several operating leases as further discussed in Note 16, "Commitments and Contingencies," which will be impacted by the new rules under this standard. The Company will not early adopt this standard, and will apply the revised lease rules for our interim and annual reporting periods starting January 1, 2019. The Company is currently evaluating the impact of these rules on its financial statements and has started the assessment process by evaluating the population of leases under the revised definition. The adoption of this standard will result in an increase in the assets and liabilities on the Company's consolidated balance sheets. The quantitative impacts of the new standard are dependent on the leases in force at the time of adoption. As a result, the evaluation of the effect of the new standards will extend over future periods.

During November 2015, the FASB issued ASU 2015-17, "Balance Sheet Classification of Deferred Taxes", which simplifies the presentation of deferred income taxes. This ASU requires that deferred tax assets and liabilities be classified as non-current in a statement of financial position by jurisdiction rather than separately presented as current and non-current portions. ASU 2015-17 is effective for fiscal years beginning after December 15, 2016, and interim periods within those annual periods. Early adoption is permitted for financial statements as of the beginning of an interim or annual reporting period. The Company chose to adopt ASU 2015-17 as of the quarter ended December 31, 2015 on a retrospective basis. Adoption of this guidance affected the balance sheets as of December 31, 2014 as follows (in thousands):

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Decrease in Non-current assets of approximately $33,242
Decrease in Current liabilities of approximately $33,242

In July 2015, the FASB issued ASU No. 2015-11, "Simplifying the Measurement of Inventory," effective for annual and interim periods beginning after December 15, 2016. ASU 2015-11 changes the inventory measurement principle for entities using the first-in, first out (FIFO) or average cost methods. For entities utilizing one of these methods, the inventory measurement principle will change from lower of cost or market to the lower of cost and net realizable value. The Company is currently in the process of evaluating the impact of adoption of this guidance on its consolidated financial statements, but do not expect the impact to be material.

May 2014, the FASB issued ASU No. 2014-09, "Revenue from Contracts with Customers (Topic 606)." In March, April, and May of 2016, the FASB issued rules clarifying several aspects of the new revenue recognition standard. The new guidance is effective for fiscal years and interim periods beginning after December 15, 2017. This guidance outlines a new, single comprehensive model for entities to use in accounting for revenue arising from contracts with customers and supersedes most current revenue recognition guidance, including industry-specific guidance. This new revenue recognition model provides a five-step analysis in determining when and how revenue is recognized. The new model will require revenue recognition to depict the transfer of promised goods or services to customers in an amount that reflects the consideration a company expects to receive in exchange for those goods and services. The new standard also requires more detailed disclosures related to the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. The Company will not early adopt the standard although early adoption is permitted. The Company is currently evaluating whether to apply the retrospective approach or modified retrospective approach with the cumulative effect recognized as of the date of initial application. The Company is currently evaluating the impact the standard is expected to have on its consolidated financial statements by evaluating current revenue streams and evaluating contracts under the revised standards.

***Principles of Consolidation***

The Company's consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

***Use of Estimates***

The accompanying consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative expenses. Actual results could differ materially from those estimates.

***Cash Equivalents***

Cash and cash equivalents consist primarily of cash on deposit, money market accounts and investment grade commercial paper that are readily convertible into cash and purchased with original maturities of three months or less.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Oil and Natural Gas Receivables***

The majority of the Company's receivables arise from sales of oil, natural gas liquids ("NGLs") or natural gas. The Company does not have any off-balance-sheet credit exposure related to its customers. Receivables from the sale of oil and natural gas are generally unsecured. Allowances for doubtful accounts are determined based on management's assessment of the creditworthiness of the customer. Receivables are considered past due if full payment is not received by the contractual due date. Past due accounts are written off against the allowance for doubtful accounts only after all the collection attempts have been exhausted. At December 31, 2016 and 2015, management believed that all balances were fully collectible and no allowance for doubtful accounts was deemed necessary.

***Oil and Natural Gas Properties***

The Company's oil and natural gas properties are accounted for using the full cost method of accounting. All direct costs and certain indirect costs associated with the acquisition, exploration and development of oil and natural gas properties are capitalized. Once evaluated, these costs, as well as the estimated costs to retire the assets, are included in the amortization base and amortized to depletion expense using the units-of-production method. Depletion is calculated based on estimated proved oil and natural gas reserves. Proceeds from the sale or disposition of oil and natural gas properties are applied to reduce net capitalized costs unless the sale or disposition causes a significant change in the relationship between costs and the estimated quantities of proved reserves.

*Full Cost Ceiling Test*—Capitalized costs (net of accumulated depreciation, depletion and amortization and deferred income taxes) of proved oil and natural gas properties are subject to a full cost ceiling limitation. The ceiling limits these costs to an amount equal to the present value, discounted at 10%, of estimated future net cash flows from estimated proved reserves less estimated future operating and development costs, abandonment costs (net of salvage value) and estimated related future income taxes. In accordance with Securities and Exchange Commission ("SEC") rules, the oil and natural gas prices used to calculate the full cost ceiling are the 12-month average prices, calculated as the unweighted arithmetic average of the first-day-of-the-month price for each month within the 12-month period prior to the end of the reporting period, unless prices are defined by contractual arrangements. Prices are adjusted for "basis" or location differentials. Prices are held constant over the life of the reserves. If unamortized costs capitalized within the cost pool exceed the ceiling, the excess is charged to expense and separately disclosed during the period in which the excess occurs. Amounts thus required to be written off are not reinstated for any subsequent increase in the cost center ceiling. During the year ended December 31, 2016, the Company recorded a full cost ceiling test impairment after income taxes of $169.0 million. During the year ended December 31, 2015, the Company recorded a full cost ceiling test impairment after income taxes of $1,365 million. During the year ended December 31, 2014, the Company recorded a full cost ceiling test impairment before income taxes of $213.8 million.

*Depreciation, depletion, amortization and accretion*—Depreciation, depletion, amortization and accretion ("DD&A") is provided using the units-of-production method based upon estimates of proved oil, NGL and natural gas reserves with oil, NGL and natural gas production being converted to a common unit of measure based upon their relative energy content. All capitalized costs of oil and natural gas properties, including the estimated future costs to develop proved reserves, are amortized using the units-of-production method based on total proved reserves. Investments in unproved properties and major development projects are not amortized until proved reserves associated with the projects can be determined or until impairment occurs. If the results of an assessment indicate that the properties are impaired, the amount of the impairment is added to the capitalized costs to be amortized. Once the assessment of unproved properties is complete and when major development projects are evaluated, the costs previously excluded from amortization are transferred to the full cost pool and amortization begins. The amortizable base includes estimated future

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

development costs and where significant, dismantlement, restoration and abandonment costs, net of estimated salvage value.

In arriving at depletion rates under the units-of-production method, the quantities of recoverable oil and natural gas reserves are established based on estimates made by internal and third party geologists and engineers, which require significant judgment as does the projection of future production volumes and levels of future costs, including future development costs. In addition, considerable judgment is necessary in determining when unproved properties become impaired and in determining the existence of proved reserves once a well has been drilled. All of these judgments may have significant impact on the calculation of depletion and impairment expense.

*Unproved Properties*—Costs associated with unproved properties and properties under development are excluded from the full cost amortization base until the properties have been evaluated. Additionally, the costs associated with seismic data, leasehold acreage, and wells currently drilling are also initially excluded from the amortization base. Unproved properties are identified on a project basis, with a project being an area in which significant leasehold interests are acquired within a contiguous area. Unproved properties are reviewed periodically by management and transferred into the full cost pool subject to amortization when management determines that a project area has been evaluated through drilling operations or a thorough geologic evaluation.

Based on management's review and current operating plans, 5%, 8% and 25% of the unproved property balance at December 31, 2016 is expected to be added to the amortization base during the years 2017, 2018 and 2019, respectively. The remaining balances in unproved properties relate to project areas that will not be thoroughly evaluated until after 2019, and represent leasehold interests that have expiration dates beginning in 2020 or leasehold interests that are currently held by production.

The table below sets forth the cost of unproved properties excluded from the amortization base as of December 31, 2016, and notes the year in which the associated costs were incurred (in thousands):

| | Year of Acquisition | | | | |
|---|---|---|---|---|---|
| | Prior to 2014 | 2014 | 2015 | 2016 | Total |
| Leasehold acquisition costs | $ 33,052 | $ 93,505 | $ 16,587 | $ 44,053 | $ 187,197 |
| Exploration costs | 2,680 | 479 | 343 | 342 | 3,844 |
| Development costs | 1,040 | 3,428 | 1,442 | 34,473 | 40,383 |
| Total | $ 36,772 | $ 97,412 | $ 18,372 | $ 78,868 | $ 231,424 |

***Oil and Natural Gas Reserve Quantities***

The Company's most significant estimates relate to its proved oil and natural gas reserves. The estimates of oil and natural gas reserves as of December 31, 2016, 2015 and 2014 are based on reports prepared by a third party engineering firm, Ryder Scott Company, L.P. ("Ryder Scott").

Estimates of proved reserves are based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Ryder Scott has historically prepared a reserve and economic evaluation of the Company's properties, utilizing information provided to it by management and other information available, including information from the operators of the property.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The standards of the Financial Accounting Standards Board (“FASB”) and rules of the SEC permit the use of new technologies to determine proved reserve estimates if those technologies have been demonstrated empirically to lead to reliable conclusions about reserve volume estimates. These rules allow, but do not require, companies to disclose their probable and possible reserves to investors in documents filed with the SEC.

In addition, the disclosure guidelines require companies to report oil and natural gas reserves using an average price based upon the prior 12-month first-day-of-the-month price rather than a period-end price.

Reserves and their relation to estimated future net cash flows impact the depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The reserve estimates and the projected cash flows derived from these reserve estimates are prepared in accordance with SEC guidelines. The independent engineering firm noted above adheres to these guidelines when preparing their reserve reports. The accuracy of the reserve estimates is a function of many factors including the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions, and the judgments of the individuals preparing the estimates, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered.

***Debt Issuance Costs***

Debt issuance costs relating to long-term debt have been deferred and are being amortized and recorded as interest expense over the term of the related debt instrument. During 2016, the Company capitalized approximately $0.1 million in costs associated with the filing of a Form S-3 Registration Statement, and capitalized approximately $1.6 million associated with amending our Second Amended and Restated Agreement (as defined in Note 5, “Long-Term Debt”). During 2015, the Company capitalized approximately $0.4 million in costs associated with amending our Second Amended and Restated Agreement. During 2014, the Company capitalized approximately $37.4 million in costs associated with the issuance of the 6.125% Notes (as defined in Note 5, “Long-Term Debt”) and costs incurred to enter into the Second Amended and Restated Credit Agreement. The Company expensed $3.9 million of debt issuance costs during 2014 in conjunction with the termination of our senior unsecured Bridge Facility (as defined in Note 5, “Long-Term Debt”) obtained in connection with the Catarina Acquisition (as defined in Note 3, “Acquisitions and Divestitures”). At December 31, 2016 and December 31, 2015, the Company had approximately $35.0 million and $41.0 million, respectively, of debt issuance costs (net of accumulated amortization of $22.5 million and $14.7 million, respectively) remaining that are being amortized over the terms of the respective debt. In accordance with ASU 2015-03, “Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs,” the debt issuance costs related to the issuance of the 6.125% Notes and Second Amended and Restated Agreement are presented on the balance sheet as a direct deduction from the long-term debt.

***Environmental Expenditures***

The Company is subject to extensive federal, state and local environmental laws and regulations. These laws regulate the discharge of materials into the environment and may require the Company to remove or mitigate the environmental effects of the disposal or release of petroleum or chemical substances at various sites. Environmental expenditures are expensed or capitalized depending on their future economic benefit. Expenditures that relate to an existing condition caused by past operations and that have no future economic benefits are expensed. Liabilities for expenditures of a non-capital nature are recorded when environmental assessment and/or remediation is probable, and the costs can be reasonably estimated. Such liabilities are generally not discounted unless the timing of cash payments for the liability or component is fixed or reliably determinable.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Liabilities for loss contingencies, including environmental remediation costs arising from claims, assessments, litigation, fines, and penalties and other sources, are recorded when it is probable that a liability has been incurred and the amount of the assessment and/or remediation can be reasonably estimated. Recoveries of environmental remediation costs from third parties, which are probable of realization, are separately recorded and are not offset against the related environmental liability.

Management believes the Company is currently in compliance with all applicable federal, state and local regulations associated with its properties. Accordingly, no environmental remediation liability or loss associated with the Company's properties was recorded as of December 31, 2016 and 2015.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, well life, inflation and credit-adjusted risk-free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset. Upon settlement of the liability, any gain or loss is treated as an adjustment to the full cost pool.

To estimate the fair value of an asset retirement obligation, the Company employs a present value technique, which reflects certain assumptions, including its credit-adjusted risk-free interest rate, inflation rate, the estimated settlement date of the liability and the estimated current cost to settle the liability. Changes in timing or to the original estimate of cash flows will result in change to the carrying amount of the liability.

***Stock-Based Compensation***

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

Stock-based compensation awards and phantom stock awards, including those awards with market performance acceleration conditions, granted to employees of the Sanchez Group (as defined in Note 7, "Stock-Based Compensation") (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expenses equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered. In accordance with the guidance, the inclusion of market performance acceleration conditions does not change the accounting classification as compared to those awards without market performance acceleration conditions. The phantom stock awards are required to be settled in cash by the Company and are classified

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

as a liability. Compensation expense for the unvested awards is revalued at each period end and is amortized over the vesting period of the stock-based award.

***Revenue Recognition***

Oil, NGL and natural gas sales are recognized when production is sold to a purchaser at a fixed or determinable price, delivery has occurred, title has transferred, and collectability of the revenue is probable. Delivery occurs and title is transferred when production has been delivered to a pipeline, railcar or truck, or a tanker lifting has occurred. The sales method of accounting is used for oil, NGL and natural gas sales. Oil and natural gas imbalances are generated on properties for which two or more owners have the right to take production “in-kind” and, in doing so, take more or less than their respective entitled percentage. As of December 31, 2016, 2015 and 2014 there were no material oil and natural gas imbalances.

***Sales to Major Customers***

The Company’s oil, NGL and natural gas production was sold to certain customers representing 10% or more of its total revenues for the years ended December 31, 2016, 2015 and 2014 as listed below:

| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Customer A | 4% | 7% | 23% |
| Customer B | 14% | 14% | 4% |
| Customer C | 0% | 4% | 15% |
| Customer D | 33% | 38% | 37% |
| Customer E | 20% | 0% | 0% |

Production is normally sold to relatively few customers. Substantially all of the Company’s customers are concentrated in the oil and natural gas industry and revenue can be materially affected by current economic conditions, the price of certain commodities such as crude oil and natural gas and the availability of alternate purchasers. Management believes the loss of any of the Company’s major customers would not have a long-term material adverse effect on the Company’s operations.

***General and Administrative Expenses***

On December 19, 2011, the Company entered into a services agreement and other related agreements with Sanchez Oil & Gas Corporation (“SOG”), pursuant to which SOG (directly or through its subsidiaries) agreed to provide the Company with the services and data that the Company believes are necessary to manage, operate and grow its business, and the Company agreed to reimburse SOG for all direct and indirect costs incurred on its behalf. See detailed discussion of the Company’s relationship with SOG in Note 9, “Related Party Transactions.”

***Derivative Instruments***

The Company utilizes derivative instruments in order to manage price risk associated with future crude oil and natural gas production. Management sets and implements all of the hedging policies, including volumes, types of instruments and counterparties, on a monthly basis. The

Company recognizes all derivatives as either assets or liabilities, measured at fair value, and recognizes changes in the fair value of derivatives in current earnings because it does not designate its derivatives as cash flow hedges.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Income Taxes***

The Company accounts for income taxes using the asset and liability method. Deferred tax assets and liabilities arise from the expected future tax consequences of temporary differences between the book carrying amounts and the tax basis of assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary difference and carryforwards are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce the deferred tax asset to the amount more likely than not to be recovered.

Additionally, the Company is required to determine whether it is more likely than not (a likelihood of more than 50%) that a tax position will be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position in order to record any financial statement benefit. If that step is satisfied, then the Company must measure the tax position to determine the amount of benefit to recognize in the financial statements. The tax position is measured at the largest amount of benefit that has greater than a 50% likelihood of being realized upon ultimate settlement. Any interest or penalties would be recognized as a component of income tax expense.

The Company applies significant judgment in evaluating its tax positions and estimating its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The actual outcome of these future tax consequences could differ significantly from these estimates, which could impact the Company's financial position, results of operations and cash flows. The Company does not have any material uncertain tax positions during the years ended December 31, 2016 or 2015.

***Earnings per Share***

Basic net income (loss) per common share are computed using the two-class method. The two-class method is required for those entities that have participating securities. The two-class method is an earnings allocation formula that determines net income (loss) per share for participating securities according to dividends declared (or accumulated) and participation rights in undistributed earnings. The Company's restricted shares of common stock (see Note 7, "Stock-Based Compensation") are participating securities under ASC 260, "Earnings per Share," because they may participate in undistributed earnings with common stock. Participating securities do not have a contractual obligation to share in the Company's losses. Therefore, in periods of net loss, no portion of the loss is allocated to participating securities.

Diluted net income (loss) per common share reflect the dilutive effects of the participating securities using the two-class method or the treasury stock method, whichever is more dilutive. They also reflect the effects of the potential conversion of the Company's Series A and Series B Preferred Stock using the if-converted method, if the effect is dilutive.

**Note 3. Acquisitions and Divestitures**

Our acquisitions are accounted for under the acquisition method of accounting in accordance with ASC Topic 805, "Business Combinations" ("ASC Topic 805"). A business combination may result in the recognition of a gain or goodwill based on the measurement of the fair value of the assets acquired at the acquisition date as compared to the fair value of consideration transferred, adjusted for purchase price adjustments. The initial accounting for acquisitions may

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

not be complete and adjustments to provisional amounts, or recognition of additional assets acquired or liabilities assumed, may occur as more detailed analyses are completed and additional information is obtained about the facts and circumstances that existed as of the acquisition dates. The results of operations of the properties acquired in our acquisitions have been included in the consolidated financial statements since the closing dates of the acquisitions.

*Catarina Acquisition*

On June 30, 2014, we completed the Catarina Acquisition for an aggregate adjusted purchase price of $557.1 million. The effective date of the transaction was January 1, 2014. The purchase price was funded with a portion of the proceeds from the issuance of the $850 million senior unsecured 6.125% notes due 2023 (the "Original 6.125% Notes") and cash on hand. The purchase price allocation for the Catarina Acquisition is preliminary and is subject to further adjustments and the settlement of certain post-closing adjustments with the seller. The total purchase price was allocated to the assets purchased and liabilities assumed based upon their fair values on the date of acquisition as follows (in thousands):

| | |
|---|---|
| Proved oil and natural gas properties | $ 446,906 |
| Unproved properties | 122,224 |
| Other assets acquired | 2,682 |
| Fair value of assets acquired | 571,812 |
| Asset retirement obligations | (14,723) |
| Fair value of net assets acquired | $ 557,089 |

*Cotulla Disposition*

On December 14, 2016, SN Cotulla Assets, LLC ("SN Cotulla"), a wholly-owned subsidiary of the Company, completed the initial closing of the sale of certain oil and gas interests and associated assets located in Dimmit County, Frio County, LaSalle County, Zavala County and McMullen County, Texas (the "Cotulla Assets") to Carrizo (Eagle Ford) LLC ("Carrizo Eagle Ford"), pursuant to a Purchase and Sale Agreement dated October 24, 2016 for an adjusted purchase price of approximately $153.5 million (the "Cotulla Disposition"). The effective date of the Cotulla Disposition is June 1, 2016. Subsequent to December 31, 2016, a second closing on an additional portion of the Cotulla Assets was completed for cash consideration of approximately $7.1 million, and the Cotulla Disposition remains subject to post-closing adjustments and potential future closings.

Normally, sales of oil and gas properties are accounted for as adjustments to capitalized costs with no gain or loss recognized. However, in circumstances where treating a sale like a normal retirement would result in a significant change in the company's amortization rate, judgment should be applied. The Company determined that adjustments to capitalized costs for the Cotulla Disposition would cause a significant change in the company's amortization rate. As such, the Company recorded a gain of approximately $112.3 million related to the Cotulla Disposition. The Company expects to record additional gains related to the potential future closings on the Cotulla Disposition in 2017, as noted above.

*Production Asset Transaction*

On November 22, 2016, the Company completed the sale of certain non-core producing oil and gas assets, located in South Texas, to SPP for an adjusted purchase price of approximately $25.6 million in cash (the "Production Asset Transaction"). The Production Asset Transaction includes working

interests in 23 producing Eagle Ford wellbores located in Dimmit and Zavala counties in South Texas together with escalating working interests in an additional 11

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

producing wellbores located in the Palmetto Field in Gonzales County, Texas. The effective date of the Production Asset Transaction was July 1, 2016. The aggregate average working interest percentage initially conveyed was 17.92% per wellbore and, upon January 1 of each subsequent year after the closing, the purchaser's working interest will automatically increase in incremental amounts according to the purchase agreement until January 1, 2018, at which point the purchaser will own a 47.5% working interest and we will own a 2.5% working interest in each of the wellbores. The Company did not record any gains or losses related to the Production Asset Transaction.

*Western Catarina Midstream Divestiture*

On October 14, 2015, the Company and SN Catarina, LLC ("SN Catarina") completed the sale of SN Catarina's interests in Catarina Midstream, LLC, a wholly-owned subsidiary of SN Catarina ("Catarina Midstream"), which as of the closing included certain midstream gathering lines and associated assets and interests located in Dimmit County and Webb County, Texas and 105,263 SPP Common Units to SPP for an adjusted purchase price of $345.8 million in cash (the "Western Catarina Midstream Divestiture"). In connection with the closing of the Western Catarina Midstream Divestiture, SN Catarina and Catarina Midstream entered into a Firm Gathering and Processing Agreement (the "Gathering Agreement") on October 14, 2015 for an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas will be dedicated for gathering by Catarina Midstream. In addition, for the first five years of the Gathering Agreement, SN Catarina will be required to meet a minimum quarterly volume delivery commitment of 10,200 barrels per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. SN Catarina will be required to pay gathering and processing fees of $0.96 per barrel for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through the gathering system, in each case, subject to an annual escalation for a positive increase in the consumer price index. In addition, SN Catarina has, under certain circumstances, a right of first refusal during the term of the agreement and afterwards with respect to dispositions by Catarina Midstream of its ownership interest in the gathering system. The Company recorded a deferred gain of approximately $74.1 million as a result of Gathering Agreement being accounted for as an operating lease. This deferred gain will be amortized straight-line over the firm commitment term of five years as an offset to the transportation fees paid to SPP under the Gathering Agreement.

*Palmetto Disposition*

On March 31, 2015, we completed our disposition to a subsidiary of Sanchez Production Partners LP ("SPP") of escalating amounts of partial working interests in 59 wellbores located in Gonzales County, Texas (the "Palmetto Disposition") for an adjusted sales price of approximately $83.4 million. The effective date of the transaction was January 1, 2015. The aggregate average working interest percentage initially conveyed was 18.25% per wellbore and, upon January 1 of each subsequent year after the closing, the purchaser's working interest will automatically increase in incremental amounts according to the purchase agreement until January 1, 2019, at which point the purchaser will own a 47.5% working interest and we will own a 2.5% working interest in each of the wellbores. We received consideration consisting of approximately $83.0 million (approximately $81.4 million as adjusted) cash and 1,052,632 common units of SPP (the "SPP Common Units") valued at approximately $2.0 million as of the date of the closing. These SPP Common Units were later sold back to SPP in October 2015 as part of the Western Catarina Midstream Divestiture described below. The Company did not record any gains or losses related to the Palmetto Disposition.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 4. Cash and Cash Equivalents**

As of December 31, 2016 and 2015, cash and cash equivalents consisted of the following (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Cash at banks | $ 58,269 | $ 35,600 |
| Money market funds | 443,648 | 399,448 |
| Total cash and cash equivalents | $ 501,917 | $ 435,048 |

**Note 5. Long-Term Debt**

Long-term debt as of December 31, 2016 consisted of $1.15 billion face value of 6.125% senior notes (the “6.125% Notes,” consisting of $850 million in Original 6.125% Notes and $300 million in Additional 6.125% Notes (defined below), which were issued at a premium to face value of $2.3 million) maturing on January 15, 2023, and $600 million principal amount of 7.75% senior notes (the “7.75% Notes,” consisting of $400 million in Original 7.75% Notes (defined below) and $200 million in Additional 7.75% Notes, which were issued at a discount to face value of $7.0 million), maturing on June 15, 2021. During the first quarter 2016, the Company adopted ASU 2015-03 retrospectively to the comparable periods in this Form 10-Q. Adoption of this guidance affected the balance sheets as of December 31, 2015 as follows (in thousands):

Decrease in Long term debt, net of premium, discount and debt issuance costs of approximately $41,039
Decrease in Debt issuance costs, net (Other Assets) of approximately $41,039

As of December 31, 2016 and 2015 the Company’s long-term debt consisted of the following:

| | Interest Rate | Maturity date | Amount Outstanding (in thousands) as of December 31, 2016 | December 31, 2015 |
|---|---|---|---|---|
| Second Amended and Restated Credit Agreement | Variable | June 30, 2019 | $ — | $ — |
| 7.75% Notes | 7.75% | June 15, 2021 | 600,000 | 600,000 |
| 6.125% Notes | 6.125% | January 15, 2023 | 1,150,000 | 1,150,000 |
| | | | 1,750,000 | 1,750,000 |
| Unamortized discount on Additional 7.75% Notes | | | (4,030) | (4,933) |
| Unamortized premium on Additional 6.125% Notes | | | 1,629 | 1,899 |
| Unamortized debt issuance costs | | | (34,832) | (41,039) |
| Total long-term debt | | | $ 1,712,767 | $ 1,705,927 |

Case 22-33553 Document [illegible] Filed in TXSB on [illegible] Page [illegible]

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The components of interest expense are (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Interest on Senior Notes | $ (116,938) | $ (116,938) | $ (78,479) |
| Interest expense and commitment fees on credit agreement | (1,561) | (1,229) | (1,564) |
| Amortization of debt issuance costs | (7,840) | (7,529) | (9,002) |
| Amortization of discount on Additional 7.75% Notes | (904) | (904) | (905) |
| Amortization of premium on Additional 6.125% Notes | 270 | 201 | 150 |
| Total interest expense | $ (126,973) | $ (126,399) | $ (89,800) |

***Credit Facility***

***Previous Credit Agreement:*** On May 31, 2013, we and our subsidiaries, SEP Holdings III, LLC ("SEP III"), SN Marquis LLC ("SN Marquis") and SN Cotulla, collectively, as the borrowers, entered into a revolving credit facility represented by a $500 million Amended and Restated Credit Agreement with Royal Bank of Canada as the administrative agent and collateral agent, and the lenders party thereto (the "Amended and Restated Credit Agreement"). The Amended and Restated Credit Agreement was to mature on May 31, 2018.

On May 12, 2014, the Company borrowed $100 million under the Amended and Restated Credit Agreement. The Company used proceeds from the issuance of the Original 6.125% Notes to repay the $100 million outstanding.

***Second Amended and Restated Credit Agreement:*** On June 30, 2014, the Company, as borrower, and SEP III, SN Marquis, SN Cotulla, SN Operating, LLC, SN TMS, LLC and SN Catarina, LLC as loan parties, entered into a revolving credit facility represented by a $1.5 billion Second Amended and Restated Credit Agreement with Royal Bank of Canada, as the administrative agent and collateral agent, and the lenders party thereto (together with all subsequent amendments, the "Second Amended and Restated Credit Agreement"). The Second Amended and Restated Credit Agreement provides for the issuance of letters of credit, limited in the aggregate to the lesser of $80 million and the total availability thereunder. As of December 31, 2016, there were no borrowings and no letters of credit outstanding under the Second Amended and Restated Credit Agreement, which had a borrowing base of $350 million and aggregate elected commitments of $300 million. Availability under the Second Amended and Restated Credit Agreement is at all times subject to customary conditions and the then applicable borrowing base and aggregate elected commitment amount. All of the $300 million aggregate elected commitment amount was available for future revolver borrowings as of December 31, 2016.

The Second Amended and Restated Credit Agreement matures on June 30, 2019. The borrowing base under the Second Amended and Restated Credit Agreement is redetermined semi-annually by the lenders based on, among other things, an evaluation of the Company's and its restricted subsidiaries' oil and natural gas reserves. Semi-annual redeterminations of the borrowing base are generally scheduled to occur on or before April 1 and October 1 of each year. The borrowing base is also subject to (i) automatic reduction by 25% of the amount of any increase in the aggregate amount of the Company's high yield debt and second lien debt, other than high yield or second lien debt issued in exchange for or to refinance existing high yield debt, permitted second lien debt incurred to refinance or replace permitted second lien debt, and permitted second lien debt representing the payment of interest in kind, (ii) interim redetermination at the election of the Company once between each scheduled redetermination, (iii) interim redetermination at the election of a majority of the lenders once between each scheduled redetermination, and (iv) if the

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

required lenders so direct, in connection with asset sales and swap terminations during the period since the most recent borrowing base determination with a combined borrowing base value of more than 10% of the value of the proved developed oil and gas properties included in the most recent reserve report, a reduction in an amount equal to the borrowing base value, as determined by the administrative agent in its reasonable judgment, of such assets and swaps

The Company's obligations under the Second Amended and Restated Credit Agreement are guaranteed by all of the Company's existing and future subsidiaries not designated as "unrestricted subsidiaries" and secured by a first priority lien on substantially all of the Company's assets and the assets of its existing and future subsidiaries including the SPV, defined below, an "unrestricted subsidiary," but excluding other subsidiaries designated as "unrestricted subsidiaries," including a first priority lien on all ownership interests in existing and future subsidiaries not designated as "unrestricted subsidiaries."

At the Company's election, interest on borrowings under the Second Amended and Restated Credit Agreement may be calculated based on an alternate base rate or an adjusted eurodollar (LIBOR) rate, plus an applicable margin. The applicable margin varies from 1.00% to 2.00% for alternate base rate borrowings and from 2.00% to 3.00% for eurodollar (LIBOR) borrowings and letters of credit, if any, depending on the Company's utilization of the borrowing base. The Company is also required to pay a commitment fee of 0.50% per annum on any unused aggregate elected commitment amount.

The Second Amended and Restated Credit Agreement contains various affirmative and negative covenants and events of default that limit the Company's ability to, among other things, incur indebtedness, make restricted payments, grant liens, consolidate or merge, dispose of certain assets, make investments, engage in transactions with affiliates, enter into hedge transactions and make acquisitions. The Second Amended and Restated Credit Agreement also provides for cross default between the Second Amended and Restated Credit Agreement and the other debt (including debt under the 6.125% Notes and the 7.75% Notes) and obligations in respect of hedging agreements (on a mark-to-market basis), of the Company and its restricted subsidiaries, in an aggregate principal amount in excess of $10 million. Furthermore, the Second Amended and Restated Credit Agreement contains financial covenants that require the Company to satisfy the following tests: (i) current assets plus undrawn borrowing capacity on the Second Amended and Restated Credit Agreement to current liabilities of at least 1.0 to 1.0 at all times, and (ii) net first lien debt (defined as the excess of first lien debt over cash) to consolidated last twelve months EBITDA of not greater than 2.00 to 1.0 as of the last day of any fiscal quarter. As of December 31, 2016, the Company was in compliance with the covenants of the Second Amended and Restated Credit Agreement.

The Second Amended and Restated Credit Amendment, among other things, also (a) permits the repurchase by the Company and its restricted subsidiaries, or by a special purpose unrestricted subsidiary of the Company (the "SPV"), of the Company's senior unsecured notes and common and preferred equity securities, from cash in excess of lender credit exposure in an aggregate amount up to approximately $298.5 million subject to certain caps on purchases of the Company's common and preferred equity securities and other limitations; (b) permits (i) the formation and capitalization of the SPV with up to $150 million, (ii) the SPV to purchase, hold and dispose of, including by way of distribution to its immediate parent, up to $150 million of the Company's senior unsecured notes and common and preferred equity securities, (iii) the SPV to hold cash received from its immediate parent in a deposit account maintained with a lender under the Second Amended and Restated Credit Agreement, and (iv) the SPV to distribute cash to its immediate parent; (c) requires (i) the Company to cause the SPV to distribute all cash held by it or in its name as of the close of business on December 31, 2016 to its immediate parent, (ii) the equity interests in the SPV to be pledged in favor of the secured parties and (iii) the Company to maintain all deposits, securities and commodity accounts with lenders or affiliates of lenders under the Second Amended and Restated Credit Agreement and to enter into account control agreements in favor of the administrative agent for the benefit of the secured parties in respect of each of such accounts; (d) provides that, in

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

the event of a borrowing base deficiency, the Company shall use unrestricted cash of the Company and its subsidiaries in excess of $35 million to prepay borrowings and cash collateralize letter of credit exposure, as applicable; and (e) restricts the Company from increasing its aggregate elected commitment amount until the lenders' next regularly scheduled borrowing base redetermination, which is expected to occur in the fourth quarter 2016.

From time to time, the agents, arrangers, book runners and lenders under the Second Amended and Restated Credit Agreement and their affiliates have provided, and may provide in the future, investment banking, commercial lending, hedging and financial advisory services to the Company and its affiliates in the ordinary course of business, for which they have received, or may in the future receive, customary fees and commissions for these transactions.

***7.75% Senior Notes Due 2021***

On June 13, 2013, we completed a private offering of $400 million in aggregate principal amount of the Company's 7.75% senior notes that will mature on June 15, 2021 (the "Original 7.75% Notes"). Interest on the notes is payable on each June 15 and December 15. We received net proceeds from this offering of approximately $388 million, after deducting initial purchasers' discounts and offering expenses, which we used to repay outstanding indebtedness under our credit facilities. The Original 7.75% Notes are senior unsecured obligations and are guaranteed on a joint and several senior unsecured basis by, with certain exceptions, substantially all of our existing and future subsidiaries.

On September 18, 2013, we issued an additional $200 million in aggregate principal amount of our 7.75% senior notes due 2021 (the "Additional 7.75% Notes" and, together with the Original 7.75% Notes, the "7.75% Notes") in a private offering at an issue price of 96.5% of the principal amount of the Additional 7.75% Notes. We received net proceeds of $188.8 million (after deducting the initial purchasers' discounts and offering expenses of $4.2 million) from the sale of the Additional 7.75% Notes. The Company also received cash for accrued interest from June 13, 2013 through the date of issuance of $4.1 million, for total net proceeds of $192.9 million from the sale of the Additional 7.75% Notes. The Additional 7.75% Notes were issued under the same indenture as the Original 7.75% Notes, and are, therefore, treated as a single class of securities under the indenture. We used the net proceeds from the offering to partially fund our acquisition of contiguous acreage in McMullen County, Texas (the "Wycross Acquisition") completed in October 2013, a portion of the 2013 and 2014 capital budgets, and for general corporate purposes.

The 7.75% Notes are senior unsecured obligations and rank equally in right of payment with all of our existing and future senior unsecured indebtedness. The 7.75% Notes rank senior in right of payment to our future subordinated indebtedness. The 7.75% Notes are effectively junior in right of payment to all of our existing and future secured debt (including under our Second Amended and Restated Credit Agreement) to the extent of the value of the assets securing such debt. The 7.75% Notes are fully and unconditionally guaranteed (except for customary release provisions) on a joint and several senior unsecured basis by the subsidiary guarantors party to the indenture governing the 7.75% Notes. To the extent set forth in the indenture governing the 7.75% Notes, certain of our subsidiaries will be required to fully and unconditionally guarantee the 7.75% Notes on a joint and several senior unsecured basis in the future.

The indenture governing the 7.75% Notes, among other things, restricts our ability and our restricted subsidiaries' ability to: (i) incur, assume, or guarantee additional indebtedness or issue certain types of equity securities; (ii) pay distributions on, purchase or redeem shares or purchase or redeem subordinated debt; (iii) make certain investments; (iv) enter into certain transactions with affiliates; (v) create or incur liens on their assets; (vi) sell assets; (vii) consolidate, merge or transfer all or substantially all of their assets; (viii) restrict distributions or other payments from the Company's restricted subsidiaries; and (ix) designate subsidiaries as unrestricted subsidiaries.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

We have the option to redeem all or a portion of the 7.75% Notes, at any time on or after June 15, 2017 at the applicable redemption prices specified in the indenture plus accrued and unpaid interest. We may also redeem the 7.75% Notes, in whole or in part, at a redemption price equal to 100% of their principal amount plus a make whole premium, together with accrued and unpaid interest and additional interest, if any, to the redemption date, at any time prior to June 15, 2017. In addition, we may be required to repurchase the 7.75% Notes upon a change of control or if we sell certain of our assets.

On July 18, 2014, we completed an exchange offer of $600 million aggregate principal amount of the 7.75% Notes that had been registered under the Securities Act of 1933, as amended (the “Securities Act”), for an equal amount of the 7.75% Notes that had not been registered under the Securities Act.

***6.125% Senior Notes Due 2023***

On June 27, 2014, the Company completed a private offering of $850 million in aggregate principal amount senior unsecured 6.125% notes due 2023 (the Original 6.125% Notes). Interest on the notes is payable on each July 15 and January 15. The Company received net proceeds from this offering of approximately $829 million, after deducting initial purchasers’ discounts and estimated offering expenses, which the Company used to repay all of the $100 million in borrowings outstanding under its Amended and Restated Credit Agreement and to finance a portion of the purchase price of the Catarina Acquisition. We used the remaining proceeds from the offering to fund a portion of the remaining 2014 capital budget and for general corporate purposes. The Original 6.125% Notes are the senior unsecured obligations of the Company and are guaranteed on a joint and several senior unsecured basis by, with certain exceptions, substantially all of the Company’s existing and future subsidiaries.

On September 12, 2014, we issued an additional $300 million in aggregate principal amount of our 6.125% senior notes due 2023 (the “Additional 6.125% Notes” and, together with the Original 6.125% Notes, the “6.125% Notes” and, together with the 7.75% Notes, the “Senior Notes”) in a private offering at an issue price of 100.75% of the principal amount of the Additional 6.125% Notes. We received net proceeds of $295.9 million, after deducting the initial purchasers’ discounts, adding premiums to face value of $2.3 million and deducting estimated offering expenses of $6.4 million. The Company also received cash for accrued interest from June 27, 2014 through the date of the issuance of $3.8 million, for total net proceeds of $299.7 million from the sale of the Additional 6.125% Notes. The Additional 6.125% Notes were issued under the same indenture as the Original 6.125% Notes, and are therefore treated as a single class of securities under the indenture. We used a portion of the net proceeds from the offering to fund a portion of the 2014 capital budget and used the remainder of the net proceeds to fund a portion of the 2015 capital budget, and for general corporate purposes.

The 6.125% Notes are senior unsecured obligations and rank equally in right of payment with all of our existing and future senior unsecured indebtedness. The 6.125% Notes rank senior in right of payment to the Company’s future subordinated indebtedness. The 6.125% Notes are effectively junior in right of payment to all of the Company’s existing and future secured debt (including under the Second Amended and Restated Credit Agreement) to the extent of the value of the assets securing such debt. The 6.125% Notes are fully and unconditionally guaranteed (except for customary release provisions) on a joint and several senior unsecured basis by the subsidiary guarantors party to the indenture governing the 6.125% Notes. To the extent set forth in the indenture governing the 6.125% Notes, certain of our subsidiaries will be required to fully and unconditionally guarantee the 6.125% Notes on a joint and several senior unsecured basis in the future.

The indenture governing the 6.125% Notes, among other things, restricts our ability and our restricted subsidiaries’ ability to: (i) incur, assume or guarantee additional indebtedness or issue certain types of equity securities;

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

(ii) pay distributions on, purchase or redeem shares or purchase or redeem subordinated debt; (iii) make certain investments; (iv) enter into certain transactions with affiliates; (v) create or incur liens on their assets; (vi) sell assets; (vii) consolidate, merge or transfer all or substantially all of their assets; (viii) restrict distributions or other payments from the Company's restricted subsidiaries; and (ix) designate subsidiaries as unrestricted subsidiaries.

The Company has the option to redeem all or a portion of the 6.125% Notes, at any time on or after July 15, 2018 at the applicable redemption prices specified in the indenture plus accrued and unpaid interest. The Company may also redeem the 6.125% Notes, in whole or in part, at a redemption price equal to 100% of their principal amount plus a make whole premium, together with accrued and unpaid interest and additional interest, if any, to the redemption date, at any time prior to July 15, 2018. In addition, the Company may redeem up to 35% of the 6.125% Notes prior to July 15, 2017 under certain circumstances with an amount not greater than the net cash proceeds of one or more equity offerings at the redemption price specified in the indenture. The Company may also be required to repurchase the 6.125% Notes upon a change of control or if we sell certain Company assets.

On February 27, 2015, we completed an exchange offer of $1.15 billion aggregate principal amount of the 6.125% Notes that had been registered under the Securities Act, for an equal amount of the 6.125% Notes that had not been registered under the Securities Act.

Pursuant to tripartite agreements by and among the Company, U.S. Bank National Association ("U.S. Bank") and Delaware Trust Company ("Delaware Trust"), effective May 20, 2016, U.S. Bank resigned as the Trustee, Notes Custodian, Registar and Paying Agent ("Trustee") under the indentures of the Senior Notes and Delaware Trust was appointed as successor Trustee. No other changes to the indentures for the 6.125% Notes or the 7.75% Notes were made at the time of the change in Trustee.

**Note 6. Stockholders' Equity**

*Common Stock Offerings*— On September 18, 2013, the Company completed a public offering of 11,040,000 shares of common stock (including 1,440,000 shares purchased pursuant to the full exercise of the underwriters' overallotment option), at an issue price of $23.00 per share. The Company received net proceeds from this offering of $241.4 million, after deducting underwriters' fees and offering expenses of $12.5 million. The Company used the net proceeds from the offering to partially fund the Wycross Acquisition completed in October 2013 and a portion of the 2013 and 2014 capital budgets, and for general corporate purposes.

On June 12, 2014, the Company completed a public offering of 5,000,000 shares of common stock, at an issue price of $35.25 per share. The Company received net proceeds from this offering of $167.5 million, after deducting underwriters' fees and offering expenses of $8.7 million. The Company used the net proceeds from the offering to partially fund the 2014 capital budget and for general corporate purposes.

As discussed further below in Note 19, "Subsequent Events," on February 6, 2017, the Company completed a public offering of 11,500,000 shares of common stock (including 1,500,000 shares purchased pursuant to the full exercise of the underwriters' overallotment option), at an issue price of $12.50 per share. The Company received net proceeds from this offering of $135.9 million, after deducting underwriters' discounts fees of approximately $7.8 million.

*Series A Preferred Stock Offering*—On September 17, 2012, the Company completed a private placement of 3,000,000 shares of Series A Preferred Stock, which were sold to a group of qualified institutional buyers pursuant to the Rule 144A exemption from registration under the Securities Act. The issue price of each share of the Series A Preferred

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Stock was $50.00. The Company received net proceeds from the private placement of $144.5 million, after deducting initial purchasers' discounts and commissions and offering costs of $5.5 million.

Each share of Series A Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.325 shares of common stock per share of Series A Preferred Stock (which is equal to an initial conversion price of $21.51 per share of common stock) and is subject to specified adjustments. As of December 31, 2016, based on the initial conversion price, approximately 4,275,640 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series A Preferred Stock.

The annual dividend on each share of Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Company's Board of Directors (the "Board"). The Company may, at its option, pay dividends in cash and, subject to certain conditions, common stock or any combination thereof. Dividends are cumulative, and as of December 31, 2016, all dividends accumulated through that date had been paid. The dividends accrued for the period from October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock on January 3, 2017.

Except as required by law or the Company's Amended and Restated Certificate of Incorporation, (the "Charter"), holders of the Series A Preferred Stock will have no voting rights unless dividends fall into arrears for six or more quarterly periods (whether or not consecutive). In that event and until such arrearage is paid in full, the holders of the Series A Preferred Stock and the holders of the Series B Preferred Stock, voting as a single class, will be entitled to elect two directors and the number of directors on the Board will increase by that same number.

At any time on or after October 5, 2017, the Company may at its option cause all outstanding shares of the Series A Preferred Stock to be automatically converted into common stock at the conversion price, if, among other conditions, the closing sale price (as defined) of the Company's common stock equals or exceeds 130% of the conversion price for a specified period prior to the conversion.

If a holder elects to convert shares of Series A Preferred Stock upon the occurrence of certain specified fundamental changes, the Company will be obligated to deliver an additional number of shares above the applicable conversion rate to compensate the holder for lost option time value of the shares of Series A Preferred Stock as a result of the fundamental change.

*Series B Preferred Stock Offering*—On March 26, 2013, the Company completed a private placement of 4,500,000 shares of Series B Preferred Stock. The issue price of each share of the Series B Preferred Stock was $50.00. The Company received net proceeds from the private placement of $216.6 million, after deducting placement agent's fees and offering costs of $8.4 million.

Each share of Series B Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock (which is equal to an initial conversion price of approximately $21.40 per share of common stock) and is subject to specified adjustments. As of December 31, 2016, based on the initial conversion price, approximately 8,244,539 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series B Preferred Stock.

The annual dividend on each share of Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. The Company may, at its option, pay dividends in cash and, subject to certain conditions,

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

common stock or any combination thereof. Dividends are cumulative, and as of December 31, 2016, all dividends accumulated through that date had been paid. The dividends accrued for the period from October 1 to December 31, 2016, were declared by the Board and paid with the Company's common stock on January 3, 2017.

Except as required by law or the Charter, holders of the Series B Preferred Stock will have no voting rights unless dividends fall into arrears for six or more quarterly periods (whether or not consecutive). In that event and until such arrearage is paid in full, the holders of the Series B Preferred Stock and the holders of the Series A Preferred Stock, voting as a single class, will be entitled to elect two directors and the number of directors on the Board will increase by that same number.

At any time on or after April 6, 2018, the Company may at its option cause all outstanding shares of the Series B Preferred Stock to be automatically converted into common stock at the conversion price, if, among other conditions, the closing sale price (as defined) of the Company's common stock equals or exceeds 130% of the conversion price for a specified period prior to the conversion.

If a holder elects to convert shares of Series B Preferred Stock upon the occurrence of certain specified fundamental changes, the Company will be obligated to deliver an additional number of shares above the applicable conversion rate to compensate the holder for lost option time value of the shares of Series B Preferred Stock as a result of the fundamental change.

*Preferred Stock Exchange*—On February 12, 2014 and February 13, 2014, the Company entered into exchange agreements with certain holders (the "February 2014 Holders") of the Series A Preferred Stock and the Series B Preferred Stock pursuant to which such holders agreed to exchange an aggregate of (i) 947,490 shares of the Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 2,425,574 shares of the Company's common stock, and (ii) 756,850 shares of the Series B Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 2,021,066 shares of the Company's common stock.

Additionally, on May 29, 2014, the Company entered into exchange agreements with certain holders (the "May 2014 Holders") of the Series A Preferred Stock and the Series B Preferred Stock pursuant to which such holders agreed to exchange an aggregate of (i) 166,025 shares of the Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 418,715 shares of the Company's common stock, and (ii) 210,820 shares of the Series B Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 553,980 shares of the Company's common stock.

Further, on August 28, 2014, the Company entered into exchange agreements with certain holders (the "August 2014 Holders,'" and together with the May 2014 Holders and the February 2014 Holders, the "Holders") of the Series A Preferred Stock, pursuant to which such holders agreed to exchange an aggregate of 47,500 shares of Series A Preferred Stock (and waive their rights to any accrued and unpaid dividends thereon) for 119,320 shares of the Company's common stock.

Since the Holders were not entitled to any consideration over and above the initial conversion rates of 2.325 and 2.337 shares of common stock for each preferred share exchanged for Series A Preferred Stock and Series B Preferred Stock, respectively, any consideration is considered an inducement for the Holders to convert earlier than the Company could have forced conversion.

The Company has determined the fair value of consideration transferred to the Holders and the fair value of consideration transferrable pursuant to the original conversion terms. The $13.9 million, $3.1 million and $0.3 million

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

excess of the fair value of the shares of common stock issued over the carrying value of the Series A Preferred Stock and Series B Preferred Stock redeemed in connection with the exchange agreements entered into in February, May and August 2014, respectively, has been reflected as an additional preferred stock dividend (i.e., as an increase in accumulated deficit) to arrive at net loss attributable to common stockholders in our condensed consolidated financial statements.

*Preferred Stock Conversion*—On November 20, 2015, a holder of our Series B Preferred Stock exercised its right to convert 4,500 shares our Series B Preferred Stock, at the prescribed initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock, in exchange for 10,517 shares of our common stock.

*NOL Rights Plan*—On July 28, 2015, the Company entered into a net operating loss carryforwards ("NOLs") rights plan (the "Rights Plan") with Continental Stock Transfer & Trust Company, as rights agent. In connection therewith, the Board declared a dividend of one preferred share purchase right ("Right") for each outstanding share of the Company's common stock. The dividend was paid on August 10, 2015 to stockholders of record as of the close of business on August 7, 2015 (the "NOL Record Date"). In addition, one Right automatically attaches to each share of common stock issued between the NOL Record Date and such date as when the Rights become exercisable.

*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net earnings (loss) per share for the years ended December 31, 2016, 2015, and 2014 (in thousands, except per share amounts):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| **Net loss** | $ (256,958) | $ (1,454,627) | $ (21,791) |
| Less: | | | |
| Preferred stock dividends | (15,948) | (16,008) | (33,590) |
| Net loss allocable to participating securities[(1)(2)] | — | — | — |
| **Net loss attributable to common stockholders** | $ (272,906) | $ (1,470,635) | $ (55,381) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic net loss per share | 58,900 | 57,229 | 52,338 |
| Dilutive shares[(3)(4)(5)] | — | — | — |
| Denominator for diluted loss per common share | 58,900 | 57,229 | 52,338 |
| **Net loss per common share - basic and diluted** | $ (4.63) | $ (25.70) | $ (1.06) |

(1) The Company's restricted shares of common stock are participating securities.

(2) For the years ended December 31, 2016, 2015 and 2014, no losses were allocated to participating restricted stock because such securities do not have a contractual obligation to share in the Company's losses.

(3) The year ended December 31, 2016 excludes 2,113,462 shares of weighted average restricted stock and 12,554,481 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

(4) The year ended December 31, 2015 excludes 2,663,010 shares of weighted average restricted stock and 12,529,314 shares of common stock resulting

from an assumed conversion of the Company's Series A Preferred Stock and

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

(5) The year ended December 31, 2014 excludes 1,732,888 shares of weighted average restricted stock and 13,527,738 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted earnings (loss) per common share as these shares were anti-dilutive.

**Note 7. Stock-Based Compensation**

At the Annual Meeting of Stockholders of the Company held on May 24, 2016 ("2016 Annual Meeting"), the Company's stockholders approved the Sanchez Energy Corporation Third Amended and Restated 2011 Long Term Incentive Plan (the "LTIP"). The Board had previously approved the LTIP on May 21, 2015, subject to stockholder approval.

The Company's directors and consultants as well as employees of SOG and its affiliates (excluding the Company) (collectively, the "Sanchez Group") who provide services to the Company are eligible to participate in the LTIP. Awards to participants may be made in the form of stock options, stock appreciation rights, restricted shares, phantom stock, other stock-based awards or stock awards, or any combination thereof. The maximum shares of common stock that may be delivered with respect to awards under the LTIP shall be (i) 17,239,790 shares plus (ii) upon the issuance of additional shares of common stock from time to time after April 1, 2016, an automatic increase equal to the lesser of (A) 15% of such issuance of additional shares of common stock, and (B) such lesser number of shares of common stock as determined by the Board or Compensation Committee; provided, however, withheld to satisfy tax withholding obligations are not considered to be delivered under the LTIP. If any award is forfeited, cancelled, exercised, paid, or otherwise terminates or expires without the actual delivery of shares of common stock pursuant to such award (the grant of restricted stock is not a delivery of shares of common stock for this purpose), the shares subject to such award shall again be available for awards under the LTIP. There shall not be any limitation on the number of awards that may be paid in cash. Any shares delivered pursuant an award shall consist, in whole or in part, of shares of common stock newly issued by the Company, shares of common stock acquired in the open market, from any affiliate of the Company, or any combination of the foregoing, as determined by the Board or Compensation Committee in its discretion.

The LTIP is administered by the Compensation Committee of the Board as appointed by the Board. The Board may terminate or amend the LTIP at any time with respect to any shares for which a grant has not yet been made. The Board has the right to alter or amend the LTIP or any part of the LTIP from time to time, including increasing the number of shares that may be granted, subject to stockholder approval as may be required by the exchange upon which shares of the common stock are listed at that time, if any. No change may be made in any outstanding grant that would materially reduce the benefits of the participant without the consent of the participant. The LTIP will expire upon its termination by the Board or, if earlier, when no shares remain available under the LTIP for awards. Upon termination of the LTIP, awards then outstanding will continue pursuant to the terms of their grants.

The Company records stock-based compensation expense for awards granted to its directors (for their services as directors) in accordance with the provisions of ASC 718, "Compensation—Stock Compensation." Stock-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Awards granted to employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 505-50, "Equity-Based Payments to Non-Employees." For awards granted to non-employees, the Company records compensation expenses equal to the fair value of the stock-based award at the measurement date, which is determined to be the earlier of the performance commitment date or the service completion date. Compensation expense for unvested awards to non-employees is revalued at each period end and is amortized over the vesting period of the stock-based award. Stock-based payments are measured based on the fair value of the equity instruments granted, as it is more determinable than the value of the services rendered.

For the restricted stock awards granted to non-employees, stock-based compensation expense is based on fair value re-measured at each reporting period and recognized over the vesting period using the straight-line method. Compensation expense for these awards will be revalued at each period end until vested.

During the year ended December 31, 2016, the Company issued 156,126 shares of restricted common stock pursuant to the LTIP to five directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair values of $8.00 and $5.81 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the vesting period.

The Company also issued approximately 4.4 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 3.3 million shares of restricted common stock vest in equal annual amounts over a three-year period and the remaining 1.1 million shares of restricted common stock with cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

During the year ended December 31, 2015, the Company issued 95,237 shares of restricted common stock pursuant to the LTIP to five directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair values of $12.65 and $9.80 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the vesting period

The Company also issued approximately 3.4 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 3.3 million shares of restricted common stock vest in equal annual amounts over a three-year period and approximately 0.1 million shares of restricted common stock vest in equal annual amounts over a five-year period.

During the year ended December 31, 2014, the Company issued 35,769 shares of restricted common stock pursuant to the LTIP to four directors of the Company that vest within one year from the date of grant. Pursuant to ASC 718, stock-based compensation expense for these awards was based on their grant date fair value of $33.05 and $14.90 per share (the closing sales price of the Company's common stock on the grant date) and is being amortized over the one year vesting period.

The Company also issued approximately 2.0 million shares of restricted common stock pursuant to the LTIP to certain employees and consultants of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 0.7 million shares of restricted common stock vest in equal annual amounts over a two-year

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

period and approximately 1.3 million shares of restricted common stock vest in equal annual amounts over a three-year period.

In February 2016 and April 2016, the Compensation Committee approved several new forms of agreement for use in equity awards pursuant to the LTIP. The new forms of agreements consist of two new forms of restricted stock award agreements, one of which provides for vesting in equal annual increments over a three year period from the grant date (the "Grant Date") and the other of which provides for cliff vesting five years after the Grant Date or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the form of agreement (the "Performance Accelerated Restricted Stock" or "PARS"), and two new forms of phantom stock agreements payable only in cash, one of which provides for vesting in equal annual increments over a three year period from the Grant Date (the "Phantom Stock") and the other of which provides for cliff vesting five years after the Grant Date or earlier if the Company's common stock closing price equals or exceeds certain benchmarks as set forth in the form of agreement (the "Performance Accelerated Phantom Stock" or "PAPS").

The PARS, PAPS and Phantom Stock awards granted to certain employees of the Sanchez Group (including those employees of the Sanchez Group who also serve as the Company's officers) and consultants in exchange for services are considered awards to non-employees and the Company records stock-based compensation expense for these awards at fair value in accordance with the provisions of ASC 718, "Compensation – Stock Compensation." In accordance with the guidance, the inclusion of market performance acceleration conditions does not change the accounting classification as compared to the restricted stock without market performance acceleration conditions, as both are still classified as equity within the Company's balance sheet. The Phantom Stock awards are required to be settled in cash by the Company and, per the guidance, should be classified as a liability. Compensation expense for the unvested awards is revalued at each period end and is amortized over the vesting period of the stock-based award.

During the year ended December 31, 2016, the Company issued approximately 1.1 million shares of PARS pursuant to the LTIP to certain employees of SOG (including the Company's officers), with whom the Company has a services agreement. These PARS shares vest have cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

During the year ended December 31, 2016, the Company issued approximately 4.0 million shares of Phantom Stock and PAPS pursuant to the LTIP to certain employees of SOG (including the Company's officers), with whom the Company has a services agreement. Approximately 2.8 million shares of Phantom Stock vest in equal annual amounts over a three-year period and the remaining 1.2 million shares of PAPS have cliff vesting at the end of a five-year period or earlier if the common stock closing price equals or exceeds certain benchmarks as set forth in the forms of agreement.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Restricted stock awards, directors | $ 1,000 | $ 917 | $ 802 |
| Restricted stock awards, non-employees | 18,145 | 13,914 | 12,041 |
| Phantom Stock awards | 17,945 | — | — |
| Total stock-based compensation expense | $ 37,090 | $ 14,831 | $ 12,843 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $22.2 million of unrecognized compensation cost related to these non-vested restricted shares (excluding the PARS shares) outstanding. The cost is expected to be recognized over a weighted average period of approximately 1.85 years.

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $3.9 million of unrecognized compensation cost related to these non-vested PARS restricted shares outstanding. The cost is expected to be recognized over a weighted average period of approximately 3.42 years.

Based on the $9.03 per share closing price of the Company's common stock on December 31, 2016, there was approximately $23.2 million of unrecognized compensation cost related to the non-vested PAPS and Phantom Stock award shares outstanding. The cost is expected to be recognized over an average period of approximately 2.50 years.

A summary of the status of the non-vested restricted common shares and PARS as of December 31, 2016 is presented below (in thousands, except per share amounts):

| | Number of Shares | Weighted Average Fair Value | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|
| Non-vested common stock at December 31, 2015 | 4,425,767 | $ 12.21 | $ 54,053 |
| Granted | 4,558,640 | 4.59 | 20,930 |
| Vested | (1,991,025) | 5.04 | (10,036) |
| Forfeited | (466,407) | 10.85 | (5,061) |
| Non-vested common stock at December 31, 2016 | 6,526,975 | $ 9.18 | $ 59,886 |

As of December 31, 2016, approximately 6.7 million shares remain available for future issuance to participants under the LTIP.

A summary of the status of the non-vested Phantom Stock shares and PAPS as of December 31, 2016 is presented below (in thousands, except per share amounts):

| | Number of Shares | Weighted Average Fair Value | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|
| Non-vested common stock at December 31, 2015 | — | $ — | $ — |
| Granted | 3,990,413 | 4.87 | 19,451 |
| Vested | — | — | — |
| Forfeited | (78,000) | 6.62 | (516) |
| Non-vested common stock at December 31, 2016 | 3,912,413 | $ 4.84 | $ 18,935 |

F-33

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 8. Income Taxes**

The components of the federal income tax provision for the years ended December 31, 2016, 2015 and 2014 are (in thousands):

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Current expense as a result of current operations | $ 1,825 | $ 158 | $ — |
| Deferred benefit as a result of current operations | (86,606) | (506,943) | (11,429) |
| Increase in valuation allowance | 86,606 | 514,385 | — |
| Net income tax expense (benefit) | $ 1,825 | $ 7,600 | $ (11,429) |

The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 35% and the Company's effective tax rate of (0.7)% is summarized as follows (in thousands):

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Income tax benefit at the federal statutory rate | $ (89,297) | $ (506,460) | $ (11,627) |
| Officers' compensation limitation | 3,115 | 1,328 | — |
| State Taxes (net of federal benefit) | (232) | (5,463) | — |
| Non-deductible general and administrative expenses | 743 | 309 | 231 |
| Percentage depletion carryforward | (144) | — | (107) |
| Other | 39 | — | — |
| Differences between actual income taxes and amounts estimated in prior years | 995 | 3,501 | 74 |
| Income tax expense (benefit) | (84,781) | (506,785) | (11,429) |
| Valuation allowance | 86,606 | 514,385 | — |
| Net income tax expense (benefit) | $ 1,825 | $ 7,600 | $ (11,429) |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The Company’s deferred tax position reflects the net tax effects of the temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax reporting. Significant components of the deferred tax assets and liabilities are as follows (in thousands):

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Deferred tax assets (liabilities): | | |
| Derivative assets (obligations) | $ 12,516 | $ (54,638) |
| Depreciable, depletable property, plant and equipment | 144,348 | 288,736 |
| Share-based compensation | 12,408 | 2,897 |
| Revenue Recognition | 7,077 | 8,417 |
| Other | 1,085 | (535) |
| Federal net operating loss carryforward | 420,302 | 268,068 |
| State net operating loss carryforward | 3,256 | 1,440 |
| Deferred tax assets: | 600,992 | 514,385 |
| Valuation allowance | (600,992) | (514,385) |
| Total Deferred tax assets | $ — | $ — |

As of December 31, 2016, the Company had NOLs of approximately $1,200.9 million which begin to expire in 2031. Additionally, the Company had net operating losses in the states of Montana, Mississippi, and Louisiana which will begin to expire in 2018, 2033 and 2026, respectively.

Management assesses the available positive and negative evidence to estimate if sufficient future taxable income will be generated to use the existing deferred tax assets. A significant piece of objective negative evidence evaluated was the cumulative loss incurred over the three-year period ended December 31, 2016.

On the basis of this evaluation, as of December 31, 2016, a valuation allowance of approximately $601.0 million has been recorded to record only the portion of the deferred tax asset that is more likely than not to be realized. The Company will continue to assess the need for a valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

The Company files income tax returns in the U.S. and various state jurisdictions. Sanchez is no longer subject to examination by federal income tax authorities prior to 2013. State statues vary by jurisdiction.

As of December 31, 2016, 2015 and 2014, the Company had no material uncertain tax positions.

**Note 9. Related Party Transactions**

SOG, headquartered in Houston, Texas, is a private full service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates.

The Company does not have any employees. On December 19, 2011 it entered into a services agreement with SOG pursuant to which specified employees of SOG provide certain services with respect to the Company's business under the direction, supervision and control of SOG. Pursuant to this arrangement, SOG performs centralized corporate functions for the Company, such as general and administrative services, geological, geophysical and reserve engineering,

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

lease and land administration, marketing, accounting, operational services, information technology services, compliance, insurance maintenance and management of outside professionals. The Company compensates SOG for the services at a price equal to SOG's cost of providing such services, including all direct costs and indirect administrative and overhead costs (including the allocable portion of salary, bonus, incentive compensation and other amounts paid to persons that provide the services on SOG's behalf) allocated in accordance with SOG's regular and consistent accounting practices, including for any such costs arising from amounts paid directly by other members of the Sanchez Group on SOG's behalf or borrowed by SOG from other members of the Sanchez Group, in each case, in connection with the performance by SOG of services on the Company's behalf. The Company also reimburses SOG for sales, use or other taxes, or other fees or assessments imposed by law in connection with the provision of services to the Company (other than income, franchise or margin taxes measured by SOG's net income or margin and other than any gross receipts or other privilege taxes imposed on SOG) and for any costs and expenses arising from or related to the engagement or retention of third party service providers.

Salaries and associated benefits of SOG employees and are allocated to the Company based on a fixed percentage that is reviewed quarterly and adjusted, if needed, based on a detailed analysis of actual time spent by the professional staff on Company projects and activities. General and administrative expenses such as office rent, utilities, supplies and other overhead costs, are allocated on the same percentages as the SOG employee salaries. Expenses allocated to the Company for general and administrative expenses for the years ended December 31, 2016, 2015 and 2014 are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Administrative fees | $ 40,901 | $ 30,430 | $ 33,610 |
| Third-party expenses | 5,001 | 5,427 | 4,515 |
| Total included in general and administrative expenses | $ 45,902 | $ 35,857 | $ 38,125 |

As of December 31, 2016 and December 31, 2015, the Company had a net receivable from SOG and other members of the Sanchez Group of $6.4 million and $3.7 million, respectively, which are reflected as "Accounts receivable—related entities" and "Accounts payable—related entities," respectively, in the consolidated balance sheets. The net receivable as of December 31, 2016 and December 31, 2015 consists primarily of advances paid related to leasehold and other costs paid to SOG. In addition, the net receivable as of December 31, 2016 and December 31, 2015 includes approximately $0.7 million and $0.7 million, respectively, of net receivable from Sanchez Resources, LLC ("Sanchez Resources").

As of December 31, 2016, the Company had a net payable to SPP of approximately $9.0 million that consists primarily of the November and December accrual for fees associated with the Gathering Agreement (see Note 3, "Acquisitions and Divestitures" for further discussion), which is reflected in the "Other Accrued liabilities" account on the consolidated balance sheets.

*Production Asset Transaction*

On November 22, 2016, we completed the Production Asset Transaction discussed above to SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

Case Document Filed in TXSB on Page

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

*Carnero Processing Disposition*

On November 22, 2016, we sold our membership interests in Carnero Processing, LLC ("Carnero Processing"), to SPP, which is a related party (see Note 16, "Investments").

*Carnero Gathering Disposition*

On July 5, 2016, we sold our membership interests in Carnero Gathering, LLC ("Carnero Gathering") to SPP, which is a related party (see Note 16, "Investments").

*Palmetto Disposition*

On March 31, 2015, we completed the Palmetto Disposition discussed above to a subsidiary of SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

*Western Catarina Midstream Divestiture*

On October 14, 2015, we completed the Western Catarina Midstream Divestiture discussed above to SPP, which is a related party (see Note 3, "Acquisitions and Divestitures").

*TMS Asset Purchase*

In August 2013, we acquired rights to approximately 40,000 net undeveloped acres in what we believe to be the core of the TMS (the "TMS Transaction") for cash and shares of our common stock. In connection with the TMS Transaction, we established an Area of Mutual Interest ("AMI") in the TMS with SR Acquisition I, LLC ("SR"), a subsidiary of our affiliate Sanchez Resources, which transaction included a carry on drilling costs for up to 6 gross (3 net) wells. Sanchez Resources is indirectly owned, in part, by our Chief Executive Officer and the Executive Chairman of the Board, who each also serve on our Board. Eduardo Sanchez, Patricio Sanchez and Ana Lee Sanchez Jacobs, each an immediate family member of our Chief Executive Officer and the Executive Chairman of our Board, collectively, either directly or indirectly, own a majority of the equity interests of Sanchez Resources. Sanchez Resources is managed by Eduardo Sanchez, who is the brother of our Chief Executive Officer and the son of our Executive Chairman of the Board. In addition, Eduardo Sanchez was named President of Sanchez Energy, effective as of October 1, 2015.

As part of the transaction, we acquired our working interests in the AMI owned at closing from three sellers (two third parties and one related party of the Company, SR) resulting in our owning an undivided 50% working interest across the AMI through the TMS.

Total consideration for the transactions consisted of approximately $70 million in cash and the issuance of 342,760 common shares of the Company, valued at approximately $7.5 million. The total cash consideration provided to SR, an affiliate of the Company, was $14.4 million, before consideration of any well carries. The acquisitions were accounted for as the purchase of assets at cost at the acquisition date. We also committed, as a part of the total consideration, to carry SR for its 50% working interest in an initial 3 gross (1.5 net) TMS wells to be drilled within the AMI (the "Initial Well Carry") with an option to drill an additional 6 gross (3 net) TMS wells ("Additional Wells") within the AMI. In August 2015, after completing the Initial Well Carry, the Company signed an agreement with SR whereby the Company paid SR approximately $8 million in lieu of drilling the remaining two

Additional Wells (the “Buyout Agreement”). The Buyout Agreement stipulates that SN has earned all rights to all acreage stated in the TMS Transaction and effectively terminates any future well carry commitments.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

## Note 10. Derivative Instruments

To reduce the impact of fluctuations in oil and natural gas prices on the Company's revenues, or to protect the economics of property acquisitions, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. The derivative contracts may include fixed-for-floating price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed-for-floating price swaps by agreeing to expand the notional quantity hedged under a fixed-for-floating price swap at the counterparty's election on a designated date.

These hedging activities, which are governed by the terms of our Second Amended and Restated Credit Agreement, are intended to support oil and natural gas prices at targeted levels and manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market makers. All of our derivatives with lenders, or affiliates of lenders, in our Second Amended and Restated Credit Agreement are collateralized by the assets securing our Second Amended and Restated Credit Agreement and, therefore, do not currently require the posting of cash collateral. Our existing derivatives with non-lender counterparties, as designated under the Second Amended and Restated Credit Agreement, are unsecured and do not require the posting of cash collateral. It is never the Company's intention to enter into derivative contracts for speculative trading purposes.

All of our derivatives are accounted for as mark-to-market activities. Under ASC Topic 815, "Derivatives and Hedging," these instruments are recorded on the condensed consolidated balance sheets at fair value as either short term or long term assets or liabilities based on their anticipated settlement date. The Company nets derivative assets and liabilities by commodity for counterparties where a legal right to such offset exists. Changes in the derivatives' fair values are recognized in current earnings since the Company has elected not to designate its current derivative contracts as cash flow hedges for accounting purposes.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The following table presents derivative positions for the periods indicated as of December 31, 2016:

| | January 1 - December 31, 2017 | 2018 | 2019 |
|---|---|---|---|
| **Oil positions:** | | | |
| Fixed-for-floating price swaps (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 1,825,000 | - | - |
| Average price ($/Bbl) | $ 51.70 | $ - | $ - |
| | | | |
| Collars (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 730,000 | - | - |
| Average long put price ($/Bbl) | $ 45.00 | $ - | $ - |
| Average short call price ($/Bbl) | $ 62.00 | $ - | $ - |
| | | | |
| **Natural gas positions:** | | | |
| Fixed-for-floating price swaps (NYMEX Henry Hub): | | | |
| Hedged volume (MMBtu) | 40,805,000 | 29,532,500 | 7,300,000 |
| Average price ($/MMBtu) | $ 3.07 | $ 3.02 | $ 3.02 |

The following table sets forth a reconciliation of the changes in fair value of the Company's commodity derivatives for the years ended December 31, 2016, 2015, and 2014 (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Beginning fair value of commodity derivatives | $ 178,283 | $ 123,316 | $ (3,397) |
| Net gains (losses) on crude oil derivatives | (47,389) | 170,592 | 115,602 |
| Net gains (losses) on natural gas derivatives | (30,307) | 26,843 | 21,603 |
| Net settlements on derivative contracts: | | | |
| Crude oil | (135,491) | (123,946) | (4,503) |
| Natural gas | (24,657) | (18,522) | (1,097) |
| Net premiums on derivative contracts: | | | |
| Crude oil | 24,547 | — | (4,892) |
| Ending fair value of commodity derivatives | $ (35,014) | $ 178,283 | $ 123,316 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

***Balance Sheet Presentation***

The Company's derivatives are presented on a net basis as "Fair value of derivative instruments" on the consolidated balance sheets. The following information summarizes the gross fair values of derivative instruments, presenting the impact of offsetting the derivative assets and liabilities on the Company's consolidated balance sheets (in thousands):

| | December 31, 2016 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 844 | $ (844) | $ — |
| Long-term asset | 1,426 | (1,426) | — |
| Total asset | $ 2,270 | $ (2,270) | $ — |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 32,622 | $ (844) | $ 31,778 |
| Long-term liability | 4,662 | (1,426) | 3,236 |
| Total liability | $ 37,284 | $ (2,270) | $ 35,014 |

| | December 31, 2015 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 172,518 | $ (24) | $ 172,494 |
| Long-term asset | 5,821 | (32) | 5,789 |
| Total asset | $ 178,339 | $ (56) | $ 178,283 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 24 | $ (24) | $ — |
| Long-term liability | 32 | (32) | — |
| Total liability | $ 56 | $ (56) | $ — |

**Note 11. Fair Value of Financial Instruments**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an

orderly transaction between market participants at the measurement date. Fair value measurements are classified and disclosed in one of the following categories:

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Level 1:** Measured based on unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities. Active markets are considered those in which transactions for the assets or liabilities occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

**Level 2:** Measured based on quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability. This category includes those derivative instruments that can be valued using observable market data. Substantially all of these inputs are observable in the marketplace throughout the term of the derivative instrument, can be derived from observable data, or supported by observable levels at which transactions are executed in the marketplace.

**Level 3:** Measured based on prices or valuation models that require inputs that are both significant to the fair value measurement and less observable from objective sources (i.e. supported by little or no market activity). The valuation models used to value derivatives associated with the Company's oil and natural gas production are primarily industry standard models that consider various inputs including: (a) quoted forward prices for commodities, (b) time value, and (c) current market and contractual prices for the underlying instruments, as well as other relevant economic measures. Although third party quotes are utilized to assess the reasonableness of the prices and valuation techniques, there is not sufficient corroborating evidence to support classifying these assets and liabilities as Level 2.

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

***Fair Value on a Recurring Basis***

The following tables set forth, by level within the fair value hierarchy, the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2016 and 2015 (in thousands):

| | As of December 31, 2016 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash and cash equivalents:* | | | | |
| Money market funds | $ 443,648 | $ — | $ — | $ 443,648 |
| *Equity investment:* | | | | |
| Investment in SPP | 26,818 | — | — | 26,818 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | (8,291) | — | (8,291) |
| Collars | — | (572) | — | (572) |
| *Gas derivative instruments:* | | | | |
| Swaps | — | (26,151) | — | (26,151) |
| Total | $ 470,466 | $ (35,014) | $ — | $ 435,452 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash and cash equivalents:* | | | | |
| Money market funds | $ 399,448 | $ — | $ — | $ 399,448 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 72,887 | — | 72,887 |
| Puts | — | 76,583 | — | 76,583 |
| *Gas derivative instruments:* | — | — | — | — |
| Swaps | — | 28,813 | — | 28,813 |
| Total | $ 399,448 | $ 178,283 | $ — | $ 577,731 |

*Financial Instruments:* The Level 1 instruments presented in the tables above consist of money market funds included in cash and cash equivalents on the Company's consolidated balance sheets as of December 31, 2016 and 2015. The Company's money market funds represent cash equivalents backed by the assets of high-quality banks and financial institutions. The Company identified the money market funds as Level 1 instruments due to the fact that the money market funds have daily liquidity, quoted prices for the underlying investments can be obtained and there are active markets for the underlying investments. In addition, the Level 1 instruments include the Company's equity investment in common units of SPP as further discussed in Note 16, "Investments." The investment in SPP is being accounting for under the fair value option, included in investments on the Company's balance sheet as of December 31, 2016. The Company identified the common units in SPP as a Level 1 instruments due to the fact that SPP is a publicly traded company on the NYSE MKT with daily quoted prices that can be easily obtained.

The Company's derivative instruments, which consist of swaps, collars and puts, are classified as Level 2 as of December 31, 2016 and 2015, in the table above. The fair values of the Company's derivatives are based on third-party pricing models which utilize inputs that are either readily available in the public market, such as forward curves, or can be corroborated from active markets of broker quotes. Swaps and collars generally have no unobservable inputs and they are classified as Level 2. Puts and call swaption derivatives have inputs which are observable, either directly or indirectly, using market data. As of December 31, 2016 and 2015, the Company believes that substantially all of the inputs required to calculate the fair value of puts and call swaptions are observable in the marketplace throughout the term of these derivative instruments or supported by observable levels at which transactions are executed in the marketplace, and are, therefore, classified as Level 2. Derivative instruments are also subject to the risk that counterparties will be unable to meet their obligations. Such non-performance risk is considered in the valuation of the Company's derivative instruments, but to date has not had a material impact on estimates of fair values. Significant changes in the quoted forward prices for commodities and changes in market volatility generally lead to corresponding changes in the fair value measurement of the Company's derivative instruments.

There were no derivative instruments classified as Level 3 as of December 31, 2016 or December 31, 2015. The fair values of the Company's derivative instruments classified as Level 3 as of December 31, 2014 were $75.5 million. The significant unobservable inputs for Level 3 contracts as of December 31, 2014 include unpublished forward prices of commodities, market volatility and credit risk of counterparties.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The following table sets forth a reconciliation of changes in the fair value of the Company's derivative instruments classified as Level 3 in the fair value hierarchy (in thousands):

| | (Level 3) Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Beginning balance | $ — | $ 75,523 | $ (519) |
| Total gains (losses) included in earnings | — | 418 | 81,404 |
| Net settlements on derivative contracts(1) | — | (14,277) | (5,362) |
| Derivative contracts transferred to Level 2 | — | (61,664) | — |
| Ending balance | $ — | $ — | $ 75,523 |
| Gains (losses) included in earnings related to derivatives still held as of December 31, 2016, 2015, and 2014 | $ — | $ (940) | $ 76,760 |

(1) Includes ($12,919) of net settlements in Level 2 that were transferred from Level 3 during 2015.

***Fair Value on a Non-Recurring Basis***

The Company follows the provisions of ASC 820-10 for nonfinancial assets and liabilities measured at fair value on a non-recurring basis. Fair value measurements of assets acquired and liabilities assumed in business combinations are based on inputs that are not observable in the market and thus represent Level 3 inputs. The fair value of acquired properties is based on market and cost approaches. Our purchase price allocations for the Catarina Acquisition is presented in Note 3, "Acquisitions and Divestitures." Liabilities assumed include asset retirement obligations existing at the date of acquisition. Asset retirement obligation estimates are derived from historical costs as well as management's expectation of future cost environments. As there is no corroborating market activity to support the assumptions, the Company has designated these liabilities as Level 3. A reconciliation of the beginning and ending balances of the Company's asset retirement obligations is presented in Note 12, "Asset Retirement Obligations."

In connection with the exchange agreements entered into in February, May and August 2014 by the Company with certain holders of the Company's Series A Preferred Stock and Series B Preferred Stock, the Company issued common stock according to the conversion rate pursuant to each agreement and additional shares to induce the holders of the preferred stock to convert prior to the date the Company could mandate conversion. In addition, on November 20, 2015, a holder of our Series B Preferred Stock exercised its right to convert 4,500 shares our Series B Preferred Stock, at the prescribed initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock, in exchange for 10,517 shares of our common stock. The fair value of the common stock issued is based on the price of the Company's common stock on the date of issuance. There were no conversions of Series A Preferred Stock or Series B Preferred Stock into shares of the Company's common stock during the year ended December 31, 2016. As there is an active market for the Company's common stock, the Company has designated this fair value measurement as Level 1. A detailed description of the Company's common stock and preferred stock issuances and redemptions is presented in Note 6, "Stockholders' Equity."

***Fair Value of Other Financial Instruments***

Financial instruments not carried at fair value consist of oil and natural gas receivables, accounts payable and accrued liabilities and long-term debt. The carrying amounts of our oil and natural gas receivables, accounts payable and accrued liabilities approximate fair value due to the highly liquid nature of these short term instruments. The registered 7.75% Notes are traded in an active market, and as such, are classified as Level 1 financial instruments. The estimated

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

fair value of the 7.75% Notes was $612.0 million as of December 31, 2016, and was calculated using quoted market prices based on trades of such debt as of that date. The Company uses a market approach to determine fair value of its unregistered 6.125% Notes using observable market data. However, as the market for the 6.125% Notes is far less active than that of the 7.75% Notes, the Company also uses comparable market values for similar instruments, which results in a Level 2 fair value measurement. The estimated fair value of the 6.125% Notes was $1,098.3 million as of December 31, 2016.

**Note 12. Asset Retirement Obligations**

The Company's asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. Revisions in estimated liabilities during the period relate primarily to changes in estimates of asset retirement costs. Revisions in estimated liabilities can also include, but are not limited to, revisions of estimated inflation rates, changes in property lives, and the expected timing of settlement. The changes in the asset retirement obligation for the years ended December 31, 2016 and 2015 were as follows (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Abandonment liability as of January 1, | $ 25,907 | $ 25,694 |
| Liabilities incurred during period | 1,492 | 6,021 |
| Acquisitions | 219 | — |
| Divestitures | (4,433) | (379) |
| Revisions | (172) | (7,623) |
| Accretion expense | 2,074 | 2,194 |
| Abandonment liability as of December 31, | $ 25,087 | $ 25,907 |

**Note 13. Accrued Liabilities**

The following information summarizes accrued liabilities as of December 31, 2016 and 2015 (in thousands):

| | As of December 31, 2016 | As of December 31, 2015 |
|---|---|---|
| Capital expenditures | $ 35,154 | $ 51,983 |
| Other: | | |
| General and administrative costs | 14,738 | 5,214 |
| Production taxes | 2,396 | 2,532 |
| Ad valorem taxes | 2,756 | 886 |
| Lease operating expenses | 23,942 | 27,077 |
| Interest payable | 34,266 | 34,265 |
| Preferred stock dividends and other | 4,360 | — |
| Total accrued liabilities | $ 117,612 | $ 121,957 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

**Note 14. Commitments and Contingencies**

*Litigation*

From time to time, the Company may be involved in lawsuits that arise in the normal course of its business. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

On December 4, 2013, and December 16, 2013, three derivative actions were filed in the Court of Chancery of the State of Delaware against the Company, certain of its officers and directors, Sanchez Resources, Altpoint Capital Partners LLC and Altpoint Sanchez Holdings, LLC (Friedman v. A.R. Sanchez, Jr. et al., No. 9158; City of Roseville Employees' Retirement System v. A.R. Sanchez, Jr. et al., No. 9132; and Delaware County Employees Retirement Fund v. A.R. Sanchez, Jr. et al., No. 9165 (collectively, the "Consolidated Derivative Actions")).

On December 20, 2013, the Consolidated Derivative Actions were consolidated, co-lead counsel for the plaintiffs was appointed and the plaintiffs were ordered to file an amended consolidated complaint (In re Sanchez Energy Derivative Litigation, Consolidated C.A. No. 9132-VCG, hereinafter, the "Delaware Derivative Action"). On January 28, 2014, a verified consolidated stockholder derivative complaint was filed. The Consolidated Derivative Actions concern the Company's purchase of working interests in the TMS from SR. Plaintiffs alleged breaches of fiduciary duty against the individual defendants as directors of the Company; breaches of fiduciary duty against Antonio R. Sanchez, III as an executive director of the Company; aiding and abetting breaches of fiduciary duty against SR, Eduardo Sanchez, Altpoint Capital Partners LLC and Altpoint Sanchez Holdings, LLC; and unjust enrichment against A.R. Sanchez, Jr. and Antonio R. Sanchez, III. All of the defendants filed a motion to dismiss on April 1, 2014. Briefing concerning the motions to dismiss concluded on June 27, 2014. A hearing was held on August 11, 2014, on the motions to dismiss, and the court subsequently granted the motions to dismiss. The plaintiffs appealed the case to the Delaware Supreme Court for which the parties fully briefed the appeal and provided oral argument. On October 2, 2015, the Delaware Supreme Court reversed the motions to dismiss and remanded the case to the Court of Chancery of the State of Delaware. The Consolidated Derivative Actions are currently in the early stages of discovery. A mediation in connection with the matter was held on July 7, 2016. The Company is unable to reasonably predict an outcome or to reasonably estimate a range of possible loss.

On January 9, 2014, a derivative action was filed in 333rd district court in Harris County, Texas against the Company and certain of its officers and directors, styled Martin v. Sanchez, No. 2014-01028 (333rd Dist. Harris County, Texas). The complaint alleged a breach of fiduciary duty, corporate waste and unjust enrichment against various officers and directors. No action has been taken to date and damages are unspecified. On March 14, 2014, this action was stayed following a ruling on the motion to dismiss in the Delaware Derivative Action. After the motions to dismiss were granted in the Delaware Derivative Action, the parties entered into another agreed stay pending the appeal of the Delaware Derivative Action to the Delaware Supreme Court. This stay was entered by the court on February 5, 2015. This action is in its preliminary stages, and the Company is unable to reasonably predict an outcome or to estimate a range of reasonably possible loss.

Defendants believe that the allegations contained in the matters described above are without merit and intend to vigorously defend themselves against the claims raised.

*Catarina Drilling Obligation*

In connection with the Catarina Acquisition, the 77,000 acres of undeveloped acreage that were included in the acquisition are subject to a continuous drilling obligation. Such drilling obligation requires us to drill (i) 50 wells in each

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

annual period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120 - day period in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50 well requirement in the subsequent annual period on a well for well basis. The lease also created a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. Our current capital budget and plans include the drilling of at least the minimum number of wells required to maintain access to such undeveloped acreage.

*Lease Payment Obligations*

As of December 31, 2016, the Company had $216.4 million in lease payment obligations that satisfy operating lease criteria. These obligations include: (i) $158.6 million in payments due with respect to firm commitment of oil and natural gas volumes under the Gathering Agreement contract signed with SPP as part of the Western Catarina Midstream Divestiture that commenced on October 14, 2015 and continues until October 13, 2020, (ii) $45.7 million for a corporate office lease that commenced in the fourth quarter of 2014 and has an expiration date in March 2025, (iii) $6.2 million for a ground lease agreement for land owned by the Calhoun Port Authority that commenced during the third quarter of 2014 and has an expiration date in August 2024 and (iv) $5.9 million for a 10 year acreage lease agreement for a promotional ranch managed by the Company in Kenedy County, Texas.

The lease agreement for the acreage in Kenedy County, Texas includes a contractual requirement for the Company to spend a minimum of $4 million to make permanent improvements over the ten year life of the lease. The lease agreement does not specify the timing for such improvements to be made within the lease term. The Company has the right to terminate the lease obligation without penalty at any time with nine months advanced written notice and payment of any accrued leasehold expenses.

The Company’s ground lease with the Calhoun Port Authority is terminable upon 180 days written notice by the Company to the lessor in addition to a $1 million termination payment.

**Note 15. Subsidiary Guarantors**

The Company filed registration statements on Form S-3 with the SEC, which became effective January 14, 2013 and June 11, 2014 and April 25, 2016 and registered, among other securities, debt securities. The subsidiaries of the Company named therein are co-registrants with the Company, and the registration statement registered guarantees of debt securities by such subsidiaries. As of December 31, 2016, such subsidiaries are 100 percent owned by the Company and any guarantees by these subsidiaries will be full and unconditional (except for customary release provisions). In the event that more than one of these subsidiaries provide guarantees of any debt securities issued by the Company, such guarantees will constitute joint and several obligations.

The Company also filed a registration statement on Form S-4 with the SEC, which became effective on June 20, 2014, pursuant to which the Company completed an offering of the 7.75% Notes, which are guaranteed by its subsidiaries named therein. As of December 31, 2016, such guarantor subsidiaries are 100 percent owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several. The Company also filed a registration statement on Form S-4 with the SEC, which became effective on January 23, 2015, pursuant to which the Company completed an offering of the 6.125% Notes, which are guaranteed by its subsidiaries named therein. As of December 31, 2016, such guarantor subsidiaries are 100 percent owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The rules of Regulation S-X Rule 3-10 require that condensed consolidating financial information be provided for a subsidiary that has guaranteed the debt of a registrant issued in a public offering, where the guarantee is full, unconditional and joint and several and where the voting interest of the subsidiary is 100% owned by the registrant. See Note 18, "Condensed Consolidating Financial Information" for further discussion regarding the condensed consolidating financial information for guarantor and non-guarantor subsidiaries.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiaries to distribute funds to the Company.

**Note 16. Investments**

On November 22, 2016, a subsidiary of the Company purchased 2,272,727 common units of SPP for $25.0 million as part of a private equity issuance. As of December 31, 2016, this ownership represents approximately 16.9% of SPP's common units outstanding. Rather than accounting for the investment under the equity method, the Company elected the fair value option to account for its interest in SPP. The Company records the equity investment in SPP at fair value at the end of each reporting period. Any gains or losses are recorded as a component of other income (expense) in the consolidated statement of operations. The Company recorded gains related to the investment in SPP for the twelve months ended December 31, 2016 of approximately $1.8 million.

On October 2, 2015, the Company, via SN Catarina, purchased from a subsidiary of Targa a 10% undivided interest in the Silver Oak II Gas Processing Facility (the "SOII Facility") in Bee County, Texas for a purchase price of $12.5 million. Targa owns the remaining undivided 90% interest in the SOII Facility, which is operated by Targa. Concurrently with the execution of the purchase and sale agreement for the SOII Facility, the Company entered into a firm gas processing agreement, whereby Targa is processing a firm quantity, 125,000 Mcf/d, until the in-service date of the Carnero Processing Plant discussed below. The Company is accounting for the investment in the SOII Facility as an equity method investment as Targa is the operator and majority interest owner of the SOII Facility. As of December 31, 2016, the Company had invested capital of $12.5 million in the SOII Facility. The Company recorded earnings from the SOII Facility investment of approximately $1.2 million from equity investments during 2016.

On November 22, 2016, SN Midstream sold its membership interests in Carnero Processing to SPP for an initial payment of $55.5 million and the assumption by SPP of remaining capital commitments to Carnero Processing, which are estimated at approximately $24.5 million (the "Carnero Processing Disposition"). The Company was accounting for this joint venture as an equity method investment as Targa is the operator of the joint ventures and has the most influence with respect to the normal day-to-day construction and operating decisions. Prior to the sale, the Company had invested approximately $48.0 million in Carnero Processing joint venture. The membership interests disposed of constitute 50% of the outstanding membership interests in Carnero Processing. The remaining 50% membership interests of Carnero Processing are owned by an affiliate of Targa. Prior to the sale of Carnero Processing, the Company recorded losses of approximately $0.1 million from equity investments during 2016. The Company recorded a deferred gain of approximately $7.5 million included in "Other Liabilities" as a result of the firm gas processing agreement that remains between the Company and Targa. This deferred gain will be amortized periodically over the term of this firm gas processing agreement according to volumes processed through the Carnero Processing facility.

On July 5, 2016, SN Midstream sold its membership interests in Carnero Gathering to SPP for an initial payment of approximately $37.0 million and the assumption by SPP of remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million (the "Carnero Gathering Disposition"). The Company was accounting for this joint venture as an equity method investment as Targa is the operator of the joint ventures and has the most influence with respect to the normal day-to-day construction and operating decisions. Prior to the sale, the

Company had invested approximately $26.0 million in Carnero Gathering joint venture. As part of the Carnero Gathering Disposition, SPP is required to pay SN Midstream a monthly earnout based on gas received at Carnero Gathering's receipt points from SN Catarina and gas delivered and processed at the Processing Plant by other producers. The membership interests disposed of constitute 50% of the outstanding membership interests in Carnero Gathering. The remaining 50% membership interests of Carnero Gathering are owned by an affiliate of Targa. Prior to the sale of Carnero Gathering, the Company recorded earnings of approximately $2.3 million from equity investments during 2016. The Company recorded a deferred gain of approximately $8.7 million included in "Other Liabilities" as a result of the firm gas gathering agreement that remains between the Company and Targa and a transportation services agreement between Targa and Carnero Gathering. This deferred gain will be amortized periodically over the term of this firm gas gathering agreement according to volumes delivered through the Carnero Gathering pipelines.

**Note 17. Variable Interest Entities**

During the first quarter of 2016, the Company adopted ASU 2015-02, "Consolidation—Amendments to the Consolidation Analysis," which introduces a separate analysis for determining if limited partnerships and similar entities are variable interest entities ("VIEs") and clarifies the steps a reporting entity would have to take to determine whether the voting rights of stockholders in a corporation or similar entity are substantive.

As noted above in Note 16, "Investments," the Company, through SN Midstream, entered into joint venture agreements with an affiliate of Targa in October 2015 to, among other things, construct the Processing Plant and associated high pressure gathering pipelines near the Company's Catarina asset in South Texas. In addition, the Company, via SN Catarina, purchased from a subsidiary of Targa a 10% undivided interest in the SOII Facility. As noted above in Note 16, "Investments," on July 5, 2016 and November 22, 2016, the Company sold its interests, and any remaining commitment to invest in Carnero Gathering and Carnero Processing, respectively, to SPP. The Company determined that ownership in the SOII Facility are more similar to limited partnerships than corporations. Under the revised guidance of ASU 2015-02, a limited partnership or similar entity with equity at risk will not be a VIE if they are able to exercise kick-out rights over the general partner(s) or they are able to exercise substantive participating rights. We concluded that the investment in SOII Facility is a VIE under the revised guidance because we cannot remove Targa as operator and we do not have substantive participating rights. In addition, Targa has the discretion to direct activities of the VIEs regarding the risks associated with price, operations, and capital investment which have the most significant impact on the VIEs economic performance.

The Company's investment in the SOII Facility represents a VIE that could expose the Company to losses. The amount of losses the Company could be exposed to from the investment in the SOII Facility is limited to the equity in the investment at any point in time.

As of December 31, 2016, the Company had invested capital of $12.5 million in the SOII Facility, and recorded earnings from the equity investment of $0.3 million. As of December 31, 2016, no debt has been incurred by the SOII Facility. The Company is accounting for the VIE as an equity method investment and determined that Targa is the primary beneficiary of the VIE as Targa is the operator of the SOII Facility and has the most influence with respect to the normal day-to-day operating decisions of the facility. We have included the VIE in the "Other Assets - Investments" long-term asset line on the balance sheet.

As noted above in Note 16, "Investments," in November 2016, the Company purchased common units of SPP for $25.0 million as part of a private equity issuance. Rather than accounting for the investment under the equity method, the Company elected the fair value option to account for its interest in SPP. The Company's investment in SPP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

The carrying amounts of the investment in SPP and the Company's maximum exposure to loss as of December 31, 2016, was approximately $26.8 million.

Below is a tabular comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of December 31, 2016 and December 31, 2015 (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Capital investments | $ 37,527 | $ 49,985 |
| Earnings in equity investments | 311 | — |
| Gain (loss) from change in fair value of investment in SPP | 1,818 | — |
| Equity in equity investments | $ 39,656 | $ 49,985 |

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Equity in equity investments | $ 39,656 | $ 49,985 |
| Guarantees of capital investments | — | 65,526 |
| Maximum exposure to loss | $ 39,656 | $ 115,511 |

**Note 18. Condensed Consolidating Financial Information**

As noted above, the rules of the SEC require that condensed consolidating financial information be provided for a subsidiary that has guaranteed the debt of a registrant issued in a public offering, where the guarantee is full, unconditional and joint and several and where the voting interest of the subsidiary is 100% owned by the registrant. The Company is, therefore, presenting condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) and should be read in conjunction with the consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows, or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically, in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | December 31, 2016 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 428,384 | $ 157,154 | $ 158,589 | $ (181,322) | $ 562,805 |
| Total oil and natural gas properties, net | - | 658,588 | - | - | 658,588 |
| Investment in subsidiaries | 734,704 | - | - | (734,704) | - |
| Other assets | 14,376 | 15,221 | 35,290 | - | 64,887 |
| **Total Assets** | $ 1,177,464 | $ 830,963 | $ 193,879 | $ (916,026) | $ 1,286,280 |
| | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current liabilities | $ 109,539 | $ 78,344 | $ 170,435 | $ (181,321) | $ 176,997 |
| Long-term liabilities | 1,764,064 | 25,087 | 16,273 | (1) | 1,805,423 |
| Total shareholders' equity (deficit) | (696,139) | 727,532 | 7,171 | (734,704) | (696,140) |
| **Total Liabilities and Shareholders' Equity (deficit)** | $ 1,177,464 | $ 830,963 | $ 193,879 | $ (916,026) | $ 1,286,280 |

| | December 31, 2015 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 671,278 | $ 37,005 | $ 704 | $ (42,369) | $ 666,618 |
| Total oil and natural gas properties, net | - | 756,103 | - | - | 756,103 |
| Investment in subsidiaries | 700,053 | - | - | (700,053) | - |
| Other assets | 14,481 | 17,737 | 46,365 | - | 78,583 |
| **Total Assets** | $ 1,385,812 | $ 810,845 | $ 47,069 | $ (742,422) | $ 1,501,304 |
| | | | | | |
| **Liabilities and Shareholders' Equity** | | | | | |
| Current liabilities | $ 78,840 | $ 88,666 | $ 42,369 | $ (42,369) | $ 167,506 |
| Long-term liabilities | 1,764,060 | 25,907 | - | - | 1,789,967 |
| Total shareholders' equity (deficit) | (457,088) | 696,272 | 4,700 | (700,053) | (456,169) |
| **Total Liabilities and Shareholders' Equity (deficit)** | $ 1,385,812 | $ 810,845 | $ 47,069 | $ (742,422) | $ 1,501,304 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 431,326 | $ - | $ - | $ 431,326 |
| Total operating costs and expenses | 111,155 | 509,985 | 1,947 | - | 623,087 |
| Other income (expense) | (177,710) | 109,920 | 4,418 | - | (63,372) |
| **Income (loss) before income taxes** | (288,865) | 31,261 | 2,471 | - | (255,133) |
| | | | | | |
| Income tax expense | 1,825 | - | - | - | 1,825 |
| Equity in income (loss) of subsidiaries | 33,730 | - | - | (33,730) | - |
| **Net income (loss)** | $ (256,960) | $ 31,261 | $ 2,471 | $ (33,730) | $ (256,958) |

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 475,779 | $ - | $ - | $ 475,779 |
| Total operating costs and expenses | 75,096 | 1,890,342 | 1,692 | - | 1,967,130 |
| Other income (expense) | 44,726 | (402) | - | - | 44,324 |
| **Loss before income taxes** | (30,370) | (1,414,965) | (1,692) | - | (1,447,027) |
| | | | | | |
| Income tax expense | 7,600 | - | - | - | 7,600 |
| Equity in income (loss) of subsidiaries | (1,416,657) | - | - | 1,416,657 | - |
| **Net income (loss)** | $ (1,454,627) | $ (1,414,965) | $ (1,692) | $ 1,416,657 | $ (1,454,627) |

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ - | $ 666,064 | $ - | $ - | $ 666,064 |
| Total operating costs and expenses | 64,454 | 681,876 | 648 | - | 746,978 |
| Other income (expense) | 47,678 | 16 | - | - | 47,694 |
| **Loss before income taxes** | (16,776) | (15,796) | (648) | - | (33,220) |
| | | | | | |
| Income tax benefit | (11,429) | - | - | - | (11,429) |
| Equity in income (loss) of subsidiaries | (16,443) | - | - | 16,443 | - |
| **Net income (loss)** | $ (21,790) | $ (15,796) | $ (648) | $ 16,443 | $ (21,791) |

F-51

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2016 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Net cash provided by (used in) operating activities | $ (38,646) | $ 219,266 | $ 631 | $ - | $ 181,251 |
| Net cash provided by (used in) investing activities | (46,602) | (133,814) | 55,571 | 16,208 | (108,637) |
| Net cash provided by (used in) financing activities | (5,745) | (85,452) | 101,660 | (16,208) | (5,745) |
| **Net increase (decrease) in cash and cash equivalents** | (90,993) | - | 157,862 | - | 66,869 |
| **Cash and cash equivalents, beginning of period** | 434,934 | - | 114 | - | 435,048 |
| **Cash and cash equivalents, end of period** | $ 343,941 | $ - | $ 157,976 | $ - | $ 501,917 |

| | Year Ended December 31, 2015 | | | | |
|---|---|---|---|---|---|
| | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Net cash provided by (used in) operating activities | $ (44,090) | $ 317,499 | $ (1,384) | $ - | $ 272,025 |
| Net cash provided by (used in) investing activities | 21,670 | (249,185) | (40,327) | (26,489) | (294,331) |
| Net cash provided by (used in) financing activities | (16,360) | (68,314) | 41,825 | 26,489 | (16,360) |
| **Net increase (decrease) in cash and cash equivalents** | (38,780) | - | 114 | - | (38,666) |
| **Cash and cash equivalents, beginning of period** | 473,714 | - | - | - | 473,714 |
| **Cash and cash equivalents, end of period** | $ 434,934 | $ - | $ 114 | $ - | $ 435,048 |

**Sanchez Energy Corporation**

**Notes to the Consolidated Financial Statements (Continued)**

| | Year Ended December 31, 2014 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (100,047) | $ 516,474 | $ (1,092) | $ - | $ 415,335 |
| Net cash provided by (used in) investing activities | (845,882) | (1,347,416) | (6,492) | 838,526 | (1,361,264) |
| Net cash provided by (used in) financing activities | 1,266,112 | 830,942 | 7,584 | (838,526) | 1,266,112 |
| **Net increase (decrease) in cash and cash equivalents** | 320,183 | - | - | - | 320,183 |
| **Cash and cash equivalents, beginning of period** | 153,531 | - | - | - | 153,531 |
| **Cash and cash equivalents, end of period** | $ 473,714 | $ - | $ - | $ - | $ 473,714 |

**Note 19. Subsequent Events**

On January 12, 2017, the Company, through two of our subsidiaries, SN EF UnSub, LP ("SN UnSub") and SN EF Maverick, LLC ("SN Maverick"), along with an entity controlled by The Blackstone Group, L.P., Gavilan Resources, LLC ("Blackstone"), signed a purchase and sale agreement (the "Comanche Purchase Agreement") to acquire assets (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP for $2,275 million in cash, subject to customary closing adjustments (the "Comanche Acquisition"). The Comanche Assets are primarily located in the Western Eagle Ford Shale and are expected to significantly expand our asset base and production. The Comanche Assets consist of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) Pearsall Shale acres, with an approximate 49% average working interest therein, contain approximately 300 MMBoe of proved reserves (70% liquids, 75% proved developed), and had production of approximately 67,000 Boe/d (70% liquids) as of December 31, 2016. The Comanche Purchase Agreement provides that SN UnSub will pay approximately 37% of the purchase price (including through a $100 million cash contribution from the Company) and SN Maverick will pay approximately 13% of the purchase price and SN UnSub and SN Maverick would acquire half of the 49% working interest in and to the Comanche Assets in the aggregate (and approximately 50% and 0%, respectively, of the estimated total proved developed producing reserves, 20% and 30%, respectively, of the estimated total proved developed non-producing reserves, and 20% and 30%, respectively, of the total proved undeveloped reserves), and Blackstone will pay 50% of the purchase price and would acquire the remaining half of the 49% working interest in and to the Comanche Assets (approximately 50% of the estimated total proved developed producing reserves, proved developed non-producing reserves and proved undeveloped reserves). We expect to close the Comanche Acquisition during the first quarter of 2017. The effective date of the transaction is July 1, 2016.

On February 6, 2017, the Company completed an underwritten public offering of 10,000,000 shares of the Company's common stock at a price of $12.50 per share ($11.7902 per share, net of underwriting discounts). The Company granted the Underwriters a 30-day option to purchase up to an additional 1,500,000 shares of the Company's common stock on the same terms, which was exercised in full and closed on February 6, 2017. The Company received net proceeds of approximately $135.9 million (after deducting underwriting discounts of approximately $7.8 million) from the sale of the shares of common stock. The Company intends to use the net proceeds of the offering for general corporate purposes, including working capital.

**Sanchez Energy Corporation**

**Supplementary Quarterly Financial Results (Unaudited)**

The following table presents the Company's unaudited quarterly financial information for 2016 and 2015 (in thousands, except per share amounts):

| **2016:** | **First Quarter** | **Second Quarter** | **Third Quarter** | **Fourth Quarter** |
|---|---|---|---|---|
| Oil and natural gas revenue | $ 79,816 | $ 110,968 | $ 114,807 | $ 125,735 |
| Impairment of oil and natural gas properties | (22,084) | (87,380) | (59,582) | — |
| Operating costs and expenses | (115,081) | (118,432) | (107,505) | (113,023) |
| Operating income (loss) | (57,349) | (94,844) | (52,280) | 12,712 |
| Interest income | 325 | 158 | 146 | 227 |
| Other income (expense) | (414) | 211 | 7 | 330 |
| Gain on disposal of assets | — | — | — | 112,294 |
| Interest expense | (31,606) | (31,822) | (31,797) | (31,748) |
| Earnings from Equity Investments | 512 | 2,179 | 463 | 312 |
| Net gains (losses) on commodity derivatives | 22,757 | (58,750) | 18,640 | (35,796) |
| Other income (expense), net | (8,426) | (88,024) | (12,541) | 45,619 |
| Income (loss) before income taxes | (65,775) | (182,868) | (64,821) | 58,331 |
| Income tax expense (benefit) | — | — | 1,441 | 384 |
| Net income (loss) | (65,775) | (182,868) | (66,262) | 57,947 |
| Less: | | | | |
| Preferred stock dividends | (3,987) | (3,987) | (3,987) | (3,987) |
| Net income allocable to participating securities [1] [2] | — | — | — | (5,601) |
| **Net income (loss) attributable to common stockholders** | $ (69,762) | $ (186,855) | $ (70,249) | $ 48,359 |
| Basic income (loss) per share [3] | $ (1.20) | $ (3.20) | $ (1.19) | 0.82 |
| Weighted average common shares outstanding - basic | 58,099 | 58,413 | 59,190 | 59,252 |
| Diluted income (loss) per share [3] | $ (1.20) | $ (3.20) | $ (1.19) | $ 0.73 |
| Weighted average common shares outstanding - diluted | 58,099 | 58,413 | 59,190 | 71,772 |

(1) No losses are allocated to participating restricted stock. Such securities do not have a contractual obligation to share in the Company's losses.

(2) The sum of quarterly net income allocable to participating securities will not agree with total year net income allocable to participating securities as each quarterly computation is based on the allocation of net income for the quarter to the participating securities.

(3) The sum of quarterly net income per share may not agree with total year net income per share as each quarterly computation is based on the allocation of net income for the quarter to the participating securities and the weighted average shares outstanding

| 2015: | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| Oil and natural gas revenue | $ 110,593 | $ 141,128 | $ 114,526 | $ 109,532 |
| Impairment of oil and natural gas properties | (441,450) | (468,922) | (454,628) | — |
| Operating costs and expenses | (166,967) | (170,640) | (148,401) | (116,122) |
| Operating income | (497,824) | (498,434) | (488,503) | (6,590) |
| Interest and other income | (1,824) | 773 | (753) | (359) |
| Interest expense | (31,558) | (31,500) | (31,442) | (31,899) |
| Net gains (losses) on commodity derivatives | 41,303 | (33,749) | 103,996 | 61,336 |
| Other income (expense), net | 7,921 | (64,476) | 71,801 | 29,078 |
| Income (loss) before income taxes | (489,903) | (562,910) | (416,702) | 22,488 |
| Income tax expense (benefit) | 7,442 | — | 158 | — |
| Net income (loss) | (497,345) | (562,910) | (416,860) | 22,488 |
| Less: | | | | |
| Preferred stock dividends | (3,991) | (3,991) | (3,991) | (4,035) |
| Net income allocable to participating securities (1) (2) | — | — | — | — |
| **Net income (loss) attributable to common stockholders** | $ (501,336) | $ (566,901) | $ (420,851) | $ 18,453 |
| Basic income (loss) per share (3) | $ (8.83) | $ (9.91) | $ (7.33) | 0.32 |
| Weighted average common shares outstanding - basic | 56,805 | 57,184 | 57,426 | 57,490 |
| Diluted income (loss) per share (3) | $ (8.83) | $ (9.91) | $ (7.33) | $ 0.32 |
| Weighted average common shares outstanding - diluted | 56,805 | 57,184 | 57,426 | 57,490 |

(1) No losses are allocated to participating restricted stock. Such securities do not have a contractual obligation to share in the Company's losses.

(2) The sum of quarterly net income allocable to participating securities will not agree with total year net income allocable to participating securities as each quarterly computation is based on the allocation of net income for the quarter to the participating securities.

(3) The sum of quarterly net income per share may not agree with total year net income per share as each quarterly computation is based on the allocation of net income for the quarter to the participating securities and the weighted average shares outstanding.

**Sanchez Energy Corporation**
**Supplemental Information on Oil and Natural Gas Exploration, Development and Production Activities**
**(Unaudited)**

The Company's oil and natural gas properties are located within the United States of America, which constitutes one cost center.

***Capitalized Costs***—Capitalized costs and accumulated depreciation, depletion and impairment relating to the Company's oil and natural gas producing activities are summarized below as of the dates indicated (in thousands):

| | As of December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Oil and Natural Gas Properties: | | | |
| Unproved | $ 231,424 | $ 253,529 | $ 385,827 |
| Proved | 3,164,115 | 2,914,867 | 2,582,441 |
| Total Oil and Natural Gas Properties | 3,395,539 | 3,168,396 | 2,968,268 |
| Less Accumulated depreciation, depletion, amortization and impairment | (2,736,951) | (2,412,293) | (706,590) |
| Net oil and natural gas properties capitalized | $ 658,588 | $ 756,103 | $ 2,261,678 |

***Costs Incurred***—Costs incurred in oil and natural gas property acquisition, exploration and development activities are summarized below (in thousands):

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Exploration costs | $ 379 | $ 30,523 | $ 64,534 |
| Development costs | 284,569 | 512,208 | 806,644 |
| Acquisition and Divestiture costs: | | | |
| Proved properties | 50 | — | 432,271 |
| Unproved properties | 13,430 | 8,508 | 122,224 |
| Total Costs Incurred | $ 298,428 | $ 551,239 | $ 1,425,673 |
| | | | |
| Seismic costs included in exploration costs | $ 379 | $ 1,446 | $ 833 |

***Results of Operations***—Results of operations for the Company's oil, NGL and natural gas producing activities are summarized below (in thousands):

| | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Oil, NGL, and natural gas revenue | $ 431,326 | $ 475,779 | $ 666,064 |
| Less operating expenses: | | | |
| Oil, NGL, and natural gas production expenses | (164,567) | (156,528) | (93,581) |
| Production and ad valorem taxes | (19,633) | (26,870) | (37,787) |
| Depreciation, depletion, amortization and accretion | (159,760) | (344,572) | (338,097) |
| Impairment of oil and natural gas properties | (169,046) | (1,365,000) | (213,821) |

| | | | |
|---|---|---|---|
| Results of operations from oil and gas producing activities | [illegible] | [illegible] | [illegible] |

***Reserves***—Proved reserves are those quantities of oil, NGL and natural gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date

Case 19-34508 Document 1853-21 Filed in TXSB on 06/12/20 Page 283 of 1725

forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probalistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

Proved developed reserves are proved reserves that can be expected to be recovered through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared with the cost of a new well.

Proved undeveloped reserves (“PUDs”) are reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required. Reserves on undrilled acreage are limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of producing economic quantities at a greater distance. Only those undrilled locations that are scheduled to be drilled within five years pursuant to a development plan can be allocated to undeveloped reserves, unless the specific circumstances justify a longer time. As of December 31, 2016, the Company did not have any PUDs previously disclosed that have remained undeveloped for five years or more and no PUD locations included in the Company’s proved oil reserves are scheduled to be drilled after five years.

Estimates of proved developed and undeveloped reserves for the periods presented are based on estimates made by the independent engineers, Ryder Scott.

Proved reserves for all periods presented were estimated in accordance with the guidelines established by the SEC and FASB. The rules require SEC reporting companies to prepare their reserve estimates based on the average prices during the 12 month period prior to the ending date of the period covered in the report, determined as the unweighted arithmetic average of the prices in effect on the first day of the month for each month within such period, unless prices were defined by contractual arrangements. The product prices used to determine the future gross revenues for each property reflect adjustments to the benchmark prices for gravity, quality, local conditions, and/or distance from the market. The pricing used for the estimates of the Company’s reserves of oil and condensate as of December 31, 2016, 2015 and 2014 was based on unweighted twelve month average WTI posted prices of $42.75, $50.28, and $94.99, respectively. The pricing used for the estimates of the Company’s reserves of natural gas as of December 31, 2016, 2015 and 2014 were based on an unweighted twelve month average Henry Hub spot natural gas prices average of $2.49, $2.58, and $4.35, respectively. The pricing used for the estimates of the Company’s reserves of natural gas liquids as of December 31, 2016, 2015 and 2014 were based on an unweighted twelve month average Mt. Belvieu prices average of $19.97, $19.90, and $44.84, respectively.

Case 19-34508 Document 685-21 Filed in TXSB on 06/24/20 Page 284 of 1724

***Net proved quantities summary***

The following table sets forth the net proved, proved developed and proved undeveloped reserves activity for the years ended December 31, 2016, 2015 and 2014:

| | Oil (MBbl) | Natural Gas Liquids (MBbl) | Natural Gas (MMcf) | MBoe (1) |
|---|---|---|---|---|
| Balance as of December 31, 2013 | 45,420 | 6,615 | 40,156 | 58,727 |
| Revisions of previous estimates | 1,261 | 3,901 | 6,412 | 6,231 |
| Extensions and discoveries | 12,107 | 6,612 | 32,691 | 24,168 |
| Purchases of reserves in place | 11,826 | 20,746 | 145,222 | 56,775 |
| Production | (6,080) | (2,590) | (14,828) | (11,141) |
| Balance as of December 31, 2014 | 64,534 | 35,284 | 209,653 | 134,760 |
| Revisions of previous estimates | (16,395) | (1,999) | 3,427 | (17,823) |
| Extensions and discoveries | 14,369 | 10,091 | 63,860 | 35,103 |
| Purchases of reserves in place | (3,578) | (824) | (4,871) | (5,213) |
| Production | (7,165) | (5,754) | (37,594) | (19,184) |
| Balance as of December 31, 2015 | 51,765 | 36,798 | 234,475 | 127,643 |
| Revisions of previous estimates | (20,506) | (10,733) | (49,076) | (39,418) |
| Extensions and discoveries | 42,778 | 39,237 | 278,715 | 128,467 |
| Purchases (sales) of reserves in place | (3,090) | (675) | (3,760) | (4,392) |
| Production | (6,370) | (5,960) | (43,189) | (19,529) |
| Balance as of December 31, 2016 | 64,577 | 58,667 | 417,165 | 192,771 |
| Proved developed reserves: | | | | |
| As of December 31, 2014 | 27,460 | 18,554 | 110,543 | 64,438 |
| As of December 31, 2015 | 21,718 | 20,803 | 132,911 | 64,672 |
| As of December 31, 2016 | 18,245 | 21,060 | 149,029 | 64,143 |
| Proved undeveloped reserves: | | | | |
| As of December 31, 2014 | 37,074 | 16,730 | 99,110 | 70,322 |
| As of December 31, 2015 | 30,048 | 15,995 | 101,564 | 62,970 |
| As of December 31, 2016 | 46,332 | 37,606 | 268,136 | 128,627 |

(1) Oil equivalents are determined under the relative energy content method by using the ratio of 6.0 Mcf of gas to 1.0 Bbl of oil.

***Standardized Measure***—The standardized measure of discounted future net cash flows relating to the Company's ownership interest in proved oil, NGL and natural gas reserves as of December 31, 2016, 2015 and 2014 is shown below (in thousands):

| Standardized Measure | As of December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Future cash inflows | $ 4,300,728 | $ 3,424,682 | $ 7,835,812 |
| Future production costs | (2,362,243) | (1,744,947) | (2,635,281) |
| Future development costs | (919,418) | (667,117) | (1,639,991) |
| Future income taxes | — | — | (407,193) |
| Discount to present value at 10% annual rate | (505,696) | (419,144) | (1,372,769) |
| Standardized measure of discounted future net cash flows | $ 513,371 | $ 593,474 | $ 1,780,578 |

The future cash flows are based on average first-day-of-month prices during the prior 12-month period and cost rates in existence at the time of the projections.

***Changes in standardized measure of discounted future net cash flows***—Changes in standardized measure of discounted future net cash flows relating to proved oil, NGL and natural gas reserves for each of the three years in the period ended December 31, 2016 are summarized below (in thousands):

| Summary of Changes | Year Ended December 31, 2016 | 2015 | 2014 |
|---|---|---|---|
| Balance, beginning of period | $ 593,474 | $ 1,780,578 | $ 1,209,555 |
| Net changes in prices and costs | (209,286) | (1,790,803) | (725,716) |
| Revisions of previous quantity estimates | (235,324) | (120,836) | 130,752 |
| Extensions, discoveries and improved recovery, less related costs | 239,765 | 279,679 | 448,464 |
| Sales of oil and gas - net of production costs | (247,126) | (292,382) | (535,580) |
| Net change in income taxes | — | 142,761 | 113,008 |
| Changes in development costs | 456,565 | 426,246 | 629,403 |
| Accretion of discount | 59,347 | 178,058 | 120,955 |
| Purchases of reserves in place | 2,319 | — | 590,559 |
| Sales of reserves in place | (49,738) | (136,828) | — |
| Change in production rates, timing, and other | (96,625) | 127,001 | (200,822) |
| Net change | (80,103) | (1,187,104) | 571,023 |
| Balance, end of period | $ 513,371 | $ 593,474 | $ 1,780,578 |

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

## CURRENT REPORT

## PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (date of earliest event reported): **March 1, 2017**

# SANCHEZ ENERGY CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **001-35372** | **45-3090102** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**1000 Main Street, Suite 3000**
**Houston, Texas 77002**
(Address of principal executive offices) (Zip Code)

**(713) 783-8000**
(Registrant’s telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240-14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

011994

**Item 1.01. Entry into a Material Definitive Agreement.**

*Closing of Comanche Eagle Ford Acquisition*

On March 1, 2017, Sanchez Energy Corporation (for the limited purposes set forth therein) (the "***Company***"), SN EF Maverick, LLC, a subsidiary of the Company ("***SN Maverick***"), SN EF UnSub, LP, an unrestricted, non-guarantor subsidiary of the Company for purposes of the agreements governing the Company's indebtedness ("***SN UnSub***"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), an entity controlled by affiliates of The Blackstone Group L.P. ("***Gavilan***" and, together with SN Maverick and SN UnSub, the "***Buyers***") completed the closing of the transactions contemplated by the purchase and sale agreement (the "***Purchase Agreement***") among the Buyers and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP (together, the "***Sellers***"). At the closing, the Buyers collectively purchased all of the right, title and interest of the Sellers in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb and LaSalle Counties, Texas, consisting of approximately 318,000 gross (155,000 net) acres and an average approximate 49.00% working interest therein (the "***Comanche Eagle Ford Assets***") for aggregate consideration of approximately $2.078 billion, subject to customary post-closing purchase price adjustments. The effective time for the acquisition is 12:01 a.m. of July 1, 2016.

In accordance with the terms of the Purchase Agreement, (i) SN Maverick paid approximately 13% of the purchase price and SN UnSub paid approximately 37% of the purchase price (including through a $100 million cash contribution from other Company entities) and SN UnSub and SN Maverick acquired approximately 77,500 net acres and an average approximate 24.50% working interest in the aggregate (and approximately 50% and 0%, respectively, of the estimated proved developed producing reserves (PDPs), 20% and 30%, respectively, of the estimated proved developed non-producing reserves (PDNPs), and 20% and 30%, respectively, of the proved undeveloped reserves (PUDs)) and (ii) Gavilan paid approximately 50% of the purchase price and acquired approximately 77,500 net acres and an average approximate 24.50% working interest in the aggregate (and approximately 50% of the estimated PDPs, PDNPs and PUDs), subject to purchase price adjustments applicable to such Buyers' shares of the purchase price in the foregoing percentages.

*Joint Development Agreement*

In connection with the closing of the transactions contemplated by the Purchase Agreement, the Buyers entered into an eight-year (subject to earlier termination as provided for therein) joint development agreement ("***JDA***") that provides for the administration, operation and transfer of the jointly-owned Comanche Eagle Ford Assets.

The JDA provides for the parties to (i) establish an operating committee which will control the timing, scope and budgeting of operations on the Comanche Eagle Ford Assets (subject to certain exceptions) and (ii) designate SN Maverick as operator of the Comanche Eagle Ford Assets and certain other interests (subject to forfeiture in the event of certain default events). The operating committee is to consist of six representatives, two of which will be appointed by SN Maverick, one of which will be appointed by SN UnSub and three of which will be appointed by Gavilan.

If (i) the operating committee is unable to approve a budget and work plan within the time periods specified in the JDA or (ii) either Gavilan or SN Maverick otherwise elects to cause a



division of operatorship under the JDA for any reason during a budget negotiation period or, as applicable, in the event of an Equitable Partition (as defined below), then, either Gavilan or SN Maverick will have the right to cause a division of operatorship pursuant to which, subject to the terms of the JDA and any applicable joint operating agreements, the rights to operatorship pursuant to applicable joint operating agreements will be divided between Gavilan and SN Maverick on a geographic wellpad-by-wellpad basis.

Subject to certain exceptions, the JDA prohibits direct or indirect transfers of a party's interests in the Comanche Eagle Ford Assets prior to the third anniversary of the date of the JDA. After the third anniversary, each party will have (i) certain tag-along rights in the event that another party directly or indirectly proposes to transfer 35% or more of its interests in the Comanche Eagle Ford Assets (including, in the case of Gavilan, certain change of control transactions with respect to the Company) and (ii) certain rights of first offer in connection with certain proposed direct or indirect transfers of any of a party's Comanche Eagle Ford Assets. In addition, if at any time after the third anniversary of the JDA (or within nine months following the termination of the JDA), Gavilan desires to directly or indirectly transfer all or substantially all of its and its affiliates' interests in a specified area which includes the area in which the Comanche Eagle Ford Assets are located (a "***Sale Transaction***," including a Sale Transaction Equitable Partition (as defined below) but not an Alternative Equity Partition (as defined below)), subject to certain exceptions, Gavilan may require the Company, SN Maverick, SN UnSub, and their respective affiliates to sell or otherwise convey their interests within such area comprising 75% of the fair market value of such area (the "***Included Percentage***") to Gavilan's transferee. However, if the transfer of such land would result in the Company transferring all or substantially all of its assets

pursuant to applicable law, then such applicable percentage of fair market value shall be such lesser percentage that would not constitute all or substantially all of the Company's assets pursuant to applicable law, but in no event less than 66% (such area, the "***Included Sale Transaction Area***," and the remainder of such designated area, the "***Excluded Sale Transaction Area***" and such remaining percentage, the "***Excluded Percentage***"). At the time of the Sale Transaction, Gavilan and its affiliates must convey all of their interests within the Excluded Sale Transaction Area to SN and SN UnSub (a "***Sale Transaction Equitable Partition***") or, in lieu thereof, make such conveyance pursuant to an alternative partition such that the Included Sale Transaction Area comprises interests in such designated area equal to 50% of the aggregate fair market value of such designated area (or such other percentage proportionate to the parties' interests, if applicable) (such percentage, the "***Gavilan Percentage***"). The Excluded Sale Transaction Area comprises that percentage of interests in such designated area equal to 100% less the Gavilan Percentage (an "***Alternative Equitable Partition***" and together with a Sale Transaction Equitable Partition, each an "***Equitable Partition***").

In the event that Gavilan is unable to cause the Company, SN Maverick, SN UnSub and/or their respective affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in the JDA, then Gavilan will have the right to effectuate an Alternative Equitable Partition, whereby Gavilan will be entitled to all interests of the parties in the Included Sale Transaction Area and SN and SN UnSub will be entitled to all interests of the parties in the Excluded Sale Transaction Area and the parties will use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the parties shall use their respective reasonable best efforts to cause Gavilan or its designee (or if applicable the transferee in a Sale Transaction) to become operator under each joint operating agreement applicable



to the conveyed assets included in the Included Sale Transaction Area and cause SN Maverick or its designee to become operator under each joint operating agreement applicable to the assets included in the Excluded Sale Transaction Area.

In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than 25% in value of publicly traded securities, subject to certain exceptions and limitations in SN Maverick's debt agreements. In addition, Gavilan may not cause Sanchez Energy, SN Maverick, SN UnSub and their respective affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN Maverick, SN UnSub and their respective affiliates achieves certain specified thresholds and satisfies certain other requirements specified in the JDA.

The JDA also establishes an area of mutual interest in respect of an area surrounding the vicinity of the Comanche Eagle Ford Assets for a period of five years from the date the JDA is signed or termination of the JDA, whichever occurs first.

*Securities Purchase Agreement*

As part of the financing for the acquisition of the Comanche Eagle Ford Assets, on January 12, 2017, the Company, SN UnSub, SN EF UnSub GP, LLC, the general partner of SN UnSub (the "***SN UnSub General Partner***"), SN UR Holdings, LLC, a subsidiary of the Company ("***SN UR Holdings***"), SN EF UnSub Holdings, LLC, a subsidiary of SN UR Holdings ("***SN UnSub Holdings***"), GSO ST Holdings Associates LLC ("***GSO Associates LLC***"), and GSO ST Holdings LP (the "***GSO Associates LP***") entered into a Securities Purchase Agreement (the "***SPA***").

On February 28, 2017, the parties to the SPA amended and restated the SPA (the "***Amended and Restated SPA***") to add Intrepid Private Equity V-A, LLC ("***Intrepid***" and, together with GSO Associates LP, the "***Preferred Unit Purchasers***") as an additional party to the SPA. GSO Associates LP is an investment vehicle owned by funds managed or advised by GSO Capital Partners LP ("***GSO***") and GSO Associates LLC, which is GSO Associates LP's general partner, is a controlled affiliate of GSO.

At the closing of the transactions contemplated by the Purchase Agreement, pursuant to the Amended and Restated SPA and subject to the other terms and conditions provided therein:

- SN UnSub Holdings purchased 100,000 common units of SN UnSub for $100,000,000,
- GSO Associates LP purchased 485,000 preferred units of SN UnSub for $485,000,000;
- Intrepid purchased 15,000 preferred units of SN UnSub for $15,000,000;

011996

- SN UR Holdings purchased 99 "Class A Units" in SN UnSub General Partner for nominal consideration;

- GSO Associates LLC purchased 1 "Class B Unit" in SN UnSub General Partner for nominal consideration;



- Certain funds managed or advised by GSO (the "***GSO Funds***") received (i) 1,455,000 shares of the Company's common stock and (ii) warrants to purchase 1,940,000 shares of the Company's common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments; and

- Intrepid received (i) 45,000 shares of the Company's common stock and (ii) warrants to purchase 60,000 shares of the Company's common stock at an exercise price of $10 per share subject to customary anti-dilution adjustments.

The Amended and Restated SPA contains representations and warranties, covenants, and termination and indemnification that are customary for this type of transaction. The representations and warranties and covenants in the Amended and Restated SPA were made or agreed to, among other things, to provide the parties with specified rights and obligations and to allocate risk among the parties. Accordingly, the Amended and Restated SPA should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Warrant Agreements*

At the closing of the transactions contemplated by the Purchase Agreement, the Company entered into (i) three separate warrant agreements to purchase an aggregate of 6,500,000 shares of the Company's common stock with each of Gavilan Resources Holdings—A, LLC, Gavilan Resources Holdings—B, LLC, and Gavilan Resources Holdings—C, LLC (collectively, the "***Blackstone Warrantholders***"), affiliates of The Blackstone Group L.P., (ii) a warrant agreement to purchase an aggregate of 1,940,000 shares of the Company's common stock with the GSO Funds, and (iii) a warrant agreement to purchase 60,000 shares of the Company's common stock with Intrepid (collectively, the "***Warrant Agreements***").

The Warrant Agreements provide for a $10 exercise price per share to purchase the Company's common stock. The exercise price and the number of shares of the Company's common stock for which a warrant is exercisable are subject to adjustment from time to time upon the occurrence of certain events including: (i) payment of a dividend or distribution to holders of shares of the Company's common stock payable in the Company's common stock, (ii) a subdivision, combination, or reclassification of the Company's common stock, (iii) the distribution of any rights, options or warrants (excluding rights issued under the Company's rights agreement) to all holders of the Company's common stock entitling them for a certain period of time to purchase shares of the Company's common stock at a price per share less than the fair market value per share, and (iv) payment of a cash distribution to all holders of the Company's common stock or a distribution to all holders of the Company's common stock any shares of the Company's capital stock, evidences of indebtedness, or any of assets or any rights, warrants or other securities of the Company. The Warrant Agreements also provide that, if the Company proposes a voluntary or involuntary dissolution, liquidation or winding up of the affairs of the Company, the holders of the warrants will receive the kind and number of other securities or assets which the holder would have been entitled to receive if the holder had exercised the warrant in full immediately prior to the time of such dissolution, liquidation or winding up and the right to exercise the warrant will terminate on the date on which the holders of record of the shares of common stock are entitled to exchange their shares for securities or assets deliverable upon such dissolution, liquidation or winding up.



011997

The warrants issued to the Blackstone Warrantholders expire on March 1, 2022 and the warrants issued to the GSO Funds and Intrepid expire on March 1, 2032, in each case in accordance with the terms and conditions of the applicable Warrant Agreement.

This summary of the Warrant Agreements does not purport to be complete and is qualified in its entirety by reference to the full text of the Warrant Agreements, which are filed as Exhibit 4.1, Exhibit 4.2, Exhibit 4.3, Exhibit 4.4, and Exhibit 4.5 to this Current Report on Form 8-K and are incorporated into this Item 1.01 by reference.

*Registration Rights Agreements*

At the closing of the transactions contemplated by the Purchase Agreement, the Company entered into separate registration rights agreements with the Blackstone Warrantholders (the "***Blackstone Registration Rights Agreement***"), the GSO Funds (the "***GSO Registration Rights Agreement***"), and Intrepid (together with the Blackstone Registration Rights Agreements and the GSO Registration Rights Agreement, the "***Registration Rights Agreements***"). The Registration Rights Agreements grant the parties certain registration rights for the shares of the Company's common stock acquired by the parties, including the shares issuable upon the exercise of the warrants to purchase the Company's common stock. The Blackstone Registration Rights Agreement and the GSO Registration Rights Agreement provide that the Company will use its reasonable best efforts to prepare and file a shelf registration statement with the U.S. Securities and Exchange Commission (the "***SEC***") to permit the public resale of all registrable securities covered by the applicable Registration Rights Agreement within 18 months of the date of the agreement and to cause such shelf registration statement to be declared effective no later than two years after the date of the agreement.

The Registration Rights Agreements include piggyback rights for the applicable holders, which provide that, if the Company proposes to file certain registration statements or supplements to certain effective registration statements for the sale of shares of the Company's common stock in an underwritten offering for its own account or that of another person or both, then the Company is required to offer the holders the opportunity to include in such underwritten offering such number of registrable securities as each such holder may request, subject to certain cutback rights if the Company has been advised by the managing underwriter that the inclusion of registrable securities for sale for the benefit of the holders will have an adverse effect on the price, timing or distribution of the shares of common stock in the underwritten offering.

The representations and warranties and covenants in the Registration Rights Agreements were made or agreed to, among other things, to provide the respective parties with specified rights and obligations and to allocate risk among the respective parties. Accordingly, the Registration Rights Agreements should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Standstill and Voting Agreement*

On March 1, 2017, the Company and each of Blackstone Capital Partners VII L.P. and Blackstone Energy Partners II L.P. (together, the "***Blackstone Funds***") entered into a Standstill and Voting Agreement (the "***Standstill and Voting Agreement***"). The Blackstone Funds agreed that, without the prior consent of the Company, the Blackstone Funds and their controlled affiliates,



including the Blackstone Warrantholders, will not, among other things, (i) subject to certain exceptions, acquire interests in any of voting securities of the Company or all or substantially all of the assets of the Company or any of its subsidiaries, (ii) call a special meeting of the holders of voting securities of the Company or any of its subsidiaries, or (iii) seek representation on the board of directors or seek the removal of any member of the board of directors of the Company or any of its subsidiaries.

Without the prior written consent of the Company, during the period commencing on the date of the Standstill and Voting Agreement and ending on the second anniversary of the date of the closing of the transactions contemplated by the Purchase Agreement, the Blackstone Funds and their controlled affiliates, including the Blackstone Warrantholders, may not, subject to certain exceptions, (i) offer, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any of the shares of the Company's common stock or the warrants to purchase the Company's common stock or (ii) directly or indirectly engage in any short sales or other derivative or hedging transactions with respect to the shares of the Company's common stock or the warrants to purchase the Company's common stock.

The Blackstone Funds also agreed that, during the term of the Standstill and Voting Agreement, subject to certain exceptions, the Blackstone Funds and their controlled affiliates will vote any voting securities of the Company that they beneficially own in the same manner as recommended by the board of directors of the Company to the other holders of voting securities of the Company.

The Company previously entered [illegible] terms as the Standstill and Voting Agreement.

The representations and warranties and covenants in the Standstill and Voting Agreement were made or agreed to, among other things, to provide the respective parties with specified rights and obligations and to allocate risk among the respective parties. Accordingly, the Standstill and Voting Agreement should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

*Shareholders Agreement*

On March 1, 2017, the Company and Gavilan Resources Holdco, LLC ("***Gavilan Holdco***") entered into a Shareholders Agreement (the "***Shareholders Agreement***") pursuant to which, until the earlier of (i) the termination of the JDA, (ii) the sale of all or substantially all of the Assets (as defined in the Purchase Agreement) acquired by Gavilan and (iii) the consummation of a Sale Transaction, Gavilan Holdco will have the right, but not the obligation, to appoint one observer representative to be present at all regularly scheduled meetings of the full board of directors of the Company, subject to the terms, conditions and limitations set forth in the Shareholders Agreement.

*SN UnSub Governing Documents*

At the closing of the transactions contemplated by the Purchase Agreement, the applicable parties entered into an amended and restated partnership agreement of SN UnSub (the "***Partnership***



***Agreement***") and an amended and restated limited liability company agreement of SN UnSub General Partner (the "***GP LLC Agreement***").

Under the terms of the Partnership Agreement, SN UnSub's preferred units are entitled to receive distributions of 10.0% per annum, payable quarterly in cash, unless a cash payment is then prohibited by certain of SN UnSub's debt agreements, in which case such distribution will be deemed to have been paid in kind. SN UnSub may not make distributions on the SN UnSub common units until the preferred units are redeemed in full.

The preferred units have priority over the common units, to the extent of the Base Return (as defined below), upon a liquidation, sale of all or substantially all assets, certain change of control and exit transactions.

UnSub may, from time to time and subject to the conditions set forth in the Partnership Agreement, redeem preferred units at a purchase price per unit sufficient to achieve the greater of (i) a 14.0% internal rate of return for such unit and (ii) a 1.50x return on the purchase price for such unit, in each case inclusive of previous distributions made in cash (the "***Base Return***"). Partners holding a majority of the preferred units in SN UnSub will have the option to request SN UnSub to redeem all of the preferred units for the Base Return at any time following the seventh anniversary of issuance or upon the occurrence of certain change of control transactions, as further described in the Partnership Agreement.

If (i) the preferred units are not timely redeemed by SN UnSub when required, (ii) SN UnSub fails, after March 1, 2018, to pay the preferred units a cash distribution in any two quarters, regardless of whether consecutive, and such failure is continuing, (iii) SN UnSub takes certain material actions without the consent of the preferred unitholders, when required, (iv) certain events of default under SN UnSub and the Company's credit agreements have occurred or (v) SN Maverick is removed as operator under the JDA under certain circumstances, then the holders of the preferred units will be entitled to appoint a majority of the members of the board of directors of SN UnSub General Partner and may cause a sale of the assets or equity of SN UnSub in order to redeem the preferred units.

Under the terms of the GP LLC Agreement, SN UR Holdings has the right to appoint three members and GSO Associates LLC has the right to appoint two members to the five-member board of directors of SN UnSub General Partner. The approval of GSO Associates LLC is required for a number of material actions by SN UnSub (unless the preferred units are redeemed at or prior to such actions), including, among other things:

- subject to certain exceptions, incurring additional debt or providing guarantees in respect of obligations of other persons;

- amending debt instruments (other than with respect to certain capital leases and purchase money security interests) or amending the JDA in a way that would adversely impact SN UnSub General Partner and certain related parties (including SN UnSub) in any material respect;

- effecting a change of control, liquidation or dissolution;



- selling or acquiring assets other than with respect to the sale of production in the ordinary course of business;

- entering hedging arrangements outside of the parameters of SN UnSub's hedging program;

- issuing any additional capital stock in SN UnSub General Partner or in SN UnSub, except for certain limited partner interests in SN UnSub that would be junior to the preferred units and would otherwise not result in SN UnSub Holdings owning less than 51% of the economic interests in SN UnSub (excluding interests represented by preferred units);

- entering into contracts with affiliates of members of SN UnSub General Partner, except that (x) no approval is required if (i) the terms of the contract are arm's length and (ii) (A) such action is not reasonably expected to result in revenue to, or costs or expenses incurred by, SN UnSub General Partner and certain affiliates (including SN UnSub) of more than $5 million or (B) such action together with all prior such actions with respect to such member or affiliate would not be reasonably expected to result in revenue to, or costs or expenses incurred by, SN UnSub General Partner and certain affiliates (including SN UnSub) of more than $25 million in the aggregate (the thresholds set forth in (A) and (B), the "***Affiliate Threshold***") and (y) with respect to any agreement between SN UnSub and certain affiliates on the one hand, and Sanchez Production Partners, LP on the other hand, that is in excess of the Affiliate Threshold, consent from GSO Associates LLC is not to be unreasonably withheld, conditioned or delayed (subject to certain exceptions including an agreement that is not arm's length or that is not approved in writing by the independent board of directors of the Company and certain other conflicts committees);

- subject to certain exceptions, making capital expenditures for drilling and completion of wells during any quarterly period if certain financial metrics have not been met within two years of the closing under the Purchase Agreement or thereafter as calculated on a quarterly basis;

- filing for bankruptcy; and

- incurring general and administrative costs in excess of $5 million during any calendar year ending on or before December 31, 2019, or in excess of $10 million in any calendar year thereafter.

*SN UnSub Credit Agreement*

On March 1, 2017, SN UnSub, as borrower, entered into a revolving credit facility represented by a $500 million Credit Agreement dated as of March 1, 2017 with JPMorgan Chase Bank, N.A. as the administrative agent and the lenders party thereto (the "***SN UnSub Credit Agreement***"). The initial borrowing base amount under the SN UnSub Credit Agreement is $330 million. Additionally, the SN UnSub Credit Agreement provides for the issuance of letters of credit, limited in the aggregate to the lesser of $50 million and the total availability under the borrowing base. As of March 1, 2017, there is approximately $173.5 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. Availability under the SN





UnSub Credit Agreement is at all times subject to customary conditions and the then applicable borrowing base, which is subject to periodic redetermination.

The SN UnSub Credit Agreement matures on March 1, 2022. The borrowing base under the SN UnSub Credit Agreement can be subsequently redetermined up or down by the lenders based on, among other things, their evaluation of SN UnSub's and its subsidiaries' oil and natural gas reserves. Redeterminations of the borrowing base are scheduled to occur 60 days after March 1, 2017, October 1, 2017 and thereafter semi-annually on April 1 and October 1 of each year. The borrowing base is also subject to reduction by 25% of the amount of certain junior debt issuances other than the first $200 million of such debt and by reductions as a result of terminating hedge positions and asset dispositions that exceed 5% of the then-effective borrowing base, together with other customary adjustments.

SN UnSub's obligations under the SN UnSub Credit Agreement are secured by a first priority lien on substantially all of SN UnSub's assets and the assets of SN UnSub's existing and future subsidiaries not designated as "unrestricted subsidiaries," including a first priority lien on all ownership interests in existing and future subsidiaries not designated as "unrestricted subsidiaries," as well as a pledge of equity interests in SN UnSub held by SN UnSub Holdings and SN UnSub General Partner, in each case, subject to customary exceptions. The obligations under the SN UnSub Credit Agreement are guaranteed by all of SN UnSub's existing and future subsidiaries not designated as "unrestricted subsidiaries," subject to customary exceptions. As of March 1, 2017, SN UnSub has no subsidiaries.

At SN UnSub's election, borrowings under the SN UnSub Credit Agreement may be made on an alternate base rate or a eurodollar rate basis, plus an applicable margin. The applicable margin varies from 1.75% to 2.75% for alternate base rate borrowings and from 2.75% to 3.75% for eurodollar borrowings, depending on the utilization of the borrowing base. Furthermore, SN UnSub is also required to pay a commitment fee on the amount of any unused commitments at a rate of 0.50% per annum.

The SN UnSub Credit Agreement contains various affirmative and negative covenants and events of default that limit SN UnSub's ability to, among other things, incur indebtedness, make restricted payments, grant liens, consolidate or merge, dispose of certain assets, make certain investments, engage in transactions with affiliates, enter into and maintain hedge transactions and make certain acquisitions. The SN UnSub Credit Agreement also provides for an event of default upon a change of control and cross default between the SN UnSub Credit Agreement and other indebtedness in an aggregate principal amount exceeding $25 million. Additionally, the SN UnSub Credit Agreement contains "separateness" covenants that require SN UnSub to comply with certain corporate formalities and transact with affiliates on an arms' length basis. Furthermore, the SN UnSub Credit Agreement contains financial covenants that require SN UnSub to satisfy certain specified financial ratios, including (i) a current assets to current liabilities ratio of at least 1.0 to 1.0 as of the last day of each fiscal quarter commencing with the fiscal quarter ending June 30, 2017 and (ii) a net debt to consolidated EBITDA ratio of not greater than 4.0 to 1.0 as of the last day of each fiscal quarter, commencing with the fiscal quarter ending June 30, 2017.

The representations and warranties and covenants in the SN UnSub Credit Agreement were made or agreed to, among other things, to provide the parties with specified rights and obligations



and to allocate risk among the parties. Accordingly, the SN UnSub Credit Agreement should not be relied upon as constituting a description of the state of affairs of any of the parties or their affiliates at the time it was entered into or otherwise.

From time to time, the agents, arrangers, book runners and lenders under the SN UnSub Credit Agreement and their affiliates have provided, and may provide in the future, investment banking, commercial lending, hedging and financial advisory services to SN UnSub and its affiliates in the ordinary course of business, for which they have received, or may in the future receive, customary fees and commissions for these transactions.

*Rights Agreement Amendment*

On March 1, 2017, the Company and Continental Stock Transfer & Trust Company, as rights agent, entered into an amendment (the "***Rights Agreement Amendment***") to the Rights Agreement, dated as of July 28, 2015, by and between the Company and the rights agent (the "***Rights Agreement***") to, among other things, amend the definition of "Exempt Person" to allow the Blackstone Warrantholders, certain specified funds managed or advised by GSO, and any other person that, together with the Blackstone Warrantholders and the specified funds managed or advised by GSO, constitutes a "group" as defined for purposes of the Securities Exchange Act of 1934, as amended, or an "entity" within the meaning of specified treasury regulations (collectively, the "***Exempted Holders***"), to acquire securities of the Company in excess of 4.9% of the then outstanding shares of the Company's common stock in connection with the consummation of the transactions contemplated by the Amended and Restated SPA without triggering the rights under the Rights Agreement. Except as provided in the Rights Agreement, as

amended by the Rights Agreement Amendment, if any of the Exempted Holders becomes the beneficial owner of any additional shares of the Company's common stock in excess of an additional 1% of the then outstanding shares of common stock, then such Exempted Holder will be deemed an "Acquiring Person" under the Rights Agreement.

This summary of the Rights Agreement Amendment does not purport to be complete, and is qualified in its entirety by reference to the full text of the Rights Agreement Amendment, which is filed as Exhibit 4.6 to this Current Report on Form 8-K and is incorporated into this Item 1.01 by reference.

**Item 2.01. Completion of Acquisition or Disposition of Assets.**

The information set forth in Item 1.01 of the Current Report on Form 8-K under the heading "Closing of Eagle Ford Comanche Acquisition" is incorporated by reference into this Item 2.01.

**Item 2.03. Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The information set forth in Item 2.03 of this Current Report on Form 8-K under the heading "SN UnSub Credit Agreement" is incorporated by reference into this Item 2.03.



---

**Item 3.02. Unregistered Sales of Equity Securities.**

The information in Item 1.01 of this Current Report on Form 8-K regarding the issuance of (i) warrants to purchase an aggregate of 6,500,000 shares of the Company's common stock to the Blackstone Warrantholders, (ii) 1,455,000 shares of the Company's common stock and warrants to purchase 1,940,000 shares of the Company's common stock to the GSO Funds and (iii) 45,000 shares of the Company's common stock and warrants to purchase 60,000 shares of the Company's common stock to Intrepid is incorporated by reference into this Item 3.02. The securities were issued pursuant to the exemption from registration provided by Section 4(a)(2) of the Securities Act of 1933, as amended, as an issuance not involving a public offering.

**Item 9.01. Financial Statements and Exhibits.**

(d) *Exhibits*.

The following materials are included as exhibits to this Current Report on Form 8-K:

| Exhibit No. | Exhibit |
|---|---|
| 2.1* | Purchase and Sale Agreement, dated January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, and Aguila Production, LLC and, solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation |
| 4.1 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—A, LLC |
| 4.2 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—B, LLC |
| 4.3 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—C, LLC |
| 4.4 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and GSO Capital Opportunities Fund III LP, GSO Energy Select Opportunities Fund LP, GSO Energy Partners—A LP, GSO Energy Partners—B LP, GSO Energy Partners—C LP, GSO Energy Partners—C II LP, GSO Energy Partners—D LP, GSO Credit Alpha Trading (Cayman) LP, GSO Harrington Credit Alpha Fund (Cayman) L.P., and GSO Capital Solutions Funds II LP |
| 4.5 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Intrepid Private Equity V-A, LLC |

| | |
|---|---|
| 4.6 | Amendment No. 1, dated as of March 1, 2017, to Rights Agreement, dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as rights agent (incorporated by reference from Exhibit 4.2 to the Company's Form 8-A/A filed with the SEC on March 3, 2017) |

* Exhibits and Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A list of these Exhibits and Schedules is included in the index of the Purchase Agreement. The Company agrees to furnish a supplemental copy of any such omitted Exhibit or Schedule to the SEC upon request.



## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

SANCHEZ ENERGY CORPORATION

Date: March 6, 2017

By: /s/ Howard J. Thill
Howard J. Thill
Executive Vice President and Chief Financial Officer



## EXHIBIT INDEX

| Exhibit No. | Exhibit |
|---|---|
| 2.1* | Purchase and Sale Agreement, dated January 12, 2017, by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, and Aguila Production, LLC and, solely for the purposes of Section 15.22 and Schedule 13.4(a), Sanchez Energy Corporation |
| 4.1 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—A, LLC |
| 4.2 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—B, LLC |
| 4.3 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Gavilan Resources Holdings—C, LLC |
| 4.4 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and GSO Capital Opportunities Fund III LP, GSO Energy Select Opportunities Fund LP, GSO Energy Partners—A LP, GSO Energy Partners—B LP, GSO Energy Partners—C LP, GSO Energy Partners—C II LP, GSO Energy Partners—D LP, GSO Credit Alpha Fund LP, GSO Harrington Credit Alpha Fund (Cayman) L.P., and GSO Capital Solutions Funds II LP |
| 4.5 | Warrant Agreement, dated as of March 1, 2017, by and between Sanchez Energy Corporation and Intrepid Private Equity V-A, LLC |
| 4.6 | Amendment No. 1, dated as of March 1, 2017, to Rights Agreement, dated as of July 28, 2015, by and between Sanchez Energy Corporation and Continental Stock Transfer & Trust Company, as rights agent (incorporated by reference from Exhibit 4.2 to the Company's Form 8-A/A filed with the SEC on March 3, 2017) |

012003

* Exhibits and Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A list of these Exhibits and Schedules is included in the index of the Purchase Agreement. The Company agrees to furnish a supplemental copy of any such omitted Exhibit or Schedule to the SEC upon request.

# Exhibit C

EX-10.7 19 sn-20170331ex107153f8e.htm EX-10.7

**Exhibit 10.7**

**AMENDED AND RESTATED**

**SECURITIES PURCHASE AGREEMENT**

by and among

SANCHEZ ENERGY CORPORATION,

SN UR HOLDINGS, LLC

SN EF UNSUB GP, LLC

SN EF UNSUB, LP,

SN EF UNSUB HOLDINGS, LLC,

GSO ST HOLDINGS ASSOCIATES LLC,

GSO ST HOLDINGS LP,

AND

INTREPID PRIVATE EQUITY V-A, LLC

**FEBRUARY 28, 2017**

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 3 |
| Section 1.01 | Definitions | 3 |
| ARTICLE II AGREEMENT TO SELL AND PURCHASE | | 11 |
| Section 2.01 | Anadarko Commitment and Related Matters | 11 |
| Section 2.02 | Anadarko Related Commitment and Related Matters | 13 |
| Section 2.03 | | 14 |
| Section 2.03 | Closing | 14 |
| Section 2.04 | Deliveries | 15 |
| Section 2.05 | Deliveries Upon Execution of KNOC PSA. Promptly following the execution of the KNOC PSA: | 15 |
| Section 2.06 | Deliveries Upon the Closings | 16 |
| Section 2.07 | Conditions of GSO Associates' and GSO Holdings' Obligations at the Closing | 18 |
| Section 2.08 | Conditions of the Common Unit Purchaser's Obligations at Committed Closing | 20 |
| Section 2.09 | Conditions of Intrepid's Obligations at the Closing | 20 |
| Section 2.10 | Nature of Obligations | 21 |
| Section 2.11 | Further Assurances | 21 |
| Section 2.12 | UCC Filings After January 12, 2017 | 21 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES RELATED TO THE GENERAL PARTNER AND THE PARTNERSHIP | | 21 |
| Section 3.01 | Existence and Power | 21 |
| Section 3.02 | Authority; Enforceability | 22 |
| Section 3.03 | Capitalization; Issuance of Units | 22 |
| Section 3.04 | Subsidiaries | 23 |
| Section 3.05 | Litigation | 23 |
| Section 3.06 | No Conflicts | 24 |
| Section 3.07 | Approvals | 24 |
| Section 3.08 | No Liabilities | 24 |
| Section 3.09 | Investment Company Status | 24 |
| Section 3.10 | No Registration Required | 25 |
| Section 3.11 | Certain Fees | 25 |
| Section 3.12 | No Integration | 25 |
| Section 3.13 | No Restrictions on Dividends | 25 |
| Section 3.14 | Springfield Gathering | 25 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASERS | | 26 |
| Section 4.01 | Existence | 26 |
| Section 4.02 | Authorization, Enforceability | 26 |
| Section 4.03 | No Breach | 26 |
| Section 4.04 | Approvals | 27 |
| Section 4.05 | Certain Fees | 27 |
| Section 4.06 | Restricted Securities | 27 |
| Section 4.07 | Financing | 28 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF SN | | 29 |
| Section 5.01 | Existence | 29 |


012007

| | | |
|---|---|---|
| Section 5.02 | Authorization, Enforceability | 29 |
| Section 5.03 | No Conflicts | 30 |
| Section 5.04 | Approvals | 30 |
| Section 5.05 | Certain Fees | 30 |
| Section 5.06 | The GSO Allocated Shares, the Intrepid Allocated Shares and the Warrants | 30 |
| Section 5.07 | Investment Company Status | 31 |
| Section 5.08 | Stock Exchange Listing and Reporting Requirements | 31 |
| Section 5.09 | No Registration Required | 31 |
| Section 5.10 | No Integration | 31 |
| Section 5.11 | Restricted Securities | 31 |
| Section 5.12 | Litigation | 32 |
| Section 5.13 | Solvency | 32 |
| Section 5.14 | No Obligation to be Guarantor or Restricted Subsidiary | 33 |
| ARTICLE VI INDEMNIFICATION, COSTS AND EXPENSES | | 33 |
| Section 6.01 | Indemnification | 33 |
| Section 6.02 | Indemnification Procedure | 35 |
| Section 6.03 | Survival | 37 |
| ARTICLE VII TERMINATION | | 37 |
| Section 7.01 | Termination | 37 |
| Section 7.02 | Notice of Termination | 38 |
| Section 7.03 | Effect of Termination | 38 |
| Section 7.04 | Termination of Commitment Related to KNOC Closing | 38 |
| ARTICLE VIII MISCELLANEOUS | | 38 |
| Section 8.01 | Expenses | 38 |
| Section 8.02 | Interpretation | 38 |
| Section 8.03 | Amendments and Waivers | 38 |
| Section 8.04 | Binding Effect | 40 |
| Section 8.05 | Communications | 40 |
| Section 8.06 | Entire Agreement; Integrated Transaction | 41 |
| Section 8.07 | Governing Law; Submission to Jurisdiction | 42 |
| Section 8.08 | Waiver of Jury Trial | 42 |
| Section 8.09 | Execution in Counterparts | 42 |
| Section 8.10 | Successors and Assigns | 42 |
| Section 8.11 | Severability | 42 |
| Section 8.12 | Interim Actions | 43 |
| Section 8.13 | No Recourse | 44 |
| Section 8.14 | Creditors | 44 |
| Section 8.15 | Public Disclosure; Confidentiality | 44 |
| Section 8.16 | Time is of the Essence | 45 |
| Section 8.17 | Remedies Generally | 45 |

**EXHIBITS**

| | | |
|---|---|---|
| EXHIBIT A | – | Form of Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP |
| EXHIBIT B | – | Form of Limited Liability Company Agreement of SN EF UnSub GP, LLC |
| EXHIBIT C-1 | – | Form of GSO Warrant Agreement |
| EXHIBIT C-2 | – | Form of Intrepid Warrant Agreement |
| EXHIBIT D | – | Form of Management Services Agreement |
| EXHIBIT E | – | Form of Joint Development Agreement |
| EXHIBIT F | – | APC/KM PSA |
| EXHIBIT G | – | Hydrocarbon Marketing Agreement |
| EXHIBIT H-1 | – | Form of GSO Registration Rights Agreement |
| EXHIBIT H-2 | – | Form of Intrepid Registration Rights Agreement |
| EXHIBIT I | – | Opinion Matters |
| EXHIBIT J | – | Equity Commitment Letters |
| EXHIBIT K-1 | – | Form of GSO Non-Solicitation Agreement |
| EXHIBIT K-2 | – | Form of Intrepid Non-Solicitation Agreement |
| EXHIBIT L | – | GSO Voting Agreement |
| EXHIBIT M | – | Allocation of SN Shares and Warrants |
| EXHIBIT N | – | SN Letter Agreement |

**SCHEDULES**

SCHEDULE 3.07 – Partnership Approvals
SCHEDULE 3.08 – Liabilities
SCHEDULE 4.04 – Preferred Unit Purchasers Approvals
SCHEDULE 5.04 – SN Approvals

---

**AMENDED AND RESTATED**

**SECURITIES PURCHASE AGREEMENT**

This AMENDED AND RESTATED SECURITIES PURCHASE AGREEMENT (this "***Agreement***"), is entered into on February 28, 2017 (the "***Effective Date***"), by and among Sanchez Energy Corporation, a Delaware corporation ("***SN***"); SN UR Holdings, LLC, a Delaware limited liability company ("***SN GP Member***"); SN EF UnSub Holdings, LLC, a Delaware limited liability company ("***Common Unit Purchaser***"); SN EF UnSub, LP, a Delaware limited partnership (the "***Partnership***"); SN EF UnSub GP, LLC, a Delaware limited liability company and the general partner of the Partnership (the "***General Partner***"); Intrepid Private Equity V-A, LLC, a Delaware limited liability company ("***Intrepid***"); GSO ST Holdings Associates LLC, a Delaware limited liability company ("***GSO Associates***"); and GSO ST Holdings LP, a Delaware limited partnership ("***GSO Holdings***" and together with Intrepid, the "***Preferred Unit Purchasers***" and, collectively with GSO Associates and Intrepid, the "***Purchasers***"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in accordance with Article I.

**R E C I T A L S:**

WHEREAS, on January 12, 2017, the Partnership entered into the APC/KM PSA as a Buyer Party, an executed copy of which APC/KM PSA is attached as Exhibit F hereto, pursuant to which the Partnership has agreed to purchase, and Anadarko has agreed to sell to the Partnership, the Acquired Properties;

WHEREAS, upon execution of the APC/KM PSA, Anadarko sent a Sale Notice to KNOC whereby KNOC will have thirty (30) days to elect to sell the KNOC Properties to the Buyer Parties under the same terms and conditions that Anadarko proposes to transfer the Acquired Properties under the APC/KM PSA;

WHEREAS, if KNOC elects to sell the KNOC Properties to the Buyer Parties pursuant to the terms included in the Sale Notice (the "***KNOC Election***"), then the Partnership and other Buyer Parties will execute a purchase agreement with KNOC pursuant to the terms of the Sale Notice, this Agreement and as otherwise agreed among the parties (such purchase agreement, if any, the "***KNOC PSA***");

WHEREAS, the Anadarko Closing (as defined below) and the KNOC Closing (as defined below) may occur on different days, provided that in such case the KNOC Closing shall not occur unless the Anadarko Closing has previously occurred ("***Separate Closings***"), or on the same day (a "***Dual Closing***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing, the Partnership will issue to the Common Unit Purchaser 100,000 newly issued Common Units in consideration for a contribution of $100,000,000.00 (the "***Common Unit Funding Amount***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing and, if applicable, the KNOC Closing, GSO Holdings has committed to contribute to the Partnership in the aggregate up to $800,000,000.00 (the "***Preferred Unit GSO Commitment Amount***"), with the actual amount to be contributed by GSO Holdings at the Anadarko Closing (whether it occurs in a Separate Closing or as part of a Dual Closing) to be set forth in the Closing Notice, provided that if the Anadarko Closing occurs in a Separate Closing the amount to be contributed by GSO Holdings shall be $500.0 million (the actual amount so contributed at the Anadarko Closing and less the amount of the Intrepid Contribution, if any, the "***Preferred Unit Anadarko Funding Amount***") and, if applicable, the actual amount (which shall be determined by SN but shall not be less than $200.0 million and not greater than $300.0 million) to be contributed by GSO Holdings at the KNOC Closing (whether it occurs in a Separate Closing or as part of a Dual Closing) to be set forth (i) in the Closing Notice if a Dual Closing is to occur and (ii) in the Supplemental Closing Notice if Separate Closings will occur (the

"***Preferred Unit KNOC Funding Amount***" and, together with the "***Preferred Unit Anadarko Funding Amount***", the "***Preferred Funding Amounts***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, at the Anadarko Closing, Intrepid has committed to contribute to the Partnership an amount equal to $15,000,000 (the "***Intrepid Contribution***");

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, (i) at the Anadarko Closing, the Partnership will issue to (A) GSO Holdings, a number of newly issued Preferred Units equal to the Preferred Unit Anadarko Funding Amount divided by the Preferred Unit Purchase Price and (B) Intrepid a number of newly issued Preferred Units equal to the Intrepid Contribution divided by the Preferred Unit Purchase Price and (ii) if applicable, at the KNOC Closing, the Partnership will issue to GSO Holdings a number of newly issued Preferred Units equal to the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price;

WHEREAS, in accordance with this Agreement and the Partnership Agreement, the Partnership will utilize the Common Unit Funding Amount, Preferred Funding Amounts and the Intrepid Contribution, together with the proceeds of the Credit Facility and Senior Debt drawn at the Preferred Unit Closings, to (i) pay to Anadarko consideration for the sale by Anadarko to the Partnership of the Acquired Properties pursuant to the APC/KM PSA, (ii) if applicable, pay to KNOC consideration for the sale by KNOC to the Partnership of the KNOC Properties pursuant to the KNOC PSA and (iii) the payment of certain fees and expenses as provided herein;

WHEREAS, concurrently with the execution of the APC/KM PSA, the Partnership, SN and SN Maverick entered into the SN Letter Agreement, an executed copy of which is attached hereto as Exhibit N, and concurrently with the execution and delivery of the Original SPA (as defined herein) the Partnership and SN Maverick entered into the Hydrocarbons Marketing Agreement (as defined herein) an executed copy of which is attached hereto as Exhibit G;

WHEREAS, at the Anadarko Closing, the Partnership will enter into the Management Services Agreement and the Joint Development Agreement, which agreements will be in the form of Exhibit D and Exhibit E hereto, respectively;

WHEREAS, as partial consideration for the commitment by GSO Holdings to contribute the Preferred Unit Anadarko Funding Amount and the Preferred Unit KNOC Funding Amount to the Partnership pursuant to this Agreement, SN has agreed, on the terms and subject to the conditions set forth in this Agreement and in the GSO Warrant Agreement, that at the Anadarko Closing, SN will issue to GSO Holdings the GSO Allocated Shares and the Warrants, which Warrants shall be issued pursuant to the GSO Warrant Agreement in the form attached as Exhibit C-1;

WHEREAS, GSO Holdings has directed SN to issue at the Anadarko Closing the GSO Allocated Shares and the Warrants included in the GSO Warrant Agreement to the funds managed by GSO that are identified in Exhibit M in the proportions set forth in Exhibit M (collectively, the "***GSO Funds***");

WHEREAS, as partial consideration for the obligation of Intrepid to contribute the Intrepid Contribution to the Partnership pursuant to this Agreement, SN has agreed, on the terms and subject to the conditions set forth in this Agreement and in the Intrepid Warrant Agreement, that at the Anadarko Closing, SN will issue to Intrepid the Intrepid Allocated Shares and the Warrants included in the Intrepid Warrant Agreement, which shall be in the form attached as Exhibit C-2;

WHEREAS, at the Anadarko Closing SN and the GSO Funds will enter into the GSO Registration Rights Agreement in the form attached as Exhibit H-1, and SN and Intrepid will enter into the Intrepid Registration

Rights Agreement in the form attached as Exhibit H-2, in each case relating to the registration of the SN Common Stock to be issued to the GSO Funds and Intrepid at the Anadarko Closing and the SN Common Stock subject to issuance upon exercise of the applicable Warrants;

WHEREAS, as a condition to and inducement for the SN Parties to enter into the Original SPA, contemporaneously with the execution of the Original SPA, the GSO Funds executed and delivered to the Partnership and SN two equity commitment letters, enforceable by SN and the Partnership, with respect to certain of GSO Holdings' obligations hereunder, copies of which are attached hereto as Exhibits J-1 and J-2 (the "***Equity Commitment Letters***");

WHEREAS, the parties hereto intend that the General Partner and the Partnership shall constitute bankruptcy remote, non-guarantor, unrestricted special purpose Subsidiaries of SN; and

WHEREAS, the parties hereto desire to amend and restate the original Securities and Purchase Agreement executed by and among SN, SN GP Member, Common Unit Purchaser, the Partnership, the General Partner, GSO Associates and GSO Holdings on January 12, 2017 ("***Original SPA***") in its entirety (including the Exhibits and Schedules thereto) to give effect to the foregoing and to the other agreements as further set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby amend and restate the Original SPA in its entirety and agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 Definitions. As used in this Agreement, the following terms have the meanings indicated:

"***Acquired Properties***" means the properties, assets and rights to be acquired, directly or indirectly, by the Partnership from Anadarko at the Closing (as such term is defined in the APC/KM PSA) pursuant to the "UnSub Assignment" (as such term is defined in the APC/KM PSA) in the form attached as Exhibit C-2 to the APC/KM PSA.

"***Affiliate***" of any Person means any other Person, directly or indirectly, Controlling, Controlled by or under common Control with such particular Person. For purposes of this Agreement, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an "Affiliate" of GSO or its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., but any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates within the credit-related businesses of The Blackstone Group L.P. shall constitute an Affiliate of GSO, and (ii) none of GSO or its Affiliates or any fund or account managed, advised or sub-advised by or Controlled by GSO or its Affiliates shall constitute an Affiliate of the Partnership or the General Partner.

"***Agreement***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Anadarko***" means Anadarko Onshore and Kerr-McGee Oil and Gas Onshore LP, a Delaware limited partnership.

"***Anadarko Closing***" means the issuance and sale of the Common Units and the Preferred Units to the Common Unit Purchaser and the Preferred Unit Purchasers, respectively, in consideration for the Common Unit



012012

Funding Amount, the Preferred Unit Anadarko Funding Amount and Intrepid Contribution, respectively, in accordance with Section 2.01(a).

"***Anadarko Closing Date***" means the date that is the "Closing Date", as such term is defined in the APC/KM PSA.

"***Anadarko Onshore***" means Anadarko E&P Onshore LLC, a Delaware limited liability company.

"***APC/KM PSA***" means that certain Purchase and Sale Agreement among Anadarko E&P Onshore LLC, Kerr-McGee Oil and Gas Onshore LP, SN Maverick, the Partnership and Blackstone Newco, dated January 12, 2017, an executed copy of which is attached as Exhibit F hereto.

"***Basic Documents***" means, collectively, this Agreement, the Partnership Agreement, the GP LLC Agreement, the APC/KM PSA, the KNOC PSA if such document is executed, the Management Services Agreement, the Joint Development Agreement, the Hydrocarbons Marketing Agreement, the GSO Warrant Agreement, the Intrepid Warrant Agreement, the GSO Registration Rights Agreement, the Intrepid Registration Rights Agreement, the Equity Commitment Letters, the SN Letter Agreement, the definitive documents relating to the Credit Facility and the Senior Debt, if any, the GSO Voting Agreement, the GSO Non-Solicitation Agreement, the Intrepid Non-Solicitation Agreement and the Drilling Commitment Agreement.

"***Blackstone***" means The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.

"***Blackstone Newco***" means Gavilan Resources, LLC, a Delaware limited liability company.

"***Business Day***" means any day other than a Saturday, Sunday or a day on which commercial banks are authorized or required to close in Houston, Texas.

"***Buyer Party***" and "***Buyer Parties***" have the meaning set forth in the APC/KM PSA.

"***Citi***" means Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America Inc. and/or any of their Affiliates.

"***Class A Common Interests***" has the meaning assigned to such term in Section 2.01(b).

"***Class B Common Interests***" has the meaning assigned to such term in Section 2.01(b).

"***Closing Notice***" means a written notice prepared and delivered by SN to GSO Holdings not less than thirteen (13) Business Days prior to the Anadarko Closing Date, which notice shall specify (i) if there will be Separate Closings, the Preferred Unit Anadarko Funding Amount in the Anadarko Closing that occurs in a Separate Closing (which amount shall be $500.0 million) and shall include wiring instructions for receipt of such Preferred Unit Anadarko Funding Amount and (ii) if there will be a Dual Closing, the Preferred Unit Anadarko Funding Amount in such Dual Closing and the Preferred Unit KNOC Funding Amount in such Dual Closing (which combined amount shall be determined by SN, but shall not exceed $800.0 million and shall not be less than $700.0 million) and shall include wiring instructions for receipt of the Preferred Unit Anadarko Funding Amount and the Preferred Unit KNOC Funding Amount, and in all cases, the Closing Notice shall be subject to deemed adjustment with respect to any Initial Debt Replacement Units in accordance with Section 2.01(c). If there will be a Dual Closing, the Anadarko Closing Date and the KNOC Closing Date will occur on the same day.

"***Commission***" means the United States Securities and Exchange Commission.

"***Commitment Fee***" means a fee payable by SN to GSO Holdings as of the date of the Original SPA in immediately available funds accordance with Section 2.04(a)(vii) of the Original SPA, which Commitment Fee shall be in an amount equal to $20.0 million.

"***Common Indemnified Parties***" has the meaning specified in Section 6.01(b).

"***Common Unit Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Common Unit Purchaser***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Common Units***" means the "Common Units" as such term is defined in the Partnership Agreement.

"***Contract***" means any contract, agreement, indenture, note, bond, mortgage, deed of trust, loan, instrument, lease, license, commitment or other arrangement, understanding, undertaking, commitment or obligation, whether written or oral.

"***Control***" has the meaning set forth in the Partnership Agreement.

"***Credit Facility***" means the up to $500.0 million senior secured first lien reserve based revolving credit facility among the Partnership, as borrower, and J.P. Morgan and Citi, as joint lead arrangers and joint book runners, J.P. Morgan as administrative agent, and J.P. Morgan, Citi and the syndicate of banks and financial institutions named therein as the lenders; *provided*, *however*, that if J.P. Morgan and Citi are unable to fully syndicate such facility, SN may in its discretion reduce, but subject to the rights of GSO Holdings set forth in Section 2.01(c), the amount of such credit facility by up to $300.0 million in the aggregate (the "***Facility Reduction Amount***") and incur Senior Debt in an amount up to such reduction.

"***Damages***" means losses, judgments, liabilities, damages and fines and all reasonable costs, fees, outlays, expenses, expenditures and disbursements of every nature (including costs of investigation and fees and expenses of attorneys, accountants, consultants, expert witnesses and other witnesses).

"***Delaware Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as amended from time to time, and any successor to the Delaware Act.

"***Deposit***" has the meaning set forth in the APC/KM PSA.

"***Drilling Commitment Agreement***" means the Development Agreement to be entered into at the Anadarko Closing (whether it occurs in a Separate Closing or at the Dual Closing), by and among Anadarko, SN Maverick, the Partnership and Blackstone Newco, and, solely for the purpose specified therein, SN, the form of which is attached as Exhibit N to the APC/KM PSA.

"***DRULPA***" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C §17-101 et seq. as amended from time to time and any successor to DRULPA.

"***Dual Closing***" has the meaning specified in the recitals of this Agreement.

"***Effective Date***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Equity Commitment Letters***" has the meaning set forth in the recitals.

"***Equity Interests***" means (i) equity interests (including capital stock, membership interests and partnership interests) of any applicable Person, (ii) obligations, evidences of indebtedness or other securities or

interests convertible or exchangeable into equity interests, and (iii) warrants, options or other rights to purchase or otherwise acquire or receive equity interests.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Facility Reduction Amount***" has the meaning set forth in the definition of the term "Credit Facility".

"***Fee Letter***" means that certain Project Lightning Fee Letter, dated January 12, 2017, among J.P. Morgan, Citi and the Partnership.

"***Final Availability Cushion***" has the meaning assigned to such term in Section 2.02(b).

"***Final Debt Replacement Election***" has the meaning assigned to such term in Section 2.02(b).

"***Final Debt Replacement Units***" has the meaning assigned to such term in Section 2.02(b).

"***Final Non-Syndicated Debt***" has the meaning set forth in Section 2.02(b).

"***Fundamental Representations***" means those representations and warranties set forth in Sections 3.01, 3.02, 3.03, 3.04, 3.05 (solely as such representation relates to the absence of proceedings as of the Effective Date), 3.06, 3.09, 3.10, 3.13, 4.01, 4.02, 5.01, 5.02, 5.03, 5.06, 5.09, 5.10, 5.12 (solely as such representation relates to the absence of proceedings as of the Effective Date) and 5.14.

"***GAAP***" means generally accepted accounting principles in the United States.

"***General Partner***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Governmental Authority***" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"***GP LLC Agreement***" means the Amended and Restated Limited Liability Company Operating Agreement of the General Partner in the form attached as Exhibit B hereto.

"***GSO***" means GSO Capital Partners LP, a Delaware limited partnership.

"***GSO Allocated Shares***" means the 1,455,000 shares of SN Common Stock to be issued by SN to the GSO Funds at the Anadarko Closing, such number of shares subject to adjustment in accordance with the last sentence of Section 6.01(b).

"***GSO Associates***" has the meaning set forth in the introductory paragraph to this Agreement.

"***GSO Funds***" has the meaning set forth in the recitals.

"***GSO Holdings***" has the meaning set forth in the introductory paragraph to this Agreement.

"***GSO Non-Solicitation Agreement***" means the Non-Solicitation Agreement to be entered into at the Anadarko Closing by and among SN, SOG and GSO, substantially in the form attached as Exhibit K-1 hereto.

"***GSO Registration Rights Agreement***" means the Registration Rights Agreement to be entered into at the Anadarko Closing between SN and the GSO Funds, substantially in the form attached as Exhibit H-1 hereto.

"***GSO Voting Agreement***" means the Voting and Standstill Agreement, executed on February 6, 2017 by and between the GSO Funds and SN, attached as Exhibit L hereto.

"***GSO Warrant Agreement***" means the Warrant Agreement to be entered into at the Anadarko Closing between the GSO Funds and SN, substantially in the form attached as Exhibit C-1 hereto.

"***Hydrocarbon Marketing Agreement***" means the Hydrocarbons Purchase and Marketing Agreement entered into on January 12, 2017 between SN Maverick and the Partnership attached as Exhibit G hereto.

"***Indebtedness***" means, with respect to any specified Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for a deferred purchase price (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person under capital leases, (e) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, regardless of whether drawn, (f) all obligations of such Person created or arising under any conditional sale or title retention agreement, (g) the liquidation value or redemption price, as the case may be, of all preferred or redeemable stock of such Person, (h) all net obligations of such Person payable under any rate, currency, commodity or other swap, option or derivative agreement, (i) all obligations secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person, regardless of whether such Person has assumed or become liable for the payment of such obligation and (j) all obligations of others guaranteed by such Person.

"***Indemnified Party***" has the meaning specified in Section 6.02(a).

"***Indemnifying Party***" has the meaning specified in Section 6.02(a).

"***Initial Availability Cushion***" has the meaning assigned to such term in Section 2.01(c).

"***Initial Debt Replacement Election***" has the meaning assigned to such term in Section 2.01(c).

"***Initial Debt Replacement Units***" has the meaning assigned to such term in Section 2.01(c).

"***Intrepid***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Intrepid Allocated Shares***" means the 45,000 shares of SN Common Stock to be issued by SN to Intrepid at the Anadarko Closing, such number of shares subject to adjustment in accordance with the last sentence of Section 6.01(b).

"***Intrepid Contribution***" has the meaning specified in the recitals of this Agreement.

"***Intrepid Non-Solicitation Agreement***" means the Non-Solicitation Agreement to be entered into at the Anadarko Closing by and among SN, SOG and Intrepid, substantially in the form attached as Exhibit K-2 hereto.

"***Intrepid Registration Rights Agreement***" means the Registration Rights Agreement to be entered into at the Anadarko Closing between SN and Intrepid, substantially in the form attached as Exhibit H-2 hereto.

"***Intrepid Warrant Agreement***" means the Warrant Agreement to be entered into at the Anadarko Closing between the Intrepid and SN, substantially in the form attached as Exhibit C-2 hereto.

"***Joint Development Agreement***" means the Joint Development Agreement to be entered into between the Partnership, Blackstone Newco and SN Maverick substantially in the form attached as Exhibit D hereto.

"***J.P. Morgan***" means J.P. Morgan Chase Bank, N.A.

"***KNOC***" means Eagle Ford TX LP, a Texas limited partnership.

"***KNOC Closing***" means the issuance and sale of the KNOC Preferred Units to GSO Holdings and, if Intrepid elects to participate in accordance with the terms hereof, Intrepid in consideration for the Preferred Unit KNOC Funding Amount in accordance with Section 2.02(a); provided, however, that in no event will the KNOC Closing occur unless the Anadarko Closing has previously occurred or occurs concurrently with the KNOC Closing.

"***KNOC Closing Date***" means, the day upon which closing occurs pursuant to the KNOC PSA, which date shall occur (i) on the day of the Anadarko Closing if a Dual Closing occurs or (ii) on a date after the Anadarko Closing has occurred if the KNOC Closing occurs in a Separate Closing.

"***KNOC Election***" has the meaning set forth in the recitals.

"***KNOC Participation Agreement***" means that certain Maverick Basin Area Participation Agreement, dated March 17, 2011, by and among Anadarko and KNOC.

"***KNOC Properties***" means KNOC's pro rata share of the Interests (as defined in the KNOC Participation Agreement).

"***KNOC PSA***" has the meaning set forth in the recitals.

"***Knowledge of SN***" means the actual knowledge, after due inquiry, of any of Antonio R. Sanchez, III, Eduardo A. Sanchez, Patricio D. Sanchez and Cameron W. George.

"***Law***" means any federal, state, local or foreign order, writ, injunction, judgment, settlement, award, decree, statute, law (including common law), rule or regulation.

"***Lien***" means any mortgage, claim, encumbrance, pledge, lien (statutory or otherwise), security agreement, conditional sale or trust receipt or a lease, consignment or bailment, preference or priority, assessment, deed of trust, charge, easement, servitude or other encumbrance upon or with respect to any property of any kind.

"***Management Services Agreement***" means the Management Services Agreement to be entered into at the Anadarko Closing by and between the Partnership and SOG, substantially in the form attached hereto as Exhibit D.

"***Non-Syndicated Debt***" has the meaning set forth in Section 2.01(c).

"***NYSE***" has the meaning assigned to such term in Section 5.07.

"***Original SPA***" has the meaning specified in the recitals of this Agreement.

"***Partnership***" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Partnership Agreement***" means the Amended and Restated Agreement of Limited Partnership of the Partnership to be entered into at the Anadarko Closing by and among the General Partner, Common Unit Purchaser and the Preferred Unit Purchasers, substantially in the form attached as Exhibit A hereto.

"***Permits***" means any approvals, authorizations, consents, licenses, permits, variances, waivers, grants, franchises, concessions, exemptions, orders, registrations or certificates of a Governmental Authority.

"***Person***" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, association or other entity or a Governmental Authority.

"***Preferred Funding Amounts***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Anadarko Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Closings***" means the Anadarko Closing and the KNOC Closing.

"***Preferred Unit GSO Commitment Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit KNOC Funding Amount***" has the meaning specified in the recitals of this Agreement.

"***Preferred Unit Purchase Price***" means a cash purchase price of $1,000 per Preferred Unit.

"***Preferred Unit Purchasers***" has the meaning set forth in the introductory paragraph of this Agreement.

"***Preferred Units***" means "Preferred Units", as defined in the Partnership Agreement.

"***Purchased Preferred Units***" means those Preferred Units purchased by the Preferred Unit Purchasers in accordance with Section 2.01(a) and, if applicable, Section 2.02(a).

"***Purchaser Indemnified Parties***" has the meaning specified in Section 6.01(a).

"***Purchasers***" has the meaning set forth in the introductory paragraph to this Agreement.

"***Restricted Subsidiary***" has the meaning assigned to such term in the SN Credit Agreement, or in any indenture or other agreement pertaining to indebtedness of SN.

"***Rights***" has the meaning assigned to such term under the SN Rights Plan.

"***Sale Notice***" has the meaning assigned to such term under Section 22.2 of the KNOC Participation Agreement.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time, and the rules and regulations of the Commission promulgated thereunder.

"***Senior Debt***" means the senior credit facility (other than, for the avoidance of doubt, the Credit Facility) and/or securities or note issuance among the Partnership, as borrower or issuer, J.P. Morgan and Citi as joint lead arrangers and joint book runners (or other equivalent roles), J.P. Morgan as administrative agent (or equivalent role) and J.P. Morgan, Citi and the syndicate of banks and the financial institutions as the lenders or holders in an original principal amount up to $300 million, but in no event shall the original principal amount of the Senior Debt exceed the Facility Reduction Amount.

"***Separate Closings***" has the meaning specified in the recitals of this Agreement.

"***SN***" has the meaning set forth in the introductory paragraph to this Agreement.

"***SN Common Stock***" means the common stock, par value $0.01 per share of SN. For purposes of this Agreement, references to a share or shares of SN Common Stock shall be deemed to include the Right(s)



012018

associated with such share or shares that are issued pursuant to the SN Rights Plan or any similar successor plan hereafter adopted by SN.

"***SN Credit Agreement***" means the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy Corporation, Royal Bank of Canada, as Administrative Agent, and the lenders party thereto, as amended, restated, modified, renewed, refunded, replaced or refinanced from time to time.

"***SN GP Member***" has the meaning set forth in the introductory paragraph to this Agreement.

"***SN Letter Agreement***" means that certain Letter Agreement, dated as of January 12, 2017, by and among SN, SN Maverick and the Partnership, attached as Exhibit P hereto.

"***SN Maverick***" means SN EF Maverick, LLC, a Delaware limited liability company.

"***SN Parties***" means SN, SN GP Member, the General Partner, the Partnership and the Common Unit Purchaser.

"***SN Rights Plan***" means that certain Rights Agreement, dated as of July 28, 2015, between SN and Continental Stock Transfer & Trust Company, as rights agent, including the exhibits attached thereto, as such rights agreement may be amended, modified or supplemented from time to time.

"***SOG***" means Sanchez Oil & Gas Corporation, a Delaware corporation.

"***Springfield Gathering Agreements***" means (a) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield Pipeline LLC, a Texas limited liability company ("***Springfield***"), and SN and (b) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and SN, in each case to be entered into upon termination of the Marketing Transition Services Agreement pursuant to the APC/KM PSA.

"***Subsidiary***" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or Controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of the membership interests, partnership interests or other similar ownership interests thereof with voting rights is at the time owned or Controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of the limited liability company, partnership, association or other business entity gains or losses or shall be or Control, directly or indirectly, the manager, managing member, managing director (or a board comprised of any of the foregoing) or general partner of such limited liability company, partnership, association or other business entity.

"***Supplemental Closing Notice***" means a written notice prepared and delivered by SN to GSO Holdings not less than thirteen (13) Business Days prior to the KNOC Closing Date that will occur in a Separate Closing, which notice shall specify the Preferred Unit KNOC Funding Amount (which amount shall be determined by SN, but shall not exceed $300.0 million and shall not be less than $200.0 million, such amount not in duplication of any amounts funded at the Anadarko Closing that has or, prior to the KNOC Closing, will occur in a Separate Closing), which Supplemental Closing Notice shall be subject to deemed adjustment with respect to any Final Debt Replacement Units in accordance with Section 2.02(b); *provided that* such written notice shall only be

delivered if Separate Closings will occur. A Supplemental Closing Notice may be only be delivered by SN to GSO Holdings if a Closing Notice for the Anadarko Closing that will occur in a Separate Closing has previously been delivered by SN to GSO Holdings.

"***Third Party Claim***" has the meaning specified in Section 6.02(b).

"***Unrestricted Subsidiary***" has the meaning assigned to such term in the SN Credit Agreement, or in any indenture or other agreement pertaining to Indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries).

"***Warrants***" means the Warrants issued in accordance with the GSO Warrant Agreement and the Intrepid Warrant Agreement, as applicable.

## ARTICLE II
## AGREEMENT TO SELL AND PURCHASE

Section 2.01 Anadarko Commitment and Related Matters.

(a) At, or prior to, the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, (i) GSO Holdings shall contribute and fund to the Partnership by wire transfer of immediately available funds the Preferred Unit Anadarko Funding Amount, (ii) Intrepid shall contribute and fund to the Partnership by wire transfer of immediately available funds the Intrepid Contribution and (iii) the Common Unit Purchaser shall contribute and fund to the Partnership by wire transfer of immediately available funds the Common Unit Funding Amount. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and Common Unit Funding Amount shall be paid by wire transfer of immediately available funds to an account of the Partnership designated in writing by SN in the Closing Notice; *provided that*, the Intrepid Contribution may be paid by Intrepid by wire transfer of immediately available funds to an account of GSO Holdings designated in writing by GSO Holdings to Intrepid at or contemporaneously with the Anadarko Closing and such payment shall be, upon GSO Holdings' contribution thereof to the Partnership, deemed a contribution of the Intrepid Contribution by Intrepid to the Partnership, in consideration for the issuance by the Partnership (x) to the Common Unit Purchaser 100,000 Common Units, (y) to Intrepid a number of Preferred Units equal to the Intrepid Contribution divided by the Preferred Unit Purchase Price and (z) subject to increase in accordance with Section 2.01(c), to GSO Holdings a number of Preferred Units equal to the Preferred Unit Anadarko Funding Amount divided by the Preferred Unit Purchase Price. Each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and the Common Unit Funding Amount shall be used, together with the proceeds of the Senior Debt, if any, and drawings on the Credit Facility as of the Anadarko Closing, to fund the portion of the "Purchase Price" (as defined in the APC/KM PSA) attributable to the Acquired Properties, with any excess funds being retained by the Partnership for its general business purposes and reimbursement of the Purchasers' expenses to the extent required under the Basic Documents.

(b) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), on the terms and subject to the conditions set forth in this Agreement, (i) GSO Associates and SN GP Member shall each make the applicable nominal contribution to the General Partner set forth in the GP LLC Agreement and (ii) the General Partner shall issue to the SN GP Member 99 Class A common membership interest (the "***Class A Common Interests***") and to GSO Associates 1 Class B common membership interest (the "***Class B Common Interest***"). Funds contributed to the General Partner pursuant to this Section 2.01(b) shall be paid by wire transfer of immediately available funds to an account designated by the General Partner pursuant to a written notice



012020

delivered to SN GP Member and GSO Associates no later than two (2) Business Days before the Anadarko Closing.

(c) Notwithstanding anything to the contrary contained herein, not less than thirteen (13) Business Days prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall notify GSO Holdings whether (i)(a) it intends to cause the Partnership to incur any Senior Debt on the day of the Anadarko Closing or (b) if the lenders to the Credit Facility have not achieved a "Successful Syndication" (as such term is defined in the Fee Letter) and the maximum size of the "Demand Facility" (as such term is defined in the Fee Letter) that may be requested by the lenders pursuant to a "Term Loan" (as such term is defined in the Fee Letter) (the "***Non-Syndicated Debt***"), or (ii) if the availability under the Credit Facility will be less than (A) $65.0 million immediately following the Anadarko Closing if Separate Closings will occur or (B) $100.0 million immediately following the Dual Closings if a Dual Closing will occur (such shortfall in clause (ii)(A) or (ii)(B), the "***Initial Availability Cushion***"), and following delivery of such notification GSO Holdings may elect within seven (7) Business Days thereafter to, in its sole discretion by written notice provided to SN (any such election, a "***Initial Debt Replacement Election***"), irrevocably commit in writing to purchase on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) an additional number of Preferred Units equal to (i) to the extent applicable (a) all or part of the Senior Debt proposed to be incurred by the Partnership on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), and/or (b) all or a part of the Initial Availability Cushion and/or (c) the Non-Syndicated Debt, divided by (ii) the Preferred Unit Purchase Price (such number of additional Preferred Units, the "***Initial Debt Replacement Units***"). Following receipt of a timely Initial Debt Replacement Election and in accordance with such election, on the day of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), (i) the Partnership shall not incur to the extent applicable (x) the portion of the proposed Senior Debt corresponding to the portion of the proposed Senior Debt to be funded by GSO Holdings as set forth in the Initial Debt Replacement Election and/or (y) borrowings under the Credit Facility in an amount corresponding to the portion of the Initial Availability Cushion to be funded by GSO Holdings as set forth in the Initial Debt Replacement Election and/or (z) the Non-Syndicated Debt, (ii) GSO Holdings shall purchase the Initial Debt Replacement Units, (iii) the maximum number of Preferred Units authorized to be issued by the Partnership shall be increased by the Initial Debt Replacement Units, (iv) the Preferred Unit Anadarko Funding Amount shall automatically be increased by the product of (A) the Initial Debt Replacement Units to be purchased by GSO Holdings at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and (B) the Preferred Unit Purchase Price and (v) the number of Preferred Units to be issued at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) to GSO Holdings shall be increased by the Initial Debt Replacement Units purchased on the day of the Anadarko Closing. In addition, at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall pay to GSO Holdings a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Initial Debt Replacement Units actually purchased by GSO Holdings at the Anadarko Closing. If GSO Holdings delivers to SN an Initial Debt Replacement Election, it shall furnish a copy of same to Intrepid and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the Initial Debt Replacement Election, to elect to pay to the Partnership at the Anadarko Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the product of the Preferred Unit Purchase Price and the number of Initial Debt Replacement Units and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the Anadarko Closing an additional number of Preferred Units equal to three percent (3.0%) of the number of Initial Debt Replacement Units and to GSO Holdings ninety-seven percent (97.0%) of the number of Initial Debt Replacement Units; *provided, however*, that if Intrepid does not elect to participate in such Initial Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement. In addition, at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN shall pay to Intrepid a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Initial Debt Replacement Units actually purchased by Intrepid at the Anadarko Closing.

(d) Not less than thirteen (13) Business Days prior to the Anadarko Closing Date, SN shall provide, based upon information available to them at such time, notice to GSO Holdings in writing of the proposed key terms of the Credit Facility and Senior Debt, if any Senior Debt is contemplated. In addition, SN and the Partnership shall, and the Common Unit Purchaser shall cause the Partnership to, keep GSO Holdings reasonably apprised of the expected Anadarko Closing Date and apprised of whether the Anadarko Closing is expected to occur on the same day as the KNOC Closing, and shall use their commercially reasonable efforts (based upon information available to them) (i) to notify GSO Holdings not later than thirteen (13) Business Days prior to the Anadarko Closing Date, *provided* that, any failure to so notify GSO Holdings shall not limit GSO Holding's obligations hereunder, including with respect to funding the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and (ii) to deliver the Closing Notice to GSO Holdings not later than thirteen (13) Business Days prior to the Anadarko Closing Date, which Closing Notice shall be prepared by SN.

(e) SN will use its commercially reasonable efforts if the KNOC Election is timely made to cause the Anadarko Closing and the KNOC Closing to occur at the Dual Closing; provided that SN shall have no liability to any Person if the Anadarko Closing and the KNOC Closing do not occur on the same day.

Section 2.02 Anadarko Related Commitment and Related Matters.

(a) SN shall promptly deliver to GSO Holdings a copy of the KNOC Election upon SN's receipt of same. At the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, on the terms and subject to the conditions set forth in this Agreement, GSO Holdings shall contribute and fund to the Partnership by wire transfer of immediately available funds the Preferred Unit KNOC Funding Amount in consideration for the issuance by the Partnership to GSO Holdings of a number of Preferred Units equal to the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price. Funds contributed to the Partnership pursuant to this Section 2.02(a) shall be paid by wire transfer of immediately available funds to an account designated by the General Partner pursuant to a written notice delivered to GSO Holdings no later than two (2) Business Days before the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing). If the KNOC Election is made, GSO Holdings shall promptly furnish a copy of same to Intrepid after GSO Holdings receives same from SN and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the copy of such KNOC Election, to elect to pay to the Partnership at the KNOC Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the Preferred Unit KNOC Funding Amount and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the KNOC Closing an additional number of Preferred Units equal to three percent (3.0%) of the quotient of the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price and to GSO Holdings ninety-seven percent (97.0%) of the quotient of the Preferred Unit KNOC Funding Amount divided by the Preferred Unit Purchase Price; provided, however, that if Intrepid does not elect to participate in such Final Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement.

(b) Notwithstanding anything to the contrary contained herein, but only if the KNOC Closing will occur in a Separate Closing, not less than thirteen (13) Business Days prior to the KNOC Closing that will occur in a Separate Closing, if such closing is to occur, SN shall notify GSO Holdings whether (i)(a) it intends to cause the Partnership to incur any Senior Debt at the KNOC Closing or (b) if the lenders to the Credit Facility have not achieved a "Successful Syndication" (as such term is defined in the Fee Letter) and the maximum size of the "Demand Facility" (as such term is defined in the Fee Letter) that may be requested by the lenders pursuant to a "Term Loan" (as such term is defined in the Fee Letter) (the "***Final Non-Syndicated Debt***") or (ii) if the availability under the Credit Facility will be less than $100.0 million at the KNOC Closing (such shortfall, the "***Final Availability Cushion***"), and following delivery of such notification GSO Holdings may elect within seven (7) Business Days thereafter to, in its sole discretion by written notice provided to SN (any such election, a "***Final Debt Replacement Election***"), irrevocably commit in writing to purchase at the KNOC Closing an additional

number of Preferred Units equal to (i) to the extent applicable (a) all or part of the Senior Debt proposed to be incurred by the Partnership, and/or (b) all or a part of the Final Availability Cushion and/or (c) the Final Non-Syndicated Debt, divided by (ii) the Preferred Unit Purchase Price (such number of additional Preferred Units, the "***Final Debt Replacement Units***"). Following receipt of a timely Final Debt Replacement Election and in accordance with such election, at the KNOC Closing that will occur in a Separate Closing, (i) the Partnership shall not incur to the extent applicable (x) the portion of the proposed Senior Debt corresponding to the portion of the proposed Senior Debt to be funded by GSO Holdings as set forth in the Final Debt Replacement Election and/or (y) borrowings under the Credit Facility in an amount corresponding to the portion of the Final Availability Cushion to be funded by GSO Holdings as set forth in the Final Debt Replacement Election and/or (z) the Final Non-Syndicated Debt, (ii) GSO Holdings shall purchase on the day of the KNOC Closing that will occur in a Separate Closing, the Final Debt Replacement Units, (iii) the maximum number of Preferred Units authorized to be issued by the Partnership shall be increased on the day of the KNOC Closing that will occur in a Separate Closing, by the Final Debt Replacement Units, (iv) the Preferred Unit KNOC Funding Amount shall automatically be increased on the day of the KNOC Closing that will occur in a Separate Closing, by the product of (A) the Final Debt Replacement Units to be purchased by GSO Holdings at the KNOC Closing and (B) the Preferred Unit Purchase Price and (v) the number of Preferred Units to be issued at the KNOC Closing that will occur in a Separate Closing, to GSO Holdings shall be increased by the Final Debt Replacement Units. In addition, if there are Separate Closings, then at the KNOC Closing that will occur in a Separate Closing, if such closing occurs, SN shall pay to GSO Holdings a fee equal to the product of (a) two and one-half percent (2.5%) and (b) the product of (i) the Preferred Unit Purchase Price and (ii) the number of Final Debt Replacement Units actually purchased by GSO Holdings at the KNOC Closing. If GSO Holdings delivers to SN an Final Debt Replacement Election, it shall furnish a copy of same to Intrepid and Intrepid shall have the right, exercisable for five (5) Business Days after Intrepid's receipt of the Final Debt Replacement Election, to elect to pay to the Partnership at the KNOC Closing by wire transfer of immediately available funds to an account designated by the Partnership an amount equal to three percent (3.0%) of the product of the Preferred Unit Purchase Price and the number of Final Debt Replacement Units and if Intrepid makes such contribution, the Partnership will issue to Intrepid at the KNOC Closing an additional number of Preferred Units equal to three percent (3.0%) of the number of Final Debt Replacement Units and to GSO Holdings ninety-seven percent (97.0%) of the number of Final Debt Replacement Units; provided, however, that if Intrepid does not elect to participate in such Final Debt Replacement Units then GSO Holdings shall have the rights set forth in Section 3.1(c)(i) of the Partnership Agreement.

(c) SN will, or will cause its Affiliates to, promptly provide GSO Holdings with copies of all notices provided to and received from KNOC regarding its response to the Sale Notice sent to KNOC by Anadarko on January 12, 2017. Additionally, SN will use commercially reasonable efforts to notify GSO Holdings within fifteen (15) days of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) if it anticipates that KNOC will exercise the KNOC Election. If KNOC makes the KNOC Election, SN will, or will cause its Affiliates to, keep GSO Holdings reasonably apprised of the expected KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing), and shall use their commercially reasonable efforts (based upon information available to them) (i) to notify GSO Holdings not later than thirteen (13) Business Days prior to the KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing), which notice may be combined with the notice provided in Section 2.01(d), *provided* that, any failure to so notify GSO Holdings shall not limit GSO Holding's obligations hereunder, including with respect to funding the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and (ii) to deliver the Supplemental Closing Notice to GSO Holdings not later than thirteen (13) Business Days prior to the KNOC Closing Date, which Supplemental Closing Notice shall be prepared by SN.

Section 2.03 Closing.

(a) On the terms and subject to the conditions hereof, the consummation of the funding of each of the Preferred Unit Anadarko Funding Amount, Intrepid Contribution and the Common Unit Funding Amount shall take place on the Anadarko Closing Date (whether in a Separate Closing or as part of a Dual Closing) at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002, at the same time as the "Closing" (as such term is defined in the APC/KM PSA).

(b) If the KNOC Election occurs, then on the terms and subject to the conditions hereof, the consummation of the funding of the Preferred Unit KNOC Funding Amount shall take place on the KNOC Closing Date (whether in a Separate Closing or as part of a Dual Closing) at the offices of Kirkland and Ellis LLP located at 600 Travis Street, Suite 3300, Houston, Texas 77002, at the same time as the closing under the KNOC PSA.

Section 2.04 Deliveries.

(a) Deliveries of SN Parties.

(i) On the Effective Date, SN shall deliver to the Purchasers counterparts of this Agreement, duly executed by the SN Parties;

(ii) On the date of the Original SPA, SN GP Member delivered to GSO Holdings and GSO Associates an executed copy of the limited liability company agreement of the General Partner, duly executed by the General Partner and SN GP Member;

(iii) On the date of the Original SPA, Common Unit Purchaser delivered to GSO Holdings and GSO Associates an executed copy of the agreement of limited partnership of the Partnership, duly executed by the General Partner and Common Unit Purchaser;

(iv) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a copy of the APC/KM PSA, duly executed by the parties thereto, including evidence that SN Maverick has paid the Deposit on behalf of SN Maverick and the Partnership;

(v) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a counterpart of (A) the SN Letter Agreement, duly executed by SN, SN Maverick and the Partnership, and (B) the Hydrocarbon Marketing Agreement, duly executed by SN Maverick and the Partnership;

(vi) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates copies of the duly executed commitments for the Credit Facility and the fee letter with respect to the Credit Facility providing the market "flex" provisions applicable to the Senior Debt;

(vii) On the date of the Original SPA, SN delivered payment to GSO Holdings of the Commitment Fee; and

(viii) On the date of the Original SPA, SN delivered to GSO Holdings and GSO Associates a copy of the Sale Notice furnished to KNOC.

(b) Deliveries by Purchasers.

(i) On the Effective Date, the Purchasers shall each deliver a counterpart of this Agreement duly executed by each of the Purchasers to the SN Parties; and

(ii) On the date of the Original SPA, GSO Holdings delivered copies of each of the Equity Commitment Letters, duly executed by GSO or the GSO Funds, as applicable, to SN and the Partnership.

Section 2.05 Deliveries Upon Execution of KNOC PSA. Promptly following the execution of the KNOC PSA:

(a) SN will deliver or cause to be delivered to GSO Holdings a copy of the KNOC PSA (including all schedules, exhibits and annexes thereto), duly executed by the parties thereto; and

(b) GSO Holdings will deliver to SN an equity commitment letter in form and substance consistent in all material respects with the Equity Commitment Letter attached as Exhibit J-1 hereto with such changes as are appropriate to address (i) the commitment of the GSO Investors (as defined in such Equity Commitment Letter attached as Exhibit J-1 hereto) to fund to the Partnership the amount necessary for the Partnership to fund the Preferred Unit KNOC Funding Amount instead of the Preferred Unit Anadarko Funding Amount and (ii) in Section 2 of such equity commitment letter the conditions to the KNOC Closing instead of the Anadarko Closing as are addressed in Section 2 of the Equity Commitment Letter attached as Exhibit J-1 hereto; *provided, that* KNOC shall not be a third party beneficiary of such equity commitment letter unless specifically requested by KNOC.

Section 2.06 Deliveries Upon the Closings.

(a) Deliveries of SN - Anadarko Closing. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), SN will deliver or cause to be delivered:

(i) a counterpart of the GP LLC Agreement, duly executed by the SN GP Member and the General Partner, to the Purchasers;

(ii) a counterpart of the Partnership Agreement, duly executed by the Common Unit Purchaser and the General Partner, to the Purchasers;

(iii) a counterpart of each of the Management Services Agreement which shall be duly executed by SOG and the Partnership, the Joint Development Agreement, duly executed by SN Maverick, Blackstone Newco and the Partnership, and the Drilling Commitment Agreement, duly executed by the parties thereto, to the Purchasers;

(iv) the GSO Registration Rights Agreement, duly executed by SN, to GSO Holdings;

(v) the GSO Allocated Shares and a counterpart of the GSO Warrant Agreement, duly executed by SN, to GSO Holdings (which in accordance with the direction of GSO Holdings will be issued to the GSO Funds, but delivered at the Anadarko Closing to GSO Holdings on behalf of the GSO Funds);

(vi) fully executed copies of the definitive agreements for the Credit Facility and, if applicable, Senior Debt, subject to Section 2.01(c), to GSO Holdings and GSO Associates;

(vii) payment by SN to GSO Holdings of the fee due in accordance with the final sentence of Section 2.01(c) in respect of the Initial Debt Replacement Units to be issued and sold to GSO Holdings at the Anadarko Closing, if any, by wire transfer of immediately available funds to an account specified by GSO Holdings not less than two (2) Business Days prior to the Anadarko Closing;

(viii) an opinion of (a) Kirkland & Ellis LLP, as counsel to SN addressing such matters set forth in substantially the same form attached hereto as Exhibit I-1 hereto and (b) Akin, Gump, Strauss, Hauer & Feld

LLP, as counsel to SN, addressing such matters set forth in substantially the same form attached hereto as Exhibit I-2, to GSO Holdings and GSO Associates;

(ix) a counterpart of the GSO Non-Solicitation Agreement, duly executed by SN and SOG

(x) the Intrepid Allocated Shares and a counterpart of the Intrepid Warrant Agreement, duly executed by SN, to Intrepid;

(xi) a counterpart of the Intrepid Non-Solicitation Agreement, duly executed by SN and SOG; and

(xii) a counterpart of the Intrepid Registration Rights Agreement, duly executed by SN, to Intrepid.

(b) Deliveries of Purchasers - Anadarko Closing. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the applicable Purchaser executing such document shall deliver to each SN Party, as applicable, the following:

(i) a counterpart of the GP LLC Agreement, duly executed by GSO Associates;

(ii) a counterpart of the Partnership Agreement, duly executed by GSO Holdings;

(iii) a counterpart of the GSO Warrant Agreement, duly executed by the GSO Funds;

(iv) a counterpart of the GSO Registration Rights Agreement, duly executed by the GSO Funds;

(v) a counterpart of the GSO Non-Solicitation Agreement; duly executed by GSO;

(vi) a counterpart of the Partnership Agreement, duly executed by Intrepid;

(vii) a counterpart of the Intrepid Warrant Agreement, duly executed by Intrepid;

(viii) a counterpart of the Intrepid Registration Rights Agreement, duly executed by Intrepid; and

(ix) a counterpart of the Intrepid Non-Solicitation Agreement; duly executed by GSO.

(c) Deliveries of SN Parties - KNOC Closing. At the KNOC Closing that occurs in a Separate Closing:

(i) SN shall deliver payment of the fee due in accordance with the final sentence of Section 2.02(b) in respect of the Final Debt Replacement Units to be issued and sold to GSO Holdings at the KNOC Closing that occurs in a Separate Closing, if any, by wire transfer of immediately available funds to an account specified by GSO Holdings not less than two (2) Business Days prior to the KNOC Closing.

(d) Delivery of Funds.

(i) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Holdings shall deliver the Preferred Unit Anadarko Funding Amount to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(ii) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), Intrepid shall deliver the Intrepid Contribution to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(iii) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Common Unit Purchaser shall deliver the Common Unit Funding Amount to the Partnership by wire transfer of immediately available funds pursuant to Section 2.01(a);

(iv) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Associates shall deliver to the General Partner such nominal amounts as set forth in the GP LLC Agreement pursuant to Section 2.01(b); and

(v) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the SN GP Member shall deliver to the General Partner such nominal amounts as set forth in the GP LLC Agreement pursuant to Section 2.01(b).

(vi) At the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, GSO Holdings shall deliver the Preferred Unit KNOC Funding Amount, if any, to the Partnership by wire transfer of immediately available funds pursuant to Section 2.02(b).

Section 2.07 Conditions of GSO Associates' and GSO Holdings' Obligations at the Closing. The obligations of GSO Holdings and/or GSO Associates to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(i) and Section 2.06(d)(iv) and, if applicable, the KNOC Closing pursuant to Section 2.06(d)(vi), and the obligations of GSO Holdings and GSO Associates to deliver the documents specified in Section 2.06(b), as applicable, are subject to the satisfaction (or waiver by GSO Holdings and GSO Associates) on or prior to the Anadarko Closing Date (whether in a Separate Closing or as part of a Dual Closing), and, as applicable, the KNOC Closing Date, of the following conditions:

(a) no statute, order, rule, decree or regulation has been entered by any Governmental Authority having jurisdiction over the parties hereto or the subject matter of this Agreement that restrains or prohibits the transactions contemplated by this Agreement and that remains in effect at the applicable Preferred Unit Closing and there shall not be pending any suit, action or proceeding by any Governmental Authority or other Person seeking to restrain, preclude, enjoin or prohibit the transactions contemplated by this Agreement;

(b) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous "Closing" (as such term is defined in the APC/KM PSA) and (ii) the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), if applicable, the simultaneous consummation of the transactions contemplated by the KNOC PSA and the Anadarko Closing shall have occurred or in the case of a Dual Closing shall occur immediately before or concurrently with the KNOC Closing;

(c) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Partnership shall not have been assigned any interest under the Springfield Gathering Agreements, and SN and Anadarko shall have executed and delivered at the Anadarko Closing the Marketing Transition Services Agreement (as such term is defined in the APC/KM PSA) in accordance with the APC/KM PSA;

(d) all of (i) the Fundamental Representations of SN contained in Article III and Article V of this Agreement shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date), (ii) the representations and warranties of SN contained in Sections 3.08, 3.14 and 5.13 shall be true and correct in all material respects at and as of each of the Anadarko

Closing Date and KNOC Closing Date, and (iii) all of the other representations and warranties of SN contained in Article III and Article V of this Agreement not specified in clauses (i) or (ii) of this Section 2.07(d), excluding for purposes of this determination any qualification in such representations or warranties of materiality or material adverse effect therein (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date) shall be true and correct at and as of each of the Anadarko Closing Date and the KNOC Closing Date, as applicable, except where the failure of any such representations and warranties to be true and correct has not had, and is not reasonably likely to have, individually or in the aggregate, a material and adverse effect on the General Partner and the Partnership considered as a whole, or GSO Holdings;

(e) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding by the Common Unit Purchaser of the Common Unit Funding Amount;

(f) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the closings of the Credit Facility and, if applicable, the Senior Debt shall have occurred or shall occur simultaneous with such Anadarko Closing, and the Partnership shall have unused availability under the Credit Facility of not less than $100.0 million, *provided that*, if a KNOC Election is not made or the KNOC Closing will not occur in a Dual Closing, the Partnership shall have unused availability under the Credit Facility of not less than $65.0 million, in each case subject to Section 2.01(c);

(g) solely with respect to the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), the Partnership shall have unused availability under the Credit Facility of not less than $100.0 million;

(h) each of the SN Parties shall have performed in all material respects all of the covenants required to be performed by it hereunder at or prior to each of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), as applicable;

(i) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), if GSO Holdings together with any of its Affiliates is or would become an Acquiring Person (as defined in the SN Rights Plan) as of such Anadarko Closing (taking into account all SN Common Stock issuable upon exercise of the Warrants and any warrants issued to any Affiliate of GSO Holdings), then the Board of Directors shall have taken all actions necessary to cause the SN Rights Plan to be amended, in a form reasonably acceptable to SN and GSO Holdings, to provide that none of GSO Holdings or any of its Affiliates shall be deemed an Acquiring Person, by designating such Persons as an Exempt Person (as defined in the SN Rights Plan) or otherwise; *provided*, *however*, that SN shall be entitled to (i) place a limitation on the maximum percentage of shares beneficially owned (as defined in the SN Rights Plan) by GSO Holdings and any of its Affiliates so long as such limitation is a higher ownership percentage than is represented by the Allocated GSO Shares and Warrants issuable at the Anadarko Closing to GSO Holdings and/or the GSO Funds and/or their Affiliates (including, without limitation, warrants to purchase Allocated GSO Shares issued to Affiliates of GSO Holdings and/or the GSO Funds), including for the avoidance of doubt the shares of SN Common Stock for which the Warrants (and such warrants issued to any such Affiliate) may be exercisable by GSO Holdings and/or the GSO Funds and/or their Affiliates after the Anadarko Closing (provided, that SN will place separate percentage limits on Affiliates associated with Blackstone, on the one hand, and Affiliates associated with GSO, on the other hand) and (ii) provide in such amendment that, (x) at such time as GSO Holdings together with any of its Affiliates no longer Beneficially Owns 4.9% or more of the SN Common Stock (provided, that SN will place separate percentage limits on Affiliates associated with Blackstone, on the one hand, and Affiliates associated with GSO, on the other hand), then such Person may no longer be an Exempt Person and/or may be an Acquiring Person thereafter, and (y) Persons not subject to or bound by the GSO Voting Agreement (or substantially similar



012028

agreement with SN) shall not be entitled to the benefits of the exemptions provided for in such amendment. As used in this clause (h) "***Affiliates***" has the meaning ascribed to such term in the SN Rights Plan; *provided, further*, that in no event will the amendment to the SN Rights Plan be structured to prohibit such Exempt Persons from maintaining their respective then-current percentage ownership in SN or from exercising Rights to acquire Allocated GSO Shares to maintain their then-current respective percentage interests;

(j) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the Board of Directors of SN shall have reserved for issuance a number of shares of SN Common Stock equal to the number of shares issuable upon exercise of the GSO Warrants;

(k) neither the General Partner nor the Partnership shall be, and shall not be required to become, a guarantor or a Restricted Subsidiary under any credit agreement, indenture or other loan agreement or other material agreement relating to indebtedness of, or guaranteed by, SN or any of its Subsidiaries (other than the General Partner and the Partnership); and

(l) solely with respect to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the GSO Allocated Shares and the SN Common Stock subject to issuance upon the exercise of the GSO Warrants shall be approved for listing on the NYSE, subject to the official notice of issuance.

Section 2.08 Conditions of the Common Unit Purchaser's Obligations at Committed Closing. The obligation of the Common Unit Purchaser and SN GP Member to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(iii) and Section 2.06(d)(v), and the obligation of SN to deliver, or cause to be delivered, (a) those Anadarko Closing deliverables set forth in Section 2.06(a) is subject to the satisfaction (or waiver by the SN Parties) on or prior to the Anadarko Closing Date and (b) the KNOC Closing deliverables set forth in Section 2.06(c) is subject to the satisfaction (or waiver by the SN Parties) on or prior to the KNOC Closing Date, of the following conditions:

(a) no statute, order, rule, decree or regulation has been entered by any Governmental Authority having jurisdiction over the parties hereto or the subject matter of this Agreement that restrains or prohibits the transactions contemplated by this Agreement and that remains in effect at the applicable Preferred Unit Closing and there shall not be pending any suit, action or proceeding by any Governmental Authority or other Person seeking to restrain, preclude, enjoin or prohibit the transactions contemplated by this Agreement;

(b) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous "Closing" (as such term is defined in the APC/KM PSA) and (ii) the KNOC Closing, if such closing occurs, the simultaneous consummation of the transactions contemplated by the KNOC PSA;

(c) all of the Fundamental Representations of the Preferred Unit Purchasers contained in this Agreement shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct on and as of such date) and all of the other representations and warranties of the Preferred Unit Purchasers contained in Article IV of this Agreement excluding for purposes of this determination any qualification in such representations or warranties of materiality or material adverse effect therein shall be true and correct at and as of each of the Anadarko Closing Date and KNOC Closing Date, as applicable, (other than representations and warranties as of an earlier specified date, which representations and warranties shall be true and correct at and as of such date) except where the failure of any such representation has not had, and is not reasonably like to have, individually and in the aggregate, a material and adverse effect on the General Partner and the Partnership considered as a whole, or the Common Unit Purchaser;

(d) solely with respect to (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding of the Preferred Unit Anadarko Funding Amount and (ii) the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), the simultaneous funding of the Preferred Unit KNOC Funding Amount; and

(e) each of GSO Associates and GSO Holdings shall have performed in all material respects all of the covenants required to be performed by them hereunder at or prior to each of the Anadarko Closing Date and KNOC Closing Date.

Section 2.09 Conditions of Intrepid's Obligations at the Closing. The obligations of Intrepid to wire funds at the Anadarko Closing pursuant to Section 2.06(d)(ii) and the obligations of Intrepid to deliver the documents specified in Section 2.06(b), as applicable, are subject solely to the simultaneous funding of the Preferred Unit Anadarko Funding Amount at the Anadarko Closing.

Section 2.10 Nature of Obligations. The obligations hereunder of GSO Holdings and GSO Associates, on the one hand, and Intrepid, on the other hand, are several and not joint. For the avoidance of doubt and notwithstanding anything to the contrary herein, the obligation of GSO Holdings to contribute the Preferred Unit Anadarko Funding Amount in accordance with Section 2.01(a) and to perform its other obligations hereunder and under the Equity Commitment Letters are not conditioned by or subject to in any manner (and the Preferred Unit GSO Commitment Amount shall not be subject to reduction) any termination of this Agreement with respect to Intrepid, Intrepid's failure to contribute the Intrepid Contribution in accordance with Section 2.01(a) or Intrepid otherwise failing to perform its other obligations hereunder.

Section 2.11 Further Assurances. From time to time after the date hereof, without further consideration, each of SN, SN GP Member, the General Partner, the Partnership, the Common Unit Purchaser and the Purchasers shall use their reasonable best efforts to take, or cause to be taken, all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and the other Basic Documents.

Section 2.12 UCC Filings After January 12, 2017. The parties hereto acknowledge that on January 12, 2017, SN caused filings on UCC Form 1s to be filed on behalf of the Partnership in the States of Delaware and Texas and in such other locations as were directed by GSO Holdings with respect to the Liens and security interests of the Partnership under the Hydrocarbons Marketing Agreement to secure payments that become due to the Partnership thereunder.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## RELATED TO THE GENERAL PARTNER AND THE PARTNERSHIP

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, SN represents and warrants to the Purchasers as follows:

Section 3.01 Existence and Power.

(a) The General Partner has been duly formed and is validly existing as a limited liability company in good standing under the Laws of the State of Delaware, has the full limited liability company power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited liability company, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so



012030

qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the General Partner. All limited liability company action required to be taken by the General Partner for the execution and delivery of this Agreement and the other Basic Documents to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the applicable Preferred Unit Closing shall have been, duly and validly taken. Upon the execution and delivery of the GP LLC Agreement by the parties thereto, the General Partner will have all requisite power and authority to issue, sell and deliver the Class A Common Interests and the Class B Common Interests, in accordance with and upon the terms set forth in this Agreement and the GP LLC Agreement.

(b) The Partnership has been duly formed and is validly existing as a limited partnership under the Laws of the jurisdiction of the State of Delaware, has the full limited partnership power and authority to own or lease its properties and assets and to conduct its business, and is duly registered or qualified as a foreign limited partnership, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the Partnership. All limited partnership action required to be taken by the Partnership for the execution and delivery by the Partnership of this Agreement and the other Basic Documents to which it is or will be a party and the consummation of the transactions contemplated hereby and thereby have been, or prior to the applicable Preferred Unit Closing shall have been, duly and validly taken. Upon execution of the Partnership Agreement, the Partnership will have all requisite power and authority to issue, sell and deliver the non-economic general partner interest, the Common Units to be issued to the Common Units Purchaser in accordance with Section 2.01 (a) and the Preferred Units to be issued to the Preferred Unit Purchasers in accordance with Section 2.01 (a) and Section 2.02(a).

Section 3.02 Authority; Enforceability.

(a) The limited liability company agreement of the General Partner and agreement of limited partnership of the Partnership, each as of the Effective Date, have been duly authorized, executed and delivered by (i) in the case of the General Partner, SN GP Member and (ii) in the case of the Partnership, by Common Unit Purchaser and the General Partner, and constitute valid and legally binding agreements, enforceable in accordance with their respective terms, except as the enforceability of such agreements may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(b) Each of the Basic Documents to which the General Partner or the Partnership is or will be a party have been duly and validly authorized and executed, or when executed shall be duly and validly authorized and executed by each of the General Partner or the Partnership, as the case may be, and constitutes, or will when executed constitute, the legal, valid and binding obligations of each of the General Partner or the Partnership that is a party thereto, as the case may be, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.03 Capitalization; Issuance of Units.

(a) As of the Effective Date:

(i) The General Partner's authorized Equity Interests consist of 100 Common Units which membership interests have been duly authorized and validly issued in accordance with the governing documents of the General Partner and applicable Law; and

(ii) The Partnership's authorized Equity Interests consist solely of (A) a non-economic general partner interest held by the General Partner and (B) 100 common limited partner interests held by Common Unit Purchaser, which partnership interests have been duly authorized and validly issued in accordance with the governing documents of the Partnership and applicable Law.

(b) Immediately following the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), after giving effect to the execution of the GP LLC Agreement and the Partnership Agreement by the parties thereto:

(i) The outstanding Equity Interests of the General Partner, shall consist of the 99 Class A Common Interests issued to SN GP Member and 1 Class B Common Interest issued to GSO Associates, which membership interests, when issued, will have been duly authorized and validly issued in accordance with the GP LLC Agreement and applicable Law, will be free of any and all Liens and restrictions on transfer, other than restrictions on transfer under the GP LLC Agreement under or applicable state and federal securities Laws and will be fully paid and non-assessable (except as such non-assessability may be affected by Sections 18-607 and 18-804 of the Delaware Act); and

(ii) The outstanding Equity Interests of the Partnership, shall consist of (A) the non-economic general partner interest held by the General Partner, (B) the Common Units issued to the Common Unit Purchaser pursuant to Section 2.01(a) and (C) the Preferred Units issued to the Preferred Unit Purchasers pursuant to Section 2.01(a), subject to increase in accordance with Section 2.01(c), which Equity Interests will be duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Common Units and Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(c) Immediately following the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing):

(i) The outstanding Equity Interests of the Partnership, shall consist of (A) the non-economic general partner interest held by the General Partner, (B) the Common Units issued to the Common Unit Purchaser pursuant to Section 2.01(a) and (C) the Preferred Units issued to the Preferred Unit Purchasers pursuant to Section 2.01(a) and Section 2.02(a), subject to increase in accordance with Section 2.01(c) and, if the KNOC Closing occurs in a Separate Closing, Section 2.02(b), respectively, which partnership interests will be duly authorized and validly issued in accordance with the Partnership Agreement and applicable Law, free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the Partnership Agreement or under applicable state and federal securities Laws, fully paid and the Common Units and Preferred Units will be non-assessable (except as such non-assessability may be affected by Sections 17-303, 17-607 and 17-804 of DRULPA).

(d) Except as set forth in this Agreement or (i) with respect to the General Partner, the GP LLC Agreement or (ii) with respect to the Partnership, the Partnership Agreement, there are no Persons entitled to preemptive, statutory or other similar contractual rights to subscribe for any Class A Common Interests, Class B Common Interests, any general partner interest of the Partnership, Common Units, Preferred Units or any other Equity Interests of either the General Partner or the Partnership.

(e) Except for the Class A Common Interests, the Class B Common Interest, the non-economic interest of the General Partner, the Common Units and the Preferred Units to be issued pursuant to this Agreement, there are no options, warrants or other rights to purchase, agreements or other obligations to issue, or rights to convert any obligations into or exchange any securities for, membership interest, general partner interest, limited partner interest or any other ownership interests in the General Partner or the Partnership, as applicable.

Section 3.04 Subsidiaries of the General Partner and the Partnership. Except for its non-economic general partnership interest in the Partnership, the General Partner does not have any Subsidiary and does not own, directly or indirectly, any Equity Interests in any other Person. The Partnership does not have any Subsidiaries and does not own, directly or indirectly, any Equity Interests in any other Person.

Section 3.05 Litigation. As of the Effective Date, there are no, and as of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if occurring, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), there will not be any, legal or governmental proceedings pending to which the General Partner or the Partnership is a party or to which any property or asset of the General Partner or the Partnership is subject or which challenges the validity of any of the Basic Documents or the right of the General Partner or the Partnership to enter into any of the Basic Documents to which it is a party or to consummate the transactions contemplated hereby or thereby and, to the Knowledge of SN, no such proceedings are threatened by any Governmental Authorities or others.

Section 3.06 No Conflicts. None of (a) the offering, issuance and sale by (i) the General Partner of the Class A Common Interests or Class B Common Interests or (ii) the Partnership of the non-economic general partners interest, the Common Units or the Preferred Units, and, in each case, the application of the proceeds therefrom, (b) the execution, delivery and performance by the General Partner or the Partnership of the Basic Documents to which it is or will be a party, or (c) the consummation of the transactions contemplated hereby or thereby (i) constitutes or will constitute a violation of the other organizational documents of the General Partner or the Partnership, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, any Contract to which the General Partner or the Partnership is a party or by which any of them or any of their respective properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over the General Partner or the Partnership or any of their respective properties in a proceeding to which any of them or their property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on the Partnership and the General Partner, taken as a whole.

Section 3.07 Approvals. Except as set forth on Schedule 3.07, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with (a) the execution, delivery or performance by any of the General Partner or the Partnership of any of the Basic Documents, (b) the General Partner's issuance at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and sale of the Class A Common Interests or Class B Common Interests, or (c) the Partnership's issuance at (i) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) of the non-economic general partner interest and the Common Units to be issued to the Common Unit Purchaser pursuant to Section 2.01(a) (ii) the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if occurring the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), of the Preferred Units to be issued to the Preferred Unit Purchasers pursuant to Section 2.01(a) and, if applicable, Section 2.02(a).

Section 3.08 No Liabilities. Except (i) as arising under this Agreement, the APC/KM PSA or, if entered into, the KNOC PSA, (ii) as set forth on Schedule 3.08 and (iii) for obligations of the General Partner and the

Partnership arising under any document contemplated (x) hereby, (y) in the APC/KM PSA or (z) if entered into, the KNOC PSA, to be entered into by the Partnership at or prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), as of the Effective Date and as of the time immediately prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or, if the KNOC PSA is entered into, immediately prior to the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), neither the General Partner or the Partnership is or will be subject to any liabilities or obligations of any nature (whether known or unknown and whether absolute, accrued, contingent or otherwise) nor has conducted any business other than in connection with the foregoing.

Section 3.09 Investment Company Status. Neither the General Partners nor the Partnership is, and upon the issuance and sale of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interest, the Common Units and the Preferred Units as herein contemplated and the application of the net proceeds therefrom, neither the General Partner nor the Partnership will be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 3.10 No Registration Required. Assuming the accuracy of the representations and warranties of the Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Closing of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units and the Preferred Units pursuant to this Agreement is exempt from the registration requirements of the Securities Act, and neither the General Partner nor the Partnership nor, to the Knowledge of SN, any authorized representative acting on behalf of the General Partner or the Partnership has taken or will take any action hereafter that would cause the loss of such exemption.

Section 3.11 Certain Fees. Except for fees payable to J.P. Morgan, Citi and the other lenders in respect of the Credit Facility or Senior Debt that have been disclosed in writing to GSO Holdings prior to the Effective Date and pursuant to the terms of the Fee Letter, no fees or commissions are or will be payable by the General Partner or the Partnership, and each of the Preferred Unit Purchasers and their Affiliates shall not be subject to any liability or other obligation with respect, to brokers, finders or investment bankers in connection with or relating to the issuance of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units, the Preferred Units, the Initial Debt Replacement Units, the Final Debt Replacement Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the Warrants, the issuance of SN Common Stock upon exercise of the Warrants or the consummation of the transactions contemplated by this Agreement; provided that, SN shall pay for any fees payable to J.P. Morgan, Citi and the other lenders that are not provided for pursuant to the Fee Letter.

Section 3.12 No Integration. Neither the General Partner nor the Partnership has, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the Class A Common Interests, the Class B Common Interests, the non-economic general partner interests, the Common Units or the Preferred Units in a manner that would require the offer and sale of any of the Class A Common Interests, Class B Common Interests, the non-economic general partner interests, Common Units or Preferred Units to be registered under the Securities Act.

Section 3.13 No Restrictions on Dividends. Neither the General Partner nor the Partnership is a party to or otherwise subject to or bound by any instrument or agreement that limits or prohibits or could limit or prohibit, directly or indirectly, the General Partner or the Partnership from (a) redeeming the Preferred Units pursuant to their terms or (b) paying any dividends or making other distributions on the Preferred Units that may be issued, except as may be set forth in the GP LLC Agreement, the Partnership Agreement, the Credit Facility or any documents relating to the Senior Debt, if applicable.

Section 3.14 Springfield Gathering. At the Closing and assuming the "Closing" (as such term is defined in the APC/KM PSA) has occurred, the Partnership shall not have been assigned any interest under the Springfield Gathering Agreements, and SN and Anadarko shall have executed and delivered at the Anadarko Closing the Marketing Transition Services Agreement (as such term is defined in the APC/KM PSA) in accordance with the APC/KM PSA.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE PREFERRED UNIT PURCHASERS

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, GSO Holdings (severally and not jointly with Intrepid) represents and warrants to the SN Parties with respect to representations and warranties related to GSO Associates, GSO Holdings and the GSO Funds, and Intrepid (severally and not jointly with GSO Holdings and GSO Associates) represents and warrants to the SN Parties with respect to representations and warrants related to Intrepid, as follows:

Section 4.01 Existence. GSO Associates is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. GSO Holdings is duly organized and validly existing as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. Each of the GSO Funds is duly organized as a limited partnership and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted. Intrepid is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 4.02 Authorization, Enforceability. GSO Associates and Intrepid have all necessary limited liability company, and GSO Holdings and the GSO Funds have all necessary limited partnership legal power and authority to enter into, deliver and perform its obligations (if any) under the Basic Documents to which it is or will be a party. The execution, delivery and performance by such Purchaser and the GSO Funds of the Basic Documents to which it is or will be a party and the consummation by it of the transactions contemplated hereby and thereby have been or, when executed, will be duly and validly authorized by all necessary legal action of such Purchaser and the GSO Funds, and no further consent or authorization of such Purchaser or the GSO Funds is required. The Basic Documents to which such Purchaser or the GSO Funds is or will be a party have been or, prior to the Closing, will be duly executed and delivered by such Purchaser or the GSO Funds, as the case may be, and constitute or, when executed, will constitute legal, valid and binding obligations of such Purchaser or the GSO Funds, as the case may be; except as, the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03 No Breach. None of the execution, delivery or performance by such Purchaser or the GSO Funds of the Basic Documents to which it is, or prior to the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) or, as applicable, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), will be a party or the consummation by such Purchaser or the GSO Funds of the transactions contemplated hereby or thereby will (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any material agreement to which such Purchaser is a party or by



012035

which such Purchaser or the GSO Funds are bound or to which any of the property or assets of such Purchaser or the GSO Funds is subject, (b) conflict with or result in any violation of the provisions of the organizational documents of each such Purchaser, or (c) violate any statute, order, rule or regulation of any court or Governmental Authority or body having jurisdiction over each such Purchaser or the GSO Funds or the property or assets of each such Purchaser or the GSO Funds, except in the case of clauses (a) and (c), for such conflicts, breaches, violations or defaults as would not prevent the consummation of the transactions contemplated by the Basic Documents to which each Purchaser or the GSO Funds, as the case may be, is or, prior to the Anadarko Closing and if applicable, the KNOC Closing, will be a party.

Section 4.04 Approvals. Except as set forth on Schedule 4.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by such Purchaser or the GSO Funds of any of the Basic Documents.

Section 4.05 Certain Fees. No fees or commissions are or will be payable by such Purchaser or the GSO Funds to brokers, finders or investment bankers with respect to the purchase by GSO Associates of the Class B Common Interest or the purchase of any of the Purchased Preferred Units by GSO Holdings and Intrepid, respectively, the issuance to the GSO Funds of the GSO Allocated Shares and GSO Warrants, the issuance to Intrepid of the Intrepid Allocated Shares and Intrepid Warrants or the consummation of the transactions contemplated by this Agreement, in each case, for which an SN Party may be liable.

Section 4.06 Restricted Securities. Except for possible permitted transfers subject to the terms of (a) in the case of Class B Common Interest, the GP LLC Agreement or (b) in the case of the Purchased Preferred Units, the Partnership Agreement, GSO Associates is acquiring the Class B Common Interest, such Preferred Unit Purchaser is acquiring its respective Purchased Preferred Units (as issued and delivered to GSO Holdings and Intrepid, respectively, pursuant to Section 2.01(a)), the GSO Funds are acquiring the GSO Allocated Shares and the GSO Warrants, and any SN Common Stock acquired upon exercise of the GSO Warrants, and Intrepid is acquiring the Intrepid Allocated Shares and the Intrepid Warrants, and any SN Common Stock acquired upon exercise of the Intrepid Warrants, for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. Such Purchaser and the GSO Funds has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its proposed investment in (a) in the case of GSO Associates, the Class B Common Interest, (b) in the case of the Preferred Unit Purchasers, each such Preferred Unit Purchaser's investment in its respective Purchased Preferred Units, (c) in the case of the GSO Funds, the GSO Allocated Shares, the GSO Warrants and any SN Common Stock issued upon exercise of the GSO Warrants and (d) in the case of Intrepid, the Intrepid Allocated Shares, the Intrepid Warrants and any SN Common Stock issued upon exercise of the Intrepid Warrants and is capable of bearing the economic risk of such investment. Such Purchaser and each GSO Fund is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501(a)(4)) promulgated under the Securities Act. Such Purchaser and each of the GSO Funds acknowledges and understands as applied to such party that the acquisition by (a) GSO Associates of the Class B Common Interest, (b) GSO Holdings and Intrepid of their respective portion of the Purchased Preferred Units, (c) the GSO Funds of the GSO Allocated Shares and the GSO Warrants and (d) Intrepid of the Intrepid Allocated Shares and the Intrepid Warrants has not been, and prior to the Closing will not be, and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants, as applicable, will not be, registered under the Securities Act in each case in reliance on an exemption therefrom and that each of SN, the General Partner and the Partnership is relying upon the truth and accuracy of, and such Purchaser's and the GSO Funds' compliance with, the representations, warranties, agreements, acknowledgments and understandings of each of the Purchasers and the GSO Funds set forth herein in order to determine the availability of such exemptions and the eligibility of GSO Associates to acquire the Class B Common Interest, the Preferred Unit Purchasers to acquire their respective portion of the Purchased Preferred Units, the GSO Funds to acquire the

GSO Allocated Shares, the GSO Warrants and any SN Common Stock acquired upon exercise of the GSO Warrants, and Intrepid to acquire the Intrepid Allocated Shares, the Intrepid Warrants and any SN Common Stock acquired upon exercise of the Intrepid Warrants and the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares the GSO Warrants, the Intrepid Warrants and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. Such Purchaser and each of the GSO Funds further acknowledge and understand, as to the equity interests being acquired by it, that (x) none of the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants, and any SN Common Stock acquired upon exercise of the GSO Warrants or Intrepid Warrants may be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and (y) when issued at the Closing, the Class B Common Interest, the Purchased Preferred Units, the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants and when issued upon exercise of the GSO Warrants or Intrepid Warrants, any SN Common Stock so issued, will bear a legend substantially as set forth below:

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

Section 4.07 Financing.

(a) At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and, if applicable, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), GSO Holdings will have all funds necessary for its payment of up to the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), in each case in accordance with this Agreement, and for all other actions necessary for GSO Associates and GSO Holdings to consummate the transactions contemplated in this Agreement and to perform its obligations hereunder. At the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), Intrepid will have all funds necessary for its payment of the Intrepid Contribution at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) in accordance with this Agreement, and for all other actions necessary for Intrepid to consummate the transactions contemplated in this Agreement and to perform its obligations hereunder. Each of the Purchasers understands that its obligations to consummate the transactions contemplated by this Agreement (including the payment of all amounts when due) are not subject to the availability to the Purchasers or Intrepid of any financing or funding.

(b) On January 12, 2017, GSO Holdings delivered to SN and the Partnership a true, complete and correct copy of each of the executed Equity Commitment Letters pursuant to which the applicable investor party or parties thereto has or have committed, on the terms and subject to the conditions set forth therein, to invest in GSO Holdings the cash amount set forth therein.

(c) GSO Holdings represents and warrants that:



012037

(i) Neither of the Equity Commitment Letters has been modified or amended and no modification or amendment is contemplated, and the commitment thereunder has not been terminated, reduced, withdrawn or rescinded in any respect and no such termination, reduction, withdrawal or recession is contemplated. There are no side letters or other Contracts or arrangements related to the funding therein that contradicts or reduces the obligations of the Affiliates of GSO thereunder to perform subject to the conditions and on the terms set forth therein. Each of the Equity Commitment Letters is in full force and effect and is the legal, valid, binding and enforceable obligations of GSO Holdings and each of the other parties thereto, as the case may be. There are no conditions precedent or other contingencies related to the funding of the full amount (or any portion) except as set forth in the Equity Commitment Letters and this Agreement. No event has occurred which, with or without notice, lapse of time or both, could reasonably be expected to constitute a default or breach on the part of GSO Holdings or any other party thereto under either of the Equity Commitment Letters. GSO Holdings has not incurred any obligation, commitment, restriction or other liability of any kind, and is not contemplating or aware of any obligation, commitment, restriction or other liability of any kind, in either case which would impair or adversely affect such resources, funds or capabilities. The Equity Commitment Letters designate SN as an intended third party beneficiary thereof who may enforce the rights of GSO Holdings pursuant to such Equity Commitment Letter as if each SN was a party thereto. All commitments and other fees, if any, required to be paid under the Equity Commitment Letters prior to the Effective Date have been paid in full.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SN

Except as otherwise expressly limited to a specific date herein, as of the Effective Date, the Anadarko Closing Date, and if the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) occurs, the KNOC Closing Date, SN represents and warrants to the Partnership, the General Partner and each of the Purchasers as follows:

Section 5.01 Existence.

(a) SN is duly organized and validly existing as a corporation and in good standing under the Laws of its state of formation, with all necessary power and authority to own, lease and operate its properties and to conduct its business as currently conducted, and is duly registered or qualified as a foreign corporation, as the case may be, for the transaction of business under the Laws of each jurisdiction in which the character of the business conducted by it or the nature or location of the properties owned or leased by it makes such registration or qualification necessary, except where the failure to be so qualified, in good standing or have such power or authority would not, individually or in the aggregate, have a material adverse effect on SN. SN has all requisite corporate power and authority to execute and deliver this Agreement and the other Basic Documents to which it is or will be a party and to perform its obligations hereunder and thereunder.

(b) SN GP Member is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

(c) Common Unit Purchaser is duly organized and validly existing as a limited liability company and in good standing under the Laws of its state of formation, with all necessary power and authority to own properties and to conduct its business as currently conducted.

Section 5.02 Authorization, Enforceability. Each of SN, SN GP Member and Common Unit Purchaser has all necessary legal power and authority to enter into, deliver and perform its obligations under the Basic Documents to which it is or will be a party. The execution, delivery and performance by SN, SN GP Member and Common Unit Purchaser of the Basic Documents and the consummation by it of the transactions

contemplated hereby and thereby have been or, when executed, will be duly and validly authorized by all necessary legal action, and no further consent or authorization of SN, SN GP Member or Common Unit Purchaser is required. The Basic Documents to which SN, SN GP Member or Common Unit Purchaser, as the case may be, is or will be a party have been or will be duly executed and delivered by SN, SN GP Member and/or Common Unit Purchaser, as the case may be, and constitute or, when executed, will constitute the legal, valid and binding obligations of SN, SN GP Member or Common Unit Purchaser, as the case may be, except or the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws relating to or affecting creditors' rights generally and by general principles of equity and except as the rights to indemnification may be limited by applicable Law (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.03 No Conflicts. None of (a) the execution, delivery and performance by SN, SN GP Member or Common Unit Purchaser of the Basic Documents to which it is or will be a party or (b) the consummation of the transactions contemplated hereby or thereby (i) constitutes or will constitute a violation of the other organizational documents of SN, SN GP Member or Common Unit Purchaser, (ii) constitutes or will constitute a breach or violation of, or a default (or an event which, with notice or lapse of time or both, would constitute such a default) under, the SN Credit Agreement or any indenture or any other agreement pertaining to indebtedness to which SN or any of its Subsidiaries is a party or any Contract to which SN is a party or by which any of them or any of their respective properties may be bound or (iii) violates or will violate any statute, Law, Permit or regulation or any order, judgment, decree or injunction of any court or Governmental Authority or body having jurisdiction over SN, SN GP Member or Common Unit Purchaser or any of their respective properties in a proceeding to which any of them or their property is or was a party, except, in cases of clauses (ii) and (iii) above, for any such conflict, breach, violation or default that would not, individually or in the aggregate, have a material adverse effect on SN.

Section 5.04 Approvals. Except as set forth on Schedule 5.04, no authorization, consent, approval, waiver, license, qualification or written exemption from, nor any filing, declaration, qualification or registration with, any Governmental Authority or any other Person is required in connection with the execution, delivery or performance by SN, SN GP Member or Common Unit Purchaser of any of the Basic Documents to which it is a party, other than consents, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations that have been or prior to Closing are obtained or made. Prior to the Anadarko Closing, and if applicable, the KNOC Closing, SN shall use its commercially reasonable efforts to take, or shall cause the SN Parties to take, all actions necessary to cause the conditions to Closing set forth in Sections 2.07 and 2.09 to be satisfied at and as of the Closing.

Section 5.05 Certain Fees. No fees or commissions are or will be payable by SN GP Member or the Common Unit Purchaser to brokers, finders or investment bankers with respect to the purchase of any of the Common Unit Purchaser's Class A Common Interests or the Common Units or the consummation of the transactions contemplated by this Agreement, in each case, for which any the General Partner, the Partnership, GSO Holdings or Intrepid may be liable.

Section 5.06 The GSO Allocated Shares, the Intrepid Allocated Shares and the Warrants. When issued to the GSO Funds and Intrepid at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), the GSO Allocated Shares and Intrepid Allocated Shares will be duly authorized, validly issued, fully paid and nonassessable. The offer and sale by SN of the GSO Warrants to the GSO Funds and the Intrepid Warrants to Intrepid has been duly authorized by SN pursuant to its organizational documents and applicable Law and, when issued and delivered to the GSO Funds and Intrepid in accordance with the terms of this Agreement and the GSO Warrant Agreement and Intrepid Warrant Agreement will each be validly issued, fully paid (to the extent required by applicable Law and, as applicable, each of the GSO Warrant Agreement and Intrepid Warrant Agreement), non-assessable and issued in compliance with all applicable Laws, including

securities Laws, and will be free and clear of any and all Liens and restrictions on transfer, other than restrictions on transfer under the GSO Warrant Agreement and Intrepid Warrant Agreement, as applicable, or arising under applicable state and federal securities Laws. Neither the execution, delivery and performance by SN of the GSO Warrant Agreement or the Intrepid Warrant Agreement, or the issuance of the GSO Allocated Shares, the Intrepid Allocated Shares, the GSO Warrants, the Intrepid Warrants or SN Common Stock upon exercise of the GSO Warrants or the Intrepid Warrants and compliances by SN with its objections under each of the GSO Warrant Agreement and Intrepid Warrant Agreement will, whether with or without the giving of notice, the passage of time or both, require any consent, approval or notice under, or will constitute a breach or violation of the organization documents of SN, conflict with or constitute a material breach of, or default under, or result in the creation or imposition of any Lien upon the property or assets of SN pursuant to any Contract to which SN is a party, or result in a violation of any applicable material Law, judgment, order, writ or decree of any Governmental Authority with jurisdiction over SN or its assets. The SN Common Stock to be issued upon exercise of the Warrants will, when issued, be validly issued, fully paid and non-assessable. The shares of SN Common Stock subject to issuance upon exercise of the Warrants have been reserved for issuance by SN and will be so reserved until the exercise in full of the Warrants. The holders of the outstanding Equity Interests of SN are not entitled to subscribe for any of the Warrants or the SN Common Stock to be issued upon exercise of the Warrants. The GSO Funds and Intrepid, as applicable, will have the right on the terms and subject to the conditions set forth in the GSO Registration Rights Agreement and Intrepid Registration Rights Agreement, to require SN to register the GSO Allocated Shares and Intrepid Allocated Shares and the SN Common Stock subject to issuance upon exercise of the warrants for resale on a registration statement to be filed by SN with the Commission.

Section 5.07 Investment Company Status. SN is not, and upon the issuance and sale of the GSO Allocated Shares and the Intrepid Allocated Shares and Warrants as herein contemplated will not be, an "investment company" or an entity "controlled" by an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and the rules and regulations of the SEC promulgated thereunder.

Section 5.08 Stock Exchange Listing and Reporting Requirements. The SN Common Stock is registered pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange (the "***NYSE***") and SN has taken no action designed to, or likely to have the effect of, terminating the registration of the SN Common Stock under the Exchange Act or delisting the SN Common Stock from the NYSE, and SN has not received any notification that the Commission or the NYSE is contemplating terminating such registration or listing. Prior to the Anadarko Closing, the GSO Allocated Shares and the SN Allocated Shares and the SN Common Stock subject to issuance upon exercise of the Warrants will be approved for listing on the NYSE, subject only to notice of official issuance.

Section 5.09 No Registration Required. Assuming the accuracy of the representations and warranties of the Preferred Unit Purchasers contained in this Agreement and their compliance with the agreements set forth in this Agreement, the sale and issuance at the Anadarko Closing of the GSO Allocated Shares and the Intrepid Allocated Shares and the Warrants pursuant to this Agreement (and, when issued, the issuance of SN Common Stock upon exercise of the Warrant) is exempt from the registration requirements of the Securities Act, and SN has not and, to the Knowledge of SN, no authorized representative acting on behalf of any of SN has taken or will take any action hereafter that would cause the loss of such exemption. The issuance and sale of the GSO Allocated Shares and the Intrepid Allocated Shares and the Warrants and the issuance of SN Common Stock upon exercise of the Warrants does not contravene the rules and regulations of the NYSE.

Section 5.10 No Integration. SN has not, directly or indirectly through any representative, made any offers or sales of any security or solicited any offers to buy any security that is or will be integrated with the issuance and sale of the GSO Allocated Shares, Intrepid Allocated Shares or the Warrants in a manner that would require the offer and sale of the GSO Allocated Shares, Intrepid Allocated Shares or the Warrants to be registered under the Securities Act.

Section 5.11 Restricted Securities. Except for possible permitted transfers subject to the terms of (a) in the case of Class A Common Interest, the GP LLC Agreement or (b) in the case of the Common Units, the Partnership Agreement, SN GP Member is acquiring the Class A Common Interests and Common Unit Purchaser is acquiring the Common Units for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable securities Laws. Each of SN GP Member and Common Unit Purchaser has such knowledge, sophistication and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in (a), in the case of SN GP Member, the Class A Common Interests and (b), in the case of Common Unit Purchaser, the Common Units and is capable of bearing the economic risk of such investment. Each of SN GP Member and Common Unit Purchaser is an "accredited investor" as that term is defined in Rule 501 of Regulation D (without regard to Rule 501 (a)(4)) promulgated under the Securities Act. Each of SN GP Member and Common Unit Purchaser acknowledges and understands that (a) (i), in the case of SN GP Member, the acquisition of the Class A Common Interests and (ii), in the case of Common Unit Purchaser, the acquisition of the Common Units, have not been registered under the Securities Act in reliance on an exemption therefrom and that each of the General Partner and the Partnership is relying upon the truth and accuracy of, and SN GP Member's and Common Unit Purchaser's compliance with, the representations, warranties, agreements, acknowledgments and understandings of SN GP Member and Common Unit Purchaser set forth herein in order to determine the availability of such exemptions and the eligibility of SN GP Member to acquire the Class A Common Interests and Common Unit Purchaser to acquire the Common Units; (b) the Class A Common Interests and the Common Units will, upon such acquisition, be characterized as "restricted securities" under state and federal securities Laws. Each of SN GP Member and Common Unit Purchaser further acknowledges and understands that the Class A Common Interests and the Common Units (x) may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except pursuant to an effective registration statement under the Securities Act or pursuant to an available exemption from the registration requirements of the Securities Act, and in compliance with other applicable state and federal securities Laws and the Warrants and (y) will bear a legend substantially as set forth below.

> "These securities have not been registered under the Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any state or other jurisdiction. These securities may not be sold or offered for sale, pledged or hypothecated except pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from registration thereunder, in each case in accordance with all applicable securities laws of the states or other jurisdictions, and in the case of a transaction exempt from registration, such securities may only be transferred if the transfer agent for such securities has receive documentation satisfactory to it that such transaction does not require registration under the Securities Act."

Section 5.12 Litigation. As of the Effective Date, there are no, and as of the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing), and if occurring, the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing), there will not be any, legal or governmental proceedings pending to which SN, SN GP Member or Common Unit Purchaser is a party that challenges the validity of any of the Basic Documents or the right of SN, SN GP Member or Common Unit Purchaser to enter into any of the Basic Documents to which it is or will be a party or to consummate the transactions contemplated hereby or thereby and, to the Knowledge of SN, no such proceedings are threatened by any Governmental Authorities or others.

Section 5.13 Solvency. As of the Effective Date and giving pro forma effect to the "Closing" (as defined in the APC/KM PSA) and the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and the consummation of the transactions contemplated by this Agreement and the Basic Documents and the APC/KM PSA and to the KNOC Closing (assuming KNOC exercises its tag right and delivers the election notice), assuming (a) such transactions were to occur at or concurrently with the Effective Date and concurrently with the funding by the Partnership, SN Maverick and Blackstone Newco of the "Purchase Price"

(as defined in the APC/KM PSA) and that (b) (i) Anadarko and Blackstone Newco have each satisfied the conditions to SN Maverick and the Partnership's obligations to consummate the transactions contemplated by the APC/KM PSA and that the representations and warranties of Anadarko and Blackstone Newco set forth in the APC/KM PSA are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation), (ii) the Purchasers and the GSO Funds have each satisfied the conditions to the SN Parties' obligations to consummate the transactions contemplated by this Agreement and that the representations and warranties of the Purchasers and the GSO Funds set forth in this Agreement are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation) and (iii) each of Anadarko, Blackstone Newco, GSO, the Purchasers and the GSO Funds, as applicable, have complied with the terms of any other Basic Document to which it is a party and that any representations or warranties made by Anadarko, Blackstone Newco, GSO, the Purchasers and the GSO Funds, as applicable, set forth in such Basic Document are accurate (for such purposes, such representations and warranties shall be true and correct without giving effect to any knowledge, materiality or "material adverse effect" qualification or expectation), (x) the amount of the "fair saleable value" of the assets of SN will, as of such time, exceed the sum of (A) the value of all "liabilities of such SN, including contingent and other liabilities," as of such time, as such quoted terms are generally determined in accordance with applicable laws governing determinations of the insolvency of debtors, and (B) the amount that will be required to pay the probable liabilities of SN, as of such date, on its existing debts (including contingent and other liabilities) as such debts become absolute and mature, (y) SN will not have, as of such date, an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged following such date, and (z) SN will be able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature. For purposes of this definition, "not have an unreasonably small amount of capital for the operation of the businesses in which it is engaged or proposed to be engaged" and "able to pay its liabilities, as of such date, including contingent and other liabilities, as they mature" means that SN will be able to generate enough cash from operations, asset dispositions or refinancing, or a combination thereof, to meet its obligations as they become due.

Section 5.14 No Obligation to be Guarantor or Restricted Subsidiary. As of the Effective Date, the Anadarko Closing Date and, if occurring, the KNOC Closing Date, neither the General Partner nor the Partnership or any of its Subsidiaries is required, or upon the Anadarko Closing and if applicable, the KNOC Closing, the consummation of the transactions contemplated hereby and by the other Basic Documents and the consummation by the Partnership of the transactions to be effected in connection with the "Closing" (as that term is defined in the APC/KM PSA) and if applicable, the consummation by the Partnership of the transaction to be effected in connection with the closing of the KNOC PSA, will be required, to become a guarantor or a Restricted Subsidiary under the SN Credit Agreement (or any amendment or replacement thereof), or under any indenture or other agreement pertaining to indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries). SN shall have taken, or caused to be taken, all actions necessary or appropriate to cause each of the General Partner and the Partnership to constitute an Unrestricted Subsidiary of SN and its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries) under the SN Credit Agreement (or any amendment or replacement thereof), and under any indenture or other agreement pertaining to indebtedness of SN or any of its Subsidiaries (other than the General Partner or the Partnership or any of its Subsidiaries).

## ARTICLE VI
## INDEMNIFICATION, COSTS AND EXPENSES

Section 6.01 Indemnification.

(a) SN agrees to indemnify and hold harmless each of the Purchasers, and each of their officers, managers, directors, employees, Affiliates, members, partners, stockholders, and agents, and the successors to and permitted assigns of the foregoing (and their respective officers, managers, directors, employees, Affiliates (including as to GSO Holdings and GSO Associates, GSO or its Affiliates or any fund or account managed, advised or sub-advised by GSO or its Affiliates, members, partners, stockholders, agents and successors and permitted assigns and solely for purposes of this Section 6.01(a), The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.) (collectively, the "***Purchaser Indemnified Parties***") from and against any and all Damages incurred or suffered by any of the Purchaser Indemnified Parties as a result of or arising out of (i) any failure of any representation or warranty in Article III or Article V to be true and correct and (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by the SN Parties pursuant to this Agreement. Without duplication of any Damages paid under the preceding sentence, if this Agreement is terminated pursuant to Section 7.01(b) or Section 7.01(c), and the termination of the APC/KM PSA referred to in Section 7.01(b) or the KNOC PSA referred to in Section 7.01(c) was not the result of a breach by GSO Holdings of its obligations under Section 2.01(a), Section 2.01(b), Section 2.02(a) or Section 7.01(e), as applicable, or the APC/KM PSA is terminated pursuant to Section 7.1(c) thereof and such termination of the APC/KM PSA is not the result of a breach by GSO Holdings of its obligation under Section 2.01(a) or Section 2.01(b) and any Purchaser Indemnified Parties, other than Intrepid and its Affiliates, suffers or incurs Damages (including unreimbursed out-of-pocket expenses incurred in due diligence or negotiating the Basic Documents) as a result of a claim brought by a third-party (other than The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P.) against the Purchaser Indemnified Parties, other than Intrepid and its Affiliates, in connection with such termination, then SN shall indemnify and hold harmless the Purchaser Indemnified Parties, other than Intrepid and its Affiliates, for all such Damages, but in no event shall the aggregate amount payable by SN pursuant to this sentence exceed the Preferred Unit GSO Commitment Amount; *provided that* any such payment shall not be in duplication of any amounts received by The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates and any officer, director, employee, member, partner or stockholder of The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. independently of any Purchaser Indemnified Party's claims hereunder.

(b) GSO Holdings agrees to indemnify and hold harmless the SN Parties and each of their respective officers, managers, directors, employees, Affiliates, members, partners, stockholders and agents and the successors and permitted assigns to the foregoing (and their respective officers, managers, directors, employees, Affiliates, members, partners, stockholders, agents, and successors and permitted assigns) (collectively, the "***Common Indemnified Parties***") from and against any and all Damages incurred or suffered by a Common Indemnified Party as a result of or arising out of (i) any failure of any representation or warranty made by GSO Holdings (for the avoidance of doubt, regardless of whether or not given on behalf of GSO Holdings, GSO Associates or the GSO Funds) in Article IV to be true and correct or (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by GSO Holdings or GSO

Associates pursuant to this Agreement. Without duplication of any Damages paid under the preceding sentence, if (A) GSO Holdings breaches its obligation under Section 2.01(a) to contribute the Preferred Unit Anadarko Funding Amount at the Anadarko Closing (whether in a Separate Closing or as part of a Dual Closing) and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of the Deposit or (B) GSO Holdings breaches its obligation under Section 2.02(a) to contribute the Preferred Unit KNOC Funding Amount at the KNOC Closing (whether in a Separate Closing or as part of a Dual Closing) and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of any deposit due under the KNOC PSA, and in the case of (A) or (B), any Damages actually incurred by the Common Indemnified Parties to Anadarko or Blackstone Newco pursuant to the APC/KM PSA and/or the KNOC PSA, as applicable, and all reasonable, out-of-pocket third-party costs and expenses incurred by such Common Indemnified Parties in connection with any resulting breach of the APC/KM PSA and/or KNOC PSA, as applicable, then GSO Holdings shall indemnify and hold harmless the Common Indemnified Parties for all such Damages but in no event shall the aggregate amount payable by GSO Holdings pursuant to this sentence exceed the excess, if any, of the Preferred Unit GSO Commitment Amount over any amounts paid to the Partnership or SN under the Equity Commitment Letter.

(c) Intrepid agrees to indemnify and hold harmless the Common Indemnified Parties from and against any and all Damages incurred or suffered by a Common Indemnified Party as a result of or arising out of (i) any failure of any representation or warranty given by Intrepid in Article IV to be true and correct or (ii) any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by Intrepid pursuant to this Agreement.

(d) Intrepid agrees to indemnify and hold harmless the GSO Holdings from and against any and all Damages incurred or suffered by GSO Holdings as a result of or arising out of any breach of a covenant or agreement, or failure to perform or observe any duty, made or to be performed by Intrepid pursuant to this Agreement. Notwithstanding anything to the contrary provided herein, if Intrepid fails to pay the Intrepid Contribution to GSO Holdings or the Partnership at the Anadarko Closing in accordance with Section 2.06(d)(ii), then (i) no Preferred Units will be issued to Intrepid at the Anadarko Closing and the Preferred Units that were to be issued to Intrepid will instead be issued to GSO Holdings, (ii) the Intrepid Allocated Shares will not be issued to Intrepid and will instead be issued to the GSO Funds and (iii) the Intrepid Warrant Agreement will not be executed and the Warrants that were to be issued thereunder will instead be issued to the GSO Funds pursuant to the GSO Warrant Agreement (with the number of Intrepid Shares and Warrants subject to the Intrepid Warrant Agreement to be allocated among the GSO Funds as directed by GSO Holdings); *provided that*, in each case, GSO Holdings has funded to the Partnership in accordance with the terms of this Agreement, an amount equal to the Intrepid Contribution.

Section 6.02 Indemnification Procedure.

(a) A claim for indemnification for any matter not involving a third-party claim may be asserted by notice from the party that may be entitled to indemnification pursuant to this Article VI (the "***Indemnified Party***") to the party that may be obligated to provide indemnification pursuant to this Article VI (the "***Indemnifying Party***"); *provided, however*, that failure to so notify the Indemnifying Party shall not release, waive or otherwise affect the Indemnifying Party's obligations with respect thereto, except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure. The notice of claim shall state in reasonable detail the basis of the claim for indemnification.

(b) If any legal proceedings shall be instituted or any claim or demand shall be asserted by any third party in respect of which indemnification may be sought under Section 6.01(a), Section 6.01(b) or Section 6.01(c) hereof (a "***Third Party Claim***"), the Indemnified Party shall promptly give written notice of the assertion of the Third Party Claim to the Indemnifying Party; *provided, however*, that failure of the Indemnified Party to



012044

so notify the Indemnifying Party shall not release, waive or otherwise affect the Indemnifying Party's obligations with respect thereto, except to the extent that the Indemnifying Party can demonstrate actual loss and prejudice as a result of such failure. Subject to the provisions of this Section 6.02, the Indemnifying Party shall have the right, at its sole expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Third Party Claim which relates to any losses indemnified against by it hereunder; *provided that*, in order to defend against, negotiate, settle or otherwise deal with any such Third Party Claim, the Indemnifying Party must first acknowledge in writing to the Indemnified Party its unqualified obligation to indemnify the Indemnified Party as provided hereunder and provide to the Indemnified Party reasonable evidence that the Indemnifying Party has reasonably sufficient financial resources to enable it to fulfill its obligations under this Article VI. Notwithstanding the preceding sentence, the Indemnifying Party shall not have the right to defend against, negotiate, settle, or otherwise deal with any Third Party Claim (i) if the Third Party Claim is not solely for monetary damages (except where any non-monetary relief being sought is merely incidental to a primary claim for monetary damages), (ii) if the Third Party Claim involves criminal allegations, or (iii) if the Indemnifying Party fails to prosecute or defend, actively and diligently, the Third Party Claim. If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Third Party Claim, it shall within fifteen (15) days of the Indemnified Party's written notice of the assertion of such Third Party Claim (or sooner if the nature of the Third Party Claim so requires) notify the Indemnified Party of its intent to do so; *provided that*, the Indemnifying Party must conduct its defense of the Third Party Claim actively and diligently thereafter in order to preserve its rights in this regard. If the Indemnifying Party elects not to defend against, negotiate, settle, or otherwise deal with any Third Party Claim, fails to notify the Indemnified Party of its election as herein provided or contests its obligation to indemnify the Indemnified Party for losses relating to such Third Party Claim under this Agreement, the Indemnified Party may defend against, negotiate, settle, or otherwise deal with such Third Party Claim. If the Indemnified Party defends any Third Party Claim, then the Indemnifying Party shall reimburse the Indemnified Party for the expenses of defending such Third Party Claim upon submission of periodic bills, which reimbursement shall be made within thirty (30) days of the applicable submission. If the Indemnifying Party shall assume the defense of any Third Party Claim, the Indemnified Party may participate, at his, her or its own expense, in the defense of such Third Party Claim; *provided*, *further*, that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; *provided further* that the Indemnifying Party shall not be required to pay for more than one such counsel (plus any appropriate local counsel) for all Indemnified Parties in connection with any single Third Party Claim. Each party hereto shall provide reasonable access to each other party to such documents and information as may reasonably be requested in connection with the defense, negotiation or settlement of any Third Party Claim. Notwithstanding anything in this Section 6.02 to the contrary, the Indemnifying Party shall not enter into any settlement of any Third Party Claim without the written consent of the Indemnified Party if such settlement (i) would create any liability of the Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder, (ii) would provide for any injunctive relief or other non-monetary obligation affecting the Indemnified Party, or (iii) does not include an unconditional release of the Indemnified Party from all liability in respect of the Third Party Claim.

(c) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement, in each case with respect to a Third Party Claim, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter and the Indemnifying Party shall pay all of such remaining sums so due and owing to the Indemnified Party by wire transfer of immediately available funds within five (5) Business Days after the date of such notice.

(d) Notwithstanding anything to the contrary in this Agreement, GSO Holdings shall not have any liability in the aggregate for any Damages arising from or relating to this Agreement that exceeds the excess, if any, of the Preferred Unit GSO Commitment Amount *minus* any amounts funded to the Partnership pursuant to the Equity Commitment Letters. Notwithstanding anything to the contrary in this Agreement, Intrepid shall not have any liability in the aggregate for any Damages arising from or relating to this Agreement that exceeds the amount of the Intrepid Contribution.

(e) Notwithstanding anything to the contrary in this Article VI or any other provision of this Agreement, in no event shall the Purchasers or SN have any liability or indemnification obligation to any other party for punitive, consequential, special, indirect, diminution in value, loss of profit, penalty or other indirect or unforeseen Damages, whether in law or equity, arising from the performance of this Agreement or the transactions contemplated hereby; *provided that* if GSO Holdings breaches its obligations under Section 2.01(a) and Section 2.06(d)(i) to contribute the Preferred Unit Anadarko Funding Amount at the Anadarko Closing and/or GSO Holdings breaches its obligations under Section 2.02(a) and Section 2.06(d)(vi) to contribute the Preferred Unit KNOC Funding Amount at the KNOC Closing, and any Common Indemnified Parties suffer or incur Damages as a result thereof, including, without limitation, the loss of all or any portion of the Deposit or the deposit under the KNOC PSA, if any, and any damages payable to Anadarko or Blackstone Newco as a result thereof, then the loss of the Deposit and/or the deposit under the KNOC PSA, if any, and any Damages actually incurred by the Common Indemnified Parties to Anadarko or Blackstone Newco pursuant to the APC/KM PSA or the KNOC PSA, as applicable, in respect thereof shall be recoverable by the Common Indemnified Parties subject to the maximum specified in Section 6.02(d) above**.**

Section 6.03 Survival. All of the Fundamental Representations shall survive the execution and delivery of this Agreement and the consummation of the Closing for a period equal to the statute of limitations applicable to breach of contract under Delaware law. All of the representations and warranties other than the Fundamental Representations set forth in Articles III, IV and V shall survive the execution and delivery of this Agreement, and the consummation of the Closing for a period ending on the one (1) year anniversary of the Closing; *provided that* any claim made prior to such date shall survive the one (1) year anniversary of the Closing until finally determined in accordance with this Article VI. All covenants contemplated herein to be performed at or prior to the Closing shall survive the Closing for a period equal to the statute of limitations applicable to breach of contract under Delaware law. Notwithstanding the foregoing, the indemnity obligations of Intrepid provided for in the first sentence of Section 6.01(d) shall not survive the funding by Intrepid of the Intrepid Contribution.

## ARTICLE VII
## TERMINATION

Section 7.01 Termination. This Agreement may be terminated at any time prior to the Closing Date as follows:

(a) as to all parties, by mutual written consent of each SN Party, GSO Holdings and GSO Associates;

(b) as to all parties, by any SN Party, GSO Holdings or GSO Associates, if the APC/KM PSA shall have been validly terminated in accordance with its terms;

(c) by any SN Party, GSO Holdings or GSO Associates, solely with respect to the obligations under this Agreement related to actions to be taken pursuant to Section 2.02 and Section 2.06 (d)(v), if the KNOC PSA shall have been validly terminated in accordance with its terms;

(d) as to all parties, by GSO Holdings or GSO Associates if the "Closing" (as defined in the APC/KM PSA) has not occurred on or before March 31, 2017;

(e) as to all parties, by GSO Holdings or GSO Associates if at any time the representations and warranties regarding the SN Parties contained in this Agreement shall fail to be true and correct or an SN Party shall at any time have failed to perform and comply with all agreements and covenants of such Person contained in this Agreement requiring performance or compliance prior to such time, and in either case, such failure (i) shall be such that, if not cured, the conditions set forth in Section 2.07(d) or Section 2.07(h) would not be fulfilled prior to or on either the Anadarko Closing Date or the KNOC Closing Date and (ii) if capable of being cured, shall not have been cured within 10 Business Days of the receipt of written notice thereof by such SN Party from either Purchaser;

(f) as to all parties, by any SN Party if at any time the representations and warranties regarding GSO Holdings or GSO Associates contained in this Agreement shall fail to be true and correct or either GSO Holdings or GSO Associates shall at any time have failed to perform and comply with all agreements and covenants of such Person contained in this Agreement requiring performance or compliance prior to such time, and in either case, such failure (i) shall be such that, if not cured, the conditions set forth in Section 2.08(c) or Section 2.08(e) would not be fulfilled prior to or on the Anadarko Closing Date or the KNOC Closing Date and (ii) if capable of being cured, shall not have been cured within 10 Business Days of the receipt of written notice thereof by GSO Holdings or GSO Associates, as applicable, from any SN Party; and

(g) solely as to Intrepid, by (i) any SN Party if at any time, the representations and warranties regarding Intrepid contained in this Agreement shall fail to be true and correct or Intrepid shall at any time have failed to perform and comply with all agreements and covenants of such Intrepid contained in this Agreement requiring performance or compliance prior to such time or (ii) GSO Holdings if Intrepid fails to contribute the Intrepid Contribution in full at the Anadarko Closing in accordance with Section 2.06(d)(ii) and GSO Holdings has instead contributed such amounts.

Section 7.02 Notice of Termination. GSO Associates and GSO Holdings may exercise their right to terminate this Agreement by giving written notice thereof from time to time to the SN Parties or, in the case of termination as to Intrepid in accordance with Section 7.01(g)(ii), Intrepid specifying the basis for the termination. Each SN Party may exercise its right to terminate this Agreement by giving written notice thereof from time to time to GSO Holdings and GSO Associates or, in the case of termination as to Intrepid in accordance with Section 7.01(g)(i), Intrepid specifying the basis for the termination.

Section 7.03 Effect of Termination. If a termination of this Agreement pursuant to the provisions of Section 7.01 shall occur with respect to any party, this Agreement shall become void and have no effect with respect to such party, and there shall be no further liability on such party in respect hereof, except that Article VIII shall survive any such termination; *provided*, *however*, that no such termination shall relieve any party of any liability resulting from any breach of this Agreement by such party prior to the time of such termination. In the event this Agreement is terminated by any SN Party pursuant to Section 7.01(f), GSO Holdings shall immediately remit to SN the Commitment Fee by wire transfer of immediately available funds.

Section 7.04 Termination of Commitment Related to KNOC Closing. If the KNOC Closing (whether in a Dual Closing or Separate Closing) has not occurred by midnight, Houston, Texas time on March 31, 2017, the Preferred Unit GSO Commitment Amount shall be reduced to $500.0 million unless GSO Holdings elects in its sole discretion for the Preferred Unit GSO Commitment Amount to remain at $800.0 million for such additional time as GSO Holdings determines to be appropriate.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.01 Expenses.

(a) Except as provided in Section 8.01(b), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation, negotiation and due diligence of this Agreement or the other Basic Documents and the transactions contemplated thereby shall be paid by the party incurring such costs and expenses unless otherwise expressly stated in such Basic Document, provided that (i) if the Anadarko Closing occurs, then the Partnership shall reimburse GSO and its Affiliates for all of their reasonable, documented, third-party out-of-pocket costs and expenses incurred in connection with the transactions contemplated hereby and thereby and (ii) if the Anadarko Closing does not occur, then SN shall reimburse GSO and its Affiliates for all of their reasonable, documented, third-party out-of-pocket costs and expenses incurred in connection with the transactions contemplated hereby and thereby prior to termination of this Agreement; *provided that* from and after the Effective Date GSO shall promptly notify the Partnership and SN at such time as the costs and expenses for which GSO intends to seek reimbursement pursuant to this Section 8.01 equal increments of $250,000; and *provided further* that GSO and its Affiliates will not entitled to any such reimbursement if this Agreement is terminated by the Common Unit Purchaser pursuant to Section 7.01(f).

(b) At or promptly after the Anadarko Closing or upon any termination of this Agreement (i) as to Intrepid pursuant to Section 7.01(g) or (ii) as to all parties pursuant to Section 7.01 at a point in time when the Agreement could be terminated as to Intrepid pursuant to Section 7.01(g), all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred by any SN Party or GSO Holdings and its Affiliates in connection with the amendment and restatement of this Agreement and the drafting and negotiation of the other Basic Documents in connection therewith, as applicable, shall be reimbursed by Intrepid to the party incurring such costs. For the avoidance of doubt, Intrepid shall be responsible for all reasonable and documented costs and expenses described in this Section 8.01(b) and in no event shall GSO or any SN Party (including the Partnership) be responsible for any of the reasonable and documented costs and expenses described in this Section 8.01(b).

Section 8.02 Interpretation. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Appendices, Articles, Sections, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause or other subdivision unless expressly so limited. The words "this Article," "this Section," "this subsection," "this clause," and words of similar import, refer only to the Article, Section, subsection and clause hereof in which such words occur. The word "including" (in its various forms) means including without limitation. All references to "$" or "dollars" shall be deemed references to the lawful currency of the United States of America. Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the date of this Agreement. Unless expressly provided to the contrary, the word "or" is not exclusive. Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Appendices, Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes. Reference herein to any federal, state, local or foreign Law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "day" or "days" shall

mean calendar day, unless denoted as a Business Day. The words "will" and "will not" are expressions of command and not merely expressions of future intent or expectation. When used in this Agreement, the word "either" shall be deemed to mean "one or the other", not "both". Unless otherwise noted, references herein to a "party" are references to the applicable party to this Agreement.

Section 8.03 Amendments and Waivers.

(a) Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each SN Party, GSO Associates and GSO Holdings, or in the case of a waiver, by the party against whom the waiver is to be effective; provided, further that any amendment or waiver that affects the rights and obligations of Intrepid under this Agreement shall also require the written consent of Intrepid. For the purposes of clarity, no signature or consent of any third-party beneficiary to any provision of Article VI shall be required in order to amend or waive any provision of Article VI.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided will be cumulative and not exclusive of any rights or remedies hereunder, under any other Basic Document, or at law or in equity; accordingly, no exercise of any right or remedy shall be construed as an election of remedies by any party.

Section 8.04 Binding Effect. This Agreement shall be binding upon the parties and their respective successors and permitted assigns, and shall remain in full force and effect after the Anadarko Closing and if occurring, the KNOC Closing. Except as expressly provided in this Agreement, this Agreement shall not be construed so as to confer any right or benefit upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

Section 8.05 Communications. All notices and demands provided for hereunder shall be in writing and shall be given by registered or certified mail, return receipt requested, telecopy, air courier guaranteeing overnight delivery or personal delivery to the following addresses

(a) If to GSO Associates or GSO Holdings:

c/o GSO Capital Partners
GSO ST Holdings LP
1111 Bagby Street, #2050
Houston, Texas 77002
Attention: Robert Horn
Email: robert.horn@gsocap.com

with a copy to (which shall not constitute notice):

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, New York 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

with a copy to (which shall not constitute notice):



012049

Andrews Kurth Kenyon LLP
600 Travis Street, Suite 4200
Houston, Texas 77002
Attention: G. Michael O'Leary
Jon Daly
Facsimile: (713) 220-4285
Email: moleary@akllp.com
jondaly@andrewskurth.com

(b) If to an SN Party:

1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, Texas 77002
Attention: John D. Pitts, P.C.
Email: john.pitts@kirkland.com

(c) If to Intrepid:

Intrepid Private Equity V-A, LLC
c/o Intrepid Private Equity Fund GP, LLC
540 Madison Avenue, 21st Floor
New York, NY 10022
Attention: Christopher Winchenbaugh
Email: Winchenbaugh@intrepidfp.com

with a copy to (which shall not constitute notice):

Baker Botts L.L.P.
910 Louisiana St.
Houston, TX 77002
Attention: Felix Phillips
Jeremy Moore
Email: felix.phillips@bakerbotts.com
jeremy.moore@bakerbotts.com

or to such other address as the parties hereto may designate in writing. All notices and communications shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; upon actual receipt if sent by certified or registered mail, return receipt requested, or regular mail, if mailed; upon actual receipt of the overnight courier copy, if sent via facsimile; and upon actual receipt when delivered to an air courier guaranteeing overnight delivery.

Section 8.06 Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein are intended by the parties as a final

expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter including those set forth in the Original SPA. Each of the parties hereto acknowledges and agrees that in executing this Agreement (i) the intent of the parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.06 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the parties hereto stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.06.

Section 8.07 Governing Law; Submission to Jurisdiction. This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement), will be construed in accordance with and governed by the laws of the State of Delaware without regard to principles of conflicts of laws. Any action against any party relating to the foregoing shall be brought in any federal or state court of competent jurisdiction located within the State of Delaware, and the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal or state court located within the State of Delaware over any such action. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

Section 8.08 Waiver of Jury Trial. THE PARTIES TO THIS AGREEMENT EACH HEREBY WAIVES, AND AGREES TO CAUSE ITS AFFILIATES TO WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE. THE PARTIES TO THIS AGREEMENT EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 8.09 Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same agreement.

Section 8.10 Successors and Assigns. The provisions of this Agreement will be binding upon and inure to the benefit of the parties and their respective permitted successors and assigns. No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement (including any transfer by way of merger or operation of law) without the consent of each other party, and any such purported assignment in violation of this Section 8.10 shall be void *ab initio*. Notwithstanding the foregoing, GSO Holdings may assign its rights and obligations under this Agreement without the prior approval of any other party to this Agreement to any fund or account managed, advised or sub-advised by GSO or any of its Affiliates; provided that any such assignment shall not relieve GSO Holdings of any of its obligations hereunder.

Section 8.11 Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but, if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision or portion of any provision in such jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction in such manner as will effect as nearly as lawfully possible the purposes and intent of such invalid, illegal or unenforceable provision.

Section 8.12 Interim Actions.

(a) SN shall consult in good faith with GSO Holdings and GSO Associates in connection with any amendment, modification or waiver of any right under or the satisfaction of any condition in the APC/KM PSA or KNOC PSA, as applicable, to be satisfied by Anadarko, it being understood that, except as specified in the immediately following sentence, the foregoing shall not be construed to require the consent of GSO Holdings and GSO Associates in order to effect any such termination amendment, modification or waiver. Notwithstanding anything to the contrary set forth in this Agreement, neither SN nor any of its Affiliates will take any of the following actions in respect of the APC/KM PSA, without the prior approval of GSO Holdings and GSO Associates, such approval not to be unreasonably withheld:

(i) Approve any amendment or modification to any provision of, or waive any right or condition under, the APC/KM PSA or KNOC PSA;

(ii) Enter into any agreements with any counterparty in respect of a “Hard Consent” (as such term is defined in the APC/KM PSA) or a consent required to assign any of the gathering or processing agreements (including, without limitation, either of the Springfield Gathering Agreements) included in the “Applicable Agreements” (as such term is defined in the APC/KM PSA), in order to obtain consents to assignment required to be obtained under the APC/KM PSA or KNOC PSA, as applicable, that would result in a $2,000,000 net cost to the Partnership (and such cost shall be shared proportionately among SN, Blackstone Newco and the Partnership with the Partnership bearing a 20% share) or that would have a material and adverse effect on the Partnership;

(iii) Enter into any hedge contracts on behalf of the Partnership, except to the extent such hedge contracts are consistent with Section 6.7 of the Partnership Agreement; *provided*, *however*, that prior to the Anadarko Closing SN shall use its commercially reasonable efforts to cause Anadarko to enter into hedges in respect of the Acquired Properties that are consistent with the hedge plan set forth in Schedule 11.9(a), Part I of the APC/KM PSA as such Schedule is in effect on the Effective Date;

(iv) Approve any amendment or modification of, or waive any right under, the Hydrocarbons Marketing Agreement; or

(v) Enter into the KNOC PSA if (A) the KNOC PSA is not on substantially the same terms and conditions as the APC/KM PSA (including, without limitation, the portion of the purchase price to be paid

by the Partnership at the KNOC Closing and the form of conveyance of properties to the Partnership by KNOC) or (B) the unadjusted base purchase price (which shall correspond to the definition of "Purchase Price" under the APC/KM PSA) payable to KNOC thereunder shall not exceed $1,137,500,000.00.

(b) SN shall consult in good faith with GSO Holdings and GSO Associates in connection with (i) SN's actions or any of its Affiliates' actions relating to each of the title defect and environmental defect process under Articles XIII and XIV, respectively, of the APC/KM PSA, or any similar provisions under the KNOC PSA, as applicable, including reviewing any interim and final defect notices prior to submission thereof to Anadarko or KNOC, as applicable, exercise of elections by or on behalf of the Partnership regarding curative matters, and arbitration and settlement title and environmental disputes and with respect to the settlement of any defect dispute after the consummation of the "Closing" (as such term is defined in the APC/KM PSA) contemplated by the APC/KM PSA or, as applicable, the exercise any analogous right under the KNOC PSA; (ii) the submission to Anadarko or KNOC, as applicable, of preliminary and final accounting settlement statements and agreements with Anadarko or KNOC, as applicable, on such settlement statements and any arbitration proceedings to resolve such matters; (iii) SN's plan to hire any Anadarko employees or KNOC employees, as applicable, and the anticipated impact thereof on general and administrative expenditures and lease operating expenditures that would be chargeable by SN or its Affiliates to the Partnership in respect of the Acquired Properties or KNOC Properties, as applicable, and operations conducted thereon; and (iv) any public announcements proposed to be made by Anadarko and SN or its Affiliates regarding the APC/KM PSA; KNOC and SN or its Affiliates regarding the KNOC PSA; the Basic Documents or the transactions contemplated thereby; in each case to the extent applicable to either GSO Holdings and/or GSO Associates and their Affiliates. Furthermore, SN shall consult in good faith with GSO Holdings and GSO Associates in connection with any contemplated termination of the APC/KM PSA and/or KNOC PSA, it being understood that the foregoing shall not be construed to require the consent of GSO Holdings and GSO Associates in order to effect any such termination.

Section 8.13 No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any party may be a partnership or limited liability company, each party hereto, by its acceptance of the benefits of this Agreement and the other Basic Documents, covenants, agrees and acknowledges that, except as may be set forth in each of the Equity Commitment Letters, no Persons other than the parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any party (or any of their successors or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the parties, whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such party against such Persons and entities, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any such Persons, as such, for any obligations of the applicable party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

Section 8.14 Creditors. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of SN or by any creditors of any Subsidiary or Affiliate of SN.

Section 8.15 Public Disclosure; Confidentiality. Unless required by Law (or the advice of counsel to an applicable party), no press release or public announcement related to the Partnership or the General Partner, this Agreement or the transactions contemplated herein or any other related announcement or communication shall be issued or made by any party without the advance approval of each other parties, in which case each party shall be provided a reasonable opportunity to review and provide suggested comments concerning the disclosure contained in such press release, announcement or communication prior to issuance, distribution or publication. In addition, except as required by Law (or the advice of counsel to an applicable party), no party shall, and each party shall cause its respective representatives not to, disclose the terms and conditions of this Agreement to any third party, in each case, without the prior written consent of each of the parties, except to authorized directors, managers, officers, legal counsel, accountants and financial advisors of such party or its Affiliates. In furtherance of the foregoing, each party shall treat the terms and conditions of this Agreement as confidential; *provided, however*, that GSO Holdings and its Affiliates shall be entitled to disclose the terms contemplated herein and high-level summary information regarding the General Partner's and the Partnership's operations (including total production volumes, total revenues, etc.) to its limited partners, owners, co-investors, prospective investors, and existing and potential investors in funds or accounts managed, advised or sub-advised by GSO, in each case, without the consent of any Person; *provided, further*, that nothing in this Section 8.15 shall derogate from the rights of any Purchaser to disclose any information it is permitted to disclose without the consent of any other Person under Section 6.6 of the Partnership Agreement. Notwithstanding anything to the contrary herein, nothing in this Section 8.15 shall limit SN or its Affiliates from publicly filing this Agreement and making additional disclosures therewith, in each case as required by applicable Law and securities regulations.

Section 8.16 Time is of the Essence. Time is of the essence in the performance of all obligations under this Agreement.

Section 8.17 Remedies Generally. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at law or that an award of specific performance is not an appropriate remedy for any reason at law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 8.17 shall not be required to provide any bond or other security in connection with any such injunction. Notwithstanding anything to the contrary provided herein, Intrepid covenants and agrees that (i) Intrepid's sole right to determine if the conditions to the Anadarko Closing are satisfied are as set forth in Section 2.09 and Intrepid shall not have the right to claim that other conditions to the Anadarko Closing have not been satisfied, and (ii) GSO Holdings shall have the sole right to determine whether to pursue any claim or remedy against SN or any its Affiliates for any breach, violation or claim under this Agreement, including, without limitation, and claim for indemnification under Section 6.01(a).

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto execute this Agreement, effective as of the Effective Date.

**SN:**

**SANCHEZ ENERGY CORPORATION**

By: /s/ Howard J. Thill
Name: Howard J. Thill
Title: Executive Vice President and Chief Fiancial Officer

**SN GP MEMBER:**

**SN UR HOLDINGS, LLC**

By: /s/ Howard J. Thill
Name: Howard J. Thill
Title: Executive Vice President and Chief Fiancial Officer

**PARTNERSHIP:**
**SN EF UNSUB, LP**

By: SN EF UNSUB GP, LLC, its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**GENERAL PARTNER:**
**SN EF UNSUB GP, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: President and Chief Executive Officer

**COMMON UNIT PURCHASER:**

**SN EF UNSUB HOLDINGS, LLC**

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Executive Vice President

**GSO ASSOCIATES:**

**GSO ST HOLDINGS ASSOCIATES LLC**

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

**PREFERRED UNIT PURCHASERS:**

**GSO ST HOLDINGS LP**

By: GSO ST HOLDINGS ASSOCIATES LLC, its General Partner

By: /s/ Marisa Beeney
Name: Marisa Beeney
Title: Authorized Signatory

**INTREPID PRIVATE EQUITY V-A, LLC**

By: Intrepid Private Equity Fund GP, LLC, its manager

By: /s/ Hugh E. McGee III
Name: Hugh E. McGee III
Title: Managing Member

# Exhibit D

**HYDROCARBONS PURCHASE AND MARKETING AGREEMENT**

**Between**

**SN EF MAVERICK, LLC**

**and**

**SN EF UNSUB, LP**

**Dated as of January 12, 2017**

---

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1. | Specific Definitions | 1 |
| 1.2. | Construction | 1 |
| ARTICLE II PURCHASE AND SERVICES | | 2 |
| 2.1. | Purchase by Marketer | 2 |
| 2.2. | Limitations | 2 |
| 2.3. | Standard of Care | 2 |
| 2.4. | Repurchase Right | 2 |
| 2.5. | Reporting | 3 |
| 2.6. | Right to Cure | 3 |
| ARTICLE III PRICE AND PAYMENT | | 3 |
| 3.1. | Price | 3 |
| 3.2. | Statements and Payments | 3 |
| 3.3. | Audit Rights | 4 |
| 3.4. | Statement Errors | 4 |
| 3.5. | Setoff and Recoupment | 4 |
| 3.6. | Deposit of Producer's Proceeds and Security Interest. | 5 |
| ARTICLE IV WARRANTY OF TITLE | | 6 |
| 4.1. | Title Warranties | 6 |
| 4.2. | Title and Risk of Loss | 6 |
| ARTICLE V FORCE MAJEURE | | 7 |
| 5.1. | Suspension of Obligations | 7 |
| 5.2. | Definition of Force Majeure | 7 |
| ARTICLE VI TAXES | | 7 |
| 6.1. | Taxes | 7 |
| 6.2. | Reimbursement | 7 |
| ARTICLE VII TERM AND TERMINATION | | 7 |
| 7.1. | Term and Termination | 7 |
| 7.2. | Early Termination | 7 |
| 7.3. | Effect of Termination | 8 |
| ARTICLE VIII GENERAL PROVISIONS | | 8 |
| 8.1. | Waivers | 8 |
| 8.2. | Assignment; Binding Effect | 8 |
| 8.3. | Joinder | 8 |
| 8.4. | Governing Law; Severability | 9 |
| 8.5. | Further Assurances | 9 |
| 8.6. | Counterparts | 9 |
| 8.7. | Notices | 9 |
| 8.8. | Remedies | 10 |
| 8.9. | Disputes | 10 |
| 8.10. | Expenses | 11 |
| 8.11. | Third Party Beneficiaries | 11 |
| 8.12. | Conflict | 12 |
| 8.13. | Subchapter K | 12 |
| 8.14. | Entire Agreement; Integrated Transaction | 12 |
| 8.15. | Sanchez Support | 12 |
| Annex I | Definitions | |
| Exhibit A | Springfield Agreements Allocable Share | |
| Exhibit B | Midstream Contracts | |

# HYDROCARBONS PURCHASE AND MARKETING AGREEMENT

This **HYDROCARBONS PURCHASE AND MARKETING AGREEMENT** (this "Agreement"), dated as of January 12, 2017 (the "Effective Date"), is between SN EF Maverick, LLC, a Delaware limited liability company ("Marketer"), SN EF UnSub, LP, a Delaware limited partnership ("Producer"), and solely for purposes of Sections 8.15 and 8.16 hereof, Sanchez Energy Corporation, a Delaware corporation ("Sanchez"). Each of Marketer and Producer is referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A. The Parties entered into that certain Purchase and Sale Agreement, dated effective as of July 1, 2016, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko"), Aguila Production, LLC ("Aguila"), and the Parties, (together with any purchase agreement that may be entered into with Korea National Oil Corporation ("KNOC") pursuant to certain tag-along rights, the "Purchase Agreement"), pursuant to which Aguila and the Parties collectively purchased all of the working interests of Anadarko and KNOC to the extent that it exercises its tag-along rights, collectively in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas (collectively, the "Assets").

B. Marketer desires to purchase from Producer, and Producer desires to sell to Marketer, the oil, gas and other Hydrocarbons produced from and attributable to the Working Interests in the Assets acquired by Producer under the Purchase Agreement as well as other Working Interests acquired by Producer after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts (such interests, "Producer's Interests"), which Marketer will gather, process, transport, market and sell, as applicable, on the terms and conditions set forth in this Agreement and the Midstream Contracts.

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1. Specific Definitions. Capitalized terms used in this Agreement have the meanings assigned to such terms in Annex I.

1.2. Construction. Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular includes the plural, and the plural includes the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof refer to the corresponding article, section or subdivision of this Agreement unless specific reference is made to articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

## ARTICLE II
## PURCHASE AND SERVICES

2.1. Purchase by Marketer. On each Day during the Term, Producer shall sell and deliver to Marketer, and Marketer shall purchase and receive from Producer, at the Receipt Points, all Hydrocarbons produced from and attributable to Producer's Interests, in accordance with the terms and conditions of this Agreement, other than Producer's Reserved Hydrocarbons.

2.2. Limitations. Marketer shall not, without Producer's prior written consent (such consent not to be unreasonably withheld) and only to the extent relating to or affecting Producer's Hydrocarbons, (1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to Producer's Hydrocarbons, (ii) impose minimum volume, take or pay, demand charges, reservation fees, or deficiency payments obligations or extensions thereof, or (iii) fix prices for the resale of Producer's Hydrocarbons for a term longer than six months (or that cannot be terminated without penalty upon six months' notice or less) or (b) otherwise have an adverse effect, in any material respect, on Producer, in each case, except to the extent the items set forth in in clauses (a) or (b) are required by Law, (2) enter into any contract with an Affiliate of Marketer that is on terms materially less favorable to Producer than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of Producer that are in excess of $20 million in any calendar year or (3) enter into any Midstream Contract after the Effective Date if such contract (a) is not also applicable to Sanchez's Hydrocarbons and Aguila's Hydrocarbons on a proportional basis (based upon reasonable forecasts of anticipated production that pertain to the Midstream Contract) or (b) has not been expressly approved by the independent members of the Sanchez board of directors or by the working interest owners that are subject to production marketing agreements or elections applicable to such Midstream Contract; *provided* that, if Producer does not consent or object in writing to Marketer's written request to undertake any of the actions described in preceding clauses (1) through (3) within 10 Business Days of Producer's receipt of such written request from Marketer, Producer shall be deemed to have consented to such action for purposes of this Section 2.2.

2.3. Standard of Care. Marketer shall purchase and provide services for Producer's Hydrocarbons delivered hereunder in accordance with all applicable Laws and in compliance with the terms of the applicable Midstream Contracts, and shall use commercially reasonable efforts to (a) obtain market rates in the area under any new contracts for the resale of Producer's Hydrocarbons, and (b) avoid any imbalances or scheduling variances and any penalty charges associated therewith under the Midstream Contracts. Producer's Hydrocarbons must be gathered, processed, transported and sold on terms and conditions no less favorable to Producer than the terms and conditions applicable to Sanchez's Hydrocarbons.

2.4. Repurchase Right. From and after April 1, 2023, for so long as the Springfield Agreements are in force and effect, Producer shall have the right for any Month, exercisable from time to time upon written notice to Marketer at least ten (10) days prior to the first day of such Month, to repurchase from Marketer at the applicable Delivery Point (as defined in the applicable Springfield Agreement) all volumes of Producer's Hydrocarbons delivered to Marketer at the Receipt Points in such Month less any LAUF or Line Fill deducted under the Springfield Agreements. If Producer exercises the repurchase right for any Month as to all or part of Producer's Hydrocarbons, then (a) Marketer shall redeliver, or cause to be redelivered, such volumes of Producer's Hydrocarbons to Producer at such applicable Delivery Point and transfer title to such Producer's Hydrocarbons to Producer at such applicable Delivery Point and (b) Producer shall pay Marketer an amount equal to Producer's Allocable Share of the Springfield Agreements for that Month attributable to such Hydrocarbons repurchased by Producer in such month. Notwithstanding the above, if Marketer has entered into Midstream Contracts that are attributable to Producer's Hydrocarbons and such contracts were approved by Producer prior to the exercise of its repurchase right hereunder, then Producer will not be entitled to exercise its repurchase rights

hereunder for the portion of Producer's Hydrocarbons committed to such approved Midstream Contracts during the term of such Midstream Contracts.

2.5. Reporting. Marketer shall consult with and provide reports to Producer on a quarterly basis regarding marketing activities concerning Producer's Hydrocarbons. Such reports will contain such information, details, and supporting documentation as Producer may reasonably request, and shall include (a) a schedule identifying the markets into which each of Producer's Hydrocarbons and Sanchez's Hydrocarbons are being sold and the realized net back pricing being received by each, broken down by sales point and by each Midstream Contract, (b) amendments to any of the Midstream Contracts pursuant to which Producer's Hydrocarbons are being gathered, processed, transported or sold, (c) upon request from Producer, any reports or other information provided to Marketer under the terms of any of the Midstream Contracts and (d) any material issues or disputes arising under such agreements. In addition to the foregoing reporting requirements, and the provisions of Section 2.6, prior to the Redemption Date, Marketer shall promptly deliver to GSO copies of all material notices delivered to Marketer under any Marketing Contract and Midstream Contract by the applicable counterparty with respect to Producer's Hydrocarbons.

2.6. Right to Cure. If Marketer defaults in the performance of any of its obligations under the Midstream Contracts, or upon the occurrence or non-occurrence of any event or condition under the Midstream Contracts that would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable the applicable counterparty to terminate or suspend its obligations or exercise any other right or remedy under such contracts or under applicable Law (a "Marketer Event"), then Marketer shall (a) promptly notify Producer of such Marketer Event, (b) use its commercially reasonable efforts to cause the applicable counterparty to allow Producer to cure such Marketer Event with respect to Producer's Hydrocarbons, and (c) use its commercially reasonable efforts to continue to perform each of Marketer's other obligations under the Midstream Contracts.

**ARTICLE III**
**PRICE AND PAYMENT**

3.1. Price. For each Month, in full consideration for Marketer's purchase of Producer's Hydrocarbons hereunder, Marketer shall pay to Producer an amount equal to (i) the payments received by Marketer from Third Parties upon the resale of Producer's Hydrocarbons and all constituents thereof (including any residue gas, condensate, and natural gas liquids, as applicable) during such Month after being gathered, treated, transported, and processed under the Midstream Contracts less (ii) Producer's Allocable Share of Midstream Charges for such Month less any actual or estimated deductions for the amounts set forth in Section 3.2(c)(ii) and (iii) (such amount, the "Net Amount"). Positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information.

3.2. Statements and Payments.

(a) Statements and Payments. Marketer shall pay to Producer the Net Amount for any given Month consistent with Marketer's normal business practice under similar circumstances, on or before the date that is 10 days after the date on which Marketer actually receives readily available funds for Producer's Hydrocarbons sold by Marketer or its Affiliates for such calendar Month from the applicable purchasers of such Producer's Hydrocarbons (such date, the "Due Date"), along with a detailed statement describing such amounts payable to Producer hereunder in such Month.

(b) Late Payments. Any amounts not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date to but excluding the date the delinquent amount is paid in full.

(c) Collection and Payment. Marketer shall use commercially reasonable efforts to (i) collect all production funds from the purchasers of such Producer's Hydrocarbons, (ii) arrange for the timely payment of severance taxes to any Governmental Authorities, (iii) make timely payment to royalty owners and third party working interest owners, and (iv) remit to Partnership its net proceeds from the sale of Producer's Hydrocarbons after making all necessary or appropriate allocations and distributions in connection with the receipt of such proceeds in accordance with Section 3.1. The Parties recognize that the calculation and payment of severance taxes and royalty payments set forth above may be based upon estimates at the time of the payment of the Net Amount in accordance with Section 3.1 and that positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information regarding actual severance tax and royalty payments.

(d) Notices. Marketer shall provide written notice to Producer not less than five Business Days prior to entering into, amending, or terminating any Midstream Contract.

3.3. Audit Rights. Upon not less than 10 Days' prior written notice to the other Party, either Party or its or representative, at reasonable times during business hours and at its own expense, may audit the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge or computation made under or pursuant to this Agreement.

3.4. Statement Errors. If an error is discovered in the amount shown to be due on any statement rendered by Marketer hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than 30 Days after the discovery of the error. If a dispute arises as to the amount payable in any invoice rendered hereunder, the disputed statement must nevertheless be paid in full, but payment will not waive the payor's right to dispute such statement in accordance with this Section 3.4. Any invoice dispute or statement adjustment must be in writing and must state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment must be made within 15 Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date to but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two years after the date on which the statement is rendered. The provisions of Section 3.3 and this Section 3.4 will survive the termination of this Agreement for the later of (a) 24 Months following the date on which such termination occurred, or (b) until a dispute initiated within such 24-Month period is finally resolved.

3.5. Setoff and Recoupment. Upon the occurrence of either or both of (a) an Event of Default of a Party, or (b) a circumstance under clauses (a), (b), (c) of Section 3.6(a), either Party may with respect to Section 3.5(a) and Producer may with respect to Section 3.5(b), in its sole discretion and without limiting any other rights or remedies, undertake any one or all of the following actions: (i) such Party may exercise recoupment by retaining, freezing, holding, and/or liquidating any proceeds that would otherwise be payable to the other Party to satisfy and apply to any amounts owed by such other Party under this Agreement or applicable Law as of the time of such recoupment or at any later time; and/or (ii) such Party may exercise setoff by retaining, freezing, holding, and liquidating any proceeds that would be otherwise deliverable or payable to such other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from such other Party to the other Party under this Agreement or applicable Law as of the time of the setoff or offset or at any later time. Should a Party elect to exercise its rights under this Section 3.5, such Party shall notify the other Party in writing, within 10 Days of such recoupment, setoff, and/or offset; provided, however, such Party will not be required to provide such other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party hereby agrees to (x) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable Law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (y) not oppose a motion by a Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 3.5, that any recoupment exercised as provided for herein will be considered to be within a

single transaction. The rights granted to the Parties pursuant to this Section 3.5 are in addition to any rights of recoupment, setoff, and/or offset the Parties may be otherwise entitled.

3.6. Deposit of Producer's Proceeds and Security Interest.

(a) Deposit of Producer Proceeds. If (a) an Investor Redemption Event occurs, (b) Marketer has failed to pay amounts owed to Producer under this Agreement within five (5) days of the applicable Due Date or (c) Producer otherwise has reasonable grounds for insecurity regarding the performance by Marketer of any obligation under this Agreement (with clause (c) being a "Basis For Requesting Assurance"), then, within 10 Business Days after written notice from Producer, Marketer and its Affiliates will direct all purchasers of Producer's Hydrocarbons to deposit amounts owed by such purchasers for Producer's Hydrocarbons into (a) a bank account or accounts designated by Producer (in which case Producer shall remit to Marketer Producer's Allocable Share of Midstream Charges or any other costs owed by Producer to Marketer) or (b) a mutually agreed escrow account (in which case Producer shall be entitled to receive amounts due each month under Section 3.1 and Marketer shall be entitled to the remainder of the amounts from such account). A Basis for Requesting Assurance will include, without limitation, any reasonable grounds for insecurity with respect to the performance of Marketer and/or any grounds that might constitute a basis for requesting adequate assurance of performance under Section 2.609 of the Uniform Commercial Code.

(b) Security Interest. Marketer is marketing Producer Hydrocarbon's on Producer's behalf and holding all proceeds from the sale of Producer's Hydrocarbons in trust on behalf of Producer. In addition, Producer retains, and Marketer grants to Producer, a first priority lien and security interest (subject to Permitted Liens (as defined below)) on (a) all of Producer's Hydrocarbons purchased under this Agreement, (b) all proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer and (c) all accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer (the "Collateral"). Marketer shall have the right to resell all of Producer's Hydrocarbons without obtaining a release of the lien or other permission from Producer. Upon the resale of Producer's Hydrocarbons, the lien and security interests retained and granted above shall be completely and automatically released by Producer without the need for execution of any document or instrument and, in lieu thereof, shall affix to the proceeds and accounts receivable resulting from the resale of Producer's Hydrocarbons to such purchasers. Producer may enforce its lien and security interest and exercise any and all of the rights and remedies available to a secured party under the Uniform Commercial Code, in addition to all of the rights and remedies otherwise provided by Law. Producer may file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Marketer, in each case where permitted by Law, and may take any and all other actions necessary to secure its interest in the Collateral. In addition, Marketer agrees that from time to time it will promptly execute and deliver all instruments and documents, and take all further actions, that Producer may reasonably request as being necessary or desirable to perfect and protect the security interest granted or purported to be granted hereby or to enable Producer to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Marketer will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as Producer may request as being necessary or desirable in order to perfect and preserve the security interests granted or purported to be granted hereby. The lien and security interest granted herein are in addition to any statutory or common law liens on Producer's Hydrocarbons in favor of Producer. Marketer warrants that, except as set forth in the sentence after this sentence, it has not consensually granted and will not consensually grant any liens or security interests on the Collateral to any other Person. Without affecting any priority of the liens and security interests on the Collateral granted to it under this Agreement or arising pursuant to Section 9.343 of the Texas Business and Commerce Code, Producer agrees and acknowledges that Marketer may, as security for the "Obligations" as defined in the Credit Agreement (defined below) and any refinancing thereof or as security for any obligations under any junior lien indebtedness that is subject to a security grant consistent with such Credit Agreement or the refinancing thereof, grant a security interest over all of Marketer's assets, including, without limitation, Producer's Hydrocarbons purchased under

this Agreement, any deposit account of Marketer in which proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer may be deposited and any accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer. As used in the preceding sentence, "Credit Agreement" means the Second Amended and Restated Credit Agreement among Sanchez, as borrower, Royal Bank of Canada, as administrative agent, and others, as amended to date and as the same may hereafter be amended, modified, refinanced, replaced, restated or supplemented. As used in this Section 3.6(b), "Permitted Liens" means (a) liens for taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like liens arising by operation of law incident to the exploration, development, operation and maintenance of oil and gas properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (c) Liens (as defined in the Credit Agreement) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board (as defined in the Credit Agreement) and no such deposit account is intended by the Borrower (as defined in the Credit Agreement) or any of its Subsidiaries (as defined in the Credit Agreement) to provide collateral to the depository institution and (d) judgment liens.

3.7. Marketing Transition Services Agreement. Pursuant to the terms of the Marketing Transition Services Agreement, the Provider (as that term is defined in such agreement) will provide Marketer certain marketing transition services, including the purchase and sale of Producer's Hydrocarbons. For avoidance of doubt, the Parties agree that the billing and payment provisions set forth in this Article III will apply during the period in which the Marketing Transition Services Agreement is in effect, including the payment of amounts to Producer for the resale of Producer's Hydrocarbons and the allocation of demand charges under the Midstream Contracts.

## ARTICLE IV
## WARRANTY OF TITLE

4.1. Title Warranties.

(a) Producer represents and warrants to Marketer that Producer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Marketer hereunder, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes, subject to the performance by the Manager of its obligations under the MSA.

(b) If Producer elects to repurchase Producer's Hydrocarbons under Section 2.4, then Marketer shall represent and warrant to Producer that Marketer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Producer under Section 2.4, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes.

4.2. Title and Risk of Loss. Title to and risk of loss of Producer's Hydrocarbons purchased by Marketer from Producer hereunder will pass from Producer to Marketer at the inlet of Springfield's measurement facilities at the Receipt Points under the Springfield Agreements or at such other receipt points as the Parties agree. As between the Parties, title to and risk of loss of Producer's Hydrocarbons shall remain with Marketer thereafter unless such Producer's Hydrocarbons are repurchased by Producer under Section 2.4, in which case title to and

risk of loss of any such repurchased Producer's Hydrocarbons shall pass to Producer at the applicable Delivery Points under the Springfield Agreements or at such other delivery points as the Parties agree.

**ARTICLE V**
**FORCE MAJEURE**

5.1. Suspension of Obligations. If either Producer or Marketer is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Party, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder), so far as they are affected by such Force Majeure, will be suspended during the continuance of any inability so caused, but for no longer period, and such cause must be remedied with all reasonable dispatch.

5.2. Definition of Force Majeure. The term "Force Majeure" means any event or circumstance not reasonably within the control of the Party claiming suspension declared as Force Majeure by a counterparty to any of the Midstream Contracts.

**ARTICLE VI**
**TAXES**

6.1. Taxes. Manager under the MSA shall pay, on behalf of Producer, to the appropriate taxing authorities severance and other Taxes levied on Producer's Hydrocarbons prior to the delivery of such Producer's Hydrocarbons to the Receipt Points hereunder. Marketer or its Affiliates shall pay any and all Taxes levied on Producer's Hydrocarbons after title to such Hydrocarbons has transferred to Marketer.

6.2. Reimbursement. If Marketer or any of its Affiliates pays or remits any Tax for or on behalf of Producer, including severance Taxes on production, then Marketer may deduct such amounts in determining the Net Amount due hereunder as shown on the Monthly statement described in Section 3.2.

**ARTICLE VII**
**TERM AND TERMINATION**

7.1. Term and Termination. The term of this Agreement will commence on the Effective Date and, unless otherwise agreed by the Parties or earlier terminated in accordance with this Section 7.2, will continue until the earlier of (i) the date of termination of both Springfield Agreements and (ii) December 31, 2034 (the "Term").

7.2. Early Termination.

(a) Either Party may terminate this Agreement effective immediately upon notice to the other Party if the other Party (or its Affiliates, with respect to Marketer) (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer in a court of competent jurisdiction seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of all or any substantial part of such its assets or properties; or (vii) is liquidated and dissolved; or

(b) Either Party may terminate this Agreement upon notice to the other Party if (i) such other Party is in material breach of this Agreement and such breach is not remedied within 30 days after such other Party's receipt of such notice or (ii) all of the Midstream Contracts are terminated or otherwise no longer in full force and effect; provided that Marketer may not terminate this Agreement pursuant to this Section 7.1(b) (x) if at the time of such breach, Sanchez and its Affiliates hold a majority of the board of directors of SN EF UnSub, GP or (y) such breach was caused by a breach of Manager under the MSA; or

(c) Following an Investor Redemption Event, Producer may terminate this Agreement in whole or in part by written notice to Marketer, provided that Producer may not terminate its obligation related to the Springfield Agreements (including to pay to Marketer Producer's Allocable Share of the Springfield Agreements) without Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain if requested by Producer.

7.3. Effect of Termination. The expiration or termination of this Agreement, for any reason, will not release either Party from any obligation or Liability to the other Party, including any payment obligation, that has already accrued hereunder. Following early termination under Sections 7.2(a), 7.2(b), or 7.2(c) upon Producer's request, Marketer and its Affiliates shall use commercially reasonable efforts to work with Producer and the applicable counterparties to partially assign, or to enter into replacements for, any of the Midstream Contracts identified by Producer to assist in the continued delivery of Producer's Hydrocarbons following the termination of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1. Waivers. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

8.2. Assignment; Binding Effect. Neither Party may assign its rights or interests under this Agreement, or delegate any duties or obligations hereunder, without the prior written consent of the other Party, which consent may be withheld by the other Party in its sole discretion; *provided* that consent is not required for an assignment of rights or interests under this Agreement by a Party (a) to an Affiliate of a Party (without releasing the assigning Party of its obligations under this Agreement) or (b) subject to obtaining Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain, to a Third Party in connection with a conveyance of all or a part of Producer's Interests. This Agreement is binding upon and inures to the benefit of the Parties and their respective legal representatives, successors, and permitted assigns.

8.3. Joinder. Marketer shall cause any of its Affiliates that acquire or own Working Interests in jointly owned properties with Producer after the Effective Date to ratify and become a party to this Agreement by an amendment executed and delivered by the Parties and such Affiliate or Affiliates.

8.4. Governing Law; Severability.

(a) **THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED AND WILL BE CONSTRUED, INTERPRETED AND GOVERNED PURSUANT TO AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES THAT , IF APPLIED, MIGHT PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement, or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will not be affected thereby and that provision will be enforced to the greatest extent permitted by applicable Law.

8.5. Further Assurances. Subject to the terms and conditions set forth in this Agreement, each of the Parties shall use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

8.6. Counterparts. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, will be deemed an original, and all of which will constitute but one and the same instrument.

8.7. Notices. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement must be in writing and sent to the address of the Party set forth below, or to such other more recent address of which the sending Party actually has received written notice. Any notice or communication provided to Producer pursuant to this Agreement shall be provided concurrently to GSO by electronic email:

(a) if to Marketer, to:

SN EF Maverick, LLC
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

(b) if to Producer, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

prior to Redemption Date, with a copy to (which shall not constitute notice):
GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com
With a copy to:
Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com
(c) if to Sanchez, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

Each such notice or other communication must be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

8.8. Remedies. Except as provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party will be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties shall not assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

8.9. Disputes.

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR

Case 22-90341 Document 683-14 Filed in TXSB on 03/27/23 Page 40 of 74

PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), WILL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES MUST BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY WILL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL WILL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN WILL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

8.10. Expenses. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.11. Third Party Beneficiaries.

(a) Prior to the Redemption Date, GSO and its Affiliates shall be express third party beneficiaries of Producer's rights under this Agreement. Other than as set forth in the preceding sentence or in clause (b) below, the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns, and this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities or obligations are owed by a Party, or (b) any liquidator, trustee or creditor acting on behalf of any Party, and no such creditor or any other Person will have any rights under this Agreement.

(b) Subject to clause (a) above, notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith may be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

8.12. Conflict. In the event of a conflict between the terms of this Agreement and the terms of any joint operating agreement applicable to the Producer Interests, the terms of this Agreement will control as between the Parties.

8.13. Subchapter K. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code.

8.14. Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its

Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

8.15. Sanchez Support. Sanchez is executing this Agreement to evidence its agreement to cause Marketer to perform and comply with Marketer's obligations under Section 3.1, Section 3.2, Section 3.6, and Section 8.3. Sanchez hereby guarantees the performance of Marketer under such provisions and agrees to be directly liable to Producer under such provisions in the event of any breach by Marketer.

8.16. Fees to Marketer and Sanchez. In consideration for (a) certain services provided by Marketer to Producer, Producer hereby agrees to pay to Marketer an annual fee equal to $50,000 and (b) certain services provided by Sanchez to Producer, Producer hereby agrees to pay to Sanchez an annual fee equal to $50,000, which such fees, in the case of preceding clauses (a) and (b), shall be due and payable by Producer to Marketer and Sanchez, as applicable, on the Effective Date and each one year anniversary of the Effective Date.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

Case 22-90341 Document 683-4 Filed in TXSB on 03/17/23 Page 104 of 174

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**SN EF MAVERICK, LLC:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UnSub GP, LLC, its general partner
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Solely for purposes of Sections 8.15 and 8.16,**
**SANCHEZ ENERGY CORPORATION:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

Case 22-90341 Document 683-14 Filed in TXSB on 03/07/23 Page 407 of 1274

**Annex I**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" (including its derivatives and similar terms) means possessing the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise. Notwithstanding the foregoing, Marketer and its Affiliates, on the one hand, and Producer and its Affiliates, on the other hand, will not be considered Affiliates of one another. For purposes of this Agreement, Sanchez Oil & Gas Corporation and its Affiliates, including all member of the Sanchez family, shall be deemed to be Affiliates of Marketer.

"Agreement" has the meaning set forth in the preamble.

"Aguila" has the meaning set forth in the recitals.

"Aguila's Hydrocarbons" means the Hydrocarbons, including all constituencies thereof, produced from the interests acquired by Aguila under the Purchase Agreement.

"Anadarko" has the meaning set forth in the recitals.

"Assets" has the meaning set forth in the recitals.

"Basic Documents" has the meaning given to such term in the Securities Purchase Agreement.

"Basis for Requesting Assurance" has the meaning set forth in Section 3.6(a).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"Central Time" means Central Standard time, as adjusted for Central Daylight time.

"Claims" means all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

"Collateral" has the meaning given to such term in Section 3.6.

"Day" or "Daily" means a period of 24 hours, commencing at 7:00 a.m., Central Time, on a calendar day and ending at 7:00 a.m., Central Time, on the next succeeding calendar day.

"Delivery Point" means the "Delivery Points" as defined and listed in the Springfield Agreements, and any future Delivery Point thereunder.

"Due Date" has the meaning set forth in Section 3.2(a).

"Effective Date" has the meaning set forth in the preamble.

"Event of Default" means, in respect of any Party, the failure to remedy, within 30 days of receipt of written notice thereof from any other Party, the material non-performance of or material non-compliance with any agreements, obligations or undertakings of such Party contained in this Agreement.

"Force Majeure" has the meaning set forth in Section 5.2.

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means GSO ST Holdings LP, a Delaware limited partnership.

"Hydrocarbons" means oil, gas, natural gas liquids, condensate, and other gaseous and liquid hydrocarbons, or any combination of the foregoing.

"Interest Rate" means an annual rate of interest equal to 2% above the prime rate published by *The Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

"Investor Redemption Event" has the meaning set forth in the LP Agreement.

"Joint Development Agreement" means the Joint Development Agreement to be entered into, among Producer, Aguila, and Marketer at the time of the closing pursuant to the Purchase Agreement.

"KNOC" has the meaning given to such term in the recitals.

"LAUF" means lost, unaccounted for, fuel and other losses of Producer's Hydrocarbons in connection with the services provided under an applicable Midstream Contract, in each case to the extent provided under the applicable Midstream Contract.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Line Fill" means line fill and tank bottom inventory and working tank inventory requirements, in each case required to be delivered to the applicable counterparty under a Midstream Contract.

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"LP Agreement" means the Amended and Restated Agreement of Limited Partnership of SN EF Unsub, LP to be entered into at the time of the closing pursuant to the Purchase Agreement, as may be amended.

"Manager" means the Manager under the MSA.

"Marketer" has the meaning set forth in the preamble.

"Marketing Transition Services Agreement" means the Marketing Transition Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement by and among Marketer, Anadarko Energy Services Company, Kerr-McGeee Oil & Gas Onshore LP and Anadarko E&P Onshore LLC and Sanchez Energy Corporation solely for purposes of defined provisions in the agreement, pursuant to which certain marketing transition services will be provided to Marketer.

"Midstream Contracts" means the contracts listed on Exhibit B hereto, including any amendments thereto, and any gathering, processing, transportation or sales agreements entered into after the Effective Date, including any amendments thereto, relating to the Producer's Interests and the Hydrocarbons produced therefrom.

"Month" or "Monthly" means a period of time beginning at 7:00 a.m., Central Time on the first Day of a calendar month and ending at 7:00 a.m., Central Time on the first Day of the next succeeding calendar month.

"MSA" means the Management Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement between Sanchez Oil & Gas Corporation and Producer.

"Net Amount" has the meaning set forth in Section 3.1.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 8.11(b).

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Producer" has the meaning set forth in the preamble.

"Producer's Allocable Share of Midstream Charges" means the sum of Producer's Allocable Share of the Springfield Agreements, plus Producer's Allocable Share of the Other Contracts.

"Producer's Allocable Share of the Other Contracts" means, for all Midstream Contracts other than the Springfield Agreements, a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to the counterparties under such Midstream Contracts during a Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to the counterparties under such Midstream Contracts during such Month, multiplied by the sum of (a) any deficiency payments or other similar fees, payments, or penalties resulting from failure to achieve minimum volume obligations that are paid by Marketer under such Midstream Contracts, (b) any commodity charges, and LAUF and Line Fill volumes incurred under such contracts that are borne by Marketer under such contracts and (c) any other amounts invoiced to Marketer under such Midstream Contracts. Notwithstanding the foregoing, (1) other than with respect to the Firm Intrastate Transportation Agreement dated January 17, 2012 between Eagle Ford Midstream, LP and Anadarko Energy Services and Transportation Services Agreement dated March 1, 2012 between Enterprise Products

Operating LLC and Anadarko Energy Services Company for the Intrastate Movement of NGLs, Producer shall not be obligated to bear any deficiency payment or other similar feeds, payments or penalties in (a) above in an amount greater than 40% of any such payments, fees or penalties that are attributable to the aggregate volume of Producer's Hydrocarbons and Marketer's and its Affiliates' Hydrocarbons produced from the Producer Interests and Sanchez's Interests and (2) Marketer shall not terminate or amend the obligation of other producers under producer marketing agreements or elections applicable to such Midstream Contracts that would increase Producer's Allocable Share of the Other Contracts in any material respect without the consent of Producer.

"Producer's Allocable Share of the Springfield Agreements" means, for as long as Marketer remains a party to the Springfield Agreements, the sum of: (i) the product of the Allocable Springfield Demand Rate in the applicable Month multiplied by the Monthly Minimum Volume Commitment (as defined in each of the Springfield Agreements) under each Springfield Agreement for such Month; (ii) the product of the Allocable Springfield Commodity Rate in the applicable Month multiplied by the volumes of Producer's Hydrocarbons delivered under each Springfield Agreement during such Month; (iii) any LAUF and Line Fill volumes retained by Springfield under the terms of the Springfield Agreements that are attributable to Producer's Hydrocarbons delivered under the Springfield Agreements; and (iv) any other amounts invoiced to Marketer under Article VII of the Springfield Agreements and attributable to Producer's Hydrocarbons being delivered under the Springfield Agreements. For purposes of this definition, (a) "Allocable Springfield Demand Rate" in any Month shall be equal to the applicable Demand Rate (as defined in each of the Springfield Agreements) multiplied by a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to Springfield under each applicable Springfield Agreement during such Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to Springfield under each applicable Springfield Agreement during such Month and (c) the Allocable Springfield Commodity Rate in any Month shall be equal to the applicable Commodity Rate (as defined in each of the Springfield Agreements); *provided* that, in any given Month, if the Total Allocable Rate for such Month is (x) greater than the "Max Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be equal to the product of the "Max Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month or (y) less than the "Min Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be the product of the "Min Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month.

"Producer's Hydrocarbons" means the Hydrocarbons produced from and attributable to Producer's Interests, including all constituencies thereof.

"Producer's Interests" has the meaning set forth in the recitals.

"Purchase Agreement" has the meaning set forth in the recitals.

"Receipt Points" means (i) the "Receipt Points" as defined and listed in the Springfield Agreements, and any future Receipt Point thereunder and (ii) for Hydrocarbons that are not delivered to Springfield, the first point at which Marketer delivers such Hydrocarbons from the wellhead to the facilities of a counterparty under a Midstream Contract.

"Redemption Date" is defined in the MSA.

"Representative" means officers, directors, employees, and other representatives of the referenced entity and its Affiliates.

Case 22-90341 Document 683-24 Filed in TXSB on 03/04/23 Page 41 of 124

"Reserved Hydrocarbons" means the volumes of Hydrocarbons that Producer does not deliver under the Springfield Agreements that are associated with field and other similar uses of Producer that are expressly reserved or excepted from the definition of Dedicated Production thereunder.

"Sanchez" has the meaning set forth in the preamble.

"Sanchez's Hydrocarbons" the Hydrocarbons produced from Sanchez's Interests, including all constituencies thereof.

"Sanchez's Interests" means the interests in the Assets acquired by Marketer under the Purchase Agreement as well as other Working Interests acquired by Marketer or its Affiliates after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts.

"Springfield" means Springfield Pipeline LLC, or its permitted successors or assigns as party to the Springfield Agreements.

"Springfield Agreements" means (1) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield and Sanchez, and (2) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and Sanchez, in each case to be entered into at the termination of the Marketing Transition Services Agreement and as each such contract may be amended from time to time.

"Taxes" means all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"Term" has the meaning set forth in Section 7.1.

"Third Party" means any Person other than a Party or one of their Affiliates.

"Total Allocable Rate" means, for any given Month, the rate calculated separately for each of the Springfield Agreements equal to (a) the Producer's Allocable Share of the Springfield Agreement divided by (b) the total volumes of Producer's Hydrocarbons delivered to Springfield under such Springfield Agreement during such Month.

"Securities Purchase Agreement" the Securities Purchase Agreement, dated January 12, 2017, among Producer, Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub GP, LLC, SN EF UnSub Holdings, LLC, GSO ST Holdings Associates LLC and GSO ST Holdings LP.

"Working Interest" means with respect to any lease or well or wellpad, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease, well, or wellpad.

* * *

**<u>Exhibit A</u>**

**Springfield Agreements Allocable Share**

| | **WES Gas Fee ($/mcf)** | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 1.14 | 1.80 |
| 2017 | 1.04 | 1.58 |
| 2018 | 0.94 | 1.37 |
| 2019 | 0.86 | 1.20 |
| 2020 | 0.85 | 1.17 |
| 2021 | 0.87 | 1.21 |
| 2022 | 0.83 | 1.12 |
| 2023 | 0.80 | 1.04 |
| 2024 | 0.77 | 0.98 |
| 2025 | 0.73 | 0.89 |
| 2026 | 0.71 | 0.84 |
| 2027 | 0.69 | 0.79 |
| 2028 | 0.69 | 0.78 |
| 2029 | 0.68 | 0.76 |
| 2030 | 0.68 | 0.75 |
| 2031 | 0.70 | 0.78 |
| 2032 | 0.71 | 0.80 |
| 2033 | 0.72 | 0.81 |
| 2034 | 0.72 | 0.81 |

Case 22-90341 Document 683-4 Filed in TXSB on 03/02/23 Page 4 of 274

| | WES Oil Fee ($/bbl) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 2.41 | 3.67 |
| 2017 | 2.05 | 2.90 |
| 2018 | 1.82 | 2.42 |
| 2019 | 1.71 | 2.18 |
| 2020 | 1.74 | 2.22 |
| 2021 | 1.73 | 2.19 |
| 2022 | 1.73 | 2.15 |
| 2023 | 1.65 | 1.97 |
| 2024 | 1.55 | 1.76 |
| 2025 | 1.54 | 1.71 |
| 2026 | 1.53 | 1.68 |
| 2027 | 1.54 | 1.67 |
| 2028 | 1.53 | 1.64 |
| 2029 | 1.54 | 1.63 |
| 2030 | 1.56 | 1.66 |
| 2031 | 1.59 | 1.70 |
| 2032 | 1.61 | 1.73 |
| 2033 | 1.63 | 1.75 |
| 2034 | 1.64 | 1.76 |

**Exhibit B**

**Midstream Contracts**

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation | 10/1/2010 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| Anadarko E&P Company LP | Texas Pipleline LLC (Howard) | Firm Transportation (gas) | 10/5/2010 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| Anadarko Energy Services Company | Flint Hills Resources, LP | Crude Oil Supply Agreement (Sales Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | Arrowhead Gathering Company, L.P. | Crude Oil Throughput and Deficiency Agreement (TPT Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 2) | 6/28/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Pipeline, LP | Crude Oil T&D (NuStar) (TPT Tranche 2) | 7/2/2012 |
| Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE) (TPT Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Plains Marketing, LP | Crude Oil Purchase Contract | 4/1/2014 |
| Anadarko E&P Onshore LLC | Shell Trading (US) Compnay | Crude Sales Contract | 12/1/2016 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Condensate Stabilization Agreement | 7/1/2014 |
| Anadarko E&P Onshore LLC | Plains South Texas Gathering LLC | Shipping Agreement | 5/1/2014 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Transportation Service Agmnt | 3/1/2013 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Gas Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Oil Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 1) | 9/1/2010 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 2) | 2/1/2011 |
| Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |
| Anadarko E&P Onshore LLC | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Shoup) | 3/1/2013 |
| Anadarko E&P Onshore LLC | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2017 |
| Anadarko E&P Company LP | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2011 |
| Anadarko E&P Onshore LLC | Texas Pipeline LLC | NGL Bank Service Agreement | 7/25/2013 |
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation Agreement for NGPA Section 311 Service, No. 9138E | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | Purchase Contract | 10/13/2016 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Master Terminal Services Agreement | 7/2/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Terminal Services Schedule No. Anadarko E&P Company LP – 001 | 7/2/2012 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Gas Gathering (Clear Springs) | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 9/9/2015 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P | Gas Processing Agreement | 8/1/2012 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement | 8/1/2015 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purch. Agreement | 9/1/2008 |
| Anadarko E&P Company LP | Trimac Transportation Central Inc. | Crude Trucking | 3/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | NGL Marketing | 10/13/2016 |

**NAESB Contract Confirmations**

| Gas Sales | Counterparty | Volume (MMBtu/d) | End Date |
|---|---|---|---|
| | Air Liquide (255602) | 12,500 | 3/31/2017 |
| | Air Liquide (255604) | 12,500 | 3/31/2017 |
| | Diamond Shamrock (248974) | 6,045 | 8/31/2017 |
| | Kinder Morgan (255681) | 10,000 | 3/31/2017 |
| | Repsol (244011) | 25,000 | 3/31/2017 |
| | Repsol (255144) | 10,000 | 3/31/2017 |
| | Techgen (221544) | 30,000 | 9/31/2021 |
| | Valero (248973) | 12,060 | 8/31/2017 |
| | Valero (248975) | 4,020 | 8/31/2017 |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 |

# Exhibit E

Sanchez Energy Corporation
1000 Main St, Suite 3000
Houston, Texas 77002

January 12, 2017

SN EF UnSub, LP
1000 Main Street, Suite 3000
Houston, Texas 77002

SN EF Maverick, LLC
1000 Main Street, Suite 3000
Houston, Texas 77002

Re: Letter Agreement

Reference is made to that certain Purchase and Sale Agreement, dated as of January 12, 2017 (the "***APC PSA***"), by and among Anadarko E&P Onshore LLC, a Delaware limited liability company ("***AEP***"), Kerr-McGee Oil & Gas Onshore LP, a Delaware limited partnership ("***KMOG***" and collectively with AEP, "***Seller***"), SN EF Maverick, LLC, a Delaware limited liability company ("***SN***"), SN EF UnSub, LP, a Delaware limited partnership ("***UnSub***"), Aguila Production, LLC, a Delaware limited liability company ("***AcqCo***" and collectively with SN and UnSub, "***Buyer***"), and, solely for the purposes of Section 15.22 and Schedule 13.4(a) of the APC PSA, Sanchez Energy Corporation, a Delaware corporation ("***SN Parent***"). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in the APC PSA.

The purpose of this letter agreement (this "***Letter Agreement***") is to set forth certain agreements of SN, SN Parent and UnSub.

NOW, THEREFORE, for and in consideration of the mutual promises contained herein, the benefits to be derived by each party hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all, SN, SN Parent and UnSub agree as follows:

1. Purchase Price Adjustment. At the Closing, the Purchase Price to be paid by SN and UnSub shall be adjusted pursuant to the provisions of Section 3.3 and Section 3.5 of the APC PSA (herein referred to as the "***Preliminary Purchase Price Adjustment***"). On or before 120 days after the Closing, the Purchase Price shall be adjusted pursuant to the provisions of Section 3.6 of the APC PSA (herein referred to as the "***Final Purchase Price Adjustment***"). Each of the Preliminary Purchase Price Adjustment and the Final Purchase Price Adjustment are sometimes hereinafter referred to individually as a "***Purchase Price Adjustment***." Pursuant to the terms of the APC PSA, Seller (a) will only be adjusting the Purchase Price pursuant to such provisions on an aggregate basis and (b) will not be providing allocations of such adjustments between SN and UnSub. The following sets forth the agreement among SN and UnSub as to allocations of such adjustments between SN and UnSub.

(a) Upon receipt of the Preliminary Settlement Statement or the Final Settlement Statement from APC, on or before (i) three (3) Business Days prior to Closing (in the case of the Preliminary Settlement Statement) or (ii) seven (7) calendar days prior to the Final Payment Date (in the case of the Final Settlement Statement), SN shall use reasonable efforts to submit to UnSub a statement that allocates the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment, as applicable, between SN and UnSub attributable to the undivided interests in the Assets to be acquired by SN and UnSub at Closing. Prior to Closing or the Final Payment Date, whichever is applicable, SN and UnSub will in good faith attempt to agree upon such allocations.

(b) If SN and UnSub are able to agree upon the allocation of the Preliminary Purchase Price Adjustment described in clause (a) above on or before two (2) Business Days prior to the Closing, then SN will notify Seller of the resulting allocation of the Preliminary Purchase Price Adjustment as between SN and UnSub prior to Closing. If SN and UnSub are able to agree upon the allocation of the Final Purchase Price Adjustment described in clause (a) above on or before two (2) Business Days prior to the Final Payment Date, then SN will notify Seller of the resulting allocation of the Final Purchase Price Adjustment as between SN and UnSub prior to the Final Payment Date.

(c) If SN is unable to submit the allocations of the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment described in clause (a) above to UnSub pursuant to the dates set forth in clause (a) above or if SN and UnSub are unable to agree upon such allocations after exercising good faith attempts to do so, then (i) if the applicable Purchase Price Adjustment would result in a payment from Seller to SN and UnSub collectively (or net downward adjustment to the Purchase Price), then such Purchase Price Adjustment shall be allocated 10% to SN and 90% to UnSub at the Closing or Final Payment Date, as applicable, and (ii) if the applicable Purchase Price Adjustment would result in a payment from SN and UnSub collectively to Seller (or net upward adjustment to the Purchase Price), then such Purchase Price Adjustment shall be allocated 90% to SN and 10% to UnSub at the Closing or Final Payment Date, as applicable, in each case, pending final settlement or agreement hereunder. SN and UnSub will continue to attempt in good faith to agree upon the allocation of the Preliminary Purchase Price Adjustment or the Final Purchase Price Adjustment for thirty (30) days after the Closing or the Final Payment Date, as applicable. If SN and UnSub are able to agree upon such allocations, then appropriate payments between SN and UnSub will be made within three (3) Business Days to reflect the agreed-upon allocation of such Purchase Price Adjustments between SN and UnSub. If SN and UnSub are unable to agree upon the allocation of the Final Purchase Price Adjustment between SN and UnSub, then SN and UnSub will resolve such disagreement according to the dispute resolution procedures set forth in Section 3.7 of the APC PSA, which shall apply *mutatis mutandis* to this Letter Agreement.

(d) SN and UnSub agree that the allocation of Purchase Price Adjustments between SN and UnSub will be based upon the Purchase Price adjustment provisions set forth in Section 3.3, Section 3.5 and Section 3.6 of the APC PSA, which will attempt to the maximum extent practicable to allocate costs and revenues to the particular undivided interests in the Assets to be acquired by each of SN and UnSub at Closing, *provided*, for the avoidance of doubt, that as between SN and UnSub, Purchase Price Adjustments pursuant to Section 3.3(a)(vii) or Section 3.3 (b)(vii) of the APC PSA will be allocated 100% to UnSub. If a Purchase Price Adjustment is not directly attributable to particular Assets transferred to each of SN and UnSub at Closing, then SN and UnSub agree to allocate such Purchase Price Adjustments 60% to SN and 40% to UnSub.

(e) Subject to Section 1(f) below, Purchase Price Adjustments for Title Defects and Environmental Defects pursuant to Section 3.3(b)(ii) and Section 3.3(b)(iii) of the APC PSA will be allocated to each of SN and UnSub based upon the ratio of (i) the sum of (A) the Title Defect Amounts for the valid uncured Title Defects attributable to such Party plus (B) the Remediation Amounts for the valid unremediated Environmental Defects attributable to such Party, compared to (ii) the sum of (A) all Title Defect Amounts for all valid uncured Title Defects asserted by all Buyer Parties plus (B) all Remediation Amounts for all valid unremediated Environmental Defects asserted by all Buyer Parties.

(f) Notwithstanding anything to the contrary in Section 1(e) above, the ratio described therein shall be calculated without regard to Title Defects or Environmental Defects related to Assets excluded from the transactions contemplated by the APC PSA, and SN and UnSub acknowledge that (i) the Purchase Price Adjustments for such excluded Assets will be determined pursuant to Section 3.3(b)(iv) of the APC PSA, and (ii) SN's and UnSub's shares of such Purchase Price Adjustments shall be based upon

the undivided interest in such excluded Assets that would be acquired by such Party at Closing if such Asset was not excluded.

(g) UnSub's agreement to the allocations of the Preliminary Purchase Price Adjustment and Final Purchase Price Adjustment proposed by SN pursuant to this Letter Agreement shall require the consent of Preferred Unit Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.

(h) The provisions of this Section 1 shall apply *mutatis mutandis* to any provisions of the KNOC PSA pertaining to purchase price adjustment (only if such provisions are substantially identical to Sections 3.3, 3.5 and 3.6 of the APC PSA).

2. Reimbursement for Indemnification Expenses.

(a) UnSub hereby agrees to reimburse SN and/or SN Parent for any payments made by SN and/or SN Parent, as applicable, in respect of any Liabilities incurred by (a) SN pursuant to SN's Indemnity Obligations under Section 8.3 of the APC PSA, a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 8.3 of the APC PSA) or pursuant to the Development Agreement or the License, in each case to the extent that such Liabilities are attributable to UnSub's acquired properties thereunder, (b) SN pursuant to Section 15.23 of the APC PSA or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 15.23 of the APC PSA) or (c), in the case of SN Parent, incurred by SN Parent in connection with an Indemnification Obligation of SN that is paid by SN Parent as a result of the SN Parent Guaranty given by SN Parent in favor of SN pursuant to Section 15.22 of the APC PSA or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 15.22 of the APC PSA), in each case to the extent that such Liabilities are attributable to UnSub's acquired properties thereunder.

(b) SN Parent and SN, jointly and severally, hereby agree to reimburse UnSub for any payments made by UnSub in respect of any Liabilities incurred by UnSub pursuant to UnSub's Indemnity Obligations under Section 8.3 or Schedule 13.4 of the APC PSA, Section 8.3 or a comparable provision of the KNOC PSA (only if such provision is substantially identical to Section 8.3 or Schedule 13.4 of the APC PSA, as applicable) or pursuant to the Development Agreement or the License, in each case to the extent that such Liabilities are attributable to SN and/or SN Parent's acquired properties thereunder.

(c) For the avoidance of doubt, any Indemnity Obligation incurred by the SN Parties as a result of a joint breach of a covenant made by both SN and UnSub that cannot otherwise be allocated solely to either SN or UnSub shall be allocated 60% to SN and 40% to UnSub.

(d) Each of SN and SN Parent hereby represents and warrants to UnSub that it is not a party to, or bound by, any contract or agreement that prohibits SN or SN Parent from making indemnification payments or reimbursements pursuant to the APC PSA or this Letter Agreement. Each of SN and SN Parent shall not enter into any contract or agreement that prohibits SN or SN Parent from making indemnification payments or reimbursements pursuant to the APC PSA or this Letter Agreement.

(e) In consideration for the services provided by SN and certain of its Affiliates to UnSub, UnSub hereby agrees to pay to SN an annual fee equal to $400,000, which such fee shall be due and payable in advance on the date hereof and on each one year anniversary thereafter.

3. Credit Support. If SN is required to post a letter of credit or surety bond for the benefit of Seller pursuant to Section 11.11(a)(iv) of the APC PSA or a comparable provision of the KNOC PSA (only if such

012087

provision is substantially identical to Section 11.11(a)(iv) of the APC PSA), the costs and expenses of such letter of credit or surety bond shall be allocated 60% to SN and 40% to UnSub.

4. Joint Properties.

(a) *Spacing Restrictions*. Without the prior written consent of UnSub, prior to the Redemption Date, SN Parent shall not, and shall cause its Affiliates (including SN) not to, vote for any successor operator under any Operating Agreement, resign or attempt to resign as the operator under any Operating Agreement, or take or omit to take any action with the intent to effectively or constructively terminate its status as operator under any Operating Agreement, unless such successor operator has agreed in writing to abide by the spacing restrictions set forth in Section 5.3 of the Joint Development Agreement.

(b) *AMI and Participation in Future Acquisitions*.

(i) If any Sanchez Vehicle or its Affiliate elects to participate in an AMI Acquisition pursuant to the terms of the Joint Development Agreement or acquire Oil and Gas Properties within the area of mutual interest in Exhibit A attached hereto (in either case, an "***AMI Participation Opportunity***"), then SN Parent shall cause the applicable Sanchez Vehicle(s) or its Affiliate to offer in writing forty percent (40%) of the interest to be acquired by the applicable Sanchez Vehicle(s) or its Affiliate in such acquisition to UnSub on the same purchase price, terms and conditions as such acquisition and otherwise in accordance with Section 5.11 of the GP LLC Agreement. In addition, if any party or parties to an Operating Agreement non-consents to an operation proposed thereunder, then UnSub shall be offered 40% of the pro rata portion of such non-consenting party's interest in such proposed operation that becomes available to SN Parent, SN or any of their Affiliates.

(ii) Notwithstanding anything in the GP LLC Agreement or Partnership Agreement to the contrary, Preferred Unit Purchaser shall have the right to act on behalf of, and enforce all rights of, UnSub in connection with Section 4.5 of the Joint Development Agreement.

(c) *Non-Consent Properties*.

(i) After receiving a capital expenditure request with respect to any property in which any Partnership Group Company, on the one hand, and any Sanchez Vehicle or any of its Affiliates (other than, for the avoidance of doubt, any Partnership Group Company), on the other hand, owns an interest, prior to responding and in no event more than ten days after receiving such request, UnSub shall or shall cause the applicable Partnership Group Company to notify SN Parent as to whether or not the applicable Partnership Group Company intends to consent to such request and SN Parent shall or shall cause the applicable Sanchez Vehicle or its Affiliate to notify UnSub as to whether or not the applicable Sanchez Vehicle or its Affiliate intends to consent to such request.

(ii) If, following the Closing, (A) UnSub intends to non-consent to any capital expenditure in respect of any of UnSub's properties in which any Sanchez Vehicle also owns an interest, or UnSub intends to cause any other Partnership Group Company to non-consent to any such capital expenditure with respect to such properties, and (B) any Sanchez Vehicle intends to consent to such capital expenditure, then, subject to the terms of any applicable Operating Agreement, joint development agreement (including the Joint Development Agreement) or participation agreement or other similar agreement(s) affecting such property, UnSub shall and shall cause the Partnership Group Companies, as applicable, and SN Parent shall and shall cause its designated Affiliate, as applicable, to use their respective commercially reasonable efforts, subject to the terms of their respective organizational documents and financing arrangements, to

take such actions as may be necessary or appropriate for the non-consenting Partnership Group Company to convey its interest in the affected property to SN Parent or its designated Affiliate, subject to reversion to the conveying Partnership Group Company after SN Parent or its Affiliates, as applicable, have recovered the applicable non-consent penalty set forth in the applicable Operating Agreement.

(iii) If, following the Closing, (A) any Sanchez Vehicle intends to non-consent to any capital expenditure in respect of any of its properties in which any Partnership Group Company owns an interest and (B) UnSub intends to consent to such capital expenditure, or intends to cause any other Partnership Group Company to consent to such capital expenditures, then, subject to the terms of the applicable Operating Agreement, joint development agreement (including the Joint Development Agreement) or participating agreement(s) or other similar agreement affecting such property, SN Parent shall cause the applicable Sanchez Vehicle(s), and UnSub shall or shall cause its designated Partnership Group Company to, use their respective commercially reasonable efforts, subject to the terms of their respective organizational documents and financing arrangements, to take such actions as may be necessary or appropriate for the non-consenting Sanchez Vehicle(s) to convey their interest in the affected property to UnSub or its designated Partnership Group Company, subject to reversion to the conveying Sanchez Vehicle after UnSub or its designated Partnership Group Company, as applicable, has recovered the applicable non-consent penalty set forth in the applicable Operating Agreement.

(d) *Certain Restricted Transfers by SN Parent*. SN Parent shall not, and shall cause each Sanchez Vehicle not to, without the prior written consent of UnSub, sell or transfer any Joint Properties, including any of the properties acquired by any Sanchez Vehicle pursuant to the APC PSA, to any third party not affiliated with SN Parent, unless in connection with such sale all outstanding Preferred Units will be redeemed in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement); *provided*, that, the foregoing restrictions shall not apply to any sale or transfer or series of sales or transfers of such assets by any Sanchez Vehicle(s) if (i) the buyer or transferee in such sale or transfer is Sanchez Production Partners LP, a Delaware limited partnership ("***SPP***"), or (ii)(A) the aggregate sales proceeds of all such sales (giving pro forma effect to those currently proposed) does not exceed 45% of the PDP PV-10 of the Joint Properties owned by the Sanchez Vehicles and (B) the aggregate net acreage conveyed or transferred in all such sales (giving pro forma effect to those currently proposed) does not exceed 45% of the Sanchez Vehicles' aggregate net acreage included in the properties acquired by the Sanchez Vehicle(s) at Closing pursuant to the APC PSA or any subsequently acquired Joint Properties in any Type Curve Area (as defined in Exhibit B attached hereto and incorporated herein) or in the aggregate.

(e) *Certain Workover and Recompletion Operations*. Upon receipt of a Workover and Recompletion Proposal from UnSub, SN Parent shall cause each Sanchez Representative to propose such operations identified in the Workover and Recompletion Proposal to the Operating Committee in accordance with the terms of the Joint Development Agreement and vote in favor of such operations. Notwithstanding anything to the contrary contained herein, upon compliance with the foregoing terms of this Section 4(e), there shall be no liability on behalf of SN Parent or any Sanchez Representative if such proposed operations are rejected or otherwise not approved by Blackstone Representatives (as defined under the Joint Development Agreement) of the Operating Committee.

(f) *Division of Operatorship*. SN Parent shall not, and shall cause each Sanchez Vehicle not to, agree to any "Equitable Division" (as defined in the Joint Development Agreement) that would result in a material adverse effect to "Existing Producing Wells" (as defined in the Joint Development

Agreement) or related offset locations owned by the Partnership Group Companies without the prior written consent of UnSub.

(g) *Tag-Rights*. UnSub shall have the tag-along rights on sales of Joint Properties by SN Parent, SN or any of their Affiliates as set forth in Exhibit C attached hereto.

(h) *Fair Market Value*. The Parties agree that, in determining the Fair Market Value of properties to be sold by UnSub and SN, respectively, pursuant to Sections 4.2 or 4.5 of the Joint Development Agreement, SN and UnSub agree that any midstream charges and the allocations set forth in the Hydrocarbons Marketing Agreement of such midstream charges (including any minimum and maximum charges contained therein) will be used in determining the Fair Market Value of such properties. The Parties agree that, although this provision will not bind Aquila regarding any position it might take with respect to the Fair Market Value of such properties, as between the Parties, they will not assert any position in such determinations of Fair Market Value that is inconsistent with the above.

5. Certain Actions. Until the Redemption Date, each of SN Parent and SN shall not, and shall cause its Affiliates not to, take any action that is not consistent with or that violates or is prohibited by the GP LLC Agreement, and each of SN Parent and SN shall comply, and shall cause its Affiliates to comply, with the GP LLC Agreement, including Sections 5.7(b), 5.11, 5.15 and 9.5.

6. No Guarantor and Restricted Subsidiary. SN Parent shall not, and shall not permit any of its Affiliates to, take any action that would cause UnSub to become a guarantor or a restricted subsidiary pursuant to any agreement governing any material indebtedness of SN Parent, SN or any of their Affiliates.

7. Tax Partnership. In the event the Tax Partnership is not terminated as contemplated by the provisions of Section 11.14 of the APC PSA, the parties agree to use commercially reasonable efforts to cause the partnership agreement of the Tax Partnership to be revised or a new agreement of tax partnership to be entered into such that all allocations of income and deduction reflect the economic interests of the parties in the properties acquired pursuant to the APC PSA and that the parties will be in the same economic position as would have occurred had the Tax Partnership been terminated prior to the Closing Date.

8. Determination of Sanchez Shares and Warrants Amount. Preferred Unit Purchaser shall propose, prior to a date that is five (5) days prior to the Anadarko Closing Date, the valuation of the SN Shares as of the Anadarko Closing Date (the "***Sanchez Shares Value***") and the valuation of the Warrants as of the Anadarko Closing Date (the "***Warrants Value***"). Preferred Unit Purchaser shall take into account any reasonable comments received from Common Unit Purchaser within two (2) days after provision of the proposed valuations. The parties shall cooperate in good faith to resolve any differences as to the Sanchez Shares Value and the Warrants Value. In the event Common Unit Purchaser and Preferred Unit Purchaser are nonetheless unable to reach an agreement as to each of the Sanchez Shares Value and the Warrants Value prior to the Anadarko Closing Date, then the matter shall be submitted for resolution and determination to a nationally recognized independent accounting firm or nationally recognized independent investment banking firm, as determined by the Preferred Unit Purchaser and reasonably acceptable to Common Unit Purchaser, in which case the nationally recognized firm will deliver to Common Unit Purchaser and Preferred Unit Purchaser a written determination of the Sanchez Shares Value and the Warrants Value no later than one (1) day prior to the Anadarko Closing Date (the Sanchez Shares Value together with the Warrants Value, in each case as finally determined pursuant this Section 8, the "***Sanchez Shares and Warrants Amount***"). The fees and expenses of the nationally recognized firm shall be paid fifty percent (50%) by Common Unit Purchaser and fifty percent (50%) by Preferred Unit Purchaser. Common Unit Purchaser and Preferred Unit Purchaser agree that they will not take nor will they permit any Affiliate to take, for Tax purposes, any position inconsistent with such valuation of the Sanchez Shares and Warrants; *provided*, that nothing contained herein shall prevent the Common Unit Purchaser or the Preferred Unit Purchaser from settling

in good faith any proposed deficiency or adjustment by any Governmental Authority based upon or arising out of the Sanchez Shares and Warrants Amount, and neither Common Unit Purchaser nor Preferred Unit Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Authority challenging such Sanchez Shares and Warrants Amount. Common Unit Purchaser, on the one hand, or Preferred Unit Purchaser, on the other hand, shall notify Preferred Unit Purchaser or Common Unit Purchaser, respectively, within ten (10) days after notice or commencement of an examination, audit or other proceeding based upon or arising from the Sanchez Shares and Warrants Amount.

9. Certain Definitions. As used in this Letter Agreement:

"***Affiliate***" means, with respect to any person, any other person that, directly or indirectly, controls, is controlled by, or is under common control with, such person. For the purposes of this Letter Agreement, "***control***," when used with respect to any specified person, means the power, direct or indirect, to direct or cause the direction of the management and policies of such person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "***controlling***" and "***controlled***" shall have correlative meanings. Notwithstanding the foregoing, solely for the purposes of this Letter Agreement, UnSub and its subsidiaries will be deemed not to be Affiliates of SN Parent or SN, and vice versa.

"***AMI Acquisition***" has the meaning given to the term "Acquisition" in the Joint Development Agreement.

"***Anadarko Closing Date***" has the meaning set forth in the Securities Purchase Agreement.

"***Base Preferred Return Amount***" has the meaning set forth in the Partnership Agreement.

"***Basic Documents***" has the meaning set forth in the Securities Purchase Agreement.

"***Common Unit Purchaser***" has the meaning set forth in the Securities Purchase Agreement.

"***Core Area***" has the meaning set forth in the Joint Development Agreement.

"***Governmental Authority***" has the meaning set forth in the Securities Purchase Agreement.

"***GP LLC Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Hydrocarbons***" means oil, gas, coal seam gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate and all other liquid and gaseous hydrocarbons produced or to be produced in conjunction therewith from a well bore and all products, by-products and other substances derived therefrom or the processing thereof, and all other minerals and substances produced in conjunction with such substances, including, but not limited to, sulfur, geothermal steam, water, carbon dioxide, helium and any and all minerals, ores or substances of value and the products and proceeds therefrom.

"***Joint Development Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Joint Properties***" has the meaning set forth in the GP LLC Agreement.

"***KNOC PSA***" has the meaning set forth in the Securities Purchase Agreement.

"***Leases***" means all oil and gas leases, oil, gas and mineral leases, oil, gas and casinghead gas leases or any other instruments, agreements, or conveyances under and pursuant to which the owner thereof has or obtains the right to enter upon lands and explore for, drill, and develop such lands for the production of Hydrocarbons.

"***Management Services Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Oil and Gas Properties***" means fee mineral interests, term mineral interests, Leases, subleases, farmouts, royalties, overriding royalties, net profit interests, carried interests, production payments and similar mineral interests, and all unsevered and unextracted Hydrocarbons in, under or attributable to the foregoing, in each case relating to Hydrocarbons.

"***Operating Agreement***" has the meaning set forth in the Joint Development Agreement.

"***Operating Committee***" has the meaning set forth in the Joint Development Agreement.

"***Partnership Agreement***" has the meaning set forth in the Securities Purchase Agreement.

"***Partnership Group Companies***" has the meaning set forth in the GP LLC Agreement.

"***PDP PV-10***" means the net present value, discounted at ten percent (10%) per annum, of the future net revenues (using NYMEX forward curve pricing for the next five (5) years as of the date of determination and flat prices from the fifth calendar year thereafter) expected to accrue to the Sanchez Vehicle's collective interest in any Proved Developed Producing Reserves (as defined in the Partnership Agreement) in any Joint Properties (in each case determined as of the last day of the most recent fiscal year or fiscal quarter for which a reserve report of the Partnership is available) during the remaining expected economic lives of such reserves. Each calculation of such expected future net revenues shall be made in accordance with the then existing standards of the Society of Petroleum Engineers, provided that in any event (a) appropriate deductions shall be made for severance and ad valorem taxes, and for operating, gathering, transportation and marketing costs required for the production and sale of such reserves, (b) the pricing assumptions used in determining PDP PV-10 Proved Reserves (as defined in the GP LLC Agreement) for any particular reserves shall be based upon the Strip Price (as defined under the GP LLC Agreement) for the next five (5) years, (c) the cash-flows derived from the pricing assumptions set forth in clause (b) above shall be further adjusted to account for the historical basis differential and (d) PDP PV-10 shall be based on the valuation of applicable properties in the Partnership reserve report as adjusted for the Sanchez Vehicles' working interest ownership percentage in such properties.

"***Preferred Unit Purchaser***" has the meaning set forth in the Securities Purchase Agreement.

"***Preferred Units***" has the meaning set forth in the Partnership Agreement.

"***Redemption Date***" means the date of redemption of all outstanding Preferred Units in cash at the Base Preferred Return Amount under the Partnership Agreement.

"***Sanchez Representative***" has the meaning set forth in the Joint Development Agreement.

"***SN Shares***" has the meaning set forth in the Securities Purchase Agreement.

"***Sanchez Vehicle***" has the meaning set forth in the GP LLC Agreement.

"***Securities Purchase Agreement***" means that certain Securities Purchase Agreement, dated as of the date hereof, by and among SN Parent, SN UR Holdings, LLC, a Delaware limited liability company, SN EF UnSub Holdings, LLC, a Delaware limited liability company, UnSub, SN EF UnSub GP, LLC, a Delaware limited liability company and the general partner of the Partnership, GSO ST Associates LLC, a Delaware limited liability company, and Preferred Unit Purchaser.

"***Warrants***" has the meaning set forth in the Securities Purchase Agreement.

"***Workover and Recompletion Proposal***" has the meaning set forth in the GP LLC Agreement.

10. Conflict of Law; Jurisdiction; Venue; Jury Waiver. The provisions of Section 15.13 of the APC PSA shall apply *mutatis mutandis* to this Letter Agreement, as if such provisions were set forth in full herein.

11. Amendments. This Letter Agreement may be amended, restated, modified or changed only by a written instrument signed by SN, SN Parent and UnSub.

12. Counterparts. This Letter Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to each of the other parties hereto (including via facsimile or other electronic transmission), it being understood that each of the parties need not sign the same counterpart.

13. Specific Performance. The parties hereto agree that irreparable damage, for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the provisions of this Letter Agreement were not performed in accordance with its specific terms and that any remedy at law for any breach of the provisions of this Letter Agreement would be inadequate. Accordingly, the parties hereto acknowledge and agree that each such party shall be entitled to an injunction, specific performance or other equitable relief to prevent breaches of this Letter Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. Each party hereby agrees that it will not oppose the granting of specific performance and other equitable relief on the basis that the other parties have an adequate remedy at Law or that an award of specific performance is not an appropriate remedy for any reason at Law or equity. The parties hereto acknowledge and agree that any other party seeking an injunction to prevent breaches of this Letter Agreement and to enforce specifically the terms and provisions of this Letter Agreement in accordance with this Section 13 shall not be required to provide any bond or other security in connection with any such injunction. The specific performance or other equitable relief available pursuant to this Section 13 is not an exclusive remedy and any non-breaching party to this Letter Agreement may pursue any remedy at Law or equity available to it.

14. Entire Agreement; Integrated Transaction. This Letter Agreement, the Securities Purchase Agreement and the Basic Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein with respect to the rights granted by the Company set forth herein. This Letter Agreement, the Securities Purchase Agreement and the Basic Documents supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the parties hereto acknowledges and agrees that in executing this Letter Agreement (i) the intent of the parties is this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its Affiliates, any claim or defense based upon the characterization that this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 14 constitute a material inducement to enter into this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the parties hereto stipulates and agrees (x) not to challenge the validity, enforceability or characterization of this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (y) this Letter Agreement, the Securities Purchase Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (z) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 14.

15. Notices. All notices and other communications provided for hereunder shall be in writing and shall be given by hand delivery, electronic mail, registered or certified mail, return receipt requested, regular mail or air courier guaranteeing overnight delivery to the following addresses:

if to SN or SN Parent to:

Sanchez Energy Corporation
1000 Main Street
Suite 3000
Houston, Texas 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld, LLP
1111 Louisiana Street, Suite #44
Houston, TX 77002
Attention: David Elder
Facsimile: 713-236-0822
Email: delder@akingump.com

if to UnSub to:

SN EF UnSub GP, LLC
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, TX 77002
Attention: Gregory Kopel
Email: gkopel@sanchezog.com

with a copy to (which shall not constitute notice):

Kirkland & Ellis LLP
600 Travis Street, Suite 3300
Houston, Texas 77002
Attention: John D. Pitts
Email: john.pitts@kirkland.com

with a copy to:

c/o GSO Capital Partners
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn

Email: Robert.horn@gsocap.com

with a copy to :

c/o GSO Capital Partners
345 Park Avenue, 31st Floor
New York, New York 10154
Email: GSO Legal@gsocap.com
GSOValuationsGroup@gsocap.com

with a copy to (which shall not constitute notice):

Andrews Kurth Kenyon LLP
4200 Travis Street
Suite 4200
Houston, Texas 77002
Attention: G. Michael O'Leary
Jon Daly

or to such other address as may be specified in a notice given pursuant to this Section 15. All notices and communications shall be deemed to have been duly given: (i) at the time delivered by hand, if personally delivered; (ii) when notice is sent by the sender and the recipient has read the message, if sent by electronic mail; (iii) upon actual receipt if sent by registered or certified mail, return receipt requested, or regular mail, if mailed; or (iv) upon actual receipt when delivered to an air courier guaranteeing overnight delivery. The parties may change the address to which notices are to be given by giving five (5) days' prior notice of such change in accordance herewith.

[*Signature Pages Follow*]

**SANCHEZ ENERGY CORPORATION**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

Accepted and Agreed to
as of the date written above

**SN EF UNSUB, LP**
By: SN EF UnSub GP, LLC, its general partner

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

---

**Exhibit A**

(Attached)


EagleFord
AMI
Core Area
ZAVALA
FRIO
MAVERICK
DIMMIT
LA SALLE
WEBB
10
Miles

012098

**<u>Exhibit B</u>**

**Type Curve Areas**

(Attached)

---


Exhibit B: Type Curve Areas
MAVERICK
DIMMIT
TEXAS
WEBB
LA SALLE
Big Wells
APC - 66.67% WI
KNOC - 33.33% WI
1
2
3
4
5
6
San Pedro
La Bandera Ranch
Maund Family LP
South Spur
Carta Ranch
Roger Dentonio Ranch
Catarina West
Catarina South
Catarina North
Catarina Ranch
Slumberg
Weinhorn
Chip East
Briscoe Friday
Diamond H Ranch
Diamond H Ranch Detail
Diamond H State
Briscoe Cochina West Ranch
Cochina East
Rancho Encantado
Chaparral Wildlife
Chupadera Ranch
Worthey Ranch
Stanley Ranch
Pearsall Formation Only
MAVERICK BASIN
Date 10/5/2016
Author: Andrew Baron

<u>**Exhibit C**</u>

**Tag-Along Rights**

(a) If at any time SN Parent, SN or any of their Affiliates proposes to transfer, directly or indirectly, all or any portion of its Joint Properties, whether in a single transaction or series of related transactions to a Third Party purchaser or purchasers (a "Proposed Sale"), such party seeking to transfer such Joint Properties (the "***Transferring Party***") shall furnish to UnSub a written notice of such Proposed Sale (the "***Tag-Along Notice***") and provide UnSub the opportunity to participate in such Proposed Sale on the terms described in this <u>Exhibit C</u> to the extent of its respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice shall include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Joint Properties to be transferred, (B) the name of the proposed transferee (the "***Proposed Transferee***"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed transfer date, if known, which date shall not be less than thirty (30) Business Days after delivery of such Tag-Along Notice; and

(ii) an invitation to UnSub to participate in such Proposed Sale at the same per Working Interest percentage price per applicable asset, for the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party shall deliver or cause to be delivered to UnSub copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) UnSub may exercise the tag-along rights provided by this <u>Exhibit C</u> within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "***Tag-Along Offer***") to the Transferring Party indicating UnSub's desire to exercise its tag-along rights hereunder. If UnSub does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, UnSub shall be deemed to have waived its rights under this <u>Exhibit C</u> with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to transfer the applicable Joint Properties to the Proposed Transferee without the participation of UnSub, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If UnSub elects to participate in the Proposed Sale pursuant to this <u>Exhibit C</u>, (i) the consideration to be received by the parties in such sale (a "***Tag-Along Transaction***") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds between the Transferring Party and UnSub based upon the relative Fair Market Value of the Leases, Wellpads and other applicable assets and other interests included by such parties (collectively, the "***Tag Interests***"), as agreed by the Transferring Party and UnSub or as otherwise determined pursuant to the valuation process set forth in paragraph (g) below, taking into account (in either case) the parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party purchaser (but only to the extent that all parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, provided that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Transferring Party and UnSub in the Proposed Sale; and (ii)

UnSub shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one party is transferring Working Interests and the other party is transferring equity interests holding Working Interests, and such other distinctions as may be applicable to the parties or their interests in the Leases, Wellpads, and other applicable Assets); *provided*, that (A) no party shall be liable for the breach of any covenant by any other party, (B) in no event shall any party be required to make representations and warranties or provide indemnities as to any other party, and (C) in no event shall UnSub be responsible for any liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by UnSub in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act of 1933, as amended, and UnSub exercises its tag-along rights hereunder in connection with such Proposed Sale, if the Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that UnSub will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) Any offer of UnSub contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, UnSub shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Oil and Gas Property interest transferred, as the Transferring Party; *provided*, *however*, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to UnSub than those set forth in the Tag-Along Notice, UnSub shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from its obligations.

(e) If UnSub exercises its rights under this Exhibit C, the closing of the sale of the Transferring Party's and UnSub's Joint Properties in the Tag-Along Transaction will take place concurrently. If the closing with the Proposed Transferee (whether or not UnSub has exercised its rights under this Exhibit C) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on transfer contained herein shall again be in effect with respect to such Oil and Gas Property interest and proposed transfer.

(f) The costs of any transactions contemplated by this Exhibit C shall be deducted pro rata from the proceeds to be paid to the Transferring Party and UnSub in connection with such transaction.

(g) In the event the Transferring Party and UnSub (for purposes of this paragraph, collectively, the "***Dispute Parties***") disagree as to the relative Fair Market Value of the Tag Interests included by each party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in Eagle Ford Shale (the "***Valuation Firm***") to determine the relative Fair Market Value (on a percentage basis) of the Tag Interests included by each party. The Valuation Firm shall be selected by the Dispute Parties from among the Approved Financial Advisor Arbiters and if the Dispute Parties are unable to agree then SN Parent shall chose. The Dispute Parties shall each cooperate fully with the

Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Dispute Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; *provided*, *however*, the Dispute Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Tag Interests (the "***Final Valuation***") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall allocated 50% to SN and 50% to UnSub.

Terms used in this Exhibit C but not defined elsewhere in this Letter Agreement shall have the following meanings:

"***Approved Financial Advisor Arbiters***" means the banks or valuation firms listed on Annex IV to the Joint Development Agreement.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"***Fair Market Value***" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"***Governmental Authority***" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"***Leases***" means, collectively, oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other oil and gas interests.

"***Person***" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"***Third Party***" means any Person other than an Affiliate of SN Parent or a Permitted Holder, *provided* that for purposes of Section 4(g) and this Exhibit C, each of SPP and its controlled Affiliates shall be deemed a Third Party of SN Parent and its Affiliates.

"***Wellpads***" has the meaning set forth in the Joint Development Agreement.

"***Working Interest***" means with respect to any lease or well or wellpad relating to the any Joint Properties, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

**SCHEDULE 3.07**

**Partnership Approvals**

1. The approval of (i) the General Partner and (ii) the sole member of the General Partner is required for the Partnership and General Partner, respectively, actions specified above, which approvals have been obtained.

2. With respect to such other Basic Documents that are to be executed at Closing and the performance of which is to occur after Closing, any authorizations, consents, approvals, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations contemplated by such Basic Documents.

**SCHEDULE 3.08**

**Liabilities**

1. Liabilities and obligations of the General Partner arising under its Limited Liability Company Agreement, dated as of December 21, 2016.

2. Liabilities and obligation of the Partnership arising under its Agreement of Limited Partnership, dated as of December 21, 2016.

**SCHEDULE 4.04**

**Preferred Unit Purchasers Approvals**

None.

---

**SCHEDULE 5.04**

**SN Approvals**

1. With respect to the Warrant Agreement and the Registration Rights Agreement, such of the foregoing as may be required under the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, state and foreign securities or "blue sky" laws, The New York Stock Exchange or any other applicable self-regulatory organization.

2. With respect to such other Basic Documents that are to be executed at Closing and the performance of which is to occur after Closing, any authorizations, consents, approvals, waivers, licenses, qualifications, exemptions, filings, declarations, qualifications or registrations contemplated by such Basic Documents.

---

# Exhibit F

EX-10.3 15 sn-20170331ex10304f7b0.htm EX-10.3

**Exhibit 10.3**

**SN EF UnSub GP, LLC**

A Delaware Limited Liability Company

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

Dated as of March 1, 2017

012109

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I ORGANIZATION | | 2 |
| 1.1 | Continuation of the Company | 2 |
| 1.2 | Name | 2 |
| 1.3 | Registered Office; Registered Agent | 2 |
| 1.4 | Principal Place of Business | 2 |
| 1.5 | Fiscal Year | 2 |
| 1.6 | Foreign Qualification | 2 |
| 1.7 | Term | 3 |
| 1.8 | No State-Law Partnership | 3 |
| 1.9 | Purposes | 3 |
| ARTICLE II MEMBERS | | 3 |
| 2.1 | Members | 3 |
| 2.2 | No Liability of Members | 3 |
| 2.3 | Representations and Warranties | 4 |
| ARTICLE III UNITS AND CAPITAL CONTRIBUTIONS | | 5 |
| 3.1 | Membership Interests | 5 |
| 3.2 | Capital Contributions | 5 |
| 3.3 | Return of Contribution | 5 |
| 3.4 | Withdrawal of Capital | 5 |
| 3.5 | Additional Capital Contributions | 6 |
| 3.6 | Additional Members | 6 |
| ARTICLE IV DISTRIBUTIONS AND ALLOCATIONS | | 6 |
| 4.1 | Distributions | 6 |
| 4.2 | Allocations | 6 |
| 4.3 | Capital Accounts | 6 |
| ARTICLE V MANAGEMENT | | 6 |
| 5.1 | Management by the Board of Directors | 6 |
| 5.2 | Actions by the Board; Delegation of Authority and Duties; Reliance by Third Parties | 6 |
| 5.3 | Board Composition | 7 |
| 5.4 | Board Meetings; Quorum; Vote Required | 9 |
| 5.5 | Action by Written Consent | 10 |
| 5.6 | Officers | 10 |
| 5.7 | Actions Requiring Approval | 12 |
| 5.8 | Issuance of Preferred Units and Certain Debt Matters | 22 |
| 5.9 | Enforcement of Affiliate Contracts | 23 |
| 5.10 | Limitation of Duties and Corporate Opportunities | 23 |
| 5.11 | AMI and Participation in Future Acquisitions | 26 |

| | | |
|---|---|---|
| 5.12 Meetings of the Members | | 27 |
| 5.13 Company Covenants, Representations and Warranties | | 28 |
| 5.14 Tag-Rights Control | | 30 |
| 5.15 Certain Workover and Recompletion Operations | | 30 |
| ARTICLE VI BOOKS, REPORTS AND COMPANY FUNDS | | 30 |
| 6.1 Records and Accounting | | 30 |
| 6.2 Reports | | 31 |
| 6.3 Inspection by Members | | 31 |
| 6.4 Public Disclosure | | 31 |
| ARTICLE VII TAX MATTERS | | 32 |
| 7.1 Tax Controversies | | 32 |
| ARTICLE VIII EXCULPATION AND INDEMNIFICATION | | 32 |
| 8.1 Performance of Duties; No Liability of Members, Directors and Officers | | 32 |
| 8.2 Right to Indemnification | | 33 |
| 8.3 Advance Payment | | 33 |
| 8.4 Indemnification of Employees and Agents | | 34 |
| 8.5 Appearance as a Witness | | 34 |
| 8.6 Nonexclusivity of Rights | | 34 |
| 8.7 Insurance | | 34 |
| 8.8 Savings Clause | | 34 |
| 8.9 Fund Indemnitors | | 34 |
| ARTICLE IX UNITS, TRANSFERS, AND OTHER EVENTS | | 35 |
| 9.1 Unit Certificates | | 35 |
| 9.2 Record Holders | | 36 |
| 9.3 Restrictions on Transfers of Units | | 36 |
| 9.4 Disposition Transactions | | 37 |
| 9.5 Exit Transactions. | | 37 |
| 9.6 Expenses | | 42 |
| 9.7 Transfers Generally; Substitute Members | | 42 |
| 9.8 Closing Date | | 43 |
| 9.9 Effect of Incapacity | | 43 |
| 9.10 No Appraisal Rights | | 43 |
| 9.11 Effect of Non-Compliance | | 43 |
| ARTICLE X DISSOLUTION, LIQUIDATION AND TERMINATION | | 44 |
| 10.1 Dissolution | | 44 |
| 10.2 Liquidation and Termination | | 44 |
| ARTICLE XI DEFINITIONS | | 45 |
| 11.1 Definitions | | 45 |
| 11.2 Construction | | 57 |
| ARTICLE XII MISCELLANEOUS | | 58 |
| 12.1 Notices | | 58 |

012111

| | | |
|---|---|---|
| 12.2 | Confidential Information | 58 |
| 12.3 | Entire Agreement; Integrated Transaction | 59 |
| 12.4 | Effect of Waiver or Consent | 59 |
| 12.5 | Amendment or Modification | 60 |
| 12.6 | Binding Effect | 60 |
| 12.7 | Consent to Jurisdiction; Waiver of Trial by Jury | 60 |
| 12.8 | Governing Law | 61 |
| 12.9 | Further Assurances | 61 |
| 12.10 | Waiver of Certain Rights | 61 |
| 12.11 | Notice to Members of Provisions | 61 |
| 12.12 | Counterparts | 61 |
| 12.13 | Headings | 61 |
| 12.14 | Remedies | 61 |
| 12.15 | Severability | 61 |
| 12.16 | No Recourse | 62 |


EXHIBITS


| | |
|---|---|
| Exhibit A | Members, Capital Contributions and Units Held |
| Exhibit B | Board Designations |
| Exhibit C | Officers |
| Exhibit D | Approved Successor Independent Auditors and Independent Reservoir Engineers |
| Exhibit E | Form of Purchase Agreement |
| Exhibit F | LTM EBITDA Levels |

Case 23-03091 Document 1-19 Filed in TXSB on 04/26/23 Page 265 of 300

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF SN EF UnSub GP, LLC A Delaware Limited Liability Company

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of SN EF UnSub GP, LLC, a Delaware limited liability company (the "Company"), effective as of March 1, 2017 (the "Effective Date"), is made and entered into by the Company; GSO ST Holdings Associates LLC, a Delaware limited liability company (the "GSO Investor"); and SN UR Holdings, LLC, a Delaware limited liability company (the "Sanchez Investor"), as the initial Members of the Company.

## R E C I T A L S:

WHEREAS, the Company was formed as a limited liability company under the Delaware Act, pursuant to the filing of the Certificate of Formation of the Company (the "Delaware Certificate") filed with the Secretary of State of the State of Delaware on December 21, 2016; and

WHEREAS, the Sanchez Investor, as the sole initial Member, executed the Limited Liability Company Agreement of SN EF UnSub GP, LLC, effective December 21, 2016 (the "Original LLC Agreement"); and

WHEREAS, the Company owns the non-economic general partner interest in, and serves as the sole general partner of, the Partnership; and

WHEREAS, the Company is a party to that certain Securities Purchase Agreement, dated as of January 12, 2017 (the "Securities Purchase Agreement"), pursuant to which the Company, the Partnership, the Sanchez Parent, SN EF UnSub Holdings, LLC, a Delaware limited liability company, the Sanchez Investor, GSO ST Holdings LP, a Delaware limited partnership, and the GSO Investor agreed, among other things, that the Original LLC Agreement would be amended and restated by this Agreement; and

WHEREAS, the Company caused the Partnership to enter into each of the Sanchez Letter Agreement and the Hydrocarbons Marketing Agreement on January 12, 2017; and

WHEREAS, the Sanchez Investor and the GSO Investor deem it advisable to amend and restate the Original LLC Agreement in its entirety as set forth herein; and

WHEREAS, as part of the Anadarko Closing, the Company, in its capacity as the general partner of the Partnership, shall cause the Partnership to enter into the MSA and the Joint Development Agreement, and will amend and restate the agreement of limited partnership of the Partnership by entering into the Partnership Agreement in the form attached as Exhibit A to the Securities Purchase Agreement; and

WHEREAS, unless the context otherwise requires, capitalized terms used herein shall have the respective meanings ascribed to them in Section 11.1.

NOW, THEREFORE, for and in consideration of the premises, the covenants and the agreements hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby amend and restate the Original LLC Agreement in its entirety as follows:

## ARTICLE I
## ORGANIZATION

1.1 Continuation of the Company. The Company was formed as a Delaware limited liability company on December 21, 2016 by the filing of the Delaware Certificate in the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act. The Members desire to continue the Company for the purposes and upon the terms and conditions set forth herein. As of the Effective Date, the GSO Investor and the Sanchez Investor constitute the sole Members of the Company. Except as provided herein, the rights, duties and liabilities of each Member will be as provided in the Delaware Act.

1.2 Name. The name of the Company is "SN EF UnSub GP, LLC". Company business will be conducted in such name or such other names that comply with applicable Law as the Board may select from time to time.

1.3 Registered Office; Registered Agent. The registered office of the Company in the State of Delaware will be the initial registered office designated in the Delaware Certificate or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware will be the initial registered agent designated in the Delaware Certificate, or such other Person or Persons as the Board may designate from time to time in the manner provided by law.

1.4 Principal Place of Business. The principal place of business of the Company will be at 1000 Main Street, Suite 3000, Houston, Texas 77002, or such other location as the Board may designate from time to time, which need not be in the State of Delaware. The Company may have such other offices as the Board may determine appropriate.

1.5 Fiscal Year. The fiscal year of the Company (the "Fiscal Year") for financial statement and federal and applicable state and local income tax purposes will end on December 31 unless otherwise determined by the Board or required under the Code.

1.6 Foreign Qualification. The Board is authorized to cause the Company to comply, to the extent procedures are available, with all requirements necessary to qualify the Company as a foreign limited liability company in any jurisdiction in which the Company owns property or transacts business or elsewhere where such qualification may be necessary or advisable for the protection of the limited liability of the Members or to permit the Company to lawfully own property or transact business, and to obtain similar qualifications for the Company's Subsidiaries. Each Officer is authorized, on behalf of the Company, to execute, acknowledge, swear to and deliver all certificates and other instruments as may be necessary or appropriate in connection with the foregoing qualifications. Further, upon request of the Board, each Member will execute,

acknowledge, swear to and deliver all certificates and other instruments that are reasonably necessary or appropriate to obtain, continue, modify or terminate such qualifications.

1.7 Term. The term of the Company commenced on the date the Delaware Certificate was filed with the office of the Secretary of State of the State of Delaware and shall continue until the Company is dissolved as determined under Section 10.1.

1.8 No State-Law Partnership. Except to the extent provided in the next sentence, the Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Officer shall be a partner or joint venturer of any other Member or Officer, for any purposes, and this Agreement shall not be construed to the contrary. Notwithstanding the foregoing, the Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes. Except to the extent otherwise provided herein, each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment unless otherwise required by law.

1.9 Purposes. The nature or purposes of the business to be conducted or promoted by the Company is to own the non-economic general partner interest in, and to serve as the general partner of, SN EF UnSub, LP, a Delaware limited partnership (the "Partnership"), and to engage in the operation and management of the Partnership in accordance with this Agreement and the Partnership Agreement, including actions that the Partnership may undertake with respect to its Subsidiaries (the Partnership and its Subsidiaries, collectively, the "Partnership Group Companies") and in any other lawful act or activity incidental or related thereto authorized by the Board and for which limited liability companies may be organized under the Delaware Act. The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. In furtherance of its purpose, (a) the Company shall have and may exercise all of the powers now or hereafter conferred by Delaware law on limited liability companies formed under the Delaware Act and (b) the Company shall have the power to do any and all acts necessary, appropriate, proper, advisable, incidental or convenient to or for the protection and benefit of the Company. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company formed under the laws of the State of Delaware.

## ARTICLE II
## MEMBERS

2.1 Members. The names, addresses, Capital Contribution balances and Percentage Interests of each Member are set forth on Exhibit A attached hereto and incorporated herein. The Board, or any appropriate Officer of the Company, is hereby authorized and directed to complete, supplement, modify, correct or amend Exhibit A to reflect the creation or issuance of any Additional Units, the admission of any additional Members, the withdrawal of any Member, the change of address of any Member, the Capital Contributions of any Member, the Units held by any Member and other information called for by Exhibit A in conformity with this Agreement. Such completion, supplementation, modification, correction or amendment may be made from time to time as and when the Board or such Officer considers it appropriate in accordance with this Section 2.1.

2.2 No Liability of Members. Except as otherwise required by applicable Law and as expressly set forth in this Agreement, no Member shall have any personal liability whatsoever in such Member's capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company. Each Member shall be liable only to make such Member's

012116

Capital Contribution to the Company and the other payments and covenants provided expressly herein. Except as otherwise provided in this Agreement, a Member's liability (in its capacity as a Member) for debts, liabilities and losses of the Company shall be limited to such Member's pro rata share of the Company's assets in accordance with each Member's respective Percentage Interests.

2.3 Representations and Warranties. Each Member hereby represents and warrants to the Company and each other Member that:

(a) Power and Authority. Such Member has full power and authority to enter into this Agreement and to perform its obligations hereunder;

(b) No Conflicts. The execution, delivery and performance of this Agreement do not conflict with any other agreement or arrangement to which such Member is a party or by which it is or its assets are bound;

(c) Contributed Property. All property contributed to the Company by such Member, and any property thereafter to be contributed to the Company by such Member, has been or will be duly and lawfully acquired;

(d) Own Account. Such Member has acquired or is acquiring its interest in the Company for investment purposes only for its own account and not with a view to any distribution, reoffer, resale or other disposition that is not in compliance with the Securities Act or any applicable state securities laws;

(e) Expertise. Such Member alone, or together with its representatives, possesses such expertise, knowledge and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that such Member is capable of evaluating the merits and economic risks of acquiring and holding the Units, and that such Member is able to bear all such economic risks now and in the future;

(f) Awareness of Economic Risk. Such Member is aware that it must bear the economic risk of such Member's investment in the Company for an indefinite period of time because Units have not been registered under the Securities Act or under the securities laws of any state, and, therefore, such Units cannot be sold unless they are subsequently registered under the Securities Act and any applicable state securities laws or an exemption from registration is available;

(g) No Registration Rights. Such Member is aware that only the Company can take action to register Units in the Company under the Securities Act and that the Company is under no such obligation and does not propose or intend to attempt to do so;

(h) Transfer Restrictions. Such Member is aware that this Agreement provides restrictions on the ability of a Member to Transfer Units, and such Member will not seek to effect any Transfer other than in accordance with such restrictions; and

(i) Accredited Investor. Such Member is, and at such time that it makes any additional Capital Contributions to the Company, will be an "accredited investor" within the meaning of Rule 501 under the Securities Act (an "Accredited Investor") unless such status as an Accredited Investor is not required in order for the Transfer of Units to such Member to be exempt from registration under the Securities Act.

## ARTICLE III
## UNITS AND CAPITAL CONTRIBUTIONS

3.1 Membership Interests.

(a) The Units issued by the Company shall consist of Class A Units and Class B Units. As of the Effective Date, the Company is authorized to issue up to 99 Class A Units and 1 Class B Unit. Subject to the terms and conditions set forth in this Agreement and the Securities Purchase Agreement, and after giving effect to the transactions contemplated by the Securities Purchase Agreement, as of the Effective Date, the Company has issued 99 Class A Units to the Sanchez Investor and 1 Class B Unit to the GSO Investor. Additional Units (or series or classes of Units) or securities convertible into or exercisable for additional Units or rights to purchase additional Units (which for purposes of this Agreement shall be "Additional Units") may be issued from time to time as may be determined by the Board pursuant to Sections 5.7(a)(xii) and 5.7(b)(x), with such relative rights, powers and duties as the Board may determine in accordance with this Agreement. The Company may issue fractional Units.

(b) Units shall constitute "securities" governed by Article 8 of the Delaware Uniform Commercial Code, as amended from time to time after the Effective Date.

(c) Upon the redemption or liquidation in full of all outstanding Preferred Units pursuant to the Partnership Agreement, each Unit then outstanding that is held by any Class B Member, GSO or any of its Affiliates shall be terminated and extinguished (including all rights and obligations associated therewith) and, other than the right to indemnification pursuant to Section 8.2 for the time period in which such Member was a Member of the Company, such Member shall not have any interest in the Company or any rights pursuant to this Agreement following such termination.

3.2 Capital Contributions. All Members acknowledge and agree that the Capital Contributions set forth on Exhibit A as of the Effective Date represent the amount of money contributed by the Members to the Company as of the Effective Date.

3.3 Return of Contribution. No Member is entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. Any Capital Contribution that has not been repaid is not a liability of the Company or of the other Members. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return the other Members' Capital Contributions.

3.4 Withdrawal of Capital. No Member has the right to withdraw any part of its Capital Contribution from the Company or to receive the return of any part of its Membership Interest in the Company prior to the Company's liquidation and termination pursuant to Article X hereof.

3.5 Additional Capital Contributions. No Class A Member or Class B Member shall be obligated to make additional Capital Contributions to the Company, and no Member is obligated to make any Capital Contributions except as the Members may otherwise expressly agree to in writing.

3.6 Additional Members. In order for a Person to be admitted as a Member of the Company with respect to any Additional Units and the exercise of any rights hereunder relating thereto, such Person shall be required to have first delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement, together with such other documents and instruments as the Board reasonably determines to be necessary or appropriate in connection with the issuance of such Additional Units to such Person or to effect such Person's admission as a Member.

## ARTICLE IV
## DISTRIBUTIONS AND ALLOCATIONS

4.1 Distributions. All distributions by the Company shall be allocated to the Members pro rata in accordance with each Member's respective Percentage Interests (at the time the amounts of such distributions are determined) and in such aggregate amounts and at such times as shall be determined by the Board. Subject to the limitations set forth in the Delaware Act and any other applicable Law, prior to the dissolution, winding-up and liquidation of the Company, the Board may, in its discretion, direct the Company to make distributions of cash or other property to the Members. Notwithstanding any provision to the contrary contained in this Agreement, neither the Company nor the Board, on behalf of the Company, shall be required or permitted to make a distribution to any Member on account of its Membership Interest if such distribution would violate the Delaware Act or other applicable Law. Any distributions pursuant to this Article IV made in error or in violation of Section 18-607(a) of the Delaware Act will, upon demand by the Board, be returned to the Company.

4.2 Allocations. Unless otherwise required by the Allocation Regulations, all items of income, gain, loss, deduction and credits will be allocated to the Members pro rata in accordance with their respective Percentage Interests.

4.3 Capital Accounts. The Company shall establish and maintain for each Member a separate capital account ("Capital Account") in accordance with the Allocation Regulations.

## ARTICLE V
## MANAGEMENT

5.1 Management by the Board of Directors. The powers, business and affairs of the Company and its Subsidiaries, including, without limitation, the powers, business and affairs of the Company that relate to management and Control of any of its Subsidiaries or the Partnership Group Companies, shall be exercised by or under the authority or direction of a board of directors (the "Board of Directors" or the "Board"), except for cases in which the approval of the Members is expressly required by non-waivable provisions of applicable law, including the Delaware Act, or in accordance with the express provisions of this Agreement. The Company shall cause the Partnership Group Companies to comply with contracts and agreements to which they are a party.

5.2 Actions by the Board; Delegation of Authority and Duties; Reliance by Third Parties.

(a) In managing the business and affairs of the Company and exercising its powers, the Board may act through meetings and written consents pursuant to Sections 5.4 and 5.5,

respectively, and through any Officer of the Company to whom authority and duties have been delegated pursuant to Section 5.6.

(b) Any Person dealing with the Company may rely on the authority of any Officer in taking any action in the name of the Company authorized by the Board without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement.

5.3 Board Composition.

(a) Composition.

(i) The Board shall initially be composed of five (5) directors (or such other number of directors as the Board may unanimously determine) that are natural persons (each, a "Director" and, collectively, the "Directors"). The Directors shall be "managers" within the meaning of Section 18-101 of the Delaware Act. No Director in his or her individual capacity shall have the authority to manage the Company or approve matters relating to, or otherwise to bind the Company, such powers being reserved to the Directors acting through the Board and to such other committees of the Board, and Officers and agents of the Company, as designated by the Board. Three (3) Directors shall be designated from time to time by the Class A Member (any Director so designated by the Class A Member, a "Sanchez Director") and, subject to Section 5.3(d) and Section 5.3(e), two (2) Directors shall be designated from time to time by the Class B Member (any Director so designated by the Class B Member, a "GSO Director"). The Sanchez Directors and the GSO Directors as of the Effective Date are set forth on Exhibit B. Notwithstanding anything to the contrary provided herein and subject to Section 5.3(e), at any time during which the Class B Member is not entitled to appoint any GSO Directors, the Board does not include a representative of the GSO Investor or the consent of such representative is not required for the Company or any Partnership Group Company to take any act described in Section 5.7(b)(vi), the Class A Member shall appoint an Independent Director to the Board no later than five (5) Business Days after the occurrence of such triggering event. The Independent Director may only be removed for Cause and no resignation or removal of the Independent Director shall be effective until (i) the Class A Member has provided the Credit Agreement Agent with five (5) Business Days' prior written notice of such resignation or removal, and (ii) a successor Independent Director is appointed. No appointment of a successor Independent Director shall be effective until such successor shall have accepted his or her appointment as the Independent Director by a written instrument. In the event of a vacancy in the position of the Independent Director, the Class A Member shall, as soon as practicable, appoint a successor Independent Director.

(ii) Each Member having the right to designate a Director to the Board hereunder shall also have the right to designate one natural person to act as its Board observer at all meetings of the Board, which designation shall be made by written notice to the Company. No Board observer shall be entitled to vote on any matter

presented to the Board. After receipt of each such designation under this Section 5.3(a)(ii), the Company will (A) give timely advance notice to each such Board observer of all such meetings of the Board and all proposals to such body for action without a meeting, (B) allow each such Board observer to attend all such meetings and (C) provide each such Board observer with copies of all written materials distributed to the Board, in connection with such meetings or proposals for action without a meeting, including but not limited to all minutes of previous actions and proceedings; *provided*, *however,* that each such Board observer shall agree to hold in confidence and trust all information so provided; and *provided further*, that the Company reserves the right to withhold any information and to exclude each such Board observer from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets.

(b) Removal; Vacancies. Subject to Section 5.3(a)(i), no Director may be removed from the Board except at the written direction of the Member(s) entitled to designate such Director, which Member(s) will upon any such removal be entitled to appoint an alternative Director to fill the vacancy. A Director may resign at any time, such resignation to be made in writing and to take effect immediately or on such later date as may be specified therein. Each of the Members may change or replace any of its respective Directors on the Board upon twenty-four (24) hours' prior written notice to the Board and the other Members. Any vacancy in the Board, whether created by the removal, resignation, retirement of a Director or otherwise, shall be filled only by the Member entitled to designate such Director in accordance with this Section 5.3.

(c) Subsidiaries. To the extent any Subsidiary of the Company is not a member-managed limited liability company or partnership of which a Partnership Group Company is the managing general partner, the Company shall take all necessary action to ensure that the board of directors, board of managers, partnership committee or similar governing body of such Subsidiary of the Company shall be comprised of designees of each of the Class A Member(s), the Class B Member(s) and the Independent Director, if applicable, that, as nearly as is practicable, are in proportion to the number of their respective designees on the Board and require the vote, consent or decision (and presence for quorum) of each such designee to the same extent as would be required for comparable actions and meetings at the Board.

(d) Board Restructuring. Following an Investor Redemption Event and solely for so long as such Investor Redemption Event remains uncured, the size and composition of the Board shall automatically, and without further action by the Board or the Members, be increased in size to seven (7) Directors such that there shall be two (2) additional Directors that shall be designated by the Class B Member, and as a result of which there shall be four (4) GSO Directors in total and three (3) Sanchez Directors in total; *provided* that, once all pending Investor Redemption Events have been cured, the composition of the Board shall automatically, and without further action by the Board or the Members, be reconstituted in accordance with Section 5.3(a)(i) and the Class B Member shall notify the Company which two (2) natural persons will serve as the GSO Directors, unless Section 5.3(e) would apply at such time.

(e) Automatic Resignation. Notwithstanding anything to the contrary contained herein, upon the redemption or liquidation in full of all outstanding Preferred Units pursuant to the Partnership Agreement, (i) all GSO Directors shall automatically be deemed to resign from the Board at the time of such redemption, (ii) the right of the Class B Member to appoint Directors pursuant to Section 5.3(a)(i) or Section 5.3(d), as applicable, shall be null and void and shall be of no further force and effect, (iii) the Class A Member shall have the right to appoint all members of the Board following such redemption and (iv) the Class A Member shall designate one natural person to serve as the Independent Director; *provided however*, that the Independent Director shall only vote on matters set forth in Section 5.7(c).

5.4 Board Meetings; Quorum; Vote Required.

(a) Meetings. The Board shall meet at least quarterly at the offices of the Company (or such other place as determined by the Board). Special meetings of the Board, to be held at the offices of the Company (or such other place as shall be determined by the Board), shall be called at the direction of any one Director, upon reasonable advance notice, but in any event upon not less than forty-eight (48) hours' prior written notice, to all Directors. Subject to the requirements of the Delaware Act, the Delaware Certificate or this Agreement for notice of meetings, the Directors may participate in and hold a meeting of the Board by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened or is not called or convened in accordance with this Agreement. Attendance of a Director at a meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business on the ground that such meeting is not properly called or convened. All meetings of the Board shall be presided over by the chairman of the meeting, who shall be a Person designated by a majority of the Directors. The chairman of the meeting of the Board shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as determined by him or her to be in order.

(b) Quorum. At all meetings of the Board, the presence of a majority of the number of Directors fixed by this Agreement, including at least one GSO Director, or for so long as the Board has seven (7) Directors pursuant to Section 5.3(d), at least one Sanchez Director (such Director, as applicable, the "Minority Director"), shall be necessary and sufficient to constitute a quorum for the transaction of business at any meeting of the Board; *provided, however,* that if at least one Minority Director is not present at a meeting of the Board called in accordance with the terms of this Agreement and is not present at the rescheduled meeting of the Board, then no Minority Director(s) shall be required in order to establish a quorum at any meeting that is rescheduled after the initially rescheduled meeting. Notwithstanding the foregoing, at any meeting which will require a vote under Section 5.7(c), the Independent Director must be present to establish a quorum. Participation by a Director in a meeting in accordance with Section 5.4(a), or pursuant to a valid written consent pursuant to Section 5.5, shall constitute presence in person at a meeting. If a quorum is not present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time for a period not to exceed sixty (60) days, without notice other than announcement at the meeting, until a quorum is present. A Director may be counted as

present for purposes of a quorum of the Board pursuant to a valid written proxy delivered to another Director who is present at such Board meeting.

(c) Board Voting. On all matters requiring the vote or action of the Board, each Director shall be entitled to one vote. Subject to Sections 5.7(b) and 5.7(c), all actions undertaken by the Board must be authorized by the affirmative vote of a majority of Directors at any meeting at which a quorum is present.

(d) Compensation of Directors. Directors shall not be entitled to any compensation unless otherwise determined by the Board, acting with unanimous consent.

5.5 Action by Written Consent. Any action permitted or required by the Delaware Act, the Delaware Certificate or this Agreement to be taken at a meeting of the Board may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Directors entitled to vote thereon. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board.

5.6 Officers.

(a) The Officers of the Company shall be appointed as provided in this Section 5.6 and shall include a President and Chief Executive Officer (the "CEO"), a Chief Financial Officer and a Chief Operations Officer, and may include a Secretary, a Treasurer, one or more Vice Presidents (including, one or more Executive or Senior Vice Presidents), and such other Officers with such titles and responsibilities as the Board may from time to time determine. The Board may choose not to fill any office for any period as it may deem advisable. Any two or more offices may be held by the same Person and Officers need not be employees of the Company. The CEO shall be appointed by the Board. The CEO shall nominate all other potential Officers of the Company, subject to the Board's confirmation and approval in accordance with Section 5.7(a)(xvii), and any such potential Officer shall become an Officer of the Company upon receipt of such Board confirmation and approval. Each Officer shall hold office until a successor is duly elected and qualified or until the earlier of his or her death, resignation or removal as hereinafter provided. Any Officer of the Company may be removed at any time by the Board. Any vacancy occurring in any office of an Officer because of death, resignation, removal, disqualification or otherwise, may be filled by the Board then in office. In the case of the absence or disability of any Officer of the Company and of any Person hereby authorized to act in such Officer's place during such Officer's absence or disability, the Board may by resolution delegate the powers and duties of such Officer to any other Officer, or to any other Person whom it may select. Subject to (i) Section 5.7, (ii) any limitations, restrictions or directions provided for in this Agreement or by the Board and (iii) the general oversight of the Board, the CEO and other Officers of the Company shall have, in a manner consistent with the management and control granted to officers of a corporation under the laws of the state of Delaware, power and authority to manage and control the day-to-day business, operations and affairs of the Company in the ordinary course of its business, to make all decisions affecting the day-to-day business, operations and affairs of the Company in the ordinary course of its business and to take all such actions as they determine necessary or appropriate to accomplish the foregoing.

(b) The Officers of the Company as of the Effective Date are set forth on Exhibit C hereto.

(c) Except as may otherwise be determined by the Board, the duties and responsibilities of the Officers of the Company shall be as follows:

(i) CEO. The CEO shall have general and active management and control of the business and affairs of the Company, subject to the control of the Board, and shall see that all orders and resolutions of the Board are carried into effect, and shall perform all other duties incident to such office.

(ii) Chief Financial Officer. The Chief Financial Officer shall have general and active management and control of the financial affairs of the Company, including assisting in the preparation of the capital budget, subject to the control of the CEO and the Board.

(iii) Chief Operations Officer. The Chief Operations Officer shall have general and active management and control of the operations of the Company, subject to the control of the CEO and the Board.

(iv) Vice Presidents. Vice Presidents, if any, in order of their seniority or in any other order determined by the Board, shall generally assist the CEO, the Chief Financial Officer and the Chief Operations Officer and perform such other duties as the Board or the CEO shall prescribe.

(v) The Secretary. The Secretary shall, to the extent practicable, attend all meetings of the Board and all meetings of the Members and shall record all votes and the minutes of all proceedings in a book to be kept for that purpose, and shall perform the same duties for any committee of the Board when so requested by such committee. The Secretary shall give or cause to be given notice of all meetings of the Members and of the Board, shall perform such other duties as may be prescribed by the Board or the CEO and shall act under the supervision of the CEO and the Chief Operations Officer. The Secretary shall keep in safe custody the seal of the Company, if any, and affix the same to any instrument that requires that the seal be affixed to it and which shall have been duly authorized for signature in the name of the Company and, when so affixed, the seal shall be attested by his signature or by the signature of the Treasurer. The Secretary shall keep in safe custody the certificate books and Member records and such other books and records of the Company as the Board or the CEO may direct and shall perform all other duties incident to the office of Secretary and such other duties as from time to time may be assigned by the Board, the CEO or the Chief Operations Officer.

(vi) The Treasurer. The Treasurer shall have the care and custody of all the funds of the Company and shall deposit such funds in such banks or other depositories as the Board, or any Officer(s) or any Officer and agent jointly, duly authorized by the Board, shall, from time to time, direct or approve. The Treasurer shall disburse the funds of the Company under the direction of the Board, the CEO,

the Chief Financial Officer and the Chief Operations Officer. The Treasurer shall keep a full and accurate account of all moneys received and paid on account of the Company and shall render a statement of accounts whenever the Board, the CEO, the Chief Financial Officer or the Chief Operations Officer shall so request and shall perform such other duties incident to the office of Treasurer and such other duties as from time to time may be assigned by the Board, the CEO, the Chief Financial Officer or the Chief Operations Officer.

(d) The Officers, in the performance of their duties as such, shall owe to the Company duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.

5.7 Actions Requiring Approval.

(a) Board Approval. In addition to such other matters as the Board may from time to time by resolution determine, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall take any of the actions described in this Section 5.7(a) without the approval of the Directors constituting a majority of the Board (in accordance with Section 5.4), unless the taking of such action is expressly and specifically contemplated by any capital budget approved pursuant to this Section 5.7(a):

(i) approve, amend, supplement, change or modify any semi-annual plan or budget of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(ii) incur general and administrative expenses including "Overhead Costs" as defined in the MSA, (A) in excess of $5.0 million each year during the two calendar years following the Effective Date and (B) thereafter, in excess of $10.0 million in any calendar year;

(iii) other than (A) drawings under the Credit Agreement or Replacement Credit Agreement for expenditures or other applications in each case that are items included in the then applicable plan or budget approved in accordance with Section 5.7(a)(i) above, (B) Indebtedness not to exceed an aggregate of $15.0 million at any time outstanding for capital leases and purchase money security interests or (C) the incurrence of trade payables arising in the ordinary course of business and obligations under Hedge Agreements, (1) create or incur any Indebtedness, assume any Indebtedness of, or guarantee or otherwise become responsible for the obligations of, any Person, in any single transaction or series of transactions, (2) redeem prior to maturity or refinance any Senior Debt or any other Indebtedness funded or committed at the date of either Preferred Unit Closing (other than pursuant to the mandatory prepayment or redemption provisions thereof) or (3) permit, create or suffer to exist any Lien (other than Permitted Liens) arising from Indebtedness on any material assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(iv) alter, repeal, amend or adopt, or consent to the waiver of, any provision of this Agreement or the Delaware Certificate or the governing document of any of the Partnership Group Companies;

(v) change, amend or otherwise modify, or take action outside of, the Company's purpose (as set forth in Section 1.9) or the Partnership's purpose (as set forth in Section 2.4 of the Partnership Agreement), or engage in any business activity outside of the AMI;

(vi) effect any recapitalization, restructuring or reorganization or any Unit, Preferred Unit or Common Unit split;

(vii) dissolve the Company, any of its Subsidiaries or any of the Partnership Group Companies; take any action that would result in a Bankruptcy Event; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(viii) directly or indirectly purchase or otherwise acquire any assets or all or any part of the business of, or Equity Interests in, or invest in or make a capital contribution to, any Person (other than a wholly owned Subsidiary of the Company), including in connection with the formation of or participation in any joint venture, partnership or similar arrangement;

(ix) make a loan or extend credit (other than, in the ordinary course, trade credit) to any Person;

(x) enter into any agreement with respect to, or consummate, any sale of any business or assets, whether by sale, merger, consolidation, restructuring, conversion, recapitalization, transfer or disposition of assets (including, without limitation, entry into any contract, arrangement or other commitment in connection with any volumetric production payment or forward sale of hydrocarbon production), other than with respect to the Partnership's sale of production in the ordinary course of business;

(xi) effect any merger, consolidation or other similar business combination of the Company, any of its Subsidiaries or any of the Partnership Group Companies or any sale of all or substantially all of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(xii) except as set forth in Section 5.8 or as set forth in the Securities Purchase Agreement, issue any Additional Units, Equity Interests or Equity Securities;

(xiii) enter into, amend, modify or terminate any commodity, basis or interest rate hedges or swaps or other derivative transactions, including, without limitation, any Hedging Activity in effect as of the date of the Anadarko Closing or required pursuant to Section 6.7 of the Partnership Agreement;

(xiv) initiate any litigation or other legal or administrative proceeding or enter into any settlement agreement with respect to any such litigation or other legal or administrative proceeding that requires the payment of any amount greater than $1,000,000 or settle any disputes related to accounts receivable or accounts payable in excess of $1,000,000;

(xv) change or modify any accounting policies, except as required by applicable regulatory authorities or independent accountants;

(xvi) enter into, terminate, extend, enforce, amend, or modify, or waive any right under, any contract, agreement, arrangement or transaction between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Member or any Affiliate of a Member, on the other hand;

(xvii) approve the appointment, hiring, termination or removal of any Officer;

(xviii) appoint, remove or terminate the engagement of, or cause the Company or any Subsidiary of the Company to appoint, remove or terminate the engagement of, the independent auditors or reserve engineer for the Company or such Subsidiary; *provided* that, as of the date of the Effective Date, the Company's independent auditors shall be KPMG LLP and the Company's reserve engineer shall be Ryder Scott Company, L.P. and no further Board approval shall be required under this Section 5.7(a)(xviii) for such initial appointments;

(xix) (A) change or designate the Tax Matters Member or Partnership Representative or, except as contemplated by this Agreement, make any tax election or take, or cause the Company or any Subsidiary of the Company to take, any other action with respect to taxes, including causing the Company or any Subsidiary of the Company to be classified as other than a partnership for federal income tax purposes, or (B) change or designate the Tax Matters Partner or Partnership Representative (each as defined in the Partnership Agreement) pursuant to the Partnership Agreement;

(xx) enter into, terminate or amend any agreement that could reasonably be expected to result in obligations of more than $10.0 million in any 12-month period that are not otherwise included in the capital budget;

(xxi) make or declare any distribution or dividend of the Company;

(xxii) authorize any Subsidiary to make or declare any distribution or dividend or determine the amount of Available Cash;

(xxiii) effectuate an initial public offering of any Equity Interests of the Company or any of its Subsidiaries or any of the Partnership Group Companies;

(xxiv) enter into an agreement with respect to or consummate any Change of Control, Disposition Transaction or any liquidation or dissolution pursuant to Section 12.2 of the Partnership Agreement;

(xxv) approve or disapprove of a transfer of all or any part of the General Partner Interest (as defined in the Partnership Agreement) in the Partnership;

(xxvi) make any payments or distributions to, or effect any redemptions in respect of, Common Units, or make any distributions on any Equity Interests other than in cash;

(xxvii) amend or modify any Senior Debt Agreement, Replacement Credit Agreement or any agreement governing Indebtedness required to be approved by the Board or related documents thereto;

(xxviii) enter into, terminate, extend, amend, or modify any midstream or marketing agreement, including, but not limited to, the Hydrocarbons Marketing Agreement;

(xxix) create any Subsidiary or invest in any Subsidiary that is not wholly owned by the Company;

(xxx) appoint the UnSub Representative to the Operating Committee pursuant to the Joint Development Agreement; or

(xxxi) take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

(b) Full Board and Class B Member Approval. Notwithstanding anything to the contrary in this Agreement (including duplicative provisions in Section 5.7(a)), in addition to such other matters as the Board may from time to time by resolution determine, so long as there are any Preferred Units outstanding, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall take any of the following actions without having first obtained the unanimous approval of the Directors constituting the entire Board (other than, for the avoidance of doubt, any Independent Director) and the Class B



012129

Member(s) holding a majority of the then-outstanding Preferred Units (together, "Special Approval"):

(i) incur general and administrative expenses, including "Overhead Costs" as defined in the MSA, (A) in excess of $5.0 million each year during the two calendar years following the Effective Date and (B) thereafter, in excess of $10.0 million in any calendar year; *provided* that no such general and administrative costs may be incurred without Special Approval if such general and administrative costs do not constitute actual costs (on a cost pass-through and no profit basis) incurred by the "Manager" (as such term is defined under the MSA) or its Affiliates that are incremental costs (over and above cost structure prior to the Anadarko Closing) incurred in connection with the businesses of the Company, its Subsidiaries and Partnership Group Companies, and, to the extent such general and administrative costs relate to the management of properties or assets in which any of the (x) Partnership Group Companies and (y) Sanchez Vehicles and/or Blackstone Newco own an interest, such costs are allocated 60% to the Partnership and 40% to the Sanchez Vehicles, respectively, after taking into account reimbursements of such costs from Blackstone Newco, if applicable;

(ii) other than (A) any drawings under the Senior Debt Agreement(s) (1) at the time of the KNOC Closing or Dual Closing, if any, and for the first year thereafter under the Demand Facility not to exceed an aggregate of $500.0 million (provided that exchange into a Demand Facility pursuant to the terms of the Fee Letter as of the date hereof with the first year of the closing shall be permitted hereunder), or (2) at the time of the Anadarko Closing that occurs in a Separate Closing, and for the first year thereafter (subject to increase at the KNOC Closing, if applicable, pursuant to clause (ii)(A)(1)) under the Demand Facility not to exceed an aggregate of $330.0 million (provided that exchange into a Demand Facility pursuant to the terms of the Fee Letter as of the date hereof with the first year of the closing shall be permitted hereunder), in each case such amount to be reduced by the value of the Initial Debt Replacement Units, if any, and Final Debt Replacement Units, if any, funded in accordance with Section 2.01(c) or Section 2.02(b), respectively, of the Securities Purchase Agreement), (B) any drawings under the Credit Agreement or Replacement Credit Agreement(s) following the Anadarko Closing, *provided* that (I) after giving effect to such drawing(s), the remaining undrawn committed capacity under the Credit Agreement or Replacement Credit Agreement(s) is not less than twenty percent (20%) of the total committed borrowing base then available under the Credit Agreement or Replacement Credit Agreement (s) and (II) pro forma for such drawing and the application of such proceeds as approved by the Board, the Partnership will not have more than $25.0 million of cash on hand; *provided further* that total outstanding Indebtedness under clauses (A) and (B) of this Section 5.7(b)(ii) shall not exceed $700.0 million if the Tag Right Interests are transferred or conveyed in connection with the exercise of the Tag Right, or $466.0 million if the Tag Right Interests are not so transferred or conveyed, at any time without Special Approval, (C) Indebtedness not to exceed $15.0 million at any time outstanding for capital leases and purchase money security interests and (D) the incurrence of trade



012130

payables arising in the ordinary course of business and obligations under Hedge Agreements, (1) create or incur any Indebtedness, assume any Indebtedness of, or guarantee or otherwise become responsible for the obligations of, any Person, in any single transaction or series of transactions, (2) redeem prior to maturity utilizing Indebtedness or refinance any Senior Debt or any other Indebtedness funded or committed at the date of either Preferred Unit Closing (other than pursuant to the mandatory prepayment or redemption provisions thereof) or (3) permit, create or suffer to exist any Lien (other than Permitted Liens) arising from Indebtedness on any material assets or properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies; *provided* that, notwithstanding anything to the contrary in this Section 5.7(b)(ii), neither the unanimous approval of the Directors constituting the entire Board nor the approval of the Class B Member shall be required in connection with the incurrence of any Indebtedness if the proceeds of such Indebtedness are used to redeem the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit, as may be required pursuant to the Partnership Agreement;

(iii) amend or modify any Senior Debt Agreement, Replacement Credit Agreement or any other agreement governing other Indebtedness, including any document related thereto, other than as relating to the incurrence of Indebtedness under Section 5.7(a)(iii)(B) or Section 5.7(b)(ii)(C) that does not require Special Approval;

(iv) change, amend or otherwise modify, or take action outside of, the Company's purpose (as set forth in Section 1.9) or the Partnership's purpose (as set forth in Section 2.4 of the Partnership Agreement), or engage in any business activity outside of the Core Area of the AMI;

(v) effect any recapitalization, restructuring or reorganization or any Unit, Preferred Unit or Common Unit split; *provided* that the foregoing shall not restrict the issuance of additional Common Units pursuant to the terms of the Partnership Agreement;

(vi) dissolve the Company, any of its Subsidiaries or any of the Partnership Group Companies; take any action that would result in a Bankruptcy Event of the Company, any of its Subsidiaries or any of the Partnership Group Companies; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a

receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies;

(vii) directly or indirectly purchase or otherwise acquire any assets or all or any part of the business of, or Equity Interests in, or invest in or make a capital contribution to, any Person (other than a wholly owned Subsidiary of the Company), including in connection with the formation of or participation in any joint venture, partnership or similar arrangement;

(viii) make a loan or extend credit (other than in the ordinary course trade credit) to any Person;

(ix) enter into any agreement with respect to, or consummate, any sale of any business or assets, whether by sale, merger, consolidation, restructuring, conversion, recapitalization, transfer or disposition of assets (including, without limitation, any exercise of tag rights of the Partnership or the occurrence of a Sale Transaction, in each case, under the Joint Development Agreement, or entry into any contract, arrangement or other commitment in connection with any volumetric production payment or forward sale of hydrocarbon production), other than with respect to the Partnership's sale of production in the ordinary course of business or a sale that occurs concurrent with the redemption of the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement);

(x) (A) create, grant or issue any Additional Units or Equity Interests of the Company or (B) create, grant or issue (1) a General Partner Interest (as defined in the Partnership Agreement) or (2) any Equity Securities of the Partnership that (w) have a liquidation preference or any rights senior to or on parity with the Preferred Units, (x) require the Partnership to pay dividends or distributions that will have priority to or parity with dividends or distributions payable on the Preferred Units, (y) have rights to dividends or distributions that would reduce the Preferred Units' distributions under the Partnership Agreement or that would be permitted to receive cash distributions prior to liquidation or redemption of the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement), or (z) results in Sanchez Parent and its Affiliates beneficially owning less than 51.0% of the economic interest in the Partnership (excluding any economic interest related to the Preferred Units);

(xi) enter into, amend, modify or terminate any commodity, basis or interest rate hedges or swaps or other derivative transactions other than those permitted to be entered into pursuant to Section 6.7 of the Partnership Agreement;

(xii) initiate, compromise or settle any litigation, administrative proceeding or other dispute involving an amount greater than $2,500,000;

(xiii) enter into, terminate, extend, enforce, amend, or modify, or waive any right under, any contract, agreement, arrangement or transaction between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Member or any Affiliate of a Member, on the other hand; *provided,* that (A) with respect to any contract, agreement, arrangement or transaction between any of the Partnership Group Companies, on the one hand, and an Affiliate of a Member (other than, with respect to the Sanchez Investor, SPP), on the other hand, no such approval shall be required under this Section 5.7(b)(xiii) if the entry into, termination, extension, enforcement, amendment or modification of, or waiver of any right under, such contract, agreement, arrangement or transaction (x) is on terms no less favorable to the Partnership Group Companies than would be obtained in a comparable arm's length transaction with an independent third party and (y) (I) such action would not be reasonably expected to (and does not ultimately) result in revenue to, or costs or expenses incurred by, the Company, any of its Subsidiaries or the Partnership Group Companies of more than $5.0 million or (II) such action together with all prior such action(s) in respect of any Member or Affiliate of any Member would not be reasonably expected to result in revenue to, or costs or expenses incurred by, the Company, any of its Subsidiaries or the Partnership Group Companies when considered in the aggregate of more than $25.0 million for any period of time (the immediately preceding clauses (I) and (II) collectively, the "Affiliate Threshold") and (B) with respect to any contract, agreement, arrangement or transaction between any of the Partnership Group Companies, on the one hand, and SPP, on the other hand, that is in excess of the Affiliate Threshold, the approval of the Class B Member required under this Section 5.7(b)(xiii) shall not be unreasonably withheld, conditioned or delayed; *provided* that it is expressly acknowledged that the Class B Member may withhold such approval or consent if the contract, agreement, arrangement or transaction with SPP (x) is on terms less favorable to the Partnership Group Companies than would be obtained in a comparable arm's length transaction with an independent third party or (y) is not approved in writing by the independent members of the board of directors of Sanchez Parent, the conflicts committee of the board of directors of the general partner of SPP and Blackstone Newco, or (z) Sanchez Parent and its Affiliates and Blackstone Newco, respectively, are not assuming a proportional share of such contract, agreement, arrangement or transaction, based on each party's respective working interests associated with the related contract or expenditure, on the same terms and conditions as the Partnership; *provided* that, notwithstanding anything to the contrary in this Section 5.7(b)(xiii), neither the unanimous approval of the Directors constituting the entire Board nor the approval of the Class B Member shall be required in connection with any sale of any business or assets to any Member or any Affiliate of a Member if the proceeds of such sale are used to redeem the outstanding Preferred Units in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit, as may be required pursuant to the Partnership Agreement.

(xiv) appoint, remove or terminate the engagement of, or cause the Company or any Subsidiary of the Company or Partnership Group Company to appoint, remove or terminate the engagement of, the independent auditors or reserve engineer for the Company or such Subsidiary; *provided* that, as of the Effective Date, the Company's and the Partnership's independent auditors shall be KPMG LLP and the Company's reserve engineer shall be Ryder Scott Company, L.P. and no further approval shall be required under this Section 5.7(b)(xiv) for such initial appointments; *provided further*, that following the Effective Date, no approval shall be required under this Section 5.7(b)(xiv) for the appointment of any entity that is listed in Exhibit D hereto as a successor of the independent auditor or reserve engineer, as applicable, provided that the entity designated as the successor independent auditor or reserve engineer is the then-current independent auditor or independent reserve engineer for the Class A Member;

(xv) (A) change or designate the Tax Matters Member or Partnership Representative or make any tax election or take, or cause the Company or any Subsidiary of the Company to take, any action with respect to taxes that would cause the Company or any Subsidiary of the Company to be classified as other than a partnership for federal income tax purposes, or (B) change or designate the Tax Matters Partner or Partnership Representative (each as defined in the Partnership Agreement) pursuant to the Partnership Agreement;

(xvi) enter into an agreement with respect to or consummate any Change of Control, Disposition Transaction or any liquidation or dissolution pursuant to Section 12.2 of the Partnership Agreement unless, upon the consummation of such Change of Control, Disposition Transaction or liquidation or dissolution, as the case may be, all outstanding Preferred Units will be redeemed in full, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Unit (as may be required pursuant to the Partnership Agreement);

(xvii) transfer all or any part of the General Partner Interest (as defined in the Partnership Agreement) in the Partnership;

(xviii) make any payments or distributions to, or effect any redemptions in respect of, Common Units, in each case, prior to the redemption in full of all Preferred Units by the Partnership, inclusive of an amount of cash equal to the Base Preferred Return Amount with respect to each outstanding Preferred Units (as may be required pursuant to the Partnership Agreement), or make any distributions on any Equity Interests other than in cash;

(xix) terminate, extend, amend, or modify the Hydrocarbons Marketing Agreement and the Sanchez Letter Agreement;

(xx) create any Subsidiary;



012134

(xxi) make or agree to make any amendment, supplement, modification or waiver of any provision of the Joint Development Agreement that, if implemented, would adversely impact the Company, any of its Subsidiaries or any of the Partnership Group Companies in any material respect, including, without limitation, the spacing protections set forth in Section 5.3 of the Joint Development Agreement;

(xxii) make or agree to make any amendment, supplement, modification or waiver of any provision in either of the Springfield Gathering Agreements that, if implemented, would adversely impact the Partnership Group Companies in any material respect, including any increase in fees or extension of any applicable duration of the demand charge period;

(xxiii) make any election for capital expenditures on behalf of any Partnership Group Company that is different than the election made by a Sanchez Vehicle with respect to operations on assets in which the Partnership Group Companies and Sanchez Vehicles both own an interest (*i.e.*, non-consent for the Partnership and consent for Sanchez Vehicle, or vice versa);

(xxiv) if, as of the end of a calendar quarter preceding the date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, elect to non-consent for greater than five percent (5%) of the gross wells proposed by Persons other than the Sanchez Vehicles in any rolling twelve-month period; *provided* that regardless of whether the PDP PV-10 Ratio is equal to or greater than the then-effective Test Level, except pursuant to the rights of the Operating Committee under the Joint Development Agreement, Special Approval shall be required to non-consent to greater than five percent (5%) of gross wells proposed by Blackstone Newco or its Affiliates (or successor owners of its working interests) in any rolling twelve-month period;

(xxv) make capital expenditures for drilling and completion of wells in any quarterly period commencing twenty-four (24) months after the Effective Date in which as of the end of the calendar quarter preceding the date of determination the PDP PV-10 Ratio was less than the then-effective Test Level, provided that if such capital expenditures constitute an "Approved Operation" (as defined in the Joint Development Agreement) pursuant to the Joint Development Agreement, then the required approval pursuant to this Section 5.7(b)(xxv) will only be applicable to an amendment or modification of such "Approved Operation" or approval of a subsequent "Approved Operation";

(xxvi) if, as of the end of a calendar quarter preceding the date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, make any elections under the Joint Development Agreement or any Operating Agreement in respect of the Partnership's properties with respect to the operation or series of related operations on Existing Producing Wells in excess of $25.0 million in any year;

(xxvii) admit or accept any Obligation (as such term is defined in the APC/KM PSA) contained in any Claim Notice (as such term is defined in the APC/KM PSA) received pursuant to the APC/KM PSA;

(xxviii) provide consent to any transaction pursuant to Section 4 (d) or Section 4(f) of the Sanchez Letter Agreement; or

(xxix) take any action, authorize or approve, or enter into any binding agreement with respect to or otherwise commit to do any of the foregoing.

(c) Notwithstanding anything to the contrary in this Agreement, at any time during which an Independent Director is required to be appointed, none of the Company, any of its Subsidiaries, any of the Partnership Group Companies nor any Officer or agent of the Company on behalf of the Company, any of its Subsidiaries or any of the Partnership Group Companies, shall, without the consent of the entire Board, including the Independent Director, take any action that would result in a Bankruptcy Event of the Company, any of its Subsidiaries or any of the Partnership Group Companies; adopt a plan of liquidation of the Company any of its Subsidiaries or any of the Partnership Group Companies; take any action to commence any suit, case, proceeding or other action under any existing or future Law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors seeking to have an order for relief entered with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies, or seeking to adjudicate the Company, any of its Subsidiaries or any of the Partnership Group Companies as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to the Company, any of its Subsidiaries or any of the Partnership Group Companies; appoint a receiver, trustee, custodian or other similar official for the Company, any of its Subsidiaries or any of the Partnership Group Companies, or for all or any material portion of the assets of the Company, any of its Subsidiaries or any of the Partnership Group Companies; or make a general assignment for the benefit of the creditors of the Company, any of its Subsidiaries or any of the Partnership Group Companies.

5.8 Issuance of Preferred Units and Certain Debt Matters. If after the Effective Date, (a) an event of default or borrowing base deficiency (or analogous term or event) under any of the Senior Debt Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies (including, without limitation, any Replacement Credit Agreement) has occurred and such event of default remains uncured by the applicable Partnership Group Company for ten (10) Business Days following receipt by the Company of notice of such event of default or (b) any of the Senior Debt Agreements, Replacement Credit Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies prohibits the payment by the Partnership of any Tax Distributions (as defined in the Partnership Agreement) or, following the date that is twelve (12) months following the Effective Date, Distributions in cash on the Preferred Units pursuant to Section 4.1(b) of the Partnership Agreement and such prohibition persists for ten (10) Business Days after the date such distribution is due to be paid, then, notwithstanding Section 5.7, the Class B Member shall have the right, in its sole discretion, to cause the Partnership to issue additional Preferred Units, which number of Preferred Units shall be determined by the Class B Member, in its sole discretion following consultation with the Board, to the GSO Partner on the same terms and conditions that the Preferred Units were issued to the GSO Partner on the Effective Date. In order to exercise such right, the Class B Member shall deliver a written notice (an "Additional Preferred Units Notice") to the Company setting forth the request and the

number of Preferred Units to be issued by the Partnership. Notwithstanding Section 5.7, upon receipt of the Additional Preferred Units Notice, the Company and the Board shall be required to cause the Partnership (A) to enter into a purchase agreement with the GSO Partner in substantially the form attached hereto as Exhibit E (with any such changes to the extent the parties thereto may mutually agree) and (B) to issue the number of Preferred Units set forth in the Additional Preferred Units Notice within five (5) Business Days of receipt of the Additional Preferred Units Notice. The Partnership shall use the proceeds from the issuance of such Preferred Units to the GSO Partner solely to repay outstanding Indebtedness of any of the Partnership Group Companies under any of the Senior Debt Agreements or any other agreements governing any material Indebtedness of any of the Partnership Group Companies (including a Replacement Credit Agreement) so as to remedy the applicable condition(s) described in clauses (a) and (b) of this Section 5.8.

5.9 Enforcement of Affiliate Contracts. Notwithstanding anything to the contrary in Section 5.7, each of the Members agree that any term or condition of any arrangement, agreement or contract between the Company, any of its Subsidiaries or any of the Partnership Group Companies, on the one hand, and any Affiliate of a Member or Affiliate of the Company (excluding at any pertinent time, any Subsidiary of the Company or Partnership Group Company), on the other hand, other than the APC/KM PSA, shall be exercised or enforced by the Company, the applicable Subsidiary or the applicable Partnership Group Company as directed by the non-Affiliated Member, without the requirement of the approval by the Board or any other Person; *provided, however,* that any such exercise or enforcement shall not entitle such non-Affiliated Member to vary any obligation of the Company or of such Affiliate under such arrangement, agreement or contract. The Company will provide to the non-Affiliated Member copies of all formal notices or material correspondence under any of such arrangements, agreements or contracts at the same time as delivery to any counterparty under such arrangements, agreements or contracts. For clarity, the foregoing shall not permit the Class B Member to enforce the rights and obligations of any Partnership Group Company under the Joint Development Agreement or any Operating Agreement to the extent that the term or condition of such arrangement, agreement or contract relates solely to a party that is not an Affiliate of a Member or Affiliate of the Company (*provided*, for the avoidance of doubt, the foregoing shall not limit the Class B Member, or the rights of its designees to the Board, under Sections 5.7(a) and 5.7(b)); *provided further* that, for clarity, the Class B Member shall be entitled to direct the exercise and enforcement by the Company, the applicable Subsidiary or the applicable Partnership Group Company under the Joint Development Agreement or any Operating Agreement to the extent that (i) the term or condition of such arrangement, agreement or contract relates to a party that is an Affiliate of a Member or an Affiliate of the Company and the Class B Member reasonably determines in good faith that there is a conflict of interest by the applicable member of the Sanchez Group in exercising or enforcing such term or condition or (ii) either the applicable member of the Sanchez Group or the Partnership is then in breach of the applicable arrangement, agreement or contract.

5.10 Limitation of Duties and Corporate Opportunities.

(a) To the fullest extent permitted by law, the Directors (each in his or her capacity as a Director) and the UnSub Representative shall owe no fiduciary or similar duty or obligation whatsoever to the Company, any Member (other than for a Director (other than the Independent Director), the Member designating such Director) or the other Directors, except as required by any provisions of the Delaware Act or other applicable Law that cannot be waived. Subject to the foregoing, each of the Company and the Members acknowledge and agree that (i) each Director may decide or determine any matter subject to the Board's approval in the sole and absolute discretion of such Director, it being the intent of all Members that such Director (other than the Independent Director) shall have the right to make such determination solely on the basis of the interests of the Member that designated such Director, (ii) the UnSub Representative shall act at the direction of the Board and (iii) the Independent Director shall only consider the interests



012137

of the Company, its Subsidiaries and the Partnership Group Companies, as applicable, when making a determination under Section 5.7(c) and shall not consider the interests of any Members or partners. Each of the Company and the Members hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against any Director or the UnSub Representative for or in connection with any such decision or determination, in each case whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are in each case expressly released and waived by the Company and each Member, to the fullest extent permitted by law, as a condition of, and as part of the consideration for, the execution of this Agreement and any related agreement, and the incurring by the Members of the obligations provided in such agreements.

(b) Each Director and, except as expressly provided herein, each Member and each of their respective Affiliates, shall be free to engage or invest in, and devote its and their time to, any other business venture or activity of any nature and description, regardless of whether such activities are considered competitive with the Company, and neither the Company nor any other Person shall have any right by virtue of this Agreement or the relationship created hereby in or to such other venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of such other venture or activity shall not be deemed wrongful or improper. No notice, approval or other sharing of any such other opportunity or activity shall be required and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines shall not be applied to any such competitive venture or activity.

(c) Notwithstanding anything in this Agreement to the contrary, the Company and each of the Members acknowledges and agrees that certain of the GSO Investor's Affiliates (which, solely for purposes of this Section 5.10(c), shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) (x) have made, prior to the date hereof, and are expected to make, on and after the date hereof, investments (by way of capital contributions, loans or otherwise), and (y) have engaged, prior to the date hereof, and are expected to engage, on and after the date hereof, in other transactions with and with respect to, in each case, Persons engaged in businesses that directly or indirectly compete with the business of the Company, its Subsidiaries and the Partnership Group Companies as conducted from time to time. The Company and the Members agree that, subject only to the limitations provided in Section 5.10(d) below, any involvement, engagement or participation of the GSO Investor and its Affiliates (including any Director designated to the Board by the GSO Group) in such investments, transactions and businesses, even if competitive with the Company, its Subsidiaries or the Partnership Group Companies, shall not be deemed wrongful or improper or to violate any duty express or implied under applicable Law or this Agreement and shall not be deemed a conflict of interest. For the purposes of clarity, the GSO Investor shall be deemed not to violate this Section 5.10 if it or any of its Affiliates shall invest in a fund or other entity, whether or not the GSO Investor Controls such fund or entity that makes an investment that directly or indirectly competes with the Company, its Subsidiaries or the Partnership Group Companies.

(d) Each of the Company and the Sanchez Investor (on behalf of itself and its respective Affiliates) hereby renounces any co-participation right, expectancy and any other rights (including information rights) with respect to any business opportunity in which the GSO Investor participates or desires or seeks to participate that either (x) is not within the purposes of the

Company as set forth in Section 1.9 or (y) is within such purposes of the Company but is not a business opportunity that (i) the Company presents to a Director solely in such individual's capacity as a Director or (ii) is identified to the Director solely through the disclosure of information by or on behalf of the Company to the Director (each business opportunity other than those referred to in clauses (x), (y)(i) or (y)(ii) are referred to as a "Renounced Business Opportunity"); for clarity, the GSO Investor and any other member of the GSO Group can pursue other opportunities in the AMI. Neither the GSO Investor nor any GSO Director nor any Affiliate of any of the foregoing (solely for purposes of this Section 5.10(d), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) shall have any obligation to communicate or offer any Renounced Business Opportunity to the Company or the Sanchez Investor, and the GSO Investor may pursue for itself or direct, sell, assign or transfer to a Person other than the Company any Renounced Business Opportunity, and any such action shall not be deemed a conflict of interest, a breach of this Agreement, or a breach of any duty. Notwithstanding anything to the contrary in this Agreement, any business opportunity that is within the purpose of the Company (as set forth in Section 1.9) and which is presented to the GSO Investor solely by the Company (as distinguished from opportunities presented by multiple Persons), will not be pursued by the GSO Investor or by GSO unless otherwise agreed to in writing by a majority of the Sanchez Directors.

(e) Each of the Company and the Members hereby agrees that any claims against, actions, rights to sue, other remedies or other recourse to or against the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(e), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) for or in connection with any such investment activity or other transaction activity or other matters made in compliance with Section 5.10(c) or Section 5.10(d)), or activities related to any of the foregoing, whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are expressly released and waived by the Company and each Member, in each case to the fullest extent permitted by applicable law; *provided, however,* that the foregoing shall not release any claims for actual fraud, willful misconduct, or a breach of this Agreement.

(f) Notwithstanding anything in this Agreement to the contrary, each of the Company and the Members acknowledges and agrees that the GSO Investor and its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) have obtained, prior to the date hereof, and are expected to obtain, on and after the date hereof, confidential information from other companies in connection with the activities and transactions described in this Section 5.10 or otherwise. The Company and each of the Members hereby agree that (x) none of the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) has any obligation to use in connection with the business, operations, management or other activities of the Company or to furnish to the Company, its Subsidiaries, the

Partnership Group Companies or any Member any such confidential information, and (y) any claims against, actions, rights to sue, other remedies or other recourse to or against the GSO Investor or any of its Affiliates (including any GSO Director and solely for purposes of this Section 5.10(f), Affiliates of the GSO Investor shall include The Blackstone Group L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group L.P.) for or in connection with any such failure to use or to furnish such confidential information, whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are expressly released and waived by each of the Company and the Members to the fullest extent permitted by applicable law.

(g) Notwithstanding anything in this Agreement to the contrary:

(i) the Company and each of the Members acknowledge and agree that as of the Effective Date, SN Maverick, an Affiliate of Sanchez Parent, and Blackstone Newco purchased from Anadarko Petroleum Corporation and Kerr McGee Oil and Gas Onshore LP certain oil, gas and mineral interests in the AMI, in connection therewith entered into the Joint Development Agreement and related Operating Agreements and on and after the Effective Date, Sanchez Investor's Affiliates (including Sanchez Parent and its Subsidiaries) will engage in oil and gas activities in the AMI related to such assets and agreements including, but not limited to, acquiring oil and gas assets, drilling and completing wells, producing oil and gas, gathering, processing, transporting and marketing oil and gas both for its own account and for the account of Blackstone Newco (the "Additional Sanchez Activities") and the Additional Sanchez Activities may directly or indirectly compete with the business of the Company, the Partnership Group Companies and any other Subsidiary of the Company as conducted from time to time; and

(ii) except as set forth in the Joint Development Agreement, the Sanchez Letter Agreement or Section 5.11, the GSO Investor shall not be entitled to and hereby renounces any co-participation right in any business opportunities pursued by SN Maverick and its Affiliates (other than the Company or any of the Partnership Group Companies).

5.11 AMI and Participation in Future Acquisitions. Upon receipt by the Partnership of an offer from Sanchez Parent or any of its Affiliates of forty percent (40%) of the interest of Sanchez Parent and its Affiliates to be acquired in an AMI Acquisition or other AMI Participation Opportunity, in each case, as such offer is required to be so presented under the Joint Development Agreement or Sanchez Letter Agreement, the Partnership shall automatically, without the need for any further action by the Board or any Member, be deemed to have approved such acquisition of the offered portion of such AMI Acquisition or AMI Participation Opportunity, unless the Class B Member declines such acquisition pursuant to Section 5.7(b), in which case the Partnership Group Companies shall be deemed to have irrevocably waived their right to acquire any properties and assets comprising the AMI Acquisition or other AMI Participation Opportunity if such acquisition is consummated on the terms and subject to the conditions presented to the Partnership within one-hundred fifty (150) days from the date that the Class B Member declines such acquisition. If the Partnership has been deemed to approve any AMI Acquisition or other AMI Participation Opportunity, then (a) the Company shall cause the Partnership to consummate the AMI Acquisition or other AMI Participation Opportunity on the terms and conditions required by the Joint Development Agreement

or the Sanchez Letter Agreement and such acquisition shall be funded by the Partnership (and the Members agree to cause their respective Affiliates who are limited partners in the Partnership to comply with the following) as follows, unless otherwise mutually determined by the Board acting with unanimous consent: (i) *first*, with cash on hand at the Partnership Group Companies, *provided* that the Partnership has not then failed to pay when due any Tax Distributions or any quarterly Distributions to the Preferred Units in cash pursuant to Section 4.1(b) of the Partnership Agreement and such failure is continuing, (ii) *second*, by incurring Indebtedness by drawing upon the Credit Agreement (or any Replacement Credit Agreement), *provided* that, with respect to any funding of such acquisition under either the immediately preceding clause (i) or this clause (ii), (A) the use of cash on hand at the Partnership Group Companies and any such drawing upon the Credit Agreement (or any Replacement Credit Agreement) does not result in undrawn committed borrowing capacity of less than sixty percent (60%) of the total committed borrowing base to then be available under the Credit Agreement (or any Replacement Credit Agreement), and (B) the ratio of (x) the sum of outstanding Indebtedness of the Partnership Group Companies and the Base Preferred Return Amount to (y) LTM EBITDA (as defined in the Credit Agreement) shall not exceed the levels set forth on Exhibit F immediately prior to and pro forma for such acquisition, (iii) *third*, by causing the Partnership to issue additional Preferred Units to Affiliates of the Class B Member designated by the Class B Member in an amount equal to 60% of the remaining purchase price and additional Common Units to Affiliates of the Class A Member designated by the Class A Member in an amount equal to 40% of the remaining purchase price; *provided* that the Class A Member and its Affiliates shall not be required to fund any amounts pursuant to this clause (iii) if prohibited from doing so pursuant to any agreement governing any Indebtedness of such entities and their Affiliates and (iv) *fourth,* any remaining amounts shall be satisfied by causing the Partnership to issue additional Preferred Units to Affiliates of the Class B Member designated by the Class B Member pursuant to a purchase agreement in substantially the form attached hereto as Exhibit E (with any such changes to the extent the parties thereto may mutually agree).

5.12 Meetings of the Members. Meetings of the Members may be called by the Board, but shall not otherwise be required for any purpose, except as may be required by applicable Law.

(a) Place of Meetings. The Board may designate any place as the place of meeting for any meeting of the Members.

(b) Notice of Meetings. Written or printed notice stating the place, day and hour of the meeting and the purposes for which the meeting is called shall be delivered to each Member entitled to vote thereat not less than five (5) Business Days (or forty-eight (48) hours in the case of a telephonic meeting) before the meeting.

(c) Manner of Acting. When a vote on any matter is required by the Members, each Member shall be entitled to one vote for each Unit held by such Member within a specified class or series of Units entitled to vote on such matter. Unless otherwise provided by Law or this Agreement, the affirmative vote of a majority of the Units having the right to vote on the matter or action subject to such vote shall constitute the act of the Members and the affirmative vote of a majority of the Units of a specified class or series having the right to vote on the matter or action subject to such vote shall constitute the act of the Members holding that class or series of Units.

(d) Proxies. At any meeting of the Members of a specified class or series of Units, a Member may vote by proxy executed in writing by such Member or by its duly authorized representative.

(e) Written Actions. Any action required to be, or which may be, taken by Members may be taken without meeting if consented thereto in a writing setting forth the action so taken and signed by all of the Members entitled to vote who are required to take such action.

(f) Telephonic Participation in Meetings. Members may participate in any meeting through telephonic or similar communications equipment by which all Persons participating in the meeting can hear one another, and such participation shall constitute presence in person at such meeting.

5.13 Company Covenants, Representations and Warranties.

(a) Notwithstanding anything in this Agreement to the contrary, for so long as any Preferred Units remain outstanding or any obligations under the Senior Debt Agreements remain outstanding, the Company shall not, and shall cause each of the Partnership Group Companies not to:

(i) fail to observe all corporate, limited liability company or partnership formalities and other formalities required by their respective organizational documents or the laws of the jurisdiction where such entity is organized, or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the Delaware Act (or such other applicable Law in the jurisdiction where such entity is organized);

(ii) commingle its funds or assets with the funds or assets of any other Person; *provided, however,* that distributions made by the Partnership not in violation of the Partnership Agreement or any Senior Debt Agreement shall not be considered assets of the Partnership for purposes of this Section 5.13(a)(ii);

(iii) fail to maintain all of its books, records, financial statements and bank accounts separate from those of any other Person (including, without limitation, any Affiliates);

(iv) maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(v) hold itself out to be responsible for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person (other than pursuant to the arrangements provided for in (A) the APC/KM PSA, (B) the KNOC PSA, (C) the MSA, (D) the Hydrocarbons Marketing Agreement, (E) the Sanchez Letter Agreement, (F) the Drilling Commitment Agreement and (G) financing fees paid at the Anadarko Closing and KNOC Closing or Dual Closing, as applicable);

(vi) fail to (A) hold itself out to the public and identify itself, in each case, as a legal entity separate and distinct from any other Person and not as a division or part of any other Person, (B) conduct its business solely in its own name, (C) hold its assets in its own name or (D) correct any known misunderstanding

regarding its separate identity (*provided*, the Partnership may authorize agents pursuant to the MSA, in their own name as agents for the Partnership, to perform management services on behalf of the Partnership);

(vii) fail to allocate shared expenses (including, without limitation, shared office space) or fail to use separate stationery, invoices and checks;

(viii) fail to pay its own liabilities from its own funds (other than pursuant to the arrangements provided for in (A) the APC/KM PSA, (B) the KNOC PSA, (C) the MSA, (D) the Hydrocarbons Marketing Agreement, (E) the Sanchez Letter Agreement, (F) the Drilling Commitment Agreement and (G) financing fees paid at the Anadarko Closing and KNOC Closing or Dual Closing, as applicable);

(ix) identify its partners or other Affiliates, as applicable, as a division or part of it;

(x) guarantee, or otherwise become a restricted subsidiary pursuant to any agreement governing, the Indebtedness of the Sanchez Investor or any of its Affiliates (other than the Company or the Partnership Group Companies);

(xi) fail to be adequately capitalized to engage in its business separate and apart from Sanchez Parent and its Affiliates and to remain solvent; *provided* the foregoing shall not be construed as imposing an obligation on any Member to contribute or loan additional capital, property or services to the Company;

(xii) fail to ensure that all material transactions between the Company, its Subsidiaries or the Partnership Group Companies, on the one hand, and any member of the Sanchez Group, on the other hand, whether currently existing or hereafter entered into, will be on an arm's length basis; or

(xiii) have the same slate of Persons serving as officers of Sanchez Parent or any of its Affiliates (excluding the Company, any of its Subsidiaries and the Partnership Group Companies) also serve in the same capacities with the Company, any of its Subsidiaries or any of the Partnership Group Companies.

(b) The assets of the Company and its Subsidiaries or the Partnership Group Companies have not been and will not be listed as assets on the financial statement of any other Person; *provided, however,* that the assets of the Company and its Subsidiaries or the Partnership Group Companies may be included in a consolidated financial statement of Sanchez Parent and its Affiliates, *provided* that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of the Company and its Subsidiaries or the Partnership Group Companies and the Members and their Affiliates and to indicate that the Company's and its Subsidiaries or the Partnership Group Companies' assets and credit are not available to satisfy the debts and other obligations of the Members and their Affiliates or any other Person and (ii) such assets shall be listed on the Company's and its Subsidiaries or the Partnership Group Company's own separate balance sheet(s). Such consolidation shall not affect the status of the Company and its Subsidiaries or the Partnership Group Companies as separate legal entities with its separate

assets and separate liabilities. The Company (in its capacity as the general partner of the Partnership) and the Partnership Group Companies have maintained and will maintain their respective books, records, resolutions and agreements as official records. Failure by the Company (in its capacity as the general partner of the Partnership) or the Partnership Group Companies to comply with any of the obligations set forth in this Section 5.13(b) shall not affect the status of the Company, the Partnership and each other Partnership Group Company as a separate legal entity, each with its separate assets and separate liabilities.

(c) The Members acknowledge and agree that the Company and each of the Partnership Group Companies are special purpose, non-guarantor, unrestricted Subsidiaries of Sanchez Parent or any Affiliate thereof and shall be bankruptcy remote from Sanchez Parent or any Affiliate of Sanchez Parent that is not the Company or is not included in the Partnership Group Companies.

5.14 Tag-Rights Control. With respect to a transfer by Blackstone Newco, at any time (a) following the fifth anniversary of the Effective Date or (b) during any calendar quarter in which the PDP PV-10 Ratio is less than the then-effective Test Level, if any Partnership Group Company receives a Tag-Along Offer (as such term is defined in the Joint Development Agreement) pursuant to the Joint Development Agreement, the Class B Member shall be permitted to cause the Partnership Group Companies to participate in the subject Tag-Along Transaction (as such term is defined in the Joint Development Agreement) in accordance with the terms of the Joint Development Agreement. With respect to a transfer by SN Maverick or any Sanchez Vehicle, the Class B Member shall be permitted to cause the Partnership Group Companies to participate in the subject Tag-Along Transaction (as such term is defined in the Joint Development Agreement and the Sanchez Letter Agreement) pursuant to the Joint Development Agreement or the Sanchez Letter Agreement.

5.15 Certain Workover and Recompletion Operations. If, as of the end of any calendar quarter preceding a date of determination, the PDP PV-10 Ratio is less than the then-effective Test Level, the Class B Member shall be entitled to (a) propose in writing to Sanchez Investor from time to time workover or recompletion operations relating to the Partnership Group Companies' assets, in each case pursuant to the terms of the Joint Development Agreement or any applicable Operating Agreement and (b) cause the Partnership to deliver such proposal in writing to Sanchez Parent. Upon receipt of such proposal, the Board will instruct the UnSub Representative to propose such operations to the Operating Committee in accordance with the terms of the Joint Development Agreement and vote in favor of such operations. Notwithstanding anything to the contrary contained herein, upon compliance with the foregoing terms of this Section 5.15, there shall be no liability on behalf of the Partnership or the UnSub Representative if such proposed operations are rejected or otherwise not approved by the Blackstone Representatives (as defined under the Joint Development Agreement) of the Operating Committee.

## ARTICLE VI
## BOOKS, REPORTS AND COMPANY FUNDS

6.1 Records and Accounting. The Company shall keep or cause to be kept at the principal office of the Company appropriate books and records with respect to the Company's business. The books of the Company shall be maintained, for financial reporting purposes, on an accrual basis in accordance with generally accepted accounting principles ("GAAP"). All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Board.

6.2 Reports.

(a) The Company shall use commercially reasonable efforts to deliver or cause to be delivered to each Member, within seventy-five (75) days after the end of each Fiscal Year, an annual report containing a statement of changes, if any, in the Member's equity and the Member's Capital Account balance for such Fiscal Year, if any.

(b) The Company shall use commercially reasonable efforts to deliver or cause to be delivered, within seventy-five (75) days after the end of each Fiscal Year, to each Person who was a Member at any time during such Fiscal Year all information necessary for the preparation of such Person's United States federal and state income tax returns.

(c) The Company shall use commercially reasonable efforts to deliver or cause to be delivered, within seventy-five (75) days after the end of each Fiscal Year, all information requested by a Member in order for such Member to complete its unrelated business taxable income and FIRPTA tax filings, if any.

(d) The Company shall use commercially reasonable efforts to deliver or cause to be delivered to each Member, within sixty (60) days after the end of each Fiscal Year, estimates of each of the items in Sections 6.2(a), 6.2(b) and 6.2(c) to the extent such items have not then been delivered.

(e) The Company shall cause the Partnership to deliver or cause to be delivered to each of the Members no later than the time delivered to the Partners (as defined in the Partnership Agreement) those reports that are required to be delivered to the Partners pursuant to Section 7.2 of the Partnership Agreement. The Company shall cause the Partnership to deliver or cause to be delivered to the Class B Member no later than the time delivered to the holders of Preferred Units the information that is required to be delivered to such holders pursuant to Section 5.7 of the Partnership Agreement.

6.3 Inspection by Members. Except as may be necessary to preserve attorney-client or similar privilege of the Company, any Member, and any accountants, attorneys, financial advisors and other representatives of such Member, may from time to time at such Member's sole expense for any reasonable purpose, visit and inspect the respective properties of the Company, any of its Subsidiaries or any of the Partnership Group Companies, examine (and make copies and extracts of) the Company's, any of its Subsidiaries' or any of the Partnership Group Companies' respective books, records and documents of any kind, and discuss the Company's, any of its Subsidiaries' or any of the Partnership Group Companies' respective affairs with its employees or independent accountants, all at such reasonable times as such Member may request upon reasonable notice.

6.4 Public Disclosure. Unless required by Law, including the rules and regulations of any securities exchange (with the advice of counsel to the Company), no press release or public announcement related to the Company, any of the Company's Subsidiaries, any of the Partnership Group Companies, this Agreement or the transactions contemplated herein or any other announcement or communication shall be issued or made by any Member, a Director, the Company, any of its Subsidiaries or any of the Partnership Group Companies without the advance approval of the Board (including any Directors appointed by the GSO Group), in which case the Board shall be provided a reasonable opportunity to review and provide suggested comments concerning the disclosure contained in such press release, announcement or communication prior to issuance, distribution or publication. The foregoing shall not limit Sanchez Parent

or its Affiliates from publicly filing the Partnership Agreement and making additional disclosures in connection therewith, in each case as required by applicable Law and securities regulations.

## ARTICLE VII
## TAX MATTERS

7.1 Tax Controversies. Subject to Sections 5.4 and 5.7, for any taxable year beginning before January 1, 2018, the Class A Member is designated as the "Tax Matters Member" as defined in Code Section 6231 (the "Tax Matters Member") as of the date hereof, and for any taxable year beginning on or after January 1, 2018, the Class A Member is designated as the "Partnership Representative" as defined in Code Section 6223(a), as added by the Bipartisan Budget Act of 2015 (the "Partnership Representative"). The Tax Matters Member or the Partnership Representative shall cause to be prepared and timely filed (on behalf of the Company) all federal, state and local tax returns, if any, required to be filed by the Company. The Company shall bear the costs of the preparation and filing of its returns. Subject to Sections 5.4 and 5.7, the Tax Matters Member or the Partnership Representative shall determine whether to make any elections on behalf of the Company. Without consent of the Board, the Tax Matters Member or the Partnership Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit concerning any tax refund or deficiency relating to any Company administrative adjustment or enter into any settlement agreement relating to any Company item of income, gain, loss, deduction or credit for any Fiscal Year. In the event the "TEFRA audit provisions" of Code Section 6221 *et seq*. apply by their terms, the Tax Matters Member shall ensure that each other Member is a notice partner within the meaning of Section 6231(a)(8) of the Code. Each Member agrees to cooperate with the Tax Matters Member or the Partnership Representative and to do or refrain from doing any and all things required by the Tax Matters Member or the Partnership Representative to conduct such proceedings. Subject to Sections 5.4 and 5.7, the designation of the Tax Matters Member or the Partnership Representative may be changed from time to time as determined by the Board.

## ARTICLE VIII
## EXCULPATION AND INDEMNIFICATION

8.1 Performance of Duties; No Liability of Members, Directors and Officers. No Member or Director (in their respective capacities as such) shall have any duty to the Company or any Member of the Company except as expressly set forth herein or in other agreements to which such Persons are party or as required by applicable law. No Member, Director or Officer of the Company (in their respective capacities as such) shall be liable to the Company, and no Director or Officer of the Company (in their respective capacities as such) shall be liable to any Member, for any loss or damage sustained by the Company or such Member (as applicable), unless such loss or damage shall (as finally determined by a court of competent jurisdiction) have resulted from such Person's fraud, intentional misconduct or, in the case of any Member, willful breach of this Agreement or, in the case of any Director or Officer of the Company, knowing and intentional breach of this Agreement or, in the case of an Officer, breach of such Person's duties pursuant to Section 5.6(d). In performing such Person's duties, each such Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid) of the following other Persons or groups: one or more Officers or employees of the Company, any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or any other Person who has been selected with reasonable care by or on behalf of the Company, in each case as to matters which such relying Person reasonably believes to be within such other Person's competence. The preceding sentence shall in no way limit any Person's right to rely on information to the